```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
 2                          AUSTIN DIVISION

 3  UNITED STATES OF AMERICA  ) Docket No. A 12-CR-210(3) SS
                              )
 4  vs.                       ) Austin, Texas
                              )
 5  JOSE TREVINO-MORALES      ) July 3, 2012

 6

                      TRANSCRIPT OF DETENTION HEARING
 7                 BEFORE THE HONORABLE MARK P. LANE

 8

 9  APPEARANCES:

10  For the United States:      Mr. Douglas W. Gardner
                                Assistant U.S. Attorney
11                              816 Congress Avenue, Suite 1000
                                Austin, Texas 78701
12

13

14  For the Defendant:          Mr. David M. Finn
                                Milner & Finn
15                              2828 North Harwood Street
                                Suite 1950, LB9
16                              Dallas, Texas 75201

17

18  Transcriber:                Ms. Lily Iva Reznik, RPR, CRR
                                200 West 8th Street
19                              Austin, Texas 78701
                                (512)916-5564
20

21

22

23

24

25  Proceedings reported by computerized stenography, transcript
    produced by computer.
```

**I N D E X**

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Steven Pennington | 8 | 50,60 | | |
| | | 69 | 84 | 85 |

**E X H I B I T S**

| | Offered | Admitted |
|---|---|---|
| Government's | | |
| (None.) | | |
| | | |
| Defendant's | | |
| (None.) | | |

```
 1              (Proceedings commence at 10:10 a.m.)

 2              THE CLERK:  The Court calls A 12-CR-201, United States

 3   vs. Defendant 3, Jose Trevino-Morales.

 4              MR. GARDNER:  Good morning, your Honor.

 5              Doug Gardner, Michelle Fernald for the United States

 6   for all defendants in this cause number.

 7              THE COURT:  Thank you, sir.

 8              MR. FINN:  Good morning, your Honor.

 9              My name is David Finn, F-I-N-N, and I represent the

10   defendant.

11              THE CLERK:  United States vs. Defendant 5, Carlos

12   Miguel Nayen-Borbolla.

13              MR. RUBINO:  Good morning, your Honor.

14              Sir, my name is Frank Rubino.  I'm admitted to the bar

15   of the State of Texas in the Southern District of Texas.  I am

16   not a member of this bar.  This morning, I went to the clerk's

17   office and I filed both a pro hac vice at the time of admission,

18   which is with the clerk this morning.  So with this court's

19   permission, I would proceed today.

20              THE COURT:  Of course.  Thank you.

21              MR. FLORES:  Your Honor, my name is Mario Flores.  I'm

22   local counsel with Mr. Frank Rubino on behalf of Carlos Nayen.

23              THE COURT:  Thank you, Mr. Flores.

24              MR. FLORES:  Thank you, your Honor.

25              THE CLERK:  United States vs. Fernando Solis-Garcia,
```

1    Defendant 7.

2            MR. WOMACK:  Good morning, your Honor.

3            I'm Guy Womack from Houston.  I'm admitted to the

4    Western District, and I'm here for Fernando Garcia.

5            THE COURT:  Good morning, Mr. Womack.  Thank you.

6            Okay.  My understanding is here -- we're here for

7    arraignments and detention hearings.  And all three defendants

8    have waived arraignment in this case, so we're moving on to the

9    detention issues.

10           Where are we, Mr. Gardner, with regard to the

11   government's motions to detain these folks.

12           MR. GARDNER:  Your Honor, I believe Mr. Finn wanted to

13   inquire of the Court of one matter.

14           MR. FINN:  Yes, sir.

15           MR. GARDNER:  A preliminary matter.

16           THE COURT:  Sure.

17           MR. FINN:  If I may.  Your Honor, may I approach the

18   podium?

19           THE COURT:  Absolutely.

20           MR. FINN:  Your Honor, I briefly discussed this with

21   the government, and I certainly don't want to imply anything, but

22   I do know that you recently left the U.S. Attorney's Office and

23   it's my understanding that this investigation into this matter

24   has been going on for quite some time.  And in abundance of

25   caution, I just wanted to inquire, respectfully, whether you were

1  ever involved in any dimension of this case while with the U.S.

2  Attorney's Office.

3          THE COURT:  It's a fair question.  I worked for the

4  U.S. Attorney's Office for 17 years.  I left at the end of March

5  of this year to start this job.  Prior to that, I did primarily

6  white-collar fraud prosecutions, and didn't have much to do with

7  the OCDETF work, Mr. Gardner.  And to answer your question, I

8  didn't have any contact with him with regard to this case or the

9  officers that were working on it, and I'm not familiar with the

10 facts in any way before I came over here.  But I'm glad you

11 asked.  I think it's a fair question.

12          MR. FINN:  Thank you, your Honor.  I appreciate your

13 answer.

14          THE COURT:  Does that resolve the matter to your

15 satisfaction?

16          MR. FINN:  It does, your Honor.

17          THE COURT:  All right.

18          MR. FINN:  Thank you.

19          THE COURT:  Thank you, Mr. Finn.

20          MR. GARDNER:  Your Honor, with respect to detention,

21 the government's prepared to move forward on all three defendants

22 with just one followup to Mr. Finn's.  Your Honor, I just wanted

23 to note, for the record, that you were also not in any

24 supervisory position over me or my work at that time; is that

25 correct?

1          THE COURT:  That's correct.

2          MR. GARDNER:  Thank you, sir.

3          The government's ready to proceed and ready to call a

4    witness.

5          THE COURT:  All right.  Let's go.

6          MR. GARDNER:  Your Honor, the government calls Special

7    Agent Steve Pennington.

8          THE COURT:  Please raise your right hand and be sworn.

9          (Witness sworn.)

10          THE COURT:  Have a seat, make yourself comfortable.

11   And before we get started, give us your full name and spell your

12   last name, please.

13          THE WITNESS:  My name is Steve Pennington.  That's

14   P-E-N-N-I-N-G-E-T-O-N.

15          MR. GARDNER:  And, your Honor, another preliminary

16   matter before we get started.  Mr. Finn, at least, and the other

17   two defense attorneys have requested any production of statements

18   under Rule 26.2, i.e., Jencks on this statement.  I have provided

19   a single copy to all three defendants of a affidavit for seizure

20   of quarter horses, an affidavit for seizure of bank records, and

21   one memorandum of interview, drafted by Special Agent Pennington.

22   All three of those are redacted, your Honor.

23          Your Honor, with respect to the two affidavits,

24   currently they are sealed.  We ask the Court just for the

25   purposes of this hearing to unseal those, obviously so the

1    defense attorneys can have an opportunity to cross-examine the

2    witness on them, if need be.

3           THE COURT:  And then, what about after this hearing?

4           MR. GARDNER:  After the hearing, we request they be

5    sealed until such time the government files a motion to unseal

6    them.

7           THE COURT:  All right.  Is that satisfactory to all

8    three lawyers?

9           MR. FINN:  Your Honor, Mr. Finn on behalf of my client,

10   my preference would be if these documents are used, that they be

11   unsealed today so that we can start to facilitate and expedite

12   discovery in this matter.  But I can live with his suggestion.

13          THE COURT:  Okay.

14          MR. GARDNER:  And, your Honor, just to follow up, I

15   represent -- I can't remember which time I've talked to.  I

16   anticipate all these documents will be unsealed within a matter

17   of the next two weeks.  I know at least one defense attorney has

18   filed a request for discovery.  So as soon as everyone files

19   discovery, I anticipate they'll have full discovery.  These

20   affidavits, the search warrants, the seizure warrants, and an

21   opportunity to review all the memorandums of interviews, and

22   ROI's and 302s.

23          MR. FINN:  With that representation, your Honor, I can

24   live with the government's suggestion.

25          THE COURT:  Okay.  And, Mr. Womack, and, Mr. Rubino?

1          MR. WOMACK:  No problem.

2          MR. RUBINO:  No objection, sir.

3          THE COURT:  Okay.  Well, then, that's what we'll do.

4   They'll be unsealed for the purposes of allowing you gentlemen to

5   cross-examine the witnesses this morning.  And what was the third

6   document?  It was affidavit on the horses, the bank accounts.

7          MR. GARDNER:  There's one memorandum of interview, your

8   Honor, we've redacted in order to keep the identity of the

9   confidential informant for this memorandum of interview

10  confidential for right now.  That's the other thing provided to

11  the defense counsel.

12         THE COURT:  Okay.  Very good.  All right.

13     STEVE PENNINGTON, called by the Government, duly sworn.

14                      DIRECT EXAMINATION

15  BY MR. GARDNER:

16  Q.   Special Agent Pennington, you were one of the case agents in

17  this case; is that correct?

18  A.   Yes, sir.

19  Q.   And if you will, could you just give a little bit of

20  background on your training and experience and time with the IRS,

21  please?

22  A.   Yes.  I'm a special agent with the Internal Revenue Service

23  Criminal Investigation, been employed since March of 1985.  I've

24  worked money-laundering investigations on -- and financial

25  investigations on organizations, trafficking and illegal

1   activities for the past 25 years.  I've worked numerous

2   money-laundering investigations and have done several

3   presentations on money-laundering investigations.

4   Q.   Now, first of all, I'd like to start off with just a general

5   description of the Zeta organization; and as a preliminary to

6   that, your information comes largely from the interviews in which

7   you were personally present and a number of cooperating

8   individuals that are delineated and laid out in the seizure

9   affidavits, correct?

10  A.   Correct.  And, also, from fellow agents.

11  Q.   And, if you will, could you please explain to the Court sort

12  of how this organization operates, who's the leadership, and how

13  the structure goes down from the leadership to the involvement of

14  quarter horse money -- laundering funds for the quarter horse

15  industry?

16  A.   Yes.  Los Zetas was a military unit that began to work for

17  the Gulf Cartel as an enforcement branch for them back in the

18  early 2000s.  They stayed with that for a period of years, then

19  branched off, basically formed their own cartel to move narcotics

20  and do their own enforcement and since then, have been in rivals

21  with the Gulf Cartel.

22        Lazcano, Zeta No. 3, is considered the leader.  Miguel

23  Trevino, A/K/A Zeta 40, is considered a coleader.  He has risen

24  through the ranks as other members of the organization have

25  either been arrested or killed.  The brother Oscar Omar

1    Trevino-Morales, A/K/A Zeta 42, is considered a top lieutenant

2    for the Zeta Cartel.  According to the witnesses, Miguel

3    Trevino-Morales and Oscar Omar Trevino-Morales wanted to get into

4    the horse-racing business as racing horses was kind of a hobby

5    for them.  So they acquired the services of a Ramiro Villarreal

6    to start purchasing horses on their behalf.  According to the

7    witnesses, currency was given to various different individuals to

8    purchase horses.

9            We know that Ramiro Villarreal took currency to

10   businesses in Mexico.  That money was eventually funneled through

11   different banks, and wire transfers were sent to auction houses

12   where Ramiro Villarreal purchased horses.  He purchased horses

13   for them, I believe, in 2008, 2009, 2010 timeframe, and then,

14   sometime in, I believe, 2010, Carlos Nayen basically took up his

15   position and became the main person to buy quarter horses for the

16   organization.

17   Q.   Okay.  And why did Mr. Nayen assume that role versus Mr.

18   Villarreal?

19   A.   Mr. Villarreal was with the organization for a period of

20   years.  He was upset over some of the dealings with some of the

21   horses, had made a few comments.  They had brought Carlos Nayen.

22   Carlos Nayen worked -- was, according to the witnesses,

23   knowledgeable in the horse industry.  He started working with Mr.

24   Villarreal.  They were together at a few of the auctions.  How

25   many, I don't know.  And then, at some point in time, I believe

1    in 2010, Ramiro Villarreal was cut out, and then, he eventually,

2    I think, died in January 2011.

3    Q.    And was that in Mexico?

4    A.    Yes.

5    Q.    Now, with respect -- I want to go back to Miguel and Omar

6    Trevino.  And let's start with the first CI that you list in your

7    affidavit, CI No. 1.

8              Has CI No. 1 personally met Miguel and Omar Trevino?

9    A.    Yes.

10   Q.    Okay.  And with respect to his knowledge of those two, what

11   did he say how their drug business related to the quarter horse

12   business?

13   A.    He was actually working, distributing narcotics for a number

14   of years through Piedras Negras, Eagle Pass area.  When the Zetas

15   took over that particular area, he got -- basically brought

16   before, I believe, in the beginning, it was Oscar Omar

17   Trevino-Morales.  And he was working for, I believe, man named

18   Moy at that time.  Anyway, he said that Omar basically either

19   killed or had Moy killed, and that he was instructed that he

20   would go to work for the Trevinos; and he said at that point in

21   time, he began to work for the Trevinos along with another person

22   out of the Piedras Negras area, and they were provided multiple

23   kilos of cocaine to have transported into the United States --

24   into the Dallas area and distributed.

25   Q.    Now, has this particular individual, CI No. 1, as you

1    identify him, has he identified Jose Trevino?

2    A.    I believe he has.  Yes, yes.  He has.

3    Q.    All right.

4    A.    Yes.

5    Q.    If you need to look at the affidavit, feel free to do so.

6    A.    Yes.  He's actually met Jose Trevino, he said, I think,

7    about four or five -- I think five occasions.  He said that

8    Miguel Trevino -- I'm sorry, Jose Trevino would travel to Mexico.

9    Once that he was in Mexico or near a Mexican border, he would be

10   kept in a safe house operated by the Zetas for three or four days

11   until they were sure that the area was cleared of law enforcement

12   and other rival cartels.  Then he would be taken and he would go

13   with and be with Miguel Trevino and Oscar Omar Trevino for three

14   or four days as they did whatever they did, and then, he'd return

15   to the United States.

16   Q.    Now, did CI No. 1 relate -- or let me ask you this question.

17   How is Jose Trevino-Morales related to Miguel and Oscar Omar

18   Trevino-Morales?

19   A.    He is their brother.

20   Q.    Full brother?  Blood brother?

21   A.    Yes.

22   Q.    So what, if anything, did CI 1 relate to Miguel knowledge or

23   setting Jose up in the quarter horse business?

24   A.    He said that he had set his brother up in the quarter horse

25   business and that his brother had no idea how much money he could

1   make in the quarter horse business.  Miguel Trevino also made a

2   comment that it was very easy to launder money through the

3   American quarter horse industry.

4   Q.   Okay.  And why was that?  Why did he say that?

5   A.   Apparently they thought it was easy to establish front

6   companies.  They could get money into the United States.  They

7   could buy the horses.  They could put any name on the document.

8   They could have any person bid on the horse.  They could put any

9   name on the document that they wish and easily transfer the

10  horses back and forth.  They could change the value of the

11  horses, whatever they deemed appropriately based on who they

12  moved the horses through.

13  Q.   And have you had the opportunity to look at subpoenaed

14  records from American Quarter Horse Association?

15  A.   Yes.  I've look at records from them, from auction houses,

16  bank records, things like that.

17  Q.   Okay.  And is the American Quarter Horse Association the

18  body responsible for governing the naming and the purchasing and

19  the registration of racing quarter horses?

20  A.   The registration, yes, they keep track of that.

21  Q.   And is it largely a system based on trust, that being the

22  buyer, the seller fills out the paperwork and submits it?

23  A.   Correct.

24  Q.   Without verification?

25  A.   Correct.

1    Q.   Okay.  So sort of corroborates what CI 1's telling you about

2    Miguel Trevino's statements?

3    A.   Yes.  And I've had other witnesses or another witness tell

4    me that you can put whatever date you want to on a transfer of

5    ownership from one person to another person, and when it goes

6    into the American Quarter Horse Association, whatever date you

7    provide is the date that they use.  However, the American Quarter

8    Horse Association will keep track of the date that that document

9    comes into their office.

10   Q.   Okay.  And that is significant for what we'll talk here

11   about in a little bit, correct?

