1            UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF TEXAS
2                  AUSTIN DIVISION

3   UNITED STATES OF AMERICA     ) Docket No. A 12-CR-210 SS
                                 )
4   vs.                          ) Austin, Texas
                                 )
5   JOSE TREVINO-MORALES (3)     )
    FRANCISCO ANTONIO            )
6   COLORADO-CESSA (6)           )
    FERNANDO SOLIS-GARCIA (7)    )
7   EUSEVIO MALDONADO-HUITRON(11) )
    JESUS MALDONADO-HUITRON (18) ) April 15, 2013

8

9              TRANSCRIPT OF TRIAL ON THE MERITS
               BEFORE THE HONORABLE SAM SPARKS
10                  Volume 1 of 15

11  APPEARANCES:

12  For the United States:      Ms. Michelle E. Fernald
                                Mr. Douglas W. Gardner
13                              Assistant U.S. Attorneys
                                816 Congress Avenue, Suite 1000
14                              Austin, Texas 78701

15  For Defendant Trevino-      Mr. David M. Finn
    Morales:                    Milner & Finn
16                              2828 North Harwood Street
                                Suite 1950, LB9
17                              Dallas, Texas 75201

18                              Ms. Christie Williams
                                Mills & Williams
19                              1112 South Rock Street
                                Georgetown, Texas 78626
20
    For Defendant Colorado-     Mr. Mike DeGeurin
21  Cessa:                      Mr. M. Andres Sanchez-Ross
                                Foreman, DeGeurin & DeGeurin
22                              300 Main Street
                                Houston, Texas 77002
23
                                Mr. John Parras
24                              Republic Bank Building
                                1018 Preston, Floor 2
25                              Houston, Texas 77002

1    **(Appearances Continued:)**

2    For Defendant Solis-Garcia:  Mr. Guy L. Womack
                                  Guy L. Womack & Associates
3                                 402 Main Street, Suite 6 North
                                  Houston, Texas 77002
4
     For Defendant Eusevio        Mr. Richard D. Esper
5    Maldonado-Huitron:           Esper Law Office
                                  801 North El Paso Street, 2nd Floor
6                                 El Paso, Texas 79902

7    For Defendant Jesus          Mr. Thomas Brent Mayr
     Maldonado-Huitron:           Law Office of Brent Mayr
8                                 4101 Washington Avenue, 2nd Floor
                                  Houston, Texas 77007
9

10   Interpreters:                Mr. Peter Heide
                                  Ms. Christina Helmerichs
11

12   Court Reporter:              Ms. Lily Iva Reznik, CRR, RMR
                                  501 West 5th Street, Suite 4153
13                                Austin, Texas 78701
                                  (512)391-8792
14

15

16

17

18

19

20

21

22

23

24

25   Proceedings reported by computerized stenography, transcript
     produced by computer.

| | | |
|---|---|---|
| 08:39:13 | 1 | THE COURT:  All right.  This is 12-CR-210, United |
| 08:39:16 | 2 | States vs. Miguel Trevino-Morales, et al. |
| 08:39:20 | 3 | I'll take announcements. |
| 08:39:22 | 4 | MR. GARDNER:  Good morning, your Honor. |
| 08:39:22 | 5 | Doug Gardner, Michelle Fernald and Daniel Castillo for |
| 08:39:26 | 6 | the United States.  Government's ready, your Honor. |
| 08:39:28 | 7 | THE COURT:  All right. |
| 08:39:31 | 8 | MR. FINN:  Morning, your Honor. |
| 08:39:33 | 9 | David Finn and Christie Williams for Jose |
| 08:39:37 | 10 | Trevino-Morales. |
| 08:39:37 | 11 | THE COURT:  All right.  Thank you, sir. |
| 08:39:41 | 12 | MR. DEGEURIN:  Your Honor, Mike DeGeurin, Andres |
| 08:39:47 | 13 | Sanchez and -- for Mr. Francisco Colorado.  We also have Andy |
| 08:39:56 | 14 | Parker and Juan Parras -- John Parras will be here later.  And we |
| 08:40:00 | 15 | have Mr. Robert Hirschhorn, who's helping us with jury selection. |
| 08:40:05 | 16 | MR. HIRSCHHORN:  Good morning, your Honor. |
| 08:40:05 | 17 | THE COURT:  We'll see.  Thank you. |
| 08:40:08 | 18 | MR. WOMACK:  Good morning, your Honor. |
| 08:40:09 | 19 | Guy Womack for Fernando Garcia-Solis. |
| 08:40:14 | 20 | MR. ESPER:  Good morning, Judge Sparks. |
| 08:40:15 | 21 | Richard Esper on behalf of Eusevio Maldonado.  We're |
| 08:40:18 | 22 | ready, your Honor. |
| 08:40:19 | 23 | THE COURT:  All right. |
| 08:40:24 | 24 | MR. MAYR:  Good morning, your Honor. |
| 08:40:25 | 25 | Brent Mayr for the Defendant Jesus Maldonado-Huitron, |

| | | |
|---|---|---|
| 08:40:29 | 1 | and we are ready to proceed. |
| 08:40:31 | 2 | THE COURT:  Mr. Huitron is -- goes by Mr. Maldonado? |
| 08:40:36 | 3 | MR. MAYR:  He goes by Mr. Huitron.  Yes. |
| 08:40:38 | 4 | THE COURT:  Okay.  And Mr. Eusevio goes by Maldonado? |
| 08:40:44 | 5 | MR. ESPER:  Eusevio Maldonado.  Yes -- no, no.  Goes by |
| 08:40:47 | 6 | Huitron, your Honor. |
| 08:40:48 | 7 | THE COURT:  Well, that's what I think. |
| 08:40:51 | 8 | MR. ESPER:  Throughout the trial, your Honor, I think |
| 08:40:52 | 9 | he's referenced by "Chevo."  That's a nickname that he has. |
| 08:40:55 | 10 | THE COURT:  Well, I won't use it. |
| 08:40:57 | 11 | MR. ESPER:  Thank you. |
| 08:40:57 | 12 | THE COURT:  That's Mr. Huitron? |
| 08:40:59 | 13 | MR. ESPER:  Yes, your Honor. |
| 08:41:00 | 14 | THE COURT:  All right.  How about Mr. Jose |
| 08:41:03 | 15 | Trevino-Morales?  Is he Mr. Trevino or Mr. Morales? |
| 08:41:08 | 16 | MR. FINN:  Trevino, your Honor. |
| 08:41:09 | 17 | THE COURT:  All right.  And I notice that Francisco |
| 08:41:12 | 18 | Antonio Colorado-Cessa goes by Mr. Cessa and Mr. Colorado.  Which |
| 08:41:17 | 19 | is preferred? |
| 08:41:19 | 20 | MR. DEGEURIN:  It's Colorado is his last name. |
| 08:41:25 | 21 | THE COURT:  And Fernando Solis-Garcia, Mr. Garcia? |
| 08:41:33 | 22 | MR. WOMACK:  Your Honor, Garcia. |
| 08:41:34 | 23 | THE COURT:  Thank you.  All right. |
| 08:41:36 | 24 | Counsel, let's get a few things down.  First off, as I |
| 08:41:41 | 25 | indicated earlier, one of the things that we were not able to |

08:41:47  1  convince the government on when they built this very nice

08:41:51  2  courthouse was public seating.  We have very limited public

08:41:57  3  seating.  The government in Washington has all of the

08:42:03  4  specifications for everything that is to be built, and in the

08:42:07  5  future, we will have the same in all new courthouses, which is a

08:42:12  6  mistake.  Apparently throughout the country, a lot of people

08:42:17  7  don't come to trials or have trials, and, of course, that's not

08:42:20  8  true in our part of the world.

08:42:24  9       So the jury panel, once it's seated, will be occupying

08:42:29  10  all of these temporary seats, the jury box, all of the seats on

08:42:34  11  this end, and I don't know how many rows on this end, which means

08:42:40  12  that I'm going to have to have probably most people in the

08:42:44  13  courtroom go to the jury assembly room, where this proceedings is

08:42:50  14  video-ed and audio-ed.  Two screens and the audio.

08:42:56  15       The difficulty is, I don't have enough interpreters in

08:43:00  16  there for the jury selection.  Once we've got the jury selected,

08:43:03  17  we will have, I think, sufficient seating for most of

08:43:09  18  particularly the members of the family that are going to be here.

08:43:13  19  But that's the only way we can accommodate this.  We've tried

08:43:17  20  even to select the jury in the jury assembly room, but that was

08:43:24  21  not as successful as I believe that we're going to do here today.

08:43:33  22       A couple of housekeeping.  I do not require you to say,

08:43:37  23  "May I approach the bench?"  Move around the court as you wish,

08:43:41  24  just don't get in the jury box.  I do require standing when you

08:43:48  25  are speaking.  And at any time that you wish, of course, you can

08:43:53   1   ask to approach the bench, this little thing right over here.

08:43:58   2   And the reason I'm sitting not in the center of things is, one,

08:44:03   3   so I can see the jury panel and, two, so I'm convenient here.

08:44:13   4   Let's double up, one lawyer after the other, so that the mainly

08:44:19   5   five lawyers who are responsible can hear what is going on.  But

08:44:22   6   it has, of course, the microphone to the court reporter.

08:44:32   7          How we're doing this, it is also typical of the

08:44:35   8   government, you should have two of these.  The first one in the

08:44:45   9   smaller package was the original that every juror gets in the

08:44:49   10  Western District of Texas.  It has some personal information.

08:44:53   11  The second one is the one that we set out and have obtained.

08:44:59   12  They will have the same numbering system.  For example, the first

08:45:06   13  one is 1A, which means it could have been a 1, then it goes to 2.

08:45:14   14         The seating chart that you're going to get that is

08:45:17   15  being run by the computer at the present time with the scramble,

08:45:22   16  and that type of thing, will have that number in -- if, for

08:45:29   17  example, if 28 in this stack is No. 1, there will be a 28

08:45:37   18  handwritten there.  So you'll be able to coordinate.  The reason

08:45:41   19  for that is the government's computers don't allow you to

08:45:45   20  exchange numbers.  So not anything I can do about that.

08:45:53   21         I intend to select a jury of 16.  And we're running

08:46:07   22  copies of the redacted indictment.

08:46:11   23         THE CLERK:  The indictment's already been taken care

08:46:14   24  of.

08:46:14   25         THE COURT:  Okay.  Now, have defense counsel had the

| | | |
|---|---|---|
| 08:46:19 | 1 | opportunity to look at the redacted indictment that's to be read |
| 08:46:23 | 2 | to the jury?  If there are any objections, I need to know them |
| 08:46:26 | 3 | now.  I asked the government to redact and to give you the |
| 08:46:34 | 4 | redacted one.  Since I know none of you are shy, I assume there |
| 08:46:41 | 5 | are no objections.  All right. |
| 08:46:55 | 6 | Now, counsel, I received requested voir dire from Mr. |
| 08:47:00 | 7 | Colorado and his counsel.  And I received requested voir dire |
| 08:47:05 | 8 | from Eusevio Huitron.  I did not receive voir dire from any other |
| 08:47:13 | 9 | defendant, not as filed as of to date.  So if you thought you |
| 08:47:17 | 10 | filed something. |
| 08:47:24 | 11 | MR. DEGEURIN:  I was going to work my way around the |
| 08:47:26 | 12 | speaker when I saw all of that.  It's a timing thing. |
| 08:47:30 | 13 | THE COURT:  It's all right. |
| 08:47:31 | 14 | MR. DEGEURIN:  Before we left voir dire -- I mean, the |
| 08:47:35 | 15 | juror questionnaires, is the Court aware that some of the jurors |
| 08:47:41 | 16 | did not have a supplemental questionnaire turned in?  Or at least |
| 08:47:46 | 17 | we never got one. |
| 08:47:48 | 18 | THE COURT:  You've got what we have.  Jury selection -- |
| 08:47:53 | 19 | I know this is going to come as a shock to Houston lawyers -- is |
| 08:47:56 | 20 | never perfect.  There will even be perhaps some that are still |
| 08:48:02 | 21 | filling them out now.  That's the best we could do. |
| 08:48:04 | 22 | MR. DEGEURIN:  That was my next question.  Those that |
| 08:48:06 | 23 | came in today or that will come in, I suppose we'll have time to |
| 08:48:11 | 24 | look at those before we -- |
| 08:48:12 | 25 | THE COURT:  Before you strike, you'll have them. |

8

```
08:48:14   1   Before you see them, you will have them.  Or you'll have them
08:48:19   2   simultaneously, in all probability, because the clerk can't see
08:48:26   3   them and can't feed the computer with the numbers without them
08:48:28   4   all being there.  Hopefully -- our folks are very good, and
08:48:34   5   hopefully it will be a short period of time.
08:48:37   6            MR. DEGEURIN:  And last thing and this is based on an
08:48:40   7   assumption, and I hate to do that being a lawyer, but I'm
08:48:44   8   assuming that some of the numbers will change because some jurors
08:48:49   9   were excused before.
08:48:51  10            THE COURT:  That's right.  There's no uniformity.  As
08:48:57  11   people were excused or not responsive in any way, those numbers
08:49:07  12   have filtered out.  So you could say we got 1A, 2, 12, 216, that
08:49:17  13   type of thing.
08:49:19  14            MR. DEGEURIN:  My request is that those that did fill
08:49:22  15   out the questionnaires or those that did that were excused, I
08:49:29  16   would like to have copies of their questionnaires preserved.
08:49:37  17            THE COURT:  They're filed of record under my order.
08:49:40  18            MR. DEGEURIN:  Well, so you anticipated that.  Okay.
08:49:45  19            THE COURT:  I've been here before.
08:49:47  20            MR. ESPER:  Your Honor, I would be remiss if I didn't
08:49:49  21   bring it to the Court's attention, Mr. Huitron's first name
08:49:53  22   Eusevio.  I know the Court is --
08:50:00  23            THE COURT:  Well, I will do my best.
08:50:02  24            MR. ESPER:  Thank you, your Honor.
08:50:36  25            MR. FINN:  Your Honor, David Finn.
```

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

| | | |
|---|---|---|
| 08:50:38 | 1 | Could I just ask you for a little clarification?  I'm |
| 08:50:42 | 2 | seated at the far right-hand side of this table, next to Ms. |
| 08:50:46 | 3 | Williams, who's next to my client, and I'm not able to see about |
| 08:50:51 | 4 | 15 to 20 of the jurors.  I'm not asking that the podium be moved, |
| 08:50:57 | 5 | but if you would allow me periodically to stand so that I can see |
| 08:51:01 | 6 | the jurors. |
| 08:51:03 | 7 | THE COURT:  That goes for everybody.  For example, you |
| 08:51:07 | 8 | see those people in the corner over there, you're going to have |
| 08:51:09 | 9 | difficulty seeing them.  They're in the -- before the front row. |
| 08:51:14 | 10 | MR. FINN:  Right. |
| 08:51:14 | 11 | THE COURT:  I can't see everybody. |
| 08:51:16 | 12 | MR. FINN:  Okay. |
| 08:51:16 | 13 | THE COURT:  But you can stand at any time. |
| 08:51:19 | 14 | MR. FINN:  All right.  Thank you, Judge. |
| 08:51:20 | 15 | THE COURT:  And, if necessary, move around. |
| 08:51:38 | 16 | Now, as we sit here today, this morning, we have a |
| 08:51:44 | 17 | little extra room in the pit, as I call it.  When we go up to |
| 08:51:51 | 18 | four, after we've selected the jury, it's going to be necessary |
| 08:51:55 | 19 | for the clients to be on the wall, and the lawyers, because we |
| 08:52:03 | 20 | have so many lawyers on the table, you feel free to talk with |
| 08:52:08 | 21 | your client at any time during the breaks or if you need to go |
| 08:52:12 | 22 | over there and whisper on it.  But we don't have enough space for |
| 08:52:16 | 23 | everybody to be seated at the table. |
| 08:52:23 | 24 | This is a larger courtroom.  If we can work it in, |
| 08:52:28 | 25 | we'll work it in.  But I tried every which way to get twelve |

| | | |
|---|---|---|
| 08:52:32 | 1 | people on that table and you just can't do it. |
| 08:52:39 | 2 | MR. FINN:  Judge, can I address that?  Your Honor, all |
| 08:52:44 | 3 | due respect, I understand that you've got constraints and that |
| 08:52:47 | 4 | the -- specifications of the courtroom are such that you've made |
| 08:52:52 | 5 | that ruling.  For the record, I'm going to object to that.  I |
| 08:52:56 | 6 | think that if we put the defendants against the wall, frankly, it |
| 08:52:59 | 7 | make them look like criminals.  And Ms. Williams has indicated |
| 08:53:03 | 8 | that if you would allow her to sit against the wall, I'll sit |
| 08:53:06 | 9 | next to my client.  But on behalf of my client, I'm going to |
| 08:53:10 | 10 | object to that. |
| 08:53:11 | 11 | THE COURT:  Well, the objection for the record is |
| 08:53:13 | 12 | overruled.  I could for security reasons easily do that. |
| 08:53:18 | 13 | However, if other people wish to make a substitution, I have no |
| 08:53:23 | 14 | objection to it.  I just assume the lawyers wanted to sit |
| 08:53:27 | 15 | together.  That could be a wrong assumption.  But if we need to |
| 08:53:33 | 16 | -- I have to have somebody on the wall, let's put it that way. |
| 08:53:38 | 17 | MR. FINN:  I understand.  I just don't want it to be my |
| 08:53:40 | 18 | client.  I think that's prejudicial, your Honor. |
| 08:53:41 | 19 | THE COURT:  It's going to be everybody or none, but we |
| 08:53:44 | 20 | can, if you want to make a substitution for one of -- some -- one |
| 08:53:52 | 21 | defendant has three or four lawyers.  Most everybody else has |
| 08:53:55 | 22 | two.  We have two with one.  Three with one?  Oh, I think we've |
| 08:54:03 | 23 | got -- |
| 08:54:04 | 24 | MR. MAYR:  Mr. Womack. |
| 08:54:06 | 25 | MR. WOMACK:  That's correct.  I'll be the sole counsel |

| | | |
|---|---|---|
| 08:54:08 | 1 | and then, Mr. Eusevio.  So we've got three. |
| 08:54:12 | 2 | THE COURT:  Okay.  Three with one.  So when we get up |
| 08:54:15 | 3 | there, we'll see what the situation is.  I have no objection to |
| 08:54:18 | 4 | defendant sitting at the table.  Actually, I don't have any |
| 08:54:21 | 5 | objection if you want to sit outside, you could go sit outside. |
| 08:54:25 | 6 | MR. FINN:  I figured that, your Honor. |
| 08:54:26 | 7 | THE COURT:  But the truth of the matter is just -- it's |
| 08:54:29 | 8 | just a matter of space. |
| 08:54:31 | 9 | MR. FINN:  All right.  Thank you. |
| 08:54:35 | 10 | MR. DEGEURIN:  Your Honor, before we get to the next, I |
| 08:54:38 | 11 | would be remiss.  I want to introduce you to Juan Manuel Torres. |
| 08:54:41 | 12 | He's a lawyer from Mexico. |
| 08:54:44 | 13 | MR. TORRES:  Nice to meet you, your Honor. |
| 08:54:45 | 14 | THE COURT:  Mr. Torres. |
| 08:54:45 | 15 | MR. DEGEURIN:  Secondly, and I know I've done this |
| 08:54:47 | 16 | already, too, is it possible we can try the case in this |
| 08:54:50 | 17 | courtroom? |
| 08:54:51 | 18 | THE COURT:  No. |
| 08:54:53 | 19 | MR. DEGEURIN:  That's a no. |
| 08:54:55 | 20 | THE COURT:  Pretty quick. |
| 08:55:05 | 21 | On the order of presentation, I intend to just go |
| 08:55:08 | 22 | straight down, which would mean on cross-examination, we would |
| 08:55:14 | 23 | have Mr. Trevino, Mr. Colorado, Mr. Garcia and then, both |
| 08:55:22 | 24 | Huitrons, just in the order of the indictment.  There will be one |
| 08:55:25 | 25 | lawyer per witness.  Two lawyers won't be able to one object to |

08:55:31  1   the testimony and one question it.  Each, y'all select who you

08:55:36  2   wish to have each witness.

08:55:54  3          After you have made your strikes and turned them in, we

08:55:57  4   have a room for you.  First, we have a room, the government has a

08:56:01  5   room.  And we have a room for defense counsel to meet if they

08:56:06  6   wish.  Mr. Hall will take you there.  Work the strikes, unless

08:56:14  7   you're striking individually, and then, I will take the strikes

08:56:25  8   in the conference room.  Any Batson objections, if they're

08:56:30  9   sustained, the juror sits.  There are no more strikes.  So that

08:56:37 10   will take care of that.

08:56:38 11          If you have a Batson challenge and it's sustained, you

08:56:44 12   just lose that strike.  Those are the only things that I meant to

08:57:07 13   bring up.  Is there anything before we start seating the jurors

08:57:12 14   that you are willing to or wish to speak to?

08:57:17 15          MR. MAYR:  Judge, I didn't make the motion, but I know

08:57:22 16   some counsel filed motions for additional peremptories.  Is the

08:57:26 17   Court willing to make a ruling on it at this time, just so I know

08:57:29 18   for my own purposes what we're working with?

08:57:31 19          THE COURT:  Operate on the rule.

08:57:34 20          MR. MAYR:  Okay.

08:57:34 21          THE COURT:  Without extra peremptories.  But the answer

08:57:38 22   is no, I'm not ready to make a ruling on it.  I'm going to wait

08:57:42 23   to see what the situation is.

08:57:49 24          MR. ESPER:  Your Honor, I have one issue with respect

08:57:50 25   to one of the questions that I had submitted was the government

08:57:53    1    would read, of course, its prospective witnesses to see if any of

08:57:57    2    the prospective jurors knew any of the potential witnesses.  One

08:58:00    3    of the witnesses, I noticed, is a special agent who I believe is

08:58:05    4    related to one of the government's lawyers, and I don't know if

08:58:09    5    that poses a problem, potential problem or potential conflict at

08:58:14    6    all.  I don't know.  I don't know what the essence of the

08:58:16    7    testimony is.

08:58:17    8              THE COURT:  That makes two of us, counsel.

08:58:20    9              MR. ESPER:  I don't know how the Court wants to

08:58:21   10    address --

08:58:21   11              THE COURT:  Are they married?

08:58:23   12              MR. ESPER:  No.

08:58:23   13              THE COURT:  Okay.  Have a seat.

08:58:26   14              MR. ESPER:  Well, I'm sorry, they are married.

08:58:28   15              THE COURT:  Husband and wife?

08:58:29   16              MR. ESPER:  Yes.

08:58:30   17              THE COURT:  Well, I guess you can bring it out if

08:58:32   18    that's the situation.  Are you asking me, am I going to

08:58:35   19    disqualify somebody because they're married?

08:58:38   20              MR. ESPER:  No.  I guess I'm going to take my seat.

08:58:42   21              THE COURT:  You know, make whatever objection.  I don't

08:58:44   22    know what the witnesses are, and I have no relationship with any

08:58:48   23    of them, by the way, Mr. Finn, and I don't have any idea what

08:58:57   24    their testimony is or anything else.  Y'all have a lot better

08:59:00   25    idea than I do.  But feel free to make any objection or ask to

08:59:04  1    approach the bench at any time you wish.

08:59:06  2              MR. ESPER:  All right.

08:59:12  3              MR. DEGEURIN:  Your Honor, the last time, we spoke

08:59:15  4    about scheduling and how many hours and days of the week we're

08:59:21  5    going to work.  It was still a little up in the air.

08:59:24  6              THE COURT:  I didn't think it was.  We're going to work

08:59:27  7    till 6:00 every day this week, including Friday, and then, I'll

08:59:30  8    tell you what the schedule will be next week.

08:59:32  9              MR. DEGEURIN:  Well, that's up in the air.  You don't

08:59:34  10   know at this point or you are unable to tell us, at this point,

08:59:37  11   our schedule in the future?

08:59:38  12             THE COURT:  No.  You know, if it looks like it's going

08:59:41  13   well, I like to give the jury Fridays off.  I think the lawyers

08:59:46  14   appreciate it, too.  If it looks like it's holding up, then I'm

08:59:51  15   going to be rescheduling 40, 45 sentences that I have set for the

08:59:57  16   next two Fridays.  We'll just see how it's going.  But this week

09:00:02  17   will be five days.  Yeah, Mr. Finn.

09:00:25  18             MR. FINN:  Your Honor, as you know, I filed a number of

09:00:28  19   motions for continuance, which you've ruled on.  For record

09:00:30  20   purposes, I would like to put on the record that to the extent

09:00:34  21   there were any speedy trial issues, my client was willing and is

09:00:37  22   willing to waive those.  And I'm making that for record purposes

09:00:40  23   only.  Thank you.

09:00:46  24             THE COURT:  He's waiving what, Mr. Finn, the motions

09:00:48  25   for continuance?

| | | |
|---|---|---|
| 09:00:49 | 1 | MR. FINN:  No, sir.  Any speedy trial issues. |
| 09:00:50 | 2 | THE COURT:  Oh, okay.  All right. |
| 09:00:55 | 3 | MR. DEGEURIN:  Back to scheduling, one of the reasons I |
| 09:00:57 | 4 | had that concern is that the juror questionnaires are telling the |
| 09:01:03 | 5 | jury it would be a two- to three-week trial.  With regard to |
| 09:01:07 | 6 | hardships, et cetera, their personal lives, that's one of the |
| 09:01:14 | 7 | reasons I wanted to know whether they will know that they'll have |
| 09:01:16 | 8 | Fridays off, or most likely will have Fridays off.  And somewhere |
| 09:01:21 | 9 | along the way, we're going to have to tell them it's going to be |
| 09:01:25 | 10 | longer than two to three weeks, I believe. |
| 09:01:27 | 11 | THE COURT:  I don't think so.  I think we'll be through |
| 09:01:30 | 12 | in three weeks, but if we aren't, we will continue the case. |
| 09:01:42 | 13 | All right.  Counsel, anything else?  All right.  Then |
| 09:01:45 | 14 | we'll stand in recess till the clerk tells us that we are ready. |
| 09:01:50 | 15 | You're going to have to get a lot more paper because you're going |
| 09:01:52 | 16 | to get charts.  Let me know when -- Margaret, let me know when |
| 09:02:01 | 17 | they're ready. |
| 09:02:02 | 18 | THE CLERK:  Yes, sir. |
| 09:02:04 | 19 | (Recess.) |
| 09:20:10 | 20 | THE COURT:  Two things.  The first row in the public |
| 09:43:46 | 21 | seating will be utilized.  That's all.  We'll be able to complete |
| 09:43:50 | 22 | it at that time with one chair.  The second is, there are media |
| 09:43:53 | 23 | out there.  I know that's no surprise to you, but they're trying |
| 09:43:56 | 24 | to talk to your family members.  Whether you wish them to or not |
| 09:44:03 | 25 | is your business.  My job is to tell you that they're trying to |

09:44:06   1   do so.  I have had it stopped because they were also trying to

09:44:11   2   talk.  They didn't know who jurors were or whatnot.  No exposure

09:44:17   3   to the jurors, but you may or may not want your folks talking to

09:44:26   4   media.

09:44:27   5          All right.  Are we ready to bring them in?  All right.

09:44:31   6   Bring them in.

09:46:28   7          (Jury panel present.)

09:46:34   8   JURY VOIR DIRE

09:46:34   9          THE COURT:  You may be seated in the courtroom.

09:48:43  10          Okay.  Good morning, ladies and gentlemen.  As you

09:55:31  11   know, welcome to the United States District Court and our new

09:55:35  12   courthouse.  One of the reasons we're so crowded is those of you

09:55:41  13   who worked or have worked for the government knows that the

09:55:44  14   government has a motto that everything is even, which means,

09:55:57  15   also, that the same theory and the same formula is placed in

09:56:05  16   every federal courthouse.  So you can rest assured that in a

09:56:08  17   courthouse in Idaho, they have the same dimensions that we have

09:56:17  18   but not near the number of people.  But we're glad to have a new

09:56:24  19   courthouse.

09:56:24  20          And then, of course, we operate with government

09:56:28  21   equipment and government computers.  You'll notice all of you are

09:56:32  22   numbers, and that's the way the computer and the jury selection

09:56:40  23   process in federal court is.  But when we have a group of people

09:56:45  24   who answered the first questionnaire and then, the second

09:56:52  25   questionnaire, and some just answered the second questionnaire,

09:56:55   1   and then, some just answered them today, we can't use the same

09:57:00   2   numbers in the computer.  You can't change those numbers.  You

09:57:06   3   just have to add them.  And so, that's what we're doing.  We came

09:57:11   4   down with two 57s, but found out that one is 57A.  So we're in

09:57:17   5   good shape here.

09:57:17   6          For those of you in the audience, I've been asked to

09:57:24   7   tell you that no iPhones, no computers, no notebooks, don't use

09:57:32   8   anything electronic.  If you do, you'll be asked to leave.  So

09:57:36   9   please don't do that.

09:57:42   10          How many of you are from outside the counties of

09:57:45   11   Travis, Williamson and Hays?  Just raise your hands.  Okay.  Now,

09:57:53   12   how many of you were surprised to get our invitation?  In federal

09:57:58   13   court, we have districts.  There are four districts in Texas.

09:58:04   14   We're in the Western District.  It is the largest geographic

09:58:08   15   district in the United States, except for Alaska, which only has

09:58:11   16   one district.  Our district runs from here to San Antonio down to

09:58:17   17   Del Rio, all the way out to El Paso, comes back to Midland,

09:58:22   18   Odessa, encircling Pecos, and comes into Waco, and then, back to

09:58:28   19   Austin.  It's a large district.

09:58:30   20          So we have 17 counties.  People can come as far east as

09:58:34   21   Brenham and as far west as Junction.  But before you start

09:58:41   22   feeling sorry for yourself having to drive into the Austin

09:58:44   23   traffic, if you were in the Pecos or Midland/Odessa Divisions, or

09:58:49   24   Del Rio Divisions, you could be driving 250 miles a day to the

09:58:54   25   courthouse and back, and you have to usually stay on jury service

09:59:02   1   for six months.  We have a lot of population, so we are able to

09:59:08   2   eliminate that.

09:59:09   3           You're here, as you can guess, from the papers that you

09:59:14   4   filled in for selection of a criminal case that will last perhaps

09:59:22   5   three weeks, maybe more, but my best estimate is three weeks,

09:59:28   6   although the trial of a lawsuit is not very scientific.  We can't

09:59:33   7   know exactly how long a witness will be on the stand, how many

09:59:38   8   questions they'll be asked, and that type of thing, for those of

09:59:41   9   you who have seen trials that you know that to be true.

09:59:46   10          But let me remind you, before I start asking questions

09:59:50   11  and we get in the process, your day actually started in 1215.

10:00:05   12  For those of you who are history buffs, you know that that is

10:00:07   13  when the Magna Carta was signed, and the first right of jury

10:00:12   14  trial was in the Magna Carta.  Up until then, the people had no

10:00:20   15  recourse, except the king, the lords, and the high commissioner,

10:00:26   16  who was appointed, could make up all of the decisions that people

10:00:31   17  have, both civilly and criminally.  And all crimes were against

10:00:36   18  the king, treason, punishable by death.

10:00:41   19          And the people by 1215 had had enough and had -- and

10:00:46   20  put in the right to trial by jury civilly and criminally, and the

10:00:52   21  determination of that would be made by people in their villages

10:00:59   22  or communities.  Trial by peers, as they said.  And that

10:01:06   23  continued through the English system, and then, we inherited the

10:01:10   24  English system with the colonies.

10:01:14   25          But in about 1770, King George and parliament started

| | | |
|---|---|---|
| 10:01:20 | 1 | placing taxes -- we all know that -- on the colonies.  An |
| 10:01:25 | 2 | interesting thing about the Revolution is that King George wasn't |
| 10:01:33 | 3 | doing very good by '70 or '72 because anybody that had a trial, |
| 10:01:40 | 4 | the jury who at that time could determine the law and the facts, |
| 10:01:45 | 5 | were not finding for England.  Not imposing liability on the |
| 10:01:51 | 6 | taxes.  So the first thing King George did is to put all jury |
| 10:02:00 | 7 | trials in Nova Scotia.  How many of you have been to Nova Scotia? |
| 10:02:07 | 8 | Well, nobody went.  There weren't any jury trials and the cases |
| 10:02:13 | 9 | just backed up.  Nobody was having decision.  Nobody had to pay |
| 10:02:16 | 10 | the taxes because they were waiting for their trial. |
| 10:02:21 | 11 | And so, right before the Revolution started, King |
| 10:02:27 | 12 | George put all courts in the colonies in admiralty where only |
| 10:02:33 | 13 | British-appointed judges made the decisions.  Now, the reason |
| 10:02:39 | 14 | that that's important is that if you go down to 1788, after the |
| 10:02:43 | 15 | Revolution when the Constitution was ratified, nine of the 13 |
| 10:02:49 | 16 | states ratified the Constitution, conditioned on the fact that |
| 10:02:55 | 17 | jury trials would be preserved, which was done in 1791 with the |
| 10:03:02 | 18 | Sixth and Seventh Amendments, and those amendments have not been |
| 10:03:05 | 19 | changed today. |
| 10:03:11 | 20 | Why?  Why was it so important?  And it was important |
| 10:03:17 | 21 | because the people who were in the colonies, the people who were |
| 10:03:21 | 22 | in England, and the people who forced the Magna Carta did not |
| 10:03:28 | 23 | trust the lords, the kings, the executive department, did not |
| 10:03:34 | 24 | trust the legislative bodies and, I'm sorry to say, did not trust |
| 10:03:39 | 25 | the judges, present company excepted.  They wanted to determine |

10:03:49    1    the rights of people themselves in their communities.

10:03:59    2            And I don't need to remind you that we have Americans

10:04:05    3    all over the world today in the armed forces that are protecting

10:04:09    4    the rights for you to come here and to be part of the United

10:04:15    5    States government.  Many of you, for the first time.  Some of

10:04:19    6    you, may be for another time.

10:04:24    7            Because the jury in this case will end up with a

10:04:27    8    decision, like all juries, that cannot be altered by any court,

10:04:35    9    including the Supreme Court, the jury's verdict remains

10:04:40    10    inviolable.  So it's serious business, even if we're a little

10:04:46    11    crowded, even if we have a lot of people here today.

10:04:48    12            Now, the purpose that we're going to do this morning is

10:04:53    13    to find 15 people.  No, 16?

10:05:02    14            THE CLERK:  Sixteen.

