```
 1                UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION

 3   UNITED STATES OF AMERICA    ) Docket No. A 12-CR-210 SS
                                 )
 4   vs.                         ) Austin, Texas
                                 )
 5   JOSE TREVINO-MORALES (3)    )
     FRANCISCO ANTONIO           )
 6   COLORADO-CESSA (6)          )
     FERNANDO SOLIS-GARCIA (7)   )
 7   EUSEVIO MALDONADO-HUITRON(11) )
     JESUS MALDONADO-HUITRON (18) ) April 16, 2013
 8

 9                TRANSCRIPT OF TRIAL ON THE MERITS
                  BEFORE THE HONORABLE SAM SPARKS
10                       Volume 2 of 15

11   APPEARANCES:

12   For the United States:      Ms. Michelle E. Fernald
                                 Mr. Douglas W. Gardner
13                               Assistant U.S. Attorneys
                                 816 Congress Avenue, Suite 1000
14                               Austin, Texas 78701

15   For Defendant Trevino-      Mr. David M. Finn
     Morales:                    Milner & Finn
16                               2828 North Harwood Street
                                 Suite 1950, LB9
17                               Dallas, Texas 75201

18                               Ms. Christie Williams
                                 Mills & Williams
19                               1112 South Rock Street
                                 Georgetown, Texas 78626
20
     For Defendant Colorado-     Mr. Mike DeGeurin
21   Cessa:                      Mr. M. Andres Sanchez-Ross
                                 Foreman, DeGeurin & DeGeurin
22                               300 Main Street
                                 Houston, Texas 77002
23
                                 Mr. John Parras
24                               Republic Bank Building
                                 1018 Preston, Floor 2
25                               Houston, Texas 77002
```

 1   **(Appearances Continued:)**

 2   For Defendant Solis-Garcia: Mr. Guy L. Womack
                                 Guy L. Womack & Associates
 3                               402 Main Street, Suite 6 North
                                 Houston, Texas 77002
 4
     For Defendant Eusevio       Mr. Richard D. Esper
 5   Maldonado-Huitron:          Esper Law Office
                                 801 North El Paso Street, 2nd Floor
 6                               El Paso, Texas 79902

 7   For Defendant Jesus         Mr. Thomas Brent Mayr
     Maldonado-Huitron:          Law Office of Brent Mayr
 8                               4101 Washington Avenue, 2nd Floor
                                 Houston, Texas 77007
 9

10   Interpreters:              Mr. Peter Heide
                                Ms. Cristina Helmerichs
11                              Mr. Steve Mines

12   Court Reporter:            Ms. Lily Iva Reznik, CRR, RMR
                                501 West 5th Street, Suite 4153
13                              Austin, Texas 78701
                                (512)391-8792
14

15

16

17

18

19

20

21

22

23

24

25   Proceedings reported by computerized stenography, transcript
     produced by computer.

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

1                          **I N D E X**

                                                        Page

2

3    Government's Opening Statements                    20

4    Defendant Trevino-Morales' Opening Statements      31

5    Defendant Colorado-Cessa's Opening Statements      42

6    Defendant Solis-Garcia's Opening Statements        57

7    Defendant Eusevio Huitron's Opening Statements     71

8
                              Direct    Cross    Redirect  Recross
9    Witnesses:

10   Jose M. Garza               83

11   Mario A. Cuellar           103      159       168      173

12                                                 174      175

13   Tammy Canida               176      189       193

14   Russell Stooks             196    211,212

15                                     217,221              222

16   Jose L. Vasquez, Jr.       225      241

17

18   Proceedings Adjourned                                 249

19

20

21

22

23

24

25

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

**E X H I B I T S**

|  | Offered | Admitted |
|---|---|---|
| Government's | | |
| #226 | 186 | 187 |
| #226A through 226C | 179 | 179 |
| #226D | 194 | 195 |
| #226E | 188 | 188 |
| #241 | 201 | 201 |
| #304 | 70 | 70 |
| #320 | 88 | 88 |
| #335A through 335B | 107 | 107 |
| Defendant's | | |
| (None.) | | |

08:27:20   1          THE COURT:  All right.  The jury's ready to come in.

08:27:27   2          Counsel, I've been really lenient except in all these

08:27:30   3   late motions, but I've now stopped.  Your motion deadline passed

08:27:36   4   months ago, weeks ago, and I'm not going to take any more.  The

08:27:42   5   objections to the government's noticed expert witnesses comes

08:27:46   6   after trial started, and you had notice before the trial.  I will

08:27:50   7   require the government to specify any opinions that are going to

08:27:55   8   be given, if any, by these witnesses by tomorrow morning.  But

08:28:01   9   the objections are over.  They're waived with the exception of

08:28:04  10   what the Court grants.  I've entered orders on all of the other

08:28:10  11   pending matters.

08:28:14  12          Mr. Gardner has a statement he wishes to make for the

08:28:16  13   record.

08:28:16  14          MR. GARDNER:  Your Honor, yesterday, I made a statement

08:28:19  15   that I believed the defense counsel provided Jencks material in

08:28:23  16   violation of the consent order.  I realize now that that was part

08:28:26  17   of the government's Bruton motion, and it was not Jencks

08:28:29  18   material, but instead, it was the defendants' statements as part

08:28:32  19   of a unsealed motion.  So I apologize to each one of the defense

08:28:36  20   attorneys.  And I'd like to apologize to the Court, as well as

08:28:38  21   the members of our press, for indicating or alleging that they

08:28:41  22   did anything incorrect.

08:28:43  23          Just one other thing, your Honor, based on the Court's

08:28:46  24   recent announcement, Joe Garza is the government's first witness.

08:28:50  25   That was disclosed to the defendants last night.  The only

08:28:53    1    opinion he should be rendering is whether or not in his

08:28:57    2    knowledge, the Los Zetas organization makes any money from

08:29:02    3    legitimate sources.  That would be his opinion today.

08:29:05    4                THE COURT:  Based on what?

08:29:08    5                MR. GARDNER:  Based on his 34 years of law enforcement

08:29:12    6    and --

08:29:12    7                THE COURT:  No.  I'm not concerned about his

08:29:14    8    experience.  I assume he's experienced.  But based on what

08:29:17    9    factual basis?

08:29:18   10                MR. GARDNER:  His study of the cartel organizations for

08:29:20   11    the last 34 years, Judge.  And that the source of all the

08:29:27   12    cartels, in particular, the Zeta, it's really indistinguishable

08:29:32   13    source of funds come from --

08:29:33   14                THE COURT:  I can't make a determination -- I

08:29:35   15    anticipate an objection, but I can't make a determination until

08:29:37   16    I've heard the basis of the questions before he's asked his

08:29:40   17    opinions.

08:29:41   18                MR. GARDNER:  One last thing, Judge.  The government

08:29:42   19    would like to invoke Rule 615.  And we'd like to exclude from

08:29:46   20    that rule our two case agents.  This is a two-year investigation

08:29:51   21    involving the FBI and IRS --

08:29:52   22                THE COURT:  I always inquire if anybody wishes to

08:29:54   23    invoke the rule.

08:29:56   24                MR. GARDNER:  Yes, sir.

08:29:56   25                THE COURT:  In my opening remarks to the jury.

08:29:58   1              MR. FINN:  May I approach, Judge?

08:29:59   2              THE COURT:  Yes.

08:30:00   3              MR. FINN:  Your Honor, on behalf of my client, we have

08:30:03   4    no objection to one case agent, but two case agents is --

08:30:06   5              THE COURT:  The objection is overruled.  You may have

08:30:09   6    your record.

08:30:10   7              MR. FINN:  Okay.  Judge, the last matter is I think

08:30:12   8    that at least one of the attorneys filed an objection to the

08:30:15   9    government's slideshow that you're about to see in opening

08:30:20   10   statement.  It's extremely prejudicial.  It's got guns, little

08:30:23   11   kids, women.  I don't know if you've had a chance to look at

08:30:27   12   this, your Honor, but it's --

08:30:28   13             THE COURT:  When did you get a chance to look at it,

08:30:30   14   counsel?

08:30:31   15             MR. FINN:  Just now.

08:30:31   16             THE COURT:  Just right now?

08:30:32   17             MR. FINN:  Yes, sir.

08:30:33   18             THE COURT:  No before?

08:30:34   19             MR. FINN:  I'm sure they sent it to me at some point,

08:30:36   20   Judge, but --

08:30:37   21             MR. GARDNER:  Disclosed on Friday, your Honor.

08:30:38   22             THE COURT:  Yes.  I've got affidavits you never even

08:30:40   23   came in to look at the discovery.  How long have defense counsel

08:30:44   24   have had in this presentation?

08:30:45   25             MR. GARDNER:  It was delivered Friday afternoon, Judge.

| | | |
|---|---|---|
| 08:30:47 | 1 | MR. FINN:  And, Judge, I was driving down here to get |
| 08:30:49 | 2 | ready for trial on Friday afternoon.  If you look at this, you'll |
| 08:30:52 | 3 | see why I'm so concerned about it.  It's unbelievably prejudicial |
| 08:30:55 | 4 | and not relevant. |
| 08:30:57 | 5 | THE COURT:  Well, I will have to look at it, I guess. |
| 08:31:02 | 6 | MR. FINN:  Can I hand it to you? |
| 08:31:04 | 7 | THE COURT:  Oh, good, you've got a printout? |
| 08:31:06 | 8 | MR. FINN:  Yes, sir. |
| 08:31:07 | 9 | THE COURT:  Just hand it to Mrs. Sims, please. |
| 08:31:48 | 10 | The objection is sustained.  This will not be shown to |
| 08:31:51 | 11 | the jury.  Mark that as Government's Exhibit 1 on the basis of |
| 08:31:56 | 12 | the objection. |
| 08:31:57 | 13 | MR. DEGEURIN:  Your Honor, may I be heard? |
| 08:32:01 | 14 | THE COURT:  Counsel, I'm not going to hear you every |
| 08:32:03 | 15 | morning.  I've got a jury out there that's ready. |
| 08:32:06 | 16 | MR. DEGEURIN:  We all feel the pressure.  Judge -- |
| 08:32:08 | 17 | THE COURT:  Well, all right.  What do you have now, |
| 08:32:11 | 18 | other than a motion this morning? |
| 08:32:13 | 19 | MR. DEGEURIN:  Yes, because, you know, we are being |
| 08:32:15 | 20 | crunched.  We're giving -- |
| 08:32:16 | 21 | THE COURT:  This case has been pending for almost a |
| 08:32:18 | 22 | year, Mr. DeGeurin.  Y'all are crunched because you didn't wait |
| 08:32:22 | 23 | until the last minute to get ready, obviously, because of the |
| 08:32:24 | 24 | motions that I'm seeing.  You've had the discovery months and |
| 08:32:28 | 25 | months.  You didn't look at the raw discovery, which is your |

08:32:31  1  privilege, and for 30 days you've had the discovery that's going

08:32:35  2  to be presented to the jury.  So don't tell me you're crunched

08:32:38  3  before I have one word of evidence.

08:32:41  4          Now, let's go.  What do you want?

08:32:43  5          MR. DEGEURIN:  Well, I think Mr. Gardner would back me

08:32:45  6  up that we have received a whole bunch last week, not months.

08:32:50  7          THE COURT:  I understand.

08:32:51  8          MR. DEGEURIN:  Okay.

08:32:51  9          THE COURT:  You got it as soon as he received it from

08:32:54 10  the Southern District, if that's what you're talking about.

08:32:56 11          MR. DEGEURIN:  That and --

08:32:57 12          THE COURT:  That motion has been presented.  That

08:32:59 13  motion's been overruled.  You have your record on it.

08:33:03 14          MR. DEGEURIN:  All right.  Next point is, your Honor, I

08:33:05 15  don't want the concept to be -- to escape us that an opinion that

08:33:11 16  we've now been told about that the -- what was it?  The Zetas

08:33:17 17  don't have any legitimate funds?  Is that -- that the Zetas do

08:33:21 18  not have any legitimate funds.  Today, at this moment, was the

08:33:24 19  first notice we have.  That's a violation of the notice rule, in

08:33:30 20  violation of your order, in violation of 702 or 7 -- whatever

08:33:35 21  that expert rule is in their procedures.

08:33:41 22          But, in addition to that, now we have that that's going

08:33:44 23  to be the only opinion.  We have a confrontational clause, also.

08:33:51 24  You cannot have someone give an opinion -- this is kind of like a

08:33:55 25  Daubert request I'm making now, Judge.  You cannot have someone

| | | |
|---|---|---|
| 08:33:59 | 1 | make an opinion based upon you've read a bunch of books or read a |
| 08:34:04 | 2 | bunch of DEA-6s. |
| 08:34:05 | 3 | THE COURT:  Mr. DeGeurin, I don't know what he's going |
| 08:34:08 | 4 | to testify to.  If he doesn't have sufficient firsthand |
| 08:34:12 | 5 | knowledge, he won't give an opinion.  But I don't know.  We're |
| 08:34:15 | 6 | just delaying that.  Make your objection at the appropriate time. |
| 08:34:19 | 7 | I have no idea what he's done.  I have no idea what he's going to |
| 08:34:22 | 8 | testify.  And then, the Court -- and then, the government will |
| 08:34:26 | 9 | ask him his opinion.  You can object, at that point in time, if |
| 08:34:30 | 10 | you don't think it's a -- got a foundation.  But I'll be glad to |
| 08:34:32 | 11 | do that. |
| 08:34:33 | 12 | MR. DEGEURIN:  So long as it doesn't come in and harm |
| 08:34:36 | 13 | us before we have a chance, like in opening statement or |
| 08:34:38 | 14 | something, Judge, fine. |
| 08:34:39 | 15 | THE COURT:  I don't think Mr. Gardner is going to |
| 08:34:43 | 16 | prejudice his case in an opening statement in this courtroom. |
| 08:34:47 | 17 | MR. DEGEURIN:  All right.  So please -- what I'm trying |
| 08:34:51 | 18 | to be clear about is, in addition to the notice is confrontation |
| 08:34:58 | 19 | clause.  We have a right to confront those people that he's read |
| 08:35:01 | 20 | about. |
| 08:35:03 | 21 | THE COURT:  That's an objection that you -- write it |
| 08:35:06 | 22 | down and you'll remember it. |
| 08:35:09 | 23 | Bring the jury in. |
| 08:35:12 | 24 | (Jury present.) |
| 08:37:32 | 25 | THE COURT:  Members of the jury, I've told you now on |

```
08:37:37   1   two occasions, before court opens every morning and before the
08:37:42   2   proceedings in the afternoon session, I will ask you those three
08:37:45   3   questions.  I need for you to answer orally.  I will be looking
08:37:49   4   at your answers, and then, I'll instruct the court reporter as to
08:37:52   5   how you've answered.  So let's go into it.
08:37:58   6           Since you have left this courtroom yesterday, learned
08:38:01   7   about this lawsuit, has anybody attempted to talk to you about
08:38:05   8   this lawsuit?
08:38:06   9           JURORS:  No.
08:38:07   10          THE COURT:  Have you talked to anyone about the
08:38:10   11  lawsuit?
08:38:10   12          JURORS:  No.
08:38:11   13          THE COURT:  And have you learned anything at all about
08:38:13   14  the lawsuit, outside the presence of one another in this
08:38:16   15  courtroom?
08:38:17   16          JURORS:  No.
08:38:17   17          THE COURT:  All right.  Show negative responses to all
08:38:20   18  questions by all jurors under oath.
08:38:22   19          If you'll stand and be sworn as the jury in this case,
08:38:25   20  please.
08:38:25   21          THE CLERK:  Do you, and each of you, solemnly swear or
08:38:33   22  affirm that in the case of United States of America vs. Jose
08:38:37   23  Trevino-Morales, Francisco Antonio Colorado-Cessa, Fernando
08:38:43   24  Solis-Garcia, Eusevio Maldonado-Huitron and Jesus
08:38:49   25  Maldonado-Huitron, that you will a true verdict render according
```

08:38:52    1    to the law and the evidence, so help you God?

08:38:55    2            (Affirmative responses given.)

08:38:57    3            THE COURT:  You may be seated.

08:38:59    4            Now, with the taking of that oath, you became the

08:39:01    5    judges in this case, the judges of the facts.  It will be your

08:39:06    6    judgment and verdict in this case as to the declaration of

08:39:10    7    innocence or guilt on each of the defendants.  Each of the

08:39:14    8    defendants will be considered by you individually.  Even though

08:39:20    9    they're all charged in the same conspiracy, the fact that one may

08:39:23   10    be innocent and another not innocent, you'll make that

08:39:26   11    determination after you've heard all of the evidence.  But you

08:39:29   12    will consider each of them individually in the verdict form.

08:39:37   13            You'll make your determination, as I've told you on

08:39:46   14    multiple occasions, on the evidence.  So let's start out and let

08:39:51   15    me tell you what the evidence will be.  The evidence will be the

08:39:55   16    testimony from the witness, the answering of the questions, not

08:39:59   17    the questions, not the statements of the lawyers, not the

08:40:03   18    arguments of the lawyers.  They are not witnesses.  They do not

08:40:08   19    provide evidence.  They will ask the questions of the witness.

08:40:12   20    However, what the lawyers say can be very important because

08:40:17   21    they're the only ones in this courtroom that know basically what

08:40:20   22    the evidence is going to be.  They've been working on this case

08:40:23   23    for a long time.

08:40:26   24            So what the lawyers say, listen to them, but remember

08:40:29   25    the lawyers are advocates.  It is the assistant United States

08:40:33  1  attorneys' duty to try to convict the defendants.  It is the

08:40:40  2  defense lawyers' duty to try to have his or her client acquitted.

08:40:48  3  They are biased.  They're not objective.  You don't have to be

08:40:51  4  objective.  The United States attorney has to ensure a fair

08:40:55  5  trial, as does the Court, but their responsibility is to attempt

08:41:00  6  to find a guilty verdict from the indictment in the case on each

08:41:04  7  of the defendants.

08:41:06  8          So when you listen to the lawyers in their opening

08:41:09  9  statement throughout the trial and in the closing statement,

08:41:12  10  remember they're advocates, and they are to give you the best

08:41:17  11  side of their client's position so that you can determine what is

08:41:22  12  the actual truth in this lawsuit.

08:41:26  13          Evidence can also come in in written form, pictures,

08:41:30  14  exhibits, physical property that you will have in the jury room

08:41:35  15  with you when you deliberate.  I don't generally allow -- back in

08:41:42  16  the old days, we give the physical property of the first juror,

08:41:46  17  and he or she would look and pass it down, and then, you forget

08:41:49  18  to listen to the rest of the trial while that's going on.

08:41:53  19  Nowadays, a lot of evidence will be on disc.  You'll see it on

08:41:57  20  the walls and that will be helpful.  But you will have all of the

08:42:02  21  exhibits at the end of the case in your deliberations.  And the

08:42:06  22  lawyers will tell you in their final arguments which exhibits

08:42:10  23  they think are important and why so that you will know which ones

08:42:15  24  to specifically look for.

08:42:17  25          And then, evidence can come in on a stipulation.  For

08:42:20   1   example, they could stipulate that yesterday was April the 15th,

08:42:25   2   and they don't have to bring a person in with a calendar to prove

08:42:29   3   it.  A stipulation is usually the lawyers will, to assist the

08:42:36   4   jury in time, stipulate to matters that there are no dispute on.

08:42:41   5   Business records, that type of thing, where they may argue what

08:42:45   6   it says, but as far as admissibility, there's no dispute.

08:42:53   7          Speaking of disputes, this isn't like television.  The

08:42:57   8   lawyers will make objections.  Now, don't think the lawyers are

08:43:01   9   trying to hide anything when they make objections.  They have a

08:43:04   10   duty to me to make an objection every time they have some doubt

08:43:08   11   that evidence is not admissible, and then, I'll make a

08:43:13   12   determination.  If I sustain the objection, you don't hear the

08:43:16   13   evidence.  Don't try to guess what the evidence was.  It's not

08:43:20   14   admissible evidence that you're going to consider when you

08:43:22   15   determine innocence or guilt in this case.

08:43:25   16          If I overrule the objection, don't think it's any more

08:43:30   17   important than any other evidence that you're going to hear in

08:43:34   18   the case.  Your job is to determine the innocence or guilt of the

08:43:42   19   defendant.  My job is to make sure that you do it on admissible

08:43:48   20   evidence.  But don't look up here for any help.  Nothing I say,

08:43:54   21   nothing I do should give you any indication of what I think your

08:44:01   22   verdict should be.  That is exclusively yours.

08:44:06   23          Now, I have this new computer sitting right here and I

08:44:11   24   have 13 other judges.  I'm the oldest and the most scarred-up in

08:44:16   25   the district, and I get memos all the time on it.  However, this

08:44:21  1   is the first time that I have seen that computer.  I don't even

08:44:28  2   know how to turn it on.  So I don't think I'm going to be looking

08:44:32  3   at it, but I will get notes handed to me.  And I will get

08:44:36  4   blinking on the telephone so I can be talking to a judge.  Don't

08:44:43  5   look up here for an expression of approval or disapproval at any

08:44:48  6   time.  That is your business.

08:44:49  7         Now, there are two kinds of evidence.  You've heard

08:45:01  8   this all the time.  There's circumstantial evidence where the

08:45:04  9   lawyers will show you certain facts from which you can draw a

08:45:10  10  conclusion on them.  For example, it hadn't rained in a while,

08:45:16  11  and if somebody says, it's not going to rain today, it's going to

08:45:20  12  be 91 degrees, like my weatherman said this morning when I was

08:45:24  13  walking, that might be circumstantial evidence that it's not

08:45:30  14  going to rain.  At the end of the day, people can tell you they

08:45:36  15  saw rain or not, that's direct evidence, what somebody saw.  The

08:45:41  16  evidence direct or the evidence circumstantial is good evidence.

08:45:48  17  You'll consider all of the evidence when you deliberate, render

08:45:54  18  your verdict.

08:45:55  19        Don't make up your mind at any time before you've heard

08:45:58  20  all of the evidence.  And listen to the views of your other

08:46:04  21  jurors who deliberate before you decide what you believe the

08:46:08  22  verdict should be and any of the five defendants that are there.

08:46:14  23  Now, the five defendants have to be considered individually, as

08:46:18  24  I've indicated, but you're going to hear names of a lot of people

08:46:21  25  who are not involved in this trial.

08:46:25  1       And you're not going to be called upon to find anything

08:46:28  2  about those people.  They have separate trials, or they've

08:46:33  3  concluded their business with the Court, or they're in the

08:46:35  4  business of concluding their business.  It's all sorts of

08:46:38  5  different ways that they're not in the courtroom at the present

08:46:42  6  time.  But you're not concerned about the guilt or innocence of

08:46:46  7  those people, even though you're going to hear evidence about

08:46:51  8  them in this case.

08:46:58  9       Now, I am going to allow you to take notes because of

08:47:05  10 the duration of the case.  But we've learned a long time ago that

08:47:08  11 a case of two weeks, that is, ten working days, there's no

08:47:14  12 necessity to get notes.  The jury will retain 90 percent of all

08:47:19  13 the testimony, and, of course, with the exhibits, they have no

08:47:24  14 problems remembering things.

08:47:26  15      If you'll remember back -- well, like when you were in

08:47:29  16 school and you're taking notes, remember you take notes and you

08:47:33  17 write something important down and then, you say, I wonder what

08:47:35  18 the person said, that's what I want to avoid.  I want you sit

08:47:38  19 back and listen, but you will take notes because we've got five

08:47:42  20 defendants, and they tell me that the case will go probably at

08:47:46  21 least three weeks, maybe more.  And so, I'm going to allow you to

08:47:51  22 take notes.

08:47:51  23      But the notes are the property of the Court.  So don't

08:47:55  24 write anything like, the Judge is fat, or something like that.

08:48:01  25 Just make the notes for yourself.  You're not to share them with

08:48:05  1    anybody else.  They're just for your own memory at the time that

08:48:07  2    you may deliberate.

08:48:26  3            Does either counsel want to invoke the rule?

08:48:29  4            MR. GARDNER:  Your Honor, the government wishes to

08:48:30  5    invoke the rule.

08:48:32  6            MR. ESPER:  Defendant would invoke the rule of

08:48:35  7    sequestration.

08:48:36  8            MR. FINN:  Yes, your Honor.

08:48:38  9            MR. WOMACK:  Yes.

08:48:38  10           THE COURT:  All right.  The rule is invoked.  That

08:48:40  11   simply means, members of the jury, with the exception of the

08:48:42  12   defendants, with the exception of representatives of the United

08:48:47  13   States, all witnesses will not discuss their testimony with any

08:48:51  14   other witness, and they will not discuss what they're going to

08:48:57  15   say with any other witness.  They have the right to speak to the

08:49:00  16   lawyers.  They have the right not to speak to the lawyers.  If

08:49:04  17   they breach that confidentiality, then I will instruct the

08:49:07  18   lawyers to so instruct their witnesses, they could be

08:49:12  19   disqualified from giving testimony.

08:49:13  20           So if there are any witnesses in the courtroom, I'll

08:49:16  21   ask them at this point to leave.

08:49:25  22           MR. DEGEURIN:  Your Honor, it's my understanding that

08:49:26  23   the rule being invoked will be after opening statements, they're

08:49:32  24   not to hear the testimony or any other witness.  They will be

08:49:35  25   excused.  I do have some in the courtroom.

08:49:37  1          THE COURT:  They're excused before opening statements.

08:49:40  2          MR. DEGEURIN:  Could I be heard on that, Judge?

08:49:42  3          THE COURT:  You can be heard on it, Mr. DeGeurin, but

08:49:45  4  the ruling will not change.

08:49:48  5          MR. DEGEURIN:  Okay.  Yes.  We have some in the

08:49:52  6  courtroom.

08:49:53  7          THE COURT:  If the government has any witnesses, I'm

08:49:55  8  going to ask them to be excused, also.

08:50:10  9          MR. DEGEURIN:  Your Honor, could we identify them?

08:50:12  10          THE COURT:  You don't need to identify them.  You're

08:50:15  11  responsible for your own witnesses.  If you do, I'll have to

08:50:17  12  swear them and we'll have to put them --

08:50:21  13          MR. DEGEURIN:  Wait a minute.  I think he has to swear

08:50:23  14  the --

08:50:24  15          THE COURT:  No.

08:50:25  16          MR. DEGEURIN:  Oh, okay.

08:50:25  17          THE COURT:  We'll swear them individually as you call

08:50:28  18  them.

08:50:40  19          MR. DEGEURIN:  Your Honor, may I ask one other thing?

08:50:44  20          I understand that the Court is waiving the

08:50:47  21  sequestration rule with regard to the agents, but when there are

08:50:52  22  multiple agents and both are testifying, the limited waiver will

08:50:56  23  be while one's testifying, the other should not be hearing his

08:50:58  24  testimony.  And I would ask that you do that.

08:51:03  25          THE COURT:  All right.  When one is called, if you'll

08:51:06   1   make that motion, I'll rule on it, sir.

08:51:08   2           MR. DEGEURIN:  Okay.  I so move.

08:51:10   3           THE COURT:  I don't know if they're going to be called

08:51:13   4   on or not.

08:51:14   5           MR. DEGEURIN:  Oh, okay.

08:51:15   6           THE COURT:  I was presented this a long time ago, Mr.

08:51:19   7   DeGeurin, and the only thing that's ever shown me is that

08:51:22   8   everybody is upsidedown.  So I don't know who's going to be

08:51:28   9   called or when, but when they're called, that's something I

08:51:31  10   certainly will consider.

08:51:39  11           As you could see, members of the jury, you're going to

08:51:41  12   have ample evidence to make a determination in this case with the

08:51:47  13   lawyers.  You're fortunate.  You've got very good lawyers.  They

08:51:51  14   will do their best to give you the evidence that you're going to

08:51:53  15   need to deliberate.  So there's no need to try to find any other

08:51:56  16   evidence.  There's no need to read the newspapers.  There's no

08:51:59  17   reason to listen to the radio or the television.  There's no need

08:52:03  18   to make any independent investigation because it would violate

08:52:10  19   the standards that are required of the lawyers.

08:52:14  20           Now, in just a minute, we'll proceed with opening

08:52:18  21   statements.  The government has the opportunity to tell you what

08:52:23  22   he believes the evidence is going to show.  Doesn't make an

08:52:28  23   argument in this case.  He's going to give you a kind of a

08:52:30  24   preview of what the testimony is going to be so that you can

08:52:33  25   start fitting in the testimony with the first witness when you

08:52:39  1   know the overall contentions of the parties.  The defendants have

08:52:42  2   the opportunity to make the same type of statement of what they

08:52:46  3   believe the evidence would be.  They have the right to make it at

08:52:50  4   this time or waive it and make it at the beginning of their

08:52:55  5   cases, if they wish to do it.

08:52:56  6          Again, I don't know how many opening statements we will

08:53:01  7   have, but remember, take every lawyer's statement with a grain of

08:53:08  8   salt: but listen to them because what they say can be important

08:53:12  9   as the trial proceeds.

08:53:27  10          Mr. Gardner, you may proceed with your opening

08:53:29  11  statement.

08:53:29  12          MR. GARDNER:  Thank you, your Honor.

08:53:30  13  GOVERNMENT'S OPENING STATEMENTS

08:53:31  14          MR. GARDNER:  May it please the Court.

08:53:33  15          THE COURT:  Yes, sir.

08:53:33  16          MR. GARDNER:  Counsel.

08:53:34  17          Ladies and gentlemen of the jury, good morning.  Again,

08:53:37  18  my name is Doug Gardner and I represent the United States of

08:53:40  19  America in this case, along with Michelle Fernald.  One person I

08:53:44  20  didn't introduce yesterday is our litigation support specialist.

08:53:46  21  She'll be handling my computers since I'll need as much help as

08:53:51  22  anyone else.

08:53:52  23          This case is really pretty simple.  Los Zetas are a

08:53:56  24  drug cartel.  They make their money by drugs, extortion,

08:54:01  25  kidnapping, murder, bribery.  They've taken that money, they're

08:54:06  1  sending it to the U.S. to buy racing quarter horses.  The two

08:54:10  2  leaders of the drug cartel are Miguel Trevino and Omar Trevino,

08:54:15  3  known as or "Cuarenta," "40," and "Cuarenta Dos," "42."  They're

08:54:21  4  doing that through their brother over here, Jose Trevino.  In 30

08:54:26  5  months, they've amassed roughly $16 million worth of expenses as

08:54:30  6  related to horses.  It's that simple.  Drug money coming forth to

08:54:36  7  the U.S. to be invested in what is a legitimate business here in

08:54:40  8  the United States.  That's money laundering.

08:54:44  9          Here's my example.  If you were to have a dry-cleaning

08:54:47  10 business and you wanted to start it up, you go to a bank to get a

08:54:51  11 loan.  That's a legitimate business.  You want to start a

08:54:55  12 dry-cleaning business --

08:54:56  13          MR. DEGEURIN:  Excuse me, Mr. Gardner.  Your Honor, I

08:54:58  14 have to object to argument, as opposed to opening.

08:55:02  15          THE COURT:  It is a form of argument, but I will allow

08:55:06  16 each of you, because money laundering is a technical offense, to

08:55:11  17 give your version of money laundering.  But let me tell you,

08:55:14  18 members of the jury, I will give you my version of money

08:55:17  19 laundering when I've heard the evidence.  And it's my definition

08:55:21  20 of money laundering that you will take into your deliberations

08:55:26  21 and render a verdict on.

08:55:28  22          MR. GARDNER:  Thank you, your Honor.

08:55:29  23          So if you couldn't get a loan, you get money from an

08:55:33  24 illegal source, that's money laundering.  Could I get the first

08:55:37  25 slide, please?

08:55:37    1          So the Judge said this is a conspiracy case.  This is a
08:55:49    2    definition I anticipate you'll receive at the end of this trial.
08:55:55    3    It comes straight from the U.S. law.  Conspiracy is an agreement
08:55:58    4    among two or more parties to commit an offense and take steps in
08:56:03    5    furtherance of that.  So really, in this case, we have two
08:56:06    6    charges:  We have conspiracy and we have the money laundering.
08:56:10    7    It's all wrapped into one.  So you can money launder and I'll
08:56:13    8    show you what that is in a second.  But if you're not money
08:56:17    9    laundering and you're someone else who helps someone money
08:56:20   10    launder, and you know that the laundered money is dirty, then
08:56:24   11    you're guilty of conspiracy.

08:56:25   12          Here's my best example on a conspiracy.  My sister
08:56:29   13    works for Wal-Mart.  She doesn't like this example.  Wal-Mart is
08:56:34   14    a conspiracy, okay?  You have a number of people and they're
08:56:37   15    looking to make money.  How do they make money?  They sell goods.
08:56:40   16    So you have the CEO, he's in charge.  You have the chief
08:56:44   17    financial officer with the money.  You have the store managers,
08:56:49   18    the checkout clerks, the people stocking the shelves, the people
08:56:53   19    driving the trucks, the people taking the money to the bank, the
08:56:55   20    financial people, the accountants.  Wal-Mart is a conspiracy.
08:56:59   21    It's a legitimate conspiracy.  You can say the federal
08:57:02   22    government's a conspiracy.

08:57:03   23          Anything that you do, any business that you have is a
08:57:06   24    conspiracy, but it's a legal conspiracy.  The reason you're here
08:57:11   25    is because of illegal activities.  Next slide, please.  So we've

08:57:17  1  alleged money laundering in two ways.  A little long definition.

08:57:27  2  You're going to see it again.  That's the legal definition that

08:57:32  3  comes from the U.S. government.  Let me break that down a little

08:57:35  4  bit.

08:57:35  5       I've alleged two ways in which they've committed money

08:57:40  6  laundering in this case.  Next slide, please.  So this is the

08:57:43  7  same thing I just displayed a little graphically.  So the

08:57:47  8  proceeds of the specified unlawful activity.  Now, that's a legal

08:57:51  9  term and simply what that means, as I read the indictment

08:57:53  10  yesterday, the unlawful activity that's alleged in this case are

08:57:58  11  narcotics, extortion and bribery of a sporting event.  Any one of

08:58:05  12  those three.  That's the unlawful activity.

08:58:07  13       So if they knew the unlawful activity and the money

08:58:10  14  came from unlawful activity and they made a monetary transaction

08:58:15  15  -- and the Judge will further define that term for you.  Simply

08:58:19  16  made a bank account, deposit, withdrawal, writing a check,

08:58:23  17  sending a wire, handing someone cash, all of those things are

08:58:28  18  monetary transactions.

08:58:29  19       All right.  And then, there's two ways at the end.

08:58:32  20  Designed to conceal the nature, the source, the location of the

08:58:37  21  source of the funds, or to avoid reporting requirements.  Now,

08:58:42  22  this is going to be important in this case, ladies and gentlemen.

08:58:56  23  My finger is moving too fast.

08:58:59  24       There are two reporting requirements and you're going

08:59:02  25  to see in the next slide.  First one is what they called a CTR, a

08:59:05   1   Cash Transaction Report.  Anytime a business or bank receives
08:59:10   2   $10,000 or more in cash, they're required to fill out a CTR and
08:59:15   3   deposit it with the IRS or the financial center to keep track of
08:59:19   4   that, and that's avoiding money laundering.  When you attempt to
08:59:24   5   avoid that, it's called structuring.  You're structuring your
08:59:28   6   payments or your deposits into an account to avoid having that
08:59:33   7   form filed against you.
08:59:35   8          So when you're structuring, you'll see a lot of $9,900,
08:59:39   9   $9,900 -- or, I'm sorry, yes, $9,000 to avoid this transaction
08:59:45  10   requirement.  Next slide, please.  This is the other way.  Two
08:59:51  11   ways.  So this one involves pretty much the same thing except
08:59:54  12   there's the international.  I'm sorry.  Thank you.  The
08:59:58  13   international movement of funds.  The same requirement that the
09:00:03  14   fund comes from an illegal source.  There's no monetary
09:00:06  15   transaction here.
09:00:07  16          So, again, a wire coming across the border, cash coming
09:00:11  17   across the border.  And, again, there is a reporting requirement
09:00:16  18   in this one.  This one's called a CMIR.  It's the same thing as a
09:00:20  19   CTR, except it's just for the international movement of cash.  So
09:00:24  20   same $10,000 amount, same reporting requirement, same type
09:00:29  21   activity to avoid that.  Again, all structuring.
09:00:33  22          Now, what is the government going to present to you
09:00:37  23   today or next couple of weeks, actually, to prove this?  We
09:00:41  24   anticipate the following.  Next slide, please.  This is your
09:00:50  25   standard.  This is reasonable doubt.  This is the instruction I

09:00:53    1    anticipate the Court is going to give you at the end of this.  So

09:00:56    2    this is how you view this evidence.  And I'd like to highlight

09:00:59    3    the first part.  Reasonable doubt is based on reason and common

09:01:04    4    sense.  Reason and common sense.

09:01:08    5            The twelve of you who deliberate are allowed to use

09:01:11    6    your common sense based on your life experiences, your

09:01:15    7    interactions with your family, your friends, your coworkers, your

09:01:18    8    fellow students, to make your judgments of whether someone is

09:01:21    9    telling the truth or telling a lie.  You're allowed to use your

09:01:25   10    common sense.  The juries across the country do this all the

09:01:28   11    time.  So this is your standard in which you view everything

09:01:32   12    coming from that stand.  Reasonable doubt.  Next slide, please.

09:01:37   13            This is Miguel Angel Trevino, "40."  He is the leader

09:01:43   14    of the Los Zetas drug cartel.  He initially started his

09:01:50   15    horse-laundering operation with a gentleman named Ramiro

09:01:53   16    Villarreal, and they began to purchase horses in the United

09:01:57   17    States using drug money.  When Villarreal purchased a number of

09:02:02   18    horses, the most significance of which to this case is a horse

09:02:05   19    called Tempting Dash.  Ramiro Villarreal owned that horse.  That

09:02:11   20    horse did very well in a race in Dallas, and that leads into the

09:02:17   21    bribery of a sporting event.  That race was fixed and you'll hear

09:02:20   22    evidence on that.

09:02:22   23            And from that point, "40" and his brother, next slide,

09:02:26   24    please, Omar -- Oscar Omar Trevino-Morales, A/K/A "42," decided

09:02:35   25    to put their younger brother Jose Trevino, next slide, please,

09:02:40    1  into the horse-racing business.  Tempting Dash wins a race in

09:02:47    2  Dallas.  He is transferred between the qualifier and the finals.

09:02:54    3  In horse racing, you have a number of qualifying races and then,

09:02:56    4  you have the finals.

09:02:58    5          So he is transferred from Ramiro Villarreal and Jose

09:03:02    6  Trevino.  And Tempting Dash wins and Jose Trevino wins

09:03:06    7  400-and-some-thousand-dollars based on a fixed race that he

09:03:10    8  begins to build his horse empire with.  So this is what we're

09:03:14    9  going to show you as we go through this case.  You're going to

09:03:18   10  hear about three types of what I like to call witnesses.  You're

09:03:22   11  going to hear these defendants, associates, members who were

09:03:26   12  either Los Zetas from Mexico or associate of Los Zetas.  They're

09:03:30   13  going to tell you the inner workings of the Los Zetas operation,

09:03:34   14  and they're going to tell you these defendants' role in that

09:03:37   15  operation.  Next slide, please.

09:03:39   16          Zulema Trevino, Jose Trevino's wife.  Again, after the

09:03:46   17  winning of Tempting Dash, they took that money, bought a ranch in

09:03:52   18  Oklahoma.  Twenty years prior, they were masonries making a

09:03:58   19  decent living.  In 30 months, they're able to expand from a ranch

09:04:05   20  house in Balch Springs, Texas in Dallas to a 200-acre ranch in

09:04:09   21  Oklahoma with 400 quarter horses.  Next slide, please.

09:04:13   22          You're going to hear about Carlos Nayen, also known as

09:04:17   23  "Carlito," also known as "Guero," as the kid.  In Spanish, they

09:04:22   24  call it "Chamaco."  He's the money man.  After Ramiro Villarreal

09:04:29   25  gets killed, another man by the name of Alejandro Barradas takes

09:04:34  1  over and he starts finding the horses.  And Alejandro Barradas

09:04:39  2  gets killed and then, Carlos Nayen takes place.  He's the man

09:04:43  3  responsible for coordinating the purchase of horses at auctions.

09:04:47  4  He's texting with "40" and "42" for directions.  He's the one

09:04:51  5  responsible for arranging the payments of the horses at auctions,

09:04:55  6  the payments of the horses at breeding facilities, and payments

09:04:59  7  for horses to sustain them in boarding facilities.

09:05:01  8        Next slide, please.  Defendant Francisco Antonio

09:05:07  9  Colorado-Cessa, also known as "Pancho."  You're going to hear

09:05:11  10  evidence that he has a oil field services company, called ADT

09:05:18  11  Petro Servicios.  You're going to hear testimony that company is

09:05:23  12  built on a lie.  All of the money he received for that company

09:05:28  13  came from Zetas drug money.  He's funneling money based on his

09:05:32  14  legitimate-looking business, both in Mexico and to the United

09:05:36  15  States for the purchase and sustainment of American quarter

09:05:40  16  horses.  Next slide, please.

09:05:41  17        Defendant Fernando Garcia.  He was "Carlitos," Carlos

09:05:48  18  Nayen's right-hand man.  When I talk about structured payments,

09:05:53  19  you are going to see at least one day where Fernando Garcia

09:05:58  20  received $90,000, all in $9,000 increments on a single day, and

09:06:02  21  quickly moved them out of his account.  Next slide, please.

09:06:06  22        This is Victor Manuel Lopez.  You're going to see

09:06:11  23  testimony about him crossing the border with bulk cash that he's

09:06:15  24  delivering for payments of quarter horses.  He's bringing the

09:06:18  25  money across the border in less than $10,000 increments, again,

09:06:23  1  another example of structuring.  Next slide, please.

09:06:26  2       Sergio Rincon, also known as "Saltillo," also known as

09:06:32  3  "El Negro."  He's another money man responsible for security of

09:06:36  4  Jose Trevino, moving money and working with the ponies.  You're

09:06:41  5  going to see evidence that he received a $50,000 wire transfer

09:06:45  6  from Francisco Colorado-Cessa.  Next slide, please.

09:06:49  7       Adan Farias.  He's a horse trainer.  You're going to

09:06:54  8  see a lot of information about the horse trainers in this case.

09:06:56  9  Mr. Farias has pled guilty.  He'll be testifying here in court

09:07:00  10  about his involvement with the Zetas and his involvement with

09:07:03  11  some of these defendants.  Next slide, please.

09:07:05  12       Defendant Eusevio Maldonado-Huitron, also known as

09:07:10  13  "Chevo."  Another horse trainer.  You're going to hear evidence

09:07:15  14  that he has met with "40," he trains "40's" horses.  In between

09:07:19  15  him and his brother, they received over the last two years

09:07:23  16  approximately $500,000 in cash structured into their accounts

09:07:27  17  here in Austin, Texas.  Next slide, please.

09:07:30  18       Felipe Quintero, another trainer from California.  He

09:07:34  19  was also receiving and making structured deposits.  He has pled

09:07:37  20  guilty and you will hear him testify here in court about his

09:07:41  21  association with these individuals.  Next slide, please.

09:07:43  22       Raul Ramirez, young kid.  Again, when I say money

09:07:49  23  laundering is, in part, to conceal the nature, the source and the

09:07:51  24  location of the funds, you're going to hear evidence that he was

09:07:54  25  bidding on $2.2 million worth of horses at Ruidoso, New Mexico

```
09:08:01   1   horse auction, an auction paid for by check from Colorado.  Next
09:08:08   2   slide, please.
09:08:09   3           Luis Aguirre, he's a veterinarian from Mexico.  Also
09:08:13   4   involved in the concealment of the horses.  A number of horses
09:08:16   5   were put in his name.  You'll hear the testimony about his
09:08:19   6   involvement.  Next slide, please.
09:08:24   7           Gerardo Quintero.  You're going to hear testimony that
09:08:27   8   Gerardo Quintero pays Jose Trevino $700,000 for two horses, based
09:08:33   9   on the structured funds that went into his account from Mexico.
09:08:36  10   Next slide, please.
09:08:39  11           Jesus Maldonado-Huitron.  He and his brother controlled
09:08:42  12   two entities called Huitron Homes and Huitron Painting.  He is
09:08:47  13   listed at alternate times with his brother as the president of
09:08:51  14   these two entities.  He is listed along with his brother as the
09:08:54  15   accountholders for the Wells Fargo account in which the
09:08:58  16   half-a-million dollars was washed through.  You're going to hear
09:09:00  17   testimony that he was responsible for the financial arrangements,
09:09:04  18   and that money essentially flowed through his accounts.  I define
09:09:09  19   flow through as structured money into his account, right out the
09:09:13  20   same day to members and entities of the organization.  Next
09:09:15  21   slide, please.
09:09:16  22           This slide is to help you get familiar with some of
09:09:23  23   these organization's names.  Some point over here on my easel,
09:09:27  24   I'm going to put up essentially this slide of the pictures of the
09:09:29  25   defendants as it relates to them.  So these are some of the names
```

09:09:33  1  I'm just going to ask you to try to become familiar with over the

09:09:36  2  next three weeks.

09:09:38  3       Jose Trevino, responsible for three companies, Tremor

09:09:43  4  Enterprises, which is short for Trevino Morales, 66 Land and Zule

09:09:49  5  Farms.  He's used these entities to conceal the nature and the

09:09:53  6  source of the drug money coming to the accounts.

09:09:56  7       Carlos Nayen uses Carmina, LLC.  And Alejandro Barradas

09:10:02  8  used a group called Grupo Aduanero Integral.  Fernando Garcia was

09:10:08  9  responsible for a number of organizations:  Garcia Bloodstock,

09:10:11  10 Bonanza Racing, Desiree Princess Ranch, as well as Poker Ranch.

09:10:15  11 And then, I already told you Mr. Cessa and his involvement.  And

09:10:20  12 finally, you're going to hear a couple of other witnesses talk

09:10:22  13 about those other two at the bottom.  So you're going to hear

09:10:25  14 those names.  And I'll have that chart up for you so you can

09:10:28  15 refer to trial here in the back of the courtroom as the witnesses

09:10:31  16 are testifying.  Next slide, please.

09:10:33  17      So, ladies and gentlemen, you're going to hear, again,

09:10:37  18 from those three types.  Members of the organization as I stated

09:10:41  19 before.  You're also going to hear from a significant number of

09:10:45  20 persons from the American quarter horse industry, and they're

09:10:48  21 going to tell you how the industry works and how these people

09:10:51  22 operated in the industry.  And finally, what you're going to hear

09:10:54  23 about are law enforcement officers.  You're going to hear about

09:10:56  24 the results they took when they made the arrests and executed the

09:11:00  25 search warrants in this case.

09:11:01  1       So this is going to be about a three-week trial, maybe

09:11:04  2  a little longer.  I ask for your patience.  I ask for you to

09:11:07  3  understand the evidence, and then, we'll make sure at the end,

09:11:10  4  we'll wrap it all up and try to fill in any of the gaps that we

09:11:15  5  may believe exists.

09:11:16  6       So, again, when I come back here at the end of this

09:11:18  7  trial, I'm going to ask you one thing.  I'm going to ask you to

09:11:21  8  convict these five defendants and find them guilty of conspiracy

09:11:25  9  to money launder.  Thank you.

09:11:28  10       THE COURT:  Mr. Finn.

09:11:30  11  DEFENDANT TREVINO-MORALES' OPENING STATEMENTS

09:11:30  12       MR. FINN:  May it please the Court, the government.

09:11:34  13       Good morning, ladies and gentlemen.  My name is David

09:11:38  14  Finn, and I'm going to speak with you for just a couple of

09:11:41  15  moments on behalf of my client, Jose Trevino-Morales.  In the

09:11:47  16  words of Paul Harvey, now for the rest of the story, Mr. Gardner

09:11:51  17  has just painted a picture for you of what he anticipates.

09:11:57  18  There's more to this story, a whole lot more.  You're going to

09:12:02  19  hear that my client, who's 46 years old, U.S. citizen, no

09:12:09  20  criminal history, is related to two bad guys.  Two brothers that

09:12:15  21  are in Mexico.

09:12:17  22       How badly do they want them?  Well, the U.S. government

09:12:21  23  has a $5 million bounty on his brother.  The Mexican government

09:12:29  24  has a $3 million bounty.  There's 8 million reasons why my client

09:12:37  25  is sitting in this courtroom right now.  His brothers are not

09:12:41  1  here.  His brothers are not on trial.  My client is on trial.

09:12:47  2  You're going to hear evidence that my client was born in the

09:12:51  3  middle of 13 children in Mexico in a little town outside of Nuevo

09:12:57  4  Laredo.

09:12:58  5          His dad was in the farming and ranching business.  They

09:13:01  6  weren't wealthy, but they could put food on the table for all

09:13:05  7  those kids.  Remember Jose's right in the middle.  Jose was tight

09:13:09  8  with his dad.  His dad knew horses, his dad knew cattle, and

09:13:14  9  that's what Jose did.  His dad basically managed two large farms

09:13:17  10  down there.

09:13:19  11          Jose works hard.  You're going to hear, over and over,

09:13:23  12  from every single witness that Jose is an incredibly hard-working

09:13:28  13  guy.  He is not a slacker.  He works seven days a week, all the

09:13:33  14  time.  You're going to hear he's not some drug-dealing,

09:13:37  15  spendthrift guy going to topless joints.  He lived in a little

09:13:41  16  house with his wife and their four children, just outside of

09:13:46  17  Dallas, little ranch house worth about $40,000, maybe.  Drive

09:13:53  18  beat-up cars, beat-up trucks.  You're not going to hear about

09:13:57  19  Porsches and Lamborghinis, you know, all kinds of cash, because

09:14:01  20  that's not Jose.

09:14:02  21          Jose comes to the United States many years ago,

09:14:10  22  legally, learns the English language, and ultimately becomes a

09:14:16  23  United States citizen about ten years ago.  And as y'all probably

09:14:20  24  know, they don't just give citizenship away anymore.  They do

09:14:24  25  background checks.  If you're assaulting your wife, if you're

| | |
|---|---|
| 09:14:28 | 1 committing mayhem, you're not going to get naturalized.  Jose was |
| 09:14:34 | 2 naturalized. |
| 09:14:36 | 3 He was a mason, which is a fancy way of saying a |
| 09:14:40 | 4 bricklayer, and he busted his tail and made about 35 to $40,000 |
| 09:14:45 | 5 for a number of years.  But Jose's passion other than his family, |
| 09:14:52 | 6 his passion is horses.  And you are going to hear from all sorts |
| 09:14:57 | 7 of horse people that Jose knew his stuff.  He was consulting with |
| 09:15:03 | 8 veterinary doctors and Texas A & M, at U.T. Dallas, at TCU, at |
| 09:15:10 | 9 SMU, all over the place, everything from what you feed a horse, |
| 09:15:15 | 10 how do you take care of a horse, how do you breed a horse, all of |
| 09:15:18 | 11 that stuff.  This isn't some front.  This is a legitimate, real |
| 09:15:23 | 12 business with real horses, real assets, built on the sweat of my |
| 09:15:32 | 13 client and his wife.  That's what you're going to hear. |
| 09:15:39 | 14 The big break that Jose got, he and his wife saved up |
| 09:15:43 | 15 money and bought this horse that you're going to hear a whole lot |
| 09:15:45 | 16 about, Tempting Dash.  Good horse.  Jose got a good deal on it. |
| 09:15:51 | 17 I think he paid, you know, 30,000, or something like that, and |
| 09:15:55 | 18 this horse could run and this horse did run and did win.  Quite a |
| 09:16:01 | 19 bit of money, as Mr. Gardner said.  Did Jose go out and just |
| 09:16:05 | 20 fritter the money away on wine, women and song?  No.  What did he |
| 09:16:09 | 21 do?  He invested it.  He saved it.  He saved it. |
| 09:16:13 | 22 They buy another horse.  And you're going to hear about |
| 09:16:15 | 23 a lot of horses.  Let me tell you something, a bunch of these |
| 09:16:18 | 24 horses were bought for, like, 400 bucks, 500 bucks, 800 bucks. |
| 09:16:23 | 25 And a whole bunch of these horses, especially the ones up in |

09:16:26  1  Oklahoma, didn't even belong to Jose.  He was taking care of

09:16:31  2  them.  He was trying to breed them.  He did not own them.  And

09:16:37  3  you're going to hear all about that from a lot of different

09:16:40  4  people.

09:16:40  5          You're going to hear from people that are in horse, you

09:16:43  6  know, racing magazines, horse weeklies, and all kinds of stuff.

09:16:48  7  And I'm going to ask them, hey, was he a legitimate horseman or

09:16:51  8  is this just some front, some fake deal to, quote, launder money?

09:16:56  9  They're going to say, oh, no, Jose cared for his horses, he loved

09:16:59  10  his horses, he knew how to train, how to breed horses.

09:17:04  11          And you're going to hear that, at some point, Tempting

09:17:08  12  Dash, this stud, if you will, got what's call a tickborne

09:17:13  13  disease.  It's got a fancy name that you'll hear about.  I can't

09:17:15  14  even remember what it is.  But it really diminished the value of

09:17:19  15  the horse because basically, they had to quarantine it.  You

09:17:23  16  couldn't race it anymore because it had this disease.  If

09:17:25  17  anybody's got any horse sense, you'll probably know what I'm

09:17:29  18  talking about.

09:17:29  19          Nevertheless, Jose kept working and working and working

09:17:32  20  and working.  During this time, occasionally, Jose would go --

09:17:37  21  you know, he's a U.S. citizen, right?  Just like you and me, he's

09:17:40  22  got a passport.  He could go to Mexico to visit his family.  He's

09:17:44  23  got a lot of family down there.  Good grief, 13 brothers and

09:17:46  24  sisters, or 12.  Every single time he crossed the border coming

09:17:50  25  back into los Estados Unidos, what would happen?  Oh, we know who

09:17:57 1   your brothers are.  Come with me.  Let's have a little chitchat

09:18:03 2   about your brothers, every single time.

09:18:06 3        What did they say?  Your brothers are bad dudes and

09:18:10 4   you're related.  We're going to get you.  We're going to get you.

09:18:16 5   They did the same thing to his mom, 70 years old.  You're going

09:18:20 6   to hear from her on the witness stand.  Little old mom coming

09:18:23 7   through, coming back to the states.  We know who your sons are.

09:18:28 8   You don't get to go through the express lane.  Come on over here

09:18:31 9   and let's have a little voluntary chitchat for an hour or so.

09:18:36 10        This is all about the brothers.  They couldn't get the

09:18:41 11  brothers, boy, they wanted the $8 million bounty.  So who are we

09:18:48 12  going to get?  Let's get the low-hanging fruit.  Let's get Jose,

09:18:51 13  the brother, who's busting his tail raising his family, paying

09:18:56 14  his taxes, no criminal history, ever.

09:19:04 15        And you hear about money laundering and drug dealing

09:19:08 16  and gangs.  What sort of evidence would you expect to hear and

09:19:12 17  see in a drug-dealing, money laundering, violent crime cartel

09:19:17 18  case?  Bunch of cash maybe?  Drugs maybe?  Guns maybe?  Wiretap

09:19:27 19  evidence maybe?  Oh, wait, there is wiretap evidence, and you're

09:19:34 20  going to hear about that because it helps Jose.  Doesn't hurt

09:19:37 21  him.

09:19:38 22        And in a wiretap, folks, here's how that works.  The

09:19:41 23  federal government says, we suspect somebody's doing something

09:19:44 24  they shouldn't be doing.  They swear out an affidavit in front of

09:19:46 25  a federal judge, like Judge Sparks, or a federal magistrate.

09:19:51  1  They can tap your phone so that if I call you and there's a

09:19:55  2  wiretap, you don't know it's being recorded and I don't know it's

09:19:58  3  being recorded.  What's the value in that?  Well, if you don't

09:20:02  4  know you're being recorded, maybe you'll tell the truth.

09:20:05  5       The truth is the guys on the phone are saying, Jose's

09:20:09  6  innocent, he's clean, he's a hard-working, ordinary dude.  That's

09:20:14  7  the evidence.  There's also something else the government can do.

09:20:21  8  Consensual recordings, okay?

09:20:23  9       Let's say that the Feds come after me and say, Finn, we

09:20:27  10 think you're doing something wrong, we think you might know some

09:20:29  11 other people that are, too.  Do us a favor, make the phone call

09:20:33  12 to that person, and we, the FBI, will listen in and record it.

09:20:39  13 That's another form of evidence.  Are you going to hear anything

09:20:43  14 like that on Jose?  (Moves head side to side.)  No guns, no

09:20:46  15 money, no cash.  Title III wiretaps help us.  Consensual

09:20:52  16 recordings.  You're going to hear about Jose talking about

09:20:54  17 horses, real horses, the price of feed, the price of a stud fee,

09:21:01  18 talking horses.

09:21:02  19      And I'm going to use -- ask you, as Mr. Gardner said,

09:21:06  20 use your common sense, use your horse sense.  Ask yourself, what

09:21:12  21 would I expect to see in a big-time money-laundering case?  You

09:21:17  22 ain't going to hear it here.  They're going to ask you to guess

09:21:21  23 him guilty because of the brothers.

09:21:26  24      Every single time the Feds came to Jose, hey, Jose,

09:21:32  25 want to have a little chat?  Whatever you say, come on in.  Hey,

09:21:38  1   we searched your car, your pickup truck, your house, your ranch,

09:21:42  2   your farm.  Come on in, guys.  Don't even need to get a search

09:21:47  3   warrant.  Come on in.  Boy, that sure sounds like a guilty

09:21:55  4   person, doesn't it?  Somebody who's not talking crime on the

09:21:58  5   phone with a wiretap or a consensual.  Somebody that says come on

09:22:02  6   in.  Somebody that gets harassed at the border every time he

09:22:05  7   comes into the country because of his brothers.  Somebody who's a

09:22:07  8   U.S. citizen.  Somebody with no criminal history.

09:22:12  9         So you're asking yourself, then, why the heck are we

09:22:15  10  here?  Two words:  The brothers.  And these brothers may be bad

09:22:24  11  dudes.  I don't know.  They may be just despicable gangsters,

09:22:30  12  responsible for all kind of mayhem south of the border.  That may

09:22:34  13  all be true.  I don't know.  I've never met them.  But I'm a

09:22:41  14  person, you know, I know why we're here.  You don't get an $8

09:22:45  15  million bounty on your head for going to church every day, do

09:22:47  16  you?  No.  And that is why we're here.

09:22:49  17         What other kind of evidence would you expect to see?

09:22:57  18  Maybe some fingerprints?  Right?  Maybe some kind of DNA?  Maybe

09:23:02  19  some surveillance videos, maybe some recordings.  You know, they

09:23:08  20  can do trash runs.  I don't know if y'all knew this.  They can go

09:23:11  21  by and pick up your trash and go through the trash to find

09:23:13  22  evidence.  They could do financial analysis.

09:23:19  23         Oh, by the way, you know, all these ill-gotten gains

09:23:23  24  that Jose supposedly made, well, he paid taxes.  Boy, that sounds

09:23:29  25  like a criminal, doesn't it?  No criminal history.  Just going to

| | |
|---|---|
| 09:23:34 | 1 |
| 09:23:37 | 2 |

wake up one day and say, hey, I'm going to launder money for the
Zetas.  Bologna.

Mr. Gardner also referenced, I think, a dry clean.
Remember that example?  Let me tell you something.  I don't know
about you, but when I take my shirts and my suit in to get
dry-cleaned, I pick them up.  I don't just leave them at the dry
cleaners.  The money didn't go back.  It's clean money.  It
didn't go back.  That would be like me going to Mexico to the
Zetas.  It's like a one-way dry cleaners, you drop it off and
then, just leave it.  Don't ever come back.  It's not very good
cleaning.  It's a one-way street, allegedly.

And I'm going to ask y'all to keep your eye on the ball
because the government's going to be talking Zeta, mayhem,
beheadings, cartels, oh, my -- the sky's falling.  That ain't why
we're here.  Don't be prejudiced by the shock and, ah, Zeta,
Zeta, Zeta, mayhem, murders, beheadings.  And unlike the Judge's
crystal ball where you look through it and everything is
upsidedown, when you look at this evidence, the end of the day,
everything is going to be right-side-up.  And you are going to
say, man, I don't know.  I just don't know.  They didn't prove
it.

You know, I was expecting to hear maybe a confession,
maybe DNA, maybe fingerprint persons, maybe guns, maybe money,
something other than a bunch of paid confidential informants who
have every reason to say whatever the government wants.  And the

| 09:25:28 | 1 | Judge will instruct you, ladies and gentlemen of the jury, right |

Judge will instruct you, ladies and gentlemen of the jury, right
before you deliberate, you are to weigh the credibility of this
informant or snitch testimony with great care. Why? It's
inherently unreliable. Why? They want something.

They want a reduced sentence. They want their case
dismissed, which, oh, by the way, they've done. They want to
stay in the U.S. They're getting paid and they're not telling
their probation department they're getting paid. They're not
paying taxes on what they're being paid. They're liars. And the
government is going to ask you to hang your hat on a bunch of
confidential informants, which, frankly, we found out their names
yesterday when you did. Yesterday.

So if you think that we knew or that I knew -- I can't
speak for everyone else -- who these confidential informants are,
I found out yesterday --

MR. GARDNER: Excuse me, your Honor, I'm going to
object to this point. We disclosed all those names to all
defendants' attorneys on Friday. That's a misstatement of facts.

MR. FINN: Okay. Excuse me, your Honor, let me
rephrase. Friday before a Monday trial. And I am from Dallas
and I'm driving down here, and I don't know who the heck I'm
going to be cross-examining. Boy, confidential informants. And
this -- you're going to love this.

One of the government's witnesses is a guy named Tyler
Graham, okay? You heard us talking yesterday about his dad, Dr.

09:25:28  1  Judge will instruct you, ladies and gentlemen of the jury, right
09:25:31  2  before you deliberate, you are to weigh the credibility of this
09:25:36  3  informant or snitch testimony with great care. Why? It's
09:25:40  4  inherently unreliable. Why? They want something.
09:25:47  5         They want a reduced sentence. They want their case
09:25:50  6  dismissed, which, oh, by the way, they've done. They want to
09:25:55  7  stay in the U.S. They're getting paid and they're not telling
09:26:00  8  their probation department they're getting paid. They're not
09:26:03  9  paying taxes on what they're being paid. They're liars. And the
09:26:09  10  government is going to ask you to hang your hat on a bunch of
09:26:15  11  confidential informants, which, frankly, we found out their names
09:26:20  12  yesterday when you did. Yesterday.
09:26:24  13         So if you think that we knew or that I knew -- I can't
09:26:28  14  speak for everyone else -- who these confidential informants are,
09:26:32  15  I found out yesterday --
09:26:34  16         MR. GARDNER: Excuse me, your Honor, I'm going to
09:26:36  17  object to this point. We disclosed all those names to all
09:26:38  18  defendants' attorneys on Friday. That's a misstatement of facts.
09:26:41  19         MR. FINN: Okay. Excuse me, your Honor, let me
09:26:43  20  rephrase. Friday before a Monday trial. And I am from Dallas
09:26:46  21  and I'm driving down here, and I don't know who the heck I'm
09:26:49  22  going to be cross-examining. Boy, confidential informants. And
09:26:58  23  this -- you're going to love this.
09:27:00  24         One of the government's witnesses is a guy named Tyler
09:27:04  25  Graham, okay? You heard us talking yesterday about his dad, Dr.

| | | |
|---|---|---|
| 09:27:07 | 1 | Graham, who is a big vet -- who is a big vet.  Owns a bunch of |
| 09:27:12 | 2 | horses in the area, et cetera, et cetera.  Initially, this Dr. |
| 09:27:15 | 3 | Graham kind of took Jose under his wing and kind of mentored him |
| 09:27:18 | 4 | and helped him build his business.  But Jose got to be so dad-gum |
| 09:27:22 | 5 | good at his business that he became a threat to Dr. Graham, and |
| 09:27:26 | 6 | Dr. Graham more or less ran him out of town.  That's why Jose, |
| 09:27:29 | 7 | you'll hear about this, why he went to Oklahoma to get away from |
| 09:27:33 | 8 | Dr. Graham because Dr. Graham was getting P-O-ed at him, okay? |
| 09:27:39 | 9 | Because, you know, you can make money in the horse |
| 09:27:41 | 10 | business.  I didn't know that till I started this case, but |
| 09:27:44 | 11 | evidently, you can.  You know, it's, what do they call it, the |
| 09:27:47 | 12 | team sport or something like that. |
| 09:27:48 | 13 | So, anyway, Dr. Graham has a grandson, Tyler Graham, |
| 09:27:54 | 14 | one of the government's witnesses.  They're going to call Tyler |
| 09:27:58 | 15 | Graham, hey, Mr. Graham, what do you know about Jose |
| 09:28:01 | 16 | Trevino-Morales?  And he's going to say whatever he's going to |
| 09:28:03 | 17 | say.  And I'm going to ask him, hey, buddy, you know what |
| 09:28:10 | 18 | structuring is?  What do you mean?  I got your records that show |
| 09:28:17 | 19 | a whole boatload of 9,000, 9,000 9,000, 9,000, 9,000, 9,000 |
| 09:28:24 | 20 | deposits made by you in cash.  Remember Mr. Gardner just told |
| 09:28:27 | 21 | you, that's structuring.  Their own witness is guilty of |
| 09:28:32 | 22 | structuring and he's up to his eyeballs in this.  But you don't |
| 09:28:37 | 23 | see him in the courtroom anywhere.  Tyler Graham?  Tyler?  Him. |
| 09:28:45 | 24 | THE COURT:  Okay.  That's enough.  There are no |
| 09:28:48 | 25 | objections, but let's stay with opening statement. |

09:28:52  1           MR. FINN:  He's a white guy.

09:28:54  2           MR. GARDNER:  Your Honor, I'm going to object to that.

09:28:57  3  That is uncalled for.  That is a violation of the Court's motion

09:29:01  4  in limine.

09:29:02  5           THE COURT:  You've violated the Court's motion in

09:29:05  6  limine.  I sustain the objection.  Make your opening statement.

09:29:09  7  All people in this courtroom, including the defendants, have

09:29:12  8  equal rights, no matter what their race or background is.  And I

09:29:17  9  strike those remarks.  Now, proceed.

09:29:20  10          MR. FINN:  Thank you, your Honor.

09:29:21  11          THE COURT:  You're welcome.

09:29:21  12          MR. FINN:  When Tyler Graham comes to court, you can

09:29:24  13  size him up.

09:29:36  14          The Judge will give you, and the government just told

09:29:38  15  you, what proof beyond a reasonable doubt is.  If those of you

09:29:43  16  that have previous jury service -- and I know some of you did --

09:29:47  17  if it was a state case, there's no definition for what a

09:29:50  18  reasonable doubt is.  The Judge will basically say, it's whatever

09:29:53  19  you think it is.  If you think the government proved the case,

09:29:56  20  the state proved the case, you convict, if not, you vote not

09:30:00  21  guilty.  Fortunately, in the federal system, there is a

09:30:03  22  definition.

09:30:03  23          Proof beyond a reasonable doubt is a doubt based on all

09:30:07  24  the evidence, after a careful and impartial consideration of the

09:30:12  25  evidence that will cause a reasonable person to hesitate to act

| | | |
|---|---|---|
| 09:30:18 | 1 | in the most important of your own affairs.  Sounds like it's |
| 09:30:22 | 2 | drafted by lawyers, right?  Yeah.  Probably was.  Here's what it |
| 09:30:25 | 3 | means.  Identify something that's dad-gum, top-of-the-list |
| 09:30:28 | 4 | important for you, whether you get married, whether you start a |
| 09:30:32 | 5 | family, whether to put a loved one in assisted living facility, |
| 09:30:37 | 6 | something top-of-the-line important. |
| 09:30:39 | 7 | And when this case is over, ask yourself, would you put |
| 09:30:45 | 8 | mom or dad in assisted living or take them out, on or off life |
| 09:30:49 | 9 | support, get married, have a child, something really, really |
| 09:30:52 | 10 | important -- |
| 09:30:52 | 11 | MR. GARDNER:  Excuse me, Mr. Finn.  Your Honor, I'm |
| 09:30:54 | 12 | going to object again.  The Court will give them a reasonable |
| 09:30:56 | 13 | doubt instruction.  He's exceeding the bounds of that legal |
| 09:30:59 | 14 | definition. |
| 09:31:00 | 15 | MR. FINN:  It's just the definition they put on the |
| 09:31:02 | 16 | board, Judge.  That is the definition. |
| 09:31:06 | 17 | THE COURT:  I will give the jury the definition of |
| 09:31:10 | 18 | reasonable doubt. |
| 09:31:10 | 19 | MR. FINN:  Okay.  Would you hesitate to act in the most |
| 09:31:14 | 20 | important of your own affairs?  No way.  It's going to be an |
| 09:31:24 | 21 | interesting trial.  Thank you. |
| 09:31:26 | 22 | THE COURT:  Mr. DeGeurin. |
| 09:31:36 | 23 | DEFENDANT COLORADO-CESSA'S OPENING STATEMENTS |
| 09:31:51 | 24 | MR. DEGEURIN:  Thank you, your Honor. |
| 09:32:02 | 25 | I didn't realize we had this up here.  Is there buttons |

09:32:11  1    I need to push if I'm going to use this?

09:33:10  2          Mike DeGeurin.  I represent Defendant Francisco

09:33:15  3    Colorado.  Remember I introduced you to Andres Sanchez.  He and I

09:33:23  4    represent him together.  Andres is my partner in Houston.  John

09:33:29  5    Parras, another Houston lawyer.  By the way, I was born in

09:33:36  6    Austin.  I transplanted to Houston.  Mr. Andy Parker.  He is

09:33:42  7    another lawyer.  The four of us are representing Mr. Colorado.

09:33:48  8    Mr. Juan Manuel Torres, he is from Mexico City.  Mexico City

09:33:54  9    lawyer.  He's Mr. Colorado's Mexican lawyer.

09:34:00  10          I don't want you to -- and I'm sure you won't.  But the

09:34:06  11    fact that Mr. Colorado has five lawyers here is not a negative

09:34:13  12    thing.  If you were accused of a crime and you're innocent, you

09:34:24  13    would do everything you could to assure that you had a fair

09:34:28  14    trial, fair representation so that a jury could acquit you.  You

09:34:35  15    know, the Judge gave you a long -- a very good explanation

09:34:41  16    yesterday about the importance of a jury.  He gave you the

09:34:48  17    history of how the concept of a jury came about and how we have

09:34:55  18    preserved the concept of a jury.

09:34:59  19          A lot of history I had even forgotten or didn't even

09:35:03  20    know myself.  I did know the importance of a jury.  And what he

09:35:10  21    told you and what I want to remind you of as we begin this trial

09:35:16  22    is that we have many in the United States, we have many different

09:35:24  23    not roadblocks but protections to ensure that no possibly

09:35:32  24    innocent person is convicted and loses his liberty.  And there's

09:35:40  25    several along the way.  I won't go through each one.

09:35:45   1        But one right we have -- and the Judge explained it to

09:35:48   2   you yesterday -- is our right to be told if we're accused, what

09:35:56   3   we're accused of, specifically, and we call that an indictment.

09:36:03   4   We have a right.  The government to write out exactly what you

09:36:09   5   say I did that's against the law.

09:36:13   6        And you heard -- I timed it for almost 20 minutes

09:36:19   7   yesterday.  You heard from Mr. Gardner and Ms. -- excuse me.

09:36:24   8        MS. FERNALD:  Fernald.

09:36:26   9        MR. DEGEURIN:  Oh, Fernald.  It's French.  Ms. Fernald,

09:36:30   10  together they read specifically -- not that these are general --

09:36:36   11  generally criminals are something, but here's specifically what

09:36:40   12  it alleges.  And that's very important.  And at the end of the

09:36:44   13  trial, the Judge will come and narrow it down again, and he'll

09:36:47   14  tell you at the and, they're not charged with this, they're

09:36:52   15  charged with this.  These specific things.  And before you would

09:37:00   16  be entitled or able to convict, you're going to have to find each

09:37:06   17  one of these elements proved from the witness stand, each one of

09:37:13   18  those elements beyond a reasonable doubt.  So here's where the

09:37:17   19  jury comes in.

09:37:18   20       After we've gone through the entire system -- and one

09:37:23   21  part of the system is this trial we have right now.  Not only do

09:37:30   22  we have a right to a jury, but we also have a right to make sure

09:37:39   23  that the evidence you have, that you receive is not highly

09:37:43   24  prejudicial without probative value.  Something to just either

09:37:48   25  scare you or to make you mad.  And the Judge is going to run

09:37:54    1   referee over that.  As he said, if there's a possibility that

09:37:57    2   something should not come into evidence so that you have a clear

09:38:01    3   head and a clear basis to make your decision, he'll rule on it,

09:38:06    4   yes or no.

09:38:08    5          And I'm going to take just a moment and ask you, if I

09:38:15    6   make an objection, as you have seen me do, and the Judge

09:38:24    7   overrules me, the Judge has already told you, don't hold that

09:38:29    8   against me.  I have an obligation to make that objection.  But,

09:38:32    9   number two, I'm going to ask you if you get upset with me, if you

09:38:37   10   think I'm asking too many questions, if you think I'm out of

09:38:43   11   line, hold it against me, not Mr. Francisco Colorado, because

09:38:49   12   he's putting all of his trust in me to protect him in this trial.

09:38:55   13          So in the end, the last protection that an accused has

09:39:06   14   is the jury.  The jury is not burdened with prosecution.  You

09:39:16   15   have no duty to try to put a case together.  Your duty is just

09:39:19   16   the opposite.  Your duty is to be skeptical of a witness'

09:39:25   17   testimony, not take it just because he says it.  Say so, don't

09:39:31   18   make it so.  You'll be --

09:39:35   19          THE COURT:  Mr. DeGeurin, I'll give them instructions

09:39:37   20   on what their duties are.  If you'll just make your opening

09:39:40   21   statements, please.

09:39:42   22          MR. DEGEURIN:  So in the end, your last protection to a

09:39:47   23   citizen.  Everything else is -- that's one of them you'll be

09:39:52   24   called upon to do at the end of the trial.

09:39:55   25          Now, what you will hear during the trial about Mr.

09:40:03  1   Francisco Colorado is that, yes, he is, indeed, the owner of an

09:40:11  2   oil environmental remediation company in Mexico.  He's been in

09:40:21  3   the oil-related business for many, many years.  He is married.

09:40:29  4   He has a wife that was introduced to you yesterday.  He has four

09:40:34  5   children.  He was raised -- his father was a very respected

09:40:41  6   lawyer in Mexico, so he had somewhat of a fortunate upbringing.

09:40:52  7   They had a ranch.  They had, relatively speaking, a comfortable,

09:40:57  8   wealthy upbringing as a child.

09:41:01  9          And he was raised around and felt a great love for

09:41:06  10  horses by virtue of -- you'll have during the trial, you'll hear

09:41:12  11  testimony about Mr. Colorado when he was six or eight years old

09:41:21  12  having a big connection with horses.  The reasons that you'll

09:41:24  13  hear during the trial that he could communicate his problem with

09:41:33  14  the horses and the horses would listen.  And that love for horses

09:41:38  15  followed him all the way up through his professional career as an

09:41:43  16  oil environmental remediator.

09:41:49  17         This picture, for example, that you see, you saw up

09:41:52  18  there was a sample of there was an oil spill in Mexico.  This is

09:42:01  19  -- these are his employees in orange.  They were called out on

09:42:07  20  emergency basis to clean up the rivers in Mexico.  That river,

09:42:12  21  cleaned the oil out of the river.  Very, very growing

09:42:22  22  consciousness in Mexico of environmental concerns.

09:42:26  23         And so, back in the early 2000s and before, he was

09:42:31  24  developing a company that dealt with environmental concerns

09:42:39  25  caused by the oil company.  ADT.  It's not a, quote, front

09:42:46  1  company of some drug organization.  It is a real company with

09:42:52  2  real employees.  Many, many employees.

09:42:57  3          There's Mr. Colorado out on the -- these are some of

09:43:02  4  his more -- employees he's proud of.  You're going to find out --

09:43:09  5  could we look at the contract -- by the way, just leave that

09:43:13  6  picture up for a second.  His office is -- you can actually look

09:43:24  7  out across the window from his office to his ranch where he has

09:43:31  8  many horses.  He's gone a long way.  And I just happened to

09:43:36  9  notice last night that just even in his office, you'll see

09:43:40  10  pictures of horses because he has a love of horses, and you're

09:43:44  11  going to see how this fits in.

09:43:47  12          You're going to see why the government might look at

09:43:53  13  some facts and be suspicious of Mr. Colorado's activities, and

09:44:03  14  you're going to find out, in the end, that they got it wrong.

09:44:09  15  They're just wrong about Mr. Francisco Colorado.  Can we look at

09:44:13  16  the contracts?  This is an example and I just took a picture

09:44:19  17  going back to 2003.

09:44:27  18          In 2003, he obtained a contract of 58,000 -- 58,888,

09:44:39  19  something like that, from Pemex Oil Company, which is the

09:44:42  20  national oil company of Mexico.  Unlike the United States, all

09:44:48  21  oil production is considered a national asset, and so, it's run

09:44:56  22  by a national company called Pemex.  Won't tell you the full name

09:45:02  23  but Pemex.  You'll hear a lot about that.  Pemex being a public

09:45:11  24  and nationally owned and controlled corporation takes bids from

09:45:20  25  people that are going to seek a contract with their companies.

| | | |
|---|---|---|
| 09:45:25 | 1 | So when they have an immediate oil spill like this and |
| 09:45:29 | 2 | they're going to hire some company to clean up that mess that was |
| 09:45:32 | 3 | made, there's a bidding process, and the bidding process has been |
| 09:45:38 | 4 | sent up over a period of time to try to make it as fair as |
| 09:45:41 | 5 | possible, and there is no local influence about who gets the |
| 09:45:49 | 6 | bids.  The bidding process is open, public.  There's a committee |
| 09:45:55 | 7 | that's made up of both national people, Mexico City, people in |
| 09:46:04 | 8 | Pemex at the various locations they own, the board of directors. |
| 09:46:11 | 9 | A civilian group has members on the board, kind of like a |
| 09:46:21 | 10 | nongovernmental organization transparency group to make sure that |
| 09:46:24 | 11 | no one is getting bids called bribery or something like that. |
| 09:46:29 | 12 | They have a lot of protection built in. |
| 09:46:32 | 13 | Now, I'm giving you this example because these are |
| 09:46:38 | 14 | contracts that he won.  He makes bids on many contracts.  These |
| 09:46:47 | 15 | are the ones he actually won.  In 2004, $7,820,000 contract.  In |
| 09:46:56 | 16 | 2005, 12.  2006, 49 million.  2007, 35 million.  2008, 15.  2009, |
| 09:47:08 | 17 | $237 million contract.  2010, 15 million.  2011, 81 million. |
| 09:47:21 | 18 | Now, this type of tremendous wealth, of course, it cost |
| 09:47:35 | 19 | a lot of money to service these contracts, but the net of -- to |
| 09:47:42 | 20 | Mr. Colorado as he's doing his contracts and I'm going to |
| 09:47:48 | 21 | estimate right now -- you'll hear testimony about it -- is well |
| 09:47:52 | 22 | over $100 million. |
| 09:47:57 | 23 | Now, what does Mr. Colorado do with his money?  He |
| 09:48:03 | 24 | hasn't forgotten.  I won't say that.  He believes that he has |
| 09:48:14 | 25 | been fortunate, whether you want to say blessed.  He's a hard, |

09:48:19   1   hard, hard worker.  You'll see in the photographs.  You've seen

09:48:23   2   the photographs of him out in the field, actually in the water

09:48:27   3   helping the people, but he hadn't forgotten and it gives him

09:48:36   4   pleasure and he feels like it's his duty to help others.

09:48:45   5        And one of the things he's done is he started a little

09:48:52   6   ranch called Los Angelitos.  We have a picture of that, Andres?

09:49:11   7   Los Angelitos is a ranch that he started, totally funded it

09:49:19   8   himself.  It's free to all mothers that have autistic children.

09:49:28   9   They determine and found out that autistic children have a

09:49:32  10   special connection with horses.  When he learned this, he's known

09:49:38  11   it for a while and he's had -- without going into all the

09:49:42  12   background of why he knows these things.  He started a ranch and

09:49:48  13   he's donated a horse for every child that has autism.  Comes to

09:49:55  14   the ranch and then, he found out who is the best person in the

09:50:04  15   world that knows how to deal with children and horses and autism

09:50:08  16   and other challenged children, and he learned the person is --

09:50:13  17        MR. GARDNER:  Mr. DeGeurin, your Honor, I'm going to

09:50:15  18   have to object at this point.  We're getting a little far afield

09:50:18  19   of what his opening statement --

09:50:19  20        THE COURT:  I sustain the objection.

09:50:20  21        MR. DEGEURIN:  Oh, no.  I have witnesses to testify to

09:50:22  22   this.  I expect them to see --

09:50:24  23        THE COURT:  We're not going to need to testify if you

09:50:26  24   keep going.

09:50:27  25        MR. DEGEURIN:  Okay.

| | | |
|---|---|---|
| 09:50:29 | 1 | THE COURT:  I sustain the objection.  Let's get back to |
| 09:50:31 | 2 | the issues in this case. |
| 09:50:33 | 3 | MR. DEGEURIN:  This year was the first anniversary of |
| 09:50:37 | 4 | Los Angelitos.  And what you're going to see from this is you're |
| 09:50:43 | 5 | going to find out they're painting a picture of Mr. Colorado as |
| 09:50:47 | 6 | being a bad person.  You're going to find out Mr. Colorado is |
| 09:50:53 | 7 | somebody you're going to say, wow, I like this person.  He is a |
| 09:51:01 | 8 | great guy and he helps others.  You're going to have testimony -- |
| 09:51:08 | 9 | you know -- well, you're going to have testimony that he started |
| 09:51:19 | 10 | an engineering school for employees free. |
| 09:51:25 | 11 | MR. GARDNER:  Your Honor, again, this is getting into |
| 09:51:27 | 12 | some good character, again, far afield what he's going to present |
| 09:51:31 | 13 | as evidence.  We object. |
| 09:51:32 | 14 | MR. DEGEURIN:  There is going to be a character |
| 09:51:34 | 15 | witness, Judge. |
| 09:51:35 | 16 | THE COURT:  Well, then, let's tell the jury generally |
| 09:51:39 | 17 | what your contentions are and let them hear the evidence. |
| 09:51:44 | 18 | MR. DEGEURIN:  All right.  I thought I was supposed to |
| 09:51:48 | 19 | talk about what was going to be said -- what I expect to be said, |
| 09:51:52 | 20 | not my impression.  But I'll do it either way. |
| 09:51:58 | 21 | All right.  You will hear testimony about one of the |
| 09:52:04 | 22 | schools he started.  It's called -- it's an engineering school. |
| 09:52:09 | 23 | It's free. |
| 09:52:09 | 24 | MR. GARDNER:  Mr. DeGeurin, again, I apologize for |
| 09:52:11 | 25 | interrupting.  Your Honor, again, same objection. |

09:52:13  1        MR. DEGEURIN:  Judge, I'm sorry, I really don't

09:52:15  2   understand the objection.  I'm not trying to do something I'm not

09:52:18  3   supposed to do.  I thought this -- I'm doing exactly what I'm

09:52:21  4   supposed to do.

09:52:22  5        THE COURT:  Well, everybody that has preceded you has

09:52:28  6   made an argument, so I let you just do whatever you want.  But

09:52:33  7   the jury is interested in evidence.  They want to know the

09:52:38  8   contentions of the parties so that they can absorb the evidence

09:52:42  9   as you lawyers put it on there.

09:52:45  10        MR. DEGEURIN:  Okay.

09:52:47  11        THE COURT:  But as I've already told them, that the

09:52:49  12   lawyers are not witnesses and that what you tell them is not

09:52:53  13   evidence.  So what you should do is to tell them who is going to

09:53:00  14   testify and what they're going to testify on so that when you

09:53:04  15   call that person, they will expect to know what type of testimony

09:53:11  16   he's going to give or she's going to give.

09:53:14  17        MR. DEGEURIN:  Well, that's the problem with going

09:53:17  18   third.  A lot of people had more leeway, I suppose, and you're

09:53:20  19   giving -- giving me a little leeway.  But I'll try to do it more

09:53:25  20   specifically.  Okay.

09:53:28  21        Albert Gomez will testify and he is a person in Mexico.

09:53:39  22   Happens to be the publisher of the national magazine for horses

09:53:42  23   international, and he will testify about Los Angelitos and some

09:53:47  24   other matters about the recognition of Mr. Colorado and his

09:53:53  25   connection with horses in Mexico.

09:53:58    1        Alfredo Guzman-Baldizan will testify about being on the
09:54:03    2   committee and at Pemex, and awarding contracts, and how they're
09:54:13    3   awarded, and the fairness of them, and the excellent, superior
09:54:20    4   work that ADT, Francisco Colorado's business in Mexico, what it
09:54:28    5   does and what it does for the environment in Mexico.

09:54:33    6        There will be another witness, David Robillard.  He is
09:54:39    7   a -- he has a international company that does due diligence
09:54:45    8   analysis for international companies like ADT, because ADT not
09:54:53    9   only works in Mexico, it has Canadian connections in other
09:54:57   10   places.  And he will testify about his account -- his analysis of
09:55:04   11   ADT and legitimacy of not only the health of that company and the
09:55:12   12   legitimacy of its contracts and its completed business and the
09:55:19   13   money expected in the future, payments for the work that ADT
09:55:24   14   does.

09:55:26   15        You've heard a little bit of testimony -- a little
09:55:37   16   anticipation from the statements about the Los Zetas, a dangerous
09:55:43   17   group in Mexico and threats, bribery and other stuff, drug
09:55:49   18   dealings.  You're going to learn that when you're somewhat -- oh,
09:55:56   19   by the way, you'll hear testimony about Mr. Colorado building a
09:56:01   20   community, like a subdivision, but it's not a subdivision where
09:56:10   21   you build houses and you sell it and make money.  It's for the
09:56:16   22   people of his community and the people that work for him so that
09:56:21   23   they have a nice place to -- safe place to live in troubled times
09:56:25   24   in Mexico at this point.

09:56:29   25        You're going to find out from Mr. Dennis Colon that I

| | | |
|---|---|---|
| 09:56:35 | 1 | introduced yesterday to you.  He is a person that provides |
| 09:56:40 | 2 | security for Microsoft employees, Leggo, CEOs, Carlos Slim's |
| 09:56:52 | 3 | family who's the richest family in the world, I understand from |
| 09:56:55 | 4 | Forbes.  The people that are subject to bad people wanting to |
| 09:57:05 | 5 | kidnap them, extort them.  You know, once you get a public |
| 09:57:13 | 6 | figure -- Mr. Colorado is not a politician, but he becomes public |
| 09:57:20 | 7 | because ADT is everywhere now.  You see them on trucks.  Anyway, |
| 09:57:26 | 8 | they're all over the place now because they do such a good job in |
| 09:57:29 | 9 | Mexico, $238 billion contract, for example. |
| 09:57:33 | 10 | So you're going to find out from Dennis Colon that he's |
| 09:57:37 | 11 | been -- he's in charge of the security for Mr. Colorado and his |
| 09:57:43 | 12 | family to protect him from Zetas and people like that.  And |
| 09:57:51 | 13 | you're going to find out that it's very expensive, $60,000 a |
| 09:57:56 | 14 | month for protection from those people that would like to take |
| 09:58:02 | 15 | advantage of someone that has apparent wealth. |
| 09:58:07 | 16 | You're also going to hear about personal interest |
| 09:58:26 | 17 | stories, how I would call it, regretful, sad situation, and what |
| 09:58:33 | 18 | it is is you're going to hear about this person called Carlos |
| 09:58:37 | 19 | Nayen that Mr. Gardner told you about.  A person who's from |
| 09:58:45 | 20 | Mexico, "Carlitos," they call him, little Carlos.  And you're |
| 09:58:55 | 21 | going to learn from testimony that Mr. Francisco Colorado met |
| 09:59:01 | 22 | "Carlitos" or met Carlos Nayen at a race track when he was like |
| 09:59:06 | 23 | 13 or 14 years old.  And he was a boy that hung out at the race |
| 09:59:11 | 24 | tracks and he acted like he knew a lot about horses, so and so, |
| 09:59:18 | 25 | and knew Mr. Colorado because Mr. Colorado also raised horses in |

| | | |
|---|---|---|
| 09:59:26 | 1 | Mexico and won some races with horses in Mexico. |
| 09:59:30 | 2 | Eventually, after a period of time, Mr. Colorado |
| 09:59:38 | 3 | allowed Mr. Carlos Nayen to help him pick horses at auctions for |
| 09:59:48 | 4 | his horses that he was going to run in Mexico or raise in Mexico. |
| 09:59:54 | 5 | Now, not all the horses that Mr. Colorado buys are race horses. |
| 09:59:58 | 6 | You're going to find he buys some horses because, as he describes |
| 10:00:02 | 7 | them, they're noble.  They will be good horses for children. |
| 10:00:06 | 8 | Some race horses end up -- buy six or seven, as somebody said, |
| 10:00:12 | 9 | you buy a bunch and then, one or two pan out, the rest you end up |
| 10:00:17 | 10 | either selling, transferring, or using for some other situation. |
| 10:00:20 | 11 | So Carlos Nayen in one race in Saltillo, Mexico, I |
| 10:00:31 | 12 | believe it is, Mr. Colorado had three horses that won, first, |
| 10:00:40 | 13 | second, fourth in these races in Saltillo.  And so, Mr. Nayen |
| 10:00:46 | 14 | kind of proved his worth.  These are horses that he helped manage |
| 10:00:52 | 15 | and Mr. Colorado -- and Mr. Colorado learned that Mr. Nayen had |
| 10:00:56 | 16 | had a difficult childhood. |
| 10:00:59 | 17 | MR. GARDNER:  Excuse me, Mr. DeGeurin.  Your Honor, |
| 10:01:01 | 18 | again, I'm objecting.  This is a conspiracy to launder money. |
| 10:01:04 | 19 | This isn't a description of what Mr. DeGeurin believes happened. |
| 10:01:09 | 20 | It need to be a description of what he expects the testimony and |
| 10:01:12 | 21 | witnesses to bring forth. |
| 10:01:14 | 22 | MR. DEGEURIN:  That's what I think I'm doing, Judge. |
| 10:01:21 | 23 | Be gentle with me. |
| 10:01:23 | 24 | THE COURT:  I'm just going to let you go on. |
| 10:01:26 | 25 | MR. DEGEURIN:  That's being gentle. |

| | | |
|---|---|---|
| 10:01:29 | 1 | THE COURT:  Do whatever you want, but what you're |
| 10:01:31 | 2 | telling us is not helping the trial proceed because the jury |
| 10:01:34 | 3 | hadn't heard one word of evidence. |
| 10:01:36 | 4 | MR. DEGEURIN:  Well, no.  We can't give evidence. |
| 10:01:38 | 5 | THE COURT:  You're doing a good job. |
| 10:01:43 | 6 | MR. DEGEURIN:  Well, I hope that this is going to be |
| 10:01:44 | 7 | helpful that when you begin the trial, we're going to take one |
| 10:01:50 | 8 | witness at a time, and they're going to say, I'm so and so, I'm |
| 10:01:53 | 9 | an agent such and such.  And so, I think it's -- I hope that it's |
| 10:01:57 | 10 | helpful to you that you see that there is something else going |
| 10:02:01 | 11 | on.  And there's a good person over there that's been accused, as |
| 10:02:08 | 12 | is his right, he has us defending him. |
| 10:02:12 | 13 | You also will hear some testimony -- I don't know |
| 10:02:17 | 14 | exactly what it's going to be yet -- from people that are, as |
| 10:02:23 | 15 | you've been told, paid informants or paid witnesses.  And by |
| 10:02:31 | 16 | that, I'm not saying Mr. Gardner pays them money to come to |
| 10:02:34 | 17 | testify.  It's a little more complicated and complex than that, |
| 10:02:39 | 18 | you'll find.  It is with the hope the witnesses will testify that |
| 10:02:48 | 19 | their testimony will be so helpful to the government, that they |
| 10:02:53 | 20 | will get something in return in the future such as freedom or |
| 10:03:00 | 21 | non-prosecution. |
| 10:03:02 | 22 | So what it amounts to, you'll see, is that they're |
| 10:03:08 | 23 | trading testimony for something, and that's something that's so |
| 10:03:16 | 24 | repulsive to most that they're not allowed to testify unless -- |
| 10:03:23 | 25 | the Judge has ensured unless we realize and you realize what they |

10:03:26  1   expect in return for their testimony.  So they're allowed to

10:03:31  2   testify so long as you treat them with great caution and care,

10:03:36  3   knowing that they are inherently unreliable people, to be ready

10:03:44  4   for that when they come.

10:03:47  5        You're going to hear testimony that Mr. Colorado wrote

10:04:08  6   checks to purchase horses at horse auctions, big checks.  One of

10:04:19  7   them 1 million, $200,000 check to buy a group of horses.  $2

10:04:29  8   million.  Several checks over 3 or $100,000 for horses.  You're

10:04:38  9   going to find that there was money wired directly from ADT

10:04:43  10  accounts to auction houses to pay for horses.

10:04:52  11       And Mr. Gardner pointed out in his opening statement or

10:04:58  12  argument about the necessity.  He says it's very simple.  We're

10:05:08  13  not talking about a drug case, we're not talking about those

10:05:12  14  sorts of things.  We're talking about money laundering.  And he

10:05:15  15  said and the key is that when Mr. Colorado sends money to an

10:05:20  16  auction, either by wire or by check, that he knows the money is

10:05:29  17  dirty.  Another way Mr. Gardner said, he must know that the money

10:05:38  18  he's sending to buy these horses came from an illegal source.

10:05:47  19       So now, do you see why it might be important to spend

10:05:50  20  the time to talk about ADT, this wonderful company?  It's so

10:05:56  21  successful and so respected in Mexico.  When all of the funds

10:06:01  22  that Mr. Colorado is sending for these horses comes from ADT.

10:06:15  23       I don't want to wear out my welcome.  Thank you so much

10:06:17  24  for the attention, and I hope that you pay close attention during

10:06:23  25  the trial.  Thank you.

| | | |
|---|---|---|
| 10:06:24 | 1 | THE COURT:  Mr. Womack. |
| 10:06:26 | 2 | MR. WOMACK:  Thank you, your Honor. |
| 10:06:29 | 3 | DEFENDANT SOLIS-GARCIA'S OPENING STATEMENTS |
| 10:06:30 | 4 | MR. WOMACK:  Ladies and gentlemen, again, I'm Guy |
| 10:06:33 | 5 | Womack.  I represent Fernando Garcia.  I'm a Lieutenant Colonel |
| 10:06:41 | 6 | in the Marines, retired.  My young adversary here with the |
| 10:06:43 | 7 | government is Lieutenant Colonel Marines still in the reserves. |
| 10:06:47 | 8 | I tell you that because between us, we have about 40 years of |
| 10:06:50 | 9 | Marine Corps time.  One or both may slip up and use Marine Corps |
| 10:06:55 | 10 | terminology and nautical terms.  If we do, we're not talking |
| 10:06:58 | 11 | tongues.  Most of you will understand the terms.  But we will |
| 10:07:02 | 12 | try, or at least I will try to keep that at a minimum. |
| 10:07:06 | 13 | I want to tell you about Fernando Garcia and the |
| 10:07:08 | 14 | evidence you want to hear in this case regarding him.  Fernando |
| 10:07:16 | 15 | is 29 years old.  He was born and raised by his parents on a |
| 10:07:24 | 16 | cattle ranch near Mission, Texas.  He worked hard.  He learned |
| 10:07:32 | 17 | the value of hard work and the satisfaction of hard work.  And he |
| 10:07:40 | 18 | came to really love working with large animals.  When he was |
| 10:07:44 | 19 | twelve or thirteen, his family started taking him to quarter |
| 10:07:47 | 20 | horse races.  Some of you are familiar with that.  Many of you |
| 10:07:50 | 21 | are not. |
| 10:07:51 | 22 | Quarter horse racing is 100-yard dash of racing.  The |
| 10:07:57 | 23 | horses run basically a quarter mile straightaway.  It is |
| 10:08:00 | 24 | absolutely a dead-out sprint.  The horses are built differently. |
| 10:08:05 | 25 | You'll learn that quarter horses are more heavily muscled.  They |

| | |
|---|---|
| 10:08:09 | 1 |
| 10:08:14 | 2 |
| 10:08:20 | 3 |
| 10:08:23 | 4 |
| 10:08:29 | 5 |

1 have short muscles.  They are sprinters, like 100-yard dash.  Of

2 course, thoroughbreds are skinny.  They run longer distances,

3 they're distance runners.  They run faster for long distance than

4 quarter horses, but they would never run the quarter horse on a

5 quarter mile.

6 Seeing these horses and the excitement of quarter-horse

7 racing and being around them all the way through high school,

8 Fernando Garcia decided he would make that his avocation.  That

9 would be his profession, instead of working on a cattle ranch.

10 Nothing wrong with that.  He wanted to identify, buy, or be

11 around and train and race quarter horses.

12 When he graduated from high school in 2001, he went to

13 Arizona because the University of Arizona has the only university

14 program in the United States where you could get a Bachelor of

15 Science in the racing industry.  Fernando went to junior college

16 for a couple of years, got English, history and the core subjects

17 and then, transferred to the University of Arizona, and he has

18 worked since then on his Bachelor of Science in animal

19 science/racing industry, horse-racing industry.

20 In 2007, still about a semester short of his degree, he

21 had the opportunity to work in the field of horse racing and the

22 call was too strong.  He still wanted his degree, but he left it

23 with about a semester left.  You'll have his school records.  But

24 he left to go work in the industry in 2007.  Now, he hadn't yet

25 met Jose Trevino, who is a great guy to work with.  And Mr.

10:10:21   1  Colorado, another great guy to work with.

10:10:26   2          But he bought a horse, he trained it, had some success,

10:10:30   3  sold it, made a little money on it.  He developed a name because

10:10:36   4  even though he was a young kid, as opposed to Mr. Huitron, who

10:10:42   5  are extremely professional trainers, he's educated, he's been

10:10:50   6  doing it since he was a child, had a real knack for quarter

10:10:55   7  horses.  That was to be his profession.

10:11:07   8          By the way, unlike the government, this Marine doesn't

10:11:10   9  use PowerPoint.  I would -- it's too sophisticated.  I use basic

10:11:14  10  stuff like an index card.  So excuse me for not being high-tech,

10:11:20  11  but I did use a ballpoint pen, not a straight pencil.

10:11:23  12          Now, when he got into the horse-racing industry and

10:11:32  13  started having success, he formed his own company, Garcia

10:11:36  14  Bloodstock and Racing.  Mr. Gardner showed you a slide with four

10:11:43  15  companies and he said these are ones he was in charge of.  You'll

10:11:47  16  hear that that's wrong.  He owned, he is Garcia Bloodstock.  That

10:11:54  17  is his company that he trains horses for and he buys horses

10:11:57  18  through.  That is his horse-racing company.

10:12:01  19          Bonanza Stables is a company that he worked for and it

10:12:06  20  was a company that -- a legitimate horse company and he worked

10:12:10  21  for them and trained horses, and he would rent stables from them

10:12:12  22  and that kind of thing.  So he has had a connection to them.  He

10:12:16  23  worked with them.  Desiree Princess, LLC and Poker Ranch, LLC,

10:12:22  24  these are other companies that he has worked for.  They had paid

10:12:26  25  him and you'll see his records.  They had paid him to train

10:12:29   1   horses.  He doesn't own or control those companies.  But he does,

10:12:32   2   he is Garcia Bloodstock and he's proud of that.

10:12:38   3          When someone wants to buy a horse, if you have the

10:12:42   4   money to buy a really good horse, if you're someone like Mr.

10:12:47   5   Colorado or Mr. Trevino, they're experts in some things, but they

10:12:54   6   may not and they don't have the expertise in buying a horse that

10:13:00   7   young Fernando Garcia has.  If you have the money and you can

10:13:06   8   hire a professional to help you, you may hire Fernando Garcia and

10:13:11   9   you'd want him to go to auctions.  They have two or three

10:13:15  10   auctions a year, different places, Texas, Oklahoma and New

10:13:18  11   Mexico, other places.  You're going to hear about some of that.

10:13:20  12          You're going to hear that people, these gentlemen and

10:13:25  13   others would hire young Fernando to study the horses that are

10:13:29  14   coming up for sale.  About a month, a little over a month before

10:13:33  15   the sales, the auction houses put online the names of the horses,

10:13:40  16   and if you're really serious -- if you'll be spending a lot of

10:13:45  17   money, you'd better be really serious.  You look at these names.

10:13:51  18   Horse racing is very much a genetic science.  A horse born from a

10:13:59  19   slow sire will probably always be slow; and if it's born from a

10:14:03  20   really fast dam and sire, it should be really fast.  At least

10:14:09  21   that's the theory.

10:14:09  22          But Fernando, you'll learn, studied these horses for

10:14:17  23   weeks.  And one of the first things he does when he sees the name

10:14:19  24   of a horse, he goes to the records for his bloodline.  Where did

10:14:23  25   that horse come from?  Now, keep in mind, these are little

| | |
|---|---|
| 10:14:26 | 1 |
| 10:14:29 | 2 |
| 10:14:34 | 3 |
| 10:14:42 | 4 |
| 10:14:47 | 5 |
| 10:14:51 | 6 |
| 10:14:56 | 7 |

horses.  These are young horses.  These are ponies.  Some of them have not been born.  They are so small, they ain't.  They may be an embryo in utero.  Many horses bought at auction are not even yet born.  Those that are born are really young.  Months old. They might even be up to a year old.  That's pretty old to start buying a horse.  You buy them really young.  As soon as you can identify and get them at an auction.

So Fernando looks at the bloodlines, then collects all the data.  Then about a week before the actual auction, the horses are actually moved to the stables at the auction house. Just like a car auction.  You can then go and kind of kick the tires.  You can't touch the horses, you can't ride the horses, you can look at them.  You could have the horses walk and you see how they walk, do they walk straight, do they have anything that looks like an imperfection in their hips, do their knees work properly.  Just from walking, you could tell something.  You can also see how muscled it is and does it look like it could carry more weight?

They had veterinarians onsite at the big auctions, the best auctions, and you could pay them to X-ray the horse so you could look inside the animal and look at the -- are there any hidden fractures you don't know about, are the knees constructed properly.  If you really know what you're doing -- and you would if you're Fernando Garcia -- you look at all this stuff, you look at this data, because either you're buying a horse with your

10:16:03   1   hard-earned money or, most of the time, you're buying it with

10:16:06   2   someone else's money, and they demand that you advise them on

10:16:10   3   what horse to buy and how much to pay and when to stop bid.

10:16:14   4         After you buy a horse, you're not done with it.  Now

10:16:21   5   you've got that young horse you've got to raise.  You'll hear

10:16:28   6   that Fernando would oversee for many of these, especially the

10:16:32   7   ones that could afford him, people like Jose Trevino when he got

10:16:37   8   into horses big time, Mr. Colorado and others.  They expect

10:16:40   9   Fernando to make sure the horse is maintained.  It has to be

10:16:45   10  trained.  Sometimes he would train the horses himself.  You're

10:16:49   11  going to find out how talented he is as a trainer.

10:16:52   12        But he can't train every horse.  Some of these stables

10:16:55   13  have dozens of horses.  He couldn't adequately focus on all these

10:17:00   14  horses at different stables.  So he'll hire people like Mr.

10:17:04   15  Huitron and other top trainers to do that.  People that he would

10:17:10   16  trust with these valuable horses.  They also have to have

10:17:17   17  veterinarian care, just like kids.  The pediatrician for a horse

10:17:21   18  is a veterinarian.  These horses have to have all kinds of care.

10:17:25   19        And keep in mind, these are professional athletes.

10:17:28   20  This is not just your average saddle horse that we may have grown

10:17:31   21  up with.  These are professional athletes.  They have to have

10:17:36   22  very good thoroughness.  They have to be cared for very carefully

10:17:41   23  and constantly and it costs a lot.  It's a big expense.

10:17:46   24        So Fernando Garcia will be trusted to arrange for great

10:17:51   25  veterinarians to take care of great horses that are being trained

| | |
|---|---|
| 10:17:56 | 1 |
| 10:18:09 | 2 |
| 10:18:13 | 3 |
| 10:18:16 | 4 |
| 10:18:20 | 5 |
| 10:18:25 | 6 |
| 10:18:25 | 7 |
| 10:18:28 | 8 |
| 10:18:32 | 9 |
| 10:18:35 | 10 |
| 10:18:41 | 11 |
| 10:18:50 | 12 |
| 10:18:59 | 13 |
| 10:19:05 | 14 |
| 10:19:08 | 15 |
| 10:19:13 | 16 |
| 10:19:16 | 17 |
| 10:19:23 | 18 |
| 10:19:27 | 19 |
| 10:19:31 | 20 |
| 10:19:36 | 21 |
| 10:19:41 | 22 |
| 10:19:45 | 23 |
| 10:19:48 | 24 |
| 10:19:54 | 25 |

1  to be great racers.  While the horses are racing or while they're

2  preparing to race, you have to evaluate:  Is this horse running

3  as good as he should?  How about this one over here?  He's the

4  best one we've got, but genetically, maybe the other guy is

5  better.  Why?  You have to evaluate.  Are we doing everything for

6  that horse that we should?

7        You'll hear that Fernando Garcia evaluated the horses

8  constantly.  We're going to show y'all great example of where he

9  stepped in and made a difference with one particular horse that

10  the government's mentioned.  And Mr. Piloto.  Sometime before

11  2009 or maybe it was in 2009, a sire by the name of Mr. Perry

12  impregnated a dam Pilot Point.  Pilot Point is an extremely fast

13  mare.  A fast mare may beat a fast gelding or a stallion.  You

14  can't say that a female horse is slower than a male horse.  Very

15  often, it's the opposite.  Pilot Point was a really fast mare.

16        Mr. Perry was no slouch.  He was a champ.  These were

17  two great horses and they had a foal named -- the owner called

18  Maverick Perry.  I don't know where Maverick came from, but Perry

19  was the sire.  You'll see that often, horses are named after the

20  parents, one or both.  Maverick Perry was bought at auction.  Mr.

21  Fernando was not -- he wasn't at the auction.  He was bought in

22  2009, but this was a phenomenal horse or his potential.  And he

23  was bought, he was taken to Mexico with a thing called match

24  racing.  It's two horses, one-on-one racing.  In the U.S., we

25  only have, I think, one track that sanctions match racing.  We do

10:19:59   1   eight or ten horses at a time, 100-yard dash.  But in Mexico,

10:20:02   2   match racing is simply a real popular support.

10:20:05   3          Well, when they took Maverick Perry down to Mexico and

10:20:10   4   ran him, you know, training races because he's only a year old

10:20:14   5   when he started racing.  He's too young to try and mature with

10:20:18   6   two-year-olds, big money.  He was running in these training races

10:20:22   7   and these match races and he was losing.  But he was the foal of

10:20:29   8   Mr. Perry and Pilot Point.  There's no reason for him to lose.

10:20:36   9          Fernando, you'll hear, was at a race, saw and he knew

10:20:41   10  the horse, he knew the mare, and he said there's no way that

10:20:44   11  horse is that slow.  He went up to the man that owned the horse

10:20:50   12  and he offered to buy it for $25,000.  That was a lot less than

10:20:54   13  the young Maverick Perry had sold for.  He sold, I think, for 80

10:20:58   14  or 90,000.  Fernando saw a bargain and he knows as a scientist

10:21:05   15  that genetically Maverick Perry had to be fast.  So he said, I

10:21:11   16  will gamble $25,000 of my money to buy that horse, and the man

10:21:17   17  sold it to him.  He brought it back to Texas in the U.S., and he

10:21:22   18  started training it himself.

10:21:24   19         Not that the trainer was doing a bad job, that he was

10:21:27   20  training it wrong for quarter horse racing here.  You'll hear

10:21:34   21  that Fernando trained that horse, and he changed the name because

10:21:37   22  the horse wasn't doing well.  Let's change his name.  He

10:21:40   23  incorporated both parents' name into the horse.  Mr. Perry.  He

10:21:46   24  took the Mr. -- Pilot Point became Piloto, Mr. Piloto.  He raced

10:21:55   25  Mr. Piloto, one of his first races, he came in eighth out of a

| | | |
|---|---|---|
| 10:22:00 | 1 | field of eight or ten.  But he worked with him.  He knew the |
| 10:22:03 | 2 | horse genetically.  He trained him.  The horse came in fourth. |
| 10:22:08 | 3 | Eventually, about seven months or so after he had bought the |
| 10:22:12 | 4 | horse, I guess it was, he ran him in a qualifier for the |
| 10:22:17 | 5 | All-American Futurity. |
| 10:22:19 | 6 | MR. GARDNER:  Excuse me, Mr. Womack.  Your Honor, I'm |
| 10:22:21 | 7 | going to object.  It's more testimony than an outline of what |
| 10:22:23 | 8 | this case -- |
| 10:22:24 | 9 | MR. WOMACK:  This is the evidence we're going to hear, |
| 10:22:26 | 10 | your Honor, from the witnesses. |
| 10:22:28 | 11 | THE COURT:  Well, yes, but let's give them a little |
| 10:22:32 | 12 | idea about it, instead of the minutiae. |
| 10:22:37 | 13 | MR. WOMACK:  Thank you, sir. |
| 10:22:38 | 14 | Again, I believe it's very important and, again, the |
| 10:22:40 | 15 | government is going to make an issue of this horse.  I want you |
| 10:22:43 | 16 | to look for the evidence on that horse.  Mr. Piloto won the |
| 10:22:48 | 17 | qualifying race for the All-American Futurity, which offers a $1 |
| 10:22:53 | 18 | million purse.  Mr. Piloto won the qualifier to go to that race. |
| 10:23:00 | 19 | Jose Trevino knows horses.  He didn't even know Fernando Garcia |
| 10:23:06 | 20 | when Fernando bought this horse and was training him. |
| 10:23:09 | 21 | But, again, he came up to Fernando and said, hey, son, |
| 10:23:13 | 22 | that's a really nice horse you've got there.  I'll pay you |
| 10:23:17 | 23 | $100,000 right now for that horse.  You'll hear obviously that |
| 10:23:25 | 24 | Fernando thought, well, I can quadruple my investment right now. |
| 10:23:30 | 25 | And there's no guarantee based on his record that Mr. Piloto |

10:23:35   1  would win any big money at the All-American Futurity.  The best

10:23:39   2  American horses in the country.

10:23:41   3        So he quadrupled his money and sold the horse to Jose

10:23:46   4  Trevino.  Mr. Trevino didn't make that big a gamble because the

10:23:50   5  worse you could do at the futurity is $50,000.  If you're dead

10:23:54   6  last, you'll get $50,000.  So Mr. Trevino, having the resources,

10:23:58   7  made the decision, I will invest in that horse, and he raced it

10:24:02   8  and he won a million dollars.  But both are happy.  Fernando

10:24:08   9  quadrupled his money, and along the way, obviously these men

10:24:14  10  trust him, they hired him to do all this work for them.

10:24:17  11        The government talked about money laundering and they

10:24:21  12  used the analogy, a really good one, of a dry cleaner.  Well, if

10:24:30  13  you operate a dry cleaner and if you don't know that the loan

10:24:40  14  you're getting to open your cleaners is unlawful proceeds, if you

10:24:44  15  don't know that the bank is loaning you drug money, you're not

10:24:50  16  money laundering.  If you only receive money and don't know that

10:24:54  17  it's unlawful proceeds, you're not involved in money laundering.

10:24:57  18        But this isn't really about investing.  We're not

10:25:01  19  saying Fernando Garcia had people investing.  He had people, Mr.

10:25:06  20  Colorado, Mr. Trevino and many others, hiring him.  They were

10:25:11  21  paying him for services.  Help us buy the right horse, train it,

10:25:16  22  maintain it and value it.  As if someone came into the dry

10:25:22  23  cleaners and paid for dry cleaning.  Does the dry cleaner ask

10:25:30  24  you, is that drug money you're using to pay for those clothes to

10:25:33  25  be cleaned?  Of course not.  They would never know.

10:25:37    1        Fernando Garcia is that dry cleaner.  He wouldn't know

10:25:40    2   and you're going to hear that.  You'll hear no evidence from the

10:25:43    3   government that anyone ever told Fernando Garcia, hey, this is

10:25:48    4   drug money from Los Zetas that we're using to hire you, and we

10:25:53    5   want you to give the money back.  The government has all of his

10:25:56    6   financial records, tax returns.  They're going to tell you,

10:26:01    7   they're going to have to, that he doesn't make big money.  I

10:26:05    8   think the most he ever made was like 80,000, 90,000 a year, and

10:26:08    9   this is one of the top trainers and horse guys in the country,

10:26:14   10   despite his young age.

10:26:14   11        He wasn't making bit make money.  He wasn't making

10:26:17   12   millions or hundreds of thousands, and the government will have

10:26:20   13   to admit that.  And you won't see any evidence at all of Fernando

10:26:24   14   Garcia taking money, putting it in a bank and handing it back to

10:26:28   15   the Zetas or to anyone connected to the Zetas.

10:26:31   16        The money that came in to him, every penny will be

10:26:34   17   accounted for by the IRS and the other agents.  Every penny went

10:26:38   18   to pay vet bills, stables, food, training fees, race fees,

10:26:46   19   transportation, everything.  It was all legitimate.  Everything

10:26:49   20   that Fernando Garcia touched and we know where it came from.  We

10:26:54   21   don't care where it came from.  No one told him it was anything

10:26:56   22   illegal.  You'll hear that what he did is -- and you'll see it.

10:27:00   23   He would spend the money on the horses, he would keep what he was

10:27:04   24   entitled to, and it was not a lot, because he's an honest horse

10:27:08   25   guy.

10:27:08  1          By the way, money laundering is a matter of perspective
10:27:17  2   because you may be a restaurant owner or a dry cleaner, and you
10:27:21  3   won't know there's money coming in is illegal.  But if you're
10:27:24  4   giving it back to the people, here, here's this money I deposited
10:27:27  5   in the bank, and you hand it back, that's money laundering.  Look
10:27:31  6   for any evidence of anything like that with Fernando Garcia.
10:27:36  7          One last thing.  The government mentioned straw
10:27:49  8   purchasers like that's a bad thing.  A straw purchaser, like the
10:27:55  9   young man, I think his name was Raul Ramirez.  About 18-year-old
10:27:58 10   kid, walks in an auction, raises his hand, buys a horse and it's
10:28:04 11   expensive.  I forgot how much it was he bought.  But these people
10:28:07 12   buy horses and the government makes that sound sinister.  You're
10:28:10 13   going to hear that straw purchasers is extremely common in buying
10:28:15 14   horses at auction.
10:28:17 15          If I'm a big-time horse racer and I buy the best horses
10:28:23 16   and you see me bid on a horse, what is it telling you?  That's a
10:28:26 17   good horse.  Maybe you should bid on that horse, too.  So I'll
10:28:31 18   have someone else not known to be a big horse buyer bid for me
10:28:35 19   and put the horse in his name so no one will know that that's my
10:28:39 20   horse that bid against me and raise the price or try to take the
10:28:42 21   horse that I want.
10:28:45 22          Just for your own common knowledge, you probable know
10:28:47 23   about Disney World.  The fact that Walt Disney, when he started
10:28:50 24   to buy this land in Florida, he didn't go to Florida and say, I'm
10:28:53 25   Walt Disney here to buy a land.  He sent people that no one knew.

```
10:28:57   1   I need some land to put a trailer on.  I need some land to farm.
10:29:01   2   They both bought all this land in Central Florida, nondescript,
10:29:06   3   nobody knew anybody.  After they bought it, Walt Disney said,
10:29:09   4   this is going to be Disney World.  He had never himself bought
10:29:14   5   it.  How much that land had cost if it was Walt Disney.  He was a
10:29:18   6   straw purchaser.  He had straw purchasers for him.  He was
10:29:21   7   financing it.  There was nothing illegal.  It, in fact, is very
10:29:25   8   common in the horse-racing industry to have straw purchasers.
10:29:28   9   So, of course, there are straw purchasers in this case.  There
10:29:30  10   should be.  You would be suspicious if there weren't.
10:29:38  11           I won't now and I won't later tell you what you should
10:29:42  12   find in this case.  The Judge is going to tell you what to do,
10:29:47  13   what the law is.  All we ask for Mr. Garcia is you take the
10:29:51  14   evidence, the law, and you do the right thing.  Thank you very
10:29:54  15   much.
10:29:57  16           THE COURT:  Members of the jury, I'm going to give you
10:29:59  17   a 15-minute break.  Use the facilities, be ready to come back in
10:30:04  18   about 15 minutes.
10:30:37  19           (Jury not present.)
10:30:49  20           THE COURT:  I want to see the copy of the expert
10:31:00  21   disclosure pursuant to the rules that Mr. DeGeurin has referred
10:31:09  22   to.
10:31:10  23           MR. GARDNER:  Yes, sir, your Honor.  I pulled the
10:31:12  24   document.  But it's been filed with the Court, the disclosure for
10:31:17  25   expert notices.  So if I could ask the Court --
```

10:31:21  1          THE COURT:  Was it filed?

10:31:22  2          MR. GARDNER:  Yes, sir.

10:31:23  3          THE COURT:  If it was filed, I'll get it

10:31:25  4  electronically.

10:31:25  5          MR. GARDNER:  Yeah.  Yes, sir.

10:31:26  6          THE COURT:  All right.  Fifteen minutes.

10:31:28  7          (Recess.)

10:54:04  8          MR. FINN:  Your Honor, can I ask you just a

10:54:05  9  housekeeping question because I've never tried a case before you.

10:54:08  10  I'm juggling quite a few witnesses, many are friendly, some are

10:54:12  11  hostile, and I'm trying to go out there occasionally and I saw

10:54:16  12  you kind of look at me once when I left during trial.  Are you

10:54:19  13  okay with me going outside the courtroom as long as Ms. Williams

10:54:23  14  is here?

10:54:24  15          THE COURT:  Yeah.

10:54:25  16          MR. FINN:  Okay.  All right.  Thank you.

10:54:27  17          MR. GARDNER:  Your Honor, again, another housekeeping

10:54:31  18  matter.  I'd like to offer Government's Exhibit 304.  It's a copy

10:54:33  19  of the government's opening PowerPoint for the appellate record.

10:54:37  20          THE COURT:  All right.  And speaking of appellate

10:54:44  21  record, who is your first witness that's going to be called?

10:54:50  22          MR. GARDNER:  Joe Garza, your Honor, should be the

10:54:52  23  first.

10:55:02  24          THE COURT:  I've looked at your disclosure.  I see no

10:55:04  25  opinions by Mr. Garza listed or described.  He's a qualified

| | | |
|---|---|---|
| 10:55:10 | 1 | person by experience.  He's got training.  I see no opinions |
| 10:55:17 | 2 | described in your disclosure, and I sustain the objection.  He |
| 10:55:21 | 3 | will give no opinions. |
| 10:55:23 | 4 | MR. GARDNER:  Okay. |
| 10:55:23 | 5 | THE COURT:  All right.  Let's proceed.  Bring the jury |
| 10:55:25 | 6 | in. |
| 10:55:28 | 7 | (Jury present.) |
| 10:57:22 | 8 | THE COURT:  Mr. Esper, you may make your opening |
| 10:57:25 | 9 | statements. |
| 10:57:26 | 10 | DEFENDANT EUSEVIO HUITRON'S OPENING STATEMENTS |
| 10:57:28 | 11 | MR. ESPER:  Please the Court, and counsel, Mr. Gardner. |
| 10:57:29 | 12 | Ladies and gentlemen of the jury, my name is Richard |
| 10:57:31 | 13 | Esper.  As I was introduced to you yesterday.  My client is |
| 10:57:35 | 14 | Eusevio "Chevo" Huitron.  I can represent to you that my opening |
| 10:57:40 | 15 | statement will be brief, but it will be succinct. |
| 10:57:44 | 16 | And I anticipate, ladies and gentlemen, that what |
| 10:57:46 | 17 | you're going to hear in this case is that "Chevo" Huitron, as a |
| 10:57:51 | 18 | teenager, came to this country with his two older brothers, one |
| 10:57:56 | 19 | of whom is Jesus Huitron.  The other is -- his name is Isabel. |
| 10:58:00 | 20 | They came to this country as lawful immigrants.  They came with |
| 10:58:04 | 21 | no money, no education, and unable to speak the native language. |
| 10:58:10 | 22 | But they did come with a burning hope and desire to somehow carve |
| 10:58:15 | 23 | out a better life for themselves and, more importantly, to carve |
| 10:58:19 | 24 | out a better life for their children and their children's |
| 10:58:22 | 25 | children. |

10:58:23  1        Now, as I use the word "hope," because hope is one of

10:58:27  2   the six Hs, and H is an abbreviation for each important principle

10:58:33  3   that this man and his brother lived their lives by.  They hoped

10:58:38  4   to carve out a better life and they have.  They have because they

10:58:43  5   implemented three other principles utilizing the initial H.  They

10:58:49  6   worked hard, they were humble, and they were honest.

10:58:53  7        They came here and took whatever jobs they could take.

10:58:58  8   They worked with their hands.  They worked many hours.  They

10:59:02  9   worked in the construction business, painting business, but as

10:59:06 10   time started to evolve into the '80s, each of them discovered

10:59:11 11   that they had another particular talent, and that uses the word

10:59:17 12   H.  Mr. Huitron developed a propensity to build homes.  One home

10:59:23 13   at a time, started expanding his home-building business.  "Chevo"

10:59:29 14   Huitron had a propensity and a talent to train horses.  And those

10:59:35 15   two overriding principles then guided their lives up to this day

10:59:41 16   and still do.

10:59:43 17        Now, Mr. Huitron, "Chevo" Huitron started training

10:59:50 18   horses, his brother started building homes, and both of them were

10:59:57 19   individuals who got up at the crack of dawn 4:00 or 5:00 in the

11:00:01 20   morning and were out applying their trade.  "Chevo" Huitron

11:00:05 21   eventually became a very proficient horse trainer.  That's all he

11:00:09 22   knows how to do.  And I don't say that demeaningly, but his

11:00:14 23   passion is to train horses.  He doesn't know how to do anything

11:00:18 24   else other than be a father, a hard worker.

11:00:22 25        And, again, I don't say this demeaningly, he has a

11:00:25  1  sixth-grade education from Mexico.  He cannot read.  He cannot

11:00:30  2  write.  He literally is illiterate.  So consequently, as a

11:00:35  3  trainer, he began to train horses in the Austin area, and he and

11:00:41  4  his brother, who also has a propensity for horses, finally

11:00:45  5  scraped up enough money in the late 1990s to where they bought a

11:00:50  6  horse.

11:00:51  7          "Chevo" trained the horse, but "Chevo" didn't have a

11:00:54  8  license.  The reason he didn't have a license, he couldn't pass

11:00:58  9  the test because he couldn't read or write.  Now, he eventually

11:01:02  10 got his license.  He eventually had enough passion to be able to

11:01:08  11 become a licensed trainer.  But they first bought a horse in

11:01:12  12 1993, "Chevo" trained the horse, it won a couple of races, and

11:01:16  13 eventually, they sold the horse and made a couple of

11:01:20  14 hundred-thousand dollars off the sale.  Legitimate income.  Hard

11:01:25  15 work.  Humility, honesty.

11:01:28  16          Now, in 1996, they -- the Huitron Homes, which was the

11:01:36  17 business that Mr. Jesse Huitron incorporated, that's his

11:01:41  18 business, Huitron Homes.  They bought -- three brothers bought a

11:01:46  19 business, rental business, property business at 4216 South U.S.

11:01:51  20 Highway 183 in Austin, Texas.  This is their home.  This

11:01:57  21 community.

11:01:59  22          A year later, they bought a home, they bought property,

11:02:03  23 15 acres at 163 Rianna Woods, which is in Dale, Bastrop County,

11:02:08  24 Texas, and that's where "Chevo" Huitron was able to establish his

11:02:16  25 stables.  Now, when I say stables, ladies and gentlemen of the

| | |
|---|---|
| 11:02:20 | 1 |
| 11:02:24 | 2 |
| 11:02:32 | 3 |
| 11:02:37 | 4 |
| 11:02:42 | 5 |

jury, I'm not talking about Lexington Farms.  I'm not talking about the Ponderosa.  This is a crude, elementary racing facility, kind of rundown.  It's nothing elaborate.  But that is an indication of the humility of "Chevo" Huitron, I anticipate the evidence will show.

It shows that he's out there working in a tough, crude, rudimentary environment, applying his trade working 12, 15 hours a day.  And you'll hear evidence and you'll hear testimony, I anticipate, that reflects that work ethic.  In 1998, Huitron Homes, Inc., which is Jesse Huitron's incorporated business, but all three brothers are part of Huitron Homes.  They now buy some residential property on Seeling Drive here in Austin, Texas.  They live in very modest homes.  They live very modestly.

But by 19 -- but by the early 2000s, "Chevo" Huitron's horse-training reputation is starting to spawn.  It's starting to grow, I anticipate the evidence is going to show, and by 2005, it has started to reach its apex.  He trains horses for a lot of people.  Some of them live in the United States, some of them are from Mexico.  And these are people that come to him or their representatives come to him and pay him to train their horse or horses.

The evidence is going to show that he charges the same fee.  It doesn't make any difference if the owner is worth 10 million or $10.  He charges $1,100 per month for each horse that he trains, that he boards.  That includes training fees, feed.

| | | |
|---|---|---|
| 11:04:29 | 1 | Does not include veterinary bills.  Does not include shoeing.  It |
| 11:04:33 | 2 | does not include saddles.  It does not include expenses if the |
| 11:04:36 | 3 | horse is going to be raced at certain racing facilities.  It |
| 11:04:40 | 4 | doesn't include entry fees into a horse being entered at certain |
| 11:04:46 | 5 | race tracks.  And you'll hear evidence about that during this |
| 11:04:49 | 6 | trial. |
| 11:04:51 | 7 | In 2005, Mr. Huitron has two horses that prove to be |
| 11:04:58 | 8 | very successful.  One is Kathys Star Quest and the other is 60 |
| 11:05:04 | 9 | Thru Traffic.  Both of these horses win a number of races at some |
| 11:05:08 | 10 | of the local area tracks.  I think there's one in San Antonio, |
| 11:05:11 | 11 | there's one in Grand Prairie, Louisiana, Houston, Lone Star. |
| 11:05:16 | 12 | There's one, I believe, in Mission, Texas.  And these two horses |
| 11:05:19 | 13 | are trained by a young lady named Shae Cox.  You're going to hear |
| 11:05:24 | 14 | her testimony.  She's a young lady who knows Mr. Huitron very |
| 11:05:29 | 15 | well, actually learned how to train horses by and through "Chevo" |
| 11:05:35 | 16 | Huitron. |
| 11:05:35 | 17 | Now, the reason she's trained the horses is because Mr. |
| 11:05:38 | 18 | Huitron hasn't passed the test yet because he can't read and he |
| 11:05:44 | 19 | can't write English; but nevertheless, he persists and a year |
| 11:05:49 | 20 | later, year or two later, he finally obtains his certified horse |
| 11:05:55 | 21 | trainer's license.  This is evidence, again, of the Hs:  Hard |
| 11:06:00 | 22 | work, humility, honesty. |
| 11:06:02 | 23 | Now, sometime in 2006, an individual named Ramiro |
| 11:06:07 | 24 | Villarreal contacts him and wanted him to start training horses. |
| 11:06:12 | 25 | He claims they're his horses.  Now, you're going to hear some |

11:06:16    1    conversations involving Ramiro Villarreal.  Mr. Gardner's already

11:06:21    2    referenced him that allegedly he's buying horses for "40" and

11:06:26    3    "42," these Zetas.  Mr. "Chevo" Huitron does not know that.  He

11:06:32    4    does not know when Joe Smith comes and asks him to train his

11:06:37    5    horses, how much do you charge?  This is what I charge.

11:06:41    6            The evidence is going to show, ladies and gentlemen,

11:06:42    7    that Mr. Huitron doesn't have the capabilities of federal law

11:06:47    8    enforcement into looking into the backgrounds of individuals who

11:06:50    9    come to hire him to train their horses.  All he knows is these

11:06:55    10   people have asked him to train their horses, and he's up at 4:00

11:07:00    11   or 5:00 in the morning trying to make those horses the best

11:07:04    12   horses he can because his owners want to make money on those

11:07:09    13   horses.  And if you're a trainer and you're not making money, the

11:07:14    14   owners that are paying you to train your horses, they're going to

11:07:18    15   go somewhere else.

11:07:19    16           Now, the evidence is going to show that there are a

11:07:25    17   number of people in the -- well, you will hear throughout this

11:07:30    18   case who gravitate to "Chevo" Huitron because they hear that he's

11:07:35    19   a good trainer.  He produces good results for his horses.  One of

11:07:40    20   the horses that he trains is this horse you're going to hear

11:07:43    21   repeatedly about is Tempting Dash.  In fact, the government's

11:07:47    22   going to put up a big photograph when Tempting Dash won some big

11:07:51    23   race, and "Chevo" Huitron is in the winner's circle with about 40

11:07:55    24   other people.  He was the trainer.

11:07:57    25           Now, the evidence is going to also show that an

| | | |
|---|---|---|
| 11:08:00 | 1 | individual named Nayen, Carlos Nayen -- and you heard Mr. Gardner |
| 11:08:05 | 2 | talk about him -- he his hand or arm around Mr. Huitron.  That, |
| 11:08:09 | 3 | ladies and gentlemen, I show to you, is not evidence of any |
| 11:08:15 | 4 | knowing participation in a conspiracy. |
| 11:08:17 | 5 | Now, I want to get to that point in a minute about |
| 11:08:22 | 6 | conspiracy and money laundering and the key element to both of |
| 11:08:27 | 7 | them, and that's the K word, knowledge.  I want you to -- all of |
| 11:08:32 | 8 | you, please, to pay attention to that element of both offenses, |
| 11:08:37 | 9 | conspiracy and money laundering, and that is, you have to be a |
| 11:08:40 | 10 | knowing participant.  You have to know that you're entering into |
| 11:08:45 | 11 | an unlawful agreement.  Not maybe, not could have, not guessing, |
| 11:08:49 | 12 | you have to show.  You have to have an unlawful intent. |
| 11:08:53 | 13 | Knowing to launder money.  You have to know that the |
| 11:08:57 | 14 | funds come from illegal sources, not maybe they came from it, not |
| 11:09:03 | 15 | possibly came from.  You have to know that those funds are |
| 11:09:07 | 16 | derived from specified unlawful activity.  You have to know that |
| 11:09:12 | 17 | this money I'm being paid came from the distribution of cocaine. |
| 11:09:17 | 18 | You have to have that knowledge to be guilty of money laundering. |
| 11:09:22 | 19 | If you're guilty of structuring deposits, you have to |
| 11:09:24 | 20 | intentionally and knowingly structure a deposit. |
| 11:09:28 | 21 | People that paid Mr. Huitron, you're going to hear |
| 11:09:31 | 22 | evidence, deposited money into his account for the payment of |
| 11:09:36 | 23 | hard-earned fees, and they deposited it into his banking account |
| 11:09:41 | 24 | in cash.  The evidence is going to show that the people that |
| 11:09:44 | 25 | deposited structured those deposits.  But they didn't structure |

11:09:49   1   them because this man told them to do it or even if he knew about

11:09:53   2   it.  This man, who cannot read or write, did not tell them -- was

11:09:59   3   not a knowing participant to structuring deposits.

11:10:02   4          The evidence is also going to show, ladies and

11:10:04   5   gentlemen, that in the course of this time period, before this

11:10:08   6   conspiracy even started, "Chevo" Huitron was a successful

11:10:13   7   trainer.  He had already hit the apex.  But one thing -- the

11:10:18   8   opposite of his success as a trainer was his ability to manage a

11:10:22   9   business.  At that, he was a total failure simply because he

11:10:28   10   didn't have the tools.  He didn't have the education.  He didn't

11:10:32   11   have the wherewithal.  I anticipate you're going to hear

11:10:35   12   evidence, he just didn't know how to make his business

11:10:39   13   profitable.

11:10:40   14          The evidence is going to show that like many

11:10:46   15   first-generation Americans, like many immigrants who come to this

11:10:49   16   country, they finally get it.  They stick together.  Jesus

11:10:54   17   Huitron said, I'm your brother's keeper.  I'm going to help you,

11:10:57   18   brother, so that this business can profit.  All this hard work

11:11:02   19   you're doing is not showing a profit.  I'm going to help you

11:11:06   20   because I'm building homes.  I'm showing a profit because I know

11:11:12   21   how to manage money, or at least I have family members who helped

11:11:15   22   to manage money.

11:11:16   23          "Chevo" says, that's fine, because all he's concerned

11:11:19   24   about is training horses.  Sure, he wants to make some money.  So

11:11:24   25   the two of them get together, and all incomes that they have --

11:11:27  1   they keep separate books, but all income goes into Huitron Homes.

11:11:32  2   And Jesse Huitron has one of his daughters and later, an

11:11:35  3   accountant, and I anticipate you'll hear evidence about that.

11:11:38  4   They're basically running money coming in, invoices going out.

11:11:43  5   Bills being paid, bills being sent out.

11:11:48  6          Each day, they're trying to operate a business.  And

11:11:52  7   they come to know, the evidence is going to show, a lot of

11:11:55  8   individuals whose names you will hear, "Chevo" Huitron trained

11:11:59  9   horses for Mr. Trevino.  He trained horses for Mr. Fernando

11:12:04  10  Garcia.  He trained horses for Mr. Colorado-Cessa.  But at no

11:12:08  11  time did he knowingly, knowingly train horses for these

11:12:14  12  despicable characters "40" and "42."  At no time, I submit to

11:12:20  13  you, ladies and gentlemen, are you going to hear evidence, and

11:12:23  14  this is what I'm asking you to pay close attention to.

11:12:26  15         At no time are you going to ever hear any evidence that

11:12:30  16  "Chevo" Huitron is on any telephone conversations discussing

11:12:35  17  something in coded language.  You're going to hear a lot about

11:12:39  18  this in this trial.  Drug dealers talk about things in codes so

11:12:42  19  that in case somebody's listening to them, they think they're

11:12:45  20  fooling law enforcement.  You're not going to hear him on one

11:12:48  21  conversation.  You're going to hear him referenced, I submit to

11:12:52  22  you, the evidence will show, by other individuals, but they're

11:12:57  23  referencing him in training horses.  Not in laundering money.  In

11:13:02  24  training horses.

11:13:03  25         The evidence is going to further show, ladies and

11:13:07  1  gentlemen, that when Mr. Huitron was arrested and charged with

11:13:10  2  this offense, there was $10,000 in his home.  There's going to be

11:13:15  3  an explanation as to where that $10,000 came from.  The

11:13:18  4  explanation, I anticipate, will come from other trainers, other

11:13:22  5  owners who paid him right before he was getting ready to take a

11:13:27  6  horse to run in a sweepstakes event.  Didn't have a chance to

11:13:30  7  deposit it.  He left it there in his home.

11:13:32  8          Every penny you're going to hear, ladies and gentlemen,

11:13:36  9  that "Chevo" Huitron made, every penny that went into Huitron

11:13:40  10  Homes was paid -- was taxed, was declared as income, they paid

11:13:45  11  their taxes on it.  I also anticipate the evidence is going to

11:13:50  12  show that Mr. Huitron and Huitron Homes, the racing business,

11:13:55  13  during the course of this horse training also took on employees,

11:13:59  14  some of whom worked for Mr. Trevino.  He had a number of horses

11:14:04  15  there, at least within his control there at where Mr. "Chevo"

11:14:11  16  Huitron was training horses.

11:14:12  17          And so, he asked him, hey, can you put my brother on

11:14:14  18  the payroll, Rudy Trevino?  He knows a lot about horses.  I want

11:14:18  19  him to keep an eye on my horses.  I know you're a good trainer,

11:14:21  20  but I want him to keep an eye on his horses.  You'll hear from

11:14:24  21  Mr. Rincon, same thing.  These are individuals who were paid a

11:14:27  22  salary.  But the money came to Mr. Huitron through either wire

11:14:33  23  transfers, checks, or money deposited into his account.

11:14:38  24          Now, I anticipate, ladies and gentlemen, and again,

11:14:43  25  this is the use of the K word "knowledge."  That is one of the

11:14:48   1   fundamental evidence I anticipate that you will have to look at

11:14:53   2   in this case.  And what I anticipate the evidence will not show

11:14:56   3   is that Mr. "Chevo" Huitron ever was a Zeta.  The evidence is not

11:15:01   4   going to show that he was a knowing member of any organization

11:15:06   5   known as Los Zetas.  The evidence is not going to show that he

11:15:10   6   was ever knowingly told, I'm a Zeta, you're doing business with a

11:15:16   7   Zeta.

11:15:17   8        The evidence is not going to show that he was ever

11:15:20   9   knowingly told by anyone that these funds are drug money.  They

11:15:26  10   came from distribution of cocaine.  You're not going to hear any

11:15:30  11   of that evidence that it was told overtly to "Chevo" Huitron.

11:15:34  12   Finally, you are not going to hear any evidence, I submit, that

11:15:38  13   Mr. Huitron knowingly structured or engaged in the structuring of

11:15:46  14   deposits into moneys that went into Huitron Homes.  You will not

11:15:52  15   hear evidence that he was a knowing participant in any of that.

11:15:56  16   You are not going to hear evidence, I submit, that he had direct

11:16:00  17   knowledge that anyone ever told him or even inferred that the

11:16:05  18   money that he was being paid for his hard-earned services came

11:16:09  19   from some sort of illegal activity.

11:16:13  20        Now, finally, ladies and gentlemen, Mr. Gardner

11:16:18  21   referred to Wal-Mart.  It's a conspiracy.  Wal-Mart is a

11:16:21  22   conspiracy.  There's a lot of people who do work for Wal-Mart.

11:16:27  23   Wal-Mart buys products from a lot of people.  If you have tires

11:16:32  24   to sell and Wal-Mart wants to buy them, they buy them from you.

11:16:36  25   Now, when you present your services, your goods and services,

11:16:40  1    they pay you with money.

11:16:42  2           Now, if Wal-Mart is engaging in illegal activity at the

11:16:46  3    top levels, does that make you a money launderer if you're a guy

11:16:53  4    selling the tires, providing the goods and services?  Only if you

11:16:56  5    know that that money that you're being paid comes from Wal-Mart's

11:17:00  6    illegal activity.  That's how you're guilty.

11:17:04  7           You're not guilty, I submit, and the evidence will show

11:17:07  8    in this case, Mr. "Chevo" Huitron is not guilty because he did

11:17:11  9    not have knowledge that any of these funds that he was busting

11:17:16  10   his butt to earn came from illegal sources.  I hope at the end of

11:17:21  11   the day, when this case is concluded, you will find Mr. "Chevo"

11:17:25  12   Huitron and his brother not guilty.  Thank you, your Honor.

11:17:29  13          THE COURT:  Mr. Mayr.

11:17:32  14          MR. MAYR:  Your Honor, I believe this jury's ready to

11:17:34  15   hear the evidence.  I know I'm ready to hear the evidence.  I

11:17:36  16   would respectfully waive my right to open at this time and

11:17:38  17   reserve the right to give an opening statement after the

11:17:41  18   government has made the case-in-chief and prior to presenting any

11:17:43  19   evidence.  If the Court would permit.

11:17:46  20          THE COURT:  Well, you've both waived your right?

11:17:51  21          MR. MAYR:  I guess I did.  I'm waiving my right at this

11:17:54  22   time to make an opening statement.  I would reserve the right to

11:17:57  23   give a statement at a later time.

11:17:58  24          THE COURT:  All right.  You may call your first

11:18:00  25   witness.

| | | |
|---|---|---|
| 11:18:00 | 1 | MR. GARDNER:  Thank you, your Honor.  The government |
| 11:18:02 | 2 | calls Joe Garza. |
| 11:19:33 | 3 | (Witness sworn.) |
| 11:19:48 | 4 | THE COURT:  Tell us your full name and spell your last |
| 11:20:01 | 5 | please. |
| 11:20:01 | 6 | THE WITNESS:  Jose M. Garza.  Last name spelling, |
| 11:20:08 | 7 | G-A-R-Z-A. |
| 11:20:10 | 8 | JOSE M. GARZA, called by the Government, duly sworn. |
| 11:20:10 | 9 | DIRECT EXAMINATION |
| 11:20:10 | 10 | BY MR. GARDNER: |
| 11:20:11 | 11 | Q.   Thank you, your Honor. |
| 11:20:11 | 12 | Mr. Garza, you and I met before; is that correct? |
| 11:20:13 | 13 | A.   That is correct, sir. |
| 11:20:14 | 14 | Q.   If you will, could you turn to the jury and tell them a |
| 11:20:16 | 15 | little bit about yourself, your background, your career, what you |
| 11:20:19 | 16 | do for a living, what you have done for a living? |
| 11:20:22 | 17 | A.   I was a state trooper for about approximately seven years, |
| 11:20:27 | 18 | narcotics agent for the Department of Public Safety.  After |
| 11:20:30 | 19 | that -- for a total of 23 years, retired from the Department of |
| 11:20:35 | 20 | Public Safety.  I took a job with the FBI as a senior |
| 11:20:38 | 21 | intelligence analyst in McAllen, I was at for approximately 13 |
| 11:20:43 | 22 | years.  I was offered a job as director of Homeland Security for |
| 11:20:48 | 23 | Kansas City Southern Railroad, which is the only railroad that |
| 11:20:50 | 24 | operates in the U.S. and Mexico.  And that's where I'm currently |
| 11:20:54 | 25 | at now. |

11:20:55  1   Q.   If you will, sir, at least during your 20-some years as a

11:20:59  2   narcotics state trooper, let me start there, was that all

11:21:03  3   narcotics experience, the last part of your DPS career?

11:21:07  4   A.   That is correct.  Yes, sir.

11:21:08  5   Q.   And what types of narcotics cases did you investigate during

11:21:11  6   that period?

11:21:12  7   A.   Drugs, money laundering, mostly organized crime, RICO cases,

11:21:22  8   anything dealing with the drug-trafficking trade.

11:21:25  9   Q.   When you say RICO, that's racketeering cases?

11:21:28  10  A.   That's racketeering, yes, sir.

11:21:30  11  Q.   Following your departure from the Department of Public

11:21:32  12  Safety, could you explain to the jury what functions you served

11:21:35  13  as an analyst for the FBI?

11:21:36  14  A.   The reason I retired is the FBI offered me a job to start an

11:21:42  15  intelligence unit at the FBI office at McAllen, Texas.  I was

11:21:46  16  part of the post seizure analysis in Austin, which really put

11:21:50  17  cases together, organized crime cases and RICO cases.  The FBI

11:21:56  18  offered me the job and I took the job as a senior intelligence

11:21:59  19  analyst to continue putting cases together, organize cases,

11:22:04  20  sharing intelligence, and working with the intelligence community

11:22:07  21  at the FBI office in McAllen, Texas.

11:22:09  22  Q.   And when you say McAllen, Texas, for those jurors who aren't

11:22:13  23  familiar with it, if any, where is McAllen, Texas?

11:22:16  24  A.   McAllen, Texas is approximately 60 miles from South Padre

11:22:20  25  Island or Brownsville, Texas.  Approximately 148 miles from south

11:22:25   1   of Laredo.

11:22:26   2   Q.   And is it also on the border between the United States and

11:22:29   3   Mexico?

11:22:29   4   A.   Yes, sir.  It's all border.

11:22:31   5   Q.   When you say organized crime cases for the FBI, what were

11:22:34   6   the organizations you were most involved with investigating?

11:22:38   7   A.   All cartels, cartels in Mexico, Mexico, South America and

11:22:45   8   other countries.  Anything to do with the cartels, how they

11:22:49   9   affected the integrity of our borders and within the United

11:22:52   10  States.

11:22:52   11  Q.   And, if you will, sir, I'll get back to the cartels in a

11:22:55   12  second.

11:22:56   13       What is your current responsibilities as the director

11:22:58   14  for Homeland Security for Kansas City Southern Railroad?

11:23:01   15  A.   I am the railroad liaison officer for the FBI.  I am also

11:23:07   16  assigned to the Joint Terrorism Intelligence Force in McAllen.  I

11:23:12   17  am the only one that as a railroad liaison officer monitors the

11:23:17   18  border from Brownsville all the way to San Diego, California for

11:23:20   19  the railroad with the FBI and checking the integrity of our

11:23:25   20  railroads that come in and out of our -- United States and

11:23:29   21  Mexico.

11:23:30   22  Q.   And is part of that duties ensuring that no contraband gets

11:23:34   23  transported from Mexico to the United States on the railroad?

11:23:37   24  A.   Well, not only the railroad, sir, but anything that affects

11:23:40   25  the railroad and the integrity of our borders.  I still maintain

| | | |
|---|---|---|
| 11:23:45 | 1 | and function on a daily basis on tracking all the cartels in |
| 11:23:49 | 2 | Mexico. |
| 11:23:50 | 3 | Q.   And, sir, if you will, over the course of your career, |
| 11:23:53 | 4 | roughly how many cartel-related matters would you say you've |
| 11:23:59 | 5 | either investigated, or been part of, or been aware of? |
| 11:24:03 | 6 | A.   It's -- be hard to give you a number exactly, sir, but |
| 11:24:07 | 7 | numerous cases.  I've been involved with a case on Juan |
| 11:24:12 | 8 | Garcia-Abrego, which was one of the first major cases on the |
| 11:24:15 | 9 | border in South Texas.  Osiel Cardenas-Escillon case as a witness |
| 11:24:24 | 10 | and also assisted with the cases.  Those were two of the major |
| 11:24:28 | 11 | cases that I've been with. |
| 11:24:29 | 12 | Q.   When you talk about Mr. Cardenas-Guillen, who was he? |
| 11:24:32 | 13 | A.   Cardenas-Guillen, in a way, is still but was the last major |
| 11:24:39 | 14 | cartel boss for the Gulf cartel. |
| 11:24:44 | 15 | MR. FINN:  Judge, excuse me, your Honor, I'm going to |
| 11:24:45 | 16 | object to the relevance. |
| 11:24:49 | 17 | MR. GARDNER:  Just laying the foundation, your Honor, |
| 11:24:51 | 18 | for the facts he's going to present in a second with respect to |
| 11:24:53 | 19 | the Zeta cartel which -- |
| 11:24:54 | 20 | THE COURT:  Okay.  We won't get into the investigation |
| 11:24:58 | 21 | other than who he was and what he did. |
| 11:25:02 | 22 | MR. GARDNER:  Yes, sir. |
| 11:25:03 | 23 | Q.   (BY MR. GARDNER) I guess my point is, Mr. Garza, did you |
| 11:25:06 | 24 | have the opportunity to interview Mr. Guillen as part of the |
| 11:25:09 | 25 | knowledge that you gained on cartels? |

11:25:11  1   A.   Yes, sir.  I did.

11:25:12  2   Q.   And how long was that interview process?

11:25:15  3   A.   The interview process was approximately 14 months while he

11:25:19  4   sat in Conroe at the prison.

11:25:21  5   Q.   And in addition to your interviews of known cartel members,

11:25:26  6   have you developed relationships with other U.S. governmental

11:25:30  7   agencies?

11:25:31  8   A.   I'm sorry, sir?

11:25:31  9   Q.   Have you developed intel relationships with other U.S.

11:25:35  10  government agencies?

11:25:36  11  A.   Yes, sir.  That's part of my job assigned to the FBI.

11:25:39  12  Q.   And have you developed relationships with Mexican

11:25:42  13  authorities, as well, on cartel information?

11:25:45  14  A.   U.S., Mexico and South America.

11:25:48  15  Q.   And you continue to stay updated on the latest intelligence

11:25:53  16  via police reports, intel reports, and other sources of

11:25:56  17  information?

11:25:57  18  A.   Yes, sir.  It's a daily operation to maintain and keep track

11:26:00  19  of everything.  It's a constant movement and change within the

11:26:03  20  cartels in Mexico.

11:26:04  21  Q.   If you will, sir, could you please give the jury a

11:26:07  22  definition of what a cartel is?

11:26:10  23  A.   A cartel is a group of individuals that control certain

11:26:14  24  areas within Mexico.  Those particular areas mostly are referred

11:26:20  25  to as a plaza, which is an area controlled.  And to define a

11:26:25  1    plaza, the simplest way is to say, for instance, the county

11:26:31  2    deputy controls the county --

11:26:35  3            MR. DEGEURIN:  Excuse me.

11:26:36  4    A.   -- while --

11:26:37  5            MR. DEGEURIN:  Excuse me.  I'm going to have to object.

11:26:40  6    Object based on -- it's based on summary of hearsay testimony.

11:26:44  7    Hearsay of these interviews and it violates the confrontation

11:26:51  8    clause.  He's basically given us what he's been told by other

11:26:55  9    people.

11:26:56  10           THE COURT:  Well, the objection is overruled.

11:27:00  11   Q.   (BY MR. GARDNER) Sir, if you will, could you look at your

11:27:02  12   monitor for me?  The monitors, are they off for the jurors?

11:27:11  13   Ladies and gentlemen, are yours --

11:27:12  14           THE JUROR:  They're on.

11:27:13  15   Q.   (BY MR. GARDNER) -- on?  Okay.

11:27:22  16           Sir, you recognize this, don't you?

11:27:24  17   A.   Yes, sir, I do.

11:27:30  18   Q.   I'll introduce Government's Exhibit 320 for demonstrative

11:27:34  19   purposes only as a map of Mexico.

11:27:38  20           MR. FINN:  No objection, your Honor.

11:27:40  21           THE COURT:  All right.  For demonstrative only, we'll

11:27:46  22   call it Demonstrative 1.

11:27:48  23           MR. GARDNER:  Demonstrative 1 will be fine, your Honor.

11:27:50  24   I'll mark that on the exhibit sticker.

11:27:52  25           THE COURT:  The map is introduced.  A demonstrative

11:27:55  1  exhibit, members of the jury, is something that demonstrates.

11:28:00  2  See how bright I am.  And the lawyers -- all of the lawyers can

11:28:04  3  use it just like a picture, like a map.  It doesn't go into the

11:28:08  4  jury room with you, but they can use it in your view at all times

11:28:14  5  and asking questions and that type of thing.

11:28:18  6  Q.   (BY MR. GARDNER) Mr. Garza, I'm sorry, can you see that map

11:28:21  7  on your video?

11:28:21  8  A.   Yes, sir, I can.

11:28:22  9  Q.   I'm going to do the pointing right now.  And when you say

11:28:26  10  McAllen, is McAllen roughly in that area of the border right now?

11:28:30  11  A.   That is correct.  Right on the tip of your pen on the

11:28:53  12  border.

11:28:53  13  Q.   I guess why I want to show you this picture, Mr. Garza, is

11:28:58  14  you mentioned plazas.  You talked about them being sort of

11:29:02  15  related to a county and constable being in charge.  Is that your

11:29:05  16  testimony?

11:29:06  17  A.   It's to explain what a plaza definition more or less would

11:29:09  18  be as is that a county officer covers the county of Austin.  And

11:29:15  19  a state officer would cover the whole state of Texas while a

11:29:17  20  federal officer covers the United States.  So that's the simplest

11:29:22  21  way of describing it.  A cartel could cover anywhere from one to

11:29:27  22  three, four or more states that are under their custody, control,

11:29:31  23  or influence.

11:29:32  24  Q.   And with respect to the plazas themselves, why is that

11:29:36  25  important with relation to the border security?

| | | |
|---|---|---|
| 11:29:40 | 1 | A.   Because of the fact that they try to maintain either drug |
| 11:29:44 | 2 | areas, drug routes, or control certain crossing points within |
| 11:29:47 | 3 | Mexico and the United States. |
| 11:29:49 | 4 | Q.   So you say there's a plaza boss.  Could you define for the |
| 11:29:54 | 5 | jury the term "comandante"? |
| 11:29:56 | 6 | A.   "Comandante" is a term used for a person of influence more |
| 11:30:01 | 7 | than anything else.  He doesn't necessarily have to be a |
| 11:30:05 | 8 | comandante or a commander of a certain military-type operation. |
| 11:30:12 | 9 | He could be the person in charge of a certain state or a certain |
| 11:30:16 | 10 | area.  He has the influence; therefore, as a form of respect, |
| 11:30:23 | 11 | they would call him a comandante. |
| 11:30:25 | 12 | Q.   Sir, you earlier mentioned about the Gulf cartel and the |
| 11:30:28 | 13 | interviews -- |
| 11:30:29 | 14 | MR. FINN:  Judge, excuse me, I'm going to object.  If |
| 11:30:30 | 15 | you look at the government's disclosure, first paragraph, you'll |
| 11:30:34 | 16 | see why I'm objecting. |
| 11:30:37 | 17 | THE COURT:  Don't keep me in suspense.  Make it for the |
| 11:30:40 | 18 | record. |
| 11:30:40 | 19 | MR. FINN:  He's trying to get into other cartels, Gulf |
| 11:30:43 | 20 | cartels.  Specifically says Zetas.  If he wants to focus on that, |
| 11:30:48 | 21 | fine. |
| 11:30:49 | 22 | MR. GARDNER:  I could rearrange my question, Judge. |
| 11:30:51 | 23 | THE COURT:  All right. |
| 11:30:51 | 24 | Q.   (BY MR. GARDNER) Are the Zeta cartels and the Gulf cartels |
| 11:30:56 | 25 | linked in some historical manner? |

11:30:58  1   A.   They were linked back in approximately 2003.  That's when

11:31:04  2   the Zetas were hired by the Gulf cartels as an enforcement unit.

11:31:09  3   After they split and the breakup between the Gulf cartel and the

11:31:12  4   Zetas, they became a cartel on their own.

11:31:14  5   Q.   And what are the Zetas -- at least the original Zetas, what

11:31:20  6   are they made of, I guess, personnel?

11:31:23  7   A.   The original group known as the Zetas, which is nothing more

11:31:27  8   than a radio call sign given to them when they first were

11:31:32  9   established by the Mexican government, to oversee and check most

11:31:36  10  of Mexico, look over the cartels, check for cartels, method of

11:31:41  11  operations, communication systems, manpower, weapons, and so

11:31:45  12  forth.  A group of approximately 30 out of the 350 that started,

11:31:53  13  deserted under their commander, who was Arturo Guzman-Decena,

11:31:59  14  known as Zeta, you know, "Zeta 1."

11:32:02  15       THE COURT:  Let's stop there and do

11:32:04  16  question-and-answer.

11:32:04  17       MR. GARDNER:  Thank you, your Honor.

11:32:06  18  Q.   (BY MR. GARDNER) So you say they were part of the Mexican

11:32:09  19  government.  Were they part of the Mexican military?

11:32:11  20  A.   They were part of the what is known as the GAFES, Grupo

11:32:16  21  Aeromovil de Fuerzas Especiales, or Special Air Mobile Forces.

11:32:19  22  Q.   Is that similar to what most people would refer to as Green

11:32:23  23  Berets in the United States?

11:32:24  24  A.   Correct, sir.

11:32:25  25  Q.   Okay.  So when the GAFES or the Zetas joined the Gulf

11:32:28   1   cartel, what were their roles in the Gulf cartel?

11:32:31   2   A.   They were the enforcement unit when they first started out

11:32:33   3   with the Gulf cartel.

11:32:34   4   Q.   And what type of enforcement would they conduct for the Gulf

11:32:39   5   cartel's activities?

11:32:41   6   A.   Anything the cartel needed to be done, whether it's

11:32:44   7   enforcing terroristic -- domestic terrorism within the community,

11:32:52   8   whether it was bribing officials, whether it was getting the job

11:32:56   9   done for the cartels.  Also, the protection of the cartel, the

11:33:00   10  cartel bosses and their areas.

11:33:02   11  Q.   When you say area, could you just describe the map?  And

11:33:05   12  I'll try to point out the states what areas of influence the Gulf

11:33:09   13  cartel and the Zetas control.

11:33:10   14           MR. FINN:  Your Honor, excuse me, I'm going to object

11:33:12   15  to relevance the history of these organizations.

11:33:18   16           THE COURT:  What is the relevance?

11:33:19   17           MR. GARDNER:  Your Honor, it's just a description of

11:33:21   18  the Zetas and how they evolved to the point where they're going

11:33:24   19  to get to today, and that's where I'm heading, your Honor, to the

11:33:27   20  point where they're at today in the Zeta activities.

11:33:30   21           THE COURT:  You're talking about location?

11:33:32   22           MR. GARDNER:  Yes, sir.

11:33:33   23           MR. FINN:  It's not relevant, Judge.

11:33:34   24           THE COURT:  I caught it the first time.  I'll allow you

11:33:38   25  to do the -- since you've already had the testimony as to where

11:33:44   1   they were then and where they are now.

11:33:47   2   Q.   (BY MR. GARDNER) Mr. Garza, maybe I can combine this.

11:33:53   3   Today, do the Zeta and the Gulf cartel share territories,

11:33:56   4   essentially overlap to some extent?

11:33:58   5   A.   Very little, sir.

11:33:59   6   Q.   Okay.  If you will, can you explain to the jury what Mexican

11:34:03   7   states the Zetas control today?

11:34:05   8   A.   Excuse me, what?

11:34:07   9   Q.   What Mexican states the Zetas control today.

11:34:10  10        MR. DEGEURIN:  Excuse me, I'm going to have to object.

11:34:13  11   Once again, summarizing debriefings from other people denies us

11:34:21  12   the right of confrontation.

11:34:22  13        THE COURT:  All right.  That objection --

11:34:24  14        MR. DEGEURIN:  Basically what he's doing is giving us a

11:34:27  15   summary of what he's gotten from other people.

11:34:29  16        THE COURT:  Well, he's doing it based on what he's

11:34:32  17   testified to and his years of experience, and your objection is

11:34:37  18   overruled.

11:34:38  19   Q.   (BY MR. GARDNER) Could you please just name the states?  And

11:34:41  20   I'll try to point to them as I find them.

11:34:43  21   A.   The current states that are the strongholds for the Zetas

11:34:48  22   currently is the state of Coahuila.

11:34:50  23   Q.   That's right there, sir?

11:34:51  24   A.   Yes, sir.

11:34:52  25   Q.   And the one right below that, is that Zacatecas?

11:34:56   1   A.   Zacatecas is mostly controlled by the ones fighting the

11:35:02   2   Zetas within themselves.  But the state right there, sir, where

11:35:06   3   you're pointing, Nuevo Leon, that's another stronghold for the

11:35:09   4   Zetas.

11:35:10   5   Q.   Okay.  Tamaulipas?

11:35:11   6   A.   Tamaulipas is about a 50/50.

11:35:14   7   Q.   And San Luis Potosi?

11:35:17   8   A.   San Luis Potosi is Zeta-controlled.  And you could go down

11:35:21   9   all the way to the areas of Veracruz, the areas of Quintana Roo,

11:35:26   10  which is further to your right, which is the area known as Cancun

11:35:32   11  or Cozumel.  They control all those particular areas and the area

11:35:37   12  of Chiapas because of the border to Guatemala.

11:35:42   13  Q.   Right here, sir?

11:35:43   14  A.   Right there.  Yes, sir.

11:35:44   15  Q.   All right.  And based on your experience, where do the Zetas

11:35:48   16  obtain their narcotics from?

11:35:51   17  A.   Now, that it comes from various countries.  There are

11:35:55   18  several European countries that are shipping precursor chemicals

11:35:59   19  for the manufacture of methamphetamine.  There are your marihuana

11:36:02   20  production and production fields within Mexico.  You get cocaine

11:36:07   21  coming in from Venezuela, Peru and Columbia.

11:36:13   22  Q.   And earlier, we talked a little bit about the Gulf and

11:36:16   23  Zetas, and you mentioned there was a split.  When did that split

11:36:19   24  occur?

11:36:20   25  A.   That split occurred approximately in about 2007, 2008.

| 11:36:26 | 1 | Q.   And are you familiar with the cause behind the split? |
| 11:36:29 | 2 | A.   The cause behind the split was -- |
| 11:36:32 | 3 | MR. FINN:  Excuse me, your Honor.  Relevance. |
| 11:36:34 | 4 | THE COURT:  Sustain the objection to relevance. |
| 11:36:37 | 5 | Q.   (BY MR. GARDNER) And since the split, have the Zetas been |
| 11:36:40 | 6 | controlling more territory? |
| 11:36:42 | 7 | A.   Yes.  They have, sir. |
| 11:36:44 | 8 | Q.   And what have they taken over in terms of the border |
| 11:36:48 | 9 | crossing points between Mexico and the U.S.? |
| 11:36:51 | 10 | A.   The same points we described as currently the state of |
| 11:36:55 | 11 | Quintana Roo, Chiapas, Coahuila, Nuevo Leon on the border. |
| 11:37:02 | 12 | Q.   Okay.  And, I'm sorry, sir.  Maybe my question wasn't clear. |
| 11:37:04 | 13 | I guess what I'm asking is, what are the major Mexican |
| 11:37:07 | 14 | cities on the border that they control and the U.S. cities that |
| 11:37:12 | 15 | are across from it? |
| 11:37:13 | 16 | A.   Okay.  You've got Laredo, which is Nuevo Laredo across from |
| 11:37:17 | 17 | it, you've got Acuna, which is Del Rio, Texas.  You've got |
| 11:37:21 | 18 | Piedras Negras, which is Eagle Pass.  And you've got close to the |
| 11:37:27 | 19 | area of Zapata, Texas, which is Starr County. |
| 11:37:32 | 20 | Q.   And who currently is the leader of the Los Zetas? |
| 11:37:34 | 21 | A.   Los Zetas right now, their leader is Zeta known as "Zeta |
| 11:37:39 | 22 | Cuarenta," who is Miguel Angel Trevino-Morales.  He also goes by |
| 11:37:45 | 23 | the name of "El Muerto."  He also goes by the A/K/A of "L-40," |
| 11:37:52 | 24 | "L" as in the letter.  He also goes by "Comandante Cuarenta." |
| 11:37:58 | 25 | Q.   And who is Oscar Omar Trevino-Morales? |

11:38:01   1   A.   That is the brother of Miguel Angel Trevino-Morales, who

11:38:06   2   goes by the A/K/A of "El Cuarenta Dos," "L-42."

11:38:11   3   Q.   And how long has "Cuarenta," "40" been in charge of Los

11:38:15   4   Zetas?

11:38:15   5   A.   He took over after the death of Heriberto Lazcano-Lazcano,

11:38:23   6   who was considered "Zeta 1."  Prior to, he also had aliases of

11:38:28   7   "Zeta Tres," "Zeta Catorce."

11:38:33   8            MR. FINN:  Judge, excuse me.  Objection.

11:38:34   9   Nonresponsive.

11:38:35  10            MR. GARDNER:  I can move on, your Honor.

11:38:36  11            THE COURT:  All right.

11:38:37  12   Q.   (BY MR. GARDNER) Now, do the Zetas identify themselves with

11:38:39  13   any particular symbols?

11:38:40  14   A.   Yes, they do.  They have either the Z sign, alphabetical

11:38:49  15   last letter on many of their uniforms, on their caps and

11:38:53  16   T-shirts.  They are also using the Ferrari symbol, which is one

11:38:58  17   of your better-known symbols today.

11:39:01  18   Q.   And do you know why they picked the Ferrari symbol?

11:39:03  19   A.   I'm sorry?

11:39:04  20   Q.   Let me strike that.

11:39:06  21            MR. FINN:  Judge, excuse me, earlier, I think you

11:39:10  22   sustained an objection as to any opinion testimony.

11:39:13  23            THE COURT:  At this point, I have a good memory,

11:39:18  24   counsel.  What is the problem?

11:39:20  25            MR. FINN:  I think we're getting into opinion.

| | | |
|---|---|---|
| 11:39:22 | 1 | THE COURT:  He withdrew the question. |
| 11:39:25 | 2 | MR. FINN:  Oh, thank you. |
| 11:39:26 | 3 | THE COURT:  Yes, sir. |
| 11:39:26 | 4 | Q.  (BY MR. GARDNER) When you say Ferrari symbol, is that the |
| 11:39:30 | 5 | symbol that the Ferrari automobile company uses? |
| 11:39:32 | 6 | A.  That is correct.  The yellow and black. |
| 11:39:34 | 7 | Q.  A horse; is that correct? |
| 11:39:35 | 8 | A.  Yes. |
| 11:39:37 | 9 | Q.  And, sir, are you familiar with the methods of communication |
| 11:39:46 | 10 | that the Zeta cartel uses? |
| 11:39:47 | 11 | A.  Yes, sir. |
| 11:39:48 | 12 | Q.  And if you could, can you please explain the use of Nextel |
| 11:39:53 | 13 | phones and push-to-talk? |
| 11:39:54 | 14 | A.  The Nextel phones is one of their widely used communication |
| 11:40:00 | 15 | systems because it's a lot harder for the governments in the |
| 11:40:05 | 16 | United States to pick up on.  They use Nextel phones to |
| 11:40:07 | 17 | communicate, their Repeater Systems, and everything else, from |
| 11:40:10 | 18 | one end of the state to the other.  They're also using certain |
| 11:40:16 | 19 | throwaway phones, as it's called here in the United States, like |
| 11:40:19 | 20 | your Crickets, and whatever they call it here, as a way of |
| 11:40:24 | 21 | communicating, dumping those phones so that they're not |
| 11:40:27 | 22 | trackable. |
| 11:40:29 | 23 | Q.  And do they utilize BlackBerry devices, as well? |
| 11:40:32 | 24 | A.  I'm sorry? |
| 11:40:33 | 25 | Q.  Do they utilize BlackBerry devices? |

11:40:35  1   A.   Yes.  BlackBerrys also can be converted to a push-to-talk,

11:40:38  2   also, and they use communications by either Twitter, texting, or

11:40:44  3   voice-to-talk.

11:40:45  4   Q.   And are you familiar with the term "PIN-to-PIN"?

11:40:49  5   A.   To ping, yes, sir.

11:40:50  6   Q.   Not to ping.  I'm sorry.

11:40:53  7        PIN-to-PIN communications using the BlackBerry?  Are

11:40:56  8   you familiar with that, sir?

11:40:57  9   A.   When you use that particular type of system, it's not being

11:41:02  10  recorded or could not be recorded on a Title III, for instance,

11:41:06  11  which is a form of trying to pick up the communications.

11:41:12  12  Q.   May I have one moment, your Honor?

11:41:13  13       THE COURT:  You may.

11:41:26  14  Q.   (BY MR. GARDNER) And, Mr. Garza, I'm sorry, a couple of more

11:41:29  15  questions on the symbols.  Are you familiar with the symbol

11:41:32  16  "hecho" in Mexico?

11:41:34  17  A.   That is correct, sir.

11:41:35  18  Q.   Can you describe that for the jury, please?

11:41:37  19  A.   There is a symbol that the Mexican manufacturing companies

11:41:43  20  use in Mexico to describe "made in Mexico."  It says on the top

11:41:48  21  of the symbol "made in" and on the bottom of the eagle that's in

11:41:52  22  -- placed in that symbol Mexico.  It's like made in Japan or made

11:41:56  23  in China, some of the products.  The cartels use that symbol much

11:42:02  24  like the Ferrari symbol to identify themselves when they turn the

11:42:06  25  eagle that normally faces --

11:42:08   1           MR. FINN:  Excuse me, sir.

11:42:09   2           THE COURT:  Hold, hold, hold.  There's no question.

11:42:11   3  There's no question before.

11:42:12   4  Q.   (BY MR. GARDNER) When you say cartels, let me just stick --

11:42:16   5           THE COURT:  Let me stop.  I want you to listen to the

11:42:18   6  question and just answer the question.

11:42:20   7           THE WITNESS:  Yes, sir.

11:42:21   8           THE COURT:  We've got, looks like, 200 lawyers out

11:42:24   9  there.  So you're going to have a lot of questions.  So let's

11:42:28  10  just handle it one at a time.

11:42:30  11           THE WITNESS:  Yes, sir.

11:42:31  12  Q.   (BY MR. GARDNER) Are you familiar with whether or not the

11:42:34  13  Zetas use the "Echo en Mexico" symbol?

11:42:36  14  A.   Yes, sir, they do.

11:42:37  15  Q.   Okay.  And finally, sir, what are the methods that the Zetas

11:42:44  16  use to generate income?

11:42:47  17           MR. FINN:  Judge, I'm going to object based on your

11:42:50  18  earlier rulings.  It's opinion testimony.

11:42:52  19           THE COURT:  Counsel, if you remind me again about that,

11:42:55  20  I'm going to recess the jury and talk to you.

11:43:01  21           MR. FINN:  I need to preserve the record, your Honor.

11:43:03  22           THE COURT:  All you have to do is object and state a

11:43:05  23  reason.  You do not have to state to the jury what I have ruled

11:43:10  24  before.

11:43:12  25           MR. FINN:  Okay.  I apologize.

11:43:13    1           THE COURT:  All right.  I don't need an apology.  I

11:43:15    2    need you not to do it.

11:43:17    3           MR. FINN:  I'll do my best.

11:43:18    4           THE COURT:  All right.  I sustain the objection to the

11:43:20    5    question.

11:43:20    6    Q.   (BY MR. GARDNER) Do the Zetas make money through the sale

11:43:23    7    and distribution of narcotics?

11:43:25    8    A.   That is just one form of --

11:43:29    9           THE COURT:  The answer is "Yes" or "No."

11:43:30   10           THE WITNESS:  Yes.

11:43:31   11           MR. GARDNER:  Thank you, Mr. Garza.  I appreciate it.

11:43:33   12    I'm going to turn you over to these gentlemen right here.

11:43:36   13           THE COURT:  Mr. Finn.

11:43:38   14           MR. FINN:  May it please the Court, members of the

11:43:40   15    jury.  No questions.

11:43:43   16           MR. DEGEURIN:  No questions, your Honor.

11:43:46   17           MR. WOMACK:  We have no questions.

11:43:48   18           MR. ESPER:  Got nothing, your Honor.

11:43:50   19           MR. MAYR:  Nothing, Judge.

11:43:51   20           THE COURT:  Okay.  May this witness be excused?

11:43:55   21           MR. FINN:  No objection, your Honor.

11:43:57   22           THE COURT:  You may be excused, sir.

11:44:06   23           THE WITNESS:  Thank you, your Honor.

11:44:08   24           MR. GARDNER:  Call my next witness, your Honor?

11:44:11   25           THE COURT:  How long will your next witness be?

11:44:14  1        MR. GARDNER:  He'll be quite lengthy, your Honor.

11:44:15  2        THE COURT:  Okay.  Members of the jury, I'm going to

11:44:20  3  give you your lunch break.  It's a quarter of 12:00.  I'd like to

11:44:26  4  start promptly at 1:20.  That will give you enough time to

11:44:31  5  stretch your legs, get a sandwich if you want to, eat lunch.

11:44:35  6  You're always welcome to, of course, stay in the jury room.  It's

11:44:40  7  whatever you wish to do.  We have a lot of people in the

11:44:44  8  courthouse.  Some are interested in this trial.  Some are

11:44:49  9  interested in other matters that are going up on seven floors

11:44:54 10  here.

11:44:55 11        Since the problem that existed in Boston yesterday, all

11:44:59 12  federal courthouses, like most federal courthouses, are on alert.

11:45:03 13  We have additional security.  That's routine for us.  Anytime

11:45:08 14  something happens in the United States, we have additional

11:45:11 15  security.  Don't pay any -- whole lot of attention to it.  But

11:45:17 16  people might not talk with you.  Don't talk with anybody else as

11:45:23 17  you go in and out because they don't know you're jurors, and

11:45:30 18  there are other possible jurors in other cases that are here.  So

11:45:34 19  just kind of smile and don't be surprised if somebody doesn't

11:45:39 20  talk to you.

11:45:41 21        And we will remember the instructions.  And we'll start

11:45:44 22  promptly at 1:20.

11:46:16 23        (Jury not present.)

11:46:23 24        THE COURT:  Counsel, we're going to get along more

11:46:26 25  efficiently and better if when you want to make an objection, you

| | | |
|---|---|---|
| 11:46:28 | 1 | just make an objection and state your ground.  All right.  1:20. |
| 13:17:45 | 2 | (Lunch recess.) |
| 13:18:31 | 3 | THE COURT:  All right.  Anything before we bring in the |
| 13:19:32 | 4 | jury? |
| 13:19:32 | 5 | MR. GARDNER:  Nothing from the government, your Honor. |
| 13:19:35 | 6 | THE COURT:  Bring the jury in.  You may call your |
| 13:19:43 | 7 | witness. |
| 13:19:44 | 8 | MR. GARDNER:  The government calls Mario Alfonso |
| 13:19:47 | 9 | Cuellar. |
| 13:20:11 | 10 | THE COURT:  We're waiting for the jury. |
| 13:21:43 | 11 | (Jury present.) |
| 13:21:44 | 12 | THE COURT:  Members of the jury, during the noon |
| 13:21:47 | 13 | recess, did anyone attempt to talk to you about this case? |
| 13:21:49 | 14 | JURORS:  No. |
| 13:21:50 | 15 | THE COURT:  Have you talked to anyone about the case |
| 13:21:52 | 16 | during the break? |
| 13:21:53 | 17 | JURORS:  No. |
| 13:21:53 | 18 | THE COURT:  And have any of you found out anything |
| 13:21:56 | 19 | about this case, outside the presence of one another in this |
| 13:21:59 | 20 | courtroom? |
| 13:21:59 | 21 | JURORS:  No. |
| 13:22:00 | 22 | THE COURT:  All right.  Thank you.  Show negative |
| 13:22:02 | 23 | responses to all questions by all jurors. |
| 13:22:04 | 24 | And if you'll swear the witness, please. |
| 13:22:06 | 25 | (Witness sworn.) |

| | | |
|---|---|---|
| 13:22:30 | 1 | THE COURT:  Tell us your full name and spell your last |
| 13:22:37 | 2 | name, please. |
| 13:22:39 | 3 | THE WITNESS:  Mario Alfonso Cuellar, C-U-E-L-L-A-R. |
| 13:22:55 | 4 | THE COURT:  You may proceed. |
| 13:22:56 | 5 | MARIO A. CUELLAR, called by the Government, duly sworn. |
| 13:22:56 | 6 | DIRECT EXAMINATION |
| 13:22:57 | 7 | BY MR. GARDNER: |
| 13:22:57 | 8 | Q.   Thank you, your Honor. |
| 13:22:58 | 9 | Mr. Cuellar, you and I have met before; is that |
| 13:23:00 | 10 | correct? |
| 13:23:02 | 11 | A.   Yes, sir. |
| 13:23:03 | 12 | Q.   If you will, could you introduce yourself for the jury? |
| 13:23:06 | 13 | Tell them how old you are, how much education you have, and where |
| 13:23:10 | 14 | you're from. |
| 13:23:18 | 15 | A.   My name is Mario Alfonso Cuellar.  I'm 46 years old.  It's |
| 13:23:32 | 16 | been 11 years -- I have 11 years of study, grade level, and I'm |
| 13:23:36 | 17 | from Mexico. |
| 13:23:38 | 18 | Q.   And, sir, what is your immigration status right now in the |
| 13:23:41 | 19 | United States? |
| 13:23:46 | 20 | A.   I'm a U.S. citizen. |
| 13:23:49 | 21 | Q.   And, sir, you're in a jail uniform; is that correct? |
| 13:23:54 | 22 | A.   Yes, sir. |
| 13:23:55 | 23 | Q.   Okay.  Were you charged with a crime in the United States? |
| 13:24:00 | 24 | A.   Yes, sir. |
| 13:24:01 | 25 | Q.   Could you please tell the jury what that crime was? |

13:24:08  1    A.    Conspiracy and drug contraband, cocaine and marihuana.

13:24:15  2    Q.    And, sir, have you pled guilty to these charges?

13:24:21  3    A.    Yes.

13:24:22  4    Q.    And, sir, have you been sentenced to a term of years in the

13:24:27  5    penitentiary to these charges?

13:24:32  6    A.    Yes, sir.  Twenty years.

13:24:35  7    Q.    And what is your hope or desire to get out of your testimony

13:24:40  8    here today?

13:24:58  9    A.    First, before anything, to tell the truth.  Second, that my

13:25:01  10   sentence may be -- would get lowered.  And then, just move

13:25:06  11   forward.

13:25:07  12   Q.    And, sir, are you married?

13:25:12  13   A.    Right now, I think so.

13:25:16  14   Q.    And is that because your wife has said that she's going to

13:25:19  15   leave you?

13:25:24  16   A.    Yes, sir.

13:25:25  17   Q.    And so, now, also, did you receive -- strike that.

13:25:30  18         Are you familiar with what is called the Wit Sec

13:25:34  19   program?

13:25:37  20   A.    Yes, sir.  A bit.  But yes.

13:25:40  21   Q.    And are you being considered for entry into that Wit Sec

13:25:44  22   program?

13:25:47  23   A.    Yes, sir.

13:25:49  24   Q.    And, if you will, could you please tell the jury how you

13:25:52  25   became to be involved with narcotics?

| | | |
|---|---|---|
| 13:26:05 | 1 | A.    I didn't understand that question. |
| 13:26:06 | 2 | Q.    When did you first start selling drugs? |
| 13:26:19 | 3 | A.    Since I was real young, I started selling marihuana. |
| 13:26:24 | 4 | Q.    And what amounts of marihuana did you sell? |
| 13:26:29 | 5 | A.    When I was 18, 50 to 100 kilos. |
| 13:26:35 | 6 | Q.    Fifteen to 100? |
| 13:26:39 | 7 | A.    When I was younger, yes, 50 to 100.  Then, later -- and as |
| 13:26:48 | 8 | time passed, the amount of drugs went up. |
| 13:26:49 | 9 | Q.    And -- I'm sorry.  Were you distributing drugs in the United |
| 13:26:54 | 10 | States when you first started or was that in Mexico? |
| 13:27:01 | 11 | A.    In the United States.  I just transported it. |
| 13:27:07 | 12 | Q.    And where did you transport it from and to what location did |
| 13:27:10 | 13 | you transport it to? |
| 13:27:17 | 14 | A.    From Piedras Negras, state of Coahuila to Dallas, Texas. |
| 13:27:23 | 15 | Q.    And was there a time in which you became involved in |
| 13:27:25 | 16 | distribution of cocaine? |
| 13:27:31 | 17 | A.    Yes, sir. |
| 13:27:33 | 18 | Q.    And was there a time when you moved from the United States |
| 13:27:37 | 19 | to Mexico? |
| 13:27:49 | 20 | A.    Yes, sir.  Due to an arrest warrant from the FBI from moving |
| 13:27:54 | 21 | drugs. |
| 13:27:55 | 22 | Q.    And is that one of the arrest warrants for the indictments |
| 13:27:58 | 23 | to which you pled guilty to? |
| 13:28:04 | 24 | A.    Yes, sir. |
| 13:28:05 | 25 | Q.    Now, you've testified before in federal court, have you not? |

| | | |
|---|---|---|
| 13:28:11 | 1 | A. Yes, sir. |
| 13:28:12 | 2 | Q. And where was that? |
| 13:28:14 | 3 | A. In Dallas, Texas. |
| 13:28:16 | 4 | Q. Was that in federal court or in state court? |
| 13:28:20 | 5 | A. Federal. |
| 13:28:21 | 6 | Q. And is it your understanding that it is that judge that will |
| 13:28:25 | 7 | make the decision on your sentencing or Judge Sparks here? |
| 13:28:36 | 8 | A. I know it's the one in Dallas. |
| 13:28:39 | 9 | Q. And so, you stated that you moved to Mexico to avoid federal |
| 13:28:42 | 10 | charges here. And what drug activities were you engaged in in |
| 13:28:47 | 11 | Mexico? |
| 13:28:50 | 12 | MS. WILLIAMS: Excuse me, Judge. Could we get a |
| 13:28:52 | 13 | timeframe? |
| 13:28:53 | 14 | MR. GARDNER: I can rephrase. |
| 13:28:54 | 15 | THE COURT: All right. |
| 13:28:55 | 16 | Q. (BY MR. GARDNER) When did you move from the United States |
| 13:28:58 | 17 | into Mexico? |
| 13:29:02 | 18 | A. 2005. |
| 13:29:04 | 19 | Q. And were you engaged in the drug trafficking in 2005 from |
| 13:29:10 | 20 | Mexico? |
| 13:29:21 | 21 | A. I stopped until 2007. I didn't move any drugs until the |
| 13:29:27 | 22 | Zeta cartel showed up. |
| 13:29:30 | 23 | Q. And you moved -- |
| 13:29:31 | 24 | THE INTERPRETER: To Piedras Negras. Interpreter's |
| 13:29:34 | 25 | correction. |

| | | |
|---|---|---|
| 13:29:34 | 1 | Q.   (BY MR. GARDNER) So in 2007, could you please tell the jury |
| 13:29:37 | 2 | how you got involved with the Los Zetas drug cartel? |
| 13:30:03 | 3 | A.   In 2007, the Zetas showed up in Piedras Negras and they |
| 13:30:08 | 4 | started picking up people to get them to work with them or they |
| 13:30:12 | 5 | were murdered, and they started lining us up so we would work |
| 13:30:15 | 6 | with them. |
| 13:30:19 | 7 | Q.   I'm going to show you what's been marked as Government's |
| 13:30:24 | 8 | Exhibit 335A.  Do you recognize that picture, sir? |
| 13:30:27 | 9 | A.   Yes, sir. |
| 13:30:28 | 10 | Q.   And who is that? |
| 13:30:31 | 11 | A.   Miguel Trevino. |
| 13:30:33 | 12 | Q.   And do you know him by another name?  Does he have a |
| 13:30:37 | 13 | nickname? |
| 13:30:38 | 14 | A.   Zeta "40." |
| 13:30:40 | 15 | Q.   And, sir, I'm showing you Government's Exhibit 335B.  Do you |
| 13:30:44 | 16 | recognize that, sir? |
| 13:30:46 | 17 | A.   Omar Trevino, Zeta "42." |
| 13:30:53 | 18 | Q.   Your Honor, I would offer Government's Exhibit 335A and |
| 13:30:56 | 19 | 335B. |
| 13:30:57 | 20 | MS. WILLIAMS:  No objection. |
| 13:30:59 | 21 | THE COURT:  Counsel.  Hearing no objection, they are |
| 13:31:03 | 22 | admitted, 335A and B. |
| 13:31:06 | 23 | Q.   (BY MR. GARDNER) So in 2007, you were approached by the |
| 13:31:09 | 24 | Zetas.  Who approached you initially? |
| 13:31:18 | 25 | A.   Omar and "Mamito." |

108

13:31:24   1   Q.   Now, on the screen here is Government's Exhibit 335B.   Is

13:31:27   2   that the picture you identified previously as Omar?

13:31:34   3   A.   Yes, sir.

13:31:36   4   Q.   And who is "Mamito"?

13:31:42   5   A.   I know it's Enrique Rejon-Aguilar.

13:31:46   6   Q.   And what was Omar Trevino's role in the Zetas when he picked

13:31:50   7   you up in 2007?

13:31:57   8            MS. WILLIAMS:   Objection.   Foundation.

13:32:06   9            THE COURT:   Well, I'll overrule that.   You may answer

13:32:08  10   that, if you know.

13:32:12  11   A.   Can you -- what do you want me to answer?

13:32:15  12   Q.   (BY MR. GARDNER) I can repeat it.

13:32:17  13            What role did Omar and Miguel Trevino -- I'm sorry,

13:32:21  14   Oscar Omar Trevino, "Cuarenta Dos," have in the Zetas in 2007

13:32:27  15   when he picked you up?

13:32:49  16   A.   He introduced himself as being a member of the Golfo cartel

13:32:54  17   was the armed branch of the Gulf cartel, or the Zetas, and he

13:32:57  18   introduced himself as Commander 42.

13:32:59  19   Q.   And who were you distributing -- strike that.   Let me ask a

13:33:03  20   different question.

13:33:04  21            Who was your supplier or your boss for the drugs before

13:33:07  22   you met "42"?

13:33:19  23   A.   Raul del Fierro and the marihuana we bought from anyone who

13:33:29  24   would show up there.

13:33:30  25   Q.   And Mr. del Fierro, what happened to him?

| | | |
|---|---|---|
| 13:33:38 | 1 | A.   I don't know where he is, but I know he's in Chihuahua. |
| 13:33:42 | 2 | Q.   And so, when you were picked up by "42," what did he tell |
| 13:33:47 | 3 | you with respect to your drug distribution? |
| 13:33:49 | 4 |         MS. WILLIAMS:  Objection.  Hearsay. |
| 13:33:51 | 5 |         MR. GARDNER:  Coconspirator hearsay statement, your |
| 13:33:53 | 6 | Honor. |
| 13:33:53 | 7 |         THE COURT:  This is 2007.  The objection is sustained. |
| 13:33:57 | 8 | Q.   (BY MR. GARDNER) Did you begin distributing drugs for Miguel |
| 13:34:02 | 9 | Omar Trevino -- I'm sorry, Omar Trevino, "42"? |
| 13:34:30 | 10 | A.   After I met him about -- |
| 13:34:36 | 11 |         MS. WILLIAMS:  Objection.  Nonresponsive.  That was a |
| 13:34:38 | 12 | "Yes" or "No" question. |
| 13:34:42 | 13 |         THE COURT:  Read me the question back. |
| 13:34:51 | 14 |         (Last question read back.) |
| 13:34:53 | 15 |         THE COURT:  That is a "Yes" or "No" question.  Answer |
| 13:34:55 | 16 | "Yes" or "No." |
| 13:35:00 | 17 | A.   Yes. |
| 13:35:02 | 18 | Q.   (BY MR. GARDNER) In what manner did you distribute drugs for |
| 13:35:05 | 19 | Omar Trevino? |
| 13:35:20 | 20 | A.   I would cross him over the river and he would deliver them |
| 13:35:30 | 21 | to me, and then, I would cross him over in sums of 150 to 200. |
| 13:35:37 | 22 | We would cross them over in 18-wheelers, bringing them into the |
| 13:35:41 | 23 | United States. |
| 13:35:41 | 24 | Q.   And when you say the amounts, could you, again, explain to |
| 13:35:44 | 25 | the jury what amounts was Omar Trevino providing you in cocaine |

13:35:50  1   to send into the United States?

13:36:08  2   A.   He would deliver 500 kilos, and I would move it at 150 to

13:36:14  3   200 kilos each time.

13:36:18  4   Q.   And where were you?  What city were you in Mexico when you

13:36:21  5   were moving these kilos across the border?

13:36:30  6   A.   Piedras Negras, Coahuila, which is across the border in

13:36:34  7   Eagle Pass, Texas.

13:36:35  8   Q.   And you mentioned a little bit but, just again, how would

13:36:39  9   you smuggle?  Or what method of concealment would you use to get

13:36:42  10  the cocaine into the United States?

13:36:44  11        MS. WILLIAMS:  Objection.  Repetitive.

13:36:47  12        THE COURT:  Objection is overruled.

13:36:50  13  Q.   (BY MR. GARDNER) You may answer that question.

13:37:06  14  A.   We would cross it over the river and then, crossing the Rio

13:37:16  15  Grande, and then, we would put it in the house in Eagle Pass, and

13:37:19  16  then, the truck, the 18-wheeler would show up and it would either

13:37:22  17  be carried in the cab or in the back.

13:37:26  18  Q.   And would you receive the money from the sales of drugs in

13:37:30  19  the United States back to you?

13:37:35  20  A.   Yes, sir.

13:37:36  21  Q.   How would that happen?

13:37:46  22  A.   Yeah.  I'd be told about a week or two weeks later, there's

13:38:02  23  money in Dallas or Chicago, a million, two million, you need to

13:38:06  24  go pick it up.  And so, then, I would go get it and it would be

13:38:08  25  in the same trucks that had taken the trucks up there.  It would

```
13:38:12   1   be -- either seven to 15 days after they crossed.
13:38:15   2   Q.   Now, would you personally go get the money or did you have
13:38:18   3   people who did that for you?
13:38:26   4   A.   No, sir.  I didn't cross over.  I had people who did it for
13:38:29   5   me.
13:38:30   6   Q.   Can you tell the ladies and gentlemen of the jury what a
13:38:32   7   plaza is?
13:38:52   8   A.   A plaza is a city, something like Piedras Negras where you
13:39:10   9   establish control over the municipal police, over the federal
13:39:13  10   police and other law enforcement agents, where you pay a monthly
13:39:16  11   fee so that you can do whatever drug business or whatever other
13:39:21  12   crime you want to commit, as long as you -- so you could make
13:39:24  13   money and produce as a cartel.
13:39:26  14   Q.   And who is the plaza boss when you were distributing drugs
13:39:30  15   for the Zetas?
13:39:35  16   A.   "Metro."
13:39:37  17   Q.   And did you report directly to him?
13:39:41  18   A.   No.  With Omar.
13:39:48  19   Q.   Now, you mentioned 500 kilos.  What would be the amount you
13:39:54  20   would receive from the United States for those 500 kilos?
13:40:04  21   A.   The amount of money?
13:40:05  22   Q.   Yes, sir.  The amount.
13:40:08  23   A.   Fifteen million.
13:40:15  24        MS. WILLIAMS:  Objection.  Nonresponsive.
13:40:18  25   A.   Depending on --
```

| | | |
|---|---|---|
| 13:40:19 | 1 | THE COURT:  Hold on.  We have two things going.  I had |
| 13:40:22 | 2 | a question answered.  What is your objection? |
| 13:40:24 | 3 | MS. WILLIAMS:  There was a question and then, there was |
| 13:40:27 | 4 | an answer, and then, he continued to answer, and the interpreter |
| 13:40:30 | 5 | was about to read back the continuation of his answer. |
| 13:40:36 | 6 | THE COURT:  Okay.  Well, I can't really rule until I |
| 13:40:40 | 7 | know what he's going to say.  So that gives me the opportunity to |
| 13:40:47 | 8 | tell you that some of you may be very proficient in Spanish, but |
| 13:40:52 | 9 | the law is that the court official interpreter's interpretation |
| 13:40:58 | 10 | of Spanish is what you shall rely on in your deliberation and in |
| 13:41:02 | 11 | your verdict.  These are certified federal interpreters that work |
| 13:41:07 | 12 | at this courthouse.  And let me ask a question, and then, we'll |
| 13:41:16 | 13 | go back and I'll have Mr. Gardner restate his. |
| 13:41:20 | 14 | We're talking about kilos but kilos of what at this |
| 13:41:24 | 15 | point in time?  So restate your question, and then, you can |
| 13:41:28 | 16 | restate your objection if it's the same question.  I just don't |
| 13:41:32 | 17 | know what it was. |
| 13:41:34 | 18 | Q.   (BY MR. GARDNER) When I say the word "kilos," does that |
| 13:41:38 | 19 | stand for kilograms? |
| 13:41:40 | 20 | A.   Yes, sir. |
| 13:41:41 | 21 | Q.   And how much does a kilogram weigh in pounds? |
| 13:41:49 | 22 | A.   2.2 pounds. |
| 13:41:52 | 23 | Q.   And when I asked you the question 500 kilos, what type of |
| 13:41:56 | 24 | drug was that? |
| 13:42:00 | 25 | A.   Cocaine. |

| | | |
|---|---|---|
| 13:42:04 | 1 | Q.   Did you ever -- you as part of the organization, did you |
| 13:42:12 | 2 | ever lose loads of cocaine or cash to the law enforcement in the |
| 13:42:18 | 3 | United States? |
| 13:42:19 | 4 | MS. WILLIAMS:  Objection.  Relevance. |
| 13:42:21 | 5 | MR. GARDNER:  Your Honor, it's relevant to his |
| 13:42:22 | 6 | relationship in the conspiracy, in the Zeta conspiracy. |
| 13:42:26 | 7 | THE COURT:  Well, he's not being charged by being in a |
| 13:42:32 | 8 | conspiracy, and this is a money-laundering case. |
| 13:42:35 | 9 | MR. GARDNER:  I asked about loads of money and cocaine. |
| 13:42:37 | 10 | I can just ask about loads of money. |
| 13:42:39 | 11 | THE COURT:  With the loads of money and cocaine, I'll |
| 13:42:41 | 12 | overrule the objection. |
| 13:42:50 | 13 | A.   Yes, sir. |
| 13:42:51 | 14 | Q.   (BY MR. GARDNER) And what would happen if you lost a load of |
| 13:42:53 | 15 | money in the United States? |
| 13:43:09 | 16 | A.   Well, as long as it can be shown that this was due to the |
| 13:43:20 | 17 | work of the authorities here, then there was not a problem.  But |
| 13:43:23 | 18 | if it could be shown that there was an informant or something |
| 13:43:27 | 19 | federal, then people would kill. |
| 13:43:30 | 20 | Q.   Killed by the Los Zetas organization? |
| 13:43:34 | 21 | A.   Yes, sir. |
| 13:43:36 | 22 | Q.   Now, I want to move to 2008.  You've identified this man as |
| 13:43:42 | 23 | Miguel Trevino, "40."  When did you meet him? |
| 13:43:56 | 24 | A.   The end of 2008. |
| 13:43:59 | 25 | Q.   And what was his role in the organization? |

| | | |
|---|---|---|
| 13:44:10 | 1 | A.   He was the second boss.  There was the first one and then, |
| 13:44:14 | 2 | he was the second one to come in of all the Zetas. |
| 13:44:18 | 3 | Q.   And do you know the name of the first boss? |
| 13:44:25 | 4 | A.   Heriberto Lazcano.  Supposedly he's dead. |
| 13:44:31 | 5 | Q.   Did you ever learn where the cocaine that the Zetas sent to |
| 13:44:35 | 6 | the United States came from? |
| 13:44:42 | 7 | A.   Yes, sir. |
| 13:44:45 | 8 | Q.   And where was that, sir? |
| 13:44:46 | 9 | A.   From Columbia. |
| 13:44:47 | 10 | Q.   Columbia.  Thank you. |
| 13:44:48 | 11 |      Did you ever come to know an individual by the name of |
| 13:44:50 | 12 | Jose Vasquez, Jr.? |
| 13:44:59 | 13 | A.   Yes, sir.  I met him after -- after he went to Mexico. |
| 13:45:03 | 14 | Q.   And what was his role in the organization? |
| 13:45:12 | 15 | A.   He was the one that bought all the cocaine and all the |
| 13:45:14 | 16 | marihuana in Dallas, Texas. |
| 13:45:16 | 17 | Q.   And how much cocaine were you sending Jose Vasquez per month |
| 13:45:21 | 18 | to Dallas, Texas? |
| 13:45:29 | 19 | A.   Could be from a thousand to 3,000 kilos.  It would vary. |
| 13:45:35 | 20 | Q.   And was he the largest Zeta distributor in the United |
| 13:45:39 | 21 | States? |
| 13:45:39 | 22 | A.   In Texas, yes. |
| 13:45:45 | 23 | Q.   What about the United States?  Was there a larger |
| 13:45:48 | 24 | distributor? |
| 13:45:51 | 25 | A.   It was another one in Chicago, but I don't know him. |

13:45:57   1   Q.   Are you familiar with an individual by the name of Hector

13:46:00   2   Moreno?

13:46:03   3   A.   Yes, sir.

13:46:03   4   Q.   And how do you know him?

13:46:13   5   A.   He is -- he was my partner and he worked with me.

13:46:16   6   Q.   And was this in Mexico?

13:46:17   7   A.   Yes, sir.

13:46:18   8   Q.   And when you say he was your partner, what did he do with

13:46:21   9   you or for you?

13:46:50   10   A.   He was the one that was in charge of handling both the money

13:46:53   11   and getting the drugs.  He was the one that took all the phone

13:46:55   12   calls.  He was the one that Jose Vasquez was his client, so he

13:47:00   13   was in contact with him.  He would gather up the money, send the

13:47:03   14   drugs.  And then, when the money was together, he'd call me and

13:47:06   15   say, come get the money, and the money would be crossed along the

13:47:09   16   Piedras Negras border.

13:47:09   17   Q.   And once you got the money, what did you do with it?

13:47:26   18   A.   I would split up the money and the denominations by 20s, 50s

13:47:36   19   and 100s.  If there are any ones, fives, or tens, because in

13:47:40   20   Columbia, they didn't want to work in those small denominations,

13:47:45   21   we would then gather them and put them into higher -- get higher

13:47:48   22   denominations.

13:47:49   23   Q.   And would all the money go back to Columbia?  Or were there

13:47:53   24   other expenses involved?

13:48:11   25   A.   No.  There were expenses that remained in Mexico, like

13:48:15    1   paying for the plazas, the horses, the workers, the ones who

13:48:19    2   crossed.

13:48:20    3   Q.   So you're familiar with an individual by the name of Raul

13:48:24    4   Guadalajara?

13:48:26    5   A.   Yes, sir.

13:48:26    6   Q.   And what was his role?

13:48:48    7   A.   He was a worker and a friend.  He is a friend, but he was a

13:48:53    8   worker of mine, and he was in charge of wrapping up the cocaine

13:48:58    9   so that you couldn't smell it.  He would package it up and he

13:49:01   10   worked with Hector Moreno.

13:49:04   11   Q.   The individual you mentioned as your partner?

13:49:11   12   A.   Yes.  Hector Moreno.

13:49:14   13   Q.   Are you familiar with an individual that goes by nickname of

13:49:18   14   "Cuno"?

13:49:22   15   A.   "Cuno."

13:49:23   16   Q.   "Cuno"?

13:49:24   17   A.   Yes, sir.

13:49:24   18   Q.   And how do you know him?

13:49:31   19   A.   He was the one that received the money.  He was the

13:49:33   20   accountant.  He's one of the Zetas' accountants.

13:49:37   21   Q.   And was he an accountant for you or for somebody else?

13:49:42   22   A.   No.  Miguel and Omar Trevino.

13:49:47   23   Q.   And so, explain to the jury the accounting methods that

13:49:50   24   Miguel and Omar, "40" and "42," would use to keep track of their

13:49:54   25   money.

13:50:41   1   A.   Well, then, I would -- okay.  So I would get the money, be

13:50:49   2   it two or three, four million, and it would then be split up and

13:50:52   3   along with denominations as I told you.  Then I would go to

13:50:55   4   "Cuno."  "Cuno" would say, how many kilos?  I would say, 500.  He

13:50:59   5   says, okay --

13:51:00   6            MS. WILLIAMS:  Objection.

13:51:04   7            THE COURT:  Okay.  I'm going to overrule that

13:51:07   8   objection.  Go ahead.

13:51:08   9   A.   He said, okay.  That's 10 to 15 million.  Do you have any

13:51:12  10   expenses?  Yes, we have expenses of transporting, of crossing, of

13:51:17  11   paying for the houses, for the storage and --

13:51:20  12            MS. WILLIAMS:  I object to hearsay.

13:51:22  13            THE COURT:  Okay.  The objection is still overruled.

13:51:31  14   A.   And then, he would prepare a report for Omar, and then, Omar

13:51:33  15   would ask me if I needed more.

13:51:36  16   Q.   (BY MR. GARDNER) More money or more cocaine?

13:51:41  17            THE COURT:  Members of the jury, the conversations he

13:51:45  18   reported then are not to be considered offered for the truth of

13:51:51  19   the matter but as to the reasons why this gentleman says what

13:51:58  20   happened.  In other words, the method.  So that's why the

13:52:02  21   testimony is before you.

13:52:04  22            You may proceed.

13:52:05  23            MR. GARDNER:  Thank you, your Honor.

13:52:06  24   Q.   (BY MR. GARDNER) Do you know why "40" and "42" have never

13:52:14  25   been arrested in Mexico?

| | | |
|---|---|---|
| 13:52:20 | 1 | A.   Yes. |
| 13:52:21 | 2 | Q.   All right.  Why is that? |
| 13:52:32 | 3 | A.   Because if they had bought off all the police in Mexico, the |
| 13:52:36 | 4 | Army, and people in high places in Mexico.  Everything. |
| 13:52:40 | 5 | Q.   And how did it come to be that you got arrested? |
| 13:52:51 | 6 | A.   In 2011, can I tell the whole story? |
| 13:52:55 | 7 | THE COURT:  Let's do it by question and answer. |
| 13:52:58 | 8 | Q.   (BY MR. GARDNER) Let me ask you a question. |
| 13:53:01 | 9 | A.   Okay. |
| 13:53:01 | 10 | Q.   When were you arrested? |
| 13:53:13 | 11 | A.   In 2011. |
| 13:53:15 | 12 | MS. WILLIAMS:  Objection.  Nonresponsive to the rest of |
| 13:53:17 | 13 | whatever is about to come. |
| 13:53:20 | 14 | MR. ESPER:  Excuse me, your Honor. |
| 13:53:22 | 15 | THE COURT:  All right.  That's a good objection.  He |
| 13:53:26 | 16 | was arrested 2011.  Ask your next question. |
| 13:53:29 | 17 | MR. ESPER:  May we approach the bench, please? |
| 13:53:40 | 18 | THE COURT:  Sure. |
| 13:53:40 | 19 | (At the bench, on the record.) |
| 13:53:46 | 20 | MR. ESPER:  Your Honor, I would request that the Rule |
| 13:53:50 | 21 | 105 limiting instruction be given, respectfully, to the jury that |
| 13:53:55 | 22 | this evidence, although it's all cocaine evidence, is solely for |
| 13:53:58 | 23 | the purpose of trying to establish funds.  This is a |
| 13:54:04 | 24 | money-laundering conspiracy.  I think an instruction under Rule |
| 13:54:06 | 25 | 105 should be applicable to both individuals who have nothing to |

13:54:09    1    do with any cocaine is my request.

13:54:13    2            MR. GARDNER:  Your Honor, I would respectfully

13:54:15    3    disagree.  Yes, he was arrested for cocaine that is a charged

13:54:20    4    item of the AUSA.  One of the charged items.  I don't think there

13:54:24    5    needs to be a limiting instruction.  This is all to determine

13:54:26    6    where the source of the funds come from.

13:54:29    7            MR. ESPER:  That's fine.  But there's a lot of

13:54:32    8    individuals who are not charged in cocaine distribution.  I think

13:54:34    9    a limiting instruction would be appropriate that cocaine

13:54:36   10    distribution is not applicable to a number of these defendants,

13:54:41   11    and they're just charged in the money-laundering conspiracy.  I

13:54:43   12    understand that the government's theory that theory is cocaine

13:54:47   13    distribution.  Some of that money was used to launder.  But what

13:54:51   14    we're hearing is tons and tons and tons of cocaine distribution,

13:54:54   15    and none of these defendants, to my knowledge, have anything to

13:54:57   16    do with any of this cocaine distribution.  I think a limiting

13:55:01   17    instruction under 105 would be appropriate.

13:55:04   18            MR. GARDNER:  I just ask if the Court is giving an

13:55:07   19    instruction --

13:55:07   20            THE COURT:  At this time, I'll overrule that objection.

13:55:19   21    Q.   (BY MR. GARDNER) Mr. Cuellar, we established that you were

13:55:22   22    arrested in 2011.  Why did you reenter the United States?

13:55:38   23    A.   Because Miguel wanted me killed.

13:55:43   24    Q.   And why was that?

13:56:05   25    A.   Because Miguel wanted me killed because people from my

| | | |
|---|---|---|
| 13:56:09 | 1 | organization started cooperating with ICE and DEA about where |
| 13:56:15 | 2 | things were and because there were people that -- because the |
| 13:56:18 | 3 | trust I had in them had the information and they were starting to |
| 13:56:23 | 4 | cooperate. |
| 13:56:24 | 5 | Q.   And what does -- or what does Miguel and/or Omar do with |
| 13:56:32 | 6 | people they consider traitors? |
| 13:56:38 | 7 | MS. WILLIAMS:  Objection.  Relevance. |
| 13:56:43 | 8 | THE COURT:  What was the last part of your question? |
| 13:56:45 | 9 | MR. GARDNER:  What does -- the people they considered |
| 13:56:49 | 10 | traitors. |
| 13:56:50 | 11 | THE COURT:  Traders. |
| 13:56:51 | 12 | MR. GARDNER:  Traitors. |
| 13:56:52 | 13 | THE COURT:  I couldn't understand. |
| 13:56:53 | 14 | MR. ESPER:  Your Honor, with respect to that question, |
| 13:56:55 | 15 | I would renew the same 105 objection I previously raised.  Now |
| 13:56:59 | 16 | we're talking about a different subject. |
| 13:57:00 | 17 | THE COURT:  Anybody else?  Objections are overruled and |
| 13:57:04 | 18 | the question -- the witness may answer. |
| 13:57:25 | 19 | A.   In 2011, I had brought -- bought BlackBerrys for |
| 13:57:53 | 20 | everybody -- |
| 13:57:53 | 21 | MS. WILLIAMS:  Objection, your Honor.  Nonresponsive. |
| 13:57:57 | 22 | MR. GARDNER:  Your Honor, I believe if the Court hears |
| 13:57:58 | 23 | the rest of the answer, we will find that it is responsive. |
| 13:58:00 | 24 | THE COURT:  Okay.  We'll hear the rest of the answer. |
| 13:58:03 | 25 | A.   Because everything was done through messaging.  I had bought |

13:58:06  1  ten, one for Miguel, one for Omar, for other people, and one was

13:58:09  2  for me.  At the time, Hector Moreno and Jose Vasquez were telling

13:58:13  3  DEA and ICE about that.  They told the Mexican authorities.  The

13:58:16  4  Mexican authorities told them that someone within my organization

13:58:20  5  was betraying them.

13:58:22  6  Q.   (BY MR. GARDNER) And, again, based on your understanding of

13:58:25  7  what the Zetas did, was that the reason you came across into the

13:58:36  8  United States?

13:58:36  9  A.   Yes, sir.

13:58:37  10  Q.   And prior to coming across, did you let anyone else know you

13:58:41  11  were crossing into the United States?

13:58:48  12  A.   Yes, sir.

13:58:49  13  Q.   Who was that, sir?

13:58:51  14  A.   My wife, my children, Hector, and that's it.  Oh, my

13:59:04  15  attorney.  Sorry.

13:59:05  16  Q.   And did you have any property in Mexico prior to leaving?

13:59:12  17  A.   Yes, sir.

13:59:13  18  Q.   And what has happened to that property?

13:59:35  19  A.   They knocked everything down, just broke it into little

13:59:39  20  pieces, the houses, the apartments.  They stole my horses.

13:59:44  21  Everything that I had, they took away from me.  And they killed a

13:59:46  22  lot of my people.

13:59:50  23  Q.   So you mentioned horses.  Why don't I talk about horses for

13:59:54  24  a little bit.  Are you familiar with the breed known as the

13:59:58  25  American quarter horse?

14:00:08   1   A.   Yes, sir.

14:00:09   2   Q.   Could you please let the jury know how you became involved

14:00:12   3   with quarter horses?

14:00:54   4   A.   In 2000, I bought a horse that was called Swift Royal and it

14:00:59   5   won a futurity for me in Laredo and I made $120,000, and that's

14:01:04   6   when I started liking horses.  And so, we would go buy horses at

14:01:08   7   the auctions, but we never paid more than $10,000 -- we didn't

14:01:13   8   buy expensive horses.  We didn't pay more than $10,000 because if

14:01:16   9   you do, IRS makes you fill out a form asking about where the

14:01:19   10   money's from.  Couldn't do that, so we never spent more than

14:01:23   11   $10,000.

14:01:25   12   Q.   And when you became involved in the Zetas, did "40" and "42"

14:01:30   13   and this individual you called "Mamito," Enrique Rejon, did he --

14:01:35   14   did they get involved with quarter horses?

14:02:12   15   A.   When I met Omar and "Mamito" when they picked me up,

14:02:19   16   "Mamito" said something about horses, and I knew about the lines

14:02:22   17   he was talking about.  He was talking about Frequently Dash,

14:02:27   18   Corona Cartel, the Royal Dutch.  And since I knew something about

14:02:30   19   those lines, he was interested, and he said, Omar, I think we

14:02:32   20   have found someone for you.  And so, he started talking to

14:02:36   21   "Mamito" about the horses, and he said, you're safe here,

14:02:40   22   nothing's going to happen to you.

14:02:41   23   Q.   And when you talk about the lines, are you referring to the

14:02:44   24   bloodline of the horses?

14:02:50   25   A.   Yes, sir.

| | | |
|---|---|---|
| 14:02:51 | 1 | Q.   And I believe you said two bloodlines, Mr. Jess Perry and |
| 14:02:57 | 2 | Corona Cartel.  Am I correct in that? |
| 14:03:04 | 3 | A.   Yes, sir.  Those are two horses. |
| 14:03:07 | 4 | Q.   And why are they, the bloodlines for those two horses so |
| 14:03:11 | 5 | valuable? |
| 14:03:41 | 6 | A.   Because of the kind of offspring they have, because their |
| 14:03:49 | 7 | offspring tend -- they ran fast, they broke records.  Out of |
| 14:03:51 | 8 | every 100 offspring that they have, five to ten would be really |
| 14:03:56 | 9 | good, and we call them the crossings or we call them maquilas, |
| 14:04:01 | 10 | the -- when you -- |
| 14:04:04 | 11 | Q.   Breedings? |
| 14:04:05 | 12 | A.   When you do the embryonic breeding, those can end up costing |
| 14:04:13 | 13 | a thousand to 30,000 once they're bred. |
| 14:04:16 | 14 | Q.   And did you buy or -- let me ask that question.  Did you buy |
| 14:04:22 | 15 | horses in the United States? |
| 14:04:27 | 16 | A.   Yes, sir. |
| 14:04:28 | 17 | Q.   And were you aware of "40," "42," or "Mamito" bought horses |
| 14:04:33 | 18 | in the United States? |
| 14:04:37 | 19 | A.   Yes, sir. |
| 14:04:38 | 20 | Q.   And where would you buy these horses? |
| 14:04:44 | 21 | A.   In Oklahoma and Ruidoso. |
| 14:04:46 | 22 | Q.   And were those private sales or at auctions? |
| 14:04:58 | 23 | A.   First at auctions and then, we went directly to the owners. |
| 14:05:01 | 24 | Q.   And are you familiar with an individual named Ramiro |
| 14:05:09 | 25 | Villarreal? |

| | | |
|---|---|---|
| 14:05:09 | 1 | A.    Yes, sir. |
| 14:05:09 | 2 | Q.    And how do you know him? |
| 14:05:13 | 3 | A.    He's the one that bought Tempting Dash and Mr. Piloto, lots |
| 14:05:31 | 4 | of horses, a lot of mares that were really fast in Mexico.  He |
| 14:05:35 | 5 | was recognized as buying really good race horses in Mexico. |
| 14:05:38 | 6 | Q.    And who would he buy these horses for? |
| 14:05:44 | 7 | A.    For Omar and Miguel and for other people.  That was his |
| 14:05:52 | 8 | business. |
| 14:05:53 | 9 | Q.    And speaking of business, how were these horses paid for in |
| 14:05:57 | 10 | the United States? |
| 14:06:14 | 11 | A.    They were bought through people that didn't -- weren't being |
| 14:06:19 | 12 | investigated by the IRS who were very solvent and who could not |
| 14:06:22 | 13 | be questioned about where the money was coming from. |
| 14:06:26 | 14 | Q.    And what type of people were these? |
| 14:06:36 | 15 | A.    People that had big businesses, like "Pancho" Colorado and |
| 14:06:45 | 16 | Alejandro Barradas. |
| 14:06:46 | 17 | Q.    I'm going to come back to Mr. Colorado in just a second.  Do |
| 14:06:49 | 18 | you recognize Mr. Colorado before we were here today? |
| 14:06:57 | 19 | A.    I haven't seen him. |
| 14:06:59 | 20 | Q.    Do you see an individual over here at counsel table?  Do you |
| 14:07:03 | 21 | recognize Mr. Colorado? |
| 14:07:07 | 22 | A.    I don't see him. |
| 14:07:09 | 23 | Q.    I know there's a lot of people there. |
| 14:07:12 | 24 | A.    I don't recognize.  I did see him, but no.  I don't |
| 14:07:19 | 25 | recognize him right now. |

| | | |
|---|---|---|
| 14:07:20 | 1 | Q.   That's fine. |
| 14:07:22 | 2 | Now, the businessmen, how would they get reimbursed for |
| 14:07:26 | 3 | payment of the horses? |
| 14:07:29 | 4 | MR. DEGEURIN:  Your Honor, objection to foundation. |
| 14:07:34 | 5 | THE COURT:  Read me back the question. |
| 14:07:39 | 6 | (Last question read back.) |
| 14:07:41 | 7 | THE COURT:  Objection's overruled. |
| 14:07:45 | 8 | A.   What was the question? |
| 14:07:46 | 9 | Q.   (BY MR. GARDNER) How would the businessmen, after they first |
| 14:07:49 | 10 | took the horses, get reimbursed by the cartel? |
| 14:07:57 | 11 | A.   They were paid in Mexico. |
| 14:07:59 | 12 | Q.   By who? |
| 14:08:03 | 13 | A.   For who? |
| 14:08:04 | 14 | Q.   By who?  Who would pay the businessmen? |
| 14:08:09 | 15 | A.   Miguel, or through "Cuno," or "Metro," or whoever was in |
| 14:08:17 | 16 | charge in Veracruz. |
| 14:08:21 | 17 | Q.   Do you know what happened to Ramiro Villarreal? |
| 14:08:28 | 18 | A.   Yes, sir. |
| 14:08:29 | 19 | Q.   And what was that? |
| 14:08:31 | 20 | A.   He was killed. |
| 14:08:32 | 21 | Q.   And who killed him? |
| 14:08:33 | 22 | A.   Omar.  Sorry, Miguel. |
| 14:08:36 | 23 | Q.   And do you know why Ramiro Villarreal was killed? |
| 14:08:41 | 24 | A.   Yes, because they realized that he was cooperating with the |
| 14:08:58 | 25 | U.S. authorities.  He was either arrested or detained in Houston. |

| 14:09:02 | 1 | He was questioned and he started cooperating. |
| 14:09:05 | 2 | Q.   And do you recall when he was killed? |
| 14:09:11 | 3 | A.   No, sir.  The exact date, no. |
| 14:09:14 | 4 | Q.   Are you familiar with an individual by the name of Alejandro |
| 14:09:20 | 5 | Barradas? |
| 14:09:21 | 6 | A.   I heard of him, sir. |
| 14:09:23 | 7 | Q.   And are you familiar with a company called Grupo Aduanero |
| 14:09:29 | 8 | Integral? |
| 14:09:31 | 9 | A.   No, sir. |
| 14:09:32 | 10 | Q.   Do you recall if he had any involvement with the horses? |
| 14:09:48 | 11 | A.   Yes.  He bought a mare from Miguel.  I don't remember how |
| 14:09:52 | 12 | much.  It was somewhere between 100 to 300,000, maybe a little |
| 14:09:56 | 13 | bit more. |
| 14:09:56 | 14 | Q.   And are you familiar with an individual by the name of |
| 14:09:59 | 15 | Carlos Nayen? |
| 14:10:02 | 16 | A.   Yes, sir. |
| 14:10:04 | 17 | Q.   And what happened to Mr. Alejandro Barradas? |
| 14:10:28 | 18 | A.   He was killed, thanks to Carlos Nayen going and telling |
| 14:10:32 | 19 | Miguel that Alejandro Barradas didn't want the mares in his name |
| 14:10:37 | 20 | still; that he wanted her taken out of his name.  Carlos was told |
| 14:10:39 | 21 | to talk to Alejandro.  Alejandro did not want the mare in his |
| 14:10:44 | 22 | name, and so, he was killed. |
| 14:10:45 | 23 | Q.   So if you know, why would "40" kill someone for wanting a |
| 14:10:51 | 24 | mare out of his name? |
| 14:10:56 | 25 | MR. DEGEURIN:  Excuse me, your Honor, I'm going to have |

14:10:58  1   to object to speculation.

14:11:00  2              THE COURT:  I sustain the objection.

14:11:03  3              MR. DEGEURIN:  And could I approach the bench?  Could

14:11:04  4   we approach the bench?  Make myself more clear about the

14:11:09  5   foundation objection I made earlier.

14:11:22  6              (At the bench, on the record.)

14:11:32  7              MR. DEGEURIN:  Judge, I cannot tell from the question

14:11:38  8   whether the person knows this or he heard about it.  And to wait

14:11:45  9   for cross-examination to point out that he just heard these

14:11:47  10  things from other people is too late.  So that's why I was asking

14:11:53  11  for foundation.  He wasn't present during any of these things

14:11:56  12  he's talking about.  At least it hasn't been established.  And

14:12:00  13  so, that's why I was objecting to foundation.  What happened to

14:12:02  14  so and so?  What happened to so and so?  It's either calling for,

14:12:07  15  well, what I heard was.  That's why I was objecting to

14:12:12  16  foundation.

14:12:13  17             THE COURT:  Well, I understand what foundation is.  I

14:12:17  18  just have to put the objection to the right question.

14:12:21  19             MR. DEGEURIN:  That's my fault.

14:12:22  20             THE COURT:  Yeah.  You're not inhibited from objecting

14:12:25  21  in any way, shape or form.  But I understand the reason for the

14:12:29  22  objection.

14:12:29  23             MR. DEGEURIN:  All right.  Okay.  Well, I'll do it

14:12:36  24  again if he starts.

14:12:36  25             THE COURT:  That's your right.

14:12:38    1              MR. DEGEURIN:  Okay.

14:12:50    2    Q.   (BY MR. GARDNER) So how do you know Carlos Nayen?

14:12:59    3    A.   I met him through Miguel at the horse races.

14:13:04    4    Q.   And what was his role, to your knowledge, with the horses in

14:13:09    5    the Zeta organization?

14:13:28    6              MR. ESPER:  Excuse me, your Honor, I'm going to object

14:13:30    7    that the proper predicate has not been laid.  If he knows from

14:13:32    8    his own personal knowledge, I think is the proper predicate to be

14:13:37    9    laid.  I don't know if he's getting this information from

14:13:38   10    somebody else or if he has his own personal knowledge.  It's not

14:13:43   11    of his own personal knowledge, then it's hearsay.

14:13:51   12              THE COURT:  Read me back the last question.

14:13:59   13              (Last question read back.)

14:13:59   14              THE COURT:  That objection is overruled.  You may

14:14:01   15    answer.

14:14:19   16    A.   And I know this because I was the one that paid the money to

14:14:22   17    Carlitos Nayen that he was in charge of paying all the

14:14:27   18    inscription or registration fees, the trainers, all the expenses

14:14:31   19    for the horses, I did this.  I gave him the money in -- all the

14:14:35   20    money in 2010.  Because I was still owed a million-and-a-half

14:14:47   21    dollars that had come from the drugs that I had paid for the

14:14:52   22    inscription and registration fees and for the maintenance of the

14:14:56   23    horses.

14:14:56   24    Q.   (BY MR. GARDNER) And was this payment for the registration

14:14:59   25    fees and the inscriptions and maintenance of the horses, was that

| | | |
|---|---|---|
| 14:15:02 | 1 | in Mexico or in the United States? |
| 14:15:17 | 2 | A.    I would hand the money to Carlos in Nuevo Laredo, and he |
| 14:15:22 | 3 | would make the payments in the United States. |
| 14:15:24 | 4 | Q.    And in what manner would you give him the money?  In cash? |
| 14:15:30 | 5 | A.    Cash. |
| 14:15:31 | 6 | Q.    And what type of -- |
| 14:15:38 | 7 | A.    Hundreds, 200, 150, whatever he would ask for, according to |
| 14:15:42 | 8 | what expenses for the horses were.  Miguel had ordered me that |
| 14:15:50 | 9 | whatever he needed for the horses, I was to give Carlos. |
| 14:15:53 | 10 | Q.    When you say 100, 200, 250, is that hundreds of thousands of |
| 14:15:58 | 11 | dollars? |
| 14:16:04 | 12 | A.    Correct.  Yes. |
| 14:16:06 | 13 | Q.    Now, how many occasions do you recall providing Carlos Nayen |
| 14:16:11 | 14 | with cash for the horse expenses? |
| 14:16:22 | 15 | A.    More than eight or ten times. |
| 14:16:26 | 16 | Q.    Do you know if Carlos Nayen would purchase these horses at |
| 14:16:31 | 17 | auctions in the United States? |
| 14:16:35 | 18 | A.    Yes, sir. |
| 14:16:35 | 19 | Q.    And who would he do that for? |
| 14:16:40 | 20 | A.    For Miguel, for "Pancho," and for himself. |
| 14:16:45 | 21 | Q.    And would you ever sit with "40" while one of these auctions |
| 14:16:49 | 22 | were ongoing? |
| 14:17:00 | 23 | A.    No, sir. |
| 14:17:02 | 24 | Q.    Do you know how "40" communicated with Carlos on which |
| 14:17:06 | 25 | horses to buy? |

14:17:13  1   A.   Through the BlackBerrys.  "40" would show me on his BB,

14:17:26  2   after he bought them, saying, look I bought this one, this one,

14:17:29  3   this one, and then, we would go record it in the books.

14:17:31  4   Q.   And when you say he would show you, what would he

14:17:33  5   specifically show you?

14:17:48  6   A.   Through messages that he would send, Carlos.  And then, he

14:17:55  7   would show me on the Blackberry and say, see, I paid 70, 80 or

14:17:59  8   100 for this one, and it's either a Frequent Dash, or Corona

14:18:02  9   Cartel, or Mr. Jess Perry, all the best lines.

14:18:06  10  Q.   Again, referring to the bloodlines you testified to earlier?

14:18:16  11  A.   You want me to repeat them?

14:18:18  12  Q.   No, no.  Thank you.

14:18:19  13  A.   Sorry.

14:18:20  14  Q.   When you say Mr. Jess Perry, Corona Cartel, those are the

14:18:24  15  valuable bloodlines that "40" liked?

14:18:32  16  A.   Yes.

14:18:47  17       MS. WILLIAMS:  Objection, your Honor.  Nonresponsive.

14:18:49  18       THE COURT:  It is.  Sustain the objection.  Ask your

14:18:51  19  next question.  It wasn't a question before.

14:18:59  20  Q.   (BY MR. GARDNER) Do you remember the names of any specific

14:19:01  21  horses that they purchased?

14:19:09  22  A.   The Tempting Dash, Mr. Piloto, and Rolls Royce, Corvette,

14:19:27  23  all of the cars.  I don't remember all the cars, but that's what

14:19:31  24  they would name the horses.

14:19:32  25  Q.   Would they name the horses after car names?

14:19:42    1    A.    No.  After they were bought, the names would be changed.

14:19:46    2    Carlos was in charge of changing -- handled changing the names.

14:19:55    3    Q.    Let's talk about Mr. Piloto for a second.  Are you familiar

14:19:59    4    with Mr. Piloto winning a race called the All American Futurity?

14:20:10    5    A.    Yes, sir.

14:20:11    6    Q.    Were you instructed to pay money to bribe to the gatekeepers

14:20:15    7    of that race?

14:20:22    8    A.    Yes, sir.

14:20:23    9    Q.    And who gave you those instructions?

14:20:45   10    A.    Miguel instructed me to pay $110,000.  Carlos -- I was there

14:20:50   11    when Carlos was calling, saying he could make an arrangement.

14:20:54   12    So --

14:20:54   13              MS. WILLIAMS:  Objection.  Hearsay.

14:20:56   14              MR. GARDNER:  That is a coconspirator hearsay

14:20:58   15    statement, your Honor.

14:20:58   16              THE COURT:  The objection is sustained -- is overruled.

14:21:03   17    Q.    (BY MR. GARDNER) You may finish.

14:21:06   18    A.    So that he could -- he could make the arrangement so that

14:21:09   19    the fastest horses that Mr. Piloto had drawn could be held back.

14:21:15   20    Q.    When you say held back, do you know how the effect of

14:21:18   21    bribing gate starters can affect a race?

14:21:37   22    A.    Yeah, a lot, because they were the ones who were in charge

14:21:41   23    of either releasing or holding the horse a millisecond, and that

14:21:44   24    would let -- a whole body length can affect the whole race.

14:21:49   25    Q.    And how long does it take for a quarter horse to run a

14:21:53   1   quarter mile?

14:22:06   2   A.   Seventeen some, 19, it's not very long.   Those are seconds.

14:22:11   3   Q.   And so, does the holding of the head by the other gate

14:22:15   4   starters of the other horses, is that what affects the race?

14:22:20   5          MS. WILLIAMS:   Objection.   Lack of foundation.

14:22:22   6          THE COURT:   Objection is overruled.

14:22:47   7   A.   Yeah.   If you were to watch the video that's available on

14:22:49   8   the internet through the AQHA, the AQHA association, you would be

14:22:54   9   able to see that the faster horses, their heads were held for a

14:22:59   10   millisecond.   I was present in all the dealings for the

14:23:09   11   corruption so that Mr. Piloto would win.

14:23:11   12   Q.   (BY MR. GARDNER) When you say AQHA, is that the A-Q-H-A, or

14:23:15   13   known as the American Quarter Horse Association?

14:23:17   14   A.   Yes.   Yes.

14:23:20   15   Q.   Now, going back to conversation you had, who came up with

14:23:23   16   the amount, the $100,000 that you said was sent to the gate

14:23:29   17   starters?

14:24:02   18          MS. WILLIAMS:   Objection.   Nonresponsive.

14:24:05   19   A.   It was $110,000 and Carlos had had a dinner with them.   And

14:24:09   20   I don't know what they call the people here that hold the horses.

14:24:12   21   And they had said it would be 3,000 and Miguel said, no.   You're

14:24:15   22   not going to give them 3,000, you're going to give them 10,000.

14:24:19   23          THE COURT:   The objection --

14:24:20   24   A.   Per horse.

14:24:22   25          THE COURT:   -- is overruled.

14:24:23   1   Q.   (BY MR. GARDNER) Was that 10,000 per horse per -- strike

14:24:27   2   that.

14:24:27   3            Was that $10,000 per gate starter?

14:24:36   4   A.   Yes, sir.

14:24:36   5   Q.   And how many horses ran in the All American Futurity finals?

14:24:43   6   A.   Eleven.

14:24:44   7   Q.   And do you recall by how much Mr. Piloto won?

14:24:56   8   A.   Are you talking about what the race difference was, the body

14:24:59   9   length?

14:25:00   10  Q.   Si.  Between -- yes.

14:25:04   11  A.   It was by a milli -- nothing.  It was barely by the nose.

14:25:13   12  Q.   How did you get the money, the $100,000 from Mexico over to

14:25:17   13  the track?

14:25:41   14  A.   It wasn't from Mexico.  It was from Dallas and I didn't

14:25:45   15  order it.  It was Hector and it was through the buyer in Dallas.

14:25:48   16  And the money was taken from Dallas to Ruidoso and delivered

14:25:52   17  there.

14:25:53   18  Q.   And just for some clarifications, when you say Hector, is

14:25:56   19  that Hector Moreno?

14:25:59   20  A.   Yes, sir.

14:25:59   21  Q.   And when you say the buyer in Dallas, is that Jose Vasquez?

14:26:05   22  A.   Yes, sir.

14:26:06   23  Q.   And do you know the name of the individual who actually went

14:26:09   24  and got the money and delivered it to Ruidoso?

14:26:18   25  A.   Yes.  Yes, sir.  Gerardo Mata.

| | | |
|---|---|---|
| 14:26:21 | 1 | Q.   And was Mr. Mata a worker of yours? |
| 14:26:27 | 2 | A.   Yes, sir. |
| 14:26:27 | 3 | Q.   When Mr. Piloto won that race, who owned that horse? |
| 14:26:41 | 4 | A.   Miguel. |
| 14:26:43 | 5 | Q.   "Cuarenta"? |
| 14:26:45 | 6 | A.   Yes, sir. |
| 14:26:46 | 7 | Q.   Do you know this gentleman sitting in the back, Fernando |
| 14:26:49 | 8 | Garcia, the purple shirt, the light, pale shirt? |
| 14:26:55 | 9 | A.   No, sir. |
| 14:26:55 | 10 | Q.   Have you ever heard the name Fernando Garcia? |
| 14:26:58 | 11 | A.   No, sir. |
| 14:27:00 | 12 | Q.   Did "Cuarenta" tell you that that was his horse? |
| 14:27:06 | 13 | MR. WOMACK:  Objection, your Honor.  Hearsay and |
| 14:27:07 | 14 | confrontation. |
| 14:27:08 | 15 | THE COURT:  Hold on. |
| 14:27:12 | 16 | MR. GARDNER:  Question was, your Honor, did "Cuarenta" |
| 14:27:15 | 17 | tell you that that was his horse? |
| 14:27:20 | 18 | THE COURT:  How would that be in furtherance of the |
| 14:27:22 | 19 | conspiracy? |
| 14:27:23 | 20 | MR. GARDNER:  The horse is listed under the name of |
| 14:27:25 | 21 | Jose Trevino that won, your Honor.  Concealment of the source of |
| 14:27:32 | 22 | the funds. |
| 14:27:34 | 23 | THE COURT:  I'll overrule the objection.  You may |
| 14:27:36 | 24 | answer.  Repeat the question. |
| 14:27:41 | 25 | A.   What was the question? |

| | | |
|---|---|---|
| 14:27:42 | 1 | Q.   (BY MR. GARDNER) Did "Cuarenta" tell you that was his horse? |
| 14:27:52 | 2 | A.   Yes, sir. |
| 14:27:53 | 3 | MS. WILLIAMS:  Objection.  Nonresponsive. |
| 14:28:00 | 4 | THE COURT:  Read me the question, please. |
| 14:28:10 | 5 | (Last question read back.) |
| 14:28:10 | 6 | THE COURT:  The answer is "Yes." |
| 14:28:12 | 7 | MR. GARDNER:  Thank you, your Honor. |
| 14:28:14 | 8 | Q.   (BY MR. GARDNER) Did "Cuarenta" ever tell you about the role |
| 14:28:16 | 9 | of his brother Jose Trevino in the horse business? |
| 14:28:25 | 10 | A.   Yes, sir. |
| 14:28:27 | 11 | Q.   And what did he tell you? |
| 14:28:28 | 12 | MS. WILLIAMS:  Objection.  Hearsay.  Confrontation |
| 14:28:33 | 13 | clause. |
| 14:28:36 | 14 | THE COURT:  I sustain the objection to the question |
| 14:28:38 | 15 | asked. |
| 14:28:42 | 16 | Q.   (BY MR. GARDNER) Did Miguel Trevino ever tell you he |
| 14:28:45 | 17 | involved his brother Jose Trevino in the horse business? |
| 14:28:50 | 18 | MS. WILLIAMS:  Same objection. |
| 14:28:52 | 19 | THE COURT:  Well, that I'm going to overrule. |
| 14:29:02 | 20 | A.   It was Omar, not Miguel. |
| 14:29:05 | 21 | Q.   (BY MR. GARDNER) So what did Omar tell you about Jose |
| 14:29:08 | 22 | Trevino's involvement with the horse racing? |
| 14:29:11 | 23 | MS. WILLIAMS:  Objection.  Hearsay.  Confrontation |
| 14:29:15 | 24 | clause. |
| 14:29:15 | 25 | THE COURT:  The objection is overruled under the |

14:29:18   1   conspiracy objection.  You may answer.

14:29:53   2   A.   Well, that Miguel -- that Jose was going to become involved

14:29:57   3   -- well, before that.  Omar had always talked a lot about Jose

14:30:01   4   saying that he had -- Jose wanted nothing to do with the drugs,

14:30:04   5   that he had worked really hard, that he was a straight person.  I

14:30:09   6   met him, I learned that was true that he wanted nothing to do

14:30:12   7   with the drugs.  It wasn't until Ramiro bought that horse for

14:30:15   8   him, the Tempting Dash that he became.

14:30:19   9   Q.   (BY MR. GARDNER) And did you know whether Tempting Dash ever

14:30:22   10  became Jose Trevino's horse?

14:30:30   11  A.   Yes.

14:30:31   12  Q.   And how did Jose Trevino obtain Tempting Dash?

14:30:38   13          MS. WILLIAMS:  Objection.  Foundation.

14:30:42   14          THE COURT:  Ask that.  What's the basis of his

14:30:48   15  knowledge?

14:30:49   16  Q.   (BY MR. GARDNER) Are you aware that Ramiro had to give up

14:30:53   17  Tempting Dash?

14:30:59   18  A.   Sold it to Jose.

14:31:04   19  Q.   How do you know that?

14:31:50   20          MR. ESPER:  Your Honor, this is really getting -- now

14:31:52   21  he's gotten testimony from his wife.  That's clearly hearsay what

14:31:55   22  his wife told him.

14:31:58   23          THE GARDNER:  I believe he's going to testify he was

14:31:59   24  present during the actual transfer, your Honor.  I would ask the

14:32:02   25  Court to listen to the answer first.  Or I could rephrase the

14:32:15   1   question, your Honor.

14:32:16   2          THE COURT:  Well, the problem is that the objection

14:32:19   3   comes before the answer's in the record, because I know people

14:32:25   4   understand Spanish, but they shouldn't object until the answer's

14:32:31   5   in the record.  On the other hand, it may not be admissible

14:32:38   6   testimony, but I'm able to give an instruction that it isn't.

14:32:42   7   But there's no way I can rule without knowing the answer.

14:32:51   8          So I'll put you in the jury room for a minute, members

14:32:54   9   of the jury.

14:33:26  10          (Jury not present.)

14:33:39  11          THE COURT:  You may.

14:33:48  12          THE WITNESS:  One day, Omar called me and told me to

14:33:50  13   take my wife because Ramiro was going to sell Jose the horse in

14:33:53  14   Mexico.  I talked to her about it.  She went very unwillingly and

14:33:59  15   she there did off-the-cuff translation about the sale.  Then she

14:34:04  16   told them to come meet her at her office in Eagle Pass where she

14:34:09  17   would have the agreement typed up and ready to go.  I don't

14:34:13  18   remember if it was in English or Spanish, but that she would have

14:34:15  19   it there.  They would sign it and seal it, that they were both

14:34:18  20   agreeing to the sale of this horse.

14:34:21  21          MR. GARDNER:  Based on that response, your Honor, I

14:34:23  22   think I can agree with Mr. Esper, it's probably hearsay based on

14:34:26  23   the wife.

14:34:26  24          THE COURT:  All right.  Okay.  Well, I'll tell you

14:34:34  25   what, since the jury's out, let's take a ten-minute break, and

14:34:40  1  tell the jury they'll have time to use the facilities if they

14:34:43  2  wish.  But, counsel, it's not a good way to proceed to ask a

14:34:53  3  question, have an objection.  I don't know how many people are on

14:34:57  4  the jury understand Spanish, but I do know some do because they

14:35:04  5  have indicated in their answers.  And so, if I sustain the

14:35:10  6  objection without an instruction, I don't know that your

14:35:15  7  objection was very informative.

14:35:17  8        But I think we're going to have to let the answer come,

14:35:21  9  then make your objection, and then, if I think it's not

14:35:24  10  admissible, I'll instruct them they can't consider it for any

14:35:28  11  purpose.  Now, a lot of people don't think that's a good remedy,

14:35:35  12  but that's the only one that we have, as far as I know.  And I'm

14:35:40  13  not aware of any jury that's ever not done that because I've

14:35:48  14  questioned jurors afterwards.  But that's a very unscientific

14:35:53  15  proof.

14:35:54  16        MR. WOMACK:  Your Honor, now that we know the answer

14:35:56  17  that's coming as inadmissible, I would ask that we do keep it cut

14:36:02  18  off where it is.  Your Honor will give the proper instruction to

14:36:05  19  the members -- to the jurors not to consider whether the answer

14:36:09  20  would have been and for those who --

14:36:11  21        THE COURT:  Oh, I'll do that now.  But I'm talking

14:36:13  22  about the next question and the one after that.

14:36:16  23        MR. WOMACK:  Oh, yes, sir.

14:36:17  24        THE COURT:  I don't want the jury having to lead on

14:36:19  25  each question and hearing the answer.

14:36:21    1          MR. ESPER:  Your Honor, I concur with the Court.  I

14:36:23    2    believe the jury's followed the Court's instructions to

14:36:26    3    disregard.  However, unequivocally, they're humans, they've heard

14:36:31    4    the answer.  It's walking a fine line.  I know they follow the

14:36:37    5    Court's instructions.  I believe that.  But sometimes they hear

14:36:39    6    an answer and it's that bell sometimes doesn't get -- the

14:36:44    7    vibration doesn't get out of their brain.

14:36:45    8          THE COURT:  You're missing the point.  They're hearing

14:36:48    9    the answer at the same time you're hearing the answer.

14:36:51   10          MR. ESPER:  I know.

14:36:51   11          THE COURT:  And then, they have no instruction, but

14:36:53   12    they've heard the answer and that's what -- y'all consult and see

14:36:58   13    how you want to handle it, and then, let me know.  There's no

14:37:01   14    real good way to handle this type of situation.  But the

14:37:06   15    traditional way is for everybody to hear the answer, and then, I

14:37:11   16    give an instruction that they're not to consider it for any

14:37:14   17    purpose.

14:37:15   18          MS. WILLIAMS:  Your Honor, I would just ask you to

14:37:16   19    renew your instruction to the jury about the Spanish and the

14:37:20   20    English.  You did give them an instruction that covers that.

14:37:22   21          THE COURT:  I'm going to sustain the objection and tell

14:37:25   22    them not to consider that for any purpose.  And then, I will tell

14:37:28   23    them, again, that the official interpretation is what they have

14:37:32   24    to have.  All right.  Take a little break.

14:45:39   25          (Recess.)

14:48:43   1                  (Jury present.)

14:48:44   2          THE COURT:  Members of the jury, I sustained the

14:48:47   3   objection to the last question.  So those of you who are

14:48:52   4   proficient in Spanish and understood the question, you cannot use

14:48:56   5   that answer for any purpose at all.  And let me reemphasize the

14:49:02   6   fact that in federal court, it is the interpreter's

14:49:07   7   interpretation from Spanish into English and from English to

14:49:12   8   Spanish that you must rely on.  Not your own understanding of

14:49:19   9   what was said.  You must rely on the official interpreter.

14:49:25  10          You may proceed.

14:49:26  11          MR. GARDNER:  Thank you, your Honor.

14:49:27  12   Q.   (BY MR. GARDNER) Mr. Cuellar, have you ever met personally

14:49:31  13   Jose Trevino?

14:49:38  14   A.   Yes, sir.

14:49:38  15   Q.   And where was that?

14:49:42  16   A.   In Mexico.

14:49:42  17   Q.   And about how many times do you recall meeting Jose Trevino?

14:49:52  18   A.   Three, four times.

14:49:53  19   Q.   And do you recall the timeframe in which this occurred?

14:50:09  20   A.   Exact dates, no, but it was more or less 2009, 2010 when I

14:50:13  21   saw him those three or four times.

14:50:15  22   Q.   And who else was with you when you met Jose Trevino, you saw

14:50:22  23   Jose Trevino?

14:50:26  24   A.   Omar.

14:50:28  25   Q.   And could you describe at least the first occasion you

| | | |
|---|---|---|
| 14:50:32 | 1 | recall and what was going on when y'all met? |
| 14:51:01 | 2 | A.   There was a day, I don't remember it was Mother's Day or |
| 14:51:06 | 3 | some baptism, and Jose was there and Omar said, come, let me |
| 14:51:12 | 4 | introduce you to my brother.  He was outside in one of the la |
| 14:51:17 | 5 | palapas out drinking, and I sat there and talked to him for two |
| 14:51:20 | 6 | or three, four hours. |
| 14:51:21 | 7 | Q.   And was Omar present during this conversation? |
| 14:51:29 | 8 | A.   No.  Omar stepped back.  It was just Jose and I. |
| 14:51:34 | 9 | Q.   And did you have conversations about horses? |
| 14:51:40 | 10 | A.   No.  Jose wasn't into horses yet.  Talked about his work, |
| 14:51:52 | 11 | about his life, but he didn't want to have anything to do with |
| 14:51:54 | 12 | what was crooked.  That he wasn't. |
| 14:51:59 | 13 | Q.   And did he tell you what he did for a living at that point? |
| 14:52:05 | 14 | A.   Yes, sir. |
| 14:52:06 | 15 | Q.   And what was that? |
| 14:52:14 | 16 | A.   Working like a regular person.  I don't know if it was a |
| 14:52:18 | 17 | brick layer or factory.  I don't remember. |
| 14:52:23 | 18 | Q.   Now, when we talked last, you made a comment meaning about |
| 14:52:27 | 19 | "42" making a statement about putting his brother into the horse |
| 14:52:31 | 20 | business.  Do you recall that? |
| 14:52:50 | 21 | THE COURT:  Just the question is, do you remember that? |
| 14:52:56 | 22 | A.   Yes. |
| 14:52:57 | 23 | Q.   (BY MR. GARDNER) Now the question is, what was that |
| 14:53:00 | 24 | statement? |
| 14:53:15 | 25 | A.   That it's going back to the same thing.  That Jose really |

| | | |
|---|---|---|
| 14:53:19 | 1 | likes country life, working with cattle and horses.  He wanted |
| 14:53:23 | 2 | nothing to do with the drugs.  He didn't want anything to do with |
| 14:53:26 | 3 | them.  That he lived a pretty humble life.  He made his own |
| 14:53:30 | 4 | living. |
| 14:53:30 | 5 | Q.   And did he make any comment about putting Jose into the |
| 14:53:34 | 6 | horse business? |
| 14:53:39 | 7 | A.   Yes.  That Jose, yes. |
| 14:53:41 | 8 | Q.   And what was that comment? |
| 14:53:45 | 9 | A.   That Jose was not going to buy Tempting Dash. |
| 14:53:51 | 10 | Q.   And did he saying anything about how much money Jose was |
| 14:53:55 | 11 | going to make in the horse business? |
| 14:53:58 | 12 | A.   No, sir. |
| 14:53:59 | 13 | Q.   With respect to payments for horse expenses, were you |
| 14:54:04 | 14 | involved in that? |
| 14:54:10 | 15 | A.   Yes, sir. |
| 14:54:11 | 16 | Q.   Could you tell the jury how you would arrange for the |
| 14:54:13 | 17 | payment of horse expenses? |
| 14:54:47 | 18 | A.   Jose Nayen would give me a list about all the expenses that |
| 14:54:50 | 19 | everything that had to be paid for the horses to be at the |
| 14:54:53 | 20 | trainers in California or in Texas, the doctors, the jockeys, the |
| 14:54:57 | 21 | mount fees, the actual training, the accessories, all of that, it |
| 14:55:02 | 22 | would be anywhere from 60, 70, 80 or more thousand dollars, and |
| 14:55:05 | 23 | he would give me the list and I would just write it out. |
| 14:55:08 | 24 | THE COURT:  Who was it that gave him the list? |
| 14:55:12 | 25 | THE WITNESS:  Carlos Nayen. |

14:55:14  1   Q.   (BY MR. GARDNER) I believe you said Jose Nayen.  Or the

14:55:18  2   interpreter --

14:55:19  3            THE INTERPRETER:  Interpreter's error.

14:55:21  4   Q.   (BY MR. GARDNER) So Carlos Nayen would give you the

14:55:23  5   expenses?

14:55:24  6   A.   Yes, sir.

14:55:24  7   Q.   And do you know for how many horses these expenses were?

14:55:32  8   A.   Forty, 60 horses.

14:55:35  9            MR. ESPER:  Sorry, your Honor, I didn't hear the

14:55:36  10  answer.

14:55:37  11           MR. GARDNER:  Forty to 60.

14:55:40  12  Q.   (BY MR. GARDNER) And where were these horses located in the

14:55:49  13  United States?

14:55:49  14  A.   In Texas, California and Ruidoso.

14:55:52  15  Q.   And Ruidoso is in New Mexico; is that correct?

14:55:55  16  A.   Yes, sir.

14:55:59  17  Q.   Now, did you ever direct funds to go directly to Jose

14:56:03  18  Trevino in the Balch Springs area?

14:56:10  19  A.   No, sir.

14:56:12  20  Q.   So all your horse expenses were through Carlos Nayen?

14:56:20  21  A.   Yes, sir.

14:56:22  22  Q.   And how would you get the money for the horses across the

14:56:25  23  border?

14:56:34  24  A.   Through Carlos had connections at the bank.

14:56:37  25  Q.   And which bank was that?

| 14:56:46 | 1 | A.   The rumor was it was HCBC (sic). |
| 14:56:51 | 2 | MS. WILLIAMS:  Objection.  Speculation. |
| 14:56:53 | 3 | THE COURT:  Sustain the objection. |
| 14:56:54 | 4 | Q.   (BY MR. GARDNER) Do you know which bank he would use? |
| 14:57:01 | 5 | A.   No.  I don't know.  I don't know.  I know HCBC was being |
| 14:57:06 | 6 | mentioned.  But no.  I don't know. |
| 14:57:08 | 7 | Q.   Do you know if it was a bank in Mexico or banks in the |
| 14:57:12 | 8 | United States? |
| 14:57:12 | 9 | A.   Mexico. |
| 14:57:14 | 10 | Q.   And then, how would the funds get sent to the United States |
| 14:57:16 | 11 | to pay for the horse expenses from there? |
| 14:57:24 | 12 | MS. WILLIAMS:  Objection.  Speculation.  I think he |
| 14:57:25 | 13 | just said he didn't know. |
| 14:57:27 | 14 | MR. GARDNER:  I think he said -- |
| 14:57:29 | 15 | THE COURT:  We'll find out. |
| 14:57:42 | 16 | A.   According to Carlos Nayen, through a bank, it was being sent |
| 14:57:45 | 17 | to wherever the money had to be paid. |
| 14:57:46 | 18 | Q.   (BY MR. GARDNER) Would that be a wire transfer? |
| 14:57:50 | 19 | A.   Yes. |
| 14:57:51 | 20 | Q.   Were you aware if the organization sent bulk cash, U.S. |
| 14:57:56 | 21 | currency across the border from Mexico into the United States? |
| 14:58:10 | 22 | A.   No, sir. |
| 14:58:14 | 23 | Q.   How much money would you estimate that the Los Zetas made in |
| 14:58:20 | 24 | one year from selling cocaine in the United States that came |
| 14:58:25 | 25 | through your plaza? |

| | | |
|---|---|---|
| 14:58:35 | 1 | A.   I don't know, but mine were an average of $60 million a |
| 14:58:47 | 2 | year. |
| 14:58:49 | 3 | Q.   For your plaza? |
| 14:58:59 | 4 | A.   For my work.  There were others that worked there, but I was |
| 14:59:03 | 5 | one of the bigger ones.  But through my work. |
| 14:59:05 | 6 | Q.   And I believe I misspoke.  You testified earlier that you |
| 14:59:08 | 7 | were not the plaza boss; is that correct? |
| 14:59:14 | 8 | A.   Of course not. |
| 14:59:16 | 9 | Q.   That was an individual by the name of "Metro"? |
| 14:59:19 | 10 | A.   "Metro."  Yes, sir. |
| 14:59:20 | 11 | Q.   And so, were there others that had sort of the same or |
| 14:59:24 | 12 | similar organization that you did that also worked for "Metro" in |
| 14:59:27 | 13 | that plaza? |
| 14:59:36 | 14 | A.   Yes, sir. |
| 14:59:37 | 15 | Q.   So about 60 million a year came back through your |
| 14:59:43 | 16 | organization.  Did that all come from the sale of cocaine in the |
| 14:59:56 | 17 | United States? |
| 14:59:56 | 18 | A.   Yes, sir. |
| 14:59:58 | 19 | Q.   And how much would you estimate you paid over the two years |
| 15:00:03 | 20 | you were involved in horse expenses back into the United States? |
| 15:00:17 | 21 | A.   Out of my pocket, a million-and-a-half dollars. |
| 15:00:20 | 22 | Q.   And what about the expenses paid to horses that you knew |
| 15:00:28 | 23 | about by the owners? |
| 15:00:41 | 24 | A.   Those were all -- all the ones I told you, the ones that |
| 15:00:44 | 25 | were named after cars, Mr. Piloto. |

15:00:46    1    Q.   Now, I'm sorry.  Maybe I wasn't clear on that.

15:00:50    2         I believe your testimony was out of your pocket, a

15:00:53    3    million-and-a-half dollars went to the United States; is that

15:01:11    4    correct?

15:01:11    5    A.   Well, in Mexico, because it was in Mexico that I handed that

15:01:16    6    to Carlos, and Carlos was the one in charge of paying that.

15:01:19    7    Q.   I guess my question is, do you know how much overall "40" or

15:01:24    8    "42" paid for horses and horse expenses in the United States?

15:01:43    9    A.   The total for 2010 was the million and a half I paid.  I

15:01:49   10    suppose that for the year before, it was about a million, a

15:01:52   11    million-something.

15:01:54   12    Q.   And when you say you paid a million and a half, what was the

15:01:59   13    source of that money?

15:02:06   14    A.   From drugs.

15:02:07   15    Q.   Was all the Zeta money earned over the course of your

15:02:11   16    involvement based on the sales of drugs?

15:02:19   17    A.   Yes, sir.

15:02:20   18    Q.   Earlier, we talked about Francisco Colorado.  Have you ever

15:02:25   19    met him in Mexico?

15:02:30   20    A.   Yes, sir.

15:02:31   21    Q.   Do you know if he has a nickname?

15:02:36   22    A.   Colorado.  "Pancho" Colorado.

15:02:41   23    Q.   And do you also have a nickname?

15:02:42   24    A.   Yes.

15:02:43   25    Q.   And what is yours?

| | | |
|---|---|---|
| 15:02:44 | 1 | A.    "Poncho." |
| 15:02:46 | 2 | Q.    Is there a difference between your nickname and "Pancho" |
| 15:02:49 | 3 | Colorado's? |
| 15:02:52 | 4 | A.    Yes.  "Pancho" is Francisco and "Poncho" is for Alfonso. |
| 15:03:02 | 5 | Q.    And do you know what "Pancho," the person you know as |
| 15:03:05 | 6 | "Pancho" Colorado does for a living? |
| 15:03:24 | 7 | A.    He has oil.  He has some concessions with Pemex.  That's |
| 15:03:29 | 8 | what I know.  He has a lot of money that way. |
| 15:03:33 | 9 | Q.    And do you know the name of his company? |
| 15:03:37 | 10 | A.    No, sir.  Don't remember it, the exact. |
| 15:03:42 | 11 | Q.    And are you aware if -- strike that. |
| 15:03:47 | 12 | Was "Pancho" Colorado involved in quarter horse racing? |
| 15:03:59 | 13 | A.    Yes, sir. |
| 15:03:59 | 14 | Q.    And was that in Mexico? |
| 15:04:08 | 15 | A.    I met him in Mexico, but he also runs horses here.  He had |
| 15:04:11 | 16 | horses with Carlitos here, also. |
| 15:04:13 | 17 | Q.    Let's talk about Mexico first.  Were you ever present when |
| 15:04:17 | 18 | "Pancho" Colorado was racing horses? |
| 15:04:29 | 19 | A.    We were racing horses and he showed up, Miguel invited him. |
| 15:04:34 | 20 | Q.    You say Miguel, that's Miguel Trevino? |
| 15:04:37 | 21 | A.    Yes, sir. |
| 15:04:38 | 22 | Q.    And did "Pancho" Colorado race horses with you on that |
| 15:04:41 | 23 | occasion? |
| 15:04:47 | 24 | A.    No. |
| 15:04:48 | 25 | Q.    And did you see "Pancho" Colorado speaking with a person we |

| | | |
|---|---|---|
| 15:04:53 | 1 | know as "Cuarento" or Miguel Trevino? |
| 15:05:00 | 2 | A.   Yes, sir. |
| 15:05:01 | 3 | Q.   Were you present for that conversation? |
| 15:05:04 | 4 | A.   Yes. |
| 15:05:05 | 5 | Q.   Could you please explain to the jury what was said by |
| 15:05:08 | 6 | "Pancho" Colorado and Miguel Trevino? |
| 15:05:21 | 7 | A.   He said, come over so you could meet "Pancho" Colorado.  We |
| 15:05:51 | 8 | were at a race in Morelos, Coahuila at the Ilusion -- the Ilusion |
| 15:05:58 | 9 | track and we were running matches, paired matches.  No.  It was |
| 15:06:01 | 10 | four, four colts at a time.  They were the new ones that would be |
| 15:06:03 | 11 | coming in for the futurities.  Met him, greeted him, hi, how are |
| 15:06:08 | 12 | you.  He talked about two or three things.  He was there |
| 15:06:12 | 13 | throughout the entire event, and he was there with Miguel and |
| 15:06:15 | 14 | Omar. |
| 15:06:17 | 15 | Q.   Any other Zeta members present during that occasion? |
| 15:06:42 | 16 | A.   It was a private event and there were all the escorts were |
| 15:06:47 | 17 | there.  "Metro" was there, Celso was there.  Don't remember all |
| 15:06:50 | 18 | the other names.  There were a lot of people there.  All of them |
| 15:06:53 | 19 | of their people. |
| 15:06:54 | 20 | Q.   When you say escorts, what do you mean by that? |
| 15:07:01 | 21 | A.   The bodyguards for "40" and "42." |
| 15:07:05 | 22 | Q.   Was there any confusion whether as to who Miguel and/or Omar |
| 15:07:10 | 23 | Trevino was by anyone there present? |
| 15:07:14 | 24 | MR. ESPER:  Your Honor, that calls for speculation. |
| 15:07:15 | 25 | THE COURT:  He doesn't.  I sustain the objection. |

15:07:18   1   Q.   (BY MR. GARDNER) Do you know if "Pancho" Colorado knew who

15:07:21   2   "40" or "42" was?

15:07:28   3   A.   Of course.  All of us know who "40" and "42" are.

15:07:32   4   Q.   And you mentioned earlier that you were aware of "Pancho"

15:07:36   5   Colorado through Carlos Nayen.  Is that your testimony?

15:07:46   6   A.   Yes, sir.

15:07:46   7   Q.   And how do you know that?

15:07:52   8   A.   Because Carlos Nayen called "Pancho" Colorado dad.  He said

15:08:12   9   he was his second dad.  He was the one that raised him.  He

15:08:16  10   talked about him.  He told all kinds of things about him, about

15:08:19  11   the buying of the horses, about the problems.  Talked about

15:08:24  12   everything.

15:08:25  13   Q.   When you say he talked about buying horses, were you aware

15:08:28  14   if "Pancho" Colorado assisted "40" in buying horses in the United

15:08:40  15   States?

15:08:40  16   A.   Yes, sir.

15:08:40  17   Q.   And where did you learn this from?

15:08:44  18   A.   From Carlos Nayen.

15:08:46  19   Q.   And what did Carlos Nayen explain to you as Mr. "Pancho"

15:08:51  20   Colorado's role in buying horses for "40" in the United States?

15:09:11  21   A.   There was a real expensive horse that was for sale.  He

15:09:15  22   would tell Carlitos, see if your dad can pay for this horse, and

15:09:20  23   then, the money would come back through Carlitos for the purchase

15:09:23  24   of the horse.

15:09:23  25   Q.   And when you say dad, is that "Pancho" Colorado?

15:09:27    1   A.   Yes, sir.

15:09:29    2   Q.   And do you know if the Defendant "Pancho" Colorado would pay

15:09:33    3   for that with personal check or through his company?

15:09:44    4   A.   That I don't know.  I couldn't tell you, sir.

15:09:47    5   Q.   To your knowledge, was "Pancho" Colorado ever involved in

15:09:51    6   moving cocaine?

15:09:57    7   A.   No, sir.

15:10:00    8   Q.   To your knowledge, do you ever recall if "Pancho" Colorado

15:10:04    9   reported any threats to him to "40"?

15:10:15   10   A.   Yes, sir.

15:10:16   11   Q.   And how do you know that?

15:10:21   12   A.   Because Carlitos had asked permission to carry a weapon

15:10:35   13   because the Golfo cartel was threatening him, because he was --

15:10:42   14   because the work he was doing in Veracruz and because he was

15:10:45   15   helping the Zetas buy the horses for "40."

15:10:48   16   Q.   When you say threatening him, is "him" Carlitos or is "him"

15:10:52   17   "Pancho" Colorado?

15:10:58   18   A.   "Pancho" Colorado.

15:11:01   19   Q.   I want to talk a little bit about some of the trainers who

15:11:04   20   were used to train the horses.  Are you familiar with an

15:11:12   21   individual by the name of Adan -- and it's either Farias or

15:11:20   22   "Fair-ias."

15:11:20   23   A.   Adan Farias.

15:11:21   24   Q.   Do you know him, sir?

15:11:22   25   A.   Yes, sir.

15:11:23    1    Q.    And have you ever met him?

15:11:25    2    A.    Saw him once in Mexico.

15:11:28    3    Q.    Can you explain the circumstances surrounding that meeting

15:11:31    4    in Mexico to the jury, please?

15:12:02    5    A.    Yeah.  I got an order from Omar to go pick up -- pick them

15:12:10    6    up at the airport, Adan Farias and another person who I don't

15:12:13    7    remember who their name was.  So I had one of my workers go pick

15:12:16    8    them up in San Antonio and brought them down to Piedras Negras.

15:12:18    9    I put him in my truck and I take him over to where Omar and

15:12:22   10    Miguel are, and they start talking about horses.  And he was the

15:12:25   11    one who's now going to be handling being the trainer for the

15:12:28   12    horses.

15:12:30   13    Q.    Just so I understand your testimony, you drove Adan Farias

15:12:34   14    to meet Miguel and Omar Trevino?

15:12:45   15    A.    Yes.

15:12:46   16    Q.    And were you present for the conversation that was occurring

15:12:50   17    between "40" and Adan Farias?

15:12:56   18    A.    Parts of it.  Not all of it but yes.  Parts of it.

15:13:04   19    Q.    And what were the discussions that you overheard?

15:13:21   20    A.    Just that they should train them really well, that they were

15:13:30   21    really good horses, and truthfully, they really were good horses.

15:13:35   22    They were some of the best bred horses.  Any trainer would have

15:13:40   23    dreamed to be able to have those horses and train them because

15:13:43   24    they were going to be good winners.

15:13:44   25    Q.    Are you familiar with the trainer by the name of Paul Jones?

| | | |
|---|---|---|
| 15:13:49 | 1 | A.   Just heard him mentioned. |
| 15:13:53 | 2 | Q.   Okay.  By who? |
| 15:13:54 | 3 | A.   A lot. |
| 15:13:55 | 4 | Q.   By who, I'm sorry? |
| 15:13:59 | 5 | A.   Because he's one of the best trainers.  There where he is. |
| 15:14:04 | 6 | Q.   And did "40" or "42" ever mention Paul Jones? |
| 15:14:13 | 7 | A.   No.  I heard of him through Carlitos that they were going to |
| 15:14:20 | 8 | hire -- that they wanted to hire him.  I don't know if they ever |
| 15:14:22 | 9 | did but. |
| 15:14:23 | 10 | Q.   And when you say Carlitos, is that the person you know as |
| 15:14:26 | 11 | Carlos Nayen? |
| 15:14:30 | 12 | A.   Yes, sir. |
| 15:14:32 | 13 | Q.   Do you know a person by the name of "Chevo" Huitron? |
| 15:14:37 | 14 | A.   Yes, sir. |
| 15:14:40 | 15 | Q.   And how many times have you met "Chevo" Huitron in the past? |
| 15:14:50 | 16 | A.   Saw him in excess of 20, 30 times. |
| 15:14:53 | 17 | Q.   And what do you know him to do for a living? |
| 15:14:59 | 18 | A.   He's a horse trainer. |
| 15:15:01 | 19 | Q.   Do you know if he trained horses for "40"? |
| 15:15:04 | 20 | A.   Yes, sir. |
| 15:15:10 | 21 | Q.   And what do you know about that? |
| 15:15:12 | 22 | A.   That that's what he is.  He is one of the best horse |
| 15:15:44 | 23 | trainers in Texas.  He's the one that really makes all the other |
| 15:15:48 | 24 | trainers in Texas run for their money.  He's got a lot of prizes, |
| 15:15:52 | 25 | first places.  He's a good trainer.  And when Miguel asked me who |

| | | |
|---|---|---|
| 15:15:55 | 1 | was one of the better trainers in Texas, I told him that the one |
| 15:15:58 | 2 | I was hearing about most was Jones. |
| 15:16:02 | 3 | Q.   Did he train any of "40's" horses? |
| 15:16:06 | 4 | A.   Yes, sir. |
| 15:16:07 | 5 | Q.   And did you give him money for training any of "40's" |
| 15:16:10 | 6 | horses? |
| 15:16:11 | 7 | A.   Yes, sir. |
| 15:16:14 | 8 | Q.   How much? |
| 15:16:16 | 9 | A.   Once, $20,000. |
| 15:16:22 | 10 | Q.   And do you know if "Chevo" Huitron submitted expenses for |
| 15:16:27 | 11 | training and boarding horses for other of "40's" horses? |
| 15:16:41 | 12 | A.   Yes, sir. |
| 15:16:42 | 13 | Q.   How long -- I guess a better question is, how many times do |
| 15:16:51 | 14 | you know that "Chevo" Huitron was getting payments for horse |
| 15:16:58 | 15 | expenses?   Sorry. |
| 15:17:11 | 16 | A.   From what I remember, close to two years he was training |
| 15:17:17 | 17 | horses for him. |
| 15:17:18 | 18 | Q.   And during that entire two-year span, was he training "40's" |
| 15:17:22 | 19 | horses? |
| 15:17:23 | 20 | A.   Yes. |
| 15:17:27 | 21 | Q.   Was there an occasion when "Chevo" Huitron came to you and |
| 15:17:30 | 22 | said he wasn't getting paid? |
| 15:17:36 | 23 | A.   Yeah.   There was an occasion when "Chevo" had a mare that |
| 15:18:07 | 24 | they called Pata Mora that won a futurity and two months had gone |
| 15:18:12 | 25 | by, he hadn't been paid his ten percent, which is what is due to |

15:18:15  1   the trainers.  And they hadn't paid for like two months of the

15:18:20  2   boarding.  And so, he said, would you tell Carlitos that they

15:18:24  3   have not paid me my money and that's the money I've earned?  It's

15:18:29  4   due me.

15:18:30  5   Q.   That's what "Chevo" said to you?

15:18:33  6   A.   Yes, sir.

15:18:34  7   Q.   Now, you used the word "they" a lot.  When you say, "Chevo"

15:18:38  8   said they owe me the money, who is "we"?  When you say "they,"

15:18:44  9   who are you referring to?

15:18:50  10  A.   "40" and "42."

15:18:52  11  Q.   And do you know if -- well, once you got that information

15:18:57  12  from "Chevo," what did you do with it?

15:19:00  13  A.   I mentioned it to Omar but not the way "Chevo" had said it,

15:19:22  14  because that would cause "Chevo" trouble.  And the one that was

15:19:24  15  looking bad in this is Carlitos because Carlitos was being paid,

15:19:28  16  but he was delaying on making the payments to "Chevo."

15:19:29  17  Q.   Now, all the money that you and "40" and "42" sent to the

15:19:34  18  United States for horses, was that used to pay legitimate horse

15:19:38  19  training, breeding and racing expenses?

15:19:58  20  A.   Yes.

15:19:59  21  Q.   And, again, the source of that funds came from where?

15:20:09  22  A.   Cocaine.

15:20:10  23  Q.   May I have one moment, your Honor?

15:20:12  24       THE COURT:  You may.

15:20:17  25  Q.   (BY MR. GARDNER) Now, you said you mentioned or saw --

15:20:25  1  strike that.

15:20:25  2          You met "Chevo" 30 or 40 times.  Is that your

15:20:30  3  testimony?

15:20:35  4  A.    I saw him.

15:20:36  5  Q.    Was any of those occasions when you were present the

15:20:40  6  Defendant Eusevio Huitron present and "40" or "42" were present?

15:20:54  7  A.    Once.

15:20:55  8  Q.    And where was that?

15:20:57  9  A.    The Everardo Muzquiz track.

15:21:03  10  Q.    Is that a race track?

15:21:06  11  A.    It's just a track.

15:21:08  12  Q.    I think one of your earlier answers you said -- tell me if

15:21:13  13  I'm wrong -- that "Chevo" told you, tell the man, quote, the man,

15:21:18  14  that Carlos owes me $40,000.  When you say "the man," who were

15:21:23  15  you referring to?

15:21:25  16          MR. ESPER:  Objection, your Honor.  Calls for

15:21:26  17  speculation on the part of this witness.

15:21:30  18          MR. GARDNER:  I think he can answer if he knows, your

15:21:32  19  Honor.  I could rephrase the question.

15:21:35  20          THE COURT:  Ask him.  Rephrase the question.

15:21:38  21          MR. GARDNER:  Yes, sir.

15:21:39  22  Q.    (BY MR. GARDNER) Mr. Cuellar, do you recall "Chevo" Huitron

15:21:44  23  saying --

15:21:46  24          MR. ESPER:  Objection, your Honor.  He's leading him

15:21:48  25  now.

156

15:21:51   1          THE COURT:  He was going to.  Let's rephrase.

15:21:55   2   Q.   (BY MR. GARDNER) Do you remember we just had a conversation

15:21:59   3   about "Chevo" Huitron approaching you?  Do you recall that

15:22:03   4   testimony two seconds ago?

15:22:13   5   A.   Yes, sir.

15:22:15   6   Q.   Could you, again, tell the jury what "Chevo" Huitron said to

15:22:18   7   you about the debt owed to him?

15:22:20   8          MR. ESPER:  Your Honor, that question was asked and

15:22:22   9   answered a few minutes ago.

15:22:23   10          THE COURT:  Well, that's why I was wondering why you

15:22:25   11   objected to it because it was asked and answered.  But since

15:22:31   12   we've done our homework now, I'll overrule the objection.  You

15:22:36   13   could answer it again.

15:22:51   14   A.   That he was owed for the race, the ten percent, and for the

15:23:00   15   boarding.

15:23:04   16          MR. ESPER:  Objection, your Honor.  There's no question

15:23:06   17   here that's calling for the witness to answer.

15:23:10   18          MR. GARDNER:  He had to finish the entire answer to the

15:23:13   19   last question, your Honor.

15:23:14   20          THE COURT:  Well, I think that's probably right.  But

15:23:16   21   let's ask it again.  He's not used to being on the stand, I

15:23:22   22   suspect, and he's getting a little confused with everybody

15:23:26   23   standing up and objecting in the middle of questions and answers.

15:23:30   24   So let's rephrase the question again.

15:23:33   25   Q.   (BY MR. GARDNER) Did "Chevo" Huitron ask you to ask to get

15:23:41  1   his $40,000?

15:23:43  2            MR. ESPER:  Objection, your Honor.  It's leading.

15:23:45  3   Leading the witness.

15:23:46  4            THE COURT:  I'll let him answer that.

15:24:07  5            MR. ESPER:  This is a -- I'll let him finish.

15:24:28  6   A.   That could I help him by telling Carlos -- by telling "40"

15:24:34  7   and "42" that Carlos had not paid him and that could they please

15:24:38  8   order him to pay him.  "Chevo" has a kind of harsh way of saying

15:24:42  9   things.  He says things harshly, so I wasn't going to put it that

15:24:44  10  way because that would put him in danger.  So I just said that

15:24:47  11  Carlitos had been paid and that he was delaying on paying him.

15:24:51  12           MR. ESPER:  Nonresponsive, your Honor.

15:24:53  13           THE COURT:  Well, overrule the objection.  It's the

15:24:56  14  same answer he's given several times.

15:24:58  15  Q.   (BY MR. GARDNER) Do you know Jesus Huitron?

15:25:02  16  A.   Yes, sir.

15:25:03  17  Q.   And how do you know him?

15:25:10  18  A.   I also met him in Monclova before.

15:25:13  19  Q.   And what is Monclova?  Is it a city?

15:25:17  20  A.   It's a city in Coahuila, like Piedras Negras.

15:25:25  21  Q.   And is Coahuila -- excuse my pronunciation -- Coahuila a

15:25:35  22  Zeta-controlled territory?

15:25:40  23  A.   Yes, sir.

15:25:40  24  Q.   Did you ever pay any expenses for the training of "40's"

15:25:45  25  horses to Mr. Jesus Huitron?

| | | |
|---|---|---|
| 15:25:53 | 1 | A.    No, sir. |
| 15:25:55 | 2 | Q.    Now, Mr. Cuellar, I appreciate your patience here.  These |
| 15:26:00 | 3 | lawyers are going to ask you some questions. |
| 15:26:02 | 4 | Have you been represented by a lawyer during there |
| 15:26:04 | 5 | whole thing? |
| 15:26:14 | 6 | A.    Right now at this time?  Moment? |
| 15:26:16 | 7 | Q.    Through your legal proceedings in the United States. |
| 15:26:21 | 8 | A.    Yes, sir. |
| 15:26:22 | 9 | Q.    And has he given you his best advice on what you should do? |
| 15:26:29 | 10 | MR. ESPER:  I'd object, your Honor.  I object to |
| 15:26:31 | 11 | relevancy.  That's hearsay, number two. |
| 15:26:34 | 12 | MR. GARDNER:  I didn't ask what he said. |
| 15:26:35 | 13 | THE COURT:  It's actually speculation.  I don't know |
| 15:26:37 | 14 | what he knows the lawyer's best advice might be.  So we'll |
| 15:26:44 | 15 | rephrase. |
| 15:26:45 | 16 | Q.    (BY MR. GARDNER) You followed your lawyer's advice in this |
| 15:26:50 | 17 | case? |
| 15:26:50 | 18 | MR. ESPER:  I don't think -- that's irrelevant.  That |
| 15:26:53 | 19 | has no bearing on any issue in this case, your Honor. |
| 15:26:54 | 20 | THE COURT:  Is that an objection? |
| 15:26:56 | 21 | MR. ESPER:  Yes, your Honor. |
| 15:26:56 | 22 | THE COURT:  It's overruled. |
| 15:27:01 | 23 | MR. DEGEURIN:  And it calls for -- |
| 15:27:03 | 24 | THE COURT:  It's overruled.  He may answer the |
| 15:27:05 | 25 | question.  It's simple. |

15:27:07  1    A.   No, sir.

15:27:08  2    Q.   (BY MR. GARDNER) I'm sorry.  Let me ask that question again.

15:27:11  3    There was a couple of objections.

15:27:12  4            Have you followed your attorney's advice in your legal

15:27:15  5    proceedings in this case?

15:27:22  6    A.   Yes.

15:27:23  7    Q.   I'll pass the witness, your Honor.

15:27:26  8            THE COURT:  Ms. Williams.

15:27:30  9            MS. WILLIAMS:  Your Honor, ladies and gentlemen of the

15:27:32  10   jury, I don't have any questions for this witness.

15:27:37  11           MR. DEGEURIN:  No questions.

15:27:41  12           MR. WOMACK:  No questions, your Honor.

15:27:43  13           MR. ESPER:  I have some, your Honor.

15:27:44  14           THE COURT:  All right, sir.

15:27:46  15                    CROSS-EXAMINATION

15:27:47  16   BY MR. ESPER:

15:27:47  17   Q.   Mr. Cuellar, when you were dealing in cocaine, you were

15:27:54  18   living in Piedras Negras or in -- what's the city on the other

15:28:00  19   side of Piedras Negras?  Eagle Pass.

15:28:13  20   A.   In Piedras Negras, sir.

15:28:14  21   Q.   And you were married at the time?

15:28:18  22   A.   Yes, sir.

15:28:19  23   Q.   And your wife worked in Eagle Pass, did she not?

15:28:24  24   A.   Yes, sir.

15:28:24  25   Q.   Okay.  And you traveled back and forth between the two

15:28:27   1   cities, did you not?

15:28:31   2   A.   No, sir.

15:28:33   3   Q.   Okay.  When you were living in Piedras Negras, did you

15:28:39   4   represent yourself to the public as a drug dealer?

15:28:50   5   A.   No, sir.

15:28:50   6   Q.   Okay.  You basically tried to camouflage yourself into

15:28:57   7   society, did you not?

15:29:04   8   A.   Like all drug dealers, yes, sir.

15:29:06   9   Q.   Absolutely.  In other words, the only people that knew you

15:29:09   10  were dealing drugs were the people you were dealing drugs with,

15:29:14   11  correct?

15:29:23   12  A.   No, sir.  Lots of other people, also.

15:29:30   13  Q.   You told lots of other people that you were dealing drugs?

15:29:49   14  A.   It's a small community.  People knew me.  People knew about

15:29:53   15  it.  Word spreads.  It's hard to hide the flow of money, the

15:29:58   16  millions, the thousands.  It's a small community.

15:30:02   17  Q.   Mr. Cuellar, I'm going to ask you questions and please

15:30:06   18  answer the questions that I'm asking you.

15:30:09   19  A.   Correct.

15:30:09   20  Q.   Did you tell everybody in the community in which you lived,

15:30:13   21  you made your money dealing cocaine?

15:30:23   22  A.   And I will answer you again.  Everyone knew.  All of them

15:30:26   23  knew that I was a drug dealer.

15:30:30   24  Q.   When you went to buy automobiles, where did you buy your

15:30:34   25  automobiles at?

15:30:41  1   A.   At the auctions in San Antonio.  Well, that's when I was

15:30:54  2   crossing over because 2005 back, I would come into the United

15:30:59  3   States.  From 2005 to 2011, I did not come in.

15:31:02  4   Q.   Where did you buy your automobiles from, Mr. Cuellar?

15:31:09  5   A.   In Mexico.

15:31:10  6   Q.   Did you buy any in the United States?

15:31:14  7   A.   Yes, sir.

15:31:15  8   Q.   Where in the United States?

15:31:22  9   A.   Dealers.

15:31:24  10  Q.   When you went to the dealers, did you tell them, I'm a drug

15:31:28  11  dealer and I want to buy a car?

15:31:35  12  A.   No.  I had other people cross over to buy them.  They were

15:31:42  13  not bought in my name.

15:31:44  14  Q.   So you tried to hide the fact that you were a drug dealer

15:31:48  15  from the car dealer that you were buying a car from, didn't you?

15:31:58  16  A.   Of course.

15:31:59  17  Q.   Okay.  Did you ever tell Mr. Huitron you were a drug dealer?

15:32:05  18  "Yes" or "No"?

15:32:07  19  A.   Never.

15:32:07  20  Q.   Okay.  Were you in the presence of "40" or "42" where they

15:32:15  21  told Mr. Huitron they're drug dealers?  "Yes" or "No"?

15:32:27  22  A.   No.

15:32:27  23  Q.   Okay.  Now, Carlitos was the one you gave all the money to

15:32:33  24  in order for him to distribute to trainers, veterinarians,

15:32:40  25  jockeys, any horse-related expenses, correct?

15:32:56   1   A.   Correct.

15:32:57   2   Q.   Okay.  And you know that he distributed the money, but you

15:33:01   3   don't know exactly how, correct?

15:33:08   4   A.   Of course.

15:33:09   5   Q.   Okay.  Now, whenever you saw -- let me withdraw that

15:33:13   6   question.

15:33:14   7            Mr. Huitron actually trained a horse that you and your

15:33:18   8   wife owned; isn't that right?

15:33:27   9   A.   Not one.  He trained eight horses, nine horses that were

15:33:36   10   mine.

15:33:36   11   Q.   Okay.  And what period of time did he train those horses?

15:33:59   12   A.   One horse he had for about six or eight months.  And then,

15:34:03   13   this year, before everything happened, he had -- I don't remember

15:34:09   14   if it was six or eight, I don't remember how many colts of mine

15:34:12   15   for four months, training them.

15:34:14   16   Q.   So one horse for about six or eight months and another one

15:34:17   17   for about three or four months.  Would that be fair?

15:34:25   18   A.   Probably.  Yes.

15:34:26   19   Q.   Okay.  And when he -- when you took him these horses, he

15:34:30   20   told you how much the fees would be for each horse, didn't he?

15:34:39   21   A.   Yes, sir.

15:34:39   22   Q.   And do you know -- and if you don't, simply say so.  Was it

15:34:44   23   1,100?

15:34:51   24   A.   He charged me a thousand.

15:34:54   25   Q.   Okay.  And that thousand dollars -- and if you know, simply

| | | |
|---|---|---|
| 15:35:00 | 1 | say so -- was for training, breeding and feeding the horses? |
| 15:35:22 | 2 | A.   Not for any of the breeding or insemination.  It was just |
| 15:35:26 | 3 | for the training and other things first. |
| 15:35:28 | 4 | Q.   Okay.  Now, veterinary bills were extra, correct? |
| 15:35:35 | 5 | A.   Yes, sir. |
| 15:35:36 | 6 | Q.   Shoeing for the horses was extra? |
| 15:35:41 | 7 | A.   Yes, sir. |
| 15:35:42 | 8 | Q.   And he billed you month by month, did he not? |
| 15:35:48 | 9 | A.   Yes, sir. |
| 15:35:49 | 10 | Q.   Now, did you come to the United States and pay him or did |
| 15:35:52 | 11 | you send somebody? |
| 15:35:57 | 12 | A.   I sent. |
| 15:35:58 | 13 | Q.   Okay.  Now, we've already established that you never told |
| 15:36:01 | 14 | him that you made your money dealing drugs, correct? |
| 15:36:11 | 15 | A.   Correct. |
| 15:36:12 | 16 | Q.   And so, you would send somebody with a cash -- with cash or |
| 15:36:17 | 17 | a check to pay him? |
| 15:36:22 | 18 | A.   Cash. |
| 15:36:22 | 19 | Q.   Okay.  And was there a invoice or receipt given to you for |
| 15:36:28 | 20 | each horse? |
| 15:36:35 | 21 | A.   That I remember, no. |
| 15:36:36 | 22 | Q.   Okay.  Did you ever ask for an invoice or a receipt? |
| 15:36:43 | 23 | A.   No, sir. |
| 15:36:44 | 24 | Q.   Did the person who you sent the money with, did he ever come |
| 15:36:48 | 25 | back and say, "I paid him"? |

15:36:58  1    A.   Yes.

15:36:59  2    Q.   And who did you send with the money?

15:37:11  3    A.   A kid that here in Austin, called -- named Rufino who

15:37:18  4    delivered the $20,000 I gave him.

15:37:21  5    Q.   Okay.  Now, this $20,000 that you gave him, this was for a

15:37:28  6    bunch of horses, was it not?

15:37:34  7    A.   Yes, sir.

15:37:35  8    Q.   For this six or seven horses that he was training for you,

15:37:38  9    correct?

15:37:44  10   A.   No.  That was for others that he had for Omar, theirs.

15:37:51  11   Q.   The $20,000 that you sent was some guy from Austin.  What

15:37:57  12   horses were those for?

15:38:09  13   A.   I don't remember.  All I know was that "Chevo" was owed

15:38:19  14   $20,000.  I was told to make the $20,000 get to him and I sent

15:38:23  15   that kid.

15:38:24  16   Q.   Okay.  And Carlitos or Carlos is the one that told you that,

15:38:27  17   correct?

15:38:30  18   A.   Yes, sir.

15:38:31  19   Q.   That's Carlos Nayen, correct?

15:38:33  20   A.   Carlos Nayen.  Yes, sir.

15:38:36  21   Q.   Okay.  And as a matter of fact, all the horses that Carlos

15:38:41  22   Nayen brought you money for or told you to give money for

15:38:45  23   trainers, jockeys, veterinarians, he was the one that told you --

15:38:51  24   gave you the instructions on how much to give everybody, correct?

15:39:07  25   A.   Yes, sir.

| 15:39:07 | 1 | Q.    Okay.  So up here, you have "40" and "42" who you claim buy |
| 15:39:15 | 2 | all these horses, correct? |
| 15:39:17 | 3 | A.    Yes, sir. |
| 15:39:18 | 4 | Q.    And they use -- they don't use their names to buy the |
| 15:39:22 | 5 | horses.  Somebody else's names, correct? |
| 15:39:29 | 6 | A.    Not them nor I when we buy. |
| 15:39:31 | 7 | Q.    Okay.  So you use somebody else's names to buy the horses, |
| 15:39:36 | 8 | correct? |
| 15:39:44 | 9 | A.    People that can prove up that the money is legal. |
| 15:39:47 | 10 | Q.    Okay.  So you have a layer or what's called a buffer in |
| 15:39:50 | 11 | between you, "40" and "42," correct? |
| 15:40:02 | 12 | A.    You can say it that way. |
| 15:40:03 | 13 | Q.    Okay.  And then, you got another buffer, who is Carlos, and |
| 15:40:06 | 14 | he's the person that's paying for the training, breeding and |
| 15:40:12 | 15 | jockey expenses for the horse? |
| 15:40:16 | 16 | A.    Yes, sir. |
| 15:40:27 | 17 | Q.    And then, eventually gets to trainers, jockeys and other |
| 15:40:31 | 18 | people, correct? |
| 15:40:37 | 19 | A.    Yes, sir. |
| 15:40:38 | 20 | Q.    And somehow, somehow, Mr. Huitron supposedly tells you to |
| 15:40:45 | 21 | tell Carlitos to tell "40" that I want my money? |
| 15:41:10 | 22 | A.    He came to Mexico to get the 16,000 I owed him from my |
| 15:41:18 | 23 | horses, and there, he said, please, can you help me get paid what |
| 15:41:23 | 24 | I'm owed for these horses?  That's money he had earned. |
| 15:41:26 | 25 | Q.    You're saying he came to Mexico to get $16,000 from you for |

| | | |
|---|---|---|
| 15:41:30 | 1 | horses he was training for you? |
| 15:41:38 | 2 | A.   Yes, sir. |
| 15:41:41 | 3 | Q.   And did you give him $16,000? |
| 15:41:46 | 4 | A.   Yes, sir. |
| 15:41:46 | 5 | Q.   Is this in addition to the $20,000 you gave him? |
| 15:41:51 | 6 | A.   Yes, sir. |
| 15:41:52 | 7 | Q.   Okay.  Now, did you see -- you said you saw them in Mexico |
| 15:41:57 | 8 | 20 or 30 times.  Was these at match races? |
| 15:42:06 | 9 | A.   This was before the Zetas were in control of Coahuila, and |
| 15:42:22 | 10 | we would see each other in Monclova, San Buena, and some of the |
| 15:42:26 | 11 | tracks in Coahuila. |
| 15:42:28 | 12 | Q.   This is ten, twelve years ago; isn't that right? |
| 15:42:31 | 13 | A.   Yes, sir. |
| 15:42:32 | 14 | Q.   That's when you first came to know them, back in the early |
| 15:42:35 | 15 | 2000s, correct? |
| 15:42:38 | 16 | A.   Yes, sir. |
| 15:42:39 | 17 | Q.   Okay.  And he trained some of your horses in 2011, before |
| 15:42:49 | 18 | you were arrested, correct?  Or 2010? |
| 15:43:01 | 19 | A.   2010, 2011, yes. |
| 15:43:03 | 20 | Q.   Okay.  When did this statements -- when was the statement |
| 15:43:07 | 21 | supposedly made to you about collecting this money?  I'm owed |
| 15:43:10 | 22 | this money because I trained this horse and I'm due this money? |
| 15:43:14 | 23 | When was this statement made, if you know? |
| 15:43:28 | 24 | A.   It was in 2010. |
| 15:43:30 | 25 | Q.   2010.  And where was it made? |

| | | |
|---|---|---|
| 15:43:35 | 1 | A.   At the Maria Isabel Restaurant where we were eating. |
| 15:43:40 | 2 | Q.   Excuse me.  Where is the Maria Isabel restaurant? |
| 15:43:44 | 3 | A.   It was him and Hector -- in Allende, Coahuila. |
| 15:43:51 | 4 | Q.   Who else was present besides you and Mr. "Chevo" Huitron? |
| 15:44:03 | 5 | A.   Hector Moreno and I and I don't remember if "Rafa." |
| 15:44:09 | 6 | "Rafa's" in Mexico. |
| 15:44:09 | 7 | Q.   And who arranged for this little dinner meeting? |
| 15:44:22 | 8 | A.   "Chevo" called me because I hadn't paid him.  That's what I |
| 15:44:25 | 9 | legally owed him.  I legally owed him because he was training my |
| 15:44:28 | 10 | horses. |
| 15:44:29 | 11 | Q.   So he called you, said, can you pay me for the work I've |
| 15:44:32 | 12 | done for you, correct? |
| 15:44:46 | 13 | A.   I talked to him.  We talk to each other pretty regularly, |
| 15:44:50 | 14 | and we agreed that we would meet so I could pay him the money. |
| 15:44:55 | 15 | Q.   Okay.  And the money you paid him, cash money, correct? |
| 15:44:59 | 16 | A.   Yes, sir. |
| 15:45:00 | 17 | Q.   And you never said, "I made this money dealing drugs, Mr. |
| 15:45:05 | 18 | Huitron"? |
| 15:45:09 | 19 | A.   Of course not, sir. |
| 15:45:11 | 20 | Q.   Thank you.  That's all I have. |
| 15:45:15 | 21 |           THE COURT:  Wait a minute.  Mr. Mayr. |
| 15:45:17 | 22 |           MR. GARDNER:  I'm sorry, I skipped one. |
| 15:45:19 | 23 |           MR. MAYR:  Judge, I don't have any questions. |
| 15:45:20 | 24 |           THE COURT:  All right. |
| 15:45:20 | 25 | |

REDIRECT EXAMINATION

BY MR. GARDNER:

Q.    Thank you.

      Mr. Cuellar, have you ever told anyone, "This money I'm giving you is the money I make from selling drugs"?

A.    No, because it would be dumb for me to do that.

Q.    Now, Mr. Esper asked you, did you ever tell Mr. Huitron that you were a drug dealer?  Do you recall that question?

A.    Yes.

Q.    Did Mr. Huitron ever comment to you that he knew you were a drug dealer?

A.    Everyone knew I was a drug dealer.

      MR. ESPER:  Objection, your Honor.  It's nonresponsive. It's a simple question.  Excuse me, your Honor.  No question has been asked.  Object.

      THE COURT:  Okay.  Well, he's just trying to respond to your statement.  So let's have another question.

Q.    (BY MR. GARDNER) Is there any doubt in your mind that "Chevo" Huitron knew what you did for a living?

      MR. ESPER:  Excuse me, your Honor.  I'm going to object.  That calls for speculation.  I believe the question was down the line.

      THE COURT:  You opened that up wider than the Grand Canyon.  You may answer the question.

A.    None.

| | | |
|---|---|---|
| 15:46:55 | 1 | Q.   (BY MR. GARDNER) Is there any doubt in your mind that |
| 15:46:59 | 2 | "Chevo" Huitron knew "40" and "42" were drug dealers? |
| 15:47:04 | 3 | MR. ESPER:  Objection, your Honor.  Calls for |
| 15:47:06 | 4 | speculation. |
| 15:47:06 | 5 | THE COURT:  It does.  I'll sustain that objection. |
| 15:47:10 | 6 | Q.   (BY MR. GARDNER) Did everyone -- strike that. |
| 15:47:21 | 7 | The associates and the people that you were with when |
| 15:47:25 | 8 | you were around "40" and "42," was there conversation such that |
| 15:47:31 | 9 | they were aware that "40" and "42" were the leaders of the Los |
| 15:47:36 | 10 | Zetas drug cartel? |
| 15:47:37 | 11 | MR. ESPER:  I'm going to object, your Honor.  That's |
| 15:47:39 | 12 | speculation again.  He's talking about all kinds of people. |
| 15:47:42 | 13 | Doesn't even identify them. |
| 15:47:44 | 14 | MR. GARDNER:  It's conversations with coconspirators |
| 15:47:46 | 15 | involved in the conspiracy, your Honor. |
| 15:47:48 | 16 | MR. ESPER:  That wasn't the question, your Honor. |
| 15:47:50 | 17 | Asking about other people that are around. |
| 15:47:52 | 18 | THE COURT:  Okay.  I don't think the jury's having any |
| 15:47:55 | 19 | trouble understanding a lot of this, but that is a speculative |
| 15:47:59 | 20 | question. |
| 15:48:01 | 21 | Q.   (BY MR. GARDNER) Now, I'm showing you Government's Exhibit |
| 15:48:08 | 22 | 65A.  And Mr. Esper asked you a question of whether or not you |
| 15:48:13 | 23 | ever received any invoices from the Defendant "Chevo" Huitron. |
| 15:48:27 | 24 | Did you ever receive any invoices in this format that |
| 15:48:30 | 25 | I'm showing you right now from Government's Exhibit 65A? |

15:48:45   1   A.   I didn't receive them.  The one who could have received them

15:48:48   2   is Hector Moreno.

15:48:49   3          MR. ESPER:  Objection, your Honor.  If he said he

15:48:50   4   didn't receive them, it's unresponsive, the rest of the answer.

15:49:08   5   Q.   (BY MR. GARDNER) Mr. Esper asked you about the cash that you

15:49:25   6   sent to Mr. Huitron.  Again, what was the name of the young

15:49:28   7   individual you sent?

15:49:38   8   A.   Rufino.

15:49:40   9   Q.   And how much cash was that again?

15:49:42   10   A.   $20,000.

15:49:45   11   Q.   And I was a little confused.  Was that $20,000 from the

15:49:48   12   training of your horses or from the training of "40's" horses?

15:50:01   13   A.   "40's."

15:50:03   14   Q.   When Mr. Esper asked you a question about your small

15:50:05   15   community, I wasn't clear.  When you referred to a small

15:50:09   16   community, was that in Mexico or in the United States?

15:50:21   17   A.   Mexico.

15:50:23   18   Q.   And do you believe when you were in that community in

15:50:25   19   Mexico -- let me ask you, first, another question.

15:50:28   20          Again, for the jury, what community or what city was

15:50:32   21   that?

15:50:37   22   A.   Piedras Negras, state of Coahuila.

15:50:40   23   Q.   And was that the small community you were referring to?

15:50:48   24   A.   It's not small, but yeah.  It's a city.

15:50:52   25   Q.   And when you said in response to Mr. Esper's question,

15:50:56    1    everyone knew you were a drug dealer, do you believe that was

15:50:59    2    your reputation in that community?

15:51:08    3    A.    Yes.

15:51:10    4    Q.    Now, not the horses that the Defendant Eusevio Huitron

15:51:15    5    trained for you, but I want to talk about Tempting Dash.  Do you

15:51:20    6    know if Eusevio Huitron trained Tempting Dash for "40"?

15:51:35    7    A.    Yes, sir.

15:51:36    8    Q.    And after Jose Trevino purchased Tempting Dash, who trained

15:51:45    9    -- who was the trainer for that horse after that?

15:51:53   10    A.    "Chevo" Huitron.

15:51:55   11    Q.    So did "Chevo" Huitron train that horse when Ramiro

15:51:58   12    Villarreal was the owner?

15:52:08   13    A.    Yes, sir.

15:52:10   14    Q.    And did he submit expenses -- he, I'm sorry, being the

15:52:13   15    Defendant Eusevio Huitron.  Did he submit expenses to the

15:52:17   16    organization for payment of his training of Tempting Dash?

15:52:39   17    A.    He would say, I'm owed so much.  And we knew already that if

15:52:42   18    he won a race, he was owed the ten percent plus the boarding of

15:52:46   19    the horses.

15:52:47   20    Q.    So I guess my question was, did he submit his expenses for

15:52:53   21    Tempting Dash to be paid by the Zetas?

15:52:58   22           MR. ESPER:  Objection, your Honor.  I think he needs to

15:53:06   23    be -- that needs to be clarified when he says, by Los Zetas, the

15:53:10   24    question should be which individual did he submit the bill to.

15:53:14   25           THE COURT:  Objection is overruled.  The witness may

15:53:16   1   answer.

15:53:37   2   A.   The expenses were given to me or were shown to me by

15:53:41   3   Carlitos.  And then, I would show them -- when I was the one that

15:53:44   4   was handling the payment, Carlitos would show me the expenses, I

15:53:47   5   would show them to "42" and say, this is what's being -- these

15:53:50   6   are the expenses and it was hundreds of thousands of dollars.

15:53:54   7   Q.   (BY MR. GARDNER) The Defendant Eusevio Huitron ever traffic

15:53:58   8   in cocaine?

15:54:03   9   A.   No, sir.

15:54:05   10   Q.   Do you believe that the expenses that he submitted were for

15:54:09   11   the actual training and feeding and racing the horses?

15:54:22   12   A.   Yes, sir.

15:54:23   13   Q.   Do you believe he was trying to shortchange the Zetas

15:54:27   14   organization in any way on his bills?

15:54:35   15   A.   I don't know, sir.

15:54:37   16   Q.   And the payments that went to "Chevo" Huitron, what was the

15:54:42   17   source of that money?

15:54:50   18   A.   Cocaine.  Drug dealing.

15:54:53   19   Q.   Pass the witness, Judge.

15:54:57   20        THE COURT:  Whoa, whoa, just a second.  Any other

15:54:59   21   questions?

15:55:00   22        MS. WILLIAMS:  No, your Honor.

15:55:01   23        MR. DEGEURIN:  No, your Honor.

15:55:02   24        MR. WOMACK:  No, your Honor.

15:55:03   25        THE COURT:  Now.

RE-CROSS EXAMINATION

15:55:04   1

15:55:05   2  BY MR. ESPER:

15:55:05   3  Q.   Mr. Cuellar, I don't want you to guess what somebody knows.

15:55:09   4  I want you to tell me --

15:55:10   5          THE COURT:  I want you to ask the questions.  Just

15:55:13   6  reread.

15:55:16   7  Q.   (BY MR. ESPER) You say that everybody knew you were a drug

15:55:20   8  dealer, including Mr. Huitron.  Is that your testimony?

15:55:31   9  A.   Yes, sir.

15:55:32  10  Q.   You tried to keep the fact that you were a drug dealer

15:55:37  11  hidden from people, did you not?

15:56:02  12  A.   People that I didn't have much dealing with, yeah, but

15:56:05  13  people knew, people would come to me if they had a debt that they

15:56:08  14  wanted to get paid, they asked me to go to "40" and "42."  They

15:56:12  15  knew the dealings I had with them and I worked for them.

15:56:15  16  Q.   "40" and "42" got Carlos Nayen to pay for the expenses of

15:56:24  17  these horses, correct?

15:56:33  18  A.   Yes.

15:56:34  19  Q.   Carlos Nayen then told you to come up with the money to help

15:56:39  20  pay for some of those horse-related expenses, correct?

15:56:51  21  A.   Yes, sir.

15:56:52  22  Q.   And I'm not asking you what people knew about you, but this

15:56:57  23  gentleman didn't know you made your money dealing drugs.

15:57:12  24  A.   He knew I was a drug dealer.

15:57:14  25  Q.   Did he know you made your money dealing drugs, Mr. Cuellar?

15:57:19  1  "Yes" or "No"?

15:57:20  2          MR. GARDNER:  Your Honor, that is asked and answered.

15:57:22  3          THE COURT:  It is.  I sustain the objection.

15:57:26  4  Q.  (BY MR. ESPER) Did you not tell me earlier that you never

15:57:28  5  told this man, "I make my money dealing drugs"?

15:57:43  6  A.  Not exactly "Chevo."  I did hide it from other people, but

15:57:47  7  it could be said that they were people we trusted.

15:57:55  8  Q.  Did "40" and "42" say in your presence to this gentleman, "I

15:58:01  9  make my money dealing drugs"?

15:58:11  10  A.  Didn't say it to him.

15:58:25  11          MR. ESPER:  That's all I have.

15:58:27  12          MR. MAYR:  I have no questions, your Honor.

15:58:29  13          MR. GARDNER:  Sorry, I just want to follow up based on

15:58:31  14  translation.

15:58:32  15                    RE-DIRECT EXAMINATION

15:58:32  16  BY MR. GARDNER:

15:58:35  17  Q.  Correct me if I'm wrong, Mr. Cuellar.  Did you originally

15:58:38  18  say that you trusted "Chevo" Huitron?

15:58:47  19          MR. ESPER:  That goes beyond re-cross, your Honor.

15:58:50  20          THE COURT:  Well, that's where it loomed.  The

15:58:55  21  objection's overruled.  You asked -- you got that answer.

15:59:00  22  A.  A lot.

15:59:02  23  Q.  (BY MR. GARDNER) To your knowledge, did "40" and "42" trust

15:59:06  24  "Chevo" Huitron?

15:59:11  25  A.  Yes, sir.

| | | |
|---|---|---|
| 15:59:12 | 1 | Q.   All I have, your Honor. |
| 15:59:15 | 2 | RE-CROSS EXAMINATION |
| 15:59:15 | 3 | BY MR. ESPER: |
| 15:59:17 | 4 | Q.   That's what they told you, Mr. Cuellar? |
| 15:59:22 | 5 | A.   No one said anything to me. |
| 15:59:23 | 6 | Q.   Thank you. |
| 15:59:27 | 7 |          THE COURT:  All right.  Anybody have any objections to |
| 15:59:29 | 8 | this witness being excused? |
| 15:59:30 | 9 |          MR. GARDNER:  No, your Honor. |
| 15:59:32 | 10 |          MS. WILLIAMS:  No, your Honor. |
| 15:59:33 | 11 |          THE COURT:  All right.  Members of the jury, I'll give |
| 15:59:38 | 12 | you a short break again.  Use the facilities.  Let's try to be |
| 15:59:42 | 13 | ready in about ten minutes, please. |
| 16:00:14 | 14 |          (Jury not present.) |
| 16:00:32 | 15 |          THE COURT:  We'll have a ten-minute recess, but first, |
| 16:00:35 | 16 | who's going to be your next witness? |
| 16:00:37 | 17 |          MR. GARDNER:  Your Honor, I need to converse with Ms. |
| 16:00:39 | 18 | Fernald real quick.  I'll let the Court know.  It's either going |
| 16:00:45 | 19 | to be Tammy Canida or Jose Vasquez. |
| 16:00:48 | 20 |          THE COURT:  We'll have an hour and 15 minute before we |
| 16:00:50 | 21 | recess. |
| 16:00:51 | 22 |          MR. FINN:  Judge, did you say 50 or 15?  How long are |
| 16:00:55 | 23 | you going tonight is my question? |
| 16:00:56 | 24 |          THE COURT:  6:00.  It will be an hour and 50 minutes |
| 16:00:58 | 25 | after the ten-minute recess. |

| 16:01:00 | 1 | MR. FINN:  All right. |
| 16:01:01 | 2 | THE COURT:  All right. |
| 16:10:36 | 3 | (Recess.) |
| 16:13:41 | 4 | (Jury present.) |
| 16:13:44 | 5 | THE COURT:  The government may call its next witness. |
| 16:13:47 | 6 | MS. FERNALD:  Government would call Tammy Canida. |
| 16:14:05 | 7 | (Witness sworn.) |
| 16:14:24 | 8 | THE COURT:  Tell us your full name and spell your last. |
| 16:14:34 | 9 | THE WITNESS:  Tammy Canida, C-A-N-I-D-A. |
| 16:14:38 | 10 | THE COURT:  You may proceed. |
| 16:14:39 | 11 | TAMMY CANIDA, called by the Government, duly sworn. |
| 16:14:39 | 12 | DIRECT EXAMINATION |
| 16:14:40 | 13 | BY MS. FERNALD: |
| 16:14:40 | 14 | Q.   Ms. Canida, what is AQHA? |
| 16:14:44 | 15 | A.   American Quarter Horse Association. |
| 16:14:47 | 16 | Q.   And do you work for them? |
| 16:14:48 | 17 | A.   Yes. |
| 16:14:48 | 18 | Q.   And where is AQHA located? |
| 16:14:51 | 19 | A.   Amarillo, Texas. |
| 16:14:52 | 20 | Q.   Can you tell the ladies and gentlemen of the jury what you |
| 16:14:56 | 21 | do at AQHA? |
| 16:14:58 | 22 | A.   I'm the director of registration operations. |
| 16:15:03 | 23 | Q.   What is the purpose of AQHA or American Quarter Horse |
| 16:15:08 | 24 | Association? |
| 16:15:08 | 25 | A.   AQHA's mission is to record and preserve the pedigrees of |

16:15:13  1  the American quarter horses.

16:15:14  2  Q.   And when you say to preserve the pedigrees, will you explain

16:15:18  3  a little bit what you mean by that?

16:15:19  4  A.   Owners can apply for registration and based on those

16:15:23  5  applications, they identify the parentage of the horses and we

16:15:28  6  record that information.  We also offer DNA testing as an extra

16:15:33  7  step if it should be needed by any rule.

16:15:35  8  Q.   And you're the lady in charge of all that; is that correct?

16:15:38  9  A.   Yes.

16:15:38  10  Q.   How many different clients do you have or members do you

16:15:42  11  have at AQHA?

16:15:44  12  A.   We have about 260,000 members.

16:15:48  13  Q.   And how many different horses do you -- or how many horses

16:15:52  14  do you certify as quarter horses?

16:15:55  15  A.   We have about six-million horses registered.

16:15:59  16  Q.   So you have a lot of horses, right?

16:16:00  17  A.   Yes, ma'am.

16:16:01  18  Q.   And the horse, does the horse get a certificate, an actual

16:16:06  19  physical document to show its lineage?

16:16:09  20  A.   Yes.

16:16:10  21  Q.   And what is that called?

16:16:11  22  A.   Certificate of registration.

16:16:13  23  Q.   Is that like, in some ways, a car title?

16:16:17  24  A.   Yes, it is.

16:16:18  25  Q.   Okay.  Can you explain to the jury what I mean by that

16:16:21   1   question?

16:16:21   2   A.   The certificate of registration will show the horse's

16:16:25   3   information, such as its name and its registration number, its

16:16:30   4   color and gender, as well as its sire and its dam and extended

16:16:37   5   pedigree.   It also shows any identifying markings, and it will

16:16:40   6   show who their current owner is according to AQHA records.

16:16:44   7   Q.   Information on the certificate of registration, the fact

16:16:47   8   that who the parent of the horse is and all of that information,

16:16:52   9   is that what you're looking for in DNA testing?

16:16:55   10   A.   Yes.

16:16:56   11   Q.   What about the other information that is obtained on there,

16:17:00   12   like ownership?   Who certifies that?

16:17:02   13   A.   As far as certifying, we base that on what an owner presents

16:17:07   14   to AQHA to report.

16:17:09   15   Q.   Did I ask you to draw up some dummy documents so that we

16:17:14   16   could go through some of those documents and the jurors would

16:17:16   17   know?

16:17:16   18   A.   Yes.

16:17:16   19   Q.   I'm showing you right now what has been marked as

16:17:28   20   Government's Exhibit 226A, B and C.   Do you recognize these

16:17:36   21   documents?

16:17:36   22   A.   Yes.

16:17:37   23   Q.   Okay.   The first document is a dummy document, is it not?

16:17:40   24   A.   Yes.

16:17:40   25   Q.   And what is it a document of?

16:17:42  1   A.    It is a certificate of registration.

16:17:44  2   Q.    And then, B and C are actually what kind of documents?

16:17:48  3   A.    One of them is a lease authorization form and the other is a

16:17:51  4   transfer report form.

16:17:54  5   Q.    And they're blank documents, correct?

16:17:56  6   A.    Yes.

16:18:08  7         MS. WILLIAMS:  No objection.

16:18:52  8         MR. ESPER:  I don't have any objection.

16:18:54  9         MS. FERNALD:  Your Honor, the government moves to

16:18:56  10  introduce 226A, B and C for demonstrative purposes only.

16:19:01  11        THE COURT:  They're received.

16:19:04  12  Q.    (BY MS. FERNALD) I'm showing you right now what's been

16:19:10  13  marked or admitted as 226A.  This is the certificate of

16:19:13  14  registration that you previously spoke about.  Is this the car

16:19:27  15  title?

16:19:28  16  A.    Basically, yes.

16:19:31  17  Q.    Can you tell us -- I'm going to start over here.  You've got

16:19:35  18  some dummy information or some false information on here for the

16:19:38  19  purpose of just showing the jury.  I'm pointing to five million.

16:19:41  20  What is that on the certificate of registration?

16:19:43  21  A.    That would be the horse's name.

16:19:46  22  Q.    And then, if I move over on this side right here where it

16:19:50  23  says, start name search and two million, what would that

16:19:54  24  represent?

16:19:54  25  A.    The start name search would normally be the sire's name.

| | | |
|---|---|---|
| 16:19:58 | 1 | And the two million would normally be the dam's name. |
| 16:20:01 | 2 | Q.   Okay.  I see some information underneath the horse's name |
| 16:20:05 | 3 | like a date.  What does that date mean? |
| 16:20:08 | 4 | A.   That is its foaling date, the date he was born. |
| 16:20:11 | 5 | Q.   And then, there's a number down here, it's a five with a |
| 16:20:14 | 6 | bunch of zeros behind it? |
| 16:20:16 | 7 | A.   Five million. |
| 16:20:17 | 8 | Q.   Oh, that was very good.  Five million.  What does that |
| 16:20:22 | 9 | number represent? |
| 16:20:22 | 10 | A.   His registration number. |
| 16:20:24 | 11 | Q.   Okay.  Is a registration number unique to each horse? |
| 16:20:28 | 12 | A.   Yes, it is. |
| 16:20:29 | 13 | Q.   Okay.  Is a name unique to each horse? |
| 16:20:31 | 14 | A.   Yes, it is. |
| 16:20:32 | 15 | Q.   And this particular horse, five million, you got two million |
| 16:20:38 | 16 | and name -- start name search.  Is that unique, also, with the |
| 16:20:42 | 17 | registration numbers? |
| 16:20:46 | 18 | A.   Yes. |
| 16:20:46 | 19 | Q.   If you look and then, does it go down the lineage, also? |
| 16:20:50 | 20 | A.   Yes. |
| 16:20:52 | 21 | Q.   You also look down here on the bottom left-hand corner and |
| 16:20:56 | 22 | you have the breeder; is that correct? |
| 16:20:58 | 23 | A.   Yes. |
| 16:21:00 | 24 | Q.   Where do you get this information from? |
| 16:21:02 | 25 | A.   The breeder is based on AQHA's record as to who owned the |

16:21:07  1  mother at the time she was bred, and it's based on information

16:21:12  2  provided to AQHA.

16:21:13  3  Q.   This information right here, the mother and the father of

16:21:18  4  the horse, is that based upon only information given by the

16:21:23  5  previous owners?

16:21:26  6  A.   There are several steps involved.  A stallion owner is

16:21:30  7  required to report the breeding to us after it occurs and before

16:21:35  8  the baby is registered in most cases.  And then, at the time of

16:21:39  9  application, the owner of the dam applies for registration, and

16:21:43  10 they list and provide that information on their application.

16:21:46  11 Q.   And then, you also talked about the DNA testing.  Is that

16:21:50  12 done sometimes?

16:21:51  13 A.   Yes, it is.

16:21:52  14 Q.   Can you tell the jury about that in order to assure the

16:21:55  15 correct lineage on this piece of paper?

16:21:57  16 A.   We have several rules in the AQHA rule book that require

16:22:02  17 parentage verification before a foal can be registered.  The

16:22:05  18 horse is produced by shipped semen, frozen semen or embryo

16:22:10  19 transfer.  Then the foals from those matings must be

16:22:15  20 parentage-verified before they can be registered.  And to

16:22:17  21 parentage verify it, we have to have the DNA of the foal as well

16:22:22  22 as the sire, its dam, so it can be analyzed.

16:22:26  23 Q.   We also hear about hip numbers, every once in a while, when

16:22:29  24 we go through these.  Can you tell me what hip numbers mean?

16:22:32  25 A.   We at AQHA do not deal with hip numbers.

| | | |
|---|---|---|
| 16:22:35 | 1 | Q.   What about the current ownership? |
| 16:22:37 | 2 | A.   That is based on information provided to AQHA.  We will |
| 16:22:41 | 3 | always register the horse originally to the owner of the dam, and |
| 16:22:45 | 4 | then, if there are subsequent changes in ownership, then they |
| 16:22:49 | 5 | will report that by sending us a transfer report form. |
| 16:22:53 | 6 | Q.   And then, again, the date acquired? |
| 16:22:56 | 7 | A.   That is reported on the transfer report form. |
| 16:23:00 | 8 | Q.   And that date right there is given to you by whom? |
| 16:23:04 | 9 | A.   Typically by the buyer. |
| 16:23:07 | 10 | Q.   It's not something that you independently verify? |
| 16:23:10 | 11 | A.   No, ma'am. |
| 16:23:11 | 12 | Q.   And then, we see the seal down here, correct? |
| 16:23:13 | 13 | A.   Yes. |
| 16:23:14 | 14 | Q.   It's not a raised seal, correct? |
| 16:23:16 | 15 | A.   It's not a raised seal.  It's a heat-sensitive seal. |
| 16:23:19 | 16 | Q.   I'm turning on the back of this registration form.  What is |
| 16:23:22 | 17 | typically on the back of this registration form? |
| 16:23:24 | 18 | A.   At the top, you will see the horse's name and registration |
| 16:23:27 | 19 | number, again, and it also shows the current owner on the |
| 16:23:32 | 20 | right-hand side.  Yes.  And that which that column should also |
| 16:23:39 | 21 | match what's on the front, and then, the date we actually issued |
| 16:23:42 | 22 | that certificate of registration. |
| 16:23:43 | 23 | Q.   Which would not necessarily be the date on the flip side of |
| 16:23:47 | 24 | purchase; is that correct? |
| 16:23:48 | 25 | A.   That's correct. |

16:23:49  1  Q.   What else would you find on this?

16:23:51  2  A.   Where you see the example stamp, that's the address that we

16:23:55  3  mailed the certificate to.  It may or may not be the owner.  If

16:23:59  4  we had pictures of the horse, that would follow in that blank

16:24:03  5  area.  And then, the markings are described on the horse, and

16:24:07  6  that's where you see the description to describe the horse's

16:24:12  7  white markings.

16:24:13  8  Q.   How important is this certificate of registration to a owner

16:24:18  9  of a quarter horse?

16:24:21  10  A.   Well, it shows who their horse is and shows who can conduct

16:24:25  11  business at the AQHA office.  It also allows them to compete at

16:24:29  12  AQHA events.

16:24:31  13  Q.   AQHA events, we should say there's different disciplines

16:24:35  14  inside AQHA; is that correct?

16:24:37  15  A.   Yes, there is.

16:24:38  16  Q.   Okay.  Can you name some different types of disciplines so

16:24:41  17  the jury knows how it's divided up with quarter horses?

16:24:45  18  A.   Within our competition area, we have racing and shows.  And

16:24:47  19  then, we also have for the casual owner, horseback-riding program

16:24:54  20  and things of that nature.

16:24:55  21  Q.   And are you aware of whether or not these documents,

16:24:59  22  certificate of registrations are important at the racing events?

16:25:02  23  A.   If it's a quarter horse race, then yes.

16:25:06  24  Q.   What about tattoos?  Can you tell us a little bit about

16:25:10  25  tattoos as it relates to horses?  Not just in general, I should

16:25:14   1   say.

16:25:14   2   A.   Horses are required to be tattooed before they can run at a

16:25:19   3   track, which -- and that's all state-regulated.  It's not

16:25:24   4   AQHA-regulated.  Before a horse can be tattooed, they're also

16:25:29   5   required to be parentage-verified.

16:25:31   6   Q.   Where is the majority of the members located throughout the

16:25:35   7   United States with AQHA?  Is there a region in the United States

16:25:41   8   the majority?

16:25:41   9   A.   Texas and Oklahoma based on inventories.

16:25:52  10   Q.   I'm showing you now what has previously been entered as

16:25:55  11   demonstrative, as a lease agreement, styled 226B.  Do you

16:26:00  12   recognize that?

16:26:01  13   A.   Yes.

16:26:02  14   Q.   What is a lease agreement?

16:26:04  15   A.   When an owner leases a horse to another party and they want

16:26:08  16   that to be recognized with AQHA, then they send this to AQHA

16:26:13  17   providing the lease dates, and both the owner and the lessee must

16:26:17  18   sign the document, and if that occurs, then we'll record it.

16:26:21  19   Typically it's done for breeding purposes, but there could be

16:26:24  20   other reasons that we're not aware of.

16:26:26  21   Q.   Again, the information that's contained on this document,

16:26:29  22   how is that relied upon as far as your organization's concerned?

16:26:32  23   A.   It's based on the signatures on that form.

16:26:34  24   Q.   And 226C, a transfer report.  Can you explain to the ladies

16:26:47  25   and gentlemen of the jury what a transfer report is?

16:26:49  1    A.    A transfer report is if an ownership has changed for a

16:26:54  2    horse, then the buyer or the seller will report that to AQHA, and

16:26:58  3    based on receiving this document with the information completed

16:27:04  4    on the form, the certificate of registration and the transfer fee

16:27:09  5    will then record that ownership change.

16:27:12  6    Q.    And, again, this is based upon the information that's

16:27:15  7    submitted to you?

16:27:15  8    A.    That's correct.

16:27:18  9    Q.    Is it unusual sometimes on these transport -- transfer

16:27:23  10   reports to get them a month or so after the actual transfer is

16:27:28  11   done?

16:27:28  12   A.    No.  That's not unusual.

16:27:31  13   Q.    Do you log in when these forms come in to you?

16:27:35  14   A.    Yes.

16:27:35  15   Q.    Okay.  And why do you do that?

16:27:37  16   A.    For historical so we'll know when we received it, and we do

16:27:42  17   that for everything because some of our processes are actually

16:27:45  18   based on date received.

16:27:57  19   Q.    What has to accompany the transfer request?

16:28:00  20   A.    The transfer -- the signed transfer report, the certificate

16:28:03  21   of registration, and the appropriate fee.

16:28:07  22   Q.    And on the -- we talked a little bit about maybe even the

16:28:13  23   name of the horse.  Can the name of the horse change?

16:28:15  24   A.    Yes, it can.

16:28:16  25   Q.    And how do you change the name of the horse?

16:28:19  1   A.   The owner requests that a name be changed.  They return the

16:28:23  2   certificate of registration and provide a new name choice and the

16:28:27  3   name change fee, and we'll change it so long as it hasn't

16:28:31  4   competed in an event or bred anything.

16:28:35  5   Q.   It has to be a unique name; is that correct?

16:28:37  6   A.   Yes.

16:28:37  7   Q.   Okay.  But does this number, this five million number under

16:28:42  8   here, has that ever changed for a horse?

16:28:45  9   A.   Only if it starts as an appendix registered horse and then,

16:28:48  10  it advances into the numbered registry.  But to change a name or

16:28:53  11  anything of that nature, then no, the number doesn't change.

16:28:55  12  Q.   So just if you change the name, the number is not going to

16:28:58  13  change?

16:28:59  14  A.   That's correct.

16:29:04  15  Q.   Did the government request a lot of documents from you in

16:29:09  16  reference to this case?

16:29:10  17  A.   Yes.

16:29:45  18  Q.   I'm showing you now what has been marked cumulatively as

16:29:49  19  Government's Exhibit 226.  Have you had a chance to come into

16:29:52  20  court when the jury's on a recess and look at these documents?

16:29:55  21  A.   Yes.

16:29:55  22  Q.   And, your Honor, at this time, based upon the business

16:29:59  23  record affidavit that's been submitted and that the defense has

16:30:01  24  been given notice of, we'd move to admit Government's Exhibit

16:30:05  25  226.

| | | |
|---|---|---|
| 16:30:11 | 1 | THE COURT:  226 is business records with the affidavit? |
| 16:30:14 | 2 | MS. FERNALD:  That is correct. |
| 16:30:15 | 3 | THE COURT:  Any objection? |
| 16:30:16 | 4 | MS. WILLIAMS:  Can you give me the Bates range of those |
| 16:30:19 | 5 | or not? |
| 16:30:20 | 6 | MS. FERNALD:  I can do so.  They'll be also on your |
| 16:30:22 | 7 | exhibit list.  It will have the B number right beside it for |
| 16:30:27 | 8 | future reference. |
| 16:30:31 | 9 | MS. WILLIAMS:  It doesn't have the Bates range. |
| 16:30:51 | 10 | MS. FERNALD:  Bates stamp on these are 61. |
| 16:31:00 | 11 | THE COURT:  To what? |
| 16:31:01 | 12 | MS. FERNALD:  Sixty-one is the Bates stamp number and |
| 16:31:03 | 13 | it follows in order. |
| 16:31:04 | 14 | THE COURT:  Sixty-one on all of them? |
| 16:31:06 | 15 | MS. FERNALD:  Yes, sir. |
| 16:31:06 | 16 | THE COURT:  All right.  Now, any objections? |
| 16:31:11 | 17 | MR. DEGEURIN:  I don't believe so. |
| 16:31:12 | 18 | MR. WOMACK:  No, your Honor. |
| 16:31:13 | 19 | MS. WILLIAMS:  No, your Honor. |
| 16:31:14 | 20 | MR. ESPER:  No. |
| 16:31:15 | 21 | MR. MAYR:  None, Judge. |
| 16:31:16 | 22 | THE COURT:  226 is in. |
| 16:31:18 | 23 | Q.   (BY MS. FERNALD) Showing you now what has been marked as |
| 16:31:20 | 24 | Government's Exhibit 226E.  Do you recognize that document? |
| 16:31:32 | 25 | A.   Yes. |

16:31:33   1    Q.   Okay.   226E came from where?

16:31:37   2    A.   AQHA.

16:31:37   3    Q.   Okay.   The records that you submitted to the government in

16:31:40   4    the last document batch?

16:31:41   5    A.   Yes.

16:31:42   6    Q.   And I just pulled out this one and made a copy, correct?

16:31:44   7    A.   Yes.

16:31:44   8    Q.   All right.   And you've had a chance to review 226E, correct?

16:31:47   9    A.   Yes.

16:31:48   10   Q.   Your Honor, for demonstrative purposes, the government will

16:31:52   11   go ahead and move to admit 226E.

16:31:55   12        MS. WILLIAMS:   This is not on my list so.

16:32:55   13        No objection.

16:32:56   14        THE COURT:   226E is admitted as a demonstrative

16:33:04   15   exhibit.

16:33:23   16        MR. DEGEURIN:   No objection, your Honor.

16:33:24   17        THE COURT:   Okay.   It's still admitted.

16:33:30   18        MR. DEGEURIN:   Must have been something I said.

16:33:33   19   Q.   (BY MS. FERNALD) Can you tell me what Exhibit 226E is?

16:33:38   20   A.   It is a log sheet when we have visitors at the AQHA office

16:33:43   21   that they go inside the building, they sign in before they can go

16:33:47   22   through the door.

16:33:48   23   Q.   I want to direct your attention to the date of January the

16:33:53   24   30th of this particular log date.

16:33:55   25   A.   Okay.

| | | |
|---|---|---|
| 16:33:56 | 1 | Q.   The line that I'm pointing to right here. |
| 16:33:59 | 2 | A.   Uh-huh. |
| 16:34:01 | 3 | Q.   What does this indicate to you? |
| 16:34:05 | 4 | A.   It indicates that someone, looks like Fernando Garcia signed |
| 16:34:11 | 5 | in at 8:14 and was taken by one of our employees to be assisted, |
| 16:34:17 | 6 | Tina. |
| 16:34:18 | 7 | Q.   And is this typical for you to do? |
| 16:34:20 | 8 | A.   Yes. |
| 16:34:21 | 9 | Q.   When someone comes in? |
| 16:34:22 | 10 | A.   Yes. |
| 16:34:23 | 11 | Q.   Do you recall this specific event? |
| 16:34:24 | 12 | A.   I do not. |
| 16:34:25 | 13 | Q.   All right.  Pass the witness, your Honor. |
| 16:34:41 | 14 | CROSS-EXAMINATION |
| 16:35:01 | 15 | BY MS. WILLIAMS: |
| 16:35:01 | 16 | Q.   I'm showing you, again, this Demonstrative Exhibit No. 226C, |
| 16:35:09 | 17 | transfer report. |
| 16:35:10 | 18 | A.   Yes. |
| 16:35:10 | 19 | Q.   Now, the prosecutor asked you about this and asked you about |
| 16:35:16 | 20 | someone sending or bringing a transfer report in to AQHA. |
| 16:35:20 | 21 | A.   Yes. |
| 16:35:21 | 22 | Q.   Sometimes, though, isn't the transfer report sent to you |
| 16:35:27 | 23 | from a race track? |
| 16:35:28 | 24 | A.   Yes. |
| 16:35:29 | 25 | Q.   All right.  Describe that situation to the jury, if you |

16:35:32   1   will.

16:35:33   2   A.   Occasionally, the race track will send us groups of

16:35:36   3   transfers that they collected in their office for us to process

16:35:39   4   and send back to them.

16:35:40   5   Q.   And so, sometimes a horse owner in between maybe a

16:35:46   6   qualifying and the actual race or, for whatever reason, a horse

16:35:51   7   will get transferred from one owner to another owner at the race

16:35:55   8   track.

16:35:56   9   A.   The transfer is not recorded at the race track, no.

16:35:59   10  Q.   I understand that.  But the --

16:36:02   11  A.   They may be allowed.

16:36:03   12  Q.   The horse may have been sold?

16:36:05   13  A.   Yes.  The horse may have been sold and they may have allowed

16:36:07   14  it to be run, but it is not initially recorded at AQHA.

16:36:12   15  Q.   That's a bad question.  Sometimes a horse is sold close to

16:36:16   16  the time of a race.

16:36:18   17  A.   I would assume so.  Yes.

16:36:19   18  Q.   And because of that, to allow it to race under somebody

16:36:26   19  else's name, the owners would bring this transfer report and give

16:36:29   20  it to the race track?

16:36:30   21  A.   I don't know the race track's policy.

16:36:32   22  Q.   And if the race track accepted that?

16:36:34   23  A.   That's up with them.

16:36:35   24  Q.   But the transfer report, if it's given to the race track in

16:36:40   25  order for the horse to race, then the people who are transferring

16:36:44   1   the horse can't then bring it to AQHA.  It has to get sent to you

16:36:49   2   from the race track.  You don't know?

16:36:52   3   A.   Not necessarily.  The race track gives it back to that

16:36:55   4   owner, then the owner can bring it to us.  We're not going to

16:36:58   5   transfer without the original certificate of registration and the

16:37:01   6   transfer report.  And as far as who brings that to us, it could

16:37:07   7   be --

16:37:07   8   Q.   You just don't know.

16:37:08   9   A.   It could be either one.

16:37:09   10   Q.   All right.  Give me just a second, your Honor.

16:38:08   11        I'm showing you out of that -- the documents that were

16:38:36   12   admitted Nos. 16349 and 16350.

16:38:42   13   A.   Okay.  Yes.

16:38:43   14   Q.   What is that document?

16:38:45   15   A.   This is a printout to show AQHA records.  One of them shows

16:38:49   16   a pedigree along with its previous owners.  And the other one

16:38:53   17   shows its basic course information and the summary of its race

16:38:58   18   record.

16:38:58   19   Q.   All right.  So 349 is the first thing you --

16:39:01   20   A.   Yes.

16:39:02   21   Q.   -- described.  A history of the horse owner?

16:39:04   22   A.   Yes.

16:39:04   23   Q.   All right.  And the second one is its race record?

16:39:08   24   A.   Yes.

16:39:09   25   Q.   Official race record according to AQHA?

| | | |
|---|---|---|
| 16:39:11 | 1 | A.   Yes. |
| 16:39:12 | 2 | Q.   What horse do these documents 16349 and 16350 have to do |
| 16:39:41 | 3 | with? |
| 16:39:42 | 4 | A.   As far as this one that I'm looking at, it's for a horse |
| 16:39:47 | 5 | named Tempting Dash, and it shows who its current owner is |
| 16:39:51 | 6 | according to AQHA records, based on that print date at the top |
| 16:39:54 | 7 | right-hand corner.  It also shows its pedigree and its previous |
| 16:39:58 | 8 | owners. |
| 16:39:58 | 9 | Q.   All right.  So this part where my finger is? |
| 16:40:04 | 10 | A.   Yes. |
| 16:40:05 | 11 | Q.   Is the part that shows the pedigree? |
| 16:40:07 | 12 | A.   Yes. |
| 16:40:07 | 13 | Q.   And this is the same information that's on the registration |
| 16:40:11 | 14 | certificate? |
| 16:40:12 | 15 | A.   That's correct. |
| 16:40:16 | 16 | Q.   And has some other information at the top that it was an |
| 16:40:20 | 17 | embryo transfer, genetic typed.  That means that DNA was |
| 16:40:26 | 18 | verified; is that true? |
| 16:40:27 | 19 | A.   That means he has a DNA type on file.  And the fact that |
| 16:40:31 | 20 | it's listed as embryo transfer would tell me that it's also |
| 16:40:34 | 21 | parentage-verified. |
| 16:40:35 | 22 | Q.   All right.  And parentage-verified is the same as saying |
| 16:40:39 | 23 | that you guys did a DNA test to verify that? |
| 16:40:42 | 24 | A.   It means we compared its DNA type to its parents.  Having |
| 16:40:45 | 25 | just a genetic type just means he just has a genetic type.  It |

| 16:40:49 | 1 | doesn't mean it's verified against anything. |

16:40:49   1   doesn't mean it's verified against anything.

16:40:51   2   Q.   And at the bottom, this lists the various owners that this

16:41:00   3   horse has had?

16:41:01   4   A.   That's correct.

16:41:10   5   Q.   And then, as to document 16350, this, again, is the race

16:41:21   6   detail.  It shows what races the horse has raced in, what his

16:41:25   7   record is?

16:41:25   8   A.   That's correct.

16:41:26   9   Q.   That's all the questions I have, your Honor.

16:41:47   10              THE COURT:  Mr. DeGeurin, any questions?

16:41:51   11              MR. DEGEURIN:  No.  I have none.

16:41:54   12              MR. WOMACK:  No, your Honor.

16:41:56   13              MR. ESPER:  I have none, your Honor.

16:41:57   14              MR. MAYR:  Neither do I.

16:41:59   15              THE COURT:  Any redirect?

16:42:06   16                        REDIRECT EXAMINATION

16:42:06   17   BY MS. FERNALD:

16:42:27   18   Q.   On the transfer form report that we just showed you and on

16:42:37   19   the certificate of service, certificate of registration, excuse

16:42:43   20   me, in order to change ownerships of it, does the owner or the

16:42:48   21   previous owner have to be present?

16:42:49   22   A.   They do not.

16:42:50   23   Q.   What has to be present in order for it to transfer?

16:42:53   24   A.   The transfer report form and the certificate of

16:42:57   25   registration.

| | | |
|---|---|---|
| 16:42:57 | 1 | Q.   A copy of the certificate of registration? |
| 16:42:59 | 2 | A.   The original. |
| 16:43:04 | 3 | Q.   16349, who was the second previous owner according to your |
| 16:43:25 | 4 | report? |
| 16:43:25 | 5 | A.   Jose Trevino-Morales. |
| 16:43:28 | 6 | Q.   Of Tempting Dash? |
| 16:43:30 | 7 | A.   Yes. |
| 16:43:30 | 8 | Q.   Who was the previous owner? |
| 16:43:31 | 9 | A.   Ramiro Guajardo-Villarreal. |
| 16:43:39 | 10 | Q.   Now, you also report on these types of forms the date in |
| 16:43:45 | 11 | which the form was actually completed versus the day which you |
| 16:43:49 | 12 | actually received the form. |
| 16:43:50 | 13 | A.   On this document you're showing me now, that is the date |
| 16:43:55 | 14 | acquired that was listed on the transfer report. |
| 16:43:57 | 15 | Q.   Not the date that it got to you, correct? |
| 16:43:59 | 16 | A.   That's correct. |
| 16:44:00 | 17 | Q.   Do you have some forms like this in which you will actually |
| 16:44:03 | 18 | have the completion date that AQHA does? |
| 16:44:07 | 19 | A.   Yes. |
| 16:44:08 | 20 | Q.   I'm going to show you what has come out of the box as 226D. |
| 16:44:34 | 21 | Do you recognize that? |
| 16:44:37 | 22 | A.   Yes. |
| 16:44:38 | 23 | Q.   Okay.  Did we go over this form prior to your testimony? |
| 16:44:40 | 24 | A.   Yes. |
| 16:44:41 | 25 | Q.   For demonstrative purposes, move for the admission of 226D. |

16:45:39  1        MS. WILLIAMS:  I don't really have an objection, but

16:45:41  2  it's very confusing because it's a document that's in evidence.

16:45:45  3  But she's offered it for demonstrative purposes.

16:45:48  4        THE COURT:  So she doesn't have to go to that big box

16:45:51  5  and get it every time.  Perfectly not confusing.  That's what

16:45:56  6  demonstrative evidence is for.

16:45:58  7        Okay.  226D is admitted for demonstrative purposes.

16:46:03  8  However, counsel, that doesn't mean you can't go over and get the

16:46:07  9  original, if you want, or the original copy.

16:46:12  10  Q.   (BY MS. FERNALD) Ms. Canida, have you seen this document

16:46:14  11  before?  I'm sorry.

16:46:15  12  A.   Yes.

16:46:15  13  Q.   Okay.  I was asking you about the dates that are contained

16:46:19  14  on there in reference to the question.  Can you tell me about the

16:46:27  15  purchase date, the CMO date, and the complete date that's at the

16:46:31  16  top of this form?

16:46:31  17  A.   Yes.  The purchase date is the date that was listed as the

16:46:35  18  date of sale on the transfer document that we received.  The CMO

16:46:39  19  date is typically the date that we mailed the certificate out of

16:46:43  20  our office.  And then, completion date is the date we actually

16:46:46  21  completed on our records.

16:46:48  22  Q.   And that's all that the form is, correct?

16:46:51  23  A.   That's correct.

16:47:07  24  Q.   Purchase date, CMO date and complete date, correct?

16:47:10  25  A.   That's correct.

| | | |
|---|---|---|
| 16:47:11 | 1 | Q.   Pass the witness. |
| 16:47:23 | 2 | MS. WILLIAMS:  Nothing further. |
| 16:47:25 | 3 | THE COURT:  May this witness be excused, counsel? |
| 16:47:28 | 4 | MR. DEGEURIN:  Yes, sir. |
| 16:47:29 | 5 | MR. ESPER:  All right. |
| 16:47:30 | 6 | THE COURT:  You may be excused, ma'am.  Call your next |
| 16:47:34 | 7 | witness. |
| 16:47:34 | 8 | MR. GARDNER:  Your Honor, the government would call Mr. |
| 16:47:36 | 9 | Russell Stooks. |
| 16:48:05 | 10 | THE COURT:  Come forward, please.  This is Mrs. Sims. |
| 16:48:08 | 11 | She's going to administer an oath to you. |
| 16:48:25 | 12 | (Witness sworn.) |
| 16:48:26 | 13 | THE COURT:  Tell us your full name and spell your last, |
| 16:48:30 | 14 | please. |
| 16:48:30 | 15 | THE WITNESS:  Russell Stooks, S-T-O-O-K-S. |
| 16:48:35 | 16 | THE COURT:  You may proceed. |
| 16:48:36 | 17 | RUSSELL STOOKS, called by the Government, duly sworn. |
| 16:48:36 | 18 | DIRECT EXAMINATION |
| 16:48:36 | 19 | BY MR. GARDNER: |
| 16:48:37 | 20 | Q.   Thank you, your Honor. |
| 16:48:37 | 21 | Mr. Stooks, you and I met before; is that correct? |
| 16:48:40 | 22 | A.   Yes. |
| 16:48:40 | 23 | Q.   If you will, could you please introduce yourself to the |
| 16:48:43 | 24 | jury?  Tell them a little bit about yourself, how old you are, |
| 16:48:46 | 25 | what you do for a living. |

```
16:48:47   1   A.   Oh, my name is Russell Stooks.  I'm 62.  Currently retired,

16:48:52   2   but I have a small horse breeding and raising operation.

16:48:57   3   Q.   Sir, before you retired, what did you do for a living?

16:48:59   4   A.   I was president of Cregion (phonetic) Industries,

16:49:03   5   manufacturing companies.

16:49:04   6   Q.   And the name of your ranch, sir, your horse operation as you

16:49:07   7   call it?

16:49:07   8   A.   Lucky 7 Ranch.

16:49:09   9   Q.   And how long have you been involved with quarter horses?

16:49:12  10   A.   Approximately 20 years.

16:49:14  11   Q.   And when I say involved with quarter horses, could you

16:49:17  12   explain that a little bit more to the jury, the length or, I'm

16:49:21  13   sorry, the level of involvement?

16:49:23  14   A.   Well, we raised -- we have brood mares, so we raise babies.

16:49:29  15   We keep some to race, we take some to sales.  So that's, yeah,

16:49:37  16   that's the level.

16:49:38  17   Q.   Let me get you to define some terms for me for the jury.

16:49:42  18   What is a weanling?

16:49:43  19   A.   Up until one year old.

16:49:45  20   Q.   And what is a yearling?

16:49:47  21   A.   One to two.

16:49:49  22   Q.   And what is the age in which a quarter horse comes of age

16:49:53  23   that it can race?

16:49:55  24   A.   After their two-year-old year.

16:49:58  25   Q.   And so, when is that two-year-old year calculated from?
```

16:50:01  1   A.   Well, it goes on a calendar basis.  So a horse becomes -- if

16:50:07  2   they're born in April, they would become one in the following

16:50:12  3   January.

16:50:13  4   Q.   So is it better to have a horse born in January to become

16:50:17  5   one in January rather than a horse born in April to become one in

16:50:20  6   January?

16:50:21  7   A.   For racing purpose, yes, because they're more mature.

16:50:24  8   Q.   A few extra months?

16:50:26  9   A.   Yes.  Exactly.

16:50:27  10  Q.   Do you know an individual by the name of Ramiro Villarreal?

16:50:30  11  A.   Yes.

16:50:31  12  Q.   Or did you know an individual by the name of --

16:50:33  13  A.   Yes.

16:50:33  14  Q.   And when did you first meet Mr. Villarreal?

16:50:36  15  A.   Oh, I don't know.  Maybe eight, ten years ago, just at the

16:50:42  16  horse sales.

16:50:43  17  Q.   When you say horse sales, could you explain to the jury,

16:50:46  18  what are the major auction houses here in the United States?

16:50:50  19  A.   Well, I think there's quite -- probably quite a few, but the

16:50:54  20  three major ones are for quarter horses are the Ruidoso horse

16:51:00  21  sale in Ruidoso, New Mexico, the Heritage Place in Oklahoma City,

16:51:05  22  and Pacific Coast sale in California.  But there's some smaller

16:51:10  23  sales, you know, in Texas.  And the Texas Breeders Association

16:51:15  24  has a sale.  And there are even a couple of other smaller ones.

16:51:19  25  Q.   Are the most valuable horses, the most sought-after horses,

16:51:22  1  are they generally sold at the three bigger sales?

16:51:24  2  A.    Yeah.   I would say that probably Ruidoso, which is the first

16:51:29  3  of the three big ones, has the most expensive horses and then,

16:51:33  4  Heritage Place probably second and then, the Pacific Coast sale

16:51:38  5  third.

16:51:38  6  Q.    So is there -- every year, these same auction houses have a

16:51:42  7  yearly sale and they all go in the same order every year?

16:51:44  8  A.    Yes.   Uh-huh.

16:51:45  9  Q.    So with respect to Mr. Villarreal, what interaction did you

16:51:49  10  have with him at these horse auctions?

16:51:51  11  A.    Oh, just, you know, just to talk to him for a few minutes,

16:51:55  12  and he was always there buying horses.

16:51:58  13  Q.    And were you aware of his clients who he was buying horses

16:52:02  14  for?

16:52:02  15  A.    No.   He was just -- he was kind of known as a broker that

16:52:06  16  would buy horses and then, take them to Mexico and sell them,

16:52:11  17  what they would call in the industry maybe pen-hook them, buy

16:52:14  18  them and resell them to people.

16:52:15  19  Q.    And were you aware of any of the people he was selling to in

16:52:18  20  Mexico?

16:52:18  21  A.    No.   Huh-uh.

16:52:19  22  Q.    And was there an occasion when Mr. Villarreal approached you

16:52:23  23  about buying some horses from you?

16:52:25  24  A.    Probably a number of occasions but in 2008 -- and I don't

16:52:33  25  remember if it was the Ruidoso sale or the Heritage sale, he

| | | |
|---|---|---|
| 16:52:39 | 1 | asked me what we had for sale.  We had some that were actually in |
| 16:52:43 | 2 | Oklahoma.  So we told him that what we had and told him to go |
| 16:52:48 | 3 | take a look at them. |
| 16:52:49 | 4 | Q.   Do you know whether or not he did look at them? |
| 16:52:51 | 5 | A.   Yeah.  He looked at them and he actually bought two of them. |
| 16:52:54 | 6 | Q.   And do you recall the name of that horse? |
| 16:52:55 | 7 | A.   It was called Blues Man Can. |
| 16:52:58 | 8 | Q.   Do you recall the amount that you sold that horse for? |
| 16:53:01 | 9 | A.   15,000. |
| 16:53:03 | 10 | THE COURT:  The name was what, sir? |
| 16:53:06 | 11 | THE WITNESS:  Blues Man Can. |
| 16:53:08 | 12 | Q.   (BY MR. GARDNER) And do you recall the manner in which Mr. |
| 16:53:14 | 13 | Villarreal paid you that horse? |
| 16:53:15 | 14 | A.   Yeah.  Cash. |
| 16:53:16 | 15 | Q.   Cash.  I'm going to show you Government's Exhibit 241.  Do |
| 16:53:24 | 16 | you recognize that, sir? |
| 16:53:27 | 17 | A.   Yes. |
| 16:53:27 | 18 | Q.   And is that a photocopy of the payment stubs that you kept |
| 16:53:33 | 19 | as part of your records? |
| 16:53:33 | 20 | A.   Yes. |
| 16:53:34 | 21 | Q.   And does that reflect the receipt of cash for Mr. Blues Man |
| 16:53:39 | 22 | Can on the top receipt? |
| 16:53:41 | 23 | A.   Yes. |
| 16:53:41 | 24 | Q.   And there's another receipt here on the side, dated |
| 16:53:44 | 25 | September 2009.  Does that reflect the receipt of payment for |

201

| | | |
|---|---|---|
| 16:53:49 | 1 | another horse purchased by Mr. Villarreal? |
| 16:53:52 | 2 | A.   Yes. |
| 16:53:53 | 3 | Q.   Your Honor, I would offer Government's Exhibit 241. |
| 16:54:36 | 4 |         MS. WILLIAMS:  No objection. |
| 16:54:37 | 5 |         MR. ESPER:  No objection, your Honor. |
| 16:54:38 | 6 |         THE COURT:  241 is admitted. |
| 16:54:41 | 7 | Q.   (BY MR. GARDNER) Mr. Stooks, I want to talk about this |
| 16:54:52 | 8 | first.  A receipt that's a receipt for $15,000 cash for the |
| 16:54:55 | 9 | purchase of Blues Man Can; is that correct? |
| 16:54:58 | 10 | A.   Yes. |
| 16:54:59 | 11 | Q.   And what's this number right here, sir? |
| 16:55:02 | 12 | A.   That would be the horse's registration number on -- it's |
| 16:55:08 | 13 | AQHA, American Quarter Horse Association's registration number |
| 16:55:11 | 14 | that's assigned to the horse. |
| 16:55:13 | 15 | Q.   And, sir, do you remember the bloodlines for Blues Man Can, |
| 16:55:17 | 16 | just generally?  Were they good bloodlines in your opinion? |
| 16:55:21 | 17 | A.   Yeah.  They were excellent. |
| 16:55:22 | 18 | Q.   And did you ever come to know that Blues Man Can's name was |
| 16:55:27 | 19 | ever changed? |
| 16:55:29 | 20 | A.   Yeah.  It was brought to my attention that it was changed. |
| 16:55:32 | 21 | Q.   And do you recall the name of the horse as it is now? |
| 16:55:35 | 22 | A.   Blues Ferrari.  I didn't -- I didn't change the name.  That |
| 16:55:39 | 23 | was changed after I sold the horse. |
| 16:55:40 | 24 | Q.   So when you sold it to Mr. Villarreal, you sold it as Blues |
| 16:55:45 | 25 | Man Can? |

| | | |
|---|---|---|
| 16:55:45 | 1 | A.   Yes.   Correct. |
| 16:55:46 | 2 | Q.   Do you know whether Mr. Villarreal changed the name or |
| 16:55:49 | 3 | someone else? |
| 16:55:51 | 4 | A.   I don't know who he sold the horse to, so, you know, I don't |
| 16:55:55 | 5 | know. |
| 16:55:55 | 6 | Q.   Sir, do you generally keep track of the horses that either |
| 16:55:58 | 7 | you raise in terms of how they race later on? |
| 16:56:02 | 8 | A.   Yeah, we pay pretty close attention.  We keep them in what's |
| 16:56:05 | 9 | called -- there's a website Equibase so you can create a stable, |
| 16:56:11 | 10 | of what's called a virtual stable.  So most of our babies that we |
| 16:56:14 | 11 | sell or that we keep, we put them in the virtual stable.  So |
| 16:56:19 | 12 | whenever they're entered into a race or for workout at the track, |
| 16:56:23 | 13 | or whatever, that you get a popup, an e-mail popup to let you |
| 16:56:28 | 14 | know how they did. |
| 16:56:28 | 15 | Q.   And did you track Blues Man Can in that database? |
| 16:56:31 | 16 | A.   Yes.  Uh-huh. |
| 16:56:32 | 17 | Q.   And do you recall what the amount of winnings this horse had |
| 16:56:37 | 18 | over the course of its racing career? |
| 16:56:40 | 19 | A.   No.  Wasn't much. |
| 16:56:41 | 20 | Q.   When you say it wasn't much, $100,000 or -- |
| 16:56:44 | 21 | A.   Oh, no.  I don't think so. |
| 16:56:46 | 22 | Q.   Less than 10,000? |
| 16:56:48 | 23 | A.   Maybe around 20, I think -- |
| 16:56:50 | 24 | MS. WILLIAMS:  Object to speculation. |
| 16:56:52 | 25 | THE COURT:  What now? |

| | | |
|---|---|---|
| 16:56:53 | 1 | MS. WILLIAMS:  Speculation. |
| 16:56:55 | 2 | THE COURT:  He's answered around 12,000. |
| 16:56:59 | 3 | THE WITNESS:  No.  Around 20,000 I think. |
| 16:57:01 | 4 | Q.  (BY MR. GARDNER) 20,000.  Based on your experience in the |
| 16:57:05 | 5 | horse industry, if you were to buy that horse for $15,000, it |
| 16:57:11 | 6 | were to win $20,000 over its racing lifespan, what would you |
| 16:57:16 | 7 | estimate the value of that horse? |
| 16:57:20 | 8 | MS. WILLIAMS:  Object to speculation and lack of |
| 16:57:21 | 9 | foundation. |
| 16:57:23 | 10 | THE COURT:  Okay.  That objection's overruled.  You may |
| 16:57:25 | 11 | answer. |
| 16:57:26 | 12 | A.  Can you repeat the question? |
| 16:57:29 | 13 | Q.  (BY MR. GARDNER) You sold this horse for $15,000. |
| 16:57:31 | 14 | A.  Correct. |
| 16:57:32 | 15 | Q.  Was it sold as a weanling? |
| 16:57:34 | 16 | A.  Yeah.  That particular horse was sold -- he actually bought |
| 16:57:40 | 17 | it when it was a weanling from me in the fall of 2008, but he |
| 16:57:46 | 18 | didn't pay for it until February of 2009.  So based on what I |
| 16:57:55 | 19 | know about that particular horse and the reason that we sold it |
| 16:57:58 | 20 | to him so cheap, if it was to be resold at a sale after its |
| 16:58:04 | 21 | racing career, based on its earnings, probably as much as its |
| 16:58:12 | 22 | earnings, maybe 20,000. |
| 16:58:15 | 23 | Q.  Now, I want to turn your attention to the other horse that |
| 16:58:19 | 24 | we talked about.  And you don't put the horse's names on here, |
| 16:58:24 | 25 | but you recall, after you and I talked, that this was another |

| 16:58:26 | 1 | horse that Ramiro Villarreal purchased? |

16:58:26  1  horse that Ramiro Villarreal purchased?

16:58:29  2  A.    Yes.   That's correct.

16:58:33  3  Q.    And is the name of that horse Blues Girls Choice?

16:58:35  4  A.    Correct.

16:58:36  5  Q.    And, again, Mr. -- according to your receipt, did Mr.

16:58:41  6  Villarreal pay you $15,000 cash for that?

16:58:43  7  A.    He actually picked it up, the horse up at the breeding farm

16:58:48  8  in College Station and paid down the cash, which they later gave

16:58:54  9  to me.

16:58:54  10  Q.    Could you explain the circumstances around the sale of that

16:58:59  11  horse to the ladies and gentlemen of the jury?

16:59:02  12  A.    Yeah.   That horse, we had it paid into sale in the fall.   I

16:59:09  13  think it would be early October.   They have the sale in Pacific

16:59:12  14  Coast yearling sales.   That horse was paid into that sale.   And

16:59:16  15  we had consigned it with Lazy E Ranch to take it to the sale for

16:59:22  16  us to sell.   But prior to going into sale, the fellow that was

16:59:32  17  breaking the horse getting the sale prepped for me, thought he --

16:59:36  18  the horse was a little off, wasn't right, whatever.

16:59:39  19          So we went ahead and had the horse X-rayed, and the

16:59:43  20  X-ray showed that the horse had a moderate case of juvenile

16:59:48  21  arthritis in its hocks.   So what we did is if a horse X-rays that

16:59:56  22  bad like that, you can't take them to a sale because any

17:00:00  23  prospective buyer that would be willing to pay any, you know,

17:00:04  24  reasonable amount for a horse would have it X-rayed at the sale.

17:00:06  25  That's pretty standard practice.

17:00:09    1    So what we did is we scratched it out of the sale.

17:00:13    2    Q.   So just so the jury understands, when a horse is entered

17:00:17    3    into a sale, is that horse then put in the sales booklet, the

17:00:21    4    publication?

17:00:22    5    A.   Yeah.  That's correct.  In other words, as an example for

17:00:25    6    that Pacific Coast sale, the sale is early October but probably

17:00:30    7    by June 1st, prior to June.  So four or five months before that,

17:00:39    8    you have to have the horse entered, pay the entry fee into the

17:00:42    9    sale, and then, they go ahead and you send the papers in, the

17:00:47   10    registration papers, the transfer papers for the horse.  And

17:00:49   11    then, they do a background check on, you know, the breeding

17:00:52   12    lines, and whatever.  And then, they come up with a sale book,

17:00:55   13    and that horse is assigned a sale number, and it's listed in the

17:00:59   14    sale catalog.

17:01:00   15    Q.   You say sale number.  Is that also commonly referred to as

17:01:03   16    hip number?

17:01:04   17    A.   Yes.  It's a hip number.  Uh-huh.

17:01:06   18    Q.   Is this horse Blues Girls Choice entered into that Pacific

17:01:10   19    Coast sale?

17:01:10   20    A.   Yes.  That's correct.

17:01:11   21    Q.   And then, you told the ladies and gentlemen of the jury that

17:01:13   22    you had withdrawn because of the juvenile arthritis?

17:01:17   23    A.   When we found out that we knew we couldn't sell it so we --

17:01:21   24    the sale, anyway, so we took it out of the sale.  Instead of

17:01:25   25    taking it to the sale and paying the expense to get it from Texas

17:01:27   1   to California, paying consignment fees at the sale, and so on, it
17:01:33   2   was better off just to take it out of the sale.
17:01:35   3   Q.   You mentioned two fees.  So I'd like to break that down a
17:01:39   4   little bit.  You said the Lazy E Ranch was responsible for
17:01:44   5   prepping that horse for auction?
17:01:46   6   A.   No.  Actually, it was being prepped in College Station, but
17:01:49   7   Lazy E Ranch has a service where they will -- you can consign
17:01:55   8   your horse with them, they will take it to the sale for you.  And
17:01:59   9   they may have, you know, 50, 60 horses consigned with them, so as
17:02:04  10   buyers come up to want to see the horses, then, you know, they'll
17:02:07  11   take him out.  If they keep him groomed up, then they take him
17:02:11  12   out and show everybody and you pay them a commission.  Usually I
17:02:15  13   think it's five or six percent of the sale price to do that.
17:02:18  14   Plus then you also pay a commission to the sale company, to
17:02:22  15   Pacific Coast sale of five percent or whatever.
17:02:27  16   Q.   So, for example, if you had a $100,000 horse that went to
17:02:32  17   auction at that amount, Lazy E took it from you and took it to
17:02:35  18   the auction, you would pay them?
17:02:36  19   A.   You pay them 5,000 and you also pay the sale company 5,000.
17:02:41  20   Q.   And so, knowing what you knew about this particular horse,
17:02:45  21   Blues Girls Choice, was that the reason you withdrew it from that
17:02:49  22   sale?
17:02:49  23   A.   The reason we withdrew it was because we knew it was X-rayed
17:02:54  24   so we go in all the expense of getting it out there and probably
17:02:58  25   end up bringing it right back.

17:03:01  1  Q.   And did Mr. Villarreal approach you after you withdrew from

17:03:05  2  that sale?

17:03:06  3  A.   He didn't approach me.  He actually went by the breeding

17:03:13  4  farm where the horse was at and because I think he had horses

17:03:16  5  there and he asked them about the horse and he -- they asked what

17:03:25  6  we wanted and he told them and they bought the horse.

17:03:27  7  Q.   And did you attend that Pacific Coast sale that year?

17:03:31  8  A.   Yes.

17:03:32  9  Q.   Okay.  And was this horse --

17:03:33  10  A.   And let me back up to say, we also gave Ramiro Villarreal

17:03:43  11  the X-ray report on that horse.

17:03:44  12  Q.   He was aware that Blues Girls Choice had juvenile arthritis?

17:03:47  13  A.   That's right.  And both horses we sold, they got the X-ray

17:03:50  14  reports.

17:03:51  15  Q.   My next question, did you eventually attend that particular

17:03:54  16  Pacific quarter horse sale?

17:03:56  17  A.   Yes.

17:03:56  18  Q.   All right.  Did you see Blues Girls Choice being auctioned

17:03:59  19  at that sale?

17:04:00  20  A.   Yes.

17:04:02  21  Q.   And whose name was it being auctioned under?

17:04:04  22  A.   I think it was still consignment in my name because we were

17:04:11  23  shocked.  I mean, we called the sale when we scratched it out and

17:04:14  24  said, you know, we're taking the horse out of the sale.  After

17:04:18  25  Ramiro bought the horse from us, he ended up picking it up and

17:04:21   1   having it vanned all the way direct to the sale, and it was kind

17:04:25   2   of a shock to everybody.  Especially like Lazy who had a

17:04:30   3   consignment because we told them we were taking the horse out of

17:04:32   4   sale.  We had no idea that he was going to take the horse to the

17:04:34   5   sale.

17:04:34   6   Q.   And when the horse got to sale, what condition was the horse

17:04:37   7   in?

17:04:38   8   A.   Poor condition.

17:04:39   9   Q.   And what --

17:04:40   10   A.   The horse was -- actually, when he picked it up from the

17:04:44   11   breeding farm, the horse had actually had a temperature and was

17:04:48   12   sick.

17:04:49   13   Q.   And you said earlier that a consignment service will take

17:04:52   14   the horse out for you.  What do you mean by taking the horse out

17:04:57   15   for a prospective buyer?

17:04:58   16   A.   Well, you could pitch your sales.  So there's hundreds of

17:05:03   17   stalls with horses in them and you just kind of -- there to look

17:05:06   18   at the -- you know, there's a placard on each stall gives the

17:05:13   19   horse's name and the breeding, and so on.  So buyers will go by

17:05:17   20   and take their sale catalog and walk out and pick out the horses

17:05:21   21   that they want to see.  So they'll go up to -- as an example,

17:05:25   22   Lazy E may have 50 or 60 horses consigned and say, we'd like you

17:05:30   23   to take out hip No. 42 so we could take a look at it.

17:05:33   24   Q.   Is that to determine the --

17:05:35   25   A.   Yeah.  That's to take a look at it.  Uh-huh.  And then, they

| 17:05:38 | 1 | have you jog the horse off. |

Q.   And do you know if Blues Girls Choice was ever taken out of the stall for anyone to look at?

A.   To the best of my knowledge, Butch Wise told me from Lazy E that no one took the horse out --

          MS. WILLIAMS:  Objection.  Hearsay.

          THE COURT:  Sustained.

          MR. GARDNER:  I'll rephrase the question.

Q.   (BY MR. GARDNER) Did that horse get sold at the Pacific Coast horse auction?

A.   It went to the sale, yes.

Q.   And who was the bidder on this horse?

A.   I think Ramiro.

Q.   And do you recall the amount that that horse went for when the gavel dropped?

A.   Somewhere around $125,000, $130,000.

Q.   So Ramiro Villarreal bought that horse from you; is that correct?

A.   That's correct.

Q.   And was he responsible for driving it out to California?

A.   That's correct.

Q.   And, again, your testimony is that he was the actual purchaser of that horse for $135,000?

A.   Yeah.  I don't know if he -- I mean, he was the one bidding on the horse.  So I don't know who him and some other -- other

| | | |
|---|---|---|
| 17:06:44 | 1 | individuals.  And I think that after the sale was complete, the |
| 17:06:50 | 2 | Pacific Coast yearling sale -- the lady there called me and asked |
| 17:06:53 | 3 | me -- she said -- |
| 17:06:54 | 4 | MS. WILLIAMS:  Objection.  Hearsay. |
| 17:06:55 | 5 | THE COURT:  Sustained. |
| 17:06:56 | 6 | Q.   (BY MR. GARDNER) What she's talking about there, Mr. Stooks, |
| 17:07:00 | 7 | is whatever somebody told you, you can't testify to.  Just what |
| 17:07:02 | 8 | your knowledge is. |
| 17:07:03 | 9 | A.   Okay.  Well, the lady at Pacific Coast yearling sale -- |
| 17:07:07 | 10 | THE COURT:  Just wait for the question.  The lawyers |
| 17:07:09 | 11 | know how to ask questions.  They'll make it easier for you.  Go |
| 17:07:13 | 12 | ahead. |
| 17:07:13 | 13 | Q.   (BY MR. GARDNER) In your opinion, the price he paid for that |
| 17:07:19 | 14 | horse, the fact that it had juvenile arthritis and the condition |
| 17:07:23 | 15 | of it in the sale, did that justify the sale price of $135,000? |
| 17:07:27 | 16 | MS. WILLIAMS:  I'm going to object to this witness |
| 17:07:30 | 17 | giving this opinion.  I object to opinion testimony from this |
| 17:07:36 | 18 | witness. |
| 17:07:36 | 19 | MR. GARDNER:  He's a lay witness, your Honor.  That's |
| 17:07:38 | 20 | the opinion we're eliciting from him is his experience.  Not as |
| 17:07:42 | 21 | an expert. |
| 17:07:42 | 22 | THE COURT:  He's in the business.  I'll overrule the |
| 17:07:44 | 23 | objection.  You may answer. |
| 17:07:47 | 24 | Q.   (BY MR. GARDNER) Would you like me to repeat the question? |
| 17:07:49 | 25 | A.   No.  The horse was not worth $135,000. |

| | | |
|---|---|---|
| 17:07:54 | 1 | Q.   That's all the questions I have, your Honor. |
| 17:08:05 | 2 | CROSS-EXAMINATION |
| 17:08:06 | 3 | BY MS. WILLIAMS: |
| 17:08:06 | 4 | Q.   Hi, Mr. Stooks. |
| 17:08:08 | 5 | A.   Hello. |
| 17:08:09 | 6 | Q.   I just have a couple of questions for you. |
| 17:08:10 | 7 | A.   Okay. |
| 17:08:11 | 8 | Q.   When you want to buy a horse at an auction, when you want to |
| 17:08:16 | 9 | sell a horse, you don't always go to sell it yourself; is that |
| 17:08:19 | 10 | correct? |
| 17:08:19 | 11 | A.   That's correct. |
| 17:08:20 | 12 | Q.   Sometimes you consign it to somebody else? |
| 17:08:22 | 13 | A.   Yes.  That's correct. |
| 17:08:23 | 14 | Q.   When you want to buy a horse at an auction, do you always go |
| 17:08:26 | 15 | and bid yourself? |
| 17:08:27 | 16 | A.   If I want to buy one, yes. |
| 17:08:29 | 17 | Q.   Okay.  Does everybody do that? |
| 17:08:32 | 18 | A.   No. |
| 17:08:34 | 19 | Q.   Why not? |
| 17:08:36 | 20 | A.   I don't know.  You'd have to ask them.  I don't know. |
| 17:08:38 | 21 | Q.   Okay.  Some people send an agent to bid for them at auction. |
| 17:08:45 | 22 | Is that your experience? |
| 17:08:45 | 23 | A.   Yes.  I think so. |
| 17:08:46 | 24 | Q.   Okay.  And that could be for variety of reasons.  They're |
| 17:08:51 | 25 | too busy, they don't want anybody to know who's bidding on the |

| | | |
|---|---|---|
| 17:08:56 | 1 | horse, right? |
| 17:08:57 | 2 | A.   That's correct. |
| 17:08:57 | 3 | Q.   All right.  And you don't know, do you, whether or not Mr. |
| 17:09:04 | 4 | Villarreal bought that horse for himself or for somebody else at |
| 17:09:07 | 5 | Pacific Coast? |
| 17:09:09 | 6 | A.   No.  I don't know that. |
| 17:09:10 | 7 | Q.   I don't have anything further. |
| 17:09:14 | 8 | MR. DEGEURIN:  No, your Honor. |
| 17:09:16 | 9 | MR. WOMACK:  Your Honor, very briefly. |
| 17:09:19 | 10 | CROSS-EXAMINATION |
| 17:09:23 | 11 | BY MR. WOMACK: |
| 17:09:23 | 12 | Q.   I want to talk to you a little bit about Government's |
| 17:09:25 | 13 | Exhibit 241.  That's the same exhibit you have on your screen. |
| 17:09:28 | 14 | A.   Okay. |
| 17:09:28 | 15 | Q.   If you'll look at each of these receipts, does the name |
| 17:09:41 | 16 | Ramiro Villarreal appear anywhere where it says, received from? |
| 17:09:49 | 17 | A.   No. |
| 17:09:52 | 18 | Q.   What it says is Mexico agent? |
| 17:09:54 | 19 | A.   That's correct. |
| 17:09:55 | 20 | Q.   And when you said Mexico agent, are you referring to Mr. |
| 17:10:00 | 21 | Villarreal? |
| 17:10:00 | 22 | A.   That's correct. |
| 17:10:03 | 23 | Q.   So you believe he was an agent for someone and not buying it |
| 17:10:07 | 24 | for himself? |
| 17:10:08 | 25 | A.   Yeah.  I think that he -- that's kind of how we knew he |

17:10:12    1   would buy horses at the sale and then, come back to Mexico and

17:10:15    2   sell them.

17:10:15    3   Q.   Okay.  So if someone comes -- this was at your farm, your

17:10:19    4   ranch, right?

17:10:20    5   A.   No.  That's not right.

17:10:22    6   Q.   Where did it happen at, these sales?

17:10:26    7   A.   The first one would have been in Oklahoma -- or, excuse me,

17:10:30    8   northern Oklahoma and the second one was in College Station.

17:10:32    9   Q.   Okay.  And what facility were these horses at in College

17:10:37   10   Station?  Was it just a stable?

17:10:39   11   A.   Yeah.  It's a horse breeding and boarding.

17:10:42   12   Q.   Okay.  And so, what would happen at, for example, the one in

17:10:47   13   College Station?  You would meet the buyer or someone at the

17:10:54   14   breeding facility, negotiate a price and in this case, normally

17:11:00   15   they would pay you.

17:11:00   16   A.   That's right.

17:11:01   17   Q.   Okay.  And you told us in one of these, Blues Man Can.  I

17:11:13   18   don't see it here.  I maybe know where I'm looking.  But that

17:11:17   19   horse was -- I believe you said it was bought in the fall of 2008

17:11:23   20   but paid for in February of 2009?

17:11:27   21   A.   That's correct.

17:11:28   22   Q.   And so, if you know, why was there a lag between fall of

17:11:34   23   2008 and February of 2009?

17:11:38   24   A.   That was Ramiro.  In other words, when he looked at the

17:11:43   25   horse and said, I'll take it for that price.

17:11:45   1   Q.   Okay.

17:11:46   2   A.   And he said, I'll meet up with you and pay you.  But I

17:11:49   3   didn't get in the papers to the horse, transfer of ownership to

17:11:52   4   him until he paid me for the horse.

17:11:54   5   Q.   So from fall of 2008 until February of 2009 when you got the

17:11:59   6   money, where was the horse?

17:12:01   7   A.   It was at the boarding operation in Norman, Oklahoma.

17:12:08   8   Q.   Okay.  And so, who was paying for that horse while it was

17:12:13   9   staying there in Oklahoma?

17:12:14   10  A.   Oh, probably me.

17:12:16   11  Q.   Okay.  So when you're telling us that you actually sold the

17:12:19   12  horse in the fall of 2008, you maintained custody of the horse,

17:12:24   13  didn't you?

17:12:24   14  A.   Yeah.  I didn't transfer any papers, any -- in other words,

17:12:28   15  he looked at it in the fall of 2008, said he was going to buy it

17:12:32   16  and then, he would meet up with me.  But that didn't happen until

17:12:36   17  February.

17:12:36   18  Q.   I gotcha.  So when you told the jury that he bought it in

17:12:39   19  fall of 2008 and paid for it in February of 2009, you mean there

17:12:44   20  was a meeting of the minds between you and Mr. Villarreal in the

17:12:48   21  fall of 2008 that told you he was buying the horse?

17:12:53   22  A.   Yeah.  He told me he was buying the horse.  Uh-huh.

17:12:56   23  Q.   And you told all of us that that's when you sold the horse

17:13:00   24  was fall of 2008?

17:13:03   25  A.   Well, I guess if you want to say the sale was not complete

17:13:06   1   until it's paid for, then it would have been February of 2009.

17:13:10   2   But he indicated to me the fall of 2008 that he was going to buy

17:13:14   3   the horse.

17:13:14   4   Q.   I understand.  And, believe me, I'm not trying to trick you.

17:13:18   5   I just want to make sure we understand, those of us not in the

17:13:21   6   horse industry.

17:13:22   7        In your mind, when you met with Mr. Villarreal in

17:13:24   8   Oklahoma in the fall 2008 and he said, I will buy this horse for

17:13:28   9   this price, in your mind, you had sold the horse that day,

17:13:32  10   correct?

17:13:37  11   A.   Yes.

17:13:38  12   Q.   And then, he actually came through and paid for the horse in

17:13:42  13   February of 2009, correct?

17:13:45  14   A.   Yes.

17:13:45  15   Q.   And that's when you actually gave him the paperwork where he

17:13:49  16   could register the horse in his name?

17:13:50  17   A.   That's correct.

17:13:51  18   Q.   And, in fact, when you did this, did you fill out a transfer

17:13:57  19   report form?

17:14:00  20   A.   Yeah.  In other words, when you sell a horse, you have --

17:14:03  21   you give the buyer the registration papers and the transfer.

17:14:07  22   Q.   And as the seller of the horse, we've had a chance to look

17:14:12  23   at a blank transfer report form?

17:14:14  24   A.   Yes.

17:14:16  25   Q.   When you sell the horse as the seller, do you fill out any

17:14:20   1   paperwork -- excuse me.  Do you fill out any of the blanks on the

17:14:25   2   transfer report form?

17:14:27   3   A.    As the seller, you fill out the seller section.

17:14:30   4   Q.    Okay.  So there's a seller section that you had filled out?

17:14:33   5   A.    Correct.

17:14:33   6   Q.    And in the case of this particular horse, Blues Man Can, you

17:14:39   7   would have filled out the seller section of the transfer report

17:14:44   8   form on or after a day in February of 2009?

17:14:49   9   A.    Yes.  That's correct.

17:14:50  10   Q.    You wouldn't have filled it out back in the fall of '08?

17:14:54  11   A.    Oh, no.  Definitely.

17:14:55  12   Q.    Because it could have fallen through?

17:14:57  13   A.    Yeah.  Yes.  And I wouldn't have done that until he paid me

17:15:01  14   for the horse.

17:15:01  15   Q.    And so, you would fill out the seller portion of the

17:15:07  16   transaction report form, and you would give that and the original

17:15:11  17   certificate on the horse to the buyer?

17:15:14  18   A.    Yes.

17:15:16  19   Q.    And then, he or she would be the one that would go through

17:15:21  20   the American Quarter Horse Association and actually do the

17:15:24  21   registration on their own.

17:15:25  22   A.    Yes.  And we take the transfer and the horse registration

17:15:33  23   papers and the transfer and send them in to the Quarter Horse

17:15:39  24   Association and get the horse transferred into their name.

17:15:41  25   Q.    And you're telling us that's how one would do it?

17:15:45  1  A.   Correct.

17:15:46  2  Q.   In this case, you don't know what was done yourself, do you,

17:15:50  3  after you hand over the paperwork to the buyer?

17:15:52  4  A.   No.

17:15:53  5  Q.   Okay.  Now, in a case like this where you only identified

17:15:57  6  him on the receipt a Mexico agent, do you know if he was going to

17:16:07  7  register the horse in his name or possibly a buyer's name?

17:16:10  8  A.   No.

17:16:19  9  Q.   No further questions.

17:16:22  10         MR. ESPER:  I have just a few, your Honor.

17:16:24  11                   CROSS-EXAMINATION

17:16:24  12  BY MR. ESPER:

17:16:26  13  Q.   Mr. Stooks, you said you knew Ramiro Villarreal for a number

17:16:29  14  of years prior to 2009?

17:16:31  15  A.   I had just seen him at the horse sales and said hello to

17:16:34  16  him.

17:16:34  17  Q.   And you knew him to be a kind of a broker, I think was the

17:16:39  18  word you used, for buying horses for other people?

17:16:44  19  A.   Yes.

17:16:44  20  Q.   Okay.  And this was the first time you had had any dealings,

17:16:50  21  transactions with Mr. Ramiro Villarreal?

17:16:53  22  A.   Yeah.  This is the first time that he directly bought a

17:16:57  23  horse from me.  I think he may have bought horses -- some of my

17:17:01  24  horses through the sales.

17:17:05  25  Q.   And I believe you knew that at least when you put on the

17:17:08  1  receipt he was a Mexican agent, was that at your doing or at his

17:17:12  2  request?

17:17:13  3  A.   No.  It was my doing.

17:17:14  4  Q.   Okay.  So you knew that he was from the Republic of Mexico,

17:17:18  5  did you not?

17:17:19  6  A.   Yes.

17:17:20  7  Q.   Okay.  And that you knew that he was representing either

17:17:25  8  himself or someone else who was from the Republic of Mexico,

17:17:28  9  correct?

17:17:31  10  A.   Well, I knew he was representing himself and/or, you know,

17:17:35  11  he was either buying a horse for himself to resell it or was

17:17:39  12  representing a third party.

17:17:41  13  Q.   Okay.  Whose decision was it to make the receipt out to cash

17:17:56  14  15,000, rather than Ramiro Villarreal 15,000, if you know?

17:18:01  15  A.   I make those receipts out.

17:18:03  16  Q.   Okay.  Did you do that at your own volition or did he

17:18:07  17  instruct you to do that?

17:18:07  18  A.   No.  Those are my records.

17:18:09  19  Q.   Okay.  So instead of making the receipt out to Ramiro

17:18:15  20  Villarreal $15,000 cash, you just made it to cash $15,000 and you

17:18:20  21  omit his name, correct?

17:18:23  22  A.   Correct.

17:18:24  23  Q.   Okay.  There wasn't any sinister purpose for that, was

17:18:28  24  there, Mr. Stooks?

17:18:29  25  A.   No.  Before just a month or so ago, I didn't even realize

17:18:36   1   that his last name is Villarreal.

17:18:38   2   Q.   Okay.  You just knew him as Ramiro?

17:18:40   3   A.   Yes.

17:18:41   4   Q.   Okay.  And he paid you with $15,000 in cash, correct?

17:18:45   5   A.   That's correct.

17:18:45   6   Q.   Not a cashier's check?

17:18:47   7   A.   No.  He -- cash.

17:18:50   8   Q.   Do you remember the denominations?  And if you don't know,

17:18:52   9   simply say so.

17:18:53  10   A.   Yeah.  I don't.  You know, cash.

17:18:55  11   Q.   And he handed it to you.  Do you remember if it was banded

17:18:59  12   or just handed to you in a brown paper bag?

17:19:01  13   A.   Oh, I think it was in the -- on the one horse it was just in

17:19:06  14   an envelope.

17:19:06  15   Q.   In an envelope?

17:19:09  16   A.   And the second horse, he actually left the money at the

17:19:12  17   breeding farm in College Station.

17:19:14  18   Q.   Okay.  And did you find that -- did you draw any suspicion

17:19:20  19   to that payment by him?

17:19:22  20   A.   No.  It's not unusual in the horse business.

17:19:25  21   Q.   Okay.  It's not unusual in the horse business to deal in

17:19:28  22   cash, correct?

17:19:29  23   A.   In small amounts.

17:19:30  24   Q.   Yeah.  And it's not -- and we're talking when we say small

17:19:34  25   amounts, 15,000 to some people is a big amount.  But for a horse,

17:19:39  1   it's probably not a big amount, is it?

17:19:42  2   A.   No.

17:19:43  3   Q.   Okay.  And so, it's not unusual for you, you're selling a

17:19:50  4   horse and someone buys it from you and pays you in cash 15,000.

17:19:54  5   A.   Correct.

17:19:54  6   Q.   Not unusual at all?

17:19:56  7   A.   Well, in that particular year, I sold two horses for cash.

17:20:05  8   I think it's not normal.  In other words, most of the time, it's

17:20:09  9   in a check or a wire transfer, or it goes through the sale

17:20:13  10  company.  So maybe since I've been doing this for the last 20

17:20:15  11  years, maybe four or five horses have been sold with cash.

17:20:19  12  Q.   And so, it happens on occasion but not with great frequency?

17:20:22  13  A.   Yes.

17:20:23  14  Q.   Now, if you're dealing with somebody who lives and resides

17:20:26  15  in the Republic of Mexico, you're not going to take a check from

17:20:29  16  him, are you?

17:20:30  17  A.   That's why it was cash.

17:20:32  18  Q.   Okay.  Yeah.  Of course.  And did Mr. Villarreal -- again,

17:20:42  19  he brought it to you in some sort of envelope and you gave him

17:20:46  20  the receipt and he took the receipt?

17:20:49  21  A.   No.  I didn't give him a receipt.

17:20:52  22  Q.   You didn't give him this receipt?

17:20:54  23  A.   No.

17:20:54  24  Q.   You just made out the receipt?

17:20:56  25  A.   Those are my -- those are my records.

17:20:57  1   Q.   Those are your books?

17:20:59  2   A.   Yeah.  Those are my records that I keep.

17:21:01  3   Q.   Okay.  You didn't actually give him a receipt?

17:21:03  4   A.   No.

17:21:03  5   Q.   Okay.  Is this some kind of duplicate form that you have

17:21:07  6   just a basic receipt book that you buy at Office Depot?

17:21:10  7   A.   Yes, exactly, and then, I just put the compilation together

17:21:13  8   at the end of the year for tax purposes.

17:21:15  9   Q.   Okay.  And so, this is actually your carbon, the bottom part

17:21:19  10  of the receipt, correct?

17:21:20  11  A.   Well, that would be -- that's a copy of my receipts.

17:21:24  12  Q.   I see.  Okay.  So, in other words, you made out the receipt

17:21:28  13  and generally you keep the bottom part, don't you, and you give

17:21:30  14  the top one to the person if they want it?

17:21:32  15  A.   If they want it.  Sure.

17:21:33  16  Q.   Okay.  And he wasn't there to want it, was he?

17:21:36  17  A.   No.

17:21:36  18  Q.   Okay.  That's all I have, your Honor.

17:21:42  19       MR. MAYR:  Briefly, your Honor.

17:21:42  20       THE COURT:  Yes, sir.

17:21:43  21                  CROSS-EXAMINATION

17:21:44  22  BY MR. MAYR:

17:21:44  23  Q.   Good afternoon, Mr. Stooks.  My name is Brent Mayr.  I just

17:21:48  24  want to ask a few questions about these records.

17:21:49  25       You testified you actually made out these receipts; is

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

17:21:52   1    that correct?

17:21:52   2    A.    Yes.

17:21:52   3    Q.    And 20 or so years that you've been doing this, do you

17:21:56   4    handwrite all of your receipts in this fashion?

17:21:59   5    A.    Well, yeah, for the most part.

17:22:02   6    Q.    For the most part.  Do you have other employees or

17:22:05   7    individuals that help you in the operation of your business?

17:22:08   8    A.    No.  I do all that myself.

17:22:10   9    Q.    You do everything.  Okay.  And, of course, these aren't --

17:22:14   10   this is just -- the specific records, these aren't all the

17:22:17   11   records relating to your business?

17:22:19   12   A.    No.

17:22:20   13   Q.    Do you keep all of your records using these sort of

17:22:23   14   handwritten receipts?  Or do you use some sort of software, like

17:22:27   15   QuickBooks, to manage all of the incoming expenses that you have

17:22:31   16   in the operation of your business?

17:22:32   17   A.    No.  We just -- it's not that big of a business, so it's

17:22:35   18   just hand records.

17:22:36   19   Q.    All hands records.  Nothing further, your Honor.  Thank you.

17:22:45   20                    RE-DIRECT EXAMINATION

17:22:45   21   BY MR. GARDNER:

17:22:47   22   Q.    Mr. Stooks, when you say small amounts, what would be a

17:22:51   23   large amount of cash you would consider for the purchase of a

17:22:54   24   horse in the quarter horse industry?

17:22:55   25   A.    Large amount to be paid in cash?

17:22:58   1    Q.   Yes, sir.

17:22:59   2    A.   Oh, I don't know.  I mean, the most that I've ever been paid

17:23:03   3    in cash was 30,000.

17:23:04   4    Q.   Did you consider that a large amount?

17:23:06   5    A.   Yes.

17:23:10   6    Q.   Were you aware that Blues Man Can or Blues Ferrari was sold

17:23:17   7    at the January 2011 Heritage Place auction by Jose Trevino?

17:23:23   8    A.   I was aware that it was sold.  I don't know who consigned

17:23:26   9    it.  I don't know who sold it.

17:23:27  10    Q.   Were you aware that Blues Girls Choice was sold at the

17:23:31  11    November 2011 Heritage Place auction by Jose Trevino?

17:23:36  12    A.   Same answer.  I was aware it was sold, but I don't know who

17:23:39  13    consigned the horse.

17:23:40  14    Q.   And with respect to Blues Ferrari, were you aware the sale

17:23:45  15    price at the January of 2011 Heritage Place auction?

17:23:49  16    A.   No.  I know it was a substantial amount, but I don't know

17:23:53  17    what the number was.

17:23:54  18    Q.   When you say substantial amount, you testified earlier that

17:23:58  19    you believe the value of Blues Ferrari or Blues Man Can was about

17:24:03  20    its winnings.

17:24:04  21    A.   Well, that's all I would pay for it.  I mean, in fact, I

17:24:08  22    wouldn't have paid that.  But I mean.

17:24:10  23    Q.   And if I recall your testimony, you said the winnings were

17:24:14  24    about $20,000?

17:24:15  25    A.   Yeah.  In that range.

17:24:18    1   Q.   And when you say that you were aware that Blues Ferrari went

17:24:23    2   to the January 2011 Heritage Sale for substantially more, can you

17:24:28    3   give us a range of what you mean when you say substantially more?

17:24:31    4        MS. WILLIAMS:  Object to speculation.  Said he didn't

17:24:33    5   know.

17:24:35    6        MR. GARDNER:  He said substantially more.  I'm just

17:24:37    7   trying to clarify the answer, your Honor.

17:24:38    8   A.   It was in the hundred-thousand --

17:24:41    9        MS. WILLIAMS:  I'm sorry, Judge.

17:24:42   10        THE COURT:  I'll overrule the objection.

17:24:44   11   Q.   (BY MR. GARDNER) I'm sorry.  What was the answer again?

17:24:45   12   A.   It was for hundreds of thousands.  I'm not sure what it was.

17:24:48   13   Q.   Knowing Ramiro as you knew him, would you have given him the

17:24:57   14   transfer report and the certificate before he paid you?

17:24:59   15   A.   Oh, absolutely not.

17:25:02   16   Q.   Would you have ever taken a personal check from Ramiro

17:25:06   17   Villarreal?

17:25:06   18   A.   No.

17:25:06   19   Q.   Pass the witness, your Honor.

17:25:09   20        MS. WILLIAMS:  No more questions.

17:25:11   21        THE COURT:  May this witness be excused, counsel?

17:25:13   22        MR. ESPER:  No objection.

17:25:14   23        MR. MAYR:  No objection.

17:25:15   24        MR. WOMACK:  No objection.

17:25:15   25        THE COURT:  You may be excused, sir.  Call your next

| | | |
|---|---|---|
| 17:25:17 | 1 | witness. |
| 17:25:18 | 2 | MR. GARDNER:  Your Honor, we would call Jose Vasquez, |
| 17:25:23 | 3 | Jr. |
| 17:26:29 | 4 | THE COURT:  This is Mrs. Sims and she's going to |
| 17:26:31 | 5 | administer an oath to you, sir. |
| 17:26:33 | 6 | (Witness sworn.) |
| 17:26:50 | 7 | THE COURT:  Tell us your full name, please, sir, and |
| 17:26:55 | 8 | spell your last. |
| 17:26:55 | 9 | THE WITNESS:  Jose Luis Vasquez, Jr., V-A-S-Q-U-E-Z. |
| 17:27:03 | 10 | THE COURT:  You may proceed. |
| 17:27:03 | 11 | JOSE L. VASQUEZ, JR., called by the Government, duly sworn. |
| 17:27:03 | 12 | DIRECT EXAMINATION |
| 17:27:03 | 13 | BY MR. GARDNER: |
| 17:27:04 | 14 | Q.   Thank you, your Honor. |
| 17:27:05 | 15 | Now, Mr. Vasquez, you and I have met before; is that |
| 17:27:08 | 16 | correct? |
| 17:27:08 | 17 | A.   Yes, sir. |
| 17:27:08 | 18 | Q.   Would you please introduce yourself for the jury?  Tell them |
| 17:27:11 | 19 | where you're from, how old you are. |
| 17:27:13 | 20 | A.   My name is Jose Luis Vasquez, Jr.  I'm from Dallas, Texas |
| 17:27:18 | 21 | and I'm 32 years old. |
| 17:27:20 | 22 | Q.   And how much education have you had, sir? |
| 17:27:21 | 23 | A.   I got my GED. |
| 17:27:23 | 24 | Q.   And you're currently incarcerated; is that correct? |
| 17:27:28 | 25 | A.   Yes, sir. |

17:27:29  1   Q.   All right.   Have you pled guilty to a federal narcotics

17:27:32  2   offense?

17:27:33  3   A.   Yes, sir.

17:27:33  4   Q.   Can you tell the ladies and gentlemen of the jury what that

17:27:36  5   offense was?

17:27:37  6   A.   It was a conspiracy case to distribute cocaine.

17:27:40  7   Q.   And do you recall the amount of cocaine that was alleged in

17:27:44  8   your indictment?

17:27:45  9   A.   Over 150 kilos.

17:27:47  10  Q.   And have you pled guilty to that offense?

17:27:50  11  A.   Yes.

17:27:50  12  Q.   And have you been sentenced?

17:27:52  13  A.   Yes.

17:27:53  14  Q.   All right.   What was the sentence you received from the

17:27:55  15  judge?

17:27:56  16  A.   I don't remember.   It was 156 or 160 months.

17:27:59  17  Q.   And have you received any type of credit for any previous

17:28:04  18  testimony?

17:28:05  19  A.   Yeah.   I got a 5K1 departure, I believe it's called.

17:28:08  20  Q.   And that's the motion that the government files to reduce

17:28:12  21  your sentence?

17:28:12  22  A.   Yes.

17:28:13  23  Q.   And where is your case, your case out of?

17:28:18  24  A.   Dallas.

17:28:19  25  Q.   Dallas.   Is that the Eastern District of Texas?

| | | |
|---|---|---|
| 17:28:21 | 1 | A.   Yes. |
| 17:28:22 | 2 | Q.   Again, is that federal court? |
| 17:28:23 | 3 | A.   Yes. |
| 17:28:24 | 4 | Q.   And have you testified in other trials before today? |
| 17:28:28 | 5 | A.   Yes, sir. |
| 17:28:29 | 6 | Q.   Can you tell the jury what kind of trial that was? |
| 17:28:32 | 7 | A.   It was also in a conspiracy to distribute cocaine. |
| 17:28:37 | 8 | Q.   And did that involve individuals that you had dealt with in |
| 17:28:41 | 9 | the past on dealing cocaine? |
| 17:28:42 | 10 | A.   Yes.  Out of St. Louis. |
| 17:28:48 | 11 | Q.   And what is your hope here today that your testimony will do |
| 17:28:51 | 12 | for you? |
| 17:28:52 | 13 | A.   Repeat that question. |
| 17:28:54 | 14 | Q.   What do you hope to get out of your testimony here today? |
| 17:28:59 | 15 | A.   For hopefully I get something toward my sentence. |
| 17:29:09 | 16 | Q.   Are you looking for a further reduction in your sentence? |
| 17:29:11 | 17 | A.   Am I looking for a further reduction?  I would hope that |
| 17:29:15 | 18 | they will grant it to me.  I don't know if I will get one or not, |
| 17:29:17 | 19 | though. |
| 17:29:17 | 20 | Q.   And you know that decision isn't based on either myself or |
| 17:29:21 | 21 | Judge Sparks.  It's up to the judge in Plano. |
| 17:29:24 | 22 | A.   Yes, sir. |
| 17:29:24 | 23 | Q.   And do you know that judge's name? |
| 17:29:26 | 24 | A.   Judge Crone. |
| 17:29:28 | 25 | Q.   And could you let the jury know when you first started |

| | | |
|---|---|---|
| 17:29:32 | 1 | getting involved in narcotics distribution? |
| 17:29:35 | 2 | A.   I was probably about 14 years old. |
| 17:29:38 | 3 | Q.   And how did that start? |
| 17:29:41 | 4 | A.   Started selling nickles and dimes on the corner street. |
| 17:29:45 | 5 | Q.   And that is a specific term that you and I are familiar |
| 17:29:49 | 6 | with.  I don't think the jury's probably ever heard of a nickle |
| 17:29:51 | 7 | or dime.  Can you explain that to them? |
| 17:29:52 | 8 | A.   Like $10 worth of cocaine, $20 worth of cocaine. |
| 17:29:56 | 9 | Q.   And about how much cocaine can you buy at that time for $20? |
| 17:30:02 | 10 | A.   Maybe about five -- .5 of a gram. |
| 17:30:05 | 11 | Q.   Is that an amount a user of cocaine would use? |
| 17:30:09 | 12 | A.   Yes, sir. |
| 17:30:10 | 13 | Q.   And did there come a point where you eventually started |
| 17:30:14 | 14 | selling more and more cocaine? |
| 17:30:16 | 15 | A.   Yes, sir. |
| 17:30:16 | 16 | Q.   And if we get to recent past, how much cocaine was the most |
| 17:30:23 | 17 | amount you were distributing a month? |
| 17:30:26 | 18 | A.   Towards the end? |
| 17:30:27 | 19 | Q.   Yes.  Towards the end.  Thank you. |
| 17:30:28 | 20 | A.   I was getting about myself, about a thousand keys a month. |
| 17:30:34 | 21 | Q.   When you say keys, we're talking kilograms, correct? |
| 17:30:37 | 22 | A.   Yes. |
| 17:30:38 | 23 | Q.   And how much does a kilogram weigh? |
| 17:30:39 | 24 | A.   A thousand grams. |
| 17:30:41 | 25 | Q.   A thousand grams.  Is that 2.2 pounds? |

| | | |
|---|---|---|
| 17:30:43 | 1 | A.   Yes. |
| 17:30:44 | 2 | Q.   And just so the jury has some reference, how much does a |
| 17:30:49 | 3 | single kilogram of cocaine cost on the streets of Dallas, Texas? |
| 17:30:55 | 4 | A.   When I was there, it was about 23,000. |
| 17:30:59 | 5 | Q.   $23,000? |
| 17:31:00 | 6 | A.   Uh-huh. |
| 17:31:01 | 7 | Q.   And so, how much would you have to pay for a thousand |
| 17:31:07 | 8 | kilograms of cocaine? |
| 17:31:09 | 9 | A.   For the total amount? |
| 17:31:10 | 10 | Q.   Total amount. |
| 17:31:11 | 11 | A.   I was paying about 21.5 million. |
| 17:31:19 | 12 | Q.   And sorry.  Let me ask you again.  What was the timeframe in |
| 17:31:25 | 13 | which you received a thousand kilograms and then, get rid of it? |
| 17:31:30 | 14 | A.   I was doing it monthly. |
| 17:31:32 | 15 | Q.   Monthly.  And so, when you sold a thousand kilograms of |
| 17:31:38 | 16 | cocaine, that 21.5, was that what was owed to your supplier? |
| 17:31:44 | 17 | A.   Yes, 21.5. |
| 17:31:46 | 18 | Q.   And how much would you make in profit from that thousand |
| 17:31:50 | 19 | kilos? |
| 17:31:50 | 20 | A.   I would profit anywhere between 800 to 1.2 million. |
| 17:31:56 | 21 | Q.   Per month? |
| 17:31:57 | 22 | A.   Yes, sir. |
| 17:32:01 | 23 | Q.   Who was your supplier? |
| 17:32:04 | 24 | A.   I used to direct myself with Hector Moreno. |
| 17:32:10 | 25 | Q.   And are you familiar with a person named "Poncho" Cuellar? |

| | | |
|--|--|--|
| 17:32:15 | 1 | A.    Yes. |
| 17:32:15 | 2 | Q.    And who is he, sir? |
| 17:32:17 | 3 | A.    He was Hector's boss. |
| 17:32:22 | 4 | Q.    So how would it work?  How would you arrange for the |
| 17:32:25 | 5 | delivery of a thousand kilograms of cocaine?  Would it come all |
| 17:32:28 | 6 | at once? |
| 17:32:29 | 7 | A.    No.  They would just call me and tell me there was a load |
| 17:32:32 | 8 | coming in, and I would know what it was when it got there.  It |
| 17:32:35 | 9 | could be 200, 150, 300. |
| 17:32:38 | 10 | Q.    So it was multiple loads per month totaling about a thousand |
| 17:32:42 | 11 | keys eventually per month? |
| 17:32:44 | 12 | A.    It was more than a thousand keys, but myself, I would get a |
| 17:32:47 | 13 | thousand keys but something like that. |
| 17:32:49 | 14 | Q.    So when you say it was more than a thousand keys, who else |
| 17:32:52 | 15 | would get the remainder? |
| 17:32:54 | 16 | A.    They had other clients that they would send me more extra |
| 17:32:59 | 17 | work so that I could give to their clients. |
| 17:33:01 | 18 | Q.    And so, when you say extra work, when you say the term |
| 17:33:05 | 19 | "work," that means more cocaine? |
| 17:33:06 | 20 | A.    Yeah.  More cocaine. |
| 17:33:07 | 21 | Q.    And about how much would you receive total both for yourself |
| 17:33:11 | 22 | and for other clients? |
| 17:33:14 | 23 | A.    Maybe about 2,000, 2,500. |
| 17:33:19 | 24 | Q.    That's per month? |
| 17:33:20 | 25 | A.    Yes, sir. |

17:33:21  1   Q.   Now, were you responsible for paying for the full amount or

17:33:24  2   just your portion?

17:33:25  3   A.   Just my portion.

17:33:27  4   Q.   So how would you arrange to have the other supplier, if you

17:33:32  5   will, get their share of the cocaine?

17:33:34  6   A.   Once I had it in my possession, I was like a -- like a

17:33:38  7   warehouse for them so they would call me and tell me when to take

17:33:41  8   to who, to who they needed to take it.

17:33:43  9   Q.   Would you supply the transportation for the cocaine?

17:33:46  10  A.   Yes.

17:33:47  11  Q.   And can you let the ladies and gentlemen of the jury know

17:33:50  12  some of the cities in which the cocaine was distributed?

17:33:53  13  A.   Well, we were working everywhere in Dallas, Fort Worth,

17:33:58  14  Arlington, Grand Prairie, St. Louis, St. Louis, Missouri and

17:34:04  15  Kaufman.

17:34:05  16  Q.   Kaufman, Texas?

17:34:07  17  A.   Yes, sir.

17:34:08  18  Q.   And were you responsible for collecting the money that went

17:34:12  19  to these other customers of Hector Moreno?

17:34:16  20  A.   Sometimes.  Sometimes I would, sometimes I wouldn't.

17:34:19  21  Q.   Then when you selected that money, were you responsible for

17:34:23  22  bundling it up, counting it?

17:34:26  23  A.   Whenever I collect it from them, I would count it, make sure

17:34:28  24  what it was and prepare it and send it back down to them -- back

17:34:32  25  to Mexico.

| | | |
|---|---|---|
| 17:34:33 | 1 | Q. How was the money transported from Dallas once you received |
| 17:34:36 | 2 | it to Mexico? |
| 17:34:38 | 3 | A. We were sending it in a lot of trucks in the gas tanks. |
| 17:34:42 | 4 | Q. And describe that for the jury. How would you rig it so it |
| 17:34:45 | 5 | would be in the gas tanks? |
| 17:34:46 | 6 | A. We would put three vacuum-sealed bags -- put three |
| 17:34:52 | 7 | vacuum-sealed bags and take off the bed of the truck and open up |
| 17:34:55 | 8 | where the fuel pump goes and put it in through there, inside the |
| 17:34:59 | 9 | gas tank. |
| 17:34:59 | 10 | Q. And did you ever lose any deliveries of cash going to Mexico |
| 17:35:04 | 11 | through law enforcement? |
| 17:35:05 | 12 | A. I lost one for about $830,000 Hillsboro, Texas. |
| 17:35:13 | 13 | Q. And so, what happened when you would lose a load of cash |
| 17:35:17 | 14 | going south? Who is responsible for that? |
| 17:35:19 | 15 | A. Once it was out of my hands, it was their responsibility. |
| 17:35:22 | 16 | If I lost it out of my possession, then it was my responsibility. |
| 17:35:24 | 17 | Q. So you didn't have to make up that $830,000? |
| 17:35:28 | 18 | A. No, sir. |
| 17:35:29 | 19 | Q. Mr. Moreno and Mr. Cuellar, did you know what organization |
| 17:35:33 | 20 | they were working for? |
| 17:35:34 | 21 | A. Yes, sir. |
| 17:35:34 | 22 | Q. And what was that? |
| 17:35:35 | 23 | A. For Los Zetas. |
| 17:35:37 | 24 | Q. And do you know who the leader of the Los Zetas is? |
| 17:35:41 | 25 | A. Yeah. At the time it was Lazcano and "40" was his |

17:35:46  1  second-in-command.

17:35:48  2  Q.    And was Lazcano charged when you were arrested?

17:35:51  3  A.    When I was arrested, yes, sir.

17:35:52  4  Q.    And, Mr. Vasquez, how did you come to be arrested?

17:35:57  5  A.    I was in -- I had left Dallas on the run and was in Mexico

17:36:01  6  for over a year, and I turned myself in on the border of El Paso.

17:36:07  7  Q.    And why were you on the run?

17:36:10  8  A.    Because I've seen DEA officers follow me -- undercovers

17:36:14  9  follow me, and so, I thought that I was going to get arrested at

17:36:17  10  any given time.  So I left to Mexico to try to avoid custody.

17:36:21  11  Q.    And what prompted you to return to the United States to turn

17:36:24  12  yourself in?

17:36:25  13  A.    What was that again?

17:36:29  14  Q.    What caused you to come back to the United States and

17:36:31  15  subject yourself to arrest?

17:36:33  16  A.    I was tired of being on the run.  And the DEA law

17:36:38  17  enforcement arrested my wife, so I had a conversation with one of

17:36:44  18  the DEA officers through my attorney, and we arranged an

17:36:47  19  agreement to turn myself in.

17:36:49  20  Q.    And did you cooperate with the DEA in assisting them finding

17:36:56  21  "Cuarenta," "40" or "42"?

17:36:58  22  A.    Yes, sir.

17:36:59  23  Q.    And how did you do that?

17:37:00  24  A.    I got them their BB, their BB numbers.

17:37:04  25  Q.    When you say BB, that's a term that you and I understand.

17:37:06    1   Could you explain what BB means to the jury?

17:37:08    2   A.    Their BlackBerry telephone.  Their messenger number, ID PIN

17:37:13    3   number and their telephone number.

17:37:14    4   Q.    You say BB number, then you say PIN.  What specifically does

17:37:18    5   that -- if I have your PIN and you have my PIN, what does that

17:37:22    6   allow you and I to do?

17:37:23    7   A.    We send instant messaging, like a text message, but it's

17:37:27    8   more like encrypted.

17:37:28    9   Q.    And why do you use the PIN-to-PIN?

17:37:31   10   A.    Well, there were -- our belief was the law enforcement

17:37:35   11   couldn't read those messages, so we had -- all of us used

17:37:38   12   PIN-to-PIN.

17:37:38   13   Q.    And who's responsible for -- let me start over.

17:37:44   14         Would you do what they call dropping phones?

17:37:52   15   A.    I would change my phone number two or three weeks.

17:37:56   16   Q.    And why is that?

17:37:57   17   A.    To avoid getting my phone like tapped or something.  I had

17:38:02   18   belief that my phones could get tapped if I stayed on too long.

17:38:05   19   So everybody that worked with me in Dallas, I would change

17:38:07   20   everybody's phone every two or three weeks.

17:38:10   21   Q.    And what type of phones would you guys use to conduct your

17:38:13   22   business?

17:38:14   23   A.    In Dallas, we would use all phones from Metro PCS to AT & T.

17:38:21   24   Different every time.  It was always different.

17:38:23   25   Q.    And how would you get the phones?  Just go to a regular

17:38:26    1   store and buy them?

17:38:26    2   A.    Yes, sir.

17:38:27    3   Q.    Would you put them in your name for subscriber information?

17:38:30    4   A.    No.  I had different people go buy them for me.

17:38:33    5   Q.    And so, when you were conducting your business on the BBs,

17:38:36    6   as you call them, the BlackBerrys, did you conduct your business

17:38:39    7   on the BlackBerrys with Hector Moreno?

17:38:41    8   A.    Yes, sir.

17:38:42    9   Q.    And so, how would you exchange your PIN numbers if you're

17:38:47   10   dropping the phones every two weeks?

17:38:49   11   A.    We would be sending money back every week, so every time we

17:38:53   12   would switch up, I would send my BB PIN number back to one of his

17:38:57   13   brothers when they would take the money back down to Mexico.

17:39:02   14   Q.    Did you ever receive any phones from Mexico, they call

17:39:09   15   Mexican tel-cells?

17:39:10   16   A.    No.  I had them when I was down there, but I never got them

17:39:12   17   when I was over here in Dallas.

17:39:15   18   Q.    I'd like to turn your attention to horses.  Do you know

17:39:23   19   anything about quarter horses?

17:39:26   20   A.    I don't know nothing about horses.  Not really.

17:39:29   21   Q.    Now, were you directed at various occasions to supply money

17:39:33   22   for horse-related expenses?

17:39:37   23   A.    That I was a lot of times.

17:39:40   24   Q.    And who directed you to do those payments?

17:39:42   25   A.    Hector would call me.  Hector would send it through a BB.

| | | |
|---|---|---|
| 17:39:46 | 1 | Q.   And, again, Hector Moreno is "Poncho" Cuellar's assistant? |
| 17:39:57 | 2 | A.   Yes, sir. |
| 17:39:58 | 3 | Q.   Let's start with the Dallas, Texas area.  Were you ever |
| 17:40:03 | 4 | directed to deliver drug proceeds from the payment of horse |
| 17:40:08 | 5 | expenses in the Dallas, Texas area? |
| 17:40:09 | 6 | A.   Yes, sir. |
| 17:40:10 | 7 | Q.   Okay.  And how many times? |
| 17:40:16 | 8 | A.   Maybe about eight or ten times. |
| 17:40:19 | 9 | Q.   We'll start with an incident on Lake June Road and |
| 17:40:23 | 10 | Interstate Highway 635.  Is that in Dallas? |
| 17:40:25 | 11 | A.   Yes, sir.  It's in Balch Springs. |
| 17:40:29 | 12 | Q.   Balch Springs? |
| 17:40:30 | 13 | A.   Uh-huh. |
| 17:40:30 | 14 | Q.   Could you please tell the ladies and gentlemen of the jury |
| 17:40:31 | 15 | what funds you delivered or amount of funds you delivered on that |
| 17:40:35 | 16 | occasion? |
| 17:40:36 | 17 | A.   I don't recall, but it was 100 or 200,000.  I don't recall |
| 17:40:40 | 18 | how much it was. |
| 17:40:41 | 19 | Q.   And who were you directed to give that money to? |
| 17:40:43 | 20 | A.   Hector Moreno told me it was going to be for "40's" brother, |
| 17:40:49 | 21 | that it needed to be nothing but hundreds because it would be |
| 17:40:52 | 22 | "40's" brother. |
| 17:40:53 | 23 | Q.   Did you ever learn the name of "40's" brother? |
| 17:40:55 | 24 | A.   Yeah.  I learned his name was Jose Trevino, but I didn't |
| 17:40:58 | 25 | know who it was at the time. |

17:41:00  1   Q.   And then, 100, $200,000, or that range, did you know what
17:41:07  2   specific expenses were going to be paid with that money?
17:41:09  3   A.   No, sir.
17:41:12  4   Q.   Did you ever -- were you ever introduced to an individual
17:41:18  5   named Carlos Nayen?
17:41:19  6   A.   I was told to give him money.
17:41:23  7   Q.   Did you ever meet him?
17:41:24  8   A.   Not myself.
17:41:24  9   Q.   So when you're told to give money, are you making these
17:41:27  10  deliveries personally, or are you sending your runners out to
17:41:30  11  make the drops?
17:41:30  12  A.   I would send my father and sometimes one of my workers.
17:41:34  13  Q.   And your father's name is?
17:41:36  14  A.   Jose Luis Vasquez, Sr.
17:41:40  15  Q.   And so, for the 100-or-so-thousand-dollar money drop in
17:41:45  16  Balch Springs, who did you send to make that delivery?
17:41:47  17  A.   My father delivered it.
17:41:49  18  Q.   And you said earlier that you made some deliveries to Carlos
17:41:56  19  Nayen in the Dallas area, anyway.  How many deliveries do you
17:41:59  20  think you made to Mr. Nayen in Dallas?
17:42:02  21  A.   I want to say about at least four, four or five times.
17:42:09  22  Q.   And the amounts generally the same each time?
17:42:13  23  A.   It varied.  I mean, we took him one time, I think, like 60
17:42:20  24  or 80,000 to a hotel, and the other times were to Lone Star, Lone
17:42:24  25  Star horse track right there in Grand Prairie.

17:42:26   1   Q.   It's called Lone Star Park?

17:42:28   2   A.   Lone Star Park.

17:42:28   3   Q.   And do you know if they conduct quarter-horse racing in Lone

17:42:31   4   Star Park?

17:42:32   5   A.   They conduct horse racing.  I don't know what kind of horse

17:42:35   6   racing, but they conduct horse racing.

17:42:36   7   Q.   And were you told what these specific cash drops were being

17:42:42   8   used for?

17:42:43   9   A.   No.  They just told me that they needed it right there at

17:42:46   10  the horse track, but I didn't know what it was for.  They just

17:42:48   11  told me that Carlos would be waiting for it.

17:42:50   12  Q.   And were you ever instructed to deliver money to trainers in

17:43:00   13  Austin, Texas?

17:43:02   14  A.   I don't know if it was -- I sent it to San Antonio.

17:43:06   15  Q.   And how much was that?

17:43:08   16  A.   In San Antonio, I sent about $450,000, somewhere around

17:43:16   17  there.

17:43:16   18  Q.   Was that one delivery or multiple deliveries?

17:43:19   19  A.   One delivery to the Retama.

17:43:21   20  Q.   Retama Park?

17:43:22   21  A.   Retama Park.

17:43:23   22  Q.   Is that the race track in San Antonio?

17:43:25   23  A.   Yes, sir.

17:43:25   24  Q.   And who directed that delivery?

17:43:28   25  A.   I was always directing myself with Hector.

17:43:31   1   Q.   And do you know who he made that delivery to?

17:43:33   2   A.   That one I'm not sure.  My cousin made the delivery.  I'm

17:43:35   3   not sure who he took it to.

17:43:36   4   Q.   Now, I want to talk about a delivery that you were directed

17:43:46   5   to make out to New Mexico.  Do you recall that?

17:43:48   6   A.   Yes, sir.

17:43:49   7   Q.   Can you tell the jury about a delivery of cash for horse

17:43:53   8   expenses to Mexico?

17:43:55   9   A.   Hector told me that he needed $110,000 to give to -- we used

17:44:03   10   to call the guy "Pariente" to take -- that he needed it to be in

17:44:07   11   New Mexico before a race.  I think they had a horse that was

17:44:10   12   called Mr. Piloto was going to race over there.

17:44:12   13   Q.   I'm sorry.  You used a term here.  Is what, "Pariente"?

17:44:12   14   A.   "Pariente."

17:44:17   15   Q.   And what's that mean in English?

17:44:18   16   A.   It's like a family member.  I think they said it was family

17:44:21   17   member to "Poncho."

17:44:24   18   Q.   "Poncho" Cuellar?

17:44:26   19   A.   Uh-huh.

17:44:26   20   Q.   And did you ever meet this gentleman or did someone -- one

17:44:34   21   of your runners give him the money?

17:44:37   22   A.   I met him myself before because he also took money back to

17:44:41   23   Mexico.  So on one occasion, he took money back to Mexico, I met

17:44:45   24   him.

17:44:45   25   Q.   So you knew him as a runner before from Hector to Mexico?

17:44:49    1    A.    Uh-huh.  Yes, sir.

17:44:50    2    Q.    And do you recall this individual's name?

17:44:54    3    A.    I know his name is Gerardo.  I don't know the last name.

17:44:57    4    Q.    Gerardo's the first name?

17:44:59    5    A.    Yes, sir.

17:44:59    6    Q.    And you said he had family relationship with Hector?

17:45:04    7    A.    With "Poncho."

17:45:05    8    Q.    With "Poncho."  Sorry.

17:45:13    9          And so, what denominations of cash did you give to this

17:45:17   10    individual you knew as Gerardo, first name, to take to New

17:45:22   11    Mexico?

17:45:22   12    A.    We went to New Mexico, I gave him $110,000 out of hundreds.

17:45:30   13    Q.    Now, I want to talk about the purchase of a number of horses

17:45:35   14    in Oklahoma.  Were you ever directed to send cash for the

17:45:38   15    purchase of horses in Oklahoma?

17:45:40   16    A.    Yes, sir.

17:45:41   17    Q.    Could you please tell the ladies and gentlemen of the jury

17:45:43   18    about that incident?

17:45:45   19    A.    I was instructed to send money to buy, I think it was, two

17:45:49   20    horses in Oklahoma that I sent my father to take $130,000.  I

17:45:56   21    don't recall exactly where it was.  I know it was about the first

17:46:00   22    or second mile once you cross the state line on 35.

17:46:03   23    Q.    And do you recall the name of the individual who was going

17:46:07   24    to get the money?

17:46:07   25    A.    No.  My father took it to him, so I don't know.

| | | |
|---|---|---|
| 17:46:09 | 1 | Q.   And do you recall the names of the horses that were to be |
| 17:46:22 | 2 | purchased with that money? |
| 17:46:23 | 3 | A.   No.  I wasn't aware of none of that. |
| 17:46:26 | 4 | Q.   Mr. Vasquez, in total, could you give the jury an idea of |
| 17:46:34 | 5 | how much money you were directed to spend for horse expenses |
| 17:46:39 | 6 | during the time you were distributing in Dallas? |
| 17:46:48 | 7 | A.   Maybe about 900,000. |
| 17:46:49 | 8 | Q.   Was all that money derived from the sale of cocaine? |
| 17:46:57 | 9 | A.   Yeah.  That was the only money I had for them.  It was all |
| 17:47:02 | 10 | from selling cocaine. |
| 17:47:03 | 11 | Q.   And how were you reimbursed or were you reimbursed that |
| 17:47:08 | 12 | money? |
| 17:47:08 | 13 | A.   No.  Like I said earlier, I would get a thousand kilos of |
| 17:47:12 | 14 | cocaine a month.  So I always had their funds because I would |
| 17:47:15 | 15 | send back maybe 3 or $4 million a week.  So if they needed |
| 17:47:20 | 16 | something there in that week, it would come out of whatever I was |
| 17:47:23 | 17 | going to be sending.  So it was never my money.  It was always |
| 17:47:25 | 18 | their money. |
| 17:47:26 | 19 | Q.   So came off the top of your tally? |
| 17:47:28 | 20 | A.   Yes, sir. |
| 17:47:29 | 21 | Q.   Your Honor, I'll pass the witness. |
| 17:47:35 | 22 | CROSS-EXAMINATION |
| 17:47:36 | 23 | BY MR. FINN: |
| 17:47:36 | 24 | Q.   Mr. Vasquez, my name is David Finn, F-I-N-N.  I don't think |
| 17:47:40 | 25 | we've ever met, have we? |

| | | |
|---|---|---|
| 17:47:42 | 1 | A.   No, sir. |
| 17:47:42 | 2 | Q.   I'm going to ask you some questions.  And if we could have a |
| 17:47:45 | 3 | gentlemen's agreement, if you'll just answer the question that I |
| 17:47:48 | 4 | pose, and if I'm confusing or you don't understand, you let me |
| 17:47:51 | 5 | know, okay? |
| 17:47:52 | 6 | A.   Yes, sir. |
| 17:47:53 | 7 | Q.   Great.  This federal sentence that you're serving is not |
| 17:47:56 | 8 | your first rodeo, is it? |
| 17:47:57 | 9 | A.   No, sir. |
| 17:47:58 | 10 | Q.   Tell the members of the jury about the other sentence that |
| 17:48:01 | 11 | you have, the TDC state prison sentence. |
| 17:48:04 | 12 | A.   I was arrested in 2002 for possession of one kilo of |
| 17:48:09 | 13 | cocaine. |
| 17:48:10 | 14 | Q.   And you got a 15-year sentence, right? |
| 17:48:12 | 15 | A.   Yes, sir. |
| 17:48:12 | 16 | Q.   But you paroled out early, didn't you? |
| 17:48:15 | 17 | A.   Yes, sir. |
| 17:48:15 | 18 | Q.   But you understand in the federal system, unlike the state |
| 17:48:19 | 19 | system, there's no such thing as parole.  You understand that, |
| 17:48:22 | 20 | right? |
| 17:48:22 | 21 | A.   Yes, sir. |
| 17:48:23 | 22 | Q.   And you've had some good lawyers over the years, Frank |
| 17:48:28 | 23 | Perez, Rafael De la Garza, good attorneys that gave you good |
| 17:48:32 | 24 | advice, right? |
| 17:48:33 | 25 | A.   Yes, sir. |

| | | |
|---|---|---|
| 17:48:33 | 1 | Q.   In fact, you know that Frank Perez used to be a Dallas |
| 17:48:37 | 2 | police officer, correct? |
| 17:48:38 | 3 | A.   Yes, sir. |
| 17:48:38 | 4 | Q.   And your case is in front of a federal judge in the Eastern |
| 17:48:43 | 5 | District, named Judge Crone, C-R-O-N-E, correct? |
| 17:48:46 | 6 | A.   Yes, sir. |
| 17:48:47 | 7 | Q.   And you know she is a tough federal judge, don't you? |
| 17:48:50 | 8 | A.   From what I hear, yes, sir. |
| 17:48:51 | 9 | Q.   Well, you know it, don't you? |
| 17:48:53 | 10 | A.   From what I hear, yes, sir. |
| 17:48:55 | 11 | Q.   You know it, don't you? |
| 17:48:56 | 12 | A.   From what I hear, yes, sir. |
| 17:48:58 | 13 |        MR. GARDNER:  I object.  He's answered that question |
| 17:49:00 | 14 | three times now. |
| 17:49:01 | 15 | Q.   (BY MR. FINN) I'll move on.  And you were looking at |
| 17:49:03 | 16 | something like 300 months in the pen until you started |
| 17:49:07 | 17 | cooperating, correct? |
| 17:49:09 | 18 | A.   I believe so. |
| 17:49:11 | 19 | Q.   You believe so? |
| 17:49:13 | 20 | A.   I believe so.  I'm not aware how much months I was going to |
| 17:49:16 | 21 | get. |
| 17:49:17 | 22 | Q.   You're telling this jury you don't know what your exposure |
| 17:49:22 | 23 | was on that federal case.  Is that your testimony? |
| 17:49:24 | 24 | A.   You're asking me how much did I know before I started |
| 17:49:27 | 25 | cooperating.  I didn't know when I started cooperating, I didn't |

| | | |
|---|---|---|
| 17:49:30 | 1 | know how much time I was going to get. |
| 17:49:32 | 2 | Q.   And you got your sentence cut basically in half because the |
| 17:49:34 | 3 | government filed a 5K motion for downward departure, correct? |
| 17:49:37 | 4 | A.   Yes, sir. |
| 17:49:39 | 5 | Q.   And that attorney for the government is a very good |
| 17:49:42 | 6 | assistant U.S. attorney named Ernest Gonzalez.  Do you recognize |
| 17:49:46 | 7 | that name? |
| 17:49:46 | 8 | A.   Yes, sir. |
| 17:49:47 | 9 | Q.   And as far as you know, prosecutors in one district can pick |
| 17:49:51 | 10 | up the phone and call prosecutors in another district to let them |
| 17:49:54 | 11 | know if you're still playing ball and cooperating, correct? |
| 17:49:57 | 12 | A.   Yes, sir. |
| 17:49:58 | 13 | Q.   And you're really hoping big time that this gentleman right |
| 17:50:02 | 14 | here, Doug Gardner, the prosecutor in this case, at the end of |
| 17:50:06 | 15 | this trial will pick up the phone and call the AUSA in Plano, |
| 17:50:12 | 16 | Ernest Gonzalez, and say, hey, Ernest, this guy really came |
| 17:50:14 | 17 | through for us, let's cut his sentence even more or at least ask |
| 17:50:18 | 18 | the Judge to cut it even more.  That's what you want to have |
| 17:50:21 | 19 | happen, correct? |
| 17:50:22 | 20 | A.   I know that they're going to ask -- they can ask the Judge |
| 17:50:26 | 21 | and it's up to the Judge to decide on it.  Yes, sir. |
| 17:50:28 | 22 | Q.   Okay.  Maybe you didn't understand my question.  That's what |
| 17:50:31 | 23 | you're hoping will happen, "Yes" or "No"? |
| 17:50:34 | 24 | A.   Well, when I started -- |
| 17:50:36 | 25 | Q.   I'm sorry -- |

| | | |
|---|---|---|
| 17:50:37 | 1 | THE COURT: Now, wait a minute. He's letting you ask |
| 17:50:40 | 2 | the question. You let him answer. |
| 17:50:44 | 3 | MR. FINN: Fair enough. |
| 17:50:45 | 4 | A. When I first turned myself in, I signed a proffer agreement |
| 17:50:48 | 5 | with the government stating that I was going to help the |
| 17:50:50 | 6 | government in full, not to withhold no information. So I've told |
| 17:50:54 | 7 | in full information against my father, against my own family. So |
| 17:50:58 | 8 | I know that they told me if I get caught in any kind of lies, |
| 17:51:01 | 9 | that anything that I say would get wiped out immediately. So |
| 17:51:06 | 10 | from day one, I knew that when I signed the paper, I was already |
| 17:51:09 | 11 | -- whatever the government requested of me, if I knew anything, |
| 17:51:13 | 12 | to tell the truth so. |
| 17:51:14 | 13 | Q. (BY MR. FINN) So whatever the government requested, if you |
| 17:51:16 | 14 | could, you're going to come through for them, right? |
| 17:51:19 | 15 | A. Yes, sir. |
| 17:51:19 | 16 | Q. And initially you told the authorities that you were going |
| 17:51:21 | 17 | to stay in Mexico, correct? Remember that? |
| 17:51:23 | 18 | A. I told authorities. |
| 17:51:25 | 19 | Q. Yeah. That you were going to stay in Mexico and that they |
| 17:51:28 | 20 | should, quote, do what they had to do. Do you remember that? |
| 17:51:29 | 21 | A. Yes, sir. |
| 17:51:30 | 22 | Q. But then, your wife got involved in this and you decided, |
| 17:51:34 | 23 | uh-oh, my wife is now getting involved in this. I'd better be a |
| 17:51:38 | 24 | man, step up to the plate and, quote, unquote, cooperate, |
| 17:51:41 | 25 | correct? |

| 17:51:42 | 1 | A.   Yes, sir. |
| 17:51:42 | 2 | Q.   And you've got children ages approximately four, 13 and 15; |
| 17:51:47 | 3 | is that correct? |
| 17:51:48 | 4 | A.   Yes, sir. |
| 17:51:49 | 5 | Q.   Tell the members of the jury what other kind of criminal |
| 17:51:51 | 6 | activity you've been up to lately. |
| 17:51:53 | 7 | MR. GARDNER:  Your Honor, we object to that with |
| 17:51:55 | 8 | respect to improper impeachment. |
| 17:52:03 | 9 | MR. FINN:  Your Honor, I've got a good -- |
| 17:52:05 | 10 | THE COURT:  Well, no.  Just wait.  Got five minutes. |
| 17:52:10 | 11 | I'll listen to the lawyers for five minutes and let y'all go |
| 17:52:13 | 12 | home.  Please remember the instructions.  Don't talk or let |
| 17:52:17 | 13 | anybody talk to you about the case.  Go home and relax.  Don't go |
| 17:52:21 | 14 | out and investigate anything.  And I'll see you at 8:30 in the |
| 17:52:25 | 15 | morning. |
| 17:53:01 | 16 | (Jury not present.) |
| 17:53:10 | 17 | THE COURT:  Mr. Finn, you may continue. |
| 17:53:22 | 18 | MR. FINN:  Judge, can I ask you a question first?  I'm |
| 17:53:25 | 19 | not particularly interested in giving this witness and the |
| 17:53:29 | 20 | government a preview of my cross with the jury not present.  If |
| 17:53:33 | 21 | that's what you want me to do, I'll do it.  But I think it's |
| 17:53:37 | 22 | unfair to me to give them a preview because, then, over the break |
| 17:53:41 | 23 | this evening, they can try to, quote, get their story straight. |
| 17:53:44 | 24 | But I'll do it in any way you want. |
| 17:53:46 | 25 | MR. GARDNER:  Judge, I can't talk to that witness, so |

| | | |
|---|---|---|
| 17:53:48 | 1 | there's no cross-examination. |
| 17:53:50 | 2 | THE COURT:  I know that and he knows that, too.  Now, |
| 17:53:56 | 3 | you asked a question and he objected. |
| 17:54:01 | 4 | MR. FINN:  Right. |
| 17:54:01 | 5 | THE COURT:  And until I know what the answer is, I |
| 17:54:04 | 6 | can't make a ruling. |
| 17:54:07 | 7 | MR. FINN:  Fair enough. |
| 17:54:08 | 8 | THE COURT:  That's why I sent the jury home so that you |
| 17:54:10 | 9 | could educate me and I could tell you whether it's going to be |
| 17:54:15 | 10 | admissible or not.  And if you think that there's an overall |
| 17:54:19 | 11 | conspiracy to find out what you're going to ask, I don't know who |
| 17:54:24 | 12 | the conspirators are, but I am not included.  I guess I could |
| 17:54:29 | 13 | just sustain the objection and then, you would be happy and he |
| 17:54:33 | 14 | would be happy. |
| 17:54:38 | 15 | MR. FINN:  Judge, with all due respect, I know what the |
| 17:54:40 | 16 | rules are in cross-examination.  I know how to do a |
| 17:54:42 | 17 | cross-examination.  I'll do it any way you want.  So if you want |
| 17:54:45 | 18 | me to proceed, I will. |
| 17:54:46 | 19 | THE COURT:  Make the bill and then, I'll make the |
| 17:54:48 | 20 | ruling, and we can all go home, Mr. Finn. |
| 17:54:49 | 21 | MR. FINN:  Thank you, Judge. |
| 17:54:52 | 22 | Q.  (BY MR. FINN) Mr. Vasquez, tell the Court about your |
| 17:54:54 | 23 | gun-running. |
| 17:54:54 | 24 | A.  About my gun-running? |
| 17:54:55 | 25 | Q.  Gun-running. |

17:54:58  1   A.   What about the gun-running?

17:55:02  2   Q.   Tell me and the Court about your gun-running experience.

17:55:06  3   A.   In the past, we send guns back to Mexico.

17:55:11  4   Q.   A whole bunch of guns, correct?

17:55:16  5   A.   Yes, sir.

17:55:17  6   Q.   I'll warn you, I've got the transcript of your earlier trial

17:55:20  7   testimony, okay?  AK-15s, AR-15s, AK-47s, .308s and, quote,

17:55:27  8   anything bigger and we send them to Mexico with dirty drug money

17:55:32  9   and they were delivered.  Does that ring a bell?

17:55:35  10  A.   Yes, sir.

17:55:39  11        THE COURT:  Is this the Dallas case or the --

17:55:42  12        MR. FINN:  Eastern District case, Judge.  Yes.  Or this

17:55:44  13  came out in a trial.

17:55:46  14        THE COURT:  The Plano case.  It's Judge Crone's case.

17:55:50  15        MR. FINN:  I think so.  The testimony I'm referring to

17:55:52  16  is May 17, 2012 in the case involving Frederick Wayne Anderson.

17:55:57  17        MR. GARDNER:  Your Honor, if that's the question he's

17:55:58  18  going to ask, he just sort of laid an open question about other

17:56:02  19  criminal activity.  If he's going to ask about that, that's fine.

17:56:04  20  I'll give him that in Jencks.  I don't have a problem with that.

17:56:06  21        THE COURT:  Okay.  Let him know what that is, he can

17:56:12  22  ask him in the morning.  And then, it will all be a surprise to

17:56:16  23  us.

17:56:16  24        MR. FINN:  Thank you.  Yeah, thanks, Judge.

17:56:19  25        THE COURT:  All right.  Recess till 8:30 in the

17:56:24   1   morning.

17:56:24   2           (Proceedings adjourned.)