```
 1                  UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION

 3  UNITED STATES OF AMERICA      ) Docket No. A 12-CR-210 SS
                                  )
 4  vs.                          ) Austin, Texas
                                  )
 5  JOSE TREVINO-MORALES (3)     )
    FRANCISCO ANTONIO            )
 6  COLORADO-CESSA (6)           )
    FERNANDO SOLIS-GARCIA (7)    )
 7  EUSEVIO MALDONADO-HUITRON(11) )
    JESUS MALDONADO-HUITRON (18) ) April 17, 2013
 8
 9                 TRANSCRIPT OF TRIAL ON THE MERITS
                   BEFORE THE HONORABLE SAM SPARKS
10                       Volume 3 of 15
11  APPEARANCES:

12  For the United States:    Ms. Michelle E. Fernald
                              Mr. Douglas W. Gardner
13                            Assistant U.S. Attorneys
                              816 Congress Avenue, Suite 1000
14                            Austin, Texas 78701

15  For Defendant Trevino-    Mr. David M. Finn
    Morales:                  Milner & Finn
16                            2828 North Harwood Street
                              Suite 1950, LB9
17                            Dallas, Texas 75201

18                            Ms. Christie Williams
                              Mills & Williams
19                            1112 South Rock Street
                              Georgetown, Texas 78626
20
    For Defendant Colorado-   Mr. Mike DeGeurin
21  Cessa:                    Mr. M. Andres Sanchez-Ross
                              Foreman, DeGeurin & DeGeurin
22                            300 Main Street
                              Houston, Texas 77002
23
                              Mr. John Parras
24                            Republic Bank Building
                              1018 Preston, Floor 2
25                            Houston, Texas 77002
```

1   **(Appearances Continued:)**

2   For Defendant Solis-Garcia:  Mr. Guy L. Womack
                                 Guy L. Womack & Associates
3                                402 Main Street, Suite 6 North
                                 Houston, Texas 77002
4
    For Defendant Eusevio        Mr. Richard D. Esper
5   Maldonado-Huitron:           Esper Law Office
                                 801 North El Paso Street, 2nd Floor
6                                El Paso, Texas 79902

7   For Defendant Jesus          Mr. Thomas Brent Mayr
    Maldonado-Huitron:           Law Office of Brent Mayr
8                                4101 Washington Avenue, 2nd Floor
                                 Houston, Texas 77007
9

10  Interpreters:                Mr. Peter Heide
                                 Ms. Cristina Helmerichs
11                               Ms. Maureen McLean
                                 Mr. Steve Mines
12

13  Court Reporter:              Ms. Lily Iva Reznik, CRR, RMR
                                 501 West 5th Street, Suite 4153
14                               Austin, Texas 78701
                                 (512)391-8792
15

16

17

18

19

20

21

22

23

24

25  Proceedings reported by computerized stenography, transcript
    produced by computer.

1                        **I N D E X**

2                              Direct    Cross      Redirect   Recross
  Witnesses:

3

4  Jose L. Vasquez, Jr.                   6,11

5                                         15         16         17

6                                         21                    24

7  Jose L. Vasquez, Sr.    25             39,42

8                                         47,63

9                                         64         71         73,74

10 Mauricio Paez           78             93,97

11                                        103,112    114        116

12 Billy Bob Price         118            129,132

13                                        139

14 Gerardo Mata-Morales    148            156,156

15                                        164        169

16 Sharon Moore Crain      170            185        195

17 Alejandra Obregon       201            213        215

18 Marciel Reyes           216            222,223    224

19 Johnny Sosa             226            229

20

21                                                             Page

22 Proceedings Adjourned                                       239

23

24

25

1                           **E X H I B I T S**

2                                              Offered    Admitted

    Government's

3

4    #227                                       236        236

5    #229 and 229A through 229E                 76         77

6    #230 and 230A through 230L                 77         78

7    #316                                        176        177

8    #317                                        204        204

9    #335                                        142        142

10   #335A through 335E                          142        142

11   #335F                                       144        145

12   #335G                                       145        145

13   #335H                                       145        145

14   #335I                                       142        142

15   #335J                                       146        146

16   #335K                                       146        146

17   #335L                                       146        146

18   #335M                                       147        147

19   #335N                                       147        147

20   #335P                                       147        147

21   #353A                                       176        177

22   #355                                        218        218

23   #362A through 362B                          183        183

24   #367                                        124        125

25

1                        **E X H I B I T S** (Continued)

2                                              Offered    Admitted

  Government's

3

4   #400                                        88          89

5

6   Defendant Jesus Huitron's

7   #JH-1                                       113         113

8

9   Defendant Solis-Garcia's

10  #2                                          161         161

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 08:26:31 | 1 | THE COURT:  All right, counsel, anything before we |
| 08:27:01 | 2 | bring in the jury? |
| 08:27:02 | 3 | MR. GARDNER:  Not from the government, your Honor. |
| 08:27:07 | 4 | MS. WILLIAMS:  No, your Honor. |
| 08:27:08 | 5 | THE COURT:  Bring them in.  Let's bring the witness in. |
| 08:29:32 | 6 | (Jury present.) |
| 08:29:41 | 7 | THE COURT:  Members of the jury, since we last met, has |
| 08:29:44 | 8 | anyone attempted to talk to you about this case? |
| 08:29:46 | 9 | JURORS:  No. |
| 08:29:47 | 10 | THE COURT:  Have you talked to anyone about the case? |
| 08:29:52 | 11 | JURORS:  No. |
| 08:29:53 | 12 | THE COURT:  And have you learned anything at all about |
| 08:29:57 | 13 | the case, outside the presence of each other in this courtroom? |
| 08:29:59 | 14 | JURORS:  No. |
| 08:29:59 | 15 | THE COURT:  Show negative responses to all questions by |
| 08:30:02 | 16 | all jurors. |
| 08:30:15 | 17 | Have a seat, sir.  Mr. Vasquez, you understand you're |
| 08:30:22 | 18 | still under oath to tell the truth under the penalties of |
| 08:30:25 | 19 | perjury? |
| 08:30:26 | 20 | THE WITNESS:  Yes, sir. |
| 08:30:26 | 21 | THE COURT:  All right.  You may proceed. |
| 08:30:28 | 22 | JOSE L. VASQUEZ, JR., called by the Government, duly sworn. |
| 08:30:28 | 23 | CROSS-EXAMINATION (Resumed) |
| 08:30:29 | 24 | BY MR. FINN: |
| 08:30:29 | 25 | Q.   Thank you, your Honor.  May it please the Court.  Members of |

| | | |
|---|---|---|
| 08:30:32 | 1 | the jury, good morning. |
| 08:30:32 | 2 | Mr. Vasquez, we left off yesterday with a question that |
| 08:30:36 | 3 | was -- that I asked you that was, I guess, a little vague.  If I |
| 08:30:41 | 4 | say the name AR-15, what does that mean to you? |
| 08:30:46 | 5 | A.   It's an assault rifle. |
| 08:30:47 | 6 | Q.   Right.  And AK-47, what does that mean to you? |
| 08:30:51 | 7 | A.   Assault rifle. |
| 08:30:52 | 8 | Q.   Assault rifle?  And .308, what does that mean to you? |
| 08:30:57 | 9 | A.   It's the same thing. |
| 08:30:58 | 10 | Q.   The same thing? |
| 08:30:59 | 11 | A.   Yes, sir. |
| 08:30:59 | 12 | Q.   So we're talking assault rifles? |
| 08:31:01 | 13 | A.   Yes, sir. |
| 08:31:01 | 14 | Q.   Right.  Tell the members of the jury, if you don't mind, how |
| 08:31:06 | 15 | you're so familiar with assault weapons. |
| 08:31:08 | 16 | A.   Well, how am I familiar with them? |
| 08:31:11 | 17 | Q.   Right. |
| 08:31:12 | 18 | A.   Is that what you're asking? |
| 08:31:13 | 19 | Q.   Yeah.  You bought them and sold them in -- to Mexico, right? |
| 08:31:18 | 20 | A.   Yes. |
| 08:31:19 | 21 | Q.   And you've admitted that you sold AR-15s, AK-47s, .308s and |
| 08:31:26 | 22 | anything bigger.  You could get whatever you wanted, maybe even a |
| 08:31:30 | 23 | machine gun if you wanted, and those were sold by you, |
| 08:31:34 | 24 | transported to Mexico; is that correct? |
| 08:31:36 | 25 | A.   Yes, sir. |

| | | |
|---|---|---|
| 08:31:38 | 1 | Q.   Tell the members of the jury about the chimney. |
| 08:31:42 | 2 | A.   About the chimney?  At my mother's house?  What about -- |
| 08:31:47 | 3 | what do you want me to tell them, that they found money there? |
| 08:31:50 | 4 | Q.   You tell me. |
| 08:31:51 | 5 | A.   Well, I had money inside my mother's chimney. |
| 08:31:56 | 6 | Q.   Couple of bucks? |
| 08:31:57 | 7 | A.   500,000. |
| 08:31:59 | 8 | Q.   $500,000? |
| 08:32:00 | 9 | A.   Yes, sir. |
| 08:32:01 | 10 | Q.   In your mother's chimney? |
| 08:32:02 | 11 | A.   Yes, sir. |
| 08:32:05 | 12 | Q.   Now, when you pled guilty in front of Judge Crone, part of |
| 08:32:11 | 13 | the process was a presentence interview.  Do you remember that? |
| 08:32:16 | 14 | A.   Yes, sir. |
| 08:32:16 | 15 | Q.   It's called a PSR or a presentence report? |
| 08:32:20 | 16 | A.   Yes, sir. |
| 08:32:21 | 17 | Q.   Remember that? |
| 08:32:21 | 18 | A.   Yes, sir. |
| 08:32:22 | 19 | Q.   And chances are your attorney, either Frank Perez or Rafael |
| 08:32:27 | 20 | De la Garza were with you during that interview.  Do you remember |
| 08:32:29 | 21 | that? |
| 08:32:30 | 22 | A.   Actually, they weren't. |
| 08:32:31 | 23 | Q.   Okay.  So it was you and a probation officer, correct? |
| 08:32:34 | 24 | A.   Yes, sir. |
| 08:32:35 | 25 | Q.   And they asked you questions like, hey, have you ever been |

08:32:40   1   mentally impaired?  Do you remember that?

08:32:42   2   A.    Yes, sir.

08:32:43   3   Q.    Have you ever been under the influence of alcohol or illegal

08:32:49   4   drugs, things like that, right?

08:32:50   5   A.    Yes, sir.

08:32:51   6   Q.    Your background, where you were born, where you were raised,

08:32:58   7   how many kids you have, things of that nature; is that correct?

08:33:01   8   A.    Yes, sir.

08:33:02   9   Q.    And you felt that you could tell the truth during that

08:33:06   10  interview, correct?

08:33:07   11  A.    Yes, sir.

08:33:08   12  Q.    And in the end of the day, a report was generated that was

08:33:12   13  about 15 or 20 pages long.  It was typed up.  Do you remember

08:33:16   14  that?

08:33:17   15  A.    When we had that interview, it was done over the phone so.

08:33:21   16  Q.    Okay.  But do you remember seeing the report?

08:33:23   17  A.    Yes, sir.

08:33:24   18  Q.    Either your lawyer sent it to you or the probation

08:33:28   19  department sent it to you?

08:33:29   20  A.    Yes, sir.

08:33:29   21  Q.    And the whole purpose of the PSR, presentence report for

08:33:33   22  Judge Crone was to give her the full benefit of your background

08:33:40   23  and all relevant conduct.  Do you remember that?

08:33:42   24  A.    Yes, sir.

08:33:42   25  Q.    Jose Trevino's name was never in that report, was it?

```
08:33:48   1   A.   No, sir.

08:33:49   2   Q.   I'm sorry?

08:33:50   3   A.   No, sir.

08:33:56   4   Q.   All right.  Well, let's talk about the cash at the Wal-Mart,

08:34:03   5   or the Sam's Club, or whatever it was.

08:34:06   6             Initially when I heard your testimony, I thought that

08:34:09   7   you had delivered the cash, but that's not the case.  You didn't

08:34:12   8   drive the cash, did you?

08:34:13   9   A.   No, sir.

08:34:14  10   Q.   Tell the members of the jury who allegedly, according to

08:34:18  11   you, delivered the cash.

08:34:19  12   A.   My father.

08:34:20  13   Q.   Okay.  What's his name?

08:34:21  14   A.   Jose Luis Vasquez, Sr.

08:34:23  15   Q.   I'm sorry, sir.  My Espanol is muy mal.

08:34:27  16   A.   Jose Luis Vasquez, Sr.

08:34:34  17   Q.   So you never saw my client, right?

08:34:37  18   A.   No, sir.

08:34:39  19   Q.   Ever, right?

08:34:40  20   A.   No, sir.

08:34:46  21   Q.   Is Jose Vasquez, Sr. alive and well, to the best of your

08:34:50  22   knowledge?

08:34:50  23   A.   Yes, sir.

08:34:51  24   Q.   Now, you also had, I think, a stash house at 406 Chancellor

08:34:59  25   Hill; is that correct?
```

08:35:00  1   A.   Yes, sir.

08:35:04  2   Q.   Please tell the members of the jury what a stash house is.

08:35:08  3   A.   It's where I would hold the cocaine to be held at while we

08:35:13  4   distributed it.

08:35:14  5   Q.   Okay.  And were any of your family members at this stash

08:35:20  6   house?

08:35:20  7   A.   No.

08:35:25  8   Q.   So you had $500,000 in a chimney.  Tell the members of the

08:35:29  9   jury about when you were arrested.  How did that go down?

08:35:34  10  A.   When I was arrested, I turned myself in on the border of El

08:35:37  11  Paso and Texas.

08:35:39  12  Q.   Right.  We talked about that yesterday.  You were worried

08:35:42  13  that the Federalis in the U.S. were going to go after your wife

08:35:48  14  and then, also, your mom because they found out that she had

08:35:51  15  half-a-million dollars squirreled away in her chimney; is that

08:35:56  16  right?

08:35:56  17  A.   Yes, sir.

08:35:56  18  Q.   That's all.  Thank you, your Honor.

08:36:01  19          THE COURT:  Mr. DeGeurin.

08:36:02  20          MR. DEGEURIN:  No questions, your Honor.

08:36:05  21          MR. WOMACK:  No questions.

08:36:09  22          MR. ESPER:  I have a few, your Honor.

08:36:12  23                  CROSS-EXAMINATION

08:36:12  24  BY MR. ESPER:

08:36:16  25  Q.   Mr. Vasquez, yesterday, you indicated that you directed one

| | | |
|---|---|---|
| 08:36:22 | 1 | of your runners to send $450,000 to the race track there in San |
| 08:36:29 | 2 | Antonio, Texas, but you didn't know to whom, correct? |
| 08:36:32 | 3 | A.   Yes, sir. |
| 08:36:33 | 4 | Q.   Do you recall having an interview with Agent Lawson of the |
| 08:36:39 | 5 | FBI, approximately a year ago? |
| 08:36:45 | 6 | A.   I've seen him a couple of times. |
| 08:36:48 | 7 | Q.   Okay.  If I show you a copy of that report which indicates |
| 08:36:53 | 8 | who you delivered the money to, would that refresh your memory? |
| 08:36:58 | 9 | A.   Probably so.  I mean, I've been through a lot of interviews |
| 08:37:01 | 10 | already. |
| 08:37:01 | 11 | Q.   I understand.  I understand. |
| 08:37:03 | 12 |      All I'm wanting to do is show you this, and if you |
| 08:37:06 | 13 | recognize it and agree with it, say so.  If you don't agree with |
| 08:37:09 | 14 | it, say so. |
| 08:37:10 | 15 | A.   Uh-huh. |
| 08:37:11 | 16 | Q.   May I approach, your Honor? |
| 08:37:12 | 17 |      MR. GARDNER:  Your Honor.  We object.  It's not his |
| 08:37:14 | 18 | statement.  It's Special Agent Lawson's statement. |
| 08:37:16 | 19 |      MR. ESPER:  Your Honor, I'm trying to establish whether |
| 08:37:18 | 20 | he's going to adopt this statement as his or not.  Then I can |
| 08:37:20 | 21 | impeach him if he does or does not. |
| 08:37:22 | 22 |      THE COURT:  Impeach him on what?  I don't recall any |
| 08:37:26 | 23 | questions about your client. |
| 08:37:27 | 24 |      MR. ESPER:  I'm asking him -- there's a statement he |
| 08:37:29 | 25 | made that he delivered -- |

08:37:30  1          THE COURT:  I understand the problem.  I know what

08:37:32  2  you're trying to do.  I know what his objection is.  I asked you

08:37:36  3  who you're trying -- what are you trying to impeach?  What

08:37:40  4  testimony are you trying to impeach?

08:37:42  5          MR. ESPER:  I'm trying to establish he identified who

08:37:44  6  he sent the money to in San Antonio, Texas.

08:37:48  7          THE COURT:  By his non-statement?  Show it to him.

08:37:53  8          MR. ESPER:  Thank you, your Honor.

08:38:00  9  Q.   (BY MR. ESPER) Could you read the highlighted part, sir?

08:38:04  10  A.   The highlighted part?

08:38:05  11  Q.   Yes.

08:38:06  12  A.   On one occasion -- oh.

08:38:08  13  Q.   Just read it to yourself.

08:38:29  14          Now, this is a statement that Agent Lawson typed up

08:38:31  15  after he interviewed you, correct?

08:38:33  16  A.   Yes, sir.

08:38:33  17  Q.   Is that statement accurate?

08:38:35  18  A.   Yes, sir.

08:38:36  19  Q.   Does it reflect who you claim you sent the money to?

08:38:39  20  A.   Yes, sir.

08:38:40  21  Q.   Who was that?

08:38:41  22  A.   To Carlos Nayen.

08:38:42  23  Q.   Okay.  Now, you said you developed -- I mean, that you

08:38:47  24  distributed how many kilos of cocaine every month?

08:38:52  25  A.   Roughly between 800 to a thousand.

| | | |
|---|---|---|
| 08:38:54 | 1 | Q.    Okay.  800 to a thousand kilograms of marihuana? |
| 08:38:58 | 2 | A.    Cocaine. |
| 08:38:59 | 3 | Q.    Cocaine.  I'm sorry.  And there's, what, a thousand grams in |
| 08:39:03 | 4 | every kilogram? |
| 08:39:03 | 5 | A.    Yes, sir. |
| 08:39:04 | 6 | Q.    Okay.  Have you ever thought about how many tens of |
| 08:39:08 | 7 | thousands of lives you destroyed in that process? |
| 08:39:11 | 8 | MR. GARDNER:  Your Honor, I'll object as argumentative. |
| 08:39:14 | 9 | THE COURT:  It's not relevant.  That's more of the |
| 08:39:17 | 10 | objection.  I sustain the objection.  You can ask him about his |
| 08:39:19 | 11 | criminal record, ask him about whatever you wish, but let's keep |
| 08:39:26 | 12 | him in the bounds of impeachment. |
| 08:39:28 | 13 | Q.    (BY MR. ESPER) During the two-year period that you were |
| 08:39:30 | 14 | distributing cocaine, how many thousands of kilograms did you |
| 08:39:34 | 15 | distribute in the United States? |
| 08:39:38 | 16 | A.    I have no idea. |
| 08:39:41 | 17 | Q.    More than a thousand kilograms? |
| 08:39:43 | 18 | A.    Oh, yeah.  We were doing 800 to a thousand a month.  It had |
| 08:39:46 | 19 | to have been more than a thousand. |
| 08:39:47 | 20 | Q.    Okay.  So 800 to a thousand a month for at least two years, |
| 08:39:51 | 21 | correct? |
| 08:39:51 | 22 | A.    At least a year and a half.  Yes, sir. |
| 08:39:53 | 23 | Q.    So anywhere from 24 to 30,000 kilograms a year over this 18 |
| 08:39:59 | 24 | -year period? |
| 08:40:00 | 25 | A.    Not every time it was 800 to a thousand.  It was roughly |

08:40:04  1   around there.  I would say, maybe a good ten times.

08:40:11  2   Q.   And now, while you're incarcerated, you're thinking -- and,

08:40:15  3   of course, you were making a lot of money back then, weren't you?

08:40:17  4   A.   Yes, sir.

08:40:18  5   Q.   Okay.  And how many -- you made, what, millions of dollars?

08:40:21  6   A.   Yes, sir.

08:40:22  7   Q.   Okay.  And now that you're in prison, you're trying to get

08:40:26  8   out of prison early, correct?

08:40:29  9   A.   I'm trying to get out of prison early.  I'm trying to help

08:40:33  10  myself.  Yes, sir.

08:40:33  11  Q.   Yeah.  Okay.  And back then when you were distributing

08:40:35  12  cocaine, you were helping yourself, weren't you?

08:40:37  13  A.   Yes, sir.

08:40:38  14  Q.   Okay.  No further questions.

08:40:42  15         THE COURT:  Mr. Mayr.

08:40:44  16                     CROSS-EXAMINATION

08:40:45  17  BY MR. MAYR:

08:40:45  18  Q.   Thank you.

08:40:46  19         Mr. Vasquez, I just want to be abundantly clear on

08:40:49  20  this.  Did you ever tell anyone -- or, to your knowledge, did you

08:40:54  21  ever have any money delivered to Austin?  After having had the

08:40:59  22  opportunity review your statement.

08:41:02  23  A.   To Austin, I don't believe so.  I don't believe I ever sent

08:41:04  24  money to Austin.

08:41:05  25  Q.   No further questions, your Honor.

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
| 08:41:07 | 1 | <u>RE-DIRECT EXAMINATION</u> |
| 08:41:07 | 2 | BY MR. GARDNER: |
| 08:41:10 | 3 | Q.   Mr. Vasquez, why were you sending guns to Mexico? |
| 08:41:13 | 4 | A.   Because they were asking for me to -- they asked me to buy |
| 08:41:17 | 5 | guns and send them to Mexico. |
| 08:41:18 | 6 | MR. ESPER:  Excuse me, your Honor, can he be specific |
| 08:41:21 | 7 | on day and time, your Honor? |
| 08:41:22 | 8 | THE COURT:  Well, I have a hunch that's his next |
| 08:41:24 | 9 | question. |
| 08:41:24 | 10 | Q.   (BY MR. GARDNER) And who was the organization you were |
| 08:41:26 | 11 | sending the guns to? |
| 08:41:28 | 12 | A.   To Los Zetas. |
| 08:41:29 | 13 | Q.   And do you know what the Zetas were doing with the guns? |
| 08:41:32 | 14 | A.   Yeah.  I knew they were in a war with the Gulf cartel and |
| 08:41:35 | 15 | other cartels. |
| 08:41:35 | 16 | Q.   So I know it's an obvious question.  But what purpose did |
| 08:41:40 | 17 | they need the guns in connection with their war with the Gulf |
| 08:41:43 | 18 | cartel? |
| 08:41:44 | 19 | A.   Well, to defend themselves.  They were fighting for |
| 08:41:46 | 20 | territory.  They were killing each other. |
| 08:41:49 | 21 | Q.   And now, when Mr. Finn was asking about -- I know you can't |
| 08:41:52 | 22 | see it, but you testified in another trial and Mr. Finn has a |
| 08:41:56 | 23 | transcript of that trial, correct? |
| 08:41:57 | 24 | A.   Yes, sir. |
| 08:41:57 | 25 | Q.   That's what he was asking questions on.  Did you tell the |

08:42:00   1   jury in the other trial the same thing you've told this jury here

08:42:02   2   today?

08:42:03   3   A.   Everything I answered, yes, sir.

08:42:05   4   Q.   Yes, sir.  And did that include the guns in that last trial?

08:42:10   5   A.   I don't recall them asking me about guns, but if they did, I

08:42:13   6   answered it the same way.

08:42:14   7   Q.   And that trial was on May 17th of 2012, last year, correct?

08:42:17   8   A.   Yes, sir.

08:42:18   9   Q.   Now, this pretrial interview that Mr. Finn asked you about,

08:42:22   10   did they ever ask you about Jose Trevino?

08:42:24   11   A.   No, sir.

08:42:29   12   Q.   And this money in a chimney, did you let law enforcement

08:42:32   13   know you had the money in the chimney?

08:42:34   14   A.   My wife let agents know and they asked me and I confirmed

08:42:38   15   it.  Told them where it was at.

08:42:39   16   Q.   And law enforcement recovered that $500,000 in the chimney?

08:42:42   17   A.   Yes, sir.

08:42:43   18   Q.   And, again, are you here today at the advice of your lawyer?

08:42:47   19   A.   Yes.  Yes, sir.

08:42:49   20   Q.   Pass the witness, your Honor.

08:42:50   21                    RE-CROSS EXAMINATION

08:42:50   22   BY MR. FINN:

08:42:53   23   Q.   Mr. Vasquez, if it please the Court.

08:42:56   24          THE COURT:  Yes, sir.

08:42:57   25   Q.   (BY MR. FINN) Thank you, your Honor.

| | | |
|---|---|---|
| 08:42:58 | 1 | Mr. Vasquez, about how many guns would you say that you |
| 08:43:00 | 2 | shipped down to Mexico? |
| 08:43:06 | 3 | A.    Maybe about 300. |
| 08:43:07 | 4 | Q.    300? |
| 08:43:08 | 5 | A.    Yes, sir. |
| 08:43:08 | 6 | Q.    And we're talking not just little cap pistols.  AR-15, |
| 08:43:13 | 7 | AK-47s.  How about any machine guns?  Did you send any fully auto |
| 08:43:18 | 8 | weapons down to Mexico? |
| 08:43:20 | 9 | A.    Yes, sir. |
| 08:43:20 | 10 | Q.    Yes? |
| 08:43:21 | 11 | A.    Yes, sir. |
| 08:43:22 | 12 | Q.    Machine guns? |
| 08:43:23 | 13 | A.    Yes, sir. |
| 08:43:25 | 14 | Q.    Tell the members of the jury how many gun counts you've been |
| 08:43:29 | 15 | prosecuted for. |
| 08:43:31 | 16 | A.    How many gun counts? |
| 08:43:32 | 17 | Q.    Gun counts. |
| 08:43:33 | 18 | A.    Zero. |
| 08:43:36 | 19 | Q.    Zero. |
| 08:43:36 | 20 | A.    Yes, sir. |
| 08:43:38 | 21 | Q.    And you sent 300 guns, weapons, AR-15s, and machine guns |
| 08:43:46 | 22 | down to Mexico -- |
| 08:43:47 | 23 | THE COURT:  I believe everybody's heard that.  Twice. |
| 08:43:51 | 24 | Q.    (BY MR. FINN) And you didn't get a single gun count? |
| 08:43:54 | 25 | A.    No, sir. |

08:43:55    1            MR. GARDNER:  Your Honor, repetitive.

08:43:56    2            THE COURT:  I'll have counsel up here.

08:44:00    3            (At the bench, on the record.)

08:44:05    4            THE COURT:  You want me to explain to the jury that his

08:44:19    5    sentence was enhanced because of the guns and that's what we do

08:44:24    6    in federal court?  Drop it at this point.  The guns you've

08:44:33    7    cleared -- you've gone into guns all the way.  But --

08:44:39    8            MR. FINN:  He could have gotten life with the gun

08:44:40    9    counts, Judge.

08:44:41   10            THE COURT:  He doesn't have a damn thing to do with

08:44:42   11    what the charges were, and I'm going to explain that to the jury

08:44:48   12    right now.  You may be seated.

08:45:00   13            Members of the jury, in the last series of questions,

08:45:05   14    of course, the defendant in a criminal case has nothing to do

08:45:10   15    with what charges are made against him.  And the fact of relevant

08:45:17   16    conduct in federal court, whether it be here, in Dallas or Plano,

08:45:24   17    the sentence takes into consideration the relevant conduct, which

08:45:27   18    would have taken into consideration the guns.

08:45:30   19            Now, let's move on.

08:45:32   20            MR. FINN:  Thank you, your Honor.

08:45:33   21            THE COURT:  Yes, sir.

08:45:33   22    Q.  (BY MR. FINN) Mr. Vasquez, we talked yesterday about your

08:45:39   23    federal case in North Texas.  Do you remember that?

08:45:42   24    A.  Yes, sir.

08:45:42   25            THE COURT:  And you're on re-cross, which means you're

08:45:46  1   limited to the cross of the redirect of the prosecutor.

08:45:52  2        MR. FINN:  Fair enough, Judge.

08:45:54  3   Q.   (BY MR. FINN) And you filed an appeal of your sentence; is

08:45:57  4   that correct?

08:45:57  5   A.   No, sir.

08:45:57  6        MR. GARDNER:  Your Honor, object.  Outside the bounds

08:46:00  7   of the government's redirect.

08:46:02  8        THE COURT:  It is, but he's already asked the question.

08:46:06  9   So you may answer.

08:46:07  10  A.   No, sir.

08:46:09  11       THE COURT:  The answer's "No, sir."  I suggest you stay

08:46:13  12  within the bounds of the redirect.

08:46:18  13  Q.   (BY MR. FINN) You were never prosecuted for selling machine

08:46:23  14  guns to Mexico; is that correct?

08:46:24  15       MR. GARDNER:  Your Honor, same objection.  The

08:46:26  16  government asked him about his lawyer, were you asked about the

08:46:30  17  Trevinos --

08:46:30  18       THE COURT:  He's already testified that he wasn't.

08:46:33  19       MR. GARDNER:  Yes, sir.

08:46:36  20       THE COURT:  Do you have any more repetitive questions?

08:46:39  21       MR. FINN:  I've got some important questions, Judge.

08:46:41  22       THE COURT:  Well, I'd suggest you get to them instead

08:46:44  23  of asking the ones you've already asked and got answers to.

08:46:47  24       MR. FINN:  Fair enough.

08:46:48  25       THE COURT:  All right.

| | | |
|---|---|---|
| 08:46:48 | 1 | MR. FINN:  That's all, Judge. |
| 08:46:49 | 2 | THE COURT:  All right. |
| 08:46:50 | 3 | MR. FINN:  Thank you. |
| 08:46:51 | 4 | THE COURT:  Yes, sir.  Mr. DeGeurin. |
| 08:46:54 | 5 | MR. DEGEURIN:  No, your Honor. |
| 08:46:55 | 6 | MR. WOMACK:  Yes, your Honor, briefly in light of that. |
| 08:46:57 | 7 | CROSS-EXAMINATION |
| 08:46:58 | 8 | BY MR. WOMACK: |
| 08:46:58 | 9 | Q.   Mr. Vasquez, I'm Guy Womack from Houston.  We've never met |
| 08:47:02 | 10 | before, have we? |
| 08:47:03 | 11 | A.   No, sir. |
| 08:47:03 | 12 | Q.   When you bought these guns that you were testifying about, |
| 08:47:07 | 13 | did you buy them from dealers? |
| 08:47:09 | 14 | A.   No, sir. |
| 08:47:10 | 15 | Q.   Did you buy them at gun shows? |
| 08:47:11 | 16 | A.   Yes, sir. |
| 08:47:12 | 17 | Q.   When you bought them at gun shows, were these around Texas? |
| 08:47:16 | 18 | Or where were these gun shows? |
| 08:47:17 | 19 | A.   Mainly in Dallas. |
| 08:47:18 | 20 | Q.   Mainly in Dallas, Texas? |
| 08:47:19 | 21 | A.   Yes, sir. |
| 08:47:20 | 22 | Q.   Do you recall that when you bought them in Dallas, that you |
| 08:47:23 | 23 | had to fill out a federal form declaring whether or not you're a |
| 08:47:26 | 24 | U.S. citizen? |
| 08:47:27 | 25 | A.   No, sir. |

| 08:47:28 | 1 | Q.   Did you fill out any kind of paperwork at all when you |
| 08:47:30 | 2 | bought these guns? |
| 08:47:31 | 3 | A.   No, sir. |
| 08:47:31 | 4 | Q.   Did you buy all the guns yourself at the gun show, or did |
| 08:47:34 | 5 | you have other people do that? |
| 08:47:35 | 6 | A.   Other people do it. |
| 08:47:36 | 7 | Q.   And these other people that did it for you, they were buying |
| 08:47:42 | 8 | those guns knowing they were going to give them to you, correct? |
| 08:47:44 | 9 | A.   Yes, sir. |
| 08:47:45 | 10 | Q.   Did you know that that's a crime under federal law for you |
| 08:47:48 | 11 | to have someone buy a gun for you as a straw purchaser and give |
| 08:47:53 | 12 | it to you? |
| 08:47:53 | 13 | A.   I did not know it.  No, sir. |
| 08:47:56 | 14 | Q.   You didn't know that? |
| 08:47:57 | 15 | A.   We didn't ever fill out no kind of paperwork, not even the |
| 08:48:00 | 16 | people that bought it for me. |
| 08:48:01 | 17 | Q.   Okay.  But as you sit here in court under oath, is it your |
| 08:48:04 | 18 | sworn testimony you did not know when you were having other |
| 08:48:07 | 19 | people buy these guns for you that it's illegal under federal law |
| 08:48:11 | 20 | for a different person to buy a gun not for themself but another |
| 08:48:17 | 21 | person to smuggle to Mexico?  You didn't know that? |
| 08:48:19 | 22 | A.   To smuggle to Mexico, I know that's a crime, but whether |
| 08:48:22 | 23 | they can buy it and give it to me, I didn't realize that was a |
| 08:48:24 | 24 | crime. |
| 08:48:25 | 25 | Q.   And how many different people did you employ to buy these |

| | | |
|---|---|---|
| 08:48:29 | 1 | guns for you, approximately? |
| 08:48:31 | 2 | A.    Five or six. |
| 08:48:32 | 3 | Q.    And they would buy multiple guns on different occasions? |
| 08:48:35 | 4 | A.    Yes, sir. |
| 08:48:36 | 5 | Q.    Okay.  What benefit did you expect to get for having used |
| 08:48:43 | 6 | these straw buyers to illegally buy guns for you to illegally |
| 08:48:47 | 7 | smuggle them into Mexico?  What benefit would you receive from |
| 08:48:50 | 8 | it? |
| 08:48:51 | 9 | A.    Well, they told us we needed to get guns, so I had to get |
| 08:48:54 | 10 | them. |
| 08:48:54 | 11 | Q.    I understand.  But did you anticipate you'd get paid |
| 08:48:57 | 12 | something for the trouble of getting these people to do that? |
| 08:49:01 | 13 | A.    No.  We never got paid for it, but I charged a different |
| 08:49:04 | 14 | price than what it cost me.  So I made something on the |
| 08:49:07 | 15 | purchases. |
| 08:49:07 | 16 | Q.    Okay.  So you had acquired the guns and sell them to the |
| 08:49:11 | 17 | Zetas, or whoever, and you would get the difference between what |
| 08:49:14 | 18 | you actually paid for the guns and what they paid for them? |
| 08:49:16 | 19 | A.    Yes, sir. |
| 08:49:16 | 20 | Q.    All right.  And did you pay the straw purchasers to go out |
| 08:49:21 | 21 | and buy the guns for you? |
| 08:49:22 | 22 | A.    Yes, sir. |
| 08:49:23 | 23 | Q.    Okay.  So for the promise of that money, whatever the profit |
| 08:49:28 | 24 | was on these weapons, you would have other people go out, go to |
| 08:49:31 | 25 | gun shows, buy guns to give you, that you could illegally smuggle |

| | | |
|---|---|---|
| 08:49:36 | 1 | into Mexico, correct? |
| 08:49:37 | 2 | A.   Yes, sir. |
| 08:49:37 | 3 | Q.   And you do that for money? |
| 08:49:38 | 4 | A.   Yes, sir. |
| 08:49:39 | 5 | Q.   No further questions. |
| 08:49:44 | 6 | THE COURT:  Mr. Esper. |
| 08:49:46 | 7 | MR. ESPER:  Nothing, your Honor. |
| 08:49:48 | 8 | RE-CROSS EXAMINATION |
| 08:49:49 | 9 | BY MR. MAYR: |
| 08:49:49 | 10 | Q.   Mr. Vasquez, when you sent those individuals to the gun show |
| 08:49:51 | 11 | to purchase those guns for you, did they know what they were |
| 08:49:54 | 12 | doing? |
| 08:49:54 | 13 | A.   Yes, sir. |
| 08:49:55 | 14 | Q.   Did they know that you were a drug dealer? |
| 08:49:57 | 15 | A.   Yes, sir. |
| 08:49:57 | 16 | Q.   Did they know that you were -- they were buying these guns |
| 08:50:00 | 17 | to have them sent to Mexico? |
| 08:50:02 | 18 | A.   Yes, sir. |
| 08:50:02 | 19 | Q.   Nothing further, your Honor. |
| 08:50:06 | 20 | MR. GARDNER:  I have no further questions, your Honor. |
| 08:50:08 | 21 | May this witness be excused? |
| 08:50:10 | 22 | MR. FINN:  No objection, your Honor. |
| 08:50:12 | 23 | MR. DEGEURIN:  No objection. |
| 08:50:14 | 24 | MR. ESPER:  No objection. |
| 08:50:15 | 25 | MR. MAYR:  None, your Honor. |

08:50:16  1          THE COURT:  You may be excused, sir.  You may call your

08:50:18  2  next witness.

08:50:20  3          MR. GARDNER:  Your Honor, I would call Mr. Jose

08:50:22  4  Vasquez, Sr.

08:51:05  5          (Witness sworn.)

08:51:20  6          THE COURT:  If you'll tell us your full name, please,

08:51:33  7  sir, and spell your last.

08:51:33  8          THE WITNESS:  My full name is Jose Luis

08:51:38  9  Vasquez-Carasco.

08:51:41  10     JOSE L. VASQUEZ, SR., called by the Government, duly sworn.

08:51:41  11                     DIRECT EXAMINATION

08:51:41  12  BY MR. GARDNER:

08:51:42  13  Q.   Thank you, your Honor.

08:51:43  14          Mr. Vasquez, you and I have met before.  I want to ask

08:51:47  15  you the first question:  Are you comfortable speaking in English

08:51:49  16  here today?

08:51:49  17  A.   Yes, sir.

08:51:49  18  Q.   You and I met before; is that correct?

08:51:51  19  A.   Yes, sir.

08:51:52  20  Q.   If you will, could you introduce yourself to the jury?  Tell

08:51:55  21  them how old a man you are, where you live, and how much

08:51:57  22  education you have.

08:52:00  23  A.   My name is Jose Luis Vasquez-Carasco.  I live in Dallas.

08:52:04  24  I'm a brick mason.  I've been a brick mason for little over 30

08:52:12  25  years as a contractor.  That's what I do for a living.  I'm here

| | | |
|---|---|---|
| 08:52:22 | 1 | to -- |
| 08:52:23 | 2 | Q.   I'll ask you another question.  Are you related to Jose |
| 08:52:26 | 3 | Vasquez, Jr.? |
| 08:52:26 | 4 | A.   Yes, sir.  He is my son. |
| 08:52:29 | 5 | Q.   Now, I'd like you to tell the jury a little bit about your |
| 08:52:33 | 6 | job as a brick mason.  What does that involve? |
| 08:52:36 | 7 | A.   Brick mason, well, actually, I become a bricklayer since I |
| 08:52:41 | 8 | was 17 years old.  I was still in high school.  My dad was a |
| 08:52:44 | 9 | brick contractor, and that's how I got involved and been a brick |
| 08:52:49 | 10 | mason.  After that, I went to look for a job some other person, |
| 08:52:52 | 11 | friend of mine.  His name is Ray Burger.  He hired me when I was |
| 08:52:57 | 12 | about 17, and I became a bricklayer with him and been a foreman |
| 08:53:00 | 13 | for him for almost three or four years.  And then, after that, I |
| 08:53:05 | 14 | started contracting. |
| 08:53:07 | 15 | And it was -- I'm talking back in the early '80s.  I |
| 08:53:11 | 16 | mean, I've been doing good doing brickwork.  And that's what I |
| 08:53:15 | 17 | like to do, I mean, that's what I learned how to do and I make my |
| 08:53:20 | 18 | living is what I do. |
| 08:53:21 | 19 | Q.   How much do you make a year as a brick mason? |
| 08:53:25 | 20 | A.   It all depends because with the weather, sometimes you work |
| 08:53:29 | 21 | good, sometimes you don't.  But you end up making from 30 to |
| 08:53:33 | 22 | $50,000 a year doing that kind of work. |
| 08:53:34 | 23 | Q.   And does that depend whether you're an hourly employee or |
| 08:53:40 | 24 | contractor? |
| 08:53:40 | 25 | A.   It all depends.  Sometimes you make more if -- when you're |

08:53:43   1   contracting, you can make a little bit more.  I say if you work

08:53:48   2   hourly, I mean, average person makes 700, $800 a week nowadays

08:53:54   3   laying brick.  If you're contracting, you might make 1,000 to

08:53:57   4   1,500 a week if you're contracting.  It all depends what you're

08:54:01   5   doing.

08:54:01   6   Q.   What is your immigration status here in the United States?

08:54:05   7   A.   Say that again, sir.

08:54:06   8   Q.   What is your immigration status here in the United States?

08:54:08   9   A.   I'm a resident.  I never did became a citizen because I've

08:54:14  10   been in Dallas, in the United States all my life.

08:54:16  11          MR. MAYR:  Objection.  Nonresponsive.

08:54:18  12          THE COURT:  Okay.  Mr. Vasquez, if you can answer the

08:54:21  13   question "Yes" or "No," go ahead and answer.  We've got a lot of

08:54:25  14   lawyers that are going to ask you questions.

08:54:26  15          THE WITNESS:  Okay, sir.  Thank you.

08:54:27  16   Q.   (BY MR. GARDNER) Thank you, Mr. Vasquez.

08:54:29  17          When you did you first come to the United States?

08:54:33  18   A.   I was a baby because my parents brought me over to the

08:54:39  19   United States.

08:54:39  20   Q.   So you've been here the majority of your adult life?

08:54:42  21   A.   Yes, sir.

08:54:42  22   Q.   Now, are you charged with a conspiracy case in Dallas?

08:54:49  23   A.   Say that again, please, sir.

08:54:50  24   Q.   I said, are you charged in indictments in the Plano, Eastern

08:54:55  25   District of Texas for a conspiracy case?

| | | |
|---|---|---|
| 08:54:56 | 1 | A.   Yes, sir. |
| 08:54:56 | 2 | Q.   Is that the same case your son's involved in? |
| 08:55:00 | 3 | A.   I believe so, sir. |
| 08:55:02 | 4 | Q.   And have you entered a plea in front of the judge up there |
| 08:55:06 | 5 | yet, a plea of guilty? |
| 08:55:07 | 6 | A.   Yes, sir. |
| 08:55:09 | 7 | Q.   And have you been sentenced yet, sir? |
| 08:55:11 | 8 | A.   No, sir. |
| 08:55:12 | 9 | Q.   And are you currently out on what they call bond, pretrial |
| 08:55:16 | 10 | release on bond? |
| 08:55:16 | 11 | A.   Yes, sir. |
| 08:55:19 | 12 | Q.   And when were you arrested? |
| 08:55:23 | 13 | A.   When was I arrested?  About a month ago. |
| 08:55:29 | 14 | Q.   And where were you prior to being arrested? |
| 08:55:33 | 15 | A.   Repeat that to me, sir.  I don't understand that. |
| 08:55:35 | 16 | Q.   Were you in the United States prior to being arrested? |
| 08:55:38 | 17 | A.   No, sir.  I was in Veracruz, Mexico and I came -- I flew |
| 08:55:43 | 18 | into the United States, and when I arrived on the plane, they |
| 08:55:47 | 19 | arrested me. |
| 08:55:47 | 20 | Q.   And did you turn yourself in?  Did they know you -- |
| 08:55:49 | 21 | A.   I turned myself in.  Yes, sir. |
| 08:55:51 | 22 | Q.   And why did you turn yourself in? |
| 08:55:55 | 23 | A.   I want to -- I have to turn myself in.  I want to get this |
| 08:56:00 | 24 | over with.  I mean, I don't know.  I don't want to be running |
| 08:56:05 | 25 | from the law. |

08:56:09  1  Q.   And what do you hope to get out of your testimony today?

08:56:15  2  What benefit do you hope to receive?

08:56:16  3  A.   I don't really expect to get nothing.  I expect to God to

08:56:20  4  get over this matter that I got involved.  As of my age, I

08:56:24  5  shouldn't have never been involved, but it's too late.  I pray to

08:56:26  6  God to get out of this.  That's all.

08:56:28  7  Q.   And do you realize that neither myself nor Judge Sparks is

08:56:31  8  going to determine your sentence?

08:56:36  9  A.   I don't know who's going to determine my sentence, but I

08:56:41  10  just pray to God it's whatever happens.  It's got to be done what

08:56:43  11  it's got to be done.

08:56:45  12  Q.   So what was your involvement in your son's business?

08:56:51  13  A.   I would take care of some money.  He had me to deliver money

08:56:56  14  to here and there for different persons.  That's all.

08:56:58  15  Q.   Were you involved in the cocaine side of the business?

08:57:01  16  A.   No, sir.  No, sir.

08:57:02  17  Q.   So when you say you were involved on the money side

08:57:05  18  delivering to people, are you familiar with an individual by the

08:57:08  19  name of Hector Moreno?

08:57:10  20  A.   Yes, sir.  I do.

08:57:11  21  Q.   And how do you know him?

08:57:14  22  A.   He was the -- one of the guys who handled the money that he

08:57:19  23  was seeing to.

08:57:22  24  Q.   So what performance or what things did you do with Mr.

08:57:25  25  Moreno, Hector Moreno?

08:57:29  1   A.   Hector Moreno would send his people or his brothers into the

08:57:37  2   United States to pick up the money to take back to Mexico, and I

08:57:40  3   would have the money to give them the amount of money to take

08:57:44  4   back to Mexico.

08:57:45  5   Q.   Was that the money from the sale of cocaine?

08:57:48  6   A.   Yes, sir.

08:57:50  7   Q.   Now, I want to talk to you about a few of your money

08:57:54  8   deliveries.  Let's talk about first one to Oklahoma.  Could you

08:57:59  9   please tell the ladies and gentlemen of the jury, did you ever

08:58:01  10  take money to Oklahoma?

08:58:02  11  A.   Yes, I did.  I took some money to a person in Oklahoma for

08:58:11  12  some horses that the people bought.  I don't know exactly who,

08:58:14  13  but they bought some horses that I took some money to a person

08:58:18  14  that's in Oklahoma.

08:58:19  15  Q.   Do you remember how much money you took?

08:58:21  16  A.   It would average about $120,000, $130,000.

08:58:25  17  Q.   And was that in cash?

08:58:27  18  A.   Yes, sir.  That was in cash.

08:58:28  19  Q.   And do you recall where in Oklahoma you took that money?

08:58:31  20  A.   Yes, sir.  I can't give you the address, but if you ask me

08:58:35  21  to take you, I'll be glad to take you.  I don't know the address.

08:58:38  22  Q.   Do you recall where it was in relation to the Oklahoma-Texas

08:58:42  23  border?

08:58:44  24  A.   I met the person in the casino called WinStar Casino, I met

08:58:50  25  him right there.  And from that casino to his place, not even

| 08:58:53 | 1 | five minutes from right there. |
| 08:58:55 | 2 | Q.   Is that casino on the Oklahoma-Texas border? |
| 08:58:58 | 3 | A.   Right on the -- right.  Yes, sir. |
| 08:59:02 | 4 | Q.   Do you recall the denominations, the bills, the types of |
| 08:59:06 | 5 | bills that you took up there?  Was it 100s, 20s, 10s? |
| 08:59:14 | 6 | A.   It was all 100 bills. |
| 08:59:17 | 7 | Q.   And how was it packaged or wrapped? |
| 08:59:20 | 8 | A.   There was wrapped in rubber-bands and in a bag that you can |
| 08:59:27 | 9 | see -- you couldn't see the money.  It's just inside the bag. |
| 08:59:30 | 10 | Q.   And did the gentleman that you gave the money to, did you |
| 08:59:32 | 11 | actually take the horses with you? |
| 08:59:34 | 12 | A.   No.  I just dropped the money and that's it. |
| 08:59:38 | 13 | Q.   Did he give you any paperwork for the horses? |
| 08:59:40 | 14 | A.   He gave me -- I don't know exactly how to say it but birth |
| 08:59:45 | 15 | certificate of the horse, whatever, the paper for the horse, the |
| 08:59:50 | 16 | birth paper, like what kind of brand of horse it was and all |
| 08:59:54 | 17 | that.  And they gave me the paper to take back to the people. |
| 09:00:01 | 18 | Q.   Do you know an individual by the name of Nayen, Carlos |
| 09:00:04 | 19 | Nayen? |
| 09:00:04 | 20 | A.   Carlos Nayen, yes, sir. |
| 09:00:06 | 21 | Q.   I'm going to show you Government's Exhibit 335E.  Do you |
| 09:00:14 | 22 | recognize that picture, sir? |
| 09:00:15 | 23 | A.   Yes, sir. |
| 09:00:15 | 24 | Q.   Is that the individual you identified as Carlos Nayen? |
| 09:00:19 | 25 | A.   Yes, sir.  But it's not the person that I took money to |

| | | |
|---|---|---|
| 09:00:22 | 1 | Oklahoma. |
| 09:00:23 | 2 | Q.   All right.   Thank you. |
| 09:00:27 | 3 | MR. GARDNER:  Your Honor, I offer Government's Exhibit |
| 09:00:28 | 4 | 335E.  Certified copy of Mr. Nayen's immigration picture and |
| 09:00:36 | 5 | then, a copy on the back. |
| 09:00:38 | 6 | MR. FINN:  No objection, your Honor. |
| 09:00:40 | 7 | MR. DEGEURIN:  May I look at it again? |
| 09:00:57 | 8 | MR. WOMACK:  No objection. |
| 09:00:58 | 9 | MR. ESPER:  I have none. |
| 09:01:02 | 10 | THE COURT:  335E is admitted. |
| 09:01:11 | 11 | MR. DEGEURIN:  May we have just a moment, Judge? |
| 09:01:14 | 12 | THE COURT:  Okay. |
| 09:01:45 | 13 | MR. MAYR:  I have no objection, your Honor. |
| 09:01:46 | 14 | MR. DEGEURIN:  No objection to our agreement, your |
| 09:01:46 | 15 | Honor. |
| 09:01:48 | 16 | THE COURT:  All right.  It's still admitted.  Now let's |
| 09:01:50 | 17 | proceed. |
| 09:01:51 | 18 | Q.   (BY MR. GARDNER) Now, Mr. Vasquez, you said earlier, this |
| 09:02:03 | 19 | was not the person you delivered the money to in Oklahoma. |
| 09:02:07 | 20 | A.   Right, sir. |
| 09:02:08 | 21 | Q.   All right.  Did you at some occasion drive money to this |
| 09:02:10 | 22 | individual? |
| 09:02:11 | 23 | A.   Yes, I did. |
| 09:02:11 | 24 | Q.   And when was that? |
| 09:02:18 | 25 | A.   Where or where? |

| 09:02:24 | 1 | Q.   When, sir? |

09:02:24    1    Q.   When, sir?

09:02:25    2    A.   When?  It's been over close to four years ago.

09:02:30    3    Q.   And now, the next question, where did you deliver that

09:02:33    4    money?

09:02:34    5    A.   He was at a hotel in -- on 183 by the DFW Airport.  I

09:02:41    6    believe it was by the Hilton Hotel right there on 183.

09:02:45    7    Q.   And did you have a conversation with him when he delivered

09:02:48    8    the money?

09:02:49    9    A.   He tried to chat with me a little bit, and I just gave him

09:02:53    10   the money in the bag, and he and the other guy together grabbed

09:03:00    11   the money and see you later.  That's it.

09:03:01    12   Q.   Do you remember how much money you gave Mr. Nayen?

09:03:04    13   A.   About 120, $130,000 cash.

09:03:08    14   Q.   All cash?

09:03:08    15   A.   Yes.

09:03:09    16   Q.   And was it in denominations of that delivery in 100s, as

09:03:13    17   well?

09:03:13    18   A.   Yeah.  I couldn't say how much 20s.  He had a little bit of

09:03:17    19   20s, but mostly it was 100s.

09:03:20    20   Q.   Not only this money but the money you talked about earlier

09:03:22    21   for the horse purchases, where did that money come from?

09:03:25    22   A.   From drugs.

09:03:29    23          MR. WOMACK:  Objection, your Honor.  Foundation.

09:03:34    24   Q.   (BY MR. GARDNER) Do you know where that money came from?

09:03:35    25   A.   Right.

09:03:36   1    Q.    And where did that money come from?  It's not a trick

09:03:43   2    question.  Where did the money that you gave Carlos Nayen and the

09:03:47   3    gentleman for the horse in Oklahoma, where did that money come

09:03:50   4    from?

09:03:50   5    A.    From drugs.  From -- yeah.  From drugs.

09:03:53   6    Q.    From sale of cocaine?

09:03:54   7    A.    Right.  Right.

09:03:56   8    Q.    I'm going to show you Government's Exhibit 335C and 335I.

09:04:09   9    Do you recognize 335C, sir?

09:04:11  10    A.    Yes, I do.

09:04:12  11    Q.    And do you recognize 335I?

09:04:16  12    A.    Uh-huh.

09:04:17  13    Q.    Did you --

09:04:19  14    A.    I delivered --

09:04:20  15          THE COURT:  No, no.  The question is, do you recognize

09:04:22  16    it?

09:04:23  17    A.    Yes, I do, sir.

09:04:25  18          MR. GARDNER:  Your Honor, I would offer Government's

09:04:28  19    Exhibit 335C and 335I.  One is a certified Texas Department of

09:04:35  20    Public Safety document, and the other one is a certified

09:04:39  21    immigration document.

09:05:12  22          MR. FINN:  No objection to the photograph, your Honor.

09:05:14  23          THE COURT:  Okay.  335C and 335I are received and

09:05:22  24    admitted.

09:05:25  25    Q.    (BY MR. GARDNER) Now, you said you identified this

| | | |
|---|---|---|
| 09:05:46 | 1 | individual.  Did you make a delivery of cash to this individual? |
| 09:05:49 | 2 | A.    Yes, sir. |
| 09:05:50 | 3 | Q.    And where was that, sir? |
| 09:05:52 | 4 | A.    Delivered money to him in late June in a Wal-Mart store. |
| 09:05:57 | 5 | THE COURT:  Which exhibit is that? |
| 09:05:58 | 6 | MR. GARDNER:  That's 335C, your Honor.  And I'll -- by |
| 09:06:02 | 7 | agreement of defense counsel, I'll re-sticker that later on. |
| 09:06:06 | 8 | Could you show me 335I? |
| 09:06:15 | 9 | Q.    (BY MR. GARDNER) And that's the other picture you |
| 09:06:17 | 10 | identified, sir.  How do you know him? |
| 09:06:19 | 11 | A.    They were both together when I turned in the money to him on |
| 09:06:24 | 12 | Lake June Road. |
| 09:06:26 | 13 | Q.    When you say Lake June Road, is that in the Dallas, Texas? |
| 09:06:30 | 14 | A.    That's in Dallas, Texas, right by 635, there's a Wal-Mart |
| 09:06:33 | 15 | right there.  We met at the parking lot. |
| 09:06:35 | 16 | Q.    Parking lot of Wal-Mart? |
| 09:06:37 | 17 | A.    Uh-huh. |
| 09:06:37 | 18 | Q.    Do you know the subdivision or the community where that |
| 09:06:41 | 19 | Wal-Mart is? |
| 09:06:44 | 20 | A.    Just on Lake June Road. |
| 09:06:47 | 21 | Q.    And who told you to deliver money to those two? |
| 09:06:51 | 22 | A.    My son told me to take the money to him. |
| 09:06:53 | 23 | Q.    And how much money did you take to them? |
| 09:06:55 | 24 | A.    That, I don't know, sir. |
| 09:06:57 | 25 | Q.    And did your son tell you what the money was for? |

09:07:01  1   A.    No.

09:07:02  2                MR. FINN:  Objection.  Hearsay, your Honor.

09:07:05  3                MR. GARDNER:  That would be a coconspirator hearsay

09:07:06  4   exception, your Honor.

09:07:07  5                MR. FINN:  It's still --

09:07:09  6                THE COURT:  Put a date on it.

09:07:10  7   Q.    (BY MR. GARDNER) Could you let the jury know when the

09:07:13  8   approximate time was you delivered the money to these two

09:07:16  9   individuals?

09:07:18  10  A.    I can't remember the exact date when I delivered the money,

09:07:21  11  but it was in the -- one evening, about 4:30, 5:00 in the

09:07:28  12  evening.

09:07:28  13  Q.    How many years ago?

09:07:30  14  A.    Same, around three-and-a-half years ago, somewhere in there.

09:07:36  15  Q.    And at that point, did your son tell you who you were going

09:07:41  16  to be delivering the money to?

09:07:42  17                MR. FINN:  Judge, objection.  Hearsay.

09:07:44  18                THE COURT:  Well, it's not.  It's an exception to the

09:07:46  19  hearsay, allegation of conspiracy since 2008.  You may answer the

09:07:53  20  question.

09:07:55  21  A.    Repeat me the question.

09:07:57  22  Q.    (BY MR. GARDNER) Yes, sir.  Absolutely.  Did your son tell

09:07:59  23  you who you would be giving the money to?

09:08:02  24  A.    He just told me to take the money.  He didn't tell me

09:08:07  25  exactly.  He said it's going to be someone right there.  Just

09:08:10    1    turn it over to him.  That's it.

09:08:11    2    Q.    So he didn't tell you --

09:08:12    3    A.    He didn't tell me nothing at that point.

09:08:14    4    Q.    And when you got there, was -- could I have the first one,

09:08:19    5    335C?  Was that individual on the one you just saw on the screen,

09:08:26    6    were they driving together?

09:08:28    7    A.    They weren't together in the same vehicle.  They were -- one

09:08:31    8    was driving one vehicle and the other one was driving the other

09:08:35    9    vehicle.

09:08:35   10    Q.    And what type of vehicles were they driving?

09:08:38   11    A.    I don't remember which one, but the one was driving a white

09:08:41   12    van, like a work van, and the other one was driving like a Ford

09:08:45   13    truck.

09:08:46   14    Q.    Who did you give the money to?

09:08:48   15    A.    The guy in the white van.

09:08:50   16    Q.    And was it this --

09:08:52   17    A.    Actually, both of them walked up to me and take the money.

09:08:55   18    Q.    And how quick did that transaction occur?

09:08:58   19    A.    Minutes.

09:08:59   20    Q.    Minutes?

09:09:00   21    A.    Minutes.

09:09:00   22    Q.    Did you have any conversation with him?

09:09:02   23    A.    Not at all.  Just switch the money, they looked at me,

09:09:06   24    turned around and go about their business.

09:09:07   25    Q.    And did you look in the bag to see approximately how much

09:09:10   1   money you gave them?

09:09:11   2   A.   I didn't have no -- I didn't do that because that's not what

09:09:15   3   I was told to do.  Just gave me the bag, told me to take it,

09:09:18   4   that's what I did.

09:09:19   5   Q.   And did you know what that money was going to be used for?

09:09:22   6   A.   Not exactly, sir.  I didn't know what that money was going

09:09:26   7   to be used for.

09:09:27   8   Q.   Why did you get involved with your son in his cocaine

09:09:31   9   business?

09:09:36   10   A.   First of all, this --

09:09:39   11       MR. FINN:  Judge, excuse me, Mr. Gardner, I'm going to

09:09:41   12   object.  Relevance.

09:09:46   13       MR. GARDNER:  I think it's relative to his involvement

09:09:49   14   in the conspiracy, your Honor.

09:09:52   15       THE COURT:  Overrule the objection.  You may answer,

09:09:54   16   sir.

09:09:57   17   A.   Because at the time I was doing brickwork.  I was doing a

09:10:01   18   big job and I had a place over in east Dallas and had some four

09:10:10   19   people that came out there to kill my son.  So I told him, I

09:10:14   20   stood beside my son for helping him not to get killed just to be

09:10:17   21   around him.  That's how I got involved in that thing but just to

09:10:23   22   trying to help my son.  That is all.

09:10:25   23   Q.   (BY MR. GARDNER) Is that because he is your family?

09:10:27   24   A.   That is my son.  Yes.  I think anybody would do the same for

09:10:30   25   your son.

| | | |
|---|---|---|
| 09:10:31 | 1 | Q.   Your Honor, I'll pass the witness. |
| 09:10:38 | 2 | CROSS-EXAMINATION |
| 09:10:38 | 3 | BY MR. FINN: |
| 09:10:44 | 4 | Q.   Good morning, Mr. Vasquez.  How are you doing? |
| 09:10:46 | 5 | A.   Just fine, sir.  Thank you. |
| 09:10:47 | 6 | Q.   Good.  My name is David Finn, F-I-N-N, and I just have a |
| 09:10:51 | 7 | couple of questions for you. |
| 09:10:52 | 8 | You've been indicted in federal court for conspiracy; |
| 09:10:58 | 9 | is that right? |
| 09:10:59 | 10 | A.   Yes, sir. |
| 09:10:59 | 11 | Q.   And your case is pending in front of Judge Marcia Crone in |
| 09:11:04 | 12 | Eastern District of Texas; is that correct? |
| 09:11:05 | 13 | A.   Right. |
| 09:11:06 | 14 | Q.   Have you entered a plea on that? |
| 09:11:10 | 15 | A.   Yes. |
| 09:11:11 | 16 | Q.   Okay.  And are you -- do you have a lawyer? |
| 09:11:14 | 17 | A.   Yes, I do, sir. |
| 09:11:16 | 18 | Q.   Who is your lawyer? |
| 09:11:18 | 19 | A.   Frank Perez. |
| 09:11:20 | 20 | Q.   Frank Perez? |
| 09:11:21 | 21 | A.   Frank Perez. |
| 09:11:23 | 22 | Q.   The same lawyer that's representing your son? |
| 09:11:24 | 23 | A.   Right, sir. |
| 09:11:27 | 24 | Q.   Are you hoping that Judge Crone and the government will file |
| 09:11:33 | 25 | a motion asking the Judge to reduce your sentence based on your |

| | | |
|---|---|---|
| 09:11:39 | 1 | cooperation? |
| 09:11:40 | 2 | A.   No, sir.  I don't expect that.  I expect to God that |
| 09:11:45 | 3 | whatever's got to be done has got to be done.  I made a mistake |
| 09:11:48 | 4 | in my life.  I don't expect that.  I mean, God knows only what he |
| 09:11:53 | 5 | can -- whatever I'm going to get is just fine.  I made a mistake. |
| 09:11:58 | 6 | Q.   Instead of me asking you what you expect, what do you want? |
| 09:12:02 | 7 | A.   What I want and I pray to God to get over this matter that I |
| 09:12:07 | 8 | made a mistake in my life and never been in this problem before. |
| 09:12:10 | 9 | Q.   So if the Judge is going to sentence you to ten years or |
| 09:12:15 | 10 | five years, which would you prefer? |
| 09:12:19 | 11 | A.   Well, naturally, I mean, from ten to five, I take the five. |
| 09:12:23 | 12 | But they tell me ten, I've got to do ten.  I mean, that's |
| 09:12:26 | 13 | whatever they decide.  It's not up to me. |
| 09:12:27 | 14 | Q.   Right. |
| 09:12:28 | 15 | A.   I mean, federal. |
| 09:12:30 | 16 | Q.   Have you -- I'm not going to ask you what you've talked to |
| 09:12:33 | 17 | Mr. Perez, your attorney, about because that would be |
| 09:12:36 | 18 | inappropriate, but have you done what's called a presentence |
| 09:12:40 | 19 | report?  Have you sort of seen what amount of time you're looking |
| 09:12:44 | 20 | at? |
| 09:12:44 | 21 | A.   No, sir.  No, sir. |
| 09:12:47 | 22 | Q.   But Mr. Perez has explained to you that if you assist the |
| 09:12:53 | 23 | government, then the government can file a motion asking Judge |
| 09:12:57 | 24 | Crone to give you less time, right?  Do you understand how it |
| 09:13:01 | 25 | works? |

09:13:02   1   A.   No.  We haven't talked about that, that matter.  No, sir.

09:13:07   2   Q.   So you're here today in front of this jury out of the

09:13:11   3   goodness of your heart, just to clarify and tell the truth?

09:13:14   4          MR. GARDNER:  Your Honor, we object to that as being

09:13:15   5   argumentative.

09:13:16   6          THE COURT:  It is.  I sustain the objection to the

09:13:18   7   question asked.  You can rephrase.

09:13:20   8          MR. FINN:  Thank you, your Honor.

09:13:21   9   Q.   (BY MR. FINN) Mr. Vasquez, were you involved in your son's

09:13:24   10  gun-running, sending machine guns down to Mexico?

09:13:27   11  A.   No, sir.  Never.

09:13:28   12  Q.   He concealed that from you; is that correct?

09:13:30   13  A.   Right.  Conceal means?

09:13:33   14  Q.   Conceal means like hide.  He didn't tell you, you didn't

09:13:38   15  know that he was selling machine guns to Mexico, right?

09:13:40   16  A.   No.  No, sir.

09:13:41   17  Q.   Is it safe to say that your son did a whole bunch of stuff

09:13:45   18  that you probably were not aware of?

09:13:48   19  A.   Yes, sir.  Most.

09:13:50   20  Q.   Thank you.

09:13:51   21  A.   Yes, sir.

09:13:51   22  Q.   Thank you.

09:13:55   23         MR. DEGEURIN:  Your Honor, I have a few questions.

09:13:56   24         THE COURT:  Yes, sir.

09:13:57   25

|          |     |                                                            |
|----------|-----|------------------------------------------------------------|
| 09:13:57 | 1   | CROSS-EXAMINATION                                          |
| 09:13:58 | 2   | BY MR. DEGEURIN:                                           |
| 09:13:58 | 3   | Q.   Mr. Vasquez.                                          |
| 09:14:02 | 4   | A.   Yes, sir.                                            |
| 09:14:04 | 5   | Q.   I'm Mike DeGeurin.  We have not met, have we?        |
| 09:14:19 | 6   | A.   No, sir.                                             |
| 09:14:22 | 7   | Q.   You identified a photograph that has been identified as |
| 09:14:28 | 8   | Carlos Nayen.                                              |
| 09:14:31 | 9   | A.   Yes, sir.                                            |
| 09:14:31 | 10  | Q.   Did you meet him?                                     |
| 09:14:33 | 11  | A.   I met him in person.  Yes, sir.                      |
| 09:14:35 | 12  | Q.   You met him in person?                               |
| 09:14:36 | 13  | A.   Yes, sir.                                            |
| 09:14:37 | 14  | Q.   And did you meet him in person that day that you took the |
| 09:14:41 | 15  | money over?  Is that --                                    |
| 09:14:42 | 16  | A.   That is the only time I met -- I have seen that person when |
| 09:14:45 | 17  | I took the money to him.                                   |
| 09:14:46 | 18  | Q.   Okay.  Tell me what day that was.                     |
| 09:14:55 | 19  | A.   Best of my knowledge, it was on a Friday.  Friday evening. |
| 09:15:02 | 20  | But I don't know which -- what day.  I mean, the date.  I don't |
| 09:15:06 | 21  | know the date.                                             |
| 09:15:07 | 22  | Q.   How about the year?  Do you remember the year?        |
| 09:15:15 | 23  | A.   It was 2008, 2009, somewhere in there.  2009, somewhere in |
| 09:15:20 | 24  | there.                                                     |
| 09:15:20 | 25  | Q.   Sometime between 2008, 2009?                          |

09:15:23   1   A.   Right.   I can't remember that exactly.

09:15:27   2   Q.   And how -- if you were, how would you determine what date it

09:15:34   3   was?   Is there anything you could go look at to determine when

09:15:40   4   you gave the money to who you believed to be the?

09:15:44   5   A.   Well, based on my time that I had been in Mexico and came

09:15:51   6   back, I say at least three, three years, about eight or nine

09:15:57   7   months.   So if you take that time back, that's when I seen Mr.

09:16:00   8   Payen.

09:16:00   9   Q.   That would be the way you would figure it out?

09:16:03   10   A.   That would be the way I would figure that out.   Yes, sir.

09:16:06   11   Q.   When did you come back?

09:16:07   12   A.   About a month ago.   No.   I take that back.   I'm sorry.   I

09:16:11   13   apologize for that.   When I come back to Dallas, it's been close

09:16:13   14   to two months.

09:16:16   15   Q.   From today?

09:16:18   16   A.   From today.

09:16:19   17   Q.   Okay.   Two months ago?

09:16:20   18   A.   Two months ago.

09:16:21   19   Q.   Okay.

09:16:22   20   A.   I came back to Dallas.

09:16:29   21   Q.   When you delivered -- your recollection is sometime around

09:16:35   22   2008, 2009, on a Friday, you delivered a package of money to a

09:16:42   23   person.   Were you told his name?   Were you introduced to him?

09:16:46   24   How did you know who to give it to?

09:16:49   25   A.   My son, he told me I was going to deliver the money to a

09:16:56   1   certain person.  When I delivered the money, that guy introduced

09:17:00   2   himself to me, Carlos Payen.  And I didn't -- I don't remember

09:17:04   3   the name of the other person he was with.

09:17:07   4   Q.   My hearing is not as good as it used to be.  Did you say

09:17:14   5   Payen or Nayen?  Or what did you say his name was?

09:17:16   6   A.   I said Payen or Nayen.  Either one of those.  But I mean, I

09:17:21   7   remember clearly the person because we stood right there outside

09:17:24   8   the hotel, the motel, whatever.

09:17:26   9   Q.   Okay.  Did I understand you to say that you -- it was your

09:17:33  10   understanding this was having to do with buying some horse?

09:17:35  11   A.   That's what I understood what the money was going to be used

09:17:38  12   for.

09:17:39  13   Q.   To buy some horse?

09:17:40  14   A.   Some horses.  Some horses.  Not horse.  Horses.

09:17:43  15   Q.   To buy some horses?

09:17:45  16   A.   Uh-huh.

09:17:45  17   Q.   And who told you that?

09:17:46  18   A.   My son did.

09:17:50  19   Q.   Okay.  So your son told you, take this money to a person and

09:17:59  20   the reason, the idea is because this -- that person or somebody

09:18:05  21   he works for is going to buy some horses?

09:18:07  22   A.   Yes, sir.

09:18:09  23   Q.   Is that the best recollection?

09:18:10  24   A.   Best of my knowledge, that's what I was told.

09:18:13  25   Q.   Okay.

| | | |
|---|---|---|
| 09:18:14 | 1 | A.   They needed the money to fly in a plane to go buy some |
| 09:18:17 | 2 | horses somewhere.  Just like that. |
| 09:18:19 | 3 | Q.   All right.  Are you familiar with horse racing, or horse |
| 09:18:24 | 4 | breeding, or anything like that? |
| 09:18:25 | 5 | A.   Nothing at all, sir. |
| 09:18:26 | 6 | Q.   Did -- you don't have -- anybody tell you what the names of |
| 09:18:32 | 7 | the horses were that were going to be purchased? |
| 09:18:35 | 8 | A.   No, sir. |
| 09:18:36 | 9 | Q.   Or how about who was going to purchase them? |
| 09:18:39 | 10 | A.   No, sir. |
| 09:18:45 | 11 | Q.   A second -- how many times did you deliver money?  How many |
| 09:18:49 | 12 | times did you deliver money? |
| 09:18:51 | 13 | A.   To him or to different persons? |
| 09:18:54 | 14 | Q.   Well, my notes -- and I have to apologize.  I had to rush |
| 09:18:59 | 15 | out and come back in.  But you've identified two different people |
| 09:19:02 | 16 | that you delivered money to. |
| 09:19:04 | 17 | A.   Four different people. |
| 09:19:06 | 18 | Q.   Okay.  So you're talking about four different occasions. |
| 09:19:10 | 19 | A.   Right. |
| 09:19:11 | 20 | Q.   One of those occasions was to buy horses? |
| 09:19:14 | 21 | A.   Right.  Well, it was two occasions to buy horses.  The one |
| 09:19:19 | 22 | in Oklahoma and that person right there. |
| 09:19:22 | 23 | Q.   Okay.  Is it Carlos was one and some other -- |
| 09:19:28 | 24 | A.   I don't remember the other.  The other person they sent me |
| 09:19:31 | 25 | to give the money in Oklahoma that was for horses they were |

| | | |
|---|---|---|
| 09:19:35 | 1 | buying.  I don't remember the name of this person. |
| 09:19:36 | 2 | Q.   Okay.  So am I correct that on one occasion, you knew that |
| 09:19:42 | 3 | money was to buy horses.  On the other occasions, you weren't |
| 09:19:46 | 4 | sure how much money or what it was for? |
| 09:19:48 | 5 | A.   Right. |
| 09:19:50 | 6 | Q.   Is that correct? |
| 09:19:51 | 7 | A.   Yes, sir.  That's the person that you asked me right there, |
| 09:19:55 | 8 | that the one on Lake June in Dallas that I don't know what the |
| 09:19:59 | 9 | money was used for right there.  I just delivered. |
| 09:20:03 | 10 | Q.   That was not Carlos Nayen or was it Carlos? |
| 09:20:05 | 11 | A.   No.  That was not Carlos Nayen. |
| 09:20:08 | 12 | Q.   Somebody else? |
| 09:20:08 | 13 | A.   Somebody else.  Yes, sir. |
| 09:20:09 | 14 | Q.   So when you said that person right there, you weren't |
| 09:20:13 | 15 | talking about Carlos Nayen? |
| 09:20:15 | 16 | A.   No, sir. |
| 09:20:19 | 17 | Q.   And I think -- did I ask you whether or not you knew what |
| 09:20:23 | 18 | type of horses or when the horses were going to be involved? |
| 09:20:27 | 19 | A.   I don't have no idea, sir. |
| 09:20:33 | 20 | Q.   Is that the extent of your knowledge with regard to any of |
| 09:20:37 | 21 | that money being used for purchasing horses?  Is that all that |
| 09:20:42 | 22 | you know? |
| 09:20:44 | 23 | A.   That's to my recall.  Yes, sir. |
| 09:20:47 | 24 | Q.   Your Honor, I pass the witness. |
| 09:20:50 | 25 | THE COURT:  Mr. Womack. |

| | | |
|---|---|---|
| 09:20:51 | 1 | MR. WOMACK:  Thank you, your Honor. |
| 09:20:53 | 2 | CROSS-EXAMINATION |
| 09:20:54 | 3 | BY MR. WOMACK: |
| 09:20:54 | 4 | Q.   Good morning, Mr. Vasquez. |
| 09:20:55 | 5 | A.   Good morning, sir. |
| 09:20:56 | 6 | Q.   I'm Guy Womack and we've never met before, have we? |
| 09:20:59 | 7 | A.   No, sir. |
| 09:20:59 | 8 | Q.   Sir, when you made your last trip to the United States, you |
| 09:21:05 | 9 | told us that you flew from Veracruz? |
| 09:21:07 | 10 | A.   I flew exactly from la capital de Mexico.  The capital of |
| 09:21:14 | 11 | Mexico.  Capitol. |
| 09:21:14 | 12 | Q.   Is that near Veracruz? |
| 09:21:17 | 13 | A.   Actually, no.  I drove the -- because from where I was, no |
| 09:21:22 | 14 | plane to the capitol of Mexico, so I drove -- rode a bus to the |
| 09:21:29 | 15 | capitol of Mexico. |
| 09:21:30 | 16 | Q.   But to come into the United States, you flew on an airplane? |
| 09:21:33 | 17 | A.   Yes, sir. |
| 09:21:33 | 18 | Q.   And what city did you fly to and first land in in the U.S.? |
| 09:21:39 | 19 | A.   DFW. |
| 09:21:41 | 20 | Q.   Okay.  So Dallas-Fort Worth? |
| 09:21:42 | 21 | A.   Dallas-Fort Worth Airport. |
| 09:21:44 | 22 | Q.   Before you went to the airport that day to start your flight |
| 09:21:47 | 23 | to the DFW, did you call the United States government and say, |
| 09:21:50 | 24 | this is me, I'm coming back to America? |
| 09:21:55 | 25 | A.   No, sir. |

| | | |
|---|---|---|
| 09:21:57 | 1 | Q.   Did you -- when you got to the airport and you checked in, |
| 09:22:01 | 2 | did you tell the airline, I'm Jose Vasquez, Sr.  I'm flying to |
| 09:22:06 | 3 | America, please call them and tell them I'm coming?  Did you do |
| 09:22:09 | 4 | that? |
| 09:22:11 | 5 | A.   No, sir.  I didn't do that. |
| 09:22:12 | 6 | Q.   So you boarded the airplane and you flew to DFW, and when |
| 09:22:17 | 7 | you got off of the plane in DFW, when did you first encounter law |
| 09:22:27 | 8 | enforcement?  Did they meet you at the plane? |
| 09:22:29 | 9 | A.   When I got to the Dallas-Fort Worth Airport, I had United |
| 09:22:34 | 10 | States marshals meet me right there and the district attorney. |
| 09:22:39 | 11 | Q.   Okay.  And did you know they were going to be there waiting |
| 09:22:42 | 12 | on you? |
| 09:22:42 | 13 | A.   Yes, I did, sir. |
| 09:22:43 | 14 | Q.   How did you know the marshals were going to be there? |
| 09:22:45 | 15 | A.   I didn't know who was there really, in reality.  I knew they |
| 09:22:49 | 16 | had some -- the law was going to be right there to pick me up. |
| 09:22:51 | 17 | Q.   And you know that's because they saw your name on a |
| 09:22:54 | 18 | passenger list? |
| 09:22:54 | 19 | A.   No, sir.  Because my son was talking to the attorney, to |
| 09:22:58 | 20 | Frank Perez, and he had told me they had spoke the attorney for |
| 09:23:02 | 21 | me to come in, turn myself in and instead of me running because I |
| 09:23:09 | 22 | was tired of being in Mexico because there's no life in Mexico. |
| 09:23:11 | 23 | So I was tired being in Mexico.  I wanted to come back to the |
| 09:23:15 | 24 | United States.  So when I came back in, then my son told me when |
| 09:23:17 | 25 | I come in, he didn't know how much I'm going to do, but it's |

09:23:22   1   better than being in Mexico.  They're starving to death over

09:23:24   2   there.  Just to come in and face what I had to face.  And I

09:23:28   3   turned myself in and that's exactly what I did.

09:23:31   4   Q.   So at that time when you flew back to America for the last

09:23:34   5   time, were you talking to this Mr. Perez, Frank Perez, the

09:23:40   6   attorney?

09:23:40   7   A.   No.  I was talking to my son.  I never talked to Mr. Perez.

09:23:43   8   Q.   And you later had Mr. Perez represent you and your son in

09:23:49   9   your federal criminal case?

09:23:50  10   A.   I didn't -- my son was already being represented by Frank

09:23:56  11   Perez.

09:23:57  12   Q.   And you had the same lawyer?

09:23:58  13   A.   Right.

09:23:59  14   Q.   Okay.  And both of your cases are pending right now in that

09:24:03  15   same court; is that right?

09:24:08  16   A.   No.  My son has been sentenced already.  He's in jail.

09:24:10  17   Q.   Okay.  Did he plead guilty in his case before you did, or

09:24:15  18   was it at the same general time?

09:24:18  19   A.   I don't have no -- I don't have no idea right there, sir.  I

09:24:21  20   understand.  I know he's in prison right now.  I don't know his

09:24:25  21   case -- how his case went.

09:24:27  22   Q.   Okay.  Now, when you hired Mr. Perez and you got ready to go

09:24:34  23   to court for yourself there, you were actually in Sherman, Texas,

09:24:38  24   wasn't it, that you went to court?

09:24:39  25   A.   No, sir.

| | | |
|---|---|---|
| 09:24:41 | 1 | Q.   Where is the court at? |
| 09:24:43 | 2 | A.   On Preston in Plano, Plano, Texas. |
| 09:24:47 | 3 | Q.   Okay.  Because all the documents say in the U.S. District |
| 09:24:50 | 4 | Court in Sherman.  But you think it was actually in Plano? |
| 09:24:53 | 5 | A.   Well, I mean, if that's what considered right there Sherman, |
| 09:24:57 | 6 | I'm not sure what's considered right there.  But I'm familiar |
| 09:24:59 | 7 | with the area where I went to court. |
| 09:25:01 | 8 | Q.   Okay.  So you went -- when you went to that court, do you |
| 09:25:04 | 9 | recall the date that you pled guilty? |
| 09:25:07 | 10 | A.   Repeat that again. |
| 09:25:09 | 11 | Q.   Do you remember standing in front of a federal judge and |
| 09:25:12 | 12 | pleading guilty? |
| 09:25:12 | 13 | A.   Yes, sir. |
| 09:25:14 | 14 | Q.   Before you entered the plea of guilty, do you recall that |
| 09:25:17 | 15 | Judge Marcia Crone, the Judge went over with you a document |
| 09:25:22 | 16 | called a plea agreement? |
| 09:25:25 | 17 | A.   Yes, sir. |
| 09:25:26 | 18 | Q.   And she had your lawyer explain or the government explain |
| 09:25:33 | 19 | the general terms of that plea agreement? |
| 09:25:35 | 20 | A.   Right. |
| 09:25:35 | 21 | Q.   And the Judge asked you questions about that plea agreement? |
| 09:25:38 | 22 | A.   Yes, sir. |
| 09:25:39 | 23 | Q.   Do you recall that paragraph 9 or a paragraph in your plea |
| 09:25:44 | 24 | agreement dealt specifically with you getting a reduced sentence |
| 09:25:49 | 25 | for cooperation with the government?  Do you remember that? |

09:25:51   1   A.   I did.  I don't remember it, sir.  No, sir.  You say that I

09:25:57   2   got a document for that?

09:25:58   3   Q.   Yeah.  That plea agreement.  Do you remember that you had a

09:26:00   4   written plea agreement that you signed before your guilty plea?

09:26:05   5   Do you remember that?

09:26:05   6   A.   I remember signing a paper.  Yes, sir.

09:26:07   7   Q.   And it was signed by your lawyer and by the government's

09:26:11   8   lawyer, wasn't it?

09:26:15   9   A.   I believe so.

09:26:17  10   Q.   And before the Judge would accept your guilty plea, she went

09:26:22  11   over with you the terms of that plea agreement, didn't she?

09:26:27  12   A.   I don't recall that, sir.  I'm sorry.

09:26:31  13        MR. WOMACK:  Your Honor, on Friday, the government gave

09:26:33  14   us five discs with discovery.  One has his plea agreement.  It's

09:26:37  15   on a computer.  I think I can hook it up to this, but I don't

09:26:40  16   know how.  If I can get someone to assist.  If I could have just

09:27:07  17   one second.  I'm sorry.

09:27:08  18        THE COURT:  Yes, sir.

09:27:26  19   Q.   (BY MR. WOMACK) Mr. Vasquez, you haven't even pled guilty

09:27:28  20   yet, have you?

09:27:28  21   A.   Sir.

09:27:29  22   Q.   You haven't pled guilty yet, have you?

09:27:31  23   A.   I haven't pled guilty.

09:27:34  24   Q.   We're trying to determine that.  You've not actually gone in

09:27:37  25   front of a judge and pled guilty, have you?

```
09:27:44   1    A.    They --
09:27:45   2            MR. GARDNER:  Your Honor, may I approach?
09:27:46   3    A.    I don't understand the -- right.
09:27:51   4            (At the bench, on the record.)
09:28:02   5            MR. GARDNER:  I spoke with the prosecutor up there last
09:28:04   6    week, Ernest Gonzalez, and he represented to me that Mr. Vasquez,
09:28:08   7    Sr. has not signed a plea agreement, he has not entered a plea of
09:28:13   8    guilty.  I think he's a little confused over his initial
09:28:15   9    appearance or his bond hearing.  But that was represented to me.
09:28:17  10    I have no plea agreement on him.  He is under indictment up there
09:28:22  11    for the conspiracy, the ten-to-life conspiracy.  But I have no --
09:28:26  12    he hadn't even signed a proffer letter with any prosecutor up
09:28:29  13    there.
09:28:31  14            MR. MAYR:  Then why is this guy being asked questions
09:28:33  15    without an attorney being present and implicating himself in
09:28:36  16    possible criminal activity if he --
09:28:36  17            MR. WOMACK:  He has no deal.
09:28:38  18            MR. MAYR:  -- yeah, with no deal?  I mean, this is --
09:28:42  19            MR. GARDNER:  This is pretty credible.
09:28:46  20            MR. DEGEURIN:  Sua sponte, I think, the Judge.  We
09:28:48  21    don't have --
09:28:50  22            MR. GARDNER:  It is Frank Perez.
09:28:52  23            MR. WOMACK:  Have you made any assurances to him?
09:28:54  24            MR. GARDNER:  My only assurance to him is that I won't
09:28:55  25    use his testimony against him.
```

09:28:57    1           MR. WOMACK:  So you have told him that.

09:28:59    2           MR. GARDNER:  Yeah.  There's be no proffer letters.

09:29:02    3           MR. WOMACK:  But you've given him a grant of use

09:29:04    4 immunity?

09:29:04    5           MR. GARDNER:  Yeah.  I have the authority.

09:29:04    6           MR. WOMACK:  Did you get that from the government?

09:29:05    7           MR. GARDNER:  I have the authority myself to do that

09:29:06    8 here.  Use immunity.

09:29:09    9           MS. FERNALD:  The testimony here.

09:29:10   10           MR. GARDNER:  I have the authority to give a proffer

09:29:11   11 letter for his testimony here in the Western District of Texas.

09:29:15   12 And it's a verbal proffer.  His issues in the Eastern District

09:29:20   13 are not my issues.

09:29:24   14           MR. ESPER:  Doug, for the record, you've represented to

09:29:25   15 me and other counsel that you have no Jencks material.

09:29:27   16           MR. GARDNER:  That is correct.  It's been represented

09:29:28   17 to me by Ernest Gonzalez that I have no Jencks material.

09:29:31   18           THE COURT:  Okay.  Now, let me ask you this.  As I

09:29:32   19 understand it, then the proffer letter was proffered that he

09:29:35   20 could give the testimony but wouldn't be indicted in this case?

09:29:39   21           MR. GARDNER:  That's correct, your Honor.

09:29:40   22           THE COURT:  Okay.  And the Dallas case then is still a

09:29:43   23 separate, although none of us understand how the same lawyer is

09:29:49   24 representing both.  All right.

09:29:52   25           MR. WOMACK:  Do we have a copy of the proffer letter?

| | | |
|---|---|---|
| 09:29:54 | 1 | MR. GARDNER:  I have no proffer letter.  Whether or |
| 09:29:56 | 2 | not -- |
| 09:29:56 | 3 | MR. WOMACK:  You said you gave him one. |
| 09:29:58 | 4 | MR. GARDNER:  A verbal proffer letter.  Whether Eastern |
| 09:30:02 | 5 | District gave him one, I don't know. |
| 09:30:05 | 6 | MR. ESPER:  Of course, the verbal proffer letter that |
| 09:30:07 | 7 | you give him indicated that he could only be prosecuted if he |
| 09:30:10 | 8 | gave a false statement or perjury. |
| 09:30:12 | 9 | MR. GARDNER:  That's correct.  Standard stuff like |
| 09:30:13 | 10 | that. |
| 09:30:14 | 11 | MR. MAYR:  So just for purposes -- |
| 09:30:15 | 12 | THE COURT:  So why don't I recess the jury and y'all go |
| 09:30:20 | 13 | over a stipulation that says that. |
| 09:30:21 | 14 | MR. WOMACK:  Yes, your Honor. |
| 09:30:23 | 15 | THE COURT:  And we can bypass the rest of this.  Okay. |
| 09:30:28 | 16 | MR. WOMACK:  Yes, sir.  That would be good.  Thank you. |
| 09:30:31 | 17 | THE COURT:  I'm going to let you get your exercise. |
| 09:30:34 | 18 | You'll have time to use the facilities and everything.  Let's try |
| 09:30:38 | 19 | to be back in about 15 minutes, please.  Remember my |
| 09:30:45 | 20 | instructions. |
| 09:31:12 | 21 | (Jury not present.) |
| 09:31:27 | 22 | MR. WOMACK:  Your Honor, normally we wouldn't approach |
| 09:31:29 | 23 | a witnesses who's on cross, but the government has asked that we |
| 09:31:32 | 24 | could all approach and just for the purposes of working up a |
| 09:31:35 | 25 | stipulation, we won't be asking any other questions.  We'd just |

| | | |
|---|---|---|
| 09:31:38 | 1 | like to flesh out how our stipulation will be worded. |
| 09:31:42 | 2 | THE COURT:  Well, I want the stipulation in writing. |
| 09:31:44 | 3 | MR. WOMACK:  Oh, yes, sir. |
| 09:31:45 | 4 | THE COURT:  And then, we can read it to the jury and |
| 09:31:48 | 5 | then, we can -- you can type it up and place it in evidence if |
| 09:31:54 | 6 | you wish.  But the main thing is that you agree to it in writing. |
| 09:31:58 | 7 | But I'm not sure.  You mean you want to ask followup questions |
| 09:32:02 | 8 | right now? |
| 09:32:03 | 9 | MR. WOMACK:  No, sir.  We wanted to just talk to him |
| 09:32:04 | 10 | and get some specifics to make sure we had everything right in a |
| 09:32:09 | 11 | stipulation. |
| 09:32:11 | 12 | THE COURT:  I think we ought to do it on the record. |
| 09:32:13 | 13 | I'm not one that does things off the record. |
| 09:32:16 | 14 | MR. WOMACK:  Yes, sir. |
| 09:32:16 | 15 | THE COURT:  Okay.  You may be seated. |
| 09:32:25 | 16 | MR. WOMACK:  Your Honor, maybe asking any other |
| 09:32:27 | 17 | questions right now -- well, probably wouldn't help to ask |
| 09:32:30 | 18 | anything right now, unless the government has questions.  Perhaps |
| 09:32:33 | 19 | they can draft this since they know what was said. |
| 09:32:36 | 20 | THE COURT:  Okay.  Well, Mr. Vasquez will stay handy. |
| 09:32:42 | 21 | Y'all do your talking, see if you can draw up a stipulation, and |
| 09:32:44 | 22 | then, you can confirm it with other questions with Mr. Vasquez. |
| 09:32:48 | 23 | Mr. Vasquez, they may ask you some more questions, but |
| 09:32:51 | 24 | I'm going to allow you to go outside now.  Don't go far. |
| 09:32:56 | 25 | THE WITNESS:  No.  I'd like to go to the restroom. |

| | | |
|---|---|---|
| 09:32:58 | 1 | THE COURT:  Okay.  Well, you could go that far. |
| 09:33:01 | 2 | THE WITNESS:  Okay, sir. |
| 09:33:02 | 3 | THE COURT:  But then, they'll come get you when they're |
| 09:33:04 | 4 | ready. |
| 09:33:04 | 5 | THE WITNESS:  Thank you, sir. |
| 09:33:05 | 6 | THE COURT:  And don't talk to anybody, sir. |
| 09:33:07 | 7 | THE WITNESS:  No problem. |
| 09:33:11 | 8 | THE COURT:  Tell me when you're ready, please, counsel. |
| 09:33:13 | 9 | (Recess.) |
| 09:50:57 | 10 | THE COURT:  All right, counsel.  Where are we? |
| 09:51:00 | 11 | MR. GARDNER:  Your Honor, we've written out an |
| 09:51:01 | 12 | agreement.  All counsel have had a chance to look at it.  I think |
| 09:51:03 | 13 | we're in agreement.  We're prepared to read it to the jury and |
| 09:51:06 | 14 | then, type it up and submit it later. |
| 09:51:08 | 15 | THE COURT:  Why don't you do me a dry run? |
| 09:51:11 | 16 | MR. GARDNER:  Yes, sir. |
| 09:51:14 | 17 | MR. FINN:  I think you'll like it, your Honor. |
| 09:51:16 | 18 | THE COURT:  You may be seated in the courtroom. |
| 09:51:18 | 19 | MR. GARDNER:  May I proceed, sir? |
| 09:51:20 | 20 | THE COURT:  I didn't hear. |
| 09:51:25 | 21 | MR. FINN:  I said I think you'll like it. |
| 09:51:26 | 22 | THE COURT:  I don't care if I like it or not.  I just |
| 09:51:29 | 23 | want to get rid of this witness.  Let's go. |
| 09:51:30 | 24 | MR. GARDNER:  Your Honor, it is stipulated to by all |
| 09:51:32 | 25 | parties that Mr. Jose Luis Vasquez, Sr. has been indicted in the |

| 09:51:36 | 1 | Eastern District of Texas for conspiracy to distribute five |
| 09:51:39 | 2 | kilograms or more of cocaine, which carries a penalty of ten |
| 09:51:44 | 3 | years up to and including life in prison.  He is currently |
| 09:51:47 | 4 | released on pretrial supervised release, and his charges remain |
| 09:51:51 | 5 | pending, and he has not entered a plea.  He is represented by |
| 09:51:54 | 6 | defense counsel named Frank Perez.  He is testifying under a |
| 09:51:58 | 7 | grant of immunity such that nothing he says can be used against |
| 09:52:01 | 8 | him in either the Western District of Texas or the Eastern |
| 09:52:03 | 9 | District of Texas.  Also in exchange for his cooperation he will |
| 09:52:06 | 10 | face no charges in the Western District of Texas to the extent he |
| 09:52:09 | 11 | was involved in the Western District of Texas. |
| 09:52:11 | 12 | THE COURT:  Okay.  So counsel have any more questions |
| 09:52:18 | 13 | of the witness? |
| 09:52:19 | 14 | MR. WOMACK:  I have just two questions, your Honor. |
| 09:52:21 | 15 | THE COURT:  Because I'm concerned -- the jury's going |
| 09:52:25 | 16 | to get this information, but I'm concerned that Mr. Vasquez may |
| 09:52:28 | 17 | not understand it. |
| 09:52:29 | 18 | MR. WOMACK:  I won't ask him anything about this. |
| 09:52:31 | 19 | THE COURT:  Okay. |
| 09:52:32 | 20 | MR. WOMACK:  We'd offer this as a stipulation of fact. |
| 09:52:34 | 21 | I guess a defense exhibit, however you want to do it, sir. |
| 09:52:38 | 22 | THE COURT:  Well, a stipulation is a stipulation of all |
| 09:52:41 | 23 | parties.  It would be stipulation No. 1. |
| 09:52:43 | 24 | MR. ESPER:  I have a couple of questions, but it will |
| 09:52:45 | 25 | not deal with his charges or his arrest. |

| | |
|---|---|
| 09:52:48 | 1 |
| 09:52:50 | 2 |

09:52:48    1         MR. WOMACK:  And my questions have nothing to do with

09:52:50    2    his plea.

09:52:51    3         MR. MAYR:  Judge, I am going to have some questions of

09:52:54    4    him regarding some of the factual basis involved -- regarding his

09:52:58    5    involvement.  But I will try to be as expeditious as possible.

09:53:02    6         THE COURT:  Well, I'm not limiting you.  I'm just --

09:53:06    7    the only thing that I'm concerned about is I'm not so sure Mr.

09:53:11    8    Vasquez understands his legal position right now.  Okay.  I mean,

09:53:20    9    I know he doesn't.  We all know he doesn't.

09:53:23   10         MR. WOMACK:  We've established that, sir.

09:53:27   11         MR. DEGEURIN:  Your Honor.

09:53:28   12         THE COURT:  Yes, sir.

09:53:28   13         MR. DEGEURIN:  I think I'm trying to get my arms around

09:53:30   14    the situation of being represented by the -- believing he's being

09:53:34   15    represented by the same lawyer as his son.

09:53:38   16         THE COURT:  And the other side of it is, is he being

09:53:42   17    represented at all?  And I understand that.  But I don't think

09:53:47   18    there's anything we can do that right now.

09:53:50   19         MR. DEGEURIN:  Well, the thing is I don't want to be

09:53:52   20    remiss.  I have not briefed it.  I don't know if under these

09:53:55   21    circumstances you have some sua sponte duty to ensure that

09:54:01   22    he's --

09:54:02   23         THE COURT:  I do generally and sometimes I'll stop the

09:54:04   24    proceedings and have one.  But I don't know how you could have

09:54:07   25    anything better than have transaction on immunity in two

09:54:12  1  different districts.  He's doing very, very well without a

09:54:18  2  lawyer.

09:54:18  3           All right.  Let's bring him back.

09:54:20  4           MR. MAYR:  Judge, briefly, let me go ahead and just get

09:54:22  5  this since we're out.  And I'd rather do this now than do it in

09:54:25  6  front of the jury.

09:54:26  7           Some of my questions are going to go beyond the

09:54:28  8  criminal case and into his immigration status.  This is what I

09:54:32  9  mean that I'm going to ask him about.  He's charged with -- my

09:54:38  10  understanding from the stipulation, he's charged with conspiracy

09:54:40  11  with intent to deliver five kilos or more.  That's an aggravated

09:54:44  12  felony.

09:54:44  13           He's already testified he's a lawful permanent

09:54:47  14  resident; therefore, he should be subject to immediate detention

09:54:51  15  by ICE officials and not entitled to an immigration mark, and

09:54:55  16  yet, he's out here.  And so, I need to ask him some questions

09:55:00  17  about that.  I will -- if I see that he doesn't understand that,

09:55:03  18  I will move on.  But I do want to ask him those questions to

09:55:06  19  explore that topic with him.  I just -- I don't want to surprise

09:55:10  20  the Court when we're representing to the Court --

09:55:13  21           THE COURT:  You're not going to surprise the Court.

09:55:15  22  But you're just opening it to a museum because, first off, nobody

09:55:18  23  could ever anticipate what the immigration courts are going to

09:55:22  24  do.

09:55:22  25           MR. MAYR:  Well --

| 09:55:22 | 1 | THE COURT: But if I had to guess right now, they're |

```
09:55:22    1        THE COURT:  But if I had to guess right now, they're
09:55:24    2   not going to deport this fella, whatever -- whenever he gets out
09:55:29    3   of the penitentiary.  I think -- I just see too many that they
09:55:36    4   don't deport that are a lot worse.
09:55:38    5        MR. MAYR:  Well, the problem is that if he does plead
09:55:40    6   guilty to what he's charged with, it's an automatic deportable
09:55:44    7   offense.
09:55:44    8        THE COURT:  Well, I understand.
09:55:45    9        MR. MAYR:  Not subject to --
09:55:48   10        THE COURT:  And I would be able to put a Scotch nickle
09:55:50   11   that he's not going to enter into.
09:55:51   12        MR. MAYR:  Well, I would like to explore if that's been
09:55:54   13   discussed maybe -- if that's been discussed in any way with him.
09:55:56   14        THE COURT:  Well, the only possible person that's
09:55:59   15   discussed it with him is Mr. Perez, who he says is his lawyer.
09:56:02   16   So I would -- I would have to think about that.  And if you're
09:56:06   17   going to do that, I'll have to stop these proceedings and get him
09:56:11   18   lawyered up.
09:56:12   19        MR. FINN:  Judge, for the record, I know Frank Perez,
09:56:16   20   not real well, but he's actually a pretty good lawyer.  So I
09:56:20   21   understand what the witness has said on the stand.  And I'm
09:56:24   22   unclear as to whether or not he's actually represented or not,
09:56:27   23   but I just wanted you to have the benefit of that.  He actually
09:56:30   24   knows what he's doing.
09:56:31   25        THE COURT:  No.  I felt a whole lot better when I find
```

| | | |
|---|---|---|
| 09:56:36 | 1 | out that he's just been to a preliminary after he got off that |
| 09:56:39 | 2 | airplane because I am sure the Judge is going to have counsel for |
| 09:56:44 | 3 | him. |
| 09:56:45 | 4 | MR. GARDNER:  And, Judge, just I was present -- |
| 09:56:48 | 5 | THE COURT:  I don't think the Judge -- I mean, counsel |
| 09:56:51 | 6 | could do any better than to have the immunity from his testimony |
| 09:56:55 | 7 | in both districts. |
| 09:56:58 | 8 | MR. FINN:  It's pretty good.  Yeah. |
| 09:57:00 | 9 | MR. GARDNER:  I was present, your Honor, with Mr. |
| 09:57:02 | 10 | Gonzalez and Mr. Perez's representative when I interviewed Mr. |
| 09:57:04 | 11 | Vasquez, Sr. in Dallas.  So he does have representation. |
| 09:57:10 | 12 | MS. FERNALD:  Ready, your Honor, with the witness? |
| 09:57:12 | 13 | THE COURT:  Yes.  Mr. Vasquez, come on back, please, |
| 09:57:25 | 14 | sir. |
| 09:57:51 | 15 | (Jury present.) |
| 09:59:10 | 16 | THE COURT:  Mr. Vasquez, you understand you're still |
| 09:59:14 | 17 | under oath, sir, under the penalties of perjury? |
| 09:59:16 | 18 | THE WITNESS:  Yes, sir. |
| 09:59:17 | 19 | THE COURT:  All right.  They're going to ask you some |
| 09:59:19 | 20 | more questions. |
| 09:59:21 | 21 | MR. GARDNER:  Would you like me to read the stipulation |
| 09:59:22 | 22 | first? |
| 09:59:23 | 23 | THE COURT:  I think probably. |
| 09:59:24 | 24 | Members of the jury, you'll remember I told you that |
| 09:59:27 | 25 | there were several ways, actually three, that evidence can come |

| | | |
|---|---|---|
| 09:59:32 | 1 | in.  One is a stipulation where all of the parties have agreed |
| 09:59:40 | 2 | that as to facts.  And so, he's going to read a stipulation to |
| 09:59:43 | 3 | you that all the parties have agreed are actual facts.  And then, |
| 09:59:47 | 4 | you'll also have it in writing as an exhibit when you deliberate. |
| 09:59:53 | 5 | MR. GARDNER:  Thank you, your Honor. |
| 09:59:54 | 6 | It is stipulated to by all parties that Mr. Jose Luis |
| 09:59:58 | 7 | Vasquez, Sr. has been indicted in the Eastern District of Texas |
| 10:00:02 | 8 | for conspiracy to distribute five kilograms or more of cocaine, |
| 10:00:06 | 9 | which carries a penalty of ten years up to and including life |
| 10:00:09 | 10 | imprisonment.  He is currently released on pretrial supervised |
| 10:00:13 | 11 | release, and his charges remain pending, and he has not entered a |
| 10:00:17 | 12 | plea.  He is represented by defense counsel named Frank Perez. |
| 10:00:21 | 13 | He's testifying under a grant of immunity such that nothing he |
| 10:00:24 | 14 | says can be used against him in either the Western District of |
| 10:00:28 | 15 | Texas and the Eastern District of Texas.  Also, in exchange for |
| 10:00:31 | 16 | his cooperation, he understands he will face no charges in the |
| 10:00:34 | 17 | Western District of Texas to the extent in which he was involved |
| 10:00:37 | 18 | in the Western District of Texas. |
| 10:00:38 | 19 | Your Honor, this is a stipulation agreed to by all |
| 10:00:41 | 20 | parties. |
| 10:00:43 | 21 | THE COURT:  Mr. Finn? |
| 10:00:43 | 22 | MR. FINN:  That's correct, your Honor.  Agreed. |
| 10:00:46 | 23 | MR. WOMACK:  That's correct, your Honor. |
| 10:00:47 | 24 | MR. MAYR:  Yes, your Honor. |
| 10:00:48 | 25 | MR. ESPER:  So stipulated. |

```
10:00:49    1              MR. MAYR:  And from my client, as well.

10:00:51    2              THE COURT:  All right.  All counsel have agreed.  Mr.

10:00:56    3    Womack, you still have the witness.

10:00:59    4    Q.   (BY MR. WOMACK) Mr. Vasquez, another thing I want to ask you

10:01:01    5    about.  You said that you began working and cooperating in

10:01:05    6    cocaine trafficking because you thought your son would be

10:01:08    7    murdered?

10:01:10    8    A.   Yes, sir.

10:01:14    9    Q.   Are you aware -- well, at that time when you were helping

10:01:18   10    your son, were you aware that his employers were actually paying

10:01:23   11    him about $1 million a month to traffic in cocaine?

10:01:28   12    A.   No, sir.  That I wasn't aware.  No, sir.

10:01:33   13    Q.   Would it surprise you to learn that during the time that you

10:01:36   14    were helping your son, Jose Vasquez, Jr., that a drug-trafficking

10:01:42   15    organization was paying him $1 million a month average?  Would

10:01:47   16    that surprise you?

10:01:48   17    A.   Surprise me because, in reality, I didn't know that, sir.

10:01:51   18    Q.   Okay.  Thank you.  Sir, we have no further questions.

10:01:54   19              THE COURT:  Mr. Esper.

10:01:56   20              MR. ESPER:  Yes, your Honor.

10:01:57   21                        CROSS-EXAMINATION

10:01:58   22    BY MR. ESPER:

10:01:58   23    Q.   Mr. Vasquez, in essence, your son did a good job of hiding

10:02:04   24    from you the fact that he was dealing drugs, right?

10:02:08   25    A.   Right.  I mean, yes, sir.
```

```
10:02:10   1   Q.   Okay.  In other words, he carried on his life like he wasn't
10:02:14   2   making a million dollars a year, did he?
10:02:17   3   A.   Well, yes.  I mean, I really don't -- I really didn't know
10:02:23   4   that because I was trying to work my business.
10:02:25   5   Q.   Sure.
10:02:26   6   A.   And I didn't see that in reality.
10:02:28   7   Q.   And he hid that from you that he was dealing drugs, correct?
10:02:32   8   A.   I didn't know all the story.  I knew he was dealing drugs,
10:02:36   9   but I didn't know all the story what he was doing.
10:02:38  10   Q.   Okay.  That's all I have, your Honor.
10:02:41  11        THE COURT:  Mr. Mayr.
10:02:44  12                  CROSS-EXAMINATION
10:02:45  13   BY MR. MAYR:
10:02:45  14   Q.   Thank you, Judge.
10:02:45  15        Good morning, Mr. Vasquez.  My name is Brent Mayr.
10:02:50  16   You've never testified in court before, have you?
10:02:52  17   A.   Never have, sir.
10:02:53  18   Q.   In fact, this is probably the first time you've ever been
10:02:55  19   involved in any kind of criminal proceedings?
10:02:58  20   A.   That's right, sir.  Never been in trouble.
10:03:00  21   Q.   I need to ask you some important questions.
10:03:03  22   A.   Okay.
10:03:03  23   Q.   If you don't understand or are unfamiliar with that, I
10:03:07  24   understand.  Just let me know.  You're not going to get into any
10:03:10  25   trouble for that.
```

| | | |
|---|---|---|
| 10:03:12 | 1 | I want to first ask you about your immigration status. |
| 10:03:17 | 2 | You testified that you are not a United States citizen; is that |
| 10:03:21 | 3 | correct? |
| 10:03:21 | 4 | A.   Right, sir. |
| 10:03:22 | 5 | Q.   You are a -- what's called a lawful permanent resident |
| 10:03:26 | 6 | residing within the United States? |
| 10:03:28 | 7 | A.   Yes, sir. |
| 10:03:28 | 8 | Q.   You go down to Immigration and Custom Enforcement, or ICE is |
| 10:03:35 | 9 | the agency, and there is paperwork that you fill out with them, |
| 10:03:40 | 10 | from time to time, to maintain your legal status here in the |
| 10:03:44 | 11 | United States; is that right? |
| 10:03:44 | 12 | A.   The question is, if I got to renew the card every time -- |
| 10:03:51 | 13 | every so often?  I believe it's every ten years, something like |
| 10:03:55 | 14 | that. |
| 10:03:55 | 15 | Q.   Okay.  Because that's what a lawful permanent resident has |
| 10:03:59 | 16 | to do? |
| 10:03:59 | 17 | A.   Yes, sir. |
| 10:04:00 | 18 | Q.   Did you work with an immigration attorney to gain your |
| 10:04:04 | 19 | lawful permanent resident status? |
| 10:04:05 | 20 | A.   No, sir.  Back in 1980 -- well, back in 1980, my ex-wife, |
| 10:04:14 | 21 | which is my son's mother, applied for -- she's a citizen and she |
| 10:04:19 | 22 | applied to get my papers. |
| 10:04:21 | 23 | Q.   So most of your dealings with immigration you're doing on |
| 10:04:27 | 24 | your own and based on information that you receive from ICE; is |
| 10:04:34 | 25 | that right?  Let me rephrase the question. |

10:04:36  1        In other words, knowing what you need to do to stay

10:04:42  2   legal, you get that information from immigration, right?

10:04:47  3   A.   Well, I mean, can I answer the way I know how?  I mean, I

10:04:52  4   had to go to the -- certain offices, you've got to go in there.

10:04:56  5   They give you an application to fill out to give you the new

10:05:01  6   card.  According to the way you fill it out, if you don't fill it

10:05:04  7   out properly -- you cannot lie on the application because you

10:05:10  8   can't, you can't.  You've got to tell the truth.

10:05:12  9        Like right now, in order to go renew my card, by being

10:05:16  10  in this problem, I don't know what's going to happen if they're

10:05:19  11  going to renew it or what they're going to do.  I'm not sure.

10:05:21  12  Q.   Okay.  And that's what I want to talk with you about.  When

10:05:25  13  you came back to the United States, you flew into Dallas-Fort

10:05:30  14  Worth Airport and you were met by, you said, U.S. marshals?

10:05:33  15  A.   U.S. marshals, U.S. Customs.

10:05:36  16  Q.   Okay.  U.S. Customs.  Did you meet with anyone from

10:05:40  17  immigration?

10:05:48  18  A.   No, sir.

10:05:49  19  Q.   Did anyone, any of those federal agents, did they discuss

10:05:54  20  with you anything regarding your immigration status being a

10:05:57  21  lawful permanent resident?

10:05:59  22  A.   No, sir.

10:06:03  23  Q.   Are you aware that as a lawful permanent -- let me back that

10:06:09  24  up.

10:06:09  25        You knew coming back to the United States that you were

| | |
|---|---|
| 10:06:13 | 1 |
| 10:06:20 | 2 |
| 10:06:23 | 3 |
| 10:06:26 | 4 |
| 10:06:26 | 5 |
| 10:06:31 | 6 |
| 10:06:36 | 7 |
| 10:06:38 | 8 |
| 10:06:49 | 9 |
| 10:06:57 | 10 |

1  charged with conspiracy to possess with intent to distribute a

2  controlled substance of five kilograms or more of cocaine.  Did

3  you know that you were charged with that -- that was the charge

4  you were facing?

5  A.   No, sir.  I didn't know that when I came back at the time.

6  When I came back at the time, my attorney went to the jail where

7  I was and explained what I was being charged with.

8  Q.   Okay.  Was it -- did anyone ever explain to you that based

9  on the criminal charge that you were facing, that aside from

10  being detained for those criminal charges, were you aware that

11  you could be detained by immigration officials because you were

12  charged with an aggravated felony?  Were you aware of that from

13  any source of information?

14  A.   No, sir.

15  Q.   Did they take your -- when you came back in and you were

16  arrested, did they take your residency card from you?

17  A.   No, sir.

18  Q.   So essentially immigration has done nothing with you,

19  despite the fact that you're charged with this very serious

20  felony offense up in the Northern District of Texas?

21        MR. GARDNER:  We object to that.  It's speculation as

22  to what immigration does.

23        THE COURT:  I don't know anybody could figure out what

24  immigration does.  I sustain the objection.

25  Q.   (BY MR. MAYR) Let me rephrase this to you.

10:07:54   1          No one has come to you and informed you that

10:07:58   2   immigration is taking any action against you to take away your

10:08:02   3   lawful permanent residence status?

10:08:05   4   A.    No, sir.

10:08:05   5   Q.    Okay.  I'm going to move forward a little bit.  In this

10:08:09   6   particular charge that you're facing up in the Northern District,

10:08:13   7   you have not pled guilty to that offense?

10:08:15   8   A.    Right, sir.

10:08:16   9   Q.    Are you -- has anyone, federal government, whatever -- are

10:08:22   10  you aware that if you plead guilty and are convicted of the

10:08:26   11  offense that you are presently charged with, are you aware that

10:08:30   12  you are subject to automatic deportation back to Mexico?

10:08:34   13         MR. GARDNER:  Your Honor, I think he's asked and

10:08:35   14  answered this question about four different times.  It's getting

10:08:39   15  repetitive.

10:08:40   16         MR. MAYR:  I was talking about pre.  Now I'm talking

10:08:42   17  about post-plea, if he's aware of that or not.

10:08:44   18         THE COURT:  Well, I know this.  If immigration did

10:08:56   19  anything, he wouldn't be here.  He's on bond.  So they have no

10:09:03   20  detainers on him.  And I don't think he can answer what is going

10:09:07   21  to happen.  I sustain the objection.  Not on the grounds -- it's

10:09:11   22  just that it's just totally conjecture.  And of the 25 of us who

10:09:17   23  do this for a living, Mr. Vasquez is the one who knows the least

10:09:23   24  about what's going on.

10:09:26   25         MR. MAYR:  Fair enough.

10:09:27  1          THE COURT:  You made your point that it's a deportable

10:09:30  2   offense.

10:09:31  3          MR. MAYR:  Okay.

10:09:31  4          THE COURT:  Let's leave it at that.

10:09:33  5          MR. MAYR:  Fair enough.

10:09:33  6   Q.  (BY MR. MAYR) You do understand what you are charged with,

10:09:41  7   the offense that you're charged with up in the Northern Direct of

10:09:43  8   Texas, correct?

10:09:46  9   A.  By listening to what he read on that earlier, yes.

10:09:49  10  Q.  Okay.  At the time that you were delivering this money that

10:10:03  11  you testified to earlier to these various individuals, did you

10:10:11  12  know what you were doing was illegal?

10:10:20  13  A.  At the point I didn't think it -- I didn't really think what

10:10:23  14  I was doing.  I was just doing what I was told to do.

10:10:27  15  Q.  Right.

10:10:28  16  A.  Come to the -- to where later that, you know, my son told me

10:10:36  17  what could happen if I was to get caught or I was going to jail.

10:10:42  18  I didn't do it no more.

10:10:43  19  Q.  Right.  That's much later on.

10:10:44  20  A.  Right.  I didn't know.

10:10:45  21  Q.  But when your son comes to you and he says, I need you to

10:10:48  22  take this money, you didn't know what you were doing was illegal,

10:10:51  23  right?

10:10:51  24  A.  Right, sir.  He just gave me the bag.

10:10:54  25  Q.  As was previously established with Mr. Esper, you didn't

```
10:10:57   1   know at the time that your son was a drug dealer.
10:11:01   2   A.   Right.
10:11:01   3   Q.   You didn't know that the money that you were delivering to
10:11:05   4   these individuals was derived from your son's illegal activities
10:11:11   5   selling and dealing in cocaine and other drugs?
10:11:14   6   A.   Right.
10:11:18   7   Q.   When you made these deliveries to individuals like Mr.
10:11:24   8   Trevino over here, you did not know what that money was going to
10:11:29   9   be used for.
10:11:35  10   A.   Mr. Trevino.  Who was Mr. Trevino?
10:11:39  11   Q.   The individual that you -- in the parking lot in --
10:11:42  12   A.   Lake June, yeah.  I didn't know what the money was used for.
10:11:47  13   Q.   No idea that it was going to be used for an illegal purpose,
10:11:51  14   correct?
10:11:51  15   A.   Right.  I didn't know that, sir.  No, sir.
10:11:55  16   Q.   Do you intend to plead guilty to your charge up in the
10:11:59  17   Northern District of Texas?
10:12:00  18        MR. GARDNER:  Your Honor, I'm going to object to that
10:12:01  19   as the relevance at this point.
10:12:03  20        THE COURT:  With the stipulation I agree.  I sustain
10:12:06  21   the objection.
10:12:14  22   Q.   (BY MR. MAYR) Do you believe that you were guilty of the
10:12:16  23   offense that you were charged with up in the Northern District of
10:12:19  24   Texas?
10:12:20  25        MR. GARDNER:  Object, your Honor.  Again, the
```

| | | |
|---|---|---|
| 10:12:22 | 1 | stipulation covers this.  He has not yet entered a plea. |
| 10:12:24 | 2 | THE COURT:  And he sits down here without a lawyer, |
| 10:12:27 | 3 | counsel. |
| 10:12:29 | 4 | MR. MAYR:  Will you allow the question then? |
| 10:12:31 | 5 | THE COURT:  Absolutely not. |
| 10:12:32 | 6 | MR. MAYR:  Thank you. |
| 10:12:42 | 7 | Q.  (BY MR. MAYR) I think you said something earlier on previous |
| 10:12:45 | 8 | questions that you're trying to help -- you're willing to do |
| 10:12:49 | 9 | anything to try to help your family; is that correct? |
| 10:12:51 | 10 | A.  Right, sir. |
| 10:12:52 | 11 | Q.  No further questions, your Honor. |
| 10:13:13 | 12 | THE COURT:  Any further redirect? |
| 10:13:14 | 13 | MR. GARDNER:  Yes, your Honor. |
| 10:13:15 | 14 | RE-DIRECT EXAMINATION |
| 10:13:15 | 15 | BY MR. GARDNER: |
| 10:13:23 | 16 | Q.  Mr. Vasquez, I think there was some confusion because my |
| 10:13:25 | 17 | recollection of your testimony when I asked you questions was |
| 10:13:29 | 18 | that you knew it was drug money, and the questions from these |
| 10:13:32 | 19 | gentlemen, you said you didn't know the extent or you didn't know |
| 10:13:38 | 20 | your son was a drug dealer.  Let me ask you this question. |
| 10:13:40 | 21 | Did you know your son was distributing cocaine? |
| 10:13:44 | 22 | A.  Distributing, what exactly it meant, the word mean, |
| 10:13:48 | 23 | distributing. |
| 10:13:48 | 24 | Q.  Okay.  Selling drugs? |
| 10:13:49 | 25 | A.  Yes, sir.  Yes.  Yes. |

| | | |
|---|---|---|
| 10:13:53 | 1 | Q.   And did you know when you delivered all that money to those |
| 10:13:56 | 2 | three locations that that money came from the sale of drugs? |
| 10:14:01 | 3 | A.   Yes, sir. |
| 10:14:01 | 4 | Q.   Now, I just want to make sure.  I'm showing you Government's |
| 10:14:05 | 5 | Exhibit 335E.  And Mr. DeGeurin asked you if that was an |
| 10:14:27 | 6 | individual you knew as Payen or Nayen.  Do you recall which one, |
| 10:14:31 | 7 | sir? |
| 10:14:32 | 8 | A.   Nayen. |
| 10:14:33 | 9 | Q.   And, again, could you just refresh the jury's memory, where |
| 10:14:37 | 10 | did you deliver money to him? |
| 10:14:40 | 11 | A.   In Dallas off 183 in a motel. |
| 10:14:45 | 12 | Q.   I'm showing you Government's Exhibit 335C.  Do you see that |
| 10:14:51 | 13 | on your screen, sir? |
| 10:14:52 | 14 | A.   Yes, sir. |
| 10:14:53 | 15 | Q.   And 335I? |
| 10:14:56 | 16 | A.   Right, sir. |
| 10:14:57 | 17 | Q.   And where did you deliver money to them? |
| 10:15:00 | 18 | A.   I delivered money to them on Lake June Road in Dallas, |
| 10:15:05 | 19 | Texas. |
| 10:15:07 | 20 | Q.   Now, Mr. Womack asked you a question about why did you come |
| 10:15:12 | 21 | back to the United States, and you said because there was no life |
| 10:15:14 | 22 | in Mexico.  What do you mean by that? |
| 10:15:18 | 23 | A.   The pay is real cheap.  You can make no money.  I mean, I've |
| 10:15:22 | 24 | been in the United States all my life.  I was raised here and I |
| 10:15:27 | 25 | went to school and everything here.  I never been living in |

10:15:31  1  Mexico to really get a good job over there.  If you don't have

10:15:36  2  education over there, you can't get a good job.  You've got to

10:15:40  3  work whatever they want to pay you for.  So that's -- I mean, I

10:15:43  4  wanted to come back, plus I got my family here, I got the rest of

10:15:46  5  my children.  That's why I wanted to come back over here.

10:15:50  6  Q.   Can you make a better living here in the United States?

10:15:52  7  A.   Right.

10:15:53  8  Q.   One of the attorneys asked you a question about your case

10:15:56  9  and you said, I've never been in trouble before.  Do you have any

10:15:59  10  other illegal problems in your life other than the current ones?

10:16:02  11  A.   Not that I recall to my knowledge.  Back in 1980 or '82, I

10:16:07  12  had a DWI.

10:16:08  13  Q.   And is that the only other criminal?

10:16:09  14  A.   That's criminal that I have right there.

10:16:12  15  Q.   Okay.  Thank you, Mr. Vasquez.

10:16:14  16       THE COURT:  Mr. Finn.

10:16:15  17                    RE-CROSS EXAMINATION

10:16:15  18  BY MR. FINN:

10:16:16  19  Q.   Thank you, your Honor.  May it please the Court, Mr.

10:16:18  20  Gardner, members of the jury.

10:16:19  21       Mr. Vasquez, you were interviewed several different

10:16:22  22  times by FBI and the DEA about these cash payments.  Is that

10:16:28  23  accurate?

10:16:29  24  A.   I didn't understand that, sir.

10:16:31  25  Q.   Okay.  I'm sorry.  I'll slow down.

10:16:34    1          You've been interviewed by the police or law

10:16:41    2    enforcement several different times about taking cash to people

10:16:45    3    for your son, right?

10:16:51    4    A.    Yes, sir.

10:16:52    5    Q.    Okay.  And do you remember at one point stating to law

10:16:58    6    enforcement that you delivered some money to the Wal-Mart at

10:17:03    7    Buckner Boulevard and I-30, a white suburban, lights on, one car,

10:17:10    8    one guy, $145,000?  Do you remember that?

10:17:19    9    A.    I-30 and Buckner?

10:17:21   10    Q.    Yes, sir.  Wal-Mart at Buckner and I-30.  Do you remember

10:17:26   11    saying that?

10:17:30   12    A.    Not to my knowledge right now, sir.  I can't remember ever

10:17:34   13    saying that, Buckner.

10:17:38   14    Q.    That's all, your Honor.  Thank you, sir.

10:17:42   15          MR. DEGEURIN:  No further questions.

10:17:44   16          MR. WOMACK:  None, sir.

10:17:46   17          MR. ESPER:  Nothing further, your Honor.

10:17:47   18          MR. MAYR:  Judge, I do have clear-up.

10:17:49   19          THE COURT:  Okay.

10:17:49   20                    RE-CROSS EXAMINATION

10:17:49   21    BY MR. MAYR:

10:17:50   22    Q.    Mr. Vasquez, I apologize for belaboring the point, but I

10:17:54   23    need to ask you again.

10:17:56   24          Mr. Gardner asked you if you were aware that what your

10:17:59   25    son -- that the money was derived from drug sales.  Do you

10:18:03  1  remember that?

10:18:06  2  A.   I can't understand, really, the way you're putting that out

10:18:09  3  to me.  If you ask what the way he asked me, if the money that

10:18:14  4  was being taken to the people that I delivered to, did that money

10:18:18  5  came from drugs?  Yes, sir.  That's what you want to ask me,

10:18:21  6  that's the way I understand that.

10:18:22  7  Q.   This is what I need to ask you.  You know that right now,

10:18:25  8  sitting in this courtroom, that that money was illegal, correct?

10:18:30  9  A.   Right, sir.

10:18:33 10  Q.   You know that because your son was indicted and has pled

10:18:38 11  guilty for his involvement in doing that, right?  Let me just ask

10:18:48 12  it this way.

10:18:48 13       How do you know that what you did was illegal?

10:18:56 14  A.   Because I knew the money was coming from the drugs.  The

10:19:00 15  money was illegal.

10:19:02 16  Q.   How did you know that?

10:19:05 17       MR. GARDNER:  Your Honor, I think he just answered that

10:19:06 18  question.  Repetitive.  Asked and answered.

10:19:09 19       THE COURT:  Listen to me.  When did it come apparent to

10:19:15 20  you that the money was from drugs?

10:19:23 21       THE WITNESS:  My son never did told me everything he

10:19:26 22  did.  I seen when he got money and tells me to take this over

10:19:33 23  there, take this over here.  I was -- at that time, I was laying

10:19:38 24  brick.  I was working legally right.  I mean, you got to be --

10:19:45 25  you can't act dumb or be dumb by not knowing so much money --

| | |
|---|---|
| 10:19:49 | 1 |

10:19:49  1  where you're getting so much money.  I mean, myself, I mean, I've

10:19:52  2  never had that kind of money myself, even though I've been

10:19:55  3  working all my life.

10:19:58  4      But he kept some stuff from me that I didn't know.

10:20:01  5  Q.  (BY MR. MAYR) And you learned about that stuff well after

10:20:05  6  you delivered this money to these individuals, right?

10:20:08  7      MR. GARDNER:  Your Honor, that is asked and answered.

10:20:11  8  Objection.

10:20:12  9      THE COURT:  He just answered it.  I'll sustain the

10:20:14  10  objection.

10:20:18  11      MR. MAYR:  I have no further questions.  Thank you, Mr.

10:20:25  12  Vasquez.  Thank you, your Honor.

10:20:26  13      MR. GARDNER:  Nothing further, your Honor.  May this

10:20:28  14  witness be excused?

10:20:29  15      MR. FINN:  No objection, your Honor.

10:20:30  16      THE COURT:  Anybody have any objections?

10:20:32  17      MR. WOMACK:  No.

10:20:33  18      MR. DEGEURIN:  No.

10:20:33  19      MR. MAYR:  None, your Honor.

10:20:34  20      THE COURT:  Mr. Vasquez, you may be excused.  You may

10:20:37  21  call your next witness.

10:20:38  22      MR. GARDNER:  Your Honor, before I call my next

10:20:41  23  witness, the government would like to offer two exhibits.

10:20:46  24  Exhibit No. 229, which consists of the Los Alamitos Horse Sale,

10:20:52  25  Quarter Horse Racing, Incorporated, 229A through E inclusive.

| | | |
|---|---|---|
| 10:20:57 | 1 | They're Bates-stamped with the following Bates stamps:  21 in |
| 10:21:02 | 2 | sequence, 48 in sequence, and 60 in sequence.  They have a |
| 10:21:08 | 3 | custodial affidavit that has been provided to the defense |
| 10:21:12 | 4 | attorneys, along with discovery.  We'd offer Government's Exhibit |
| 10:21:14 | 5 | 229A through E. |
| 10:21:47 | 6 | MR. MAYR:  We have no objection. |
| 10:21:49 | 7 | MR. DEGEURIN:  Okay.  I have no objection. |
| 10:21:50 | 8 | MR. MAYR:  No objections, your Honor. |
| 10:21:52 | 9 | MR. ESPER:  No objection. |
| 10:21:54 | 10 | THE COURT:  Were there any objections? |
| 10:21:57 | 11 | MR. FINN:  (Moves head side to side.) |
| 10:21:58 | 12 | THE COURT:  All right.  229, 229A through E are |
| 10:22:01 | 13 | admitted. |
| 10:22:02 | 14 | MR. GARDNER:  Your Honor, I'd also like to offer |
| 10:22:05 | 15 | Government's Exhibit 230, which is 230A through L.  They are the |
| 10:22:10 | 16 | Heritage Place auction records.  They have a business record |
| 10:22:16 | 17 | affidavit signed by the custodian of the records at Heritage |
| 10:22:19 | 18 | Place.  They're Bates-stamped the following Bates stamp |
| 10:22:23 | 19 | sequences:  13, 32 and 59.  They've been provided to defense |
| 10:22:29 | 20 | counsel in discovery. |
| 10:22:37 | 21 | THE COURT:  Were there any objections to those |
| 10:22:38 | 22 | exhibits?  Or do you need additional time? |
| 10:22:44 | 23 | MR. FINN:  Judge, could I confer with co-counsel?  No |
| 10:22:49 | 24 | objections, Judge. |
| 10:22:53 | 25 | MR. DEGEURIN:  One second, Judge.  No objection. |

| | | |
|---|---|---|
| 10:23:05 | 1 | THE COURT:  All right.  Any objections?  All right. |
| 10:23:11 | 2 | 230, 230A through L are admitted. |
| 10:23:16 | 3 | MR. GARDNER:  With that, we would call Mauricio Paez. |
| 10:23:32 | 4 | (Witness sworn.) |
| 10:23:51 | 5 | THE COURT:  I want you to tell us your full name and |
| 10:23:59 | 6 | spell your last, please, sir. |
| 10:24:00 | 7 | THE WITNESS:  Mauricio Paez, P-A-E-Z. |
| 10:24:04 | 8 | THE COURT:  You may proceed. |
| 10:24:05 | 9 | MR. GARDNER:  Thank you, your Honor. |
| 10:24:06 | 10 | MAURICIO PAEZ, called by the Government, duly sworn. |
| 10:24:06 | 11 | DIRECT EXAMINATION |
| 10:24:06 | 12 | BY MR. GARDNER: |
| 10:24:13 | 13 | Q.   Mr. Paez, you and I have met before; is that correct? |
| 10:24:16 | 14 | A.   Yes. |
| 10:24:16 | 15 | Q.   And where are you a citizen, sir? |
| 10:24:19 | 16 | A.   Mexico. |
| 10:24:21 | 17 | Q.   And you speak very good English.  And would you and I and do |
| 10:24:26 | 18 | these defense lawyers -- let me strike that. |
| 10:24:28 | 19 | Would you like to give your testimony in English today? |
| 10:24:30 | 20 | A.   Okay. |
| 10:24:31 | 21 | Q.   And you have interpreter back there in case you need to |
| 10:24:34 | 22 | clarify any terms or questions, correct? |
| 10:24:36 | 23 | A.   Yes. |
| 10:24:37 | 24 | Q.   Okay.  Please feel free to use her. |
| 10:24:40 | 25 | So, sir, how long -- do me a favor.  Could you |

| | | |
|---|---|---|
| 10:24:43 | 1 | introduce yourself to the jury?  Tell them how you old are, what |
| 10:24:47 | 2 | you do for a living. |
| 10:24:48 | 3 | A.   I'm 48 years old.  And I do real estate. |
| 10:24:52 | 4 | Q.   And how long have you done real estate? |
| 10:24:55 | 5 | A.   About ten years. |
| 10:24:56 | 6 | Q.   And is that in Mexico? |
| 10:24:57 | 7 | A.   Yeah. |
| 10:24:58 | 8 | Q.   And what city in Mexico? |
| 10:25:00 | 9 | A.   Monterrey. |
| 10:25:01 | 10 | Q.   And, sir, what is your ability to travel to the United |
| 10:25:06 | 11 | States?  What is your ability to travel?  How are you here today? |
| 10:25:10 | 12 | A.   By car. |
| 10:25:11 | 13 | Q.   Okay.  That's a good answer.  Can you cross the border |
| 10:25:20 | 14 | legally? |
| 10:25:20 | 15 | A.   Yes. |
| 10:25:20 | 16 | Q.   That was a better question.  And how can you do that? |
| 10:25:24 | 17 | A.   With my passport and my visa. |
| 10:25:26 | 18 | Q.   Do you have a visa that allows you to travel to the United |
| 10:25:28 | 19 | States? |
| 10:25:28 | 20 | A.   Yes, sir. |
| 10:25:29 | 21 | Q.   And sir, what is the name of your company? |
| 10:25:34 | 22 | A.   Basic Enterprises. |
| 10:25:36 | 23 | Q.   When you say Basic, that's B-A-S-I-C? |
| 10:25:39 | 24 | A.   Yes, sir. |
| 10:25:39 | 25 | Q.   And, sir, when was that company formed? |

10:25:42  1    A.    In 2008, approximately.  Seven or 8.  I don't remember

10:25:49  2    exactly.

10:25:49  3    Q.    And you mentioned earlier, that's a real estate company?

10:25:52  4    A.    Yes.

10:25:53  5    Q.    Okay.  What type of real estate are you involved with?

10:25:56  6    A.    Buying and selling houses and all that kind.

10:26:03  7    Q.    Residential real estate?

10:26:05  8    A.    Yes.

10:26:06  9    Q.    Commercial real estate, as well?

10:26:07  10   A.    Yes.

10:26:07  11   Q.    And you also have another business?

10:26:11  12   A.    Yes, sir.

10:26:12  13   Q.    And what business is that?

10:26:13  14   A.    Exchange house.

10:26:15  15   Q.    When you say exchange house, sometimes in the United States,

10:26:17  16   we call them casa de cambios.

10:26:21  17   A.    Yes, sir.

10:26:21  18   Q.    And does that involve the exchange of foreign currency from

10:26:25  19   one currency to another?

10:26:26  20   A.    Yes, sir.

10:26:28  21   Q.    And so, what -- or how long have you had that business?

10:26:32  22   A.    About 13 years.

10:26:34  23   Q.    And is that also in Monterrey?

10:26:36  24   A.    Yes, sir.

10:26:37  25   Q.    So what currencies do you deal with?

| | | |
|---|---|---|
| 10:26:39 | 1 | A.   U.S. dollars and Euros and sterling pounds. |
| 10:26:47 | 2 | Q.   Do you exchange them between each other and pesos? |
| 10:26:50 | 3 | A.   Yes. |
| 10:26:51 | 4 | Q.   Now, what is the limit that someone can deposit U.S. cash |
| 10:26:57 | 5 | into your exchange house? |
| 10:27:00 | 6 | A.   Right now, it's about $5,000. |
| 10:27:03 | 7 | Q.   And is that based on Mexican regulations? |
| 10:27:07 | 8 | A.   Yes. |
| 10:27:07 | 9 | Q.   Being from Mexico, are you familiar with the fact that |
| 10:27:10 | 10 | sometimes drug dealers use exchange houses to exchange dollars |
| 10:27:14 | 11 | for pesos? |
| 10:27:15 | 12 | A.   Yes. |
| 10:27:16 | 13 | Q.   And what steps have you personally taken to prevent that |
| 10:27:20 | 14 | from happening with your exchange house? |
| 10:27:24 | 15 | A.   I increase my fee with them so they cannot go with me. |
| 10:27:29 | 16 | Q.   So you charge a higher fee? |
| 10:27:31 | 17 | A.   Yes. |
| 10:27:31 | 18 | Q.   So who are most of your customers? |
| 10:27:33 | 19 | A.   All the Mexican people that lives for a long time in |
| 10:27:41 | 20 | Monterrey and there's some known in Mexico. |
| 10:27:45 | 21 | Q.   Are they known to you? |
| 10:27:47 | 22 | A.   Me and public persons with a lot of time, with a lot of |
| 10:27:52 | 23 | business in Monterrey or in Mexico. |
| 10:27:54 | 24 | Q.   Okay.  For most of these customers, have you dealt with them |
| 10:27:57 | 25 | since you opened your business? |

```
10:27:59   1   A.   Yes.

10:27:59   2   Q.   Have you known an individual by the name of Ramiro

10:28:04   3   Villarreal?

10:28:04   4   A.   Yes.

10:28:05   5   Q.   And how do you know that individual?

10:28:06   6   A.   He came with -- I got a client named Francisco Rodriguez.

10:28:13   7   He called and he told me about Ramiro Villarreal that he make --

10:28:19   8   he was in his business doing -- buying and selling horses and he

10:28:25   9   want to be -- make some transactions with me so.

10:28:30  10   Q.   Which --

10:28:30  11   A.   That's why -- how I knew him.

10:28:32  12   Q.   And so, did you know him prior to being introduced by Mr.

10:28:37  13   Rodriguez?

10:28:37  14   A.   No.

10:28:38  15   Q.   So were you ever then introduced to Mr. Ramiro Villarreal?

10:28:43  16   A.   Yes.

10:28:43  17   Q.   And when do you recall the first time you met him, the first

10:28:47  18   year?

10:28:48  19   A.   Maybe about 2007, 2008 -- no.  2008 maybe.

10:28:55  20   Q.   And you said you verified some of your other customers.

10:28:59  21   Could you verify Mr. Ramiro Villarreal?

10:29:00  22   A.   Yes.

10:29:00  23   Q.   And how do you do that, sir?

10:29:01  24   A.   Via internet.  I look for his name and all the information I

10:29:05  25   got from him with pictures and everything, say that he was good
```

10:29:12  1   salesman in horses.

10:29:16  2   Q.   So what exactly did you do for Mr. Villarreal in terms of

10:29:20  3   helping him out?

10:29:21  4   A.   He gave me money so he can pay the horses that he bought in

10:29:27  5   the U.S.

10:29:28  6   Q.   And what denominations or what country's currency did he

10:29:33  7   give?

10:29:34  8   A.   U.S. dollars.

10:29:34  9   Q.   And did you ask him to give you U.S. dollars?

10:29:37  10  A.   No.  I request pesos, but he told me it was easier for him

10:29:42  11  with U.S. dollars.

10:29:43  12  Q.   And why did you request pesos?

10:29:45  13  A.   Because it's easier and cheaper for him.

10:29:48  14  Q.   How so?  How is it easier and cheaper for him?

10:29:52  15  A.   It's easier because we can buy pesos.  With pesos we buy

10:29:58  16  dollars.  Instead, if I got dollars, I got to sell the dollars

10:30:02  17  and then, by -- cash dollars and then, by wire to transfer to do

10:30:10  18  the payment in U.S.

10:30:11  19  Q.   So does it take a little longer to get the dollars?

10:30:14  20  A.   Yes, sir.

10:30:15  21  Q.   And sell them off?

10:30:17  22       And did Mr. Villarreal explain to you why he couldn't

10:30:19  23  simply just pick up the horses in the United States?

10:30:23  24  A.   No.  He didn't told me.

10:30:25  25  Q.   And so, what specific services -- let's just use one

| | | |
|---|---|---|
| 10:30:30 | 1 | example.  So let's say Mr. Villarreal gave you cash. |
| 10:30:32 | 2 | A.   Yes. |
| 10:30:33 | 3 | Q.   How would that transaction occur and what would you do with |
| 10:30:36 | 4 | that money? |
| 10:30:36 | 5 | A.   I would sell the cash with my clients and then, with that |
| 10:30:41 | 6 | pesos, I will buy a wire and do the deposit to the instructions |
| 10:30:46 | 7 | that Ramiro gave me in that case. |
| 10:30:49 | 8 | Q.   So how would you receive the instructions? |
| 10:30:51 | 9 | A.   Via internet or via e-mail or in paper. |
| 10:30:59 | 10 | Q.   When you say paper, I'm sorry? |
| 10:31:00 | 11 | A.   Letter. |
| 10:31:02 | 12 | Q.   Okay.  And did Mr. Villarreal ever explain why he couldn't |
| 10:31:13 | 13 | open his own bank account? |
| 10:31:15 | 14 | A.   No.  Never. |
| 10:31:16 | 15 | Q.   And did you have a bank account that was available for that? |
| 10:31:18 | 16 | A.   Yes. |
| 10:31:21 | 17 | Q.   Now, sir, I'm going to show you Government's Exhibits 230D, |
| 10:31:30 | 18 | specifically page 13-1160.  Is that your company on there, sir? |
| 10:31:38 | 19 | A.   Yes, sir. |
| 10:31:39 | 20 | Q.   That's Basic Enterprise, correct? |
| 10:31:41 | 21 | A.   Yes, sir. |
| 10:31:42 | 22 | Q.   And did you make this wire transfer? |
| 10:31:45 | 23 | A.   Yes. |
| 10:31:54 | 24 | Q.   Putting that on the screen right in front of you so the jury |
| 10:31:58 | 25 | could see what I'm referring to, that's the Bates number down |

| | | |
|---|---|---|
| 10:32:01 | 1 | there, 13-1160. |
| 10:32:04 | 2 | And this is a wire transfer from you, as you testified, |
| 10:32:09 | 3 | right, sir? |
| 10:32:10 | 4 | A.   Yes. |
| 10:32:11 | 5 | Q.   And it's going to this place? |
| 10:32:13 | 6 | A.   That's correct. |
| 10:32:14 | 7 | Q.   Was that what you were told by Mr. Ramiro Villarreal, just |
| 10:32:19 | 8 | he gave you those wiring instructions? |
| 10:32:20 | 9 | A.   Yes, sir. |
| 10:32:21 | 10 | Q.   In this case, sir, how much was the wire for? |
| 10:32:27 | 11 | A.   It says $100,000. |
| 10:32:30 | 12 | Q.   And, again, was that $100,000 for this particular wire |
| 10:32:34 | 13 | provided to you in cash by Mr. Ramiro Villarreal? |
| 10:32:37 | 14 | A.   Yes. |
| 10:32:38 | 15 | Q.   Showing you Government's Exhibit 229B, which is a Los |
| 10:32:53 | 16 | Alamitos sales records, specifically, page 21-264.  Is that |
| 10:32:58 | 17 | another wire, sir, from you personally? |
| 10:33:00 | 18 | A.   Yes. |
| 10:33:01 | 19 | Q.   And was this another wire that was directed by Mr. Ramiro |
| 10:33:04 | 20 | Villarreal? |
| 10:33:04 | 21 | A.   That's correct. |
| 10:33:05 | 22 | Q.   And, sir, I'm going to flip the page here to Bates No. |
| 10:33:09 | 23 | 21-265.  Is that another wire? |
| 10:33:12 | 24 | A.   Yes, sir. |
| 10:33:15 | 25 | Q.   And, again, right up there, this is you, correct, sir? |

| | | |
|---|---|---|
| 10:33:40 | 1 | A.   Yes, sir. |
| 10:33:41 | 2 | Q.   And this is where you sent the wire to? |
| 10:33:48 | 3 | A.   Yes. |
| 10:33:49 | 4 | Q.   And the amount is how much? |
| 10:33:51 | 5 | A.   $50,000. |
| 10:33:52 | 6 | Q.   Is that U.S. dollars? |
| 10:33:54 | 7 | A.   U.S. dollars. |
| 10:33:55 | 8 | Q.   And the next page, again, to the same place and what's the |
| 10:34:02 | 9 | amount here, sir? |
| 10:34:02 | 10 | A.   $70,000. |
| 10:34:05 | 11 | Q.   And, again, this is not you this time but your company? |
| 10:34:08 | 12 | A.   Yes, sir. |
| 10:34:08 | 13 | Q.   Sir, how did you come to learn about this investigation? |
| 10:34:13 | 14 | A.   Sir, can you repeat the -- |
| 10:34:15 | 15 | Q.   How did you come to learn about the U.S. government's |
| 10:34:17 | 16 | investigation? |
| 10:34:18 | 17 | A.   In June, I got a notice via newspaper in Monterrey and I |
| 10:34:24 | 18 | approached with my lawyer, and then spoke with -- to do a meeting |
| 10:34:31 | 19 | with the FBI to declare that I was not involved in this kind of |
| 10:34:35 | 20 | business. |
| 10:34:36 | 21 | Q.   And so, did you come across the border willingly? |
| 10:34:38 | 22 | A.   Yes. |
| 10:34:39 | 23 | Q.   Okay.  Do you have a lawyer to advise you? |
| 10:34:41 | 24 | A.   Yes, sir. |
| 10:34:42 | 25 | Q.   And when you said the FBI, is that Special Agent Lawson over |

| | | |
|---|---|---|
| 10:34:45 | 1 | there you met with? |
| 10:34:46 | 2 | A.   Yes.   That's correct. |
| 10:34:47 | 3 | Q.   All right.   And what did you provide him with when you came |
| 10:34:49 | 4 | across? |
| 10:34:50 | 5 | A.   All those papers and all the e-mails that I have from |
| 10:34:56 | 6 | Ramiro, from Francisco and his assistant, also. |
| 10:34:58 | 7 | Q.   Did you provide him with passwords to your e-mail account? |
| 10:35:01 | 8 | A.   Yes. |
| 10:35:02 | 9 | Q.   And did you provide him with what they call a USB -- |
| 10:35:05 | 10 | A.   A USB also. |
| 10:35:06 | 11 | Q.   Did you ever deal directly with the horse auction houses in |
| 10:35:23 | 12 | the United States? |
| 10:35:23 | 13 | A.   No, sir. |
| 10:35:24 | 14 | Q.   So all the instructions came through Ramiro Villarreal? |
| 10:35:26 | 15 | A.   Yes, sir. |
| 10:35:27 | 16 | Q.   Were you ever familiar with the names of the horses that Mr. |
| 10:35:35 | 17 | Villarreal was buying? |
| 10:35:36 | 18 | A.   No, sir. |
| 10:35:40 | 19 | Q.   In addition to the purchases for the horses, did you make |
| 10:35:42 | 20 | other payments at the request of Mr. Villarreal? |
| 10:35:45 | 21 | A.   Yes.   Through some hospitals and to buy some stuff to |
| 10:35:49 | 22 | horses. |
| 10:35:53 | 23 | Q.   Mr. Villarreal, I'm showing you Government's Exhibit 400. |
| 10:36:21 | 24 | Was that a piece of the information that you provided to Special |
| 10:36:24 | 25 | Agent Lawson? |

| | | |
|---|---|---|
| 10:36:24 | 1 | A.   Yes, sir. |
| 10:36:25 | 2 | Q.   And do you recognize that, sir? |
| 10:36:27 | 3 | A.   This paper? |
| 10:36:28 | 4 | Q.   Yes, sir. |
| 10:36:29 | 5 | A.   Yes, sir. |
| 10:36:30 | 6 | Q.   And is this one of your records? |
| 10:36:31 | 7 | A.   Yes. |
| 10:36:32 | 8 | Q.   Your Honor, I would offer Government's Exhibit 400. |
| 10:36:38 | 9 | MR. ESPER:  No objection. |
| 10:36:39 | 10 | MR. WOMACK:  No objection. |
| 10:36:41 | 11 | MR. MAYR:  Judge, if I may have one moment.  Make sure |
| 10:36:45 | 12 | this isn't something in the Jencks material. |
| 10:36:59 | 13 | Judge, may we approach? |
| 10:37:05 | 14 | (At the bench, on the record.) |
| 10:37:17 | 15 | MR. MAYR:  Your Honor, going through my Jencks material |
| 10:37:20 | 16 | from this document was taken from, I see that there's a number of |
| 10:37:23 | 17 | other similar documents showing transactions with a number of |
| 10:37:28 | 18 | other individuals.  Under the rule of optional completeness, I |
| 10:37:30 | 19 | would like to have those other documents admitted, in addition to |
| 10:37:37 | 20 | Government's Exhibit No. 400, as this only presents a very minute |
| 10:37:43 | 21 | portion of the number of transactions that this witness was |
| 10:37:45 | 22 | dealing with. |
| 10:37:47 | 23 | MR. DEGEURIN:  I have no objections. |
| 10:37:49 | 24 | MR. GARDNER:  He can introduce whatever he wants to on |
| 10:37:49 | 25 | his. |

10:37:50  1          THE COURT:  I was going to say.  You're going to have

10:37:52  2  the opportunity to.

10:37:53  3          MR. MAYR:  Okay.  I just want to make my objection

10:37:56  4  known at this point.  Well --

10:37:57  5          THE COURT:  So you're objecting.

10:38:00  6          MR. MAYR:  I guess what -- I guess under -- my

10:38:04  7  understanding what optional completeness is, I have to make the

10:38:06  8  objection now and ask that the entire exhibit be admitted and not

10:38:08  9  just part of it.

10:38:11 10          MR. DEGEURIN:  That is the rule in the state court.

10:38:13 11          MR. GARDNER:  It's not an exhibit, Judge.  It's a set

10:38:15 12  of documents.

10:38:16 13          THE COURT:  You want the entire set?

10:38:18 14          MR. MAYR:  Yes.  I could admit it during my cross of

10:38:23 15  Mr. --

10:38:23 16          THE COURT:  Well, you see, you all have seen it and you

10:38:26 17  know what's relevant.  I take it from the conversation, there's

10:38:29 18  no objections.  Maybe there is an objection to the rest of it.

10:38:33 19  So at this point in time, I'll admit the individual document.  I

10:38:39 20  reserve on the admissibility on the other until it's presented,

10:38:45 21  because there may be objections to it.

10:38:46 22          MR. MAYR:  Fair enough.  Thank you, Judge.

10:38:47 23          THE COURT:  You're welcome.  400 is received and

10:38:57 24  admitted.

10:39:06 25  Q.   (BY MR. GARDNER) Mr. Villarreal, Government's Exhibit 400 is

10:39:11  1   the document that we just talked about, correct?

10:39:15  2   A.   Yes.

10:39:16  3   Q.   This is one of many documents --

10:39:19  4   A.   Absolutely.  Yes.

10:39:20  5   Q.   -- you provided.  The documents in general are the list of

10:39:23  6   your expenses that you paid.  Are they the list of your expenses

10:39:27  7   you paid on behalf of Mr. Villarreal?

10:39:29  8   A.   Yes, sir.

10:39:29  9   Q.   All right.  And this one here, in particular, was this an

10:39:34  10  expense you paid to Huitron Homes in Austin, Texas?

10:39:37  11  A.   Yes.

10:39:42  12  Q.   Was all the money or all the funds that Mr. Villarreal

10:39:47  13  provided you, was it all in United States currency?

10:39:51  14  A.   Yes, sir.

10:39:52  15  Q.   If you could give the jury your best estimate of the amount

10:39:57  16  of money that Mr. Villarreal gave you over the timeframe you

10:40:00  17  dealt with him, what would that be?

10:40:02  18  A.   About -- in all the time?

10:40:04  19  Q.   All the time, yes, sir.

10:40:05  20  A.   About -- I think about three-and-a-half-million dollars.

10:40:08  21  Q.   And, sir, what was the length of time in which you dealt

10:40:11  22  with Mr. Villarreal?

10:40:12  23  A.   Since 2010 -- 7 to 2010, approximately.

10:40:17  24  Q.   And was there a period there, at the end, when you stopped

10:40:19  25  dealing with Mr. Villarreal?

```
10:40:21    1   A.   Yes.
10:40:21    2   Q.   And why was that, sir?
10:40:22    3   A.   Because he had a problem with one of his employees and that
10:40:31    4   stole some -- I think that Ramiro told me, then, that he stole --
10:40:36    5   that his employee stole the money from him.
10:40:38    6            MR. DEGEURIN:  Excuse me, your Honor, I'm going to
10:40:40    7   object to hearsay.
10:40:40    8            THE COURT:  It is hearsay.  Need a little quicker
10:40:44    9   objection to, but we'll slide with it.  I don't know that it has
10:40:50   10   any materiality.
10:40:52   11            MR. GARDNER:  It's not that important at this point,
10:40:53   12   your Honor.
10:40:54   13   Q.   (BY MR. GARDNER) And so, was that employee that you talked
10:40:57   14   about earlier Francisco Rodriguez?
10:40:59   15   A.   Yes, sir.
10:41:00   16   Q.   And did you have a conversation with Mr. Villarreal about
10:41:04   17   Mr. Rodriguez stealing that money?
10:41:06   18   A.   Yes.
10:41:07   19   Q.   All right.  And what was that conversation?
10:41:10   20   A.   When he noticed that Francisco --
10:41:12   21            MR. DEGEURIN:  That's hearsay.
10:41:15   22            MR. GARDNER:  Coconspirator exception, your Honor.
10:41:17   23            THE COURT:  Well, I understand that.  But I don't know
10:41:19   24   what the answer is.
10:41:21   25            Members of the jury, you go get some exercise.  I've
```

| | | |
|---|---|---|
| 10:41:25 | 1 | got to listen to this. |
| 10:42:01 | 2 | (Jury not present.) |
| 10:42:31 | 3 | THE COURT:  Lily, if you'll read back the question. |
| 10:42:31 | 4 | (Last question read back.) |
| 10:42:33 | 5 | A.   Ramiro told me that Francisco didn't know whose money it |
| 10:42:40 | 6 | was.  He was in a real problem because it was not Ramiro's money. |
| 10:42:49 | 7 | MR. GARDNER:  We believe that raises the inference that |
| 10:42:52 | 8 | Mr. Ramiro was getting his money from others, the Zetas. |
| 10:43:01 | 9 | THE COURT:  I sustain the objection to the question |
| 10:43:04 | 10 | asked.  It's not a statement in furtherance of the conspiracy. |
| 10:43:16 | 11 | Bring them in. |
| 10:43:16 | 12 | While the jury's coming back, I received a note from |
| 10:43:21 | 13 | the jury:  We do not know who G-335C or 335I are.  I started to |
| 10:43:36 | 14 | tell them I don't either, but that's a communication that I got |
| 10:43:41 | 15 | in a little sheet of paper.  So you might -- just so you know |
| 10:43:48 | 16 | that's part of the record. |
| 10:44:44 | 17 | (Jury present.) |
| 10:44:54 | 18 | THE COURT:  I can assure you that that's not going to |
| 10:45:03 | 19 | become routine, but sometimes I must listen to the evidence from |
| 10:45:06 | 20 | the response to make a ruling on it one way or the other. |
| 10:45:09 | 21 | The objection is sustained.  You may ask your next |
| 10:45:12 | 22 | question. |
| 10:45:12 | 23 | Q.   (BY MR. GARDNER) When the period was you were having |
| 10:45:17 | 24 | dealings or much dealings, did you stop have dealings with Ramiro |
| 10:45:21 | 25 | Villarreal? |

| | | |
|---|---|---|
| 10:45:21 | 1 | A.   Can you repeat the question, please? |
| 10:45:22 | 2 | Q.   Did you at some point stop having dealings with Mr. |
| 10:45:26 | 3 | Villarreal? |
| 10:45:26 | 4 | A.   Yes. |
| 10:45:27 | 5 | Q.   And when was that? |
| 10:45:27 | 6 | A.   Almost at the end. |
| 10:45:29 | 7 | Q.   Could you give me a timeframe on that, sir? |
| 10:45:32 | 8 | A.   Maybe about June or July 2009, I think. |
| 10:45:38 | 9 | Q.   Okay.  And why did you stop having interactions with Mr. |
| 10:45:41 | 10 | Villarreal? |
| 10:45:41 | 11 | A.   They didn't -- just they didn't came to my office and I was |
| 10:45:49 | 12 | waiting for them. |
| 10:45:53 | 13 | Q.   Your Honor, I'll pass the witness. |
| 10:45:56 | 14 | MS. WILLIAMS:  No question. |
| 10:46:02 | 15 | CROSS-EXAMINATION |
| 10:46:05 | 16 | BY MR. DEGEURIN: |
| 10:46:05 | 17 | Q.   Mr. Paez, I'm Mike DeGeurin and we have not had the pleasure |
| 10:46:11 | 18 | of meeting, have we? |
| 10:46:12 | 19 | A.   No. |
| 10:46:13 | 20 | Q.   You mentioned that Mr. Villarreal came to you different |
| 10:46:24 | 21 | times.  And you also mentioned a Mr. Francisco Rodriguez. |
| 10:46:30 | 22 | A.   Yes. |
| 10:46:30 | 23 | Q.   And Francisco Rodriguez would be with him at times? |
| 10:46:36 | 24 | A.   At the beginning, they told me that they were just friends. |
| 10:46:40 | 25 | And afterwards, Ramiro told me that Francisco was -- was going to |

10:46:44  1  be working with him.

10:46:47  2  Q.   And Mr. Villarreal, did you say Mr. Villarreal was buying

10:46:54  3  horses for many different people, including himself?

10:46:58  4  A.   I don't know.  I just was told that he was -- his business

10:47:02  5  was buying and selling horses.

10:47:04  6  Q.   All right.  And did you have any personal experience with

10:47:09  7  whether or not -- or how many horses Mr. Villarreal bought, and

10:47:14  8  how many he bought for other people, and how many other people he

10:47:16  9  worked for?

10:47:17  10  A.   No, sir.

10:47:20  11  Q.   You don't know whether he had a number of clients or?

10:47:24  12  A.   No.  I don't know.

10:47:25  13  Q.   Ten clients.

10:47:28  14       How about Mr. Francisco Rodriguez?  What did you

10:47:32  15  understand or what were you told Mr. Francisco Rodriguez's job

10:47:39  16  was?

10:47:39  17  A.   With Ramiro Villarreal.

10:47:43  18  Q.   Yes.

10:47:43  19  A.   He was working with him.  I don't know the specific things

10:47:47  20  he was doing.

10:47:50  21  Q.   So it was your impression that Mr. Francisco Rodriguez was

10:47:54  22  helping Mr. Villarreal buy horses for whoever he was buying

10:47:59  23  horses for?

10:48:02  24  A.   Exactly, I don't know what he was -- his real things do with

10:48:10  25  Ramiro.

| | | |
|---|---|---|
| 10:48:11 | 1 | Q.   All right.   But that's what you -- that's what you thought? |
| 10:48:15 | 2 | A.   Yes.   That he was working -- Ramiro told me, Francisco was |
| 10:48:19 | 3 | going to be working with me. |
| 10:48:21 | 4 | Q.   Okay. |
| 10:48:21 | 5 | A.   That's all. |
| 10:48:23 | 6 | Q.   Now, did Mr. Francisco Rodriguez have a nickname? |
| 10:48:30 | 7 | A.   "Paco." |
| 10:48:31 | 8 | Q.   "Paco"? |
| 10:48:32 | 9 | A.   Yes. |
| 10:48:32 | 10 | Q.   P-A-C-O? |
| 10:48:33 | 11 | A.   Yes.   P-A-C-O. |
| 10:48:45 | 12 | Q.   Is it -- I've been learning from your testimony this |
| 10:48:52 | 13 | morning.   If someone is going to wire money from Mexico to the |
| 10:49:00 | 14 | United States and want to send it by wire and they have dollars, |
| 10:49:04 | 15 | are you telling me that what they would do, come to a business |
| 10:49:08 | 16 | like yours, one -- part of your business, and then, you would |
| 10:49:12 | 17 | take those dollars and sell those dollars to clients of yours? |
| 10:49:16 | 18 | A.   Yes. |
| 10:49:17 | 19 | Q.   That want to buy dollars? |
| 10:49:18 | 20 | A.   Yes. |
| 10:49:18 | 21 | Q.   To turn those dollars into pesos.   And then, you wire the |
| 10:49:24 | 22 | pesos to somewhere in the United States? |
| 10:49:27 | 23 | A.   I buy the U.S. wire to send it to the U.S. |
| 10:49:34 | 24 | Q.   And you buy the U.S. wire with pesos? |
| 10:49:36 | 25 | A.   Yes, sir. |

10:49:37  1   Q.   Why is that?

10:49:39  2   A.   Because my business is buying and selling dollars and to buy

10:49:46  3   -- to buy dollars, I need pesos.  I cannot pay dollars with

10:49:50  4   dollars.

10:49:53  5   Q.   Okay.  So you -- but you use the pesos to wire to the United

10:49:57  6   States?

10:49:57  7   A.   Yes, sir.

10:49:58  8   Q.   All right.  And that's something you do routinely in your

10:50:01  9   business?

10:50:01  10  A.   Yes, sir.

10:50:02  11  Q.   For real estate people and banks?

10:50:06  12  A.   No, no.  I have two different companies, real estate and

10:50:11  13  exchange house.

10:50:15  14  Q.   Okay.  Is there less exchange rate cost if you wire in pesos

10:50:29  15  to a U.S. bank or to a U.S. government?

10:50:32  16  A.   Can you repeat the question, please?

10:50:33  17  Q.   I'm trying to find out why you don't just wire dollars.

10:50:36  18  A.   Because it's -- I cannot -- to buy a wire transfer, I need

10:50:42  19  pesos.

10:50:42  20  Q.   Oh, okay.  What you were doing for Mr. Villarreal and other

10:50:50  21  customers that you had is they would bring you dollars, you

10:50:55  22  change them to pesos, and then, you'd wire the pesos.

10:50:58  23  A.   I buy dollars to wire dollars.

10:51:01  24  Q.   You buy pesos.

10:51:03  25  A.   I buy pesos with the dollar with the cash.  Dollar cash,

| | | |
|---|---|---|
| 10:51:03 | 1 | okay? |
| 10:51:07 | 2 | Q.   Yes. |
| 10:51:08 | 3 | A.   And then, with the pesos that I receive with the selling of |
| 10:51:11 | 4 | the cash dollars. |
| 10:51:12 | 5 | Q.   Right. |
| 10:51:13 | 6 | A.   I buy a wire transfer to send a wire to the U.S. |
| 10:51:17 | 7 | Q.   And when the wire comes to the U.S., does it come in pesos |
| 10:51:21 | 8 | or dollars? |
| 10:51:21 | 9 | A.   In dollars, because I buy dollars that way with pesos. |
| 10:51:28 | 10 | Q.   All right.  I'm going to -- |
| 10:51:30 | 11 | THE COURT:  The rate changes all the time. |
| 10:51:33 | 12 | MR. DEGEURIN:  Yes.  I'm -- I just -- what I was going |
| 10:51:36 | 13 | to do, Judge, is pass the witness.  Go down and sit down and ask |
| 10:51:39 | 14 | Mr. Andres Sanchez, what did I just learn, and he'll explain it |
| 10:51:44 | 15 | to me. |
| 10:51:45 | 16 | THE COURT:  Well, let's do it after the jury break. |
| 10:51:48 | 17 | MR. DEGEURIN:  Okay.  Pass the witness. |
| 10:51:51 | 18 | CROSS-EXAMINATION |
| 10:51:53 | 19 | BY MR. WOMACK: |
| 10:51:53 | 20 | Q.   Good morning, sir. |
| 10:51:56 | 21 | A.   Good morning. |
| 10:51:56 | 22 | Q.   I'm Guy Womack.  I live in Houston, but I have an office in |
| 10:51:59 | 23 | McAllen.  Monterrey is near McAllen, a few miles away from |
| 10:52:04 | 24 | McAllen? |
| 10:52:04 | 25 | A.   Yes. |

10:52:05  1   Q.   So we understand how this exchange works, if someone comes

10:52:11  2   into your casa de cambios or your exchange house.

10:52:15  3   A.   Yes.

10:52:16  4   Q.   And have a U.S. address and they want to send U.S. dollars

10:52:18  5   by wire transfer to an American bank, a U.S. bank, you tell us

10:52:25  6   that first you have to take those U.S. dollars and convert them

10:52:27  7   into pesos?

10:52:28  8   A.   Yes.

10:52:28  9   Q.   And because you're a casa de cambios -- is that a good term

10:52:32  10  to use?

10:52:33  11  A.   Yes.

10:52:33  12  Q.   Because you operate a casa de cambios, when you convert from

10:52:37  13  dollars to pesos, regardless of exchange rate, you actually take

10:52:43  14  -- you actually adjust the exchange rate so that you make money

10:52:46  15  on that?

10:52:47  16  A.   Yes, sir.

10:52:48  17  Q.   Okay.  So you make a profit when you exchange dollars for

10:52:51  18  pesos?

10:52:52  19  A.   Yes, sir.

10:52:52  20  Q.   And then, when you turn around and you take pesos and you

10:52:55  21  buy dollars to wire to America, you make money on that end, too,

10:53:01  22  as well?

10:53:01  23  A.   Yes, sir.

10:53:02  24  Q.   So by handling the money and making it go from dollars to

10:53:08  25  pesos back to dollars to wire to America, you actually get paid

10:53:11  1  twice on the exchange rate.

10:53:13  2  A.   Yes.

10:53:14  3  Q.   Okay.  Now, you also told us that you were asked by the

10:53:17  4  government, how do you combat people coming in with drug proceeds

10:53:24  5  and converting that into pesos?  And you told us that what you do

10:53:28  6  is you charge them a higher fee?

10:53:30  7  A.   Yes, sir.

10:53:31  8  Q.   So that they can still come in and get pesos and convert to

10:53:35  9  whatever.

10:53:36  10  A.   Not with me, because I rise the top of the fee about 10

10:53:41  11  percent or 14 percent so they cannot come with -- they don't do

10:53:46  12  the exchange with me.

10:53:47  13  Q.   Okay.  Well, if I came into your casa de cambios in

10:53:53  14  Monterrey.

10:53:53  15  A.   Yes.

10:53:53  16  Q.   And I said, look, I just made a big drug deal, I've got a

10:53:57  17  million dollars U.S., I really made to convert this, and I need

10:53:59  18  to send it to America, okay?  You would still let me do that, you

10:54:04  19  wold just charge me a really high fee?

10:54:05  20  A.   No.  If you tell me that you're a drug dealer, I will not

10:54:09  21  receive your money.

10:54:11  22  Q.   Well, you told us that you would accept it, you'd charge a

10:54:14  23  higher fee.

10:54:15  24  A.   Well, if you are a drug dealer, no, because you are telling

10:54:21  25  me you're making drugs.

| | | |
|---|---|---|
| 10:54:22 | 1 | Q.   Okay.  So I come in there and I've got a bag of cash and I |
| 10:54:27 | 2 | just say, I've got a million dollars, I won't tell you where I |
| 10:54:31 | 3 | got it, but I want to convert it and wire it back to America |
| 10:54:34 | 4 | because I don't want to go across the border with it, will you do |
| 10:54:37 | 5 | it for me?  You would, because I look suspicious, you might |
| 10:54:40 | 6 | charge me a high fee. |
| 10:54:42 | 7 | A.   As I told you, just a few minutes ago, I do my investigation |
| 10:54:47 | 8 | and check that Ramiro Villarreal is -- |
| 10:54:49 | 9 | Q.   I'm sorry, I can't understand you.  Can you say it a little |
| 10:54:51 | 10 | bit slower? |
| 10:54:52 | 11 | A.   Okay.  I told you a few minutes ago that when I -- a |
| 10:55:03 | 12 | exchanger makes my office and requests one kind of -- that kind |
| 10:55:06 | 13 | of transactions, I got to do my investigations before I send the |
| 10:55:11 | 14 | money. |
| 10:55:11 | 15 | Q.   Okay.  And what kind of investigation would you do if I walk |
| 10:55:15 | 16 | in and say, hey, I've got an American passport, I want to send |
| 10:55:19 | 17 | money back to my bank.  What kind of investigation would you do? |
| 10:55:23 | 18 | A.   To check the -- what you do for a living, to check your |
| 10:55:29 | 19 | background. |
| 10:55:30 | 20 | Q.   Okay.  And so, I tell you that, hey, I'm a brick mason. |
| 10:55:39 | 21 | A.   A what? |
| 10:55:40 | 22 | Q.   I'm a brick mason or I'm a professional fisher.  Yeah.  I'm |
| 10:55:45 | 23 | a professional fisherman, and here's a million dollars I got, I |
| 10:55:49 | 24 | just sold a load of tuna.  Is that your investigation or do you |
| 10:55:54 | 25 | go check on tuna -- |

| | | |
|---|---|---|
| 10:55:57 | 1 | A.   I check with the relatives and with all the people, the |
| 10:55:59 | 2 | internet and everything.  I check all the details. |
| 10:56:02 | 3 | Q.   I'm an orphan.  I don't have any family. |
| 10:56:05 | 4 | A.   I won't do the transaction. |
| 10:56:08 | 5 | Q.   Well, then, who exactly -- tell us, who do you charge higher |
| 10:56:10 | 6 | fees to? |
| 10:56:12 | 7 | A.   To the people that comes -- that people -- the people that |
| 10:56:16 | 8 | -- all my clients in Monterrey are relatives or friends of mine. |
| 10:56:21 | 9 | Q.   Everybody comes in there that successfully gets money from |
| 10:56:24 | 10 | you is a relative or a friend of yours. |
| 10:56:27 | 11 | A.   Yes.  A friend. |
| 10:56:28 | 12 | Q.   I would like to be your friend, but I'm an orphan fisherman |
| 10:56:32 | 13 | and I have a lot of money.  Would you let me do this and I'll be |
| 10:56:36 | 14 | your friend for life? |
| 10:56:37 | 15 | A.   No. |
| 10:56:39 | 16 | Q.   Okay.  Well, then, who of your relatives and friends do you |
| 10:56:44 | 17 | charge higher fees to?  You told us you charge higher fees. |
| 10:56:48 | 18 | A.   Yes.  I try -- if they approach to my office and I don't -- |
| 10:56:54 | 19 | it does not look -- the person don't look -- the person in a good |
| 10:57:03 | 20 | shape or a good way, I won't receive the money. |
| 10:57:05 | 21 | Q.   Okay.  But you told us there are people you do charge higher |
| 10:57:09 | 22 | fees to? |
| 10:57:09 | 23 | A.   Yes. |
| 10:57:10 | 24 | Q.   And are these lots of good friends? |
| 10:57:13 | 25 | A.   Hold on.  I will tell him that I will charge a higher fee, |

| | | |
|---|---|---|
| 10:57:19 | 1 | and in that way, the guy won't do the transaction with me. |
| 10:57:25 | 2 | Q.   But if he says, again, I'm your friend, the orphan |
| 10:57:29 | 3 | fishermen. |
| 10:57:29 | 4 | A.   Never happened that way. |
| 10:57:30 | 5 | Q.   And I'm asking if you're going to charge me a higher fee, if |
| 10:57:34 | 6 | I'm willing to pay it, you would accept it, right? |
| 10:57:36 | 7 | A.   Yes.  But never happened that way. |
| 10:57:37 | 8 | Q.   Because I would know I could go to another one and do a |
| 10:57:40 | 9 | cheaper -- |
| 10:57:40 | 10 | A.   Maybe. |
| 10:57:41 | 11 | Q.   And that's how you would combat doing this as you would just |
| 10:57:46 | 12 | charge a higher fee, correct? |
| 10:57:48 | 13 | A.   In my office, yes. |
| 10:57:56 | 14 | THE COURT:  Let me have counsel even here for a minute, |
| 10:57:58 | 15 | please. |
| 10:58:02 | 16 | MR. WOMACK:  Your Honor.  I have no further questions. |
| 10:58:05 | 17 | THE COURT:  That's all right. |
| 10:58:05 | 18 | (At the bench, on the record.) |
| 10:58:12 | 19 | THE COURT:  Back when I was in college and playing |
| 10:58:16 | 20 | basketball, they didn't have a no foul song. |
| 10:58:21 | 21 | MR. WOMACK:  You told us your no foul song, we can't |
| 10:58:23 | 22 | get in the box. |
| 10:58:24 | 23 | THE COURT:  That's right. |
| 10:58:25 | 24 | MR. WOMACK:  But I think I can walk over there. |
| 10:58:26 | 25 | THE COURT:  I think that you have violated the foul |

| | | |
|---|---|---|
| 10:58:31 | 1 | song.  You're too close.  For one thing, you're cutting off the |
| 10:58:34 | 2 | vision of one or two of the jurors. |
| 10:58:37 | 3 | MR. WOMACK:  Okay.  I'll do that. |
| 10:58:38 | 4 | THE COURT:  So I'll keep you handy.  Start -- stay |
| 10:58:43 | 5 | parallel -- I'm not setting limits, but stay parallel to the end |
| 10:58:47 | 6 | of the government's table. |
| 10:58:51 | 7 | MR. WOMACK:  Yes, sir. |
| 10:58:52 | 8 | THE COURT:  Now, I'm going to look like I'm talking to |
| 10:58:55 | 9 | you, but I'm not.  But I do appreciate the fact that you put that |
| 10:58:59 | 10 | windshield wiper up.  Okay.  Now y'all can resume trial. |
| 10:59:08 | 11 | MR. ESPER:  It has a purpose, your Honor. |
| 10:59:09 | 12 | THE COURT:  I know. |
| 10:59:21 | 13 | MR. WOMACK:  Again, your Honor, we have no further |
| 10:59:22 | 14 | question. |
| 10:59:23 | 15 | THE COURT:  Okay, sir.  Mr. Esper. |
| 10:59:26 | 16 | CROSS-EXAMINATION |
| 10:59:27 | 17 | BY MR. ESPER: |
| 10:59:27 | 18 | Q.   Thank you, your Honor. |
| 10:59:28 | 19 | Mr. Paez, did I understand you correctly to say that |
| 10:59:33 | 20 | you stopped doing business with Mr. Ramiro Villarreal in June or |
| 10:59:43 | 21 | July of 2009? |
| 10:59:44 | 22 | A.   I don't remember exactly the year, but I think he was there |
| 10:59:54 | 23 | about in January.  So I think that -- |
| 10:59:56 | 24 | Q.   Okay.  Well, Government's Exhibit No. 400 shows this wire |
| 11:00:00 | 25 | transfer coming from you, your business, in September of 2009. |

```
11:00:06   1   A.   Yes.

11:00:06   2   Q.   So you would have still been doing business with him at that

11:00:08   3   time?

11:00:08   4   A.   Yes.  Maybe until September.  I don't remember -- summer of

11:00:12   5   2009, okay?

11:00:14   6   Q.   Okay.  But this is September of 2009?

11:00:17   7   A.   Yes.

11:00:17   8   Q.   I'm just trying to -- and I know this may be a little

11:00:20   9   difficult, but you vacillated between 2009 and 2010.  Could you

11:00:26  10   have stopped in 2010 doing business with him?

11:00:28  11   A.   No.  Before 2010.  About three or four months before he

11:00:32  12   died.

11:00:32  13   Q.   Okay.  So this document of September of 2009 was probably

11:00:37  14   one of the last --

11:00:38  15   A.   Maybe.

11:00:38  16   Q.   -- transactions you did with him?

11:00:39  17   A.   Yes.

11:00:40  18   Q.   Okay.  This person who came in to see you back in 2007 was

11:00:50  19   Mr. Francisco Rodriguez, correct?

11:00:52  20   A.   Yes, sir.

11:00:52  21   Q.   And he is -- he was an established friend or client of

11:00:57  22   yours, correct?

11:00:58  23   A.   Yes.

11:00:59  24   Q.   At the time?

11:00:59  25   A.   Yes.
```

| | | |
|---|---|---|
| 11:01:00 | 1 | Q.   Okay.  And he brings this individual with him named Ramiro |
| 11:01:05 | 2 | Villarreal and introduces him to you? |
| 11:01:07 | 3 | A.   Yes. |
| 11:01:07 | 4 | Q.   As a potential client, correct? |
| 11:01:09 | 5 | A.   Yes, sir. |
| 11:01:10 | 6 | Q.   And he basically vouches for Mr. Ramiro Villarreal, correct? |
| 11:01:15 | 7 | A.   What vouches?  Well, yes. |
| 11:01:18 | 8 | Q.   Okay.  But nevertheless, you do your own investigation about |
| 11:01:24 | 9 | Ramiro Villarreal? |
| 11:01:24 | 10 | A.   Yes. |
| 11:01:25 | 11 | Q.   And, of course, we all know that the internet, anybody can |
| 11:01:30 | 12 | put anything up on the internet, right? |
| 11:01:32 | 13 | A.   Yes. |
| 11:01:34 | 14 | Q.   But nevertheless, you do some investigation on the internet, |
| 11:01:37 | 15 | and you find out through the internet that Ramiro Villarreal is a |
| 11:01:42 | 16 | very good horse salesman or good salesman for horses? |
| 11:01:48 | 17 | A.   Yes, sir. |
| 11:01:49 | 18 | Q.   Okay.  That's what there's some website out there that tells |
| 11:01:54 | 19 | you that, correct? |
| 11:01:54 | 20 | A.   Yes. |
| 11:01:55 | 21 | Q.   Okay.  You don't have the capabilities that law enforcement, |
| 11:01:59 | 22 | either in the United States or Mexico, have to look into |
| 11:02:03 | 23 | somebody's background to see if they're under investigation, do |
| 11:02:05 | 24 | you? |
| 11:02:05 | 25 | A.   Uh-huh.  That's correct. |

11:02:07  1   Q.   Was that no, you don't have that?

11:02:09  2   A.   I don't have that.

11:02:10  3   Q.   Okay.  But you do the best you can to try to make sure that

11:02:14  4   the person you're dealing with is not -- the money he's giving

11:02:19  5   you is not drug money, right?

11:02:21  6   A.   That's correct.

11:02:21  7   Q.   But it's not a hundred percent certain, correct?

11:02:24  8   A.   Yes, sir.

11:02:24  9   Q.   Okay.  So Ramiro Villarreal now starts bringing you cash in

11:02:31  10  U.S. dollars that he's having wired to certain places in the

11:02:37  11  United States?

11:02:37  12  A.   Uh-huh.  Yes.

11:02:38  13  Q.   And I believe one of them was 100,000, another was 70,000.

11:02:44  14  Those are pretty significant amounts, aren't they?

11:02:46  15  A.   Yes.

11:02:46  16  Q.   Did that raise your suspicion about, wait a minute, I wonder

11:02:53  17  if this guy's really on the legit or not?

11:02:57  18  A.   Because I didn't know what was the amount -- the total

11:03:02  19  amount of -- quantities of horses that he bought.  So that's why.

11:03:06  20  Q.   You were still convinced he's buying horses and he's a

11:03:08  21  legitimate guy?

11:03:09  22  A.   Yes.

11:03:10  23  Q.   Okay.  It was -- you said -- when was it that you thought

11:03:15  24  there was something suspicious about those transactions when this

11:03:21  25  case appeared in the newspapers?

```
11:03:23   1   A.    No.

11:03:24   2   Q.    When?

11:03:24   3   A.    When "Paco" Rodriguez, Francisco Rodriguez didn't take the

11:03:31   4   -- didn't send me some U.S. dollars to do the wires, and then,

11:03:36   5   Ramiro called me and request me, what's happening with the wires?

11:03:41   6   Q.    Okay.  That's when you decided, I'm coming to the United

11:03:47   7   States and telling them what's going on?

11:03:48   8   A.    No.

11:03:49   9   Q.    Not then?

11:03:50  10   A.    Not then.

11:03:51  11   Q.    What caused you to come to the United States, meet with Mr.

11:03:55  12   Lawson and tell him, hey, look, I got clean hands in this thing?

11:04:00  13   A.    In June last year.

11:04:01  14   Q.    In June of last year.  Did you read about something in the

11:04:05  15   newspaper?

11:04:05  16   A.    Yes, sir.

11:04:06  17   Q.    Okay.  So when you read about something in the newspaper, it

11:04:11  18   apparently references Mr. Villarreal, doesn't it?

11:04:13  19   A.    Yes, sir.

11:04:13  20   Q.    And then, it goes off into your head, hey, wait a minute,

11:04:16  21   there's -- maybe I was wrong about this guy?

11:04:19  22   A.    Yes.

11:04:19  23   Q.    Correct?  And now, you come to the FBI with your lawyer and

11:04:23  24   you tell him, hey, you know, Mr. Villarreal had me wire-transfer

11:04:28  25   these moneys?
```

| | | |
|---|---|---|
| 11:04:29 | 1 | A.   Yes. |
| 11:04:30 | 2 | Q.   But at the time, I thought he was a legitimate guy? |
| 11:04:34 | 3 | A.   That's correct. |
| 11:04:35 | 4 | Q.   Correct? |
| 11:04:36 | 5 | A.   Yes. |
| 11:04:36 | 6 | Q.   And I even did these background searches on him and they all |
| 11:04:40 | 7 | turned up that he was an on-the-square guy, right? |
| 11:04:43 | 8 | A.   Uh-huh.  Yes. |
| 11:04:45 | 9 | Q.   And over this period, even though over this period of time, |
| 11:04:49 | 10 | you wired approximately three-and-one-half-million dollars from |
| 11:04:56 | 11 | your money exchange houses to various places in the United |
| 11:05:00 | 12 | States. |
| 11:05:00 | 13 | A.   Can you repeat the question? |
| 11:05:02 | 14 | Q.   Even though during this period of time, this two- or |
| 11:05:07 | 15 | three-year period of time, you wire-transferred $3.5 million, |
| 11:05:13 | 16 | approximately, for Ramiro Villarreal? |
| 11:05:16 | 17 | A.   Yes. |
| 11:05:16 | 18 | Q.   Okay.  But it wasn't until something appeared in the |
| 11:05:20 | 19 | newspapers that aroused your suspicion? |
| 11:05:23 | 20 | A.   Yes. |
| 11:05:24 | 21 | Q.   Up to that time, your suspicions were not aroused or -- by |
| 11:05:29 | 22 | Mr. Villarreal, correct? |
| 11:05:31 | 23 | A.   Yes. |
| 11:05:36 | 24 | Q.   Okay.  Now, as a money exchange house, you -- there's a |
| 11:05:42 | 25 | number of money exchange houses in Mexico, correct? |

| | | |
|---|---|---|
| 11:05:44 | 1 | A.    Yes. |
| 11:05:45 | 2 | Q.    And some of them are not as -- they're a lot more flexible |
| 11:05:53 | 3 | about exchanging money than perhaps you are, correct? |
| 11:05:56 | 4 | A.    Yes. |
| 11:05:58 | 5 | Q.    And one of the concerns with money exchange houses in Mexico |
| 11:06:03 | 6 | is that you may be exchanging dollars that are derived from drug |
| 11:06:12 | 7 | dealing, correct? |
| 11:06:13 | 8 | A.    Yes. |
| 11:06:13 | 9 | Q.    And is it your experience that if you charge a bigger fee, a |
| 11:06:19 | 10 | higher fee, someone who is possibly making their money illegally |
| 11:06:25 | 11 | isn't going to pay that fee? |
| 11:06:26 | 12 | A.    Yes. |
| 11:06:27 | 13 | Q.    Okay.  But with Mr. Ramiro Villarreal, he obviously had you |
| 11:06:36 | 14 | convinced this was not drug money or proceeds from drug money? |
| 11:06:42 | 15 | A.    Yes. |
| 11:06:42 | 16 | Q.    So he didn't get clipped for that higher fee, correct? |
| 11:06:47 | 17 | A.    That's correct. |
| 11:06:47 | 18 | Q.    Now, you said something about there's a restriction of |
| 11:06:51 | 19 | $5,000? |
| 11:06:52 | 20 | A.    Right now. |
| 11:06:52 | 21 | Q.    Right now. |
| 11:06:53 | 22 | A.    Yes. |
| 11:06:54 | 23 | Q.    When did that go into effect? |
| 11:06:56 | 24 | A.    About a year and a half. |
| 11:06:57 | 25 | Q.    Okay.  So approximately in 2011, that went into effect? |

| | | |
|---|---|---|
| 11:07:01 | 1 | A.   Yes. |
| 11:07:02 | 2 | Q.   That you could not take more than $5,000 in U.S. currency? |
| 11:07:06 | 3 | A.   Yes. |
| 11:07:06 | 4 | Q.   And either exchange it or wire transfer? |
| 11:07:09 | 5 | A.   Yes. |
| 11:07:10 | 6 | Q.   Okay.  But that wasn't the case in 2007, 2008, 2009, 2010? |
| 11:07:16 | 7 | A.   That's correct. |
| 11:07:17 | 8 | Q.   Okay.  And, Mr. Paez, what is the extent of your education, |
| 11:07:25 | 9 | sir? |
| 11:07:25 | 10 | A.   I'm a public accountant. |
| 11:07:28 | 11 | Q.   Okay.  And you received all your education in Mexico? |
| 11:07:32 | 12 | A.   Yes. |
| 11:07:32 | 13 | Q.   You're obviously fluent in English? |
| 11:07:35 | 14 | A.   Well, I try to. |
| 11:07:37 | 15 | Q.   Okay.  Did you go to -- did you get your degree at |
| 11:07:40 | 16 | Monterrey? |
| 11:07:40 | 17 | A.   Yes. |
| 11:07:41 | 18 | Q.   Okay.  And you also were involved in real estate |
| 11:07:46 | 19 | transactions? |
| 11:07:47 | 20 | A.   Yes. |
| 11:07:47 | 21 | Q.   Businesses? |
| 11:07:48 | 22 | A.   Yes. |
| 11:07:48 | 23 | Q.   Both in Mexico and in the United States? |
| 11:07:50 | 24 | A.   Almost everything in Mexico. |
| 11:07:52 | 25 | Q.   In Mexico? |

| | | |
|---|---|---|
| 11:07:53 | 1 | A.   Almost. |
| 11:07:53 | 2 | Q.   So it would be fair to say -- and I don't want you to be |
| 11:07:59 | 3 | humble -- but you're fairly sophisticated as far as money, buying |
| 11:08:02 | 4 | stuff, correct? |
| 11:08:06 | 5 | A.   Yes. |
| 11:08:06 | 6 | Q.   Yeah.  Okay.  As opposed to someone who has no education. |
| 11:08:16 | 7 | A.   Yes. |
| 11:08:17 | 8 | Q.   Okay.  May I have just a moment, your Honor? |
| 11:08:20 | 9 | THE COURT:  You may. |
| 11:08:33 | 10 | Q.   (BY MR. ESPER) Did you ask Mr. Villarreal -- and you may |
| 11:08:38 | 11 | have already answered this question -- why he couldn't get his |
| 11:08:41 | 12 | own bank account? |
| 11:08:42 | 13 | A.   I didn't ask him. |
| 11:08:45 | 14 | Q.   Okay.  He volunteered that information? |
| 11:08:46 | 15 | A.   Yes. |
| 11:08:47 | 16 | Q.   Correct? |
| 11:08:51 | 17 | A.   No. |
| 11:08:54 | 18 | Q.   Okay.  There was some comment that you made that Mr. |
| 11:08:56 | 19 | Villarreal never explained why he couldn't have his own bank |
| 11:09:01 | 20 | account. |
| 11:09:01 | 21 | A.   No.  I asked him, why you don't give me pesos.  It's cheaper |
| 11:09:05 | 22 | for you.  That's why.  That's what I asked him.  I never asked |
| 11:09:09 | 23 | him about how come. |
| 11:09:11 | 24 | Q.   Okay.  Because you were making a fee on the buying of the |
| 11:09:17 | 25 | dollars. |

| | | |
|---|---|---|
| 11:09:17 | 1 | A.   Yes. |
| 11:09:18 | 2 | Q.   Pesos and then, buying back in dollars, correct? |
| 11:09:21 | 3 | A.   Yes. |
| 11:09:21 | 4 | Q.   That's all I've got, your Honor. |
| 11:09:28 | 5 | CROSS-EXAMINATION |
| 11:09:29 | 6 | BY MR. MAYR: |
| 11:09:29 | 7 | Q.   So, Mr. Paez, if I've got this correct, you learned well |
| 11:09:40 | 8 | after the fact that these transactions that you were conducting |
| 11:09:43 | 9 | for Ramiro were possibly involving illegal funds, correct? |
| 11:09:47 | 10 | A.   Yes, sir. |
| 11:09:48 | 11 | Q.   But because you learned of it after the fact, you committed |
| 11:09:54 | 12 | no crime? |
| 11:09:54 | 13 | A.   I think so. |
| 11:09:55 | 14 | Q.   That's why you haven't been charged with anything, right? |
| 11:09:57 | 15 | A.   Okay. |
| 11:09:58 | 16 | Q.   Okay.  Now, this Government's Exhibit 400 that was |
| 11:10:02 | 17 | previously introduced, this wasn't the only record of |
| 11:10:05 | 18 | transactions involving Ramiro that you provided to the |
| 11:10:08 | 19 | government, correct? |
| 11:10:09 | 20 | A.   That's correct. |
| 11:10:21 | 21 | Q.   I'm going to show you what I've marked as Defendant's |
| 11:10:25 | 22 | Exhibit JH-1.  I'll have you take a look at each one of those |
| 11:10:29 | 23 | documents and tell me if you recognize them. |
| 11:10:33 | 24 | A.   Yes. |
| 11:10:34 | 25 | Q.   Okay.  All of these documents, these are the other |

11:10:39  1  transactions -- the other documents of transactions that you

11:10:42  2  provided to the government?

11:10:43  3  A.   I don't remember -- I think so.

11:10:45  4  Q.   Okay.  These are that, correct?

11:10:49  5  A.   Can I --

11:10:49  6  Q.   Sure.  Go ahead.  Take your time.

11:10:51  7  A.   Yes.  I give them to them.

11:10:52  8  Q.   Okay.

11:10:53  9       MR. GARDNER:  Your Honor, we have no objection to

11:10:55  10  Defense Exhibit JH-1 being admitted.

11:11:00  11       THE COURT:  Hearing no objections, Defendant's JH-1 is

11:11:05  12  admitted.

11:11:05  13       MR. MAYR:  May I publish these to the jury, your Honor?

11:11:08  14       THE COURT:  On the machine, sure.

11:11:18  15  Q.   (BY MR. MAYR) Just so we're clear, there's a number of

11:11:21  16  transactions that were sent to a variety of individuals and

11:11:25  17  companies shown on these pages, correct?  Can you see okay up

11:11:29  18  there, Mr. Paez?

11:11:30  19  A.   Yes.

11:11:30  20  Q.   Okay.  We see here, one sent to Ruidoso Downs, correct?

11:11:42  21  A.   Yes.

11:11:44  22  Q.   And another one over here to Los Alamitos in California?

11:11:47  23  A.   Yes.

11:11:48  24  Q.   And a couple here, also sent to Heritage Place, just like

11:11:53  25  those other wire transfers we saw?

| | | |
|---|---|---|
| 11:11:55 | 1 | A.   Yes. |
| 11:11:55 | 2 | Q.   All right.  When Ramiro first comes to you, you do this |
| 11:12:12 | 3 | cursory internet search to research his background, check? |
| 11:12:15 | 4 | A.   Yes. |
| 11:12:16 | 5 | Q.   And that would require some knowledge about how to use a |
| 11:12:19 | 6 | computer. |
| 11:12:20 | 7 | A.   Uh-huh. |
| 11:12:21 | 8 | Q.   So if you didn't know how to use the computer or how to use |
| 11:12:27 | 9 | the internet, it would be difficult to conduct these rigorous |
| 11:12:30 | 10 | background searches that you're conducting on these individuals, |
| 11:12:33 | 11 | right? |
| 11:12:34 | 12 | A.   Right. |
| 11:12:34 | 13 | Q.   No further questions, your Honor. |
| 11:12:37 | 14 | THE COURT:  Any redirect? |
| 11:12:40 | 15 | MR. GARDNER:  One moment, your Honor. |
| 11:12:49 | 16 | RE-DIRECT EXAMINATION |
| 11:12:49 | 17 | BY MR. GARDNER: |
| 11:12:57 | 18 | Q.   Now, Mr. Paez, this document that Mr. Mayr showed you, JH-1, |
| 11:13:03 | 19 | Defense Exhibit JH-1, as you explained, there are two different |
| 11:13:11 | 20 | places, right?  Were these all directed by Mr. Villarreal to you |
| 11:13:15 | 21 | to make those payments? |
| 11:13:17 | 22 | A.   Actually, I don't remember if this one -- did I give these |
| 11:13:23 | 23 | to you? |
| 11:13:23 | 24 | Q.   Yes.  I believe you did, sir. |
| 11:13:25 | 25 | A.   Yes.  This is Ramiro gave me those instructions. |

```
11:13:27   1   Q.   And for each one of these that Mr. Mayr showed you.

11:13:30   2   A.   Yes.

11:13:30   3   Q.   Did Mr. Ramiro Villarreal ever explain to you why he

11:13:34   4   couldn't make these transactions himself?

11:13:36   5   A.   No.  He just told me some -- there were some payments that

11:13:40   6   he has to do.

11:13:42   7   Q.   Are you aware if there's any law that restricts the amount

11:13:46   8   of U.S. dollars you can bring into the United States?

11:13:49   9   A.   Yes.

11:13:50  10   Q.   And what is that here?

11:13:52  11   A.   $10,000.

11:13:53  12   Q.   $10,000.  Now, Mr. Esper asked you, and I believe Mr. Mayr

11:14:01  13   did, whether you knew that Mr. Ramiro Villarreal was, quote,

11:14:05  14   legit or not.  Do you remember that series of questions?

11:14:15  15   A.   Yes.  I remember.

11:14:16  16   Q.   Okay.  And when I was asking you questions, we talked about

11:14:21  17   an incident in which Mr. Francisco Rodriguez stole money from Mr.

11:14:26  18   Villarreal?

11:14:27  19   A.   Yes.

11:14:27  20   Q.   That occasion, did that give you any suspicion that Mr.

11:14:31  21   Ramiro Villarreal's business might not be legit?

11:14:35  22   A.   Yes.

11:14:36  23   Q.   And why is that, sir?

11:14:37  24   A.   Because after Ramiro spoke with Francisco, he spoke with me

11:14:44  25   and he told me, "Paco" doesn't know with who he's dealing with.
```

| | | |
|---|---|---|
| 11:14:51 | 1 | That money's not mine, it is from other people. |
| 11:14:54 | 2 | Q.   And did Mr. Villarreal identify the other people? |
| 11:14:56 | 3 | A.   No. |
| 11:14:57 | 4 | Q.   Pass the witness, your Honor. |
| 11:15:02 | 5 | MS. WILLIAMS:  No questions. |
| 11:15:04 | 6 | THE COURT:  Any further questions of this witness? |
| 11:15:07 | 7 | MR. DEGEURIN:  No, your Honor. |
| 11:15:08 | 8 | THE COURT:  All right. |
| 11:15:09 | 9 | MR. WOMACK:  One brief area, your Honor. |
| 11:15:11 | 10 | RE-CROSS EXAMINATION |
| 11:15:11 | 11 | BY MR. WOMACK: |
| 11:15:13 | 12 | Q.   Sir, in answer to a couple of the last questions by the |
| 11:15:16 | 13 | government, you said that there's a limit as to how much money, |
| 11:15:19 | 14 | cash someone can bring into America. |
| 11:15:21 | 15 | A.   Less than $10,000.  If -- |
| 11:15:27 | 16 | Q.   If I wanted to bring in a million dollars cash? |
| 11:15:29 | 17 | A.   You can, but you have to declare it. |
| 11:15:30 | 18 | Q.   Yes.  I can bring in any amount of cash.  I just have to |
| 11:15:33 | 19 | declare -- |
| 11:15:33 | 20 | A.   Yes. |
| 11:15:34 | 21 | Q.   -- that I'm bringing it, correct? |
| 11:15:35 | 22 | A.   Yes. |
| 11:15:35 | 23 | Q.   So when you told the jury that you can't bring more than |
| 11:15:39 | 24 | $10,000 cash, that's not correct, is it? |
| 11:15:41 | 25 | A.   Yes.  That's -- yes. |

| | | |
|---|---|---|
| 11:15:43 | 1 | Q.   You could bring any amount as long as you declare it? |
| 11:15:46 | 2 | A.   As long as you declare it.  Yes.  That's correct. |
| 11:15:48 | 3 | Q.   And among the family and friends that you have done business |
| 11:15:51 | 4 | for, are some of them jewellers? |
| 11:15:54 | 5 | A.   Yes. |
| 11:15:55 | 6 | Q.   And you know that jewellers when they travel from America to |
| 11:15:58 | 7 | Mexico to buy jewels and gold, they always use cash, don't they? |
| 11:16:03 | 8 | A.   I don't know. |
| 11:16:04 | 9 | Q.   They've told you they can bargain better if they have cash |
| 11:16:07 | 10 | and can hand it to the person selling the gold? |
| 11:16:10 | 11 | A.   Yes. |
| 11:16:10 | 12 | Q.   Okay.  Thank you.  No further questions. |
| 11:16:15 | 13 | MR. ESPER:  That's it. |
| 11:16:17 | 14 | MR. MAYR:  Nothing further, your Honor. |
| 11:16:18 | 15 | THE COURT:  May this witness be excused?  You may be |
| 11:16:22 | 16 | excused, sir. |
| 11:16:26 | 17 | MR. GARDNER:  May I call my next witness, your Honor? |
| 11:16:27 | 18 | THE COURT:  You may. |
| 11:16:28 | 19 | MR. GARDNER:  Thank you.  Government calls Mr. Bill |
| 11:17:03 | 20 | Price. |
| 11:17:24 | 21 | (Witness sworn.) |
| 11:17:40 | 22 | THE COURT:  Sir, tell us your full name, please, sir, |
| 11:17:51 | 23 | and spell your last. |
| 11:17:53 | 24 | THE WITNESS:  Billy Bob Price, P-R-I-C-E. |
| 11:17:56 | 25 | THE COURT:  You may proceed. |

11:17:57    1        BILLY BOB PRICE, called by the Government, duly sworn.

11:17:57    2                    DIRECT EXAMINATION

11:17:57    3   BY MR. GARDNER:

11:17:58    4   Q.   Thank you, your Honor.

11:17:59    5            Mr. Price, you and I have met before; is that correct,

11:18:01    6   sir?

11:18:01    7   A.   Yes, sir.

11:18:02    8   Q.   Could you turn to the jury, tell them how old you are, and

11:18:05    9   what you do for a living, and where you're from?

11:18:07   10   A.   I'm 76.  And I race horses.  I'm a breeder and a racer.

11:18:16   11   Q.   And where are you from, sir?

11:18:18   12   A.   Oklahoma.

11:18:18   13   Q.   And do you have a small horse operation in Oklahoma?

11:18:22   14   A.   Yes, sir.

11:18:22   15   Q.   And you said earlier, you race and breed horses.  How long

11:18:26   16   have you been doing that?

11:18:27   17   A.   Oh, since the '90s.  I would think.

11:18:32   18   Q.   Sir, do you need a cup of water?

11:18:34   19   A.   Do what, sir?

11:18:35   20   Q.   Do you need a cup of water, sir?

11:18:37   21   A.   Yes, please.

11:18:53   22   Q.   I'm sorry.  I think the last question was, what is the

11:18:59   23   extent of your horse operation, your quarter horse operation?

11:19:04   24   A.   What do you mean by that?

11:19:06   25   Q.   Well, you said you've been racing and breeding for 30 years.

| | | |
|---|---|---|
| 11:19:09 | 1 | A.   Yes, sir. |
| 11:19:10 | 2 | Q.   How many horses do you generally race per year? |
| 11:19:15 | 3 | A.   Raise? |
| 11:19:17 | 4 | Q.   Race, I'm sorry. |
| 11:19:18 | 5 | A.   Race? |
| 11:19:18 | 6 | Q.   Yes, sir.  Quarter-horse racing. |
| 11:19:20 | 7 | A.   This year, I've probably got twelve on the track. |
| 11:19:25 | 8 | Approximately twelve. |
| 11:19:26 | 9 | Q.   And now, how many do you raise each year? |
| 11:19:31 | 10 | A.   I try to raise 15 or 20. |
| 11:19:34 | 11 | Q.   And do you do your own breeding at your operation? |
| 11:19:38 | 12 | A.   No, sir. |
| 11:19:38 | 13 | Q.   And who does that for you? |
| 11:19:40 | 14 | A.   I send them out to different stallion farms. |
| 11:19:45 | 15 | Q.   You also mentioned to me that you are a participant in what |
| 11:19:51 | 16 | they call a syndicate. |
| 11:19:54 | 17 | A.   Yes. |
| 11:19:54 | 18 | Q.   Can you explain that to the jury, please? |
| 11:19:57 | 19 | A.   Well, what they do, they take a high-dollar horse and |
| 11:20:02 | 20 | they'll sell -- you'll buy shares in him and you'll -- one share, |
| 11:20:10 | 21 | you get two breedings a year for one share.  And a half a share, |
| 11:20:15 | 22 | you get one breeding a year.  And these horses is quite |
| 11:20:22 | 23 | expensive.  That's why they syndicate them out like that. |
| 11:20:24 | 24 | Q.   And what horses do you own shares in? |
| 11:20:28 | 25 | A.   Corona Cartel and First Down Dash, Wave Carver. |

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

| 11:20:35 | 1 | Q.   And with respect to Corona -- |
| 11:20:37 | 2 | A.   And FDD Dynasty.  FDD Dynasty, I forgot him. |
| 11:20:39 | 3 | Q.   And where is Corona Cartel being -- |
| 11:20:42 | 4 | A.   In Guthrie, Oklahoma at the Lazy E. |
| 11:20:45 | 5 | Q.   Who's the manager of the Lazy E Ranch? |
| 11:20:48 | 6 | A.   Butch Wise. |
| 11:20:49 | 7 | Q.   And First Down Dash, I understand that horse is now dead; is |
| 11:20:52 | 8 | that correct? |
| 11:20:52 | 9 | A.   He's -- yes.  He's at Vessels Stallion Farm in California, |
| 11:20:56 | 10 | but we still have frozen semen. |
| 11:20:58 | 11 | Q.   And it's possible to impregnate or make an embryo out of |
| 11:21:04 | 12 | semen? |
| 11:21:04 | 13 | A.   Yes. |
| 11:21:05 | 14 | Q.   And how much does a share of one of those types of race |
| 11:21:08 | 15 | horses cost? |
| 11:21:13 | 16 | A.   I think, best I remember, First Down was about 150 and I |
| 11:21:19 | 17 | think Corona's about 150.  And there's one more I own a part of a |
| 11:21:25 | 18 | share and that's Valiant Hero.  I forgot about him. |
| 11:21:28 | 19 | Q.   So when you say 150, that's 150,000? |
| 11:21:31 | 20 | A.   Yeah.  Yes, sir. |
| 11:21:33 | 21 | Q.   And why did you purchase those particular bloodlines?  I |
| 11:21:39 | 22 | know you've got a couple of others, but why do you purchase the |
| 11:21:42 | 23 | Corona Cartel share and the First Down Dash share? |
| 11:21:46 | 24 | A.   Well, it's just what we call black type and I just had a |
| 11:21:50 | 25 | good feeling.  So that's the ones I chose. |

| | | |
|---|---|---|
| 11:21:53 | 1 | Q.   And what goes into picking a horse for breeding? |
| 11:21:57 | 2 | A.   The black type, what's called -- I guess you'd say the momma |
| 11:22:02 | 3 | and the grandma and the great-grandma and on down. |
| 11:22:06 | 4 | Q.   And have those particular bloodlines for Corona Cartel and |
| 11:22:10 | 5 | First Down Dash proved good? |
| 11:22:11 | 6 | A.   Yes. |
| 11:22:13 | 7 | Q.   When I say good, how does that relate to their offspring? |
| 11:22:18 | 8 | A.   Well, Corona Cartel, his breeding is selling for $35,000 |
| 11:22:28 | 9 | each. |
| 11:22:29 | 10 | Q.   That's one breed? |
| 11:22:30 | 11 | A.   One breeding. |
| 11:22:33 | 12 | Q.   Now, do you also sell some of your horses, sir? |
| 11:22:36 | 13 | A.   Yes. |
| 11:22:36 | 14 | Q.   And I want to talk to you about two particular horses.  The |
| 11:22:39 | 15 | first one is Snowy Cartel. |
| 11:22:42 | 16 | A.   Yes. |
| 11:22:42 | 17 | Q.   Did you have a horse called Snowy Cartel? |
| 11:22:45 | 18 | A.   Yes. |
| 11:22:45 | 19 | Q.   And did you sell that horse? |
| 11:22:47 | 20 | A.   Yes. |
| 11:22:48 | 21 | Q.   If you will, could you please let the ladies and gentlemen |
| 11:22:51 | 22 | of the jury know how you were contacted to sell that horse? |
| 11:22:55 | 23 | A.   Well, I got a phone call and they asked me if I wanted to |
| 11:23:03 | 24 | sell it.  If I had a Corona Cartel for sale, and I said yes. |
| 11:23:08 | 25 | Q.   You said if I had a Corona Cartel for sale? |

| | | |
|---|---|---|
| 11:23:10 | 1 | A.   Yeah. |
| 11:23:12 | 2 | Q.   So when you say if I had a Corona Cartel for sale, how does |
| 11:23:15 | 3 | that relate to the name of this horse Snowy Cartel? |
| 11:23:19 | 4 | A.   Corona Cartel is his daddy.  Snowy Cartel's daddy. |
| 11:23:25 | 5 | Q.   So you were asked if you had any Corona Cartel babies in |
| 11:23:29 | 6 | your breeding? |
| 11:23:30 | 7 | A.   Yes. |
| 11:23:30 | 8 | Q.   And so, obviously Snowy Cartel is a Corona Cartel baby. |
| 11:23:36 | 9 | What happened then? |
| 11:23:37 | 10 | A.   Yes.  Well, they called me and I told them I did. |
| 11:23:45 | 11 | Q.   And then, what happened after that? |
| 11:23:48 | 12 | A.   Well, they come look.  They said they'd come look.  They |
| 11:23:56 | 13 | come looked. |
| 11:23:56 | 14 | Q.   When you say "they." |
| 11:23:58 | 15 | A.   Well, it was two or three of them.  I don't know, two or |
| 11:24:01 | 16 | three people come look. |
| 11:24:02 | 17 | Q.   And did you know their names? |
| 11:24:04 | 18 | A.   No.  No, sir. |
| 11:24:05 | 19 | Q.   And did they look at all your -- let me back up.  Did you |
| 11:24:10 | 20 | have more than just that one Corona Cartel offspring on your |
| 11:24:16 | 21 | ranch? |
| 11:24:16 | 22 | A.   He's the only yearling Corona Cartel I had at that time. |
| 11:24:21 | 23 | Q.   So when these individuals came, did they look at all your |
| 11:24:24 | 24 | offsprings, all your yearlings? |
| 11:24:26 | 25 | A.   No, sir. |

```
11:24:26   1   Q.   And who did they just look at?

11:24:27   2   A.   At Snowy Cartel.

11:24:29   3   Q.   And did they eventually agree to purchase that horse?

11:24:33   4   A.   Yes.

11:24:34   5   Q.   And did you agree to sell that horse?

11:24:36   6   A.   Yes.

11:24:37   7   Q.   And what was the agreed-upon price?

11:24:38   8   A.   $70,000.  But I agreed -- agreement when I sold him was over

11:24:46   9   the phone, not there.

11:24:48  10        MR. MAYR:  Objection.  Nonresponsive.

11:24:50  11        THE COURT:  Okay.  You're kind of peculiar here in the

11:24:55  12   room.  Listen to the question and if you can answer the question

11:24:57  13   "Yes" or "No."  But we've got a lot of lawyers, they're going to

11:25:02  14   have a lot of questions.  So don't volunteer anything.  Just

11:25:06  15   answer the question.

11:25:08  16   Q.   (BY MR. GARDNER) So let me back up a little bit.

11:25:13  17        The first call you got about that horse, who called

11:25:17  18   you?

11:25:18  19   A.   Randy Hill.

11:25:19  20   Q.   And who is Randy Hill?

11:25:22  21   A.   He works for Michael Pohl.  He works for Michael Pohl.  Or

11:25:29  22   agent for Michael Pohl, I guess maybe.

11:25:31  23   Q.   And he also in the quarter horse business?

11:25:34  24   A.   Yes.

11:25:34  25   Q.   And when was this call, do you remember?
```

| | | |
|---|---|---|
| 11:25:40 | 1 | A.    No.  Not really.  I don't remember the dates.  No. |
| 11:25:43 | 2 | Q.    What about the year?  Do you remember the year, sir? |
| 11:25:45 | 3 | A.    I guess it was '09. |
| 11:25:47 | 4 | Q.    And how long after you received that call from Mr. Hill did |
| 11:25:52 | 5 | you meet with these other three individuals? |
| 11:25:59 | 6 | A.    Probably eight to ten days. |
| 11:26:03 | 7 | Q.    And then, did they offer you -- you may have mentioned it. |
| 11:26:08 | 8 | The deal was over the phone, so did you discuss the price when |
| 11:26:11 | 9 | they were looking at the horse Snowy Cartel? |
| 11:26:18 | 10 | A.    I really don't remember.  I don't think so. |
| 11:26:23 | 11 | Q.    And so, did you finalize or seal the deal after they left at |
| 11:26:30 | 12 | another time later? |
| 11:26:34 | 13 | A.    I just -- I don't remember it.  I just don't remember when |
| 11:26:41 | 14 | they finally -- I guess they called me back and told me the deal |
| 11:26:46 | 15 | was -- Randy Hill.  I don't know.  I just don't remember it. |
| 11:26:49 | 16 | Q.    And how was that horse paid for? |
| 11:26:50 | 17 | A.    By wire transfer. |
| 11:26:54 | 18 | Q.    I'm showing you Government's Exhibit 367.  Do you see all |
| 11:27:02 | 19 | that, sir? |
| 11:27:07 | 20 | A.    Okay.  No.  You want me to point?  I can't see it. |
| 11:27:16 | 21 | Q.    If you'll look right here. |
| 11:27:17 | 22 | A.    Okay.  Yeah. |
| 11:27:18 | 23 | Q.    It's not a very good copy, is it? |
| 11:27:26 | 24 | A.    Yes. |
| 11:27:27 | 25 | Q.    Your Honor, I'd offer Government's Exhibit 367. |

| | | |
|---|---|---|
| 11:27:34 | 1 | MR. FINN:  No objection. |
| 11:27:38 | 2 | MR. WOMACK:  No objection. |
| 11:27:43 | 3 | MR. DEGEURIN:  No objection. |
| 11:27:43 | 4 | THE COURT:  All right.  367 is received. |
| 11:27:46 | 5 | Q.  (BY MR. GARDNER) Mr. Price, I put 367 up on the screen.  You |
| 11:27:50 | 6 | can see it is pretty dark.  I guess maybe better hand around the |
| 11:28:05 | 7 | box.  But can you read what it says right here, sir?  Is that too |
| 11:28:08 | 8 | difficult based on the shadow? |
| 11:28:09 | 9 | A.  I really -- I see a Snowy Fling on there. |
| 11:28:14 | 10 | Q.  Can you make out the word "wire transfer"? |
| 11:28:16 | 11 | A.  Yeah.  Yeah.  I do there, yeah.  I do there.  Yes. |
| 11:28:19 | 12 | Q.  And for the amount, can you make out 68,000? |
| 11:28:21 | 13 | A.  68,5, yes. |
| 11:28:23 | 14 | Q.  68,5?  Is that the way you remember it was paid for that |
| 11:28:26 | 15 | horse? |
| 11:28:26 | 16 | A.  Yes. |
| 11:28:27 | 17 | Q.  Now, was that the agreed-on price, 68,5? |
| 11:28:35 | 18 | A.  No.  70,000. |
| 11:28:37 | 19 | Q.  So when they came to pick up the horse, did they have the |
| 11:28:40 | 20 | other 1,500 with them? |
| 11:28:41 | 21 | A.  Yes. |
| 11:28:41 | 22 | Q.  Now, you sold another horse called Snowy Fling? |
| 11:28:49 | 23 | A.  Yes. |
| 11:28:50 | 24 | Q.  What is the relation of Snowy Fling to Snowy Cartel? |
| 11:28:54 | 25 | A.  Snowy Fling is the mother of Snowy Cartel. |

11:28:58   1   Q.   And how long after you sold Snowy Cartel were you approached

11:29:03   2   about selling Snowy Fling?

11:29:04   3   A.   About three to four months.  Two months maybe.  Two to three

11:29:09   4   months.

11:29:10   5   Q.   And was it the same group of individuals?

11:29:15   6   A.   I don't know.  They called.  I don't know.  They called when

11:29:22   7   they -- they called.

11:29:28   8   Q.   To your knowledge, were they the same, these group of people

11:29:33   9   who purchased Snowy Cartel?

11:29:37   10   A.   I don't know for sure.

11:29:40   11   Q.   So how did that transaction come about?  How were you

11:29:43   12   contacted and how did you come about selling Snowy Fling?

11:29:47   13   A.   Well, I got a phone call and they said, we can get you

11:29:51   14   100,000 for Snowy Cartel -- Snowy Fling.  And I said no.  I'll

11:29:56   15   take 130.  And he says, I'll get back with my people.

11:30:02   16   Q.   And did you receive another call agreeing upon that price?

11:30:05   17   A.   Yes.

11:30:06   18   Q.   And to your knowledge, how was that payment originally going

11:30:10   19   to be made?

11:30:12   20   A.   I don't guess we talked about it.  They just called and

11:30:17   21   said, I'm on my way.

11:30:18   22   Q.   And did you meet these individuals?

11:30:21   23   A.   Yes.

11:30:21   24   Q.   And where did you meet them, sir?

11:30:23   25   A.   I met them at Exit 1 at Interstate 35.

| | | |
|---|---|---|
| 11:30:27 | 1 | Q.   Is that Exit 1 just across the Texas-Oklahoma border? |
| 11:30:31 | 2 | A.   Yes, sir. |
| 11:30:31 | 3 | Q.   Is there a large casino there? |
| 11:30:33 | 4 | A.   Yes, sir. |
| 11:30:34 | 5 | Q.   And where did -- specifically did you meet them? |
| 11:30:37 | 6 | A.   There at the gas station. |
| 11:30:40 | 7 | Q.   And did you conclude the purchase for Snowy Fling at the gas |
| 11:30:46 | 8 | station, or did you go somewhere else? |
| 11:30:47 | 9 | A.   No, sir.  We went -- followed me to the house. |
| 11:30:53 | 10 | Q.   And how were you paid for that horse? |
| 11:30:54 | 11 | A.   Cash. |
| 11:30:56 | 12 | Q.   And in what nature was that -- when you say cash, can you |
| 11:31:00 | 13 | tell the ladies and gentlemen of the jury? |
| 11:31:01 | 14 | A.   Dollars or $100 bills. |
| 11:31:04 | 15 | Q.   And how were they packaged or wrapped? |
| 11:31:07 | 16 | A.   It was in $10,000 to a package. |
| 11:31:16 | 17 | Q.   And was it the same individuals who came earlier to buy |
| 11:31:19 | 18 | Snowy Cartel? |
| 11:31:21 | 19 | A.   I don't think so.  No.  I don't think so. |
| 11:31:24 | 20 | Q.   Now, you're familiar being in the quarter horse industry |
| 11:31:27 | 21 | with registration, the purpose of a registration paperwork.  Is |
| 11:31:32 | 22 | that a fair statement? |
| 11:31:34 | 23 | A.   Yes. |
| 11:31:35 | 24 | Q.   Each horse has its own essentially registration certificate? |
| 11:31:39 | 25 | A.   Yes. |

11:31:41  1   Q.   And did you provide the registration certificate to that

11:31:45  2   individual picking up that horse?

11:31:48  3   A.   You mean the one picking up the horse or brought the money?

11:31:51  4   Q.   That's a good question.  The one who brought the money.

11:31:53  5   A.   Yes.  I gave him, yes.

11:31:56  6   Q.   And were you later contacted about that same registration

11:31:59  7   certificate?

11:31:59  8   A.   Yes.

11:32:00  9   Q.   And how long after you sold the horse did that occur?

11:32:06  10  A.   I'd say about four months.

11:32:10  11  Q.   And what did you do then?

11:32:11  12  A.   I signed a -- they got a -- I guess you'd call it lost title

11:32:18  13  certificate or I don't -- you sign another certificate, and then,

11:32:22  14  they get a new certificate from AQHA.

11:32:26  15  Q.   Now, sir, when the government contacted you on this case,

11:32:29  16  had you paid your taxes on that $130,000 in cash?

11:32:32  17  A.   When they first contacted me?

11:32:34  18  Q.   Yes, sir.

11:32:35  19  A.   No.

11:32:35  20  Q.   All right.  Have you since taken care of that issue with

11:32:37  21  your attorney?

11:32:38  22  A.   Yes.

11:32:39  23  Q.   May I have one moment, your Honor?

11:32:40  24          THE COURT:  You may.

11:32:44  25          MR. GARDNER:  Your Honor, I'll pass the witness.

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 11:32:46 | 1  | CROSS-EXAMINATION                                            |
| 11:32:55 | 2  | BY MS. WILLIAMS:                                             |
| 11:32:55 | 3  | Q.   Good morning, Mr. Price.                               |
| 11:32:56 | 4  | A.   Howdy.                                                 |
| 11:32:57 | 5  | Q.   My name is Christie Williams.  I just have a couple of |
| 11:33:00 | 6  | questions for you.                                          |
| 11:33:00 | 7  | A.   Okay.                                                  |
| 11:33:01 | 8  | Q.   I want to ask you about syndication.  The government asked |
| 11:33:05 | 9  | you about these shares in these syndicates that you own.  When a |
| 11:33:12 | 10 | horse owner syndicates the horse, how many shares do they sell? |
| 11:33:20 | 11 | A.   Normally about 40, I would think.                     |
| 11:33:25 | 12 | Q.   And so, I brought my calculator because I'm not super-good |
| 11:33:28 | 13 | at math.                                                    |
| 11:33:32 | 14 |       If the owner of First Down Dash sold 40 shares in the |
| 11:33:39 | 15 | syndicate, then that owner made that year $40 million -- I'm |
| 11:33:50 | 16 | sorry, 6 million?                                           |
| 11:33:52 | 17 | A.   I don't understand that.                              |
| 11:33:53 | 18 | Q.   See, I told you I wasn't good at math.                |
| 11:33:56 | 19 |       $6 million.  150,000 times 40, my calculator says     |
| 11:34:02 | 20 | that's $6 million.                                          |
| 11:34:03 | 21 | A.   Yeah, I guess it would.                               |
| 11:34:04 | 22 | Q.   All right.                                             |
| 11:34:04 | 23 | A.   Yeah.  Fine.                                           |
| 11:34:07 | 24 | Q.   And they do that -- the owner does that because that  |
| 11:34:10 | 25 | obviously gives them a big influx of cash right then, so that's |

| | | |
|---|---|---|
| 11:34:16 | 1 | good for them? |
| 11:34:19 | 2 | A.   Well, they don't pay for all of it at once. |
| 11:34:21 | 3 | Q.   Okay.  That's what I was going to ask you.  How do you pay |
| 11:34:23 | 4 | that out? |
| 11:34:24 | 5 | A.   They get it paid out in three years. |
| 11:34:28 | 6 | Q.   So over a three-year period, each shareowner paid $50,000, |
| 11:34:35 | 7 | then the next year, $50,000, and the next year, $50,000. |
| 11:34:39 | 8 | A.   Yeah.  I really think First Down Dash, I might have been |
| 11:34:43 | 9 | wrong.  I don't know correctly.  I think his was $75,000 down, |
| 11:34:47 | 10 | then $50,000 for each year, I think.  But I don't know. |
| 11:34:51 | 11 | Q.   Regardless, it gets paid out over a couple of years? |
| 11:34:54 | 12 | A.   Three years. |
| 11:34:54 | 13 | Q.   And that gives the owner of the horse some money up front. |
| 11:35:05 | 14 | A.   I suppose so.  Yes. |
| 11:35:06 | 15 | Q.   Okay.  And what that does for you is for as long as that |
| 11:35:10 | 16 | horse is producing and you have a share in it, every year, you |
| 11:35:15 | 17 | get two babies? |
| 11:35:18 | 18 | A.   If you own a share, yes. |
| 11:35:20 | 19 | Q.   And you said it was two breedings.  But just so the members |
| 11:35:24 | 20 | of the jury understand, if you breed the horse and you don't get |
| 11:35:29 | 21 | a baby, you get to breed it again. |
| 11:35:33 | 22 | A.   If the stallion's alive. |
| 11:35:36 | 23 | Q.   Not if it's frozen, right? |
| 11:35:39 | 24 | A.   If it's frozen, you got one shot. |
| 11:35:41 | 25 | Q.   As long as the stallion is alive and that's why we're doing |

| | | |
|---|---|---|
| 11:35:43 | 1 | this so that we all get educated about how this works. |
| 11:35:46 | 2 | A.   Okay. |
| 11:35:47 | 3 | Q.   As long as the stallion is alive, you get to breed -- have |
| 11:35:53 | 4 | two mares bred to that horse every year and get two babies? |
| 11:35:56 | 5 | A.   Yes, ma'am. |
| 11:35:56 | 6 | Q.   All right.  So as many breedings as it takes to get two |
| 11:35:59 | 7 | babies. |
| 11:36:00 | 8 | A.   No.  On First Down, I don't think so.  I think -- well, I |
| 11:36:06 | 9 | don't know.  I don't know about -- I just don't know.  I can't |
| 11:36:09 | 10 | answer that. |
| 11:36:10 | 11 | Q.   When you buy the share in the syndicate, the rules are set |
| 11:36:17 | 12 | out in the contract? |
| 11:36:17 | 13 | A.   Yes. |
| 11:36:18 | 14 | Q.   And so, you know what you're buying? |
| 11:36:19 | 15 | A.   Yes. |
| 11:36:19 | 16 | Q.   Okay.  And so, when you as a horse breeder and you want to |
| 11:36:34 | 17 | race these horses, what you've done, your business model, if you |
| 11:36:38 | 18 | will, is you've bought shares in several really great stallions? |
| 11:36:44 | 19 | A.   Yes. |
| 11:36:45 | 20 | Q.   And you, I assume, have some really great mares? |
| 11:36:50 | 21 | A.   Yes. |
| 11:36:50 | 22 | Q.   And so, what you do is every year, you get those babies and |
| 11:36:54 | 23 | you pick out the best ones and train them and race them? |
| 11:36:57 | 24 | A.   Try to. |
| 11:36:59 | 25 | Q.   No further questions. |

11:37:02    1            MR. DEGEURIN:  No questions.

11:37:04    2            MR. WOMACK:  Some cross, your Honor.

11:37:06    3                     CROSS-EXAMINATION

11:37:07    4    BY MR. WOMACK:

11:37:07    5    Q.   Mr. Price, I'm Guy Womack from Houston.  How are you doing?

11:37:11    6    Can you hear me okay, sir?

11:37:12    7    A.   Yes, sir.

11:37:13    8    Q.   Do you know Fernando Garcia?

11:37:18    9    A.   No, sir.

11:37:18   10    Q.   He's standing right here.  Fernando, if you'll stand up.  Do

11:37:22   11    you remember him?

11:37:22   12    A.   Not really.

11:37:23   13    Q.   Do you recall meeting him, in fact, inviting him to your

11:37:26   14    ranch in Oklahoma?

11:37:27   15    A.   Not really.  No.

11:37:29   16    Q.   You don't remember him going there and y'all talking about

11:37:31   17    bloodlines on horses in general?

11:37:33   18    A.   Not really.  No.

11:37:35   19    Q.   Okay.  You go to the big shows, don't you, like Heritage

11:37:39   20    Place, the sales, Los Alamitos --

11:37:42   21    A.   I go to the sales.  Yes, sir.

11:37:43   22    Q.   Do you ever recall talking to Fernando at some of these

11:37:47   23    sales?

11:37:48   24    A.   I don't remember it.  No.  I talked to a lot -- I don't

11:37:51   25    remember it.  No.  I might have.  I don't know.

11:37:54  1   Q.   Okay.  Do you ever buy horses at the sales?

11:38:05  2   A.   Yes, sir.

11:38:05  3   Q.   And before you go to the sale like Heritage Place, you know

11:38:11  4   that they put online the names of the horses that are going to be

11:38:15  5   put up for sale at that auction about a month before the auction;

11:38:18  6   is that right?

11:38:19  7   A.   I don't know.

11:38:20  8   Q.   Have you ever looked at that site yourself?

11:38:22  9   A.   No.

11:38:24  10  Q.   But before you go to an auction, do you not research the

11:38:28  11  bloodlines of the horses that are going to be available for sale?

11:38:31  12  A.   On what?  Research on what?

11:38:34  13  Q.   The bloodlines on those horses that will be for sale.

11:38:37  14  A.   I look at the catalogs.

11:38:39  15  Q.   Okay.  Now, tell the jury what a catalog is.

11:38:42  16  A.   It's the horse's name in there.  Then it shows the momma and

11:38:47  17  the daddy and the grandma and the great-grandma and on down.

11:38:51  18  Then at -- starting at the top of the page under the pedigree, it

11:39:02  19  will list First Down, and what she has produced, and how much

11:39:07  20  money is made.  Then we're going down to the second dam and do

11:39:12  21  the same thing.  Then if there's room on the page, we'll go to a

11:39:16  22  third.

11:39:17  23  Q.   So basically by getting this catalog of the horses for sale,

11:39:21  24  you can look at the bloodlines, you can research the horse

11:39:25  25  looking at that book, can't y'all?

| | | |
|---|---|---|
| 11:39:27 | 1 | A.   Yes. |
| 11:39:27 | 2 | Q.   Now, how long before the big sales do you get that catalog? |
| 11:39:37 | 3 | You personally. |
| 11:39:37 | 4 | A.   Probably 30 days.  I don't -- probably 30 days. |
| 11:39:40 | 5 | Q.   Okay.  And, again, were you aware you could do the same |
| 11:39:44 | 6 | thing online, as well? |
| 11:39:45 | 7 | A.   No. |
| 11:39:47 | 8 | Q.   But when you do it, you do it looking through actual paper |
| 11:39:51 | 9 | catalog; is that right? |
| 11:39:52 | 10 | A.   Yes. |
| 11:39:52 | 11 | Q.   And if you know you're going to a big sale, Heritage Place, |
| 11:39:58 | 12 | how long before the sale do you personally start looking at that |
| 11:40:03 | 13 | catalog? |
| 11:40:04 | 14 | A.   I start looking after the day I get it. |
| 11:40:06 | 15 | Q.   Okay.  So a month or so before the sale? |
| 11:40:08 | 16 | A.   Yeah. |
| 11:40:09 | 17 | Q.   And that helps you determine if there are horses there that |
| 11:40:13 | 18 | by their bloodline may be of interest to you? |
| 11:40:16 | 19 | A.   Yes. |
| 11:40:16 | 20 | Q.   And you'd agree with us that the better the bloodline -- I |
| 11:40:22 | 21 | mean, at horse racing, the bloodline is a very important factor, |
| 11:40:25 | 22 | isn't it? |
| 11:40:26 | 23 | A.   Yes. |
| 11:40:26 | 24 | Q.   And if you know a horse comes from a good sire and dam with |
| 11:40:32 | 25 | a long history of great horses, that may be a more valuable horse |

| | | |
|---|---|---|
| 11:40:38 | 1 | than other horses with a lesser bloodline? |
| 11:40:40 | 2 | A.   It's a good possibility. |
| 11:40:42 | 3 | Q.   And especially if it's a horse that you could syndicate, you |
| 11:40:46 | 4 | know, where you could actually sell these shares, it needs to |
| 11:40:49 | 5 | have a really good bloodline, correct? |
| 11:40:51 | 6 | A.   Yes. |
| 11:40:52 | 7 | Q.   Now, in addition to looking at the catalog starting a month |
| 11:40:55 | 8 | before the show, do you go to the actual site of the show to the |
| 11:41:00 | 9 | stables and look at the horse before the show? |
| 11:41:03 | 10 | A.   Sometimes. |
| 11:41:04 | 11 | Q.   And sometimes when you do that, you'll have a stable boy or |
| 11:41:07 | 12 | someone actually have the horse walk by you, won't it? |
| 11:41:11 | 13 | A.   Yeah.  Yes. |
| 11:41:12 | 14 | Q.   And tell us, what are you looking for when you have them |
| 11:41:15 | 15 | walk the horse? |
| 11:41:18 | 16 | A.   You're just looking at the horse, in general, from his feet |
| 11:41:21 | 17 | to his back and his disposition. |
| 11:41:26 | 18 | Q.   And these things, looking at his disposition, how he carries |
| 11:41:32 | 19 | himself, him or her, how they walk, looking at their back, their |
| 11:41:36 | 20 | front, their legs, everything about them, a knowledgeable |
| 11:41:41 | 21 | horseman can factor that in, along with other information, in |
| 11:41:45 | 22 | determining how valuable that horse might be, correct? |
| 11:41:48 | 23 | A.   It helps a whole lot. |
| 11:41:49 | 24 | Q.   And in addition to looking at the catalog for that month, |
| 11:41:54 | 25 | walking the horse by you, have you had occasion to have horses |

| | | |
|---|---|---|
| 11:41:58 | 1 | X-rayed by the on-scene veterinarian? |
| 11:42:01 | 2 | A.    Yes. |
| 11:42:01 | 3 | Q.    That's a pretty good practice, too, isn't it? |
| 11:42:04 | 4 | A.    Yes. |
| 11:42:04 | 5 | Q.    Tell us why you would do that. |
| 11:42:07 | 6 | A.    Well, I really don't know what they call OCDs in them and in |
| 11:42:13 | 7 | their joints and places, and the X-ray will show it up.  And once |
| 11:42:22 | 8 | you start running that horse will show up and sometimes where the |
| 11:42:28 | 9 | OCDs are.  I don't know what OCD is, but anyway. |
| 11:42:31 | 10 | Q.    And you're calling it OCD? |
| 11:42:33 | 11 | A.    I think that's what they call them. |
| 11:42:34 | 12 | Q.    Like Oscar Charlie Delta? |
| 11:42:35 | 13 | A.    I guess.  I think that's what -- that's what we call them. |
| 11:42:39 | 14 | I don't know what they are. |
| 11:42:39 | 15 | Q.    And these are basically defects or things that might cause |
| 11:42:42 | 16 | problems in the horse if undetected? |
| 11:42:44 | 17 | A.    It could, but it don't always.  No. |
| 11:42:46 | 18 | Q.    Okay.  But certainly if you have the -- if you paid the |
| 11:42:50 | 19 | veterinarian to X-ray the horse at the sales, that gives you some |
| 11:42:55 | 20 | more information that you may or may not want to buy that horse? |
| 11:42:58 | 21 |         MR. GARDNER:  Your Honor, at this point, I'm going to |
| 11:43:00 | 22 | object to the relevance of this line of questioning. |
| 11:43:04 | 23 |         MR. WOMACK:  Your Honor, it was one of the very first |
| 11:43:06 | 24 | questions that Mr. Price answered.  He said he buys these horses, |
| 11:43:10 | 25 | I think he said, by instinct.  I want to show that his instincts |

11:43:13  1   are based on a lot of science.

11:43:16  2           THE COURT:  Well, let's proceed.

11:43:18  3           MR. WOMACK:  Thank you, sir.

11:43:19  4   Q.   (BY MR. WOMACK) Mr. Price, well, that's really it.  You told

11:43:23  5   us you have instincts on horses, don't you?

11:43:26  6   A.   Uh-huh.

11:43:26  7   Q.   That's a "Yes"?

11:43:27  8   A.   Yes.

11:43:27  9   Q.   You nodded your head but the record has to --

11:43:30  10  A.   Oh.

11:43:31  11  Q.   You're doing great, sir.

11:43:33  12          And part of what gives you these great instincts is

11:43:37  13  that you get all the available information on a horse before you

11:43:40  14  bid on it, don't you?

11:43:43  15  A.   You get it or you know it.  Or you know it or you think you

11:43:48  16  know it.

11:43:48  17  Q.   Yes, sir.  And, sir, you've heard the expression beauty is

11:43:53  18  in the eye of the beholder?

11:43:55  19  A.   Yes, sir.

11:43:57  20  Q.   You've heard of that?

11:43:58  21  A.   Yeah.

11:43:59  22  Q.   And with regards to evaluating a horse, appraising a horse

11:44:03  23  to buy at auction, applying that same idea, for some people, a

11:44:10  24  horse when they get all the information, a horse may be worth

11:44:13  25  more money to that person than to other people, correct?

| | | |
|---|---|---|
| 11:44:17 | 1 | A.   Well, yeah.  Yes. |
| 11:44:19 | 2 | Q.   In other words, you may see a horse and from your research |
| 11:44:23 | 3 | learn that it has OCDs.  You may look back and say, well, you |
| 11:44:28 | 4 | know, the sire hasn't always been that good, and you may see some |
| 11:44:32 | 5 | things that make you think that horse is not worth as much as |
| 11:44:36 | 6 | someone else who doesn't really know, and they may value the |
| 11:44:38 | 7 | horse higher than you would. |
| 11:44:38 | 8 | A.   That's true. |
| 11:44:40 | 9 | Q.   And the reverse is also true, isn't it? |
| 11:44:43 | 10 | A.   True. |
| 11:44:43 | 11 | Q.   You've had people offer you too little for your horse, |
| 11:44:47 | 12 | haven't you? |
| 11:44:47 | 13 | A.   Yes. |
| 11:44:47 | 14 | Q.   And you've turned them down because you know it's worth more |
| 11:44:50 | 15 | money. |
| 11:44:51 | 16 | A.   You think it is. |
| 11:45:04 | 17 | Q.   And ultimately, a horse is worth what people will pay for |
| 11:45:07 | 18 | it, isn't it? |
| 11:45:08 | 19 | A.   It's true. |
| 11:45:10 | 20 | Q.   And they pay for it both buying the horse, winnings the |
| 11:45:14 | 21 | horse might have, its value for a stallion for its semen, a mare |
| 11:45:21 | 22 | for -- all of them for their bloodlines.  There are a lot of |
| 11:45:24 | 23 | things you factor into the value of a horse, isn't there? |
| 11:45:26 | 24 | A.   Yes. |
| 11:45:27 | 25 | Q.   Thank you, sir.  Sir, we have no further questions. |

11:45:31  1            MR. ESPER:  Your Honor, I just have a couple of

11:45:33  2  questions.

11:45:33  3                      CROSS-EXAMINATION

11:45:33  4  BY MR. ESPER:

11:45:36  5  Q.   Mr. Price, you indicated that you like to raise, R-A-I-S-E,

11:45:41  6  about 15 to 20 horses per year?

11:45:44  7  A.   Yes.

11:45:45  8  Q.   Okay.  And is that with -- with the following year, would

11:45:49  9  that be another 15 to 20?

11:45:51  10  A.   Yes.

11:45:51  11  Q.   Okay.  So in any -- over a three-year period, you could have

11:45:55  12  anywhere from 45 to 60 horses there on your farm, correct?

11:46:00  13  A.   Well, no.  Not on the farm.  I wouldn't have them there.

11:46:03  14  But I would be -- I would -- I'd have that many, yes.

11:46:09  15  Q.   Okay.  At your particular farm, you like to kind of limit it

11:46:14  16  to about 15 to 20, correct, per year?

11:46:19  17  A.   I like to raise.  I try to raise 15 or 20 per year.

11:46:23  18  Q.   Per year?

11:46:24  19  A.   Yes.

11:46:24  20  Q.   Okay.  But you don't keep that many on your particular --

11:46:28  21  A.   No.

11:46:28  22  Q.   At your stables, so to speak?

11:46:31  23  A.   No.

11:46:32  24  Q.   What's the most that you ever keep at your stables more or

11:46:35  25  less?

11:46:37  1  A.   Well, when the babies is being -- probably 30, because the
11:46:44  2  babies is being born, then the yearlings hadn't went off to the
11:46:48  3  sales yet.   Probably 30.
11:46:49  4  Q.   Okay.   And are your stables relatively considered small
11:46:53  5  stables or?
11:46:54  6  A.   Oh, very small.
11:46:55  7  Q.   Very small.   Okay.   Some stables keep up to a hundred,
11:47:00  8  right?
11:47:00  9  A.   No.   Very small.
11:47:00  10  Q.   Yours is very small?
11:47:02  11  A.   I mean, I consider it very small.
11:47:04  12  Q.   Okay.   Thank you, sir.
11:47:07  13        MR. MAYR:   I have no questions, your Honor.
11:47:09  14        THE COURT:   Any redirect?
11:47:10  15        MR. GARDNER:   I have no followup, your Honor.   May this
11:47:12  16  witness be excused?
11:47:12  17        THE COURT:   Anybody object to his being excused?
11:47:15  18        MS. WILLIAMS:   No, your Honor.
11:47:16  19        THE COURT:   You could be excused.
11:47:18  20        THE WITNESS:   Thank you.
11:47:31  21        THE COURT:   Those of you who thought you wouldn't get
11:47:33  22  lunch, you will.   Give you your lunch break.   Let's start at
11:47:40  23  1:20.   Remember the instructions.   And have a nice lunch.
11:48:17  24        (Jury not present.)
11:48:19  25        THE COURT:   We're in recess until 1:20.

```
13:14:42   1              (Lunch recess.)

13:17:03   2              THE COURT:  Anything before we bring the jury in?

13:17:10   3              MR. GARDNER:  Your Honor, my next witness is in

13:17:12   4   custody, so the marshal went to grab him.

13:18:01   5              THE COURT:  I assume that all of those pictures are in

13:18:03   6   evidence.

13:18:03   7              MR. GARDNER:  That is going to be a demonstrative

13:18:06   8   exhibit, Judge.

13:18:06   9              MS. FERNALD:  It's a blowup of --

13:18:10   10             MR. GARDNER:  I could offer these pictures in.

13:18:12   11             THE COURT:  Well, I just don't want the jury coming in

13:18:14   12   and looking at them and say -- and the people saying they didn't

13:18:17   13   know they were there.

13:18:18   14             MR. DEGEURIN:  Like me.

13:18:20   15             THE COURT:  Like I.

13:19:27   16             Okay.  Is everybody okay with that chart now?

13:19:31   17             MR. DEGEURIN:  I have some reservations about the

13:19:33   18   writing on it.  If they just show photographs.

13:19:36   19             THE COURT:  Well, the jury's on their way, so if you

13:19:38   20   have some, tell Mr. Gardner, and then, we can get it at the next.

13:20:19   21             MR. DEGEURIN:  I can take it up when they --

13:20:21   22             THE COURT:  Oh, no, we'll do it right now.

13:20:23   23             MR. GARDNER:  I don't have to show it right now, Judge.

13:20:33   24             (Jury present.)

13:21:14   25             THE COURT:  Members of the jury, since we last met in
```

| | | |
|---|---|---|
| 13:21:17 | 1 | this room, has anybody attempted to talk to you about the case? |
| 13:21:20 | 2 | JURORS:  No. |
| 13:21:21 | 3 | THE COURT:  Have you talked to anyone about the case? |
| 13:21:24 | 4 | JURORS:  No. |
| 13:21:24 | 5 | THE COURT:  And have you learned anything at all about |
| 13:21:27 | 6 | the case, outside the presence of each other in this courtroom? |
| 13:21:30 | 7 | JURORS:  No. |
| 13:21:31 | 8 | THE COURT:  Thank you.  Show negative responses to all |
| 13:21:34 | 9 | questions by all jurors. |
| 13:21:35 | 10 | You may call your next witness. |
| 13:21:37 | 11 | MR. GARDNER:  Your Honor, prior to calling our next |
| 13:21:40 | 12 | witness, the government would like to offer a number of certified |
| 13:21:42 | 13 | photographs, previously provided to defense counsel. |
| 13:21:47 | 14 | The government has previously provided or entered into |
| 13:21:50 | 15 | evidence Government's Exhibit 335A, a picture of Miguel Trevino. |
| 13:22:33 | 16 | And the government has also previously admitted Government's |
| 13:22:37 | 17 | Exhibit 335B, Omar Trevino-Morales. |
| 13:22:45 | 18 | Your Honor, the government offers Exhibit 335C, |
| 13:22:50 | 19 | certified Texas Department of Public Safety license photo of |
| 13:22:53 | 20 | Zulema Trevino.  Oh, I'm sorry, your Honor. |
| 13:22:57 | 21 | THE COURT:  I've got 335C and 335I, admitted without |
| 13:23:03 | 22 | objection.  I have 335E, which is Mr. Nayen, admitted.  Ms. Sims, |
| 13:23:12 | 23 | do you have 335? |
| 13:23:16 | 24 | THE CLERK:  I have what you have. |
| 13:23:17 | 25 | THE COURT:  Those are what we have. |

13:23:26    1          MR. GARDNER:  Give me one second, your Honor.  I have

13:23:28    2   Ms. Fernald looking for one.

13:23:29    3          So 335E is a certified immigration photo, your Honor,

13:23:33    4   of Carlos Nayen.  I believe that's already been admitted into

13:23:36    5   evidence.

13:23:36    6          THE COURT:  Yes, sir.  That's been admitted.  E, C and

13:23:40    7   I are admitted.

13:23:42    8          MR. GARDNER:  And, your Honor, just -- understanding

13:23:44    9   I'm just admitting the full document.  I'm only showing the jury

13:23:47   10   the picture of the full document as a Texas Department of Public

13:23:50   11   Safety certified on 335C of Jose Trevino.

13:24:01   12          THE CLERK:  We have that already admitted.

13:24:10   13          MR. GARDNER:  And Government's Exhibit 335D is a

13:24:14   14   certified Texas Public Department of Safety photo of Zulema

13:24:21   15   Trevino.

13:24:23   16          THE CLERK:  I don't have D yet.

13:24:24   17          THE COURT:  Yeah.  He's just identifying them.  All

13:24:33   18   right.  Any objections to 335C and 335D?

13:24:38   19          MS. WILLIAMS:  D's already admitted.

13:24:41   20          MR. GARDNER:  A, B and C are admitted, your Honor.  I'm

13:24:44   21   offering D.

13:25:00   22          THE COURT:  I don't have A, B, C.

13:25:02   23          THE CLERK:  Yeah.  They were admitted yesterday.

13:25:26   24          THE COURT:  Any objection to D?  All right.  Then 335,

13:25:30   25   so the record is clear, A, B, C, D and E are admitted, and I.  A,

| | | |
|---|---|---|
| 13:25:40 | 1 | B, C, D, E and I.  Okay. |
| 13:26:06 | 2 | MR. GARDNER:  Could you publish D?  And, your Honor, |
| 13:26:14 | 3 | you say Government's Exhibit E is already admitted?  335E? |
| 13:26:17 | 4 | THE COURT:  E and I were introduced as -- and |
| 13:26:26 | 5 | identified by Mr. Vasquez, Sr., but they were not identified. |
| 13:26:34 | 6 | MR. GARDNER:  Then we would offer Government's Exhibit |
| 13:26:35 | 7 | 335E with the identification certification for Carlos Nayen.  And |
| 13:26:42 | 8 | with the agreement of the defense counsel, we've agreed to remove |
| 13:26:46 | 9 | the biographical data on that exhibit and submit the picture |
| 13:26:51 | 10 | only. |
| 13:26:51 | 11 | THE COURT:  All right.  And then, I? |
| 13:26:56 | 12 | MR. GARDNER:  Could you publish E, please?  And Mr. |
| 13:27:02 | 13 | DeGeurin is currently looking over 335F, your Honor. |
| 13:27:07 | 14 | MR. DEGEURIN:  With regard to F, it's just a very bad |
| 13:27:11 | 15 | photograph.  I'd like to substitute Mr. -- |
| 13:27:16 | 16 | MS. FERNALD:  It's the one we have on record from the |
| 13:27:19 | 17 | State Department. |
| 13:27:20 | 18 | MR. DEGEURIN:  I could give you a better photograph. |
| 13:27:22 | 19 | MR. GARDNER:  If you can submit your own.  I'll allow |
| 13:27:26 | 20 | you to submit your own. |
| 13:27:27 | 21 | MR. DEGEURIN:  Okay.  Sorry.  Thank you. |
| 13:27:29 | 22 | MR. GARDNER:  Your Honor, we'd offer Government's |
| 13:27:31 | 23 | Exhibit 335F, a certified immigration photograph of Defendant |
| 13:27:35 | 24 | Francisco Colorado-Cessa. |
| 13:28:01 | 25 | THE COURT:  He's going to substitute a picture. |

| | | |
|---|---|---|
| 13:28:03 | 1 | MR. GARDNER: I believe he's going to offer his own |
| 13:28:04 | 2 | photograph, your Honor, during his case presentation. |
| 13:28:08 | 3 | THE COURT: Okay. |
| 13:28:26 | 4 | MR. GARDNER: Has that been received, your Honor? |
| 13:28:28 | 5 | THE COURT: Well, you've offered F, he's holding it and |
| 13:28:31 | 6 | he's going to offer his own. |
| 13:28:32 | 7 | MR. DEGEURIN: Yes. |
| 13:28:33 | 8 | THE COURT: So I'm going to make one of these mystic |
| 13:28:37 | 9 | orders. I'm going to admit a photograph of the Defendant |
| 13:28:44 | 10 | Colorado and then, if you're going to substitute it or whatever |
| 13:28:48 | 11 | you want to do it. Are you going to -- are you offering yours? |
| 13:28:53 | 12 | MR. GARDNER: Yes, sir. |
| 13:28:53 | 13 | THE COURT: And then, you can put in yours. Everybody |
| 13:28:57 | 14 | will be happy. All right. F is received. |
| 13:28:59 | 15 | MR. GARDNER: Could you publish F, please? Your Honor, |
| 13:29:13 | 16 | we offer Government's Exhibit 335G, a Texas Department of Public |
| 13:29:16 | 17 | Safety photograph of Defendant Fernando Solis-Garcia. |
| 13:29:24 | 18 | MR. WOMACK: No objections. |
| 13:29:25 | 19 | THE COURT: All right. G is received. |
| 13:29:45 | 20 | MR. GARDNER: Your Honor, we offer Government's Exhibit |
| 13:29:48 | 21 | 335H. May I have one second, your Honor? H, your Honor, is a |
| 13:30:23 | 22 | Texas Department of Public Safety photograph of Victor Lopez. |
| 13:30:33 | 23 | THE COURT: Any objection to H? All right. 335H is |
| 13:30:39 | 24 | received. |
| 13:30:44 | 25 | MR. GARDNER: Your Honor, I believe the Court has |

```
13:30:47  1   already admitted 335I, but I'd like to admit the immigration
13:30:51  2   certification for Sergio Rincon on 335I.  Could we publish that,
13:30:59  3   please, Ms. Saldana?
13:30:59  4           THE COURT:  Is Rincon?
13:31:00  5           MR. GARDNER:  Rincon, yes, sir, your Honor.
13:31:05  6           THE COURT:  All right.
13:31:06  7           MR. GARDNER:  Offer Government's Exhibit 335J,
13:31:08  8   California Transportation Department certified photograph of one
13:31:17  9   Adan Farias.
13:31:17  10          THE COURT:  How do you spell that?
13:31:20  11          MR. GARDNER:  Adan is spelled A-D --
13:31:21  12          THE COURT:  No.  I know how to spell --
13:31:23  13          MR. GARDNER:  Yes, sir.  Farias is F-A-R-I-A-S.
13:31:31  14          Offer Government's Exhibit 335K, certified photograph
13:31:35  15   of Defendant Eusevio Maldonado-Huitron.  Publish, please, Farias.
13:31:55  16          MR. ESPER:  I don't have any.
13:31:58  17          MR. GARDNER:  I'm sorry, is 335K received?
13:32:02  18          THE COURT:  Mr. Huitron, is that Eusevio?
13:32:08  19          MR. GARDNER:  Eusevio.  Yes, sir.
13:32:10  20          THE COURT:  Okay.  Yes.  It's received.
13:32:12  21          MR. GARDNER:  Can we publish that?  Government's
13:32:15  22   Exhibit 335L from California Department of Transportation --
13:32:23  23   Motor Vehicles, rather, photograph of Felipe Quintero.
13:32:41  24          THE COURT:  Hearing no objection, 335L will be
13:32:46  25   admitted.  Last name on that one?
```

| | | |
|---|---|---|
| 13:32:47 | 1 | MR. GARDNER:  Quintero, your Honor, Q-U. |
| 13:32:51 | 2 | Government offers 335M, the Texas Department of Public |
| 13:32:58 | 3 | Safety certified photograph of Raul Ramirez. |
| 13:33:18 | 4 | THE COURT:  M is received. |
| 13:33:20 | 5 | MR. GARDNER:  Government's Exhibit 335N, certified |
| 13:33:26 | 6 | photograph of Luis Gerardo Aguirre. |
| 13:33:45 | 7 | THE COURT:  It's received. |
| 13:33:47 | 8 | MR. GARDNER:  And Government's Exhibit 335P, Texas |
| 13:33:52 | 9 | Department of Public Safety photograph of Jesus |
| 13:33:55 | 10 | Maldonado-Huitron. |
| 13:34:11 | 11 | THE COURT:  P is received. |
| 13:34:12 | 12 | MR. MAYR:  Judge, as to that exhibit, I would object. |
| 13:34:17 | 13 | Relevance.  There's been no testimony identifying my client. |
| 13:34:20 | 14 | There's been no testimony regarding my client at all up until |
| 13:34:23 | 15 | this point.  I would rather wait until -- therefore, it's not |
| 13:34:27 | 16 | relevant. |
| 13:34:29 | 17 | THE COURT:  Wait, therefore, when it's not relevant. |
| 13:34:32 | 18 | MR. MAYR:  At this time, it's not relevant.  There's |
| 13:34:34 | 19 | not -- |
| 13:34:35 | 20 | THE COURT:  I understand your objection, but I think |
| 13:34:37 | 21 | you threw a "not" in there that you didn't mean to do that.  In |
| 13:34:41 | 22 | any event, your objection is overruled.  P is in evidence. |
| 13:35:08 | 23 | MR. GARDNER:  Your Honor, I'd handing the certified |
| 13:35:12 | 24 | copies to the clerk, keeping the photographs at counsel table. |
| 13:35:15 | 25 | THE COURT:  Okay. |

13:35:16   1          MR. GARDNER:  Your Honor, I would call Gerardo Mata as

13:35:25   2   our next witness.

13:35:34   3          (Witness sworn.)

13:36:04   4          THE COURT:  I want you to state your full name and

13:36:16   5   spell your last name.

13:36:18   6          THE WITNESS:  Gerardo Mata-Morales.

13:36:32   7          THE COURT:  It's your witness.

13:36:35   8     GERARDO MATA-MORALES, called by the Government, duly sworn.

13:36:35   9                    DIRECT EXAMINATION

13:36:35  10   BY MR. GARDNER:

13:36:35  11   Q.   Thank you, your Honor.

13:36:36  12          Mr. Mata, you and I have met before; is that correct?

13:36:40  13   A.   Yes.

13:36:41  14   Q.   If you will, could you turn to the jury, introduce yourself,

13:36:45  15   tell them how old you are, and what you did for a living?

13:36:57  16   A.   Good afternoon, jury.  Before, I used to work transporting

13:37:13  17   cars and here I am.  Good afternoon.

13:37:16  18   Q.   When you say here you are, you're currently in jail?

13:37:23  19   A.   Yes.

13:37:24  20   Q.   And are you currently on loan from the Bureau of Prisons?

13:37:29  21   A.   Uh, what?

13:37:38  22   Q.   Good question.

13:37:40  23          Prior to coming here to court, were you at the Bastrop

13:37:43  24   Federal Correctional Institute?

13:37:48  25   A.   Oh, yes.  Uh-huh.

| 13:37:50 | 1 | Q. | And what were you in jail for? |

13:37:50  1  Q.   And what were you in jail for?

13:37:53  2  A.   Oh, for money laundering and drugs, cocaine.

13:38:02  3  Q.   And what was your sentence?

13:38:04  4  A.   135 months.

13:38:11  5  Q.   And was this out of the Eastern District of Texas, up in the

13:38:14  6  Plano area?

13:38:19  7  A.   Yes.

13:38:22  8  Q.   So what do you hope to get out of your testimony here today?

13:38:32  9  A.   No.  I don't hope for anything.

13:38:34  10  Q.   And do you know that neither myself nor this judge will be

13:38:37  11  responsible for any part of your sentence?

13:38:47  12  A.   Uh-huh.  Okay.

13:38:48  13  Q.   Do you know a person by the name of Mario Alfonso Cuellar?

13:38:55  14  A.   Yes.

13:38:56  15  Q.   Does he have a nickname?

13:38:59  16  A.   "Poncho."

13:39:00  17  Q.   I'm just going to ask you to refer to him as Mr. Cuellar

13:39:03  18  from here on out, if that's okay.

13:39:08  19  A.   Okay.  Uh-huh.

13:39:09  20  Q.   So how do you know Mr. Cuellar?

13:39:17  21  A.   I worked with him at a junkyard, auto parts, and I would

13:39:27  22  transport cars when he bought them at auction.

13:39:31  23  Q.   From where to where would you transport the cars?

13:39:45  24  A.   In the beginning, I transported from San Antonio to Eagle

13:39:49  25  Pass.  Later, he sent me to Dallas.

13:39:51   1   Q.   And did you eventually get involved in transporting money

13:39:54   2   for Mr. Cuellar?

13:40:12   3   A.   Yes.   I mean, I was working with him fine, just in the

13:40:17   4   transporting of cars.   But then, he offered if -- he asked if I

13:40:21   5   wanted to earn more money.

13:40:23   6   Q.   And did he tell you how you were going to earn more money?

13:40:40   7   A.   He didn't say, but he did say that I had to pick up money in

13:40:43   8   San Antonio to Eagle Pass.   This was in the beginning, right?

13:40:47   9   Q.   Yes.   In the beginning.

13:40:54  10   A.   And then, later -- in the beginning.   And then, later, he

13:41:00  11   sent me to Dallas to transport more money from Dallas to Eagle

13:41:05  12   Pass.

13:41:05  13   Q.   And going back a little bit, when you say in the beginning,

13:41:09  14   do you recall a year when that started happening?

13:41:21  15   A.   The beginning, about 2005.

13:41:23  16   Q.   And what were the amounts that you were transporting from

13:41:26  17   San Antonio down to Eagle Pass?

13:41:34  18   A.   100,000, 150,000.

13:41:36  19   Q.   And when did you start going to Dallas and transporting

13:41:41  20   money from Dallas?

13:41:53  21   A.   Then later, about after a year, 2007, 2008, then I

13:41:58  22   transported more money.

13:42:00  23   Q.   And what were the amounts you were transporting from Dallas

13:42:03  24   to the border?

13:42:13  25   A.   From a million to a million, 500,000.   That was the maximum.

| | | |
|---|---|---|
| 13:42:16 | 1 | The max. |
| 13:42:17 | 2 | Q.   Was that per trip? |
| 13:42:20 | 3 | A.   Yes.  Per trip.  Uh-huh. |
| 13:42:23 | 4 | Q.   And approximately how many trips have you made in total |
| 13:42:26 | 5 | during that timeframe? |
| 13:42:38 | 6 | A.   During a month, it was like two or three trips per month. |
| 13:42:44 | 7 | Q.   And did you know where the money was coming from? |
| 13:42:51 | 8 | A.   There I was sent to a person named "Junior."  I would talk |
| 13:43:07 | 9 | to him there, and then, he would send the workers with the money. |
| 13:43:10 | 10 | Q.   And do you know what was sold to get the money? |
| 13:43:18 | 11 | A.   Yes.  Uh-huh. |
| 13:43:19 | 12 | Q.   And what was that? |
| 13:43:21 | 13 | A.   Cocaine. |
| 13:43:22 | 14 | Q.   Did you ever take part in any transportation of cocaine |
| 13:43:26 | 15 | loads from Mexico to the United States? |
| 13:43:32 | 16 | A.   No.  Just money. |
| 13:43:35 | 17 | Q.   And where would you conceal this money during the trips from |
| 13:43:39 | 18 | Dallas to the border region? |
| 13:43:54 | 19 | A.   Sometimes I had to hide it in the doors, and then, if not, |
| 13:43:58 | 20 | then I would bring it in washers or refrigerators. |
| 13:44:03 | 21 | Q.   Were you ever stopped by police during any of these trips? |
| 13:44:22 | 22 | A.   Just once, but it was only -- he was checking on a light. |
| 13:44:27 | 23 | He said for me to go on, be careful, but he didn't check to see |
| 13:44:32 | 24 | what I had with me. |
| 13:44:32 | 25 | Q.   And how would you get paid for transporting the money? |

| | | |
|---|---|---|
| 13:44:39 | 1 | A.   I was paid one percent. |
| 13:44:41 | 2 | Q.   So given your example of a million dollars on one trip, how |
| 13:44:47 | 3 | much would you be paid for that? |
| 13:44:52 | 4 | A.   10,000. |
| 13:44:55 | 5 | Q.   Did you ever take a trip to Ruidoso, New Mexico? |
| 13:45:00 | 6 | A.   Yes. |
| 13:45:01 | 7 | Q.   And how did it come to be that you were instructed to make a |
| 13:45:06 | 8 | trip to Ruidoso? |
| 13:45:20 | 9 | A.   Okay.  I got a phone call from Mario, "Poncho."  Mario |
| 13:45:23 | 10 | saying he wanted to talk to me.  And I went to the Nava.  He said |
| 13:45:34 | 11 | come to Nava.  And so, I went to the house at Nava -- in Nava and |
| 13:45:38 | 12 | "Poncho" and Hector were there. |
| 13:45:39 | 13 | Q.   Let me back up a second.  When was this? |
| 13:45:43 | 14 | A.   That was more or less in 2010, August, July.  I don't |
| 13:45:57 | 15 | remember. |
| 13:45:58 | 16 | Q.   And you said the house at Nava.  Where is Nava? |
| 13:46:04 | 17 | A.   Nava's in Coahuila. |
| 13:46:08 | 18 | Q.   In Mexico? |
| 13:46:09 | 19 | A.   In Mexico, yes. |
| 13:46:11 | 20 | Q.   And lastly, you said you went there to meet with Mr. Cuellar |
| 13:46:13 | 21 | and an individual named Hector.  Do you know Hector's full name? |
| 13:46:24 | 22 | A.   Hector Moreno. |
| 13:46:28 | 23 | Q.   And when you arrived at this house in Nava in Coahuila, what |
| 13:46:32 | 24 | were you told? |
| 13:46:48 | 25 | A.   I was told, you're going to go to Dallas.  There, you're |

| | | |
|---|---|---|
| 13:46:51 | 1 | going to pick up some money and from Dallas, you're going to go |
| 13:46:53 | 2 | to New Mexico to Ruidoso. |
| 13:46:55 | 3 | Q.   And were you told how much money you were going to pick up? |
| 13:47:01 | 4 | A.   Yes. |
| 13:47:01 | 5 | Q.   And how much was it? |
| 13:47:04 | 6 | A.   $110,000. |
| 13:47:06 | 7 | Q.   And were you told what that money was for? |
| 13:47:17 | 8 | A.   I wasn't told.  I was just told that I should pick it up, |
| 13:47:20 | 9 | and there in New Mexico, you should deliver it to a woman. |
| 13:47:24 | 10 | Q.   And did you, in fact, go from Nava to Dallas to pick up |
| 13:47:29 | 11 | money? |
| 13:47:32 | 12 | A.   Uh-huh.  Yes.  And from there, I called "Junior," letting |
| 13:47:47 | 13 | him know I had arrived in Dallas to pick up the money.  And |
| 13:47:50 | 14 | "Junior" sent me a worker to bring me the money. |
| 13:47:53 | 15 | Q.   And do you know "Junior's" full name? |
| 13:47:57 | 16 | A.   Jose Vasquez. |
| 13:47:59 | 17 | Q.   And you went to pick up the money from "Junior," who you |
| 13:48:04 | 18 | know as Jose Vasquez, and what did you do after that? |
| 13:48:15 | 19 | A.   Okay.  And, well, okay.  Then when I got the money, I |
| 13:48:37 | 20 | wrapped it up, and I put it in one of those pressure cookers, the |
| 13:48:41 | 21 | one you use for turkey.  And then, from there, I went to Ruidoso, |
| 13:48:46 | 22 | and there, I went to the Wal-Mart.  Do you want me to go on? |
| 13:48:50 | 23 | Q.   One second.  Let me ask you another question. |
| 13:48:52 | 24 |       When you say you wrapped up the money, what type of |
| 13:48:55 | 25 | bills were they?  What amounts? |

13:49:01  1   A.   All 100s.

13:49:03  2   Q.   And how was it packaged when you received it?

13:49:11  3   A.   It wasn't packaged.  It was just given to me like that in a

13:49:15  4   bag.  Just like that in a bag.

13:49:16  5   Q.   Was it wrapped in anything?  Paper?  Anything?

13:49:21  6   A.   Just had rubber-bands.  Just had rubber-bands.

13:49:24  7   Q.   And during your trip to New Mexico, did you receive any

13:49:28  8   calls?

13:49:45  9   A.   Yeah.  Hector was calling me, asking me where I was, what

13:49:50  10  time was I going to get there, and that when I got to Ruidoso,

13:49:52  11  that I should call him so that he could give me the phone number

13:49:54  12  to the woman that I was supposed to meet there.

13:49:57  13  Q.   So prior to arriving in Ruidoso, you were not aware who you

13:50:01  14  were going to meet?

13:50:05  15  A.   No.  I just grabbed -- got the money and I went on to

13:50:20  16  Ruidoso.  And it was about three hours before I got to Ruidoso

13:50:23  17  that I called Hector.

13:50:25  18  Q.   And so, you got to Ruidoso, I believe you testified, then

13:50:28  19  you pulled into a Wal-Mart; is that correct?

13:50:31  20  A.   To Wal-Mart.  Uh-huh.

13:50:34  21  Q.   And were you eventually given that number to call somebody

13:50:38  22  by Hector Moreno?

13:50:46  23  A.   Yeah.  Gave it to me.  Gave it to me and I called the lady

13:51:11  24  and she said, you know what, you wait there.  And so, I waited

13:51:14  25  there about two hours, and after about two hours, I called her,

13:51:18   1   and she said, you know what, I'm just getting there.  I'm just

13:51:21   2   getting there.  Meet me over at the track, at the race -- at the

13:51:24   3   horse race track.

13:51:25   4   Q.   And do you know the name of the race track?

13:51:28   5   A.   It's just a track.  It's where they run horses and it was

13:51:46   6   empty.  It's like a race track, a horse race track and I just

13:51:52   7   waited there.  There was no one there.

13:51:54   8   Q.   And this woman you were supposed to meet, did she eventually

13:51:58   9   show up?

13:52:01  10   A.   Yeah.  From when I called within ten minutes, she was

13:52:21  11   arriving.  She was pulling into the parking lot.  And when she

13:52:24  12   pulled into the parking lot, I just grabbed the pen, I gave it to

13:52:27  13   her, and then, I left.

13:52:28  14   Q.   And did you have any conversation with this woman?

13:52:31  15   A.   No.  Not at all.

13:52:32  16   Q.   And can you describe what she looked like for the jury?

13:52:37  17   A.   Well, it's been about two years, but more or less, it was a

13:53:02  18   truck.  It was either black or white, a big one, a diesel.  The

13:53:07  19   lady, she was an American lady, and I remember she had dark

13:53:10  20   glasses on.

13:53:14  21   Q.   And I think I asked you this question, but did you have a

13:53:17  22   conversation with her?  I did ask you that question.  Never mind.

13:53:20  23        Have you ever heard of a horse named Mr. Piloto?

13:53:27  24   A.   No, sir.

13:53:29  25   Q.   Have you got a lawyer assist you through this process of you

| | | |
|---|---|---|
| 13:53:34 | 1 | being arrested and your criminal proceedings? |
| 13:53:43 | 2 | A.    Are you asking if he helped me? |
| 13:53:46 | 3 | Q.    Have you had an attorney through this whole process? |
| 13:53:57 | 4 | A.    Oh, yeah.  Before.  I mean, I don't think he's here right |
| 13:54:00 | 5 | now but before, yes. |
| 13:54:01 | 6 | Q.    And I'm sure these gentlemen who also have lawyers are going |
| 13:54:04 | 7 | to have an opportunity to talk to you.  And I'll pass the |
| 13:54:06 | 8 | witness, your Honor. |
| 13:54:13 | 9 | CROSS-EXAMINATION |
| 13:54:17 | 10 | BY MS. WILLIAMS: |
| 13:54:17 | 11 | Q.    What's your lawyer's name? |
| 13:54:21 | 12 | A.    Rafael Del la Garza. |
| 13:54:25 | 13 | Q.    Rafael De la Garza, the same as Mr. Cuellar's lawyer? |
| 13:54:31 | 14 | A.    No. |
| 13:54:31 | 15 | MR. GARDNER:  Your Honor, I believe that misstates the |
| 13:54:34 | 16 | facts.  I believe Mr. Cuellar's lawyer was Frank Perez. |
| 13:54:39 | 17 | MS. WILLIAMS:  No further questions. |
| 13:54:44 | 18 | MR. DEGEURIN:  I have no questions. |
| 13:54:47 | 19 | MR. WOMACK:  Yes, your Honor.  Briefly. |
| 13:54:48 | 20 | CROSS-EXAMINATION |
| 13:54:48 | 21 | BY MR. WOMACK: |
| 13:54:51 | 22 | Q.    Good afternoon, Mr. Mata. |
| 13:54:53 | 23 | A.    Good afternoon. |
| 13:54:54 | 24 | Q.    I'm Guy Womack from Houston.  We've never met, have we? |
| 13:54:59 | 25 | A.    No.  Huh-uh. |

13:55:02  1   Q.   At the time that you pled guilty in the Eastern District, do

13:55:06  2   you recall that you had entered into a written contract with the

13:55:10  3   government called a plea agreement?

13:55:22  4   A.   Uh-huh.

13:55:23  5   Q.   Is that "Yes"?

13:55:29  6   A.   Yes.  Let me see.  I don't remember.  Yes.  Yes.

13:55:35  7   Q.   Do you recall that at the time that you pled guilty, before

13:55:40  8   the judge would accept your plea of guilty, the judge went over

13:55:44  9   with you a plea agreement that set out the terms of your

13:55:49  10  agreement with the United States Attorney's Office?

13:55:57  11  A.   Uh-huh.  Yes.

13:56:10  12  Q.   And before the judge would accept your plea, the judge made

13:56:14  13  sure that you understood all the terms of that agreement.

13:56:28  14  A.   Uh-huh.  Yes.

13:56:29  15  Q.   And do you recall that among the terms was that you would

13:56:33  16  plead guilty to something; is that right?

13:56:42  17  A.   Yes.

13:56:44  18  Q.   And you would waive your right to appeal that conviction or

13:56:47  19  sentence forever.

13:56:59  20  A.   Uh-huh.  Yes.

13:57:00  21  Q.   And it also had a paragraph that was entitled "Cooperation,"

13:57:05  22  and it said in there that if you were to cooperate with the

13:57:09  23  United States government, you could get your sentence reduced.

13:57:13  24  Do you recall that?

13:57:28  25  A.   Yes.  Yes.  I understand that.

13:57:33   1   Q.   And, in fact, it said there are two times or two ways that

13:57:37   2   you can get your sentence reduced for cooperation.  One of them

13:57:41   3   was called a downward departure from the sentence guidelines.  Do

13:57:46   4   you recall that?

13:58:00   5   A.   Yes.

13:58:00   6   Q.   And you understood that that was for cooperation that you

13:58:03   7   gave the government before the time that you were actually

13:58:06   8   sentenced?

13:58:14   9   A.   Uh-huh.

13:58:15   10   Q.   Is that "Yes"?

13:58:21   11   A.   Yeah, but I'm not expecting anything from the government.

13:58:24   12   You understand?

13:58:24   13   Q.   Okay.  But the agreement says that the second part of the

13:58:29   14   cooperation is even for cooperation you give after your

13:58:32   15   sentencing, you could get a reduction of sentence for

13:58:36   16   cooperation.  Do you understand that?

13:58:48   17   A.   Yeah.  I understand.  But I'm not certain that they're going

13:58:53   18   to reduce it.

13:58:54   19   Q.   We understand that.  And the reason that you're not certain

13:58:59   20   is because in your plea agreement, it says only the United States

13:59:03   21   Attorney can decide if you have actually cooperated.  Is that

13:59:17   22   right?

13:59:17   23   A.   Yeah.  Only the prosecutor can.

13:59:20   24   Q.   Okay.  And that means that you understand that in order for

13:59:26   25   you to get a reduction for cooperating here, it would be required

| | | |
|---|---|---|
| 13:59:32 | 1 | that the prosecutors here tell the prosecutors in the Eastern |
| 13:59:37 | 2 | District that you have cooperated with them, correct? |
| 13:59:51 | 3 | A.   This is right. |
| 13:59:53 | 4 | Q.   So, in other words, the only way you can get a reduction of |
| 13:59:57 | 5 | sentence in the Eastern District is if Mr. Gardner or his office |
| 14:00:02 | 6 | from here tells the Eastern District that you have helped them, |
| 14:00:07 | 7 | correct? |
| 14:00:20 | 8 | A.   Uh-huh. |
| 14:00:20 | 9 | Q.   Is that "Yes"? |
| 14:00:23 | 10 | A.   Uh-huh. |
| 14:00:25 | 11 | Q.   Is that "Si" or "No"? |
| 14:00:29 | 12 | A.   It's that I don't understand your question. |
| 14:00:31 | 13 | Q.   Does "Uh-Huh" mean "Yes" or "No"? |
| 14:00:34 | 14 |         MR. GARDNER:  Your Honor, he answered the question.  I |
| 14:00:35 | 15 | object, your Honor.  He's answered the question.  I think we all |
| 14:00:38 | 16 | know what "Uh-Huh" means in this court. |
| 14:00:40 | 17 |         THE COURT:  Well -- |
| 14:00:42 | 18 |         MR. WOMACK:  We need it for the record. |
| 14:00:45 | 19 |         THE COURT:  I'm never sure the court reporter knows how |
| 14:00:47 | 20 | to write "Uh-Huh."  So we'll have a "Yes" or a "No." |
| 14:00:55 | 21 | A.   No.  No. |
| 14:00:57 | 22 | Q.   (BY MR. WOMACK) So you don't think it's important that the |
| 14:01:00 | 23 | U.S. Attorney here notify the U.S. Attorney in the Eastern |
| 14:01:04 | 24 | District of your cooperation?  You don't think that's important? |
| 14:01:16 | 25 | A.   No.  No.  I don't.  No. |

14:01:18   1   Q.   Your lawyer didn't tell you that you could have your

14:01:21   2   sentence reduced for testifying in this trial?

14:01:33   3   A.   What can I say?  The attorney never even came to see me.

14:01:36   4   Q.   Have the attorneys here not told you that your cooperation

14:01:40   5   could get them to tell the Eastern District of your cooperation?

14:01:44   6           MR. GARDNER:  Your Honor, this has been asked and

14:01:45   7   answered.

14:01:45   8           THE COURT:  It has been asked and answered.

14:01:49   9   Q.   (BY MR. WOMACK) You understand that the only way your

14:01:51   10  sentence can be reduced is with the help of the prosecutors here?

14:01:54   11          MR. GARDNER:  Your Honor, that's been asked and

14:01:55   12  answered.

14:01:58   13          THE COURT:  No, no.  He answered that you couldn't help

14:02:03   14  him but by -- I think you'd better start over.

14:02:06   15          MR. WOMACK:  Yes, sir.  I knew you were going to say

14:02:09   16  that, sir, but yes.

14:02:11   17  Q.   (BY MR. WOMACK) Do you understand that under the terms of

14:02:14   18  your plea agreement that you signed in the Eastern District of

14:02:18   19  Texas, you can get a reduced sentence for cooperation?

14:02:37   20  A.   But I didn't sign anything, did I?  I mean, what can I say?

14:02:49   21  The attorney never came.  I mean, in a year, year and a half, he

14:02:52   22  only came twice.

14:03:18   23  Q.   Sir, I'm going to show you what's been marked as Defendant's

14:03:22   24  Exhibit Garcia No. 2.  It's a multi-page document.  If you will

14:03:31   25  thumb through all the pages and familiarize yourself with what

| | | |
|---|---|---|
| 14:03:35 | 1 | that is and then, look back up. |
| 14:03:38 | 2 | MR. GARDNER:  We have no objection.  Mr. Womack didn't |
| 14:03:41 | 3 | even lay the foundation.  We have no objection to Garcia No. 2. |
| 14:03:45 | 4 | THE COURT:  Well. |
| 14:03:48 | 5 | MR. WOMACK:  So with that I would offer Garcia |
| 14:03:51 | 6 | Defendant's Exhibit No. 2 and ask to publish it. |
| 14:03:56 | 7 | THE COURT:  It's received. |
| 14:04:06 | 8 | Q.   (BY MR. WOMACK) Mr. Mata, have you had a chance to look at |
| 14:04:26 | 9 | that exhibit? |
| 14:04:33 | 10 | A.   Yeah, it was shown to me, but it was really, really quick. |
| 14:04:36 | 11 | The attorney didn't -- |
| 14:04:39 | 12 | Q.   Do you remember the judge in the court that you were in? |
| 14:04:50 | 13 | A.   She's Cone -- Crone. |
| 14:04:52 | 14 | Q.   Judge Crone.  It's a lady, wasn't it? |
| 14:04:56 | 15 | A.   Yes.  It's a lady. |
| 14:05:05 | 16 | Q.   Your Honor, we're trying to figure out how to back this |
| 14:05:08 | 17 | thing up. |
| 14:05:20 | 18 | Okay.  Mr. Mata, I'm showing you what has been marked |
| 14:05:29 | 19 | as Garcia -- or Defendant's Exhibit Garcia No. 2, and it's |
| 14:05:36 | 20 | entitled, "Plea Agreement."  Do you see that? |
| 14:05:52 | 21 | A.   Uh-huh.  Yes. |
| 14:05:54 | 22 | Q.   Okay.  And the first page has your name on it, doesn't it? |
| 14:06:04 | 23 | A.   Yes. |
| 14:06:06 | 24 | Q.   And it says that you have an attorney named Rafael De la |
| 14:06:10 | 25 | Garza, II? |

| 14:06:15 | 1 | A.   Yes. |

14:06:15  1  A.   Yes.

14:06:19  2  Q.   In addition to talking about rights that you're waiving,

14:06:27  3  like to have a jury trial, talking a little bit about the

14:06:31  4  sentencing guidelines.  We get over to page 4, paragraph 7, which

14:06:49  5  says that you, the defendant, shall give truthful and complete

14:06:55  6  information and/or testimony concerning your participation in the

14:07:00  7  offense of conviction and knowledge of other criminal activities.

14:07:06  8  Do you remember that?

14:07:35  9  A.   Uh-huh.  Yes.

14:07:37  10  Q.   Turn over to page -- well, do you see where now, I've turned

14:07:41  11  to page 6 of the agreement and looking at paragraph 9, where it

14:07:46  12  says, substantial assistance, do you see that?

14:07:57  13  A.   Yes.

14:07:59  14  Q.   And it says in that paragraph that if in its sole

14:08:04  15  discretion, the government determines that you have provided

14:08:09  16  substantial assistance in the investigation or prosecution of

14:08:13  17  others, the government will file a motion for downward departure

14:08:20  18  pursuant to Sentencing Guideline Section 5K1, or a motion for

14:08:24  19  reduction of sentence under Federal Rules of Criminal Procedure

14:08:28  20  35.  Do you remember that?

14:08:59  21  A.   Yes.

14:09:01  22  Q.   If you flip to the last page, page 9, which I've got on the

14:09:07  23  screen now, paragraph 17 says that you, your attorney and the

14:09:11  24  government acknowledge that this is a complete statement of your

14:09:15  25  agreement in this case.  It takes the place of any other plea

14:09:21   1   agreements and can't be modified.  Can't be modified unless the

14:09:26   2   modification is in writing and signed by all parties, and no

14:09:31   3   other promises have been made.  Do you see that?

14:09:56   4   A.   Yes.

14:09:57   5   Q.   And down about the middle of the page, do you see where it

14:10:00   6   says, I have read or had read to me this plea agreement and have

14:10:06   7   carefully reviewed every part of it with my attorney.  I fully

14:10:11   8   understand it and voluntarily agree to it, and has a date 4-25-12

14:10:20   9   and it has a signature.  Whose signature is that?

14:10:46  10   A.   It's mine.

14:10:51  11   Q.   And you see that underneath where you signed it, your

14:10:55  12   attorney signed it saying that he was your counsel, that he had

14:11:00  13   carefully reviewed every part of this plea agreement with you,

14:11:05  14   and to his knowledge and belief, you understood your decision to

14:11:10  15   enter into it was an informed and voluntary one.  And he signed

14:11:15  16   it, didn't he?

14:11:35  17   A.   Uh-huh.  Yes.

14:11:36  18   Q.   And right above you, you see where the U.S. Attorney or, in

14:11:39  19   this case, the Assistant U.S. Attorney Mr. Gonzalez also signed

14:11:43  20   the plea agreement?

14:11:53  21   A.   Yes.

14:11:54  22   Q.   And you see that he signed it a day after you and your

14:11:56  23   lawyer signed it.  Do you see that?

14:12:00  24        MR. GARDNER:  Your Honor, at this point, I'm going to

14:12:01  25   object to the relevance about the day, when people were signing

| | | |
|---|---|---|
| 14:12:04 | 1 | the plea agreement. |
| 14:12:04 | 2 | MR. WOMACK:  I think it's important, your Honor, to |
| 14:12:07 | 3 | show that -- the process he went through and must have known what |
| 14:12:11 | 4 | he was signing. |
| 14:12:13 | 5 | MR. GARDNER:  I think he's already admitted that, your |
| 14:12:15 | 6 | Honor. |
| 14:12:16 | 7 | THE COURT:  Well, let him ask the questions. |
| 14:12:20 | 8 | Q.   (BY MR. WOMACK) You actually gave this agreement to the |
| 14:12:22 | 9 | government the day before your trial, didn't you? |
| 14:12:33 | 10 | A.   Yes. |
| 14:12:33 | 11 | Q.   And then, while you were standing there in front of Judge |
| 14:12:36 | 12 | Crone, she went over all these material terms with you and made |
| 14:12:42 | 13 | sure that you understood them, didn't she? |
| 14:12:49 | 14 | A.   Yes. |
| 14:12:50 | 15 | Q.   And you had the assistance of a Spanish interpreter, just |
| 14:12:53 | 16 | like you do here at court, didn't you? |
| 14:12:58 | 17 | A.   Yes. |
| 14:13:03 | 18 | Q.   Those are all the questions I have.  Thank you. |
| 14:13:15 | 19 | CROSS-EXAMINATION |
| 14:13:15 | 20 | BY MR. ESPER: |
| 14:13:29 | 21 | Q.   Mr. Mata, before you were locked up, what city did you live |
| 14:13:36 | 22 | in? |
| 14:13:41 | 23 | A.   Oh, Eagle Pass. |
| 14:13:42 | 24 | Q.   Okay.  So you are a United States citizen? |
| 14:13:47 | 25 | A.   Yes. |

14:13:48  1  Q.   And you for the last ten years before you were locked up,

14:13:54  2  you made your living transporting cars?  Would that be a fair

14:14:00  3  statement?

14:14:01  4  A.   Yeah.  Right.  I worked transporting cars.  I worked at

14:14:15  5  Wal-Mart.  I worked straight.

14:14:16  6  Q.   When did you start working for Mr. Cuellar?

14:14:25  7  A.   In about 2004.

14:14:27  8  Q.   Okay.  And you got locked up in 2012?

14:14:33  9  A.   No.  In '11.  2011.

14:14:36  10  Q.   In late 2011?

14:14:39  11  A.   September.  Yes.

14:14:41  12  Q.   Okay.  So you worked for Mr. Cuellar for about seven years,

14:14:44  13  correct?

14:14:45  14  A.   No.  I worked -- besides him, I worked with other people.  I

14:15:03  15  would get crosswise with him and I'd go work for someone else.

14:15:05  16  Q.   Okay.  Were you an independent trucker?

14:15:17  17  A.   Yeah.  When I worked for Mario when he had cars, he would

14:15:30  18  loan me his vehicle, his truck, and I would use his truck.  Then

14:15:34  19  I got my own truck and I would transport.

14:15:37  20  Q.   So but the first time you started working for Mr. Cuellar

14:15:40  21  was in 2004, correct?

14:15:50  22  A.   Yeah.  Like about 2004 and it was just a little bit in the

14:15:53  23  beginning, a little money.

14:15:54  24  Q.   That's fine.  I'm not trying to trick you on the years.

14:15:58  25        Now, you say that you would get crosswise with Mr.

14:16:02  1  Cuellar.  About what?

14:16:11  2  A.   It's that he's got a really strong personality, lot of

14:16:15  3  energy.

14:16:16  4  Q.   Lot of energy?

14:16:27  5  A.   Well, yeah, because he would get angry.  If I did something

14:16:30  6  wrong, he would scold me, and then, I'd get mad and I'd go

14:16:33  7  somewhere else, work somewhere else.

14:16:36  8  Q.   He had a bad temper, didn't he?

14:16:38  9  A.   Yes.  He had a bad temper.

14:16:40  10  Q.   And oftentimes, he'd try to fool you, didn't he?

14:16:53  11  A.   Not much, but it's just that he has that quirk that he's

14:17:00  12  very strict that there were certain things I had to pay attention

14:17:03  13  to.

14:17:03  14  Q.   And if you didn't, you got scolded and talked down to,

14:17:09  15  correct?

14:17:28  16  A.   Yes.  And then, I would get mad and I'd say I'm not going to

14:17:30  17  work with him anymore, and I'd go away for about a year.  And

14:17:34  18  then, I'd work for someone else, and then, the work would run out

14:17:37  19  and I'd have to call him back.

14:17:39  20  Q.   When you went back, he made sure you understood that he was

14:17:42  21  running the show and you had to do what he told you to do?

14:17:53  22  A.   Yes.  Yes.

14:17:55  23  Q.   Now, you say that, at some juncture, he convinces you to

14:18:00  24  start going and picking up money, correct?

14:18:21  25  A.   Well, in the beginning, yes.  He said, you want to make more

14:18:24   1   money because that was just a little bit.  You want to make more

14:18:27   2   money because I have large amounts and you can make more money.

14:18:29   3   Q.   And is this -- would this be about in 2007, 2008, 2009?  If

14:18:41   4   you know.

14:18:49   5   A.   Yes.  2007 -- well, when things got good, good was 2009 to

14:19:01   6   2010.  The money I was getting.

14:19:04   7   Q.   Okay.  Did Mr. Cuellar tell you this money that you're

14:19:10   8   picking up comes from the sale of cocaine that I've supplied to

14:19:17   9   "Junior"?

14:19:40   10  A.   Well, with Cuellar, after that, I didn't talk to Cuellar.

14:19:44   11  He said, you know what, you talk to Hector.  He's the one that's

14:19:47   12  going to be handling the money.

14:19:48   13  Q.   Okay.  Did Hector tell you, this money that you're picking

14:19:53   14  up, this money you're picking up, Gerardo, is money that comes

14:20:00   15  from the sale of cocaine by "Junior" that we've sent up to him?

14:20:17   16  A.   Yes.

14:20:18   17  Q.   And that you didn't shy away from picking up that money,

14:20:23   18  even after Hector told you that?

14:20:33   19  A.   No.  I kept bringing money.

14:20:34   20  Q.   Okay.  Now, were Hector and Cuellar partners?

14:20:40   21  A.   Yes.  Uh-huh.

14:20:41   22  Q.   Now, did Mr. Cuellar own a business in Piedras Negras?  You

14:20:46   23  said something about a junkyard.

14:21:03   24  A.   Oh, in Piedras Negras, yes, he did have a business.

14:21:06   25  Q.   Okay.

14:21:07   1   A.   Something to do with machinery.   Some kind of machinery.   I

14:21:10   2   don't remember.

14:21:10   3   Q.   Did he have a business in Eagle Pass?

14:21:21   4   A.   Oh, but that was in the beginning when I worked -- when I

14:21:24   5   started working with him at the auto parts junkyard.

14:21:27   6   Q.   Okay.   He had an auto parts junkyard in Eagle Pass, correct?

14:21:32   7   A.   Yes.   Yes.   Correct.

14:21:36   8   Q.   And where did he live, in Eagle Pass or Piedras Negras or

14:21:39   9   both?

14:21:44   10   A.   Mario?   Are you asking about Mario?

14:21:48   11   Q.   Mr. Cuellar.

14:21:56   12   A.   In the end, he worked -- he lived in Piedras Negras -- Nava.

14:22:01   13   Piedras Negras, Coahuila.

14:22:02   14   Q.   Didn't have a house in Eagle Pass?

14:22:07   15   A.   That I remember, no.

14:22:11   16   Q.   Okay.   When you worked for Mr. Cuellar, did you believe

14:22:27   17   everything that he told you?

14:22:36   18   A.   Sometimes.   Sometimes no.   He was kind of a liar.

14:22:42   19   Q.   He was a pretty good liar, wasn't he?

14:22:50   20   A.   No.   Not much.   A little bit.

14:22:53   21   Q.   Whenever it was his benefit to lie, he lied, didn't he?

14:23:02   22   A.   Well, yeah, because when he paid me, he didn't pay me right.

14:23:05   23   Q.   Yeah.   Okay.   That's all I got, your Honor.

14:23:15   24             MR. MAYR:   Judge, I have no further questions.

14:23:15   25

14:23:15    1                   RE-DIRECT EXAMINATION

14:23:15    2    (BY MR. GARDNER)

14:23:22    3    Q.   Mr. Mata, did you come here to tell the truth today?

14:23:26    4    A.   Yes.

14:23:27    5              MR. ESPER:  Objection, your Honor.  That's for the jury

14:23:29    6    to decide whether he's telling the truth or not.  This calls for

14:23:34    7    a --

14:23:35    8              THE COURT:  The question has been answered.  Next

14:23:37    9    question.

14:23:38   10    Q.   (BY MR. GARDNER) Have you told the truth here today?

14:23:40   11              MR. ESPER:  Objection, your Honor.

14:23:41   12              THE COURT:  All right.  The objection is overruled.

14:23:43   13    You can inquire if he's telling the truth.  That's what you've

14:23:46   14    been doing for an hour.

14:23:50   15    A.   Yes.

14:23:50   16    Q.   (BY MR. GARDNER) And is the truth that you took that money

14:23:53   17    to Ruidoso?

14:23:56   18    A.   Yes.

14:23:56   19    Q.   That's all I have, your Honor.

14:23:59   20              THE COURT:  Any further questions from defense?

14:24:01   21              MR. WOMACK:  No questions.

14:24:02   22              THE COURT:  Mr. --

14:24:03   23              MR. ESPER:  I have none, your Honor.

14:24:05   24              THE COURT:  Okay.  May this witness be excused?  You

14:24:09   25    may step down, sir.  Call your next witness.

| | | |
|---|---|---|
| 14:24:15 | 1 | MS. FERNALD:  The government would call Sharon Moore. |
| 14:24:47 | 2 | (Witness sworn.) |
| 14:25:10 | 3 | THE COURT:  Ma'am, if you'll tell us your full name and |
| 14:25:14 | 4 | spell your last, please. |
| 14:25:14 | 5 | THE WITNESS:  Sharon Moore Crain, C-R-A-I-N. |
| 14:25:19 | 6 | THE COURT:  You may proceed. |
| 14:25:20 | 7 | SHARON MOORE CRAIN, called by the Government, duly sworn. |
| 14:25:20 | 8 | DIRECT EXAMINATION |
| 14:25:20 | 9 | BY MS. FERNALD: |
| 14:25:21 | 10 | Q.   Ms. Moore Crain, can you tell the ladies and gentlemen of |
| 14:25:24 | 11 | the jury where you live and what you do for a living? |
| 14:25:26 | 12 | A.   I live in Mesquite, Texas and I do income taxes.  And I'm a |
| 14:25:31 | 13 | bookkeeper. |
| 14:25:34 | 14 | MS. WILLIAMS:  Your Honor, I'm having a little trouble |
| 14:25:36 | 15 | hearing the witness. |
| 14:25:37 | 16 | MS. FERNALD:  I am, too. |
| 14:25:38 | 17 | THE COURT:  Let's move -- yeah.  If you'll speak. |
| 14:25:41 | 18 | THE WITNESS:  Is that better? |
| 14:25:42 | 19 | THE COURT:  If you'll speak into that mic, it will |
| 14:25:45 | 20 | work. |
| 14:25:46 | 21 | Q.   (BY MS. FERNALD) You live where? |
| 14:25:48 | 22 | A.   In Mesquite, Texas. |
| 14:25:50 | 23 | Q.   And what do you do for a living? |
| 14:25:51 | 24 | A.   I do income taxes and bookkeeping. |
| 14:25:54 | 25 | Q.   Are you known as a tax preparer? |

| | | |
|---|---|---|
| 14:25:56 | 1 | A.   Yes, ma'am. |
| 14:25:58 | 2 | Q.   How long have you been a tax preparer? |
| 14:25:59 | 3 | A.   Twenty years. |
| 14:26:01 | 4 | Q.   And who do you work for? |
| 14:26:03 | 5 | A.   My own company. |
| 14:26:05 | 6 | Q.   What is the name of your company? |
| 14:26:06 | 7 | A.   Peggy's Bookkeeping and Tax Service. |
| 14:26:09 | 8 | Q.   And where is it located? |
| 14:26:11 | 9 | A.   On Gross Road in Mesquite, Texas. |
| 14:26:13 | 10 | Q.   How long have you worked for this company? |
| 14:26:15 | 11 | A.   Twenty years. |
| 14:26:16 | 12 | Q.   And can you tell the ladies and gentlemen of the jury how |
| 14:26:18 | 13 | this company was formed? |
| 14:26:20 | 14 | A.   My mother began this company 40 years ago and I joined her |
| 14:26:26 | 15 | 20 years ago.  Unfortunately, we lost her. |
| 14:26:30 | 16 | Q.   All right.  And so, you basically run this business; is that |
| 14:26:34 | 17 | correct? |
| 14:26:34 | 18 | A.   That is true. |
| 14:26:34 | 19 | Q.   And her first name is Peggy? |
| 14:26:36 | 20 | A.   Yes. |
| 14:26:36 | 21 | Q.   All right.  Ms. Moore Crain, can you tell me a little bit |
| 14:26:42 | 22 | about your educational background for the jury? |
| 14:26:45 | 23 | A.   Yes, ma'am.  I have a high school diploma and I've had some |
| 14:26:50 | 24 | college. |
| 14:26:52 | 25 | Q.   And you've had a lot of on-the-job training and experience? |

| | | |
|---|---|---|
| 14:26:55 | 1 | A.   A lot of on-the-job training. |
| 14:26:57 | 2 | Q.   In 20 years, how many clients do you approximate that you |
| 14:27:01 | 3 | have seen to prepare their taxes? |
| 14:27:03 | 4 | A.   Wow, I probably do 6 to 700 a year.  So I do quite a bit. |
| 14:27:10 | 5 | Q.   And how many people work in your office with you? |
| 14:27:13 | 6 | A.   About nine. |
| 14:27:15 | 7 | Q.   Okay.  And is Tracy Pennington one of these employees? |
| 14:27:19 | 8 | A.   Yes, ma'am. |
| 14:27:20 | 9 | Q.   Who is Allen Fischer? |
| 14:27:21 | 10 | A.   He is a CPA in Dallas, Texas. |
| 14:27:24 | 11 | Q.   When an individual comes into your office for you to prepare |
| 14:27:31 | 12 | their tax return, can you just give the ladies and gentlemen of |
| 14:27:33 | 13 | the jury a little bit about what happens and what is the |
| 14:27:36 | 14 | interaction there? |
| 14:27:37 | 15 | A.   Well, we ask them to fill out a form that -- we ask a lot of |
| 14:27:44 | 16 | questions, you know, who's your dependents and their Socials. |
| 14:27:47 | 17 | And, of course, we get their identification.  And, you know, ask |
| 14:27:52 | 18 | them what sorts of income that they have to prepare their taxes. |
| 14:27:56 | 19 | Q.   Income, different expenses that they have? |
| 14:27:59 | 20 | A.   Yes, ma'am. |
| 14:28:00 | 21 | Q.   Things like exemptions? |
| 14:28:01 | 22 | A.   Yes, ma'am. |
| 14:28:02 | 23 | Q.   Items like that.  You ask for bank accounts and records? |
| 14:28:05 | 24 | A.   Yes, ma'am. |
| 14:28:06 | 25 | Q.   W-2s? |

14:28:07  1    A.    Yes, ma'am.

14:28:08  2    Q.    1099s?

14:28:09  3    A.    Yes, ma'am.  And if they don't have it, I get it from the

14:28:14  4    IRS.

14:28:15  5    Q.    Do you know an individual by the name of Jose

14:28:19  6    Trevino-Morales?

14:28:19  7    A.    Yes, ma'am.

14:28:20  8    Q.    And how do you know that individual?

14:28:22  9    A.    He came to my office.

14:28:24  10   Q.    What year did he come to your office?

14:28:26  11   A.    In late 2009.

14:28:30  12   Q.    Do you remember the month?

14:28:33  13   A.    I believe it was November or October.  I don't know the

14:28:38  14   exact date.

14:28:39  15   Q.    Ms. Moore Crain, would you take a moment to -- you may even

14:28:43  16   have to stand up, look around the courtroom and see if you see

14:28:47  17   Mr. Jose Trevino-Morales in the courtroom today.

14:28:49  18   A.    Yes.  I do.

14:28:50  19   Q.    Okay.  And can you identify the type of clothing that he's

14:28:55  20   wearing?

14:28:55  21   A.    A blue shirt and maroon tie.

14:28:58  22   Q.    So this is the individual that came into your office in late

14:29:01  23   2009?

14:29:02  24   A.    Yes, ma'am.

14:29:03  25   Q.    Thank you.

14:29:06  1        Ms. Moore Crain, what was the purpose obviously of him
14:29:09  2   coming into your office in late 2009?
14:29:12  3   A.   That he had won a race and that he wanted to start a
14:29:17  4   company.
14:29:18  5   Q.   Won a race?
14:29:20  6   A.   Yes, ma'am.  Lone Star -- at the Lone Star Park, he had won
14:29:25  7   a horse race.
14:29:26  8   Q.   A horse race.  And what did he tell you at that time?
14:29:33  9   A.   That he had won the race and that he wanted to form a
14:29:39  10  company and that he had bought a horse for $25,000 from a tip
14:29:46  11  from one of his relatives.
14:29:48  12  Q.   Do you recall the name of that horse?
14:29:52  13  A.   Tempting Dash.
14:29:55  14       THE COURT:  Tell me again.
14:29:56  15       THE WITNESS:  Tempting Dash.
14:29:58  16  Q.   (BY MS. FERNALD) Tempting Dash?  Is that what you said?
14:30:01  17  A.   Yes, ma'am.
14:30:01  18  Q.   And when you say a relative, did he identify which relative
14:30:06  19  this was that helped him with this tip?
14:30:09  20  A.   Either a brother or a brother-in-law.  I don't know.
14:30:13  21  Q.   Do you recall the name?
14:30:15  22  A.   No, ma'am.
14:30:16  23  Q.   Does the name Rodolfo refresh your recollection?
14:30:19  24  A.   Yes, ma'am.
14:30:20  25  Q.   Did he have the same last name as Jose Trevino?

```
14:30:24   1   A.   I believe so.
14:30:29   2   Q.   Did Mr. Jose Trevino at that time tell you where he got the
14:30:34   3   $25,000?
14:30:37   4   A.   No, ma'am.
14:30:40   5   Q.   Did you ever see a purchase contract for Tempting Dash?
14:30:44   6   A.   No, ma'am.
14:30:46   7   Q.   What did you find out later about Tempting Dash, the horse's
14:30:53   8   condition?
14:30:54   9   A.   That there was something wrong with the horse's blood.
14:31:00  10   Q.   And when he said -- meaning Mr. Trevino-Morales said that he
14:31:04  11   wanted to form a company, did he, in fact, form a company at that
14:31:08  12   time?
14:31:08  13   A.   Yes, ma'am.
14:31:10  14   Q.   Do you recall the name of the company?
14:31:12  15   A.   Tremor Enterprises.
14:31:17  16   Q.   I'm showing you what has been marked as Government's Exhibit
14:31:20  17   353A.  Have you ever seen this document before?
14:31:32  18   A.   Yes, ma'am.
14:31:33  19   Q.   What is that document?
14:31:35  20   A.   It's a certificate from the Secretary of State, stating that
14:31:39  21   they are a legal entity.
14:31:41  22   Q.   And when you say "they," who is "they"?
14:31:43  23   A.   The owners of the company.
14:31:45  24   Q.   Okay.  And what is the name of the company?
14:31:47  25   A.   Tremor Enterprises.
```

| | | |
|---|---|---|
| 14:31:51 | 1 | Q.   I'm sorry.  Go ahead. |
| 14:31:52 | 2 | A.   Tremor Enterprises, LLC. |
| 14:31:53 | 3 | Q.   Okay.  Move for the introduction of Government's Exhibit |
| 14:31:58 | 4 | 353E.  I'm sorry, A.  I can't read.  I'm sorry.  353A. |
| 14:32:02 | 5 | MS. WILLIAMS:  No objection. |
| 14:32:04 | 6 | THE COURT:  It's received. |
| 14:32:10 | 7 | Q.   (BY MS. FERNALD) Did you know by your conversations that the |
| 14:32:16 | 8 | documents that were provided to you by the Defendant Jose |
| 14:32:21 | 9 | Trevino-Morales, what he did for a living? |
| 14:32:25 | 10 | A.   Well, I only prepared his taxes one year, and I understood |
| 14:32:30 | 11 | before the race that he was a masonary. |
| 14:32:35 | 12 | Q.   And would you have received W-2s in support of that? |
| 14:32:37 | 13 | A.   Yes. |
| 14:32:38 | 14 | Q.   In fact, I'm going to show you now what has been marked as |
| 14:32:42 | 15 | Government's Exhibit 316.  We met last night and you had a chance |
| 14:32:48 | 16 | to look through this, did you not? |
| 14:32:49 | 17 | A.   Yes, ma'am. |
| 14:32:50 | 18 | Q.   Okay.  Could you just take a brief look at it? |
| 14:33:06 | 19 | A.   Yes, ma'am. |
| 14:33:07 | 20 | Q.   Okay.  Tell me what's contained in Government's Exhibit 316. |
| 14:33:12 | 21 | A.   These are profit-and-losses prepared by my bookkeeping |
| 14:33:19 | 22 | department through bank statements furnished from the client. |
| 14:33:23 | 23 | Q.   Okay.  And who was that client? |
| 14:33:25 | 24 | A.   Mr. Trevino. |
| 14:33:31 | 25 | Q.   Move for introduction of these records contained in |

```
14:33:35   1  Government's Exhibit 316.
14:33:36   2              MS. WILLIAMS:  Could I have a Bates?
14:33:41   3              MS. FERNALD:  Your Bates stamp numbers on 316 are Bates
14:33:45   4  stamps No. 58 and 61.
14:33:52   5              MS. WILLIAMS:  No objection.
14:33:54   6              THE COURT:  316 is received.
14:33:58   7  Q.  (BY MS. FERNALD) So when the Defendant Trevino-Morales came
14:34:03   8  into your office, what did you ask him to provide you?
14:34:09   9  A.  Well --
14:34:10  10  Q.  In order to prepare his taxes.
14:34:12  11  A.  His family's identification and their documents, of course,
14:34:18  12  if his wife had worked, her W-2, oldest children's birth dates
14:34:22  13  and Socials, and that's what we need to provide -- to do taxes.
14:34:27  14  Q.  What about any of his bank accounts?
14:34:30  15  A.  Oh, yes, ma'am.  I have to have the bank accounts to do
14:34:33  16  business.
14:34:34  17  Q.  Why do you need the bank accounts?
14:34:36  18  A.  Because that actually proves what is going through a bank
14:34:39  19  account.
14:34:40  20  Q.  Okay.  So can you tell the jury a little bit about how the
14:34:44  21  whole transaction happened with Mr. Trevino?  Would he provide
14:34:48  22  you these documents?
14:34:50  23  A.  That is true.
14:34:51  24  Q.  And then, what would you do with the documents?
14:34:53  25  A.  We would translate them into a profit-and-loss.
```

14:34:57  1   Q.   I'll show you what has previously been introduced in 316 for

14:35:03  2   the record.  I promise you, I'm not going to go through each one

14:35:18  3   of these.

14:35:18  4   A.   Okay.  Thank you.

14:35:19  5   Q.   This is not a tax case, so I'm not going to go through each

14:35:22  6   one of these.  But is this basically what you prepared for Tremor

14:35:33  7   Enterprises?

14:35:34  8   A.   Yes, ma'am.

14:35:35  9   Q.   This is a profit-and-loss, correct?

14:35:38  10  A.   Yes, ma'am.

14:35:38  11  Q.   And what are you trying to show on the profit-and-loss just

14:35:42  12  for us?

14:35:43  13  A.   You're showing income versus expenses.

14:35:51  14  Q.   Then on the second page, you're going to have what type of

14:35:58  15  documents?

14:35:59  16  A.   You're going to have your assets and their liabilities.

14:36:03  17  Q.   Is this a further breakdown of what's contained on the first

14:36:06  18  page?

14:36:06  19  A.   Yes, ma'am.

14:36:07  20  Q.   Do you have a software program that helps you with this?

14:36:13  21  A.   QuickBooks.

14:36:18  22  Q.   And then, on the third page of this document, what is this

14:36:21  23  called?

14:36:23  24  A.   This is a breakdown of the actual transactions that were

14:36:28  25  given from his bank statement.

| | | |
|---|---|---|
| 14:36:35 | 1 | Q.   It's called a general ledger, correct? |
| 14:36:37 | 2 | A.   Yes. |
| 14:36:39 | 3 | Q.   And it goes through different transactions? |
| 14:36:41 | 4 | A.   Yes, ma'am. |
| 14:36:42 | 5 | Q.   And what you've just reviewed in 316, that is contained for |
| 14:36:51 | 6 | Tremor Enterprises in the year of 2009? |
| 14:36:56 | 7 | A.   Yes, ma'am. |
| 14:36:58 | 8 | Q.   2010? |
| 14:37:00 | 9 | A.   Yes, ma'am. |
| 14:37:00 | 10 | Q.   And also, of course, some other companies that we'll talk |
| 14:37:02 | 11 | about a little bit later; is that correct? |
| 14:37:04 | 12 | A.   Yes, ma'am. |
| 14:37:14 | 13 | Q.   If Tremor or Jose Trevino-Morales wrote a check out for |
| 14:37:19 | 14 | certain expenses, how would that get transmitted to you and your |
| 14:37:24 | 15 | company? |
| 14:37:24 | 16 | A.   The bank sends out photographic copies of the checks, and we |
| 14:37:29 | 17 | get the bank statements. |
| 14:37:31 | 18 | Q.   And would he fax those to you? |
| 14:37:34 | 19 | A.   No.  They brought them to us. |
| 14:37:36 | 20 | Q.   They would bring them to you? |
| 14:37:38 | 21 | A.   Yes. |
| 14:37:39 | 22 | Q.   Personally? |
| 14:37:39 | 23 | A.   Yes. |
| 14:37:40 | 24 | Q.   How often would that occur? |
| 14:37:42 | 25 | A.   Once a month. |

14:37:48  1  Q.   Who did you rely upon in order to enter these expenses

14:37:54  2  and/or gains in the general ledger?

14:38:00  3  A.   Well, the checks that he had written or someone had written.

14:38:04  4  Q.   And how would those checks be identified as a gain or as an

14:38:08  5  expense?  Who would tell you that?

14:38:10  6  A.   Well, they actually -- like on deposit tickets, they would

14:38:15  7  actually write if it was for breeding or if it was a horse sale,

14:38:18  8  or if they were buying a horse, or that sort of thing.

14:38:23  9  Q.   Did you go out and do independent investigation of whether

14:38:28  10  or not that was true?

14:38:28  11  A.   No, ma'am.

14:38:29  12  Q.   And why do you not do that as a tax preparer?

14:38:32  13  A.   I have quite a few clients.  That's pretty hard to do.

14:38:37  14  Q.   Who all was involved with Tremor Enterprises and who did you

14:38:41  15  have contact with with Tremor Enterprises?  Who were those

14:38:45  16  individuals?

14:38:48  17  A.   Mr. Jose and his wife Zulema.

14:38:51  18  Q.   Zulema.  Was there anybody else?

14:38:54  19  A.   No.

14:38:55  20  Q.   Did they have a daughter?

14:38:56  21  A.   Yes.

14:38:57  22  Q.   Did you ever have contact with her?

14:38:58  23  A.   I didn't.

14:38:59  24  Q.   Okay.  And I believe you had previously testified that you

14:39:08  25  actually prepared the 2009?

| | | |
|---|---|---|
| 14:39:10 | 1 | A.    Yes. |
| 14:39:11 | 2 | Q.    When you prepared the 2009, did you request that the |
| 14:39:15 | 3 | defendant and his wife come into the office? |
| 14:39:19 | 4 | A.    No, because they had already brought their information, and |
| 14:39:23 | 5 | I already had all their information.  So I just put it on the tax |
| 14:39:26 | 6 | return. |
| 14:39:27 | 7 | Q.    Did you ever review the tax return with them? |
| 14:39:30 | 8 | A.    Yes. |
| 14:39:31 | 9 | Q.    Okay.  And what do you do -- or what did you do at that |
| 14:39:35 | 10 | session with them? |
| 14:39:36 | 11 | A.    Tell them how much money they owe. |
| 14:39:39 | 12 | Q.    And do they, in fact, owe money in 2009? |
| 14:39:42 | 13 | A.    Yes. |
| 14:39:42 | 14 | Q.    And what was Mr. Trevino-Morales's reaction to that? |
| 14:39:47 | 15 | A.    Well, I don't think he was happy with what he owed. |
| 14:39:50 | 16 | Q.    And have you ever had a client that was happy about owing |
| 14:39:53 | 17 | the IRS taxes? |
| 14:39:54 | 18 | A.    Not really. |
| 14:39:57 | 19 | Q.    If you do, please let us know. |
| 14:40:03 | 20 |       Did you prepare the 2010 tax returns? |
| 14:40:06 | 21 | A.    No, ma'am. |
| 14:40:07 | 22 | Q.    Why not? |
| 14:40:08 | 23 | A.    Well, the money was too big and I'm used to working with |
| 14:40:13 | 24 | smaller numbers, and so, I was afraid of it; and so, I sent it to |
| 14:40:21 | 25 | a more qualified person. |

| | | |
|---|---|---|
| 14:40:23 | 1 | Q.   And when you say a more qualified person, how do you mean |
| 14:40:26 | 2 | that? |
| 14:40:27 | 3 | A.   More educated. |
| 14:40:29 | 4 | Q.   Okay.   Education does not always equal how smart you are? |
| 14:40:33 | 5 | A.   That's true. |
| 14:40:34 | 6 | Q.   When you sent it to this other person, do you know who this |
| 14:40:38 | 7 | other person is? |
| 14:40:39 | 8 | A.   Yes, ma'am. |
| 14:40:39 | 9 | Q.   And who was that? |
| 14:40:40 | 10 | A.   Allen Fischer. |
| 14:40:41 | 11 | Q.   And he's a CPA; is that correct? |
| 14:40:43 | 12 | A.   Yes, ma'am. |
| 14:40:44 | 13 | Q.   When you reviewed the documents for Tremor Enterprises, are |
| 14:40:57 | 14 | you aware of whether or not there are any employment agreement |
| 14:41:00 | 15 | contracts in their documents? |
| 14:41:03 | 16 | A.   No.   There's not. |
| 14:41:05 | 17 | Q.   Was there a set salary in which Jose Trevino or Zulema |
| 14:41:10 | 18 | Trevino received money from Tremor Enterprises? |
| 14:41:12 | 19 | A.   Not as far as I knew. |
| 14:41:14 | 20 | Q.   How was that done?   Do you know? |
| 14:41:16 | 21 | A.   Well, basically, if they wrote theirselves a check, we would |
| 14:41:24 | 22 | build the taxes on top of it normally. |
| 14:41:26 | 23 | Q.   And do they pay -- to the best of your knowledge, do they |
| 14:41:28 | 24 | pay their taxes? |
| 14:41:29 | 25 | A.   As far as I knew. |

| | | |
|---|---|---|
| 14:41:31 | 1 | Q.   All right.  And are you aware of in 2011, the beginning or |
| 14:41:42 | 2 | the starting of two other corporations by Jose Trevino-Morales |
| 14:41:47 | 3 | and his wife Zulema? |
| 14:41:48 | 4 | A.   Yes. |
| 14:41:49 | 5 | Q.   Are you familiar with 66 Land and Zule Farms? |
| 14:41:53 | 6 | A.   Yes. |
| 14:41:54 | 7 | Q.   I'm showing you now what has been marked as Government's |
| 14:42:08 | 8 | Exhibit 362A and 362B.  Take a moment to look at those. |
| 14:42:41 | 9 | A.   Yes, ma'am. |
| 14:42:42 | 10 | Q.   Do you recognize those documents? |
| 14:42:43 | 11 | A.   Yes, ma'am. |
| 14:42:44 | 12 | Q.   What do you recognize those documents to be? |
| 14:42:47 | 13 | A.   They are corporations of the state of Oklahoma. |
| 14:42:53 | 14 | Q.   For which entities? |
| 14:42:54 | 15 | A.   The 66 Land, LLC and the Zule Farms, LLC. |
| 14:42:59 | 16 | Q.   Move for the introduction of Government's Exhibit No. 362A |
| 14:43:07 | 17 | in reflection to 66 Land and 362B in reflection to Zule Farms. |
| 14:43:13 | 18 | MS. WILLIAMS:  No objection. |
| 14:43:16 | 19 | THE COURT:  They're received.  What is T what Farms? |
| 14:43:21 | 20 | THE WITNESS:  I'm sorry? |
| 14:43:22 | 21 | THE COURT:  What is T -- Zule Farm? |
| 14:43:26 | 22 | THE WITNESS:  Zule, Z-U-L-E. |
| 14:43:28 | 23 | THE COURT:  Okay. |
| 14:43:29 | 24 | THE WITNESS:  I believe he named it after his wife. |
| 14:43:31 | 25 | THE COURT:  Yeah.  Okay. |

14:43:35  1   Q.   (BY MS. FERNALD) Zule Farms is the name of the entity; is

14:43:38  2   that correct?

14:43:38  3   A.   Uh-huh.

14:43:39  4   Q.   And that's contained in B.  And then, 66 Land contained in

14:43:46  5   A, correct?

14:43:46  6   A.   Yes, ma'am.

14:43:47  7   Q.   All right.  What was your reaction when these two entities

14:43:56  8   were created?

14:43:59  9   A.   Well, I don't really have a reaction.  That's what he wanted

14:44:04  10  to do, so that's what we did.

14:44:06  11  Q.   Are you aware of whether or not Oklahoma has a state income

14:44:09  12  tax?

14:44:10  13  A.   Yes, ma'am.  They do.

14:44:11  14  Q.   Do you know whether or not how those particular corporations

14:44:16  15  were funded?

14:44:18  16  A.   Well, from what we received as information, it was through

14:44:23  17  either horse sales, horse racing, breeding, that sort of thing.

14:44:30  18  Q.   Are you familiar with management fees?

14:44:33  19  A.   Yes, ma'am.

14:44:34  20  Q.   All right.  Do you recall whether or not they were funded

14:44:36  21  through management fees?

14:44:37  22  A.   Yes, ma'am.  Some of them were.

14:44:39  23  Q.   Did you ever see any management fee agreements between these

14:44:44  24  two entities or these three entities?  Excuse me.

14:44:47  25  A.   No, ma'am.

14:44:57  1    Q.    Were you aware of the arrest and the seizure in June of

14:45:01  2    2012?

14:45:03  3    A.    Yes, ma'am.

14:45:04  4    Q.    What was your reaction to that?

14:45:06  5    A.    Well, we were shocked.  We didn't know.

14:45:10  6    Q.    And why were you shocked?

14:45:14  7    A.    Well, because of the nature of the arrest and their -- what

14:45:24  8    I saw them taking, they seized over 400 horses, yet, we only had

14:45:29  9    on our records nine when I reviewed it.

14:45:34  10   Q.    Do you know prior to 2009, how much money Jose Trevino -- or

14:45:40  11   I should say, prior to the Tempting Dash horse coming in, how

14:45:44  12   much money Jose Trevino-Morales was making a year?

14:45:48  13   A.    Around a million dollars.  Oh, prior to 2009?  I'm sorry.

14:45:54  14   He made 35 to 45,000.

14:45:57  15   Q.    A year?

14:45:58  16   A.    A year.

14:46:00  17   Q.    Do you know whether or not Tremor was the parent company of

14:46:06  18   Zule Farms and 66 Land?

14:46:08  19   A.    That's what I felt like.  Yes, ma'am.

14:46:10  20   Q.    Pass the witness.

14:46:30  21                       CROSS-EXAMINATION

14:46:36  22   BY MS. WILLIAMS:

14:46:36  23   Q.    Your last name is Moore Crain?

14:46:44  24   A.    Yes, ma'am.

14:46:44  25   Q.    I had you down on my list as Moore.  So that was new to me.

| | | |
|---|---|---|
| 14:46:48 | 1 | A.   Okay. |
| 14:46:48 | 2 | Q.   My name is Christie Williams. |
| 14:46:51 | 3 | A.   Hello. |
| 14:46:52 | 4 | Q.   And I represent Mr. Trevino in this case. |
| 14:46:55 | 5 | Are you familiar with a man by the name of Mike Bazilla |
| 14:47:02 | 6 | (phonetic)? |
| 14:47:02 | 7 | A.   Yes, ma'am. |
| 14:47:03 | 8 | Q.   He's an investigator that works for me? |
| 14:47:05 | 9 | A.   Yes. |
| 14:47:05 | 10 | Q.   And he came and tried to talk to you before this case. |
| 14:47:07 | 11 | A.   Right. |
| 14:47:08 | 12 | Q.   Right.  And you basically told him no, you wouldn't talk to |
| 14:47:11 | 13 | him; is that right? |
| 14:47:12 | 14 | A.   Right. |
| 14:47:13 | 15 | Q.   And you did that, as I understand it, because Mr. Fernald, |
| 14:47:20 | 16 | Michael Fernald, told you not to talk to us; is that right? |
| 14:47:25 | 17 | A.   Well, ma'am, we were scared.  I mean, it's natural. |
| 14:47:33 | 18 | Q.   Of? |
| 14:47:34 | 19 | A.   Of the cartel. |
| 14:47:39 | 20 | Q.   Because of what the government had told you and what I had |
| 14:47:44 | 21 | read? |
| 14:47:44 | 22 | A.   Yes, ma'am. |
| 14:47:44 | 23 | Q.   And what you had read in the media? |
| 14:47:46 | 24 | A.   Yes, ma'am. |
| 14:47:47 | 25 | Q.   During time that you helped Mr. Trevino, there was never |

14:47:57   1   anything about him that caused you to be afraid?

14:48:00   2   A.   No, ma'am.

14:48:01   3   Q.   Right?

14:48:02   4   A.   That is true.

14:48:06   5   Q.   And when he came to you in 2009, did he appear to have ever

14:48:16   6   started his own business before?

14:48:19   7   A.   I didn't think so.

14:48:20   8   Q.   I'm sorry?

14:48:20   9   A.   I didn't think so.

14:48:21   10   Q.   You didn't think so.

14:48:22   11   A.   No, ma'am.

14:48:23   12   Q.   And so, when he came to you, he -- one of the things he

14:48:28   13   wanted was to get his taxes done?

14:48:29   14   A.   Right.

14:48:30   15   Q.   Because he knew that his tax situation had changed during

14:48:32   16   that year due to winning the race?

14:48:34   17   A.   Right.

14:48:34   18   Q.   Is that your understanding?

14:48:35   19   A.   Yes, ma'am.

14:48:36   20   Q.   All right.  So he came to you and said, look, I need some

14:48:39   21   help knowing what the right thing is to do.

14:48:41   22   A.   Right.

14:48:42   23   Q.   And you, during 2009, began to help him in two ways, as I

14:48:49   24   understand it.  Number one, you helped prepare the 2009 tax

14:48:52   25   return.

| | | |
|---|---|---|
| 14:48:53 | 1 | A.    Okay. |
| 14:48:54 | 2 | Q.    Is that right? |
| 14:48:54 | 3 | A.    Yes. |
| 14:48:55 | 4 | Q.    Okay.  And the second thing is that Tracy, I think, who |
| 14:48:59 | 5 | works for you -- what's her last name? |
| 14:49:01 | 6 | A.    Pennington. |
| 14:49:02 | 7 | Q.    Tracy Pennington began to do the books for Tremor |
| 14:49:07 | 8 | Enterprises? |
| 14:49:07 | 9 | A.    Yes. |
| 14:49:08 | 10 | Q.    She was their bookkeeper? |
| 14:49:10 | 11 | A.    Yes. |
| 14:49:10 | 12 | Q.    All right.  And so, your interaction was sort of twofold. |
| 14:49:15 | 13 | Number one, let's take care of the taxes and, number two, we have |
| 14:49:18 | 14 | this new business that's just getting off the ground and we want |
| 14:49:21 | 15 | to -- somebody who knows what they're doing to keep the books? |
| 14:49:26 | 16 | A.    Yes. |
| 14:49:26 | 17 | Q.    All right.  So when Mr. Trevino brought you his documents, |
| 14:49:34 | 18 | did he appear to have kept records?  Did he have receipts and |
| 14:49:41 | 19 | bills and -- |
| 14:49:42 | 20 | A.    Yes, ma'am. |
| 14:49:43 | 21 | Q.    And every month, he would bring you his bank statement? |
| 14:49:48 | 22 | A.    Yes, ma'am. |
| 14:49:49 | 23 | Q.    And in that bank statement would be copies of his checks? |
| 14:49:52 | 24 | A.    Yes. |
| 14:49:53 | 25 | Q.    And his deposits? |

14:49:55  1   A.   That's true.

14:49:55  2   Q.   All right.  And so, there would be money coming in and money

14:49:59  3   going out?

14:49:59  4   A.   That's true.

14:50:00  5   Q.   Right?

14:50:00  6   A.   Yes.

14:50:01  7   Q.   And it was Tracy's job to put those various deposits and

14:50:08  8   checks into their proper categories?

14:50:10  9   A.   Yes, ma'am.

14:50:10  10  Q.   All right.  When Mr. Trevino first came to you, I think you

14:50:19  11  told the government that he was making 35 or $45,000?

14:50:24  12  A.   I believe so.

14:50:25  13  Q.   All right.  But his wife also worked?

14:50:27  14  A.   Yes.

14:50:27  15  Q.   And how much did she make, do you remember?

14:50:30  16  A.   No, ma'am.  I'm sorry.  I don't.

14:50:32  17  Q.   But she worked and she made not quite as much as him?

14:50:36  18  A.   Twenty-five, 35, somewhere around there.

14:50:39  19  Q.   So together, they were making as little as 60 and as much as

14:50:44  20  $80,000?

14:50:44  21  A.   Right.

14:50:46  22  Q.   And Mr. Trevino, I think you said, explained to you that his

14:50:55  23  brother Rodolfo -- did you know Rodolfo was living down in Elgin,

14:50:59  24  Texas?

14:51:00  25  A.   No.

14:51:01   1   Q.   Had given him a hint on this horse and he had bought this

14:51:04   2   horse and won a big race, and they had this money, right?   And it

14:51:09   3   was a big sum of money.   Do you remember how much it was?   Was it

14:51:12   4   $100,000?

14:51:13   5   A.   No.   It was closer to half a million dollars.

14:51:16   6   Q.   Okay.   So they had this sum of money, right?   Bigger and

14:51:23   7   different than any money they had previously been dealing with.

14:51:26   8   A.   This is true.

14:51:27   9   Q.   And they came to you and they said, what do we do?

14:51:30  10   A.   Yes.

14:51:31  11   Q.   Right?

14:51:32  12   A.   They wanted to start a company.

14:51:34  13   Q.   Okay.   And so, what did you tell them?   That we want to

14:51:38  14   start a company.

14:51:40  15   A.   Well, you explain the different types of organizations you

14:51:44  16   can do.

14:51:44  17   Q.   Okay.   So you told them you can form an LLC, a partnership,

14:51:48  18   a corporation?

14:51:49  19   A.   Right.

14:51:49  20   Q.   And you laid out for them kind of here are the advantages

14:51:56  21   and the disadvantages of these different kinds of companies?

14:51:59  22   A.   Yes.

14:51:59  23   Q.   And together you made a decision.   About what -- or they

14:52:03  24   made a decision based on --

14:52:04  25   A.   Of course, it's always the customer's decision.

14:52:08   1   Q.   And where was this sum of money at that point?  Was it in

14:52:17   2   the bank?  Was it in a check?  Where was this big sum of race

14:52:21   3   money?  Was it in their personal bank account?  Do they still

14:52:24   4   have the check?

14:52:24   5   A.   I thought it went to Tremor Enterprises.

14:52:26   6   Q.   That's what I was asking you.  When they first came to you,

14:52:29   7   though, there was no Tremor Enterprises.

14:52:32   8   A.   Okay.  Then I don't know where the money was.

14:52:34   9   Q.   Okay.  So let's assume that it was in their personal bank

14:52:43   10  account because, right, they didn't have a Tremor Enterprises

14:52:45   11  bank account.

14:52:46   12  A.   Okay.

14:52:46   13  Q.   Right?

14:52:47   14  A.   Okay.

14:52:47   15  Q.   Well, don't say okay.  I don't mean to jump on you, but I'm

14:52:53   16  asking you the question.

14:52:55   17       There was no Tremor Enterprises bank account when they

14:52:57   18  came to see you; is that right?

14:52:58   19  A.   That's true.

14:52:59   20  Q.   Okay.  So when they came to you, it was either in some sort

14:53:05   21  of check or it was in their personal bank account, because it

14:53:08   22  couldn't have been in the Tremor Enterprises bank account, right?

14:53:11   23  A.   Yes.

14:53:11   24  Q.   Okay.  Do you remember what you told them about what to do

14:53:16   25  with the money?

| | | |
|---|---|---|
| 14:53:20 | 1 | A.   No, ma'am. |
| 14:53:21 | 2 | Q.   Some money needed to go into Tremor, LLC to start the |
| 14:53:27 | 3 | company, right? |
| 14:53:27 | 4 | A.   I thought the check was made out to Tremor Enterprises. |
| 14:53:30 | 5 | Q.   Okay. |
| 14:53:32 | 6 | A.   That's what I thought. |
| 14:53:33 | 7 | Q.   Okay.  I'll look at that in a minute.  I bet the Judge will |
| 14:54:23 | 8 | give me a break here in a minute and I'll be able to find what |
| 14:54:25 | 9 | we're looking for without taking up our time. |
| 14:54:27 | 10 | After -- at what point did you tell Mr. Trevino that he |
| 14:54:36 | 11 | probably needed to also consult with Mr. Fischer?  Do you |
| 14:54:41 | 12 | remember approximately when that was? |
| 14:54:44 | 13 | A.   I believe it was in mid-2011.  Somewhere around there. |
| 14:54:52 | 14 | Q.   So for almost two years, you and your staff helped run this |
| 14:54:59 | 15 | business, helped do the bookkeeping for this business? |
| 14:55:02 | 16 | A.   Yes, ma'am. |
| 14:55:02 | 17 | Q.   You didn't actually run the business, but you did their |
| 14:55:05 | 18 | bookkeeping? |
| 14:55:05 | 19 | A.   Yes, ma'am. |
| 14:55:06 | 20 | Q.   And then, by that point there was enough money coming in and |
| 14:55:08 | 21 | going out that you felt like you needed -- they needed more |
| 14:55:12 | 22 | expert help? |
| 14:55:12 | 23 | A.   Yes, ma'am. |
| 14:55:13 | 24 | Q.   Was that before or after 66 Land and Zule Farms were formed? |
| 14:55:22 | 25 | A.   It was before. |

14:55:26  1   Q.   So you don't have any knowledge of why or what the process

14:55:29  2   was for creating those companies.  That would have been Mr.

14:55:33  3   Fischer?

14:55:34  4   A.   No, ma'am.  I don't know why he created the companies.

14:55:39  5   Q.   Because that was done after they were talking to Mr. Fisher?

14:55:42  6   A.   Yes.  He just -- Mr. Trevino asked us to form the company,

14:55:46  7   so I called Allen and asked him to help.

14:55:52  8   Q.   And is Mr. Fischer somebody that you referred other clients

14:55:57  9   to over the years?

14:55:58  10  A.   Oh, yes, ma'am.

14:55:59  11  Q.   It's not unusual for a smaller firm to get a bigger client

14:56:03  12  and say, oh, now you've kind of grown beyond where we can really

14:56:07  13  help you.  We can still help you with your bookkeeping, but we've

14:56:10  14  kind of gone beyond where I want to help you with your taxes.

14:56:13  15  You kind of need to move on to a CPA?

14:56:15  16  A.   Yes, ma'am.

14:56:15  17  Q.   And so, even after Mr. Fischer took over the taxes for the

14:56:24  18  Trevinos and their companies, you continued to do the bookkeeping

14:56:27  19  work?

14:56:27  20  A.   Yes.

14:56:28  21  Q.   And even after there was land purchased in Oklahoma, they

14:56:39  22  continued to use you for bookkeeping?

14:56:41  23  A.   Yes.

14:56:42  24  Q.   And would the -- would they continue to bring their bank

14:56:50  25  statements --

| | | |
|---|---|---|
| 14:56:50 | 1 | A.    Yes. |
| 14:56:50 | 2 | Q.    -- to you?  Every month? |
| 14:56:52 | 3 | A.    Yes. |
| 14:56:53 | 4 | Q.    And would they bring, also, receipts? |
| 14:56:58 | 5 | A.    Yes. |
| 14:56:59 | 6 | Q.    Receipts for what kind of things? |
| 14:57:01 | 7 | A.    Well, I didn't actually see them. |
| 14:57:04 | 8 | Q.    Tracy did? |
| 14:57:05 | 9 | A.    Tracy did.  And, you know, like she would have told me if |
| 14:57:09 | 10 | she would have seen something out of the ordinary, she would have |
| 14:57:12 | 11 | told me. |
| 14:57:13 | 12 | Q.    And that never happened? |
| 14:57:14 | 13 | A.    No, ma'am. |
| 14:57:16 | 14 | Q.    There was never one reason for you to think anything was |
| 14:57:19 | 15 | amiss? |
| 14:57:20 | 16 | A.    That's true. |
| 14:57:23 | 17 | Q.    I'll pass the witness. |
| 14:57:27 | 18 | MR. DEGEURIN:  No questions, Judge. |
| 14:57:30 | 19 | MR. WOMACK:  No questions, your Honor. |
| 14:57:32 | 20 | MR. ESPER:  I have none, your Honor. |
| 14:57:33 | 21 | MR. MAYR:  Neither do I, your Honor. |
| 14:57:35 | 22 | THE COURT:  Any redirect? |
| 14:57:36 | 23 | MS. FERNALD:  Yes, your Honor. |
| 14:57:36 | 24 | |
| 14:57:38 | 25 | |

|          |    |                                                               |
|----------|----|---------------------------------------------------------------|
| 14:57:38 | 1  | RE-DIRECT EXAMINATION                                          |
| 14:57:38 | 2  | BY MS. FERNALD:                                                |

Q.   Ms. Moore Crain, just to clarify the point.  Would you only record what Trevino-Morales' individuals would bring into your office with Tremor?  Were they supplying you with the information?

A.   Yes.

Q.   There was a question about a private investigator visiting with you for Mr. Trevino-Morales.  You want to tell the jury about that?

A.   Well, they -- he came into my office and, of course, they came during tax time.  It's very busy.  And so, I didn't talk to him then and, like I said, we were afraid.

Q.   Did they ask for you to sign any documents?

A.   Yeah.  They said they were going to fax me something about me not having to testify or something.  I don't know.  Or they were going to e-mail it to me.

Q.   When you initially got a phone call from the government, the Special Agent Michael Fernald, were you afraid then?

A.   I was very afraid.

Q.   What did you do?  Who did you contact prior to talking to any agent in this case?

A.   Allen Fischer.

Q.   And did Mr. Fischer advise for you to call an attorney?

        MR. DEGEURIN:  Your Honor, really is not my witness,

| | | |
|---|---|---|
| 14:59:12 | 1 | but that's hearsay. |
| 14:59:15 | 2 | MS. FERNALD:  I'll rephrase the question. |
| 14:59:17 | 3 | Q.   (BY MS. FERNALD) Did you contact an attorney to make sure |
| 14:59:19 | 4 | that you were okay? |
| 14:59:20 | 5 | A.   Yes, I did. |
| 14:59:21 | 6 | Q.   Why did you do that? |
| 14:59:23 | 7 | A.   Because it's my livelihood and I was afraid. |
| 14:59:28 | 8 | Q.   And did you consult with your attorney -- did you consult |
| 14:59:34 | 9 | with your attorney on whether or not you should talk to these |
| 14:59:38 | 10 | parties? |
| 14:59:39 | 11 | A.   Yes. |
| 14:59:41 | 12 | Q.   Including the government? |
| 14:59:42 | 13 | A.   Yes. |
| 14:59:43 | 14 | MR. DEGEURIN:  Your Honor, may we -- it's really not my |
| 14:59:46 | 15 | dog in the fight, but I think we need to approach at this point. |
| 14:59:50 | 16 | THE COURT:  Okay.  Get an afternoon break.  At least 15 |
| 15:00:01 | 17 | minutes.  Use the facilities, remember the instructions.  Ma'am, |
| 15:00:34 | 18 | I'm going to ask you to step out in the hall. |
| 15:00:36 | 19 | THE WITNESS:  Sure. |
| 15:00:36 | 20 | THE COURT:  Don't go far. |
| 15:00:38 | 21 | THE WITNESS:  I won't. |
| 15:00:39 | 22 | (Jury not present.) |
| 15:00:58 | 23 | THE COURT:  Okay.  Mr. DeGeurin, you have the floor. |
| 15:01:01 | 24 | You said it's not your dog in the fight.  That hadn't stopped any |
| 15:01:05 | 25 | of the lawyers from cross-examining witnesses when their clients |

15:01:09  1    haven't even been mentioned in the direct.  So everybody is in

15:01:15  2    that same bus.  But what is the deal?

15:01:17  3         MR. DEGEURIN:  They're asking her what her reaction was

15:01:20  4    when the police called her or when the agent called her.  And

15:01:24  5    then, she went to see a lawyer, and why she did when she was

15:01:28  6    frightened because of the cartel is irrelevant, it's prejudicial.

15:01:33  7    The probative value is outweighed by the prejudicial effect.  For

15:01:38  8    all those reasons.

15:01:39  9         THE COURT:  It came on cross-examination.

15:01:42  10         MR. DEGEURIN:  Not whether she was frightened.

15:01:44  11         THE COURT:  Yes, it did, as to why she didn't talk with

15:01:47  12    the investigator for Mr. Morales.  That's when it all came in.

15:01:56  13    And the question didn't ask for attorney-client privilege.  I

15:02:02  14    would think to leave it alone, but that's y'all -- you gentlemen

15:02:06  15    and ladies' decision one way or the other.

15:02:08  16         MR. DEGEURIN:  Well, if --

15:02:10  17         THE COURT:  Nothing came in about fear.  Nothing came

15:02:14  18    in about any organization on direct examination.  I can't

15:02:23  19    control -- as much as I'd like to control you lawyers, I can't do

15:02:27  20    it.

15:02:28  21         MR. DEGEURIN:  Well, then I am -- I request not to go

15:02:33  22    there.  Might leave everything alone as it is because it might go

15:02:40  23    away.

15:02:42  24         (The Court holding up crystal ball.)

15:02:46  25         THE COURT:  Anybody else want to make a comment before

| | | |
|---|---|---|
| 15:02:47 | 1 | you take a break?  Fifteen minutes. |
| 15:12:25 | 2 | (Recess.) |
| 15:18:00 | 3 | THE COURT:  You may be seated. |
| 15:18:11 | 4 | MS. FERNALD:  Your Honor, are you ready for the |
| 15:18:13 | 5 | witness? |
| 15:18:14 | 6 | THE COURT:  I am.  Have a seat, ma'am.  We'll bring the |
| 15:18:58 | 7 | jury in right now. |
| 15:19:02 | 8 | (Jury present.) |
| 15:20:13 | 9 | THE COURT:  You understand, ma'am, you're still under |
| 15:20:36 | 10 | oath? |
| 15:20:36 | 11 | THE WITNESS:  Yes, sir. |
| 15:20:36 | 12 | THE COURT:  Okay. |
| 15:20:37 | 13 | Q.   (BY MS. FERNALD) I'm going to re-ask the question. |
| 15:20:40 | 14 | Did you consult with an attorney prior to talking to |
| 15:20:44 | 15 | either the government or to the defendant? |
| 15:20:47 | 16 | A.   Yes, I did. |
| 15:20:48 | 17 | Q.   And what was his name? |
| 15:20:49 | 18 | A.   William Kunofsky. |
| 15:20:52 | 19 | Q.   And in review of Tremor's business, did you have any |
| 15:20:58 | 20 | concerns about the money going through? |
| 15:21:05 | 21 | A.   Concerns? |
| 15:21:05 | 22 | Q.   Uh-huh. |
| 15:21:06 | 23 | A.   I don't understand the question.  I'm sorry. |
| 15:21:07 | 24 | Q.   We had a conversation last night in which you were concerned |
| 15:21:11 | 25 | about how much money was flowing through. |

15:21:13   1   A.   There was a lot of money going through the accounts.  But he

15:21:17   2   had one a horse race, too, in '11.  I believe it was '11.  I'm

15:21:25   3   lost on the years now.  I'm sorry.  May have been '10.

15:21:27   4   Q.   A lot of money flowing through?

15:21:29   5   A.   Yes, ma'am.

15:21:30   6   Q.   Pass the witness, your Honor.

15:21:35   7           THE COURT:  Did I start without Ms. Williams?

15:21:37   8           MS. WILLIAMS:  I'm sorry.  I don't have any further

15:21:40   9   questions.

15:21:40   10          MR. DEGEURIN:  No further questions.

15:21:41   11          MR. WOMACK:  No, sir.

15:21:42   12          MR. ESPER:  None, your Honor.

15:21:44   13          MR. MAYR:  None.

15:21:44   14          THE COURT:  May this witness be excused?

15:21:51   15          THE WITNESS:  Thank you.

15:21:55   16          THE COURT:  Call your next witness.

15:21:57   17          MR. GARDNER:  Government would call Ms. Alejandra

15:22:07   18   Obregon.

15:22:41   19          THE COURT:  If you'll come this way, please.  This is

15:22:43   20   Mrs. Sims and she's going to administer an oath to you, ma'am.

15:22:51   21          (Witness sworn.)

15:22:57   22          MR. GARDNER:  Your Honor, can we approach before

15:22:58   23   questioning?

15:23:04   24          THE COURT:  Sure.

15:23:04   25          (At the bench, on the record.)

| | | |
|---|---|---|
| 15:23:11 | 1 | MR. GARDNER:  Your Honor, as per the Court's request, |
| 15:23:17 | 2 | I've been sending the defense attorneys the witnesses for |
| 15:23:19 | 3 | tomorrow.  I sent them the list last night, and I did not exclude |
| 15:23:23 | 4 | Ms. Obregon on that list.  So that's my fault.  There's nothing |
| 15:23:27 | 5 | intentional violation. |
| 15:23:30 | 6 | MR. DEGEURIN:  And I accept that completely, but it's |
| 15:23:33 | 7 | -- I don't even know who she is at this moment. |
| 15:23:35 | 8 | MR. GARDNER:  Your Honor, I did provide all defense |
| 15:23:37 | 9 | counsel, an hour ago, the 302 statement by Scott Lawson of his |
| 15:23:42 | 10 | interview with Ms. Alejandra.  So they have any Jencks material |
| 15:23:48 | 11 | by her. |
| 15:23:48 | 12 | MR. DEGEURIN:  I don't have a dog in the fight. |
| 15:23:52 | 13 | MR. GARDNER:  Then why'd you come up here then? |
| 15:23:54 | 14 | MR. DEGEURIN:  Because I didn't know about that.  At |
| 15:24:02 | 15 | this point, I don't even know my dog's name. |
| 15:24:03 | 16 | MR. GARDNER:  The only one that she had -- |
| 15:24:06 | 17 | THE COURT:  No, no.  So he's not involved.  Does |
| 15:24:09 | 18 | anybody else have any hesitation about that?  All right.  Let's |
| 15:24:13 | 19 | proceed. |
| 15:24:39 | 20 | Ma'am, if you'll tell me your full name and spell your |
| 15:24:43 | 21 | last, but I need you to talk into the microphone. |
| 15:24:47 | 22 | THE WITNESS:  Alejandra Obregon. |
| 15:24:47 | 23 | ALEJANDRA OBREGON, called by the Government, duly sworn. |
| 15:24:47 | 24 | |
| 15:24:54 | 25 | |

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 15:24:54 | 1  | DIRECT EXAMINATION                                            |
| 15:24:54 | 2  | BY MR. GARDNER:                                               |
| 15:24:55 | 3  | Q.   Ms. Obregon, you and I have met before; is that correct? |
| 15:24:57 | 4  | A.   Yes.                                                     |
| 15:24:58 | 5  | Q.   And if you will, could you introduce yourself for the jury? |
| 15:25:00 | 6  | Tell them what you do for a living and where you live.        |
| 15:25:02 | 7  | A.   My name is Alejandra Obregon.  I'm a staff accountant in |
| 15:25:06 | 8  | Texas.                                                        |
| 15:25:07 | 9  | Q.   And could you explain to them a little bit of your education |
| 15:25:10 | 10 | and your work experience?                                     |
| 15:25:13 | 11 | MR. ESPER:  Your Honor, could we ask the Court if the |
| 15:25:15 | 12 | witness could speak up a little.                              |
| 15:25:19 | 13 | THE WITNESS:  I'm sorry.                                      |
| 15:25:25 | 14 | MR. ESPER:  Thank you, your Honor.                            |
| 15:25:27 | 15 | Q.   (BY MR. GARDNER) I'll repeat the question.  I know you're |
| 15:25:45 | 16 | nervous.  Just take your time.                                |
| 15:25:48 | 17 | I think the question was, could you let the ladies and |
| 15:25:52 | 18 | gentlemen of the jury know a little bit about your education and |
| 15:25:53 | 19 | work experience?                                              |
| 15:25:55 | 20 | A.   Yes.  I'm a staff accountant with an accounting firm.  I've |
| 15:26:00 | 21 | been there for 17 years and my -- I have a Bachelor's Degree in |
| 15:26:08 | 22 | Accounting.                                                   |
| 15:26:09 | 23 | Q.   And are you a Certified Public Accountant?               |
| 15:26:11 | 24 | A.   No.  I'm not.                                            |
| 15:26:12 | 25 | Q.   And in your job at your accounting firm, what are your    |

15:26:17   1   duties on a day-to-day basis?

15:26:19   2   A.   To prepare financial statements, personal tax returns,

15:26:23   3   business tax returns, meet with clients, help them organize their

15:26:32   4   bookkeeping records.

15:26:34   5   Q.   And are many of your clients longstanding clients in the

15:26:37   6   community that you service on a yearly basis?

15:26:40   7   A.   I'm sorry, I don't understand the question.

15:26:43   8   Q.   Are many of your clients in your accounting firm, those

15:26:46   9   individuals that have been with the firm for a long time?

15:26:50   10   A.   Yes.

15:26:51   11   Q.   And do you do their yearly taxes, both personal and

15:26:55   12   business, if needed?

15:26:56   13   A.   Yes.

15:26:57   14   Q.   I want to turn your attention to an incident in which an

15:27:03   15   individual by the name of Victor Lopez came to your place.  Do

15:27:06   16   you recall that?

15:27:06   17   A.   Yes.

15:27:06   18   Q.   I'm going to show you a picture of Government's Exhibit

15:27:14   19   335H.  Do you recognize that man as the Victor Lopez just

15:27:17   20   described?

15:27:18   21   A.   Yes.

15:27:46   22   Q.   Again, Ms. Obregon, this video on the screen in front of

15:27:49   23   you, that is Victor Lopez?

15:27:51   24   A.   Yes.

15:27:51   25   Q.   Could you tell the ladies and gentlemen of the jury when you

15:27:53  1    first met him?

15:27:57  2    A.    Not exactly.  I don't have an exact date.

15:27:59  3    Q.    How about the year?

15:28:01  4    A.    The year, 2011.

15:28:02  5    Q.    Okay.  And did he come to the offices of your accounting

15:28:05  6    firm?

15:28:05  7    A.    Yes.

15:28:06  8    Q.    And how did it come to pass that you were the one that met

15:28:11  9    him?

15:28:13  10   A.    I was assigned to his client.

15:28:17  11   Q.    And is that the way it normally works?  You get assigned to

15:28:20  12   clients?

15:28:21  13   A.    Yes.

15:28:21  14   Q.    And did you, in fact, meet with Mr. Lopez?

15:28:23  15   A.    Yes, I did.

15:28:23  16   Q.    Okay.  And what did Mr. Lopez ask you to do?

15:28:28  17   A.    He was inquiring about how to open a new business.

15:28:32  18   Q.    And was it a business for him or for others?

15:28:36  19   A.    At the time, I believe it was for him.

15:28:39  20   Q.    And did you, in fact, open a business for him?

15:28:42  21   A.    Yes.

15:28:43  22   Q.    And do you recall the name of that business?

15:28:46  23   A.    Desiree Princess Ranch and Poker Ranch.

15:28:51  24   Q.    So was Desiree Princess Ranch and Poker Ranch one business

15:28:55  25   or two businesses?

| 15:28:56 | 1 | A.    Two businesses. |

A.    Two businesses.

Q.    Showing you Government's Exhibit 317.  And you and I went
through these, did you not?

A.    Yes.

Q.    And are these the business records of the accounting firm of
Carranco & Lawson?

A.    Yes.

Q.    Your Honor, I'd offer Government's Exhibit 317.  It does
have a copy of business records affidavit.  It is Bates stamp No.
55 and 61.

        MS. WILLIAMS:  I didn't hear the second one.

        MR. GARDNER:  Fifty-five and 61.

        MS. FERNALD:  I'm sorry.  I was looking at the wrong
one.  I'm sorry.  It's just 55.

        MR. GARDNER:  I've been informed, your Honor, it's just
Bates stamp 55.

        MR. SANCHEZ:  No objection.

        THE COURT:  All right.  317 is admitted.

Q.    (BY MR. GARDNER) Now, you and I reviewed this prior to you
coming to testify here this afternoon, correct?

A.    Yes.

Q.    And what is this document, Ms. Obregon?

A.    That's an article of incorporation.

Q.    And was that for the Desiree Princess Ranch?

A.    Yes.

15:31:08  1    Q.    And, again, was that Mr. Lopez who approached you with those

15:31:11  2    documents?

15:31:11  3    A.    Yes.

15:31:12  4    Q.    Did your accounting firm prepare these documents?

15:31:16  5    A.    No.

15:31:17  6    Q.    And do you know who prepared these documents?

15:31:19  7    A.    Yes.

15:31:19  8    Q.    And who was that?

15:31:20  9    A.    That was Mr. Alarcon.

15:31:23  10   Q.    And who is he?

15:31:24  11   A.    He's an attorney in Texas.

15:31:26  12   Q.    Now, is he someone that your firm works with on a regular

15:31:30  13   basis?

15:31:30  14   A.    Yes.

15:31:31  15   Q.    And why is that?

15:31:33  16   A.    We refer clients to him or he refers clients to the

15:31:38  17   accounting firm.

15:31:39  18   Q.    And on this occasion, do you recall whether or not he

15:31:43  19   referred Mr. Lopez to you or you referred Mr. Lopez to him?

15:31:47  20   A.    Mr. Lopez was referred to us.

15:31:51  21   Q.    To us from the lawyer?

15:31:53  22   A.    From -- yes.

15:31:54  23   Q.    And so, Desiree Princess Ranch is one and you said the other

15:31:58  24   one was Poker Ranch; is that correct?

15:31:59  25   A.    Yes.

| | | |
|---|---|---|
| 15:32:00 | 1 | Q.   Is that certificate of filing for Poker Ranch, LLC? |
| 15:32:11 | 2 | A.   Yes. |
| 15:32:11 | 3 | Q.   And did Mr. Lopez ever tell you the reason why he wanted to |
| 15:32:16 | 4 | establish these two companies? |
| 15:32:18 | 5 | A.   They were for horse racing. |
| 15:32:21 | 6 | Q.   And were these companies established in the name of Victor |
| 15:32:23 | 7 | Lopez as either the president or the manager of these companies? |
| 15:32:27 | 8 | A.   No. |
| 15:32:27 | 9 | Q.   And do you recall who was responsible for these two |
| 15:32:32 | 10 | companies? |
| 15:32:36 | 11 | A.   Not exactly.  No. |
| 15:32:38 | 12 | Q.   Was one -- do you recall the name Mr. Gomez, Ochoa-Gomez? |
| 15:32:44 | 13 | A.   Yes. |
| 15:32:44 | 14 | Q.   And do you recall the other one, Mr. Cabrera-Del la Vega? |
| 15:32:47 | 15 | A.   Yes. |
| 15:32:48 | 16 | Q.   And did you ever meet with these two gentlemen? |
| 15:32:51 | 17 | A.   Yes. |
| 15:32:51 | 18 | Q.   And how many times did you meet with them? |
| 15:32:54 | 19 | A.   One time. |
| 15:32:55 | 20 | Q.   Okay.  What was that purpose for? |
| 15:32:58 | 21 | A.   They needed to come in to sign a W-7. |
| 15:33:01 | 22 | Q.   And could you let the ladies and gentlemen of the jury you |
| 15:33:03 | 23 | know what a W-7 is? |
| 15:33:04 | 24 | A.   A W-7 is when a foreigner does not have a Social Security |
| 15:33:10 | 25 | number, they need to file a tax return in the United States, they |

15:33:14  1    need to apply for -- it's called an ITN number.

15:33:19  2    Q.   And what does ITN number stand for?

15:33:21  3    A.   Individual Taxpayer Identification number.

15:33:26  4    Q.   And that's the same thing as Social Security number for

15:33:30  5    foreign persons?

15:33:31  6    A.   Yes.

15:33:31  7    Q.   Okay.  When you were visiting with Mr. Cabrera and Mr.

15:33:37  8    Ochoa-Gomez, what was their level of interest in either Poker

15:33:44  9    Ranch or Desiree Princess Ranch?

15:33:47  10   A.   They didn't seem to have any questions.

15:33:49  11   Q.   And the companies had already been established at that

15:33:52  12   point?

15:33:52  13   A.   Yes.

15:33:53  14   Q.   And did you provide them with a W-7 form?

15:33:56  15   A.   Yes, I did.

15:33:56  16   Q.   Did you provide them with instructions on what they needed

15:34:00  17   to do with it?

15:34:00  18   A.   Yes.

15:34:00  19   Q.   And what were those instructions?

15:34:02  20   A.   A W-7 normally is filed with their personal tax return, and

15:34:08  21   in this case, they didn't have anything to report.  So we

15:34:14  22   requested a letter from the bank where they were supposed to open

15:34:20  23   an interest-bearing account.  And I had requested that letter

15:34:26  24   from the bank and they never brought it in.

15:34:28  25   Q.   So if I understand your testimony, you gave them the W-7.

```
15:34:33   1    A.   Uh-huh.

15:34:34   2    Q.   Told them they needed to go to the bank?

15:34:36   3    A.   Right.

15:34:36   4    Q.   And then, return to you with what?

15:34:38   5    A.   With the letter stating from the bank that they needed to

15:34:41   6    file for an ITN number.

15:34:44   7    Q.   And did either Mr. Cabrera-De la Vega or Mr. Ochoa-Gomez

15:34:50   8    ever return with that number?

15:34:51   9    A.   No.

15:34:52   10   Q.   Dealing with these two accounts for Desiree Princess Ranch

15:34:57   11   and for Poker Ranch, who was the individual you had the most

15:34:59   12   contact with?

15:35:01   13   A.   Victor Lopez.

15:35:04   14   Q.   And in what manner or what conversations did you have

15:35:08   15   contact with Mr. Lopez?

15:35:10   16   A.   Mostly inquiries on how to go about opening the business,

15:35:17   17   what was needed to be filed, the requirement.

15:35:22   18   Q.   Let me show you Government's Exhibit 335E.  Do you recognize

15:35:26   19   that?

15:35:27   20   A.   Yes.

15:35:28   21   Q.   And who is that?

15:35:29   22   A.   Mr. Carlos Nayen.

15:35:32   23   Q.   And, again, for the jury, that's Mr. Carlos Nayen?

15:35:45   24   A.   Yes.

15:35:46   25   Q.   All right.  When did you meet him?
```

| | | |
|---|---|---|
| 15:35:48 | 1 | A.   Back in 2011. |
| 15:35:50 | 2 | Q.   And did he come to you to form a company, as well? |
| 15:35:54 | 3 | A.   Yes. |
| 15:35:55 | 4 | Q.   Now, how far after the formation of the other two, Desiree |
| 15:36:00 | 5 | Princess Ranch and Poker Ranch, did you see Mr. Nayen? |
| 15:36:04 | 6 | A.   Months later. |
| 15:36:06 | 7 | Q.   Same year, though? |
| 15:36:07 | 8 | A.   Yes. |
| 15:36:07 | 9 | Q.   Okay.  And for what reason did he request to establish a |
| 15:36:12 | 10 | company? |
| 15:36:12 | 11 | A.   Horse racing. |
| 15:36:13 | 12 | Q.   And do you remember the name of that company? |
| 15:36:15 | 13 | A.   Carmina, LLC. |
| 15:36:23 | 14 | Q.   And, your Honor, I apologize.  The first document I showed |
| 15:36:27 | 15 | her was Bates stamp 55-486 that was Desiree Princess Ranch for |
| 15:36:32 | 16 | the record.  The second document was 55-587, that's Poker Ranch. |
| 15:36:45 | 17 | THE COURT:  And what is the third one that you just |
| 15:36:48 | 18 | mentioned? |
| 15:36:48 | 19 | THE WITNESS:  Carmina, LLC. |
| 15:36:58 | 20 | Q.   (BY MR. GARDNER) Carmina, LLC right here, is that the |
| 15:37:01 | 21 | spelling of the company formed by Carlos Nayen? |
| 15:37:04 | 22 | A.   Yes. |
| 15:37:04 | 23 | Q.   Your Honor, for the record, that's 55-770. |
| 15:37:08 | 24 | Now, what interaction did you have with Mr. Nayen |
| 15:37:11 | 25 | regarding the establishment of Carmina, LLC? |

15:37:14   1    A.    He came in one day to sign his personal tax return.

15:37:21   2    Q.    And did you have previous problems communicating with Mr.

15:37:24   3    Nayen?

15:37:25   4    A.    Yes.

15:37:26   5    Q.    Did Mr. Nayen have a cellphone number in which he could be

15:37:30   6    contacted?

15:37:30   7    A.    Not for him.  But he gave me a friend's cellphone number.

15:37:34   8    Q.    And how was your -- or what was the manner of your -- I'm

15:37:39   9    sorry.  Getting ahead of myself.

15:37:41   10           If you couldn't communicate with him by phone, how did

15:37:44   11   you communicate with Mr. Nayen?

15:37:46   12   A.    By e-mail.

15:37:47   13   Q.    And when he came in that one day to fill out his tax

15:37:52   14   returns, were you able to obtain a phone number?

15:37:55   15   A.    Yes.

15:37:56   16   Q.    And was it his friend?

15:37:57   17   A.    Yes.

15:37:58   18   Q.    And did you write that down somewhere?

15:37:59   19   A.    Yes.  I did.

15:38:00   20   Q.    Okay.  You've seen that before coming here to testify this

15:38:03   21   afternoon?

15:38:03   22   A.    Yes.

15:38:04   23   Q.    Ms. Obregon, I'm showing you page 55-846.  Is that your

15:38:17   24   handwriting there where it says, Fernando?

15:38:19   25   A.    Yes, it is.

15:38:20   1   Q.   Okay.  Is this your handwriting where it says, Arizona?

15:38:23   2   A.   Yes.

15:38:23   3   Q.   Was this the number that this man gave you?

15:38:30   4   A.   Yes.

15:38:31   5   Q.   All right.  And how did he identify this Fernando?

15:38:36   6   A.   Just by his first name.

15:38:38   7   Q.   Did he give you no last name?

15:38:40   8   A.   No.

15:38:41   9   Q.   Okay.  With respect to this word here, "Arizona," why did

15:38:47  10   you write that down?

15:38:48  11   A.   I asked him what area code he had for the phone number, and

15:38:54  12   he told me it was from Arizona.

15:38:55  13   Q.   So you're telling me that you asked him if the 520 area code

15:39:00  14   was an Arizona area code?

15:39:02  15   A.   Yes.

15:39:02  16   Q.   Now, was there any time when Mr. Lopez had any involvement

15:39:07  17   with Carmina, LLC?

15:39:09  18   A.   There was that one time that he came into our firm, and he

15:39:16  19   requested correspondence for Carmina, LLC.

15:39:20  20   Q.   And did you provide that to him?

15:39:22  21   A.   No.  I did not.  I asked him if it was okay for me to

15:39:25  22   confirm with Mr. Nayen before we could provide that information.

15:39:29  23   Q.   What was Mr. Lopez's response?

15:39:31  24   A.   Yes.  Oh, he said that was fine.

15:39:35  25   Q.   And did Mr. -- or how did you contact Mr. Nayen to see if

15:39:40   1   Mr. Lopez could involve himself with Carmina?

15:39:43   2   A.   Via e-mail.

15:39:44   3   Q.   And did you ever get a response?

15:39:46   4   A.   I don't recall.

15:39:47   5   Q.   And was Mr. Lopez gone at that point?

15:39:50   6   A.   Yes.  When I came back, he was gone.

15:39:55   7   Q.   And with respect to the accounts, your accounting purpose

15:40:00   8   there at the firm, did you have the opportunity to review the

15:40:03   9   bank accounts of Desiree Princess Ranch?

15:40:06   10   A.   No.

15:40:07   11   Q.   And the bank accounts of Poker Ranch?

15:40:09   12   A.   No.

15:40:10   13   Q.   And the bank accounts of Carmina, LLC?

15:40:12   14   A.   Yes.

15:40:13   15   Q.   Okay.  Could you please tell the ladies and gentlemen of the

15:40:16   16   jury what amounts, to the best of your recollection, you recall

15:40:19   17   going in and out of Carmina, LLC?

15:40:23   18   A.   I don't recall the amounts.

15:40:30   19   Q.   Now, in the business records, there is a retainer fee paid.

15:40:34   20   In fact, it's on the first page.  And it shows a retainer fee

15:40:47   21   paid for by Desiree Princess Ranch for 500 and Poker Ranch for

15:40:52   22   500.  Would you agree with me that the numbers on your receipts

15:40:58   23   are in sequence?

15:40:58   24   A.   Right.

15:41:00   25   Q.   Do you know who paid those retainer fees?

```
15:41:02   1   A.   Victor Lopez.

15:41:05   2   Q.   That's all the questions I have, your Honor.  I pass the

15:41:08   3   witness.

15:41:09   4             MS. WILLIAMS:  No questions.

15:41:12   5             MR. DEGUERIN:  No questions, your Honor.

15:41:14   6             MR. WOMACK:  I do, your Honor.

15:41:15   7                       CROSS-EXAMINATION

15:41:15   8   BY MR. WOMACK:

15:41:19   9   Q.   Ms. Obregon, do you know this gentleman standing next to me?

15:41:22  10   A.   I'm sorry?

15:41:23  11   Q.   Do you know this man standing next to me?

15:41:24  12   A.   No.  I do not.

15:41:25  13   Q.   You've never met him before, have you?

15:41:27  14   A.   No.

15:41:27  15   Q.   He's never been at your accounting firm?

15:41:29  16   A.   No.

15:41:32  17   Q.   These three entities you talked about, Carmina, LLC, that

15:41:42  18   was a company owned by Carlos Nayen?

15:41:45  19   A.   That's correct.

15:41:46  20   Q.   And it was your understanding it was involving a horse

15:41:48  21   racing?

15:41:49  22   A.   Yes.

15:41:49  23   Q.   Poker Ranch, LLC, that was also a horse-racing company,

15:41:55  24   wasn't it?

15:41:55  25   A.   Yes.
```

15:41:56   1   Q.   And who owned that one?  Is that Mr. Cabrera?

15:42:03   2   A.   I'm not sure which one owned which company.

15:42:09   3   Q.   Do you remember the name Armando Cabrera-De la Vega?

15:42:12   4   A.   Yes.

15:42:12   5   Q.   And he owned one of the two companies, either Poker Ranch or

15:42:16   6   Desiree Princess, LLC?

15:42:17   7   A.   Yes.

15:42:19   8   Q.   And do you recall that there was also a Jorge Ochoa-Gomez?

15:42:23   9   A.   Yes.

15:42:24   10   Q.   And together -- well, not together.  He and Mr. Cabrera

15:42:30   11   owned these two companies.  One owned Poker Ranch and the other

15:42:33   12   owned Desiree Princess, LLC?

15:42:36   13   A.   Correct.  Yes.

15:42:38   14   Q.   Okay.  The first answer didn't come over the microphone for

15:42:42   15   some reason.

15:42:42   16   A.   Oh, okay.

15:42:43   17   Q.   To your knowledge, all three were horse-racing entities?

15:42:49   18   A.   Yes.

15:42:50   19   Q.   And Mr. Nayen, when he told you that -- gave you his phone

15:42:55   20   number for a man named Fernando in Arizona, did he tell you that

15:42:59   21   Fernando is someone that trains race horses for all three

15:43:03   22   companies?

15:43:03   23   A.   No.

15:43:03   24   Q.   He just said, here's a number you can reach me at?

15:43:05   25   A.   Correct.

| | | |
|---|---|---|
| 15:43:06 | 1 | Q.   Thank you.  No further question, your Honor. |
| 15:43:09 | 2 | MR. ESPER:  I've got none, your Honor. |
| 15:43:11 | 3 | MR. MAYR:  None, your Honor. |
| 15:43:12 | 4 | THE COURT:  Any redirect? |
| 15:43:13 | 5 | MR. GARDNER:  Briefly, your Honor. |
| 15:43:14 | 6 | RE-DIRECT EXAMINATION |
| 15:43:14 | 7 | BY MR. GARDNER: |
| 15:43:19 | 8 | Q.   Ms. Obregon, I probably should have shown this to you in the |
| 15:43:22 | 9 | beginning, page 587.  If I put the page of 588, it shows that |
| 15:43:27 | 10 | Jose Luis Ochoa-Gomez is the owner of Desiree Princess Ranch, |
| 15:43:33 | 11 | correct? |
| 15:43:33 | 12 | A.   Yes. |
| 15:43:33 | 13 | Q.   I'm sorry.  I messed that up.  Let me start over. |
| 15:43:51 | 14 | Could I go to 486?  That's Desiree Princess Ranch, |
| 15:43:56 | 15 | correct? |
| 15:43:56 | 16 | Q. |
| 15:43:56 | 17 | A.   Yes. |
| 15:43:56 | 18 | Q.   I have flipped the page to that.  Desiree Princess Ranch is |
| 15:44:01 | 19 | owned by Armando Cabrera-De la Vega? |
| 15:44:04 | 20 | A.   Yes. |
| 15:44:05 | 21 | Q.   And then, when I go to Poker Ranch here and then, flip the |
| 15:44:20 | 22 | page to 588, that shows Jose Luis Ochoa-Gomez? |
| 15:44:25 | 23 | A.   Yes. |
| 15:44:28 | 24 | Q.   And then, finally, Carmina right there on page 770, when I |
| 15:44:40 | 25 | flip the page, the owner is Carlos Miguel Nayen-Borbolla? |

```
15:44:47   1   A.    Yes.

15:44:48   2   Q.    Ms. Obregon, that's all the questions I have.  Thank you.

15:44:51   3             THE COURT:  May this witness be excused?

15:44:53   4             MS. WILLIAMS:  (Moving head up and down.)

15:44:55   5             MR. WOMACK:  Yes, your Honor.

15:44:56   6             THE COURT:  You may be excused.

15:45:15   7             MR. GARDNER:  Your Honor, the government calls Marciel

15:45:19   8   Reyes.

15:45:49   9             (Witness sworn.)

15:46:02  10             THE COURT:  Tell us, please, sir, your full name and

15:46:11  11   spell your last.

15:46:12  12             THE WITNESS:  My name is Marciel Reyes, R-E-Y-E-S.

15:46:17  13             THE COURT:  Now, we had a little trouble with the

15:46:19  14   microphone -- yeah.  That will be fine.  All right.

15:46:23  15        MARCIEL REYES, called by the Government, duly sworn.

15:46:23  16                     DIRECT EXAMINATION

15:46:23  17   BY MR. GARDNER:

15:46:23  18   Q.    Thank you, your Honor.

15:46:24  19             If you will, could you please explain to the jury what

15:46:27  20   you do for a living, sir?

15:46:28  21   A.    Yes.  I'm a U.S. Customs and Border Protection officer.  I'm

15:46:32  22   stationed at the Dallas-Fort Worth International Airport.  My job

15:46:35  23   is to talk to and search incoming passengers, international

15:46:44  24   passengers or their belongings, their possessions, cargo,

15:46:48  25   anything that they have on them.
```

| | | |
|---|---|---|
| 15:46:49 | 1 | Q.   And the Dallas-Fort Worth Airport is an international |
| 15:46:54 | 2 | point-of-entry; is that correct? |
| 15:46:54 | 3 | A.   Yes, sir.  That's correct. |
| 15:46:55 | 4 | Q.   Flights come in from various countries to include Mexico? |
| 15:46:58 | 5 | A.   Yes, sir.  Correct. |
| 15:46:59 | 6 | Q.   And how long have you been stationed there, sir? |
| 15:47:01 | 7 | A.   Nine-and-a-half years. |
| 15:47:03 | 8 | Q.   And when you say you search individuals, I want to refer to |
| 15:47:07 | 9 | a term called "pocket trash."  Are you familiar with that term? |
| 15:47:10 | 10 | A.   Yes, sir. |
| 15:47:10 | 11 | Q.   Could you please explain that term for the jury? |
| 15:47:13 | 12 | A.   Pocket trash, pretty much what it sounds like.  Anything |
| 15:47:17 | 13 | inside passengers' pockets that they have in their possession. |
| 15:47:20 | 14 | But pocket trash can also include stuff that they have on |
| 15:47:24 | 15 | electronic devices, laptops, computers, phones, cameras. |
| 15:47:30 | 16 | Q.   Okay.  And does the law allow you to conduct a search of |
| 15:47:34 | 17 | individuals entering the country? |
| 15:47:35 | 18 | A.   Yes, sir.  It's under the border search authority. |
| 15:47:39 | 19 | Q.   Does the law allow you to search just domestic passengers |
| 15:47:43 | 20 | going back and forth between different cities? |
| 15:47:44 | 21 | A.   No, sir.  Only international passengers, arriving and |
| 15:47:48 | 22 | departing. |
| 15:47:49 | 23 | Q.   Do you commonly search pocket trash? |
| 15:47:51 | 24 | A.   Yes, sir. |
| 15:47:51 | 25 | Q.   What's the purpose of that? |

| | | |
|---|---|---|
| 15:47:54 | 1 | A.   Our job as customs also is a mediator.  We're in the middle. |
| 15:48:00 | 2 | Usually we're -- there are other agencies, federal agencies that |
| 15:48:07 | 3 | request our assistance, and that pocket trash is turned over to |
| 15:48:11 | 4 | them and to further their investigation. |
| 15:48:15 | 5 | Q.   And when you do the pocket trash, do you look at it and do |
| 15:48:19 | 6 | you somehow make a copy of it? |
| 15:48:20 | 7 | A.   Yes, sir. |
| 15:48:20 | 8 | Q.   And is that copy then placed in a database, a customs |
| 15:48:24 | 9 | database? |
| 15:48:25 | 10 | A.   Yes, sir.  And/or it's turned over to the agency that |
| 15:48:28 | 11 | requested that information. |
| 15:48:30 | 12 | Q.   And who has access to that database? |
| 15:48:32 | 13 | A.   Federal officers is the majority of people. |
| 15:48:38 | 14 | Q.   I'm showing you Government's Exhibits 355.  You and I have |
| 15:48:44 | 15 | looked at these before, but do you recognize those? |
| 15:48:46 | 16 | A.   Yes, sir. |
| 15:48:47 | 17 | Q.   Is this pocket trash you took on a particular stop? |
| 15:48:51 | 18 | A.   Yes, sir. |
| 15:48:52 | 19 | Q.   Your Honor, I'd offer Government's Exhibit 355. |
| 15:50:21 | 20 | THE COURT:  Hearing no objections, 355 is admitted. |
| 15:50:25 | 21 | Q.   (BY MR. GARDNER) Sir, I'd just like to go through these. |
| 15:50:32 | 22 | Just for the jury reference, that's 355 down in the corner if I |
| 15:50:37 | 23 | can get it up there.  And so, what are these two items here, sir? |
| 15:50:44 | 24 | A.   These were taken off the -- Mr. Armando here.  I believe |
| 15:50:50 | 25 | they were in his wallet, part of the pocket trash, and appears to |

15:50:54  1   be IDs for Oklahoma Horse Racing Commission.

15:50:57  2   Q.   You really can't tell the names from the front of the card,

15:50:59  3   but you also made a copy of the back of the card; is that

15:51:02  4   correct?

15:51:02  5   A.   Yes, sir.  That's correct.

15:51:03  6   Q.   In this case it says, Armando Cabrera-Del la Vega, Princess

15:51:08  7   Ranch and Jorge Luis Ochoa-Gomez with Poker Ranch, correct?

15:51:12  8   A.   Yes.

15:51:13  9   Q.   That's the second page.  This on the third page, pretty

15:51:19  10  self-explanatory?

15:51:20  11  A.   Yes, sir.  Uh-huh.

15:51:21  12  Q.   What is this right here?

15:51:31  13  A.   Appears to be a Wells Fargo statement that also the

15:51:35  14  passenger had in his possession.

15:51:37  15  Q.   And on that statement, there seemed to be a writing here,

15:51:47  16  Fernie004@hotmail.com?

15:51:50  17  A.   Correct.

15:51:50  18  Q.   Was this writing on the document when you took possession of

15:51:53  19  it and made a copy of it?

15:51:54  20  A.   Yes, sir, it was.

15:51:55  21  Q.   Do you know who Fernie004@hotmail.com belongs to?

15:52:00  22  A.   No, sir, I do not.

15:52:10  23  Q.   Going back again, this appears to be a company formation; is

15:52:14  24  that correct?

15:52:14  25  A.   Yes, sir.

15:52:15  1  Q.   And this is just a Wells Fargo Bank account business

15:52:21  2  application?

15:52:22  3  A.   Correct.  Yes, sir.

15:52:24  4  Q.   And this is part of the same thing, Desiree Princess Ranch?

15:52:28  5  A.   Yes, sir.

15:52:28  6  Q.   And I'm not too concerned about the remainder of the

15:52:31  7  business applications, but what I'd like to ask you about is

15:52:41  8  this.  It's a little hard to see on the screen.  Could you

15:52:44  9  describe for the ladies and gentlemen of the jury what that is a

15:52:46  10  picture of?

15:52:46  11  A.   Yes, sir.  Appears to be packages of U.S. currency inside of

15:52:51  12  a duffel bag.

15:52:53  13  Q.   And it appears to be a BlackBerry telephone.  So was this

15:53:04  14  either Mr. Del la Vega's or Mr. Ochoa-Gomez's BlackBerry?

15:53:11  15  A.   Yes, sir.  It was in his possession at the time of the

15:53:13  16  inspection.  Correct.

15:53:14  17  Q.   And does the Border Protection Act allow you to look through

15:53:17  18  or scroll through phone contacts and pictures on the phones?

15:53:19  19  A.   Yes, sir.  Any type of electronic data.

15:53:22  20  Q.   Is that what you did in this case?

15:53:24  21  A.   Yes, sir.

15:53:24  22  Q.   And did you discover that picture?

15:53:26  23  A.   Yes, sir.

15:53:28  24  Q.   And, again, can you explain to the ladies and gentlemen of

15:53:31  25  the jury what this is a picture of?

15:53:32  1  A.   In my nine-and-a-half years of being a U.S. Customs and

15:53:36  2  Border Protection officer, this is consistent with money seizures

15:53:40  3  that I have -- the agency has acquired.

15:53:43  4  Q.   And does it appear to be some numbers written on top of the

15:53:47  5  wrapped currency?

15:53:48  6  A.   Yes, sir.

15:53:49  7  Q.   Is this consistent in your training and experience with

15:53:53  8  narcotics trafficking?

15:53:54  9  A.   Yes, sir.

15:53:54  10  Q.   Pass the witness, your Honor.  Oh, I'm sorry, your Honor.

15:54:01  11       You talked about taking photos of the telephone and

15:54:04  12  looking through the telephone contact list.  Is there merely a

15:54:08  13  recitation of the contact list that were contained within that

15:54:10  14  telephone?

15:54:11  15  A.   Yes, sir.  That's correct.

15:54:12  16  Q.   And address?  Same thing, correct?

15:54:16  17  A.   Yes, sir.

15:54:16  18  Q.   So however they had it listed in there, for example, "Jany"

15:54:20  19  and then, a number for that?

15:54:21  20  A.   That is correct.

15:54:24  21  Q.   Was this all then placed in a database for all the

15:54:28  22  individuals looking for these or possibly these two individuals

15:54:33  23  at a later date?

15:54:34  24  A.   That is correct.  Yes.

15:54:35  25  Q.   Now, we've talked about two individuals or two people

15:54:40   1   identified in the paperwork.  Was it one person who you searched

15:54:45   2   the pocket trash or two people you searched the pocket trash?

15:54:47   3   A.   Just one person.

15:54:48   4   Q.   And do you recall who this person was?

15:54:50   5   A.   Yes, sir.  Mr. Armando De la Vega.

15:54:55   6   Q.   Pass the witness, your Honor.

15:54:57   7                        CROSS-EXAMINATION

15:55:03   8   BY MS. WILLIAMS:

15:55:03   9   Q.   Are you Mr. Reyes?

15:55:07   10  A.   Mr. Reyes is fine.  Yes.

15:55:09   11  Q.   Mr. Reyes, you testified about your activity at an airport?

15:55:13   12  A.   Correct.

15:55:13   13  Q.   Are there also Customs and Border Patrol agents who are at

15:55:17   14  the border?

15:55:18   15  A.   Yes.  There's land border, sea ports-of-entry.

15:55:21   16  Q.   So somebody comes to the border, shows their passport,

15:55:24   17  whether they're going one way or the other, depending, you can do

15:55:28   18  the same process?

15:55:29   19  A.   Yes.  Correct.

15:55:29   20  Q.   That's, in effect, since how long?

15:55:33   21  A.   I don't know the exact year, but numbers of years maybe.  It

15:55:40   22  was enacted by Congress that gives us this authority.

15:55:43   23  Q.   So I just want to make sure I understand the process.  If my

15:55:49   24  client Jose Trevino was in Mexico and he came into the United

15:55:52   25  States and he has his United States passport, Customs and Border

| | | |
|---|---|---|
| 15:55:57 | 1 | Patrol could, if they wanted to, take his phone, everything |
| 15:56:01 | 2 | that's in his pocket, and go and copy whatever they want to, |
| 15:56:03 | 3 | enter it into this database under his name and his passport |
| 15:56:07 | 4 | information, date of birth, all that identifying information? |
| 15:56:10 | 5 | A.   Yes.   That is correct. |
| 15:56:12 | 6 | Q.   No further questions. |
| 15:56:17 | 7 | MR. DEGEURIN:  No questions, your Honor. |
| 15:56:18 | 8 | MR. WOMACK:  No questions. |
| 15:56:19 | 9 | MR. ESPER:  Your Honor, I just have one clarifying |
| 15:56:21 | 10 | question. |
| 15:56:22 | 11 | CROSS-EXAMINATION |
| 15:56:22 | 12 | BY MR. ESPER: |
| 15:56:23 | 13 | Q.   The photograph that's on that BlackBerry. |
| 15:56:24 | 14 | A.   Yes, sir. |
| 15:56:25 | 15 | Q.   You say that is consistent with the seizure of money? |
| 15:56:27 | 16 | A.   In my personal experience, yes, sir. |
| 15:56:28 | 17 | Q.   So, in other words, it appears that somebody took a |
| 15:56:32 | 18 | photograph of money that had already been seized by law |
| 15:56:36 | 19 | enforcement? |
| 15:56:36 | 20 | A.   No, sir. |
| 15:56:36 | 21 | Q.   That's not -- that's not what you're testifying to? |
| 15:56:40 | 22 | A.   Exactly.   No. |
| 15:56:41 | 23 | Q.   Okay.   It was just a picture of some money and it had some |
| 15:56:46 | 24 | -- looked like 4,000, I think it went to the thousands or |
| 15:56:49 | 25 | something, correct? |

15:56:49  1  A.   Correct.  Yes, sir.

15:56:50  2  Q.   But that was not money that had been seized by law

15:56:55  3  enforcement and then, zipped up in an envelope?

15:56:56  4  A.   That is correct, sir.

15:56:57  5  Q.   Okay.

15:56:57  6  A.   At that time of the inspection there was no seizure of

15:57:01  7  anything.

15:57:02  8  Q.   I know you didn't seize any money, but you said that

15:57:05  9  photograph was a photograph of currency that looked like it had

15:57:10  10  been seized.

15:57:10  11  A.   No, no.  It was a picture of currency.  In my personal

15:57:15  12  experience when I see money wrapped like that that appears to be

15:57:19  13  cellophane, it's usually having to do with some type of smuggling

15:57:22  14  of either currency or narcotics.

15:57:24  15  Q.   I just wanted to clarify that it wasn't somebody who had

15:57:27  16  access to law enforcement seizure of money and took a picture of

15:57:30  17  it.

15:57:30  18  A.   No, sir.  To my knowledge, no, sir.  It was not.

15:57:33  19  Q.   Okay.  No further question.

15:57:35  20       MR. MAYR:  And I have no question, your Honor.

15:57:36  21       THE COURT:  Any redirect?

15:57:38  22                    RE-DIRECT EXAMINATION

15:57:38  23  BY MR. GARDNER:

15:57:39  24  Q.   On the phones that Mr. Esper asked, I only want to talk

15:57:43  25  about one thing.  This phone is a BlackBerry, correct?

15:57:55  1    A.   Yes, sir.  Appears to be.

15:57:59  2    Q.   And just for the record, could you read what that word

15:58:02  3    appears to be?

15:58:03  4    A.   Looks like "pines" or "pins."

15:58:07  5    Q.   Could it be PINS?  BlackBerry PINS?

15:58:10  6    A.   Could possibly be.  I can't tell for certain.

15:58:13  7    Q.   And just for the record, could you tell the jury what this

15:58:19  8    name is?

15:58:19  9    A.   "Yo-Yo."

15:58:20  10   Q.   "Yo-Yo."  It appears to be his PIN behind it, correct?

15:58:23  11   A.   Yes, sir.

15:58:23  12   Q.   That's all I have, your Honor.

15:58:28  13           THE COURT:  May this witness be excused?

15:58:31  14           MS. WILLIAMS:  (Moving head up and down.)

15:58:32  15           MR. DEGEURIN:  Yes, your Honor.

15:58:33  16           THE COURT:  You may be excused, sir.

15:58:35  17           MR. GARDNER:  The government calls TFO Johnny Sosa.

15:59:16  18           THE COURT:  If you'll come forward, please.  This is

15:59:19  19   Mrs. Sims.  She's going to administer an oath to you.

15:59:21  20           (Witness sworn.)

15:59:36  21           THE COURT:  Tell us your full name and spell your last,

15:59:40  22   please.

15:59:40  23           THE WITNESS:  Yes, sir.  Johnny Sosa, S-O-S-A.

15:59:40  24       JOHNNY SOSA, called by the Government, duly sworn.

15:59:44  25

<u>DIRECT EXAMINATION</u>

BY MR. GARDNER:

Q.    Thank you, your Honor.

      You go by Agent Sosa?

A.    Officer Sosa.

Q.    Officer Sosa?

A.    Yes, sir.

Q.    If you will, Officer Sosa, could you introduce yourself to the jury and tell them what you do for a living and where you do it?

A.    Yes, sir.  My name is Johnny Sosa.  I'm a Fort Worth Police officer.  I've been a police officer for 23 years.  In 1998, I was assigned as a task force officer to the Drug Enforcement Administration, and been assigned in that position since that time.  My duties and responsibilities include the investigation of large scale drug-trafficking organizations.

Q.    And, sir, was there an occasion in which you came to arrive at Jose Trevino's residence in Balch Springs, Texas?

A.    Yes, sir.

Q.    Do you recall the date of that, sir?

A.    Yes, sir.  That was February 24, 2011.

Q.    All right.  And was that based on another investigation?

A.    Yes.

Q.    And where was Mr. Trevino's residence at that time?

A.    It was at 12909 Timothy Lane in Balch Springs, Texas.

16:00:49   1   Q.   Now, the jury has heard some information about an exit on

16:00:54   2   Lake June Road at IH-635.  Are you familiar with that exit?

16:00:59   3   A.   Yes, sir.

16:00:59   4   Q.   Is that also in Balch Springs, Texas?

16:01:02   5   A.   Yes.

16:01:03   6   Q.   How far would you estimate the distance from that exit to

16:01:06   7   Mr. Trevino's house?

16:01:07   8   A.   It's probably like approximately about a mile.

16:01:11   9   Q.   And when you went to Mr. Trevino's house on another

16:01:14   10  investigation, was Mr. Trevino home?

16:01:16   11  A.   Yes, he was.

16:01:16   12  Q.   And who else was home, sir?

16:01:18   13  A.   His wife Zulema Trevino was present as well as four

16:01:22   14  children.

16:01:23   15  Q.   And did you ask some questions of Mr. Trevino?

16:01:25   16  A.   Yes, sir.

16:01:26   17  Q.   And what were those questions?

16:01:28   18  A.   I asked Mr. Trevino when the last time was that he had seen

16:01:33   19  his brothers Omar or Miguel Trevino, and Mr. Trevino told me that

16:01:38   20  he had not seen or spoken with either brother in over five years.

16:01:43   21  I also --

16:01:44   22  Q.   Can I interrupt you for a second?

16:01:46   23  A.   Yes, sir.

16:01:46   24  Q.   Had either seen or spoke to his brothers in over five years?

16:01:49   25  A.   Yes, sir.  That's correct.

| | | |
|---|---|---|
| 16:01:50 | 1 | Q.   Thank you.  Go ahead. |
| 16:01:51 | 2 | A.   I also asked Mr. Trevino what he did for a living.  He |
| 16:01:55 | 3 | stated that he was a bricklayer by trade, but that he had |
| 16:01:59 | 4 | recently started a business with his wife Zulema and that the |
| 16:02:04 | 5 | business was a racing-horse business.  I asked him how he |
| 16:02:09 | 6 | obtained the money to start the business.  He stated that he and |
| 16:02:14 | 7 | his wife had saved approximately $25,000 to start the business, |
| 16:02:19 | 8 | and that they had purchased seven quarter horses, which he was |
| 16:02:24 | 9 | maintaining in different locations to include Mexico, Texas and |
| 16:02:29 | 10 | Oklahoma. |
| 16:02:30 | 11 | Q.   Did you ask for consent at his -- an agreement from Mr. |
| 16:02:35 | 12 | Trevino to search his house? |
| 16:02:36 | 13 | A.   Yes, sir, I did. |
| 16:02:37 | 14 | Q.   And did he willingly provide that consent? |
| 16:02:39 | 15 | A.   Yes, he did. |
| 16:02:40 | 16 | Q.   And did you search his house? |
| 16:02:41 | 17 | A.   Yes, I did. |
| 16:02:42 | 18 | Q.   Did you find anything of evidentiary significance? |
| 16:02:44 | 19 | A.   No, sir. |
| 16:02:44 | 20 | Q.   And was Mr. Trevino cooperative during the whole incident? |
| 16:02:48 | 21 | A.   Yes, he was. |
| 16:02:49 | 22 | Q.   And was his wife cooperative? |
| 16:02:50 | 23 | A.   Yes, sir. |
| 16:02:51 | 24 | Q.   All right.  And after you searched his house, what did you |
| 16:02:55 | 25 | do then? |

| | | |
|---|---|---|
| 16:02:55 | 1 | A.   After we finished searching the house, we just left the |
| 16:02:58 | 2 | residence and, you know, thanked Mr. Trevino for his cooperation. |
| 16:03:03 | 3 | Q.   And was he pleasant and respectful during the whole |
| 16:03:05 | 4 | incident? |
| 16:03:06 | 5 | A.   Yes, sir, he was. |
| 16:03:07 | 6 | Q.   I'll pass the witness, your Honor. |
| 16:03:19 | 7 | CROSS-EXAMINATION |
| 16:03:22 | 8 | BY MS. WILLIAMS: |
| 16:03:22 | 9 | Q.   So you were conducting an investigation.  You knew that this |
| 16:03:41 | 10 | man -- or believed that this man was the brother of Miguel and |
| 16:03:45 | 11 | Omar Trevino.  Yes? |
| 16:03:47 | 12 | A.   Yes, ma'am. |
| 16:03:49 | 13 | Q.   And you went to his house and you knocked on the door? |
| 16:03:52 | 14 | A.   Correct. |
| 16:03:52 | 15 | Q.   How many people were there? |
| 16:03:53 | 16 | A.   I don't recall the exact number, but there were |
| 16:03:57 | 17 | approximately seven to ten investigators, at least, there. |
| 16:04:00 | 18 | Q.   Seven to ten investigators went to Mr. Trevino's house to |
| 16:04:03 | 19 | conduct an interview? |
| 16:04:05 | 20 | A.   It wasn't to conduct an interview.  It was an investigation. |
| 16:04:10 | 21 | Q.   So these seven to ten officers went there and what were they |
| 16:04:16 | 22 | wearing? |
| 16:04:17 | 23 | A.   We were all wearing clearly identifiable police uniforms, |
| 16:04:21 | 24 | whether they be raid vests that said "police" on the front. |
| 16:04:24 | 25 | Q.   I'm sorry, I didn't understand that last part.  Raid vests? |

| | | |
|---|---|---|
| 16:04:27 | 1 | A.   Yeah.   Just protective bulletproof vests that we wear that |
| 16:04:32 | 2 | say "police" on the front. |
| 16:04:32 | 3 | Q.   Describe what that looks like to the members of the jury. |
| 16:04:34 | 4 | A.   I mean, they're various different styles.   Every agency has |
| 16:04:37 | 5 | a different type of protective ballistic vests, but they're |
| 16:04:40 | 6 | typically black in color, and typically on the front in white |
| 16:04:44 | 7 | lettering and it will say "police" in big letters so that the |
| 16:04:47 | 8 | individuals there know that it's the police coming to the |
| 16:04:49 | 9 | residence. |
| 16:04:50 | 10 | Q.   So it's your SWAT gear basically? |
| 16:04:52 | 11 | A.   It's not SWAT gear, but it's what we use when we conduct an |
| 16:04:56 | 12 | enforcement operation. |
| 16:04:57 | 13 | Q.   And how many different agencies were represented? |
| 16:05:01 | 14 | A.   At that location, I want to say approximately two to three. |
| 16:05:07 | 15 | Q.   And who were they? |
| 16:05:09 | 16 | A.   Of course, there was DEA.   I believe we had some individuals |
| 16:05:12 | 17 | from Homeland Security there, as well, and ATF, as well. |
| 16:05:19 | 18 | Q.   And did you, like, physically knock on the door? |
| 16:05:25 | 19 | A.   Yes, ma'am. |
| 16:05:25 | 20 | Q.   And were all of you there when you knocked on the door? |
| 16:05:28 | 21 | A.   Two of us went to the front door.   Everybody else remained |
| 16:05:32 | 22 | towards the front area towards the street or the property, and |
| 16:05:36 | 23 | then, I went to the door.   I knocked on the door.   Mr. Trevino's |
| 16:05:41 | 24 | son answered the door.   I asked him if he could get his dad and |
| 16:05:43 | 25 | then, his dad came to the door. |

| | | |
|---|---|---|
| 16:05:44 | 1 | Q.   Older son or younger son? |
| 16:05:46 | 2 | A.   He was, I believe, a younger son but he was -- I mean, he |
| 16:05:51 | 3 | was pretty tall. |
| 16:05:52 | 4 | Q.   Was he eight or was he 18? |
| 16:05:53 | 5 | A.   He was probably closer to 18.  Yeah. |
| 16:05:55 | 6 | Q.   And he went and got his dad? |
| 16:05:57 | 7 | A.   Yes, ma'am. |
| 16:05:57 | 8 | Q.   And he said, come on in? |
| 16:06:01 | 9 | A.   Yes, ma'am.  I asked him if we could conduct a protective |
| 16:06:05 | 10 | search just to make sure there weren't any other people inside |
| 16:06:08 | 11 | that could actually cause us any harm.  He was very cooperative, |
| 16:06:11 | 12 | said, sure, come on in.  We went inside, conducted a protective |
| 16:06:15 | 13 | sweep, just kind of shuffled everyone into the kitchen area where |
| 16:06:19 | 14 | we can kind of maintain a visual of everyone that was at the |
| 16:06:22 | 15 | house. |
| 16:06:22 | 16 | Q.   And what time of day or night was this? |
| 16:06:24 | 17 | A.   It was 7:00 a.m. in the morning. |
| 16:06:26 | 18 | Q.   So you showed up at his house at 7:00 a.m. in the morning |
| 16:06:29 | 19 | and you make everybody go into the kitchen, or you asked them to, |
| 16:06:33 | 20 | and they do? |
| 16:06:34 | 21 | A.   Yes, ma'am. |
| 16:06:34 | 22 | Q.   And then, what do you do? |
| 16:06:35 | 23 | A.   At that point, I step outside with Mr. Trevino, and at that |
| 16:06:41 | 24 | point, I started asking him the questions that we spoke about |
| 16:06:44 | 25 | just a minute ago. |

| | | |
|---|---|---|
| 16:06:45 | 1 | Q.   And he answered all your questions? |
| 16:06:47 | 2 | A.   Yes, he did. |
| 16:06:48 | 3 | Q.   Did -- when you did your protective search, of course, |
| 16:06:52 | 4 | you're a trained police officer. |
| 16:06:53 | 5 | A.   Yes, ma'am. |
| 16:06:54 | 6 | Q.   How many years? |
| 16:06:55 | 7 | A.   Twenty-three years. |
| 16:06:56 | 8 | Q.   And so, when you do your protective search, I know that |
| 16:07:00 | 9 | preliminary -- or mainly you're looking for people who could be a |
| 16:07:07 | 10 | problem to you.  Could be a danger? |
| 16:07:09 | 11 | A.   We just wanted to make sure there wasn't anybody else in the |
| 16:07:11 | 12 | house that could potentially hurt us. |
| 16:07:13 | 13 | Q.   While you're doing that, you're also on alert to see |
| 16:07:15 | 14 | anything illegal? |
| 16:07:18 | 15 | A.   Well, as an investigator, we're trained that is where, you |
| 16:07:21 | 16 | know, if we happen to see anything in plain sight that obviously |
| 16:07:25 | 17 | we'd want to, you know, pay attention to everything that may -- |
| 16:07:29 | 18 | it could be weapons, drugs, or anything else that may be in the |
| 16:07:31 | 19 | house. |
| 16:07:31 | 20 | Q.   Large sums of money? |
| 16:07:32 | 21 | A.   Absolutely.  Yes. |
| 16:07:33 | 22 | Q.   Guns.  Anything that obviously causes you to -- your |
| 16:07:41 | 23 | investigator's radar to go up? |
| 16:07:43 | 24 | A.   Yes, ma'am. |
| 16:07:43 | 25 | Q.   And did you see any of that? |

| | | |
|---|---|---|
| 16:07:45 | 1 | A.   No, ma'am. |
| 16:07:49 | 2 | Q.   How long were you there? |
| 16:07:51 | 3 | A.   I want to say we were probably there maybe an hour at the |
| 16:07:55 | 4 | most.  Probably closer to like 45 minutes, I would guesstimate. |
| 16:08:00 | 5 | Q.   And how much of that time were you outside talking to Mr. |
| 16:08:05 | 6 | Trevino and how much time was spent searching? |
| 16:08:07 | 7 | A.   I spent the majority of my time outside talking with Mr. |
| 16:08:11 | 8 | Trevino.  The other investigators that were there with me |
| 16:08:13 | 9 | actually were the ones conducting the search inside the |
| 16:08:16 | 10 | residence. |
| 16:08:17 | 11 | Q.   No further questions.  Thank you. |
| 16:08:18 | 12 | A.   Yes, ma'am.  Thank you. |
| 16:08:20 | 13 | MR. DEGEURIN:  No questions. |
| 16:08:21 | 14 | MR. WOMACK:  No questions. |
| 16:08:22 | 15 | MR. ESPER:  Nothing, your Honor. |
| 16:08:22 | 16 | MR. MAYR:  Nothing, your Honor. |
| 16:08:23 | 17 | THE COURT:  May this witness be excused? |
| 16:08:26 | 18 | MR. MAYR:  He may, your Honor. |
| 16:08:27 | 19 | MR. GARDNER:  Yes, your Honor.  Thank you. |
| 16:08:28 | 20 | THE COURT:  You're excused, sir. |
| 16:08:30 | 21 | THE WITNESS:  Thank you. |
| 16:08:30 | 22 | THE COURT:  Call your next witness. |
| 16:08:32 | 23 | MS. FERNALD:  The United States would call Jose |
| 16:08:35 | 24 | Hinojosa.  Hinojosa. |
| 16:09:09 | 25 | (Witness sworn.) |

| | | |
|---|---|---|
| 16:09:31 | 1 | MR. DEGEURIN:  May we approach? |
| 16:09:32 | 2 | (At the bench, on the record.) |
| 16:09:39 | 3 | MR. DEGEURIN:  I don't think this one's on the list |
| 16:09:40 | 4 | either. |
| 16:09:42 | 5 | MR. GARDNER:  I think it was on the list. |
| 16:09:46 | 6 | THE COURT:  Who -- I only saw one Hinojosa. |
| 16:09:53 | 7 | MR. DEGEURIN:  What's his name? |
| 16:09:54 | 8 | MS. FERNALD:  Hinojosa. |
| 16:10:01 | 9 | THE COURT:  Jose Carlos?  Okay.  What's the problem? |
| 16:10:13 | 10 | MR. DEGEURIN:  This is not on the list that was given |
| 16:10:17 | 11 | to us last night on witnesses today. |
| 16:10:20 | 12 | MS. FERNALD:  That's correct. |
| 16:10:21 | 13 | MR. DEGEURIN:  Happens to be a witness that's got a |
| 16:10:24 | 14 | bunch of Jencks and Giglio and stuff. |
| 16:10:31 | 15 | THE COURT:  What's your problem, you're not ready? |
| 16:10:33 | 16 | MR. DEGEURIN:  We're not ready. |
| 16:10:35 | 17 | MS. FERNALD:  And that is correct, your Honor. |
| 16:10:36 | 18 | THE COURT:  Okay.  Let's put him on in the morning. |
| 16:10:56 | 19 | MS. FERNALD:  And I can do business records stuff.  So |
| 16:10:58 | 20 | I can do some stuff. |
| 16:11:00 | 21 | THE COURT:  All right.  Members of the jury, I had |
| 16:11:09 | 22 | requested, because this is a longer trial, the government to give |
| 16:11:14 | 23 | a list of witnesses each day for the next day to the lawyers so |
| 16:11:20 | 24 | that they would know who's coming to testify.  And unfortunately, |
| 16:11:26 | 25 | Mr. Hinojosa is on tomorrow's list.  So I'm going to put him back |

| | | |
|---|---|---|
| 16:11:32 | 1 | in custody, and you'll hear from him tomorrow because it was an |
| 16:11:37 | 2 | omission.  The government says that we're going too fast.  I |
| 16:11:41 | 3 | don't agree with that.  But if it's anybody's fault, it's mine. |
| 16:11:48 | 4 | So we'll see you tomorrow, sir. |
| 16:11:53 | 5 | THE WITNESS:  Okay. |
| 16:12:17 | 6 | THE COURT:  Call your next witness. |
| 16:12:18 | 7 | MS. FERNALD:  At this time, I'd like to go through the |
| 16:12:23 | 8 | time trying to get some business records affidavits and business |
| 16:12:27 | 9 | records, a little bit tedious, and it has to get on the record. |
| 16:12:30 | 10 | And I'm going to start with Government's Exhibit 226, which is |
| 16:12:35 | 11 | the AQHA records that were previously admitted yesterday. |
| 16:12:39 | 12 | THE COURT:  All right.  Let me stop you.  When she says |
| 16:12:44 | 13 | there's an affidavit, the statutes allow all parties to put in |
| 16:12:50 | 14 | business records if they have the appropriate affidavit and |
| 16:12:55 | 15 | authorization that they are, in fact, business records that were |
| 16:12:59 | 16 | maintained in a business, and they were recorded at or near the |
| 16:13:04 | 17 | time that they say they're recorded, and that they're the normal |
| 16:13:10 | 18 | type of records kept in a business. |
| 16:13:14 | 19 | So that's when she says a certificate, she's talking |
| 16:13:17 | 20 | about a certificate of a person who has custody of those records. |
| 16:13:21 | 21 | That's what we're talking about. |
| 16:13:24 | 22 | Stay awake if you can.  All right.  Let's proceed. |
| 16:13:28 | 23 | MS. FERNALD:  I don't sing or dance very well, but I'll |
| 16:13:31 | 24 | try. |
| 16:13:31 | 25 | Your Honor, in reference to the previously admitted |

16:13:33   1    record of 226 of AQHA records, I previously cited that it was

16:13:39   2    Bates stamp No. 61.  I would also like to include that it was

16:13:43   3    Bates stamp No. 16, in addition to 61.  In reference to 227,

16:13:56   4    talking about horse-racing records, the government would move to

16:13:59   5    introduce 227, Bates stamps No. 23 and 55.

16:14:09   6              Would you like for me to do this cumulative, your

16:14:13   7    Honor, instead of waiting for a ruling on each one?

16:14:15   8              THE COURT:  I think they need to have a ruling on each

16:14:17   9    one as we proceed.  First on 26 -- 226, Bates stamp 16.

16:14:24  10              MS. FERNALD:  And 61.

16:14:25  11              THE COURT:  And 61.  I thought -- all right.  Sixty-one

16:14:28  12    and 16.

16:14:30  13              MS. FERNALD:  It's already been admitted.

16:14:32  14              THE COURT:  That's what I thought.

16:14:33  15              MS. FERNALD:  So may I move to the next one, which is

16:14:36  16    227, Bates stamp No. 23 and 55?

16:14:44  17              MS. WILLIAMS:  Bates stamp 55 is associated with

16:14:48  18    Exhibit No. 317.

16:14:49  19              MS. FERNALD:  Fifty-five has numerous records in it.

16:14:52  20    Bates stamp No. 55 had page number in reference to Schvaneveldt.

16:15:01  21    Sixty-one --

16:15:01  22              THE COURT:  Okay.  I think it only fair to make the

16:15:09  23    lawyers work and get all these numbers straight so that they can

16:15:12  24    see what they're doing.  So I'm going to let you go home early

16:15:17  25    today, and we'll have the lawyers stay until they get this list

16:15:23  1    through and we know if there's any objections and I can rule on

16:15:26  2    them.  There's no point in having y'all just sitting here

16:15:30  3    listening.

16:15:31  4          So when you come back in the morning, you'll have to

16:15:34  5    listen, but it will be pretty quick.  Remember the instructions.

16:15:38  6    Be able to answer those questions "No" tomorrow.  And I will see

16:15:43  7    you at 8:30 in the morning.

16:16:22  8          (Jury not present.)

16:16:34  9          THE COURT:  Okay.  We'll let Ms. Fernald be the

16:16:42  10   instructor.  Get your exhibits out.  Let's find out if there are

16:16:47  11   any objections.  Are all these under business records affidavits?

16:16:51  12         MS. FERNALD:  Yes.  And, your Honor, I apologize.  Some

16:16:53  13   of my frustration, these have been available for them to look at.

16:16:56  14   We have sent them copies on discs to look at.  I've given them

16:17:01  15   notice.

16:17:01  16         THE COURT:  I know I have -- I'm not giving any

16:17:05  17   instructions to the jury.  I'm well aware the government supplied

16:17:10  18   this months ago.  If it comes up, I will have no hesitation to

16:17:14  19   instruct the jury of that.  But that's not the point.

16:17:18  20         The point is, now you're going to tender them into

16:17:21  21   evidence, so I want y'all to figure out which they are and if you

16:17:25  22   have any objections.  We're not leaving here until they're all

16:17:28  23   ruled on.  All right.

16:17:31  24         MS. WILLIAMS:  To be fair to us, your Honor, that is

16:17:33  25   all true, but the government has provided us with this exhibit

16:17:36    1    list, and they've never told us what Bates numbers go with what

16:17:41    2    exhibits.  And so, 55 --

16:17:44    3         MS. FERNALD:  On the notice.  They're on the notice.

16:17:49    4    There's three notices that have been filed each time.

16:17:52    5         MS. WILLIAMS:  And it does.  It says what Bates --

16:17:54    6    prefix it has, but Bates prefix might be 10,000 records long and

16:18:01    7    we don't know -- 55 can be in three or four different exhibits.

16:18:05    8    That's why I keep asking for a Bates range when these exhibits

16:18:09    9    come in.  So we have some frustration of our own for the record.

16:18:16   10         THE COURT:  I don't have time to share my frustration.

16:18:23   11    So let me repeat.  She will instruct you on what we are doing.

16:18:30   12    Make notes if you have any objections.  I rather suspect there

16:18:35   13    are not any or many objections, since these are all business

16:18:39   14    records, but let's start now and complete it.  And how many

16:18:51   15    exhibits do you have?

16:18:53   16         MS. FERNALD:  Fifty.

16:18:54   17         THE COURT:  Okay.  All right.  I'm going to recess

16:18:59   18    until 8:00 in the morning.  I will meet with you at 8:00 in the

16:19:03   19    morning.  I, too, will go home, make sure I have family.  I'll

16:19:09   20    hear all of the objections at 8:00 a.m.

16:19:11   21         MS. FERNALD:  And, your Honor, just for all of the

16:19:12   22    parties and so the Court will know, I'm mainly talking about

16:19:16   23    Government's Exhibits 226 through 323.  So those are the

16:19:27   24    concentrated areas.

16:19:32   25         THE COURT:  So just 94, huh?

16:19:39    1              MS. FERNALD:  Well, there's some numbers missing.

16:19:42    2              THE COURT:  That's all right.  I know you've got a lot

16:19:43    3    of paper.  8:00 in the morning, counsel.  Have a good evening.

16:19:43    4              (Proceedings adjourned.)

            5

            6

            7

            8

            9

           10

           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25