```
 1                  UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3  UNITED STATES OF AMERICA     ) Docket No. A 12-CR-210 SS
                                 )
 4  vs.                         ) Austin, Texas
                                 )
 5  JOSE TREVINO-MORALES (3)     )
    FRANCISCO ANTONIO            )
 6  COLORADO-CESSA (6)           )
    FERNANDO SOLIS-GARCIA (7)    )
 7  EUSEVIO MALDONADO-HUITRON(11) )
    JESUS MALDONADO-HUITRON (18) ) April 18, 2013
 8

 9              TRANSCRIPT OF TRIAL ON THE MERITS
                 BEFORE THE HONORABLE SAM SPARKS
10                    Volume 4 of 15

11  APPEARANCES:

12  For the United States:    Ms. Michelle E. Fernald
                              Mr. Douglas W. Gardner
13                            Assistant U.S. Attorneys
                              816 Congress Avenue, Suite 1000
14                            Austin, Texas 78701

15  For Defendant Trevino-    Mr. David M. Finn
    Morales:                  Milner & Finn
16                            2828 North Harwood Street
                              Suite 1950, LB9
17                            Dallas, Texas 75201

18                            Ms. Christie Williams
                              Mills & Williams
19                            1112 South Rock Street
                              Georgetown, Texas 78626
20
    For Defendant Colorado-   Mr. Mike DeGeurin
21  Cessa:                    Mr. M. Andres Sanchez-Ross
                              Foreman, DeGeurin & DeGeurin
22                            300 Main Street
                              Houston, Texas 77002
23
                              Mr. John Parras
24                            Republic Bank Building
                              1018 Preston, Floor 2
25                            Houston, Texas 77002
```

1   **(Appearances Continued:)**

2   For Defendant Solis-Garcia:  Mr. Guy L. Womack
                                 Guy L. Womack & Associates
3                                402 Main Street, Suite 6 North
                                 Houston, Texas 77002
4
    For Defendant Eusevio        Mr. Richard D. Esper
5   Maldonado-Huitron:           Esper Law Office
                                 801 North El Paso Street, 2nd Floor
6                                El Paso, Texas 79902

7   For Defendant Jesus          Mr. Thomas Brent Mayr
    Maldonado-Huitron:           Law Office of Brent Mayr
8                                4101 Washington Avenue, 2nd Floor
                                 Houston, Texas 77007
9

10  Interpreters:                Mr. Peter Heide
                                 Ms. Cristina Helmerichs
11                               Ms. Maureen McLean
                                 Mr. Steve Mines
12

13  Court Reporter:              Ms. Lily Iva Reznik, CRR, RMR
                                 501 West 5th Street, Suite 4153
14                               Austin, Texas 78701
                                 (512)391-8792
15

16

17

18

19

20

21

22

23

24

25  Proceedings reported by computerized stenography, transcript
    produced by computer.

1                         I N D E X

2                         Direct    Cross     Redirect   Recross
   Witnesses:

3

4  Hernando Guerra        19        47,52

5                                   60,64

6                                   76        80         87

7  Shalyn B. Bliss        92        104       122

8  William J. Pilgrim     125       138

9  Jose C. Hinojosa       140       156       164        192

10

11                                                       Page

12 Proceedings Adjourned                                 226

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          E X H I B I T S

2                                          Offered    Admitted
    Government's
3

4   #28E                                    101        101

5   #32                                      135        136

6   #58C                                     35         35

7   #227A through C                          6          6

8   #228                                     17         18

9   #229A through E                          17         18

10  #230A through L                          17         18

11  #231A through D                          17         18

12  #232A through B                          17         18

13  #233A through B                          17         18

14  #234                                     17         18

15  #235                                     17         18

16  #237 through 240                         17         18

17  #243                                     17         18

18  #250A through G                          17         18

19  #251A through B                          17         18

20  #252A through L                          17         18

21  253A through B                           17         18

22  #254                                     17         18

23  #255A through D                          17         18

24  #256A through B                          17         18

25  #257A through D                          17         18
```

# E X H I B I T S

|  |  | Offered | Admitted |
|---|---|---|---|
| Government's |  |  |  |
| #258 |  | 17 | 18 |
| #259A through C |  | 17 | 18 |
| #260 through 271 |  | 17 | 18 |
| #273 |  | 17 | 18 |
| #274 |  | 17 | 18 |
| #301 |  | 17 | 18 |
| #307 through 309 |  | 17 | 18 |
| #313 |  | 17 | 18 |
| #315 |  | 17 | 18 |
| #318 |  | 17 | 18 |
| #321 |  | 17 | 18 |
| #323A through TT |  | 17 | 18 |
| #354 |  | 17 | 18 |
| #366 |  | 22 | 22 |
| #402 |  | 191 | 191 |
|  |  |  |  |
| Defendant Colorado Cessa's |  |  |  |
| #1 |  | 200 | 200 |

| | | |
|---|---|---|
| 08:06:21 | 1 | MR. FINN:  Good morning, your Honor. |
| 08:06:22 | 2 | THE COURT:  Good morning. |
| 08:06:23 | 3 | MR. ESPER:  Morning, Judge. |
| 08:10:11 | 4 | THE COURT:  All right.  I believe everybody's here, so |
| 08:10:13 | 5 | let's begin. |
| 08:10:16 | 6 | MS. FERNALD:  Your Honor, the government would move to |
| 08:10:19 | 7 | introduce Government's Exhibit 227A, B, and C, the records from |
| 08:10:27 | 8 | Schvaneveldt. |
| 08:10:30 | 9 | THE COURT:  Records from where? |
| 08:10:31 | 10 | MS. FERNALD:  Schvaneveldt 227.  It's the name of a |
| 08:10:35 | 11 | place.  It is S-C-H-V-A-N-E-V-E-L-D-T. |
| 08:10:47 | 12 | THE COURT:  Okay. |
| 08:10:53 | 13 | MS. FERNALD:  Is that admitted? |
| 08:10:54 | 14 | THE COURT:  I hear no objections to 227A, B and C, |
| 08:10:57 | 15 | they're admitted. |
| 08:10:58 | 16 | MS. FERNALD:  Your Honor, for the record, if I could |
| 08:11:00 | 17 | get the screen down, I'm only going to do this on this first one, |
| 08:11:03 | 18 | and then, I'll go through the rest of them just so the record |
| 08:11:05 | 19 | properly reflects the way in which these records are being |
| 08:11:10 | 20 | introduced. |
| 08:11:52 | 21 | Your Honor, as the record is clear from everything that |
| 08:11:56 | 22 | has been going on, this has been an ongoing investigation.  We |
| 08:12:00 | 23 | initially sent out subpoenas to different entities.  As we would |
| 08:12:05 | 24 | get subpoenas back -- or subpoenaed records back, we would |
| 08:12:10 | 25 | oftentimes have to go back and reissue subpoenas getting |

| | | |
|---|---|---|
| 08:12:15 | 1 | additional records as we looked at something.  So, for example, |
| 08:12:17 | 2 | at a bank, we would ask for the statements on the account.  We |
| 08:12:21 | 3 | would look at the statements of the account and then, realize |
| 08:12:23 | 4 | that we would need the checks, and the supporting documents, the |
| 08:12:28 | 5 | deposit slips, anything else that went with it.  So we may have |
| 08:12:32 | 6 | two subpoenas associated, or even up to three or four subpoenas |
| 08:12:35 | 7 | associated with one single entity on one particular account or |
| 08:12:40 | 8 | one document. |
| 08:12:41 | 9 | As we were getting in -- as the government was getting |
| 08:12:44 | 10 | in this information, it was important to the government that -- |
| 08:12:47 | 11 | we knew this would be a large volume case, that we go ahead and |
| 08:12:51 | 12 | kick out the discovery to the defendants as soon as we got it. |
| 08:12:56 | 13 | So what we did is we Bates-stamped each piece of paper that came |
| 08:13:00 | 14 | in so that when we got to trial, we could make sure that what we |
| 08:13:07 | 15 | were looking at, the defense had an opportunity to review through |
| 08:13:10 | 16 | the discovery process. |
| 08:13:14 | 17 | So the Bates-stamped numbers that are contained on the |
| 08:13:16 | 18 | documents are really more for discovery purposes and to ensure |
| 08:13:21 | 19 | that the defendants had an opportunity to review this evidence. |
| 08:13:26 | 20 | Once that was over with, because we -- because they came in at |
| 08:13:30 | 21 | different periods of time, each entity may have one, or two, or |
| 08:13:34 | 22 | even three Bates stamp number associated with it. |
| 08:13:38 | 23 | So as you look at these documents on the record -- I |
| 08:13:42 | 24 | don't know why this is not working.  But as you look at the |
| 08:13:44 | 25 | documents on the record, you're going to see that the entity, for |

| | | |
|---|---|---|
| 08:13:50 | 1 | example, Schvaneveldt -- as I look at 227A, Schvaneveldt will |
| 08:13:57 | 2 | have a Bates stamp number on it that starts with 2307, and you'll |
| 08:14:16 | 3 | go through and, all of a sudden, just a few pages down, it will |
| 08:14:19 | 4 | go to 23-458.  So it's not in numerical sequence because we had |
| 08:14:25 | 5 | to add the documents in so that they would make sense to the |
| 08:14:28 | 6 | jury. |
| 08:14:28 | 7 | There's also certain tabs that are placed in here that |
| 08:14:32 | 8 | are not really officially business records, but, again, they were |
| 08:14:36 | 9 | organized in order for the jury to be able to look through, |
| 08:14:40 | 10 | should they need to.  And on this particular one, on 227A, we |
| 08:14:46 | 11 | have it organized according to the horses.  So this is done in |
| 08:14:52 | 12 | all of the business records I -- or the government.  And I |
| 08:14:58 | 13 | shouldn't say I because I never do anything.  It's all the people |
| 08:15:01 | 14 | that work behind the scenes. |
| 08:15:03 | 15 | There's a business record affidavit -- this must have |
| 08:15:22 | 16 | gotten out of order.  I'm sorry.  That is contained in each file |
| 08:15:33 | 17 | that will reflect the number of pages.  I had the custodians to |
| 08:15:37 | 18 | go back after we had reorganized these files and assured that we |
| 08:15:44 | 19 | had 355 pages from Schvaneveldt with the predicate offense or the |
| 08:15:52 | 20 | predicate foundation for the business record affidavit. |
| 08:15:56 | 21 | There are three files that are associated with |
| 08:15:59 | 22 | Schvaneveldt.  It's in a bank ledger, a manila folder here, and |
| 08:16:05 | 23 | there are three files.  The papers that were contained in this |
| 08:16:10 | 24 | file were placed in a counter, and as you look at 227A, it will |
| 08:16:17 | 25 | say, 130 pages.  The label on the file will also say 1 of 3.  So |

08:16:34  1    when you look at 2 of 3, you will see there's another 61 pages to

08:16:41  2    63 contained in 227B.  And then, contained in 3 of 3 with

08:16:52  3    Schvaneveldt, you'll see that it has 164, which adds up to the

08:17:01  4    355 on the business record affidavit.

08:17:05  5            There's a green dot that's also contained on the front

08:17:08  6    of the file.  That was my simple way of knowing that the business

08:17:11  7    record affidavit had been complete and these were good to go.

08:17:15  8    It's a go sign for me.

08:17:16  9            THE COURT:  So the only thing that is not a business

08:17:18  10   record are the labels of the names of the horses.

08:17:23  11           MS. FERNALD:  That is correct.

08:17:24  12           THE COURT:  All right.

08:17:25  13           MS. FERNALD:  And this is done, again, on every single

08:17:27  14   one of them.  So I'm ready -- I think I covered everything.  Let

08:17:31  15   me make sure that that's correct.  I should say, also --

08:17:45  16           MR. PARRAS:  I do have some question -- okay.

08:17:47  17           MS. FERNALD:  That the business record affidavit, I'm

08:17:49  18   sorry, is in a plastic sleeve, and it's contained with the

08:17:53  19   exhibit sticker on it in order to identify them.

08:17:57  20           MR. PARRAS:  Thank you.  Judge, you've hit the nail on

08:18:02  21   the head.  The labels themselves are not the records of the

08:18:06  22   business.  We understand that they did this to aid the jury and

08:18:11  23   to make their presentation easier.  We have no problem with that,

08:18:15  24   especially if it's brought out in front of the jury and that's

08:18:19  25   made evident to them.

| | | |
|---|---|---|
| 08:18:19 | 1 | Something I heard new this morning that I didn't hear |
| 08:18:22 | 2 | yesterday is that all of the records that were originally |
| 08:18:27 | 3 | subpoenaed have been rearranged.  And all of the records that |
| 08:18:31 | 4 | originally subpoenaed are now made into exhibits just in -- you |
| 08:18:35 | 5 | know, in different form.  It was my understanding that they asked |
| 08:18:40 | 6 | for 10,000 documents or received 10,000 documents.  They may have |
| 08:18:44 | 7 | paired that down to just 100 that they believe is relevant. |
| 08:18:47 | 8 | I don't know whether that's true or they're admitting |
| 08:18:51 | 9 | all of them just in a different form. |
| 08:18:53 | 10 | MS. FERNALD:  And he is correct.  What we would do is |
| 08:18:57 | 11 | we would subpoena a bank account, for example, Mr. Trevino's bank |
| 08:19:02 | 12 | account, Bank of America 5,000, which is his personal account. |
| 08:19:07 | 13 | And we may have subpoenaed -- I don't think this is true but just |
| 08:19:12 | 14 | for example, 2005.  We didn't need those records placed into |
| 08:19:16 | 15 | evidence because they were not relevant to our investigation.  We |
| 08:19:20 | 16 | would have provided that in discovery, but I wouldn't have |
| 08:19:23 | 17 | necessarily included that in evidence. |
| 08:19:27 | 18 | Again, my clue to let them know what I had given them |
| 08:19:30 | 19 | in discovery is the fact that there is a Bates stamp on the |
| 08:19:34 | 20 | bottom. |
| 08:19:35 | 21 | THE COURT:  So does that give you any problem now? |
| 08:19:37 | 22 | MR. PARRAS:  It doesn't -- if there were some |
| 08:19:40 | 23 | accompanying Bates-numbered log that would say, Exhibit 227 now |
| 08:19:44 | 24 | contains the following Bates numbers, that would help us, but my |
| 08:19:46 | 25 | understanding is there isn't.  And if they had a copy of the |

08:19:49  1  exhibits as they now exist, that would help us, but they don't.

08:19:53  2  And I don't think there's any easy way to get that done in a way

08:19:56  3  that's meaningful and useful in keeping this case going along.

08:19:59  4        So what we've decided to do is we'll have to prepare

08:20:02  5  our own exhibits, and they've agreed to have a Bates label at the

08:20:06  6  bottom.  They're not going to be objecting to authenticity.

08:20:08  7        THE COURT:  Well, that was the suggestion I was going

08:20:11  8  to make.  And even if there's some duplication, because of the

08:20:14  9  number of exhibits, I don't think the stars will fall out of the

08:20:20  10 heavens.

08:20:21  11       MR. PARRAS:  All right.

08:20:23  12       THE COURT:  So how many exhibits do you plan on

08:20:25  13 introducing in front of the jury?

08:20:28  14       MS. FERNALD:  I didn't count, but I think there's about

08:20:30  15 50 of them.  And I think that we can do it fairly quickly now

08:20:35  16 that I can just read the exhibit number and move for the

08:20:38  17 introduction and just leave it that way, now that we have all of

08:20:41  18 this on the record.

08:20:43  19       If the Court would please, I'll try to be a little bit

08:20:46  20 more succinct than what I just did, but be able to show the jury

08:20:50  21 so that they will know why the defense are putting in duplicate

08:20:54  22 copies or anything like that.

08:20:56  23       THE COURT:  And after she gets through with her

08:20:59  24 explanation, if you will then indicate that because they have

08:21:08  25 done some editorializing, you may have additional exhibits, and I

08:21:12  1  will then say, well, that's fine, present them as you proceed.

08:21:15  2  And then, the jury should have a full picture of what we're going

08:21:18  3  to do.  Although in 50 years, I've never had much confidence that

08:21:27  4  the jury goes through the thousands of pieces of paper, but this

08:21:34  5  may be the first one.

08:21:36  6          All right.  Are we ready for the jury?

08:21:39  7          MS. FERNALD:  Government's ready to proceed.

08:21:40  8          THE COURT:  All right.  Bring the jury in.

08:21:44  9          MR. PARRAS:  Mr. DeGeurin is not here.  I think he said

08:21:48  10  he'd be here at 8:30.  There is eight minutes still.  I'm not

08:21:51  11  saying that the weather.

08:21:53  12          THE COURT:  Yeah.

08:21:56  13          MR. PARRAS:  And I would like to --

08:22:01  14          THE COURT:  The weather is terrible.  The jury was here

08:22:03  15  at 7:30.

08:22:04  16          MR. PARRAS:  I understand.  I would like to run to the

08:22:07  17  restroom, if that's okay.

08:22:09  18          THE COURT:  I know.  Just go.  Good morning, Mr.

08:26:30  19  DeGeurin.

08:26:31  20          MR. DEGEURIN:  Good morning.

08:26:32  21          THE COURT:  Mr. DeGeurin is back in the courtroom.  So

08:26:36  22  just one person short?

08:26:42  23          MR. DEGEURIN:  Mr. Womack.

08:26:43  24          THE COURT:  Yeah.  Okay.

08:27:50  25          (Jury present.)

08:29:46  1          THE COURT:  Members of the jury, since you left here
08:29:50  2  yesterday afternoon until the present, has anybody attempted to
08:29:54  3  talk to you about this case?
08:29:55  4          JURORS:  No, sir.
08:29:56  5          THE COURT:  Have you talked to anybody about the case?
08:29:58  6          JURORS:  No.
08:29:58  7          THE COURT:  And have you learned anything at all about
08:30:01  8  the case, outside the presence of one another in this courtroom?
08:30:04  9          JURORS:  No.
08:30:05 10          THE COURT:  Thank you.  Show negative responses to all
08:30:08 11  questions by all jurors.
08:30:09 12          Now, even though we lost an hour and a half of
08:30:15 13  testimony, the lawyers have been going through an enormous amount
08:30:22 14  of records.  That's what they're going to be doing, first thing
08:30:25 15  in front of you, is introducing these records, and they'll
08:30:32 16  explain what they're doing and why.  And then, of course, you're
08:30:36 17  going to have all of these records in the jury room when you
08:30:39 18  deliberate.
08:30:41 19          One of the reasons that I've given you a notepad and
08:30:44 20  pencil is at the time of their final deliberations, if there are
08:30:54 21  special documents that they wish you to review, they'll tell you,
08:30:58 22  and then, you can write it down and you'll know where it is.
08:31:01 23          So just don't worry about the volume of records are
08:31:05 24  going to be.  The lawyers know that there are a lot of records in
08:31:09 25  this case, because we're talking about from 2008 to the present,

08:31:14    1    but don't be overwhelmed by it.  It's their job and they will

08:31:17    2    tell you what they believe you should review and what the records

08:31:21    3    would mean, and it will be up to you on how you wish to proceed.

08:31:26    4           So that's where we are.

08:31:28    5           MS. FERNALD:  Your Honor, outside of the presence of

08:31:30    6    the jury, the government moved to introduce without objection

08:31:34    7    Government's Exhibit 227A, B and C and it was admitted into

08:31:39    8    evidence.  But if I could have a moment for the record and for

08:31:42    9    the jury to explain how these business records are actually done.

08:31:46   10    And defense has graciously agreed to all the business records to

08:31:51   11    make this an easier process for all of us.

08:31:54   12           In front of the jury box right now are some white

08:31:57   13    banker boxes that the jurors aren't able to see, but there are

08:32:02   14    approximately 13 boxes over here, and on the outside of these

08:32:09   15    boxes, there's a label of what is contained in this box and the

08:32:13   16    exhibit number on it.  So in reference to 227A through C is

08:32:20   17    Schvaneveldt.  It's a horse company, the exhibit that was just

08:32:23   18    introduced.

08:32:24   19           So you will find as soon as I get finished with A, B

08:32:28   20    and C, you will find in the front of this box some files.  One of

08:32:35   21    3, which will be A, 226A; B, which is 2 of 3; and then, C, which

08:32:43   22    is 3 of 3.  I'll put this up on the Elmo so you could see it a

08:32:48   23    little bit better.  But you'll have the exhibit number here,

08:33:01   24    227A, it's identified on there, Schvaneveldt.  You have 1 of 3,

08:33:06   25    so you know that there's going to be three file folders there.

| | | |
|---|---|---|
| 08:33:08 | 1 | And then, you have a little green dot that indicates to me that a |
| 08:33:12 | 2 | business record from a custodian of the businesses has completed |
| 08:33:17 | 3 | these records and they're good to go.  It's a green light for me |
| 08:33:20 | 4 | to know that these records are completed by a custodian and |
| 08:33:23 | 5 | looked at. |
| 08:33:24 | 6 | There's a number that's contained on the upper |
| 08:33:28 | 7 | right-hand side.  This particular one that I'm looking at now on |
| 08:33:33 | 8 | 227A has 130.  That means inside of this little file folder, |
| 08:33:40 | 9 | there are 130 pages contained in there.  And then, if you look at |
| 08:33:51 | 10 | B, you're going to see that there's 61 pages up there.  And if |
| 08:33:58 | 11 | you look at C, you're going to have 164 pages.  And those will |
| 08:34:06 | 12 | add up to the business record, which will be contained in the |
| 08:34:12 | 13 | file folder, and it's easy to identify because it's in a plastic |
| 08:34:16 | 14 | sleeve. |
| 08:34:16 | 15 | So the business record affidavit associated with the |
| 08:34:20 | 16 | number and it will have the actual page numbers on there, the 355 |
| 08:34:28 | 17 | on each one of these, so you'll know that you're getting the |
| 08:34:32 | 18 | business records through the exhibits. |
| 08:34:36 | 19 | What happened in this particular case, your Honor, |
| 08:34:40 | 20 | ladies and gentlemen of the jury, is this was a long |
| 08:34:42 | 21 | investigation, and so, occasionally, subpoenas would be issued -- |
| 08:34:47 | 22 | MR. PARRAS:  Judge, at this point, I think we've gone |
| 08:34:49 | 23 | beyond explaining the records, and we're going now into, I guess, |
| 08:34:53 | 24 | rationale, and I just don't know if that's necessary. |
| 08:34:58 | 25 | THE COURT:  Well, I think what you're going to do is |

08:35:02    1    have an explanation of the Bates number, because jurors may be

08:35:08    2    familiar with Bates numbers for various reasons.  But suffice it

08:35:13    3    to say, that records are obtained by subpoenas and then, other

08:35:24    4    records are obtained by subpoenas at a different time, but they

08:35:31    5    may relate back to the first records.  And so, the Bates numbers

08:35:37    6    are identified not necessarily throughout the exhibit that you're

08:35:43    7    seeing, but was differentiated because of the different time

08:35:48    8    sequences that they were received.

08:35:50    9          So what the parties have agreed to basically -- Mr.

08:35:56   10    Parras, you tell me if I'm wrong -- is the government has gone

08:35:59   11    through all of these records.  They've all been available to the

08:36:02   12    defendants, and they have extrapolated what they think are

08:36:06   13    germane to the case.  And there's an agreement that the

08:36:11   14    defendants, later on, in their cases can introduce any other part

08:36:17   15    of those records that they think are germane that the government

08:36:21   16    may have left out.

08:36:22   17          Is that basically correct?

08:36:24   18          MR. PARRAS:  That's basically correct, Judge, with one

08:36:26   19    addition, and that is that all of the labels that they see are

08:36:29   20    really the government's labels.  They're not the business records

08:36:32   21    themselves.

08:36:33   22          THE COURT:  Correct.

08:36:33   23          MR. PARRAS:  And they were made that way to aid the

08:36:35   24    government in its presentation.  So they're argumentative to some

08:36:39   25    extent and they're not -- it helps the government present their

08:36:42  1    case.  It's not Schvaneveldt's records.

08:36:45  2                THE COURT:  Correct.

08:36:46  3                MR. PARRAS:  That they seek.

08:36:47  4                THE COURT:  And that's a good point.  All of the

08:36:49  5    labels, which are the names of particular horses, are not

08:36:54  6    business records.  The government has just put those in there for

08:36:57  7    identification if you were to refer or wanted to refer to any of

08:37:03  8    those horses.  Is that the only labeling done?

08:37:07  9                MS. FERNALD:  That is the only labeling except for the

08:37:09  10   outside of the file folder to identify, but that's correct.

08:37:11  11               THE COURT:  All right.  You may proceed.

08:37:13  12               MS. FERNALD:  Government would move to introduce 228,

08:37:43  13   229A, B, C, D and E, 230 that contains A through L, 231A, B, C

08:38:13  14   and D, 232A and B.

08:38:33  15               THE COURT:  A and D?

08:38:35  16               MS. FERNALD:  And B as in boy.  Excuse me.  233A and B,

08:38:50  17   234, 235, 237, 238, 239, 240, 242, 243, 250A through G, 251A and

08:39:37  18   B, 252A through L, 253A and B, 254, 255A through D, 256A and B,

08:40:20  19   257A through D, as in dog, 258, 259A through C, 260, 261, 262,

08:40:53  20   263, 264, 265, 266, 267, 268, 269, 270, 271.  Next number is 273,

08:41:34  21   274, 301, 302 -- scratch 302, your Honor.  305, 307, 308, 309,

08:42:09  22   313, 315, 318, 321, 323A through TT.  One moment, please.  Move

08:42:52  23   for the introduction, your Honor.

08:42:58  24               THE COURT:  All right.  Any objections to any of these

08:43:01  25   business records identified?  And I'll call them out if there are

```
08:43:05   1    no objections.

08:43:07   2              MR. PARRAS:  Judge, we have an issue with two.  There

08:43:11   3    are only two that I have a question about.  One was identified as

08:43:15   4    273.  In the exhibit list that we received, it's 273A.  Just some

08:43:21   5    clarification on what's being --

08:43:24   6              THE COURT:  Come look.

08:43:25   7              MS. FERNALD:  And I'm aware of that.  It was just a

08:43:29   8    typo on the actual exhibit list that was made for the Court.  The

08:43:36   9    A should not be there.  The actual exhibit sticker will not have

08:43:40  10    the A on it.

08:43:41  11              THE COURT:  Okay.

08:43:55  12              MR. PARRAS:  Judge, there's one exhibit that the

08:43:57  13    government has agreed to reserve at this moment and not offer, if

08:44:02  14    I can identify it so that we can -- by number and then, other

08:44:05  15    than that, we have no objections.

08:44:08  16              THE COURT:  But is it one of the numbers called out?

08:44:10  17              MR. PARRAS:  It is, Judge.  And we're working to

08:44:12  18    identify the number for you.  It is No. 305.

08:44:19  19              THE COURT:  305.  So that will be in the balance and

08:44:27  20    not admitted at this time.

08:44:29  21              MR. PARRAS:  All right.

08:44:30  22              THE COURT:  All right.  With those statements, then,

08:44:32  23    the Court admits Exhibits -- Government's Exhibits 228, 229A

08:44:39  24    through E, 230A through L, 231A through D, 232A and B, 233A and

08:44:52  25    B, 234, 235, 237, 238, 239, 240, 242, 243, 250A through G, 251A
```

08:45:07    1   and B, 252A through L, 253A and B, 254, 255A to D, 256A and B,

08:45:21    2   257A through D, 258, 259A through C, 260, 261, 262, 263, 264,

08:45:37    3   265, 266, 267, 268, 269, 270, 271, 273, 274, 301.  305 is not

08:45:51    4   admitted at this time.  307, 308, 309, 313 and 315, 318, 321 and

08:46:03    5   323A through TT are admitted.

08:46:10    6           And, you know, I told you, members of the jury, that

08:46:15    7   the parties could make agreements to save you time.  I just think

08:46:20    8   that you ought to know that it would have taken probably a full

08:46:23    9   day to admit these numbers.  They would have been numbers to you.

08:46:28   10   You would have had trouble staying in your seats.  It's just the

08:46:33   11   fact that we have confident lawyers that understand evidence and

08:46:40   12   do not want to waste your time any more than they want to waste

08:46:43   13   ours.  So it's a compliment to the lawyers.

08:46:47   14           All right.  You may call your next witness.

08:46:48   15           MR. GARDNER:  Thank you, your Honor.  The government

08:46:50   16   calls Hernando Guerra.

08:47:31   17           (Witness sworn.)

08:47:52   18           THE COURT:  I want you to tell us your full name,

08:47:54   19   please, sir, and spell your last name.

08:47:57   20           THE WITNESS:  I'm Hernando Guerra.  My full name is

08:48:04   21   G-U-E-R-R-A.

08:48:05   22           THE COURT:  Thank you.

08:48:06   23      HERNANDO GUERRA, called by the Government, duly sworn.

08:48:06   24                        DIRECT EXAMINATION

08:48:06   25   BY MR. GARDNER:

08:48:07  1   Q.   Good morning, Mr. Guerra.   You and I met before; is that

08:48:09  2   correct?

08:48:09  3   A.   Yes, sir.

08:48:09  4   Q.   And your English is very good.

08:48:11  5   A.   Try to.

08:48:12  6   Q.   You have an interpreter back there in case there's any terms

08:48:16  7   that you don't understand, and she can help you interpret them

08:48:20  8   and understand; is that correct?

08:48:21  9   A.   Thank you, sir.  Appreciate it.

08:48:22  10  Q.   If you will, if could you please turn to the jury, introduce

08:48:25  11  yourself, tell them how old you are, what you do for a living,

08:48:28  12  and where you're from.

08:48:29  13  A.   I'm Hernando Guerra.  I'm 55 years old.  My living is buying

08:48:36  14  and sell cattle, horses.  I'm an advisor in genetics and

08:48:40  15  cross-breeding.  And I am an international judge in cattle.

08:48:43  16  Q.   And are you a citizen of Mexico, sir?

08:48:46  17  A.   That's correct.  I live in Mexico and I born in Mexico.

08:48:49  18  Q.   And are you in the United States with a valid passport and a

08:48:53  19  valid visa?

08:48:54  20  A.   I have a visa, a tourist visa, and most of the time, I

08:48:58  21  travel to Texas looking for cattle and riding horses.

08:49:02  22  Q.   And, sir, if you will, could you explain to the jury what

08:49:06  23  type of horses are you looking for?

08:49:10  24  A.   Most of the time, I'm looking for cutting, riding horses

08:49:14  25  but, too, some few racing horses, quarter horses, racing.

08:49:19  1  Q.   Have you been involved in both the cattle industry and the

08:49:21  2  horse industry for the 30 years you mentioned?

08:49:23  3  A.   That's correct.  Most of them cattle but a few horses since

08:49:28  4  33 years ago.

08:49:29  5  Q.   And, sir, do you know an individual by the name of Ramiro

08:49:33  6  Villarreal?

08:49:33  7  A.   Yes, sir.  He was my friend.

08:49:35  8  Q.   How long have you known him, sir?

08:49:38  9  A.   Probably around more than 20 years.

08:49:41  10  Q.   And what did you know Mr. Villarreal to do for a living?

08:49:46  11  A.   Mr. Villarreal was another buyer for horses since more than

08:49:52  12  20 years ago.

08:49:53  13  Q.   And did you attend auctions with him in the United States,

08:49:58  14  horse auctions in the United States?

08:49:59  15  A.   Yeah.  Many times, we were in auction together.  Most of the

08:50:03  16  people from Mexico that come to say that we are together, sitting

08:50:09  17  together, and sometimes take a lunch together and talk together.

08:50:13  18  Q.   Was there a point when Mr. Villarreal approached you and

08:50:15  19  asked you to help him out?

08:50:17  20  A.   Can you repeat the question, please?

08:50:19  21  Q.   Was there a time when Mr. Villarreal approached you and

08:50:22  22  asked you to help him out with the horse business?

08:50:24  23  A.   Yeah.  Many times, he help me to truck horses and sometimes

08:50:29  24  asked me for genetics and crossbreeding horses.

08:50:32  25  Q.   And was there another particular occasion when he asked you

| | | |
|---|---|---|
| 08:50:35 | 1 | to form a company for him? |
| 08:50:37 | 2 | A.   Yes.  Back in 2010, he asked me if I can open a company LLC. |
| 08:50:45 | 3 | And because he has many horses in his name in the states, he |
| 08:50:51 | 4 | would like to -- me open a company for his family and for |
| 08:50:55 | 5 | himself. |
| 08:50:56 | 6 | Q.   And did he ever explain to you why he couldn't open a |
| 08:50:59 | 7 | company himself? |
| 08:50:59 | 8 | A.   Yes.  He told me he had many horses in his name and he could |
| 08:51:05 | 9 | not pay taxes or IRS report.  He doesn't have the number to pay |
| 08:51:09 | 10 | it. |
| 08:51:09 | 11 | Q.   And did you form that company, sir? |
| 08:51:11 | 12 | A.   That's correct.  I formed my company and the name was Fast |
| 08:51:16 | 13 | And Furious, LLC back in 2010. |
| 08:51:19 | 14 | Q.   Sir, I'm going to show you Government's Exhibit 366.  Do you |
| 08:51:29 | 15 | recognize that document, sir? |
| 08:51:31 | 16 | A.   Yes, sir.  That's my company and that my sign. |
| 08:51:36 | 17 | Q.   Your Honor, government offers Government's Exhibit 366, Fast |
| 08:51:41 | 18 | And Furious, LLC, Articles of Incorporation. |
| 08:51:43 | 19 |         MR. DEGEURIN:  No objection. |
| 08:51:43 | 20 |         MR. ESPER:  No objection. |
| 08:51:45 | 21 |         THE COURT:  All right.  What is that number again? |
| 08:51:48 | 22 |         MR. GARDNER:  366, your Honor. |
| 08:51:49 | 23 |         THE COURT:  366 is received. |
| 08:51:51 | 24 | Q.   (BY MR. GARDNER) And, Mr. Guerra, who picked out the name |
| 08:51:56 | 25 | Fast And Furious? |

```
08:51:56   1   A.   I did, sir.

08:51:57   2   Q.   And why did you do that?

08:51:58   3   A.   My little son got -- really liked that kind of movie that I

08:52:07   4   picked that name.  That will be the real reason.

08:52:08   5   Q.   The Disney movie Cars?

08:52:10   6   A.   That's correct.

08:52:11   7   Q.   And so, when Mr. Villarreal asked you to form his company,

08:52:15   8   what was your understanding of how it was going to be used in the

08:52:18   9   horse industry?

08:52:18  10   A.   My understanding was they're going to use a few horses of

08:52:23  11   his own or his papa owned and tried to pay income taxes and IRS

08:52:29  12   taxes for his family.

08:52:31  13   Q.   And who is responsible or who was going to be responsible

08:52:34  14   for paying those taxes?

08:52:35  15   A.   I was the responsible because the company was in all name.

08:52:40  16   Q.   And was Mr. Villarreal going to reimburse you for those

08:52:43  17   expenses?

08:52:44  18   A.   That's correct, sir.

08:52:45  19   Q.   Now, why did you agree to form this company with Mr.

08:52:48  20   Villarreal?

08:52:48  21   A.   I agreed because he was my friend since many years ago.  We

08:52:52  22   were close friends.

08:52:54  23   Q.   And do you have any suspicion he was involved with the Los

08:52:58  24   Zetas drug cartel?

08:52:58  25   A.   Not in that time, sir.
```

| | | |
|---|---|---|
| 08:53:03 | 1 | Q.   Sir, I'm showing you Government's Exhibit 354.  Do you |
| 08:53:14 | 2 | recognize that, sir? |
| 08:53:24 | 3 | A.   Yes, sir.  I recognize those three horses.  They were -- |
| 08:53:27 | 4 | belonged to Ramiro and Ramiro father. |
| 08:53:30 | 5 | Q.   And the rest of the documents, are these documents that you |
| 08:53:32 | 6 | provided to the agents of the United States?  If you'd look |
| 08:53:35 | 7 | through those for me, please. |
| 08:53:43 | 8 | A.   All of them I signed.  They were belonged to me.  That my |
| 08:53:48 | 9 | statements and my report for the taxes and statement of banks. |
| 08:53:51 | 10 | Q.   So they're documents relating to your business Fast And |
| 08:53:55 | 11 | Furious? |
| 08:53:55 | 12 | A.   That's correct, sir. |
| 08:53:56 | 13 | Q.   Your Honor, I would offer Government's Exhibit 354. |
| 08:54:00 | 14 | MS. WILLIAMS:  I'm sorry, your Honor.  I did not |
| 08:54:01 | 15 | understand what the witness said about the first couple of |
| 08:54:04 | 16 | documents, something about Mr. Villarreal. |
| 08:54:07 | 17 | MR. GARDNER:  He said those were the horses that Mr. |
| 08:54:09 | 18 | Villarreal put in his company. |
| 08:54:13 | 19 | MS. WILLIAMS:  No objection. |
| 08:54:25 | 20 | MR. ESPER:  I have no objection, your Honor. |
| 08:54:27 | 21 | MR. DEGEURIN:  No objection, your Honor. |
| 08:54:28 | 22 | THE COURT:  All right.  354 is received. |
| 08:54:31 | 23 | Q.   (BY MR. GARDNER) And, Mr. Guerra, you said before I had the |
| 08:54:39 | 24 | opportunity to show this to the jury that the first three pages |
| 08:54:42 | 25 | were horses that Mr. Villarreal put in the company.  Is that a |

08:54:46   1    fair statement?

08:54:46   2    A.   Yes, sir.

08:54:47   3    Q.   Okay.  So what am I looking at here?  What is that document?

08:54:52   4    A.   This is one -- copy of the registration paper for Fly

08:54:57   5    Corona.

08:54:57   6    Q.   This is the American Quarter Horse Association certificate?

08:55:00   7    A.   Yes, sir.

08:55:01   8    Q.   All right.  So Fly Corona, that's the name right there?

08:55:05   9    A.   Yes.

08:55:05   10   Q.   This is another AQHA Certificate of Registration?

08:55:08   11   A.   Yes, sir.  Snowy Cartel was Ramiro Villarreal's horse, too.

08:55:13   12   Q.   And finally, you said one for his father and that's Dallas

08:55:21   13   Cartel B?

08:55:21   14   A.   Yes, sir.  That's correct.

08:55:22   15   Q.   All right.  Now, when I'm looking at the second page of the

08:55:26   16   Certificate of Registration of AQHA, it says the seller Bill

08:55:31   17   Price.  Do you know Mr. Bill Price?

08:55:32   18   A.   No, sir.  Never met him.

08:55:35   19   Q.   Now, the jury has heard information about Mr. Price.  Did

08:55:40   20   you purchase Snowy Cartel for $70,000?

08:55:44   21   A.   No, sir.  I didn't.

08:55:45   22   Q.   As far as you're concerned -- let me ask you this question.

08:55:51   23   Whose horse was Snowy Cartel?

08:55:53   24   A.   Was Ramiro Villarreal.

08:56:00   25   Q.   And so, in connection with your forming the company, did you

| | | |
|---|---|---|
| 08:56:02 | 1 | also open a bank account in the United States? |
| 08:56:04 | 2 | A.   Yes, sir, I did.  As soon as I opened my company, I opened a |
| 08:56:08 | 3 | checking account in a bank in the states. |
| 08:56:19 | 4 | THE COURT:  Mr. Gardner, who are the three horses' |
| 08:56:23 | 5 | names?  I couldn't read. |
| 08:56:25 | 6 | MR. GARDNER:  Yes, your Honor.  Fly Corona. |
| 08:56:28 | 7 | THE COURT:  Fly Corona.  Okay. |
| 08:56:29 | 8 | MR. GARDNER:  Yes, sir.  And A Snowy Cartel is the |
| 08:56:32 | 9 | second one.  And then, the third one is Dallas Cartel B. |
| 08:56:41 | 10 | THE COURT:  Dallas Cartel what? |
| 08:56:42 | 11 | MR. GARDNER:  B, your Honor, as in Bravo. |
| 08:56:44 | 12 | THE COURT:  Okay.  Thank you. |
| 08:56:46 | 13 | Q.   (BY MR. GARDNER) And do you recall the bank in which you |
| 08:56:51 | 14 | opened an account? |
| 08:56:52 | 15 | A.   Yes, sir. |
| 08:56:53 | 16 | Q.   Which one was that, sir? |
| 08:56:54 | 17 | A.   I opened the name of the bank is Lone Star Bank, National |
| 08:56:59 | 18 | Bank in McAllen. |
| 08:57:01 | 19 | Q.   In where, sir? |
| 08:57:01 | 20 | A.   In McAllen, Texas. |
| 08:57:03 | 21 | Q.   And what was the purpose of you opening a bank account? |
| 08:57:05 | 22 | A.   The purpose of the checking account was -- had the money |
| 08:57:10 | 23 | that the horse going to have like a profit, and by that checking |
| 08:57:14 | 24 | account, we're going to pay the expenses for those horses. |
| 08:57:25 | 25 | Q.   When you say a profit, I'm showing you a copy of the check |

08:57:28    1    that you provided the government in the Horsemen's Bookkeeper to

08:57:34    2    you in the amount of $169,167.25.

08:57:39    3    A.    That's correct, sir.

08:57:40    4    Q.    Do you recognize that check?

08:57:41    5    A.    Yes, sir.

08:57:42    6    Q.    Okay.   Where did that check come from?

08:57:43    7    A.    They come from the Texas Racing Commission.

08:57:48    8    Q.    And was it the winnings from a horse?

08:57:50    9    A.    For winning for a horse -- the first horse was that Corona

08:57:56   10    Cartel mare.   I don't remember exactly the one right now.   The

08:57:59   11    one you just showed me.

08:58:00   12    Q.    Was that Snowy Cartel?

08:58:01   13    A.    That's correct.   Snowy Cartel.

08:58:03   14    Q.    And so, those winnings were placed in your bank account?

08:58:05   15    A.    Yes, sir.

08:58:06   16    Q.    And why were they placed in your bank account?

08:58:07   17    A.    Because while Ramiro told me put in the account and with

08:58:11   18    that money, pay the expense of the other horse that he has here.

08:58:14   19    Q.    So Snowy Cartel is not your horse?

08:58:18   20    A.    No, sir.   Never was my horse.

08:58:19   21    Q.    Okay.   And how were you directed to pay expenses for other

08:58:23   22    horses?

08:58:24   23    A.    Ramiro told me had to pay some insurance money, some

08:58:28   24    expenses for breeding mares, some expenses for vets, from

08:58:35   25    trainers, from anyone that are around the horse business.

| | | |
|---|---|---|
| 08:58:37 | 1 | Q.   And I think you said vets.  That's veterinarians? |
| 08:58:40 | 2 | A.   That's correct. |
| 08:58:41 | 3 | Q.   And so, would this money -- how were you directed to spend |
| 08:58:45 | 4 | it? |
| 08:58:45 | 5 | A.   I sent checks or sent a wire transfers to that people. |
| 08:58:53 | 6 | Q.   So if you will, this date on here is November 3rd of 2010. |
| 08:58:57 | 7 | Would you agree with that, for the record? |
| 08:58:58 | 8 | A.   Yes, sir. |
| 08:59:03 | 9 | Q.   Now, here where the red sticky is, there's a check to Celina |
| 08:59:14 | 10 | Molina for $140,000, dated November 22nd of the same year. |
| 08:59:18 | 11 | A.   Yes, sir.  I did that check. |
| 08:59:20 | 12 | Q.   Who is Celina Molina? |
| 08:59:22 | 13 | A.   Celina Molina, she is the owner the horse Corona Cartel. |
| 08:59:27 | 14 | Q.   And what is the amount of $140,000? |
| 08:59:29 | 15 | A.   Ramiro told me he's going to have three breedings from |
| 08:59:33 | 16 | Corona Cartel stallion in the amount of $140,000. |
| 08:59:37 | 17 | Q.   And breedings are the semen from the stud? |
| 08:59:41 | 18 | A.   They're going to bred some mares with that money. |
| 08:59:50 | 19 | Q.   Sir, I believe you also said you have some expenses for |
| 08:59:54 | 20 | trainers? |
| 08:59:55 | 21 | A.   Yes, sir. |
| 08:59:56 | 22 | Q.   I'm showing you what is a Lone Star document, dated 12-31, |
| 09:00:07 | 23 | for payment of wire transfer in the amount of $19,860? |
| 09:00:12 | 24 | A.   That's correct, sir. |
| 09:00:13 | 25 | Q.   Okay.  Was that payment also part of the money that was |

| | | |
|---|---|---|
| 09:00:17 | 1 | received for the winnings of Snowy Cartel? |
| 09:00:20 | 2 | A.   Yes, sir. |
| 09:00:21 | 3 | Q.   And how did you know to send it to Huitron Homes? |
| 09:00:25 | 4 | A.   Ramiro sent me the address to send a check to transfer. |
| 09:00:32 | 5 | Q.   Have you ever spoken to Mr. Eusevio, known as "Chevo," or |
| 09:00:38 | 6 | Mr. -- |
| 09:00:38 | 7 | A.   I never meet him before in person.  Probably I know him one |
| 09:00:41 | 8 | or two times, but I never been in person. |
| 09:00:43 | 9 | Q.   Did they train any horses for you? |
| 09:00:45 | 10 | A.   No, sir.  Never. |
| 09:01:02 | 11 | Q.   I'm showing you a wire transfer that you provided the |
| 09:01:07 | 12 | government.  This is to you, correct? |
| 09:01:17 | 13 | A.   Yes, sir. |
| 09:01:19 | 14 | Q.   And reflects a $40,000 wire transfer from Tremor |
| 09:01:24 | 15 | Enterprises? |
| 09:01:24 | 16 | A.   That's correct. |
| 09:01:26 | 17 | Q.   Have you ever met Jose Trevino? |
| 09:01:28 | 18 | A.   Never, sir. |
| 09:01:29 | 19 | Q.   And the wire transfer reflects purchase of the Snowy Cartel? |
| 09:01:34 | 20 | A.   Yes. |
| 09:01:36 | 21 | Q.   How were you informed about this transaction? |
| 09:01:39 | 22 | A.   Well, when Ramiro called me always explaining what I have to |
| 09:01:44 | 23 | do.  But, you know, when Ramiro passed away, I still got -- when |
| 09:01:49 | 24 | Ramiro passed away, other guy, I never met him before in my life, |
| 09:01:54 | 25 | he called me by radio.  He always say, Mi Rey.  That one gave me |

| 09:02:01 | 1 | the instructions to send the money about expenses. |
| 09:02:04 | 2 | Q.   Let me back up a second there.  You said, Mi Rey. |
| 09:02:07 | 3 | A.   Mi Rey.  That's correct. |
| 09:02:08 | 4 | Q.   And in English, that stands for my king? |
| 09:02:11 | 5 | A.   My king. |
| 09:02:12 | 6 | Q.   Did you ever meet this individual? |
| 09:02:13 | 7 | A.   Never, sir. |
| 09:02:14 | 8 | Q.   Did Mr. Villarreal tell you that this person called Mi Rey |
| 09:02:19 | 9 | would be calling you? |
| 09:02:20 | 10 | A.   Yes. |
| 09:02:21 | 11 | Q.   And what did this Mi Rey do or tell you to do? |
| 09:02:25 | 12 | A.   I really don't know what he's doing but just he made phone |
| 09:02:29 | 13 | calls to me by radio and tell me where I have to pay the expenses |
| 09:02:33 | 14 | for horses. |
| 09:02:36 | 15 | Q.   And was there some point in which you discovered that a |
| 09:02:41 | 16 | number of horses were being put in your name? |
| 09:02:43 | 17 | A.   That's correct, sir. |
| 09:02:44 | 18 | Q.   And what were the names of these horses? |
| 09:02:46 | 19 | A.   Well, I don't remember exactly the name, but there were a |
| 09:02:50 | 20 | bunch of horses with the name of cars.  And a friend of mine from |
| 09:02:53 | 21 | California called me one time and say that if my company show |
| 09:02:57 | 22 | like many horses.  I didn't know.  So I asked Ramiro about it |
| 09:03:03 | 23 | that bunch of horses were supposed to not have in my account in |
| 09:03:07 | 24 | my company.  And Ramiro told me it was a mistake, a big mistake |
| 09:03:11 | 25 | but he will fix it.  That's what he told me. |

09:03:14   1   Q.   And when you say names of cars, like the names of

09:03:17   2   manufacturers of cars?

09:03:18   3   A.   Yeah.  There were names of the cars.  I don't remember the

09:03:21   4   name of the cars, but there were a bunch of horses.

09:03:25   5   Q.   And do you know if those were the original names of horses

09:03:28   6   or they had changed the names?

09:03:31   7   A.   I hear they change the names because most of the time, the

09:03:34   8   breeders -- the horse breeders, they keep the lines in the name

09:03:38   9   for everyone knows what kind of bloodline have the horse.  If you

09:03:41  10   put a car name, you'll know what kind of blood it's going to

09:03:45  11   have.

09:03:58  12   Q.   I'm showing you another document from Lone Star Bank.

09:04:02  13        MS. WILLIAMS:  I'm sorry, your Honor, can we get a date

09:04:05  14   on these bank statement?  There's no number.  I'm having a real

09:04:08  15   hard time.

09:04:09  16        MR. GARDNER:  Right there.

09:04:10  17        MS. WILLIAMS:  I understand.  I can't see the whole

09:04:11  18   page, so I don't know what date.

09:04:15  19   Q.   (BY MR. GARDNER) That is dated June 8th, correct?

09:04:19  20   A.   That's correct.

09:04:20  21        MS. WILLIAMS:  Of what year?

09:04:24  22   Q.   (BY MR. GARDNER) Then that is dated the statement of June

09:04:27  23   the 17th of 2011.

09:04:30  24   A.   That's correct.

09:04:32  25   Q.   Sir, reflects a payment to Paul and Maria Jones.

| | | |
|---|---|---|
| 09:04:37 | 1 | A.   That's correct. |
| 09:04:39 | 2 | Q.   Do you know what that payment was for? |
| 09:04:42 | 3 | A.   No.  Just tell me to send that money that guy. |
| 09:04:45 | 4 | Q.   Do you know who Mr. Jones is? |
| 09:04:47 | 5 | A.   Never meet him. |
| 09:04:49 | 6 | Q.   Do you know what he does for a living? |
| 09:04:51 | 7 | A.   He train horses. |
| 09:04:53 | 8 | Q.   Now, there's another transfer down here on June 16th -- June |
| 09:05:00 | 9 | 17th, rather, of 2011 for $25,000 to Yearsley Bloodstock? |
| 09:05:04 | 10 | A.   Yeah.  Once I paid for insurance on a horse. |
| 09:05:07 | 11 | Q.   Do you know which horses? |
| 09:05:08 | 12 | A.   No.  I don't know which horses. |
| 09:05:09 | 13 | Q.   And -- |
| 09:05:10 | 14 | A.   I just send the money. |
| 09:05:11 | 15 | Q.   And do you know who owned the horses? |
| 09:05:13 | 16 | A.   No.  Supposed to be Ramiro but. |
| 09:05:21 | 17 | Q.   Now, there's a handwritten note here and it doesn't have a |
| 09:05:32 | 18 | date on it.  I'll zoom out so Ms. Williams can see the whole |
| 09:05:41 | 19 | thing. |
| 09:05:42 | 20 | Lone Star Bank, National Bank from Hernando Guerra, |
| 09:05:46 | 21 | that's you, sir? |
| 09:05:47 | 22 | A.   That's correct.  That's my sign. |
| 09:05:49 | 23 | Q.   What is this document? |
| 09:05:49 | 24 | A.   It's a wire transfer that he asked me to send to that guy, |
| 09:05:53 | 25 | Paul and Maria Jones. |

| | | |
|---|---|---|
| 09:05:56 | 1 | Q.   And so, why did you prepare this document and then, what did |
| 09:05:58 | 2 | you do with it? |
| 09:05:58 | 3 | A.   Because I was in Mexico and if I want to send a wire |
| 09:06:03 | 4 | transfer to the states in the state banks, I gotta send over |
| 09:06:07 | 5 | something by computer, but I'm not a computer man, or a fax.  So |
| 09:06:10 | 6 | I'll send that fax to my banker in McAllen so he can wire the |
| 09:06:17 | 7 | money to the other guy. |
| 09:06:20 | 8 | Q.   And you did this each time? |
| 09:06:22 | 9 | A.   Pardon? |
| 09:06:23 | 10 | Q.   You wrote out a handwritten -- |
| 09:06:24 | 11 | A.   Yes.  My hand and my sign. |
| 09:06:44 | 12 | Q.   Sir, this is a check from Tremor Enterprises, Fast And |
| 09:06:51 | 13 | Furious.  Again, Fast And Furious is your company, correct? |
| 09:06:54 | 14 | A.   Correct, sir. |
| 09:06:54 | 15 | Q.   For the purchase of a horse named Blues Ferrari? |
| 09:07:01 | 16 | A.   Yes. |
| 09:07:02 | 17 | Q.   Signed Jose Trevino? |
| 09:07:04 | 18 | A.   Yep. |
| 09:07:05 | 19 | Q.   Did you ever own a horse named Blues Ferrari? |
| 09:07:07 | 20 | A.   I never owned a horse that name, sir. |
| 09:07:09 | 21 | Q.   And did you receive this check for $50,000 on 12-20 of 2010? |
| 09:07:14 | 22 | A.   Yes, sir.  I received it and I put it in my checking |
| 09:07:17 | 23 | account, business account. |
| 09:07:18 | 24 | Q.   What were you told to do with these funds? |
| 09:07:19 | 25 | A.   The guy Mi Rey called me, they're going to receive a check |

| | | |
|---|---|---|
| 09:07:23 | 1 | and I have to put it in a checking account. |
| 09:07:26 | 2 | Q.   Do you know how much Blues Ferrari was worth? |
| 09:07:29 | 3 | A.   No, sir. |
| 09:07:29 | 4 | Q.   Were you aware that Blues Ferrari was sold a month later at |
| 09:07:33 | 5 | auction for $310,000? |
| 09:07:34 | 6 | A.   I did not know. |
| 09:07:36 | 7 | Q.   Weren't told about the auction?  You were not told about the |
| 09:07:40 | 8 | auction? |
| 09:07:40 | 9 | A.   No, sir. |
| 09:07:40 | 10 | Q.   Is this the check from you, sir? |
| 09:07:51 | 11 | A.   Yes, sir.  That my check, my company and my sign. |
| 09:07:54 | 12 | Q.   Okay.  And, again, the Yearsley Bloodstock Insurance? |
| 09:07:57 | 13 | A.   Yes. |
| 09:07:57 | 14 | Q.   And what were you told about this check? |
| 09:07:58 | 15 | A.   It's for pay insurance in different horses. |
| 09:08:03 | 16 | Q.   Sir, this is dated 8-31 of '11.  Okay.  Another wire |
| 09:08:21 | 17 | transfer to Huitron Homes in $10,000.  Do you know what that was |
| 09:08:24 | 18 | for, sir? |
| 09:08:25 | 19 | A.   Yes, sir.  Mi Rey called me, have to wire that money for |
| 09:08:28 | 20 | that guy. |
| 09:08:32 | 21 | Q.   Looking at 9-30 of '11 on another statement from the bank. |
| 09:08:43 | 22 | Again, another payment to Huitron Homes? |
| 09:08:46 | 23 | A.   That's correct, sir. |
| 09:08:47 | 24 | Q.   Okay.  And were you told what this one was for? |
| 09:08:49 | 25 | A.   Yeah.  I think some -- another guy called me to send money |

| | | |
|---|---|---|
| 09:08:53 | 1 | to that guy. |
| 09:08:55 | 2 | Q.    The Huitron Homes? |
| 09:08:56 | 3 | A.    Yes, sir. |
| 09:08:57 | 4 | Q.    And do you know whether it was "Chevo" Huitron or Jesus |
| 09:09:00 | 5 | Huitron? |
| 09:09:01 | 6 | A.    Never met him in my life, those guys. |
| 09:09:03 | 7 | Q.    Now, I asked you about Snowy Cartel.  Did you ever send |
| 09:09:15 | 8 | $130,000 cash to Oklahoma to pay for a horse named Snowy Fling? |
| 09:09:18 | 9 | A.    No, sir.  Never. |
| 09:09:24 | 10 | Q.    Showing you Government's Exhibit 58C.  You have seen this |
| 09:09:32 | 11 | photo before, have you not, sir? |
| 09:09:34 | 12 | A.    Yes, sir.  I saw the photo before. |
| 09:09:36 | 13 | Q.    Your Honor, I'll offer Government's Exhibit 58C. |
| 09:09:42 | 14 |         MR. DEGEURIN:  No objection. |
| 09:09:44 | 15 |         MR. WOMACK:  No objection. |
| 09:09:45 | 16 |         MS. WILLIAMS:  No objection. |
| 09:09:46 | 17 |         MR. ESPER:  No objection. |
| 09:09:47 | 18 |         MR. MAYR:  None. |
| 09:09:49 | 19 |         THE COURT:  58C is received. |
| 09:09:50 | 20 | Q.    (BY MR. GARDNER) I got a little bit of glare.  This is a |
| 09:10:03 | 21 | winning photo of Snowy Cartel at the Dash For Cash Futurity in |
| 09:10:10 | 22 | Texas on October 9, 2010.  Lists you as the owner, sir? |
| 09:10:17 | 23 | A.    Yes, sir.  It was Ramiro horse. |
| 09:10:19 | 24 | Q.    Did you ever have the AQHA registration papers for that |
| 09:10:23 | 25 | horse? |

36

| | | |
|---|---|---|
| 09:10:23 | 1 | A.   Never did.  No, sir.  Never. |
| 09:10:25 | 2 | Q.   Did you ever fill out the transfer report? |
| 09:10:27 | 3 | A.   I did. |
| 09:10:28 | 4 | Q.   Transferring the horse from where to where? |
| 09:10:31 | 5 | A.   From my name to I don't know which one going to be the |
| 09:10:34 | 6 | owner.  I just signed the transfer. |
| 09:10:36 | 7 | Q.   Was it blank when you signed it? |
| 09:10:37 | 8 | A.   Yes, sir.  I signed it in blank. |
| 09:10:46 | 9 | Q.   Are you present in this photo, sir? |
| 09:10:48 | 10 | A.   No, sir. |
| 09:10:50 | 11 | Q.   The jury previously identified this person as Sergio Rincon. |
| 09:10:54 | 12 | A.   I didn't know him. |
| 09:10:55 | 13 | Q.   You don't know him? |
| 09:10:56 | 14 | A.   No, sir. |
| 09:10:58 | 15 | Q.   Do you know this woman, Alexandra Trevino? |
| 09:11:02 | 16 | A.   I don't know her. |
| 09:11:03 | 17 | MS. WILLIAMS:  Your Honor, I'm going to object to |
| 09:11:05 | 18 | leading and information is not in evidence. |
| 09:11:12 | 19 | MR. GARDNER:  I'm asking if he knows that person. |
| 09:11:14 | 20 | MS. WILLIAMS:  But he's saying who it is when he asks |
| 09:11:16 | 21 | if he knows the person. |
| 09:11:18 | 22 | THE COURT:  But I believe he said -- all right.  I |
| 09:11:23 | 23 | thought he said, do you know that person and pointed. |
| 09:11:25 | 24 | MS. WILLIAMS:  He said her name and then, I objected. |
| 09:11:27 | 25 | Q.   (BY MR. GARDNER) Do you know a person Jose Trevino, Jr.? |

| | | |
|---|---|---|
| 09:11:30 | 1 | A.   No, sir. |
| 09:11:31 | 2 | Q.   Do you recognize that person right there? |
| 09:11:34 | 3 | A.   I don't recognize him. |
| 09:11:36 | 4 | MS. WILLIAMS:  Again, your Honor, Mr. Gardner is |
| 09:11:43 | 5 | identifying people in this photo.  That is not in evidence. |
| 09:11:47 | 6 | THE COURT:  The photo is not. |
| 09:11:49 | 7 | MS. WILLIAMS:  The identification of the people in this |
| 09:11:50 | 8 | photograph is not in evidence.  Mr. Gardner cannot identify who |
| 09:11:54 | 9 | they are.  He can ask the witness if he knows the people.  He can |
| 09:11:59 | 10 | ask the witness if he knows people by name.  But he can't point |
| 09:12:03 | 11 | to the person and say, this is so and so.  Do you know them? |
| 09:12:07 | 12 | THE COURT:  All right. |
| 09:12:07 | 13 | MS. WILLIAMS:  And I object. |
| 09:12:10 | 14 | THE COURT:  You may ask if they know somebody. |
| 09:12:13 | 15 | Q.   (BY MR. GARDNER) Do you know Alexandra Trevino? |
| 09:12:17 | 16 | A.   No, sir. |
| 09:12:18 | 17 | Q.   Do you know or recognize that person? |
| 09:12:21 | 18 | A.   I don't recognize her. |
| 09:12:22 | 19 | Q.   Do you know Jose Trevino, Jr.? |
| 09:12:25 | 20 | A.   No, sir.  I don't know. |
| 09:12:26 | 21 | Q.   Do you know -- |
| 09:12:28 | 22 | MR. DEGEURIN:  Excuse me, Mr. Gardner.  May we approach |
| 09:12:30 | 23 | the bench? |
| 09:12:36 | 24 | (At the bench, on the record.) |
| 09:12:48 | 25 | MR. DEGEURIN:  I just didn't want to keep having this |

| | | |
|---|---|---|
| 09:12:52 | 1 | discussion in front of the jury. |
| 09:12:55 | 2 | First of all, I join Ms. Williams' objection.  It's a |
| 09:12:59 | 3 | way of identifying for the jury who someone is without testimony |
| 09:13:06 | 4 | of that.  It's not being done intentionally, but if we allow this |
| 09:13:10 | 5 | to continue -- |
| 09:13:11 | 6 | THE COURT:  How are we -- |
| 09:13:12 | 7 | MR. GARDNER:  There's no questions.  I'm sorry. |
| 09:13:15 | 8 | THE COURT:  You're objecting to the question, do you |
| 09:13:18 | 9 | recognize somebody and do you know somebody?  And your objection |
| 09:13:25 | 10 | is because there is an exhibit that by inference he is suggesting |
| 09:13:35 | 11 | that is the person. |
| 09:13:39 | 12 | MR. DEGEURIN:  Actually, you worded it much better than |
| 09:13:41 | 13 | I did. |
| 09:13:42 | 14 | MR. WOMACK:  My point is -- |
| 09:13:42 | 15 | THE COURT:  Well, I understand that. |
| 09:13:44 | 16 | MR. WOMACK:  The point is he's testifying.  He's |
| 09:13:46 | 17 | saying, do you know Alexandra?  Nobody does.  Then he says -- |
| 09:13:50 | 18 | THE COURT:  Well, no, no, no.  I understand.  It's the |
| 09:13:52 | 19 | pointing, though, that you are objecting. |
| 09:13:55 | 20 | MR. DEGEURIN:  Thank you, Judge.  That's what I'm |
| 09:13:56 | 21 | saying. |
| 09:13:56 | 22 | MR. WOMACK:  And calling the name, do you know, you |
| 09:13:59 | 23 | know. |
| 09:13:59 | 24 | THE COURT:  He is absolutely entitled to ask this |
| 09:14:02 | 25 | witness if he knows -- |

| | | |
|---|---|---|
| 09:14:03 | 1 | MR. WOMACK:  Absolutely. |
| 09:14:03 | 2 | THE COURT:  -- Abraham Lincoln. |
| 09:14:05 | 3 | MR. WOMACK:  I know.  But then, to point at it. |
| 09:14:07 | 4 | THE COURT:  Okay.  Do not point. |
| 09:14:09 | 5 | MR. GARDNER:  I won't point.  No pointing.  Got it. |
| 09:14:31 | 6 | Q.   (BY MR. GARDNER) Sir, were you the winner of this race? |
| 09:14:44 | 7 | A.   That was in San Antone. |
| 09:14:45 | 8 | Q.   This is the Dash For Cash Futurity? |
| 09:14:47 | 9 | A.   Oh, sorry about that.  That's make a mistake. |
| 09:14:53 | 10 | Q.   I'm sorry, the question was, were you aware of this race |
| 09:14:55 | 11 | even happening? |
| 09:14:56 | 12 | A.   No, sir. |
| 09:14:57 | 13 | Q.   And was this the race in which you received $169,000 that |
| 09:15:01 | 14 | you testified to previously? |
| 09:15:02 | 15 | A.   That's correct. |
| 09:15:24 | 16 | Q.   Sir, you mentioned earlier that, at some point, you became |
| 09:15:27 | 17 | aware of Ramiro Villarreal's death? |
| 09:15:30 | 18 | A.   That's correct. |
| 09:15:31 | 19 | Q.   Do you know how he died? |
| 09:15:33 | 20 | A.   In my understanding, he died in a crash. |
| 09:15:36 | 21 | MS. WILLIAMS:  Object to speculation. |
| 09:15:42 | 22 | MR. GARDNER:  I asked him if he knew, your Honor. |
| 09:15:44 | 23 | THE COURT:  I know.  And she said it's speculative. |
| 09:15:50 | 24 | Ask about the basis of his knowledge. |
| 09:15:52 | 25 | Q.   (BY MR. GARDNER) At some point, did you stop communicating |

09:15:54   1   with Mr. Villarreal?

09:15:55   2   A.   Yes.

09:15:57   3   Q.   And when you originally formed this company Fast And

09:16:02   4   Furious, how many horses did Mr. Villarreal tell you he was going

09:16:06   5   to put in that company?

09:16:07   6   A.   He told me going to be three horses, two at his home and one

09:16:12   7   for his father.   Three horses.

09:16:14   8   Q.   And did you become aware that it became much more than that?

09:16:17   9   A.   Yes.   I did and I asked him and like I say before --

09:16:22   10          THE COURT:   No, no.   Just listen to the question and

09:16:25   11   just answer the question because each of these lawyers are going

09:16:28   12   to ask you questions.

09:16:30   13   Q.   (BY MR. GARDNER) The question, sir, was at some point, did

09:16:32   14   you become aware that there were more than three horses in your

09:16:35   15   name?

09:16:35   16   A.   Yes.

09:16:36   17   Q.   Last night, we went over names of those horses; is that

09:16:41   18   correct?

09:16:41   19   A.   That's correct.

09:16:41   20   Q.   And I don't want to go over all the names of them, but did

09:16:44   21   you own any of those horses that are still in your name?

09:16:46   22   A.   No, sir.

09:16:52   23   Q.   Now, you talked about this Mi Rey.   How would he get in

09:16:56   24   contact with you?

09:16:57   25   A.   He called me by radio.

| | | |
|---|---|---|
| 09:16:59 | 1 | Q.   When you say radio, can you define that for us? |
| 09:17:02 | 2 | A.   It's like a phone, mobile phone. |
| 09:17:09 | 3 | Q.   You heard the term "push-to-talk"? |
| 09:17:12 | 4 | A.   Yes. |
| 09:17:13 | 5 | Q.   Is that the same thing, sir?  And when he would call you on |
| 09:17:18 | 6 | the radio, what instructions would he give you with respect to |
| 09:17:27 | 7 | putting the horses in your name? |
| 09:17:32 | 8 | A.   He called me only when I have to pay some expenses or to pay |
| 09:17:37 | 9 | some entries.  He didn't say anything about the horses that were |
| 09:17:42 | 10 | in my name. |
| 09:17:44 | 11 | Q.   Sir, have you ever met Miguel Trevino? |
| 09:17:46 | 12 | A.   Yes, sir.  I did. |
| 09:17:47 | 13 | Q.   And do you know a nickname that he goes by? |
| 09:17:51 | 14 | A.   Yes, sir. |
| 09:17:51 | 15 | Q.   And what is that? |
| 09:17:52 | 16 | A.   "Cuarenta." |
| 09:17:54 | 17 | Q.   And how did you come to meet him? |
| 09:17:56 | 18 | A.   Ramiro took me with him because he was to know something |
| 09:18:00 | 19 | about breeding and some bloodline horses. |
| 09:18:03 | 20 | Q.   And where did you meet him? |
| 09:18:05 | 21 | A.   In Monterrey in a stable. |
| 09:18:07 | 22 | Q.   And where, I'm sorry? |
| 09:18:08 | 23 | A.   In a stable in Monterrey.  Horse stable. |
| 09:18:11 | 24 | Q.   And what discussions did you have with Mr. -- |
| 09:18:13 | 25 | A.   He asked me some question about bloodlines and |

| | | |
|---|---|---|
| 09:18:17 | 1 | crossbreeding. |
| 09:18:19 | 2 | Q.    And how long was that meeting? |
| 09:18:22 | 3 | A.    Around three or four years ago. |
| 09:18:29 | 4 | Q.    Do you know an individual named Francisco Colorado-Cessa, |
| 09:18:34 | 5 | also known as "Pancho"? |
| 09:18:35 | 6 | A.    Yes, sir, I know him. |
| 09:18:36 | 7 | Q.    And where did you meet him, sir? |
| 09:18:38 | 8 | A.    I met him at a horse sale. |
| 09:18:39 | 9 | Q.    The United States or Mexico? |
| 09:18:41 | 10 | A.    In the United States. |
| 09:18:42 | 11 | Q.    And was he with anyone? |
| 09:18:45 | 12 | A.    He was with some friends from Mexico, some friend of his |
| 09:18:49 | 13 | friends. |
| 09:18:49 | 14 | Q.    Do you know an individual by the name of Carlos Nayen? |
| 09:18:51 | 15 | A.    Yes, I know him, too. |
| 09:18:53 | 16 | Q.    And was Mr. Nayen present at those auctions with Mr. |
| 09:18:57 | 17 | Colorado? |
| 09:18:57 | 18 | A.    Yes, sir. |
| 09:18:58 | 19 | Q.    I'm just going to show you some documents, sir.  I'm showing |
| 09:19:13 | 20 | you Government's Exhibit 29.  Do you recognize that address? |
| 09:19:20 | 21 | A.    Yes, sir.  That the address I used for my company is one of |
| 09:19:25 | 22 | my friend's homes in McAllen. |
| 09:19:26 | 23 | Q.    If you will, could you read that address? |
| 09:19:28 | 24 | A.    Yes.  3317 Kent Lane, McAllen, Texas 78503. |
| 09:19:36 | 25 | Q.    And is this your handwriting? |

```
09:19:39   1   A.   No, sir, is not.
09:19:41   2   Q.   Did you prepare this document?
09:19:42   3   A.   No, sir.  I didn't.
09:19:43   4   Q.   Do you know where this document came from?
09:19:45   5   A.   No, sir.
09:19:50   6   Q.   Showing you Government's Exhibit 55B.  Is this your
09:19:53   7   document, sir?
09:20:07   8   A.   I don't recognize.
09:20:08   9   Q.   Do you know where it came from?  Do you know where this
09:20:14  10   document was located or found for this trial?
09:20:16  11   A.   Yes, sir.
09:20:17  12   Q.   Now, there's a number of indications with your name beside a
09:20:20  13   number of horses or your company's name.  Do you see those, sir?
09:20:25  14   A.   Yes, sir.
09:20:25  15   Q.   And are those horses, in fact, your horses?
09:20:28  16   A.   No.  They're not my horses.  They were Ramiro's horses.
09:20:33  17   Q.   And I'm showing you Government's Exhibit 60A.  Is that a
09:20:46  18   document prepared by you?
09:20:48  19   A.   No, sir.
09:20:50  20   Q.   And there's a name up here.  Is that your name, sir?
09:20:53  21   A.   My name is "Nando."
09:20:55  22   Q.   "Nando"?
09:20:56  23   A.   But not my letter.
09:20:58  24   Q.   There's a number there.  Is that your number?
09:21:01  25   A.   It was my radio.
```

| | | |
|---|---|---|
| 09:21:01 | 1 | Q.   Your radio number? |
| 09:21:02 | 2 | A.   Yeah. |
| 09:21:03 | 3 | Q.   And I'm showing you 60B.  Have you ever seen that document |
| 09:21:07 | 4 | before? |
| 09:21:08 | 5 | A.   No, sir. |
| 09:21:10 | 6 | Q.   All right.  There's a significant number of horses here that |
| 09:21:13 | 7 | has your name listed beside them. |
| 09:21:15 | 8 | A.   Yes. |
| 09:21:16 | 9 | Q.   So have you ever owned Forty Force? |
| 09:21:19 | 10 | A.   Never. |
| 09:21:19 | 11 | Q.   Have you ever owned Viva Mexico? |
| 09:21:21 | 12 | A.   Never. |
| 09:21:22 | 13 | MS. WILLIAMS:  Your Honor, objection.  Reading from |
| 09:21:23 | 14 | this document.  It's not in evidence unless I'm mistaken. |
| 09:21:27 | 15 | MR. GARDNER:  I don't have to have him read from a |
| 09:21:29 | 16 | document. |
| 09:21:30 | 17 | Q.   (BY MR. GARDNER) Have you ever owned Bugatti? |
| 09:21:33 | 18 | A.   No, sir. |
| 09:21:33 | 19 | Q.   Have you ever owned Porsche Turbo? |
| 09:21:36 | 20 | A.   No, sir. |
| 09:21:36 | 21 | Q.   Have you ever owned Mercedes Roadster? |
| 09:21:39 | 22 | A.   No, sir. |
| 09:21:40 | 23 | Q.   Have you ever owned This Girl Is Bad? |
| 09:21:42 | 24 | A.   No, sir. |
| 09:21:42 | 25 | Q.   Have you ever owned Cocopata? |

| | | |
|---|---|---|
| 09:21:44 | 1 | A.   No, sir. |
| 09:21:45 | 2 | Q.   Have you ever owned Lady Nayen? |
| 09:21:47 | 3 | A.   No, sir. |
| 09:21:48 | 4 | Q.   I'm showing you Government's Exhibit 60C.  Do you recognize |
| 09:21:53 | 5 | this document, sir? |
| 09:21:54 | 6 | A.   No, sir.  I didn't. |
| 09:21:56 | 7 | Q.   Did you ever -- you did not prepare this? |
| 09:21:58 | 8 | A.   No, sir. |
| 09:21:59 | 9 | Q.   And, again, is your name on here? |
| 09:22:04 | 10 | A.   That my company's name. |
| 09:22:05 | 11 | Q.   There's a number of horses listed under there, correct? |
| 09:22:11 | 12 | A.   I recognize Flying Corona. |
| 09:22:12 | 13 | Q.   All right.  Did you own any of those horses? |
| 09:22:14 | 14 | A.   No.  I don't own any of those. |
| 09:22:19 | 15 | Q.   I'm going to show you what's already been admitted into |
| 09:22:39 | 16 | evidence is a page from Government's Exhibit 231, specifically |
| 09:22:43 | 17 | 231A.  Bates No. 592584 for the jury's reference.  592584. |
| 09:23:03 | 18 |      Sir, there's three horses listed here. |
| 09:23:06 | 19 | A.   Yes, sir. |
| 09:23:06 | 20 | Q.   This is a record from the Ruidoso sale in your name, |
| 09:23:10 | 21 | correct? |
| 09:23:10 | 22 | A.   That's correct. |
| 09:23:13 | 23 | Q.   And three horses listed as purchased by you? |
| 09:23:17 | 24 | A.   Yes. |
| 09:23:17 | 25 | Q.   Did you purchase any of those horses? |

| | | |
|---|---|---|
| 09:23:19 | 1 | A.   Nemo's First Moon, that's my own horse and Do You Love |
| 09:23:25 | 2 | Corona was my own horse. |
| 09:23:26 | 3 | Q.   For the record, what was the -- |
| 09:23:27 | 4 | A.   And the Oceans Apart was Ramiro's horse and he make a |
| 09:23:31 | 5 | syndicate for that horse. |
| 09:23:33 | 6 | Q.   And how much did he pay for Nemo's First Moon? |
| 09:23:37 | 7 | A.   I paid 10,000 for Nemo's. |
| 09:23:38 | 8 | Q.   And how much did you pay for Do You Love Corona? |
| 09:23:41 | 9 | A.   35,000. |
| 09:23:41 | 10 | Q.   And do you still own those two horses? |
| 09:23:43 | 11 | A.   No.  Both of them out there already. |
| 09:23:47 | 12 | Q.   Did you train these horses for racing? |
| 09:23:49 | 13 | A.   Yes, I did. |
| 09:23:50 | 14 | Q.   I believe you already mentioned, but did you ever use |
| 09:23:53 | 15 | "Chevo" or Jesus Huitron for training? |
| 09:23:55 | 16 | A.   Never using my own horse. |
| 09:23:57 | 17 | Q.   Who is your trainer? |
| 09:23:58 | 18 | A.   My trainer in Texas is Bobby Martinez.  And my trainer in |
| 09:24:02 | 19 | California is Felipe Gonzalez. |
| 09:24:04 | 20 | Q.   Do you use those trainers your whole career?  Have you used |
| 09:24:09 | 21 | those trainers a long time? |
| 09:24:10 | 22 | A.   Yes, since 15, 20 years ago. |
| 09:24:12 | 23 | Q.   Do you know who Ramiro received the $300,000 from to buy |
| 09:24:18 | 24 | that horse? |
| 09:24:18 | 25 | A.   I don't know. |

| | | |
|---|---|---|
| 09:24:20 | 1 | Q.   Do you know an individual by the name of Fernando Garcia? |
| 09:24:36 | 2 | A.   Yes, I know him. |
| 09:24:37 | 3 | Q.   And how do you know him, sir? |
| 09:24:38 | 4 | A.   I know his since many years ago.  He's -- we're very close |
| 09:24:43 | 5 | neighbors in where I was born. |
| 09:24:46 | 6 | Q.   And do you know him to be involved in the horse industry? |
| 09:24:48 | 7 | A.   He was involved in order to buy horses for different |
| 09:24:51 | 8 | customers since years ago. |
| 09:24:54 | 9 | Q.   And have you had the occasion to meet him here in the United |
| 09:24:57 | 10 | States? |
| 09:24:57 | 11 | A.   I don't know. |
| 09:24:58 | 12 | Q.   Have you seen him at auctions? |
| 09:24:59 | 13 | A.   Yes, sir. |
| 09:25:01 | 14 | Q.   Do you know any of the details of his horse business? |
| 09:25:05 | 15 | A.   No, sir.  He buy and sell horses. |
| 09:25:07 | 16 | Q.   Your Honor, may I have a moment? |
| 09:25:09 | 17 | THE COURT:  Yes, sir. |
| 09:25:15 | 18 | MR. GARDNER:  Your Honor, I'll pass the witness. |
| 09:25:27 | 19 | CROSS-EXAMINATION |
| 09:25:29 | 20 | BY MS. WILLIAMS: |
| 09:25:29 | 21 | Q.   Good morning, Mr. Guerra. |
| 09:25:57 | 22 | A.   Good morning. |
| 09:25:57 | 23 | Q.   My name is Christie Williams.  I'm just going to have a few |
| 09:26:02 | 24 | questions for you. |
| 09:26:02 | 25 | A.   Okay. |

09:26:03  1   Q.   So as I understand your testimony, as a favor to your

09:26:10  2   friend, Mr. Villarreal, you opened a company?

09:26:12  3   A.   That's correct.

09:26:13  4   Q.   And you wanted to -- he wanted -- tell me if I'm correct

09:26:20  5   because I may not be.

09:26:21  6        He wanted to have the company in the United States so

09:26:24  7   that he could have tax records?

09:26:26  8   A.   No.

09:26:27  9   Q.   Okay.  Why did he want to have a company in the United

09:26:32  10  States?

09:26:32  11  A.   He told me he had many horses racing in his name already.

09:26:36  12  And another thing, he cannot pay taxes or IRS report because he

09:26:41  13  doesn't have the number to pay here in the states.

09:26:44  14  Q.   All right.  So he doesn't have a Social Security number.

09:26:46  15  He's not a citizen?

09:26:47  16  A.   That's correct.  He was a Mexican, like me.

09:26:49  17  Q.   And he couldn't, for whatever reason, apply for the number

09:26:53  18  to file?

09:26:56  19  A.   I don't know.

09:26:56  20  Q.   Okay.  You didn't ask too many questions.

09:27:01  21  A.   To my friends?

09:27:02  22  Q.   Right.

09:27:03  23  A.   Yes.

09:27:04  24  Q.   You just did what he asked you to do?

09:27:07  25  A.   Yes.

| | | |
|---|---|---|
| 09:27:11 | 1 | Q.   And as time went on, the company did things that were |
| 09:27:19 | 2 | outside your original agreement with Mr. Villarreal? |
| 09:27:22 | 3 | A.   That's correct. |
| 09:27:23 | 4 | Q.   But you continued to follow his instructions? |
| 09:27:28 | 5 | A.   Yes, I did. |
| 09:27:29 | 6 | Q.   Because he was your friend? |
| 09:27:31 | 7 | A.   He was my friend and he told me he's going to fix it, those |
| 09:27:35 | 8 | horses that don't belong to him. |
| 09:27:36 | 9 | Q.   He told you that the horses that didn't belong to you, he |
| 09:27:41 | 10 | was going to fix that? |
| 09:27:42 | 11 | A.   No.   Those horses belong to him.   But initially, he said he |
| 09:27:48 | 12 | going to be three horses in the company.   And after I don't know |
| 09:27:52 | 13 | how many months after that, they showed many other horses in my |
| 09:27:55 | 14 | company name.   He told me was a mistake, but he will fix it. |
| 09:28:03 | 15 | Q.   At what point did you start to have conversations with |
| 09:28:07 | 16 | representatives from this? |
| 09:28:10 | 17 | A.   Last summer. |
| 09:28:12 | 18 | Q.   Last summer? |
| 09:28:13 | 19 | A.   Yes, sir. |
| 09:28:13 | 20 | Q.   Did you come to them or did they come to you? |
| 09:28:15 | 21 | A.   I come to them. |
| 09:28:18 | 22 | Q.   Did you bring a lawyer? |
| 09:28:20 | 23 | A.   Yes, I did. |
| 09:28:21 | 24 | Q.   And you and your lawyer met with this team, representatives |
| 09:28:35 | 25 | from this team.   I don't know exactly who.   But who did you meet |

| | | |
|---|---|---|
| 09:28:38 | 1 | with? |
| 09:28:39 | 2 | A.    I meet with I don't remember the names. |
| 09:28:44 | 3 | Q.    Some agent? |
| 09:28:45 | 4 | A.    That's correct. |
| 09:28:45 | 5 | Q.    And then, later with this prosecutor? |
| 09:28:46 | 6 | A.    Yes. |
| 09:28:47 | 7 | Q.    And how many meetings have you had with him? |
| 09:28:49 | 8 | A.    A couple of times. |
| 09:28:51 | 9 | Q.    Two?  Three?  Four? |
| 09:28:52 | 10 | A.    Two times. |
| 09:28:53 | 11 | Q.    Two?  One last summer and then, right before you testified? |
| 09:28:58 | 12 | A.    Yes. |
| 09:28:58 | 13 | Q.    Is that correct? |
| 09:29:00 | 14 | A.    Once last summer, probably the other around October.  I |
| 09:29:04 | 15 | don't know exactly the date. |
| 09:29:11 | 16 | Q.    And did they give your lawyer some sort of letter saying you |
| 09:29:19 | 17 | weren't going to be in any trouble? |
| 09:29:21 | 18 | A.    Say it again, please. |
| 09:29:22 | 19 | Q.    Did they give your lawyer some kind of letter saying that |
| 09:29:27 | 20 | you weren't going to be in any trouble? |
| 09:29:29 | 21 | A.    No. |
| 09:29:31 | 22 | Q.    Did they say you were going to be in trouble? |
| 09:29:34 | 23 | A.    I don't know. |
| 09:29:36 | 24 | Q.    You don't know, sitting here today, whether you're in |
| 09:29:39 | 25 | trouble or not? |

09:29:40  1  A.   Well, I'm just come to say the truth and explain all my

09:29:45  2  records.

09:29:46  3  Q.   I understand that.  But what I'm asking you is whether --

09:29:52  4  what's your understanding of whether or not you are in trouble

09:29:56  5  with the United States government?

09:29:58  6  A.   Okay.  Last summer, I saw the TV and I read the news in

09:30:07  7  media.

09:30:07  8  Q.   Excuse me.  Let me stop you.  I want to make sure we

09:30:09  9  understand each other.  Okay.  And I want to make sure that

09:30:15  10  you're going to answer the question that I'm asking, okay?  And

09:30:17  11  I'm not asking why you came to talk to the government.

09:30:21  12        What I'm asking is, do you think that you're in

09:30:26  13  trouble?  Do you think that they're going to try to put you in

09:30:27  14  jail?

09:30:30  15  A.   I don't know.

09:30:31  16  Q.   You don't know?

09:30:31  17  A.   No.

09:30:32  18  Q.   The both times that you've met with representatives from the

09:30:46  19  government, has your lawyer been there?

09:30:48  20  A.   He was with me.

09:30:53  21  Q.   Do you have people that work for you?

09:31:04  22  A.   Do I have people that work for me?  Yes.

09:31:06  23  Q.   Like 10?  Fifty?  How many people?

09:31:09  24  A.   Nah.  Less than five.

09:31:10  25  Q.   Less than five.  Okay.  And have you had telephone

52

| | | |
|---|---|---|
| 09:31:16 | 1 | conversations with my client, Jose Trevino?  Could you stand up, |
| 09:31:19 | 2 | Jose?  He might not be able to see you. |
| 09:31:22 | 3 | A.   Never. |
| 09:31:22 | 4 | Q.   You don't remember having any conversations with Mr. -- |
| 09:31:25 | 5 | A.   No.  I never meet him either. |
| 09:31:27 | 6 | Q.   About selling a horse to him? |
| 09:31:28 | 7 | A.   No. |
| 09:31:28 | 8 | Q.   I don't have anything further. |
| 09:31:34 | 9 | CROSS-EXAMINATION |
| 09:31:39 | 10 | BY MR. DEGEURIN: |
| 09:31:39 | 11 | Q.   Mr. Guerrera, I'm Mike DeGeurin.  Nice to meet you. |
| 09:31:48 | 12 | A.   Nice to meet you. |
| 09:31:50 | 13 | Q.   Sorry under these circumstances. |
| 09:31:53 | 14 | Mr. Guerra, you -- one of the things that I don't think |
| 09:32:01 | 15 | has been brought out yet is that you're also very knowledgeable |
| 09:32:04 | 16 | in cattle or livestock.  Is that true? |
| 09:32:07 | 17 | A.   That's correct. |
| 09:32:08 | 18 | Q.   In fact, you're an international judge of livestock.  Is |
| 09:32:13 | 19 | that correct? |
| 09:32:13 | 20 | A.   That's correct. |
| 09:32:15 | 21 | Q.   And then, we have like livestock shows in Houston and other |
| 09:32:21 | 22 | places, oftentimes you'll be there either as a judge or in |
| 09:32:25 | 23 | looking for cattle to buy for yourself or for others? |
| 09:32:28 | 24 | A.   That's correct. |
| 09:32:31 | 25 | Q.   And you were asked if you had seen Mr. Francisco Colorado at |

| | | |
|---|---|---|
| 09:32:38 | 1 | a horse race.  You have also -- know that he is involved in the |
| 09:32:42 | 2 | cattle business? |
| 09:32:43 | 3 | A.   Yes, sir.  I know. |
| 09:32:45 | 4 | Q.   And you have -- isn't it true that his son Jose Antonio |
| 09:32:52 | 5 | Colorado accompanied you to a livestock show so that you could |
| 09:32:58 | 6 | begin teaching Jose Antonio what to look for in cattle? |
| 09:33:04 | 7 | A.   That's correct. |
| 09:33:07 | 8 | Q.   And there was -- I may not be correct about this name but |
| 09:33:14 | 9 | the Juan Carlos Molina, do you know him? |
| 09:33:17 | 10 | A.   I know him.  He's my friend. |
| 09:33:19 | 11 | Q.   Okay.  I want to make sure we're talking about the same |
| 09:33:23 | 12 | person. |
| 09:33:24 | 13 | And Juan Carlos Molina, did he introduce Mr. Francisco |
| 09:33:31 | 14 | Colorado to you? |
| 09:33:32 | 15 | A.   No, sir. |
| 09:33:32 | 16 | Q.   Okay.  But Mr. Molina purchased cattle in the United States |
| 09:33:40 | 17 | like Mr. Colorado does; is that correct? |
| 09:33:42 | 18 | A.   That's correct. |
| 09:33:43 | 19 | Q.   And was there an occasion -- for example, from time to time, |
| 09:33:50 | 20 | would you move cattle, livestock from United States to Mexico for |
| 09:33:57 | 21 | Mr. Molina and for Mr. Colorado? |
| 09:34:00 | 22 | A.   I maybe drove in the truck for Mr. Molina, but Mr. Molina |
| 09:34:05 | 23 | have some friends and they put the cattle together.  That's |
| 09:34:08 | 24 | correct. |
| 09:34:08 | 25 | Q.   And one of those occasions was Mr. Francisco Colorado? |

| | | |
|---|---|---|
| 09:34:11 | 1 | A.   Yes, sir. |
| 09:34:12 | 2 | Q.   And they bought prize cattle, livestock somewhere in the |
| 09:34:20 | 3 | United States, and then, you brought both Mr. Molina's and Mr. |
| 09:34:24 | 4 | Colorado's cattle back to Mexico? |
| 09:34:26 | 5 | A.   Yeah. |
| 09:34:28 | 6 | Q.   And do you know whether or not Mr. Francisco Colorado is |
| 09:34:35 | 7 | known to have some very good livestocks, prize cattle in Mexico? |
| 09:34:42 | 8 | A.   I never been in his place.  I don't know what the quality. |
| 09:34:49 | 9 | Q.   There were some times that you were asked the number of |
| 09:35:00 | 10 | horses that you owned, that you knew you owned -- let me rephrase |
| 09:35:07 | 11 | that. |
| 09:35:08 | 12 | In your company -- I say your company, it was yours and |
| 09:35:16 | 13 | Ramiro Villarreal's company, correct? |
| 09:35:17 | 14 | A.   Yes, sir. |
| 09:35:17 | 15 | Q.   Y'all have been friends for many, many years? |
| 09:35:20 | 16 | A.   That's correct. |
| 09:35:21 | 17 | Q.   And you were asked which of the horses -- that list that was |
| 09:35:26 | 18 | given to you by the prosecutor from some document and some of the |
| 09:35:30 | 19 | horses you recognize as being your horses and some of them you |
| 09:35:36 | 20 | said you did not own. |
| 09:35:37 | 21 | A.   Yes, sir. |
| 09:35:38 | 22 | Q.   But they were in your company -- your company owned them, at |
| 09:35:44 | 23 | least on paper; is that correct? |
| 09:35:45 | 24 | A.   That's correct. |
| 09:35:46 | 25 | Q.   And you had ownership of that company? |

09:35:49  1  A.   Yes.

09:35:49  2  Q.   So would it be more accurate to say, these were horses that

09:35:57  3  at that particular time, I didn't know I owned?  Would that be a

09:36:03  4  more accurate statement maybe?

09:36:05  5  A.   Probably.

09:36:08  6  Q.   If someone were trying to sell those horses that were in

09:36:14  7  your name, your company's name, they would not be able to do that

09:36:17  8  without some sort of transfer from your company to somebody else?

09:36:22  9  A.   That's correct, sir.  But you don't have the original

09:36:28  10  registration paper, you cannot sell anything.  Can't show me your

09:36:31  11  name, but if you don't have the original, cannot sell anything.

09:36:34  12  Q.   Okay.  Let me ask you this.  This is more out of curiosity,

09:36:39  13  I suppose.  But every horse that's purchased, is there a

09:36:44  14  requirement that the horse be registered?

09:36:48  15  A.   Not in my understand.

09:36:50  16  Q.   So -- I'm sorry.  Did you say no?

09:36:53  17  A.   Not in my understand.  I don't know exactly the rules for

09:36:56  18  the quarter horse.

09:36:57  19  Q.   Okay.  But I suppose if you're going to race a horse, if

09:37:03  20  that's your intent that it may be a race horse, then you may want

09:37:07  21  to register the horse.  Would that be correct?

09:37:12  22  A.   Yeah.  To compete in an official race, got to be with

09:37:16  23  registration paper.

09:37:17  24  Q.   You go to a horse auction and purchase a number of horses

09:37:23  25  and not have to register all of them; is that correct?

| | | |
|---|---|---|
| 09:37:27 | 1 | A.   It's not correct.  If you go to a official auction, you got |
| 09:37:31 | 2 | to have the registration paper. |
| 09:37:32 | 3 | Q.   Okay.  Maybe I'm misusing the word.  Register with the |
| 09:37:38 | 4 | American Quarter Horse Association, do you have to register them |
| 09:37:41 | 5 | if you buy a horse at an auction? |
| 09:37:44 | 6 | A.   No.  You receive the registration paper if you can keep it |
| 09:37:47 | 7 | that way.  You don't have to register again. |
| 09:37:50 | 8 | Q.   But if you're going to -- if you're planning to possibly |
| 09:37:55 | 9 | race that horse that you bought at an auction and you're going to |
| 09:38:03 | 10 | race them a year or two later -- because you buy a yearling, it |
| 09:38:10 | 11 | would be wise to go ahead and register them in the quarter horse |
| 09:38:15 | 12 | association so that you could race him later? |
| 09:38:17 | 13 | A.   That's correct. |
| 09:38:18 | 14 | Q.   Okay.  Did you say your father also raced horses? |
| 09:38:27 | 15 | A.   No, sir.  I didn't. |
| 09:38:28 | 16 | Q.   Okay.  But Ramiro Villarreal's father, did he -- |
| 09:38:32 | 17 | A.   That's correct. |
| 09:38:33 | 18 | Q.   So at least two generations of the Villarreals were involved |
| 09:38:39 | 19 | in the -- in racing some horses.  Would that be a fair statement? |
| 09:38:44 | 20 | A.   No.  Ramiro Villarreal started and after that, his father |
| 09:38:48 | 21 | liked horses. |
| 09:38:48 | 22 | Q.   Okay.  So younger generation, went back in time? |
| 09:38:53 | 23 | A.   That's correct. |
| 09:38:56 | 24 | Q.   But you've learned -- I suppose you've learned enough about |
| 09:38:59 | 25 | the horse-racing industry -- quarter horse-racing industry that |

| | | |
|---|---|---|
| 09:39:06 | 1 | you may -- you don't know when you buy a horse if he's going to |
| 09:39:11 | 2 | be one that is -- turns out to be valuable? |
| 09:39:14 | 3 | A.   You never know when you buy a horse. |
| 09:39:17 | 4 | Q.   So I take it from that that you might buy several horses at |
| 09:39:22 | 5 | an auction, register them, the quarter horse association, and |
| 09:39:32 | 6 | then, somewhere along the way, determine he's got a problem with |
| 09:39:36 | 7 | his hip or doesn't have -- wasn't born with speed, something like |
| 09:39:42 | 8 | that.   And so, you're not really interested in keeping that horse |
| 09:39:46 | 9 | as a race horse on down the line? |
| 09:39:49 | 10 | A.   That's correct. |
| 09:39:52 | 11 | Q.   But during that period, that year that you try to find them, |
| 09:39:58 | 12 | maybe six months when you're trying to determine whether or not |
| 09:40:00 | 13 | you're going to make -- invest money to make a race horse out of |
| 09:40:04 | 14 | that horse, during that period of time, it would be in your |
| 09:40:13 | 15 | corporation's name and you determine somewhere along the way or |
| 09:40:18 | 16 | Ramiro Villarreal determined along the way, this is one horse |
| 09:40:23 | 17 | we're not going to keep paying vet bills on, we're not going to |
| 09:40:27 | 18 | spend all this money on -- even if they have a toothache, you've |
| 09:40:30 | 19 | got to fix a race horse, too, right?  We're not going to spend |
| 09:40:34 | 20 | all that money on those horses, on these particular horses, we're |
| 09:40:37 | 21 | going to try to sell a horse. |
| 09:40:39 | 22 | A.   Can be. |
| 09:40:40 | 23 | Q.   Okay.  I want to make sure I had that understanding.  Thank |
| 09:40:51 | 24 | you very much. |
| 09:40:51 | 25 | A.   You're welcome.  Anytime. |

| | | |
|---|---|---|
| 09:41:01 | 1 | Q.   Oh, I'm sorry.  Let me ask one more question.  May I? |
| 09:41:08 | 2 | You mentioned Carlos Nayen. |
| 09:41:13 | 3 | A.   Yes, sir. |
| 09:41:13 | 4 | Q.   Okay.  Did you know him to be someone that was -- had some |
| 09:41:20 | 5 | kind of expertise of the bloodline of race horses? |
| 09:41:28 | 6 | A.   He's expertise in that. |
| 09:41:29 | 7 | Q.   He's what? |
| 09:41:30 | 8 | A.   Expertise.  Yeah.  And he's an order buyer.  An order buyer |
| 09:41:36 | 9 | of horses. |
| 09:41:36 | 10 | Q.   And a buyer.  He's expertise -- |
| 09:41:38 | 11 | A.   Buying an order. |
| 09:41:40 | 12 | Q.   Okay.  I'm sorry.  I'm not hearing. |
| 09:41:43 | 13 | A.   When you buy horses from someone else. |
| 09:41:45 | 14 | Q.   Yeah.  Okay.  So he buys? |
| 09:41:48 | 15 | A.   Buy and sells. |
| 09:41:49 | 16 | Q.   Buys and sells? |
| 09:41:50 | 17 | A.   That's correct. |
| 09:41:51 | 18 | Q.   And sometimes he'll buy and sell quickly.  Sometimes he'll |
| 09:41:55 | 19 | buy until he finds a good buyer and seller? |
| 09:41:58 | 20 | A.   That's correct. |
| 09:42:01 | 21 | Q.   And has he done that for you? |
| 09:42:03 | 22 | A.   For me? |
| 09:42:03 | 23 | Q.   Yes. |
| 09:42:04 | 24 | A.   No.  He didn't. |
| 09:42:05 | 25 | Q.   Because you have some expertise yourself and you have your |

| | | |
|---|---|---|
| 09:42:11 | 1 | own trainer? |
| 09:42:12 | 2 | A.    That's correct. |
| 09:42:15 | 3 | Q.    Are there times that horses, if they're going to be raced in |
| 09:42:20 | 4 | a different geographical area than Mexico, that you would keep |
| 09:42:25 | 5 | those race horses while you're preparing them to compete in the |
| 09:42:33 | 6 | same geographical area where they're going to race? |
| 09:42:36 | 7 | A.    Well, sometime you move it from a long ways.  Sometimes you |
| 09:42:39 | 8 | stay close to where they're going to compete.  It all depends. |
| 09:42:43 | 9 | Q.    Is there some theory or some horse managers or trainers that |
| 09:42:49 | 10 | it's best to keep them or at least have them in the environment |
| 09:42:53 | 11 | where they're going to be racing -- |
| 09:42:54 | 12 | A.    That's correct. |
| 09:42:55 | 13 | Q.    -- to do their best?  So if you're going to race a horse in |
| 09:43:03 | 14 | Texas, you might want to keep the horse in Texas or train the |
| 09:43:06 | 15 | horse in Texas? |
| 09:43:07 | 16 | A.    It all depends on point of view.  Some of the horses are |
| 09:43:12 | 17 | very -- are climatized much better when they're close to the race |
| 09:43:15 | 18 | there.  And some, they are climatized much better long way for |
| 09:43:19 | 19 | the horse there.  So depend.  Every horse is individual. |
| 09:43:23 | 20 | Q.    By the way, Mr. Colorado's son accompanied you to a cattle |
| 09:43:29 | 21 | auction, Jose Antonio.  How old was he when he went with you? |
| 09:43:36 | 22 | A.    The young guy? |
| 09:43:36 | 23 | Q.    Yes. |
| 09:43:37 | 24 | A.    He's a young guy.  I don't know how old is he.  As a kid. |
| 09:43:42 | 25 | Q.    Pass the witness. |

<pre>
09:43:43   1                    CROSS-EXAMINATION
09:43:43   2   BY MR. WOMACK:
09:43:46   3   Q.   Good morning, Mr. Guerra.
09:43:47   4   A.   Good morning, sir.
09:43:47   5   Q.   I'm Guy Womack.  I live in Houston.  I have an office down
09:43:52   6   in McAllen.  I go to Roma frequently.  I have a handful of
09:43:59   7   questions.
09:44:00   8             First of all, I want to talk about this push-to-talk
09:44:01   9   phone that you were asked about.  You have talked to people on
09:44:05  10   push-to-talk phones.
09:44:06  11   A.   Say again, please, slowly.
09:44:08  12   Q.   A push-to-talk phone where you're calling a radio?
09:44:10  13   A.   Yes.
09:44:11  14   Q.   It's like a Nextel phone?
09:44:12  15   A.   That's correct.  Nextel.
09:44:13  16   Q.   And you use those regularly, don't you?
09:44:16  17   A.   Yeah.
09:44:18  18   Q.   One reason would be because you're on the border or you're
09:44:21  19   near the border on the Rio Grande River, between Texas and
09:44:25  20   Mexico, you've noticed that with a cellphone there's a lot of
09:44:28  21   interference near the river, isn't there?
09:44:30  22   A.   Sometimes.
09:44:30  23   Q.   You might pick up a phone to make a call to another city, or
09:44:34  24   even in Roma, across town and get a Mexican phone company?
09:44:38  25   A.   Sometimes happen.
</pre>

| | | |
|---|---|---|
| 09:44:39 | 1 | Q.   Yeah.  And with the push-to-talk phone you don't have that |
| 09:44:42 | 2 | problem, do you? |
| 09:44:43 | 3 | A.   Well, sometimes they're busy lines, too. |
| 09:44:46 | 4 | Q.   Do they seem to be a little bit more reliable than a |
| 09:44:49 | 5 | cellphone? |
| 09:44:49 | 6 | A.   Not necessarily. |
| 09:44:50 | 7 | Q.   Okay.  Do they enable you to make international calls |
| 09:44:55 | 8 | quickly and cheaply? |
| 09:44:56 | 9 | A.   One of the reason, yes. |
| 09:44:57 | 10 | Q.   Okay.  And the point I'm getting at, you use a Nextel |
| 09:45:02 | 11 | push-to-talk phone, but you're not a drug trafficker, are you? |
| 09:45:04 | 12 | A.   No.  I'm not. |
| 09:45:05 | 13 | Q.   Okay.  And you know that many legitimate businessmen like |
| 09:45:09 | 14 | yourself, especially down in the valley, routinely use Nextel |
| 09:45:13 | 15 | phones, don't they? |
| 09:45:13 | 16 | A.   That's correct. |
| 09:45:14 | 17 | Q.   These first three horses that Mr. Villarreal brought into |
| 09:45:31 | 18 | your -- I guess brought into your company? |
| 09:45:32 | 19 | A.   Yes, sir. |
| 09:45:33 | 20 | Q.   Fly Corona, Snowy Cartel and Dallas Cartel B, that was the |
| 09:45:43 | 21 | original names of those horses, weren't they? |
| 09:45:44 | 22 | A.   They were original names.  Yes, sir. |
| 09:45:46 | 23 | Q.   And those names come from the sire and the dam that produced |
| 09:45:52 | 24 | those horses? |
| 09:45:54 | 25 | A.   Well, when you're the breeder, you pick the names, but |

| | | |
|---|---|---|
| 09:45:56 | 1 | usually, the breeder use something relative with a papa for |
| 09:46:01 | 2 | someone else can see the bloodline.  But yes, for the name. |
| 09:46:05 | 3 | Q.    And for the benefit of the jury, one reason you would use |
| 09:46:08 | 4 | those combined names is so that potential buyers would say, oh, |
| 09:46:12 | 5 | that's the offspring or the foal of these two great horses? |
| 09:46:16 | 6 | A.    That's correct. |
| 09:46:17 | 7 | Q.    Which means that you would expect that that foal would grow |
| 09:46:22 | 8 | up to be a great horse? |
| 09:46:24 | 9 | A.    It's a lot of advertising. |
| 09:46:33 | 10 | Q.    Insurance costs on race horses, that's a big expense, isn't |
| 09:46:38 | 11 | it? |
| 09:46:38 | 12 | A.    Yes, sir. |
| 09:46:40 | 13 | Q.    I mean, it could be thousands of dollars to have insurance |
| 09:46:43 | 14 | on a race horse? |
| 09:46:45 | 15 | A.    Yeah. |
| 09:46:47 | 16 | Q.    Veterinarian bills, that's a legitimate expense for race |
| 09:46:51 | 17 | horses, isn't it? |
| 09:46:52 | 18 | A.    I would say that be the most expense in this deal. |
| 09:46:56 | 19 | Q.    And paying for trainers and stables, these are all |
| 09:47:00 | 20 | legitimate expenses? |
| 09:47:01 | 21 | A.    Yes, sir. |
| 09:47:01 | 22 | Q.    That's Fernando Garcia, right? |
| 09:47:18 | 23 | A.    Yes, sir.  I know him. |
| 09:47:19 | 24 | Q.    That's the one that you know, you've known for years.  You |
| 09:47:22 | 25 | can have a sit, Fernando.  Thank you. |

| | | |
|---|---|---|
| 09:47:24 | 1 | You know that he's actually studying horse racing at |
| 09:47:28 | 2 | the University of Arizona. |
| 09:47:29 | 3 | A.   I don't know.  I didn't know. |
| 09:47:31 | 4 | Q.   You know that he was going to college about horse racing? |
| 09:47:33 | 5 | A.   I didn't know. |
| 09:47:34 | 6 | Q.   Don't you recall discussing with him that he's actually in |
| 09:47:38 | 7 | school -- maybe you don't know -- at the university? |
| 09:47:39 | 8 | A.   I don't remember. |
| 09:47:40 | 9 | Q.   Okay.  But you know that he has gone to a lot of auctions. |
| 09:47:47 | 10 | You've seen him at auctions? |
| 09:47:48 | 11 | A.   That's correct. |
| 09:47:49 | 12 | Q.   And you know that he buys horses but, also, he helps other |
| 09:47:53 | 13 | people pick horses to buy? |
| 09:47:54 | 14 | A.   That's correct.  He's an order buyer.  We call order buyers |
| 09:47:57 | 15 | the people who do that job. |
| 09:47:59 | 16 | Q.   Sorry, what do you call him? |
| 09:48:00 | 17 | A.   Order buyer. |
| 09:48:00 | 18 | Q.   Order buyers.  An order buyer is someone, then, who would go |
| 09:48:05 | 19 | to an auction and if someone's wanting to buy horses, they could |
| 09:48:09 | 20 | hire him, get him to assist them in picking out the horses? |
| 09:48:12 | 21 | A.   That's correct. |
| 09:48:12 | 22 | Q.   And talking about racing quarter horses, what does the term |
| 09:48:19 | 23 | "runner" mean?  Runner.  A horse is a runner. |
| 09:48:24 | 24 | A.   Well, supposed to run enough to win. |
| 09:48:28 | 25 | Q.   So if a horse is a runner -- if a quarter horse is a runner, |

| | | |
|---|---|---|
| 09:48:31 | 1 | that means that should be a fast horse? |
| 09:48:34 | 2 | A.   That's correct. |
| 09:48:34 | 3 | Q.   And you know that Fernando Garcia has gone to these auctions |
| 09:48:39 | 4 | and bought a lot of -- or picked out a lot of runners? |
| 09:48:42 | 5 | A.   He's a good picker. |
| 09:48:43 | 6 | Q.   And, in fact, you know that he's picked out several runners |
| 09:48:46 | 7 | that won futurities? |
| 09:48:49 | 8 | A.   That's correct.  I know. |
| 09:48:50 | 9 | Q.   And you know that part of -- apparently part of his success |
| 09:49:03 | 10 | in picking runners that win is you know he -- you've discussed |
| 09:49:08 | 11 | with him that he studies the bloodlines very carefully? |
| 09:49:10 | 12 | A.   Yeah.  He's expertise, too.  He's an expertise in race |
| 09:49:15 | 13 | horses. |
| 09:49:16 | 14 | Q.   He's an expert in that? |
| 09:49:16 | 15 | A.   Yes, sir. |
| 09:49:17 | 16 | Q.   Okay.  Thank you.  Sir, no further questions. |
| 09:49:23 | 17 | MR. ESPER:  Yes, your Honor. |
| 09:49:24 | 18 | CROSS-EXAMINATION |
| 09:49:24 | 19 | BY MR. ESPER: |
| 09:49:26 | 20 | Q.   Mr. Guerra, I believe you testified that you yourself own |
| 09:49:32 | 21 | some horses, correct? |
| 09:49:33 | 22 | A.   That's correct, sir. |
| 09:49:35 | 23 | Q.   And those horses, some of them you own, you train them to -- |
| 09:49:41 | 24 | or have them trained to race in events, correct? |
| 09:49:44 | 25 | A.   That's correct. |

| | | |
|---|---|---|
| 09:49:45 | 1 | Q.   And I believe you testified you had your own trainer who |
| 09:49:50 | 2 | trains your horses? |
| 09:49:51 | 3 | A.   Yes.  Since 15, 20 years ago. |
| 09:49:54 | 4 | Q.   Okay.  And his name is? |
| 09:49:55 | 5 | A.   Bobby Martinez. |
| 09:49:56 | 6 | Q.   Okay.  And Bobby Martinez, you, of course, have to pay him a |
| 09:50:03 | 7 | fee, do you not, to train your horses? |
| 09:50:04 | 8 | A.   That's correct, sir.  Every other month. |
| 09:50:07 | 9 | Q.   Every other month, you pay him.  Okay.  But he bills you on |
| 09:50:10 | 10 | a monthly basis, does he not?  Or does he bill you every other |
| 09:50:13 | 11 | month? |
| 09:50:13 | 12 | A.   Every other month. |
| 09:50:14 | 13 | Q.   Okay.  And more or less, what does he bill you to -- for |
| 09:50:19 | 14 | example, you have one horse with him? |
| 09:50:21 | 15 | A.   Okay. |
| 09:50:22 | 16 | Q.   What is the average bill that you have to pay, not including |
| 09:50:28 | 17 | veterinarian bills, the additional charges? |
| 09:50:30 | 18 | A.   750 bucks. |
| 09:50:33 | 19 | Q.   $750? |
| 09:50:34 | 20 | A.   Per month. |
| 09:50:35 | 21 | Q.   Per month? |
| 09:50:35 | 22 | A.   Yes, sir. |
| 09:50:36 | 23 | Q.   That's what Mr. Martinez bills you per horse? |
| 09:50:38 | 24 | A.   Yes. |
| 09:50:39 | 25 | Q.   So if you've got -- let's say you've got ten horses with him |

| | | |
|---|---|---|
| 09:50:45 | 1 | that he's training, that's 7,000, 7,500 bucks a month? |
| 09:50:50 | 2 | A.   That's correct. |
| 09:50:51 | 3 | Q.   Okay.  It gets expensive, does it not? |
| 09:50:54 | 4 | A.   It is a lot. |
| 09:50:54 | 5 | Q.   And that $750 a month covers what, sir? |
| 09:50:58 | 6 | A.   All the feed and take care of it.  No go to the race track, |
| 09:51:04 | 7 | no vet, no change shoes, no vitamins. |
| 09:51:08 | 8 | Q.   Okay.  It takes care of his training fees and -- |
| 09:51:13 | 9 | A.   Just feed him and walking.  That's it. |
| 09:51:15 | 10 | Q.   Pardon me? |
| 09:51:15 | 11 | A.   Just feeding and walking. |
| 09:51:17 | 12 | Q.   Okay.  Feeding, walking and training the horse, correct? |
| 09:51:19 | 13 | A.   Yeah. |
| 09:51:20 | 14 | Q.   Okay.  It doesn't include vitamins.  That can get expensive, |
| 09:51:25 | 15 | correct? |
| 09:51:25 | 16 | A.   Yes. |
| 09:51:26 | 17 | Q.   It doesn't include veterinarian bills? |
| 09:51:29 | 18 | A.   That's correct. |
| 09:51:29 | 19 | Q.   That could get expensive, correct? |
| 09:51:31 | 20 | A.   Yes. |
| 09:51:31 | 21 | Q.   Especially if the horse has an injury? |
| 09:51:32 | 22 | A.   Yeah. |
| 09:51:33 | 23 | Q.   Okay.  It doesn't include shoeing the horse? |
| 09:51:36 | 24 | A.   Yeah. |
| 09:51:36 | 25 | Q.   It doesn't include if you enter the horse in a race? |

| | | |
|---|---|---|
| 09:51:42 | 1 | A.   The entries. |
| 09:51:42 | 2 | Q.   The entry fees? |
| 09:51:43 | 3 | A.   That's correct. |
| 09:51:44 | 4 | Q.   Now, if you want to enter one of your horses in a race, do |
| 09:51:49 | 5 | you pay the -- put up the money in the horsemen's account or does |
| 09:51:53 | 6 | he? |
| 09:51:54 | 7 | A.   No.  I pay most of the time. |
| 09:51:56 | 8 | Q.   Okay. |
| 09:51:56 | 9 | A.   I send the money directly to him. |
| 09:51:59 | 10 | Q.   And who makes the decision whether to run a horse in a race, |
| 09:52:02 | 11 | you or him or both?  You both talk together? |
| 09:52:04 | 12 | A.   Both together. |
| 09:52:05 | 13 | Q.   Okay.  Now, you say you do not know "Chevo" Huitron? |
| 09:52:11 | 14 | A.   I don't know him. |
| 09:52:11 | 15 | Q.   Okay.  Do you know Paul Jones? |
| 09:52:14 | 16 | A.   I don't know him personally.  I just hear about it.  He's a |
| 09:52:17 | 17 | trainer from California. |
| 09:52:18 | 18 | Q.   Okay.  And you heard about him through the horse business, |
| 09:52:22 | 19 | correct? |
| 09:52:23 | 20 | A.   Through Ramiro. |
| 09:52:25 | 21 | Q.   Through Ramiro? |
| 09:52:25 | 22 | A.   That's correct. |
| 09:52:26 | 23 | Q.   So Ramiro told you this guy is a horse trainer, Paul Jones? |
| 09:52:30 | 24 | A.   Yes, sir. |
| 09:52:31 | 25 | Q.   Did Ramiro ever tell you Mr. "Chevo" Huitron is a horse |

| | | |
|---|---|---|
| 09:52:34 | 1 | trainer? |
| 09:52:35 | 2 | A.    I don't remember. |
| 09:52:36 | 3 | Q.    So what you're saying is you just don't know whether he told |
| 09:52:39 | 4 | you that or not? |
| 09:52:40 | 5 | A.    I don't remember about Mr. Huitron. |
| 09:52:43 | 6 | Q.    Okay.  Mr. Villarreal could have told you that, you just |
| 09:52:46 | 7 | don't remember? |
| 09:52:47 | 8 | A.    That's correct. |
| 09:52:48 | 9 | Q.    Okay.  Now, Ramiro Villarreal, you've indicated there were |
| 09:52:53 | 10 | some people here like Mr. Nayen, Mr. Fernando Garcia who had a |
| 09:52:58 | 11 | reputation for expertise in the horse business, correct? |
| 09:53:03 | 12 | A.    That's correct, sir. |
| 09:53:04 | 13 | Q.    Okay.  And Mr. Ramiro Villarreal had an expertise? |
| 09:53:08 | 14 | A.    That's correct. |
| 09:53:09 | 15 | Q.    In the horse business? |
| 09:53:10 | 16 | A.    Too. |
| 09:53:11 | 17 | Q.    Correct? |
| 09:53:11 | 18 | A.    Yes, sir. |
| 09:53:12 | 19 | Q.    Now, Mr. Ramiro Villarreal was your friend, I believe you |
| 09:53:15 | 20 | testified, for well over 20 years? |
| 09:53:16 | 21 | A.    More than 20 years probably. |
| 09:53:18 | 22 | Q.    Okay.  And basically, there came a time in 2009 or 2010 when |
| 09:53:26 | 23 | he came to you and said, Fernando, could you help me out here |
| 09:53:31 | 24 | with this -- these horses? |
| 09:53:32 | 25 | A.    That's correct. |

| | | |
|---|---|---|
| 09:53:33 | 1 | Q.   Okay.  And because he was your friend and because he had a |
| 09:53:37 | 2 | good reputation, you trusted him, correct? |
| 09:53:40 | 3 | A.   I did. |
| 09:53:40 | 4 | Q.   Okay.  And as it turns out, that trust was kind of taken |
| 09:53:49 | 5 | advantage of, was it not? |
| 09:53:52 | 6 | A.   Yes, sir. |
| 09:53:53 | 7 | Q.   Okay.  Now, he asked you to open a particular bank account |
| 09:54:01 | 8 | in the United States.  He asked you to open -- that's correct, |
| 09:54:05 | 9 | number one? |
| 09:54:05 | 10 | A.   That's correct. |
| 09:54:06 | 11 | Q.   He asked you to form an LLC for these particular horses, |
| 09:54:11 | 12 | correct? |
| 09:54:11 | 13 | A.   Yes, sir. |
| 09:54:12 | 14 | Q.   And all of that was going to be put under your name? |
| 09:54:15 | 15 | A.   My company's name. |
| 09:54:17 | 16 | Q.   Yes.  And you trusted Ramiro Villarreal when he represented |
| 09:54:20 | 17 | to you that these are my horses, but I don't have a taxpayer ID? |
| 09:54:29 | 18 | A.   That's correct. |
| 09:54:30 | 19 | Q.   Okay.  And he first told you there's only three horses, and |
| 09:54:34 | 20 | then, all of a sudden, you got 20, 30, 40 horses that are in your |
| 09:54:38 | 21 | name? |
| 09:54:38 | 22 | A.   I don't know how many, but he start with three.  He told me |
| 09:54:41 | 23 | that the one he want to use. |
| 09:54:42 | 24 | Q.   Okay.  All of a sudden, there were a bunch of them, correct? |
| 09:54:45 | 25 | A.   Yes.  Correct. |

```
09:54:46   1   Q.   Now, was it before that time or after that time -- and if
09:54:51   2   you don't remember, simply say so -- that he took you to meet
09:54:55   3   Miguel Trevino?
09:54:56   4   A.   I don't remember.
09:54:57   5   Q.   In your testimony, you said three or four years ago?
09:55:00   6   A.   Yes.
09:55:01   7   Q.   Is that three or four years ago from now, from this date?
09:55:04   8   A.   Yeah.
09:55:04   9   Q.   Okay.  So roughly we're talking 2008, 2009?
09:55:09  10   A.   Okay.  That's correct.
09:55:10  11   Q.   Okay.  And he took you to meet Mr. Miguel Trevino in
09:55:13  12   Monterrey, Mexico?
09:55:14  13   A.   Yes, sir.
09:55:15  14   Q.   At some stables, correct?
09:55:17  15   A.   A stable I don't know who belong to.
09:55:19  16   Q.   Some stables?
09:55:20  17   A.   Some stables.
09:55:21  18   Q.   Okay.  And you all had a discussion about breeding a horse's
09:55:26  19   bloodlines?
09:55:26  20   A.   Yes.  He asked me some questions about what kind of
09:55:29  21   bloodlines mix well with the others for some crossbreeding.
09:55:32  22   Q.   Okay.  Did Ramiro Villarreal ever tell you that the horses
09:55:36  23   that were in his name really belonged to Miguel Trevino?
09:55:39  24   A.   Never, sir.
09:55:40  25   Q.   Okay.  Did Miguel Trevino ever tell you, you know, I own all
```

| | | |
|---|---|---|
| 09:55:46 | 1 | these horses that -- |
| 09:55:47 | 2 | A.    Never, sir. |
| 09:55:47 | 3 | Q.    That's the only conversation that you had with him, correct? |
| 09:55:51 | 4 | A.    Two times.  I saw him two times. |
| 09:55:53 | 5 | Q.    You met him a second time? |
| 09:55:55 | 6 | A.    Yes, sir. |
| 09:55:55 | 7 | Q.    And where was that? |
| 09:55:56 | 8 | A.    It was another kind of short conversation with Ramiro. |
| 09:55:59 | 9 | Q.    Okay.  You were with Ramiro again? |
| 09:56:01 | 10 | A.    Yes, sir. |
| 09:56:01 | 11 | Q.    And was the conversation or the encounter, was it a brief |
| 09:56:07 | 12 | encounter? |
| 09:56:09 | 13 | A.    What do you mean with brief? |
| 09:56:10 | 14 | Q.    Was it -- did y'all sit and talk for 20, 30 minutes or for |
| 09:56:13 | 15 | hours? |
| 09:56:14 | 16 | A.    No, no.  Less than 30 minutes. |
| 09:56:15 | 17 | Q.    Huh? |
| 09:56:15 | 18 | A.    Less than 30 minutes. |
| 09:56:17 | 19 | Q.    Okay.  Now, you say that you -- you say you had this Nextel |
| 09:56:29 | 20 | telephone? |
| 09:56:29 | 21 | A.    Yes, sir. |
| 09:56:29 | 22 | Q.    Did somebody give you that phone? |
| 09:56:31 | 23 | A.    No.  It was my own. |
| 09:56:32 | 24 | Q.    It was your own? |
| 09:56:33 | 25 | A.    Yes, sir. |

| | | |
|---|---|---|
| 09:56:33 | 1 | Q.   Okay.  And, all of a sudden now, at some point, you start |
| 09:56:39 | 2 | getting -- who tells you that someone's going to be calling you |
| 09:56:43 | 3 | whose name is Mi Rey? |
| 09:56:45 | 4 | A.   Nobody tell me. |
| 09:56:46 | 5 | Q.   Somebody calls you? |
| 09:56:47 | 6 | A.   Call me and say, soy Mi Rey. |
| 09:56:51 | 7 | Q.   Okay.  Were you surprised when this person calls you and |
| 09:56:54 | 8 | says, soy Mi Rey? |
| 09:56:56 | 9 | A.   Yes. |
| 09:56:56 | 10 | Q.   Did you ask him who he is? |
| 09:56:58 | 11 | A.   No.  I didn't. |
| 09:56:59 | 12 | Q.   Did that person tell you, I'm the one who's going to be |
| 09:57:01 | 13 | telling you who to pay, how much money to spend, the trainers, |
| 09:57:07 | 14 | vets, et cetera? |
| 09:57:08 | 15 | A.   He did. |
| 09:57:09 | 16 | Q.   Okay.  Did you ever find out who that person was? |
| 09:57:10 | 17 | A.   No. |
| 09:57:11 | 18 | Q.   Was Ramiro Villarreal still alive at that time? |
| 09:57:18 | 19 | A.   As soon as Ramiro Villarreal died, he start to. |
| 09:57:21 | 20 | Q.   That's when this guy started calling you? |
| 09:57:23 | 21 | A.   Yes. |
| 09:57:23 | 22 | Q.   Okay.  Up to that point, Ramiro Villarreal is telling you |
| 09:57:26 | 23 | how much to pay for particular trainers, et cetera? |
| 09:57:30 | 24 | A.   Yes. |
| 09:57:30 | 25 | Q.   Okay.  And then, after Ramiro dies, which is approximately |

09:57:35   1   in March of 2011, correct?

09:57:37   2   A.   More or less, yeah.  I don't remember February or March but

09:57:41   3   more than two years for sure.

09:57:42   4   Q.   All of a sudden, you start getting a call from this person

09:57:45   5   who identifies himself as soy Mi Rey?

09:57:49   6   A.   Yes, sir.

09:57:50   7   Q.   And that basically means I'm the king or your king?

09:57:55   8   A.   Me king.

09:57:56   9   Q.   Yeah.  Okay.  And this person now starts telling you how to

09:58:03  10   distribute moneys for the payment?

09:58:06  11   A.   The profit from Ramiro's horses.  Yes.

09:58:09  12   Q.   Ramiro's horses?  And at this time you're finding out that

09:58:13  13   there's all kinds of horses in his name, correct?

09:58:16  14   A.   Well, I find out before Ramiro was dead.

09:58:18  15   Q.   Okay.  Before he died?

09:58:20  16   A.   That's correct.

09:58:21  17   Q.   Now, I believe you may have already answered this, but

09:58:32  18   somebody -- the Nextel telephone you have, apparently somebody

09:58:37  19   gave this person who's identified himself as Mi Rey?

09:58:42  20   A.   Yes, sir.

09:58:42  21   Q.   Your number?

09:58:43  22   A.   That's correct.

09:58:44  23   Q.   Besides Ramiro Villarreal, were there other people that had

09:58:48  24   your phone number?

09:58:50  25   A.   Many people get my phone number.

| | | |
|---|---|---|
| 09:58:51 | 1 | Q.   Sure.  May I have just a moment, your Honor? |
| 09:59:04 | 2 | THE COURT:  Yes. |
| 09:59:21 | 3 | Q.   (BY MR. ESPER) Mr. Guerra, how many -- in the last two |
| 09:59:23 | 4 | years, how many horses do you actually own? |
| 09:59:26 | 5 | A.   In my own? |
| 09:59:29 | 6 | Q.   Yes. |
| 09:59:30 | 7 | A.   I have three brood mares that get a baby every other year |
| 09:59:35 | 8 | and I bought a -- probably around six horses in the last two |
| 09:59:39 | 9 | years and sold five of them and keep one of them. |
| 09:59:43 | 10 | Q.   Okay.  So you only have one horse that's being trained for |
| 09:59:47 | 11 | racing? |
| 09:59:47 | 12 | A.   Right now, yes. |
| 09:59:48 | 13 | Q.   Just one? |
| 09:59:48 | 14 | A.   Yes. |
| 09:59:49 | 15 | Q.   Okay.  Are their fees the same whether they're being trained |
| 09:59:53 | 16 | for racing or they're not? |
| 09:59:55 | 17 | A.   Well, different. |
| 09:59:57 | 18 | Q.   There's a difference? |
| 09:59:57 | 19 | A.   They're spending a little bit higher than the other one. |
| 10:00:01 | 20 | Q.   Okay.  So, for example, if you're paying Mr. Martinez to |
| 10:00:04 | 21 | train one of your horses for the purposes of entering in race |
| 10:00:09 | 22 | track events, those fees are higher, are they not? |
| 10:00:12 | 23 | A.   Yes, sir. |
| 10:00:13 | 24 | Q.   As opposed to just -- |
| 10:00:15 | 25 | A.   For brood mare. |

| | | |
|---|---|---|
| 10:00:18 | 1 | Q.   Yes.   Different fee? |
| 10:00:19 | 2 | A.   Different fee, different kind of work. |
| 10:00:22 | 3 | Q.   When you said $750 per horse, is that for the training a |
| 10:00:27 | 4 | horse to be -- for races or just -- |
| 10:00:29 | 5 | A.   Yes.   For races. |
| 10:00:30 | 6 | Q.   For races? |
| 10:00:31 | 7 | A.   Plus vet, plus shoes, plus every other expense. |
| 10:00:34 | 8 | Q.   That $750 a month can turn into about $2,000 a month, can't |
| 10:00:40 | 9 | it? |
| 10:00:40 | 10 | A.   Sometimes more. |
| 10:00:42 | 11 | Q.   Sometimes more? |
| 10:00:42 | 12 | A.   Yes. |
| 10:00:43 | 13 | Q.   And basically, if you've got -- again, you only had one. |
| 10:00:46 | 14 | But if you've got ten, it can, all of a sudden, turn into a 10, |
| 10:00:49 | 15 | $20,000 a month? |
| 10:00:50 | 16 | A.   Yes, sir.   A lot of money. |
| 10:00:51 | 17 | Q.   A lot of money? |
| 10:00:53 | 18 | A.   Okay. |
| 10:00:59 | 19 | Q.   Do you keep your horse here in the United States or in |
| 10:01:01 | 20 | Mexico? |
| 10:01:01 | 21 | A.   Some here, some in Mexico. |
| 10:01:03 | 22 | Q.   Okay.   I believe that's all I have. |
| 10:01:10 | 23 |         MR. MAYR:   Your Honor, if I may have a moment, I'd like |
| 10:01:12 | 24 | to gather some exhibits from the government. |
| 10:02:01 | 25 | |

CROSS-EXAMINATION

BY MR. MAYR:

Q.   Good morning, Mr. Guerra.  My name is Brent Mayr.  I
represent Jesus Huitron.  I believe you testified that you've
never met him or know anything about him?

A.   Never met him in my life.

Q.   Okay.  Showing what's been admitted as 354.  Government's
Exhibit 354.  You can see this up there, Mr. Guerra, correct?

A.   Yeah.

Q.   Fast And Furious, LLC.  This checking account?

A.   That's correct.

Q.   Even though your name is on this account and you're
responsible for the account?

A.   Yes, sir.

Q.   Ramiro Villarreal, another person, is responsible for
directing you as to what transactions to conduct using that
account?

A.   That's correct.

Q.   These checks written on the Fast And Furious account are
signed in your name, correct?

A.   That was my check.  Yes.

Q.   Did you actually write out this check?

A.   Yeah.  That's my letter.  Yes.  I did.

Q.   And in addition to using the Fast And Furious account, you
also used your own personal banking account in the name of

| 10:03:37 | 1 | Hernando Guerra? |
| 10:03:38 | 2 | A.   That's correct. |
| 10:03:39 | 3 | Q.   Okay.  To make expenses on behalf of another person, Ramiro |
| 10:03:47 | 4 | Villarreal; is that right? |
| 10:03:47 | 5 | A.   That's correct. |
| 10:03:49 | 6 | Q.   You would make wire transfers on his behalf? |
| 10:03:56 | 7 | A.   Yeah. |
| 10:03:57 | 8 | Q.   Okay.  And you also wrote personal checks in your name to |
| 10:04:04 | 9 | expenses that he directed you to make? |
| 10:04:08 | 10 | A.   Si. |
| 10:04:10 | 11 | Q.   Now, I'm going to show you part of Government's Exhibit 231. |
| 10:04:44 | 12 | Do you recognize this document, Mr. Guerra? |
| 10:04:46 | 13 | A.   Yes, sir. |
| 10:04:46 | 14 | Q.   This is a statement of account that you had in your name |
| 10:04:50 | 15 | with Ruidoso Downs; is that right? |
| 10:04:52 | 16 | A.   That's right. |
| 10:04:53 | 17 | Q.   And even though it's in your name, another individual, |
| 10:05:00 | 18 | you're conducting transactions for that other individual in your |
| 10:05:03 | 19 | account, namely, Ramiro Villarreal? |
| 10:05:06 | 20 | A.   Yes, sir. |
| 10:05:06 | 21 | Q.   Okay.  So just so we're clear, you're the one who's writing |
| 10:05:13 | 22 | the checks, setting up the wire transfers, signing off on the |
| 10:05:17 | 23 | transfers; is that right? |
| 10:05:17 | 24 | A.   That's right. |
| 10:05:18 | 25 | Q.   Did you ever have anyone else do that for you?  In other |

| | | |
|---|---|---|
| 10:05:23 | 1 | words, you're tied up at work, you call your wife up and say, |
| 10:05:27 | 2 | ma'am -- say, honey, could you go make this wire transfer for me? |
| 10:05:31 | 3 | Or did you have someone else that you would direct to do these |
| 10:05:34 | 4 | transactions for you at any time? |
| 10:05:36 | 5 | A.   No. |
| 10:05:36 | 6 | Q.   You did them all? |
| 10:05:38 | 7 | A.   I did them all. |
| 10:05:39 | 8 | Q.   Okay.  So even though you were doing all of these things on |
| 10:05:46 | 9 | behalf of your friend, writing checks, signing the checks, |
| 10:05:50 | 10 | processing the wire transfers, you were committing no crime; is |
| 10:05:58 | 11 | that right? |
| 10:05:58 | 12 | A.   Yes, sir. |
| 10:06:00 | 13 | Q.   You don't believe that you were committing a crime? |
| 10:06:02 | 14 | A.   Not that I know. |
| 10:06:04 | 15 | Q.   In your mind, you were doing nothing illegal? |
| 10:06:07 | 16 | A.   Yeah.  I was doing for my friend. |
| 10:06:11 | 17 | Q.   And you never had any knowledge that Ramiro Villarreal was |
| 10:06:18 | 18 | doing anything illegal? |
| 10:06:18 | 19 | A.   No, sir. |
| 10:06:20 | 20 | Q.   Even though you met "Cuarenta," "40," Miguel Trevino, who |
| 10:06:26 | 21 | you knew was the leader of the Zetas? |
| 10:06:28 | 22 | A.   I didn't know at that time. |
| 10:06:29 | 23 | Q.   I apologize for that.  But even though you met him, you had |
| 10:06:34 | 24 | no idea that anything that Ramiro was doing that was illegal? |
| 10:06:38 | 25 | A.   No, because Ramiro has a lot of customers. |

| | | |
|---|---|---|
| 10:06:42 | 1 | Q.   And so, because you were processing thousands and thousands |
| 10:06:48 | 2 | of dollars of transactions, you never suspected that Ramiro was |
| 10:06:52 | 3 | doing anything illegal, right? |
| 10:06:54 | 4 | A.   Right. |
| 10:06:55 | 5 | Q.   You didn't believe that you were committing -- that you |
| 10:06:58 | 6 | yourself were doing anything illegal by processing these |
| 10:07:02 | 7 | transactions for him? |
| 10:07:04 | 8 | A.   I never know was illegal. |
| 10:07:07 | 9 | Q.   You just thought that you were helping a friend out? |
| 10:07:09 | 10 | A.   That's correct. |
| 10:07:10 | 11 | Q.   Someone who was like a brother to you, right? |
| 10:07:14 | 12 | A.   He was very good friend of mine. |
| 10:07:16 | 13 | Q.   Pass the witness, your Honor. |
| 10:07:29 | 14 |         THE COURT:  About how long on your redirect? |
| 10:07:31 | 15 |         MR. GARDNER:  Thirty, 40 questions, your Honor. |
| 10:07:34 | 16 |         THE COURT:  Members of the jury, I'll give you the |
| 10:07:36 | 17 | morning break.  You'll have enough time to use the facilities and |
| 10:07:40 | 18 | return.  Remember the instructions. |
| 10:07:43 | 19 |         (Jury not present.) |
| 10:08:25 | 20 |         THE COURT:  Counsel, I'm not going to comment on |
| 10:08:33 | 21 | anything, but I suggest you look at the jury.  The repetitive |
| 10:08:40 | 22 | questions that each of you are asking, over and over again, has |
| 10:08:45 | 23 | put them to sleep.  So if you have anything in your |
| 10:08:47 | 24 | cross-examination that you want to get out, you should get it out |
| 10:08:51 | 25 | without asking the same question that they've heard time and time |

| | | |
|---|---|---|
| 10:08:55 | 1 | again because right now, frankly, they're not listening to you. |
| 10:09:00 | 2 | Fifteen minutes. |
| 10:26:46 | 3 | (Recess.) |
| 10:28:19 | 4 | (Jury present.) |
| 10:28:27 | 5 | THE COURT:  Mr. Guerra, you understand you're still |
| 10:28:30 | 6 | under oath, sir? |
| 10:28:31 | 7 | THE WITNESS:  Yes, sir. |
| 10:28:33 | 8 | THE COURT:  You may proceed. |
| 10:28:34 | 9 | RE-DIRECT EXAMINATION |
| 10:28:34 | 10 | BY MR. GARDNER: |
| 10:28:35 | 11 | Q.   Thank you, your Honor. |
| 10:28:36 | 12 | Mr. Guerra, what is the name of your attorney? |
| 10:28:39 | 13 | A.   Thomas Fagerberg. |
| 10:28:41 | 14 | Q.   And has he been giving you advice during this whole process? |
| 10:28:45 | 15 | A.   Yes, sir, he did. |
| 10:28:46 | 16 | Q.   Is he back here in the gallery today? |
| 10:28:47 | 17 | A.   Yes.  He's here. |
| 10:28:48 | 18 | Q.   Do you know a Mauricio Paez? |
| 10:28:52 | 19 | A.   Repeat the name, please. |
| 10:28:54 | 20 | Q.   Mauricio Paez? |
| 10:28:55 | 21 | A.   I don't remember the name. |
| 10:28:57 | 22 | Q.   Have you ever heard of a company called Basic Enterprises? |
| 10:29:00 | 23 | A.   No, sir.  Never. |
| 10:29:01 | 24 | Q.   Now, Mr. DeGeurin asked you a number of questions about Mr. |
| 10:29:06 | 25 | Colorado's cattle business.  Similar to the horse-racing |

| | | |
|---|---|---|
| 10:29:11 | 1 | business, are there prize bloodlines in the cattle business? |
| 10:29:16 | 2 | A.   Say it again, please. |
| 10:29:16 | 3 | Q.   Are there valuable bloodlines in the cattle business? |
| 10:29:19 | 4 | A.   Yes.  It is like horses. |
| 10:29:22 | 5 | Q.   So you track the sire and the dam? |
| 10:29:25 | 6 | A.   That's correct.  The bloodlines. |
| 10:29:26 | 7 | Q.   And do you know if Mr. Colorado also purchased valuable |
| 10:29:32 | 8 | bulls? |
| 10:29:34 | 9 | A.   He buy good cattle. |
| 10:29:37 | 10 | Q.   You also mentioned about the registration papers in response |
| 10:29:39 | 11 | to one of his questions.  When you were filling out the transfer |
| 10:29:43 | 12 | reports, was the buyer's name ever in these transfer reports? |
| 10:29:49 | 13 | A.   When you buy a horse, the money from the quarter horse have |
| 10:29:55 | 14 | different rulers.  If you buy a horse, if you can say it's from |
| 10:30:01 | 15 | Dwayne Thomas, they send you a registration paper of the name |
| 10:30:05 | 16 | Dwayne Thomas.  They're like open mind to get the registration |
| 10:30:10 | 17 | papers. |
| 10:30:15 | 18 | Q.   And did you ever have in the original registration papers |
| 10:30:19 | 19 | for any of the horses that you filled out a transfer? |
| 10:30:21 | 20 | A.   The one in my company, never.  Never have any reason. |
| 10:30:24 | 21 | Q.   You now, Mr. Womack asked you a number of questions about |
| 10:30:29 | 22 | Fernando Garcia.  Are you ever -- were you ever familiar with a |
| 10:30:32 | 23 | company owned by him called Garcia Bloodstock and Racing? |
| 10:30:35 | 24 | A.   I hear about it. |
| 10:30:37 | 25 | Q.   Did Mr. Fernando Garcia ever act as an agent for Fast And |

| | | |
|---|---|---|
| 10:30:42 | 1 | Furious? |
| 10:30:42 | 2 | A.   No, sir. |
| 10:30:43 | 3 | Q.   And I showed you Government's Exhibit 354 earlier.  This is |
| 10:31:02 | 4 | the Yearsley Bloodstock check, dated January 18, 2010.  Do you |
| 10:31:09 | 5 | know if that Yearsley Insurance payment went to pay insurance for |
| 10:31:13 | 6 | any of Fernando Garcia's horses? |
| 10:31:14 | 7 | A.   I didn't know.  I paid some different horses, but I didn't |
| 10:31:18 | 8 | know which ones.  They just called me and say, you have to pay |
| 10:31:22 | 9 | the money. |
| 10:31:23 | 10 | Q.   Now, Mr. Womack asked you if Mr. Garcia was a, quote, good |
| 10:31:28 | 11 | picker.  Do you recall that question? |
| 10:31:29 | 12 | A.   That's correct.  He's a good picker for racing horses. |
| 10:31:33 | 13 | Q.   Do people with money look for good pickers to spend their |
| 10:31:39 | 14 | money on horses? |
| 10:31:40 | 15 | A.   That's correct.  Most of the people, the smart people who |
| 10:31:42 | 16 | buy horses, they go through a good pick guy. |
| 10:31:48 | 17 | Q.   Now, you said your trainer was who again, I'm sorry? |
| 10:31:52 | 18 | A.   Here in Texas, Bobby Martinez. |
| 10:31:53 | 19 | Q.   Does he send his bills directly to you? |
| 10:31:56 | 20 | A.   Yes, sir. |
| 10:31:57 | 21 | Q.   Has he ever sent any of your bills to someone else to pay? |
| 10:32:00 | 22 | A.   No, sir. |
| 10:32:01 | 23 | Q.   And you said when you pay entry fees for race horses for |
| 10:32:06 | 24 | races, who generally pays those to your experience? |
| 10:32:10 | 25 | A.   In my experience, most of the time in my point of view, the |

10:32:16  1    owner is the one who pay.

10:32:20  2    Q.   Now, I believe your testimony was that when Mr. Ramiro

10:32:25  3    Villarreal took you to meet "40," at that point you were not

10:32:29  4    aware of him as --

10:32:30  5    A.   Yes.

10:32:31  6    Q.   -- a bad person.

10:32:32  7    A.   I didn't know.

10:32:35  8    Q.   And when did you become aware that he was a bad person?

10:32:39  9    A.   I don't remember how long time after that, but there were

10:32:42  10   months after that.

10:32:43  11   Q.   And what is your knowledge of Mr. Miguel Trevino, also known

10:32:48  12   as "40"?

10:32:49  13   A.   Well, the one that I see the media, the TV, or the

10:32:52  14   newspapers.

10:32:53  15   Q.   And what does he do?

10:32:54  16   A.   They say he run a cartel.

10:32:58  17   Q.   And on either occasion when you met "40," had Fast And

10:33:04  18   Furious been formed at that point?

10:33:04  19   A.   No, sir.

10:33:05  20   Q.   It was prior to Fast And Furious being formed.

10:33:11  21          Now, when you pay your expenses for your horses, do

10:33:14  22   some of those expenses come to the United States?

10:33:17  23   A.   I pay for my checking account from the states.

10:33:20  24   Q.   Have you ever deposited U.S. currency in your accounts in

10:33:27  25   amounts of less than $10,000?

10:33:30   1    A.    No more than $10,000.  Never.

10:33:32   2    Q.    And why is that?

10:33:34   3    A.    Pardon?

10:33:35   4    Q.    Let me ask you a better question.  Are you familiar with the

10:33:38   5    reporting requirement to report $10,000?

10:33:40   6    A.    Yes, sir.  I know that when I cross the bridge, if I have

10:33:45   7    more than that sum, I have to make a declaration.

10:33:48   8    Q.    And have you ever had the occasion to deposit amounts in

10:33:52   9    your bank account less than $10,000?

10:33:54  10    A.    Less than 10,000, yes.

10:33:55  11    Q.    Have you deposited multiple amounts less than $10,000 on the

10:34:00  12    same day?

10:34:00  13    A.    No, sir.

10:34:04  14    Q.    Mr. Guerra, I'm going to show you what's previously been

10:34:16  15    entered into evidence as 323C.  I'm showing you Bates stamp page

10:34:24  16    592394, it's the bottom here.  These are Yearsley Bloodstock

10:34:34  17    Insurance records?

10:34:38  18    A.    Okay.

10:34:42  19    Q.    Was Santa Fe Roldan ever an agent for Fast And Furious?

10:34:47  20    A.    No, sir.  I never meet him.

10:34:49  21    Q.    And how did Santa Fe Roldan in care of Hernando Guerra --

10:34:54  22    A.    I don't know, sir.  That's my correct address, but I don't

10:34:57  23    know who's the guy.

10:34:58  24    Q.    So you were unaware of this transaction?

10:35:00  25    A.    Yes.  I don't have nothing to do with that.

| | | |
|---|---|---|
| 10:35:06 | 1 | Q.   Have you ever had anything to do with Santa Fe Roldan? |
| 10:35:10 | 2 | A.   No, sir. |
| 10:35:15 | 3 | Q.   Your Honor, may I have one moment? |
| 10:35:32 | 4 | When did you come to learn Mr. Ramiro Villarreal had |
| 10:35:38 | 5 | died?  I'm sorry, let me -- |
| 10:35:43 | 6 | A.   Could you repeat, please? |
| 10:35:45 | 7 | Q.   Yeah.  No problem.  When did you come to learn that Mr. |
| 10:35:47 | 8 | Villarreal had died? |
| 10:35:50 | 9 | A.   After two or three days, they called me from Laredo and told |
| 10:35:56 | 10 | me he was died in a crash accident. |
| 10:35:58 | 11 | Q.   I want to -- the reason I ask that is I want to go back to |
| 10:36:02 | 12 | that horse auction you attended with him.  Remember we talked |
| 10:36:05 | 13 | about two horses that you bought and one that Ramiro Villarreal |
| 10:36:08 | 14 | bought? |
| 10:36:09 | 15 | A.   Okay.  The one in Ruidoso. |
| 10:36:10 | 16 | Q.   Okay.  And that was Oceans Apart that he -- |
| 10:36:14 | 17 | A.   Yes, sir. |
| 10:36:14 | 18 | Q.   And do you recall the purchase price for that? |
| 10:36:16 | 19 | A.   Say it again. |
| 10:36:17 | 20 | Q.   Do you recall the purchase price for that horse? |
| 10:36:18 | 21 | A.   Yeah. |
| 10:36:19 | 22 | Q.   And what was that, sir? |
| 10:36:20 | 23 | A.   I bought three horses, two of my own and one for the |
| 10:36:24 | 24 | Ramiro's $300,000 for that horse he paid. |
| 10:36:26 | 25 | Q.   And did you get reimbursed for that $300,000? |

| | | |
|---|---|---|
| 10:36:30 | 1 | A.   I gave a check for a deposit check.  Ramiro was a good |
| 10:36:35 | 2 | customer with the American Breeders.  They give like 30 to 60 |
| 10:36:38 | 3 | days to pay.  So I leave one of my check -- personal check for |
| 10:36:42 | 4 | deposit. |
| 10:36:43 | 5 | Q.   And how much was the deposit? |
| 10:36:43 | 6 | A.   $100,000. |
| 10:36:45 | 7 | Q.   And how were you reimbursed for that payment? |
| 10:36:48 | 8 | A.   He sent me a wire transfer from Mexico. |
| 10:36:51 | 9 | Q.   From Mexico? |
| 10:36:51 | 10 | A.   Yes, sir. |
| 10:36:52 | 11 | Q.   Do you know how the balance of -- |
| 10:36:56 | 12 | A.   No, sir. |
| 10:36:56 | 13 | Q.   Did Mr. Villarreal ever provide you payments of $9,900 in |
| 10:37:01 | 14 | U.S. currency? |
| 10:37:01 | 15 | A.   No, sir.  Never. |
| 10:37:02 | 16 | Q.   Has he ever provided you payments or reimbursements in U.S. |
| 10:37:07 | 17 | currency? |
| 10:37:07 | 18 | A.   No. |
| 10:37:13 | 19 | Q.   With respect to your horses, who pays for the boarding of |
| 10:37:20 | 20 | your horses? |
| 10:37:21 | 21 | A.   I pay. |
| 10:37:21 | 22 | Q.   Who pays for the breeding of your horses? |
| 10:37:23 | 23 | A.   I pay. |
| 10:37:24 | 24 | Q.   Who pays for the training of your horses? |
| 10:37:26 | 25 | A.   I pay. |

| | | |
|---|---|---|
| 10:37:28 | 1 | Q.   Who pays for the insurance of your race horses? |
| 10:37:30 | 2 | A.   I pay. |
| 10:37:31 | 3 | Q.   May I have one moment, your Honor? |
| 10:37:53 | 4 | I'm showing you, again, Government's Exhibit 323N.  In |
| 10:37:59 | 5 | this case, it's page 59-9.  I've already talked about the -- |
| 10:38:13 | 6 | again, this is the Yearsley Bloodstock Insurance.  Says Fast And |
| 10:38:21 | 7 | Furious, Blues Ferrari. |
| 10:38:22 | 8 | A.   Yes, sir. |
| 10:38:23 | 9 | Q.   Did you ever own Blues Ferrari? |
| 10:38:25 | 10 | A.   Never owned the horse. |
| 10:38:26 | 11 | Q.   Then on this record, says Carlos Nayen as manager in the |
| 10:38:32 | 12 | U.S. for LLC.  Was Carlos Nayen ever a manager for Fast And |
| 10:38:37 | 13 | Furious? |
| 10:38:37 | 14 | A.   I don't remember. |
| 10:38:38 | 15 | Q.   And, again, was Fernando Garcia ever a manager for Fast And |
| 10:38:41 | 16 | Furious? |
| 10:38:41 | 17 | A.   I don't remember. |
| 10:38:45 | 18 | Q.   Your Honor, I'll pass the witness. |
| 10:38:49 | 19 | MS. WILLIAMS:  Nothing. |
| 10:38:52 | 20 | MR. DEGEURIN:  No further questions, sir. |
| 10:38:54 | 21 | MR. WOMACK:  No questions. |
| 10:38:56 | 22 | MR. ESPER:  I do, your Honor. |
| 10:38:57 | 23 | RE-CROSS EXAMINATION |
| 10:38:58 | 24 | BY MR. ESPER: |
| 10:38:58 | 25 | Q.   Mr. Guerra, this exhibit that you've just looked at is dated |

| | | |
|---|---|---|
| 10:39:04 | 1 | May the 3rd, 2010; is that correct? |
| 10:39:07 | 2 | A.   Yes. |
| 10:39:08 | 3 | Q.   And that certainly preceded the death of Mr. Ramiro |
| 10:39:13 | 4 | Villarreal, does it not? |
| 10:39:14 | 5 | A.   He died in 2011. |
| 10:39:18 | 6 | Q.   He died in 2011, okay? |
| 10:39:21 | 7 | A.   Yeah. |
| 10:39:22 | 8 | Q.   Now, Mr. Gardner also showed you an exhibit where there was |
| 10:39:31 | 9 | a -- something in Santa Fe Roldan? |
| 10:40:01 | 10 | MR. GARDNER:  Your Honor, may I have one moment with |
| 10:40:03 | 11 | Mr. Esper? |
| 10:40:04 | 12 | THE COURT:  Sure. |
| 10:40:34 | 13 | MR. ESPER:  Thank you, Mr. Gardner.  You're gracious. |
| 10:40:37 | 14 | Q.   (BY MR. ESPER) Mr. Guerra, this 2336 that was previously |
| 10:40:43 | 15 | showed to you that showed the insured Santa Fe Roldan, Inc., care |
| 10:40:47 | 16 | of Hernando Guerra, if you'll look at the date, what's the date |
| 10:40:52 | 17 | on that? |
| 10:40:52 | 18 | A.   Yes.   September 15. |
| 10:40:53 | 19 | Q.   And that's preceding the death of Mr. Ramiro Villarreal, did |
| 10:40:57 | 20 | it not? |
| 10:40:57 | 21 | A.   Say it again, please. |
| 10:40:58 | 22 | Q.   That date, that document preceded, came before Mr. |
| 10:41:03 | 23 | Villarreal ever passed away? |
| 10:41:05 | 24 | A.   That's correct, sir. |
| 10:41:06 | 25 | Q.   Did you ever live at 3317 Kent Lane? |

| | | |
|---|---|---|
| 10:41:10 | 1 | A.   That's my address in McAllen.  It's a friend of mine home. |
| 10:41:14 | 2 | Q.   That's a friend of yours home? |
| 10:41:15 | 3 | A.   That's correct.  And that's the correct address for my |
| 10:41:17 | 4 | company. |
| 10:41:17 | 5 | Q.   Okay.  So that's a friend of yours address in McAllen and |
| 10:41:22 | 6 | that's the address for your company? |
| 10:41:23 | 7 | A.   Yes, sir. |
| 10:41:24 | 8 | Q.   In McAllen? |
| 10:41:25 | 9 | A.   Yes, sir. |
| 10:41:25 | 10 | Q.   And other than your friend, who else knew about that |
| 10:41:28 | 11 | address? |
| 10:41:30 | 12 | A.   Many people. |
| 10:41:31 | 13 | Q.   Many people did? |
| 10:41:32 | 14 | A.   Yes, sir. |
| 10:41:32 | 15 | Q.   Certainly Ramiro Villarreal was one of them, correct? |
| 10:41:34 | 16 | A.   For sure. |
| 10:41:35 | 17 | Q.   Okay.  Now, you indicated that you paid directly for the |
| 10:41:48 | 18 | training of your horses, the training fees, the expenses? |
| 10:41:52 | 19 | A.   My own horses. |
| 10:41:53 | 20 | Q.   Yes, your own horses? |
| 10:41:55 | 21 | A.   Yes, sir. |
| 10:41:55 | 22 | Q.   Do you know -- and if you don't, simply say so -- whether |
| 10:41:59 | 23 | you know other owners who use a representative to pay for those |
| 10:42:04 | 24 | expenses? |
| 10:42:04 | 25 | A.   Yes, sir.  There's some that do that. |

| | | |
|---|---|---|
| 10:42:06 | 1 | Q.   Some do that? |
| 10:42:06 | 2 | A.   Yeah. |
| 10:42:07 | 3 | Q.   Do you know any by name? |
| 10:42:11 | 4 | A.   I don't remember the name but many people do that. |
| 10:42:13 | 5 | Q.   Okay. |
| 10:42:15 | 6 | A.   Many people that have another business so they're busy. |
| 10:42:17 | 7 | Q.   Yes.  Of course. |
| 10:42:18 | 8 | A.   They call someone to make the payments and all the stuff for |
| 10:42:23 | 9 | the horses. |
| 10:42:23 | 10 | Q.   Right.  And so, basically the representative would call the |
| 10:42:26 | 11 | owner and say, okay, here's how much the expenses are, the owner |
| 10:42:31 | 12 | gives them a check, and then, the representative disburses the -- |
| 10:42:34 | 13 | A.   That's correct, sir. |
| 10:42:35 | 14 | Q.   And then, will either pay him by cash, wired money transfer, |
| 10:42:39 | 15 | or check. |
| 10:42:39 | 16 | A.   I always use my check. |
| 10:42:43 | 17 | Q.   Pardon me? |
| 10:42:43 | 18 | A.   I always use a check. |
| 10:42:45 | 19 | Q.   Okay. |
| 10:42:45 | 20 | A.   Just to get -- when I get my income tax and everything, get |
| 10:42:48 | 21 | something to prove. |
| 10:42:49 | 22 | Q.   Makes it easier. |
| 10:42:50 | 23 | A.   Yes. |
| 10:42:51 | 24 | Q.   Yes.  Okay.  No further questions, your Honor.  I'm sorry, I |
| 10:42:58 | 25 | did have one other question with the Court's permission. |

| 10:43:00 | 1 | Race entry fees, you say you pay them directly? |
| 10:43:04 | 2 | A.   Yes. |
| 10:43:05 | 3 | Q.   Okay.  Again, an owner can use the representative to pay the |
| 10:43:10 | 4 | race entry fees? |
| 10:43:11 | 5 | A.   That's correct.  The owner and sometimes the trainers pay |
| 10:43:13 | 6 | for the owner.  Sometimes when they gotta push, they use it to |
| 10:43:18 | 7 | pay the entries to the futures. |
| 10:43:19 | 8 | Q.   You've answered my question. |
| 10:43:21 | 9 | A.   Okay, sir. |
| 10:43:22 | 10 | MR. MAYR:  And I have no further questions for this |
| 10:43:24 | 11 | witness, your Honor. |
| 10:43:25 | 12 | MR. GARDNER:  Nothing, your Honor.  May this witness be |
| 10:43:27 | 13 | excused? |
| 10:43:28 | 14 | MR. ESPER:  No objection, your Honor. |
| 10:43:29 | 15 | THE COURT:  All right.  You may be excused, sir. |
| 10:43:34 | 16 | MR. GARDNER:  Your Honor, the government calls Dr. |
| 10:44:05 | 17 | Shalyn Bliss. |
| 10:44:19 | 18 | (Witness sworn.) |
| 10:44:35 | 19 | THE COURT:  I want you to tell us all your full name |
| 10:44:46 | 20 | and spell your last. |
| 10:44:47 | 21 | THE WITNESS:  My full name is Shalyn Beth Bliss, |
| 10:44:52 | 22 | B-L-I-S-S. |
| 10:44:52 | 23 | SHALYN B. BLISS, called by the Government, duly sworn. |
| 10:44:52 | 24 | |
| 10:44:54 | 25 | |

DIRECT EXAMINATION

BY MR. GARDNER:

Q.    Thank you, your Honor.

      Morning, Dr. Bliss.  You and I met before; is that correct?

A.    Yes, sir.

Q.    If you will, could you please introduce yourself to the jury and tell them what you do for a living?

A.    I'm Shalyn Bliss.  I'm a veterinarian that works in horse reproduction.

Q.    And where did you receive your education from?

A.    I got my veterinary degree from Oklahoma State University. And then, I did my reproduction training at Texas A & M.

Q.    And how long have you been a licensed veterinarian?

A.    Seven years.

Q.    And when you talked about reproductive specialty, could you explain a little bit more of that to the jury?

A.    Yes.  The areas that I work in are equine embryo transfers, so that allows you to collect embryos, multiple embryos from one mare and allow her to have more than one baby in a year.  She's very valuable.  Or if a mare is older or debilitated, it allows another mare to carry her baby for her so that she can still reproduce, even though she wouldn't be able to carry a baby herself.

      And I also deal with subfertility issues in stallions.

| | | |
|---|---|---|
| 10:46:03 | 1 | Many of the issues that human doctors would help infertile men |
| 10:46:07 | 2 | deal with occur in stallions.  And so, you have techniques to |
| 10:46:12 | 3 | help all those stallions to reproduce. |
| 10:46:14 | 4 | Q.   And just a couple of terms.  So the female, the mare? |
| 10:46:19 | 5 | A.   Uh-huh. |
| 10:46:20 | 6 | Q.   Provides the egg.  What is she called? |
| 10:46:23 | 7 | A.   Typically you would call her a donor mare. |
| 10:46:26 | 8 | Q.   And when you say you transfer that egg and then, you |
| 10:46:30 | 9 | inseminate it with the sperm from the stallion? |
| 10:46:35 | 10 | A.   The insemination occurs in the donor mare, and then, once |
| 10:46:38 | 11 | she ovulates a week later, the embryo is retrieved from the donor |
| 10:46:43 | 12 | mare and transferred into what we would call a recipient mare or |
| 10:46:46 | 13 | a surrogate. |
| 10:46:46 | 14 | Q.   And is a short term for recipient mare a reset mare? |
| 10:46:50 | 15 | A.   Yes. |
| 10:46:51 | 16 | Q.   And, Dr. Bliss, was there a point when you came to know Jose |
| 10:46:55 | 17 | Trevino? |
| 10:46:56 | 18 | A.   Yes. |
| 10:46:56 | 19 | Q.   And do you recognize him here in the courtroom today? |
| 10:47:00 | 20 | A.   Yes.  Right there. |
| 10:47:01 | 21 | Q.   Your Honor, may the record reflect the witness has |
| 10:47:03 | 22 | identified the Defendant Jose Trevino? |
| 10:47:05 | 23 |         THE COURT:  So reflects. |
| 10:47:07 | 24 | Q.   (BY MR. GARDNER) And when did you first meet Mr. Trevino? |
| 10:47:10 | 25 | A.   I believe it would have been about September of 2011. |

10:47:14   1   Q.   And could you please explain to the jury the circumstances

10:47:16   2   of that meeting?

10:47:18   3   A.   He called me.  He had been given my number by my mentor at

10:47:22   4   Texas A & M.  He was looking for a veterinarian to do the

10:47:26   5   reproductive work at his ranch in Oklahoma, and I had just moved

10:47:30   6   to the area and didn't have a job at the time, and so, he was

10:47:33   7   calling me about a job.

10:47:34   8   Q.   When you say the area, is that the Oklahoma City area?

10:47:38   9   A.   Yes.

10:47:38   10   Q.   And how far is the Defendant Jose Trevino's ranch from

10:47:42   11   Oklahoma City?

10:47:43   12   A.   Probably 30 to 45 minutes.

10:47:46   13   Q.   And did you two engage in a employment contract?

10:47:50   14   A.   Yes.  We met and came to a verbal agreement, and I started

10:47:54   15   to work there in January of 2012.

10:47:57   16   Q.   January of 2012?

10:47:58   17   A.   Uh-huh.

10:47:59   18   Q.   So what were your daily duties at the ranch at Lexington?

10:48:03   19   A.   I would come in the morning and we would on breeding days

10:48:07   20   collect the stallion, and every day, we would palpate all of the

10:48:12   21   mares, the donor mares and the recipient mares.  When the mares

10:48:16   22   are in heat, they need to be checked every day to get the timing

10:48:20   23   between the two of them correct.  And we also do the pregnancy

10:48:23   24   tests and all that, so that would usually take all morning and

10:48:26   25   sometimes into the afternoon.

10:48:28   1          Also, I administered plasma to some of the foals as a
10:48:33   2   preventive thing to prevent disease, and review other
10:48:37   3   miscellaneous, you know, veterinary tasks, things that were sick
10:48:40   4   or ill.
10:48:41   5   Q.   Now, did you conduct some of the -- you said, various other
10:48:45   6   veterinary tasks.  Did other vets take care of the horses when
10:48:48   7   they were sick?
10:48:49   8   A.   Yes.  Mostly, I only did the reproductive things.
10:48:53   9   Occasionally, I would do a few other things, but I tried to just
10:48:56  10   focus on the reproduction.
10:48:58  11   Q.   And on this verbal contract that you entered into between
10:49:02  12   yourself and Jose Trevino, what was the salary that you were to
10:49:05  13   be paid?
10:49:06  14   A.   $75,000 for the year and I was to receive the bulk of that
10:49:11  15   during the breeding season and then, a smaller portion of it
10:49:14  16   during the offseason.
10:49:16  17   Q.   And when you arrived at the ranch, could you please explain
10:49:20  18   to the ladies and gentlemen of the jury approximately how many
10:49:22  19   horses were on the ranch?
10:49:24  20   A.   When I arrived?
10:49:25  21   Q.   When you started working there.
10:49:28  22   A.   I don't recall exactly.  The number certainly increased
10:49:32  23   during my time there, but I don't know.  When I very first
10:49:36  24   started, there weren't a lot of mares there.  Maybe, you know, 20
10:49:39  25   to 40 horses.  And then, as he acquired recipient mares and more

| | | |
|---|---|---|
| 10:49:44 | 1 | donor mares arrived, there were quite a few more. |
| 10:49:47 | 2 | Q.   And what would you estimate to be the most number of horses |
| 10:49:50 | 3 | that were on the ranch? |
| 10:49:52 | 4 | A.   That I was aware of, I would say 4 to 500. |
| 10:49:56 | 5 | Q.   And can you recall approximate size of the Defendant Jose |
| 10:50:00 | 6 | Trevino's ranch? |
| 10:50:02 | 7 | A.   I don't know if I ever knew the exact acres, but I would |
| 10:50:05 | 8 | assume there was somewhere around 100 acres total there. |
| 10:50:08 | 9 | Q.   And in your opinion, as a doctor of veterinary medicine, was |
| 10:50:14 | 10 | that size of ranch able to support that number of horses? |
| 10:50:16 | 11 | A.   No.  There were a lot of mares in the pasture and there was |
| 10:50:20 | 12 | a lot of overcrowding in the pasture. |
| 10:50:22 | 13 | Q.   And what's the danger of that from a veterinary standpoint? |
| 10:50:25 | 14 | A.   You have to worry about diseases that can be transmitted |
| 10:50:29 | 15 | from one horse to another, especially when there's a lot of |
| 10:50:33 | 16 | horses that are going in and out of the property that come from |
| 10:50:36 | 17 | various places and are exposed to different things, and then, |
| 10:50:40 | 18 | they're commingled in a tight spot, they transmit disease very |
| 10:50:43 | 19 | easily.  They can also injure each other more readily.  They pick |
| 10:50:49 | 20 | at each other and fight and kick and can cause a lot of injuries. |
| 10:50:52 | 21 | Q.   And in your opinion, the conditions on the ranch were |
| 10:50:54 | 22 | susceptible to those types of conditions? |
| 10:50:56 | 23 | A.   Yes. |
| 10:50:58 | 24 | Q.   Now, do you recall some of the names of the horses that he |
| 10:51:01 | 25 | had on the ranch? |

10:51:02  1    A.   Some of them, yes.

10:51:03  2    Q.   And do you recall if he had all of his horses on the ranch?

10:51:08  3    A.   No.  Not all of the horses were on the ranch.  There were

10:51:12  4    mares at other breeding farms being bred there.  And I also was

10:51:16  5    aware that he had some horses in training at various tracks

10:51:20  6    around the country.

10:51:21  7    Q.   And are you aware if he had a horse by the name of A Snowy

10:51:26  8    Fling?

10:51:26  9    A.   Yes.  That mare was at the ranch and then, she left to go to

10:51:30  10   another ranch for breeding.

10:51:31  11   Q.   And in the course of your employment with the Defendant Jose

10:51:34  12   Trevino, did you have a discussion with him on how he obtained

10:51:38  13   his funds to purchase this ranch and those horses?

10:51:42  14   A.    Yes.  He told me that he was a mason and had built up a

10:51:46  15   construction company, and that the business had been kind of

10:51:50  16   rough the last few years and that he had decided to sell his

10:51:53  17   companies and invest in the ranch.

10:51:56  18   Q.   And, I'm sorry, did you say company or companies?

10:51:59  19   A.    It was my impression that there were more than one company.

10:52:03  20   Q.   And were all the companies involved in masonry, or do you

10:52:09  21   recall that there was a distinction between different companies?

10:52:12  22   A.    The conversation about the companies wasn't very detailed.

10:52:15  23   I don't know.

10:52:18  24   Q.   And did he provide you the names of those construction

10:52:21  25   companies?

| | | |
|---|---|---|
| 10:52:21 | 1 | A.    No. |
| 10:52:23 | 2 | Q.    Were you aware that any of the construction companies |
| 10:52:25 | 3 | involved masonry or bricklaying? |
| 10:52:28 | 4 | A.    When he would talk about has work, it was always related to |
| 10:52:31 | 5 | construction and mostly bricklaying, and so, that was my |
| 10:52:34 | 6 | impression that they were involved with that. |
| 10:52:36 | 7 | Q.    And are you familiar with the Defendant Jose Trevino's |
| 10:52:39 | 8 | family? |
| 10:52:40 | 9 | A.    Yes. |
| 10:52:40 | 10 | Q.    And were they also present at the Oklahoma ranch? |
| 10:52:44 | 11 | A.    Yes. |
| 10:52:44 | 12 | Q.    Do you know the name of the Defendant Jose Trevino's wife? |
| 10:52:48 | 13 | A.    Zulema. |
| 10:52:49 | 14 | Q.    And what was her role in the ranch? |
| 10:52:51 | 15 | A.    She worked in the office with all of the records and paying |
| 10:52:58 | 16 | bills, you know, administrative type things. |
| 10:53:01 | 17 | Q.    And are you familiar with Alexandra Trevino? |
| 10:53:04 | 18 | A.    Yes. |
| 10:53:05 | 19 | Q.    And who is she? |
| 10:53:06 | 20 | A.    She's his daughter. |
| 10:53:07 | 21 | Q.    Are you familiar with Jose Trevino, Jr.? |
| 10:53:09 | 22 | A.    Yes. |
| 10:53:10 | 23 | Q.    And who is he? |
| 10:53:11 | 24 | A.    His son. |
| 10:53:13 | 25 | Q.    And what was Alexandra Trevino's role at the ranch? |

```
10:53:16    1   A.   She was the breeding manager, so she was the one that I
10:53:19    2   spent the most time with.  She assisted me every day in keeping
10:53:23    3   the medical records.
10:53:24    4   Q.   And when you talk about medical records, was there some
10:53:28    5   point when you identified that none of the records had owner's
10:53:31    6   names on them?
10:53:32    7   A.   Yes.  When I went to work there, the medical records just
10:53:37    8   had the name of the horse and there wasn't an owner listed, and
10:53:40    9   so, I had requested the owner name be listed on the cards.
10:53:44   10   Q.   And why do you do that?
10:53:45   11   A.   Because as a veterinarian, my duty is to the owner of the
10:53:50   12   animal, and I needed to understand who owned which horses so that
10:53:54   13   I could keep track of what was going on with them.  And if I was
10:53:57   14   ever to need to communicate with them, I would know that they
10:54:00   15   were the owner of record.
10:54:02   16   Q.   And when you asked Alexandra Trevino for the horse's owner's
10:54:08   17   name, did she start providing them on the medical records?
10:54:11   18   A.   Yes.  After I asked her that, then all the names were
10:54:13   19   written on the tops of the cards, and when that mare would come
10:54:16   20   in for her examination, she would tell me her name and who the
10:54:19   21   owner was.
10:54:19   22   Q.   And do you recall some of the names here today of the owners
10:54:24   23   listed?
10:54:27   24   A.   There were basically four owners.  They were all Hispanic
10:54:33   25   names.  If you told me the name, I would remember, but I can't
```

| 10:54:34 | 1 | recall right now. |
| 10:54:35 | 2 | Q.   Does the name Hector Santa Fe Roldan ring a bell? |
| 10:54:40 | 3 | A.   Yes. |
| 10:54:40 | 4 | Q.   Does the fall Nian Hernandez ring a bell? |
| 10:54:43 | 5 | A.   Yes. |
| 10:54:43 | 6 | Q.   Does the name Efren Aguallo ring a bell? |
| 10:54:47 | 7 | A.   Yes. |
| 10:54:47 | 8 | Q.   Did you ever meet any of these owners? |
| 10:54:49 | 9 | A.   No. |
| 10:54:49 | 10 | Q.   Now, did there come a point in time when Jose Trevino, the |
| 10:54:54 | 11 | defendant, made a comment about his daughter putting those names |
| 10:54:57 | 12 | on the records? |
| 10:54:58 | 13 | A.   Not to me, but she stopped doing it and I asked why, and she |
| 10:55:02 | 14 | said her dad had asked her to stop. |
| 10:55:03 | 15 | Q.   Stop putting the owner's names on the records? |
| 10:55:07 | 16 | A.   Yes. |
| 10:55:08 | 17 | Q.   You also relayed to me on one occasion in which a |
| 10:55:11 | 18 | pharmaceutical sales rep called you and visited the ranch? |
| 10:55:14 | 19 | A.   Yes. |
| 10:55:15 | 20 | Q.   Could you please relate the circumstances of that visit to |
| 10:55:18 | 21 | the jury, please? |
| 10:55:18 | 22 | A.   Sure.  Very common for pharmaceutical reps when they're in |
| 10:55:23 | 23 | your area to stop by and touch base with you and tell you about |
| 10:55:26 | 24 | any products that they have, and one called on my phone and asked |
| 10:55:30 | 25 | if he could come by.  And so, I said sure and it's pretty common |

10:55:33   1    that they would come back while you're working.  They don't

10:55:36   2    expect you to stop because breeding season is very busy.  And so,

10:55:39   3    they'll hang out with you while you're working.  And when he

10:55:42   4    arrived, I could tell that he wasn't welcome there, and things

10:55:47   5    were kind of short.  And so, I asked him if he could go ahead and

10:55:50   6    go, and I didn't have any others back.

10:55:52   7    Q.   When you say he wasn't welcome there, did Jose Trevino

10:55:56   8    encounter the pharmaceutical rep?

10:55:58   9    A.   Yes.  He was there and he didn't have any prior knowledge

10:56:02  10    that he was coming, so when he showed up, he wanted to know who

10:56:05  11    he was and why he was there and just could tell he wasn't

10:56:08  12    comfortable with him back there.

10:56:10  13    Q.   I'm showing you Government's Exhibit 28E.  Do you recognize

10:56:18  14    this, Dr. Bliss?

10:56:20  15    A.   It looks like an invoice from the program that we used at

10:56:25  16    the ranch Wise Option, the recordkeeping.

10:56:29  17    Q.   This name here, Victor Nieto, N-I-E-T-O, is that another one

10:56:35  18    of the owner's names?

10:56:37  19    A.   Yes.

10:56:37  20    Q.   Your Honor, I would offer Government's Exhibit 28E.  28E.

10:56:47  21         MR. ESPER:  I have no objection.

10:56:51  22         MR. WOMACK:  No objection.

10:57:17  23         MR. DEGEURIN:  No objection.

10:57:19  24         THE COURT:  28E is received.

10:57:21  25    Q.   (BY MR. GARDNER) Dr. Bliss, on the screen in front of you is

| | | |
|---|---|---|
| 10:57:28 | 1 | Government's Exhibit 28E, as referenced by the evidence sticker. |
| 10:57:35 | 2 | And, again, this individual, was that one of the four owners that |
| 10:57:38 | 3 | was provided by Alexandra Trevino? |
| 10:57:41 | 4 | A.   Yes. |
| 10:57:41 | 5 | Q.   Now, I want to turn to a couple of horses here.  First one |
| 10:57:47 | 6 | is called Katys Sign.  And when I look at the dates on the |
| 10:57:56 | 7 | invoice, it's dated 11-21-2011 for deworming and Ivermectin, |
| 10:58:08 | 8 | 11-21-11 for rabies, and 11-21-2011 for a six-way vaccine called |
| 10:58:16 | 9 | Vetera Gold? |
| 10:58:18 | 10 | A.   Yes. |
| 10:58:18 | 11 | Q.   Do I have all that correct? |
| 10:58:19 | 12 | A.   Uh-huh. |
| 10:58:19 | 13 | Q.   When did you say your employment began? |
| 10:58:21 | 14 | A.   In January. |
| 10:58:22 | 15 | Q.   Now, when we talked before, you mentioned that you had a |
| 10:58:27 | 16 | particular knowledge of this six-way vaccine called Vetera Gold? |
| 10:58:31 | 17 | A.   Yes.  When I started to work there, it was in the ranch that |
| 10:58:34 | 18 | there were no existing vaccine protocols in place, and that was |
| 10:58:37 | 19 | the vaccine that I chose to use. |
| 10:58:40 | 20 | Q.   Did you treat these horses in November or December prior to |
| 10:58:43 | 21 | your employment? |
| 10:58:46 | 22 | A.   No.  I didn't treat any donor mares until January when I |
| 10:58:49 | 23 | started.  I did treat some recipient mares in, I think, about |
| 10:58:53 | 24 | October but no donor mares. |
| 10:58:54 | 25 | Q.   And you also mentioned where you could get this six-way |

| | | |
|---|---|---|
| 10:58:59 | 1 | vaccine called Vetera Gold.  Is there a veterinary pharmaceutical |
| 10:59:04 | 2 | supply store in the Oklahoma area? |
| 10:59:05 | 3 | A.   Yes.  There is, but I'm not aware that they carry that |
| 10:59:09 | 4 | specific vaccine. |
| 10:59:10 | 5 | Q.   So is that a vaccine that you commonly use in your |
| 10:59:14 | 6 | veterinary care? |
| 10:59:15 | 7 | A.   It's one that I use.  Yes. |
| 10:59:16 | 8 | Q.   And where do you obtain that vaccine from? |
| 10:59:18 | 9 | A.   I order it from a veterinary distributor company. |
| 10:59:23 | 10 | Q.   I'm showing you another horse.  Let me just back up here. |
| 10:59:34 | 11 | Front page of this document, Government's Exhibit 28E, these list |
| 10:59:40 | 12 | all the horses in this particular billing statement.  Is that a |
| 10:59:44 | 13 | fair statement? |
| 10:59:45 | 14 | A.   Yes. |
| 10:59:46 | 15 | Q.   And as to what we looked at, was that particular horse's |
| 10:59:51 | 16 | billing for that period of time? |
| 10:59:52 | 17 | A.   Yes. |
| 11:00:00 | 18 | Q.   And I want to talk about this horse, Mr. Perrys Wine.  And, |
| 11:00:04 | 19 | again, as you could see, there were treatments, veterinary |
| 11:00:07 | 20 | treatments, including your specified vaccine in November.  Did |
| 11:00:11 | 21 | you treat Mr. Perrys Wine in November or December of 2011? |
| 11:00:14 | 22 | A.   No. |
| 11:00:15 | 23 | Q.   And when did you first become aware -- back up a second. |
| 11:00:20 | 24 | What date in January did you first start working for |
| 11:00:23 | 25 | Mr. Jose Trevino? |

| | | |
|---|---|---|
| 11:00:25 | 1 | A.   I'm sorry.  I don't recall exactly what date.  Probably |
| 11:00:29 | 2 | around the second week of January. |
| 11:00:31 | 3 | Q.   And were these two horses on the property when you started |
| 11:00:35 | 4 | working? |
| 11:00:36 | 5 | A.   I don't recall if those specific ones were there or not. |
| 11:00:41 | 6 | Q.   Your Honor, may I have a moment? |
| 11:00:42 | 7 |         THE COURT:  Yes, sir. |
| 11:00:46 | 8 |         MR. GARDNER:  Your Honor, I'll pass the witness. |
| 11:00:54 | 9 |                     CROSS-EXAMINATION |
| 11:00:57 | 10 | BY MS. WILLIAMS: |
| 11:00:57 | 11 | Q.   Hi, Ms. Bliss.  My name is Christie Williams.  We haven't |
| 11:01:16 | 12 | met, have we? |
| 11:01:17 | 13 | A.   No, ma'am. |
| 11:01:18 | 14 | Q.   Do you remember that my investigator Mike Bazilla came to |
| 11:01:22 | 15 | talk to you and your husband?  I don't think you ever met with |
| 11:01:26 | 16 | him. |
| 11:01:26 | 17 | A.   I didn't meet him.  There was someone that I didn't know |
| 11:01:29 | 18 | about that came to my husband's work, but I never met him. |
| 11:01:33 | 19 | Q.   And let's start with Wise Option, since that's where you |
| 11:01:38 | 20 | left off with the prosecutor.  Tell the members of the jury what |
| 11:01:40 | 21 | a Wise Option is. |
| 11:01:42 | 22 | A.   Wise Option is a computer software program that's used |
| 11:01:46 | 23 | mostly by breeding farms.  A few training facilities use it, |
| 11:01:51 | 24 | also, to keep track of the medical records and the billing for |
| 11:01:54 | 25 | the farm. |

11:01:55   1   Q.   So it's -- I don't know that this is a good example, but

11:01:58   2   it's like QuickBooks but you use it -- it's specifically designed

11:02:02   3   for veterinary practice?

11:02:04   4   A.   For horse-breeding practice.  It's used by more than just

11:02:08   5   veterinarians.

11:02:09   6   Q.   Okay.  So if you want to be a horse breeder, you're probably

11:02:15   7   going to use this program or a program like it?

11:02:17   8   A.   Yes.

11:02:18   9   Q.   When you first met Mr. Trevino, you mentioned that you got

11:02:26  10   the referral through your mentor at Texas A & M.  Who is that?

11:02:34  11   A.   Dickson Varner.

11:02:36  12   Q.   So Dr. Varner apparently had some conversation with -- did

11:02:42  13   you know that Dr. Varner knew Mr. Trevino?

11:02:46  14   A.   Yes.  I knew of Mr. Trevino, prior to the phone call, he had

11:02:51  15   had a stallion at Texas A & M.  I didn't meet him or work on his

11:02:56  16   stallion, but I knew of him.

11:02:57  17   Q.   And just so we can put this in a little bit of perspective

11:03:00  18   and if you don't know any of this, just let me know.  But Jose

11:03:05  19   Trevino bought a horse named Tempting Dash.  Did you know that?

11:03:09  20   A.   That was a stallion.  That was it at Texas A & M.

11:03:12  21   Q.   And that horse won a race, a big horse race?

11:03:18  22   A.   Right.

11:03:18  23   Q.   Did you know that?

11:03:20  24   A.   After the fact.  I didn't know that.  Yes.

11:03:22  25   Q.   I'm just trying to give them a little bit of perspective

| | | |
|---|---|---|
| 11:03:25 | 1 | about when you came into the picture. |
| 11:03:26 | 2 | A.   Well after that. |
| 11:03:27 | 3 | Q.   Okay.  And this horse Tempting Dash, after it ran a race, |
| 11:03:33 | 4 | there was, I guess -- I don't know if it was a new disease but a |
| 11:03:36 | 5 | disease called piroplasmosis? |
| 11:03:38 | 6 | A.   Yes.  It's not a new disease but yes.  He at some point |
| 11:03:43 | 7 | tested positive for that disease. |
| 11:03:44 | 8 | Q.   After that race.  You don't know? |
| 11:03:49 | 9 | A.   I don't know. |
| 11:03:49 | 10 | Q.   What does testing positive -- am I pronouncing it right, |
| 11:03:54 | 11 | piroplasmosis?  What does testing positive for piroplasmosis mean |
| 11:03:59 | 12 | for a race horse? |
| 11:03:59 | 13 | A.   It's kind of an evolving situation.  And at the time that I |
| 11:04:03 | 14 | met Mr. Trevino, I wasn't really focused on the race horse |
| 11:04:06 | 15 | business, but it's my understanding that it means that they can't |
| 11:04:09 | 16 | race anymore because they don't want to take a chance on a |
| 11:04:13 | 17 | disease being transmitted to other horses. |
| 11:04:17 | 18 | Q.   So the horse can't go from Texas to California to race |
| 11:04:20 | 19 | because of the danger of it takes the disease from Texas and |
| 11:04:25 | 20 | infecting horses in California, where it's going to be in the |
| 11:04:28 | 21 | stables preparing for the race? |
| 11:04:29 | 22 | A.   Correct. |
| 11:04:29 | 23 | Q.   And so, now, Mr. Trevino has this very valuable horse and it |
| 11:04:40 | 24 | became more valuable because it won a race, correct? |
| 11:04:42 | 25 | A.   Uh-huh. |

| | | |
|---|---|---|
| 11:04:42 | 1 | Q.   You have to answer "Yes" or "No." |
| 11:04:44 | 2 | A.   I'm sorry. |
| 11:04:45 | 3 | Q.   This lady is taking down everything you say, and she can't |
| 11:04:48 | 4 | see when you're nodding your head. |
| 11:04:49 | 5 | A.   Oh, I'm sorry.  Yes. |
| 11:04:50 | 6 | Q.   Now, he has this very valuable race horse that can't race? |
| 11:04:53 | 7 | A.   Yes. |
| 11:04:53 | 8 | Q.   And so, as I understand it, at that time it was unclear |
| 11:05:02 | 9 | whether or not you could breed a stallion that had tested |
| 11:05:07 | 10 | positive for piroplasmosis? |
| 11:05:09 | 11 | A.   There's no legal reason that you can't breed the horse, but |
| 11:05:13 | 12 | it's still unknown, the danger of whether that disease can be |
| 11:05:17 | 13 | passed by breeding. |
| 11:05:18 | 14 | Q.   And so, in order to -- well, no one's going to want to breed |
| 11:05:26 | 15 | their prize mare to a diseased stallion without a lot of |
| 11:05:33 | 16 | assurances by someone who knows what they're talking about. |
| 11:05:36 | 17 | A.   Exactly. |
| 11:05:37 | 18 | Q.   And so, Mr. Trevino went to Texas A & M with this horse or |
| 11:05:44 | 19 | to talk to Dr. Varner about doing some testing to see whether or |
| 11:05:50 | 20 | not it would be safe to breed Tempting Dash? |
| 11:05:55 | 21 | A.   I believe that's why he was there.  Yes. |
| 11:05:56 | 22 | Q.   And Dr. Varner, he was your mentor.  What kind of |
| 11:06:02 | 23 | qualifications did he have? |
| 11:06:03 | 24 | A.   Dr. Varner?  He's a board-certified theriogenologist, which |
| 11:06:08 | 25 | means that after veterinary school, he did a residency in |

11:06:13  1  specific animal reproduction and passed a horse certification

11:06:18  2  test.  That's his qualification from paper.  But he's a world

11:06:23  3  authority on stallions.  He gets flown all over the world to look

11:06:26  4  at stallions that have different issues.

11:06:28  5  Q.   And so, working together, Dr. Varner with a lot of other

11:06:33  6  people was able to create a protocol where he felt like this

11:06:39  7  stallion could be safely bred to mares without transmitting

11:06:45  8  piroplasmosis?

11:06:45  9  A.   Yes.  There was no guarantee, but they felt pretty confident

11:06:50  10  that the procedure would allow them to do that.

11:06:54  11  Q.   And did you work on that process at all?

11:06:56  12  A.   Not for Tempting Dash and not for that disease.  I've worked

11:06:59  13  on that process for other reasons.

11:07:00  14  Q.   During your time or both?

11:07:04  15  A.   Both.

11:07:05  16  Q.   So now, we're -- I think we've kind of caught up almost to

11:07:08  17  when you're about to go to work for Mr. Trevino?

11:07:11  18  A.   Okay.

11:07:11  19  Q.   Is that fair?

11:07:14  20  A.   I think so.  I honestly don't know because I wasn't involved

11:07:16  21  in any of it until I did go to work for Mr. Trevino.

11:07:19  22  Q.   When did you graduate from veterinary school?

11:07:22  23  A.   2006.

11:07:23  24  Q.   And where had you been between 2006 and 2011?

11:07:28  25  A.   I was up in North Texas out of the reproduction facility for

| | | |
|---|---|---|
| 11:07:33 | 1 | five years, and then, I was around College Station after that |
| 11:07:38 | 2 | until I moved in 2011. |
| 11:07:40 | 3 | Q.   And do you remember when you first talked to Mr. Trevino |
| 11:07:44 | 4 | about working for him? |
| 11:07:46 | 5 | A.   That would have been September or October of 2011. |
| 11:07:49 | 6 | Q.   All right.  That's when you made this verbal agreement that |
| 11:07:52 | 7 | you've testified to? |
| 11:07:53 | 8 | A.   Yes. |
| 11:07:53 | 9 | Q.   To come to work? |
| 11:07:54 | 10 | A.   Yes. |
| 11:07:55 | 11 | Q.   And did you come out to the farm sometime between that |
| 11:07:58 | 12 | verbal agreement and before you actually formally started |
| 11:08:02 | 13 | working, did you come out to the farm a little bit and treat some |
| 11:08:04 | 14 | horses? |
| 11:08:05 | 15 | A.   I didn't treat any horses.  I came out a few times to look |
| 11:08:10 | 16 | at the facilities he was building and wanted of my input on a |
| 11:08:14 | 17 | couple of things.  And then, there was one occasion that I came |
| 11:08:17 | 18 | out and vaccinated a handful of recipient mares, maybe ten or |
| 11:08:21 | 19 | twelve recipient mares. |
| 11:08:23 | 20 | Q.   Okay.  So some of those records that the prosecutor showed |
| 11:08:26 | 21 | you might have had something to do with that; is that correct? |
| 11:08:31 | 22 | A.   I wouldn't think so.  I worked on recipient mares, which are |
| 11:08:35 | 23 | a house and a pasture.  And I remember the mares are valuable |
| 11:08:39 | 24 | donor mares that would have been in stalls, and they weren't |
| 11:08:41 | 25 | there at that time because they were building. |

11:08:43  1   Q.   Okay.  Now, I started on Wise Option, so I kind of got off

11:08:48  2   track.

11:08:48  3   A.   That's okay.

11:08:49  4   Q.   When you came to work for Mr. Trevino, is it fair to say

11:08:55  5   that the farm was in the very, very early stages?

11:08:58  6   A.   Yes.

11:09:02  7   Q.   Were the facilities ready to start breeding mares when you

11:09:08  8   first came and talked to him?

11:09:09  9   A.   No.

11:09:09  10  Q.   And what -- and do you know whether or not they had recently

11:09:17  11  purchased and installed this Wise Option program?

11:09:21  12  A.   I don't know.  They may have purchased and installed it.

11:09:25  13  There were no office spaces, or computers, or anything there when

11:09:29  14  I visited in October.  And by January, everything was up and

11:09:33  15  running.

11:09:34  16  Q.   And so, when you first came out to talk to Mr. Trevino, he

11:09:39  17  had apparently just purchased the property and was building and

11:09:44  18  fixing things so that it could be a breeding operation?

11:09:48  19  A.   Yes, and did a lot of remodeling.

11:09:52  20  Q.   When you first came to the farm, what was its condition?

11:09:56  21  Was it clean and nice and ready?

11:09:58  22  A.   No.  It was a nice farm, but it was older and rundown, and

11:10:02  23  you could tell that it hadn't had any maintenance done in quite

11:10:05  24  some time.

11:10:06  25  Q.   And there was a lot of remodeling and, I guess, rebuilding

11:10:10  1   that had to be done?

11:10:11  2   A.   Yes.

11:10:11  3   Q.   And did you participate in the design of some of that

11:10:14  4   remodeling and rebuilding?

11:10:16  5   A.   Yes.

11:10:16  6   Q.   Tell the jury about that.

11:10:19  7   A.   Mr. Trevino asked me if I -- for input on the facilities

11:10:24  8   that I would be working with and what my thoughts were on what

11:10:29  9   would work well, and I told him my opinion on a few things.  And

11:10:33  10  I also asked him if he would visit the place that I had worked

11:10:36  11  previously and take some measurements and design the stock area

11:10:40  12  where the mares were palpated to be like that and he did.

11:10:44  13  Q.   He went and visited this place where you worked before and

11:10:48  14  did he build the stocks to those specifications?

11:10:51  15  A.   Yes.  He did.

11:10:52  16  Q.   That was at your request?

11:10:53  17  A.   Yes.

11:10:53  18  Q.   Once you began talking to Mr. Trevino, was he very open and

11:11:12  19  honest with you about the fact that he didn't know much about

11:11:16  20  breeding?

11:11:17  21  A.   Yes.  But he -- eventually that came out.  In the beginning,

11:11:24  22  I don't know that we had that frank of a discussion about it.  He

11:11:27  23  told me that he had a lot of mares and owned the two stallions

11:11:31  24  that were in Texas.  And then, once we started going on things,

11:11:35  25  then, yeah, we talked a lot about that he had never ran an

| | | |
|---|---|---|
| 11:11:40 | 1 | operation like this and that he didn't -- there were a lot of |
| 11:11:42 | 2 | things he didn't know.  He was very eager to learn and he asked |
| 11:11:44 | 3 | lots of questions. |
| 11:11:45 | 4 | Q.   He asked a lot of questions, didn't he? |
| 11:11:47 | 5 | A.   Yes. |
| 11:11:47 | 6 | Q.   And that was a regular part of, I think, your job was that |
| 11:11:54 | 7 | Mr. Trevino would come out and watch what you were doing and ask |
| 11:11:57 | 8 | you a lot of questions about what you were doing and why you were |
| 11:12:00 | 9 | doing it, correct? |
| 11:12:02 | 10 | A.   Yes. |
| 11:12:03 | 11 | Q.   And did you indicate to him that that was okay, that's what |
| 11:12:09 | 12 | you were there for and you would help him learn? |
| 11:12:11 | 13 | A.   Yes. |
| 11:12:12 | 14 | Q.   And you did that? |
| 11:12:13 | 15 | A.   Yes. |
| 11:12:15 | 16 | Q.   Now, in a horse-breeding operation, oftentimes the stallion |
| 11:12:23 | 17 | and mare may not be onsite? |
| 11:12:25 | 18 | A.   Correct. |
| 11:12:26 | 19 | Q.   And explain that to the members of the jury because that |
| 11:12:28 | 20 | sounds kind of odd. |
| 11:12:30 | 21 | A.   Yes.  There's different situations where someone may own a |
| 11:12:35 | 22 | mare or several mares and they may live in a city or they may be |
| 11:12:39 | 23 | a businessperson that this is a hobby for, and so, they're not |
| 11:12:42 | 24 | directly involved in that horse's care.  They're an owner.  And |
| 11:12:46 | 25 | the horse is cared for out of a breeding farm or facility, may |

| | | |
|---|---|---|
| 11:12:50 | 1 | have an agent that moves up from different facilities, depending |
| 11:12:54 | 2 | on what the needs of that mare is.  Also, stallions are often |
| 11:12:59 | 3 | owned that way and stood at a stallion station, and sometimes |
| 11:13:04 | 4 | stallions and mares are even owned by multiple partners. |
| 11:13:08 | 5 | Q.   So it's not unusual for the stallions to be in one city and |
| 11:13:13 | 6 | the mare to be in another city? |
| 11:13:16 | 7 | A.   Oh, no.  Also, shipped semen is a very common thing in horse |
| 11:13:21 | 8 | breeding.  If we live in Texas and we want to breed to a very |
| 11:13:24 | 9 | valuable stallion in California, they collect the stallion and |
| 11:13:29 | 10 | Fed-Ex it overnight, and you're able to breed the mare and get |
| 11:13:33 | 11 | pregnancies.  That's very common. |
| 11:13:35 | 12 | Q.   And then, you talked about this a little it.  I just want to |
| 11:13:39 | 13 | flush it out a little bit. |
| 11:13:40 | 14 |        You impregnate the mare hopefully. |
| 11:13:46 | 15 | A.   Yes. |
| 11:13:47 | 16 | Q.   Right?  And then, oftentimes, you flush the embryo from that |
| 11:13:52 | 17 | mare and put it into a recipient mare? |
| 11:13:54 | 18 | A.   Correct. |
| 11:13:55 | 19 | Q.   And I think you told the jury why that is.  But that's a |
| 11:13:58 | 20 | really common -- |
| 11:14:00 | 21 | A.   On valuable horses that's a very common practice. |
| 11:14:02 | 22 | Q.   And that's another reason to have -- you have to have more |
| 11:14:06 | 23 | horses so you've got now.  You've got the mares at your breeding |
| 11:14:10 | 24 | farm.  Some belong to the farm and some belong to other people |
| 11:14:13 | 25 | who. |

| | | |
|---|---|---|
| 11:14:14 | 1 | A.   Who are paying you to manage their horse.  Yes. |
| 11:14:17 | 2 | Q.   All right.  And then, you've got these recipient mares that |
| 11:14:20 | 3 | are generally owned by the farm, right?  That's part of the |
| 11:14:23 | 4 | breeding operation.  That's part of what people are paying for? |
| 11:14:26 | 5 | A.   Right. |
| 11:14:26 | 6 | Q.   And so then, your job is to monitor the mare, the actual |
| 11:14:36 | 7 | mother of the baby to determine when the right time is for her to |
| 11:14:41 | 8 | get pregnant? |
| 11:14:42 | 9 | A.   Right.  You monitor. |
| 11:14:44 | 10 | Q.   Correct me at any time. |
| 11:14:45 | 11 | A.   No.  You're fine.  You monitor her daily and you're also |
| 11:14:48 | 12 | monitoring correspondent recipient mares because they need to be |
| 11:14:52 | 13 | at the same stage in the cycle. |
| 11:14:54 | 14 | Q.   All right.  So the mare that actually gets pregnant and the |
| 11:14:57 | 15 | mare that's going to carry the baby have to be at the same point |
| 11:15:00 | 16 | in their cycle for this all to work right? |
| 11:15:03 | 17 | A.   Right. |
| 11:15:03 | 18 | Q.   And how do you do that?  Do you do that artificially, or |
| 11:15:07 | 19 | does that just happen naturally? |
| 11:15:09 | 20 | A.   You can do both.  The most successful way is to have it |
| 11:15:15 | 21 | naturally, and that requires a very large number of recipient |
| 11:15:17 | 22 | mares.  It can be manipulated with hormones, but it doesn't work |
| 11:15:21 | 23 | as well that way; and it becomes more expensive because you have |
| 11:15:24 | 24 | to pay for the hormone. |
| 11:15:26 | 25 | Q.   And what about lighting? |

11:15:28  1   A.   I'm sorry, yes.  And lighting, that's not really to

11:15:32  2   synchronize the donor and recipient mares.  That has more to do

11:15:35  3   with artificially shifting the breeding season.

11:15:38  4   Q.   Tell the members of the jury about that.

11:15:39  5   A.   So horses are seasonal breeders.  They naturally cycle in

11:15:44  6   the spring and the summer, and then, they'll shut down and not

11:15:48  7   cycle at all over the fall and over the winter.  But breeding

11:15:53  8   associations have a January 1st birthday assigned to every horse.

11:15:57  9   So it doesn't matter if your horse is born on December 31st, on

11:16:00  10  January 1st, it's considered a year old.  Horses are more

11:16:05  11  valuable, especially in the racing industry, if they're born

11:16:09  12  earlier in the year because that allows them more time to grow by

11:16:12  13  sales season.

11:16:13  14       So instead of waiting until March, April, May for the

11:16:16  15  mares to start cycling naturally, it's very common to

11:16:20  16  artificially shift that with a lighting regimen.  The light is

11:16:24  17  what signals them to begin cycling.  So most people will start

11:16:29  18  artificial lighting in November, and then, by January, the mares

11:16:32  19  are ready to start breeding.

11:16:34  20  Q.   And how do you do the artificial lighting?

11:16:37  21  A.   There's big floodlights that like you would see at a

11:16:41  22  football stadium.  The mares need 16 hours of continuous light,

11:16:45  23  and so, you have those where they come on and go off at a certain

11:16:50  24  time till about 16 hours of total light, including the sun.

11:16:54  25  Q.   And did you -- were those installed and did you have those

| | | |
|---|---|---|
| 11:16:58 | 1 | at Jose Trevino's farm? |
| 11:17:00 | 2 | A.    Those were eventually installed.  The recipient mares did |
| 11:17:07 | 3 | not go under lights in November, like they normally would have, |
| 11:17:09 | 4 | because things were not up and operational then. |
| 11:17:12 | 5 | Q.    But by November of 2012? |
| 11:17:18 | 6 | A.    November of 2011, they were not.  November of 2012, I wasn't |
| 11:17:23 | 7 | there anymore.  But sometime during the breeding season -- |
| 11:17:29 | 8 | Q.    Sometime? |
| 11:17:29 | 9 | A.    -- they were installed while I was there. |
| 11:17:37 | 10 | Q.    Got a little off track.  So we're having the mare -- the |
| 11:17:44 | 11 | brood mare.  Is that the right term? |
| 11:17:46 | 12 | A.    Donor mare. |
| 11:17:47 | 13 | Q.    The donor mare and the recipient mare at the same site? |
| 11:17:50 | 14 | A.    Yes. |
| 11:17:51 | 15 | Q.    You're trying to do that, right?  And so, then, you -- what |
| 11:17:55 | 16 | happens next? |
| 11:17:57 | 17 | A.    You're tracking them, the mare will grow a follicle on her |
| 11:18:02 | 18 | ovary, and when it gets to an appropriate size, we would either |
| 11:18:06 | 19 | order semen from a stallion offsite or be preparing her to breed |
| 11:18:10 | 20 | to a stallion onsite.  Normally I would give them an |
| 11:18:15 | 21 | ovulation-inducing drug, and then, the next day, they would be |
| 11:18:18 | 22 | bred, and the day after that, they should have ovulated.  And |
| 11:18:22 | 23 | then, to synchronize the recipient mare, I would give her the |
| 11:18:26 | 24 | ovulation-inducing drug one day after I gave it to the donor |
| 11:18:30 | 25 | mare, and then, she would ovulate one day later so that they were |

| | | |
|---|---|---|
| 11:18:34 | 1 | close, but that the recipient mare was a little bit behind the |
| 11:18:37 | 2 | donor. |
| 11:18:37 | 3 | Q.   And then, how soon, again, can the donor mare be bred? |
| 11:18:43 | 4 | A.   So when she ovulates, it's typically seven to eight days |
| 11:18:47 | 5 | that we would do an embryo flush.  And on that day, she's given a |
| 11:18:51 | 6 | shot that will cause her to come back in heat and from that -- |
| 11:18:56 | 7 | from the day of the shot to when she's in heat is usually about a |
| 11:18:59 | 8 | week.  So basically -- |
| 11:19:02 | 9 | Q.   The whole process starts -- |
| 11:19:04 | 10 | A.   -- every two weeks, you could be breeding a mare and |
| 11:19:06 | 11 | flushing her. |
| 11:19:07 | 12 | Q.   And what kind of hours do you work during that time? |
| 11:19:09 | 13 | A.   Depends on the size of the operation but long hours.  It's |
| 11:19:13 | 14 | seven days a week during that -- during the breeding season. |
| 11:19:16 | 15 | Q.   And that's, I assume, why you wanted to be paid more during |
| 11:19:21 | 16 | that time, in order to load your salary during that time and less |
| 11:19:26 | 17 | during the time -- |
| 11:19:27 | 18 | A.   Yes.  I had had a different experience that had nothing to |
| 11:19:30 | 19 | do with Mr. Trevino where I was worked very hard for the breeding |
| 11:19:33 | 20 | season and then, let go and lost what I felt was a lot of money I |
| 11:19:38 | 21 | was paid.  So it had nothing to do with my situation with Mr. |
| 11:19:40 | 22 | Trevino.  It's just something I wanted to do. |
| 11:19:50 | 23 | Q.   During breeding season while you're out there working, how |
| 11:19:54 | 24 | many hours a day did you see Mr. Trevino? |
| 11:19:57 | 25 | A.   He was always there when I got there in the morning, and he |

| | | |
|---|---|---|
| 11:20:02 | 1 | was there every day unless he was traveling.  He was present all |
| 11:20:06 | 2 | the time. |
| 11:20:07 | 3 | Q.   He was a very active part of this horse-breeding operation? |
| 11:20:12 | 4 | A.   Yes.  He was very involved.  He was very hard-working.  He |
| 11:20:16 | 5 | was in the middle of everything. |
| 11:20:18 | 6 | Q.   All right.  And I don't mean to be indelicate, but at the |
| 11:20:22 | 7 | time that Mr. Trevino hired you, or sometime during that time, |
| 11:20:27 | 8 | you became pregnant? |
| 11:20:28 | 9 | A.   Yes.  Seemed like I am perpetually pregnant. |
| 11:20:34 | 10 | Q.   And was that a source of some concern for Mr. Trevino as you |
| 11:20:38 | 11 | started working these long hours? |
| 11:20:41 | 12 | A.   In the beginning, I tried to be reassuring that was my |
| 11:20:45 | 13 | second pregnancy, and I worked very hard the pregnancy before and |
| 11:20:48 | 14 | had no trouble with it.  And so, when I told him I was a little |
| 11:20:50 | 15 | nervous how he would react, but he was very nice about that. |
| 11:20:54 | 16 | During the course of my pregnancy, I did get sick several times, |
| 11:20:58 | 17 | and Mr. Trevino was very worried about that, very compassionate, |
| 11:21:03 | 18 | very sympathetic about my pregnancy. |
| 11:21:06 | 19 | Q.   And kept telling you to go home and -- |
| 11:21:08 | 20 | A.   Yes. |
| 11:21:09 | 21 | Q.   You said you had things to do? |
| 11:21:11 | 22 | A.   Yeah. |
| 11:21:12 | 23 | Q.   There was that sort of tension going on? |
| 11:21:14 | 24 | A.   Yes.  He -- I wanted to get the work done and he was worried |
| 11:21:18 | 25 | about me overdoing it. |

| | | |
|---|---|---|
| 11:21:19 | 1 | Q.   What about you mentioned Mr. Trevino's children.  Did they |
| 11:21:30 | 2 | also work on the farm? |
| 11:21:31 | 3 | A.   Yes.  Two of them did.  Two of them were there, but they |
| 11:21:34 | 4 | were younger children.  They didn't work. |
| 11:21:36 | 5 | Q.   Did they come out and watch you quite a bit, the younger |
| 11:21:38 | 6 | children? |
| 11:21:39 | 7 | A.   Yes.  They were always around. |
| 11:21:44 | 8 | Q.   Did it seem like they wanted to learn about farming and |
| 11:21:48 | 9 | horses and all the things they could learn from you? |
| 11:21:50 | 10 | A.    Yes.  They had never been around anything like what we were |
| 11:21:54 | 11 | doing, and they thought it was very interesting and asked a lot |
| 11:21:57 | 12 | of questions. |
| 11:21:57 | 13 | Q.   How did you get paid? |
| 11:22:05 | 14 | A.   By check once a month. |
| 11:22:08 | 15 | Q.   Do you remember what company that check came from? |
| 11:22:10 | 16 | A.   From Zule Farms. |
| 11:22:12 | 17 | Q.   From Zule Farms? |
| 11:22:14 | 18 | A.   Uh-huh. |
| 11:22:14 | 19 | Q.   Or 66 Land? |
| 11:22:15 | 20 | A.   I may have received one or two checks in the beginning from |
| 11:22:19 | 21 | 66 Land and Cattle or something like that. |
| 11:22:22 | 22 | Q.   Were you aware of the business structure? |
| 11:22:26 | 23 | A.   No.  I wasn't involved in any of the business structure. |
| 11:22:29 | 24 | Q.   So in terms of what part of the business Zule Farms did, |
| 11:22:37 | 25 | what part of the business 66 Land did, and what part of the |

| 11:22:39 | 1 | business Tremor Enterprises did, you didn't get involved in that? |
| 11:22:43 | 2 | A.   No.   Those are all names I heard for different reasons, but |
| 11:22:46 | 3 | as far as what they actually meant, I don't know. |
| 11:22:47 | 4 | Q.   You didn't know.  How many employees were there? |
| 11:22:53 | 5 | A.   There was probably seven to ten farm workers. |
| 11:22:56 | 6 | Q.   So there were people who did billing and that was mostly -- |
| 11:23:01 | 7 | A.   The billing was all done by Zulema and Alex Trevino. |
| 11:23:06 | 8 | Q.   So Zulema and Alex did the billing, but there were people |
| 11:23:09 | 9 | who did -- |
| 11:23:10 | 10 | A.   Who cleaned the stalls, who led the mares, who fed, who |
| 11:23:13 | 11 | watered, those kinds of things. |
| 11:23:14 | 12 | Q.   And then, sometimes would a horse owner send an employee of |
| 11:23:21 | 13 | their own to kind of monitor what was going on at the farm, as |
| 11:23:24 | 14 | well? |
| 11:23:25 | 15 | A.   Not to my knowledge.  No. |
| 11:23:27 | 16 | Q.   Even after the babies were born -- we haven't quite got to |
| 11:23:31 | 17 | that part yet, but even after the babies were born, would |
| 11:23:33 | 18 | somebody send a trainer to see the foal, to take care of it? |
| 11:23:39 | 19 | A.   If that happened, I wasn't involved.  Pretty much everyone |
| 11:23:43 | 20 | that came around that didn't work at the farm spoke Spanish, and |
| 11:23:47 | 21 | I don't speak Spanish, so that could have been why they were |
| 11:23:49 | 22 | there.  But I wouldn't know. |
| 11:23:50 | 23 | Q.   Fair enough.  When the baby is finally born, what does that |
| 11:24:00 | 24 | mean for you as the farm veterinarian? |
| 11:24:05 | 25 | A.   What duties that entailed? |

| | | |
|---|---|---|
| 11:24:07 | 1 | Q.   Yes.   Kind of changes your -- |
| 11:24:10 | 2 | A.   Sure.   So I wasn't the one that was there watching them foal |
| 11:24:15 | 3 | and all of that.   I lived about 45 minutes away, so if there was |
| 11:24:19 | 4 | a big problem, they would have probably called someone closer for |
| 11:24:22 | 5 | that.   But once the baby was on the crown, I gave them |
| 11:24:26 | 6 | hyperimmune plasma, which is plasma collected from a horse that's |
| 11:24:30 | 7 | either been vaccinated for or challenged with specific diseases. |
| 11:24:35 | 8 | Specifically, there's a pneumonia disease called Rhodococcus |
| 11:24:39 | 9 | that's very prevalent among large horse farms, and it could be |
| 11:24:43 | 10 | fatal to foals.   The most valuable foals are given this |
| 11:24:46 | 11 | hyperimmune Rhodococcus formula on the day they're born and then, |
| 11:24:50 | 12 | two weeks later, and I was the one that did that. |
| 11:24:53 | 13 | Q.   And you mentioned plasma. |
| 11:24:55 | 14 | A.   Yes. |
| 11:24:55 | 15 | Q.   I think sometimes foals are given plasma? |
| 11:24:58 | 16 | A.   All of them receive day one and day 14 hyperimmune plasma. |
| 11:25:02 | 17 | Q.   And how did you keep track of the work that you did so they |
| 11:25:07 | 18 | could be billed out to the respective mare owner? |
| 11:25:09 | 19 | A.   That was what Alex Trevino did. |
| 11:25:11 | 20 | Q.   That's why she was with you every day, marking down what you |
| 11:25:14 | 21 | did and that sort of thing? |
| 11:25:15 | 22 | A.   Yes. |
| 11:25:34 | 23 | Q.   Jose was a good boss? |
| 11:25:36 | 24 | A.   Yes. |
| 11:25:36 | 25 | Q.   He offered to send you to seminars and pay for them himself? |

| | | |
|---|---|---|
| 11:25:41 | 1 | A.   Yeah.  That was part of our employment agreement, as well. |
| 11:25:44 | 2 | Q.   Again, your life experience? |
| 11:25:47 | 3 | A.   Well, that's pretty common, actually, for veterinarians to |
| 11:25:50 | 4 | have that included. |
| 11:25:52 | 5 | Q.   This was a real business. |
| 11:25:56 | 6 | A.   Yes. |
| 11:25:58 | 7 | Q.   It involved real work? |
| 11:25:59 | 8 | A.   Yes. |
| 11:26:00 | 9 | Q.   Actual horses? |
| 11:26:01 | 10 | A.   Yes. |
| 11:26:01 | 11 | Q.   And Jose was a very big part of that? |
| 11:26:04 | 12 | A.   Yes. |
| 11:26:05 | 13 | Q.   No further questions. |
| 11:26:10 | 14 | MR. DEGEURIN:  No questions. |
| 11:26:11 | 15 | MR. WOMACK:  No questions, your Honor. |
| 11:26:12 | 16 | MR. ESPER:  I have none, your Honor. |
| 11:26:14 | 17 | MR. MAYR:  Neither do I, your Honor. |
| 11:26:16 | 18 | RE-DIRECT EXAMINATION |
| 11:26:16 | 19 | BY MR. GARDNER: |
| 11:26:18 | 20 | Q.   Ms. Williams asked you if this was a real business? |
| 11:26:21 | 21 | A.   Yes. |
| 11:26:21 | 22 | Q.   You said yes. |
| 11:26:22 | 23 | A.   Yes. |
| 11:26:23 | 24 | Q.   Did you know the source of the funds to pay for this real |
| 11:26:26 | 25 | business? |

| | | |
|---|---|---|
| 11:26:26 | 1 | A.   Only what I was told that it came from the construction |
| 11:26:29 | 2 | company. |
| 11:26:30 | 3 | Q.   And that came from the Defendant Jose Trevino? |
| 11:26:32 | 4 | A.   Yes. |
| 11:26:33 | 5 | Q.   Took a lot of money to run that type of an operation? |
| 11:26:36 | 6 | A.   Yes. |
| 11:26:37 | 7 | Q.   Now, I think you originally said that when you first |
| 11:26:41 | 8 | started, there was about 30 or 40 mares, and then, some point, it |
| 11:26:45 | 9 | bumped to 3 to 400 or 4 to 500 mares? |
| 11:26:49 | 10 | A.   Correct. |
| 11:26:49 | 11 | Q.   And were those mares, the increasing amount of mares, were |
| 11:26:54 | 12 | they being delivered during the breeding season? |
| 11:26:57 | 13 | A.   Yes. |
| 11:26:59 | 14 | Q.   Is it unusual for mares to be delivered in that quantity to |
| 11:27:03 | 15 | a first-year breeding operation in your experience? |
| 11:27:08 | 16 | A.   It depends on which type of mare that you're talking about. |
| 11:27:12 | 17 | The donor mares.  It is very common for those to fluctuate |
| 11:27:17 | 18 | between farms.  The recipient mares are usually all in place at |
| 11:27:20 | 19 | the beginning of breeding season and, in this case, would have |
| 11:27:24 | 20 | been several hundred horses.  The reason for that is these mares |
| 11:27:28 | 21 | are mares that are bought at sales all around the country. |
| 11:27:33 | 22 | They're usually very poor body condition.  They've been exposed |
| 11:27:35 | 23 | to lots of diseases.  They're under a lot of stress.  You want to |
| 11:27:39 | 24 | get them to the farm, get them healthy, get them under lights and |
| 11:27:42 | 25 | have them ready to go by breeding season.  So usually you don't |

| | | |
|---|---|---|
| 11:27:45 | 1 | buy recipient mares during the season. |
| 11:27:47 | 2 | Q.   And those are usually $500 horses, right? |
| 11:27:50 | 3 | A.   Yeah.  Kind of depends on the market, but they're clean |
| 11:27:53 | 4 | horses that normally would go to slaughter, and we're buying them |
| 11:28:00 | 5 | and using them for a different purpose. |
| 11:28:01 | 6 | Q.   And I guess my better question probably should have been, is |
| 11:28:04 | 7 | it common for owners such as these four that you listed to put |
| 11:28:10 | 8 | all their valuable mares in a first-year breeding operation? |
| 11:28:16 | 9 | A.   I don't really know how to answer that question.  It depends |
| 11:28:19 | 10 | on the owner and their relationship with who owns the farm. |
| 11:28:24 | 11 | Q.   Did you ever meet any of the four listed owners who you saw |
| 11:28:28 | 12 | on the Wise Option? |
| 11:28:31 | 13 | A.   No.  I never went and visited. |
| 11:28:32 | 14 | Q.   Ms. Williams also asked you that Mr. Trevino seemed to ask |
| 11:28:36 | 15 | you a lot of questions? |
| 11:28:37 | 16 | A.   Yes. |
| 11:28:38 | 17 | Q.   At the beginning of your employment, did he seem to be very |
| 11:28:41 | 18 | knowledgeable about the breeding operations? |
| 11:28:44 | 19 | A.   Yes.  And I think I assumed a lot of things base -- because |
| 11:28:49 | 20 | he was very knowledgeable about certain things, but there's some |
| 11:28:54 | 21 | gaps in what he knew and I think I assumed he knew a lot more |
| 11:28:57 | 22 | than he did in the beginning.  And then, as things came out and |
| 11:29:01 | 23 | we talked, I realized there were some gaps in what he had been |
| 11:29:04 | 24 | exposed to. |
| 11:29:05 | 25 | Q.   You educated him as the employment period went along? |

| | | |
|---|---|---|
| 11:29:09 | 1 | A.   As best I could. |
| 11:29:11 | 2 | Q.   Pass the witness. |
| 11:29:13 | 3 | MS. WILLIAMS:  No further questions. |
| 11:29:14 | 4 | THE COURT:  May this witness be excused? |
| 11:29:16 | 5 | MR. DEGEURIN:  Yes. |
| 11:29:17 | 6 | MS. WILLIAMS:  Yes, your Honor. |
| 11:29:18 | 7 | MR. GARDNER:  Yes, sir. |
| 11:29:19 | 8 | THE COURT:  All right.  You may be excused, ma'am. |
| 11:29:23 | 9 | Call your next witness. |
| 11:29:24 | 10 | MR. GARDNER:  Your Honor, the government calls Mr. Bill |
| 11:29:43 | 11 | Pilgrim. |
| 11:30:22 | 12 | THE COURT:  Come forward, please. |
| 11:30:23 | 13 | (Witness sworn.) |
| 11:30:48 | 14 | THE COURT:  I want you to tell us your full name, |
| 11:30:50 | 15 | please, sir, and spell your last name. |
| 11:30:54 | 16 | THE WITNESS:  William Jesse Pilgrim.  My spelling on |
| 11:30:57 | 17 | the last name is P-I-L-G-R-I-M. |
| 11:31:02 | 18 | WILLIAM J. PILGRIM, called by the Government, duly sworn. |
| 11:31:02 | 19 | DIRECT EXAMINATION |
| 11:31:02 | 20 | BY MR. GARDNER: |
| 11:31:03 | 21 | Q.   Thank you, your Honor. |
| 11:31:03 | 22 | Mr. Pilgrim, you and I have met.  Could you please |
| 11:31:06 | 23 | introduce yourself to the jury?  Tell them how old you are and |
| 11:31:08 | 24 | what you do for a living. |
| 11:31:09 | 25 | A.   I'm 60 years old and I'm -- I've been a builder for quite -- |

11:31:17  1   most all of my life.  And I'm now somewhat retired and I do breed

11:31:24  2   and raise race horses.

11:31:26  3   Q.   You're also involved in the real estate business a little

11:31:30  4   bit?

11:31:30  5   A.   Yes, sir.  I've always been in the real estate throughout my

11:31:37  6   career.

11:31:38  7   Q.   If you will, could you please explain to the jury what your

11:31:42  8   experience is in the quarter horse business?

11:31:47  9   A.   I started fairly young interested in horses.  I've been

11:31:51 10   around horses most of my life, and I turned to racing back in the

11:31:56 11   early '80s.  And what I did, I wanted to, you know, be able to do

11:32:01 12   as many aspects of it as I could, which was breeding and racing

11:32:08 13   and, also, in -- somewhat in the stallion industry.

11:32:11 14   Q.   And, sir, did you up to a year ago own a piece of property

11:32:16 15   in Lexington, Oklahoma?

11:32:18 16   A.   Yes, sir.  I still own that.

11:32:19 17   Q.   Still own.  That's right.  And what is the address of that

11:32:22 18   property?

11:32:22 19   A.   17850 84th Street, Lexington, Oklahoma.

11:32:29 20   Q.   And what does that property consist of, the acreage and the

11:32:33 21   structures on it?

11:32:34 22   A.   It was 60 acres, a home, three-bedroom home, approximately

11:32:44 23   13-stall, what we call a mare barn or training barn, a two-stall

11:32:51 24   stud barn, and then, a quite tall hay barn was the structures.

11:33:01 25   Q.   And did you have a neighbor next door to you that you've

11:33:05   1   known for many years?

11:33:06   2   A.   Yes.   My time in Oklahoma up there, I knew the Douglases.

11:33:12   3   Yes, sir.

11:33:13   4   Q.   Van Douglas and his wife?

11:33:18   5   A.   Yes, sir.

11:33:19   6   Q.   And did they own a piece of property next to you?

11:33:21   7   A.   I was on the south line.   They was on the north line of the

11:33:23   8   same quadrant.

11:33:24   9   Q.   Did y'all have a fence between the properties?

11:33:27  10   A.   Yes, sir.

11:33:27  11   Q.   And would you consider Mr. Douglas a friend of yours?

11:33:30  12   A.   Yes, sir.

11:33:32  13   Q.   And could you please describe to the jury what structures

11:33:35  14   were on his property?

11:33:39  15   A.   The main barn there was approximately a 300-foot long -- I

11:33:46  16   think in the beginning, it was probably built for a mare motel,

11:33:50  17   and he primarily trained his own personal horses over a lot of

11:33:59  18   years.   The other structures would have been a small hay barn,

11:34:05  19   garage type, and then, a doublewide mobile home.   And I think as

11:34:13  20   far as permanent structure, that's all I can remember at that

11:34:17  21   time.

11:34:17  22   Q.   There was some point in September of 2011 when you learned

11:34:20  23   that Mr. Douglas was selling his property?

11:34:22  24   A.   He had let us -- I knew it was for sale that summer, and we

11:34:30  25   learned that he, you know, he needed to sell it and wanted to

| | | |
|---|---|---|
| 11:34:38 | 1 | sell it, and I would think it would probably be August or |
| 11:34:40 | 2 | September. |
| 11:34:41 | 3 | Q.   Okay.  Do you know an individual by the name of Jose |
| 11:34:44 | 4 | Trevino? |
| 11:34:45 | 5 | A.   Yes, sir. |
| 11:34:45 | 6 | Q.   And do you see him here in the courtroom today? |
| 11:34:47 | 7 | A.   Yes, sir. |
| 11:34:48 | 8 | Q.   Could you please point him out and describe an article of |
| 11:34:51 | 9 | clothing? |
| 11:34:51 | 10 | A.   He's standing right over there with the gray suit on. |
| 11:34:54 | 11 | Q.   Your Honor, may the record reflect the witness has |
| 11:34:55 | 12 | identified the Defendant Jose Trevino? |
| 11:34:58 | 13 | A.   Yes, sir. |
| 11:34:59 | 14 |         THE COURT:  So reflects. |
| 11:35:00 | 15 | Q.   (BY MR. GARDNER) And when did you meet him, sir? |
| 11:35:02 | 16 | A.   That would have been September of 2011, approximately the |
| 11:35:09 | 17 | 20th, 21st day of the month. |
| 11:35:12 | 18 | Q.   And was that a chance meeting?  Or did one of you contact |
| 11:35:15 | 19 | the other? |
| 11:35:17 | 20 | A.   A third party approached me that had just said that he would |
| 11:35:25 | 21 | like to meet me, and I said that's fine. |
| 11:35:29 | 22 | Q.   I'm sorry.  Where did you meet him again? |
| 11:35:31 | 23 | A.   That was at the Heritage Place sale in Oklahoma City. |
| 11:35:37 | 24 | Q.   And what did you and Mr. Jose Trevino talk about? |
| 11:35:42 | 25 | A.   He just made mention that he was going to be my neighbor, |

| | | |
|---|---|---|
| 11:35:46 | 1 | that he was purchasing that farm north of me, and that at some |
| 11:35:54 | 2 | time, he liked to consider talking to me about purchasing mine. |
| 11:35:58 | 3 | Q.   And what was your response to that request to purchase your |
| 11:36:00 | 4 | property? |
| 11:36:01 | 5 | A.   I first, you know, was pretty reluctant to necessarily |
| 11:36:08 | 6 | wanting to move or wanting to sell.  So, as I recall, I just |
| 11:36:14 | 7 | mentioned it.  I didn't think I was ready to talk about it as far |
| 11:36:21 | 8 | as -- it hit me kind of cold. |
| 11:36:23 | 9 | Q.   And did you become aware at some point where Mr. Douglas did |
| 11:36:27 | 10 | sell his ranch to the Defendant Jose Trevino? |
| 11:36:30 | 11 | A.   I knew at that point that it was sold.  I didn't know |
| 11:36:34 | 12 | exactly who the purchaser was.  But I guess I did know that it |
| 11:36:43 | 13 | was being sold.  I don't think it was closed at that point. |
| 11:36:48 | 14 | Q.   That was my next question.  Do you know when it closed? |
| 11:36:51 | 15 | A.   I thought it probably closed in October, just guessing, |
| 11:36:56 | 16 | because that was the time period of the moving.  They moved out. |
| 11:36:59 | 17 | Q.   And when did you first see the Defendant Jose Trevino taking |
| 11:37:03 | 18 | occupancy of that portion of the land? |
| 11:37:07 | 19 | A.   It would probably have been in October. |
| 11:37:11 | 20 | Q.   Could you just describe for the jury what activity you saw |
| 11:37:16 | 21 | Mr. Jose Trevino do on that portion of the quadrant? |
| 11:37:20 | 22 | A.   Mostly construct -- a lot of construction taking place as |
| 11:37:25 | 23 | far as changing its -- the structure of the building and, you |
| 11:37:36 | 24 | know, of course, horses -- they were bringing in horses and that |
| 11:37:42 | 25 | kind of -- you know, a lot of construction. |

11:37:45  1   Q.   Let's talk about that for a second.  When you say

11:37:47  2   construction, would you classify it as extensive construction?

11:37:53  3   A.   Well, I mean, I felt like they was doing a tremendous job of

11:37:58  4   improving the property basically.

11:38:01  5   Q.   And that improvement of property, did it appear to be they

11:38:05  6   were putting forth every effort to make it the best piece of

11:38:10  7   property they could?

11:38:11  8   A.   Probably so.  Yes, sir.

11:38:14  9   Q.   You talked about a lot of horses coming in.  Could you

11:38:17  10  describe the arrival of horses at that piece of property?

11:38:20  11  A.   They were arriving probably daily, what I would recall.

11:38:30  12  Q.   And how would they arrive?

11:38:32  13  A.   By van or truck, horse truck.

11:38:34  14  Q.   Do you recall the size of the horse trailers that they --

11:38:36  15  A.   I'm pretty sure that most days, it would be a ten-horse

11:38:40  16  trailer, probably came mostly every day for a while.

11:38:46  17  Q.   And from October until -- and I know we're going to get to

11:38:49  18  January here in a little bit.

11:38:50  19  A.   Okay.

11:38:51  20  Q.   Did Mr. Trevino re-approach you, questioning you purchasing

11:38:56  21  your piece of property?

11:38:57  22  A.   We talked numerous times trying to come up with a plan for

11:39:04  23  to sell it.

11:39:05  24  Q.   And did your mind about selling your portion of that

11:39:09  25  quadrant change at some point?

```
11:39:10   1   A.    Yes, sir.

11:39:11   2   Q.    Okay.  Why was that?

11:39:17   3   A.    Primarily, my position -- and my wife and I talked about it

11:39:21   4   and after we -- we've always -- as long as we've done this, have

11:39:27   5   always kept a controlled herd or a private herd that we just

11:39:32   6   didn't try to participate in where animals came and went.  We

11:39:39   7   tried to keep them disease-free, that kind of thing.  And my

11:39:42   8   experience has always been that when you have too many in one

11:39:47   9   spot, you're probably going to have problems.  Those problems

11:39:51  10   lead to bigger problems.

11:39:54  11   Q.    When you say problems, how did you see those problems on

11:40:00  12   the --

11:40:00  13   A.    Well, disease, flies, you know, any livestock, not just

11:40:05  14   horses, and just -- it was -- we never wanted our horses touching

11:40:13  15   noses with unknown horses that we don't know what their origin

11:40:19  16   was.

11:40:20  17   Q.    And based on your experience of 20-some years in the quarter

11:40:24  18   horse business, did the Van Douglas piece of property that Mr.

11:40:29  19   Trevino bought have too many horses?

11:40:31  20   A.    Oh, no.  Before when Mr. Douglas had it?

11:40:34  21   Q.    No.  When Mr. Trevino had it.

11:40:35  22   A.    Oh, as time went by, it was multiplying.

11:40:38  23   Q.    In your opinion, did that amount of acreage -- was that

11:40:42  24   amount sufficient to support the number of horses that Jose

11:40:45  25   Trevino had on it?
```

11:40:46   1   A.   In my way of doing it or my way of thinking, it was very

11:40:52   2   much in excess.

11:40:55   3   Q.   Now, you mentioned to me in our last conversation about

11:41:01   4   things that you saw involving flashlights.  Do you recall that

11:41:04   5   conversation?

11:41:04   6   A.   Yes, sir.  I'm aware that I know at night, they would patrol

11:41:14   7   the pastures with flashlights, as actually going out in the area

11:41:20   8   with the horses.  And I felt like there was probably, you know,

11:41:26   9   just keeping an eye on things or whatever.  I thought it was

11:41:30   10   dangerous because of stampeding and that kind of thing.

11:41:33   11   Q.   Had you ever seen that before in your 20 years?

11:41:36   12   A.   Stampede or?

11:41:37   13   Q.   The flashlights?

11:41:39   14   A.   No.  No.  Not that -- not with the quantity of horses.  To

11:41:44   15   me, it's dangerous.

11:41:46   16   Q.   Well, how so?

11:41:47   17   A.   Well, a horse is a flight animal and if they want to get

11:41:52   18   away from something, they're going to run.  One runs, they all

11:41:55   19   run.  And somebody's out there in the dark, they could easily get

11:42:00   20   ran over.

11:42:02   21   Q.   So you're seeing this activity, this increase of horses.  At

11:42:06   22   some point, did you make a decision to sell to the defendant?

11:42:09   23   A.   Yes, sir.

11:42:09   24   Q.   Could you tell the jury about that?

11:42:11   25   A.   We came to an agreement on price and that was prior -- it

```
11:42:19   1   was before Christmas and I was -- I had to have a heart surgery
11:42:25   2   just before Christmas, and I left it that if he wanted to get
11:42:31   3   together, we would meet at the title company, which is American
11:42:35   4   Title, and they would do the contract and they would prepare the
11:42:39   5   documents and we could reach an agreement.  And we started the
11:42:44   6   paperwork and I got out of the hospital, and it hadn't been
11:42:49   7   signed at that point.  So I said, well, I'm going to visit my
11:42:52   8   family for Christmas and I will be back after that, and if you
11:42:58   9   sign it, we've got a deal.  If you don't, the deal's off.
11:43:02   10   Q.   May I stop you there for a second?
11:43:06   11   A.   Okay.
11:43:06   12   Q.   When you came to a meeting of the minds, how much did you
11:43:09   13   decide for the sale price for that property?
11:43:10   14   A.   The sales price was 500 even.
11:43:14   15   Q.   Now, did Mr. Trevino seem reluctant to go to a title
11:43:19   16   company?
11:43:20   17   A.   He was kind of somewhat reluctant to doing it that way.
11:43:25   18   Yeah.
11:43:25   19   Q.   When you got back from Christmas, in your opinion, did Mr.
11:43:31   20   Trevino's interest in your property seem to increase?
11:43:34   21   A.   It was -- he was ready to get it done.
11:43:37   22   Q.   Okay.  Can you or do you know why he was ready to get it
11:43:42   23   done?
11:43:42   24        MS. WILLIAMS:  Object to speculation.
11:43:44   25        MR. GARDNER:  I'm asking if he knew why, your Honor.
```

```
11:43:46   1         THE COURT:  I'll sustain it, the objection to the
11:43:49   2   question asked.
11:43:50   3   Q.   (BY MR. GARDNER) Did Mr. Trevino explain to you why he was
11:43:54   4   wanting to buy your property in January?
11:43:57   5         MS. WILLIAMS:  Object to hearsay.
11:43:58   6         THE COURT:  That will be overruled.
11:43:59   7   Q.   (BY MR. GARDNER) You may answer that question.
11:44:01   8   A.   Okay.  I assumed that basically breeding season starting, I
11:44:08   9   mean, it's upon us, and if he's going to be in business and doing
11:44:13  10   what his vision of that farm was, he would have had to start and
11:44:19  11   he needed more room.  And the stallion barn was on my property,
11:44:25  12   and bringing in stallions, and that kind of thing, he probably
11:44:27  13   needed it a lot worse than I did.
11:44:29  14   Q.   The stallion barn is for the purpose of bringing the
11:44:32  15   stallions in?
11:44:33  16   A.   Well, it was just a very nice, safe kind of environment for
11:44:37  17   a horse of that nature.
11:44:39  18   Q.   When you say a horse of that nature, is that expensive
11:44:43  19   horses?
11:44:43  20   A.   Well, expensive and just a stallion can be a little bit more
11:44:48  21   rambunctious, let's say, and they need to be housed away from the
11:44:55  22   mares and the other animals.  They need to be in a secured place,
11:45:01  23   I feel like.  I would want mine in a place like that.
11:45:04  24   Q.   Speaking of expensive stallions, did Mr. Trevino ever
11:45:06  25   approach you about essentially boarding a horse named Mr. Piloto?
```

| | | |
|---|---|---|
| 11:45:12 | 1 | A.    Yes, sir. |
| 11:45:12 | 2 | Q.    Could you tell the jury about that? |
| 11:45:14 | 3 | A.    He asked me before we ever got that contract finished and |
| 11:45:20 | 4 | all, could he put him in the barn and the barn was empty.  And I |
| 11:45:26 | 5 | didn't have a stallion.  My stallions are somewhere else.  And I |
| 11:45:30 | 6 | said yes. |
| 11:45:34 | 7 | Q.    And when did he arrive with that horse? |
| 11:45:37 | 8 | A.    Oh, man, I would -- it was in the winter.  I mean, I don't |
| 11:45:43 | 9 | know that date. |
| 11:45:43 | 10 | Q.    And what time of day was it? |
| 11:45:44 | 11 | A.    It was at night. |
| 11:45:46 | 12 | Q.    Did you find that odd? |
| 11:45:48 | 13 | A.    Well, I figured he probably got in a lengthy trip, you know, |
| 11:45:54 | 14 | coming from wherever he brought him to there and it was a rainy |
| 11:46:00 | 15 | night.  I mean, it was a very stormy night, and he probably got |
| 11:46:04 | 16 | delayed or something. |
| 11:46:05 | 17 | Q.    Was this prior to you selling him the property? |
| 11:46:09 | 18 | A.    Yes, sir. |
| 11:46:11 | 19 | Q.    Mr. Pilgrim, I'm showing you Government's Exhibit 32. |
| 11:46:15 | 20 | A.    Okay. |
| 11:46:15 | 21 | Q.    Do you recognize that, sir? |
| 11:46:17 | 22 | A.    Yes, sir. |
| 11:46:18 | 23 | Q.    And how do you recognize it? |
| 11:46:20 | 24 | A.    It is the contract that was prepared by American Title |
| 11:46:28 | 25 | Company for sales. |

| | | |
|---|---|---|
| 11:46:33 | 1 | MR. GARDNER:  Your Honor, I would offer Government's |
| 11:46:35 | 2 | Exhibit 32. |
| 11:46:37 | 3 | MS. WILLIAMS:  No objection. |
| 11:46:40 | 4 | MR. DEGEURIN:  No objection. |
| 11:46:40 | 5 | THE COURT:  All right.  Thirty-two is admitted. |
| 11:46:44 | 6 | Q.   (BY MR. GARDNER) Sir, this is the legal description of the |
| 11:46:47 | 7 | property where I'm generally pointing right here, correct? |
| 11:46:51 | 8 | A.   Yes, sir. |
| 11:46:51 | 9 | Q.   And when we go down here, it talks about purchase price? |
| 11:46:55 | 10 | A.   Yes, sir. |
| 11:46:56 | 11 | Q.   They've got $100,000 and $200,000 and another $200,000 |
| 11:47:01 | 12 | payment in support of the contract? |
| 11:47:03 | 13 | A.   Yes, sir. |
| 11:47:03 | 14 | Q.   When you were originally negotiating the price of the sale, |
| 11:47:06 | 15 | did Mr. Trevino offer to swap you a horse in exchange for some |
| 11:47:11 | 16 | type of horse as far as the purchase price? |
| 11:47:14 | 17 | A.   I guess the answer's yes. |
| 11:47:19 | 18 | Q.   Could you tell the jury about that? |
| 11:47:22 | 19 | A.   It was just that he thought -- I think he -- the way he put |
| 11:47:27 | 20 | it is he could probably get it -- I could get paid and get it |
| 11:47:32 | 21 | over with faster that way if I could take some of it in -- under |
| 11:47:38 | 22 | a deal that I did -- I never understood the deal.  I just didn't |
| 11:47:41 | 23 | know.  And I said I'm not interested in that, and that's the way |
| 11:47:45 | 24 | I left it. |
| 11:47:46 | 25 | Q.   And what was the deal the Defendant Jose Trevino proposed to |

11:47:51   1   you involving a horse?

11:47:53   2   A.    That he could buy a horse for -- he could buy the horse for

11:48:04   3   part of the payment on the farm, I guess you'd say, and show a

11:48:10   4   less of a basis in the amount of the farm purchase price.

11:48:13   5   Q.    So was he offering to a buy a horse from you?

11:48:19   6   A.    That's kind of the way I felt like.  I didn't have anything

11:48:23   7   that I wanted to sell.

11:48:24   8   Q.    And so, if he's lowering the purchase price, did you have a

11:48:28   9   $100,000 horse that he named specifically?

11:48:32  10   A.    No.

11:48:33  11   Q.    And did he indicate to you that the horse would be an

11:48:36  12   expensive horse or a cheap horse that he wanted to buy?

11:48:38  13   A.    He didn't really as far as explicitly have a number.  He --

11:48:43  14   just a theory is the way I look at it.

11:48:47  15   Q.    And, again, you say you rejected that --

11:48:48  16   A.    Yes.

11:48:49  17   Q.    -- offer.

11:48:50  18   A.    I rejected that.

11:48:51  19   Q.    So you got back from Christmas and then, what conversations

11:48:54  20   did you have with Mr. Trevino that got you to the title company?

11:48:57  21   A.    I was gone a little longer than I thought, and it was first

11:49:02  22   of January and when I got back.  He said, let's go to the title

11:49:08  23   company and let's get this contract finished, and within probably

11:49:14  24   one to two days, we did.  I think we finished it around the 5th.

11:49:19  25   Q.    And what was the amount that was due to you at the closing?

| 11:49:24 | 1 | A.   The final closing would be $200,000.   The earnest money |
| 11:49:30 | 2 | would have been two payments, just exactly like it says right |
| 11:49:33 | 3 | here to -- one of them was due at the time of signing.   The |
| 11:49:41 | 4 | second one was due on the 15th of February. |
| 11:49:46 | 5 | Q.   And did Mr. Trevino make both of those payments? |
| 11:49:48 | 6 | A.   Yes, sir, he did. |
| 11:49:49 | 7 | Q.   And how were they paid? |
| 11:49:50 | 8 | A.   They were made by checks from -- do you want me to tell you |
| 11:49:56 | 9 | the type of check or something? |
| 11:49:57 | 10 | Q.   Were they checks from the title company? |
| 11:49:59 | 11 | A.   Checks from I believe that was Bank of America and they were |
| 11:50:09 | 12 | very timely. |
| 11:50:10 | 13 | Q.   And the last one was interrupted by the government's |
| 11:50:13 | 14 | actions? |
| 11:50:13 | 15 | A.   Yes, sir.   It was probably -- the closing of the property |
| 11:50:16 | 16 | would have took place within two to three weeks of the date that |
| 11:50:22 | 17 | the government took over. |
| 11:50:26 | 18 | Q.   Were you ever aware where Mr. Trevino got his money? |
| 11:50:30 | 19 | A.   No, sir. |
| 11:50:31 | 20 | Q.   I'll pass the witness, your Honor. |
| 11:50:40 | 21 | CROSS-EXAMINATION |
| 11:50:54 | 22 | BY MS. WILLIAMS: |
| 11:50:54 | 23 | Q.   Do you have that property back? |
| 11:50:57 | 24 | A.   Do I have the property back?   I paid the taxes on it and |
| 11:51:00 | 25 | I've kept it insured, and I haven't been wanting to take |

| | | |
|---|---|---|
| 11:51:06 | 1 | possession of it as of right now. |
| 11:51:09 | 2 | Q.   Nothing further. |
| 11:51:10 | 3 | A.   I was just waiting for this to. |
| 11:51:16 | 4 | MR. DEGEURIN:  I have no questions. |
| 11:51:19 | 5 | MR. WOMACK:  No questions. |
| 11:51:20 | 6 | MR. ESPER:  I've got none, Judge. |
| 11:51:23 | 7 | MR. MAYR:  As well, Judge, none. |
| 11:51:24 | 8 | THE COURT:  May the witness be excused? |
| 11:51:26 | 9 | MS. WILLIAMS:  Yes, your Honor. |
| 11:51:27 | 10 | THE COURT:  You may be excused. |
| 11:51:53 | 11 | Okay.  Members of the jury, I'll give you your lunch |
| 11:51:55 | 12 | break.  Be ready to get back at 1:20.  Remember the instructions |
| 11:52:05 | 13 | and my questions at 1:20. |
| 11:52:42 | 14 | (Jury not present.) |
| 11:52:46 | 15 | THE COURT:  All right.  We're in recess till 1:20. |
| 13:22:04 | 16 | (Lunch recess.) |
| 13:22:07 | 17 | THE COURT:  Anything before we bring in the jury, |
| 13:22:09 | 18 | counsel? |
| 13:22:10 | 19 | MS. FERNALD:  Not from the government, your Honor. |
| 13:22:12 | 20 | MR. ESPER:  No, your Honor. |
| 13:22:13 | 21 | MR. WOMACK:  No, your Honor. |
| 13:22:17 | 22 | (Jury present.) |
| 13:24:06 | 23 | THE COURT:  Members of the jury, during the noon hour, |
| 13:24:11 | 24 | after you left here together, has anyone attempted to talk to you |
| 13:24:15 | 25 | about this case? |

13:24:16  1          JURORS:  No.

13:24:16  2          THE COURT:  Have you talked to anybody about the case?

13:24:19  3          JURORS:  No.

13:24:19  4          THE COURT:  And have you learned anything at all about

13:24:22  5     the case, outside the presence of each other?

13:24:24  6          JURORS:  No.

13:24:24  7          THE COURT:  Ever sung in a choir?  Show negative

13:24:31  8     responses to all questions by all jurors.

13:24:34  9          You may call your next witness.

13:24:35  10         MS. FERNALD:  Jose Carlos Hinojosa.  Your Honor, he was

13:24:51  11    sworn yesterday.

13:24:55  12         THE COURT:  He was sworn yesterday.  Have a seat.

13:25:06  13    Mr. Hinojosa, you understand that you were sworn

13:25:10  14    yesterday, so you're still under oath and to tell the truth under

13:25:18  15    the penalties of perjury?  Do you understand that?

13:25:23  16         THE WITNESS:  Yes.

13:25:24  17         THE COURT:  If you'll tell me your full name and spell

13:25:27  18    your last, please.

13:25:34  19         THE WITNESS:  Jose Carlos Hinojosa.

13:25:38  20      JOSE CARLOS HINOJOSA, called by the Government, duly sworn.

13:25:38  21                      DIRECT EXAMINATION

13:25:38  22    BY MS. FERNALD:

13:25:39  23    Q.   And do you go by a nickname, Mr. Hinojosa?

13:25:43  24    A.   Yes.  Charlie.

13:25:45  25    Q.   Can you introduce yourself to the ladies and gentlemen of

| | | |
|---|---|---|
| 13:25:48 | 1 | the jury?  Tell them how old you are, where you're from, and a |
| 13:25:52 | 2 | little bit about your educational background. |
| 13:26:13 | 3 | A.   I'm from Miguel Aleman, state of Tamaulipas.  I'm 35 years |
| 13:26:17 | 4 | old and studied to be an attorney in Mexico. |
| 13:26:19 | 5 | Q.   Did you actually practice law in Mexico? |
| 13:26:24 | 6 | A.   Yes. |
| 13:26:25 | 7 | Q.   From what year did you practice law? |
| 13:26:44 | 8 | A.   It was during the time I was doing my degree work and I was |
| 13:26:48 | 9 | working for an attorney, and then, through the end of my degree |
| 13:26:51 | 10 | work and then, I practiced.  That was around '98, '99. |
| 13:26:57 | 11 | Q.   Are you in jail right now? |
| 13:27:01 | 12 | A.   Yes. |
| 13:27:02 | 13 | Q.   What are you in jail for? |
| 13:27:10 | 14 | A.   Charges of drug conspiracy and money laundering. |
| 13:27:13 | 15 | Q.   And is that case out of Houston? |
| 13:27:19 | 16 | A.   No.  It's in McAllen, Texas. |
| 13:27:21 | 17 | Q.   Which is located -- the central place is in Houston.  Did |
| 13:27:27 | 18 | you go to court in Houston or McAllen? |
| 13:27:33 | 19 | A.   In McAllen. |
| 13:27:35 | 20 | Q.   When were you arrested on that case? |
| 13:27:42 | 21 | A.   December 2nd, 2008. |
| 13:27:48 | 22 | Q.   And are you cooperating with law enforcement -- did you |
| 13:27:53 | 23 | plead guilty to the charges? |
| 13:27:59 | 24 | A.   Yes. |
| 13:27:59 | 25 | Q.   And are you cooperating with the government? |

| | | |
|---|---|---|
| 13:28:04 | 1 | A.   Yes. |
| 13:28:04 | 2 | Q.   In other words, are you giving testimony? |
| 13:28:09 | 3 | A.   Yes. |
| 13:28:10 | 4 | Q.   In exchange for what? |
| 13:28:22 | 5 | A.   I wasn't promised anything or anything, but I know that if I |
| 13:28:26 | 6 | cooperate with the government, I can get some benefit.  If I tell |
| 13:28:37 | 7 | the truth and I cooperate and everything that the government |
| 13:28:41 | 8 | asks. |
| 13:28:42 | 9 | Q.   Then what can happen? |
| 13:28:52 | 10 | A.   My sentence could be reduced, but there's no promise or |
| 13:28:54 | 11 | anything. |
| 13:28:56 | 12 | Q.   Have you been sentenced on your case? |
| 13:29:00 | 13 | A.   Yes. |
| 13:29:00 | 14 | Q.   And how much time did you get? |
| 13:29:04 | 15 | A.   The twenty-four years.  That was with the conspiracy and 20 |
| 13:29:12 | 16 | years for money laundering. |
| 13:29:15 | 17 | Q.   And were those sentences combined so you have a total of 24 |
| 13:29:21 | 18 | years? |
| 13:29:26 | 19 | A.   Yes. |
| 13:29:31 | 20 | Q.   Do you know who Francisco Colorado-Cessa is? |
| 13:29:45 | 21 | A.   Yes. |
| 13:29:45 | 22 | Q.   And did he go by a nickname? |
| 13:29:51 | 23 | A.   We knew it was "Pancho" Colorado. |
| 13:29:53 | 24 | Q.   Is he in the courtroom today? |
| 13:29:57 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 13:29:59 | 1 | Q.   Can you identify him for us? |
| 13:30:03 | 2 | A.   Yes. |
| 13:30:04 | 3 | Q.   Do you want to stand up?  Or can you see him from where |
| 13:30:07 | 4 | you're sitting? |
| 13:30:09 | 5 | A.   I see him from here. |
| 13:30:10 | 6 | Q.   Okay.  Can you point toward him? |
| 13:30:15 | 7 | A.   Yes.  He's seated at that table over there and he's in a |
| 13:30:21 | 8 | gray suit. |
| 13:30:22 | 9 | Q.   What color is his tie? |
| 13:30:27 | 10 | A.   Like blue, aqua. |
| 13:30:29 | 11 | Q.   And what color is his shirt? |
| 13:30:32 | 12 | A.   White. |
| 13:30:34 | 13 | Q.   Your Honor, move to -- may the record reflect he has |
| 13:30:38 | 14 | properly identified the defendant? |
| 13:30:39 | 15 | THE COURT:  So reflects. |
| 13:30:42 | 16 | Q.   (BY MS. FERNALD) Mr. Hinojosa, have you testified in any |
| 13:30:50 | 17 | other cases regarding your knowledge of certain activities in |
| 13:30:55 | 18 | Mexico? |
| 13:31:01 | 19 | A.   Yes. |
| 13:31:02 | 20 | Q.   Where was that? |
| 13:31:07 | 21 | A.   In Washington, D.C. |
| 13:31:09 | 22 | Q.   When was that? |
| 13:31:13 | 23 | A.   This year.  It was about, like, March.  March -- between |
| 13:31:28 | 24 | February and March. |
| 13:31:29 | 25 | Q.   All right.  And did you -- do you know whether or not there |

13:31:33  1   was a transcript or paper made of everything that you said?

13:31:45  2   A.    No.  I wouldn't know.

13:31:47  3   Q.    How did you meet "Pancho" Colorado?

13:32:06  4   A.    Well, we worked for the same boss and that's where I met

13:32:09  5   him.

13:32:10  6            MR. DEGEURIN:  Your Honor, may we approach the bench?

13:32:21  7            (At the bench, on the record.)

13:32:30  8            MR. DEGEURIN:  Your Honor, from my discovery, we've

13:32:38  9   looked over all last night, from the debriefings and the

13:32:42  10  testimonies, et cetera, from the 302s, and it's my understanding

13:32:48  11  that he was going to be offered as 404(b) material.  We asked for

13:32:55  12  404(b) material.  While I'll have to go by e-mails, so on a

13:33:01  13  number given to us.  What he's going to testify about, I'm

13:33:07  14  anticipating, is that in 2003 or 2004, he learned of -- or was

13:33:22  15  present, somehow he knows that a guy named Efrain Torres loaned

13:33:28  16  $10 million to Mr. Colorado, and that Mr. Colorado used that to

13:33:35  17  enhance his business.  And whether we believe that or not is --

13:33:44  18  let's just accept that as true.  Of course, that's why I'm up

13:33:48  19  here.

13:33:48  20            And then, the argument is that if it's not 404(b), then

13:33:55  21  it's intrinsic, it's money laundering because many, many years

13:34:00  22  later, money from that business was wired to buy horses, which is

13:34:07  23  an oil business.  We know from statements it's a highly

13:34:11  24  successful oil business, a lot of money generated.  And that the

13:34:21  25  money loan in 2003 or 4 is the money that was wired from an

13:34:32   1    account in the oil business.

13:34:35   2            My point is I don't think that's sufficiently tied in

13:34:41   3    to be part of this money laundering.  The specific -- the

13:34:45   4    transaction, monetary transaction was 2011 or '12, what are money

13:34:57   5    at auction houses, check with moneys -- the account also, ADT

13:35:04   6    account, in 2011, 2012, after the business was very, very

13:35:11   7    successful.  You have to point to the specific money to be

13:35:16   8    derived from illegal funds.

13:35:22   9            THE COURT:  Only question I have before me is, how did

13:35:25  10    you meet, and we work for the same boss.

13:35:30  11            MR. DEGEURIN:  Once we got there, I knew that's where

13:35:32  12    she was going.  So.

13:35:35  13            THE COURT:  Are you going to be asking about something

13:35:37  14    that happened in 2003?

13:35:39  15            MS. FERNALD:  Absolutely, because the money --

13:35:41  16            THE COURT:  All right.

13:35:41  17            MR. GARDNER:  Your Honor, may we be heard on that?

13:35:43  18            THE COURT:  Why, sure.

13:35:44  19            Members of the jury, I'm going to put you up in the

13:35:46  20    jury room, please.

13:36:19  21            (Jury not present.)

13:36:29  22            THE COURT:  All right.  Let me hear the testimony.

13:36:32  23    Q.   (BY MS. FERNALD) My last question was, how do you know

13:36:41  24    Francisco Colorado-Cessa?

13:36:51  25    A.   Because we worked for the same boss there in Veracruz.

13:36:56  1   Q.   And who was that boss?

13:37:00  2   A.   "Zeta 14."

13:37:02  3   Q.   What is "Zeta 14's" name?

13:37:07  4   A.   Efrain Teodoro Torres.

13:37:13  5   Q.   Mr. Hinojosa, what did "Zeta 14" do for a living?

13:37:24  6   A.   When I met him, he was the one that was in charge of the

13:37:52  7   plaza, with the entire state of Veracruz when I met Mr. "Pancho"

13:37:56  8   Colorado, but he --

13:37:59  9              THE COURT:  No.  Wait a minute.  When he met who?

13:38:03  10             THE WITNESS:  "Pancho" Colorado.

13:38:05  11             MS. FERNALD:  Who was --

13:38:07  12             THE COURT:  Go ahead.  I just want to make sure.

13:38:09  13  Q.   (BY MS. FERNALD) Who was in charge of the plaza?

13:38:13  14  A.   "Zeta 14."

13:38:15  15  Q.   And approximately when did this occur?

13:38:21  16  A.   About 2004, 2005.

13:38:24  17  Q.   Then just so I understand, in 2004 and 2005, that is when

13:38:29  18  you met Colorado-Cessa?

13:38:38  19  A.   Approximately.  Yes.

13:38:40  20  Q.   And when you say plaza boss in reference to "14," tell me

13:38:46  21  what a plaza boss is.

13:39:14  22  A.   That's the person that's in charge of the entire state of --

13:39:22  23  of the entire plaza to have control over the cities and the

13:39:25  24  routes for the drug distribution and to be in control of

13:39:29  25  everything.

| | | |
|---|---|---|
| 13:39:30 | 1 | Q.   And we keep talking about -- have you said the word |
| 13:39:34 | 2 | "company" yet? |
| 13:39:37 | 3 | A.   No. |
| 13:39:37 | 4 | Q.   Okay.  We're talking about the cartel, aren't we? |
| 13:39:47 | 5 | A.   Yes.  The Gulf cartel, we called it the company or the Gulf |
| 13:39:51 | 6 | cartel. |
| 13:39:52 | 7 | Q.   Back in 2004, the Gulf cartel was in charge of that area, |
| 13:39:56 | 8 | right? |
| 13:40:02 | 9 | A.   Yes. |
| 13:40:02 | 10 | Q.   And your boss was whom? |
| 13:40:07 | 11 | A.   "Zeta 14." |
| 13:40:08 | 12 | Q.   And his name is? |
| 13:40:10 | 13 | A.   Efrain Teodoro Torres. |
| 13:40:15 | 14 | Q.   Did Mr. Torres -- |
| 13:40:17 | 15 | THE COURT:  Give me the name again.  Efrain. |
| 13:40:20 | 16 | THE WITNESS:  Teodoro. |
| 13:40:22 | 17 | THE COURT:  Teodoro. |
| 13:40:24 | 18 | THE INTERPRETER:  Teodoro. |
| 13:40:25 | 19 | THE COURT:  Thank you.  Go ahead. |
| 13:40:27 | 20 | Q.   (BY MS. FERNALD) What did you do for "Zeta 14"? |
| 13:40:40 | 21 | A.   I was the one that did all the account, handled all the |
| 13:40:48 | 22 | accounts of the drugs that came up to the border.  I was the one |
| 13:40:51 | 23 | that was in charge of getting it paid.  I was the one that |
| 13:40:54 | 24 | received and sent money and everything that he told me he wanted |
| 13:41:01 | 25 | done. |

13:41:02  1   Q.   Were you, in essence, the accountant for the plaza boss

13:41:06  2   Efrain Torres "14"?

13:41:19  3   A.   Yes.  For everything that was taken over there to the

13:41:22  4   border, yes.

13:41:23  5   Q.   Did you personally know about Efrain Torres' finances?

13:41:35  6   A.   Yes.

13:41:35  7   Q.   How did he make all of his money?

13:41:45  8   A.   Drugs, contraband, kidnappings, everything.

13:41:49  9   Q.   Did he have any legitimate or legal income?

13:41:58  10  A.   No.

13:42:02  11  Q.   Do you know whether or not Efrain Torres ever gave money to

13:42:13  12  Francisco Colorado-Cessa?

13:42:17  13  A.   Yes.

13:42:19  14  Q.   Tell me about how many occasions did he give him money that

13:42:23  15  you know about?  May I withdraw that question?  Because that may

13:42:32  16  be confusing.

13:42:33  17       When is the first time that you knew that Efrain Torres

13:42:39  18  gave "Pancho" Colorado-Cessa money?

13:42:59  19  A.   One of the first times, I don't remember if it was from

13:43:02  20  before or after was when they had to be a large sum of money

13:43:07  21  given to support the governor --the candidate for the

13:43:09  22  governorship of the state of Veracruz.

13:43:12  23  Q.   Let me rephrase the question then.

13:43:14  24       Do you know whether or not any money was given by

13:43:20  25  Efrain Torres to the Defendant "Pancho" Colorado for ADT Petro

| | | |
|---|---|---|
| 13:43:27 | 1 | Servicios? |
| 13:43:37 | 2 | A.    Yes. |
| 13:43:38 | 3 | Q.    When was that? |
| 13:43:53 | 4 | A.    I don't remember the exact date, but it was for machinery |
| 13:43:57 | 5 | because they were going to be working on government projects. |
| 13:43:59 | 6 | They were going to set up a company to get government projects. |
| 13:44:03 | 7 | Q.    Okay.  Although you don't remember the exact date, give me |
| 13:44:08 | 8 | an idea of what period of time that was. |
| 13:44:22 | 9 | A.    Between 2004, 2005. |
| 13:44:24 | 10 | Q.    How much money was he given then? |
| 13:44:34 | 11 | A.    What I had in it from the machinery was approximately $6 |
| 13:44:41 | 12 | million. |
| 13:44:41 | 13 | Q.    Tell me about ADT Petro Servicios.  We've heard a little bit |
| 13:44:45 | 14 | about it.  But tell me what type of company it was. |
| 13:45:13 | 15 | A.    It was a company to build highways, to do Pemex projects, to |
| 13:45:18 | 16 | do drilling, to do clean up, things like that, anything that the |
| 13:45:23 | 17 | government Pemex hired them to do. |
| 13:45:29 | 18 | Q.    Prior to giving money, Efrain Torres giving money the first |
| 13:45:36 | 19 | time, how big was ADT Petro Servicios? |
| 13:45:58 | 20 | A.    It wasn't that big because it was with that money that they |
| 13:46:01 | 21 | were going to buy all -- all of the machinery to be able to work |
| 13:46:05 | 22 | on the projects and the contracts for the state government. |
| 13:46:08 | 23 | Q.    When you use the word "they," who do you mean? |
| 13:46:17 | 24 | A.    I'm sorry? |
| 13:46:19 | 25 | Q.    You said "for them" or "they" to buy machinery. |

| | | |
|---|---|---|
| 13:46:27 | 1 | A.    Oh, oh, "Pancho" Colorado and "Zeta 14." |
| 13:46:32 | 2 | Q.    All right.  Who owned ADT Petro Servicios? |
| 13:46:42 | 3 | A.    I knew that "Pancho" Colorado, but he was the one that was |
| 13:46:50 | 4 | the head of the company, the face of the company. |
| 13:46:53 | 5 | Q.    Who controlled that company? |
| 13:46:58 | 6 | A.    "Pancho" Colorado. |
| 13:46:59 | 7 | Q.    Did Mr. Torres have any authority over ADT Petro Servicios? |
| 13:47:23 | 8 | A.    Authority, no, but since they were partners in the purchase |
| 13:47:27 | 9 | of the machinery and in the company, they had come to some |
| 13:47:30 | 10 | agreement about the distribution of earnings and all that. |
| 13:47:37 | 11 | Q.    Then who financed the company? |
| 13:47:42 | 12 | A.    "Zeta 14." |
| 13:47:44 | 13 | Q.    And how was that money derived to finance the company? |
| 13:47:53 | 14 | A.    From drugs. |
| 13:47:56 | 15 | Q.    Was there a second occasion in which Efrain Torres, "Zeta |
| 13:48:05 | 16 | 14," gave money to ADT Petro Servicios? |
| 13:48:29 | 17 | A.    I don't know if it was ADT Petro Servicios, but he did give |
| 13:48:33 | 18 | money to "Pancho" Colorado from a variety of occasions for a |
| 13:48:38 | 19 | variety of reasons. |
| 13:48:39 | 20 | Q.    Tell me the amounts in which he gave money to "Pancho" |
| 13:48:42 | 21 | Colorado-Cessa. |
| 13:48:54 | 22 | A.    Well, for the governors campaign, what I had entered was $12 |
| 13:48:59 | 23 | million.  For the purchase of the machinery, it was $6 million. |
| 13:49:11 | 24 | For the purchase of some horses, $180,000.  That's what I |
| 13:49:18 | 25 | remember more or less. |

| | | |
|---|---|---|
| 13:49:27 | 1 | Q.   I want to skip ahead a little bit for the purpose of this |
| 13:49:32 | 2 | hearing. |
| 13:49:33 | 3 |      When was Efrain Torres killed? |
| 13:49:42 | 4 | A.   March of 2007. |
| 13:49:47 | 5 | Q.   In March of 2007, was the Gulf cartel still in control? |
| 13:49:57 | 6 | A.   Yes. |
| 13:49:59 | 7 | Q.   Was "Pancho" Colorado-Cessa, was he able to sell ADT Petro |
| 13:50:08 | 8 | Servicios and do what he wanted with it? |
| 13:50:29 | 9 | A.   At that moment, I don't believe he could have sold it |
| 13:50:31 | 10 | because he was really in debt to "Zeta 14" when "Zeta 14" was |
| 13:50:36 | 11 | killed. |
| 13:50:38 | 12 | Q.   He was in a lot of debt.  So I need to know, who took over |
| 13:50:44 | 13 | the position of Efrain Torres, "Zeta 14," after he was killed? |
| 13:51:02 | 14 | A.   "40." |
| 13:51:05 | 15 | Q.   And who did Francisco Colorado-Cessa report to after Efrain |
| 13:51:12 | 16 | Torres was killed? |
| 13:51:17 | 17 | A.   With "40." |
| 13:51:19 | 18 | Q.   And how do you know that? |
| 13:51:37 | 19 | A.   Because when "Zeta 14" was killed, I was pulled into a |
| 13:51:43 | 20 | meeting.  They called a meeting about everybody -- for everybody |
| 13:51:48 | 21 | that worked there and there was an accounting. |
| 13:51:57 | 22 | Q.   Who is "they"?  Who called the meeting? |
| 13:52:07 | 23 | A.   Lazcano and "Cuarenta." |
| 13:52:10 | 24 | Q.   And that was when? |
| 13:52:16 | 25 | A.   Few days after "Zeta 14" was killed. |

| | | |
|---|---|---|
| 13:52:19 | 1 | Q.   What was the purpose of the meeting? |
| 13:52:45 | 2 | A.   It was to find out what had happened and to get everybody |
| 13:52:50 | 3 | who had worked with him, with "Zeta 14" together and to see if we |
| 13:52:55 | 4 | could continue working; and to find out everything that there |
| 13:53:08 | 5 | was, everything that they had, all the debts, find out everything |
| 13:53:12 | 6 | about the state of Veracruz. |
| 13:53:15 | 7 | Q.   What about all of the assets? |
| 13:53:34 | 8 | A.   The assets that I had, I turned those in and the ones that |
| 13:53:38 | 9 | were there in Veracruz, those -- that accounting was done with |
| 13:53:42 | 10 | one of "14's" nephews, who had all the money there. |
| 13:53:47 | 11 | Q.   Were you present at this meeting? |
| 13:53:50 | 12 | A.   Yes. |
| 13:53:51 | 13 | Q.   Did you directly report to "40" about Efrain Torres' |
| 13:53:58 | 14 | property and money? |
| 13:54:10 | 15 | A.   Yes. |
| 13:54:11 | 16 | Q.   And when you reported to him, did you, in fact, tell him |
| 13:54:16 | 17 | about Francisco Colorado-Cessa? |
| 13:54:27 | 18 | A.   Yes. |
| 13:54:31 | 19 | Q.   And what did you tell him? |
| 13:55:12 | 20 | A.   Well, I gave him the full list of everybody who owed money. |
| 13:55:16 | 21 | It wasn't just "Pancho."  It was a lot of people.  But then, I |
| 13:55:20 | 22 | explained to him that what I had listed there as the debt was I |
| 13:55:27 | 23 | did not have the last report and that "Zeta 14" had told me that |
| 13:55:31 | 24 | he owed much more than what's showed. |
| 13:55:35 | 25 | Q.   Do you know whether or not the debt was ever settled with |

| | | |
|---|---|---|
| 13:55:42 | 1 | Francisco Colorado-Cessa and "40" over Efrain's affairs? |
| 13:56:02 | 2 | A.    Yes. |
| 13:56:03 | 3 | Q.    And what was that? |
| 13:56:08 | 4 | A.    What do you mean? |
| 13:56:12 | 5 | Q.    Did Francisco Colorado-Cessa start reporting to "40" at that |
| 13:56:23 | 6 | point? |
| 13:56:23 | 7 | A.    Yes.  Well, yeah, because -- I had the list and he said, all |
| 13:56:45 | 8 | the people that owe you, you go get -- collect that money and the |
| 13:56:49 | 9 | ones that don't, you tell the ones there at the border to have |
| 13:56:54 | 10 | them picked up.  And then, about a month to a month and a half |
| 13:57:09 | 11 | later, he called me and said to take "Pancho" off the list |
| 13:57:14 | 12 | because he had already worked it out with Francisco Colorado. |
| 13:57:19 | 13 | Q.    Who called you and told you to take him off of the debt |
| 13:57:23 | 14 | list? |
| 13:57:25 | 15 | A.    "40." |
| 13:57:30 | 16 | Q.    May I have just one moment? |
| 13:57:32 | 17 |         THE COURT:  You may. |
| 13:58:03 | 18 | Q.    (BY MS. FERNALD) Mr. Hinojosa, do you know whether or not |
| 13:58:12 | 19 | Francisco Colorado-Cessa knew what Efrain Torres did? |
| 13:58:27 | 20 | A.    Yes. |
| 13:58:28 | 21 | Q.    How do you know that? |
| 13:58:44 | 22 | A.    Because we were always over there at his ranch.  We were -- |
| 13:58:48 | 23 | he was always armed.  And when it came to the drugs, he was |
| 13:58:51 | 24 | invited to participate in the pool. |
| 13:58:53 | 25 | Q.    Okay.  You got a lot of "he's" in there.  I want you to |

| | | |
|---|---|---|
| 13:58:57 | 1 | start using names, okay? |
| 13:58:59 | 2 | A.   Ah, okay. |
| 13:59:03 | 3 | Q.   You were at whose ranch? |
| 13:59:06 | 4 | A.   "Pancho's. |
| 13:59:08 | 5 | Q.   Many times? |
| 13:59:11 | 6 | A.   A lot of occasions. |
| 13:59:13 | 7 | Q.   And you said that he was armed.  Who was armed? |
| 13:59:20 | 8 | A.   "Zeta 14" and all the people that were there. |
| 13:59:25 | 9 | Q.   His -- for a lack of a better term, his entourage, his |
| 13:59:30 | 10 | guards? |
| 13:59:36 | 11 | A.   Yes. |
| 13:59:37 | 12 | Q.   And when you say that he was invited to take part of the |
| 13:59:43 | 13 | drug distribution, who are you talking about? |
| 13:59:53 | 14 | A.   "Pancho." |
| 13:59:55 | 15 | Q.   And did he, in fact, accept the invitation? |
| 14:00:01 | 16 | A.   Yes. |
| 14:00:03 | 17 | Q.   What year was that, approximately? |
| 14:00:08 | 18 | A.   About 2006. |
| 14:00:09 | 19 | Q.   When did he stop? |
| 14:00:18 | 20 | A.   Well, until the day "14" died, I still had the accounts. |
| 14:00:23 | 21 | Q.   Okay.  Let me step one step further.  Do you know whether or |
| 14:00:28 | 22 | not Francisco Colorado-Cessa knew what "40" did for a living? |
| 14:00:41 | 23 | A.   Yes. |
| 14:00:43 | 24 | Q.   Explain how you know that. |
| 14:01:15 | 25 | A.   Because "40" was head of the Gulf cartel and then, later, |

14:01:21  1  the Zetas, and because a meeting -- and this was before, before

14:01:25  2  they killed "14," "40" was there, Lazcano was there, "14" was

14:01:30  3  there, "Pancho" was there, and the meeting was in Veracruz.

14:01:39  4  Q.   How many years were you involved with the cartel, the

14:01:42  5  company?

14:01:55  6  A.   Starting in about 2001, 2002, until I was arrested.

14:02:05  7  Q.   How deeply were you involved with the cartel?

14:02:21  8  A.   Well, I knew all the members of the main members of the

14:02:40  9  cartel.  I handled their -- the accounts.  When they had

14:02:45  10  meetings, I was one of the ones that was at those meetings

14:02:48  11  because I was one of the first ones that became part of the

14:02:53  12  Miguel Aleman plaza.

14:02:56  13  Q.   You're aware of the bribes that the cartel and the company

14:03:00  14  took, made?

14:03:08  15  A.   Yes.

14:03:09  16  Q.   Not only aware, but you participated in the taxing of the

14:03:14  17  drug dealers and distributors in the area?

14:03:26  18  A.   Yes.

14:03:27  19  Q.   You're also -- are you aware of any murders in --

14:03:34  20       THE COURT:  I think we're going far afield.

14:03:37  21       MS. FERNALD:  I'm just trying to give the Court -- I

14:03:38  22  didn't want to surprise the Court on anything.  But that's the

14:03:40  23  testimony.

14:03:46  24       THE COURT:  All right.  Do you wish to question the

14:03:54  25  witness?

| | | |
|---|---|---|
| 14:03:55 | 1 | MR. DEGEURIN:  About two questions. |
| 14:03:57 | 2 | THE COURT:  All right.  Two questions and then, I'll |
| 14:04:00 | 3 | have him removed and hear your argument. |
| 14:04:03 | 4 | CROSS-EXAMINATION |
| 14:04:04 | 5 | BY MR. DEGEURIN: |
| 14:04:04 | 6 | Q.   You were incarcerated in 2008, right? |
| 14:04:10 | 7 | THE COURT:  December 2nd.  He's already testified. |
| 14:04:12 | 8 | Q.   (BY MR. DEGEURIN) Okay.  Been out of custody since 2008. |
| 14:04:18 | 9 | A.   No. |
| 14:04:22 | 10 | Q.   I think that's all I have to ask him.  That's all I have to |
| 14:04:26 | 11 | ask him. |
| 14:04:26 | 12 | THE COURT:  I'll ask Mr. Hinojosa to be placed in the |
| 14:04:32 | 13 | hall, please. |
| 14:05:03 | 14 | MS. FERNALD:  Are you ready for me? |
| 14:05:06 | 15 | THE COURT:  Well, the objection is actually Mr. |
| 14:05:13 | 16 | DeGeurin, so he gets to go first. |
| 14:05:17 | 17 | MS. FERNALD:  Okay. |
| 14:05:20 | 18 | MR. DEGEURIN:  Your Honor, first of all, the idea of a |
| 14:05:26 | 19 | campaign contributions in 2003 to the governor, it was made |
| 14:05:29 | 20 | through "Catorce" I think is all removed from the allegations in |
| 14:05:35 | 21 | this indictment, both temporally and legally, and doesn't tie |
| 14:05:45 | 22 | into the allegations in this indictment at all.  I consider that |
| 14:05:49 | 23 | 404(b) and not admissible.  Certainly is not intrinsic. |
| 14:05:55 | 24 | THE COURT:  Well, to this jury you painted an |
| 14:05:57 | 25 | incredible picture of your client.  No -- just a self-made |

| | | |
|---|---|---|
| 14:06:04 | 1 | person, took a company up to making $250 million a year. |
| 14:06:11 | 2 | MR. DEGEURIN:  Uh-huh. |
| 14:06:12 | 3 | THE COURT:  An upstanding person.  I'm not so sure an |
| 14:06:15 | 4 | upstanding person would spend, what did he say, $12 million to |
| 14:06:20 | 5 | keep control of a plaza, but maybe they would.  But in light of |
| 14:06:25 | 6 | what I've heard on opening statement and plus the fact that he |
| 14:06:30 | 7 | was giving him $180,000, even back in those days for horses, I |
| 14:06:35 | 8 | don't know why this is not admissible.  So give me your best |
| 14:06:40 | 9 | argument. |
| 14:06:41 | 10 | MR. DEGEURIN:  Well, it's prejudice.  There's some |
| 14:06:47 | 11 | evidence from this witness hearsay that campaign contributions |
| 14:06:52 | 12 | were given to the governor. |
| 14:06:54 | 13 | THE COURT:  He said he gave the money to Colorado. |
| 14:07:00 | 14 | MR. DEGEURIN:  No.  He didn't say Colorado gave the |
| 14:07:02 | 15 | money.  He said Colorado introduced "14" to the governor.  So at |
| 14:07:06 | 16 | any rate, so campaign contribution -- |
| 14:07:06 | 17 | THE COURT:  Well, he wrote down the amounts, but you're |
| 14:07:09 | 18 | right. |
| 14:07:10 | 19 | MR. DEGEURIN:  Okay.  So I'm going to put that aside |
| 14:07:12 | 20 | because I think I'm pretty strong on that one because that has |
| 14:07:16 | 21 | nothing to do with this indictment.  Whether he did or did not |
| 14:07:20 | 22 | support the governor, how the money was raised and what can be |
| 14:07:24 | 23 | raised in Mexico is something else.  Whether the governor liked |
| 14:07:29 | 24 | "14" or not, doesn't matter.  He didn't say this is Zetas.  You |
| 14:07:35 | 25 | know, there's no allegation of that. |

14:07:37  1        With regard to money being spent on horses in 2011,

14:07:48  2   2012 by Mr. Colorado through his company ADT, small amount, of a

14:07:57  3   huge amount, the time between that and, as he says, at least in

14:08:03  4   his debriefings, a loan to buy equipment for the company -- for

14:08:12  5   "Pancho's" company to buy some more equipment, in 2000 -- now

14:08:20  6   he's saying 2004 or 5, I think, that loan to Mr. Colorado's

14:08:34  7   company -- and Colorado's not a partner with Mr. Torres, "14,"

14:08:41  8   never was.  Once -- she asked some more questions, they didn't

14:08:45  9   say what says it.  They owed the money back and that he

14:08:49  10  understood there was some agreement, but he didn't know what it

14:08:52  11  was.

14:08:54  12        Now, let's just say, for sake of argument here, that he

14:09:02  13  did -- Mr. Colorado did accept a loan from Mr. Efrain Torres in

14:09:11  14  2004 or 5 to buy some extra equipment for his company, and

14:09:18  15  thereafter, many years later, his company grows and grows and

14:09:22  16  grows to the point where I was talking about.

14:09:24  17        THE COURT:  Torres was killed in March of '07.

14:09:26  18        MR. DEGEURIN:  Right.  Okay.  So just say --

14:09:31  19        THE COURT:  One year before this alleged conspiracy.

14:09:35  20        MR. DEGEURIN:  Right.

14:09:35  21        THE COURT:  All right.

14:09:37  22        MR. DEGEURIN:  And let's just say that he was slowly

14:09:40  23  paying him back, I don't know.  For sake of argument for the

14:09:44  24  government's argument, he's slowly paying him back, this loan

14:09:48  25  from a bad guy, maybe he knew that the bank had -- or that Mr.

14:09:55   1    Torres had gotten some bad moneys along the way, and he borrowed

14:10:00   2    the money and he's paying him back.  Then Mr. Torres dies in

14:10:09   3    2007.  2008, this man goes to jail.  And the government is saying

14:10:16   4    that that money that was loaned back then, it was owed to the man

14:10:21   5    that's dead is ill-gotten gains that they're paying later out of

14:10:27   6    a company that's very successful.

14:10:30   7          It would almost be like saying if Mr. Kennedy -- old

14:10:36   8    man Kennedy bootlegged whiskey, and that later on, the children

14:10:43   9    took money from the grandfather's inheritance and made their own

14:10:49   10   businesses, you'd follow it.  There's got to be a line somewhere.

14:10:53   11   What I'm saying is, Judge, I think there's too far a gap between

14:10:56   12   a loan that he talks about, $6 million loan, and a $1 million, $2

14:11:05   13   million wires from ADT in 2010 or '11, '11 and '12.  You cannot

14:11:12   14   point to the specific activity and the money that is illegal.

14:11:19   15         THE COURT:  You're taking the position in this case,

14:11:23   16   Mr. DeGeurin, that Mr. Colorado didn't use Zeta funds.

14:11:31   17         MR. DEGEURIN:  That's correct.

14:11:32   18         THE COURT:  To buy horses.

14:11:33   19         MR. DEGEURIN:  That's right.

14:11:35   20         THE COURT:  And here, there is evidence, whether it's

14:11:39   21   credible or not, there's evidence he borrowed $180,000 sometime

14:11:44   22   before March of 2008 to buy horses.

14:11:51   23         MR. DEGEURIN:  Now, that's a third point that -- you

14:11:58   24   had zeroed in that.  Put the loan aside that was years ago and in

14:12:01   25   2008, this man is going to testify that Mr. Torres -- 2008 that

| | | |
|---|---|---|
| 14:12:08 | 1 | Torres was dead by then.  But anyway, someone gave Colorado 180. |
| 14:12:13 | 2 | THE COURT:  He died March in 2007, sir, according to |
| 14:12:16 | 3 | the testimony. |
| 14:12:17 | 4 | MR. DEGEURIN:  Yes.  I'm not quite sure what he's going |
| 14:12:20 | 5 | to say when he wrote down in his machine, as he puts it, that |
| 14:12:24 | 6 | $180,000 was given to Mr. Colorado to buy horses.  Mr. Colorado |
| 14:12:29 | 7 | was buying horses for much more than that.  He was paying a lot |
| 14:12:33 | 8 | more.  One horse or two horses cost more than that.  So I'm not |
| 14:12:38 | 9 | really quite sure about that $180,000. |
| 14:12:44 | 10 | But the other's so far removed, Judge, that it should |
| 14:12:48 | 11 | not be allowed. |
| 14:12:51 | 12 | THE COURT:  Well, you denied that he used Zeta money to |
| 14:12:54 | 13 | buy horses. |
| 14:12:56 | 14 | MR. DEGEURIN:  If the argument is from the government |
| 14:12:59 | 15 | -- I didn't mean to cut you off. |
| 14:13:00 | 16 | THE COURT:  I'm just asking you what your argument is. |
| 14:13:03 | 17 | MR. DEGEURIN:  Yeah.  He did not use Zeta money -- |
| 14:13:06 | 18 | certainly did not use any -- did not knowingly use any Zeta money |
| 14:13:12 | 19 | because the money that he used was money that was paid to his |
| 14:13:17 | 20 | company.  And he owned contracts, legitimate contracts with |
| 14:13:27 | 21 | Pemex, and you saw the list of some of those contracts.  He was |
| 14:13:31 | 22 | being paid in excess of $70 million a year from the oil company. |
| 14:13:42 | 23 | That's the payments.  You get the contracts here and they pay |
| 14:13:45 | 24 | out.  You've been through those litigations.  You know how that |
| 14:13:50 | 25 | goes. |

161

| | | |
|---|---|---|
| 14:13:50 | 1 | THE COURT:  Actually, my litigation is when you get |
| 14:13:52 | 2 | contracts and they don't pay. |
| 14:13:54 | 3 | MR. DEGEURIN:  Don't pay.  Yeah.  No.  I am firmly |
| 14:13:58 | 4 | taking the position -- |
| 14:13:59 | 5 | THE COURT:  I understand your position. |
| 14:14:00 | 6 | MR. DEGEURIN:  So. |
| 14:14:02 | 7 | THE COURT:  Anything further on the objection? |
| 14:14:05 | 8 | MR. DEGEURIN:  One second.  That's my position, Judge. |
| 14:14:10 | 9 | THE COURT:  All right.  I'll hear from the government. |
| 14:14:14 | 10 | MS. FERNALD:  Your Honor, it's the government's |
| 14:14:16 | 11 | position on this case, as outlined in Mr. DeGeurin's opening |
| 14:14:21 | 12 | statement, that this is not a front company, it was a real |
| 14:14:25 | 13 | company.  And then, further, in this particular argument, that |
| 14:14:30 | 14 | even if the Zeta money was used, that it was not used knowingly. |
| 14:14:35 | 15 | And those type of defenses open the door to explain where the |
| 14:14:40 | 16 | money came from. |
| 14:14:40 | 17 | Later testimony will support that these horses were |
| 14:14:44 | 18 | purchased by Francisco Colorado-Cessa, not only from his personal |
| 14:14:48 | 19 | accounts but from his ADT accounts, and that any money that was |
| 14:14:52 | 20 | derived from ADT, a small business that was financed by the |
| 14:14:57 | 21 | Zetas, as far back as 2004, according to this witness, comes in. |
| 14:15:03 | 22 | Also, your Honor, testimony that didn't come out was these |
| 14:15:07 | 23 | legitimate contracts with Pemex.  In order -- this witness will |
| 14:15:13 | 24 | testify that in order to get contracts with Pemex, there has to |
| 14:15:17 | 25 | be some form of bribes that are taken in order to get these type |

14:15:23   1   of contracts for Pemex and that this witness is aware that

14:15:29   2   Francisco Colorado-Cessa participated in those bribes.  It's all

14:15:34   3   directly related.

14:15:36   4          The dates of the conspiracies that are charged in the

14:15:39   5   indictment, beginning on or about 2008, the Court is well aware

14:15:45   6   that the dates are not controlling to the indictment, but to the

14:15:48   7   relevant conduct --

14:15:50   8          THE COURT:  What else did I not hear from this witness

14:15:52   9   in your direct that -- I heard nothing about the bribes.

14:15:57  10          MS. FERNALD:  I realize that you didn't and that was my

14:16:01  11   fault, your Honor.  I thought that you were asking me to be quiet

14:16:04  12   and sit down and shut up, and I took a clue from that.  I'm not

14:16:13  13   so concerned about the bribes and bringing that out with the

14:16:16  14   government's presentation of its case-in-chief.  I'm concerned

14:16:22  15   about this jury knowing how he started ADT Petro Servicios and

14:16:28  16   that any money was commingled with legitimate funds in order to

14:16:31  17   derive the buying and purchasing of horses for the organization

14:16:35  18   or for the cartel.

14:16:38  19          MR. DEGEURIN:  May I respond briefly?

14:16:39  20          THE COURT:  Certainly.  Your objection is still first.

14:16:46  21          MR. DEGEURIN:  The bribery thing, if that's going to --

14:16:51  22   she says it's not too concerned about bringing that up.  Okay.

14:16:54  23   Fine.  If she is, I want to hear it before to let the Judge rule

14:16:59  24   on.  I think that his first -- whether he has any knowledge of

14:17:02  25   any bribery, to me, would be absolutely incredible because it

```
14:17:06    1  can't happen in those contracts.  They're done a different way.

14:17:11    2  You don't bribe somebody.

14:17:12    3          THE COURT:  Well, I don't know that you're right on

14:17:13    4  that either.  He's a business associate himself with cartels.

14:17:18    5  Said he was an honest businessman, made it himself.

14:17:22    6          MR. DEGEURIN:  That's true.

14:17:23    7          THE COURT:  Well, according to this witness, he could

14:17:25    8  go to the cartels and obtain $12 million to try to effect an

14:17:30    9  election.  That doesn't sound disassociated to me.

14:17:35   10          MR. DEGEURIN:  Sounds incredible to me from this

14:17:38   11  witness from what I know.

14:17:39   12          THE COURT:  I've lived here all my life.  It doesn't

14:17:43   13  sound incredible at all.

14:17:44   14          MR. DEGEURIN:  My point is, Judge, a company started by

14:17:48   15  -- no.  The company was -- he had the oil company and, according

14:17:54   16  to this witness, he borrowed some money from Mr. Efrain Torres,

14:18:00   17  according to this witness, to buy some equipment for that

14:18:05   18  company.  You do have to have equipment to --

14:18:07   19          THE COURT:  And they were going to share in the

14:18:09   20  profits.

14:18:10   21          MR. DEGEURIN:  Well, that's what he says.

14:18:12   22          THE COURT:  That's what we're talking about is his

14:18:14   23  testimony.  That's all we're talking about.

14:18:16   24          MR. DEGEURIN:  Yeah.  Back in 2000 -- way back before

14:18:19   25  the indictment.
```

| | | |
|---|---|---|
| 14:18:19 | 1 | THE COURT:  All right.  Okay.  Well, in light of the |
| 14:18:29 | 2 | opening statement and the presentation of no association with the |
| 14:18:34 | 3 | cartels or the Zetas, and no connection whatsoever with drugs -- |
| 14:18:43 | 4 | or the funds from the Zetas, if the jury believes that evidence, |
| 14:18:56 | 5 | it's certainly significant evidence.  And I overrule the |
| 14:19:08 | 6 | objection and the testimony can be brought out in front of the |
| 14:19:12 | 7 | jury.  Take ten minutes. |
| 14:28:06 | 8 | (Recess.) |
| 14:30:08 | 9 | (Jury present.) |
| 14:30:11 | 10 | THE COURT:  Bring the witness in.  Mr. Hinojosa, you're |
| 14:30:40 | 11 | still under oath.  Do you understand that? |
| 14:30:42 | 12 | THE WITNESS:  Yes. |
| 14:30:44 | 13 | THE COURT:  You may proceed. |
| 14:30:46 | 14 | THE WITNESS:  Yes, sir. |
| 14:30:46 | 15 | RE-DIRECT EXAMINATION |
| 14:30:46 | 16 | BY MS. FERNALD: |
| 14:30:49 | 17 | Q.   Mr. Hinojosa, just a little bit about your background. |
| 14:30:51 | 18 | We'll start there.  Where did you work in approximately the year |
| 14:30:57 | 19 | 2000? |
| 14:31:07 | 20 | A.   At the federal prosecutor's office in Miguel Aleman. |
| 14:31:11 | 21 | Q.   What did you do there? |
| 14:31:26 | 22 | A.   I was one of the legal clerks at the prosecutor's office.  I |
| 14:31:29 | 23 | was the one who took the detainee statements, decided whether to |
| 14:31:32 | 24 | assign the case for court or to release the detainee. |
| 14:31:36 | 25 | Q.   After you had been at the federal prosecutor's office for |

| | | |
|---|---|---|
| 14:31:39 | 1 | about six months, did you start participating in any illegal |
| 14:31:43 | 2 | activities? |
| 14:31:51 | 3 | A.   Yes. |
| 14:31:52 | 4 | Q.   Can you tell the ladies and gentlemen of the jury about the |
| 14:31:54 | 5 | bribes that you took? |
| 14:32:18 | 6 | A.   Yes.  We paid the fees that were required for -- to be |
| 14:32:28 | 7 | allowed to have the movement throughout the entire border area |
| 14:32:31 | 8 | that was under our jurisdiction for the movement of drugs. |
| 14:32:36 | 9 | Q.   Wait a minute, just a second, Mr. Hinojosa.  I'm going to |
| 14:32:39 | 10 | take you little small steps, okay?  I want you to stay with me on |
| 14:32:43 | 11 | this year. |
| 14:32:43 | 12 | Can you see that up there where my finger is?  I'm |
| 14:32:49 | 13 | showing you now what has been marked and previously admitted into |
| 14:32:54 | 14 | evidence as Government's Exhibit 320.  It's a map of Mexico. |
| 14:33:07 | 15 | A.   Uh-huh. |
| 14:33:08 | 16 | Q.   You were working in the prosecutor's office where? |
| 14:33:18 | 17 | A.   Miguel Aleman, state of Tamaulipas. |
| 14:33:22 | 18 | Q.   I'm putting my finger right here in front of a word that |
| 14:33:25 | 19 | says "Tamaulipas"? |
| 14:33:28 | 20 | A.   Yes. |
| 14:33:29 | 21 | Q.   Is this the area? |
| 14:33:31 | 22 | A.   That's the state. |
| 14:33:33 | 23 | Q.   Right.  Where is Miguel -- what's -- |
| 14:33:39 | 24 | A.   It's in between Nuevo Laredo and Reynosa. |
| 14:33:48 | 25 | Q.   Right here?  Where my finger is right here? |

| | | |
|---|---|---|
| 14:33:53 | 1 | A.    But up between Nuevo Laredo and Reynosa.  There you go. |
| 14:33:59 | 2 | Q.    Much better.  Thank you for helping me.  It's right on the |
| 14:34:02 | 3 | border of the United States, correct? |
| 14:34:06 | 4 | A.    Yes.  Where the river travels. |
| 14:34:11 | 5 | Q.    Okay.  Stay with me in the year 2000, okay?  After you had |
| 14:34:16 | 6 | been working in the federal prosecutor's office in the year of |
| 14:34:20 | 7 | 2000, did you start accepting bribes? |
| 14:34:29 | 8 | A.    Yes. |
| 14:34:31 | 9 | Q.    And why? |
| 14:34:46 | 10 | A.    To allow the drug dealers to work freely so you accepted the |
| 14:34:51 | 11 | bribes to allow them to work. |
| 14:34:53 | 12 | Q.    How common was that in your office? |
| 14:35:11 | 13 | A.    It's pretty common in Mexico to accept the bribes so that |
| 14:35:16 | 14 | you won't be bothering the people, the drug dealer. |
| 14:35:18 | 15 | Q.    And the government offices? |
| 14:35:23 | 16 | A.    Yes. |
| 14:35:24 | 17 | Q.    Are you familiar with the term "Gulf cartel"? |
| 14:35:35 | 18 | A.    Yes. |
| 14:35:35 | 19 | Q.    Can you tell the jury what the Gulf cartel is and how you |
| 14:35:39 | 20 | know what it is? |
| 14:36:11 | 21 | A.    The Gulf cartel, that has to do with the movement of drugs. |
| 14:36:18 | 22 | It's a group that was organized that took over all the plazas of |
| 14:36:21 | 23 | the state of Tamaulipas to control all the movement of drugs into |
| 14:36:27 | 24 | the United States and to handle all the bribing of the government |
| 14:36:31 | 25 | officials. |

| | | |
|---|---|---|
| 14:36:31 | 1 | Q.   When did that occur? |
| 14:36:42 | 2 | A.   2001.  Mid-2001, approximately. |
| 14:36:47 | 3 | Q.   So mid-2001, is this the area that the Gulf cartel took |
| 14:36:57 | 4 | over? |
| 14:37:10 | 5 | A.   Yes.  In Tamaulipas, that's where they started. |
| 14:37:14 | 6 | Q.   Are you familiar with the group called the Los Zetas? |
| 14:37:20 | 7 | A.   Yes. |
| 14:37:27 | 8 | Q.   In 2000 -- mid of 2001, how did the Los Zetas and the Gulf |
| 14:37:34 | 9 | cartel work together? |
| 14:37:59 | 10 | A.   They worked together.  I mean, in mid-2001, they were part |
| 14:38:05 | 11 | of it.  They were the enforcers.  They were the ones that were in |
| 14:38:08 | 12 | charge of picking up people, of murdering people, of spreading |
| 14:38:13 | 13 | terror in the plazas. |
| 14:38:14 | 14 | Q.   And you say "they."  Who were you talking about, Mr. |
| 14:38:18 | 15 | Hinojosa? |
| 14:38:27 | 16 | A.   The Zetas.  They were the armed branch of the Gulf cartel. |
| 14:38:31 | 17 | Q.   Did that ever change? |
| 14:38:34 | 18 | A.   Yes. |
| 14:38:36 | 19 | Q.   Listen to my question.  What year did that change? |
| 14:38:41 | 20 | MR. DEGEURIN:  Excuse me, your Honor.  We're getting |
| 14:38:45 | 21 | into expert testimony -- what I would call expert testimony, and |
| 14:38:50 | 22 | I don't think foundation has been laid.  If he was a federal |
| 14:38:54 | 23 | prosecutor during those years, is that where the -- his opinion |
| 14:39:00 | 24 | could come in as being a federal prosecutor? |
| 14:39:04 | 25 | THE COURT:  He -- |

14:39:06  1          MR. DEGEURIN:  That's the only foundation I heard.

14:39:08  2          THE COURT:  Well, I haven't heard any.

14:39:14  3          MR. DEGEURIN:  I'm going to object to opinion

14:39:16  4  testimony.

14:39:17  5          THE COURT:  All right.  That objection right now is

14:39:20  6  based on his observations, so I overrule the objection.  You may

14:39:23  7  proceed.

14:39:32  8  Q.   (BY MS. FERNALD) Let me go back to the question.  What year

14:39:36  9  did this working relationship change between the Gulf and the

14:39:39 10  Zetas?

14:40:14 11  A.   That was about 2010, 2011.  That's when they separated.

14:40:19 12  Before that, they were together.  But the leadership of the

14:40:25 13  different plazas was distributed.

14:40:27 14          MR. DEGEURIN:  That's what I was afraid of.  I'm going

14:40:29 15  to renew my objection.  Foundation was he's a federal prosecutor

14:40:32 16  back in 2000.  Early 2000.  He's been in jail since 2008.  He's

14:40:40 17  talking now about his opinion what he reads in the paper here in

14:40:44 18  2010 or '11.  So that's my -- the only foundation is while taking

14:40:50 19  bribes as a federal prosecutor, he knows these things or observes

14:40:55 20  these things.  That was years ago.

14:41:00 21          MS. FERNALD:  Your Honor, I'll move on at this point

14:41:01 22  and withdraw that question.  Move on.  The purpose of it is to

14:41:05 23  establish -- and I can ask the next question and clear up the

14:41:08 24  foundation, if the Court would let me proceed.

14:41:12 25          THE COURT:  Well, if you've withdrawn the question,

| | | |
|---|---|---|
| 14:41:15 | 1 | I'll instruct the jury not to consider the answer for any part |
| 14:41:19 | 2 | since the government has withdrawn the question. |
| 14:41:22 | 3 | All right.  Ask your next question. |
| 14:41:23 | 4 | Q.   (BY MS. FERNALD) How involved were you with the Gulf cartel |
| 14:41:27 | 5 | and the Los Zetas? |
| 14:41:35 | 6 | A.   Starting in 2001. |
| 14:41:37 | 7 | Q.   And continuing until when? |
| 14:41:40 | 8 | A.   Till the day I was arrested. |
| 14:41:48 | 9 | Q.   December? |
| 14:41:48 | 10 | A.   September of 2008. |
| 14:41:52 | 11 | Q.   Okay.  In mid-2001, the Gulf cartel had taken over the area |
| 14:42:02 | 12 | in which you worked; is that correct? |
| 14:42:15 | 13 | A.   Yeah.  The whole state.  The whole border region. |
| 14:42:18 | 14 | Q.   And when I say they took over, what does that mean? |
| 14:42:39 | 15 | A.   That they started taking over all the plazas of all the |
| 14:42:43 | 16 | cities in the area.  That they established certain order among |
| 14:42:46 | 17 | the drug dealers, that they had to pay fees to the cartel. |
| 14:42:51 | 18 | Q.   And what were those fees for? |
| 14:43:01 | 19 | A.   To pay the bribes to all the law enforcement agencies and to |
| 14:43:13 | 20 | pay for all the expenses of all the people that worked for the |
| 14:43:16 | 21 | company, the cartel. |
| 14:43:16 | 22 | Q.   Including yourself? |
| 14:43:18 | 23 | A.   Yes. |
| 14:43:19 | 24 | Q.   When did you begin working for the cartel? |
| 14:43:58 | 25 | A.   It was about mid-2001 that they gathered up all of us that |

14:44:03   1   worked in security agencies, government employees that had to do

14:44:09   2   anything with security or law enforcement, and they kind of read

14:44:12   3   the rules to us.  They established the rules to be followed and

14:44:16   4   that we were not to interfere with or bother any of the

14:44:21   5   trafficking or anybody else that they told us that we were not to

14:44:25   6   bother, that they were to be allowed to work freely.

14:44:28   7   Q.   You had previously testified that you knew Francisco

14:44:33   8   Colorado-Cessa because the two of you had the same boss.

14:44:45   9   A.   That's right.

14:44:46   10  Q.   And who was that boss?

14:44:52   11  A.   "Zeta 14."

14:44:55   12  Q.   What was "Zeta 14's" name?

14:45:00   13  A.   Efrain Teodoro Torres.

14:45:08   14  Q.   Did I spell that correctly?

14:45:14   15  A.   It's A-I and there's a Teodoro.  It's Teodoro Torres.

14:45:33   16  Q.   "Zeta 14," what was he in charge of?

14:45:50   17  A.   At that time he was the one that was in charge of the Miguel

14:45:53   18  Aleman plaza on the border.

14:45:56   19  Q.   Where you worked?

14:45:58   20  A.   That encompassed about five county or cities.

14:46:09   21  Q.   And what did you start doing for "Zeta 14"?

14:46:38   22  A.   Well, because there at the federal prosecutor's office, I

14:46:41   23  was the one who knew who most of the drug dealers were, and since

14:46:46   24  they no longer had to pay the right to work fees to us, they were

14:46:52   25  being paid to the cartel.

| | | |
|---|---|---|
| 14:46:53 | 1 | Q.   Did you end up leaving the prosecutor's office? |
| 14:47:00 | 2 | A.   Yes. |
| 14:47:01 | 3 | Q.   And when was that? |
| 14:47:07 | 4 | A.   Somewhere between 2002, 2003. |
| 14:47:12 | 5 | Q.   And in 2002 and 2003, is that when you started working for |
| 14:47:18 | 6 | "Zeta 14"? |
| 14:47:53 | 7 | A.   No.  When I was working at the federal prosecutor's office, |
| 14:47:56 | 8 | I -- since I was one of the ones that had handled all the |
| 14:48:00 | 9 | payments by the drug dealers of the fees that were paid, I then |
| 14:48:04 | 10 | had to start reporting them to him.  And so, I made those reports |
| 14:48:08 | 11 | to him, and then, I started handling some of the accounting.  And |
| 14:48:12 | 12 | at one point, he finally said, oh, are you working for them or |
| 14:48:17 | 13 | you working for me?  And I decided to work for him. |
| 14:48:20 | 14 | Q.   So in 2002 and 2003, you went full-time with the cartel, |
| 14:48:25 | 15 | correct? |
| 14:48:27 | 16 | A.   That's right. |
| 14:48:29 | 17 | Q.   And when I say full-time with the cartel, what did you do -- |
| 14:48:33 | 18 | how did you work for the cartel then? |
| 14:48:57 | 19 | A.   Well, at that time I did -- I handled many of the same |
| 14:49:16 | 20 | things.  I was the one that would collect the fees from all the |
| 14:49:20 | 21 | drug dealers.  I do the payments to the people wouldn't be |
| 14:49:24 | 22 | bothered.  Everything I was told to do.  I also was the one that |
| 14:49:28 | 23 | got the fees from the coyotes or the people that traffic across |
| 14:49:35 | 24 | the border, bribe to the federal police, customs, everything I |
| 14:49:40 | 25 | knew about. |

| | | |
|---|---|---|
| 14:49:40 | 1 | Q.   And when you say across the border, you're talking about in |
| 14:49:44 | 2 | the United States? |
| 14:49:48 | 3 | A.   Yes. |
| 14:49:49 | 4 | Q.   Columbia? |
| 14:50:00 | 5 | A.   No.  Right now, we're talking about there, the border |
| 14:50:03 | 6 | between Miguel Aleman, Mexico, U.S. |
| 14:50:05 | 7 | Q.   So you're sticking with the date that I'm making you; is |
| 14:50:10 | 8 | that correct? |
| 14:50:10 | 9 | A.   Yes. |
| 14:50:10 | 10 | Q.   Okay.  All right.  In 2004, did you meet Francisco "Pancho" |
| 14:50:23 | 11 | Colorado -- I'm sorry, Francisco Colorado-Cessa? |
| 14:50:34 | 12 | A.   It was somewhere between 2004, 2005 because that's when |
| 14:50:45 | 13 | "Zeta 14" was moved to Veracruz. |
| 14:50:48 | 14 | Q.   I'm sorry, was moved where? |
| 14:50:50 | 15 | A.   To Veracruz. |
| 14:50:52 | 16 | Q.   Veracruz.  Okay.  Tell me about his move to Veracruz. |
| 14:51:19 | 17 | A.   He was moved.  He was told that he had to go and establish |
| 14:51:22 | 18 | control of the state of Veracruz plaza because that was a port |
| 14:51:27 | 19 | and that would be good for the Gulf cartel. |
| 14:51:31 | 20 | Q.   And you know this how? |
| 14:51:41 | 21 | A.   Because we were involved in drugs and we know how all of |
| 14:51:44 | 22 | that is handled. |
| 14:51:45 | 23 | Q.   Were you present during some of those conversations? |
| 14:51:53 | 24 | A.   Which conversations? |
| 14:51:54 | 25 | Q.   That he was going to be moved? |

14:52:15   1    A.   Oh, no.   That was when he said that he was going to have to

14:52:21   2    turn over --

14:52:22   3            MR. DEGEURIN:  Your Honor, I'm sorry with the

14:52:24   4    difficulty between the translation and the answers.  I would like

14:52:26   5    to object now to hearsay.

14:52:29   6            THE COURT:  I'll sustain that objection.

14:52:31   7    Q.   (BY MS. FERNALD) Did y'all move -- did he move to Veracruz?

14:52:38   8    A.   Yes.

14:52:39   9    Q.   What did he start doing in Veracruz?

14:52:57   10   A.   Same thing that they had done in Miguel Aleman to begin

14:53:01   11   establishing control, to begin establishing relationships so that

14:53:04   12   you could then take over all the plazas of Veracruz.

14:53:09   13   Q.   And I'm pointing kind of in the middle of Government's

14:53:13   14   Exhibit 320.  Again, this is the map of Mexico and I'm pointing

14:53:17   15   underneath the word.  Is this where Veracruz is?

14:53:30   16   A.   Yes.

14:53:31   17   Q.   Is it approximately in the yellow area outlined in this map?

14:53:39   18   A.   Yes.

14:53:40   19           THE COURT:  I think you need to clarify who went to

14:53:43   20   Veracruz.

14:53:44   21           MS. FERNALD:  Okay.  Thank you.

14:53:45   22   Q.   (BY MS. FERNALD) Who went to Veracruz?

14:53:52   23   A.   As I said before, "Zeta 14."  That's when he was moved to

14:53:56   24   Veracruz.

14:53:57   25   Q.   Did you go with him?

| | | |
|---|---|---|
| 14:54:09 | 1 | A.    No, not completely, because I had -- I had my plazas, my |
| 14:54:17 | 2 | deals in Miguel Aleman, and I was going to be in charge of |
| 14:54:33 | 3 | everything that he had left there of all the drugs that he left |
| 14:54:37 | 4 | there.  Everything that was his that was there, I was to handle. |
| 14:54:41 | 5 | And he is "Zeta 14." |
| 14:54:44 | 6 | Q.    Thank you very much. |
| 14:54:47 | 7 | Were you aware of "14's" finances? |
| 14:54:56 | 8 | A.    Yes. |
| 14:54:57 | 9 | Q.    Did you know how much money he took in? |
| 14:55:06 | 10 | A.    Yes. |
| 14:55:06 | 11 | Q.    Did you know how much money he spent? |
| 14:55:15 | 12 | A.    I don't remember the amounts, but it was a lot of money. |
| 14:55:17 | 13 | Q.    But were you aware of all of his finances? |
| 14:55:29 | 14 | A.    Yes, of everything.  Of everything that came to the border. |
| 14:55:32 | 15 | Yes. |
| 14:55:33 | 16 | MR. DEGEURIN:  Excuse me.  Your Honor, may I have a -- |
| 14:55:38 | 17 | based on the conference objection I had before, a running |
| 14:55:43 | 18 | objection?  I know you don't like running objections, but if I'm |
| 14:55:48 | 19 | interrupting the whole time, it would be quite often to testimony |
| 14:55:52 | 20 | about Mr. Torres' activities back in 2002, 3 or 4, even before he |
| 14:56:02 | 21 | moved down to the state of Veracruz and his own activities. |
| 14:56:10 | 22 | Could we approach?  I'll be a little more specific |
| 14:56:12 | 23 | about it. |
| 14:56:16 | 24 | (At the bench, on the record.) |
| 14:56:27 | 25 | MR. DEGEURIN:  You've already overruled my objections, |

| 14:56:29 | 1 | so I'm aware of that.  But -- his testimony.  But I don't think |
| 14:56:34 | 2 | when you overruled my objection, you were contemplating a lot of |
| 14:56:37 | 3 | testimony about what happened in 2002. |
| 14:56:39 | 4 | THE COURT:  You're right.  I thought I heard all the |
| 14:56:41 | 5 | testimony that was going to be given.  And we have moved now to |
| 14:56:48 | 6 | Veracruz and split the witness' -- I'm hearing testimony I |
| 14:56:52 | 7 | haven't heard. |
| 14:56:54 | 8 | So that's two things.  One is I haven't made any |
| 14:56:59 | 9 | rulings because I haven't had any objections; but it also means I |
| 14:57:03 | 10 | can't give you a running objection because I don't know what |
| 14:57:06 | 11 | they're going to proceed.  I have made one ruling and that is |
| 14:57:11 | 12 | that the association of Mr. Colorado with "14" and subsequently |
| 14:57:21 | 13 | with "40" and the financial conditions between them that this man |
| 14:57:29 | 14 | had personal knowledge of is admissible, in light of the |
| 14:57:33 | 15 | presentation in the opening statements and the fact that the -- |
| 14:57:39 | 16 | there is a denial of the -- |
| 14:57:43 | 17 | MR. DEGEURIN:  Money being used. |
| 14:57:45 | 18 | THE COURT:  Yeah.  And I have his denial of using Zeta |
| 14:57:53 | 19 | money to buy horses, and that's not evidence of the guilt in this |
| 14:58:03 | 20 | case.  It just goes under the rules to show opportunity, motive, |
| 14:58:08 | 21 | history, but the rules so state.  I haven't been asked to give an |
| 14:58:13 | 22 | instruction.  Or I haven't gotten to it.  Now, where are we |
| 14:58:17 | 23 | going? |
| 14:58:17 | 24 | MS. FERNALD:  I'm sorry, I didn't mean to mislead |
| 14:58:19 | 25 | anybody with the presentation.  I was just trying to get a |

| | | |
|---|---|---|
| 14:58:22 | 1 | foundation and I'll move on, your Honor. |
| 14:58:24 | 2 | THE COURT: Okay. Well, we don't have a foundation. |
| 14:58:27 | 3 | We've moved from Tamaulipas to Veracruz. |
| 14:58:36 | 4 | MS. FERNALD: I'll move on, your Honor. |
| 14:58:37 | 5 | THE COURT: All right. |
| 14:58:37 | 6 | MR. DEGEURIN: And I don't -- I'm going to have to |
| 14:58:40 | 7 | touch on those in my cross because they're here. |
| 14:58:42 | 8 | THE COURT: Well, I understand. You're going to have |
| 14:58:45 | 9 | free rein on cross. That's not the problem. But since I know |
| 14:58:50 | 10 | where we are, I'm not foolish enough to give y'all a complete |
| 14:58:55 | 11 | running objection. But you do have an objection with regard to |
| 14:58:58 | 12 | what I've just said and I've overrule that. But whatever else |
| 14:59:03 | 13 | comes in, you feel free to make whatever timely objections you |
| 14:59:07 | 14 | think are necessary. |
| 14:59:08 | 15 | MS. FERNALD: And you can interrupt me anytime. And I |
| 14:59:11 | 16 | should say, too, some of this -- Mr. DeGeurin, some of this was |
| 14:59:14 | 17 | brought out because it was negative information about this man |
| 14:59:17 | 18 | and impeachment material they knew was going to be brought up -- |
| 14:59:21 | 19 | THE COURT: Well, I think y'all have plenty of that. |
| 14:59:23 | 20 | MS. FERNALD: Yeah, I do, too. |
| 15:00:19 | 21 | Q.   (BY MS. FERNALD) Are you aware -- are you familiar with the |
| 15:00:22 | 22 | term "accountant"? |
| 15:00:27 | 23 | A.   Yes. |
| 15:00:28 | 24 | Q.   Were you the accountant for "14"? |
| 15:00:42 | 25 | A.   I was the one that handled his accounting for the drug |

| | | |
|---|---|---|
| 15:00:46 | 1 | trafficking and things like that. |
| 15:00:48 | 2 | Q.   That's what I'm asking. |
| 15:00:51 | 3 | A.   Yes. |
| 15:00:53 | 4 | Q.   Do you know if Mr. Torres, how he made his money? |
| 15:01:03 | 5 | A.   Yes. |
| 15:01:04 | 6 | Q.   How did he make his money? |
| 15:01:08 | 7 | A.   Drug trafficking, contraband, kidnapping, everything that is |
| 15:01:23 | 8 | related to the cartel. |
| 15:01:24 | 9 | Q.   And I call it cartel.  You call it company. |
| 15:01:30 | 10 | A.   Yes. |
| 15:01:36 | 11 | Q.   Was 100 percent of his income derived from illegal |
| 15:01:40 | 12 | activities? |
| 15:01:46 | 13 | A.   Yes. |
| 15:01:49 | 14 | Q.   You stated that you met Francisco Colorado-Cessa in 2004 and |
| 15:01:56 | 15 | 2005.  How did you meet him? |
| 15:02:12 | 16 | A.   It was there in Veracruz.  We worked for the same person. |
| 15:02:21 | 17 | And one time when I went down there, he -- we were at a place and |
| 15:02:26 | 18 | he introduced me to him. |
| 15:02:27 | 19 | Q.   And who was that person? |
| 15:02:31 | 20 | A.   "Zeta 14." |
| 15:02:34 | 21 | Q.   Do you know whether or not "Zeta 14" ever gave any money -- |
| 15:02:41 | 22 | let me rephrase it. |
| 15:02:42 | 23 | Can you tell me the first time that you were aware that |
| 15:02:46 | 24 | "Zeta 14" gave Francisco Colorado-Cessa money? |
| 15:03:08 | 25 | A.   Yes.  It was when we had the support of candidate to the |

15:03:13   1    governorship of Veracruz.

15:03:16   2    Q.   Do you --

15:03:18   3          MR. DEGEURIN:  Your Honor, at this time I would ask for

15:03:20   4    a contemporaneous instruction to the jury as to how to receive

15:03:24   5    this evidence.

15:03:34   6          THE COURT:  Members of the jury, I anticipate we're

15:03:37   7    going to run into some evidence here that occurred prior to 2008.

15:03:43   8    The indictment in this case runs from on or about 2008.  The

15:03:50   9    substantive criminal charge can be established at a reasonable

15:03:55   10   time to 2008.  But this occurred prior to 2008.  So it is not

15:04:03   11   being admitted for the truth of the conviction or the offense or

15:04:10   12   the charge in this case.  It's just being admitted so that you

15:04:15   13   will have knowledge -- if you believe the credibility of this

15:04:20   14   witness, you would have knowledge of the opportunity, the intent,

15:04:27   15   the knowledge that Mr. Cessa may have had after 2008 to the

15:04:35   16   present time in this charge to establish possible opportunity,

15:04:47   17   motive, knowledge.  But it is not evidence of this charge.  You

15:04:52   18   can only consider it for the purposes I've just said.

15:04:56   19          And I'll give you another instruction with the legal

15:04:58   20   instructions at the end of the case.  You may proceed.  Is that

15:05:04   21   sufficient, counsel?

15:05:05   22          MR. DEGEURIN:  Yes, your Honor.

15:05:06   23          THE COURT:  All right.

15:05:07   24   Q.   (BY MS. FERNALD) Do you know whether or not Efrain Torres,

15:05:10   25   "Zeta 14," ever gave money to Colorado-Cessa for ADT Petro

15:05:27  1   Servicios?

15:05:27  2   A.   Yes.

15:05:28  3   Q.   How much money -- when did he give him the money?

15:05:49  4   A.   I don't remember the exact date, but it was more or less in

15:05:53  5   that -- those years that he gave him money to buy machinery for

15:05:59  6   some government projects that they were going to take on.

15:06:02  7   Q.   And when you say those years, what years are you referring

15:06:05  8   to?

15:06:11  9   A.   2004, 2005.

15:06:13  10  Q.   How much approximately did Efrain Torres give

15:06:17  11  Colorado-Cessa?

15:06:25  12  A.   Yeah.  It was approximately about $6 million to buy

15:06:29  13  machinery.  That's what I had in it.

15:06:35  14  Q.   Hold on a second.  Listen to my questions, please.

15:06:42  15       Did you record that in the books for Efrain Torres?

15:06:51  16  A.   Yes.

15:06:51  17  Q.   Is that how you know?

15:06:54  18  A.   Yes.

15:06:57  19  Q.   Where did Efrain Torres get $6 million to give to the

15:07:02  20  defendant?

15:07:10  21  A.   Came from the drugs, from the cocaine that was being sold

15:07:16  22  here in the U.S.

15:07:19  23  Q.   Was there another occasion in which Efrain Torres gave

15:07:24  24  Colorado-Cessa money for ADT Petro Servicios?

15:07:46  25  A.   I don't remember if it was for Petro Servicio, but there was

15:07:53   1   another occasion where he gave him a suitcase of money.

15:07:56   2   Q.   How much money was it?

15:08:04   3   A.   I don't remember because I wasn't the one on that occasion

15:08:08   4   that sent it, but we were the ones that took it out of the truck

15:08:11   5   in the black suitcase.

15:08:12   6   Q.   When the $6 million -- I want to back up a little bit.   When

15:08:16   7   the $6 million was given to Colorado-Cessa, how big was ADT Petro

15:08:22   8   Servicios as a company?   Was it a big company?

15:08:32   9           MR. DEGEURIN:   Your Honor, I'm going to object that he

15:08:35  10   does not have the expertise to analyze the size of the

15:08:40  11   corporation and the company.   Foundation's not been laid for him.

15:08:46  12           THE COURT:   I'll sustain the objection and also to the

15:08:49  13   word "big."   All right.   Rephrase.

15:08:52  14   Q.   (BY MS. FERNALD) Did ADT Petro Servicios have a lot of

15:08:55  15   machines before the money was given?

15:09:27  16   A.   No, because that's why they became -- the investment was

15:09:30  17   made.   They became partners.   As partners, they were going to

15:09:33  18   expand it and grow using government projects.   When the candidate

15:09:40  19   won the governorship, he was going to give them projects, and

15:09:42  20   then, they were going to get government contracts through Pemex

15:09:47  21   from the federal government.

15:09:49  22   Q.   What is Pemex?

15:09:53  23   A.   Pemex means Petroleos Mexicanos, Mexican oil, and it has to

15:10:17  24   do with everything that all the products that come from the oil

15:10:22  25   that is property -- that is of the nation.   Gasoline, any oil

15:10:26  1  product.

15:10:31  2  Q.   Did you attend the funeral of "Zeta 14," Efrain Torres?

15:10:45  3  A.   Yes.

15:10:46  4  Q.   When was that funeral?

15:11:15  5  A.   It was in March of 2007, a day -- one or two days after he

15:11:20  6  was killed.

15:11:30  7  Q.   Between the time period of 2004 through March of 2007, how

15:11:40  8  much money did Efrain Torres give Colorado-Cessa?

15:12:21  9  A.   Well, what I had entered on the books was the $12 million

15:12:26  10  for the candidate for the governorship, the $6 million for the

15:12:32  11  machinery.  That would have been $18 million.  Then the $180,000

15:12:38  12  he gave them for a horse.  And then, the money that was given in

15:12:41  13  that suitcase that I never knew how much that was.

15:12:48  14  Q.   Around 18,000 to be conservative -- 18 million to be

15:12:52  15  conservative?

15:12:56  16  A.   That's what I remember and that's what I had entered in my

15:13:02  17  computer.

15:13:07  18  Q.   We talked about horses.  How much money did Efrain Torres

15:13:14  19  give Colorado-Cessa for the purchase of horses?

15:13:27  20  A.   That I know of?

15:13:28  21  Q.   Yes.

15:13:29  22  A.   That I had entered was $180,000.  That I don't know if it

15:13:39  23  was for one horse or two horses.

15:13:43  24  Q.   You had previously -- you had previously stated that they

15:13:46  25  were partners, meaning Colorado-Cessa and "14."  Do you recall

| | | |
|---|---|---|
| 15:13:52 | 1 | that? |
| 15:13:58 | 2 | A.   Yes. |
| 15:14:00 | 3 | Q.   Were they equal partners in ADT and business activities? |
| 15:14:04 | 4 | MR. DEGEURIN:  Your Honor, I'm going to object to that. |
| 15:14:06 | 5 | He would not know that.  We can't cross-examine Mr. Torres, |
| 15:14:12 | 6 | Efrain Torres.  I don't care what he writes down in the book, he |
| 15:14:17 | 7 | could not know. |
| 15:14:18 | 8 | THE COURT:  Whoa, whoa, let's not get any personal |
| 15:14:21 | 9 | opinions here.  I'm going to sustain the objection unless you can |
| 15:14:26 | 10 | show a foundation on that. |
| 15:14:29 | 11 | Q.   (BY MS. FERNALD) Do you know whether or not Colorado-Cessa |
| 15:14:44 | 12 | controlled ADT Petro Servicios? |
| 15:14:47 | 13 | A.   Who?  Sorry. |
| 15:14:48 | 14 | Q.   Did "14" control ADT Petro Servicios or did Francisco |
| 15:14:54 | 15 | Colorado-Cessa? |
| 15:15:05 | 16 | A.   What's happening here is that "Zeta 14" invested.  He |
| 15:15:18 | 17 | invested money in that company, but the one that was at the head |
| 15:15:22 | 18 | of the company was Francisco Colorado. |
| 15:15:26 | 19 | Q.   Do you know whether or not Colorado-Cessa -- let me pull |
| 15:15:37 | 20 | that back.  I lost my train of thought. |
| 15:15:41 | 21 | Do you know whether Colorado-Cessa knew where the money |
| 15:15:45 | 22 | came from from Efrain Torres? |
| 15:15:54 | 23 | A.   Yes. |
| 15:15:56 | 24 | Q.   How did he know where the money -- where did the money come |
| 15:15:59 | 25 | from? |

15:16:00  1        MR. DEGEURIN:  Excuse me.  I'm going to object.  The

15:16:02  2  first question was no.  The last question I object to without a

15:16:07  3  foundation.

15:16:14  4        THE COURT:  Rephrase your question.

15:16:18  5  Q.  (BY MS. FERNALD) Where did the $18 million come from that he

15:16:22  6  gave -- that Efrain Torres gave Colorado-Cessa?  Where did that

15:16:26  7  come from?

15:16:39  8  A.  It came from the sale of cocaine of the drugs that were sold

15:16:42  9  here in the United States.

15:16:44  10  Q.  Do you know whether or not Francisco Colorado-Cessa knew

15:16:47  11  that?

15:16:54  12  A.  He knew.

15:16:55  13  Q.  How do you know that?

15:16:58  14  A.  Because he knew.  Francisco Colorado knew that "Zeta 14" was

15:17:15  15  one of the leaders of the cartel and that he was the head of the

15:17:20  16  Veracruz plaza.

15:17:22  17  Q.  How did he know that "14" was a major drug distributor?

15:17:29  18        MR. DEGEURIN:  Your Honor, I'm going to have to object.

15:17:31  19  Calls for speculation.

15:17:33  20        THE COURT:  I'll sustain the objection to the question

15:17:36  21  asked.

15:17:37  22  Q.  (BY MS. FERNALD) Do you know whether or not Colorado-Cessa

15:17:41  23  was ever present for cocaine distribution by "Zeta 14"?

15:18:02  24  A.  When you say distributor, are you asking if he was present

15:18:07  25  where there were drugs or?

| | | |
|---|---|---|
| 15:18:10 | 1 | Q.   Yes.   Did he know about it? |
| 15:18:12 | 2 | MR. DEGEURIN:  That's a different question. |
| 15:18:16 | 3 | THE COURT:  Let's start over. |
| 15:18:18 | 4 | Q.   (BY MS. FERNALD) Was he present? |
| 15:18:40 | 5 | MR. DEGEURIN:  It sounds nonresponsive.  I object. |
| 15:18:42 | 6 | A.   No.   He was -- |
| 15:18:45 | 7 | THE COURT:  Well, I don't know. |
| 15:18:47 | 8 | MR. DEGEURIN:  It just sounded a lot longer than a |
| 15:18:49 | 9 | "Yes" or "No." |
| 15:18:52 | 10 | THE COURT:  May be well.  Let's make shorter questions. |
| 15:18:59 | 11 | I'm going to allow you to lead him a little bit because if he can |
| 15:19:03 | 12 | answer "Yes" or "No," I want him to answer "Yes" or "No."  And |
| 15:19:06 | 13 | then, each of you can ask followup questions, if necessary. |
| 15:19:13 | 14 | MR. DEGEURIN:  Your Honor, I understand the Court's |
| 15:19:17 | 15 | ruling.  What my fear is that by leading, there might be a |
| 15:19:23 | 16 | suggestion of the answer. |
| 15:19:24 | 17 | THE COURT:  All right.  I take it back.  I'm not going |
| 15:19:26 | 18 | to let you lead.  Whatever he says, it will be on counsel's feet, |
| 15:19:33 | 19 | not the Court's.  All right.  Proceed. |
| 15:19:35 | 20 | Q.   (BY MS. FERNALD) How do you know that Colorado-Cessa knew |
| 15:19:41 | 21 | Efrain Torres was selling drugs? |
| 15:19:57 | 22 | A.   Because several times, we used the plane that he had to move |
| 15:20:00 | 23 | them. |
| 15:20:02 | 24 | Q.   Did Colorado-Cessa ever partake in the distribution of |
| 15:20:06 | 25 | cocaine? |

| | | |
|---|---|---|
| 15:20:12 | 1 | A.   Yes.  In 2006. |
| 15:20:14 | 2 | Q.   Tell us about that. |
| 15:20:47 | 3 | A.   Because the amount -- in 2006, the amounts that were owed to |
| 15:20:53 | 4 | "Zeta 14" were very high, and since he was the godfather to the |
| 15:20:59 | 5 | son, he invited him to participate in a pool that was being |
| 15:21:05 | 6 | organized, and he was really low on money because he'd lost a lot |
| 15:21:09 | 7 | of money on the horses and because some of the payment of the |
| 15:21:12 | 8 | contracts were being delayed. |
| 15:21:14 | 9 | Q.   You used a lot of "he's," so I'm going to ask you what you |
| 15:21:18 | 10 | meant by that. |
| 15:21:27 | 11 | A.   Well, we're talking about -- |
| 15:21:28 | 12 | Q.   Okay.  Who got in debt? |
| 15:21:34 | 13 | A.   Mr. "Pancho," Francisco. |
| 15:21:36 | 14 | Q.   And who was he in debt to? |
| 15:21:42 | 15 | A.   With "Zeta 14." |
| 15:21:44 | 16 | Q.   And you said something about godfather.  Who was godfather |
| 15:21:54 | 17 | to Efrain, "14's" child? |
| 15:22:01 | 18 | A.   Mr. "Pancho." |
| 15:22:02 | 19 | Q.   What does it mean to be godfather in your culture of a |
| 15:22:06 | 20 | child? |
| 15:22:22 | 21 | A.   Well, because he was the godfather of -- for the baptism, |
| 15:22:28 | 22 | that is someone who is very close to you, and that's someone who |
| 15:22:30 | 23 | is going to watch over your child because it was part of the |
| 15:22:33 | 24 | baptism. |
| 15:22:34 | 25 | Q.   And then, you said something about a pool and getting into a |

15:22:39    1   pool.  Will you explain that?  Who was it?

15:23:05    2            MR. DEGEURIN:  Your Honor, I'm going to have to object

15:23:07    3   again, and this is way beyond what is necessary to the foundation

15:23:12    4   of the last question.

15:23:14    5            THE COURT:  I don't -- in light of the charge that's

15:23:19    6   made that the jury's going to determine, I think I'll sustain the

15:23:23    7   objection on this line of questioning with regard to assumption.

15:23:33    8            MS. FERNALD:  I want to move on now.

15:23:41    9   Q.   (BY MS. FERNALD) After March of 2007, was there a big

15:23:45   10   meeting that occurred that you attended?

15:23:59   11   A.   Yes.  After "Zeta 14's" funeral.

15:24:04   12   Q.   What was the purpose of this meeting?

15:24:14   13   A.   There they wanted to get to know the whole team, everybody

15:24:38   14   who worked with "Zeta 14" and who worked in Veracruz.  They

15:24:42   15   wanted to check on the money.  They wanted to check on all the

15:24:46   16   properties, everything that was "Zeta 14's."

15:24:51   17   Q.   And you keep using "they."  Please tell me who "they" are.

15:24:57   18   A.   The leaders, the leaders of what at that time was the

15:25:04   19   cartel.

15:25:05   20   Q.   Who were those leaders?

15:25:07   21   A.   At that meeting, Lazcano and "40" were there.

15:25:16   22   Q.   Who was the leader of the Zeta organization -- what did

15:25:21   23   Lazcano do?

15:25:38   24   A.   He was the leader.  He was the leader of the Zetas, and he

15:25:42   25   was the leader of the Zetas who controlled many of the states in

| | | |
|---|---|---|
| 15:25:49 | 1 | our country. |
| 15:25:50 | 2 | Q.   At that time, correct? |
| 15:25:53 | 3 | A.   Yes.  At that time. |
| 15:25:54 | 4 | Q.   Did I spell his name correctly? |
| 15:26:00 | 5 | A.   Where is it? |
| 15:26:02 | 6 |      THE JUROR:  Can't see it. |
| 15:26:05 | 7 | A.   Yeah. |
| 15:26:06 | 8 | Q.   (BY MS. FERNALD) Okay.  Lazcano was the leader at that time? |
| 15:26:13 | 9 | A.   Yes. |
| 15:26:14 | 10 | Q.   Who else was present? |
| 15:26:16 | 11 | A.   "40." |
| 15:26:18 | 12 | Q.   What is "40's" name, do you know? |
| 15:26:23 | 13 | A.   Miguel.  Miguel Trevino. |
| 15:26:29 | 14 | Q.   Do you know what Miguel Trevino looks like? |
| 15:26:35 | 15 | A.   Yes. |
| 15:26:43 | 16 | Q.   Who is that in 335A? |
| 15:26:47 | 17 | A.   That's "40." |
| 15:26:50 | 18 | Q.   And is this who you were referring to at that meeting? |
| 15:26:57 | 19 | A.   Yes. |
| 15:26:58 | 20 | Q.   What was discussed at that meeting? |
| 15:27:11 | 21 | A.   Well, first, if we knew, or if it was known, or if we had |
| 15:27:45 | 22 | heard rumors about who had killed him.  And then, also, to find |
| 15:27:50 | 23 | out if we would be able to continue working, even under another |
| 15:27:55 | 24 | head of that plaza to check on all of the assets and to check on |
| 15:28:00 | 25 | everything that was left pending. |

| | | |
|---|---|---|
| 15:28:02 | 1 | MR. DEGEURIN:  Your Honor, I'm going to object to going |
| 15:28:04 | 2 | any further along this line or another instruction as to why |
| 15:28:08 | 3 | that's being admitted. |
| 15:28:09 | 4 | THE COURT:  What is your objection? |
| 15:28:12 | 5 | MR. DEGEURIN:  Before it was -- it's not relevant to -- |
| 15:28:15 | 6 | THE COURT:  It is not relevant.  I sustain that one. |
| 15:28:20 | 7 | Let's go into something that's relevant. |
| 15:28:24 | 8 | Q.   (BY MS. FERNALD) Who was Colorado-Cessa supposed to report |
| 15:28:28 | 9 | to after this meeting? |
| 15:28:37 | 10 | A.   With "40."  He reported to "40." |
| 15:28:41 | 11 | Q.   And how do you know that? |
| 15:28:58 | 12 | A.   Because I was given the list and I was to collect from |
| 15:29:01 | 13 | everybody that was -- that's still owed, about a month to month |
| 15:29:08 | 14 | and a half later, I told to take him off the list because the |
| 15:29:13 | 15 | account had been handled. |
| 15:29:16 | 16 | Q.   Who told you to take him off the list? |
| 15:29:18 | 17 | A.   "40." |
| 15:29:21 | 18 | Q.   When you got arrested in September of 2008, where were you |
| 15:29:29 | 19 | arrested? |
| 15:29:34 | 20 | A.   In Mission, Texas. |
| 15:29:37 | 21 | Q.   And did you go to jail there? |
| 15:29:39 | 22 | A.   Yes. |
| 15:29:40 | 23 | Q.   Did you try to bribe any prison guards there? |
| 15:29:47 | 24 | A.   Yes. |
| 15:29:48 | 25 | Q.   Tell the jury about that. |

```
15:30:14   1   A.   Well, I get to the jail and since in Mexico, bribes were
15:30:32   2   common, I get there and I'm offered extra visits, privileges,
15:30:39   3   ability to get better food, visits on days that weren't visiting
15:30:43   4   days, cellphones.
15:30:45   5   Q.   And did you actually get cellphones, which is illegal to get
15:30:48   6   in jail, correct?
15:30:53   7   A.   Yes.
15:30:54   8   Q.   And why did you that?
15:31:31   9          MR. DEGEURIN:  Excuse me, your Honor.  I believe this
15:31:35  10   is not only irrelevant.  The little Spanish that I understand --
15:31:41  11   may we approach the bench?  It's worse than just being
15:31:45  12   irrelevant.
15:31:45  13          THE COURT:  All right.
15:31:53  14          (At the bench, on the record.)
15:32:04  15          MR. DEGEURIN:  The probative value of what I think he
15:32:21  16   was saying.
15:32:22  17          THE COURT:  He's saying that he hadn't done anything
15:32:24  18   wrong, but they kidnapped his father, his brother, several other
15:32:31  19   members of the family, took him, all of his property.
15:32:37  20          MR. DEGEURIN:  So that's why he got -- people to get
15:32:40  21   the cellphones?
15:32:41  22          THE COURT:  Yeah.  So he was trying to rectify that,
15:32:51  23   protect his family.  I don't see that that's particularly
15:32:55  24   relevant.
15:32:56  25          MS. FERNALD:  The only reason is they're going to
```

15:32:58   1   impeach him on that.

15:32:59   2          THE COURT:  Well, if they do, they're going to get a

15:33:01   3   bad answer, but that's their judgment.  But anyway, that's what

15:33:03   4   the interpreter tells me that she would be interpreting.

15:33:07   5          MS. FERNALD:  And that's my understanding from talking

15:33:09   6   to him.

15:33:11   7          MR. DEGEURIN:  So he didn't deny getting the cellphones

15:33:14   8   illegally.  He's saying he had good reason to do so, and we don't

15:33:19   9   go into the good reason to do so.  Is that what --

15:33:22  10          THE COURT:  Well, I told you all I know, counsel.

15:33:24  11          MR. DEGEURIN:  Okay.

15:33:26  12          MS. FERNALD:  Thank you.

15:33:27  13          MR. DEGEURIN:  I do object to the nonresponsive --

15:33:30  14   object to the answer that may have -- has not come yet from the

15:33:35  15   witness.

15:33:35  16          THE COURT:  Okay.  Well, I will sustain it.

15:33:38  17          MS. FERNALD:  Thank you, your Honor.  If I could just

15:33:43  18   have a moment.  Pass the witness, your Honor.

15:34:04  19          MR. DEGEURIN:  Your Honor, Ms. Williams reminded me

15:34:06  20   that I'm amiss that I should ask you to renew your instruction to

15:34:10  21   the jury about the interpreter's -- that should some of them know

15:34:15  22   Spanish better than me, that they should disregard the evidence

15:34:20  23   the way you worded it before.

15:34:21  24          THE COURT:  What counsel is asking me is, I sustained

15:34:28  25   the objection, but you heard probably the answer in Spanish.  And

15:34:37  1   I had the interpreter interpret it fully for me, so I knew what

15:34:41  2   the answer would be so I could decide if it's admissible.  It is

15:34:45  3   not.  It's not relevant to any issue that you're going to be

15:34:48  4   deciding.  The charge he wants me to say, I've said twice, and

15:34:55  5   that is, you can only consider the translation of the official

15:35:00  6   interpreter, but she didn't give it to you and I've sustained the

15:35:05  7   objection.  So do not rely on anything if you understood the

15:35:12  8   Spanish answer to the last question.

15:35:17  9          And I'll give you a short, ten-minute break.  Use the

15:35:20  10  facilities, be ready to come back.

15:35:53  11          (Jury not present.)

15:35:59  12          THE COURT:  We're in recess for ten minutes.

15:47:58  13          (Recess.)

15:49:43  14          (Jury present.)

15:49:47  15          THE COURT:  Ms. Fernald.

15:49:49  16          MS. FERNALD:  Your Honor, the government would offer

15:49:50  17  Government's Exhibit 402.  It's the piece of paper that I wrote

15:49:53  18  on for demonstrative purposes and for appellate record.

15:50:00  19          MR. DEGEURIN:  I have no objection to this

15:50:03  20  demonstrative, your Honor.

15:50:06  21          THE COURT:  And for appellate record, that's a new one

15:50:08  22  on me.

15:50:09  23          MR. DEGEURIN:  Yeah, me, too.

15:50:11  24          THE COURT:  Anybody have objection?  I'll admit it as

15:50:15  25  demonstrative.  But I love to keep things away from the appellate

| | | |
|---|---|---|
| 15:50:22 | 1 | record. |
| 15:50:22 | 2 | MS. FERNALD:  Thank you, your Honor. |
| 15:50:33 | 3 | THE COURT:  Just a second, Mr. Finn, Ms. Williams, |
| 15:50:36 | 4 | y'all had no questions? |
| 15:50:37 | 5 | MS. WILLIAMS:  No, your Honor.  I'm sorry, no |
| 15:50:38 | 6 | questions. |
| 15:50:39 | 7 | THE COURT:  All right.  Mr. DeGeurin. |
| 15:50:40 | 8 | MR. DEGEURIN:  Thank you, your Honor. |
| 15:50:41 | 9 | RE-CROSS EXAMINATION |
| 15:50:42 | 10 | BY MR. DEGEURIN: |
| 15:50:42 | 11 | Q.   Mr. Hinojosa, if I'm correct on your direct examination, you |
| 15:51:02 | 12 | said that your corruption started while you were a federal |
| 15:51:09 | 13 | prosecutor in Mexico; is that correct? |
| 15:51:30 | 14 | A.   I worked at the federal prosecutor's office.  Yes. |
| 15:51:36 | 15 | Q.   I realize you worked there.  I mean, when did you start |
| 15:51:40 | 16 | taking bribes?  Is that when you were a federal prosecutor? |
| 15:51:56 | 17 | A.   It's that I worked there, but I wasn't responsible for that |
| 15:52:00 | 18 | office.  I was just a law clerk at the federal prosecutor's |
| 15:52:09 | 19 | office.  And yes, that is when I began. |
| 15:52:13 | 20 | Q.   That's when you began taking bribes? |
| 15:52:18 | 21 | A.   Yes. |
| 15:52:19 | 22 | Q.   If you'd ever said that you were a lawyer and a prosecutor |
| 15:52:26 | 23 | in Mexico, that would be an exaggeration, wouldn't it? |
| 15:52:43 | 24 | A.   Exaggeration in what sense? |
| 15:52:46 | 25 | Q.   Let's just call it a lie.  If you'd ever said before, you |

| | | |
|---|---|---|
| 15:52:50 | 1 | were a federal prosecutor in Mexico, it's a lie, isn't it? |
| 15:53:07 | 2 | A.    Can you repeat that question? |
| 15:53:11 | 3 | Q.    You know, no.  I'm going to move on.  I may come back to it. |
| 15:53:17 | 4 |       Were you a lawyer in Mexico? |
| 15:53:20 | 5 | A.    Yes. |
| 15:53:23 | 6 | Q.    Were you in the prosecutor's office? |
| 15:53:29 | 7 | A.    Yes. |
| 15:53:30 | 8 | Q.    Did you take bribes while you were in the prosecutor's |
| 15:53:34 | 9 | office? |
| 15:53:36 | 10 | A.    Yes. |
| 15:53:41 | 11 | Q.    And then, I believe you testified on direct examination, you |
| 15:53:44 | 12 | left the prosecutor's office to go to work full-time for, as you |
| 15:53:53 | 13 | call it, the cartel? |
| 15:54:02 | 14 | A.    Yes. |
| 15:54:03 | 15 | Q.    That would have been somewhere around 2002 or 3? |
| 15:54:09 | 16 | A.    Yes.  Approximately. |
| 15:54:18 | 17 | Q.    And then, you testified under oath, you testified that you |
| 15:54:27 | 18 | began working for a man whose name is Efrain Torres -- now we're |
| 15:54:37 | 19 | referring to him as "14" -- when you left the federal |
| 15:54:45 | 20 | prosecutor's office; is that correct? |
| 15:54:58 | 21 | A.    Yes. |
| 15:54:59 | 22 | Q.    Was Efrain Torres' name that he used out in the public |
| 15:55:08 | 23 | Alejandro? |
| 15:55:22 | 24 | A.    Everyone that used -- everybody called him either "Chaparro" |
| 15:55:28 | 25 | or "Chispa" as nicknames, "14." |

15:55:34  1   Q.   All right.  Let's talk about geographical area.  Where were

15:55:38  2   you working for Efrain Torres when you left the prosecutor's

15:55:43  3   office?

15:56:16  4   A.   It was the entire border.  It was throughout the entire

15:56:19  5   border that encompasses the five major cities from Diaz Ordaz to

15:56:27  6   Nueva Ciudad Guerrero.

15:56:30  7   Q.   And that is what you're talking about is the state of

15:56:35  8   Tamaulipas, correct?

15:56:41  9   A.   Yes.

15:56:42  10  Q.   That would be this green area?

15:56:49  11  A.   Yes.

15:56:51  12  Q.   And when you say around the border, because it goes -- it's

15:56:55  13  a strange shape of a state.  It goes all the way up the Rio

15:56:59  14  Grande to Nuevo Laredo, right?

15:57:10  15  A.   Yes.

15:57:12  16  Q.   And Miguel Aleman is somewhere south of Nuevo Laredo,

15:57:21  17  correct?

15:57:24  18  A.   Exactly there.

15:57:25  19  Q.   So it was there that you became a full-time criminal?

15:57:35  20  A.   Yes.

15:57:39  21  Q.   And that was where Efrain Torres, No. "14," was, too; is

15:57:51  22  that correct?

15:57:51  23  A.   Yes.

15:57:55  24  Q.   And who was Mr. Mendoza, Francisco Mendoza?  Or somebody

15:58:03  25  Mendoza that worked for you?

15:58:18  1    A.   Francisco Mendoza, he's a friend, he's a friend of mine.

15:58:22  2    He's a friend of "14."  He did not work for me.  He worked

15:58:26  3    directly for "14."

15:58:31  4    Q.   And was that in Miguel Aleman?

15:58:45  5    A.   He was with "14" in Miguel Aleman in Veracruz.  He didn't

15:58:50  6    have a location.  He was always with "14" or with me.

15:58:56  7    Q.   And Lupe, who was Lupe?

15:59:06  8    A.   One of my workers.  I mean, there's a lot of them, Lupes.

15:59:09  9    But one of my workers was Lupe.

15:59:13 10    Q.   And that particular Lupe that I'm referring to that worked

15:59:19 11    for you, worked for you and Miguel Aleman?

15:59:35 12    A.   He worked with me and Miguel Aleman.  He worked with me and

15:59:39 13    other plazas that I handled in Sabinas, in Cerralvo.

15:59:48 14    Q.   So he worked for you in several places and for a period of

15:59:52 15    time, a long period of time?

15:59:59 16    A.   Yes.

16:00:00 17    Q.   This is the same Lupe that you swore under oath you could

16:00:06 18    not remember his last name, correct?

16:00:13 19    A.   Yes.

16:00:16 20    Q.   Memory gotten any better since you swore under oath you

16:00:22 21    could not remember the guy working for you, last name?

16:00:43 22    A.   No.  No.  We all knew each other by our nicknames.  I didn't

16:00:49 23    remember his last name and no.

16:00:50 24    Q.   But this particular guy is someone that you put great trust

16:00:54 25    in, didn't you?  Your life, you entrusted with him.

| | | |
|---|---|---|
| 16:01:14 | 1 | A.   He was just like any other worker.  There was nothing |
| 16:01:16 | 2 | particular about him, nothing special. |
| 16:01:18 | 3 | Q.   Well, you called him your deputy. |
| 16:01:35 | 4 | A.   He was a worker like anyone else.  Sometimes I sent him to |
| 16:01:43 | 5 | one plaza or another, the ones I was in command of.  Just as I |
| 16:01:52 | 6 | would send him, I would send another.  There was nothing special |
| 16:01:55 | 7 | about that. |
| 16:01:55 | 8 | Q.   So how many people did you have working under you, sending |
| 16:02:01 | 9 | people around doing your work for you? |
| 16:02:10 | 10 | A.   It was around 20, 30 people. |
| 16:02:15 | 11 | Q.   I suppose that's why when you were brought to justice, you |
| 16:02:25 | 12 | testified that your guideline level was life, correct? |
| 16:02:39 | 13 | A.   Yes. |
| 16:02:47 | 14 | Q.   You offered to trade information to try to lower your |
| 16:02:55 | 15 | sentence after you found out that the guidelines that the Judge |
| 16:03:01 | 16 | was going to have to consider in sentencing you.  You offered to |
| 16:03:06 | 17 | trade information that was valuable to the government in order to |
| 16:03:12 | 18 | try to lower your potential sentence from life to something else, |
| 16:03:17 | 19 | right? |
| 16:03:43 | 20 | A.   Yes. |
| 16:03:43 | 21 | Q.   And you wrote letters to prosecutors asking, I've got |
| 16:03:54 | 22 | something I could trade.  Maybe you could lower my sentence for |
| 16:03:58 | 23 | me, correct?  You actually handwrote them letters. |
| 16:04:09 | 24 | A.   Yes. |
| 16:04:10 | 25 | Q.   And so, then, there was an agreement reached between you and |

16:04:17    1    the prosecutor -- not these prosecutors right here but other

16:04:21    2    prosecutors, that if you could -- if your information that you

16:04:29    3    were offering were valuable enough to where it would

16:04:32    4    substantially assist the government in prosecuting other people,

16:04:39    5    they would lower your sentence; is that correct?

16:05:05    6                THE COURT:  I think what you meant was that they would

16:05:09    7    ask to lower.

16:05:11    8                MR. DEGEURIN:  I was asking for his belief.

16:05:18    9    Q.   (BY MR. DEGEURIN) And after that occurred, you met with --

16:05:25   10    multiple times, met with agents and -- primarily agents but,

16:05:29   11    also, with assistant U.S. attorneys and told them all about your

16:05:37   12    criminal activity.

16:05:54   13    A.   Yes.

16:05:54   14    Q.   And one of those first meetings was back in November of

16:06:07   15    2008.

16:06:08   16    A.   Don't remember the date.

16:06:10   17    Q.   Well, let me ask you this.  Do you remember that your

16:06:15   18    indictment was in August of 2008?

16:06:31   19    A.   I don't remember the date.  I don't remember the dates, but

16:06:33   20    I know I was arrested in September of 2008.

16:06:38   21    Q.   And do you remember that it was after you were arrested and

16:06:44   22    before you entered a plea of guilty, you made this agreement with

16:06:51   23    the U.S. Attorney's Office, wherever you were?

16:07:06   24    A.   Yes.

16:07:10   25    Q.   I'm going to try to save a little bit of time.  I'm going to

| | | |
|---|---|---|
| 16:07:13 | 1 | give you some dates way back in 2008, and I will later, if I need |
| 16:07:22 | 2 | to, show you documents that will maybe refresh your memory.  But |
| 16:07:26 | 3 | I'm going to save some time. |
| 16:07:39 | 4 | You met November 25, 2008, November 25th, in the |
| 16:07:43 | 5 | afternoon of 2008, December 4th, 2008, February the 11th, 2009, |
| 16:07:51 | 6 | March the 16th, 2009, March 23rd, 2009 and March 27th, 2009. |
| 16:08:37 | 7 | A.   I don't know the dates, but yes, I had many, many |
| 16:08:40 | 8 | interviews. |
| 16:08:41 | 9 | Q.   Okay.  Now, for full disclosure, I'm going to tell you that |
| 16:08:51 | 10 | by order of the Court and by agreement of the prosecutors, I have |
| 16:08:56 | 11 | been provided reports of all of those interviews you had with |
| 16:09:02 | 12 | these agents over the years with the agreement that after this |
| 16:09:08 | 13 | trial is over, I give them back.  But I know about these |
| 16:09:14 | 14 | meetings.  I'll give you that as a disclosure. |
| 16:09:38 | 15 | A.   Uh-huh.  Okay. |
| 16:09:40 | 16 | Q.   And will you agree with me that each time you met in these |
| 16:09:50 | 17 | interviews in your process of trying to lower your sentence, that |
| 16:09:53 | 18 | there were multiple agents or U.S. attorneys present while you |
| 16:10:03 | 19 | sometimes you used the word "debriefed," while you gave your |
| 16:10:06 | 20 | interview?  Is that true? |
| 16:10:24 | 21 | A.   Yes. |
| 16:10:25 | 22 | Q.   You will agree with me that's true, right? |
| 16:10:30 | 23 | A.   Yes. |
| 16:10:30 | 24 | Q.   Okay.  When you went before the Court, you were sentenced to |
| 16:10:43 | 25 | 288 months; is that correct? |

| | | |
|---|---|---|
| 16:10:53 | 1 | A.   Yes. |
| 16:10:58 | 2 | Q.   That's substantially lower than a life sentence, isn't it? |
| 16:11:07 | 3 | A.   Yes. |
| 16:11:11 | 4 | Q.   And you had agreed before you went to court, before you went |
| 16:11:19 | 5 | to your sentencing, you had sworn under oath -- raised your hand |
| 16:11:25 | 6 | to the judge and you swore that you would not appeal your case. |
| 16:11:35 | 7 | You would accept the sentence that was given, correct? |
| 16:11:56 | 8 | A.   I don't remember that about the appeal.  I don't remember |
| 16:12:11 | 9 | that about the appeal, but I do remember that when I pled guilty, |
| 16:12:15 | 10 | the Judge asked me if I was in agreement with everything. |
| 16:12:19 | 11 | Q.   And do you recall him asking you, do you understand that |
| 16:12:23 | 12 | you're waiving your right to appeal unless my sentence is an |
| 16:12:28 | 13 | unlawful sentence, words to that effect? |
| 16:12:47 | 14 | A.   To be totally truthful, I don't remember that.  I don't |
| 16:12:58 | 15 | remember that.  I trusted my attorney.  I don't remember that. |
| 16:13:01 | 16 | Q.   Well, you gave -- you tried to appeal your case without a |
| 16:13:07 | 17 | lawyer, didn't you? |
| 16:13:14 | 18 |      MS. FERNALD:  Your Honor, at this time I'm going to |
| 16:13:17 | 19 | object that this has been asked and answered several times. |
| 16:13:22 | 20 | Repetitive. |
| 16:13:23 | 21 |      THE COURT:  He hasn't tried to file a -- |
| 16:13:27 | 22 |      MR. DEGEURIN:  He actually filed a notice. |
| 16:13:29 | 23 |      THE COURT:  Pardon? |
| 16:13:29 | 24 |      MR. DEGEURIN:  He actually filed it.  I didn't want to |
| 16:13:31 | 25 | use "notice."  I'm just asking if he tried to appeal without a |

| | | |
|---|---|---|
| 16:13:34 | 1 | lawyer. |
| 16:13:35 | 2 | THE COURT:  You can ask him. |
| 16:13:42 | 3 | A.   No.  I don't remember that.  That I don't know.  That I |
| 16:13:56 | 4 | tried to appeal without an attorney?  I don't remember that. |
| 16:13:59 | 5 | Q.   (BY MR. DEGEURIN) Well, let's just break it down.  Did you |
| 16:14:01 | 6 | try to appeal? |
| 16:14:21 | 7 | A.   Supposedly, I told my attorney when -- after the sentencing |
| 16:14:25 | 8 | that I wanted to appeal.  He took some papers to me.  I signed |
| 16:14:28 | 9 | them, I don't know what they are.  They were in English.  I don't |
| 16:14:32 | 10 | know about the laws in the United States.  I don't know what's |
| 16:14:37 | 11 | been done. |
| 16:14:48 | 12 | Q.   Well, there's the notice of appeal that was filed -- |
| 16:14:53 | 13 | THE COURT:  Counsel, I assume you're going to introduce |
| 16:14:55 | 14 | that? |
| 16:14:58 | 15 | MR. DEGEURIN:  I'll move to introduce as Defense |
| 16:15:01 | 16 | Exhibit No. 1. |
| 16:15:02 | 17 | THE COURT:  Okay.  Let's don't show the jury anything |
| 16:15:05 | 18 | before it's admitted. |
| 16:15:07 | 19 | MS. FERNALD:  And, your Honor, the government has no |
| 16:15:09 | 20 | objection to introduction of Colorado-Cessa No. 1. |
| 16:15:14 | 21 | THE COURT:  Colorado 1 is in evidence. |
| 16:15:19 | 22 | Q.   (BY MR. DEGEURIN) According to this document, you signed it |
| 16:15:23 | 23 | right here? |
| 16:15:27 | 24 | A.   Yes. |
| 16:15:32 | 25 | Q.   Do you have any doubt that's your signature? |

| | | |
|---|---|---|
| 16:15:35 | 1 | A.    No. |
| 16:15:40 | 2 | Q.    How about the date of October 30th, '09? |
| 16:15:52 | 3 | A.    Those are the papers that my attorney took to me after my |
| 16:15:55 | 4 | sentencing.  Since I don't know English, he told me that these |
| 16:16:04 | 5 | were supposedly in order to appeal.  And he told me that if I was |
| 16:16:19 | 6 | going to hire him to do that, that that was going to be a |
| 16:16:22 | 7 | separate charge because that was a separate case, and I told him |
| 16:16:27 | 8 | for him just to file the papers for the appeal. |
| 16:16:31 | 9 | Q.    You did tell him? |
| 16:16:34 | 10 | A.    Huh? |
| 16:16:35 | 11 | Q.    So you tried to appeal? |
| 16:16:38 | 12 | A.    Yes. |
| 16:16:39 | 13 | Q.    The answer's "Yes"? |
| 16:16:39 | 14 | A.    Yes. |
| 16:16:41 | 15 | Q.    Si. |
| 16:16:43 | 16 | A.    Yes.  Yes, sir. |
| 16:16:46 | 17 | Q.    That's your signature, also, isn't it? |
| 16:16:51 | 18 | A.    Yes, sir. |
| 16:16:55 | 19 | Q.    Your appeal was dismissed, wasn't it? |
| 16:17:06 | 20 | A.    That I didn't know. |
| 16:17:07 | 21 | Q.    You think it's still up there on appeal somewhere? |
| 16:17:13 | 22 | A.    No.  No. |
| 16:17:14 | 23 | Q.    You know it's not on appeal? |
| 16:17:25 | 24 | A.    No.  I mean, in other words, there's nothing else I filed |
| 16:17:28 | 25 | with that attorney.  No. |

| | | |
|---|---|---|
| 16:17:30 | 1 | Q.   The reason I know you realized -- well, strike that. |
| 16:17:38 | 2 | You started a letter-writing campaign with the |
| 16:17:44 | 3 | assistant U.S. attorneys in McAllen?  Is that where you were |
| 16:17:52 | 4 | tried? |
| 16:17:59 | 5 | A.   Yes. |
| 16:17:59 | 6 | Q.   You were mad, weren't you? |
| 16:18:05 | 7 | A.   Yes. |
| 16:18:08 | 8 | Q.   And you wrote a letter saying that they had violated their |
| 16:18:13 | 9 | agreement with you, not what you agreed to? |
| 16:18:24 | 10 | A.   Yes. |
| 16:18:27 | 11 | Q.   That didn't get you very far, did it? |
| 16:18:47 | 12 | A.   Well, it's that after I signed those papers, my attorney |
| 16:18:51 | 13 | would never take my -- never answer my phone calls.  And before I |
| 16:18:56 | 14 | pled guilty, he told me that I was looking at from ten years to |
| 16:18:59 | 15 | life, but that since I didn't have a record, that I would get |
| 16:19:02 | 16 | around ten years. |
| 16:19:11 | 17 | Q.   I believe it's -- |
| 16:19:13 | 18 | A.   That is when I wrote the prosecutor saying what I said in |
| 16:19:15 | 19 | the letter. |
| 16:19:18 | 20 | Q.   The judge told you when you pled guilty that any prediction |
| 16:19:25 | 21 | by the lawyers about what your sentence is going to be was only a |
| 16:19:30 | 22 | prediction and asked you if you understood that, that the |
| 16:19:36 | 23 | sentence was going to be up to the judge.  Do you remember that? |
| 16:19:55 | 24 | A.   Yes. |
| 16:19:57 | 25 | Q.   All right.  So the -- when you told the prosecutor that this |

| 16:20:06 | 1 | 288 months was not what you agreed to, what did the prosecutor |
| 16:20:13 | 2 | do? |
| 16:20:20 | 3 | A.   Didn't respond. |
| 16:20:24 | 4 | Q.   So you continued writing letters and making phone calls, |
| 16:20:28 | 5 | didn't you, trying to lower your sentence? |
| 16:20:34 | 6 | A.   Yes. |
| 16:20:34 | 7 | Q.   Trying to find some way, any way that you could get that |
| 16:20:38 | 8 | sentence lowered, right? |
| 16:20:46 | 9 | A.   Yes. |
| 16:20:47 | 10 | Q.   Even to the extent that you continued illegal activity while |
| 16:20:52 | 11 | you were in custody? |
| 16:21:00 | 12 | A.   What illegal activities? |
| 16:21:02 | 13 | Q.   You kept in contact with the associates that you hadn't |
| 16:21:09 | 14 | testified about that you couldn't remember their last name and |
| 16:21:12 | 15 | stuff, you kept in contact with those people, didn't you? |
| 16:21:27 | 16 | A.   With some of them.  When I did have the cellphones because |
| 16:21:31 | 17 | they had kidnapped my family. |
| 16:21:36 | 18 | Q.   Now, let's talk about your continued -- if you don't mind me |
| 16:21:45 | 19 | using the word "continued attempt to corrupt the system" after |
| 16:21:50 | 20 | you were incarcerated. |
| 16:21:52 | 21 | THE COURT:  Well, rephrase your question. |
| 16:21:57 | 22 | Q.   (BY MR. DEGEURIN) You continued to commit crimes that had |
| 16:22:01 | 23 | the potential of corrupting our justice system while you were |
| 16:22:07 | 24 | incarcerated, didn't you? |
| 16:22:20 | 25 | A.   That was before sentencing. |

16:22:22    1    Q.    So are you telling me that bribing the jailers, bribing the

16:22:45    2    officers in charge of your incarceration all happened before

16:22:50    3    sentencing?

16:23:01    4    A.    Yes.

16:23:04    5    Q.    And that included not only the $100,000 you offered to get

16:23:11    6    out of jail.  Did we talk about that earlier?

16:23:14    7    A.    No.

16:23:14    8    Q.    Okay.  You did offer $100,000 to get out of jail, right?

16:23:36    9    A.    One of the bonds people -- they're called bonds people.  One

16:23:48   10    of the bonders told me that for $100,000, he could get me out of

16:23:52   11    jail.  He'd get me out of jail as long as I didn't come back to

16:23:55   12    the United States and that I shouldn't ask about how he got the

16:23:58   13    100,000.  And since he had gotten other people out, I put my

16:24:04   14    trust in him.

16:24:07   15    Q.    You jumped at that idea, okay, pay $100,000, don't ask any

16:24:13   16    questions and they'll release you from jail.  That was your

16:24:16   17    thinking?

16:24:25   18    A.    Yes.

16:24:26   19    Q.    You paid 50,000 down, the other 50 when you get out?

16:24:35   20    A.    Yes.  Something like that.  I don't know the exact amount

16:24:41   21    but something like that.

16:24:42   22    Q.    Okay.  So something like that included asking other people

16:24:45   23    to go get the money and take it to the people who bribed the

16:24:49   24    guards, correct?

16:24:57   25    A.    Yes.

| | | |
|---|---|---|
| 16:24:58 | 1 | Q.   Did you ask family members to go bribe the guards? |
| 16:25:05 | 2 | A.   Yes. |
| 16:25:12 | 3 | Q.   When you didn't get out, did you ask for your money back? |
| 16:25:20 | 4 | A.   Yes. |
| 16:25:22 | 5 | Q.   And what were you threatening to do if they didn't pay you |
| 16:25:25 | 6 | money back? |
| 16:25:37 | 7 | A.   I told them to give it back to me because they had lied to |
| 16:25:40 | 8 | me, and if not, I would let everybody know legally that they'd |
| 16:25:46 | 9 | done that. |
| 16:25:47 | 10 | Q.   Because by now, you found out that if you had or pretended |
| 16:25:55 | 11 | to have information that would get somebody in trouble, you had |
| 16:26:00 | 12 | some power.  Isn't that true? |
| 16:26:15 | 13 | A.   What?  Power how? |
| 16:26:17 | 14 | Q.   If you don't give the money back, I know who I can talk to |
| 16:26:21 | 15 | and you're going to get in trouble.  That was the message you |
| 16:26:24 | 16 | sent out? |
| 16:26:32 | 17 | A.   Yes. |
| 16:26:33 | 18 | Q.   Well, did it occur to you at the time that whole situation |
| 16:26:38 | 19 | was illegal to pay in the money and receiving that money back? |
| 16:26:44 | 20 | Did that -- did you understand that? |
| 16:27:13 | 21 | A.   No, because I had put my trust -- I trusted that person |
| 16:27:17 | 22 | because that person had gotten other people out.  That was also |
| 16:27:20 | 23 | the person that was getting me the extra visits, the additional |
| 16:27:23 | 24 | food.  I trusted in that person.  He seemed like he knew what he |
| 16:27:27 | 25 | was doing. |

| | | |
|---|---|---|
| 16:27:28 | 1 | Q.   But you paid other money for the treatment in jail, didn't |
| 16:27:39 | 2 | you -- paid that money to somebody else? |
| 16:27:55 | 3 | A.   No.  It was to him for the guard to set up the visits, the |
| 16:28:04 | 4 | warden. |
| 16:28:05 | 5 | Q.   The warden.  Isn't it true that you paid not only money to |
| 16:28:13 | 6 | the warden to be treated differently, you also paid money to have |
| 16:28:21 | 7 | special visits?  Let's get that part first.  Want to get that |
| 16:28:29 | 8 | agreement. |
| 16:28:47 | 9 | A.   The thing about the visits was through him, through the |
| 16:28:50 | 10 | warden, and the telephones were through a guard. |
| 16:28:57 | 11 | Q.   Okay.  So who did you pay to be able to see your wife on one |
| 16:29:04 | 12 | day and your girlfriend on another? |
| 16:29:13 | 13 | A.   The same person who was trying to charge me $100,000. |
| 16:29:16 | 14 | Q.   But then, you had to pay somebody else not to tell your wife |
| 16:29:20 | 15 | about the girlfriend coming on another day, didn't you? |
| 16:29:33 | 16 | A.   The second jailer there at the jail. |
| 16:29:38 | 17 | Q.   Where was it going to stop?  Is that the last one you pay to |
| 16:29:43 | 18 | keep that lie going? |
| 16:30:01 | 19 | A.   It's just that those are the first few months that I was in |
| 16:30:04 | 20 | jail.  It seemed so easy, I wasn't thinking about what I was |
| 16:30:07 | 21 | doing.  I just wanted to be able to get out.  I wanted to keep my |
| 16:30:10 | 22 | privileges. |
| 16:30:12 | 23 | Q.   No.  I was talking about your wife and your girlfriend on |
| 16:30:17 | 24 | separate days and paying people not to tell your wife about it. |
| 16:30:20 | 25 | That's not just being wanting to get out. |

16:30:41  1    A.    It wasn't -- it was just so that she would be quiet, not

16:30:48  2    that she didn't tell her.   I didn't send the message, don't say

16:30:51  3    anything.

16:30:53  4    Q.    Okay.   Then just be quiet.   You didn't say, don't talk.   You

16:30:57  5    just said, be quiet, correct?

16:31:03  6    A.    Yes.

16:31:04  7    Q.    I think I understand that.

16:31:08  8          Now, back to the map.   Before I do that, once the

16:31:23  9    appeal would have been -- once the appeal didn't happen, you

16:31:26  10   wrote the letters to the prosecutor telling him you're mad that

16:31:31  11   you didn't get what you agreed to.   Eventually, you determined

16:31:35  12   and you learned that the only way you're going to get a lower

16:31:39  13   sentence was to convince or have -- tender to the prosecutor

16:31:48  14   information that they may consider to be valuable.   Ask him if

16:31:55  15   that's true.

16:32:21  16   A.    It's that the letters, I don't remember what -- which was

16:32:37  17   the last letter I sent to the prosecutor.   But after I got

16:32:39  18   sentenced, I hired another attorney, and he was the one that

16:32:43  19   handled talking to the prosecutor.

16:32:46  20   Q.    All right.   Let me -- maybe my question was unclear.

16:32:54  21         You learned -- you may not be honest, but you're not --

16:33:00  22         MS. FERNALD:   Your Honor.

16:33:01  23         THE COURT:   Questions.

16:33:03  24         MR. DEGEURIN:   Okay.

16:33:05  25   Q.    (BY MR. DEGEURIN) You are dishonest --

16:33:07  1            MS. FERNALD:  Your Honor, I object.

16:33:09  2            MR. DEGEURIN:  I'm sorry.

16:33:10  3            MS. FERNALD:  Argumentive.

16:33:12  4            THE COURT:  You need a place to stay tonight?  Don't do

16:33:17  5  that again.

16:33:18  6            MR. DEGEURIN:  Okay.  May I approach the witness, your

16:33:27  7  Honor, because I was going to try to refresh him with some days.

16:33:30  8            THE COURT:  You don't need my permission.

16:33:35  9  Q.   (BY MR. DEGEURIN) I have gone to the trouble to try to put

16:33:43  10  together the number of times that you spoke with agents and

16:33:51  11  prosecutors to try to reduce your sentence.

16:33:56  12            MS. FERNALD:  And, your Honor, I object.  Either he's

16:33:59  13  going to testify, take the oath, and get on the witness stand or

16:34:01  14  he can ask a question.

16:34:05  15            THE COURT:  Well --

16:34:06  16            MR. DEGEURIN:  It's a predicate.

16:34:07  17            THE COURT:  He's showing a piece of paper to the

16:34:09  18  witness.  I'll allow him to tell his description of the paper.

16:34:13  19  But let's break it up so that the interpreter can interpret it as

16:34:20  20  you go.  But let's don't testify.  Just describe what the exhibit

16:34:26  21  or paper is.

16:34:43  22  Q.   (BY MR. DEGEURIN) The dates in blue are the ones that I came

16:34:47  23  up with from my investigation that you met with multiple agents

16:34:55  24  or prosecutors.  I would like you to look at the dates that are

16:35:14  25  in blue and tell me whether you believe those are proximately

16:35:17  1  correct.  And I understand you don't know the exact date.

16:35:32  2  A.   I don't know how many times.  I couldn't tell you.  I do

16:35:36  3  not.  I do not remember the dates.

16:35:38  4  Q.   Would you quarrel, would you argue with the statement that

16:35:58  5  you may have met with the agents attempting to sell information

16:36:05  6  on at least 28 times?

16:36:19  7         MS. FERNALD:  Objection to the characterization of the

16:36:21  8  question.

16:36:21  9         THE COURT:  Sustained.  Rephrase your question.

16:36:25 10  Q.   (BY MR. DEGEURIN) Did you meet with agents?  Would you

16:36:32 11  quarrel with the statement that you met within at least 28 times

16:36:39 12  to give them information to see if it would be useful to lower

16:36:44 13  your sentence?

16:37:05 14  A.   I do not remember how many times, but there were many times

16:37:09 15  that I met with government agents.

16:37:19 16  Q.   And I'm talking about now through the years 2008, 2009,

16:37:29 17  2010, 2011 and 2012.  Did you meet with them all through those

16:37:40 18  years, a number of times?

16:37:47 19  A.   I've been locked up for 55 months.  I have met with them

16:37:59 20  many times.  I don't remember if it was five, 10, 15.  I could

16:38:03 21  tell you it was many times.

16:38:04 22  Q.   You told the agents when you met with them that you're

16:38:17 23  telling them about all of the things that you've done illegal or

16:38:22 24  wrong; is that correct?

16:38:35 25  A.   Well, it's all the things I remember because my criminal

16:38:59  1   career started, what, eight years I was in that?  And for me to

16:39:06  2   be able to tell them day per day everything I'd done, I'd still

16:39:10  3   be sitting here.  But what I remember, what I've been asked about

16:39:17  4   that I remember, I have told them.

16:39:19  5   Q.   And what you offered to testify about, right?  You did do

16:39:24  6   that.

16:39:31  7   A.   Yes.

16:39:35  8   Q.   You gave -- talked about Mr. Efrain Torres, Miguel Trevino,

16:39:59  9   Lazcano, those people, your father and others, many times, didn't

16:40:04  10  you, in those debriefings?

16:40:19  11  A.   My father?

16:40:20  12  Q.   And your father.

16:40:22  13  A.   About what?

16:40:24  14  Q.   Well, I don't want to dig into it right now.  We'll pass on.

16:40:29  15  Do you remember talking about your father's involvement in your

16:40:31  16  activity?

16:40:49  17  A.   My father?  I believe my father's one of the most honest

16:40:52  18  people.  I don't think he had knowledge of what I was doing.

16:40:56  19  Q.   And your brother Juan Felipe?

16:41:03  20  A.   He was kidnapped.  He was a public accountant and they

16:41:10  21  kidnapped him, and he was returned afterwards to me.  Oh, he was

16:41:20  22  not returned to me.  He's been disappeared.  My dad was returned

16:41:37  23  because they took all my money, all my belongings, and everything

16:41:41  24  was turned -- all my things was turned over.

16:41:43  25  Q.   Well, they didn't take the 100,000 from you to get out of

16:41:46  1   jail, did they?

16:41:50  2   A.   No.

16:41:53  3   Q.   May I approach?  I've got a list of what I count as being

16:42:04  4   109 people that you offered testimony against, and I want to see

16:42:20  5   if you go through there, take your father's name off and your

16:42:25  6   brother's and all the rest.

16:42:29  7        Were these people that you offered testimony against if

16:42:34  8   you could get a lower sentence?  Take your time.  Anyone that you

16:42:50  9   didn't offer to testify against, we'll just scratch them.  Your

16:42:54  10  father and your brother.

16:43:08  11  A.   A lot of the people here, they were in my conspiracy.  I was

16:43:11  12  never asked to testify against them.  And there's others here

16:43:21  13  that I've never, never been asked about.  I don't know what

16:43:27  14  you're referring to.

16:43:31  15  Q.   How about these?  These are people that you gave information

16:43:39  16  to the agents.

16:44:00  17  A.   There's a lot of petition here.

16:44:04  18  Q.   You think it's less than 100 people?

16:44:14  19  A.   I was never asked to testify against these people.  Now, if

16:44:26  20  they were related to the cartel, if they were workers, yeah,

16:44:28  21  there's a bunch of them here.  And there's a lot of names that

16:44:36  22  are repeated here that show up on every single one of the pages.

16:44:40  23  So I don't know if you could put them in order first, then I

16:44:46  24  could tell you.

16:44:46  25  Q.   All right.  I'll put them in this order.  It is true that

| | | |
|---|---|---|
| 16:44:52 | 1 | some of these people, you offered to testify about on more than |
| 16:44:56 | 2 | one occasion, but once we got down -- |
| 16:44:59 | 3 | THE COURT:  I'll have the lawyers up here, please. |
| 16:45:10 | 4 | (At the bench, on the record.) |
| 16:45:17 | 5 | THE COURT:  You need to ask questions, not make |
| 16:45:28 | 6 | statements. |
| 16:45:30 | 7 | MR. DEGEURIN:  Uh-huh. |
| 16:45:30 | 8 | THE COURT:  You're doing the same thing that you |
| 16:45:33 | 9 | objected to earlier when I stopped the government from doing. |
| 16:45:35 | 10 | Remember the pointing incidents? |
| 16:45:38 | 11 | MS. FERNALD:  Yeah. |
| 16:45:40 | 12 | THE COURT:  Now you're reading and making statements |
| 16:45:43 | 13 | about exhibits that are not in evidence and -- |
| 16:45:49 | 14 | MR. DEGEURIN:  I'm trying to think of another way of |
| 16:45:51 | 15 | doing it but -- |
| 16:45:51 | 16 | THE COURT:  It's just -- everybody's got ways of doing |
| 16:45:55 | 17 | things, but if you can't know how to do it, counsel, don't do it. |
| 16:46:02 | 18 | But, you know, I know you know how to do it.  But I don't want to |
| 16:46:08 | 19 | -- this is not, I don't think, helping much right now.  You've |
| 16:46:11 | 20 | got a lot of things you could cross-examine, I think, that would |
| 16:46:14 | 21 | help you more than that.  But I can see the government's about to |
| 16:46:17 | 22 | get up and make the same thing, and they're going to make a |
| 16:46:20 | 23 | little speech about your earlier objection and I just want to |
| 16:46:24 | 24 | avoid that.  I don't want snipping with the lawyers. |
| 16:46:33 | 25 | MR. DEGEURIN:  Possibly with a brief break sometime, I |

| | | |
|---|---|---|
| 16:46:35 | 1 | could get this in an order where I don't -- it won't take so long |
| 16:46:38 | 2 | through an interpreter and stuff.  I have compiled a list, but it |
| 16:46:41 | 3 | comes from this. |
| 16:46:43 | 4 | THE COURT:  Well, I see what you've done, and it may be |
| 16:46:46 | 5 | very effective if you do it right.  But I'm not going to give you |
| 16:46:51 | 6 | a break right now with this jury. |
| 16:46:53 | 7 | MR. DEGEURIN:  Okay. |
| 16:46:55 | 8 | THE COURT:  It's not good. |
| 16:46:57 | 9 | MR. DEGEURIN:  All right. |
| 16:46:58 | 10 | THE COURT:  They're looking at a long time and several |
| 16:47:01 | 11 | days. |
| 16:47:01 | 12 | MR. DEGEURIN:  I'll try it another way. |
| 16:47:03 | 13 | THE COURT:  Try it another way.  The time is now ten of |
| 16:47:08 | 14 | 5:00.  You can use 40 minutes. |
| 16:47:13 | 15 | MR. DEGEURIN:  Okay. |
| 16:47:14 | 16 | THE COURT:  Then I'll recess and you can do whatever |
| 16:47:17 | 17 | you want during the night. |
| 16:47:18 | 18 | MR. DEGEURIN:  Okay. |
| 16:47:19 | 19 | THE COURT:  All right? |
| 16:47:20 | 20 | MR. DEGEURIN:  All right. |
| 16:47:21 | 21 | THE COURT:  But I don't want to let this jury go |
| 16:47:23 | 22 | without at least another 40 minutes of testimony. |
| 16:47:25 | 23 | MR. DEGEURIN:  All right. |
| 16:48:06 | 24 | Q.   (BY MR. DEGEURIN) I'm going to try to make this a little |
| 16:48:12 | 25 | easier.  I want you to look at these names and strike any of them |

| | | |
|---|---|---|
| 16:48:27 | 1 | that you didn't give information to the agents in hopes of |
| 16:48:38 | 2 | lowering your sentence. |
| 16:48:41 | 3 | Will you look through these names and see that those |
| 16:48:43 | 4 | are all names that you gave them? |
| 16:49:04 | 5 | A.   I really don't understand what you want.  You want me to |
| 16:49:09 | 6 | eliminate or scratch out the ones I did what? |
| 16:49:12 | 7 | Q.   Here's -- the problem is I don't want to call these names |
| 16:49:15 | 8 | out in public, but I'm going to -- I want you to look at the |
| 16:49:22 | 9 | names because you'll recognize -- you may recognize them.  More |
| 16:49:30 | 10 | important than that, you'll be able to remember whether or not |
| 16:49:32 | 11 | you offered to give information about these people, discussed |
| 16:49:46 | 12 | these people with agents and their criminal -- their alleged |
| 16:49:51 | 13 | criminal activity so that, in the end, we'll count them.  All |
| 16:50:04 | 14 | right? |
| 16:50:05 | 15 | So just -- and you can go as fast or as slow as you |
| 16:50:09 | 16 | want, but I don't think -- |
| 16:50:11 | 17 | THE COURT:  He's not going to do it right now.  I'm not |
| 16:50:13 | 18 | going to have this jury sitting here while he's doing with three |
| 16:50:16 | 19 | or four pages of single-spaced things.  If he's going to do it, |
| 16:50:20 | 20 | he'll do it over the evening recess. |
| 16:50:25 | 21 | MR. DEGEURIN:  Okay. |
| 16:50:32 | 22 | Q.   (BY MR. DEGEURIN) Back to the map that I was trying to go -- |
| 16:50:36 | 23 | before I got sidetracked a bit, the green state is Tamaulipas. |
| 16:50:48 | 24 | And I believe what your testimony was that until 2006 or |
| 16:50:55 | 25 | thereabouts, you were in the green state working in Miguel |

| | | |
|---|---|---|
| 16:51:02 | 1 | Aleman. |
| 16:51:22 | 2 | A.   Yes, because I had left the plaza at Cerralvo and some of |
| 16:51:27 | 3 | them I had in Nuevo Leon.  Yes.  And I focused completely on |
| 16:51:37 | 4 | things from Veracruz. |
| 16:51:39 | 5 | Q.   Things coming from Veracruz? |
| 16:51:43 | 6 | A.   And the accounting for Veracruz.  Yes. |
| 16:51:47 | 7 | Q.   When was it that you say that Efrain Torres moved from |
| 16:51:53 | 8 | Miguel Aleman to Veracruz? |
| 16:52:04 | 9 | A.   Somewhere between 2004, 2005.  I don't remember the year. |
| 16:52:09 | 10 | Q.   And did I understand you correctly that you went with Efrain |
| 16:52:14 | 11 | Torres when he went to the state of Veracruz? |
| 16:52:32 | 12 | A.   I didn't go over there to live there completely.  I would go |
| 16:52:36 | 13 | over there, do the accounting for four or five days and then, I |
| 16:52:40 | 14 | would come back. |
| 16:52:40 | 15 | Q.   And is the same true with Efrain Torres, the guy you worked |
| 16:52:45 | 16 | for? |
| 16:52:50 | 17 | A.   What do you mean? |
| 16:52:51 | 18 | Q.   He would go to Veracruz, you would go to Veracruz two or |
| 16:53:00 | 19 | three days? |
| 16:53:02 | 20 | A.   No.  He stayed there.  He was completely in that state.  He |
| 16:53:19 | 21 | did come to Tamaulipas once or twice a month when he was told to |
| 16:53:25 | 22 | come back or if he had things to handle there. |
| 16:53:31 | 23 | Q.   Do you know where -- there's a city Veracruz and there's |
| 16:53:38 | 24 | also the state of Veracruz, correct? |
| 16:53:42 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 16:53:44 | 1 | Q.   And Efrain Torres was living in the city of Veracruz? |
| 16:53:50 | 2 | A.   He lived everywhere. |
| 16:53:52 | 3 | Q.   He lives everywhere.  Okay.  Do you see Poza Rica? |
| 16:54:04 | 4 | A.   No.  There it is. |
| 16:54:07 | 5 | Q.   No wonder.  Right there? |
| 16:54:11 | 6 | A.   Uh-huh. |
| 16:54:13 | 7 | Q.   Do you know where that is? |
| 16:54:16 | 8 | A.   Yes. |
| 16:54:19 | 9 | Q.   How long does it take to get from just roughly from there |
| 16:54:22 | 10 | back to Miguel Aleman, where you were most of the time? |
| 16:54:28 | 11 | A.   Twelve hours. |
| 16:54:29 | 12 | Q.   Okay.  You said that Efrain Torres, 100 percent of what he |
| 16:54:58 | 13 | did was illegal.  Remember that? |
| 16:55:09 | 14 | A.   Yeah.  That I know of, yes. |
| 16:55:11 | 15 | Q.   Did he have any businesses?  Ranches, or cattle, or anything |
| 16:55:22 | 16 | like that? |
| 16:55:28 | 17 | A.   Yes. |
| 16:55:31 | 18 | Q.   All right.  And where did he keep his cattle? |
| 16:55:48 | 19 | A.   He had several.  He had several ranches there around |
| 16:55:51 | 20 | Veracruz.  I don't remember the city. |
| 16:55:58 | 21 | Q.   If someone were to meet Mr. Efrain Torres at a horse race |
| 16:56:10 | 22 | looking at him, would you say he's a Zeta? |
| 16:56:38 | 23 | A.   Well, everybody that ran horses knew him.  He was always |
| 16:56:43 | 24 | armed.  He always traveled with 10 to 15 trucks.  The people that |
| 16:56:49 | 25 | -- races were organized among themselves. |

| | | |
|---|---|---|
| 16:56:56 | 1 | Q.   So that's why you say everybody knows he's Zeta, right? |
| 16:57:09 | 2 | A.   That was after a time that people realized it because had a |
| 16:57:18 | 3 | lot of horses.  They were all well-armed, but a lot of money. |
| 16:57:25 | 4 | Q.   So after a while, you'd realized you saw -- he doesn't have |
| 16:57:30 | 5 | a dozen horses.  He has a whole lot of horses, that sort of |
| 16:57:34 | 6 | thing? |
| 16:57:42 | 7 | A.   And I don't remember how many he had, but he had several |
| 16:57:45 | 8 | horses. |
| 16:57:46 | 9 | Q.   Not getting too far with you, Mr. Hinojosa, but one thing |
| 16:58:03 | 10 | that just keeps bugging me and bugging me and that is, regardless |
| 16:58:08 | 11 | of how many people there really are -- and we don't have time |
| 16:58:13 | 12 | right now to go through the stacks of paper it takes to do so -- |
| 16:58:18 | 13 | I've looked at all of your -- go ahead and maybe do that first |
| 16:58:25 | 14 | and I'll get to the question quickly. |
| 16:58:50 | 15 |      What's bugging me is that through all those years of |
| 16:58:55 | 16 | meeting with the multiple agents, talking about all these people, |
| 16:59:04 | 17 | it wasn't until after the newspapers came out -- |
| 16:59:12 | 18 |      MS. FERNALD:  Your Honor, again, objection.  Excuse me |
| 16:59:15 | 19 | for interrupting.  But objection.  Is there a question aside? |
| 16:59:20 | 20 |      THE COURT:  Eventually.  Just ask questions, counsel. |
| 16:59:26 | 21 | Q.   (BY MR. DEGEURIN) Years later, after multiple meetings, the |
| 16:59:31 | 22 | first time you mentioned anything about Francisco Colorado was |
| 16:59:38 | 23 | after the newspapers said Mr. Colorado has been indicted and |
| 16:59:45 | 24 | accused of a crime.  That's when you first talked about or said |
| 16:59:53 | 25 | you had information about Mr. Colorado.  Is that true? |

2afcbcf46d0c1944

218

```
17:00:29   1   A.   I don't remember when the first -- that was the first time.
17:00:33   2   But since the time I was arrested, they've known everything,
17:00:37   3   everything about who I worked for.  And that once he was
17:00:49   4   arrested, they asked me about information.  They asked me for
17:00:52   5   information about him.
17:00:55   6   Q.   Now being 2012?
17:01:04   7   A.   Don't remember, but it seems like it.  Yes.
17:01:06   8   Q.   By the way, there is a person named Francisco or "Pancho"
17:01:14   9   Mendoza, isn't there?
17:01:20  10   A.   Yes.
17:01:21  11   Q.   And you offered to testify against Mr. "Pancho" Mendoza
17:01:25  12   about receiving money and to get contracts with the Mexican
17:01:36  13   government, didn't you?
17:02:00  14   A.   I don't remember.  I don't remember that "Pancho" Mendoza
17:02:02  15   has contracts with the government.  "Pancho's" not detained -- is
17:02:08  16   not arrested here.
17:02:09  17   Q.   Did you give information about a Francisco Mendoza?
17:02:14  18   A.   Yes.
17:02:16  19   Q.   Also known as "Pancho"?  And you told them you wrote it down
17:02:20  20   in your computer?
17:02:24  21   A.   Yes.
17:02:25  22   Q.   And what you were trying to tell them is that he bribed --
17:02:35  23   through bribery he got contracts?
17:02:42  24   A.   He bought and sold machinery.
17:02:44  25   Q.   Yeah.  And he did that because through bribery and a
```

| | | |
|---|---|---|
| 17:02:52 | 1 | governor or something? |
| 17:03:07 | 2 | A.   He had -- |
| 17:03:07 | 3 | MS. FERNALD:  Your Honor, excuse me.  Objection. |
| 17:03:09 | 4 | Outside the scope of direct and improper impeachment. |
| 17:03:19 | 5 | THE COURT:  I don't know if it's impeachment or |
| 17:03:21 | 6 | improper impeachment because he's asking him questions, and the |
| 17:03:25 | 7 | witness isn't agreeing with him.  So we'll go to the next |
| 17:03:33 | 8 | question. |
| 17:03:37 | 9 | Q.   (BY MR. DEGEURIN) Did you say that Mr. Mendoza provided |
| 17:03:40 | 10 | machinery to Efrain Torres? |
| 17:03:50 | 11 | A.   He bought and sold machines.  Even before I knew him, |
| 17:03:57 | 12 | that's how he made his living. |
| 17:04:00 | 13 | Q.   That's who?  What Efrain did or what Mendoza did? |
| 17:04:05 | 14 | A.   Mendoza. |
| 17:04:06 | 15 | Q.   All right.  So if Mendoza bought and sold machinery with |
| 17:04:11 | 16 | Efrain Torres, he's not committing a crime, is he? |
| 17:04:19 | 17 | A.   Efrain Torres, "Zeta 14" was not his client.  He sold to |
| 17:04:33 | 18 | other people. |
| 17:04:34 | 19 | Q.   He being Mendoza sold to Efrain Torres and to other people? |
| 17:04:40 | 20 | Is that what you're saying? |
| 17:04:56 | 21 | A.   His business was buying machinery here, exporting it and |
| 17:04:59 | 22 | selling it in Mexico. |
| 17:05:02 | 23 | Q.   May I approach the witness? |
| 17:05:06 | 24 | A.   But that was with his own money, not with cartel money. |
| 17:05:10 | 25 | Q.   Are you talking now about Efrain Torres or are you talking |

220

```
17:05:15    1   about --
17:05:15    2   A.    Mendoza.
17:05:17    3   Q.    Okay.  Did you keep records of Mendoza in your -- in his
17:05:39    4   dealings with Efrain Torres?
17:05:48    5   A.    On drugs, yes.
17:05:52    6   Q.    Okay.  That's what was throwing me off.  So you did offer to
17:05:56    7   testify against "Pancho" Mendoza for his drug dealing with Efrain
17:06:05    8   Torres?
17:06:20    9   A.    But he's not even arrested here.
17:06:22   10   Q.    No, no.  I know that's probably true.  But you offered to
17:06:28   11   testify against him, correct, if they catch him?
17:06:41   12   A.    Everything they asked me about him, they knew about.
17:06:52   13   Q.    It's nonresponsive, Judge --
17:06:54   14   A.    I've never been asked to testify against someone.
17:06:56   15   Q.    Rephrase it.  I'll move on.  May be through with you.  One
17:07:01   16   moment.
17:08:09   17         I want to know if this is what you want me and other
17:08:20   18   people to believe and I'm going to make a statement.  Tell him
17:08:25   19   that first.
17:08:29   20         MS. FERNALD:  Your Honor, I'm going to object to.
17:08:33   21         THE COURT:  To what?
17:08:34   22         MS. FERNALD:  To the characterization of that question.
17:08:42   23         THE COURT:  I don't know what statement he's going to
17:08:46   24   make, so I can't really make a rule.  I think you need to
17:08:49   25   rephrase.  I'm not so sure that what this witness wants anybody
```

17:08:55  1  to believe is relevant.  But you can ask him specifically.

17:09:05  2          MR. DEGEURIN:  It's tricky, but I'm trying.

17:09:10  3  Q.   (BY MR. DEGEURIN) Are you telling us that you over several

17:09:18  4  years of debriefing with prosecutors and agents, multiple,

17:09:28  5  multiple times, that you never mentioned any information or that

17:09:34  6  you could have any information about Francisco Colorado until

17:09:41  7  2012?

17:10:02  8  A.   I don't remember if they asked me about him in the

17:10:14  9  beginning, but they knew all the people who were related to "Zeta

17:10:20  10  14."  And after the arrest in 2012, I was also asked about him.

17:10:27  11  Q.   So you are saying that until 2012, you never said anything

17:10:33  12  about Francisco Colorado because no one asked you until after

17:10:39  13  2012?

17:10:53  14  A.   I don't remember exactly because it's been a lot of

17:11:02  15  information about a lot of things and a lot of people.  You

17:11:05  16  understand?

17:11:06  17  Q.   Okay.  Can we settle on this?  You don't remember ever

17:11:12  18  saying anything about Francisco Colorado over all that period of

17:11:15  19  time and all those debriefings until 2012.  Can you settle on

17:11:19  20  that?

17:11:42  21  A.   Yes.  I don't remember that exactly, because everything they

17:11:46  22  asked me about "14," they knew -- they know it all.  We're

17:11:53  23  talking about almost five years ago, you know.

17:11:58  24  Q.   Yeah.  2012 is not five years.

17:12:04  25  A.   No.

17:12:05  1  Q.   And, actually, isn't it true that when you debriefed, when

17:12:11  2  you met and told them that you had information that you wanted to

17:12:15  3  give against -- testimony against Mr. Francisco Colorado, it was

17:12:20  4  right after in the front page all over Mexico, it announced that

17:12:26  5  Mr. Colorado had been charged with a criminal offense?

17:12:49  6  A.   I already said, I do not remember if they had already asked

17:12:53  7  me about him.  But after, after that came out about Francisco

17:13:09  8  Colorado, I was questioned.

17:13:14  9  Q.   And the information that you've given -- I think you'll

17:13:20  10  agree with me on this.  The information you've given is

17:13:24  11  information about a meeting that you were at, Efrain Torres was

17:13:31  12  at, who's dead, and there's no photograph, tape recording, any

17:13:40  13  evidence of that meeting, correct?

17:13:49  14  A.   No.  But there were other people.

17:14:05  15  Q.   Where are they?

17:14:08  16  A.   I don't know.

17:14:11  17  Q.   And you believe you have an unjust sentence and you want to

17:14:17  18  reduce it, correct?

17:14:23  19  A.   Yes.  If possible.  Nothing's been promised.  Nothing's been

17:14:31  20  said.  It all depends on the judge in McAllen.

17:14:38  21  Q.   And someone has to ask for your sentence to be reduced,

17:14:42  22  correct?

17:14:46  23  A.   Yes.

17:14:48  24  Q.   You act like you don't know.  You know that, don't you?

17:14:52  25  A.   I mean, that's obvious, isn't it?  Yes.

17:15:00   1   Q.   We don't have exact dates of these things you say happened

17:15:11   2   because it's so long ago, as you say.  But you keep saying you

17:15:24   3   know it's true because it's -- you put it in your QuickBooks or

17:15:30   4   whatever.

17:15:39   5   A.   Yes.

17:15:40   6   Q.   Have you seen those QuickBook entries?

17:15:48   7   A.   No.

17:15:52   8   Q.   Where are they?  Because you keep referring to all the time,

17:16:00   9   well, I put it in my entry, I entered this, I entered that, that

17:16:05  10   means it's true.

17:16:10  11   A.   Because I had my main computer that was with one of my

17:16:51  12   accountants and then, I had my computer, and I would load that

17:16:57  13   information using one of my flash drives.  And so, then, when I

17:17:01  14   was arrested and when they kidnapped one of my workers, they got

17:17:08  15   my main computer.  And then, my computer with my flash drive,

17:17:13  16   they haven't found it.  They got my computer and everything, but

17:17:22  17   they did not find the flash drive in it.

17:17:37  18   Q.   Maybe I got it wrong.  You're saying they took your computer

17:17:42  19   meaning they, bad guys?

17:17:55  20   A.   My main computer when they kidnapped my worker, yes, I am.

17:18:01  21   Q.   And then, the other computer?

17:18:05  22   A.   The FBI agents that arrested me.

17:18:09  23   Q.   Okay.  And I take it that on the other computer, it doesn't

17:18:12  24   have all the stuff that you have on your main computer.

17:18:21  25   A.   I had it on my flash drive in the computer.

| | | |
|---|---|---|
| 17:18:29 | 1 | Q.   Flash drive that plugs into the computer? |
| 17:18:33 | 2 | A.   Yes.  Yes. |
| 17:18:37 | 3 | Q.   And that's the one taken by the bad guys or the FBI? |
| 17:18:50 | 4 | A.   Well, when the FBI searched my house and everything, that |
| 17:18:55 | 5 | was at my house.  My computer and everything. |
| 17:18:57 | 6 | Q.   Okay.  It's a little bit different.  I didn't want to jump |
| 17:19:04 | 7 | on that.  You're not saying the FBI have it.  You're saying it |
| 17:19:07 | 8 | was at your house, you don't know where it is, and the FBI was at |
| 17:19:10 | 9 | your house, and you were assuming that they took it. |
| 17:19:24 | 10 | A.   Yes. |
| 17:19:26 | 11 | Q.   Has anybody told you that the FBI had it? |
| 17:19:30 | 12 | A.   No.  No. |
| 17:19:35 | 13 | Q.   Well, you see the difference between saying that you don't |
| 17:19:38 | 14 | know but you think is different than saying the FBI took it?  Can |
| 17:19:43 | 15 | you see the difference?  I asked for a "Yes" or "No," if you can |
| 17:19:56 | 16 | answer. |
| 17:20:01 | 17 | A.   Then can you repeat the question? |
| 17:20:05 | 18 | Q.   No.  I mean, I don't have to, do I, Judge? |
| 17:20:08 | 19 | THE COURT:  No.  You don't have to. |
| 17:20:13 | 20 | MR. DEGEURIN:  I'm sorry.  I'm going to pass the |
| 17:20:15 | 21 | witness.  It's late.  Apologize. |
| 17:20:19 | 22 | MR. WOMACK:  No questions. |
| 17:20:23 | 23 | MR. ESPER:  I don't have questions, Judge. |
| 17:20:28 | 24 | MR. MAYR:  I don't have any questions, your Honor. |
| 17:20:33 | 25 | MS. FERNALD:  No further questions from the government, |

17:20:35    1   your Honor.

17:20:35    2            THE COURT:  May the witness be excused?

17:20:39    3            MR. DEGEURIN:  Judge, I want to -- I'm going to check

17:20:44    4   something over the evening.  Could we not excuse him yet, just in

17:20:48    5   case?

17:20:48    6            THE COURT:  Well, you passed him, but I don't think

17:20:51    7   he's going anywhere.  You can step down.

17:21:14    8            Members of the jury, I think you've had enough today.

17:21:18    9   I'm going to let you experience some of the traffic in Austin so

17:21:25   10   you can appreciate the fact that you don't have -- some of you

17:21:27   11   don't have to use it every day.  Be careful.  We'll see you at

17:21:33   12   8:30 in the morning.

17:21:34   13            For your planning, however, I'm going to let you go at

17:21:39   14   1:00 tomorrow.  So you'll have some time tomorrow to have some

17:21:42   15   personal things.  So we'll go from 8:30 to 1:00 and let you go

17:21:48   16   for the weekend.  Be sure and be able to follow the instructions

17:21:51   17   so that you can answer the questions correctly tomorrow.

17:22:27   18            (Jury not present.)

17:22:44   19            MR. DEGEURIN:  Your Honor, what I was -- out of the

17:22:46   20   presence of the jury, what I was struggling with is, how do I

17:22:51   21   show without taking up a bunch of time and without calling each

17:22:55   22   one of the agents that were present at the interview to impeach

17:23:00   23   him, how am I going to show in all those interviews, it was never

17:23:04   24   mentioned Mr. Francisco Colorado?  And I'm going to work on

17:23:10   25   possibly a stipulation from the government, save us a whole lot

17:23:13    1    of time.

17:23:14    2            THE COURT:  Well, that's fine.  There was a time,

17:23:17    3    before 1991, where I got paid a lot of money for advice.  I

17:23:23    4    haven't gotten paid that in a long time, and I don't give it.  So

17:23:28    5    that will be between however you wish to work it, okay?  We'll go

17:23:33    6    off the record.  Do you have anything on the record?

17:23:36    7            MR. ESPER:  No, your Honor.

17:23:37    8            THE COURT:  All right.  Then, for the record, we are in

17:23:40    9    recess until 8:30 in the morning.

17:23:40   10            (Proceedings adjourned.)

           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25