```
1                     UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF TEXAS
2                           AUSTIN DIVISION

3   UNITED STATES OF AMERICA      ) Docket No. A 12-CR-210 SS
                                  )
4   vs.                           ) Austin, Texas
                                  )
5   JOSE TREVINO-MORALES (3)      )
    FRANCISCO ANTONIO             )
6   COLORADO-CESSA (6)            )
    FERNANDO SOLIS-GARCIA (7)     )
7   EUSEVIO MALDONADO-HUITRON(11) )
    JESUS MALDONADO-HUITRON (18)  ) April 19, 2013
8

9                    TRANSCRIPT OF TRIAL ON THE MERITS
                       BEFORE THE HONORABLE SAM SPARKS
10                          Volume 5 of 15

11  APPEARANCES:

12  For the United States:      Ms. Michelle E. Fernald
                                Mr. Douglas W. Gardner
13                              Assistant U.S. Attorneys
                                816 Congress Avenue, Suite 1000
14                              Austin, Texas 78701

15  For Defendant Trevino-      Mr. David M. Finn
    Morales:                    Milner & Finn
16                              2828 North Harwood Street
                                Suite 1950, LB9
17                              Dallas, Texas 75201

18                              Ms. Christie Williams
                                Mills & Williams
19                              1112 South Rock Street
                                Georgetown, Texas 78626
20
    For Defendant Colorado-     Mr. Mike DeGeurin
21  Cessa:                      Mr. M. Andres Sanchez-Ross
                                Foreman, DeGeurin & DeGeurin
22                              300 Main Street
                                Houston, Texas 77002
23
                                Mr. John Parras
24                              Republic Bank Building
                                1018 Preston, Floor 2
25                              Houston, Texas 77002
```

1    **(Appearances Continued:)**

2    For Defendant Solis-Garcia:  Mr. Guy L. Womack
                                  Guy L. Womack & Associates
3                                 402 Main Street, Suite 6 North
                                  Houston, Texas 77002
4
     For Defendant Eusevio        Mr. Richard D. Esper
5    Maldonado-Huitron:           Esper Law Office
                                  801 North El Paso Street, 2nd Floor
6                                 El Paso, Texas 79902

7    For Defendant Jesus          Mr. Thomas Brent Mayr
     Maldonado-Huitron:           Law Office of Brent Mayr
8                                 4101 Washington Avenue, 2nd Floor
                                  Houston, Texas 77007
9

10   Interpreters:                Ms. Rosario Figueroa
                                  Mr. Peter Heide
11

12   Court Reporter:              Ms. Lily Iva Reznik, CRR, RMR
                                  501 West 5th Street, Suite 4153
13                                Austin, Texas 78701
                                  (512)391-8792
14

15

16

17

18

19

20

21

22

23

24

25   Proceedings reported by computerized stenography, transcript
     produced by computer.

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

**I N D E X**

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Edward J. O'Dwyer | 6 | 18 | | |
| Joshua P. Schenk | 20 | 28 | 33 | |
| Matthew S. Martin | 34 | 42,49 | 55 | 57 |
| Jonathan Spaeth | 58 | 71,73 | 86 | |
| Jane Eckert | 86 | 112,119 | | |
| | | 128 | 129 | 133 |
| Andrew Farabow | 136 | 148 | | |
| Scott Thagard | 155 | | | |

| | Page |
|---|---|
| Proceedings adjourned | 166 |

**E X H I B I T S**

|  |  | Offered | Admitted |
|---|---|---|---|
| Government's |  |  |  |
| #306 |  | 139 | 139 |
| #318 |  | 13 | 13 |
| #365 |  | 25 | 25 |
| #365A through C |  | 38 | 38 |
| #370A through P |  | 140 | 140 |
| #379A through B |  | 62 | 62 |
| #403 |  | 97 | 97 |
| #404 |  | 135 | 135 |
|  |  |  |  |
| Defendant Trevino-Morales' |  |  |  |
| #J-1 |  | 49 | 49 |

| | | |
|---|---|---|
| 08:26:58 | 1 | THE COURT:  All right.  We have a new interpreter this |
| 08:27:34 | 2 | morning, and if you'll come forward and be sworn, please. |
| 08:27:40 | 3 | (Interpreter sworn.) |
| 08:27:50 | 4 | THE COURT:  Your name, please. |
| 08:27:52 | 5 | THE INTERPRETER:  Rosario Figueroa, R-O-S-A-R-I-O. |
| 08:27:57 | 6 | THE COURT:  Thank you, ma'am.  The record will reflect |
| 08:28:03 | 7 | that the interpreter was so certified by the federal government |
| 08:28:09 | 8 | as being federal district court interpreters. |
| 08:28:15 | 9 | Anything before we bring in the jury, counsel? |
| 08:28:17 | 10 | MR. GARDNER:  Not from the government, your Honor. |
| 08:28:19 | 11 | Thank you. |
| 08:28:20 | 12 | MR. DEGEURIN:  Nothing. |
| 08:28:21 | 13 | THE COURT:  Bring them in, John. |
| 08:28:24 | 14 | (Jury present.) |
| 08:30:39 | 15 | THE COURT:  Members of the jury, since we met yesterday |
| 08:30:42 | 16 | afternoon, has anyone attempted to talk to you about this case? |
| 08:30:45 | 17 | JURORS:  No. |
| 08:30:46 | 18 | THE COURT:  Have you talked to anyone about the case? |
| 08:30:48 | 19 | JURORS:  No. |
| 08:30:49 | 20 | THE COURT:  And have any of you learned anything, |
| 08:30:52 | 21 | outside the presence of each other in this courtroom, about the |
| 08:30:54 | 22 | case? |
| 08:30:55 | 23 | JURORS:  No. |
| 08:30:55 | 24 | THE COURT:  All right.  Show negative responses to all |
| 08:30:58 | 25 | questions by all jurors.  You may call your next witness. |

| | | |
|---|---|---|
| 08:31:03 | 1 | MR. GARDNER:  Thank you, your Honor. |
| 08:31:04 | 2 | Your Honor, the government would call Special Agent Ed |
| 08:31:06 | 3 | O'Dwyer.  Special Agent Dwyer, this lady here in the teal suit |
| 08:31:15 | 4 | will swear you. |
| 08:31:16 | 5 | (Witness sworn.) |
| 08:31:29 | 6 | THE COURT:  If you'll please tell us your full name and |
| 08:31:35 | 7 | spell your last name, please. |
| 08:31:37 | 8 | THE WITNESS:  Certainly.  My first name is Edward |
| 08:31:39 | 9 | James.  My last name is O'Dwyer, O, apostrophe, D-W-Y-E-R. |
| 08:31:45 | 10 | THE COURT:  You may proceed. |
| 08:31:49 | 11 | EDWARD J. O'DWYER, called by the Government, duly sworn. |
| 08:31:49 | 12 | DIRECT EXAMINATION |
| 08:31:49 | 13 | BY MR. GARDNER: |
| 08:31:50 | 14 | Q.  Thank you, your Honor. |
| 08:31:50 | 15 | Good morning, Special Agent O'Dwyer. |
| 08:31:51 | 16 | A.  Good morning. |
| 08:31:52 | 17 | Q.  You and I have met before, correct? |
| 08:31:53 | 18 | A.  We have. |
| 08:31:54 | 19 | Q.  Could you please introduce yourself to the jury and tell |
| 08:31:56 | 20 | them what you do for a living? |
| 08:31:57 | 21 | A.  Certainly.  My name is Special Agent Edward O'Dwyer, special |
| 08:32:01 | 22 | agent with Homeland Security Investigations in Laredo, Texas. |
| 08:32:04 | 23 | Q.  And how long have you been an agent, sir? |
| 08:32:07 | 24 | A.  I've been an agent -- I've been employed by the agency since |
| 08:32:10 | 25 | August of 2010, graduated the academy in February of 2011, and |

08:32:16  1   been assigned to Laredo ever since.

08:32:17  2   Q.    And prior to that, did you have any law enforcement

08:32:19  3   experience?

08:32:20  4   A.    Prior to that, I was a border patrol agent in Kingsville,

08:32:23  5   Texas for just a little bit over three years.

08:32:24  6   Q.    And, sir, what group or division do you work for with the

08:32:29  7   Department of Homeland Security in Laredo?

08:32:33  8   A.    The Homeland Security Investigations Office that I'm

08:32:36  9   assigned to, I'm assigned to a bulk-cash smuggling group.  We

08:32:43  10  work narcotics.  We also are mainly assigned to bulk-cash

08:32:48  11  smuggling, which involves the -- obviously when the drugs come

08:32:52  12  into the United States, the narcotics come into the United

08:32:54  13  States, they're sold, and that money needs to make it back to the

08:33:00  14  country of origin of those drugs, or wherever the

08:33:04  15  drug-trafficking organizations or cartels are led from.  So the

08:33:10  16  cash goes back in various manners, probably the simplest of which

08:33:14  17  is to smuggle the cash in bulk back to those countries.

08:33:19  18  Q.    And are you familiar with the term "structure"?

08:33:22  19  A.    I am.

08:33:22  20  Q.    And could you define that term for the jury, please?

08:33:25  21  A.    Structuring, when a person enters or leaves a country,

08:33:31  22  there's a reporting requirement that if you have in your

08:33:35  23  possession more than $10,000 in cash, or what they call monetary

08:33:40  24  instruments -- if you're carrying more than $10,000 on you, you

08:33:44  25  need to declare that to the Customs and Border Protection

08:33:47  1  officers that's at the airport or the border, whatever the

08:33:50  2  port-of-entry is.

08:33:52  3         Oftentimes, in order to -- and it's not like they take

08:33:57  4  -- they'll -- if you have more than $10,000, they don't take that

08:34:00  5  money away, they don't tax it, but it's just a reporting

08:34:03  6  requirement.  And a form is completed that you enter or exit the

08:34:09  7  country with more than $10,000.  Oftentimes, to avoid that, to

08:34:14  8  avoid that reporting requirement, people will either on their own

08:34:20  9  travel back and forth multiple times with quantities under

08:34:24  10 $10,000 to avoid that requirement, or they divide up amongst many

08:34:31  11 people into quantities less than $10,000 to avoid the reporting

08:34:35  12 requirement.

08:34:36  13        However, to do so, if you divide it up like that to

08:34:39  14 avoid that reporting requirement, that, too, is illegal.

08:34:42  15 Q.   And does your bulk-cash smuggling group investigate

08:34:47  16 individuals attempting to structure funds into the United States?

08:34:50  17 A.   Yes, we do.

08:34:52  18 Q.   And are you familiar with the term "mule"?

08:34:54  19 A.   Yes.

08:34:55  20 Q.   As it relates to structuring?

08:34:57  21 A.   Yes.

08:34:57  22 Q.   Okay.  Could you define the term "mule" for the ladies and

08:35:02  23 gentlemen of the jury?

08:35:02  24 A.   A mule in whether it's cash or any type of smuggling, I

08:35:05  25 mean, is a person that is hired to transfer something.  In our

| 08:35:12 | 1 | business it would be across the border.  But a mule in the sense |

08:35:12  1  business it would be across the border.  But a mule in the sense

08:35:18  2  that they're tasked with the carrying of whatever the merchandise

08:35:22  3  is, whether that be narcotics, or cash, or whatever the

08:35:26  4  contraband.

08:35:27  5  Q.   And so, have you encountered mules carrying cash less than

08:35:32  6  $10,000 into the United States?

08:35:34  7  A.   I'm sorry?

08:35:35  8  Q.   Have you encountered in your investigations just generally

08:35:38  9  mules transporting less than $10,000 into the United States?

08:35:41  10  A.   Yes, I have.

08:35:42  11  Q.   All right.  If you will, could you just provide the jury a

08:35:45  12  generic example of how someone would use mules to, say, transport

08:35:52  13  $50,000 in the U.S.?

08:35:55  14  A.   I mean, again, to use a mule scenario for $50,000, you'd

08:36:03  15  have to divide it up into quantities of less than $10,000 and so,

08:36:15  16  into quantities of -- if it was $5,000 apiece and you have ten

08:36:20  17  people carrying $5,000 apiece, that would be a way to structure

08:36:24  18  the importation of $50,000 of cash into the U.S.

08:36:29  19  Q.   And did you become associated with this case through an

08:36:33  20  investigation of an individual who you believed was structuring

08:36:36  21  money into the United States?

08:36:38  22  A.   Yes.

08:36:38  23  Q.   And who was that individual, please?

08:36:40  24  A.   That individual was a person by the name of Victor Manuel

08:36:43  25  Lopez.

| | | |
|---|---|---|
| 08:36:44 | 1 | Q.   Could you please pull up 335?  And, Special Agent O'Dwyer, |
| 08:36:54 | 2 | I'm showing you a picture of Government's Exhibit 335H.  Do you |
| 08:36:57 | 3 | recognize that individual? |
| 08:36:58 | 4 | A.   I do. |
| 08:36:58 | 5 | Q.   And who do you recognize him as? |
| 08:37:00 | 6 | A.   It's Victor Manuel Lopez. |
| 08:37:03 | 7 | Q.   And how did Mr. Lopez come to your attention? |
| 08:37:09 | 8 | A.   On was it July 22nd of 2011, I received a phone call from |
| 08:37:14 | 9 | the Laredo port-of-entry bridge one, which is a bridge downtown |
| 08:37:20 | 10 | Laredo.  The kind of an old -- their oldest, smallest bridge. |
| 08:37:26 | 11 | It's the only bridge in Laredo that you can cross as a |
| 08:37:29 | 12 | pedestrian, so there's a lot of pedestrian traffic and a little |
| 08:37:34 | 13 | bit of vehicle traffic.  On this morning, they called me to -- |
| 08:37:37 | 14 | Customs and Border Protection officers called to inform me that |
| 08:37:40 | 15 | they had stopped -- |
| 08:37:41 | 16 | MS. WILLIAMS:  Object to hearsay. |
| 08:37:43 | 17 | MR. GARDNER:  It's not for the truth of the matter, |
| 08:37:45 | 18 | your Honor.  It's to frame his actions. |
| 08:37:48 | 19 | THE COURT:  Well, it's after the call.  You can ask |
| 08:37:53 | 20 | what he did. |
| 08:37:53 | 21 | Q.   (BY MR. GARDNER) So you received a call from Border Patrol, |
| 08:37:56 | 22 | correct? |
| 08:37:57 | 23 | A.   Customs and Border Protection.  The bridge personnel. |
| 08:38:00 | 24 | Q.   And based on that call, did you go down to the bridge? |
| 08:38:05 | 25 | A.   I did. |

08:38:06   1   Q.   And could you pick up, what happened after that?

08:38:09   2   A.   Certainly.  At the bridge, I interviewed the three female

08:38:14   3   citizens of Mexico that had attempted to cross into the U.S. on a

08:38:19   4   valid -- they had visas to do so.  And they had -- each of them

08:38:22   5   had with them $9,900.

08:38:26   6   Q.   Okay.  Let me ask a question there.  Is that consistent with

08:38:29   7   what you just testified to as being structuring?

08:38:31   8   A.   It is.

08:38:32   9   Q.   And so, after seeing each one of these females have $9,900

08:38:36  10   each, what did you do then?

08:38:38  11   A.   Well, not only the $9,900, they also had a flight itinerary

08:38:44  12   to El Paso, Texas that took them to El Paso that day and back and

08:38:47  13   forth in the same day through Houston on Continental Airlines.

08:38:54  14   We interviewed them.  The first individual Veronica Duran had

08:39:05  15   been given the money by a person she only knew as Victor.  She

08:39:12  16   was friends with Victor's wife, had been asked by Victor on the

08:39:16  17   day before, on the 21st of July, if she would be willing to --

08:39:20  18        MS. WILLIAMS:  Your Honor, excuse me, I object to

08:39:21  19   narrative form of testimony.

08:39:23  20        MR. GARDNER:  I can break it up a little bit.

08:39:25  21        MR. ESPER:  I also think, your Honor, I would object

08:39:27  22   that there's hearsay coming in here about what this female is

08:39:30  23   telling this agent.

08:39:31  24        THE COURT:  May be.

08:39:34  25   Q.   (BY MR. GARDNER) Let me break it up a little bit, Special

08:39:37  1   Agent.

08:39:37  2   A.   Certainly.

08:39:38  3   Q.   So after you interviewed these females with all the cash,

08:39:43  4   did you take their itinerary?

08:39:45  5   A.   I did.

08:39:46  6   Q.   And did there appear -- or were there any other names

08:39:50  7   appeared on the itinerary?

08:39:51  8   A.   Only the only itinerary was given.  But we contacted -- or

08:39:55  9   as they had in their possession.  They only had their individual

08:39:58 10   itineraries.  But we contact --

08:39:59 11            MR. MAYR:  Objection.  Nonresponsive.

08:40:01 12            THE COURT:  Listen to the question.  You've been on the

08:40:02 13   stand before.

08:40:03 14            THE WITNESS:  Yes, sir.

08:40:03 15            THE COURT:  Answer the question.  You've got plenty of

08:40:05 16   lawyers, give plenty of questions.

08:40:08 17            THE WITNESS:  Certainly.

08:40:09 18   Q.   (BY MR. GARDNER) What did you do with the itineraries after

08:40:11 19   you obtained them from these three females?

08:40:13 20   A.   We used the record locator where the reservation number on

08:40:17 21   the itinerary to contact -- and with that, contacted Continental

08:40:23 22   Airlines through a subpoena to obtain a copy of the full

08:40:28 23   reservation.

08:40:29 24   Q.   And did you, in fact, obtain a copy of the full reservation?

08:40:32 25   A.   Yes, we did.

08:40:33  1   Q.   All right.  I'm showing you Government's Exhibit 318.  Do
08:40:41  2   you recognize that, sir?
08:40:41  3   A.   I do.
08:40:43  4   Q.   And how do you recognize it?
08:40:44  5   A.   It's the response to the subpoena that was provided by
08:40:48  6   Continental Airlines.
08:40:50  7   Q.   And it has an attached business record affidavit to it?
08:40:53  8   A.   Correct.
08:41:43  9          MR. GARDNER:  Your Honor, the government offers Exhibit
08:41:45  10  318.
08:41:46  11         MR. ESPER:  No objection.
08:41:47  12         THE COURT:  All right.  318's received.
08:42:00  13  Q.   (BY MR. GARDNER) Sir, I'm showing you the second page, Bates
08:42:11  14  stamp 621103.  Sir, these names I'm highlighting and the three on
08:42:51  15  the bottom, are those the three women you encountered that
08:42:54  16  morning?
08:42:54  17  A.   Yes, sir.
08:42:55  18  Q.   And did you encounter either Juan Francisco Javier Nunez or
08:42:59  19  Victor Manuel Lopez crossing the border?
08:43:02  20  A.   I did not encounter them.  No.
08:43:04  21  Q.   And so, what happened to the cash?
08:43:07  22  A.   The cash was abandoned by the three females and seized by
08:43:12  23  Customs and Border Protection at the bridge.
08:43:14  24  Q.   And with respect to this flight, were you aware if either
08:43:20  25  the women or Victor Manuel Lopez or Mr. Nunez took that flight?

08:43:25   1   A.   None of them took the flight that's notated on, I believe,
08:43:29   2   the first page of that response from Continental.
08:43:37   3   Q.   Now, with respect to Victor Manuel Lopez, what did you do
08:44:00   4   following that?
08:44:01   5   A.   Following that, we started to -- we examined his crossing
08:44:12   6   history and on occasion, would have him stopped at the bridge
08:44:19   7   when he was entering the U.S.  He'd enter generally every day,
08:44:22   8   sometimes as many as three times a day from Nuevo Laredo, Mexico.
08:44:28   9   And on occasion, we would have him stopped to see -- to get a
08:44:33  10   formal declaration of how much money he had with him.
08:44:37  11               MR. ESPER:  Excuse me, your Honor, could we get a
08:44:38  12   timeframe here?
08:44:39  13   Q.   (BY MR. GARDNER) Did you hear what Mr. Esper asked you, a
08:44:42  14   timeframe on the crossings during the investigation?
08:44:47  15   A.   At that time of July of 2011, Victor was crossing generally
08:44:52  16   every day and sometimes up to as many as two and three times a
08:44:56  17   day.
08:44:57  18   Q.   Now, I want to go back to this.  This is the first page,
08:45:01  19   621102.  Now, this reservation, does it reflect that all five of
08:45:13  20   those people were on the same reservation?
08:45:17  21   A.   It does.  This is a copy of the reservation under the record
08:45:22  22   locator number, which is the third number in the third line down,
08:45:27  23   RLOC.  And that record locator is a -- essentially a reservation
08:45:32  24   number, and all those five people are listed under that
08:45:35  25   reservation.

| | | |
|---|---|---|
| 08:45:35 | 1 | Q.   Now, earlier, you said no one took the flight? |
| 08:45:39 | 2 | A.   Correct.  And that's where it's notated.  Yes. |
| 08:45:43 | 3 | Q.   Now, in addition to subpoenaing the records of this |
| 08:45:47 | 4 | particular flight, what else did the subpoena request? |
| 08:45:53 | 5 | A.   It requested previous flights.  And both Continental and |
| 08:46:01 | 6 | American Airlines, the two airlines serving Laredo, were |
| 08:46:04 | 7 | subpoenaed for any flight reservations or trips made by Victor |
| 08:46:10 | 8 | Manuel Lopez and Francisco Javier Nunez. |
| 08:46:13 | 9 | Q.   And was there another occasion in which you were alerted to |
| 08:46:16 | 10 | a flight that Mr. Lopez was taking? |
| 08:46:18 | 11 | A.   Yes.  There was a flight June 24th of 2011 to Los Angeles. |
| 08:46:24 | 12 | Q.   And did you or any other law enforcement take any action |
| 08:46:28 | 13 | with respect to that flight? |
| 08:46:29 | 14 | A.   No.  That was -- that flight predated the one on which we |
| 08:46:32 | 15 | encountered the females. |
| 08:46:36 | 16 | Q.   And who else was on that flight through record locator? |
| 08:46:40 | 17 | A.   The trip to Los Angeles? |
| 08:46:42 | 18 | Q.   Yes. |
| 08:46:42 | 19 | A.   Xuzel Delgado, who was also on the Continental flight to El |
| 08:46:47 | 20 | Paso but did not fly that day.  She was on that flight as well as |
| 08:46:53 | 21 | I believe there was three other individuals whose names I don't |
| 08:46:58 | 22 | recall at the time. |
| 08:46:59 | 23 | Q.   Now, I want to turn your attention to a little bit later |
| 08:47:03 | 24 | into February of last year. |
| 08:47:05 | 25 | A.   Okay. |

08:47:06  1   Q.   All right.  Were you alerted that Victor Manuel Lopez was

08:47:13  2   purchasing a ticket?

08:47:14  3   A.   I was on February 14th of 2012, I received a phone call as a

08:47:22  4   result of a subpoena I had submitted to Continental Airlines and

08:47:26  5   American Airlines to be notified if Victor Manuel Lopez bought

08:47:30  6   any tickets or boarded any aircraft.  I was called by American

08:47:34  7   Airlines security office on the morning of February 14th and told

08:47:39  8   that.

08:47:39  9        MS. WILLIAMS:  Object to hearsay.

08:47:40  10        THE COURT:  Sustained.

08:47:43  11   Q.   (BY MR. GARDNER) Did you ask -- or did the subpoena ask for

08:47:47  12   you to be alerted when Mr. Lopez took any flights?

08:47:50  13   A.   Yes.

08:47:51  14   Q.   And so, were you alerted on that occasion?

08:47:54  15   A.   I was.

08:47:55  16   Q.   All right.  And based on that alert, what did you do?

08:47:59  17   A.   I went to the Laredo Airport and observed through the

08:48:04  18   security cameras Victor Lopez waiting for his flight, American

08:48:13  19   Airlines.  His itinerary was to Oklahoma City.  I then contacted

08:48:16  20   our duty agent in Oklahoma City, Homeland Security Investigations

08:48:21  21   in Oklahoma City, the special agent was there Coburn and told him

08:48:25  22   that we had a subject --

08:48:28  23        MS. WILLIAMS:  Object to hearsay.

08:48:29  24        MR. GARDNER:  He's testifying as to what he told the

08:48:31  25   agent in Oklahoma City, your Honor.

08:48:33   1         MS. WILLIAMS:  Still hearsay.

08:48:34   2         THE COURT:  Outside the presence of the jury and not

08:48:37   3   under oath, it is hearsay.  I sustain the objection.

08:48:41   4   Q.   (BY MR. GARDNER) Did you alert agents in Oklahoma?

08:48:43   5   A.   I did.

08:48:44   6   Q.   And what is the purpose for you alerting agents in Oklahoma?

08:48:48   7   A.   I alerted the agents in Oklahoma so that they would conduct

08:48:54   8   a surveillance of Victor Lopez while he was in Oklahoma.

08:48:58   9   Q.   And why did you feel it was necessary to have agents in

08:49:02  10   Oklahoma conduct a surveillance of Mr. Lopez?

08:49:05  11   A.   To see who -- to see where he traveled, who he met, any

08:49:10  12   vehicles he contacted or businesses he would have made contact

08:49:14  13   with.

08:49:14  14   Q.   And what was your suspicion that Victor Lopez was doing

08:49:20  15   traveling to Oklahoma?

08:49:21  16         MS. WILLIAMS:  Object to speculation.

08:49:24  17         MR. GARDNER:  His thoughts, your Honor.

08:49:25  18         THE COURT:  Pardon?

08:49:26  19         MR. GARDNER:  It's his thoughts, your Honor, as the

08:49:28  20   reason why he contacted the agents in Oklahoma City.

08:49:31  21         THE COURT:  Well, he's answered that is what they do.

08:49:36  22   But on the question was, why did he do it, I'll permit it.  Or

08:49:44  23   objection to the question asked is speculative.

08:49:48  24   Q.   (BY MR. GARDNER) Why did you contact the agents to have them

08:49:52  25   stop or track Mr. Lopez?

08:49:55 1  A.   He was the subject of our investigation and want to see who

08:49:59 2  he made contact with in Oklahoma City.

08:50:03 3  Q.   Now, when you looked at that reservation and saw Mr. Lopez,

08:50:08 4  how long was he going to stay, or what was the itinerary for that

08:50:11 5  day?

08:50:12 6  A.   For him to travel to Oklahoma City and immediately return to

08:50:15 7  Laredo.

08:50:16 8  Q.   Same day?

08:50:16 9  A.   Correct.

08:50:17 10 Q.   Were you aware of how he paid for that reservation?

08:50:20 11 A.   I don't believe I was.

08:50:22 12 Q.   Your Honor, may I have one moment?

08:50:24 13        THE COURT:  Yes, sir.

08:50:30 14        MR. GARDNER:  Your Honor, I'll pass the witness.

08:50:35 15        THE COURT:  Ms. Williams.

08:50:40 16        MS. WILLIAMS:  No questions.

08:50:43 17        MR. DEGEURIN:  No questions, your Honor.

08:50:44 18        MR. WOMACK:  No questions.

08:50:45 19        MR. ESPER:  I just have a couple, your Honor.

08:50:52 20                    CROSS-EXAMINATION

08:50:52 21 BY MR. ESPER:

08:50:53 22 Q.   Mr. O'Dwyer, I believe you said one of the three females

08:50:56 23 that was carrying $9,900, was one of their names Vanessa Lopez?

08:51:01 24 A.   Vanessa Lopez.

08:51:04 25 Q.   What were the names you recall?

| | | |
|---|---|---|
| 08:51:05 | 1 | A.   On the reservation, it said Xuzel Delgado, Veronica Duran |
| 08:51:10 | 2 | and Ruth Garcia. |
| 08:51:12 | 3 | Q.   Okay.  Do you know -- and if you don't, simply say so -- |
| 08:51:14 | 4 | whether or not any of these three individuals were related by |
| 08:51:19 | 5 | blood or marriage to Victor Lopez? |
| 08:51:21 | 6 | A.   All of them claimed they were not. |
| 08:51:23 | 7 | Q.   Okay.  Did you conduct an examination of your own to |
| 08:51:28 | 8 | determine whether or not they were related by blood or marriage |
| 08:51:31 | 9 | to Victor Lopez? |
| 08:51:32 | 10 | A.   I did not.  The one who provided the wife's name of Victor |
| 08:51:37 | 11 | Lopez and neither of them was anyone that went by that name. |
| 08:51:42 | 12 | Q.   Okay.  My question to you, again, did you conduct your own |
| 08:51:45 | 13 | independent investigation to determine whether any of these three |
| 08:51:49 | 14 | women were related by blood or marriage to Victor Lopez? |
| 08:51:52 | 15 | A.   I did not. |
| 08:51:52 | 16 | Q.   Other than talking to these three? |
| 08:51:54 | 17 | A.   No, sir. |
| 08:51:56 | 18 | Q.   That's all I have, your Honor. |
| 08:52:00 | 19 | MR. MAYR:  I have no question, your Honor. |
| 08:52:01 | 20 | THE COURT:  Any redirect? |
| 08:52:02 | 21 | MR. GARDNER:  No, your Honor. |
| 08:52:03 | 22 | THE COURT:  May this witness be excused? |
| 08:52:05 | 23 | MR. GARDNER:  He may. |
| 08:52:06 | 24 | THE COURT:  You may be excused. |
| 08:52:07 | 25 | THE WITNESS:  Thank you. |

08:52:09    1              THE COURT:  Call your next witness.

08:52:11    2              MR. GARDNER:  Thank you, your Honor.  Your Honor, the

08:52:12    3    government would call Special Agent Joshua Schenk.

08:52:46    4              (Witness sworn.)

08:52:50    5              THE COURT:  If you'll tell us your full name and spell

08:52:55    6    your last, please, sir.

08:52:56    7              THE WITNESS:  Joshua Paul Schenk.  Last name is

08:52:59    8    spelled, S-C-H-E-N-K.

08:53:01    9              THE COURT:  Go ahead.

08:53:03   10        JOSHUA P. SCHENK, called by the Government, duly sworn.

08:53:03   11                         DIRECT EXAMINATION

08:53:03   12    BY MR. GARDNER:

08:53:04   13    Q.   Thank you, your Honor.

08:53:04   14              Special Agent Schenk, you and I have met before.  Could

08:53:07   15    you introduce yourself to the jury and tell them what you do for

08:53:09   16    a living and where?

08:53:10   17    A.   Again, my name is Joshua Paul Schenk.  I'm a supervisor

08:53:14   18    special agent with the Department of Homeland Security, Homeland

08:53:17   19    Security Investigations in Oklahoma City.

08:53:21   20    Q.   Sir, I want to turn your attention to February 14th of 2012.

08:53:25   21    Were you on duty that day?

08:53:26   22    A.   That's correct, sir.  Yes.

08:53:28   23    Q.   And did you receive a call from Special Agent Ed O'Dwyer in

08:53:34   24    Laredo?

08:53:34   25    A.   I did.

| | | |
|---|---|---|
| 08:53:35 | 1 | Q.   Without getting too much into what Special Agent O'Dwyer |
| 08:53:38 | 2 | told you, what were your actions that day?  Or based on that |
| 08:53:41 | 3 | conversation, what were your actions? |
| 08:53:43 | 4 | A.   We established surveillance at the Oklahoma City -- Will |
| 08:53:50 | 5 | Rogers Oklahoma City Airport.  We were looking for a -- what |
| 08:53:56 | 6 | Agent O'Dwyer had -- what he believed he identified a bulk-cash |
| 08:54:02 | 7 | smuggler.  He had given us a description of that individual, and |
| 08:54:07 | 8 | we established surveillance in the airport waiting for him to |
| 08:54:10 | 9 | arrive at the Oklahoma City Airport. |
| 08:54:13 | 10 | Q.   And when you say you were given a description, was that |
| 08:54:16 | 11 | general description of his physical makeup? |
| 08:54:18 | 12 | A.   Physical makeup and the item, the clothing that he was |
| 08:54:22 | 13 | wearing that day. |
| 08:54:23 | 14 | Q.   And at some point, did you see an individual matching that |
| 08:54:26 | 15 | description exit an airplane? |
| 08:54:28 | 16 | A.   We did. |
| 08:54:30 | 17 | Q.   And was that airplane arrived -- or did it arrive from |
| 08:54:34 | 18 | Laredo, Texas? |
| 08:54:34 | 19 | A.   Yes, it did. |
| 08:54:35 | 20 | Q.   May I have 335?  And do you recognize this individual, sir? |
| 08:54:53 | 21 | A.   Yes, sir. |
| 08:54:53 | 22 | Q.   And was that the individual who got off the plane that day? |
| 08:54:56 | 23 | A.   It was. |
| 08:54:57 | 24 | Q.   Sir, after Mr. Lopez got off the plane, what actions did you |
| 08:55:03 | 25 | or other agents take? |

08:55:05  1   A.   We followed Mr. Lopez from the terminal area after he got

08:55:08  2   off the plane.  Mr. Lopez -- we followed him through the

08:55:14  3   underground tunnel area up towards the parking area at which time

08:55:21  4   he met up with two other individuals, and they proceeded to go up

08:55:25  5   to the parking deck.

08:55:27  6   Q.   Now, these other two individuals, were you able to identify

08:55:30  7   them at the time they met with Mr. Lopez?

08:55:33  8   A.   We identified them later.  Yes.

08:55:35  9   Q.   And based on that later identification, who did Mr. Lopez

08:55:40  10  meet with?

08:55:41  11  A.   He met with the defendant, Mr. Trevino-Morales, and with

08:55:46  12  another individual -- I don't recall his name.

08:55:50  13  Q.   And does Fidencio Jimenez help to refresh your memory?

08:55:53  14  A.   That's correct.  Yes, sir.

08:55:54  15  Q.   So based on that surveillance, did you follow him out into

08:55:57  16  the parking lot?

08:55:58  17  A.   Yes, I did.

08:55:58  18  Q.   And what did you observe these three individuals doing?

08:56:02  19  A.   We observed Mr. Lopez and Mr. Trevino.  They proceeded into

08:56:09  20  a pickup truck that was parked in the parking garage.  Mr.

08:56:16  21  Fidencio stayed in the -- there's a glass enclosure at the top of

08:56:21  22  the parking garage while the other two individuals were in that

08:56:24  23  pickup truck.  They remained in that pickup truck for

08:56:28  24  approximately four minutes, at which point Victor Lopez exited

08:56:32  25  the vehicle towards -- and walked back towards the glass

| | | |
|---|---|---|
| 08:56:38 | 1 | enclosure where Fidencio was. |
| 08:56:41 | 2 | They acknowledged each other, Fidencio proceeded back |
| 08:56:45 | 3 | to the pickup, and Mr. Lopez proceeded back to the terminal. |
| 08:56:49 | 4 | THE COURT:  We have three Trevinos listed in the |
| 08:56:53 | 5 | indictment.  You just said defendant.  Do you know which Trevino? |
| 08:56:58 | 6 | THE WITNESS:  Yes, sir.  It was a Juan Trevino. |
| 08:57:04 | 7 | Q.   (BY MR. GARDNER) Juan or Jose? |
| 08:57:05 | 8 | A.   I'm sorry.  Jose.  Jose. |
| 08:57:08 | 9 | Q.   And when you observed Mr. Lopez go back into the terminal, |
| 08:57:14 | 10 | what did he do? |
| 08:57:16 | 11 | A.   Mr. Lopez proceeded back through security and basically |
| 08:57:22 | 12 | waited for his flight back to Laredo. |
| 08:57:26 | 13 | Q.   And following Mr. Lopez's departure, what happened to Mr. |
| 08:57:31 | 14 | Jose Trevino and Fidencio Jimenez? |
| 08:57:34 | 15 | A.   Mr. Trevino and Mr. Jimenez proceeded to exit the airport at |
| 08:57:40 | 16 | which time we followed them out of the airport area. |
| 08:57:44 | 17 | Q.   And what happened based on that surveillance of Mr. Trevino? |
| 08:57:49 | 18 | A.   Mr. Trevino was -- a vehicle stop was initiated on Mr. |
| 08:57:54 | 19 | Trevino by the Oklahoma City Police Department at near, I |
| 08:57:58 | 20 | believe, Walker and 240, I-240 there in Oklahoma City.  He gave |
| 08:58:06 | 21 | consent to search his vehicle, at which time we proceeded to |
| 08:58:10 | 22 | search his vehicle. |
| 08:58:11 | 23 | Q.   Are you familiar with a task force officer named Matt |
| 08:58:15 | 24 | Martin? |
| 08:58:15 | 25 | A.   I am, sir. |

08:58:16   1              MS. WILLIAMS:  I'm sorry?

