```
 1                  UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION

 3  UNITED STATES OF AMERICA    ) Docket No. A 12-CR-210 SS
                                )
 4  vs.                         ) Austin, Texas
                                )
 5  JOSE TREVINO-MORALES (3)    )
    FRANCISCO ANTONIO           )
 6  COLORADO-CESSA (6)          )
    FERNANDO SOLIS-GARCIA (7)   )
 7  EUSEVIO MALDONADO-HUITRON(11) )
    JESUS MALDONADO-HUITRON (18) ) April 22, 2013
 8

 9                  TRANSCRIPT OF TRIAL ON THE MERITS
                   BEFORE THE HONORABLE SAM SPARKS
10                       Volume 6 of 15

11  APPEARANCES:

12  For the United States:      Ms. Michelle E. Fernald
                                Mr. Douglas W. Gardner
13                              Assistant U.S. Attorneys
                                816 Congress Avenue, Suite 1000
14                              Austin, Texas 78701

15  For Defendant Trevino-      Mr. David M. Finn
    Morales:                    Milner & Finn
16                              2828 North Harwood Street
                                Suite 1950, LB9
17                              Dallas, Texas 75201

18                              Ms. Christie Williams
                                Mills & Williams
19                              1112 South Rock Street
                                Georgetown, Texas 78626
20
    For Defendant Colorado-     Mr. Mike DeGeurin
21  Cessa:                      Mr. M. Andres Sanchez-Ross
                                Foreman, DeGeurin & DeGeurin
22                              300 Main Street
                                Houston, Texas 77002
23
                                Mr. John Parras
24                              Republic Bank Building
                                1018 Preston, Floor 2
25                              Houston, Texas 77002
```

1   **(Appearances Continued:)**

2   For Defendant Solis-Garcia: Mr. Guy L. Womack
                                Guy L. Womack & Associates
3                               402 Main Street, Suite 6 North
                                Houston, Texas 77002
4
    For Defendant Eusevio       Mr. Richard D. Esper
5   Maldonado-Huitron:          Esper Law Office
                                801 North El Paso Street, 2nd Floor
6                               El Paso, Texas 79902

7   For Defendant Jesus         Mr. Thomas Brent Mayr
    Maldonado-Huitron:          Law Office of Brent Mayr
8                               4101 Washington Avenue, 2nd Floor
                                Houston, Texas 77007
9

10  Interpreters:               Mr. Peter Heide
                                Ms. Cristina Helmerichs
11                              Mr. Steve Mines

12  Court Reporter:             Ms. Lily Iva Reznik, CRR, RMR
                                501 West 5th Street, Suite 4153
13                              Austin, Texas 78701
                                (512)391-8792
14

15

16

17

18

19

20

21

22

23

24

25  Proceedings reported by computerized stenography, transcript
    produced by computer.

1                      **I N D E X**

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Hector Moreno | 16 | 40,44 | | |
| | | 51,61 | | |
| | | 79 | 79 | 90 |
| Diane K. Reed | 91 | 101,111 | 112 | 113 |
| Alfonso Del Rayo-Mora | 115 | 139,153 | 158 | |
| Jeff Tebow | 161 | 172,181 | 183 | |
| Myrna C. Reyes | 185 | 193,202 | | |
| | | 207,212 | | 213 |
| Brian Schutt | 215 | | | |

| | Page |
|---|---|
| Proceedings Adjourned | 247 |

**E X H I B I T S**

| | Offered | Admitted |
|---|---|---|
| Government's | | |
| #1 through 2 | 13 | 13 |
| #2A through B | 13 | 13 |
| #3 through 7 | 13 | 13 |
| #7B through G | 13 | 13 |
| #8 | 13 | 13 |
| #8A through G | 13 | 13 |
| #9 through 10 | 13 | 13 |
| #11A through F | 13 | 13 |
| #12 through 20 | 13 | 13 |
| #22 through 26 | 13 | 13 |
| #27A through F | 13 | 13 |
| #28A through B | 14 | 14 |
| #28D | 14 | 14 |
| #29 through 30 | 13 | 13 |
| #31A through B | 13 | 13 |
| #33 through 38 | 13 | 13 |
| #38A through AA | 13 | 13 |
| #39 | 13 | 13 |
| #39A through E | 13 | 13 |
| #40A through B | 13 | 13 |
| #41 | 13 | 13 |
| #41A through E | 13 | 13 |

|  | **E X H I B I T S** (Continued) | | |
|---|---|---|---|
| | | Offered | Admitted |
| Government's | | | |
| #42 through 43 | | 13 | 13 |
| #51A through B | | 13 | 13 |
| #52 | | 13 | 13 |
| #54 | | 13 | 13 |
| #55A through C | | 13 | 13 |
| #56 | | 13 | 13 |
| #58A through B | | 13 | 13 |
| #58D | | 13 | 13 |
| #59 | | 13 | 13 |
| #60A through E | | 13 | 13 |
| #61 | | 13 | 13 |
| #62A through B | | 13 | 13 |
| #63 through 64 | | 13 | 13 |
| #65A through B | | 13 | 13 |
| #66 through 68 | | 13 | 13 |
| #69A through B | | 13 | 13 |
| #70 through 74 | | 13 | 13 |
| #101 | | 13 | 13 |
| #102A through N | | 13 | 13 |
| #103A through B | | 13 | 13 |
| #105 | | 13 | 13 |
| #106A through E | | 13 | 13 |

**E X H I B I T S** (Continued)

|  | Offered | Admitted |
|---|---|---|
| Government's | | |
| #126 through 127 | 13 | 13 |
| #128A through B | 13 | 13 |
| #129 through 132 | 13 | 13 |
| #134 through 135 | 13 | 13 |
| #137 through 140 | 13 | 13 |
| #142 | 13 | 13 |
| #142A through B | 13 | 13 |
| #143 | 13 | 13 |
| #176 | 13 | 13 |
| #177A through F | 13 | 13 |
| #178A through B | 13 | 13 |
| #179 through 182 | 13 | 13 |
| #183A through D | 13 | 13 |
| #201A through B | 13 | 13 |
| #202 through 203 | 13 | 13 |
| #206 through 207 | 13 | 13 |
| #272A through B | 129 | 129 |
| #303 | 29 | 29 |
| #310A | 224 | 224 |
| #311A | 224 | 224 |
| #312A | 224 | 224 |
| #324A through J | 118 | 118 |

```
 1                    E X H I B I T S (Continued)

 2                                      Offered    Admitted

 3    Government's

 4    #325                                222        223

 5    #359A through B                     129        130

 6    #361                                137        137

 7    #401                                188        189

 8    #405                                9          9

 9    #405A                               15         15

10    #408                                93         94

11

12    Defendant Colorado-Cessa's

13    #2                                  51         51

14    #3                                  149        149

15

16    Defendant Solis-Garcia's

17    #3                                  56         56

18

19    Defendant Eusevio Huitron's

20    #EH-1                               67         67

21    #EH-2                               79         79

22    #EH-3                               212        212

23

24    Court's Exhibit

25    #3                                  89         89
```

08:25:10

| | | |
|---|---|---|
| 08:25:10 | 1 | THE COURT:  All right.  Let's go on the record. |
| 08:25:13 | 2 | Counsel, anything before I bring in the jury? |
| 08:25:16 | 3 | MR. GARDNER:  Your Honor, just waiting for the parties |
| 08:25:18 | 4 | to execute the stipulation.  I'd like to introduce evidence as |
| 08:25:23 | 5 | our first item this morning. |
| 08:25:27 | 6 | THE COURT:  For the record, he means sign -- |
| 08:25:30 | 7 | MR. MAYR:  Right.  One more signature. |
| 08:25:38 | 8 | THE COURT:  Is that a song, just one more thing?  Did |
| 08:25:48 | 9 | you have anything else? |
| 08:25:50 | 10 | MR. MAYR:  I did not, Judge. |
| 08:25:51 | 11 | MR. GARDNER:  No, your Honor. |
| 08:25:52 | 12 | THE COURT:  Okay.  Bring them in. |
| 08:26:07 | 13 | MR. GARDNER:  Your Honor, I'm just giving you -- these |
| 08:26:09 | 14 | are the list of evidence items for your reference, also tender |
| 08:26:12 | 15 | one to the clerk, and I'll be reading the following the |
| 08:26:14 | 16 | stipulation. |
| 08:26:28 | 17 | (Jury present.) |
| 08:28:06 | 18 | THE COURT:  Well, it was a gorgeous weekend, but it |
| 08:28:09 | 19 | didn't seem to help Texas baseball in any way.  Men nor women. |
| 08:28:15 | 20 | But while they were playing baseball and after you left the |
| 08:28:18 | 21 | courtroom and before you came here today, has anyone attempted to |
| 08:28:21 | 22 | talk to you about this case? |
| 08:28:22 | 23 | JURORS:  No. |
| 08:28:24 | 24 | THE COURT:  Have you talked to anyone about the case? |
| 08:28:26 | 25 | JURORS:  No. |

08:28:26  1          THE COURT:  And have you learned anything at all about

08:28:29  2  the case, outside the presence of each other in this courtroom?

08:28:31  3          JURORS:  No, sir.

08:28:33  4          THE COURT:  All right.  Show negative responses to all

08:28:35  5  questions by all jurors.  You may call your witness.

08:28:38  6          MR. GARDNER:  Thank you, your Honor.

08:28:39  7          Your Honor, based on the testimony of a number of

08:28:42  8  custodial witnesses on Friday, the parties have entered into a

08:28:46  9  stipulation regarding the physical evidence.  At this point, we

08:28:50  10  would offer Government's Exhibit 405 as a stipulation that's been

08:28:54  11  signed by all the parties.

08:28:56  12          THE COURT:  You may read the stipulation.

08:28:58  13          MR. GARDNER:  United States of America vs. Jose

08:29:04  14  Trevino-Morales, Francisco Antonio Colorado-Cessa, Fernando

08:29:08  15  Solis-Garcia, Eusevio Maldonado-Huitron and Jesus

08:29:13  16  Maldonado-Huitron, stipulation:  Comes now the United States of

08:29:16  17  America by and through the assistant United States Attorney for

08:29:19  18  the Western District of Texas and the defendants, Jose

08:29:23  19  Trevino-Morales, Francisco Antonio Colorado-Cessa, Fernando

08:29:27  20  Solis-Garcia, Eusevio Maldonado-Huitron, Jesus Maldonado-Huitron,

08:29:32  21  and their respective defense attorneys and hereby stipulate to

08:29:35  22  the following facts.

08:29:36  23          The defendants fully understand that they do not have

08:29:39  24  to stipulate to these facts and that each defendant has an

08:29:42  25  individual constitutional right to require the government to call

08:29:44  1  witnesses at trial and have them testify as to the facts

08:29:47  2  stipulated to in this agreement.  The defendants also understand

08:29:51  3  that they each have the individual constitutional right to

08:29:54  4  cross-examine any witness the government might call to give

08:29:57  5  testimony against them.  Knowing all of the above, the

08:30:00  6  defendants, after consultation with their respective individual

08:30:03  7  attorneys, agree to waive these two rights and agree to stipulate

08:30:06  8  to the following facts:

08:30:07  9          That on June 12th, 2012, agents with the Federal Bureau

08:30:12  10  of Investigation, Drug Enforcement Administration and Internal

08:30:16  11  Revenue Service executed search warrants on the locations listed

08:30:18  12  below.  The named agents collected papers, pictures, computers,

08:30:22  13  phones, and other items, and placed them into designated boxes

08:30:26  14  labeled with an identifier number.  These agents had no role in

08:30:29  15  the investigation of the criminal matter and were tasked with the

08:30:32  16  collection of the above items only.  The agents then sealed the

08:30:34  17  boxes and arranged for them to be securely transported --

08:30:39  18          INTERPRETER:  I lost you after "the boxes."

08:30:41  19          MR. GARDNER:  Oh, I'm sorry.  Thank you for stopping

08:30:43  20  me.  Let me just start that whole sentence again.

08:30:47  21          The named agents collected papers, pictures, computers,

08:30:51  22  phones, and other items, and placed them in designated boxes

08:30:55  23  labeled with an identifier number.  These agents had no role in

08:31:00  24  the investigation of the criminal matter and were tasked with the

08:31:05  25  collection of the above items only.  The agents then sealed the

| 08:31:07 | 1 | boxes and arranged for them to be securely transported to San |
| 08:31:11 | 2 | Antonio and Austin, Texas for evaluation.  The following |
| 08:31:15 | 3 | locations are such: |
| 08:31:16 | 4 | 84th Street Lexington, Oklahoma search warrant.  FBI |
| 08:31:23 | 5 | Special Agent Andrew Farabow collected boxes 1B-152, 1B-153, |
| 08:31:31 | 6 | 1B-154.  Special Agent Carole Lee collected boxes 1B-5 and 1B-13. |
| 08:31:37 | 7 | Special Agent James Killpack collected boxes 1B-19, 1B-22, 1B-33, |
| 08:31:45 | 8 | 1B-35, 1B-37.  Special Agent Anne Fernandez collected boxes 1B-78 |
| 08:31:52 | 9 | and 1B-79.  And Special Agent Scott Thagard collected boxes |
| 08:31:58 | 10 | 1B-81, 1B-83, 1B-84, 1B-94, 1-B-95, 1B-97, 1B-99, 1B-105, 1B-110, |
| 08:32:11 | 11 | 1B-111. |
| 08:32:14 | 12 | MR. FINN:  Excuse me, your Honor, can I approach? |
| 08:32:20 | 13 | MR. GARDNER:  1B-113, 1B-114, 1B-122, 1B-134 and |
| 08:32:30 | 14 | 1B-135. |
| 08:32:30 | 15 | 801 Seeling Drive and at Highway 183 at Austin, Texas, |
| 08:32:36 | 16 | the search warrants, Special Agent Donna Cowling of the FBI |
| 08:32:40 | 17 | collected the following boxes:  1B-168, 1B-175, 1B-179, 1B-198, |
| 08:32:50 | 18 | 1B-209, 1B-222, 1B-224, 1B-226, 1B-227, 1B-229, 1B-230, 1B-234, |
| 08:33:06 | 19 | 1B-238.  Special Agent Kevin Hicks seized the following:  1B-258, |
| 08:33:12 | 20 | 1B-259. |
| 08:33:15 | 21 | At the Mission, Texas search warrant, FBI Special Agent |
| 08:33:18 | 22 | Carlos Salinas seized the following boxes:  1B-263, 1B-266, |
| 08:33:27 | 23 | 1B-269. |
| 08:33:27 | 24 | At the Ruidoso and Alto, New Mexico search warrants, |
| 08:33:31 | 25 | Special Agent David Kice seized the following:  1B-287, 1B-288, |

| | | |
|---|---|---|
| 08:33:39 | 1 | 1B-291, 1B-293, 1B-294, 1B-296, 1B-298, 1B-300, 1B-303, 1B-305, |
| 08:33:54 | 2 | 1B-309. |

08:33:56   3       At the Dallas, Texas search warrant, Special Agent

08:33:58   4   Santiago Moya seized the following items:  1B-25, 1B-28, 1B-29.

08:34:08   5   At 9 MacArthur Place in Santa Anna, California, Special Agent

08:34:13   6   Lynelle Torikai seized the following items out of a search

08:34:16   7   warrant:  1B-124, 1B-127, 1B-146, 1B-148, 1B-150.  And at 720

08:34:28   8   Olvey Lane, California, Special Agent Charles Adams seized the

08:34:31   9   following:  1B-144, 1B-145 and 1B-156.

08:34:38  10       By entering into this stipulation, none of the

08:34:41  11   defendants forfeit the right to object at trial to the relevance

08:34:43  12   of any exhibit.  The foregoing stipulation of facts are true and

08:34:47  13   correct, and they're approved by the person signing below:  Jose

08:34:51  14   Trevino, defendant, David Finn, counsel for defendant, Francisco

08:34:54  15   Colorado-Cessa, defendant, Michael DeGeurin, counsel for the

08:34:59  16   defendant, Fernando Solis-Garcia, defendant, Guy Womack, counsel

08:35:05  17   for Defendant, Eusevio Maldonado-Huitron, defendant, Richard

08:35:10  18   Esper, counsel for the defendant, and Jesus Maldonado-Huitron,

08:35:13  19   defendant, and Brent Mayr, counsel for defendant, and myself,

08:35:16  20   Douglas Gardner, assistant United States attorney.

08:35:18  21       THE COURT:  And that is number what?

08:35:20  22       MR. GARDNER:  This is No. 405, your Honor.

08:35:22  23       THE COURT:  All right.

08:35:28  24       MR. GARDNER:  Your Honor, based on that, the government

08:35:30  25   introduces the following items from those boxes.  Government's

08:35:35  1   Exhibit 1, your Honor, does the Court want a brief description of

08:35:40  2   those items or just the numbers?

08:35:43  3          THE COURT:  Well, let's see, we have 207 of them?  No.

08:35:51  4   I don't recall -- I am sure that all counsel will tell the jury

08:35:58  5   which exhibit that they have emphasis on at the appropriate time

08:36:03  6   or use it the appropriate time.  And since they're taking notes,

08:36:07  7   you can just read it into the record.

08:36:08  8          MR. GARDNER:  Yes, sir, your Honor.

08:36:09  9          The government introduces the following exhibits:

08:36:11  10  Government's Exhibit 1, 2, 2A, 2B, 3, 4, 5, 6, 7, 8, 7B, 7C, 7D,

08:36:25  11  7E, 7F, 7G, Government's Exhibit 8A through G, Government's

08:36:34  12  Exhibit 9, Government's Exhibit 10, Government's Exhibit 11A

08:36:39  13  through F, Government's Exhibit 12, 13, 14, 15, 16, 17, 18, 19,

08:36:52  14  20, 22, 23, 24, 25, 26, 27A through F.  28E's already admitted,

08:37:07  15  your Honor.  Twenty-nine, 30, 31A, 31B.  Thirty-two is already in

08:37:15  16  evidence.  Thirty-three, 34, 35, 36, 37, 38, Government's

08:37:25  17  Exhibits 38A through 38AA, 39, 39A through E, 40A and 40B, 41,

08:37:45  18  41A through E, 42, 43, 51A, 51B, 52, 54, 55A, B and C, 56, 58A

08:38:05  19  and B.  58C is in evidence.  58D, 59, 60A through E, 61, 62A and

08:38:18  20  B, 63, 64, 65A and B, 66, 67, 68, 69A and B, 70, 71, 72, 73, 74,

08:38:38  21  101, 102A through N, 103A and B, 105, 106A through E, 126, 127,

08:38:58  22  128A and B, 129, 130, 131, 132, 134, 135, 137, 138, 139, 140,

08:39:14  23  142, 142A and B, 143, 176, 177A through F, 178A and B, 179, 180,

08:39:29  24  181, 182, 183A through D, 201A and B, 202, 203, 206, 207, your

08:39:42  25  Honor.

| | | |
|---|---|---|
| 08:39:43 | 1 | THE COURT:  No. 406? |
| 08:39:48 | 2 | MR. GARDNER:  That was 40 -- 406 was the stipulation. |
| 08:39:50 | 3 | THE CLERK:  405. |
| 08:39:53 | 4 | MR. GARDNER:  405. |
| 08:39:54 | 5 | THE COURT:  All right. |
| 08:39:55 | 6 | MR. FINN:  Judge, excuse me, just for clarification, is |
| 08:39:57 | 7 | it 107 boxes, Mr. Gardner?  Did I get the number right?  107? |
| 08:40:04 | 8 | MR. GARDNER:  You're going to have to count.  I didn't |
| 08:40:06 | 9 | count the on the stipulation.  So whatever the stipulation has in |
| 08:40:09 | 10 | terms of number of boxes that your client signed, that's the |
| 08:40:10 | 11 | number of boxes that the items came from. |
| 08:40:13 | 12 | MR. FINN:  Thank you. |
| 08:40:16 | 13 | MR. GARDNER:  Your Honor, just in case I missed it, Ms. |
| 08:40:18 | 14 | Fernald pointed out to me 28A, B and D. |
| 08:40:23 | 15 | THE COURT:  All right.  Counsel, let me have you up |
| 08:40:26 | 16 | here. |
| 08:40:36 | 17 | (At the bench, on the record.) |
| 08:40:41 | 18 | THE COURT:  I'm sure y'all are a whole lot more |
| 08:40:51 | 19 | familiar with all of these exhibits than I, but if there is |
| 08:40:53 | 20 | anybody that intends to use the exhibits extensively, it might be |
| 08:40:59 | 21 | helpful to put this in as a guide so that when the jury's |
| 08:41:04 | 22 | deliberating, they can go to it. |
| 08:41:09 | 23 | MS. FERNALD:  There are some -- there's a few notes on |
| 08:41:11 | 24 | there that I saw, your Honor, that I probably need to take off, |
| 08:41:14 | 25 | like notes for us to link it to other pieces of evidence. |

08:41:17  1          THE COURT:  Okay.

08:41:17  2          MS. FERNALD:  So if we could go back and redact that.

08:41:20  3          THE COURT:  If you'll do that and then, show it, we

08:41:21  4  won't need it until --

08:41:23  5          MS. FERNALD:  No editorials is what I'm trying to --

08:41:25  6          THE COURT:  Right.  Take that out and then, we'll mark

08:41:27  7  that as 405A and submit it, and we can tell the jury later then.

08:41:33  8  But we won't need that until the end of the evidence.

08:41:37  9          MS. FERNALD:  All right.  Thank you.

08:41:46  10         THE COURT:  Members of the jury, I told you at the

08:41:47  11 beginning that you're fortunate you're going to have competent

08:41:50  12 lawyers in this case.  These lawyers understand how to try

08:41:55  13 lawsuits and they understand the sacrifice of juries in coming

08:41:59  14 in.  They also know what is admissible and what is not

08:42:05  15 admissible.  The stipulation they've just entered has saved us

08:42:08  16 probably a day and a half of testimony of people coming in and

08:42:12  17 just proving up the documents, like the last two witnesses we

08:42:17  18 had, when there's really no dispute about it.

08:42:21  19         And so, it's evidence that these lawyers know what

08:42:24  20 they're doing.  You may call your witness.

08:42:26  21         MR. GARDNER:  Thank you, your Honor.  The government

08:42:28  22 calls Hector Moreno.

08:42:49  23         (Witness sworn.)

08:43:21  24         THE COURT:  I want you to tell us your full name and

08:43:33  25 spell your last name, please.

| | | |
|---|---|---|
| 08:43:36 | 1 | THE WITNESS:  Hector Moreno, M-O-R-E-N-O. |
| 08:43:47 | 2 | THE COURT:  You may proceed. |
| 08:43:48 | 3 | HECTOR MORENO, called by the Government, duly sworn. |
| 08:43:48 | 4 | DIRECT EXAMINATION |
| 08:43:48 | 5 | BY MR. GARDNER: |
| 08:43:48 | 6 | Q.   Thank you, your Honor. |
| 08:43:50 | 7 | Mr. Moreno, you and I met before.  Can you please turn |
| 08:43:54 | 8 | to the jury, introduce yourself, tell them how old you are? |
| 08:44:05 | 9 | A.   Hector Moreno and I'm 35 years old. |
| 08:44:11 | 10 | Q.   And do you know a person by the name of Alfonso or "Poncho" |
| 08:44:16 | 11 | Cuellar? |
| 08:44:19 | 12 | A.   Yes. |
| 08:44:20 | 13 | Q.   And how do you know him, sir? |
| 08:44:27 | 14 | A.   I worked with him from 2007 to 2011. |
| 08:44:29 | 15 | Q.   And when you say worked with him, what activities did that |
| 08:44:33 | 16 | consist of? |
| 08:44:40 | 17 | A.   This drug dealing. |
| 08:44:42 | 18 | Q.   Could you explain where that occurred? |
| 08:44:53 | 19 | A.   In Piedras Negras and in Coahuila, 2007. |
| 08:44:57 | 20 | Q.   And if you will, can you explain to the jury how much |
| 08:45:00 | 21 | narcotics you were moving into the United States with Mr. |
| 08:45:03 | 22 | Cuellar? |
| 08:45:16 | 23 | A.   A lot of drugs, four or five tons, maybe more, cocaine. |
| 08:45:22 | 24 | Q.   When you say four or five tons, what time span is that?  Is |
| 08:45:26 | 25 | that per year or total? |

| 08:45:35 | 1 | A.   A year. |

08:45:35  1   A.   A year.

08:45:37  2   Q.   And how would you participate in the drugs crossing the

08:45:41  3   border?  What specifically would you do?

08:46:00  4   A.   By phone, I talked to the drivers, to my clients, to

08:46:06  5   Cuellar's clients, to Omar Trevino, Miguel Trevino-Morales.

08:46:09  6   Q.   And do you know Miguel Trevino by another name?

08:46:17  7   A.   Yes, "40," "Commander 40."

08:46:21  8   Q.   And do you know Omar Trevino by another name?

08:46:26  9   A.   Yes, "Commander 42."

08:46:28  10   Q.   Could you pull up 335A?  Do you recognize that individual on

08:46:36  11   the screen in front of you, sir?

08:46:42  12   A.   Yes.  That's "Commander 40."

08:46:45  13   Q.   B, please.  Do you recognize that person?

08:46:54  14   A.   Omar Trevino, "Commander 42."

08:46:57  15   Q.   How often would you see these two individuals while you were

08:46:59  16   working for Alfonso Cuellar?

08:47:17  17   A.   Pretty regular, two or tree -- sometimes it was two or three

08:47:20  18   times a month.  Then they would disappear for like four months.

08:47:24  19   And then, other times, it was like once or twice a week.

08:47:27  20   Q.   You said earlier, you would interact with Alfonso Cuellar's

08:47:31  21   clients, but you also have clients of your own.  Did I hear that

08:47:34  22   correctly?

08:47:48  23   A.   My own clients, yes, I had my own clients.  One.

08:47:51  24   Q.   And who was that individual?

08:47:53  25   A.   Jose Vasquez.

08:47:55   1    Q.   And where was he located?

08:47:58   2    A.   Dallas, Texas.

08:48:00   3    Q.   Could you give the jury an idea of how much cocaine you were

08:48:03   4    sending him each month?

08:48:13   5    A.   800 kilos, a ton.

08:48:19   6    Q.   Were you also responsible for receiving the moneys back into

08:48:22   7    Mexico from the United States from the sale?

08:48:30   8    A.   Yes.

08:48:31   9    Q.   And how much money would you receive in exchange for the 800

08:48:35 10    kilos to a ton you would send each month?

08:48:52 11    A.   $4 million every ten days.

08:48:56 12    Q.   When you got the money back into Mexico, what denominations

08:49:00 13    was it in?

08:49:17 14    A.   All kinds of bills but to the -- to "40's" and "42's"

08:49:21 15    accountants, you only gave them bills of 20s, 50s and 100.

08:49:26 16    Q.   Why was that?

08:49:27 17    A.   Those were the rules.  If there were $5 and $10 bills, you

08:49:39 18    had to exchange them for larger bills and pay them.

08:49:42 19    Q.   And was there an accounting system between your -- yours and

08:49:47 20    Alfonso Cuellar's business and "40" and "42"?

08:50:05 21    A.   Yeah.  We paid everything to an accountant, to "Cuno," "40"

08:50:10 22    and "42's" accountant.

08:50:13 23    Q.   And, Mr. Moreno, how did you come into the United States?

08:50:20 24    A.   In March of 2011, there was a lot of trouble going on over

08:50:37 25    there in Coahuila, and I asked for help from the United States

| | | |
|---|---|---|
| 08:50:39 | 1 | government. |
| 08:50:40 | 2 | Q.   And when you say trouble, explain that, please. |
| 08:50:45 | 3 | MR. DEGEURIN:  Excuse me, your Honor.  May we approach? |
| 08:50:50 | 4 | Limine. |
| 08:50:56 | 5 | (At the bench, on the record.) |
| 08:51:07 | 6 | MR. DEGEURIN:  Your Honor, we had the benefit of some |
| 08:51:10 | 7 | Jencks material testimony before where he has testified about |
| 08:51:15 | 8 | killings, and tortures, and things like this in Mexico.  And I |
| 08:51:20 | 9 | didn't know if he was going into that. |
| 08:51:21 | 10 | THE COURT:  Yeah. |
| 08:51:23 | 11 | MR. GARDNER:  I just wasn't sure why he was coming into |
| 08:51:24 | 12 | the United States. |
| 08:51:25 | 13 | MR. DEGEURIN:  But that "why" is so broad that he might |
| 08:51:28 | 14 | say -- |
| 08:51:30 | 15 | MR. GARDNER:  Well, my anticipation, he said he was |
| 08:51:31 | 16 | scared of getting killed by "40." |
| 08:51:35 | 17 | MR. DEGEURIN:  If that's as far as it goes, fine, but |
| 08:51:37 | 18 | he starts talking about families being killed. |
| 08:51:40 | 19 | MR. GARDNER:  I'll redirect that. |
| 08:51:46 | 20 | MR. DEGEURIN:  Okay. |
| 08:51:50 | 21 | Q.   (BY MR. GARDNER) Mr. Moreno, when you say there was |
| 08:52:01 | 22 | problems, how did the problems relate specifically to you? |
| 08:52:15 | 23 | A.   Lots of deaths.  They even started killing families in |
| 08:52:29 | 24 | Allende, and Piedras Negras, and Musquiz and Sabinas.  They also |
| 08:52:33 | 25 | wanted to kill me. |

| | | |
|---|---|---|
| 08:52:34 | 1 | Q.   And now, the jury's already heard from Mr. Cuellar.  Why |
| 08:52:38 | 2 | would they want to kill you? |
| 08:52:46 | 3 | A.   Well, there were a lot of losses from November, December, |
| 08:53:20 | 4 | January 2010, 2011.  There were also a lot of seizures.  They |
| 08:53:25 | 5 | were upset that we didn't have the clients to be moving that kind |
| 08:53:29 | 6 | of stuff and -- or those kinds of amounts.  And they were upset |
| 08:53:35 | 7 | and they thought we had something to do with these losses. |
| 08:53:39 | 8 | Q.   So you said earlier, you contacted the United States.  Were |
| 08:53:42 | 9 | you under indictment in the United States at that time facing |
| 08:53:45 | 10 | charges? |
| 08:53:54 | 11 | A.   No. |
| 08:53:55 | 12 | Q.   Do you know if you're facing any charges in the state of |
| 08:53:57 | 13 | Texas or any other states in the state level? |
| 08:54:08 | 14 | A.   No. |
| 08:54:09 | 15 | Q.   You contacted the federal government and they agreed to |
| 08:54:12 | 16 | bring you across.  Can you explain to the jury what your |
| 08:54:16 | 17 | understanding of your part of that agreement is? |
| 08:54:41 | 18 | A.   To give all the information I have about the Zetas, about |
| 08:54:46 | 19 | "40" and "42," how their operations worked both in the United |
| 08:54:49 | 20 | States and in Mexico. |
| 08:54:50 | 21 | Q.   And was it "40" and "42" the one who wanted to kill you? |
| 08:54:56 | 22 | A.   Yes. |
| 08:54:58 | 23 | Q.   And were there other members of your family that also came |
| 08:55:01 | 24 | across with you? |
| 08:55:09 | 25 | A.   Somewhat later, yes. |

| | | |
|---|---|---|
| 08:55:11 | 1 | Q.   And did that include your brothers and other family members? |
| 08:55:16 | 2 | A.   Yes. |
| 08:55:17 | 3 | Q.   And what is your and their immigration status in the U.S. |
| 08:55:21 | 4 | currently? |
| 08:55:30 | 5 | A.   We have permission to be here. |
| 08:55:33 | 6 | Q.   Have you testified before for the federal government in |
| 08:55:35 | 7 | another case? |
| 08:55:41 | 8 | A.   Yes. |
| 08:55:42 | 9 | Q.   Was that up in the Eastern District of Texas? |
| 08:55:49 | 10 | A.   It was in Texas.  Yes. |
| 08:55:53 | 11 | Q.   Were you aware of "40" sending drug money to the United |
| 08:55:57 | 12 | States for the purpose of quarter horses? |
| 08:56:07 | 13 | A.   Yes. |
| 08:56:09 | 14 | Q.   Do you know if "40" was expecting to get any money back from |
| 08:56:12 | 15 | the quarter horses back into Mexico? |
| 08:56:30 | 16 | A.   He said that it was a good business and that they were going |
| 08:56:33 | 17 | to get clean money out of this business. |
| 08:56:35 | 18 | Q.   Are you familiar with a horse called Tempting Dash? |
| 08:56:44 | 19 | A.   Yeah.  I know. |
| 08:56:45 | 20 | Q.   And how do you know about Tempting Dash? |
| 08:57:23 | 21 | A.   That was a horse.  That was a horse that had run in Laredo |
| 08:57:26 | 22 | under the name of Huesos, and then, they brought him into the |
| 08:57:30 | 23 | United States and they didn't expect much out of him, but he did |
| 08:57:34 | 24 | -- he made some good times.  And it was "40's" horse, but Ramiro |
| 08:57:38 | 25 | had bought him, but when he won, that's when they changed the |

| 08:57:41 | 1 | ownership and changed the name. |

08:57:41    1    ownership and changed the name.

08:57:47    2    Q.   You said the word was "Huesos."  Would that mean bones in

08:57:51    3    Spanish?

08:57:56    4    A.   Yes.

08:57:57    5    Q.   Why do they call it bones?

08:58:02    6    A.   Because he was a skinny horse.

08:58:05    7    Q.   So then, you mentioned they decided to change the name.

08:58:09    8    Were you present when they transferred the ownership of that

08:58:12    9    horse?

08:58:18   10    A.   I heard --

08:58:28   11           MS. WILLIAMS:  Objection.  Nonresponsive.

08:58:32   12           THE COURT:  Sustain the objection.  Rephrase.

08:58:38   13    Q.   (BY MR. GARDNER) Were you aware of how the horse got

08:58:40   14    transferred?

08:58:45   15    A.   Yes.

08:58:46   16    Q.   And how did that horse get transferred?

08:58:58   17    A.   Through "Poncho's" wife, the notary.

08:59:02   18           MS. WILLIAMS:  I object to hearsay.

08:59:04   19           MR. GARDNER:  Your Honor, I believe it's a

08:59:05   20    coconspirator hearsay statement in furtherance of the conspiracy.

08:59:07   21           THE COURT:  The objection is overruled.

08:59:10   22    A.   She was the one that was gathering all the papers to do the

08:59:12   23    transfer.

08:59:13   24    Q.   (BY MR. GARDNER) And do you know who the horse was

08:59:15   25    transferred into?

08:59:25  1   A.   The brother of "40" or Miguel Trevino.

08:59:29  2   Q.   And do you know why they transferred the ownership?

08:59:45  3   A.   Because it was a good horse, it was a good future for that

08:59:48  4   horse, and he didn't want it in anyone else's name where he

08:59:50  5   didn't have control.

08:59:51  6   Q.   And when you say "he," who are you referring to?

08:59:58  7   A.   Miguel Trevino.

09:00:01  8   Q.   Other than Tempting Dash, were you aware if Miguel Trevino

09:00:05  9   bought other horses in the United States?

09:00:17  10  A.   Yes.  Yeah, he bought a lot of horses.

09:00:20  11  Q.   Were these horses purchased at auctions or private sales?

09:00:36  12  A.   In both.  In both; in auctions and private.

09:00:40  13  Q.   And how would they keep track of these auctions?  I'm sorry,

09:00:45  14  let me back up.

09:00:45  15       How would "40" keep track of these auctions?

09:01:03  16  A.   Through internet.  Internet, Carlos Nayen would come to buy

09:01:07  17  the horses and BlackBerry.

09:01:09  18  Q.   And so, when you say the internet, were you present during

09:01:14  19  any of these internet-watching sessions?

09:01:21  20  A.   Yes.

09:01:22  21  Q.   And so, could you explain to the jury what was happening?

09:01:27  22  For example, when "40" wanted a horse, how he would communicate

09:01:32  23  with Carlos Nayen?

09:02:05  24  A.   Well, before any auction, they would study the pedigree of

09:02:08  25  the horses, and then, they would tell him -- well, Carlos Nayen

09:02:12 | 1 | already knew what the price was, but if the price was going above

09:02:15 | 2 | that, then they would contact him through BlackBerry to tell him

09:02:19 | 3 | how much further up to go.

09:02:21 | 4 | Q.   And so, you may have said this already, but so who was

09:02:28 | 5 | present for the Zetas at the auctions in the U.S.?  Is that

09:02:32 | 6 | Carlos Nayen?

09:02:42 | 7 | A.   Carlos Nayen.

09:02:45 | 8 | Q.   Do you recognize that person, Mr. Moreno?

09:02:53 | 9 | A.   Yes.  That's Carlos Nayen.

09:02:54 | 10 | Q.   That's 335E, your Honor.

09:03:03 | 11 |      To your knowledge, how many horses did "40" buy in the

09:03:08 | 12 | U.S. -- let's just go by year -- in 2008?

09:03:34 | 13 | A.   In 2008?  I had been working with "Poncho" for about six or

09:03:40 | 14 | seven months, and they bought about 60 horses.

09:03:45 | 15 |      MR. FINN:  I'm sorry, Judge, I didn't understand that.

09:03:46 | 16 | Q.   (BY MR. GARDNER) It was 60?

09:03:49 | 17 | A.   No.  Forty.

09:03:50 | 18 | Q.   Forty.  And in 2009, how many horses, to your knowledge, did

09:04:00 | 19 | "40" purchase?

09:04:12 | 20 | A.   He bought some 70 or 80, because that's where he started

09:04:23 | 21 | buying mares to breed.

09:04:25 | 22 | Q.   What about 2010?

09:04:42 | 23 | A.   In 2010, at the auctions, he bought less, but that's when he

09:04:48 | 24 | was buying horses in mares for breeding and expensive horses.

09:04:54 | 25 | Q.   And when did you come across the border in 2011?

09:05:02  1   A.   March of 2011.

09:05:04  2   Q.   So were you aware of how many horses he bought in January

09:05:09  3   through March of 2011?

09:05:13  4          MR. DEGEURIN:  Excuse me.  I have an objection to make.

09:05:28  5   That would no longer be an exception of the coconspirator.

09:05:33  6          MR. GARDNER:  I said from January to March 2011, when

09:05:35  7   he turned himself in.  He turned himself in in March 2011.  Thank

09:05:40  8   you.

09:05:41  9          MR. DEGEURIN:  Okay.

09:05:42  10          MR. GARDNER:  Sorry.

09:05:43  11          MR. DEGEURIN:  I don't think I heard that.

09:05:44  12   Q.   (BY MR. GARDNER) Let me repeat the question, Mr. Moreno.

09:05:50  13          My understanding from your testimony is that in March

09:05:52  14   of 2011, you turned yourself in.  Is that your testimony?

09:06:03  15   A.   Yes.

09:06:03  16   Q.   Okay.  So all I want to know is, what you were aware of in

09:06:06  17   January, February and March, before you turned yourself in, in

09:06:10  18   terms of the number of horses "40" bought during that period.

09:06:35  19   A.   The auctions start in September.  So would have been from

09:06:39  20   September 2010, September, October, November, December.

09:06:42  21   Q.   Okay.  Now, were you familiar with a horse called Mr.

09:06:47  22   Piloto?

09:06:52  23   A.   Yes.

09:06:52  24   Q.   And were you familiar with the circumstances surrounding the

09:06:56  25   fixing of that race?

| | | |
|---|---|---|
| 09:07:09 | 1 | A.    Yes. |
| 09:07:10 | 2 | Q.    And how do you know that race was fixed? |
| 09:07:21 | 3 | A.    Well, because during all the trial races, Mr. Piloto had the |
| 09:08:00 | 4 | lowest time.  He was ninth or tenth of the tenth.  And then, at |
| 09:08:05 | 5 | the end of the race, Miguel Trevino was really happy because |
| 09:08:08 | 6 | Carlos Nayen had managed to buy off all the starters, the gates. |
| 09:08:15 | 7 | Paid eleven people $110,000. |
| 09:08:17 | 8 | Q.    Were you present when "40" was involved in that negotiation |
| 09:08:21 | 9 | with Carlos Nayen? |
| 09:08:27 | 10 | A.    Yes.  He ordered "Poncho" to send $110,000 to Ruidoso. |
| 09:08:37 | 11 | Q.    And how was that $110,000 supposed to be used? |
| 09:08:50 | 12 | A.    To pay the ten people at the gates and then, the one who |
| 09:08:54 | 13 | handled the gates. |
| 09:08:56 | 14 | Q.    Now, was "42," Omar Trevino, involved in this payment of the |
| 09:09:00 | 15 | bribe? |
| 09:09:10 | 16 | A.    Both of them were there.  Both of them watching the races |
| 09:09:13 | 17 | and the finals.  Both of them were there. |
| 09:09:14 | 18 | Q.    And who was sent to deliver the bribe money? |
| 09:09:28 | 19 | A.    It was a guy from Dallas and then, Gerardo Mata took it to |
| 09:09:33 | 20 | Ruidoso. |
| 09:09:33 | 21 | Q.    And why was -- and what was Gerardo Mata's relationship to |
| 09:09:40 | 22 | "Poncho" Cuellar? |
| 09:09:46 | 23 | A.    He was either his brother-in-law or his ex-brother-in-law. |
| 09:09:49 | 24 | Q.    And why was he sent? |
| 09:09:51 | 25 | A.    Because he worked with us transporting money to Mexico. |

| | | |
|---|---|---|
| 09:10:04 | 1 | Q.   Now, did you ever handle any of the expenses for the |
| 09:10:08 | 2 | payments of the horses? |
| 09:10:36 | 3 | A.   Yes. |
| 09:10:37 | 4 | MS. WILLIAMS:  Objection.  Nonresponsive.  Did you |
| 09:10:45 | 5 | ever? |
| 09:10:45 | 6 | THE COURT:  You may follow up. |
| 09:10:47 | 7 | MR. GARDNER:  Thank you. |
| 09:10:49 | 8 | THE COURT:  Members of the jury, what that was is that |
| 09:10:51 | 9 | it was a question that called for a "Yes" or "No."  He said |
| 09:10:55 | 10 | "Yes," and then, he added on to it, so it's nonresponsive.  You |
| 09:10:58 | 11 | may proceed. |
| 09:10:59 | 12 | Q.   (BY MR. GARDNER) So, yes, you did handle horse expenses in |
| 09:11:05 | 13 | Mexico? |
| 09:11:11 | 14 | A.   Yes. |
| 09:11:12 | 15 | Q.   The followup question is, what were those horse expenses? |
| 09:11:36 | 16 | A.   It was vet bills, jockeys, transportation of Carlos Nayen, |
| 09:11:42 | 17 | flights for Carlos Nayen, boarding, feed, shoeing.  The payment |
| 09:11:50 | 18 | of the nomination fees for the futurities. |
| 09:11:53 | 19 | Q.   Race fees, race entry fees? |
| 09:11:57 | 20 | A.   Yes. |
| 09:11:58 | 21 | Q.   Do you know a person named "Yo Yo"? |
| 09:12:03 | 22 | A.   Yes. |
| 09:12:03 | 23 | Q.   Who is "Yo Yo"? |
| 09:12:05 | 24 | A.   He was like Carlos Nayen's secretary or assistant in Nuevo |
| 09:12:15 | 25 | Laredo. |

| | | |
|---|---|---|
| 09:12:15 | 1 | Q.   Did you ever know his real name or his first name? |
| 09:12:22 | 2 | A.   No. |
| 09:12:24 | 3 | Q.   Did this person you knew as "Yo Yo" also move cocaine? |
| 09:12:40 | 4 | A.   That started after Mr. Piloto won because as a prize, they |
| 09:12:49 | 5 | gave Carlos Nayen 10, 10 kilos. |
| 09:12:53 | 6 | Q.   And "Yo Yo," was he responsible for moving that? |
| 09:12:57 | 7 | A.   Yes. |
| 09:12:59 | 8 | Q.   When you say 10 kilos, was that one time, 10 kilos, or did |
| 09:13:05 | 9 | that occur -- or somewhere on a regular basis? |
| 09:13:31 | 10 | A.   The first time, it was 10 kilos.  Fifteen kilos, a second |
| 09:13:36 | 11 | time; third time, 25 kilos; fourth time, 25 kilos; and then, the |
| 09:13:41 | 12 | fifth time, there were 25 kilos, but that was March of 2011. |
| 09:13:45 | 13 | Those had stayed in Mexico because those weren't -- we weren't |
| 09:13:49 | 14 | able to move those. |
| 09:13:50 | 15 | Q.   And were you responsible for giving money for horse expenses |
| 09:13:53 | 16 | to "Yo Yo"? |
| 09:14:00 | 17 | A.   Yes. |
| 09:14:01 | 18 | Q.   And how did you pay him, in cash? |
| 09:14:06 | 19 | A.   Cash. |
| 09:14:07 | 20 | Q.   Where did that cash come from? |
| 09:14:19 | 21 | A.   From the sales of "40" and "42's" kilos here in the U.S. |
| 09:14:24 | 22 | Q.   And how did "Yo Yo" get the money across the border into the |
| 09:14:41 | 23 | United States? |
| 09:14:41 | 24 | A.   Through exchange houses and then, several people that he |
| 09:14:45 | 25 | sent money to in Laredo, Texas. |

| | | |
|---|---|---|
| 09:14:48 | 1 | Q.   I'm sorry.  Can you repeat that last answer? |
| 09:15:01 | 2 | A.   Through the exchange houses and he sent people to Laredo, |
| 09:15:04 | 3 | Texas to banks to deposit money. |
| 09:15:08 | 4 | Q.   How were the expenses tracked? |
| 09:15:29 | 5 | A.   They were sent either Carlos Nayen, or if he couldn't, then |
| 09:15:34 | 6 | "Yo Yo" would.  It lists specifying the expenses, "Poncho" would |
| 09:15:40 | 7 | take them to "40" and "42," and they would authorize the |
| 09:15:43 | 8 | payments. |
| 09:15:44 | 9 | Q.   Now, Mr. Moreno, I'm showing you Government's Exhibit 303. |
| 09:15:49 | 10 | Do you recognize that, sir? |
| 09:15:51 | 11 | A.   Yes. |
| 09:15:52 | 12 | Q.   Was this one of the lists that you were talking about? |
| 09:15:56 | 13 | A.   Yes.  Those are it. |
| 09:15:58 | 14 | Q.   And did you, in fact, provide this list to the government |
| 09:16:01 | 15 | after coming across the border? |
| 09:16:08 | 16 | A.   That's right. |
| 09:16:10 | 17 | Q.   Your Honor, I'd offer Government's Exhibit 303.  It also has |
| 09:16:14 | 18 | a certified translation by a certified interpreter on the back of |
| 09:16:18 | 19 | it. |
| 09:16:23 | 20 | THE COURT:  Hearing no objection, it is admitted. |
| 09:16:28 | 21 | MR. ESPER:  I have no objection. |
| 09:17:09 | 22 | Q.   (BY MR. GARDNER) Mr. Moreno, while they're handing around |
| 09:17:11 | 23 | that document, do you know an individual by the name of "Pancho" |
| 09:17:14 | 24 | Colorado?  Let me stop you there. |
| 09:17:44 | 25 | A.   I heard -- |

09:17:45  1   Q.   Let me stop you.

09:17:49  2        The question was -- and I just want a simple "Yes" or

09:17:53  3   "No" on this.  We'll get to it.  Do you know "Pancho" Colorado?

09:17:56  4   A.   Yeah.

09:17:57  5   Q.   So before, everything we've talked before, we're talking

09:18:00  6   "Poncho" Cuellar?

09:18:07  7   A.   Yes.

09:18:12  8   Q.   I'm showing you Government's Exhibit 303.  I just want to

09:18:24  9   point out a couple of things.  So I want you, Mr. Moreno, to read

09:18:31  10  this part in Spanish.  And then, I'll flip it over so the jury

09:18:39  11  can read it in English.

09:18:58  12       All right.  So I want you to read this part where my

09:19:01  13  finger is, Mr. Moreno.

09:19:14  14  A.   I sent for feed, food, diesel, boxes of syringes, one week.

09:19:24  15  Q.   When you talked about "Yo Yo," is that the "Yo Yo" you

09:19:28  16  referred to?

09:19:32  17  A.   Yes.

09:19:33  18  Q.   And "Yo Yo's" getting 500.  Is that in dollars or in pesos?

09:19:41  19  A.   Dollars.

09:19:47  20  Q.   And then, when it says, un pony a Elgin for $2,500, what was

09:19:57  21  that expense for, if you recall?

09:20:11  22  A.   A pony is a horse, a horse that they take along with the

09:20:20  23  race horse out onto the track to work him.

09:20:23  24  Q.   So that was an expense for the training of the horses?

09:20:32  25  A.   Yes.  That's right.

| | | |
|---|---|---|
| 09:20:34 | 1 | Q.   And who is Jose Luis Canales? |
| 09:20:42 | 2 | A.   I -- I don't have any idea. |
| 09:20:46 | 3 | Q.   And are you familiar with this individual, Paul Jones? |
| 09:20:58 | 4 | A.   Yes.  He's a horse trainer. |
| 09:21:00 | 5 | Q.   And are you familiar with this individual, Tyler Graham? |
| 09:21:10 | 6 | A.   Yes.  He's the -- he's a vet. |
| 09:21:13 | 7 | Q.   Now, was there ever a time when horse expenses were directed |
| 09:21:29 | 8 | from the U.S. to people into the United States directly? |
| 09:21:43 | 9 | A.   Yes. |
| 09:21:45 | 10 | Q.   And how did that occur? |
| 09:21:58 | 11 | A.   Once, we sent stuff to Oklahoma to pay for a mare. |
| 09:22:05 | 12 | Q.   And how did that occur? |
| 09:22:19 | 13 | A.   Through Jose Vasquez.  Jose Vasquez's dad took the money to |
| 09:22:25 | 14 | Oklahoma and saw the person we were told to see there. |
| 09:22:30 | 15 | Q.   And do you know who gained control of that horse? |
| 09:22:40 | 16 | A.   No.  No, I don't know. |
| 09:22:42 | 17 | Q.   When "40" bought horses, did he ever list them in fake |
| 09:22:46 | 18 | companies in the United States? |
| 09:23:23 | 19 | A.   There were several.  One futurity that was -- it was here in |
| 09:23:30 | 20 | Texas and "40 Cuarenta" and Tamaulipas Boy, several of his horses |
| 09:23:36 | 21 | run under different registrations. |
| 09:23:39 | 22 | Q.   And do you recall any of those names that they were under? |
| 09:23:58 | 23 | A.   No.  No.  I don't remember.  I mean, it was three years ago. |
| 09:24:08 | 24 | Q.   If I were to -- |
| 09:24:10 | 25 | A.   I remember the horses' names. |

| | | |
|---|---|---|
| 09:24:11 | 1 | Q.   Well, let's start with the horses.  Do you remember a horse |
| 09:24:18 | 2 | by the name of Juanita Mi Amor? |
| 09:24:32 | 3 | A.   No.  That's when there was trouble and we didn't -- we |
| 09:24:37 | 4 | wouldn't -- we didn't have anything to do with the moving of |
| 09:24:39 | 5 | those horses. |
| 09:24:41 | 6 | Q.   So what horses do you remember? |
| 09:24:50 | 7 | A.   Blues Ferrari, Mr. Piloto, Rolls Royce, Harry, Tamaulipas |
| 09:25:40 | 8 | Boy, Jaguar, Futurity My Honor, Snowy Cartel, Forty XL, there |
| 09:25:46 | 9 | were a lot.  There were a lot of horses. |
| 09:25:50 | 10 | Q.   Okay.  When you say Forty XL. |
| 09:26:03 | 11 | A.   Yes. |
| 09:26:06 | 12 | Q.   Are you aware what this number is in Roman numerals? |
| 09:26:15 | 13 | A.   Yes.  Forty. |
| 09:26:21 | 14 | Q.   Can you name any of the businesses that "40" used to send |
| 09:26:32 | 15 | money to in the United States? |
| 09:26:43 | 16 | A.   I don't understand. |
| 09:26:45 | 17 | Q.   If I were to say the name Carmina, LLC, does that refresh |
| 09:26:51 | 18 | your recollection? |
| 09:26:54 | 19 | A.   Yeah.  There's Carmina, Garcia, Tremor Enterprises, Broyers |
| 09:27:17 | 20 | (phonetic).  Broyers is another name. |
| 09:27:20 | 21 | Q.   Now, you talked about a horse called Blues Ferrari.  Were |
| 09:27:24 | 22 | you aware of how he was sold at auction? |
| 09:27:55 | 23 | A.   He was run at Alamitos.  He didn't do -- he didn't qualify |
| 09:28:02 | 24 | and then, after that, he didn't do so well.  And he said that he |
| 09:28:06 | 25 | was going to sell him to be able to buy some more other horses. |

| | | |
|---|---|---|
| 09:28:10 | 1 | Q.   Who was going to sell him? |
| 09:28:19 | 2 | A.   It was going to be sold.  It was going to be Tremor |
| 09:28:26 | 3 | Enterprises had him and he was going to be -- he would be sold |
| 09:28:29 | 4 | and then, it would be taken to "40." |
| 09:28:32 | 5 | Q.   It being Blues Ferrari taken to "40."  I'm sorry.  When you |
| 09:28:39 | 6 | say "it," are you referring to Blues Ferrari? |
| 09:28:50 | 7 | A.   Blues Ferrari. |
| 09:28:52 | 8 | Q.   So earlier, when I asked you if you were talking about |
| 09:28:56 | 9 | "Poncho" Cuellar or "Pancho" Colorado, let's talk about "Pancho" |
| 09:29:01 | 10 | Colorado.  Do you see him in the courtroom today? |
| 09:29:14 | 11 | A.   Yes. |
| 09:29:14 | 12 | Q.   Could you describe an article of clothing that he's wearing? |
| 09:29:21 | 13 | A.   Gray suit with a pink tie. |
| 09:29:27 | 14 | Q.   This gentleman back here, the one in the glasses? |
| 09:29:31 | 15 | A.   Yes. |
| 09:29:32 | 16 | Q.   Your Honor, may the record reflect the witness has |
| 09:29:34 | 17 | identified the defendant? |
| 09:29:35 | 18 |         THE COURT:  So reflects. |
| 09:29:37 | 19 | Q.   (BY MR. GARDNER) How do you know "Pancho" Colorado? |
| 09:30:00 | 20 | A.   In 2009, when they were going to be running the gates at the |
| 09:30:26 | 21 | La Ilusion Ranch, "40" and "42" colts were there.  And then, |
| 09:30:31 | 22 | Carlos Nayen also had "Pancho" Colorado's horses.  "Poncho" took |
| 09:30:35 | 23 | some of his, Celso took some of his.  They did seven runs.  They |
| 09:30:41 | 24 | ran the gate seven times and whoever one -- it was to see how |
| 09:30:44 | 25 | they ran, and then, whoever won was going to win 20 to $30,000. |

| | | |
|---|---|---|
| 09:30:50 | 1 | Q. And did you see the Defendant "Pancho" Colorado talking with |
| 09:30:55 | 2 | "40" or "42"? |
| 09:31:07 | 3 | A. Yeah. He had a red flower shirt on, straw hat and a cigar. |
| 09:31:14 | 4 | Q. Did you always see "Pancho" Colorado with a cigar? |
| 09:31:24 | 5 | A. Just when I saw him there at those races, yes. |
| 09:31:27 | 6 | Q. And approximately how many races would you say "Pancho" |
| 09:31:32 | 7 | Colorado was in attendance? |
| 09:31:43 | 8 | A. I only saw him on that occasion in Morelos, Coahuila at the |
| 09:31:48 | 9 | La Ilusion track. |
| 09:31:50 | 10 | Q. Do you know what he did for a living? What his business |
| 09:31:58 | 11 | was? |
| 09:32:00 | 12 | A. He was -- had lots of money. He was from Veracruz, had to |
| 09:32:06 | 13 | do with oil. |
| 09:32:08 | 14 | Q. Did "40" ever talk about doing horse business with "Pancho" |
| 09:32:18 | 15 | Colorado? |
| 09:32:19 | 16 | A. Yeah. They were asking how he was going to pay for those |
| 09:32:37 | 17 | expensive horses at the action, and he said that through Carlos |
| 09:32:42 | 18 | Nayen that "Pancho" Colorado had said that he would pay for them |
| 09:32:45 | 19 | at the auction. |
| 09:32:46 | 20 | Q. And so, how did the orders flow? I mean, who to who to who |
| 09:32:51 | 21 | to get to the purchase? |
| 09:33:07 | 22 | A. "Cuarenta" would pay "Pancho" and "Pancho" would pay here in |
| 09:33:11 | 23 | the U.S. |
| 09:33:12 | 24 | Q. And do you know how "40" would pay "Pancho" Colorado? |
| 09:33:22 | 25 | A. No. I don't know. |

| | | |
|---|---|---|
| 09:33:25 | 1 | Q.   Did "40" have any money from anything other than the sale of |
| 09:33:29 | 2 | narcotics? |
| 09:33:41 | 3 | A.   I don't think so. |
| 09:33:44 | 4 | Q.   Did you watch any races with "40" over the internet? |
| 09:33:55 | 5 | A.   Yes.  Yes, I saw it. |
| 09:33:57 | 6 | Q.   Were those races also watched over the internet? |
| 09:34:04 | 7 | A.   Yes. |
| 09:34:04 | 8 | Q.   And who was present at those watching sessions? |
| 09:34:28 | 9 | Okay.  I want to make sure it's clear.  When you say |
| 09:34:29 | 10 | "Poncho," is that "Poncho" Cuellar? |
| 09:34:32 | 11 | A.   "Poncho" Cuellar.  So "40," "42," Lazcano, 2000, Carlitos, |
| 09:34:37 | 12 | or Carlos Nayen, "Poncho" and myself.  "Poncho" Cuellar. |
| 09:34:42 | 13 | Q.   And how did you log onto the internet? |
| 09:35:05 | 14 | A.   We would go into Cool -- Cool Living and we would be going |
| 09:35:11 | 15 | in through Petro Servicios at -- or Petro Servicio ADT and the |
| 09:35:19 | 16 | password was "Pancho" Colorado -- Francisco Colorado. |
| 09:35:26 | 17 | Q.   But is it your testimony that "Pancho" Colorado wasn't |
| 09:35:32 | 18 | present during the watching of that race? |
| 09:35:42 | 19 | A.   That's right. |
| 09:35:43 | 20 | Q.   Do you know "Chevo" Huitron? |
| 09:35:49 | 21 | A.   Yes.  I do know him. |
| 09:35:50 | 22 | Q.   Okay.  And how do you know him? |
| 09:36:24 | 23 | A.   Because he went two or three times to collect the money that |
| 09:36:29 | 24 | he was owed for training.  "Poncho" Cuellar also had some horses |
| 09:36:34 | 25 | with him, so "Poncho" also paid him.  We also sent him some |

09:36:37  1  undocumented workers.  We had five undocumenteds that we crossed

09:36:42  2  over through Acuna to go work with the horses.

09:36:46  3  Q.   When you say undocumented workers to work with the horses,

09:36:50  4  were they working for "Chevo"?

09:37:00  5  A.   No.  They worked for "40."

09:37:03  6  Q.   And was "Chevo" working for "40"?

09:37:10  7  A.   Yeah, because he had "Cuarentas'" horses.

09:37:14  8  Q.   Did you ever see "Cuarenta" and "Chevo" together in Mexico?

09:37:23  9  A.   Yeah.  Monclova.

09:37:24  10  Q.   What interaction did they have?

09:37:35  11  A.   No.  They were talking at a table and no one could draw

09:37:39  12  near.

09:37:39  13  Q.   So you didn't hear the substance of the conversation?

09:37:44  14  A.   No.

09:37:46  15  Q.   Did "40" ever talk about "Chevo"?

09:37:50  16  A.   Yes.

09:37:51  17  Q.   And what discussions did "40" have with you or in your

09:37:56  18  presence regarding "Chevo" Huitron?

09:38:30  19  A.   No.  It's just that "Chevo" had Tempting Dash.  And then,

09:38:35  20  "Chevo" had some trouble because they pulled his licensing.  He

09:38:37  21  couldn't go onto the tracks, and so, he was going under another

09:38:40  22  name.  So then, he quit sending his good horses to him and would

09:38:43  23  send them to other trainers, Adan Farias.

09:38:48  24  Q.   Were you present at a -- did you have dinner with "Chevo"

09:38:55  25  and "Poncho" Cuellar on one occasion in a town called Nava in

09:38:59   1   Mexico?

09:39:08   2   A.   Yes.

09:39:09   3   Q.   Do you recall the name of the restaurant where that was?

09:39:13   4   A.   Maria Isabel.

09:39:18   5   Q.   And where is that?

09:39:21   6   A.   On the Highway 57 in the segment for Morelos.

09:39:31   7   Q.   And who else was present at that dinner?

09:39:46   8   A.   Me, "Poncho," I think Raul Guadalajara was also there, and

09:39:53   9   "Chevo" Huitron.

09:39:54  10   Q.   And what was discussed at that dinner?

09:40:09  11   A.   The horses he had for "40," for "Poncho," how they were

09:40:14  12   doing, and I think we paid him $40,000.  I think it was 40,000.

09:40:19  13   Q.   Do you know "Chevo's" brother Jesus Huitron?

09:40:25  14   A.   No.

09:40:27  15   Q.   Do you know or have ever met "40's" brother Jose Trevino?

09:40:36  16   A.   Yeah.  I saw him on two occasions.

09:40:38  17   Q.   Can you describe those -- the first occasion in which you

09:40:41  18   saw him to the Court?

09:41:18  19   A.   First time I saw him, he was with Ramiro Villarreal, he was

09:41:24  20   in a white Jetta.  It was to go through the denominations in

09:41:29  21   California to see who was going to be at what gate, which horses

09:41:31  22   they were going to run with "40."  And then, the second occasion

09:41:33  23   is when he took him a horse like a trophy.

09:41:37  24   Q.   Okay.  Let's start with the first occasion.  Do you remember

09:41:41  25   the year in which that occurred?

09:41:52   1   A.   That was in 2010.

09:41:55   2   Q.   And do you remember the year of the second occasion?

09:42:09   3   A.   2010, it was November, December.

09:42:15   4   Q.   And I believe you said Jose Trevino gave a trophy to "40."

09:42:22   5   Can you explain that?

09:42:35   6   A.   Yes.  It was for having bought -- for having spent the most

09:42:39   7   money in buying horses in Ruidoso.

09:42:42   8   Q.   For 2010?

09:42:47   9   A.   Yes.  That was after Mr. Piloto won because he also took the

09:42:54  10   belt buckle.

09:42:55  11   Q.   And what was the belt buckle for?

09:43:01  12   A.   It was because Mr. Piloto had won the All American.

09:43:08  13   Q.   The last individual I'd like to ask you about, do you know

09:43:11  14   Mr. Fernando Garcia, sitting at the end of the table?

09:43:20  15   A.   No.  I don't know him.

09:43:21  16   Q.   May I have one moment, your Honor?

09:43:34  17        Now, you mentioned Adan Farias once.  Did he ever

09:43:38  18   travel to Mexico?

09:43:44  19   A.   Yes.  On one occasion.

09:43:46  20   Q.   Okay.  Could you explain that to the jury, please?

09:44:21  21   A.   Yeah.  Came to get him in San Antonio and I took him down to

09:44:26  22   "Poncho" Cuellar's stables in Piedras Negras.  "40" and "42" came

09:44:31  23   by.  They went over to a lot of ranches to look at different

09:44:33  24   colts, then he came back.  He was really happy he was going to be

09:44:38  25   getting 30 horses to train and that they were going to give him

09:44:41  1    some more to buy to be able to train.

09:44:45  2    Q.   Now, I asked you about a horse earlier called Blues Ferrari.

09:44:49  3    Do you recall a horse named Snowy Cartel?

09:45:00  4    A.   Yes.

09:45:00  5    Q.   Could you tell me about that horse, please?

09:45:28  6    A.   She was a horse that belonged to Carlitos.  Not Carlitos

09:45:33  7    Nayen but Commander Carlitos and they had him -- they owned her

09:45:37  8    between the two of them.  They brought her over here to the U.S.

09:45:40  9    She did really well and he wanted to buy Commander Carlitos out

09:45:45  10   to then start breeding her.

09:45:46  11   Q.   And when you say "he," are you referring to "40"?

09:45:52  12   A.   Yes.  "40."

09:45:53  13   Q.   And do you know who -- under whose name A Snowy Cartel ran

09:45:58  14   in the United States?

09:46:16  15   A.   No.  I don't remember.  I did see that race several times,

09:46:20  16   both live and in repetition.  But I don't remember whose name she

09:46:24  17   was under.

09:46:25  18   Q.   And we talked a little bit about the money going for the

09:46:28  19   horses.  Do you recall "42" asking you to make sure you sent

09:46:33  20   someone clean to deliver the money?

09:46:50  21   A.   Yes.

09:46:51  22   Q.   And who said that?

09:46:59  23   A.   "42," Omar Trevino.

09:47:01  24   Q.   And why did he say that?

09:47:09  25   A.   Because it was his brother who was going to be receiving the

| | | |
|---|---|---|
| 09:47:12 | 1 | money and that we should send someone we trusted. |
| 09:47:14 | 2 | Q.   Your Honor, I'll pass the witness. |
| 09:47:23 | 3 | THE COURT:  Mr. Finn. |
| 09:47:25 | 4 | MR. FINN:  Your Honor, Ms. Williams will be doing the |
| 09:47:28 | 5 | cross.  Thank you. |
| 09:47:28 | 6 | THE COURT:  Yes. |
| 09:47:33 | 7 | CROSS-EXAMINATION |
| 09:47:33 | 8 | BY MS. WILLIAMS: |
| 09:47:40 | 9 | Q.   Mr. Moreno, when you decided to come to the United States, |
| 09:47:43 | 10 | how did you accomplish that? |
| 09:47:52 | 11 | A.   Through the attorney and the people who are in charge of |
| 09:48:02 | 12 | that.  I don't know who it is.  The prosecutor. |
| 09:48:04 | 13 | Q.   Who's your attorney? |
| 09:48:09 | 14 | A.   An attorney from Dallas. |
| 09:48:10 | 15 | Q.   Is his name Frank Perez? |
| 09:48:12 | 16 | A.   Yes. |
| 09:48:13 | 17 | Q.   So you called Frank Perez and told him you wanted to come to |
| 09:48:19 | 18 | the United States and he needed to do what it took to make that |
| 09:48:23 | 19 | happen? |
| 09:48:32 | 20 | A.   That's right. |
| 09:48:33 | 21 | Q.   Did you call him while you were still in Mexico? |
| 09:48:37 | 22 | A.   Yes.  From Monterrey, Mexico. |
| 09:48:39 | 23 | Q.   How did you get his number? |
| 09:48:44 | 24 | A.   He was Jose Vasquez's attorney. |
| 09:48:53 | 25 | Q.   And then, did you later testify against Jose Vasquez?  I'm |

| | | |
|---|---|---|
| 09:49:13 | 1 | sorry, that's a "Yes" or "No" question.  Did you testify against |
| 09:49:16 | 2 | Jose Vasquez?  "Yes" or "No"? |
| 09:49:27 | 3 | A.   In a court or with someone in authority?  What do you mean? |
| 09:49:33 | 4 | Q.   Do you think you testified against Jose Vasquez or not? |
| 09:49:38 | 5 | A.   Yes. |
| 09:49:39 | 6 | Q.   All right.  So this attorney Frank Perez made some sort of |
| 09:49:46 | 7 | arrangements with the government.  How long did that take? |
| 09:49:49 | 8 | Months?  Weeks? |
| 09:50:07 | 9 | A.   Two weeks to three weeks.  Between two and three weeks. |
| 09:50:12 | 10 | Q.   And so, when you came to the United States, where did you |
| 09:50:14 | 11 | go? |
| 09:50:20 | 12 | A.   To Dallas, Texas. |
| 09:50:21 | 13 | Q.   And did they have a place for you to stay there? |
| 09:50:28 | 14 | A.   No. |
| 09:50:28 | 15 | Q.   So where were you living? |
| 09:50:33 | 16 | A.   In a hotel. |
| 09:50:34 | 17 | Q.   Who paid for that hotel? |
| 09:50:36 | 18 | A.   I paid for it. |
| 09:50:37 | 19 | Q.   And then, you started meeting with the government. |
| 09:50:45 | 20 | A.   Yes. |
| 09:50:45 | 21 | Q.   Did the governmental allow you in this arrangement to bring |
| 09:50:51 | 22 | some money with you? |
| 09:51:09 | 23 | A.   I didn't bring any money because "40," "42" destroyed or |
| 09:51:14 | 24 | seized all of it; and because of this, they killed 2, 300 people |
| 09:51:21 | 25 | in Allende, Coahuila. |

| | | |
|---|---|---|
| 09:51:24 | 1 | Q.   So how did you pay for the hotel? |
| 09:51:27 | 2 | A.   Through my family. |
| 09:51:29 | 3 | Q.   Your family loaned you money. |
| 09:51:32 | 4 | A.   Yes. |
| 09:51:32 | 5 | Q.   So when you came over, did you bring -- you're married. |
| 09:51:39 | 6 | A.   Yes.  I'm married. |
| 09:51:40 | 7 | Q.   And you have two children? |
| 09:51:42 | 8 | A.   Yes. |
| 09:51:44 | 9 | Q.   Young children? |
| 09:51:46 | 10 | A.   Yes. |
| 09:51:46 | 11 | Q.   And they came with you? |
| 09:51:52 | 12 | A.   Two weeks later. |
| 09:51:54 | 13 | Q.   But they're here now with you? |
| 09:51:59 | 14 | A.   They're not with me.  They are here in the United States. |
| 09:52:05 | 15 | Q.   But they don't live with you? |
| 09:52:06 | 16 | A.   No. |
| 09:52:08 | 17 | Q.   And how many times have you met with the government since |
| 09:52:18 | 18 | you came to the United States? |
| 09:52:26 | 19 | A.   With the government? |
| 09:52:28 | 20 | Q.   Yes.  With the prosecutor, or police officer, an FBI, a DEA |
| 09:52:32 | 21 | agent. |
| 09:52:40 | 22 | A.   A lot of times.  I don't have any idea. |
| 09:52:42 | 23 | Q.   A hundred times? |
| 09:52:45 | 24 | A.   No. |
| 09:52:46 | 25 | Q.   Fifty times? |

| | | |
|---|---|---|
| 09:52:49 | 1 | A.    Maybe. |
| 09:52:50 | 2 | Q.    And do you have some sort of written agreement with the |
| 09:52:53 | 3 | government? |
| 09:53:01 | 4 | A.    My attorney must have that.  I don't know. |
| 09:53:03 | 5 | Q.    Well, have you seen a written agreement? |
| 09:53:09 | 6 | A.    I haven't seen anything. |
| 09:53:10 | 7 | Q.    Did you sign something? |
| 09:53:15 | 8 | A.    I signed a lot of papers. |
| 09:53:19 | 9 | Q.    So what's your understanding of your arrangement with the |
| 09:53:25 | 10 | government? |
| 09:53:26 | 11 | A.    That I -- I don't have charges.  I've been cooperating since |
| 09:53:44 | 12 | the beginning. |
| 09:53:45 | 13 | Q.    So you were selling $4 million worth of drugs in the United |
| 09:53:55 | 14 | States every ten days? |
| 09:54:08 | 15 | A.    I worked for "Poncho" Cuellar. |
| 09:54:11 | 16 | Q.    That wasn't my question.  My question was, weren't you |
| 09:54:13 | 17 | moving $10 million worth of drugs into the United States, $4 |
| 09:54:19 | 18 | million worth of drugs into the United States every ten days? |
| 09:54:22 | 19 | Wasn't that your testimony? |
| 09:54:32 | 20 | A.    Yes.  Yes. |
| 09:54:33 | 21 | Q.    And you're facing no charges? |
| 09:54:39 | 22 | A.    Not to date.  No. |
| 09:54:41 | 23 | Q.    And in exchange for that, you're testifying for the |
| 09:54:49 | 24 | government. |
| 09:55:00 | 25 | A.    I testify what I know. |

| | | |
|---|---|---|
| 09:55:03 | 1 | Q.   And you're not facing any charges? |
| 09:55:05 | 2 | MR. GARDNER:  Your Honor, it's been asked and answered. |
| 09:55:08 | 3 | THE COURT:  It has. |
| 09:55:11 | 4 | Q.   (BY MS. WILLIAMS) And you get to stay in the United States? |
| 09:55:20 | 5 | A.   At least until now. |
| 09:55:22 | 6 | Q.   And your family's in the U.S.? |
| 09:55:26 | 7 | A.   That's right. |
| 09:55:26 | 8 | Q.   But you could get sent back at any time? |
| 09:55:29 | 9 | A.   That's right. |
| 09:55:32 | 10 | Q.   That's all the questions I have. |
| 09:55:52 | 11 | MR. DEGEURIN:  Your Honor, may we go -- may I go to the |
| 09:55:56 | 12 | bathroom before? |
| 09:55:58 | 13 | THE COURT:  Well, if you'd have just waited three |
| 09:56:02 | 14 | minutes.  So we'll give you the benefit of three minutes.  I'll |
| 09:56:06 | 15 | give you your morning break, members of the jury.  You'll have |
| 09:56:09 | 16 | time to use the facilities.  Try to be ready in 15 minutes. |
| 09:56:43 | 17 | (Jury not present.) |
| 09:56:55 | 18 | THE COURT:  Fifteen-minute recess. |
| 10:14:46 | 19 | (Recess.) |
| 10:15:45 | 20 | (Jury present.) |
| 10:16:44 | 21 | THE COURT:  Mr. DeGeurin, your witness. |
| 10:16:49 | 22 | CROSS-EXAMINATION |
| 10:16:51 | 23 | BY MR. DEGEURIN: |
| 10:16:51 | 24 | Q.   Thank you, your Honor. |
| 10:16:52 | 25 | Mr. Moreno, I'm Mike DeGeurin.  We have not met, have |

| | | |
|---|---|---|
| 10:17:09 | 1 | we? |
| 10:17:12 | 2 | A.   No. |
| 10:17:15 | 3 | Q.   I want to get some details down that I missed in your direct |
| 10:17:23 | 4 | examination. |
| 10:17:28 | 5 | A.   Okay. |
| 10:17:29 | 6 | Q.   First of all, you said you signed a lot of papers.  It |
| 10:17:38 | 7 | wasn't described what papers you signed with your agreement with |
| 10:17:45 | 8 | the government.  Can you give me a little more description of the |
| 10:17:50 | 9 | papers you signed? |
| 10:18:02 | 10 | A.   Yeah.  Well, every time I get questioned, depending on who's |
| 10:18:21 | 11 | questioning me, they take a piece of paper saying that whatever |
| 10:18:24 | 12 | I'm questioned about won't be used against me.  That. |
| 10:18:31 | 13 | Q.   I see.  And that would be papers that were prepared between |
| 10:18:37 | 14 | you and the government and your lawyer? |
| 10:18:47 | 15 | A.   Yes. |
| 10:18:48 | 16 | Q.   In other words, anything that you tell the agents or the |
| 10:18:54 | 17 | prosecutors or the government, whatever you tell them, any crimes |
| 10:18:59 | 18 | that you tell them about, you will not be prosecuted for; is that |
| 10:19:17 | 19 | correct? |
| 10:19:17 | 20 | A.   Yes. |
| 10:19:19 | 21 | Q.   So it really gives you kind of a free rein to say things |
| 10:19:24 | 22 | that are incriminating about yourself, or make up things even, |
| 10:19:30 | 23 | and you're not going to be prosecuted for -- |
| 10:19:31 | 24 | MR. GARDNER:  Your Honor, I'm going to object to the |
| 10:19:33 | 25 | form of that question.  It's argumentative. |

| | | |
|---|---|---|
| 10:19:36 | 1 | MR. DEGEURIN:  I don't think it was argumentative. |
| 10:19:40 | 2 | THE COURT:  Okay.  I'll sustain. |
| 10:19:48 | 3 | Q.   (BY MR. DEGEURIN) So you're given an opportunity to say |
| 10:19:50 | 4 | things about crimes you participated in with an agreement that |
| 10:19:56 | 5 | you will not be prosecuted for anything that you tell them. |
| 10:20:09 | 6 | A.   Yes.  That's what I understood. |
| 10:20:14 | 7 | Q.   Now, one of the things that I'm curious about is being able |
| 10:20:20 | 8 | to investigate what you said -- what you say and check it out. |
| 10:20:33 | 9 | You understand? |
| 10:20:42 | 10 | A.   Yes. |
| 10:20:43 | 11 | Q.   You know, the details, someone can go check out the details. |
| 10:20:48 | 12 | And so, the first detail I want to ask you about is this one time |
| 10:20:53 | 13 | that you saw Mr. Colorado was at a ranch in Coahuila, the state |
| 10:21:03 | 14 | of Coahuila, but where was the ranch? |
| 10:21:26 | 15 | A.   It's in Morelos, Coahuila and the name of the ranch is La |
| 10:21:36 | 16 | Ilusion. |
| 10:21:36 | 17 | Q.   La Ilusion, is that like hope or ranch of hope or ranch -- |
| 10:21:47 | 18 | A.   No.  It's La Ilusion. |
| 10:21:50 | 19 | Q.   Okay.  Can I get you to spell that for me? |
| 10:21:58 | 20 | A.   I-L-U-S-I-O-N. |
| 10:22:09 | 21 | Q.   That would be rancho la -- |
| 10:22:13 | 22 | MR. GARDNER:  Your Honor, I'm interested in Mr. |
| 10:22:16 | 23 | DeGeurin's artwork, but just for purposes of this, could we have |
| 10:22:18 | 24 | a clean sheet of paper? |
| 10:22:23 | 25 | MR. DEGEURIN:  If it's used at all, it would be for |

10:22:27  1   demonstrative purposes.

10:22:27  2              THE COURT:  He's talking about the portrait.

10:22:29  3              MR. GARDNER:  Portrait.  Artwork.

10:22:29  4              MR. DEGEURIN:  The one I made of the prosecutor?

10:22:34  5              MR. GARDNER:  I'm a very good-looking man.  But I

10:22:37  6   understand that, your Honor.

10:22:39  7              MR. DEGEURIN:  I don't see any harm here, your Honor.

10:22:42  8   It's a way to remember who the witness is.  I could write the

10:22:46  9   name under it.

10:22:49  10             THE COURT:  Well, let's go on.  I don't think it's

10:22:51  11  going to impress anybody one way or the other.

10:22:54  12             MR. DEGEURIN:  Thank you, your Honor.

10:23:05  13  Q.   (BY MR. DEGEURIN) All right.  And when was that ranch --

10:23:09  14  when was that race at La Ilusion that you saw Mr. Colorado at?

10:23:28  15  A.   In 2009.

10:23:31  16  Q.   All right.  And when was it that you came to the United

10:23:44  17  States and to start your agreement with the government?

10:24:00  18  A.   2011.  March, April, 2011.

10:24:03  19  Q.   At the race at that ranch, was there a race track there,

10:24:15  20  private race track?

10:24:27  21  A.   That's where the Zaragoza, Coahuila futurity is held every

10:24:32  22  year.

10:24:33  23  Q.   Oh.  So it's an actual race track, not some private race

10:24:36  24  track?

10:24:47  25  A.   Well, it's somewhat private, but there's nothing private for

| 10:24:52 | 1 | "40," "42." |

Q.   That wasn't my question.

        If the futurity is raced there every year in Mexico, it is a legitimate race track, correct?

A.   Yes.  That -- yes.  It's a legitimate race track during the months of April and May.

Q.   And you testified that "40" had some horses there that he was racing, right?

A.   Yes.

Q.   And that Carlos Nayen was there, also?

A.   Yes.

Q.   And that Mr. Carlos Nayen had brought some horses that belonged to Mr. Colorado to race.

A.   Yes.

Q.   And you did not talk to Mr. Colorado yourself, did you?

A.   No.

Q.   And Mr. Carlos Nayen helped -- I believe you testified he helped "40" or his people to select horses to purchase to race in races?

A.   That's right.  For a certain period because before that, he had selected "Pancho" Colorado's horses.

Q.   So Mr. Nayen helped and advised Mr. "Pancho" Colorado in purchasing -- helping him purchase horses, also, correct?

A.   Yes.  He took the Coronita Cartel there and she later ran in Nuevo Laredo.

| | | |
|---|---|---|
| 10:27:44 | 1 | Q.   Carita -- what did you say, Carita Cartel? |
| 10:27:54 | 2 | A.   Coronita Cartel. |
| 10:27:55 | 3 | Q.   Coronita.  When you say he brought, are you talking about |
| 10:27:58 | 4 | Carlos Nayen brought that horse there to race? |
| 10:28:10 | 5 | A.   Yeah, for what is 10, something like that. |
| 10:28:16 | 6 | Q.   For what? |
| 10:28:18 | 7 | A.   For the Marias.  For the Las Marias Ranch. |
| 10:28:29 | 8 | Q.   Would it be correct if I put down here, you have never |
| 10:28:32 | 9 | spoken to Mr. Colorado? |
| 10:28:40 | 10 | A.   Just as I said, no. |
| 10:28:48 | 11 | Q.   You testified that you watched some race in the United |
| 10:29:09 | 12 | States and you watched it on the internet, along with Carlos |
| 10:29:16 | 13 | Nayen and other group of people watching it on the internet. |
| 10:29:32 | 14 | A.   No.  Not with Carlos Nayen. |
| 10:29:36 | 15 | Q.   You used a -- I do believe you said you named some people |
| 10:29:46 | 16 | that were there, and you said that Mr. Colorado was not present |
| 10:29:50 | 17 | when you were watching.  Who were the people there? |
| 10:30:11 | 18 | A.   "40," "42," 2000, Lazcano and Carlitos. |
| 10:30:17 | 19 | Q.   All right.  That's where I was confused.  You said Carlitos, |
| 10:30:21 | 20 | but that's not Carlos Nayen. |
| 10:30:24 | 21 | A.   No.  Commander Carlitos. |
| 10:30:30 | 22 | Q.   So just the five of them were watching it on the internet? |
| 10:30:38 | 23 | A.   Yes.  And "Poncho" Cuellar. |
| 10:30:48 | 24 | Q.   You said something about a site or something that had to do |
| 10:31:04 | 25 | with Petro Servicios or something.  Did you use some login or |

10:31:16   1   were you watching it on some kind of site?  I wasn't clear about

10:31:22   2   that.

10:31:46   3   A.   Yes.  To be able to watch live or watch the repetitions, we

10:31:54   4   would have to type in Petro Servicios ADT at -- or I don't

10:31:59   5   remember if it was ADT Petro Servicios at and the user name, and

10:32:04   6   the password would be Francisco Colorado.

10:32:07   7   Q.   That would be the -- what Mr. Colorado would use if he was

10:32:12   8   going to watch something on the -- a race on the internet.

10:32:27   9   A.   I would imagine, but I don't know what he uses.

10:32:31  10   Q.   Did you have that information yourself to type in?

10:32:42  11   A.   Yes.  "40" got it off a message had been sent to him on his

10:32:48  12   BlackBerry.

10:32:50  13   Q.   We have heard that Mr. Carlos Nayen would sometimes

10:32:55  14   communicate privately with "40" on his BlackBerry.

10:33:08  15   A.   Yes.

10:33:12  16   Q.   Do you know whether that is true or not?  Did he communicate

10:33:17  17   with "40" on his BlackBerry?  Do you know that?

10:33:36  18   A.   Yeah.  I saw photographs of him.  He sent naked photographs

10:33:41  19   that Carlos Nayen would send "40."

10:33:44  20   Q.   Well, no one has shown me the naked photographs.

10:33:48  21         THE COURT:  Let's ask questions.

10:33:53  22   Q.   (BY MR. DEGEURIN) Where were you physically located when you

10:33:58  23   were watching this race on the internet?

10:34:09  24   A.   In Nava, Coahuila.  In Nava, Coahuila and Piedras Negras at

10:34:20  25   "40's" ranch.

| | | |
|---|---|---|
| 10:34:22 | 1 | Q.   All right.  Once again, Mr. Colorado was not present while |
| 10:34:26 | 2 | you were watching this race on the internet. |
| 10:34:34 | 3 | A.   Mr. Colorado, I only saw one time at the La Ilusion Ranch. |
| 10:34:44 | 4 | Never saw him again. |
| 10:34:49 | 5 | Q.   Is that correct that you never saw him again after that one |
| 10:35:12 | 6 | time? |
| 10:35:20 | 7 | A.   Today.  I saw him today. |
| 10:35:57 | 8 | MR. DEGEURIN:  Your Honor, I'm going to mark this for |
| 10:35:59 | 9 | demonstrative purposes only.  This would be D-2 and offer it for |
| 10:36:22 | 10 | demonstrative purposes only. |
| 10:36:24 | 11 | MR. GARDNER:  No objection, your Honor. |
| 10:36:25 | 12 | THE COURT:  All right.  It's received. |
| 10:36:28 | 13 | MR. DEGEURIN:  Pass the witness. |
| 10:36:32 | 14 | THE COURT:  Mr. Womack. |
| 10:36:34 | 15 | CROSS-EXAMINATION |
| 10:36:34 | 16 | BY MR. WOMACK: |
| 10:36:35 | 17 | Q.   Thank you, your Honor. |
| 10:36:38 | 18 | Mr. Moreno, I'm Guy Womack from Houston.  We've never |
| 10:36:46 | 19 | met before, have we? |
| 10:36:51 | 20 | A.   No. |
| 10:36:55 | 21 | Q.   You told us that every time you met with the government, you |
| 10:36:58 | 22 | signed some kind of a -- like an immunity letter? |
| 10:37:09 | 23 | A.   I don't know what name you give that. |
| 10:37:15 | 24 | Q.   Right.  But it was a letter that told you that nothing you |
| 10:37:18 | 25 | said would be used against you. |

| | | |
|---|---|---|
| 10:37:25 | 1 | A.    That's right. |
| 10:37:26 | 2 | Q.    And you said you met with the government maybe 50 times. |
| 10:37:36 | 3 | A.    Yes. |
| 10:37:36 | 4 | Q.    So there should be 50 of these letters with your signature |
| 10:37:39 | 5 | on it somewhere. |
| 10:37:51 | 6 | A.    No, because I spoke to the same people several times. |
| 10:37:55 | 7 | Q.    Okay.  So the first time you would meet with a particular |
| 10:37:59 | 8 | group of agents or prosecutors is when you'd sign the letter. |
| 10:38:12 | 9 | A.    Yes. |
| 10:38:12 | 10 | Q.    And how many different groups do you think you met with |
| 10:38:16 | 11 | where you signed these letters? |
| 10:38:27 | 12 | A.    I don't remember.  When I got here, there was a lot, a lot |
| 10:38:44 | 13 | of people, ATF, FBI, DEA, ICE. |
| 10:38:49 | 14 | Q.    And what I'm trying to focus on right now is the number of |
| 10:38:52 | 15 | letters that you signed saying that nothing would be used against |
| 10:38:57 | 16 | you.  Do you think you may have signed a dozen of those? |
| 10:39:13 | 17 | A.    I have no idea.  At that moment, everything that was going |
| 10:39:31 | 18 | on in Mexico, I didn't know what my situation was.  I was very |
| 10:39:35 | 19 | pressured.  My mind wasn't clear.  I couldn't think about that. |
| 10:39:39 | 20 | Q.    But you remember signing several of them, don't you? |
| 10:39:45 | 21 | A.    Yes. |
| 10:39:47 | 22 | Q.    Now, as you see it, you were Mario Cuellar's right-hand man; |
| 10:40:07 | 23 | is that right? |
| 10:40:16 | 24 | A.    You could say that.  Yes. |
| 10:40:17 | 25 | Q.    And you have said that under oath before, haven't you? |

| | | |
|---|---|---|
| 10:40:24 | 1 | A.   Several times. |
| 10:40:28 | 2 | Q.   And you believed that you were aware of everything that he |
| 10:40:33 | 3 | was doing? |
| 10:40:43 | 4 | A.   Everything I was doing, yes. |
| 10:40:45 | 5 | Q.   You were aware of everything that Mario Cuellar was doing |
| 10:40:49 | 6 | because you're his right-hand man. |
| 10:40:58 | 7 | A.   Didn't sleep with him.  I didn't know what he was doing when |
| 10:41:04 | 8 | I wasn't with him.  When I was with him at work, I knew what he |
| 10:41:07 | 9 | was doing. |
| 10:41:08 | 10 | Q.   Okay.  So with regards to his drug-trafficking activity and |
| 10:41:12 | 11 | gun trafficking, you knew about all of that, didn't you? |
| 10:41:22 | 12 | A.   Yes. |
| 10:41:24 | 13 | Q.   And you were -- you personally were in charge of Jose |
| 10:41:28 | 14 | Vasquez, Jr., weren't you? |
| 10:41:34 | 15 | A.   That's right. |
| 10:41:35 | 16 | Q.   And you would send him to do different things in assisting |
| 10:41:40 | 17 | you and Mario Cuellar. |
| 10:41:47 | 18 | A.   That's right. |
| 10:41:48 | 19 | Q.   Did you pay Jose Vasquez, Jr. any money? |
| 10:41:55 | 20 | A.   No, because since he owed so much money and he had the |
| 10:42:14 | 21 | company's money, he didn't charge us for the favors we asked. |
| 10:42:19 | 22 | Q.   Okay.  To your knowledge, did you or the company pay him a |
| 10:42:24 | 23 | salary of a million or a commission of $1 million a month?  Just |
| 10:42:43 | 24 | answer "Yes" or "No." |
| 10:42:44 | 25 | A.   I think he was earning more.  Yes. |

10:42:52   1   Q.   And you started to say, before I cut you off, sometimes it
10:42:56   2   was even more than a million dollars a month.
10:43:02   3   A.   Yes.
10:43:03   4   Q.   How much were you getting paid yourself?
10:43:12   5   A.   I was paid $200 per kilo.
10:43:15   6   Q.   Okay.  If Jose Vasquez, Jr. was getting a million dollars
10:43:22   7   and more a month, how much were you getting every month?
10:43:55   8   A.   I was paid 200,000, but then, I lost it all because anytime
10:44:00   9   that something was lost or Jose Vasquez or someone made a
10:44:04   10  mistake, had to pay it.  There was one time that between "Poncho"
10:44:08   11  and I, "Poncho" and I, we paid a year's earnings.
10:44:13   12  Q.   Now, during the time that you worked with Cuellar and
10:44:20   13  Vasquez, Jr., in essence, what you were controlling was cocaine
10:44:25   14  being smuggled from Mexico into the United States; is that right?
10:44:34   15  A.   Yes.
10:44:42   16  Q.   And then, you also coordinate -- you also smuggled money
10:44:46   17  from the United States back into Mexico.
10:44:58   18  A.   Yes.  With the drivers.
10:45:01   19  Q.   And also, you would smuggle guns from the United States into
10:45:04   20  Mexico.
10:45:13   21  A.   Yes.
10:45:17   22  Q.   Before today, you have never told a jury anything about
10:45:25   23  diverting money within the United States to pay for horses, have
10:45:29   24  you?
10:45:39   25  A.   No.

| | | |
|---|---|---|
| 10:45:40 | 1 | Q. No, you haven't, or no, that's not true? |
| 10:45:47 | 2 | A. No. I hadn't done it. |
| 10:45:50 | 3 | Q. You had never said that before? |
| 10:45:54 | 4 | A. No. |
| 10:45:55 | 5 | Q. And you also have never before told a jury that money was |
| 10:45:59 | 6 | smuggled from Mexico back into the United States to pay for |
| 10:46:03 | 7 | horses. |
| 10:46:15 | 8 | A. Because I didn't introduce the money. |
| 10:46:16 | 9 | THE INTERPRETER: I didn't bring the money in. |
| 10:46:18 | 10 | Interpreter's correction. |
| 10:46:19 | 11 | Q. (BY MR. WOMACK) But everything that Jose Vasquez, Jr. did |
| 10:46:23 | 12 | and everything that Mario Cuellar did, you were aware of, |
| 10:46:26 | 13 | correct? |
| 10:46:35 | 14 | A. Yes. It was money that was here, here in the U.S. |
| 10:46:37 | 15 | Q. Okay. And so, when I say divert money, if the money is in |
| 10:46:40 | 16 | America and it stays in America, but it goes to pay for horses in |
| 10:46:45 | 17 | America, you've never told a jury that before, have you? |
| 10:47:01 | 18 | A. No. |
| 10:47:02 | 19 | Q. In fact, you've never mentioned to a jury anywhere in |
| 10:47:05 | 20 | America anything about horses at all, have you, before today? |
| 10:47:20 | 21 | A. No. I hadn't mentioned -- the horses, no. |
| 10:47:31 | 22 | Q. Now, you told us that you're not pending charges as long as |
| 10:47:39 | 23 | you cooperate with the United States government; is that correct? |
| 10:47:52 | 24 | A. True. |
| 10:47:53 | 25 | Q. And the person who will decide if you've been cooperating |

| | | |
|---|---|---|
| 10:48:00 | 1 | with the U.S. government are the prosecutors that you testify |
| 10:48:07 | 2 | for, correct? |
| 10:48:12 | 3 | A.   Yes.  Since the first day I came. |
| 10:48:21 | 4 | Q.   Now, I want to talk to you a little bit about Mr. Piloto. |
| 10:48:28 | 5 | You actually watched Mr. Piloto win the All American, didn't you? |
| 10:48:38 | 6 | A.   Yes. |
| 10:48:39 | 7 | Q.   Your Honor, we'd like to play that race.  During the break, |
| 10:48:44 | 8 | the government was nice enough to download the YouTube onto a |
| 10:48:49 | 9 | disc.  If they'll show me how to operate it. |
| 10:49:12 | 10 | MR. GARDNER:  Do you have a number on it? |
| 10:49:14 | 11 | MR. WOMACK:  I don't.  We'll make it Garcia 3. |
| 10:49:16 | 12 | MR. GARDNER:  Your Honor.  We have no objection to |
| 10:49:19 | 13 | Garcia 3. |
| 10:49:19 | 14 | THE COURT:  All right.  Admitted. |
| 10:49:22 | 15 | Q.   (BY MR. WOMACK) So I'm going to stand back here so I can |
| 10:49:24 | 16 | operate the computer a little bit.  That's not to be funny. |
| 10:49:28 | 17 | But as we're looking at it right now, if you look at |
| 10:49:33 | 18 | the top, it says, Ruidoso Downs.  That's in New Mexico, isn't |
| 10:49:39 | 19 | its? |
| 10:49:43 | 20 | A.   Yes. |
| 10:49:45 | 21 | Q.   And the All American Race of 2010 was run on September 6, |
| 10:49:53 | 22 | 2010, correct? |
| 10:50:04 | 23 | A.   Don't remember the date. |
| 10:50:06 | 24 | Q.   Do you see up at the top middle in the blue where it says, |
| 10:50:09 | 25 | 9-6-2010? |

| | | |
|---|---|---|
| 10:50:15 | 1 | A.   Yes. |
| 10:50:16 | 2 | Q.   Could it be the race was run on September 6, 2010? |
| 10:50:33 | 3 | A.   When this race starts and I see the path that Mr. Piloto |
| 10:50:39 | 4 | takes, I can tell you if that's the race or not. |
| 10:50:41 | 5 | Q.   Let's do that. |
| 10:50:43 | 6 | (Video and audio file played.) |
| 10:51:37 | 7 | Q.   Now, have you seen that videotape?  You remember that, don't |
| 10:51:40 | 8 | you? |
| 10:51:43 | 9 | A.   Yes. |
| 10:51:44 | 10 | Q.   It was a pretty exciting race, wasn't it? |
| 10:51:48 | 11 | A.   Yes. |
| 10:51:49 | 12 | Q.   And one of the reasons it was exciting as we saw in the |
| 10:51:56 | 13 | race, Mr. Piloto was in the chute No. 9.  He was on the extreme |
| 10:52:00 | 14 | as you look at the screen, to the extreme left, wasn't he? |
| 10:52:17 | 15 | A.   Yes. |
| 10:52:18 | 16 | Q.   And when he first comes out of the chute, we're going to |
| 10:52:27 | 17 | watch it and I'm going to stop it. |
| 10:52:28 | 18 | (Video and audio file played.) |
| 10:52:49 | 19 | Q.   All of these open at exactly the same time, don't they? |
| 10:52:58 | 20 | A.   It would appear so.  Yes. |
| 10:52:59 | 21 | Q.   And, in fact, the horses in, looks like, 3, 4, 6 actually |
| 10:53:10 | 22 | have a jump -- they explode -- some of those horses explode out |
| 10:53:14 | 23 | of the chute faster than Mr. Piloto, don't they?  You see it, |
| 10:53:31 | 24 | don't you? |
| 10:53:31 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 10:53:31 | 1 | Q.    Now. |
| 10:53:34 | 2 | (Video and audio file played.) |
| 10:53:38 | 3 | Q.    And while the other horses are going more or less straight |
| 10:53:42 | 4 | down the track, Mr. Piloto veers off to his right, doesn't he? |
| 10:53:54 | 5 | A.    A lot. |
| 10:53:56 | 6 | Q.    He goes all the way within about two meters of the rail |
| 10:54:03 | 7 | before he finally straightens up and goes down the course, |
| 10:54:05 | 8 | correct? |
| 10:54:16 | 9 | A.    That's right. |
| 10:54:17 | 10 | Q.    At this point, however far that is, 30 meters or whatever, |
| 10:54:22 | 11 | he is pretty much dead last, isn't he? |
| 10:54:38 | 12 | A.    Yeah.  You don't even -- you really don't even see that |
| 10:54:42 | 13 | until you get up to where the people are. |
| 10:54:46 | 14 | (Video and audio file played.) |
| 10:54:53 | 15 | Q.    And you know at this point, around the midpoint of the race, |
| 10:54:56 | 16 | he's still back there at least four or five horses in front of |
| 10:54:59 | 17 | him, aren't there? |
| 10:55:12 | 18 | A.    No.  I don't remember. |
| 10:55:14 | 19 | Q.    Well, looking at it, you can tell he's on the far left of |
| 10:55:17 | 20 | the picture, he's behind all but maybe one or two horses, isn't |
| 10:55:20 | 21 | he? |
| 10:55:37 | 22 | A.    No.  No.  He's about equal.  I mean, the angle that you are |
| 10:55:41 | 23 | looking at this time, you don't see it clearly, but he -- that |
| 10:55:44 | 24 | horse is about almost in the lead. |
| 10:55:46 | 25 | Q.    You know they don't mention his name until near the end |

10:55:49  1  because it's Mr. Big Time and the other horses that are leading.

10:56:01  2  A.    Yes.  Big Time and Dominion.

10:56:06  3            (Video and audio file played.)

10:56:24  4  Q.    So rather than the starters holding these horses back, as

10:56:28  5  you claimed, you saw the gates all open at the same time and if

10:56:32  6  anything -- and definitely Mr. Piloto -- they said "Pil-auto," we

10:56:37  7  know it's Mr. Piloto -- Mr. Piloto was behind in the beginning.

10:56:41  8  He ran further because he went to the outside and he caught

10:56:45  9  everyone --

10:56:46  10           MR. GARDNER:  Your Honor, Mr. Womack's testifying.  We

10:56:48  11  would ask that he answer -- or ask a question.  We would object

10:56:51  12  to the form --

10:56:51  13           MR. WOMACK:  I'm getting ready to ask.  I understand.

10:56:54  14  Q.    (BY MR. WOMACK) You saw that Mr. Piloto was not the first

10:56:57  15  horse out of the gate.

10:57:14  16  A.    Well, you know, with the motion of the race here, it looks

10:57:17  17  like all of the gates open the same.

10:57:19  18  Q.    And he was not even the first one out of the gate, was he?

10:57:35  19  A.    He was a really slow horse.  The gates all have to open at

10:57:40  20  the same time.  What doesn't -- what doesn't happen is that they

10:57:42  21  don't release them at the same time.

10:57:44  22  Q.    And you saw that other horses -- several of the other horses

10:57:47  23  actually were ahead of him coming out of the gates.  You saw

10:57:50  24  that?

10:57:58  25  A.    Yes, I saw it.

| | | |
|---|---|---|
| 10:58:00 | 1 | Q.   Okay.  And when Mr. Piloto finally got out of the gate, he |
| 10:58:04 | 2 | veered off to his right towards the rail, didn't he? |
| 10:58:13 | 3 | A.   Yes. |
| 10:58:14 | 4 | Q.   And he ran near the rail and finally straightened up, went |
| 10:58:19 | 5 | straight down the course. |
| 10:58:28 | 6 | A.   Yes. |
| 10:58:28 | 7 | Q.   And he caught the entire field and passed them by a nose at |
| 10:58:33 | 8 | the end, correct? |
| 10:58:41 | 9 | A.   I don't know if he caught them or they caught him.  I don't |
| 10:58:52 | 10 | know.  I don't know about horse races. |
| 10:58:55 | 11 | Q.   It was pretty obvious that if he's behind and then, he wins, |
| 10:58:59 | 12 | he must have overtaken the other horses, right? |
| 10:59:10 | 13 | A.   That's right. |
| 10:59:11 | 14 | Q.   He won this race on pure speed, correct? |
| 10:59:15 | 15 | MR. GARDNER:  I'm going to object to the form of that |
| 10:59:17 | 16 | question.  It's argumentative. |
| 10:59:20 | 17 | THE COURT:  Not argumentative.  If he wants to hear the |
| 10:59:23 | 18 | answer, he can ask it. |
| 10:59:43 | 19 | A.   I don't know.  I don't know if orders were followed or were |
| 10:59:46 | 20 | not followed.  I was ordered, I was told to pay $110,000 to |
| 10:59:51 | 21 | people in Ruidoso.  I don't know. |
| 10:59:54 | 22 | Q.   (BY MR. WOMACK) And you told us that was to affect the start |
| 10:59:57 | 23 | of the race, correct? |
| 11:00:01 | 24 | A.   That's right. |
| 11:00:03 | 25 | Q.   And we know that the slowest horse coming out of the gate |

| | | |
|---|---|---|
| 11:00:06 | 1 | and the one that ran to the outside overtook everyone and won the |
| 11:00:11 | 2 | race, and that was Mr. Piloto, correct? |
| 11:00:22 | 3 | A.    That's right. |
| 11:00:24 | 4 | Q.    You know this race was run under the control of the New |
| 11:00:28 | 5 | Mexico Racing Commission, as it always is. |
| 11:00:44 | 6 | A.    I don't know the rules under which races are run. |
| 11:00:47 | 7 | Q.    You know that there were nine or ten owners interested in |
| 11:00:51 | 8 | the outcome of this race. |
| 11:01:02 | 9 | A.    It's the most important race for quarter horses. |
| 11:01:10 | 10 | Q.    So if there had been any kind of irregularity in this race, |
| 11:01:14 | 11 | don't you think they would still be fighting over who gets the |
| 11:01:16 | 12 | money? |
| 11:01:24 | 13 | A.    I don't know. |
| 11:01:27 | 14 | Q.    Your Honor, I have no further questions. |
| 11:01:39 | 15 | MR. ESPER:  May it please the Court. |
| 11:01:40 | 16 | CROSS-EXAMINATION |
| 11:01:40 | 17 | BY MR. ESPER: |
| 11:02:07 | 18 | Q.    Mr. Moreno, do you remember speaking with this Agent Lawson |
| 11:02:17 | 19 | and a female agent a number of times? |
| 11:02:27 | 20 | A.    Yes. |
| 11:02:28 | 21 | Q.    And do you remember whenever you were speaking to Agent |
| 11:02:32 | 22 | Lawson and this female agent, one of them was asking you |
| 11:02:36 | 23 | questions and the other was interpreting or writing down notes? |
| 11:02:56 | 24 | A.    Yes. |
| 11:02:57 | 25 | Q.    Now, that was about a year ago or year and a half ago, was |

| | | |
|---|---|---|
| 11:03:00 | 1 | it not? |
| 11:03:06 | 2 | A.   I -- I have no idea.  I don't know.  Well, it's been two |
| 11:03:17 | 3 | years.  Maybe, yes. |
| 11:03:19 | 4 | Q.   Okay.  And in the course of those interviews, you were being |
| 11:03:24 | 5 | asked questions, were you not? |
| 11:03:29 | 6 | A.   Yes. |
| 11:03:30 | 7 | Q.   And you were giving truthful answers, correct? |
| 11:03:38 | 8 | A.   That's right. |
| 11:03:39 | 9 | Q.   And you were also being asked to -- if you remembered things |
| 11:03:43 | 10 | that weren't being asked, to volunteer, correct? |
| 11:03:49 | 11 | A.   Yes. |
| 11:03:53 | 12 | Q.   Now, isn't it true, Mr. Moreno, that you never told Agent |
| 11:04:03 | 13 | Lawson or the female FBI agent that was interviewing you about |
| 11:04:09 | 14 | this dinner that you had in Nava, Mexico that you told the jury |
| 11:04:15 | 15 | about? |
| 11:04:31 | 16 | A.   The dinner in Nava, Mexico that I had -- yeah, yeah, I |
| 11:04:39 | 17 | mentioned it. |
| 11:04:40 | 18 | Q.   You told the agents that? |
| 11:04:51 | 19 | A.   I told them the whole story, the whole story about Tempting |
| 11:04:54 | 20 | Dash, Mr. Piloto.  I told them the whole story. |
| 11:04:56 | 21 | Q.   That's not what I'm asking you. |
| 11:04:58 | 22 |      Did you tell the agents that you had dinner at this |
| 11:05:03 | 23 | restaurant in Nava, Mexico, just like you've told this jury here |
| 11:05:07 | 24 | today? |
| 11:05:16 | 25 | A.   I don't know specifically if I told him about the first |

| | |
|---|---|
| 11:05:29 | 1 |
| 11:05:31 | 2 |
| 11:05:34 | 3 |
| 11:05:43 | 4 |
| 11:05:44 | 5 |
| 11:05:49 | 6 |
| 11:05:55 | 7 |
| 11:06:04 | 8 |
| 11:06:05 | 9 |
| 11:06:13 | 10 |
| 11:06:20 | 11 |
| 11:06:34 | 12 |
| 11:06:35 | 13 |
| 11:06:38 | 14 |
| 11:06:39 | 15 |
| 11:06:52 | 16 |
| 11:07:15 | 17 |
| 11:07:22 | 18 |
| 11:07:27 | 19 |
| 11:07:28 | 20 |
| 11:07:33 | 21 |
| 11:07:34 | 22 |
| 11:07:44 | 23 |
| 11:07:49 | 24 |
| 11:07:50 | 25 |

interview or other interviews, but yes, I did talk about it.

Q.   Okay.  So the questions I'm asking you are either "Yes,"
"No," or "I don't remember," okay?

A.   Don't remember.

Q.   Okay.  Did you tell the agents about the supposed smuggling
of aliens into the United States to go work at Mr. Huitron's
horse-training stables?

A.   Yes.

Q.   You told them that.  Did you tell the agents about Mr.
Huitron supposedly sitting at a table talking with "40," Miguel
Trevino?  "Yes," "No," or "I don't remember"?

A.   No.

Q.   You didn't tell them that, did you?

A.   No.

Q.   Okay.  Did you tell the agents that you directed Mr. Vasquez
to deliver $200,000 to Mr. "Chevo" Huitron to buy horses?  "Yes,"
"No," or "I don't remember"?

A.   I gave Jose Vasquez orders for purchases.  I don't remember
exactly who it was for.

Q.   Okay.  So the answer was, "I don't remember"?

A.   Don't remember.

Q.   Okay.  Now, did you ever meet Mr. Paul Jones?  He's a
trainer, correct?

A.   No.

Q.   Do you know -- and if you don't, simply say so -- whether or

| | | |
|---|---|---|
| 11:07:54 | 1 | not you, "Poncho" Cuellar or Mr. Vasquez had money sent to Paul |
| 11:08:01 | 2 | Jones? |
| 11:08:15 | 3 | A.    No.  No I don't know. |
| 11:08:17 | 4 | Q.    Okay.  Did Mr. Cuellar own some horses that Mr. Huitron |
| 11:08:22 | 5 | trained? |
| 11:08:28 | 6 | A.    Yes. |
| 11:08:29 | 7 | Q.    How many, if you know? |
| 11:08:33 | 8 | A.    Don't have any idea.  Three or four. |
| 11:08:35 | 9 | Q.    Okay.  And do you know how much Mr. Cuellar paid "Chevo" |
| 11:08:41 | 10 | Huitron to train and board his horses? |
| 11:08:53 | 11 | A.    No.  I have no idea. |
| 11:08:54 | 12 | Q.    And do you know who paid "Chevo" Huitron the fees for his |
| 11:09:00 | 13 | services and for boarding those horses? |
| 11:09:09 | 14 | A.    Whose horses? |
| 11:09:16 | 15 | Q.    Mr. Cuellar, "Poncho's." |
| 11:09:18 | 16 | A.    "Poncho" or I. |
| 11:09:19 | 17 | Q.    Okay.  Let's talk about what you paid Mr. "Chevo" Huitron. |
| 11:09:24 | 18 | How much did you pay him for the training of Mr. "Poncho" |
| 11:09:29 | 19 | Cuellar's horses? |
| 11:09:43 | 20 | A.    10,000. |
| 11:09:45 | 21 | Q.    When did you pay him?  When and where did you pay him? |
| 11:10:02 | 22 | A.    "Poncho" Cuellar's house in Nava, Coahuila. |
| 11:10:06 | 23 | Q.    Okay.  You personally gave him $10,000? |
| 11:10:11 | 24 | A.    Yes. |
| 11:10:12 | 25 | Q.    Now, you also claim that at this dinner in Nava, Mexico, |

| | | |
|---|---|---|
| 11:10:17 | 1 | somebody gave "Chevo" Huitron $40,000. |
| 11:10:30 | 2 | A.   I.  I pulled it out and I gave it to him. |
| 11:10:33 | 3 | Q.   And that was for "Poncho" Cuellar's horse, was it not? |
| 11:10:37 | 4 | A.   No.  I noted that on Miguel Trevino's marihuana account. |
| 11:10:49 | 5 | Q.   You've noted that on Miguel Trevino's marihuana account? |
| 11:11:10 | 6 | A.   Correct, because from what was owed to him from the |
| 11:11:16 | 7 | marihuana, that was discounted from that amount because he had |
| 11:11:18 | 8 | one or two tons that was being dedicated to that. |
| 11:11:21 | 9 | Q.   Okay.  Who's he? |
| 11:11:26 | 10 | A.   Commander 40. |
| 11:11:27 | 11 | Q.   Okay.  And did Commander 40 tell you to give $40,000 to Mr. |
| 11:11:34 | 12 | Huitron?  That's not what I asked you, sir. |
| 11:11:45 | 13 | MR. GARDNER:  Your Honor, I know Mr. Esper speaks |
| 11:11:48 | 14 | Spanish, but per the Court's earlier rulings, could we hear the |
| 11:11:51 | 15 | answer, please? |
| 11:11:52 | 16 | MR. ESPER:  I apologize, your Honor. |
| 11:11:55 | 17 | A.   "Pancho" Cuellar asked me for them and I asked against whom. |
| 11:12:03 | 18 | Q.   (BY MR. ESPER) "Poncho" Cuellar asked you for the $40,000, |
| 11:12:06 | 19 | correct? |
| 11:12:10 | 20 | A.   Correct. |
| 11:12:10 | 21 | Q.   And "Poncho" Cuellar told you how this money is supposed to |
| 11:12:15 | 22 | be credited or debited to somebody's account, correct? |
| 11:12:25 | 23 | A.   That's right. |
| 11:12:26 | 24 | Q.   Now, when you gave this money supposedly to Mr. "Chevo" |
| 11:12:31 | 25 | Huitron, you never told him, this is drug money, Mr. Huitron, did |

| | | |
|---|---|---|
| 11:12:36 | 1 | you? |
| 11:12:45 | 2 | A.   No. |
| 11:12:46 | 3 | Q.   That would have been stupid, correct? |
| 11:12:50 | 4 | A.   Well, yeah.  Of course. |
| 11:12:51 | 5 | Q.   Now, let's talk about your drug dealing, Mr. Moreno.  You |
| 11:12:59 | 6 | know what cocaine looks like, don't you? |
| 11:13:05 | 7 | A.   Like what? |
| 11:13:06 | 8 | Q.   You know what cocaine looks like, don't you? |
| 11:13:12 | 9 | A.   Yes. |
| 11:13:13 | 10 | Q.   And you've seen it not only in kilo quantities but in ounce |
| 11:13:17 | 11 | quantities, too, haven't you? |
| 11:13:23 | 12 | A.   Yes. |
| 11:13:25 | 13 | Q.   Now, your Honor, I'm technologically challenged.  Is there |
| 11:13:38 | 14 | someone that can -- thank you. |
| 11:13:57 | 15 |          Now, Mr. Moreno, how many grams are in a kilo of |
| 11:14:07 | 16 | cocaine? |
| 11:14:08 | 17 | A.   Thousand. |
| 11:14:09 | 18 | Q.   That would be accurate, correct? |
| 11:14:26 | 19 | A.   Yes. |
| 11:14:27 | 20 | Q.   Okay.  How many ounces are in a kilo, do you know? |
| 11:14:37 | 21 | A.   No. |
| 11:14:39 | 22 | Q.   How many grams are in an ounce of cocaine? |
| 11:14:47 | 23 | A.   I don't know. |
| 11:14:47 | 24 | Q.   You've never seen an ounce of cocaine? |
| 11:14:53 | 25 | A.   Yeah, but I've never asked that and I've never weighed it. |

| | | |
|---|---|---|
| 11:14:56 | 1 | Q.   Okay.  Your Honor, for demonstrative purposes, I have marked |
| 11:15:00 | 2 | this exhibit as Defendant's Exhibit EH-1. |
| 11:15:03 | 3 | MR. GARDNER:  No objection, your Honor. |
| 11:15:05 | 4 | Q.   (BY MR. ESPER) You've seen something like this before, |
| 11:15:08 | 5 | haven't you? |
| 11:15:13 | 6 | A.   Yes. |
| 11:15:14 | 7 | Q.   For the record, your Honor, this is not cocaine.  This is |
| 11:15:19 | 8 | flour. |
| 11:15:20 | 9 | THE COURT:  I had a hunch. |
| 11:15:21 | 10 | Q.   (BY MR. ESPER) Thank you, your Honor. |
| 11:15:23 | 11 | And that's about an ounce of cocaine, is it not? |
| 11:15:27 | 12 | A.   I have no idea. |
| 11:15:29 | 13 | Q.   But you've seen this before, haven't you? |
| 11:15:35 | 14 | A.   I've seen loose cocaine.  Yes. |
| 11:15:37 | 15 | Q.   Okay.  And how many of these ounces of cocaine do you know |
| 11:15:43 | 16 | are in a kilo?  Thirty-five, 40 of these? |
| 11:15:56 | 17 | A.   I don't know. |
| 11:15:57 | 18 | Q.   A lot of them, correct? |
| 11:15:58 | 19 | A.   We sold kilos, not ounces. |
| 11:16:01 | 20 | Q.   Okay.  A lot of them, correct? |
| 11:16:05 | 21 | A.   Yeah.  I would imagine, yes. |
| 11:16:07 | 22 | Q.   Okay.  And isn't it a fact, sir, that you smuggled four to |
| 11:16:12 | 23 | five tons -- you brought four to five tons of cocaine into the |
| 11:16:21 | 24 | United States per year, correct? |
| 11:16:32 | 25 | A.   Yes. |

11:16:33   1   Q.   Would it surprise you, sir, that four to five tons of

11:16:36   2   cocaine comes down to about 176,000 of these that you and your

11:16:43   3   buddies flooded the United States market with?

11:16:46   4              MR. GARDNER:  Your Honor --

11:16:48   5   Q.   (BY MR. ESPER) Do you know?

11:16:48   6              MR. GARDNER:  Your Honor, I'm going to object.  I

11:16:50   7   appreciate why Mr. Esper seeks this question.  I'm going to

11:16:53   8   object that it's argumentative.

11:16:54   9              THE COURT:  It is argumentative.  And when he objects,

11:17:01  10   don't continue.

11:17:02  11   Q.   (BY MR. ESPER) Do you know how much cocaine you infiltrated

11:17:05  12   into this country?

11:17:10  13   A.   No.

11:17:11  14   Q.   Well, four to five tons is what you claim, correct?

11:17:18  15   A.   Yes.

11:17:18  16   Q.   And you would agree that that's a lot of cocaine, isn't it?

11:17:26  17   A.   Yes.

11:17:27  18   Q.   Okay.  And when you were doing that, you weren't concerned

11:17:30  19   about federal authorities arresting you, were you?

11:17:44  20   A.   Yes.

11:17:47  21   Q.   You were concerned?

11:17:49  22   A.   Yes.

11:17:50  23   Q.   And you were concerned because the truth is, Mr. Moreno, you

11:17:55  24   had been arrested back in 2004, coming across Piedras Negras into

11:18:03  25   Eagle Pass at the port-of-entry with 10 kilograms of cocaine,

| | | |
|---|---|---|
| 11:18:07 | 1 | correct? |
| 11:18:21 | 2 | A.    Yes. |
| 11:18:22 | 3 | Q.    And you were taken to jail, were you not? |
| 11:18:27 | 4 | A.    Yes. |
| 11:18:27 | 5 | Q.    And you appeared in a federal court, similar to one like |
| 11:18:33 | 6 | this, didn't you? |
| 11:18:39 | 7 | A.    Yes. |
| 11:18:40 | 8 | Q.    And do you remember the judge that you appeared in front of |
| 11:18:43 | 9 | in your case?  His name? |
| 11:18:51 | 10 | A.    No. |
| 11:18:52 | 11 | Q.    If I gave it to you, would you recognize the name? |
| 11:18:57 | 12 | A.    Yes. |
| 11:18:57 | 13 | Q.    Was it William Wayne Justice? |
| 11:19:01 | 14 | A.    Yes. |
| 11:19:02 | 15 | Q.    Okay.  And that was back in 2004 and 2005, correct? |
| 11:19:10 | 16 | A.    Yes. |
| 11:19:11 | 17 | Q.    And do you remember being told in that case that you were |
| 11:19:16 | 18 | facing a sentence of a minimum of ten years to life in prison? |
| 11:19:27 | 19 | MR. GARDNER:  Your Honor, may I approach? |
| 11:19:33 | 20 | THE COURT:  Yes, sir. |
| 11:19:34 | 21 | (At the bench, on the record.) |
| 11:19:41 | 22 | MR. GARDNER:  Your Honor, I believe Mr. Esper has the |
| 11:19:43 | 23 | right to inquire into the conviction itself.  The underlying |
| 11:19:46 | 24 | facts surrounding the conviction, I don't believe he has the |
| 11:19:48 | 25 | proper impeachment -- |

| | | |
|---|---|---|
| 11:19:50 | 1 | MR. ESPER:  I'm not going into the facts.  I'm going |
| 11:19:50 | 2 | into -- |
| 11:19:52 | 3 | MR. GARDNER:  He's going into the sentencings and facts |
| 11:19:54 | 4 | and the statutory range, and who's the judge. |
| 11:19:56 | 5 | MR. ESPER:  Your Honor, I think it's permissible to go |
| 11:19:58 | 6 | into what his knowledge was of what he was facing and what |
| 11:20:02 | 7 | sentence he ultimately ended up.  I'm not going to ask him about |
| 11:20:06 | 8 | who he cooperated on, but I'm going to try to show that he did |
| 11:20:10 | 9 | cooperate and gotten a substantial -- |
| 11:20:12 | 10 | THE COURT:  Okay. |
| 11:20:13 | 11 | MR. ESPER:  -- decrease. |
| 11:20:16 | 12 | THE COURT:  I have no objection from. |
| 11:20:18 | 13 | MR. GARDNER:  I object to improper impeachment, your |
| 11:20:20 | 14 | Honor. |
| 11:20:20 | 15 | THE COURT:  Okay.  I'll overrule. |
| 11:20:24 | 16 | MR. WOMACK:  Before we leave, we haven't been given any |
| 11:20:27 | 17 | -- to my knowledge, any copies of plea agreements of any kind, |
| 11:20:30 | 18 | and no proffer letters, or letters of immunity.  He said there's |
| 11:20:35 | 19 | several of them.  We'd like the government to give us those.  We |
| 11:20:40 | 20 | have not gotten any of them. |
| 11:20:40 | 21 | MR. GARDNER:  Your Honor, I've never given him a |
| 11:20:43 | 22 | proffer letter.  When I interviewed him, I was told these were a |
| 11:20:46 | 23 | verbal proffer from the Eastern District of Texas.  I believe |
| 11:20:47 | 24 | he's a little confused.  And I honestly believe I gave these |
| 11:20:50 | 25 | gentlemen Jencks material on Friday, and this is the first time |

| | | |
|---|---|---|
| 11:20:53 | 1 | I've heard this. |
| 11:20:54 | 2 | MR. WOMACK:  Because we didn't know they existed until |
| 11:20:55 | 3 | the witness talked about it.  We didn't know he signed anything. |
| 11:21:01 | 4 | We don't think the government's trying to hide the ball. |
| 11:21:01 | 5 | MR. GARDNER:  He's already cross-examined him on it |
| 11:21:05 | 6 | extensively.  And it's in his prior testimony from his prior |
| 11:21:08 | 7 | trial. |
| 11:21:09 | 8 | MR. WOMACK:  We have a right to see those because there |
| 11:21:12 | 9 | might be 100 of them, or there might be one.  He said there's |
| 11:21:14 | 10 | several.  We don't know how many.  We should be allowed to see |
| 11:21:18 | 11 | those, and the plea agreements, if they exist.  I know these |
| 11:21:21 | 12 | prosecutors can get them all.  If they were aware of it, they |
| 11:21:23 | 13 | would give it to us.  But now they all know about it.  We would |
| 11:21:26 | 14 | like to see those. |
| 11:21:28 | 15 | THE COURT:  Well, first off, the assistant United |
| 11:21:31 | 16 | States attorney in this case has made it clear that all of his |
| 11:21:34 | 17 | proffers were oral.  That takes care of one thing.  And I don't |
| 11:21:41 | 18 | know what documents because he's not so testified.  If there are |
| 11:21:49 | 19 | immunity documents, he's been told, and he hasn't stated they |
| 11:21:55 | 20 | were in Spanish.  He hasn't stated he read them.  He hadn't |
| 11:21:59 | 21 | stated anything about them.  We don't know who they are.  We |
| 11:22:01 | 22 | don't know where they are.  I guess they're in the Eastern |
| 11:22:04 | 23 | District of Texas. |
| 11:22:05 | 24 | MR. WOMACK:  He said he signed them. |
| 11:22:06 | 25 | THE COURT:  He signed them.  Yeah. |

| | | |
|---|---|---|
| 11:22:08 | 1 | MR. WOMACK:  And -- yes, sir.  And also, he said he |
| 11:22:10 | 2 | signed them but on several occasion -- different ones.  He signed |
| 11:22:12 | 3 | them.  And it was explained to him by his lawyer or by the agents |
| 11:22:17 | 4 | that these were letters that would promise nothing will be used |
| 11:22:20 | 5 | against him.  So it is a proffer letter or something. |
| 11:22:23 | 6 | MR. GARDNER:  I could ask him. |
| 11:22:25 | 7 | MR. WOMACK:  And we're entitled to them.  During the |
| 11:22:28 | 8 | lunch hour, you can ask.  I'm sorry, I -- |
| 11:22:29 | 9 | THE COURT:  He can ask him another question. |
| 11:22:32 | 10 | MR. DEGEURIN:  Okay.  On the stand. |
| 11:22:33 | 11 | THE COURT:  But the evidence today is he signed a lot |
| 11:22:38 | 12 | of papers.  He's arranged with the lawyer.  He has nothing that |
| 11:22:49 | 13 | is keeping him from being prosecuted.  He has loose immunity |
| 11:22:55 | 14 | because he's been told that nothing he tells the federal agents |
| 11:23:01 | 15 | can be used against him.  He actually hasn't said he can't be |
| 11:23:06 | 16 | charged, but that's because he doesn't understand the questions |
| 11:23:12 | 17 | y'all asked.  And you've turned that into what is not his |
| 11:23:18 | 18 | testimony, but that's your business and not mine. |
| 11:23:22 | 19 | Now, if this is an oral motion for all of the papers he |
| 11:23:29 | 20 | signed, it's denied. |
| 11:23:31 | 21 | MR. DEGEURIN:  Your Honor, one thing.  The problem is |
| 11:23:34 | 22 | the Giglio material, we don't have because the witness has told |
| 11:23:43 | 23 | Mr. Gardner all of his proffers were oral.  That's not true |
| 11:23:47 | 24 | apparently.  So that's -- I think we need to be able to check the |
| 11:23:52 | 25 | Giglio material we don't have now.  Some time.  I don't want to |

11:24:01   1   uphold the jury --

11:24:02   2           THE COURT:  You're not asking --

11:24:04   3           MR. DEGEURIN:  And check that with --

11:24:05   4           THE COURT:  -- you're asking for what he signed since

11:24:07   5   he's been here?

11:24:08   6           MR. DEGEURIN:  No, no -- well, yeah, since he's been

11:24:10   7   here.

11:24:11   8           MR. MAYR:  Since he's been cooperating with the

11:24:13   9   government.

11:24:13  10           THE COURT:  Since 2011.

11:24:16  11           MR. DEGEURIN:  The Giglio material has been turned over

11:24:18  12   to the other witnesses, but apparently, for some reason or

11:24:19  13   another, Mr. Gardner doesn't have it for this witness right now.

11:24:22  14   Is that correct, Mr. Gardner?  They exist, just doesn't have it.

11:24:27  15           MR. GARDNER:  Well, I don't even know if they exist.

11:24:29  16           MR. DEGEURIN:  Okay.  And I don't either except he says

11:24:33  17   he signed then.  I think we'd request in the alternative would be

11:24:38  18   that some time over the lunch hour, Mr. Gardner check to see.

11:24:42  19           MR. GARDNER:  I can send an e-mail to the Eastern

11:24:47  20   District.

11:24:47  21           MR. DEGEURIN:  And then, we get those if they find

11:24:50  22   them.

11:24:50  23           MS. FERNALD:  And for the record, the government at

11:24:52  24   this point, these representatives of the government, we don't

11:24:56  25   have any documents.  I just --

| | | |
|---|---|---|
| 11:25:00 | 1 | MR. WOMACK:  Well, we don't doubt at all. |
| 11:25:05 | 2 | THE COURT:  Okay.  He's going to check to see what the |
| 11:25:12 | 3 | Eastern District has in writing, and we'll find out, of course. |
| 11:25:16 | 4 | We all know, sitting up here, it's meaningless, but y'all make |
| 11:25:20 | 5 | your record the way you wish. |
| 11:25:40 | 6 | MR. ESPER:  May I proceed, your Honor? |
| 11:25:46 | 7 | THE COURT:  Yes. |
| 11:25:47 | 8 | Q.   (BY MR. ESPER) Now, Mr. Moreno, when you got arrested in |
| 11:25:51 | 9 | Eagle Pass, Texas, I believe you said you were put in jail, |
| 11:25:55 | 10 | correct? |
| 11:26:02 | 11 | A.   Yes. |
| 11:26:02 | 12 | Q.   You didn't get out on a bond, did you? |
| 11:26:06 | 13 | A.   No. |
| 11:26:07 | 14 | Q.   And you made a number of court appearances in that case, did |
| 11:26:12 | 15 | you not? |
| 11:26:17 | 16 | A.   Yes. |
| 11:26:18 | 17 | Q.   Now, I believe I asked you that the range of punishment was |
| 11:26:22 | 18 | mandatory ten years to life, correct? |
| 11:26:33 | 19 | A.   Yes. |
| 11:26:34 | 20 | Q.   That's 120 months, correct? |
| 11:26:38 | 21 | A.   Yes. |
| 11:26:39 | 22 | Q.   Now, you had a lawyer in that case, did you not? |
| 11:26:43 | 23 | A.   Yes. |
| 11:26:44 | 24 | Q.   You pled guilty in that case, did you not? |
| 11:26:48 | 25 | A.   Yes. |

11:26:49  1    Q.   And you appeared for sentencing in front of Judge Justice,

11:26:55  2    correct?

11:26:59  3    A.   Yes.

11:27:00  4    Q.   And whenever you pled guilty and before you were sentenced,

11:27:03  5    before you pled guilty, before you were sentenced, you were put

11:27:06  6    under oath, just like you were here today, were you not?

11:27:20  7    A.   Yes.

11:27:20  8    Q.   And you knew that you had to tell the truth whenever you

11:27:23  9    pled guilty and anything you said at sentencing, correct?

11:27:35  10   A.   Yes.

11:27:35  11   Q.   And, of course, you didn't know what sentence Judge Justice

11:27:38  12   was going to give you before it came out of his mouth, did you?

11:27:46  13   A.   Yes.

11:27:47  14   Q.   And you wanted him to be lenient on you and give you as

11:27:51  15   little time in jail as possible, right?

11:28:02  16   A.   Yes.

11:28:03  17   Q.   And as a matter of fact, you told Judge Justice, before he

11:28:07  18   sentenced you, that -- and I may not be using the exact words --

11:28:12  19   but I'm sorry, I won't do this again.  You won't ever see me

11:28:17  20   here, correct?

11:28:17  21        MR. GARDNER:  Your Honor, I'm going to object this time

11:28:19  22   to improper impeachment.

11:28:25  23        THE COURT:  All right.  I think it's -- I'll overrule

11:28:28  24   that objection.  You may answer the question.

11:28:44  25   A.   I think so.  Yes.

```
11:28:45   1   Q.   (BY MR. ESPER) Yes.  And then, Judge Justice -- and, of
11:28:49   2   course, you were telling him that because you wanted out of jail,
11:28:53   3   correct?
11:28:59   4   A.   Uh-huh.
11:29:01   5   Q.   Okay.  And then, did Judge Justice give you a sentence of
11:29:09   6   twelve months and one day?
11:29:19   7   A.   That's right.
11:29:21   8   Q.   And so, that was a far cry from the 120 months that you were
11:29:26   9   looking at, right?
11:29:33  10   A.   Yes.
11:29:34  11   Q.   And you were very happy with that, weren't you?
11:29:39  12   A.   Yes.
11:29:40  13   Q.   Now, he also -- out of that twelve months and one day, how
11:29:45  14   much time did you actually spend in prison?
11:30:03  15   A.   Ten, eleven months.  Don't remember.
11:30:08  16   Q.   And part of the reason why you got this sentence, besides
11:30:14  17   you pleading with the judge for this, is you gave -- you
11:30:20  18   cooperated, correct?
11:30:32  19   A.   That's right.
11:30:33  20   Q.   Now, I'm not asking you for the names or what you said, but
11:30:36  21   cooperation means you have to give up information about people,
11:30:40  22   right?
11:30:51  23   A.   That's right.
11:30:52  24   Q.   So the cooperation plus your pleas under oath to Judge
11:30:57  25   Justice got you a twelve-months-and-one-day sentence, correct?
```

11:31:12  1   A.   Yes.

11:31:13  2   Q.   And that was for trying to bring ten kilograms of cocaine

11:31:17  3   into the United States?

11:31:25  4   A.   Yes.

11:31:26  5   Q.   Now, Judge Justice also gave you -- you know what supervised

11:31:30  6   release is?

11:31:36  7   A.   No.

11:31:37  8   Q.   Do you know whether or not Judge Justice said you cannot

11:31:41  9   come back into this country for the next three years because

11:31:45  10  you're going to be on supervised release?

11:32:00  11  A.   Yeah, but it didn't matter, because I didn't have a way to

11:32:03  12  get here.

11:32:03  13  Q.   Okay.  So after you were released from prison, you were

11:32:06  14  deported back to Mexico, correct?

11:32:14  15  A.   That's right.

11:32:14  16  Q.   And other than when you went to the bridge in 2011, March of

11:32:19  17  2011, did you ever sneak into the United States?

11:32:31  18  A.   No.  Never.

11:32:31  19  Q.   Okay.  But after you got out of prison in 2005 -- is that

11:32:36  20  the year you got out?

11:32:43  21  A.   Yes.

11:32:44  22  Q.   For the next couple of years, you've kept your word that you

11:32:48  23  promised Judge Justice that you wouldn't get involved in this

11:32:52  24  again, didn't you, for a couple of years?

11:33:03  25  A.   Yes.

| | | |
|---|---|---|
| 11:33:03 | 1 | Q.   And then, in 2007, you got back into the drug-dealing |
| 11:33:07 | 2 | business, correct? |
| 11:33:12 | 3 | A.   That's right. |
| 11:33:13 | 4 | Q.   So when you were in that courtroom in front of Judge Justice |
| 11:33:17 | 5 | telling him under oath you weren't going to do this stuff again, |
| 11:33:19 | 6 | you lied to him, didn't you? |
| 11:33:33 | 7 | A.   I had to go back because of the circumstances. |
| 11:33:35 | 8 | Q.   I'm not asking you what you had to do, Mr. Moreno.  You lied |
| 11:33:39 | 9 | to Judge Justice because you went back and did something that you |
| 11:33:44 | 10 | swore to him under oath you weren't going to do again. |
| 11:33:51 | 11 | A.   Yes. |
| 11:33:52 | 12 | Q.   And you were under oath, just like you are right now, aren't |
| 11:33:56 | 13 | you? |
| 11:34:01 | 14 | A.   Yes. |
| 11:34:01 | 15 | Q.   No further questions, your Honor. |
| 11:34:04 | 16 |             THE COURT:  Mr. Mayr. |
| 11:34:15 | 17 |             MR. ESPER:  Your Honor, I move for the admission of |
| 11:34:17 | 18 | Defendant EH-1, exhibit for purposes of demonstrative purposes |
| 11:34:21 | 19 | only, your Honor. |
| 11:34:22 | 20 |             THE COURT:  What is the number? |
| 11:34:24 | 21 |             MR. ESPER:  EH -- Defendant's EH-1, your Honor. |
| 11:34:28 | 22 |             THE COURT:  We've already got a 1. |
| 11:34:30 | 23 |             MR. ESPER:  I'm sorry.  EH-2 would be the other one, |
| 11:34:33 | 24 | your Honor. |
| 11:34:33 | 25 |             THE COURT:  All right. |

| | | |
|---|---|---|
| 11:34:34 | 1 | MR. GARDNER:  EH-2 is your note? |
| 11:34:37 | 2 | MR. ESPER:  Yes. |
| 11:34:38 | 3 | MR. GARDNER:  No objection, your Honor. |
| 11:34:39 | 4 | THE COURT:  For demonstrative purposes. |
| 11:34:41 | 5 | MR. ESPER:  Thank you, your Honor. |
| 11:34:42 | 6 | CROSS-EXAMINATION |
| 11:34:43 | 7 | BY MR. MAYR: |
| 11:34:43 | 8 | Q.   Good morning, Mr. Moreno.  My name is Brent Mayr and I |
| 11:34:51 | 9 | represent Jesus Huitron. |
| 11:35:00 | 10 | Early this morning, when Mr. Gardner was asking you |
| 11:35:03 | 11 | questions, he asked you if you knew my client Jesus Huitron.  Do |
| 11:35:12 | 12 | you remember that? |
| 11:35:17 | 13 | A.   Yes. |
| 11:35:22 | 14 | Q.   And your response was, I don't know him. |
| 11:35:28 | 15 | A.   Yes. |
| 11:35:30 | 16 | Q.   I have no further questions, your Honor. |
| 11:35:34 | 17 | RE-DIRECT EXAMINATION |
| 11:35:34 | 18 | BY MR. GARDNER: |
| 11:35:38 | 19 | Q.   Mr. Moreno, I'm holding in my hand what I've marked as |
| 11:35:41 | 20 | Government's Exhibit 407.  Do you recall testifying on May 17, |
| 11:35:45 | 21 | 2012, in front of Judge Crone up in the Eastern District of |
| 11:35:49 | 22 | Texas? |
| 11:36:04 | 23 | A.   Yes. |
| 11:36:06 | 24 | Q.   And do you recall in that trial, the question by Mr. Ernest |
| 11:36:11 | 25 | Gonzalez, the assistant United States attorney, was, have you |

| 11:36:13 | 1 | ever been convicted of any felony offenses?  Do you recall that |

11:36:13   1   ever been convicted of any felony offenses?  Do you recall that

11:36:18   2   question?

11:36:26   3   A.   Yes.

11:36:27   4   Q.   And do you recall your response was that you were convicted

11:36:34   5   in 2003?

11:36:36   6   A.   Yes.

11:36:38   7   Q.   And it talks about being in Eagle Pass and you received a

11:36:41   8   one-year sentence, and then, you returned back to Mexico.  Do you

11:36:45   9   recall that?

11:36:51   10   A.   Yes.

11:36:54   11   Q.   And do you recall the questions by Mr. Womack about the fact

11:36:57   12   that you've never testified in court before regarding horses?  Do

11:37:03   13   you recall that question?

11:37:12   14   A.   Yes.

11:37:14   15   Q.   I've looked through this testimony.  It's also been

11:37:17   16   available to the defense attorneys.  Would you agree with me that

11:37:20   17   there was no question asked of you regarding horses during your

11:37:23   18   last testimony?

11:37:34   19   A.   It's the first time I'd ever been in a trial I -- I don't

11:37:49   20   remember if I ever mentioned Tremor Enterprises.

11:37:51   21   Q.   Your Honor, I'd offer Government's Exhibit 407 under Rule

11:37:55   22   613(b) as extrinsic evidence of a prior consistent statement,

11:38:00   23   testimony from a previous trial.

11:38:02   24           MR. WOMACK:  Objection.  Prior consistent statement?

11:38:06   25           MR. GARDNER:  Yes.

11:38:07    1          MR. WOMACK:   Your Honor, we object because obviously it

11:38:08    2   was created after he had a motive to fabricate.   Prior consistent

11:38:14    3   statement has to be made before a person has a reason to lie.

11:38:14    4          MR. GARDNER:   I don't think there's that standard.

11:38:17    5          MR. WOMACK:   The motive to fabricate.   So we object

11:38:19    6   because this was obviously made after he had -- started working

11:38:22    7   for the government.

11:38:23    8          THE COURT:   Tender the exhibit to the clerk.   How many

11:38:28    9   pages?   I'll make a ruling after the noon hour.

11:38:31   10          MR. GARDNER:   All right, your Honor.   May I inquire

11:38:34   11   further on other subjects?

11:38:35   12          THE COURT:   Certainly.

11:38:36   13          MR. GARDNER:   Thank you.

11:38:37   14   Q.   (BY MR. GARDNER) Now, Mr. Esper asked you some questions

11:38:40   15   about the money that you paid "Chevo" Huitron the $10,000, and I

11:38:45   16   believe your response was it came off "40's" marihuana account.

11:39:04   17   A.   That's right.

11:39:06   18   Q.   And were those expenses that you paid the $10,000, were they

11:39:11   19   "40's" expenses or "Poncho" Cuellar's expenses?

11:39:23   20   A.   They were "40's" because it was credit -- counted against

11:39:27   21   "40's" account.

11:39:28   22   Q.   And do you know what "Chevo" Huitron did for a living?

11:39:40   23   A.   That he, here close to Austin, trained horses.

11:39:49   24   Q.   Do you know that there were, in fact, objections made to

11:39:51   25   that, Mr. Piloto raced by the other owners?

| 11:40:00 | 1 | A.   I don't know. |

```
11:40:00   1   A.   I don't know.

11:40:08   2   Q.   Now, when you were asked questions, could you have extensive

11:40:13   3   -- I'm sorry.  I should have prefaced that.

11:40:15   4        When the defense attorneys asked you all these

11:40:18   5   questions about the number of times you've talked with members of

11:40:20   6   the government, do you recall those sets of questions?

11:40:35   7   A.   Yes.

11:40:35   8   Q.   I think you said you had Immigration Customs Enforcement,

11:40:42   9   ICE, FBI, DEA, the ATF, all asking you questions.  Do you recall

11:40:47  10   that did you work for the cartel -- the Zetas cartel for a long

11:41:02  11   period of time?

11:41:07  12   A.   Yes.

11:41:08  13   Q.   And when you cooperated, did you know all the areas that

11:41:12  14   U.S. law enforcement was interested with respect to the cartels?

11:41:26  15   A.   Yes.

11:41:27  16   Q.   And you know Special Agent Scott Lawson, sitting over here

11:41:30  17   at counsel table?

11:41:35  18   A.   Yes.

11:41:35  19   Q.   Was he the first federal agent that actually asked you about

11:41:39  20   the quarter horses?

11:41:44  21   A.   Yes.

11:41:46  22   Q.   And Ms. Williams asked you a question about your family.

11:41:50  23   Why did you bring your wife and children into the United States?

11:42:00  24   A.   Well, because they were going to be killed over there.

11:42:03  25   Q.   That's all I have, your Honor.
```

| 11:42:06 | 1 | MS. WILLIAMS: Nothing further, your Honor. |

MS. WILLIAMS: Nothing further, your Honor.

MR. DEGEURIN: We reserve, your Honor, after the decision is made about our bench conference.

THE COURT: All right. Okay. Looks like I get to go to work then. Members of the jury, I'll give you a lunch break. Be ready to come back at 1:20. 1:20. Remember the instructions by the Court.

(Jury not present.)

THE COURT: 1:20.

(Lunch recess.)

MR. FINN: Your Honor, just for planning purposes, I'm not going to try to figure out if we're going to be in trial on Friday. Have you made a decision on that yet?

THE COURT: No later than in the morning, if that will help you.

MR. FINN: That will help. Thank you.

THE COURT: All right. On Government's Exhibit 407, there are no questions about horses. There are no responses about horses. The issue is, do I submit this whole transcript, which you've all reviewed? Or do I just tell the jury that I've looked at it and there are no questions or any other comment about horses in the transcript of May 17, 2012 and not admit it. You might want to talk about it for just a second.

MR. GARDNER: Your Honor.

THE COURT: Before you do that, what did we learn about

| | | |
|---|---|---|
| 13:17:06 | 1 | the noon hour with regard to letters, or papers, whatever they |
| 13:17:12 | 2 | are? |
| 13:17:12 | 3 | MR. GARDNER:  Your Honor, I'm tendering to the Court an |
| 13:17:14 | 4 | e-mail submitted by my assistant at 11:40:  AUSA Gonzalez, Doug |
| 13:17:19 | 5 | has asked me to reach out to you to see if you could e-mail us |
| 13:17:23 | 6 | any, slash, all proffer letters and Giglio material that you |
| 13:17:27 | 7 | might have regarding Hector Moreno.  Your prompt attention would |
| 13:17:29 | 8 | really be appreciated.  Thanks. |
| 13:17:31 | 9 | Your Honor, I'd submit to the Court, before I came down |
| 13:17:33 | 10 | to court, we have received no response yet. |
| 13:17:36 | 11 | THE COURT:  All right. |
| 13:17:37 | 12 | MR. GARDNER:  Your Honor, I'm also tendering to the |
| 13:17:38 | 13 | Court what we discussed earlier with respect to the search |
| 13:17:41 | 14 | warrant evidence as 406A.  Our editorial comments have been |
| 13:17:45 | 15 | removed.  Before I do that, your Honor, let me give it to defense |
| 13:17:50 | 16 | attorneys so they could take a look at it. |
| 13:17:53 | 17 | MR. FINN:  Judge, can we hold off on 406A?  I think we |
| 13:17:56 | 18 | need to talk. |
| 13:17:57 | 19 | MR. GARDNER:  Yeah.  No problem. |
| 13:17:58 | 20 | MR. FINN:  If that's okay rather than. |
| 13:18:00 | 21 | THE COURT:  Sure. |
| 13:18:01 | 22 | MR. FINN:  Okay.  That's fine. |
| 13:18:03 | 23 | THE COURT:  We don't need to know that till the end of |
| 13:18:07 | 24 | the evidence.  Okay.  So that's a continuing question.  So the |
| 13:18:15 | 25 | witness will be retained and available. |

```
13:18:18    1              MR. GARDNER:  Yes, sir.
13:18:18    2              THE COURT:  All right.  Anything else?
13:18:21    3              MR. WOMACK:  I think he was still being cross-examined
13:18:24    4    by --
13:18:24    5              THE COURT:  Well, I know where we are.  I'm not that
13:18:27    6    old.  I remember this morning.
13:18:28    7              MR. WOMACK:  I -- oh, no.  I thought you were saying he
13:18:31    8    would be off the stand right now.
13:18:33    9              THE COURT:  No, no.  He will continue to be available.
13:18:36   10              MR. WOMACK:  Yes, sir.
13:18:36   11              THE COURT:  All right.  Anything else before I bring in
13:18:38   12    the jury?
13:18:39   13              MS. WILLIAMS:  Judge, I don't know if we got a final
13:18:40   14    answer on how you were going to handle this transcript.  I mean,
13:18:43   15    the witness has already said he wasn't asked any questions about
13:18:46   16    this, and he didn't answer any questions about horses.  That's
13:18:49   17    what the evidence is at this moment.
13:18:51   18              THE COURT:  That's right.  And he was crossed on it.
13:18:54   19    And I don't remember every question but he was -- actually said
13:19:02   20    he didn't say anything about horses.  And the issue is -- and, of
13:19:08   21    course, when he gets him back on direct, I'm sure he's going to
13:19:13   22    point out that none of the other cases had anything to do with
13:19:18   23    horses.  And so, this is all about nothing.
13:19:21   24              But y'all continue to amaze me by doing good
13:19:26   25    cross-examination.  It's entertaining but, you know, you've
```

| | | |
|---|---|---|
| 13:19:30 | 1 | crossed somebody that doesn't say anything adverse against your |
| 13:19:33 | 2 | client, which I guess in the old -- I'm too old to forget the |
| 13:19:37 | 3 | first rule of cross-examination. |
| 13:19:38 | 4 | MR. DEGEURIN: Your Honor, may I weigh in just one |
| 13:19:41 | 5 | moment on that issue? It's not just that we don't have the |
| 13:19:50 | 6 | Jencks materials. It's a little deeper than that. We don't know |
| 13:19:53 | 7 | what we don't have. But we do know, according to the witness, |
| 13:19:56 | 8 | that it exists -- not Jencks. Giglio. |
| 13:20:19 | 9 | Anyway, I'm sorry. Your Honor, it's deeper than just |
| 13:20:24 | 10 | whether he said something or didn't say something in that trial. |
| 13:20:28 | 11 | It's deeper than that. We don't have -- we were not given any of |
| 13:20:33 | 12 | the Giglio material. Giglio is not Jencks. We argued Jencks. |
| 13:20:38 | 13 | But it's something that the Supreme Court has said we must have |
| 13:20:43 | 14 | with enough sufficient time to be able to effectively use it. |
| 13:20:46 | 15 | THE COURT: And he's trying to get it and I understand |
| 13:20:48 | 16 | that, and I hope he gets these papers. We don't know if it's |
| 13:20:51 | 17 | Giglio or not. We know it's some papers. |
| 13:20:54 | 18 | What I do know is you're not going to be able to show |
| 13:20:58 | 19 | any more than you're showing: That somebody's trying to get a |
| 13:21:02 | 20 | reduction in sentence or somebody's got immunity and not going to |
| 13:21:05 | 21 | have any charges. You're not going to get anything better than |
| 13:21:07 | 22 | that. I don't care who prepared it. |
| 13:21:09 | 23 | MR. DEGEURIN: Yeah. And I understand. |
| 13:21:10 | 24 | THE COURT: So it's nothing. But y'all go ahead and |
| 13:21:13 | 25 | press it. |

13:21:13  1          MR. DEGEURIN:  No, no.  I understood that's what you

13:21:15  2   meant and I understand that and I get that, Judge.

13:21:17  3          THE COURT:  Good.

13:21:17  4          MR. DEGEURIN:  But I want you to dignify the issue of

13:21:20  5   not -- I mean, you're talking more like harmless error at this

13:21:24  6   point.  I'm talking about a more --

13:21:27  7          THE COURT:  Actually, I'm talking really about any kind

13:21:29  8   of prejudice.  If I thought there was any kind of prejudice,

13:21:33  9   well, there's not anything more I can do than ask if they can get

13:21:36  10  it and get it to you, and that's what we're going to do.  And if

13:21:39  11  it turns out to be something, well, that will be good.  If it

13:21:45  12  turns out to be -- I can't imagine how it could be anything

13:21:51  13  better for the defendant than immunity from prosecution use and I

13:21:59  14  hope to heck I get a reduction in my sentence.  So far, that's

13:22:03  15  all I've heard.

13:22:04  16         MR. DEGEURIN:  And that's experienced trial lawyer

13:22:06  17  speak, and I understand and I accept that.  But we still don't

13:22:08  18  know until we see it.

13:22:10  19         THE COURT:  All right.  And for the record, it should

13:22:20  20  have been given.  I'll say that.  Any kind of agreements made, if

13:22:26  21  there are any agreements.  I don't know.  But I do know that I

13:22:30  22  suspect Mr. Moreno is not conversant nor can he read English.  My

13:22:47  23  guess is all of these statements that he signed are in English.

13:22:54  24  He's working through a lawyer that seem to represent a lot of

13:23:01  25  people.  It reminds me of the -- what is it, the street?  Lombard

| | | |
|---|---|---|
| 13:23:10 | 1 | Street, goes every which way in San Francisco. |
| 13:23:14 | 2 | All right.  Bring the jury in. |
| 13:23:18 | 3 | MR. ESPER:  Judge, it's the crooked-est street in the |
| 13:23:21 | 4 | world. |
| 13:23:22 | 5 | THE COURT:  It is if you're running up and down, I |
| 13:23:23 | 6 | suspect. |
| 13:23:24 | 7 | (Jury present.) |
| 13:24:03 | 8 | THE COURT:  Members of the jury, during the noon break, |
| 13:24:04 | 9 | after you left the courtroom, did anyone attempt to talk to you |
| 13:24:07 | 10 | about this case? |
| 13:24:08 | 11 | JURORS:  No. |
| 13:24:08 | 12 | THE COURT:  Have you talked to anybody about the case |
| 13:24:11 | 13 | during the noon break? |
| 13:24:12 | 14 | JURORS:  No. |
| 13:24:13 | 15 | THE COURT:  And have you learned anything at all about |
| 13:24:15 | 16 | this case, outside the presence of each other in this courtroom? |
| 13:24:18 | 17 | JURORS:  No. |
| 13:24:19 | 18 | THE COURT:  All right.  Show negative responses to all |
| 13:24:20 | 19 | questions by all jurors. |
| 13:24:23 | 20 | (At the bench, on the record.) |
| 13:24:27 | 21 | THE COURT:  And I should have done this before the jury |
| 13:24:29 | 22 | came in.  It just slipped my mind.  Which is it that you wish, a |
| 13:24:34 | 23 | comment by the Court or the transcript? |
| 13:24:37 | 24 | MR. WOMACK:  Neither one.  They've asked the witness. |
| 13:24:40 | 25 | I think that's good enough, sir. |

| | | |
|---|---|---|
| 13:24:41 | 1 | THE COURT: I've got a tender and an objection on the |
| 13:24:44 | 2 | record. |
| 13:24:44 | 3 | MR. DEGEURIN: I think now -- I think -- |
| 13:24:46 | 4 | THE COURT: Do you withdraw the objection? |
| 13:24:47 | 5 | MR. WOMACK: No. Subject -- no. It will be subject -- |
| 13:24:50 | 6 | we don't want the transcript in. |
| 13:24:51 | 7 | MR. DEGEURIN: Yeah. I think my position is that the |
| 13:24:54 | 8 | Court simply state we've gone through the transcript, there's no |
| 13:25:00 | 9 | questions and no answers about horses. |
| 13:25:02 | 10 | MR. GARDNER: I'm fine with that. |
| 13:25:03 | 11 | THE COURT: All right. Members of the jury, the |
| 13:25:14 | 12 | Government's Exhibit 407, which I'll now make Court Exhibit what |
| 13:25:19 | 13 | number, Mrs. Sims? |
| 13:25:23 | 14 | THE CLERK: Court Exhibit. |
| 13:25:24 | 15 | THE COURT: I think it's 3. Court Exhibit 3 means it's |
| 13:25:28 | 16 | my exhibit, not yours. I reviewed it during the noon hour, and |
| 13:25:34 | 17 | the transcript of the proceedings involving this witness on May |
| 13:25:43 | 18 | 17, 2012 in the Eastern District of Texas, there were no |
| 13:25:51 | 19 | questions about horses, and there was no response or any |
| 13:25:57 | 20 | information or testimony regarding horses. |
| 13:26:01 | 21 | All right. I believe you still, Mr. Womack, have the |
| 13:26:05 | 22 | witness. No, no, it was on redirect? |
| 13:26:09 | 23 | MR. GARDNER: I had tendered the witness just prior to |
| 13:26:11 | 24 | the lunch break, your Honor. |
| 13:26:11 | 25 | THE COURT: All right. |

| | | |
|---|---|---|
| 13:26:12 | 1 | MR. DEGEURIN:  Back around with me? |
| 13:26:14 | 2 | THE COURT:  Ms. Williams. |
| 13:26:15 | 3 | MS. WILLIAMS:  That's correct. |
| 13:26:16 | 4 | MR. DEGEURIN:  And I have no further questions. |
| 13:26:17 | 5 | MR. WOMACK:  Sir, I have no questions. |
| 13:26:19 | 6 | MR. ESPER:  I just have a couple, your Honor. |
| 13:26:21 | 7 | RE-CROSS EXAMINATION |
| 13:26:21 | 8 | BY MR. ESPER: |
| 13:26:22 | 9 | Q.   Mr. Moreno, on redirect examination, Mr. Gardner asked you |
| 13:26:28 | 10 | that when you went to the bridge seeking help, you were in fear |
| 13:26:35 | 11 | for your life, correct? |
| 13:26:44 | 12 | A.   That's right. |
| 13:26:45 | 13 | Q.   Did you tell Mr. Cuellar that you were going to the bridge |
| 13:26:50 | 14 | before you did? |
| 13:27:06 | 15 | A.   No.  No.  I went to Monterrey.  That's where I started |
| 13:27:10 | 16 | making the phone calls, and then, I flew to El Paso. |
| 13:27:13 | 17 | Q.   Okay.  So you entered at the port-of-entry in El Paso, which |
| 13:27:19 | 18 | is hundreds of miles away, correct? |
| 13:27:28 | 19 | A.   Yes. |
| 13:27:28 | 20 | Q.   My question to you, again, was, did you talk to Mr. Cuellar |
| 13:27:33 | 21 | and tell him, I'm going to the U.S. to try to save myself? |
| 13:27:50 | 22 | A.   No.  I didn't speak to anyone because I didn't trust anyone |
| 13:27:52 | 23 | at that time. |
| 13:27:52 | 24 | Q.   Okay.  Including Mr. Cuellar? |
| 13:27:55 | 25 | A.   Everyone. |

```
13:27:56   1    Q.   Okay.  May I have just one moment, your Honor?
13:28:01   2            THE COURT:  Yes, sir.
13:28:20   3            MR. ESPER:  Nothing further, your Honor.  Thank you.
13:28:23   4            MR. MAYR:  I have no further questions, your Honor.
13:28:24   5            THE COURT:  Any redirect?
13:28:26   6            MR. GARDNER:  No, your Honor.  Thank you.
13:28:27   7            THE COURT:  This witness needs to be -- remain
13:28:30   8    available.  You may step down, sir.  Thank you.  You may call
13:28:33   9    your next witness.
13:28:34   10           MR. GARDNER:  The government calls Diana Reed.
13:29:19   11           (Witness sworn.)
13:29:35   12           THE COURT:  I want you to tell us your full name and
13:29:50   13   spell your last name, please.
13:29:51   14           THE WITNESS:  Diane Kathleen Reed, R-E-E-D.
13:29:56   15           THE COURT:  Thank you.
13:29:58   16      DIANE K. REED, called by the Government, duly sworn.
13:29:58   17                    DIRECT EXAMINATION
13:29:58   18   BY MR. GARDNER:
13:29:59   19   Q.   Thank you, your Honor.
13:29:59   20           Good afternoon, Ms. Reed.  You and I have spoken
13:30:01   21   before; is that correct?
13:30:02   22   A.   Yes, sir.
13:30:02   23   Q.   Could you please introduce yourself to the jury and tell
13:30:05   24   them what you do for a living?
13:30:07   25   A.   My name is Diane Kathleen Reed and I'm the office manager
```

| | | |
|---|---|---|
| 13:30:12 | 1 | for the Ruidoso Horse Sale in Ruidoso, New Mexico. |
| 13:30:17 | 2 | Q.   And what do you do for the Ruidoso Horse Sale? |
| 13:30:21 | 3 | A.   I am in charge of, number one, getting the catalog ready, |
| 13:30:26 | 4 | which entails consigners sending in their requests.  I take care |
| 13:30:34 | 5 | of all the paperwork prior to the sale.  And after the sale, as |
| 13:30:39 | 6 | the buyers buy the horses, then it's my job to record the |
| 13:30:48 | 7 | purchase price, the buyer, their address, the money that comes |
| 13:30:58 | 8 | in, and it more or less -- and then, after that, my job ends with |
| 13:31:03 | 9 | transferring the ownership to -- from the seller to the buyer. |
| 13:31:08 | 10 | Q.   And how do you do that? |
| 13:31:11 | 11 | A.   There is -- we sell two types of horses.  We sell |
| 13:31:17 | 12 | thoroughbreds and quarter horses.  Our first sale is what they |
| 13:31:22 | 13 | call New Mexico-bred.  All those horses have to be registered |
| 13:31:27 | 14 | with New Mexico.  Some of those are thoroughbreds, some of them |
| 13:31:31 | 15 | are quarter horses.  The thoroughbreds, we transfer there in the |
| 13:31:35 | 16 | office.  The quarter horses, there is a certain form called a |
| 13:31:39 | 17 | transfer report.  We fill that out and send it to the American |
| 13:31:45 | 18 | Quarter Horse Association, along with the registration papers, |
| 13:31:50 | 19 | and the association then prepares new registration papers and |
| 13:31:56 | 20 | mails them to the purchaser.  That's the standard procedure. |
| 13:32:01 | 21 | Q.   Now, I want to turn your attention to one particular sale |
| 13:32:03 | 22 | and that is the September 2010 sale that y'all had.  Do you |
| 13:32:10 | 23 | recall the -- that sale before or after the All American race? |
| 13:32:15 | 24 | A.   It's before.  It's the three days before. |
| 13:32:18 | 25 | Q.   And just for the jury's reference, do you recall which horse |

| | | |
|---|---|---|
| 13:32:21 | 1 | won that All American race? |
| 13:32:22 | 2 | A.    I believe that was Mr. Piloto that won that year. |
| 13:32:26 | 3 | Q.    And following the sale, did an individual come and pay for a |
| 13:32:35 | 4 | selection of horses? |
| 13:32:36 | 5 | A.    Yes, sir. |
| 13:32:37 | 6 | Q.    Do you recall that individual's name? |
| 13:32:39 | 7 | A.    That was Francisco Colorado-Cessa. |
| 13:32:43 | 8 | Q.    And do you recall how many horses he came to pay for? |
| 13:32:46 | 9 | A.    Twenty-three. |
| 13:32:48 | 10 | Q.    All right.  Could you describe that scenario to the jury, |
| 13:32:52 | 11 | please? |
| 13:32:52 | 12 | A.    Well, when we sell a horse out in the arena, we call it, |
| 13:33:02 | 13 | there's a certain form that the ticket runners take to the buyer, |
| 13:33:09 | 14 | and that's a four-page form.  The buyer gets one, I get two, and |
| 13:33:16 | 15 | whoever hauls the animal gets the third one -- I mean, the fourth |
| 13:33:21 | 16 | one. |
| 13:33:22 | 17 | Q.    Let me stop you right there.  I'm showing you Government's |
| 13:33:26 | 18 | Exhibit 408.  Is that the form that you were just describing? |
| 13:33:31 | 19 | A.    Yes, it is. |
| 13:33:32 | 20 | Q.    Okay.  You provided that just a blank copy.  It's a sample |
| 13:33:35 | 21 | form, correct? |
| 13:33:36 | 22 | A.    When this form -- this is -- yes.  This is just a blank |
| 13:33:39 | 23 | copy. |
| 13:33:39 | 24 | Q.    All right.  Your Honor, I would offer Government's Exhibit |
| 13:33:41 | 25 | 408 for demonstrative purposes only. |

13:33:46    1              THE COURT:  Received.

13:33:47    2              MR. WOMACK:  No objection.

13:33:48    3              THE COURT:  As a demonstrative piece of evidence.

13:33:51    4    Q.   (BY MR. GARDNER) If you will, Ms. Reed, could you please

13:33:54    5    hold that up for the jury and show them the separate forms that

13:33:57    6    you were talking about?

13:33:59    7    A.   This is an old-fashioned form.  It's carbon.  There's four.

13:34:05    8    These two I get back.

13:34:08    9    Q.   And for the record, that's the white and the yellow one,

13:34:11   10    correct?

13:34:11   11    A.   The pink one is the form that goes to the horse hauler.

13:34:15   12    They have to have this to get the horse off of the ground.  And

13:34:21   13    this, the gold copy goes to whoever signed the acknowledgment.

13:34:29   14    Sometimes it's an agent.  Sometimes it's the actual purchaser of

13:34:32   15    the horse.  And this comes into the office when they come to pay.

13:34:44   16    Q.   Thank you.  Ms. Reed, I'm putting the -- I'll call it the

13:34:56   17    golden copy.  All the forms are the same.  They're simply carbon

13:35:01   18    copies with different colors, correct?

13:35:03   19    A.   That's correct.

13:35:04   20    Q.   And so, this is a bigger one, the person who bid on the

13:35:08   21    horse in the arena gets?

13:35:10   22    A.   Yes.  Now, that form is -- has all the -- the top part is

13:35:16   23    filled out by me with the sale, the date, the consigner, the hip

13:35:22   24    number up in the top right-hand corner.  That's all filled out at

13:35:26   25    the time the buyer signs it.

| | | |
|---|---|---|
| 13:35:29 | 1 | Q.   Okay.  And so, when a buyer makes a purchase or bids in the |
| 13:35:37 | 2 | arena, he gets a copy of this form, correct? |
| 13:35:40 | 3 | A.   Yes, he does. |
| 13:35:40 | 4 | Q.   All right.  And so, how does he take this form and then, |
| 13:35:44 | 5 | make a payment for it with you? |
| 13:35:47 | 6 | A.   That there's two ways to pay.  We have a line of tellers at |
| 13:35:52 | 7 | the night of the sale.  He takes that to them, after the tellers |
| 13:35:59 | 8 | go home, and the next horning, they're brought to me.  They bring |
| 13:36:03 | 9 | this gold copy and by that time, that purchase is entered in the |
| 13:36:08 | 10 | computer, and we compare that with what's in the computer to make |
| 13:36:13 | 11 | certain that he's paying for, number one, enough horses. |
| 13:36:17 | 12 | Q.   And so, the day following the sale, that's when Francisco |
| 13:36:21 | 13 | Colorado-Cessa appeared in your office? |
| 13:36:22 | 14 | A.   Yes, sir. |
| 13:36:24 | 15 | Q.   And did he have a handful of these golden tickets? |
| 13:36:27 | 16 | A.   Yes, he did. |
| 13:36:28 | 17 | Q.   All right.  Do you recall how many? |
| 13:36:29 | 18 | A.   I believe there was 23. |
| 13:36:31 | 19 | Q.   All right.  And were they all in his name? |
| 13:36:34 | 20 | A.   No, sir.  They were in a variety of names, whoever bid on |
| 13:36:38 | 21 | the horse signed it. |
| 13:36:40 | 22 | Q.   So what did you do with this ticket -- or these 23 tickets |
| 13:36:44 | 23 | when they were handed to you? |
| 13:36:45 | 24 | A.   We transferred the name that was on the ticket, which had |
| 13:36:49 | 25 | already been entered in the computer into Mr. Cessa's name.  So |

| | | |
|---|---|---|
| 13:36:54 | 1 | we would know the total of the horses that he was paying for. |
| 13:36:58 | 2 | Q.   And when Mr. Cessa arrived in your office, did he come by |
| 13:37:03 | 3 | himself or was he accompanied with other individuals? |
| 13:37:05 | 4 | A.   No, sir.  I believe he had two gentlemen with him.  They |
| 13:37:09 | 5 | kind of stood in the background.  They never did come into the -- |
| 13:37:13 | 6 | into my office. |
| 13:37:14 | 7 | Q.   And what was your impression those gentlemen's role? |
| 13:37:18 | 8 | A.   Well, they were very attentive to Mr. Cessa.  They didn't |
| 13:37:26 | 9 | say anything.  They just stood there, and I thought, well, a lot |
| 13:37:30 | 10 | of our customers are very wealthy people and they travel with |
| 13:37:34 | 11 | protection and that occurred to me. |
| 13:37:36 | 12 | Q.   You assumed they were bodyguards or protection of some sort? |
| 13:37:40 | 13 | A.   Yes, I think so. |
| 13:37:41 | 14 | Q.   And did Mr. Colorado-Cessa mention anything about those two |
| 13:37:43 | 15 | people? |
| 13:37:43 | 16 | A.   No, sir. |
| 13:37:46 | 17 | Q.   And so, you took these 23 forms and when you totalled them |
| 13:37:52 | 18 | up, what was the total? |
| 13:37:55 | 19 | A.   It was $2.1 million plus a little bit. |
| 13:37:59 | 20 | Q.   I'm showing you what's already been entered unto evidence as |
| 13:38:11 | 21 | Government's Exhibit 231A, Bates No. 14-160.  Do you recognize |
| 13:38:19 | 22 | that check, Ms. Reed? |
| 13:38:20 | 23 | A.   Yes.  That is what I wrote.  Actually, it's $2.2. |
| 13:38:24 | 24 | Q.   $2.2 million, huh?  And this is a record from Ruidoso Downs. |
| 13:38:38 | 25 | Again, for the jury's attention, page No. 14-000160. |

13:38:52  1        And right here in the far left-hand column, what are

13:38:56  2   those numbers, Ms. Reed?

13:38:57  3   A.   That is the hip number of the horse.  That's the succession

13:39:00  4   that they went through the sale.  If it's 191, they went through

13:39:04  5   190 first.

13:39:06  6   Q.   So 47 was the 47th portion of the sale?

13:39:10  7   A.   Yes.  Uh-huh.

13:39:11  8   Q.   And this is obviously the name?

13:39:12  9   A.   Yes.

13:39:12  10  Q.   And what is this column?

13:39:14  11  A.   That is the purchase price.

13:39:16  12  Q.   So you mentioned this check.  Whose handwriting is this on

13:39:22  13  the check?

13:39:22  14  A.   That's mine.

13:39:23  15  Q.   Okay.  And could you tell the jury why you filled out the

13:39:26  16  check?

13:39:28  17  A.   I'm sorry?  What?

13:39:29  18  Q.   Could you please explain to the jury why that is your

13:39:31  19  handwriting on the check?

13:39:32  20  A.   Well, Mr. Cessa handed me his checkbook and indicating he

13:39:39  21  wanted me to fill it out, which is not uncommon at all.  We do

13:39:42  22  that, not a lot but some.  As you can see by his signature,

13:39:48  23  sometimes the writing is a little hard to read, so they ask us to

13:39:52  24  write the check.

13:39:53  25  Q.   So it's not uncommon?

| | | |
|---|---|---|
| 13:39:54 | 1 | A.   I'm sorry? |
| 13:39:54 | 2 | Q.   That's not uncommon? |
| 13:39:55 | 3 | A.   No.  It is not. |
| 13:39:56 | 4 | Q.   Okay.  Have you ever written a check for this amount before? |
| 13:39:59 | 5 | A.   No, sir. |
| 13:39:59 | 6 | Q.   That's the most you've ever written a check for? |
| 13:40:02 | 7 | A.   Yes, sir. |
| 13:40:03 | 8 | Q.   Does the Ruidoso Horse Sales company have a trophy for the |
| 13:40:10 | 9 | top buyer and the top seller? |
| 13:40:12 | 10 | A.   Yes. |
| 13:40:14 | 11 | Q.   And what are those trophy -- what do they look like? |
| 13:40:17 | 12 | A.   They're a running horse with a jockey on board and they're |
| 13:40:19 | 13 | on a wooden base of approximately, I'd say, 12 to 14 inches long |
| 13:40:26 | 14 | and maybe six inches wide.  Some of them have a marble base right |
| 13:40:34 | 15 | under the horse.  Some of them don't.  We've had the same one for |
| 13:40:43 | 16 | years. |
| 13:40:45 | 17 | Q.   And who is Lowell Neumayer? |
| 13:40:48 | 18 | A.   He is the boss.  He is the manager of the horse sale. |
| 13:40:51 | 19 | Q.   How many of those horse sale trophies have either you or |
| 13:40:57 | 20 | Lowell Neumayer handed out? |
| 13:40:59 | 21 | A.   Since I have been there, we handed one out. |
| 13:41:02 | 22 | Q.   And which one was that one? |
| 13:41:04 | 23 | A.   That was to Mr. Cessa. |
| 13:41:05 | 24 | Q.   And did you physically hand Mr. Cessa that trophy? |
| 13:41:09 | 25 | A.   I'm sorry? |

| | | |
|---|---|---|
| 13:41:09 | 1 | Q.   Did you, you yourself hand it? |
| 13:41:12 | 2 | A.   Yes, I did, sir. |
| 13:41:13 | 3 | Q.   Why did you do that? |
| 13:41:14 | 4 | A.   Well, we don't often sell that many horses to one person, |
| 13:41:20 | 5 | and I felt that it was appropriate to give him a remembrance of |
| 13:41:28 | 6 | the sale.  Over the time I have been there, Lowell has quit |
| 13:41:34 | 7 | giving those out because we have dual sellers, dual buyers, and |
| 13:41:41 | 8 | he was afraid we wouldn't have enough. |
| 13:41:46 | 9 | Q.   Gets a little confusing sometimes? |
| 13:41:48 | 10 | A.   Do what? |
| 13:41:48 | 11 | Q.   I said it gets -- with all the sellers and buyers and |
| 13:41:51 | 12 | agents, it might be multiple? |
| 13:41:52 | 13 | A.   Yeah. |
| 13:41:55 | 14 | Q.   Now, you said earlier that you, you, the Ruidoso Horse Sales |
| 13:42:00 | 15 | company, also handles the transfer of ownership from the buyer to |
| 13:42:05 | 16 | the seller and submit that transfer to AQHA? |
| 13:42:08 | 17 | A.   Yes, sir. |
| 13:42:09 | 18 | Q.   Did you do it in this case? |
| 13:42:10 | 19 | A.   No, sir.  We did not. |
| 13:42:12 | 20 | Q.   And why not? |
| 13:42:13 | 21 | A.   Because we were asked to hold those that they wanted to |
| 13:42:17 | 22 | transfer their own horses. |
| 13:42:20 | 23 | Q.   And who asked you to do that? |
| 13:42:22 | 24 | A.   Mr. Garcia did. |
| 13:42:24 | 25 | Q.   And did you ever meet Fernando Garcia? |

13:42:27   1   A.   When he came into the office, yes.

13:42:29   2   Q.   Okay.  And how long after the sale was it that Mr. Fernando

13:42:34   3   Garcia came into the office?

13:42:35   4   A.   It was not immediate.  I'm going to say maybe a month,

13:42:39   5   something like that.

13:42:41   6   Q.   And do you know where those horses were taken according to

13:42:44   7   Mr. Garcia?

13:42:46   8   A.   Well, I'm not surely positive.  I know that Mr. Garcia

13:42:52   9   was --

13:42:53   10          MR. WOMACK:  Objection.  She's already answered the

13:42:55   11   question she didn't know.

13:42:56   12          THE WITNESS:  I'm sorry.

13:42:57   13          MR. GARDNER:  I think she said she knows Mr. Garcia.  I

13:43:00   14   believe that's her response, Judge.

13:43:03   15          THE COURT:  Ask the question.

13:43:04   16   Q.   (BY MR. GARDNER) What did Mr. Garcia tell you with respect

13:43:06   17   to those horses?

13:43:07   18   A.   I mentioned something about the horses and he said that they

13:43:12   19   were at a farm in Tularosa.

13:43:14   20   Q.   And did he identify who was the owner of that farm?

13:43:18   21   A.   Yes, sir.  He said Mr. Cessa was.

13:43:21   22   Q.   Your Honor, may I have one moment?

13:43:39   23          I just want to point out one horse, No. 102.  And if

13:43:43   24   you would, I know it says right there where everyone can see, but

13:43:46   25   could you read that into the record, please?

| | | |
|---|---|---|
| 13:43:48 | 1 | A.   No. 102? |
| 13:43:49 | 2 | Q.   Yes, ma'am. |
| 13:43:49 | 3 | A.   That's First Fly Down. |
| 13:43:50 | 4 | Q.   And the purchase price? |
| 13:43:51 | 5 | A.   300,000. |
| 13:43:53 | 6 | Q.   Thank you, ma'am.  Your Honor, that's all the questions I |
| 13:43:55 | 7 | have. |
| 13:43:59 | 8 |          MS. WILLIAMS:  No questions. |
| 13:44:05 | 9 |                    CROSS-EXAMINATION |
| 13:44:05 | 10 | BY MR. DEGEURIN: |
| 13:44:18 | 11 | Q.   It's Ms. Reed, isn't it? |
| 13:44:19 | 12 | A.   Yes. |
| 13:44:20 | 13 | Q.   Do you still work for the Ruidoso -- is it called Ruidoso |
| 13:44:24 | 14 | Downs or? |
| 13:44:25 | 15 | A.   It's called the Ruidoso Horse Sale.  I do not work for |
| 13:44:28 | 16 | Ruidoso Downs. |
| 13:44:29 | 17 | Q.   You didn't work for the race track? |
| 13:44:30 | 18 | A.   No, sir. |
| 13:44:32 | 19 | Q.   But the auction is held somewhere near the race track? |
| 13:44:35 | 20 | A.   Yes.  We're on the adjoining property. |
| 13:44:39 | 21 | Q.   And I know this is going back a while.  Testing your memory. |
| 13:44:48 | 22 | If you don't remember, you just tell me. |
| 13:44:50 | 23 | A.   I will. |
| 13:44:50 | 24 | Q.   But were there a lot of people at the auction? |
| 13:44:53 | 25 | A.   Oh, yes, sir.  Thousands. |

| | | |
|---|---|---|
| 13:44:56 | 1 | Q.   Thousands.  How many horses were purchased? |
| 13:45:01 | 2 | A.   I believe that year, this is called the select quarter horse |
| 13:45:06 | 3 | sale.  There were 530 or something like that. |
| 13:45:11 | 4 | Q.   And 530 and they all sold in one day? |
| 13:45:16 | 5 | A.   No, sir.  Three nights. |
| 13:45:18 | 6 | Q.   Okay.  Three nights? |
| 13:45:19 | 7 | A.   Uh-huh. |
| 13:45:20 | 8 | Q.   And they -- do you recall which night it was that the |
| 13:45:26 | 9 | tickets were brought to you for payment of the horses? |
| 13:45:29 | 10 | A.   This was on Monday morning, not one of the nights. |
| 13:45:33 | 11 | Q.   So it's not like every night, they bring tickets -- tickets |
| 13:45:39 | 12 | are brought to you. |
| 13:45:40 | 13 | A.   They do not -- well, some of the people will come in to me |
| 13:45:42 | 14 | because they know me and want to visit, to pay me instead of |
| 13:45:45 | 15 | going to the tellers.  The tellers are only open during the sale |
| 13:45:49 | 16 | nights. |
| 13:45:50 | 17 | Q.   And had you met Mr. Colorado before -- ever before? |
| 13:45:56 | 18 | A.   Who? |
| 13:45:57 | 19 | Q.   Mr. Colorado? |
| 13:45:58 | 20 | A.   No.  I don't believe I had. |
| 13:46:00 | 21 | Q.   Did you refer to him as Cessa? |
| 13:46:06 | 22 | A.   Uh-huh. |
| 13:46:06 | 23 | Q.   Had you met Mr. Cessa ever before? |
| 13:46:09 | 24 | A.   No, sir. |
| 13:46:10 | 25 | Q.   Have you seen him before or since that day? |

13:46:14  1   A.   No, sir.

13:46:15  2   Q.   That day that you believe that you remember seeing him at

13:46:19  3   the sale?

13:46:19  4   A.   Not that I remember, no.  I haven't seen him since and I'm

13:46:22  5   not certain about before.

13:46:24  6   Q.   Okay.  So it would have been a -- basically a total stranger

13:46:29  7   to you that brought in the tickets?

13:46:33  8   A.   Uh-huh.

13:46:35  9   Q.   And there were two people with him?

13:46:37  10  A.   Yes, sir.

13:46:39  11  Q.   That seemed to be with him?

13:46:40  12  A.   Uh-huh.

13:46:41  13  Q.   And attentive to him?

13:46:42  14  A.   Uh-huh.

13:46:43  15  Q.   Could you tell whether or not they could speak English?

13:46:46  16  A.   No.  I could not.

13:46:47  17  Q.   Could you tell whether or not Mr. Colorado could speak

13:46:50  18  English?

13:46:52  19  A.   I just don't recall.  I don't recall how much we conversed.

13:46:58  20  I just don't recall.

13:47:03  21  Q.   When you were preparing -- and I don't mean that in a bad

13:47:08  22  way, but I don't know how often you appear in court.  Are you a

13:47:12  23  witness very often?

13:47:13  24  A.   No, sir.

13:47:14  25  Q.   Okay.  I suppose you have questions like, well, how do I do

13:47:20   1   this, or what do I say, or that sort of thing.  Did you have an

13:47:24   2   opportunity to prepare for your testimony today?

13:47:28   3   A.   Well, of course, there's a little brochure explaining what

13:47:31   4   to do, but as far as preparing prepared questions, no.

13:47:36   5   Q.   Well, oftentimes, the lawyer will ask you questions outside

13:47:41   6   the courtroom and expect that you will probably answer the same

13:47:45   7   way inside the courtroom.

13:47:47   8   A.   I was asked questions and I responded the same way in as I

13:47:52   9   did out.

13:47:53   10   Q.   Was that recently or a while back?

13:47:56   11   A.   No.  Just recently.

13:47:58   12   Q.   Like this week or last week?

13:48:01   13   A.   This week.  Uh-huh.

13:48:03   14   Q.   Before that, had you been interviewed by anybody to ask you

13:48:07   15   questions about this --

13:48:08   16   A.   Yes.

13:48:09   17   Q.   -- particular sale?

13:48:09   18   A.   We had a phone interview and asking basically the same

13:48:18   19   questions that, you know, we're discussing right now.

13:48:21   20   Q.   So you had a phone interview first?

13:48:23   21   A.   Yes.

13:48:23   22   Q.   That would have been -- when would that have been

13:48:26   23   approximately?

13:48:26   24   A.   I'm going to say ten days ago, something like that, a week,

13:48:29   25   ten days.

13:48:29   1   Q.   Before that ten days ago, you had not talked with anybody

13:48:35   2   about this matter, about the matter you're testifying about?

13:48:39   3   A.   You mean from the prosecuting attorney's office or what?

13:48:42   4   Anybody?

13:48:43   5   Q.   Well, let's -- yeah, okay.  Prosecuting attorney's office.

13:48:47   6   A.   We had a meeting several weeks, months ago, way back when --

13:48:55   7   with some of the people.

13:48:57   8   Q.   And were you shown photographs to look at?

13:49:02   9   A.   No, sir.

13:49:03   10   Q.   Have you ever been shown any photographs?

13:49:06   11   A.   No.  Of what?

13:49:08   12   Q.   People.

13:49:09   13   A.   No, sir.  No.

13:49:13   14   Q.   You could be a lawyer.  You want to know the question before

13:49:19   15   you answer it.  That's the way you should be.

13:49:26   16           So a while back, you were interviewed, you met and

13:49:30   17   shown no photographs of anyone?

13:49:32   18   A.   That is correct.

13:49:33   19   Q.   And then, a week or so ago -- and then, you had a telephone

13:49:38   20   interview?

13:49:38   21   A.   Yes.

13:49:39   22   Q.   Probably to explain maybe how the system works out there at

13:49:43   23   the auction?

13:49:44   24   A.   Yes.  I explained basically what I explained a few minutes

13:49:48   25   ago, how the paperwork is routed, and so forth.

| | | |
|---|---|---|
| 13:49:52 | 1 | Q.   And then, you met about a week ago, tell you when you might |
| 13:50:00 | 2 | testify and some of the questions that might be asked you? |
| 13:50:04 | 3 | A.   We did not.  Me, this was the phone conversation. |
| 13:50:07 | 4 | Q.   Phone call. |
| 13:50:08 | 5 | A.   Yes. |
| 13:50:08 | 6 | Q.   So since the phone conversation, you've spoken to nobody? |
| 13:50:11 | 7 | A.   Until today. |
| 13:50:12 | 8 | Q.   Until today.  And that was like lunch hour or something? |
| 13:50:15 | 9 | A.   Yeah.  Right before lunch. |
| 13:50:18 | 10 | Q.   And were you shown any photographs then? |
| 13:50:19 | 11 | A.   No, sir. |
| 13:50:21 | 12 | Q.   When was the first time that -- so what year and what month |
| 13:50:33 | 13 | was this? |
| 13:50:34 | 14 | A.   This was September of 2010.  Our sale is always Labor Day. |
| 13:50:42 | 15 | Q.   And do you recognize the person you talked to in September |
| 13:50:52 | 16 | of 2010? |
| 13:50:53 | 17 | A.   You mean that came into the office? |
| 13:50:54 | 18 | Q.   Uh-huh.  Yes. |
| 13:50:56 | 19 | A.   Where am I supposed to look? |
| 13:51:00 | 20 | Q.   Well, let's play a game.  Not at the prosecutor's table. |
| 13:51:04 | 21 | A.   Well. |
| 13:51:09 | 22 | Q.   Oh, yeah.  You and I have something in common.  I knew that. |
| 13:51:12 | 23 | If you would stand up, it would be helpful. |
| 13:51:17 | 24 | A.   Do I recognize anyone? |
| 13:51:18 | 25 | Q.   Yes. |

13:51:21  1   A.   I can't say that I do.  I'm sorry.

13:51:25  2   Q.   Okay.  You don't have to be sorry about anything.

13:51:32  3        Now, when a -- when people bid on horses at the

13:51:38  4   auction, is there any requirement that the person bidding have to

13:51:42  5   be the person that pays for the horse?

13:51:45  6   A.   No.

13:51:47  7   Q.   In fact, it's very common, Ms. Reed -- is it Mrs. Reed or

13:51:52  8   Ms. Reed?

13:51:53  9   A.   Ms.

13:51:54  10  Q.   Ms.  Okay.  With an M-S, right?

13:51:56  11  A.   Uh-huh.

13:51:57  12  Q.   It's common, Ms. Reed, that people will bid on behalf of

13:52:01  13  other people?

13:52:02  14  A.   Yes.  It's very common.

13:52:04  15  Q.   All right.  The people that -- and I guess it's also common

13:52:10  16  experts in horses helping people bid?

13:52:14  17  A.   Yes.

13:52:17  18  Q.   Then -- this is the part I don't know.  You can educate me.

13:52:25  19        After the bidding stops and they go, "sold American,"

13:52:31  20  or whatever they say, then does the bidder get a piece of paper

13:52:35  21  that shows that they won the bid?

13:52:39  22  A.   We have what we call ticket runners, and that form that Mr.

13:52:44  23  Gardner showed, the four-page form, that has information printed

13:52:49  24  on the top of it with those hip numbers, the name of the

13:52:52  25  consigner, the name of the horse, blah, blah.  That form is taken

| | | |
|---|---|---|
| 13:52:57 | 1 | by our ticket runner to the person that the bid taker points out |
| 13:53:05 | 2 | he bid.  He got the final hammer on that horse. |
| 13:53:08 | 3 | Q.   Okay. |
| 13:53:09 | 4 | A.   And that's taken over to him and he signs it. |
| 13:53:14 | 5 | Q.   Right there on the spot? |
| 13:53:16 | 6 | A.   Yes, sir. |
| 13:53:18 | 7 | Q.   And then, in this case two or three days later, someone |
| 13:53:23 | 8 | comes in with the tickets? |
| 13:53:24 | 9 | A.   Yes, sir. |
| 13:53:25 | 10 | Q.   And there's no requirement that that person be the bidder? |
| 13:53:30 | 11 | A.   That's correct. |
| 13:53:32 | 12 | Q.   And that person that pays for those tickets that you make |
| 13:53:40 | 13 | that list of the horses that correspond with each ticket, right? |
| 13:53:44 | 14 | A.   I'm sorry.  What was the question? |
| 13:53:46 | 15 | Q.   Make that list that we saw up on the board. |
| 13:53:50 | 16 | A.   Uh-huh. |
| 13:53:50 | 17 | Q.   That this all the hip numbers of those tickets? |
| 13:53:54 | 18 | A.   Yes. |
| 13:53:54 | 19 | Q.   And the price paid, sold for? |
| 13:53:58 | 20 | A.   Yes. |
| 13:54:02 | 21 | Q.   How do you determine -- the person that paid for that day, |
| 13:54:08 | 22 | is that necessarily going to be the owner? |
| 13:54:12 | 23 | A.   Not necessarily.  No. |
| 13:54:14 | 24 | Q.   And that's not uncommon either, is it? |
| 13:54:19 | 25 | A.   I would not say it's uncommon.  I would say out of 100 |

13:54:27  1    horses that sold, perhaps two of them are paid by somebody that

13:54:33  2    the horses are not going to go to perhaps.

13:54:37  3    Q.    But they don't have to be there in person to pay?

13:54:39  4    A.    No.  They don't.

13:54:40  5    Q.    So someone could pay and not be present or someone could be

13:54:45  6    present and pay and not be the owner?

13:54:46  7    A.    That is true.

13:54:47  8    Q.    Or either way?

13:54:48  9    A.    That is true.

13:54:49  10   Q.    After the -- that list is made -- by the way, is that list

13:54:57  11   that we saw on the board, is that signed any way by the person

13:55:01  12   paying?

13:55:01  13   A.    That list is prepared off of those forms that you saw.

13:55:06  14   Those forms and our bookkeeping department and that list is made

13:55:12  15   off of those forms.

13:55:13  16   Q.    So as the person leaves, that list is --

13:55:16  17   A.    No, sir.  That's done immediately after the hammer hits.

13:55:22  18   That form then goes to a girl who sits there and enters all that

13:55:26  19   information into the computer.  So it's done before we close the

13:55:33  20   sale that night.

13:55:36  21   Q.    And then, is there any communication between that night and

13:55:40  22   the day that the payment is made?

13:55:43  23   A.    What do you mean?  Communication?

13:55:46  24   Q.    Well, you've got a list of horses?

13:55:47  25   A.    Yes.

| | | |
|---|---|---|
| 13:55:48 | 1 | Q.   You've got a list of bidders? |
| 13:55:49 | 2 | A.   Right. |
| 13:55:50 | 3 | Q.   Bidders are not necessarily going to be the person that |
| 13:55:53 | 4 | pays? |
| 13:55:54 | 5 | A.   Right. |
| 13:55:55 | 6 | Q.   So I would assume there's no communication like, mister |
| 13:56:02 | 7 | so-and-so, you won this bid and you need to pay up? |
| 13:56:05 | 8 | A.   No.  The only communication would be is if we had a problem |
| 13:56:10 | 9 | with his address or something like that.  But no. |
| 13:56:15 | 10 | Q.   When do you get the address? |
| 13:56:18 | 11 | A.   As he signs that ticket, the address is put on there. |
| 13:56:24 | 12 | Q.   The ticket that they bring to your office? |
| 13:56:26 | 13 | A.   Exactly. |
| 13:56:29 | 14 | Q.   But not that night.  It was at another time -- oh, I see. |
| 13:56:33 | 15 | There's triplicate copies of that ticket? |
| 13:56:35 | 16 | A.   Right. |
| 13:56:42 | 17 | Q.   You make notations -- or did you make notations of your own |
| 13:56:46 | 18 | about this particular transaction other than the bid papers that |
| 13:56:52 | 19 | we've seen? |
| 13:56:53 | 20 | A.   No, sir. |
| 13:57:18 | 21 | MR. DEGEURIN:  All right, Judge.  Thank you, Ms. Reed. |
| 13:57:20 | 22 | No further questions. |
| 13:57:22 | 23 | THE COURT:  Mr. Womack. |
| 13:57:22 | 24 | |
| 13:57:24 | 25 | |

CROSS-EXAMINATION

BY MR. WOMACK:

Q.   Good afternoon, Ms. Reed.

A.   Hello.

Q.   I'm Guy Womack.  I live in Houston and I represent Fernando
Garcia.  You know Fernando, don't you?

A.   I know him.  He walked in the office to pick up some
paperwork.

Q.   Fernando, stand up.

A.   Oh, there --

Q.   That's him sitting there, isn't it?

A.   I think so.

Q.   Come here, Fernando, so she could see you.  Is this Fernando
Garcia?

A.   Yes.

Q.   Okay.  Grab a seat.  You've known him for some time, haven't
you?

A.   Well, he came in in 2010 and I don't believe I've seen him
but maybe once since.

Q.   You know he has come in before to Ruidoso and actually
represented a number of buyers, not just Mr. Colorado but others,
as well?

A.   Well, perhaps.  I can't say.  I don't know.

Q.   Are you aware that he's even bought one or two horses at
Ruidoso himself?

| | | |
|---|---|---|
| 13:58:25 | 1 | A.   Yes. |
| 13:58:25 | 2 | Q.   Okay.  And in regards to this particular sale where Mr. |
| 13:58:31 | 3 | Colorado bought some horses, you told us that Fernando came in |
| 13:58:36 | 4 | and told you to hold the registration certificates? |
| 13:58:40 | 5 | A.   I don't know if he came in or called me.  One or the other. |
| 13:58:43 | 6 | Q.   Correct.  It may have been another call.  Do you recall that |
| 13:58:47 | 7 | when he told you that, he said the reason was because these are |
| 13:58:50 | 8 | expensive horses and he wanted to collect all of the certificates |
| 13:58:53 | 9 | at once and have them delivered to Mr. Colorado rather than |
| 13:58:58 | 10 | mailing them into Mexico?  Do you remember that? |
| 13:59:01 | 11 | A.   No. |
| 13:59:02 | 12 | Q.   You don't remember what the reason was? |
| 13:59:04 | 13 | A.   No.  And it's a buyer's prerogative.  They can do that. |
| 13:59:09 | 14 | He's not the only one that ever did that.  It's their |
| 13:59:13 | 15 | prerogative, so I don't question them.  It's their business. |
| 13:59:15 | 16 | Q.   Okay.  Thank you. |
| 13:59:17 | 17 | A.   You're welcome. |
| 13:59:17 | 18 | Q.   No further questions. |
| 13:59:20 | 19 | MR. ESPER:  Nothing, your Honor. |
| 13:59:21 | 20 | MR. MAYR:  I have no questions, your Honor. |
| 13:59:22 | 21 | THE COURT:  Any redirect? |
| 13:59:25 | 22 | MR. GARDNER:  Yes, your Honor.  Thank you. |
| 13:59:26 | 23 | RE-DIRECT EXAMINATION |
| 13:59:26 | 24 | BY MR. GARDNER: |
| 13:59:28 | 25 | Q.   Ms. Reed, I believe my line of questions follow up Mr. |

| | | |
|---|---|---|
| 13:59:34 | 1 | DeGeurin's and Mr. Womack's.  I want to talk about some years. |
| 13:59:39 | 2 | Do you recall your testimony on the question of whether |
| 13:59:41 | 3 | you'd ever seen Mr. Colorado-Cessa before or Mr. Fernando Garcia? |
| 13:59:48 | 4 | A.   Well, I don't think I'd ever seen Mr. Cessa before.  And I |
| 13:59:53 | 5 | could have seen Mr. Garcia, but I see so many people, I just -- |
| 14:00:00 | 6 | didn't stick.  I'm sorry. |
| 14:00:01 | 7 | Q.   No.  That's fine.  No reason to say you're sorry. |
| 14:00:05 | 8 | How long did you work at the Ruidoso Horse company? |
| 14:00:07 | 9 | A.   I went to work there in -- in late 2003. |
| 14:00:16 | 10 | Q.   So from 2003 to 2012 -- let me back up.  How many auctions |
| 14:00:25 | 11 | does the Ruidoso Horse company have each year? |
| 14:00:27 | 12 | A.   Two. |
| 14:00:28 | 13 | Q.   Two.  So from 2003 to 2012, I have that as nine years.  So |
| 14:00:32 | 14 | over 18 auctions, you've only seen Colorado-Cessa buy horses on |
| 14:00:37 | 15 | one occasion? |
| 14:00:40 | 16 | A.   Yes. |
| 14:00:42 | 17 | Q.   And the same question for Mr. Garcia. |
| 14:00:46 | 18 | A.   That I can recall, that's all. |
| 14:00:48 | 19 | Q.   Thank you, ma'am.  That's all I have. |
| 14:00:51 | 20 | THE COURT:  Any further questions, counsel? |
| 14:00:53 | 21 | MS. WILLIAMS:  No, your Honor. |
| 14:01:09 | 22 | RE-CROSS EXAMINATION |
| 14:01:09 | 23 | BY MR. DEGEURIN: |
| 14:01:16 | 24 | Q.   Are you -- now we're going to play a legal game here.  Are |
| 14:01:20 | 25 | you saying you don't believe Mr. Colorado-Cessa ever bought any |

14:01:28  1  horses after that date, or you don't remember whether or not he

14:01:32  2  ever bought any horses?

14:01:33  3  A.   After 2010?

14:01:35  4  Q.   Yes, ma'am.  Or someone on his behalf or some --

14:01:41  5  A.   I did not research back to 2003.  Actually, the records are

14:01:48  6  archived and unless someone asks me specifically for a year, it

14:01:53  7  could have been when I did not, you know, research the archives.

14:01:58  8  But recently, no.

14:02:02  9  Q.   Okay.  So you did research forward from 2010, '11, '12, you

14:02:11  10 looked that way, but you didn't look backwards?

14:02:15  11 A.   I cannot recall the exact years that I was requested to pull

14:02:21  12 those records.  The years that I requested the records be pulled,

14:02:27  13 I believe Mr. Cessa only purchased in that one year.  But I would

14:02:32  14 not swear to that.

14:02:35  15 Q.   The records that you pulled, I'm going to try to reword it,

14:02:40  16 and you tell me whether or not you agree with it.

14:02:43  17       You can't remember exactly what records you were asked

14:02:46  18 to look at, but whichever ones you did look at, you -- it is your

14:02:51  19 testimony today, your belief today that of those you looked at,

14:02:54  20 the records don't reflect Mr. Cessa was involved with any horses

14:02:59  21 except 2010?

14:03:00  22 A.   That's the way I recall.

14:03:01  23 Q.   Okay.  Thank you, Ms. Reed.

14:03:03  24       THE COURT:  Mr. Womack?

14:03:04  25       MR. WOMACK:  No questions, your Honor.

| | | |
|---|---|---|
| 14:03:05 | 1 | THE COURT:  Mr. Esper? |
| 14:03:07 | 2 | MR. ESPER:  No, your Honor. |
| 14:03:08 | 3 | MR. MAYR:  No, Judge. |
| 14:03:09 | 4 | MR. GARDNER:  May the witness be excused, your Honor? |
| 14:03:12 | 5 | THE COURT:  You may be excused, ma'am. |
| 14:03:14 | 6 | Call your next witness. |
| 14:03:16 | 7 | MR. GARDNER:  Thank you, your Honor.  The government |
| 14:03:17 | 8 | calls Mr. Alfonso Del Rayo-Mora. |
| 14:04:01 | 9 | (Witness sworn.) |
| 14:04:30 | 10 | THE COURT:  If you will, sir, I'd like for you to tell |
| 14:04:33 | 11 | me your full name and spell your last, please. |
| 14:04:35 | 12 | THE WITNESS:  Alfonso Del Rayo-Mora, D-E-L, R-A-Y-O. |
| 14:04:53 | 13 | ALFONSO DEL RAYO-MORA, called by the Government, duly sworn. |
| 14:04:53 | 14 | DIRECT EXAMINATION |
| 14:04:53 | 15 | BY MR. GARDNER: |
| 14:04:55 | 16 | Q.   Good afternoon, Mr. Del Rayo.  You and I have met before, |
| 14:04:57 | 17 | correct? |
| 14:04:57 | 18 | A.   Yes. |
| 14:04:57 | 19 | Q.   Could you please introduce yourself to the jury?  Tell them |
| 14:04:59 | 20 | what you do for a living, how old you are, and where you are |
| 14:05:01 | 21 | from. |
| 14:05:02 | 22 | A.   Yes.  My name is Alfonso Javier Del Rayo-Mora.  I'm from |
| 14:05:07 | 23 | Veracruz, Veracruz in Mexico.  I do -- I've been doing real |
| 14:05:13 | 24 | estate business and it's about 15, 16 years ago.  I'm 46 years |
| 14:05:20 | 25 | old.  I'm also a father with family. |

| | | |
|---|---|---|
| 14:05:28 | 1 | Q.   Sir, your English is much better than my Spanish, but you |
| 14:05:30 | 2 | requested the interpreter back there in case you need -- |
| 14:05:32 | 3 | A.   Yes, sir. |
| 14:05:33 | 4 | Q.   -- need a word interpreted, correct? |
| 14:05:35 | 5 | A.   Yes, sir. |
| 14:05:35 | 6 | Q.   Please feel free to take advantage of that. |
| 14:05:37 | 7 | A.   Thank you. |
| 14:05:38 | 8 | Q.   Mr. Del Rayo, how much would you estimate your net worth to |
| 14:05:46 | 9 | be? |
| 14:05:46 | 10 | A.   Between 20 and 25 million. |
| 14:05:50 | 11 | Q.   And that's U.S. dollars, correct? |
| 14:05:51 | 12 | A.   Yes. |
| 14:05:52 | 13 | Q.   Is that based on your real estate investments? |
| 14:05:54 | 14 | A.   Yes. |
| 14:05:56 | 15 | Q.   You were originally indicted in this case; is that correct? |
| 14:06:00 | 16 | A.   Yes, sir. |
| 14:06:02 | 17 | Q.   You were charged as a criminal defendant? |
| 14:06:05 | 18 | A.   Yes. |
| 14:06:05 | 19 | Q.   So when the government made arrests in June 2012, where were |
| 14:06:10 | 20 | you? |
| 14:06:10 | 21 | A.   I was in Veracruz City. |
| 14:06:13 | 22 | Q.   And how did you come to learn of the indictment? |
| 14:06:16 | 23 | A.   I was called by one of the agents and he explained me what's |
| 14:06:22 | 24 | my situation, and I told him that I didn't have anything to do |
| 14:06:26 | 25 | with that.  I told him what happened to me.  And I decided to |

14:06:32  1  come over to the states of any own will, try to clear everything.

14:06:40  2  Q.    And when you came to the United States, had you already or

14:06:44  3  previously contacted a lawyer in the United States?

14:06:46  4  A.    No.

14:06:47  5  Q.    And so, did you turn yourself in and did Special Agent

14:06:50  6  Lawson meet you at the airport?

14:06:51  7  A.    Yes.  He called me, like, around the first day of July,

14:06:59  8  within a week I was here at San Antonio airport, and they took me

14:07:06  9  over here to Austin.

14:07:10  10  Q.    And why, having protections of the country in Mexico, did

14:07:14  11  you make the decision to come to the United States?

14:07:16  12  A.    Can you repeat that, please?

14:07:19  13  Q.    Sure.  Why did you make the decision, knowing you were under

14:07:22  14  indictment in the United States, to come and turn yourself in?

14:07:26  15  A.    Because I wanted to clear my whole situation because I know

14:07:33  16  that I never been in a criminal action of any way.

14:07:42  17  Q.    When you came to the United States, you told me what had

14:07:45  18  happened to you.  So I want to turn your attention to December of

14:07:50  19  2010.  Could you please tell the jury what happened to you in

14:07:53  20  December 2010?

14:07:54  21  A.    On December 10, 2010, I was kidnapped.  I was kidnapped by a

14:08:01  22  group of between 12 and 15 people coming out of the restroom bar

14:08:08  23  at 4:30 in the morning, and they took me to a security -- to a

14:08:16  24  safe house and they told me that they were Zetas and they wanted

14:08:24  25  me -- they wanted from me 15 million pesos, which is about

| | | |
|---|---|---|
| 14:08:28 | 1 | four-and-a-half-million dollars. |
| 14:08:31 | 2 | Q.   And when they took you or kidnapped you, did they inflict |
| 14:08:35 | 3 | any injuries upon you? |
| 14:08:37 | 4 | A.   Yeah.  They beat me up.  They beat me up pretty bad.  I |
| 14:08:42 | 5 | thought I was going to be killed. |
| 14:08:46 | 6 | Q.   Showing you Government's Exhibit 324A through J.  Did you |
| 14:08:53 | 7 | provide me with those pictures, sir? |
| 14:08:55 | 8 | A.   Yes, sir. |
| 14:08:55 | 9 | Q.   If you could look through them just to make sure that they |
| 14:08:58 | 10 | are true and accurate. |
| 14:09:16 | 11 | A.   Yes, sir. |
| 14:09:18 | 12 | Q.   Your Honor, I'd offer Government's Exhibits 324A through J. |
| 14:09:51 | 13 | THE COURT:  Hearing no objection, 324A through J are |
| 14:09:57 | 14 | received. |
| 14:10:02 | 15 | MR. GARDNER:  324A. |
| 14:10:04 | 16 | THE COURT:  324A through J.  Thank you. |
| 14:10:07 | 17 | Q.   (BY MR. GARDNER) Now, there's a little bit of a glare on the |
| 14:10:09 | 18 | screen, Mr. Del Rayo, but what did they do to your hand here? |
| 14:10:14 | 19 | A.   I was hit by -- I was hit, all of my body, with the end of, |
| 14:10:22 | 20 | I don't know, AK-47, AR-15, you know, with the end.  I was hit |
| 14:10:29 | 21 | all my body like that. |
| 14:10:30 | 22 | Q.   We're talking that's commonly referred to as the buttstock |
| 14:10:34 | 23 | of the weapon? |
| 14:10:34 | 24 | A.   Yeah.  And they broke two of my fingers. |
| 14:10:38 | 25 | Q.   Two of your fingers? |

```
14:10:39   1   A.   Yeah.
14:10:40   2   Q.   Showing you Government's Exhibit 34B.  And what happened
14:10:46   3   there, sir?
14:10:47   4   A.   I was hit in the face, too, and I was also hit in like my --
14:10:53   5   in my head.  I needed surgery.
14:11:45   6   Q.   There's a large bruise under your eye.  And your eye is red,
14:11:50   7   a number of burst blood vessels in your eye?
14:11:52   8   A.   Yes.
14:11:57   9   Q.   I'm showing you 324G.  What is this round mark up here on
14:12:02  10   the top of your head?
14:12:03  11   A.   Hits with, you know, with the point of the AK-47, you know,
14:12:09  12   the whole -- I don't know.
14:12:11  13   Q.   The muzzle, the rifle barrel?
14:12:12  14   A.   Yeah.
14:12:15  15   Q.   And, again, another view of the other and what did they hit
14:12:20  16   you with here?
14:12:21  17   A.   Same.
14:12:21  18   Q.   Same thing?  And, sir, it's hard to tell here on 324I, but
14:12:31  19   where did this injury come from?
14:12:33  20   A.   Same thing.
14:12:38  21   Q.   Let me show you, this is you in the hospital.  Again, is
14:12:42  22   this your broken hand?
14:12:43  23   A.   Yes.
14:12:43  24   Q.   And you mentioned something earlier about surgery.  What
14:12:45  25   kind of surgery did you have to have?
```

14:12:47  1   A.   They had to --

14:13:04  2        THE INTERPRETER:  Had a plastic surgeon come in and

14:13:06  3   have all the circular scarring removed.

14:13:11  4   A.   And they had to re-break my fingers so they can put them in

14:13:16  5   its place.

14:13:21  6   Q.   (BY MR. GARDNER)  324A.  They had to re-break these fingers?

14:13:24  7   A.   Yes.

14:13:25  8   Q.   And that was the subsequent picture of the cast, correct?

14:13:27  9   A.   Yes.

14:13:29  10  Q.   And also, as the defense attorneys have been provided, you

14:13:34  11  provided me with a number of hospital bills along that date to

14:13:38  12  show me the --

14:13:39  13  A.   Yes.

14:13:39  14  Q.   To verify you being in the hospital, correct?

14:13:42  15  A.   Yes, sir.

14:13:42  16  Q.   And how long, again, were you in captivity?

14:13:46  17  A.   Nine days.

14:13:48  18  Q.   And you mentioned earlier, something about a 50-million-peso

14:13:51  19  ransom?

14:13:52  20  A.   Yes.

14:13:52  21  Q.   And could you pay that ransom?

14:13:55  22  A.   No.

14:13:55  23  Q.   And why not?

14:13:56  24  A.   I didn't have the cash.  I mean, all the money that -- well,

14:14:01  25  all of my assets are in properties and real estate properties.

14:14:08   1   Q.   And how did you come to be released?

14:14:12   2   A.   For some reason, they found out that they were not going to

14:14:16   3   get the money from me.  And the other side, this is something

14:14:22   4   that I knew after I was released.  My wife called people in the

14:14:26   5   government of the state, for some reason, they got people helping

14:14:31   6   her try to contact where I was, with whom; and for some reason,

14:14:41   7   after nine days, they let me free with no pay at all.

14:14:47   8   Q.   And, sir, after you were released, were you approached by

14:14:51   9   someone?

14:14:52   10  A.   Yeah, but not right away.  It passed about -- I was released

14:15:00   11  the 18th of December, and I believe a week, a week and a half

14:15:08   12  after that, I was called by a person called Jose Guillermo

14:15:15   13  Herrera-Mendoza, which at the time was Secretary of

14:15:18   14  Communications of the state in the government of Veracruz.  He

14:15:22   15  told me that he needed to talk to me.  He needed to go to my

14:15:27   16  house.  He needed to get someone to my house that needed to talk

14:15:33   17  to me about my kidnapping.

14:15:37   18         I told him, yeah, just let me know what day and I'll

14:15:43   19  wait for you here.  So that date came, you know, after two or

14:15:48   20  three days, and when he got home, he got home with Carlos Nayen.

14:15:54   21  Q.   And let me show you a picture, sir, see if you recognize

14:15:57   22  that.  Is that the person you recognize as Carlos Nayen?

14:16:07   23  A.   Yes, sir.

14:16:08   24  Q.   Your Honor, for the record, that's 335E.

14:16:10   25         Now, I want to talk a little bit about Mr. Guillermo

```
14:16:13   1   Herrera.  What did you say his role was?
14:16:17   2   A.   Yeah.  He was at the time Secretary of Communications, which
14:16:22   3   is one of the secretary -- one of the top positions in the
14:16:29   4   government of the state of Veracruz.
14:16:31   5   Q.   And who was the governor at that time?
14:16:35   6   A.   At that time, it was a -- he had like a week or two weeks
14:16:42   7   the new governor, which is now governor -- his name is Javier
14:16:47   8   Duarte.  But he used to be Secretary of Communications since the
14:16:53   9   other administration with Fidel Herrera.
14:16:56  10   Q.   Fidel Herrera was the previous governor?
14:16:59  11   A.   Yeah.  He was the one that put Guillermo Herrera as a
14:17:03  12   Secretary of Communications.
14:17:05  13   Q.   So would I be correct in saying that Guillermo Herrera,
14:17:08  14   Secretary of Communications, that's a political position?
14:17:12  15   A.   Yes, sir.
14:17:13  16   Q.   And so, could you refresh the jury, again, on the date that
14:17:17  17   he and this individual Carlos Nayen came to your house?
14:17:21  18   A.   It was between a week, a week and a half after I was
14:17:25  19   released.
14:17:27  20   Q.   And were you introduced to Carlos Nayen?
14:17:30  21   A.   Yeah.
14:17:31  22   Q.   And what did Guillermo Herrera say Mr. Nayen's position was?
14:17:36  23   A.   Well, Guillermo had told me that this guy wanted to talk to
14:17:40  24   me about my kidnap.  Okay.  So I said, well, I'm here, you know,
14:17:48  25   I don't know what you want to talk about.  So he tried explaining
```

| | | |
|---|---|---|
| 14:17:52 | 1 | me -- he started explaining me that I was saved by his boss, you |
| 14:18:02 | 2 | know, and because of that, I had to do -- as a payback, I had to |
| 14:18:10 | 3 | come over to Oklahoma City between the 13 and 15 of January and |
| 14:18:17 | 4 | buy a horse. |
| 14:18:18 | 5 | Q.   And what did you tell him with respect to your injuries? |
| 14:18:22 | 6 | A.   Yeah.  I told him that I had to have surgery during those |
| 14:18:29 | 7 | days.  He told me that I had to do the best to be on time to |
| 14:18:36 | 8 | Oklahoma City in case of I wouldn't show, I will be in problems |
| 14:18:44 | 9 | again. |
| 14:18:44 | 10 | Q.   And did he say anything with regards to the safety of not |
| 14:18:47 | 11 | only you but your family? |
| 14:18:48 | 12 | A.   About my family, my wife, my kids. |
| 14:18:51 | 13 | Q.   And when he said bosses, did he say any names, specifically? |
| 14:18:57 | 14 | A.   No. |
| 14:19:00 | 15 | Q.   And so, did you go ahead and have the surgery as scheduled? |
| 14:19:03 | 16 | A.   Yeah.  I did move my surgery so I could be on time to fly to |
| 14:19:11 | 17 | Oklahoma and be on the 13 of January at Oklahoma, which I did. |
| 14:19:16 | 18 | Q.   And when were you released from the hospital? |
| 14:19:18 | 19 | A.   I was released from the hospital like around 10 or 11.  I |
| 14:19:24 | 20 | don't recall. |
| 14:19:25 | 21 | Q.   Tenth or 11th of January? |
| 14:19:26 | 22 | A.   Yeah.  I just had time to go and pick up my kids to Mexico |
| 14:19:31 | 23 | City because they were there by -- because of security, and we |
| 14:19:38 | 24 | went back to Veracruz and took an airplane to San Antonio, then |
| 14:19:43 | 25 | to Oklahoma. |

14:19:44  1   Q.   And so, when you got to Oklahoma, did anybody meet you when

14:19:48  2   you got off the plane?

14:19:49  3   A.   No.  I got to Oklahoma and I wait like -- I waited like two

14:19:54  4   hours, no one showed.  So Carlos Nayen with two other persons

14:20:01  5   showed, and then, we left the airport.

14:20:04  6   Q.   Do you recall the names of the two other persons?

14:20:06  7   A.   Yeah.  One is Fernando Solis and the other guy is Carlos'

14:20:14  8   brothers, Antonio, Antonio Nayen.

14:20:16  9   Q.   Okay.  Now, when you were told you have to come to buy a

14:20:20  10  horse in the United States, had you ever bought any horses

14:20:23  11  before?

14:20:23  12  A.   No.  I never had anything to do with any horses.

14:20:27  13  Q.   Okay.  Do you know anything about the quarter-horse racing?

14:20:30  14  A.   Nothing.  No.

14:20:33  15  Q.   When you get to Oklahoma, what time of the day is that,

14:20:36  16  morning or night?

14:20:37  17  A.   Early in the morning.  Like the first flight.

14:20:40  18  Q.   And so, after Carlos Nayen and Fernando Garcia and Carlos'

14:20:46  19  brother meet you, what do you do then?

14:20:48  20  A.   We went to -- we went right to the hotel.  We left a stop

14:20:58  21  there and then, we take to the auction place, to the Heritage

14:21:02  22  Place.

14:21:02  23  Q.   Heritage Place in Oklahoma City?

14:21:04  24  A.   Heritage Place, yeah.

14:21:06  25  Q.   When you went to the hotel, did they provide you your own

| | | |
|---|---|---|
| 14:21:10 | 1 | room? |
| 14:21:10 | 2 | A.   No.   We stayed at the same room, which was a suite.   It had |
| 14:21:15 | 3 | two rooms together. |
| 14:21:17 | 4 | Q.   So you, Carlos? |
| 14:21:20 | 5 | A.   Antonio. |
| 14:21:21 | 6 | Q.   And Fernando and Antonio were all together? |
| 14:21:25 | 7 | A.   Yes. |
| 14:21:26 | 8 | Q.   So you go to the auction place at Heritage Place and what |
| 14:21:31 | 9 | did you do that first day? |
| 14:21:33 | 10 | A.   Not much.   Just stay, you know, stay around.   Not much. |
| 14:21:41 | 11 | Q.   Did they explain to you what your role was going to be? |
| 14:21:44 | 12 | A.   Excuse me? |
| 14:21:44 | 13 | Q.   Did they explain to you what you were going to be doing? |
| 14:21:47 | 14 | A.   Not that day.   They started explaining me until Saturday. |
| 14:21:54 | 15 | Q.   And so, what did they explain to you with regard to buying a |
| 14:21:57 | 16 | horse? |
| 14:21:57 | 17 | A.   They explained me -- they showed me a book, a pretty big |
| 14:22:03 | 18 | book with all the horses that they were selling, and they told |
| 14:22:09 | 19 | me, you know, the horse I had to buy, it's almost at the end.   So |
| 14:22:14 | 20 | that is going to be tomorrow, which is Sunday.   And they tried -- |
| 14:22:20 | 21 | they start explaining me, you know, taking me to the place where |
| 14:22:26 | 22 | the auction take place, you know, how was I supposed to buy the |
| 14:22:33 | 23 | horse, you know.   They started explaining me, you're going to |
| 14:22:38 | 24 | have to raise your hand, letting them know that you're interested |
| 14:22:44 | 25 | in that horse, and then, someone is going to push, and then, you |

| | | |
|---|---|---|
| 14:22:49 | 1 | have to go and push again until it's yours.  Whatever reason, you |
| 14:22:58 | 2 | gotta buy it. |
| 14:22:59 | 3 | Q.   And when you say push, does that mean raise your hand and |
| 14:23:02 | 4 | bid? |
| 14:23:02 | 5 | A.   Yeah.  Keep raising my hand until the horse is mine. |
| 14:23:05 | 6 | Q.   Now, when you were at the auctions on Friday and Saturday, |
| 14:23:10 | 7 | were Carlos Nayen and Fernando Garcia with you all the time? |
| 14:23:14 | 8 | A.   No.  They were doing their business.  I mean, they were on |
| 14:23:19 | 9 | their own things and I was in different places, and I was taken |
| 14:23:26 | 10 | care of by his brother, which is Antonio Nayen. |
| 14:23:29 | 11 | Q.   All right.  So, for example, when you went outside to smoke? |
| 14:23:32 | 12 | A.   Yeah. |
| 14:23:33 | 13 | Q.   Did Antonio go with you? |
| 14:23:34 | 14 | A.   Yeah.  Antonio.  And Carlos and Fernando spent the whole day |
| 14:23:41 | 15 | doing other things. |
| 14:23:42 | 16 | Q.   Did Antonio ever leave your side? |
| 14:23:44 | 17 | A.   No. |
| 14:23:49 | 18 | Q.   Now, at this time are your injuries still visible?  Can you |
| 14:23:54 | 19 | still see your wounds and your injuries? |
| 14:23:56 | 20 | A.   Me?  Right now? |
| 14:23:58 | 21 | Q.   No.  When you -- I'm sorry. |
| 14:24:00 | 22 | A.   Oh, yeah.  At that time? |
| 14:24:01 | 23 | Q.   Yes. |
| 14:24:01 | 24 | A.   Yeah.  I was pretty hurt.  I had to do some -- I had to do |
| 14:24:12 | 25 | treatments.  Take medicines for the inflammations, antibiotics |

127

| | | |
|---|---|---|
| 14:24:19 | 1 | and things like that. |
| 14:24:19 | 2 | Q.   And did Fernando Garcia see your injuries? |
| 14:24:22 | 3 | A.   Yes. |
| 14:24:23 | 4 | Q.   Did he see you take your medications? |
| 14:24:25 | 5 | A.   Yes. |
| 14:24:25 | 6 | Q.   And did he see you apply the treatments to your hand? |
| 14:24:28 | 7 | A.   Yes.  I had to take showers with a band -- with a bag in my |
| 14:24:33 | 8 | hand, you know, take those kind of cares. |
| 14:24:38 | 9 | Q.   Did Fernando Garcia ever ask you how you got hurt? |
| 14:24:41 | 10 | A.   No. |
| 14:24:42 | 11 | Q.   And so, you're going Sunday and is that the day that you |
| 14:24:47 | 12 | actually bought the horse? |
| 14:24:48 | 13 | A.   Yes. |
| 14:24:48 | 14 | Q.   And do you remember the name of the horse? |
| 14:24:50 | 15 | A.   Yeah.  It was called Blues Ferrari.  Yeah, Blues Ferrari. |
| 14:24:56 | 16 | Q.   Did you ever know anything about that horse before? |
| 14:24:59 | 17 | A.   No. |
| 14:24:59 | 18 | Q.   Were you aware that Tremor Enterprises owned that horse? |
| 14:25:02 | 19 | A.   No. |
| 14:25:02 | 20 | THE COURT:  What was the name of the horse again? |
| 14:25:04 | 21 | THE WITNESS:  Blues Ferrari. |
| 14:25:09 | 22 | Q.   (BY MR. GARDNER) And tell us -- tell the jury about the |
| 14:25:14 | 23 | bids.  How did the bidding go?  If you could just describe that |
| 14:25:17 | 24 | physically for the jury. |
| 14:25:18 | 25 | A.   They started, you know, like around $5,000.  Is that what |

14:25:24   1   you're talking about?

14:25:25   2   Q.   Correct.  Yes, sir.

14:25:27   3   A.   So I went to, I don't know, I remember 7, $8,000.  Then they

14:25:34   4   went to 10.  I went to 12.  They went to 15.  I went to 20.  They

14:25:44   5   went like, suddenly, from 20 to 30.  I went to 35.  It kept going

14:25:52   6   that way.  Suddenly, we were between 100,000, 200,000.  Then all

14:25:58   7   the way to $150,000, to $175,000.  When they get to -- I got to

14:26:08   8   around 280 or 290, and someone called 300, and then, I went to

14:26:14   9   310,000, and then, no one kept going.

14:26:22   10   Q.   Where was Carlos Nayen and Fernando Garcia while you were

14:26:24   11   raising your hand?

14:26:26   12   A.   I don't know, but they weren't there.  The only person with

14:26:31   13   me was his brother.  They didn't want to be with me.

14:26:35   14   Q.   Why do you say that?

14:26:37   15   A.   That's what they said.  They said they couldn't be with me.

14:26:40   16   They didn't want people to know that they were like involved in

14:26:47   17   that transaction.

14:26:50   18   Q.   So after the auction, did you pay for the horse?

14:26:53   19   A.   Yeah.  I was called to go to the office, and I gave some

14:27:01   20   checks.  Two checks to pay for the horse.

14:27:10   21   Q.   I want to show you Government's Exhibit 272A.  272B, while

14:27:22   22   I'm up here, can you go through that, tell me what those are?

14:27:26   23   A.   These are two checks, one for $150,000 and the second one

14:27:32   24   for $160,000, that makes $310,000 for the cost of the horse.

14:27:39   25   Q.   Okay.  And just while I'm up here, these other documents,

| | | |
|---|---|---|
| 14:27:43 | 1 | are they also your banking records? |
| 14:27:44 | 2 | A.   Yes. |
| 14:27:44 | 3 | Q.   Your Honor, I offer Government's Exhibit 272A and 272B. |
| 14:27:53 | 4 | MR. WOMACK:  No objection. |
| 14:28:06 | 5 | THE COURT:  272A and B are admitted. |
| 14:28:09 | 6 | Q.   (BY MR. GARDNER) This is what we just talked about, correct? |
| 14:28:22 | 7 | Mr. Del Rayo, this check here in your wife's account for |
| 14:28:27 | 8 | $150,000? |
| 14:28:29 | 9 | A.   Uh-huh.  Yes. |
| 14:28:30 | 10 | Q.   And this next one over here for $160,000? |
| 14:28:33 | 11 | A.   Yes, sir. |
| 14:28:34 | 12 | Q.   Why two checks? |
| 14:28:37 | 13 | A.   Because I told them that I didn't have the whole amount with |
| 14:28:41 | 14 | me at the moment.  So they said no problem.  Give us two checks. |
| 14:28:49 | 15 | Tell us when we can cash the next check. |
| 14:28:54 | 16 | Q.   So you asked them to hold one until you let them know? |
| 14:28:57 | 17 | A.   Yes. |
| 14:28:58 | 18 | Q.   I'm showing you Government's Exhibit 359B.  I'm sorry, 359A |
| 14:29:03 | 19 | and 359B.  Do you recognize those two photos? |
| 14:29:08 | 20 | A.   Yes, sir. |
| 14:29:08 | 21 | Q.   Okay.  Is that you in 359B? |
| 14:29:11 | 22 | A.   Yes, sir. |
| 14:29:12 | 23 | Q.   And can you identify the individuals in 359A? |
| 14:29:15 | 24 | A.   Yes.  Fernando Garcia and Antonio Nayen. |
| 14:29:20 | 25 | Q.   Your Honor, I offer 359A and 359B for relevance objections. |

| | | |
|---|---|---|
| 14:29:36 | 1 | THE COURT:  359A and B are admitted. |
| 14:29:50 | 2 | Q.   (BY MR. GARDNER) I'm showing you 359A, Mr. Del Rayo.  Where |
| 14:29:53 | 3 | is this?  Where are you in this picture? |
| 14:29:55 | 4 | A.   That's the office of, I guess, the manager of the place, the |
| 14:30:02 | 5 | auction place. |
| 14:30:02 | 6 | Q.   Is this where you went to? |
| 14:30:05 | 7 | A.   To give the checks.  Yes. |
| 14:30:08 | 8 | Q.   And, again, you talked -- when you and I were up there at |
| 14:30:11 | 9 | the witness stand, who was that individual? |
| 14:30:12 | 10 | A.   That's Antonio Nayen, Carlos' brother. |
| 14:30:15 | 11 | Q.   And that individual? |
| 14:30:16 | 12 | A.   That's Fernando Garcia. |
| 14:30:17 | 13 | Q.   Okay.  Did they -- obviously, did they accompany you to the |
| 14:30:22 | 14 | sales office after the auction? |
| 14:30:24 | 15 | A.   They took me there. |
| 14:30:25 | 16 | Q.   They took you there? |
| 14:30:26 | 17 | A.   Yes. |
| 14:30:26 | 18 | Q.   Do you have any indication from either Mr. Nayen or Mr. |
| 14:30:29 | 19 | Garcia that horse would go for $310,000? |
| 14:30:31 | 20 | A.   No.  But they told me that I had to buy it at any price. |
| 14:30:37 | 21 | Q.   I'm showing you 359B.  And is this in the same location, |
| 14:30:46 | 22 | sir? |
| 14:30:46 | 23 | A.   Yes, sir. |
| 14:30:47 | 24 | Q.   All right.  Is that when you're filling out the check? |
| 14:30:51 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 14:30:52 | 1 | Q.   At least from my photo here, seems like your finger's |
| 14:30:56 | 2 | sticking out there.  Is that the hand that was injured? |
| 14:30:58 | 3 | A.   Yes, sir. |
| 14:30:59 | 4 | Q.   After the auction, what happened? |
| 14:31:09 | 5 | A.   After the auction, we went back to San Antonio the next day. |
| 14:31:15 | 6 | Q.   When you say "we," who? |
| 14:31:18 | 7 | A.   We took -- we all together. |
| 14:31:21 | 8 | Q.   So yourself? |
| 14:31:22 | 9 | A.   Carlos, Fernando and Antonio and me. |
| 14:31:25 | 10 | Q.   And so, when you got off the airplane -- let me back up a |
| 14:31:31 | 11 | second.  You have a residence in San Antonio? |
| 14:31:33 | 12 | A.   I do own a house in San Antonio. |
| 14:31:36 | 13 | Q.   So when you got back to San Antonio, was it your thought to |
| 14:31:40 | 14 | go to your home? |
| 14:31:41 | 15 | A.   Yes. |
| 14:31:42 | 16 | Q.   And when you told -- let me back up. |
| 14:31:46 | 17 |      Did you let Carlos Nayen or Fernando Garcia know you |
| 14:31:49 | 18 | were going to the house? |
| 14:31:50 | 19 | A.   Yes. |
| 14:31:50 | 20 | Q.   And what was their response? |
| 14:31:52 | 21 | A.   They wanted to take me and because they know that I had a |
| 14:31:59 | 22 | minivan that I rented, and they wanted to take me to my house to |
| 14:32:04 | 23 | see where I live.  And then, they wanted -- they asked me to take |
| 14:32:09 | 24 | them to a place, I guess, Retama Park, a place that looks like a |
| 14:32:18 | 25 | race place, horse place. |

14:32:23  1   Q.   When they took you to your house, did you get the sense that

14:32:26  2   they were verifying where you live in the United States?

14:32:28  3   A.   Yes.

14:32:33  4   Q.   So you went to your house and then, you got in your car from

14:32:35  5   your house?

14:32:37  6   A.   Yes.

14:32:37  7   Q.   And then, you took everyone?

14:32:38  8   A.   I took them.

14:32:40  9   Q.   To Retama?

14:32:41  10  A.   I drove and I took them to this horse place.

14:32:44  11  Q.   And when you got to Retama Park, did you meet anyone else?

14:32:49  12  A.   Well, there was like five or six people waiting for Carlos,

14:32:59  13  and I just left and that was all.

14:33:02  14  Q.   When you met these five or six people waiting for Carlos,

14:33:05  15  how did they treat him?

14:33:07  16  A.   Like -- well, like he was their boss.

14:33:12  17  Q.   How old is Carlos?

14:33:15  18  A.   Middle 20s.

14:33:20  19  Q.   So after that, you went home and did you go back to Mexico?

14:33:25  20  A.   After I went home -- after I stayed, you know, three or four

14:33:30  21  days in San Antonio, and then, I go back to Veracruz.

14:33:34  22  Q.   Were you ever contacted by Carlos again?

14:33:38  23  A.   Yes.

14:33:39  24  Q.   And when was that?

14:33:40  25  A.   He called me back, like, three months later.  Like around

| | | |
|---|---|---|
| 14:33:55 | 1 | March, at the end of March, beginning of April. |
| 14:34:00 | 2 | Q.   And what did he tell you? |
| 14:34:02 | 3 | A.   He told me, in other words, that the things were pretty bad |
| 14:34:08 | 4 | and they needed me to get more money.  I asked him how much.  He |
| 14:34:16 | 5 | told me that he needed -- that they need -- that they told him |
| 14:34:20 | 6 | that they needed to ask me for 10 million pesos. |
| 14:34:26 | 7 | Q.   And, again, based on the exchange rate, about how much U.S. |
| 14:34:29 | 8 | dollars is that? |
| 14:34:30 | 9 | A.   About 7, 600 -- between 650, $700,000. |
| 14:34:40 | 10 | Q.   And did you have that money available in your bank account? |
| 14:34:45 | 11 | A.   No. |
| 14:34:45 | 12 | Q.   So how did you -- first question, did you get that money for |
| 14:34:48 | 13 | them? |
| 14:34:48 | 14 | A.   Well, first of all, I told him that I didn't have the money, |
| 14:34:54 | 15 | that I would have to look around to have to get it.  I had to |
| 14:35:00 | 16 | look for what to sell to get the money, and he told me that I had |
| 14:35:05 | 17 | to do it fastest I could. |
| 14:35:09 | 18 | Q.   Did you felt you had the option of saying no to Carlos |
| 14:35:13 | 19 | Nayen? |
| 14:35:14 | 20 | A.   No, because in the other side, I started receiving calls |
| 14:35:19 | 21 | from on my radio with death threats about if I didn't get that |
| 14:35:27 | 22 | money, I will get killed or my family. |
| 14:35:30 | 23 | Q.   Did you report these to Carlos? |
| 14:35:33 | 24 | A.   Yeah.  I told Carlos that that was happening, and he told |
| 14:35:36 | 25 | me, don't worry, nothing's going to happen to you, just get the |

14:35:39   1   money.

14:35:41   2   Q.   And so, this 10 million pesos or approximately $600,000, did

14:35:47   3   you eventually sell property to obtain those funds?

14:35:49   4   A.   Yeah.  I had to sell some properties to get the money.  And

14:35:52   5   when I had the money, I told Carlos I already had it.  He told me

14:36:00   6   that he wanted it in cash.  I had it in cash in about a week.

14:36:07   7   And when I told him that it was ready, he changed the whole thing

14:36:12   8   and told me, we don't need the cash anymore.  We need to put it

14:36:17   9   back in the bank because you're going to have to make wires to

14:36:20   10  where we're going to tell you to.

14:36:22   11  Q.   And where did they tell you to send it?

14:36:24   12  A.   They gave me a list of accounts in the states, the name of

14:36:32   13  the company, Southwest Stallion, and that's where I had to

14:36:38   14  deposit all that money.  But it took me like a week, week and a

14:36:43   15  half to put the money back in the bank.

14:36:45   16  Q.   I'm showing you page 2 of Government's Exhibit 272A.  This

14:36:50   17  is the cashier's check from Chase with your name to Southwest

14:36:55   18  Stallion Station for $250,000?

14:36:58   19  A.   Yes.

14:36:58   20  Q.   Dated July 28, 2011.  And here's a check from Southwest

14:37:03   21  Stallion Station, dated the same day, for $300,000?

14:37:07   22  A.   Yes.

14:37:08   23  Q.   Were you ever told what those payments were for?

14:37:13   24  A.   I was told those payments were needed for the company which

14:37:21   25  uses to take care of the horses.

| | | |
|---|---|---|
| 14:37:26 | 1 | Q.   Do you know anything about Southwest Stallion Station? |
| 14:37:28 | 2 | A.   Excuse me? |
| 14:37:29 | 3 | Q.   Did you know anything about Southwest Stallion Station? |
| 14:37:31 | 4 | A.   No.  Just -- I just knew this guy which I met when I paid |
| 14:37:39 | 5 | for the horse telegram. |
| 14:37:43 | 6 | Q.   You met him when -- |
| 14:37:45 | 7 | THE COURT:  He keeps saying Southwest. |
| 14:37:47 | 8 | MR. GARDNER:  Stallion Station, your Honor. |
| 14:37:53 | 9 | Q.   (BY MR. GARDNER) So you've never been to that particular |
| 14:37:56 | 10 | facility in the U.S.? |
| 14:37:57 | 11 | A.   Never. |
| 14:37:59 | 12 | Q.   Now, for the $310,000 that you paid for Blues Ferrari or the |
| 14:38:05 | 13 | $550,000 you paid for horse expenses, did the Zetas ever |
| 14:38:10 | 14 | reimburse you for that? |
| 14:38:11 | 15 | A.   No.  Not at all. |
| 14:38:14 | 16 | Q.   Now I'm going to show you what's been marked as Government's |
| 14:38:17 | 17 | Exhibit 272B.  Here's a check for $50,000 to Southwest Stallion |
| 14:38:24 | 18 | Station on August 8, 2011, check No. 1009, August 12, check 10010 |
| 14:38:30 | 19 | for $50,000 to the same, and August 15, 2011, check No. 1011 for |
| 14:38:39 | 20 | $50,000 to Southwest Stallion Station. |
| 14:38:40 | 21 | Could you explain to the jury what these are for? |
| 14:38:42 | 22 | A.   Yeah.  Those are also part of the money from the 10 million |
| 14:38:48 | 23 | pesos that they asked me.  Had a lot of trouble transferring the |
| 14:38:51 | 24 | money from Mexico to the states for obvious reason, you know, |
| 14:38:56 | 25 | that was a lot of money.  And it took some time to get the wire |

| | | |
|---|---|---|
| 14:39:00 | 1 | through because the first wires were sent back.  The bank in |
| 14:39:06 | 2 | Mexico, they didn't accept it. |
| 14:39:11 | 3 | So there was money left to pay to this company.  So I |
| 14:39:16 | 4 | had to come over myself and give him those checks to this guy |
| 14:39:23 | 5 | Tyler Graham.  And I told him, you can cash one and I'll let you |
| 14:39:26 | 6 | know when can you cash the next one and, you know, keep that way. |
| 14:39:30 | 7 | Q.   And did you actually talk to Tyler Graham over the phone? |
| 14:39:33 | 8 | A.   Yes.  I did talk to -- I did talk to him on the phone, and I |
| 14:39:37 | 9 | did see him in person, also, because I give him the checks |
| 14:39:41 | 10 | personally. |
| 14:39:43 | 11 | Q.   I want to turn your attention to the winter of 2011.  I'm |
| 14:39:51 | 12 | sorry.  Yes.  2011.  Did you attend a wedding of Carlos Nayen? |
| 14:39:56 | 13 | A.   On winter 2011.  December 3rd, 2011, yes, I did. |
| 14:40:01 | 14 | Q.   Can you tell the jury how that came about? |
| 14:40:04 | 15 | A.   Yeah.  I was asked for -- I was asked for Carlos to be |
| 14:40:12 | 16 | there.  I just went.  I just went.  I got there between 9:30 at |
| 14:40:18 | 17 | night -- about 9:30, 10:00 at night, and I came back two hours |
| 14:40:23 | 18 | later.  I spent like two hours there. |
| 14:40:27 | 19 | Q.   And did you see an individual there that you knew by the |
| 14:40:31 | 20 | name of "Pancho" Colorado? |
| 14:40:34 | 21 | A.   Well, I saw him.  I didn't know him, you know.  I knew who |
| 14:40:41 | 22 | was him, you know, but I was present -- I was introduced to him |
| 14:40:45 | 23 | by Carlos and by Jose Guillermo Herrera-Mendoza. |
| 14:40:49 | 24 | Q.   And it's the same Guillermo Herrera who came with you? |
| 14:40:52 | 25 | A.   And Carlos. |

```
14:40:53   1   Q.   And Carlos to your house?

14:40:54   2   A.   Yes.

14:40:57   3   Q.   Showing you Government's Exhibit 361.  Do you recognize

14:41:02   4   that, sir?

14:41:03   5   A.   Yes.

14:41:04   6   Q.   Did you obtain that for the government at our request?

14:41:07   7   A.   Yes.

14:41:08   8   Q.   All right.  And were you present when this document was

14:41:10   9   filled out?

14:41:12  10   A.   Yes.

14:41:12  11   Q.   And what is that document?

14:41:14  12   A.   It's a marriage certificate.

14:41:16  13   Q.   Okay.  Of Carlos Nayen?

14:41:17  14   A.   Carlos Nayen marriage certificate.

14:41:20  15   Q.   Your Honor, we offer Government's Exhibit 361.

14:41:34  16        THE COURT:  Hearing no objection, 361 is admitted.

14:41:39  17   Q.   (BY MR. GARDNER) Now, Mr. Del Rayo, it's in Spanish, but

14:41:53  18   could you explain to the jury in English what testigos de los

14:41:58  19   contrayentes means?

14:41:59  20   A.   Witnesses.

14:42:00  21   Q.   Witnesses?

14:42:01  22   A.   Yes.

14:42:01  23   Q.   And Francisco Antonio Colorado-Cessa was a witness?

14:42:06  24   A.   Yes.

14:42:06  25   Q.   Now, in the Mexican culture, what is the significance of
```

14:42:09    1    having witnesses at one's wedding?

14:42:13    2    A.    It's like grandfather.

14:42:14    3    Q.    Like a godfather?

14:42:15    4    A.    Yeah.

14:42:16    5    Q.    Is there any significance to the order such that the person

14:42:20    6    on top is more important than anyone else?

14:42:22    7    A.    Not really.   The order doesn't.

14:42:26    8    Q.    And below here, the actual signatures of the witnesses,

14:42:29    9    correct?

14:42:30   10    A.    Yes.

14:42:33   11    Q.    And where was "Pancho" Colorado sitting at that wedding in

14:42:40   12    relation to the head table?

14:42:42   13    A.    You know, I didn't see him seated at all.   He was kind of

14:42:46   14    taking care of the whole thing.   He was like the one in charge of

14:42:50   15    the whole wedding.   That was my -- that's what I could -- that I

14:42:55   16    could see.

14:42:57   17    Q.    Now, following your arrest and you coming into the United

14:43:02   18    States, have you been contacted by members of Carlos Nayen's

14:43:06   19    family?

14:43:06   20    A.    Before.   Before I came here, yeah.

14:43:09   21    Q.    And what did they ask you when they contacted you?

14:43:12   22    A.    First of all, they asked me for the keys of the house in San

14:43:17   23    Antonio, which I gave it to them.   And then, I was asked for more

14:43:23   24    money to pay expenses for his lawyer.

14:43:27   25    Q.    And do you know why they asked you for the keys to your

| | | |
|---|---|---|
| 14:43:30 | 1 | house? |
| 14:43:30 | 2 | A.   Yeah.   They told me that they needed the house so his wife |
| 14:43:35 | 3 | and his son could go and live there. |
| 14:43:39 | 4 | Q.   During the pendency of his criminal case, correct? |
| 14:43:41 | 5 | A.   Excuse me? |
| 14:43:42 | 6 | Q.   During the pendency or during his criminal matter. |
| 14:43:45 | 7 | A.   They didn't tell me how long, but they told me they needed |
| 14:43:49 | 8 | the house for that. |
| 14:43:50 | 9 | Q.   And based on the government's representation, we asked you |
| 14:43:55 | 10 | not to contact her? |
| 14:43:56 | 11 | A.   Yes, sir. |
| 14:44:00 | 12 | Q.   Did you feel you had the ability to ever say no to Carlos |
| 14:44:03 | 13 | Nayen or any of the Zetas during this whole ordeal? |
| 14:44:08 | 14 | A.   No. |
| 14:44:09 | 15 | Q.   What do you think would happen if you had said no? |
| 14:44:12 | 16 | A.   I get punished. |
| 14:44:21 | 17 | Q.   Your Honor, I'll pass the witness. |
| 14:44:30 | 18 |        MS. WILLIAMS:  I don't have any questions. |
| 14:44:35 | 19 |                    CROSS-EXAMINATION |
| 14:44:39 | 20 | BY MR. SANCHEZ: |
| 14:44:39 | 21 | Q.   Mr. Del Rayo. |
| 14:45:02 | 22 | A.   Yes. |
| 14:45:03 | 23 | Q.   My name's Andres Sanchez.  We haven't met, have we? |
| 14:45:06 | 24 | A.   No. |
| 14:45:09 | 25 | Q.   I want to get just to make sure I understand the amounts of |

```
14:45:17   1    money and the times when you were paying these amounts of moneys
14:45:23   2    so I have that clear.
14:45:24   3    A.    Uh-huh.  Yes.
14:45:25   4    Q.    And I guess, before, you said you were kidnapped sometime in
14:45:31   5    December of 2010?
14:45:33   6    A.    The 10 of December.
14:45:35   7    Q.    Okay.  So December 10, 2010?
14:45:38   8    A.    Yes.
14:45:39   9    Q.    And lasted nine days?
14:45:41  10    A.    Yeah.  Until the 18.
14:45:43  11    Q.    Until the 18th.  And then, on the 18th, you're released and
14:45:47  12    then, sometime a week or so later, Carlos Nayen comes to visit
14:45:51  13    you?
14:45:51  14    A.    Yes.  Not to visit me, just he came with Jose Guillermo
14:45:58  15    Herrera to talk to me about what he wanted.
14:46:03  16    Q.    Right.  And maybe there's some issue in the translation.  I
14:46:06  17    don't mean visit you as in how are you doing, nice to meet you,
14:46:09  18    but he came to your house?
14:46:10  19    A.    Yes.
14:46:11  20    Q.    And your house is -- you said you're from Veracruz,
14:46:16  21    Veracruz.  The house you were living in when you were living in
14:46:18  22    Mexico, is that in Veracruz, Veracruz?
14:46:20  23    A.    Yes, sir.
14:46:20  24    Q.    And Veracruz is a city within the state of Veracruz?
14:46:25  25    A.    Well, it's a city within the state of Veracruz, but there
```

| | | |
|---|---|---|
| 14:46:29 | 1 | are three cities together.  Veracruz, Boca del Rio and Alvarado. |
| 14:46:36 | 2 | We call it Veracruz but, you know, there are differences, though. |
| 14:46:40 | 3 | Mine is in Alvarado. |
| 14:46:42 | 4 | Q.   Okay.  Do you know where Nayen lives? |
| 14:46:44 | 5 | A.   Where who? |
| 14:46:45 | 6 | Q.   Carlos Nayen?  Do you know where he lives? |
| 14:46:47 | 7 | A.   No. |
| 14:46:48 | 8 | Q.   The Boca del Rio is one of those three cities? |
| 14:46:53 | 9 | A.   Yes. |
| 14:46:54 | 10 | Q.   That you consider Veracruz? |
| 14:46:56 | 11 | A.   Yes. |
| 14:46:57 | 12 | Q.   How far away is Tuxpan? |
| 14:47:00 | 13 | A.   How far away is Tuxpan from that area, I don't know, three, |
| 14:47:06 | 14 | three-and-a-half hours. |
| 14:47:08 | 15 | Q.   What about Pozo Rica? |
| 14:47:11 | 16 | A.   Four -- yeah, between same time.  About the same time. |
| 14:47:16 | 17 | Q.   Okay.  Sorry.  I got a little off track. |
| 14:47:19 | 18 |      But so, in January of 2011, in that time period, Carlos |
| 14:47:25 | 19 | Nayen came to your home; is that correct? |
| 14:47:26 | 20 | A.   No.  It was in January. |
| 14:47:29 | 21 | Q.   It was still in December? |
| 14:47:31 | 22 | A.   Yes. |
| 14:47:31 | 23 | Q.   December, he comes to your home and tells you that he would |
| 14:47:35 | 24 | like for you to attend an auction where you're going to be paying |
| 14:47:41 | 25 | some money for a horse. |

| | | |
|---|---|---|
| 14:47:43 | 1 | A.    No.   That I had to buy a horse as a payback for my release. |
| 14:47:49 | 2 | Q.    Okay.   And I guess what's important to me is I want to try |
| 14:47:52 | 3 | to get the details right.   Did he tell you, you're going to be |
| 14:47:55 | 4 | having to write a check for a horse at that particular time? |
| 14:48:00 | 5 | A.    No.   He just told me that I had to buy the horse. |
| 14:48:06 | 6 | Q.    What I'm trying to figure out is, how did you know to show |
| 14:48:09 | 7 | up with your checkbook from the San Antonio account that you |
| 14:48:12 | 8 | have? |
| 14:48:14 | 9 | A.    Can you say that again? |
| 14:48:15 | 10 | Q.    Sure.   When you got to the auction in January, you showed up |
| 14:48:22 | 11 | and you were ready to write the check.   You had an account or a |
| 14:48:25 | 12 | checkbook from Chase? |
| 14:48:26 | 13 | A.    Uh-huh.   Yes. |
| 14:48:29 | 14 | Q.    Right?   And at least $150,000 in that account as a portion |
| 14:48:34 | 15 | of the $310,000 to pay for it, right? |
| 14:48:38 | 16 | A.    Yes. |
| 14:48:38 | 17 | Q.    So that $150,000 in that account, how did you know to show |
| 14:48:42 | 18 | up with that particular checkbook and pay in that particular |
| 14:48:45 | 19 | manner with that checkbook? |
| 14:48:47 | 20 | A.    Well, I didn't know how much money to take.   I just had that |
| 14:48:51 | 21 | money at that time, and that's what I paid that time. |
| 14:48:56 | 22 | Q.    So you had $150,000 in that particular account, and you |
| 14:49:02 | 23 | wrote out a check for $150,000, then another 170? |
| 14:49:05 | 24 | A.    160. |
| 14:49:06 | 25 | Q.    160? |

14:49:07  1    A.    Yes.

14:49:07  2    Q.    Okay.  So there was already $150,000 in your U.S. Chase

14:49:11  3    account.  Is that what you're telling us?

14:49:13  4    A.    Yes.  They couldn't get that check paid right away.

14:49:21  5    Q.    You told them, go ahead and cash that check but wait for the

14:49:24  6    160?

14:49:24  7    A.    Yes.

14:49:25  8    Q.    And I see a date -- I don't know exactly what date it is.

14:49:36  9    Looks like January 26.  Is that what date that was on?

14:49:40  10   A.    January -- yeah, January 20-something.  Can I see that 161?

14:49:49  11   It's about the same.

14:49:51  12   Q.    In one?  Wait, what do you want to see?

14:49:54  13   A.    January 20-something.  Yeah.

14:49:56  14   Q.    Okay.  All right.  So what I'm trying to figure out is the

14:50:00  15   remaining 160, how did you get that money into that particular

14:50:05  16   account?

14:50:05  17   A.    I had to send money from Mexico.

14:50:10  18   Q.    And I want the details of that, if you could, please.

14:50:13  19   A.    To go back to Mexico to Veracruz, I had to get some money on

14:50:18  20   my own, you know, and send it back -- and send it to my account

14:50:22  21   in Chase.

14:50:23  22   Q.    Okay.  And so, you gave instruction -- what was the -- money

14:50:27  23   in pesos?

14:50:28  24   A.    I went myself.  I went back to Veracruz, you know, I get the

14:50:33  25   money, and then, I sent it and I make a wire to that account to

| | | |
|---|---|---|
| 14:50:39 | 1 | have the other part of the money. |
| 14:50:43 | 2 | Q.   Did you sell property to get that 160? |
| 14:50:45 | 3 | A.   Well, I had some money over there from other things. |
| 14:50:50 | 4 | Q.   Was it in pesos? |
| 14:50:51 | 5 | A.   Yes. |
| 14:50:52 | 6 | Q.   So it was in pesos? |
| 14:50:53 | 7 | A.   All the money in Veracruz was in pesos. |
| 14:50:57 | 8 | Q.   All the money in your account in Veracruz was in pesos? |
| 14:50:59 | 9 | A.   Yeah.  There's no dollars -- there's no dollars accounts in |
| 14:51:03 | 10 | Veracruz. |
| 14:51:04 | 11 | Q.   So -- |
| 14:51:05 | 12 | A.   As far as I know. |
| 14:51:06 | 13 | Q.   So you converted the money from pesos to wire it to dollars |
| 14:51:10 | 14 | to that account? |
| 14:51:10 | 15 | A.   The bank does it itself, you know.  I just say, I want to |
| 14:51:14 | 16 | send a million pesos and they take, you know, the rate, the |
| 14:51:20 | 17 | exchange rate at that day, and they put it in whatever -- |
| 14:51:26 | 18 | wherever account it's sent. |
| 14:51:29 | 19 | Q.   Okay.  So in January -- do you know how long it took before |
| 14:51:33 | 20 | you had the money to -- for this check? |
| 14:51:37 | 21 | A.   It took me more than that date.  I can't recall. |
| 14:51:42 | 22 | Q.   I won't hold you to it.  Was it a week?  Was it a month?  Do |
| 14:51:45 | 23 | you know how long roughly? |
| 14:51:46 | 24 | A.   Less than a month. |
| 14:51:47 | 25 | Q.   So by February, you'd already spent $310,000? |

| | | |
|---|---|---|
| 14:51:52 | 1 | A.   Yes. |
| 14:51:54 | 2 | Q.   And then, you talked about in April -- so in April is when |
| 14:52:21 | 3 | this occurred? |
| 14:52:22 | 4 | A.   No.  That occurred until June -- July. |
| 14:52:27 | 5 | Q.   All right.  I'm sorry.  In April is when Nayen approached |
| 14:52:30 | 6 | you again? |
| 14:52:31 | 7 | A.   Uh-huh.  Yes. |
| 14:52:33 | 8 | Q.   And asked you to collect the money that ultimately turned |
| 14:52:36 | 9 | out to be these checks? |
| 14:52:37 | 10 | A.   Uh-huh.  Yes. |
| 14:52:39 | 11 | Q.   And you collected in cash but then, had to redeposit it? |
| 14:52:44 | 12 | A.   I had it in bags but they -- but he wanted it in cash. |
| 14:52:51 | 13 | Q.   In pesos? |
| 14:52:52 | 14 | A.   In pesos.  Yes. |
| 14:52:54 | 15 | Q.   And then, you deposited it back into the bank? |
| 14:52:57 | 16 | A.   I had to deposit it back in cash to my accounts and then, |
| 14:53:03 | 17 | make the wires. |
| 14:53:05 | 18 | Q.   All right.  So what I'm trying to figure out was that cash |
| 14:53:08 | 19 | that you got, was that from selling land or? |
| 14:53:11 | 20 | A.   Yeah.  I did sell like two or three properties to have the |
| 14:53:16 | 21 | money. |
| 14:53:17 | 22 | Q.   And people brought you cash for those properties? |
| 14:53:19 | 23 | A.   No.  Not all the money was cash.  Some of it, yeah. |
| 14:53:27 | 24 | Q.   Okay.  So then, when they're saying -- when you're being |
| 14:53:31 | 25 | told by Nayen or -- I think it was Nayen, correct? |

14:53:34  1    A.   Yes.

14:53:35  2    Q.   By the way, everything, all the contacts that you had about

14:53:38  3    these checks and all the money was through Nayen?

14:53:40  4    A.   Yes.

14:53:41  5    Q.   Nayen was telling you what to do?

14:53:43  6    A.   Yes, sir.

14:53:44  7    Q.   When Nayen tells you, never mind, we want this wired or

14:53:51  8    ultimately in a check, how do you get that cash to the U.S.?

14:53:56  9    A.   No.  I didn't get any cash.  I had to put it back everything

14:54:00  10   in my accounts.  I got several accounts in Veracruz from

14:54:07  11   companies that I have.  I have to put various deposits -- you

14:54:18  12   know, it took me like two weeks to get all the money inside the

14:54:24  13   accounts.  When I had the money inside the accounts, I collect --

14:54:29  14   I collect all the money in the accounts, and I put in one account

14:54:33  15   so I can transfer the money from one account.

14:54:35  16   Q.   Gotcha.  So you have several accounts.  You started putting

14:54:40  17   in money in those several accounts, and those several accounts

14:54:43  18   sent money to Chase to get the cashier's check?

14:54:46  19   A.   Yes.

14:54:46  20   Q.   Okay.  And that was in June?

14:54:48  21   A.   But before that -- but before that, I tried to do the wires

14:54:51  22   directly to that account of the Southwest Stallion company, and

14:54:57  23   that's when I had trouble because they sent it back to me.  They

14:55:02  24   didn't went through for -- how do you call it, for security

14:55:10  25   reasons.  That's what they explained to me in Mexico.

14:55:17   1   Q.   By the way, how many accounts do you have in Veracruz?  I

14:55:19   2   know a Santander account.  What other accounts do you have?

14:55:25   3   A.   All of my accounts are Santander.  I have a Banco Norte

14:55:30   4   account.  I had a BBVA account.

14:55:37   5   Q.   What about Banamex?

14:55:42   6   A.   No.

14:55:43   7   Q.   Never?

14:55:44   8   A.   Later, I had a Banamex.

14:55:46   9   Q.   What year did you open that account?

14:55:48   10   A.   In 2012.

14:55:57   11   Q.   So now we're up to -- with the 310 plus this 550, you're at

14:56:07   12   a total of 860,000 that you've paid?

14:56:12   13   A.   Yeah, plus the $150,000 in checks that I gave to Tyler

14:56:18   14   Graham.

14:56:18   15   Q.   All right.  So we'll jump right to that.  Those 150,000 in

14:56:23   16   checks, that came in August?

14:56:29   17   A.   Yes.

14:56:30   18   Q.   So the same thing.  This time, you know you don't need it in

14:56:34   19   cash.  How did you get the money to that particular account, do

14:56:37   20   you remember?

14:56:37   21   A.   Yeah.  I get deposit in Mexico so I could transfer that

14:56:45   22   money to this accounts in the United States.  I get the money.

14:56:49   23   Q.   And, again, this money was from?

14:56:55   24   A.   Sales.

14:56:56   25   Q.   Sales.

| | | |
|---|---|---|
| 14:56:56 | 1 | A.   Yes. |
| 14:56:58 | 2 | Q.   Of property? |
| 14:56:58 | 3 | A.   Property sales. |
| 14:56:59 | 4 | Q.   And the Zetas never paid you back and Carlos Nayen never |
| 14:57:04 | 5 | paid you back? |
| 14:57:04 | 6 | A.   Excuse me? |
| 14:57:05 | 7 | Q.   The Zetas never paid you back and Carlos Nayen never paid |
| 14:57:08 | 8 | you back? |
| 14:57:08 | 9 | A.   Never. |
| 14:57:09 | 10 | Q.   We talked a second about this.  That top name is Francisco |
| 14:57:44 | 11 | Antonio Colorado-Cessa.  That's who you know to be Francisco |
| 14:57:52 | 12 | Antonio Colorado-Cessa? |
| 14:57:53 | 13 | A.   Excuse me? |
| 14:57:54 | 14 | Q.   Is that who you know to be Francisco -- |
| 14:57:56 | 15 | A.   Yes.  Yes, sir. |
| 14:57:58 | 16 | Q.   You said that the witness would be the godfather? |
| 14:58:04 | 17 | A.   Well, that's -- that's what I heard Carlos call him. |
| 14:58:11 | 18 | Q.   But you're not saying that this particular document |
| 14:58:13 | 19 | indicates that he's a godfather? |
| 14:58:15 | 20 | A.   No. |
| 14:58:16 | 21 | Q.   Okay.  Because here, the third and fourth witnesses are 21 |
| 14:58:20 | 22 | and 22 years old, right? |
| 14:58:22 | 23 | A.   Yeah.  But I don't know. |
| 14:58:24 | 24 | Q.   They're not godparents of Carlos, are they? |
| 14:58:27 | 25 | A.   I don't know. |

| | | |
|---|---|---|
| 14:58:31 | 1 | Q.   One thing we missed out on about the wedding.  Do you know |
| 14:58:40 | 2 | who Anali Faces is?  I may be mispronouncing the name. |
| 14:58:45 | 3 | A.   Yes.  It's his wife. |
| 14:58:46 | 4 | Q.   Whose wife? |
| 14:58:48 | 5 | A.   Carlos Nayen's wife. |
| 14:58:50 | 6 | Q.   Carlos Nayen's wife and that's the wedding you went to was |
| 14:58:56 | 7 | for Anali and Carlos? |
| 14:58:58 | 8 | A.   Yes. |
| 14:59:38 | 9 | Q.   Do you recognize that photo? |
| 14:59:39 | 10 | A.   Yes.  Well, that's his wedding. |
| 14:59:43 | 11 | Q.   That's his wedding? |
| 14:59:44 | 12 | A.   Their wedding. |
| 14:59:44 | 13 | Q.   And that's Ana? |
| 14:59:47 | 14 | A.   I believe so. |
| 14:59:49 | 15 | Q.   And that's Carlos? |
| 14:59:51 | 16 | A.   Yeah.  That's Carlos. |
| 14:59:55 | 17 | Q.   We offer Colorado 3, your Honor. |
| 14:59:58 | 18 | MR. GARDNER:  No objection, your Honor. |
| 15:00:02 | 19 | THE COURT:  Colorado 3 is received. |
| 15:00:05 | 20 | Q.   (BY MR. SANCHEZ) So when you talked about getting invited to |
| 15:00:21 | 21 | this wedding, you mentioned on direct that Carlos Nayen asked you |
| 15:00:30 | 22 | directly to go to the wedding? |
| 15:00:31 | 23 | A.   Yeah.  He called me and told me that he wanted me -- he |
| 15:00:35 | 24 | wanted me to be there. |
| 15:00:36 | 25 | Q.   Have you ever told agents, or anyone else, that Ana's father |

| | | |
|---|---|---|
| 15:00:43 | 1 | asked you to go to the wedding? |
| 15:00:45 | 2 | A.   No.   That's another -- I told them, yeah.  I told them also |
| 15:00:49 | 3 | that, that they called me and invited me to. |
| 15:00:53 | 4 | Q.   Ana's father called you? |
| 15:00:55 | 5 | A.   Yeah, because I know Ana's father from a long time ago. |
| 15:00:58 | 6 | Q.   Okay.  And were you in any way afraid of telling Ana's |
| 15:01:03 | 7 | father, no, you didn't want to go to the wedding? |
| 15:01:05 | 8 | A.   No.  He doesn't know or he didn't know anything about my |
| 15:01:13 | 9 | situation. |
| 15:01:17 | 10 | Q.   And you have no reason to believe that he knew about your |
| 15:01:22 | 11 | situation or knew anything about Carlos and the son who his |
| 15:01:28 | 12 | daughter -- or the man his daughter was marrying, right? |
| 15:01:30 | 13 | A.   I had no idea. |
| 15:01:36 | 14 | Q.   This wedding, where was the wedding? |
| 15:01:39 | 15 | A.   That was in Jalapa, the capital of the state of Veracruz. |
| 15:01:46 | 16 | Q.   And was it a open event or was it by invitation only? |
| 15:01:52 | 17 | A.   Well, it was an invitation. |
| 15:01:56 | 18 | Q.   Was it something where there were armed men walking around |
| 15:02:00 | 19 | with the AK-47s that they had where they held you? |
| 15:02:04 | 20 | A.   Not that I noticed. |
| 15:02:06 | 21 | Q.   Were there a lot of people at this wedding? |
| 15:02:09 | 22 | A.   Yes. |
| 15:02:09 | 23 | Q.   Were there any other people, well-known, respected people |
| 15:02:14 | 24 | from Veracruz at the wedding? |
| 15:02:16 | 25 | A.   Not that I noticed. |

| | | |
|---|---|---|
| 15:02:18 | 1 | Q.   Not that you noticed? |
| 15:02:19 | 2 | A.   No. |
| 15:02:20 | 3 | Q.   Just you and Francisco Colorado, nobody else from the |
| 15:02:23 | 4 | community of Veracruz? |
| 15:02:24 | 5 | A.   Well, it was Guillermo Herrera, too.  He was there. |
| 15:02:28 | 6 | Q.   And those are the only three people at the wedding that |
| 15:02:30 | 7 | were -- |
| 15:02:30 | 8 | A.   I saw a lot of people, but I cannot tell you they're, you |
| 15:02:34 | 9 | know, highly recognized in, you know, in Veracruz society or not. |
| 15:02:39 | 10 | Q.   Did you recognize them? |
| 15:02:41 | 11 | A.   Not many.  Probably a couple. |
| 15:02:44 | 12 | Q.   How many people total were at this wedding? |
| 15:02:46 | 13 | A.   A lot.  Like, I don't know, tell between 500, 700 people. |
| 15:03:06 | 14 | Q.   Did you ever receive a 1 million peso payment from Miguel |
| 15:03:57 | 15 | Nayen -- I'm sorry, from Carlos Nayen to your Banamex account? |
| 15:04:02 | 16 | A.   I received 2 million pesos. |
| 15:04:05 | 17 | Q.   Two-million pesos? |
| 15:04:06 | 18 | A.   Yes. |
| 15:04:07 | 19 | Q.   From Nayen? |
| 15:04:08 | 20 | A.   Yes. |
| 15:04:08 | 21 | Q.   When was that? |
| 15:04:08 | 22 | A.   That was 2012. |
| 15:04:10 | 23 | Q.   Do you know what month? |
| 15:04:12 | 24 | A.   Probably about February or March. |
| 15:04:24 | 25 | Q.   But that wasn't anything to do with this particular -- the |

| | | |
|---|---|---|
| 15:04:27 | 1 | payments we discussed? |
| 15:04:28 | 2 | A.   No. |
| 15:04:35 | 3 | Q.   What was it for? |
| 15:04:36 | 4 | A.   He asked me again for money.  I told him that I didn't have |
| 15:04:41 | 5 | the money.  He told me or asked me to look for it because, I |
| 15:04:50 | 6 | don't know, three or four weeks before I told him, you know, |
| 15:04:52 | 7 | there's no way I can get any money flat.  He got to the point and |
| 15:04:59 | 8 | said, okay, I'm going to lend it to you, but you're going to owe |
| 15:05:02 | 9 | it to me.  So that's why he sent money. |
| 15:05:06 | 10 | Q.   He asked you for money but, in the end, ended up giving you |
| 15:05:09 | 11 | money? |
| 15:05:10 | 12 | A.   He asked me for money.  When he found out that I didn't have |
| 15:05:16 | 13 | the money, that I had no way to get the money, he told me, I'm |
| 15:05:23 | 14 | going to lend it to you and you'll owe it to me. |
| 15:05:33 | 15 | Q.   I'll pass the witness. |
| 15:05:43 | 16 | THE COURT:  Members of the jury, I'll give you your |
| 15:05:45 | 17 | afternoon break.  Time to use the facilities, stretch.  Be ready |
| 15:05:50 | 18 | to come back in about 15 minutes. |
| 15:06:25 | 19 | (Jury not present.) |
| 15:06:29 | 20 | THE COURT:  Fifteen-minute recess. |
| 15:06:31 | 21 | (Recess.) |
| 15:22:33 | 22 | THE COURT:  I'll have counsel up here. |
| 15:22:52 | 23 | (At the bench, on the record.) |
| 15:23:00 | 24 | THE COURT:  When you asked me if we were going to go on |
| 15:23:02 | 25 | Friday, I forgot, we have somebody that needs medical attention |

| | | |
|---|---|---|
| 15:23:08 | 1 | on Friday.  So we will not go on Friday. |
| 15:23:13 | 2 | MR. ESPER:  Judge, in that vein -- thank you very much. |
| 15:23:15 | 3 | In that vein, I took the liberty of making a flight at 7:15.  I |
| 15:23:22 | 4 | know we've been working till 6:00.  Do you think maybe on |
| 15:23:24 | 5 | Thursday, maybe we could stop at 5:30? |
| 15:23:27 | 6 | THE COURT:  For you?  If you would stop cross-examining |
| 15:23:35 | 7 | when you shouldn't be up there.  As long as you'll let me play |
| 15:23:38 | 8 | with your windshield -- |
| 15:23:39 | 9 | MR. ESPER:  I tell you what, you can do the latter, but |
| 15:23:41 | 10 | the former, I think I -- |
| 15:23:43 | 11 | THE COURT:  Remind me Thursday. |
| 15:23:45 | 12 | MR. ESPER:  I will. |
| 15:23:46 | 13 | MR. GARDNER:  Your Honor, I'm sorry.  Just one other |
| 15:23:49 | 14 | thing.  We made a number of calls to Ernest Gonzalez, at 1:28, |
| 15:23:53 | 15 | at 1:30.  Can I release this witness for today, have him subject |
| 15:23:57 | 16 | to recall?  And once we get the information, we can provide it. |
| 15:24:00 | 17 | THE COURT:  Sure.  Just as long as he's available. |
| 15:24:06 | 18 | (Jury present.) |
| 15:24:36 | 19 | THE COURT:  Let's have our witness.  You understand, |
| 15:25:23 | 20 | sir, you're still under oath? |
| 15:25:24 | 21 | THE WITNESS:  Yes. |
| 15:25:25 | 22 | THE COURT:  You may proceed. |
| 15:25:26 | 23 | CROSS-EXAMINATION |
| 15:25:27 | 24 | BY MR. WOMACK: |
| 15:25:27 | 25 | Q.   Thank you, sir. |

15:25:28   1        Good afternoon, Mr. Del Rayo.

15:25:29   2   A.   Good afternoon.

15:25:30   3   Q.   I'm Guy Womack.  I'm from Houston.  I represent Fernando

15:25:35   4   Garcia-Solis.  Fernando, would you stand up?  You know Fernando?

15:25:40   5   A.   Yes.

15:25:40   6   Q.   Okay.  Thank you.  You may have a seat.

15:25:42   7        And first time you met him or when you met him was at

15:25:46   8   this auto auction that you've told us about.

15:25:49   9   A.   I met him at the Oklahoma City Airport.

15:25:53   10  Q.   Right.  And that was at a horse sale?

15:25:56   11  A.   Yes.

15:25:57   12  Q.   Okay.  And when you met Fernando Garcia, he told you that

15:26:02   13  what he does is he trains horses and, also, he helps people

15:26:06   14  identify horses to buy when they're fast.  Remember that?

15:26:10   15  A.   No.  He didn't tell me that.  He didn't tell me much about

15:26:14   16  what he does.

15:26:16   17  Q.   Don't you recall that he gave you some ideas on things to

15:26:20   18  look for when you look at horses?

15:26:21   19  A.   No.

15:26:21   20  Q.   Do you ever recall that he told you you should always have

15:26:24   21  the horse X-rayed?

15:26:25   22  A.   Excuse me?

15:26:26   23  Q.   Do you recall him telling you that you should always have a

15:26:29   24  horse X-rayed?  Do you recall that?

15:26:33   25  A.   No.  I can't recall that.

15:26:35  1   Q.   You don't remember that conversation?

15:26:37  2   A.   No.

15:26:37  3   Q.   At Oklahoma City?

15:26:39  4   A.   To what?

15:26:40  5   Q.   You don't remember that conversation?

15:26:41  6   A.   No.

15:26:41  7   Q.   In Oklahoma City?

15:26:42  8   A.   No.

15:26:42  9   Q.   Okay.  You never told Fernando Garcia about being kidnapped.

15:26:51 10   A.   No.

15:26:51 11   Q.   Or about being threatened by this Nayen character?

15:26:54 12   A.   No.

15:26:59 13   Q.   During the day of the auction, you told us that there were

15:27:03 14   times that Fernando was gone.  Remember that?

15:27:07 15   A.   I don't understand.

15:27:08 16   Q.   During the day of the auction, there are times that you were

15:27:11 17   there with these other people and Fernando Garcia was gone?

15:27:14 18   A.   Yeah.

15:27:15 19   Q.   Working at the auction or looking at horses?

15:27:17 20   A.   Yes.

15:27:17 21   Q.   Okay.  Now, you told us that you and Fernando and Nayen and

15:27:32 22   Nayen's brother all stayed in a suite, a large hotel room with

15:27:36 23   different bedrooms?

15:27:37 24   A.   Yes.  Different -- yeah, different beds, not bedrooms.

15:27:45 25   Q.   Okay.  And it had beds for everybody?

| | | |
|---|---|---|
| 15:27:51 | 1 | A.   No.  It has like, you know, like a lovey? |
| 15:27:55 | 2 | Q.   A couch that extends out into a bed? |
| 15:27:57 | 3 | A.   Yeah.  That's where Fernando stayed at the front.  At the |
| 15:28:01 | 4 | end, there were two beds.  In one bed stayed Carlos and his |
| 15:28:06 | 5 | brother.  On the other bed was for me. |
| 15:28:07 | 6 | Q.   Okay.  Now, there was never a time at the sale where you |
| 15:28:16 | 7 | were alone with Fernando Garcia where you could tell him about |
| 15:28:20 | 8 | what had happened, was there? |
| 15:28:22 | 9 | A.   Probably we spent three days, you know, together. |
| 15:28:26 | 10 | Q.   Okay. |
| 15:28:27 | 11 | A.   But I never told him or he never asked me what happened to |
| 15:28:31 | 12 | me. |
| 15:28:31 | 13 | Q.   You never bother -- you didn't tell anyone what Nayen had |
| 15:28:34 | 14 | been doing to you? |
| 15:28:35 | 15 | A.   No. |
| 15:28:37 | 16 | Q.   Fernando Garcia never told you to buy a horse, did he? |
| 15:28:56 | 17 | A.   No. |
| 15:28:56 | 18 | Q.   Fernando Garcia, never told you to buy a house.  He never |
| 15:29:00 | 19 | told you that you should buy Blues Ferrari?  He never recommended |
| 15:29:07 | 20 | that, did he? |
| 15:29:07 | 21 | A.   No.  He never told me to buy Blues Ferrari, but he showed me |
| 15:29:13 | 22 | the way to be in the, you know, in the auction. |
| 15:29:16 | 23 | Q.   Right. |
| 15:29:17 | 24 | A.   And how to, you know, work it out to get the horse. |
| 15:29:25 | 25 | Q.   But it was only Nayen that was telling you, you've got to |

15:29:28   1   buy a particular horse and you've got to keep paying till I tell

15:29:31   2   you to stop?

15:29:32   3   A.   Yeah.

15:29:34   4   Q.   And Fernando was not a part of that at all.  He never gave

15:29:37   5   you any instructions like that.

15:29:38   6   A.   No.  He only showed me, you know, you gotta do there, this

15:29:41   7   is going to happen, you gotta do this.  This might happen, but

15:29:46   8   you gotta do this, and be careful with this or be careful with

15:29:49   9   that.

15:29:49   10   Q.   Okay.

15:29:50   11   A.   Things like that.

15:29:50   12   Q.   And, again, I was asking you earlier about him, Fernando

15:29:53   13   giving you advice on how you buy horses.  He did have a

15:29:56   14   conversation with you where he said, this is how you auction

15:29:59   15   horses.  You'll raise your hand or you'll signal a bid if you

15:30:02   16   want to make one.  He was telling you that kind of stuff?

15:30:04   17   A.   Yes.

15:30:05   18   Q.   But he never told you how to buy a particular horse.  He

15:30:09   19   never said anything like that, did he?

15:30:10   20   A.   They both told me that at any cost, I had to get the horse.

15:30:15   21   Q.   Okay.  And it was very obvious to you that the only

15:30:21   22   instructions you were getting about you had to do something, that

15:30:24   23   was coming from Carlos Nayen, right?

15:30:27   24   A.   That was the first instruction, yeah, since I met Carlos

15:30:30   25   Nayen.

| | | |
|---|---|---|
| 15:30:30 | 1 | Q.   Yeah.  And as you told us just a little bit ago on the |
| 15:30:43 | 2 | cross-examination by Mr. Sanchez, the only person that knew about |
| 15:30:47 | 3 | your situation and what you were having to do was Carlos Nayen? |
| 15:30:52 | 4 | A.   Well. |
| 15:30:53 | 5 | Q.   As far as you know. |
| 15:30:54 | 6 | A.   That's what I know. |
| 15:30:55 | 7 | Q.   Thank you.  No further questions. |
| 15:31:00 | 8 | THE COURT:  Mr. Esper. |
| 15:31:02 | 9 | MR. ESPER:  No cross, your Honor. |
| 15:31:03 | 10 | THE COURT:  Mr. Mayr? |
| 15:31:03 | 11 | MR. MAYR:  No questions either, your Honor. |
| 15:31:05 | 12 | THE COURT:  Any redirect? |
| 15:31:05 | 13 | MR. GARDNER:  Yes, your Honor. |
| 15:31:07 | 14 | RE-DIRECT EXAMINATION |
| 15:31:07 | 15 | BY MR. GARDNER: |
| 15:31:09 | 16 | Q.   So was Fernando Garcia with Carlos Nayen when you were told |
| 15:31:13 | 17 | to buy Blues Ferrari at any cost? |
| 15:31:15 | 18 | A.   Yes. |
| 15:31:17 | 19 | Q.   And was Fernando Garcia next to you when you were raising |
| 15:31:21 | 20 | your hand for the bid on Blues Ferrari? |
| 15:31:24 | 21 | A.   No.  He wasn't with me. |
| 15:31:25 | 22 | Q.   Was he with Carlos Nayen? |
| 15:31:27 | 23 | A.   Yes. |
| 15:31:28 | 24 | Q.   Why didn't you tell Garcia you were kidnapped? |
| 15:31:40 | 25 | A.   I believed that that was something that I had to keep for |

| | | |
|---|---|---|
| 15:31:46 | 1 | myself.  I mean, something that I couldn't be, you know, telling |
| 15:31:49 | 2 | anyone.  Even if they ask me, those people asked me what happened |
| 15:31:56 | 3 | to me, I had to say it was an accident, that I went to an |
| 15:32:01 | 4 | accident. |
| 15:32:01 | 5 | Q.   And, again, I'm showing you 324B.  Ms. Sims, would you lower |
| 15:32:08 | 6 | the lights for me, please? |
| 15:32:27 | 7 | Your Honor, may I do the old school route, publish |
| 15:32:30 | 8 | these directly to the jury, since the glare's on the screen for |
| 15:32:34 | 9 | them to look at? |
| 15:32:36 | 10 | THE COURT:  No.  I'm not going to take the time for |
| 15:32:38 | 11 | that.  They'll have the pictures. |
| 15:32:43 | 12 | Q.   (BY MR. GARDNER) 324B, Mr. Del Rayo, were these injuries |
| 15:32:47 | 13 | visible during the time that you were bidding on Blues Ferrari? |
| 15:32:51 | 14 | A.   Yes. |
| 15:32:58 | 15 | Q.   And 324 -- or, sorry, 359B, was your hand injury, the |
| 15:33:05 | 16 | surgery from your hand still visible when you were filling out |
| 15:33:07 | 17 | that check? |
| 15:33:07 | 18 | A.   Yes, sir. |
| 15:33:10 | 19 | Q.   When Mr. Sanchez asked you before the break about this |
| 15:33:14 | 20 | payment to you from Nayen.  Do you recall that? |
| 15:33:20 | 21 | A.   Yes. |
| 15:33:21 | 22 | Q.   How does Guillermo Herrera relate to that loan as Nayen |
| 15:33:26 | 23 | called it? |
| 15:33:26 | 24 | A.   At the end, when I got the money from him, he asked me to |
| 15:33:30 | 25 | get that money in cash for Guillermo Herrera. |

| 15:33:35 | 1 | Q.   So the loan that you got from Nayen was for? |

15:33:35  1   Q.   So the loan that you got from Nayen was for?

15:33:39  2   A.   Was for Guillermo Herrera.

15:33:41  3   Q.   Guillermo Herrera.

15:33:47  4           THE COURT:  Tell me that again.  Went to where?

15:33:50  5           THE WITNESS:  Excuse me?

15:33:51  6           THE COURT:  Where did the money go to?

15:33:52  7           THE WITNESS:  To Guillermo Herrera.  Guillermo Herrera

15:33:57  8   was the person that introduced Carlos Nayen.

15:33:59  9   Q.   (BY MR. GARDNER) He was the politician?

15:34:00  10  A.   Yes.  Is.

15:34:01  11  Q.   Is a politician.  Do you know who this woman is, Maria Emma

15:34:08  12  Salman-Rocha?

15:34:09  13  A.   No, sir.

15:34:13  14  Q.   Pass the witness, your Honor.

15:34:15  15          THE COURT:  Any further questions?

15:34:16  16          MS. WILLIAMS:  No, your Honor.

15:34:18  17          MR. SANCHEZ:  No, your Honor.

15:34:20  18          MR. ESPER:  No, your Honor.

15:34:21  19          THE COURT:  May this witness be excused?  You may be

15:34:26  20  excused, sir.  You may call your next witness.

15:34:33  21          MR. GARDNER:  Thank you, your Honor.  The government

15:34:34  22  would call Jeff Tebow.

15:35:22  23          (Witness sworn.)

15:35:33  24          THE COURT:  Sir, tell us your full name and spell your

15:35:38  25  last.

15:35:40   1          THE WITNESS:  My name is Jeff Tebow.  Last name

15:35:45   2   spelled, T-E-B-O-W.

15:35:47   3          THE COURT:  You may proceed.

15:35:48   4      JEFF TEBOW, called by the Government, duly sworn.

15:35:48   5                  DIRECT EXAMINATION

15:35:48   6   BY MR. GARDNER:

15:35:49   7   Q.   Thank you, your Honor.

15:35:50   8          Mr. Tebow, you and I have met before; is that correct?

15:35:53   9   A.   Yes, sir.

15:35:54  10   Q.   And if you will, could you please turn and introduce

15:35:56  11   yourself to the jury?  Tell them a little bit about yourself, who

15:36:00  12   you are, and how old you are, and what you do for a living.

15:36:02  13   A.   My name is Jeff Tebow.  I'm from Piedmont, Oklahoma.  I'm

15:36:06  14   the general manager and chief financial officer of Heritage

15:36:10  15   Place, horse sale auction company, located in Oklahoma City.  I

15:36:14  16   am 46 years old.

15:36:15  17   Q.   If you will, sir, could you tell the jury what Heritage

15:36:19  18   Place does?

15:36:19  19   A.   Yes.  Heritage Place is a horse sale auction company.  We've

15:36:23  20   been in existence for, I believe, 37 years.  We're the premier

15:36:28  21   quarter horse sale facility in the world for racing quarter

15:36:31  22   horses.

15:36:31  23   Q.   And, sir, I want to turn your attention to some of the

15:36:34  24   individuals you've been involved with.  First of all, do you know

15:36:38  25   or did you know a Ramiro Villarreal?

| | | |
|---|---|---|
| 15:36:40 | 1 | A.   Yes, sir. |
| 15:36:40 | 2 | Q.   And how did you know him as it relates to the auction |
| 15:36:44 | 3 | business, sir? |
| 15:36:44 | 4 | A.   Ramiro Villarreal was a customer of Heritage Place for a |
| 15:36:47 | 5 | number of years.  He bought a lot of horses. |
| 15:36:49 | 6 | Q.   Did he buy horses for himself or was he acting as an agent? |
| 15:36:53 | 7 | A.   It appeared that he was acting as an agent. |
| 15:36:57 | 8 | Q.   And what type of, say, stock or horses, for lack of a better |
| 15:37:05 | 9 | term, would he buy?  Quality, I guess, is the better term. |
| 15:37:07 | 10 | A.   For the most part, they were the better end -- what we call |
| 15:37:10 | 11 | the better end of the bloodstock of the higher pedigrees, the |
| 15:37:14 | 12 | better quality of horse. |
| 15:37:16 | 13 | Q.   And was there a point when Mr. Villarreal stopped showing |
| 15:37:19 | 14 | up? |
| 15:37:19 | 15 | A.   Yes, sir. |
| 15:37:20 | 16 | Q.   And who showed up in his place? |
| 15:37:28 | 17 | A.   His name was Carlito and Fernando is all I knew them by. |
| 15:37:33 | 18 | Q.   And how did you relate them to being a replacement for |
| 15:37:37 | 19 | Ramiro Villarreal? |
| 15:37:39 | 20 | A.   Ramiro actually told me that some of the customers that he |
| 15:37:43 | 21 | was buying for were now -- that he was no longer buying for them |
| 15:37:48 | 22 | and that they had replaced him. |
| 15:37:52 | 23 | Q.   And if you will, can you describe to the jury the |
| 15:37:56 | 24 | relationship between Carlitos -- the person you know as Carlitos |
| 15:38:01 | 25 | and Fernando Garcia?  Who was the boss?  Who was the worker? |

15:38:05  1   A.   It seemed like Fernando, Carlito would have been in charge,

15:38:10  2   but they were always -- most of the time that they were together.

15:38:13  3   But oftentimes, I dealt with Fernando probably more than Carlito.

15:38:18  4   Q.   And did Carlito speak English?

15:38:20  5   A.   A little bit.  Not very much but just a little bit.

15:38:23  6   Q.   And how about Fernando?

15:38:24  7   A.   Yes.  He was fluent.

15:38:27  8   Q.   Now, I want to turn your attention to the sale of a horse

15:38:30  9   named Dashin Follies.  Could you tell the jury about the value of

15:38:36  10  Dashin Follies?

15:38:37  11  A.   Yes, sir.  Dashin Follies was a mare.  I believe we sold in

15:38:42  12  January what we refer to as the winter mixed sale in 2010.  She

15:38:47  13  was probably one of the highest-priced mares that we'd ever sold

15:38:52  14  at Heritage Place.  She was a brood mare that had offspring.  She

15:38:57  15  had been a dam offspring of some very valuable horses in our

15:39:02  16  industry, and we sold that mare at that sale.

15:39:05  17  Q.   And in our conversations, you used a phrase, to play at the

15:39:12  18  elite as it relates to Dashin Follies.  What did you mean by

15:39:14  19  that?

15:39:14  20  A.   Would you repeat that, please?

15:39:15  21  Q.   Play at the elite or play at the elite level?

15:39:19  22  A.   Yeah.  Well, in our industry, mares like Dashin Follies

15:39:23  23  don't come along very often.  They're referred to as what we

15:39:26  24  refer to as a blue hen mare.  They're the best of the best.  And

15:39:31  25  we were very honored as an auction company to get the opportunity

| | | |
|---|---|---|
| 15:39:34 | 1 | to sell that mare, and so, we sold her at that winter mixed sale |
| 15:39:40 | 2 | in -- I believe the final bid price was $875,000. |
| 15:39:47 | 3 | Q.   And who acted as the agent for that sale? |
| 15:39:51 | 4 | A.   Tyler Graham. |
| 15:39:53 | 5 | Q.   Now, do you know a Jose Trevino? |
| 15:39:56 | 6 | A.   Yes, sir. |
| 15:39:56 | 7 | Q.   And how do you know him, sir? |
| 15:39:58 | 8 | A.   Just through the horse business. |
| 15:40:00 | 9 | Q.   Would he attend your auctions? |
| 15:40:02 | 10 | A.   Yeah, some of them.  Yes. |
| 15:40:03 | 11 | Q.   And when did you first start seeing him attending the |
| 15:40:06 | 12 | auctions? |
| 15:40:07 | 13 | A.   About the time -- I think the winter mixed sale of 2010, |
| 15:40:13 | 14 | somewhere around there. |
| 15:40:14 | 15 | Q.   So I want to talk about the sale of a horse named Blues |
| 15:40:21 | 16 | Ferrari.  Are you familiar with that horse, sir? |
| 15:40:22 | 17 | A.   Yes, sir. |
| 15:40:24 | 18 | Q.   I'm showing you -- they've been admitted -- Government's |
| 15:40:29 | 19 | Exhibit 359A, look at the screen in front of you, and 359B.  Do |
| 15:40:38 | 20 | you recognize those photographs, sir? |
| 15:40:40 | 21 | A.   Yes, sir. |
| 15:40:40 | 22 | Q.   Who took those photographs? |
| 15:40:42 | 23 | A.   I did. |
| 15:40:46 | 24 | Q.   Obviously you were in the office, but how did you take the |
| 15:40:49 | 25 | photographs? |

| | | |
|---|---|---|
| 15:40:50 | 1 | A.   With my cellphone. |
| 15:40:51 | 2 | Q.   Can you describe to the jury why you took those photographs? |
| 15:40:55 | 3 | A.   Yeah.  This particular photo was taken here, I'd never seen |
| 15:41:00 | 4 | this gentleman before who showed up at our auction, and he |
| 15:41:03 | 5 | purchased this horse called Blues Ferrari that was a full brother |
| 15:41:07 | 6 | to a world champion mare in our industry, a mare whose name was |
| 15:41:13 | 7 | Blues Girl Too.  So the pedigree for this horse was very |
| 15:41:17 | 8 | valuable.  However, I believe that this horse was a |
| 15:41:20 | 9 | three-year-old at the time that we sold him.  And in our |
| 15:41:23 | 10 | industry, that horse's premier racing age is as a two- and a |
| 15:41:27 | 11 | three-year-old.  And this horse had raced but, yet, had not done |
| 15:41:30 | 12 | very well. |
| 15:41:31 | 13 | This horse was consigned to our sale and it was |
| 15:41:35 | 14 | purchased by this gentleman here, and I'd never seen this |
| 15:41:40 | 15 | gentleman before.  So I was a bit alarmed who this person was and |
| 15:41:45 | 16 | how we were going to obtain the funds.  You know, this person was |
| 15:41:49 | 17 | going to be making payment on these horses, and this happens to |
| 15:41:53 | 18 | be when he was in an area in our office where they check out. |
| 15:41:59 | 19 | So I remember this because this horse brought a lot of |
| 15:42:02 | 20 | money for how well it happened to perform or the lack of |
| 15:42:07 | 21 | performance, I guess you would say, with this horse having.  I |
| 15:42:10 | 22 | think this horse sold in excess of 300 -- $310,000 and this |
| 15:42:14 | 23 | gentleman was writing two checks, one which we were told that we |
| 15:42:19 | 24 | could deposit immediately, and it seemed like the next check for |
| 15:42:24 | 25 | the other half.  The remaining amount was to be able to be |

15:42:28   1   deposited a week or ten days later, something of that nature.

15:42:32   2   Q.   Now, what was the physical condition of this gentleman when

15:42:34   3   you saw him?

15:42:35   4   A.   Well, that was another reason that I had some concern.   I

15:42:41   5   don't know.   The picture quality is not that good.   But this

15:42:44   6   person had looked like he had been in an accident or something

15:42:48   7   had happened.   I remembered his -- I think you can see there from

15:42:51   8   his left finger was swole up.   His head was kind of swole up, and

15:42:57   9   so, it was just really -- I don't know, I just -- I'd never seen

15:43:01   10  this person before and they were buying a very expensive horse,

15:43:04   11  and I was just very concerned with the transaction at the time.

15:43:09   12  Q.   Now, you know these two individuals sitting next to him in

15:43:13   13  359A?

15:43:15   14  A.   Well, yes, sir.   The one on the left standing up is

15:43:21   15  Fernando.   I can't tell from that picture who that is.

15:43:24   16  Q.   Okay.

15:43:25   17  A.   Sitting there.

15:43:26   18  Q.   And, again, obviously this is the individual who purchased

15:43:30   19  the horse, correct?

15:43:30   20  A.   Yes, sir.

15:43:32   21  Q.   Now, you said something about Blues Ferrari having good

15:43:35   22  pedigree but didn't race very well.   What condition was that

15:43:37   23  horse brought into the auction arena?

15:43:40   24  A.   I wasn't -- you know, when I manage a sale and I believe at

15:43:46   25  that sale, we had 12 or 1,300 horses.   But from time to time, I'm

15:43:52  1  out back, I'm in the sale ring, I'm just kind of all over the

15:43:55  2  place.  But I remembered what that mare looked like, and I wanted

15:43:58  3  to see the condition of this horse because I knew that there was

15:44:01  4  a good chance, you know, even with the pedigree that it would

15:44:04  5  sell well.

15:44:05  6       But I went and looked at the horse and I was a little

15:44:09  7  -- kind of amazed, I guess, if you will, the condition of the

15:44:12  8  horse wasn't that great.  I remember the horse being kind of

15:44:14  9  thin, and that's what I remembered about the horse.

15:44:21  10  Q.   I don't think we've learned yet, the jury hadn't learned

15:44:25  11  yet.  What -- when we need to -- I'm sorry.  I'm stepping over

15:44:29  12  myself.  When you bring a horse into the ring, when you want him

15:44:33  13  in good condition, can you define good condition or sale

15:44:36  14  condition for the jury?

15:44:37  15  A.   Well, I think the condition of a horse oftentimes depends on

15:44:42  16  what the horse's use is.  A horse -- for example, we sell a lot

15:44:48  17  of yearlings and those are horses that are one year old that are

15:44:51  18  going to be racing the next year, and oftentimes, it seems that

15:44:55  19  those horses that have a good hair coat, have good conditioning,

15:45:00  20  seem to obviously bring more money than one that has long hair,

15:45:05  21  doesn't appear that it's been cared for, you know.  A brood mare,

15:45:10  22  you know, is not as important as a horse of racing age, for

15:45:16  23  example, as Blues Ferrari was.

15:45:17  24       But the overall condition of a horse, just kind of the

15:45:22  25  better they look in their hair coating, if they're carrying good

15:45:25    1   weight and appear to be sound, seem to be advantageous in the

15:45:29    2   auction environment.

15:45:31    3   Q.   Were you surprised when Blues Ferrari went for $310,000?

15:45:35    4   A.   Yes, sir.

15:45:37    5   Q.   Now, I want to jump ahead to the fall mixed sale the same

15:45:41    6   year.  Were you familiar with Forty Horses, Number One Cartel,

15:45:47    7   Devils Ridge, Blues Girls Choice and Forty Force?

15:45:50    8   A.   I remember those horses being in our sale.  Yes, sir.

15:45:53    9   Q.   Again, the same question.  Were you surprised at the amount

15:45:56   10   that those four horses brought at that sale?

15:45:58   11   A.   Yes, sir.

15:46:05   12   Q.   I want to show you one Exhibit 28D.  Do you recognize that,

15:46:11   13   sir?

15:46:12   14   A.   Yes, sir.

15:46:13   15   Q.   You, in fact, gave that book to me some months ago, correct?

15:46:16   16   A.   Yes, sir.

15:46:17   17   Q.   And what is that book?

15:46:19   18   A.   This is our sale catalog from the 2012 January winter mixed

15:46:23   19   sale.

15:46:25   20   Q.   Your Honor, I offer Government's Exhibit 28D.

15:46:32   21            MR. DEGEURIN:  The entire book?

15:46:33   22            MR. GARDNER:  Yes.

15:47:06   23            MR. DEGEURIN:  Your Honor, I just think it's a lot for

15:47:11   24   the jury to digest.  But I won't -- I will not object.  It will

15:47:20   25   be under 403-type objection.  Maybe we'll work out a way to

15:47:24  1   identify the particular pages.

15:47:28  2           MR. GARDNER:  I could make sure the record shows that,

15:47:30  3   your Honor.

15:47:30  4           THE COURT:  I hear no objection.  28D is in.  And

15:47:36  5   however you want to proceed.

15:47:38  6           MR. GARDNER:  Thank you, your Honor.

15:47:38  7           THE COURT:  Just show counsel if he's going to change

15:47:41  8   it in any way.

15:47:41  9           MR. GARDNER:  Yes, sir.

15:47:42  10          THE COURT:  All right.

15:47:42  11  Q.   (BY MR. GARDNER) Mr. Tebow, what's the purpose of this book

15:47:45  12  or books like it?

15:47:48  13  A.   The purpose of that book is to identify the horses that will

15:47:51  14  be sold and each page in there is -- describes the name or the

15:47:57  15  horse, we call them a hip number, which is the order of sale

15:48:01  16  delivery.  A horse that's in there would have a particular order

15:48:04  17  and following a chronological order through the sale.

15:48:07  18  Q.   Again, this is the January -- let me just show it.  This is

15:48:12  19  the January 19th and 21st, 2012 sale?

15:48:16  20  A.   Yes, sir.

15:48:17  21  Q.   Now, does each horse that's listed in the book, is it

15:48:20  22  required to come through the sale ring at Heritage Place to be

15:48:23  23  sold?

15:48:24  24  A.   Yes, sir.

15:48:26  25  Q.   I want to go to a couple of examples.  Turn to page or,

15:48:34  1   rather, a horse with hip No. 210, and, Mr. Tebow, for the record,

15:48:42  2   that horse's name is Mr. Perrys Wine, correct?

15:48:44  3   A.   Yes, sir.

15:48:45  4   Q.   So what it says here across the very top, consigned by Lazy

15:48:49  5   E Ranch for La Feliz Montana Ranch.  What's that mean?

15:48:53  6   A.   Well, Lazy E Ranch is a business that represents consigners

15:49:04  7   in our industry, probably one of the biggest bloodstock agents

15:49:07  8   and consigners in our industry.  And this particular horse was

15:49:12  9   consigned by La Feliz Montana that had a complete disbursal in

15:49:18  10   that sale.

15:49:18  11   Q.   And so, by that consignment, is Lazy E Ranch the business

15:49:24  12   that's responsible for getting that horse to the auction,

15:49:27  13   prepping it and showing it?

15:49:28  14   A.   Well, they're certainly responsible for that horse while

15:49:33  15   it's at Heritage Place.  Yes, sir.

15:49:34  16   Q.   And how long before the auction are the consignees or --

15:49:39  17   yeah, consignees required to have the horse at Heritage Place?

15:49:42  18   A.   Usually it's -- I think our sale conditions require it to be

15:49:46  19   there the morning of.  But the majority of time, horses are there

15:49:49  20   a day or two before so that the buying public can show up and

15:49:53  21   inspect horses and allow Lazy E to do what their job is, which is

15:49:58  22   to show the horses and try to promote them.

15:50:01  23   Q.   So prior to this auction, do you have any knowledge where

15:50:05  24   this particular horse was?

15:50:06  25   A.   No.  I don't.

| | | |
|---|---|---|
| 15:50:09 | 1 | Q.   I want to show you one more.  Hip No. 444, Katies Sign, it's |
| 15:50:15 | 2 | signed by Jerry Windham.  Again, is Mr. Windham the person who is |
| 15:50:21 | 3 | bringing it to the auction for sale? |
| 15:50:23 | 4 | A.   Yeah.  He's the one that on our records show that he's the |
| 15:50:26 | 5 | consigner of the horse.  Yes, sir. |
| 15:50:27 | 6 | Q.   And, again, do you have any idea where Mr. Windham had |
| 15:50:31 | 7 | Katies Sign before the January 18, 2012 auction? |
| 15:50:35 | 8 | A.   I have no knowledge of where that mare was prior to the |
| 15:50:38 | 9 | sale. |
| 15:50:38 | 10 | Q.   And, sir, if you will generally explain what the rest of the |
| 15:50:41 | 11 | information is on this page. |
| 15:50:45 | 12 | A.   Well, if you can take it out a little bit further maybe. |
| 15:50:50 | 13 | You look at this page, would you slide it down just a little bit |
| 15:50:54 | 14 | so I could see the top?  Katies Sign is the name of the mare. |
| 15:50:57 | 15 | She's a 2000 sorrel mare.  Sorrel being the color.  And the SI |
| 15:51:01 | 16 | 104 refers to speed index of 104.  So it meant that that mare at |
| 15:51:08 | 17 | some point in her career had a speed index of 104, which is a |
| 15:51:11 | 18 | very high speed index that shows that she was a fast mare on the |
| 15:51:16 | 19 | race track. |
| 15:51:16 | 20 | The first dam, if you look at the pedigree, Vital Signs |
| 15:51:21 | 21 | is the sire or the father of that mare, if you will, and Runaway |
| 15:51:26 | 22 | Kate would be the mother.  And then, you go to the paternal and |
| 15:51:30 | 23 | maternal pedigree there, as you read down the page and, you know, |
| 15:51:35 | 24 | the different colors, the bold type, whether something's |
| 15:51:40 | 25 | capitalized in bold or is not capitalized but bold, it has |

| | | |
|---|---|---|
| 15:51:47 | 1 | different meanings, means that they were either a stakes winner |
| 15:51:51 | 2 | or a stakes placer. |
| 15:51:55 | 3 | So there's a lot of different things that as you become |
| 15:51:57 | 4 | familiar with this industry, you can read this pedigree and you |
| 15:52:00 | 5 | can see what the -- kind of what the lineage is, if you will. |
| 15:52:03 | 6 | Q.   So the history of the horse and the horse's parents? |
| 15:52:05 | 7 | A.   Yes, sir. |
| 15:52:05 | 8 | Q.   May I have one moment? |
| 15:52:12 | 9 | THE COURT:  Yes, sir. |
| 15:52:20 | 10 | Q.   (BY MR. GARDNER) Sir, do you know an individual named Luis |
| 15:52:23 | 11 | Aguirre? |
| 15:52:25 | 12 | A.   Well, the name sounds real familiar, but I can't picture.  I |
| 15:52:29 | 13 | know that we've done business, but I can't picture that person in |
| 15:52:33 | 14 | my mind right now. |
| 15:52:34 | 15 | Q.   Can you picture -- I know it's been a long time ago.  Can |
| 15:52:38 | 16 | you picture any of the horses he purchased? |
| 15:52:41 | 17 | A.   No, sir. |
| 15:52:43 | 18 | Q.   I won't ask you to.  Your Honor, I pass the witness. |
| 15:52:47 | 19 | CROSS-EXAMINATION |
| 15:52:47 | 20 | BY MS. WILLIAMS: |
| 15:53:04 | 21 | Q.   Mr. Tebow, my name's Christie Williams.  I just have a |
| 15:53:08 | 22 | couple of questions for you. |
| 15:53:09 | 23 | I bet if I give you this book, you could do this a lot |
| 15:53:16 | 24 | more quickly.  Can you find Blues Ferrari in this book for me? |
| 15:53:27 | 25 | So you're looking in the front and there's an index of all the |

| | | |
|---|---|---|
| 15:53:30 | 1 | hip numbers, and I think it's alphabetical. |
| 15:53:32 | 2 | A.   Yes, ma'am.  There's several different indexes.  There's one |
| 15:53:36 | 3 | that's indexed to horses and one is an index to the sire and dam. |
| 15:53:45 | 4 | Q.   So if you were -- |
| 15:53:46 | 5 | A.   I don't think Blues Ferrari is in this book, ma'am, based on |
| 15:53:50 | 6 | the index of horses here.  I don't think that was the sale that |
| 15:53:54 | 7 | that horse was in. |
| 15:53:55 | 8 | Q.   This is the 2012 book. |
| 15:54:04 | 9 |      You talked to the prosecutor about something called a |
| 15:54:09 | 10 | blue hen mare.  Do you remember that? |
| 15:54:11 | 11 | A.   Yes, ma'am. |
| 15:54:12 | 12 | Q.   Would Corona Cartel fall into that category? |
| 15:54:16 | 13 | A.   No, ma'am. |
| 15:54:16 | 14 | Q.   Why not? |
| 15:54:18 | 15 | A.   A blue hen mare is referring to the female line, a female |
| 15:54:23 | 16 | horse; so, therefore, that wouldn't be the case because Corona |
| 15:54:26 | 17 | Cartel is a stallion. |
| 15:54:27 | 18 | Q.   Makes a lot of sense. |
| 15:54:29 | 19 |      Who -- well, Corona Cartel is a famous stallion. |
| 15:54:36 | 20 | A.   Yes, sir -- I mean, yes, ma'am. |
| 15:54:37 | 21 | Q.   Okay.  Now we're even. |
| 15:54:41 | 22 |      Do you have any independent recollection of when that |
| 15:54:44 | 23 | horse was born? |
| 15:54:45 | 24 | A.   Corona Cartel, you're asking about? |
| 15:54:47 | 25 | Q.   I am. |

| | | |
|---|---|---|
| 15:54:48 | 1 | A.   Roughly 16, 17 years ago. |
| 15:54:50 | 2 | Q.   1994, does that sound about right? |
| 15:54:52 | 3 | A.   Yes, ma'am. |
| 15:54:52 | 4 | Q.   Okay. |
| 15:54:53 | 5 | A.   Probably. |
| 15:54:54 | 6 | Q.   And when that horse was first purchased, do you know the |
| 15:54:58 | 7 | first owner of Corona Cartel? |
| 15:55:00 | 8 | A.   I believe I do.  Yes, ma'am. |
| 15:55:01 | 9 | Q.   Who is that? |
| 15:55:02 | 10 | A.   Her name is Salina Molina. |
| 15:55:05 | 11 | Q.   All right.  And so, Salina Molina's father, I think, bought |
| 15:55:12 | 12 | that horse for her when it was a baby horse.  Is that -- do you |
| 15:55:16 | 13 | know?  It's okay if you don't know. |
| 15:55:17 | 14 | A.   Yeah.  I mean, I think the horse was purchased as a |
| 15:55:21 | 15 | yearling.  Yes, ma'am. |
| 15:55:21 | 16 | Q.   Right.  And after that, ran some races, won some money and |
| 15:55:28 | 17 | became a very valuable stallion? |
| 15:55:30 | 18 | A.   Yes, ma'am. |
| 15:55:31 | 19 | Q.   And after Salina Molina, who owned that horse? |
| 15:55:36 | 20 | A.   I believe the horse was what in our industry, what we term |
| 15:55:41 | 21 | syndicated. |
| 15:55:41 | 22 | Q.   Okay.  Do you know who syndicated? |
| 15:55:44 | 23 | A.   I believe Butch Wise syndicated that horse.  I believe it |
| 15:55:49 | 24 | was a syndicate manager. |
| 15:55:50 | 25 | Q.   And you had previously been asked a question by the |

15:55:55   1   prosecutor about the Lazy E Ranch.  Is that Butch Wise's ranch?

15:55:59   2   A.   Actually, I don't believe he owns it.  I think he's just a

15:56:03   3   manager or employee of some kind.

15:56:05   4   Q.   When you say the name Butch Wise and Lazy E, they kind of go

15:56:09   5   together in the horse industry?

15:56:09   6   A.   Yeah.  I think most people understand that the Lazy E horse

15:56:13   7   operation, it's a multifaceted deal.  But when you're talking

15:56:16   8   about the Lazy E Ranch and the racing quarter horses, I think Mr.

15:56:21   9   Wise has been there for a number of years, 15, 20 years.  So

15:56:23  10   yeah, I think that would be safe to say that.

15:56:25  11   Q.   And so, Corona Cartel gets syndicated, and the members of

15:56:31  12   the jury have heard a little bit about how that works.  And it's

15:56:36  13   managed, the syndicate, as I understand it -- and correct me if

15:56:39  14   I'm wrong -- is managed by the Lazy E Ranch.

15:56:43  15   A.   Yes.  I believe that's correct.

15:56:45  16   Q.   So if you are either, number one, part of that syndicate,

15:56:50  17   which means you get a couple of breedings a year, or, number two,

15:56:53  18   you buy a breeding of the horse Corona Cartel, you're going to

15:56:57  19   deal with the Lazy E Ranch?

15:56:59  20   A.   Yes, ma'am.

15:57:00  21   Q.   And because of the way bloodlines of horses work, if you

15:57:05  22   have a baby that is sired by Corona Cartel, you're likely going

15:57:11  23   to name the horse something-Cartel?

15:57:13  24   A.   Yes, ma'am.

15:57:14  25   Q.   Because, number one, you want people to know that that's the

15:57:18    1    bloodlines of that horse; is that right?

15:57:21    2    A.    Yes, ma'am.

15:57:22    3    Q.    And, number two, because they know that that's the

15:57:25    4    bloodlines of that horse, it probably makes it more valuable

15:57:28    5    theoretically?

15:57:29    6    A.    Theoretically.  Yes, ma'am.

15:57:31    7    Q.    So while we're talking about theory, when you sell a horse

15:57:40    8    at auction, you might predict in your own head, knowing what you

15:57:47    9    do about horses, how much the horse is going to sell for, but the

15:57:53   10    horse sells for however much somebody's willing to buy for it?

15:57:57   11    A.    Yes, ma'am.

15:57:58   12    Q.    And sometimes you're surprised by that?

15:57:59   13    A.    Yes, ma'am.

15:58:00   14    Q.    You said you were surprised by this horse sale.  This was

15:58:03   15    the first time you were surprised by how much a horse sold for or

15:58:06   16    didn't sell for?

15:58:07   17    A.    That's correct.

15:58:08   18    Q.    Now, who was the consigner of Blues Ferrari?

15:58:12   19    A.    I believe that was Southwest Stallion Station.

15:58:17   20    Q.    And tell the members of the jury when -- I mean, I think you

15:58:20   21    alluded to this a little bit on direct examination, but when

15:58:22   22    you're the consigner of a horse at auction, it's your

15:58:25   23    responsibility to prepare that horse and bring it and make sure

15:58:29   24    that it's -- looks good for the sale.

15:58:35   25    A.    Well, I would say that as a consigner, some consigners get

15:58:40    1    horses sent to them well in advance of an auction, and so, they

15:58:44    2    may have them for 90, 120 days, maybe longer.  They may have even

15:58:49    3    raised the horse for a consigner and they do that.  And I know

15:58:53    4    oftentimes, that a horse is brought to our sale as, for example,

15:58:59    5    Lazy E agent and Lazy E will have not seen or done anything to

15:59:05    6    that horse until it gets to the sale.  So, therefore, you know,

15:59:09    7    they're representing it at the sale, but they didn't have -- you

15:59:11    8    know, they didn't have it in their care, custody and control, if

15:59:14    9    you will, for a period of time where they could be responsible

15:59:17   10    for, really, the condition of the horse.

15:59:19   11         So I think that it's oftentimes, it's both.  They've

15:59:23   12    had it in their possession for a period of time, and other times,

15:59:27   13    a horse -- an owner just brings the horse to the sale, and they

15:59:30   14    put it with an agent, if you will, that's going to represent them

15:59:35   15    at the sale.

15:59:36   16    Q.   Who owns Southwest Stallion Station?

15:59:39   17    A.   I understand Dr. Charles Graham.  Dr. Charlie Graham.

15:59:44   18    Q.   And he also owns your auction or is part owner of the

15:59:48   19    auction.  Is that true?

15:59:49   20    A.   Yes, ma'am.  That's correct.

15:59:50   21    Q.   Does that make him your boss?

15:59:51   22    A.   Yes, ma'am.

15:59:52   23    Q.   All right.  And who runs Southwest Stallion Station?

15:59:56   24    A.   Dr. Graham and his grandson Tyler Graham.

16:00:01   25    Q.   And you're very familiar with those two?

| | | |
|---|---|---|
| 16:00:03 | 1 | A.    Yes, ma'am. |
| 16:00:07 | 2 | Q.    What does it mean to be Oklahoma-bred? |
| 16:00:15 | 3 | A.    Oklahoma-bred is a status that is designated on a horse |
| 16:00:22 | 4 | meaning that that horse was eligible to be accredited |
| 16:00:28 | 5 | Oklahoma-bred. |
| 16:00:29 | 6 | Q.    And explain to the members of the jury what that does, I |
| 16:00:32 | 7 | guess, potentially to the value of the horse. |
| 16:00:35 | 8 | A.    The reason that there are state-bred programs like, for |
| 16:00:39 | 9 | example, an Oklahoma-bred or there's Louisiana, New Mexico, |
| 16:00:42 | 10 | Texas, there's lot of them -- there is value in having an |
| 16:00:47 | 11 | Oklahoma-bred because of the state organizations, there is |
| 16:00:50 | 12 | additional money or incentives in the form of money that these |
| 16:00:55 | 13 | horses are eligible for.  So, as an example, you can have an |
| 16:01:00 | 14 | Oklahoma-bred horse that's racing, and if it's Oklahoma-bred and |
| 16:01:04 | 15 | it wins a race, the Oklahoma-bred fund would give additional |
| 16:01:08 | 16 | compensation or additional prize money for that horse, as well as |
| 16:01:12 | 17 | the mare owner could earn money every time the offspring ran, |
| 16:01:18 | 18 | even though they didn't own it anymore if they were the breeder |
| 16:01:21 | 19 | of it. |
| 16:01:22 | 20 | And the same for the stallion.  If the stallion bred |
| 16:01:24 | 21 | that offspring and foal that went on to win, even though they no |
| 16:01:28 | 22 | longer have ownership of, if the offspring is successful, the |
| 16:01:31 | 23 | mare owner and the stallion owner, as well as the owner of the |
| 16:01:35 | 24 | horse that's competing get additional incentives. |
| 16:01:39 | 25 | Q.    And what has to -- in timing, what has to happen during the |

16:01:44  1    breeding for the horse to be Oklahoma-bred?

16:01:47  2    A.   Well, I'm certainly no expert in the Oklahoma-bred program,

16:01:50  3    but I do know that the mare has to be in Oklahoma at the time of

16:01:57  4    foaling.  And when they are producing that foal, if you will,

16:02:03  5    during the breeding season, one year, they have to breed to an

16:02:08  6    instate stallion.  A stallion standing in Oklahoma and that's the

16:02:11  7    incentive to get stallions to come to the state of Oklahoma.  And

16:02:15  8    then, every other year, they can breed out of state, and they can

16:02:18  9    choose to breed to a stallion that may be located in Texas, or

16:02:22  10   Arkansas, or, really, anywhere else.  So that's kind of how that,

16:02:25  11   works, but I'm certainly no expert in it.

16:02:28  12   Q.   How did you meet Jose Trevino?

16:02:31  13   A.   I just met Jose there at Heritage Place -- I believe is

16:02:36  14   probably the first time I was introduced to him.

16:02:38  15   Q.   Did Tyler Graham introduce you to him or do you know?

16:02:40  16   A.   I don't know that.

16:02:42  17   Q.   Several times, you went to breakfast with Jose Trevino and

16:02:48  18   Tyler Graham and Dr. Graham.  Do you remember that?

16:02:51  19   A.   Yeah.  I've had several meals with Mr. Trevino.

16:02:55  20   Q.   And you're aware that he and Tyler Graham were associated

16:03:03  21   with this horse Tempting Dash?

16:03:06  22   A.   Yes, ma'am.

16:03:07  23   Q.   And Tyler Graham wanted that horse, Tempting Dash, didn't

16:03:14  24   he?  Do you know?

16:03:15  25   A.   Wanted him in what sense?

16:03:17  1   Q.   Wanted to own the horse.

16:03:21  2   A.   I don't know.  A sense of owning him, I don't know about

16:03:24  3   that.

16:03:25  4   Q.   Do you remember when Mr. Trevino decided that he was going

16:03:30  5   to buy some land?

16:03:31  6   A.   Yes, ma'am.

16:03:32  7   Q.   And you helped him with that, didn't you?

16:03:34  8   A.   No.  I didn't help him with the ranch, but I remember

16:03:37  9   talking with him, and we went and looked at a ranch together and

16:03:41  10  spent the afternoon and looking at a couple of places.  And he

16:03:43  11  would come to my office and talk about, you know, buying land in

16:03:47  12  Oklahoma.

16:03:48  13  Q.   And there were two reasons why Mr. Trevino wanted to buy

16:03:52  14  some land in Oklahoma.  Number one was the Oklahoma-bred program

16:03:56  15  I think that you just talked to the jury about.  Do you remember

16:04:00  16  that?

16:04:00  17  A.   Yes, ma'am.

16:04:01  18  Q.   And the second was because he wanted to get out of Texas and

16:04:05  19  get away from the influence of the Grahams.  Is that true?

16:04:09  20  A.   Yeah.  I don't know about the second statement, but I do

16:04:12  21  know that there's lots of people that wanted to come to Oklahoma

16:04:16  22  because of the Oklahoma-bred program.  Unfortunately, Texas

16:04:18  23  doesn't have the type of program some of the other states do, and

16:04:21  24  it's good ranching, good horse country up there.

16:04:23  25  Q.   Jose Trevino was always polite?

| | | |
|---|---|---|
| 16:04:27 | 1 | A.   Yes, ma'am. |
| 16:04:28 | 2 | Q.   Appeared to really want to do well in the horse business? |
| 16:04:31 | 3 | A.   Yes, ma'am. |
| 16:04:32 | 4 | Q.   Worked hard? |
| 16:04:33 | 5 | A.   Yeah.  Seemed to.  Very much.  Wanted to really -- tried |
| 16:04:38 | 6 | hard to become a student in the industry. |
| 16:04:40 | 7 | Q.   Asked a lot of questions, didn't he? |
| 16:04:42 | 8 | A.   Yes, ma'am. |
| 16:04:42 | 9 | Q.   No further questions. |
| 16:04:46 | 10 | THE COURT:  Mr. DeGeurin. |
| 16:04:48 | 11 | MR. DEGEURIN:  No questions, your Honor. |
| 16:04:49 | 12 | THE COURT:  Mr. Womack. |
| 16:04:50 | 13 | MR. WOMACK:  Yes, sir, thank you. |
| 16:04:51 | 14 | CROSS-EXAMINATION |
| 16:04:52 | 15 | BY MR. WOMACK: |
| 16:04:52 | 16 | Q.   Good afternoon, Mr. Tebow. |
| 16:04:54 | 17 | A.   Good afternoon. |
| 16:04:55 | 18 | Q.   I'm Guy Womack.  I'm from Houston and I represent Fernando |
| 16:04:59 | 19 | Garcia.  You know Fernando? |
| 16:05:00 | 20 | A.   Yes. |
| 16:05:01 | 21 | Q.   I'll get to that in just a minute.  But first, I want to ask |
| 16:05:04 | 22 | you about a couple of horses.  It was page 210 of this catalog |
| 16:05:09 | 23 | from 2012, had a horse named Mr. Perrys Wine.  Do you remember |
| 16:05:19 | 24 | that? |
| 16:05:19 | 25 | A.   Yes, sir. |

| | | |
|---|---|---|
| 16:05:20 | 1 | Q.   And Mr. Perrys Wine was a blue hen mare. |
| 16:05:23 | 2 | A.   Yeah.  She was a nice mare.  Yes, sir. |
| 16:05:27 | 3 | Q.   And do you recall that her sire was Mr. Jess Perry? |
| 16:05:32 | 4 | A.   Yes, sir. |
| 16:05:33 | 5 | Q.   And you know that Mr. Jess Perry was also the sire of the |
| 16:05:38 | 6 | horse Mr. Piloto? |
| 16:05:41 | 7 | A.   Yes, sir. |
| 16:05:42 | 8 | Q.   So she's the -- I guess you could say, she's the younger |
| 16:05:46 | 9 | half-sister of Mr. Piloto? |
| 16:05:48 | 10 | A.   Yeah.  I think she's the older half-sister, but yeah, |
| 16:05:51 | 11 | they're bred the same way. |
| 16:05:52 | 12 | Q.   Okay.  She was older than him? |
| 16:05:53 | 13 | A.   Yes. |
| 16:05:53 | 14 | Q.   Okay.  I'm sorry.  That's right.  She was sold in 2012, but |
| 16:05:58 | 15 | she was a brooding mare at that point? |
| 16:06:00 | 16 | A.   Yeah.  Just recalling the pedigree page a minute ago, I |
| 16:06:03 | 17 | believe she was foaled in maybe 2006?  Is that correct?  I'm not |
| 16:06:09 | 18 | supposed to be asking you questions. |
| 16:06:10 | 19 | Q.   That's fine.  You can ask me, but I won't know the answer. |
| 16:06:17 | 20 |      Regarding this Corona Cartel, as you know about Corona |
| 16:06:24 | 21 | Cartel, wasn't Corona, California the town where the breeder was |
| 16:06:28 | 22 | located when that horse was born? |
| 16:06:29 | 23 | A.   I have no idea.  I don't know that, sir. |
| 16:06:32 | 24 | Q.   Okay.  And you wouldn't know anything else about the naming |
| 16:06:36 | 25 | of that horse, would you? |

| | | |
|---|---|---|
| 16:06:37 | 1 | A.   No, sir. |
| 16:06:37 | 2 | Q.   Okay.  Back to Fernando Garcia.  You've seen Fernando at |
| 16:06:42 | 3 | your sale a number of times? |
| 16:06:43 | 4 | A.   Yes, sir. |
| 16:06:43 | 5 | Q.   And you know that he goes there and acts as a representative |
| 16:06:48 | 6 | for a number of buyers that are looking at horses. |
| 16:06:51 | 7 | A.   Yes, sir. |
| 16:06:52 | 8 | Q.   And he's bought horses himself there? |
| 16:06:54 | 9 | A.   I believe so.  Yes, sir. |
| 16:06:56 | 10 | Q.   And you know the name of his company Garcia Bloodstock and |
| 16:07:01 | 11 | Racing, don't you? |
| 16:07:08 | 12 | A.   Yes, sir. |
| 16:07:09 | 13 | Q.   Thank you.  No further questions, sir. |
| 16:07:17 | 14 | MR. ESPER:  No questions, Judge Sparks. |
| 16:07:19 | 15 | MR. MAYR:  No questions, your Honor. |
| 16:07:21 | 16 | THE COURT:  Any direct? |
| 16:07:22 | 17 | MR. GARDNER:  Yes, your Honor.  Thank you. |
| 16:07:23 | 18 | RE-DIRECT EXAMINATION |
| 16:07:23 | 19 | BY MR. GARDNER: |
| 16:07:25 | 20 | Q.   Mr. Tebow, Ms. Williams asked you about no guarantees.  Are |
| 16:07:31 | 21 | there any guarantees when selecting a horse on the bloodlines |
| 16:07:35 | 22 | that it's going to do well in racing? |
| 16:07:37 | 23 | A.   No, sir. |
| 16:07:38 | 24 | Q.   That's why they call it gambling, right? |
| 16:07:41 | 25 | A.   Yes, sir. |

| | | |
|---|---|---|
| 16:07:41 | 1 | Q.   She also asked you that a horse sells as much as a horse is |
| 16:07:47 | 2 | going to sell for.  Do you recall that question? |
| 16:07:48 | 3 | A.   Yes, sir. |
| 16:07:49 | 4 | Q.   I walk into Heritage Place, could I bid on a horse? |
| 16:07:53 | 5 | A.   Yes, sir.  We try to -- we have a procedure that we go |
| 16:07:56 | 6 | through that we want people to be kind of registered before they |
| 16:08:00 | 7 | buy, but unfortunately, that doesn't always happen. |
| 16:08:03 | 8 | Q.   So if I wanted to bid against Ms. Fernald here, she could |
| 16:08:08 | 9 | raise her hand on one bid and I could raise my hand on the next |
| 16:08:11 | 10 | bid? |
| 16:08:11 | 11 | A.   Yes, sir. |
| 16:08:12 | 12 | Q.   Do you know where Mr. Del Rayo got his money from to use to |
| 16:08:16 | 13 | pay for Blues Ferrari? |
| 16:08:18 | 14 | A.   No, sir. |
| 16:08:18 | 15 | Q.   Do you know where Mr. Trevino got his money from? |
| 16:08:20 | 16 | A.   No, sir. |
| 16:08:21 | 17 | Q.   Pass the witness, your Honor. |
| 16:08:24 | 18 | THE COURT:  Any other questions?  May this witness be |
| 16:08:29 | 19 | excused? |
| 16:08:30 | 20 | MR. FINN:  Your Honor, can you -- one second.  Thank |
| 16:08:32 | 21 | you. |
| 16:08:32 | 22 | THE COURT:  Yes, sir. |
| 16:08:44 | 23 | MS. WILLIAMS:  Nothing further, your Honor. |
| 16:08:46 | 24 | THE COURT:  May the witness be excused? |
| 16:08:53 | 25 | MR. MAYR:  Yes, your Honor. |

| | | |
|---|---|---|
| 16:08:53 | 1 | THE COURT:  Call your next witness. |
| 16:08:56 | 2 | MR. GARDNER:  Your Honor, the government calls Myrna |
| 16:09:00 | 3 | Reyes. |
| 16:09:40 | 4 | (Witness sworn.) |
| 16:10:04 | 5 | THE COURT:  Tell us your full name and spell your last |
| 16:10:07 | 6 | name, please. |
| 16:10:08 | 7 | THE WITNESS:  My name is Myrna Carolina Reyes, |
| 16:10:13 | 8 | R-E-Y-E-S. |
| 16:10:14 | 9 | MYRNA C. REYES, called by the Government, duly sworn. |
| 16:10:14 | 10 | DIRECT EXAMINATION |
| 16:10:14 | 11 | BY MR. GARDNER: |
| 16:10:15 | 12 | Q.   Thank you, your Honor. |
| 16:10:15 | 13 | Good afternoon, Ms. Reyes.  You and I met before, |
| 16:10:18 | 14 | correct? |
| 16:10:18 | 15 | A.   Yes, sir. |
| 16:10:19 | 16 | Q.   Could you please introduce yourself to the jury and explain |
| 16:10:21 | 17 | to them what you do for a living, please? |
| 16:10:22 | 18 | A.   I am a supervisory Customs and Border Protection officer. |
| 16:10:27 | 19 | Q.   And what are your current duties as a Customs and Border |
| 16:10:31 | 20 | Protection officer? |
| 16:10:33 | 21 | A.   I am assigned to the administrative office.  I oversee |
| 16:10:38 | 22 | several offices, which include human resource, payroll. |
| 16:10:43 | 23 | MR. ESPER:  Excuse me, your Honor, could the witness |
| 16:10:46 | 24 | speak up? |
| 16:10:47 | 25 | THE WITNESS:  I'm sorry. |

16:10:49   1   A.   I oversee several offices, human resources, payroll, time

16:10:54   2   and attendance, property, the privacy office, which deals with

16:10:59   3   records, workers compensation, among other administrative duties.

16:11:05   4   Q.   (BY MR. GARDNER) And what does the Customs and Border

16:11:08   5   Protection Office do?

16:11:10   6   A.   The agency, essentially in a nutshell, all it does is we

16:11:16   7   oversee the flow of legitimate travel and trade into the United

16:11:22   8   States from other countries.

16:11:23   9   Q.   And is there a record made any time someone enters the

16:11:27   10  United States?

16:11:27   11  A.   Yes, sir.

16:11:28   12  Q.   And what's the purpose of that record being made?

16:11:30   13  A.   For record purposes, archives.

16:11:36   14  Q.   And let's say I come into the United States.  What do I have

16:11:39   15  to do to gain entry and how is that reflected in the records?

16:11:45   16  A.   Everyone is now mandated to prove your citizenship and

16:11:50   17  identity.  You're required to begin -- if you're a nonimmigrant,

16:11:57   18  somebody who's not legally permitted to live in the United States

16:12:01   19  or U.S. citizen, you have to present a visa, a document that

16:12:05   20  allow lawful entry.  And then, a declaration is taken of any

16:12:14   21  goods that you will be bringing in.  There's also customs

16:12:18   22  regarding your -- the reason of your visit to the international

16:12:24   23  travel.

16:12:24   24  Q.   So when somebody comes across and presents identification,

16:12:27   25  whether it be a U.S. citizen or a foreign national, is there

16:12:31   1   someone there taking that information and making a data entry?

16:12:34   2   A.   Yes, sir.   There's always a primary officer and you may be

16:12:37   3   referred in for a secondary examination.

16:12:40   4   Q.   Okay.   Can you define what the purpose of a secondary

16:12:42   5   examination is?

16:12:46   6   A.   If there's any discrepancies in the primary inspection,

16:12:49   7   there may be some type of alert, as well, just refer the search.

16:12:56   8   Q.   And when those records were made, are they stored in some

16:12:58   9   type of database?

16:12:59  10   A.   Yes, sir.   There's several databases.

16:13:03  11   Q.   Officer Reyes, I'm showing you Government's Exhibit 401.

16:13:08  12   Did you prepare these documents at the request of my office for

16:13:12  13   trial here?

16:13:13  14   A.   Yes, sir.

16:13:14  15   Q.   All right.   And they are the crossing documents for a number

16:13:17  16   of individuals, correct?

16:13:17  17   A.   Yes, sir.

16:13:18  18   Q.   All right.   Now, there's a black mark on some of that

16:13:22  19   documents.   What is underneath those redacted portions?

16:13:26  20   A.   Some redactions, there's a couple of reasons why they may be

16:13:32  21   blacked out.   One of the reasons is some of the information as a

16:13:36  22   personal identifier for that particular primary officer who are

16:13:41  23   making these records, and they constitute an unwarranted invasion

16:13:44  24   of privacy.   And a second reason is some are internal codes,

16:13:49  25   technical codes that may disclose some law enforcement procedures

16:13:54  1   per our agency and eventually -- or it could be used to

16:13:58  2   circumvent the law if they fall into the wrong hands.

16:14:00  3   Q.   Okay.  And did you provide me with the exact set of the same

16:14:03  4   documents that did not have the redactions?

16:14:05  5   A.   Yes, sir.

16:14:05  6   Q.   All right.  And, your Honor, I'll represent to the Court I

16:14:07  7   provided those for inspection to defense attorneys.

16:14:10  8            Now, all of these documents with the entry, data entry

16:14:13  9   in them, are they made at the time a person crosses the border?

16:14:17 10   A.   Yes, sir.

16:14:18 11   Q.   And is the data kept in a database for later retrieval?

16:14:24 12   A.   Yes, sir.

16:14:24 13   Q.   And what's the name of that database?

16:14:26 14   A.   TECS.

16:14:26 15   Q.   And who has access to TECS?

16:14:29 16   A.   Customs and Border Protection officers, people who are

16:14:33 17   certified.

16:14:33 18   Q.   Your Honor, I'll offer Government's Exhibit 401, public

16:14:38 19   record under hearsay exception 803(8).

16:14:42 20            MR. ESPER:  Your Honor, may we approach there?

16:14:43 21            THE COURT:  You may.

16:14:49 22            (At the bench, on the record.)

16:14:58 23            MR. ESPER:  Your Honor, I'd object to the admission of

16:15:00 24   these particular documents.  They are -- they constitute hearsay

16:15:05 25   that are not an exception to the hearsay rule.  Number two, they

16:15:09    1    are made by someone we don't know who made the entries, and this

16:15:12    2    witness cannot testify to who made the entries.  I don't believe

16:15:18    3    they qualify as a business record exception under the hearsay

16:15:20    4    rule, but they are clearly hearsay, and I'd move to exclude them

16:15:24    5    on that basis, your Honor.

16:15:25    6              MR. GARDNER:  May I respond, your Honor?

16:15:28    7              MR. ESPER:  I would like to state, on top of that, it's

16:15:30    8    a violation of the confrontation clause.  We don't know who the

16:15:33    9    officer was that made the entries.  Won't be able to question

16:15:36   10    them.

16:15:36   11              MR. GARDNER:  Your Honor --

16:15:37   12              THE COURT:  The last objection's overruled.  Let me --

16:15:44   13    the document, are these entries?  Anybody else want to state any

16:16:07   14    objections?  The only thing that concerns me is you're going to

16:16:15   15    put these redacted ones in?

16:16:16   16              MR. GARDNER:  Yes, your Honor.  That's per the agency.

16:16:18   17    I could get the unredacted ones at the time.  The agency asked me

16:16:21   18    not to submit the unredacted because of their codes and their

16:16:24   19    personnel identifiers.

16:16:25   20              THE COURT:  Well, the only thing I don't like about it

16:16:29   21    is the jury not understanding what's on those.  Tell you what

16:16:33   22    we'll do.  The objections are overruled.  The 401 will be

16:16:37   23    admitted.  But let's put the unredacted in, and then, at the end

16:16:44   24    of the trial, you can move for substitution.

16:16:48   25              MR. GARDNER:  Yes, sir.  Thank you, your Honor.

| | | |
|---|---|---|
| 16:16:49 | 1 | THE COURT:  All right. |

16:17:00   2   Q.   (BY MR. GARDNER) Now, Officer Reyes, I just want to go

16:17:17   3   through two of these documents just so we could sort of explain

16:17:19   4   to the jury what we're looking at.  And, your Honor, per the

16:17:23   5   Court's ruling, I will substitute the unredacted ones at the end

16:17:27   6   of this case.

16:17:32   7        So these black marks are the redacted information on

16:17:35   8   the privacy.

16:17:36   9   A.   Yes, sir.

16:17:37   10   Q.   So what are we looking at here, Officer Reyes?

16:17:42   11   A.   This is secondary inspection archive.  They're pretty much

16:17:45   12   just documents what -- this vehicle was referred into for a

16:17:50   13   secondary inspection.  And gives by graphic information, the time

16:17:54   14   when the vehicle crossed and there's -- there should be a second

16:17:58   15   screen of this.

16:17:59   16        THE COURT:  Let me -- members of the jury, let me give

16:18:01   17   you an instruction here.  When you get these exhibits, they're

16:18:06   18   not going to be redacted.  At the end of the trial, I'm going to

16:18:12   19   substitute the exhibits that they're using that are redacted

16:18:16   20   because the redactions are either by regulation of statute

16:18:23   21   confidential information, but I don't want you guessing at what

16:18:27   22   those are because these are germane as to this lawsuit.  So while

16:18:32   23   you're looking at redacted ones, you will not be looking at

16:18:35   24   redacted ones when you deliberate.

16:18:38   25        MR. GARDNER:  Thank you, your Honor.

16:18:39    1    Q.   (BY MR. GARDNER) And so, with this particular incident, who

16:18:43    2    was the individual who crossed?

16:18:44    3    A.   Rodrigo Acevez-Avelose.

16:18:49    4    Q.   And on the date, what is the date of that crossing?

16:18:52    5    A.   I can't see it.  It's July 27th, 2010.

16:18:58    6    Q.   Okay.  You said there is a secondary page.

16:19:00    7    A.   It should be a second page right there.  Yes.

16:19:03    8    Q.   And what does that page represent?

16:19:06    9    A.   It gives just the reason -- the first line is the reason the

16:19:10   10    vehicle was referred in.  It's because there was some information

16:19:15   11    on Rodrigo Acevez-Avelose that merits secondary inspection.  And

16:19:20   12    below it, it says the reason for his visit, which is to go to

16:19:27   13    Eagle Pass to drop off friends.  And then, the fact that there

16:19:30   14    was negative findings, which means that there were -- there was

16:19:33   15    no reason to detain the gentleman or process him for any type of

16:19:38   16    adverse action.  There was just negative inspection and he could

16:19:42   17    be on his way.

16:19:43   18    Q.   And I'm showing you this third page.  Is that a list of the

16:19:45   19    individuals that was contained in that particular car?

16:19:48   20    A.   Yes, sir.

16:19:50   21    Q.   For the record, it's Rodrigo Avelose, the driver, and then,

16:19:55   22    an individual name Adan Farias, and then, an individual named

16:20:00   23    Moreno-Villanueva?

16:20:02   24    A.   Yes, sir.

16:20:03   25    Q.   Now, so those records that have been introduced, they should

16:20:09   1   reflect the crossings and the times of each individual crossing

16:20:12   2   into the United States.  Would that be a fair statement?

16:20:15   3   A.   Yes, sir.

16:20:15   4   Q.   Accurate statement?  While I'm showing you another one and

16:20:21   5   these are the records for who?

16:20:25   6   A.   This one is for Jose Trevino-Morales.

16:20:29   7   Q.   And the address, is that the correct address in the United

16:20:33   8   States?

16:20:33   9   A.   That's the address he -- the gentleman provided at the time

16:20:36   10   of his inspection.

16:20:40   11   Q.   And then, on this particular statement, what is this

16:20:46   12   statement?

16:20:46   13   A.   I'm sorry.

16:20:47   14   Q.   I'm sorry.  What's the purpose of this statement?

16:20:50   15   A.   It's a narrative regarding the -- that particular

16:20:54   16   inspection.  In this case, the gentleman must have been referred

16:20:58   17   in and it goes on to show what transpired during the inspection.

16:21:02   18   It was more so for -- anytime an individual is referred into

16:21:05   19   secondary to the office, per officer safety purposes, their

16:21:12   20   person's searched, they go through a pat-down, and you have to

16:21:15   21   record these on all pat-downs on a screen, which is this.

16:21:20   22   Q.   So, in particular, this shows that Mr. Jose Gerardo

16:21:24   23   Chapa-Garcia came across with Mr. Jose Trevino, correct?

16:21:27   24   A.   Their truck was -- yes.  He accompanied him.  Yes.  The

16:21:32   25   truck was driven by Jose Gerardo Chapa and Mr. Trevino was in

| | | |
|---|---|---|
| 16:21:37 | 1 | there. |
| 16:21:42 | 2 | Q.   And, Officer Reyes, instead of having you go through these, |
| 16:21:46 | 3 | I just want to ask you if you would agree with me these are the |
| 16:21:49 | 4 | crossing records for Felipe Quintero, Fernando Garcia, Rodrigo |
| 16:21:54 | 5 | Acevez, Carlos Nayen, Jose Trevino, Eusevio Huitron, |
| 16:22:02 | 6 | Colorado-Cessa, Raul Ramirez and Victor Lopez.  Would you agree |
| 16:22:05 | 7 | with that? |
| 16:22:05 | 8 | A.   Yes.  Those are the ones -- the names that you gave me. |
| 16:22:10 | 9 | Q.   May I have one moment, your Honor? |
| 16:22:12 | 10 | THE COURT:  You may. |
| 16:22:13 | 11 | MR. GARDNER:  I'll pass the witness, your Honor. |
| 16:22:28 | 12 | CROSS-EXAMINATION |
| 16:22:28 | 13 | BY MR. FINN: |
| 16:22:32 | 14 | Q.   May it please the Court.  Members of the jury. |
| 16:22:35 | 15 | Is it Agent Reyes or should I refer to you as Ms. |
| 16:22:38 | 16 | Reyes? |
| 16:22:38 | 17 | A.   Officer Reyes. |
| 16:22:39 | 18 | Q.   Officer?  Okay. |
| 16:22:41 | 19 | My name is David Finn.  We've never met or spoken, have |
| 16:22:45 | 20 | we? |
| 16:22:45 | 21 | A.   No, sir. |
| 16:22:45 | 22 | Q.   Okay.  And the purpose of keeping these records that the |
| 16:22:50 | 23 | government just introduced is to more or less keep an eye on and |
| 16:22:55 | 24 | monitor who's going in or leaving the country or, more |
| 16:22:59 | 25 | importantly, entering this country, correct? |

16:23:01   1    A.   Yes.  All applicants into the United States are.

16:23:05   2    Q.   We're all American citizens and there's been a whole lot

16:23:09   3    going on in the world that would give us concern about people

16:23:12   4    coming into our country, correct?

16:23:14   5    A.   Yes.

16:23:16   6    Q.   Now, when my client came in, the record indicates that he's

16:23:22   7    a U.S. citizen, no criminal history, but there was an intensive

16:23:28   8    search.  It says, I think, intensive?

16:23:30   9         THE COURT:  Mr. Finn, you probably need to tell her who

16:23:33   10   you represent.  If you did, I'm sorry.

16:23:36   11   Q.   (BY MR. FINN) Jose Trevino-Morales.  Okay, Judge, I should

16:23:41   12   have made that clear.

16:23:42   13        Intensive searches, intensive secondary searches.  Do

16:23:45   14   you remember seeing that in the records?

16:23:46   15   A.   Yes, sir.  That's the reason -- and everyone is subject to a

16:23:52   16   secondary inspection, regardless of whether or not there's an

16:23:54   17   alert.

16:23:54   18   Q.   What's an intensive secondary?

16:23:56   19   A.   That's what a second -- anything meriting other than a

16:24:01   20   primary inspection is a intensive search.

16:24:03   21   Q.   Let me see if I understand how the process works.  I'm

16:24:06   22   coming into the United States, I showed my passport and I may be

16:24:12   23   able to go through the, you know, the nine items or less line, go

16:24:16   24   through the express lane, so to speak.  On the other hand, I

16:24:19   25   might get pulled aside and you might say, Mr. Finn, we've got

```
16:24:23   1   some questions for you, correct?
16:24:25   2   A.   Yes, sir.
16:24:25   3   Q.   We want to go through your pockets and see what you have on
16:24:29   4   your person, right?
16:24:30   5   A.   Yes, sir.
16:24:31   6   Q.   We might want to go through your cellphone and look at all
16:24:36   7   of your e-mail messages, your photographs, get information from
16:24:40   8   my cellphone, right?
16:24:41   9   A.   Yes, sir.
16:24:42  10   Q.   And even -- the jury's heard this -- take photographs of
16:24:46  11   what's on my phone, correct?  And make copies is what I meant,
16:24:53  12   really.
16:24:54  13   A.   I don't -- yeah.  We can search all electronics if that's
16:24:59  14   what you're asking.  Yes.
16:25:01  15   Q.   So my grandparents came here from Ireland, okay, but let's
16:25:04  16   say that they thought the government thought that I was a suspect
16:25:07  17   with the IRA, or that my brothers were suspects with the IRA, and
16:25:11  18   I entered the United States.  You all have the ability and the
16:25:16  19   means legally to go through my phone and see if David Finn is
16:25:21  20   calling brother Sean Finn, or Patrick Finn, or -- you can go
16:25:27  21   through and pull up this information to see if there's a
16:25:30  22   connection, right?
16:25:30  23   A.   Yes, sir.
16:25:33  24   Q.   Y'all do this all the time.  It's a standard technique,
16:25:35  25   correct?
```

16:25:37  1   A.    It's at the discretion of the officer.

16:25:40  2   Q.    Okay.  Well, let's say that my brothers have an $8 million

16:25:47  3   bounty on their head.  They are wanted big-time.  Might that be

16:25:51  4   the sort of occasion where someone would want to go through my

16:25:54  5   phone?

16:25:56  6   A.    It could be, but again, that's at the discretion -- I don't

16:26:00  7   know what the reason for that secondary inspection was.

16:26:03  8   Q.    Might that be a reason that any questioning or interrogation

16:26:07  9   of me at the border might be videotaped?

16:26:13  10  A.    It could be, but again.

16:26:16  11  Q.    Audio-taped?

16:26:18  12  A.    We do not do any types of recordings.  Those type of

16:26:23  13  recording for Customs and Border Protection, my agency, we do --

16:26:28  14  okay.  My agency that inspected -- the initial agency would not

16:26:34  15  do that; however, if other agencies come in, they would.

16:26:37  16  Q.    Okay.  So if the FBI, the DEA, the Secret Service said,

16:26:43  17  David Finn's brothers are bad guys and we think Finn's up to no

16:26:47  18  good, we want another agency to do a video recording or an audio

16:26:54  19  recording, that can be done and that is done, correct?

16:26:57  20  A.    Again, we do not -- Customs and Border Protection does not

16:27:01  21  do that.  The agency would come in and do that themselves there

16:27:04  22  at our secondary inspection and they do it.  It's -- they take

16:27:09  23  over their inspection there.

16:27:10  24  Q.    Okay.  Maybe I'm being obtuse.  That's what my wife tells me

16:27:14  25  on a daily basis.

16:27:17  1        I'm coming across the border.  The FBI, the DEA, Secret

16:27:22  2   Service, Treasury, IRS, some agency says, we don't like Finn's

16:27:28  3   brothers, we don't like Finn, this is a great opportunity to pull

16:27:32  4   him out of line, interrogate him, then not your agency but

16:27:37  5   another agency could do video-recording of the interview or the

16:27:42  6   questioning, correct?

16:27:44  7   A.   Again, they handle their inspection and interview rooms.

16:27:50  8   Unfortunately, I don't know what goes -- because they are now

16:27:53  9   conducting their own inspection, we allow them to use the holding

16:27:57 10   rooms.  We would not be involved.

16:27:59 11   Q.   Okay.  You allow these other agencies to use the holding

16:28:02 12   rooms, right?

16:28:03 13   A.   They could use the premises.  Yes.

16:28:05 14   Q.   And with Jose's, my client's situation, it wasn't just a

16:28:11 15   little knock-knock, let's talk, you know, where are your

16:28:15 16   brothers.  We're talking about a detention for 45 minutes to an

16:28:19 17   hour, correct?

16:28:21 18   A.   I would have to see the record again.  Unfortunately, I

16:28:24 19   don't recall.  I ran many records.  All I did was just run them

16:28:28 20   and redact them.  I didn't -- I'm not certain what it reads.

16:28:32 21   Q.   Okay.  And if somebody is uncooperative or, in this case, a

16:28:37 22   horse's rear end, that might make it into the report, and it

16:28:41 23   would say the person was combative, abusive, confrontational,

16:28:46 24   something like that, correct?

16:28:48 25   A.   It could.  Again, the narrative is written by the inspecting

16:28:51  1    officer.

16:28:52  2    Q.   And if they think that I'm a sneaky son of a gun and I'm

16:28:56  3    being evasive, that might make it into a report, correct?

16:28:59  4    A.   Again, it's at the discretion of the officer who writes up

16:29:02  5    the narrative.

16:29:03  6    Q.   So what conclusion, if any, should this jury draw from the

16:29:13  7    fact that there's no mention of my client being sneaky, evasive,

16:29:17  8    deceptive, argumentative, or anything like that?  Can they draw

16:29:21  9    any conclusion from the absence of all those records?

16:29:24  10             MR. GARDNER:  Your Honor, I'm going to object.  The

16:29:26  11   jury can draw their own conclusions.  Form of the question.

16:29:29  12             THE COURT:  Just redo the question.  What the jury is

16:29:36  13   going to infer, one way or the other, is the jury's business, but

16:29:38  14   you can rephrase.

16:29:40  15             MR. FINN:  Okay.  Fair enough, Judge.

16:29:41  16   Q.   (BY MR. FINN) Ma'am, if my client told the agents at the

16:29:45  17   border, I am not proud of my brothers and they have made my life

16:29:50  18   a living hell for the last three years, would that be included in

16:29:55  19   the report?

16:29:56  20   A.   Not necessarily.  No.  The reason for that report is that

16:30:01  21   particular screen is an IOL, and what it is is to record the

16:30:06  22   pat-down more so than anything, the reason for the search.

16:30:09  23   Q.   Okay.  Ma'am, the government, a moment ago, Mr. Gardner put

16:30:14  24   on the screen a portion of one of these records, and in this

16:30:25  25   report that's now in evidence, it says that officer somebody,

16:30:31   1   it's redacted, which is the fancy way of saying blacked out --

16:30:34   2   officer blacked out, made copies of the driver, Mr. Trevino's

16:30:39   3   pocket trash and faxed the copies per lookout request.  Do you

16:30:46   4   remember seeing that?

16:30:46   5   A.   Again, I recall having -- I ran a lot of records.  But

16:30:52   6   that's what it reads.

16:30:54   7   Q.   If my client Jose Trevino-Morales has an inordinate amount

16:30:59   8   of cash on him, would that go in the record?

16:31:01   9   A.   If it's a declaration over $10,000, yes, it would be.

16:31:05   10   Q.   So if it's not there, it's not there.  Fair?

16:31:08   11   A.   Yes.

16:31:10   12   Q.   If my client tried to bring a gun, or a knife, or some

16:31:13   13   illegal substance into the country and was caught, dope, drugs,

16:31:19   14   cocaine, marihuana, methamphetamine, would that make it in the

16:31:22   15   record?

16:31:22   16   A.   It would be a different report in that system.  Yes.

16:31:26   17   Q.   Okay.  But we would have a record at least?

16:31:27   18   A.   Yes, sir.

16:31:28   19   Q.   Correct?

16:31:29   20   A.   Yes, sir.

16:31:30   21   Q.   Now, when it says that my client, Jose Trevino-Morales, was

16:31:36   22   pulled from the express lane and put in a room and questioned,

16:31:40   23   you're not free to just get up and walk out the door, are you?  I

16:31:43   24   mean, it's a custodial situation.  You're not free to just leave,

16:31:48   25   are you?

| | | |
|---|---|---|
| 16:31:48 | 1 | A.   You're detained.  Yes. |
| 16:31:50 | 2 | Q.   You are detained.  And there's not a lawyer present to tell |
| 16:31:52 | 3 | you how to answer the questions, right? |
| 16:31:54 | 4 | A.   No, sir. |
| 16:31:57 | 5 | Q.   It's agents of the government and the citizen who's being |
| 16:32:02 | 6 | pulled into the room, correct? |
| 16:32:03 | 7 | A.   Yes, sir. |
| 16:32:05 | 8 | Q.   So when it says that the agents performed an immediate |
| 16:32:09 | 9 | pat-down, an immediate pat-down, does that mean this, immediate |
| 16:32:15 | 10 | pat-down? |
| 16:32:16 | 11 | A.   Yes, sir. |
| 16:32:16 | 12 | Q.   For officer safety? |
| 16:32:18 | 13 | A.   Yes.  All persons who are escorted into the secondary area, |
| 16:32:21 | 14 | which is the area -- behind the secure door have to be -- have to |
| 16:32:27 | 15 | go through a pat-down. |
| 16:32:28 | 16 | Q.   So when it says officer safety, that doesn't mean that Jose |
| 16:32:31 | 17 | made threats against police, right?  You put that in every form |
| 16:32:36 | 18 | where there's a secondary.  You say it's for officer safety, |
| 16:32:39 | 19 | correct? |
| 16:32:40 | 20 | A.   It's for officer safety.  Pat-downs are done for officer |
| 16:32:44 | 21 | safety. |
| 16:32:44 | 22 | Q.   My point is that goes into every form of every citizen that |
| 16:32:48 | 23 | gets pulled into the room is going to say in the form that you're |
| 16:32:51 | 24 | doing that for officer safety, correct? |
| 16:32:54 | 25 | A.   Yes. |

16:32:54   1   Q.   It doesn't mean that Jose threatened anyone or that anyone

16:32:58   2   thought that he was a terrorist, right?

16:33:02   3   A.   No, sir.  I -- no.

16:33:04   4   Q.   Okay.  Now, there's another entry in another record where

16:33:16   5   Jose was coming back to the country via pedestrian walk.  And

16:33:25   6   again, there's a pat-down for officer safety with negative

16:33:30   7   findings and then, subject Trevino was placed and secured in IPT

16:33:39   8   hard secondary.  What does that mean?

16:33:42   9   A.   That's the immigration processing area, immigration

16:33:46   10  processing team area, which is essentially the same secondary

16:33:49   11  area.  Our bridges are not segregating two different areas.

16:33:55   12  Q.   So, again, just pulled out of the express lane, he gets put

16:33:59   13  in for second -- hard secondary questioning, and, again, we have

16:34:04   14  negative findings, even though y'all went through his clothes,

16:34:07   15  you went through his books, you went through his phone, and you

16:34:12   16  also found coloring books and crayons and toiletries.  Really

16:34:19   17  nothing that's not consistent with somebody that's got two young

16:34:23   18  children, crayons and coloring books.  Nothing else, right?

16:34:26   19  A.   Right.

16:34:27   20  Q.   Did you think that it would be beneficial for this jury to

16:34:41   21  be able to see and hear what my client sounded like and looked

16:34:46   22  like when he's getting pulled into these rooms reentering the

16:34:51   23  country?  You think that would be of some benefit to this jury?

16:34:53   24        MR. GARDNER:  Your Honor, we object, again, to the form

16:34:55   25  of the question.  It's not relevant what --

16:34:57  1            THE COURT:  I'll sustain the objection to the question

16:35:02  2  asked.

16:35:05  3  Q.   (BY MR. FINN) To the best of your knowledge, there's no

16:35:08  4  videotape of any of these interrogations, is there, to the best

16:35:11  5  of your knowledge?

16:35:12  6  A.   I wouldn't know, sir.

16:35:14  7  Q.   Fair enough.  Thank you.  Pass the witness, your Honor.

16:35:19  8            THE COURT:  Mr. DeGeurin.

16:35:20  9            MR. DEGEURIN:  No questions.

16:35:21 10            THE COURT:  Mr. Womack.

16:35:22 11            MR. WOMACK:  Thank you.

16:35:23 12                    CROSS-EXAMINATION

16:35:23 13  BY MR. WOMACK:

16:35:29 14  Q.   Good afternoon, Officer Reyes.

16:35:30 15  A.   Hello.

16:35:31 16  Q.   Again, what we're talking about is Government's Exhibit 401.

16:35:52 17  And you had border crossing records for a number of different

16:35:57 18  individuals, correct?

16:35:58 19  A.   Yes, sir.

16:35:59 20  Q.   I'll show you the ones pertaining to Fernando Garcia.  And

16:36:17 21  this is the first page of the stack.  And it shows that Fernando

16:36:27 22  Garcia came across the border near Roma, Texas and that was on

16:36:34 23  April 3rd of 2006?

16:36:37 24  A.   Yes, sir.

16:36:43 25  Q.   And he was the only one in the vehicle, correct?

203

```
16:36:47   1   A.   As documented, yes.

16:36:49   2   Q.   I'm sorry?

16:36:49   3   A.   As documented on there, yes.  Just one.  One person.

16:36:53   4   Q.   So that means it was him.  He was alone?

16:36:55   5   A.   Yes.

16:36:56   6   Q.   Okay.  And the second page said, K-9 and Buster were used

16:37:21   7   during the inspection?

16:37:23   8   A.   Yes, sir.

16:37:23   9   Q.   What is Buster?

16:37:25  10   A.   It's an unobtrusive device used to measure the density of a

16:37:32  11   vehicle or any object.

16:37:35  12   Q.   Okay.  And so, in addition to looking in the vehicle and

16:37:40  13   searching his person, y'all used both a dog, K-9, and this device

16:37:46  14   called a Buster, and it came back negative results?

16:37:51  15   A.   Yes.

16:37:52  16   Q.   And negative results means good results, there was nothing

16:37:56  17   illegal at all?

16:37:57  18   A.   That's correct.

16:37:58  19   Q.   Okay.  Mr. Garcia told you -- or when he told the agents

16:38:16  20   that he was coming back from a weekend trip in Miguel Aleman.  Do

16:38:20  21   you see that?

16:38:20  22   A.   Yes, sir.

16:38:21  23   Q.   Now, Miguel Aleman is the Mexican city directly across the

16:38:25  24   bridge from Roma, Texas?

16:38:26  25   A.   I believe so.  Yes.
```

16:38:28  1   Q.   On April 16th of 2006, Fernando Garcia came across that same

16:38:48  2   location, at Roma?

16:38:51  3   A.   Yes, sir.

16:38:51  4   Q.   And, again, he was the only person in the car, correct?

16:39:02  5   A.   Yes, sir.  That's correct.  Yes.

16:39:12  6   Q.   And this inspection lasted about 14 minutes?

16:39:16  7   A.   Yes, sir.  That's what the officer entered on the screen.

16:39:25  8   Q.   And he showed y'all his identification and the inspection

16:39:32  9   was negative and you also did a -- or they.  I say y'all.  Border

16:39:39  10  Patrol did a check on NCIS.  Tell the jury what NCIS refers to.

16:39:44  11  A.   NCIC is a law enforcement database that shows any type of

16:39:50  12  record.

16:39:51  13  Q.   I said NCIS.  I meant NCIC.  NCIC stands for the National

16:39:59  14  Criminal Information Center; is that right?

16:40:02  15  A.   Yes, sir.

16:40:03  16  Q.   And that's a federal database that law enforcement officers

16:40:07  17  all over the country can access to see if there's any warrants or

16:40:12  18  any kind of information on that individual; is that correct?

16:40:15  19  A.   Yes, sir.

16:40:16  20  Q.   Now, what is TECS, T-E-C-S?

16:40:19  21  A.   I'm not certain of the accuracy of the acronym because we

16:40:23  22  just -- for the most part, we usually use acronyms, but I think

16:40:26  23  it's a Treasury Enforcement Communication System.  That's the

16:40:29  24  Customs database.

16:40:30  25  Q.   Oh, okay.

| | | |
|---|---|---|
| 16:40:31 | 1 | A. Customs and Border Protection. |
| 16:40:33 | 2 | Q. And, again, everything came back negative for Mr. Garcia? |
| 16:40:36 | 3 | A. Yes, sir. That's correct. That's what it says. |
| 16:40:40 | 4 | Q. Now, both of these were in 2006 that we're looking at so |
| 16:40:49 | 5 | far. I want to show you one, the next one was July 23rd, 2009. |
| 16:40:56 | 6 | Do you see that? |
| 16:40:57 | 7 | A. Yes, sir. |
| 16:40:58 | 8 | Q. And, again, that's Fernando Garcia? |
| 16:41:00 | 9 | A. Yes, sir. |
| 16:41:01 | 10 | Q. And, again, he was alone. Correct? |
| 16:41:09 | 11 | A. Yes, sir. |
| 16:41:12 | 12 | Q. And this was about a 13-minute search. |
| 16:41:18 | 13 | A. Yes, sir. |
| 16:41:20 | 14 | Q. Would you say? |
| 16:41:21 | 15 | A. From 9:15 to 9:28. |
| 16:41:24 | 16 | Q. And so, your document says it was about a 13-minute search? |
| 16:41:28 | 17 | A. That's what the officer entered. Yes. |
| 16:41:33 | 18 | Q. And here, he was checked, he was actually selected for |
| 16:41:37 | 19 | A-TCET outbound inspection; is that right? |
| 16:41:40 | 20 | A. Yes, sir. |
| 16:41:41 | 21 | Q. Tell us what that is. What is an A-TCET outbound |
| 16:41:49 | 22 | inspection? |
| 16:41:50 | 23 | A. That's also an acronym for a group that -- what they do are |
| 16:41:57 | 24 | also intensive inspections. They randomly select people. |
| 16:42:01 | 25 | Q. Okay. |

| | | |
|---|---|---|
| 16:42:02 | 1 | A.   For inspection.  Further inspections.  That's all they do |
| 16:42:05 | 2 | all day. |
| 16:42:06 | 3 | Q.   And they asked him, among other things, if he was carrying |
| 16:42:09 | 4 | money in excess of $10,000? |
| 16:42:10 | 5 | A.   That's correct. |
| 16:42:11 | 6 | Q.   And he said, no, I was not, correct? |
| 16:42:14 | 7 | A.   Yes, sir. |
| 16:42:16 | 8 | Q.   They asked him if he was carrying ammunition, guns, or |
| 16:42:20 | 9 | exporting any kind of commercial goods, correct? |
| 16:42:22 | 10 | A.   Yes, sir. |
| 16:42:23 | 11 | Q.   And he said, no, I'm not doing any of that? |
| 16:42:26 | 12 | A.   That's correct.  Yes. |
| 16:42:27 | 13 | Q.   And the search confirmed that? |
| 16:42:31 | 14 | A.   Yes, sir. |
| 16:42:38 | 15 | Q.   And the last one we have for Mr. Garcia is August 5th of |
| 16:42:49 | 16 | 2009, and this is at the Hidalgo International Bridge? |
| 16:42:54 | 17 | A.   Yes, sir. |
| 16:42:58 | 18 | Q.   Is that in the town of Hidalgo, Texas or do you know? |
| 16:43:01 | 19 | A.   Yes, sir. |
| 16:43:01 | 20 | Q.   Okay.  And, again, Mr. Garcia was by himself, correct? |
| 16:43:15 | 21 | A.   Yes. |
| 16:43:16 | 22 | Q.   And this search in the afternoon lasted about 15 minutes? |
| 16:43:19 | 23 | A.   Yes, sir. |
| 16:43:23 | 24 | Q.   And, again, he had been selected for this A-TCET outbound |
| 16:43:31 | 25 | inspection, correct? |

16:43:32    1    A.   Yes, sir.

16:43:32    2    Q.   And he denied carrying excessive cash, guns, ammunition, or

16:43:38    3    any kind of commercial goods, correct?

16:43:41    4    A.   Yes, sir.

16:43:43    5    Q.   And the inspection confirmed that?

16:43:46    6    A.   Yes.  He was inspected.  Yes.

16:43:58    7    Q.   Your Honor, I have no further question.

16:44:02    8         THE COURT:  Mr. Esper.

16:44:04    9         MR. ESPER:  Yes, your Honor.

16:44:05   10                    CROSS-EXAMINATION

16:44:05   11    BY MR. ESPER:

16:44:12   12    Q.   Ms. Reyes, these queries that you ran for border crossings,

16:44:20   13    that covered every port-of-entry in the state of Texas?

16:44:24   14    A.   Yes, sir.

16:44:25   15    Q.   And do you know how many different ports-of-entry there are

16:44:28   16    in the state?

16:44:30   17    A.   I'm not certain, no.  Exactly, no.

16:44:32   18    Q.   Okay.  Certainly there's El Paso?

16:44:34   19    A.   Oh, yeah.

16:44:35   20    Q.   Eagle Pass?

16:44:35   21    A.   Eagle Pass, Del Rio, Hidalgo, Roma, Laredo.  Laredo has

16:44:39   22    four.  I mean, each city might have several bridges.  Laredo has

16:44:43   23    four bridges.

16:44:44   24    Q.   And some bridges have a lot more traffic than other bridges,

16:44:47   25    correct?

| | | |
|---|---|---|
| 16:44:48 | 1 | A.   Yes, sir. |
| 16:44:48 | 2 | Q.   These are the query that was made concerning the border |
| 16:44:58 | 3 | crossings of Eusevio Maldonado-Huitron, correct? |
| 16:45:04 | 4 | A.   Yes, sir. |
| 16:45:04 | 5 | Q.   And I believe -- could you tell the ladies and gentlemen how |
| 16:45:27 | 6 | many crossings there were in 2009 for Mr. Huitron? |
| 16:45:37 | 7 | A.   In 2009 only? |
| 16:45:39 | 8 | Q.   Yes. |
| 16:45:40 | 9 | A.   There's one here for 11-30. |
| 16:45:43 | 10 | Q.   November 30th? |
| 16:45:54 | 11 | A.   That's it.  In this stack, that's all. |
| 16:46:09 | 12 | Q.   I'm sorry, for 2009 there was just one? |
| 16:46:11 | 13 | A.   In this stack, yes.  Here.  Yes. |
| 16:46:15 | 14 | Q.   Are there others that I'm missing?  So there's one in 2009 |
| 16:46:32 | 15 | on November 30th? |
| 16:46:34 | 16 | A.   November 30th, 2009.  Yes. |
| 16:46:36 | 17 | Q.   Okay.  And that particular -- was that -- where does that |
| 16:46:40 | 18 | occur, do you know? |
| 16:46:41 | 19 | A.   This one, it was in Eagle Pass, Texas. |
| 16:46:43 | 20 | Q.   And was he referred to secondary? |
| 16:46:45 | 21 | A.   This car was referred to secondary.  Yes. |
| 16:46:47 | 22 | Q.   Okay.  And the secondary inspection lasted, what, about |
| 16:46:49 | 23 | eight minutes? |
| 16:46:50 | 24 | A.   From 19:27 to 19:35. |
| 16:46:54 | 25 | Q.   Okay.  And there's a number of reasons -- well, law |

16:46:59  1  enforcement doesn't have to have a reason when you come into the

16:47:02  2  United States to look in your vehicle, search your person, et

16:47:05  3  cetera, do they?

16:47:05  4  A.    No.

16:47:06  5  Q.    Okay.  And, of course, not only are -- when you come to a

16:47:10  6  port-of-entry to primary inspection, the officer will ask, are

16:47:15  7  you bringing anything into the United States, correct?

16:47:17  8  A.    Yes, sir.

16:47:18  9  Q.    Money, contraband, liquor, cigarettes, all of that, correct?

16:47:23  10  A.    Yes.

16:47:24  11  Q.    And if a person gives a no declaration, sometimes they wave

16:47:29  12  them through, sometimes they can refer them to secondary without

16:47:32  13  even having a reason, correct?

16:47:34  14  A.    Sure.

16:47:35  15  Q.    And at some ports-of-entries, they have canines who are

16:47:38  16  doing advance searches or sniff searches of vehicles before they

16:47:42  17  even come to the booth, correct?

16:47:45  18  A.    Yes, sir.

16:47:45  19  Q.    And if that dog alerts, that's going to send them over to

16:47:49  20  secondary?

16:47:49  21  A.    Yes.

16:47:49  22  Q.    Okay.  Now, this vehicle on November 30, 2009 Mr. Huitron

16:47:54  23  was in, and you don't know whether that occurred at Thanksgiving

16:47:59  24  in 2009, do you?

16:48:01  25  A.    No, sir.

210

16:48:02  1  Q.   Okay.  Now, let's talk about 2010.  How many crossings were

16:48:08  2  there?

16:48:09  3  A.   There was one on December 24th.

16:48:12  4  Q.   Okay.

16:48:13  5  A.   2010.

16:48:14  6  Q.   2010.  And he was not referred to secondary?

16:48:20  7  A.   There's a crossing.  No.  I don't know.

16:48:23  8  Q.   But it's December 24th, which is Christmas Eve, correct?

16:48:27  9  A.   Right.

16:48:27  10 Q.   Now, 2011, there's a total of five, is there not?

16:48:31  11 A.   There was one on March 10th, April 11th, June 30th and July

16:48:40  12 28th and December 30th.  I'm sorry, that's 2011.  Yeah.

16:48:59  13 Q.   Okay.  So the first one is March the 10th of 2011, correct?

16:49:05  14 A.   Yes.

16:49:06  15 Q.   And all the rest are subsequent to March of 2011, correct?

16:49:12  16 A.   Yes, sir.

16:49:19  17 Q.   Now, whenever a person is referred to secondary, are they

16:49:24  18 usually allowed to sit on the benches, or are they sometimes

16:49:28  19 taken to a station house?

16:49:29  20 A.   It could be either or depending on the officer's discretion

16:49:34  21 on whatever type of inspection is going on.

16:49:36  22 Q.   Would it reflect on that particular document or not?

16:49:39  23 A.   On the crossings on these particular crossings?

16:49:44  24 Q.   Yes?

16:49:44  25 A.   No.  It does not say that.

16:49:45  1   Q.   And sometimes when they're taken on the bench, they're just

16:49:47  2   told to sit there.  And sometimes when they're taken to a station

16:49:51  3   house, they're told to sit on a bench, correct?

16:49:53  4   A.   Yes.  You could wait outside.  Or you could wait in the

16:49:56  5   office before the secure door.  It could be after the secure

16:49:59  6   door.

16:49:59  7   Q.   Sometimes if you even go to the office, sometimes they even

16:50:02  8   handcuff you to a chair?

16:50:03  9   A.   If it's behind the secure door, yes.  You are secured.

16:50:06  10  Q.   Okay.  But that record, again, would not indicate whether

16:50:10  11  that happened?

16:50:10  12  A.   This particular screen is just his crossing.  This is just a

16:50:15  13  crossing to start with.  There's different screens for different

16:50:17  14  documentation.

16:50:18  15  Q.   They're also looking for currency, are they not?

16:50:20  16  A.   For incoming currency, yes.

16:50:22  17  Q.   That's not reported?

16:50:23  18  A.   Yes.

16:50:24  19  Q.   Okay.  It's not a crime to bring currency in so long as you

16:50:28  20  fill out the form?

16:50:29  21  A.   So long as you declare over $10,000.

16:50:30  22  Q.   And is there a point where you have -- I mean, do you have

16:50:34  23  to have that form already filled out when you get to the

16:50:37  24  inspection booth?

16:50:37  25  A.   So long as you declare it to the primary inspection, you can

| | | |
|---|---|---|
| 16:50:40 | 1 | fill it out at the secondary area.  Or if you've already got it |
| 16:50:43 | 2 | filled out, you just hand it to the primary inspector or |
| 16:50:47 | 3 | secondary officer.  Probably have to declare it to a secondary |
| 16:50:50 | 4 | officer. |
| 16:50:51 | 5 | Q.   If there was a declaration made about money coming in, would |
| 16:50:54 | 6 | it be reflected on that query? |
| 16:50:56 | 7 | A.   Not on this particular screen.  This is just a crossing |
| 16:51:02 | 8 | again. |
| 16:51:02 | 9 | Q.   Okay.  Your Honor, I would move for the exhibit -- |
| 16:51:16 | 10 | demonstrative Exhibit EH-3 as a demonstrative exhibit, your |
| 16:51:20 | 11 | Honor. |
| 16:51:20 | 12 | MR. GARDNER:  No objection, your Honor. |
| 16:51:23 | 13 | MR. ESPER:  With that, I have no further question. |
| 16:51:25 | 14 | THE COURT:  Received as demonstrative.  EH-3. |
| 16:51:35 | 15 | Mr. Mayr. |
| 16:51:37 | 16 | MR. MAYR:  Thank you, Judge. |
| 16:51:38 | 17 | CROSS-EXAMINATION |
| 16:51:38 | 18 | BY MR. MAYR: |
| 16:51:52 | 19 | Q.   Good afternoon. |
| 16:51:53 | 20 | A.   Hello. |
| 16:51:53 | 21 | Q.   I'm going to make this really easy for you. |
| 16:51:56 | 22 | Your Honor, the government and I have -- we have |
| 16:51:58 | 23 | reached an agreement to stipulate that none of these records |
| 16:52:01 | 24 | contain any border crossing records that pertain to my client, |
| 16:52:04 | 25 | Jesus Huitron.  Is that acceptable? |

| | | |
|---|---|---|
| 16:52:06 | 1 | MR. GARDNER:  That's acceptable, your Honor. |
| 16:52:07 | 2 | THE COURT:  Okay. |
| 16:52:09 | 3 | MR. MAYR:  And I have nothing further.  Thank you, |
| 16:52:11 | 4 | ma'am. |
| 16:52:11 | 5 | THE COURT:  Any redirect? |
| 16:52:13 | 6 | MR. GARDNER:  No, your Honor.  May this witness be |
| 16:52:14 | 7 | excused? |
| 16:52:15 | 8 | MR. FINN:  Your Honor, if I may approach, Judge, I just |
| 16:52:17 | 9 | realized I forgot to ask a couple of questions.  Two or three. |
| 16:52:20 | 10 | THE COURT:  Okay. |
| 16:52:21 | 11 | RE-CROSS EXAMINATION |
| 16:52:21 | 12 | BY MR. FINN: |
| 16:52:23 | 13 | Q.   Ma'am, is it safe to say that when my client came -- well, |
| 16:52:29 | 14 | these records really just prove that my client Jose |
| 16:52:33 | 15 | Trevino-Morales, a U.S. citizen with no criminal history, visited |
| 16:52:37 | 16 | in Mexico and came back to the U.S. |
| 16:52:39 | 17 | A.   That's correct. |
| 16:52:40 | 18 | Q.   Is it unusual if somebody is born in another country, let's |
| 16:52:44 | 19 | say Mexico, for them to go back to the home country, for example, |
| 16:52:48 | 20 | to visit their 70-year-old ailing mother?  Is there anything |
| 16:52:52 | 21 | unusual about that? |
| 16:52:54 | 22 | A.   No, sir. |
| 16:52:55 | 23 | Q.   Is there anything sinister about that? |
| 16:52:58 | 24 | A.   No, sir. |
| 16:52:59 | 25 | Q.   And when these folks are handcuffed to a chair coming into |

| | | |
|--|--|--|
| 16:53:03 | 1 | the country and grilled about their brother's activity, they're |
| 16:53:07 | 2 | not given Miranda warnings, are they? |
| 16:53:11 | 3 | A.   No, sir.  They're not under arrest. |
| 16:53:12 | 4 | Q.   And Miranda means you've got the right to an attorney, |
| 16:53:16 | 5 | you've got the right to keep your mouth shut, et cetera, et |
| 16:53:18 | 6 | cetera, that the jury's familiar with.  So they're not even |
| 16:53:21 | 7 | warned when they're interrogated, right? |
| 16:53:23 | 8 | A.   They're not arrested, no. |
| 16:53:24 | 9 | Q.   They're not arrested, but they're in custody, handcuffed to |
| 16:53:28 | 10 | a chair? |
| 16:53:28 | 11 | A.   They're detained.  Yes. |
| 16:53:30 | 12 | Q.   They're detained? |
| 16:53:31 | 13 | A.   Yes. |
| 16:53:31 | 14 | Q.   With the handcuff to the chair? |
| 16:53:33 | 15 | A.   Yes. |
| 16:53:33 | 16 | Q.   Thank you.  That's all. |
| 16:53:36 | 17 | MR. GARDNER:  No, your Honor.  Thank you. |
| 16:53:37 | 18 | THE COURT:  You may be excused. |
| 16:53:45 | 19 | Okay.  Members of the jury, I intend to go to 6:00. |
| 16:53:47 | 20 | Does anybody need a little short break?  Call your next witness. |
| 16:53:53 | 21 | MS. FERNALD:  Government would call Brian Schutt. |
| 16:54:09 | 22 | MR. FINN:  Judge, could I approach real quick? |
| 16:54:21 | 23 | THE COURT:  Sure. |
| 16:54:21 | 24 | (At the bench, off the record.) |
| 16:54:21 | 25 | THE COURT:  All right.  Let's make it ten minutes. |

16:54:56   1          (Jury not present.)

16:55:03   2          THE COURT:  Ten-minute recess.

17:05:01   3          (Recess.)

17:05:28   4          (Jury present.)

17:06:31   5          THE COURT:  You may swear the witness.

17:06:33   6          (Witness sworn.)

17:06:51   7          THE COURT:  If you'll tell us your full name, please,

17:06:56   8   sir, and spell your last.

17:06:57   9          THE WITNESS:  Brian Schutt, S-C-H-U-T-T.

17:07:02  10      BRIAN SCHUTT, called by the Government, duly sworn.

17:07:02  11                     DIRECT EXAMINATION

17:07:03  12   BY MS. FERNALD:

17:07:03  13   Q.   And can you tell the ladies and gentlemen of the jury what

17:07:05  14   you do for a living?

17:07:06  15   A.   I'm an Irving Police officer.

17:07:07  16   Q.   How long have you been an Irving Police Department --

17:07:10  17   officer?

17:07:11  18   A.   Over 27 years.

17:07:13  19   Q.   And through the course of the 27 years, have you been

17:07:16  20   assigned to a task force?

17:07:18  21   A.   Yes, I have.

17:07:18  22   Q.   And what period of time have you been assigned to this task

17:07:22  23   force?

17:07:22  24   A.   Since 1998, all the way through now.

17:07:25  25   Q.   Can you tell the ladies and gentlemen of the jury just what

| | | |
|---|---|---|
| 17:07:27 | 1 | a task force is? |
| 17:07:29 | 2 | A.   A task force is a group of agencies that get together, |
| 17:07:32 | 3 | federal, could be state and local.  We work cases together |
| 17:07:37 | 4 | because we have different investigations where we're working, and |
| 17:07:40 | 5 | we can bring all these investigations together and work it. |
| 17:07:44 | 6 | Q.   And what is the name of the task force in which you're |
| 17:07:47 | 7 | employed? |
| 17:07:48 | 8 | A.   Waco Treasury Task Force. |
| 17:07:50 | 9 | Q.   And with the Waco Treasury Task Force, you work with the |
| 17:07:55 | 10 | IRS? |
| 17:07:55 | 11 | A.   Yes, I do. |
| 17:07:56 | 12 | Q.   How long have you worked with Steve Pennington? |
| 17:07:58 | 13 | A.   Since 1998. |
| 17:08:01 | 14 | Q.   Were you involved in the investigation of this particular |
| 17:08:05 | 15 | case? |
| 17:08:05 | 16 | A.   Yes, I am. |
| 17:08:06 | 17 | Q.   When did you start working on this case? |
| 17:08:08 | 18 | A.   Over two years ago. |
| 17:08:11 | 19 | Q.   In the course of your work, do you know if there were any |
| 17:08:15 | 20 | search warrants that were executed? |
| 17:08:17 | 21 | A.   Yes. |
| 17:08:17 | 22 | Q.   Tell me how many search warrants were executed. |
| 17:08:19 | 23 | A.   Seven. |
| 17:08:22 | 24 | Q.   Seven search warrants or seven locations? |
| 17:08:24 | 25 | A.   Seven locations. |

17:08:29  1   Q.   And do you know whether or not any subpoenas were issued?

17:08:32  2   A.   Yes.

17:08:33  3   Q.   How many subpoena requests were done in this particular

17:08:36  4   case?

17:08:36  5   A.   Approximately 200.

17:08:42  6   Q.   Can you tell the ladies and gentlemen of the jury what you

17:08:45  7   were tasked to do in your role for the jury trial?

17:08:51  8   A.   My major task was to try to follow the horses from when they

17:08:54  9   were purchased through the races, the stables, where they're

17:09:03  10   stabled at, AQHA records, who's the owners.  Anything to do with

17:09:10  11   the race horse itself.

17:09:14  12   Q.   And as you see these boxes that are lined up against the

17:09:18  13   jury box and lined up against these walls, did you go through all

17:09:21  14   these boxes?

17:09:21  15   A.   Yes.

17:09:22  16   Q.   So did you go through subpoena material and the search

17:09:26  17   warrant material in order to determine about the horses, where

17:09:31  18   they came from, who paid for them, other things?

17:09:34  19   A.   Yes.

17:09:41  20   Q.   Did you work on this by yourself?

17:09:43  21   A.   No.

17:09:44  22   Q.   Who did you work with?

17:09:45  23   A.   Kim Williams.

17:09:46  24   Q.   And is she sitting back in the courtroom right now in the

17:09:49  25   black suit and the red shirt?

17:09:51  1   A.   Yes.

17:09:52  2   Q.   How many hours did you spend going through these different

17:09:55  3   boxes with Investigator Williams?

17:09:59  4   A.   Thousands.

17:10:01  5   Q.   And were you also asked to put together a presentation for

17:10:06  6   this jury in order to track the ownership, the paying of the

17:10:10  7   bills, the boarding, the race earnings, the vet fees, and the

17:10:13  8   insurance of these particular horses?

17:10:15  9   A.   Yes.

17:10:21  10  Q.   Because of the voluminous nature of all of these documents,

17:10:25  11  were you asked to narrow the scope of your investigation to

17:10:28  12  particularly this?

17:10:29  13  A.   Yes.

17:10:30  14  Q.   Can you tell the ladies and gentlemen of the jury, after the

17:10:40  15  search warrants were conducted, how these pieces of evidence were

17:10:45  16  actually cataloged back at the office?

17:10:49  17  A.   Yes.

17:10:50  18  Q.   Please tell them.

17:10:52  19  A.   Once the -- example was we had boxes coming in from

17:10:57  20  Lexington for seized evidence.  We would go through that box.  If

17:11:03  21  we took evidence out of it, we would color-code a file, and then,

17:11:06  22  we put that box number on the cover of that file so that we knew

17:11:11  23  this is the evidence that came out of this box.

17:11:14  24  Q.   All right.  So if, for example, if you're in Lexington, you

17:11:21  25  know that those particular files were colored in orange; is that

17:11:26   1   correct?

17:11:26   2   A.   Yes.

17:11:28   3   Q.   Okay.  And so, you would take the document and you would

17:11:31   4   place it in the orange file folder?

17:11:33   5   A.   Yes.

17:11:34   6   Q.   And then, after it was placed in the orange file folder, how

17:11:37   7   would it be labeled?

17:11:38   8   A.   We would mark the box number, which is a B number, and the

17:11:43   9   box number itself.

17:11:45   10   Q.   And was this done with all the locations in this particular

17:11:48   11   case?

17:11:48   12   A.   Yes.

17:11:49   13   Q.   And why was that done?  What was the purpose of that?

17:11:52   14   A.   So we knew where the evidence came from.

17:11:57   15   Q.   And did you track all of these documents with certain B

17:12:00   16   numbers?

17:12:01   17   A.   Yes.

17:12:02   18   Q.   Okay.  Can you tell the jury about that?

17:12:05   19   A.   The B numbers is just the box itself, and the number behind

17:12:11   20   it, the FBI numbers it that way for their evidence as far as

17:12:15   21   logging it in.

17:12:16   22   Q.   And back to the horses of this particular case, did you look

17:12:22   23   at every single horse in this particular case?

17:12:25   24   A.   Yes.

17:12:26   25   Q.   How many horses did you look at?

17:12:28   1   A.   Over 500.

17:12:31   2   Q.   Were there some horses that you were unable to actually

17:12:35   3   track?

17:12:36   4   A.   Yes.

17:12:36   5   Q.   And why is that?

17:12:38   6   A.   If they're -- sometimes they're sold in private sales, there

17:12:41   7   is no record of that sale happening because it's a private sale.

17:12:46   8   So we don't have records for that.

17:12:50   9   Q.   In reference to AQHA, what were you looking for on those

17:12:58   10   particular records?

17:13:00   11   A.   Those records will actually show us the ownership as far as

17:13:05   12   how it goes through timeline.  It also shows leases and transfer

17:13:12   13   of horses, also.

17:13:14   14   Q.   What about the sales barns in this particular case?

17:13:18   15   A.   We subpoenaed several sales barns.

17:13:21   16   Q.   Can you tell the ladies and gentlemen of the jury the name

17:13:23   17   of the sales barns that we subpoenaed in this case?

17:13:25   18   A.   Ruidoso, Heritage Place, Los Alamitos, Eclipse sale and

17:13:33   19   Schvaneveldt sales.

17:13:34   20   Q.   There was also -- was there a Lazy E?

17:13:37   21   A.   That's not a sale barn.  That's a private ranch.

17:13:40   22   Q.   All right.  Other sales documents that you also obtained

17:13:43   23   through this, correct?

17:13:46   24   A.   Yes.

17:13:47   25   Q.   What about horsemen's accounts?  Can you tell the ladies and

17:13:51  1   gentlemen of the jury a little bit about what a horsemen's

17:13:52  2   account is?

17:13:54  3   A.   Each state has rules for a horsemen's account.  Basically

17:13:59  4   it's a checking account.  An example, in Los Alamitos, that race

17:14:02  5   track in California, you have an account there, if you have

17:14:06  6   horses and you can put money into this account to pay expenses

17:14:11  7   for those horses.  If they win, the race track will put money

17:14:17  8   into your account.  So you draw on it just like a checking

17:14:20  9   account.

17:14:21  10  Q.   And does it differ from state to state on whether or not the

17:14:25  11  horsemen's account is localized?

17:14:27  12  A.   Yes.

17:14:28  13  Q.   And can you -- that sounded like a weird question.  Can you

17:14:31  14  explain to the jury what I mean by that?

17:14:33  15  A.   In Texas, there's one local account that's for all the race

17:14:39  16  tracks.  And California, there's an account for every race track.

17:14:50  17  Q.   Did you also become familiar with the different entities for

17:14:55  18  businesses associated with this conspiracy?

17:14:59  19  A.   Yes.

17:15:00  20  Q.   Are you familiar with Tremor Enterprises?

17:15:03  21  A.   Yes.

17:15:03  22  Q.   And are you familiar who that is associated with?

17:15:06  23  A.   Jose Trevino.

17:15:07  24  Q.   What about ADT Petro Servicios?

17:15:10  25  A.   Francisco Colorado-Cessa.

| | | |
|---|---|---|
| 17:15:17 | 1 | Q.   I'm showing you now what has been marked as Government's |
| 17:15:28 | 2 | Exhibit, is that 325? |
| 17:15:29 | 3 | A.   325. |
| 17:15:29 | 4 | Q.   Thank you.   325.   Do you recognize this? |
| 17:15:32 | 5 | A.   Yes. |
| 17:15:32 | 6 | Q.   Have I asked for you to look at it before? |
| 17:15:35 | 7 | A.   Yes. |
| 17:15:35 | 8 | Q.   And what is this? |
| 17:15:38 | 9 | A.   This is a chart with four people listed with their companies |
| 17:15:44 | 10 | that they're involved with. |
| 17:15:45 | 11 | Q.   Okay.   Are they necessarily owners of these companies? |
| 17:15:48 | 12 | A.   No. |
| 17:15:49 | 13 | Q.   But they're involved with the companies? |
| 17:15:51 | 14 | A.   Yes. |
| 17:15:52 | 15 | Q.   Would this particular piece of evidence help you explain |
| 17:15:56 | 16 | your testimony to the jury today? |
| 17:15:59 | 17 | A.   Yes, it would. |
| 17:16:00 | 18 | Q.   Move for the introduction of Government's Exhibit 325 for |
| 17:16:11 | 19 | demonstrative purposes. |
| 17:16:12 | 20 | THE COURT:  Let's don't show it to the jury. |
| 17:16:14 | 21 | MS. FERNALD:  Sure. |
| 17:17:09 | 22 | MR. DEGEURIN:  May I make an objection at the bench, |
| 17:17:12 | 23 | your Honor? |
| 17:17:12 | 24 | THE COURT:  Well, sure. |
| 17:17:19 | 25 | (At th bench, on the record.) |

| | | |
|---|---|---|
| 17:17:29 | 1 | MR. DEGEURIN:  I object to the exhibit because the |
| 17:17:36 | 2 | photograph they have of Mr. Colorado is a booking photograph, and |
| 17:17:43 | 3 | it's -- my opinion, it displays him in a very poor light.  The |
| 17:17:49 | 4 | rest of them -- and the other ones -- |
| 17:17:52 | 5 | THE COURT:  Is there any other objections?  I have one. |
| 17:17:52 | 6 | MS. FERNALD:  What's that? |
| 17:17:59 | 7 | THE COURT:  On the right hand of the board, you've got |
| 17:18:01 | 8 | written there two words, it looks like.  I want -- I need for you |
| 17:18:15 | 9 | to tape over, or do something, the right hand up where you've got |
| 17:18:20 | 10 | the related -- |
| 17:18:22 | 11 | MR. MAYR:  Involved entity, I think it says. |
| 17:18:24 | 12 | MS. FERNALD:  Okay. |
| 17:18:25 | 13 | THE COURT:  Other than that, it's admissible and you'll |
| 17:18:30 | 14 | just cover that up. |
| 17:18:33 | 15 | MS. FERNALD:  Okay. |
| 17:19:10 | 16 | Q.  (BY MS. FERNALD) I'm showing you now what has been marked as |
| 17:19:13 | 17 | Government's Exhibit 310A, 311A and 312A.  Do you recognize these |
| 17:19:21 | 18 | documents? |
| 17:19:23 | 19 | A.   Yes. |
| 17:19:23 | 20 | Q.   What do you recognize these documents to be? |
| 17:19:25 | 21 | A.   These are illustrations of information that I put together |
| 17:19:31 | 22 | to show the ownership of horses.  Of certain horses.  The race |
| 17:19:38 | 23 | payment, training bill, veterinary bill, insurance fees, along |
| 17:19:43 | 24 | with some type of ownership of these horses. |
| 17:19:48 | 25 | Q.   And will these particular exhibits help you in summarizing |

| | | |
|---|---|---|
| 17:19:53 | 1 | your evidence for the jury in illustrating it? |
| 17:19:56 | 2 | A.   Yes, it will. |
| 17:19:58 | 3 | Q.   Move for the introduction of these Government's Exhibit |
| 17:20:03 | 4 | 310A, 311A and 312A for demonstrative purposes only, your Honor. |
| 17:20:16 | 5 | THE COURT:  Have counsel seen these? |
| 17:20:19 | 6 | MS. FERNALD:  They have been e-mailed to them over the |
| 17:20:21 | 7 | weekend, your Honor. |
| 17:20:48 | 8 | MS. WILLIAMS:  Your Honor, Judge, we did get these |
| 17:20:50 | 9 | yesterday morning, but the words are real -- |
| 17:20:54 | 10 | MR. DEGEURIN:  We can't see it.  In the form it came to |
| 17:20:57 | 11 | us, you cannot see it -- at least I couldn't see it on my |
| 17:21:00 | 12 | computer. |
| 17:21:00 | 13 | THE COURT:  Okay. |
| 17:21:01 | 14 | MR. DEGEURIN:  Still having a hard time. |
| 17:21:03 | 15 | THE COURT:  Well, look at it. |
| 17:22:19 | 16 | MR. DEGEURIN:  I object.  It's just for demonstratives |
| 17:22:23 | 17 | purposes?  Is that -- |
| 17:22:24 | 18 | THE COURT:  That's all it's offered. |
| 17:22:26 | 19 | MS. FERNALD:  That's correct. |
| 17:22:27 | 20 | MR. DEGEURIN:  All right.  I have no objection. |
| 17:22:29 | 21 | THE COURT:  310A, 311A, 312A are admitted for |
| 17:22:36 | 22 | demonstrative purposes. |
| 17:22:37 | 23 | Again, members of the jury, let me remind you that |
| 17:22:39 | 24 | means that all of the lawyers can use it in front of you, but |
| 17:22:43 | 25 | it's not evidence itself that should go back to you.  But a good |

17:22:47   1   way to look at it is in my day, whatever you would write on the

17:22:53   2   blackboard would be demonstrative evidence.  Now they've got all

17:22:57   3   these computers.

17:22:59   4           All right.  You may proceed.

17:23:00   5   Q.   (BY MS. FERNALD) Thank you.

17:23:02   6           And finally, I'm showing you right in front of you, the

17:23:05   7   notebooks.  I'm sorry, Government's Exhibit 310, 311 and 312.  Do

17:23:12   8   you recognize these notebooks?

17:23:13   9   A.   Yes.

17:23:13  10   Q.   What do you recognize these notebooks to be?

17:23:17  11   A.   These are the documents pertaining to each horse, and we

17:23:21  12   pulled these documents out of the evidence and subpoenas.

17:23:25  13   Q.   And when you say each horse, how many horses did you do in

17:23:28  14   preparation of your testimony today?

17:23:30  15   A.   For today, it's these three horses.

17:23:33  16   Q.   Okay.  There's three horses for those, correct?

17:23:35  17   A.   Yes.

17:23:36  18   Q.   All right.  And are these duplicate copies contained with --

17:23:41  19   that are contained in those boxes that have previously been

17:23:44  20   admitted?

17:23:45  21   A.   Yes.

17:23:45  22   Q.   And do you have the little exhibit stickers on each one of

17:23:49  23   these that pertains to that piece of evidence?

17:23:52  24   A.   Yes.

17:23:52  25   Q.   And do you also have the Bates stamp number on them?

17:23:55  1    A.    Yes.

17:23:56  2    Q.    Okay.  And Government's Exhibit 310 is a notebook.  Will it

17:24:02  3    correspond with the presentation that's going to be exhibited in

17:24:06  4    Government's Exhibit 310A?

17:24:08  5    A.    Yes.

17:24:09  6    Q.    All right.  Government's Exhibit 310 is which horse?

17:24:13  7    A.    Fly First Down.

17:24:14  8    Q.    Government's Exhibit 311 is which horse?

17:24:19  9    A.    Blues Girl Choice.

17:24:20  10   Q.    And Government's Exhibit 312, which horse is that?

17:24:23  11   A.    Blues Ferrari.

17:24:25  12   Q.    Move for the introduction of Government's Exhibit 310, 311

17:24:29  13   and 312.

17:24:35  14              MR. DEGEURIN:  I'm sorry.  Is that the same one we just

17:24:37  15   looked at?

17:24:38  16              MS. FERNALD:  It is.  It is the documents that have

17:24:40  17   already -- they're duplicate documents that the jury can take

17:24:44  18   back with them to look at these particular horses as it relates

17:24:47  19   with the presentation.

17:25:00  20              MR. DEGEURIN:  This may take a little while, your

17:25:02  21   Honor.

17:25:06  22              THE COURT:  Well, if they're already in evidence, but

17:25:07  23   go ahead and examine them.

17:25:09  24              MR. DEGEURIN:  Well, these are not in -- well, they're

17:25:12  25   in huge boxes.

| | | |
|---|---|---|
| 17:25:14 | 1 | THE COURT:  Yeah.  They're in -- okay. |
| 17:25:19 | 2 | MR. DEGEURIN:  Needle in a haystack is what I -- |
| 17:25:22 | 3 | MS. FERNALD:  Yes. |
| 17:25:23 | 4 | THE COURT:  Counsel, on 310, 311 and 312, we can let |
| 17:25:44 | 5 | the lawyers look at them after 5:00.  Can you proceed with |
| 17:25:48 | 6 | testimony until 5:00? |
| 17:25:51 | 7 | MS. FERNALD:  Yes, I can, your Honor. |
| 17:25:53 | 8 | THE COURT:  Then proceed. |
| 17:25:54 | 9 | MS. FERNALD:  Yes, your Honor. |
| 17:26:05 | 10 | THE COURT:  When I said 5:00, I really meant 6:00. |
| 17:26:07 | 11 | MS. FERNALD:  I understand. |
| 17:26:09 | 12 | THE COURT:  5:00 mountain time. |
| 17:26:15 | 13 | Q.  (BY MS. FERNALD) Can you pull up Government's Exhibit 310A, |
| 17:26:20 | 14 | please? |
| 17:26:24 | 15 | As you looked through the boxes on these particular |
| 17:26:27 | 16 | horses, we're going to do Fly First Down is going to be the first |
| 17:26:30 | 17 | horse that we did.  Did you include every single document that |
| 17:26:33 | 18 | pertained to Fly First Down? |
| 17:26:35 | 19 | A.  No. |
| 17:26:36 | 20 | Q.  Why not? |
| 17:26:38 | 21 | A.  Because some of the documents were duplicates and some of |
| 17:26:44 | 22 | them do not relate to an expense, or race payment, or ownership |
| 17:26:50 | 23 | records.  They just had no relevance. |
| 17:26:56 | 24 | Q.  Can you just go ahead and show the entire document? |
| 17:27:05 | 25 | The name of the horse I'm looking at at the top |

17:27:08   1   left-hand corner is Fly First Down, correct?

17:27:11   2   A.   That is correct.

17:27:12   3   Q.   And then, underneath that, I see that there are some box --

17:27:18   4   if you can kind of zoom into that, please.  It says, timeline of

17:27:26   5   payment of ownership underneath Fly First Down, correct?

17:27:31   6   A.   That is correct.

17:27:32   7   Q.   And there's also a box here that has the catalog or the

17:27:36   8   index for this particular diagram; is that right?

17:27:39   9   A.   That's correct.

17:27:40   10   Q.   Can you tell us about the different color-coding that is

17:27:43   11   done on these?  Are these randomly assigned?

17:27:45   12   A.   Yes.

17:27:45   13   Q.   And what was the purpose of the colors being used in this?

17:27:50   14   A.   The colors just make it easier to follow the evidence per

17:27:54   15   person.  So we just color-coordinated each person that the

17:27:59   16   document is associated with, so if somebody sees it, they'll go,

17:28:03   17   okay, this relates to this person.

17:28:06   18   Q.   And very randomly assigned, just like the search warrant

17:28:13   19   evidence, correct?

17:28:14   20   A.   That's correct.

17:28:14   21   Q.   All right.  And then, there's a line on the bottom.

17:28:17   22   Obviously, is this the timeline on this particular demonstrative

17:28:20   23   aid?

17:28:21   24   A.   Yes.

17:28:23   25   Q.   And there's also some line going up and down?

| | | |
|---|---|---|
| 17:28:27 | 1 | A.   Yes. |
| 17:28:27 | 2 | Q.   Going vertical.  What do those lines represent? |
| 17:28:31 | 3 | A.   Those will be dates for times of ownership. |
| 17:28:36 | 4 | Q.   And on the claims of ownership, we'll also see, later on, |
| 17:28:39 | 5 | some lines that are going to go crossways or horizontal.  What |
| 17:28:45 | 6 | are those lines going to represent? |
| 17:28:46 | 7 | A.   Those represent expenses or income. |
| 17:28:50 | 8 | Q.   If you go up another category, there's going to be expenses |
| 17:28:53 | 9 | or income.  You go up another line, what is there going to be |
| 17:28:56 | 10 | there? |
| 17:28:57 | 11 | A.   There will be stable fees, race entries. |
| 17:29:03 | 12 | Q.   Veterinary fees and, also, insurance will be another |
| 17:29:05 | 13 | category; is that correct? |
| 17:29:06 | 14 | A.   Yes. |
| 17:29:07 | 15 | Q.   All right.  Let's take the first entry that is contained on |
| 17:29:11 | 16 | 310A.  What is the first entry that you have on it? |
| 17:29:18 | 17 | A.   This is September 3rd, 2010, Fly First Down was sold at |
| 17:29:23 | 18 | Ruidoso sales for $300,000. |
| 17:29:28 | 19 | Q.   And what was the date on that? |
| 17:29:30 | 20 | A.   September 3rd, 2010. |
| 17:29:33 | 21 | Q.   All right.  And I see aside from that is a document that was |
| 17:29:38 | 22 | associated with that.  What is that document? |
| 17:29:41 | 23 | A.   That is the sale record. |
| 17:29:42 | 24 | Q.   All right.  And you have highlighted that particular |
| 17:29:46 | 25 | document, have you not? |

17:29:47   1    A.   Yes.

17:29:48   2    Q.   Can you enlarge that a little bit?  Is this the record that

17:29:54   3    supports your entry on the first line?

17:29:57   4    A.   Yes.

17:30:01   5    Q.   And is that contained in the notebook of 310, this

17:30:04   6    particular document?

17:30:05   7    A.   Yes.

17:30:10   8    Q.   If you'll go back out, please.  Can you go to the next claim

17:30:15   9    of ownership?  Can you tell us about that?

17:30:21   10   A.   The owner is noted as -- it's going to be Raul Ramirez and

17:30:28   11   this is a race entry for Pacific Coast.

17:30:34   12   Q.   Okay.  What date was it made?

17:30:37   13   A.   September 16th, 2010.

17:30:39   14   Q.   And where did you get this particular document in order to

17:30:43   15   prove this point?

17:30:43   16   A.   This is a subpoenaed document.

17:30:45   17   Q.   From Pacific Coast?

17:30:47   18   A.   Yes.

17:30:48   19   Q.   And what is the exhibit contained on this particular

17:30:51   20   document?

17:30:51   21   A.   228.

17:30:55   22   Q.   Next entry.  The next claim of ownership comes from a

17:31:01   23   photograph; is that correct?

17:31:02   24   A.   Yes.

17:31:03   25   Q.   Tell me about this photograph and the claim of ownership on

17:31:06   1    it.

17:31:07   2    A.   This is a race photo and the owner is Francisco

17:31:15   3    Colorado-Cessa.

17:31:20   4    Q.   When was this photo taken?

17:31:22   5    A.   May 27, 2011.

17:31:26   6    Q.   Were you involved with the arrest and the seizure warrants

17:31:29   7    of this particular case?

17:31:30   8    A.   Yes.

17:31:31   9    Q.   Do you know what the status of Fly First Down is?

17:31:35   10   A.   It's deceased.

17:31:40   11   Q.   Go to the next entry, please.  What is the next entry that

17:31:52   12   you see in this voluminous amount of documents in reference to

17:31:55   13   Fly First Down?

17:31:55   14   A.   The next record is June 5, 2011, where it's a transfer fee

17:32:04   15   to AQHA to change the names of ownership.

17:32:11   16   Q.   I think we jumped ahead of you.  We went all the way to the

17:32:14   17   next entry, which was in June, on June the 7th of 2011.  What is

17:32:24   18   that?

17:32:29   19   A.   That is a check for the purchase of Fly First Down from

17:32:34   20   Tremor Enterprises to Francisco Colorado.

17:32:37   21   Q.   What is significant about this check?

17:32:39   22   A.   This check was never negotiated with the bank.

17:32:42   23   Q.   Where was this check found?

17:32:45   24   A.   It was found in Lexington, Oklahoma.

17:32:48   25   Q.   Pursuant to what?

| | | |
|---|---|---|
| 17:32:50 | 1 | A.    I couldn't hear you. |
| 17:32:52 | 2 | Q.    Pursuant to a search warrant? |
| 17:32:53 | 3 | A.    Yes. |
| 17:32:56 | 4 | Q.    And what was the status of this check? |
| 17:33:01 | 5 | A.    It was never negotiated. |

17:33:05     6     Q.    Next entry.  What is the next claim of ownership?

17:33:13     7     A.    This is a Benny Smith transfer invoice for Fly First Down to

17:33:18     8     Jose Trevino.

17:33:21     9     Q.    And, again, what is the claim of ownership on it?

17:33:26    10     A.    Jose Trevino.

17:33:28    11     Q.    Did you see any paperwork to reflect whether or not he

17:33:32    12     actually purchased the check -- I mean, the horse at that time?

17:33:36    13     A.    There was no legitimate purchase.

17:33:39    14             MS. WILLIAMS:  Objection, your Honor.

17:33:41    15             MS. FERNALD:  At that time?  Excuse me.

17:33:44    16             MS. WILLIAMS:  Objection, your Honor.  We've gotten no

17:33:46    17     notice of any opinion testimony by this witness, and I would

17:33:50    18     object to any opinion testimony that he might --

17:33:53    19             MR. DEGEURIN:  And that is nonresponsive, your Honor.

17:33:56    20             MS. FERNALD:  I didn't ask his opinion.  I asked --

17:33:59    21             THE COURT:  I stain the objection.

17:34:00    22             And, members of the jury, the last answer by the

17:34:05    23     witness, you are not to consider for any purpose.  An expert is a

17:34:10    24     person that could give an opinion, as I've already told you, but

17:34:14    25     the parties must notify the others who is alleged to be an expert

| | | |
|---|---|---|
| 17:34:20 | 1 | and what their opinions will be, and they have not been in this |
| 17:34:23 | 2 | witness.  So you cannot consider that for any other purpose. |
| 17:34:27 | 3 | And from now on, counsel, let's don't refer to what's |
| 17:34:30 | 4 | legal and what's not.  Then that would make me feel hopeless up |
| 17:34:35 | 5 | here because that's exactly what I determine.  Do you understand? |
| 17:34:38 | 6 | THE WITNESS:  I do. |
| 17:34:39 | 7 | THE COURT:  Good.  All right. |
| 17:34:40 | 8 | Q.   (BY MS. FERNALD) Did you go through all this paperwork? |
| 17:34:43 | 9 | A.   Yes. |
| 17:34:43 | 10 | Q.   Did you find a purchase contract for Jose Trevino at that |
| 17:34:48 | 11 | time to purchase Fly First Down from Colorado-Cessa? |
| 17:34:51 | 12 | A.   No. |
| 17:34:51 | 13 | Q.   Are you aware of any checks that were negotiated with the |
| 17:34:54 | 14 | bank for the purchase of Fly First Down at this time? |
| 17:34:58 | 15 | A.   No. |
| 17:34:59 | 16 | Q.   Next claim of ownership.  Can you tell us about this |
| 17:35:11 | 17 | particular photograph? |
| 17:35:12 | 18 | A.   This is another race photo for a win by Fly First Down. |
| 17:35:18 | 19 | Q.   It was on when? |
| 17:35:20 | 20 | A.   October 16, 2011. |
| 17:35:23 | 21 | Q.   And who was listed as the owner of Fly First Down at this |
| 17:35:26 | 22 | time? |
| 17:35:26 | 23 | A.   Tremor Enterprises. |
| 17:35:37 | 24 | Q.   Same questions.  Did you see a check negotiated or a |
| 17:35:39 | 25 | purchase contract between Colorado-Cessa and Tremor Enterprises |

234

| | | |
|---|---|---|
| 17:35:45 | 1 | for Jose Trevino at this time? |
| 17:35:47 | 2 | A.   No. |
| 17:35:50 | 3 | Q.   Next claim.  When does Fly First Down die? |
| 17:35:58 | 4 | A.   December 25th, 2011. |
| 17:36:02 | 5 | Q.   And that's what this line is indicating right here? |
| 17:36:05 | 6 | A.   Yes. |
| 17:36:06 | 7 | Q.   Next claim of ownership entry.  What do you see that happens |
| 17:36:14 | 8 | three months later after Fly First Down dies? |
| 17:36:17 | 9 | A.   It is the purchase of Fly First Down, a check from Tremor |
| 17:36:23 | 10 | Enterprises to Francisco Colorado. |
| 17:36:26 | 11 | Q.   For how much money? |
| 17:36:27 | 12 | A.   $50,000. |
| 17:36:30 | 13 | Q.   Was it actually written on this particular date of March the |
| 17:36:34 | 14 | 21st of 2012? |
| 17:36:37 | 15 | A.   Yes. |
| 17:36:38 | 16 | Q.   Do you know the date in which it was negotiated? |
| 17:36:42 | 17 | A.   4-20 of '12. |
| 17:36:45 | 18 | Q.   One month later? |
| 17:36:45 | 19 | A.   Yes. |
| 17:36:46 | 20 | Q.   Go back out.  I want to go to the bottom line of race |
| 17:36:56 | 21 | payments and entry.  First entry.  Do you see a race payment that |
| 17:37:06 | 22 | is made on the first entry?  Can you tell us about that? |
| 17:37:09 | 23 | A.   This is also in conjunction with the blue dot above that |
| 17:37:16 | 24 | where Ramirez is noted as the owner, but Adan Farias makes the |
| 17:37:20 | 25 | payment of $200 for the race entry. |

| | | |
|---|---|---|
| 17:37:25 | 1 | Q.    You're talking about right here? |
| 17:37:26 | 2 | A.    Yes. |
| 17:37:30 | 3 | Q.    Next entry, please.  Who's paying for the race payments |
| 17:37:36 | 4 | during February of 2011? |
| 17:37:39 | 5 | A.    Carlos Nayen is. |
| 17:37:42 | 6 | Q.    By the way, on the race payments and earnings, did you |
| 17:37:46 | 7 | include every single one? |
| 17:37:49 | 8 | A.    The race payments, we included all the race payments.  The |
| 17:37:55 | 9 | race earnings, we included all the race earnings. |
| 17:37:57 | 10 | Q.    Okay.  Next.  What happened in May of 2011? |
| 17:38:11 | 11 | A.    The horses under Francisco Colorado-Cessa, it's a Ruidoso |
| 17:38:17 | 12 | Downs statement of accounts, and those payments were from that |
| 17:38:21 | 13 | account. |
| 17:38:23 | 14 | Q.    Is that a red dot or an orange dot for Trevino? |
| 17:38:27 | 15 | A.    That is a red dot for Cessa. |
| 17:38:29 | 16 | Q.    Next entry.  Horse had some earnings on May the 27th of |
| 17:38:39 | 17 | 2011; is that correct? |
| 17:38:39 | 18 | A.    Yes. |
| 17:38:40 | 19 | Q.    And who did those earnings go to? |
| 17:38:42 | 20 | A.    Colorado-Cessa. |
| 17:38:43 | 21 | Q.    And that would have gone to his horsemen's account; is that |
| 17:38:46 | 22 | correct? |
| 17:38:46 | 23 | A.    Yes. |
| 17:38:47 | 24 | Q.    Next.  In June of 2011, what do you see about the earnings? |
| 17:38:55 | 25 | Where do the earnings start going to? |

17:38:57  1   A.   The race earning goes to Tremor.

17:39:02  2   Q.   And it's earning $16,000, is it not?

17:39:06  3   A.   Yes.

17:39:07  4   Q.   Next.  Next.  Next.  Scroll on down.  Are these all earnings

17:39:18  5   or, excuse me, payments that are being made by Tremor Enterprises

17:39:21  6   during this period of time?

17:39:22  7   A.   Yes, they are.

17:39:23  8   Q.   Next.  Is that it?  If you'll scroll on down.

17:39:41  9        During the time period of June the 27th to the time

17:39:43 10   that it dies, or a couple of days before its death, December,

17:39:49 11   what -- for Tremor, what is the race payments?

17:39:52 12   A.   $9,050.

17:39:55 13   Q.   And the race earnings, lifetime race earnings?

17:40:01 14   A.   $67,786.

17:40:04 15   Q.   Next category, please.  Training and boarding bills.  We'll

17:40:11 16   go through these pretty quickly.

17:40:13 17        Who's paying for the training and the boarding bills in

17:40:17 18   the winter months of 2011?

17:40:20 19   A.   Carlos Nayen.

17:40:22 20   Q.   Who owns the horse during this time, according to the

17:40:24 21   paperwork?

17:40:25 22   A.   I see no paperwork.

17:40:28 23   Q.   Colorado-Cessa?

17:40:30 24   A.   Colorado-Cessa owns it.

17:40:40 25   Q.   During this period of time is when Colorado-Cessa is owning

17:40:43   1   the horse; is that correct?

17:40:50   2   A.   Yes.

17:40:52   3   Q.   Next entry.  And in June, Tremor picks it up and starts

17:41:02   4   paying for the training and the boarding bills; is that correct?

17:41:05   5   A.   Yes.

17:41:09   6   Q.   Scroll on down.  Total amount of the training and boarding

17:41:20   7   bills for this time period is what?

17:41:22   8   A.   For the total amount is $19,819.

17:41:27   9   Q.   When Colorado-Cessa's name was on the ownership of this

17:41:31   10   horse, how much was paid by Carlos Nayen during that time period?

17:41:36   11   A.   $4,672.

17:41:39   12   Q.   And starting in June of 2011, how much did Tremor

17:41:45   13   Enterprises pay for the boarding of this particular horse?

17:41:48   14   A.   $15,147.

17:41:52   15   Q.   Next, please, category.  Next category is veterinary bills;

17:42:00   16   is that correct?

17:42:00   17   A.   Yes.

17:42:02   18   Q.   Veterinarian bills during the time of June.  Do you have all

17:42:06   19   of the vet bills, by the way?

17:42:08   20   A.   They're in the book.

17:42:10   21   Q.   Do you know whether or not you have vet bills prior to this?

17:42:14   22   Did you subpoena every veterinarian company in the United States

17:42:17   23   of America?

17:42:18   24   A.   No.

17:42:19   25   Q.   All right.  So these are the vet bills that you're aware of;

| | | |
|---|---|---|
| 17:42:22 | 1 | is that correct? |
| 17:42:22 | 2 | A.    That is correct. |
| 17:42:23 | 3 | Q.    Okay.  What was the total amount of the vet bill from June |
| 17:42:35 | 4 | until December of 2011? |
| 17:42:38 | 5 | A.    $33,000. |
| 17:42:40 | 6 | Q.    Of course, that would include the death of the horse, too, |
| 17:42:42 | 7 | and obviously horse being sick, correct? |
| 17:42:46 | 8 | A.    Yes. |
| 17:42:48 | 9 | Q.    What about insurance on this particular horse? |
| 17:42:52 | 10 | A.    There was insurance. |
| 17:42:54 | 11 | Q.    Who was paying for this horse? |
| 17:42:57 | 12 | A.    It started out as Tremor Enterprises. |
| 17:43:00 | 13 | Q.    When? |
| 17:43:01 | 14 | A.    9-5 of '10. |
| 17:43:04 | 15 | Q.    Who was listed as the owner of this particular horse 9-5-10? |
| 17:43:11 | 16 | A.    Francisco Colorado. |
| 17:43:13 | 17 | Q.    Next entry.  What happens in November, October of 2010? |
| 17:43:22 | 18 | A.    The insurance is paid by Garcia Bloodstock, and they're |
| 17:43:32 | 19 | shown to be the insured -- the person insuring it and the |
| 17:43:35 | 20 | payments. |
| 17:43:36 | 21 | Q.    How much is insurance premiums on a horse like this? |
| 17:43:39 | 22 | A.    For that time period, it was $8,730. |
| 17:43:45 | 23 | Q.    Next entry.  And in June of 2011, who picks up insurance on |
| 17:43:51 | 24 | this horse? |
| 17:43:52 | 25 | A.    Tremor Enterprises. |

17:43:54  1   Q.   What was the amount of -- how much was it insured for?

17:43:58  2   A.   $400,000.

17:44:00  3   Q.   And what was the amount of premium?

17:44:02  4   A.   $6,809.

17:44:05  5   Q.   Next.  Insurance from October -- I'm sorry.  Mid-October of

17:44:15  6   2011.  Is that the total amount?  Is that the total amount of

17:44:22  7   premiums?

17:44:22  8   A.   That's the total premium.

17:44:25  9   Q.   What is total amount of premium on this particular horse?

17:44:27  10  A.   $19,400.

17:44:30  11  Q.   And, again, when was the paperwork found that showed the

17:44:42  12  negotiation between Colorado-Cessa and Tremor Enterprises?

17:44:48  13  A.   When was it found?

17:44:50  14  Q.   When was that check -- when was that check issued?

17:44:53  15  A.   3-21 of 2012.

17:45:00  16  Q.   Did I miss anything, in particular, on this horse?

17:45:03  17  A.   No.

17:45:03  18  Q.   Government's Exhibit 311A.  Tell the ladies and gentlemen of

17:45:35  19  the jury about Blues Girls Choice.

17:45:37  20  A.   This is a timeline, again, of the horse from its purchase to

17:45:42  21  the sale of it.  And then, it will have the same -- it's

17:45:47  22  basically the same chart with the same expenses, race earnings,

17:45:52  23  insurance.

17:45:54  24  Q.   Let's go over these one by one.  What's the first entry on

17:46:00  25  claim of ownership here?

17:46:01   1   A.   The first entry is the purchase of Blues Girls Choice by

17:46:08   2   Ramiro Villarreal for $15,000 cash.

17:46:13   3   Q.   And this is the Lucky 7 Ranch exhibit that's previously been

17:46:18   4   admitted, correct?

17:46:19   5   A.   Yes.

17:46:20   6   Q.   Contained in the notebook which you prepared for this jury?

17:46:23   7   A.   Yes.

17:46:23   8   Q.   Next claim.  Initially purchased it for $15,000 on September

17:46:37   9   9th.  What happens a month later?

17:46:41   10   A.   Ramiro Villarreal repurchases his own horse at the Los

17:46:48   11   Alamitos horse sale for $135,000.

17:46:51   12   Q.   Next claim.

17:47:03   13   A.   The next claim is Hector Roldan is noted as the owner of

17:47:08   14   Blues Girl Choice by AQHA on that same day.

17:47:12   15   Q.   Next entry.

17:47:15   16   A.   On October 5th, the next day, Tremor Enterprises is noted as

17:47:21   17   the owner by AQHA records.

17:47:24   18   Q.   The BGC, obviously Blues Girls Choice?

17:47:27   19   A.   Yes.

17:47:28   20   Q.   Next entry.  What do you find out in January of 2010?

17:47:34   21   A.   This is a subpoenaed document for Pacific Coast for Carlos

17:47:39   22   Nayen, who's noted as the owner of Blues Girls Choice.

17:47:42   23   Q.   Next entry.  When does Tremor purchase Blues Girls Choice?

17:47:49   24   A.   On May 20, 2010.

17:47:51   25   Q.   How much does Tremor purchase Blues Girls Choice for?

| | | |
|---|---|---|
| 17:47:55 | 1 | A.   $30,000. |
| 17:47:58 | 2 | Q.   And the last purchase that you have on there is for |
| 17:48:04 | 3 | $135,000; is that correct? |
| 17:48:04 | 4 | A.   Yes. |
| 17:48:06 | 5 | Q.   Next entry.  What do you find out in November of 2011? |
| 17:48:23 | 6 | A.   Blues Girl Choice is placed for sale by Tremor and Efrain |
| 17:48:29 | 7 | Ramos purchases Blues Girls Choice for $102,000. |
| 17:48:41 | 8 | Q.   So purchased it for 30,000 and then, sold it for 102; is |
| 17:48:47 | 9 | that correct? |
| 17:48:47 | 10 | A.   Yes. |
| 17:48:47 | 11 | Q.   Next entry.  I guess I should say next category, please. |
| 17:49:02 | 12 | Race payments and earnings, let's go through these. |
| 17:49:05 | 13 | Who was making the race payments when Villarreal owned |
| 17:49:09 | 14 | it or was claiming ownership of it in January of 2010? |
| 17:49:14 | 15 | A.   The first payment was Nayen put it in the race, but a Grupo |
| 17:49:23 | 16 | wire was sent to make the entry payments. |
| 17:49:29 | 17 | Q.   Next.  Who's making the race payments during this period of |
| 17:49:32 | 18 | time? |
| 17:49:32 | 19 | A.   Carlos Nayen. |
| 17:49:34 | 20 | Q.   Next.  Who's receiving the money for it? |
| 17:49:41 | 21 | A.   Tremor Enterprises. |
| 17:49:42 | 22 | Q.   Race earnings? |
| 17:49:43 | 23 | A.   Yes. |
| 17:49:43 | 24 | Q.   Next.  Scroll down, please.  Tremor has now placed ownership |
| 17:49:52 | 25 | papers for $30,000 during this time period? |

| | | |
|---|---|---|
| 17:49:55 | 1 | A.   Yes. |
| 17:49:57 | 2 | Q.   Who's making the race payments and who is getting the race |
| 17:50:00 | 3 | earnings? |
| 17:50:01 | 4 | A.   Tremor Enterprises. |
| 17:50:03 | 5 | Q.   Next.  Lifetime race earnings? |
| 17:50:07 | 6 | A.   $4,630. |
| 17:50:13 | 7 | Q.   Is this the first time that you have been familiar with the |
| 17:50:17 | 8 | quarter horse industry? |
| 17:50:18 | 9 | A.   No. |
| 17:50:19 | 10 | Q.   Can you tell the ladies and gentlemen of the jury what you |
| 17:50:21 | 11 | did when you were a kid? |
| 17:50:22 | 12 | A.   I grew up on a quarter horse farm. |
| 17:50:25 | 13 | Q.   How many years did you spend with quarter horses? |
| 17:50:28 | 14 | A.   Over five years. |
| 17:50:30 | 15 | Q.   Is it pretty much a gambling business?  Sometimes you |
| 17:50:33 | 16 | purchase horses for a lot of money, they don't make a lot for |
| 17:50:36 | 17 | you, and vice versa? |
| 17:50:37 | 18 | A.   That's correct. |
| 17:50:37 | 19 | Q.   All right.  Next category, please.  Training and boarding |
| 17:50:48 | 20 | from April -- excuse me.  From May of 2010 until November of |
| 17:50:58 | 21 | 2010.  Who's paying for the boarding? |
| 17:51:00 | 22 | A.   Tremor Enterprises. |
| 17:51:00 | 23 | Q.   Next entry.  Who pays for it on November the 30th? |
| 17:51:07 | 24 | A.   Carlos Nayen. |
| 17:51:09 | 25 | Q.   Next entry, please.  Again, who's paying for the boarding? |

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

17:51:16  1   A.    Tremor Enterprises.

17:51:18  2   Q.    Next entry.

17:51:22  3   A.    Carlos Nayen.

17:51:23  4   Q.    Next category, please.  Veterinarian bills.  Who's paying

17:51:33  5   for the vet bills?

17:51:35  6   A.    Tremor Enterprises.

17:51:36  7   Q.    Which is consistent with the papers -- paperwork of

17:51:39  8   purchasing it with $30,000; is that correct?

17:51:41  9   A.    That's correct.

17:51:43  10  Q.    Next entry.   Insurance.

17:51:48  11  A.    The insurance is under Santa Fe Roldan.

17:51:55  12  Q.    Premium amount?

17:51:57  13  A.    $4,038.

17:52:00  14  Q.    What were the insurance papers like to go through on these

17:52:04  15  particular horses?

17:52:06  16  A.    Very, very confusing.

17:52:08  17  Q.    And why is that?

17:52:11  18  A.    The person who may show to be the owner on the horse

17:52:15  19  document is not the person insuring the horse or even dealing

17:52:18  20  with getting the insurance for the horse.  You have many

17:52:23  21  different people obtaining the insurance, and you'll have

17:52:27  22  different people paying the insurance.

17:52:30  23  Q.    How confusing were all of these particular horses to go

17:52:34  24  through and determine all of these different categories?

17:52:36  25  A.    Very confusing.

17:52:37  1    Q.    Why?

17:52:39  2    A.    You have many different people who are making payments, they

17:52:45  3    don't show any ownership.  They are receiving some income by the

17:52:51  4    documents, but they don't own the horse.  They are making

17:52:56  5    payments on insurance that they have no association -- the

17:53:01  6    documentation showing that they are associated with this horse at

17:53:04  7    all.

17:53:13  8    Q.    Those are all the categories on this?  Insurance, again, I

17:53:19  9    guess insurance picks up with Tremor up here in October of 2010,

17:53:23  10   correct?

17:53:24  11   A.    Yes.

17:53:24  12   Q.    Next.  Let's move to 312A, please.  312A is Blues Ferrari.

17:53:56  13   A.    Yes.

17:53:57  14   Q.    Ownership, please?

17:53:58  15   A.    The first ownership is Ramiro Villarreal purchased the horse

17:54:07  16   from Lucky 7 Ranch.  This time, the horse is named Blues Man Can.

17:54:12  17   Q.    Next.  And this was for how much?

17:54:14  18   A.    15,000.

17:54:16  19   Q.    Next, please.  What do you see in January of 2010?

17:54:22  20   A.    This is a race payment.  It's from Pacific Coast subpoena.

17:54:28  21   Carlos Nayen is noted as the owner.

17:54:30  22   Q.    Next.  What happens in March of 2010?

17:54:38  23   A.    Per AQHA records, this horse is registered to Fast And

17:54:45  24   Furious.

17:54:45  25   Q.    Next.  What do you find out in April of 2010?

17:54:53  1  A.    Nayen is still shown as the owner of this horse, and he

17:54:58  2  changes the name Blues Man Can to Blues Ferrari.

17:55:02  3  Q.    Next.  What do we have a dotted line here?

17:55:08  4  A.    This is the -- it's a check for the purchase of Blues

17:55:17  5  Ferrari from Tremor Enterprises to Fast And Furious, but it's

17:55:23  6  voided.

17:55:23  7  Q.    And this is on which date?

17:55:25  8  A.    10-1, I believe, 2010.

17:55:28  9  Q.    Next.  This is a picture of Blues Ferrari in the winner's

17:55:40  10  circle, correct?

17:55:40  11  A.    Yes.

17:55:41  12  Q.    What's the date on it?

17:55:43  13  A.    October 15, 2010.

17:55:45  14  Q.    And who's the listed owner?

17:55:47  15  A.    Tremor Enterprises.

17:55:49  16  Q.    Did you find the purchase agreement or any documents to

17:55:53  17  reflect the ownership to Tremor at this time?

17:55:55  18  A.    No.

17:55:56  19  Q.    Next.

17:56:14  20  A.    This is the Tremor Enterprises check to Fast And Furious for

17:56:18  21  $50,000, dated 12-20 of 2010.

17:56:24  22  Q.    Next.  It went backwards.  Why did it do that?

17:56:36  23  A.    This is a sale fee to put the horse up for purchase at

17:56:40  24  Heritage to sell the horse.

17:56:44  25  Q.    So prior to the purchase of the horse, what was Tremor

246

17:56:49  1   Enterprises doing?

17:56:50  2   A.   He is putting the horse up for sale.

17:56:55  3   Q.   Can we go back to the photograph at the winner circle?  See

17:57:01  4   how good you are.  Do you know who's in this picture?

17:57:04  5   A.   Yes.

17:57:06  6   Q.   Identify the parties for me.

17:57:09  7   A.   This is Ramiro Villarreal.  This is Adan Farias, and this is

17:57:20  8   Fernando Garcia.

17:57:40  9   Q.   Tell me about the next entry.

17:57:43  10  A.   The horse Blues Ferrari is sold at the Heritage sale for

17:57:48  11  $310,000, January 15, 2011 to Alfonso Del Rayo.

17:57:59  12  Q.   How much is it sold for?

17:58:00  13  A.   $310,000.

17:58:03  14  Q.   And, Investigator Schutt, how much was it purchased for just

17:58:07  15  a month before?

17:58:08  16  A.   $50,000.

17:58:08  17  Q.   Next entry.  What do you see with these particular checks?

17:58:13  18  A.   These are two personal checks for the purchase of the horse

17:58:16  19  by Del Rayo's wife.

17:58:25  20  Q.   Next entry.  Race payments and earnings.  Tell me who was

17:58:34  21  making the race payments.

17:58:36  22       THE COURT:  Mark your spot.  6:00, members of the jury.

17:58:44  23  Remember my instructions.  Let me give you some further

17:58:47  24  instructions.  We will not be working on Friday.  So Friday will

17:58:52  25  be your day to do whatever you need during the week.  We try to

17:58:57   1   do that generally.  But everybody seems to need to do something

17:59:04   2   on a Friday from lawyers on up.  So we will not be working on

17:59:09   3   Friday.  We will be working till Friday, hopefully till 6:00 each

17:59:15   4   night.

17:59:16   5            Remember the instructions and have a nice night.

17:59:50   6            (Jury not present.)

18:00:01   7            THE COURT:  8:30 tomorrow, everybody but the lawyers.

18:00:10   8   8:25 for the lawyers.  I'll hear any objections on 310, 11 and

18:00:17   9   12.  That will give you time to look at them and see what you

18:00:21  10   want to do on that.  Have a good evening.

18:00:23  11            MR. FINN:  Yes, your Honor.

18:00:23  12            (Proceedings adjourned.)

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25