```
 1                 UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3  UNITED STATES OF AMERICA      ) Docket No. A 12-CR-210 SS
                                  )
 4  vs.                           ) Austin, Texas
                                  )
 5  JOSE TREVINO-MORALES (3)      )
    FRANCISCO ANTONIO             )
 6  COLORADO-CESSA (6)            )
    FERNANDO SOLIS-GARCIA (7)     )
 7  EUSEVIO MALDONADO-HUITRON(11) )
    JESUS MALDONADO-HUITRON (18)  ) April 23, 2013
 8

 9                 TRANSCRIPT OF TRIAL ON THE MERITS
                   BEFORE THE HONORABLE SAM SPARKS
10                       Volume 7 of 15

11  APPEARANCES:

12  For the United States:      Ms. Michelle E. Fernald
                                Mr. Douglas W. Gardner
13                              Assistant U.S. Attorneys
                                816 Congress Avenue, Suite 1000
14                              Austin, Texas 78701

15  For Defendant Trevino-      Mr. David M. Finn
    Morales:                    Milner & Finn
16                              2828 North Harwood Street
                                Suite 1950, LB9
17                              Dallas, Texas 75201

18                              Ms. Christie Williams
                                Mills & Williams
19                              1112 South Rock Street
                                Georgetown, Texas 78626
20
    For Defendant Colorado-     Mr. Mike DeGeurin
21  Cessa:                      Mr. M. Andres Sanchez-Ross
                                Foreman, DeGeurin & DeGeurin
22                              300 Main Street
                                Houston, Texas 77002
23
                                Mr. John Parras
24                              Republic Bank Building
                                1018 Preston, Floor 2
25                              Houston, Texas 77002
```

 1   **(Appearances Continued:)**

 2   For Defendant Solis-Garcia:  Mr. Guy L. Womack
                                 Guy L. Womack & Associates
 3                               402 Main Street, Suite 6 North
                                 Houston, Texas 77002

 4
     For Defendant Eusevio       Mr. Richard D. Esper
 5   Maldonado-Huitron:          Esper Law Office
                                 801 North El Paso Street, 2nd Floor
 6                               El Paso, Texas 79902

 7   For Defendant Jesus         Mr. Thomas Brent Mayr
     Maldonado-Huitron:          Law Office of Brent Mayr
 8                               4101 Washington Avenue, 2nd Floor
                                 Houston, Texas 77007

 9

10   Interpreters:               Mr. Peter Heide
                                 Mr. Steve Mines

11

12   Court Reporter:             Ms. Lily Iva Reznik, CRR, RMR
                                 501 West 5th Street, Suite 4153
13                               Austin, Texas 78701
                                 (512)391-8792

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings reported by computerized stenography, transcript
     produced by computer.

```
 1                        I N D E X

 2                        Direct    Cross     Redirect   Recross
     Witnesses:

 3

 4   Brian Schutt        13        39,53

 5                                 68,92

 6   Floyd E. Wise       115       124,127

 7                                 129,133   135

 8   Jose M. Mendoza     137       149,154

 9   Matthew R. Witman   155       169,170

10                                 178       180        182,183

11                                                      183

12   Adan Farias         187       199,202

13                                 217       218        220

14   Ricardo Barrera     223,230   256

15   Arian Jaff          228

16                                                      Page

17

18   Proceedings Adjourned                             271

19

20

21

22

23

24

25
```

**E X H I B I T S**

|  | Offered | Admitted |
|---|---|---|
| Government's | | |
| #356 | 197 | 197 |
| #409 | 38 | 38 |
| #415 | 163 | 163 |
| | | |
| Defendant Solis-Garcia's | | |
| #4 | 72 | 72 |
| | | |
| Defendant Colorado-Cessa's | | |
| #4 | 174 | 174 |
| #5 | 178 | 178 |
| #6 | 268 | 268 |
| #6A | 269 | 269 |
| #6B | 269 | 269 |

| 08:27:29 | 1 | THE COURT:  All right.  Counsel, have you had time to |
| 08:27:40 | 2 | examine Government's 310, 311 and 312? |
| 08:27:49 | 3 | MR. DEGEURIN:  Yes, your Honor. |
| 08:27:49 | 4 | MR. WOMACK:  Yes, your Honor. |
| 08:27:50 | 5 | THE COURT:  Any objections? |
| 08:27:53 | 6 | MR. DEGEURIN:  No, your Honor.  All those matters are |
| 08:27:56 | 7 | in the boxes. |
| 08:27:57 | 8 | THE COURT:  They're extrapolated? |
| 08:27:58 | 9 | MR. WOMACK:  We would have an objection, not to the |
| 08:28:00 | 10 | books but to the demonstrative exhibit.  I don't know the number. |
| 08:28:06 | 11 | It's the one on Forty First Down.  Oh, it's 310A. |
| 08:28:12 | 12 | THE COURT:  I've already admitted 310A. |
| 08:28:15 | 13 | MR. WOMACK:  Yes, your Honor.  We discovered later, |
| 08:28:17 | 14 | during the evening, that the government helped us with this.  It |
| 08:28:19 | 15 | has a colored line that the witness had created, or his staff, |
| 08:28:25 | 16 | that incorrectly says that Fernando Garcia paid the insurance on |
| 08:28:29 | 17 | that horse.  They've determined that it was actually Fernando -- |
| 08:28:35 | 18 | in talking to the government, they say that they believe at least |
| 08:28:39 | 19 | Fernando was responsible, and their own Exhibit 310 in the |
| 08:28:43 | 20 | notebook shows it was actually the horse of -- at that time of |
| 08:28:47 | 21 | Mr. Colorado-Cessa.  My client was more of his agent.  He was not |
| 08:28:52 | 22 | responsible for the horse, he did not own the horse.  Their |
| 08:28:54 | 23 | exhibits show the loss payee, the beneficiary on the insurance |
| 08:28:58 | 24 | with Mr. Colorado-Cessa. |
| 08:29:00 | 25 | So Mr. Fernando Guerra's name should not be on there at |

| | | |
|---|---|---|
| 08:29:05 | 1 | all.  That's our objection. |
| 08:29:06 | 2 | THE COURT:  You mean Mr. Garcia. |
| 08:29:08 | 3 | MR. WOMACK:  I'm sorry? |
| 08:29:09 | 4 | MS. FERNALD:  Mr. Garcia's name. |
| 08:29:11 | 5 | MR. WOMACK:  Mr. Garcia's name should not be on there. |
| 08:29:13 | 6 | THE COURT:  You said somebody else. |
| 08:29:14 | 7 | MR. WOMACK:  If I said somebody else, I misspoke. |
| 08:29:17 | 8 | MS. FERNALD:  There seems to be a little bit of |
| 08:29:19 | 9 | confusion.  I wasn't trying to -- yesterday, the witness and he's |
| 08:29:23 | 10 | in the courtroom.  Would you like for him to step out?  Step out, |
| 08:29:26 | 11 | please. |
| 08:29:27 | 12 | THE COURT:  Love to. |
| 08:29:49 | 13 | MR. WOMACK:  Your Honor, I had asked him to leave only |
| 08:29:51 | 14 | because he'd already discussed it last time -- |
| 08:29:54 | 15 | THE COURT:  I would have asked him to leave. |
| 08:29:57 | 16 | MR. WOMACK:  He discussed it with the government, so he |
| 08:30:00 | 17 | was already aware. |
| 08:30:05 | 18 | THE COURT:  Is this part of it that you -- |
| 08:30:07 | 19 | MR. WOMACK:  Yes, sir. |
| 08:30:08 | 20 | THE COURT:  -- discussed yesterday? |
| 08:30:09 | 21 | MR. WOMACK:  Yes, sir.  It will be a green line at the |
| 08:30:11 | 22 | top. |
| 08:30:12 | 23 | MS. FERNALD:  We're going to get to the full animation, |
| 08:30:14 | 24 | if you'll give me a minute, please. |
| 08:30:17 | 25 | MR. WOMACK:  They're trying to navigate. |

08:30:34   1          MS. FERNALD:  Your Honor, at the very, very top of this

08:30:38   2   diagram on the left-hand side, there is the insurance right

08:30:45   3   there.  It's in the color green in correlation to Garcia

08:30:50   4   Bloodstock.  The reason why it was colored green is because the

08:30:54   5   witnesses testified that the insurance was under Garcia's name,

08:30:59   6   and that's the reason it's colored green.

08:31:01   7          The confusion was -- is yesterday, I asked the question

08:31:08   8   or Investigator Schutt responded to a question and said that

08:31:12   9   Fernando Garcia paid for the premium.  He didn't actually pay for

08:31:16  10   the premium.  That was a mistake.  Hernando Guerra paid for the

08:31:23  11   premium, however, it was still under Garcia Bloodstock's name.

08:31:26  12          THE COURT:  All right.

08:31:27  13          MR. WOMACK:  And, your Honor, the notebook, if we have

08:31:29  14   it, 310?

08:31:30  15          MS. FERNALD:  Uh-huh.

08:31:31  16          MR. WOMACK:  On page 59-3-615 shows that the horse was

08:31:41  17   actually -- the loss payee was actually Colorado-Cessa.  It was

08:31:47  18   not my client.

08:31:49  19          MS. FERNALD:  Not initially.  And I guess my point is

08:31:53  20   this is a demonstrative aid, and if he wants to cross-examine the

08:31:56  21   witness on this particular point, I believe that he can.  But

08:31:59  22   demonstratively, we're trying to show who the insurance was

08:32:03  23   under.

08:32:03  24          THE COURT:  That may be.  And he has full right of

08:32:06  25   doing it, but I leave to you to at least correct the testimony of

08:32:10   1   yesterday.

08:32:11   2          MS. FERNALD:  I will.  I intend to correct that today.

08:32:13   3          MR. WOMACK:  Your Honor, the problem is their own

08:32:14   4   documents disprove that, so it gives a false impression that --

08:32:18   5   the problem with this is as your Honor has pointed out.  There

08:32:20   6   were literally thousands and thousands of pages of documents.

08:32:26   7   And the impact of this big screen of colors on it is meant to

08:32:31   8   stick with the jury in case they don't look at all the documents.

08:32:35   9          And here, in fine print in the government's notebook,

08:32:38   10  it shows the loss payee for this period of time was Mr.

08:32:43   11  Colorado-Cessa.  That means he owned the insurance policy.

08:32:45   12         THE COURT:  That doesn't mean that at all.  Just

08:32:47   13  because you're the beneficiary of an insurance policy doesn't

08:32:49   14  mean that you are the owner of the insurance policy.

08:32:53   15         MR. WOMACK:  It means you're the one that gets the

08:32:56   16  benefit.

08:32:57   17         THE COURT:  That's fine.

08:32:57   18         MR. WOMACK:  Yes, sir.

08:32:58   19         THE COURT:  I don't think my kids own all the insurance

08:33:02   20  policies I've got beneficiaries on them.

08:33:04   21         MR. WOMACK:  Yes, sir.

08:33:05   22         THE COURT:  That's an area of the law I spent an awful

08:33:07   23  lot of time in.  But I think it's immaterial.  Your point wants

08:33:14   24  to indicate that what?  That Mr. Colorado-Cessa was the

08:33:22   25  beneficiary or the payee on the insurance.

08:33:26    1            MR. WOMACK:  Yes, sir, because he owned the horse and a

08:33:30    2   Mr. Guerra paid for the policy.

08:33:32    3            THE COURT:  Right.

08:33:33    4            MR. WOMACK:  My client has nothing to do with that.  So

08:33:35    5   his name and this color should not be on this graphic chart.  It

08:33:39    6   prejudices him.  He was merely an agent for the sale of the

08:33:43    7   horse.  He has nothing to do with the insurance policy.  So his

08:33:45    8   name should not be on this chart.  And the government's own

08:33:49    9   documents prove that.  I just want to take him off there and

08:33:54   10   explain it to the members of the jury that it's an honest

08:33:58   11   mistake.

08:33:58   12            THE COURT:  So what is the connection of Garza to --

08:34:08   13   excuse me, of Garcia to the insurance policy?

08:34:10   14            MS. FERNALD:  Well, that's the whole point.

08:34:12   15            THE COURT:  Yeah, I know.

08:34:13   16            MS. FERNALD:  He wasn't the agent on this particular

08:34:15   17   one, but he is the one who took this out during this time period,

08:34:19   18   the insurance policy during this time period.  And that's the

08:34:22   19   point.

08:34:24   20            THE COURT:  And what proves that?

08:34:26   21            MS. FERNALD:  The documents that are contained in

08:34:35   22   Government's Exhibit 323R.

08:34:48   23            MR. WOMACK:  Your Honor, that's the same document I was

08:34:49   24   just referring to.  I used the Bates number, but it's 323R.  And

08:34:59   25   that's the one that shows the loss payee as Mr. Colorado-Cessa.

| | | |
|---|---|---|
| 08:35:21 | 1 | MS. FERNALD:  323R, your Honor, is -- these are our |
| 08:35:29 | 2 | tabs that we placed on there -- is Yearsley, which is the |
| 08:35:32 | 3 | insurance company.  It is addressed to Garcia Bloodstock.  And as |
| 08:35:38 | 4 | you go down the page, it talks about Fly First Down as one in |
| 08:35:44 | 5 | which is insured, and that's the whole point. |
| 08:35:48 | 6 | THE COURT:  All right.  Well, let's correct the |
| 08:35:51 | 7 | testimony.  You can use that 323 to show that it was, at one |
| 08:35:58 | 8 | time, issued to Garcia Bloodstock, and then, counsel can finish |
| 08:36:07 | 9 | it up with cross-examination. |
| 08:36:09 | 10 | MS. FERNALD:  Sure. |
| 08:36:09 | 11 | MR. WOMACK:  Yes, your Honor.  I don't think they |
| 08:36:11 | 12 | answered your question, sir.  This is not the insurance policy. |
| 08:36:14 | 13 | This is showing that they had e-mailed my client about a number |
| 08:36:19 | 14 | of horses and asked him to arrange -- make sure that these are |
| 08:36:22 | 15 | all correct.  He was merely an agent.  There is nothing that |
| 08:36:25 | 16 | shows him -- the government knows he did not pay that insurance |
| 08:36:28 | 17 | policy, and he was not the loss payee. |
| 08:36:32 | 18 | THE COURT:  Well, y'all can argue that one way or the |
| 08:36:36 | 19 | other.  I don't know the evidence as to who paid.  Is this the |
| 08:36:41 | 20 | horse that died in December? |
| 08:36:44 | 21 | MS. FERNALD:  That is correct. |
| 08:36:44 | 22 | THE COURT:  And Mr. Colorado-Cessa sold or bought it in |
| 08:36:50 | 23 | March? |
| 08:36:51 | 24 | MS. FERNALD:  That is correct.  Three months after its |
| 08:36:54 | 25 | death. |

08:36:54   1          THE COURT:  And he was the beneficiary under the

08:36:56   2   insurance?

08:36:57   3          MS. FERNALD:  No, because at that time, it had been

08:36:59   4   changed to Tremor Enterprises.

08:37:00   5          THE COURT:  Okay.

08:37:01   6          MS. FERNALD:  Yeah, I know.

08:37:03   7          MR. WOMACK:  This period of time was before that, sir,

08:37:04   8   this insurance policy.  And that's what I'm saying, if they have

08:37:06   9   a policy that has Mr. Garcia's name on it, that's fine, but there

08:37:09   10  is no such thing.  There's no document that shows insurance in

08:37:13   11  the name of, or bought by, or owned by Fernando Garcia.

08:37:17   12         THE COURT:  Well, you can make that point.  She's got

08:37:20   13  an exhibit that at least the insurance company identified that

08:37:25   14  horse at one period of time.  And as to the color of the diagram,

08:37:33   15  you can make the point that it shouldn't be colored green or

08:37:40   16  whatever it was.

08:37:41   17         MR. WOMACK:  Yes, sir.  I understand.

08:37:49   18         THE COURT:  It was better on the blackboard where you

08:37:52   19  can just erase it.

08:38:00   20         All right.  Anything else before we bring in the jury?

08:38:02   21         MR. FINN:  One thing, your Honor.  Ms. Williams is

08:38:04   22  going to be crossing this witness.  This continuous publication

08:38:09   23  of these charts, I'm going to object to that.  If they're using a

08:38:13   24  chart, that's one thing.  But to just have something up in front

08:38:15   25  of a jury box, that close, I'm going to --

| 08:38:19 | 1 | THE COURT:  I agree.  Take it down. |

08:38:19    1          THE COURT:  I agree.  Take it down.

08:38:21    2          MS. FERNALD:  Okay.

08:38:21    3          MR. FINN:  Thank you.

08:38:52    4          THE COURT:  So are you going to be using this chart?

08:38:55    5          MS. FERNALD:  Oh, I'm sorry.  I thought somebody took

08:38:56    6  it down for us.

08:39:14    7          THE COURT:  Okay.  Anything else?

08:39:42    8          (Jury present.)

08:41:15    9          THE COURT:  Members of the jury, I appreciate y'all

08:41:19   10  being so prompt each day.  I could only tell you that we start a

08:41:25   11  little bit before 8:30 here in the courtroom, and then, sometimes

08:41:28   12  there's a problem that comes up that has to be resolved, and

08:41:31   13  that's the reason we're running just a little bit late but not as

08:41:35   14  late as it could be.

08:41:37   15          And since we last met on yesterday, when you were in

08:41:41   16  that box together until now, has anybody attempted to talk to you

08:41:46   17  about this case?

08:41:47   18          JURORS:  No.

08:41:48   19          THE COURT:  Have you talked to anyone about the case?

08:41:50   20          JURORS:  No.

08:41:50   21          THE COURT:  Have you learned anything at all about the

08:41:53   22  case, outside the presence of each other in this courtroom?

08:41:56   23          JURORS:  No.

08:41:56   24          THE COURT:  All right.  Show negative responses to all

08:41:58   25  questions.

| | | |
|---|---|---|
| 08:42:00 | 1 | And Exhibits 310, 311 and 312 are admitted.  Those |
| 08:42:05 | 2 | exhibits merely have selections of the exhibits already admitted |
| 08:42:11 | 3 | in all of these boxes, which are in front of the jury box.  You |
| 08:42:19 | 4 | can't count them because Scotch-Irish boys don't like the number |
| 08:42:23 | 5 | 13.  All right.  Let's proceed. |
| 08:42:25 | 6 | MS. FERNALD:  Thank you, your Honor. |
| 08:42:26 | 7 | BRIAN SCHUTT, called by the Government, duly sworn. |
| 08:42:26 | 8 | DIRECT EXAMINATION (Resumed) |
| 08:42:27 | 9 | BY MS. FERNALD: |
| 08:42:27 | 10 | Q.   Yesterday, we left off, Investigator Schutt, on Blues |
| 08:42:30 | 11 | Ferrari, and we've been through the claim of ownership and got |
| 08:42:33 | 12 | down to the race payment and earnings.  Can you go through that a |
| 08:42:36 | 13 | little bit with us on the race payment and earnings? |
| 08:42:38 | 14 | A.   The first race payment was through Nayen and it was a wire |
| 08:42:45 | 15 | pay, the entry fee. |
| 08:42:50 | 16 | Q.   All right. |
| 08:42:54 | 17 | A.   Another entry fee by Nayen.  Also, another entry fee by |
| 08:42:59 | 18 | Nayen. |
| 08:42:59 | 19 | Q.   At that time, it was registered to Fast And Furious; is that |
| 08:43:03 | 20 | correct? |
| 08:43:03 | 21 | A.   That's correct. |
| 08:43:04 | 22 | Q.   Next. |
| 08:43:04 | 23 | A.   The next payment is by Fast And Furious. |
| 08:43:06 | 24 | Q.   Okay. |
| 08:43:07 | 25 | A.   Then they received a race earnings, another race earnings, |

08:43:13   1   another race payment earnings.

08:43:17   2   Q.   Okay.  Let's stop right there.  So during this period of

08:43:20   3   time, you have one with Carlos Nayen and the other ones with Fast

08:43:24   4   And Furious on the earnings and the payments, correct?

08:43:25   5   A.   That's correct.

08:43:26   6   Q.   Okay.  Next, please.  We have the $50,000 check that was

08:43:38   7   winning?

08:43:39   8   A.   That's correct.

08:43:40   9   Q.   And then, what started happening?

08:43:41   10   A.   Tremor Enterprises started making race payments and race

08:43:44   11   earnings.

08:43:46   12   Q.   Next.

08:43:47   13   A.   A race earning.

08:43:48   14   Q.   And what was the amount of that race earning?

08:43:50   15   A.   $23,709.

08:43:53   16   Q.   Was that substantially more than the other earnings during

08:43:57   17   that period of time?

08:43:57   18   A.   Yes.

08:43:58   19   Q.   Next.

08:44:01   20   A.   These are race payments.

08:44:06   21   Q.   All right.  So from the period of time of the voided check

08:44:10   22   and Tremor noted on a race photo as the owner, how much were the

08:44:16   23   race payments?

08:44:19   24   A.   $2,400.

08:44:21   25   Q.   And what were the race earnings?

08:44:23  1   A.   $25,909.

08:44:26  2   Q.   All right.  Next.  The boarding fees.  I'm sorry.  Lifetime

08:44:33  3   race earnings were how much?

08:44:35  4   A.   $29,939.

08:44:39  5   Q.   Now we're going to go to the boarding.  What do you see?

08:44:43  6   A.   The boarding fees are paid by Tremor Enterprises.

08:44:48  7   Q.   Okay.  Can you go back up to the grid in an overview,

08:44:55  8   please?  I see that there's an orange dot here with yellow on the

08:45:01  9   outside.  Can you explain that, please?

08:45:03  10  A.    It's actually green.  This is Adan Farias.  He is sending

08:45:10  11  invoices to Tremor Enterprises for the boarding and training of

08:45:14  12  these horses for this horse.  That's why he is designated with a

08:45:20  13  little green circle.

08:45:21  14  Q.   All right.  Next.  What are you seeing on the veterinarian

08:45:33  15  bills?

08:45:35  16  A.   Tremor Enterprises is paying for the bills.

08:45:39  17  Q.   And was that prior to their actual purchase of it?

08:45:44  18  A.   Yes.

08:45:46  19  Q.   Next.

08:45:53  20  A.   Tremor Enterprises is paying the vet bills.

08:45:56  21  Q.   And now, the insurance.  Insurance is being paid by whom?

08:46:04  22  A.   The insurance is under Fast And Furious in care of Hernando

08:46:17  23  Guerrera.

08:46:17  24  Q.   And then next.

08:46:18  25  A.   The insurance is under Tremor Enterprises.

|          |    |                                                                              |
|----------|----|------------------------------------------------------------------------------|
| 08:46:23 | 1  | Q.   Next.  We're going to look at an overall view.  So can you |
| 08:46:31 | 2  | tell me the name of the individuals that actually touched this |
| 08:46:36 | 3  | horse during this time period? |
| 08:46:39 | 4  | A.   Ramiro Villarreal, Carlos Nayen, Fast And Furious, Tremor |
| 08:46:49 | 5  | Enterprises and Alfonso Del Rayo. |
| 08:46:54 | 6  | Q.   I'm showing you what has previously been admitted as |
| 08:47:00 | 7  | Government's Exhibit 323M.  This is in reference to -- whoops. |
| 08:47:09 | 8  | Thank you.  This is in reference to the insurance and what is |
| 08:47:16 | 9  | contained in notebook 312?  What does this tell you about the |
| 08:47:23 | 10 | insurance? |
| 08:47:31 | 11 | A.   This is they're saying -- the subject is Fast And Furious |
| 08:47:35 | 12 | they used Hernando Guerra's address for. |
| 08:47:38 | 13 | Q.   I'm sorry.  Go ahead. |
| 08:47:40 | 14 | A.   For the mailings of the insurance documents. |
| 08:47:44 | 15 | Q.   Who is Nancy Yearsley? |
| 08:47:46 | 16 | A.   She is the owner of Yearsley Insurance. |
| 08:47:54 | 17 | Q.   And attached to the same exhibit, what is the veterinary |
| 08:48:23 | 18 | certificate -- whose name is the animal under? |
| 08:48:24 | 19 | A.   The name is under Carlos Nayen with Fast And Furious, LLC |
| 08:48:29 | 20 | also included.  And the horse is Blues Ferrari. |
| 08:48:35 | 21 | Q.   And finally, on the insurance, in reference to government's |
| 08:48:54 | 22 | previously admitted Exhibit 323H, again, this is with the |
| 08:49:05 | 23 | insurance company? |
| 08:49:07 | 24 | A.   Yes. |
| 08:49:08 | 25 | Q.   And what does it describe? |

| 08:49:11 | 1 | A.   I am working on these spreadsheets for Tremor and Garcia as |
| 08:49:14 | 2 | you requested.  We have made so many changes on these two |
| 08:49:17 | 3 | accounts that it's difficult to keep them straight. |
| 08:49:25 | 4 | Q.   And have you been back through the records of AQHA on the |
| 08:49:30 | 5 | agent of this particular case -- on this particular horse? |
| 08:49:33 | 6 | A.   Yes. |
| 08:49:34 | 7 | Q.   And was it Fernando Garcia according to any paperwork that |
| 08:49:38 | 8 | you saw? |
| 08:49:39 | 9 | A.   No. |
| 08:49:54 | 10 | Q.   Could we do that overview, please, fully animated of 310A? |
| 08:50:23 | 11 | We looked at Fly First Down and Investigator Williams |
| 08:50:27 | 12 | pulled this up yesterday.  I just briefly want to go, again, who |
| 08:50:32 | 13 | are the players that touched on this particular horse on Fly |
| 08:50:36 | 14 | First Down? |
| 08:50:37 | 15 | A.   Colorado-Cessa, Garcia Bloodstock, Tremor Enterprises, |
| 08:50:47 | 16 | Carlos Nayen, Raul Ramirez and Adan Farias. |
| 08:50:53 | 17 | Q.   I want to touch a little bit on this green section right |
| 08:50:56 | 18 | here.  Yesterday, I asked you a question.  I believe I asked you |
| 08:51:02 | 19 | who paid for the insurance on this, and I believe your response |
| 08:51:05 | 20 | was Fernando Garcia.  Is that correct? |
| 08:51:09 | 21 | A.   I said that yes, but that's incorrect. |
| 08:51:11 | 22 | Q.   Okay.  Can you explain to the jury how you were wrong |
| 08:51:15 | 23 | yesterday? |
| 08:51:15 | 24 | A.   The insurance is under Garcia Bloodstock and Racing.  The |
| 08:51:20 | 25 | insurance was paid for by Hernando Guerra. |

08:51:41  1   Q.   I'm showing you what has previously been admitted as 223R.

08:52:02  2   Are you familiar with this document?

08:52:06  3   A.   Yes.

08:52:08  4   Q.   And is this a invoice from Yearsley Insurance?

08:52:12  5   A.   Yes.

08:52:13  6   Q.   And on this document, who is it addressed to?

08:52:16  7   A.   Garcia Bloodstock and Racing, care of Fernando Garcia.

08:52:21  8   Q.   Did you go through the AQHA paperwork to determine whether

08:52:27  9   or not Fernando Garcia or Bloodstock showed up as an agent on Fly

08:52:33  10  First Down?

08:52:33  11  A.   He did not or the company did not.

08:52:41  12  Q.   And is Fly First Down a part of the horses that was invoiced

08:52:48  13  to Fernando Garcia at Bloodstock?

08:52:53  14  A.   Yes.

08:52:54  15  Q.   And, again, who paid for that?  Did Fernando Garcia?

08:53:07  16  A.   No.

08:53:07  17  Q.   Who paid for it?

08:53:09  18  A.   Hernando Guerra.

08:53:21  19  Q.   In reference to Government's Exhibit 102N, this is a

08:53:36  20  photograph.  Do you recognize any of the players in the

08:53:39  21  photograph on Fly First Down?

08:53:41  22  A.   Yes.

08:53:42  23  Q.   The owner of this horse at the time was listed on this

08:53:45  24  photograph as?

08:53:46  25  A.   Francisco Colorado-Cessa.

08:53:48  1    Q.    And that was consistent with your paperwork?

08:53:53  2    A.    Yes.

08:53:53  3    Q.    And who do you notice in the picture?

08:53:55  4    A.    Fernando Garcia.

08:53:57  5    Q.    Which one is he?  Oh, you've got it.  Thank you.  Who else

08:54:03  6    do you recognize in the photograph?

08:54:04  7    A.    This is Paul Jones, a trainer.

08:54:07  8    Q.    Anyone else?

08:54:08  9    A.    This is Nancy Yearsley, the insurance lady.

08:54:13  10   Q.    Is she the one in the front?  Or is she your blue dot on

08:54:18  11   both females there?

08:54:19  12   A.    The one I got my little pointer on.

08:54:22  13   Q.    Behind Fernando Garcia, correct?

08:54:24  14   A.    Yes.

08:54:25  15   Q.    Anyone else?

08:54:29  16   A.    That's all I recognize.

08:54:31  17   Q.    And finally, on Fly First Down, Government's Exhibit 38C,

08:54:55  18   where was this document found?

08:55:10  19   A.    Lexington, Oklahoma.

08:55:12  20   Q.    And what is this?

08:55:13  21   A.    This is going to be a ESMS vet invoice to Tremor

08:55:21  22   Enterprises.

08:55:21  23   Q.    And what is significant about this amount?

08:55:25  24   A.    If you zoom in, it's showing that this horse was bought from

08:55:32  25   -- it's going to be Carlos Nayen right here.

| | | |
|---|---|---|
| 08:55:44 | 1 | Q.   If we could go to the full animation of 311.   311A, excuse |
| 08:55:52 | 2 | me.   Blues Girls Choice, 311A, again, who were the players that |
| 08:56:10 | 3 | were involved and touched this horse? |
| 08:56:13 | 4 | A.   Ramiro Villarreal, Santa Fe Roldan, Carlos Nayen, Tremor |
| 08:56:24 | 5 | Enterprises and then, a company Grupo Aduanero, which is a wiring |
| 08:56:31 | 6 | company. |
| 08:56:39 | 7 | Q.   In reference to claim of ownership.   I'm referring you now |
| 08:56:49 | 8 | to Exhibit 241.   What were these receipts to? |
| 08:56:54 | 9 | A.   This was the receipt for the purchase of Blues Girls Choice, |
| 08:57:02 | 10 | and it's Mr. Stooks' receipt and it was written for a cash |
| 08:57:07 | 11 | receipt from -- or for Ramiro Villarreal would be this one for |
| 08:57:15 | 12 | Blues Girls Choice. |
| 08:57:23 | 13 | Q.   Whoops, I messed you up.   I'm sorry. |
| 08:57:26 | 14 | A.   That's okay. |
| 08:57:26 | 15 | Q.   But this one over here? |
| 08:57:27 | 16 | A.   Yes. |
| 08:57:28 | 17 | Q.   I'm showing you now what is 226, Government's Exhibit 226. |
| 08:57:34 | 18 | Do you recognize this document? |
| 08:57:37 | 19 | A.   This is American Quarter Horse Association document that -- |
| 08:57:43 | 20 | it's a subpoena document. |
| 08:57:46 | 21 | Q.   That shows what? |
| 08:57:47 | 22 | A.   This shows the ownership through that horse. |
| 08:57:51 | 23 | Q.   Through Tremor Santa Fe Roldan and Lucky 7? |
| 08:57:55 | 24 | A.   Yes. |
| 08:57:59 | 25 | Q.   And we're not going through every single document, correct? |

08:58:05  1   A.   That's correct.

08:58:07  2   Q.   In reference to Government's Exhibit 230, do you recognize

08:58:15  3   this document?

08:58:16  4   A.   Yes.

08:58:17  5   Q.   What do you recognize this document to be?

08:58:19  6   A.   It's a subpoena document from Heritage Place.

08:58:26  7   Q.   And if you flip over a few pages, there's a security

08:58:29  8   agreement that's attached.  What does it say?

08:58:32  9   A.   The buyer's name is Fernando Garcia, and they intend to move

08:58:36  10  the horse to Lexington, Oklahoma.

08:58:39  11  Q.   And what is significant about this document?

08:58:42  12  A.   Well, Tremor Enterprises just sold the horse, and now

08:58:46  13  they're moving the horse back to their location after the sale.

08:58:50  14  Q.   And who's doing it?

08:58:51  15  A.   Fernando Garcia.

08:58:53  16  Q.   And finally, in reference to Government's Exhibit 323C, do

08:59:14  17  you recognize this?

08:59:15  18  A.   Yes.

08:59:16  19  Q.   What is it?

08:59:17  20  A.   It's a Yearsley Insurance document.

08:59:21  21  Q.   And as you flip through that Bates stamp number 592378 at

08:59:30  22  the bottom, what do you recognize there?

08:59:38  23  A.   On this page, it's Santa Fe Roldan, Incorporated, care of

08:59:43  24  Fernando Garcia.  The page before that is Santa Fe Roldan, I

08:59:46  25  believe in care of Hernando Guerrera.  Or Guerra, I should say.

| | | |
|---|---|---|
| 09:00:01 | 1 | Q.   And is this consistent with your testimony yesterday about |
| 09:00:02 | 2 | how confusing these documents are? |
| 09:00:04 | 3 | A.   Yes. |
| 09:00:07 | 4 | Q.   How many horses did you look at? |
| 09:00:11 | 5 | A.   Over 500. |
| 09:00:12 | 6 | Q.   And over the 500 horses that you looked at, did you -- we |
| 09:00:17 | 7 | only went through three with the jury.  Did you see a similar |
| 09:00:20 | 8 | pattern? |
| 09:00:21 | 9 | A.   Yes. |
| 09:00:22 | 10 | Q.   And what was that pattern? |
| 09:00:25 | 11 | A.   The pattern was these horses would change claims of |
| 09:00:30 | 12 | ownership quite rapidly.  Some of the companies are alias |
| 09:00:35 | 13 | companies.  The people's names on the AQHA records are alias |
| 09:00:38 | 14 | names.  Some of them are real names.  But that people did not |
| 09:00:42 | 15 | purchase the horses or have anything to do with the horses. |
| 09:00:46 | 16 | Q.   And as you looked at Blues Girls Choice under the AQHA |
| 09:00:54 | 17 | records, did it ever change from Tremor's name after the Heritage |
| 09:00:59 | 18 | sale? |
| 09:00:59 | 19 | A.   No.  It's currently still in Tremor's name. |
| 09:01:10 | 20 | Q.   In addition to doing these presentation and charts and |
| 09:01:13 | 21 | diagrams, did we request that you pull certain evidence from |
| 09:01:17 | 22 | these boxes to review with the jury today? |
| 09:01:21 | 23 | A.   Yes. |
| 09:01:23 | 24 | Q.   Exhibit No. 5, please.  Can you tell me about Exhibit No. 5? |
| 09:01:38 | 25 | First of all, where was it found? |

09:01:40  1   A.    Lexington, Oklahoma.

09:01:42  2   Q.    And, again, who is Lexington, Oklahoma associated with?

09:01:45  3   A.    Jose Trevino.

09:01:47  4   Q.    And what is it a picture of?

09:01:49  5   A.    That is a picture of a horse named Royal Jess.

09:01:54  6   Q.    Can you tell me the significance of that Royal Jess in your

09:01:56  7   review of the records?

09:02:01  8   A.    The horse was sold from Cookin Cox on 3-25-10 to Bonanza

09:02:09  9   Racing stables 9-4-11.  That's the only ownership I show on this

09:02:12  10  horse.  The horse was stabled at Paul Jones under Carlos Nayen

09:02:19  11  and when we seized the horse in Ruidoso, New Mexico.

09:02:23  12  Q.    Okay.  And you say seized the horse in Ruidoso, New Mexico,

09:02:26  13  when was that?

09:02:28  14  A.    June last year, 2012.

09:02:30  15  Q.    Was that the same date of the search warrants and the arrest

09:02:33  16  warrants done in this case?

09:02:34  17  A.    Yes.

09:02:36  18  Q.    Next, Exhibit No. 6.  Exhibit No. 6 came from where?

09:02:47  19  A.    Lexington, Oklahoma.

09:02:48  20  Q.    And as you turn through the pages, what do you find in

09:02:52  21  Exhibit No. 6?

09:02:53  22  A.    The check to Hector Roldan from Tremor Enterprises for the

09:02:59  23  purchase of Separate Fire for $45,000, dated 3-18 of '11.

09:03:07  24  Q.    And what's that significance?

09:03:08  25  A.    This check was never negotiated for the purchase of this

| | | |
|---|---|---|
| 09:03:11 | 1 | horse. |
| 09:03:13 | 2 | Q.   Next, Exhibit No. 43.  Exhibit No. 43, where was it located? |
| 09:03:21 | 3 | A.   Lexington, Oklahoma. |
| 09:03:23 | 4 | Q.   And what is this exhibit? |
| 09:03:26 | 5 | A.   This is a Bank of America's payment for Tremor Enterprises. |
| 09:03:33 | 6 | Q.   For Tremor Enterprises.  And what does it reflect? |
| 09:03:37 | 7 | A.   This is a -- it's going to be a wire transfer from Tremor |
| 09:03:42 | 8 | Enterprises to Santa Fe Roldan, and the payment detail says, pay |
| 09:03:47 | 9 | back of loan. |
| 09:03:51 | 10 | Q.   At the bottom where I'm pointing? |
| 09:03:53 | 11 | A.   Yes. |
| 09:03:57 | 12 | Q.   Do you know how these funds -- how this was funded? |
| 09:04:07 | 13 | A.   The money came from -- it's off of drug sales. |
| 09:04:14 | 14 | Q.   What about Grupo? |
| 09:04:18 | 15 | A.   Grupo. |
| 09:04:20 | 16 | Q.   Exhibit No. 26.  Where was this document seized? |
| 09:04:26 | 17 | A.   Lexington, Oklahoma. |
| 09:04:28 | 18 | Q.   And what -- do you see the picture of the horse?  Just -- I |
| 09:04:31 | 19 | don't know if they've seen -- the jury has seen this before. |
| 09:04:33 | 20 | What is this called? |
| 09:04:34 | 21 | A.   This was a Coggins test. |
| 09:04:36 | 22 | Q.   Is that C-O-G-G-I-N-S? |
| 09:04:38 | 23 | A.   Yes. |
| 09:04:39 | 24 | Q.   And what does it reflect, in essence? |
| 09:04:42 | 25 | A.   Basically it's a veterinary -- veterinarian is giving this |

09:04:48    1    horse a passing bill of health so they could transfer the horse

09:04:52    2    from state to state.

09:04:53    3    Q.   And what is the name of this particular horse?

09:04:55    4    A.   Separate Fire.

09:04:59    5    Q.   And who is the owner on this particular horse?

09:05:02    6    A.   The name on the statement is Felipe Quintero.

09:05:11    7    Q.   And what do you know in regards to the AQHA history on this

09:05:15    8    particular horse?

09:05:22    9    A.   I'd have to pull up my spreadsheet to look at this one.

09:05:28   10    Q.   Let's go on to the next document.  Exhibit No. 28F.  Do you

09:05:43   11    recognize this document?

09:05:44   12    A.   Yes.

09:05:45   13    Q.   What do you recognize this -- or where was this document

09:05:48   14    seized?

09:05:48   15    A.   Lexington, Oklahoma.

09:05:50   16    Q.   Can you tell the ladies and gentlemen of the jury what this

09:05:52   17    document is?

09:05:54   18    A.   This is a four-page document basically denoting the owners

09:06:00   19    of the horses.

09:06:01   20    Q.   All right.  And let's just go to the first horse.  The first

09:06:06   21    horse is Act Up; is that correct?

09:06:08   22    A.   Yes.

09:06:09   23    Q.   Who owns that horse, according to this document that was

09:06:12   24    seized in Lexington?

09:06:13   25    A.   Zule Farms.

09:06:15  1   Q.   As you go on down, do you also see who else owns these

09:06:21  2   horses, according to this document?

09:06:25  3   A.   If you turn the pages, it will be Victor Nieto.  There's a

09:06:34  4   Nahin Hernandez.

09:06:35  5   Q.   Next one, please.  Next page, please.  And I'm pointing to

09:06:40  6   highlighted area.  Is this where you're referring?

09:06:42  7   A.   Yes.

09:06:43  8   Q.   Next.

09:06:49  9   A.   Nahin Hernandez.

09:06:54  10  Q.   Let's look at a few of those.  Are you familiar with some of

09:06:57  11  these horses, also?

09:06:58  12  A.   Yes.

09:07:00  13  Q.   And then, finally, on that page.  Who's the next listed

09:07:11  14  individual?

09:07:12  15  A.   Efrain Aguallo.

09:07:16  16  Q.   Next.

09:07:23  17  A.   Efrain Aguallo.

09:07:25  18  Q.   And these are the horses listed underneath it?

09:07:27  19  A.   Yes.

09:07:27  20  Q.   Next.

09:07:34  21  A.   We're repeating the same page.  There's only four pages.

09:07:37  22  Q.   I think that's the same page.  Did you look at the AQHA

09:07:40  23  records -- I want to say that again.  AQHA records as all of

09:07:47  24  these different horses listed under these names?

09:07:50  25  A.   Yes.

09:07:51  1   Q.   What did you find?

09:07:53  2   A.   The four people listed behind Zule Farms, they do not own

09:07:59  3   these horses.  They were never -- any of the AQHA paperwork,

09:08:05  4   Roldan has three horses that he had where he appeared on the

09:08:08  5   paperwork.

09:08:24  6   Q.   The next document that's contained as Exhibit No. 33 -- you

09:08:30  7   don't have to flip to that document yet.  Are you familiar with

09:08:33  8   Exhibit No. 33?

09:08:34  9   A.   Yes.

09:08:35  10  Q.   Is it just a typed-out version of the handwritten notes that

09:08:39  11  we just went over?

09:08:40  12  A.   Yes.

09:08:42  13  Q.   And the horses were listed under which names?

09:08:54  14  A.   Efrain Aguallo, Nahin Hernandez.  That's the two names on

09:09:16  15  the typed-out version.

09:09:26  16  Q.   Santa Fe?

09:09:28  17  A.   Typed-out version, just these two names.  On the

09:09:32  18  handwritten.

09:09:32  19  Q.   I'm sorry.  I'm on the handwritten.

09:09:37  20  A.   Victor Nieto and Hector Roldan.

09:09:56  21  Q.   Is that correct?

09:09:57  22  A.   Yes.

09:10:00  23  Q.   Where were these horses stabled or boarded according to your

09:10:05  24  records?

09:10:07  25  A.   Over 50 percent were boarded at Southwest Stallion and Paul

| | | |
|---|---|---|
| 09:10:13 | 1 | Jones had some of them.  And then, they ended up at Zule Farms. |
| 09:10:26 | 2 | Q.   And who were the expenses paid for?  And I'm talking about |
| 09:10:34 | 3 | boarding expenses, vet expenses. |
| 09:10:38 | 4 | A.   The expenses at Southwest Stallion, Carlos Nayen paid for |
| 09:10:42 | 5 | some.  Lopez paid for some, Alfonso Del Rayo paid for some.  A |
| 09:10:53 | 6 | guy named Alcala paid for some.  Guzman paid for some.  And an |
| 09:10:59 | 7 | individual named Comacho also paid for some. |
| 09:11:09 | 8 | Q.   And in reference to the type of money that was used, the |
| 09:11:12 | 9 | form of money that was used by Carlos Nayen, what was mainly his |
| 09:11:16 | 10 | form of money? |
| 09:11:17 | 11 | A.   Wires. |
| 09:11:24 | 12 | Q.   Lopez? |
| 09:11:29 | 13 | A.   Cash. |
| 09:11:30 | 14 | Q.   And Del Rayo? |
| 09:11:36 | 15 | A.   Personal checks. |
| 09:11:53 | 16 | Q.   All right.  Can we go to Government's Exhibit 55A?  Can you |
| 09:12:23 | 17 | tell the ladies and gentlemen of the jury what 55A -- or where it |
| 09:12:26 | 18 | was found, first of all? |
| 09:12:27 | 19 | A.   In Austin, Texas. |
| 09:12:34 | 20 | Q.   And what individuals were associated in Austin, Texas with |
| 09:12:38 | 21 | search warrants? |
| 09:12:38 | 22 | A.   The two Huitrons. |
| 09:12:41 | 23 | Q.   Is that both Eusevio and Jesus? |
| 09:12:44 | 24 | A.   Yes. |
| 09:12:44 | 25 | Q.   Can you tell me the significance of Government's Exhibit |

| | | |
|---|---|---|
| 09:12:53 | 1 | 55A? |
| 09:12:55 | 2 | A.   These are veterinarian bills for numerous horses.  And these |
| 09:13:02 | 3 | horses are all horses that I'm very familiar with on my |
| 09:13:06 | 4 | spreadsheets. |
| 09:13:15 | 5 | Q.   And who were these horses associated with that you have gone |
| 09:13:19 | 6 | through for the jury? |
| 09:13:22 | 7 | A.   These horses are associated with Ramiro Villarreal, Santa Fe |
| 09:13:26 | 8 | Roldan, Colorado-Cessa, Desiree Princess Ranch, Poker Ranch, 66 |
| 09:13:34 | 9 | Land, Bonanza Racing, Tremor Enterprises, Fernando Garcia are |
| 09:13:42 | 10 | some of the companies and names that are associated with these |
| 09:13:45 | 11 | horses. |
| 09:14:02 | 12 | Q.   Carmina associated with what was found? |
| 09:14:06 | 13 | A.   Yes. |
| 09:14:08 | 14 | Q.   In Austin, Texas.  Tremor Enterprises, who's that associated |
| 09:14:12 | 15 | with? |
| 09:14:12 | 16 | A.   Jose Trevino. |
| 09:14:16 | 17 | Q.   Francisco Colorado-Cessa, what entity is that associated |
| 09:14:20 | 18 | with? |
| 09:14:21 | 19 | A.   ADT. |
| 09:14:23 | 20 | Q.   Desiree Princess Ranch? |
| 09:14:27 | 21 | A.   Fernando Garcia. |
| 09:14:28 | 22 | Q.   Poker Ranch? |
| 09:14:30 | 23 | A.   Fernando Garcia. |
| 09:14:31 | 24 | Q.   Fast And Furious? |
| 09:14:32 | 25 | A.   Hernando Guerra. |

09:14:35   1   Q.   And all of these were veterinary bills found at the
09:14:42   2   Huitrons' home in Austin, correct, or business?
09:14:44   3   A.   I believe it was the business.
09:14:57   4   Q.   Government's Exhibit 55D.  What is this document and where
09:15:13   5   was it found?
09:15:14   6   A.   What document did you say?
09:15:16   7   Q.   I said 55D.  That might be a typo on mine.
09:15:22   8   A.   This is a --
09:15:23   9   Q.   What is 55D?
09:15:25   10  A.   It was found in Austin.  It's an Elgin Veterinary Hospital
09:15:29   11  fax to Jessica Huitron.
09:15:42   12  Q.   Was Jessica Huitron -- what's the significance of this
09:15:45   13  particular document?
09:15:47   14  A.   This has a list of horses, and then, behind the horses,
09:15:51   15  you'll see names associating the horse with the name or the
09:15:56   16  company.
09:16:05   17  Q.   All right.  And the significance of this?
09:16:08   18  A.   These are all horses that we are familiar with.
09:16:12   19  Q.   And how are you familiar with them?
09:16:14   20  A.   Through the sales and purchases of these horses and the
09:16:18   21  seizures.
09:16:20   22  Q.   And anything listed under Fernando Garcia?
09:16:23   23  A.   There's several horses.
09:16:25   24  Q.   Did you go back with the AQHA records on that?
09:16:29   25  A.   I did.  One of the documents that we have coming up on

| | | |
|---|---|---|
| 09:16:33 | 1 | numerous horses. |
| 09:16:35 | 2 | Q.   55C.  What is this document? |
| 09:16:46 | 3 | A.   This is a list of horses for, once again, individuals who |
| 09:16:52 | 4 | are associated with this horse.  And the very last page is for |
| 09:17:01 | 5 | Fernando Garcia. |
| 09:17:02 | 6 | Q.   Where was this document found? |
| 09:17:04 | 7 | A.   Austin, Texas. |
| 09:17:07 | 8 | Q.   And what is the very last page? |
| 09:17:09 | 9 | A.   It's Fernando Garcia's horses. |
| 09:17:11 | 10 | Q.   Okay.  This is what you were referring to earlier? |
| 09:17:14 | 11 | A.   Yes. |
| 09:17:15 | 12 | Q.   Did you go back and look at all of these horses? |
| 09:17:17 | 13 | A.   I did. |
| 09:17:18 | 14 | Q.   And what records did you use in order to determine where |
| 09:17:22 | 15 | these horses came from? |
| 09:17:23 | 16 | A.   AQHA. |
| 09:17:25 | 17 | Q.   What did you find out in reference to ownership and/or agent |
| 09:17:29 | 18 | under Fernando Garcia with these horses? |
| 09:17:32 | 19 | A.   Of the 33 horses, six of them are in Fernando Garcia's name. |
| 09:17:38 | 20 | Q.   What about the rest of them? |
| 09:17:40 | 21 | A.   They fall under Desiree Princess Ranch, Tremor Enterprises, |
| 09:17:46 | 22 | Colorado-Cessa, Carmina, LLC, Poker Ranch, Santa Fe Roldan, |
| 09:17:55 | 23 | Bonanza Racing, 66 Land. |
| 09:18:00 | 24 | Q.   Do you see in the middle of the page where my red laser is? |
| 09:18:06 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 09:18:06 | 1 | Q.   What's the name of that horse? |
| 09:18:08 | 2 | A.   Mr. Jess Forty. |
| 09:18:10 | 3 | Q.   And you say Forty.  There's an XL there.  Does Roman numeral |
| 09:18:16 | 4 | XL stand for 40? |
| 09:18:18 | 5 | A.   Yes, it does. |
| 09:18:18 | 6 | Q.   Do you know any other players in the particular conspiracy |
| 09:18:21 | 7 | that goes by "40"? |
| 09:18:22 | 8 | A.   Miguel Trevino. |
| 09:18:27 | 9 | Q.   Government's Exhibit 60A.  Can you tell me what Government's |
| 09:18:36 | 10 | Exhibit -- where it was found first? |
| 09:18:38 | 11 | A.   It was found in Austin, Texas. |
| 09:18:40 | 12 | Q.   And what is the significance of all of these handwritten |
| 09:18:43 | 13 | notes? |
| 09:18:45 | 14 | A.   This is a document of handwritten notes that just ties the |
| 09:18:49 | 15 | individuals together. |
| 09:18:50 | 16 | Q.   All right.  Who's on -- help me a little bit here.  Who is |
| 09:18:54 | 17 | this that I'm pointing to right here? |
| 09:18:56 | 18 | A.   Felipe Quintero.  He's a trainer in California. |
| 09:19:00 | 19 | Q.   And is there also a phone number listed under here for him? |
| 09:19:06 | 20 | A.   It's a phone number listed for Fernando Garcia. |
| 09:19:10 | 21 | Q.   What about "Nando" Guerra at the top right-hand corner? |
| 09:19:13 | 22 | A.   That's Hernando Guerra's phone number. |
| 09:19:16 | 23 | Q.   And, again, this was found either at the business of the |
| 09:19:18 | 24 | Huitrons'; is that correct? |
| 09:19:19 | 25 | A.   That's correct. |

09:19:24  1   Q.   What about this right here?  Who does that say?

09:19:27  2   A.   Says Roberto Ramirez.

09:19:30  3   Q.   And, again, these are the people that are associated with

09:19:33  4   the same names that you looked through with these documents,

09:19:35  5   correct?

09:19:35  6   A.   Yes.

09:19:37  7   Q.   60B, where was this document found?

09:19:49  8   A.   Austin, Texas.

09:19:51  9   Q.   And could you tell me the significance of 60B?

09:19:56  10  A.   There are numerous horses that are listed under Hernando

09:19:59  11  Guerra that he never owned.

09:20:01  12  Q.   And how do you know he never owned those horses?

09:20:05  13  A.   Because during our interview, he told us he did not own

09:20:09  14  these horses, and looking at AQHA records, he also did not appear

09:20:15  15  on the records.

09:20:16  16  Q.   One of those horses, hip No. 28; is that correct?

09:20:22  17  A.   I don't know if the hip number -- if that's a hip number or

09:20:25  18  not, but Forty Force.

09:20:28  19  Q.   Again, are you familiar with "40" in reference to nickname

09:20:32  20  of any of the coconspirators?

09:20:34  21  A.   Miguel Trevino.

09:20:35  22  Q.   You look down at 45, what's the name of that particular

09:20:40  23  horse?

09:20:40  24  A.   Lady Nayen.

09:20:42  25  Q.   Are you familiar with the name Nayen?

| | | |
|---|---|---|
| 09:20:44 | 1 | A.   Yes. |
| 09:20:45 | 2 | Q.   And is that name associated with any coconspirator in this |
| 09:20:50 | 3 | case? |
| 09:20:50 | 4 | A.   Carlos Nayen. |
| 09:20:52 | 5 | Q.   Thank you.   Next.  67, I'm sorry.  Government's Exhibit No. |
| 09:21:23 | 6 | 67, where was this particular document located? |
| 09:21:28 | 7 | A.   Austin, Texas. |
| 09:21:29 | 8 | Q.   What is this document? |
| 09:21:31 | 9 | A.   This is the license application for Carlos Nayen. |
| 09:21:37 | 10 | Q.   So the licensing application for Carlos Nayen found at the |
| 09:21:41 | 11 | Huitrons' business, correct? |
| 09:21:43 | 12 | A.   Yes. |
| 09:21:43 | 13 | Q.   Next, Government's Exhibit 70.  Excuse me.  Are you familiar |
| 09:21:55 | 14 | with this document? |
| 09:21:55 | 15 | A.   Yes. |
| 09:21:56 | 16 | Q.   Again, where was it found? |
| 09:21:57 | 17 | A.   Austin, Texas. |
| 09:21:58 | 18 | Q.   And what's the significance of this document? |
| 09:22:03 | 19 | A.   The horses are horses we are familiar with.  The notations |
| 09:22:09 | 20 | at the top are Mexico, $4,693 and Jose, $802. |
| 09:22:19 | 21 | Q.   We have a coconspirator in this case on the name of Jose? |
| 09:22:22 | 22 | A.   Yes. |
| 09:22:23 | 23 | Q.   And does he have any associates, any family relatives in |
| 09:22:26 | 24 | Mexico? |
| 09:22:27 | 25 | A.   Yes. |

09:22:31  1   Q.   Exhibit No. 72.  Where was Exhibit No. 72 located?

09:22:40  2   A.   Austin, Texas.

09:22:42  3   Q.   And what is Exhibit No. 72?

09:22:46  4   A.   It is a list of horses.

09:22:50  5   Q.   Horses that you're familiar with?

09:22:51  6   A.   Yes.

09:22:53  7   Q.   How?

09:22:55  8   A.   Through the records of AQHA and, also, the seizures and

09:23:01  9   purchases of these horses.

09:23:02  10  Q.   And as you look at these horses -- or did you look at these

09:23:05  11  horses in review for the jury today?

09:23:08  12  A.   Yes.

09:23:09  13  Q.   What did you notice about the ownership or the claim of

09:23:11  14  ownership on these horses?

09:23:12  15  A.   There's a variety of claims of ownership.

09:23:16  16  Q.   Again, consistent with the review of the three horses that

09:23:20  17  we did earlier?

09:23:21  18  A.   Yes.

09:23:21  19  Q.   Government's Exhibit No. 301A.  This is a copy of

09:24:17  20  Government's Exhibit 103A.

09:24:21  21  A.   Yes.

09:24:23  22  Q.   It's 103A.  That's why I messed you up, isn't it?  Keep me

09:24:33  23  on my toes.

09:24:34  24       Can you tell me what this is?

09:24:36  25  A.   This is American Quarter Horse Association Certificate of

09:24:40  1    Registration for First Prize Smith.

09:24:43  2    Q.    Where was it located?

09:24:45  3    A.    This was located in Mission, Texas.

09:24:47  4    Q.    And who is that associated with, Mission Texas?

09:24:52  5    A.    Fernando Garcia.

09:24:54  6    Q.    Tell me the significance of this particular horse.

09:24:57  7    A.    This horse is -- the owner per AQHA is Bonanza Racing

09:25:03  8    Stables, located in Mission, Texas, and the horse was stabled at

09:25:09  9    Zule Farms Ordad.

09:25:12  10   Q.    I'm sorry, what was the last part?

09:25:14  11   A.    It was stabled at Zule Farms Ordad.

09:25:21  12   Q.    Government's Exhibit 103B?

09:25:26  13   A.    This is another certificate of American Quarter Horse

09:25:30  14   Association for Corona B Cool.

09:25:34  15   Q.    Current owner?

09:25:35  16   A.    Bonanza Racing Stables.

09:25:38  17   Q.    Where was the certificate located?

09:25:41  18   A.    Mission, Texas.

09:25:43  19   Q.    And again, associated with which defendant?

09:25:46  20   A.    With Fernando Garcia and, also, with Jose Trevino.  The

09:25:54  21   horse was stabled at Zule Farms in Oklahoma and it also died.

09:26:01  22   Q.    I just pointed to state county.  That was wrong.  I

09:26:05  23   shouldn't have done that; is that correct?

09:26:07  24   A.    I couldn't hear you.

09:26:09  25   Q.    That's not where it was farmed.  That's another entry; is

| | | |
|---|---|---|
| 09:26:12 | 1 | that correct? |
| 09:26:12 | 2 | A.   Well, Homer Hill was the person who was the breeder of this |
| 09:26:17 | 3 | horse. |
| 09:26:17 | 4 | Q.   Right.  But not where it was actually located as you were |
| 09:26:22 | 5 | giving that testimony.  I messed up is what I'm saying. |
| 09:26:24 | 6 | A.   Okay. |
| 09:26:26 | 7 | Q.   Government's Exhibit 203.  Where was Government's Exhibit |
| 09:26:35 | 8 | 203 located? |
| 09:26:36 | 9 | A.   California. |
| 09:26:38 | 10 | Q.   And, again, we're seeing this Yearsley.  What is Yearsley? |
| 09:26:42 | 11 | A.   This is the horse insurance. |
| 09:26:46 | 12 | Q.   And which horse is this in reference to? |
| 09:26:50 | 13 | A.   This is in reference to several horses. |
| 09:26:55 | 14 | Q.   And what are those horses? |
| 09:26:59 | 15 | A.   Night Jasmine, then it's 443.  I don't know the name of that |
| 09:27:09 | 16 | horse. |
| 09:27:10 | 17 | Q.   Is that Mr. Jess Perry? |
| 09:27:14 | 18 | A.   443? |
| 09:27:17 | 19 | Q.   Yes. |
| 09:27:18 | 20 | A.   I don't recall. |
| 09:27:19 | 21 | Q.   Okay.  And then, 443, is that Fly Down Dash?  Tempting |
| 09:27:28 | 22 | Chick? |
| 09:27:28 | 23 | A.   The 443 was Night Jasmine.  443 is the parents for the |
| 09:27:34 | 24 | horse. |
| 09:27:35 | 25 | Q.   And what's the significance of this? |

| | | |
|---|---|---|
| 09:27:38 | 1 | A.    Well, these are horses we're familiar with. |
| 09:27:41 | 2 | Q.    Next page.  And again, these particular horses. |
| 09:27:53 | 3 | A.    On the left side, that is the parents.  On the right side is |
| 09:27:57 | 4 | the name of the horse. |
| 09:27:59 | 5 | Q.    All right. |
| 09:28:01 | 6 | A.    And the summary requested for insurance on these horses. |
| 09:28:06 | 7 | Q.    And finally, the third page on this document, please.  What |
| 09:28:12 | 8 | is the third page on this document?  What's significant about it? |
| 09:28:15 | 9 | A.    These are some more horses, but they're all renamed and they |
| 09:28:23 | 10 | are insured under Garcia Bloodstock and the purchase -- or the |
| 09:28:29 | 11 | requested amount for insuring on the horse. |
| 09:28:35 | 12 | Q.    And there is a handwritten note, if you'll zoom out on the |
| 09:28:37 | 13 | bottom of this page. |
| 09:28:42 | 14 | A.    It's actually the last page. |
| 09:28:43 | 15 | Q.    Oh, the last page.  What does it say there? |
| 09:28:46 | 16 | A.    Carlito insurance. |
| 09:28:48 | 17 | Q.    And what does that mean? |
| 09:28:49 | 18 | A.    It's Carlos Nayen's.  This was located at his residence. |
| 09:29:08 | 19 | Q.    Your Honor, at this time the government would tender |
| 09:29:11 | 20 | Government's 409 as demonstrative handwritten notes from direct |
| 09:29:16 | 21 | examination. |
| 09:29:23 | 22 |        THE COURT:  All right.  409 is received as |
| 09:29:26 | 23 | demonstrative exhibit. |
| 09:29:28 | 24 |        MS. FERNALD:  Pass the witness. |
| 09:29:38 | 25 | |

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
| 09:29:38 | 1  | CROSS-EXAMINATION                                       |
| 09:29:38 | 2  | BY MS. WILLIAMS:                                        |
| 09:29:54 | 3  | Q.   Investigator Schutt, we don't know each other, do we? |
| 09:29:56 | 4  | A.   No.  My name is Schutt.                            |
| 09:29:58 | 5  | Q.   Schutt?                                            |
| 09:29:59 | 6  | A.   Yes.                                               |
| 09:29:59 | 7  | Q.   I'm sorry.  I thought I heard the prosecutor call you |
| 09:30:03 | 8  | something different.  My name is Christie Williams.  We have |
| 09:30:06 | 9  | never met.                                              |
| 09:30:07 | 10 | A.   No.                                                |
| 09:30:07 | 11 | Q.   I represent Jose Trevino.                          |
| 09:30:09 | 12 | A.   Yes.                                               |
| 09:30:10 | 13 | Q.   I want to first ask -- Marisol, can you pull up Exhibit 43? |
| 09:30:18 | 14 | I want to ask you about something that you testified to.  Could |
| 09:30:25 | 15 | you zoom in a little bit?                               |
| 09:30:37 | 16 | Ms. Fernald asked you about this wire transfer.  Do you |
| 09:30:43 | 17 | remember that?                                          |
| 09:30:44 | 18 | A.   Yes.                                               |
| 09:30:45 | 19 | Q.   And this is, I guess, first -- I guess we need to go back. |
| 09:30:50 | 20 | First is Exhibit 6.  Sorry.  There's a check at the top, dated |
| 09:30:59 | 21 | March 28th of 2011, for the purchase of Separate Fire.  |
| 09:31:04 | 22 | A.   That's correct.                                    |
| 09:31:05 | 23 | Q.   To Hector Roldan?                                  |
| 09:31:06 | 24 | A.   Yes.                                               |
| 09:31:06 | 25 | Q.   And that check was never negotiated.               |

| | | |
|---|---|---|
| 09:31:09 | 1 | A.    That's correct. |
| 09:31:10 | 2 | Q.    And so, then, now we go back to Exhibit 43 where the money |
| 09:31:16 | 3 | was wired. |
| 09:31:18 | 4 | A.    Yes. |
| 09:31:19 | 5 | Q.    And that money was funded from Mr. Trevino's bank account; |
| 09:31:24 | 6 | isn't that true? |
| 09:31:25 | 7 | A.    It came from his bank account. |
| 09:31:28 | 8 | Q.    Is that a "Yes"? |
| 09:31:28 | 9 | A.    Yes. |
| 09:31:30 | 10 | Q.    I'm having a little bit of trouble hearing you.  Will you -- |
| 09:31:33 | 11 | A.    Yes. |
| 09:31:33 | 12 | Q.    -- just lift that microphone up just a little bit? |
| 09:31:37 | 13 | So Mr. Trevino wrote a check that, for whatever reason, |
| 09:31:43 | 14 | was not negotiated, and then, a few months later, he wired the |
| 09:31:51 | 15 | money. |
| 09:31:51 | 16 | A.    Yes. |
| 09:31:52 | 17 | Q.    And there was a period of time he wired the money from his |
| 09:31:57 | 18 | bank account, from the same bank account that he wrote that check |
| 09:31:59 | 19 | on, right? |
| 09:32:08 | 20 | A.    Yes. |
| 09:32:09 | 21 | Q.    And he had the money in the bank account at the time the |
| 09:32:12 | 22 | check was written and at the time the wire was sent; isn't that |
| 09:32:15 | 23 | true? |
| 09:32:17 | 24 | A.    Yes. |
| 09:32:22 | 25 | Q.    But when you -- now, we didn't see a chart about this |

09:32:28  1   particular horse, but when you -- if you were going to make a

09:32:32  2   chart about this horse, you would put the purchase date as June

09:32:38  3   the 28th of 2011, instead of 3-28-2011, wouldn't you?

09:32:44  4   A.   No.  I would not.

09:32:45  5   Q.   You wouldn't?

09:32:46  6   A.   No.

09:32:47  7   Q.   Okay.  Well, let's look at Exhibit 312.  Do you have that in

09:32:57  8   front of you?

09:33:00  9   A.   What is it?

09:33:01  10  Q.   It's one of your colorful charts.

09:33:04  11  A.   Could you tell me which horse?

09:33:08  12  Q.   Blues Ferrari?

09:33:13  13  A.   I do not have the chart in front of me.  I'll have to have

09:33:15  14  it pulled up.

09:33:16  15  Q.   All right.  Would you mind?

09:33:18  16        THE COURT:  While you're doing that, counsel, if y'all

09:33:20  17  would come up.

09:33:28  18        (At the bench, on the record.)

09:33:33  19        THE COURT:  I don't want to break up your cross, but I

09:33:43  20  think you're running over our interpreters awfully.

09:33:48  21        MS. WILLIAMS:  Going too fast.  Okay.  I'll try to

09:33:50  22  speak more slow, your Honor.

09:33:52  23        THE COURT:  Yeah.

09:34:17  24  Q.   (BY MS. WILLIAMS) All right.  We've got this pulled up.  And

09:34:19  25  I've been advised to speak a little more slowly and I will try.

| | | |
|---|---|---|
| 09:34:25 | 1 | So you just told me that you didn't make the purchase |
| 09:34:30 | 2 | date, the date that a check was negotiated.  But on this exhibit, |
| 09:34:34 | 3 | which I think is 312, you see where you wrote a big red "No." |
| 09:34:42 | 4 | A.   Yes. |
| 09:34:42 | 5 | Q.   Over the check that was sent on October 1st? |
| 09:34:47 | 6 | A.   Yes. |
| 09:34:50 | 7 | Q.   That's because the check wasn't actually deposited until |
| 09:34:55 | 8 | December the 20th, right? |
| 09:34:58 | 9 | A.   That check was voided. |
| 09:35:00 | 10 | Q.   That wasn't my question.  The check for $50,000 wasn't |
| 09:35:04 | 11 | actually deposited until December 20th, right? |
| 09:35:07 | 12 | A.   There are two different checks. |
| 09:35:08 | 13 | Q.   I understand that.  I'll get to that.  I promise. |
| 09:35:11 | 14 | But the check was deposited on December 20th, right? |
| 09:35:16 | 15 | A.   A check was deposited.  Yes. |
| 09:35:19 | 16 | Q.   And that's where you drew the orange line that signifies on |
| 09:35:23 | 17 | your chart ownership, right? |
| 09:35:25 | 18 | A.   A claim of ownership.  Yes. |
| 09:35:27 | 19 | Q.   So when you told me, a while ago, that you didn't use the |
| 09:35:31 | 20 | date that a check was negotiated as a claim of ownership, the |
| 09:35:34 | 21 | date of a claim of ownership, that wasn't really right, was it? |
| 09:35:38 | 22 | A.   Every -- |
| 09:35:40 | 23 | Q.   Was it?  It's a "Yes" or "No" question.  It was right or it |
| 09:35:43 | 24 | wasn't right. |
| 09:35:45 | 25 | A.   Okay.  Ask your question again. |

| | | |
|---|---|---|
| 09:35:46 | 1 | Q.   When you told me, a while ago, that you didn't actually use |
| 09:35:49 | 2 | the date that actually was negotiated or the payment was made as |
| 09:35:52 | 3 | the date of a claim of ownership, that wasn't really right, |
| 09:35:56 | 4 | because that's what you did on this chart; isn't that true? |
| 09:36:01 | 5 | A.   Yes. |
| 09:36:03 | 6 | Q.   So let's talk a little bit about this big red "No."  Because |
| 09:36:08 | 7 | that's a symbol for "No," right? |
| 09:36:10 | 8 | A.   Yes. |
| 09:36:10 | 9 | Q.   No parking.  No littering. |
| 09:36:14 | 10 | When you went through Mr. Trevino's belongings that you |
| 09:36:22 | 11 | took from his house and his office, you found that check for |
| 09:36:28 | 12 | $50,000 that was written on December -- I mean, October 1st, |
| 09:36:32 | 13 | didn't you? |
| 09:36:32 | 14 | A.   It was found.  Yes. |
| 09:36:34 | 15 | Q.   And you also found a Fed Ex envelope where that check was |
| 09:36:40 | 16 | sent to Hernando Guerra in McAllen, didn't you? |
| 09:36:45 | 17 | A.   I didn't see that. |
| 09:36:50 | 18 | Q.   If Mr. Trevino Fed Ex-ed a check to Mr. Guerra on or about |
| 09:36:57 | 19 | October the 1st and, for whatever reason, it didn't get delivered |
| 09:37:02 | 20 | and it came back and then, he issued a new check, that would make |
| 09:37:08 | 21 | a little more sense, wouldn't it? |
| 09:37:11 | 22 | A.   It could make sense. |
| 09:37:14 | 23 | Q.   I want to ask you about insurance for horses.  Insurance for |
| 09:37:27 | 24 | horses is a complicated process.  Would you agree with me? |
| 09:37:30 | 25 | A.   Yes. |

09:37:31   1   Q.   Because it's a little bit like -- not exactly but a little

09:37:38   2   bit like car insurance.  When they send you your bill for car

09:37:41   3   insurance, it's generally for a period of time.

09:37:46   4   A.   Yes.

09:37:47   5   Q.   So you might pay the insurance from January 1st to December

09:37:54   6   31st?

09:37:55   7   A.   Yes.

09:37:56   8   Q.   But you might sell the car on October 1st, right?

09:38:04   9   A.   Is that a question or --

09:38:05   10   Q.   You might.  You might sell the car, right?  But you still

09:38:09   11   have already paid the rest of the year of insurance.

09:38:12   12   A.   Yes.

09:38:13   13   Q.   And so, when you make your colored lines, did you take that

09:38:18   14   into account?

09:38:19   15   A.   Yes.

09:38:25   16   Q.   When you insure a horse, you could only collect on the

09:38:30   17   insurance if you have two things at the time the horse dies.  Do

09:38:35   18   you know what those two things are?

09:38:36   19   A.   One's a veterinary statement showing the -- what caused his

09:38:42   20   death is one of them I know of.

09:38:44   21   Q.   Okay.  It wasn't really what I was thinking of, but that's

09:38:47   22   probably true.  You have to have insurance in your name at the

09:38:51   23   time the horse dies.  Would you agree with me?

09:38:54   24   A.   I would agree.

09:38:55   25   Q.   And you have to have a certificate of ownership that shows

09:38:58   1   you own the horse.  You have to have the horse's title --

09:39:01   2   A.   Yes.

09:39:02   3   Q.   -- right?  And if those two things aren't in your

09:39:06   4   possession, or you don't have them, at the time the horse dies,

09:39:09   5   it doesn't matter what e-mails you have.  You don't get to

09:39:13   6   collect on the horse, right?

09:39:16   7   A.   I would assume so.

09:39:24   8   Q.   You talked a little bit about a veterinarian statement.  Did

09:39:27   9   you do some research into -- as part of your work on this case

09:39:32  10   into what happens when a horse dies?  Did you talk to some people

09:39:37  11   about that?

09:39:38  12   A.   As far as the autopsy?

09:39:40  13   Q.   Okay.  We'll start there.  Did you?

09:39:43  14   A.   I know they do an autopsy.  It's called a different name.

09:39:47  15   Q.   They call it a necropsy; is that right?

09:39:49  16   A.   Yes.

09:39:50  17   Q.   And so, when a horse dies and it's insured, the difference

09:39:55  18   between a person dying and having life insurance and a horse

09:39:58  19   dying and having horse insurance is that the horse insurance

09:40:01  20   company gets to run the investigation into what happened to the

09:40:04  21   horse, right?

09:40:07  22   A.   I don't know.

09:40:09  23   Q.   You don't know about that?

09:40:10  24   A.   No.

09:40:10  25   Q.   All right.  Could I have 311A?  Thank you.

09:40:49  1          All right.  So, again, I'm looking at your orange line

09:41:14  2    right here where you have, I think in your words, said that

09:41:21  3    Tremor Enterprises has asserted a claim of ownership.

09:41:24  4    A.    Yes.

09:41:26  5    Q.    But there's a little bit of time prior to that where Tremor

09:41:32  6    Enterprises is paying the training.

09:41:35  7    A.    Yes.

09:41:36  8    Q.    And one explanation for that could be that you picked the

09:41:42  9    date the actual check was negotiated, instead of whatever day the

09:41:46  10   agreement was made to sell the horse, right?

09:41:53  11   A.    Okay.  There was no check for a race payment before the

09:42:00  12   purchase of that horse.

09:42:01  13   Q.    I didn't say -- well, if I said --

09:42:03  14   A.    You're confusing me.  There is race payments and race

09:42:07  15   earnings.

09:42:08  16   Q.    Okay.  But I think what I said was training.  That's what I

09:42:12  17   meant to say.

09:42:13  18   A.    Okay.

09:42:13  19   Q.    See where that long orange line is that goes a little bit to

09:42:17  20   the left?

09:42:18  21   A.    Yes.

09:42:25  22   Q.    See where that long orange line is that goes a little bit to

09:42:28  23   the left of your ownership line?

09:42:30  24   A.    Yes.

09:42:30  25   Q.    And so, one explanation for that would be that an agreement

09:42:34   1   was made to sell this horse back at the end of April, but the

09:42:39   2   check actually wasn't negotiated until May 23rd, right?

09:42:46   3   A.   That's possible.

09:42:50   4   Q.   So we don't always know what the agreement is between the

09:42:59   5   buyer and the seller?

09:43:01   6   A.   That's correct.

09:43:02   7   Q.   When you sell a horse?

09:43:03   8   A.   That's correct.

09:43:04   9   Q.   Sometimes there's a contract and sometimes there's not.

09:43:08   10  A.   That's correct.

09:43:09   11  Q.   And in the horse industry, both of those are completely

09:43:12   12  normal.

09:43:13   13  A.   Yes.

09:43:15   14  Q.   And so -- can we go to 310A?  You know that sometimes a

09:43:45   15  person -- two people will agree to buy and sell a horse, and

09:43:50   16  sometimes the whole payment isn't made at once.

09:43:56   17  A.   That's possible.

09:43:57   18  Q.   Well, like we had some testimony from the lady who runs the

09:44:02   19  Heritage Place auction, and she told us that sometimes people put

09:44:06   20  a deposit and then, they make the remainder of the payment at a

09:44:09   21  later date.  Do you remember that?

09:44:11   22  A.   I wasn't present for that.

09:44:12   23  Q.   You weren't here.  But you would agree with me that that --

09:44:14   24  A.   That's possible.

09:44:15   25  Q.   It's possible.  Not just possible, but it happens on a real

| | | |
|---|---|---|
| 09:44:18 | 1 | regular basis in the horse industry. |
| 09:44:20 | 2 | A.   If that's what they testified to. |
| 09:44:22 | 3 | Q.   Well, do you agree that that's a regular -- |
| 09:44:25 | 4 | A.   I just said it's possible. |
| 09:44:26 | 5 | Q.   Okay.  And it's also a regular practice in the horse |
| 09:44:37 | 6 | industry to trade horses for, for example, breedings.  I have a |
| 09:44:50 | 7 | really valuable stallion, right? |
| 09:44:55 | 8 | A.   I don't know if you have a valuable stallion. |
| 09:44:57 | 9 | Q.   I'm going to give you an example.  You tell me if you're |
| 09:44:59 | 10 | with me.  Okay? |
| 09:45:01 | 11 | A.   All right. |
| 09:45:02 | 12 | Q.   I'm setting up the hypothetical.  I own a valuable stallion. |
| 09:45:09 | 13 | You have a horse that I want to buy.  Are you with me so far? |
| 09:45:15 | 14 | A.   Yes. |
| 09:45:20 | 15 | Q.   I agree to let you breed one of your mares to my stallion, |
| 09:45:24 | 16 | but I want you to, in exchange, instead of paying me money, I |
| 09:45:28 | 17 | want you to give me the horse.  That could happen, can't it? |
| 09:45:34 | 18 | A.   That's possible. |
| 09:45:41 | 19 | Q.   I mean, I know the prosecutor said that you spent five years |
| 09:45:45 | 20 | growing up on a quarter horse ranch? |
| 09:45:48 | 21 | A.   Yes. |
| 09:45:48 | 22 | Q.   Right?  How old were you then? |
| 09:45:50 | 23 | A.   Fifth, sixth, seventh. |
| 09:45:54 | 24 | Q.   Junior high? |
| 09:45:55 | 25 | A.   I was in -- |

09:45:56  1   Q.    Ish?

09:45:56  2   A.    Younger than junior high.

09:45:58  3   Q.    Younger than junior.  All right.  You're not a horse expert?

09:46:00  4   A.    I never said I was.

09:46:01  5   Q.    I understand and I'm not trying to make you into one.  But

09:46:06  6   you have made some conclusions, and I want to make sure that the

09:46:11  7   jury understands that there are some alternate scenarios that you

09:46:15  8   might not have considered.  Fair enough?

09:46:17  9   A.    Yes.

09:46:19  10  Q.    So, for example, when this exchange is done between Mr.

09:46:31  11  Cessa, Mr. Colorado, and Mr. Trevino, you have no idea what their

09:46:37  12  agreement was, do you?

09:46:38  13  A.    No.

09:46:40  14  Q.    And you have no idea whether the writing of that $400,000

09:46:44  15  check was symbolic to seal their agreement.  You have no idea, do

09:46:50  16  you?

09:46:50  17  A.    No.

09:46:55  18  Q.    Now, you left out what I would consider to be a pretty

09:46:59  19  significant piece of this puzzle on Fly First Down.  Right here,

09:47:10  20  Fly First Down dies.  Oh, it is on here.  It's not on mine.  This

09:47:21  21  is the one the government gave me.  It doesn't have this whole

09:47:23  22  part up here, right?

09:47:25  23  A.    It would have printed out.  Do you have the -- if they sent

09:47:29  24  you electronically, all these dots go up here, because I

09:47:32  25  personally sent that to the prosecutor.  And I know everything on

| | | |
|---|---|---|
| 09:47:38 | 1 | those spreadsheets that we've seen today was e-mailed to her, |
| 09:47:42 | 2 | which would have been forwarded to you. |
| 09:47:43 | 3 | Q.   Okay.  Well, the one I printed out, for whatever reason, |
| 09:47:46 | 4 | doesn't have this part.  So let me look at this real quick.  And |
| 09:47:48 | 5 | I apologize because you did include it. |
| 09:48:01 | 6 | And because the -- I mean, the middle of that line, the |
| 09:48:07 | 7 | horse is dead?  Just because it's no color? |
| 09:48:09 | 8 | A.   I couldn't hear you. |
| 09:48:10 | 9 | Q.   Is the middle of that dot right here, these two dots, is |
| 09:48:14 | 10 | that because the horse is dead and -- |
| 09:48:15 | 11 | A.   It's just a different dot showing that he died on that date. |
| 09:48:19 | 12 | Q.   And the fact that this dot is circled in orange, that |
| 09:48:25 | 13 | indicates that Mr. Trevino obviously had the insurance and the |
| 09:48:30 | 14 | certificate of ownership of that horse, certificate of |
| 09:48:34 | 15 | registration of that horse; and so, after the investigation was |
| 09:48:36 | 16 | done by the insurance company, they paid Mr. Trevino $400,000? |
| 09:48:42 | 17 | A.   Yes. |
| 09:48:42 | 18 | Q.   And then, after that, Mr. Trevino paid Mr. Colorado $50,000? |
| 09:48:54 | 19 | A.   Yes. |
| 09:48:54 | 20 | Q.   I want to talk for a minute about race payment.  This one |
| 09:49:10 | 21 | isn't a good example, but on your -- okay.  So this race payment |
| 09:49:15 | 22 | right here -- oh, that's a race earning.  This race payment right |
| 09:49:19 | 23 | here, dot 22, does that signify that -- what date did you use to |
| 09:49:24 | 24 | make this dot? |
| 09:49:26 | 25 | A.   5-22 was when the payment was made. |

09:49:31  1  Q.   When the check was written or when the race people actually

09:49:38  2  deposited it?

09:49:43  3  A.   Hang on a second.  I can look at my sheet here.

09:49:45  4  Q.   Okay.

09:50:00  5  A.   On that one, you're pointing out on 5-22, that is a Ruidoso

09:50:06  6  Downs statement of account under Francisco Cessa, so that was

09:50:11  7  when the payment was made from his account.

09:50:12  8  Q.   All right.  And you know, don't you, that sometimes you have

09:50:15  9  to make a race payment far in advance of when the race is

09:50:20  10  actually held.

09:50:21  11  A.   Yes.

09:50:21  12  Q.   So you might make a payment here, but the race doesn't

09:50:29  13  happen till sometime in here, right?

09:50:31  14  A.   Yes.

09:50:32  15  Q.   And, again, did you look at -- right here, did you look at

09:50:42  16  the bank account for Tremor Enterprises on the date that that

09:50:46  17  check was symbolically written to see whether or not Mr. Trevino

09:50:49  18  had the funds in the bank account?

09:50:51  19  A.   I did not look at the bank accounts.

09:50:53  20  Q.   Would you do that?

09:50:56  21  A.   Other agents did.

09:51:07  22  Q.   Now I can't see.  What date is on that -- on your "No"

09:51:10  23  circle?

09:51:13  24  A.   6-7-2011.

09:51:19  25  Q.   And on that date -- do you see that --

09:51:23  1  A.   Yes.

09:51:26  2  Q.   -- Tremor Enterprises account had enough money to negotiate

09:51:29  3  that check, didn't it?

09:51:31  4  A.   Yes.

09:51:40  5  Q.   Now, at the end of the government's questioning of you, the

09:51:45  6  prosecutor went through a bunch of exhibits, and she kept asking

09:51:49  7  you, what's the significance of this, and your answer was, these

09:51:55  8  are horses we are familiar with, right?  Do you remember those?

09:51:58  9  A.   Yes.

09:51:59 10 Q.   Now, the government -- not just you but your team went to

09:52:07 11 each of these people's homes and businesses, and you got their

09:52:11 12 paperwork and you took the horses.  You seized the horses,

09:52:15 13 correct?

09:52:15 14 A.   Yes.

09:52:16 15 Q.   That were in their stables at the time, right?

09:52:21 16 A.   Yes.

09:52:22 17 Q.   And so, to say that these are horses that you're familiar

09:52:25 18 with, those are horses that were in their stables, or there was

09:52:30 19 paperwork at the time that you executed your search warrants;

09:52:34 20 isn't that right?

09:52:35 21 A.   I was working on these horses a year before we did the

09:52:38 22 seizures.  So I was familiar with the horses working up to the

09:52:43 23 seizures.

09:52:45 24 Q.   I don't have anything further.

09:52:59 25

| | | |
|---|---|---|
| 09:52:59 | 1 | CROSS-EXAMINATION |
| 09:52:59 | 2 | BY MR. SANCHEZ: |
| 09:53:05 | 3 | Q.   Mr. Schutt? |
| 09:53:08 | 4 | A.   It's Schutt. |
| 09:53:08 | 5 | Q.   Schutt.  I'm sorry.  Andres Sanchez. |
| 09:53:12 | 6 | A.   All right. |
| 09:53:12 | 7 | Q.   I'm not going to ask you to repeat that.  I represent |
| 09:53:17 | 8 | Francisco Colorado. |
| 09:53:19 | 9 |      You talked at the beginning about the different records |
| 09:53:35 | 10 | that you reviewed when you subpoenaed.  And I think it was you |
| 09:53:43 | 11 | went through, you said, we didn't subpoena all that record, but |
| 09:53:46 | 12 | we tried to get as many as we could? |
| 09:53:49 | 13 | A.   Yes. |
| 09:53:49 | 14 | Q.   And what I'm -- and, I guess, in that theme, what I want to |
| 09:53:55 | 15 | know is your subpoenas beyond that records, you subpoenaed AQHA |
| 09:54:01 | 16 | records or you reviewed AQHA records? |
| 09:54:04 | 17 | A.   We subpoenaed AQHA. |
| 09:54:05 | 18 | Q.   And reviewed them? |
| 09:54:06 | 19 | A.   Yes. |
| 09:54:06 | 20 | Q.   You personally reviewed them? |
| 09:54:08 | 21 | A.   Yes. |
| 09:54:08 | 22 | Q.   You reviewed Ruidoso Downs records, the race records from |
| 09:54:13 | 23 | Ruidoso? |
| 09:54:14 | 24 | A.   The purchase records. |
| 09:54:16 | 25 | Q.   What about the race records? |

| | | |
|---|---|---|
| 09:54:17 | 1 | A.   I didn't review the race records. |
| 09:54:21 | 2 | Q.   What about the accounts for the races? |
| 09:54:26 | 3 | A.   I would look at the accounts if they pertain to one of the |
| 09:54:30 | 4 | horses and that individual if it was a -- to a horse. |
| 09:54:38 | 5 | Q.   Okay.  Let me just skip ahead then. |
| 09:54:43 | 6 |     Did you review any records related to vet bills, race |
| 09:54:47 | 7 | records, or any kind of other horse records for horses in Mexico? |
| 09:54:55 | 8 | Horses that were purchased here in the United States and |
| 09:54:58 | 9 | transferred down to Mexico? |
| 09:54:59 | 10 | A.   I didn't see any records from Mexico for vet bills and |
| 09:55:04 | 11 | things like that. |
| 09:55:05 | 12 | Q.   Okay.  So those horses that were bought here in the United |
| 09:55:09 | 13 | States and taken down to Mexico, and had vet bills in Mexico, had |
| 09:55:13 | 14 | race payments in Mexico, had race earnings in Mexico, you didn't |
| 09:55:18 | 15 | review any of those records? |
| 09:55:19 | 16 | A.   No. |
| 09:55:20 | 17 | Q.   So you can't tell us anything about those races that are in |
| 09:55:24 | 18 | Mr. Colorado's name but are in Mexico? |
| 09:55:27 | 19 | A.   I cannot. |
| 09:55:30 | 20 | Q.   And do you know anything about the horse industry in Mexico, |
| 09:55:34 | 21 | the racing industry? |
| 09:55:35 | 22 | A.   No.  I do not. |
| 09:55:36 | 23 | Q.   So you wouldn't know that AQHA only has one particular race |
| 09:55:42 | 24 | horse in Mexico that's in Mexico City and all the other ones are |
| 09:55:45 | 25 | not AQHA-affiliated?  You don't know that? |

| | | |
|---|---|---|
| 09:55:48 | 1 | A.   Well, I know AQHA is worldwide, and if you're racing horses |
| 09:55:54 | 2 | and you want to breed the horses and sell them at their value, |
| 09:56:00 | 3 | you will register them with AQHA. |
| 09:56:02 | 4 | Q.   And that's what I'm trying to figure out.  Do you know that |
| 09:56:05 | 5 | if you wanted to race them in any of the other races in Mexico |
| 09:56:11 | 6 | other than the one race in Mexico City, do you know any reason to |
| 09:56:18 | 7 | register it with AQHA? |
| 09:56:22 | 8 | A.   Because if you're breeding the horses to get your value, |
| 09:56:28 | 9 | you'd want to register it with AQHA to show the heritage, to get |
| 09:56:32 | 10 | your value of that horse when you sold it.  That's why you |
| 09:56:35 | 11 | register it with AQHA. |
| 09:56:39 | 12 | Q.   I guess what I'm saying is if you have no intention of |
| 09:56:43 | 13 | running it in a race that's AQHA-affiliated, or if you don't plan |
| 09:56:47 | 14 | on selling it, you don't plan on breeding it, and it's your horse |
| 09:56:51 | 15 | that you're going to race in all the other races in Mexico, |
| 09:56:54 | 16 | what's the purpose of registering it with AQHA?  Do you know? |
| 09:56:57 | 17 | A.   I don't know. |
| 09:57:05 | 18 | Q.   Here, it says Fly -- wait, sorry.  Yeah, Fly First Down sold |
| 09:57:35 | 19 | to Cessa by Ruidoso Horse Sales, right? |
| 09:57:39 | 20 | A.   Yes. |
| 09:57:40 | 21 | Q.   And on there, you have actually a date of 9-3-2010, right? |
| 09:57:50 | 22 | A.   Yes. |
| 09:57:51 | 23 | Q.   That's not the date that the check was written, correct? |
| 09:57:55 | 24 | A.   That's the date of the sale.  Yes. |
| 09:57:57 | 25 | Q.   Now, hold on a second.  What I'm asking, was that the date |

| | | |
|---|---|---|
| 09:58:00 | 1 | that the check was written? |
| 09:58:02 | 2 | A.   If you give me the book so I could tell you what date the |
| 09:58:06 | 3 | check was written.  The check was written 9-6 of 2010. |
| 09:58:23 | 4 | Q.   On the paperwork showing 9-3-2010, this will be easier, I |
| 09:58:36 | 5 | think, if I'm over here.  Is it the paperwork that shows |
| 09:58:43 | 6 | 9-3-2010? |
| 09:58:43 | 7 | A.   Yes.  It's September 3rd, 2010. |
| 09:58:47 | 8 | Q.   All right.  Just so we get a clear picture, on September |
| 09:58:50 | 9 | 3rd, 2010 is when the bidding happened and they won the horse, |
| 09:58:54 | 10 | right? |
| 09:58:55 | 11 | A.   Yes. |
| 09:58:56 | 12 | Q.   Okay.  And then, the check was written three days later on |
| 09:59:00 | 13 | September 6, 2010, right? |
| 09:59:02 | 14 | A.   Yes. |
| 09:59:03 | 15 | Q.   So do you know whether agents were there at that particular |
| 09:59:13 | 16 | auction on September 3rd, 2010? |
| 09:59:17 | 17 | A.   I don't know. |
| 09:59:18 | 18 | Q.   You don't know? |
| 09:59:19 | 19 | A.   No. |
| 09:59:20 | 20 | Q.   You haven't talked to any other agents that went to that |
| 09:59:22 | 21 | auction at that date? |
| 09:59:23 | 22 | A.   I don't know if they were at that auction. |
| 09:59:27 | 23 | Q.   All right.  Well, at least on this particular paperwork, if |
| 09:59:32 | 24 | you don't mind, I'm just going to switch back and forth up here, |
| 09:59:36 | 25 | if I can. |

| | | |
|---|---|---|
| 09:59:54 | 1 | And on this particular paperwork is for Fly First Down. |
| 10:00:13 | 2 | A.   Yes. |
| 10:00:13 | 3 | Q.   Who signs here? |
| 10:00:22 | 4 | A.   Raul Ramirez. |
| 10:00:23 | 5 | Q.   Raul Ramirez.  Do you know who Raul Ramirez was working for |
| 10:00:28 | 6 | on that particular date? |
| 10:00:31 | 7 | A.   No. |
| 10:00:35 | 8 | Q.   You don't know whether he was working for Carlos Nayen on |
| 10:00:38 | 9 | that date? |
| 10:00:39 | 10 | A.   I don't know. |
| 10:00:40 | 11 | Q.   By the way, does it say -- it says, transfer ownership to. |
| 10:00:45 | 12 | Does it say Francisco Colorado? |
| 10:00:50 | 13 | A.   What we're looking at, no. |
| 10:00:52 | 14 | Q.   So on this particular document that's signed on September |
| 10:00:58 | 15 | 3rd, does Francisco's name appear anywhere? |
| 10:01:02 | 16 | A.   Yes. |
| 10:01:03 | 17 | Q.   Right here? |
| 10:01:04 | 18 | A.   Yes. |
| 10:01:07 | 19 | Q.   It doesn't say transferred to his name, right? |
| 10:01:09 | 20 | A.   No. |
| 10:01:11 | 21 | Q.   So it's listing him as the payer, but it doesn't list him to |
| 10:01:18 | 22 | transfer.  That comes later, right? |
| 10:01:20 | 23 | A.   Yes. |
| 10:01:23 | 24 | Q.   Let me switch back to that.  Oh, I'm sorry.  That's me. |
| 10:01:29 | 25 | MS. FERNALD:  That's Plaintiff's 2. |

| | | |
|---|---|---|
| 10:01:32 | 1 | Q.   (BY MR. SANCHEZ) So you don't know -- Raul Ramirez, is that |
| 10:01:39 | 2 | the same Ramirez you see on 9-16? |
| 10:01:42 | 3 | A.   Yes. |
| 10:01:43 | 4 | Q.   Again, you don't know whether he was working for Nayen, |
| 10:01:46 | 5 | right? |
| 10:01:47 | 6 | A.   I do not. |
| 10:01:49 | 7 | Q.   And here, Adan Farias when he makes his race payment, do you |
| 10:01:54 | 8 | know whether he's working at the direction of Nayen? |
| 10:01:58 | 9 | A.   I do not.  No. |
| 10:02:00 | 10 | Q.   We'll have to ask him. |
| 10:02:02 | 11 | A.   Yes. |
| 10:02:03 | 12 | Q.   These two dots right here, who's paying for these dots? |
| 10:02:10 | 13 | A.   Carlos Nayen. |
| 10:02:13 | 14 | Q.   This training and boarding bills, who's paying for that? |
| 10:02:17 | 15 | A.   Carlos Nayen. |
| 10:02:19 | 16 | Q.   All right.  And we went through this insurance paperwork and |
| 10:02:22 | 17 | we talked a lot about that, but did you see Carlos Nayen's name |
| 10:02:26 | 18 | appear?  Or at least is there any evidence that Carlos Nayen was |
| 10:02:31 | 19 | associated with that insurance, as well?  Maybe we'll speed this |
| 10:02:40 | 20 | up. |
| 10:02:40 | 21 | The exhibit that we looked at that you said was seized |
| 10:02:43 | 22 | at Carlos Nayen's house, 203? |
| 10:02:48 | 23 | A.   Yes. |
| 10:02:49 | 24 | Q.   Is that some handwritten insurance, Carlitos' insurance |
| 10:02:52 | 25 | paperwork? |

| | | |
|---|---|---|
| 10:02:53 | 1 | A.   Yes. |
| 10:02:53 | 2 | Q.   Does that have Fly First Down on it? |
| 10:02:57 | 3 | A.   I'd have to see it again. |
| 10:02:59 | 4 | Q.   Can we pull up 203? |
| 10:03:06 | 5 | A.   You were asking about the insurance, on Yearsley Insurance |
| 10:03:11 | 6 | document to Fernando Garcia referring to Carlitos as an urgent |
| 10:03:15 | 7 | payment is in evidence, the book. |
| 10:03:19 | 8 | Q.   Okay.  I guess we could go.  Sorry. |
| 10:03:22 | 9 | So you'd agree with me that Carlos is involved in |
| 10:03:25 | 10 | getting the insurance with this particular horse? |
| 10:03:28 | 11 | A.   Yes. |
| 10:03:31 | 12 | Q.   And Carlos, do you know whether Carlos speaks English? |
| 10:03:35 | 13 | A.   Yes, he does. |
| 10:03:37 | 14 | Q.   He speaks English well? |
| 10:03:39 | 15 | A.   I've never talked to the individual.  I just know they say |
| 10:03:41 | 16 | he speaks English. |
| 10:03:43 | 17 | Q.   Do you know whether he would often have other people who |
| 10:03:48 | 18 | speak better English negotiate some of the insurance and the |
| 10:03:52 | 19 | other race payments? |
| 10:03:53 | 20 | A.   I don't know that. |
| 10:03:56 | 21 | Q.   All right.  So we'll ask about these two, but this -- well, |
| 10:04:04 | 22 | and this one, as well, because Raul Ramirez we saw, he was the |
| 10:04:06 | 23 | one that signed on that 9-3, right? |
| 10:04:10 | 24 | A.   Yes. |
| 10:04:11 | 25 | Q.   The last -- we'll try to figure out if he's working for |

| | | |
|---|---|---|
| 10:04:14 | 1 | Nayen.  These payments, they're at least associated with Nayen, |
| 10:04:18 | 2 | right? |
| 10:04:19 | 3 | A.   The green. |
| 10:04:22 | 4 | Q.   And this is? |
| 10:04:23 | 5 | A.   Tremor Enterprises. |
| 10:04:25 | 6 | Q.   And you don't know whether Nayen is talking to Tremor about |
| 10:04:29 | 7 | that, do you?  We can go back to 203.  Sorry.  So in both of |
| 10:04:59 | 8 | those -- sorry.  Previous page. |
| 10:05:14 | 9 | A.   It's the second page for Fly First Down. |
| 10:05:16 | 10 | Q.   Sorry.  Okay.  Can we go back to the second page?  Here it |
| 10:05:30 | 11 | is, right? |
| 10:05:31 | 12 | A.   No. 3. |
| 10:05:33 | 13 | Q.   Okay.  So as early as 9-5, Carlos in his insurance paperwork |
| 10:05:44 | 14 | has listed Fly First Down, right? |
| 10:05:48 | 15 | A.   Scroll down.  Can you scroll down? |
| 10:05:51 | 16 | Q.   Sure.  Well, I can't.  No.  She can. |
| 10:05:55 | 17 | A.   My mistake.  Can you scroll back up to the top? |
| 10:06:05 | 18 | There is no insured address, I don't think, on any of |
| 10:06:08 | 19 | these documents.  It just has an envelope with Carlitos on it and |
| 10:06:12 | 20 | these documents were in -- I can't say that this is Carlitos |
| 10:06:16 | 21 | Nayen's insurance.  It's just a document. |
| 10:06:20 | 22 | Q.   Yeah.  And I guess maybe we're -- I think we're missing -- |
| 10:06:34 | 23 | I'm not suggesting or I'm not trying to suggest that this is |
| 10:06:37 | 24 | necessarily Carlos' insurance.  What I'm saying is there's |
| 10:06:41 | 25 | paperwork that shows as early as 9-5, paperwork found in Carlos' |

| 10:06:45 | 1 | house where at least he's associated -- whether it's he's |

10:06:45   1   house where at least he's associated -- whether it's he's

10:06:50   2   negotiating, whether he's getting people to help negotiate with

10:06:54   3   him, the insurance paperwork -- can we scroll back down for Fly

10:07:01   4   First Down; is that right?

10:07:02   5   A.   Yes.

10:07:03   6   Q.   All right.  So there's some questions about Farias and

10:07:46   7   Ramirez, at least there's some association with Carlos here, this

10:07:50   8   insurance payment.  We know that these three payments or Zeta

10:08:00   9   payments are from Carlos Nayen, right?

10:08:02   10   A.   Yes.

10:08:03   11   Q.   This photo is just a photo, right?  We don't know who listed

10:08:06   12   or who created that photo.  It's just a photo you found, right?

10:08:09   13   A.   The photo would be from the race track it came from.

10:08:13   14   Q.   Right.  I mean, you didn't help put that photo together.

10:08:19   15   You didn't --

10:08:19   16   A.   No.  I did not.

10:08:20   17   Q.   Okay.  So now, I want to get to these two dots here.  You

10:08:30   18   said something when Ms. Williams was asking you about them.  You

10:08:35   19   said they were paid for Francisco Colorado.  Do you remember

10:08:41   20   that?

10:08:48   21   A.   Can we pull the screen back up?

10:08:50   22   Q.   Yeah.  This one?

10:08:52   23   A.   Yes.  You were asking about 5-22.  I'm trying to get to

10:08:56   24   the --

10:08:58   25   Q.   This one and this one.  Both of these.  I think it's going

| | | |
|---|---|---|
| 10:09:01 | 1 | to be on the same document. |
| 10:09:08 | 2 | A.   On 5-22, that's the Ruidoso Downs statement of accounts |
| 10:09:11 | 3 | subpoena. |
| 10:09:11 | 4 | Q.   All right.  So we're all looking at the same thing and you |
| 10:09:15 | 5 | tell me if we're not.  Is this what you're -- oh, wait.  Is this |
| 10:09:23 | 6 | what you're looking at? |
| 10:09:24 | 7 | A.   This is Exhibit 231B.  Yes.  That's it. |
| 10:09:35 | 8 | Q.   So this is your source for those two dots? |
| 10:09:41 | 9 | A.   Yes. |
| 10:09:41 | 10 | Q.   And here, it says, Francisco Colorado-Cessa? |
| 10:09:44 | 11 | A.   Yes. |
| 10:09:46 | 12 | Q.   Do you know who's associated with that particular address |
| 10:09:49 | 13 | listed below? |
| 10:09:50 | 14 | A.   Yes. |
| 10:09:51 | 15 | Q.   Who's that? |
| 10:09:51 | 16 | A.   Fernando Garcia. |
| 10:09:54 | 17 | Q.   Do you know whether Fernando Garcia and Carlos Nayen worked |
| 10:09:58 | 18 | together? |
| 10:09:59 | 19 | A.   They did. |
| 10:10:02 | 20 | Q.   So these payments -- and I think you correctly used the |
| 10:10:07 | 21 | passive voice because you're not suggesting that Francisco, |
| 10:10:10 | 22 | himself, made these two payments, right? |
| 10:10:12 | 23 | A.   No. |
| 10:10:13 | 24 | Q.   They were just debited out of an account with his name on it |
| 10:10:19 | 25 | with this address? |

| 10:10:20 | 1 | A.   Yes. |

10:10:20   1   A.   Yes.

10:10:24   2   Q.   So on 5-22 and 5-27, those -- we got those payments from

10:10:35   3   this document?

10:10:36   4   A.   You have a payment and an earning, I believe.

10:10:39   5   Q.   Payment and what?

10:10:40   6   A.   And earning.

10:10:40   7   Q.   And an earning, right?

10:10:41   8   A.   The earning is 5-27.

10:10:43   9   Q.   Okay.  So earnings get deposited in there and sometimes the

10:10:49   10   payments get pulled out of there.  Is that how it works?

10:10:52   11   A.   Yes.

10:10:53   12   Q.   But we don't know whether they did that automatically or

10:10:59   13   whether Carlos or somebody else told them, pull this out of that

10:11:03   14   account?  Or do you know?

10:11:04   15   A.   I do not know.

10:11:07   16        THE COURT:  Counsel, mark your place.  Members of the

10:11:10   17   jury, I'll give you your morning recess.  You'll have 15 minutes

10:11:14   18   to use the facilities, stretch, and be ready to come back and

10:11:18   19   work in 15 minutes.

10:11:51   20        (Jury not present.)

10:12:04   21        MR. GARDNER:  Thank you, your Honor.

10:12:05   22        Your Honor, I just want to update the Court with

10:12:07   23   respect to the witness yesterday on Hector Moreno.  I received an

10:12:10   24   e-mail from Ernest Gonzalez, the AUSA in the Eastern District of

10:12:15   25   Texas, at 10:07 today, and he says -- I'll just read it, since I

10:12:18   1   don't have the opportunity to print it out:  Doug, sorry I didn't

10:12:20   2   get your message yesterday regarding Moreno early enough to

10:12:23   3   respond timely.  I see that he's already testified.  The

10:12:27   4   information is probably late, but I did not have a proffer and

10:12:29   5   the only benefit he received was the help with his immigration.

10:12:33   6   He goes on to say that his assistant is back, and he is back in

10:12:36   7   his office for the remainder of the week.  Let me know if you

10:12:39   8   need anything else.  Good luck.

10:12:41   9           That's the gist of it, your Honor.  So we would ask

10:12:45  10   that Mr. Moreno be excused permanently.

10:12:52  11           THE COURT:  Well, he didn't get a written proffer or

10:12:56  12   didn't get any proffer?

10:12:57  13           MR. GARDNER:  That's what he said, your Honor.  Just an

10:12:59  14   oral proffer --

10:13:00  15           THE COURT:  What about signing of papers?  Do we know

10:13:03  16   anything about that?

10:13:04  17           MR. GARDNER:  That's the only response he gave to me,

10:13:05  18   your Honor.  I could send another query about any papers he

10:13:08  19   signed.

10:13:08  20           THE COURT:  Well, I suggest you do so.  They're

10:13:12  21   claiming it's Giglio material and --

10:13:17  22           MR. GARDNER:  Well, I'd also note, your Honor, that the

10:13:19  23   witness being from Mexico seemed a little confused as to what he

10:13:22  24   was signing.

10:13:23  25           THE COURT:  Oh, I have no idea what he signed.  And I'm

10:13:26   1    pretty sure he has no idea what he signed, also.

10:13:30   2            MR. ESPER:  Your Honor, in response to what Mr. Gardner

10:13:32   3    just read, there was some comment about we helped him with his

10:13:36   4    immigration.  And I'm just curious as to what help that was other

10:13:41   5    than keeping him here in the United States.

10:13:44   6            THE COURT:  Well, that's what he testified, that he and

10:13:46   7    his family were over here.

10:13:48   8            MR. GARDNER:  Yes, sir.

10:13:48   9            MR. ESPER:  But is that -- in other words, he's here

10:13:50  10    temporarily.

10:13:51  11            MR. GARDNER:  That's what he testified to yesterday.

10:13:52  12    Yeah.

10:13:55  13            MR. ESPER:  Okay.

10:13:59  14            THE COURT:  All right.  Take your break.

10:25:08  15            (Recess.)

10:28:49  16            (Jury present.)

10:30:19  17            THE COURT:  You may proceed.

10:30:26  18            MR. SANCHEZ:  Thank you, your Honor.

10:30:27  19    Q.   (BY MR. SANCHEZ) So when we talked about how the different

10:30:36  20    people involved in these payments and Nayen seems to be -- with

10:30:40  21    the exception of these, Nayen seems to be tied to the maintenance

10:30:46  22    and the payments of Fly First Down.

10:30:50  23            One thing that was asked on direct examination, you

10:30:55  24    were asked whether -- who was the agent for Fly First Down?  Do

10:31:03  25    you remember that?

| | | |
|---|---|---|
| 10:31:05 | 1 | A.   Could I see the document?  The book? |
| 10:31:07 | 2 | Q.   Is there a document?  Okay. |
| 10:31:10 | 3 | A.   Could you give me Fly First Down's book?  I'll be able to |
| 10:31:14 | 4 | tell you. |
| 10:31:15 | 5 | Q.   Let me put a tab so I could make sure I could go back before |
| 10:31:23 | 6 | I lose it. |
| 10:31:31 | 7 | A.   The person who signs the document is Raul Ramirez. |
| 10:31:35 | 8 | Q.   So he's listed as the agent? |
| 10:31:38 | 9 | A.   It doesn't say agent.  He's just acknowledging the purchase |
| 10:31:42 | 10 | of this horse. |
| 10:31:43 | 11 | Q.   Okay.  So maybe that's a mis -- are you done with that? |
| 10:31:49 | 12 | A.   I'll ask for it back if I need it. |
| 10:31:51 | 13 | Q.   Okay.  I'll bring it back if you need it. |
| 10:31:54 | 14 | A.   Okay. |
| 10:31:54 | 15 | Q.   Maybe I misunderstood the question and the answer then. |
| 10:31:58 | 16 | Is there something in AQHA that you have to list as the |
| 10:32:03 | 17 | owner or the agent -- sorry.  The agent saying, here's the owner |
| 10:32:08 | 18 | and I'm an agent for this particular horse going forward? |
| 10:32:14 | 19 | A.   I didn't understand your question. |
| 10:32:16 | 20 | Q.   You have to register as an agent for a particular horse. |
| 10:32:20 | 21 | A.   No. |
| 10:32:21 | 22 | Q.   So somebody can own a horse and leave all the management of |
| 10:32:29 | 23 | the vet bills, the insurance, the boarding, the race payments up |
| 10:32:34 | 24 | to an agent? |
| 10:32:36 | 25 | A.   Yes. |

10:32:36   1   Q.   And it's not only something they can do but is done often in

10:32:43   2   this industry.

10:32:43   3   A.   Yes.

10:32:44   4   Q.   And the insurance companies and the race tracks, they have

10:32:53   5   no problem dealing with Nayen, even though the listed owner is

10:32:59   6   Francisco Colorado, right?  I mean, you see, time and time again,

10:33:03   7   Nayen's sending payments or Nayen's taking care of the boarding

10:33:07   8   and paying the race premiums -- or not race premiums but the race

10:33:11   9   nominations when it's actually Francisco Colorado's horse, right?

10:33:17  10   A.   Yes.

10:33:17  11   Q.   And right here, there's no issue with that particular

10:33:35  12   account being handled and the race payment account where you get

10:33:41  13   the payments from May 22nd, May 27th, the race earnings.  There's

10:33:48  14   no issue with Nayen handling that particular account?

10:33:53  15   A.   I don't know who handled the account.  It's just under

10:33:56  16   Ruidoso Downs statement for Francisco Colorado.

10:33:59  17   Q.   Do you know whose address it was?

10:34:02  18   A.   It was Fernando Garcia's.

10:34:04  19   Q.   Right.  So it's not like it has to be listed with the

10:34:08  20   Ruidoso Downs address for Francisco Colorado.  He could put it in

10:34:13  21   somebody else's address, right?

10:34:15  22   A.   Well, they did that.

10:34:17  23   Q.   Did Ruidoso Downs complain that you know of?

10:34:21  24   A.   Not that I know of.

10:34:41  25         MR. SANCHEZ:  I'll pass the witness.

| 10:34:42 | 1 | THE COURT:  Mr. Womack. |
|---|---|---|

10:34:42    1                    THE COURT:  Mr. Womack.

10:34:45    2                    MR. WOMACK:  Yes, sir.  Thank you, your Honor.

10:34:48    3                         CROSS-EXAMINATION

10:34:48    4    BY MR. WOMACK:

10:34:51    5    Q.   Morning, Agent Schutt.

10:34:53    6    A.   How's it going?

10:34:54    7    Q.   Are you a special agent?

10:34:56    8    A.   No.  I'm an investigator.

10:34:58    9    Q.   Investigator.

10:35:10    10            Looking at this chart here, this is the one where

10:35:13    11   yesterday, you incorrectly said that Fernando Garcia had paid for

10:35:17    12   that insurance; is that correct?

10:35:19    13   A.   That's correct.

10:35:20    14   Q.   And the name of the person who actually paid was Hernando

10:35:25    15   Guerra, correct?

10:35:26    16   A.   Yes.

10:35:26    17   Q.   Were names that similar that you confused them?

10:35:32    18   A.   Yes.

10:35:33    19   Q.   Okay.  I noticed that virtually all the names in this case

10:35:41    20   are Spanish surnames, Hispanic names.  Do you have a problem with

10:35:46    21   Hispanic names, confusing them?

10:35:48    22   A.   No.  Yesterday, we were moving so fast.

10:35:50    23   Q.   Uh-huh.

10:35:51    24   A.   I didn't get a chance to go through my notes at the same

10:35:54    25   time.  That's all it was.

10:35:55    1    Q.    Okay.

10:35:56    2    A.    I'm not getting confused with the names.  It was yesterday,

10:35:59    3    moving as fast as we did.

10:36:01    4    Q.    Okay.  Did you create this chart yesterday?

10:36:04    5    A.    No.  I did not.

10:36:05    6    Q.    You created -- how long ago did you create this chart?

10:36:08    7    A.    We finished it on Saturday.

10:36:11    8    Q.    Okay.  So the area that you were testifying about that you

10:36:17    9    say is Garcia Bloodstock, that actually occurred back over the

10:36:22   10    weekend, correct?

10:36:25   11    A.    We were working on it through the week.  Yes.  And weekend.

10:36:28   12    Q.    Okay.  And so, yesterday -- and did you talk to the

10:36:31   13    government about what questions you'd be asked?

10:36:35   14    A.    On the insurance, not specifically.  No.

10:36:37   15    Q.    Well, overall, what you were going to be testifying to, you

10:36:40   16    basically rehearsed with the government, didn't you?

10:36:42   17    A.    We didn't rehearse.  We discussed the chart.

10:36:45   18    Q.    And you looked at all the exhibits, didn't you?

10:36:47   19    A.    Yes.

10:36:48   20    Q.    Okay.  And so, when someone asked you yesterday -- and it

10:36:52   21    was the government that asked you.  When the prosecutor asked you

10:36:55   22    yesterday, who paid for the insurance, that wasn't a surprise

10:36:57   23    question, was it?

10:36:59   24    A.    No.  It was not.

10:37:00   25    Q.    Okay.  But you told this jury under oath it was Fernando

| | | |
|---|---|---|
| 10:37:05 | 1 | Garcia, and that wasn't correct, was it? |
| 10:37:06 | 2 | A.   Yes.  I admit I made a mistake. |
| 10:37:08 | 3 | Q.   Okay.  And we all can.  I'm not going to pile on you about |
| 10:37:13 | 4 | that.  I want to make sure it's clear, though, that even an |
| 10:37:16 | 5 | investigator with 27 years can make mistakes like this. |
| 10:37:21 | 6 | A.   Oh, yes. |
| 10:37:22 | 7 | Q.   Okay.  Now, if I can find Exhibit 323R.  Oh, it's page |
| 10:37:48 | 8 | 59-615.  It's book three. |
| 10:38:13 | 9 | I'm showing you what's been marked as -- I'm showing |
| 10:38:56 | 10 | you Government's Exhibit 323R, like Romeo.  Do you see that? |
| 10:39:00 | 11 | A.   Yes. |
| 10:39:01 | 12 | Q.   And, again, this is a letter.  Do you know if this is a |
| 10:39:08 | 13 | letter, or an e-mail, or what? |
| 10:39:09 | 14 | A.   This is an insurance document. |
| 10:39:12 | 15 | Q.   And the original, is it a letter that was mailed out?  Or |
| 10:39:16 | 16 | was it an e-mail that was sent?  Or do we know? |
| 10:39:18 | 17 | A.   I don't know. |
| 10:39:20 | 18 | Q.   Okay.  So you just have this page was found in the records; |
| 10:39:24 | 19 | is that correct? |
| 10:39:24 | 20 | A.   Yes. |
| 10:39:25 | 21 | Q.   Okay.  And this is an invoice about premiums as for the |
| 10:39:37 | 22 | Yearsley Insurance Company? |
| 10:39:40 | 23 | A.   Yes. |
| 10:39:40 | 24 | Q.   It has an address to Garcia Bloodstock and Racing in New |
| 10:39:49 | 25 | Mexico? |

| | | |
|---|---|---|
| 10:39:49 | 1 | A.   Yes. |
| 10:39:50 | 2 | Q.   Or NM is. |
| 10:39:55 | 3 | A.   Yes. |
| 10:39:55 | 4 | Q.   And do you know that down the page, about halfway where it |
| 10:39:58 | 5 | says, Fly First Down, it showed that the actual loss payee on |
| 10:40:07 | 6 | that horse was Francisco Cessa? |
| 10:40:09 | 7 | A.   Yes. |
| 10:40:09 | 8 | Q.   And there are a number of various loss payees, for example, |
| 10:40:28 | 9 | Rolls Royce, Ghost, the loss payee was Santa Fe Roldan? |
| 10:40:33 | 10 | A.   Yes. |
| 10:40:33 | 11 | Q.   I want to hand you what's been marked as Defendant's Exhibit |
| 10:41:20 | 12 | Garcia 4, ask you to look at it.  In your work in this case, you |
| 10:41:31 | 13 | actually looked at tens of thousands of documents; is that right? |
| 10:41:35 | 14 | A.   Yes. |
| 10:41:38 | 15 | Q.   And y'all actually marked every page, didn't you? |
| 10:41:41 | 16 | A.   Somebody marked the pages.  Yes. |
| 10:41:43 | 17 | Q.   And they call these Bates stamps? |
| 10:41:45 | 18 | A.   Yes. |
| 10:41:46 | 19 | Q.   Okay.  Look at that exhibit.  And you see the Bates stamp |
| 10:41:56 | 20 | numbers are at the bottom right-hand corner? |
| 10:41:58 | 21 | A.   Yes. |
| 10:41:59 | 22 | Q.   Just like all the other exhibits in this case, aren't they? |
| 10:42:02 | 23 | A.   Yes. |
| 10:42:03 | 24 | Q.   Okay.  And every page is sequential: it has a different |
| 10:42:06 | 25 | number than the page before and after. |

```
10:42:09   1   A.   Yes.

10:42:10   2   Q.   Okay.

10:42:13   3   A.   Well, this one's not sequential.

10:42:15   4   Q.   But they all have page numbers?

10:42:17   5   A.   Yes, they are.

10:42:18   6   Q.   And every page number is different.

10:42:20   7   A.   Yes.

10:42:20   8   Q.   Okay.  Now, looking through that -- your Honor, at this time

10:42:25   9   we'll offer Garcia 4 into evidence.

10:42:28  10          MS. FERNALD:  With no objection, your Honor.

10:42:30  11          THE COURT:  All right.  Garcia 4 is admitted.

10:42:33  12   Q.   (BY MR. WOMACK) I'll retrieve the exhibit from you and look

10:42:40  13   at it on the screen.  And, again, this is Garcia 4, correct?

10:42:54  14   A.   Yes.

10:42:56  15   Q.   I'll slide down.  And this is actually a string of e-mails,

10:43:03  16   isn't it?

10:43:03  17   A.   Yes.

10:43:05  18   Q.   Do you know who Renee Spivey is?

10:43:09  19   A.   She works for Yearsley Insurance.

10:43:13  20   Q.   Okay.  And Nancy, that's Nancy Yearsley, isn't it?

10:43:21  21   A.   Yes.

10:43:22  22   Q.   And she's one of the owners of Yearsley Insurance?

10:43:25  23   A.   Yes.

10:43:26  24   Q.   Okay.  And this string of e-mails -- there's a note there

10:43:41  25   from Renee Spivey to Nancy saying that Anthony, whoever that is,
```

| | | |
|---|---|---|
| 10:43:46 | 1 | noted that Blues Ferrari was paid by Hernando Guerra and Feature |
| 10:43:52 | 2 | Honor has been paid by Tremor.  Do you see that? |
| 10:43:57 | 3 | A.   Yes. |
| 10:43:57 | 4 | Q.   And this is just business e-mail traffic between these |
| 10:43:59 | 5 | insurance agents at the company. |
| 10:44:01 | 6 | A.   Yes. |
| 10:44:02 | 7 | Q.   And down further in the page, this says, again, from Renee |
| 10:44:20 | 8 | Spivey to in this case Ian Snow and Nancy Y, Nancy Yearsley, and |
| 10:44:30 | 9 | cc-ed to Anke Thayer, whoever that is.  It says, subject, Tremor |
| 10:44:35 | 10 | and Garcia's spreadsheet.  Do you see that? |
| 10:44:38 | 11 | A.   Yes. |
| 10:44:39 | 12 | Q.   Was that "Yes"? |
| 10:44:40 | 13 | A.   Yes. |
| 10:44:43 | 14 | Q.   And it says, attached is a spreadsheet with one tab for |
| 10:44:46 | 15 | Tremor and the second tab for Garcia Bloodstock.  Do you see |
| 10:44:51 | 16 | that? |
| 10:44:52 | 17 | A.   Yes. |
| 10:44:53 | 18 | Q.   And it goes on to say that when you look through there, some |
| 10:44:57 | 19 | of these pertain to Garcia, some pertain to Tremor, correct? |
| 10:45:02 | 20 | A.   Yes. |
| 10:45:03 | 21 | Q.   And then, if you flip through there, there are a series of |
| 10:45:12 | 22 | pages, and some of the pages at the top say, Tremor Enterprises. |
| 10:45:20 | 23 | A.   Yes. |
| 10:45:21 | 24 | Q.   And that would have the names of horses? |
| 10:45:28 | 25 | A.   Yes. |

10:45:29   1   Q.   Okay.  And information about the insurance, like whether it

10:45:33   2   was -- if it was a racing horse and the amount of insurance; is

10:45:40   3   that correct?

10:45:40   4   A.   Yes.

10:45:41   5   Q.   And there are a couple of pages that say, Tremor

10:45:49   6   Enterprises.

10:45:49   7   A.   Yes.

10:45:49   8   Q.   And when the last page that doesn't have a name, these are

10:45:58   9   the horses associated in some way with Fernando Garcia?

10:46:03   10   A.   Can you move the page?  Yes.

10:46:10   11   Q.   Okay.  For example, this horse here, Number One Cartel, it's

10:46:27   12   the third horse down on that list is a racing horse insured for

10:46:37   13   $155,000 and the insured -- the person giving the money on that

10:46:45   14   horse is Garcia Bloodstock and Racing?

10:46:47   15   A.   Yes.

10:46:51   16   Q.   And you know that's the company owned by Fernando Garcia?

10:46:54   17   A.   Yes.

10:46:55   18   Q.   Now, you've never met Fernando Garcia, have you?

10:46:58   19   A.   Yes.

10:46:59   20   Q.   Oh, you have met him?

10:47:00   21   A.   Yes.

10:47:00   22   Q.   Okay.  Fernando, if you'll stand up.  Is that Fernando

10:47:04   23   Garcia?

10:47:04   24   A.   Yes.

10:47:04   25   Q.   Okay.  Thank you.  Have a seat, sir.

10:47:10  1          And further down this list, you'll see where it lists

10:47:13  2  the horse Fly First Down.

10:47:18  3  A.   Yes.

10:47:20  4  Q.   And if we follow that over, you see that the -- again, the

10:47:25  5  insured on that horse is Francisco Cessa?

10:47:29  6  A.   Yes.

10:47:29  7  Q.   And, again, there are various owners or insureds on this

10:47:35  8  page.  There's Fast And Furious, Santa Fe Roldan, Mr.

10:47:40  9  Colorado-Cessa and Garcia himself.  But there are a number of

10:47:44  10  different owners or insureds listed on this tab; is that correct?

10:47:49  11  A.   Yes.

10:47:53  12  Q.   When you looked through the thousands of documents in this

10:48:01  13  case, with regards to Fly First Down, the horses, what was on

10:48:06  14  that green thing earlier, you didn't find any insurance policy in

10:48:11  15  the name of Fernando Garcia, did you?

10:48:19  16  A.   It is in -- I'm not sure of your question.  I'm confused, I

10:48:24  17  guess.

10:48:24  18  Q.   Many of us have had insurance before, or have insurance on

10:48:31  19  our lives, our health, cars, any kind of property, and normally

10:48:36  20  you're actually given a policy with your name on it.

10:48:38  21  A.   Yes.

10:48:39  22  Q.   Did you see any policy for Fly First Down with the name of

10:48:43  23  the owner being -- or the insured being Fernando Garcia?

10:48:47  24  A.   Yes.  It says, Fly First Down is insured under Garcia

10:48:53  25  Bloodstock.

10:48:53   1   Q.   Uh-huh.  But that's just a sheet on the back of an e-mail,
10:48:58   2   correct?
10:48:59   3   A.   That's an insurance document.
10:49:01   4   Q.   Okay.  So you mean if I have that, if I have that e-mail, or
10:49:07   5   that piece of paper and a horse died and my name was on it, I
10:49:11   6   could collect if I had other documents?  I mean, if I had like
10:49:15   7   the registration on it?  Is this the only insurance document I
10:49:18   8   would need to collect $300,000?
10:49:21   9   A.   I'm not an insurance agent.  I just go by what I saw on the
10:49:26   10  document.
10:49:26   11  Q.   Okay.  And all that you saw, in the thousands of documents,
10:49:31   12  that pertain to Fernando Garcia and this horse and insurance was
10:49:37   13  an e-mail, this?
10:49:41   14  A.   It's not an e-mail.  It's the insurance document.
10:49:45   15  Q.   Well, you just looked at it.  It's a string of e-mails and
10:49:51   16  it has a list of horses attached to it?
10:49:56   17  A.   Could you bring that here?
10:49:57   18  Q.   Sure.  Again, Garcia 4.
10:50:12   19  A.   When I look at it, I see two pages as an e-mail.  The next
10:50:16   20  three pages or four pages are not an e-mail.  They're an
10:50:20   21  insurance document.
10:50:21   22  Q.   And when you call them insurance document, they are a list
10:50:25   23  of horses and the value of the horse, the purpose, like racing
10:50:31   24  horse, and the name of the party insured or the loss payee; is
10:50:36   25  that correct?

| | | |
|---|---|---|
| 10:50:36 | 1 | A.   It's an insurance.  Yes.  Insurance document. |
| 10:50:39 | 2 | Q.   And you know that they were attached to an e-mail. |
| 10:50:48 | 3 | A.   You're saying -- I'm confused by your question.  They're |
| 10:50:51 | 4 | attached as -- |
| 10:50:52 | 5 | Q.   Okay.  You have the exhibit. |
| 10:50:53 | 6 | A.   Yes. |
| 10:50:54 | 7 | Q.   The exhibit consists of two pages.  Well, actually, one page |
| 10:51:02 | 8 | of e-mail traffic and it references in there -- look at the |
| 10:51:06 | 9 | middle of the page, again, where it says -- mine's highlighted |
| 10:51:12 | 10 | but that will be just fine here.  In the middle of the page, it |
| 10:51:14 | 11 | says attached, and he means attached to the e-mail.  You |
| 10:51:18 | 12 | understand that, right? |
| 10:51:19 | 13 | A.   I did not see that before.  Okay. |
| 10:51:20 | 14 | Q.   Attached -- I'll go over it with you.  You didn't see it? |
| 10:51:24 | 15 | Attached is the spreadsheet with one tab for Tremor and the |
| 10:51:29 | 16 | second tab for Garcia Bloodstock.  And it says, Anke.  Is that an |
| 10:51:38 | 17 | employee at the insurance company? |
| 10:51:39 | 18 | A.   I don't know who that one is. |
| 10:51:41 | 19 | Q.   Okay.  Anke has checked the spreadsheet for Tremor but had |
| 10:51:47 | 20 | to leave before checking the one for Garcia.  If you pull a |
| 10:51:50 | 21 | statement for Tremor Enterprises, which should really be Garcia, |
| 10:51:53 | 22 | and remove the following, and it goes into some other stuff. |
| 10:52:04 | 23 | And then, behind that, we have the second page of the |
| 10:52:10 | 24 | e-mail says, I think that's all for now.  Again, let me know if I |
| 10:52:15 | 25 | need to make changes, et cetera.  Thanks.  Renee.  Do you see |

```
10:52:18    1   that?

10:52:18    2   A.    Yes.

10:52:19    3   Q.    So that's a two-page e-mail and then, the spreadsheets are

10:52:24    4   attached, correct?

10:52:25    5   A.    Yes.

10:52:26    6   Q.    And so, your testimony before this jury where you say

10:52:30    7   there's an insurance document that shows Fernando Garcia as being

10:52:37    8   insured, that's the document you're referring to, right?

10:52:42    9   A.    Yes.

10:52:43   10   Q.    And, again, look at Fly First Down, the horse that is on

10:52:47   11   this string, if I could ever find it.

10:52:59   12         So the document that you relied on in putting that

10:53:04   13   green bar up there was an e-mail with a spreadsheet attached to

10:53:08   14   it, correct?

10:53:13   15   A.    Yes.

10:53:14   16   Q.    Okay.  Out of the thousand document -- thousands of

10:53:18   17   documents in this case, that's what drew you to that conclusion,

10:53:21   18   correct?

10:53:23   19   A.    Yes.

10:53:24   20   Q.    Look at the spreadsheet, again, the last page of the

10:53:28   21   spreadsheet.  Watch this.  Now, after the two pages of the

10:53:43   22   e-mail, we have the Tremor Enterprises spreadsheet, page 1.  Then

10:53:49   23   there's another page of Tremor Enterprises.  And the third page

10:53:55   24   just says, Tremor Enterprises, or the total of premiums, or

10:53:59   25   something like that.  Says total due.
```

| | | |
|---|---|---|
| 10:54:01 | 1 | And then, the last page is that second spreadsheet. |
| 10:54:04 | 2 | Remember she said tab 1 is a spreadsheet for Tremor Enterprises. |
| 10:54:09 | 3 | And the second tab is the one for Garcia.  And sure enough, |
| 10:54:14 | 4 | that's the one that has Garcia's name on it, correct? |
| 10:54:16 | 5 | A.   Yes. |
| 10:54:17 | 6 | Q.   But the horse for which Garcia Bloodstock is the insured is |
| 10:54:28 | 7 | Number One Cartel.  And for Fly First Down, the one that's on |
| 10:54:33 | 8 | your chart, is Francisco Cessa.  Do you see that? |
| 10:54:39 | 9 | A.   Yes.  I see that. |
| 10:54:45 | 10 | Q.   I want to retrieve the exhibit.  So from looking at these |
| 10:55:10 | 11 | forms and reading them however you did, you left the conclusion |
| 10:55:17 | 12 | that Fernando Garcia owned the policy on Fly First Down, correct? |
| 10:55:23 | 13 | A.   Yes. |
| 10:55:28 | 14 | Q.   If I can find a picture, I'll show of -- never mind. |
| 10:55:52 | 15 | Is there a separate exhibit for 323?  I want to show |
| 10:56:30 | 16 | you Exhibit -- this says -- I guess it's 102N.  It's in that |
| 10:56:47 | 17 | notebook that has Government's Exhibit 310, okay? |
| 10:56:51 | 18 | A.   Yes. |
| 10:56:52 | 19 | Q.   And remember there's a picture of Fly First Down after |
| 10:57:00 | 20 | winning the Ruidoso Quarter Horse Futurity trial No. 11.  In |
| 10:57:10 | 21 | other words, this horse on May 27, 2011 had won this race at |
| 10:57:16 | 22 | Ruidoso, correct? |
| 10:57:17 | 23 | A.   Yes. |
| 10:57:18 | 24 | Q.   Okay.  And you told us that standing there, somehow the |
| 10:57:25 | 25 | government can make it look straight.  I can't. |

10:57:32   1          Next to Fly First Down, there are a number of people,
10:57:35   2   correct?
10:57:35   3   A.   Yes.
10:57:36   4   Q.   And the government asked you to identify Fernando Garcia.
10:57:42   5   Do you remember that?
10:57:43   6   A.   They asked me to identify the people in the picture I knew.
10:57:47   7   Q.   And you only identified a couple of them, right?
10:57:50   8   A.   I identified three.
10:57:51   9   Q.   Okay.  And I believe you had a point -- no.  You were using
10:57:56  10   an illustrator that had like a blue mark on it?
10:57:59  11   A.   Yes.
10:58:01  12   Q.   Do you have that available to you right now?  Well, you
10:58:04  13   can't use it on this, I guess.  Can you use it on this one?
10:58:06  14   A.   Yeah.  I guess I can.
10:58:07  15   Q.   Okay.  Good.  And where is Fernando Garcia?
10:58:13  16   A.   I have a circle around him.
10:58:15  17   Q.   Okay.  Do you recall that earlier, when you were shown that,
10:58:19  18   the government took a red mark -- a laser pointer and pointed --
10:58:25  19   and you put the blue mark over to the person that was holding the
10:58:28  20   horse.  Did you know that?
10:58:29  21   A.   I did not.
10:58:30  22   Q.   We all saw it.  I wrote it down.  You don't remember doing
10:58:33  23   that?
10:58:33  24   A.   I circled Fernando Garcia's face.
10:58:35  25   Q.   Okay.  So if everyone remembers that differently, it's just

10:58:42  1   that they remember differently than you.

10:58:43  2   A.   I circled his face.

10:58:44  3   Q.   Okay.  Now, you were asked questions about changing

10:58:51  4   ownership of horses.  If a horse is registered with the American

10:58:59  5   Quarter Horse Association and it changes owners, if the owner

10:59:04  6   intends -- the new owner.  If he or she intends to race that

10:59:09  7   horse, they have to register it in their name, don't they?

10:59:12  8   A.   Yes.

10:59:13  9   Q.   And you know that a quarter horse registered with AQHA has a

10:59:20  10  certificate like a title on a car, correct?

10:59:24  11  A.   Yes.

10:59:26  12  Q.   And every successive owner that would intend to race that

10:59:32  13  horse has to register it in their name, correct?

10:59:36  14  A.   Yes.  They should.

10:59:38  15  Q.   Well, I mean, if they want to race it, they have to prove

10:59:42  16  they own the horse on there?

10:59:43  17  A.   Yes.

10:59:44  18  Q.   So the answer to my question is, yes, if they intend to race

10:59:48  19  the horse, they have to register it with AQHA, don't they?

10:59:52  20  A.   Yes.

10:59:53  21  Q.   Okay.  And a horse can change owners daily, correct?

11:00:00  22  A.   They could.  Yes.

11:00:01  23  Q.   I mean, it would be extreme, but you can change owners.  In

11:00:05  24  fact, from your experience in this case, or wherever, horses get

11:00:10  25  sold to other people, don't they?

11:00:11   1   A.   Yes.

11:00:12   2   Q.   Now, we have here on the screen this photograph of a horse

11:01:36   3   named A Royal Jess.  Do you remember testifying about that horse?

11:01:40   4   A.   Yes.

11:01:41   5   Q.   When you were asked about it, the government asked you the

11:01:45   6   significance of it, and you talked about -- and I forget what it

11:01:50   7   was exactly, but you talked about what you believe to be

11:01:52   8   significant about A Royal Jess.  Do you remember that?

11:01:56   9   A.   I believe I testified the ownership of that horse.

11:01:59   10  Q.   Okay.  And you said that was the significance of it; is that

11:02:04   11  right?

11:02:04   12  A.   I just said this is the owner of the horse.  The ownership

11:02:08   13  of the horse.

11:02:09   14  Q.   The question was -- that the government asked you is, what

11:02:11   15  is significant about that horse, and you said he was owned by

11:02:15   16  someone, correct?

11:02:17   17  A.   Yes.

11:02:19   18  Q.   Okay.  Is this a winner's circle photograph?

11:02:22   19  A.   Yes.

11:02:23   20  Q.   Okay.  So that means this horse won a race, correct?

11:02:28   21  A.   Yes.

11:02:29   22  Q.   And if I tell you the significance of A Royal Jess is that

11:02:35   23  it was sired by Mr. Jess Perry, are you familiar with the horse

11:02:41   24  Mr. Jess Perry from your investigation in this case?

11:02:44   25  A.   Yes.

| | | |
|---|---|---|
| 11:02:45 | 1 | Q.   Did you notice that every horse that you've seen in this |
| 11:02:50 | 2 | case that was sired by Mr. Jess Perry was fast? |
| 11:02:56 | 3 | A.   I didn't notice that. |
| 11:02:58 | 4 | Q.   You didn't notice that Mr. Piloto, Blues Girls Choice, I |
| 11:03:06 | 5 | think it was, this horse, everything -- every horse that listed |
| 11:03:10 | 6 | the name Mr. Jess Perry happened to be a great horse.  You didn't |
| 11:03:14 | 7 | notice that? |
| 11:03:15 | 8 | A.   Blues Girls Choice was not a great horse.  It only won |
| 11:03:22 | 9 | $4,600. |
| 11:03:22 | 10 | Q.   Okay. |
| 11:03:23 | 11 | A.   That's not a fast horse. |
| 11:03:24 | 12 | Q.   Okay.  Was it sired by Jess Perry -- we've had a number of |
| 11:03:26 | 13 | horses sired by him.  The members of the jury will remember it |
| 11:03:28 | 14 | better than me. |
| 11:03:30 | 15 |         But so far, every horse we've seen sired by him was |
| 11:03:33 | 16 | fast.  Did you not notice that? |
| 11:03:35 | 17 | A.   I didn't notice it. |
| 11:03:36 | 18 | Q.   Okay.  Was it obvious from going through all the records |
| 11:03:39 | 19 | that some of these horses, certain bloodlines were just naturally |
| 11:03:46 | 20 | fast?  Did you notice that? |
| 11:03:48 | 21 | A.   Yes. |
| 11:03:49 | 22 | Q.   And you didn't remember the names of any of the horses that |
| 11:03:53 | 23 | created that bloodline? |
| 11:03:54 | 24 | A.   I know some. |
| 11:03:56 | 25 | Q.   And wasn't Jess Perry one of them? |

| | | |
|---|---|---|
| 11:03:58 | 1 | A.   Jess Perry's one.  Mr. Jess Perry.  Yes. |
| 11:04:01 | 2 | Q.   Okay.  Now, the chart -- okay.  Now, again, did you |
| 11:04:49 | 3 | participate in creating this chart? |
| 11:04:51 | 4 | A.   Yes. |
| 11:04:51 | 5 | Q.   And who supplied the numbers for this chart? |
| 11:04:58 | 6 | A.   The numbers came off of documents that we either seized or |
| 11:05:03 | 7 | subpoenaed. |
| 11:05:04 | 8 | Q.   Okay.  And in particular, race earnings, who came up with |
| 11:05:10 | 9 | that number? |
| 11:05:10 | 10 | A.   AQHA gives us that number off of their documents. |
| 11:05:14 | 11 | Q.   Okay.  Now, tell the jury, when you say race earnings, this |
| 11:05:17 | 12 | is the money the horse won in races, correct? |
| 11:05:23 | 13 | A.   Yes. |
| 11:05:24 | 14 | Q.   It does not account for anything else, any other income the |
| 11:05:28 | 15 | horse generated, correct? |
| 11:05:30 | 16 | A.   That's correct. |
| 11:05:32 | 17 | Q.   And a race horse may generate income in other ways than |
| 11:05:37 | 18 | running fast; is that correct? |
| 11:05:38 | 19 | A.   That's correct. |
| 11:05:39 | 20 | Q.   For example, a stallion may be the sire of other race |
| 11:05:50 | 21 | horses, correct? |
| 11:05:51 | 22 | A.   Yes. |
| 11:05:53 | 23 | Q.   And people who would want to have a foal by that horse often |
| 11:06:00 | 24 | pay large sums of money to get semen from that fast horse, |
| 11:06:04 | 25 | correct? |

| | | |
|---|---|---|
| 11:06:04 | 1 | A.   Yes. |
| 11:06:06 | 2 | Q.   And they may pay a syndication fee where up to 40 people |
| 11:06:11 | 3 | share in the semen of that horse for their mares, correct? |
| 11:06:17 | 4 | A.   Yes. |
| 11:06:18 | 5 | Q.   And we've had testimony in this case -- you may or may not |
| 11:06:22 | 6 | know -- about one horse where the syndication was worth $6 |
| 11:06:28 | 7 | million over a three-year period.  Are you aware that the |
| 11:06:32 | 8 | syndication can be that kind of money? |
| 11:06:34 | 9 | A.   Yes. |
| 11:06:36 | 10 | Q.   If a horse is a mare, the fact that she herself is fast and |
| 11:06:46 | 11 | perhaps comes from a good bloodline, she can generate income |
| 11:06:49 | 12 | because she can produce embryos, once bred with the semen of |
| 11:06:55 | 13 | another good horse and those embryos could be sold at auction, |
| 11:06:59 | 14 | can't they? |
| 11:06:59 | 15 | A.   Yes. |
| 11:07:01 | 16 | Q.   And would you agree with me that the racing life of a horse |
| 11:07:10 | 17 | -- of a quarter horse, the actual racing period where they're |
| 11:07:12 | 18 | making money, if at all, racing is only a couple of years, isn't |
| 11:07:17 | 19 | it? |
| 11:07:17 | 20 | A.   Two years. |
| 11:07:18 | 21 | Q.   Okay.  So basically there's a two-year-old and a |
| 11:07:21 | 22 | three-year-old, correct? |
| 11:07:22 | 23 | A.   Yes. |
| 11:07:23 | 24 | Q.   But as far as producing a line of great horses, that can go |
| 11:07:30 | 25 | on for many years, can't it? |

| | | |
|---|---|---|
| 11:07:32 | 1 | A.   Yes. |
| 11:07:32 | 2 | Q.   Again, the production -- the production of income or |
| 11:07:40 | 3 | generation of income or earnings by a race horse for these other |
| 11:07:46 | 4 | things for breeding purposes may far exceed actual race winnings, |
| 11:07:51 | 5 | correct? |
| 11:07:51 | 6 | A.   Yes. |
| 11:07:53 | 7 | Q.   Where does that reflect -- where is that reflected on your |
| 11:07:56 | 8 | chart? |
| 11:07:56 | 9 | A.   It is not. |
| 11:07:57 | 10 | Q.   You're telling the people -- the jury the horse's race |
| 11:08:02 | 11 | earnings and you're not giving them a picture of its complete |
| 11:08:04 | 12 | value, are you? |
| 11:08:05 | 13 | A.   I did not have that information.  No. |
| 11:08:09 | 14 | Q.   You couldn't look through here and find out if these horses |
| 11:08:12 | 15 | had been bred? |
| 11:08:15 | 16 | MS. FERNALD:  Your Honor, asked and answered and |
| 11:08:17 | 17 | relevance objection, also. |
| 11:08:20 | 18 | MR. WOMACK:  Your Honor, he says he didn't have the |
| 11:08:22 | 19 | records. |
| 11:08:23 | 20 | THE COURT:  He's testified multiply as to what he had |
| 11:08:29 | 21 | and what he did with them.  He hasn't testified as to all of the |
| 11:08:39 | 22 | other materials in the world he was looking at. |
| 11:08:41 | 23 | MR. WOMACK:  Correct, your Honor.  That's the point I |
| 11:08:43 | 24 | wanted to make. |
| 11:08:43 | 25 | THE COURT:  I think you've made it, just like others |

11:08:45   1   have made it.  Let's move on.

11:08:48   2   Q.   (BY MR. WOMACK) Why did you omit that information from this

11:08:52   3   chart?

11:08:52   4          MS. FERNALD:  Your Honor, objection.

11:08:54   5          THE COURT:  I sustain the objection.

11:08:58   6   Q.   (BY MR. WOMACK) From the records you saw, did it show that

11:09:00   7   some of the mares had been the donor of embryos?

11:09:06   8   A.   Yes.

11:09:07   9   Q.   And that's part of this other income generation by a mare,

11:09:12  10   isn't it?

11:09:12  11   A.   Yes.

11:09:18  12   Q.   And even where you saw that, you chose not to include that

11:09:25  13   under the income of that horse?

11:09:29  14   A.   These three horses, I did not see that.

11:09:35  15   Q.   Did you see it on many of the other horses?

11:09:40  16   A.   There's other horses that I saw breeding fees.

11:09:43  17   Q.   On these three horses, did you check to see if they had been

11:09:46  18   bred or had embryos?

11:09:49  19   A.   If there was a document that had this horse's name on it, we

11:09:54  20   would have pulled it, we would have scanned it, and we would have

11:09:57  21   it in that book, and it would reflect on our chart.

11:10:11  22   Q.   Is Blues Girls Choice one of the three horses you looked at?

11:10:15  23   A.   Yes.

11:10:16  24   Q.   That's Government's Exhibit 311.

11:10:18  25   A.   Yes.

| | | |
|---|---|---|
| 11:10:18 | 1 | Q.   One of the pages you included was a master ownership record |
| 11:10:32 | 2 | with small pedigree for Blues Girls Choice? |
| 11:10:38 | 3 | A.   Yes. |
| 11:10:40 | 4 | Q.   You see that she -- she is a mare -- did embryo transfer and |
| 11:10:48 | 5 | it's in her pedigree.  She has done that? |
| 11:10:50 | 6 | A.   Yes. |
| 11:10:52 | 7 | Q.   And she has been genetic-typed? |
| 11:10:56 | 8 | A.   Yes. |
| 11:10:57 | 9 | Q.   And she had been nominated for races? |
| 11:11:02 | 10 | A.   Yes. |
| 11:11:04 | 11 | Q.   Okay.  And this is one of the horses that you did create a |
| 11:11:11 | 12 | file on, correct, and a chart? |
| 11:11:13 | 13 | A.   Yes. |
| 11:11:13 | 14 | Q.   But you didn't mention that she has done embryos before? |
| 11:11:19 | 15 | A.   As I said, I do not have a piece of paper that showed she -- |
| 11:11:25 | 16 | somebody paid money for her eggs.  I don't have that. |
| 11:11:29 | 17 | Q.   Okay.  You have evidence that's been done.  You don't know |
| 11:11:33 | 18 | how much it cost. |
| 11:11:35 | 19 | A.   I have no idea. |
| 11:11:38 | 20 | Q.   But you know it could be many thousands of dollars, couldn't |
| 11:11:41 | 21 | it? |
| 11:11:41 | 22 | A.   It could. |
| 11:11:42 | 23 | Q.   And you didn't look for any such documents, did you? |
| 11:11:46 | 24 |      MS. FERNALD:  Your Honor, that has been asked and |
| 11:11:48 | 25 | answered so many different times.  Objection. |

| | | |
|---|---|---|
| 11:11:49 | 1 | THE COURT:  It had. |
| 11:11:59 | 2 | Q.   (BY MR. WOMACK) You were asked about different companies. |
| 11:12:07 | 3 | Among them, Bonanza Stables, Desiree Princess, LLC and Poker |
| 11:12:18 | 4 | Ranch, LLC.  Do you remember those? |
| 11:12:19 | 5 | A.   Yes. |
| 11:12:19 | 6 | Q.   And you made the comment that somehow Fernando Garcia was |
| 11:12:22 | 7 | associated with that.  Do you remember that? |
| 11:12:23 | 8 | A.   Yes. |
| 11:12:24 | 9 | Q.   And associated means that he has worked as an agent for them |
| 11:12:27 | 10 | or trained horses for them; is that correct? |
| 11:12:29 | 11 | A.   He has paperwork that is associated with him and that name |
| 11:12:35 | 12 | of that company. |
| 11:12:35 | 13 | Q.   So he might have like notes, he might have documents |
| 11:12:39 | 14 | pertaining to the horses, things related to insurance, anything, |
| 11:12:42 | 15 | but he would have something where you know that he has in some |
| 11:12:45 | 16 | way been involved with the owners of that company, or each of |
| 11:12:49 | 17 | these companies, correct? |
| 11:12:50 | 18 | A.   Yes. |
| 11:12:50 | 19 | Q.   Okay.  But you know he was not the owner of any of those |
| 11:12:54 | 20 | companies.  Of those three. |
| 11:12:58 | 21 | A.   Yes. |
| 11:13:00 | 22 | Q.   But he did own, does own Garcia Bloodstock and Racing.  You |
| 11:13:06 | 23 | know that? |
| 11:13:06 | 24 | A.   Yes. |
| 11:13:07 | 25 | Q.   And that is his company? |

| | | |
|---|---|---|
| 11:13:09 | 1 | A.    Yes. |
| 11:13:10 | 2 | Q.    And from all the different entities, ranches, companies in |
| 11:13:16 | 3 | this case, that's the only company that you know that he owns, |
| 11:13:19 | 4 | correct? |
| 11:13:19 | 5 | A.    Yes. |
| 11:13:19 | 6 | Q.    Now, you were asked by the government about the letters XL. |
| 11:13:36 | 7 | Do you remember that? |
| 11:13:37 | 8 | A.    Yes. |
| 11:13:38 | 9 | Q.    And you told us that that could be the Roman numeral for 40? |
| 11:13:42 | 10 | A.    That is the Roman numeral for 40. |
| 11:13:45 | 11 | Q.    Okay.  Does it mean anything else other than 40?  Or is XL |
| 11:13:49 | 12 | only used to refer to a Roman numeral? |
| 11:13:52 | 13 | A.    It's used otherwise. |
| 11:13:54 | 14 | Q.    For example, if someone wears a clothing that's extra large, |
| 11:13:59 | 15 | it might say XL on the label? |
| 11:14:02 | 16 | A.    That's correct. |
| 11:14:03 | 17 | Q.    If they buy an upgrade of a vehicle like a Honda Accord, the |
| 11:14:09 | 18 | luxury model might be called an XL, correct? |
| 11:14:13 | 19 | A.    I don't know if it is or not.  It could be. |
| 11:14:15 | 20 | Q.    You've seen cars of some kind with XLs on them, haven't you? |
| 11:14:20 | 21 | A.    Yes. |
| 11:14:20 | 22 | Q.    And typically that's like an upgrade of that vehicle, isn't |
| 11:14:23 | 23 | it? |
| 11:14:24 | 24 | A.    I don't know. |
| 11:14:26 | 25 | Q.    Okay.  But you would agree with me that XL could mean things |

| 11:14:32 | 1 | other than just a number, couldn't it? |
|---|---|---|

11:14:32   1   other than just a number, couldn't it?

11:14:33   2   A.   Yes.

11:14:34   3   Q.   How about the numeral 42?  Does the numeral 42 -- from your

11:14:43   4   recollection in this case, does the number 42, just the Arabic

11:14:47   5   numeral 42, does that pertain to any codefendant in this case?

11:14:53   6   A.   Yes.

11:14:55   7   Q.   And that's Omar Trevino-Morales?

11:14:57   8   A.   Yes.

11:15:00   9   Q.   There's a very popular movie that's been around about two

11:15:06   10   weeks, the title of it is "42."  Is that movie of the life story

11:15:11   11   of Omar Trevino-Morales?

11:15:15   12   A.   I've never seen it advertised.

11:15:17   13   Q.   If I tell you that it's the biography of Jackie Robinson and

11:15:21   14   that was his baseball number, would you argue with that?

11:15:24   15   A.   I have no idea.

11:15:26   16   Q.   So you could see numbers 40, 42, 12, any number, and it

11:15:35   17   could pertain to anything, couldn't it?

11:15:39   18   A.   It could.

11:15:40   19   Q.   It doesn't necessarily pertain to one individual only,

11:15:44   20   correct?

11:15:44   21   A.   That's possible.

11:15:46   22   Q.   I don't have any further questions.  Thank you.

11:16:09   23           THE COURT:  Mr. Esper.

11:16:11   24           MR. ESPER:  I have nothing, your Honor.

11:16:13   25           THE COURT:  Mr. Mayr.

|          |    |                                                            |
|----------|----|------------------------------------------------------------|
| 11:16:15 | 1  | <u>CROSS-EXAMINATION</u>                                   |
| 11:16:15 | 2  | BY MR. MAYR:                                                |
| 11:16:16 | 3  | Q.   Thank you, your Honor.                                 |
| 11:16:17 | 4  |           Good morning, Officer Schutt.                     |
| 11:17:27 | 5  | A.   Good morning.                                          |
| 11:17:27 | 6  | Q.   I want to make sure I understand this.  You are obviously |
| 11:17:30 | 7  | one of a number of individuals that are collaborating as part of |
| 11:17:36 | 8  | a team to investigate this case; is that right?            |
| 11:17:39 | 9  | A.   That correct.                                          |
| 11:17:40 | 10 | Q.   Okay.  Certain individuals have certain responsibilities; is |
| 11:17:46 | 11 | that right?                                                 |
| 11:17:46 | 12 | A.   Yes.                                                   |
| 11:17:47 | 13 | Q.   Who are the other members of your team and what are their |
| 11:17:51 | 14 | roles as it pertains to them testifying here in court today, or |
| 11:17:58 | 15 | at any point during this trial?                            |
| 11:18:01 | 16 | A.   Steve.                                                 |
| 11:18:02 | 17 | Q.   In other words, who are you working with?             |
| 11:18:03 | 18 | A.   Steve Pennington.                                      |
| 11:18:04 | 19 | Q.   Steve Pennington.  Okay.  And what was his -- what's his |
| 11:18:11 | 20 | role in all of this?                                        |
| 11:18:12 | 21 | A.   He's case agent overall.                               |
| 11:18:16 | 22 | Q.   Who else?                                              |
| 11:18:16 | 23 | A.   Scott Lawson.                                          |
| 11:18:20 | 24 | Q.   Who else?                                              |
| 11:18:21 | 25 | A.   Billy Williams.                                        |

| | | |
|---|---|---|
| 11:18:25 | 1 | Q.   What's his role? |
| 11:18:28 | 2 | A.   Financial. |
| 11:18:29 | 3 | Q.   Okay.  Who else? |
| 11:18:38 | 4 | A.   Billy with DEA should be testifying. |
| 11:18:46 | 5 | Q.   And his role? |
| 11:18:50 | 6 | A.   I believe it's going to be e-mails.  Subpoenaing e-mails. |
| 11:19:00 | 7 | Q.   Okay.  Anyone else, main members of your team? |
| 11:19:04 | 8 | A.   Testifying?  I believe that's it. |
| 11:19:06 | 9 | Q.   Okay.  So if I understand your role collecting, your job is |
| 11:19:13 | 10 | to follow the horses; is that right? |
| 11:19:15 | 11 | A.   Yes. |
| 11:19:15 | 12 | Q.   Okay.  And that obviously was not an easy thing to do. |
| 11:19:21 | 13 | A.   No. |
| 11:19:22 | 14 | Q.   You had to go through multiple records? |
| 11:19:26 | 15 | A.   Yes. |
| 11:19:27 | 16 | Q.   Very time-consuming process to determine who the owners |
| 11:19:31 | 17 | were. |
| 11:19:32 | 18 | A.   Yes. |
| 11:19:32 | 19 | Q.   While it would appear that one person was the owner, you |
| 11:19:38 | 20 | came across something else that would suggest that someone |
| 11:19:41 | 21 | completely different owned that horse? |
| 11:19:44 | 22 | A.   Yes. |
| 11:19:44 | 23 | Q.   In short, it was difficult to know who owned what horse? |
| 11:19:53 | 24 | A.   At times, yes. |
| 11:19:55 | 25 | Q.   Even to a trained investigator like you, with all of your |

11:19:58    1  experience and all the time that you've had to go through these

11:20:01    2  records?

11:20:03    3  A.    Yes.

11:20:03    4  Q.    You can't show this jury a document that person A owns a

11:20:11    5  horse and that be it, right?

11:20:14    6  A.    That's correct.

11:20:15    7  Q.    You have to relate and explain from that these records that

11:20:20    8  are here, that someone else really owns the horse, correct?

11:20:29    9  A.    Yes.

11:20:30   10  Q.    All right.  Ms. Fernald talked with you about a number of

11:20:37   11  exhibits that you testified about obtained from Austin, Texas?

11:20:43   12  A.    Yes.

11:20:43   13  Q.    Did you participate in the execution of the search warrants

11:20:51   14  that resulted in the discovery of those pieces of evidence that

11:20:55   15  have been presented to this jury?

11:20:56   16  A.    No.

11:20:58   17  Q.    Okay.  What was your role in that search and looking at

11:21:03   18  those documents?

11:21:07   19  A.    My role in that search, I was not there.

11:21:09   20  Q.    Okay.  You had no role in it whatsoever.

11:21:11   21  A.    In the Austin search warrants, no.

11:21:14   22  Q.    Okay.  Who would be the best person who could talk about the

11:21:20   23  circumstances under which those documents were found?

11:21:25   24  A.    I have no idea.

11:21:28   25  Q.    Okay.  I guess we'll just wait and see.  I'll strike that.

11:21:32    1          You are aware, though, that those items were recovered

11:21:38    2    here in Austin, Texas.

11:21:40    3    A.   Yes.

11:21:41    4    Q.   You're aware that they were recovered based after search

11:21:46    5    warrants were prepared and signed off on, right?

11:21:53    6    A.   Yes.

11:21:54    7    Q.   And that there were actually three locations within Austin,

11:21:59    8    Texas that these documents were found at.  There was three

11:22:04    9    locations where search warrants were located within the Austin

11:22:07   10    area.

11:22:07   11    A.   Yes.

11:22:08   12    Q.   Okay.  One of those locations was 8008 Seeling Drive.

11:22:16   13    A.   Yes.

11:22:17   14    Q.   Okay.  And you're aware that that location is the residence

11:22:22   15    of Mr. Eusevio "Chevo" Huitron?

11:22:27   16    A.   Yes.

11:22:28   17    Q.   The second location was 4216 U.S. 183?

11:22:33   18    A.   Yes.

11:22:34   19    Q.   You're aware that that is the business location of the

11:22:39   20    Huitron Homes, Huitron Painting business, right?

11:22:44   21    A.   Yes.

11:22:45   22    Q.   And the third location was the ranch located on Rianna Woods

11:22:51   23    in Dale, Texas, where the horses were being kept.

11:22:55   24    A.   Yes.

11:22:56   25    Q.   Have you ever been out to that location?

11:22:59   1   A.   No.

11:23:01   2   Q.   Okay.   Now, to your knowledge, was there ever a search

11:23:08   3   warrant obtained to search my client's residence -- my client,

11:23:13   4   Jesus Huitron, was there ever a search warrant executed on his

11:23:19   5   residence?

11:23:19   6   A.   No.

11:23:21   7   Q.   You know he lives right across the street from his brother

11:23:25   8   Eusevio Huitron.   Are you aware of that?

11:23:27   9   A.   No.

11:23:27   10  Q.   Okay.   So to your knowledge, no one on your team ever went

11:23:32   11  to my client's house and said, can we search your residence?

11:23:37   12  A.   No.

11:23:42   13  Q.   So these exhibits came from one of three locations, either

11:23:47   14  Eusevio Huitron's home, the business location, or the ranch.

11:23:52   15  A.   Yes.

11:23:53   16  Q.   May I see 55A, please?   Okay.   This is the first exhibit

11:24:06   17  that you testified to.   Can you see it there in front of you,

11:24:09   18  Officer Schutt?

11:24:10   19  A.   Yes.

11:24:10   20  Q.   You testified 55A was found in Austin, Texas.   Do you know

11:24:17   21  where in Austin, Texas it was located?

11:24:20   22  A.   I do not.

11:24:21   23  Q.   Someone else would have to be able to testify to that,

11:24:24   24  right?

11:24:24   25  A.   Yes.

| | | |
|---|---|---|
| 11:24:27 | 1 | Q.   And this appears to be a fax cover sheet from Elgin |
| 11:24:38 | 2 | Veterinary Hospital? |
| 11:24:39 | 3 | A.   Right.  Yes. |
| 11:24:41 | 4 | Q.   Now, you see the name right there?  What's that name? |
| 11:24:44 | 5 | A.   Shae. |
| 11:24:46 | 6 | Q.   Right above that.  Who's it from, to? |
| 11:24:48 | 7 | A.   Jessica. |
| 11:24:49 | 8 | Q.   Fax being sent to Jessica, right? |
| 11:24:52 | 9 | A.   Yes. |
| 11:24:54 | 10 | Q.   Jessica is Jessica Huitron? |
| 11:24:57 | 11 | A.   Yes. |
| 11:24:58 | 12 | Q.   Jessica Huitron is my client's daughter? |
| 11:25:02 | 13 | A.   Yes. |
| 11:25:03 | 14 | Q.   Jessica Huitron is the person who is running the office |
| 11:25:08 | 15 | located at 4216 U.S. 183. |
| 11:25:13 | 16 | A.   Yes. |
| 11:25:13 | 17 | Q.   She is the one who is responsible for conducting all of |
| 11:25:17 | 18 | these transactions that you talked -- that are shown in each one |
| 11:25:22 | 19 | of these exhibits. |
| 11:25:24 | 20 | A.   I'm not sure if she's the one responsible for it, but she's |
| 11:25:28 | 21 | receiving it. |
| 11:25:28 | 22 | Q.   Okay.  Doesn't say Jesse Huitron on there, does it? |
| 11:25:33 | 23 | A.   No. |
| 11:25:34 | 24 | Q.   It doesn't say Jesus Huitron? |
| 11:25:36 | 25 | A.   Not on the first page. |

11:25:40   1   Q.   Shae is Shae Cox, correct?

11:25:43   2   A.   Yes.

11:25:44   3   Q.   Shae Cox at that time was an employee of Elgin Veterinary

11:25:48   4   hospital.

11:25:49   5   A.   Yes.

11:25:53   6   Q.   There's multiple pages in this.  Go to the next page.  Okay.

11:26:01   7   Go ahead and scroll through all those pages.

11:26:22   8            So what it appears from this document is that Shae Cox,

11:26:24   9   who's working at Elgin Veterinary Clinic, is sending a list of

11:26:30   10  veterinary expenses related to various horses; is that right?

11:26:33   11  A.   Yes.

11:26:34   12  Q.   And it's your theory that these horses belong to individuals

11:26:45   13  who are named as defendants in this case, correct?

11:26:48   14  A.   Yes.

11:26:49   15  Q.   As part of some organization, right?

11:26:52   16  A.   Yes.

11:26:53   17  Q.   Okay.  And you testified that this is a list of horses

11:26:59   18  belonging to that organization, correct?

11:27:01   19  A.   Yes.

11:27:04   20  Q.   Scroll back through the pages.  Each one of these horses

11:27:08   21  shown here are receiving treatment from Elgin Veterinary

11:27:15   22  Hospital, right?

11:27:15   23  A.   Yes.

11:27:16   24  Q.   So according to your theory, Elgin Veterinary Hospital is

11:27:24   25  providing veterinary services to these horses allegedly belonging

| | | |
|---|---|---|
| 11:27:29 | 1 | to the Zetas, right? |
| 11:27:31 | 2 | A.    Yes. |
| 11:27:35 | 3 | Q.    Is Elgin Veterinary Hospital under criminal indictment? |
| 11:27:39 | 4 | A.    No. |
| 11:27:40 | 5 | Q.    Is the owner of the clinic charged with anything? |
| 11:27:44 | 6 | A.    No. |
| 11:27:45 | 7 | Q.    Are any of the employees -- |
| 11:27:47 | 8 | MS. FERNALD:  Your Honor, I'm going to object.  Who's |
| 11:27:50 | 9 | charged in this case, who's not charged in this case is not |
| 11:27:52 | 10 | relevant to this jury.  Only these defendants are relevant to |
| 11:27:56 | 11 | this jury. |
| 11:28:04 | 12 | (At the bench, on the record.) |
| 11:28:17 | 13 | MR. MAYR:  I can rephrase the question. |
| 11:28:18 | 14 | THE COURT:  Well, you've opened the door.  Do you want |
| 11:28:20 | 15 | this prosecutor to tell who's charged in the case? |
| 11:28:24 | 16 | MR. MAYR:  No. |
| 11:28:24 | 17 | THE COURT:  No.  Then stop. |
| 11:28:26 | 18 | MR. MAYR:  Okay.  May I proceed, your Honor? |
| 11:28:47 | 19 | THE COURT:  Yes, sir. |
| 11:28:47 | 20 | Q.   (BY MR. MAYR) Have you or any members of your team suspected |
| 11:28:50 | 21 | anyone at Elgin Veterinary Hospital of any criminal activity? |
| 11:28:56 | 22 | A.    No. |
| 11:29:02 | 23 | Q.    Let me see 55B, please.  55B is another fax -- it's another |
| 11:29:15 | 24 | fax cover sheet from Elgin Veterinary Hospital, correct? |
| 11:29:17 | 25 | A.    Yes. |

| | | |
|---|---|---|
| 11:29:18 | 1 | Q.   Again, to Jessica from Shae? |
| 11:29:23 | 2 | A.   Yes. |
| 11:29:24 | 3 | Q.   And we see over here, Ms. Huitron has made a little bit of a |
| 11:29:30 | 4 | doodle, right? |
| 11:29:31 | 5 | A.   Yes. |
| 11:29:32 | 6 | Q.   With her name Jessica Gabriela Huitron? |
| 11:29:36 | 7 | A.   Yes. |
| 11:29:37 | 8 | Q.   And that appears to be her handwriting.  It's writing her |
| 11:29:46 | 9 | name? |
| 11:29:46 | 10 | A.   Yes. |
| 11:29:47 | 11 | Q.   Next page.  Now, this list of horses that's contained also |
| 11:29:59 | 12 | on 55B -- just kind of keep scrolling through the list, please -- |
| 11:30:07 | 13 | has some handwritten notes in that same handwriting that Jessica |
| 11:30:11 | 14 | Huitron writes her name; is that right? |
| 11:30:14 | 15 | A.   It's the same handwriting. |
| 11:30:16 | 16 | Q.   Keep going.  And it appears that what she's trying to do is |
| 11:30:29 | 17 | establish who owns what horse, right? |
| 11:30:33 | 18 | A.   Yes. |
| 11:30:35 | 19 | Q.   Let's go to 55C.  55C appears to be just a typed version of |
| 11:30:47 | 20 | that handwritten statement. |
| 11:30:55 | 21 | A.   Yes. |
| 11:30:55 | 22 | Q.   You have both the documents up there so you can confirm, |
| 11:30:58 | 23 | right? |
| 11:30:58 | 24 | A.   Yes. |
| 11:30:59 | 25 | Q.   Okay.  The first one, Snowy Cartel, says, Hernando Guerra, |

| 11:31:15 | 1 | right? |
| 11:31:15 | 2 | A.    Yes. |
| 11:31:16 | 3 | Q.    It doesn't say, Hernando Guerra on behalf of Ramiro |
| 11:31:21 | 4 | Villarreal? |
| 11:31:21 | 5 | A.    No. |
| 11:31:22 | 6 | Q.    On behalf of Miguel Trevino? |
| 11:31:26 | 7 | A.    No. |
| 11:31:27 | 8 | Q.    It just says Hernando Guerra? |
| 11:31:29 | 9 | A.    Yes. |
| 11:31:31 | 10 | Q.    Now, you know through your investigation and all the tools |
| 11:31:37 | 11 | that you have available, subpoenas, ability to interview, and |
| 11:31:40 | 12 | whatnot, you later come to know that Hernando Guerra is really |
| 11:31:48 | 13 | acting on Ramiro's behalf, right? |
| 11:31:51 | 14 | A.    Yes. |
| 11:31:54 | 15 | Q.    You don't know if they know that? |
| 11:31:57 | 16 | A.    Who's they? |
| 11:32:00 | 17 | Q.    Jessica Huitron. |
| 11:32:02 | 18 | A.    I don't know if she knows. |
| 11:32:04 | 19 | Q.    Okay.  And we see that there's horses in Mexico, right? |
| 11:32:10 | 20 | A.    Yes. |
| 11:32:11 | 21 | Q.    And we know and we've heard testimony, and correct me if I'm |
| 11:32:14 | 22 | wrong, that it's common for a number of owners of quarter horses |
| 11:32:20 | 23 | to live in Mexico. |
| 11:32:23 | 24 | A.    Yes. |
| 11:32:26 | 25 | Q.    Oscar Montemayor, you could scroll out.  You can zoom out, |

| | | |
|---|---|---|
| 11:32:31 | 1 | please.  Oscar Montemayor, Malinsky Cattle Company, were they |
| 11:32:38 | 2 | ever a -- did you ever suspect Malinsky Cattle Company of |
| 11:32:41 | 3 | anything illegal in this case? |
| 11:32:43 | 4 | A.   I didn't. |
| 11:32:44 | 5 | Q.   Okay.  There's some question marks for some of these, right? |
| 11:32:48 | 6 | A.   Yes. |
| 11:32:58 | 7 | Q.   And, again, we see Jessica Huitron signing that document up |
| 11:33:04 | 8 | at the top of 55C, right? |
| 11:33:07 | 9 | A.   Yes. |
| 11:33:09 | 10 | Q.   There's a little happy face underneath there? |
| 11:33:12 | 11 | A.   Yes. |
| 11:33:13 | 12 | Q.   Let's go to 60A.  You testified that these were notes about |
| 11:33:24 | 13 | the horses regarding various horses and various individuals, |
| 11:33:31 | 14 | right? |
| 11:33:33 | 15 | A.   I believe I testified these were members. |
| 11:33:37 | 16 | Q.   Okay.  And, again, this handwriting appears to be that of |
| 11:33:42 | 17 | Jessica Huitron's? |
| 11:33:44 | 18 | A.   Yes. |
| 11:33:50 | 19 | Q.   We see there's names on here like Forty Force and Viva |
| 11:33:57 | 20 | Mexico and Porsche Turbo, and different notes about Felipe |
| 11:34:01 | 21 | Quintero and other individuals, but you don't know what the |
| 11:34:04 | 22 | correlation is between those, do you? |
| 11:34:11 | 23 | A.   No.  I don't know the correlation. |
| 11:34:12 | 24 | Q.   It's just a document with some notes written by not my |
| 11:34:16 | 25 | client but Jessica Huitron? |

| | | |
|---|---|---|
| 11:34:18 | 1 | A.   Yes. |
| 11:34:23 | 2 | Q.   Let's see 60B.  Again, we see a list of -- and you don't |
| 11:34:30 | 3 | know -- again, you don't know where this was found in |
| 11:34:34 | 4 | specifically within Austin, Texas? |
| 11:34:36 | 5 |         MS. FERNALD:  Your Honor, at this time, this is |
| 11:34:37 | 6 | misleading because there's a stipulation into evidence that has |
| 11:34:40 | 7 | the box number where this particular exhibit came in that the |
| 11:34:44 | 8 | jury and Mr. Mayr has in his possession. |
| 11:34:48 | 9 |         MR. MAYR:  And let me clarify that. |
| 11:34:51 | 10 | Q.   (BY MR. MAYR) Are you personally familiar with where this |
| 11:34:54 | 11 | document was seized from? |
| 11:34:55 | 12 | A.   Not the location.  No. |
| 11:34:56 | 13 | Q.   Okay.  Fair enough. |
| 11:34:58 | 14 |         Now, there's some handwriting over here, Fire Street, |
| 11:35:03 | 15 | Streaky Baby, some of these -- that also appears to be Jessica |
| 11:35:06 | 16 | Huitron's handwriting. |
| 11:35:08 | 17 | A.   Yes. |
| 11:35:09 | 18 | Q.   Could you zoom into the bottom, please?  And actually, could |
| 11:35:18 | 19 | we get it a little bit higher? |
| 11:35:25 | 20 |         And we see some of these horses listed here with the |
| 11:35:27 | 21 | name Hernando Guerra written right next to it, right? |
| 11:35:34 | 22 | A.   Yes. |
| 11:35:34 | 23 | Q.   Again, noting Hernando Guerra on behalf of Ramiro |
| 11:35:45 | 24 | Villarreal? |
| 11:35:45 | 25 | A.   It just says, Hernando Guerra. |

| | | |
|---|---|---|
| 11:35:51 | 1 | Q.   If you can scroll down to the very bottom, please.  There's |
| 11:35:58 | 2 | a note here, have no papers to verify owners and horse, the |
| 11:36:03 | 3 | government sticker's covering that up.  But you see the bulk of |
| 11:36:07 | 4 | it, have no papers to verify owner of horse, right? |
| 11:36:11 | 5 | A.   Yes. |
| 11:36:12 | 6 | Q.   So it would appear from this document that someone is trying |
| 11:36:14 | 7 | to determine who owns the horse, who really owns the horse, |
| 11:36:18 | 8 | right? |
| 11:36:19 | 9 | A.   Yes. |
| 11:36:27 | 10 | Q.   Let's go to 70.  Again, another bill from Elgin Veterinary |
| 11:36:39 | 11 | Hospital, correct? |
| 11:36:40 | 12 | A.   Yes. |
| 11:36:41 | 13 | Q.   And the handwriting, again, you testified to these notes up |
| 11:36:47 | 14 | here, Jose MX, that appears to be Jessica Huitron's handwriting? |
| 11:36:53 | 15 | A.   Yes. |
| 11:37:00 | 16 | Q.   And 72, please.  Go ahead and zoom up to the top, please. |
| 11:37:14 | 17 | That is an e-mail from? |
| 11:37:19 | 18 | A.   Diego Verdaguer. |
| 11:37:23 | 19 | Q.   To? |
| 11:37:24 | 20 | A.   Jessica Huitron. |
| 11:37:25 | 21 | Q.   Jessica Huitron, correct? |
| 11:37:26 | 22 | A.   Yes. |
| 11:37:27 | 23 | Q.   That's her e-mail address, Jessicahuitron_Huitron@yahoo.com? |
| 11:37:34 | 24 | A.   Yes. |
| 11:37:34 | 25 | Q.   Did you ever attempt to subpoena her e-mails in this case? |

| 11:37:39 | 1 | A.   I did not. |
| 11:37:43 | 2 | Q.   Did you ever attempt to subpoena any e-mails belonging to my |
| 11:37:46 | 3 | client, Jesus Huitron? |
| 11:37:48 | 4 | A.   I did not. |
| 11:37:51 | 5 | Q.   Is that possible because he doesn't have an e-mail account? |
| 11:37:55 | 6 | A.   I wasn't responsible for the e-mails. |
| 11:37:57 | 7 | Q.   Who was? |
| 11:37:58 | 8 | A.   Billy with DEA. |
| 11:38:00 | 9 | Q.   Billy with DEA.  All right.  There's two e-mails here. |
| 11:38:06 | 10 | Let's go to the second page.  I think there was actually three |
| 11:38:16 | 11 | pages.  Go to the second page. |
| 11:38:21 | 12 |          Again, another e-mail to Jessica Huitron, correct? |
| 11:38:26 | 13 | A.   Yes. |
| 11:38:27 | 14 | Q.   And on the third page, also Jessica Huitron? |
| 11:38:32 | 15 | A.   That's the same page as the last. |
| 11:38:34 | 16 | Q.   Oh, I'm sorry.  Let's go to -- there's only two.  Okay.  I |
| 11:38:38 | 17 | just want to make sure I got it all straightened out. |
| 11:38:48 | 18 |          Now, in addition to your education, your training, your |
| 11:38:53 | 19 | experience in determining -- that you have available to you to |
| 11:38:57 | 20 | determine who the owners, the real owners of these horses are, |
| 11:39:01 | 21 | what other tools do you have at your disposal?  You can issue |
| 11:39:10 | 22 | subpoenas, right? |
| 11:39:11 | 23 | A.   We issue subpoenas. |
| 11:39:12 | 24 | Q.   What else? |
| 11:39:13 | 25 | A.   Interviews, we did search warrants for documents. |

| | | |
|---|---|---|
| 11:39:18 | 1 | Q.   What else? |
| 11:39:19 | 2 | A.   For the horses? |
| 11:39:20 | 3 | Q.   Uh-huh. |
| 11:39:22 | 4 | A.   Issue subpoenas for documents for the horses. |
| 11:39:24 | 5 | Q.   Okay.  You can -- before any charges are filed, you can |
| 11:39:30 | 6 | issue grand-jury subpoenas and have people brought before the |
| 11:39:33 | 7 | grand jury to testify about what they know about these records, |
| 11:39:37 | 8 | right? |
| 11:39:38 | 9 | A.   The prosecutors can do that. |
| 11:39:40 | 10 | Q.   Okay.  And you can request the prosecutors to do that? |
| 11:39:44 | 11 | A.   I don't request prosecutors to do anything. |
| 11:39:49 | 12 | Q.   But y'all are on the same team and you all talk about the |
| 11:39:52 | 13 | possibility that you may want to subpoena a witness to grand |
| 11:39:55 | 14 | jury, sometimes that happens, right? |
| 11:39:57 | 15 | A.   We discuss it and they make the decisions on what we will |
| 11:39:59 | 16 | do. |
| 11:40:00 | 17 | Q.   Okay.  You can also do criminal background checks on |
| 11:40:05 | 18 | individuals? |
| 11:40:06 | 19 | A.   Yes. |
| 11:40:07 | 20 | Q.   You can get their e-mails via subpoena? |
| 11:40:09 | 21 | A.   Yes. |
| 11:40:12 | 22 | Q.   And, of course, you can go interview and talk with |
| 11:40:16 | 23 | witnesses, right? |
| 11:40:17 | 24 | A.   Yes. |
| 11:40:18 | 25 | Q.   Now, in your investigation, based on the material that we've |

| | | |
|---|---|---|
| 11:40:24 | 1 | received, you interviewed a number of horse trainers or stable |
| 11:40:30 | 2 | owners; is that right? |
| 11:40:31 | 3 | A.   Yes. |
| 11:40:31 | 4 | Q.   You interviewed an individual by the name of Juan Aleman; is |
| 11:40:38 | 5 | that right? |
| 11:40:38 | 6 | A.   Yes. |
| 11:40:40 | 7 | Q.   Juan Aleman is a trainer out in California, right? |
| 11:40:44 | 8 | A.   Yes. |
| 11:40:44 | 9 | Q.   And he was, based on your theory, in possession of horses |
| 11:40:51 | 10 | belonging to this organization, right? |
| 11:40:53 | 11 | A.   Yes. |
| 11:40:56 | 12 | Q.   And you went and talked with him, and he explained to you |
| 11:41:00 | 13 | what the circumstances were? |
| 11:41:02 | 14 | A.   Yes. |
| 11:41:03 | 15 | Q.   And he's not suspected of any criminal activity. |
| 11:41:10 | 16 | A.   I didn't say that. |
| 11:41:11 | 17 | Q.   All right.  Do you suspect him of any criminal activity? |
| 11:41:15 | 18 | A.   I would say there's some involved.  Yes. |
| 11:41:17 | 19 | Q.   Okay.  But at least you went and talked with him, though, |
| 11:41:22 | 20 | right? |
| 11:41:22 | 21 | A.   I seized horses from him.  Yes. |
| 11:41:24 | 22 | Q.   Okay.  You went and interviewed an individual by the name of |
| 11:41:27 | 23 | Jose Flores, right? |
| 11:41:28 | 24 | A.   Yes. |
| 11:41:29 | 25 | Q.   Also a horse trainer who, according to you, kept horses |

| | | |
|---|---|---|
| 11:41:36 | 1 | belonging to individuals involved in this case, right? |
| 11:41:38 | 2 | A.   Yes. |
| 11:41:39 | 3 | Q.   And you spoke with him and asked him about what he knew |
| 11:41:44 | 4 | about these horses, right? |
| 11:41:45 | 5 | A.   Yes. |
| 11:41:47 | 6 | Q.   Carlos de Jesus Gonzalez.  Did you go talk with him? |
| 11:41:52 | 7 | A.   Yes. |
| 11:41:53 | 8 | Q.   Same thing?  You asked him about horses that he was in |
| 11:41:59 | 9 | possession of horses that, according to you, belonged to this |
| 11:42:03 | 10 | organization, right? |
| 11:42:04 | 11 | A.   Yes. |
| 11:42:18 | 12 | Q.   Showing you the cover of 310.  This is the photograph from |
| 11:42:28 | 13 | Ruidoso Downs for -- |
| 11:42:32 | 14 | THE COURT:  Counsel, mark your place. |
| 11:42:34 | 15 | MR. MAYR:  Okay. |
| 11:42:34 | 16 | THE COURT:  Members of the jury, I'll give you your |
| 11:42:37 | 17 | lunch break.  Please remember the instructions.  Have a nice |
| 11:42:39 | 18 | lunch.  We'll start at 1:20. |
| 11:43:13 | 19 | (Jury not present.) |
| 11:43:20 | 20 | THE COURT:  Counsel, I would like this case to conclude |
| 11:43:29 | 21 | this year.  But based on your cross-examination -- I'm going to |
| 11:43:37 | 22 | have you leave the courtroom, please. |
| 11:43:44 | 23 | (Witness exits courtroom.) |
| 11:43:55 | 24 | THE COURT:  The government can ask him, who did testify |
| 11:43:58 | 25 | in the grand jury, who did they go talk to, and what did they |

11:44:05   1   say.  I suggest that you think about some of the questions you're

11:44:11   2   asking right now.

11:44:16   3           MR. MAYR:  I'm -- I will take that under advisement,

11:44:19   4   your Honor.

11:44:19   5           THE COURT:  All right.  I'm not going to stop you

11:44:22   6   again.  Two times is all I want.

11:49:54   7           (Lunch recess.)

13:23:57   8           MR. GARDNER:  One thing, your Honor.

13:24:01   9           Your Honor, the latest update is I sent Ernest Gonzalez

13:24:04   10  an e-mail at 10:17 with respect to Mr. Moreno.  I said, he

13:24:08   11  testified yesterday as to the fact that he signed some, quote,

13:24:11   12  unquote, papers, but wasn't sure what.  I say, my suspicion is

13:24:17   13  they're related to his entry.  Do you have any, quote, unquote,

13:24:18   14  papers with his signature?  Thanks.  AUSA Gonzalez's response

13:24:24   15  was, no, I don't have any papers.  You were probably correct.  It

13:24:28   16  most likely involved his immigration status.  Daniel Padilla, who

13:24:31   17  is a special agent with the immigration folks, has all those

13:24:36   18  documents.  If you need them, I will hunt them down for you.

13:24:39   19          So, your Honor, with respect to the papers that he

13:24:42   20  testified today as possibly being Jencks or Giglio material, to

13:24:46   21  the best of my knowledge and to the best of the knowledge of the

13:24:48   22  Eastern District of Texas, there are none in existence.

13:24:51   23          THE COURT:  Okay.  Anything further before we bring in

13:24:59   24  the jury?

13:25:04   25          (Jury present.)

13:26:42  1        THE COURT:  Members of the jury, during the noonday

13:26:47  2   break, after you left the courtroom, did anyone attempt to talk

13:26:50  3   to you about this case?

13:26:51  4        JURORS:  No.

13:26:52  5        THE COURT:  Have you talked to anyone about the case?

13:26:55  6        JURORS:  No.

13:26:55  7        THE COURT:  Has anyone attempted to -- or have you

13:27:00  8   found out anything at all, outside of each other in this

13:27:04  9   courtroom on this case?

13:27:05  10       JURORS:  No.

13:27:05  11       THE COURT:  Thank you.  Show negative responses to all

13:27:08  12  questions.

13:27:10  13       Do you understand you're still under oath?

13:27:13  14       THE WITNESS:  Yes.

13:27:16  15       MR. MAYR:  Thank you, your Honor.

13:27:17  16  Q.   (BY MR. MAYR) Mr. Schutt, when we left off, we were talking

13:27:23  17  about individuals that you went and talked to after you had

13:27:27  18  followed the horses and determined that certain individuals were

13:27:30  19  in possession of or involved with some of these horses; is that

13:27:33  20  right?

13:27:33  21  A.   Yes.

13:27:36  22  Q.   I'm only going to ask you about two more people and then

13:27:40  23  leave you alone.  Could I see Government's Exhibit 5, please?

13:27:52  24       We talked a little bit about Government's Exhibit No.

13:27:57  25  5.  This photograph shows that it is being -- that the horse was

13:28:01  1  trained by a Fidencio Jimenez, correct?

13:28:05  2  A.   Yes.

13:28:06  3  Q.   In the course of your investigation, did you personally ever

13:28:10  4  go and talk with Fidencio Jimenez?

13:28:13  5  A.   No.

13:28:14  6  Q.   To your knowledge, has anyone that's a part of your

13:28:19  7  investigative team gone and talked with this individual regarding

13:28:22  8  this horse?

13:28:25  9  A.   I don't know.

13:28:30  10  Q.   For the record, I'm showing you the cover of Government's

13:28:39  11  Exhibit No. 310.  This is the photograph of Fly First Down.  Paul

13:28:48  12  Jones listed as the trainer of this horse that you followed?

13:28:52  13        MS. FERNALD:  Your Honor, I'm sorry for interrupting

13:28:55  14  you.  Could I ask for an instruction from the Court that the jury

13:28:59  15  is to be concerned about these defendants that are charged here

13:29:01  16  today and no other pending investigation that is going on on the

13:29:06  17  government's case?

13:29:10  18        THE COURT:  I think I've already done that, but let me

13:29:12  19  reemphasize.

13:29:15  20        These five individuals are the only ones that are in

13:29:19  21  this particular trial.  You're not to be concerned about the

13:29:24  22  guilt or innocence of any other party that may or may not be

13:29:29  23  involved in other cases or other segments of this trial.  The

13:29:34  24  only five that you are to determine, after hearing the evidence

13:29:39  25  in this case, are the five individuals in front of you.

13:29:44  1          All right.

13:29:45  2          MR. MAYR:  Thank you, your Honor.

13:29:47  3   Q.   (BY MR. MAYR) Have you, in the course of your information,

13:29:54  4   spoken to -- in following your horse like you're talking about,

13:29:57  5   have you talked with Paul Jones and his involvement with this

13:30:02  6   particular horse?

13:30:06  7   A.   I know he's been interviewed.  I have not asked him about

13:30:09  8   this horse, I don't believe.

13:30:11  9   Q.   Fair enough.  Now, to your knowledge, in following the

13:30:14  10  horses, you determined that Paul Jones handled a number of horses

13:30:21  11  that, according to your theory, allegedly belonged to this

13:30:27  12  organization, correct?

13:30:28  13  A.   Yes.

13:30:30  14  Q.   And while you did not interview him, someone else on your

13:30:33  15  investigative team did?

13:30:36  16  A.   Yes.

13:30:38  17  Q.   Now, what I'm asking -- now, to get to the point of why I'm

13:30:43  18  asking you all of these questions is this.  When did you -- you

13:30:48  19  talked about how you've gone and you've talked with all these

13:30:51  20  individuals or someone with your team has gone and talked to

13:30:53  21  these individuals.

13:30:54  22          When did you go and talk to my client, Jesus Huitron,

13:30:59  23  about these things that you've testified to that have been

13:31:02  24  admitted into evidence?

13:31:04  25          MS. FERNALD:  Objection, your Honor.  This is not

| | | |
|---|---|---|
| 13:31:07 | 1 | proper.  This is not a party opponent.  Hearsay.  He is not the |
| 13:31:12 | 2 | party opponent to be getting into hearsay. |
| 13:31:15 | 3 | MR. MAYR:  I'm asking when he interviewed my client. |
| 13:31:23 | 4 | MS. FERNALD:  Go ahead.  Let him ask the question. |
| 13:31:25 | 5 | THE COURT:  Okay. |
| 13:31:27 | 6 | Q.   (BY MR. MAYR) When did you go and interview my client, Jesus |
| 13:31:32 | 7 | Huitron, prior to him being charged in this courtroom today? |
| 13:31:36 | 8 | A.   I did not interview him. |
| 13:31:38 | 9 | Q.   To your knowledge, has anyone on your team interviewed or |
| 13:31:43 | 10 | gone to try to talk with my client -- |
| 13:31:47 | 11 | THE COURT:  All right.  Counsel. |
| 13:31:51 | 12 | MS. FERNALD:  Your Honor, objection.  This is not |
| 13:31:54 | 13 | proper. |
| 13:31:56 | 14 | THE COURT:  Come up here, counsel. |
| 13:32:02 | 15 | (At the bench, on the record.) |
| 13:32:11 | 16 | MR. GARDNER:  I think we were entitled to start asking, |
| 13:32:13 | 17 | did you come into -- |
| 13:32:13 | 18 | THE COURT:  No, no, no -- |
| 13:32:13 | 19 | MR. GARDNER:  -- the U.S. Attorney's Office and |
| 13:32:14 | 20 | volunteer to make a statement? |
| 13:32:15 | 21 | MS. FERNALD:  I'm trying to -- you can -- |
| 13:32:16 | 22 | MR. MAYR:  That's fine.  I'm very well aware of that -- |
| 13:32:19 | 23 | MR. GARDNER:  That's not proper. |
| 13:32:20 | 24 | MS. FERNALD:  It is so improper. |
| 13:32:21 | 25 | THE COURT:  They're going to ask him why. |

13:32:23    1          MS. FERNALD:  You really want me to?

13:32:24    2          THE COURT:  And then, they're going to say, because X,

13:32:27    3    Y and Z told us he was guilty, and there's not a thing you can do

13:32:30    4    about it.  And I don't know that X, Y and Z are not sitting in

13:32:34    5    this courtroom.

13:32:34    6          MR. MAYR:  Okay.  I think I'm prepared to deal with it,

13:32:39    7    but I'm going to withdraw the question in light of that.

13:32:42    8          MS. FERNALD:  Yeah.

13:32:43    9          MR. MAYR:  Okay?

13:32:43    10         THE COURT:  Let's stay with the direct evidence and

13:32:48    11   we've gone too far.  I'm not going to allow any mistrial just

13:32:52    12   because of an errant question comes in that allows the government

13:32:57    13   to get in evidence that they would not normally get in.

13:32:58    14         MR. MAYR:  Okay.

13:33:19    15         THE COURT:  Counsel, let's go on to another subject.

13:33:22    16         MR. MAYR:  Sure.

13:33:36    17   Q.   (BY MR. MAYR) Again, determining who the owners of these

13:33:40    18   horses were was a difficult task for you to accomplish?

13:33:44    19   A.   Yes.

13:33:45    20   Q.   Thank you, Officer Schutt.  Your Honor, I have no further

13:34:04    21   questions.

13:34:05    22         THE COURT:  Any redirect?

13:34:07    23         MS. FERNALD:  No redirect, your Honor.  Pass the

13:34:08    24   witness.

13:34:09    25         THE COURT:  Counsel, may this witness be excused?

13:34:13  1          MR. FINN:  (Moving head up and down.)

13:34:13  2          THE COURT:  You may be excused, sir.  You may call your

13:34:16  3  next witness.

13:34:17  4          MR. GARDNER:  Thank you, your Honor.  The government

13:34:31  5  calls Butch Wise.

13:35:03  6              (Witness sworn.)

13:35:16  7          THE COURT:  If you'll just kind of talk into that

13:35:18  8  microphone, sir, and play like it's not there, and tell us your

13:35:22  9  full name and spell your last.

13:35:22  10         THE WITNESS:  My full name is Floyd Edmund Wise.  My

13:35:25  11  last name is spelled, W-I-S-E.

13:35:28  12      FLOYD E. WISE, called by the Government, duly sworn.

13:35:28  13                    DIRECT EXAMINATION

13:35:28  14  BY MR. GARDNER:

13:35:29  15  Q.   Thank you, your Honor.

13:35:30  16         Mr. Wise, you also go by the moniker of "Butch"?

13:35:33  17  A.   I do.

13:35:34  18  Q.   If you will, could you introduce yourself to the jury and

13:35:36  19  tell them what you do for a living, please?

13:35:38  20  A.   I have a company that manages the Lazy E Ranch at Guthrie,

13:35:42  21  Oklahoma.

13:35:42  22  Q.   And what does the Lazy E Ranch do?

13:35:45  23  A.   Lazy E Ranch is a breeding and sales organization that

13:35:52  24  markets racing quarter horses.

13:35:53  25  Q.   And how long have you been the manager up there, sir?

13:35:56   1   A.   Nineteen years.

13:35:58   2   Q.   And were you there in the founding of the company?

13:36:01   3   A.   I was not.

13:36:03   4   Q.   How long has the company been in operation?

13:36:06   5   A.   About 30 years.

13:36:07   6   Q.   Sir, could you please explain to the jury what -- as the

13:36:10   7   manager or, in general, what does the Lazy E do for its

13:36:15   8   customers?

13:36:16   9   A.   This time of the year, we breed mares.  Then we transition

13:36:21  10   into the sale of racing quarter horses yearlings and brood mares

13:36:27  11   for the rest of the year.  And then, we manage horses for clients

13:36:29  12   all over the world at the ranch.  They live there.

13:36:34  13   Q.   And approximately how many horses do you have at the Lazy E

13:36:38  14   right now?

13:36:38  15   A.   It depends on the time of the year, but usually between 300

13:36:41  16   and 550 a year.

13:36:43  17   Q.   And how big is the Lazy E Ranch in terms of acreage?

13:36:46  18   A.   About a thousand acres.

13:36:49  19   Q.   Sir, you have a famous stallion named Corona Cartel?

13:36:53  20   A.   We're very fortunate to have him.  Yes, we are.

13:36:56  21   Q.   And would you agree with me that -- let me give you two

13:37:00  22   other names.  Mr. Jess Perry and First Down Dash is recently

13:37:05  23   deceased.  Would you agree with me that those are probably the

13:37:07  24   top three stallions for breeding purposes in the country?

13:37:10  25   A.   I would.

13:37:11    1    Q.    And if you will, sir, do you know the price per breeding for

13:37:16    2    First Down Dash?

13:37:17    3    A.    This year's 25,000.

13:37:19    4    Q.    The price for your horse Corona Cartel?

13:37:22    5    A.    35,000.

13:37:23    6    Q.    And the price for Mr. Jess Perry?

13:37:24    7    A.    Also 35,000.

13:37:26    8    Q.    So if I were to breed a horse to any one of those stallions,

13:37:31    9    what would be the odds of that horse would be better than any

13:37:35    10   other horse I might buy at auction not in that bloodline?

13:37:39    11   A.    Well, it's almost a very close proportional relationship in

13:37:44    12   that the better horses that command the better stud fees have a

13:37:49    13   higher statistical probability of achieving your desire and

13:37:54    14   success at the race track.

13:37:56    15   Q.    So would you agree with the statement if I wanted to play at

13:38:00    16   the elite level, I'm going to have to pay at the elite level?

13:38:02    17   A.    I'm sorry, would you repeat the question?

13:38:04    18   Q.    Sure.  Would you agree with the statement that if I want to

13:38:06    19   play, race at the elite in the quarter horse business, I'm going

13:38:11    20   to have to pay for the elite stallion breedings?

13:38:15    21   A.    You certainly are.

13:38:18    22   Q.    Sir, do you know an individual by the name of Ramiro

13:38:22    23   Villarreal?

13:38:22    24   A.    I did.  Yes, sir.

13:38:23    25   Q.    And how do you know him, sir?

| | | |
|---|---|---|
| 13:38:25 | 1 | A.   He was a client of the ranches. |
| 13:38:27 | 2 | Q.   When you say client, do you recall in what manner?  Was he |
| 13:38:32 | 3 | personally breeding or did he have horses at your ranch? |
| 13:38:36 | 4 | A.   He did both of those.  He purchased breedings and he had |
| 13:38:38 | 5 | mares that we managed for him and bred for him. |
| 13:38:40 | 6 | Q.   And are you aware of a horse called Tempting Dash? |
| 13:38:43 | 7 | A.   I am. |
| 13:38:45 | 8 | Q.   And were you aware that the ownership at some point changed? |
| 13:38:48 | 9 | A.   Yes. |
| 13:38:49 | 10 | Q.   Okay.  Do you know who it changed to? |
| 13:38:52 | 11 | A.   It changed from Jose -- I mean, from Mr. Villarreal, I |
| 13:38:58 | 12 | believe, to Jose Trevino. |
| 13:38:59 | 13 | Q.   And do you know Jose Trevino? |
| 13:39:01 | 14 | A.   I have met him.  Yes, sir. |
| 13:39:03 | 15 | Q.   And has that been at the Lazy E Ranch at the auction house? |
| 13:39:09 | 16 | A.   That's correct. |
| 13:39:10 | 17 | Q.   Can you describe what type of person he is? |
| 13:39:11 | 18 | A.   Seemed to be a nice fella.  He was always very pleasant to |
| 13:39:14 | 19 | me. |
| 13:39:14 | 20 | Q.   And when you first became aware of Mr. Trevino, how did that |
| 13:39:20 | 21 | occur?  Why did you first become aware of Mr. Trevino? |
| 13:39:23 | 22 | A.   Well, when you're in connection with very high profile |
| 13:39:28 | 23 | horses in our business, we're going to try to find out what we |
| 13:39:31 | 24 | can, and hopefully our services can be used by those individuals. |
| 13:39:38 | 25 | Q.   And when you looked into Mr. Trevino, what did you find? |

13:39:42  1   A.   Had a lot of really good horses.

13:39:48  2   Q.   Now, you mentioned an individual named Ramiro Villarreal.

13:39:51  3   Did at some point he stop managing those horses at the Lazy E or

13:39:55  4   stop being responsible for them?

13:39:56  5   A.   That's correct.

13:39:57  6   Q.   And who stepped into his place?

13:40:00  7   A.   Carlos Nayen.

13:40:05  8   Q.   Call up 335.  Sir, do you recognize that individual in front

13:40:15  9   of you?

13:40:16  10  A.   That is Carlos Nayen.  Yes, sir.

13:40:18  11  Q.   Government's Exhibit 335E.  Sir, how did you know that he

13:40:23  12  was taking over Ramiro Villarreal's horses?

13:40:27  13  A.   We were instructed by Mr. Villarreal that Mr. Nayen would be

13:40:36  14  the go-to man on those horses that had previously been managed by

13:40:43  15  Mr. Villarreal.

13:40:45  16  Q.   And was the paperwork at your ranch changed to reflect that?

13:40:48  17  A.   It was.

13:40:49  18  Q.   And who's Mr. Matt Witman, sir?

13:40:52  19  A.   He's my partner and my second-in-command.

13:40:54  20  Q.   And he'll be here to testify after you about those specific

13:40:58  21  documents; is that correct?

13:40:58  22  A.   He will, sir.

13:40:59  23  Q.   Now, when you met Mr. Nayen, did he have anyone else with

13:41:04  24  him?

13:41:05  25  A.   He had several people with him on various sundry occasions.

13:41:09    1    Yes, sir.

13:41:09    2    Q.    Do you remember an individual by the name of Fernando

13:41:13    3    Garcia?

13:41:13    4    A.    I do.

13:41:14    5    Q.    And do you recognize him here in the courtroom today?

13:41:17    6    A.    Yes, I do.

13:41:18    7    Q.    Is that --

13:41:19    8    A.    Standing there.

13:41:20    9    Q.    Standing there?

13:41:21   10    A.    Yes, sir.

13:41:22   11    Q.    And when Mr. Nayen would arrive at the Lazy E, would Mr.

13:41:27   12    Garcia be with him?

13:41:28   13    A.    On some occasions, yes, sir.

13:41:30   14    Q.    And what horses did they look at when they were at the Lazy

13:41:34   15    E?

13:41:34   16    A.    Well, the horses included mares like Dashin Follies and

13:41:39   17    Sportiness and Marry For Money and She's Bad.  Several different

13:41:42   18    ones.

13:41:43   19    Q.    And were those the horses that were being taken care of by

13:41:47   20    Carlos Nayen?

13:41:48   21    A.    Yes, sir.

13:41:49   22    Q.    And were those the same horses that were previously being

13:41:52   23    taken care of by Ramiro Villarreal?

13:41:54   24    A.    Correct.

13:41:55   25    Q.    When I say taken care of, those are my words.  What was

| | | |
|---|---|---|
| 13:42:03 | 1 | involved in managing their horses at your facility? |
| 13:42:06 | 2 | A.   Well, obviously on a day-to-day basis, we're caring for the |
| 13:42:10 | 3 | horses.  What we needed from them was instructions on how to |
| 13:42:13 | 4 | breed them and to what stallions. |
| 13:42:17 | 5 | Q.   And so, in that respect, that's what Carlos Nayen was doing? |
| 13:42:21 | 6 | A.   That's correct. |
| 13:42:23 | 7 | Q.   Now, we talked a little bit about Tempting Dash being Ramiro |
| 13:42:29 | 8 | Villarreal's horse and becoming Jose Trevino's horse.  And the |
| 13:42:35 | 9 | records that are in evidence from the AQHA show a number of |
| 13:42:39 | 10 | horses switching from various individuals to Jose Trevino.  That |
| 13:42:43 | 11 | would be Tempting Dash, Mr. Piloto, Separate Fire, Feature Honor, |
| 13:42:49 | 12 | Fly First Down, Big Daddy Cartel and Mr. Ease Cartel. |
| 13:42:54 | 13 | How common is it for an owner to sell his horse between |
| 13:43:00 | 14 | winning a qualifying race and qualifying for the final? |
| 13:43:05 | 15 | A.   It does occur. |
| 13:43:06 | 16 | Q.   It does occur? |
| 13:43:07 | 17 | A.   Yes, sir. |
| 13:43:07 | 18 | Q.   Would you say that it is a common occurrence? |
| 13:43:11 | 19 | A.   If enough money changes hands, it's not a -- it's not |
| 13:43:15 | 20 | common, but it does happen. |
| 13:43:17 | 21 | Q.   If I were to say one, two, three, four, five, six, seven |
| 13:43:20 | 22 | horses I just listed for you, would you say that was common on |
| 13:43:24 | 23 | seven different occasions? |
| 13:43:25 | 24 | A.   I would not. |
| 13:43:26 | 25 | Q.   The Lazy E also operates as a consigner.  Is that a fair |

| | | |
|---|---|---|
| 13:43:35 | 1 | statement? |
| 13:43:35 | 2 | A.    It is. |
| 13:43:36 | 3 | Q.    Could you explain to the jury what a consigner does? |
| 13:43:40 | 4 | A.    A client will approach us about where to sell a horse, and |
| 13:43:45 | 5 | we will then give them the benefit of our expertise.  And |
| 13:43:49 | 6 | oftentimes, we'll look at that individual and then, we'll make a |
| 13:43:52 | 7 | plan for that horse.  That horse will oftentimes be sent to us to |
| 13:43:56 | 8 | prepare for the auction and we'll use a -- but not unlike a young |
| 13:44:01 | 9 | high school athlete, we'll take that horse and get them ready, |
| 13:44:05 | 10 | get them physically fit and outwardly fit, and try to present the |
| 13:44:09 | 11 | best possible package that we can at the auction.  We don't |
| 13:44:13 | 12 | always get those horses -- completely have our hands on them. |
| 13:44:20 | 13 | Some will be sent to us directly to the sales. |
| 13:44:23 | 14 |       But we have a lot of contacts in the business |
| 13:44:25 | 15 | throughout the racing quarter horse world, and so, they use our |
| 13:44:29 | 16 | expertise to help get the most money that we can for their |
| 13:44:33 | 17 | particular product because it's just like a harvest for them. |
| 13:44:36 | 18 | Q.    So using the example you gave that sometimes as consigner, |
| 13:44:41 | 19 | you receive the horse at the auction itself.  How many days does |
| 13:44:47 | 20 | that occur before the actual sale? |
| 13:44:49 | 21 | A.    Well, we like to have those horses 90 days prior to the sale |
| 13:44:53 | 22 | to get the optimum condition on the horse.  Doesn't always happen |
| 13:44:58 | 23 | that way, but we like that optimally. |
| 13:45:01 | 24 | Q.    So on these occasions where that doesn't happen, let's say |
| 13:45:03 | 25 | you get it a day or two before the auction, what do you do to |

13:45:07   1   prep that horse for sale?

13:45:08   2   A.   Basically about what you can do is trim their feet and trim

13:45:12   3   their bridle paths and their ears and do the best job you can in

13:45:16   4   24 to 48 hours.

13:45:18   5   Q.   Now, the jury's heard some testimony from a witness who

13:45:20   6   bought a horse called Blues Ferrari at the January 2011 winter

13:45:26   7   sale at Heritage Place.  Were you present at that sale, sir?

13:45:29   8   A.   Yes, sir.

13:45:29   9   Q.   And did you see Blues Ferrari come to the sales ring?

13:45:34   10  A.   Yes, sir.

13:45:35   11  Q.   I know when we interviewed you earlier, you used a phrase

13:45:38   12  and I'm going to repeat it.  You said that horse came into the

13:45:41   13  arena looking like death eating a cracker?

13:45:45   14  A.   Correct.

13:45:46   15  Q.   That sticks with me.  What do you mean by that?

13:45:49   16  A.   Well, the horse was not ready to sell.  I mean, he was --

13:45:55   17  his outward condition was not even close to optimal and kind of

13:46:00   18  -- pretty well beat up.

13:46:02   19  Q.   And are you aware that horse went for $310,000?

13:46:05   20  A.   Yes, sir.

13:46:07   21  Q.   Were you in the position of the ultimate purchaser, would

13:46:12   22  you have paid $310,000 for that horse?

13:46:15   23  A.   No, sir.  I would not have.

13:46:16   24  Q.   Thank you, Mr. Wise.  I pass the witness, your Honor.

13:46:21   25

CROSS-EXAMINATION

BY MS. WILLIAMS:

Q.    Good afternoon, Mr. Wise.  My name is Christie Williams.  I just have a couple of questions for you.

A.    I'm ready.

Q.    Okay.  Do you know who consigned Blues Ferrari?

A.    I believe it was Southwest Stallion Station.

Q.    And who runs Southwest Stallion Station?

A.    Dr. Charles Graham and Tyler Graham and David Graham.

Q.    So they're the ones who should have taken steps to get that horse as ready as they could?

A.    If they had him long enough, yes, ma'am.

Q.    I want to ask you briefly about syndication.

A.    Yes, ma'am.

Q.    The jury's heard a little bit about you before you came here because we talked about the fact that the Corona Cartel syndicate was housed at your ranch.

A.    That's correct.

Q.    And is that the only syndicate that's housed at Lazy E or are there others?

A.    No.  Currently, we have three syndicated stallions at Lazy E.

Q.    So that would be Mr. Jess Perry?

A.    No.

Q.    Which three are they?

13:47:39   1   A.   Corona Cartel, Teller Cartel and Valiant Hero.

13:47:47   2   Q.   And is the value of the syndicate or the cost to get in, is

13:47:57   3   that public record?  If I ask you some questions about how much

13:48:01   4   people had to pay to get in, I'm not getting into secret stuff,

13:48:04   5   am I?

13:48:05   6   A.   It's not proprietary.  No, ma'am.

13:48:07   7   Q.   All right.  So Corona Cartel, that syndicate, how many

13:48:13   8   shares are in that syndicate?

13:48:14   9   A.   All of the syndicates are 40-share syndicates.

13:48:17   10  Q.   Now, is that -- does it have to be 40 shares or is that just

13:48:21   11  what you invested?

13:48:23   12  A.   It's traditional model that's been used for about 70 years

13:48:28   13  now.

13:48:28   14  Q.   All right.  So each of these three have 40 shares.  And

13:48:34   15  what's the -- what was the total value for Corona Cartel or how

13:48:38   16  much were the shares?  I guess either way.

13:48:40   17  A.   Initially or when they originally sold?

13:48:44   18  Q.   Yes, sir.

13:48:45   19  A.   At $175,000 a share.

13:48:52   20  Q.   So $7 million?

13:48:53   21  A.   Correct.

13:48:54   22  Q.   All right.  Do people sell -- if I buy a share of a

13:49:02   23  syndicate and then, I decide I want to get out of the horse

13:49:04   24  business, is that a marketable thing?

13:49:08   25  A.   Commodity?

| | | |
|---|---|---|
| 13:49:09 | 1 | Q.   Commodity. |
| 13:49:10 | 2 | A.   Yes.  Yes, ma'am.  That's the mark of a very good investment |
| 13:49:16 | 3 | is liquidity. |
| 13:49:17 | 4 | Q.   All right.  So I can sell that share in the Corona Cartel |
| 13:49:22 | 5 | syndicate to someone else? |
| 13:49:23 | 6 | A.   You may. |
| 13:49:24 | 7 | Q.   Does that have to be approved?  That sale, does that have to |
| 13:49:28 | 8 | be approved by you or the group? |
| 13:49:30 | 9 | A.   All shares are -- all sales are dictated -- one of the |
| 13:49:35 | 10 | benefits of being in a syndicate is that any sale has to be |
| 13:49:39 | 11 | offered to the members first, and they have first right of |
| 13:49:44 | 12 | refusal. |
| 13:49:44 | 13 | Q.   And so, if I wanted to today buy that share, how much would |
| 13:49:49 | 14 | that cost? |
| 13:49:49 | 15 | A.   300,000. |
| 13:49:53 | 16 | Q.   And as far as -- I don't want to go on and on.  But as far |
| 13:49:59 | 17 | as Teller Cartel and Valiant Hero, are the values about the same |
| 13:50:02 | 18 | or are they different? |
| 13:50:03 | 19 | A.   They're different.  It would be about 200,000 in the case of |
| 13:50:09 | 20 | Valiant Hero share right now and probably about 75,000 in Teller |
| 13:50:18 | 21 | Cartel. |
| 13:50:18 | 22 | Q.   So about $8 million? |
| 13:50:21 | 23 | A.   Give or take. |
| 13:50:22 | 24 | Q.   Give or take.  That's all the questions I have.  Oh, hang |
| 13:50:28 | 25 | on.  You didn't get away that easy.  Could I have just a minute, |

| | | |
|---|---|---|
| 13:50:49 | 1 | your Honor? |
| 13:50:49 | 2 | THE COURT:  Yes, ma'am. |
| 13:51:16 | 3 | Q.   (BY MS. WILLIAMS) Are you familiar with the farm that Mr. |
| 13:51:20 | 4 | Trevino purchased in Lexington, Oklahoma? |
| 13:51:22 | 5 | A.   I am. |
| 13:51:23 | 6 | Q.   How were you familiar with that? |
| 13:51:25 | 7 | A.   Jose told me they were in the process of purchasing that |
| 13:51:29 | 8 | farm.  I had actually lived on that farm in the '70s. |
| 13:51:32 | 9 | Q.   And at the time you lived on the farm, was it a |
| 13:51:36 | 10 | state-of-the-art farm? |
| 13:51:37 | 11 | A.   It was. |
| 13:51:38 | 12 | Q.   And at the time Jose purchased that farm, was it a |
| 13:51:42 | 13 | state-of-the-art farm? |
| 13:51:43 | 14 | A.   It was not. |
| 13:51:44 | 15 | Q.   No further questions. |
| 13:51:51 | 16 | CROSS-EXAMINATION |
| 13:51:57 | 17 | BY MR. DEGEURIN: |
| 13:51:57 | 18 | Q.   Mr. Wise, I'm Mike DeGeurin. |
| 13:52:05 | 19 | You used -- the term was used by Mr. Gardner, the |
| 13:52:11 | 20 | prosecutor, and you -- I noticed several terms were used that |
| 13:52:15 | 21 | seemed to be interchangeable:  Go-to man, the person taking care |
| 13:52:21 | 22 | of, the person responsible for, the person giving the |
| 13:52:25 | 23 | instructions.  And I think those were all used with regard to the |
| 13:52:30 | 24 | person managing the horse that's brought to your place to get |
| 13:52:34 | 25 | ready for auction.  In other words, someone that tell you, breed |

13:52:42   1   the horse, or get the horse ready for auction, or whatever.

13:52:46   2         You've also heard the term he's the agent for the owner

13:52:51   3   of the horse.  Are all these terms interchangeable?

13:52:54   4   A.   No, sir.

13:52:55   5   Q.   All right.  Kind of explain what the difference are.

13:52:58   6   A.   Well, usually in the race horse business -- and I might add,

13:53:05   7   we did not sell horses for this group.  We merely bred horses for

13:53:11   8   them or cared for those horses.  But traditionally, an agent is

13:53:15   9   one that represents a buyer and a seller.

13:53:21   10   Q.   One agent for the buyer and one for the seller?

13:53:24   11   A.   That's usually correct.  Yes, sir.

13:53:25   12   Q.   That's the general way the terms are used?

13:53:28   13   A.   That's correct.

13:53:28   14   Q.   All right.  And if someone -- if an owner wanted to put a

13:53:35   15   horse on your farm to -- for whatever reason, either for breeding

13:53:42   16   or to get it ready for an auction, the owner himself wouldn't

13:53:48   17   have to be there.  Somebody else could be there in his stead and

13:53:51   18   tell you, here's what we'd like to do; is that correct?

13:53:53   19   A.   That's correct.  As long as they have the authority to do

13:53:55   20   so.

13:53:56   21   Q.   All right.  That's all I have, Judge.  Thank you, Mr. Wise.

13:54:06   22         THE COURT:  Mr. Womack.

13:54:08   23         MR. WOMACK:  Yes, your Honor.  Thank you.

13:54:08   24

13:54:10   25

|          |    |                                                                          |
|----------|----|--------------------------------------------------------------------------|
| 13:54:10 | 1  | CROSS-EXAMINATION                                                         |
| 13:54:10 | 2  | BY MR. WOMACK:                                                            |
| 13:54:15 | 3  | Q.   Good afternoon, Mr. Weiss.  I'm Guy Womack.  I'm an attorney         |
| 13:54:19 | 4  | from Houston and I represent Fernando Garcia, who you pointed out         |
| 13:54:22 | 5  | earlier.                                                                  |
| 13:54:22 | 6  | A.   Yes.                                                                 |
| 13:54:23 | 7  | Q.   Sir, if you would, please tell the jury, do you remember            |
| 13:54:27 | 8  | meeting Fernando Garcia?                                                  |
| 13:54:29 | 9  | A.   Yes.                                                                 |
| 13:54:29 | 10 | Q.   Do you recall him coming to your ranch to introduce himself?        |
| 13:54:33 | 11 | A.   No.  I don't recall that.  But I saw him on several                  |
| 13:54:37 | 12 | difference occasions.  Yes, sir.                                         |
| 13:54:38 | 13 | Q.   And do you recall that some of these occasions, he talked to        |
| 13:54:41 | 14 | you about -- in particular, about the breeding of and the               |
| 13:54:43 | 15 | bloodline of Corona Cartel?                                              |
| 13:54:47 | 16 | A.   No.  I don't remember that.  But okay.                              |
| 13:54:50 | 17 | Q.   Okay.  Do you remember him telling you about his studies           |
| 13:54:58 | 18 | pursuing a bachelor of science in horse racing at the University        |
| 13:55:01 | 19 | of Arizona?  Do you remember him talking about that?                    |
| 13:55:04 | 20 | A.   I was unaware of that also.                                        |
| 13:55:05 | 21 | Q.   You don't remember ever discussing that with him?                  |
| 13:55:08 | 22 | A.   I don't, sorry.                                                     |
| 13:55:08 | 23 | Q.   But you talked to him and seen him on several occasions?           |
| 13:55:11 | 24 | A.   I have.                                                             |
| 13:55:11 | 25 | Q.   Have you seen him at some of the auctions and sales?               |

| | | |
|---|---|---|
| 13:55:14 | 1 | A.   I have. |
| 13:55:14 | 2 | Q.   Do you recall seeing him at your ranch at Lazy E? |
| 13:55:18 | 3 | A.   Absolutely. |
| 13:55:18 | 4 | Q.   And sometimes you said he was actually there with Carlos |
| 13:55:21 | 5 | Nayen? |
| 13:55:21 | 6 | A.   Yes.  On a couple of occasions. |
| 13:55:23 | 7 | Q.   Do you recall on the couple of occasions he was with Carlos |
| 13:55:26 | 8 | Nayen that Fernando basically translated or interpreted for |
| 13:55:30 | 9 | Carlos Nayen?  Do you remember that? |
| 13:55:31 | 10 | A.   I do remember him translating for Carlos.  Yes. |
| 13:55:34 | 11 | Q.   Okay.  But you've seen Fernando Garcia on many other |
| 13:55:38 | 12 | occasions by himself? |
| 13:55:39 | 13 | A.   I have. |
| 13:55:39 | 14 | Q.   And are you aware that he operates a company called Garcia |
| 13:55:44 | 15 | Bloodstock and Racing? |
| 13:55:45 | 16 | A.   I wasn't. |
| 13:55:46 | 17 | Q.   Okay.  But you know that you have -- I guess you've seen him |
| 13:55:51 | 18 | buy horses before? |
| 13:55:51 | 19 | A.   I have. |
| 13:55:52 | 20 | Q.   And are you aware that he sometimes manages horses like Mr. |
| 13:55:57 | 21 | Villarreal or others for other owners? |
| 13:55:59 | 22 | A.   I was aware that he did for Carlos.  I mean, I haven't dealt |
| 13:56:06 | 23 | with any of his other clients. |
| 13:56:08 | 24 | Q.   Okay.  In order to race a quarter horse here in America, is |
| 13:56:22 | 25 | it true that the owner of the horse must have a license with the |

13:56:29   1   state racing commission in that state where he hopes to race a

13:56:33   2   horse?

13:56:33   3   A.   It is.

13:56:34   4   Q.   And to get a license from the state racing commission in all

13:56:37   5   of the states, does the owner have to subject himself to

13:56:40   6   background investigation?

13:56:41   7   A.   No.

13:56:42   8   Q.   What does he have to do to get a license?

13:56:45   9   A.   You just have to fill out an application and then, you have

13:56:48   10  to -- they'll ask you if you've had any felonies or any

13:56:50   11  convictions and -- but they don't subject you to that.

13:56:53   12  Q.   Okay.  Do you know if you submit -- if you give fingerprints

13:56:56   13  to any of the racing commissions?

13:56:57   14  A.   In most jurisdictions, you must.

13:57:00   15  Q.   Okay.  So an owner wishing to get a license to race horses

13:57:05   16  in any state or in most states must submit fingerprints along

13:57:10   17  with his application for the license?

13:57:12   18  A.   That is correct.

13:57:13   19  Q.   And in every state, you must submit the application for a

13:57:16   20  license?

13:57:17   21  A.   Yes.

13:57:17   22  Q.   And they ask you background information about whether you

13:57:20   23  have criminal convictions, that sort of thing?

13:57:22   24  A.   That's correct.

13:57:22   25  Q.   Now, once you get your license where you're an owner who can

| | | |
|---|---|---|
| 13:57:27 | 1 | put horses in a race, when you go to a particular race or when |
| 13:57:31 | 2 | you nominate a horse, do you have to be the registered owner on |
| 13:57:36 | 3 | the certificate for that horse controlled by the American Quarter |
| 13:57:42 | 4 | Horse Association? |
| 13:57:43 | 5 | A.    No. |
| 13:57:44 | 6 | Q.    So you can be an owner and race a horse without having the |
| 13:57:47 | 7 | title to the horse? |
| 13:57:48 | 8 | A.    You can by way of a lease. |
| 13:57:50 | 9 | Q.    Okay.  I understand.  So there are two methods by which an |
| 13:57:55 | 10 | owner or a licensed racer, if you will, can race a horse.  He can |
| 13:58:03 | 11 | either own the horse outright or have a lease agreement allowing |
| 13:58:07 | 12 | him to race the horse? |
| 13:58:08 | 13 | A.    That's correct. |
| 13:58:10 | 14 | Q.    And in the case of a lease agreement, does the owner have -- |
| 13:58:14 | 15 | or the man bringing the horse to the race, does he have to be |
| 13:58:18 | 16 | able to prove that the leases for that particular horse in the |
| 13:58:22 | 17 | name that it's registered with the American Quarter Horse |
| 13:58:25 | 18 | Association? |
| 13:58:25 | 19 | A.    Yes. |
| 13:58:26 | 20 | Q.    So I guess what I'm trying to say is in every case where a |
| 13:58:30 | 21 | gentleman like yourself or someone else is racing or putting a |
| 13:58:34 | 22 | horse in a race, they have to prove they either own the horse as |
| 13:58:39 | 23 | registered in their name or they own a lease agreement that |
| 13:58:42 | 24 | allows them to race that horse, and they can prove the horse is |
| 13:58:46 | 25 | owned by the person who granted them the lease? |

13:58:49  1   A.   Correct.

13:58:50  2   Q.   Thank you, sir.  No further questions.

13:59:06  3            MR. ESPER:  Just a few, your Honor.

13:59:07  4                    CROSS-EXAMINATION

13:59:08  5   BY MR. ESPER:

13:59:08  6   Q.   Mr. Wise, how long did you know Ramiro Villarreal?

13:59:12  7   A.   Oh, probably six or seven years.

13:59:19  8   Q.   And I believe you testified that he either managed or owned

13:59:23  9   horses that he brought to the Lazy E, correct?

13:59:29  10  A.   That's correct.

13:59:30  11  Q.   Now, whenever he managed horses, you indicated in a question

13:59:34  12  that Mr. DeGeurin asked you that so long as the person had

13:59:37  13  authority -- he was managing a horse.  So long as he had

13:59:43  14  authority from the owner, that was sufficient for you, correct?

13:59:45  15  A.   Yes.  In many cases, we needed -- we didn't have an owner.

13:59:49  16  He was just our go-to guy.

13:59:51  17  Q.   Okay.  He was your go-to guy meaning that if there were

13:59:54  18  decisions to be made, you went to him?

13:59:56  19  A.   Correct.

13:59:57  20  Q.   If there were bills to be paid, you went to him?

13:59:59  21  A.   Correct.

14:00:00  22  Q.   If there were -- and when I say bills, I'm talking about

14:00:04  23  bills from the Lazy E, correct?

14:00:06  24  A.   Exactly.

14:00:07  25  Q.   If there were other bills that needed to be paid other than

| | | |
|---|---|---|
| 14:00:10 | 1 | your own, did you front those -- did you front those expenses or |
| 14:00:14 | 2 | did you go to collect the money from him first? |
| 14:00:16 | 3 | A.   Well, in a traditional situation, I mean, you bill them on a |
| 14:00:20 | 4 | monthly basis, so you're always a month behind. |
| 14:00:22 | 5 | Q.   Okay.  And so, you would bill him and he would tender |
| 14:00:25 | 6 | payment in some form to you? |
| 14:00:27 | 7 | A.   That's correct. |
| 14:00:28 | 8 | Q.   Either wire transfer, cashier's check, personal check, cash, |
| 14:00:32 | 9 | correct? |
| 14:00:32 | 10 | A.   Correct. |
| 14:00:33 | 11 | Q.   Okay.  And what type of authority would you want from him |
| 14:00:39 | 12 | that he possessed the necessary authority?  Would it have to be |
| 14:00:43 | 13 | in writing or just his representation? |
| 14:00:44 | 14 | A.   His representation. |
| 14:00:45 | 15 | Q.   Okay.  And that was because you knew him or just -- if I |
| 14:00:50 | 16 | walked into your place and I said, I manage this horse for Joe |
| 14:00:54 | 17 | Smith.  Are you going to accept my representation? |
| 14:00:56 | 18 | A.   No.  Usually not.  But when you're dealing across borders, |
| 14:01:01 | 19 | it's a little bit more difficult.  And in most of the cases we |
| 14:01:04 | 20 | had seen where he had bought those horses, sometimes in his name, |
| 14:01:09 | 21 | sometimes in other people's names.  So we felt fairly certain |
| 14:01:11 | 22 | that he was -- had the authority to do so. |
| 14:01:14 | 23 | Q.   He had a very substantial reputation within the horse-racing |
| 14:01:17 | 24 | community, did he not? |
| 14:01:19 | 25 | A.   He did. |

14:01:20   1   Q.   Okay.  That's all I have, your Honor.

14:01:24   2            MR. MAYR:  Your Honor, I have no questions for this

14:01:25   3   witness.

14:01:26   4                      RE-DIRECT EXAMINATION

14:01:26   5   BY MR. GARDNER:

14:01:27   6   Q.   Mr. Wise, to your knowledge, was Tempting Dash ever

14:01:31   7   syndicated?

14:01:31   8   A.   To my knowledge, no.

14:01:33   9   Q.   You said you actually lived on that property in Lexington,

14:01:37  10   Oklahoma when you were younger?

14:01:38  11   A.   I did.

14:01:39  12   Q.   How big is that property?

14:01:42  13   A.   I don't know.  It's been divided, but it's a couple of

14:01:46  14   hundred acres.

14:01:46  15   Q.   And were you aware the number of horses that Mr. Jose

14:01:49  16   Trevino had on that piece of property?

14:01:51  17   A.   Well, let me back up.  The original property was a couple of

14:01:54  18   hundred acres.  That was probably -- I'm going to say it was

14:01:57  19   somewhere around 70 or 80 what he was dealing with there.

14:02:00  20   Q.   And in your opinion, was that enough space for the number of

14:02:03  21   horses that Mr. Trevino had on that property?

14:02:05  22   A.   There were a lot of horses there.

14:02:07  23   Q.   Was there enough space for the number of horses?  Or do you

14:02:10  24   feel comfortable making that opinion?

14:02:12  25   A.   Well, no.  It would certainly have been better if they had

136

```
14:02:16   1   more places to put them.
14:02:19   2   Q.    Thank you, Mr. Wise.
14:02:21   3   A.    Thank you.
14:02:24   4            THE COURT:  Any further questions?
14:02:25   5            MS. WILLIAMS:  No further questions, your Honor.
14:02:28   6            MR. DEGEURIN:  No.
14:02:29   7            THE COURT:  Mr. DeGeurin?  Mr. Womack?
14:02:31   8            MR. WOMACK:  No.
14:02:32   9            MR. ESPER:  No, your Honor.
14:02:34  10            MR. GARDNER:  May this witness be excused, your Honor?
14:02:36  11            THE COURT:  May the witness?
14:02:38  12            THE WITNESS:  Thank you.
14:02:41  13            MR. GARDNER:  Government calls Mr. Jose Mendoza.
14:03:06  14            (Witness sworn.)
14:03:26  15            THE COURT:  I want you to tell us, please, sir, your
14:03:30  16   full name and spell your last.
14:03:32  17            MR. FINN:  Judge, can I approach real quick?
14:03:38  18            (At the bench, on the record.)
14:03:42  19            MR. FINN:  He raised his left hand when he was just
14:03:42  20   sworn in.
14:03:42  21            THE COURT:  Well, that's very typical with this.
14:03:45  22            MR. FINN:  Okay.  I mean, as long as you're okay with
14:03:47  23   that.  Thanks.
14:03:54  24            THE WITNESS:  It's Jose Manuel Mendoza, M-E-N-D-O-Z-A.
14:04:00  25            THE COURT:  You may proceed.
```

14:04:01   1    JOSE M. MENDOZA, called by the Government, duly sworn.

14:04:01   2                    DIRECT EXAMINATION

14:04:01   3    BY MR. GARDNER:

14:04:02   4    Q.   Thank you, your Honor.

14:04:02   5         Mr. Mendoza, good afternoon.

14:04:04   6    A.   Good afternoon, sir.

14:04:05   7    Q.   Could you please introduce yourself to the jury and let them

14:04:07   8    know what you do for a living and where?

14:04:09   9    A.   Jose Mendoza.  Lazy E Ranch.  I worked for Lazy E Ranch

14:04:14   10   since I was about 16 years old.  Been my home, been my life, it's

14:04:21   11   been the place where I grew up.

14:04:24   12   Q.   Mr. Mendoza, if you will, could you pull that microphone

14:04:27   13   just a little bit over that way?  Okay.

14:04:30   14        What do you do at the Lazy E?

14:04:32   15   A.   Basically what I do at the Lazy E is I'm in charge of the

14:04:40   16   Hispanics.  I also in charge of the hay, the grain.  I talk to a

14:04:47   17   lot of Hispanic clients because my bilingual, I speak both

14:04:54   18   English and Spanish.  I do a lot of translating when they're

14:05:00   19   needed to be translated on the phone.

14:05:02   20   Q.   And do you handle -- just to back up.  One of the defense

14:05:06   21   counsel couldn't hear you at the beginning, so let me summarize.

14:05:10   22        You said the Lazy E, that's where you were raised,

14:05:12   23   that's where you grew up, that's your life.  You've been there

14:05:14   24   for a long time.  Is that a fair statement?

14:05:16   25   A.   Yes.  I have.  Like I said, again, at the Lazy E, I've been

14:05:21  1  there since I was 16 and worked through summers, vacation.  I was

14:05:28  2  full-time in '94.

14:05:31  3  Q.   And in addition to making contact with Hispanic clients,

14:05:35  4  what other tasks do you do involving the horses on the ranch?

14:05:40  5  A.   I'm sorry?

14:05:41  6  Q.   What's your job on the ranch other than just dealing with

14:05:44  7  Hispanic clients?

14:05:45  8  A.   Make sure everything has been fed, make sure all the mares

14:05:50  9  come to range or identified, everything in the barn as the studs,

14:05:59  10  mares, they're all getting identified as who they are.

14:06:04  11  Q.   And do you know an individual by the name of Ramiro

14:06:07  12  Villarreal?

14:06:07  13  A.   Yes, I do.

14:06:08  14  Q.   And when did you first meet Mr. Villarreal?

14:06:11  15  A.   Mr. Villarreal, I met him through sales, through the sales

14:06:20  16  that's when Lazy goes to the sales.  I met him at the ranch when

14:06:24  17  he came to the ranch and look at the studs and dropped his mares

14:06:32  18  off.

14:06:32  19  Q.   And when he dropped his mares off, we've heard plenty of

14:06:35  20  testimony assuming he was wanting to breed those mares to studs

14:06:39  21  at the ranch?

14:06:40  22  A.   Yes.

14:06:40  23  Q.   Could you tell the jury what stallions he was looking at?

14:06:44  24  A.   At that time, we still did have him is Corona Cartel.  That

14:06:52  25  is the stud that is most valuable at the ranch.  Also through

14:06:58  1  some more studs that we have there, Azul, Valiant Hero, Teller

14:07:06  2  Cartel.  There will be some other ones but not as valuable as

14:07:16  3  those ones.

14:07:17  4  Q.   And does the Lazy E also involve obtaining breedings from

14:07:23  5  other valuable stallions, such as Mr. Jess Perry and First Down

14:07:28  6  Dash?

14:07:28  7  A.   Yes.  Also, First Down Dash is -- was in California.  He's

14:07:33  8  dead now.  Mr. Jess Perry was the four sixes is still alive.  We

14:07:42  9  do get mares.  What I mean by that is get semen from other

14:07:48  10  places, studs, and breed them at the ranch.

14:07:50  11  Q.   Was Mr. Villarreal also looking for possible breedings to

14:07:55  12  those other horses?

14:07:56  13  A.   Yes, he was.

14:07:57  14  Q.   Do you know an owner by the name of Michael Pohl?

14:08:00  15  A.   Michael Pohl.  I don't know him personally.  I have talked

14:08:07  16  to on the phone.

14:08:08  17  Q.   And he's an owner obviously of horses?

14:08:12  18  A.   Yes, he is.  He's well-known guy.  He's got a real nice set

14:08:18  19  of mares.

14:08:19  20  Q.   And did Mr. Villarreal contact you one day looking to buy a

14:08:24  21  certain type of horse?

14:08:25  22  A.   Yes.

14:08:26  23  Q.   What type of horse was that?

14:08:27  24  A.   Mr. Villarreal called me and asked me if I knew Mr. Pohl.  I

14:08:34  25  told him that I knew who he was, that I knew his ranch manager.

14:08:42    1    So I called Rene Hill to Mr. Hill.  They got me through Mr. Pohl.

14:08:49    2    Q.   And what type of horses -- in terms of bloodlines, what type

14:08:53    3    of bloodlines was Ramiro Villarreal looking for?

14:08:55    4    A.   Coronas and Jess Perrys.

14:08:58    5    Q.   And do you know if Mr. Pohl had any Coronas or Jess Perrys

14:09:03    6    offspring at his place?

14:09:04    7    A.   Yes, he was.

14:09:06    8    Q.   And did you inform that -- or inform Mr. Villarreal of that?

14:09:10    9    A.   Yes, I did.

14:09:11    10   Q.   At some point, were you contacted by an individual named

14:09:15    11   Bill Price?

14:09:16    12   A.   Bill Price, I know Mr. Price through the ranch.  And how I

14:09:25    13   know Mr. Price, he's a syndicate member; so that means he comes

14:09:30    14   to the ranch when he needs to breed his mares to Corona Cartel.

14:09:35    15   That's how I know Mr. Bill Price.  And I know what mares he had

14:09:41    16   at that time.

14:09:41    17   Q.   Did Mr. Ramiro Villarreal ever contact you asking about Bill

14:09:47    18   Price?

14:09:47    19   A.   Yes.  Mr. Villarreal contact me and asked me if I knew Bill

14:09:52    20   Price.  I told him I did know Bill Price.

14:09:55    21   Q.   And in terms of him asking what you do, do you know why

14:10:03    22   Ramiro Villarreal was asking the question?

14:10:04    23   A.   He was asking -- well, he didn't -- basically he said, do

14:10:09    24   you know if Mr. Price has any yearlings?  And I didn't know.  I'm

14:10:14    25   assuming that's because he breeds mares here.

14:10:16   1   Q.   And when he's talking about yearling, just one-year-old

14:10:20   2   horse, correct?

14:10:21   3   A.   Yes.   One-year-old horse or one and three months or one and

14:10:24   4   two months.

14:10:24   5   Q.   When he's saying yearlings, again, what bloodlines was

14:10:31   6   Ramiro Villarreal looking for?

14:10:32   7   A.   Corona Cartels.

14:10:34   8   Q.   And do you know if Ramiro Villarreal ever got a hold of Mr.

14:10:37   9   Price?

14:10:40   10   A.   He did and Mr. Price called me back and asked me about it,

14:10:46   11   and I said he, Mr. Villarreal contact me to give him this

14:10:53   12   information and I did.

14:10:55   13   Q.   Now, did Mr. Villarreal ever contact you about actually

14:10:58   14   looking at Mr. Price's horses?

14:11:01   15   A.   Yes, he did.   And at the time I was working, and I told him

14:11:06   16   I didn't have time.   But when I had time, it was convenient, I

14:11:11   17   will look at him.

14:11:13   18   Q.   And did you actually go to Mr. Price's facility and look at

14:11:16   19   his yearling?

14:11:17   20   A.   I did.   One week and that my family took a trip to Texas and

14:11:26   21   drove out to his place.

14:11:27   22   Q.   And do you recall the name of the -- either the yearling or

14:11:30   23   the mare that was bred to Corona Cartel?

14:11:33   24   A.   It was Snowy Fling.

14:11:36   25   Q.   Snowy Fling was the name of the --

14:11:38    1    A.    Dam.

14:11:39    2    Q.    -- dam.  And do you know what the offspring was?

14:11:41    3    A.    Snowy Cartel.

14:11:43    4    Q.    Snowy Cartel.  And do you know -- I'm sorry.  Let me back

14:11:48    5    up.

14:11:49    6          Did you look, in fact, at this yearling, referring back

14:11:53    7    the Ramiro Villarreal?

14:11:53    8    A.    I did.  I did.  I told him.  I said, that's a nice

14:11:58    9    individual yearling, but she's small.

14:12:01   10    Q.    And do you know if Ramiro Villarreal ever bought that horse?

14:12:04   11    A.    He called me later, oh, maybe months or so, and say, quote,

14:12:12   12    I bought her.

14:12:13   13    Q.    And do you know -- at some point, did Mr. Villarreal stop

14:12:18   14    representing the horses that you had at Lazy E Ranch?

14:12:24   15    A.    Don't recall the day, but yes.  He did call me and said,

14:12:34   16    hey, I will not be taking over these horses at the ranch.

14:12:39   17    Q.    And I'm sorry.  You said someone called you and said they

14:12:43   18    were going to be taking over the horses at the ranch?

14:12:44   19    A.    No.  He called me.

14:12:46   20    Q.    Okay.  He being Ramiro Villarreal?

14:12:49   21    A.    Yes.

14:12:49   22    Q.    I'm sorry.  So he called you and said somebody's going to be

14:12:52   23    taking over the horses at the ranch?

14:12:54   24    A.    Yes.

14:12:54   25    Q.    Did he give you a name?

| | | |
|---|---|---|
| 14:12:56 | 1 | A.   Carlitos Nayen. |
| 14:12:57 | 2 | Q.   Could I see 335E, please?  Do you recognize this photo, Mr. |
| 14:13:04 | 3 | Mendoza? |
| 14:13:04 | 4 | A.   Yes, I do. |
| 14:13:05 | 5 | Q.   Okay.  Is that Mr. Nayen? |
| 14:13:06 | 6 | A.   Yes. |
| 14:13:07 | 7 | Q.   Okay.  That's 335E. |
| 14:13:10 | 8 |      And did you actually get a call from this individual |
| 14:13:13 | 9 | you knew as Carlitos? |
| 14:13:15 | 10 | A.   Later, he did call me.  Don't recall it was a week or later |
| 14:13:22 | 11 | on, some time that week, he did call me and said, hey, I'm taking |
| 14:13:27 | 12 | over the horses. |
| 14:13:29 | 13 | Q.   And have you heard from your boss Butch Wise?  I assume |
| 14:13:35 | 14 | that's your boss. |
| 14:13:35 | 15 | A.   Yes.  Butch was my boss. |
| 14:13:37 | 16 | Q.   About what that meant.  But do you recall what horses Carlos |
| 14:13:41 | 17 | Nayen took over for Ramiro Villarreal? |
| 14:13:43 | 18 | A.   Well, when Mr. Nayen called me, I told my boss.  I said, |
| 14:13:49 | 19 | hey, Carlitos Nayen called me, he's taking over these horses. |
| 14:13:55 | 20 | And those horses were pretty much everything that had Ramiro on |
| 14:14:03 | 21 | his name.  At that time was Long Straw, Sportiness, and about |
| 14:14:14 | 22 | seven or eight resets. |
| 14:14:18 | 23 | Q.   And the jury's heard that a reset mare is one who's accepted |
| 14:14:21 | 24 | a viable embryo of a good horse to carry the pregnancy, correct? |
| 14:14:28 | 25 | A.   Correct. |

| | | |
|---|---|---|
| 14:14:29 | 1 | Q.   So did you eventually meet Carlos Nayen? |
| 14:14:34 | 2 | A.   That year, I think he came to the ranch, but I don't recall |
| 14:14:43 | 3 | what month or when.  It was later on that year. |
| 14:14:47 | 4 | Q.   And I don't think I asked you that question.  Do you recall |
| 14:14:49 | 5 | the year in which that happened? |
| 14:14:51 | 6 | A.   Sir, '09 maybe. |
| 14:15:02 | 7 | Q.   So when Carlos Nayen called you about taking over the |
| 14:15:07 | 8 | horses, did the Lazy E change all the names on the accounts that |
| 14:15:11 | 9 | were previously Ramiro Villarreal's name? |
| 14:15:15 | 10 | A.   That didn't happen right away because he didn't give an |
| 14:15:18 | 11 | address or anything.  But we did change everything to his name. |
| 14:15:28 | 12 | Maybe a period of two weeks or so. |
| 14:15:33 | 13 | Q.   And whether it was 2009 or '10 when Ramiro Villarreal -- I'm |
| 14:15:39 | 14 | sorry, when Carlos Nayen came to the ranch, was anybody with him? |
| 14:15:43 | 15 | A.   When Carlitos came to the ranch the first year, person by |
| 14:15:52 | 16 | the name of Fernando came with him. |
| 14:15:53 | 17 | Q.   And do you see this person named Fernando in the courtroom |
| 14:15:56 | 18 | today? |
| 14:15:57 | 19 | A.   Yes, I do. |
| 14:15:58 | 20 | Q.   The individual who's standing up? |
| 14:16:00 | 21 | A.   Yes, I do. |
| 14:16:01 | 22 | Q.   Your Honor, may the record reflect that the witness has |
| 14:16:04 | 23 | identified the Defendant Fernando Garcia? |
| 14:16:07 | 24 | THE COURT:  So reflects. |
| 14:16:08 | 25 | Q.   (BY MR. GARDNER) And so, you have these horses, they're in |

| | | |
|---|---|---|
| 14:16:14 | 1 | Carlos Nayen's name.  Who would call to, for lack of a better |
| 14:16:19 | 2 | term, deal with the horses? |
| 14:16:20 | 3 | A.   I'm sorry, sir?  The question? |
| 14:16:21 | 4 | Q.   Who would call when they had a question, or they wanted to |
| 14:16:24 | 5 | give you instructions, or receive an update for the horses? |
| 14:16:28 | 6 | A.   Either -- most of the time, either Fernando or Carlitos. |
| 14:16:36 | 7 | Q.   And specifically, with respect to the Defendant Fernando |
| 14:16:40 | 8 | Garcia, what kind of questions or conversations would you have |
| 14:16:44 | 9 | with him? |
| 14:16:45 | 10 | A.   Basically was how the mares, how many embryos we have, how |
| 14:16:53 | 11 | are they doing, how they look like, are the babies any good. |
| 14:17:00 | 12 | Q.   If there were billing questions, who would handle those, |
| 14:17:04 | 13 | Carlos Nayen or Fernando Garcia? |
| 14:17:06 | 14 | A.   Same thing.  Either Carlitos or Fernando. |
| 14:17:13 | 15 | Q.   Do you know a Jose Trevino? |
| 14:17:15 | 16 | A.   I met him at the ranch. |
| 14:17:18 | 17 | Q.   At the Lazy E? |
| 14:17:19 | 18 | A.   Yes. |
| 14:17:19 | 19 | Q.   And do you see him in the courtroom today?  The gentleman |
| 14:17:26 | 20 | standing? |
| 14:17:26 | 21 | A.   Yes, sir. |
| 14:17:27 | 22 | Q.   Your Honor, may the record reflect the witness has |
| 14:17:29 | 23 | identified the Defendant Jose Trevino? |
| 14:17:32 | 24 | THE COURT:  So reflects. |
| 14:17:33 | 25 | Q.   (BY MR. GARDNER) And how many times does Mr. Jose Trevino |

14:17:37  1  visit the ranch?

14:17:38  2  A.   Oh, probably six times or so.

14:17:45  3  Q.   And when you first encountered him, was that before or after

14:17:49  4  Carlos Nayen first came to the ranch?

14:17:52  5  A.   That was after Nayen.

14:17:54  6  Q.   And what horses would Jose Trevino look at when he came to

14:18:00  7  the ranch?

14:18:02  8  A.   Dashin Follies, Long Straw and studs.

14:18:12  9  Q.   And with respect to Dashin Follies and Long Straw, were

14:18:16  10  those horses in Carlos Nayen's names?

14:18:18  11  A.   Yes, sir.

14:18:19  12  Q.   Do you know a person by the name of Francisco Colorado?

14:18:26  13  A.   I met him through -- I met him at the ranch.

14:18:30  14  Q.   How many times?

14:18:30  15  A.   First time.

14:18:31  16  Q.   Just one time?

14:18:31  17  A.   One time.

14:18:32  18  Q.   And how did he introduce himself?

14:18:33  19  A.   As "Pancho" Francisco Colorado.

14:18:37  20  Q.   Do you see him in the courtroom today?

14:18:38  21  A.   Yes, I do.

14:18:39  22  Q.   Is this Mr. "Pancho" Colorado standing right here?

14:18:42  23  A.   Yes, sir.

14:18:43  24  Q.   Your Honor, may the record reflect the witness has

14:18:45  25  identified the Defendant Francisco Colorado-Cessa?

| | | |
|---|---|---|
| 14:18:49 | 1 | THE COURT:  So reflects. |
| 14:18:51 | 2 | Q.   (BY MR. GARDNER) Now, when did you first meet him, Mr. |
| 14:18:54 | 3 | Mendoza? |
| 14:18:57 | 4 | A.   I met Mr. Colorado, oh, it was -- as a weekend.  I don't |
| 14:19:07 | 5 | recall the month. |
| 14:19:10 | 6 | Q.   Let me give you a point of reference.  Were you present at |
| 14:19:13 | 7 | the Lazy E when federal authorities came and seized a bunch of |
| 14:19:17 | 8 | horses? |
| 14:19:17 | 9 | A.   No, sir. |
| 14:19:18 | 10 | Q.   Were you aware of that seizure? |
| 14:19:21 | 11 | A.   Yes. |
| 14:19:22 | 12 | Q.   And using that point as a reference, when did the Defendant |
| 14:19:26 | 13 | Colorado come to the ranch? |
| 14:19:27 | 14 | A.   That weekend.  That Saturday or Sunday. |
| 14:19:34 | 15 | Q.   And did the Defendant Colorado tell you what he did for a |
| 14:19:38 | 16 | living? |
| 14:19:39 | 17 | A.   No.  He didn't specifically say what he did for a living, |
| 14:19:45 | 18 | but he had oil. |
| 14:19:53 | 19 | Q.   Nothing specific? |
| 14:19:54 | 20 | A.   Nothing specific.  Oil.  I mean. |
| 14:20:00 | 21 | Q.   And what horses was he there to look at? |
| 14:20:04 | 22 | A.   He looked at two mares and two babies. |
| 14:20:11 | 23 | Q.   And were those mares and those babies, were those horses |
| 14:20:15 | 24 | under Carlos Nayen's account? |
| 14:20:16 | 25 | A.   Yes, sir. |

14:20:17  1   Q.   And did Mr. Colorado give you any instructions with respect

14:20:24  2   to those two -- or two mares and two babies?

14:20:24  3   A.   Yes.

14:20:33  4   Q.   Did he ask you to switch the accounts on those horses?

14:20:37  5   A.   When we got back into the office, he asked for the bill,

14:20:44  6   what was the total bill for those mares and two mares and babies.

14:20:48  7   So we gave him the total bill on that month.  And I recall, it

14:20:55  8   was about $1,500, somewhere around there.  And then, we said, Mr.

14:21:01  9   Colorado, this mare's going to Carlitos Nayen, because they asked

14:21:09  10  me if they wanted to be Oklahoma-bred, those babies.  He said no.

14:21:15  11  Switch them to his name.

14:21:18  12  Q.   And at the Lazy E, you automatically switched the accounts

14:21:22  13  or the responsibility per horse based on their request of

14:21:28  14  somebody who comes into the office?

14:21:29  15  A.   Uh-huh.  Yes.

14:21:29  16  Q.   And did you verify this with Carlos Nayen?

14:21:32  17  A.   He called Carlos Nayen.

14:21:34  18  Q.   He being Defendant Colorado?

14:21:35  19  A.   Mr. Colorado.

14:21:36  20  Q.   And I just want to make sure I'm clear.  I may have

14:21:38  21  misunderstood.

14:21:39  22       Did Colorado come into the office before federal

14:21:44  23  authorities seized horses or after?

14:21:47  24  A.   Yes.  No.  Before.

14:21:48  25  Q.   All right.  You testified earlier that you were not present

14:21:53  1  on the Lazy E when federal authorities came and seized those

14:21:56  2  horses?

14:21:57  3  A.    No, sir.  I was not.

14:22:00  4  Q.    Did you start receiving a number of phone calls that day?

14:22:02  5  A.    I did.

14:22:04  6  Q.    And what type of calls did you receive?

14:22:07  7  A.    Basically is how's everything.  We heard that those horses

14:22:16  8  have been seized.  My answer is, I don't know, I'm not there, I

14:22:21  9  don't have any idea.

14:22:22  10  Q.    And were those calls from people you knew?

14:22:25  11  A.    No number.  A no number.  People that, I mean, I don't know

14:22:32  12  them.  Don't know -- do not know those persons because it was a

14:22:39  13  no number.

14:22:39  14  Q.    And is your number posted on the Lazy E website?

14:22:43  15  A.    Yes.  My number is posted on the Lazy E website as a

14:22:46  16  Hispanic interpreter.

14:22:48  17  Q.    Mr. Mendoza, that's all the questions I have.  Thank you.

14:22:51  18  A.    Thank you.

14:22:53  19        MS. WILLIAMS:  I don't have any questions of this

14:22:54  20  witness, your Honor.

14:23:11  21                       CROSS-EXAMINATION

14:23:11  22  BY MR. DEGEURIN:

14:23:25  23  Q.    Mr. Mendoza, I'm Mike DeGeurin.  We have not met, have we?

14:23:29  24  A.    No, sir.

14:23:30  25  Q.    Okay.  You knew that Carlos Nayen managed horses for Mr.

14:23:41  1  Francisco Colorado?

14:23:42  2  A.   Yes.   That's what he said.

14:23:44  3  Q.   And Mr. Nayen managed horses for other people, too, I guess?

14:23:49  4  A.   Correct.

14:23:50  5  Q.   Okay.   And when you met Mr. Colorado -- by the way, is

14:24:07  6  Dashing Little Reba at the Lazy E Ranch?

14:24:12  7  A.   Was.

14:24:12  8  Q.   It was?

14:24:13  9  A.   Yes.   I mean, at that time it was there.

14:24:15  10  Q.   And that was Mr. Colorado's horse?

14:24:18  11  A.   Yes.

14:24:20  12  Q.   Managed by Mr. Nayen?

14:24:22  13  A.   Correct.

14:24:32  14  Q.   So you told us that Mr. Nayen would come on behalf of

14:24:39  15  different clients and that with him sometimes would be Mr.

14:24:45  16  Fernando Garcia.   He was working with Mr. Nayen?

14:24:50  17  A.   Carlitos and.

14:24:53  18  Q.   Fernando?

14:24:54  19  A.   Fernando came to the ranch a couple of different times.

14:25:00  20  Q.   Couple dozen times?

14:25:02  21  A.   Couple of times.

14:25:03  22  Q.   Couple of times?

14:25:05  23  A.   Uh-huh.   And several occasions, not every week, not every

14:25:09  24  month, but twice a year maybe.

14:25:18  25  Q.   Is there a horse named Royal Quick Dash?

14:25:21  1   A.   Royal Quick Dash.   Yes.

14:25:23  2   Q.   Tell me about that horse.

14:25:26  3   A.   Personally I don't know that horse pretty well.   He's a

14:25:31  4   stud.   Last time I heard, he's in Brazil.   Well-known horse.

14:25:38  5   Good horse.

14:25:39  6   Q.   And did Mr. Colorado have one of Royal Quick Dash's

14:25:47  7   brothers?

14:25:48  8   A.   He mentioned at that time Mr. Colorado came to the ranch, he

14:25:53  9   mentioned something about son of him.

14:25:57  10  Q.   The son of?

14:25:58  11  A.   Yes.

14:25:59  12  Q.   Of Colorado?   And was the horse in Mexico or did he have it

14:26:04  13  in Brazil?   Or where did Mr. Colorado have the horse?

14:26:07  14  A.   To my understanding, he was in Mexico.

14:26:11  15  Q.   Did you talk with Mr. -- by the way, the two horses you

14:26:16  16  said, the two mares that Mr. Colorado said, give me the bills for

14:26:22  17  those two mares?

14:26:23  18  A.   Yes.

14:26:23  19  Q.   Remember that?

14:26:24  20  A.   Yes.

14:26:24  21  Q.   Was that the last time you saw him?

14:26:26  22  A.   Yes.

14:26:27  23  Q.   Okay.   And to your recollection, were those mares -- had

14:26:33  24  they been managed by Mr. Nayen or?

14:26:36  25  A.   Yes.

| | | |
|---|---|---|
| 14:26:36 | 1 | Q.   Okay. |
| 14:26:37 | 2 | A.   Yes.  It was managed by Mr. Nayen. |
| 14:26:39 | 3 | Q.   And Mr. Nayen was with Mr. Colorado one time? |
| 14:26:43 | 4 | A.   No.  Not at that time that Mr. Colorado came to the ranch. |
| 14:26:47 | 5 | Q.   But you had known Nayen was managing Mr. Colorado's horses |
| 14:26:51 | 6 | before you met Mr. Colorado? |
| 14:26:54 | 7 | A.   Yes. |
| 14:26:55 | 8 | Q.   All right.  So after Nayen had been there managing some |
| 14:27:00 | 9 | horses for Mr. Colorado, then Mr. Colorado came? |
| 14:27:03 | 10 | A.   Came.  True. |
| 14:27:05 | 11 | Q.   And to your recollection, you only saw him -- he only came |
| 14:27:09 | 12 | once? |
| 14:27:10 | 13 | A.   On. |
| 14:27:11 | 14 | Q.   Mr. Colorado? |
| 14:27:12 | 15 | A.   Yes.  Once only. |
| 14:27:15 | 16 | Q.   And you said he was looking for two babies.  Do you mean |
| 14:27:26 | 17 | colts of some other? |
| 14:27:28 | 18 | A.   No.  These two babies out of those mares.  Those two mares. |
| 14:27:33 | 19 | Q.   Oh, okay.  So Mr. Nayen, managing somebody else, had some |
| 14:27:39 | 20 | mares.  Those mares had babies and Mr. Colorado wanted to look at |
| 14:27:44 | 21 | those babies. |
| 14:27:45 | 22 | A.   No, sir. |
| 14:27:46 | 23 | Q.   No? |
| 14:27:47 | 24 | A.   Mr. Colorado came by the ranch and saw his two mares. |
| 14:27:52 | 25 | Q.   His own, Colorado's mares? |

| 14:27:54 | 1 | A.   Yes.  His two mares and his two babies. |

14:27:54  1  A.   Yes.  His two mares and his two babies.

14:27:59  2  Q.   His two mares and his own horses' babies?

14:28:03  3  A.   Yes.

14:28:03  4  Q.   So he's checking up on his horses?

14:28:05  5  A.   Correct.

14:28:06  6  Q.   One moment.  Was the horse I asked you about, the Dashing

14:28:31  7  Little Reba a pretty famous horse?

14:28:32  8  A.   Real nice horse.  Real nice.  Pretty horse.  Good horse.

14:28:42  9  Q.   And the horse that's in Brazil, that's the one we're talking

14:28:48  10  about?

14:28:48  11  A.   The Royal Quick Dash?

14:28:49  12  Q.   Yeah.  That one.

14:28:50  13  A.   That horse, I don't know personally.  I never saw him my

14:28:56  14  whole life.  I seen picture --

14:28:58  15  Q.   But he was there for a while.

14:29:00  16  A.   No.  He was not there at the ranch.

14:29:02  17  Q.   You saw him on?

14:29:02  18  A.   No.  That horse, Royal Quick Dash, I have never seen him in

14:29:06  19  my whole life.  I seen pictures.

14:29:09  20  Q.   Okay.  But in the horse business, people know who that horse

14:29:14  21  is?

14:29:14  22  A.   Yes.

14:29:15  23  Q.   All right.  Thank you.  Pass the witness.

14:29:24  24       THE COURT:  Mr. Womack.

14:29:25  25       MR. DEGEURIN:  Wait a minute.  No.  That's all.  Thank

14:29:36    1    you.

14:29:38    2                        CROSS-EXAMINATION

14:29:38    3    BY MR. WOMACK:

14:29:47    4    Q.    Good afternoon, Mr. Mendoza.

14:29:48    5    A.    Good afternoon, sir.

14:29:49    6    Q.    I'm Guy Womack.  I'm from Houston.  I represent Fernando

14:29:53    7    Garcia.

14:29:54    8    A.    Uh-huh.

14:29:54    9    Q.    Now, you know Fernando Garcia?

14:29:56   10    A.    Yes.

14:29:56   11    Q.    And you've seen him at the Lazy E many times?

14:29:59   12    A.    I do.

14:30:00   13    Q.    And on some of these occasions, you actually showed him

14:30:05   14    Corona Cartel?

14:30:06   15    A.    Correct.

14:30:06   16    Q.    And one of the reasons additional to see Corona Cartel, one

14:30:12   17    of the reasons was he was discussing with you possibly having one

14:30:16   18    of his clients buy shares in the syndicate?

14:30:19   19    A.    Correct.

14:30:19   20    Q.    And you know that when he was talking to you about buying

14:30:23   21    shares into the syndicate for Corona Cartel, it wasn't for

14:30:27   22    himself but for clients of his?

14:30:29   23    A.    Correct.  That's what he said.

14:30:31   24    Q.    And you know that he represented a number of people who were

14:30:35   25    in the horsing business?

| | | |
|---|---|---|
| 14:30:36 | 1 | A.   Correct. |
| 14:30:41 | 2 | Q.   That's all the questions I have.  Thank you. |
| 14:30:43 | 3 | A.   You're welcome. |
| 14:30:44 | 4 | THE COURT:  Mr. Esper. |
| 14:30:46 | 5 | MR. ESPER:  I have no questions, your Honor. |
| 14:30:47 | 6 | MR. MAYR:  Nor do I. |
| 14:30:49 | 7 | MR. GARDNER:  Nothing further, your Honor. |
| 14:30:50 | 8 | THE COURT:  May this witness be excused? |
| 14:30:52 | 9 | MS. WILLIAMS:  Yes, your Honor. |
| 14:30:53 | 10 | THE COURT:  You may be excused. |
| 14:30:54 | 11 | THE WITNESS:  Thank you. |
| 14:31:02 | 12 | MR. GARDNER:  Your Honor, the government would call Mr. |
| 14:31:04 | 13 | Matt Witman. |
| 14:31:39 | 14 | (Witness sworn.) |
| 14:31:41 | 15 | THE COURT:  Tell us first your full name and spell your |
| 14:31:46 | 16 | last. |
| 14:31:47 | 17 | THE WITNESS:  Matthew Ross Witman, W-I-T-M-A-N. |
| 14:31:51 | 18 | MATTHEW R. WITMAN, called by the Government, duly sworn. |
| 14:31:51 | 19 | DIRECT EXAMINATION |
| 14:31:51 | 20 | BY MR. GARDNER: |
| 14:31:52 | 21 | Q.   Thank you, your Honor. |
| 14:31:52 | 22 | Good afternoon, Mr. Witman.  Could you please introduce |
| 14:31:55 | 23 | yourself to the jury and tell them what you do for a living? |
| 14:31:57 | 24 | A.   I'm Matt Witman from Lazy E Ranch in Guthrie, Oklahoma and |
| 14:32:02 | 25 | I'm manager there. |

14:32:03  1   Q.   And what are your responsibilities as a manager?

14:32:06  2   A.   Little bit of everything.  Sales prep, breeding, managing

14:32:09  3   the stallion accounts.  If you can do it on that farm, I can do

14:32:14  4   it.

14:32:15  5   Q.   Now, I want to talk a little bit about the stallion

14:32:18  6   accounts.  First of all, I want to talk about an individual the

14:32:20  7   name of Ramiro Villarreal.  Do you know him, sir?

14:32:21  8   A.   Yes, sir.

14:32:23  9   Q.   All right.  How do you know him?

14:32:24  10  A.   I met him at horse sales five or six years ago probably.

14:32:28  11  Q.   Did he have an account at the Lazy E?

14:32:31  12  A.   Yes, sir.

14:32:31  13  Q.   I'm showing you some of your bank records, already been

14:32:36  14  admitted, 239.  Bates stamp 611280.  Sir, what is this document?

14:32:47  15  A.   That is the contact data sheet that is the basis for all of

14:32:53  16  our billings, and any time a horse comes in, that belonged to

14:32:57  17  Ramiro Villarreal, it would tie back to this record.

14:32:59  18  Q.   Okay.  And who provides the information on the contact

14:33:03  19  sheet?

14:33:03  20  A.   Mr. Villarreal.

14:33:05  21  Q.   Okay.  So the customer?

14:33:06  22  A.   Yes, sir.

14:33:06  23  Q.   And with respect to -- at least with this particular

14:33:11  24  document, these are the e-mail contacts that he's provided?

14:33:15  25  A.   Yes, sir.

```
14:33:16   1   Q.   And specifically, the one on top, M-R, underscore, Cabrera,

14:33:21   2   C-A-B-R-E-R-A, at hotmail.es, correct?

14:33:25   3   A.   Yes, sir.

14:33:27   4   Q.   Sir, are you familiar with an individual by the name of

14:33:32   5   Hernando Guerra?

14:33:33   6   A.   No, sir.

14:33:34   7   Q.   I'm showing you page 611281.  This is the contact page for

14:33:46   8   Mr. Hernando Guerra?

14:33:48   9   A.   Yes, sir.

14:33:48  10   Q.   But you don't have any recollection of ever meeting Mr.

14:33:52  11   Guerra?

14:33:52  12   A.   No, sir.

14:33:52  13   Q.   Do you know an individual by the name of Carlos Nayen?

14:33:56  14   A.   Yes, sir.

14:33:59  15   Q.   Pull up 335E, please?  And is that him, sir?

14:34:04  16   A.   Yes, sir.

14:34:04  17   Q.   And how many times do you think you've met Mr. Nayen?

14:34:09  18   A.   Twenty-five or so.

14:34:19  19   Q.   I'm showing you the contact data for Mr. Nayen, it also says

14:34:24  20   care of.  Is that what that means, the little --

14:34:26  21   A.   Yes, sir.

14:34:27  22   Q.   Tyler Graham?

14:34:28  23   A.   Yes, sir.

14:34:28  24   Q.   These e-mails down here, again, mr_cabrera@hotmail.es?

14:34:37  25   A.   Correct.
```

14:34:37   1   Q.   Okay.  I'm sorry, your Honor, it's page 61-1282.

14:34:42   2        Would you agree with me that mr_cabrera@hotmail is the

14:34:46   3   same one that Ramiro Villarreal provided for your facility?

14:34:50   4   A.   Yes, sir.

14:34:51   5   Q.   There's also one that appears to be cut off here, but I

14:34:54   6   believe you could read it as Fernie, F-E-R-N-I-E,

14:35:01   7   004@hotmail.com?

14:35:01   8   A.   Yes, sir.

14:35:02   9   Q.   Finally the last one, Miguel.Almazon@gmail.com?

14:35:07  10   A.   Yes, sir.

14:35:10  11        MR. WOMACK:  Your Honor, if I could get the page

14:35:11  12   number, Defendant's Exhibit number.

14:35:13  13        MR. GARDNER:  That was 1282.

14:35:15  14        MR. WOMACK:  The exhibit number is?

14:35:16  15        MR. GARDNER:  Exhibit number is 239.

14:35:20  16        MR. WOMACK:  Thank you.

14:35:23  17   Q.   (BY MR. GARDNER) Do you know Fernando Garcia?

14:35:27  18   A.   Yes, sir.

14:35:27  19   Q.   Okay.  Have you met him before?

14:35:29  20   A.   Yes, sir.

14:35:29  21   Q.   Is that in conjunction with Mr. Nayen?

14:35:32  22   A.   Yes, sir.

14:35:32  23   Q.   Do you see Mr. Garcia in the courtroom?  I'm sure he's

14:35:35  24   standing up at this point.

14:35:36  25   A.   Yes, sir.

| | | |
|---|---|---|
| 14:35:37 | 1 | Q.    Okay.  Your Honor, may the witness -- the record reflect the |
| 14:35:39 | 2 | witness has identified the defendant? |
| 14:35:40 | 3 | THE COURT:  So reflects. |
| 14:35:42 | 4 | Q.    (BY MR. GARDNER) For the record, I'm showing page 1285.  Is |
| 14:35:55 | 5 | this the contact sheet for Francisco Colorado-Cessa? |
| 14:35:58 | 6 | A.    Yes, sir. |
| 14:35:59 | 7 | Q.    Have you ever met that gentleman before? |
| 14:36:01 | 8 | A.    No, sir. |
| 14:36:02 | 9 | Q.    Would you agree with me that the contact information on this |
| 14:36:07 | 10 | e-mail, Miguel.Almazon@gmail.com, is the same for Carlos Nayen? |
| 14:36:15 | 11 | A.    Yes, sir. |
| 14:36:27 | 12 | Q.    It's page 1369.  Zoom that out a little bit, Mr. Witman. |
| 14:36:36 | 13 | What is this page right here? |
| 14:36:38 | 14 | A.    That is the board data entry sheet for Mr. Perrys Wine. |
| 14:36:44 | 15 | Q.    And what's the purpose of that sheet? |
| 14:36:46 | 16 | A.    That is where anytime a horse arrives or departs, whatever |
| 14:36:50 | 17 | board rate they arrive, in this case it was sales prep, this is |
| 14:36:55 | 18 | where they are.  And then, when they're departed, that is where |
| 14:36:59 | 19 | they're listed also, and it starts and stops the board process |
| 14:37:03 | 20 | for our billing. |
| 14:37:04 | 21 | Q.    Now, I want to come back to this, but I think I got a little |
| 14:37:08 | 22 | ahead of myself. |
| 14:37:10 | 23 | Contact sheet for Mr. Jose Trevino. |
| 14:37:15 | 24 | A.    Yes, sir. |
| 14:37:16 | 25 | Q.    Have you met him before? |

14:37:17   1   A.   Yes, sir.

14:37:17   2   Q.   Is that this gentleman right here in the purple tie?

14:37:19   3   A.   Yes, sir.

14:37:29   4   Q.   Okay.  Now, back to Mr. Perrys Wine, I'll show you what's

14:37:43   5   previously admitted into evidence as Government's Exhibit 28E is

14:37:47   6   a document seized from Jose Trevino's property in Lexington,

14:37:52   7   Oklahoma.  Appears to be a billing statement.  Would you agree

14:37:58   8   with me, for the record, Mr. Witman, that that is Mr. Perrys

14:38:01   9   Wine?

14:38:01   10   A.   Yes, sir.

14:38:05   11   Q.   The thing I want to talk about here is the boarding and

14:38:18   12   training.  So would you agree with me that this particular

14:38:21   13   document in the name of Victor Nieto shows boarding and training

14:38:28   14   from November 1st, 2011 till January 31st, 2012?

14:38:34   15   A.   Yes, sir.

14:38:35   16   Q.   Have you seen this box before, sir?

14:38:43   17   A.   Yes, sir.

14:38:44   18   Q.   Many times, right?

14:38:45   19   A.   Many times.

14:38:45   20   Q.   For the record, it's 28D.  It's an auction book, correct?

14:38:50   21   A.   Yes, sir.

14:38:50   22   Q.   With respect to Mr. Perrys Wine, that horse was put through

14:39:04   23   the auction on January 19th or 20th of 2012?

14:39:09   24   A.   Yes, sir.

14:39:10   25   Q.   You'd agree with me?

14:39:11   1   A.   Yes, sir.

14:39:12   2   Q.   This is the Heritage Place January 19th through 21st sale?

14:39:17   3   A.   Yes, sir.

14:39:17   4   Q.   And up here, it says, consigned by the Lazy E Ranch, the La

14:39:28   5   Feliz Montana group?

14:39:29   6   A.   Correct.

14:39:29   7   Q.   When do you normally take a horse to auction?

14:39:32   8   A.   It varies.  Sometimes the horses meet me directly at the

14:39:37   9   auction.  Sometimes horses come in 90 days before.  Sometimes

14:39:40   10   they come in 10, 15 days before.  It varies.

14:39:44   11   Q.   And so, are you familiar with the La Feliz Montana Ranch?

14:39:50   12   A.   Yes, sir.

14:39:50   13   Q.   Did you, in fact, make a trip out to this ranch to inspect

14:39:54   14   this particular -- this horse and a group of horses?

14:39:56   15   A.   I went -- I looked at everything that was there early --

14:40:02   16   mid-December.

14:40:02   17   Q.   Mid-December?

14:40:03   18   A.   Yes, sir.

14:40:03   19   Q.   And would you agree with me that Mr. Perrys Wine was at the

14:40:08   20   La Feliz Montana Ranch in early December?

14:40:10   21   A.   The best that I can recall, yes, sir.

14:40:12   22   Q.   So to your knowledge, on that date, was Mr. Perrys Wine

14:40:18   23   located at Zule Farms in Lexington, Oklahoma?

14:40:22   24   A.   Not to my knowledge.

14:40:37   25   Q.   Showing you a page from Government's Exhibit 28A.  The

| | | |
|---|---|---|
| 14:41:05 | 1 | jury's heard a little bit about this, but what is this, sir? |
| 14:41:07 | 2 | A.   That's an equine infectious anemia test form, also known as |
| 14:41:12 | 3 | a Coggins.  All horses are required to have a negative one to |
| 14:41:16 | 4 | travel. |
| 14:41:22 | 5 | Q.   And who filled out this particular line? |
| 14:41:25 | 6 | A.   That would have been the La Feliz, somebody involved with |
| 14:41:28 | 7 | them. |
| 14:41:29 | 8 | Q.   Okay.  Will you agree with me the date on that is 12-5 of |
| 14:41:34 | 9 | 2011? |
| 14:41:34 | 10 | A.   Yes, sir. |
| 14:41:35 | 11 | Q.   Okay.  210 refers to the hip number that was in the auction |
| 14:41:39 | 12 | box that we just talked about? |
| 14:41:40 | 13 | A.   Yes, sir. |
| 14:41:40 | 14 | Q.   Showing you another page from the same exhibit.  This is |
| 14:41:49 | 15 | another Coggins report from the Lazy E Ranch, dated 1-9 of '12. |
| 14:41:57 | 16 | Would you agree with that? |
| 14:41:57 | 17 | A.   Yes, sir. |
| 14:41:57 | 18 | Q.   Where was that horse on January 9th of 2012? |
| 14:42:00 | 19 | A.   That horse was at Lazy E in Guthrie, Oklahoma. |
| 14:42:03 | 20 | Q.   Sir, would you agree with me it wasn't at Zule Farms on the |
| 14:42:06 | 21 | dates listed? |
| 14:42:07 | 22 | A.   Yes, sir. |
| 14:42:07 | 23 | Q.   Now, late last night, I requested of you to pull the arrival |
| 14:42:18 | 24 | record for that particular horse.  Did you do that, sir? |
| 14:42:21 | 25 | A.   Yes, sir. |

```
14:42:24   1    Q.   I'm showing you Government's Exhibit 415.  Do you recognize
14:42:28   2    that, sir?
14:42:29   3    A.   Yes, sir.
14:42:29   4    Q.   And was that the document you gave me today?
14:42:31   5    A.   Yes, sir.
14:42:32   6    Q.   Okay.  Is that a 2012 arrival record for Mr. Perrys Wine?
14:42:36   7    A.   Yes, sir.
14:42:37   8    Q.   Your Honor, I offer Government's Exhibits 415.
14:42:43   9         MS. WILLIAMS:  No objection.
14:43:12  10         THE COURT:  415's admitted.
14:43:15  11    Q.   (BY MR. GARDNER) If I'm looking at the top of this, it says
14:43:31  12    1-8 of 12?
14:43:33  13    A.   Yes, sir.
14:43:33  14    Q.   Is that the date that horse arrived at the Lazy E?
14:43:37  15    A.   Yes, sir.
14:43:38  16    Q.   And where did it arrive from?
14:43:40  17    A.   La Feliz Montana.
14:43:45  18    Q.   Sir, based on your own record, can you positively state that
14:43:48  19    at least on 1-8 of '12, that horse was not at Zule Farms?
14:43:53  20    A.   Yes, sir.
14:43:53  21    Q.   And through auction was it either in Lazy E's care, custody
14:43:58  22    and control?
14:43:58  23    A.   Yes, sir.
14:43:59  24    Q.   Sir, I want to reference a couple of more pages from 28A.
14:44:17  25    Do you know what this is, sir?
```

| | | |
|---|---|---|
| 14:44:18 | 1 | A.   Yes, sir. |
| 14:44:19 | 2 | Q.   And what is that? |
| 14:44:20 | 3 | A.   That's the -- what we call an out slip from Heritage Place. |
| 14:44:25 | 4 | That sheet of paper allows the horse to leave the ground. |
| 14:44:27 | 5 | Q.   So the date of the leave or sale date was January 19th? |
| 14:44:33 | 6 | A.   Yes, sir. |
| 14:44:33 | 7 | Q.   And who was this individual listed here, one Robert Marquez? |
| 14:44:39 | 8 | A.   I don't know him, sir. |
| 14:44:41 | 9 | Q.   And the buyer's signature is listed as who? |
| 14:44:46 | 10 | A.   Fernando. |
| 14:44:49 | 11 | Q.   And what's this portion down here that says receipt? |
| 14:44:54 | 12 | A.   That is who took the horse. |
| 14:44:57 | 13 | Q.   In this case, it says Jose Trevino? |
| 14:45:00 | 14 | A.   Yes, sir. |
| 14:45:02 | 15 | Q.   And just one other thing on this.  The security agreement |
| 14:45:08 | 16 | says, I intend to move the animal to -- in this case, there's the |
| 14:45:11 | 17 | initials "OK." |
| 14:45:13 | 18 | A.   Yes, sir. |
| 14:45:13 | 19 | Q.   Oklahoma? |
| 14:45:14 | 20 | A.   Yes, sir. |
| 14:45:14 | 21 | Q.   And the date on that is 1-21? |
| 14:45:18 | 22 | A.   1-21-12.  Yes, sir. |
| 14:45:22 | 23 | Q.   I'll show you Katies Sign.  Would you agree with me that the |
| 14:45:46 | 24 | boarding and training is also on the same dates? |
| 14:45:50 | 25 | A.   Yes, sir. |

| | | |
|---|---|---|
| 14:45:51 | 1 | Q.   Without going through this box, if Katies Sign was in the |
| 14:45:55 | 2 | auction, would you agree with me that it would be in Heritage |
| 14:45:58 | 3 | Place on January 19th through 21st, at least? |
| 14:46:02 | 4 | A.   Yes, sir. |
| 14:46:02 | 5 | Q.   And not at Zule Farms? |
| 14:46:05 | 6 | A.   No, sir. |
| 14:46:17 | 7 | Q.   What is this document, sir?  For the record, I'm sorry, it's |
| 14:46:56 | 8 | 61130. |
| 14:47:01 | 9 | A.   It's just a contract master list. |
| 14:47:06 | 10 | Q.   In this case, it's for the horse Marry For Money? |
| 14:47:12 | 11 | A.   That particular horse, yes, sir. |
| 14:47:13 | 12 | Q.   There's also one here called Sportiness? |
| 14:47:16 | 13 | A.   For the foal out of her reset. |
| 14:47:18 | 14 | Q.   And there's also one called Dashin Follies, correct? |
| 14:47:21 | 15 | A.   Yes, sir. |
| 14:47:21 | 16 | Q.   Would you agree with me each one of those, there's a phone |
| 14:47:26 | 17 | number below it for home phone for Fernando Garcia? |
| 14:47:30 | 18 | A.   Yes, sir. |
| 14:47:31 | 19 | Q.   Next to it, one for A-N-R-I Lopez? |
| 14:47:35 | 20 | A.   Yes, sir. |
| 14:47:35 | 21 | Q.   Would you agree with me that for each one of those horses |
| 14:47:37 | 22 | listed, there's a home phone for Fernando Garcia, Anri Lopez, |
| 14:47:43 | 23 | Fernando Garcia, and Anri Lopez? |
| 14:47:45 | 24 | A.   Yes, sir. |
| 14:47:46 | 25 | Q.   I know it's a fairly obvious question, but what's the |

14:47:51   1    purpose of having all that contact information under a

14:47:54   2    individual's name?

14:47:56   3    A.    In case of an emergency, we need to contact someone, tell

14:48:01   4    them where the status of their mare, trying to collect a bill,

14:48:04   5    those types of things.

14:48:06   6    Q.    I want to turn your attention back to Mr. Jose Trevino.  Did

14:48:10   7    he ever come to the ranch looking for breedings?

14:48:15   8    A.    Occasionally.

14:48:17   9    Q.    And I want to talk about specifically in early 2012 with

14:48:23   10   what I believe you termed two Coronas and two Jess Perrys?

14:48:27   11   A.    Yes.

14:48:27   12   Q.    Okay.  Do you recall that, sir?

14:48:28   13   A.    Yes, sir.

14:48:29   14   Q.    Could you please explain to the jury what Mr. Trevino asked

14:48:32   15   you for?

14:48:32   16   A.    He told me he needed two Corona Cartel breedings and two Mr.

14:48:37   17   Jess Perry breedings.  He told me that on the Corona Cartels, he

14:48:41   18   was going to try and put together a foal share and he needed the

14:48:45   19   breedings.

14:48:46   20   Q.    And did he provide the mares for those breedings?

14:48:51   21   A.    Yes, sir.

14:48:51   22   Q.    Do you recall the mares he provided?

14:48:53   23   A.    I believe I know one of them was Dashin Follies.  I can't

14:48:58   24   recall the other.

14:49:00   25   Q.    And did Mr. Jose Trevino tell you how the payments -- let me

14:49:05  1  back up a second.

14:49:06  2          What is the price of two Coronas, Corona Cartel

14:49:10  3  breedings?

14:49:10  4  A.   At that time they were somewhere between 35 and 40.

14:49:14  5  Q.   And the two Jess Perrys?

14:49:16  6  A.   The same, sir.

14:49:16  7  Q.   And were you able to secure all four breedings?

14:49:20  8  A.   Yes, sir.

14:49:22  9  Q.   All right.  And how did Mr. Trevino say he was going to pay

14:49:24  10  for those?

14:49:25  11  A.   He told me that he was going to have one of his partners

14:49:30  12  wire me the money.

14:49:31  13  Q.   Did you receive a wire?

14:49:32  14  A.   Yes, sir.

14:49:32  15  Q.   Who did you receive the wire from?

14:49:33  16  A.   ADT Petro Servicios.

14:49:36  17  Q.   In what amount?

14:49:38  18  A.   $152,700.

14:49:40  19  Q.   And did that include the breedings and other expenses?

14:49:44  20  A.   Yes, sir.  Included the farm fees for the four sixes and for

14:49:47  21  us.

14:49:48  22  Q.   May I have one moment, your Honor?

14:49:51  23          THE COURT:  Yes, sir.

14:49:58  24  Q.   (BY MR. GARDNER) One other area, Mr. Witman.  What would the

14:50:07  25  Lazy E do if you started getting large amounts of cash deposits

14:50:10   1   into the Lazy E bank accounts?

14:50:12   2   A.   Well, when we take it to the bank, they fill out the forms

14:50:20   3   and go through the usual process for any cash deposits.

14:50:24   4   Q.   You provide your bank account information to customers for

14:50:28   5   direct deposits?

14:50:29   6   A.   No, sir.

14:50:30   7   Q.   Let's say for hypothetically speaking, if someone were to

14:50:34   8   obtain your bank account and made direct cash deposits, what

14:50:39   9   would the Lazy E do?

14:50:40  10   A.   As soon as we were notified, we'd talk to the bank and find

14:50:44  11   out which branch of law enforcement that needed to be reported

14:50:47  12   to.

14:50:49  13   Q.   That's all the questions I have.  Oh, sorry, your Honor.

14:50:54  14   That's all the questions I have.

14:50:58  15            MS. WILLIAMS:  Judge, I need to look for an exhibit.

14:51:00  16   Is it too early to have a break?

14:51:04  17            THE COURT:  I expect you won't find any argument.  All

14:51:12  18   right.  We'll take a quick ten-minute break.  Use the facilities.

14:51:39  19            (Jury not present.)

15:07:45  20            (Recess.)

15:13:39  21            (Jury present.)

15:15:23  22            THE COURT:  Mr. Witman, you understand you're still

15:15:26  23   under oath?

15:15:26  24            THE WITNESS:  Yes, sir.

15:15:28  25            THE COURT:  You may proceed.

15:15:28    1                       CROSS-EXAMINATION

15:15:28    2    BY MS. WILLIAMS:

15:15:30    3    Q.    Thank you, your Honor.

15:15:30    4              Mr. Witman, prior to the break, you testified about

15:15:34    5    Jose Trevino coming out to the ranch and talking to you about a

15:15:36    6    foal share.

15:15:38    7    A.    It was actually on the phone, I believe.  Yes, ma'am.

15:15:40    8    Q.    Okay.  And tell the members of the jury what a foal share

15:15:44    9    is.

15:15:45   10    A.    A foal share is when you have one person that has the mare,

15:15:49   11    you have another person that has the breeding.  They breed the

15:15:54   12    mare using that breeding, and then, the resulting foal is owned

15:15:58   13    by both parties.

15:15:58   14    Q.    And isn't it true, Mr. Witman, that the people that Jose

15:16:04   15    Trevino was in the foal share with were Salvador Lozano and

15:16:11   16    Socrates Rosas?

15:16:12   17    A.    Not to my knowledge.

15:16:13   18    Q.    I'm asking you to look at this document, it's 611330, Bates

15:16:29   19    number, and tell the members of the jury whether or not you got

15:16:33   20    some wires in the amounts you previously testified to, $3,000

15:16:38   21    from Socrates Rosas and Salvador Lozano.

15:16:41   22    A.    Yes, ma'am.

15:16:42   23    Q.    And on page 611331, do you see where these mares are bred

15:16:58   24    and the owner of the mare is listed as Lozano/Zule?

15:17:03   25    A.    Yes.

15:17:04  1   Q.   And then, further, there are the backup for that, the

15:17:16  2   specific wire transfers that were listed on that first page that

15:17:20  3   I showed you?

15:17:21  4   A.   Yes, ma'am.

15:17:22  5   Q.   And the wire that you testified about that came from ADT was

15:17:33  6   several months earlier than those wires?

15:17:39  7   A.   Correct.

15:17:39  8   Q.   There were some babies born of that breeding?

15:18:00  9   A.   I'd have to look at the record to see.

15:18:02  10  Q.   Is that the records I just took?

15:18:04  11  A.   Possibly.  You're talking about from where we -- this was in

15:18:34  12  2012?  These were the -- I don't understand.  Those horses were

15:18:48  13  seized.

15:18:49  14  Q.   So we don't know?

15:18:50  15  A.   I don't know.

15:18:55  16  Q.   That's all the questions I have.

15:19:06  17                      CROSS-EXAMINATION

15:19:06  18  BY MR. DEGEURIN:

15:19:15  19  Q.   Mike DeGeurin, Mr. Witman.  Is it Witman?

15:19:18  20  A.   Yes, sir.

15:19:19  21  Q.   Okay.  So a foal share is where you can -- if there's a mare

15:19:25  22  and a stallion -- or a mare being bred with a stallion either by

15:19:31  23  sperm or by together, you can buy into the foal that may come

15:19:38  24  out.  You can have a foal share like that?

15:19:41  25  A.   No.  No, sir.

| | | |
|---|---|---|
| 15:19:42 | 1 | Q.   Okay.  Explain it. |
| 15:19:45 | 2 | A.   You have an owner that has a mare. |
| 15:19:48 | 3 | Q.   Right. |
| 15:19:49 | 4 | A.   And you have someone that has either a breeding to a |
| 15:19:52 | 5 | stallion or actually owns the stallion.  They make an agreement |
| 15:19:56 | 6 | to breed the mare to the stallion, and then, they will own the |
| 15:19:59 | 7 | resulting foal in partnership. |
| 15:20:01 | 8 | Q.   Okay.  I wanted to ask you -- the young man that testified |
| 15:20:12 | 9 | right before you.  What was his name? |
| 15:20:13 | 10 | A.   Mr. Mendoza. |
| 15:20:14 | 11 | Q.   Mendoza? |
| 15:20:15 | 12 | A.   Yes, sir. |
| 15:20:16 | 13 | Q.   He worked for you? |
| 15:20:17 | 14 | A.   Yes, sir. |
| 15:20:17 | 15 | Q.   I had asked him about a very known and famous horse name was |
| 15:20:34 | 16 | -- let me get back to it.  By the way, do you know Mr. Colorado? |
| 15:20:52 | 17 | A.   I've never met him.  No, sir. |
| 15:20:54 | 18 | Q.   You would not know what any type of agreement that he would |
| 15:20:59 | 19 | have with somebody else? |
| 15:21:00 | 20 | A.   No, sir. |
| 15:21:02 | 21 | Q.   Or the terms of the agreement he may have with any other |
| 15:21:09 | 22 | person has a horse at your place? |
| 15:21:12 | 23 | A.   Right. |
| 15:21:13 | 24 | Q.   You did know that Carlos Nayen -- you know him, right? |
| 15:21:18 | 25 | A.   Yes, sir. |

15:21:18    1   Q.   And you know that Carlos Nayen manages and has authority to
15:21:21    2   manage horses for different clients?
15:21:24    3   A.   Yes, sir.
15:21:25    4   Q.   Is it your belief that Mr. Carlos Nayen has authority to
15:21:30    5   manage some of Mr. Colorado's horses?
15:21:33    6   A.   To my knowledge, yes, sir.
15:21:34    7   Q.   You've been told that?
15:21:36    8   A.   Yes, sir.
15:21:36    9   Q.   So if there's a bill for one of Nayen's horses that he's
15:21:44   10   managing at Lazy E Ranch, he's the go-to man to send the bill to?
15:21:51   11   A.   Correct.
15:21:52   12   Q.   And then, Mr. Nayen would have caused the money to be paid
15:21:57   13   to the horse?
15:22:00   14   A.   Yes.
15:22:00   15   Q.   And if he has several different clients that he represents,
15:22:07   16   he can ask one client, send the money for a horse, you don't know
15:22:14   17   what the agreement is between Mr. Nayen and Mr. Colorado, for
15:22:18   18   example?
15:22:18   19   A.   No, sir.
15:22:19   20   Q.   Okay.  Royal Quick Dash?
15:22:24   21   A.   Uh-huh.
15:22:25   22   Q.   You've heard that horse?
15:22:26   23   A.   Yes, sir.
15:22:27   24   Q.   Tell the ladies and gentlemen of the jury, I mean, there are
15:22:30   25   a lot of famous horses and then, there's real famous horses?

```
15:22:34   1    A.   Right, sir.

15:22:35   2    Q.   And Royal Quick Dash sits up there in the real famous

15:22:41   3    horses, right?

15:22:41   4    A.   Yes, sir.

15:22:42   5    Q.   Anybody that's in the business like you are, if I threw out

15:22:48   6    that name, oh, sure, everybody knows Royal Quick Dash.

15:22:56   7         I don't remember the exact.  I'm going to show you this

15:23:18   8    up on the board in a minute but just so you could get familiar

15:23:22   9    with it.  I'm showing him Bates No. 1630824.  So I'll be asking

15:23:30  10    you about these different horses, okay?

15:23:32  11    A.   Sure.

15:23:32  12    Q.   And what it means to you.

15:23:34  13    A.   Okay.

15:23:34  14    Q.   First of all, what is this document?  Would you describe

15:23:47  15    what it is?

15:23:48  16    A.   That's a master ownership record from the American Quarter

15:23:54  17    Horse Association.

15:23:56  18    Q.   And I want to ask you about Royal Quick Dash is the one that

15:24:06  19    I was talking to you about earlier that's such a famous horse?

15:24:10  20    A.   Yes, sir.

15:24:11  21    Q.   Might be in Brazil now or someplace?

15:24:13  22    A.   I believe so.

15:24:15  23    Q.   Would I be correct if I said Royal Quick Dash is the

15:24:24  24    offspring of, First Down Dash would be the sire?

15:24:31  25    A.   Yes, sir.
```

| | | |
|--|--|--|
| 15:24:32 | 1 | Q.   And the mother would be Harems Choice? |
| 15:24:35 | 2 | A.   Correct. |
| 15:24:37 | 3 | Q.   Okay.  And so, that father First Down Dash and Harems |
| 15:24:44 | 4 | Choice, the mother, produced one of the finest horses in the |
| 15:24:46 | 5 | world? |
| 15:24:46 | 6 | A.   Yes, sir. |
| 15:24:56 | 7 | Q.   I'm going to show you something.  Can you identify what this |
| 15:25:05 | 8 | is without going into the context of it? |
| 15:25:07 | 9 | A.   That's a four or five generation pedigree from All Breed |
| 15:25:11 | 10 | database. |
| 15:25:12 | 11 | Q.   All right.  It's something that you look at from time to |
| 15:25:16 | 12 | time? |
| 15:25:16 | 13 | A.   No, sir. |
| 15:25:17 | 14 | Q.   Okay.  Do you have any reason to doubt the information in |
| 15:25:19 | 15 | there? |
| 15:25:19 | 16 | A.   No, sir. |
| 15:25:19 | 17 | Q.   Okay.  This is going to be a Demonstrative 3, I think. |
| 15:25:54 | 18 | Defendant Colorado Demonstrative 3? |
| 15:25:57 | 19 | THE CLERK:  Yes. |
| 15:25:58 | 20 | MR. DEGEURIN:  Is that right? |
| 15:25:59 | 21 | THE CLERK:  It's 4. |
| 15:26:01 | 22 | MR. DEGEURIN:  It's 4? |
| 15:26:03 | 23 | THE CLERK:  Cessa. |
| 15:26:07 | 24 | MR. DEGEURIN:  We've been marking them Colorado. |
| 15:26:36 | 25 | Q.   (BY MR. DEGEURIN) Now, I want to ask you, first of all, I'm |

| | | |
|---|---|---|
| 15:26:44 | 1 | looking at First Down Dash would be the sire.  Harems Choice |
| 15:26:54 | 2 | would be the mother? |
| 15:26:55 | 3 | A.   Correct. |
| 15:26:59 | 4 | Q.   And produced out of that group, those parents, is Harems |
| 15:27:07 | 5 | Legacy? |
| 15:27:08 | 6 | A.   Correct. |
| 15:27:10 | 7 | Q.   If Mr. Colorado owns Harems Legacy, that would be a pretty |
| 15:27:18 | 8 | valuable horse, wouldn't it? |
| 15:27:19 | 9 | A.   Yes, sir. |
| 15:27:20 | 10 | Q.   In fact, it's got the same parents as one of the most famous |
| 15:27:39 | 11 | horses in the world, correct? |
| 15:27:40 | 12 | A.   Yes, sir. |
| 15:27:41 | 13 | Q.   Did you know that Mr. Colorado owns that horse? |
| 15:27:44 | 14 | A.   No, sir. |
| 15:27:57 | 15 | Q.   When you met Mr. Carlos Nayen, you said you met with him |
| 15:28:05 | 16 | several times, right? |
| 15:28:06 | 17 | A.   I met him several times. |
| 15:28:07 | 18 | Q.   Okay.  And he would have people with him that helped |
| 15:28:12 | 19 | translate?  Or do you speak Spanish? |
| 15:28:14 | 20 | A.   No.  I do not speak Spanish.  There was usually somebody to |
| 15:28:17 | 21 | translate. |
| 15:28:17 | 22 | Q.   Okay.  So whatever Mr. Mendoza testified to about meetings |
| 15:28:25 | 23 | with Carlos Nayen, he would probably be in a better position than |
| 15:28:30 | 24 | you with regard to what was said? |
| 15:28:32 | 25 | A.   Yes, sir. |

| | | |
|---|---|---|
| 15:28:36 | 1 | Q.   Okay.  We're having so many witnesses and the trial is for a |
| 15:28:50 | 2 | while, and I'm going to do another demonstrative.  That's you and |
| 15:29:02 | 3 | I want to put down that the most valuable -- one of the most |
| 15:29:08 | 4 | valuable horses in the world would be what's the name? |
| 15:29:11 | 5 | A.   Royal. |
| 15:29:13 | 6 | Q.   Royal? |
| 15:29:13 | 7 | A.   The one you're talking about? |
| 15:29:14 | 8 | Q.   Yes. |
| 15:29:15 | 9 | A.   Royal Quick Dash. |
| 15:29:17 | 10 | Q.   Royal Quick Dash.  And the same parents, First Down Dash, |
| 15:29:52 | 11 | Harems Choice, the same parents with -- have the same -- are the |
| 15:29:58 | 12 | same parents of the most famous in the world, right? |
| 15:30:00 | 13 | A.   One of, yes, sir. |
| 15:30:03 | 14 | Q.   Okay.  Now, the number underneath Harems Legacy, 2004, what |
| 15:30:16 | 15 | is that? |
| 15:30:17 | 16 | A.   It's the year of foal. |
| 15:30:20 | 17 | Q.   It's the year of the foal, right? |
| 15:30:26 | 18 | A.   Yeah. |
| 15:30:28 | 19 | Q.   So you would expect that Harems Legacy would be a very, very |
| 15:31:12 | 20 | good horse, too, correct? |
| 15:31:13 | 21 | A.   Possibility, sir.  Yes, sir. |
| 15:31:16 | 22 | Q.   Possibility or that's pretty good? |
| 15:31:19 | 23 | A.   I don't know if it's a stallion or a mare.  I don't have any |
| 15:31:25 | 24 | of that information. |
| 15:31:28 | 25 | Q.   All right.  And so, you can't tell from? |

| | | |
|---|---|---|
| 15:31:30 | 1 | A.   It's not listed in that document. |
| 15:31:33 | 2 | Q.   Okay. |
| 15:31:35 | 3 | A.   It might be at the top.  It's a colt. |
| 15:31:42 | 4 | Q.   Huh? |
| 15:31:43 | 5 | A.   It's a stallion. |
| 15:31:44 | 6 | Q.   It's a stallion. |
| 15:31:46 | 7 | A.   Uh-huh. |
| 15:31:46 | 8 | Q.   And we've been hearing that these horses, the stallion have |
| 15:32:00 | 9 | a stud fee of anywhere from 35 to $40,000? |
| 15:32:04 | 10 | A.   Some can. |
| 15:32:07 | 11 | Q.   And knowing the importance of Royal Quick Dash, do you think |
| 15:32:13 | 12 | that that was 35 or $40,000 stud fees? |
| 15:32:18 | 13 | A.   Royal Quick Dash? |
| 15:32:19 | 14 | Q.   Yes. |
| 15:32:20 | 15 | A.   No. |
| 15:32:22 | 16 | Q.   What do you think it's worth? |
| 15:32:24 | 17 | A.   Royal Quick Dash?  He probably never stood for more than 6 |
| 15:32:29 | 18 | or $7,000. |
| 15:32:29 | 19 | Q.   Why is that? |
| 15:32:30 | 20 | A.   Economy, production. |
| 15:32:33 | 21 | Q.   Oh, the economy? |
| 15:32:34 | 22 | A.   Production.  But he never stood for -- I know he never stood |
| 15:32:38 | 23 | for more than 10. |
| 15:32:39 | 24 | Q.   So maybe $10,000 of stud fees.  And so, how many times can |
| 15:32:43 | 25 | you do that a year? |

| | | |
|---|---|---|
| 15:32:46 | 1 | A.   Right after the race track, he probably bred 100, 125 mares, |
| 15:32:51 | 2 | but I don't know that. |
| 15:32:51 | 3 | Q.   100 to 125 a year? |
| 15:32:56 | 4 | A.   The possibility's there. |
| 15:32:58 | 5 | Q.   A little over a million a year, worst-case scenario? |
| 15:33:03 | 6 | A.   Could. |
| 15:33:04 | 7 | Q.   So would it be conservative to say that Harems Legacy would |
| 15:33:18 | 8 | get maybe a million a year most as the conservative way for stud |
| 15:33:23 | 9 | fees? |
| 15:33:24 | 10 | A.   No.  It wouldn't generate a million a year. |
| 15:33:29 | 11 | Q.   Two to $300,000? |
| 15:33:34 | 12 | A.   Possibility. |
| 15:33:35 | 13 | Q.   The most conservative, right?  That would be -- it could be |
| 15:33:50 | 14 | over 200,000 a year? |
| 15:33:51 | 15 | A.   It's possible. |
| 15:34:00 | 16 | Q.   All right, your Honor.  I'll introduce for demonstrative |
| 15:34:03 | 17 | purposes only Defense 5. |
| 15:34:08 | 18 | THE CLERK:  (Moving head up and down.) |
| 15:34:09 | 19 | MR. GARDNER:  No objection, your Honor. |
| 15:34:11 | 20 | THE COURT:  It's received. |
| 15:34:26 | 21 | MR. DEGEURIN:  Pass the witness. |
| 15:34:51 | 22 | CROSS-EXAMINATION |
| 15:34:51 | 23 | BY MR. WOMACK: |
| 15:34:55 | 24 | Q.   Good afternoon, Mr. Witman. |
| 15:34:56 | 25 | A.   Good afternoon. |

| | | |
|---|---|---|
| 15:34:57 | 1 | Q.   I'm Guy Womack.  I'm from Houston.   I represent Fernando |
| 15:35:01 | 2 | Garcia. |
| 15:35:01 | 3 | A.   Okay. |
| 15:35:01 | 4 | Q.   First of all, how long has Lazy E Ranch been doing breeding? |
| 15:35:12 | 5 | A.   Twenty-five years, 30 years. |
| 15:35:14 | 6 | Q.   Now, as a manager of the Lazy E, you basically oversee the |
| 15:35:20 | 7 | complete operation of the ranch? |
| 15:35:21 | 8 | A.   Yes, sir. |
| 15:35:22 | 9 | Q.   And one of your duties would be to oversee horses that are |
| 15:35:26 | 10 | being presented for sale at the auctions? |
| 15:35:29 | 11 | A.   Yes, sir. |
| 15:35:29 | 12 | Q.   And you don't actually go to the auctions, the sales |
| 15:35:32 | 13 | yourself, don't you? |
| 15:35:33 | 14 | A.   Yes, sir. |
| 15:35:33 | 15 | Q.   And you watch to make sure, among other things, that your |
| 15:35:36 | 16 | horses always look their best, correct? |
| 15:35:39 | 17 | A.   Yes, sir. |
| 15:35:40 | 18 | Q.   And just oversee how the sale itself is going? |
| 15:35:44 | 19 | A.   Yes, sir. |
| 15:35:45 | 20 | Q.   Okay.  You've seen Fernando Garcia on quite a few occasions, |
| 15:35:52 | 21 | haven't you? |
| 15:35:53 | 22 | A.   Yes, sir. |
| 15:35:53 | 23 | Q.   You've seen him both at the Lazy E and at sales? |
| 15:35:56 | 24 | A.   Yes, sir. |
| 15:35:56 | 25 | Q.   And on occasions when he's been at the Lazy E prior to |

15:36:01    1    sales, you've actually shown him some of the horses that you're

15:36:04    2    getting ready to present for sale?

15:36:06    3    A.   Yes, sir.

15:36:06    4    Q.   Those are all the questions I have.  Thank you.

15:36:16    5    A.   Thank you.

15:36:18    6              MR. ESPER:  No questions, your Honor.

15:36:20    7              MR. MAYR:  Nor do I.

15:36:22    8                      RE-DIRECT EXAMINATION

15:36:22    9    BY MR. GARDNER:

15:36:26   10    Q.   Mr. Witman, Ms. Williams asked you about a incident with an

15:36:29   11    individual named Salvador Lozano?

15:36:32   12    A.   Yes, sir.

15:36:33   13    Q.   Do you recall those questions?  Was that a different set of

15:36:36   14    breedings than the one you and I talked about involving ADT Petro

15:36:40   15    Servicios?

15:36:40   16    A.   Yes.

15:36:41   17    Q.   Okay.  So which one -- which incident did Mr. Jose Trevino

15:36:46   18    refer to his partner and it was followed up by a payment?

15:36:52   19    A.   ADT.

15:36:52   20    Q.   The ADT Petro Servicios?

15:36:54   21    A.   Yes.

15:36:54   22    Q.   I want to show you this document that Mr. DeGeurin looked at

15:36:59   23    with his client's horse.  This is just the parentage record,

15:37:05   24    correct?

15:37:05   25    A.   Yes, sir.

| | | |
|---|---|---|
| 15:37:06 | 1 | Q.   So this is the actual horse? |
| 15:37:07 | 2 | A.   Yes, sir. |
| 15:37:08 | 3 | Q.   Secret Baby Doll? |
| 15:37:10 | 4 | A.   Yes, sir. |
| 15:37:11 | 5 | Q.   And who currently owns that horse? |
| 15:37:13 | 6 | A.   66 Land, LLC. |
| 15:37:14 | 7 | Q.   Are you familiar that's one of Jose Trevino's companies? |
| 15:37:18 | 8 | A.   Yes, sir. |
| 15:37:18 | 9 | Q.   And this, who is the second previous owner? |
| 15:37:21 | 10 | A.   Gerardo -- Luis Gerardo Aguirre. |
| 15:37:25 | 11 | Q.   Luis Gerardo Aguirre? |
| 15:37:28 | 12 | A.   I'll take it.  Yes, sir. |
| 15:37:29 | 13 | Q.   And he's listed an address of 4049 East Goodwin Road, |
| 15:37:34 | 14 | Mission, Texas? |
| 15:37:35 | 15 | A.   Yes, sir. |
| 15:37:35 | 16 | Q.   Have you ever dealt with that individual before? |
| 15:37:37 | 17 | A.   No, sir. |
| 15:37:39 | 18 | Q.   Now, I'm showing you a document from Government's Exhibit |
| 15:37:43 | 19 | 239, Bates 611281.  This is your contact sheet on -- I'm sorry. |
| 15:37:57 | 20 | One second.  Contact sheet 611283 of Fernando Garcia; is that |
| 15:38:15 | 21 | correct? |
| 15:38:15 | 22 | A.   Yes, sir. |
| 15:38:16 | 23 | Q.   Would you agree with me that that address provided by Mr. |
| 15:38:20 | 24 | Garcia is the exact same address provided under Luis Aguirre |
| 15:38:30 | 25 | Gerardo? |

| | | |
|---|---|---|
| 15:38:30 | 1 | A.    Yes, sir. |
| 15:38:30 | 2 | Q.    Do you know who actually lives at that location down in |
| 15:38:33 | 3 | Mission, Texas? |
| 15:38:33 | 4 | A.    No, sir. |
| 15:38:35 | 5 | Q.    I'll pass the witness, your Honor. |
| 15:38:45 | 6 | RE-CROSS EXAMINATION |
| 15:38:45 | 7 | BY MS. WILLIAMS: |
| 15:39:13 | 8 | Q.    This is the page I asked you about earlier, 611331. |
| 15:39:19 | 9 | A.    Uh-huh. |
| 15:39:19 | 10 | Q.    Do you see where it says -- where it lists the owner, owners |
| 15:39:24 | 11 | of the mare? |
| 15:39:24 | 12 | A.    Yes. |
| 15:39:25 | 13 | Q.    And it says, Lozano-Zule? |
| 15:39:27 | 14 | A.    Yes. |
| 15:39:28 | 15 | Q.    All right.  Who prepared this piece of paper? |
| 15:39:31 | 16 | A.    I did. |
| 15:39:32 | 17 | Q.    Why? |
| 15:39:33 | 18 | A.    I was asked to. |
| 15:39:34 | 19 | Q.    By? |
| 15:39:36 | 20 | A.    The prosecution. |
| 15:39:37 | 21 | Q.    And they asked you to list all the breedings that were |
| 15:39:41 | 22 | purchased by wire transfer, right? |
| 15:39:43 | 23 | A.    That I received.  Yes, ma'am. |
| 15:39:44 | 24 | Q.    And if I give you this piece of paper, are you going to show |
| 15:39:48 | 25 | me something that says Zule-ADT? |

| | | |
|---|---|---|
| 15:39:52 | 1 | A.    No. |
| 15:39:53 | 2 | Q.    No further question. |
| 15:40:04 | 3 | RE-CROSS EXAMINATION |
| 15:40:05 | 4 | BY MR. DEGEURIN: |
| 15:40:05 | 5 | Q.    Quickly.  I think maybe Mr. Gardner made it clear that when |
| 15:40:15 | 6 | he was talking about or asking you questions about these owners, |
| 15:40:21 | 7 | he was not talking about Royal Quick Dash that I was talking |
| 15:40:25 | 8 | about? |
| 15:40:25 | 9 | A.    Yes, sir. |
| 15:40:26 | 10 | Q.    He was talking about the owner of Secret Baby Doll? |
| 15:40:30 | 11 | A.    Correct. |
| 15:40:31 | 12 | Q.    Okay.  Thank you. |
| 15:40:36 | 13 | RE-CROSS EXAMINATION |
| 15:40:36 | 14 | BY MR. WOMACK: |
| 15:40:38 | 15 | Q.    Mr. Witman, one of the only questions the government just |
| 15:40:42 | 16 | asked you was about a horse, and it shows you a document that |
| 15:40:47 | 17 | said that the owner was someone named Aguirre? |
| 15:40:50 | 18 | A.    Uh-huh. |
| 15:40:51 | 19 | Q.    And then, they showed you the contact sheet where it had the |
| 15:40:55 | 20 | name of the contact as being Fernando Garcia? |
| 15:40:58 | 21 | A.    Correct. |
| 15:40:59 | 22 | Q.    And that would be consistent with Fernando Garcia being the |
| 15:41:04 | 23 | person that represented or the agent of the owner of the horse? |
| 15:41:09 | 24 | A.    Okay. |
| 15:41:10 | 25 | Q.    I mean, you see that a lot, don't you? |

15:41:12    1    A.    Yes, sir.

15:41:13    2    Q.    Thank you.  No further questions.

15:41:17    3              MR. ESPER:  I have nothing, your Honor.

15:41:19    4              MR. MAYR:  Neither do I, your Honor.

15:41:20    5              MR. DEGEURIN:  Your Honor, may we approach?

15:41:27    6              (At the bench, on the record.)

15:41:35    7              MR. DEGEURIN:  One of the last answers of this witness

15:41:40    8    rang a bell with me.  That exhibit, do you still have that

15:41:45    9    exhibit?  It was produced as a business record and introduced as

15:41:49   10    a business record.  However, I learned today that it wasn't a

15:41:56   11    business record.  It was something prepared by this witness for

15:41:59   12    the purposes of the prosecution for the trial.  Is that

15:42:03   13    basically --

15:42:04   14              MR. GARDNER:  Yeah.

15:42:06   15              MR. DEGEURIN:  So it slipped in us thinking that it was

15:42:12   16    a business record.  I don't know what we're going to do about

15:42:18   17    that because it's not right.  I looked through 178,000 business

15:42:23   18    records just to make sure that everything in there was a business

15:42:28   19    record.  May have been my fault, but that should not have been a

15:42:32   20    business record.

15:42:32   21              MR. GARDNER:  You want to strike Ms. Williams'

15:42:35   22    cross-examination using that record to her effect?

15:42:40   23              MR. DEGEURIN:  Don't make me --

15:42:41   24              THE COURT:  Well, I tell you, it's in front of the

15:42:45   25    jury.  The jury's talked about it.  I don't know the consequence

15:42:50   1   of that one way or the other.  I just know the jury's listening

15:42:53   2   to us right now.  But let me suggest that from 6:00 p.m. to 8:30

15:43:05   3   a.m., you'll have plenty of time to think about that.

15:43:09   4            MR. DEGEURIN:  I just thought that the timing that I

15:43:13   5   let you know, I probably need to think now.  Probably wouldn't be

15:43:17   6   time if I objected tomorrow and we'll come up with a solution.

15:43:21   7            THE COURT:  I don't know one way or the other, but it's

15:43:23   8   in evidence.  So do you want to make the motion or anything at

15:43:33   9   this point in time?

15:43:34   10           MR. DEGEURIN:  No.  I just want to make sure the --

15:43:39   11           MR. SANCHEZ:  I think that record that was prepared in

15:43:41   12   litigation should be removed as a demonstrative.  We can discuss

15:43:46   13   that.

15:43:47   14           MR. GARDNER:  I don't have a problem with that, Judge.

15:43:48   15   I think Ms. Williams might.  I don't know her thoughts on it or

15:43:51   16   Mr. Finn's.  So I think it's up to these folks to figure out

15:43:54   17   among themselves.

15:43:55   18           MS. WILLIAMS:  What I would like to do, Judge --

15:43:57   19           MR. GARDNER:  I have no dog in the fight.

15:44:00   20           MS. WILLIAMS:  -- is look a little more closely at that

15:44:02   21   exhibit and see how many things might be in there other than

15:44:05   22   that, because I know there's at least two or three that I saw

15:44:07   23   that might be affected by that, and then, let's decide how that

15:44:11   24   might affect the totality of the exhibit if we took them out

15:44:15   25   before we make a decision.

| | | |
|---|---|---|
| 15:44:18 | 1 | MR. DEGEURIN:  So back to your suggestion. |
| 15:44:45 | 2 | THE COURT:  May this witness be excused? |
| 15:44:48 | 3 | MS. FERNALD:  May I have one moment, please, your |
| 15:44:50 | 4 | Honor? |
| 15:45:00 | 5 | MR. GARDNER:  Your Honor, could we approach one more |
| 15:45:01 | 6 | time?  I apologize. |
| 15:45:07 | 7 | (At the bench, on the record.) |
| 15:45:14 | 8 | MR. GARDNER:  Sorry, your Honor.  Your Honor, with the |
| 15:45:18 | 9 | Court's permission, I would like to remove that exhibit, look |
| 15:45:22 | 10 | through it.  This witness is a custodian for that particular |
| 15:45:24 | 11 | business, so I'd like to have him be able to recertify those |
| 15:45:27 | 12 | records as the original records from the business.  So, A, I |
| 15:45:33 | 13 | don't want him really excused until he's gone through that and |
| 15:45:35 | 14 | able to prepare another affidavit in eventuality that these |
| 15:45:38 | 15 | individuals -- |
| 15:45:39 | 16 | MR. DEGEURIN:  I have no problem with that. |
| 15:45:40 | 17 | THE COURT:  All right. |
| 15:45:42 | 18 | MR. GARDNER:  Thank you, your Honor. |
| 15:45:44 | 19 | THE COURT:  What is the number of what we were talking |
| 15:45:46 | 20 | about? |
| 15:45:46 | 21 | MR. GARDNER:  That was Government's Exhibit 239, I |
| 15:45:50 | 22 | believe, your Honor. |
| 15:45:50 | 23 | MS. FERNALD:  It's 239, your Honor.  I'll verify it |
| 15:45:53 | 24 | when I go back to the table. |
| 15:45:54 | 25 | MR. GARDNER:  Thank you, sir. |

15:46:02  1          THE COURT:  Any more questions for this witness?

15:46:06  2          MR. DEGEURIN:  No.

15:46:07  3          MR. GARDNER:  No, your Honor.

15:46:08  4          THE COURT:  You may step down, sir.

15:46:10  5          THE WITNESS:  Thank you.

15:46:11  6          MS. FERNALD:  Your Honor, 239.

15:46:20  7          MR. GARDNER:  Your Honor, may I have one moment?

15:46:21  8          THE COURT:  Yes, sir.

15:46:41  9          MR. GARDNER:  Your Honor, the government calls Adan

15:46:44  10  Farias.

15:47:19  11          (Witness sworn.)

15:47:39  12          THE COURT:  Tell us your full name and spell your last

15:47:48  13  name, please.

15:47:48  14          THE WITNESS:  My name is Adan Farias.  Last name is

15:47:52  15  F-A-R-I-A-S.

15:47:53  16          THE COURT:  You may proceed.

15:47:55  17          ADAN FARIAS, called by the Government, duly sworn.

15:47:55  18                        DIRECT EXAMINATION

15:47:55  19  BY MR. GARDNER:

15:47:56  20  Q.   Thank you, your Honor.

15:47:56  21          Mr. Farias, if you will, good afternoon.  Please

15:48:00  22  introduce yourself to the jury and tell them who you are and what

15:48:03  23  you do for a living.

15:48:03  24  A.   Hi.  My name is Adan Farias.  I'm a race horse trainer.

15:48:07  25  Q.   And how long have you been a race horse trainer?

| | | |
|---|---|---|
| 15:48:11 | 1 | A.   Over 15 years. |
| 15:48:11 | 2 | Q.   And where do you primarily base yourself out of? |
| 15:48:13 | 3 | A.   At Los Alamitos, California. |
| 15:48:16 | 4 | Q.   You are a defendant in this case; is that correct? |
| 15:48:18 | 5 | A.   That's correct. |
| 15:48:18 | 6 | Q.   Could please tell the ladies and gentlemen of the jury what |
| 15:48:20 | 7 | you've pled to? |
| 15:48:21 | 8 | A.   I pled guilty to structuring, a lesser charge. |
| 15:48:26 | 9 | Q.   And can you define your understanding to the jury what |
| 15:48:29 | 10 | structuring is? |
| 15:48:30 | 11 | A.   When receiving over 10,000 in multiple deposits. |
| 15:48:35 | 12 | Q.   And in addition to pleading to a lesser charge, you and I |
| 15:48:38 | 13 | have an agreement, correct? |
| 15:48:39 | 14 | A.   Correct. |
| 15:48:39 | 15 | Q.   And what is your understanding of that agreement? |
| 15:48:42 | 16 | A.   To testify. |
| 15:48:43 | 17 | Q.   Okay.  And anything you say today can't be used against you |
| 15:48:48 | 18 | in further proceedings? |
| 15:48:49 | 19 | A.   Correct. |
| 15:48:50 | 20 | Q.   Okay.  Do we also have an agreement with respect to I |
| 15:48:54 | 21 | recommend to the Court that you receive a sentence of probation? |
| 15:48:58 | 22 | A.   That's correct. |
| 15:48:59 | 23 | Q.   Your understanding, is that just a recommendation? |
| 15:49:01 | 24 | A.   Yes, I do. |
| 15:49:02 | 25 | Q.   Okay.  What is your understanding of who ultimately makes |

15:49:05   1   that decision?

15:49:06   2   A.   The judge.

15:49:07   3   Q.   And Judge Sparks, sitting here?

15:49:08   4   A.   Judge Sparks.

15:49:09   5   Q.   So I want to start sometime January 2010.  Did you meet an

15:49:15   6   individual by the name of Carlos Nayen?

15:49:17   7   A.   Yes, I did.

15:49:18   8   Q.   335E.  Do you recognize that person, sir?

15:49:32   9   A.   Yes, I do.

15:49:33  10   Q.   Is that Carlos Nayen?

15:49:34  11   A.   Yes, he is.

15:49:35  12   Q.   All right.  Could you please explain to the ladies and

15:49:38  13   gentlemen of the jury how you encountered Mr. Nayen?

15:49:40  14   A.   I was at the race track running races, the trials, I

15:49:46  15   believe, and he had a few horses that didn't perform as he

15:49:50  16   pleased, and he approached me, asked if I would train for him.

15:49:53  17   And he asked me what was my day rate, and I explained to him I

15:49:56  18   charged $45 a day per horse.

15:49:58  19   Q.   And what goes into a day rate?  What's that for?

15:50:00  20   A.   We feed the horses, we groom them, the bedding.  That's

15:50:07  21   training, galloping, that's pretty much it.

15:50:10  22   Q.   And you were actually the first trainer the jury has seen.

15:50:13  23   So, if you will, could you please explain to them sort of what

15:50:16  24   does a trainer do once he gets a horse?

15:50:18  25   A.   Well, normally when get a horse, we check the tattoo to see

15:50:22    1    if it's the correct horse.  And after, that we look at his

15:50:24    2    conditions.  We normally see if they're well-trained, if they

15:50:28    3    need to be in shape, well-fed, multiple things, check their teeth

15:50:33    4    to see if the teeth are good.  It's a lot of things.  But I'm a

15:50:40    5    little bit nervous right now.

15:50:42    6    Q.    Now, does the trainer also take care of the vet bills and

15:50:45    7    the bills and dentist bills?

15:50:50    8    A.    No.  We only take care of the feeding program and the

15:50:53    9    training.  And the vet, the shoeing, and the dentist is all

15:50:56   10    separate.

15:50:56   11    Q.    And who takes care of that?

15:50:58   12    A.    The owner does.

15:51:02   13    Q.    I think probably the most important thing, you may have said

15:51:08   14    it, the trainer gets a horse ready to race?

15:51:10   15    A.    That's correct.

15:51:10   16    Q.    So going back Carlos Nayen, do you recall the names of any

15:51:14   17    horses he gave to you to train in 2010?

15:51:17   18    A.    Yes.  He brought me ten horses, which were Number One

15:51:21   19    Cartel, Blues Ferrari, Blues Girls Choice, Tamaulipas Boy,

15:51:32   20    Corvette LA, Jaguar XJ.  Those are some of the horses.

15:51:36   21    Q.    The ten in total?

15:51:38   22    A.    Ten total.

15:51:39   23    Q.    And you said Jaguar XJ after the car?

15:51:44   24    A.    Correct.

15:51:45   25    Q.    How well did these horses do in 2010?

| | | |
|---|---|---|
| 15:51:48 | 1 | A.   Well, not as good as he wanted to. |
| 15:51:54 | 2 | Q.   Did you have a company name that you raced under, as well? |
| 15:51:59 | 3 | A.   I had a company called LA Horses, LLC. |
| 15:52:02 | 4 | Q.   Is that after LA, Los Angeles? |
| 15:52:05 | 5 | A.   No, no.  It was just LA.  It was just we chose it not by |
| 15:52:10 | 6 | probably anything else.  Just we called it LA Horses. |
| 15:52:13 | 7 | Q.   Do you know a Fernando Garcia? |
| 15:52:16 | 8 | A.   Yes, I do. |
| 15:52:17 | 9 | Q.   And how do you know him? |
| 15:52:19 | 10 | A.   He's -- I've seen him.  He's a horse expert. |
| 15:52:23 | 11 | Q.   And do you recognize him here in the courtroom today? |
| 15:52:26 | 12 | A.   Yes, I do. |
| 15:52:26 | 13 | Q.   Standing up, correct? |
| 15:52:27 | 14 | A.   Correct. |
| 15:52:28 | 15 | Q.   When you say horse expert, what do you mean by that? |
| 15:52:31 | 16 | A.   He's very knowledgeable in the horse industry.  He knows how |
| 15:52:34 | 17 | to choose horses and make racing decisions. |
| 15:52:41 | 18 | Q.   And are you also involved in picking horses and advising |
| 15:52:44 | 19 | owners on which horses to pick? |
| 15:52:45 | 20 | A.   Yes, I am. |
| 15:52:47 | 21 | Q.   And how do you go about doing that? |
| 15:52:49 | 22 | A.   Well, if it's going to be at the sale, you normally look at |
| 15:52:52 | 23 | the confirmation, the bloodlines to see if you're looking for |
| 15:52:55 | 24 | what you want and the race horse. |
| 15:52:57 | 25 | Q.   And do you attend most of the auctions? |

| | | |
|---|---|---|
| 15:53:00 | 1 | A.   Yes, I do. |
| 15:53:01 | 2 | Q.   And the purpose of you attending the auction as a trainer? |
| 15:53:06 | 3 | A.   To get hopefully more clientele owners.  And if any of my |
| 15:53:10 | 4 | owners at the time have questions about certain horses, I provide |
| 15:53:13 | 5 | them the answers. |
| 15:53:14 | 6 | Q.   Now, with respect to Fernando Garcia, was he associated with |
| 15:53:20 | 7 | Carlos Nayen in training of those ten or so horses you received? |
| 15:53:23 | 8 | A.   I'm not sure if he was with him, but every time Nayen would |
| 15:53:26 | 9 | come to me, Fernando was with him. |
| 15:53:29 | 10 | Q.   And who were you billing?  Who were you sending your billing |
| 15:53:33 | 11 | statements to? |
| 15:53:33 | 12 | A.   To Carlos Nayen. |
| 15:53:34 | 13 | Q.   And do you know how those bills were paid? |
| 15:53:37 | 14 | A.   Cash. |
| 15:53:38 | 15 | Q.   Cash.  And how did you get those billing statements to |
| 15:53:45 | 16 | Carlos Nayen? |
| 15:53:46 | 17 | A.   I would e-mail it to him. |
| 15:53:47 | 18 | Q.   Do you recall the e-mail address? |
| 15:53:48 | 19 | A.   It's carlosnayen@hotmail.com. |
| 15:53:52 | 20 | Q.   Carlosnayen@hotmail.com. |
| 15:53:58 | 21 |      And these nine or ten horses that you had, do you |
| 15:54:02 | 22 | recall what names they were racing under? |
| 15:54:05 | 23 | A.   Some of them were Fast And Furious and Garcia Bloodstock. |
| 15:54:13 | 24 | Q.   Now, I'd like to turn your attention to July of that year. |
| 15:54:20 | 25 | Did you take a trip to Mexico to meet Miguel Trevino? |

| | | |
|---|---|---|
| 15:54:23 | 1 | A.   Yes, I did. |
| 15:54:24 | 2 | Q.   And also known as "Cuarenta"? |
| 15:54:25 | 3 | A.   Yes, sir. |
| 15:54:26 | 4 | Q.   All right.  How did that trip come about?  Can you explain |
| 15:54:29 | 5 | that to the jury? |
| 15:54:29 | 6 | A.   I was asked by Carlos Nayen to go to Mexico more than a few |
| 15:54:34 | 7 | times, and I would just put it off, put it off.  And then, one |
| 15:54:38 | 8 | day, he approached me.  He was all like, either you go or I'll |
| 15:54:41 | 9 | take you.  I was like, okay.  I put my flight to San Antonio.  I |
| 15:54:44 | 10 | was picked up by an individual which I don't know, and I was |
| 15:54:47 | 11 | taken to Mexico. |
| 15:54:52 | 12 | Q.   Showing you a page from Government's Exhibit 401.  Bates |
| 15:54:58 | 13 | stamp 62824.  This is a crossing record, dated July 27, 2010.  Is |
| 15:55:09 | 14 | that when you crossed? |
| 15:55:10 | 15 | A.   That's correct. |
| 15:55:11 | 16 | Q.   And who is this Rodrigo Acevez? |
| 15:55:15 | 17 | A.   He's once of my friends. |
| 15:55:16 | 18 | Q.   And this other individual, is that the individual that |
| 15:55:18 | 19 | picked you up? |
| 15:55:18 | 20 | A.   That was the individual that picked me up. |
| 15:55:19 | 21 | Q.   All right.  So tell the jury about that.  Where did you get |
| 15:55:21 | 22 | picked up? |
| 15:55:21 | 23 | A.   We got picked up in San Antonio.  And then, we crossed the |
| 15:55:25 | 24 | border to Mexico.  And once I was in Mexico, I wasn't sure |
| 15:55:28 | 25 | exactly where I was at. |

15:55:29   1   Q.   Do you remember the ports or the city on the U.S. side that

15:55:34   2   you went across?

15:55:36   3   A.   I believe it was San Antonio.

15:55:39   4   Q.   I'm sorry.  Where did you cross the Rio Grande?  Do you

15:55:43   5   recall the city in which you went through?

15:55:45   6   A.   I don't recall that.

15:55:48   7   Q.   So you crossed into Mexico and how did it come about that

15:55:54   8   you met Miguel Trevino?

15:55:55   9   A.   Once I got to Mexico, Carlos Nayen came up to me and picked

15:55:59   10   me up, and we went to multiple ranches.

15:56:03   11   Q.   And I assume there's horses at the ranches?

15:56:06   12   A.   Correct.

15:56:07   13   Q.   What was the purpose of your trip to Mexico?

15:56:11   14   A.   One, to look at the horses that they have, the confirmation

15:56:14   15   to give them my opinion and, second, to give my opinion on what

15:56:17   16   kind of horses I like for winning big races.

15:56:21   17   Q.   And what advice did you provide?

15:56:24   18   A.   I provided -- I told them that I like First Down Dash was my

15:56:28   19   first choice.  Corona Cartel, second.  And Jess Perry, third

15:56:34   20   choice.  The sires.

15:56:35   21   Q.   Are those the top three sires in the industry?

15:56:37   22   A.   For me they are.

15:56:38   23   Q.   You're not the only one.  Showing you Government's Exhibit

15:56:50   24   335A.  Is that the individual you met in Mexico?

15:56:52   25   A.   Yes, I did.

15:56:52    1    Q.   Your Honor, 335A for the record is Miguel Trevino.

15:56:57    2              When you were down here, what was your interaction with

15:57:00    3    this individual?

15:57:01    4    A.   We were talking the whole time just about the horses.

15:57:05    5    Q.   Did he have an armed escort or bodyguards to your knowledge?

15:57:09    6    A.   Yes.   There was bodyguards.

15:57:11    7    Q.   And at the time you met him, did you know who he was?

15:57:13    8    A.   No.

15:57:15    9    Q.   And what did Carlos Nayen say to you in terms of who you

15:57:19   10    were going to meet?

15:57:25   11    A.   Well, he said the "40."

15:57:30   12    Q.   "40"?

15:57:31   13    A.   Uh-huh.

15:57:32   14    Q.   Did this man "40" instruct you to buy any horses for him?

15:57:39   15    A.   No.   He didn't.

15:57:40   16    Q.   He just wanted you to train horses?

15:57:42   17    A.   Yes.

15:57:43   18    Q.   And about how many horses do you think you looked at while

15:57:46   19    you were down there in Mexico?

15:57:47   20    A.   At least over 100 horses.

15:57:49   21    Q.   On how many places?

15:57:51   22    A.   Three different ranches.

15:57:52   23    Q.   And could you tell the ladies and gentlemen of the jury the

15:57:55   24    condition of those ranches?

15:57:57   25    A.   They were very nice ranches and the horses were well-kept,

15:58:01    1    and everything looked really good.

15:58:03    2    Q.   Facilities were kept up and maintained?

15:58:05    3    A.   Yes.  Everything was really, really nice.

15:58:07    4    Q.   So after you came back across the border, at what point did

15:58:13    5    you realize you were dealing with the leader of the Zetas drug

15:58:17    6    cartel?

15:58:17    7    A.   As soon as I got home.  I Googled them and that's what I

15:58:23    8    see.  Wow.

15:58:24    9    Q.   And you still decided to continue to train the horses,

15:58:26   10    correct?

15:58:26   11    A.   I couldn't quit.  So I just -- I was hoping gradually they

15:58:30   12    would go away, which they didn't.

15:58:32   13    Q.   So you couldn't quit.  Why couldn't you quit?

15:58:35   14    A.   Because you fear the name.

15:58:37   15    Q.   Because the name?

15:58:38   16    A.   Yes.

15:58:38   17    Q.   The name of what?

15:58:39   18    A.   Zetas.

15:58:40   19    Q.   Okay.  What would you -- what do you think would have

15:58:46   20    happened to you if you said, no, I don't want to train your

15:58:48   21    horses?

15:58:48   22    A.   Well, you hear a lot of rumors that anything could happen.

15:58:54   23    Q.   Did you attend the qualifying race of Mr. Piloto in August

15:59:02   24    of 2010?

15:59:03   25    A.   Not the trials.  Just the finals.

| | | |
|---|---|---|
| 15:59:05 | 1 | Q.   Just finals.  And was Fernando Garcia present at the finals? |
| 15:59:10 | 2 | A.   Yes, he was. |
| 15:59:12 | 3 | Q.   I'm showing you Government's Exhibit 356.  Do you recognize |
| 15:59:19 | 4 | that, sir? |
| 15:59:24 | 5 | A.   Yes. |
| 15:59:24 | 6 | Q.   And those are your initials at the top? |
| 15:59:26 | 7 | A.   Yes, they are. |
| 15:59:27 | 8 | Q.   Okay.  You had an opportunity to go through this, correct? |
| 15:59:29 | 9 | A.   That's correct. |
| 15:59:29 | 10 | Q.   Now, you didn't prepare this report.  Is that a fair |
| 15:59:33 | 11 | statement? |
| 15:59:33 | 12 | A.   Yes. |
| 15:59:33 | 13 | Q.   Will you go through it and you've identified that these are, |
| 15:59:36 | 14 | in fact, your phone numbers? |
| 15:59:37 | 15 | A.   That's correct. |
| 15:59:39 | 16 | Q.   And are these the phone numbers that were on your phone |
| 15:59:42 | 17 | taken at the time of your arrest? |
| 15:59:44 | 18 | A.   Yes. |
| 15:59:45 | 19 | Q.   And that was in June 12th of 2012? |
| 15:59:47 | 20 | A.   That's correct. |
| 15:59:48 | 21 | Q.   Your Honor, I'd offer Government's Exhibit 356. |
| 16:00:38 | 22 | MR. DEGEURIN:  I have no objection. |
| 16:00:43 | 23 | THE COURT:  Hearing no objection, 356 is admitted. |
| 16:00:46 | 24 | Q.   (BY MR. GARDNER) And when you went to the finals, did you |
| 16:00:50 | 25 | again encounter Fernando Garcia? |

| | | |
|---|---|---|
| 16:00:53 | 1 | A.   Yes. |
| 16:00:54 | 2 | Q.   Did you ask Mr. Garcia for his phone number? |
| 16:00:57 | 3 | A.   Yes, I did. |
| 16:00:58 | 4 | Q.   Okay.  Did you put that phone number in your phone? |
| 16:01:00 | 5 | A.   That's correct. |
| 16:01:11 | 6 | Q.   There's an entry here called, Fernando Z and a phone number. |
| 16:01:17 | 7 | Is that Fernando Garcia's phone number? |
| 16:01:18 | 8 | A.   Yes, it is. |
| 16:01:19 | 9 | Q.   And why did you put the Z? |
| 16:01:21 | 10 | A.   Because at the time, we were joking around, we're at the |
| 16:01:25 | 11 | casino and I told him it was a Z, and then, I removed it. |
| 16:01:31 | 12 | Q.   When you say, we were joking around. |
| 16:01:33 | 13 | A.   Yes. |
| 16:01:33 | 14 | Q.   Is that you and Fernando Garcia? |
| 16:01:34 | 15 | A.   That's correct. |
| 16:01:35 | 16 | Q.   The defendant in the back of the courtroom? |
| 16:01:37 | 17 | A.   Yes. |
| 16:01:38 | 18 | Q.   Did he see this Z? |
| 16:01:41 | 19 | A.   I showed it to him and he said, don't do that. |
| 16:01:44 | 20 | Q.   And again, this was the phone that was seized from you on |
| 16:01:47 | 21 | June 12th, 2012? |
| 16:01:48 | 22 | A.   That's correct. |
| 16:01:49 | 23 | Q.   Some point, you were banned from racing for a series of bad |
| 16:02:01 | 24 | tests; is that correct? |
| 16:02:02 | 25 | A.   Yes, it is. |

| | | |
|---|---|---|
| 16:02:03 | 1 | Q.   Could you tell the ladies and gentlemen about that? |
| 16:02:05 | 2 | A.   In 2011, I had a few horses that tested for Zilpaterol, and |
| 16:02:10 | 3 | that was a Class I.  That's why I was pulled off of the race |
| 16:02:13 | 4 | track. |
| 16:02:17 | 5 | Q.   Were the horses that you were provided to train, were they |
| 16:02:19 | 6 | good horses? |
| 16:02:21 | 7 | A.   Horses from whom? |
| 16:02:22 | 8 | Q.   From the Zetas. |
| 16:02:23 | 9 | A.   They were really good horses. |
| 16:02:25 | 10 | Q.   Why does a trainer -- it's pretty obvious question.  Why |
| 16:02:30 | 11 | does a trainer want the best horses? |
| 16:02:31 | 12 | A.   Obviously with the best horses, you could win the races. |
| 16:02:34 | 13 | Winning races, you make money. |
| 16:02:36 | 14 | Q.   Your Honor, I pass the witness. |
| 16:02:40 | 15 |         MS. WILLIAMS:  No questions. |
| 16:02:42 | 16 |         MR. DEGEURIN:  No questions. |
| 16:02:45 | 17 |         MR. WOMACK:  Questions. |
| 16:02:46 | 18 |                 CROSS-EXAMINATION |
| 16:02:46 | 19 | BY MR. WOMACK: |
| 16:02:49 | 20 | Q.   Good afternoon, Mr. Farias. |
| 16:02:50 | 21 | A.   How are you doing? |
| 16:02:51 | 22 | Q.   I'm Guy Womack.  I represent Fernando Garcia. |
| 16:02:55 | 23 |       Now, you told us that you saw this Carlos Nayen and at |
| 16:03:04 | 24 | some time, he had Fernando Garcia with him; is that right? |
| 16:03:07 | 25 | A.   Correct. |

16:03:08   1   Q.   Did you notice that on those occasions, Fernando Garcia was

16:03:11   2   translating for him?

16:03:12   3   A.   No.

16:03:12   4   Q.   They speak in English?

16:03:14   5   A.   No.

16:03:15   6   Q.   Okay.  But you saw them together a couple of times, didn't

16:03:18   7   you?

16:03:18   8   A.   That's correct.

16:03:19   9   Q.   And you've seen Fernando Garcia many more times without

16:03:23   10   Nayen being there?

16:03:23   11   A.   That's correct.

16:03:25   12   Q.   And most of the time, the interaction you've had with

16:03:28   13   Fernando Garcia has been in California, hasn't it?

16:03:31   14   A.   That's correct.

16:03:31   15   Q.   And that was at race tracks in California and at horse sales

16:03:37   16   in California?

16:03:38   17   A.   That is correct.

16:03:38   18   Q.   Okay.  And you said that you went to Mexico and you actually

16:03:44   19   met with this "Z 40," or whatever, this Miguel Trevino; is that

16:03:50   20   right?

16:03:50   21   A.   Yes, it is.

16:03:51   22   Q.   Now, when you first met him in California, you didn't know

16:03:53   23   who that was, did you?

16:03:54   24   A.   No.  I did not.

16:03:55   25   Q.   You found that out later when you were checking his name or

16:03:58   1   whatever?

16:03:58   2   A.    That's correct.

16:03:59   3   Q.    Okay.  And when you met with this Miguel Trevino in Mexico,

16:04:05   4   Fernando Garcia was not there, was he?

16:04:06   5   A.    No.  He was not.

16:04:07   6   Q.    And when y'all were in a casino and you put his name in the

16:04:11   7   phone and put Fernando Z, where were y'all at?

16:04:15   8   A.    At the casino at the table.

16:04:17   9   Q.    Is that at Los Alamitos?

16:04:20   10   A.    No.  That was in Ruidoso at God In The Mountains Casino

16:04:24   11   (sic).

16:04:24   12   Q.    So y'all were in New Mexico and this was in connection with

16:04:27   13   auctions or races?

16:04:28   14   A.    It was going to be the finals of the All American Futurity,

16:04:31   15   and three days before that, the sale takes place.

16:04:35   16   Q.    Okay.  And when you put in there Fernando Z, you showed that

16:04:40   17   to Fernando?

16:04:41   18   A.    Yes, I did.

16:04:42   19   Q.    And you meant that as a joke?

16:04:44   20   A.    Yes, I did.

16:04:46   21   Q.    When he saw it had a Z next to it, he said you shouldn't do

16:04:49   22   that?

16:04:49   23   A.    Right.

16:04:50   24   Q.    And you know that everybody that has connections to Mexico

16:04:54   25   in any way, when they see the letter Z, it means something bad,

| 16:05:00 | 1 | doesn't it? |
| 16:05:00 | 2 | A.   Correct. |
| 16:05:01 | 3 | Q.   Thank you.  No further questions. |
| 16:05:13 | 4 | CROSS-EXAMINATION |
| 16:05:13 | 5 | BY MR. ESPER: |
| 16:05:15 | 6 | Q.   Mr. Farias, you were born and raised in California? |
| 16:05:18 | 7 | A.   That's correct. |
| 16:05:19 | 8 | Q.   Okay.  Educated in California? |
| 16:05:21 | 9 | A.   Correct. |
| 16:05:22 | 10 | Q.   Do you have an education beyond high school? |
| 16:05:26 | 11 | A.   Yes, I do. |
| 16:05:26 | 12 | Q.   In college? |
| 16:05:27 | 13 | A.   College. |
| 16:05:28 | 14 | Q.   How far did you go? |
| 16:05:29 | 15 | A.   Four years. |
| 16:05:29 | 16 | Q.   Four years? |
| 16:05:30 | 17 | A.   Yes. |
| 16:05:30 | 18 | Q.   So you got an undergraduate degree? |
| 16:05:32 | 19 | A.   No.  I didn't. |
| 16:05:33 | 20 | Q.   Okay.  You went four years, but just didn't get a degree? |
| 16:05:36 | 21 | A.   Right. |
| 16:05:36 | 22 | Q.   And where did you go to college? |
| 16:05:38 | 23 | A.   I went to Cerritos College. |
| 16:05:41 | 24 | Q.   Pardon me? |
| 16:05:43 | 25 | A.   Cerritos College. |

16:05:43   1   Q.   That's in Cerritos, California?

16:05:46   2   A.   That's correct.

16:05:46   3   Q.   And was it during this time period that you took up horse

16:05:51   4   training?

16:05:51   5   A.   Yes.

16:05:52   6   Q.   Was it before then or during this time period?

16:05:55   7   A.   While I was going to school, I was being a trainer.

16:05:57   8   Q.   Okay.  Now, you say that you charged -- let me ask you this.

16:06:02   9   You said that you pled guilty to a -- what is called structuring

16:06:05   10  deposits, correct?

16:06:06   11  A.   That is correct.

16:06:08   12  Q.   Now, what was it that you did?  When Mr. Nayen gave you

16:06:13   13  cash, you deposited the money in less than 10,000 increments?

16:06:17   14  A.   No.  When I sent Nayen my bill, he would deposit it,

16:06:21   15  whatever the amount was at the month and different numbers within

16:06:27   16  three days, that was over $10,000.

16:06:29   17  Q.   Okay.  He was making the deposits into your account,

16:06:33   18  correct?

16:06:33   19  A.   Yes.

16:06:35   20  Q.   Into your bank account?

16:06:36   21  A.   Into my bank account.

16:06:37   22  Q.   Did you know that -- did you and he get together and say,

16:06:40   23  okay, don't deposit more than 10,000 at one time?

16:06:44   24  A.   No.  We didn't.

16:06:44   25  Q.   You didn't know he was going to do that, did you?

| | | |
|---|---|---|
| 16:06:47 | 1 | A.   I just gave him a bill and I didn't care how I got paid.   I |
| 16:06:50 | 2 | provide the service and I wanted to get paid. |
| 16:06:51 | 3 | Q.   Sure.   And so, now you -- if you submit a bill, I believe |
| 16:06:55 | 4 | you charge $25 a day, which is basically $750 a month, correct? |
| 16:06:59 | 5 | A.   No.   I don't charge $25.   $45. |
| 16:07:02 | 6 | Q.   $45? |
| 16:07:03 | 7 | A.   Yes. |
| 16:07:03 | 8 | Q.   I'm sorry.   So do you bill for all 30 days? |
| 16:07:06 | 9 | A.   No.   If the month has 28 days, I bill for 28.   But if it has |
| 16:07:10 | 10 | 31, I bill for 31. |
| 16:07:11 | 11 | Q.   Okay.   So it definitely would be over a thousand dollars a |
| 16:07:14 | 12 | month? |
| 16:07:14 | 13 | A.   That's correct. |
| 16:07:15 | 14 | Q.   Okay.   You had ten horses with you? |
| 16:07:16 | 15 | A.   Yes. |
| 16:07:17 | 16 | Q.   So for the low, that's 10,000 a month? |
| 16:07:21 | 17 | A.   Right. |
| 16:07:21 | 18 | Q.   For those ten horses? |
| 16:07:23 | 19 | A.   Uh-huh. |
| 16:07:23 | 20 | Q.   Okay.   And that didn't include vet bills, shoeing, vitamins, |
| 16:07:30 | 21 | that type of stuff? |
| 16:07:31 | 22 | A.   That's correct. |
| 16:07:31 | 23 | Q.   Now, when you -- if you feel that the horse needs to be |
| 16:07:36 | 24 | taken to the vet, do you call the owner and say, hey, he's got to |
| 16:07:42 | 25 | go to the vet?   Or do you just take him to the vet, pay the bill |

16:07:45   1   and then, got reimbursed?

16:07:47   2   A.   No.   That's not the way it works.   We have vets on the

16:07:50   3   grounds, and whatever the horse needs, it's my judgment to

16:07:53   4   determine to call the vet and have the horse looked at.   And I

16:07:56   5   don't bill the owners.   The vet directly bills the owners.

16:07:59   6   Q.   Okay.   So you've got vets on the grounds?

16:08:02   7   A.   Yes.

16:08:02   8   Q.   Okay.   If someone doesn't have a vet on the grounds, they've

16:08:05   9   got to take him to -- you're aware of circumstances where

16:08:08   10   trainers don't have vets on the grounds, correct?

16:08:10   11   A.   Not at the race track.   At the race track, there's always

16:08:14   12   vets.

16:08:14   13   Q.   You work at the race track?

16:08:15   14   A.   At the race track.

16:08:16   15   Q.   Okay.   And which race track do you work at?

16:08:18   16   A.   Used to work at Los Alamitos.

16:08:20   17   Q.   That's a fairly big track in California, is it not?

16:08:23   18   A.   Yes, it is.

16:08:24   19   Q.   Okay.   So you actually have the vets there.   And if one of

16:08:29   20   Mr. Nayen's horses needed veterinary care, you would take him to

16:08:33   21   the vet, and then, the vet would bill Mr. Nayen?

16:08:36   22   A.   I would not take the horse to the vet.   The vet will come to

16:08:39   23   my barn and do whatever he had to do with the horse, and he would

16:08:42   24   bill the owners.

16:08:43   25   Q.   Okay.   But he'd ask you, whose horse does this belong to?

| | | |
|---|---|---|
| 16:08:47 | 1 | A.   The first time, yes, and then, normally they keep it in |
| 16:08:51 | 2 | track. |
| 16:08:51 | 3 | Q.   And you'd give him the contact information, correct? |
| 16:08:53 | 4 | A.   Correct. |
| 16:08:53 | 5 | Q.   And you don't know how he was paid? |
| 16:08:55 | 6 | A.   No.  I don't. |
| 16:08:56 | 7 | Q.   Okay.  So every month, you're billing Mr. Nayen starting in |
| 16:09:00 | 8 | January of 2010.  And I may not be correct on this date.  Is |
| 16:09:07 | 9 | January 10th, 2010 when you start billing Mr. Nayen? |
| 16:09:10 | 10 | A.   I'm not exactly sure on the date. |
| 16:09:11 | 11 | Q.   Sometime in January, correct? |
| 16:09:18 | 12 | A.   I'm not sure. |
| 16:09:19 | 13 | Q.   Let me ask you this.  You went to Mexico in July? |
| 16:09:21 | 14 | A.   Right. |
| 16:09:22 | 15 | Q.   So for a number of months before July, you were billing Mr. |
| 16:09:27 | 16 | Nayen for these ten horses that he brought you? |
| 16:09:30 | 17 | A.   Yes. |
| 16:09:30 | 18 | Q.   And basically it's 10,000 a month for those ten horses? |
| 16:09:34 | 19 | A.   It's more than 10,000. |
| 16:09:36 | 20 | Q.   More than 10,000.  And is he paying you every month or is he |
| 16:09:39 | 21 | kind of slow? |
| 16:09:40 | 22 | A.   No.  Sometimes he will pay me once a month.  Sometimes he |
| 16:09:43 | 23 | will pay every two months.  It depends. |
| 16:09:45 | 24 | Q.   Okay.  And Mr. Nayen would call you and say, give me your |
| 16:09:48 | 25 | bank account number and I'll deposit the money in that bank |

16:09:51  1  account?

16:09:51  2  A.   I called Nayen -- why I told Nayen I needed my money for the

16:09:54  3  training, and he was like, let me have the bank account.   And

16:09:57  4  that's the one that I gave him.

16:09:58  5  Q.   Okay.   He said he didn't have a bank account?

16:10:00  6  A.   No.   He said for me to give him my bank account.

16:10:03  7  Q.   Okay.   So you gave him your bank account number and the name

16:10:06  8  of the bank.

16:10:07  9  A.   Correct.

16:10:07  10  Q.   And he then made the deposits into your account?

16:10:11  11  A.   That's correct.

16:10:11  12  Q.   And he did that every month, or every other month, or

16:10:16  13  whenever he made the payments?

16:10:17  14  A.   Yes.

16:10:18  15  Q.   And what he was doing was if the amount owed was more than

16:10:20  16  10,000, he would make a deposit for less than 10,000.   He'd make

16:10:25  17  multiple deposits, correct?

16:10:26  18  A.   Yes.

16:10:26  19  Q.   Okay.   Did you ever tell him, hey, don't do that, man?

16:10:30  20  A.   No.

16:10:31  21  Q.   Okay.   Now, you say that the horses when you trained them

16:10:39  22  didn't do as well as you expected, or the owners or Mr. Nayen

16:10:43  23  expected?

16:10:43  24  A.   The breeding of the horses were expected to run a lot more.

16:10:46  25  Q.   Okay.   You say that in determining -- you sometimes go with

16:10:53  1  an owner or an owner's representative to auctions to pick out

16:10:58  2  horses, correct?

16:10:58  3  A.   I always go to the auctions on my own, and my owners have

16:11:02  4  questions, I will provide them whatever answers they want.

16:11:07  5  Q.   I'm sure you are well-versed in technology, in computers?

16:11:09  6  A.   Yes.

16:11:10  7  Q.   Okay.  So you could research -- one of the things I

16:11:13  8  mentioned as a trainer is you have the ability to research

16:11:16  9  bloodlines, correct?

16:11:17  10  A.   Yes.  Bloodlines is one thing.

16:11:18  11  Q.   Okay.  That's one of the things you look at in determining

16:11:21  12  whether to keep the horse, correct?

16:11:23  13  A.   Anybody could pick the bloodlines.

16:11:25  14  Q.   Yes.  And number two is just your training and experience,

16:11:28  15  correct?

16:11:28  16  A.   No.  You have to learn confirmation, legs on horses, body

16:11:31  17  size.

16:11:32  18  Q.   Okay.  But that's part of your experience as a trainer,

16:11:36  19  right?

16:11:36  20  A.   That's correct.

16:11:36  21  Q.   Okay.  So what else do you use?  What other combination?

16:11:41  22  What other factors do you use in looking at a horse and

16:11:45  23  recommending to an owner or to an owner's representative, I think

16:11:48  24  this is a good horse?

16:11:49  25  A.   To see the body, if he has a good body -- good confirmation,

16:11:53   1   the history of the babies of that mare.

16:11:55   2   Q.   Okay.  And the history, of course, you research online,

16:12:00   3   correct?

16:12:00   4   A.   No.  There's a catalog provided.

16:12:02   5   Q.   Oh, a catalog provided?

16:12:04   6   A.   Yes.

16:12:04   7   Q.   Okay.  And, of course, you have to be able to read and write

16:12:07   8   to read the catalog?

16:12:08   9   A.   That's correct.

16:12:09   10   Q.   Okay.  Now, you say that Mr. Nayen kept not nagging at you

16:12:18   11   but kept wanting you to go to Mexico to meet -- how did he put

16:12:24   12   it?  To meet "40"?

16:12:26   13   A.   No.  He asked a couple of times, the boss wants to meet you

16:12:30   14   in Spanish.

16:12:31   15   Q.   The boss?

16:12:32   16   A.   Yes.

16:12:32   17   Q.   Okay.  When he first brought you these ten horses, did he

16:12:36   18   tell you, these are my horses or they belong to somebody else?

16:12:39   19   A.   I didn't ask him that question.

16:12:41   20   Q.   You just assumed they were his horses?

16:12:44   21   A.   No.  They were running under different.

16:12:46   22   Q.   Different names?

16:12:47   23   A.   Not names but companies.

16:12:49   24   Q.   Okay.  It didn't -- but Mr. Nayen represented that he either

16:12:54   25   -- represented to you that he either represented those companies

| | | |
|---|---|---|
| 16:12:58 | 1 | or he owned those companies or both? |
| 16:13:00 | 2 | A.   Yes.  He represented those companies. |
| 16:13:01 | 3 | Q.   Okay.  Whenever he said, let's go to Mexico and meet the |
| 16:13:05 | 4 | boss, that's the first time he ever said that, right? |
| 16:13:08 | 5 | A.   That's correct. |
| 16:13:08 | 6 | Q.   Okay.  And did you ask him who's the boss? |
| 16:13:13 | 7 | A.   No, because I didn't want to go. |
| 16:13:15 | 8 | Q.   You didn't want to go? |
| 16:13:16 | 9 | A.   I just kind of let it slide. |
| 16:13:17 | 10 | Q.   Okay.  In other words, you just didn't want to go to Mexico? |
| 16:13:20 | 11 | A.   That's correct. |
| 16:13:20 | 12 | Q.   Okay.  And you grew up in California, correct? |
| 16:13:24 | 13 | A.   Yes, I did. |
| 16:13:24 | 14 | Q.   All right.  Now, eventually, you go to Mexico, correct? |
| 16:13:28 | 15 | A.   Correct. |
| 16:13:29 | 16 | Q.   And when you get to Mexico -- before you got to Mexico, you |
| 16:13:34 | 17 | fly to San Antonio, you bring a friend with you? |
| 16:13:35 | 18 | A.   Yes, I did. |
| 16:13:36 | 19 | Q.   Okay.  And is this the longtime friend of yours? |
| 16:13:39 | 20 | A.   Yes, it is. |
| 16:13:40 | 21 | Q.   Okay.  And someone picks you up at the airport? |
| 16:13:44 | 22 | A.   Correct. |
| 16:13:44 | 23 | Q.   You drive to one of the port-of-entries.  You don't remember |
| 16:13:47 | 24 | which one? |
| 16:13:47 | 25 | A.   That's correct. |

| 16:13:48 | 1 | Q. Cross over into Mexico? |
| 16:13:49 | 2 | A. Correct. |
| 16:13:50 | 3 | Q. And then, how far do you drive before you meet Mr. Nayen? |
| 16:13:54 | 4 | A. I'm not exactly sure on the drive. |
| 16:13:57 | 5 | Q. Was he right on the other side of the bridge when you first |
| 16:14:02 | 6 | crossed, or was it a while? |
| 16:14:03 | 7 | A. It was at least 30 minutes. |
| 16:14:04 | 8 | Q. Then you go to some ranches, correct? |
| 16:14:06 | 9 | A. I went to a restaurant to wait for Nayen, when Nayen picked |
| 16:14:10 | 10 | me up. |
| 16:14:11 | 11 | Q. Okay. Now, this individual that was introduced to you, was |
| 16:14:15 | 12 | he introduced to you as Miguel Trevino or as "Cuarenta"? |
| 16:14:18 | 13 | A. I can't remember exactly how he was introduced, but I |
| 16:14:21 | 14 | remember him saying "Cuarenta." |
| 16:14:22 | 15 | Q. "Cuarenta." Okay. And you talked with this guy for -- at |
| 16:14:31 | 16 | length, correct? |
| 16:14:31 | 17 | A. For at least three hours. |
| 16:14:33 | 18 | Q. Okay. Did you go to different stables? |
| 16:14:36 | 19 | A. Yes, we did. Different ranches. |
| 16:14:37 | 20 | Q. Okay. And did this guy ask you, buy horses or do anything? |
| 16:14:42 | 21 | A. No. |
| 16:14:42 | 22 | Q. Okay. And did he say he wanted you to train his horses? |
| 16:14:47 | 23 | A. I was already training the horses. |
| 16:14:49 | 24 | Q. Okay. You were already training his horses? |
| 16:14:50 | 25 | A. Yes. |

16:14:51  1   Q.   Who told you that?

16:14:52  2   A.   We spoke about those horses there when I got there.

16:14:55  3   Q.   Okay.  When you met with "Cuarenta," that's the first time

16:14:59  4   you found out that those were his horses?

16:15:00  5   A.   Right.

16:15:01  6   Q.   Okay.  Did that surprise you that those were his horses that

16:15:05  7   you were training?

16:15:07  8   A.   In a way.

16:15:08  9   Q.   Okay.  And you talked about the training of those ten

16:15:11  10  horses?

16:15:12  11  A.   I just told him how the horses were doing.

16:15:15  12  Q.   Okay.  And then, you were there, what, one day?

16:15:19  13  A.   No.  Few hours.

16:15:21  14  Q.   A few hours.  Then you drove back to the port-of-entry

16:15:25  15  crossing into the United States, correct?

16:15:26  16  A.   Correct.

16:15:27  17  Q.   Got on a plane to San Antonio?

16:15:29  18  A.   No.  I stayed in a hotel overnight and then, in the morning,

16:15:31  19  I got the --

16:15:33  20  Q.   Flew back to Los Angeles?

16:15:34  21  A.   Okay.

16:15:35  22  Q.   Now, when you get back to Los Angeles or to the Los Angeles

16:15:39  23  area, you immediately get on the computer, right?

16:15:41  24  A.   No.  I fell asleep.  I was tired.

16:15:44  25  Q.   Okay.  Whenever you awoke from your slumber, you got on the

| | | |
|---|---|---|
| 16:15:52 | 1 | computer and said, I want to check out who this "Cuarenta" guy |
| 16:15:54 | 2 | is? |
| 16:15:54 | 3 | A.   That's correct. |
| 16:15:55 | 4 | Q.   You said you went on the Google? |
| 16:15:57 | 5 | A.   Google. |
| 16:15:58 | 6 | Q.   And what keyword did you use, "Cuarenta"? |
| 16:16:01 | 7 | A.   Zeta, "Cuarenta." |
| 16:16:02 | 8 | Q.   Zeta.  Okay.  When was the first time you ever heard the |
| 16:16:05 | 9 | word "Zeta"? |
| 16:16:06 | 10 | A.   Well, we've heard the word "Zeta" for a long time. |
| 16:16:09 | 11 | Q.   Even in California? |
| 16:16:10 | 12 | A.   Everywhere. |
| 16:16:13 | 13 | Q.   You live in California, right? |
| 16:16:14 | 14 | A.   That's correct. |
| 16:16:14 | 15 | Q.   Is that where you heard it from? |
| 16:16:16 | 16 | A.   Yes. |
| 16:16:18 | 17 | Q.   Okay.  Do you train here in Texas at all? |
| 16:16:20 | 18 | A.   No, I don't. |
| 16:16:21 | 19 | Q.   Okay.  But out in California, you've heard of Zetas? |
| 16:16:24 | 20 | A.   Correct. |
| 16:16:25 | 21 | Q.   And you probably hear about a lot of different drug cartels |
| 16:16:29 | 22 | in Mexico, do you not? |
| 16:16:30 | 23 | A.   Yes. |
| 16:16:30 | 24 | Q.   Okay.  But who told you this guy was a Zeta? |
| 16:16:38 | 25 | A.   Well, he introduced himself, he said, "Zeta Cuarenta." |

| | | |
|---|---|---|
| 16:16:41 | 1 | Q.   Pardon? |
| 16:16:42 | 2 | A.   When he introduced himself. |
| 16:16:43 | 3 | Q.   Oh, okay.  He said, "Zeta Cuarenta"? |
| 16:16:46 | 4 | A.   "Z 40." |
| 16:16:48 | 5 | Q.   That's what he said? |
| 16:16:49 | 6 | A.   Yes. |
| 16:16:50 | 7 | Q.   So now, you Google "Zeta Cuarenta," and there's all kinds of |
| 16:16:54 | 8 | media or internet blogs on it, correct? |
| 16:16:56 | 9 | A.   Yes. |
| 16:16:57 | 10 | Q.   Okay.  Now, when you say that he had bodyguards, were these |
| 16:17:03 | 11 | just two guys that were with him, or was it a militia? |
| 16:17:07 | 12 | A.   No.  There was actually a few guys that were there. |
| 16:17:09 | 13 | Q.   Okay.  Were they just dressed in regular clothes, or did |
| 16:17:12 | 14 | they have Army fatigues? |
| 16:17:13 | 15 | A.   Regular clothes. |
| 16:17:14 | 16 | Q.   Regular clothes? |
| 16:17:15 | 17 | A.   Yes. |
| 16:17:15 | 18 | Q.   Did they have weapons displayed? |
| 16:17:17 | 19 | A.   Yes, they did. |
| 16:17:18 | 20 | Q.   They did? |
| 16:17:18 | 21 | A.   Yes. |
| 16:17:19 | 22 | Q.   What kind of weapons did they have, AR-15s hanging off their |
| 16:17:22 | 23 | shoulders? |
| 16:17:22 | 24 | A.   I wouldn't know the difference of those weapons. |
| 16:17:24 | 25 | Q.   Okay.  But I mean, were they assault weapons? |

| | | |
|---|---|---|
| 16:17:27 | 1 | A.    Yeah.  Big -- the big guns. |
| 16:17:29 | 2 | Q.    Big guns? |
| 16:17:30 | 3 | A.    Yeah. |
| 16:17:30 | 4 | Q.    Okay.  They weren't little pistols that were in their |
| 16:17:35 | 5 | pockets? |
| 16:17:36 | 6 |          MR. DEGEURIN:  May I approach the bench?  I'm sorry.  I |
| 16:17:38 | 7 | have an emergency.  Not bad. |
| 16:17:45 | 8 |          (At the bench, on the record.) |
| 16:17:59 | 9 |          THE COURT:  Yes. |
| 16:18:00 | 10 |          MR. DEGEURIN:  Getting into motion in limine, I want to |
| 16:18:02 | 11 | know how much further you're going to go.  He's kind of hurting, |
| 16:18:08 | 12 | my client. |
| 16:18:08 | 13 |          MR. ESPER:  I'm done. |
| 16:18:11 | 14 |          MR. DEGEURIN:  Oh, you are?  Well, I mean, you picked a |
| 16:18:11 | 15 | good place to stop.  I just -- |
| 16:18:14 | 16 |          MR. GARDNER:  Your Honor, one thing.  Mr. Matt Witman |
| 16:18:18 | 17 | identified two pages as nonbusiness records.  He's completed his |
| 16:18:23 | 18 | new business record affidavit with the two pages and wants to |
| 16:18:26 | 19 | know if he may be excused. |
| 16:18:27 | 20 |          MR. DEGEURIN:  I have no problem. |
| 16:18:35 | 21 |          THE COURT:  Let's do one thing at a time. |
| 16:18:38 | 22 |          MR. DEGEURIN:  Okay. |
| 16:18:39 | 23 |          THE COURT:  You said motion in limine? |
| 16:18:42 | 24 |          MR. DEGEURIN:  I didn't know what else to call it at |
| 16:18:44 | 25 | this moment. |

16:18:45  1          THE COURT:  You wanted to stop the cross-examination?

16:18:48  2  Okay.

16:18:49  3          MR. DEGEURIN:  Yes.

16:18:49  4          THE COURT:  We did.  He says he's through.

16:18:52  5          MR. DEGEURIN:  I'll withdraw the motion in limine.

16:18:53  6          THE COURT:  So there's nothing before the Court.

16:18:55  7          MR. DEGEURIN:  That's correct.

16:18:56  8          THE COURT:  All right.

16:18:57  9          MR. DEGEURIN:  Except that we don't object to releasing

16:19:00  10  him.

16:19:22  11          MR. ESPER:  May I have just one moment, your Honor?

16:19:24  12          THE COURT:  Yes, sir.

16:19:30  13  Q.  (BY MR. ESPER) Finally, Mr. Farias, even after that, you

16:19:33  14  continued training horses for Mr. Nayen, correct?

16:19:36  15  A.  Yes.

16:19:37  16  Q.  Okay.  And that continued all the way up to the time you

16:19:43  17  were arrested in 2012?

16:19:44  18  A.  No.

16:19:45  19  Q.  When did it stop?

16:19:46  20  A.  To December of that year.

16:19:47  21  Q.  Okay.  So in December of 2010, you stopped?

16:19:51  22  A.  Yes.

16:19:52  23  Q.  And did you tell Mr. Nayen?

16:19:57  24  A.  I'm not sure if I got fired or he just took the horses away.

16:20:00  25  Q.  Okay.  He either took them away or you got fired?

16:20:04  1   A.   Yes.  One or the other.

16:20:05  2   Q.   Was he displeased because you weren't winning enough?  Is

16:20:08  3   that --

16:20:08  4   A.   Yes.

16:20:09  5   Q.   Okay.  That's all I have.

16:20:12  6            MR. MAYR:  Just briefly, your Honor.

16:20:14  7                     CROSS-EXAMINATION

16:20:14  8   BY MR. MAYR:

16:20:21  9   Q.   Mr. Farias, were you a one-man operation?  Or did you have

16:20:25  10  any employees assisting you with your horse-training business?

16:20:27  11  A.   I had a lot of employees.

16:20:29  12  Q.   You have a lot of employees?

16:20:31  13  A.   Yes.

16:20:31  14  Q.   Okay.  But I believe you testified that you were personally

16:20:35  15  responsible for sending the invoices to Mr. Nayen?

16:20:38  16  A.   Yes.

16:20:39  17  Q.   And you would personally check to see the payments that were

16:20:43  18  coming back, right?

16:20:44  19  A.   I didn't check them because I had a lot of horses at the

16:20:48  20  time, and I would get a lot of deposits to my account.  So I

16:20:50  21  didn't check them.  I wasn't worried about checking how much

16:20:53  22  money I had in my account.

16:20:54  23  Q.   Okay.  So how did you know that he was paying his bills?

16:20:58  24  A.   Because he would call me and tell me, I had made the

16:21:02  25  deposits already.

16:21:03  1  Q.   And then, you would go and check to see if he made the

16:21:06  2  deposits?

16:21:06  3  A.   Sometimes I will and sometimes I didn't.

16:21:08  4  Q.   But you would check them and you would see that he was

16:21:10  5  making these structured deposits into your account, right?

16:21:13  6  A.   That is correct.

16:21:14  7  Q.   And then, you testified that you had this realization of who

16:21:23  8  you were dealing with when you went home and you got on your

16:21:26  9  computer and Googled "Zeta 40," right?

16:21:29  10  A.   That's correct.

16:21:30  11  Q.   If you don't -- if you didn't know how to use a computer or

16:21:33  12  how to Google someone, you wouldn't have been able to find that

16:21:36  13  out so readily; is that right?

16:21:38  14  A.   That's right.

16:21:39  15  Q.   No further questions, your Honor.

16:21:43  16        THE COURT:  Any redirect?

16:21:44  17        MR. GARDNER:  Thank you, your Honor.

16:21:45  18                   RE-DIRECT EXAMINATION

16:21:45  19  BY MR. GARDNER:

16:21:46  20  Q.   Mr. Farias, Mr. Esper asked about you where you heard about

16:21:50  21  the Zetas, and I believe your response was you heard it in

16:21:54  22  California and it was everywhere.  Does that sound right?

16:21:56  23  A.   That is correct.

16:21:58  24  Q.   Does the fact that the Zetas were involved in the horse

16:22:01  25  business, was that an open secret in the horse-racing business?

| | | |
|---|---|---|
| 16:22:03 | 1 | A.   Yes, it was. |
| 16:22:05 | 2 | MR. DEGEURIN:  Your Honor, I'm going to object to |
| 16:22:06 | 3 | hearsay rumor.  I didn't open that door, and I don't think it was |
| 16:22:11 | 4 | open for everybody.  Object to it under 403. |
| 16:22:16 | 5 | THE COURT:  It's cross-examination.  Or, actually, |
| 16:22:19 | 6 | redirect on what was brought up at cross.  So I overrule your |
| 16:22:23 | 7 | objection. |
| 16:22:23 | 8 | Q.   (BY MR. GARDNER) When I say it's an open secret, what kind |
| 16:22:26 | 9 | of discussions were had among the stables in Los Alamitos where |
| 16:22:29 | 10 | you were at? |
| 16:22:30 | 11 | MR. DEGEURIN:  Again, object.  I think it's going |
| 16:22:32 | 12 | beyond. |
| 16:22:33 | 13 | THE COURT:  I'm going to sustain the objection to that |
| 16:22:35 | 14 | question asked. |
| 16:22:36 | 15 | MR. GARDNER:  Yes, your Honor. |
| 16:22:38 | 16 | Q.   (BY MR. GARDNER) When you put this number into your phone -- |
| 16:22:52 | 17 | by the way, Felipe Quintero, another trainer? |
| 16:22:55 | 18 | A.   Yes, Felipe Quintero. |
| 16:23:01 | 19 | Q.   When you put this number and this name Fernando Z in that |
| 16:23:04 | 20 | phone, did you consider Fernando Garcia as part of this |
| 16:23:06 | 21 | organization? |
| 16:23:08 | 22 | A.   I cannot say he was, but he was with the people. |
| 16:23:12 | 23 | Q.   Okay.  And finally, Mr. Esper asked you about horses that |
| 16:23:19 | 24 | "40" talked to you about that you already had in your stables. |
| 16:23:22 | 25 | Do you recall those questions? |

```
16:23:23   1   A.   Yes.
16:23:23   2   Q.   All right.  I believe on direct, you said Number One Cartel,
16:23:27   3   Blues Girls Choice, Blues Ferrari, Tamaulipas Boy, and a Jaguar
16:23:32   4   XJ?
16:23:32   5   A.   Correct.
16:23:33   6   Q.   Which ones of those horses were associated with Garcia
16:23:36   7   Bloodstock?
16:23:37   8   A.   I cannot recall that.
16:23:39   9   Q.   Would it be safe to say that at least some of those horses
16:23:42  10   were under Garcia Bloodstock?
16:23:43  11   A.   Yes.
16:23:43  12   Q.   I'll pass the witness, your Honor.  One moment, your Honor.
16:24:13  13   Your Honor, may I have one moment?
16:24:14  14              THE COURT:  You may.
16:24:26  15              MR. GARDNER:  I'll pass the witness.
16:24:28  16              THE COURT:  Any further questions?
16:24:29  17              MS. WILLIAMS:  No questions.
16:24:30  18              MR. DEGEURIN:  No further questions, Judge.
16:24:32  19              MR. WOMACK:  One, your Honor.
16:24:32  20                      RE-CROSS EXAMINATION
16:24:32  21   BY MR. WOMACK:
16:24:34  22   Q.   Mr. Farias, when you put this Fernando Z thing in the
16:24:39  23   phonebook, that was purely a joke, wasn't it?
16:24:41  24   A.   Yes, it was.
16:24:41  25   Q.   And Fernando Garcia has never said anything to you to
```

16:24:44   1  suggest that he was involved with the Zetas, did he?

16:24:46   2  A.   That's correct.

16:24:47   3  Q.   Thank you.   No further questions.

16:24:49   4        MR. GARDNER:  Based on that, your Honor, nothing

16:24:52   5  further.

16:24:52   6        THE COURT:  May this witness be excused?

16:24:55   7        MR. WOMACK:  Yes, your Honor.

16:24:56   8        THE COURT:  All right.  You may be excused, sir.

16:24:57   9        THE WITNESS:  Thank you.

16:25:00  10        THE COURT:  Call your next witness.

16:25:02  11        MR. GARDNER:  Thank you, your Honor.

16:25:03  12        I call Mr. Ricardo Barrera.  And may I approach, your

16:25:06  13  Honor?

16:25:10  14        THE COURT:  You may.

16:25:10  15        (At the bench, on the record.)

16:26:00  16        MR. GARDNER:  Ricardo Barrera, your Honor.  Your Honor,

16:26:03  17  Mr. DeGeurin filed a motion in limine with respect to the

16:26:05  18  incidents at the Flor de Maria Ranch in March 2012.  Mr. Barrera

16:26:11  19  will testify to the fact that Mr. Colorado himself in May of 2012

16:26:18  20  admitted to him the events of March 2012, the fact that "Pancho"

16:26:26  21  was at the ranch and Mexican federal -- military federal police

16:26:31  22  authorities stormed the ranch.  Statements, your Honor, shows his

16:26:37  23  connection with the Zetas in my opinion and it's admissible as

16:26:41  24  such.

16:26:41  25        THE COURT:  You don't agree?

16:26:45  1        Members of the jury, I'm going to put you in the jury

16:26:46  2  room.

16:27:42  3        (At the bench, on the record.)

16:27:47  4        MR. ESPER:  I would ask the Court -- I know the Court

16:27:49  5  gives it in its final instructions, but I'd ask the Court to give

16:27:51  6  an instruction to the jury that that one codefendant in the

16:27:56  7  indictment, the defendant has pled guilty is not reflective on

16:27:59  8  other defendants.

16:28:04  9        THE COURT:  That's what we call requested instruction.

16:28:08  10       MR. ESPER:  I understand.

16:28:10  11       THE COURT:  And I'll give it, anyway.

16:28:12  12       MR. ESPER:  I know.

16:28:12  13       THE COURT:  But don't take up the trial time for an

16:28:15  14  instruction at this point.  I'm going to instruct them.

16:28:22  15       MR. ESPER:  Okay.

16:28:23  16       THE COURT:  All right.  You may be seated.  If the

16:28:32  17  witness would be sworn, please.

16:28:34  18       (Witness sworn.)

16:28:57  19       THE COURT:  And if you'll tell us, please, sir, your

16:28:59  20  full name and spell your last, please.

16:29:01  21       THE WITNESS:  Ricardo Barrera.

16:29:05  22       THE COURT:  And spell your last name.

16:29:07  23       THE WITNESS:  B-A-R-R-E-R-A.

16:29:07  24  RICARDO BARRERA, called by the Government, duly sworn.

16:29:10  25

DIRECT EXAMINATION

16:29:10    2  BY MR. GARDNER:

16:29:11    3  Q.   Mr. Barrera, we just had to put the jury out.  I want to

16:29:14    4  talk to you about one specific area, and I'm just going to set

16:29:16    5  the scene for you real quick and you can explain what happened.

16:29:19    6          When we visited with you, you said that an individual

16:29:24    7  you knew as "Pancho" Colorado visited you in May 2012 in Miami.

16:29:30    8  Do you recall that?

16:29:30    9  A.   Approximately, yes.

16:29:31   10  Q.   Okay.  And you told me in an interview with your attorney

16:29:34   11  present that Mr. Colorado related to you an incident where Zetas

16:29:40   12  were killed on his ranch in Mexico?

16:29:42   13  A.   Correct.

16:29:42   14  Q.   Could you please tell the Court what Colorado told you?

16:29:47   15  A.   There was an incident in the ranch that he was not --

16:29:57   16  nothing to do with him.  Most of it is a political issue, nothing

16:30:05   17  for him.  And another thing maybe I can remember.  That some

16:30:17   18  lawyers or something in Mexico were trying to fix that because he

16:30:21   19  was just trying to advise me just if I let -- if I know from the

16:30:25   20  press or from other instances.

16:30:28   21  Q.   Okay.  So did he bring it up or did you bring it up?

16:30:31   22  A.   He bring it up.

16:30:32   23  Q.   Okay.  At the time that he brought it up, were you even

16:30:34   24  aware of the fact that Zetas were on his property in Mexico?

16:30:37   25  A.   No.

| 16:30:38 | 1 | Q.   And with respect to any details, did he tell you when that |
| 16:30:42 | 2 | occurred? |
| 16:30:43 | 3 | A.   I don't remember. |
| 16:30:45 | 4 | Q.   Was it in 2012? |
| 16:30:46 | 5 | A.   Yes. |
| 16:30:47 | 6 | Q.   Did he give you any details of about specifically what |
| 16:30:51 | 7 | happened on that ranch? |
| 16:30:52 | 8 | A.   That the organization or group throw some bodies in his |
| 16:31:00 | 9 | ranch and that's all.  That it was nothing occurred inside the |
| 16:31:07 | 10 | ranch.  That someone throw them inside the ranch but no -- for |
| 16:31:11 | 11 | him, nothing happened inside the ranch. |
| 16:31:13 | 12 | Q.   And when we talk about the ranch, is that Flor de Maria? |
| 16:31:18 | 13 | A.   Correct. |
| 16:31:19 | 14 | Q.   Have you been there before? |
| 16:31:20 | 15 | A.   Yes. |
| 16:31:20 | 16 | Q.   Your Honor, I'd pass the witness to Mr. DeGeurin. |
| 16:31:26 | 17 | THE COURT:  What did he say was thrown? |
| 16:31:30 | 18 | THE WITNESS:  The bodies appear in the ranch. |
| 16:31:39 | 19 | THE INTERPRETER:  I'm sorry, your Honor, could we ask |
| 16:31:40 | 20 | for repetition? |
| 16:31:40 | 21 | THE COURT:  Pardon me? |
| 16:31:41 | 22 | THE INTERPRETER:  We didn't hear.  Could we ask for |
| 16:31:43 | 23 | repetition from the witness? |
| 16:31:44 | 24 | THE COURT:  Yeah.  I asked what was thrown.  I didn't |
| 16:31:46 | 25 | catch that.  He said the bodies. |

16:31:50   1          THE INTERPRETER:  Thank you.

16:31:51   2          THE COURT:  Okay.  Is that the tender?

16:31:53   3          MR. GARDNER:  That is, your Honor.

16:31:54   4          THE COURT:  All right.  The witness may be excused.

16:31:57   5   Just stay outside the door, please.

16:32:19   6          MR. GARDNER:  Your Honor, I would also offer the Court

16:32:21   7   that the next witness, Mr. Arian Jaff, was told the same or

16:32:26   8   similar story by Mr. Cessa, as well.

16:32:31   9          THE COURT:  That bodies -- I don't know if it's of

16:32:39  10   Zetas or bodies of non-Zetas were thrown on his ranch?

16:32:44  11          MR. GARDNER:  Correct, your Honor.

16:32:45  12          THE COURT:  What does that have to do with this case?

16:32:47  13          MR. GARDNER:  Your Honor, obviously the allegation is

16:32:49  14   that Mr. Colorado-Cessa is an associate of the Los Zetas, and we

16:32:54  15   believe that through the testimony of Mr. Barrera and the

16:32:57  16   following testimony of Mr. Jaff in which Mr. Cessa made

16:33:00  17   admissions to them, indicating that he was fully aware that the

16:33:03  18   Zetas were on his ranch and that the Mexican authorities, whether

16:33:08  19   it's military or police, stormed the ranch and killed Zetas.  The

16:33:12  20   government believes that raises the inference Mr. Zeta -- or as

16:33:16  21   Mr. DeGeurin says, Mr. Zeta (sic) was supplying harbor for the

16:33:22  22   Zeta organization.

16:33:23  23          THE COURT:  So you intend to show evidence in 2012 that

16:33:29  24   there were Zetas on Mr. Colorado-Cessa's ranch and that the

16:33:36  25   military or some law enforcement authority went on the ranch and

16:33:43   1   there were bodies left.

16:33:46   2           MR. GARDNER:  That's what Mr. Barrera will testify to,

16:33:49   3   your Honor.  Mr. Jaff has a little more detail than that,

16:33:51   4   according to what Defendant Colorado told him.  Mr. Jaff's here,

16:33:56   5   your Honor.  I don't know if the Court wants to hear him real

16:33:58   6   quick.

16:33:58   7           THE COURT:  Probably will.  I didn't get any of that

16:34:00   8   out of Mr. Barrera.

16:34:03   9           MR. FINN:  I agree with you, Judge.  It was vague and

16:34:06   10  it's a rabbit trail.

16:34:07   11          THE COURT:  I don't know if it's a rabbit trail, but I

16:34:13   12  didn't get anything out of it.

16:34:13   13          MR. SANCHEZ:  Your Honor, if you listen to what the

16:34:15   14  witness said, he actually said that Mr. Colorado denied any

16:34:20   15  involvement with any of the allegations that were brought up in

16:34:23   16  the newspapers about it.  So what they're trying to do is bring

16:34:28   17  in a statement where Mr. Colorado denies any involvement to

16:34:32   18  introduce that that's not true.  And I don't think that's proper

16:34:37   19  and I don't -- it's going to waste a bunch of time.

16:34:40   20          They don't have any witness that can come testify

16:34:42   21  specifically about the event.  Instead, what they're going to do

16:34:45   22  is have Mr. Barrera talk about a conversation that happened in

16:34:48   23  May where my client is saying that he didn't have anything to do

16:34:54   24  with that.  That allegation isn't true.  It's not as it said in

16:34:58   25  the newspaper, and I have the lawyers down in Mexico that are

| | | |
|---|---|---|
| 16:35:00 | 1 | resolving the issue. |
| 16:35:02 | 2 | I think it opens up the door into a lot.  We actually |
| 16:35:06 | 3 | filed a motion to depose certain witnesses to try to clear this |
| 16:35:09 | 4 | up.  We've been asking since as early as August, who are the |
| 16:35:13 | 5 | witnesses that are going to come testify about this particular |
| 16:35:16 | 6 | incident, and we never received a response.  And now, the only |
| 16:35:19 | 7 | response we get is that Mr. Barrera's going to try to introduce |
| 16:35:24 | 8 | some negating statement by Mr. Colorado. |
| 16:35:27 | 9 | THE COURT:  You got plenty of response from me.  I told |
| 16:35:30 | 10 | you to take the depositions at the border.  All they had to do |
| 16:35:33 | 11 | was come across so that they could be taken by an authorized |
| 16:35:36 | 12 | court reporter under oath, and that didn't occur. |
| 16:35:41 | 13 | Let me hear the second witness. |
| 16:35:43 | 14 | MR. GARDNER:  Yes, your Honor.  Mr. Jaff. |
| 16:36:19 | 15 | (Witness sworn.) |
| 16:36:39 | 16 | THE COURT:  If you'll tell us your full name and spell |
| 16:36:44 | 17 | your last please, sir. |
| 16:36:45 | 18 | THE WITNESS:  My name is Arian Jaff.  Last name, |
| 16:36:50 | 19 | J-A-F-F. |
| 16:36:50 | 20 | THE COURT:  And your first name? |
| 16:36:54 | 21 | THE WITNESS:  Arian, A-R-I-A-N. |
| 16:37:01 | 22 | THE COURT:  Mr. Jaff, it seems to me that you are |
| 16:37:03 | 23 | totally fluent in English.  You don't require an interpreter? |
| 16:37:08 | 24 | THE WITNESS:  No.  I do not.  I don't. |
| 16:37:09 | 25 | THE COURT:  You may proceed. |

16:37:09   1          ARIAN JAFF, called by the Government, duly sworn.

16:37:09   2                        DIRECT EXAMINATION

16:37:09   3   BY MR. GARDNER:

16:37:11   4   Q.   Mr. Jaff, we're here right now just for a very limited

16:37:14   5   purpose.  So let me sort of set the scene for you.

16:37:18   6          When you and I talked, you mentioned the fact that

16:37:21   7   Pancho Colorado made a statement to you about an incident that

16:37:24   8   occurred at his Flor de Maria Ranch in 2012.  Do you recall that?

16:37:32   9   A.   Yes, I do.

16:37:33   10  Q.   Okay.  Can you please tell the Court, in as much detail as

16:37:36   11  you can recall, what "Pancho" Colorado told you about that

16:37:37   12  incident?

16:37:38   13  A.   Yes.  I had a conversation with "Pancho" Colorado on --

16:37:44   14  through Nextel and he told me that --

16:37:48   15              THE COURT:  On what, sir?

16:37:50   16              THE WITNESS:  Through Nextel phone that there had been

16:37:58   17  a chase through the military and some armed guys from the Zeta

16:38:05   18  cartel had taken a hard left and gone into his ranch, and there

16:38:11   19  had been a fight, gunfight, and he had been accused of being part

16:38:15   20  of that, but he had nothing to do with it.

16:38:19   21  Q.   (BY MR. GARDNER) And did you initiate that conversation or

16:38:21   22  did "Pancho" Colorado initiate the conversation?

16:38:24   23  A.   No.  He told me about it.

16:38:25   24  Q.   What was the nature of the call?  Did you call him or did he

16:38:28   25  call you?

| | | |
|---|---|---|
| 16:38:28 | 1 | A.   I called him. |
| 16:38:29 | 2 | Q.   Do you recall when this conversation occurred? |
| 16:38:38 | 3 | A.   Not exact dates, but I believe around April 2012. |
| 16:38:42 | 4 | Q.   And you've been to the Defendant Colorado's ranch in Tuxpan? |
| 16:38:48 | 5 | A.   I have been there. |
| 16:38:49 | 6 | Q.   Okay.  Do you recall the name of that ranch? |
| 16:38:52 | 7 | A.   Flor de Maria. |
| 16:38:53 | 8 | MR. GARDNER:  Your Honor, that's all.  That's the |
| 16:38:55 | 9 | tender. |
| 16:38:55 | 10 | THE COURT:  The objection is sustained.  All right. |
| 16:38:59 | 11 | MR. GARDNER:  Thank you, Mr. Jaff. |
| 16:39:00 | 12 | THE WITNESS:  I can leave? |
| 16:39:02 | 13 | MR. GARDNER:  Not forever. |
| 16:39:03 | 14 | THE COURT:  You can leave right now, though. |
| 16:39:05 | 15 | MR. GARDNER:  Nice try, though. |
| 16:39:07 | 16 | THE COURT:  Let's take a short break and we'll go ten |
| 16:39:08 | 17 | minutes. |
| 16:46:53 | 18 | (Recess.) |
| 16:49:48 | 19 | (Jury present.) |
| 16:51:05 | 20 | THE COURT:  Have we got everybody back now?  You may |
| 16:51:21 | 21 | proceed, sir. |
| 16:51:22 | 22 | MR. GARDNER:  Thank you, your Honor.  We would call -- |
| 16:51:24 | 23 | recall Mr. Barrera. |
| 16:52:13 | 24 | THE COURT:  Members of the jury, I've already placed |
| 16:52:15 | 25 | Mr. Barrera under oath in the circumstances.  So you understand |

| | | |
|---|---|---|
| 16:52:21 | 1 | you're under oath? |
| 16:52:21 | 2 | THE WITNESS:  That's fine. |
| 16:52:22 | 3 | THE COURT:  Okay. |
| 16:52:23 | 4 | DIRECT EXAMINATION (Resumed) |
| 16:52:23 | 5 | BY MR. GARDNER: |
| 16:52:24 | 6 | Q.   Mr. Barrera, if you could, pull that microphone just a |
| 16:52:28 | 7 | little bit closer. |
| 16:52:29 | 8 | A.   That's okay? |
| 16:52:29 | 9 | Q.   Yes.  Perfect.  Thank you, sir. |
| 16:52:31 | 10 | Could you please introduce yourself to the jury?  Tell |
| 16:52:33 | 11 | them who you are and what you do for a living. |
| 16:52:35 | 12 | A.   I'm Ricardo Barrera.  I'm a private banking and work in the |
| 16:52:41 | 13 | private banking sector since -- for 19 years.  The first eight |
| 16:52:47 | 14 | years in private banking in Mexico and the last eleven here in |
| 16:52:52 | 15 | the United States.  I live in Miami, and I work in private |
| 16:52:58 | 16 | banking in the wealth management sector. |
| 16:53:00 | 17 | Q.   And what bank are you currently employed by? |
| 16:53:03 | 18 | A.   Actually, I'm employed by UBS, United Bank of Switzerland |
| 16:53:09 | 19 | based in Miami. |
| 16:53:10 | 20 | Q.   That's an international bank? |
| 16:53:12 | 21 | A.   Correct. |
| 16:53:13 | 22 | Q.   And when you say wealth management, can you explain that a |
| 16:53:15 | 23 | little bit more to the ladies and gentlemen of the jury? |
| 16:53:17 | 24 | A.   Correct.  Wealth management, we manage -- financial advisor |
| 16:53:23 | 25 | for international accounts and for the Mexican market.  And what |

16:53:29  1   I do daily basically is managing investments for a lot of

16:53:36  2   American clients and Mexican clients, his wealth, his money that

16:53:43  3   they have that they want to have outside his business or outside

16:53:46  4   his country.

16:53:48  5   Q.   And is that a personal wealth management or a business

16:53:53  6   wealth management?

16:53:53  7   A.   Correct.  Both.  Basically it's the core.  It's on the

16:54:01  8   personal management or family wealth.  And we use sometimes the

16:54:09  9   corporate services to clients.  Most of our clients are

16:54:16  10  entrepreneurs, businessmen, so they have corporations that we can

16:54:23  11  do some business there, as well.

16:54:24  12  Q.   And you also provide loan services to your clients?

16:54:27  13  A.   Correct.

16:54:28  14  Q.   And what do you usually use as collateral?  I'm sorry.  What

16:54:33  15  does UBS usually use as collateral for these loans?

16:54:37  16  A.   We are a wealth management bank.  We are not a corporate

16:54:42  17  bank.  We used to have service of loans and as a collateral, we

16:54:49  18  use their investments.  We -- we can make loans for the

16:54:55  19  corporations and basically use collateral on their investments.

16:55:00  20  Q.   So, for example, if I had $10 million in your bank but I

16:55:04  21  wanted to borrow $12 million for my business, could I?

16:55:07  22  A.   Impossible.

16:55:08  23  Q.   Possible?

16:55:09  24  A.   $12 million loan, it's impossible.

16:55:15  25  Q.   What if I want -- good to know.  So if I wanted to borrow --

| | | |
|---|---|---|
| 16:55:23 | 1 | what was the most I could borrow on $10 million? |
| 16:55:26 | 2 | A.   Correct.  Based on the investments on their risk profile on |
| 16:55:33 | 3 | the investment classified, most of our clients are international |
| 16:55:38 | 4 | clients are on the conservative or moderate risk profile because |
| 16:55:42 | 5 | they don't want to speculate on the money they have outside.  So |
| 16:55:49 | 6 | the loan-to-value for what we made for those expenses, it depends |
| 16:55:54 | 7 | on the risk profile, but it's between 50, 60, 80 percent of their |
| 16:55:58 | 8 | investments. |
| 16:55:59 | 9 | Q.   Okay.  So if I was a strong credit, I could probably get an |
| 16:56:03 | 10 | $8 million loan? |
| 16:56:03 | 11 | A.   Correct. |
| 16:56:04 | 12 | Q.   Sir, do you know an individual by the name of Francisco |
| 16:56:09 | 13 | Colorado-Cessa? |
| 16:56:09 | 14 | A.   Excuse me, can you repeat that? |
| 16:56:11 | 15 | Q.   Do you know an individual by the name of Francisco |
| 16:56:14 | 16 | Colorado-Cessa? |
| 16:56:16 | 17 | A.   Correct. |
| 16:56:16 | 18 | Q.   And do you see him in the courtroom here today? |
| 16:56:17 | 19 | A.   Yes. |
| 16:56:18 | 20 | Q.   Okay.  And is this the individual standing back here?  Your |
| 16:56:21 | 21 | Honor, may the record reflect the witness has identified the |
| 16:56:22 | 22 | defendant? |
| 16:56:22 | 23 | THE COURT:  So reflects. |
| 16:56:23 | 24 | Q.   (BY MR. GARDNER) When did you first meet the Defendant |
| 16:56:27 | 25 | Colorado? |

16:56:27  1   A.   When?

16:56:28  2   Q.   Yes, sir.   When?

16:56:30  3   A.   I don't remember the month exactly, but it's around 2005 in

16:56:37  4   Tuxpan.

16:56:37  5   Q.   And were you working for UBS at that time?

16:56:40  6   A.   No.

16:56:40  7   Q.   Who were you working for at that time?

16:56:41  8   A.   American Express Bank.

16:56:43  9   Q.   And were you performing the same type of services for

16:56:45  10  American Express?

16:56:46  11  A.   Correct.

16:56:46  12  Q.   And how did you come to meet the Defendant Colorado?

16:56:50  13  A.   He was referred by a referral agent that I have in Mexico.

16:56:56  14  Referral agents are pretty common in this industry so they refer

16:57:01  15  us to different type of clients.   And in this case, it was a

16:57:06  16  referral to Mr. Colorado.   And Tuxpan is not a very popular town

16:57:12  17  or city to have private banking service and this -- it was by a

16:57:16  18  referral agent.

16:57:17  19  Q.   And where in Tuxpan did you meet the Defendant Colorado?

16:57:21  20  A.   At his ranch at Flor de Maria.

16:57:24  21  Q.   And how many times since that first meeting have you been at

16:57:29  22  that ranch?

16:57:32  23  A.   I usually visited once a year.   And in the last three years

16:57:38  24  and 2010, 2011, I visit like two or three times a year because

16:57:46  25  about different services he wants on his corporate account.

16:57:53   1   Q.   And if you will, Mr. Barrera, I just want you to physically

16:57:57   2   describe how you get to the ranch and the layout of the ranch in

16:58:02   3   general, please.

16:58:03   4   A.   Okay.  To get to Tuxpan is not easy.  It's a little bit

16:58:08   5   complicated.  You have to fly from Mexico City to Poza Rica.  And

16:58:12   6   Poza Rica, it's about 50 minutes to Tuxpan, Veracruz driving.

16:58:21   7   And the Flor de Maria ranch is almost in Tuxpan.  It's about

16:58:25   8   three or four, five miles before right into Tuxpan.  And the

16:58:31   9   ranch is located just in the side of the main highway from Tuxpan

16:58:38   10  to Poza Rica.

16:58:41   11  Q.   And when you enter the ranch, is there a office on the

16:58:44   12  ranch?

16:58:44   13  A.   Of course.  It's his house and corporate offices.

16:58:48   14  Q.   Okay.  And does he live in that house?

16:58:50   15  A.   As I understand, no.  He lives in Tuxpan.

16:58:54   16  Q.   And how far is that office located from the road on Flor de

16:59:01   17  Maria, the ranch office?

16:59:02   18  A.   How far from?

16:59:04   19  Q.   Yeah.  Approximately how far -- say, you go on the road and

16:59:07   20  you turn off into the ranch.  How far into the ranch do you have

16:59:10   21  to travel till you get to the house?

16:59:12   22  A.   Immediately.

16:59:13   23  Q.   Would you say 50 to 100 meters?

16:59:15   24  A.   Yes.  It's just parking lot and you enter into the office.

16:59:22   25  Q.   Could you describe the interior of the office for the ladies

16:59:27  1   and gentlemen of the jury?

16:59:27  2   A.   Normal common offices.  There's like a headquarters of his

16:59:35  3   company.  If describe a little, just in opening the door, you can

16:59:43  4   find -- it's very curious, but you can find crystal showcase of a

16:59:50  5   horse, of a fossil horse that he is a fan of horses.

16:59:55  6   Q.   And just outside of the office building, could you describe

16:59:59  7   any other outbuildings surrounding the headquarters?

17:00:04  8   A.   No.  There's no other buildings.  Just behind those

17:00:09  9   corporate offices, he has the horse stables and you can see them.

17:00:18  10  Q.   And during the time that you visited that place, are there,

17:00:22  11  in fact, horses on the ranch?

17:00:23  12  A.   Yes.

17:00:24  13  Q.   Is there also cattle on the ranch?

17:00:26  14  A.   Excuse me?

17:00:26  15  Q.   Is there also cattle, cows on the ranch?

17:00:28  16  A.   A few.  There are few.  The ranch is very big, so I just

17:00:34  17  visit just around the office, not all the ranch because it's --

17:00:38  18  the ranch is big.

17:00:39  19  Q.   All right.  So going back to the meeting, what did you

17:00:44  20  discuss with the Defendant Colorado regarding investments?

17:00:47  21  A.   On my first day?

17:00:49  22  Q.   Yes, sir.

17:00:52  23  A.   He wants me to explain about our capabilities and services

17:00:56  24  outside Mexico.  As he told me in the first meeting, he doesn't

17:01:01  25  have any private banking relationship in -- outside Mexico.  So

17:01:08  1  he wanted to understand how it works.  And especially specific

17:01:14  2  services on the deposits like that, as a very conservative

17:01:22  3  business that he has.

17:01:22  4  Q.   And, again, if you will, what year was that?  I know you

17:01:25  5  weren't clear on the month, but what was the year again?

17:01:27  6  A.   Excuse me?

17:01:28  7  Q.   What was the year of that meeting?

17:01:29  8  A.   Must be 2005.

17:01:33  9  Q.   Did you eventually sign the Defendant Colorado up as a

17:01:37  10  client?

17:01:37  11  A.   Excuse me?

17:01:38  12  Q.   Did you eventually retain Defendant Colorado as a client of

17:01:43  13  yours?

17:01:48  14  A.   Before 2005?

17:01:50  15  Q.   No, sir.  After.  After that first meeting.  I'm sorry.

17:01:53  16  A.   Yes.  2006, he opens the account with American Express at

17:01:57  17  that time.

17:01:57  18  Q.   And what type of account is that?

17:02:01  19  A.   I don't remember the month exactly.

17:02:06  20  Q.   Do you recall how he funded that account?

17:02:09  21  A.   I don't remember exactly.  Could be Mexican pesos.

17:02:16  22  Q.   And so, how long were you at American Express in 2005 until

17:02:21  23  your current employment at UBS?

17:02:23  24  A.   Until 2009.  I just remember that in 2007, American Express

17:02:28  25  sold its private banking to another institution named Standard

17:02:35  1  Charter.  And I was with the Standard Charter until 2008, and I

17:02:38  2  moved to UBS on August 1st.

17:02:43  3  Q.   Okay.  And did you bring Mr. Colorado with you from American

17:02:48  4  Express to Standard Charter as a client?

17:02:51  5  A.   I don't have to bring him.  It was an automatic transfer for

17:02:57  6  all clients when Standard Charter bought American Express.  It

17:02:59  7  was an immediate transfer for clients.

17:03:02  8  Q.   And how about when you left Standard Charter, went to UBS?

17:03:06  9  A.   I spoke with all my clients to offer them and to advise them

17:03:11  10  that I will move to UBS and that if they want to move, as well,

17:03:16  11  they can do it.

17:03:17  12  Q.   And did the Defendant Colorado choose to move with you to

17:03:21  13  UBS?

17:03:22  14  A.   No not immediately.  He moved.

17:03:24  15  Q.   And, again, what year was that, sir?

17:03:26  16  A.   I believe that it was in 2010 that he moves.

17:03:31  17  Q.   Are you aware what the Defendant Colorado did for a living?

17:03:36  18  A.   Yes.  He is from the oil and gas industry, petro business.

17:03:43  19  Q.   I think part of what you said earlier was that you evaluate

17:03:47  20  the risk.  As his wealth manager, do you undertake an evaluation

17:03:53  21  of his company in this case?

17:03:57  22  A.   Personally, I don't -- it's not part of my job.  I'm not the

17:04:02  23  expert on the -- we name that service investment bank.  As a

17:04:08  24  bank, we have that service, that type of abilities with a

17:04:11  25  different business in the bank.  And he was interested on

17:04:16   1   tentative setting up his company.  I referred that job to a

17:04:22   2   specific person at UBS.

17:04:26   3   Q.   I want to get there in a second, but you mentioned something

17:04:28   4   so I'll just cover it now.  Showing you Government's Exhibit

17:04:32   5   252K.  Specifically, Bates stamp No. 62113.

17:04:50   6            Was this provided to you by the Defendant Colorado or

17:04:54   7   provided to your company UBS by Defendant Colorado?

17:04:57   8   A.   It was provided by the company to UBS.

17:05:00   9   Q.   Okay.  ADT Petro Servicios?

17:05:02   10   A.   Correct.

17:05:03   11   Q.   And I've also seen a 2009 statement, as well?

17:05:13   12   A.   Correct.

17:05:14   13   Q.   And a 2010 statement?

17:05:18   14   A.   Correct.

17:05:19   15   Q.   And I'm showing you a different statement, but it's also

17:05:28   16   dated 2008 up here, sir.  What's the difference between this

17:05:34   17   financial statement and the previous one I showed you on this

17:05:40   18   page?

17:05:42   19   A.   As a policy, UBS asked for statements on the corporate and

17:05:47   20   we made -- we have corporate accounts, and one is like to prove a

17:05:55   21   company is outstanding.  Second, if he asked for loans, our loan

17:06:00   22   department wants to see statements regarding that we have a

17:06:03   23   collateral as a business.  They want to know that the company's

17:06:07   24   solvent or it's working.  And every year, they require financial

17:06:13   25   statements audited.  And sometimes the client don't have those

17:06:19    1   audited in time, and sometimes they send those internal

17:06:23    2   statements or sometimes they're audited.  But I cannot confirm to

17:06:27    3   you that one is audited and one is not.  I cannot -- it is not

17:06:32    4   part of my job, but I don't know who is -- if that's the case if

17:06:37    5   one is audited or not.

17:06:38    6   Q.   Okay.  So we have a statement here 2008 with no signatures,

17:06:41    7   correct?  And that's 621133 for the record.

17:06:45    8   A.   Uh-huh.

17:06:46    9   Q.   And we also have a 2008 with signatures, correct?

17:06:49   10   A.   Uh-huh.

17:06:50   11   Q.   You don't check these to make sure that the numbers are

17:06:54   12   adding up?

17:06:54   13   A.   Correct.

17:06:55   14   Q.   Okay.  That's another department within your bank?

17:06:57   15   A.   Correct.  The loan department.

17:06:59   16   Q.   And were those documents provided to Special Agent Fernald

17:07:03   17   for his analysis?  Michael Fernald?

17:07:08   18   A.   Who?

17:07:09   19   Q.   Special Agent Michael Fernald, the other individual who has

17:07:12   20   been sitting in on the interviews with me?

17:07:14   21   A.   Okay.  Correct.

17:07:15   22   Q.   Okay.  The IRS agent?

17:07:17   23   A.   Yes.

17:07:17   24   Q.   Thank you.  Sorry.

17:07:18   25   A.   I forgot his name, sir.

| | | |
|---|---|---|
| 17:07:28 | 1 | Q.   Now, you talked a little bit about him wanting to sell the |
| 17:07:32 | 2 | company.  I want to go back a little bit. |
| 17:07:33 | 3 | So in 2009, did he have a personal and a corporate |
| 17:07:36 | 4 | account? |
| 17:07:37 | 5 | A.   At Standard Charter, only personal account. |
| 17:07:40 | 6 | Q.   What about when he moved to UBS? |
| 17:07:44 | 7 | A.   He begins with a personal account and during 2010, he opened |
| 17:07:49 | 8 | a corporate account, as well. |
| 17:07:53 | 9 | Q.   Now, when you're interviewing the clients, do you request of |
| 17:07:59 | 10 | him what his comfort level is in terms of risk? |
| 17:08:03 | 11 | A.   Of course. |
| 17:08:04 | 12 | Q.   And what was Defendant Colorado's comfort level in terms of |
| 17:08:08 | 13 | risk? |
| 17:08:09 | 14 | A.   On his investments side? |
| 17:08:11 | 15 | Q.   Yes, sir. |
| 17:08:11 | 16 | A.   Conservative. |
| 17:08:12 | 17 | Q.   Conservative? |
| 17:08:13 | 18 | A.   Yes.  Clearly with no equity exposure. |
| 17:08:19 | 19 | Q.   And when you say no equity exposure, what does that mean? |
| 17:08:22 | 20 | A.   Stocks. |
| 17:08:23 | 21 | Q.   Stocks? |
| 17:08:23 | 22 | A.   Correct. |
| 17:08:24 | 23 | Q.   Don't want to risk my stocks? |
| 17:08:26 | 24 | A.   Correct. |
| 17:08:26 | 25 | Q.   And so, what type of returns at least for UBS in your |

17:08:31  1  account managements does a conservative investor expect, a

17:08:36  2  percentage?

17:08:36  3  A.   Okay.  Usually it depends on the year and depends on the

17:08:42  4  economical environment of the country, of the world, but it could

17:08:47  5  be around two percent to six or seven percent.

17:08:52  6  Q.   And what type of investments did you recommend to Defendant

17:08:58  7  Colorado?

17:08:58  8  A.   Most of them, between six or seven percent must be on the

17:09:06  9  fixed-income side that you have government agency bonds, some

17:09:13  10  government agencies, corporate bonds.  And we give outside as an

17:09:24  11  investment as a buffer on return and some currency trading

17:09:27  12  between Mexican peso and U.S. dollar.

17:09:29  13  Q.   And those are all investments based on your recommendations?

17:09:32  14  A.   Correct.

17:09:32  15  Q.   And on the dual currency that you mention, what type of

17:09:35  16  return do you get on that type of investment?

17:09:38  17  A.   Between five to seven percent, eight percent.

17:09:43  18  Q.   Now, going back to Defendant Colorado's business, do you

17:09:52  19  recall the name of the business?

17:09:54  20  A.   ADT Petro Servicios.

17:09:56  21  Q.   Did you ever meet any of the other executives or directors

17:09:59  22  of that business?

17:10:03  23  A.   I met one time with like his CFO, Mr. Francisco Deschamps.

17:10:12  24  Q.   Deschamps?

17:10:13  25  A.   Correct.

| | | |
|---|---|---|
| 17:10:14 | 1 | Q.   Is that D-E-S-C-H-A-M-P-S? |
| 17:10:18 | 2 | A.   Correct. |
| 17:10:19 | 3 | Q.   Deschamps.  Did you ever meet with an individual named |
| 17:10:23 | 4 | Francisco Silva-Ramos? |
| 17:10:27 | 5 | A.   No. |
| 17:10:28 | 6 | Q.   Is that name familiar to you? |
| 17:10:30 | 7 | A.   No. |
| 17:10:33 | 8 | Q.   Do you know the Defendant Colorado's wife? |
| 17:10:36 | 9 | A.   Correct. |
| 17:10:37 | 10 | Q.   And what is her name? |
| 17:10:38 | 11 | A.   Maria Alma Salman-Rocha. |
| 17:10:43 | 12 | Q.   Have you met her on various occasions? |
| 17:10:46 | 13 | A.   Because she worked as well on the accountability side of the |
| 17:10:52 | 14 | business. |
| 17:10:52 | 15 | Q.   When you say accountability side, could you explain that a |
| 17:10:55 | 16 | little bit farther, what her role was? |
| 17:10:57 | 17 | A.   Exactly, I don't know the role, but she was in charge of the |
| 17:11:03 | 18 | checking accounts and cash available for payments, et cetera. |
| 17:11:11 | 19 | Q.   We would call that -- I guess maybe the term -- |
| 17:11:11 | 20 | A.   Treasurer. |
| 17:11:16 | 21 | Q.   -- accounting office? |
| 17:11:17 | 22 | A.   Yes. |
| 17:11:21 | 23 | Q.   Did the Defendant Colorado state how long he'd been involved |
| 17:11:24 | 24 | in the oil business? |
| 17:11:28 | 25 | A.   The first meeting we have, he told me that it was around 15 |

17:11:36   1   -- between 20 years at that time.  So right now, it's almost 30

17:11:46   2   years.

17:11:46   3   Q.   And did he say specifically what his company did?  He just

17:11:50   4   talked about oil services.  Could you be more specific, please?

17:11:53   5   A.   ADT has a different type of business.  The very common one

17:12:00   6   was in the restoration, sanitation and transportation of oil

17:12:11   7   receivers.  ADT has four containment centers in the country.  One

17:12:18   8   is in Tabasco, two are in Veracruz, and one is in Tampico.  The

17:12:25   9   other side of the business was on the construction and

17:12:30   10   development highways and bridges, like signal construction.  And

17:12:38   11   the other one that is at the end, it was in the drilling oil

17:12:44   12   inland.  And I don't exactly he was listing for that specific job

17:12:51   13   or he was in that job specifically, but he owns drilling

17:12:54   14   machines.

17:12:56   15   Q.   We'll talk about the drilling machines in a second.  That's

17:12:59   16   associated with a company called MTTM?

17:13:02   17   A.   Correct.  That's another company he has.  I don't know it's

17:13:10   18   as it should have, but it's another company entity TrasCo,

17:13:13   19   Transportation Colorado.

17:13:14   20   Q.   So from 2009 to 2010, he has a personal wealth management

17:13:18   21   account with you?

17:13:20   22   A.   Correct.

17:13:21   23   Q.   What type of activity is going on in that account in 2009

17:13:25   24   and 2010 generally?

17:13:27   25   A.   Personal or both?

17:13:28   1   Q.   Personal right now.

17:13:29   2   A.   The personal account, usually he has all his investments and

17:13:37   3   sometimes we receive funds to that account.  He used to have

17:13:41   4   corporate and personal account, but most of it to the personal

17:13:45   5   account, it was for his investments.

17:13:47   6   Q.   What type of expenditures or withdrawals did he make from

17:13:52   7   that personal account?

17:13:53   8   A.   On the personal account?

17:13:54   9   Q.   Yes, sir.  Just personal right now.

17:13:58   10   A.   Most of them of the most common was he has an American

17:14:04   11   Express card that he used to travel, and that it was related to

17:14:07   12   his personal account.  And I don't remember some of the payments

17:14:13   13   who are in exactly which one are for the personal and which one

17:14:17   14   are for the corporate.  But there were payments related to the

17:14:24   15   company sometimes and sometimes personal expenses.

17:14:30   16   Q.   You keyed up my memory.  You said you didn't know which ones

17:14:35   17   were for the personal account and which ones were for the

17:14:38   18   corporate account.  Did Defendant Colorado often mix his personal

17:14:40   19   expenses with his corporate expenses?

17:14:43   20   A.   A lot.

17:14:45   21   Q.   Can you describe for the jury Defendant Colorado's sort of

17:14:50   22   financial awareness or intelligence, for lack of a better word?

17:14:56   23   Let me back up.

17:14:57   24        How savvy of an investor was the Defendant Colorado?

17:15:01   25   A.   Not sophisticated.

| | | |
|---|---|---|
| 17:15:02 | 1 | Q.   Not sophisticated? |
| 17:15:03 | 2 | A.   Correct. |
| 17:15:04 | 3 | Q.   And can you give us an example of that? |
| 17:15:07 | 4 | A.   On investment sides, he relied on my advice and he -- when |
| 17:15:14 | 5 | we have a meeting, we always talk about economics and what is |
| 17:15:18 | 6 | happening around the world and how he was impacted in his |
| 17:15:21 | 7 | portfolio.  But as a conservative, as I told you before that he |
| 17:15:25 | 8 | was a risk, his portfolio or his investments were not volatile. |
| 17:15:33 | 9 | So I was trying to explain him on detail each portfolio he has, |
| 17:15:41 | 10 | but he was not too sophisticated to be involved, or he don't want |
| 17:15:48 | 11 | to be involved a lot on that type because he relied on my advice. |
| 17:15:52 | 12 | Q.   You said earlier that at one point, the Defendant Colorado |
| 17:15:55 | 13 | wished to sell his company? |
| 17:15:57 | 14 | A.   Correct. |
| 17:15:58 | 15 | Q.   Did he approach you about that? |
| 17:16:01 | 16 | A.   Yes.  I was the one who approached that service because UBS |
| 17:16:09 | 17 | as a differentiator with our competitors, we used to approach the |
| 17:16:14 | 18 | client as well as on his corporate because his wealth -- or his |
| 17:16:23 | 19 | heart on his wealth is in the corporate because it's where they |
| 17:16:29 | 20 | build, and when we have cash derivative from his corporate, it's |
| 17:16:38 | 21 | a very good part for us.  But they want to hear more about his |
| 17:16:42 | 22 | corporate. |
| 17:16:43 | 23 |       So as a competitor and to differentiate about our |
| 17:16:49 | 24 | competitors, I tried to approach him on the corporate side, as |
| 17:16:52 | 25 | well.  And we have -- UBS has a service that we call this |

17:16:57　1　investment bank.  That investment bank, usually what it makes is

17:17:02　2　mergers, acquisitions, build some cash for the companies.  Very

17:17:10　3　sophisticated services that are very expensive.  Usually it's for

17:17:14　4　very large companies.  So we make those services for our clients

17:17:21　5　or family businesses.

17:17:22　6　　　　　　And when I explain him about services of the name CAG,

17:17:28　7　these Corporate Advisory Group, he told me that he will be

17:17:31　8　interested on selling his company in 2010.

17:17:34　9　Q.  And what's the CAG, as you called it, the Corporate Advisory

17:17:39　10　Group?  What do they do with relation to selling a company?

17:17:45　11　What's their function?

17:17:45　12　A.  Correct.  They first met with the client because some

17:17:49　13　clients say that they want to sell their business or family

17:17:54　14　business, but they are not prepared to do it or, really, they

17:17:57　15　don't want to do it when you try to explain to them.  And he was

17:18:03　16　convinced that he wants to do it.  And their second part of the

17:18:09　17　job is this route to being involved in a due diligence where we

17:18:14　18　do due diligence is to go inside of the company on the

17:18:17　19　financially and operating, to know more about the company,

17:18:21　20　because we need to know the value of the company to have

17:18:25　21　potential buyers interested in the company.

17:18:28　22　Q.  And based on that CAG report, was the company in good enough

17:18:33　23　shape to sell?

17:18:34　24　A.  Excuse me?

17:18:35　25　Q.  Was the company in financial straits -- I'm not a banker.  I

17:18:41  1  apologize.

17:18:42  2  A.   Don't worry.

17:18:43  3  Q.   Was the company financially sound enough to sell based on

17:18:46  4  the CAG report?

17:18:46  5  A.   On the operation -- it's a very good question because on the

17:18:50  6  operation outside, it's -- and we informed that to Mr. Colorado.

17:18:56  7  On the operational side, the company was very, very good because

17:19:00  8  we understand they have international clients and Pemex as his

17:19:07  9  main client.  And in the financial side, it was very weak because

17:19:13  10  we found that he was commingling some expenses and some activity

17:19:20  11  between personal thing -- personal things and corporate expenses.

17:19:26  12  So at that time we were recommending him to fix that and to have

17:19:34  13  balance.

17:19:34  14  Q.   Do you know if he ever did fix that financial side of the

17:19:37  15  company?

17:19:37  16  A.   We recommend him to have experts or a firm who is expert to

17:19:45  17  doing that.  We have potential three firms that were interested

17:19:51  18  on trying to fix that.  They told us that it was very common and

17:19:55  19  popular to have those type of problems on -- in family

17:19:59  20  businesses, that they combine or comingle different type of

17:20:05  21  expenses.  And we visit three of them and we decide one of them

17:20:11  22  that it was a very large and prestigious firm because it had

17:20:17  23  international buyers.  We want to have that -- a good firm to

17:20:22  24  evaluate the financials.

17:20:24  25  Q.   Was that Price Waterhouse?

17:20:25  1  A.    Correct.  Price Waterhouse.

17:20:26  2  Q.    Now, how did ADT make its money?

17:20:32  3  A.    How?

17:20:33  4  Q.    Right.

17:20:36  5  A.    Basically it's by contracts and that he went with different

17:20:41  6  clients.  But as I understand, his 70 or 80 percent of their

17:20:46  7  revenue came from Pemex.

17:20:47  8  Q.    And was there some point when you became aware that ADT

17:20:52  9  Petro Servicios was suspended from any Pemex contracts?

17:20:56  10  A.    We found that on -- I think it was on the end of 2011, when

17:21:03  11  Mr. Colorado wants to increase his loan facility or his line of

17:21:07  12  credit.  And what we asked -- we asked, it was not more legally,

17:21:15  13  it was more on the environmental issue, not legal issue.

17:21:20  14  Q.    But nonetheless, he was suspended from any Pemex contracts.

17:21:25  15  So the source of his income would have stopped, regardless of the

17:21:27  16  underlying reason for suspension.

17:21:31  17  A.    As I understand, he was doing business with Pemex with

17:21:35  18  different companies.  Not exactly ADT, with a different company.

17:21:41  19  I don't remember the name.

17:21:42  20  Q.    And does the name or the name of the company with the

17:21:44  21  initials P-I-I-G-G, does that sound familiar?

17:21:50  22  A.    It sounds familiar.  Maybe.  I don't know.

17:21:52  23  Q.    And you mentioned earlier another company MTTM?

17:21:55  24  A.    Correct.

17:21:56  25  Q.    All right.  When was that company formed?

17:21:59  1   A.   When was the company what?

17:22:01  2   Q.   When was the MTTM company formed?

17:22:04  3   A.   I don't know.

17:22:05  4   Q.   Do you know if it was before or after the suspension of the

17:22:09  5   Pemex contracts?

17:22:09  6   A.   I don't know.

17:22:10  7   Q.   Did you ever know the amount of salary that ADT Petro

17:22:18  8   Servicios paid Defendant Colorado?

17:22:20  9   A.   No.  I don't know.

17:22:21  10  Q.   He never let that be known to you?

17:22:24  11  A.   No.  I don't know that.

17:22:25  12  Q.   So how would he obtain his funds then?

17:22:31  13  A.   By dealing from the ADT.

17:22:35  14  Q.   From the corporation?

17:22:36  15  A.   Corporation.  Correct.

17:22:39  16  Q.   Are you aware of some of Mr. Cessa's -- Defendant

17:22:52  17  Colorado-Cessa's other activities outside of his business --

17:22:56  18  A.   No.

17:22:56  19  Q.   -- dealings?  Has he ever expressed to you his desire to

17:23:04  20  race horses or raise horses?

17:23:06  21  A.   Yes.  But not -- as I understand, not as a business, as more

17:23:10  22  as a hobby or passion.

17:23:13  23  Q.   Hobby or passion?

17:23:14  24  A.   Yes.

17:23:14  25  Q.   Do you know if he had any other interests in Tuxpan other

17:23:22   1   than -- and I'm talking business interest other than ADT?

17:23:25   2   A.   No.  Well, he told me about if we sold his company and he

17:23:33   3   will retire and maybe involve his kids, his sons on new business

17:23:40   4   on the same sector, but more in the drilling side on the sea, but

17:23:45   5   it will be his own ADT.

17:23:47   6   Q.   I guess what I'm asking, do you know if he had any real

17:23:50   7   estate investments in Tuxpan?

17:23:52   8   A.   Correct.

17:23:52   9   Q.   That involved some houses?

17:23:53   10  A.   Correct.  On the ranch Flor de Maria, there's a golf course,

17:24:01   11  a public golf course that he has a nine-hole golf course that he

17:24:07   12  remodeling.  He was remodeling very quickly.  And he spent his

17:24:14   13  real estate business around this golf course to begin a real

17:24:19   14  estate business to sell property land.  And a marina, as well.

17:24:28   15  Q.   A marina on the river?

17:24:30   16  A.   Yes.

17:24:31   17  Q.   When Mr. Colorado-Cessa wanted to make a purchase, would he

17:24:35   18  often call you to discuss that purchase?

17:24:38   19  A.   What kind of purchase?

17:24:40   20  Q.   Any purchase for personal use, I'm sorry.

17:24:43   21  A.   Oh, okay.  Yes.  He always wants to have a checking account

17:24:50   22  related to his investments.  Related to his business with UBS.

17:24:55   23  He has a regular checking account, and he uses the checking

17:24:59   24  account.  And every time he wants to use it, he call me.

17:25:04   25  Ricardo, I want to buy X or Y thing, just to let you know that

17:25:08   1   I'm writing a check of X or Y amount and the purpose of the

17:25:12   2   check.

17:25:13   3   Q.   And you said earlier, he wasn't sophisticated.  Would he

17:25:16   4   often have someone else fill out the check and would he sign it?

17:25:19   5   A.   Yes.  Sometimes.  Sometimes he do that.  He's employing

17:25:26   6   someone, he gives it to the person to write the check and he will

17:25:28   7   sign it.

17:25:29   8   Q.   And is that common with the Defendant Colorado?

17:25:33   9   A.   Yes.

17:25:34  10   Q.   And do you recall that was at every time he would write a

17:25:41  11   check and call you and see if there was enough?

17:25:42  12   A.   Yes.  Like to make sure that -- because not always I have

17:25:47  13   cash in his account.  So sometimes I need to make an investment

17:25:56  14   withdrawal to cover those checks.

17:26:02  15   Q.   Did he ever discuss with you his quarter-horse purchases at

17:26:07  16   auctions in the United States?

17:26:13  17   A.   No.

17:26:14  18   Q.   Would it surprise you to learn that he made approximately $9

17:26:16  19   million in quarter-horse purchases since 2009 in the U.S.?

17:26:24  20   A.   What amount?

17:26:25  21   Q.   $9 million in quarter-horse purchases.

17:26:28  22   A.   He never told me about that.

17:26:29  23   Q.   He never discussed that with you?

17:26:30  24   A.   No.

17:26:31  25   Q.   What type of -- you said credit facility.  Is that like a

17:26:37    1   line of credit?

17:26:37    2   A.   Correct.

17:26:39    3   Q.   What was the interest on that line of credit?  What would he

17:26:44    4   have to pay back in terms of interest for taking the loan?

17:26:48    5   A.   That line of credit, that's the reason we make the corporate

17:26:51    6   account services.  He opens the accounts under the corporate

17:26:55    7   name, and we open the line to the corporate account.  And we

17:27:00    8   usually have different type of clients who wants different terms

17:27:05    9   of the loans.  It could be for one month to one year or two

17:27:09   10   years.  He usually have six-month loans.

17:27:12   11   Q.   And what was the interest that he would be required to pay

17:27:15   12   back for that loan?

17:27:17   13   A.   The interest must be the cost of funds of the bank plus his

17:27:26   14   spread, and from 2010 to 2012, it was approximately between 1.5

17:27:31   15   percent to 1.8, 2 percent at the most.

17:27:35   16   Q.   And, again, I believe you said his investment strategy was

17:27:41   17   conservative, maybe anywhere from two to six percent, depending

17:27:47   18   on the investment?

17:27:47   19   A.   Correct.  Sometimes was four percent, sometimes five

17:27:51   20   percent, sometimes six percent.  And it's important to know that

17:27:56   21   this credit facility of this service on the loans, it was

17:28:00   22   recommended by me to take advantage of the low environment rates

17:28:05   23   that we have since 2010, and we still have it right now.  So

17:28:11   24   that's why we call carriage rate because the price of the loans,

17:28:15   25   it's very, very cheap against the investment could have on the

17:28:21    1   returns.

17:28:21    2   Q.   So Defendant Colorado could have called you up at any time

17:28:24    3   and said, hey, I would like a loan, Ricardo, and it would be

17:28:28    4   somewhere around 1.8 or 2 percent?

17:28:30    5   A.   Correct.

17:28:30    6   Q.   Are your clients required to disclose any personal loans?

17:28:39    7   A.   No.  Not required.

17:28:43    8   Q.   Did Defendant Colorado disclose to you any personal loans

17:28:46    9   that he arranged for?

17:28:48   10   A.   No.

17:28:52   11   Q.   Would it be a shock to you to learn that he contacted a hard

17:28:57   12   currency lender on at least two occasions, obtained a prepaid

17:29:02   13   interest loan?

17:29:05   14   A.   He never told me that.

17:29:07   15   Q.   Would you advise him that a 27 percent interest hard

17:29:11   16   currency loan was not in his best interest?

17:29:14   17   A.   It's a lot difference.

17:29:17   18   Q.   Did Defendant Colorado ever approach you in November of 2011

17:29:21   19   and discuss with you a ten percent per month hard currency loan

17:29:26   20   for --

17:29:27   21         MR. SANCHEZ:  Your Honor, I'm going to object at this

17:29:28   22   point.  He said several times that he didn't discuss any other

17:29:31   23   personal loans.  He's just asking him questions when the answer's

17:29:35   24   no.

17:29:36   25         MR. GARDNER:  I don't think I asked a specific

17:29:37  1  question, your Honor.  I asked him generally and now I'm more

17:29:40  2  specific.

17:29:40  3           THE COURT:  Okay.  Let's see where we go.

17:29:43  4  Q.   (BY MR. GARDNER) I want to talk to you about November of

17:29:45  5  2011.  Did he ever advise you of a ten percent per month loan?

17:29:51  6  A.   No.

17:29:53  7  Q.   What would be that at an annual rate?

17:29:59  8  A.   120 percent possibly.

17:30:02  9  Q.   120 percent?

17:30:03  10  A.   Approximately.

17:30:08  11  Q.   And he never discussed with you the fact that loan was for

17:30:11  12  $1.7 million payable over 14 days?

17:30:16  13  A.   No.

17:30:16  14           MR. SANCHEZ:  Again, your Honor, I object.  He knows

17:30:18  15  the answer is that he didn't discuss any loans, and he keeps

17:30:20  16  asking the witness the same questions.

17:30:23  17           MR. GARDNER:  I'm going to move on to another area,

17:30:25  18  your Honor.

17:30:25  19           THE COURT:  All right.

17:30:25  20  Q.   (BY MR. GARDNER) Is a prepaid interest loan common in your

17:30:29  21  banking business?

17:30:31  22  A.   Yes.  We call revolving.  Revolving loan that, for example,

17:30:40  23  on the six term loan, he have to pay the interest and he can

17:30:48  24  revolve the loan for another six months or one month, whatever he

17:30:51  25  wants.  All the collateral is on the investment is always

| | | |
|---|---|---|
| 17:30:57 | 1 | available. |
| 17:30:57 | 2 | Q.   Okay.  Was that what he was doing with the credit facility |
| 17:30:59 | 3 | in your bank? |
| 17:31:00 | 4 | A.   Yes. |
| 17:31:00 | 5 | Q.   And, again, that percentage was 1.8 percent? |
| 17:31:04 | 6 | A.   Approximately. |
| 17:31:05 | 7 | Q.   Is that for the entire six months? |
| 17:31:07 | 8 | A.   Annualized. |
| 17:31:10 | 9 | Q.   Annualized? |
| 17:31:10 | 10 | A.   Correct. |
| 17:31:11 | 11 | Q.   So if he were to repay back in six months, it wouldn't be |
| 17:31:15 | 12 | 1.8 percent? |
| 17:31:16 | 13 | A.   It's about one percent.  Correct. |
| 17:31:19 | 14 | Q.   May I have one moment, your Honor? |
| 17:31:41 | 15 | Were you in attendance at Defendant Colorado's 50th |
| 17:31:44 | 16 | birthday party? |
| 17:31:45 | 17 | A.   Yes.  I attend. |
| 17:31:46 | 18 | Q.   And at that party, did Mr. Colorado introduce you around? |
| 17:31:51 | 19 | A.   Yes. |
| 17:31:52 | 20 | Q.   And you mentioned something earlier about him calling you |
| 17:31:55 | 21 | his, quote, Greenspan? |
| 17:31:58 | 22 | A.   It was not exactly in that -- on that party.  He usually |
| 17:32:07 | 23 | introduced me with the people around his business or with other |
| 17:32:14 | 24 | people.  He always referred to me as his very successful |
| 17:32:19 | 25 | financial advisor, and he was very happy always to introduce me |

| | | |
|---|---|---|
| 17:32:24 | 1 | with people he knows. |
| 17:32:26 | 2 | Q.    Did he introduce you to any other financial advisors of his? |
| 17:32:30 | 3 | A.    Yes.  Domestic bankers, suppliers, I think it was common. |
| 17:32:39 | 4 | Q.    And did they handle his personal wealth retirement accounts? |
| 17:32:42 | 5 | A.    I don't know if it's personal wealth, but I think it's the |
| 17:32:47 | 6 | regular corporate accounts, personal account.  But I don't think |
| 17:32:51 | 7 | it's a private banking or a wealth service.  Wealth management |
| 17:32:57 | 8 | services. |
| 17:32:59 | 9 | Q.    Was there any suspicion that in your mind that Defendant |
| 17:33:04 | 10 | Colorado would be involved in money laundering? |
| 17:33:06 | 11 | A.    No.  Not suspicious. |
| 17:33:12 | 12 | Q.    I pass the witness, your Honor. |
| 17:33:25 | 13 |          MS. WILLIAMS:  No questions. |
| 17:33:29 | 14 |                    CROSS-EXAMINATION |
| 17:33:29 | 15 | BY MR. SANCHEZ: |
| 17:33:36 | 16 | Q.    Mr. Barrera? |
| 17:33:37 | 17 | A.    Yes. |
| 17:33:38 | 18 | Q.    Are you ready? |
| 17:33:39 | 19 | A.    Yes.  I'm fine.  Thank you. |
| 17:33:40 | 20 | Q.    My name is an Andres Sanchez.  We haven't met in person, but |
| 17:33:44 | 21 | we've spoken on the phone, correct? |
| 17:33:46 | 22 | A.    One time.  Correct. |
| 17:33:47 | 23 | Q.    I think twice, actually.  One time -- well, it doesn't |
| 17:33:51 | 24 | matter. |
| 17:33:52 | 25 | A.    Uh-huh. |

17:33:52  1  Q.   I want to talk about you said you -- you went to Mexico in

17:34:07  2  2005 to try to get Mr. Colorado's business?

17:34:12  3  A.   It was referred.  Exactly.

17:34:14  4  Q.   Right.  So you got a referral saying Mr. Colorado may need

17:34:22  5  some business.  You might want to go talk to him and try to win

17:34:26  6  his business, something to that effect?

17:34:27  7  A.   And he will be interested in having this type of services

17:34:30  8  because nobody comes to Tuxpan to have those services.  Tuxpan is

17:34:35  9  not a popular place to have as a market in Mexico.

17:34:40  10  Q.   That's what I was getting at.  So Tuxpan's a small town, but

17:34:45  11  do you know how related it is -- or not necessarily Tuxpan but

17:34:48  12  the Poza Rica area, how related is that to the oil business in

17:34:52  13  Mexico?

17:34:53  14  A.   I think it's the most popular city in the country on this

17:34:57  15  industry.

17:34:58  16  Q.   So a lot of the Mexican oil action happens in that general

17:35:03  17  area?

17:35:03  18  A.   Correct.  In the state of Veracruz and specifically there,

17:35:07  19  that area, yes.

17:35:07  20  Q.   And was that the first client you had in that particular

17:35:10  21  area?

17:35:10  22  A.   Correct.

17:35:11  23  Q.   Have you had clients in that area since?

17:35:14  24  A.   Just one and just another one.

17:35:19  25  Q.   And so, you said in 2006, is that when he actually agreed to

17:35:25    1   become your client?

17:35:26    2   A.   It's when he opens -- he decides to open the account.

17:35:30    3   Q.   And that's you're at American Express at that point?

17:35:33    4   A.   Correct.

17:35:34    5   Q.   And he starts depositing money, sending it from Mexico to

17:35:40    6   your bank in Miami?

17:35:42    7   A.   Correct.

17:35:43    8   Q.   And you don't know whether that was in pesos or dollars at

17:35:47    9   that point in time?

17:35:48   10   A.   I don't remember, but it could be on both currencies.

17:35:52   11   Q.   It could be in either currency?

17:35:53   12   A.   Correct.

17:35:53   13   Q.   And so, that's what I wanted to try to -- is to try to

17:35:58   14   figure out.

17:35:58   15        So can you send directly in pesos to American Express?

17:36:03   16   A.   It was sent directly to an account American Express has at

17:36:09   17   that time with Bancomer.  So at that time make a deposit to

17:36:13   18   Bancomer, and then, when the money is in Bancomer, you have to

17:36:20   19   include all the details of that deposit for further credit.  In

17:36:23   20   that case, for American Express bank in Miami.  It's like a

17:36:27   21   concentration account that the client needs to be more specific

17:36:31   22   on details where the money goes, that in this case to his account

17:36:35   23   in Miami.

17:36:36   24   Q.   Okay.  And then, what if the client, instead of wanting to

17:36:40   25   use American Express' local Bancomer account, what if he wanted

| 17:36:47 | 1 | to use a Monex account that he had to deposit pesos in that Monex |

17:36:47   1   to use a Monex account that he had to deposit pesos in that Monex

17:36:52   2   account and have Monex send U.S. dollars directly to American

17:36:57   3   Express?  Could he do that?

17:36:58   4   A.    Correct.  It's exactly what we call wire transfer.

17:37:00   5   Q.    Right.  So one way or another, it has to change from pesos

17:37:04   6   to dollars before it arrives in Miami?

17:37:07   7   A.    No.  He cannot take pesos in an account in Miami.

17:37:12   8   Q.    Maybe I misspoke.  So he has -- so one way or another, we

17:37:16   9   list it two ways.  One way, it has to go from pesos, change into

17:37:21   10  dollars before it arrives into Miami?

17:37:23   11  A.    No.  You cannot take Mexican peso in an account in Miami.

17:37:28   12  Q.    All right.  I'll move on.  But that structure that we talked

17:37:32   13  about in American Express, it's the same as UBS?

17:37:35   14  A.    With different -- yes.  But with Bancomer, you will use

17:37:42   15  Citibank Banamex.

17:37:44   16  Q.    Right.  So obviously different accounts but the same idea,

17:37:47   17  you could either do it through your own account in Monex or you

17:37:50   18  could do it through UBS's Citibank account?

17:37:53   19  A.    Correct.  As a bank, you have accounts in Mexico.  So

17:37:59   20  clients who wants to deposit on local currency, they can do it

17:38:03   21  through these banks.

17:38:04   22  Q.    Okay.  And we've heard a lot about how you said Mr. Colorado

17:38:12   23  wasn't necessarily the most sophisticated financially?

17:38:18   24  A.    Uh-huh.

17:38:19   25  Q.    Right?  And when you say that, you mean as far as the

17:38:23  1   investments go, he's not very sophisticated in how to deal with

17:38:26  2   his money.  He's not very sophisticated?

17:38:27  3   A.    Correct.

17:38:28  4   Q.    Right?  And I think the prosecutor was searching for a word,

17:38:33  5   but he used intelligent financially.  You're not trying to imply

17:38:39  6   that Mr. Colorado's not intelligent generally?

17:38:42  7   A.    Correct.

17:38:43  8   Q.    And in his business, what you saw, he actually managed his

17:38:47  9   business quite well, minus the financial side.

17:38:50  10  A.    Correct.

17:38:51  11  Q.    And he knew how to gain contracts with Pemex and how to deal

17:38:56  12  with his employees quite well?

17:38:58  13  A.    Correct.

17:38:59  14  Q.    You said that this is a small point, but I know through the

17:39:21  15  records, Mr. Colorado transferred what appears to be the money

17:39:25  16  that was in American Express into an account in UBS in December

17:39:29  17  2009.  Would you disagree with that date?

17:39:32  18  A.    It was December or January 2010.  I don't remember exactly

17:39:36  19  the month.

17:39:37  20  Q.    Okay.

17:39:39  21  A.    But he closed that account at American Express or Standard

17:39:43  22  Charter to move it to UBS.

17:39:45  23  Q.    So end of 2009, you've already had four years of a

17:39:56  24  relationship with Mr. Colorado?

17:39:58  25  A.    Correct.

17:39:59   1   Q.   And at that point, you were eager to have him come with you

17:40:02   2   to UBS?

17:40:03   3   A.   I invite all my clients.  I invite him to move to UBS.

17:40:09   4   Q.   Had you -- you were visiting him once a year at least.  Soon

17:40:13   5   after that, you started visiting him two or three times.  Did you

17:40:16   6   actually -- beyond the client, did you see Mr. Colorado as a

17:40:20   7   friend?

17:40:20   8   A.   Mr. Colorado what?

17:40:21   9   Q.   As a friend?

17:40:24  10   A.   Our relation was of professionalism and to refer as a friend

17:40:30  11   is -- when you are in this business, you receive a lot of trust

17:40:37  12   of clients and confidence of clients, and you have a lot of

17:40:40  13   information from them.  Very personal information because you're

17:40:45  14   going to manage their wealth.  So they need to be very honest

17:40:49  15   with you on different concepts.  And all dealing with those

17:40:58  16   clients, you have to maintain a very, very good relationship.

17:41:00  17   It's not as a friend that as if I have friends there, that way.

17:41:05  18   But all the relationships that you have as a private banker

17:41:09  19   became very, very close with your clients.

17:41:13  20   Q.   And when we're on that, seeing that Mr. Colorado wasn't

17:41:18  21   necessarily sophisticated financially, did he delegate a lot of

17:41:22  22   how to manage his money to you?

17:41:24  23   A.   Correct.

17:41:25  24   Q.   And he left that trust in you and what to do specifically

17:41:29  25   with his money up to you, correct?

17:41:32  1  A.   I advised him not to give me discretion on the account.  It

17:41:38  2  was -- everything I want to recommend, I need to contact him.

17:41:41  3  Maybe he will not understand or he will not -- he will rely on my

17:41:46  4  advice.  But he didn't give me 100 percent discretion on a

17:41:54  5  document.  But every time I want to invest or make something in

17:41:59  6  his portfolio, I contact him, or I explain him what will be the

17:42:05  7  new investments on the new returns we have.

17:42:08  8  Q.   I want to talk a little bit about the Corporate Advisory

17:42:20  9  Group, an issue about selling his ranch.  Was that tied in any

17:42:24 10  way to his 50th birthday?

17:42:26 11  A.   No.

17:42:27 12  Q.   The issue about retiring at 50 or selling his company at 50?

17:42:32 13  Do you recall that conversations?

17:42:36 14  A.   I don't know if it's not tied.  I think it's not tied, but

17:42:42 15  the relationship with CAG begins on the conversations between

17:42:48 16  February and March of 2010.  We signed a mandate to sell the

17:42:57 17  company on October or November of 2010, I think.  Yes.  No.

17:43:04 18  November 2010.

17:43:05 19  Q.   Do you know when his birthday was?

17:43:08 20  A.   I know it's in October, but I don't remember 2010 or 2009.

17:43:14 21  I don't know.

17:43:15 22  Q.   Did you ever get to the point where you had found or you

17:43:24 23  started to find investors, Chinese investors that were interested

17:43:28 24  in buying companies like ADT?

17:43:34 25  A.   It was not -- as I told you before, it was not part of my

17:43:37  1  job at this specific task for the investment bank advice.  But

17:43:42  2  what I heard from CAG group and from Mr. Colorado, it's that must

17:43:50  3  be local or domestic company that will be interested and could be

17:43:53  4  as well international, especially in the U.S., and maybe one in

17:43:57  5  Asia.  It was a conversation that I heard between Mr. Colorado

17:44:04  6  and CAG group.  But we never mentioned any specific companies.

17:44:09  7  Q.   Do you know what the CAG came out with a proximate value of

17:44:14  8  the worth of ADT?  Do you remember what that number was?

17:44:17  9  A.   At the beginning, we believe that it was approximately

17:44:21  10  between $70 to $90 million.  And at the beginning of the

17:44:29  11  conversations and when we saw the contracts that he has with

17:44:36  12  Pemex and, as I understand, he won very good contracts at the end

17:44:40  13  of -- during this process of the mandate and everything, he won a

17:44:46  14  lot of other contracts that will increase the value of the

17:44:49  15  company.

17:44:51  16      We always mentioned him that in the case we are

17:44:54  17  successful in selling the company, he need to be involved with

17:44:58  18  the new buyers because normally this type of companies -- this is

17:45:04  19  like a key client, like a key administration because about his

17:45:11  20  relationship with Pemex, that represents the 80 percent of his

17:45:16  21  revenue of ADT.

17:45:17  22  Q.   While we're on that topic, we talked a little bit about the

17:45:19  23  suspension.  Do you remember that?

17:45:22  24  A.   As I told you --

17:45:26  25  Q.   And I'm sorry.  I think my question wasn't quite clear.

17:45:29   1          When Mr. Gardner was asking you some questions, he

17:45:32   2   asked you about the suspension regarding Pemex.  Do you remember

17:45:36   3   that?

17:45:36   4   A.   I remember that as a monumental issue, that suspension for

17:45:44   5   ADT.  I think it was in 2011.

17:45:46   6   Q.   Yeah.  And Mr. Gardner talked to you about the suspension or

17:45:50   7   asked you some questions.  I want to just make it clear.  Are you

17:45:53   8   aware that the suspension was only towards not receiving any new

17:45:57   9   contracts with Pemex, that Mr. Colorado and ADT could still

17:46:01   10  receive payments from existing Pemex contracts?

17:46:08   11  A.   For new contracts.

17:46:09   12  Q.   Right.  He just couldn't win any brand-new contracts?

17:46:12   13  A.   As I understand that was the suspension.

17:46:14   14  Q.   And, in fact, the contracts that were already in place, he

17:46:16   15  was still allowed to increase those within the percentage

17:46:18   16  available.  Were you aware of that?

17:46:20   17  A.   I don't know exactly if they can increase or not.  I don't

17:46:24   18  know.

17:46:24   19  Q.   In the CAG process, you talked about how Price Waterhouse

17:46:32   20  Cooper was actually familiar with this issue about smaller

17:46:37   21  businesses or family businesses commingling personal and business

17:46:42   22  funds, right?

17:46:42   23  A.   Correct.

17:46:43   24  Q.   So that's something that comes up with these smaller

17:46:47   25  businesses in Mexico?

17:46:48   1   A.   Correct.

17:46:48   2   Q.   And so, by the way, this is in English, correct?

17:47:19   3   A.   It's translated, I think.

17:47:21   4   Q.   Right.  That's the point I'm trying to make.  The one that

17:47:25   5   UBS received was actually in Spanish, correct?

17:47:27   6   A.   Correct.

17:47:28   7   Q.   So the Spanish one would be the one that was signed.  This

17:47:38   8   is Spanish?

17:47:39   9   A.   Correct.

17:47:40  10   Q.   Okay.  So when we're looking at these numbers -- and the

17:47:43  11   point that I want to ask you about, when we're looking at these

17:47:47  12   numbers, part of the problem that Price Waterhouse and Cooper had

17:47:53  13   was that he was including his personal expenses as ADT expenses,

17:47:57  14   right?

17:47:57  15   A.   Something to be clear.  Price Waterhouse never visit the

17:48:02  16   client.  We were involved on deciding who were the best, and we

17:48:07  17   decided it was Price Waterhouse.  They must begin their work on

17:48:14  18   summer of last year that and they never began.  But they never

17:48:18  19   contact the client.  They never saw statements, they never saw

17:48:21  20   anything.

17:48:21  21   Q.   All right.  Well, at least C-A-G, UBS Group, C-A-G --

17:48:26  22   A.   Correct.

17:48:27  23   Q.   -- CAG, when they were talking about the fact that they were

17:48:30  24   commingled, those expenses would end up in these financial

17:48:34  25   statements.  The personal expenses.

| | | |
|---|---|---|
| 17:48:36 | 1 | A.   I don't know. |
| 17:48:36 | 2 | Q.   Okay.  Well -- |
| 17:48:39 | 3 | A.   I don't know if it's validated on their statements, but I |
| 17:48:43 | 4 | will assume. |
| 17:48:45 | 5 | Q.   So we're clear, this is not your job to look through this |
| 17:48:48 | 6 | particular financial statement? |
| 17:48:50 | 7 | A.   Excuse me, can you repeat? |
| 17:48:51 | 8 | Q.   This is not -- part of your job is not to look through these |
| 17:48:54 | 9 | financial statements? |
| 17:48:55 | 10 | A.   Correct. |
| 17:48:55 | 11 | Q.   But somebody within your group or, sorry, somebody within |
| 17:48:59 | 12 | your bank whose job it is to look at these financial statements |
| 17:49:02 | 13 | did review these financial statements? |
| 17:49:04 | 14 | A.   Correct. |
| 17:49:04 | 15 | Q.   And that they reviewed those financial statements before any |
| 17:49:07 | 16 | loan was made to Francisco Colorado? |
| 17:49:11 | 17 | A.   Correct. |
| 17:49:12 | 18 | Q.   So they evaluated these financial statements and agreed to |
| 17:49:15 | 19 | make the loan to Francisco Colorado? |
| 17:49:18 | 20 | A.   To ADT. |
| 17:49:19 | 21 | Q.   Well, to ADT? |
| 17:49:23 | 22 | A.   Correct. |
| 17:49:24 | 23 | Q.   Okay.  I'm going to show you some documents that I think |
| 17:50:08 | 24 | you've reviewed.  I did give them to your attorney.  I just |
| 17:50:11 | 25 | wanted to make sure.  And you let me know if you reviewed them or |

| | | |
|---|---|---|
| 17:50:22 | 1 | not.  Have you reviewed this set of documents? |
| 17:50:30 | 2 | A.    Correct. |
| 17:50:30 | 3 | Q.    And what is that set of documents? |
| 17:50:34 | 4 | A.    The first one was you include all the funds that were |
| 17:50:38 | 5 | transferred to the different accounts. |
| 17:50:42 | 6 | Q.    So transferred into the UBS account. |
| 17:50:45 | 7 | A.    Transferred.  Correct. |
| 17:50:46 | 8 | Q.    So this is money that was outside of UBS that Francisco or |
| 17:50:50 | 9 | ADT transferred into UBS? |
| 17:50:51 | 10 | A.    Correct. |
| 17:50:51 | 11 | Q.    And this is for the period from beginning from the first |
| 17:50:56 | 12 | period in December of 2009 all the way through June of 2012? |
| 17:51:00 | 13 | A.    Correct.  And both currencies. |
| 17:51:05 | 14 | Q.    And right.  And I see that you wrote MXN? |
| 17:51:09 | 15 | A.    Correct. |
| 17:51:10 | 16 | Q.    The amount next to that MXN, is that in dollars or is that |
| 17:51:14 | 17 | in pesos? |
| 17:51:15 | 18 | A.    It was in dollars. |
| 17:51:16 | 19 | Q.    Okay.  So the amounts listed at least are in U.S. dollars? |
| 17:51:19 | 20 | A.    Correct. |
| 17:51:19 | 21 | Q.    Now, when you have MXN, it means that it originally came in |
| 17:51:24 | 22 | pesos? |
| 17:51:24 | 23 | A.    Correct.  And they are still in pesos. |
| 17:51:30 | 24 | Q.    Okay.  All right.  But that's the approximate value at the |
| 17:51:34 | 25 | time it was deposited in dollars? |

| | | |
|---|---|---|
| 17:51:36 | 1 | A.   The exchange rate at the time he made the transfer. |
| 17:51:41 | 2 | Q.   And then, so I'm separating -- this is a chart that I |
| 17:51:45 | 3 | prepared, but this is the actual supporting documents for this |
| 17:51:48 | 4 | chart. |
| 17:51:48 | 5 | A.   Correct. |
| 17:51:48 | 6 | Q.   And these are the UBS documents? |
| 17:51:51 | 7 | A.   Correct. |
| 17:51:55 | 8 | Q.   Do you see a total amount that was deposited into the UBS |
| 17:51:59 | 9 | account between 20 -- the very end of 2009 till June 1, 2012? |
| 17:52:05 | 10 | A.   Yes. |
| 17:52:05 | 11 | Q.   What was that? |
| 17:52:06 | 12 | A.   The amount, it's $27 million. |
| 17:52:11 | 13 | Q.   $27 million? |
| 17:52:14 | 14 | A.   Approximately, yes. |
| 17:53:04 | 15 | MR. GARDNER:  No objection, your Honor. |
| 17:53:06 | 16 | MR. SANCHEZ:  I'm going to introduce Colorado 6, your |
| 17:53:08 | 17 | Honor. |
| 17:53:12 | 18 | THE COURT:  No objections, it is admitted. |
| 17:53:19 | 19 | Q.   (BY MR. SANCHEZ) So these are just parts of the statement, |
| 17:53:21 | 20 | correct? |
| 17:53:22 | 21 | A.   Correct. |
| 17:53:24 | 22 | Q.   And the highlights are the receipt of funds, right? |
| 17:53:30 | 23 | A.   Yes. |
| 17:54:01 | 24 | MR. GARDNER:  Your Honor, I'm sorry.  I'm looking at |
| 17:54:03 | 25 | summary charts that Mr. Sanchez prepared that I haven't seen yet. |

17:54:06   1   So let me just quickly look at it, the Court gives me a minute.

17:54:27   2            Your Honor, I was not aware on Colorado 6 that Mr.

17:54:31   3   Sanchez had highlighted certain pages.  And so, therefore, we

17:54:35   4   would ask that that be admitted as a demonstrative exhibit only

17:54:38   5   on Colorado 6, since he's highlighted portions that he believes

17:54:41   6   are important to him.  If he wants to submit it separate without

17:54:45   7   the highlighting, we have no objection to that, your Honor.  And

17:54:47   8   we have no objection to him offering Colorado 6A for

17:54:51   9   demonstrative --

17:54:51   10            THE COURT:  I thought 6, the highlighting was on just

17:54:54   11   the deposits.

17:54:55   12            MR. SANCHEZ:  I just highlighted the deposits out of

17:54:58   13   specific pages.  But I'm happy to -- this I'll mark as 6A.  I'll

17:55:04   14   replace it with 6 that's not highlighted.

17:55:06   15            THE COURT:  That's fine.

17:55:07   16            MR. GARDNER:  No objection to either exhibit, your

17:55:09   17   Honor.

17:55:09   18            THE COURT:  All right.  Received.

17:55:12   19            MR. SANCHEZ:  And then, I'm now marking 6B as just the

17:55:15   20   summary.

17:55:31   21   Q.   (BY MR. SANCHEZ) This is that summary, right --

17:55:34   22   A.   Correct.

17:55:34   23   Q.   -- we just looked at.  This should go quicker, but do you

17:55:48   24   know what on May 31st, roughly what's the percentage of

17:55:55   25   loan-to-equity?

17:55:56  1   A.   Loan-to-value, you mean?

17:55:58  2   Q.   Yeah.

17:55:59  3   A.   It's around 60 percent.

17:56:02  4   Q.   All right.  The last thing I want to show you is the

17:56:06  5   financial advances.  These are the loans that you're talking

17:56:09  6   about?

17:56:09  7   A.   Correct.

17:56:10  8   Q.   Did you have a chance to review these?

17:56:12  9   A.   Yes.

17:56:12  10  Q.   I'll mark this as demonstrative.

17:56:39  11        MR. SANCHEZ:  Your Honor, we've agreed to include in

17:56:41  12  this 6A some more documents that I've shown to Mr. Gardner.

17:56:45  13        THE COURT:  All right.

17:56:45  14        MR. GARDNER:  No objection, your Honor.

17:56:49  15  Q.   (BY MR. SANCHEZ) So here, this chart shows the financial

17:56:57  16  advances and on the date that they were provided, correct?

17:57:02  17  A.   Correct.

17:57:05  18  Q.   And these documents that I just showed you, this is the

17:57:08  19  supporting documents to this chart?

17:57:10  20  A.   Correct.

17:57:27  21  Q.   So before he ever took out any loan or a financial advance

17:57:32  22  in January 14th of 2011, he had made quite a few deposits; is

17:57:39  23  that right?

17:57:39  24  A.   Correct.

17:57:40  25  Q.   And in general, this idea of taking out a loan was your

17:57:47  1  idea?

17:57:47  2  A.    Correct.  My recommendation.

17:57:51  3  Q.    Your recommendation.  And the idea was that the money he had

17:58:00  4  deposited earns, let's just say, five percent and the money he's

17:58:06  5  borrowing, he pays 1.7 percent?

17:58:08  6  A.    Correct.

17:58:09  7  Q.    And so, it's actually more beneficial to borrow money than

17:58:14  8  to use the money you've already deposited in that account?

17:58:16  9  A.    Correct.

17:58:50  10         THE COURT:  It is now 6:00.  So no matter what they're

17:58:54  11  talking about, you'll have to wait till tomorrow to find out.

17:58:59  12         MR. SANCHEZ:  Your Honor, I'm -- I'm done with this

17:59:05  13  witness.  I don't know if you have any -- I know he's coming from

17:59:08  14  Miami is the only reason why.

17:59:10  15         MR. GARDNER:  Your Honor, I don't know if either Mr.

17:59:12  16  Womack, or Mr. Esper, or Mr. Mayr have any questions, but I would

17:59:16  17  have none.

17:59:17  18         MR. MAYR:  No questions.

17:59:18  19         MR. ESPER:  I don't dare ask a question.

17:59:21  20         THE COURT:  When did that start?

17:59:24  21         Members of the jury, go home, be safe, follow the

17:59:27  22  instructions.  See you in the morning at 8:30.  You are excused.

18:02:13  23         (Proceedings adjourned.)

24

25