12   A.   Yes.

13   Q.   All right.  First of all, I want to talk about CI No. 3 with

14   respect to cash provided to Jose Trevino.  Could you inform the

15   Court where that cash came from?

16   A.   CI 2, 3, 4, I believe, 5 all work for CI 1.  Those

17   individuals would, like I said, just have the cocaine distributed

18   in Dallas.  Their responsibility was to collect the money and get

19   the money back to Mexico.  One of the CIs, his job was to help

20   sort the bills, make sure that it was counted properly.  If they

21   had marked bills, or whatever, he was supposed to separate that

22   money from the stack and then, put that to the side.  They only

23   wanted clean money.  Once that money was all properly packaged,

24   it would be given to the accountant of Miguel Trevino.

25   Q.   And did some of that money come directly from the drug sales

1    to Jose Trevino in the United States, or did it go down to Mexico

2    and then, back up?

3    A.    Yeah.  Drug proceeds, you had a main distributor in the

4    Dallas area that was moving $20 to $25 million of cocaine per

5    month, and he was operating with that organization, I believe, in

6    2008, 2009, 2010, early 2011 timeframe.

7    Q.    So his due to Mexico to Miguel and Omar Trevino was $20 to

8    $25 million a month?

9    A.    Yes.

10   Q.    Based on the cocaine he received?

11   A.    Right.

12   Q.    All right.

13   A.    And then, once that cocaine was sold, that money would be

14   collected, it would be shipped down to Mexico in a number of

15   ways.  Or, if so directed, that money would be sent to other

16   people and other locations.

17          For example, on one occasion, they directed this

18   individual to send, I think, $145,000 in cash to Jose Trevino.

19   One of the workers for this organization met Jose Trevino at a

20   business parking lot there in Dallas, Texas and, I think,

21   provided him the $145,000 cash.

22   Q.    Now, Mr. Jose Trevino identified that he lives in a location

23   in Balch Springs, Texas.  Where is Balch Springs, Texas?

24   A.    Balch Springs is a little suburb connected with Mesquite,

25   just on the east side of Dallas.

1  Q.   Okay.  And were you able to identify the location of the

2  meet where the cash was transferred as also being in Balch

3  Springs?

4  A.   It was close to Balch Springs.

5  Q.   Now, so we're on that idea of the money being paid directly

6  from the drug proceeds, did any of that money go to Carlos Nayen?

7  A.   Yes.  There's numerous occasions where drug proceeds would

8  be sent directly to Carlos Nayen by various different people.

9  And I can't recall which CI, but I know that some of the money

10 went to him at racetracks at Loan Star Park at Grand Prairie,

11 Texas.  Money went to him at other locations.  One of the CIs, I

12 think who was in charge of making sure that the horse-related

13 expenses were paid, said that during the timeframe, he provided,

14 I think, approximately $4 million in cash to Carlos Nayen for

15 horse-related expenses.

16 Q.   And was money also -- I know he's not a defendant here

17 today, but was money also provided to Eusevio Huitron in terms of

18 cash from drug sales for horse-related expenses?

19 A.   Yes.

20 Q.   And about how much was that?

21 A.   About 3 to $400,000.

22 Q.   Now, I want to talk about a couple of individual horses.

23      Have you done an investigation as to Jose Trevino's

24 income?

25 A.   Another IRS agent did the financial investigation into the

1   finances of Jose Trevino prior to him getting involved into the

2   horse industry.  And then, as things continued, a number of the

3   horses and financial transactions were documented and financial

4   -- continuing financial investigation was done.

5   Q.   Okay.  So what was Mr. Jose Trevino's employment prior to

6   him being involved in the horse-racing business?

7   A.   He was working as a bricklayer.  His wife was also working,

8   I believe, in 2008-2009 timeframe.  Their combined income was

9   less than $60,000.  Analysis of the bank account, I believe,

10  shows that that money was deposited into his bank accounts.  The

11  bank accounts were analyzed.  No expense over $2,000 materialized

12  out of that account.  So the money was spent in small increments

13  as he was supporting, again, his wife and, I think, four children

14  at the time.

15  Q.   So normal living expenses?

16  A.   I believe so.  Yes.

17  Q.   All right.  Could you tell the Court about a horse called

18  Tempting Dash?

19  A.   Yes.  Tempting Dash was purchased in 2008 in California by

20  Ramiro Villarreal.  Again, this is cash that was provided, sent

21  through the different businesses and wired to the auction house

22  in California.  The horse was placed in the name of Ramiro

23  Villarreal, and it stayed in his name for a period of time.  In

24  September-October, he was set to run in Lone Star Park in Grand

25  Prairie, Texas.  In October, he ran a qualifying race in Grand

1  Prairie, Texas, and he was still under the name of Ramiro

2  Villarreal and ran under his name.  He qualified for the Dash For

3  Cash race.  He ran in that two weeks later still under the name

4  of Ramiro Villarreal and won $178,000.

5  Q.   So you're able to verify that.  How were these winnings --

6  the fees and the winnings, how were those tracked by?

7  A.   That is tracked by the horseman's account for the state of

8  Texas.  So we've got records from horseman account, and it shows

9  the entry fees being paid by Ramiro Villarreal to run Tempting

10 Dash in those races.  It shows the winnings going from Lone Star

11 Park into his horseman's account.  And then, the horseman's

12 account writes a check to Ramiro Villarreal for that $178,000,

13 and they sent him a check, and he takes that check and, I

14 believe, he deposits that into his own bank account.

15 Q.   And so, what happens at the next race?

16 A.   The next race, the horse is racing under the name of Jose

17 Trevino.  There's a document filed with the American Quarter

18 Horse Association claiming that Ramiro Villarreal sold the horse

19 to Jose Trevino, and the date they use is, I think, September the

20 22nd of 2009.  However, the document is not received by the

21 American Quarter Horse Association until -- I believe the date is

22 November the 14th, 2009.

23         And there's actually witnesses that say that that

24 document was backdated, that the organization wanted to transfer

25 Tempting Dash from Ramiro Villarreal's name to Jose Trevino's

1   name.  So they backdated the documents.  And then, in the two

2   followup races, the qualifying race, Tempting Dash won that, and

3   then, the next race, he also won that.  And he won, I think,

4   $466,000, and then, that money went into a horseman's account for

5   Jose Trevino, and then, that was transferred to his personal

6   account or they wrote him a check for his personal account.

7   Q.   Okay.  Let me stop you there.

8        Was there any evidence that you located that shows how

9   much Jose Trevino paid for this horse?

10  A.   When we looked at the documents prior to the running of

11  those races, we do not see any funds where Jose Trevino paid for

12  Tempting Dash.  According to the analysis of his accounts, the

13  money did not come or could not have come from his bricklaying

14  job or his wife's job as that money was already previously

15  expended.  And so, we don't see legitimate thing -- we don't even

16  see a payment.  We were told that by the members that the horse

17  already belonged to the organization.  They just simply

18  transferred the ownership from one name to the next name.

19  Q.   Did you see any boarding fees, any training fees, any entry

20  fees paid by Jose Trevino with respect to Tempting Dash?

21  A.   Prior to that, no.  Now, after the fact, when the horse won,

22  won the race, you see a ten percent training fee come out of the

23  horseman's bookkeeper's account paid to the trainer of Tempting

24  Dash, which I believe was Eusevio Huitron.  You also see -- after

25  the fact, you see a check.  I believe there's a check written to

1    Ramiro Villarreal, if I'm not getting my horses confused.   I

2    think there's a check written to Ramiro Villarreal for the

3    purchase of Tempting Dash after the fact, after Jose Trevino had

4    winnings.

5    Q.   Tell the Court about how Jose Trevino's washing the money

6    from the winnings of Tempting Dash.

7    A.   The winnings, again, goes from him to his personal account,

8    and then, from there he establishes two business accounts, or at

9    least a business account called Tremor Enterprises, and we

10   believe that stands for Trevino-Morales.   He transfers the money

11   to that account.   He then writes himself -- I believe there's two

12   checks that go back to his personal account for, like, a total of

13   $157,000.   And then, he immediately -- the money immediately goes

14   back into the business account via checks written, and what this

15   allows him to do is show in his income tax return that he made

16   $100,000 personally from working for Tremor Enterprises.   So that

17   way he's able to start showing money through the IRS that he's

18   winning and making money in the horse-racing business.

19   Q.   Now, you said that the paperwork was backdated showing that

20   he actually purchased the horse before the final race which he

21   won all the money, correct?

22   A.   It was actually backdated to show that he purchased the

23   horse prior to the horse even qualifying.

24   Q.   Now, when did the American Quarter Horse Association receive

25   those records?

```
 1   A.    I believe it was November 14, 2009.

 2   Q.    Okay.  So after all the races?

 3   A.    No, no, no.  Between the races.  You had --

 4   Q.    Between the races.

 5   A.    You had the qualifying for the Dash For Cash.  And then, you

 6   had the Dash For Cash where he won $178,000.  Then you have -- I

 7   think, a week goes by, and then, you have the American Quarter

 8   Horse Association receiving the paperwork.  And then, you have

 9   Tempting Dash running in the next race and then, two weeks later,

10   running in the other race where he won the $466,000.

11   Q.   So now, is this pattern or this backdating, does it develop

12   into a pattern with the organization?

13   A.    What we've been told by the organization is that -- or the

14   witnesses, members of the organization, at one point in time, is

15   that when a horse started to run well and showed promise, that it

16   would be transferred to Jose Trevino or one of his businesses'

17   name so that he could look like that he got this great deal on a

18   horse before it actually, quote, ran but -- and then, he's able

19   to win a lot of money with very little investment is what they

20   wanted it to appear to be.

21         We had seen other documents going to another horse, Mr.

22   Pilotos.

23   Q.    Okay.  That was my next question.  So let's talk about Mr.

24   Pilotos.

25   A.    Mr. Pilotos was a horse that was purchased, again, by Ramiro
```

1    Villarreal for, I think, $81,000.

2    Q.   And what --

3    A.   Again, you have the cash going into the thing, the horse

4    being purchased through the wire transfers.  And then --

5    Q.   What was the original name of the horse purchased?

6    A.   Maverick Perry.

7    Q.   Okay.  And so, who changed the name to Mr. Pilotos?

8    A.   I'm not sure who changed it, but I was told that Pilotos is

9    a nickname for Carlos Nayen.  And so, the name was changed to Mr.

10   Pilotos, and then, it stayed in Ramiro Villarreal's name.  And I

11   don't know if it was changed prior to going from Ramiro

12   Villarreal to Fernando Garcia or Fernando Garcia is the one that

13   changed it.

14         Now, the relationship between Fernando Garcia and

15   Carlos Nayen, we've been told, is that they referred to Fernando

16   Garcia as the gofer for Carlos Nayen, that he would carry out

17   tasks at Nayen's direction.

18   Q.   All right.  So Mr. Pilotos gets bought under another name by

19   Mr. Villarreal?

20   A.   Yes.

21   Q.   What happens to Mr. Pilotos then?

22   A.   Mr. Pilotos is transferred into the name of Fernando Garcia.

23   Q.   And what company is?

24   A.   Garcia Bloodstock & Racing.

25   Q.   Okay.  Have you determined that Mr. Garcia here is the

1  registered owner-operator of Garcia Bloodstock & Racing?

2  A.    Yes.  The horse is in his name.  Now, again, looking at the

3  financial documents myself and other folks, we have not seen the

4  documentation as to Mr. Fernando Garcia actually purchasing that

5  horse from Ramiro Villarreal.  We know the organization will

6  establish front companies and that they will basically buy the

7  horse and place the horse in that guy's or that company's name.

8  And when the horse is -- when something's done with the horse,

9  that front -- that person necessarily won't show any money for

10  himself nor will he receive money, unless it's beneficial to the

11  organization to pay him to show something on paperwork and then,

12  have that person pay other horse-related expenses.

13        So we don't see Fernando Garcia providing money to

14  purchase Mr. Pilotos.  Mr. Pilotos runs on August the 19th of

15  2010 in a qualifying race in Ruidoso, New Mexico and qualifies

16  for the All American Futurity, which is, I believe, a $2 million

17  race in Ruidoso Downs, held in September of 2010.

18  Q.    Okay.  Let me stop you there.  All right.

19        I want to go back to where the CIs are talking about

20  delivering cash from the sales of drugs directly to the

21  organization in the United States.  Was there cash delivered to

22  Carlos Nayen with respect to and relating to Mr. Pilotos' running

23  in the All American Futurity?

24  A.    It wasn't delivered to Mr. Nayen.

25  Q.    Okay.

1 A.   The way that the witnesses lay it out is that Carlos Nayen

2 met with some gatekeepers at the Ruidoso Downs racetrack in

3 Ruidoso, New Mexico.  The gatekeepers are the people responsible

4 for holding the horses prior to the gate opening to make sure

5 that the head's straight, they're ready to go.  And then, you

6 have one guy, once he sees that all the horses are lined up

7 properly, he's supposed to release the gate and the horses are

8 off and running.

9         We were told by our witnesses that Carlos Nayen had met

10 with these people and come to an agreement that they would pay

11 cash to the gatekeepers to fix the race at Ruidoso Downs New

12 Mexico.  Our witnesses state that they collected, I believe,

13 $110,000 in drug proceeds.  They got one of the associates to

14 transport that cash to Ruidoso, New Mexico.  We talked to the

15 individual that transported the cash.  The individual said that

16 when the cash arrived in Ruidoso, New Mexico, that the cash was

17 given to the wife of one of the gatekeepers.  We've been trying

18 to document or find out who that is.  But supposedly that money

19 was given to the wife, and then, that money was used -- each

20 gatekeeper was paid $10,000.  And then, Mr. Pilotos -- to fix the

21 race so Mr. Pilotos could win, and he did, in fact -- he had the

22 lowest odds of winning the race, and he ended up winning the

23 race.

24 Q.   The greatest odds meaning he was a long shot?

25 A.   Yeah.  I'm sorry.  Yeah.  The long shot.

1  Q.   Okay.  Now, with respect to the bribe, do your sources who

2  are in New Mexico with Miguel and Omar Trevino, do they confirm

3  that through statements by either one of those two gentlemen?

4  A.   I know that they were watching the race in New Mexico with

5  Miguel Trevino and Omar Trevino, and without looking, I can't

6  recall what they said.

7  Q.   Well, do you recall whether or not they claimed Mr. Pilotos

8  is one of their horses?

9  A.   Oh, yes.

10 Q.   All right.  So I took you off track there.

11      So we have Mr. Pilotos winning a couple of qualifying

12 races, qualifying for the $2 million stakes race.  What happens

13 to the ownership of Mr. Pilotos currently in Garcia Bloodstock's

14 name?

15 A.   The horse qualifies for a race on August the 19th.  He wins

16 -- or he qualifies during that race.  The big race is set for

17 September the 6th, 2010.  Documents are sent to the American

18 Quarter Horse Association on September the 3rd of 2010, changing

19 ownership of Mr. Pilotos from Garcia Bloodstock to Tremor

20 Enterprises, and they're showing the date on that particular one

21 of July the 10th of 2010.

22 Q.   Now, a copy of one of your memorandum of interviews of a

23 interview of a confidential informant was provided to defense

24 counsel.  At this point, for that person's safety, do you wish do

25 keep that name confidential?

```
 1  A.    Correct.
 2  Q.    And as is laid out here, what was that witness' relation to
 3  you of Mr. Garcia's attitude with respect that he lost Mr.
 4  Pilotos?
 5  A.    Mr. Garcia was upset that he had to give up Mr. Pilotos and
 6  have the name changed from his name to Tremor Enterprises.
 7  Q.    Okay.  And so, what documentation in terms of paperwork did
 8  you find with respect to any payment by Mr. Jose Trevino and
 9  Tremor Enterprises for Mr. Garcia's horse Pilotos?
10  A.    As a matter of fact, I believe it was the same witness made
11  a comment that he thought that Fernando Garcia was paid $50,000
12  after the race as kind of a, you know, the horse did good, you
13  know, you're a good soldier, you know, here's your money.  There
14  was a check after Mr. Pilotos won the race on September, and
15  approximately 900-and-some-odd-thousand dollars was deposited
16  into the horseman's account for Tremor Enterprises in New Mexico
17  and then, a check written to Tremor Enterprises.  Tremor
18  Enterprises wrote a hundred-thousand-dollar check, and I believe
19  the date of the check is October the 25th of 2010 for $100,000,
20  and in the memo section it says, purchase of Mr. Pilotos.  And
21  then, Fernando Garcia held that check and did not deposit that
22  check into his account until, I believe, December of 2010.
23  Q.    I want to talk a little bit about some of the purchase of
24  these horses.  Do you know where these horses were bought?
25  A.    Where?
```

1   Q.    Yeah.  Where in general?

2   A.    You have auctions in Oklahoma City.  You have auctions in

3   Ruidoso, New Mexico, Los Alamitos, California are the main ones.

4   Q.    Now, I'll get into some of the specific auctions as it

5   relates to Mr. Garcia and Mr. Nayen, Mr. Trevino in a second.