10:05:03    15            THE COURT:  Sixteen people who can stand up and under

10:05:07    16    oath, represent to these parties and to me that I'm fully able to

10:05:16    17    listen to the evidence in this case.  I will listen to the

10:05:21    18    evidence in the case, and I will answer by my verdict solely on

10:05:29    19    the evidence I hear in the trial of this case, and I will follow

10:05:36    20    the instructions of the Court.  That sounds simple, but it's what

10:05:43    21    our whole justice system is based on: and the reason for it is

10:05:51    22    that no one is to be tried in the newspapers.  No one is to be

10:05:54    23    tried in the home fires over a cup of coffee, or in the streets,

10:06:00    24    or in restaurants, or the bars.  And no one is to be tried on any

10:06:08    25    basis other than admissible evidence in a courtroom, listened to

| | | |
|---|---|---|
| 10:06:16 | 1 | by the jury. |
| 10:06:17 | 2 | Now, when you've answered the questionnaires, you |
| 10:06:23 | 3 | understand that we're dealing with a criminal case.  Some of you |
| 10:06:29 | 4 | have had some exposure to publicity or the media with regard to |
| 10:06:39 | 5 | the allegations made in this lawsuit.  The first thing that I |
| 10:06:45 | 6 | need to tell you is, I need people who are going to be jurors in |
| 10:06:54 | 7 | this case who will do what we're supposed to do in the United |
| 10:06:57 | 8 | States, and that is make a judgement in this case solely on what |
| 10:07:01 | 9 | you hear in this courtroom. |
| 10:07:04 | 10 | There was an article in the paper today about this |
| 10:07:07 | 11 | trial.  There was one last week.  People are quoted.  Articles |
| 10:07:14 | 12 | may be right, may be wrong, but have no materiality with regard |
| 10:07:21 | 13 | to what the jury will be hearing and deciding in this case.  So |
| 10:07:27 | 14 | my questions are really for those reasons. |
| 10:07:31 | 15 | Now, we have a lot of people.  And although I'm pretty |
| 10:07:38 | 16 | good at faking like I've got good eyesight, I can't really see |
| 10:07:45 | 17 | the folks out there.  So when you need to respond to a question, |
| 10:07:53 | 18 | if you'll please stand up, look at your shirt or blouse so that |
| 10:07:59 | 19 | you've got your number.  Repeat your number and answer the |
| 10:08:04 | 20 | questions. |
| 10:08:07 | 21 | I need to qualify 16 people today who can make that |
| 10:08:11 | 22 | oath.  I also have a magic little microphone right over here that |
| 10:08:22 | 23 | you can't see that goes to the court reporter, and if I ask a |
| 10:08:28 | 24 | question that you would prefer answering privately, you have the |
| 10:08:34 | 25 | right to say, "I'd like to approach the bench."  This is the |

10:08:37  1   bench.  I don't think anybody ever knows why they call it the

10:08:42  2   bench, but it's been the bench forever.  And you can come in and

10:08:48  3   in pseudo privacy, because all of the lawyers will come up to

10:08:51  4   hear your answer, you may give a private answer.

10:08:57  5          And I think I've tried to cover it best I can in the

10:09:02  6   questionnaires, but the first question is -- I am pretty

10:09:07  7   confident this case will go for three weeks.  There is a

10:09:11  8   possibility it could go further.  This isn't California where you

10:09:15  9   go months and months and months.  But in Texas, in federal court,

10:09:21  10  particularly, you can have multiple-week trials, and this is one

10:09:26  11  of them.

10:09:29  12         Now, in the questionnaires that I've gone over each of

10:09:32  13  them with the clerk's office, it would appear that most

10:09:37  14  everybody, if not everybody, that has been requested to be here

10:09:41  15  indicated that they could go three weeks or perhaps four weeks.

10:09:47  16  Is there anybody who, right now, for whatever reason, would not

10:09:52  17  be able to do that?  Now, everybody here, everybody here is here

10:10:01  18  inconveniently.  If you can't think of something you'd rather do,

10:10:07  19  you really have some personality problems.  But the truth of the

10:10:14  20  matter is, I know it's economically inconvenient.  There's no

10:10:19  21  economic excuse in the federal court.  I know it's hard to get

10:10:25  22  into here.  And I know that giving up a period of time such as

10:10:31  23  three or four weeks is a sacrifice, but to maintain our system of

10:10:37  24  justice and to maintain everybody's right in the United States,

10:10:43  25  it must be done.

| | | |
|---|---|---|
| 10:10:45 | 1 | Now, let me take the first row here.  Is there anybody |
| 10:10:49 | 2 | who would not be able to make that time commitment, please raise |
| 10:10:52 | 3 | your hand.  I'll take the second row.  And the third row, please. |
| 10:11:01 | 4 | All right.  Ma'am, if you'd just tell me your number. |
| 10:11:04 | 5 | THE JUROR:  303. |
| 10:11:05 | 6 | THE COURT:  Okay.  And tell me why you could not. |
| 10:11:08 | 7 | THE JUROR:  I have a plane reservation in four weeks. |
| 10:11:12 | 8 | THE COURT:  In four weeks? |
| 10:11:13 | 9 | THE JUROR:  It's May the 13th is when I fly out in the |
| 10:11:16 | 10 | morning. |
| 10:11:18 | 11 | THE COURT:  Okay.  I need to write that down.  And your |
| 10:11:23 | 12 | number again? |
| 10:11:24 | 13 | THE JUROR:  303. |
| 10:11:25 | 14 | THE COURT:  All right.  Thank you, ma'am.  Plane |
| 10:11:30 | 15 | reservation.  All right.  The reason I'm not acting is we may be |
| 10:11:35 | 16 | through by then, and we'll just see if we are.  But I'll get back |
| 10:11:40 | 17 | with you. |
| 10:11:41 | 18 | How about the fourth row?  All right.  Those of you who |
| 10:11:47 | 19 | are in the chairs over here, anybody can't make the commitment? |
| 10:11:54 | 20 | All right.  How about the front row on the benches?  If you'll |
| 10:11:59 | 21 | stand up, please, and tell me your number. |
| 10:12:01 | 22 | THE JUROR:  331. |
| 10:12:02 | 23 | THE COURT:  And what is the reason you would not be |
| 10:12:07 | 24 | able to serve? |
| 10:12:08 | 25 | THE JUROR:  I have a flight to Chicago this Wednesday |

10:12:11  1  for a wedding and next week, a con -- business conference that

10:12:15  2  came up in New York City.

10:12:16  3        THE COURT:  And if you'd read the instructions I sent

10:12:18  4  to you, you wouldn't be here.  You would have called the clerk,

10:12:22  5  and the clerk would have said, we want you to come back in June.

10:12:32  6  But I'll excuse you because you've got that commitment, but you

10:12:39  7  -- just sit there for a minute.

10:12:42  8        How about the next row?  How about the next row?  I

10:12:52  9  don't even know how many rows are back there.  Anybody on this

10:12:55  10  side need to make -- back in the corner.

10:13:00  11        THE JUROR:  No. 72.  My business just laid off 800

10:13:05  12  people, and now they want me to go to India next week or the week

10:13:08  13  after.

10:13:09  14        THE COURT:  The real India?

10:13:13  15        THE JUROR:  Yeah.  Mumbai.

10:13:14  16        THE COURT:  What is your number, sir?

10:13:15  17        THE JUROR:  Seventy-two.

10:13:16  18        THE COURT:  All right.  Have a seat.  How about the

10:13:24  19  folks over here?  Anybody can't make that commitment?  Oh, I have

10:13:27  20  another.

10:13:29  21        THE JUROR:  No. 129.  I have an elderly mother that's

10:13:33  22  been in the business and may require some skilled nursing.

10:13:38  23        THE COURT:  Well, that's enough.  You could have gotten

10:13:40  24  away with it on the telephone call.

10:13:43  25        THE JUROR:  Well, it was just last week all this

| 10:13:45 | 1 | happened. |

10:13:45  2          THE COURT:  Okay.  Well, we work Saturday and Sunday.

10:13:49  3          THE JUROR:  I told them Friday.  I said I would come

10:13:52  4  in, anyway.

10:13:52  5          THE COURT:  Okay.  Well, good.  I appreciate your

10:13:55  6  coming in.  Anybody else?  Anybody in the courtroom that needs to

10:14:02  7  speak to that?

10:14:08  8          All right.  I'm going to excuse 303, 331 and 72.  I

10:14:14  9  need for you to replace 303.  Now, we're going to play a game

10:14:25 10  called musical chairs.  Mr. Hall will tell you where to go.

10:14:31 11          MS. DEMINGS:  Juror No. 303 is replaced by Juror No.

10:14:36 12  208.

10:15:24 13          THE COURT:  That means, counsel, you draw on box 27, a

10:15:29 14  blank -- on 37.  Thirty-seven will just be a blank.

10:15:48 15          All right.  Now, let me remind you a little bit about

10:15:53 16  not only our history but our Constitution.  Every person charged

10:16:03 17  with a crime in our country and in federal court is protected by

10:16:10 18  what we call the presumption of innocence.  We all know what it

10:16:14 19  is.  We study it.  We answer it in our civics class, and we

10:16:20 20  listen to it frequently.  But what that means is that, as a

10:16:33 21  practical matter, when you're charged with a criminal charge, the

10:16:39 22  only obligation you have is to show up.  The government in this

10:16:47 23  case, the United States Attorney's Office, has the obligation, if

10:16:52 24  they make the charge, to present evidence of it and to attempt to

10:16:59 25  convince a jury beyond a reasonable doubt that the charge is

10:17:04  1    valid and the person is guilty.

10:17:08  2            The jury has to make that determination, but the jury

10:17:15  3    also has to understand that if they are not convinced beyond a

10:17:27  4    reasonable doubt, they must vote not guilty.  And the jury in

10:17:34  5    making that determination must know that they can't infer any

10:17:41  6    evidence of guilt or bad faith if the defendant does not testify

10:17:52  7    or if the defendant does not present any evidence, because a

10:17:56  8    defendant is not required to present evidence nor give any

10:18:00  9    testimony.

10:18:02  10           Now, I've heard all my life -- I've been at this job

10:18:07  11   over 50 years trying lawsuits, as a lawyer, as a judge, and I've

10:18:13  12   heard so many times, you know, if I was ever charged with a

10:18:17  13   crime, I'd testify.  Well, that's a person, one, that hadn't been

10:18:22  14   charged with a crime, and that decision is made by a lawyer who's

10:18:29  15   trained as to whether or not somebody should or shouldn't

10:18:34  16   testify.  But that's immaterial because you must remember the

10:18:40  17   government must convince you, if you're a jury, by the evidence

10:18:46  18   of guilt beyond a reasonable doubt or you must acquit the

10:18:51  19   defendant.

10:18:53  20           Doesn't make any difference if you think the defendant

10:18:55  21   might be guilty.  It doesn't make any difference whether the --

10:19:01  22   you believe the defendant was just walking down the street and

10:19:04  23   they picked him up and arrested him.  If you do not believe the

10:19:10  24   government's evidence convinces you beyond a reasonable doubt,

10:19:14  25   you must vote not guilty.

10:19:16   1          Now, is there anybody who doesn't understand that?  Is

10:19:22   2   there anybody who can't follow that law, which is the basic

10:19:29   3   principle of our justice system in this country?

10:19:35   4          All right.  Criminal cases in the United States

10:19:47   5   District Court are the responsibility of the United States

10:19:52   6   Attorney.  And in this particular case, the Assistant United

10:19:59   7   States Attorney in charge of this case is Doug Gardner.

10:20:02   8          Mr. Gardner, if you would stand, please.

10:20:04   9          MR. GARDNER:  Good morning.

10:20:04  10          THE COURT:  And if you would introduce all of those

10:20:06  11   people that are in the courtroom that are on your team, so to

10:20:12  12   speak.

10:20:13  13          MR. GARDNER:  Yes, sir, your Honor.  Thank you.

10:20:14  14          Ladies and gentlemen, good morning.  Again, as the

10:20:16  15   Judge stated, my name is Doug Gardner.  I'm an Assistant United

10:20:19  16   States Attorney.  I am the lead prosecutor in this case as we

10:20:22  17   term it.  Assisting me in this case is Ms. Michelle Fernald.

10:20:25  18   She's also an Assistant United States Attorney.  And Mr. Daniel

10:20:28  19   Castillo, Assistant United States Attorney involved in our asset

10:20:32  20   forfeiture section.

10:20:33  21          Also seated with me, Special Agent Scott Lawson of the

10:20:36  22   Federal Bureau of Investigation.  And also, Special Agent Steve

10:20:40  23   Pennington of the Internal Revenue Service.  Thank you, your

10:20:43  24   Honor.

10:20:43  25          THE COURT:  All right.  First, is there anybody on the

| | | |
|---|---|---|
| 10:20:46 | 1 | panel -- let's just take this side of the room first, anybody on |
| 10:20:53 | 2 | the panel who knows Mr. Gardner or Ms. Fernald?  Anybody on the |
| 10:20:59 | 3 | panel who thinks you may know anybody in the United States |
| 10:21:03 | 4 | Attorney's Office?  Anybody know Mr. Pennington from the Internal |
| 10:21:12 | 5 | Revenue Service or Mr. Lawson from the FBI? |
| 10:21:17 | 6 | All right.  Now, let me ask those folks over here, |
| 10:21:23 | 7 | anybody know anybody in the U.S. Attorney, including those here, |
| 10:21:27 | 8 | or Mr. Pennington, or Mr. Lawson?  And how about these folks? |
| 10:21:35 | 9 | Anybody need to respond to that question?  All right. |
| 10:21:44 | 10 | Now, is there anybody on this panel, now or in the |
| 10:21:50 | 11 | past, you or some member of your immediate family, ever worked |
| 10:21:54 | 12 | for the Internal Revenue Service?  All right.  If you'd stand, |
| 10:21:58 | 13 | please, and give me your number. |
| 10:21:59 | 14 | THE JUROR:  181. |
| 10:22:01 | 15 | THE COURT:  And was it you or your family? |
| 10:22:04 | 16 | THE JUROR:  My husband. |
| 10:22:06 | 17 | THE COURT:  And what does he do? |
| 10:22:07 | 18 | THE JUROR:  He's a tax examiner. |
| 10:22:09 | 19 | THE COURT:  Okay.  And is he here in Austin? |
| 10:22:12 | 20 | THE JUROR:  Yes. |
| 10:22:13 | 21 | THE COURT:  All right.  Thank you, name.  Yes, ma'am. |
| 10:22:17 | 22 | THE JUROR:  326.  I just spent one season as data |
| 10:22:21 | 23 | entry. |
| 10:22:22 | 24 | THE COURT:  Okay.  Thank you.  I saw -- yes, ma'am. |
| 10:22:26 | 25 | THE JUROR:  15A.  I spent one season working with the |

10:22:30    1    IRS.

10:22:30    2           THE COURT:  All right.  I should ask you about when.

10:22:33    3           THE JUROR:  Actually, it was more than one season, but

10:22:36    4    the last time was probably two years ago.

10:22:38    5           THE COURT:  Okay.  And how about you, ma'am?

10:22:40    6           THE JUROR:  Seven years.

10:22:41    7           THE COURT:  Okay.  Anybody else?  Yes, ma'am.

10:22:46    8           THE JUROR:  No. 3.  The same, data entry.

10:22:49    9           THE COURT:  Okay.  About when?

10:22:50   10           THE JUROR:  About 15 years ago.

10:22:51   11           THE COURT:  Okay.  Anybody else?  Okay.  I'm going to

10:22:57   12    get over there.  Okay.  Yes, ma'am.  We'll start with you in the

10:23:00   13    corner.

10:23:01   14           THE JUROR:  Seventy-seven.  And I worked in the service

10:23:05   15    center 20 years ago.

10:23:07   16           THE COURT:  All right.  Yes, ma'am.

10:23:10   17           THE JUROR:  No. 62.  I retired from the Internal

10:23:14   18    Revenue year and a half ago.

10:23:15   19           THE COURT:  All right.  And what did you do before you

10:23:17   20    retired?

10:23:18   21           THE JUROR:  Customer service representative.

10:23:20   22           THE COURT:  All right.

10:23:22   23           THE JUROR:  167.  I worked as a transcriber in 1994.

10:23:28   24           THE COURT:  All right.

10:23:29   25           THE JUROR:  And my grandmother retired from the IRS

10:23:32   1   many years ago.

10:23:33   2          THE COURT:  All right.  What did she do, if you

10:23:35   3   remember?

10:23:35   4          THE JUROR:  I think she was a tax examiner.  She's

10:23:41   5   deceased.

10:23:42   6          THE COURT:  Okay.  Yes, ma'am.  Over here.

10:23:44   7          THE JUROR:  121A.  I worked for the Internal Revenue

10:23:49   8   Service for ten years, and it's been six years since I've been

10:23:53   9   there.

10:23:54  10          THE COURT:  All right.  Thank you.

10:23:56  11          THE JUROR:  No. 48.  My daughter's presently working

10:23:59  12   there.

10:24:00  13          THE COURT:  Do you know what she does?

10:24:01  14          THE JUROR:  No, sir.

10:24:01  15          THE COURT:  Okay.

10:24:04  16          THE JUROR:  No. 8.  I retired 2006.

10:24:08  17          THE COURT:  And what did you do before you retired?

10:24:11  18          THE JUROR:  Revenue officer.

10:24:12  19          THE COURT:  Thank you.  Yes, sir.

10:24:13  20          THE JUROR:  269.  My wife worked there seasonally one

10:24:19  21   year about 15 years ago.  I'm not sure what she did.

10:24:24  22          THE COURT:  How about over here?  All right.  Has

10:24:30  23   everybody responded to that question?  Those of you who responded

10:24:34  24   to the question, the fact that the Internal Revenue Service has

10:24:38  25   an agent here in the room, may be involved, would that fact alone

10:24:44  1  influence you in any way, good, bad, or indifferent, if you were

10:24:49  2  to be a juror in this case?  If it would, please raise your hand.

10:24:56  3          Now, the same question, FBI.  Anybody, you or your

10:25:01  4  family, immediate family ever worked for the FBI?  All right.

10:25:08  5  How about back of the room here?  And how about over here?  All

10:25:13  6  right.

10:25:18  7          The Defendant Jose Trevino-Morales, Mr. Trevino is

10:25:24  8  represented by Mr. David Finn.  Mr. Finn, if you would introduce

10:25:27  9  your client and your associate.

10:25:29  10          MR. FINN:  Good morning, your Honor.  Thank you.

10:25:30  11          Morning, folks.  My name is David Finn, F-I-N-N, and I

10:25:35  12  have the pleasure of representing Jose Trevino-Morales.

10:25:39  13  Assisting me in the trial of this case is an Austin lawyer, Ms.

10:25:43  14  Christie Williams.

10:25:45  15          THE COURT:  Mr. Finn's from Dallas?

10:25:49  16          MR. FINN:  Yes, sir.

10:25:50  17          THE COURT:  Mr. Finn's from Dallas.  Ms. Williams is

10:25:52  18  from Austin.  And Mr. Trevino.  Anybody on the panel know any of

10:25:56  19  those people?  If you do, please raise your hands.  All right.

10:26:02  20  Thank you.

10:26:05  21          Then Francisco Antonio Colorado-Cessa.  Mr. Colorado is

10:26:13  22  represented by Mr. Mike DeGeurin.  Mr. DeGeurin, if you would

10:26:16  23  introduce the folks in the courtroom who are assisting you with

10:26:19  24  your client.

10:26:20  25          MR. DEGEURIN:  Thank you, your Honor.

| | | |
|---|---|---|
| 10:26:21 | 1 | First of all, I'm Mike DeGeurin.  This is |
| 10:26:25 | 2 | Colorado-Cessa.  Assisting me and working with me is Mr. Andres |
| 10:26:30 | 3 | Sanchez.  Mr. John Parras, Mr. Andy Parker, Mr. Juan Manuel |
| 10:26:43 | 4 | Torres from Mexico.  He is a lawyer in Mexico that's allowed to |
| 10:26:48 | 5 | be here during this trial for Mr. Francisco.  Oh, and today, this |
| 10:26:54 | 6 | is Mr. Robert Hirschhorn, helping us pick the jury. |
| 10:27:03 | 7 | THE COURT:  Anybody on the panel know Mr. DeGeurin, Mr. |
| 10:27:07 | 8 | Colorado, or any of these other people?  If you do, please raise |
| 10:27:10 | 9 | your hands. |
| 10:27:14 | 10 | Then we have Fernando Solis-Garcia.  Oh. |
| 10:27:21 | 11 | THE JUROR:  No. 36.  I worked with Mike DeGeurin at the |
| 10:27:24 | 12 | Court of Appeals. |
| 10:27:26 | 13 | THE COURT:  The fact that you know -- he has ever |
| 10:27:29 | 14 | represented you? |
| 10:27:30 | 15 | THE JUROR:  No, sir. |
| 10:27:30 | 16 | THE COURT:  Okay.  The fact that you know him and you |
| 10:27:33 | 17 | worked with him, would that influence you to where you could not |
| 10:27:36 | 18 | independently look at the evidence, listen to the evidence, and |
| 10:27:39 | 19 | make your mind up, notwithstanding your past relationship, or |
| 10:27:44 | 20 | present, with Mr. DeGeurin? |
| 10:27:46 | 21 | THE JUROR:  No.  It would not interfere. |
| 10:27:47 | 22 | THE COURT:  All right.  Thank you, sir.  Okay. |
| 10:27:53 | 23 | Mr. Garcia is represented by Mr. Womack.  Mr. Womack, |
| 10:27:57 | 24 | if you'd introduce yourself and your client, please. |
| 10:27:59 | 25 | MR. WOMACK:  Thank you, your Honor. |

| | | |
|---|---|---|
| 10:28:00 | 1 | Good morning, ladies and gentlemen.  I'm Guy Womack. |
| 10:28:02 | 2 | I'm from Houston.  And I have the honor of representing Fernando |
| 10:28:06 | 3 | Garcia-Solis. |
| 10:28:07 | 4 | THE COURT:  Okay.  Thank you. |
| 10:28:09 | 5 | Anybody know Mr. Womack or his client here, Mr. Garcia? |
| 10:28:18 | 6 | All right.  Thank you. |
| 10:28:20 | 7 | And Mr. Eusevio Huitron-Maldonado is represented by Mr. |
| 10:28:30 | 8 | Esper, Richard Esper.  If you would introduce your client and |
| 10:28:33 | 9 | yourself, please. |
| 10:28:34 | 10 | MR. ESPER:  Yes, your Honor. |
| 10:28:35 | 11 | Good morning, ladies and gentlemen of the jury panel. |
| 10:28:36 | 12 | My name is Richard Esper.  My client is Eusevio Huitron. |
| 10:28:43 | 13 | Sometimes you may hear during the course of this case nickname of |
| 10:28:47 | 14 | "Chevo."  Thank you. |
| 10:28:49 | 15 | THE COURT:  Anybody know Mr. Huitron or Mr. Esper? |
| 10:28:58 | 16 | And then, Jesus Maldonado-Huitron is represented by |
| 10:29:05 | 17 | Thomas Mayr.  Mr. Mayr, if you could introduce your client, |
| 10:29:09 | 18 | please. |
| 10:29:09 | 19 | MR. MAYR:  Good morning, ladies and gentlemen of the |
| 10:29:12 | 20 | panel.  My name is Brent Mayr.  I'm Thomas Mayr, but I go by |
| 10:29:15 | 21 | Brent.  I have the pleasure of representing Jesus Huitron and |
| 10:29:20 | 22 | it's just us.  Thank you, Judge. |
| 10:29:23 | 23 | THE COURT:  All right.  All criminal cases come with a |
| 10:29:33 | 24 | pleading called an indictment.  The indictment is a piece of |
| 10:29:43 | 25 | paper at this point, important piece of paper, because it tells |

10:29:48   1   the defendants what they're charged with.  It tells me what

10:29:52   2   they're charged with.  In just a minute, it's going to tell you

10:29:55   3   what they're charged with.  It also tells what they're not

10:30:01   4   charged with.

10:30:06   5           This is a complex case because it has several

10:30:09   6   defendants, and it's an alleged conspiracy case, which means that

10:30:15   7   there's substantial amount of evidence that the jury will hear.

10:30:20   8   But basically it's a one-count charge of indictment.  So after we

10:30:27   9   hear all of the evidence, it will not be a complicated case.

10:30:35   10           Now, I'm going to have the government read the

10:30:38   11   indictment because, then, some of the questions that I ask will

10:30:45   12   be more logical; and, also, of course, it's the charge that the

10:30:50   13   jury will have at the end of the case, and you'll know what this

10:30:53   14   case is about, after you've listened to the indictment.

10:30:59   15           A lot of people, of course, know about grand juries,

10:31:04   16   and it is important.  You can't have a criminal case without an

10:31:09   17   indictment.  But the government in this particular case would

10:31:12   18   present and request an indictment, and if the grand jury gives

10:31:20   19   them an indictment, then there will be a criminal charge.  If

10:31:23   20   they don't, there's not.  It's important, though, right now, for

10:31:29   21   you to know that it has no importance at all other than telling

10:31:33   22   us what the case is about.  It's not evidence.  It's not an

10:31:37   23   editorial comment.  Without it, we wouldn't be here, so it's

10:31:43   24   important, but it has no relevance whatsoever in the issue of

10:31:49   25   guilt or innocence.  That will be the evidence you'll hear in the

10:31:53    1    trial.

10:31:55    2            You may proceed to read the indictment.  And I might

10:31:58    3    add, too, this is a redacted indictment because there are only

10:32:04    4    five people on trial here.  Anybody that's not on trial here has

10:32:14    5    other obligations and will be in other cases or will be in other

10:32:19    6    proceedings.  You only have five that are here.  So I've asked

10:32:21    7    the government just to read the portions of the indictment that

10:32:25    8    relate to these five that they have charged here today.

10:32:30    9            You may proceed.

10:32:31    10           MR. GARDNER:  Thank you, your Honor.  Ms. Fernald and I

10:32:34    11   will split the reading, given the length.

10:32:36    12           Ladies and gentlemen, The United States of America, the

10:32:39    13   Plaintiff vs. Jose Trevino-Morales, Francisco Antonio

10:32:44    14   Colorado-Cessa, also known as "Pancho," Fernando Solis-Garcia,

10:32:49    15   also known as "Freddy," Eusevio Maldonado-Huitron, also known as

10:32:53    16   "Chevo," and Jesus Maldonado-Huitron, also known as "Jesse," are

10:32:59    17   the defendants.

10:33:00    18           And the grand jury charges that at various times

10:33:04    19   material to this indictment, the Defendants Jose Trevino-Morales,

10:33:07    20   Francisco Colorado-Cessa, Fernando Solis-Garcia, Eusevio

10:33:13    21   Maldonado-Huitron, and Jesus Maldonado-Huitron, and others, were

10:33:17    22   members of a money-laundering conspiracy using the proceeds

10:33:21    23   derived from the sale of cocaine, marihuana, and other illegal

10:33:25    24   narcotics by an organization known as Los Zetas.  Los Zetas drug

10:33:31    25   cartel is a powerful drug organization operating out of Mexico,

| | | |
|---|---|---|
| 10:33:34 | 1 | which funnels thousands of kilos of cocaine and other narcotics |
| 10:33:37 | 2 | into the United States each year.  Los Zetas are the largest drug |
| 10:33:42 | 3 | cartel in Mexico in geographical presence and they control 11 |
| 10:33:45 | 4 | states within Mexico.  The organization is based in the city of |
| 10:33:50 | 5 | Nuevo Laredo, Tamaulipas, directly across from the border from |
| 10:33:54 | 6 | Laredo, Texas.  The huge-scale drug trafficking of this |
| 10:33:57 | 7 | organization generates multi-million-dollar revenues. |
| 10:34:01 | 8 | Los Zetas funnels drug proceeds from Miguel Angel |
| 10:34:06 | 9 | Trevino-Morales, also known as "40," hereafter referred to either |
| 10:34:11 | 10 | by first and last name or just "40," and his brother Oscar Omar |
| 10:34:15 | 11 | Trevino-Morales, also known as "42," hereinafter referred to |
| 10:34:19 | 12 | either by first and last name or just "42," into the United |
| 10:34:23 | 13 | States.  "40" and "42" are the two co-leaders of Los Zetas.  The |
| 10:34:27 | 14 | numbers associated with some Zeta leaders' names were first |
| 10:34:31 | 15 | assigned at the inception of the Los Zetas as a carryover from |
| 10:34:34 | 16 | their military call signs.  The numbers generally show members' |
| 10:34:37 | 17 | rank within the criminal organization.  The "3," therefore, for |
| 10:34:41 | 18 | example, would demonstrate third in rank in the overall |
| 10:34:43 | 19 | organization when Los Zetas was first organized. |
| 10:34:47 | 20 | "40" and his brother "42" utilized another brother |
| 10:34:52 | 21 | living within the United States, the Defendant Jose |
| 10:34:55 | 22 | Trevino-Morales, as well as other contacts, to help launder their |
| 10:34:59 | 23 | drug money through the purchase of American quarter horses.  The |
| 10:35:01 | 24 | ownership of the horses and the source of the funds to purchase |
| 10:35:05 | 25 | the horses are placed in various nominees' names to disguise |

10:35:09   1   "40's" and "42's" connections to these assets.  Nominees are real

10:35:13   2   or fictitious persons or entities that are used instead of the

10:35:17   3   real and true owner.  This helps legitimize the appearance of the

10:35:20   4   drug money since horse racing is a legal activity, and also

10:35:24   5   provides "40" and "42" and those working with them freestanding

10:35:28   6   assets that can be later sold or cashed in.  It also generates

10:35:32   7   legitimate-looking income during the intervening time period.

10:35:36   8   The money-laundering network of this conspiracy reached from the

10:35:39   9   United States and Mexico border to numerous locations in and near

10:35:42  10   Austin, Texas and elsewhere.

10:35:45  11        Telephones were utilized extensively by members of the

10:35:48  12   conspiracy in order for coconspirators to coordinate aspects of

10:35:52  13   their money laundering.  Coconspirators would attend quarter

10:35:56  14   horse auctions to purchase racing quarter horses.  Via electronic

10:36:01  15   wire communications, members of the conspiracy would coordinate

10:36:03  16   the purchase of various racing quarter horses and the payment of

10:36:07  17   boarding, breeding and racing fees using the proceeds derived

10:36:11  18   from the sale of illegal narcotics.

10:36:13  19        Objective of the conspiracy.  It was the objective --

10:36:17  20   the object of the conspiracy to launder U.S. currency gained from

10:36:21  21   the sale of illegal controlled substances by Los Zetas to

10:36:24  22   purchase, breed, train, and race quarter horses in the United

10:36:29  23   States and Mexico.

10:36:31  24        Manner and means.  For all periods of time relevant to

10:36:34  25   the charges contained in this indictment, the defendants and

10:36:38  1  other coconspirators, both known and unknown to the grand jury,

10:36:41  2  used the following manner and means to accomplish the goals of

10:36:44  3  the conspiracy.

10:36:44  4       The defendants were members or associates of a

10:36:48  5  transnational drug-trafficking organization or cartel based in

10:36:52  6  Mexico known as Los Zetas.  Under the direction of Miguel and

10:36:57  7  Oscar Trevino-Morales, Los Zetas controlled hundreds of miles of

10:37:02  8  Mexican territory along the border of Mexico and the United

10:37:05  9  States, which they used to conduct their drug-trafficking and

10:37:07  10  money-laundering operations.

10:37:09  11       Proceeds from the sale of illegal narcotics in the

10:37:13  12  United States would be transported from the United States to

10:37:15  13  Mexico via bulk cash shipments.  These cash shipments would be

10:37:20  14  delivered to plaza bosses for counting and distribution to

10:37:24  15  promote the continuing distribution of illegal narcotics and to

10:37:27  16  launder illegal proceeds through various activities.  Included

10:37:31  17  amongst these activities were investments in racing quarter

10:37:35  18  horses purchased via bulk currency payments, wire transfers,

10:37:39  19  checks from businesses established by the organization,

10:37:42  20  structured deposits, and bulk currency deposits.

10:37:45  21       The quarter horse is an American breed of racehorse

10:37:48  22  that is bred to sprint short distances ranging from 220 to 870

10:37:54  23  yards.  Quarter horses are raced primarily in the Southwest

10:37:57  24  United States in California.

10:37:59  25       Miguel and Oscar Trevino-Morales would direct portions

10:38:03  1  of the bulk cash derived from the sale of illegal narcotics to

10:38:06  2  their brother, Jose Trevino-Morales, and others, for the

10:38:10  3  purchase, training, breeding and racing of quarter horses in the

10:38:13  4  United States.

10:38:14  5          The defendants and other members of Los Zetas utilized

10:38:17  6  Nextel push-to-talk telephones, BlackBerry and UHF/VHF radio

10:38:24  7  communications to coordinate their money-laundering activities

10:38:26  8  through the horse-racing industry and to evade law enforcement

10:38:29  9  surveillance.

10:38:30  10         The individual roles performed within Los Zetas

10:38:33  11  organization by each of the defendants were as follows:  No. 1,

10:38:43  12  Miguel Angel Trevino-Morales, also known as "40," also known as

10:38:48  13  "Zeta 40," also known as "Cuarenta."  Miguel Trevino is the

10:38:53  14  ranking member of Los Zetas and is recognized as the leader of

10:38:57  15  the Los Zetas.  Miguel Trevino was actively involved in managing

10:39:00  16  the activities of the Los Zetas drug cartel in Mexico, including

10:39:04  17  the coordination of cocaine and marihuana shipments from South

10:39:07  18  America via Central America into United States, as well as

10:39:11  19  receipt of bulk cash shipments into Mexico from the United

10:39:14  20  States.  He was actively involved in the management of the

10:39:18  21  quarter horse activities, including directing funds to pay for

10:39:21  22  purchase, breeding, training and racing of the quarter horses.

10:39:25  23         No. 2, Oscar Omar Trevino-Morales, also known as "42,"

10:39:30  24  also known as "Cuarenta Dos."  Oscar Trevino has a leadership

10:39:35  25  role and oversees Los Zetas activities in Mexico.  Oscar Trevino

10:39:40  1  was actively involved in managing the activities of the Los Zetas

10:39:43  2  drug cartel in Mexico, including the coordination of cocaine and

10:39:47  3  marihuana shipments into the United States, as well as the

10:39:50  4  receipt of bulk currency shipments into Mexico from the United

10:39:53  5  States.  He was also actively involved in the management of the

10:39:57  6  quarter horse activities, including directing funds to pay for

10:39:59  7  the purchase, breeding, training and racing of quarter horses.

10:40:04  8          Jose Trevino-Morales.  Jose Trevino-Morales is the

10:40:08  9  brother of Miguel and Oscar Trevino-Morales and was actively

10:40:12  10  involved in managing the activities of the money-laundering

10:40:15  11  operation in the United States posing as a legitimate quarter

10:40:19  12  horse owner.  His activities included the coordination of

10:40:22  13  purchasing, training and racing quarter horses using bulk

10:40:26  14  currency, wire transfers, checks from businesses established by

10:40:29  15  the organization, bulk currency deposits, and structured payments

10:40:34  16  from Mexico into the United States.

10:40:36  17          Jose Trevino and his wife, Zulema Trevino, created

10:40:41  18  Tremor Enterprises, LLC, 66 Land, LLC, Zule Farms, LLC, which are

10:40:47  19  business entities for the purpose of promoting the

10:40:51  20  money-laundering activities.

10:40:52  21          Francisco Colorado-Cessa -- I'm sorry.  Let me back up

10:40:56  22  one second.