08:58:17   2              MR. GARDNER:  Matt Martin.

08:58:19   3              MS. WILLIAMS:  Thank you.

08:58:20   4   Q.   (BY MR. GARDNER) And he's here to testify, too?

08:58:22   5   A.   Yes, he is.

08:58:23   6   Q.   Did he conduct an interview of Mr. Trevino?

08:58:25   7   A.   Yes, he did.

08:58:25   8   Q.   I want to turn your attention back to the airport.  I'm

08:58:28   9   showing you Government's Exhibit 365.  Are those your initials,

08:58:32  10   sir, on that disc?

08:58:33  11   A.   Yes, they are.

08:58:33  12   Q.   All right.  What is this a disc of?

08:58:35  13   A.   That's a surveillance footage from the airport itself.

08:58:39  14   Q.   Okay.  And when you say from the airport, is that the

08:58:42  15   airport security cameras?

08:58:43  16   A.   Yes, it is.

08:58:44  17   Q.   Did the airport security cameras capture the meeting of

08:58:48  18   Victor Lopez and the Defendant Jose Trevino?

08:58:51  19   A.   Yes, they did.

08:58:52  20   Q.   And where was the view of this meeting captured?

08:58:55  21   A.   That was on the top parking deck at the airport.

08:59:00  22   Q.   And based on your review of this video and your initials of

08:59:03  23   the disc, is it a true and accurate representation of the events

08:59:06  24   that happened that day?

08:59:07  25   A.   It is.

| | | |
|---|---|---|
| 08:59:08 | 1 | Q.    Your Honor, I would offer Government's Exhibit 365. |
| 08:59:18 | 2 | MR. DEGEURIN:  No objection. |
| 08:59:18 | 3 | THE COURT:  365 is admitted. |
| 08:59:20 | 4 | MR. GARDNER:  Your Honor, may I publish it to the jury? |
| 08:59:22 | 5 | THE COURT:  You may. |
| 08:59:23 | 6 | Q.    (BY MR. GARDNER) All right.  Special Agent Schenk, if you |
| 09:00:09 | 7 | will, could you set the scene for us here?  Could you stop it, |
| 09:00:14 | 8 | please? |
| 09:00:14 | 9 | (Video file played.) |
| 09:00:14 | 10 | A.    You will see Mr. Lopez and Mr. Trevino-Morales coming from |
| 09:00:19 | 11 | the bottom right-hand of the screen.  That would be coming from |
| 09:00:23 | 12 | the direction of the glass enclosure, located at the top of the |
| 09:00:29 | 13 | parking deck, and proceed to the pickup.  It's a -- like a |
| 09:00:33 | 14 | light-blue-colored Chevy Silverado crew cab pickup that's parked |
| 09:00:37 | 15 | in between the other two white vehicles there. |
| 09:00:41 | 16 | Q.    And give me one second here.  And when you say the pickup |
| 09:00:48 | 17 | here, is this the pickup you're talking about? |
| 09:00:50 | 18 | A.    That's correct, sir. |
| 09:00:51 | 19 | Q.    And with respect to the amount of time you testified |
| 09:00:55 | 20 | earlier, what's this down here at the bottom left-hand corner? |
| 09:00:58 | 21 | A.    That is the timestamp for the surveillance photo. |
| 09:01:01 | 22 | Q.    All right.  So the date, 2-14-2012, right now looking at |
| 09:01:06 | 23 | 1:29 p.m., correct? |
| 09:01:06 | 24 | A.    Yes, sir. |
| 09:01:07 | 25 | Q.    Could you go ahead and play it, please? |

| | | |
|---|---|---|
| 09:01:22 | 1 | (Video file played.) |
| 09:02:03 | 2 | Q.   Could you stop it, please?  Who are these two individuals? |
| 09:02:10 | 3 | A.   Individual on the left-hand side is Jose Trevino-Morales. |
| 09:02:15 | 4 | Individual on the right-hand side is Victor Lopez. |
| 09:02:18 | 5 | Q.   This one on the left is Jose Trevino, correct? |
| 09:02:23 | 6 | A.   That's correct, sir. |
| 09:02:24 | 7 | Q.   Now, have you reviewed this entire video?  I'm just playing |
| 09:02:26 | 8 | a portion.  Did you review this entire video? |
| 09:02:28 | 9 | A.   Yes, sir. |
| 09:02:28 | 10 | Q.   And did Mr. Jose Trevino exit from that truck to go into the |
| 09:02:33 | 11 | truck earlier on this video? |
| 09:02:34 | 12 | A.   Yes, sir.  He did. |
| 09:02:35 | 13 | Q.   And so, on the left, again, is Defendant Jose Trevino and on |
| 09:02:39 | 14 | the right is Victor Lopez? |
| 09:02:40 | 15 | A.   That's correct, sir. |
| 09:02:42 | 16 | Q.   Please play. |
| 09:02:43 | 17 | (Video file played.) |
| 09:03:03 | 18 | Q.   And you didn't have any recording devices or cameras inside |
| 09:03:07 | 19 | the pickup truck between the departure and the arrival of Mr. |
| 09:03:12 | 20 | Lopez, did you? |
| 09:03:12 | 21 | A.   No.  We did not. |
| 09:03:13 | 22 | Q.   So you have no idea what conversation occurred in that cab? |
| 09:03:16 | 23 | A.   No, sir. |
| 09:03:17 | 24 | Q.   Could you please forward it -- is there anything in that |
| 09:03:23 | 25 | intervening four minutes that happened of significance? |

09:03:25  1    A.    No, sir.

09:03:28  2              (Video file played.)

09:03:59  3    Q.    And again, Special Agent Schenk, is that Victor Lopez

09:04:03  4    departing the pickup truck?

09:04:04  5    A.    That is.

09:04:05  6    Q.    So what happened with Mr. Lopez and where is he heading at

09:04:11  7    that camera view?

09:04:13  8    A.    Mr. Lopez was walking towards the glass enclosure area,

09:04:16  9    again, that would lead you back down towards the tunnel that went

09:04:20  10   into the airport terminals.  He met up -- at that point, he met

09:04:25  11   up with Fidencio in the glass enclosure area.  Like I said, they

09:04:32  12   greeted each other and he proceeded back into the airport,

09:04:36  13   towards the terminal.

09:04:38  14   Q.    In a minute, are we going to see Fidencio Jimenez returning

09:04:42  15   to the truck?

09:04:42  16   A.    Yes, sir.

09:04:43  17   Q.    Who is that, sir?

09:04:43  18   A.    That is Fidencio there.

09:04:45  19   Q.    After they get in the truck, do they leave immediately?

09:04:47  20   A.    Yes, sir.

09:04:48  21   Q.    Now, Special Agent, in your training and experience, have

09:04:56  22   you seen this type of activity before?

09:04:58  23   A.    Yes, sir.

09:04:59  24   Q.    And what is that consistent with?

09:05:01  25              MS. WILLIAMS:  Excuse me, your Honor.  What activity or

| | | |
|---|---|---|
| 09:05:05 | 1 | specific activity are we talking about? |
| 09:05:07 | 2 | MR. GARDNER:  I'll lay a better foundation, your Honor. |
| 09:05:09 | 3 | I thought the video explained it, but I'll ask a question. |
| 09:05:13 | 4 | THE COURT:  Let's just ask questions. |
| 09:05:14 | 5 | Q.  (BY MR. GARDNER) Have you seen individuals arrive on a |
| 09:05:21 | 6 | roundtrip ticket, the same day, using cash, meeting for a short |
| 09:05:26 | 7 | period of time and then, departing the same location shortly |
| 09:05:30 | 8 | thereafter? |
| 09:05:30 | 9 | A.  Well, and, actually, this is the first time I'd ever seen |
| 09:05:33 | 10 | anything like that.  Yes, sir. |
| 09:05:36 | 11 | Q.  Your Honor, I'll pass the witness. |
| 09:05:39 | 12 | CROSS-EXAMINATION |
| 09:05:41 | 13 | BY MS. WILLIAMS: |
| 09:05:41 | 14 | Q.  Special Agent Schenk. |
| 09:05:47 | 15 | A.  Yes, ma'am. |
| 09:05:48 | 16 | Q.  Am I pronouncing your name right? |
| 09:05:49 | 17 | A.  Yeah.  Schenk. |
| 09:05:51 | 18 | Q.  On this video that we're looking at, what is -- I'm facing |
| 09:05:57 | 19 | the screen.  What's right there to the left?  What's that |
| 09:06:02 | 20 | structure? |
| 09:06:02 | 21 | A.  To the left of what? |
| 09:06:04 | 22 | Q.  Well, to the left of the -- if we're looking at the picture, |
| 09:06:07 | 23 | what's to my left?  What is that structure? |
| 09:06:09 | 24 | A.  That is still a parking garage. |
| 09:06:11 | 25 | Q.  A public parking garage? |

| | | |
|---|---|---|
| 09:06:12 | 1 | A.    That's correct. |
| 09:06:13 | 2 | Q.    So Mr. Trevino could have chosen to park in the covered |
| 09:06:16 | 3 | parking garage, correct? |
| 09:06:17 | 4 | A.    Yes. |
| 09:06:18 | 5 | Q.    But he didn't? |
| 09:06:19 | 6 | A.    No. |
| 09:06:22 | 7 | Q.    So as I understand your testimony, after Mr. Trevino left |
| 09:06:29 | 8 | this parking lot -- not the garage but the lot, you gave some |
| 09:06:37 | 9 | instructions to Oklahoma City Police Department to make a traffic |
| 09:06:43 | 10 | stop? |
| 09:06:43 | 11 | A.    To follow the vehicle and to attempt to stop it, if |
| 09:06:49 | 12 | possible. |
| 09:06:49 | 13 | Q.    What does that mean? |
| 09:06:51 | 14 | A.    In other words, to follow the vehicle, we asked them to |
| 09:06:55 | 15 | follow the vehicle in order to identify the occupants and that if |
| 09:06:58 | 16 | there was a traffic violation to have had occurred in their |
| 09:07:02 | 17 | presence, to go ahead and stop the vehicle. |
| 09:07:03 | 18 | Q.    And so, in law enforcement terms, that means make up a |
| 09:07:07 | 19 | traffic violation and stop the vehicle? |
| 09:07:09 | 20 |        MR. GARDNER:  Your Honor, that's argumentative. |
| 09:07:11 | 21 |        THE COURT:  Very.  Sustained. |
| 09:07:14 | 22 | Q.    (BY MS. WILLIAMS) Is that what's called a pretext stop? |
| 09:07:17 | 23 |        MR. GARDNER:  Your Honor, argumentative. |
| 09:07:20 | 24 |        THE COURT:  He can answer that question. |
| 09:07:24 | 25 | A.    No.  No.  I've never -- I've never heard it referred to it a |

09:07:29  1    as a pretext stop.

09:07:31  2    Q.    (BY MS. WILLIAMS) You've never heard -- Oklahoma City Police

09:07:38  3    Department isn't really stopping Mr. Trevino because he made a

09:07:41  4    traffic violation.  They're stopping him because they know that

09:07:44  5    you want to try to -- you want them to try to talk to him?

09:07:48  6              MR. GARDNER:  Your Honor, right now, it's argumentative

09:07:50  7    and she's testifying.

09:07:51  8              THE COURT:  I think -- it's cross-examination.

09:07:56  9              MR. GARDNER:  I understand.

09:07:57  10             THE COURT:  But to the question asked, I sustain the

09:07:59  11   objection.

09:08:00  12   Q.    (BY MS. WILLIAMS) What was the reason for the stop, do you

09:08:02  13   know?

09:08:02  14   A.    It was crossing right of center.

09:08:05  15   Q.    What does that mean?

09:08:06  16   A.    It means that that vehicle basically in layman's term -- I'm

09:08:12  17   not a traffic officer either.

09:08:15  18   Q.    I understand that.

09:08:15  19   A.    From what I understand, that means that vehicle crossed the

09:08:19  20   -- basically crossed into another lane of traffic without

09:08:21  21   signaling.

09:08:23  22   Q.    Well, does it -- is there a difference in your mind between

09:08:31  23   cross right of center and changing lanes without a signal?  Are

09:08:37  24   those two different things?

09:08:38  25   A.    I don't know.  I'm not -- I've never worked traffic.

| | | |
|---|---|---|
| 09:08:40 | 1 | Q.   Fair enough. |
| 09:08:50 | 2 | Were you a part of the traffic stop? |
| 09:08:55 | 3 | A.   I was not there initially.  I arrived after the stop had |
| 09:08:59 | 4 | already been made. |
| 09:08:59 | 5 | Q.   All right.  And did you talk to Mr. Trevino? |
| 09:09:02 | 6 | A.   I never personally spoke to Mr. Trevino. |
| 09:09:05 | 7 | Q.   Did Mr. Trevino give consent to search his car? |
| 09:09:09 | 8 | A.   Yes, he did. |
| 09:09:10 | 9 | Q.   Did -- was he then placed in the back of a patrol car? |
| 09:09:16 | 10 | A.   Yes, he was. |
| 09:09:17 | 11 | Q.   And his passenger placed in the back of another patrol car? |
| 09:09:20 | 12 | A.   Yes. |
| 09:09:20 | 13 | Q.   And did he complain about that at all? |
| 09:09:23 | 14 | A.   No.  Not that I recall. |
| 09:09:24 | 15 | Q.   Did you put handcuffs on him? |
| 09:09:33 | 16 | A.   I don't recall if he was handcuffed. |
| 09:09:36 | 17 | Q.   But once he got in the back of that patrol car, he couldn't |
| 09:09:46 | 18 | get out, could he? |
| 09:09:47 | 19 | A.   At some point, the car door was opened.  I don't -- |
| 09:09:53 | 20 | Q.   Let me stop.  My question was, once Mr. Trevino was placed |
| 09:09:56 | 21 | in the back of the patrol car, he couldn't get out, could he?  He |
| 09:10:00 | 22 | couldn't physically open the door, could he? |
| 09:10:02 | 23 | A.   No.  He would not be able to. |
| 09:10:04 | 24 | Q.   Until somebody came and let him out? |
| 09:10:05 | 25 | A.   That's correct. |

09:10:06  1   Q.   After they finished talking to him?

09:10:08  2   A.   No.  He wouldn't start talking to him until he opened the

09:10:13  3   door.

09:10:13  4   Q.   Doesn't let him get out after they finished talking to him?

09:10:16  5   A.   No.  They --

09:10:18  6   Q.   Was the interview conducted in the car or out of the car?

09:10:21  7   A.   Outside the car.  He was still in the car, however, the

09:10:23  8   officers were outside the car.

09:10:24  9   Q.   And do we have video of that interview?

09:10:27  10  A.   No.  We don't.

09:10:33  11  Q.   So you set up surveillance at the airport, but when you

09:10:38  12  actually go to talk to Mr. Trevino and ask him why he was there

09:10:43  13  and what was happening and asked for his explanation, you don't

09:10:48  14  have that on video?

09:10:49  15  A.   The surveillance at the airport was the actual airport

09:10:52  16  surveillance cameras.  We used those cameras.  We don't have

09:10:56  17  surveillance cameras on Walker and 240.

09:11:00  18  Q.   Oklahoma City Police Department doesn't have cameras in

09:11:04  19  their car?

09:11:04  20  A.   I'm not sure if they do or not.

09:11:07  21  Q.   You could have asked for that, though, couldn't you?

09:11:10  22  A.   It's not -- that's not something that we customarily ask

09:11:13  23  for.

09:11:14  24             THE COURT:  Question is, could you have asked for?

09:11:17  25             THE WITNESS:  We could have asked.  Yes, sir.

| | | |
|---|---|---|
| 09:11:19 | 1 | MS. WILLIAMS:  Nothing further.  Thank you. |
| 09:11:25 | 2 | MR. GARDNER:  I'm sorry.  I did jump the gun.  I |
| 09:11:27 | 3 | apologize. |
| 09:11:28 | 4 | MR. WOMACK:  No questions. |
| 09:11:29 | 5 | MR. MAYR:  No. |
| 09:11:30 | 6 | THE COURT:  Go ahead. |
| 09:11:32 | 7 | RE-DIRECT EXAMINATION |
| 09:11:32 | 8 | BY MR. GARDNER: |
| 09:11:33 | 9 | Q.   Are there surveillance cameras all over this airport to |
| 09:11:36 | 10 | include all structured parking? |
| 09:11:38 | 11 | A.   Yes.  Just about every square foot of the parking's covered. |
| 09:11:43 | 12 | Q.   And it wasn't until later.  I guess wasn't until the traffic |
| 09:11:47 | 13 | stop when you first learned of Mr. Jose Trevino? |
| 09:11:50 | 14 | A.   That's correct, sir. |
| 09:11:51 | 15 | Q.   Pass the witness, your Honor. |
| 09:11:54 | 16 | THE COURT:  May the witness be excused, counsel? |
| 09:11:57 | 17 | MS. WILLIAMS:  Yes, your Honor. |
| 09:11:58 | 18 | THE COURT:  You may be excused, sir.  You may call your |
| 09:11:59 | 19 | next witness. |
| 09:12:00 | 20 | MR. GARDNER:  Thank you, your Honor.  The government |
| 09:12:02 | 21 | calls Matt Martin. |
| 09:12:26 | 22 | (Witness sworn.) |
| 09:12:41 | 23 | THE COURT:  Good morning.  Tell us, please, sir, your |
| 09:12:48 | 24 | full name and spell your last. |
| 09:12:49 | 25 | THE WITNESS:  It's Matthew Scott Martin, M-A-R-T-I-N. |

| | | |
|---|---|---|
| 09:12:55 | 1 | MR. GARDNER:  Thank you, your Honor. |
| 09:12:56 | 2 | MATTHEW S. MARTIN, called by the Government, duly sworn. |
| 09:12:56 | 3 | DIRECT EXAMINATION |
| 09:12:56 | 4 | BY MR. GARDNER: |
| 09:12:57 | 5 | Q.   Officer Martin, if you will, could you please introduce |
| 09:12:59 | 6 | yourself to the jury and tell them what you do for a living? |
| 09:13:01 | 7 | A.   My name is Matthew Martin.  I'm a detective for the Oklahoma |
| 09:13:05 | 8 | City Police Department.  I'm assigned to special projects in the |
| 09:13:08 | 9 | major violators unit.  I'm on a federal task force at Homeland |
| 09:13:12 | 10 | Security Investigations. |
| 09:13:14 | 11 | Q.   Don't take this the wrong way, but you don't look like a |
| 09:13:17 | 12 | cop.  You've got a very robust beard working there. |
| 09:13:22 | 13 | A.   Yes, sir.  Working undercover capacity. |
| 09:13:24 | 14 | Q.   That's for your undercover appearance, correct? |
| 09:13:27 | 15 | A.   Yes, sir. |
| 09:13:27 | 16 | Q.   All right.  And, sir, were you on duty on February 14th of |
| 09:13:30 | 17 | 2012? |
| 09:13:31 | 18 | A.   Yes, sir.  I was. |
| 09:13:32 | 19 | Q.   And what were you doing that day? |
| 09:13:34 | 20 | A.   I had received a call from Special Agent Eric Coburn, who |
| 09:13:40 | 21 | was at the airport, the Will Rogers Airport in Oklahoma City, and |
| 09:13:45 | 22 | asked me if I could assist him. |
| 09:13:46 | 23 | MS. WILLIAMS:  Object to hearsay. |
| 09:13:48 | 24 | THE COURT:  Sustained. |
| 09:13:49 | 25 | Q.   (BY MR. GARDNER) I understand what you were told.  So based |

09:13:52  1   on what you were told, what actions did you conduct?

09:13:56  2   A.   I proceeded to Will Rogers World Airport area.  I set up in

09:14:00  3   a motel just north of the airport on Meridian Avenue and waited

09:14:05  4   for instructions from Special Agent Coburn.

09:14:08  5   Q.   And based on your activities that day, were you instructed

09:14:14  6   to proceed to where a traffic stop could be made?

09:14:17  7   A.   Yes, sir.  There was a vehicle that left the airport.  It

09:14:20  8   was a 2009 Chevy pickup, light-blue in color, and I followed the

09:14:28  9   vehicle until I could get a black-and-white to stop the car in

09:14:32  10  traffic.

09:14:33  11  Q.   Did you have any idea who was the occupants of that vehicle

09:14:35  12  at that time?

09:14:35  13  A.   Yes, sir.  The driver --

09:14:37  14  Q.   Let me interrupt you for a second.  At that time, did you?

09:14:40  15  A.   Oh, no, sir.  I did not.

09:14:41  16  Q.   Was it later you identified them?

09:14:43  17  A.   Yes, sir.

09:14:44  18  Q.   All right.  And were you able to obtain what you termed a

09:14:47  19  black-and-white marked patrol unit?

09:14:50  20  A.   Yes, sir.

09:14:50  21  Q.   And did that patrol unit conduct a traffic stop?

09:14:53  22  A.   Yes, sir.  Sergeant Warren McMullen from Oklahoma City

09:14:56  23  Police Department was able to obtain charges to make a traffic

09:14:59  24  stop and stop the vehicle.

09:15:00  25  Q.   And how long after the traffic stop did you arrive on the

09:15:03  1   scene?

09:15:04  2   A.   I was from -- I was behind the black-and-white when he

09:15:07  3   stopped the pickup truck.

09:15:08  4   Q.   And when you made -- or when Officer McMullen approached

09:15:13  5   him, how soon did you make contact with the occupants?

09:15:16  6   A.   Approximately five minutes to ten minutes later.

09:15:18  7   Q.   And were you able to identify the driver of that vehicle?

09:15:20  8   A.   Yes, sir.  I was.

09:15:22  9   Q.   And who was it at that time, sir?

09:15:25  10  A.   Jose Morales-Trevino.

09:15:27  11  Q.   And the passenger, were you able to identify the passenger?

09:15:31  12  A.   I was.  I'm going to have trouble with his name, I'm sorry,

09:15:36  13  sir.  It's --

09:15:38  14          MR. WOMACK:  Objection.  It appears the witness is

09:15:39  15  looking at something.

09:15:41  16  Q.   (BY MR. GARDNER) Are those your notes?

09:15:42  17  A.   It's the police report.  Yes, sir.

09:15:44  18  Q.   Your police report from that?

09:15:45  19  A.   Yes, sir.

09:15:45  20  Q.   Okay.  Does it help refresh your memory today?

09:15:48  21  A.   It does.

09:15:50  22          MR. WOMACK:  Your Honor, perhaps it would be better for

09:15:52  23  the government to lay a foundation if he doesn't have a memory

09:15:54  24  and then, look at it, rather than have him reading from his notes

09:15:59  25  on the stand.  Normally that would be how we would do it to

09:16:01   1   refresh recollection.

09:16:03   2           MR. GARDNER:  Mr. Womack wants me to go through that

09:16:05   3   long --

09:16:06   4           THE COURT:  Now --

09:16:07   5           MR. GARDNER:  -- I'll do it, your Honor.

09:16:08   6           THE COURT:  -- now, now.

09:16:09   7           MR. GARDNER:  I believe he can use his notes.

09:16:11   8           THE COURT:  I have no objection.

09:16:14   9           MR. WOMACK:  That's correct, sir.  I have no objection.

09:16:16  10   I just didn't know what it was he was reading.

09:16:18  11           THE COURT:  Ask the question.

09:16:19  12   Q.  (BY MR. GARDNER) Was that report made at the time of the

09:16:21  13   incident?

09:16:22  14   A.  Yes, sir.  That day.

09:16:23  15   Q.  All right.  And it's been over a year since that time,

09:16:27  16   correct?

09:16:27  17   A.  Yes, sir.  About 14 months.

09:16:29  18   Q.  I'm going to show you what's been marked as Government's

09:16:35  19   Exhibit 365A, 365B and 365C.  Do you recognize those pictures,

09:16:43  20   sir?

09:16:43  21   A.  Yes, sir.  I do.

09:16:44  22   Q.  And are those pictures taken on the day, February 14th of

09:16:49  23   2012?

09:16:50  24   A.  Yes, sir.  They were taken by Agent Coburn.

09:16:52  25   Q.  And are they a fair and accurate representation of the

| | | |
|---|---|---|
| 09:16:55 | 1 | events that happened that day? |
| 09:16:56 | 2 | A.   Yes, sir.  They're exactly what happened that day. |
| 09:17:03 | 3 | Q.   Your Honor, I'd offer Government's Exhibit 365A, 365B, 365C. |
| 09:17:14 | 4 |         MS. WILLIAMS:  No objection. |
| 09:17:18 | 5 |         THE COURT:  All right.  365A, B and C are admitted. |
| 09:17:31 | 6 | Q.   (BY MR. GARDNER) Is this the driver's license that was |
| 09:17:33 | 7 | provided that day from the driver? |
| 09:17:34 | 8 | A.   Yes, sir.  It is. |
| 09:17:36 | 9 | Q.   Mr. Jose Trevino-Morales, correct? |
| 09:17:38 | 10 | A.   Yes, sir. |
| 09:17:38 | 11 | Q.   And 365B, was that the heavy truck that you just testified |
| 09:17:47 | 12 | to? |
| 09:17:49 | 13 | A.   Yes, sir. |
| 09:17:49 | 14 | Q.   And the purpose of taking it from this angle is to, in fact, |
| 09:17:54 | 15 | capture the license plate for identification? |
| 09:17:56 | 16 | A.   Yes, sir. |
| 09:17:56 | 17 | Q.   Now, did you request to Mr. Trevino to search that car? |
| 09:18:02 | 18 | A.   No, sir.  Not at that time, I did not. |
| 09:18:05 | 19 | Q.   Was it eventually somebody's request to do a consent search |
| 09:18:08 | 20 | of his truck? |
| 09:18:09 | 21 | A.   Yes, sir.  The patrol officers that were there on the scene, |
| 09:18:12 | 22 | Sergeant McMullen received permission to search the vehicle. |
| 09:18:15 | 23 | Q.   All right.  And did you or other officers present search the |
| 09:18:18 | 24 | vehicle? |
| 09:18:19 | 25 | A.   Yes, sir, they did. |

09:18:20  1    Q.    And was any contraband found?

09:18:21  2    A.    No, sir.

09:18:22  3    Q.    Was there any hidden compartments located in the truck

09:18:25  4    anywhere?

09:18:26  5    A.    No, sir.  None were located.

09:18:28  6    Q.    And was Mr. Trevino cooperative during the whole time?

09:18:32  7    A.    Somewhat.

09:18:33  8    Q.    When you say somewhat, did he ever ask you the reason for

09:18:36  9    the traffic stop?

09:18:37  10   A.    No, sir.  He didn't ask me.

09:18:39  11   Q.    And did you talk to Mr. Trevino?

09:18:41  12   A.    Yes, sir, I did.  Later.

09:18:43  13   Q.    And after talking to him -- or before talking to him, was a

09:18:48  14   amount of currency found on his person?

09:18:50  15   A.    Yes, sir.  Sergeant McMullen told me that he had found

09:18:53  16   $5,000 in cash on Mr. Trevino.

09:18:56  17   Q.    And were you able to verify the $5,000 cash?

09:18:59  18   A.    Yes, I was.

09:19:00  19   Q.    I'm showing you Government's Exhibit 365C.  Who is that a

09:19:05  20   picture of?

09:19:06  21   A.    That's Mr. Trevino.

09:19:07  22   Q.    All right.  What is he holding in his hand right here?

09:19:10  23   A.    $5,000 in cash.

09:19:14  24   Q.    Now, when you talked to Mr. Trevino, what kind of questions

09:19:17  25   did you ask him?

09:19:18  1   A.   I just asked him where he'd been, where he was coming from,

09:19:21  2   what he did for a living.

09:19:23  3   Q.   With respect to the questions where he'd been, at that

09:19:27  4   point, did you know he had come from the airport?

09:19:28  5   A.   Yes, sir, I did.

09:19:29  6   Q.   All right.  So when you asked him, where have you been, what

09:19:33  7   was his response?

09:19:35  8   A.   He told me that he was coming from Remington Park that he

09:19:38  9   had been at the horse track.

09:19:40  10  Q.   And was that not true according to what you'd seen that day?

09:19:43  11  A.   Yes, sir.  That was not true.

09:19:45  12  Q.   Did you see him at any time between leaving the airport and

09:19:48  13  being stopped to go to Remington Park?

09:19:50  14  A.   No, sir.  It's about 15 miles on the other side of the city.

09:19:55  15  Q.   Remington Park, is that a horse race track?

09:19:57  16  A.   Yes, sir, it is.

09:19:58  17  Q.   All right.  And did you confront Mr. Trevino with the fact

09:20:01  18  that he just lied to you about coming from the airport?

09:20:03  19  A.   Yes, I did.

09:20:04  20          MS. WILLIAMS:  Objection.  That assumes facts not in

09:20:06  21  evidence.

09:20:10  22          THE COURT:  Rephrase your question.

09:20:11  23  Q.   (BY MR. GARDNER) Did you confront Mr. Trevino with the fact

09:20:15  24  that you knew he had just come from the airport?

09:20:18  25  A.   Yes, sir, I did.

09:20:19    1    Q.   And what was his response to that?

09:20:21    2    A.   He had no response.

09:20:23    3    Q.   Did he mention that he was meeting someone at the airport?

09:20:28    4    A.   He told me that he had been to the airport earlier that day

09:20:31    5    to pick up the guy that was with him, Mr. Jimenez.

09:20:38    6    Q.   I'm going to ask you to refer to your notes.

09:20:40    7    A.   Yes, sir.

09:20:40    8    Q.   Do you recall a statement that Mr. Trevino made after the --

09:20:45    9    let me back up.  Let me just go over some stuff.

09:20:48   10    A.   Yes, sir.

09:20:48   11    Q.   So he made the statement that he's never been to the

09:20:50   12    airport?

09:20:50   13    A.   That he wasn't coming from the airport.

09:20:54   14    Q.   And do you recall him making another statement after that

09:20:57   15    that he was going to meet -- he was at the airport and he was

09:21:00   16    going to meet a friend?

09:21:02   17    A.   What he originally told me was that he had been at the

09:21:05   18    airport earlier, earlier in the day, that morning, had picked up

09:21:11   19    Mr. Jimenez, who is a horse trainer, according to Mr. Trevino,

09:21:16   20    taking him to Remington Park.  They had just come from Remington

09:21:19   21    Park and were headed back to the horse ranch.

09:21:24   22    Q.   And was Mr. Trevino ever placed in handcuffs?

09:21:27   23    A.   No, sir.  Not once.

09:21:30   24    Q.   May I have one moment, your Honor?