6   But generally how would the organization coordinate the purchase

7   and decide on which horses to buy?

8   A.    Ramiro Villarreal was real good at picking horses, and

9   that's the reason he was recruited into the organization is

10  because of his talent for picking a good bloodline.  So he would

11  basically pick the horses for the organization.  He and Carlos

12  Nayen were together for a period of time.  And also understand

13  that Carlos Nayen is knowledgeable with horses, therefore, he

14  could also pick a good horse.  They also recruited different

15  trainers, people that had an eye for horses, and they would ask

16  those people to assist in the acquisition or telling which horses

17  to bid on.

18          And at different auctions, the organization would have

19  different people who would be the bidders on those respective

20  horses.  And they would bid on a number of horses, when to bid,

21  and after the bid was won, they'd figure out how much total was

22  due from that particular group.  And then, they'd arrange for the

23  payment to come in from the places in Mexico to make the purchase

24  of the horses.

25  Q.    Okay.  So multiple owners listed?

1    A.   A number of times, like I said, you had different -- you had

2    certain people in control, which appeared to be Carlos Nayen,

3    Jose Trevino.  They would direct other people to buy horses or

4    bid on horses.  They would --

5              MR. FINN:  Your Honor, excuse me, if I may.  At this

6    point, I've got to object going into this.  This is not a trial.

7    This is not a probable cause hearing.  It's an indictment.  And I

8    just don't see how this would bear on the issue of detention.

9              MR. GARDNER:  One of the issues the Court has to decide

10   is the weight of the evidence against the defendants with respect

11   to flight risk.

12             MR. FINN:  Your Honor, if I may.

13             THE COURT:  Sure.

14             MR. FINN:  How does the name of a horse have any

15   relevance on whether or not my client is a flight risk?  We're

16   getting into detail and minutia that normally would be reserved

17   for a trial, and that's kind of putting the cart before the

18   horse.

19             THE COURT:  Well, he has a point at least in the name

20   of the horse, how it relates, but just remember that the detail

21   to which you go into is probably opening it up the detail to

22   which they're going to be able to cross.

23             MR. GARDNER:  No.  I understand, your Honor.

24             THE COURT:  Why don't you rephrase the question?

25             MR. GARDNER:  Okay.

```
1              THE COURT:  Go.  Start there.
2   Q.   (BY MR. GARDNER) What direction did Miguel and Omar Trevino
3   give Carlos and Nayen and their brother Jose Trevino with respect
4   to the purchase of the horses?
5   A.   Okay.  I'm sorry.  One more time.
6   Q.   What direction or involvement did Miguel Trevino and Omar
7   Trevino have with respect to Carlos Nayen and Jose Trevino
8   purchasing the horses at auctions?
9   A.   I believe that they wanted horses purchased, but since they
10  weren't knowledgeable in the horses, they left the people in the
11  know as to which horses to pick, and they were the ones that were
12  going to fund the purchase of the horses.
13  Q.   Did they communicate with Oscar Omar Trevino and Miguel
14  Trevino during the auction?
15  A.   Yeah.  According to the witnesses.  Yes.  They were in
16  communications, whether it was texting, Nextel and/or internet.
17  I'm not sure if they used all three of them.
18  Q.   Okay.  Since Mr. Finn objected, let's just talk about one
19  other thing.
20              Separate Fire, another horse, correct?
21  A.   Yes.
22  Q.   Same sort of movement from owner to owner to owner,
23  eventually ending up into?
24  A.   Actually, I believe Separate Fire, if I'm not mistaken on
25  that one, is that Separate Fire was bid on by somebody.  On the
```

1  statement of account during the purchase, it was listed a

2  different name.  The funds came in from one of the sources in

3  Mexico, and then, that horse was -- and it was purchased for

4  $45,000, and that horse was immediately put into the name of Jose

5  Trevino or Tremor Enterprises.  And, again, looking at the

6  financial analysis, we don't see any money coming from Tremor,

7  Jose, or his businesses, to pay the 45,000 for that horse.

8  Q.    Okay.  How many horses were involved in this investigation?

9  A.    There were -- I think we got records on over 500 horses from

10  the various different auctions.  We had a lot of different

11  nominee names that were provided to us of people associated with

12  this.  Now, I will say that some of those horses were purchased

13  by these people on their own.

14          And I say that, for example, a guy named Luis Aguirre

15  was a vet in Mexico who would come to horse auctions, and he

16  would buy cheap horses and those cheap horses would then -- he

17  would say, these are my horses -- and I'm saying cheap horses,

18  you know, 2 to $5,000 value.  These are my horses and he would

19  send them to Mexico and sell them.  There's a number of times his

20  name appeared as the owner of a number of more expensive horses,

21  and witnesses have said that if a more expensive horse would

22  appear in his name, that he is simply just a front man for the

23  organization that those really were not his horses.

24  Q.    So the majority of the horses, where were they located?

25  A.    You had -- the majority of horses right now, or at least a

1  lot of them, are on a ranch in Oklahoma.  Zule Farms, which is

2  the ranch of Jose Trevino.  He has approximately 400 head of

3  horses up there.  Now, some of those are going to be horses that

4  we've documented in purchases.  Some of those are going to be

5  brood mares that we were not able to document.  And then, some of

6  those are going to be the colts and babies of breedings that he

7  has done over the last two years.

8  Q.   So when Zulema Trevino, upon arrest, makes the statements

9  that her and her husband Jose only had two stud horses and 15

10 mares, is that consistent with your investigation?

11 A.   No.

12 Q.   Now, with respect to the Lexington, Oklahoma ranch, Jose

13 Trevino made a statement to Pretrial Services with respects that

14 he did not know the value of the ranch in Oklahoma.  How long has

15 he had that ranch?

16 A.   He started acquiring it, I believe, in 2011.

17 Q.   Late 2011?

18 A.   Yeah.

19 Q.   And when you say acquire the ranch, is it one parcel or

20 multiple parcels?

21 A.   Multiple parcels.

22 Q.   So when did he acquire -- how many parcels, three?

23 A.   I believe it's three parcels.  He acquired the first two

24 parcels, and I think that value may have been he paid around -- I

25 want to say around 400,000.  And then, he's buying another parcel

1   of land that he was still paying, because it's still held in a

2   previous owner's name.  So he was still paying for that.  I think

3   he had one more payment to make.

4   Q.   And when did he acquire that parcel?

5   A.   2012, I believe.  And the value of that place, I believe, is

6   right around a million dollars.

7   Q.   So when he says that he couldn't provide a value for these

8   properties, as of his interview yesterday, your investigation

9   shows you can provide a value for the properties?

10  A.   Yes.

11  Q.   Let's talk about Mr. Trevino's crossing history.  His

12  Pretrial Service report, he stated he has an active passport and

13  could not recall the last time he traveled internationally.  Have

14  you looked at his crossing history?

15  A.   Yes.

16  Q.   When was the last time he crossed either into Mexico or back

17  into the United States from Mexico?

18  A.   May 14, 2012.

19  Q.   So two months ago?

20  A.   Yes.

21  Q.   And with respect to how many times he crossed, what do you

22  have there in terms of the numbers?

23  A.   One, two, three, four, five, six, seven, eight, nine.  Nine

24  crossings.  I've got two crossings in 2006, one crossing in 2007,

25  one, two, three -- three crossings in 2010.  One crossing in 2011

 1    and then, two crossings in 2012.  And those are the crossings

 2    that's actually been documented as him coming in and out.  When

 3    the witnesses talk about him going to Mexico and staying in a

 4    safe house and going back and forth to meet with his brothers, I

 5    do not have any idea if that was where he crossed, whether these

 6    are recorded or if those are additional crossings that's not

 7    recorded.

 8    Q.    Okay.  So he makes a statement upon his arrest to Special

 9    Agent Scott Lawson, quote, I haven't seen my brothers in years,

10    referring to 40 and 42.  Is that statement inconsistent with the

11    CIs and the crossing history?

12    A.    The CIs were talking during the -- I believe it was the 2000

13    -- they were dealing with the Trevinos in 2009, 2010 and the

14    first part of 2011.  I think through May of 2011.

15    Q.    Now, I know the Court's probably tired of horses' names, but

16    could you give the Court some representation of the names of

17    various horses that relate to the word "cartel"?

18    A.    Yeah.  We had a horse, again, you had a Number One Cartel.

19    You've got Divine cartel.  You've Sportiness Cartel.  The Snowy

20    Cartel.  There's just a number of horses that have a cartel name

21    in it.  You had a name change Mr. Pilotos, the reference, I

22    believe Nayen's nickname.  You had a horse nicknamed or changed

23    to Forty Force, I believe represent Miguel Trevino No. 40.

24    Q.    Horse named Mr. Ease Cartel was --

25    A.    Yeah.  Mr. Ease Cartel.

1  Q.    And who was that associated with?

2  A.    That was actually a horse that was born to, I believe, the

3  Long Straw, which is owned by Jose Trevino, bred to another

4  horse.  They had the baby -- had a couple of babies.  And then,

5  that horse was running under Bonanza Racing, LLC which --

6  Q.    Okay.  Who was running Bonanza Racing, LLC?

7  A.    Fernando Garcia.

8  Q.    Okay.  So another connection to the organization, correct?

9  A.    Yes.  And then, that horse was transferred -- after it

10 showed promise and, I think, qualified for a race in Los

11 Alamitos, California, again, that horse was transferred to Jose

12 Trevino, and that information came from employees out of Los

13 Alamitos.

14 Q.    Okay.  That was just this year in March, correct?

15 A.    Yes.

16 Q.    All right.  I want to talk a little bit about Mr. Nayen.

17 Have you reviewed his visa application for entry into the United

18 States?

19 A.    Not actually reviewed it, but I've been told about it.

20 Q.    And is he currently possibly on an overstay status?

21 A.    Yes.  I believe that he came in in January of 2012 for a

22 three-month, and has a possible overstay on the visa.

23 Q.    And on his visa application, he makes a reference or

24 provides a reference for his bona fides or his qualities as

25 citizen of a company called Carmina, LLC?

```
1   A.    Yes.

2   Q.    Who owns Carmina, LLC?

3   A.    Carlos Nayen.

4   Q.    So he's using his own company as a reference?

5   A.    Yes.

6   Q.    Okay.  And he also uses a reference, another individual by

7   the name Adan Farias.  Who is Adan Farias?

8   A.    Adan Farias is a horse trainer out of California.  And I

9   believe in 2010, Adan Farias was actually brought to Texas and

10  then, traveled into Mexico to meet with Miguel and Omar Trevino

11  to discuss him helping train horses for the organization.  So he

12  met with them for a couple of days, came back, and they agreed

13  and a number of horses were actually sent to him to be trained.

14  Q.   Now, I want to talk about some of the auction houses.  Let's

15  talk about the one in which a horse by the name of Dashin Follies

16  was purchased.

17            What can you tell the Court about an employee of

18  Heritage Place discussing the payment of $650,000 in cash by

19  Carlos Nayen?

20  A.    There was two horses and two foals purchased for a little

21  over a million dollars.  Dashin Follies was 875,00, Coronita

22  Cartel was $250,000, and then, the two foals were 20,000 each.

23  Most of the money or part of the money came in in wires to pay

24  for that.  There was still an outstanding balance.  And I believe

25  the employee stated that they were contacted and asked whether or
```

1    not they'd be willing to accept $650,000 in cash for the

2    remaining balance, which they declined to do so.  So, therefore,

3    that particular thing was dropped.

4            Now, with that being said, the balance of that, we know

5    that part of that was in cash.  I think a hundred-thousand

6    dollars was brought and paid to Heritage Place, a

7    hundred-thousand dollars in currency.  And then, there was other

8    ways of money being funneled in to pay the balance of those

9    horses.

10   Q.   Now, I want to talk about a couple of auctions in

11   particular.  Let's start with the Ruidoso, New Mexico sales

12   auction in September 2-4, 2011.  Was surveillance conducted at

13   that auction by law enforcement officials?

14   A.   Yes.  FBI did surveillance at a couple of auctions and that

15   was one of them.

16   Q.   Okay.  They observed Mr. Nayen snapping pictures consistent

17   with what the CIs were saying?

18   A.   Yes.

19   Q.   All right.  And just to shortcut a little bit, $2.2 million

20   worth of horses were purchased at that auction?

21   A.   Yes.  $2,240,000 I believe, is the amount.

22   Q.   Okay.  Who paid for those horses?

23   A.   I believe that came in from Francisco Colorado Cessa or his

24   business, ADT Petro Services.

25   Q.   Okay.  And who is this Francisco Colorado Cessa?

1   A.   Francisco Colorado Cessa is a businessman in Mexico.  He was

2   actually friends with Efrain Torres, A/K/A Zeta 14.  And when

3   Zeta 14 was killed -- because he actually worked with Zeta 14,

4   according to a witness, in both the money laundering and in the

5   drug business.  And when Efrain Torres was killed, Miguel

6   Trevino, Lazcano and some other people met with Francisco

7   Colorado and basically said that Francisco Colorado would go to

8   work for Miguel Trevino in kind of his same capacity.  Now, we

9   know that based on --

10  Q.   And how is he related to Mr. Nayen over here?

11  A.   Been described as a stepfather, a godfather to Carlos Nayen.

12  Carlos Nayen was also a worker for Efrain Torres, Zeta 14, and

13  then, he's one of the other ones after Efrain Torres' death was

14  told that he would go to work for Miguel Trevino in the same type

15  of capacity that he was working before.

16  Q.   Now, there's four other indictments out there across the

17  country, dating back 2001, with Miguel and Omar Trevino being

18  indicted for their various money laundering and drug

19  organizations.

20         What role does Cessa have in terms of providing

21  protection for -- political protection for the Trevinos?

22  A.   Colorado Cessa actually introduced Efrain Torres to a

23  governor-elect, a person that was running for governor in

24  Veracruz back in 2004.  Efrain Torres provided drug proceeds

25  through Francisco Colorado to help get this person elected.  Once

1   the person was elected governor, contracts were then obtained as

2   Colorado -- Francisco Colorado Cessa acquired $10 to $12 million

3   in drug proceeds from Efrain Torres to open up some businesses.

4   These businesses then were used -- one business was used to get

5   government contracts through the governor that was elected there.

6   Others were used for his contracts with Pemex, his own business

7   ADT Petro Services.

8   Q.   So what effect does that -- those businesses have in

9   protecting the Zetas criminal organization?

10   A.   They basically continued to funnel money to -- as bribes to

11   allow the Zetas to operate in the state of Veracruz.

12   Q.   Okay.  So almost a sanctuary?

13   A.   Yes.

14   Q.   So are people in the organization protected by that

15   sanctuary?

16   A.   Yes.  Or -- yes, to a certain extent, because if something

17   would happen, then they would get tipped off and they would come.

18   And there's been reports where I think Miguel and Omar Trevino

19   have been tipped off on various different occasions about

20   different things.

21   Q.   So in your opinion, if Jose Trevino, Fernando Garcia and

22   Carlos Nayen were allowed to remain on bond, could they avail

23   themselves of that sanctuary in Veracruz?