10:40:57  23          Carlos Miguel Nayen-Borbolla, A/K/A "Carlito," A/K/A

10:41:03  24  "Pilotos."  Nayen was actively involved in managing the

10:41:05  25  activities of the money-laundering operations in the United

| | | |
|---|---|---|
| 10:41:07 | 1 | States, including the coordination of purchasing, training and |
| 10:41:11 | 2 | racing quarter horses using bulk currency, wire transfers, checks |
| 10:41:16 | 3 | from businesses established by the organization, bulk currency |
| 10:41:19 | 4 | deposits, and structured payments from Mexico into the United |
| 10:41:21 | 5 | States.  Nayen was responsible for arranging the various payments |
| 10:41:25 | 6 | to various trainers and boarding facilities for the |
| 10:41:28 | 7 | organization's horses.  Nayen is listed as an officer of Carmina, |
| 10:41:32 | 8 | LLC, a business entity, which is a front company for Los Zetas' |
| 10:41:38 | 9 | money-laundering activities used to conceal and disguise the |
| 10:41:41 | 10 | ownership of the quarter horses. |
| 10:41:43 | 11 | Francisco Antonio Colorado-Cessa, also known as |
| 10:41:47 | 12 | "Pancho."  Cessa was a Mexican businessman operating as a straw |
| 10:41:53 | 13 | purchaser for Miguel and Oscar Trevino-Morales.  Cessa would act |
| 10:41:57 | 14 | as a straw purchaser for various horses.  He would make payments |
| 10:42:01 | 15 | via personal check, checks from businesses established by the |
| 10:42:05 | 16 | organization and wire transfers for the purchase and, also, the |
| 10:42:09 | 17 | boarding and training of quarter horses.  Cessa controls ADT |
| 10:42:14 | 18 | Petro Servicios, a business entity which is a front company for |
| 10:42:17 | 19 | Los Zetas' money-laundering activities used to conceal and |
| 10:42:21 | 20 | disguise the ownership of quarter horses. |
| 10:42:23 | 21 | Fernando Solis-Garcia, also known as "Freddy," also |
| 10:42:27 | 22 | known as "Fer."  Garcia was actively involved in the activities |
| 10:42:31 | 23 | of the money-laundering operations in the United States.  Garcia |
| 10:42:35 | 24 | would work with Defendants Jose Trevino and Nayen in purchasing, |
| 10:42:39 | 25 | training and racing quarter horses using various straw purchasers |

10:42:43  1  and placing quarter horses in various entities for the

10:42:46  2  organization to disguise their true ownership.  Garcia is listed

10:42:49  3  as an officer of Garcia Bloodstock, LLC, and has control of

10:42:54  4  Bonanza Racing, LLC, which, again, are front companies for Los

10:42:58  5  Zetas' money-laundering activities used to conceal and disguise

10:43:00  6  the ownership of quarter horses.

10:43:02  7         Victor Manuel Lopez.  Lopez was actively involved in

10:43:08  8  the activities of money laundering operations in the United

10:43:10  9  States.  Lopez worked under the direction of Defendant Nayen and

10:43:14  10  was responsible for making payments for the care and upkeep of

10:43:17  11  quarter horses via cash payments, wire transfers and personal

10:43:20  12  checks using bulk currency, bulk currency deposits, and

10:43:24  13  structured deposits -- structured payments from Mexico to the

10:43:28  14  United States.

10:43:29  15         Sergio Rogelio Guerrero-Rincon, also known as "El

10:43:33  16  Negro," also known as "El Saltillo."  Rincon was actively

10:43:37  17  involved in the activities of money-laundering operations in the

10:43:40  18  United States.  Rincon would work with Defendant Jose Trevino in

10:43:43  19  making payments for the care and upkeep of quarter horses via

10:43:47  20  cash payments using bulk currency, bulk currency deposits, and

10:43:51  21  structured payments from Mexico into the United States.

10:43:54  22         Eusevio Maldonado-Huitron, also known as "Chevo."

10:43:59  23  Eusevio Huitron worked as a race trainer for the quarter horses

10:44:03  24  under the control of this organization and advised Defendant Jose

10:44:06  25  Trevino and other members and associates of Los Zetas on quarter

10:44:10   1   horse purchases, training and racing.  Eusevio Huitron and his

10:44:13   2   brother Jesus Huitron utilized Huitron Homes and Huitron

10:44:18   3   Painting, both business entities, to launder funds for the

10:44:20   4   organization.

10:44:22   5        Felipe Alejandro Quintero.  Quintero worked as a race

10:44:28   6   trainer for the quarter horses under the control of this

10:44:29   7   organization in California.  Quintero met with Defendants Jose

10:44:33   8   Trevino and Nayen to discuss the training of quarter horses and

10:44:37   9   the method of payment to conceal activities of Los Zetas.  He

10:44:40  10   advised members and associates of Los Zetas on quarter horse

10:44:42  11   purchases, training and racing.

10:44:45  12        Adan Farias.  Farias worked as a race trainer for

10:44:50  13   quarter horses under the control of this organization and advised

10:44:52  14   members and associates of Los Zetas on quarter horse purchases,

10:44:55  15   training and racing.  Farias met with Defendant Miguel Trevino

10:44:59  16   and others to discuss the laundering of drug proceeds via the

10:45:02  17   quarter horse-racing industry.

10:45:04  18        Raul Ramirez.  Ramirez was actively involved in the

10:45:06  19   activities of the money-laundering operations in the United

10:45:10  20   States.  Ramirez would bid on horses on behalf of the

10:45:13  21   organization at auction to aid in disguising the true ownership

10:45:16  22   of the horses.

10:45:17  23        Luis Gerardo Aguirre.  Aguirre operated as a straw

10:45:20  24   purchaser for Los Zetas in which he would purchase quarter horses

10:45:25  25   in his name which would be transferred at a later date to

10:45:28  1  Defendant Jose Trevino-Morales for little or no money.

10:45:31  2       Erick Jovan Lozano-Diaz.  Diaz was involved in making

10:45:34  3  payments for this organization.  Diaz provided approximately

10:45:37  4  $700,000 in bulk U.S. currency and wire transfers to Defendant

10:45:42  5  Gerardo Garza-Quintero to funnel funds to Tremor Enterprises, LLC

10:45:48  6  for the purchase of quarter horses.

10:45:50  7       Gerardo Garza-Quintero.  Quintero was involved in

10:45:53  8  providing funding for this organization.  He would collect bulk

10:45:56  9  U.S. currency and wire transfers from Los Zetas in Mexico and

10:45:59  10  then, used these funds for the purchase of quarter horses that

10:46:02  11  were never actually transferred as a manner for Jose

10:46:06  12  Trevino-Morales to obtain funding.

10:46:07  13       And Jesus Maldonado-Huitron.  Jesus Huitron worked as a

10:46:10  14  race trainer for the quarter horses under this organization.

10:46:13  15  Jesus Huitron and his brother, Eusevio Huitron, utilized Huitron

10:46:18  16  Homes/Huitron Painting, both business entities, to launder funds

10:46:22  17  for this organization.

10:46:22  18       Count 1 reads:  Violation of Title 18, United States

10:46:27  19  Code, Section 1956(h), conspiracy to launder monetary

10:46:31  20  instruments.  Beginning in or about 2008, and continuing until on

10:46:35  21  or about the date of this indictment, which is December 4, 2012,

10:46:39  22  in the Western District of Texas and elsewhere, the Defendants

10:46:42  23  Jose Trevino-Morales, Francisco Antonio Colorado-Cessa, Fernando

10:46:49  24  Solis-Garcia, Eusevio Maldonado-Huitron, and Jesus

10:46:53  25  Maldonado-Huitron, together and with others, known and unknown to

| | |
|---|---|
| 10:46:56 | 1 |
| 10:47:00 | 2 |
| 10:47:04 | 3 |
| 10:47:07 | 4 |
| 10:47:12 | 5 |
| 10:47:16 | 6 |
| 10:47:22 | 7 |
| 10:47:25 | 8 |
| 10:47:30 | 9 |
| 10:47:35 | 10 |
| 10:47:38 | 11 |
| 10:47:42 | 12 |
| 10:47:45 | 13 |
| 10:47:49 | 14 |
| 10:47:53 | 15 |
| 10:47:55 | 16 |
| 10:48:01 | 17 |
| 10:48:04 | 18 |
| 10:48:09 | 19 |
| 10:48:13 | 20 |
| 10:48:17 | 21 |
| 10:48:21 | 22 |
| 10:48:24 | 23 |
| 10:48:28 | 24 |
| 10:48:32 | 25 |

1  the grand jury, did unlawfully, willfully and knowingly combine,

2  conspire, confederate and agree together and with each other to

3  commit certain offenses against the United States as follows:

4           (a) knowing that the property involved in a financial

5  transaction represented the proceeds of some form of unlawful

6  activity (1) did conduct and attempt to conduct such a financial

7  transaction which involved the proceeds of a specified unlawful

8  activity, that is, conspiracy to distribute controlled substances

9  and extortion and bribery in sporting events (2) knowing that the

10  transaction was designed, in whole or in part, to conceal and

11  disguise the nature, the location, the source, the ownership, and

12  the control of the proceeds of the specified unlawful activity,

13  and to avoid a transaction reporting requirement under federal

14  law, all in violation of Title 18, United States Code, Section

15  1956(a)(1)(B).

16           (b) knowing that the property involved in a financial

17  transaction represented the proceeds of some form of unlawful

18  activity, did transport, transmit and transfer and attempt to

19  transport, transmit and transfer a monetary instrument and funds

20  from a place in the United States to or through a place outside

21  the United States and to a place in the United States from or

22  through a place outside the United States, knowing that such

23  transportation was designed, in whole or in part, to conceal and

24  disguise the nature, the location, the source, the ownership and

25  control of the proceeds of the specified unlawful activity, that

| | |
|---|---|
| 10:48:35 | 1 |
| 10:48:39 | 2 |
| 10:48:44 | 3 |
| 10:48:47 | 4 |
| 10:48:52 | 5 |

1  is, conspiracy to distribute narcotics, controlled substances,

2  and extortion and bribery at sporting contests, and to avoid a

3  transaction reporting requirement under federal law, in violation

4  of Title 18, United States Code, Section 1956(a)(2)(B).  All in

5  violation of Title 18, United States Code, Section 1956(h).

6          And I'm going to turn over the listing of the specific

7  overt acts to my co-counsel, Ms. Fernald.

8          MS. FERNALD:  The overt acts outlined in the conspiracy

9  charge:  In furtherance of the conspiracy and in order to effect

10  the object thereof, the defendants and their coconspirators,

11  known and unknown to the grand jury, committed and caused to be

12  committed one of the following overt acts, among others, in the

13  Western District of Texas and elsewhere:

14          Overt Act No. 1.  On or about December the 14th of

15  2008, Ramiro Villareal purchased a quarter horse named Tempting

16  Dash for $21,500.  On October the 24th of 2009, Tempting Dash won

17  the Dash For Cash at the Lone Star Park racetrack in Grand

18  Prairie, Texas, listing Villarreal as the owner.  On November the

19  14th of 2009, the American Quarter Horse Association received

20  paperwork transferring the registration on Tempting Dash from

21  Villarreal to Defendant Jose Trevino.  Trevino put the date of

22  September the 29th of 2009 as the date of transfer, thus

23  backdating the transfer.

24          Overt Act No. 2.  On or about September the 4th of

25  2009, that the defendant, Francisco Colorado-Cessa, with the

10:50:34   1   assistance of others purchased 13 horses at Ruidosa 2009 Yearling
10:50:42   2   Auction for a total of $546,500.  Payment for these horses was
10:50:48   3   made in part with a $516,500 check drawn on the American Express
10:50:56   4   Bank International account of Colorado-Cessa.  This purchase
10:51:02   5   included quarter horses Morning Cartel and Feature Honor, which
10:51:09   6   were subsequently transferred to Defendant Jose Trevino and his
10:51:14   7   entities Tremor Enterprises and 66 Land.
10:51:19   8         Overt Act No. 3.  Defendant Jose Trevino transferred
10:51:26   9   $435,000 gained from the winnings of quarter horse Tempting Dash
10:51:31   10  from one of his Bank of America accounts to his Tremor
10:51:36   11  Enterprises bank account on December the 21st of 2009.  On
10:51:41   12  December the 22nd of 2009, Jose Trevino wrote two checks to
10:51:46   13  himself in the amount of $100,000 and another check of $57,793
10:51:53   14  from Tremor Enterprises account, and deposited these checks into
10:51:58   15  this personal account.  One week later, Jose Trevino wrote two
10:52:02   16  checks from his personal account and put the $157,793 back into
10:52:11   17  Tremor's account, thus creating the appearance of personal
10:52:15   18  income.
10:52:16   19        Overt Act No. 4.  On or about January the 14th of 2010,
10:52:23   20  at the Heritage Place Winter Mixed auction, Defendant Jose
10:52:28   21  Trevino directed the purchase of the quarter horse named Dashin
10:52:33   22  Follies for approximately $875,000 and a quarter horse named
10:52:39   23  Corona Coronita Cartel at approximately $250,000 in a nominee's
10:52:45   24  name.  A $100,000 cash payment was made in the name of Defendant
10:52:51   25  Luis Aguirre as part of the purchase price.  Grupo, a business

10:52:57  1  Mexican entity controlled by Alejandro Barradas, made a number of

10:53:04  2  wire transfers in excess of $900,000.

10:53:08  3       In December 2010, ownership of these two horses were

10:53:12  4  transferred into the name of the Defendant Luis Aguirre.  Payment

10:53:17  5  for the care, boarding and feeding of these horses was arranged

10:53:22  6  for by Defendants Carla Nayen and Victor Lopez.  In January 29th

10:53:28  7  of 2012, these two horses were transferred to 66 Land, an entity

10:53:36  8  under the control of Jose and Zulema Trevino, and moved to

10:53:43  9  Lexington, Oklahoma.

10:53:44  10      Overt Act No. 5.  Defendant Felipe Quintero trained

10:53:49  11  quarter horses on behalf of the organization.  On February the

10:53:53  12  12th of 2010, Felipe Quintero opened up a Bank of America account

10:53:59  13  in the name of Felipe Quintero.  On September the 22nd of '10,

10:54:06  14  Felipe Quintero received a $90,000 wire transfer from ADT Petro

10:54:12  15  Servicios, a business entity controlled by Defendant Francisco

10:54:17  16  Colorado-Cessa and used by the Los Zetas.

10:54:20  17      Defendant Victor Lopez made currency deposits of $5,000

10:54:25  18  on October the 5th of 2010, $4,000 on October the 6th of 2010,

10:54:33  19  and $3,000 on October the 7th of the same year, that were

10:54:37  20  structured into Quintero's account.  Another $9,900 in currency

10:54:43  21  was deposited into the account on October the 18th of 2010.

10:54:49  22      Overt Act No. 6.  In or about June of 2010, Defendant

10:54:55  23  Zulema Trevino, acting on behalf of Tremor Enterprises, in which

10:54:59  24  she was listed as a 25 percent owner, made payments for the

10:55:04  25  boarding, upkeep and breeding of the organization's quarter

10:55:06  1   horses.

10:55:08  2           Overt Act No. 7.  On or about June the 25th of 2010,

10:55:15  3   Defendant Adan Farias opened a Bank of America checking account

10:55:19  4   for LA Horses, Incorporated.  The following were among deposits

10:55:25  5   made into the account in 2010 from Laredo, Texas:  On October the

10:55:31  6   21st, there was a structure of 8,000, and then, another structure

10:55:35  7   of 8,000.  On October the 22nd, 5,500, 8,000.  On October the

10:55:44  8   29th, 9,900.  November the 1st, 6,300, and then, $8,000 on the

10:55:51  9   same day.  On November the 2nd, 1,650.  On November the 17th,

10:55:59  10  $6,000.  November the 17th, 9,000.  November the 18th, 9,000.

10:56:06  11  December the 20th, $5,900 and December the 20th, $9,900.

10:56:13  12          Overt Act No. 8.  On or about September the 3rd through

10:56:17  13  the 5th of 2010, that the Defendants Jose Trevino, Carlos Nayen,

10:56:23  14  Sergio Rincon and Raul Ramirez, and others, attended the Ruidoso

10:56:30  15  Horse Sales Company Yearling Sales in Ruidoso, New Mexico.

10:56:35  16  Ramirez bid on quarter horses on behalf of Nayen and Trevino.

10:56:41  17  Members of the organization purchased 23 horses for $2,240,700.

10:56:50  18  After the auction, Defendant Francisco Colorado-Cessa was listed

10:56:55  19  on the auction paperwork as the owner and provided a check in the

10:57:00  20  amount of $2,240,700 to pay for the horses.  This purchase

10:57:08  21  included quarter horse Fly First Down, which was purchased for

10:57:13  22  $300,000.

10:57:15  23          Overt Act No. 9.  On or about October the 2nd through

10:57:20  24  the 3rd of 2010, at the Los Alamitos Equine Sales at Los

10:57:27  25  Alamitos, California, Defendant Felipe Quintero and others

10:57:32  1   purchased five horses in the name of Grupo, a Mexican business

10:57:36  2   entity, for approximately $442,000.  Wire transfers from Grupo

10:57:44  3   were used to pay for the horses.  Felipe Quintero acted as the

10:57:48  4   purchasing agent for Grupo.

10:57:52  5        Overt Act No. 10.  On or about January the 13th through

10:57:57  6   15th of 2011, Tremor Enterprises, under the ownership and control

10:58:03  7   of Defendant Jose Trevino, placed a quarter horse named Blues

10:58:08  8   Ferrari for auction at the Heritage Place Winter Mixed auction in

10:58:13  9   Oklahoma City, Oklahoma.  This horse was sold for $310,000 to a

10:58:21  10  nominee, in order to provide the appearance of legitimate income

10:58:26  11  for Jose Trevino.

10:58:28  12       Overt Act No. 11.  On or about January the 13th through

10:58:33  13  15th, 2011, at the Heritage Place Mixed Winter Sale in Oklahoma

10:58:39  14  City, Oklahoma, members of the organization to include Jose

10:58:43  15  Trevino, Carlos Nayen, Luis Aguirre, purchased 12 horses for

10:58:49  16  approximately $546,200 in various nominees' names.  Defendant

10:58:56  17  Aguirre also purchased an embryo for approximately $30,000.  All

10:59:01  18  the purchases were paid for by Grupo, a Mexican business entity

10:59:07  19  controlled by Alejandro Barradas.

10:59:10  20       Overt Act No. 12.  On or about May the 20th of 2011,

10:59:18  21  that Defendants Eusevio Huitron and Jesus Huitron, Huitron Homes,

10:59:23  22  received two cash deposits from Victor Lopez totaling

10:59:28  23  approximately $19,800 into their Wells Fargo Bank account.  Each

10:59:36  24  deposit was $9,900 and was deposited into the Wells Fargo account

10:59:42  25  in Laredo, Texas, which payments were made for the boarding and

10:59:46   1   the training of the organization's quarter horses.

10:59:50   2          Overt Act No. 13.  On or about June the 7th of 2011,

10:59:58   3   that Zulema Trevino wrote a check in the amount of $400,000 to

11:00:03   4   Francisco Colorado-Cessa, with the notation in the memo section

11:00:08   5   stating, purchase of Fly First Down.  This check was never

11:00:13   6   negotiated.  The ownership of quarter horse Fly First Down was

11:00:18   7   changed from Cessa to Tremor after winning a qualifying race on

11:00:23   8   May the 27th of 2011, with no actual funds being exchanged to

11:00:30   9   provide the organization with the appearance of legitimate

11:00:33   10  proceeds through the purchase of a valuable quarter horse.

11:00:37   11         Overt Act No. 14.  On or about July the 6th of 2011,

11:00:45   12  Eusevio Huitron and Jesus Huitron received two cash deposits

11:00:50   13  totaling $19,800 into their Wells Fargo account.  Each deposit

11:00:56   14  was 9,900 and was deposited into the Wells Fargo account in

11:01:01   15  Laredo, Texas, which payments were made for the boarding and the

11:01:05   16  training of the organization's quarter horses.

11:01:08   17         Overt Act No. 15.  On or about November the 5th of

11:01:15   18  2011, at the Heritage Place Fall Mixed Sale in Oklahoma City,

11:01:20   19  Oklahoma, that Defendants Fernando Garcia and Carlos Nayen

11:01:24   20  assisted the organization in purchasing eight horses for a total

11:01:29   21  of approximately $211,500.  Garcia acted as a surety for the

11:01:36   22  purchase of the horses.  During the same sale, Jose Trevino

11:01:45   23  brought four horses to be sold at the auction.  Garcia also acted

11:01:50   24  as the surety for the purchasers of these horses.  Jose Trevino

11:01:55   25  sold Blues Girl Choice at approximately $102,000, Devil Ridge for

11:02:04  1   approximately $100,000, Number One Cartel for approximately

11:02:10  2   $280,000, and Forty Force for approximately $40,000.  The price

11:02:17  3   paid for Number One Cartel was greater than the market value and

11:02:21  4   was sold to members of his own organization in order to provide

11:02:25  5   the appearance of a legitimate sale.  All payment arrangements

11:02:30  6   for all of the horses were made by Nayen.

11:02:32  7          Overt Act No. 16.  Zulema Trevino and her husband,

11:02:39  8   Defendant Jose Trevino, controlled 66 Land and Zule Farms, both

11:02:44  9   business entities registered in the state of Oklahoma.  In or

11:02:49  10  about November of 2011, Zulema Trevino, acting on behalf of 66

11:02:56  11  Land, made a number of payments for the boarding and the upkeep

11:03:01  12  of the organization's horses.

11:03:02  13         Overt Act No. 17.  On or about November the 12th of

11:03:08  14  2011, Defendant Victor Lopez made three cash deposits totaling

11:03:13  15  approximately $65,580 into various accounts to include $20,800

11:03:23  16  into the account of the Defendants Eusevio Huitron and Jesus

11:03:27  17  Huitron, D/B/A Huitron Homes and Huitron Painting.

11:03:32  18         Overt Act No. 18.  On or about January 19th through the

11:03:38  19  21st of 2012, at the Heritage Place Winter Mixed Sale held in

11:03:45  20  Oklahoma City, Oklahoma, Defendant Fernando Garcia assisted in

11:03:50  21  the purchase of five horses and two foals in utero.  The horses

11:03:56  22  were placed in the name of various nominees as purchasers.  The

11:03:59  23  total cost was $280,400.  ADT Petro Servicios, a company owned by

11:04:09  24  Defendant Francisco Colorado-Cessa, wired $228,700 on February

11:04:18  25  the 15th, 2012, to cover part of the purchase price for these

11:04:23   1    horses.

11:04:25   2         Overt Act No. 19.  Beginning on February the 28th of

11:04:31   3    2012 until March the 2nd of 2012, Defendant Fernando Garcia

11:04:39   4    directed eight cash payments totaling $51,700, none of which were

11:04:46   5    more than $10,000, to Heritage Place Auction House to pay the

11:04:51   6    remaining balance owed for the purchase of various quarter horses

11:04:55   7    at the Heritage Place 2012 Mixed Sale Auction as alleged in Overt

11:05:02   8    Act No. 18.

11:05:03   9         This is the indictment that is signed by the foreman

11:05:06   10   and by the Assistant United States Attorney Douglas Gardner in

11:05:11   11   this case.

11:05:14   12        THE COURT:  Those are the charges.  Now, on this side

11:05:20   13   of the room, is there anyone, simply because of the indictment

11:05:27   14   that you just heard read, for whatever reason, could not take the

11:05:37   15   oath that I've already defined to you?  And that is that you'll

11:05:39   16   put all of your information, if any, aside, and you'll make a

11:05:45   17   judgment only on the evidence that you hear in this trial?  Is

11:05:48   18   there anything in that indictment that creates a bias, one way or

11:05:54   19   the other, where you could not sit as a judge in this case?  Is

11:05:59   20   there anybody that has that perception?

11:06:02   21        All right.  Let's try here on the right side.  My left,

11:06:10   22   your right.  Anybody, because of the indictment itself and the

11:06:14   23   allegations they made, could not represent to me and these

11:06:19   24   parties that you could make a judgment only on the evidence that

11:06:22   25   you hear in trial?  And how about here on this side?  All right.

| | | |
|---|---|---|
| 11:06:30 | 1 | Now, is there anybody on the panel who, for some |
| 11:06:36 | 2 | reason, knows anything about -- |
| 11:06:39 | 3 | MR. MAYR:  Your Honor. |
| 11:06:40 | 4 | THE COURT:  Okay.  I'm sorry.  Would you stand up and |
| 11:06:43 | 5 | tell me your number? |
| 11:06:44 | 6 | THE JUROR:  92A. |
| 11:06:47 | 7 | THE COURT:  Okay.  I appreciate your being candid and I |
| 11:06:49 | 8 | will excuse 92A.  Anybody that thinks you know anything about the |
| 11:07:07 | 9 | facts as alleged in the indictment? |
| 11:07:25 | 10 | Now, you heard in the indictment read that this is a |
| 11:07:34 | 11 | conspiracy made up of, at least in part, members of the Los Zetas |
| 11:07:42 | 12 | organization.  The charge, however, is that these five people |
| 11:07:51 | 13 | participated in what is called a conspiracy that will be defined |
| 11:07:55 | 14 | for you that they participated in money laundering, that is, |
| 11:08:00 | 15 | moving money taken from illegal operations into a situation |
| 11:08:06 | 16 | disguising it as legitimate money.  That's what this case is |
| 11:08:12 | 17 | about when everything clears. |
| 11:08:15 | 18 | Now, is there anybody on the panel simply because -- |
| 11:08:20 | 19 | not going to be asked any questions if anybody is a Zeta or not. |
| 11:08:24 | 20 | We're not going to have a whole lot of -- there will be evidence |
| 11:08:31 | 21 | as to how the proceeds got where they got, because that's the |
| 11:08:36 | 22 | allegation, and how those proceeds came into being.  But is there |
| 11:08:41 | 23 | anybody simply because something that you've read about any of |
| 11:08:46 | 24 | the gangs in Mexico or in the United States -- and for those of |
| 11:08:51 | 25 | you who still read the newspaper, there was an article last week |

```
11:08:55   1   and an article this week about that type of thing.  Has no
11:09:01   2   bearing on the judgment of the jury in this case.  Only the jury
11:09:07   3   that hears the evidence will make that determination.  And I know
11:09:11   4   I've said that a dozen times, but I'll say it a dozen times more
11:09:15   5   before we're through because it's that important.
11:09:17   6             Anything on this side simply because it involves the
11:09:22   7   Los Zetas, the allegations, organization, that you would not be
11:09:28   8   able to be objective, listen to the evidence and base your
11:09:31   9   judgment solely on what you hear as a juror in this case?  Is
11:09:35  10   there anybody that can't do that, now is the time to raise your
11:09:39  11   hand.  All right.  If you'll just stand, please, and just tell me
11:09:43  12   your number.
11:09:44  13             THE JUROR:  348.
11:09:46  14             THE COURT:  Okay, sir.  And I saw another hand.
11:09:49  15             THE JUROR:  167.
11:09:50  16             THE COURT:  All right.
11:09:55  17             THE JUROR:  171.
11:09:56  18             THE COURT:  Okay.  I'd better start writing these down.
11:09:59  19   I used to could remember things, but age has caught me.  167?
11:10:04  20             THE JUROR:  171.
11:10:06  21             THE COURT:  171.  Help me with the other two.
11:10:08  22             THE JUROR:  348.
11:10:10  23             THE COURT:  348.
11:10:11  24             THE JUROR:  167.
11:10:12  25             THE COURT:  And 167.  Okay.  I want those three, we'll
```

| | | |
|---|---|---|
| 11:10:24 | 1 | -- let's replace 167, 348 and 171.  And if y'all would just |
| 11:10:30 | 2 | follow Mr. Hall.  This is Mr. Hall.  He looks like a real nice |
| 11:10:36 | 3 | person, but he's a mean fellow.  He runs the courtroom.  If you'd |
| 11:10:51 | 4 | just wait a minute, we'll get you another chair. |
| 11:10:53 | 5 | MS. DEMINGS:  Juror No. 167 is replaced by Juror No. |
| 11:10:57 | 6 | 82. |
| 11:11:06 | 7 | THE COURT:  I tell you what, while we're doing this, |
| 11:11:11 | 8 | let us -- |
| 11:11:21 | 9 | MS. DEMINGS:  Juror No. 348 is replaced by Juror 193. |
| 11:11:35 | 10 | THE COURT:  Okay.  I'm sorry.  What was it?  What was |
| 11:11:38 | 11 | the first one? |
| 11:11:39 | 12 | MS. DEMINGS:  Juror No. 167 is replaced by 82. |
| 11:11:42 | 13 | THE COURT:  Okay. |
| 11:11:43 | 14 | MS. DEMINGS:  And then, Juror 348 is replaced by 193. |
| 11:11:50 | 15 | THE COURT:  Okay. |
| 11:11:56 | 16 | MS. DEMINGS:  And Juror 171 is replaced by Juror 278. |
| 11:12:18 | 17 | THE COURT:  Okay.  Before was set them there, Mr. Hall, |
| 11:12:20 | 18 | let's take those three and set them right over here on this |
| 11:12:25 | 19 | bench, behind counsel. |
| 11:12:29 | 20 | COURT SECURITY OFFICER:  I believe that last lady's |
| 11:12:31 | 21 | been excused. |
| 11:12:32 | 22 | THE COURT:  And 208's going to join them.  Counsel, |
| 11:12:43 | 23 | y'all probably have already done that, but I'm going to start |
| 11:12:45 | 24 | doing that now to make sure that you know what you're doing. |
| 11:12:54 | 25 | All right.  Anybody else?  Anybody out there on this |

11:13:01  1  section because of the allegation, if you'd stand, please, tell

11:13:04  2  me your number.

11:13:05  3           THE JUROR:  182.

11:13:06  4           THE COURT:  182.  Okay.  Slow down just a second.  When

11:13:16  5  I was important, I used to have a secretary, you see, that would

11:13:19  6  do that.  182 is what number?  Fifty-three.  Okay.

11:13:27  7           THE JUROR:  131.

11:13:28  8           THE COURT:  All right.  131.  If you'd just have a

11:13:31  9  seat.  Thank you.  And back in the back.

11:13:36  10          THE JUROR:  121A.

11:13:40  11          THE COURT:  All right.

11:13:42  12          THE JUROR:  121A.

11:13:48  13          MS. DEMINGS:  I didn't hear the number.

11:13:49  14          THE COURT:  I'm sorry, I couldn't hear you.

11:13:50  15          THE JUROR:  121A.

11:13:52  16          THE COURT:  121A.  Okay.  All right.  Counsel, did you

11:14:02  17  get all of those?

11:14:03  18          COURT SECURITY OFFICER:  Your Honor, there's one on the

11:14:05  19  back row on the left.

11:14:06  20          THE JUROR:  Juror 162A.

11:14:08  21          THE COURT:  All right.  162A.  Anybody else?  All

11:14:19  22  right.  The next thing that we're going to do is I'm going to

11:14:23  23  have the lawyers read to you the possible list of witnesses.

11:14:30  24  Doesn't mean that all of these people are going to testify, but

11:14:33  25  I've told them to be totally inclusive so that there's not the

| | |
|---|---|
| 11:14:39 | 1 |
| 11:14:45 | 2 |
| 11:14:48 | 3 |

names of anybody that you won't hear that will be witnesses.  If you think you may know any of these people as the lawyers read their witness list, please raise your hand and we'll inquire.

MR. GARDNER:  May I proceed, your Honor?

THE COURT:  Yes, sir.

MR. GARDNER:  Now comes the United States of America and provided, this is a list of potential witnesses in the above-styled case.  The government may or may not call the witnesses listed below and reserves the right to call additional witnesses not on this list in rebuttal.

Adan Farias, Alejandra Obregon, Alfonso Del Rayo-Mora, Annelle Reynolds, Bill Pilgrim, Bill Price.

THE COURT:  Little slower.

MR. GARDNER:  Yes, sir.

Brian Schutt, Butch Wise, Carlos Arian Jaff-Bosdet, Myrna Reyes, Charles Cox, David Weiss, Debbie Kempe or Kemp, Diane Reed, Felipe Quintero, Gerardo Chapa, Gerardo Mata-Morales, Hector Gerardo Moreno-Villanueva, Hernando Guerra, Jaime Gomez, Jane Eckert, Jeff Tebow, Jessica Murray, Jesus Enrique Rejon-Aguilar, Joe Garza, Jose Carlos Hinojosa, Jose Flores, Jose Mendoza, Jose Vasquez, Jr., Jose Vasquez, Sr., Juan Aleman, Kyle Mori, Marcial Reyes, Mario Alfonso Cuellar-Salazar, Matt Martin, Matt Witman, Mauricio Paez, Mayra Conde, Melody Knuchell, Randy Lynn Hill, Raul Guajardo Guadalajara-Guia, Ricardo Barrera, Russell Stooks, Andrew Farabow, Anne Fernandez, Bill Johnston,

| | | |
|---|---|---|
| 11:17:30 | 1 | Billy Williams, Carlos Salinas, Carole Lee, Charles Adam, David |
| 11:17:41 | 2 | Kice, Donna Cowling, Edward O'Dwyer, Haskell Wilkins, John |
| 11:17:51 | 3 | Spaeth, Joshua Schenk, Kyle Casey, Lynelle Torikai, Michael |
| 11:18:02 | 4 | Fernald, Randall K. Hicks, known as Kevin, Santiago Moya, Scott |
| 11:18:11 | 5 | Lawson, Scott Thaggard, Steve Pennington, Scott Craigmyle, Shalyn |
| 11:18:20 | 6 | Bliss, Sharon Moore, Tammy Canida, TFO Johnny Sosa -- that's a |
| 11:18:30 | 7 | task force officer -- Tyler Graham, and Mexican-protected witness |
| 11:18:35 | 8 | by the name of "Pitufo."  That will be all I have, your Honor. |
| 11:18:38 | 9 | THE COURT:  Anybody -- okay.  I've got a couple of |
| 11:18:43 | 10 | hands.  Yes, ma'am. |
| 11:18:44 | 11 | THE JUROR:  Well, there was -- |
| 11:18:45 | 12 | THE COURT:  Tell me your number, please. |
| 11:18:47 | 13 | THE JUROR:  246. |
| 11:18:48 | 14 | THE COURT:  All right. |
| 11:18:49 | 15 | THE JUROR:  I just wanted to clarify if there was a |
| 11:18:52 | 16 | Brian Scott or no? |
| 11:18:54 | 17 | MR. GARDNER:  The name is Schutt -- Brian Schutt.  He's |
| 11:18:57 | 18 | from the Irving Police Department officer.  City of Irving, near |
| 11:19:00 | 19 | Dallas. |
| 11:19:01 | 20 | THE JUROR:  Oh, no. |
| 11:19:03 | 21 | THE COURT:  Yes, ma'am. |
| 11:19:03 | 22 | THE JUROR:  268, Haskell Wilkins, he's been in the |
| 11:19:07 | 23 | family for. |
| 11:19:09 | 24 | MR. GARDNER:  Okay.  Haskell Wilkins is an FBI agent in |
| 11:19:12 | 25 | Laredo. |

| 11:19:14 | 1 | THE JUROR:  Uh-huh. |
| 11:19:14 | 2 | THE COURT:  I missed that. |
| 11:19:16 | 3 | THE JUROR:  He's like far down the line of my family. |
| 11:19:18 | 4 | THE COURT:  Okay.  Not a Floridian.  All right. |
| 11:19:23 | 5 | Anybody else think you might know any of those people?  I see one |
| 11:19:28 | 6 | hand back there. |
| 11:19:29 | 7 | THE JUROR:  207.  Jaime Gomez. |
| 11:19:33 | 8 | MR. GARDNER:  Jaime Gomez is a horse trainer out of |
| 11:19:36 | 9 | California. |
| 11:19:36 | 10 | THE JUROR:  No. |
| 11:19:37 | 11 | THE COURT:  All right.  Let the record reflect that |
| 11:19:40 | 12 | that's not the right Jaime Flores. |
| 11:19:43 | 13 | THE JUROR:  319.  Donna Cowling. |
| 11:19:46 | 14 | MR. GARDNER:  Donna Cowling is a special agent with the |
| 11:19:49 | 15 | FBI here in Austin, Texas, your Honor. |
| 11:19:50 | 16 | THE COURT:  All right. |
| 11:19:52 | 17 | THE JUROR:  She's a family friend of my husband's. |
| 11:19:55 | 18 | THE COURT:  Okay.  The fact that she may testify, would |
| 11:20:01 | 19 | that -- would you be able to evaluate her testimony just like |
| 11:20:05 | 20 | anybody else?  Or because you know her, you think it would be |
| 11:20:08 | 21 | best not for you to be on the jury to determine her credibility? |
| 11:20:13 | 22 | THE JUROR:  I would like to think that I would listen |
| 11:20:16 | 23 | to her testimony.  I just don't -- not certain if that's the |
| 11:20:19 | 24 | case. |
| 11:20:20 | 25 | THE COURT:  You know, we're not in my courtroom.  My |

| | | |
|---|---|---|
| 11:20:21 | 1 | courtroom, I have a horseshoe there and I pick it up when I get |
| 11:20:25 | 2 | something like that, and I say, you know, there's no point in |
| 11:20:29 | 3 | being close in the courtroom.  Can you represent to these parties |
| 11:20:35 | 4 | that you can listen to her testimony and evaluate it just like |
| 11:20:38 | 5 | you would anybody that you did not know? |
| 11:20:40 | 6 | THE JUROR:  Yes, sir. |
| 11:20:41 | 7 | THE COURT:  All right.  Thank you.  Anybody else?  All |
| 11:20:46 | 8 | right. |
| 11:20:50 | 9 | MR. DEGEURIN:  Your Honor, may we approach the bench? |
| 11:20:56 | 10 | THE COURT:  You may. |
| 11:20:58 | 11 | (At the bench, on the record.) |
| 11:21:16 | 12 | MR. DEGEURIN:  I'm going to object to using the |
| 11:21:16 | 13 | nickname "Pitufo" as a witness.  We can't identify -- we know who |
| 11:21:29 | 14 | he is but not by that nickname.  He doesn't even use that name |
| 11:21:31 | 15 | himself, "Pitufo."  If there's a security reason or something, |
| 11:21:37 | 16 | I'd like to know about it.  But otherwise, I'm going to object to |
| 11:21:41 | 17 | it and see if anybody knows him. |
| 11:21:41 | 18 | MR. GARDNER:  Your Honor, that is the name by the |
| 11:21:45 | 19 | Mexican government that was assigned for the protected witness. |
| 11:21:45 | 20 | He's never testified here in the United States.  There is a |
| 11:21:53 | 21 | security reason.  If he were to testify anywhere, the name |
| 11:22:00 | 22 | "Pitufo" was definitely going to be released.  They would |
| 11:22:00 | 23 | recognize him by the name "Pitufo."  But it's -- |
| 11:22:03 | 24 | MR. DEGEURIN:  But if someone were to know him. |
| 11:22:06 | 25 | THE COURT:  Well, I think it's highly unlikely that you |

| | |
|---|---|
| 11:22:08 | 1 |
| 11:22:13 | 2 |
| 11:22:14 | 3 |
| 11:22:17 | 4 |
| 11:22:19 | 5 |
| 11:22:20 | 6 |
| 11:22:23 | 7 |
| 11:22:26 | 8 |
| 11:22:27 | 9 |
| 11:22:28 | 10 |
| 11:22:30 | 11 |
| 11:22:32 | 12 |
| 11:22:32 | 13 |
| 11:22:35 | 14 |
| 11:22:38 | 15 |
| 11:22:40 | 16 |
| 11:22:41 | 17 |
| 11:22:42 | 18 |
| 11:23:01 | 19 |
| 11:23:05 | 20 |
| 11:23:08 | 21 |
| 11:23:15 | 22 |
| 11:23:23 | 23 |
| 11:23:31 | 24 |
| 11:23:36 | 25 |

1  might have to inquire.  In the present time, I'll overrule the

2  objection.