09:21:31   25              THE COURT:  Yes.

| | | |
|---|---|---|
| 09:21:41 | 1 | Q.   (BY MR. GARDNER) Are you familiar with the term "canine |
| 09:21:44 | 2 | dog"? |
| 09:21:44 | 3 | A.   Yes, sir, I am. |
| 09:21:45 | 4 | Q.   And what is a canine dog? |
| 09:21:47 | 5 | A.   It is a police dog. |
| 09:21:49 | 6 | Q.   And what are the police dogs generally trained to do? |
| 09:21:54 | 7 | A.   As far as I know, sir, they're one of three things.  They're |
| 09:21:57 | 8 | a bomb-sniffing drug, a drug-sniffing dog, or an attack dog for |
| 09:22:02 | 9 | -- better word of it, I mean, it's -- that's not what they call |
| 09:22:05 | 10 | it, but that's what it is. |
| 09:22:06 | 11 | Q.   And was a canine dog out there that day? |
| 09:22:08 | 12 | A.   Yes, sir.  From our interdiction unit brought a dog over. |
| 09:22:13 | 13 | Q.   And was that dog, what they call, run around Mr. Trevino's |
| 09:22:16 | 14 | truck? |
| 09:22:17 | 15 | A.   Yes, sir.  It was. |
| 09:22:18 | 16 | Q.   Do you know if that dog conducted an alert on that truck? |
| 09:22:21 | 17 | A.   It alerted on several locations on the vehicle.  Yes, sir. |
| 09:22:23 | 18 | Q.   But, again, were you able to locate any narcotics? |
| 09:22:26 | 19 | A.   No, sir.  I was not. |
| 09:22:27 | 20 | Q.   All right.  I'll pass the witness. |
| 09:22:32 | 21 | CROSS-EXAMINATION |
| 09:22:32 | 22 | BY MS. WILLIAMS: |
| 09:22:45 | 23 | Q.   Detective Martin. |
| 09:22:46 | 24 | A.   Yes, ma'am. |
| 09:22:47 | 25 | Q.   Did I hear you correctly say that Remington Park is 50 miles |

| | | |
|---|---|---|
| 09:22:51 | 1 | from the airport? |
| 09:22:51 | 2 | A.   I'm sorry, ma'am, 15, 1-5. |
| 09:22:54 | 3 | Q.   Thank you.  My hearing. |
| 09:22:55 | 4 | A.   I'm sorry.  I've kind of got a cold or something. |
| 09:23:00 | 5 | Q.   So Mr. Trevino told you that he had picked up this man who |
| 09:23:08 | 6 | was with him who was a trainer and taking him out to Remington |
| 09:23:11 | 7 | Park? |
| 09:23:11 | 8 | A.   Yes. |
| 09:23:12 | 9 | Q.   And do you remember him telling you that he was wanting that |
| 09:23:18 | 10 | trainer to get his trainer's license?  Did you have a |
| 09:23:20 | 11 | conversation about that? |
| 09:23:21 | 12 | A.   Yes.  I had a conversation with Mr. Jimenez and Mr. Trevino |
| 09:23:25 | 13 | both about the trainer license. |
| 09:23:26 | 14 | Q.   And they both told the same story about that, did they not? |
| 09:23:30 | 15 | A.   On that part, yes, ma'am. |
| 09:23:35 | 16 | Q.   Do you remember specifically what your question was?  Was |
| 09:23:39 | 17 | it, where are you coming from, or what is your business in |
| 09:23:41 | 18 | Oklahoma City? |
| 09:23:42 | 19 | A.   Where are you coming from. |
| 09:23:44 | 20 | Q.   All right.  Do you know what the term "pretext stop" means? |
| 09:23:50 | 21 | A.   No, ma'am. |
| 09:23:51 | 22 | Q.   You've never heard that term? |
| 09:23:52 | 23 | A.   No, ma'am. |
| 09:23:59 | 24 | Q.   You work in narcotics? |
| 09:24:01 | 25 | A.   Yes, ma'am. |

| | | |
|---|---|---|
| 09:24:02 | 1 | Q.   When you want a traffic officer to stop somebody for you, do |
| 09:24:08 | 2 | you have a term for that? |
| 09:24:11 | 3 | A.   I'm not sure what you mean, ma'am. |
| 09:24:13 | 4 | Q.   I mean, every day in your job. |
| 09:24:15 | 5 | A.   Yes. |
| 09:24:16 | 6 | Q.   You want to stop somebody and you don't want to do it |
| 09:24:19 | 7 | yourself because you're not in a marked car; is that correct? |
| 09:24:21 | 8 | A.   Yes, ma'am. |
| 09:24:21 | 9 | Q.   And so, it's an everyday part of your job to have a marked |
| 09:24:26 | 10 | patrol car stop a car for you. |
| 09:24:28 | 11 | A.   No, ma'am.  Not every day, no. |
| 09:24:33 | 12 | Q.   Every week? |
| 09:24:37 | 13 | A.   Not really, ma'am.  I mean. |
| 09:24:39 | 14 | Q.   Once a month? |
| 09:24:41 | 15 | A.   Maybe once every two or three months maybe. |
| 09:24:46 | 16 | Q.   And so, on this occasion, you called a marked patrol car and |
| 09:24:51 | 17 | you said, we want to talk to this guy. |
| 09:24:54 | 18 | A.   I asked him if he could try to stop the car.  Yes, ma'am. |
| 09:24:58 | 19 | Q.   Is that where -- were those your words? |
| 09:25:02 | 20 | A.   I'm sure.  I mean, something to that effect. |
| 09:25:06 | 21 | Q.   Can I see this? |
| 09:25:07 | 22 | A.   Sure. |
| 09:25:19 | 23 | Q.   I haven't seen this, before, your Honor.  Could I have a |
| 09:25:23 | 24 | second? |
| 09:25:23 | 25 | THE COURT:  Take your time. |

| | | |
|---|---|---|
| 09:25:27 | 1 | MS. WILLIAMS:  Thank you, your Honor, I apologize. |
| 09:26:28 | 2 | Give that back to you in case you need to refresh your |
| 09:26:31 | 3 | recollection. |
| 09:26:32 | 4 | Q.   (BY MS. WILLIAMS) What was Mr. Trevino stopped for? |
| 09:26:42 | 5 | A.   Failure to keep right of center is I think what the ticket |
| 09:26:45 | 6 | said. |
| 09:26:45 | 7 | Q.   What did that mean? |
| 09:26:46 | 8 | A.   You have lines on the road and you have to stay within them. |
| 09:26:57 | 9 | Q.   Here in Texas, we have a offense called failure to maintain |
| 09:27:01 | 10 | a single lane of traffic.  Is that? |
| 09:27:04 | 11 | A.   No, ma'am.  We have city ordinances is what we write tickets |
| 09:27:07 | 12 | on.  That's a city ordinance that he pled guilty to. |
| 09:27:10 | 13 | Q.   Failure to keep front of center is what this ticket appears |
| 09:27:17 | 14 | to say. |
| 09:27:17 | 15 | A.   Right.  It's right of center. |
| 09:27:21 | 16 | Q.   Okay.  All right.  So your marked patrol car issues Mr. |
| 09:27:44 | 17 | Trevino a ticket for failure to keep? |
| 09:27:53 | 18 | A.   Right. |
| 09:27:54 | 19 | Q.   Okay.  Right of center and then, you -- I guess your traffic |
| 09:28:01 | 20 | officer stays there a little while until you can get there? |
| 09:28:04 | 21 | A.   No.  I was there.  We pulled off the interstate because it |
| 09:28:06 | 22 | was on Interstate 240 and it was busy, so we pulled off of the |
| 09:28:11 | 23 | interstate down onto the service road. |
| 09:28:13 | 24 | Q.   And how many officers were there? |
| 09:28:18 | 25 | A.   Officers and agents or just Oklahoma City or -- |

| | | |
|---|---|---|
| 09:28:21 | 1 | Q.   How many people were there? |
| 09:28:24 | 2 | A.   Six, seven, eight. |
| 09:28:25 | 3 | Q.   Does that include Mr. Trevino and his passenger? |
| 09:28:28 | 4 | A.   Oh, no, no, no.  Counting them, maybe eight, nine, ten, |
| 09:28:33 | 5 | something there. |
| 09:28:33 | 6 | Q.   So there were about eight law enforcement officers there for |
| 09:28:36 | 7 | this traffic stop of failure to keep right of center? |
| 09:28:39 | 8 | A.   Yes, ma'am. |
| 09:28:42 | 9 | Q.   So you know that this man right here, Mr. Trevino knew that |
| 09:28:48 | 10 | that couldn't possibly have been a traffic stop? |
| 09:28:52 | 11 |       MR. GARDNER:  Your Honor, we object to what Mr. Trevino |
| 09:28:54 | 12 | knew or did know. |
| 09:29:01 | 13 |       THE COURT:  I sustain the objection. |
| 09:29:03 | 14 | Q.   (BY MS. WILLIAMS) He certainly would have been well within |
| 09:29:07 | 15 | his rights to say, no, you cannot search my car.  Can I go on my |
| 09:29:11 | 16 | way? |
| 09:29:11 | 17 | A.   Correct. |
| 09:29:12 | 18 | Q.   And he didn't do that? |
| 09:29:13 | 19 | A.   No, ma'am. |
| 09:29:13 | 20 | Q.   And you put him in the back of a car. |
| 09:29:16 | 21 | A.   Yes. |
| 09:29:16 | 22 | Q.   And -- |
| 09:29:17 | 23 | A.   I didn't.  Another officer did. |
| 09:29:21 | 24 | Q.   You as law enforcement put him in the back of a car? |
| 09:29:25 | 25 | A.   Yes, ma'am. |

09:29:30   1   Q.   And closed the door?

09:29:33   2   A.   Maybe briefly.  Yes.

09:29:35   3   Q.   And you conducted -- how long were you there?

09:29:39   4   A.   I have no idea.  Maybe 15 to 20 minutes.

09:29:43   5   Q.   Are you sure about that?

09:29:45   6   A.   No, ma'am.  I'm not.

09:29:54   7   Q.   Could it have been as much as an hour?

09:30:02   8   A.   No.

09:30:04   9   Q.   And did you physically search Mr. Trevino or did he empty

09:30:13   10  his pockets voluntarily for you?

09:30:15   11  A.   I didn't.  No, ma'am.

09:30:19   12  Q.   Did anyone physically search Mr. Trevino or did he empty his

09:30:24   13  pockets?

09:30:24   14  A.   I don't know, ma'am.

09:30:36   15  Q.   In Oklahoma, are your patrol cars equipped for -- with

09:30:41   16  video?

09:30:41   17  A.   No, ma'am.  They're not.

09:30:42   18  Q.   None of them?

09:30:43   19  A.   Not Oklahoma City.  No, ma'am.

09:30:46   20  Q.   So when you make a DWI arrest, you don't have any video of

09:30:51   21  that?

09:30:51   22  A.   No, ma'am.

09:30:56   23  Q.   You did not have enough information at that point to obtain

09:31:01   24  a search warrant; is that correct?

09:31:05   25  A.   No, ma'am.

| | | |
|---|---|---|
| 09:31:10 | 1 | Q.   Did Mr. Trevino tell you why he had $5,000 in his pocket? |
| 09:31:17 | 2 | A.   Eventually, he told me that it was to buy food and take care |
| 09:31:21 | 3 | of the horses. |
| 09:31:23 | 4 | Q.   Did he tell you that he had been paid $5,000 for breeding of |
| 09:31:28 | 5 | a horse? |
| 09:31:29 | 6 | A.   Not that I recall.  No. |
| 09:31:32 | 7 | Q.   Consult your report, if you don't mind.  Does your report |
| 09:32:12 | 8 | indicate that conversation? |
| 09:32:17 | 9 | A.   It states that he was not able to provide a logical |
| 09:32:19 | 10 | explanation for having such a large amount of cash on him. |
| 09:32:23 | 11 | Q.   And whose opinion is that? |
| 09:32:26 | 12 | A.   Mine. |
| 09:32:30 | 13 | Q.   Mr. Trevino had a concealed handgun license in his wallet, |
| 09:32:34 | 14 | did he not? |
| 09:32:35 | 15 | A.   Yes, ma'am. |
| 09:32:36 | 16 | Q.   And -- but he didn't have a weapon? |
| 09:32:38 | 17 | A.   No, ma'am. |
| 09:32:40 | 18 | Q.   No drugs? |
| 09:32:42 | 19 | A.   None were found. |
| 09:32:46 | 20 | Q.   Now, when you bring a canine officer to the scene and that |
| 09:32:51 | 21 | canine alerts on the truck, you can go -- you can do -- you can |
| 09:32:55 | 22 | tear that truck apart, can't you? |
| 09:32:57 | 23 | A.   Yes, ma'am. |
| 09:32:58 | 24 | Q.   But you didn't, did you? |
| 09:33:02 | 25 | A.   I mean, I don't understand what you're asking.  We searched |

09:33:05    1    the vehicle.  Yes.

09:33:06    2    Q.   You could have taken it apart with a screwdriver and a

09:33:10    3    wrench, couldn't you?

09:33:12    4    A.   Yes, ma'am.  We could have.  But we could have disassembled

09:33:15    5    the whole vehicle, but we didn't.  No.

09:33:16    6    Q.   Thank you.  I'll offer Defendant's J-1.

09:33:21    7              MR. GARDNER:  No objection, your Honor.

09:33:22    8              THE COURT:  J-1's received.

09:33:30    9              MS. WILLIAMS:  I don't have any further questions.

09:33:48   10              MR. DEGEURIN:  No questions.

09:33:49   11              MR. WOMACK:  Your Honor, briefly, just to -- I want to

09:33:51   12    make sure it's clear about the stop.

09:33:52   13              THE COURT:  All right.

09:33:53   14                        CROSS-EXAMINATION

09:33:53   15    BY MR. WOMACK:

09:33:55   16    Q.   You are special agent, or officer, or detective?

09:33:57   17    A.   Detective, sir.

09:34:01   18    Q.   Detective Martin, when y'all did this -- when the officers

09:34:06   19    did the traffic stop, it was some time after 1:30?

09:34:10   20    A.   Yes, sir.

09:34:10   21    Q.   In the afternoon?

09:34:12   22    A.   Correct.

09:34:13   23    Q.   Now, when you stopped the vehicle, the first thing that your

09:34:18   24    officer did, the traffic officer, y'all identified Mr. Trevino

09:34:22   25    and Mr. Jimenez as being the only two people in the truck?

| | | |
|---|---|---|
| 09:34:26 | 1 | A.    Yes, sir. |
| 09:34:28 | 2 | Q.    And you're welcome to look at your notes if you need to.  We |
| 09:34:32 | 3 | have a copy of the same notes.  All the lawyers here do. |
| 09:34:35 | 4 | A.    Thank you, sir. |
| 09:34:36 | 5 | Q.    When you looked at -- well, you identified them and you said |
| 09:34:40 | 6 | that you got them out of the vehicle and put them in separate |
| 09:34:43 | 7 | cars, correct? |
| 09:34:43 | 8 | A.    Yes, sir. |
| 09:34:44 | 9 | Q.    And tell the jury, why would you do that?  Why would you |
| 09:34:47 | 10 | separate them? |
| 09:34:48 | 11 | A.    So we could verify their story to see if they were telling |
| 09:34:51 | 12 | the truth. |
| 09:34:52 | 13 | Q.    And the way you'd do that is you would ask one of them |
| 09:34:54 | 14 | something? |
| 09:34:54 | 15 | A.    Correct. |
| 09:34:55 | 16 | Q.    And the other one couldn't hear it? |
| 09:34:56 | 17 | A.    Correct. |
| 09:34:56 | 18 | Q.    Then you'd go to the other person, ask them something and |
| 09:34:59 | 19 | the first guy couldn't hear it? |
| 09:35:01 | 20 | A.    Correct. |
| 09:35:01 | 21 | Q.    And you'd compare the stories? |
| 09:35:02 | 22 | A.    Correct. |
| 09:35:03 | 23 | Q.    Okay.  So you get them out of the truck, you identify them, |
| 09:35:07 | 24 | separate them, and you get consent to search the truck? |
| 09:35:11 | 25 | A.    Yes, sir. |

| | | |
|---|---|---|
| 09:35:12 | 1 | Q.   And to search their person? |
| 09:35:14 | 2 | A.   Correct. |
| 09:35:17 | 3 | Q.   And from Mr. Jimenez, you see there were suitcases in the |
| 09:35:22 | 4 | truck and he gives you consent to search his suitcase? |
| 09:35:25 | 5 | A.   Yes, sir. |
| 09:35:25 | 6 | Q.   Okay.  So you searched the truck, you searched the |
| 09:35:30 | 7 | suitcases, and their persons, you find the $5,000 on Mr. Trevino |
| 09:35:37 | 8 | but no drugs at all? |
| 09:35:38 | 9 | A.   No, sir. |
| 09:35:39 | 10 | Q.   And you find no hidden compartments in the truck? |
| 09:35:42 | 11 | A.   No, sir. |
| 09:35:46 | 12 | Q.   And there are no drugs or nothing illegal in the suitcases? |
| 09:35:50 | 13 | A.   Correct. |
| 09:35:51 | 14 | Q.   Okay.  And then, you talked to both men? |
| 09:35:55 | 15 | A.   Yes, sir. |
| 09:35:55 | 16 | Q.   Separately? |
| 09:35:56 | 17 | A.   Yes, sir. |
| 09:35:57 | 18 | Q.   And Mr. Trevino tells you that he had picked up Mr. Jimenez |
| 09:36:03 | 19 | that -- earlier that day? |
| 09:36:04 | 20 | A.   Yes, sir. |
| 09:36:06 | 21 | Q.   That he had hired Mr. Jimenez to train horses? |
| 09:36:09 | 22 | A.   Yes, sir. |
| 09:36:10 | 23 | Q.   And had taken him to the race track to tour the facility? |
| 09:36:14 | 24 | A.   Correct. |
| 09:36:15 | 25 | Q.   And then, you talked to Mr. Jimenez and Mr. Jimenez says he |

| | | |
|---|---|---|
| 09:36:21 | 1 | had flown into Will Rogers that morning at about 11:00? |
| 09:36:25 | 2 | A.   Yes, sir. |
| 09:36:26 | 3 | Q.   He'd been picked up by Mr. Trevino? |
| 09:36:28 | 4 | A.   Correct. |
| 09:36:28 | 5 | Q.   That he'd been hired to train horses for Mr. Trevino? |
| 09:36:31 | 6 | A.   Correct. |
| 09:36:31 | 7 | Q.   That they had gone to Remington Casino Park horse-racing |
| 09:36:37 | 8 | track? |
| 09:36:37 | 9 | A.   Yes, sir. |
| 09:36:37 | 10 | Q.   And that they had toured the race track? |
| 09:36:39 | 11 | A.   Correct. |
| 09:36:41 | 12 | Q.   And that they had gone back to the airport? |
| 09:36:44 | 13 | A.   Yes, sir. |
| 09:36:45 | 14 | Q.   And he thought they were going back to pick up someone? |
| 09:36:48 | 15 | A.   Yeah.  He stated they were going to pick up a friend of Mr. |
| 09:36:51 | 16 | Trevino's. |
| 09:36:51 | 17 | Q.   Okay.  And then, that was new information you didn't have |
| 09:36:56 | 18 | yet? |
| 09:36:56 | 19 | A.   Correct. |
| 09:36:57 | 20 | Q.   So you went back to Mr. Trevino and you asked him about |
| 09:36:59 | 21 | that? |
| 09:36:59 | 22 | A.   I did. |
| 09:37:00 | 23 | Q.   And he told you that he did not intend to pick up a friend, |
| 09:37:04 | 24 | but he met a friend at the airport? |
| 09:37:06 | 25 | A.   No.  He originally told me he had not been at the airport. |

| | | |
|---|---|---|
| 09:37:09 | 1 | Q.   Look at your report.  When you went back to talk to Mr. |
| 09:37:13 | 2 | Trevino, he said, well, yes, I did go to the airport and I met an |
| 09:37:16 | 3 | old friend there. |
| 09:37:16 | 4 | A.   I talked to Mr. Jimenez first. |
| 09:37:18 | 5 | Q.   Right.  And look on page 6 of your report, the very first |
| 09:37:23 | 6 | full paragraph, Trevino said he saw one of his old friends while |
| 09:37:29 | 7 | he was at the airport? |
| 09:37:30 | 8 | A.   Page -- I don't have that page, sir. |
| 09:37:35 | 9 | Q.   Does it have a page 6 at the top like mine does? |
| 09:37:38 | 10 | A.   No, sir, it does not. |
| 09:37:39 | 11 | Q.   Yours is a narrative? |
| 09:37:45 | 12 | A.   Right here, sir. |
| 09:37:46 | 13 | Q.   Okay.  The third from the last paragraph on your report |
| 09:37:51 | 14 | appears to be word-for-word the same as mine, doesn't it? |
| 09:37:54 | 15 | A.   Yes, it is. |
| 09:37:55 | 16 | Q.   Okay.  So -- |
| 09:37:57 | 17 | A.   I'm sorry, sir.  I got kind of confused on. |
| 09:37:59 | 18 | Q.   I understand.  That was my fault.  I thought you had the |
| 09:38:02 | 19 | same exact report.  You have the same narrative, but you don't |
| 09:38:04 | 20 | have page numbers like mine does? |
| 09:38:06 | 21 | A.   Okay.  I mean, Mr. Trevino did later say that he had been at |
| 09:38:09 | 22 | the airport to meet a friend. |
| 09:38:11 | 23 | Q.   Immediately? |
| 09:38:12 | 24 | A.   But originally he said that he had not been at the airport. |
| 09:38:17 | 25 | He was not coming from the airport. |

09:38:18  1   Q.   Right.  He told you he was coming back from the track?

09:38:20  2   A.   Yes, sir.

09:38:20  3   Q.   Okay.  But when you asked him about meeting someone with

09:38:24  4   Jimenez at the airport, he said, well, yeah, I met someone, a

09:38:27  5   friend at the airport.  I didn't pick him up, but I met somebody

09:38:30  6   at the airport and Jimenez was with me?

09:38:33  7   A.   Yes, sir.

09:38:33  8   Q.   That's what he told you?

09:38:34  9   A.   Yes, sir.

09:38:35  10  Q.   Okay.  Now, while you were doing this, you have some

09:38:41  11  Department of Homeland Security investigators that used to be

09:38:45  12  called ICE?

09:38:45  13  A.   Yes, sir.

09:38:45  14  Q.   Now it's called Department of Homeland Security

09:38:47  15  Investigations?

09:38:48  16  A.   Yes, sir.  Homeland Security Investigation.

09:38:50  17  Q.   Some of them were present, were they?

09:38:52  18  A.   Yes, sir.

09:38:53  19  Q.   But you didn't identify any of them to Mr. Jimenez or Mr.

09:38:58  20  Trevino, did you?

09:38:58  21  A.   No.  I did not.

09:39:00  22  Q.   And they didn't identify themselves either?

09:39:02  23  A.   No, sir.  As far as I know, they did not.

09:39:05  24  Q.   Well, you put in the report the agents didn't identify

09:39:08  25  themselves?

| | | |
|---|---|---|
| 09:39:08 | 1 | A.   As far as I know, they did not identify their self. |
| 09:39:10 | 2 | Q.   Thank you.  No further questions. |
| 09:39:12 | 3 | A.   You're welcome. |
| 09:39:14 | 4 | MR. ESPER:  I have none, your Honor. |
| 09:39:15 | 5 | MR. MAYR:  None. |
| 09:39:16 | 6 | RE-DIRECT EXAMINATION |
| 09:39:16 | 7 | BY MR. GARDNER: |
| 09:39:20 | 8 | Q.   Agent Martin, I want to break down what you termed these |
| 09:39:23 | 9 | inconsistent statements. |
| 09:39:24 | 10 | A.   Yes, sir. |
| 09:39:24 | 11 | Q.   And based on what Mr. Womack asked you what Mr. Jimenez |
| 09:39:29 | 12 | said, so what did Mr. Jimenez say about the trip to the airport? |
| 09:39:34 | 13 | A.   His story was that he had been picked up that morning by Mr. |
| 09:39:38 | 14 | Trevino at the airport.  He had come to Oklahoma to work for Mr. |
| 09:39:44 | 15 | Trevino as a horse trainer.  They went to Remington Park, toured |
| 09:39:49 | 16 | the park, toured the race track, I'm sorry, went back to the |
| 09:39:53 | 17 | airport to meet a friend.  Then Mr. Jimenez said that he did not |
| 09:39:57 | 18 | meet the friend.  He didn't meet the friend of Mr. Trevino.  They |
| 09:40:01 | 19 | stayed at the airport a short time, then they left and were |
| 09:40:04 | 20 | headed back to the horse ranch. |
| 09:40:05 | 21 | Q.   And did he tell you whether or not Mr. Trevino told him he |
| 09:40:10 | 22 | met a friend? |
| 09:40:10 | 23 | A.   That's what he said is that they were going to meet a |
| 09:40:13 | 24 | friend. |
| 09:40:13 | 25 | Q.   All right.  The statement was he did not, in fact, meet a |

09:40:16  1   friend?  I'm trying to confuse you.  I'm trying to confuse

09:40:23  2   myself.

09:40:23  3          Now, did Mr. Jimenez say whether or not they, in fact,

09:40:28  4   met that person?  Why don't I do what Mr. Womack did.  I'm

09:40:42  5   referring to this line right here at the end.  Right here.

09:40:49  6   A.   Yes.  Okay.  Mr. Jimenez said that Mr. Trevino told him that

09:40:53  7   his friend did not make it to the airport.

09:40:55  8   Q.   Have you reviewed the video of the parking lot airport?

09:41:00  9   A.   No, I have not, sir.

09:41:04  10  Q.   Is there anything wrong with stopping an individual and

09:41:07  11  identifying them?

09:41:09  12  A.   No.

09:41:11  13  Q.   Perfectly legal within the law, correct?

09:41:13  14  A.   Yes, sir.

09:41:13  15  Q.   All right.  Now, Ms. Williams asked you when we were talking

09:41:18  16  about the money, Ms. Williams asked you who made the statement,

09:41:24  17  the money was -- the story regarding the money was inconsistent,

09:41:29  18  and she asked you whose opinion that was and you said it was

09:41:31  19  yours?

09:41:32  20  A.   Yes, sir.

09:41:32  21  Q.   Why did you feel the statement was inconsistent with the

09:41:36  22  money he had in his possession?

09:41:40  23  A.   He just told different stories and he was just evasive

09:41:44  24  during -- while I was talking to him, the whole time.

09:41:47  25  Q.   Define evasive for us.

| | | |
|---|---|---|
| 09:41:50 | 1 | A.   Not telling the truth. |
| 09:41:54 | 2 | Q.   I'll pass the witness, your Honor. |
| 09:41:56 | 3 | RE-CROSS EXAMINATION |
| 09:41:56 | 4 | BY MS. WILLIAMS: |
| 09:42:00 | 5 | Q.   Did you keep the money? |
| 09:42:01 | 6 | A.   No, ma'am. |
| 09:42:02 | 7 | Q.   Why not? |
| 09:42:04 | 8 | A.   Wasn't enough probable cause to keep the money, ma'am. |
| 09:42:08 | 9 | Q.   No further questions. |
| 09:42:10 | 10 | THE COURT:  Any further questions?  May this witness be |
| 09:42:13 | 11 | excused? |
| 09:42:14 | 12 | MS. WILLIAMS:  No objection. |
| 09:42:15 | 13 | THE COURT:  You may be excused, sir. |
| 09:42:16 | 14 | THE WITNESS:  Thank you, sir. |
| 09:42:31 | 15 | MR. GARDNER:  Your Honor, the government would call |
| 09:42:38 | 16 | Special Agent Jonathan Spaeth. |
| 09:43:03 | 17 | (Witness sworn.) |
| 09:43:16 | 18 | THE COURT:  Why don't you state your full name, please, |
| 09:43:25 | 19 | sir, and spell your last. |
| 09:43:25 | 20 | THE WITNESS:  Yes, sir.  My name is Jonathan Spaeth. |
| 09:43:29 | 21 | Spelling of my last name is S-P-A-E-T-H. |
| 09:43:35 | 22 | THE COURT:  Your witness. |
| 09:43:36 | 23 | MR. GARDNER:  Thank you, your Honor. |
| 09:43:36 | 24 | JONATHAN SPAETH, called by the Government, duly sworn. |
| 09:43:38 | 25 | |

| | | |
|---|---|---|
| 09:43:38 | 1 | <u>DIRECT EXAMINATION</u> |
| 09:43:38 | 2 | BY MR. GARDNER: |
| 09:43:40 | 3 | Q.   Special Agent Spaeth, you and I met before.  Could you |
| 09:43:43 | 4 | please introduce yourself to the jury, and tell them who you are, |
| 09:43:46 | 5 | what you do, and how long you've been doing it? |
| 09:43:48 | 6 | A.   Yes, sir.  Like I said, my name is Jonathan Spaeth.  I'm an |
| 09:43:53 | 7 | FBI agent, and I have been so for the past four years.  Prior to |
| 09:43:55 | 8 | that, I was a police officer and detective for ten years.  During |
| 09:43:59 | 9 | my time as a detective, narcotics investigator for six and |
| 09:44:03 | 10 | assigned to the DEA Drug Task Force for two years. |
| 09:44:07 | 11 | Q.   And where are you currently stationed, sir? |
| 09:44:09 | 12 | A.   In Laredo, Texas. |
| 09:44:10 | 13 | Q.   And are you involved in this investigation? |
| 09:44:15 | 14 | A.   Yes, I am. |
| 09:44:16 | 15 | Q.   And what were you tasked with back in 2011? |
| 09:44:19 | 16 | A.   I was tasked with surveillance of the Ruidoso Downs race on |
| 09:44:25 | 17 | September 5th in the auction on September 3rd and 4th. |
| 09:44:33 | 18 | MR. ESPER:  Could we have the year, your Honor? |
| 09:44:35 | 19 | Q.   (BY MR. GARDNER) The year? |
| 09:44:36 | 20 | A.   Of 2011. |
| 09:44:37 | 21 | Q.   I'd like to start with the auction first or, better yet, why |
| 09:44:43 | 22 | as a general principle does law enforcement conduct surveillance? |
| 09:44:46 | 23 | A.   Surveillance is an investigative tool utilized by the |
| 09:44:50 | 24 | investigator to corroborate evidence gathered from other means, |
| 09:44:53 | 25 | such as subpoenas, search warrants, confidential sources, |

09:44:58  1  confidential informants, and they use that to develop and to

09:45:04  2  corroborate the information provided.  Also, to identify

09:45:07  3  associates and patterns of activity by subjects.

09:45:10  4  Q.   And you know Special Agent Scott Lawson sitting here at

09:45:13  5  counsel table?

09:45:14  6  A.   Yes, I do.

09:45:15  7  Q.   Is he part of your same squad in Laredo?

09:45:17  8  A.   He is on a separate squad.

09:45:18  9  Q.   Same office?

09:45:19  10  A.   Same office.  Yes, sir.

09:45:20  11  Q.   And did he provide you information before you went out to

09:45:24  12  the auction in Ruidoso?

09:45:26  13  A.   Yes, he did.

09:45:26  14  Q.   And what information were you looking to gather out of that

09:45:31  15  auction and race?

09:45:33  16  A.   Special Agent Lawson requested that Task Force Ernesto

09:45:38  17  Elizondo and I photograph and surveil Carlos Nayen and Jose

09:45:44  18  Trevino and associates of Tremor Enterprises, LLC.

09:45:48  19  Q.   So let's start with the first day of the auction.  What day

09:45:51  20  was that again, sir?

09:45:52  21  A.   It was September 3rd, 2011.

09:45:54  22  Q.   When did you arrive?  What time of day did you arrive at the

09:45:57  23  auction?

09:45:58  24  A.   Right at the evening at approximately 6:30 p.m.

09:46:01  25  Q.   And was the auction ongoing at that point?

09:46:03   1   A.   Yes.  The auction had been ongoing for approximately a half

09:46:08   2   an hour.

09:46:08   3   Q.   And were you able to identify an individual known as Carlos

09:46:12   4   Nayen?

09:46:13   5   A.   Yes, I was.

09:46:14   6   Q.   Could you please bring up his photo?  And, sir, I'm showing

09:46:27   7   you Government's Exhibit 335E.  Is that the individual you

09:46:30   8   identified as Carlos Nayen?

09:46:32   9   A.   Yes, sir.

09:46:33   10   Q.   Was that the individual present at the auction on September

09:46:36   11   3rd?

09:46:37   12   A.   Yes, sir.

09:46:37   13   Q.   And what activities did you observe Mr. Nayen doing?

09:46:43   14   A.   When we arrived at the auction, he was to arrive at the

09:46:48   15   auctioneer block in the outdoor arena, and he had several

09:46:53   16   associates with him.  And I specifically observed him bid,

09:46:56   17   actively bid to single individuals in the crowd to bid on two

09:47:00   18   particular horses.

09:47:02   19   Q.   And when you were at the auction, how were the horses

09:47:05   20   identified?

09:47:05   21   A.   They're identified by number.

09:47:07   22   Q.   And where is that number placed?

09:47:09   23   A.   The number is placed in a -- it was in a catalog of

09:47:13   24   approximately 350 horses.

09:47:16   25   Q.   So you could look through the catalog, find out what

09:47:19  1   horse --

09:47:19  2   A.   Yes.

09:47:19  3   Q.   -- is being sold?

09:47:20  4   A.   Yes.

09:47:21  5   Q.   And how was the actual horse identified in the ring?

09:47:25  6   A.   It is -- the horse is brought out by what I believe was a

09:47:29  7   trainer and brought around.  They identify by number and then, by

09:47:33  8   its name.

09:47:34  9   Q.   Okay.  And that number's on the hip of the horse, correct?

09:47:37  10  A.   Yes, sir.

09:47:38  11  Q.   If you will, you may want to step back a little bit from

09:47:40  12  that microphone.

09:47:42  13       So was Mr. Nayen himself bidding on horses?

09:47:47  14  A.   What I observed on a portion of 195 and 197, that he was --

09:47:53  15  he would be text-messaging, and while the bidding process would

09:47:55  16  be going on he, would be motioning through a nod to individuals

09:48:00  17  across the arena on the -- around the fence of the arena, and

09:48:04  18  they would be the ones to actually bid.

09:48:06  19  Q.   Okay.  That was my question.  Following that nod, the person

09:48:09  20  that you observed him nodding to would then make a bid on a

09:48:12  21  horse?

09:48:12  22  A.   Yes.

09:48:12  23  Q.   Showing you what's been marked as Government's Exhibit 379A

09:48:17  24  and 379B.  Do you recognize those photos, sir?

09:48:21  25  A.   Yes, I do.

| | | |
|---|---|---|
| 09:48:22 | 1 | Q.   All right.  And did you, in fact, take those photos? |
| 09:48:25 | 2 | A.   Yes, I did. |
| 09:48:26 | 3 | Q.   Your Honor, offer Government's Exhibit 379A and 379B. |
| 09:48:55 | 4 | MR. ESPER:  I have no objection. |
| 09:48:56 | 5 | THE COURT:  All right.  Hearing no objection, 379A and |
| 09:49:00 | 6 | B are admitted. |
| 09:49:01 | 7 | Q.   (BY MR. GARDNER) Show you, Agent Spaeth, I'm putting on the |
| 09:49:08 | 8 | screen Government's Exhibit 379A.  This number here, 163, the hip |
| 09:49:14 | 9 | number you referred to to identify each horse? |
| 09:49:16 | 10 | A.   Yes, sir. |
| 09:49:17 | 11 | Q.   Okay.  That's just an example of that particular horse had |
| 09:49:20 | 12 | his own number, correct? |
| 09:49:21 | 13 | A.   Yes, sir. |
| 09:49:21 | 14 | Q.   Okay.  And who is this individual here? |
| 09:49:23 | 15 | A.   That was Carlos Nayen on September 3rd, 2011. |
| 09:49:27 | 16 | Q.   And were you able to identify or later identify this |
| 09:49:31 | 17 | individual based on the information you now know? |
| 09:49:33 | 18 | A.   Yes.  It was the jockey Esgar Ramirez. |
| 09:49:36 | 19 | Q.   And were you able to identify this individual on the right? |
| 09:49:39 | 20 | A.   That was his brother Raul Ramirez. |
| 09:49:43 | 21 | Q.   So what activities were they conducting with Mr. Nayen? |
| 09:49:49 | 22 | A.   They stood around him while Mr. Nayen was taking photographs |
| 09:49:56 | 23 | with his phone of a particular horse, specifically, 197, and they |
| 09:50:01 | 24 | were standing -- just conversing with him while he was |
| 09:50:06 | 25 | text-messaging and nodding to other individuals in the crowd. |

| | | |
|---|---|---|
| 09:50:08 | 1 | Q.   So it would appear that they were associates? |
| 09:50:11 | 2 | A.   Yes, sir. |
| 09:50:11 | 3 | Q.   And when you said Mr. Nayen would take a picture of a horse, |
| 09:50:14 | 4 | did you also observe him take a picture of the -- I'll call it |
| 09:50:18 | 5 | the board that shows the hip number and the final price? |
| 09:50:22 | 6 | A.   Yes, sir.  I observed that the next night on September 4th. |
| 09:50:27 | 7 | Q.   With respect to the pictures of the horses, we'll stick on |
| 09:50:31 | 8 | that since we're on the night of September 3rd.  After he would |
| 09:50:34 | 9 | take a picture of a horse, what would he do then? |
| 09:50:36 | 10 | A.   He would then put his head down and appeared he was in a |
| 09:50:39 | 11 | manner consistent with sending a text message or an e-mail from a |
| 09:50:43 | 12 | phone. |
| 09:50:43 | 13 | Q.   And you said hip No. 197, do you recall the amounts that |
| 09:50:48 | 14 | that horse went for? |
| 09:50:49 | 15 | A.   Yes, I do. |
| 09:50:50 | 16 | Q.   What was that, sir? |
| 09:50:51 | 17 | A.   $310,000. |
| 09:50:53 | 18 | Q.   Were you able to observe that evening whether he bid on any |
| 09:50:56 | 19 | other horses? |
| 09:50:58 | 20 | A.   Yes. |
| 09:50:59 | 21 | Q.   Do you recall the hip number there? |
| 09:51:01 | 22 | A.   195 when -- and during the bidding of that horse, it was, |
| 09:51:06 | 23 | again, a signal to the crowd, and in between signalling, he would |
| 09:51:12 | 24 | send text messages.  It would appear to me text messages. |
| 09:51:14 | 25 | Q.   Okay.  Do you recall the final purchase price on that horse? |

09:51:16   1    A.   No.  I don't.

09:51:17   2    Q.   Do you recall if they, in fact, won that auction on that

09:51:21   3    particular horse or not?