24   A.   They could go to Mexico and I think they would fall under

25   the protection of the Zetas and whatever that affords them down

```
1   there.
2   Q.   And Cessa, he's been wanted by the Mexican authorities since
3   2005; is that correct?
4   A.   They did an investigation -- the Mexican authorities did an
5   investigation on Colorado Cessa.  I am not sure if they actually
6   have an outstanding arrest warrant for him or if the
7   investigation is still ongoing, but I do know that they were
8   investigating his dealings in the public corruption arena.
9   Q.   Let's talk a little bit about Mr. Garcia's crossings.  Now,
10  in his Pretrial Services report, he states that his family
11  members reside here in the United States.  Did Mr. Garcia provide
12  a statement to Special Agent Billy Williams of the Internal
13  Revenue Service?
14  A.   Yes, he did.
15  Q.   All right.  And did he mention that he has family members in
16  Mexico?
17  A.   Yes, he did.
18  Q.   Did he identify the particular family members in Mexico?
19  A.   That I do not remember.
20  Q.   And do you also have a crossing history on Mr. Fernando
21  Garcia?
22  A.   Yes.
23  Q.   Okay.  Where is he crossing at or at least on?
24  A.   Where, I do not know.  I know that he's crossed in 2005,
25  2007 twice, 2008 three times, 2009, once 2010, once December
```

1   2011.  He did make a -- I think he said that he -- his last

2   crossing was actually in April of 2012; however, there's no

3   official record of that particular crossing.  So how many times

4   he crossed back and forth without an official record is unknown.

5   Q.   All right.  In his statement there under paragraph 8, he

6   says he knows who Carlos Nayen is.  And, also, he admits to

7   owning Garcia Bloodstock but not Bonanza Racing stables.

8            Have you come across some documentation on insurance

9   with respect to Mr. Garcia claiming a managerial position in a

10  company called Fast And Furious?

11  A.   Yes.  Fast And Furious was a front company set up by the

12  organization to register some of the horses that were purchased

13  through Ramiro Villarreal.  Some insurance documents we have

14  shows both Carlos Nayen and Fernando Garcia as the managers of

15  Fast And Furious, LLC.  We know that, you know, several horses,

16  five to ten horses were actually placed into that company name,

17  and then, after the death of Ramiro Villarreal, those horses were

18  then removed from that company name and placed in other names.

19  Q.   Now, again, I don't want to get into too many of the horses'

20  names, but I want to go to the Heritage Place auction on January

21  18th, 21st, 2012.  And this relates to the fact that Garcia in

22  his statement to Billy Williams say he did not train any horses

23  for Tremor Enterprise and he did not pick any horses for Tremor

24  Enterprise.

25            Okay.  On the Heritage Place auction in January of this

1  year, what function did Mr. Garcia perform?  If you'll look at

2  page 46 of your bank affidavit.

3  A.   Okay.  There were five horses and two foals in utero that

4  were purchased during that particular auction, and Fernando

5  Garcia participated in assisting in the purchasing of those

6  horses.  We've got records from Heritage Place reflecting that

7  the funds -- the total amount came to $280,400.  ADT Petro

8  Services, which is a business of Francisco Colorado Cessa, wired

9  in $228,700 on February 15th.  He covered part of the cost.  That

10 left an additional $51,700 outstanding.

11 Q.   And who paid that?

12 A.   That money was actually structured into various different

13 bank -- Heritage Place, on occasion, would provide their bank

14 account information to people that buy horses.  So they provided

15 their bank account information to Fernando Garcia because of the

16 outstanding balance.  I believe that's who they provided it to.

17 Somebody in Laredo, Texas went into ATM machines and made four

18 $9,900 cash deposits, and then, they made four other deposits to

19 get the total of $51,700 into that account.

20        Now, Heritage Place, when they have somebody deposit

21 money into their account, they don't know who to apply that money

22 to until after somebody sends an e-mail claiming, hey, we made

23 the deposits, apply this to our bill.  So the person that

24 apparently made the cash deposits funneled an e-mail to a Jose

25 Luis, who then funneled the e-mail to Fernando Garcia saying,

1    hey, these are the deposits.  They attached a copy of the deposit

2    slips.  These are the deposits to pay the remaining balance of

3    these horses.  These horses -- I mean, I'm sorry.  Fernando

4    Garcia sent that e-mail on to Heritage Place claiming

5    responsibility for the payments saying, this pays off our debt.

6    Q.   Okay.  So Cessa, he bids, he being Garcia bids, Cessa makes

7    the payment and Garcia finalizes the remainder of the payment for

8    those structured deposits, correct?

9    A.   Yes.

10   Q.   All right.

11   A.   Now, one of the horses on that was a horse by the name of

12   Mr. Perry's Wine for $132,000.  That's one of the horses that we

13   actually seized in -- at the ranch in Oklahoma, at Jose Trevino's

14   ranch in Oklahoma.

15   Q.   Now, speaking of that, during the investigation at Ruidoso

16   where Mr. Garcia was, he also sits there and claims that he did

17   not train any horses for Tremor, did not pick up any horses for

18   Tremor.  Did special Agent Billy Williams interview one of the

19   stable hands who related he'd been to Oklahoma?

20   A.   Yes.

21   Q.   And what was that statement?

22   A.   He said he went to Oklahoma -- to the ranch in Oklahoma to

23   pick up horses and brought them back.

24   Q.   Okay.  Brought them back to Ruidoso?

25   A.   Yes.

1  Q.   And during -- and did you participate in the search warrant

2  at Lexington, Oklahoma?

3  A.   Yes.

4  Q.   And did you find any Garcia Bloodstock's horses or records

5  for his horses that had been --

6  A.   There was actually two horses, a Corona Be Cool and a First

7  Prize Smith and I can't remember if they were -- I think they

8  were actually in the name of Bonanza Racing.  Those two horses

9  died.  One was euthanized, the other died, and they had to do --

10 the vet had to examine the horses for insurance purposes.  And

11 the vet recorded that information under Francisco Fernando Garcia

12 and Garcia Bloodstock & Racing is what they told me.

13 Q.   Okay.  Now, I want to -- again, going back to the statement

14 that he did not pick any horses for Tremor Enterprise, based on

15 his post-arrest, go to the Heritage Place November 5th, 2011

16 auction.  Did Garcia act as a agent for both the buyers and

17 sellers for nine horses and four horses, respectively?

18 A.   He acted as the agent for the buyers, and that included you

19 have four horses that Jose Trevino wanted to sell.  Those horses

20 were Forty Force, Blues Girl Choice, Devil Ridge, Number One

21 Cartel.  Number One Cartel was actually in the name of Garcia

22 Bloodstock & Racing in 2010.  On February the 2nd of 2011,

23 Fernando Garcia transfers Number One Cartel from his name to

24 Tremor Enterprises.  He does receive a $70,000 check from Tremor

25 Enterprises.  During 2011, that horse wins $420.  You get to the

1   November 5th, 2011 sale, you have Fernando Garcia acting as the

2   agent for the purchaser as Jose Trevino was selling that horse.

3   They buy that horse for $280,000.

4   Q.   So what does that --

5   A.   That's four times the value of it.

6            MR. FINN:  Who's they?

7   A.   They -- the horse -- I've got the name of the nominee that

8   they used.  They used a La Lupita Nieto-Gonzalez, a Manuel La

9   Lupita Nieto-Gonzalez out of Veracruz, Mexico as the statement on

10  the account where they purchased the Number One Cartel.

11           What I'm getting at is that this horse, plus the other

12  three horses, plus the horses that were purchased by the

13  organization, the payments for all of those came from the --

14  basically the same source, which was a guy named Aryan Jeff in

15  Quick Loans.  So funds were all coming from the same location to

16  pay for the horses that were bought and the horses that were

17  sold.  And when Fernando Garcia was acting on behalf of this

18  transaction, three of these four horses, Fernando Garcia signs as

19  the security agent and says that these horses are going to

20  Lexington, Oklahoma.

21  Q.   (BY MR. GARDNER) So, again, inconsistent with the statement

22  he made post-arrest?

23  A.   Right.  And then, the horses that were actually purchased --

24  there were eight or nine horses that were actually purchased and,

25  again, using different nominee names on the statement of account,

1    they were -- Fernando Garcia signed the security agreement as the

2    buyer, says they're going to Lexington, Oklahoma.  When you get

3    the American Quarter Horse records, they show that several of

4    these horses were actually in the name of Luis Aguirre, a name

5    that we had talked about before.

6    Q.   Also a defendant in the indictment?

7    A.   Yes.

8    Q.   Okay.

9    A.   And, again, like I said, the money to pay for these horses

10   that were both bought and sold coming from Quick Loans and from

11   Aryan Jeff.

12   Q.   Now, I want to talk about one other auction, Heritage Place

13   Auction September --

14            MR. FINN:  Your Honor, excuse me.  I'm going to renew

15   my objection.  The sole issue this morning in this courtroom is

16   detention.  And I understand why he wants to go into the details.

17   I get that.  But I'm asking you to please use your discretion and

18   let's urge the government to focus on detention-related issues.

19            THE COURT:  Well, I mean, it is a factor in detention

20   the weight of the evidence against a particular defendant.  But I

21   do think if you'll --

22            MR. GARDNER:  Flying a dead horse.

23            THE COURT:  Piling on or you're not getting as much

24   bang for your buck as the first time.

25            MR. GARDNER:  Well, let me just finish up one more

1   auction as it relates to involvement in Mexico, your Honor, and

2   then, I'll move on to something else.

3           THE COURT:  Sure.

4   Q.   (BY MR. GARDNER) Okay.  The Heritage Place auction September

5   15th, 2011, Garcia, Jose -- Fernando Garcia, Jose Trevino and

6   Nayen were present in which $2.2 million worth of horses were

7   purchased, correct?

8   A.   Yes.

9   Q.   That was paid for by Cessa?

10  A.   I'd have to go back and look at the actual auction.

11  Q.   Now, recently the Mexican federales ran a search warrant in

12  Mexico at the residence of a person nicknamed "Cucho."

13  A.   Yes.

14  Q.   Okay.  Who is "Cucho"?

15  A.   He is one of the accountants for Miguel Trevino.

16  Q.   Okay.  And was a list found of horses purchased at U.S.

17  auctions at that place?

18  A.   Yes.

19  Q.   A search warrant was also conducted in Mission, Texas,

20  correct?

21  A.   Correct.

22  Q.   And that's here obviously in the U.S. and who is that

23  residence associated with?

24  A.   That is the girlfriend of Fernando Garcia.

25  Q.   Okay.  Was there also a similar list found at that location,

1   list of horses?

2   A.   Yes.   There was a list of pertaining to one of the auctions

3   that listed the horses that were purchased and the $2,240,000

4   cost, I believe is what it was.

5   Q.   Now, there's been some claim that these guys are just

6   trainers and they don't know what's going on.   Was there reports

7   coming from Ruidoso, New Mexico that they referred to Fernando

8   Garcia stables as the, quote, unquote, Zeta stables?

9   A.   Yes.

10  Q.   Now, in his post-arrest statement, Mr. Garcia states that in

11  paragraph 12, he knows Eusevio Huitron as a race trainer, has

12  been since 2005.   Garcia has not had any dealings with Huitron.

13  Could you explain to the Court the confidential informant

14  information that indicates that's not exactly true?

15  A.   Right.   We were told that Fernando Garcia was in charge of

16  training the Zeta horses in New Mexico and that they brought

17  Eusevio Huitron to that location to assist in the training of the

18  horses.   And I believe they may have actually roomed together or

19  next door to one another.

20  Q.   Now, I just want to go back to Mr. Nayen for a second.   What

21  did the CIs with respect to those involved in the drug business

22  say about Nayen's drug involvement?

23  A.   He would get, I think, 20, 25 kilos per month cocaine from

24  these people.   He would have it shipped up by his -- the person

25  referred to as "Yo-Yo," his right-hand man in the drug business,

1    to have it distributed.  He also had access to additional cocaine

2    from other sources.

3    Q.    Now, do you have any information that Jose Trevino's

4    personally involved in any of the killings conducted by the Zetas

5    in Mexico?

6    A.    Jose Trevino?

7    Q.    Jose Trevino.

8    A.    No.

9    Q.    Do you have any information if Fernando Garcia's personally

10   involved in any of the killings conducted by the Zeta

11   organization?

12   A.    No.

13   Q.    Do you have any information that Carlos Nayen is personally

14   involved in some of killings conducted by the Zeta organization?

15   A.    Carlos Nayen made a statement to one of the witnesses that

16   he had proved himself to Miguel Trevino.

17   Q.    What did that witness understand that to be?

18   A.    To mean that Carlos Nayen conducted some type of violence.

19   Q.    And with respect to the violence conducted or known to by

20   Carlos Nayen, what happened when someone would threaten Francisco

21   Colorado Cessa?  What action would take place?

22   A.    He could let Miguel and Omar know and the person could be

23   taken care of, could be killed.

24   Q.    And was that done through Nayen?

25   A.    Yes.

1   Q.   Your Honor, may I have a moment?

2        THE COURT:  Sure.

3   Q.   (BY MR. GARDNER) One other thing with respect to Mr. Nayen.

4   Upon his arrest in California, was it discovered that he and his

5   wife had filed for welfare payments?

6   A.   That's what I was told.

7   Q.   Okay.  And was there at least one particular piece of

8   jewelry worth over $30,000 located there?

9   A.   Yes.  They found a $30,000 watch.

10  Q.   So based on your knowledge of Mr. Nayen's finances, is the

11  fact he on welfare consistent with his personal wealth?

12  A.   No.

13  Q.   Pass the witness, your Honor.

14       THE COURT:  Just a second.  Okay.  Who wants to go

15  first?

16       MR. FINN:  I would, your Honor.

17       THE COURT:  Yeah.  Just for the record, I'm talking to

18  the interpreter about her capacity to keep going without a break.

19  Knowing her for a long time, she's strong, she's willing to keep

20  going, but her colleague downstairs has been at it for a while.

21  And either way, we're going to make it work, but I'm just telling

22  the lawyers, we're not breaking for lunch.  We're just going to

23  keep going.  All right?  Mr. Finn.

24       MR. FINN:  May it please the Court, counsel.

25

1                          CROSS-EXAMINATION

2    BY MR. FINN:

3    Q.   Agent, my name is David Finn.  I don't recognize you.  Do

4    you recognize me?

5    A.   No, sir.  I do not.

6    Q.   Okay.  I just have a few questions for you.  Probably not

7    more than 10 or 15 minutes.  If you don't understand me, would

8    you ask me to rephrase?

9    A.   Yes, sir.

10   Q.   And could we have a gentlemen's agreement that if I ask you

11   a direct question, you'll give me a direct answer?

12   A.   Best I can.

13   Q.   Okay.  And if I ask you, how's the weather outside, you'll

14   give me an answer related to the question and not veer off into

15   something that's nonresponsive?  Is that fair?

16   A.   Unless I need to explain something that includes the whole

17   truth.  So I can't --

18   Q.   The whole truth.

19   A.   Because I swear to tell truth, the whole truth so.

20   Q.   Okay.  We'll try.  This --

21   A.   Very good.

22   Q.   We'll try this the easy way and see how far we can go.

23            How long was this investigation going on?

24   A.   IRS started a financial investigation into Jose Trevino, I

25   believe, in 2010.  I believe that FBI --

1    Q.    So a couple of years?

2    A.    Yes.  FBI got information independently and started their

3    investigation, I believe, in 2010.

4    Q.    In the allegation contained in the indictment against my

5    client Jose Trevino-Morales is that he knowingly used dirty

6    money, criminal proceeds, knowingly used dirty money to buy and

7    sell horses for a brutal organization down in Mexico.  Is that

8    basically the allegation?

9    A.    Yes.

10   Q.    And the charge is -- in this one-count indictment is

11   conspiracy to launder money.  It's not a drug conspiracy, it's a

12   money-laundering charge, correct?