3        MR. DEGEURIN:  Yeah.  I don't mean to put anybody in

4  danger, but, I mean, are you saying that his real name --

5        MR. GARDNER:  Yes.

6        MR. DEGEURIN:  -- cannot be used in the United States?

7        MR. GARDNER:  If he is to take the stand, then his real

8  name will be used.

9        MR. DEGEURIN:  Oh, okay.

10        MR. GARDNER:  I'm just saying --

11        MR. DEGEURIN:  I hope it's not too late for the jury,

12  you know, to find out they know him and have to --

13        MR. GARDNER:  Yeah.  I'm not going to ask to have him

14  identified --

15        MR. DEGEURIN:  Okay.  My objection has been overruled?

16        THE COURT:  Yes, sir.

17        MR. DEGEURIN:  I still keep it.

18        THE COURT:  Okay.  Close to your heart.

19        Okay.  When we have these little things, just think of

20  it like the catcher and the pitcher.  They run out there and talk

21  for a minute, except I'm the referee, too.  I tell them when it's

22  over.

23        Anybody that walks into this courthouse, a black

24  person, an Anglo, an Hispanic, an American citizen, a

25  non-American citizen, everyone that walks into this courthouse

| | |
|---|---|
| 11:23:42 | 1 |

has the same constitutional rights that we all have that are
sitting here.  Now, some folks, for whatever reason, may be good,
may be bad, doesn't make any difference, can't apply that rule.
But in the courtroom, it has to be applied.  When they come and
testify, it doesn't make any difference, the race, the
nationality, the citizenship, the jury must determine the
credibility of the witness when he testifies, but you can't be
influenced by something of the physical makeup of a person.

Now, is there anybody on the panel who can't represent
to me that any witness that comes in here, no matter what race,
gender, citizenship, you cannot start off even and listen to the
testimony and judge that person solely on the testimony and not
where that person is from, or what he looks like, or she?  If you
can't do that, not anything wrong with that.  Some people can't.
But I need to know that now.

All right.  It's mentioned in the indictment that Mr.
Colorado is the owner of an oil field environmental remediation
company in Mexico, or a company in Mexico, anyway, referred to as
ADT.  Is there anybody on the panel who's ever heard of that
corporation?

Is there anybody on the panel who, actively now or in
the past, has been involved in the oil field environmental
remediation business?

COURT SECURITY OFFICER:  Your Honor.

THE COURT:  Okay.

| | | |
|---|---|---|
| 11:26:16 | 1 | THE JUROR:  21.  I wasn't involved in the business, but |
| 11:26:19 | 2 | I worked for TCEQ, Texas Commission on Environmental Quality. |
| 11:26:29 | 3 | THE COURT:  And did you work with any company called |
| 11:26:31 | 4 | ADT? |
| 11:26:32 | 5 | THE JUROR:  No, sir.  But I did do risk assessment with |
| 11:26:36 | 6 | work on projects that might have involved oil pollution and such. |
| 11:26:42 | 7 | THE COURT:  As far as you know with the allegations |
| 11:26:46 | 8 | you've heard in this case, does the fact that somebody might have |
| 11:26:54 | 9 | been associated with an oil remediation company, would that be |
| 11:26:59 | 10 | influential to you? |
| 11:27:00 | 11 | THE JUROR:  No, sir. |
| 11:27:01 | 12 | THE COURT:  Thank you.  All right. |
| 11:27:04 | 13 | COURT SECURITY OFFICER:  Your Honor, lady to the left. |
| 11:27:07 | 14 | THE COURT:  Okay.  Now, somebody's going to have to |
| 11:27:09 | 15 | stand up.  Okay. |
| 11:27:10 | 16 | THE JUROR:  I am standing.  I'm Juror 102. |
| 11:27:17 | 17 | THE COURT:  Before you get to laughing, my wife's |
| 11:27:20 | 18 | five-two. |
| 11:27:20 | 19 | THE JUROR:  Juror 102.  My husband's in the |
| 11:27:22 | 20 | environmental remediation business. |
| 11:27:23 | 21 | THE COURT:  Okay.  And have you ever heard of this |
| 11:27:26 | 22 | company in Mexico? |
| 11:27:27 | 23 | THE JUROR:  I can't say that I have. |
| 11:27:28 | 24 | THE COURT:  Okay.  Whether you can't say or not, have |
| 11:27:32 | 25 | you heard? |

| | | |
|---|---|---|
| 11:27:32 | 1 | THE JUROR:  I have not. |
| 11:27:33 | 2 | THE COURT:  Okay.  All right.  Thank you. |
| 11:27:37 | 3 | Well, the next thing we're going to get into, I want to |
| 11:27:40 | 4 | know on this side of how many of you have ever been in the horse |
| 11:27:45 | 5 | business?  I'm not talking about a horse in the backyard that the |
| 11:27:49 | 6 | kids ride and ate a lot of hay.  I'm talking about raising |
| 11:27:56 | 7 | horses, whether on a farm or a ranch, and, of course, raising |
| 11:28:00 | 8 | horses in racing horses and quarter horses.  So how many of you |
| 11:28:06 | 9 | have experience in raising, or riding, or buying, or selling |
| 11:28:20 | 10 | quarter horses?  How many of you back -- we've got one here.  If |
| 11:28:23 | 11 | you'd tell me your number please. |
| 11:28:24 | 12 | THE JUROR:  No. 80. |
| 11:28:26 | 13 | THE COURT:  And tell me how you're associated. |
| 11:28:29 | 14 | THE JUROR:  If I understood the question properly, I |
| 11:28:32 | 15 | have a horse -- we had horses when I was younger. |
| 11:28:35 | 16 | THE COURT:  Pardon me? |
| 11:28:36 | 17 | THE JUROR:  We had horses in our family when I was |
| 11:28:39 | 18 | younger. |
| 11:28:39 | 19 | THE COURT:  Okay.  Did you know if it was a quarter |
| 11:28:41 | 20 | horse or not? |
| 11:28:42 | 21 | THE JUROR:  It was a quarter horse. |
| 11:28:43 | 22 | THE COURT:  Okay.  And did it race other than when you |
| 11:28:45 | 23 | were on it? |
| 11:28:46 | 24 | THE JUROR:  No. |
| 11:28:47 | 25 | THE COURT:  Okay.  All right.  Thank you, ma'am. |

| | | |
|---|---|---|
| 11:28:50 | 1 | Anybody else?  And the fact that you know things about horses, it |
| 11:28:55 | 2 | may be important to the lawyers, so be liberal in your answer. |
| 11:29:00 | 3 | How about back here?  Anybody, background with horses?  We'll |
| 11:29:04 | 4 | start off with you in the corner, sir. |
| 11:29:06 | 5 | THE JUROR:  Forty-seven.  Up in Ohio, we dealt with |
| 11:29:11 | 6 | pacers and trotters and they would stay on our ranch. |
| 11:29:14 | 7 | THE COURT:  Okay.  All right.  Never did have any |
| 11:29:18 | 8 | quarter horses? |
| 11:29:18 | 9 | THE JUROR:  No, sir. |
| 11:29:19 | 10 | THE COURT:  They're really interesting to watch.  I've |
| 11:29:23 | 11 | just seen those on television.  Okay.  Next.  Yes. |
| 11:29:27 | 12 | THE JUROR:  205.  I own several quarter horses.  I was |
| 11:29:32 | 13 | barrel racing, my daughter barrel raced, but we did not race in |
| 11:29:37 | 14 | quarter horse racing. |
| 11:29:38 | 15 | THE COURT:  All right.  And where did you do the barrel |
| 11:29:40 | 16 | racing? |
| 11:29:41 | 17 | THE JUROR:  South Texas, Corpus Christi area. |
| 11:29:44 | 18 | THE COURT:  Okay.  Thank you.  Anybody else?  I've got |
| 11:29:50 | 19 | one way in the back. |
| 11:29:52 | 20 | THE JUROR:  Ninety.  My husband's family raised some |
| 11:29:58 | 21 | horses that they sold, but that was before I joined the family. |
| 11:30:03 | 22 | THE COURT:  Where was that, ma'am? |
| 11:30:05 | 23 | THE JUROR:  In Brenham, Texas. |
| 11:30:06 | 24 | THE COURT:  All right.  Thank you.  Yes, ma'am. |
| 11:30:13 | 25 | THE JUROR:  319.  My stepmother's family used to buy |

| 11:30:18 | 1 | and race quarter horses, particularly after their racing |
| 11:30:25 | 2 | lifespan. |
| 11:30:25 | 3 | THE COURT:  Okay.  And where do they live? |
| 11:30:28 | 4 | THE JUROR:  Georgetown, Texas. |
| 11:30:29 | 5 | THE COURT:  Okay.  Yes.  You don't need -- yeah. |
| 11:30:35 | 6 | You're right. |
| 11:30:36 | 7 | THE JUROR:  No. 6.  My father trained quarter horses in |
| 11:30:40 | 8 | the late '80s, early '90s in South Texas. |
| 11:30:44 | 9 | THE COURT:  Where now? |
| 11:30:45 | 10 | THE JUROR:  Victoria, Goliad County. |
| 11:30:48 | 11 | THE COURT:  Okay.  Did you ever assist? |
| 11:30:50 | 12 | THE JUROR:  No.  I did not. |
| 11:30:51 | 13 | THE COURT:  Did you ever ride? |
| 11:30:52 | 14 | THE JUROR:  I never rode. |
| 11:30:54 | 15 | THE COURT:  You want to sit down?  Yes, ma'am. |
| 11:31:01 | 16 | THE JUROR:  181.  Just horses for pleasure.  Worked at |
| 11:31:07 | 17 | a stable as a young girl. |
| 11:31:09 | 18 | THE COURT:  Whereabouts? |
| 11:31:10 | 19 | THE JUROR:  South Texas, Dickinson area, south of |
| 11:31:15 | 20 | Houston. |
| 11:31:16 | 21 | THE COURT:  Thank you.  Anybody else want to tell us |
| 11:31:18 | 22 | about horses?  Yes. |
| 11:31:19 | 23 | THE JUROR:  252.  Distant family members raised quarter |
| 11:31:25 | 24 | horses.  My wife worked for them for a short time. |
| 11:31:26 | 25 | THE COURT:  Whereabouts? |

| | | |
|---|---|---|
| 11:31:27 | 1 | THE JUROR:  In Lee County. |
| 11:31:28 | 2 | THE COURT:  Okay.  Thank you.  Did I get everybody? |
| 11:31:39 | 3 | See, the nice thing about being here, I've got somebody that's |
| 11:31:42 | 4 | going to correct me there and somebody's going to correct me |
| 11:31:44 | 5 | there. |
| 11:31:49 | 6 | All right.  How many of you have ever been to a quarter |
| 11:31:55 | 7 | horse race in Ruidoso or anywhere else?  Okay.  Let's slow down |
| 11:32:01 | 8 | just a minute.  Racing is one thing, riding is another |
| 11:32:06 | 9 | apparently.  Let's do it by rows because the lawyers will want to |
| 11:32:11 | 10 | check y'all off.  So raise your hand on the first row.  Five of |
| 11:32:20 | 11 | them.  Keep them up.  I'm not going to ask you if you won or |
| 11:32:28 | 12 | lost.  Okay.  How about the next row?  Now, how did y'all get |
| 11:32:38 | 13 | five on one row?  How about the next row?  We've got two.  And |
| 11:32:44 | 14 | the last row?  One. |
| 11:32:48 | 15 | MR. MAYR:  Judge, could we do it one more time? |
| 11:32:51 | 16 | They're popping up and going right back down. |
| 11:32:52 | 17 | THE COURT:  No.  They weren't, but the lawyers are |
| 11:32:54 | 18 | slow.  They're just like me, they want a secretary.  Okay.  Let's |
| 11:32:57 | 19 | do third row again.  Two.  And then, we had one on the last row. |
| 11:33:08 | 20 | Okay.  Let's try over here.  Anybody been -- okay.  Just the |
| 11:33:13 | 21 | first row.  Keep your hand up.  Okay.  Next row, please.  I have |
| 11:33:29 | 22 | two. |
| 11:33:33 | 23 | MS. WILLIAMS:  Judge, if they could stand up, we could |
| 11:33:35 | 24 | see their numbers a lot better. |
| 11:33:36 | 25 | THE COURT:  You've been requested to stand up.  All of |

```
11:33:40   1   you'd better stand up.  Okay.  And the next row.  If y'all will
11:33:46   2   stand up, please.  Four.  And the next row.  Two.  Anybody else
11:34:11   3   on that back row?  Okay.  And how about over here on the right
11:34:22   4   side?  All right.  I've already got two of you with numbers.  But
11:34:32   5   I don't have your number, if you'll do.
11:34:35   6           THE JUROR:  154A.
11:34:39   7           THE COURT:  All right.  All of you who have gone to a
11:34:43   8   racetrack and seen a quarter horse race, was that so astounding
11:34:51   9   in your life that would influence you if you're to be a juror in
11:34:55  10   this case?  I see no hands.
11:35:02  11           Now, I didn't inquire about anybody working for the
11:35:08  12   FBI.
11:35:09  13           MS. DEMINGS:  We've got some more.
11:35:10  14           THE JUROR:  3A.  I just wanted clarification.  I've
11:35:14  15   been at a track working and seeing the races, but I've never gone
11:35:18  16   on my own volition to go see the race.
11:35:21  17           THE COURT:  Well, that's all right.  If you worked at a
11:35:24  18   track, they want to know that.  Which track?
11:35:26  19           THE JUROR:  Well, I worked for Pepsi and we would go to
11:35:28  20   the different tracks.  They had horse races in Manor at the Manor
11:35:31  21   Downs track.  I don't know if those are the quarter horses or
11:35:34  22   not.
11:35:34  23           THE COURT:  But you were selling cold drinks?
11:35:37  24           THE JUROR:  Yeah.  I worked I was a technician for
11:35:39  25   Pepsi, and so, we would go out there, and in between, we'd watch
```

```
11:35:42   1   some of the races and things like that.  But.

11:35:45   2              THE COURT:  Well, I'm sure they have some quarter

11:35:47   3   horses in Manor.  Okay.  Well, you told us.

11:35:57   4              Let's stay right here and this group.  Other than the

11:36:02   5   FBI, is there in your immediate family or you that's ever been

11:36:07   6   involved in active law enforcement?  Yes, ma'am.  If you'll tell

11:36:13   7   me.

11:36:13   8              THE JUROR:  My brother.

11:36:15   9              THE COURT:  What now?

11:36:15  10              THE JUROR:  111.

11:36:20  11              THE COURT:  And what was it?

11:36:21  12              THE JUROR:  My brother.

11:36:22  13              THE COURT:  And what did he do?

11:36:23  14              THE JUROR:  Did.  He's a police officer in northern

11:36:26  15   California, but also participated in undercover task force for

11:36:32  16   narcotics.

11:36:32  17              THE COURT:  Is he retired now?

11:36:34  18              THE JUROR:  No.  He's deceased.

11:36:35  19              THE COURT:  He's deceased.  All right.  Yes, ma'am.

11:36:39  20              THE JUROR:  Fifteen.  I was involved in city code

11:36:43  21   enforcement.  I don't know if you're calling that law enforcement

11:36:46  22   or not.

11:36:46  23              THE COURT:  Just depends.  If I got a ticket, I would

11:36:50  24   probably say so.  Yes.  For what entity?

11:36:54  25              THE JUROR:  The city health department.
```

| | | |
|---|---|---|
| 11:36:56 | 1 | THE COURT:  Okay.  Yes, sir. |
| 11:36:58 | 2 | THE JUROR:  282.  I had a nephew that was highway |
| 11:37:09 | 3 | patrolman.  And I had a brother-in-law that was a police officer. |
| 11:37:13 | 4 | THE COURT:  Whereabouts? |
| 11:37:14 | 5 | THE JUROR:  At Lockhart. |
| 11:37:17 | 6 | THE COURT:  Okay.  Thank you.  Yes, ma'am. |
| 11:37:21 | 7 | THE JUROR:  272.  My brother-in-law used to work with a |
| 11:37:26 | 8 | threat assessment group monitoring phone calls with the jail |
| 11:37:30 | 9 | system. |
| 11:37:31 | 10 | THE COURT:  Okay.  Worked for county sheriff? |
| 11:37:33 | 11 | THE JUROR:  No.  He worked in Huntsville. |
| 11:37:36 | 12 | THE COURT:  Okay. |
| 11:37:37 | 13 | THE JUROR:  Huntsville, Texas. |
| 11:37:38 | 14 | THE COURT:  Okay.  The prison system there.  Okay. |
| 11:37:40 | 15 | Thank you.  Yes, ma'am. |
| 11:37:41 | 16 | THE JUROR:  181.  I currently work for the city, |
| 11:37:48 | 17 | support the Office of the Medical Director that supports EMS, AFD |
| 11:37:53 | 18 | and APD.  And had a cousin who is a narcotics officer in Houston. |
| 11:37:59 | 19 | THE COURT:  All right.  Thank you.  Yes, ma'am. |
| 11:38:03 | 20 | THE JUROR:  127.  My mother-in-law is a retired federal |
| 11:38:07 | 21 | judge for the U.S. Air Force. |
| 11:38:09 | 22 | THE COURT:  Okay.  Administrative judge? |
| 11:38:11 | 23 | THE JUROR:  Yes, sir. |
| 11:38:11 | 24 | THE COURT:  Thank you.  Yes, ma'am. |
| 11:38:14 | 25 | THE JUROR:  268.  My dad is a career law enforcement in |

| | | |
|---|---|---|
| 11:38:19 | 1 | Lockhart.  And my uncle-in-law works for APD. |
| 11:38:23 | 2 | THE COURT:  What type of work did he do? |
| 11:38:24 | 3 | THE JUROR:  My uncle-in-law works for APD.  My father |
| 11:38:27 | 4 | works in Lockhart as a police officer. |
| 11:38:30 | 5 | THE COURT:  Okay. |
| 11:38:32 | 6 | THE JUROR:  208.  My retired husband was an arson |
| 11:38:35 | 7 | investigator with the fire department in Austin. |
| 11:38:37 | 8 | THE COURT:  Here in Austin? |
| 11:38:38 | 9 | THE JUROR:  Uh-huh. |
| 11:38:39 | 10 | THE COURT:  All right.  Yes, sir. |
| 11:38:40 | 11 | THE JUROR:  Seventy-eight.  I have a cousin that was a |
| 11:38:44 | 12 | police officer for Huntsville Police Department, accident |
| 11:38:48 | 13 | investigator. |
| 11:38:48 | 14 | THE COURT:  All right. Yes, ma'am. |
| 11:38:51 | 15 | THE JUROR:  I have an uncle who was in the Arizona |
| 11:38:54 | 16 | Highway Patrol. |
| 11:38:56 | 17 | THE COURT:  Okay.  Anybody else on this side?  Yes, |
| 11:39:01 | 18 | sir. |
| 11:39:01 | 19 | THE JUROR:  My son -- 189.  My son is a active police |
| 11:39:06 | 20 | officer right now in San Antonio. |
| 11:39:07 | 21 | THE COURT:  All right.  Thank you.  All right.  Back |
| 11:39:11 | 22 | over here, let's try the front row.  Yes, ma'am. |
| 11:39:16 | 23 | THE JUROR:  182.  Texas Department of Public Safety |
| 11:39:19 | 24 | criminal. |
| 11:39:24 | 25 | THE COURT:  What did you do? |

11:39:25   1          THE JUROR:  I was a crime analyst.

11:39:26   2          THE COURT:  Okay.  Yes.

11:39:29   3          THE JUROR:  Sixty-seven.  My son-in-law's a deputy

11:39:31   4   sheriff.

11:39:32   5          THE COURT:  Whereabouts?

11:39:33   6          THE JUROR:  San Joaquin County, California.

11:39:36   7          THE COURT:  Okay.  Yes.

11:39:37   8          THE JUROR:  Forty-four.  While with the military, I was

11:39:41   9   a criminal investigator.

11:39:43   10          THE COURT:  Okay.  And where was that?

11:39:46   11          THE JUROR:  In the United States and overseas.  I was

11:39:50   12   in the military.

11:39:51   13          THE COURT:  Well, I understand that, but so you did it

11:39:53   14   both outside the United States and inside?

11:39:56   15          THE JUROR:  (Moving head up and down.)

11:39:56   16          THE COURT:  Okay.  All right.  Anybody else on the

11:39:59   17   second row?  If you'd just do me -- just stand.

11:40:04   18          THE JUROR:  207.  I'm a retired detective with the

11:40:08   19   Austin Police Department.

11:40:08   20          THE COURT:  All right.  How long have you been retired?

11:40:11   21          THE JUROR:  I retired in '05.

11:40:13   22          THE COURT:  Okay.  Thank you.

11:40:15   23          THE JUROR:  Thirty-six.  I have a cousin who works for

11:40:20   24   Travis County Sheriff's Department and a cousin that works with

11:40:22   25   the Williamson County Sheriff's Department.

| | | |
|---|---|---|
| 11:40:23 | 1 | THE COURT:  All right.  Thank you. |
| 11:40:26 | 2 | THE JUROR:  209.  My brother was a Bastrop County |
| 11:40:29 | 3 | sheriff's deputy. |
| 11:40:30 | 4 | THE COURT:  All right.  You say was. |
| 11:40:32 | 5 | THE JUROR:  Yes, sir.  Not anymore. |
| 11:40:34 | 6 | THE COURT:  Okay.  And I saw somebody -- yes. |
| 11:40:38 | 7 | THE JUROR:  206.  My husband in Pennsylvania was a |
| 11:40:42 | 8 | part-time municipal. |
| 11:40:47 | 9 | THE COURT:  All right.  Thank you.  Anybody else on |
| 11:40:51 | 10 | this side right here?  Yes, sir. |
| 11:40:53 | 11 | THE JUROR:  144.  My first cousin who's a state |
| 11:40:59 | 12 | trooper. |
| 11:41:00 | 13 | THE COURT:  Okay.  In Texas? |
| 11:41:02 | 14 | THE JUROR:  Yes. |
| 11:41:02 | 15 | THE COURT:  Okay. |
| 11:41:03 | 16 | THE JUROR:  Austin. |
| 11:41:04 | 17 | THE JUROR:  Fifty-four.  I used to work for the capitol |
| 11:41:10 | 18 | with state conflicts. |
| 11:41:11 | 19 | THE COURT:  Was that -- is that for the state? |
| 11:41:13 | 20 | THE JUROR:  It was the capitol complex and now DPS. |
| 11:41:17 | 21 | But it was capitol system in the late '80s. |
| 11:41:19 | 22 | THE COURT:  Okay. |
| 11:41:20 | 23 | THE JUROR:  252.  My wife worked for the animal control |
| 11:41:23 | 24 | officers for the police department in Giddings. |
| 11:41:25 | 25 | THE COURT:  All right. |

| | | |
|---|---|---|
| 11:41:27 | 1 | THE JUROR:  Juror 8.  Currently, APD.  Can I approach |
| 11:41:33 | 2 | the bench and tell you? |
| 11:41:35 | 3 | THE COURT:  You may.  While he's approaching, is there |
| 11:41:41 | 4 | anybody else? |
| 11:41:41 | 5 | THE JUROR:  Forty-one.  My sister-in-law's husband was |
| 11:41:44 | 6 | an attorney with the U.S. Department of Justice. |
| 11:41:47 | 7 | THE COURT:  Where? |
| 11:41:48 | 8 | THE JUROR:  The U.S. Department of Justice. |
| 11:41:51 | 9 | THE COURT:  I know, but U.S. has got a lot of land. |
| 11:41:54 | 10 | THE JUROR:  Oh, Utah. |
| 11:41:55 | 11 | THE COURT:  Okay.  Yes. |
| 11:41:58 | 12 | THE JUROR:  Seventy-two.  I spent ten years as a |
| 11:42:01 | 13 | military policeman.  When I got out, I married a prosecutor in |
| 11:42:05 | 14 | Illinois. |
| 11:42:07 | 15 | THE COURT:  I'm not going to touch that one. |
| 11:42:17 | 16 | THE JUROR:  Seventy-seven.  I was formerly employed |
| 11:42:19 | 17 | with Williamson County Sheriff's Office crisis intervention |
| 11:42:23 | 18 | officer. |
| 11:42:23 | 19 | THE COURT:  All right.  Counsel. |
| 11:42:37 | 20 | (At the bench, on the record.) |
| 11:42:45 | 21 | THE JUROR:  My daughter currently works for the police |
| 11:42:47 | 22 | chief here in Austin and she's on the staff.  She is the PIO |
| 11:42:53 | 23 | manager. |
| 11:42:54 | 24 | THE COURT:  What is the PI? |
| 11:42:56 | 25 | THE JUROR:  Public information officer. |

| | | |
|---|---|---|
| 11:43:00 | 1 | THE COURT:  She's been busy. |
| 11:43:01 | 2 | THE JUROR:  Yes, sir. |
| 11:43:02 | 3 | THE COURT:  Okay.  You can go back to your seat. |
| 11:43:04 | 4 | THE JUROR:  Okay.  I just didn't know. |
| 11:43:20 | 5 | THE COURT:  Over here.  Yes, ma'am. |
| 11:43:23 | 6 | THE JUROR:  319.  We have a cousin who's a detective |
| 11:43:26 | 7 | with APD and then, another cousin who works for the Hays County |
| 11:43:29 | 8 | Sheriff's Department. |
| 11:43:30 | 9 | THE COURT:  All right. |
| 11:43:32 | 10 | THE JUROR:  167.  You've already moved me. |
| 11:43:35 | 11 | THE COURT:  That's right.  You're like that button on |
| 11:43:38 | 12 | the TV that says mute. |
| 11:43:43 | 13 | THE JUROR:  A1.  My sister-in-law is a deputy sheriff |
| 11:43:49 | 14 | in Travis County. |
| 11:43:49 | 15 | THE JUROR:  No. 90.  My cousin was DPS undercover |
| 11:43:56 | 16 | officer. |
| 11:43:56 | 17 | THE COURT:  Whereabouts? |
| 11:43:57 | 18 | THE JUROR:  He worked -- I don't know where he worked, |
| 11:44:04 | 19 | where he did his work.  I don't know. |
| 11:44:06 | 20 | THE COURT:  Well, I understand that.  But where did he |
| 11:44:08 | 21 | live? |
| 11:44:09 | 22 | THE JUROR:  He lived in Montgomery County. |
| 11:44:14 | 23 | THE COURT:  Thank you, ma'am.  Yes, sir. |
| 11:44:16 | 24 | THE JUROR:  Sixty-eight.  My father-in-law was a DEA |
| 11:44:20 | 25 | agent. |

```
11:44:21   1              THE COURT:  Okay.  Whereabouts?

11:44:22   2              THE JUROR:  Miami.

11:44:23   3              THE COURT:  All right.

11:44:26   4              THE JUROR:  29A.  My cousin is currently employed with

11:44:31   5    Bastrop County.  He's a trooper, I believe.  Or not trooper but

11:44:36   6    patrol.  And then, his wife works for DPS and she is a trooper.

11:44:40   7              THE COURT:  All right.  Okay.  Those of you who have in

11:44:45   8    the past or present served and those who have family, talked with

11:44:50   9    your family, you have stories you tell -- I don't want to hear

11:44:54   10   them, but what I do want to know is, is there anybody who can't

11:45:02   11   set aside those experiences, not let them influence you if you're

11:45:09   12   to be a juror in this case, and make your mind up solely on what

11:45:13   13   you hear with your fellow jurors in testimony?  If you can't do

11:45:19   14   that, please let me know.  Yes, ma'am.  Number.

11:45:24   15             THE JUROR:  No. 111.

11:45:26   16             THE COURT:  111.  I'm going to replace you.  I'm going

11:45:29   17   to let you go sit over there with Mr. Mute.

11:45:36   18             MS. DEMINGS:  Juror No. 111 is replaced by Juror 200.

11:45:57   19             THE COURT:  Anybody else?  This gentleman right here,

11:46:16   20   who almost jumped out of his seat when I looked at him, is an

11:46:22   21   interpreter.  He's a very good interpreter.  Many of the people

11:46:28   22   who may testify in this case require interpreters.  Right now,

11:46:33   23   he's interpreting what I say to the people in the audience who

11:46:37   24   are interested and who prefer Spanish for comprehension purposes,

11:46:45   25   and perhaps some of the defendants.
```

| | |
|---|---|
| 11:46:47 | 1 |
| 11:46:51 | 2 |
| 11:46:55 | 3 |
| 11:47:02 | 4 |

Now, is there anybody on the panel, simply because a person has to use or prefers -- sometimes you don't have to, but prefers to use an interpreter for that reason alone, would discount that person's testimony?  If so, let me know.

All right.  One of the questions requested by the lawyers is about expert witnesses.  I don't know if there are going to be expert witnesses or not in this case.  Generally are expert witnesses who testify in federal court.  An expert is a person who by education or experience has expertise in a subject that can convince me that he's entitled to give an opinion. Because other witnesses are not allowed to give an opinion.  They testify what they see, what they hear, what they do.

An expert can give an opinion.  The jury evaluates an expert just like any other witness.  You listen to the expertise and why he thinks he's or she's an expert.  You have the right to believe any, and all of their testimony, none of their testimony. You just have to make that determination just like anybody else that's not an expert.

Now, is there anybody who couldn't do that?  Is there anybody who thinks, well, if that person's an expert and gives an opinion, I've got to do it?  Now, I'll give you an instruction that you don't got to do it.  But the question is, is there anybody on the panel who would believe an expert just because they qualify as an expert and would not evaluate their testimony?

All right.  Has anybody ever sworn out a criminal

| | | |
|---|---|---|
| 11:49:29 | 1 | complaint?  I'm excluding anybody in law enforcement that have |
| 11:49:34 | 2 | already answered the questions.  Anybody ever gone down and/or |
| 11:49:38 | 3 | had law enforcement ask you to swear out a criminal complaint? |
| 11:49:43 | 4 | Anybody over here had that experience?  I have one hand.  If |
| 11:49:48 | 5 | you'll tell me your number, please. |
| 11:49:49 | 6 | THE JUROR:  Ninety-three. |
| 11:49:51 | 7 | THE COURT:  And was that with assistance of law |
| 11:49:55 | 8 | enforcement, or was that like in the justice case, or what? |
| 11:49:58 | 9 | THE JUROR:  It was in criminal cases representing |
| 11:50:02 | 10 | clients in cases that were reduced down from misdemeanors to |
| 11:50:07 | 11 | tickets. |
| 11:50:07 | 12 | THE COURT:  Oh, I see.  Okay.  Thank you.  Anybody |
| 11:50:16 | 13 | else?  A complaint in a criminal case.  All right. |
| 11:50:28 | 14 | Lawyers want to know how many of you have been in the |
| 11:50:31 | 15 | military.  Let's do it by rows.  How many on the first row been |
| 11:50:37 | 16 | in the military?  Number, please, sir. |
| 11:50:41 | 17 | THE JUROR:  282. |
| 11:50:44 | 18 | THE COURT:  Okay.  What position did you have and when |
| 11:50:49 | 19 | did you cease? |
| 11:50:52 | 20 | THE JUROR:  I was in Vietnam era. |
| 11:50:56 | 21 | THE COURT:  Okay. |
| 11:50:58 | 22 | THE JUROR:  '60s. |
| 11:50:59 | 23 | THE COURT:  And what was your rank? |
| 11:51:01 | 24 | THE JUROR:  E4 was the highest. |
| 11:51:03 | 25 | THE COURT:  Okay.  Thank you. |

11:51:05  1            THE JUROR:  U.S. Army, Vietnam, I was -- I was out on

11:51:13  2   the first of November, '66.

11:51:16  3            THE COURT:  And Juror 137.

11:51:18  4            THE JUROR:  Yes.  I'm 137.

11:51:19  5            THE COURT:  And what did you do?

11:51:21  6            THE JUROR:  I was specialist.

11:51:22  7            THE COURT:  What was your rank?

11:51:23  8            THE JUROR:  E4.

11:51:24  9            THE COURT:  E4.  Thank you.  Anybody else on the front

11:51:27  10  row?  How about the second row?  Yes, ma'am.