09:51:22   4    A.   I do not recall.

09:51:24   5    Q.   And was there another horse they bid on that night?

09:51:27   6    A.   They took pictures of 199, however, I do not recall if they

09:51:32   7    ended up purchasing that horse.

09:51:34   8    Q.   So let's go ahead and move to Sunday, which would be

09:51:38   9    September 4th, right?

09:51:40  10    A.   Yes, sir.

09:51:40  11    Q.   And was the auction ongoing on Saturday and Sunday?

09:51:44  12    A.   Yes.  It was a two-night affair.

09:51:48  13    Q.   Now, I jumped you a little bit on Saturday about the auction

09:51:52  14    board, and you said you observed that activity on Sunday.

09:51:56  15    A.   Yes, sir.

09:51:56  16    Q.   Okay.  Could you explain to the jury, please?

09:51:59  17    A.   Well, they actively bid on three horses that night.  And

09:52:03  18    when they were bidding at approximately 6:30, they began bidding

09:52:07  19    on a horse registered 315 in the Ruidoso Downs book A Dash of

09:52:14  20    Sweet Heat and was sold for $650,000.  And following the sale

09:52:17  21    price or following the sale of that horse, they -- I observed

09:52:22  22    Nayen in a manner consistent with taking a photo, take a photo of

09:52:25  23    the final purchase price, which was displayed on their board.

09:52:31  24           THE COURT:  What was name of the horse?

09:52:33  25           THE WITNESS:  A Dash of Sweet Heat.

| | | |
|---|---|---|
| 09:52:37 | 1 | MR. GARDNER:  A Dash Of Sweet Heat, your Honor. |
| 09:52:42 | 2 | THE COURT:  And the sales price? |
| 09:52:44 | 3 | THE WITNESS:  Was $650,000. |
| 09:52:46 | 4 | THE COURT:  All right.  Pardon the interruption. |
| 09:52:48 | 5 | MR. GARDNER:  Thank you, your Honor. |
| 09:52:49 | 6 | Q.   (BY MR. GARDNER) And following his taking what in your |
| 09:52:53 | 7 | testimony was a manner consistent with taking a picture, what did |
| 09:52:56 | 8 | he do then? |
| 09:52:57 | 9 | A.   He began, it appeared to be, sending text messages, taking |
| 09:53:02 | 10 | notes or sending an e-mail following those photographs. |
| 09:53:05 | 11 | Q.   And later that night, did you receive information that Mr. |
| 09:53:11 | 12 | Jose Trevino might be present at that auction? |
| 09:53:13 | 13 | A.   Yes, sir. |
| 09:53:14 | 14 | Q.   And were you provided with a description of Jose Trevino |
| 09:53:18 | 15 | prior to going to that auction? |
| 09:53:20 | 16 | A.   Yes, I was. |
| 09:53:21 | 17 | Q.   And did you -- were you able to identify anyone known as |
| 09:53:26 | 18 | Jose Trevino that night? |
| 09:53:27 | 19 | A.   At that time, no. |
| 09:53:28 | 20 | Q.   Now, you and I had a discussion and you talked about |
| 09:53:30 | 21 | conducting surveillance on Mr. Nayen and following him around the |
| 09:53:34 | 22 | auction facility.  Do you recall that information? |
| 09:53:37 | 23 | A.   Yes, I do. |
| 09:53:38 | 24 | Q.   Could you explain to the jury what happened when you |
| 09:53:41 | 25 | followed Mr. Nayen from one part of the auction arena to the |

09:53:45 1    other?

09:53:46 2    A.   Well, after the purchase of the $650,000 horse, I observed

09:53:51 3    Mr. Nayen and he began to move around the crowd.  And then, I

09:53:56 4    observed him enter an indoor arena and he was coming -- he was

09:54:00 5    going between the outdoor arena and the indoor arena, and

09:54:04 6    approximately 7:45 between 7:45 and 8:00, a task force officer

09:54:09 7    entered the outdoor arena -- or the indoor arena, correction.  As

09:54:13 8    we walked in there to our immediate right, we observed Mr. Nayen

09:54:17 9    and another individual, which I wasn't able to identify, sitting

09:54:21 10   there together having a discussion.  And at that point, we left

09:54:25 11   the indoor arena.  We weren't able to photograph them inside

09:54:28 12   there.

09:54:30 13   Q.   And when you left that indoor arena, did you believe you

09:54:35 14   were being followed?

09:54:36 15   A.   Yes, I did.

09:54:37 16   Q.   Okay.  And could you explain that to the jury?

09:54:40 17   A.   After we left the indoor arena, we went into an open area,

09:54:44 18   which is like a shop area, and we noticed an individual,

09:54:51 19   approximately six-two and bald head, Hispanic male, he began to

09:54:55 20   follow us through the shop area.  We were going through the shop

09:54:58 21   area into an open cafeteria.  At that point, I decided to duck in

09:55:04 22   behind like a soda machine or in a little hallway to see if -- to

09:55:09 23   see what this -- to observe the individual, and he stopped and he

09:55:13 24   was looking around inside that cafeteria.  And so, I reappeared

09:55:17 25   into his vision and I walked out to the outdoor arena.  When I

| | | |
|---|---|---|
| 09:55:21 | 1 | walked to the outdoor arena, he followed us out there, stood |
| 09:55:24 | 2 | beside -- approximately about 20 feet from myself and the other |
| 09:55:28 | 3 | task force officer.  At that point, we decided that it was in our |
| 09:55:32 | 4 | best interest to terminate our surveillance. |
| 09:55:34 | 5 | Q.   And now, I'd like to move to the next day.  That's the day |
| 09:55:37 | 6 | of the race? |
| 09:55:37 | 7 | A.   Yes, sir. |
| 09:55:38 | 8 | Q.   Okay.  And what race was that? |
| 09:55:40 | 9 | A.   It was the All American at Ruidoso Downs 2011 Futurity race. |
| 09:55:48 | 10 | Q.   All right.  And was the purse on that $2 million? |
| 09:55:51 | 11 | A.   Yes, sir. |
| 09:55:53 | 12 | Q.   And did you look through the race program? |
| 09:55:54 | 13 | A.   Yes, I did. |
| 09:55:55 | 14 | Q.   And were you able to determine a horse by the name of Big -- |
| 09:56:01 | 15 | MR. DEGEURIN:  Excuse me.  Pardon me.  May we approach |
| 09:56:04 | 16 | just a moment? |
| 09:56:18 | 17 | (At the bench, on the record.) |
| 09:56:20 | 18 | MR. DEGEURIN:  I've been notified that the -- I didn't |
| 09:56:26 | 19 | want to say it out loud that the translator is not translating |
| 09:56:32 | 20 | everything that's being said.  That's not -- |
| 09:56:38 | 21 | MR. SANCHEZ:  Going too slow so that our client's not |
| 09:56:39 | 22 | catching everything that's translating.  It's moving on to the |
| 09:56:41 | 23 | next on.  I think it's -- |
| 09:56:45 | 24 | MR. GARDNER:  Slow down a little bit. |
| 09:56:46 | 25 | MR. SANCHEZ:  I don't know whatever the solution is. |

| | | |
|---|---|---|
| 09:56:48 | 1 | MR. DEGEURIN:  Is it just the speed? |
| 09:56:53 | 2 | MR. PARRAS:  Speed is what he said.  He said that it |
| 09:56:53 | 3 | was going too -- translation was going too --  that was verified |
| 09:56:54 | 4 | by the lawyer that we have from Mexico. |
| 09:56:58 | 5 | THE COURT:  Members of the jury, I'm going to give you |
| 09:56:59 | 6 | your morning break.  Remember the instructions.  You'll have |
| 09:57:04 | 7 | plenty of time to use the facilities.  Try to be back and ready |
| 09:57:08 | 8 | in 15 minutes. |
| 09:57:38 | 9 | (Jury not present.) |
| 09:57:38 | 10 | THE COURT:  We're going to break, also, but I just want |
| 09:58:14 | 11 | you to know that I've checked with the head interpreter and he |
| 09:58:17 | 12 | says that everything is okay.  There's some -- a little slowness. |
| 09:58:23 | 13 | So I'm going to ask the lawyers to slow down just a little bit on |
| 09:58:27 | 14 | the questioning. |
| 09:58:29 | 15 | MR. GARDNER:  Yes, sir. |
| 09:58:30 | 16 | THE COURT:  But he indicates that everything else |
| 09:58:32 | 17 | should be correct.  All right.  Fifteen minutes. |
| 10:15:44 | 18 | (Recess.) |
| 10:17:26 | 19 | (Jury present.) |
| 10:17:29 | 20 | THE COURT:  Mr. Spaeth, you understand you're still |
| 10:17:32 | 21 | under oath? |
| 10:17:32 | 22 | THE WITNESS:  Yes, sir. |
| 10:17:32 | 23 | THE COURT:  All right.  You may proceed. |
| 10:17:35 | 24 | Q.   (BY MR. GARDNER) Special Agent Spaeth, I'm going to slow it |
| 10:17:42 | 25 | down a little bit to make sure the interpreters are able to |

| | | |
|---|---|---|
| 10:17:46 | 1 | translate to the defendants. |
| 10:17:50 | 2 | A.   Yes, sir. |
| 10:17:50 | 3 | Q.   If you could slow down your answer a little bit, too, that |
| 10:17:54 | 4 | way everyone in the courtroom could hear. |
| 10:17:56 | 5 | A.   Yes, sir. |
| 10:17:57 | 6 | Q.   All right.  I think we left off at you terminating your |
| 10:18:04 | 7 | surveillance the night of September 4th, correct? |
| 10:18:07 | 8 | A.   Yes, sir. |
| 10:18:08 | 9 | Q.   All right.  Did you -- actually, we got to Sunday.  You |
| 10:18:14 | 10 | attended the auction or the race itself, the All American |
| 10:18:17 | 11 | Futurity in 2011? |
| 10:18:19 | 12 | A.   Yes.  On September 5th. |
| 10:18:23 | 13 | Q.   Did you note a horse in that race of significance? |
| 10:18:27 | 14 | A.   Yes.  When I arrived, I obtained a program and reviewed it, |
| 10:18:32 | 15 | and in the program, I noticed Big Daddy Cartel entered into the |
| 10:18:37 | 16 | -- I believe it was the tenth race of the day for a purse of $2 |
| 10:18:42 | 17 | million, and the owner, the listed owner of that horse was Tremor |
| 10:18:47 | 18 | Enterprises, LLC. |
| 10:18:47 | 19 | Q.   And were you able to conduct surveillance that day? |
| 10:18:51 | 20 | A.   Yes. |
| 10:18:53 | 21 | Q.   Did you have difficulty conducting surveillance that day? |
| 10:18:56 | 22 | A.   Yes, I did. |
| 10:18:56 | 23 | Q.   And why was that? |
| 10:18:58 | 24 | A.   Due to the large crowd and our limited access to the owner's |
| 10:19:05 | 25 | area, we were only able to photograph the race itself.  And two |

10:19:08   1   individuals carrying a life-size cardboard cutout of the horse

10:19:13   2   and its jockey.

10:19:15   3   Q.   And when you say the horse's jockey, do you recall the name

10:19:18   4   of the jockey for Big Daddy Cartel?

10:19:21   5   A.   Yes, listed in the program was Esgar Ramirez.

10:19:23   6   Q.   And, again, I'm referring you to Government's Exhibit 379B.

10:19:30   7   Little dark on the screen, but is that the Esgar Ramirez listed

10:19:33   8   as the jockey?

10:19:34   9   A.   Yes, sir.

10:19:34   10   Q.   And you may have mentioned it, but who was the owner listed

10:19:39   11   in the race program for Big Daddy Cartel?

10:19:43   12   A.   The listed owner was Tremor Enterprises, LLC.

10:19:48   13           THE COURT:   When you say Tremor, would you spell it?

10:19:51   14           THE WITNESS:   T-R-E-M-O-R.

10:19:55   15   Q.   (BY MR. GARDNER) And just tell the rest of the story.   What

10:19:59   16   happened with the race?

10:20:02   17   A.   During that race, Big Daddy Cartel was disqualified for

10:20:07   18   interference out of the gate.

10:20:11   19   Q.   And was there anything else of significance that occurred

10:20:13   20   after that?

10:20:16   21   A.   Not that day.   No.

10:20:17   22   Q.   Were you able to identify either Mr. Nayen or Mr. Trevino

10:20:21   23   during the course of the race day?

10:20:23   24   A.   No, sir.

10:20:25   25   Q.   And just so we're clear, this race occurred in 2011,

| | | |
|---|---|---|
| 10:20:29 | 1 | correct? |
| 10:20:29 | 2 | A.   Labor Day 2011. |
| 10:20:33 | 3 | Q.   And so, this was not the race where Mr. Piloto won.  That |
| 10:20:37 | 4 | was 2010, correct? |
| 10:20:38 | 5 | A.   Yes.  2010 was the race. |
| 10:20:41 | 6 | Q.   May I have one moment, your Honor?  Your Honor, I have |
| 10:20:47 | 7 | nothing further. |
| 10:20:50 | 8 | MS. WILLIAMS:  Just a couple of questions your Honor. |
| 10:20:52 | 9 | CROSS-EXAMINATION |
| 10:20:52 | 10 | BY MS. WILLIAMS: |
| 10:21:00 | 11 | Q.   Agent Spaeth, is it Spaeth? |
| 10:21:01 | 12 | A.   Yes, ma'am. |
| 10:21:03 | 13 | Q.   Had you ever been to a horse auction before? |
| 10:21:06 | 14 | A.   No, ma'am. |
| 10:21:07 | 15 | Q.   So you really have no idea whether what you saw was usual or |
| 10:21:10 | 16 | unusual? |
| 10:21:12 | 17 | A.   With regards to what? |
| 10:21:14 | 18 | Q.   With regard to how people act at a horse auction. |
| 10:21:19 | 19 | A.   Again, what specific activity? |
| 10:21:21 | 20 | Q.   Well, the specific activity that you've described to the |
| 10:21:24 | 21 | jury.  You have no idea whether that's normal activity or |
| 10:21:27 | 22 | abnormal activity. |
| 10:21:28 | 23 | A.   I just testified to what I observed that day with Mr. Nayen. |
| 10:21:32 | 24 | Q.   I understand.  And now what I'm asking you is, since you had |
| 10:21:35 | 25 | never been to a horse auction before, you have no idea whether |

10:21:37   1   that activity that you just described is normal or abnormal.

10:21:43   2   A.   I have no basis.   I could only testify to the activities I

10:21:46   3   observed that day.

10:21:47   4   Q.   And when people -- when Mr. Nayen won the bid or won the

10:21:57   5   auction of a horse, he wasn't the only person bidding; is that

10:22:01   6   correct?

10:22:01   7   A.   No.

10:22:03   8   Q.   That's not correct or that is correct?

10:22:04   9   A.   Well, that's correct.   There was other people bidding.

10:22:07  10   Q.   Other people were also bidding?

10:22:08  11   A.   Yes, ma'am.

10:22:08  12   Q.   And increments of the bid were sort of up to the auctioneer?

10:22:15  13   A.   Yes, ma'am.

10:22:16  14   Q.   And so, I don't know what the increments were, but if

10:22:22  15   somebody bid $275,000 and somebody bid $285,000, and so on and so

10:22:29  16   on, until someone stopped, is that the way an auction worked?

10:22:33  17   A.   Yes, ma'am.

10:22:33  18   Q.   And at no time did anybody that you saw just stand up and

10:22:39  19   say, I'll pay XYZ for this horse?

10:22:44  20   A.   I never observed that activity.

10:22:46  21   Q.   And the next day at the race, I guess, third day.

10:22:53  22   A.   Yes.   September 5th.

10:22:55  23   Q.   Mr. Gardner asked you, was there -- I can't remember exactly

10:23:02  24   what the question was, but was there a horse of significance or

10:23:05  25   was there a horse that you were paying attention to?

| | | |
|---|---|---|
| 10:23:07 | 1 | A.   Yes, ma'am. |
| 10:23:08 | 2 | Q.   And my question is, were you paying attention to it because |
| 10:23:12 | 3 | its name was Cartel, or were you paying attention to it because |
| 10:23:15 | 4 | it was owned by Jose Trevino? |
| 10:23:19 | 5 | A.   I was paying attention to it based on information that I |
| 10:23:22 | 6 | received from Special Agent Scott Lawson that the horse that was |
| 10:23:26 | 7 | going to be entered was Big Daddy Cartel. |
| 10:23:27 | 8 | Q.   So you already knew the name of the horse? |
| 10:23:31 | 9 | A.   Yes, ma'am. |
| 10:23:31 | 10 | Q.   And as you testified, that horse did not win? |
| 10:23:33 | 11 | A.   No.  It did not. |
| 10:23:34 | 12 | Q.   Nothing further. |
| 10:23:38 | 13 | MR. DEGEURIN:  No, your Honor. |
| 10:23:39 | 14 | MR. WOMACK:  Yes, your Honor. |
| 10:23:40 | 15 | CROSS-EXAMINATION |
| 10:23:40 | 16 | BY MR. WOMACK: |
| 10:23:41 | 17 | Q.   Special Agent Spaeth, what agency are you with again? |
| 10:23:43 | 18 | A.   FBI. |
| 10:23:44 | 19 | Q.   FBI.  Okay.  Now, had you been to a horse auction before |
| 10:23:58 | 20 | this auction in 2011? |
| 10:23:59 | 21 | A.   No, sir. |
| 10:24:02 | 22 | Q.   Had you talked to other agents or other people about what to |
| 10:24:07 | 23 | expect at a big-time horse auction? |
| 10:24:12 | 24 | A.   No, sir. |
| 10:24:13 | 25 | Q.   Okay.  Did you know that the Ruidoso auction is like one of |

| | | |
|---|---|---|
| 10:24:20 | 1 | the big horse auctions? |
| 10:24:21 | 2 | A.   I learned prior to my assignment to this detail. |
| 10:24:25 | 3 | Q.   Okay.  And did you have a chance to look at the catalog of |
| 10:24:30 | 4 | the horses that were being offered for sale at this big Ruidoso |
| 10:24:34 | 5 | show? |
| 10:24:35 | 6 | A.   When I arrived, I obtained a catalog. |
| 10:24:37 | 7 | Q.   Okay.  So you didn't have a chance to study it? |
| 10:24:41 | 8 | A.   Are you saying prior to the -- prior to me going to Ruidoso? |
| 10:24:45 | 9 | Q.   Right. |
| 10:24:45 | 10 | A.   No, sir. |
| 10:24:46 | 11 | Q.   Okay.  And from the time you got the catalog to the time |
| 10:24:50 | 12 | that the auction -- the sale started, how much time had you spent |
| 10:24:54 | 13 | looking through the catalog? |
| 10:24:56 | 14 | A.   When we arrived there, it was approximately already -- the |
| 10:25:02 | 15 | auction was 30 minutes underway.  I spent some time reviewing it |
| 10:25:06 | 16 | before because I think the first horse that I noticed being 195. |
| 10:25:12 | 17 | So probably about 30 horses in between there that was -- I |
| 10:25:15 | 18 | actually took the time to review because, as I said before, I |
| 10:25:18 | 19 | don't have a basis for -- |
| 10:25:19 | 20 | Q.   I gotcha.  But you were there to watch Carlos Nayen, right? |
| 10:25:25 | 21 | A.   Yes, sir. |
| 10:25:26 | 22 | Q.   So if horses were being auctioned and he was standing there, |
| 10:25:32 | 23 | were you looking at the catalog or were you looking at him? |
| 10:25:35 | 24 | A.   My focus was on Mr. Nayen and I utilized the catalog to |
| 10:25:40 | 25 | follow along. |

```
10:25:41   1   Q.   And really, looking at the catalog wouldn't be a lot of help
10:25:47   2   to you, would it?  I mean, you wouldn't know if what horse should
10:25:49   3   be a good horse.  You wouldn't know that.
10:25:51   4   A.   No, sir.
10:25:52   5   Q.   Okay.  So you told us that when you watched Mr. Nayen, it
10:25:58   6   was obvious to you that when certain horses -- these two or three
10:26:05   7   horses when they were up on the block, he was texting someone,
10:26:10   8   correct?
10:26:10   9   A.   Manner consistent with texting.  Yes, sir.
10:26:13  10   Q.   It looked like he was texting someone?
10:26:14  11   A.   Yes, sir.
10:26:15  12   Q.   And also, you would see him nod to someone.
10:26:19  13   A.   Yes, sir.
10:26:20  14   Q.   And the person he was nodding to was some distance away,
10:26:24  15   wasn't he?
10:26:25  16   A.   Yes, sir.
10:26:26  17   Q.   Using the courtroom as an example, assume that you're Nayen.
10:26:30  18   The person he was nodding to, how far away was that person?  You
10:26:36  19   tell me when to stop.  Am I too far away?
10:26:37  20   A.   No.  Keep going.
10:26:39  21   Q.   Further back than this?
10:26:40  22   A.   I would say the back wall because that was about the size of
10:26:43  23   the arena.
10:26:43  24   Q.   Okay.  So if Mr. Nayen was where you were standing, the
10:26:48  25   person he's nodding to would have been back here against this
```

10:26:51   1   wall as far as distance?

10:26:52   2   A.   Yes, sir.

10:26:53   3   Q.   Okay.  And for your vantage point, you could see, it looked

10:26:59   4   to you like they were acknowledging each other, correct?

10:27:03   5   A.   It looked like -- what I testified to was I was -- I could

10:27:09   6   observe Mr. Nayen.  He would nod to someone in that crowd, and

10:27:13   7   then, I would hear a bid come from that crowd.

10:27:16   8   Q.   And it appeared to you -- and you're right.  It appeared to

10:27:20   9   you that the person he was nodding to, some maybe 40 feet away,

10:27:26  10   would that be about right?

10:27:27  11   A.   No.  It would be greater distance than that.

10:27:30  12   Q.   Greater than 40 feet?

10:27:31  13   A.   Yes, sir.

10:27:31  14   Q.   So somewhere beyond 40 feet away, you would notice someone

10:27:35  15   raise a hand and bid on that horse?

10:27:38  16   A.   I noticed the auctioneer would acknowledge the person.  Say

10:27:43  17   I'm the auctioneer, he would acknowledge the individual in the

10:27:46  18   crowd.

10:27:47  19   Q.   So it seemed to you -- again, you're right.  It seemed

10:27:51  20   reasonable at the time that Nayen was signaling that person to

10:27:58  21   bid and the person bid, correct?

10:28:00  22   A.   Yes, sir.

10:28:01  23   Q.   Okay.  Now, would you agree with me that because you were

10:28:07  24   focused on Mr. Nayen, if there were other people there that were

10:28:11  25   not watching him, they may not know that he was signaling other

| | | |
|---|---|---|
| 10:28:15 | 1 | people?  In other words, it could go unnoticed by other people in |
| 10:28:20 | 2 | the crowd, couldn't it? |
| 10:28:21 | 3 | A.   That other people that were -- |
| 10:28:25 | 4 | Q.   I confused everybody, I'm sure.  You're describing something |
| 10:28:28 | 5 | that looks like a secretive communication, correct? |
| 10:28:31 | 6 | A.   It appeared to be a signal. |
| 10:28:33 | 7 | Q.   Yes.  And secreted by the way he did it, correct? |
| 10:28:37 | 8 | A.   It was discreet. |
| 10:28:38 | 9 | Q.   Well, he didn't raise the hand and say, hey, you, bid |
| 10:28:41 | 10 | another thousand dollars.  He didn't do that, did he? |
| 10:28:44 | 11 | A.   No, sir. |
| 10:28:45 | 12 | Q.   He was nodding. |
| 10:28:46 | 13 | A.   He was discreet.  Yes, sir. |
| 10:28:48 | 14 | Q.   And so, if the other person beyond 40 feet, if that person |
| 10:28:51 | 15 | wasn't focused on him like you were, he wouldn't have seen that |
| 10:28:53 | 16 | nod, would he? |
| 10:28:56 | 17 | A.   Are you asking if that person across from him had the same |
| 10:28:59 | 18 | attention that I did? |
| 10:29:01 | 19 | Q.   He obviously did, correct? |
| 10:29:02 | 20 | A.   Yes. |
| 10:29:03 | 21 | Q.   Because he saw the nod? |
| 10:29:04 | 22 | A.   Yes, sir. |
| 10:29:04 | 23 | Q.   But other people standing right next to that person, if they |
| 10:29:07 | 24 | weren't focused on Mr. Nayen, they may not have seen that, |
| 10:29:10 | 25 | correct? |

| | | |
|---|---|---|
| 10:29:11 | 1 | A.    Correct. |
| 10:29:11 | 2 | Q.    Okay.  So I'm just trying to establish that there was some |
| 10:29:14 | 3 | kind of secretive signaling going on between Mr. Nayen and the |
| 10:29:19 | 4 | bidder, and you believe that's what happened, wasn't it? |
| 10:29:23 | 5 | A.    That's what it appeared to be based on observations. |
| 10:29:26 | 6 | Q.    And you're right.  I just want to show there's a foundation |
| 10:29:30 | 7 | for you thinking that.  You had never seen that kind of activity |
| 10:29:35 | 8 | before because you had never been to a horse auction? |
| 10:29:38 | 9 | A.    No, sir. |
| 10:29:38 | 10 | Q.    Okay.  Since then, have you talked to other agents that go |
| 10:29:42 | 11 | to horse auctions? |
| 10:29:43 | 12 | A.    No, sir. |
| 10:29:44 | 13 | Q.    Have you talked to owners of horses, buyers of horses, |
| 10:29:48 | 14 | sellers of horses, anyone that routinely goes to auctions? |
| 10:29:51 | 15 | A.    No, sir. |
| 10:29:52 | 16 | Q.    So you don't know, like you've answered earlier, you don't |
| 10:29:59 | 17 | know if that's common practice or not, do you? |
| 10:30:01 | 18 | A.    I've never been to a horse auction.  I've been to actual |
| 10:30:04 | 19 | auctions, and I've never seen that behavior before. |
| 10:30:06 | 20 | Q.    You've been to auctions where people are buying horses for |
| 10:30:11 | 21 | 600 or buying anything for $650,000? |
| 10:30:14 | 22 | A.    No, sir. |
| 10:30:15 | 23 | Q.    Okay.  Would you agree with me that if you were -- if you're |
| 10:30:19 | 24 | in the know or think you're in the know and you know what horses |
| 10:30:23 | 25 | are worth and which horses are really worth something, that you |

| | | |
|---|---|---|
| 10:30:27 | 1 | might want to keep it a secret that you're bidding on this horse? |
| 10:30:30 | 2 | Does that make sense? |
| 10:30:32 | 3 | A.   Can you rephrase it, please? |
| 10:30:33 | 4 | Q.   Okay.  What I'm saying, horses, if you wanted to buy |
| 10:30:37 | 5 | something really that you know has great value, it might be a |
| 10:30:42 | 6 | painting that to me looks like red paint on a stick. |
| 10:30:46 | 7 | A.   Uh-huh. |
| 10:30:46 | 8 | Q.   But you know it was painted by somebody great and that no |
| 10:30:50 | 9 | one knows who it's by and you know that painting's worth a lot, |
| 10:30:54 | 10 | you may want to keep it a secret that you know or that you're |
| 10:30:57 | 11 | interested in that piece of art, correct? |
| 10:31:03 | 12 | A.   Based on the auctions that I've been to, if I wanted to |
| 10:31:06 | 13 | auction on something, they would just raise their hand.  I only |
| 10:31:09 | 14 | can testify to what I observed that day in my limited knowledge |
| 10:31:11 | 15 | of the surveillance. |
| 10:31:12 | 16 | Q.   Okay.  But you've never been on anything that cost hundreds |
| 10:31:16 | 17 | of thousands of dollars, have you? |
| 10:31:18 | 18 | A.   Gnaw.  I've never bid on anything that cost over half a |
| 10:31:22 | 19 | million. |
| 10:31:22 | 20 | Q.   I understand.  And the horse that went for $650,000, it was |
| 10:31:34 | 21 | called A Dash of Sweet Heat; is that right? |
| 10:31:37 | 22 | A.   Yes, sir. |
| 10:31:37 | 23 | Q.   Has anyone explained to you how horses are often named after |
| 10:31:41 | 24 | their mom and dad? |
| 10:31:44 | 25 | A.   No, sir. |

| | | |
|---|---|---|
| 10:31:45 | 1 | Q.   Okay.  And looking through the catalog, did you notice that |
| 10:31:51 | 2 | by each horse, it would show its lineage on the daddy's side, we |
| 10:31:57 | 3 | call it a sire, and on the mom's side, a damn.  Did you notice it |
| 10:32:04 | 4 | had the family trees of each horse, showing back two or three |
| 10:32:07 | 5 | generations? |
| 10:32:08 | 6 | A.   Underneath the name up at the very top of the catalog, they |
| 10:32:12 | 7 | would have name of the horse and then, I guess, how it was -- the |
| 10:32:16 | 8 | horses they used to breed it. |
| 10:32:18 | 9 | Q.   Did you notice it actually went back like two or three |
| 10:32:21 | 10 | generations?  Not just mom and dad, it would show grandma, |
| 10:32:24 | 11 | granddad, grandpas, granddads? |
| 10:32:26 | 12 | A.   I don't recall the particular lineage of that horse. |
| 10:32:29 | 13 | Q.   Because it wasn't important to you.  It meant nothing to |
| 10:32:32 | 14 | you? |
| 10:32:32 | 15 | A.   My detail at the time was to conduct surveillance. |
| 10:32:34 | 16 | Q.   Okay.  I understand.  Now, if you remember, how many people |
| 10:32:42 | 17 | bid on a Dash Of Sweet Heat? |
| 10:32:44 | 18 | A.   I do not recall. |
| 10:32:45 | 19 | Q.   Dozens? |
| 10:32:47 | 20 | A.   I do not recall. |
| 10:32:48 | 21 | Q.   Okay.  Do you remember where the bidding started on that |
| 10:32:51 | 22 | horse? |
| 10:32:52 | 23 | A.   No.  I do not. |
| 10:32:53 | 24 | Q.   Was it -- if you remember, was it more or less than |
| 10:32:56 | 25 | $100,000? |

| | | |
|---|---|---|
| 10:32:57 | 1 | A.   I do not remember. |
| 10:32:58 | 2 | Q.   Do you remember what the last bid was that didn't buy the |
| 10:33:02 | 3 | horse?  In other words, how much lower was the last bid than |
| 10:33:05 | 4 | $650,000? |
| 10:33:05 | 5 | A.   I do not recall. |
| 10:33:06 | 6 | Q.   Was it pretty close to it, though? |
| 10:33:08 | 7 | A.   I don't recall. |
| 10:33:10 | 8 | Q.   You weren't paying any attention to the numbers, were you? |
| 10:33:13 | 9 | A.   It was actually going on so fast that I wasn't able to take |
| 10:33:16 | 10 | accurate notes at that time. |
| 10:33:17 | 11 | Q.   And it was going fast because the auctioneer talking in the |
| 10:33:22 | 12 | way they talk, asked for bids and somebody raised their hand, |
| 10:33:26 | 13 | correct? |
| 10:33:26 | 14 | A.   Yes, sir. |
| 10:33:27 | 15 | Q.   And hands were going up in different places around the area? |
| 10:33:31 | 16 | A.   Yes. |
| 10:33:31 | 17 | Q.   Okay.  From your work on this case, I take it you don't know |
| 10:33:49 | 18 | whether it's common at big horse auctions where really fast |
| 10:33:56 | 19 | horses are sold to have these straw bidders, these nobodys |
| 10:34:01 | 20 | bidding on horses.  You wouldn't know that, would you? |
| 10:34:04 | 21 | A.   Based on what I knew at the time, I knew that Mr. Nayen and |
| 10:34:09 | 22 | Mr. Trevino employed several people that would assist them with |
| 10:34:14 | 23 | the bidding at the time. |
| 10:34:16 | 24 |      MS. WILLIAMS:  Objection.  Nonresponsive. |
| 10:34:19 | 25 | Q.   (BY MR. WOMACK) Did you know it was very common for buyers |

10:34:23  1   -- oh, I'm sorry.

10:34:24  2           THE COURT:  Objection is overruled.  You may inquire if

10:34:28  3   you wish.

10:34:29  4   Q.   (BY MR. WOMACK) Did you know it was very common for lots of

10:34:34  5   buyers, the big buyers buying the fast horses, the ones buying

10:34:40  6   big race horses with two thirds of a million dollars, did you

10:34:45  7   know it was common for them to employ agents or straw buyers to

10:34:48  8   raise their hand for them?

10:34:49  9   A.   Sir, I can't accurately testify to how those operate.

10:34:53  10  Q.   The answer is no, you didn't know that?

10:34:55  11  A.   I can't testify to how other individuals operate.

10:34:57  12  Q.   I understand.  Let's go to the next day.  Was the All

10:35:01  13  American Futurity the next day?

10:35:03  14  A.   There was two auctions on September 3rd, September 4th, and

10:35:07  15  then, the All American on September 5th, the Monday, Labor Day.

10:35:11  16  Q.   Okay.  Did you know then or now that the All American

10:35:18  17  Futurity for quarter horse race, it's the biggest quarter horse

10:35:23  18  race in America.  Did you know that?

10:35:24  19  A.   I learned that at the time.

10:35:26  20  Q.   I'm sorry?

10:35:26  21  A.   I learned that prior to going.

10:35:29  22  Q.   Okay.

10:35:30  23  A.   To Ruidoso.