13   A.    Correct.

14   Q.    And whether it's using dirty money derived from

15   prostitution, gambling, loan sharking, or anything else,

16   knowingly doing so is a crime, in and of itself, correct?

17   A.    Money laundering is you have to know it's SUA, specified

18   unlawful activity.

19   Q.    Right.

20   A.    And then, you have to do something with that --

21   Q.    Right.

22   A.    -- to either conceal or to further.

23   Q.    Just I want to make it abundantly clear to everyone, but

24   particularly to Judge, that this ultimately is a money-laundering

25   charge, not a drug conspiracy charge, correct?

```
 1   A.   Correct.
 2   Q.   There were no allegations whatsoever against Jose
 3   Trevino-Morales that he engaged in any acts of violence, correct?
 4   A.   Correct.
 5   Q.   There's no allegation whatsoever in this indictment or in
 6   your testimony that he is a drug user, or a drug pusher, or a
 7   drug buyer or seller.  That's not in this indictment, is it?
 8   A.   It is not.
 9   Q.   So the thrust of the government's position is that my guy,
10   Jose Trevino, knew the money was dirty and went ahead and bought
11   horses and sold horses, anyway, right?
12   A.   He joined the organization and did a number of transactions
13   with the horses.  Correct.
14   Q.   Okay.  Money laundering is normally considered to be a
15   white-collar offense.  Would you agree with that?
16   A.   No, sir.
17   Q.   Well, you understand that there is not a presumption in this
18   case for detention.  Do you understand that?
19   A.   Yes.
20   Q.   What's the significance of that?
21   A.   Do not know.
22   Q.   They could have brought other charges where there's a
23   presumption for detention, but that's not what we have today.
24   We've got conspiracy to launder money.  Money laundering, right?
25   A.   Correct.
```

1    Q.    All right.  Well, let's talk about these confidential

2    informants a little bit.

3              How many CIs or confidential informants are involved in

4    this case?  I heard you say five, maybe six?

5    A.    Yeah.  We're -- it's more than that.  I want to say we

6    probably have 14, 15.

7    Q.    Okay.  But you're not willing to share with me the names or

8    identities of any of them, are you?

9    A.    That is correct.

10   Q.    So not only is the Court being asked to rely on hearsay,

11   it's also nameless, faceless hearsay, and we have no idea who

12   these people are, right?

13   A.    Correct.

14   Q.    We don't know what their criminal history is, do we?

15   A.    No, sir.  You do not.

16   Q.    Did you ever run their criminal history?

17   A.    I know the criminal history on some of them.  Yes.

18   Q.    A bunch of them got jammed up for illegal activity and then,

19   flipped to try to help themselves out.  Isn't that true?

20   A.    Yes.

21   Q.    And several of them also had immigration issues, flipped,

22   cooperated to try to help themselves, correct?

23   A.    Don't know about the immigration issues.

24   Q.    Okay.  And some of these confidential informants are

25   related, aren't they?

```
 1   A.   Yes.

 2   Q.   So now we have nameless, faceless hearsay with people that

 3   are motivated to lie because they're in a jam and getting

 4   prosecuted themselves and some of them are even related, fair?

 5   A.   Fair.

 6   Q.   And none of them are in the courtroom today, are they?

 7             THE COURT:  I thought we weren't identifying them.

 8             MR. FINN:  Okay.  I think I made my point, Judge.

 9             THE COURT:  You did.

10   Q.   (BY MR. FINN) All right.  Were there any wiretaps, Title III

11   intercepts used in this case?

12   A.   No court-ordered wiretaps.

13   Q.   How else do you get a wiretap if it's not a Title III court

14   application?

15   A.   Consensual monitoring.

16   Q.   Consensual monitoring?

17   A.   Yes.

18   Q.   Okay.  So there are some recordings?

19   A.   Yes.

20   Q.   Do you have recordings here today of Jose Trevino-Morales

21   saying to somebody, hey, I know this is dirty drug money, but I'm

22   going to buy horses, anyway?  Do you have that?

23   A.   No.

24   Q.   Do we have any video recordings of my client doing anything

25   illicit?
```

1   A.   Video, I don't believe so.

2   Q.   Photographs?

3   A.   No.

4   Q.   So we've got no video, no photographs, no wiretap, some

5   consensual recordings that my guy's not on.  So your case is

6   basically --

7   A.   I believe your guy is on some of the recordings.

8   Q.   Saying something illicit?

9   A.   I don't know what he said.  I know there's recording --

10  recorded calls, but I don't know the content.

11  Q.   Do you speak Spanish?

12  A.   No.

13  Q.   Were the conversations in Spanish?

14  A.   Don't believe so.

15  Q.   Okay.  So you've got these confidential informants.  And

16  you're assuming, based on the allegation, the government is

17  assuming that -- because you have to assume this.  Maybe you can

18  prove it, maybe you can't -- that he knew that the money that he

19  was using to buy and sell horses was dirty money.

20  A.   I believe that the evidence shows that he had knowledge it

21  was illegal proceeds, and I believe that that would come out per

22  all the witnesses that would testify.

23  Q.   And we don't know the names of any of these witnesses.

24  A.   You do not.  That's correct.

25  Q.   So what, I'm supposed to trust you basically.

1   A.   Yes.

2   Q.   Are you aware of the fact that my client had a bookkeeper,

3   an accountant, a CPA, a tax advisor, and even an attorney that

4   gave him business advice as to how to manage his horse farm?

5   A.   I knew his wife acted as a businessperson for him, and then,

6   she made a comment that they had a bookkeeper.

7   Q.   Did you interview the bookkeeper?

8   A.   I have not.

9   Q.   Did you interview the accountant?

10  A.   No.  I have not.

11  Q.   Did you interview the CPA that prepared the taxes?

12  A.   No.  I have not.

13  Q.   Did you interview his tax advisor, an attorney in the

14  Mesquite area of Dallas, Texas?

15  A.   No.  I have not.

16  Q.   But you seized all of my client's records which showed that

17  he kept meticulous records about every single purchase and sale

18  that he made, correct?

19  A.   I have not had a chance to go through the records.  What we

20  got from the search, I do not know.

21  Q.   Well, wouldn't that be useful for the Judge to know?  I

22  mean, if you're engaged in illegal activity, you're probably not

23  going to record it meticulously, or you're going to use a code,

24  or something, right?

25  A.   Depends on what you're trying to record.

1   Q.   All right.  Well, let's talk about the quarter horse

2   industry.  Do you know much about the quarter horse industry?

3   A.   What I know is what I learned during this investigation.

4   Q.   Okay.  If I represented to you that it is a common practice

5   for people buying and selling horses to try to conceal their

6   identities, use straw purchasers, because it is a cut-throat

7   competitive business, would you argue with me that that is common

8   practice?

9   A.   No.  I wouldn't argue with you.

10  Q.   And a lot of times, these purchases are made with cash, wire

11  transfers, again, to basically conceal somebody's identity,

12  because you don't want your competitor knowing necessarily who's

13  buying what horse and at what price, correct?

14  A.   I would not argue with you on that.

15  Q.   And it's also common practice to send people to auctions to

16  buy on behalf of people that are not present at the auction,

17  correct?

18  A.   Again, I would not argue with you on that.

19  Q.   All right.  Have you reviewed -- well, tell the Judge about

20  my client's extensive criminal history.

21  A.   Don't know that he has a criminal history.

22  Q.   That would be correct.  Absolutely zero criminal history.

23  And my client is a U.S. citizen, correct?

24  A.   Naturalized citizen, I believe.

25  Q.   Right.  And that means a citizen, correct?

1    A.    Yes.

2    Q.    And y'all seized his passport when you raided the farm,

3    correct, not just his but some others, as well?

4    A.    I don't know if that was in part of the stuff taken or not.

5    Q.    Well, it's in the inventory.

6    A.    Okay.  Then it was taken.

7    Q.    And if I -- if I can represent to you that the federal

8    prosecutors, seated to my left, has represented to me that

9    they've got my guy's passport, we could take his word for it,

10   right?

11   A.    Yes.

12   Q.    He's an honest guy.

13          Have you seen the presentence report?  Or has the

14   government shared with you what's contained by way of a

15   recommendation in this case on bond?

16   A.    What I heard them talking was that they had recommended a

17   bond.

18   Q.    Right.  And then, my client's wife -- her attorney's seated

19   right there.  She's probably in the courtroom somewhere.  I've

20   never met her -- was released earlier by his Honor on a $25,000

21   bond with -- unsecured bond with a number of restrictions,

22   correct?

23   A.    I believe that's correct.

24   Q.    And the recommendation in this case as to Mr. Jose

25   Trevino-Morales on this money-laundering charge by Cecilia

1  Salinas is the exact same thing, unsecured bond, 25,000 with a

2  number, in fact, a boatload of conditions, right?  I mean, that's

3  what you understand.

4  A.   If that's what it says.

5  Q.   Okay.  And Ms. Salinas is trained to evaluate people's

6  flight risk, their danger to the community, their ability to make

7  bond, and she does that for a living, day in and day out, for

8  this court, right?

9      MR. GARDNER:  Your Honor, relevance as to what he knows

10 about Ms. Salinas.

11     THE COURT:  Yeah.  Where are you going with that?  I

12 mean, I have the report and I have read it.

13     MR. FINN:  All right.  I can move on.

14     THE COURT:  Okay.

15 Q.   (BY MR. FINN) You mentioned during your direct testimony

16 that my client stated that he used to travel to Nuevo Laredo,

17 Mexico about five times a year, right?

18 A.   No.  I didn't say that.

19 Q.   Okay.  The prosecution asked you how many times my guy, my

20 client crossed into Mexico.  Remember that testimony?

21 A.   Yes.

22 Q.   And what was your answer?

23 A.   You have two times in 2006, once in 2007, three times in

24 2010, one time in 2011, two times in 2012, the last one being May

25 14, 2012.  Those are the documented border crossings.  How many

1  times he crossed that wasn't documented, I have no idea.

2  Q.   Right.  We'd be guessing at that, right?

3  A.   Yeah.  I have no idea.

4  Q.   Could have been a hundred times, could have been no times.

5            So if my client told Pretrial Services that he traveled

6  to Nuevo Laredo, Mexico about five times a year, that's more or

7  less accurate.  In fact, it may be an overstatement, right?

8  A.   That's if it's five times per year, then it's more than what

9  I have on here.  So there's several times that he crossed that

10 were not documented.

11 Q.   That's all, Judge.  Pass the witness.

12            THE COURT:  Thank you, Mr. Finn.  Who wants to go next?

13 Mr. Womack, give us one second with the interpreter.  Mr. Womack,

14 witness is yours.

15            MR. WOMACK:  Thank you.

16                       CROSS-EXAMINATION

17 BY MR. WOMACK:

18 Q.   Thank you.  Good morning, agent -- special agent.

19 A.   Good morning.

20 Q.   I'm Guy Womack.  I represent Fernando Garcia.  We've never

21 met before either, have we?

22 A.   No, sir.  We have not.

23 Q.   During your testimony, you said that at a Heritage auction

24 and I believe this was on 2012, it was referred to as page 46 of

25 your bank affidavit.  You talk about an auction where a lot of

1   horses were involved at this Heritage auction, mixed auction

2   sale.  And in there, in your affidavit for the search warrant,

3   you say that Fernando Garcia, he assisted in the auction?

4   A.   Yes.

5   Q.   How did he assist?

6   A.   The details of what he did, I do not know.  I do know that

7   in that auction that they recorded his name on a number of the

8   documents.  Let me get to that here.

9   Q.   So what you have is that he might have participated in

10  helping select horses and actually buying some of the horses.

11  A.   Correct.  He may have been the one helping select, giving

12  directions on what to do, that type of stuff.

13  Q.   And as far as you know, there's nothing illegal about

14  someone doing that, is there?

15  A.   No.

16  Q.   Especially not if you're a horse trainer.

17  A.   If you are a person who's doing it for legit -- businessman

18  and legit reasons, then you're right.  I mean, somebody could go

19  up there and bid and do whatever.

20  Q.   And even if you don't know about the legitimacy of the

21  person you're working for, as far as you're doing it

22  legitimately, that's okay, isn't it?

23  A.   If you don't know the source of the funds and you're doing

24  this, then you can actually do it without violating the law.

25  Q.   Okay.  Now, you told us that there's something about

1   receipts for some deposits.  It was like $51,000 that were in

2   deposits that were made on February 28, 29 and March 1 of 2012 as

3   payment -- partial payment of these horses; is that correct?

4   A.   Correct.

5   Q.   And if I understand correctly from reading your affidavit,

6   what happened was that for part of that, that $51,000 that went

7   to pay for five horses and then, two foals that were bought in

8   utero, they weren't even alive -- I mean, they weren't even --

9   hadn't even been delivered yet, correct?

10  A.   Correct.

11  Q.   But speculating on that, these individuals bought those

12  effectively seven horses, correct?

13  A.   Yes.

14  Q.   Okay.  And you said that some of the money was paid through

15  an ATM machine?

16  A.   Yes.

17  Q.   Okay.  And then, ultimately there were receipts for each of

18  those deposits, correct?

19  A.   Correct.

20  Q.   And the involvement of Mr. Garcia in that was that he sent

21  an e-mail to Heritage, to the auction house, and informed them

22  that all the payments had been made now and here are copies of

23  the receipts I've received from a person who made the payments,

24  correct?

25  A.   Yes.

1    Q.    Okay.

2    A.    And --

3    Q.    And to your knowledge, there was nothing illegal about

4    telling Heritage that, oh, by the way, we have satisfied the

5    complete debt to you.   There's nothing wrong with that, is there?

6    A.    Unless he knows that the proceeds are from illegal

7    activities, then there's something wrong with it.   Yes.

8    Q.    Right.   And so, based on what we have here and what Mr.

9    Garcia must have known, all we know is that he reported to the

10   Heritage auction house that the complete debt had been satisfied,

11   correct?

12   A.    The documents show that the cash was structured into the

13   accounts, and the documents show that he notified Heritage Place

14   that the funds were there.

15   Q.    Correct.   He notified Heritage Place that the debt had been

16   satisfied, correct?

17   A.    Yes.

18   Q.    And he actually sent them copies of these receipts proving

19   that, correct?

20   A.    Yes.   They were attached to the e-mail.

21   Q.    And he was not the one who made these, what you're calling

22   structured deposits, was he?

23   A.    No.   He did not personally make those that I know of.   We

24   believe --

25   Q.    So he merely reported to the auction house, hey, we have

1    completely satisfied the debt owed to you for these horses,

2    correct?

3    A.    Yes.  He notified Heritage Place.

4    Q.    Okay.  And Heritage Place was the auction house?

5    A.    Yes.

6    Q.    Okay.  And you know from your investigation that Fernando

7    Garcia is a 29-year-old horse trainer.

8    A.    Yes.  I believe he has a degree from Arizona State that

9    deals something with that, too.

10   Q.    He went to the University of Arizona, didn't he?

11   A.    Arizona State.

12   Q.    The only university?

13   A.    Okay.

14   Q.    He went to a -- an Arizona university, correct?

15   A.    Yes.

16   Q.    Okay.  How do you know the value of a quarter horse?

17   A.    Me personally?

18   Q.    Can you look at it and tell the value of it?

19   A.    Me?  No.  Can other people?  Yes.

20   Q.    But even for someone that knows horses and makes their

21   living in evaluating horses, they can be wrong about the value of

22   a horse, can they?

23   A.    Yes, they.

24   Q.    They can -- for example, they can look at a mare who's

25   carrying a foal and they can say, you know, we think knowing her

1  bloodline and the bloodline of that foal, that that foal is worth

2  buying, correct?

3  A.   There's a number of people that can look at a horse, look at

4  the bloodline and give you a value of that horse.

5  Q.   And sometimes, like happened in 2012 at Heritage, people who

6  are knowledgeable in the quarter horse business may buy a foal in

7  utero and the foal may die, correct?

8  A.   It's possible, yes.

9  Q.   Well, you know from your investigation in this case that's

10 happened in this case?  Didn't you tell us that one of the foals

11 died?