11:51:29  11           THE JUROR:  I was an E6 active duty from January '88 to

11:51:32  12  November '97.  And I'm currently in the reserves for the Navy as

11:51:38  13  E6.

11:51:38  14           THE COURT:  All right.  Thank you.  Yes, sir.

11:51:42  15           THE JUROR:  318.  I retired from the Air Force, 20

11:51:46  16  years.

11:51:47  17           THE COURT:  And what was your rank when you retired?

11:51:50  18           THE JUROR:  Seven.

11:51:52  19           THE COURT:  Thank you.

11:51:53  20           THE JUROR:  No. 172.  I was in the Navy for

11:51:58  21  four-and-a-half years, ranked E4, and then, was in reserves for

11:52:04  22  twelve years and ranked E6.

11:52:07  23           THE COURT:  All right.  Thank you.  Yes, ma'am.

11:52:09  24           THE JUROR:  No. 119.  U.S. Army, 19 -- oh, gosh, it's

11:52:22  25  been so long.

| 11:52:23 | 1 | THE COURT:  More than five years ago? |

11:52:23  1          THE COURT:  More than five years ago?

11:52:24  2          THE JUROR:  Yes.  In the late '70s.

11:52:27  3          THE COURT:  And what rank did you have?

11:52:29  4          THE JUROR:  E4.

11:52:30  5          THE COURT:  Thank you, ma'am.  All right.  Anybody else

11:52:33  6  on that row?  How about the third row?  Yes, sir.

11:52:36  7          THE JUROR:  Yes, your Honor.  I retired as lieutenant

11:52:38  8  colonel in 1992.  My last job was a political military planner in

11:52:42  9  the joint chiefs of staff from 2006 to 2009.  I was a civilian

11:52:46  10  employee of the Department of Defense as a professor of national

11:52:50  11  security affairs, specializing in Latin America.

11:52:53  12          THE COURT:  All right.  Thank you.  Yes, sir.

11:52:56  13          THE JUROR:  Ninety-seven.  I was in the Air Force from

11:53:00  14  '66 till '70, E4.  I was in communications.

11:53:03  15          THE COURT:  Thank you, sir.  Anybody else on this side?

11:53:10  16  Front row on this side?

11:53:15  17          THE JUROR:  I'm No. 47.  I was in the Air Force from

11:53:20  18  '82 to '86, electronic measures.

11:53:24  19          THE COURT:  Thank you.

11:53:25  20          THE JUROR:  290.  Air Force, retired, E8.

11:53:30  21          THE COURT:  All right.  Thank you.  Anybody else on

11:53:32  22  that row?  How about second row back there?  Yes, sir.

11:53:37  23          THE JUROR:  207.  I was in the Air Force, got out in

11:53:40  24  '75.  I was an E4.

11:53:42  25          THE COURT:  Thank you.  Third row.  Oh, I have one on

| | | |
|---|---|---|
| 11:53:46 | 1 | the first row. |
| 11:53:48 | 2 | THE JUROR:  Forty-four.  Retired, E7, 1986, was in |
| 11:53:56 | 3 | avionics and criminal investigations Air Force. |
| 11:54:00 | 4 | THE COURT:  All right.  Thank you.  Let's skip back to |
| 11:54:04 | 5 | the third row then.  Yes, sir. |
| 11:54:05 | 6 | THE JUROR:  Twenty-one.  Naval reserve active duty from |
| 11:54:10 | 7 | 1973 through 1975.  Operations specialist E4. |
| 11:54:15 | 8 | THE COURT:  Thank you. |
| 11:54:17 | 9 | THE JUROR:  Juror No. 8.  '69 to '73, E4, Air Force. |
| 11:54:22 | 10 | THE COURT:  Thank you. |
| 11:54:24 | 11 | THE JUROR:  Forty-eight.  '66 to '69, Vietnam, |
| 11:54:29 | 12 | communications ammo, ammunition. |
| 11:54:33 | 13 | THE COURT:  Thank you.  How about that back row back |
| 11:54:36 | 14 | there? |
| 11:54:37 | 15 | THE JUROR:  Seventy-two.  I was in the Army from '72 to |
| 11:54:42 | 16 | '82.  I ended up as a captain running the military police on |
| 11:54:46 | 17 | base. |
| 11:54:46 | 18 | THE COURT:  All right.  Thank you. |
| 11:54:49 | 19 | THE JUROR:  '70s, U.S. Army, got out as captain. |
| 11:54:53 | 20 | THE COURT:  All right. |
| 11:54:55 | 21 | THE JUROR:  No. 45.  U.S. Air Force.  I got out E4 in |
| 11:54:59 | 22 | '96. |
| 11:55:00 | 23 | THE COURT:  All right, sir.  Over here? |
| 11:55:04 | 24 | THE JUROR:  Air Force reserves, 1996, communications. |
| 11:55:07 | 25 | THE COURT:  Okay.  Have we got everybody?  All right. |

11:55:26   1          One of the easiest questions I ask, which is not meant
11:55:30   2    to be an easy question, by the way, is there anybody who can't
11:55:34   3    commit to me, right now, that if you're selected to be on this
11:55:39   4    jury, that you will follow the legal instructions I give you?
11:55:47   5    Now, I've never had 100 folks leap up, say "No" and try to get
11:55:51   6    out.  But it's an important thing because I haven't heard the
11:55:57   7    evidence in this case.  I'll be hearing it with the jury.
11:55:59   8          At the end of the evidence, it's my job to legally
11:56:02   9    instruct the jury.  I do that orally and in writing.  And
11:56:09  10    everybody in the courtroom will expect the jury to follow the
11:56:13  11    legal instructions, the determination of the factual issues in
11:56:18  12    this case.  That is, innocence or guilt will be in the verdict,
11:56:21  13    but we will all expect that you follow the legal instructions.
11:56:26  14    Unlike the juries in the 1770s, the jury just determines the
11:56:30  15    facts.  The judges determine the law and the legal instructions.
11:56:37  16          Is there anybody here that can't commit to follow the
11:56:39  17    legal instructions?  How about back there?  And how about over
11:56:47  18    here to the right?  Okay.  Just give me your number.
11:56:51  19          THE JUROR:  Sixty-eight.
11:56:52  20          THE COURT:  Okay.  Mr. 68 is excused.  All right.
11:57:27  21          A couple of more general questions and we're going to
11:57:30  22    have to take a little break.  First is, is there anybody on the
11:57:34  23    panel who knows anybody that works here in the courthouse?  We
11:57:40  24    have four judges, Judge Yeakel, myself, Judge Austin and Judge
11:57:46  25    Lane.  Then we have a lot of probation officers.  We have a lot

```
11:57:49   1   of clerks.  We have small offices of other entities in the
11:57:57   2   federal government.  Yes, ma'am.
11:58:00   3              THE JUROR:  193.  I mean, I can't give any names.  I
11:58:03   4   work in the legal field, so I talk to clerks, people
11:58:07   5   particularly.
11:58:07   6              THE COURT:  No one-to-one?
11:58:09   7              THE JUROR:  No one-to-one significant communications.
11:58:12   8   No.
11:58:12   9              THE COURT:  All right.  And they're going to ask me if
11:58:15  10   they don't have your slip.  What do you do in the legal field?
11:58:18  11              THE JUROR:  I'm a paralegal.
11:58:23  12              THE COURT:  Anybody else?  Yes.
11:58:25  13              THE JUROR:  Eight-six.  I don't know Judge Austin, but
11:58:28  14   he speaks with the students at my school.  So I have met him.
11:58:35  15   Have talked with him.
11:58:35  16              THE COURT:  Well, he won't be involved in the case, but
11:58:37  17   the lawyers do like to know who knows anybody at the courthouse.
11:58:44  18   How about the back?  Anybody know anybody?  Yes.
11:58:50  19              THE JUROR:  Just professionally and working with the
11:58:52  20   different attorneys, clerks at the federal court I went to law
11:58:56  21   school with.
11:58:59  22              THE COURT:  Okay.  Yes, sir.
11:59:00  23              THE JUROR:  207.  I know a couple of the marshals that
11:59:02  24   work here.
11:59:05  25              THE COURT:  All right.
```

85

| | | |
|---|---|---|
| 11:59:07 | 1 | THE JUROR:  102.  I know Judge Austin. |
| 11:59:11 | 2 | THE COURT:  He's a popular fellow. |
| 11:59:13 | 3 | THE JUROR:  He is. |
| 11:59:15 | 4 | THE COURT:  He speaks at schools and. |
| 11:59:17 | 5 | THE JUROR:  I know him personally and professionally. |
| 11:59:20 | 6 | I work in the legal field, as well. |
| 11:59:22 | 7 | THE COURT:  All right.  Anybody else there?  How about |
| 11:59:27 | 8 | over here? |
| 11:59:28 | 9 | THE JUROR:  Yeah.  I know Judge Yeakel and Desiree |
| 11:59:33 | 10 | Durst. |
| 11:59:33 | 11 | THE COURT:  Okay.  Anybody over here know anybody that |
| 11:59:37 | 12 | works in the courthouse?  All right. |
| 11:59:52 | 13 | Okay.  I've kept you for a couple of hours.  I hate to |
| 11:59:59 | 14 | give you a break, but I suspect everybody wants a break.  I'd |
| 12:00:05 | 15 | like for you to be back at 1:15.  Now, I'm going to give you the |
| 12:00:12 | 16 | most important instructions of all, and that is, talk about how |
| 12:00:21 | 17 | exciting the Masters was yesterday.  Talk about how miserable |
| 12:00:27 | 18 | Texas baseball is, but do not talk about this case, even among |
| 12:00:33 | 19 | each other as you go to lunch. |
| 12:00:36 | 20 | The whole system of the way we try cases in the United |
| 12:00:42 | 21 | States in the federal system is that once you are brought in as a |
| 12:00:50 | 22 | potential juror and especially if you're selected as a juror, |
| 12:00:55 | 23 | that you don't talk to anybody about the case, friends, family, |
| 12:01:02 | 24 | social media, telephone, nothing, because we believe that you |
| 12:01:12 | 25 | should not be influenced in any way outside the presence of the |

| | |
|---|---|
| 12:01:17 | 1 |
| 12:01:21 | 2 |

12:01:17   1   other jurors in the courtroom.  And they'll all have the same

12:01:21   2   instructions.

12:01:24   3          And I can't tell you how important that is,

12:01:25   4   particularly in this electronic world where you can take your

12:01:29   5   telephone.  And mine just dials.  The government had to go to a

12:01:35   6   warehouse someplace up in Vermont to find me a telephone that

12:01:40   7   just dials.  But yours probably does like my wife's.  She finds

12:01:48   8   out anything she wants to find out to tell me I'm wrong usually.

12:01:55   9   Don't talk about it.  Don't send a message that you're here on

12:02:00  10   this trial.  Please don't do any of that.

12:02:05  11          Every morning, I will ask the jurors and every day,

12:02:08  12   after the noon recess, I will ask the jurors:  Have you talked to

12:02:12  13   anybody about this case?  Have you permitted anybody to talk to

12:02:17  14   you about this case?  Have you learned anything at all about this

12:02:21  15   case, outside the presence of the other jurors in this courtroom?

12:02:28  16   And you have to say "Yes" to those questions under oath or the

12:02:32  17   whole system collapse.

12:02:35  18          So have an hour and 15 minutes.  It's going to be hard,

12:02:40  19   but look around to where you are.  The clerks are here to assist

12:02:43  20   you to find your right place.  But I want you in the same chairs

12:02:47  21   that you're in, please.  Okay.

12:05:40  22          (Jury panel not present.)

12:05:44  23          THE COURT:  All right.  Counsel, you may be seated.

12:05:49  24   Let's sit down.  Everybody sit down.  Counsel asked me if I'm

12:06:03  25   going to ask you to read your witness list.  I will.  So that you

| | | |
|---|---|---|
| 12:06:10 | 1 | know what else I'm going to do, I'll get into Victims of Crime |
| 12:06:17 | 2 | and criminal charges.  And then, I usually will have the jurors |
| 12:06:27 | 3 | give us a little summary of who they are and what they do. |
| 12:06:36 | 4 | If you have any individual questions raised by the |
| 12:06:38 | 5 | questionnaire during the break, write them out for me, put the |
| 12:06:43 | 6 | number of the juror and the specific number if you can't tell |
| 12:06:50 | 7 | from their answers something, let me look at it so that I can |
| 12:06:55 | 8 | decide if I'm going to give it or not. |
| 12:06:57 | 9 | For those of you who were kind enough to send me the |
| 12:07:02 | 10 | voir dire, I think I've covered your questions.  If you don't |
| 12:07:06 | 11 | think I've covered the questions, let me know.  But I'm not |
| 12:07:14 | 12 | through with voir dire.  I think probably we're looking at an |
| 12:07:18 | 13 | hour and a half by the time I get through the number I think we |
| 12:07:24 | 14 | need to go to, and then, we'll give you the best idea of timing |
| 12:07:30 | 15 | right now. |
| 12:07:32 | 16 | All right.  Anything else before we take a break? |
| 12:07:36 | 17 | 1:15. |
| 12:07:50 | 18 | (Lunch recess.) |
| 13:19:17 | 19 | (Jury panel present.) |
| 13:19:17 | 20 | THE COURT:  All right.  Will all those who didn't |
| 13:19:19 | 21 | return stand up?  Juror No. 25, they used to have a tradition in |
| 13:19:27 | 22 | the old courthouse that when the last one came in, everybody |
| 13:19:32 | 23 | would stand up and clap.  But this is a new courthouse. |
| 13:19:42 | 24 | All right.  The next series of questions I'm going to |
| 13:19:44 | 25 | ask, you've answered in part, some and some have not.  I can just |

13:19:52  1  tell you, even though this is a new courthouse, the courthouse

13:19:55  2  down the street -- or up the street, as the case may be, has

13:20:00  3  heard every answer to these questions that you could think

13:20:05  4  possible.

13:20:05  5          The question is, have you ever been arrested or placed

13:20:11  6  in jail?  Or has somebody in your immediate family been arrested

13:20:18  7  or placed in jail?  And I'll start off, of course.  First off,

13:20:25  8  I've been in jail four times, four contempts of court by four

13:20:31  9  different federal judges when I was a practicing lawyer, and I

13:20:37  10  think two of them were wrong.  I have five sons and one daughter,

13:20:46  11  and I've had to go down and get a boy or two out of jail.  Never

13:20:54  12  adult.

13:20:55  13          So if there is an answer that you prefer to be in

13:21:00  14  private, just say, "I'd like to come to the bench," and then, you

13:21:05  15  can come over here.  But that's where we're going to start off.

13:21:09  16  You or some member of your immediate family, children, parents,

13:21:14  17  spouses, on the front row, anybody heed to answer that?  Yes,

13:21:21  18  ma'am.

13:21:21  19          THE JUROR:  No. 135.  My son, I guess it's DUI.

13:21:29  20          THE COURT:  And did you get that privilege going down

13:21:32  21  and seeing him in jail?

13:21:33  22          THE JUROR:  Just sat and wait for him to get processed

13:21:37  23  out.

13:21:37  24          THE COURT:  Well, that qualifies.  Okay.  And about how

13:21:39  25  long ago was that?

13:21:45   1              THE JUROR:  I think it was November of last year.

13:21:47   2              THE COURT:  Okay.  Thank you.  Yes, next.

13:21:53   3              THE JUROR:  282.  My son was in jail about four or five

13:21:59   4  years ago.

13:21:59   5              THE COURT:  Okay.  And about how long ago was that,

13:22:02   6  sir?

13:22:02   7              THE JUROR:  About four years, five years ago.

13:22:04   8              THE COURT:  And what was it for, do you know --

13:22:06   9  remember?

13:22:07  10              THE JUROR:  Yeah.  He failed to appear in court.

13:22:16  11              THE COURT:  Everybody hear that?  Thanks.  All right.

13:22:21  12  Next.  Yes, sir.

13:22:22  13              THE JUROR:  137.  May I approach the bench there?

13:22:27  14              THE COURT:  You may, sir.  Just right up here.

13:22:32  15              (At the bench, on the record.)

13:22:42  16              THE JUROR:  Okay.  I filled out the questionnaire in

13:22:48  17  explicit detail, but just to put the dot at the end of the

13:22:52  18  sentence, me, personally, in 1966, and I spent three days in the

13:23:00  19  county jail.

13:23:00  20              THE COURT:  Okay.  And that was petty larceny?

13:23:03  21              THE JUROR:  Uh-huh.

13:23:04  22              THE COURT:  And.

13:23:06  23              THE JUROR:  And one DWI, about 30 years ago.  No one

13:23:09  24  was hurt.  I just got a ticket.

13:23:12  25              THE COURT:  Okay.

| | | |
|---|---|---|
| 13:23:13 | 1 | THE JUROR:  And they put me in jail overnight. |
| 13:23:15 | 2 | THE COURT:  Thank you. |
| 13:23:17 | 3 | THE JUROR:  Okay. |
| 13:23:29 | 4 | THE COURT:  I think the most favorite answer I've had, |
| 13:23:32 | 5 | over all of the years, is one lady said that her mother, who was |
| 13:23:38 | 6 | 87, was arrested because she went out to the nuclear facility |
| 13:23:43 | 7 | here between Houston and Austin and sat in a patch of bluebonnets |
| 13:23:48 | 8 | and wouldn't leave when they told them.  Yes, sir. |
| 13:23:53 | 9 | THE JUROR:  340.  My brother was arrested back when he |
| 13:23:56 | 10 | was in high school.  So it's been 20 years now. |
| 13:23:58 | 11 | THE COURT:  Okay.  Did you go down to the jail? |
| 13:24:01 | 12 | THE JUROR:  No. |
| 13:24:02 | 13 | THE COURT:  All right.  Next.  Yes, sir. |
| 13:24:03 | 14 | THE JUROR:  256.  May I approach the bench? |
| 13:24:07 | 15 | THE COURT:  Yes, sir. |
| 13:24:11 | 16 | (At the bench, on the record.) |
| 13:24:19 | 17 | THE JUROR:  I had a son in the federal -- |
| 13:24:21 | 18 | THE COURT:  Wait.  Wait. |
| 13:24:23 | 19 | THE JUROR:  Okay.  I had a son that was in federal |
| 13:24:30 | 20 | court.  He was in for a possession and being racketeer, I |
| 13:24:36 | 21 | believe, and he's been out about three years. |
| 13:24:39 | 22 | THE COURT:  Okay.  And did you go down and see him in |
| 13:24:42 | 23 | jail? |
| 13:24:43 | 24 | THE JUROR:  Yeah.  Uh-huh. |
| 13:24:43 | 25 | THE COURT:  Was he in prison? |

| | | |
|---|---|---|
| 13:24:44 | 1 | THE JUROR:  Yes, sir. |
| 13:24:44 | 2 | THE COURT:  Where was that? |
| 13:24:45 | 3 | THE JUROR:  He was in Bastrop and he was in Belton. |
| 13:24:49 | 4 | THE COURT:  I understand that, but in what court? |
| 13:24:51 | 5 | THE JUROR:  It was in federal.  It was a district -- it |
| 13:24:54 | 6 | was a federal court here in Austin. |
| 13:24:57 | 7 | THE COURT:  Here in Austin, okay.  Thank you, sir. |
| 13:24:59 | 8 | THE JUROR:  And I've also been arrested myself. |
| 13:25:01 | 9 | THE COURT:  Okay.  When was that? |
| 13:25:03 | 10 | THE JUROR:  Oh. |
| 13:25:06 | 11 | THE COURT:  More than five? |
| 13:25:07 | 12 | THE JUROR:  It was in '80 -- '85. |
| 13:25:07 | 13 | THE COURT:  And what were you arrested for? |
| 13:25:09 | 14 | THE JUROR:  Shoplifting, theft.  Uh-huh. |
| 13:25:12 | 15 | THE COURT:  Did you go to jail? |
| 13:25:13 | 16 | THE JUROR:  I spent jail one night.  Uh-huh.  Yes, sir. |
| 13:25:16 | 17 | THE COURT:  Is that it? |
| 13:25:17 | 18 | THE JUROR:  That's all. |
| 13:25:18 | 19 | THE COURT:  That's all. |
| 13:25:18 | 20 | THE JUROR:  Okay. |
| 13:25:27 | 21 | THE COURT:  Anybody else on the first row?  Yes, ma'am. |
| 13:25:35 | 22 | THE JUROR:  I'd like to approach the bench, please. |
| 13:25:39 | 23 | THE COURT:  Yes, ma'am.  Get your exercise. |
| 13:25:48 | 24 | (At the bench, on the record.) |
| 13:25:57 | 25 | THE COURT:  Mr. Womack.  Okay.  You're juror number? |

13:26:03  1          THE JUROR:  Eighty.  Well, I misbehaved.  I interfered

13:26:06  2  with a 911 phone call, and I got to spend a night in jail.

13:26:11  3          THE COURT:  Okay.  About how long ago was that?

13:26:13  4          THE JUROR:  2007.

13:26:15  5          THE COURT:  Okay.  That's it?

13:26:17  6          THE JUROR:  Uh-huh.

13:26:18  7          THE COURT:  That's all?

13:26:19  8          THE JUROR:  That's it.

13:26:19  9          THE COURT:  Okay.  You may sit down.

13:26:25 10          Anybody else on the first row?  So far, I'm leading.

13:26:33 11  How about the second row?  Yes, sir.

13:26:34 12          THE JUROR:  No. 172.  I was working for a friend who

13:26:41 13  was taking all the money out of the account, and so, I wrote -- I

13:26:44 14  was writing the checks, and he was taking the money out without

13:26:47 15  letting me know.  So I got busted for writing false checks.

13:26:51 16          THE COURT:  Okay.  And did you spend any time in jail?

13:26:54 17          THE JUROR:  Overnight.

13:26:55 18          THE COURT:  Okay.  Thank you.  Yes, ma'am.

13:26:58 19          THE JUROR:  246.  My brother was arrested.

13:27:03 20          THE COURT:  How about how long ago?

13:27:05 21          THE JUROR:  Oh, ten years.

13:27:06 22          THE COURT:  Okay.  And did you go see him while he was

13:27:09 23  in jail?

13:27:09 24          THE JUROR:  No.

13:27:10 25          THE COURT:  All right.  Yes, ma'am.  I saw a hand up

13:27:12    1    there.

13:27:12    2              THE JUROR:  No. 119.  My mother, but I was a teenager.

13:27:16    3    It was back in the '70s.

13:27:21    4              THE COURT:  Yes, sir.

13:27:22    5              THE JUROR:  318.  My daughter, unpaid tickets.

13:27:26    6              THE COURT:  And about how long ago was that, sir?

13:27:28    7              THE JUROR:  I would say about three.

13:27:30    8              THE COURT:  And did you go down to the jail and get her

13:27:32    9    out or see her?

13:27:33   10              THE JUROR:  No.

13:27:34   11              THE COURT:  Okay.  Anybody else on the second row?  How

13:27:40   12    about the third?  We've got two slow hands up here.  Go ahead,

13:27:46   13    sir.

13:27:47   14              THE JUROR:  Yeah.  Arrested for DUI.

13:27:50   15              THE COURT:  About how long ago?

13:27:52   16              THE JUROR:  About 15 years ago.

13:27:53   17              THE COURT:  Okay.

13:27:55   18              THE JUROR:  Twenty-five.  DUI, 2006.

13:27:58   19              THE COURT:  About how long ago?

13:27:59   20              THE JUROR:  2006.

13:28:01   21              THE COURT:  Yes, sir.

13:28:03   22              THE JUROR:  44A.  About 18 years ago, my daughter was

13:28:07   23    arrested for DUI.  And then, about 15 years ago, my son was

13:28:11   24    arrested for mischief, and they both spent the night in jail.

13:28:15   25              THE COURT:  Did you go down?

| | | |
|---|---|---|
| 13:28:16 | 1 | THE JUROR:  No, sir.  I did not. |
| 13:28:17 | 2 | THE COURT:  Yes. |
| 13:28:19 | 3 | THE JUROR:  268.  My husband, about four years ago. |
| 13:28:22 | 4 | THE COURT:  Okay.  And did you go down? |
| 13:28:24 | 5 | THE JUROR:  No. |
| 13:28:25 | 6 | THE COURT:  Okay.  Anybody else on that row?  How about |
| 13:28:28 | 7 | the last row?  Yes, ma'am. |
| 13:28:32 | 8 | THE JUROR:  15A.  My sister, about ten years ago. |
| 13:28:35 | 9 | THE COURT:  Okay.  And did you go down to the jail? |
| 13:28:37 | 10 | THE JUROR:  Yes.  It was just overnight. |
| 13:28:40 | 11 | THE COURT:  Okay.  Thank you. |
| 13:28:42 | 12 | THE JUROR:  My son, about ten years ago, and I picked |
| 13:28:45 | 13 | him up in the morning. |
| 13:28:48 | 14 | THE COURT:  Yes, ma'am. |
| 13:28:49 | 15 | THE JUROR:  Fifty-two.  Do ex-spouses count? |
| 13:28:53 | 16 | THE COURT:  Well, it depends.  But since you're already |
| 13:28:56 | 17 | up there, we all wonder if you went down to the jail. |
| 13:29:01 | 18 | THE JUROR:  Yes.  I went down to jail.  It was in the |
| 13:29:03 | 19 | '80s.  I don't even remember the year.  And I went down in the |
| 13:29:07 | 20 | jail to get him out.  And then, I had a brother arrested for DUI |
| 13:29:11 | 21 | in the early '90s. |
| 13:29:12 | 22 | THE COURT:  All right.  Thank you, ma'am.  All right. |
| 13:29:14 | 23 | Did I get everybody on this side?  All right.  Let's try the |
| 13:29:18 | 24 | front row over here.  Go ahead, sir.  Any of you, stand up and |
| 13:29:23 | 25 | we'll get to all of you. |

```
13:29:24   1              THE JUROR:  My daughter was arrested and served nine

13:29:28   2   months on an 18-month sentence for writing bad checks.

13:29:31   3              THE COURT:  Okay.  And during that period of time, did

13:29:34   4   you -- was she incarcerated where you went down to see her?

13:29:38   5              THE JUROR:  Yes.  And that was about a year and a half,

13:29:44   6   maybe ten years.

13:29:46   7              THE JUROR:  266.  I've been in jail twice.

13:29:48   8              THE COURT:  About how long ago?

13:29:50   9              THE JUROR:  Twenty-two, 23 years ago, DWI.  About ten

13:29:54  10   years ago for possession of a weapon.

13:29:56  11              THE COURT:  Okay.  Was the possession of a weapon

13:30:00  12   misdemeanor?

13:30:01  13              THE JUROR:  It was thrown out.  I was determined to be

13:30:05  14   a traveler.

13:30:05  15              THE COURT:  So you were just arrested and released.

13:30:09  16              THE JUROR:  Correct.

13:30:09  17              THE COURT:  All right.

13:30:10  18              THE JUROR:  778.  Bounced check, 17 years ago.

13:30:15  19              THE JUROR:  261.  My husband was arrested about three

13:30:19  20   years ago for reckless driving.

13:30:21  21              THE COURT:  Did you go down and see him in jail?

13:30:24  22              THE JUROR:  His mom went and got him the next morning.

13:30:29  23              THE COURT:  All right.  Let's go to the next row.  Yes,

13:30:32  24   ma'am.

13:30:33  25              THE JUROR:  258.  And I have a son in Chicago and
```

| | | |
|---|---|---|
| 13:30:38 | 1 | jumped in a bar eight years ago, and he did spend the night in |
| 13:30:43 | 2 | jail, but the thing was dismissed later. |
| 13:30:45 | 3 | THE COURT:  Okay.  Thank you. |
| 13:30:46 | 4 | THE JUROR:  Juror No. 93.  My stepson was arrested for |
| 13:30:53 | 5 | assault and a criminal mischief and a criminal trespass in |
| 13:30:57 | 6 | Williamson County.  And my youngest son was arrested for DWI, |
| 13:31:02 | 7 | which was dismissed.  Another son was arrested for evading when |
| 13:31:07 | 8 | he was young and was dismissed.  And my husband spent some time |
| 13:31:13 | 9 | in a jail in Williamson County.  And yes, I went to see all of |
| 13:31:17 | 10 | them, except for the one in Houston on a DWI. |
| 13:31:20 | 11 | THE COURT:  Well, about how long ago was the last? |
| 13:31:26 | 12 | THE JUROR:  Most recent one was probably three years |
| 13:31:29 | 13 | ago. |
| 13:31:29 | 14 | THE COURT:  Thank you, ma'am.  Yes, sir. |
| 13:31:31 | 15 | THE JUROR:  209.  About 15 years ago, I was arrested -- |
| 13:31:37 | 16 | I was arrested three times, right out of high school, drinking |
| 13:31:41 | 17 | and MIPs. |
| 13:31:43 | 18 | THE COURT:  Did you spend overnight in jail, that type |
| 13:31:47 | 19 | of thing? |
| 13:31:47 | 20 | THE JUROR:  Yes, sir. |
| 13:31:48 | 21 | THE COURT:  Okay.  Yes. |
| 13:31:50 | 22 | THE JUROR:  302.  Twenty-one years ago, Class C |
| 13:31:54 | 23 | misdemeanor. |
| 13:31:55 | 24 | THE COURT:  Okay.  Anybody else? |
| 13:31:58 | 25 | THE JUROR:  207.  I got my brother out of jail in the |

13:32:01  1  late '80s for fighting.

13:32:04  2       THE COURT:  All right.

13:32:06  3       THE JUROR:  Twenty-three.  My brother went to jail for

13:32:15  4  insobriety was the only thing he was convicted for.  And he lived

13:32:17  5  in another state, so I could not get him out of jail.

13:32:19  6       THE COURT:  All right.

13:32:23  7       THE JUROR:  103.  My brother, about five years ago,

13:32:25  8  DUI.

13:32:26  9       THE COURT:  All right.  Now, let's go to the next row

13:32:29  10  back.  I can't see how many rows that is.

13:32:32  11       THE JUROR:  Twenty-one.  About four days ago, my older

13:32:40  12  sibling was arrested.  As I recall, just spent enough time in

13:32:43  13  jail to be bailed out and overnight maybe.  Had community

13:32:48  14  service.  I've been in jail longer than that for a -- earlier

13:32:55  15  than that for a teenage beer in the car kind of thing.  My

13:33:00  16  parents came and got me out.  That's it.

13:33:02  17       THE COURT:  All right.  Thank you.

13:33:04  18       THE JUROR:  144.  Back in '75, I went to jail, spent

13:33:10  19  the night for public intoxication.  And 2002, my son spent the

13:33:16  20  night in jail for impersonating a police officer.

13:33:21  21       THE COURT:  I guess he was a bad impersonation.

13:33:27  22       THE JUROR:  Forty-eight.  Moving violations in Sherman,

13:33:31  23  Texas.  Went before the judge.  He asked me if I had the

13:33:37  24  documents, and I told him I had it at the house, so he put me in

13:33:41  25  the jailhouse there.  2010, my son was arrested, sent to the

| | | |
|---|---|---|
| 13:33:49 | 1 | penitentiary for child dereliction of duties on child support. |
| 13:33:57 | 2 | THE COURT:  And did you go visit him while he's there? |
| 13:34:00 | 3 | THE JUROR:  Yes, sir.  I went down. |
| 13:34:01 | 4 | THE COURT:  Okay.  Yes, ma'am. |
| 13:34:05 | 5 | THE JUROR:  My younger son was in jail about 20 years |
| 13:34:09 | 6 | ago. |
| 13:34:11 | 7 | THE COURT:  All right.  Next row. |
| 13:34:14 | 8 | THE JUROR:  No. 62.  My brother was incarcerated for |
| 13:34:19 | 9 | several years, but he's been out since 2008. |
| 13:34:22 | 10 | THE COURT:  When he was incarcerated, did you go visit |
| 13:34:25 | 11 | him? |
| 13:34:26 | 12 | THE JUROR:  No. |
| 13:34:26 | 13 | THE COURT:  All right.  Thank you. |
| 13:34:30 | 14 | THE JUROR:  I just want to clarify.  Are you asking |
| 13:34:33 | 15 | just about the defendant or are you asking -- I was an employee, |
| 13:34:38 | 16 | so I kind of went to jail a lot. |
| 13:34:41 | 17 | THE COURT:  You had a nice boss, huh? |
| 13:34:45 | 18 | THE JUROR:  No.  I work for Williamson County. |
| 13:34:47 | 19 | THE COURT:  Now that you're up, go ahead and tell us. |
| 13:34:49 | 20 | THE JUROR:  I work for the Williamson County Sheriff's |
| 13:34:52 | 21 | Office. |
| 13:34:52 | 22 | THE COURT:  Oh, okay.  That was your office. |
| 13:34:56 | 23 | THE JUROR:  Right.  That's what I'm asking is whether |
| 13:34:58 | 24 | or not -- |
| 13:34:58 | 25 | THE COURT:  No, no.  You don't have to do that yet. |

| | | |
|---|---|---|
| 13:35:02 | 1 | THE JUROR:  No. 72.  I got caught speeding in West |
| 13:35:05 | 2 | Texas and got thrown in jail for the night.  That was about 40 |
| 13:35:09 | 3 | years ago. |
| 13:35:10 | 4 | THE COURT:  Okay.  And the nice thing is when you get a |
| 13:35:15 | 5 | little older, you won't remember it.  Okay.  Next. |
| 13:35:20 | 6 | THE JUROR:  In 1999, my twin brother was charged with a |
| 13:35:23 | 7 | DUI.  It was later turned into obstructing traffic.  About six |
| 13:35:30 | 8 | months later, because it was being sorted out, it wasn't being |
| 13:35:35 | 9 | tried, he was driving home and had about three beers and his |
| 13:35:39 | 10 | taillight was out.  And I got a DUI about 2000.  Fifteen hours in |
| 13:35:45 | 11 | jail. |
| 13:35:46 | 12 | THE COURT:  That's a good twin story. |
| 13:35:49 | 13 | THE JUROR:  Yeah. |
| 13:35:49 | 14 | THE COURT:  Okay.  Anybody else on this side?  Yes, |
| 13:35:52 | 15 | ma'am. |
| 13:35:52 | 16 | THE JUROR:  Fifty-seven.  Do ex-husbands count? |
| 13:35:59 | 17 | THE COURT:  I've been asked that question lots of |
| 13:36:01 | 18 | times, and I've never answered it yet. |
| 13:36:06 | 19 | THE JUROR:  We were still -- I was separated from him |
| 13:36:10 | 20 | at the time and we were still legally married.  This was back in |
| 13:36:13 | 21 | the early '90s. |
| 13:36:15 | 22 | THE COURT:  What I'm interested in, did you go down to |
| 13:36:17 | 23 | the jail and visit him? |
| 13:36:19 | 24 | THE JUROR:  No. |
| 13:36:19 | 25 | THE COURT:  Okay.  Yes, ma'am. |

13:36:23   1          THE JUROR:  About ten years ago, I picked up my sister

13:36:28   2    for -- she was in jail for public intoxication, and I did go

13:36:32   3    visit her and her husband for not paying parking tickets.

13:36:37   4          THE COURT:  Okay.

13:36:41   5          THE JUROR:  No. 49.  My brother, rape, two years ago.

13:36:45   6    He's serving that.  I did go visit him.

13:36:48   7          THE COURT:  Okay.

13:36:49   8          THE JUROR:  My daughter was a minor, intoxication.

13:36:56   9          THE JUROR:  239.  Four brothers, about four years ago,

13:37:00  10    DWI.

13:37:04  11          THE JUROR:  129.  Fifteen years ago, DWI arrest.

13:37:08  12          THE COURT:  All right.