10:35:31  24  Q.   It's like the Kentucky Derby of quarter horse racing.  You

10:35:35  25  knew that?

| | | |
|---|---|---|
| 10:35:35 | 1 | A.   I knew it was a significant race.  The most significant in |
| 10:35:38 | 2 | that type of horse racing. |
| 10:35:39 | 3 | Q.   Right.  For the whole country, it's the biggest.  You knew |
| 10:35:42 | 4 | that? |
| 10:35:43 | 5 | A.   Yes.  I knew it was the most significant one. |
| 10:35:46 | 6 | Q.   And did you know that every race -- every All American |
| 10:35:51 | 7 | Futurity being the biggest race in America because it's in New |
| 10:35:56 | 8 | Mexico, it is tightly controlled by the New Mexico Racing |
| 10:36:00 | 9 | Commission.  Do you know that? |
| 10:36:01 | 10 | A.   No.  I did not know that. |
| 10:36:03 | 11 | Q.   Have you ever heard of the New Mexico Racing Commission? |
| 10:36:06 | 12 | MR. GARDNER:  Your Honor, I'm going to object.  I think |
| 10:36:08 | 13 | we're getting outside the scope of the direct examination of this |
| 10:36:10 | 14 | witness. |
| 10:36:11 | 15 | MR. WOMACK:  Sir, he's talking about going to the race. |
| 10:36:13 | 16 | I want to make sure we know if he knows what this race is. |
| 10:36:15 | 17 | THE COURT:  I don't think he knows anything. |
| 10:36:21 | 18 | Q.   (BY MR. WOMACK) I didn't say that.  His Honor did.  And no |
| 10:36:25 | 19 | one expects you to know all about horses.  I'm just asking if you |
| 10:36:29 | 20 | knew these. |
| 10:36:29 | 21 | THE COURT:  Or the racing commission. |
| 10:36:31 | 22 | MR. WOMACK:  Yes, sir.  Thank you. |
| 10:36:32 | 23 | Q.   (BY MR. WOMACK) But you did learn that it was the biggest |
| 10:36:34 | 24 | race in America for quarter horses.  You know that and I was |
| 10:36:38 | 25 | asking if you knew about the racing commission.  You said you |

| | | |
|---|---|---|
| 10:36:40 | 1 | don't? |
| 10:36:41 | 2 | A.   No.  I don't. |
| 10:36:41 | 3 | Q.   That's fair.  You said that -- I forget his name now.  Big |
| 10:36:48 | 4 | Daddy Cartel.  Do you know how he has the name Cartel?  Do you |
| 10:36:55 | 5 | know how he got the name Cartel? |
| 10:36:57 | 6 | A.   For that particular horse? |
| 10:36:58 | 7 | Q.   Yes. |
| 10:36:59 | 8 | A.   No.  I do not. |
| 10:37:00 | 9 | Q.   So no one told you that if you go back generations and |
| 10:37:03 | 10 | generations, that one of his forefathers or mothers was named |
| 10:37:08 | 11 | Cartel? |
| 10:37:09 | 12 | MR. GARDNER:  Your Honor, I'm going to object at this |
| 10:37:10 | 13 | point.  He answered the question he didn't know how Big Daddy |
| 10:37:13 | 14 | Cartel was named. |
| 10:37:13 | 15 | THE COURT:  And he's answered that he didn't go back |
| 10:37:15 | 16 | generations. |
| 10:37:16 | 17 | MR. WOMACK:  Thank you, your Honor. |
| 10:37:17 | 18 | Q.   (BY MR. WOMACK) Special Agent Spaeth, you said that Big |
| 10:37:28 | 19 | Daddy Cartel was disqualified.  Do you know that he was |
| 10:37:30 | 20 | disqualified for bumping into another horse? |
| 10:37:34 | 21 | A.   That's what I recall from the race at the time. |
| 10:37:37 | 22 | Q.   And if you -- have you ever run track before? |
| 10:37:42 | 23 | A.   Yes, I did. |
| 10:37:42 | 24 | Q.   Would you agree with me -- were you a sprinter? |
| 10:37:46 | 25 | A.   I was not a very good sprinter, but I did. |

10:37:48  1   Q.   But you -- I was a sprinter.  If you come out of the

10:37:53  2   starting blocks and you bump into another runner, that slows you

10:37:55  3   down, doesn't it?

10:37:57  4   A.   Yes, it does.  I was very slow so.

10:38:05  5   Q.   So you might -- you would slow yourself down and you could

10:38:08  6   also impede the other runner, correct?

10:38:10  7   A.   Yes, sir.

10:38:11  8   Q.   And so, if it's humans racing or quarter horse racing, if

10:38:17  9   horses bump into each other, they could be disqualified for that,

10:38:21  10  correct?

10:38:23  11  A.   All I know is that day, it was disqualified for interference

10:38:27  12  of another horse.

10:38:28  13  Q.   And you saw the race and the interference was that the

10:38:31  14  horses bumped into each other?

10:38:34  15  A.   I was quite a ways from the gate, out of the gate, so I

10:38:37  16  can't testify to what the interference was.

10:38:40  17  Q.   Okay.

10:38:41  18  A.   Of the horse.

10:38:41  19  Q.   A moment ago, you told me that you understood it was that

10:38:44  20  they bumped into each other?

10:38:45  21  A.   I believe interference.  I didn't observe it.  That's what I

10:38:48  22  think you're asking.

10:38:50  23  Q.   Thank you, sir.  I have no further question.

10:38:59  24           MR. ESPER:  I have nothing, Judge.

10:39:00  25           MR. MAYR:  None.

| | | |
|---|---|---|
| 10:39:01 | 1 | THE COURT:  Any redirect? |
| 10:39:02 | 2 | RE-DIRECT EXAMINATION |
| 10:39:02 | 3 | BY MR. GARDNER: |
| 10:39:03 | 4 | Q.   Were you the case agent in this case, Special Agent? |
| 10:39:05 | 5 | A.   No, sir. |
| 10:39:06 | 6 | Q.   And are you allowed to use your common sense and training |
| 10:39:12 | 7 | when you make your observations on surveillance? |
| 10:39:14 | 8 | A.   Yes, I am. |
| 10:39:15 | 9 | Q.   No further question, your Honor. |
| 10:39:17 | 10 | THE COURT:  May this witness be excused? |
| 10:39:19 | 11 | MS. WILLIAMS:  No objection. |
| 10:39:20 | 12 | THE COURT:  You may be excused, sir. |
| 10:39:22 | 13 | THE WITNESS:  Thank you, sir.  Thank you. |
| 10:39:25 | 14 | THE COURT:  Call your next witness. |
| 10:39:26 | 15 | MR. GARDNER:  Your Honor, government calls Jane Eckert. |
| 10:39:59 | 16 | (Witness sworn.) |
| 10:40:15 | 17 | THE COURT:  Tell us your full name, please, and spell |
| 10:40:26 | 18 | your last. |
| 10:40:26 | 19 | THE WITNESS:  Jane Eckert, E-C-K-E-R-T. |
| 10:40:31 | 20 | JANE ECKERT, called by the Government, duly sworn. |
| 10:40:31 | 21 | DIRECT EXAMINATION |
| 10:40:31 | 22 | BY MR. GARDNER: |
| 10:40:32 | 23 | Q.   Good morning, Ms. Eckert.  You and I met before. |
| 10:40:38 | 24 | Would you please introduce yourself to the ladies and |
| 10:40:40 | 25 | gentlemen of the jury, and tell them what you do for a living? |

| | | |
|---|---|---|
| 10:40:42 | 1 | A.   I'm Jane Eckert.  I am an accountant and I have been in the |
| 10:40:48 | 2 | industry for, oh, 20 years, and I was employed at Heritage Place |
| 10:40:56 | 3 | in Oklahoma City. |
| 10:40:57 | 4 | Q.   And you're no longer employed there, correct? |
| 10:40:59 | 5 | A.   No. |
| 10:40:59 | 6 | Q.   Would you let the ladies and gentlemen of the jury know the |
| 10:41:02 | 7 | dates of your employment at Heritage Place? |
| 10:41:04 | 8 | A.   I worked there from January 2006 to December 2006 and then, |
| 10:41:09 | 9 | again, from July 2008 until May 2012. |
| 10:41:16 | 10 | Q.   And what were your duties at Heritage Place? |
| 10:41:19 | 11 | A.   My title was controller.  I did all the accounting.  I paid |
| 10:41:22 | 12 | all the bills.  I was also the office manager and HR.  It's a |
| 10:41:29 | 13 | small office. |
| 10:41:31 | 14 | Q.   And where is Heritage Place auction house? |
| 10:41:33 | 15 | A.   It is in Oklahoma City close to the airport. |
| 10:41:36 | 16 | Q.   And what is Heritage Place auction house? |
| 10:41:38 | 17 | A.   They auction quarter horse for racing mostly.  There are |
| 10:41:45 | 18 | some people that buy for other reasons, but majority is for |
| 10:41:49 | 19 | quarter horse racing. |
| 10:41:50 | 20 | Q.   And how many auctions does Heritage Place hold each year? |
| 10:41:54 | 21 | A.   During the time that I was there, they held three auctions |
| 10:41:58 | 22 | per year. |
| 10:42:00 | 23 | Q.   And do they have a title? |
| 10:42:01 | 24 | A.   Each auction has a title.  Yes. |
| 10:42:03 | 25 | Q.   And what are those titles? |

10:42:04  1   A.   The January sale is called the winter mixed sale.   The one

10:42:09  2   in September is the quarter horse yearling sale.   And the October

10:42:14  3   or November sale is the fall mixed sale.

10:42:21  4   Q.   I'm going to do what Ms. Fernald did yesterday, helps me

10:42:28  5   keep track of things.

10:42:29  6            So you said the first auction occurs what part of the

10:42:33  7   year?

10:42:33  8   A.   January.

10:42:34  9   Q.   And the name of that auction?

10:42:36  10  A.   Winter mixed sale.

10:42:57  11  Q.   And the next sale?

10:42:58  12  A.   September.

10:43:01  13  Q.   And what is the name of the September sale?

10:43:03  14  A.   Quarter horse yearling sale.

10:43:19  15  Q.   And the last auction?

10:43:20  16  A.   Is either last of October, first of November and it's the

10:43:23  17  fall mixed sale.

10:43:35  18  Q.   Would you generally describe to the ladies and gentlemen of

10:43:39  19  the jury the auction process, how you organize an auction, how do

10:43:45  20  the horses get there, and how are the horses sold, and let's stop

10:43:48  21  there and then, we'll ask some questions after that.

10:43:51  22  A.   To get ready for a sale, first thing they do is there's a

10:43:56  23  form they fill out if they want to enter a horse, and there is a

10:44:00  24  $600 fee to enter a horse.   There is a consignment secretary that

10:44:05  25  handles all the paperwork for that part of it.   Then the week

| | | |
|---|---|---|
| 10:44:10 | 1 | before the sale, the horses are transported in, and they are |
| 10:44:15 | 2 | stabled there on the grounds.  And the auctions start at 10:00 |
| 10:44:20 | 3 | a.m. each day.  They sell either half or a third, depending on if |
| 10:44:25 | 4 | it's a two- or three-day sale of the horses each day, even it |
| 10:44:30 | 5 | out. |
| 10:44:31 | 6 | And the Heritage Place takes five percent of the sales, |
| 10:44:39 | 7 | the selling price of each horse.  A horse can either be sold, it |
| 10:44:45 | 8 | can be withdrawn if it's either injured or, for whatever reason, |
| 10:44:49 | 9 | they change their mind and do not want to sell the horse.  It can |
| 10:44:52 | 10 | be repurchased, which means that the owner didn't get enough |
| 10:44:57 | 11 | money for the horse, and so, they decide that they are not |
| 10:45:00 | 12 | actually going to let it go, and they still pay five percent on |
| 10:45:04 | 13 | that repurchase price. |
| 10:45:05 | 14 | Q.   So how long before the actual auction dates do the horses |
| 10:45:09 | 15 | arrive at the auction? |
| 10:45:12 | 16 | A.   The auctions always start on Thursday or Friday and go |
| 10:45:15 | 17 | through Saturday.  The horses generally are not allowed to arrive |
| 10:45:21 | 18 | before Tuesday of that week. |
| 10:45:22 | 19 | Q.   And do they have to be all present at a certain date? |
| 10:45:25 | 20 | A.   Yes.  They have to be there the day before they're supposed |
| 10:45:30 | 21 | to be sold. |
| 10:45:30 | 22 | Q.   Okay.  And each horse is assigned a number.  We heard |
| 10:45:37 | 23 | testimony on that.  So does the auction break it up by hip number |
| 10:45:41 | 24 | per day of the auction? |
| 10:45:42 | 25 | A.   Yes. |

10:45:42  1   Q.   So how does a horse get brought into the auction ring to be

10:45:45  2   bid on?

10:45:46  3   A.   Somebody from either an agent or somebody that works for the

10:45:52  4   owner has control of the horse up until, like, one or two horses,

10:45:57  5   before it's their turn, and then, the horse is handed off to one

10:46:01  6   of the ring men, who then lead the horse into the auction ring,

10:46:07  7   because there's a prep area behind the auction ring.

10:46:12  8   Q.   When you say prep area, what goes into prepping a horse for

10:46:16  9   sale?

10:46:17  10  A.   They walk it around a few times, just to get it -- because

10:46:21  11  they're kind of high-strung, and they walk the horse around until

10:46:27  12  it's their turn and then, they hand it over, and they walk it in

10:46:32  13  the ring, which is a horseshoe shaped and there's -- it's a

10:46:37  14  one-way street basically, one way in, one way out.

10:46:40  15  Q.   So if people bid on the horse and when somebody wins, how do

10:46:43  16  they pay for that?

10:46:46  17  A.   It depends on the arrangements that they've made.  They can

10:46:52  18  -- there's a formula they can fill out ahead of time to be

10:46:55  19  allowed credit.  It's a bank transaction form.  Basically it

10:47:01  20  gives all their banking information, which is either notarized by

10:47:05  21  their bank or it's called and verified that the funds would be

10:47:10  22  available up to a certain amount so that they're pre-approved for

10:47:13  23  a certain amount of sale.

10:47:14  24       They could also be approved by the general manager for

10:47:21  25  a certain amount.  Otherwise, we expect to collect cash or check

| | | |
|---|---|---|
| 10:47:26 | 1 | at the time of sale. |
| 10:47:27 | 2 | Q.   Or wire.  Are wires permitted, too? |
| 10:47:30 | 3 | A.   Right.  Yes. |
| 10:47:31 | 4 | Q.   Do you know an individual by the name of Ramiro Villarreal? |
| 10:47:35 | 5 | A.   Yes. |
| 10:47:36 | 6 | Q.   And when did you first encounter Mr. Villarreal? |
| 10:47:39 | 7 | A.   My first auction in January of 2006. |
| 10:47:42 | 8 | Q.   2006.  And what type of horses did Mr. Ramiro Villarreal |
| 10:47:58 | 9 | purchase? |
| 10:47:58 | 10 | A.   I'm not sure what you're asking. |
| 10:48:00 | 11 | Q.   In terms of the price. |
| 10:48:04 | 12 | A.   He, as I recall, purchased multiple horses and some were |
| 10:48:09 | 13 | more expensive. |
| 10:48:11 | 14 | Q.   And did you consider him an owner or an agent as you |
| 10:48:15 | 15 | testified to? |
| 10:48:16 | 16 | A.   Probably more of an agent. |
| 10:48:24 | 17 | Q.   And what was the length of time in which you knew Mr. |
| 10:48:29 | 18 | Villarreal to purchase horses?  When did he stop essentially |
| 10:48:33 | 19 | coming to the auction? |
| 10:48:34 | 20 | A.   I don't remember the exact timeframe.  I know all during |
| 10:48:38 | 21 | 2006, he did, and when I returned in 2008, he was still a steady |
| 10:48:46 | 22 | customer.  Sometime probably around 2009.  I think I saw him at |
| 10:48:55 | 23 | an auction that he didn't purchase anything, but I don't remember |
| 10:48:59 | 24 | the exact date. |
| 10:49:00 | 25 | Q.   And did you see him after 2009? |

10:49:06  1  A.   I don't remember the timing, but I do remember that Jeff

10:49:11  2  Tebow told me that he died.

10:49:14  3          MR. FINN:  Objection.  Excuse me, I'm going to object

10:49:16  4  to hearsay.

10:49:17  5  Q.   (BY MR. GARDNER) So about 2009 was the last time you saw him

10:49:19  6  to the best of your recollection?

10:49:20  7  A.   I think so.

10:49:22  8  Q.   Okay.  I'm not asking for an exact date so just

10:49:26  9  approximately.

10:49:27  10          At some point, did you come to know an individual by

10:49:29  11  the name of Carlos?

10:49:32  12  A.   Yes.

10:49:42  13  Q.   Is that the individual you know as Carlos Nayen on your

10:49:44  14  screen?

10:49:44  15  A.   Yes.

10:49:45  16  Q.   Okay.  That's Government's Exhibit 335E.  Did you ever come

10:49:50  17  to know a Fernando Garcia?

10:49:51  18  A.   Yes.

10:49:53  19  Q.   Actually, Mr. Garcia just stood up, right?  Is that the

10:50:02  20  individual you know as Mr. Garcia?

10:50:04  21  A.   Yes.

10:50:05  22  Q.   And how do you know Mr. Garcia?

10:50:08  23  A.   Through purchasing horses at Heritage Place.

10:50:12  24  Q.   And when did Mr. Garcia -- let me back up.  Could you put up

10:50:16  25  Mr. Nayen again?  When did Carlos Nayen first start appearing at

| | | |
|---|---|---|
| 10:50:24 | 1 | the auction house? |
| 10:50:26 | 2 | A.   I think January of 2010. |
| 10:50:36 | 3 | Q.   And when did Fernando Garcia start appearing at the auction |
| 10:50:43 | 4 | house? |
| 10:50:43 | 5 | A.   At the same time. |
| 10:50:51 | 6 | Q.   Can you describe the interaction between those two based on |
| 10:50:58 | 7 | your observations? |
| 10:51:01 | 8 | A.   Carlos did not speak any English that I was aware of. |
| 10:51:05 | 9 | Fernando always translated for Carlos. |
| 10:51:09 | 10 | Q.   And talking about the horse? |
| 10:51:12 | 11 | A.   The transactions.  The times that they spoke to me, it had |
| 10:51:18 | 12 | to do with the paying for the horses that were purchased. |
| 10:51:27 | 13 | Q.   And what seemed to be the relationship between them in terms |
| 10:51:30 | 14 | of supervisor and employee, if there was any?  Who was in charge, |
| 10:51:37 | 15 | I guess? |
| 10:51:38 | 16 | A.   It seemed that Carlos was. |
| 10:51:41 | 17 | Q.   Do you recall how many auctions they attended together? |
| 10:51:48 | 18 | A.   I think they were at every one that I can recall from |
| 10:51:52 | 19 | January until I left in 2012. |
| 10:51:59 | 20 | Q.   That would be three in 2010 and three -- |
| 10:52:02 | 21 | A.   So that would be like seven. |
| 10:52:03 | 22 | Q.   Seven total.  And did they appear to have the same |
| 10:52:15 | 23 | relationship during the course of your interaction with them over |
| 10:52:18 | 24 | these seven auctions? |
| 10:52:19 | 25 | A.   It seemed the same.  Yes. |

| | | |
|---|---|---|
| 10:52:21 | 1 | Q.   Did Carlos and Defendant Fernando Garcia purchase a lot of |
| 10:52:28 | 2 | horses? |
| 10:52:28 | 3 | A.   Quite a few. |
| 10:52:31 | 4 | Q.   Was that consistent through each one of these seven |
| 10:52:33 | 5 | auctions? |
| 10:52:35 | 6 | A.   Fairly consistent. |
| 10:52:37 | 7 | Q.   And were these inexpensive horses or expensive horses? |
| 10:52:40 | 8 | A.   No.  They were expensive. |
| 10:52:43 | 9 | Q.   And once they purchased horses, were either Mr. Nayen or Mr. |
| 10:52:49 | 10 | Garcia listed as the purchaser of the horse on your records? |
| 10:52:53 | 11 | A.   I don't believe so. |
| 10:52:55 | 12 | Q.   Now, is there a difference between, I'll use the term, |
| 10:53:00 | 13 | bidder and purchaser? |
| 10:53:01 | 14 | A.   Yes, there can be. |
| 10:53:03 | 15 | Q.   And can you explain that to the jury? |
| 10:53:05 | 16 | A.   The bidder can be basically anybody that has authority on |
| 10:53:09 | 17 | behalf of somebody else to purchase horses.  The trainer |
| 10:53:13 | 18 | sometimes will purchase horses for the owner because sometimes |
| 10:53:18 | 19 | they are more familiar with horses instead of the ones that are |
| 10:53:25 | 20 | going to be training the horse.  It could be another family |
| 10:53:29 | 21 | member that can also sign a form that gives another person the |
| 10:53:36 | 22 | full rights to be their agent.  And there's also informal agents. |
| 10:53:41 | 23 | Q.   And why do buyers use agents? |
| 10:53:45 | 24 | A.   Sometimes because the buyer's not able to travel, not able |
| 10:53:49 | 25 | to be present.  Some of the owners have other jobs other than |

| | | |
|---|---|---|
| 10:53:56 | 1 | just owning horses.  I'm sure there's a variety of reasons. |
| 10:54:02 | 2 | Q.   Going back to the horses purchased by Carlos Nayen and |
| 10:54:06 | 3 | Fernando Garcia, did you feel that the purchasers were real |
| 10:54:12 | 4 | people? |
| 10:54:14 | 5 | A.   Sometimes yes.  Sometimes the name of the -- it was a |
| 10:54:21 | 6 | company.  Not a person's name. |
| 10:54:22 | 7 | Q.   So what keyed you to believe that some of the names weren't |
| 10:54:31 | 8 | real? |
| 10:54:31 | 9 | A.   When somebody doesn't want it known who the actual purchaser |
| 10:54:37 | 10 | is, they will use a company name; and in that case, I don't ever |
| 10:54:42 | 11 | get a full address. |
| 10:54:46 | 12 | Q.   I want to give you a couple of company names right now, see |
| 10:54:49 | 13 | if you recall.  Let me ask you this.  Do you recall any company |
| 10:54:52 | 14 | names that Fernando Garcia or Carlos Nayen used? |
| 10:55:02 | 15 | A.   In some of these, I'm not sure what the relationship was but |
| 10:55:07 | 16 | LA Horses. |
| 10:55:28 | 17 | Q.   So LA Horses.  Just the initials LA? |
| 10:55:30 | 18 | A.   Right. |
| 10:55:31 | 19 | Q.   LA Horses.  Any others? |
| 10:55:42 | 20 | A.   I'm drawing a blank.  FF Stables. |
| 10:55:44 | 21 | Q.   FF Stables.  If I use the term Basic Enterprises, would that |
| 10:55:57 | 22 | refresh your recollection? |
| 10:55:59 | 23 | A.   That was one form of payment.  I don't remember that being |
| 10:56:07 | 24 | one of the purchase names. |
| 10:56:08 | 25 | Q.   You keyed me that I probably didn't ask the best question. |

10:56:13  1        So I guess the question is, the payments made for the

10:56:19  2   purchase of those horses by Fernando Garcia and Carlos Nayen, who

10:56:23  3   were those people?

10:56:25  4   A.   The wire transfers, Basic Enterprises, Grupo Aduanero, ADT

10:56:35  5   Petro Servicios.   And I think one time, there was another one and

10:56:38  6   I don't recall the name.

10:56:43  7   Q.   Grupo, G-R-U-P-O, Aduanero, A-D-U-A-N-E-R-O.   And ADT Petro

10:56:55  8   Servicios?   Is that correct?

10:56:56  9   A.   Yes.

10:56:56  10  Q.   If I were to use the company Fast And Furious, would that

10:57:08  11  refresh your recollection?

10:57:10  12  A.   Yes.

10:57:14  13  Q.   Did you ever meet the individuals who owned or control these

10:57:17  14  companies?

10:57:18  15  A.   Not that I'm aware of.

10:57:34  16  Q.   And so, generally, could you tell us any particular auction

10:57:37  17  that Carlos Nayen and Fernando Garcia bought horses, how would

10:57:43  18  they interact with you and the auction house in terms of

10:57:46  19  identifying the horses they purchased and then, arranging for

10:57:52  20  payments?

10:57:52  21  A.   Usually they would go through Tyler Graham and Tyler Graham

10:57:58  22  would notify me the hip number and the name of the horse that I

10:58:03  23  could expect payment from grouped together.

10:58:08  24  Q.   And who is Tyler Graham?

10:58:10  25  A.   Tyler Graham is grandson of one of the owners of Heritage

| | | |
|---|---|---|
| 10:58:10 | 1 | Place. |
| 10:58:15 | 2 | Q.   And does he have a role in Heritage Place company? |
| 10:58:18 | 3 | A.   I think he's on the board of directors. |
| 10:58:20 | 4 | Q.   And when you say he would notify you, was he acting in his |
| 10:58:23 | 5 | capacity as board of director or as an agent? |
| 10:58:26 | 6 | A.   As I understood it, an agent.  He was the agent in the |
| 10:58:30 | 7 | January sale where Dashin Follies was purchased. |
| 10:58:34 | 8 | Q.   Is that the first time you noticed Tyler Graham acting as an |
| 10:58:39 | 9 | agent for -- |
| 10:58:39 | 10 | A.   Yes. |
| 10:58:39 | 11 | Q.   -- Fernando and Carlos, Fernando Garcia and Carlos Nayen? |
| 10:58:53 | 12 | I'm going to show you Government's Exhibit 403 for |
| 10:58:57 | 13 | demonstrative purposes only.  Are you familiar with that form? |
| 10:58:59 | 14 | A.   Yes. |
| 10:59:00 | 15 | Q.   And what form is that? |
| 10:59:01 | 16 | A.   That's an 8300.  It's required by the IRS. |
| 10:59:05 | 17 | Q.   Are you required to fill these forms out in the course of |
| 10:59:09 | 18 | your duties as controller for Heritage Place? |
| 10:59:12 | 19 | A.   Yes. |
| 10:59:12 | 20 | Q.   Your Honor, I'd offer Government's Exhibit 403 for |
| 10:59:16 | 21 | demonstrative purposes only. |
| 10:59:18 | 22 | MR. WOMACK:  No objection. |
| 10:59:19 | 23 | MR. MAYR:  No objection. |
| 10:59:21 | 24 | THE COURT:  It's received. |
| 10:59:25 | 25 | Q.   (BY MR. GARDNER) What is this form to you, Ms. Eckert? |

| | | |
|---|---|---|
| 10:59:33 | 1 | A.   Any time over the course of an action, if $10,000 or more |
| 10:59:36 | 2 | was received in cash or in multiple instruments, like money |
| 10:59:44 | 3 | order, cashier's checks, then I would fill those out to the best |
| 10:59:51 | 4 | of my ability, based on information collected by the cashiers at |
| 10:59:54 | 5 | the time of the purchase. |
| 10:59:55 | 6 | Q.   Okay.  So let's talk about the information.  So report of |
| 11:00:00 | 7 | cash payments over $10,000.  I'm highlighting part 1 of |
| 11:00:05 | 8 | Government's Exhibit 403.  What is the purpose of that section? |
| 11:00:10 | 9 | A.   That is the person who actually appeared at the window with |
| 11:00:14 | 10 | the cash. |
| 11:00:18 | 11 | Q.   And then, part two? |
| 11:00:22 | 12 | A.   If that person provided cash but was paying on behalf of |
| 11:00:27 | 13 | someone else, the horse was going to, like, be registered in |
| 11:00:33 | 14 | their name.  Or, like, for instance, the individual with the cash |
| 11:00:36 | 15 | could be the trainer, but the owner was going to be a different |
| 11:00:41 | 16 | person, and so, sometimes a trainer would be given cash to |
| 11:00:46 | 17 | purchase on behalf of their owner.  And that's how the paperwork |
| 11:00:49 | 18 | would be filled out. |
| 11:00:51 | 19 | Q.   And who was responsible for supplying that information? |
| 11:00:55 | 20 | Were there cashiers at Heritage Place or the -- |
| 11:00:57 | 21 | A.   They would ask for the information and we would get as much |
| 11:01:02 | 22 | of that information as we could, but a lot of times, we weren't |
| 11:01:06 | 23 | able to get a tax payer number because it wasn't known. |
| 11:01:14 | 24 | Q.   And part III, what does that reflect? |
| 11:01:20 | 25 | A.   It asks for the date the cash received, which I would put |

11:01:22   1   the last day of the sale as the date.  The total of the cash

11:01:29   2   amount because sometimes people, if they're buying multiple

11:01:34   3   horses, they might pay part cash, part check.  So this would be

11:01:37   4   just for the cash portion, and then, it just wants to know if it

11:01:44   5   was received in more than one payment.  And like if the total

11:01:54   6   purchases were more than the cash received, then that would be

11:01:58   7   the amount in box 31.

11:02:01   8   Q.   So let me jump ahead to that.  On this form there's another

11:02:06   9   part of the form and then, there's a series of instructions.  I

11:02:10   10  went ahead and highlighted the general instructions.

11:02:27   11         So you mentioned something about multiple transactions

11:02:32   12  that you would then follow the form, even if there was less than

11:02:37   13  $10,000.  Is that your previous testimony?

11:02:41   14  A.   That would be in the case of multiple payments by cashier's

11:02:45   15  checks or money orders.

11:02:47   16  Q.   Could you describe how you could tell at the auction house?

11:02:51   17  A.   If somebody had a cashier's check for $25,000, that would

11:02:55   18  not trigger this form because they would have filled out the form

11:03:02   19  at the bank.  If there were multiple, like I say, 3 to $5,000

11:03:10   20  cashier's checks and they total more than $10,000, then those

11:03:13   21  multiple instruments would be reported on here.  The total amount

11:03:16   22  would still be over 10,000.

11:03:19   23  Q.   If I were to give you an example, I buy one horse for

11:03:24   24  $8,000, I buy another horse for $7,000, and I buy a third horse

11:03:29   25  for $5,000, therefore, there's 20,000 total, you fill out one of

| | | |
|---|---|---|
| 11:03:32 | 1 | these Form 8300s? |
| 11:03:34 | 2 | A.   Depends.  If you only paid $8,000 cash and you wrote a check |
| 11:03:37 | 3 | for the other two, no.  If all three of them were cash, yes. |
| 11:03:40 | 4 | Q.   Yes.  Yes.  Thank you. |
| 11:03:42 | 5 | What bank does Heritage Place use? |
| 11:03:44 | 6 | A.   They use two.  They have MidFirst Bank and Bank of America. |
| 11:03:47 | 7 | Q.   And is MidFirst Bank a local Oklahoma City bank? |
| 11:03:52 | 8 | A.   Yes. |
| 11:03:53 | 9 | Q.   And Bank of America is obviously nationwide. |
| 11:03:57 | 10 | A.   Yes. |
| 11:03:57 | 11 | Q.   Why does Heritage Place have the Bank of America account? |
| 11:04:01 | 12 | A.   They had Bank of America first.  They got rid of all the |
| 11:04:05 | 13 | accounts except for one account that they decided to keep because |
| 11:04:12 | 14 | of customers that live throughout the -- probably mostly southern |
| 11:04:19 | 15 | United States could make deposits into the Bank of America |
| 11:04:25 | 16 | account.  They would ask for our account number, and then, they |
| 11:04:30 | 17 | could go into the bank and make a deposit directly into the bank |
| 11:04:36 | 18 | account. |
| 11:04:37 | 19 | Q.   And what kind of deposits do you generally see into that |
| 11:04:40 | 20 | Bank of America account? |
| 11:04:44 | 21 | A.   They would be to pay for the balance on horses.  I could |
| 11:04:51 | 22 | never identify based on the online account or anything from the |
| 11:04:56 | 23 | bank where the cash or check -- I wouldn't know if it was a cash |
| 11:05:02 | 24 | or check or what form of money came into the Bank of America |
| 11:05:07 | 25 | account.  Someone would have to notify me that they had made a |

11:05:13  1  deposit on what date, and how much, and how they wanted it to be

11:05:16  2  applied.

11:05:21  3  Q.   On that note, I'd like to go through one of these auctions

11:05:24  4  with you.   Talking about that.

11:05:30  5           This is the Heritage Place 2012 winter mixed sale; is

11:05:38  6  that correct?

11:05:38  7  A.   Yes.

11:05:39  8  Q.   Though I haven't marked it yet, I'm just putting up my note

11:05:43  9  page again.   That's one of the three, the first one of the year?

11:05:49 10  A.   Yes.

11:05:50 11  Q.   So talking about this particular document here, what is this

11:06:04 12  here, Ms. Eckert?

11:06:06 13  A.   That is the statement of account.   Every person who either

11:06:10 14  buys or sells a horse will have a statement like that showing

11:06:15 15  each hip number, horse number, the amount paid, and if they're

11:06:20 16  the seller, then they would have commissions and registration

11:06:24 17  fees.

11:06:24 18  Q.   For this particular horse that was sold whose name is Mr.

11:06:27 19  Perrys Wine?

11:06:27 20  A.   Yes.

11:06:28 21  Q.   All right.   And Mr. Perrys Wine was present on the Heritage

11:06:34 22  Place auction ground on January 19th?

11:06:36 23  A.   Yes.

11:06:39 24  Q.   And who was listed as the purchaser of that horse?

11:06:43 25  A.   Robert Marquez.

| 11:06:44 | 1 | Q. And was this what you're talking about earlier when there |
| 11:06:47 | 2 | was no addresses or other contact information? |
| 11:06:51 | 3 | A. Right. |
| 11:06:51 | 4 | Q. On the purchaser? |
| 11:06:53 | 5 | A. Right. |
| 11:06:54 | 6 | Q. And do you know -- did you write this notation down here, |
| 11:06:57 | 7 | Fernando Carlito? |
| 11:06:58 | 8 | A. That is Jeff Tebow's handwriting. He's general manager. |
| 11:07:01 | 9 | Q. And then, the jury has also heard about a horse called |
| 11:07:06 | 10 | Katies Sign. Was Katies Sign also present on January 19th of |
| 11:07:12 | 11 | 2012 of that auction? |
| 11:07:13 | 12 | A. Yes. |
| 11:07:14 | 13 | Q. Do you know this person Alejandro Lagunes? |
| 11:07:17 | 14 | A. Not by sight. |
| 11:07:19 | 15 | Q. Have you heard of or what -- let me ask you this. Did he |
| 11:07:25 | 16 | also go by Alejandro Barradas? |
| 11:07:27 | 17 | A. I have no idea. I've heard that name. |
| 11:07:31 | 18 | Q. And who do you associate that name with? |
| 11:07:35 | 19 | A. I believe Azoom. |
| 11:07:39 | 20 | Q. Azoom is another company? |
| 11:07:40 | 21 | A. Yes. |
| 11:07:41 | 22 | Q. I'm just going to go through these a little bit. And now, |
| 11:07:48 | 23 | what is this document here? |
| 11:07:50 | 24 | A. That is a notification that was e-mailed to me by MidFirst |
| 11:07:58 | 25 | Bank. It shows the account that it went into and the amount, |

11:08:12  1   228,700.

11:08:13  2   Q.   Okay.  And when you say the account it went into, I'm

11:08:15  3   highlighting here, that's the Heritage Place winter mixed sale?

11:08:18  4   A.   Yes.

11:08:18  5   Q.   So this is a payment for the first two horses or number of

11:08:24  6   horses that were in the previous page, correct?

11:08:29  7   A.   Yes.  I actually applied that to three accounts based on my

11:08:32  8   notes.

11:08:33  9   Q.   And, your Honor, just for the record, I apologize, that's

11:08:36  10  Bates No. 13.  And the first number in that sequence on

11:08:41  11  Government's Exhibit 230L is 1689.

11:08:47  12          How much is this wire for?

11:08:51  13  A.   $228,700.

11:08:55  14  Q.   I believe you testified earlier, this here, ADT Petro

11:09:00  15  Servicios, is that the individual who's paying for it?

11:09:02  16  A.   Yes.  That's the money came from a bank in Mexico.

11:09:10  17  Q.   And that's bank Monex, correct, above it?

11:09:21  18  A.   Yes.

11:09:23  19  Q.   Is that your writing, Ms. Eckert?

11:09:38  20  A.   Yes.

11:09:39  21  Q.   And what does that reflect?

11:09:40  22  A.   Those payments listed above, that's how I was told to apply

11:09:48  23  the money that was received.

11:09:50  24  Q.   To that particular set of auction purchases?

11:09:54  25  A.   Yes.  March payment would have been for January.

| 11:10:03 | 1 | Q.   And, again, is this the same thing with these three |

11:10:03    1    Q.   And, again, is this the same thing with these three

11:10:07    2    individuals, Ray Gonzales, Ismael Para, and Salvador -- and I

11:10:13    3    apologize, I can't pronounce that last name.

11:10:14    4    A.   Roshan.  Yes.

11:10:17    5    Q.   And did they pay the $9,900 to your auction house, or was

11:10:22    6    this, again, money that was wired into or deposited into the Bank

11:10:26    7    of America account?