12 A.   I don't think I told you that.

13 Q.   No.  I thought you said that.  Did you not say that?

14 A.   No.  I don't believe I did.

15 Q.   Okay.  But necessarily there's a risk when you buy a foal in

16 utero that it may not even survive, correct?

17 A.   Correct.

18 Q.   And sometimes you may look at a horse that has a good

19 bloodline, and it may never really realize what you thought its

20 potential was, correct?

21 A.   Yes.

22 Q.   And sometimes horses that may not have a great pedigree may

23 turn out to be a very successful horse, correct?

24 A.   Correct.

25 Q.   So necessarily it's always guesswork at what a particular

1  horse is worth, isn't it?

2  A.   By the people that -- yes.  By the people that know.

3  Q.   Even by those people, it's still guesswork, isn't it?

4  A.   They will determine the value based on performance and

5  bloodline.

6  Q.   Right.  And so, if you buy a horse that's just starting out,

7  you don't know his or her performance yet, will you?

8  A.   Correct.

9  Q.   And so, would you agree with me that the value of a horse,

10 especially a racehorse, may go up and down throughout the

11 competitive life of that horse, correct?

12 A.   If it performs well in a race, the value will go up.

13 Q.   So is that a yes, the value can go up and down?  Is that a

14 yes?

15 A.   It can go up.  If it performances poorly, it can go down.

16 Q.   Okay.  So that was a yes then?  It can actually fluctuate,

17 can't it?

18 A.   If it goes up and wins races, then you have a value that

19 will stay consistent.  If you have a horse that loses and doesn't

20 win any, the value will stay low.

21 Q.   Okay.  So if a horse -- if I understand you, then, you're

22 saying that if a horse wins, that -- his value will stay up there

23 forever, correct?

24 A.   If a horse wins and is considered a good bloodline.

25 Q.   Uh-huh.

1  A.   Then use that horse for breeding and stays there, the value

2  of that horse will stay consistently high is my understanding.

3  Q.   And could it be that if the horse gets too old to race

4  anymore, then its value might diminish?

5  A.   No.  At that point in time, you use it either as a donor

6  mare or a stud horse, so the value will remain consistent.

7  Q.   And a horse that's merely now good for breeding, is it as

8  valuable as a horse that's about to win a race tomorrow?

9  A.   Yes.

10 Q.   It is?

11 A.   Yes.

12 Q.   In your opinion, a horse that might win tomorrow is no more

13 valuable than an older horse that's merely good for semen.

14 That's what you say?

15 A.   I believe that's correct.

16 Q.   Okay.  But you think there might be experts who would

17 disagree with you on that?

18 A.   Could be.  Like I say, I'm not an expert at it.

19 Q.   From your investigation of Fernando Garcia, you don't know

20 of him being involved in any acts of violence of any kind, do

21 you?

22 A.   That is correct.

23 Q.   And you have no recordings, videos, audio recordings,

24 nothing of Fernando Garcia discussing anything illegal with

25 anyone, do you?

1   A.   I believe there's recordings of him.

2   Q.   Talking to someone?

3   A.   Yes.

4   Q.   And is he saying anything about drug money?

5   A.   Don't know the contents of the phone calls.

6   Q.   So to your knowledge, you have no recordings of Fernando

7   Garcia saying anything illegal, correct?

8   A.   Don't know the contents.

9   Q.   So that's yes, or you know of nothing that he has said

10  illegal, correct?

11  A.   Again, I do not know the contents of the phone calls.

12          THE COURT:  You see, that wasn't his question.  It's

13  just do you know, "Yes" or "No"?

14          THE WITNESS:  No.  I do not know.

15  Q.   (BY MR. WOMACK) Okay.  And you have no evidence of Fernando

16  Garcia visiting any known Zetas on any of the trips that he ever

17  made into Mexico.

18  A.   No.  I do not.

19  Q.   You know he's a lawful permanent resident of the United

20  States.  You know that?

21  A.   Yes.  I think I did.  Yes.

22  Q.   In fact, he's been here since he was three weeks old.  You

23  know that?

24  A.   No.  I did not know that.

25  Q.   Okay.  You know he lives -- that his parents live in the

1   Mission, Texas area?

2   A.   I don't know if I knew that or not.  If I did, I don't

3   recall it.

4   Q.   His siblings live there, too, don't they, in that area?

5   A.   I do not know.

6   Q.   You know his fiance lives in that same area?

7   A.   The girlfriend, yes.  Fiance, I didn't know his fiance but

8   the girlfriend, yes.

9   Q.   And, in fact, they all -- all the family and the extended

10  family, his fiance, they all live within about a mile of each

11  other, don't they?

12  A.   That I did not know.

13  Q.   You know that Fernando Garcia has no prior convictions of

14  any kind.  You're aware of that?

15  A.   Yes.

16  Q.   And as with Mr. Trevino, you know that probation has

17  recommended that he be released pending trial on a bond, correct?

18  A.   I'd heard that.  Yes.

19  Q.   We have no further question.

20          THE COURT:  Thank you, Mr. Womack.  Mr. Rubino.

21          MR. RUBINO:  Yes, sir.

22                    CROSS-EXAMINATION

23  BY MR. RUBINO:

24  Q.   Good afternoon, Agent.

25          Sir, I represent Carlos Miguel Nayen, who's the

1  gentleman to your left.  The last one.  Do you see him there?

2  A.   Yes, sir.

3  Q.   During the course of your investigation, have you ever

4  personally observed Carlos Miguel Nayen?

5  A.   No, sir.  I have not.

6  Q.   Initially in your early testimony today, you said in 2010,

7  Carlos Nayen purchased horses for the organization.  Do you

8  remember saying that?

9  A.   Yes.

10 Q.   How many times in 2010 did Carlos Nayen actually purchase

11 horses?

12 A.   His name appearing as the actual purchaser?  I don't believe

13 that ever happened.

14 Q.   So the answer is he never purchased horses.

15 A.   I guess the proper thing would be he directed the purchase

16 of horses.

17 Q.   Well, did he act as a bidder at any time?

18 A.   No.  I believe he had other people act as the bidders.

19 Q.   No.  My question simply stated is, did he act as a bidder?

20 It's a simple "Yes" or "No" question.

21 A.   No.  He did not.

22 Q.   Did he act as an agent?

23 A.   I don't believe his name appears on any documents.

24 Q.   Did he act as a broker?

25 A.   No, sir.

1   Q.   Did he act as an owner?

2   A.   Some horses are in Carmina, LLC.  So yes.  On some of them,

3   I think he did.

4   Q.   Is he the owner of Carmina, LLC?

5   A.   Yes.

6   Q.   So when did Carmina, LLC purchase any horses?

7   A.   Without going back and look at the records, I could not tell

8   you.

9   Q.   How many auctions in 2010 did he attend?

10   A.   Without going back and looking at the entire thing, I could

11   not tell you.  I know FBI did surveillance, I think, in 2010 and

12   2011.  I know he was at one, maybe at both.  He was at the

13   auction, I believe, in Heritage Place in 2010.  But without going

14   back and rereading and/or looking specifically for that, I cannot

15   tell you.

16   Q.   So basically what you're telling us, to the best of your

17   knowledge, he may have attended two auctions, one in 2010 and one

18   in 2011; is that correct?

19   A.   No.  He may have -- I believe he attended more than that,

20   but without going back and looking, I can't tell you how many.

21   Q.   How many more do you think?  Three?  Four?  Five?  A

22   hundred?

23   A.   Without looking, can't tell you.

24   Q.   Don't have the faintest idea?

25   A.   Without looking, can't tell you.

1  Q.    Now, you told us about CI 1.  Has CI 1 ever met the

2  Defendant Nayen?

3  A.    I want to say yes, but I'd have to go back and read to be

4  sure.

5  Q.    Have you interviewed CI 1 personally?

6  A.    Yes.

7  Q.    And did he ever tell you that he personally observed the

8  Defendant Nayen?

9  A.    Without going back and reading, I could not tell you.  We've

10  interviewed a number of different folks, and I don't know exactly

11  what he said without reading it.  Could not tell you.

12  Q.    This was your chance to do it today.  Okay.

13          How about an any other CI, without going through 15 or

14  16 of them, two, three, four or five, et cetera, which ones can

15  you tell me have actually personally observed Nayen?

16  A.    Can't tell you how many.

17  Q.    Can you tell me if any have personally observed Nayen?

18  A.    Okay.  CI No. 1 did meet Carlos Nayen.

19  Q.    Where did he meet him?

20  A.    Don't know.

21  Q.    When did he meet him?

22  A.    Don't know.  But in the affidavit, it talks about in October

23  2010 to January 2011, he gave Nayen 20 kilos of cocaine every two

24  weeks.  I believe he also had people give Nayen cash.  So yes, I

25  believe CI 1 did, in fact, meet Carlos Nayen.

```
 1   Q.   Any other CI ever personally met Nayen?
 2   A.   I know a couple more did.  Yes.
 3   Q.   Which ones personally met him face-to-face, dealt with him?
 4   A.   CI 7 and CI 8.
 5   Q.   Okay.  When did CI 7 meet him?  Where and under what
 6   circumstances?
 7   A.   CI 7, don't recall where they met.
 8   Q.   How about CI 8?  When and under what circumstances?
 9   A.   I believe that was actually at an auction.
10   Q.   First time CI 8 ever observed the defendant was at a horse
11   auction?
12   A.   I think so.
13   Q.   Did he observe him -- what did he observe him during?  What
14   did he report to you he observed him doing at a horse action?
15   A.   I believe CI 8 talks about Carlos Nayen and Jose Trevino and
16   others entered into a relationship where horses would be boarded
17   at a place in California.
18   Q.   Sounds more like a meeting.  Was he present for this meeting
19   and heard or observed all this?
20   A.   Yeah, I believe.
21   Q.   Is that what you're telling us?
22   A.   Yes.  I believe so.
23   Q.   Okay.  Now, you told us the drug proceeds were sent to
24   Carlos Nayen at racetracks, $4 million in cash, you said.
25   A.   Four million total, not all those at race tracks.  No, sir.
```

1  Q.   Okay.  So $4 million, you say, was sent to Carlos Nayen,

2  correct?

3  A.   Yes.

4  Q.   And was that in cash, U.S. currency?

5  A.   Yes.

6  Q.   And was it all delivered at one time?

7  A.   No.

8  Q.   Was it delivered over a period of time?

9  A.   Yes.

10 Q.   How long a period of time?

11 A.   Don't know.

12 Q.   Who delivered it to him?

13 A.   CI 1 either delivered himself or directed a person to

14 deliver the cash to him.

15 Q.   Which was it?

16 A.   I think both.

17 Q.   So the only person who delivered money to the defendant was

18 CI 1.  Is that your testimony, sir?

19 A.   Don't know.  Either he did himself or he directed people to

20 do it.  Which other CIs did it, I do not recall.

21 Q.   Now, you told us that Nayen met with gatekeepers, and he

22 made an agreement to fix races with them.

23 A.   Yes.  Fix a race.

24 Q.   Where do you get that information that he met with

25 gatekeepers?

```
 1   A.   The CIs.

 2   Q.   How many CIs?

 3   A.   I think four CIs talk about it.  Four or five.

 4   Q.   Were they present -- I'm sorry.  I didn't mean to cut you

 5   often.

 6   A.   Four or five.

 7   Q.   Were they present at that meeting?

 8   A.   No.  I don't think so.

 9   Q.   Were any of them present at the meeting?

10   A.   At which meeting are you talking about?

11   Q.   At any meeting where he bribed people to throw races.

12   A.   No.  I don't think they were.

13   Q.   Well, then, how do they know if they weren't there?

14   A.   Because they sent the money.

15   Q.   But they weren't present at any meeting where he allegedly

16   bribed anybody?

17   A.   They were not present during the meeting with the

18   gatekeepers.

19   Q.   That's my question --

20   A.   That is correct.

21   Q.   -- simply stated.

22   A.   They were not present.

23   Q.   So they heard no words, saw no acts of him meeting with

24   gatekeepers.

25   A.   No.  The conversation, I think it was directions from Carlos
```

1    and Miguel to send the money to this particular person.

2    Q.   That wasn't my question.  I don't think you were paying

3    attention.

4            The question simply stated, sir, is they were never

5    present at any meeting with any gatekeepers where he instructed

6    gatekeepers to throw a race.  Is that true or not true?

7    A.   Gatekeepers, I think that's true.

8    Q.   Thank you.

9            Has anyone reported to you that they were ever present

10   at a meeting with him and gatekeepers where he asked gatekeepers

11   to throw races?

12   A.   Okay.  One more time.

13   Q.   Was any -- has anyone reported to you that they were present

14   at any meeting where Nayen met with gatekeepers to throw a race?

15   A.   I'm not quite following your question.

16   Q.   I'll try it again.

17           Allegedly, Nayen meets with gatekeepers to throw a

18   race, correct?

19   A.   Correct.

20   Q.   Do you have any witness who was present at the meeting where

21   that occurs?

22   A.   With the gatekeepers, no.

23   Q.   Yes.  The answer is no, you do not, correct?  Have you ever

24   interviewed any of the gatekeepers?

25   A.   No.  I have not.

1    Q.   Have any of them been arrested?

2    A.   Not at this time.

3    Q.   Has law enforcement officer interviewed any of the

4    gatekeepers?

5    A.   Do not know.

6    Q.   Has it been reported to you that any law enforcement

7    officers interviewed any of the gatekeepers?

8    A.   No.

9    Q.   Now, you've told us Carlos Nayen was present at an auction

10   where two horses and two foal were purchased, and part of the

11   money to pay was by wire transfer and part was supposed to be

12   $650,000 in cash.  Remember that incident you testified about?

13   A.   Yes.

14   Q.   Okay.  Which auction was that?

15   A.   Heritage Place 2010, I believe.  It was the Dashin Follies,

16   Coronita Cartel purchase.

17   Q.   So the answer is Heritage Place 2010?

18   A.   Let me double-check.  January 2010.

19   Q.   Okay.  Carlos Nayen was observed at the Heritage Place 2010

20   January auction, correct?

21   A.   Yes.

22   Q.   And who observed him there?

23   A.   One of the CIs.

24   Q.   Okay.  And did the CI report to you that Carlos Nayen

25   actually bid on any horses?

1   A.    No.

2   Q.    Did he report that he acted as a broker on any horses?

3   A.    No.

4   Q.    Did he report that he personally purchased any horses?

5   A.    No.

6   Q.    What did Carlos -- what was it reported to you by the CI

7   that Nayen did at that particular auction?

8   A.    He was attempting to assist in the payment of the horses.

9   Q.    Okay.  He attempted to assist in the payment.  How did he do

10  that?  How did he attempt to assist?

11  A.    By offering to give the $650,000 in currency to Heritage

12  Place.

13  Q.    Okay.  Who did he offer to pay the currency to?

14  A.    I don't know if it was Heritage Place itself, an employee at

15  Heritage Place, or CI 7.

16  Q.    Now, are you telling us that your CI reports that he walked

17  up to an employee of Heritage Place and asked them if they would

18  accept $650,000 in cash?  Is that your testimony?

19  A.    How it actually took place, I do not know.  I don't know if

20  it was through CI 7 or if it's through an employee.  I don't

21  recall that.

22  Q.    So you allege that he offered to assist.  We don't have the

23  faintest idea how he did it, right?

24  A.    He talked to somebody and explained that the currency was in

25  Laredo, Texas and that somebody would have to go to Laredo, Texas

1   to get the currency.

2   Q.   Who did he talk to?  Who's somebody?

3   A.   Apparently it's CI 7.

4   Q.   So he didn't talk to an auction official and he didn't

5   attempt to pay an auction official or an auction company, did he?

6   A.   The auction owner refused to receive that much in currency.

7   Q.   No.  That's not my question.  My question simply stated

8   is --

9            MR. GARDNER:  Your Honor, I think it was his question.

10  So we're going to object and allow the Court to let the witness

11  answer the question that was posed.