13:37:11  13          THE JUROR:  Can I approach the bench?

13:37:12  14          THE COURT:  You may.

13:37:24  15          (At the bench, on the record.)

13:37:34  16          THE COURT:  Yes, sir.

13:37:35  17          THE JUROR:  I was arrested at 18 and charged with

13:37:38  18    burglary of a habitat and a deferred adjudication, and was told

13:37:42  19    it wasn't a conviction because I went through my probation and

13:37:47  20    all that without any trouble.

13:37:49  21          THE COURT:  And it was dismissed?

13:37:51  22          THE JUROR:  Yeah.  They -- I don't have it on my record

13:37:52  23    anymore, but I was technically arrested and fingerprinted and

13:37:55  24    spent the night.

13:37:58  25          THE COURT:  Thank you.  What number are you, sir?  I

13:38:11   1    need that for the record.

13:38:12   2              THE JUROR:  3A.

13:38:16   3              THE COURT:  Thank you.

13:38:22   4              THE JUROR:  260.  About 25 years ago, my -- one of my

13:38:26   5    brothers had a DUI, and about ten years ago, my oldest daughter

13:38:31   6    did.

13:38:31   7              THE COURT:  All right.  Over here on the right side, my

13:38:36   8    right side.  Y'all are both eager, but you got up first.

13:38:42   9              THE JUROR:  May I approach the bench?

13:38:43   10             THE COURT:  Yes.  Y'all hear that funny sound?  That's

13:38:59   11   white noise, or that's what they tell me.  I don't know how they

13:39:05   12   know it's white.

13:39:07   13             (At the bench, on the record.)

13:39:10   14             THE JUROR:  Okay.  Back in the late '70s, my father was

13:39:14   15   convicted of accessory to murder.

13:39:17   16             THE COURT:  And did you go visit him while he was

13:39:18   17   incarcerated?

13:39:18   18             THE JUROR:  I did a few times.

13:39:40   19             THE COURT:  Okay.

13:39:40   20             THE JUROR:  No. 134.  About five years ago, my brother

13:39:43   21   was in jail briefly for theft, and I do not see him in jail.

13:39:49   22             THE COURT:  All right.  Yes, sir.

13:39:50   23             THE JUROR:  No. 6.  I arrested about 15 years ago with

13:39:54   24   PI.

13:39:55   25             THE COURT:  Thank you.  Anybody else on that side?  All

13:39:58   1   right.  Now, have I gotten everybody?

13:40:01   2          All right.  Now I'm going to flip the question around.

13:40:05   3   This time, I want to know how many of you or members of your

13:40:12   4   immediate family have been the victims of a substantial crime?

13:40:20   5   I'm not talking about driving tickets, or that type of thing,

13:40:27   6   traffic things, but burglaries and any kind of significant crime

13:40:34   7   that you've had the experience of you or some member of your

13:40:36   8   family has had to go through.  So we'll start with the front row.

13:40:42   9          Yes, ma'am.

13:40:43   10          THE JUROR:  No. 80.  Could I approach?

13:40:45   11          THE COURT:  Sure.

13:40:55   12          (At the bench, on the record.)

13:41:09   13          THE JUROR:  Okay.  I guess it was back in 2001, my mom,

13:41:13   14   this guy like conned his way into her apartment and tried to rape

13:41:16   15   her.  And the prosecutor like pled with this attorney, and it was

13:41:22   16   like attempted burglary with intent to do something.  I forget.

13:41:27   17   But anyway, he's going to get out in November.  But every year,

13:41:30   18   it's like I've got to write letters to the parole board, and call

13:41:33   19   and find out.  Trauma, trauma, and it's like now, I'm like, is

13:41:36   20   there any way I could get a protective order from this guy?  You

13:41:39   21   know, it's a nightmare.

13:41:42   22          THE COURT:  Okay.  With that wonderful experience you

13:41:52   23   had, are you able to put it aside and just make up your mind

13:41:54   24   based on the evidence?  Or is it something that will influence

13:41:56   25   you?

| | | |
|---|---|---|
| 13:41:56 | 1 | THE JUROR:  I'd like to say I could, but crime and |
| 13:42:06 | 2 | money, it's like did anybody get hurt.  But I'm sure a lot of |
| 13:42:09 | 3 | people got hurt in the drug thing.  I don't know.  It probably |
| 13:42:13 | 4 | would color my opinion. |
| 13:42:14 | 5 | THE COURT:  You don't have to talk to anybody else. |
| 13:42:18 | 6 | THE JUROR:  Okay. |
| 13:42:44 | 7 | THE COURT:  Okay.  I'm going to let you sit on that |
| 13:42:47 | 8 | bench over there.  Thank you. |
| 13:42:50 | 9 | All right.  Anybody else on the front row?  Anybody |
| 13:42:55 | 10 | else on the second row?  Yes, ma'am. |
| 13:42:58 | 11 | MR. MAYR:  Judge, I think Juror No. 2. |
| 13:43:00 | 12 | THE COURT:  Oh, I'm having trouble.  You're on the |
| 13:43:02 | 13 | corner here. |
| 13:43:03 | 14 | THE JUROR:  Yeah.  I need to approach the bench again, |
| 13:43:06 | 15 | sir. |
| 13:43:06 | 16 | THE COURT:  Come right on up. |
| 13:43:12 | 17 | (At the bench, on the record.) |
| 13:43:22 | 18 | THE COURT:  256. |
| 13:43:23 | 19 | THE JUROR:  Yeah.  256.  Yeah.  It was my son and it |
| 13:43:26 | 20 | was a drug case, and he was sentenced to 10 years, and it was |
| 13:43:32 | 21 | about three years ago, and since, he's been released. |
| 13:43:36 | 22 | THE COURT:  Well, you've told us that, but was this |
| 13:43:40 | 23 | something that had anybody done any criminal act against you? |
| 13:43:42 | 24 | THE JUROR:  Against me, oh, no. |
| 13:43:44 | 25 | THE COURT:  Not you or your family or anything. |

13:43:47  1          THE JUROR:  Not me.  No, sir.  Okay.  All right.

13:44:03  2          MS. DEMINGS:  Juror No. 80 is replaced by Juror No. 3.

13:44:11  3          THE COURT:  That's all right, ma'am.  Just have a seat.

13:44:14  4  We don't need to fill the seats.  We'll just count that.  Okay.

13:44:23  5  You stood up three times.  Go ahead.

13:44:26  6          THE JUROR:  No. 193.  Can I approach?

13:44:28  7          THE COURT:  Yes, ma'am.

13:44:30  8          (At the bench, on the record.)

13:44:47  9          THE JUROR:  Okay.  My husband.

13:44:49  10         THE COURT:  You're No. 193.

13:44:50  11         THE JUROR:  Yes.  193.  My husband was sexually

13:44:52  12  assaulted as a child, and just two years ago, we had to go back

13:44:55  13  to court to make sure that guy stayed on the sexual offender

13:44:58  14  list.

13:45:00  15         THE COURT:  And that happened before you even knew your

13:45:04  16  husband?

13:45:04  17         THE JUROR:  Oh, yeah.  He was a little boy.

13:45:06  18         THE COURT:  Okay.  That --

13:45:31  19         MR. WOMACK:  Of course, we're going to have followup.

13:45:34  20         MR. MAYR:  Juror No. 8 had an experience with her

13:45:36  21  mother having been raped, if that would influence her.  And I

13:45:38  22  think that's what Mr. DeGeurin's asking is if you're going to ask

13:45:41  23  followup questions to that extent with each one of these

13:45:44  24  individuals.

13:45:44  25         THE COURT:  Not with each one.  Particularly not the

13:45:47   1   one sexually assaulted when he was three or four years old.

13:45:53   2   We're not going to do that.  I'm not going to pry.  But anytime I

13:45:59   3   see that experience would influence any person's judgment, I will

13:46:09   4   follow it up.  But feel free to remind me.

13:46:09   5           MR. WOMACK:  That was my --

13:46:13   6           MR. DEGEURIN:  I knew you thought that.  I knew that

13:46:15   7   would be on the edge of whether followup was necessary, but I

13:46:16   8   didn't know whether it was going to be a policy or yes, you're

13:46:20   9   going to follow up.

13:46:20   10          THE COURT:  And you're welcome to suggest to me.  It's

13:46:26   11  not often.  But I'm going to follow up on anybody I think can be

13:46:32   12  influenced by some past experience.

13:46:33   13          MR. WOMACK:  Okay.

13:46:34   14          THE COURT:  Sometimes it's general, but most of the

13:46:36   15  time it's just individual.

13:46:47   16          Yes, ma'am.

13:46:49   17          THE JUROR:  No. 119.  My sister was a victim of assault

13:46:55   18  in a local department store.  I believe it was in 2011, the

13:47:02   19  perpetrator was charged, and I believe it resulted in further

13:47:06   20  incarceration.

13:47:07   21          THE COURT:  Okay.  Now, were you involved in that other

13:47:10   22  than supporting your sister?

13:47:12   23          THE JUROR:  Just only to.

13:47:17   24          THE COURT:  Okay.  Would that influence you in any way,

13:47:19   25  shape or form if you were to be a juror in this case?

13:47:21   1           THE JUROR:  No, sir.  Okay.

13:47:26   2           THE JUROR:  Seems so true, but since you said burglary,

13:47:29   3   my family's apartment was burglarized one Christmas when I was

13:47:33   4   six years old.  So we caught them in the act.

13:47:36   5           THE COURT:  Have you gotten over that?

13:47:38   6           THE JUROR:  Oh, yeah.

13:47:40   7           THE COURT:  Anybody else on that row?  Yes, ma'am.

13:47:42   8           THE JUROR:  Can I approach?

13:47:44   9           THE COURT:  Yes, ma'am.

13:47:46  10           (At the bench, on the record.)

13:48:04  11           THE JUROR:  I was --

13:48:05  12           THE COURT:  246.

13:48:06  13           THE JUROR:  Yes.  246.  Five years ago, I was raped.

13:48:11  14           THE COURT:  Now, that experience was not pleasant.

13:48:13  15           THE JUROR:  No.

13:48:14  16           THE COURT:  Do you think it would influence you in any

13:48:17  17   way, shape or form if you were to be a juror in this case?

13:48:20  18           THE JUROR:  Of course that means everything.  What do

13:48:23  19   you mean?

13:48:24  20           THE COURT:  Well, you're the only one that can answer

13:48:27  21   that.  This is a criminal case.  But that was a very meaningful

13:48:34  22   experience that you had.  Do you think it's best not to

13:48:39  23   participate in this case?

13:48:41  24           THE JUROR:  I don't think it has anything to do with

13:48:43  25   this.  I mean.

| | | |
|---|---|---|
| 13:48:45 | 1 | THE COURT:  Well, let me explain because this is the |
| 13:48:49 | 2 | $64 question.  Can you represent to all these people that you |
| 13:48:53 | 3 | could listen to the evidence and make the decision only on the |
| 13:48:57 | 4 | evidence that you hear in this case? |
| 13:48:59 | 5 | THE JUROR:  Yes. |
| 13:49:01 | 6 | THE COURT:  Okay.  You can return to your seat, ma'am. |
| 13:49:18 | 7 | THE JUROR:  That's okay. |
| 13:49:30 | 8 | THE COURT:  Who's next?  All right.  How about the |
| 13:49:32 | 9 | third row?  Yes, ma'am. |
| 13:49:34 | 10 | THE JUROR:  My sister was a victim of assault about a |
| 13:49:37 | 11 | year and a half ago.  And I witnessed a theft at my summer job |
| 13:49:41 | 12 | like five years ago. |
| 13:49:42 | 13 | THE COURT:  Would that experience in any way influence |
| 13:49:45 | 14 | you if you were to be a juror in this case? |
| 13:49:47 | 15 | THE JUROR:  No, sir. |
| 13:49:48 | 16 | THE COURT:  All right.  Anybody else on that?  Yes, |
| 13:49:51 | 17 | sir. |
| 13:49:51 | 18 | THE JUROR:  Juror 97.  I had a house robbed and a car |
| 13:49:55 | 19 | stolen. |
| 13:49:55 | 20 | THE COURT:  About how long ago? |
| 13:49:56 | 21 | THE JUROR:  Latest one is 20 years. |
| 13:50:01 | 22 | THE COURT:  All right.  Thank you.  Anybody else on |
| 13:50:02 | 23 | that row?  Anybody the last row up here?  How about the first row |
| 13:50:09 | 24 | down there?  Yes, sir. |
| 13:50:12 | 25 | THE JUROR:  No. 47.  We had our house robbed in '97. |

| | | |
|---|---|---|
| 13:50:15 | 1 | And then, I had an aunt that was murdered in San Antonio and it's |
| 13:50:21 | 2 | a cold case. |
| 13:50:21 | 3 | THE COURT:  All right.  The experience that you had |
| 13:50:24 | 4 | with your family members, you say it's still a cold case? |
| 13:50:29 | 5 | THE JUROR:  Yes, sir. |
| 13:50:30 | 6 | THE COURT:  Would that influence you if you were to be |
| 13:50:33 | 7 | a juror in this case in any way? |
| 13:50:36 | 8 | THE JUROR:  No, sir. |
| 13:50:36 | 9 | THE COURT:  All right.  Thank you.  Yes, ma'am. |
| 13:50:37 | 10 | THE JUROR:  121A.  I've had a house broken into and a |
| 13:50:45 | 11 | car broken into. |
| 13:50:47 | 12 | THE COURT:  Thank you.  Anybody else on that row?  Yes, |
| 13:50:51 | 13 | sir. |
| 13:50:51 | 14 | THE JUROR:  May I approach? |
| 13:50:52 | 15 | THE COURT:  You may. |
| 13:51:01 | 16 | (At the bench, on the record.) |
| 13:51:17 | 17 | THE COURT:  You're No. 66. |
| 13:51:19 | 18 | THE JUROR:  Yes, sir.  My wife's father molested her, |
| 13:51:21 | 19 | and he went to prison for it.  And also, my kids were molested by |
| 13:51:29 | 20 | their stepfather.  And my parent's home was burglarized recently. |
| 13:51:34 | 21 | THE COURT:  All right.  Those things, as significant as |
| 13:51:41 | 22 | they were, do you think would influence you in any way if you |
| 13:51:43 | 23 | were to be a juror in this case? |
| 13:51:44 | 24 | THE JUROR:  No, sir. |
| 13:51:44 | 25 | THE COURT:  You could listen to the evidence and make |

13:51:46    1    up your mind and not even refer to those instances and set aside

13:51:50    2    any biases that you have?

13:51:52    3            THE JUROR:  Yes, sir.

13:51:53    4            THE COURT:  Okay.  Thanks.

13:51:54    5            THE JUROR:  All right.  Thanks.

13:52:03    6            THE COURT:  Anybody else on the front row?  How about

13:52:08    7    the second row?  Yes.  I see a hand.  Okay.

13:52:14    8            THE JUROR:  My office was burglarized about a year ago.

13:52:18    9    And two of my children were victims of hit-and-run accidents here

13:52:22   10    in the last three years.

13:52:23   11            THE COURT:  All right.  If you were to be a juror in

13:52:26   12    this case, would those experiences influence you in any way?

13:52:29   13            THE JUROR:  No.

13:52:30   14            THE COURT:  All right.  Thank you.  Yes.

13:52:32   15            THE JUROR:  Juror 269.  And the mid-'90s, one of my

13:52:37   16    daughters had her car stolen in front of our house and totalled.

13:52:41   17            THE COURT:  All right.  Thank you.  Yes, ma'am.

13:52:45   18            THE JUROR:  302.  Twenty-six years ago, my sister was

13:52:48   19    working and she was held at knifepoint for robbery.

13:52:52   20            THE COURT:  Would that influence you if you're to be a

13:52:54   21    juror in this case?

13:52:55   22            THE JUROR:  No.

13:52:55   23            THE COURT:  All right.  Anybody else on that row?  How

13:52:59   24    about the next row?  Yes.

13:53:03   25            THE JUROR:  No. 106.  About 40 years ago, I was a

13:53:09   1   victim of assault walking down the street in Corpus Christi.  The

13:53:12   2   perpetrator was not found.  And about 30 years ago, I had a

13:53:15   3   cousin who was murdered.  The perpetrator was not found.

13:53:18   4            THE COURT:  Now, those two significant things that have

13:53:20   5   happened to you, I need to ask you the same question.  If you

13:53:24   6   were to be a juror in this case, would those experiences

13:53:29   7   influence you in any way?

13:53:31   8            THE JUROR:  No.

13:53:31   9            THE COURT:  Okay.  Thank you.

13:53:34   10           THE JUROR:  Twenty-one.  I had a nephew who was one of

13:53:40   11   five people killed by a hit-and-run drunk driver.

13:53:45   12           THE COURT:  Okay.  Would that experience influence you

13:53:49   13   if you were to be a juror in this case?

13:53:50   14           THE JUROR:  No, sir.

13:53:51   15           THE COURT:  All right.  Anybody else on that row?  Yes,

13:53:54   16   ma'am.

13:53:55   17           THE JUROR:  Juror No. 27.  I had a physical assault in

13:54:00   18   the '70s, and house broken into about five years ago.

13:54:07   19           THE COURT:  Those experiences, as unpleasant as they

13:54:09   20   are, if you were to be selected as a juror in this case, would

13:54:14   21   they influence you in any way?

13:54:15   22           THE JUROR:  No, sir.

13:54:16   23           THE COURT:  All right.  Thank you.  All right.  The

13:54:19   24   next row, the final row back there, anybody needs to respond to

13:54:22   25   that question?

13:54:30   1          THE JUROR:  Fifty-seven.  It was the early to mid-'90s,

13:54:35   2   household burglary and an assault.

13:54:40   3          THE COURT:  Thank you, ma'am.  Anybody on this side?

13:54:45   4   Yes, ma'am.

13:54:46   5          THE JUROR:  Home burglary and then, several job site

13:54:50   6   burglaries.

13:54:51   7          THE COURT:  About how long ago was the burglary?

13:54:52   8          THE JUROR:  Home burglary was about eight and the

13:54:56   9   worksite burglary was about six months ago.

13:54:58  10          THE COURT:  All right.  Thank you.  Anybody else need

13:55:01  11   to respond?  Yes.

13:55:01  12          THE JUROR:  154A.  Home burglary about three years ago.

13:55:05  13          THE COURT:  Okay.  Anybody else?  All right.  We'll

13:55:21  14   start with Juror No. 140 and one -- just keep your seat.  I want

13:55:28  15   you to stand up and tell everybody a little bit about yourself.

13:55:31  16   Let me give you a preview.

13:55:38  17          My name is Sam Sparks.  My number is 1,746.2.  I was

13:55:48  18   born here in Austin, Texas in 1939.  All of my education was at

13:55:53  19   the university.  I'm married.  I have six children with my wife.

13:55:58  20   We have seven grandchildren.  My wife was a teacher for 24 years

13:56:05  21   and won't let me come home, so I'm still active here.  That kind

13:56:12  22   of thing just so that we can know where you are.

13:56:20  23          That's right.  No names.  Just a number.  That's why

13:56:22  24   I'm said I'm -- can any of you remember my number?  If you'll

13:56:30  25   introduce yourself as a number and tell us a little bit about

13:56:32   1   you, your wife and your employment.

13:56:34   2            THE JUROR:  All right.  Well, I'm 140.  I was born in

13:56:39   3   Denver.  I lived most of my life in Hawaii.  However, jobs became

13:56:44   4   difficult there, and I had to move to the mainland.  And my

13:56:48   5   employer said I could live in one of several places, including

13:56:52   6   Dallas.  I said I would live in Dallas, but I moved to

13:56:55   7   Fredericksburg, instead, and I've been there ever since.  So I

13:56:59   8   have eight kids.  I work in the healthcare industry.

13:57:05   9            THE COURT:  All right.  Thank you.  And if you'll just

13:57:09   10  go right down the row.  Yes, ma'am.

13:57:11   11           THE JUROR:  I'm Juror 181.  I'm native Texan.  My

13:57:20   12  husband and I met in college.  We've been married 28 years.  We

13:57:24   13  have one child.  He's 20 at U.T.  I've gone from elementary

13:57:33   14  education to corporate world to nonprofit, and now working for

13:57:36   15  the city.  That's about it.

13:57:41   16           THE COURT:  What do you do for the city?

13:57:43   17           THE JUROR:  I'm the executive assistant for medical

13:57:46   18  directors for Austin Travis County EMS.

13:57:49   19           THE COURT:  You've told us that.  I'm sorry.  And how

13:57:52   20  about your husband?  What does he do?

13:57:53   21           THE JUROR:  He works for the IRS as a tax --

13:57:55   22           THE COURT:  Okay.  You've told us that, too.

13:57:57   23           THE JUROR:  That's all right.

13:57:58   24           THE COURT:  I'm old.  I'm not young like y'all.

13:58:01   25           THE JUROR:  I'm Juror 135.  Lived in Pennsylvania,

13:58:07    1    Florida, Kansas and here.  I'm married 30 years, two children.

13:58:14    2    I'm retired dental hygienist due to back injuries.  And now I

13:58:19    3    just take care of babies when they're sick and can't go to their

13:58:22    4    daycares and stuff.

13:58:26    5            THE JUROR:  272.  I'm divorced.  No children.  I lived

13:58:32    6    in Texas my whole life.  I work in customer service field, data

13:58:38    7    entry.  So not much.

13:58:41    8            THE COURT:  It's all right.  You did fine.

13:58:44    9            THE JUROR:  I've got to look again, 282.  I'm like you,

13:58:49   10    I'm getting old.  I was born in 1944, after the war or right

13:58:54   11    during the war.  But anyway, I spent time in the military for a

13:59:00   12    while and then, I got out, and I spent 30-something years with --

13:59:07   13    working for cities, assistant city manager for a couple of them

13:59:13   14    in enforcement, building inspector for the last.  Retired in

13:59:19   15    2005.  I'm married, been married nearly 45 years.  Got -- I had

13:59:24   16    three kids and two of my kids are deceased.

13:59:28   17            THE COURT:  All right.  Thank you, sir.

13:59:31   18            THE JUROR:  I'm No. 15.  I was born and raised in

13:59:37   19    Fredericksburg.  I came to Austin in '68 to go to U.T., and I've

13:59:42   20    been here ever since.  I'm divorced.  I have no kids and I'm

13:59:48   21    retired.

13:59:49   22            THE COURT:  What did you do before you retired?

13:59:51   23            THE JUROR:  I worked for the city of Austin Health

13:59:54   24    Department.

13:59:54   25            THE COURT:  Thank you.

13:59:55    1          THE JUROR:  I'm 192.  I grew up in Indiana.  I met my

14:00:00    2    wife at -- in college in Nashville, Tennessee, and we moved down

14:00:04    3    here 15 years ago, and been married for 15 years.  We've got

14:00:07    4    three children.  My wife is a stay-at-home mom.  She was a

14:00:11    5    teacher before that.  I work at software development.

14:00:16    6          THE COURT:  Thank you.

14:00:17    7          THE JUROR:  I'm 200.  A Dallas native, an English major

14:00:24    8    from SMU, and did most of my -- I'm single, travel a lot, and

14:00:30    9    early retired from Farm Credit System and did administrative --

14:00:38   10    was the director of administrative services for that.

14:00:43   11          THE COURT:  Thank you.

14:00:44   12          THE JUROR:  162.  Married, 28 years.  We have three

14:00:49   13    kids, seven grandsons.  Early retirement, federal government.

14:00:56   14    And then, I worked for my husband, who's also recently retired.

14:01:01   15    And what else was I supposed to say?

14:01:05   16          THE COURT:  What did your husband do that you worked

14:01:07   17    for him?

14:01:08   18          THE JUROR:  President of his own corporation.  We did

14:01:10   19    underground utilities, storm and sanitary sewer in Houston, and I

14:01:14   20    did the books for him.  And his mother is elderly and in assisted

14:01:23   21    living, and so, I manage all of her books, as well.  And I'm

14:01:26   22    retired, Social Security.

14:01:27   23          THE COURT:  Thank you, ma'am.

14:01:30   24          THE JUROR:  I'm No. 137.  And I started out -- I got a

14:01:38   25    degree in secondary education.  I lived in Montana, New Mexico

14:01:42   1   and here all my life.  And I figured out I didn't really like

14:01:46   2   teaching that much, so I went to a community college, picked up

14:01:51   3   an electronic technology training, and I went to work as an

14:01:55   4   electronic technician in Albuquerque.  And then, later on, I

14:01:58   5   started going to University of New Mexico, and I got a mechanical

14:02:00   6   engineering degree and I worked at mechanical engineering --

14:02:05   7   well, another employer here in Austin and then, one in Taylor.

14:02:08   8   And I'm retired now and I'm a gadgeteer, and I have five rescue

14:02:13   9   dogs and one rescue cat.

14:02:16   10          THE JUROR:  I'm Juror 340.  I was born in Indiana,

14:02:20   11   lived there through college, moved to Phoenix for a year, then

14:02:23   12   lived in Austin since then, except for four years in France.  I

14:02:27   13   am an engineer at a semiconductor facility.

14:02:30   14          THE COURT:  All right.  Thank you, sir.

14:02:31   15          THE JUROR:  My name is 256.  And I was born and raised

14:02:38   16   in Austin, Texas, went to Stephen F. Austin High School, went to

14:02:42   17   Texas Southern University.  I've been married three times.  I

14:02:45   18   have seven kids, and nine grandkids, and two great grandkids.

14:02:51   19   And employed at the University of Texas, which I've been there

14:02:54   20   for 26 years.  And I'll be retiring at the end of this year.

14:02:58   21          THE COURT:  What did you do -- what are you doing at

14:03:00   22   the university?

14:03:01   23          THE JUROR:  I'm a plant mechanic, making chiller --

14:03:07   24   water in a chiller plant.

14:03:08   25          THE COURT:  Thank you.  No. 189.

| | | |
|---|---|---|
| 14:03:13 | 1 | THE JUROR:  Juror 189.  Born here in Central Texas |
| 14:03:28 | 2 | 1948, what can I say?  I'm married, 40 years in September.  I |
| 14:03:35 | 3 | have two children.  I have a 37-year-old daughter, three |
| 14:03:39 | 4 | granddaughters.  My son is 29.  He's a police officer in San |
| 14:03:46 | 5 | Antonio past eight years.  I'm retired, work for the Public Works |
| 14:03:56 | 6 | Department.  And also, I had to stop working.  I'm a school bus |
| 14:04:02 | 7 | driver but got injury to my shoulder, so I'm not working right |
| 14:04:05 | 8 | now. |
| 14:04:05 | 9 | THE COURT:  All right, sir.  Thank you.  Next. |
| 14:04:09 | 10 | THE JUROR:  Hi, Juror 82.  Born and raised in Illinois. |
| 14:04:13 | 11 | Currently, I'm working for Williamson County Health District as |
| 14:04:18 | 12 | an RN.  We relocated here with my husband back in 2007, as we |
| 14:04:26 | 13 | wanted a career change.  I have two children and I've been |
| 14:04:29 | 14 | married 19 years. |
| 14:04:30 | 15 | THE COURT:  Thank you, ma'am. |
| 14:04:32 | 16 | THE JUROR:  I'm Juror 127.  Yes.  I was born in |
| 14:04:40 | 17 | Illinois, but have been in Texas for as long as I can remember. |
| 14:04:44 | 18 | Went to school at A & M with a Bachelor's Degree in Science.  Met |
| 14:04:49 | 19 | my husband at A & M.  And we have two children. |
| 14:04:51 | 20 | THE COURT:  Thank you. |
| 14:04:53 | 21 | THE JUROR:  Juror 193, native Texan, married, no kids. |
| 14:05:00 | 22 | That's it. |
| 14:05:05 | 23 | THE JUROR:  Juror 119.  I'm married, 32 years.  I'm a |
| 14:05:11 | 24 | mother.  I'm a step-grandmother.  And I'm a native Texan, |
| 14:05:20 | 25 | Austinite.  And that's about it. |

| 14:05:21 | 1 | THE COURT:  Time out.  What in the world was that? |

14:05:21  1          THE COURT:  Time out.  What in the world was that?

14:05:28  2          THE JUROR:  Juror No. 118.  I grew up in Chicago.  I

14:05:31  3  was there for probably 35 years, and then, I went to Indianapolis

14:05:37  4  for ten and then, I came to Austin.  So I've been lost about

14:05:42  5  eight years.  I have four boys, four sons that are all grown.

14:05:47  6  And my husband sells computer chips.  And I'm a financial

14:05:51  7  planner.

14:05:51  8          THE COURT:  Thank you.

14:05:53  9          THE JUROR:  Juror 172.  I was born and raised in

14:05:59  10 Nashville, Tennessee.  Moved to Texas in '80, go to school here

14:06:06  11 at Southwest.  I finished here, went out to California, went to

14:06:11  12 grad school.  And I'm retired from -- self-employed.

14:06:20  13         THE COURT:  Okay.

14:06:22  14         THE JUROR:  Juror 246.  I was born in Hawaii.  My dad

14:06:28  15 was in the Navy.  Grew up in upstate New York, moved to Texas in

14:06:33  16 '95.  I work as a nanny, two little girls.

14:06:38  17         THE COURT:  Okay.

14:06:41  18         THE JUROR:  Juror 318.  Originally born in Houston.

14:06:47  19 I'm married, 33 years.  Two children, six grandchildren.  And

14:06:54  20 presently employed in the logistics security business.  Also a

14:06:58  21 coach, track and field.  That's about it.

14:07:01  22         THE COURT:  Okay.

14:07:03  23         THE JUROR:  Juror 326.  I was born in Houston, raised

14:07:09  24 in Austin.  I did ten years in the Navy, traveling all over the

14:07:13  25 world.  I was a single mother.  I lived in New Mexico.  Worked

| | | |
|---|---|---|
| 14:07:19 | 1 | for a couple of years.  When my grandmother passed away, I |
| 14:07:22 | 2 | switched to AMD.  That's what brought me back here to Austin.  I |
| 14:07:26 | 3 | met my husband.  We're married -- ten years this year is our |
| 14:07:31 | 4 | anniversary.  We have a six-year-old and surprise, a |
| 14:07:36 | 5 | three-year-old.  My oldest son is 19.  He's in the Navy, as well, |
| 14:07:41 | 6 | and he works -- he's still working at Expansion.  And I'm the |
| 14:07:47 | 7 | supervisor for basically the Texas Abuse Hotline. |
| 14:07:50 | 8 | THE COURT:  All right. |
| 14:07:51 | 9 | THE JUROR:  Juror 28.  I was born in Texas, but I spent |
| 14:07:55 | 10 | most of my childhood in Oklahoma.  I moved to Texas after 20 |
| 14:08:01 | 11 | years.  I have a beautiful 20-years-old daughter, married to a |
| 14:08:04 | 12 | high school football coach and teacher.  That's it. |
| 14:08:07 | 13 | THE COURT:  All right. |
| 14:08:08 | 14 | THE JUROR:  Juror 213.  Born and raised here in Austin. |
| 14:08:12 | 15 | Graduated from Texas A & M.  Never married or kids, but I did |
| 14:08:17 | 16 | work in a daycare for eight years.  Now I'm a receptionist at the |
| 14:08:21 | 17 | Austin Diagnostic Clinic. |
| 14:08:23 | 18 | THE JUROR:  Juror 251.  I grew up in Idaho.  And my |
| 14:08:30 | 19 | husband and I retired from the Air Force about 13 years ago when |
| 14:08:36 | 20 | we took a job here in Austin and moved here.  We have three |
| 14:08:40 | 21 | beautiful girls.  All educated beautiful women. |
| 14:08:48 | 22 | THE COURT:  Okay.  We're going down to 199 now or up to |
| 14:08:51 | 23 | 199. |
| 14:08:52 | 24 | THE JUROR:  199.  Born in 1950 and raised on a farm in |
| 14:08:57 | 25 | Spring, Texas and went to Sam Houston State, north of Houston. |

| | | |
|---|---|---|
| 14:09:05 | 1 | Married in '86. Got two sons or my first wife had -- wife I |
| 14:09:12 | 2 | married had a son and I had a son. We joined families and my son |
| 14:09:16 | 3 | was later killed. And then -- but I still have my stepson, who's |
| 14:09:23 | 4 | at Utah. |
| 14:09:24 | 5 | THE COURT: All right. Thank you. |
| 14:09:27 | 6 | THE JUROR: 74A. I'm originally from Austin. I work |
| 14:09:35 | 7 | for a food company, sales rep and restaurant consultant in the |
| 14:09:45 | 8 | hill country. My wife and I have three sons, four grandkids. |
| 14:09:58 | 9 | And for 23 years, I was a professional dad. We were foster |
| 14:10:04 | 10 | parents. During that time, we had a lot of kids through our |
| 14:10:09 | 11 | house. |
| 14:10:14 | 12 | THE JUROR: Juror 25. Born and raised in Texas. |
| 14:10:18 | 13 | Graduated, chemical engineering degree, and work in healthcare |
| 14:10:25 | 14 | industry. |
| 14:10:26 | 15 | THE JUROR: Juror 78. Born and raised in Houston, |
| 14:10:30 | 16 | Texas. Sam Houston State University, graduated with a degree. |
| 14:10:36 | 17 | Moved to Austin in 1998. Been with the same company for about |
| 14:10:42 | 18 | almost 16 years now as an analyst. I have a little girl, three |
| 14:10:47 | 19 | years old. |
| 14:10:48 | 20 | THE COURT: Okay. Thank you. |
| 14:10:50 | 21 | THE JUROR: Juror 97. Born in Ohio. Divorced. Two |
| 14:10:56 | 22 | sons, four grandkids. My father was a career military. Between |
| 14:11:01 | 23 | his career, my military career and oil field industries, pretty |
| 14:11:05 | 24 | well traveled around the world. Enjoying retirement. |
| 14:11:12 | 25 | THE JUROR: 121. Born in Texas, raised in New Jersey. |

| | | |
|--|--|--|
| 14:11:22 | 1 | Ever since grad school at A & M, picked up a couple of degrees |
| 14:11:28 | 2 | and a wife.  We lived in Houston.  Now we're in Dripping Springs. |
| 14:11:32 | 3 | THE COURT:  You went from New Jersey to A & M? |
| 14:11:35 | 4 | THE JUROR:  Well, no.  Went from New Jersey to Southern |
| 14:11:39 | 5 | and stayed. |
| 14:11:39 | 6 | THE COURT:  I figured you had to have a buffer a little |
| 14:11:42 | 7 | bit. |
| 14:11:42 | 8 | THE JUROR:  208.  And I met my husband in the first |
| 14:11:45 | 9 | grade.  We've lived in Austin for 40 years.  One child, two |
| 14:11:49 | 10 | grandchildren and three dogs. |
| 14:11:53 | 11 | THE JUROR:  Juror 268.  I graduated from Texas A & M. |
| 14:11:58 | 12 | I am a second-grade teacher.  I am married to my husband since |
| 14:12:04 | 13 | high school, and he is an accountant here in Austin. |
| 14:12:08 | 14 | THE COURT:  Okay. |
| 14:12:09 | 15 | THE JUROR:  Juror No. 44A.  I grew up in New England, |
| 14:12:12 | 16 | 23 years in the Air Force as a Latin American specialist, living |
| 14:12:15 | 17 | in various places here and overseas.  After the Air Force, I |
| 14:12:19 | 18 | spent seven years in the telecom sector in academia.  I'm now |
| 14:12:23 | 19 | retired since 2009.  My wife is a retired teacher. |
| 14:12:26 | 20 | THE COURT:  Thank you, sir. |
| 14:12:28 | 21 | THE JUROR:  278.  I was born in Taiwan and I came to |
| 14:12:34 | 22 | U.T. Austin in 1975.  And I got my master degree in U.T., and now |
| 14:12:40 | 23 | I'm working as a software engineer at IBM.  I'm married with two |
| 14:12:48 | 24 | kids.  And my husband is retired from IBM. |
| 14:12:54 | 25 | THE COURT:  Okay.  Thank you, ma'am. |

14:12:58  1        THE JUROR:  No. 3.  I was born in Houston, graduated
14:13:01  2  from University of Texas.  I live in Austin and work in human
14:13:05  3  resources.
14:13:06  4        THE JUROR:  Been in Austin for over 20 years.  All my
14:13:10  5  degrees are from the University of Texas.  I'm a high school
14:13:12  6  principal and have two dogs.
14:13:17  7        THE COURT:  Thank you, ma'am.
14:13:18  8        THE JUROR:  15A.  Born and raised here in Austin and I
14:13:21  9  work for the state.
14:13:22  10        THE COURT:  All right.  Thank you.
14:13:23  11        THE JUROR:  Juror 290.  Born in Germany, grew up in
14:13:28  12  Missouri.  Twenty-three years in the Air Force, moved here to
14:13:32  13  Texas about twelve years ago.  Married 35 years and two adult
14:13:38  14  children and three grandkids.
14:13:41  15        THE JUROR:  Juror 52.  Born in Seattle, Washington.
14:13:45  16  Spent part of my childhood in Arizona, rest in Texas through
14:13:50  17  various places in Texas.  I am an educational specialist at a
14:13:54  18  Regions Service Center.  That's about it.
14:13:58  19        THE COURT:  Okay.  All right.  No. 47.
14:14:03  20        THE JUROR:  Juror 47.  I was born in Texas, studied
14:14:09  21  U.T., 28-year career in aviation.  Then I got laid off from it,
14:14:15  22  started a real estate business where I'm in farm and ranch.  And
14:14:18  23  I have two kids that want to go to college state.
14:14:24  24        THE COURT:  Okay.
14:14:25  25        THE JUROR:  Juror No. 121A.  I'm married, been married

14:14:32  1  16 years.  My husband is a veteran.  I work for a local company

14:14:40  2  here.