11:10:27    8    A.   That's the Bank of America account.  So it wasn't wired

11:10:31    9    because wires from Bank of America looked different.  And

11:10:36    10   normally I can identify those on my own without assistance.

11:10:42    11   Q.   If I zoom in on this, says commercial deposit, commercial

11:10:48    12   deposit, $9,900 and $9,900, correct?

11:10:51    13   A.   Yes.

11:11:04    14   Q.   Now, here you have writing that says, Fernando Garcia

11:11:08    15   e-mail?

11:11:09    16        MR. WOMACK:  Your Honor, I'm sorry, if we could ask for

11:11:11    17   the Bates number for this.

11:11:13    18        MR. GARDNER:  Absolutely.  133638.

11:11:16    19        MR. WOMACK:  I'm sorry 13.

11:11:18    20        MR. GARDNER:  3638.  I apologize.

11:11:20    21   Q.   (BY MR. GARDNER) Is this your writing, Ms. Eckert?

11:11:23    22   A.   Yes.

11:11:24    23   Q.   And so, what did he e-mail you?

11:11:26    24   A.   The receipts from Bank of America to prove that he was the

11:11:31    25   one who sent the money to our account.

| 11:11:35 | 1 | Q. And is this the same balance in which the ADT Petro |
| 11:11:42 | 2 | Servicios was applied to? |
| 11:11:44 | 3 | A. Yes. |
| 11:11:49 | 4 | Q. Again, the date of this deposit for the record is 2-28-12 |
| 11:11:58 | 5 | and how much, Ms. Eckert? |
| 11:12:00 | 6 | A. $9,900. |
| 11:12:02 | 7 | Q. And the date of this deposit is 2-28-12 and, again, how much |
| 11:12:07 | 8 | is that deposit? |
| 11:12:07 | 9 | A. $9,900. |
| 11:12:10 | 10 | Q. And the date of this deposit is? |
| 11:12:14 | 11 | A. 3-1 for $4,900. |
| 11:12:18 | 12 | Q. And for 4,900 and the date of this deposit? |
| 11:12:22 | 13 | A. 2-29. |
| 11:12:24 | 14 | Q. And for the amount of? |
| 11:12:26 | 15 | A. 1,700. |
| 11:12:28 | 16 | Q. And the date of this deposit? |
| 11:12:30 | 17 | A. 2-28. |
| 11:12:32 | 18 | Q. And for the amount of? |
| 11:12:33 | 19 | A. $9,900. |
| 11:12:34 | 20 | Q. Your Honor, for the record, that's the next page 13-3636. |
| 11:12:40 | 21 | Turn to 3637. And the date of this one, Ms. Eckert? |
| 11:12:47 | 22 | A. 3-1. |
| 11:12:50 | 23 | Q. And the amount? |
| 11:12:52 | 24 | A. 9,900. |
| 11:12:52 | 25 | Q. The date of the next one? |

| | | |
|---|---|---|
| 11:12:54 | 1 | A.   3-1. |
| 11:12:55 | 2 | Q.   And the amount? |
| 11:12:55 | 3 | A.   5,000. |
| 11:12:57 | 4 | Q.   And these deposits of all less than $10,000, those were |
| 11:13:01 | 5 | applied to the account for this particular purchase, correct? |
| 11:13:05 | 6 | A.   Right.  For the group. |
| 11:13:06 | 7 | Q.   For the group of horses.  There's more than one horse here. |
| 11:13:08 | 8 | A.   Correct. |
| 11:13:09 | 9 | Q.   And do you know who bought Mr. Perrys Wine? |
| 11:13:16 | 10 | A.   According to the notes that I received, Fernando and Carlos. |
| 11:13:25 | 11 | Q.   Do you know who bought -- |
| 11:13:26 | 12 | A.   Or they're responsible for the payment of. |
| 11:13:28 | 13 | Q.   Responsible for payment of.  Not necessarily listed as the |
| 11:13:31 | 14 | owners, correct? |
| 11:13:32 | 15 | A.   Right. |
| 11:13:32 | 16 | Q.   And do you know same thing for Katies Sign? |
| 11:13:35 | 17 | A.   Right.  I would have been given a list. |
| 11:13:38 | 18 | Q.   And do you know where Katies Sign and Mr. Perrys Wine |
| 11:13:43 | 19 | eventually ended up? |
| 11:13:43 | 20 | A.   No. |
| 11:13:44 | 21 | Q.   Okay.  You talked earlier about a horse called Dashin |
| 11:13:51 | 22 | Follies, so I'm showing you Government's Exhibit 230F.  Bates |
| 11:13:56 | 23 | stamp 13-1506.  And, again, you said Tyler Graham is the acting |
| 11:14:06 | 24 | agent on this sale? |
| 11:14:07 | 25 | A.   Yes. |

```
11:14:08   1   Q.   And you have one, two, three, four horses listed on this
11:14:13   2   front page?
11:14:13   3   A.   Yes.
11:14:14   4   Q.   Okay.  What's the significance of that in terms of this
11:14:17   5   document?
11:14:18   6   A.   Well, Dashin Follies at the time was the record-selling
11:14:29   7   brood mare for quarter horse at auction.  That was a real big
11:14:37   8   deal.
11:14:37   9   Q.   In the history of your auction house?
11:14:40  10   A.   Well, we had sold -- well, as far as brood mare, yes.  I
11:14:43  11   mean, I think not just our place.  I mean, brood mares don't
11:14:49  12   normally go, I guess, for that much.  I don't know that much
11:14:54  13   about horses.
11:14:54  14   Q.   Were these four horses all bought in one group?
11:14:56  15   A.   Yes.
11:14:57  16   Q.   Tyler Graham was, in fact, the agent?
11:15:02  17   A.   Yes.
11:15:02  18   Q.   Now, can you tell the ladies and gentlemen of the jury how
11:15:13  19   this was paid for?
11:15:15  20   A.   Each of those line items has the date and that it was a wire
11:15:20  21   and that the wire was received from Grupo Aduanero, and they were
11:15:27  22   different amounts on different days.
11:15:29  23   Q.   Now, do you recall --
11:15:33  24   A.   It's like ten payments.
11:15:36  25   Q.   Ten payments.  The amount is $935,000 total; is that
```

11:15:43    1    correct?

11:15:43    2    A.    Yes.

11:15:44    3    Q.    Do you recall a $100,000 cash deposit for the sale of this

11:15:48    4    horse to Heritage Place?

11:15:49    5    A.    Yes.

11:15:51    6    Q.    Who made that cash deposit?

11:15:54    7    A.    Tyler Graham brought the money to me and I made the deposit.

11:15:59    8    Q.    So the money was all U.S. currency?

11:16:02    9    A.    Yes.

11:16:02   10    Q.    And do you recall the denominations of the bills?

11:16:05   11    A.    No.

11:16:07   12    Q.    Did you fill out this form, Government's Exhibit 403, a Form

11:16:21   13    8300?

11:16:23   14    A.    Yes.

11:16:24   15    Q.    For the cash?

11:16:25   16    A.    Yes.

11:16:26   17    Q.    Did you list Tyler Graham as the person in Part I?

11:16:32   18    A.    Yes.

11:16:32   19    Q.    And do you recall who you listed in Part II?

11:16:36   20    A.    I know I did not have a Social Security number.  I believe

11:16:42   21    it was Luis Aguirre.

11:16:56   22    Q.    I want to go through at least one more sale with you.  This

11:17:03   23    is Government's Exhibit 230K, Bates 133483.  And what's this

11:17:25   24    particular document show, Ms. Eckert?

11:17:29   25    A.    That company sold four horses in the fall mixed sale 2011.

11:17:39   1   It shows --

11:17:39   2   Q.   I'm sorry.

11:17:40   3   A.   It shows hip number, name of the horses, the price each

11:17:44   4   horse bought, the commission and registration fee that Heritage

11:17:50   5   Place collected, and the net is the amount that the owner would

11:17:54   6   have received by check.

11:17:56   7   Q.   So in this case, it's Tremor Enterprises who sold these

11:17:59   8   horses?

11:17:59   9   A.   Yes.

11:18:00  10   Q.   And these are the four horses, including Blues Girls Choice

11:18:04  11   they sold?

11:18:04  12   A.   Yes.

11:18:05  13   Q.   And the amounts over here.  So Blues Girls Choice, for

11:18:09  14   example, it was sold for how much?

11:18:11  15   A.   $102,000.

11:18:13  16   Q.   Other horses are Number One Cartel and Forty Force?

11:18:17  17   A.   Yes.

11:18:20  18   Q.   Generally what type of horses do you see at the fall mixed

11:18:23  19   sale?

11:18:23  20   A.   The fall mixed sale usually has fewer horses entered.  It's

11:18:31  21   usually on a two-day sale, instead of a three-day sale, and the

11:18:37  22   quality is usually a little less.

11:18:42  23   Q.   Why is that?

11:18:45  24   A.   I was told that the fall sale was when people culled the

11:18:52  25   herd of the horses that they didn't want to feed during the

```
11:18:56   1   winter.
11:18:56   2   Q.   And have you, upon my request, looked at other fall mixed
11:19:02   3   sales?
11:19:02   4   A.   Yes.
11:19:02   5   Q.   And what was the general price for the highest sale at those
11:19:08   6   sales?
11:19:09   7   A.   I went back and looked at -- and this is online at
11:19:14   8   heritageplace.com.  The top seller for the fall mixed sale for
11:19:19   9   2008, which was the first year when I came back, the high seller
11:19:24  10   at that time was $60,000.
11:19:26  11   Q.   And so, did this particular auction with the horses listed
11:19:29  12   by Tremor Enterprises bring it to your attention?
11:19:35  13   A.   In the fall sale when a horse brings over $100,000, it's
11:19:39  14   very exciting.  It's noticeable.
11:19:41  15   Q.   When you say top seller, so does this top seller combine all
11:19:47  16   of the amounts together for a total that we're talking about?
11:19:49  17   A.   No.  That's $60,000 for single horse was the top seller in.
11:19:54  18   Q.   2008?
11:19:56  19   A.   The other sale.
11:19:56  20   Q.   In this case, we have --
11:19:58  21   A.   The 280 was the top seller in that sale.
11:20:02  22   Q.   Does Heritage Place give out some sort of trophy for that?
11:20:05  23   A.   They have.  They haven't always done it, but I think it's
11:20:08  24   something that they started more recently.
11:20:11  25   Q.   And who do they give that to?
```

| | | |
|---|---|---|
| 11:20:13 | 1 | A.    The seller. |
| 11:20:16 | 2 | Q.    So in this case, had they given a trophy, it would have |
| 11:20:20 | 3 | been? |
| 11:20:20 | 4 | A.    To Tremor Enterprises. |
| 11:20:21 | 5 | Q.    Now, do you know who owns Tremor Enterprises? |
| 11:20:27 | 6 | A.    Jose Trevino. |
| 11:20:28 | 7 | Q.    Do you see Mr. Trevino here in the courtroom today? |
| 11:20:31 | 8 | A.    Yes. |
| 11:20:32 | 9 | Q.    Could you point him?  He just stood up? |
| 11:20:35 | 10 | A.    Yes. |
| 11:20:35 | 11 | Q.    Have you met Mr. Trevino before? |
| 11:20:37 | 12 | A.    In my office, yes. |
| 11:20:39 | 13 | Q.    And what conversations have you had with Jose Trevino? |
| 11:20:45 | 14 | A.    Mostly, I spoke to him shortly after this sale happened.  I |
| 11:20:54 | 15 | was about to write the checks, so I knew that he was getting the |
| 11:20:59 | 16 | largest check for that particular sale, and I congratulated him |
| 11:21:05 | 17 | on that.  And we just -- it was a very friendly conversation |
| 11:21:13 | 18 | about his future plans to expand his business, and he had just |
| 11:21:21 | 19 | purchased a ranch just south of Oklahoma City.  He was very proud |
| 11:21:28 | 20 | and excited about that. |
| 11:21:29 | 21 | Q.    Nothing out of the ordinary? |
| 11:21:31 | 22 | A.    No. |
| 11:21:32 | 23 | Q.    The jury's heard some evidence that Ramiro Villarreal |
| 11:21:37 | 24 | previously owned Blues Girls Choice.  Did you and Mr. Jose |
| 11:21:40 | 25 | Trevino have a discussion of how he acquired that horse prior to |

| | | |
|---|---|---|
| 11:21:43 | 1 | him selling it? |
| 11:21:44 | 2 | A.   No. |
| 11:21:45 | 3 | Q.   May I have one moment, your Honor? |
| 11:21:58 | 4 | THE COURT:  Yes, ma'am. |
| 11:22:04 | 5 | MR. GARDNER:  Your Honor, I'll pass the witness. |
| 11:22:06 | 6 | CROSS-EXAMINATION |
| 11:22:06 | 7 | BY MR. FINN: |
| 11:22:09 | 8 | Q.   May it please the Court, members of the jury. |
| 11:22:11 | 9 | Ms. Eckert, my name is David Finn, F-I-N-N.  I don't |
| 11:22:14 | 10 | believe we've ever met, have we? |
| 11:22:16 | 11 | A.   No. |
| 11:22:16 | 12 | Q.   Haven't spoken on the phone? |
| 11:22:18 | 13 | A.   No. |
| 11:22:18 | 14 | Q.   No conversations, okay.  And you're from -- where are you |
| 11:22:22 | 15 | living, Oklahoma? |
| 11:22:22 | 16 | A.   Yes. |
| 11:22:23 | 17 | Q.   Okay.  Have you ever seen that Southwest Airlines ad, want |
| 11:22:28 | 18 | to get away? |
| 11:22:28 | 19 | A.   That's how I flew down here. |
| 11:22:30 | 20 | Q.   Oh, congratulations.  All right.  Let me ask just a couple |
| 11:22:34 | 21 | of questions. |
| 11:22:34 | 22 | When you were interacting with my client, Jose |
| 11:22:37 | 23 | Trevino-Morales, I think you said you met him one time; is that |
| 11:22:41 | 24 | right? |
| 11:22:41 | 25 | A.   That I recall very clearly, yes. |

| | | |
|---|---|---|
| 11:22:42 | 1 | Q.   Okay.  And he was courteous, polite, professional and it was |
| 11:22:46 | 2 | just a standard professional conversation, correct? |
| 11:22:49 | 3 | A.   Yes. |
| 11:22:50 | 4 | Q.   And he treated you with respect and you treated him with |
| 11:22:53 | 5 | respect? |
| 11:22:53 | 6 | A.   Yes. |
| 11:22:54 | 7 | Q.   Accurate? |
| 11:22:54 | 8 | A.   Yes. |
| 11:22:55 | 9 | Q.   Now, you mentioned the name on direct examination of Tyler |
| 11:23:03 | 10 | Graham.  Do you remember that? |
| 11:23:03 | 11 | A.   Yes. |
| 11:23:05 | 12 | Q.   Tell the members of the jury who Tyler Graham is, please. |
| 11:23:09 | 13 | A.   Tyler Graham is the grandson of one of the owners, Charlie |
| 11:23:14 | 14 | Graham. |
| 11:23:14 | 15 | Q.   Okay.  So we've got Charlie Graham, one of the owners of the |
| 11:23:18 | 16 | auction; is that correct? |
| 11:23:19 | 17 | A.   Yes. |
| 11:23:20 | 18 | Q.   And then, Charlie's got a son named David, right? |
| 11:23:23 | 19 | A.   Yes. |
| 11:23:23 | 20 | Q.   And then, David has a son named Tyler, correct? |
| 11:23:26 | 21 | A.   Correct. |
| 11:23:27 | 22 | Q.   And Tyler is a broker, right? |
| 11:23:30 | 23 | A.   Yes.  Agent. |
| 11:23:32 | 24 | Q.   An agent and he's been in the horse industry for a number of |
| 11:23:36 | 25 | years, just like granddad, correct? |

| | | |
|---|---|---|
| 11:23:38 | 1 | A.   Learning the business. |
| 11:23:39 | 2 | Q.   Learning the business.  How old is Tyler Graham, if you |
| 11:23:44 | 3 | know, approximately? |
| 11:23:45 | 4 | A.   He's around 30. |
| 11:23:47 | 5 | Q.   Around 30 years old? |
| 11:23:49 | 6 | A.   Yes. |
| 11:23:49 | 7 | Q.   Is he really, really tight with granddad Charles Graham? |
| 11:23:54 | 8 | A.   Seems to be. |
| 11:23:56 | 9 | Q.   I mean, they've got, as far as you know, a really good |
| 11:23:59 | 10 | relationship, correct? |
| 11:24:00 | 11 | A.   Yes. |
| 11:24:01 | 12 | Q.   And Charlie Graham or Charles Graham, Dr. Graham, he's a |
| 11:24:06 | 13 | doctor of veterinary medicine; is that right? |
| 11:24:09 | 14 | A.   Yes. |
| 11:24:09 | 15 | Q.   Did you know that early when Jose Trevino-Morales, my |
| 11:24:14 | 16 | client, was getting into the horse business, that Dr. Graham more |
| 11:24:19 | 17 | or less tutored or taught Jose about horses and breeding and |
| 11:24:24 | 18 | things like that?  They had sort of a mentor-mentee relationship? |
| 11:24:28 | 19 | Were you aware of that? |
| 11:24:29 | 20 | A.   No. |
| 11:24:30 | 21 | Q.   Now, you're not -- Dr. Graham has been very, very successful |
| 11:24:39 | 22 | over the years in the horse business, correct? |
| 11:24:42 | 23 | A.   Yes. |
| 11:24:44 | 24 | Q.   I mean, not just in the horse business but with investments. |
| 11:24:48 | 25 | He's pretty well off, isn't he? |

| | | |
|---|---|---|
| 11:24:49 | 1 | A.   Seems to be. |
| 11:24:53 | 2 | Q.   And does he seem to be fairly connected to politicians, |
| 11:24:57 | 3 | elected officials, people that are in powers of position? |
| 11:25:02 | 4 | A.   I don't know. |
| 11:25:03 | 5 | Q.   Okay.  What do you know about this -- well, if Tyler Graham |
| 11:25:10 | 6 | came to you and made deposits of cash of $9,900, $9,900, $9,900, |
| 11:25:22 | 7 | $9,900, $9,900, would that trigger the reporting requirement that |
| 11:25:29 | 8 | you testified about earlier? |
| 11:25:31 | 9 | A.   Yes. |
| 11:25:34 | 10 | Q.   And why would it be important to record -- even though it's |
| 11:25:37 | 11 | not the $10,000 magic number, why would it be important to record |
| 11:25:42 | 12 | those kinds of cash transactions? |
| 11:25:45 | 13 | A.   They're related transactions. |
| 11:25:48 | 14 | Q.   The related transactions? |
| 11:25:50 | 15 | A.   Yes. |
| 11:25:51 | 16 | Q.   Yeah, because, otherwise, somebody could try to get away |
| 11:25:54 | 17 | with structuring, right?  You're familiar with that term? |
| 11:25:57 | 18 | A.   Yes. |
| 11:25:58 | 19 | Q.   I'm sorry? |
| 11:25:58 | 20 | A.   Yes. |
| 11:25:59 | 21 | Q.   So if somebody's trying to pull a fast one and get around |
| 11:26:03 | 22 | the requirements, you're smart and savvy and experienced enough |
| 11:26:08 | 23 | to know, uh, uh, uh, sorry, Charlie, not so fast, I'm going to |
| 11:26:14 | 24 | report this, anyway, because you know what to look for, right? |
| 11:26:17 | 25 | A.   Right. |

| | | |
|---|---|---|
| 11:26:21 | 1 | Q. What is your if you have -- did you know that this grandson |
| 11:26:24 | 2 | Tyler Graham was a government informant, a confidential |
| 11:26:27 | 3 | informant? |
| 11:26:27 | 4 | A. No. |
| 11:26:30 | 5 | Q. Is that news to you? |
| 11:26:33 | 6 | A. Recent news, yes. |
| 11:26:35 | 7 | Q. Who did you find that out from, the government? |
| 11:26:42 | 8 | A. I think I may have heard it from the general manager at |
| 11:26:49 | 9 | Heritage Place. |
| 11:26:50 | 10 | Q. Heritage Place. Where his granddad is one of the owners? |
| 11:26:53 | 11 | A. Yes. |
| 11:26:54 | 12 | Q. Is this grandson? |
| 11:27:00 | 13 | A. This would have been after the subpoena of records. |
| 11:27:02 | 14 | Q. Okay. Did you ever have occasion where you caught Tyler |
| 11:27:09 | 15 | Graham, the grandson of the owner of your former employer, |
| 11:27:15 | 16 | telling a fib? |
| 11:27:19 | 17 | A. About -- nothing comes to mind. |
| 11:27:24 | 18 | Q. Fair enough. Pass the witness. |
| 11:27:29 | 19 | MR. DEGEURIN: No questions. |
| 11:27:31 | 20 | MR. WOMACK: Your Honor, I have some. |
| 11:27:32 | 21 | MR. MAYR: Judge, may we approach before he begins his |
| 11:27:35 | 22 | cross-examination? |
| 11:27:41 | 23 | (At the bench, on the record.) |
| 11:27:53 | 24 | MR. MAYR: Now, my client -- and I've kind of confirmed |
| 11:27:56 | 25 | with my verbal thought with Mr. DeGeurin's client is indicating |

| | | |
|---|---|---|
| 11:27:58 | 1 | that the interpreter is having trouble keeping up with Mr. -- |
| 11:28:02 | 2 | that with Mr. Finn's very deliberate pace.  She's still having |
| 11:28:06 | 3 | very much difficulty keeping up with the translations.  So what |
| 11:28:11 | 4 | will -- and I actually listened to it, Judge, and what's |
| 11:28:13 | 5 | happening is she -- she'll start translating and then, she'll |
| 11:28:19 | 6 | stop in mid-sentence when the next question is asked and not |
| 11:28:23 | 7 | finish with any of the translations.  Does that make sense? |
| 11:28:26 | 8 | THE COURT:  Uh-huh.  What's happening is that she's |
| 11:28:31 | 9 | running across a word that she has to think to interpret and she |
| 11:28:36 | 10 | gets behind. |
| 11:28:37 | 11 | MR. MAYR:  Yeah. |
| 11:28:38 | 12 | THE COURT:  Okay. |
| 11:28:40 | 13 | MR. MAYR:  I'm sorry, Judge. |
| 11:28:41 | 14 | MR. WOMACK:  I'm trying to go slow. |
| 11:28:43 | 15 | MR. MAYR:  I want to make sure everyone is hearing. |
| 11:28:47 | 16 | MR. DEGEURIN:  It's pretty bad, I understand. |
| 11:28:49 | 17 | THE COURT:  Okay. |
| 11:28:51 | 18 | MR. WOMACK:  If we could get the interpreter -- they |
| 11:28:53 | 19 | could bring another interpreter that's faster.  She's a legal |
| 11:28:57 | 20 | assistant, that's the problem. |
| 11:28:59 | 21 | THE COURT:  She's okayed with San Antonio. |
| 11:29:08 | 22 | MR. MAYR:  That's my concern is I was listening and Mr. |
| 11:29:10 | 23 | Finn was very slow and deliberate, and the witness is not |
| 11:29:14 | 24 | answering really fast. |
| 11:29:16 | 25 | THE COURT:  The lady was fast. |

| | | |
|---|---|---|
| 11:29:18 | 1 | MR. MAYR:  Oh. |
| 11:29:20 | 2 | THE COURT:  Yeah.  But we'll do what I can. |
| 11:29:25 | 3 | Peter. |
| 11:29:27 | 4 | THE INTERPRETER:  Yes, your Honor. |
| 11:29:27 | 5 | THE COURT:  Everybody is complaining about not getting |
| 11:29:32 | 6 | complete answers. |
| 11:29:42 | 7 | THE INTERPRETER:  Sorry, your Honor.  Sorry? |
| 11:29:44 | 8 | THE COURT:  I said we have multiple complaints that |
| 11:29:47 | 9 | we're not getting complete answers by the interpreter because |
| 11:29:51 | 10 | she'll be going along and then, there will be a slight pause and |
| 11:29:56 | 11 | then, she gets into the next question.  Now, the last witness was |
| 11:30:02 | 12 | rather fast.  But what I want you to do is to take over, and |
| 11:30:08 | 13 | we'll run it one more hour. |
| 11:30:10 | 14 | THE INTERPRETER:  We can go till 1:00, Judge. |
| 11:30:13 | 15 | THE COURT:  All right. |
| 11:30:14 | 16 | THE INTERPRETER:  As a matter of fact, I just handed it |
| 11:30:16 | 17 | over.  Just -- it's been like a couple of questions. |
| 11:30:19 | 18 | MR. MAYR:  Right. |
| 11:30:20 | 19 | THE INTERPRETER:  And I've just taken it back again |
| 11:30:21 | 20 | because I kinda realized what's going on.  So yeah, it's |
| 11:30:24 | 21 | something we need to work out. |
| 11:30:26 | 22 | THE COURT:  Okay.  Thank you. |
| 11:30:27 | 23 | MR. MAYR:  Thanks. |
| 11:30:51 | 24 | THE COURT:  You may proceed, sir. |
| 11:30:53 | 25 | |

11:30:53  1                    CROSS-EXAMINATION

11:30:54  2   BY MR. WOMACK:

11:30:54  3   Q.   Ms. Eckert, I'm Guy Womack.  I'm from Houston.  We've never

11:30:57  4   met before, have we?

11:30:57  5   A.   No.

11:30:58  6   Q.   Got several questions to ask you.  First of all, you told us

11:31:03  7   that Heritage Place has a small office?

11:31:05  8   A.   Yes.

11:31:05  9   Q.   But you know that you're one of the great horse sales?

11:31:09  10  A.   Yes.

11:31:09  11  Q.   In fact, your motto is on your letterhead, where champions

11:31:09  12  are sold?

11:31:17  13  A.   Yes.

11:31:17  14  Q.   And you know that happens to be true?

11:31:18  15  A.   Yes.

11:31:18  16  Q.   Now, you told us that you have sales in January, September

11:31:24  17  and October?

11:31:24  18  A.   Yes.

11:31:26  19  Q.   The September sale is the yearling sale?

11:31:28  20  A.   Yes.

11:31:29  21  Q.   Those are horses that are -- the way they compute ages,

11:31:33  22  those horses are one year old?

11:31:34  23  A.   Yes.

11:31:34  24  Q.   And that's where the high quality -- the highest quality of

11:31:38  25  horses are sold?

| | | |
|---|---|---|
| 11:31:39 | 1 | A.   Yes. |
| 11:31:40 | 2 | Q.   And that's where the biggest money is spent? |
| 11:31:42 | 3 | A.   Yes. |
| 11:31:43 | 4 | Q.   Okay.  Now, y'all that work at Heritage remember the names |
| 11:31:57 | 5 | of some of the more significant sales, don't you? |
| 11:31:59 | 6 | A.   Yes. |
| 11:32:01 | 7 | Q.   How about a horse by the name of A Dash Of Sweet Heat?  Do |
| 11:32:06 | 8 | you remember that horse selling this fall? |
| 11:32:08 | 9 | A.   I wasn't there. |
| 11:32:10 | 10 | Q.   Have you heard that y'all sold it for $1 million? |
| 11:32:14 | 11 | A.   Yes.  I did hear that. |
| 11:32:15 | 12 | Q.   Even though you weren't there, you heard about that? |
| 11:32:17 | 13 | A.   Yes.  I didn't work there anymore.  But yes, I did. |
| 11:32:20 | 14 | Q.   Okay.  Now, you told us that some sales, like the mixed |
| 11:32:32 | 15 | sales in January or in October, whenever it was, those may not |
| 11:32:37 | 16 | bring the highest prices; is that right? |
| 11:32:39 | 17 | A.   Right. |
| 11:32:41 | 18 | Q.   But you're not suggesting to the jury that anyone paid too |
| 11:32:44 | 19 | much for a horse, are you? |
| 11:32:46 | 20 | A.   I wouldn't have any clue.  I don't know horses. |
| 11:32:50 | 21 | Q.   Sometimes you may buy a horse for a price and find out you |
| 11:32:54 | 22 | paid too much because it doesn't perform? |
| 11:32:57 | 23 | A.   It's all a gamble. |
| 11:32:58 | 24 | Q.   Yeah.  And sometimes you buy a horse like A Dash Of Sweet |
| 11:33:05 | 25 | Heat for hundreds of thousands and then, later, sell it for a |

11:33:09    1   million dollars, and that might be a bargain for that buyer?

11:33:12    2   A.    Right.

11:33:13    3   Q.    They paid a million dollars might be a bargain, right?

11:33:15    4   A.    Could be.

11:33:16    5   Q.    We won't know until we see how the horse -- how much it

11:33:19    6   produces over the long haul?

11:33:20    7   A.    Right.

11:33:21    8   Q.    Okay.  So you're not in any way suggesting that horses are

11:33:25    9   being bought too expensively or too cheaply.  You're not saying

11:33:30   10   that?

11:33:30   11   A.    I wouldn't have any idea.  I'm not that type of expert.

11:33:35   12   Q.    It would be up to the people actually paying the money to

11:33:37   13   make that decision?

11:33:38   14   A.    Correct.

11:33:42   15   Q.    Now, you said that Ramiro Villarreal, you knew he would come

11:33:47   16   in and buy horses, and he usually bought the higher dollar

11:33:52   17   horses, didn't he?

11:33:52   18   A.    Frequently.

11:33:54   19   Q.    And you also said that you -- you said he bought, but

11:34:00   20   actually, you consider him more of an agent; is that right?

11:34:03   21   A.    I believe the horses he purchased went into other people's

11:34:05   22   names, not his own name.

11:34:08   23   Q.    And from your experience at Heritage, you know that was

11:34:10   24   actually very common?

11:34:10   25   A.    Right.

| | | |
|---|---|---|
| 11:34:11 | 1 | Q.   That a buyer would have an agent go down -- or a number of |
| 11:34:14 | 2 | buyers may have an agent buy horses for all of them? |
| 11:34:17 | 3 | A.   Correct. |
| 11:34:17 | 4 | Q.   Fernando Garcia, you know he did that? |
| 11:34:22 | 5 | A.   Correct. |
| 11:34:23 | 6 | Q.   He would buy horses for different companies or different |
| 11:34:26 | 7 | buyers, but he would be the man physically coming to Heritage, |
| 11:34:31 | 8 | quote, as the buyer, correct? |
| 11:34:32 | 9 | A.   Correct. |
| 11:34:33 | 10 | Q.   But if you then looked at the certificates where the horses |
| 11:34:38 | 11 | were registered with the American Quarter Horse Association, of |
| 11:34:40 | 12 | course, they have to be for racing, then you could find out who |
| 11:34:44 | 13 | the real owner was, correct? |
| 11:34:46 | 14 | A.   Right. |
| 11:34:46 | 15 | Q.   Okay.  Did you ever actually go to an auction? |
| 11:34:57 | 16 | A.   I was present in the back room. |
| 11:35:00 | 17 | Q.   Okay.  And on some of the really big horses, they would be |
| 11:35:06 | 18 | pretty exciting to watch, wouldn't it? |
| 11:35:07 | 19 | A.   Yes. |
| 11:35:07 | 20 | Q.   Because the numbers were going up astronomically every time |
| 11:35:11 | 21 | someone raised their hand? |
| 11:35:12 | 22 | A.   Yes. |
| 11:35:12 | 23 | Q.   And did you notice that sometimes because you did the |
| 11:35:18 | 24 | paperwork, sometimes the bidders were like unknown people? |
| 11:35:22 | 25 | A.   Yes. |

11:35:23  1   Q.   And then, you find out later doing the paperwork that the

11:35:27  2   buyer was somebody else that wasn't raising his hand?

11:35:29  3   A.   Yes.

11:35:30  4   Q.   Okay.  And that was common?

11:35:31  5   A.   Yes.

11:35:33  6   Q.   You mentioned you saw Fernando -- he went to most of your

11:35:50  7   actions while you were there, didn't he?

11:35:54  8   A.   I first noticed him after the 2010.  I mean, he could have

11:36:01  9   been -- I'm in the back office.

11:36:02  10  Q.   I understand.  If I took -- well, but if he bought a horse,

11:36:05  11  you would see him because he'd come by your office, wouldn't he?

11:36:08  12  A.   Not necessarily.  During auction, there are eight cashiers

11:36:15  13  and that's who they would speak to first.

11:36:18  14  Q.   If I told you that he wasn't at the January 2010 auction,

11:36:23  15  could that be true?  January of 2010.

11:36:27  16  A.   I wouldn't have any idea.

11:36:29  17  Q.   Okay.  So you're not saying he was at every auction.  You

11:36:32  18  know he came to some?

11:36:33  19  A.   Right.

11:36:37  20  Q.   The Form 8300 that the government put on the screen, did you

11:36:49  21  notice that that was the newest version of that form?

11:36:52  22  A.   I didn't notice it looked any different.

11:36:56  23  Q.   At the top right corner, it says, revised July 2012.  Are

11:37:01  24  you aware that the forms have changed?