12           MR. RUBINO:  I'd appreciate if he would answer the one

13  posed.

14           THE COURT:  Okay.  Answer the one posed.

15  Q.   (BY MR. RUBINO) Which simply stated is --

16           MR. GARDNER:  Judge, I think the witness --

17           THE COURT:  Mr. Gardner, what was the question then?

18           MR. RUBINO:  Let's have them read it back, then, if

19  that's what it takes.

20           THE COURT:  We don't have a read it back.

21           MR. RUBINO:  Okay.

22           MR. GARDNER:  Question was, what was the somebody, and

23  the witness was answering that somebody was the auction owner,

24  and he was not allowed to finish that question.  I think he

25  should be allowed to finish the question asked, your Honor.

```
 1              THE COURT:  Well, if it's the auction owner, it's the
 2    auction owner.  Is it the auction owner?
 3              THE WITNESS:  It says -- I don't know if it's the
 4    auction owner or CI 7 that actually provided the information.
 5              THE COURT:  Okay.  That was the question.  So that was
 6    the answer.
 7    Q.   (BY MR. RUBINO) The answer is I don't know.
 8    A.   Do not know.
 9    Q.   Now, he was observed at the Heritage Place auction in
10    September 15th, he meaning the defendant, September 15th, 2011
11    also.  Am I correct?
12    A.   September 15th, 2011?
13    Q.   I think that was the date you gave.
14    A.   All right.  Are you talking about Heritage Place?
15    Q.   Okay.
16    A.   Are you talking about Ruidoso?
17    Q.   That's what I understand.  Correct me if I'm wrong.
18    A.   Okay.
19    Q.   My notes say, Nayen was observed at an auction and photos
20    were taken of him.  That's the one I'm speaking of.
21    A.   I believe that was Ruidoso.
22    Q.   I'm sorry, sir?
23    A.   Ruidoso, New Mexico.
24    Q.   My mistake.  Okay.  At Ruidoso, New Mexico, he was observed
25    at an auction, correct?
```

```
 1   A.   Yes.
 2   Q.   How many other people were observed at that auction?
 3   A.   FBI had set surveillance up to observe -- let me get to that
 4   place and I'll tell you.
 5   Q.   Well, let me make it simple for you.  Weren't there hundreds
 6   of people observed there?
 7   A.   They were folks on -- okay.  Here it is.  September 3rd
 8   through 5th, 2010, FBI agents observed Jose Trevino, Carlos
 9   Nayen, Sergio Rincon, Rene Ruiz, Raul Ramirez, Jr. and others.
10   Q.   Okay.  So that's five or six people they observed.  Weren't
11   there hundreds of people there?
12   A.   Yes.
13   Q.   How did they not observe hundreds of other people?
14   A.   They were concentrating on those individuals I just
15   mentioned.
16   Q.   So out of the hundreds, they only saw five of them is your
17   testimony?
18   A.   No.  My testimony is that they went there to surveil Jose
19   Trevino, Carlos Nayen, Sergio Rincon, and they identified Rene
20   Ruiz, Raul Ramirez, Jr. as people that were associated with Jose
21   Trevino and Carlos Nayen.
22   Q.   Okay.  Now, they observed Nayen there.  Did they observe
23   Nayen purchase any horses?
24   A.   No.
25   Q.   Did they observe him bid on any horses?
```

1    A.    That was done through Rene Ruiz.

2    Q.    Did they observe him bid on any horses?

3    A.    Personally bid, no.

4    Q.    Did they observe him act as a broker?

5    A.    Personally, no.

6    Q.    Did they observe him sign any documents?

7    A.    No.

8    Q.    Now, that's the time when $2.2 million worth of horses were

9    purchased.  I think it was 23 horses, was it not?

10   A.    Correct.

11   Q.    Okay.  And he did not buy, bid, purchase, or broker that

12   sale, did he?

13   A.    Not personally.

14   Q.    Now, you say a CI says Nayen would get 20 to 25 kilos.  Is

15   that the same CI, CI 1 we talked about earlier?

16   A.    Yes.

17   Q.    Now, did CI 1 -- he says Nayen would get them.  How does he

18   know?  Did he provide them to him?

19   A.    Yes.

20   Q.    Personally?

21   A.    That I do not know.

22   Q.    How many occasions did he provide them to him?

23   A.    I think twice a week for October 2010 through January 2011,

24   25 kilograms of cocaine every two weeks.  And then, he had an

25   additional cocaine source of another supply link to Los Zeta.

1   Q.   Now, is it CI 1's testimony to you or another law

2   enforcement officer that Nayen would actually distribute this

3   cocaine?

4   A.   He had a man named "Yo-Yo" that acted as his right-hand man

5   who had actually was responsible for moving the narcotics for

6   him.

7   Q.   Now, are there any audio recordings of Nayen?

8   A.   Yes.

9   Q.   All right.  Are these audio recordings that were made

10  personally or made on the telephone?

11  A.   Telephone.

12  Q.   No personal ones?

13  A.   Correct.

14  Q.   Were there any video recordings of Nayen?

15  A.   No.  There's photographs at the auctions, but I don't know

16  that they video-ed it.

17  Q.   Okay.  There are no other photos/videos other than that at

18  auctions, correct?

19  A.   I believe that's correct.

20  Q.   Have you seized or obtained any physical evidence against

21  Nayen?

22  A.   Such as?

23  Q.   You tell me what you may have seized either came from,

24  belongs to him.

25          MR. GARDNER:  Excuse me, your Honor.  I'm going to

1    object.  This is a detention hearing as been noted by other

2    defense attorneys, not a discovery hearing.  He files an

3    appropriate motion, I'll give him everything we've seized as it

4    relates to this defendant.

5             THE COURT:  I have no doubt you won't, but a minute

6    ago, we talked about weight of the evidence as a factor and we

7    got into details.  So go ahead.

8    Q.   (BY MR. RUBINO) You may answer the question.

9    A.   There's a number of things we have in our possession.

10   Financial documents.  They seized some things from his residence

11   in California.  I have not had a chance to review those documents

12   or those -- those items from California.

13   Q.   Okay.  I have nothing further.  Thank you, your Honor.

14            THE COURT:  Thank you.

15                    RE-DIRECT EXAMINATION

16   BY MR. GARDNER:

17   Q.   You recall the question by Mr. Rubino that Carlos Nayen --

18   and I don't know if I got the words right -- bid, purchased, buy,

19   broker, signed for any horses.  You recall those sets of

20   questions?

21   A.   Yes.

22   Q.   Why is he going to all these auctions then?  Is he an

23   auction groupie?

24   A.   No.  The witnesses said --

25            THE COURT:  The question was, is he an auction groupie?

```
 1   A.   No.

 2   Q.   (BY MR. GARDNER) Okay.  So why is he at all these auctions

 3   if he's not doing anything?

 4   A.   He's directing other people to buy horses for the

 5   organization, according to the witnesses.

 6   Q.   Okay.  According to the other witnesses?

 7   A.   Yes.

 8   Q.   And when you talk about CIs, you take a CI at his word

 9   alone?

10   A.   No.  You've got to corroborate it.  Corroborate the CI.

11   Q.   Okay.  And all these CIs, are all of them facing criminal

12   charges?

13   A.   No.

14   Q.   Are some just concerned citizens?

15   A.   Yes.

16   Q.   Okay.  And have you interviewed other witnesses that are not

17   listed as CIs involved in this case?

18   A.   Yes.

19   Q.   Okay.  Pass the witness, your Honor.

20            MR. FINN:  One question, your Honor.

21            THE COURT:  Sure.

22                    RE-CROSS EXAMINATION

23   BY MR. FINN:

24   Q.   I think I can hear somebody's stomach grumbling for lunch

25   and it could be mine, if not yours.
```

1          Agent, you've referred during your testimony to, a

2    number of times, CI 1, CI 2, CI 3.  What's the grand total of CIs

3    that you've testified about today?

4    A.   We have, I think, eleven CIs in the affidavit.  Since then,

5    we have talked to several more individuals that I think would

6    fall into that category and be a CI.  So we're --

7    Q.   Let me interrupt you so we can expedite this.

8          When this case goes to trial and we have a transcript

9    of this hearing and it has you referencing CI 1, CI 2, we might

10   not be able to know who you're referring to.  Would you be

11   willing, if the Court asks you to do so, to write down the

12   identities?  You don't need to give them to me, but give them to

13   the Court, you know, under seal, ex parte so that, down the road,

14   we know exactly who you're referring to.  Would you be willing to

15   do that if the Court requested it?

16          MR. GARDNER:  Your Honor, I'm going to object at this

17   point.  That's more appropriate for a motion to disclose the name

18   of the CI.  And then, if we do get to trial, we could always

19   cross-examine them on the CI.

20          MR. FINN:  The problem with that, Judge, and I'm doing

21   this for a reason.  I've had this happen where at a detention

22   hearing, the witness says, CI 1, 2, 3, 4, 5.  If there's not some

23   record somewhere as to who he's referring to as CI 1 here today,

24   there's a chance that it's going to be confusion by the time we

25   get to trial.

1        THE COURT:  Well, I see what you're worried about, but

2   I'm going to sustain the objection.  The reason I am is if he's

3   deviating from who 7 is, who 8 is, who 1 is at a trial, he's

4   opening himself up, or the government has certainly, to some

5   pretty good cross-examination.  That would be a point I think

6   you'll make at trial.

7        MR. FINN:  Right.  As long as I know.  I mean -- and

8   I'm not suggesting that the government is devious or wouldn't

9   give Brady or Jencks or Giglio.  I'm just saying I have been down

10  this road before and it's caused confusion.  But I respect your

11  ruling.  That's all I have.  Thank you.

12       THE COURT:  Thank you, Mr. Finn.  Mr. Womack, anything

13  further?

14       MR. WOMACK:  No questions.

15       THE COURT:  Mr. Rubino?

16       MR. RUBINO:  No, sir.

17       THE COURT:  All right.  Of these CIs that you've

18  mentioned, Agent Pennington, you know, I know y'all have many

19  decisions to make, but is, like, CI 1 number prepared to testify?

20       THE WITNESS:  Yes.

21       THE COURT:  Seven and 8?

22       THE WITNESS:  Yes.

23       THE COURT:  Then why do you believe them?

24       THE WITNESS:  Because we have corroborated them with

25  other Cs with documentation.

1          THE COURT:  Okay.  That's all I have.  You can step

2   down.

3          MR. GARDNER:  Your Honor, we would -- we have no other

4   witnesses with respect to the evidence.  I would like to call,

5   however, Ms. Stacy Salinas with regards to some of the

6   verification she made in her reports.

7          THE COURT:  Well, she's not here right now.

8          MR. GARDNER:  Your Honor, I sent her an e-mail this

9   morning, said I would like her to be present for testimony.

10          THE COURT:  Okay.  David, can you call her and get her

11   over here?  And we'll, of course, get her here.  But anything

12   further that you need?

13          MR. GARDNER:  Your Honor, about the only thing I would

14   ask the Court to do -- I'm not asking the Court take judicial

15   notice of the Pretrial Services report on either Miguel Trevino

16   or Fernando Garcia.  I will add to the Court --

17          THE COURT:  You are or are not?

18          MR. GARDNER:  Are not.  I am asking the Court with

19   respect to the Pretrial Services report out the Central District

20   of California with respect to Mr. Nayen, and there's two of them,

21   your Honor.  I don't know if the Court's seen both of those.

22          THE COURT:  No.  I've got them.

23          MR. GARDNER:  Particularly with respect to the fact

24   that he declined to provide an interview with the Pretrial

25   Services report.  But absent Ms. Salinas, your Honor, and I don't

1    know if the defense has any witnesses.

2              THE COURT:  Well, Mr. --

3              MR. GARDNER:  I don't have anything else.

4              THE COURT:  Let me ask you this.  If Ms. Salinas were

5    called to testify, I mean, do you have a proffer that can get us

6    where we need to be?

7              MR. GARDNER:  Maybe, your Honor.  I am concerned that

8    her only source of verification for Jose Trevino-Morales is the

9    codefendant's wife.  I mean, I -- in my opinion, taking the

10   wife's unverified word as a codefendant presents all kinds of

11   problems.  The statements that Mr. Trevino makes with respect to

12   he doesn't know the value of his own ranch, wasn't verified.  Ms.

13   Salinas had the opportunity to call the agents, call other folks,

14   call INS with respect to border crossing.  So I'm concerned that

15   the report with both respect to Mr. Garcia and Mr.

16   Trevino-Morales, they're essentially unverified.

17             THE COURT:  Well, I guess my quick thinking here is

18   that whether I take judicial notice of it or not, I've read it.

19   I've read the report.  And so, we both know what's in the report.

20   And I think what you're talking about is more argument than it

21   is --

22             MR. GARDNER:  Right.  I mean, I can make the argument,

23   your Honor.  Let me just -- give me a second, please.

24             If I could direct the Court's attention to Mr. Garcia's

25   Pretrial Service report.  Your Honor, he mentions that he -- his

1    parents live in -- and siblings live here in Texas.  However, in

2    his post-arrest interview, he mentions that he has family members

3    in Mexico, something he didn't mention or something that Ms.

4    Salinas didn't inquire into.

5         THE COURT:  Right.  But I think you established that,

6    didn't you?

7         MR. GARDNER:  I agree, your Honor.  I'm just pointing

8    out to that.  So I'm a little concerned with respect to that

9    verification.  And I guess this is sort of argument in advance of

10   argument.  Your Honor, I'm also concerned that, you know, she

11   used Veronica Aguirre as someone who obviously has a bias for Mr.

12   Garcia as the sole source of verification, particularly with the

13   terms of employment history, because as you've seen, he only

14   lists Bonanza Racing Stables as his employment, but he also owns

15   his own business Garcia Bloodstock.  And there's also insurance

16   document indicates he has a managerial position with a company

17   called Fast And Furious.  So I'm a little concerned with the

18   employment history with respect to him, your Honor.

19        Your Honor, with respect to Mr. Jose Trevino Morales

20   where he talks about three siblings, well, two of the siblings

21   are probably the most violent drug traffickers in Mexico.  So I'm

22   a little concerned as to the extent that Ms. Salinas went into

23   questions of Mr. Trevino regarding his contact with his two

24   brothers.  The travel history shows he crossed in May of 2012.

25   So I was concerned about when she -- if she asked him

1    specifically the last time he crossed because, in my opinion,

2    crossing two months prior is something you can fairly remember.

3    I'm concerned with the fact that he doesn't know the payment for

4    the properties in Lexington, Oklahoma, despite the fact obtaining

5    the properties in this year.

6              THE COURT:  But, see, I guess what I'm suggesting is

7    that Ms. Salinas is going to say that Mr. Trevino and Mr. Garcia

8    said what is in the report, and to the extent you believe it's

9    inaccurate, you've attempted through Agent Pennington to impeach

10   that.

11             MR. GARDNER:  I agree, your Honor.  No.  I totally

12   agree.  I mean, I'm not saying I need to call her.  I just wanted

13   to make sure that those inconsistencies were pointed out based on

14   the evidence and the fact that the verification of the Pretrial

15   Services report wasn't as complete.

16             THE COURT:  You know what my favorite part of hearings

17   is?

18             MR. GARDNER:  What's that, Judge?

19             THE COURT:  The lawyering part.  So I'm going to

20   suggest that that's argument.  And then, I'm looking forward to

21   hearing your argument.  But why don't we start -- if there's no

22   other evidence and to be presented by the defense, do y'all have

23   something -- anything Mr. Finn?  Mr. Womack?

24             MR. FINN:  No, your Honor.

25             MR. WOMACK:  No, sir.

1              THE COURT:  Mr. Rubino?  All right.  Then let's argue.

2    Mr. Finn, since you've gone first, why don't you take the

3    lectern.

4              MR. FINN:  Your Honor, based on the evidence that

5    you've heard and seen, I'm willing to do something that I don't

6    think I've ever done in a detention hearing, and I'll waive

7    argument if the government will.