14:14:44  3         THE JUROR:  Juror 205.  I'm native Texan.  I was raised

14:14:48  4  on a farm.  I married far beyond -- divorced way later than I

14:14:53  5  should.  I have two adult children.  And I've been in the legal

14:14:56  6  field for 30 years as a secretary.

14:15:01  7         THE JUROR:  33A.  Born in South Texas, moved here 1990.

14:15:07  8  I got a degree in IT, worked with the Department Health Services.

14:15:12  9  Married.  She's been working for Dell as project manager.  And I

14:15:15  10  have two boys, two teenagers.  I have two horses, two dogs, and

14:15:20  11  the chickens on the way.

14:15:25  12         THE JUROR:  No. 85.  I'm married.  My husband's an

14:15:29  13  engineering worker.  We have three kids.  And I've gone to church

14:15:34  14  pretty much my whole adult life, 17 years in adult ministry.  And

14:15:39  15  that's about it.

14:15:42  16         THE JUROR:  I'm Juror No. 4.  I was born and grew up in

14:15:46  17  Phoenix, Arizona.  I moved here about 18 years ago.  I'm a

14:15:49  18  financial director at Dell Computer.  And I've been married 29

14:15:53  19  years, and I have three girls.

14:15:56  20         THE JUROR:  I'm Juror 182.  I was born here in Austin,

14:16:00  21  went to Stephen F. Austin.  Married my husband.  Went to work for

14:16:06  22  Department of Public Safety in the intelligence field.  Retired.

14:16:09  23  I went to work at A & M in the Homeland Defense, and they

14:16:13  24  disbanded.  And then, I received my investigative license about

14:16:18  25  five or six years ago and doing that.  Plus doing all the

14:16:20  1  traveling, which is really a great way to retire, and a lot of

14:16:27  2  volunteer work at my church.

14:16:28  3          THE COURT:  Okay.

14:16:30  4          THE JUROR:  Juror 2066.  I was born in Houston, moved

14:16:33  5  around about eight years ago.  I've been married for 16 years and

14:16:37  6  I have two kids.

14:16:39  7          THE JUROR:  No. 67.  Born in Louisiana, moved to most

14:16:44  8  of my life in California.  And married, divorced and then,

14:16:49  9  remarried.  And I have three grown daughters and moved this way

14:16:54  10  about five years ago.

14:16:56  11          THE JUROR:  331.  Born in Michigan, been in Austin for

14:17:01  12  the last ten years.  Went to the University of Texas.  Currently

14:17:03  13  in sales in technology industry.  I'm married and no kids.

14:17:09  14          THE JUROR:  131.  I'm a native Texan.  I'm an

14:17:15  15  accounting manager for an agricultural supply company.  I've got

14:17:18  16  an MBA from A & M.  And I have one son and four grandsons.

14:17:23  17  That's about it.

14:17:24  18          THE JUROR:  I'm 261.  I was born in Germany and raised

14:17:29  19  as an Air Force brat.  Lived in Texas since the mid-'90s and met

14:17:34  20  my husband at college at Texas State in San Marcos, about ten

14:17:37  21  years ago.  We've been married a little bit over a year, and we

14:17:40  22  have two dogs and a cat.  And I work for a nonprofit.

14:17:44  23          THE JUROR:  I'm 44.  And I'm 66, but that's not my

14:17:49  24  number.  Spent 20 years in the Air Force doing avionics and

14:17:58  25  criminal counterintelligence work.  Got out in '86, came to Texas

| | | |
|---|---|---|
| 14:18:04 | 1 | for the first time, although basic training in '91.  Working in |
| 14:18:11 | 2 | information control. |
| 14:18:16 | 3 | THE COURT:  Thank you.  Go ahead. |
| 14:18:18 | 4 | THE JUROR:  Oh, I have five kids, four grandkids. |
| 14:18:22 | 5 | Married 43 years. |
| 14:18:24 | 6 | THE COURT:  All right.  We'll just hold up, stop.  Let |
| 14:18:27 | 7 | me talk with the clerks for a minute. |
| 14:23:09 | 8 | MS. DEMINGS:  Juror No. 80 has been replaced by Juror |
| 14:23:12 | 9 | No. 3. |
| 14:24:21 | 10 | THE COURT:  Juror No. 278. |
| 14:24:27 | 11 | THE JUROR:  Here. |
| 14:24:29 | 12 | COURT SECURITY OFFICER:  278. |
| 14:24:29 | 13 | THE COURT:  If you'll come here, please, ma'am. |
| 14:24:45 | 14 | (At the bench, on the record.) |
| 14:24:56 | 15 | THE COURT:  On your questionnaire, you indicated that |
| 14:25:01 | 16 | you were not proficient in English, although you've got a Ph.D. |
| 14:25:03 | 17 | THE JUROR:  Well, no.  I got my master degree. |
| 14:25:07 | 18 | THE COURT:  Have you had any difficulty understanding? |
| 14:25:10 | 19 | (Bench microphone not functioning.) |
| 14:25:10 | 20 | THE JUROR:  I meant I have but -- |
| 14:25:31 | 21 | THE COURT:  I'm not concerned about people not |
| 14:25:32 | 22 | understanding you.  People never have understood me.  But I am |
| 14:25:40 | 23 | asking if you have difficulty understanding the English language. |
| 14:25:43 | 24 | THE JUROR:  Well, I'm concerned about that. |
| 14:25:45 | 25 | THE COURT:  Okay.  All right.  You may take your seat. |

14:25:51    1          THE JUROR:  Okay.  Thank you.

14:25:52    2          THE COURT:  I don't know of any reason, but anyone want

14:26:03    3   to object to her?

14:26:08    4          MR. WOMACK:  We'd challenge her for cause.  She has

14:26:18    5   trouble understanding English.

14:26:18    6          MR. DEGEURIN:  She said she's had difficulty already.

14:26:20    7          THE COURT:  She's not disqualified as a matter of law.

14:26:25    8   We've got plenty of jurors.  If y'all want to object to her, I'll

14:26:29    9   take her off as mine.  Not yours.  278 will be off.

14:26:36   10          MR. DEGEURIN:  Thank you.

14:27:18   11          THE COURT:  Members of the jury panel, we have several

14:27:23   12   of you who have family members or past experiences and

14:27:33   13   association with the Internal Revenue Service and the FBI and law

14:27:43   14   enforcement.  Now, is there anyone on the panel who feels that a

14:27:47   15   person in law enforcement per se, without any other influence, is

14:27:55   16   a more credible witness than anybody else?

14:28:00   17          And the reason I ask that is the jurors who are going

14:28:05   18   to be selected in this case must individually listen to each

14:28:10   19   individual and make the determination of what weight you want to

14:28:13   20   give that person's testimony.  And the fact that somebody is a

14:28:19   21   law enforcement officer, I want to know if anybody would put more

14:28:25   22   credit on that witness just because of that, without even hearing

14:28:32   23   from that law enforcement officer.  So that's the question that

14:28:36   24   the parties wish for me to ask and I'm asking.

14:28:39   25          So is there anybody who can't evaluate a law

14:28:44  1   enforcement officer's testimony like you would anybody else's,

14:28:53  2   any what we call fact witnesses?  If you feel that a law

14:28:57  3   enforcement officer has more credibility just because of the fact

14:29:02  4   that he or she's in law enforcement, let me see your hand.

14:29:09  5        All right.  Now, we have a large number of people here,

14:29:26  6   so this is a tuff question, but I want to know if any of you knew

14:29:33  7   anybody else before today?  So let's just talk -- look at the

14:29:42  8   front row.  Yes, sir.

14:29:43  9        THE JUROR:  Yes.  I know the lady 119.  We went to

14:29:49  10  school together.

14:29:50  11       THE COURT:  Okay.  And other than going to school

14:29:54  12  together, do you have any other relationship?  Have you ever been

14:29:59  13  in her home, or she been in your home, or children that went to

14:30:02  14  the same schools, or that type of thing?

14:30:04  15       THE JUROR:  Well, we been -- while we was in high

14:30:08  16  school.

14:30:08  17       THE COURT:  Okay.  All right.  The real question is,

14:30:12  18  can you make up your mind independently?

14:30:15  19       THE JUROR:  Yes.

14:30:16  20       THE COURT:  And can you?

14:30:18  21       THE JUROR:  Yes.

14:30:18  22       THE COURT:  Okay.  Anybody else?  Yes.

14:30:22  23       THE JUROR:  Juror No. 6, we're coworkers.

14:30:28  24       THE COURT:  All right.  Either of you in any type of

14:30:32  25  supervisory capacity over the other?

| | | |
|---|---|---|
| 14:30:35 | 1 | THE JUROR:  No. |
| 14:30:36 | 2 | THE COURT:  Can you make up your mind, even if you have |
| 14:30:39 | 3 | to disagree with him? |
| 14:30:40 | 4 | THE JUROR:  Absolutely. |
| 14:30:44 | 5 | THE COURT:  Speaking of absolutely, you're No. 78. |
| 14:30:49 | 6 | Can you make up your mind if you disagreed with him? |
| 14:30:52 | 7 | THE JUROR:  Yes, sir. |
| 14:30:52 | 8 | THE COURT:  And your number is? |
| 14:30:54 | 9 | THE JUROR:  Six. |
| 14:30:54 | 10 | THE COURT:  Six.  Okay.  Yes, ma'am. |
| 14:30:57 | 11 | THE JUROR:  I work with 205. |
| 14:30:59 | 12 | THE COURT:  Okay.  And do either one of your supervise |
| 14:31:03 | 13 | each other? |
| 14:31:03 | 14 | THE JUROR:  No, sir. |
| 14:31:04 | 15 | THE COURT:  And can you make up your mind independently |
| 14:31:10 | 16 | over her opinion? |
| 14:31:11 | 17 | THE JUROR:  Yes, sir. |
| 14:31:11 | 18 | THE COURT:  Okay.  Then I need to ask 205 the same |
| 14:31:14 | 19 | thing. |
| 14:31:14 | 20 | THE JUROR:  Yes.  I could work pretty independent. |
| 14:31:19 | 21 | THE COURT:  I don't have any doubt you can.  Yes, |
| 14:31:21 | 22 | ma'am. |
| 14:31:24 | 23 | THE JUROR:  No. 119.  I formerly worked with No. 200. |
| 14:31:31 | 24 | So I know No. 200. |
| 14:31:33 | 25 | THE COURT:  Okay. |

14:31:33   1               THE JUROR:  About 20 years ago.

14:31:35   2               THE JUROR:  Well, no.  Maybe within the past ten years.

14:31:39   3               THE JUROR:  Maybe ten.  Okay.

14:31:41   4               THE COURT:  Let me ask you this, ma'am:  Do you two

14:31:45   5   think that you could make up your mind independently?

14:31:48   6               THE JUROR:  Yeah.

14:31:49   7               THE JUROR:  Sure.

14:31:50   8               THE COURT:  Yes, ma'am.

14:31:51   9               THE JUROR:  I'm Juror 268.  And without saying her

14:31:56   10   name, the second row on the left side.

14:32:02   11               THE COURT:  Okay.  And what is --

14:32:03   12               THE JUROR:  She was my fifth-grade teacher.

14:32:13   13               THE COURT:  Let me think about how to ask.  Can you

14:32:18   14   make up your mind independently of your fifth-grade teacher?

14:32:21   15               THE JUROR:  Yes, sir.

14:32:23   16               THE COURT:  How about you?

14:32:25   17               THE JUROR:  Yes, sir.

14:32:25   18               THE COURT:  All right.  Anybody else?  Anybody else?

14:32:30   19               COURT SECURITY OFFICER:  Back row, your Honor.

14:32:32   20               THE JUROR:  No. 15A.  I know the gentleman who's

14:32:35   21   outside the courtroom who knows one of the gentleman here.

14:32:40   22               THE COURT:  Okay.  I'm not sure I understand what

14:32:42   23   you're telling me.

14:32:42   24               THE JUROR:  There's a gentleman outside the courtroom

14:32:45   25   that I know who knows one of the defendants here today.

```
14:32:47   1              THE COURT:  So you know somebody that's down here as a
14:32:50   2   spectator?
14:32:51   3              THE JUROR:  I'm not sure.
14:32:54   4              THE COURT:  Okay.  Well, we need to find that out.  Do
14:32:58   5   you know a name?
14:32:59   6              THE JUROR:  Yes.
14:33:00   7              THE COURT:  What's the name?
14:33:00   8              THE JUROR:  Graham.  Charles Graham.
14:33:06   9              THE COURT:  Okay.  That's a name that hadn't been named
14:33:11  10   yet, but maybe going to be named in just a minute.
14:33:15  11              THE JUROR:  Okay.
14:33:15  12              THE COURT:  So have a seat.  You're juror number?
14:33:18  13              THE JUROR:  15A.
14:33:20  14              THE COURT:  15A.  Okay.
14:33:24  15              All right.  One of the last questions that I ask you is
14:33:27  16   I'll have the lawyers read their potential witness list.
14:33:33  17              MR. GARDNER:  Excuse me, your Honor, we have one more
14:33:35  18   in the back here.
14:33:36  19              THE COURT:  Okay.
14:33:37  20              THE JUROR:  This is hardly worth mentioning, but I
14:33:39  21   think while -- I'm 21.  While one of your jurors was describing
14:33:45  22   themselves, I think I realize that I bought a car from she and
14:33:49  23   her husband a couple of years ago.  I don't know her, but that's
14:33:55  24   the extent of it.
14:33:56  25              THE COURT:  Well, did it work out?
```

| | | |
|---|---|---|
| 14:33:59 | 1 | THE JUROR:  It's running well. |
| 14:34:00 | 2 | THE COURT:  Okay.  All right.  Well, Mr. Finn, we'll |
| 14:34:05 | 3 | start off with you.  If you'll address the jury about witnesses |
| 14:34:09 | 4 | that you may call.  Again, these are names that people that may |
| 14:34:14 | 5 | be called, but doesn't mean they'll be called. |
| 14:34:17 | 6 | MR. FINN:  Thank you, your Honor.  May it please the |
| 14:34:18 | 7 | Court.  Judge, you indicated you attended the university. |
| 14:34:22 | 8 | THE COURT:  The university? |
| 14:34:23 | 9 | MR. FINN:  Of? |
| 14:34:25 | 10 | THE COURT:  That is what I referred to. |
| 14:34:28 | 11 | MR. FINN:  We've got some Aggies here, your Honor.  I |
| 14:34:30 | 12 | just want to be clear.  Never mind. |
| 14:34:33 | 13 | THE COURT:  I have two Aggies.  TCU wife, TCU daughter |
| 14:34:41 | 14 | and Texas Tech and two Texas. |
| 14:34:46 | 15 | MR. FINN:  So we've got them pretty well covered then. |
| 14:34:49 | 16 | Okay.  I'll move on. |
| 14:34:50 | 17 | THE COURT:  Don't worry about it. |
| 14:34:51 | 18 | MR. FINN:  Thank you.  All right.  Your Honor, members |
| 14:34:53 | 19 | of the jury, my name -- or the prospective jury, my name is David |
| 14:34:56 | 20 | Finn.  I represent Jose Trevino-Morales, along with Ms. Christie |
| 14:35:00 | 21 | Williams. |
| 14:35:01 | 22 | I'm going to read you a list of the witnesses.  And, |
| 14:35:05 | 23 | Judge, did you want any sort of description or just the name? |
| 14:35:08 | 24 | THE COURT:  Well, just the name.  And if anybody thinks |
| 14:35:10 | 25 | that they might know them, then you could give a description. |

| | | |
|---|---|---|
| 14:35:14 | 1 | MR. FINN:  Starting with Doctor of Veterinary Medicine |
| 14:35:17 | 2 | Dr. Charles Graham, Elizabeth Sanders. |
| 14:35:23 | 3 | THE COURT:  Okay.  Now, hold on.  We have -- this is |
| 14:35:26 | 4 | Dr. Graham that you know? |
| 14:35:27 | 5 | THE JUROR:  Yes. |
| 14:35:28 | 6 | THE COURT:  Okay.  Go ahead. |
| 14:35:32 | 7 | THE JUROR:  One here, too.  I know him, too.  321. |
| 14:35:37 | 8 | THE COURT:  Give me that number again.  321? |
| 14:35:41 | 9 | THE JUROR:  321.  He lives in Elgin. |
| 14:35:45 | 10 | THE COURT:  Okay.  And your number? |
| 14:35:49 | 11 | THE JUROR:  15A. |
| 14:35:57 | 12 | MR. FINN:  His son David Graham, Dr. Graham's grandson, |
| 14:36:05 | 13 | I believe the government read his name earlier, Tyler Graham. |
| 14:36:11 | 14 | Elizabeth Sanders works at a company -- waste company in Oklahoma |
| 14:36:16 | 15 | City, Christine Hudson owns Track Magazine, a horse magazine, |
| 14:36:23 | 16 | Coronado Artiega.  And, Judge, I apologize, my pronunciation of |
| 14:36:28 | 17 | some of these names is not very good.  Director of Veterinary |
| 14:36:31 | 18 | Medicine Justin Voge, V-O-G-E, Stella Escobedo, Doctor of |
| 14:36:39 | 19 | Veterinary Medicine Perry Blanchard, Jennifer Brown, Michelle |
| 14:36:46 | 20 | Melton, M-E-L-T-O-N, Marlo Caddedu, C-A-D-D-E-D-U, must be Cajun, |
| 14:36:56 | 21 | Director -- Doctor of Veterinary Medison Don Knolls, K-N-O-L-L-S, |
| 14:37:02 | 22 | Pedro Alcala, A-L-C-A-L-A, Director of Veterinary Medicine Tommy |
| 14:37:10 | 23 | Barton, B-A-R-T-O-N, who's with the Texas Animal Health |
| 14:37:15 | 24 | Commission, Director of Veterinary Medicine Keith Chaffin, |
| 14:37:21 | 25 | C-H-A-F-F-I-N, who's a professor at Texas A & M, the Texas A & M |

14:37:28  1  University, Danny Williamson, Kim Hensarling, Shelly Tiggs,

14:37:35  2  T-I-G-G-S, Russell Glen Islet, I-S-L-E-T, Cody Hollingsworth,

14:37:45  3  Shay Cox, S-H-A-Y, Cox, female, about 25, Bush Wise, W-I-S-E,

14:37:54  4  Brian Bohol, B-O-H-O-L, Filamon Saucedo, he's a trainer, horse

14:38:02  5  trainer in Elgin, Texas, Matt Witman, manager of the Lazy Ranch

14:38:08  6  in Oklahoma, Butch Wise, W-I-S-E, another manager of Lazy E Ranch

14:38:15  7  in Guthrie, Oklahoma.

14:38:17  8         Now I'm going to read one, two, three, four, five

14:38:20  9  names, and they're all Director of Veterinary Medicine.  Geraldo

14:38:25  10  Chapa from Eagle Pass, Dickson Varner, professor at Texas A & M

14:38:30  11  University, Tommy Hayes, H-A-Y-E-S, from Elgin, Texas.  Burns,

14:38:36  12  all I have is the last name at this point, Burns, B-U-R-N-S,

14:38:41  13  Menifee, California, Ellis, don't have a first name, Texas Animal

14:38:44  14  Health Commission, Austin, Texas.

14:38:47  15         Okay.  Now we're beyond the director -- or Doctor of

14:38:52  16  Veterinary Medicines.  Those are other sort of witnesses.

14:38:55  17  Jessica Huitron, H-U-I-T-R-O-N, worked for Huitron Homes, Saul,

14:39:02  18  S-A-U-L, Ramirez, he's a horse jockey, Janie Perez.  Your Honor,

14:39:08  19  I'm sorry, I think it's Jaime Perez, Eagle Pass, Texas, Betty

14:39:13  20  Berge, B-E-R-G-E, from Amarillo, Chad Pierce, G. Allen Fisher,

14:39:21  21  CPA in Dallas, Sharon Moore, tax preparer in Mesquite, which is

14:39:27  22  up near Dallas, Tracy Pennington, bookkeeper up near Dallas in

14:39:32  23  Mesquite, Texas, Maria Trevino, General Clifford Massingale,

14:39:38  24  who's from Lexington, Oklahoma, Tom Lipe, L-I-P-E, Lexington,

14:39:45  25  Oklahoma resident, Amanda Glidden, G-L-I-D-D-E-N, who's with

| 14:39:51 | 1 | Steed horse magazine, Bill Pilgrim, horse owner in Lexington, |

14:39:51  1  Steed horse magazine, Bill Pilgrim, horse owner in Lexington,

14:39:57  2  Oklahoma, Julie Pilgrim, horse trainer in Lexington, Oklahoma,

14:40:04  3  okay, another director or Doctor of Veterinary Medicine Mike

14:40:08  4  Schoonover, S-C-H-O-O-N-O-V-E-R, Doctor of Veterinary Medicine,

14:40:14  5  Trent Bliss, B-L-I-S-S, Doctor of Veterinary Medicine Shaylin

14:40:19  6  Bliss, S-H-A-Y-L-I-N, Bliss, Nancy Yearsley, Preston Pollard,

14:40:28  7  Salina Molina, Frederick Parsons, Clint Broden, Beth Bosillo, and

14:40:37  8  that's B-O-S-I-L-L-O, her husband Mike or Michael Bosillo,

14:40:43  9  husband-and-wife investigators, Francisco Trevino, Geronimo

14:40:48  10  Garcia, who's from Houston, Texas, Paul Ramirez, Lisa Powell,

14:40:55  11  Jimmy Barton, Van Douglas, Caroline Douglas, Mr. Skinner, who

14:41:03  12  owns Skinner Masonry in Mesquite, Texas, Douglas Thomas, who's

14:41:09  13  with Skinner Masonry, foreman, a foreman for that company in

14:41:13  14  Dallas, Texas.

14:41:14  15           THE COURT:  Hold on.  I've got a hand up here.

14:41:17  16           THE JUROR:  Sharon Douglas.

14:41:23  17           THE COURT:  I'm sorry.

14:41:23  18           THE JUROR:  I know a Caroline Douglas.

14:41:29  19           MR. FINN:  Caroline Douglas.  Judge, could I confer

14:41:34  20  with Ms. Williams for one second?

14:41:36  21           THE COURT:  You may.  Tell me your number, please, sir.

14:41:38  22           THE JUROR:  Oh, No. 300.

14:41:40  23           THE COURT:  Okay.  Hold on one second, Mr. 300.

14:41:45  24           MR. FINN:  Your Honor, and, sir, the Caroline Douglas

14:41:48  25  that I'm referring to lives in Oklahoma.

| | | |
|---|---|---|
| 14:41:51 | 1 | THE JUROR:  Not her. |
| 14:41:53 | 2 | MR. FINN:  Not her?  Okay.  Thank you. |
| 14:41:56 | 3 | Jim Davis, who's another person with Skinner Masonry, |
| 14:42:01 | 4 | foreman in Dallas, Texas, Dee Brown, D-E-E, Brown.  It's a |
| 14:42:06 | 5 | company name, Dee Brown.  Okay.  One, two, three, four, the next |
| 14:42:12 | 6 | five names are folks that work for Dee Brown Masonry in Mesquite, |
| 14:42:19 | 7 | which is near Dallas, Texas.  It's basically a suburb at the |
| 14:42:22 | 8 | intersection of Jupiter Road and Northwest Highway.  And all I |
| 14:42:25 | 9 | have at this point are first names. |
| 14:42:29 | 10 | Cliff, C-L-I-F-F, a Burt, B-U-R-T, Jeff, Jay or |
| 14:42:34 | 11 | Madelyn.  All these folks live in the Dallas area and work at Dee |
| 14:42:38 | 12 | Brown Masonry.  Melody Kurchelle, K-U-R-C-H-E-L-L-E, who's with |
| 14:42:44 | 13 | the Los Alamitos racecourse, horse racing, James Simpson, Texas |
| 14:42:52 | 14 | Stone and Tile, Mike Resendes, R-E-S-E-N-D-E-S, again, Roni |
| 14:43:00 | 15 | Gregory, R-O-N-I, Gregory, who's a trainer, a horse trainer in |
| 14:43:06 | 16 | California, Juan Barbosa, Julia -- and I'm going to have to spell |
| 14:43:13 | 17 | this one your Honor -- R-U-B-A-L-C-A-V-A, Rubalcava, who's from |
| 14:43:21 | 18 | Houston.  They make silk clothing for jockeys.  Julian Cantu, |
| 14:43:26 | 19 | C-A-N-T-U, a jockey from Houston area, Fred Stanley, who's from |
| 14:43:34 | 20 | Marietta, Oklahoma, deals with horse insurance, Alfred -- or, I'm |
| 14:43:39 | 21 | sorry, Alred Lamica, L-A-M-I-C-A, worked for Zule Farms in |
| 14:43:45 | 22 | Lexington, Oklahoma, Rob Westeler, W-E-S-T-E-L-E-R, Texas Quarter |
| 14:43:53 | 23 | Horse Association in Austin, Andy Knight, who's a horseshoer, |
| 14:43:58 | 24 | horseshoes, your Honor, Purcell, Oklahoma, Randy Hill, Lexington, |
| 14:44:04 | 25 | Oklahoma, Hector Chapa, Piedras Negras, Paula Cuellar from Eagle |

```
14:44:12   1  Pass, notary in Eagle Pass, Texas, Daniel Cuellar.  And Cuellar
14:44:17   2  is spelled, C-U-E-L-L-A-R.  Samuel Cuellar, Bill Purcell, Rex
14:44:24   3  Reynolds, who's an investigator in Dallas, Kathy Bryant, who's
14:44:30   4  from the Dallas area, Jim Blevins, Andy Schwartz, Austin, Texas
14:44:35   5  Animal Health Commission, Elizabeth Sanders, Jesus Vardugo, who
14:44:43   6  was a -- worked for Skinner Masonry in the Dallas area, Rudolfo
14:44:48   7  Trevino from Oklahoma, Zulema Trevino, Alex Trevino, Mario
14:44:54   8  Martinez, Jessica Murphy, somebody from the Office of General
14:44:58   9  Council, U.S. Homeland Security, somebody from the Immigration
14:45:03  10  Custom Enforcement Department, government agency in the United
14:45:07  11  States, probably a business records custodian.  And last is
14:45:12  12  Mariano Rodriguez.
14:45:16  13         And folks in the back, I apologize, I had my back to
14:45:19  14  you.  I'm not trying to be rude, but I was trying to read from my
14:45:21  15  notes.  So no offense taken, I hope.  That's it, Judge.
14:45:24  16         THE COURT:  All right.  I saw no hands except for one
14:45:29  17  we've talked about.
14:45:30  18         Mr. DeGeurin, do you have a witness list you wish to
14:45:34  19  publish?
14:45:35  20         MR. DEGEURIN:  Yes, your Honor.
14:45:42  21         Been a long day.  I'm Mike DeGeurin again.  I represent
14:45:45  22  Mr. Francisco Colorado.
14:45:48  23         We have a few witnesses that we may be calling during
14:45:52  24  the trial, and many of them are here today.  And so, the first
14:45:58  25  one is Albert Gomez, Alfredo Guzman-Baltizan, David Robyard.
```

| | | |
|---|---|---|
| 14:46:13 | 1 | He's an analyst, a financial analyst.  Dennis Collins.  I believe |
| 14:46:21 | 2 | he's -- are you here today?  No longer.  But Dennis Collins. |
| 14:46:27 | 3 | He's in charge of security.  Isabelle Paez.  She's here, I |
| 14:46:34 | 4 | believe.  Maybe you could recognize her.  Would you stand up, |
| 14:46:37 | 5 | please?  Nobody.  Jose Mendoza, Ricardo Barrera.  Okay. |
| 14:46:52 | 6 | Francisco Silva-Ramos, Camillo Moreno, Marcus Maraches, Albert |
| 14:47:10 | 7 | Gomez.  That's twice.  I'm sorry.  Angel Lopez, Dr. Jose |
| 14:47:25 | 8 | Faustino-Aranjo, Rosilia Alvarez, Hector Roban, Oscar Thomas, |
| 14:47:43 | 9 | Jesus Jimenez, Gustavo Cruz.  All right.  Oscar Garcia-Rojas, |
| 14:48:04 | 10 | Angel Reyna, Maria Salman-Rocha, Jose Antonio, Maria Colorado, |
| 14:48:34 | 11 | Rodrigo Ojeda, Francisco Colorado, Jr., Miguel Almason, Miguel |
| 14:48:53 | 12 | Colorado, Miguel Angel Colorado, Syra Mejia, Sergio Colorado, and |
| 14:49:09 | 13 | then, there's Ramon Segura.  Would you stand up, Ramon?  That's |
| 14:49:16 | 14 | all I have, your Honor. |
| 14:49:18 | 15 | THE COURT:  I take it no one knows any of those |
| 14:49:21 | 16 | witnesses. |
| 14:49:23 | 17 | Okay.  Mr. Womack, do you have list, please, sir? |
| 14:49:26 | 18 | MR. WOMACK:  Thank you, sir.  I'm just going to stand |
| 14:49:28 | 19 | here and speak.  If I use the microphone, there's too much |
| 14:49:32 | 20 | feedback.  I know I talk loud.  Guy Womack for Mr. Garcia. |
| 14:49:35 | 21 | Our witnesses, Mike Hagen from Los Angeles, California, |
| 14:49:41 | 22 | Luis Alvarez, also from Los Angeles, California, Scott Hinkley |
| 14:49:48 | 23 | from Gainesville, Florida, Peter Ayala from Hialeah, Florida, |
| 14:49:57 | 24 | Chance Tim is from Lexington, Kentucky, Nancy Yearsley, a name |
| 14:50:05 | 25 | already mentioned from Lexington, Kentucky, Eric Breham, or |

14:50:12   1   B-R-E-H-A-M, from Houston, and Gerardo Montez from El Paso,

14:50:19   2   Texas.  So that's it.

14:50:24   3           THE COURT:  I take it no one knows any of those folks

14:50:26   4   with no show of hands.

14:50:28   5           Mr. Esper.

14:50:29   6           MR. ESPER:  Yes, your Honor.  May it please the Court.

14:50:32   7           Ladies and gentlemen of the jury panel, the Defendant

14:50:36   8   Eusevio Huitron may call one or more of the following witnesses.

14:50:41   9   Ultimately, may call none of them.  These are the potential

14:50:44   10   witnesses that we may call.  None of whom live in the Austin

14:50:49   11   area.

14:50:49   12           Javier Sanchez, Macadonio Lozano, Juan Aguilar, Shae

14:50:58   13   Cox.  And my witness Shae Cox's name is spelled, S-H-A-E.  I

14:51:03   14   don't know if it's the same one that Mr. Finn referenced as a

14:51:07   15   potential witness.  Joe Frescas, Paul Jones and Daniel Renteria.

14:51:15   16   None of them are from the Austin area or the Austin metroplex

14:51:19   17   area.

14:51:19   18           THE COURT:  All right.  No hands have been raised.

14:51:22   19           Mr. Mayr.

14:51:24   20           MR. MAYR:  Thank you, Judge.  If I may.

14:51:26   21           First of all, I'd like to introduce myself again, Brent

14:51:28   22   Mayr.  I'm representing my client Jesus Huitron.  Earlier, Judge,

14:51:32   23   when you introduced us, the panel wasn't given an opportunity to

14:51:37   24   divulge whether they recognize myself or my client.  I did some

14:51:41   25   time here in the Austin area, even though I'm from Houston.  But

14:51:43   1   my client has been here for the past 30 years.  So I want to make

14:51:46   2   sure that no one has heard of the name Jesus Huitron.  That's

14:51:51   3   H-U-I-T-R-O-N, or anyone familiar with that last name.  Okay.

14:51:56   4           And then, we don't anticipate calling any witnesses,

14:52:00   5   but if we do have to, we would call Ruby Segura, Kerry Casler,

14:52:07   6   Jessica Huerta-Perez, and Joe Macias.  Thank you, Judge.

14:52:14   7           THE COURT:  If I didn't ask you before -- I don't

14:52:17   8   remember one way or the other -- but does anybody know Mr. Mayr?

14:52:21   9           THE JUROR:  I'm sorry.  I'm a teacher at night to

14:52:26   10  adults and I teach a Joe Macias.  Is there a student -- Joe

14:52:31   11  Macias a student here in Austin?

14:52:35   12          MR. MAYR:  He's an older gentleman.

14:52:40   13          THE JUROR:  He's about 45?

14:52:40   14          MR. MAYR:  Oh, okay.

14:52:41   15          THE JUROR:  I think that's older.

14:52:48   16          THE COURT:  You're in the hole, not me.

14:52:51   17          MR. MAYR:  I don't think we're talking about the same

14:52:54   18  person.

14:52:55   19          THE JUROR:  Okay.

14:52:57   20          THE COURT:  All right.  I'll have counsel up here,

14:53:02   21  please.

14:53:10   22          (At the bench, on the record.)

14:53:22   23          THE COURT:  Juror No. 15A.  That's all right.  You can

14:53:40   24  stand there.  You indicate that you may know Mr. or Dr. Graham?