11:37:06  25  A.   No, because I don't do that anymore.

| 11:37:11 | 1 | Q. When did you quit doing Form 8300s? |
| 11:37:14 | 2 | A. When I quit Heritage Place. |
| 11:37:16 | 3 | Q. Which is? |
| 11:37:18 | 4 | A. I gave my notice in February of 2012. So I finished up all |
| 11:37:25 | 5 | paperwork on January 2012 sale as part of my exit. So yeah, |
| 11:37:35 | 6 | sometime a year ago. So where I'm at now, it's not necessary. |
| 11:37:39 | 7 | Q. So you wouldn't know how they changed, how the form has |
| 11:37:42 | 8 | changed? |
| 11:37:43 | 9 | A. I wouldn't have looked at it recently because I wouldn't |
| 11:37:46 | 10 | have cause to. |
| 11:37:46 | 11 | Q. Most of it, didn't know it had changed. It's an accident |
| 11:37:49 | 12 | that anybody knows, but you're not aware of the changes? |
| 11:37:50 | 13 | A. No. |
| 11:37:51 | 14 | Q. Okay. |
| 11:37:51 | 15 | A. I don't know what the changes would be. |
| 11:37:52 | 16 | Q. Now, if a buyer or an agent bought multiple horses at an |
| 11:38:01 | 17 | auction, isn't it common for them to make separate payments for |
| 11:38:07 | 18 | each horse just for accounting purposes? |
| 11:38:11 | 19 | A. They do it all different ways. I've seen so many different |
| 11:38:16 | 20 | combinations, I couldn't even begin to tell you. |
| 11:38:20 | 21 | Q. Let's say they're paying you with wire transfers. Isn't it |
| 11:38:26 | 22 | common if a person bought multiple horses that they would send |
| 11:38:29 | 23 | you a wire transfer for each horse? |
| 11:38:31 | 24 | A. It could be. Yes. |
| 11:38:33 | 25 | Q. And that could be for accounting purposes for them? |

| | | |
|---|---|---|
| 11:38:35 | 1 | A.   It could be.  Yes. |
| 11:38:36 | 2 | Q.   So they'd know how much they could account for:  I spent |
| 11:38:39 | 3 | this much money for this horse alone? |
| 11:38:42 | 4 | A.   Right. |
| 11:38:42 | 5 | Q.   And this much money went for that horse alone? |
| 11:38:44 | 6 | A.   Right. |
| 11:38:44 | 7 | Q.   And that wouldn't surprise you at all? |
| 11:38:47 | 8 | A.   No. |
| 11:38:48 | 9 | Q.   Okay.  If a horse is -- or horses are paid for by a buyer by |
| 11:39:02 | 10 | wire transfer, you don't do a Form 8300, do you? |
| 11:39:07 | 11 | A.   No. |
| 11:39:08 | 12 | Q.   The 8300, this transaction report would be filled out -- |
| 11:39:14 | 13 | actually, the bank would fill out their own currency transaction |
| 11:39:16 | 14 | report? |
| 11:39:17 | 15 | A.   Right.  Correct. |
| 11:39:18 | 16 | Q.   So, in other words, when you got wire transfers to pay for |
| 11:39:24 | 17 | horses, what you get is the actual money wired from a bank to |
| 11:39:29 | 18 | your bank? |
| 11:39:29 | 19 | A.   Correct. |
| 11:39:31 | 20 | Q.   And you wouldn't know where the money came from or how it |
| 11:39:35 | 21 | was deposited in that paying bank.  You would just know a wire |
| 11:39:39 | 22 | from that bank came to your bank? |
| 11:39:41 | 23 | A.   Correct. |
| 11:39:41 | 24 | Q.   There was a government exhibit, it was like 1336, 37, if I |
| 11:39:49 | 25 | can -- |

| | | |
|---|---|---|
| 11:39:52 | 1 | MR. GARDNER:  I'm sorry.  Which one do you want? |
| 11:39:55 | 2 | MR. WOMACK:  1336, 37, 38, something like that.  It's a |
| 11:39:59 | 3 | series. |
| 11:40:29 | 4 | Q.   (BY MR. WOMACK) Okay.  This thing is on.  You see where it |
| 11:40:35 | 5 | says, Fernando Garcia e-mail? |
| 11:40:37 | 6 | A.   Yes. |
| 11:40:38 | 7 | Q.   Who wrote that? |
| 11:40:39 | 8 | A.   Me. |
| 11:40:40 | 9 | Q.   And explain to us what that means.  What does that notation |
| 11:40:46 | 10 | mean? |
| 11:40:47 | 11 | A.   That means that I received an e-mail from Fernando and |
| 11:40:50 | 12 | attached were either individual copies or those pages of copies |
| 11:40:56 | 13 | of deposit slips. |
| 11:40:57 | 14 | Q.   Okay.  And so, what you received from Fernando -- this was a |
| 11:41:04 | 15 | horse or horses where he was an agent for someone? |
| 11:41:07 | 16 | A.   Correct. |
| 11:41:08 | 17 | Q.   Okay.  And these deposit slips, is that into Heritage's |
| 11:41:17 | 18 | account or someone else's account? |
| 11:41:18 | 19 | A.   Those are all into the Bank of America Heritage Place |
| 11:41:22 | 20 | account. |
| 11:41:22 | 21 | Q.   Okay.  So the e-mail that you got from Fernando showed you |
| 11:41:29 | 22 | deposit slips showing that someone had deposited sufficient money |
| 11:41:34 | 23 | into Heritage's account to settle that debt? |
| 11:41:37 | 24 | A.   Yes. |
| 11:41:38 | 25 | Q.   Okay.  It doesn't say who made the deposit? |

| | | |
|---|---|---|
| 11:41:41 | 1 | A.   No. |
| 11:41:42 | 2 | Q.   You're not suggesting for a minute that Fernando Garcia made |
| 11:41:46 | 3 | these deposits? |
| 11:41:47 | 4 | A.   I don't know who made the deposits.  I was told how to apply |
| 11:41:52 | 5 | the payments. |
| 11:41:53 | 6 | Q.   Right. |
| 11:41:54 | 7 | A.   To which accounts. |
| 11:41:54 | 8 | Q.   And so here, the agent for these buyers, or one buyer, or |
| 11:41:58 | 9 | however many it was, sent you an e-mail proving that some people |
| 11:42:03 | 10 | had made deposits that covered that debt. |
| 11:42:06 | 11 | A.   Yes. |
| 11:42:07 | 12 | Q.   And that's all it shows? |
| 11:42:08 | 13 | A.   Yes. |
| 11:42:08 | 14 | Q.   Okay.  Now, notice on the -- and that was on the page we |
| 11:42:24 | 15 | were just looking at is 13-003638.  Remember that.  There will be |
| 11:42:31 | 16 | a test next week. |
| 11:42:34 | 17 | The front page of that exhibit is 13-001689 and I'm |
| 11:42:41 | 18 | kidding.  Don't remember.  It has the name Fernando and Carlito |
| 11:42:48 | 19 | written on it.  Is that your writing? |
| 11:42:50 | 20 | A.   No. |
| 11:42:51 | 21 | Q.   Do you know who wrote that? |
| 11:42:52 | 22 | A.   Jeff Tebow. |
| 11:42:54 | 23 | Q.   Okay.  And is he somebody that worked at Heritage? |
| 11:42:56 | 24 | A.   He's the general manager.  He was my boss. |
| 11:42:58 | 25 | Q.   Okay.  And this shows that Mr. Perrys Wine was bought for |

| | | |
|---|---|---|
| 11:43:07 | 1 | $132,000. |
| 11:43:14 | 2 | A.   There was no commission to the buyer. |
| 11:43:17 | 3 | Q.   Okay.  So is Robert Marquez the buyer of the horse or the |
| 11:43:22 | 4 | seller? |
| 11:43:22 | 5 | A.   The buyer. |
| 11:43:23 | 6 | Q.   Okay.  So do you know why the name Fernando is written on |
| 11:43:29 | 7 | there? |
| 11:43:30 | 8 | A.   That would be Jeff's way of letting me know how to group |
| 11:43:39 | 9 | multiple purchases that were under different names. |
| 11:43:41 | 10 | Q.   Okay.  And Fernando, do you think that would be Fernando |
| 11:43:46 | 11 | Garcia? |
| 11:43:46 | 12 | A.   Yes. |
| 11:43:46 | 13 | Q.   Okay.  Because, again, you know he was regularly assisting |
| 11:43:50 | 14 | buyers at your auction? |
| 11:43:51 | 15 | A.   Right. |
| 11:43:52 | 16 | Q.   All right.  Sir, I have no further questions. |
| 11:44:17 | 17 |          THE COURT:  Mr. Esper. |
| 11:44:18 | 18 |          MR. ESPER:  Yes, your Honor. |
| 11:44:19 | 19 |                    CROSS-EXAMINATION |
| 11:44:19 | 20 | BY MR. ESPER: |
| 11:44:21 | 21 | Q.   Ms. Eckert, I believe you testified that on occasions, an |
| 11:44:27 | 22 | owner or a purchaser of a horse, whether they were an owner, |
| 11:44:32 | 23 | intentional owner or an agent, would often bring a trainer with |
| 11:44:36 | 24 | them to assist them in purchasing a horse, correct? |
| 11:44:40 | 25 | A.   Yes. |

| 11:44:41 | 1 | Q.   Okay.  And that was a common practice that occurred, did it |
| 11:44:44 | 2 | not? |
| 11:44:44 | 3 | A.   Yes. |
| 11:44:44 | 4 | Q.   Okay.  And have you ever seen this man before? |
| 11:44:50 | 5 | A.   Not that I'm aware of. |
| 11:44:51 | 6 | Q.   Okay.  If I were to tell you he's a horse trainer, would |
| 11:44:56 | 7 | that refresh your recollection of whether you've ever seen him at |
| 11:44:59 | 8 | Heritage Place? |
| 11:45:00 | 9 | A.   No.  I'm in the back office. |
| 11:45:02 | 10 | Q.   Okay.  So you don't know him at all? |
| 11:45:04 | 11 | A.   I don't see very many people. |
| 11:45:06 | 12 | Q.   Okay.  Whenever Mr. Fernando Garcia and Mr. Nayen came, this |
| 11:45:12 | 13 | man wasn't with them, were they? |
| 11:45:15 | 14 | A.   Not that I recall. |
| 11:45:16 | 15 | Q.   That's all I have, your Honor. |
| 11:45:18 | 16 |           MR. MAYR:  I don't have any questions of the witness. |
| 11:45:22 | 17 |                      RE-DIRECT EXAMINATION |
| 11:45:22 | 18 | BY MR. GARDNER: |
| 11:45:23 | 19 | Q.   Mr. Womack asked you about the sales and the payments.  I |
| 11:45:30 | 20 | have one quick question on Government's Exhibit 230L, page |
| 11:45:37 | 21 | 13-1689.  Is that "Carlisto" that Mr. Womack said or Carlito? |
| 11:45:45 | 22 | A.   Carlito. |
| 11:45:45 | 23 | Q.   And who is Carlito? |
| 11:45:46 | 24 | A.   Carlos. |
| 11:45:47 | 25 | Q.   Carlos Nayen? |

| | | |
|---|---|---|
| 11:45:48 | 1 | A.   Yes. |
| 11:45:48 | 2 | Q.   And are those two -- as your testimony earlier stated, they |
| 11:45:52 | 3 | were always together? |
| 11:45:56 | 4 | A.   I'd occasionally see Fernando without Carlos, but I don't |
| 11:45:59 | 5 | think I ever saw Carlos without Fernando. |
| 11:46:02 | 6 | Q.   What happens to the horses after the auction? |
| 11:46:07 | 7 | A.   They're supposed to be out of the barn by Sunday at noon, |
| 11:46:12 | 8 | and where they go depends on the purchaser. |
| 11:46:19 | 9 | Q.   So I'm showing you page 133385.  Again, that's Blues Girls |
| 11:46:30 | 10 | Choice, correct? |
| 11:46:30 | 11 | A.   Yes. |
| 11:46:32 | 12 | Q.   This represents -- this top portion here represents what? |
| 11:46:36 | 13 | A.   That is the consigner information.  Those are printed out. |
| 11:46:41 | 14 | It's a three-part -- there's a white, a yellow and a green sheet. |
| 11:46:47 | 15 | The very top part that's printed by the computer, that's the -- |
| 11:46:52 | 16 | because we know ahead of time which day it's going to sell on |
| 11:46:55 | 17 | according to the hip number.  The name of the horse and the name |
| 11:46:59 | 18 | of the consigner, and then, everything else is filled out after |
| 11:47:03 | 19 | the purchase. |
| 11:47:05 | 20 | Q.   Okay.  So in this case, it's Blues Girls Choice consigned by |
| 11:47:11 | 21 | Tremor Enterprises? |
| 11:47:11 | 22 | A.   Correct. |
| 11:47:12 | 23 | Q.   And then, your testimony earlier was that's Jose Trevino's |
| 11:47:15 | 24 | company? |
| 11:47:15 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:47:16 | 1 | Q.   Okay.  And here's the purchase price? |
| 11:47:18 | 2 | A.   Yes. |
| 11:47:18 | 3 | Q.   So what's this portion here that's called security |
| 11:47:21 | 4 | agreement? |
| 11:47:24 | 5 | A.   In order to leave the premises with a horse, whoever -- |
| 11:47:28 | 6 | whether it's a hauler, the owner, their agent, their trainer, |
| 11:47:32 | 7 | whoever checks out the horse and pays for it or makes |
| 11:47:38 | 8 | arrangements for payment will receive a green sheet, and then, |
| 11:47:43 | 9 | whoever they give it to is who can leave the premises with the |
| 11:47:46 | 10 | horse.  They have to pass through security. |
| 11:47:49 | 11 | Q.   Okay.  So in this case, that person is Fernando Garcia? |
| 11:47:52 | 12 | A.   Actually, the horse was officially released to. |
| 11:47:56 | 13 | Q.   Fernando Garcia for Blues Girls Choice? |
| 11:47:58 | 14 | A.   Yes. |
| 11:47:58 | 15 | Q.   And then, the form says, I intend to move this animal to, |
| 11:48:06 | 16 | and who fills in the location of where the animal goes? |
| 11:48:11 | 17 | A.   The person -- the cashier fills out the form, they ask, |
| 11:48:15 | 18 | where are you taking the horse? |
| 11:48:16 | 19 | Q.   So in this case, the horse is going to Lexington, Oklahoma? |
| 11:48:19 | 20 | A.   According to that.  Yes. |
| 11:48:20 | 21 | Q.   And are you familiar with where Jose Trevino's ranch is? |
| 11:48:24 | 22 | A.   Yes. |
| 11:48:25 | 23 | Q.   Is that Lexington, Oklahoma? |
| 11:48:27 | 24 | A.   Yes. |
| 11:48:29 | 25 | Q.   I'm showing you the security agreement for Devil Ridge. |

11:48:36  1  Tremor Enterprises, it says, Fernando Garcia, again, signing for

11:48:39  2  that animal?

11:48:39  3  A.   Yes.

11:48:40  4  Q.   Does it appear to be going back to Lexington, Oklahoma?

11:48:43  5  A.   Yes.

11:48:44  6  Q.   That was Bates 133396, your Honor.

11:48:54  7       And this is the security agreement for Forty Force,

11:48:58  8  another Tremor horse, correct?

11:48:59  9  A.   Yes.

11:49:00  10  Q.   And is Fernando Garcia signing the security agreement for

11:49:04  11  that?

11:49:04  12  A.   Yes.

11:49:05  13  Q.   In this case, there is no location where it's going?

11:49:08  14  A.   They failed to fill that part out.

11:49:15  15  Q.   And finally, this is a security agreement for Number One

11:49:19  16  Cartel.  Again, is that Mr. Fernando Garcia?

11:49:21  17  A.   Yes.

11:49:22  18  Q.   And where is that horse going?

11:49:24  19  A.   It says, Lex, Oklahoma.  So.

11:49:29  20  Q.   Consistent with Lexington, Oklahoma?

11:49:31  21  A.   Yes.

11:49:32  22  Q.   Pass the witness, your Honor.

11:49:41  23       MR. FINN:  Have a safe flight home.  No questions, your

11:49:43  24  Honor.

11:49:48  25       MR. ESPER:  Nothing, your Honor.

|          |     |                                                              |
|----------|-----|--------------------------------------------------------------|
| 11:49:50 | 1   | <u>RE-CROSS EXAMINATION</u>                                   |
| 11:49:50 | 2   | BY MR. WOMACK:                                               |
| 11:50:02 | 3   | Q.   I'll make sure we're clear on this.                    |
| 11:50:04 | 4   |      You would see Fernando Garcia in your office at        |
| 11:50:08 | 5   | Heritage Place more often than you would see Carlito, Carlos, |
| 11:50:15 | 6   | whatever his name is, Nayen, correct?                       |
| 11:50:18 | 7   | A.   Somewhat, yes.                                         |
| 11:50:19 | 8   | Q.   You told us that sometimes you would see Fernando there by |
| 11:50:23 | 9   | himself.                                                    |
| 11:50:24 | 10  | A.   Occasionally.                                          |
| 11:50:24 | 11  | Q.   Or other people?                                       |
| 11:50:27 | 12  | A.   Right.                                                 |
| 11:50:30 | 13  | Q.   But you remember that whenever Nayen came in, Fernando would |
| 11:50:35 | 14  | come and translate for him?                                 |
| 11:50:36 | 15  | A.   Yes.  I never heard him speak English.                 |
| 11:50:39 | 16  | Q.   Nayen?                                                 |
| 11:50:40 | 17  | A.   Correct.                                               |
| 11:50:41 | 18  | Q.   Okay.  But you saw Fernando there other times when Nayen |
| 11:50:44 | 19  | wasn't even there.                                          |
| 11:50:46 | 20  | A.   Yes.                                                   |
| 11:50:47 | 21  | Q.   And you know that Fernando himself bought horses for    |
| 11:50:51 | 22  | himself?                                                    |
| 11:50:53 | 23  | A.   I don't remember specifically.                         |
| 11:50:55 | 24  | Q.   Okay.  The government showed you -- I'll use one as an  |
| 11:51:08 | 25  | example.  The security agreement on hip No. 478 Devil Ridge and |

| | | |
|---|---|---|
| 11:51:20 | 1 | Fernando signed as the buyer, correct?  I mean, he signed that |
| 11:51:27 | 2 | block? |
| 11:51:27 | 3 | A.   Yeah. |
| 11:51:28 | 4 | Q.   Actually, I guess it's not his signature, is it? |
| 11:51:30 | 5 | A.   No.  That's just his handwritten name.  His signature is -- |
| 11:51:33 | 6 | I mean, I get that's the signature down by the -- where it says |
| 11:51:35 | 7 | buyers and the X.  That was filled out by one of the clerks. |
| 11:51:39 | 8 | Q.   And by looking at that form, we don't know if Fernando was |
| 11:51:43 | 9 | the buyer, the agent for the buyer or a trainer, correct? |
| 11:51:49 | 10 | A.   True. |
| 11:51:51 | 11 | Q.   We know that he is the one that came into the office to make |
| 11:51:55 | 12 | arrangements to take the horse? |
| 11:51:56 | 13 | A.   Yes. |
| 11:51:57 | 14 | Q.   Okay.  And he could be in any capacity.  But what we know is |
| 11:52:01 | 15 | that for those horses, he was the guy that was in charge of |
| 11:52:04 | 16 | getting the horse? |
| 11:52:05 | 17 | A.   Yes. |
| 11:52:06 | 18 | Q.   Okay.  And although the government showed you four of them, |
| 11:52:10 | 19 | you know from your own experience Fernando has been in your |
| 11:52:14 | 20 | office and has had his name on lots of other horses? |
| 11:52:17 | 21 | A.   Yes. |
| 11:52:18 | 22 | Q.   Okay.  And are you aware that he had his own company Garcia |
| 11:52:29 | 23 | Bloodstock and Racing? |
| 11:52:32 | 24 | A.   No. |
| 11:52:32 | 25 | Q.   Okay.  You're not familiar with that particular company? |

| | | |
|---|---|---|
| 11:52:35 | 1 | A.   No. |
| 11:52:36 | 2 | Q.   Okay.  Thank you.  No further questions. |
| 11:52:56 | 3 |       MR. ESPER:  Nothing further, your Honor. |
| 11:52:57 | 4 |       MR. MAYR:  None. |
| 11:52:59 | 5 |       MR. GARDNER:  Nothing further, your Honor. |
| 11:53:01 | 6 |       MR. FINN:  No objection. |
| 11:53:04 | 7 |       THE COURT:  You may be excused. |
| 11:53:10 | 8 |       MR. GARDNER:  Your Honor, I forgot to offer |
| 11:53:13 | 9 | Government's Exhibit 404 for demonstrative purposes into the |
| 11:53:16 | 10 | record, or into the clerk. |
| 11:53:25 | 11 |       THE COURT:  404 is received as a demonstrative |
| 11:53:27 | 12 | evidence.  Who's the next witness, counsel? |
| 11:53:36 | 13 |       MS. FERNALD:  Andrew Farabow. |
| 11:53:38 | 14 |       THE COURT:  About how long? |
| 11:53:40 | 15 |       MS. FERNALD:  He's a custodian witness.  We're about to |
| 11:53:44 | 16 | start custodians. |
| 11:53:45 | 17 |       THE COURT:  Invite him in. |
| 11:53:46 | 18 |       MS. FERNALD:  Thank you. |
| 11:54:10 | 19 |       (Witness sworn.) |
| 11:54:23 | 20 |       THE COURT:  I want you to tell us, please, sir, your |
| 11:54:28 | 21 | full name and spell your last. |
| 11:54:29 | 22 |       THE WITNESS:  My name is Andrew Farabow.  That's |
| 11:54:34 | 23 | F-A-R-A-B-O-W. |
| 11:54:34 | 24 |     ANDREW FARABOW, called by the Government, duly sworn. |
| 11:54:37 | 25 | |

<table>
<tr><td>11:54:37</td><td>1</td><td>DIRECT EXAMINATION</td></tr>
</table>

11:54:37    1                    DIRECT EXAMINATION

11:54:38    2    BY MS. FERNALD:

11:54:38    3    Q.   And what do you do for a living, sir?

11:54:40    4    A.   I'm a special agent with the FBI.  I'm assigned to the

11:54:43    5    Oklahoma City Division.

11:54:45    6    Q.   Can you tell the ladies and gentlemen of the jury a little

11:54:47    7    bit about your background?

11:54:49    8    A.   I've been a special agent with the FBI for over 18 years.

11:54:54    9    I've been in Oklahoma for approximately 18 years.

11:54:57   10    Q.   And what kind of cases have you done over the 18 years of

11:55:00   11    your employment with the FBI?

11:55:03   12    A.   A wide variety of criminal cases.

11:55:11   13    Q.   Tell me a little bit about your training and your experience

11:55:13   14    with the FBI.

11:55:15   15    A.   Well, like all agents, I went through new agents training

11:55:19   16    for 16 weeks at Quantico, and after that, I was assigned to

11:55:24   17    Oklahoma City.  And as I said, I've worked wide variety of

11:55:28   18    criminal cases during my 18 years with the FBI.

11:55:31   19    Q.   Okay.  Were you assigned to coordinate the arrest and search

11:55:37   20    warrant in Lexington, Oklahoma in reference to Jose Trevino?

11:55:41   21    A.   Yes, ma'am.  I was.

11:55:43   22    Q.   And approximately when did that occur?

11:55:45   23    A.   The search warrant was served in June of 2012.  I was

11:55:51   24    assigned to assist in the case in May of 2012.

11:55:54   25    Q.   Can you tell the jury a little bit about -- have you been

| | | |
|---|---|---|
| 11:55:58 | 1 | involved in a large investigation with multi-jurisdictions |
| 11:56:02 | 2 | before? |
| 11:56:03 | 3 | A.   Yes, I have. |
| 11:56:04 | 4 | MR. FINN:  Judge, excuse me, I'm going to object to |
| 11:56:06 | 5 | relevance.  He's a records custodian, I believe. |
| 11:56:10 | 6 | MS. FERNALD:  He coordinated the operational plan, and |
| 11:56:12 | 7 | I'm just going over operation plans. |
| 11:56:14 | 8 | THE COURT:  All right.  Permit it at this point. |
| 11:56:17 | 9 | Q.   (BY MS. FERNALD) Have you been involved in investigations |
| 11:56:20 | 10 | with different -- where evidence is collected in different |
| 11:56:23 | 11 | jurisdictions? |
| 11:56:24 | 12 | A.   Yes, ma'am. |
| 11:56:25 | 13 | Q.   And where arrests were made in different jurisdictions? |
| 11:56:28 | 14 | A.   Yes, ma'am. |
| 11:56:29 | 15 | Q.   There's usually the lead case agent; is that correct? |
| 11:56:32 | 16 | A.   Yes. |
| 11:56:33 | 17 | Q.   Can you tell me how that lead case agent gets to every |
| 11:56:36 | 18 | location to execute those search warrants, or do they rely upon |
| 11:56:40 | 19 | their field offices to assist? |
| 11:56:42 | 20 | A.   They rely upon agents in other field offices to assist in |
| 11:56:46 | 21 | their case. |
| 11:56:47 | 22 | Q.   And do you know Special Agent Scott Lawson with the FBI? |
| 11:56:51 | 23 | A.   Yes, ma'am. |
| 11:56:52 | 24 | Q.   He's in the courtroom today, correct? |
| 11:56:54 | 25 | A.   Yes, he is. |

11:56:55  1  Q.   Is he the one that called and asked for you to assist him on

11:56:58  2  this case?

11:56:58  3  A.   Yes, he was.

11:57:00  4  Q.   Okay.  Tell me exactly what you did in order to assist on

11:57:03  5  this particular case, starting in May of 2012.

11:57:06  6  A.   Well, I received background information from Agent Lawson.

11:57:11  7  Eventually, I obtained the search warrant for the Trevino

11:57:15  8  residence based upon information that was forwarded to me by the

11:57:19  9  case agents in this investigation.  And then, as I said before, I

11:57:23  10  helped coordinate the execution of the warrants.

11:57:26  11  Q.   Was your role pretty limited in this case, or do you know

11:57:29  12  about the investigation of this case?

11:57:32  13  A.   It was limited in the sense that I obtained the search

11:57:37  14  warrant and helped coordinate the execution of the warrants.

11:57:41  15  Since that date, I have not been involved in the investigation.

11:57:44  16  Q.   Can you tell the jury just very briefly, what do you do

11:57:49  17  prior to the search warrant?  Y'all just all run in and execute

11:57:53  18  the warrant?  Or what do you do prior to the search warrant?

11:57:55  19  A.   Typically prior to a search warrant, we prepare an

11:57:58  20  operations order that lists the specific roles and

11:58:02  21  responsibilities of everybody that's going to participate.  We

11:58:05  22  also have a briefing to go over the procedures that are to be

11:58:09  23  utilized during the execution of the search warrant.

11:58:14  24  Q.   How many people participated in this particular search

11:58:18  25  warrant?

| | | |
|---|---|---|
| 11:58:18 | 1 | A.   Over 100. |
| 11:58:19 | 2 | Q.   And did you have a vast area to cover? |
| 11:58:22 | 3 | A.   Yes.  It was a ranch. |
| 11:58:25 | 4 | Q.   I'm showing you what has been previously marked as |
| 11:58:30 | 5 | Government's Exhibit 306.  Take a look at that. |
| 11:58:34 | 6 | A.   Yes, ma'am. |
| 11:58:35 | 7 | Q.   Do you recognize that? |
| 11:58:36 | 8 | A.   I do. |
| 11:58:36 | 9 | Q.   What do you recognize it to be? |
| 11:58:38 | 10 | A.   This is an aerial photograph of the ranch. |
| 11:58:40 | 11 | Q.   Does it fairly and accurately depict the area at the time |
| 11:58:44 | 12 | that you executed the search warrant? |
| 11:58:46 | 13 | A.   Yes, ma'am. |
| 11:58:49 | 14 | Q.   Move for the introduction of Government's Exhibit 306. |
| 11:58:57 | 15 | MR. FINN:  No objection, your Honor. |
| 11:58:58 | 16 | THE COURT:  306 is received. |
| 11:59:03 | 17 | Q.   (BY MS. FERNALD) And is this the area in which you actually |
| 11:59:24 | 18 | had to execute the search warrant in this particular case? |
| 11:59:27 | 19 | A.   Yes, ma'am. |
| 11:59:34 | 20 | Q.   Did you have any other concerns, not only with the search of |
| 11:59:38 | 21 | the area, but did you have any other concerns with the animals |
| 11:59:41 | 22 | being on the property? |
| 11:59:42 | 23 | A.   Yes.  We did. |
| 11:59:43 | 24 | Q.   Okay.  What was the weather like in June of 2012? |
| 11:59:49 | 25 | A.   It was hot. |

| | | |
|---|---|---|
| 11:59:50 | 1 | Q.   Okay.  So what was your first priority as y'all executed the |
| 11:59:55 | 2 | search of the ranch?  I assume -- |
| 11:59:58 | 3 | MR. FINN:  Judge, objection.  Relevance.  Weather? |
| 12:00:03 | 4 | THE COURT:  It's always hot in June.  Let's go. |
| 12:00:09 | 5 | Q.   (MS. FERNALD) I'm showing you now what has previously been |
| 12:00:13 | 6 | marked as Government's Exhibit 370A through P.  Can you take a |
| 12:00:22 | 7 | chance to look at those? |
| 12:00:54 | 8 | A.   Yes, ma'am. |
| 12:00:55 | 9 | Q.   Do you recognize those photographs? |
| 12:00:56 | 10 | A.   I do.  Those are photos of the premises. |
| 12:00:58 | 11 | Q.   Okay.  Move for the introduction of Government's Exhibit |
| 12:01:04 | 12 | 370A through P. |
| 12:01:11 | 13 | THE COURT:  Through P or G? |
| 12:01:13 | 14 | MS. FERNALD:  P as in Paul. |
| 12:01:42 | 15 | MR. FINN:  No objection. |
| 12:01:44 | 16 | THE COURT:  370A through P are received. |
| 12:01:48 | 17 | Q.   (BY MS. FERNALD) On that particular day, how many structures |
| 12:01:58 | 18 | -- maybe I should have you go through and identify this.  My |
| 12:02:00 | 19 | apologies.  I'm going to show you how you can draw on the screen |
| 12:02:19 | 20 | so you can help me point out different structures, please. |
| 12:02:23 | 21 | A.   Okay. |
| 12:02:37 | 22 | Q.   Can you show us the different structures that are on this |
| 12:02:39 | 23 | particular photograph? |
| 12:02:41 | 24 | A.   Well, in total, there were approximately 28 structures, |
| 12:02:45 | 25 | including these small buildings that are in various places on the |

12:02:51  1  property.

12:02:52  2  Q.   And you're highlighting the upper portion of the photograph

12:02:58  3  at this time; is that correct?

12:02:58  4  A.   Correct.

12:02:59  5  Q.   Okay.  And what other structures were there?

12:03:02  6  A.   The large barn down here, which contained the business

12:03:07  7  office, the primary residence up here, the doublewide

12:03:15  8  manufactured home over here.  There were two trailers over here,

12:03:20  9  a barn that was in the process of being built right over here,

12:03:24  10  and then, some smaller out buildings up here.

12:03:27  11  Q.   And because you're saying here, I just want to make sure

12:03:30  12  that the record accurately reflects that the main residence is

12:03:33  13  contained in the upper left-hand corner, is that correct, of this

12:03:37  14  diagram or this photograph?

12:03:38  15  A.   Correct.

12:03:38  16  Q.   And there's some structures behind it, correct?

12:03:41  17  A.   Yes.

12:03:42  18  Q.   And also, there's a large linear silver line going down on

12:03:47  19  the left-hand side, closer to the center that you described as

12:03:51  20  the barn; is that correct?

12:03:52  21  A.   Yes, ma'am.

12:03:53  22  Q.   And there is a doublewide beneath it on the photograph and

12:03:57  23  then, behind it, some trailers; is that correct?

12:04:00  24  A.   Correct.

12:04:00  25  Q.   All right.  And this was the area that was searched,

| | | |
|---|---|---|
| 12:04:04 | 1 | correct? |
| 12:04:05 | 2 | A.    Yes, ma'am. |
| 12:04:06 | 3 | Q.    On June the 12th of 2012, when you made entry, was this |
| 12:04:10 | 4 | entry without incident, as we call it? |
| 12:04:12 | 5 | A.    Yes, ma'am. |
| 12:04:13 | 6 | Q.    It went pretty smooth? |
| 12:04:14 | 7 | A.    It did. |
| 12:04:15 | 8 | Q.    Was the arrest of Mr. Trevino made at that time? |
| 12:04:19 | 9 | A.    Yes, it was. |
| 12:04:21 | 10 | Q.    Can you tell the ladies and gentlemen of the jury after you |
| 12:04:23 | 11 | got to the facilities, what did you do at that point? |
| 12:04:27 | 12 | A.    Then we began the search. |
| 12:04:30 | 13 | Q.    Who searched? |
| 12:04:33 | 14 | A.    FBI agents and IRS agents.  We had six different search |
| 12:04:38 | 15 | teams assigned to various structures on the property. |
| 12:04:41 | 16 | Q.    And how were those -- just briefly because you have an |
| 12:04:46 | 17 | evidence team that comes in and actually collects evidence; is |
| 12:04:49 | 18 | that correct? |
| 12:04:49 | 19 | A.    Correct.  And for five of those teams, the designated team |
| 12:04:54 | 20 | leader was a member of the evidence response team, and those |
| 12:04:58 | 21 | individuals had received specialized training in collecting and |
| 12:05:01 | 22 | handling evidence. |
| 12:05:03 | 23 | Q.    And do you know whether or not those individuals are present |
| 12:05:06 | 24 | when you testify? |
| 12:05:08 | 25 | A.    Yes, they are. |

12:05:09  1   Q.   What was your job, however?

12:05:10  2   A.   My job was just to help coordinate overall operation.  I was

12:05:14  3   not assigned to a particular search team.

12:05:17  4   Q.   I'm showing you now just real briefly what has been marked

12:05:22  5   -- can you clear that screen?  Thank you.  As Government's

12:05:27  6   Exhibit 370A.  What is this a photograph of?

12:05:32  7   A.   That is the cover sheet of the photo log.

12:05:37  8   Q.   It's got a shadow on it.  It looks like to me when the

12:05:39  9   picture was made, there was a shadow on it; is that correct?

12:05:42  10  A.   It appears to be.  Yes.

12:05:44  11  Q.   Government's Exhibit 370B.

12:05:56  12  A.   That's the main residence.

12:05:59  13  Q.   As I go through these, if you'll just identify.  370C.

12:06:08  14  A.   That's part of the large barn on the property.

12:06:12  15  Q.   The large linear silver area that we discussed?

12:06:16  16  A.   Yes, ma'am.

12:06:17  17  Q.   370D?

12:06:19  18  A.   That's the same location from a different angle.

12:06:27  19  Q.   E, 370E?

12:06:29  20  A.   Again, part of the same barn or, actually, that may be the

12:06:35  21  barn that's adjacent to it.

12:06:39  22  Q.   I'm pointing to the silver structure right there.

12:06:42  23  A.   Okay.  Yes.

12:06:45  24  Q.   370F?

12:06:53  25  A.   Yes.  That's the barn.

| | | |
|---|---|---|
| 12:07:00 | 1 | Q. 370G? |
| 12:07:02 | 2 | A. That's the interior of the same barn. |
| 12:07:05 | 3 | Q. Were there any offices located on the interior of this barn? |
| 12:07:09 | 4 | A. Adjacent to it, yes, within the same building. |
| 12:07:20 | 5 | Q. 370H? |
| 12:07:22 | 6 | A. That's the office space of the barn. |
| 12:07:26 | 7 | Q. The one we were just referring to? |
| 12:07:28 | 8 | A. Yes, ma'am. |
| 12:07:28 | 9 | Q. The interior? |
| 12:07:30 | 10 | A. Yes. |
| 12:07:30 | 11 | Q. 370I? |
| 12:07:40 | 12 | A. That's the interior of the same barn. |
| 12:07:48 | 13 | Q. 370J? |
| 12:07:53 | 14 | A. That's within the same structure within that same barn or |
| 12:07:58 | 15 | the office area. |
| 12:08:02 | 16 | Q. 370K? |
| 12:08:07 | 17 | A. That's a trophy that was, I believe, in the office area. |
| 12:08:17 | 18 | Q. 370L? |
| 12:08:21 | 19 | A. That's a photograph of a certificate that was displayed in |
| 12:08:24 | 20 | the office area. |
| 12:08:25 | 21 | Q. Do you know who Shalyn Bliss is, a veterinarian? |
| 12:08:29 | 22 | A. Yes. I know that she was -- she was the veterinarian for |
| 12:08:32 | 23 | the horses on the premises. |
| 12:08:37 | 24 | Q. 370M? |
| 12:08:41 | 25 | A. Those are two of the trailers that were located on the |

| 12:08:45 | 1 | premises. |
|---|---|---|

12:08:47  2  Q.   I'm sorry, these were behind where?

12:08:52  3  A.   They were behind -- they were to the west of the long barn.

12:09:02  4  Q.   370N?

12:09:07  5  A.   That's one of the trailers that was on the property.

12:09:11  6  Q.   370O?

12:09:14  7  A.   Another trailer that was on the property.

12:09:20  8  Q.   And 370P?

12:09:22  9  A.   That's the doublewide manufactured home that was towards the

12:09:27  10  north side of the property.

12:09:34  11  Q.   Did you collect any evidence in this case?

12:09:37  12  A.   I did collect a few items.

12:09:40  13  Q.   Last night, did I ask for you to review the evidence that

12:09:45  14  you collected in this case?

12:09:46  15  A.   Yes.

12:09:47  16  Q.   Where was that evidence located?

12:09:48  17  A.   At the U.S. Attorney's Office.

12:09:50  18  Q.   And which U.S. Attorney's Office?  What city?

12:09:53  19  A.   Here in Austin.

12:09:54  20  Q.   Okay.  What did you do over at the U.S. Attorney's Office,

12:09:58  21  our office yesterday afternoon?

12:10:01  22  A.   I looked at two of the items that I had seized.

12:10:05  23  Q.   Okay.  And the items that you seized, were they numbered in

12:10:10  24  a certain way?

12:10:11  25  A.   Yes, they were.

| | | |
|---|---|---|
| 12:10:13 | 1 | Q.   And did we have a B number associated with a particular |
| 12:10:17 | 2 | item? |
| 12:10:18 | 3 | A.   Yes. |
| 12:10:19 | 4 | Q.   Okay.  You have a box in front of you, or you brought one |
| 12:10:22 | 5 | in. |
| 12:10:23 | 6 | A.   Yes, ma'am.  I do. |
| 12:10:25 | 7 | Q.   What is the B item number on that particular box? |
| 12:10:29 | 8 | A.   This one is 1B-154. |
| 12:10:32 | 9 | Q.   And did you actually seized the items that were contained in |
| 12:10:35 | 10 | that box? |
| 12:10:35 | 11 | A.   I did take custody of them.  Yes. |
| 12:10:37 | 12 | Q.   Okay.  How do you know that that's the same box that you |
| 12:10:44 | 13 | seized the items or took custody of the items that is here today? |
| 12:10:48 | 14 | A.   Because I labeled it and I initialed it. |
| 12:10:51 | 15 | Q.   And how do you do that? |
| 12:10:52 | 16 | A.   I put the date that the items were seized, my initials, the |
| 12:10:58 | 17 | case file number, description of the item, and where the item was |
| 12:11:03 | 18 | found.  Then I placed the items in this box, and I sealed the box |
| 12:11:08 | 19 | and initialed the tape. |
| 12:11:09 | 20 | Q.   Will you pull that box up, please?  And I see on the outside |
| 12:11:19 | 21 | of the box that you're pulling up right now, there are some |
| 12:11:22 | 22 | numbers associated with it.  Will you go through that, please? |
| 12:11:27 | 23 | A.   Yes, ma'am.  The case file number is written on the side of |
| 12:11:30 | 24 | the box.  That's 245 C-SA-62996.  Also, on the side of the box is |
| 12:11:41 | 25 | the 1B number that it was assigned, which is 1B-154.  And then, |

| | | |
|---|---|---|
| 12:11:46 | 1 | the markings that I've described are on the top of the box. |
| 12:11:52 | 2 | Q.   And you put your signature on it, and there's also a piece |
| 12:11:54 | 3 | of red tape going over the top of the box that we're looking at. |
| 12:11:59 | 4 | What is that? |
| 12:11:59 | 5 | A.   That's the evidence tape that I used to seal the box. |
| 12:12:03 | 6 | Q.   The B numbers in this particular -- is this the only box |
| 12:12:08 | 7 | that was seized? |
| 12:12:08 | 8 | A.   No, ma'am. |
| 12:12:09 | 9 | Q.   Did you have a series of B numbers assigned in this |
| 12:12:12 | 10 | particular case? |
| 12:12:13 | 11 | A.   I seized several items, yes. |
| 12:12:15 | 12 | Q.   Do you know that if there were numbers assigned to certain B |
| 12:12:19 | 13 | boxes in this case? |
| 12:12:20 | 14 | A.   Yes, I do. |
| 12:12:21 | 15 | Q.   Okay.  And is that true? |
| 12:12:23 | 16 | A.   Yes. |
| 12:12:24 | 17 | Q.   What would you have done with that box right there? |
| 12:12:30 | 18 | A.   I kept this in my custody until I took it to the Oklahoma |
| 12:12:36 | 19 | City office and released custody to an evidence control |
| 12:12:39 | 20 | technician, and then, subsequently, I requested that this and the |
| 12:12:43 | 21 | other items that I had recovered be Fed Ex-ed down to the Austin |
| 12:12:48 | 22 | office of the FBI -- or, rather, the San Antonio office of the |
| 12:12:51 | 23 | FBI. |
| 12:12:52 | 24 | Q.   And, in fact, you seized three different boxes relevant to |
| 12:12:56 | 25 | this, 1B-152, 1B-153 and 1B-154; is that correct? |

12:13:03   1   A.   Yes.   Three different items.   They weren't all packaged in

12:13:07   2   boxes.   1B-152 was two large photographs.   On those, I just

12:13:15   3   labeled the back of the photographs because I did not have boxes

12:13:19   4   that would accommodate them.

12:13:21   5   Q.   When the boxes are taken to the FBI office in Oklahoma City,

12:13:27   6   is that a secure location?

12:13:28   7   A.   Yes, ma'am.

12:13:29   8   Q.   And although these items are not inherently illegal, do you

12:13:36   9   still maintain a chain of custody on them?

12:13:37  10   A.   Yes, we did.

12:13:38  11   Q.   And why do you do that?

12:13:39  12   A.   So that we can state definitively who possessed them and

12:13:44  13   when.

12:13:46  14   Q.   Pass the witness, your Honor.

12:14:05  15                      CROSS-EXAMINATION

12:14:05  16   BY MR. FINN:

12:14:13  17   Q.   Agent, my name is David Finn, F-I-N-N.   I don't believe

12:14:16  18   we've ever met or spoken, have we?

12:14:18  19   A.   No, sir.   Not to my knowledge.

12:14:19  20   Q.   My client, Jose Trevino-Morales, was polite and courteous

12:14:23  21   during this entire search, correct?   He didn't give you any guff

12:14:28  22   or a hard time?

12:14:29  23   A.   Not to my knowledge.   No, sir.

12:14:30  24   Q.   Well, you would know if he did.   To your knowledge, he was

12:14:34  25   polite and diplomatic and treated y'all with respect, correct?

12:14:38  1   A.   Sir, I never had any direct contact with him, but I never

12:14:42  2   received any complaints about his behavior.

12:14:43  3   Q.   So if the members of the jury wanted to know about my

12:14:47  4   client's demeanor, meaning how he appeared in his attitude and

12:14:51  5   his words and his actions, should I ask Special Agent Scott

12:14:55  6   Lawson?  Would he be a better person to ask?

12:14:58  7   A.   Yes, sir.  I believe he would.

12:14:59  8   Q.   And SSA Manuel Perez, Jr.?

12:15:04  9   A.   I don't know.

12:15:06  10  Q.   TFO or Task Force Officer Ernesto Elizondo, should I ask

12:15:13  11  those folks how my client behaved?

12:15:14  12  A.   With regard to the latter two, I know that they participated

12:15:17  13  in the operation, but I don't know what the extent of their

12:15:18  14  contact was with Mr. Trevino.

12:15:20  15  Q.   You told the jury on direct, a moment ago, there were about

12:15:24  16  100 agents involved in this operation, right?

12:15:28  17  A.   Approximately 100 different people.  Some were agents, some

12:15:32  18  were not agents.

12:15:33  19  Q.   And a couple of helicopters in the air, correct?

12:15:37  20  A.   I don't know.  I know that there was one unit of air support

12:15:41  21  that was utilized.

12:15:42  22  Q.   Okay.  One unit of air support.  Can you translate to normal

12:15:46  23  language?  What does that mean?

12:15:47  24  A.   I believe it was a helicopter, but I'm not certain.

12:15:50  25  Q.   Okay.  Tell the members of the jury -- and, you know, you've

| | | |
|---|---|---|
| 12:15:56 | 1 | got 100 people out there, so this is a pretty dad-gum official |
| 12:16:01 | 2 | search, right? |
| 12:16:01 | 3 | A.   It was designed to be, yes. |
| 12:16:02 | 4 | Q.   Okay.  It was designed to be.  Let me ask the question |
| 12:16:05 | 5 | again.  This was a pretty thorough search with about 100 agents |
| 12:16:10 | 6 | from different agencies, correct? |
| 12:16:12 | 7 | A.   Correct. |
| 12:16:13 | 8 | Q.   So it's not like if somebody squirrelled away a million |
| 12:16:17 | 9 | dollars of cash in their attic or in their basement that you guys |
| 12:16:21 | 10 | are going to miss it because you're trained to look everywhere, |
| 12:16:24 | 11 | correct? |
| 12:16:25 | 12 | A.   Well, I hope we looked everywhere. |
| 12:16:29 | 13 | Q.   Do you have any reason to believe that you missed anything? |
| 12:16:31 | 14 | A.   I do not. |
| 12:16:32 | 15 | Q.   You do not? |
| 12:16:33 | 16 | A.   I do not. |
| 12:16:34 | 17 | Q.   Thank you. |
| 12:16:35 | 18 | And when you're doing a search, safe to say that the |
| 12:16:41 | 19 | occupants of the house are not able to, you know, prevent you |
| 12:16:46 | 20 | from going in a bedroom, prevent you from going into a garage. |
| 12:16:49 | 21 | Jose Trevino-Morales and his family's basically told, get out of |
| 12:16:54 | 22 | the way, this is a federal search warrant that's being executed, |
| 12:16:58 | 23 | correct? |
| 12:16:59 | 24 | A.   We had access to the entire premises.  Yes. |
| 12:17:01 | 25 | Q.   Entire premises, right? |

```
12:17:04   1   A.    Right.
12:17:04   2   Q.    And if you wanted to get into a locked closet, or a locker,
12:17:08   3   or a trailer, you would have a way of getting in there to look
12:17:12   4   for evidence, right?
12:17:13   5   A.    Yes, sir.
12:17:15   6   Q.    Tell the members of this jury how much cash you found on
12:17:20   7   this property during your search.
12:17:23   8   A.    Sir, I don't know offhand.
12:17:24   9   Q.    Let me see if I could refresh your recollection.  None.
12:17:29  10         Tell the members of the jury about the AK-47 machine
12:17:33  11   guns and assault weapons that you found on this property.
12:17:36  12   A.    I don't believe there were any found.
12:17:37  13   Q.    That's correct.  Tell the members of the jury about the
12:17:41  14   Porsche, the Lamborghini --
12:17:43  15         MS. FERNALD:  Excuse me, I'm going to interrupt, but I
12:17:45  16   would just ask the defense counsel not be so argumentative with
12:17:48  17   the witness.  Just ask him a question.
12:17:50  18         THE COURT:  Well, it's cross-examination.  Let's keep
12:17:52  19   our comments --
12:17:54  20         MR. FINN:  Got it, Judge.
12:17:55  21   Q.    (BY MR. FINN) Tell the members of the jury, if you would,
12:17:57  22   about the fancy luxury automobiles and vehicles at the residence.
12:18:02  23   A.    There were several vehicles at the residence.  I don't know
12:18:06  24   that I would classify any as fancy luxury vehicles.
12:18:09  25   Q.    Right.  They're basically beat-up pickup trucks used for a
```

12:18:13  1   farm or at a real ranch, correct?

12:18:15  2   A.   There were pickup trucks there.  I don't recall the nature

12:18:19  3   of all the vehicles that were there.

12:18:20  4   Q.   Okay.  Tell the members of the jury -- and you knew -- well,

12:18:26  5   did you know that my client had a concealed handgun permit?

12:18:30  6   A.   Yes, sir, I did.

12:18:31  7   Q.   And you all found one handgun in his bedroom under his

12:18:36  8   mattress, correct?

12:18:36  9   A.   Yes, sir.  I believe that's true.

12:18:38  10  Q.   And they don't just give concealed handgun permits away, do

12:18:42  11  they?  I mean, you've got to go through the class, you've got to

12:18:45  12  be qualified, you've got to make sure you don't have a criminal

12:18:47  13  history, things like that, correct?

12:18:48  14  A.   I believe so.  Yes.

12:18:49  15  Q.   I mean, this -- based on your impression, real horses, real

12:19:03  16  ranch, real work, real people, correct?  This looked like what it

12:19:09  17  was, a horse ranch, correct?

12:19:11  18  A.   It was a horse ranch.  Yes.

12:19:13  19  Q.   And there were a bunch of horses out there.

12:19:15  20        And by the way, you showed a trailer or the government

12:19:20  21  did earlier.  Isn't that the trailer where the workers who were

12:19:23  22  building the improvements on the farm were living, the workers

12:19:25  23  were staying in that little trailer?

12:19:27  24  A.   There were some workers staying in the trailer.  I'm not

12:19:29  25  sure what they were doing on the premises.

12:19:31  1  Q.   Okay.  Did you interview any of these workers that were in

12:19:35  2  the trailer or working on the property?

12:19:37  3  A.   I personally did not.

12:19:40  4  Q.   So if I wanted to ask about, for example, what Jose said to

12:19:46  5  the FBI during this search, I would need to ask that to another

12:19:51  6  witness, not you, because you didn't interview my client,

12:19:54  7  correct?

12:19:54  8  A.   Correct.

12:19:56  9  Q.   Do you know who did it?

12:19:59  10  A.   Not for certain.  I believe Agent Lawson participated in the

12:20:03  11  interview.

12:20:03  12  Q.   It's a pretty lengthy interview, wasn't it?

12:20:06  13  A.   I don't know.

12:20:06  14  Q.   You don't know?

12:20:07  15  A.   No, sir.  I wasn't there.

12:20:09  16  Q.   Where were you?

12:20:10  17  A.   On the premises.

12:20:13  18  Q.   Where on the premises?  What does that mean?  Where?

12:20:15  19  A.   I moved around the premises.  I was helping to coordinate

12:20:18  20  the operation.

12:20:20  21  Q.   Okay.  I don't mean to be difficult, okay?  Where were you?

12:20:26  22  A.   At different points during the day, I was at different

12:20:29  23  buildings.

12:20:33  24  Q.   Were you the one that pulled aside my client's 13-year-old

12:20:39  25  daughter Rebecca and tried to interrogate her without mom or dad

| | | |
|---|---|---|
| 12:20:42 | 1 | being present? |
| 12:20:43 | 2 | A.   No, sir.  I was not. |
| 12:20:44 | 3 | Q.   That wouldn't be very kosher, would it? |
| 12:20:48 | 4 |        MS. FERNALD:  Objection, your Honor.  Argumentative. |
| 12:20:50 | 5 |        MR. FINN:  That wasn't -- I could rephrase. |
| 12:20:52 | 6 | Q.   (BY MR. FINN) That would not be appropriate to interview a |
| 12:20:55 | 7 | 13-year-old girl without the parents being present, would it? |
| 12:20:58 | 8 | A.   I think it would depend on the circumstances. |
| 12:21:01 | 9 | Q.   And they were asking her, we want your uncles.  Where are |
| 12:21:05 | 10 | your uncles?  Do you remember that? |
| 12:21:07 | 11 | A.   I don't.  I have no knowledge of that. |
| 12:21:09 | 12 | Q.   All right.  Have a good weekend.  That's all, Judge.  Thank |
| 12:21:12 | 13 | you. |
| 12:21:15 | 14 |        THE COURT:  Anybody else? |
| 12:21:16 | 15 |        MR. WOMACK:  No, sir. |
| 12:21:17 | 16 |        MR. ESPER:  No. |
| 12:21:19 | 17 |        MS. FERNALD:  Your Honor, the government would call |
| 12:21:21 | 18 | Scott Thagard. |
| 12:21:24 | 19 |        THE COURT:  May this witness be excused? |
| 12:21:26 | 20 |        MR. FINN:  Yes, your Honor.  No objection. |
| 12:21:59 | 21 |        (Witness sworn.) |
| 12:22:18 | 22 |        THE COURT:  Would you tell me your full name and spell |
| 12:22:26 | 23 | your last, please? |
| 12:22:27 | 24 |        THE WITNESS:  My name is Scott Thagard.  The last name |
| 12:22:30 | 25 | is spelled, T-H-A-G-A-R-D. |

| | | |
|---|---|---|
| 12:22:38 | 1 | THE COURT:  You may proceed, counsel. |
| 12:22:39 | 2 | SCOTT THAGARD, called by the Government, duly sworn. |
| 12:22:39 | 3 | DIRECT EXAMINATION |
| 12:22:39 | 4 | BY MS. FERNALD: |
| 12:22:41 | 5 | Q.   Thank you. |
| 12:22:41 | 6 | Can you tell the ladies and gentlemen of the jury what |
| 12:22:43 | 7 | you do for a living? |
| 12:22:44 | 8 | A.   I'm a forensic accountant for the FBI. |
| 12:22:47 | 9 | Q.   And where are you stationed right now? |
| 12:22:49 | 10 | A.   Muskogee, Oklahoma. |
| 12:22:52 | 11 | Q.   How long have you done that? |
| 12:22:52 | 12 | A.   Forensic accountant I've done for little over a year. |
| 12:22:57 | 13 | Financial analyst, been with the FBI for 15 years. |
| 12:23:01 | 14 | Q.   And in your course of being with FBI, do you participate in |
| 12:23:06 | 15 | what is called a evidence response team? |
| 12:23:09 | 16 | A.   I do. |
| 12:23:09 | 17 | Q.   Okay.  And do you go by the acronym? |
| 12:23:13 | 18 | A.   ERT. |
| 12:23:13 | 19 | Q.   ERT.  So we hear that a lot.  What is the purpose of ERT? |
| 12:23:19 | 20 | A.   It's basically just a group that's organized to go out and |
| 12:23:22 | 21 | conduct searches or collect evidence from searches or crime |
| 12:23:27 | 22 | scenes. |
| 12:23:28 | 23 | Q.   And do you have a systematic way of doing that with the FBI? |
| 12:23:34 | 24 | A.   Yes. |
| 12:23:34 | 25 | Q.   Did you participate in the search warrant of -- in |

12:23:39  1  Lexington, Oklahoma on June the 12th of 2012?

12:23:42  2  A.    I did.

12:23:44  3  Q.    And were you one of the team leaders?

12:23:46  4  A.    I was.

12:23:47  5  Q.    Can you tell the ladies and gentlemen of the jury, what does

12:23:50  6  it mean to be a team leader out at a particular search warrant

12:23:54  7  location?

12:23:55  8  A.    Team leader's just kind of the guy who goes in.  He's the

12:24:00  9  one in charge of the actual search.  He will have a team that's

12:24:05  10  with him.  He will be the one who's responsible for dictating to

12:24:10  11  them what they do.  And he'd probably also be the guy who is

12:24:15  12  going to be taking evidence with him when it's completed.

12:24:19  13  Q.    As -- let's just -- on this particular location, were you

12:24:23  14  assigned to a building?

12:24:24  15  A.    I was.

12:24:25  16  Q.    And what was that building?

12:24:27  17  A.    I don't know what everybody else is referring to, but I

12:24:30  18  referred to it as building No. 5.

12:24:31  19  Q.    And can you tell the members of the jury what was building

12:24:34  20  No. 5?

12:24:35  21  A.    Building No. 5 was a very large horse facility with lots of

12:24:42  22  stables, and there was a central area where there was an office

12:24:46  23  and, also, a vet area.

12:24:49  24  Q.    I'm showing you what has previously been marked and

12:24:52  25  identified and admitted as Government's Exhibit 306.  It's an

12:24:57  1   aerial photo shot.  Do you recognize this photograph?

12:24:59  2   A.    I do.

12:24:59  3   Q.    And when you referred to building 5, are you referring to

12:25:03  4   the building that is the long, rectangular-shaped, silver

12:25:10  5   building in almost the center of the photograph?

12:25:12  6   A.    That is the building, yes.

12:25:13  7   Q.    So you had the big building, then, did you not?

12:25:16  8   A.    I did.  Yes.

12:25:17  9   Q.    Can you tell the ladies and gentlemen of the jury how you

12:25:19  10  and your team went in and collected the evidence out of this big

12:25:22  11  building?

12:25:23  12  A.    Okay.  I was staged off scene and waited for the building to

12:25:30  13  be cleared to make sure that it was safe for us to come in.  Once

12:25:36  14  I received a phone call, I brought my team into the site.  And as

12:25:40  15  the team leader, the first thing I would do was go into the

12:25:43  16  building and just have a preliminary survey, just to see what we

12:25:49  17  were dealing with.  So I had assigned a photographer to start

12:25:55  18  taking photographs of the facility as I was going in and just to

12:26:00  19  see what we were up against.

12:26:05  20        I went in, I looked at it and at that point, I

12:26:09  21  determined what our game plan was going to be, and I came back

12:26:13  22  out of the building, grabbed my team together, told them what I

12:26:17  23  had seen, and what we were going to do, and how we were going to

12:26:20  24  do it.

12:26:20  25  Q.    And does that typically happen -- I say typically.  Does

12:26:23   1  that happen with each other team that searches each other's

12:26:27   2  sites?

12:26:27   3  A.   That is typically the way it works with ERT.

12:26:30   4  Q.   Okay.  So what happened that day?  You did do all those

12:26:34   5  things that day?

12:26:35   6  A.   I did.  Yes.

12:26:36   7  Q.   Okay.  And tell me about the collection of the evidence, how

12:26:38   8  did that go?

12:26:39   9  A.   Basically what would happen is that I'd ask the people to --

12:26:45  10  everybody had been briefed as to what type of items we were

12:26:47  11  looking for.  We began our search, individual team members would

12:26:54  12  find something, and then, they would come to me.  I would look at

12:26:59  13  it and I'd say, yeah, that's something that is applicable to the

12:27:02  14  warrant.  That's something we need to take, or no, I don't think

12:27:05  15  it works.

12:27:07  16       So each individual team members would find items, they

12:27:10  17  would bring it to my attention, we would discuss it, and if it

12:27:14  18  was an item we were taking, we would box it up or put it in some

12:27:19  19  sort of container.  We would seal the -- seal the container and

12:27:26  20  then, there is a -- we have seven items that we put on each

12:27:31  21  individual piece of evidence at the scene.

12:27:34  22  Q.   And just to make sure, you were assigned to collecting the

12:27:39  23  evidence in this particular case; is that correct?

12:27:41  24  A.   That is correct.  Yes.

12:27:42  25  Q.   Were you assigned to analysis of the records that you've

| | | |
|---|---|---|
| 12:27:46 | 1 | collected? |
| 12:27:46 | 2 | A.   I'm sorry. |
| 12:27:47 | 3 | Q.   Were you assigned to analyze -- do an analysis on the |
| 12:27:50 | 4 | records that you collected? |
| 12:27:51 | 5 | A.   No.  I was not. |
| 12:27:52 | 6 | Q.   Do you know anything about the investigation in this |
| 12:27:55 | 7 | particular case? |
| 12:27:55 | 8 | A.   Very little. |
| 12:27:57 | 9 | Q.   When you went to the location or prior to going to the |
| 12:28:06 | 10 | location, did you have a series of what I'm going to call B |
| 12:28:09 | 11 | numbers assigned for the collection of evidence? |
| 12:28:12 | 12 | A.   When I went to the location? |
| 12:28:15 | 13 | Q.   (Moving head up and down.) |
| 12:28:16 | 14 | A.   The 1B numbers were assigned after the evidence was |
| 12:28:20 | 15 | collected. |
| 12:28:21 | 16 | Q.   Okay.  Can you tell me about that? |
| 12:28:23 | 17 | A.   Typically one of the seven items that I was telling you |
| 12:28:27 | 18 | about that we placed on -- say I take a box of records, I will |
| 12:28:31 | 19 | give it an item number, and that item number would just be |
| 12:28:36 | 20 | written on, say, if it's a box, I'll write on the outside of the |
| 12:28:39 | 21 | box.  Once it is transported to our evidence folks, then they |
| 12:28:43 | 22 | will enter that into an FBI database of some sort, and they will |
| 12:28:47 | 23 | assign it what is called a 1B number. |
| 12:28:50 | 24 | Q.   So how do you ensure that the evidence that you're |
| 12:28:53 | 25 | collecting at the scene is going to be the same evidence that |

| 12:28:56 | 1 | comes up at trial? |
| 12:29:01 | 2 | A.   Well, I mean, my job is to collect the evidence and to seal |
| 12:29:05 | 3 | it, and then, we go through a chain of custody process to where I |
| 12:29:13 | 4 | am the first who signed saying, at such and such time, I am |
| 12:29:16 | 5 | taking this evidence into my custody.  I will then transport that |
| 12:29:21 | 6 | to the evidence folks, and at that point, I will sign off on the |
| 12:29:25 | 7 | chain of custody, and they will now put it into evidence or into |
| 12:29:29 | 8 | our evidence, assign it the 1B number; and then, if that item is |
| 12:29:34 | 9 | something that's going to be used in a hearing, then that item |
| 12:29:39 | 10 | will be brought before the Court and used as evidence. |
| 12:29:42 | 11 | Q.   Do you put your signature on the items when you bring it to |
| 12:29:45 | 12 | court so you can make sure it was the same box in which you |
| 12:29:48 | 13 | collected the evidence? |
| 12:29:49 | 14 | A.   Yes.  Not necessarily a signature but initials. |
| 12:29:52 | 15 | Q.   Okay. |
| 12:29:53 | 16 | A.   Sometimes you sign it, sometimes you put your initials. |
| 12:29:56 | 17 | Q.   Yesterday afternoon, did I ask for you to go to the United |
| 12:29:59 | 18 | States Attorney's Office here in Austin, look at the evidence |
| 12:30:02 | 19 | that was seized in this particular case? |
| 12:30:03 | 20 | A.   You did. |
| 12:30:04 | 21 | Q.   And you brought in a box when you walked into the courtroom |
| 12:30:08 | 22 | today.  Did I ask you to bring a sample of the evidence that you |
| 12:30:11 | 23 | collected in this particular case? |
| 12:30:12 | 24 | A.   Yes, ma'am, you did. |
| 12:30:12 | 25 | Q.   Can you put that box up on the table for me, please?  It's a |

| | | |
|---|---|---|
| 12:30:20 | 1 | banker's box that I'm looking at right now, and it's got some |
| 12:30:24 | 2 | writing on the outside and on top of it. |
| 12:30:27 | 3 | Can you tell the ladies and gentlemen of the jury about |
| 12:30:28 | 4 | this particular box and how you can identify that this is the |
| 12:30:32 | 5 | box, in fact, that you collected evidence from from that |
| 12:30:36 | 6 | particular building? |
| 12:30:37 | 7 | A.   Okay.  Take the lid off? |
| 12:30:39 | 8 | This is the top of this box that basically this is |
| 12:30:44 | 9 | items that we have taken from the search, and I can identify that |
| 12:30:49 | 10 | this would be the case number, the case we were working on.  And |
| 12:30:53 | 11 | this is building No. 5, which is the large building, and we will |
| 12:30:58 | 12 | do a diagram sketch of the location we're searching and we will |
| 12:31:03 | 13 | name it room A, room B, room C.  We won't say, like, office, you |
| 12:31:08 | 14 | know, bathroom, anything.  You just say room, room B, room C, |
| 12:31:13 | 15 | have the address, the date.  And this here is the item number |
| 12:31:16 | 16 | that I assign at the scene.  This would be the 1B number that |
| 12:31:21 | 17 | would be associated with it once it got to evidence.  And we will |
| 12:31:26 | 18 | put a brief description of what is in the box, and then, the |
| 12:31:29 | 19 | person who located it, put their name and initials.  And then, me |
| 12:31:34 | 20 | the team leader, slash, evidence custodian will also put my name |
| 12:31:38 | 21 | and initials. |
| 12:31:43 | 22 | Q.   Is that correct? |
| 12:31:46 | 23 | A.   That is correct. |
| 12:31:46 | 24 | Q.   Did I ask you to review the following boxes last night at |
| 12:31:51 | 25 | the U.S. Attorney's Office? |

| | | |
|---|---|---|
| 12:31:52 | 1 | A.   Yes, ma'am. |
| 12:31:53 | 2 | Q.   1B-81, 1B-83, 1B-84, 1B-94, 1B-95, 1B-97, 1B-99, 1B-105, |
| 12:32:11 | 3 | 1B-110, 1B-111, 1B-113, 1B-114, 1B-122, 1B-134, and 1B-135.  Did |
| 12:32:25 | 4 | you review those? |
| 12:32:26 | 5 | A.   Yes, ma'am.  I did. |
| 12:32:27 | 6 | Q.   And they all have your signature and markings on those |
| 12:32:31 | 7 | boxes? |
| 12:32:31 | 8 | A.   They do. |
| 12:32:32 | 9 | Q.   I wanted to ask you one more question. |
| 12:32:45 | 10 | A.   Okay. |
| 12:32:45 | 11 | Q.   On this particular box, there's a little red label that's |
| 12:32:55 | 12 | right there.  Did you put that on the box? |
| 12:32:57 | 13 | A.   I did not. |
| 12:32:57 | 14 | Q.   Okay.  So is that the only thing that's different about the |
| 12:33:02 | 15 | box than when you actually retrieved it? |
| 12:33:07 | 16 | A.   That and the 1B-114.  I did not put that on there. |
| 12:33:11 | 17 | Q.   Okay.  Pass the witness. |
| 12:33:21 | 18 | MS. WILLIAMS:  No questions. |
| 12:33:24 | 19 | MR. SANCHEZ:  No questions, your Honor. |
| 12:33:25 | 20 | MR. WOMACK:  No questions. |
| 12:33:26 | 21 | MR. ESPER:  I have none, your Honor. |
| 12:33:27 | 22 | MR. MAYR:  None. |
| 12:33:28 | 23 | THE COURT:  May the witness be excused? |
| 12:33:30 | 24 | MR. FINN:  No objection. |
| 12:33:31 | 25 | MR. GARDNER:  Your Honor, may we approach? |

12:33:37   1          (At the bench, on the record.)

12:33:50   2          MR. GARDNER:  Earlier in this case, the government

12:33:54   3   prepared a stipulation to the following custodial witnesses, and

12:33:58   4   without naming the party, we were told that, no, you need to

12:34:03   5   bring the custodians.  Five minutes ago, I've been informed that

12:34:05   6   all parties will now agree, despite the fact the government has

12:34:10   7   spent a great amount of money bringing the individuals from

12:34:11   8   California, New Mexico, Dallas, Oklahoma to testify as to simple

12:34:16   9   evidence custodian, they will now agree.  However, they say they

12:34:18   10  want it in writing.  I do not have the stipulation here in court

12:34:21   11  in writing.  But we made an agreement from all these counsel that

12:34:27   12  I can at least send the witnesses back to their home states,

12:34:30   13  otherwise, I need to keep them here.  I'm more than willing to

12:34:32   14  stipulate it at this point.

12:34:36   15         MR. MAYR:  I have a proposed stipulation in an e-mail

12:34:39   16  so I could pull it up --

12:34:39   17         THE COURT:  I can't get you on the record unless you

12:34:40   18  get a little closer.

12:34:40   19         MR. MAYR:  I think I have the proposed stipulation

12:34:43   20  which I was going to agree to on my computer.  I can print it

12:34:47   21  out.  So if you want to use something in writing, I'll be glad to

12:34:49   22  make that available.

12:34:50   23         THE COURT:  He wants to know if the commitment is

12:34:52   24  there.  I was going to ask at the break if -- why this --

12:34:58   25         MS. WILLIAMS:  These are all the boxes.

| | | |
|---|---|---|
| 12:35:00 | 1 | MR. GARDNER:  They're all the boxes.  They're boxes |
| 12:35:04 | 2 | that came from the search warrants, multiple search warrants in |
| 12:35:07 | 3 | California, search warrants in New Mexico, search warrants in two |
| 12:35:10 | 4 | locations in Austin, the search warrant in Dallas, the search |
| 12:35:14 | 5 | warrant in Mission, the search warrant in New Mexico.  That's |
| 12:35:17 | 6 | what the stipulation will be to. |
| 12:35:20 | 7 | MR. SANCHEZ:  Just so we're clear, not the e-mails that |
| 12:35:23 | 8 | subpoena -- |
| 12:35:23 | 9 | MR. GARDNER:  No.  Those are separate search warrants. |
| 12:35:25 | 10 | They are not included in the stipulation. |
| 12:35:28 | 11 | MR. WOMACK:  I have no problem. |
| 12:35:31 | 12 | MR. ESPER:  I never had a problem. |
| 12:35:32 | 13 | THE COURT:  Mr. Esper did respond to me.  He's the one |
| 12:35:34 | 14 | who said he didn't -- |
| 12:35:35 | 15 | MR. MAYR:  And I've never had a problem. |
| 12:35:37 | 16 | THE COURT:  Okay.  Well, whether you never have or have |
| 12:35:40 | 17 | one up until right now, I take it that everybody is in agreement |
| 12:35:43 | 18 | to the stipulation. |
| 12:35:45 | 19 | MS. WILLIAMS:  That's correct, your Honor. |
| 12:35:46 | 20 | MR. GARDNER:  Your Honor, I have one more short |
| 12:35:48 | 21 | witness.  She is a basically records custodian for border |
| 12:35:52 | 22 | crossings.  She didn't do any of the data entry.  She's just the |
| 12:35:56 | 23 | custodian of records.  She's from Laredo.  I don't know what |
| 12:36:02 | 24 | cross-examination there is so. |
| 12:36:08 | 25 | MR. ESPER:  Your Honor, just before you bring the |

12:36:10   1   witness, I object to his witness.

12:36:16   2              THE COURT:  Can you --

12:36:17   3              MR. ESPER:  It's hearsay.

12:36:18   4              THE COURT:  Can you remember the objection until

12:36:21   5   Monday?

12:36:21   6              MR. ESPER:  I will, your Honor.

12:36:22   7              THE COURT:  All right.

12:36:23   8              MR. GARDNER:  Are you sure?  I'll write that down for

12:36:24   9   you.

12:36:26   10             MR. PARRAS:  We have no objection to the stuff coming

12:36:27   11  in.  If there's something that they didn't mark or that they are

12:36:30   12  not admitting and we want in, as long as the records custodian

12:36:33   13  doesn't have to come back and we'll let them know.

12:36:36   14             MR. GARDNER:  Yeah.  I made that agreement with Mr.

12:36:37   15  Esper, too, so.

12:36:38   16             MR. PARRAS:  With that understanding.

12:36:40   17             MR. GARDNER:  If you want something in the boxes,

12:36:42   18  time's running out.  You've got to let us know.

12:36:46   19             MR. PARRAS:  Got it.

12:36:51   20             THE COURT:  Members of the jury, they voted

12:36:53   21  eight-to-zero to let you go home.  Actually, one didn't, but I'm

12:36:57   22  not going to tell you who it was.  Remember the instructions.

12:37:02   23  Going to be hard this weekend.  You know, it's going to be hard

12:37:07   24  to go watch West Virginia play Texas.  I don't recommend it.  But

12:37:15   25  remember the instructions so that Monday, you answer those

```
12:37:18   1   questions.  We'll start Monday at 8:30.  Y'all have a safe
12:37:22   2   weekend.
12:37:54   3              (Jury not present.)
12:37:56   4              THE COURT:  We are in recess until 8:30 Monday.
12:37:56   5              (Proceedings adjourned.)
           6
           7
           8
           9
          10
          11
          12
          13
          14
          15
          16
          17
          18
          19
          20
          21
          22
          23
          24
          25
```