8              MR. GARDNER:  No, your Honor.  Appreciate the offer.

9              MR. FINN:  All right.

10              Your Honor, I can represent to you that my client has a

11    extensive family, a very good family.  I've met with them many,

12    many times in my office.  Many of them are here today.  If you're

13    -- if it's okay, could I ask them just to stand so you know?

14              THE COURT:  Absolutely.

15              MR. FINN:  If you're here for Jose, please stand.

16    Thank you.  We've got his wife here, his daughter here, his son

17    here.  I think grandmother, grandfather, et cetera.  He has no

18    criminal history.

19              THE COURT:  And I'd note for the record about ten

20    people stood up.  But they can sit down now.

21              MR. FINN:  No criminal history whatsoever.  The

22    government's got his passport.  And despite the argument or

23    observations by the government, Judge, you know as well as I do,

24    and everybody in this courtroom knows, the last place on this

25    planet that my client is going to go, given the publicity

1   surrounding this case, is Mexico.  He's not an idiot.  And based

2   on the allegations, and the fanfare, and the press, and the

3   drumbeating, and the chest beating, trying to turn what is

4   essentially a money-laundering case into something that it's not,

5   I won't say it's offensive because the government has a job to

6   do.  And what's going on with our neighbors to the south is

7   tragic, it's horrific, I get that, but that's not why we're here

8   today.

9          My client was a very good horseman.  He grew up on a

10  ranch.  He learned about horses and cows.  And the reason he

11  picked horses over cows is because horses could run.  And he's

12  really into this invitro fertilization stuff.  I mean, he's not

13  faking it.  He's really into it.  And I'd submit the government

14  is making my case for me.  They're trying to tar and feather and

15  blame my client for what his brothers in another country

16  allegedly have done.  That's not fair.  That's not right.  That's

17  not America.  There's not a presumption for detention in this

18  case.

19         You put my client's wife, who's similarly situated, on

20  a unsecured bond last week, took her passport, put restrictions

21  on her.  I submit to you, based on everything you've seen and

22  heard and, more importantly, Judge, which you have not heard, my

23  client should be released.  Thank you.

24         THE COURT:  Thank you, Mr. Finn.  Mr. Womack.

25         MR. WOMACK:  Yes, sir.

1                  Your Honor, similarly, what Fernando Garcia does is he

2       trains horses.  And in this case, the government has clearly cast

3       their net too wide.  They're looking for Los Zetas out of Mexico,

4       a laudable thing for the government to do.  They should do that.

5       But here, they have cast this net so wide that they're bringing

6       up people who are trainers, gallop boys, which are like trainee

7       jockeys, people that are on the periphery of horse racing or that

8       are part of training horses for horse racing.

9                  As the agent said, he has no evidence of Fernando -- no

10      evidence of Fernando Garcia doing anything that on its face is

11      illegal.  Fernando Garcia is a 29-year-old horse trainer.  He's

12      lived in America since he was three weeks old.  He's a lawful

13      permanent resident of this country.  His family is also here.  If

14      y'all would stand up, please.  Y'all in the back row here.

15      That's his father, his mother, his sister.  His brother couldn't

16      be here.  He's at work down in Mission.  And his fiance Veronica

17      is here.  Y'all could have a seat.  Thank you.

18                  We do ask your Honor to take notice of the Pretrial

19      Services report.  You've already read it.  His father and mother

20      are here to sign.  In fact, they've already signed the documents

21      for Pretrial Services to act as sureties and third-party

22      custodians.  Mr. Garcia will live with his parents.  His fiance

23      lives a mile away.  They don't live together.  They never have.

24      She lives with her mother.  And he'll be living with his parents

25      one mile away with his family.

1          Now, he may have family in Mexico, but his immediate

2   family -- and this is verified and they're sitting here.  His

3   immediate family lives in Mission, Texas.  So he will go back

4   home with his family.  He'll surrender his U.S. passport -- I

5   mean, his Mexican passport.  He'll surrender that to the Court,

6   if it's not already been seized.  But he'll give that to the

7   Court.  He is not a flight risk.  Certainly a horse trainer who

8   is named in the press as being part of this big case involving

9   Zetas supposedly is not going to run back to Mexico for any

10  reason.

11         He's not insulated in any way.  As the special agent

12  said, they don't know of him ever even meeting a Zeta in Mexico.

13  There's no suggestion that he has some safe house to hide in,

14  that that's absurd.  Mr. Garcia is not going to run away.  He's

15  going to stay here, and the evidence against him is so scant as

16  to be nonexistent.  He's going to stay here and the case will be

17  dismissed or he'll win it, but he's not going anywhere.  His

18  family will see to that.  The Court will see to that.  And he's

19  an outstanding candidate for bond in this case.  And we'd ask

20  that you go along with the recommendations of Pretrial Services.

21  Thank you.

22         THE COURT:  Thank you, Mr. Womack.  Mr. Rubino.

23         MR. RUBINO:  Your Honor, we've never met before, but

24  when I appear before a court, I believe that my credibility is at

25  stake as much as anything else.

1          Let me give you a little background on Mr. Nayen.  Mr.

2     Nayen is a Mexican national.  He's here on a tourist visa.  He

3     owns no property or assets in the United States.  He has no

4     friends, no relatives in the United States.  Essentially he has

5     no ties to the community.  He has his second federal indictment

6     in the Eastern District of Texas.  So if you release him, he'll

7     go to the Eastern District.  If they release him, immigration's

8     going to pick him up.  He's a perfect candidate for pretrial

9     detention.  We so stipulate.  But it's been a good discovery

10    proceeding.

11          THE COURT:  Yes.  Thank you, Mr. Rubino.  Mr. Gardner.

12          MR. GARDNER:  Your Honor, Mr. Trevino and Mr. Garcia

13    are so scared to go to Mexico, why do they keep going down there?

14    If it's such a violent place and they're so scared and they don't

15    have sanctuary, why do they keep going to Nuevo Laredo, Zeta

16    central?  You know, again, the big elephant in the room is this

17    man is the brother of two of the most violent drug traffickers in

18    Mexico.  He's farming his horse-racing business, Snowy Cartel,

19    Mr. Ease Cartel associated with Garcia, Number One Cartel

20    associated with Mr. Garcia and Mr. Trevino.  They're farming

21    their connections to the drug-trafficking organization.  So when

22    they say the evidence is weak, I know they haven't looked at it

23    all yet.  They've seen the two 70-page affidavits which, I

24    submit, are fairly similar.  But I understand that they have a

25    role in this proceeding and they have to support their client's

1  position.

2          Your Honor, I think the evidence is clear from the

3  multiple witnesses, whether they're witnesses who are attempting

4  to gain some favor or benefit from the government, whether

5  they're witnesses in the business, or whether they're witnesses

6  who have come forward, they're all corroborated, according to the

7  agent's testimony, by documentations from AQHA showing a pattern

8  here of buying horses and then, eventually transferring them into

9  Mr. Jose Trevino's name.  So I don't think they've seen or

10  understand the significance of the evidence against both of these

11  folks.

12          Your Honor, when someone says, we all know those are

13  the Zetas' stables, meaning Mr. Garcia's stables, you can't tell

14  me that he does not have an awareness, a college-educated man, of

15  working with Jose Trevino.  You can't tell me he's not aware that

16  he is working with horses run by a drug-trafficking organization.

17  Your Honor, I'd also submit to you that his statements to the

18  special agent minimize his role.  They conflict with his

19  statements to Pretrial Services.  Mr. Jose Trevino's statements,

20  again, minimize his assets and his roles.  They are unverifiable.

21          Your Honor, the flight risk, the sanctuary that these,

22  -- well, two gentlemen now have in Veracruz, the state of

23  Veracruz, based on the funding by Mr. Cessa, I think indicates

24  that the Court cannot set any conditions that would ensure that

25  these two wouldn't flee and stay down there, like their brothers

```
 1    have for the past decade, unencumbered, unmolested by law

 2    enforcement --

 3              MR. FINN:  Judge --

 4              MR. GARDNER:  -- either the Mexican federal --

 5              MR. FINN:  I'm sorry.  I don't normally object in

 6    closing argument but --

 7              MR. GARDNER:  Thought you were going to waive.

 8              MR. FINN:  -- there's no evidence -- I was going to

 9    waive, but you refused to waive.  There's no evidence about what

10    his brothers did or didn't do.  None.  I haven't heard that once

11    in this hearing.

12              THE COURT:  I told you a minute ago, I love the

13    lawyering, so I'm going to let Mr. Gardner make his argument.

14    It's not a jury trial.  We're just at a detention hearing.

15    You'll certainly have the opportunity to respond.  Go ahead, Mr.

16    Gardner.

17              MR. GARDNER:  Again, your Honor, there's two brothers

18    with their 20 to $25 million a month that they can pay for

19    bribes, they can pay for payoffs, they could take care of law

20    enforcement, more than establish that they have a sanctuary down

21    there that they can flee to and remain outside the presence and

22    the connections to U.S. law enforcement.

23              THE COURT:  Let me ask you this.  Are you suggesting,

24    then, that they remain a flight risk?  But what's your position

25    on danger to the community?
```

 1          MR. GARDNER:  Your Honor, again, as Mr. Rubino says, my

 2  credibility is at issue here.  I cannot say but for some

 3  ephemeral connection to their brothers committing violence that

 4  they are a danger to the community.  I would agree with Mr. Finn

 5  to some extent, although they're using drug money, their hands

 6  aren't touching the drug, except for Mr. Nayen obviously.

 7          THE COURT:  Okay.

 8          MR. GARDNER:  So.

 9          THE COURT:  Anybody want to respond?  Mr. Finn?  Mr.

10  Womack?  Mr. Rubino?

11          MR. RUBINO:  Judge, one correction.

12          THE COURT:  Yes, sir.

13          MR. RUBINO:  He keeps referring to don't have any

14  brothers.  My client's brother lives in Mission, Texas.  He's not

15  related in any way to the Morales-Trevino brothers in Mexico.

16          THE COURT:  Okay.  All right.  Anything else from

17  anybody?  Okay.

18          The statute requires me to release people on the least

19  restrictive conditions that I can come up with that guarantee

20  their appearance in court and, also, allow for the safety,

21  continued safety of the community.  The government has -- has at

22  least conceded somewhat that these three gentlemen do not

23  represent an immediate threat to the community.  However, they

24  continue to argue that all three of you are -- represent a risk

25  of nonappearance.

1          I'll start with the easiest one.  Mr. Garcia, the

2    Pretrial Services office has recommended your release on

3    conditions of bond, and that is what I intend to do is to follow

4    the Pretrial Services recommendation with regard to your release.

5          Mr. Nayen, you know, you have a right not to talk to

6    Pretrial Services, and as your attorney indicated, though, you're

7    not a really good candidate right now for release for all the

8    reasons that your attorney stated.  He's just being candid.  But

9    he represented you very well, I think, this morning.  So you will

10   be detained pending further proceedings in your case.

11         Mr. Trevino, while your wife was released last week, I

12   have to tell you, I find the evidence to be quite different in an

13   analysis of your wife's situation than your situation.  You have

14   also been represented capably by Mr. Finn this morning.  But,

15   sir, I'm going to order that you continue to be detained pending

16   further disposition of this case, and the reasons for that is I

17   do find that you are a flight risk and there are no conditions

18   that I can come up with that are sufficient to guarantee that

19   your continued appearance in this case.  And I'll enter an order

20   to that effect to state the reasons in a little more detail.

21         But basically your association with the two primary

22   defendants in this case who remain fugitives and have been

23   fugitives, according to the government's evidence, on federal

24   indictments since 2001, the fact that you are a bricklayer as

25   soon as, I don't know, what, three or four years ago, making

```
 1   $60,000 a year and now you're running multi-million-dollar
 2   ranches and enterprises involving millions of dollars of horses.
 3   That's what jumps out at me there.
 4            So those are going to be my rulings, gentlemen.  And
 5   unless anybody has anything further, I want to move on to Mr.
 6   Garcia.  Mr. Finn, do you have something?
 7            MR. FINN:  Yes, your Honor.
 8            THE COURT:  Yes.
 9            MR. FINN:  I don't know the proper procedure, but we do
10   plan to appeal your decision.
11            THE COURT:  Sure.  Absolutely.
12            MR. FINN:  Can I do so now orally on the record, or I
13   do I need to file some sort of motion?
14            THE COURT:  I don't know.  But why don't you do
15   something on the record for starters, and then, we'll get back
16   with you and let you know.
17            MR. FINN:  Your Honor, on behalf of my client, we would
18   like to appeal to the district court your decision not allowing
19   my client out on any bond whatsoever.
20            THE COURT:  Okay.  Mr. Finn, very good.
21            MR. FINN:  Thank you.
22            THE COURT:  Mr. Womack, Mr. Rubino, anything further?
23            MR. WOMACK:  No, sir.
24            MR. RUBINO:  No, sir.
25            THE COURT:  Okay.  Mr. Sartin, do you want to take two
```

1    of the defendants away and then, we'll move on to Mr. Garcia.

2          MR. GARDNER:  Your Honor, I apologize.  One sort of

3    collateral matter.

4          THE COURT:  Yes, sir.

5          MR. GARDNER:  Judge Sparks entered a protective order

6    with respect to the horses.  I have given Mr. -- I've not given

7    Mr. Rubino a copy today.  I can.  But I've given Mr. Finn and Mr.

8    Womack a copy.  Both -- all defendants are listed in there as --

9    under the protective order by Judge Sparks as ensuring that the

10   assets that the government has provided notice of forfeiture for

11   are protected and cared for, and if such an occasion comes to

12   pass that they cannot, they alert the government in a timely

13   manner.

14         So I would just ask the Court -- I'm not asking for

15   that to be a special condition of Mr. Garcia's bond, since Judge

16   Sparks has already entered that order.  But I would just ask the

17   Court to make sure that either through representation of the

18   defendants by their attorney that they understand a protective

19   order's in place, and either through their attorneys or

20   designated representative, they will contact the government in

21   the event that the care and feeding of the horses cannot be

22   accomplished.

23         THE COURT:  I guess my quick thought, because this came

24   up last week, I just don't see this particular magistrate court

25   having a dog in that fight right now.  If Judge Sparks sends it

1  back to me for some type of disposition, I'll look into it.  My

2  sense would be you can work with the lawyers on that.  They'll

3  acknowledge probably at least electronic receipt of that

4  protective order, and I think you can go further from there.

5          MR. GARDNER:  Yes, sir.  I just wanted to make sure it

6  was on the record so that -- at this hearing, since I have all

7  defendants and the attorneys are aware of the protective order

8  so.

9          THE COURT:  Absolutely.

10         MR. GARDNER:  But I'll work with them.  Thank you, your

11 Honor.

12         THE COURT:  Mr. Gardner, thank you, sir.

13         All right.  Take a minute here to let the Marshal

14 Service escort Mr. Trevino and Mr. Nayen out.  And then, we'll

15 have Mr. Garcia and Mr. Womack approach the lectern once they

16 leave -- left.

17              (Proceedings conclude at 12:42 p.m.)

18

19

20

21

22

23

24

25

1

2

3

4

5

6                          REPORTER'S CERTIFICATE

7

8      I, LILY I. REZNIK, DO HEREBY CERTIFY THAT THE FOREGOING WAS

9   TRANSCRIBED FROM AN ELECTRONIC RECORDING MADE AT THE TIME OF THE

10  AFORESAID PROCEEDINGS AND IS A CORRECT TRANSCRIPT, TO THE BEST OF

11  MY ABILITY, MADE FROM THE PROCEEDINGS IN THE ABOVE-ENTITLED

12  MATTER, AND THAT THE TRANSCRIPT FEES AND FORMAT COMPLY WITH THOSE

13  PRESCRIBED BY THE COURT AND JUDICIAL CONFERENCE OF THE UNITED

14  STATES.

15

16  /s/Lily I. Reznik                    August 2nd, 2012

17  LILY I. REZNIK                       DATE

18

19

20

21

22

23

24

25