14:53:49   25          THE JUROR:  Yes.

| | | |
|---|---|---|
| 14:53:50 | 1 | THE COURT:  If he's to be called as a witness or |
| 14:53:53 | 2 | another Graham -- Tyler Graham is called as a witness, do you |
| 14:53:58 | 3 | know Tyler Graham? |
| 14:53:59 | 4 | THE JUROR:  No.  I don't. |
| 14:54:00 | 5 | THE COURT:  David Graham? |
| 14:54:02 | 6 | THE JUROR:  No. |
| 14:54:03 | 7 | THE COURT:  Okay.  So it's Dr. Graham that you know. |
| 14:54:05 | 8 | THE JUROR:  Yes. |
| 14:54:07 | 9 | THE COURT:  Would you be able to evaluate his testimony |
| 14:54:10 | 10 | just like anybody else?  Or because you know him, would you be |
| 14:54:16 | 11 | having a tendency to probably lean towards or against him just |
| 14:54:21 | 12 | because of your knowledge of him? |
| 14:54:23 | 13 | THE JUROR:  No.  I would evaluate him. |
| 14:54:25 | 14 | THE COURT:  I couldn't hear you. |
| 14:54:26 | 15 | THE JUROR:  I would be able to evaluate his opinion. |
| 14:54:29 | 16 | THE COURT:  You could evaluate his testimony just like |
| 14:54:31 | 17 | anybody else? |
| 14:54:31 | 18 | THE JUROR:  Yes. |
| 14:54:32 | 19 | THE COURT:  Okay.  You can have a seat. |
| 14:54:39 | 20 | (At the bench, on the record.) |
| 14:54:43 | 21 | THE COURT:  First off, I'm through with the questions |
| 14:54:45 | 22 | unless any of you have anything specific. |
| 14:54:49 | 23 | MR. ESPER:  Your Honor, in my proposed Question 21, |
| 14:54:54 | 24 | it's one that I borrowed from Judge Hudspeth many years ago, and |
| 14:54:57 | 25 | it basically recites, if you were a defendant, would you be |

| | | |
|---|---|---|
| 14:55:02 | 1 | satisfied with the juror who is in your -- |
| 14:55:05 | 2 | THE COURT:  Well, I think that's a great question. |
| 14:55:08 | 3 | Judge Hudspeth will continue to ask it.  Any other questions? |
| 14:55:13 | 4 | MR. GARDNER:  Not from the government, Judge. |
| 14:55:15 | 5 | MR. DEGEURIN:  Your Honor, we had asked that -- |
| 14:55:17 | 6 | THE COURT:  I got them. |
| 14:55:18 | 7 | MR. DEGEURIN:  Since filling out the questionnaire, |
| 14:55:20 | 8 | have you heard about the case or read about it, since filling out |
| 14:55:25 | 9 | the questionnaire, and I think that's an important question.  We |
| 14:55:31 | 10 | know that some of them have read about it ten times. |
| 14:55:34 | 11 | THE COURT:  Well, I don't know -- all the questions are |
| 14:55:37 | 12 | for the present, as we sit here today, and the circumstance -- |
| 14:55:41 | 13 | MR. DEGEURIN:  Well, if you did that, that's what I'm |
| 14:55:43 | 14 | talking about. |
| 14:55:44 | 15 | THE COURT:  That's what I did.  For hours this morning. |
| 14:55:47 | 16 | MR. DEGEURIN:  Okay.  It wasn't limited to the |
| 14:55:50 | 17 | questionnaire. |
| 14:55:52 | 18 | THE COURT:  No. |
| 14:55:53 | 19 | MR. DEGEURIN:  Okay. |
| 14:55:54 | 20 | THE COURT:  The questionnaire is just information that |
| 14:55:56 | 21 | y'all could draw on and ask questions about generally things |
| 14:56:03 | 22 | covered in the general questions that I'll follow up with |
| 14:56:06 | 23 | specific questions.  But it's not new questions.  I want the |
| 14:56:11 | 24 | clerk up here with the questions. |
| 14:56:21 | 25 | According to my calculations, we're looking at |

14:56:35   1  everybody on the front row who is set here to the second row, and

14:56:41   2  I think that takes care of most everyone.  Under the rules, there

14:56:48   3  would be twelve people for the jury, four alternates.

15:08:07   4        All right.  Ladies and gentlemen, sounds like four

15:08:22   5  minutes after church.  I'm going to recess you for 45 minutes.

15:08:29   6  Forty-five minutes.  Don't leave.  Walk around, look at this

15:08:35   7  pretty building.  It really is a pretty building.  I wish we had

15:08:40   8  a few more benches in it.  Admire the glass that they tell me is

15:08:50   9  the largest piece of glass art in the country.  I don't know if

15:08:56  10  it is or not.  I know it came from Germany.

15:09:01  11        But anyway, walk around.  Don't talk about this case.

15:09:05  12  In 45 minutes, please be at the same seat that you're in.  Same

15:09:10  13  seat that you're in.  All right.  We're in recess for 45 minutes.

15:12:40  14        For the record, counsel, each of you have three, strike

15:12:47  15  separately or strike together.  If you want to strike together,

15:12:52  16  Mr. Hall will show you the room the government has so you could

15:12:58  17  have it there.  If you'll be seated, please, in the courtroom.

15:13:07  18  Let's go back on the record.  Margaret, I'm going to need you to

15:13:18  19  swear a witness in in a minute.

15:13:21  20        Mr. Finn.

15:13:21  21        MR. FINN:  May it please the Court, your Honor, a

15:13:24  22  witness that I subpoenaed is present in the courtroom, and he's

15:13:26  23  been kind enough to wait for me to get him before your Honor.  He

15:13:32  24  has been subpoenaed.  His name is Dr. Charles Graham.  If you

15:13:35  25  would -- wouldn't mind swearing him in, then I could put him on

15:13:40   1   telephone standby and he can get on about his business, if that's

15:13:43   2   all right.

15:13:43   3          THE COURT:  That will be fine.  If you'd come forward,

15:13:46   4   please.  Dr. Graham, this is Mrs. Sims.  She's not only a clerk,

15:13:57   5   she is a Methodist minister.  So when she swears you, you stay

15:14:00   6   sworn.

15:14:02   7          (Witness sworn.)

15:14:09   8          THE COURT:  What all this means is that you've been

15:14:12   9   subpoenaed and you are a witness now.  I anticipate that the rule

15:14:21  10   is going to be invoked in a few minutes when the jury has been

15:14:25  11   selected, which means that the witnesses cannot talk to each

15:14:31  12   other about their testimony.  You have the right to talk with the

15:14:36  13   lawyers.  You have the right not to talk with the lawyers.  But

15:14:38  14   don't tell anybody else what you may testify to or have testified

15:14:43  15   to.  And then, I can release you because Mr. Finn says that he

15:14:48  16   will notify you by telephone when you need to appear.  But then,

15:14:51  17   you'd have to appear just as if you were subpoenaed.

15:14:54  18          Do you understand that?

15:14:56  19          THE WITNESS:  Yes, sir.

15:14:57  20          MR. FINN:  Judge, could I ask one question?  You recall

15:15:01  21   that I filed a motion last week asking for clarification whether

15:15:05  22   or not there was a relationship between your Honor and Dr.

15:15:06  23   Graham.  Earlier in the hallway, Dr. Graham indicated that he was

15:15:10  24   somewhat familiar with you and that you all knew each other, but

15:15:14  25   it had been a number of years since, I guess, your last

15:15:17   1   conversation or interaction.

15:15:20   2           Am I characterizing that accurately, Dr. Graham?

15:15:24   3           THE WITNESS:  I think he was involved with a guy named

15:15:26   4   Mr. Stokes.

15:15:26   5           THE COURT:  No, no.  That's Sammy D. Sparks.

15:15:29   6           THE WITNESS:  Is that the one?  So I don't know him.

15:15:33   7           MR. FINN:  You don't know this judge?

15:15:36   8           THE COURT:  Actually, Mr. Webb and Mr. Stokes and Mr.

15:15:41   9   Sparks had a lot of horses.

15:15:43   10          THE WITNESS:  Yes, sir.

15:15:44   11          THE COURT:  And they made a lot of money practicing

15:15:47   12  law, not so much with horses, but they were clients of mine.

15:15:51   13  When they got sued, I defended them.  All right.

15:15:53   14          MR. FINN:  Thank you, Judge.

15:15:59   15          THE COURT:  You know, when you go fishing, sometimes

15:16:01   16  you didn't always catch a fish.

15:16:03   17          MR. FINN:  But you've got to check it out, though.

15:16:05   18  You've got to check the line.

15:16:06   19          THE COURT:  All right.  Forty-five minutes.

16:10:32   20          (In chambers.)

16:15:46   21          THE COURT:  Okay.  Somebody from each side, get your

16:16:04   22  strikes because I'm going to ask you in the record now.

16:16:10   23          All right.  If the government will give me your

16:16:14   24  strikes, please.

16:16:16   25          MS. FERNALD:  256.

16:16:20   1          MR. GARDNER:  We're out of order, Judge.

16:16:22   2          MS. FERNALD:  Mr. Gardner wrote them down, so we're out

16:16:24   3  of order.

16:16:26   4          THE COURT:  All right.  256.

16:16:28   5          MS. FERNALD:  340, 137.

16:16:44   6          THE COURT:  This is the Chinese numbering system?

16:16:46   7          MS. FERNALD:  Yes, sir, it is.  127, 119, 25, 199, 193.

16:17:30   8  And we elected not to use our ninth one.

16:17:32   9          THE COURT:  All right.

16:17:40  10          MS. FERNALD:  Do you want to do the alternates?

16:17:42  11          THE COURT:  Not unless you do.

16:17:44  12          MS. FERNALD:  I'll do whatever.

16:17:46  13          THE COURT:  Did you strike some alternates?

16:17:48  14          MS. FERNALD:  We did.

16:17:48  15          THE COURT:  Well, which ones?

16:17:50  16          MS. FERNALD:  15A.

16:17:54  17          MR. GARDNER:  Seat 44.

16:17:58  18          THE COURT:  Okay.

16:18:00  19          MS. FERNALD:  Fifty-two.  On the next page, 266.

16:18:12  20          THE COURT:  Okay.  Defense counsel, any objections,

16:18:16  21  Batson challenges to any of the strikes from the government?

16:18:24  22          MS. WILLIAMS:  No, your Honor.

16:18:26  23          MR. FINN:  No, sir.

16:18:26  24          THE COURT:  All right.  The Court see no basis for

16:18:28  25  Batson challenges.

| | | |
|---|---|---|
| 16:18:30 | 1 | And if the defendants will tell me their strikes, |
| 16:18:32 | 2 | please. |
| 16:18:34 | 3 | MS. WILLIAMS:  181, 272, 282, 15, 189, 193, 172, 246, |
| 16:19:30 | 4 | 318, 326, 97, 208, 268, 44A. |
| 16:19:58 | 5 | THE COURT:  You sure you want to get rid of -- |
| 16:20:02 | 6 | MS. WILLIAMS:  I couldn't figure out how to use two |
| 16:20:04 | 7 | strikes.  And 86. |
| 16:20:10 | 8 | THE COURT:  And what other? |
| 16:20:12 | 9 | MS. WILLIAMS:  Eight-six.  Last one. |
| 16:20:14 | 10 | THE COURT:  Okay. |
| 16:20:22 | 11 | MS. WILLIAMS:  And then, for alternates 15A, 290 and |
| 16:20:34 | 12 | 52. |
| 16:20:54 | 13 | THE COURT:  Okay.  Ms. Sims, let's -- all right, |
| 16:21:00 | 14 | counsel.  Listen up.  Here's the jury. |
| 16:21:02 | 15 | THE CLERK:  Juror No. 140 in seat No. 1, Juror No. 3, |
| 16:21:10 | 16 | seat No. 3. |
| 16:21:14 | 17 | THE COURT:  Seat No. 2. |
| 16:21:14 | 18 | THE CLERK:  Yeah.  Seat No. 3. |
| 16:21:20 | 19 | THE COURT:  Are you going to put a space in there? |
| 16:21:22 | 20 | THE CLERK:  Yeah.  Well, no.  It's really seat No. 2. |
| 16:21:26 | 21 | I'm sorry. |
| 16:21:26 | 22 | THE COURT:  Right. |
| 16:21:28 | 23 | THE CLERK:  Juror No. 135 in seat No. 4. |
| 16:21:34 | 24 | THE COURT:  Let's dismiss with the seat numbers. |
| 16:21:36 | 25 | THE CLERK:  Well, let's say No. 135 is in seat. |

16:21:40  1          THE COURT:  Three.

16:21:40  2          THE CLERK:  Just leave that out?

16:21:42  3          THE COURT:  Yeah.  Just call the numbers.

16:21:46  4          THE CLERK:  Okay.  Juror No. 192, Juror No. 200, Juror

16:21:54  5  No. 162, Juror No. 82, Juror No. 118, Juror No. 28, Juror No.

16:22:18  6  213, Juror No. 251, Juror No. 74A.

16:22:30  7          Alternates, Juror No. 47, the next page, Juror No. 205,

16:22:44  8  Juror No. 77A, Juror No. 85.  That's 16.

16:22:56  9          THE COURT:  Is the jury satisfactory with the

16:22:58  10  government?

16:22:58  11          MR. GARDNER:  It is, your Honor.

16:23:00  12          THE COURT:  Satisfactory with the defendants?

16:23:02  13          (Affirmative responses given.)

16:23:04  14          THE COURT:  All right.  It's 4:20 now.  So I will go

16:23:08  15  out and select the jury.  I'm going to leave them in the box and

16:23:14  16  give them the instructions.  And then, John, you can take them to

16:23:22  17  four, show them where they're going to come in in the morning.

16:23:26  18          Ms. Sims, did you check to see how far any of these

16:23:30  19  are?

16:23:32  20          THE CLERK:  We've got some from Gillespie and Burnet

16:23:36  21  from what I can see.  And I've checked.

16:23:38  22          THE COURT:  Burnet's not bad.

16:23:40  23          THE CLERK:  Gillespie, Burnet, Burleson.  I don't know

16:23:42  24  how far that is.

16:23:44  25          THE COURT:  I'll ask them because I'm going to ask them

| | | |
|---|---|---|
| 16:24:10 | 1 | what they're going to do at 8:30.  We'll see. |
| 16:24:12 | 2 | All right.  Anything else before we go in the |
| 16:24:14 | 3 | courtroom?  Let's go. |
| 16:22:30 | 4 | (Jury panel present.) |
| 16:22:30 | 5 | THE COURT:  Members of the jury panel, Mrs. Sims is |
| 16:22:34 | 6 | going to call out the names of the jurors who have been selected. |
| 16:22:39 | 7 | If your name is called, simply stand at your seat. |
| 16:22:43 | 8 | THE CLERK:  Juror No. 140, Juror No. 3, Juror No. 135, |
| 16:22:54 | 9 | Juror No. 192, Juror No. 200, Juror No. 162, Juror No. 82, Juror |
| 16:23:09 | 10 | No. 118, Juror No. 28, Juror No. 213, Juror No. 251, Juror No. |
| 16:23:24 | 11 | 74A, Juror No. 47, Juror No. 205, Juror No. 77A, and Juror No. |
| 16:23:41 | 12 | 85. |
| 16:23:41 | 13 | THE COURT:  Okay.  Ladies and gentlemen, y'all will be |
| 16:23:43 | 14 | the jury.  I'm going to change my mind and have Mr. Hall take you |
| 16:23:49 | 15 | up to the fourth floor, and you can go ahead and put them in the |
| 16:23:56 | 16 | jury room.  So if you'll get your purses and stuff, Mr. Hall will |
| 16:24:02 | 17 | take you to the fourth floor. |
| 16:24:04 | 18 | COURT SECURITY OFFICER:  Take them to the jury box? |
| 16:24:05 | 19 | THE COURT:  Yes. |
| 16:24:06 | 20 | COURT SECURITY OFFICER:  Those jurors selected that are |
| 16:24:08 | 21 | standing, follow me, please.  Come around this way. |
| 16:24:12 | 22 | THE CLERK:  No. 278, you are not called.  I'm sorry. |
| 16:24:20 | 23 | THE COURT:  Good try, though. |
| 16:24:46 | 24 | (Jury exits.) |
| 16:24:50 | 25 | THE COURT:  Members of the jury panel, it is the |

16:24:53  1  practice of our court because the number-one expense of the

16:24:56  2  federal courts are juries -- you're our most expensive, more than

16:25:02  3  our salaries, more than all of the costs of the administration of

16:25:06  4  the courts of justice.  We'll spend more on juries than we do on

16:25:10  5  anything else.  So we try to have multiple jury selection, but

16:25:17  6  I'm advised that the other three judges are not going to be in

16:25:20  7  trial.

16:25:22  8          So I, unfortunately, can't offer you another

16:25:25  9  opportunity to be on that jury on this occasion.  But you'll

16:25:29 10  remain on the books, what, month and a half from now?

16:25:37 11          MS. DEMINGS:  The end of April.  Or, I'm sorry, the

16:25:40 12  middle of May.

16:25:40 13          THE COURT:  The middle of May.  I hope that you'll have

16:25:44 14  an opportunity to come and serve at that time.  We're fortunate,

16:25:49 15  because of the population in Central Texas, not to have you stay

16:25:53 16  six months as many of our brother and sister courts do, and but

16:26:01 17  we appreciate your being here.  Don't think your time is wasted.

16:26:05 18          In a case like this, as you know, we had

16:26:08 19  questionnaires, and we try to eliminate a lot of people who

16:26:14 20  obviously couldn't serve.  I appreciate y'all coming in there.

16:26:19 21  We ended up with more jurors than we normally have.  The reason

16:26:25 22  for that is the notoriety that has been in the newspapers, along

16:26:31 23  with the length of the trial.  But I appreciate everybody coming

16:26:35 24  in and all of you that were willing to serve, and I'm going to

16:26:40 25  release you.  You're released from any obligations and all

16:26:43  1    obligations until you're called next time.

16:26:45  2         Let me put in a little caveat.  When you get your next

16:26:50  3    notice, if you get the next notice and you have a problem, we

16:26:56  4    have employees in the clerk's office.  That's all they do is work

16:27:01  5    with the jurors.  So if you have a conflict, call or use the

16:27:07  6    magic machine, the computer, and you can do it online, too.  We

16:27:14  7    want you to come in and serve when you can.  When you can't, we

16:27:19  8    don't want to bring you in and pay you.  It's really that simple.

16:27:25  9         But you're all excused from this session with the

16:27:28  10   thanks of the Court.  And you may be excused.  Counsel, go to

16:27:35  11   four.

16:37:28  12         (Jury present.)

16:40:24  13         THE COURT:  Members of the jury, it's been a fairly

16:40:44  14   long day.  Took a little longer to select the jury than I had

16:40:49  15   anticipated, so we won't have much to do this evening, except I'm

16:40:54  16   going to make a few brief remarks and then, allow you to go in

16:40:59  17   with Mr. Hall so that he can explain to you how you're going to

16:41:03  18   get here in the morning, and where you're to go, and look at the

16:41:07  19   jury room that you have.  The jury room is kind of like this

16:41:15  20   room.  It's short of space, as you've seen, for the number of

16:41:22  21   people on the jury.  It's a difficult room.  But we'll -- we work

16:41:26  22   with what we have.  It's a large room but not a whole lot of

16:41:32  23   seating for the lawyers and the parties and the folks that want

16:41:38  24   to watch.

16:41:41  25         So the main thing I want to emphasize to you is

16:41:46   1   communications.  I've already talked to you about this, but when

16:41:49   2   you get home today, your friends or family are going to say, what

16:41:54   3   case is it?  And you just tell them that you can't discuss the

16:41:57   4   case.  Tell them anything you want.  You can tell them, you know,

16:42:02   5   I'm in that crazy Sparks' court, and he's the one that puts

16:42:07   6   people in jail and stuff like that.  Make up anything you want.

16:42:14   7        Or you can just tell them the truth, and the truth is,

16:42:17   8   I will ask you every morning on your oath, and every afternoon,

16:42:19   9   after the noon break, if you've allowed anybody to talk to you

16:42:24   10  about the case, if you've talked to anybody about the case, or if

16:42:27   11  you've learned anything about the case, outside the presence of

16:42:32   12  each of you in this courtroom.  As long as you can say "Yes" to

16:42:36   13  those questions, then the case will proceed, and we will do what

16:42:41   14  we're supposed to do.

16:42:43   15       I can't emphasize the importance of it.  Even little

16:42:47   16  things like sending an e-mail that says, I got on a jury and what

16:42:53   17  jury it is.  Just don't do that.  You are going to be judges in

16:43:00   18  this case, judges of the facts, and your verdict is exclusive.

16:43:04   19  Whatever the verdict is that you will render at the end of this

16:43:07   20  case, that's it.  I, no appellate judge, no Congress, no

16:43:14   21  President can.  So it is a responsibility that you must carry

16:43:21   22  through as I give you those instructions.

16:43:26   23       Now, we usually start court at 8:30 in the morning, but

16:43:32   24  I know some of you are living outside of the area.  I could have

16:43:36   25  people as far as Junction one way and Brenham the other, but most

16:43:41    1   people live in the area where they can get to Austin 8:00-ish,

16:43:47    2   somewhere in that vicinity.  Is there anybody that would not be

16:43:51    3   able to start at 8:30 in the morning?  If so, let me know,

16:43:57    4   because we've got a long haul, a lot of evidence and a lot of

16:44:00    5   witnesses, regardless of how many they'll call.

16:44:03    6           And I'd like to go at 8:30, and then, we'll go into the

16:44:08    7   late afternoon.  We'll have, of course, breaks, and you'll have a

16:44:11    8   noon break and that type of thing.  You will find --

16:44:15    9   unfortunately, for those of you who are not here every day,

16:44:18   10   you'll find it's going to be very difficult to get out of Austin.

16:44:21   11   It's just horrible traffic.  But you could get out at the area of

16:44:28   12   6:00 a lot easier and get home a lot easier than you can 5:00.

16:44:34   13   And that's why we're going to go till 6:00.

16:44:37   14           So plan kind of an 8:30 to 6:00.  You'll get more

16:44:42   15   specific instructions from a practical matter.  And then, in the

16:44:45   16   morning, I will give you the legal instructions with regard to

16:44:49   17   trial.  They're very brief.  They're not going to take long.  And

16:44:52   18   the lawyers will then make their opening statements, which are

16:44:56   19   statements as to what they anticipate the evidence will be.  They

16:44:59   20   won't be arguing their case because they will place evidence in

16:45:06   21   every day; and then, they will have an opportunity to argue their

16:45:08   22   case at the end of the case.  And that's in a nutshell where we

16:45:15   23   are.

16:45:15   24           Let me ask you this:  How many of you -- I forgot your

16:45:18   25   questionnaires, but I don't have it close enough.  How many of

16:45:22  1   you have been on the jury before?  Well, then, you know pretty

16:45:26  2   much the routine.  You can't exaggerate the instructions I have

16:45:31  3   just given you.  They're very, very important.  And I'm going to

16:45:34  4   place you in the custody of Mr. Hall, and I'll see you in the

16:45:38  5   morning at 8:30.

16:45:40  6           (Jury not present.)

16:46:19  7           THE COURT:  I don't know who's responsible for the

16:46:32  8   design of this hall, but I do caution you, after I've discharged

16:46:37  9   the duties, for at least five minutes, they can hear anything

16:46:41  10  that you say.  So be careful about that.

16:46:43  11          Secondly, I received motions in limine, which I thought

16:46:46  12  we would discuss just briefly, and that was the government has

16:46:55  13  three motions in limine not to refer or ask witnesses with regard

16:47:02  14  to what's stated in reports that doesn't have the witness

16:47:10  15  interview, the witness who has signed the report, or has

16:47:20  16  otherwise acknowledged the statements on the report other than

16:47:24  17  the reviewer, and motion not to make any race-based prosecution

16:47:33  18  statements.  I grant that one.  Before you get into any of that,

16:47:37  19  approach the bench, tell me what you intend to do and why so that

16:47:41  20  everybody will have an opportunity to know what's coming.

16:47:46  21          Motions in limine do not result in evidentiary rulings.

16:47:49  22  These are not evidentiary rulings.  They're just instructions to

16:47:52  23  you to approach the bench.

16:47:54  24          The government's motion in limine, the Court knows what

16:48:00  25  hearsay is.  Just make your objections timely.  There's no point

153

16:48:04   1   in coming to the bench every time that there's a witness.

16:48:08   2   Sometimes the statements may be admissible, sometimes they're

16:48:12   3   not.  Just make your motions timely.

16:48:14   4           And then, Mr. Colorado has a motion here, I've already

16:48:19   5   sustained briefly that the part with regard to the alleged

16:48:24   6   allegations of what happened down there.  I don't know how the

16:48:28   7   government, or why, or if the government is going to go into

16:48:32   8   that, but before you go into that, give notice to opposing

16:48:38   9   counsel so that we will all be on the same team.

16:48:41   10          Okay.  That's all I have for this evening.  Anything

16:48:43   11  from the government?

16:48:44   12          MR. GARDNER:  Yes, sir, your Honor.

16:48:47   13          Your Honor, in this case, the Court has entered two

16:48:49   14  protective orders, one for discovery and then, a consent for

16:48:53   15  protective order for Jencks material.  At a break previous to

16:48:57   16  this one, I was informed by a member of my office that there are

16:49:00   17  three reporters in the back of the courtroom, one from Dallas

16:49:02   18  Morning News, one from the San Antonio Express, and a reporter

16:49:06   19  from the state of Mexico.  They had in their possession 302s,

16:49:10   20  which are FBI reports and Dallas PD reports.  Those materials

16:49:15   21  were given out on Friday as early Jencks to what -- each of these

16:49:20   22  five lawyers.  One of these five lawyers has disclosed Jencks in

16:49:26   23  violation of the Court's order to the press, among who knows who

16:49:31   24  else.

16:49:32   25          Your Honor, the government has been very concerned

16:49:36   1   about the security of the witnesses in this case.  We agreed to

16:49:40   2   redact the indictment to protect the record and not to taint the

16:49:46   3   jury as to any violence.  We've agreed to keep the violence down.

16:49:49   4   But the disclosure of the government's interview reports to

16:49:52   5   outside people, in violation of this court's order, is

16:49:56   6   disturbing.

16:49:56   7           Now, it's my fault that I didn't watermark every one

16:50:00   8   and per defendant, like I've done everything else, so the cat's

16:50:03   9   out of the bag.  But what I would ask the Court is to require all

16:50:06  10   the lawyers return the Jencks CD that I provided to them on

16:50:09  11   Friday, and I will provide the Jencks statement following each

16:50:12  12   witness' testimony.  That's all I have, your Honor.

16:50:26  13           THE COURT:  Whoever did it, you're in contempt of my

16:50:30  14   order.  And if it's established that somebody did it, then

16:50:36  15   somebody will have to pay the price.  The difficulty in cases

16:50:39  16   like this is that I require the government to go out and do

16:50:43  17   things that they're not required to do so that we, one, have a

16:50:47  18   fair trial and, two, that y'all can be prepared in talking with

16:50:51  19   defense lawyers.  And if one of you breached that agreement, that

16:50:57  20   not only hurts you in this case, it hurts every defense lawyer

16:51:00  21   that comes down here to the federal court.  No excuse for it.

16:51:06  22           If I find out in any way, shape or form who did it, I

16:51:11  23   want to know that.  That gives me the opportunity, also, saying

16:51:16  24   that there was an article in the paper today, there was an

16:51:19  25   article in the paper last Wednesday quoting government officials,

16:51:26   1   quoting defense lawyers.  I don't want to see any of that.  I'm

16:51:32   2   not putting a gag order on this case, but I do not want to see

16:51:37   3   any more articles until we're through with this case that are

16:51:44   4   quoting government officials.  And I don't want to see anything

16:51:50   5   that violates the ethical standards by the defense lawyers.

16:51:59   6          If, in fact, copies have been given to the press, as

16:52:08   7   far as I'm concerned, whoever did it will never practice in

16:52:10   8   federal court again.  That's how strongly I feel about that,

16:52:15   9   because you each got a benefit so that you would be ready and

16:52:21   10  could be as prepared or more prepared than you would normally in

16:52:27   11  the way that routine cases go, and that is, getting all of the

16:52:32   12  material at the same time the witness takes the stand.

16:52:37   13          MR. FINN:  Judge, may I address the Court?

16:52:41   14          Mr. Gardner just mentioned a specific newspaper, Dallas

16:52:45   15  Morning News.

16:52:46   16          THE COURT:  And the San Antonio Express.

16:52:48   17          MR. FINN:  Okay.  As far as I know, I'm the only Dallas

16:52:50   18  lawyer in this case, and I can represent to you, to the

16:52:54   19  government and Mr. Gardner, not only did I not give anything to

16:52:58   20  the press, I never even opened the disc.  I immediately Fed-Exed

16:53:03   21  it to Ms. Williams, who also didn't give it to the press.  So I

16:53:06   22  just want you to know that.  I didn't give anything to the press.

16:53:10   23          THE COURT:  I'm not making any inference.  I don't know

16:53:12   24  who did it.  I did see that you were quoted in the newspaper, in

16:53:16   25  the Dallas newspaper.

| | | |
|---|---|---|
| 16:53:18 | 1 | MR. FINN:  That is true, in response to the |
| 16:53:21 | 2 | government's quotes. |
| 16:53:22 | 3 | THE COURT:  Well, I don't want any more quotes. |
| 16:53:26 | 4 | MR. FINN:  Understood. |
| 16:53:26 | 5 | THE COURT:  This is a volatile case and if it gets out |
| 16:53:31 | 6 | of control, then I have concern whether or not the defendants |
| 16:53:35 | 7 | will get a fair trial. |
| 16:53:37 | 8 | MR. FINN:  Judge, can I ask you one clarification? |
| 16:53:40 | 9 | When you say the government, you're not just referring to the |
| 16:53:42 | 10 | prosecution team or the U.S. -- |
| 16:53:44 | 11 | THE COURT:  I'm not talking about the prosecution team. |
| 16:53:46 | 12 | They haven't been quoted at all.  I'm talking about spokesmen for |
| 16:53:50 | 13 | the Internal Revenue Service and the DEA.  Those were the ones |
| 16:53:54 | 14 | that I've seen in the newspaper. |
| 16:53:56 | 15 | MR. FINN:  The U.S. Attorney himself was quoted |
| 16:53:59 | 16 | extensively when this case broke.  But I understand what you're |
| 16:54:01 | 17 | saying.  Thank you. |
| 16:54:07 | 18 | MR. DEGEURIN:  May I?  This is probably unnecessary, |
| 16:54:14 | 19 | but the prosecutor has pointed at our table and said, one of |
| 16:54:18 | 20 | these defense counsel has disclosed Jencks.  I think that he must |
| 16:54:25 | 21 | be very frustrated as I would be if I thought that, if I were |
| 16:54:29 | 22 | him. |
| 16:54:30 | 23 | THE COURT:  Apparently y'all are the ones that have it. |
| 16:54:32 | 24 | MR. DEGEURIN:  Well, I'm telling you, we haven't |
| 16:54:34 | 25 | disclosed any Jencks to anybody.  But there could be other |

16:54:39   1   possibilities of how his Jencks got out of whatever -- wherever

16:54:43   2   it got out, but it wasn't through me or my team that represents

16:54:49   3   Francisco Colorado.

16:54:50   4           THE COURT:  The Court hadn't made any accusations.  The

16:54:54   5   Court just made a statement that I'd liked to have an inquiry,

16:54:56   6   but I'm not going to do that.  But if I find out or if somebody

16:55:00   7   points out some factual basis, I'll explore it.

16:55:04   8           MR. DEGEURIN:  Yeah.  I just felt compelled.  I cannot

16:55:07   9   just silently have a finger pointed at my table and be one of the

16:55:11  10   people being pointed at without something other than what he

16:55:16  11   said.  And he saw some reporters with what apparent -- appeared

16:55:20  12   to be 302s.  So I just couldn't let it stand any other way.

16:55:28  13           I know and I agree with the Judge, with you, that we do

16:55:32  14   things by honor of the lawyers, respecting the lawyer's oath.  So

16:55:38  15   that even though the rules might make a trial last a lot longer,

16:55:45  16   by agreement and with our honor not disclose Jencks, trials work

16:55:50  17   better and more fairly.  It all gets turned upsidedown if the

16:55:56  18   lawyers don't follow the rules, and it's right for you to expect

16:56:01  19   us to.

16:56:03  20           I'm a little -- I felt accused as a group by pointing

16:56:09  21   at my table and saying one of us did it.

16:56:11  22           THE COURT:  Well, Mr. DeGeurin, do you have any idea

16:56:14  23   what they say about me all the time?

16:56:16  24           MR. DEGEURIN:  Judge, can I have cart --

16:56:19  25           THE COURT:  You develop a thick skin.  I'm just giving

| | | |
|---|---|---|
| 16:56:22 | 1 | a warning I don't want any more. |
| 16:56:25 | 2 | MR. DEGEURIN:  And I always respond when I hear those |
| 16:56:27 | 3 | things about you, Judge.  It's not deserving. |
| 16:56:33 | 4 | MR. FINN:  Plus, Judge, the Jencks will probably hurt |
| 16:56:36 | 5 | our clients, not help our clients.  Jencks would be from the |
| 16:56:38 | 6 | government's witnesses. |
| 16:56:39 | 7 | THE COURT:  Well, the problem is exactly right and |
| 16:56:42 | 8 | that's why the government is concerned.  The government has an |
| 16:56:45 | 9 | obligation of a fair trial, too, and if they give the materials |
| 16:56:50 | 10 | out, it jeopardizes a fair trial.  They could be subject to |
| 16:56:56 | 11 | criticism for following my instructions.  They didn't have to |
| 16:57:01 | 12 | give you that Jencks and that's the problem. |
| 16:57:03 | 13 | All right.  We're not going to solve it tonight. |
| 16:57:06 | 14 | Anything further? |
| 16:57:06 | 15 | MR. MAYR:  Judge, may I approach? |
| 16:57:08 | 16 | THE COURT:  You may. |
| 16:57:11 | 17 | MR. MAYR:  Judge, and I do have to present this at this |
| 16:57:14 | 18 | time.  Friday, I filed a motion for leave and a motion to dismiss |
| 16:57:19 | 19 | based on selective and vindictive prosecution.  I don't know if |
| 16:57:22 | 20 | the Court has had an opportunity to rule on that, but I -- |
| 16:57:25 | 21 | THE COURT:  The Court ruled on it within ten minutes |
| 16:57:27 | 22 | that I got it, and you should have had the order.  I granted the |
| 16:57:30 | 23 | motion filed and I denied the motion. |
| 16:57:35 | 24 | MR. MAYR:  Okay.  I apologize. |
| 16:57:36 | 25 | THE COURT:  To dismiss. |

| | | |
|---|---|---|
| 16:57:37 | 1 | MR. MAYR:  I did not receive the ECF notice. |
| 16:57:39 | 2 | THE COURT:  Pick it up electronically. |
| 16:57:42 | 3 | MR. MAYR:  I'll take your word on it.  Thank you, |
| 16:57:43 | 4 | Judge, for that. |
| 16:57:44 | 5 | THE COURT:  You're welcome.  I think you'll find that a |
| 16:57:46 | 6 | grand jury made that indictment. |
| 16:57:48 | 7 | MR. DEGEURIN:  There's one other motion that's our |
| 16:57:49 | 8 | motion to exclude the evidence pursuant to Rule 16, had to do |
| 16:57:54 | 9 | with the wiretaps that were evidence we first learned about a |
| 16:58:02 | 10 | week and a half ago, and so, we filed the motion.  It's either |
| 16:58:06 | 11 | pending or if you rule on it today. |
| 16:58:07 | 12 | THE COURT:  Well, it technically hadn't been because |
| 16:58:12 | 13 | they hadn't had enough time for the opposing response.  But it |
| 16:58:16 | 14 | will be denied so that you know. |
| 16:58:18 | 15 | All right.  I'm in recess until 8:30 in morning. |
| 16:58:18 | 16 | (Proceedings adjourned.) |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |