```
 1                UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TEXAS
 2                     AUSTIN DIVISION

 3  UNITED STATES OF AMERICA     ) Docket No. A 12-CR-210 SS
                                 )
 4  vs.                          ) Austin, Texas
                                 )
 5  JOSE TREVINO-MORALES (3)     )
    FRANCISCO ANTONIO            )
 6  COLORADO-CESSA (6)           )
    FERNANDO SOLIS-GARCIA (7)    )
 7  EUSEVIO MALDONADO-HUITRON(11) )
    JESUS MALDONADO-HUITRON (18) ) April 24, 2013
 8

 9                TRANSCRIPT OF TRIAL ON THE MERITS
                  BEFORE THE HONORABLE SAM SPARKS
10                     Volume 8 of 15

11  APPEARANCES:

12  For the United States:     Ms. Michelle E. Fernald
                               Mr. Douglas W. Gardner
13                             Assistant U.S. Attorneys
                               816 Congress Avenue, Suite 1000
14                             Austin, Texas 78701

15  For Defendant Trevino-     Mr. David M. Finn
    Morales:                   Milner & Finn
16                             2828 North Harwood Street
                               Suite 1950, LB9
17                             Dallas, Texas 75201

18                             Ms. Christie Williams
                               Mills & Williams
19                             1112 South Rock Street
                               Georgetown, Texas 78626
20
    For Defendant Colorado-    Mr. Mike DeGeurin
21  Cessa:                     Mr. M. Andres Sanchez-Ross
                               Foreman, DeGeurin & DeGeurin
22                             300 Main Street
                               Houston, Texas 77002
23
                               Mr. John Parras
24                             Republic Bank Building
                               1018 Preston, Floor 2
25                             Houston, Texas 77002
```

1    **(Appearances Continued:)**

2    For Defendant Solis-Garcia:  Mr. Guy L. Womack
                                   Guy L. Womack & Associates
3                                  402 Main Street, Suite 6 North
                                   Houston, Texas 77002
4
     For Defendant Eusevio        Mr. Richard D. Esper
5    Maldonado-Huitron:           Esper Law Office
                                   801 North El Paso Street, 2nd Floor
6                                  El Paso, Texas 79902

7    For Defendant Jesus          Mr. Thomas Brent Mayr
     Maldonado-Huitron:           Law Office of Brent Mayr
8                                  4101 Washington Avenue, 2nd Floor
                                   Houston, Texas 77007
9

10   Interpreters:                Mr. Peter Heide
                                   Mr. Steve Mines
11

12   Court Reporter:              Ms. Lily Iva Reznik, CRR, RMR
                                   501 West 5th Street, Suite 4153
13                                 Austin, Texas 78701
                                   (512)391-8792
14

15

16

17

18

19

20

21

22

23

24

25   Proceedings reported by computerized stenography, transcript
     produced by computer.

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

1                    **I N D E X**

| 2  Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| 4  Arian Jaff | 9 | 11 | 13 | |
| 5  | | 46 | 47 | |
| 6  Michael J. Fernald | 51 | 92,115 | 130 | 137,141 |
| 7  | | | 142 | |
| 8  Kyle Mori | 143 | | | |
| 9  Felipe A. Quintero | 147 | 179,183 | | |
| 10 | | 197,202 | 205 | 216,217 |
| 11  Deborah Kempe | 219 | | | |
| 12  Jose A. Flores | 232 | | | |
| 13  Jaime Gomez | 238 | 243,245 | | |
| 14 | | 249 | | |
| 15  Juan G. Aleman | 250 | 256 | 258 | |
| 16  Raul Guadalajara-Guia | 258 | 275 | | |

| | Page |
|---|---|
| 19  Proceedings Adjourned | 282 |

20

21

22

23

24

25

4

| | | EXHIBITS | Offered | Admitted |
|---|---|---|---|---|

Government's

| | Offered | Admitted |
|---|---|---|
| #178A through B | 74 | 74 |
| #305 | 24 | 25 |
| #313 | 253 | 253 |
| #322 | 241 | 242 |
| #358G | 172 | 172 |
| #358H | 157 | 165 |
| #404A | 87 | 87 |
| #404B | 58 | 58 |
| #417 | 39 | 39 |

Defendant Colorado Cessa's

| | Offered | Admitted |
|---|---|---|
| #7 | 92 | 92 |
| #8 | 102 | 102 |
| #9 | 181 | 182 |

Defendant Trevino-Morales'

| | Offered | Admitted |
|---|---|---|
| #JT-6 | 128 | 128 |

08:28:26   1                  MR. GARDNER:  Good morning, your Honor.

08:28:28   2                  I've got two items before the jury comes in.

08:28:30   3                  THE COURT:  All right.

08:28:32   4                  MR. GARDNER:  Your Honor, the first item is with

08:28:34   5       respect to the individual who testified the other day, Hector

08:28:38   6       Moreno.  We did some followup on the immigration file out of the

08:28:43   7       Eastern District of Texas and as well as any proffer letters.

08:28:49   8       So, again, we received confirmation from the Eastern District of

08:28:51   9       Texas, AUSA Ernest Gonzalez, there's no written proffer letters

08:28:56   10      or agreement.  There was also none out of the Western District,

08:28:59   11      your Honor.

08:29:00   12                 With regards to the immigration, the Department of

08:29:03   13      Homeland Security reviewed Hector Moreno's file, it states -- and

08:29:09   14      I'm reading from an e-mail -- that Moreno had received a benefit

08:29:11   15      of $2,000 from DHS, Department of Homeland Security, in order to

08:29:17   16      facilitate his effort to gain employment, authorization cards for

08:29:21   17      himself and his family.  And so, we would disclose that under

08:29:26   18      Giglio, your Honor, as a benefit given to him and make sure that

08:29:31   19      the Court and the defense counsel are aware of that.

08:29:34   20                 With respect to number of people in his family, your

08:29:36   21      Honor, I know he had obviously his wife and children, but he also

08:29:41   22      brought over a number of his brothers and their families.  So how

08:29:45   23      that $2,000 was spread out, I'm not aware of that.

08:30:01   24                 MR. DEGEURIN:  May I be heard on that?

08:30:12   25                 Your Honor, we would request the documentary backup of

08:30:17  1   those payments, those things we just heard about today, payments

08:30:22  2   to him, the assurances from Homeland Security, to review them.

08:30:35  3            MR. GARDNER:  Your Honor, I think it's irrelevant at

08:30:37  4   this point.

08:30:37  5            THE COURT:  I think so, too.  He's just making a

08:30:39  6   record.

08:30:39  7            MR. GARDNER:  I know.

08:30:40  8            THE COURT:  It's not relevant, it's not going to do

08:30:42  9   anything, but he's got the right to make the record.  So get the

08:30:46  10  papers if you can get them.

08:30:48  11           MR. GARDNER:  Yes, sir.

08:30:48  12           THE COURT:  If not, he's still available.

08:30:51  13           MR. GARDNER:  Yes, sir.

08:30:51  14           THE COURT:  He's available to the defendants to put on

08:30:53  15  the stand and prove up the cross-examination.  I'll not release

08:30:57  16  him until then.  You can ask him whatever he's got, how many

08:31:02  17  brothers and sisters.  You cannot ask him the location of these

08:31:05  18  people.  Other than that, he's fully able to answer any questions

08:31:11  19  that you have.  Or you can enter into a stipulation.  If you

08:31:18  20  could get the immigration documents, get them.  But he obviously

08:31:23  21  has the right to stay here at the present time.  He testified he

08:31:28  22  doesn't know how long that is existing or that's correct.  But he

08:31:35  23  didn't mention or he wasn't asked if he'd gotten any money.  So I

08:31:39  24  don't know about that.

08:31:40  25           MR. DEGEURIN:  Your Honor, that's only for the record,

| | | |
|---|---|---|
| 08:31:42 | 1 | I feel that it's my obligation under my ethical efforts -- |
| 08:31:47 | 2 | THE COURT:  I'm not criticizing you.  It's another |
| 08:31:49 | 3 | thing, a bit to do about nothing, but it's something you're |
| 08:31:55 | 4 | entitled to.  So we'll try to get it for you. |
| 08:31:58 | 5 | MR. DEGEURIN:  Yeah.  And it's not only something may |
| 08:32:02 | 6 | come up to be a bit of nothing, but it's something we have an |
| 08:32:06 | 7 | obligation as a lawyer under our oath to review records like that |
| 08:32:10 | 8 | to see.  Imagine someone looking later at our work we saw, we |
| 08:32:18 | 9 | don't need to look at those records.  Of course we need to look |
| 08:32:20 | 10 | at them.  We may not use them, probably won't use them.  Most |
| 08:32:23 | 11 | likely we won't.  But we certainly -- |
| 08:32:25 | 12 | THE COURT:  You may or may not.  Moreno's testimony |
| 08:32:30 | 13 | wasn't nearly as damaging as other witnesses.  Okay.  Now, let's |
| 08:32:33 | 14 | go back to where we are. |
| 08:32:36 | 15 | What's the second point? |
| 08:32:40 | 16 | MR. GARDNER:  Your Honor, with respect to the |
| 08:32:42 | 17 | government's next witness, Mr. Arian Jaff, I would ask the Court |
| 08:32:47 | 18 | to recall Mr. DeGeurin's opening statement in which he said, Mr. |
| 08:32:52 | 19 | Colorado had contracts from Pemex, a nationally owned company, |
| 08:32:55 | 20 | which takes bids.  There is no local influence.  The bidding |
| 08:32:58 | 21 | process is open in public.  There is a board of directors, a lot |
| 08:33:02 | 22 | of protections built in.  Contracts that he's won that he did |
| 08:33:07 | 23 | bids on, quote, legitimate contracts.  And then, yesterday, Mr. |
| 08:33:10 | 24 | Sanchez inquired of Mr. Barrera on Pemex that he gained |
| 08:33:14 | 25 | contracts, and the question was, did Mr. Colorado know how to |

08:33:18   1   gain and manage these Pemex contracts?  Mr. Jaff is prepared to

08:33:22   2   testify that he was present at a breakfast in which Mr. Colorado

08:33:27   3   and a Pemex director discussed a $5 million bribe for Pemex

08:33:34   4   contracts.  We believe that Mr. DeGeurin and Mr. Sanchez have

08:33:38   5   opened the door to this type of testimony.

08:33:48   6          MR. DEGEURIN:  Well, number one, I'm not aware of that

08:33:52   7   discussing a bribe with a Pemex official, but I'd like to see

08:33:59   8   that.  Is that --

08:34:02   9          MR. GARDNER:  There's no -- are you talking in opening

08:34:06   10  statement or are you talking --

08:34:08   11         MR. DEGEURIN:  No, no.  I want to know what Jaff said.

08:34:24   12         THE COURT:  Well, let's find out.  Tell the jury to

08:34:28   13  relax.

08:34:31   14         Also, I'm advised that Mr. Colorado-Cessa is ill.  So I

08:34:36   15  want the marshals to facilitate any time Mr. Colorado needs to be

08:34:45   16  excused to go to the restroom, which we have right beyond the

08:34:48   17  door here, he has the right to mention it, and if y'all will take

08:34:52   18  him, and then, he can return.  Hopefully he won't need it, but if

08:34:59   19  he does need it, provide that courtesy.

08:35:09   20         MR. GARDNER:  Mr. Jaff, just take a seat up there at

08:35:11   21  the witness chair, please.

08:35:12   22         Your Honor, I believe this witness was sworn yesterday.

08:35:15   23         THE COURT:  What you believe is correct.  He has been

08:35:17   24  sworn.  You understand that you're under oath, sir?

08:35:26   25         THE WITNESS:  I'm what?

| | | |
|---|---|---|
| 08:35:26 | 1 | THE COURT:  You're under oath? |
| 08:35:27 | 2 | THE WITNESS:  Yes.  I do. |
| 08:35:28 | 3 | THE COURT:  All right. |
| 08:35:30 | 4 | ARIAN JAFF, called by the Government, duly sworn. |
| 08:35:30 | 5 | DIRECT EXAMINATION (Resumed) |
| 08:35:30 | 6 | BY MR. GARDNER: |
| 08:35:31 | 7 | Q.   Mr. Jaff, you and I had a discussion about a breakfast.  I |
| 08:35:34 | 8 | believe it's a breakfast or conference you attended in which the |
| 08:35:37 | 9 | Defendant Colorado and a director from Pemex were sitting at the |
| 08:35:43 | 10 | table and a bribe -- the term "bribe" was discussed.  Do you |
| 08:35:47 | 11 | recall that incident? |
| 08:35:49 | 12 | A.   I do recall. |
| 08:35:51 | 13 | Q.   Okay.  Could you please explain the facts and circumstances |
| 08:35:54 | 14 | surrounding that to the Court, please? |
| 08:35:59 | 15 | THE COURT:  First of all, when did it occur? |
| 08:36:04 | 16 | THE WITNESS:  In 2012, in February. |
| 08:36:09 | 17 | Q.   (BY MR. GARDNER) And where was this conversation held? |
| 08:36:15 | 18 | A.   At his -- at the office of the subdirector. |
| 08:36:19 | 19 | Q.   The office of the subdirector for Pemex? |
| 08:36:21 | 20 | A.   Yes. |
| 08:36:22 | 21 | Q.   And what was the discussion? |
| 08:36:29 | 22 | A.   It was about money that needed to be transferred to the |
| 08:36:37 | 23 | United States. |
| 08:36:37 | 24 | Q.   And was there discussion involving you on how to transfer |
| 08:36:40 | 25 | that money to the United States? |

08:36:42  1   A.   My advice was asked and I recommended that a lawyer be -- do

08:36:49  2   this, but I don't know what the funds were for exactly.

08:36:52  3   Q.   And was it your understanding that this -- well, let me ask

08:36:57  4   you this.  How much money was discussed?

08:37:00  5   A.   $5 million.

08:37:02  6   Q.   And was it your understanding this $5 million was part of a

08:37:05  7   legitimate Pemex contract between Pemex and Defendant Colorado?

08:37:10  8   A.   I was not aware what the proceeds of the money were for.

08:37:14  9   That was my understanding that it was for something that was not

08:37:19  10  for -- was for something that -- for a contract.  But I don't

08:37:26  11  know what it was for exactly.  I was never told and I never

08:37:29  12  asked.

08:37:30  13  Q.   And did the subdirector of Pemex, did he make any statements

08:37:35  14  indicating that he wished to conceal that money?

08:37:39  15  A.   Yes.

08:37:40  16  Q.   Okay.  What was that, sir?

08:37:42  17  A.   That he wanted it to -- he couldn't have it in -- he

08:37:46  18  couldn't have the money in Mexico.

08:37:48  19           MR. GARDNER:  Your Honor, I tender the witness as the

08:37:51  20  tender of the government.

08:38:04  21           MR. DEGEURIN:  First of all, your Honor, the date was

08:38:08  22  significant, February the 12th, that this happened.  That's --

08:38:12  23           THE COURT:  Do you have any questions?

08:38:14  24           MR. DEGEURIN:  Yes.  I do.

08:38:15  25

|          |    |                                                            |
|----------|----|------------------------------------------------------------|
| 08:38:15 | 1  | CROSS-EXAMINATION                                          |
| 08:38:16 | 2  | BY MR. DEGEURIN:                                           |
| 08:38:16 | 3  | Q.   Who was the person who was the subdirector of Pemex?  Who |
| 08:38:27 | 4  | was that?                                                  |
| 08:38:27 | 5  | A.   Hinojosa.                                             |
| 08:38:29 | 6  | Q.   And not what you were thinking, but what was said by Mr. |
| 08:38:39 | 7  | Cessa, Mr. Colorado and Mr. Hinojosa?                      |
| 08:38:43 | 8  | A.   That he was a friend and that he needed to transfer $5 |
| 08:38:49 | 9  | million to his account in some way.                        |
| 08:38:53 | 10 | Q.   All right.                                            |
| 08:38:54 | 11 |         THE COURT:  Needed to transfer whose account?     |
| 08:38:57 | 12 |         THE WITNESS:  From Mr. Colorado to Mr. Hinojosa.   |
| 08:39:02 | 13 | Q.   (BY MR. DEGEURIN) Oh, so Mr. Hinojosa was asking?     |
| 08:39:04 | 14 | A.   No.                                                   |
| 08:39:05 | 15 | Q.   Transfer?                                             |
| 08:39:05 | 16 | A.   Colorado.                                             |
| 08:39:14 | 17 | Q.   And what preceded the conversation or the statements before |
| 08:39:21 | 18 | -- tell me exactly what you think you heard him say, Mr.   |
| 08:39:28 | 19 | Colorado.                                                  |
| 08:39:32 | 20 | A.   That he needed to give some of -- this $5 million to Mr. |
| 08:39:37 | 21 | Hinojosa.                                                  |
| 08:39:40 | 22 | Q.   What $5 million?  Is he talking to you, or is he talking to |
| 08:39:47 | 23 | Mr. Hinojosa?                                              |
| 08:39:48 | 24 | A.   He told me.                                           |
| 08:39:48 | 25 | Q.   In Mr. Hinojosa's office?                             |

08:39:50  1    A.    Yes.  And Mr. Hinojosa was present, also.

08:39:53  2    Q.    And asking you how to give the $5 million for a contract in

08:39:58  3    the United States?

08:39:59  4    A.    It was -- the contract was never mentioned.

08:40:04  5    Q.    So I thought I heard you say something about in the United

08:40:08  6    States.

08:40:09  7    A.    That the money -- they wanted the money in the United

08:40:12  8    States.  Transferred to the United States.

08:40:15  9    Q.    And was there any discussion about a contract?

08:40:18  10   A.    No.

08:40:23  11   Q.    Don't know what the money was for?

08:40:25  12   A.    No.

08:40:29  13   Q.    Do you know what kind of business Mr. Hinojosa was in other

08:40:32  14   than when he was the subdirector?

08:40:35  15   A.    Besides being a subdirector, I have no knowledge of what

08:40:38  16   else he did.

08:40:39  17   Q.    Where was his office?

08:41:09  18   A.    In the Pemex building.

08:41:12  19   Q.    Where?  Which city or state?

08:41:18  20   A.    Ciudad del Carmen.

08:41:23  21   Q.    I'm sorry?

08:41:23  22   A.    Ciudad del Carmen.

08:41:30  23   Q.    So the discussion, what you recall is something about money

08:41:36  24   in -- to Mr. Hinojosa, anything in return for that?

08:41:44  25   A.    What do you mean?

| | | |
|---|---|---|
| 08:41:45 | 1 | Q.   You said, if I give you this, you'll do something for me? |
| 08:41:49 | 2 | A.   No.  I told him I would introduce him to the lawyer who can |
| 08:41:54 | 3 | maybe help them -- a business lawyer. |
| 08:41:59 | 4 | Q.   And there were -- strike that.  Your Honor, I'm prepared to |
| 08:42:11 | 5 | argue. |
| 08:42:12 | 6 | THE COURT:  Any more questions of Mr. Jaff? |
| 08:42:17 | 7 | MR. GARDNER:  Just one, your Honor. |
| 08:42:20 | 8 | RE-DIRECT EXAMINATION |
| 08:42:20 | 9 | BY MR. GARDNER: |
| 08:42:22 | 10 | Q.   Mr. Jaff, it appears to be that the money that was |
| 08:42:28 | 11 | discussed, was it for a future obligation or a past obligation? |
| 08:42:37 | 12 | A.   I want to believe it was for a past, but I did not ask |
| 08:42:41 | 13 | specifics. |
| 08:42:41 | 14 | Q.   And no one discussed whether it was for something already |
| 08:42:45 | 15 | performed or something to be performed? |
| 08:42:46 | 16 | A.   I did not ask specifics. |
| 08:42:47 | 17 | Q.   That's all I have. |
| 08:42:50 | 18 | THE COURT:  Any further questions? |
| 08:42:52 | 19 | MR. DEGEURIN:  No, sir. |
| 08:42:53 | 20 | THE COURT:  And this was -- this conversation was to |
| 08:42:58 | 21 | transfer $5 million from Mr. Colorado's account into the United |
| 08:43:09 | 22 | States into Mr. Hinojosa's account. |
| 08:43:13 | 23 | THE WITNESS:  What I understand is Mr. Hinojosa did not |
| 08:43:15 | 24 | have an account in the United States yet. |
| 08:43:20 | 25 | THE COURT:  Well, did the conversation exist that |

| | | |
|---|---|---|
| 08:43:27 | 1 | Hinojosa was to get the money once it got to the United States? |
| 08:43:34 | 2 | THE WITNESS:  That was the intention -- that was the |
| 08:43:36 | 3 | intention. |
| 08:43:41 | 4 | THE COURT:  Okay.  Sir.  If you'll step out of the |
| 08:43:43 | 5 | courtroom.  It's your objection. |
| 08:44:06 | 6 | MR. DEGEURIN:  I'm not sure how he's going to testify |
| 08:44:09 | 7 | about what the intention was, since he has -- there were no words |
| 08:44:13 | 8 | to that effect, that would be his speculation.  And I appreciate |
| 08:44:18 | 9 | the question you asked him.  I should have asked that same |
| 08:44:21 | 10 | question. |
| 08:44:22 | 11 | Secondly, your Honor, we asked for 404(b) disclosures |
| 08:44:30 | 12 | before -- well before discovery was cut off, well before trial. |
| 08:44:37 | 13 | There was no 404(b) notification of anything.  And before opening |
| 08:44:43 | 14 | statements, before all that, we were confident that if there had |
| 08:44:48 | 15 | been any 404(b), he would have given it to us.  We not only |
| 08:44:52 | 16 | talked him about it, we also e-mailed request for 404. |
| 08:44:55 | 17 | And so, this is what happens with 404(b) sometimes -- |
| 08:45:01 | 18 | and at least we have those notices -- is because you become |
| 08:45:05 | 19 | surprised at some witness saying, oh, I remember a conversation I |
| 08:45:09 | 20 | had, I don't remember exactly what their thoughts were, but |
| 08:45:11 | 21 | here's what I heard.  Here's what I thought it was. |
| 08:45:15 | 22 | So it's going to -- if that comes in, it's going to be |
| 08:45:20 | 23 | 404(b), and then, it may be, I guess, rebuttal to my opening |
| 08:45:28 | 24 | statement, I guess? |
| 08:45:29 | 25 | THE COURT:  Well, there's no question about it wasn't |

08:45:31  1   404(b) evidence.  It probably wasn't evidence at all before your

08:45:35  2   opening statement and the cross-examination of the last witness

08:45:39  3   to show how wealthy Mr. Colorado is, and how much money he's

08:45:50  4   made, and that he's a wonderful financier and businessman.  I

08:45:58  5   mean, there wouldn't be any point in trying to get that type of

08:46:02  6   evidence in.  And I suspect with the list of witnesses that you

08:46:12  7   voir dired the jury on, you're going to attempt to establish his

08:46:18  8   reputation as a very successful businessman who made all this

08:46:26  9   money and, therefore, never did do any of the things that the

08:46:30  10  government alleges.  That's what makes it a close question.

08:46:36  11          MR. DEGEURIN:  It is a close question and it's going to

08:46:38  12  require -- my head is spinning right now -- but a statement like

08:46:43  13  this where he doesn't really know what it's about.  Just that his

08:46:47  14  understanding was --

08:46:49  15          THE COURT:  I don't know what it's going to require,

08:46:51  16  but here's the problem.

08:46:52  17          MR. DEGEURIN:  Well, not require.

08:46:54  18          THE COURT:  I'm going to give you a little recess and

08:46:56  19  you sit with your other couple of lawyers, and y'all decide what

08:46:59  20  you want to put in the record.  Here's the problem.  This is a

08:47:02  21  money-laundering case.

08:47:03  22          MR. DEGEURIN:  Yes.

08:47:04  23          THE COURT:  And here, I have evidence that is

08:47:11  24  consistent with money laundering.  Moving $5 million from one

08:47:15  25  person to the United States to another.  Now, is that 404(b) and

| | | |
|---|---|---|
| 08:47:24 | 1 | if it is, is it more prejudicial than probative?  And your |
| 08:47:33 | 2 | opening statement that pretty well puts a crown on Mr. Colorado's |
| 08:47:43 | 3 | head as if you're going to show that these allegations are |
| 08:47:49 | 4 | preposterous.  And that's been the cross-examination to date of |
| 08:47:55 | 5 | anybody that knows Mr. Colorado. |
| 08:47:59 | 6 | I cut out the first stuff about the ranch because it |
| 08:48:04 | 7 | didn't pertain to anything, and it was more prejudicial than |
| 08:48:06 | 8 | probative because there wasn't any evidence as to whether the |
| 08:48:11 | 9 | Zetas were there on the property, or had been on the property, or |
| 08:48:15 | 10 | there was any association.  But this particular case and the |
| 08:48:20 | 11 | money-laundering case bothers me.  And I'll give you ten minutes |
| 08:48:23 | 12 | to think about it.  Pardon me.  Particularly in light of the |
| 08:48:38 | 13 | cross-examination yesterday, where millions of dollars went into |
| 08:48:44 | 14 | his United States account, brought out by co-counsel. |
| 08:51:27 | 15 | (Recess.) |
| 09:00:30 | 16 | THE COURT:  All right.  Counsel, anything further on |
| 09:00:42 | 17 | this record? |
| 09:00:42 | 18 | MR. GARDNER:  Nothing from the government, your Honor. |
| 09:00:52 | 19 | THE COURT:  Invite Mr. DeGeurin into the courtroom.  At |
| 09:01:41 | 20 | this time, I will sustain the objection and not allow the |
| 09:01:44 | 21 | testimony for the following reasons, but I will keep it under |
| 09:01:48 | 22 | advisement in case it comes up.  One, it's speculation as to what |
| 09:01:55 | 23 | the money was for.  It's inconsistent with the opening statement. |
| 09:02:03 | 24 | It's inconsistent with -- and it is consistent with money |
| 09:02:09 | 25 | laundering, although the sources of the money laundering and the |

| | |
|---|---|
| 09:02:12 | 1 |
| 09:02:22 | 2 |

09:02:12   1   conspiracy was bribery to win a race, drug money, but didn't

09:02:22   2   cover bribery of commercial law, or whatever you want to put it.

09:02:31   3          It's material because it is a laundry case.  And it's

09:02:39   4   material because the evidence in the case before the jury is that

09:02:50   5   in the period of time, including 2012, money was being put into

09:02:56   6   the account and a loan was being made, without explanations, but

09:03:06   7   it is speculative as to what went on.  So while good evidence is

09:03:11   8   prejudicial, at this point in time, it appears to me the

09:03:15   9   prejudice outweighs the probative value that the jury can have.

09:03:20  10   So I'll exclude it unless there's some more that comes in that

09:03:27  11   can explain the transaction to the jury.

09:03:32  12          All right.  Bring the jury in.

09:03:34  13          (Jury present.)

09:05:38  14          THE COURT:  Members of the jury, where have y'all been?

09:05:46  15   I can assure you that we've been working, trying to

09:05:49  16   save your time.  That's the message from the government that you

09:05:56  17   could rest assured.

09:05:57  18          Since you were here last afternoon until you have been

09:06:03  19   seated again, has anybody attempted to talk to you about this

09:06:06  20   case?

09:06:06  21          JURORS:  No.

09:06:07  22          THE COURT:  Have you talked to anybody about the case?

09:06:10  23          JURORS:  No.

09:06:10  24          THE COURT:  And has any one of you learned anything

09:06:13  25   about the case, outside the presence of each other in this

| | | |
|---|---|---|
| 09:06:16 | 1 | courtroom? |
| 09:06:17 | 2 | JURORS:  No. |
| 09:06:17 | 3 | THE COURT:  All right.  Thank you.  Show negative |
| 09:06:20 | 4 | responses to all questions by all injures. |
| 09:06:22 | 5 | MR. GARDNER:  Thank you, your Honor.  Your Honor, the |
| 09:06:24 | 6 | government calls Arian Jaff. |
| 09:06:42 | 7 | THE COURT:  Members of the jury, Mr. Jaff has been |
| 09:06:44 | 8 | sworn.  If you'll have a seat there, please, sir. |
| 09:06:48 | 9 | MR. GARDNER:  Thank you, your Honor. |
| 09:06:49 | 10 | RE-DIRECT EXAMINATION (Resumed) |
| 09:06:49 | 11 | BY MR. GARDNER: |
| 09:06:51 | 12 | Q.   Good morning, Mr. Jaff. |
| 09:06:52 | 13 | A.   Good morning. |
| 09:06:52 | 14 | Q.   Would you please introduce yourself to the jury?  Tell them |
| 09:06:54 | 15 | how old you are, where you're from, and what you do for a living. |
| 09:06:56 | 16 | A.   My name is Arian Jaff.  It's A-R-I-A-N, J-A-F-F.  From San |
| 09:07:05 | 17 | Diego, California.  And I've been in the business of doing hard |
| 09:07:08 | 18 | money loans and currency exchange. |
| 09:07:12 | 19 | Q.   And how old are you, sir? |
| 09:07:13 | 20 | A.   I am 28 years old. |
| 09:07:15 | 21 | Q.   And can you explain to the ladies and gentlemen of the jury |
| 09:07:17 | 22 | what a hard money loan is? |
| 09:07:21 | 23 | A.   Yes.  It's giving out loans with basically no collateral. |
| 09:07:29 | 24 | It's given to people -- in our business, we give it to people we |
| 09:07:37 | 25 | know or based on a government contract. |

09:07:44    1    Q.   And you say you had two businesses.  The other one was a

09:07:46    2    currency exchange?

09:07:47    3    A.   Correct.

09:07:48    4    Q.   Could you explain to the ladies and gentlemen how that

09:07:50    5    works?

09:07:51    6    A.   We buy currency in Mexico and we export it -- we buy U.S.

09:07:57    7    dollars in Mexico and we export it to the U.S.

09:08:00    8    Q.   And how do you make your profit off that?

09:08:02    9    A.   There is a spread between the -- what we buy the U.S.

09:08:09   10    dollars for and what the number of pesos we give in return.

09:08:15   11    Q.   So, for example, if I -- the spread is 10 percent at the

09:08:19   12    bank and 15 percent at the window of the exchange.  Is that how

09:08:22   13    you make your money between those two percentage points?

09:08:26   14    A.   In essence, yes.

09:08:27   15    Q.   And so, when you get the U.S. dollars back on this side of

09:08:33   16    the border, what do you do with it?

09:08:36   17    A.   They're deposited into a financial institution, and from

09:08:42   18    there, they're transferred over to Mexico to be paid out.

09:08:45   19    Q.   And when did you start this currency exchange?  How old were

09:08:48   20    you when you started that?

09:08:50   21    A.   June 2010.  So I was approximately 25 years old.

09:08:56   22    Q.   All right.  And when you first started the business, how did

09:08:59   23    you get the cash into U.S. banks?

09:09:05   24    A.   At first, it was money service business accounts were being

09:09:10   25    opened, which is a type of special account that needs to be open.

| | | |
|---|---|---|
| 09:09:14 | 1 | And then, there was -- it began -- the business evolved to |
| 09:09:24 | 2 | selling the cash. |
| 09:09:25 | 3 | Q.   And when you say evolved, do you now have a money remitter? |
| 09:09:30 | 4 | A.   My parents took over the business and they do different -- |
| 09:09:36 | 5 | they sell the cash to a money transmitter.   Correct. |
| 09:09:40 | 6 | Q.   Transmitter.   I'm sorry.   And where is that money |
| 09:09:43 | 7 | transmitter? |
| 09:09:43 | 8 | A.   It's in Boston. |
| 09:09:44 | 9 | Q.   So how does the cash get from you in San Diego to Boston? |
| 09:09:47 | 10 | A.   It's flown through Brink's. |
| 09:09:49 | 11 | Q.   Brink's Security? |
| 09:09:50 | 12 | A.   Correct. |
| 09:09:51 | 13 | Q.   All right.   And so, then, it's then deposited into the |
| 09:09:54 | 14 | business account, once it goes through the transmitter? |
| 09:09:56 | 15 | A.   Correct. |
| 09:09:56 | 16 | Q.   Is that transmitter bonded? |
| 09:09:58 | 17 | A.   It's licensed and bonded, correct, in 42 states. |
| 09:10:05 | 18 | Q.   Assuming you pay them a fee, correct? |
| 09:10:07 | 19 | A.   Yes, we do. |
| 09:10:08 | 20 | Q.   Now, are you also licensed, your business with the federal |
| 09:10:11 | 21 | government? |
| 09:10:11 | 22 | A.   My parent's business is licensed there -- is registered |
| 09:10:16 | 23 | through FinCEN and licensed through Vice in San Diego. |
| 09:10:21 | 24 | Q.   And when you say FinCEN, that's the U.S. Treasury |
| 09:10:25 | 25 | Department? |

| | | |
|---|---|---|
| 09:10:25 | 1 | A.   It is the U.S. Treasury Department.   Correct. |
| 09:10:27 | 2 | Q.   What's the Vice? |
| 09:10:28 | 3 | A.   Vice is San Diego Police Department, the Vice department. |
| 09:10:32 | 4 | Q.   Now, you said earlier that you normally make these hard |
| 09:10:38 | 5 | loans, these currency loans on no collateral to people you know. |
| 09:10:42 | 6 | How do you go about discovering a client's background, potential |
| 09:10:48 | 7 | client's background? |
| 09:10:49 | 8 | A.   Mostly, it's referrals and then, we do background checks. |
| 09:10:57 | 9 | We use a company called Roll Check that does all the -- to make |
| 09:11:04 | 10 | sure that they're not on any type of lists and it's a very close |
| 09:11:11 | 11 | -- it's usually friends of friends or it's mostly referrals. |
| 09:11:15 | 12 | Q.   And when you say lists, what do you mean by list? |
| 09:11:18 | 13 | A.   Make sure they're not on any suspicious list or OFAC list. |
| 09:11:26 | 14 | Q.   OFAC is another treasury department? |
| 09:11:27 | 15 | A.   Correct. |
| 09:11:28 | 16 | Q.   Do you know the Defendant Colorado-Cessa? |
| 09:11:32 | 17 | A.   I do know him.   Yes. |
| 09:11:33 | 18 | Q.   Do you see him in the courtroom here today?   The individual |
| 09:11:36 | 19 | standing up? |
| 09:11:37 | 20 | A.   Yes.   I consider him a good friend. |
| 09:11:39 | 21 | Q.   And when did you first meet the Defendant Colorado? |
| 09:11:44 | 22 | A.   I met him September 2009 in Villahermosa.   I was attending a |
| 09:11:55 | 23 | Pemex convention and I was looking for new clients. |
| 09:11:59 | 24 | Q.   And when you say Hermosia, I'm sorry, is that what you said |
| 09:12:04 | 25 | in Mexico? |

| | | |
|---|---|---|
| 09:12:05 | 1 | A.    Villahermosa. |
| 09:12:06 | 2 | Q.    That's in Mexico, correct? |
| 09:12:07 | 3 | A.    Correct. |
| 09:12:07 | 4 | Q.    So how were you introduced to the Defendant Colorado? |
| 09:12:10 | 5 | A.    Through another friend of mine, his name is Gustavo Mason. |
| 09:12:15 | 6 | We met at a cafe.  We were able to get a meeting with Francisco |
| 09:12:23 | 7 | Colorado. |
| 09:12:24 | 8 | Q.    And why did you seek a meeting with Mr. Colorado? |
| 09:12:29 | 9 | A.    Because he was the most -- he was one of the most important |
| 09:12:33 | 10 | Pemex contractors.  He was the real deal, basically the person |
| 09:12:43 | 11 | you wanted to meet if you wanted to do anything in Pemex. |
| 09:12:46 | 12 | Q.    And did you feel he had a number of contacts that you could |
| 09:12:51 | 13 | hopefully develop in the future?  Is that why you sought him out? |
| 09:12:54 | 14 | A.    Unlimited. |
| 09:12:55 | 15 | Q.    And so, what was the substance of that first meeting, that |
| 09:12:58 | 16 | first conversation? |
| 09:12:59 | 17 | A.    It was just a meet-and-greet.  He was extremely, extremely, |
| 09:13:05 | 18 | extremely nice, and he invited us to his annual golf tournament, |
| 09:13:16 | 19 | which we were very, very happy to attend. |
| 09:13:20 | 20 | Q.    And if you will, can you just generally describe to the jury |
| 09:13:25 | 21 | how your relationship with the Defendant Colorado evolved?  What |
| 09:13:30 | 22 | contacts he had, what discussions he had, would you contact him |
| 09:13:34 | 23 | on the phone, sort of the background information. |
| 09:13:37 | 24 | A.    He became a very good friend, like a mentor.  We talked |
| 09:13:45 | 25 | frequently, maybe once or twice, once every month or every two |

09:13:52  1  months, and it was a relationship that slowly developed.

09:13:59  2  Q.   And did you have the opportunity to visit his operation?

09:14:02  3  A.   I did.  I visited his -- I visited Tuxpan a number of times,

09:14:11  4  and I was able to see his whole operation.

09:14:17  5  Q.   And did you ever visit his ranch?

09:14:19  6  A.   I did visit Flor de Maria, correct.

09:14:23  7  Q.   When you say Flor de Maria, that's the name of the ranch?

09:14:26  8  A.   That correct.

09:14:27  9  Q.   Can you physically describe for the jury where the ranch

09:14:29  10 headquarters is situated in relation to the main road?

09:14:35  11 A.   It's right off the main road deal.  It's right on the main

09:14:42  12 road.

09:14:43  13 Q.   One-hundred, 100 yards off the highway?

09:14:49  14 A.   If that.

09:14:50  15 Q.   And what are some of the surrounding outbuildings around the

09:14:54  16 headquarters?

09:14:55  17 A.   It's all open road.  It's not a very developed -- it's not a

09:15:00  18 very developed town.  It's a lot of agriculture.

09:15:04  19 Q.   Does he have any stables or sort of farm-type buildings?

09:15:08  20 A.   He does.  He had award-winning bulls and lots of horses on

09:15:14  21 his ranch.

09:15:16  22 Q.   And can you describe for the jury the inside of the office?

09:15:19  23 A.   Inside of his office was a one-story building, a little bit

09:15:32  24 rustic where it's the -- if you would go in, it would be open and

09:15:38  25 there was a skeleton of a horse that -- of a prized horse that

09:15:46  1    had been -- I'm not sure.  It was preserved.  And then, to his

09:15:50  2    right was his secretary and then, his -- and then, his office.

09:16:00  3    Q.   And what kind of pictures did he have on the wall in his

09:16:02  4    office?

09:16:04  5    A.   He had pictures of his family, and he also had pictures of

09:16:13  6    politicians or the main director of Pemex.

09:16:19  7    Q.   And so, how often would you say -- let's just stick with

09:16:24  8    2009 for right now.  How often would you say you either visited

09:16:27  9    or spoke with the Defendant Colorado-Cessa in 2009?

09:16:31  10   A.   In 2009, I had that initial meeting September, and then, in

09:16:36  11   December, I was able to -- I had the privilege of going to his

09:16:42  12   golf tournament.

09:16:45  13   Q.   I'm showing you what's been previously marked, but not

09:16:53  14   admitted, as Government's Exhibit 305.  But for my tabs, did you

09:16:58  15   go through that the other day?

09:17:00  16   A.   I did go through this.  Correct.

09:17:02  17   Q.   Okay.  Are those your business records from your business?

09:17:04  18   A.   These are e-mails and contracts.  Correct.

09:17:09  19   Q.   Okay.  Loan contracts?

09:17:10  20   A.   Correct.

09:17:11  21   Q.   And your business, does it have a name or at the time?

09:17:16  22   A.   Quick Loans.  It's a sole proprietorship.

09:17:19  23   Q.   Your Honor, I offer Government's Exhibit 305.  That is the

09:17:22  24   only business record not agreed to by defense counsel.  I

09:17:30  25   apologize, your Honor.  It's 57, Bates 10.

09:17:34  1       MR. DEGEURIN:  No objection.

09:17:34  2       THE COURT:  All right.  305 is received.

09:17:37  3  Q.   (BY MR. GARDNER) Mr. Jaff, I want to talk to you a little

09:17:41  4  bit about your business transactions with Mr. Colorado.  Was

09:17:45  5  there some point he approached you requesting a loan?

09:17:49  6  A.   There was.

09:17:50  7  Q.   And I want to talk -- let's just generally talk about how

09:17:55  8  many occasions was that?

09:17:57  9  A.   How many times did we loan him money or how many times did

09:18:01 10  he ask -- request for money?

09:18:02 11  Q.   Let's start how many times did he request for money?

09:18:07 12  A.   Three times.

09:18:08 13  Q.   And how many times did you loan him money?

09:18:10 14  A.   All three times.

09:18:11 15  Q.   All three times.  So I want to talk about the first loan in

09:18:20 16  May.  This is all in Spanish, correct?

09:18:24 17  A.   Correct.  It was done by a law firm called Conde Abogados,

09:18:34 18  and it was documented by a public notary in Mexico.

09:18:39 19  Q.   So would you agree with me that this is a loan to the

09:18:43 20  Defendant Colorado?

09:18:45 21  A.   It was done to ADT.  Francisco Colorado was the legal

09:18:49 22  representative.

09:18:53 23  Q.   And would you agree with me that the amount paid to Mr.

09:18:57 24  Colorado was $922,500?

09:19:01 25  A.   That's what was agreed on, but what was initially given to

| | | |
|---|---|---|
| 09:19:06 | 1 | him was less. |
| 09:19:07 | 2 | Q.   And we'll get to that in a second. |
| 09:19:09 | 3 |      So this is the term of the loan agreement, correct? |
| 09:19:11 | 4 | A.   Correct. |
| 09:19:12 | 5 | Q.   And the repayment of that was $1 million, correct? |
| 09:19:16 | 6 | A.   Correct. |
| 09:19:16 | 7 | Q.   And that's in U.S. dollars? |
| 09:19:18 | 8 | A.   U.S. dollars. |
| 09:19:19 | 9 | Q.   All right.  What's the percentage rate on that? |
| 09:19:25 | 10 | A.   It was -- the first loan was for 14 percent annually.  And |
| 09:19:30 | 11 | the second loan was for 15 percent annually. |
| 09:19:34 | 12 |      THE COURT:  Do we have a date on these? |
| 09:19:35 | 13 |      MR. GARDNER:  Yes, sir, your Honor.  This one was May |
| 09:19:38 | 14 | 2010. |
| 09:19:46 | 15 | Q.   (BY MR. GARDNER) All right.  So you say this particular |
| 09:19:49 | 16 | loan, the first one I showed in May 2010 states $922,500? |
| 09:19:55 | 17 | A.   That was the second loan. |
| 09:20:02 | 18 | Q.   I'm sorry.  Let me just refer to this one again.  And just |
| 09:20:05 | 19 | for the record, your Honor, it's Bates stamp 57108.  I'm talking |
| 09:20:18 | 20 | about this amount right here? |
| 09:20:19 | 21 | A.   That is the second loan.  Correct.  That was for the amount |
| 09:20:22 | 22 | of 15 percent interest. |
| 09:20:23 | 23 | Q.   Okay.  So let's talk about the first loan.  You said that a |
| 09:20:33 | 24 | loan agreement wasn't accurate in terms of the amount you |
| 09:20:38 | 25 | actually gave him. |

| | | |
|---|---|---|
| 09:20:39 | 1 | A.   On the second loan.   Correct. |
| 09:20:40 | 2 | Q.   Second loan.  So let's talk about the first loan.  How much |
| 09:20:43 | 3 | did you give him for the first loan? |
| 09:20:45 | 4 | A.   500,000. |
| 09:20:46 | 5 | Q.   Why did Mr. Colorado, this Pemex contractor, ask you for a |
| 09:20:54 | 6 | hard currency loan? |
| 09:20:57 | 7 | A.   He had told us that he was in need of cash.  He had |
| 09:21:05 | 8 | liquidity issues and that he needed a loan for 500,000.  This was |
| 09:21:09 | 9 | not something that's uncommon in the Pemex -- within the Pemex |
| 09:21:17 | 10 | contractors. |
| 09:21:18 | 11 | Q.   Were you aware that he had a UBS account? |
| 09:21:24 | 12 | A.   I was aware he had a -- not at the moment, but I was aware |
| 09:21:30 | 13 | later that there was -- he had a UBS account that he called his |
| 09:21:34 | 14 | retirement fund, which was untouchable. |
| 09:21:37 | 15 | Q.   You don't know the details of that, whether he could loan |
| 09:21:40 | 16 | from that? |
| 09:21:40 | 17 | A.   I never asked. |
| 09:21:41 | 18 | Q.   He never explained the percentage rates he was getting from |
| 09:21:44 | 19 | that account? |
| 09:21:45 | 20 | A.   I never asked. |
| 09:21:47 | 21 | Q.   And so, you said he was having a liquidity problem, the |
| 09:21:52 | 22 | $500,000 loan. |
| 09:21:53 | 23 | A.   He had -- there was a request for more money but we were -- |
| 09:21:57 | 24 | we only gave 500,000. |
| 09:21:58 | 25 | Q.   How much money did he request? |

| | | |
|---|---|---|
| 09:22:01 | 1 | A.   I do not recall at the moment what the exact amount was. |
| 09:22:04 | 2 | Q.   And what was the reason why you only gave him 500,000? |
| 09:22:12 | 3 | A.   At the moment, that's what we were comfortable in lending. |
| 09:22:16 | 4 | Q.   And does the $500,000 loan documents, was that -- did that |
| 09:22:21 | 5 | actually reflect the terms of the loan? |
| 09:22:24 | 6 | A.   It did, but it was paid off early.  So instead of being at |
| 09:22:28 | 7 | 14 percent, he only paid seven percent interest. |
| 09:22:31 | 8 | Q.   Seven percent. |
| 09:22:33 | 9 | A.   He ended up paying -- because he only kept it for six |
| 09:22:36 | 10 | months. |
| 09:22:37 | 11 | Q.   And did he pay it off in full? |
| 09:22:39 | 12 | A.   He did. |
| 09:22:39 | 13 | Q.   Now, would you agree with me that your loan documents say |
| 09:22:44 | 14 | that should be paid to your Bank of America accounts? |
| 09:22:46 | 15 | A.   Correct. |
| 09:22:47 | 16 | Q.   Was it, in fact, paid to your Bank of America accounts? |
| 09:22:49 | 17 | A.   The first one was paid to my Bank of America account. |
| 09:22:51 | 18 | Q.   And that's a $500,000? |
| 09:22:53 | 19 | A.   Correct. |
| 09:22:54 | 20 | Q.   So let's go to the second loan.  How much was that for? |
| 09:22:58 | 21 | A.   The amount was for a million dollars, the loan. |
| 09:23:01 | 22 | Q.   That's the one I showed you, correct? |
| 09:23:04 | 23 | A.   Correct. |
| 09:23:04 | 24 | Q.   So maybe I got confused.  But can you tell the Court when |
| 09:23:09 | 25 | the first loan was, the $500,000 loan? |

| | | |
|---|---|---|
| 09:23:16 | 1 | A.    If I can look at the records. |
| 09:23:20 | 2 | Q.    Go ahead.  Take your time. |
| 09:23:52 | 3 | A.    February 24th, 2011. |
| 09:23:56 | 4 | Q.    2000 what?  I'm sorry. |
| 09:23:59 | 5 | A.    '11. |
| 09:24:00 | 6 | Q.    And that's which loan? |
| 09:24:17 | 7 | A.    I think for 500,000. |
| 09:24:18 | 8 | Q.    Okay.  Take your time. |
| 09:24:29 | 9 | A.    For $500,000. |
| 09:24:30 | 10 | Q.    Okay. |
| 09:24:33 | 11 |         THE COURT:  I'm confused. |
| 09:24:34 | 12 |         MR. GARDNER:  Yeah.  So am I. |
| 09:24:36 | 13 | Q.    (BY MR. GARDNER) All right.  So let's talk about the loans |
| 09:24:37 | 14 | again.  The first loan was when?  You have the documents in front |
| 09:24:43 | 15 | of you.  Take your time.  Tell me the date and the amount of the |
| 09:24:48 | 16 | first loan. |
| 09:24:51 | 17 | A.    I'm sorry.  I made a mistake.  It was in February 2010 and |
| 09:24:57 | 18 | due in February of 2011. |
| 09:24:59 | 19 | Q.    All right.  So loan one was February 2010 for how much? |
| 09:25:03 | 20 | A.    500,000. |
| 09:25:04 | 21 | Q.    And loan two was February 2011. |
| 09:25:07 | 22 | A.    Loan two is May 2010. |
| 09:25:13 | 23 | Q.    I just want to do it one more time so I make sure we're |
| 09:25:17 | 24 | together.  So February 2010 is the first loan. |
| 09:25:20 | 25 | A.    Correct. |

| | | |
|---|---|---|
| 09:25:20 | 1 | Q.   $500,000.  May 2010 is the second loan. |
| 09:25:28 | 2 | A.   Correct. |
| 09:25:28 | 3 | Q.   And that's for? |
| 09:25:30 | 4 | A.   $1 million. |
| 09:25:31 | 5 | Q.   One million.  And then, there's a third loan, correct? |
| 09:25:35 | 6 | A.   There was a third loan, which was a number -- it was a |
| 09:25:41 | 7 | number of payments.  Correct. |
| 09:25:43 | 8 | Q.   We'll get to that.  So generally just give me the month and |
| 09:25:47 | 9 | the year of that third loan. |
| 09:25:49 | 10 | A.   November 2011. |
| 09:25:52 | 11 | Q.   And the overall amount of that loan? |
| 09:25:54 | 12 | A.   $1,782,248.16. |
| 09:26:01 | 13 | Q.   Okay. |
| 09:26:02 | 14 | THE COURT:  You want to do that one more time. |
| 09:26:04 | 15 | THE WITNESS:  $1,782,248.16. |
| 09:26:11 | 16 | THE COURT:  Okay. |
| 09:26:13 | 17 | Q.   (BY MR. GARDNER) Thank you.  Just so I'm straight on the |
| 09:26:23 | 18 | payments and the repayments.  So the February 2010 loan for |
| 09:26:27 | 19 | $500,000, how was that money given to the Defendant Colorado? |
| 09:26:33 | 20 | A.   It was wired from our account in Wells Fargo, wired to my |
| 09:26:42 | 21 | Bancomer account in Mexico, and from there it was wired to his |
| 09:26:45 | 22 | account.  He required Mexican pesos, so I needed to transfer to |
| 09:26:51 | 23 | my Mexican account to be able to convert it. |
| 09:26:54 | 24 | Q.   So it was converted from U.S. dollars to pesos? |
| 09:26:56 | 25 | A.   Correct. |

09:26:58   1   Q.   And I know you've already said it, but tell me again, how

09:27:03   2   was that loan repaid?

09:27:04   3   A.   It was paid into my Bank of America account.

09:27:07   4   Q.   And, again, was that the loan that was paid early?

09:27:10   5   A.   It was paid early.  Correct.

09:27:13   6   Q.   And what was -- just so I'm straight.  What was the stated

09:27:19   7   interest rate on that February 2010 loan?

09:27:21   8   A.   Fourteen percent.

09:27:22   9   Q.   And I believe your testimony was because he repaid it early,

09:27:25   10   it ended up being only seven percent?

09:27:27   11   A.   Correct.

09:27:28   12   Q.   All right.  So when did he repay that first loan?  Let me

09:27:38   13   ask you this.  Was it prior to the second loan?

09:27:40   14   A.   No.

09:27:42   15   Q.   So when he comes to you for the one million, that first loan

09:27:45   16   is still outstanding?

09:27:48   17   A.   Correct.

09:27:48   18   Q.   Can you explain to the jury the circumstances surrounding

09:27:53   19   why the Defendant Colorado asked you for the second loan of $1

09:27:58   20   million?

09:27:58   21   A.   Yes.  My -- one of my friends who introduced me to Mr.

09:28:07   22   Colorado had told him he was also in the hard money loans and

09:28:14   23   ended up not delivering.  It was all phony promises.  So Mr.

09:28:24   24   Colorado was expecting to receive money from Mr. Gustavo Mason

09:28:32   25   and ended up not receiving and needed -- needed more money to

| | | |
|---|---|---|
| 09:28:37 | 1 | fulfill his obligations, too, for his contracts. |
| 09:28:43 | 2 | Q.   Is it uncommon for Pemex contractors to have liquidity |
| 09:28:48 | 3 | problems? |
| 09:28:49 | 4 | A.   It is because Pemex, even though it's a great, great |
| 09:28:54 | 5 | company, they're sometimes delayed in payments. |
| 09:29:01 | 6 | Q.   Did the Defendant Colorado ever talk to you about his |
| 09:29:04 | 7 | company being suspended from Pemex contracts? |
| 09:29:07 | 8 | A.   He did mention it and told me the suspension had been |
| 09:29:12 | 9 | lifted. |
| 09:29:12 | 10 | Q.   And what timeframe was that? |
| 09:29:15 | 11 | A.   It should have been in 2011.  I do not have an exact date. |
| 09:29:22 | 12 | Q.   And did he refer to just one suspension or two suspensions? |
| 09:29:29 | 13 | A.   I cannot answer specifics. |
| 09:29:35 | 14 | Q.   So we got the May loan for $1 million.  How much money did |
| 09:29:39 | 15 | you originally provide to the Defendant Colorado? |
| 09:29:43 | 16 | A.   $1.5 million. |
| 09:29:45 | 17 | Q.   For the May 2010? |
| 09:29:47 | 18 | A.   Oh, I'm sorry.  Total.  $1 million for the May. |
| 09:29:52 | 19 | Q.   And did you give him a million dollars? |
| 09:29:53 | 20 | A.   I did not. |
| 09:29:54 | 21 | Q.   Okay.  But the loan was for a million dollars? |
| 09:29:56 | 22 | A.   Correct. |
| 09:29:56 | 23 | Q.   And so, how much money did you actually give him? |
| 09:30:00 | 24 | A.   $850,000-plus. |
| 09:30:02 | 25 | Q.   And that's, again, in U.S. dollars? |

09:30:03  1   A.   Correct.

09:30:05  2   Q.   Now, would you agree with me that the actual loan document

09:30:08  3   that I showed you on the screen states $922,500?

09:30:13  4   A.   Correct.  When we met in person, the terms were changed.

09:30:22  5   And since there was a relationship -- a trust relationship with

09:30:25  6   Mr. Colorado, we just signed the document, but it was not -- we

09:30:33  7   didn't mention -- I didn't mention to the lawyers, which was my

09:30:35  8   fault.

09:30:36  9   Q.   Okay.  So the actual loan document doesn't truly reflect the

09:30:39  10  amount of the loan?

09:30:39  11  A.   Correct.

09:30:40  12  Q.   Okay.  What was the repayment amount on the $850,000?

09:30:45  13  A.   A million dollars.

09:30:47  14  Q.   So he owed you $150,000 interest?

09:30:50  15  A.   Fifteen percent.

09:30:52  16  Q.   So at this point in May 2010, he owes you $1.5 million?

09:31:04  17  A.   Correct.

09:31:04  18  Q.   We're going back to the 850 that you sent him, how was that

09:31:08  19  provided to the Defendant Colorado?

09:31:10  20  A.   In the same way.  It was transferred from our account at our

09:31:18  21  bank, transferred to our Bancomer account, and from Bancomer to

09:31:22  22  ADT's account.

09:31:23  23  Q.   Again, was that from U.S. dollars to pesos?

09:31:24  24  A.   Correct.

09:31:25  25  Q.   And that's not uncommon, correct?

| | | |
|---|---|---|
| 09:31:27 | 1 | A.   That is not uncommon.  A Mexican company with Mexican pesos. |
| 09:31:34 | 2 | Q.   So when did the Defendant Colorado repay you the $1.5 |
| 09:31:38 | 3 | million? |
| 09:31:44 | 4 | A.   500 was paid, if I'm not mistaken, in September.  But if I |
| 09:31:49 | 5 | can take a look at the documents. |
| 09:31:52 | 6 | Q.   Let me just show you one here real quick. |
| 09:31:55 | 7 | A.   And the other one was paid in December. |
| 09:31:57 | 8 | Q.   Okay.  Bates 5718? |
| 09:32:02 | 9 | A.   That was for second loan in December.  Correct. |
| 09:32:06 | 10 | Q.   So you get the loan in February, May, and he doesn't pay you |
| 09:32:11 | 11 | back until December of the same year? |
| 09:32:13 | 12 | A.   Correct. |
| 09:32:14 | 13 | Q.   And that check cleared, correct? |
| 09:32:16 | 14 | A.   Yes. |
| 09:32:20 | 15 | Q.   And that included the full 15 percent interest? |
| 09:32:22 | 16 | A.   Correct. |
| 09:32:26 | 17 | Q.   So describe to the jury your relationship with the Defendant |
| 09:32:29 | 18 | Colorado after the repayment of this loan in December of 2010. |
| 09:32:36 | 19 | A.   It was just a friendly relationship after the payment.  Our |
| 09:32:45 | 20 | bond became closer as true friends. |
| 09:32:51 | 21 | Q.   And during your visits to the Flor de Maria, did you observe |
| 09:32:58 | 22 | any oil rigs? |
| 09:33:00 | 23 | A.   I did.  I was able to see -- it was not at Flor de Maria. |
| 09:33:07 | 24 | It was at his waste management company in the back, in the back |
| 09:33:11 | 25 | part, there was one of the oil rigs from Extreme was there. |

09:33:15  1    Q.    And did he ever mention how much those rigs cost him?

09:33:19  2    A.    He did.  The number at the moment, I don't remember.  It was

09:33:26  3    five or 15 million.

09:33:27  4    Q.    If I were to say 13 million per rig, would that be accurate?

09:33:33  5    A.    Correct.

09:33:33  6    Q.    Refresh your memory?  And, again, was this 2010 or 2011 when

09:33:37  7    you saw those rigs?

09:33:38  8    A.    2011.

09:33:43  9    Q.    I want you to do me a favor and describe what type of person

09:33:48  10   Defendant Colorado is to the jury.  His lifestyle, if you will.

09:33:54  11   A.    He was a very, very generous man.  He was the town.  If you

09:34:04  12   want to say everyone in town knew him.  I was able to witness

09:34:09  13   firsthand he had mentally disabled employees working for him, and

09:34:16  14   I asked him why and he said that everyone deserves a job.  So he

09:34:21  15   was always in his work, and with all the people he was around, he

09:34:30  16   would always be smiling and with a positive attitude going

09:34:36  17   forward.

09:34:37  18   Q.    And with respect to when you visited him at Tuxpan or among

09:34:42  19   his associates, for lack of a better term, was there sort of a

09:34:47  20   hierarchy of who was the most important guy in the room?

09:34:50  21   A.    Mr. Colorado was always the most important.  He always knew

09:34:54  22   how to be in charge of the conversation.

09:35:01  23   Q.    When you were visiting with the Defendant Colorado on these

09:35:05  24   financial arrangements and his financial wherewithal, would you

09:35:11  25   classify his knowledge as sophisticated or unsophisticated?

09:35:16   1   A.   Can you rephrase the question, please?

09:35:18   2   Q.   Sure.  You've had many discussions with Mr. Colorado.

09:35:23   3   You've engaged in loans with him.  You've discussed various

09:35:29   4   contacts and doing business in Mexico.

09:35:32   5   A.   Uh-huh.

09:35:32   6   Q.   Would you rate his business savvy as advanced and

09:35:38   7   knowledgeable or un-advanced and unknowledgeable?

09:35:40   8   A.   I would consider him a great operational businessman, but in

09:35:46   9   terms of what we know in the U.S. as a corporate man, he was not

09:35:51  10   a corporate businessman.

09:36:02  11   Q.   All right.  So I want to turn your attention to the last

09:36:05  12   loan.  When did that occur again?

09:36:10  13   A.   In November of 2011.

09:36:11  14   Q.   You said that was a $1.7 million loan?

09:36:14  15   A.   In total aggregate, correct.

09:36:18  16   Q.   So what we're looking at here is Bates stamp 5772.  This is

09:36:23  17   the promissory note for that loan?

09:36:26  18   A.   Correct.

09:36:27  19   Q.   Okay.  And you've listed the installments here and these are

09:36:31  20   the installments you were to pay, correct?

09:36:34  21   A.   Those are installments we paid.  Correct.  Again, these were

09:36:37  22   sent in Mexican pesos.  That's why the amounts are a little bit

09:36:44  23   -- that's why the sent amount.

09:36:48  24   Q.   So where they're reflected here is in U.S. dollars?

09:36:52  25   A.   Correct.

| | | |
|---|---|---|
|09:36:52|1|Q.   Now, I want to know the dates, November 1, November 3,|
|09:36:56|2|November 8, November 11, November 14 and November 15, correct?|
|09:37:01|3|A.   That is correct.|
|09:37:03|4|Q.   And these, again, are what?|
|09:37:06|5|A.   Those were loans from our company to Mr. Colorado.|
|09:37:11|6|Q.   So why so many installments over those dates?|
|09:37:17|7|A.   Those were at his request and that's the term we had agreed|
|09:37:21|8|upon.  We had agreed upon 15 to 20 million pesos, and with our|
|09:37:29|9|cash flow, that's what we could pay him.|
|09:37:32|10|Q.   So tell me about -- or tell the jury, rather, about that|
|09:37:35|11|loan.  How were you contacted and asked about that particular|
|09:37:38|12|loan?|
|09:37:38|13|A.   I was contacted at 9:00 at night, San Diego time -- it was|
|09:37:46|14|about 11:00 Mr. Colorado's time -- and asked if I could lend him|
|09:37:53|15|-- that he was in a financial bind and if I could lend him money|
|09:37:58|16|right away.|
|09:38:00|17|Q.   And did he have the same persona during that conversation as|
|09:38:03|18|he had had during your past dealings?|
|09:38:05|19|A.   It was the first time he had called me so late.  So I|
|09:38:12|20|consider that maybe it was something of urgent matter.  It was a|
|09:38:16|21|little bit more desperate, but it was still Mr. Colorado who I|
|09:38:24|22|considered a friend that was calling a friend in need.|
|09:38:30|23|Q.   And did you go visit him to arrange the --|
|09:38:33|24|A.   I went to go visit him around November 15th or November|
|09:38:40|25|18th.  November -- yes.|

| | | |
|---|---|---|
| 09:38:43 | 1 | Q.   Before the loan, I'm sorry? |
| 09:38:45 | 2 | A.   No.  I did not.  I went to go visit him after the loan.  I |
| 09:38:48 | 3 | was there prior to the loan, but we did not speak about the loan. |
| 09:38:52 | 4 | Q.   And so, the loan occurs in November.  What was the period |
| 09:38:56 | 5 | before that loan -- how long -- sorry. |
| 09:39:04 | 6 |      When was the last time you saw him before this loan? |
| 09:39:07 | 7 | A.   A few months before. |
| 09:39:10 | 8 | Q.   Were you still in contact, though? |
| 09:39:12 | 9 | A.   We were in constant contact. |
| 09:39:14 | 10 | Q.   All right.  So you arranged the agreement for this |
| 09:39:18 | 11 | particular loan, correct? |
| 09:39:19 | 12 | A.   Correct. |
| 09:39:20 | 13 | Q.   And is that all handled via Fed Ex or e-mail?  How was the |
| 09:39:27 | 14 | loan negotiations conducted? |
| 09:39:29 | 15 | A.   Through phone.  Through Nextel. |
| 09:39:33 | 16 | Q.   And did -- you said although he sounded desperate, the same |
| 09:39:41 | 17 | guy, what did he say he needed this money for? |
| 09:39:44 | 18 | A.   I didn't ask.  He said he had liquidity issues to keep -- |
| 09:39:47 | 19 | just keep everything afloat. |
| 09:39:50 | 20 | Q.   And did you arrange a percentage for the payback, the |
| 09:39:53 | 21 | interest rate? |
| 09:39:54 | 22 | A.   He had told me that Pemex would pay him within a month, and |
| 09:39:58 | 23 | he would give me ten percent. |
| 09:40:02 | 24 | Q.   And when was he supposed to pay that back? |
| 09:40:04 | 25 | A.   In December. |

| | | |
|---|---|---|
| 09:40:06 | 1 | Q.   So there was a one-month loan? |
| 09:40:07 | 2 | A.   Correct. |
| 09:40:08 | 3 | Q.   At ten percent.  I'd like to go to the next page that |
| 09:40:22 | 4 | says -- |
| 09:40:22 | 5 | THE COURT:  This is November of what year? |
| 09:40:24 | 6 | THE WITNESS:  2011. |
| 09:40:25 | 7 | THE COURT:  Thank you. |
| 09:40:26 | 8 | Q.   (BY MR. GARDNER) All right.  This is 5771 on Bates.  And I |
| 09:40:36 | 9 | marked as a demonstrative exhibit two pages, same one, 71, mark |
| 09:40:44 | 10 | it 417, your Honor, and 72. |
| 09:40:55 | 11 | MR. DEGEURIN:  No objection. |
| 09:40:58 | 12 | THE COURT:  Okay.  What are the numbers? |
| 09:41:00 | 13 | MR. GARDNER:  Two pages, your Honor, 417 is the |
| 09:41:02 | 14 | exhibit. |
| 09:41:03 | 15 | THE COURT:  All right.  417's received. |
| 09:41:05 | 16 | Q.   (BY MR. GARDNER) So what does this appear to be a |
| 09:41:15 | 17 | spreadsheet, Mr. Jaff?  What does this represent? |
| 09:41:16 | 18 | A.   This is the total amount that if you see the middle where it |
| 09:41:20 | 19 | says loan amount at the bottom, it gets the same amount of |
| 09:41:27 | 20 | $1,782,248. |
| 09:41:29 | 21 | Q.   This right here? |
| 09:41:31 | 22 | A.   That is correct. |
| 09:41:32 | 23 | Q.   These are the installments that you reflected in the |
| 09:41:47 | 24 | promissory note? |
| 09:41:48 | 25 | A.   Correct. |

| | | |
|---|---|---|
| 09:41:49 | 1 | Q.   Okay.  So November 1, November 3, November 8, November 11, |
| 09:41:54 | 2 | correct? |
| 09:41:54 | 3 | A.   Correct. |
| 09:41:56 | 4 | Q.   Again, these are all in pesos. |
| 09:41:58 | 5 | A.   That is 5 million pesos at the conversion rate gives you the |
| 09:42:03 | 6 | amount of 371, 376. |
| 09:42:08 | 7 | Q.   And when I go across so that's the total amount here that |
| 09:42:12 | 8 | you paid him -- I'm sorry, here that you paid him to date? |
| 09:42:14 | 9 | A.   Correct.  The bottom one.  The 1,400. |
| 09:42:22 | 10 | Q.   I'll get to that one in a second. |
| 09:42:24 | 11 | A.   Okay. |
| 09:42:25 | 12 | Q.   So the first four go from Santander.  Is that your bank? |
| 09:42:32 | 13 | A.   That is correct. |
| 09:42:32 | 14 | Q.   And how was that money sent? |
| 09:42:36 | 15 | A.   It is sent from our U.S. account to our Santander account, |
| 09:42:42 | 16 | converted to pesos, and transferred to his ADT account. |
| 09:42:46 | 17 | Q.   So this November 14 payment, that comes from a Wells Fargo |
| 09:42:52 | 18 | account, correct? |
| 09:42:53 | 19 | A.   Correct. |
| 09:42:54 | 20 | Q.   And this one is for how much? |
| 09:42:56 | 21 | A.   300,000. |
| 09:42:57 | 22 | Q.   Where does that money go, sir? |
| 09:43:07 | 23 | A.   It goes to Heritage Place. |
| 09:43:12 | 24 | Q.   I'm showing you page 53.  Quick Loans, correct? |
| 09:43:24 | 25 | A.   Correct. |

| | | |
|---|---|---|
| 09:43:25 | 1 | Q. $300,000? |
| 09:43:26 | 2 | A. Correct. |
| 09:43:27 | 3 | Q. On November 14 of 2011? |
| 09:43:29 | 4 | A. Correct. |
| 09:43:30 | 5 | Q. To Heritage Place? |
| 09:43:32 | 6 | A. Correct. |
| 09:43:32 | 7 | Q. Who gave you the instructions to send that money to Heritage |
| 09:43:36 | 8 | Place? |
| 09:43:36 | 9 | A. Mr. Colorado. |
| 09:43:38 | 10 | Q. Was that money sent under the name of ADT Petro Servicios? |
| 09:43:42 | 11 | A. It was not. |
| 09:43:43 | 12 | Q. What was it sent under? |
| 09:43:45 | 13 | A. Under my company because I sent the payment. |
| 09:43:48 | 14 | Q. Do you know what Heritage Place is? |
| 09:43:50 | 15 | A. At the moment, I have no idea. |
| 09:43:51 | 16 | Q. Have you since come to learn what Heritage Place is? |
| 09:43:54 | 17 | A. Unfortunately, I have. |
| 09:43:55 | 18 | Q. Is it a horse auction place? |
| 09:43:57 | 19 | A. Correct. |
| 09:43:57 | 20 | Q. Did Mr. Colorado seem desperate for money, explain to you |
| 09:44:04 | 21 | why he's sending $300,000 to a horse auction place? |
| 09:44:09 | 22 | A. He told me he had the prior commitment and that he had |
| 09:44:12 | 23 | already bought this horse. |
| 09:44:22 | 24 | Q. Going back to Government's Exhibit 417. All right. So we |
| 09:44:32 | 25 | have this $300,000 here. I've highlighted in yellow or 330, |

| 09:44:37 | 1 | rather.  What's this blank here with the 370, next column? |
| 09:44:45 | 2 | A.   He sent in a payment to us for $370,000.  We were at our |
| 09:44:50 | 3 | limit where we couldn't loan out more money.  So he was able to |
| 09:44:54 | 4 | -- we were able to recall a payment for the first amount, the |
| 09:44:58 | 5 | very first loan and for 370,000. |
| 09:45:03 | 6 | Q.   Now, did he ask you -- prior to you saying this, did he ask |
| 09:45:06 | 7 | you for the final installment of 430? |
| 09:45:09 | 8 | A.   He did. |
| 09:45:10 | 9 | Q.   So he asked you for the final installment and what's your |
| 09:45:13 | 10 | response? |
| 09:45:14 | 11 | A.   I don't have the liquidity to give any more money.  And so, |
| 09:45:19 | 12 | he was able to give me 370, and I was able to loan him a little |
| 09:45:23 | 13 | bit more money. |
| 09:45:24 | 14 | Q.   So he gives you 370,000 on November 15th, correct? |
| 09:45:32 | 15 | A.   Correct. |
| 09:45:32 | 16 | Q.   And then, you loan him the remaining balance of 433,000 on |
| 09:45:39 | 17 | November 16th? |
| 09:45:41 | 18 | A.   Correct. |
| 09:45:41 | 19 | Q.   This $433,000, where did that money go? |
| 09:45:59 | 20 | A.   To Heritage Place, as well. |
| 09:46:01 | 21 | Q.   As well? |
| 09:46:03 | 22 | A.   Correct. |
| 09:46:03 | 23 | Q.   Did Mr. Colorado ever explain to you why he couldn't wire |
| 09:46:08 | 24 | that $370,000 he had himself? |
| 09:46:12 | 25 | A.   No. |

| | | |
|---|---|---|
| 09:46:14 | 1 | Q.   Did you have any conversations with him about the $370,000 |
| 09:46:21 | 2 | and its source? |
| 09:46:22 | 3 | A.   No.  I believe it was from his company.  That's all I -- |
| 09:46:28 | 4 | that was to what I understood or believed. |
| 09:46:31 | 5 | Q.   May I have one moment, your Honor? |
| 09:46:42 | 6 |         Let me ask a couple of more questions, Mr. Jaff.  Have |
| 09:46:54 | 7 | you ever had any conversations with the Defendant Colorado about |
| 09:46:57 | 8 | his company and how he started it? |
| 09:47:02 | 9 | A.   He told me his company was -- he had told me he had worked |
| 09:47:09 | 10 | for 30 years in Pemex, but he started from scratch when he built |
| 09:47:16 | 11 | ADT. |
| 09:47:18 | 12 | Q.   And when did he -- |
| 09:47:20 | 13 | A.   I believe ADT was formed in 2001. |
| 09:47:23 | 14 | Q.   So he said he built that company up from scratch? |
| 09:47:27 | 15 | A.   Correct. |
| 09:47:27 | 16 | Q.   Did he ever discuss with you how ADT was capitalized with |
| 09:47:31 | 17 | the funding paid for that company? |
| 09:47:32 | 18 | A.   I have never asked. |
| 09:47:35 | 19 | Q.   Do you know an individual by the name of Francisco |
| 09:47:38 | 20 | Silva-Ramos? |
| 09:47:39 | 21 | A.   Yes, I do. |
| 09:47:40 | 22 | Q.   Do you know him by nickname? |
| 09:47:41 | 23 | A.   "Paco." |
| 09:47:42 | 24 | Q.   Do you know where he lives? |
| 09:47:44 | 25 | A.   I believe he lives in Tuxpan. |

| | | |
|---|---|---|
| 09:47:47 | 1 | Q.   Do you know what his role is in ADT? |
| 09:47:56 | 2 | A.   No. |
| 09:47:58 | 3 | Q.   Was he present when you had meetings with Defendant |
| 09:48:02 | 4 | Colorado? |
| 09:48:02 | 5 | A.   For short periods of time.  Never -- it was always he would |
| 09:48:07 | 6 | come in to speak to Mr. Colorado or something.  But he was always |
| 09:48:13 | 7 | very nice, said hello and -- but he never stuck around for a full |
| 09:48:18 | 8 | meeting. |
| 09:48:19 | 9 | Q.   Do you know if he had a horse company in the United States? |
| 09:48:22 | 10 | A.   Not to my knowledge. |
| 09:48:26 | 11 | Q.   Now, I want to turn your attention back a little bit.  I |
| 09:48:29 | 12 | forgot something on this loan.  You said you didn't visit |
| 09:48:32 | 13 | Defendant Colorado before making this series of loans. |
| 09:48:37 | 14 | A.   I had visited him but not -- the loan was not discussed. |
| 09:48:41 | 15 | Q.   But you did visit him at some point later? |
| 09:48:44 | 16 | A.   Yes. |
| 09:48:44 | 17 | Q.   And when was that? |
| 09:48:47 | 18 | A.   I visited him in -- after November, November 15 or 18. |
| 09:48:53 | 19 | Q.   Can you describe his physical appearance to the jury at that |
| 09:48:56 | 20 | point? |
| 09:48:56 | 21 | A.   Yes.  He had a little bit of unshaven, 5:00 shadow.  And he |
| 09:49:06 | 22 | had for the first time I had seen him with heavy security. |
| 09:49:09 | 23 | Q.   That was the first time you saw him? |
| 09:49:10 | 24 | A.   He had four or five bodyguards, which is not uncommon in |
| 09:49:14 | 25 | Mexico. |

| | | |
|---|---|---|
| 09:49:17 | 1 | Q.   And did you have a conversation with Mr. Colorado in 2012 |
| 09:49:25 | 2 | about his living arrangements in Mexico, whether or not he wanted |
| 09:49:31 | 3 | to stay in Mexico? |
| 09:49:32 | 4 | A.   Correct.  In 2012, he was living in Houston.  The few times |
| 09:49:38 | 5 | I spoke to him and he had mentioned that he had some issues in -- |
| 09:49:47 | 6 | security issues in Mexico and at the moment, he was living in |
| 09:49:54 | 7 | Houston. |
| 09:49:54 | 8 | Q.   And what part of 2012 was this? |
| 09:50:00 | 9 | A.   March, April 2012. |
| 09:50:02 | 10 | Q.   Did you ever have an occasion to meet Defendant |
| 09:50:06 | 11 | Colorado-Cessa in California at the Los Alamitos race track? |
| 09:50:09 | 12 | A.   I did meet him at the Los Alamitos race track. |
| 09:50:11 | 13 | Q.   Who was he with, do you recall? |
| 09:50:13 | 14 | A.   He was with Carlos Nayen, a Dr. Luis Rojas, I believe. |
| 09:50:32 | 15 | Q.   What was the date of that?  Or how about a year?  Just give |
| 09:50:38 | 16 | me a year. |
| 09:50:39 | 17 | A.   2011. |
| 09:50:42 | 18 | Q.   That individual? |
| 09:50:43 | 19 | A.   Mr. Nayen. |
| 09:50:51 | 20 | Q.   Your Honor, I'll pass the witness. |
| 09:50:57 | 21 | MS. WILLIAMS:  I don't have any questions. |
| 09:51:35 | 22 | THE COURT:  All right.  Let's go. |
| 09:51:41 | 23 | MR. DEGEURIN:  Actually, I don't -- I don't have any |
| 09:51:43 | 24 | questions for him.  Thank you, sir. |
| 09:51:47 | 25 | THE WITNESS:  Thank you. |

| | | |
|---|---|---|
| 09:51:48 | 1 | THE COURT:  Mr. Womack. |
| 09:51:49 | 2 | MR. WOMACK:  Your Honor, very, very briefly. |
| 09:51:51 | 3 | CROSS-EXAMINATION |
| 09:51:51 | 4 | BY MR. WOMACK: |
| 09:51:52 | 5 | Q.   Good morning, Mr. Jaff. |
| 09:51:53 | 6 | A.   Good morning. |
| 09:51:53 | 7 | Q.   I'm Guy Womack.  I'm from Houston.  I have just a couple of |
| 09:51:57 | 8 | questions. |
| 09:51:58 | 9 | You told us that you met Francisco Silva-Ramos? |
| 09:52:03 | 10 | A.   Correct. |
| 09:52:04 | 11 | Q.   Okay.  Did you see him in California when you went to Los |
| 09:52:09 | 12 | Alamitos? |
| 09:52:09 | 13 | A.   No. |
| 09:52:10 | 14 | Q.   Did Mr. Silva tell you or other people tell you that he |
| 09:52:14 | 15 | owned Bonanza Racing Stables, which operated race horses and |
| 09:52:20 | 16 | stables in Los Alamitos, California, in Oklahoma and New Mexico? |
| 09:52:25 | 17 | A.   Today's the first I've heard that he owned anything about |
| 09:52:30 | 18 | horses, Mr. Silva. |
| 09:52:31 | 19 | Q.   Okay.  So he didn't mention it at all himself? |
| 09:52:33 | 20 | A.   Never. |
| 09:52:35 | 21 | Q.   And you didn't go to his home, I guess? |
| 09:52:37 | 22 | A.   I've never been to his home. |
| 09:52:40 | 23 | Q.   Okay.  Thank you.  No further questions. |
| 09:52:44 | 24 | THE COURT:  Mr. Esper. |
| 09:52:46 | 25 | MR. ESPER:  I have no questions. |

| | | |
|---|---|---|
| 09:52:47 | 1 | THE COURT:  Mr. Mayr? |
| 09:52:48 | 2 | MR. MAYR:  Nor do I, your Honor. |
| 09:52:49 | 3 | THE COURT:  Any redirect? |
| 09:52:53 | 4 | RE-DIRECT EXAMINATION |
| 09:52:53 | 5 | BY MR. GARDNER: |
| 09:52:57 | 6 | Q.   Just real briefly, Mr. Jaff. |
| 09:53:00 | 7 | Talking about the rigs, again, could it have been more |
| 09:53:03 | 8 | than one rig you saw on the property? |
| 09:53:09 | 9 | A.   I want to remember two rigs, but I can't confirm that it was |
| 09:53:12 | 10 | two.  I'm sorry. |
| 09:53:13 | 11 | Q.   That's fine. |
| 09:53:14 | 12 | And then, on Mr. Colorado's career, he worked for |
| 09:53:23 | 13 | Pemex.  Is that your statement he worked for Pemex? |
| 09:53:25 | 14 | MR. WOMACK:  Objection.  This is beyond the scope.  I |
| 09:53:29 | 15 | only asked about Mr. Silva-Ramos. |
| 09:53:31 | 16 | THE COURT:  I'm going to let him answer the question. |
| 09:53:33 | 17 | Q.   (BY MR. GARDNER) The question is, he worked for Pemex and |
| 09:53:37 | 18 | then, he started ADT, correct? |
| 09:53:38 | 19 | A.   Correct. |
| 09:53:39 | 20 | Q.   I just wanted to make sure that was clear.  That's all I |
| 09:53:42 | 21 | have, your Honor. |
| 09:53:42 | 22 | THE COURT:  May this witness be excused?  You may be |
| 09:53:47 | 23 | excused, sir. |
| 09:53:47 | 24 | THE WITNESS:  Thank you. |
| 09:53:48 | 25 | THE COURT:  Yes, sir.  Call your next witness. |

```
09:54:01   1              MR. GARDNER:  Your Honor, may I have a moment to confer
09:54:03   2    with counsel?
09:54:04   3              THE COURT:  Sure.
09:55:08   4              MR. GARDNER:  Your Honor, we call Special Agent Michael
09:55:10   5    Fernald.
09:55:22   6              MR. DEGEURIN:  Again, your Honor.  May we approach?
09:55:38   7              (At the bench, on the record.)
09:55:42   8              MR. SANCHEZ:  Your Honor, the next witness has a
09:55:44   9    summary chart and it's, I think, the government's intention to
09:55:47  10    summarize evidence that's in evidence.  There is some minor
09:55:55  11    disputes that we have with some of the evidence, like I think
09:55:59  12    they were intending to have Mr. Jaff talk about three rigs and
09:56:03  13    they only talked about one rig, and they show up in the chart
09:56:06  14    that there's three rigs.  And then --
09:56:09  15              THE COURT:  Actually, we had one, two and now we're at
09:56:13  16    three.
09:56:13  17              MR. SANCHEZ:  Right.  And another issue is about
09:56:17  18    whether there was one suspension from Pemex or two suspensions,
09:56:21  19    and he only -- he was unclear about that.  I think what the
09:56:26  20    government's going to rely on is a e-mail where that's not yet
09:56:33  21    introduced into evidence, and it's an e-mail from somebody inside
09:56:40  22    UBS to Ricardo Barrera.  It was given to us, but still, wasn't
09:56:44  23    something we could cross the person who wrote the e-mail.
09:56:48  24              We can confront the person who wrote the e-mail and
09:56:51  25    elicit information.  I think it's possible we can come to an
```

| | | |
|---|---|---|
| 09:56:53 | 1 | agreement as far as the summary chart.  But I don't know if we |
| 09:56:57 | 2 | can do it while he's directing the next witness.  I don't know if |
| 09:57:02 | 3 | it's -- |
| 09:57:06 | 4 | MR. DEGEURIN:  The point is not necessarily for timing |
| 09:57:07 | 5 | but the flow of the trial, it might make sense to take a break |
| 09:57:10 | 6 | now, just a ten-minute break so we can discuss. |
| 09:57:13 | 7 | MR. GARDNER:  I'm fine with them just cross-examining |
| 09:57:15 | 8 | on his opinion and the stuff he's placed on the chart.  If they |
| 09:57:18 | 9 | think it's incorrect, then they can cross-examine. |
| 09:57:19 | 10 | THE COURT:  Well, what they're asking is a ten-minute |
| 09:57:21 | 11 | break and I'm going to have to give it right in the middle of |
| 09:57:23 | 12 | your presentation.  So I mine as well take it now. |
| 09:57:29 | 13 | MR. SANCHEZ:  And so we're clear about this, if he |
| 09:57:33 | 14 | introduces a summary and it's not based on the testimony that's |
| 09:57:35 | 15 | yet in evidence, then it's going to require us to draw out |
| 09:57:38 | 16 | something that's not in evidence that we've never had a right to |
| 09:57:40 | 17 | confront.  But that's our issue. |
| 09:57:43 | 18 | MR. GARDNER:  He's identified as an expert witness.  An |
| 09:57:46 | 19 | expert witness can base his opinions on the things he's seen. |
| 09:57:49 | 20 | THE COURT:  I went to law school a long time.  I wasn't |
| 09:57:57 | 21 | particularly good at it.  So I don't need any help with -- |
| 09:58:00 | 22 | MR. GARDNER:  Yes, sir. |
| 09:58:03 | 23 | THE COURT:  I've got eight lawyers right here, and I |
| 09:58:06 | 24 | promise you, if I need help, I will take it.  We'll take a |
| 09:58:13 | 25 | ten-minute break. |

| | | |
|---|---|---|
| 09:58:14 | 1 | MR. SANCHEZ:  Thank you, your Honor. |
| 09:58:20 | 2 | THE COURT:  There was a lot of talk, but what they |
| 09:58:22 | 3 | really wanted was a break.  They've been working since before |
| 09:58:28 | 4 | 8:30.  So I know you don't need one, but you can stretch and |
| 09:58:32 | 5 | enjoy it.  But I'm going to give them 15 minutes. |
| 09:59:09 | 6 | (Jury not present.) |
| 09:59:20 | 7 | THE COURT:  Counsel, I don't know about whether there's |
| 09:59:26 | 8 | one, two or three oil wells or rigs, and I don't know about the |
| 09:59:31 | 9 | other.  But I do know that I let Mr. Barrera go at your request. |
| 09:59:39 | 10 | So keep that in mind. |
| 09:59:41 | 11 | MR. SANCHEZ:  Yes, your Honor. |
| 09:59:42 | 12 | THE COURT:  All right.  Y'all work out your agreements |
| 09:59:43 | 13 | and take a 15-minute break. |
| 10:11:01 | 14 | (Recess.) |
| 10:14:02 | 15 | THE COURT:  Got everything worked out? |
| 10:14:22 | 16 | MR. GARDNER:  We do, your Honor. |
| 10:14:23 | 17 | THE COURT:  Good. |
| 10:15:59 | 18 | (Jury present.) |
| 10:16:10 | 19 | MR. GARDNER:  Your Honor, government calls Special |
| 10:16:12 | 20 | Agent Michael Fernald. |
| 10:16:18 | 21 | (Witness sworn.) |
| 10:16:33 | 22 | THE COURT:  Tell us your full name and spell your last, |
| 10:16:49 | 23 | please. |
| 10:16:50 | 24 | THE WITNESS:  Yes, sir.  Michael J. Fernald, |
| 10:16:54 | 25 | F-E-R-N-A-L-D. |

| | |
|---|---|
| 10:16:56 | 1 |

10:16:56   1      MICHAEL J. FERNALD, called by the Government, duly sworn.

10:16:56   2                     DIRECT EXAMINATION

10:16:56   3   BY MR. GARDNER:

10:16:57   4   Q.   Thank you, your Honor.

10:16:57   5        Special Agent Fernald, could you please introduce

10:17:00   6   yourself to the jury?

10:17:02   7   A.   Sure.  My name is Michael Fernald.  I'm 39 years old and

10:17:06   8   here from Austin.  Graduated from high school in 1992.  Out of

10:17:11   9   high school, I joined the U.S. Army until 1997.  Out of the Army,

10:17:16   10  I attended college and graduated from the University of Texas in

10:17:20   11  Austin with a Bachelor's Degree in Accounting, Master's Degree in

10:17:24   12  Accounting.

10:17:25   13  Q.   And are you a Certified Public Accountant?

10:17:27   14  A.   I am a CPA.

10:17:27   15  Q.   And what's your current assignment?

10:17:29   16  A.   I'm a special agent with the Criminal Investigation Division

10:17:32   17  of the IRS.

10:17:33   18  Q.   And how long have you been with the IRS?

10:17:35   19  A.   Since 2002.

10:17:37   20  Q.   Could you generally explain to the ladies and gentlemen of

10:17:40   21  the jury what a criminal investigator from the IRS does?

10:17:43   22  A.   Sure.  An IRS criminal investigator, essentially we're

10:17:47   23  fact-gatherers.  We gather facts based upon information as

10:17:51   24  received.  We analyze the information.  Generally it's related to

10:17:56   25  criminal violations with the Internal Revenue Code.  However, we

10:18:00   1   also have jurisdiction over really any type of crimes that

10:18:05   2   involve moneys.  For instance, wire frauds or investment fraud

10:18:11   3   schemes.  We investigate the information, provide the information

10:18:17   4   to the U.S. Attorney's Office and make a determination if it's

10:18:20   5   presented to the grand jury for indictment.

10:18:23   6   Q.   I notice you have the same last name as my charming

10:18:26   7   co-counsel over here.

10:18:27   8   A.   I do.

10:18:27   9   Q.   Are you related to this woman?

10:18:29  10   A.   I'm fortunate enough to be married to her.  Yes.

10:18:33  11   Q.   And I'm asking the questions because you're under oath and

10:18:35  12   sworn to tell the truth, right?

10:18:37  13   A.   Sure.

10:18:42  14   Q.   I'm protecting you.

10:18:45  15        In all seriousness, since this trial started, have you

10:18:49  16   discussed any of the other witnesses' testimony with your spouse

10:18:52  17   regarding your testimony here today?

10:18:54  18   A.   Absolutely not.

10:18:55  19   Q.   And that's because you're under the rule that prevents you

10:18:58  20   as a witness talking to other folks about other witnesses'

10:19:02  21   testimony?

10:19:02  22   A.   That's correct.

10:19:03  23   Q.   So the investigation, your results have mainly been between

10:19:07  24   you and I?

10:19:08  25   A.   That's correct.

10:19:08  1  Q.   So when did you join this investigation?

10:19:11  2  A.   I got involved in late September, early October of last

10:19:15  3  year.

10:19:15  4  Q.   And what was your role?

10:19:17  5  A.   My role was very simple.  It was financial analysis of Jose

10:19:21  6  Trevino and his companies Tremor Enterprises, 66 Land, Zule

10:19:29  7  Farms, and a financial analysis of Francisco Colorado-Cessa and

10:19:33  8  his company ADT Petro Servicios.

10:19:35  9  Q.   Let's start with Defendant Colorado's financial analysis.

10:19:43  10 What specifically did you review for your testimony here today

10:19:47  11 regarding Defendant Colorado?

10:19:49  12 A.   For Mr. Colorado, for ADT Petro Servicios, I reviewed bank

10:19:54  13 statements, financial statements, and also obtained information

10:19:58  14 from witness statements and conversations I've had with case

10:20:02  15 agents.

10:20:04  16 Q.   And with respect to the UBS accounts, how many accounts did

10:20:08  17 you analyze?

10:20:10  18 A.   There were a total of six accounts, however, only four were

10:20:13  19 actually funded, meaning four actually had money.

10:20:17  20 Q.   And that's Government's Exhibit 252A through F that's in one

10:20:19  21 of these boxes over here, correct?

10:20:21  22 A.   That's correct.

10:20:21  23 Q.   And did you -- what other accounts of Defendant Colorado did

10:20:26  24 you evaluate?

10:20:27  25 A.   Mr. Colorado or his company ADT Petro Servicios had several

10:20:32   1   accounts in the United States.  They included a UBS account,

10:20:37   2   Compass account, an account at International Bank, and an account

10:20:46   3   at American Express International Bank.  He also had a loan from

10:20:54   4   Arian Jaff or Quick Loans.  I believe that's all.

10:20:59   5   Q.   Now, with respect to the UBS materials, the jury yesterday

10:21:03   6   saw financial statements from ADT Petro Servicios.  Did you

10:21:08   7   review those?

10:21:08   8   A.   I did.

10:21:09   9   Q.   Okay.  What years did you review them?

10:21:11   10   A.   There was 2008, 2009 and 2010.

10:21:15   11   Q.   And were you able to obtain a 2011 financial statement from

10:21:20   12   ADT?

10:21:20   13   A.   I was not, or 2012.

10:21:22   14   Q.   Now, the jury saw two separate ADT financial statements, one

10:21:27   15   was signed and unsigned.  Did you compare the numbers on one to

10:21:29   16   the other for the same years?

10:21:31   17   A.   I did.  So for 2008, 2009 there were two separate financial

10:21:36   18   statements.  One being signed, the other being unsigned.  The

10:21:41   19   difference between the two were the ones that were unsigned had a

10:21:47   20   higher net income, meaning they had a lower amount of expenses

10:21:51   21   for ADT Petro Servicios.

10:21:52   22   Q.   And so, which one would be the most generous with regards to

10:21:58   23   Defendant Colorado's financial status?

10:22:00   24   A.   The ones that were unsigned, the ones that I utilized in my

10:22:04   25   financial analysis.

10:22:05    1    Q.   So more conservative analysis based on those, rather than
10:22:08    2    the signed ones?
10:22:09    3    A.   That's correct.  I wanted to give Mr. Colorado and ADT the
10:22:12    4    benefit of the doubt.
10:22:13    5    Q.   All right.  Did you -- or are you aware of other agents
10:22:16    6    attempting to obtain any documents from the country of Mexico?
10:22:19    7    A.   I did.
10:22:19    8    Q.   And what efforts were made to obtain any documents related
10:22:22    9    to Defendant Colorado from the country of Mexico?
10:22:25   10    A.   Well, there were actually three.  I personally sent a
10:22:29   11    request through FinCEN, which is Financial Crimes Enforcement
10:22:33   12    Network.  Essentially it's a branch of United States Treasury.
10:22:37   13    They have attachés.  They have the abilities in other countries
10:22:41   14    to get financial information.  They were unsuccessful in their
10:22:44   15    efforts to obtain information.
10:22:46   16         We within the IRS have an attaché in Mexico, as well.
10:22:50   17    There was a request that was sent to the attaché.  He was
10:22:53   18    unsuccessful.  And then, there was a more formal, called MLAT
10:22:58   19    request through Department of Justice, I believe, to the
10:23:01   20    government in Mexico, and that was unsuccessful, as well.
10:23:03   21    Q.   Were all those requests made in 2012?
10:23:06   22    A.   Around there.  Yes, sir.
10:23:08   23    Q.   Now, the Defendant Colorado's provided some materials of
10:23:14   24    their own in discovery with regards to bank records.  Did you
10:23:16   25    review those?

| | | |
|---|---|---|
| 10:23:17 | 1 | A.    Briefly. |
| 10:23:18 | 2 | Q.    And what did that information consist of? |
| 10:23:21 | 3 | A.    It consisted of incomplete bank records for ADT Petro |
| 10:23:27 | 4 | Servicios. |
| 10:23:27 | 5 | Q.    When you say incomplete, could you define that a little bit |
| 10:23:29 | 6 | more for the jury? |
| 10:23:31 | 7 | A.    Incomplete meaning there were no signature cards.  Generally |
| 10:23:36 | 8 | they only consisted of bank statements.  There were no -- what I |
| 10:23:41 | 9 | refer to as source items, checks, wires, the actual source item |
| 10:23:47 | 10 | that makes up the deposit or withdrawal from the bank statement. |
| 10:23:50 | 11 | Q.    So, example, if I were to write a check to Michael Fernald |
| 10:23:54 | 12 | and deposit it into your account, would that show up on your |
| 10:23:56 | 13 | statement? |
| 10:23:57 | 14 | A.    That would show up on my statement probably as just a |
| 10:23:59 | 15 | deposit, but to know that you actually wrote it to me, I would |
| 10:24:03 | 16 | need the physical check, or the copy of the check, or image of |
| 10:24:08 | 17 | the check. |
| 10:24:08 | 18 | Q.    And were there any contracts provided in that discovery that |
| 10:24:11 | 19 | you found with respect to oil field -- |
| 10:24:14 | 20 | A.    No. |
| 10:24:16 | 21 | Q.    -- purchases? |
| 10:24:17 | 22 |        Now, is the information that the defendant provided, |
| 10:24:19 | 23 | has that changed your analysis? |
| 10:24:21 | 24 | A.    It does not. |
| 10:24:22 | 25 | Q.    What's the purpose of the financial analysis? |

10:24:25  1   A.   The purpose of the financial analysis, as far as I was

10:24:28  2   concerned, I was mostly interested in his financial wherewithal

10:24:32  3   and the cash flow, the amount of cash that was coming into ADT.

10:24:36  4   Q.   And so, what do you do?  How do you work through the

10:24:41  5   financial analysis via your process or your method?

10:24:47  6   A.   Well, since I was mostly concerned with the cash flow, like

10:24:50  7   I said, coming into ADT, I did two separate things for Mr.

10:24:55  8   Colorado and ADT.  When I say ADT, I'm referring to ADT Petro

10:25:01  9   Servicios.  There were the financial statements and then, there

10:25:03  10  were the bank records for the accounts.  For the bank accounts I

10:25:08  11  did what's called a source application.  Essentially I input from

10:25:11  12  the bank statements the information into an Excel spreadsheet,

10:25:15  13  and I separated all source items or all deposits and all

10:25:20  14  applications or withdrawals.  So I knew exactly what was coming

10:25:24  15  into the account and how the moneys were being utilized.

10:25:27  16       Now, for the financial statements, there was a balance

10:25:34  17  sheet and an income statement, and essentially what I did, I

10:25:37  18  compared the amount of money that's coming in to the amount of

10:25:41  19  money that's coming out.

10:25:41  20  Q.   On the ADT Petro Servicios?

10:25:44  21  A.   On the financial statements.

10:25:45  22  Q.   The ones that were provided by them to?

10:25:47  23  A.   UBS.

10:25:49  24  Q.   And generally did you conduct an analysis of the UBS -- the

10:25:55  25  four funded accounts from UBS?

```
10:25:56   1   A.    I did.

10:25:56   2   Q.    For what years was that?

10:25:57   3   A.    That was the UBS account was -- there was one that funded in

10:26:02   4   late 2009.  So 2009, '10, '11 and 2012.

10:26:08   5   Q.    And so, you mentioned the source and application.  Could you

10:26:11   6   define what you're looking for when you talk about source and

10:26:13   7   application?

10:26:14   8   A.    Sure.  I'm basically tracing money.  I want to know the

10:26:18   9   moneys that are coming in, where those are being derived, and how

10:26:23  10   they're being utilized.

10:26:24  11   Q.    And I'm not going to subject the jury to one of your

10:26:27  12   spreadsheets, but did you prepare this in aid of your testimony

10:26:32  13   here today?

10:26:32  14   A.    I did.

10:26:33  15   Q.    Okay.  Is that an accurate reflection of the documents that

10:26:37  16   you reviewed and the information that you received from all

10:26:39  17   sources in conducting your financial analysis?

10:26:41  18   A.    That's correct.

10:26:42  19   Q.    Did you prepare this as an aid to explain your testimony to

10:26:46  20   the jury?

10:26:46  21   A.    I did.

10:26:47  22   Q.    Your Honor, I offer Government's Exhibits 404B.

10:27:05  23        MR. SANCHEZ:  No objection.

10:27:11  24        THE COURT:  404B is received.

10:27:14  25   Q.    (BY MR. GARDNER) Special Agent Fernald, what does this chart
```

| | | |
|---|---|---|
| 10:27:42 | 1 | represent? |
| 10:27:43 | 2 | A.   This is essentially a timeline of events related to ADT and |
| 10:27:49 | 3 | Francisco Colorado. |
| 10:27:50 | 4 | Q.   So here on the bottom is exactly what you said, it is a |
| 10:27:55 | 5 | timeline, correct? |
| 10:27:55 | 6 | A.   Yes. |
| 10:27:55 | 7 | Q.   And what is the long axis up here at this column? |
| 10:27:59 | 8 | A.   I'm sorry? |
| 10:27:59 | 9 | Q.   What will be on the long axis, this column? |
| 10:28:01 | 10 | A.   There's specific events -- as we go through, there's |
| 10:28:04 | 11 | specific events that will be highlighted. |
| 10:28:06 | 12 | Q.   Okay.  So let's talk about the first event. |
| 10:28:09 | 13 | A.   Sure.  So in May of 2001, ADT Petro Servicios is formed. |
| 10:28:22 | 14 | Q.   Next, please.  What's this number? |
| 10:28:26 | 15 | A.   All right.  That's $18 million that essentially capitalized |
| 10:28:31 | 16 | ADT Petro Servicios that Mr. Colorado received from Efrain |
| 10:28:35 | 17 | Torres. |
| 10:28:35 | 18 | Q.   Okay.  That's based on the testimony of another witness. |
| 10:28:38 | 19 | The jury's going to determine that credibility of that testimony. |
| 10:28:42 | 20 | You just put it on here for your analysis? |
| 10:28:44 | 21 | A.   Correct. |
| 10:28:44 | 22 | Q.   Do you use that amount in conducting your financial |
| 10:28:47 | 23 | analysis? |
| 10:28:47 | 24 | A.   I did not. |
| 10:28:48 | 25 | Q.   So didn't factor into your overall opinion of the net worth |

10:28:53  1  of the company?

10:28:54  2  A.    Not of that aspect.  No.

10:28:56  3  Q.    Next, please.  This $2 million, what is this, sir?

10:29:01  4  A.    That's essentially just showing an outlay of $2 million for

10:29:05  5  the purchase of an oil rig by ADT.

10:29:08  6  Q.    Okay.  And just for the record, when you say the date on

10:29:11  7  that.

10:29:12  8  A.    March 1st of 2010.

10:29:14  9  Q.    And what occurred here in April through August of 2010?

10:29:20  10  A.    In April, ADT was suspended from bidding on Pemex contracts

10:29:24  11  and it was summarily lifted.

10:29:27  12  Q.    Do you have that reflected here?  So about six months or

10:29:31  13  six-month suspension?

10:29:33  14  A.    Around that number.  Yes.

10:29:35  15  Q.    Next event, please.  And where do you get the $39 million on

10:29:51  16  the oil rigs at the ranch?

10:29:53  17  A.    I got that information through the documents in UBS and

10:29:57  18  then, from the statement.  So essentially just showing there's

10:30:01  19  more cash outlay coming out of ADT.

10:30:03  20  Q.    Expenses that he is --

10:30:04  21  A.    Expenses out of ADT.

10:30:06  22  Q.    And this right here with respect to this suspension?

10:30:08  23  A.    That's a subsequent suspension where ADT was forbidden from

10:30:14  24  bidding on Pemex contracts.

10:30:16  25  Q.    And, again, where did you obtain that information from?

10:30:19  1   A.   From the UBS records and from witness statements.

10:30:22  2   Q.   Okay.  Next, please.

10:30:24  3   A.   We're going to have to go back to the left.  I'm sorry.

10:30:28  4   There's more.

10:30:28  5   Q.   So what are these purple dots?  What do they represent?

10:30:31  6   A.   Those are deposits from ADT to Francisco Colorado-Cessa's

10:30:36  7   wife Maria Salman.  The first deposit was a $50,000 deposit in

10:30:43  8   November 28, 2011, and that coincides to when she moved to

10:30:49  9   Houston from Tuxpan.

10:30:51 10   Q.   Okay.  Again, these go in from what account to what account?

10:30:55 11   A.   This is going from ADT account to a Frost Bank account in

10:31:00 12   the United States.

10:31:01 13   Q.   And there's two subsequent payments here.  One on 1-23 of

10:31:05 14   '12 and one on May 3rd of '12.

10:31:08 15   A.   That's correct.  So a total of $300,000 was deposited to the

10:31:11 16   Frost Bank account.  And as I reviewed that account, it was

10:31:15 17   obviously that was -- she was living out of that account.  She

10:31:18 18   was in the United States.

10:31:18 19   Q.   So when you say living out of it?

10:31:20 20   A.   Expenses.  It was everyday expenses.

10:31:24 21   Q.   Next, please.  Special Agent Fernald, what does this line

10:31:31 22   represent?

10:31:31 23   A.   This next line's going to say bank-to-bank transfers.

10:31:35 24   Again, just putting a perspective and showing the moneys coming

10:31:39 25   out of ADT and being deposited to accounts in the United States,

10:31:43    1    whether it's UBS, International Bank, Frost Bank, America Express

10:31:49    2    Bank, or Compass.

10:31:53    3    Q.   The banks that you identified through subpoenaed records and

10:31:56    4    search warrant items?

10:31:57    5    A.   That's correct.

10:31:58    6    Q.   Next, please.

10:32:05    7    A.   So in June of 2009, there was $764,500 deposit from ADT to

10:32:14    8    the Compass Bank account, and that was the opening deposit in

10:32:17    9    that account.

10:32:18   10    Q.   And did you track the expenses -- the subsequent expenses

10:32:21   11    from that account?

10:32:22   12    A.   I did.

10:32:22   13    Q.   And could you tell the jury what you discovered?

10:32:26   14    A.   Well, shortly after the $764,500 was deposited, there was a

10:32:32   15    $600,000 unknown purchase.  I've had discussions with Compass

10:32:39   16    Bank.  It's believed that Mr. Colorado purchased several

10:32:43   17    certificates of deposit from that.  But there were some

10:32:47   18    subsequent deposits to the account, as well.  But that was the

10:32:49   19    biggest chunk of that money.

10:32:51   20    Q.   Next, please.  And I believe we've heard testimony from Mr.

10:32:58   21    Barrera that he brought Defendant Colorado's account over from

10:33:02   22    AMX to UBS?

10:33:04   23    A.   That's the balance from the account from American Express.

10:33:06   24    And that's the opening deposit to the UBS account in December

10:33:15   25    '09.

```
10:33:15   1   Q.   Explain all these, please.
10:33:16   2   A.   Again, just a summary of movement of funds that's
10:33:21   3   approximately $14, $15 million coming out of ADT and being
10:33:25   4   deposited into Mr. Colorado's personal account.  The importance
10:33:30   5   is just that's $15 million that is not available to pay expenses
10:33:34   6   at the company.
10:33:36   7   Q.   And you're going to talk a little bit about the credit
10:33:39   8   facility that Mr. Barrera discussed yesterday, correct?
10:33:42   9   A.   Yes.
10:33:42  10   Q.   Next, please.  And what are these, sir?
10:33:49  11   A.   Again, more transfers from ADT to personal accounts, all of
10:33:55  12   them in 2011.  So right now, we're just going by year, transfers
10:33:59  13   in 2010, 2011.
10:34:04  14   Q.   Next, please.  And what is this one right here?
10:34:10  15   A.   All right.  That's in October of 2011.  This deposit was
10:34:16  16   directly from Pemex.  It never was deposited to the ADT account.
10:34:21  17   Essentially they needed that deposit.  Mr. Colorado needed that
10:34:24  18   deposit.  Because of the credit facility you just mentioned, Mr.
10:34:27  19   Colorado wanted to draw down on the credit facility, but he
10:34:32  20   needed to make deposits into the collateral account in order for
10:34:35  21   the loan-to-value ratio to be sufficient for UBS to make that
10:34:39  22   loan.  So that's what this deposit was was just to get the
10:34:43  23   collateral to the right ratios.
10:34:45  24   Q.   And you talked with Mr. Barrera, correct?
10:34:47  25   A.   I did.
```

10:34:48   1   Q.   And he said they needed anywhere from a 60 to 80 percent

10:34:52   2   loan-to-value ratio?

10:34:54   3   A.   Loan-to-value ratio.  That's correct.

10:34:55   4   Q.   So this UBS or this Pemex deposit is to ensure that ratio is

10:35:00   5   satisfactory to UBS?

10:35:00   6   A.   That's correct.  Because without this deposit, the

10:35:03   7   loan-to-value ratio would not have been sufficient.

10:35:05   8   Q.   Next, please.

10:35:12   9   A.   Same thing.

10:35:13   10   Q.   Next, please.

10:35:14   11   A.   Same thing.  Mr. Colorado did not have enough money in his

10:35:18   12   collateral account to draw down on it, so he had to make

10:35:21   13   deposits.  And these are, again, coming directly from Pemex.

10:35:24   14   They're not being utilized by ADT.

10:35:27   15   Q.   So these are not funds available for ADT?

10:35:30   16   A.   That's correct.

10:35:31   17   Q.   For what?

10:35:31   18   A.   For expenses of the company.

10:35:33   19   Q.   Their operating expenses?

10:35:35   20   A.   That's correct.

10:35:35   21   Q.   Next, please.  And these are?

10:35:43   22   A.   Again, more movement of funds from ADT to UBS.  There's two

10:35:47   23   more transfers.

10:35:49   24   Q.   Next, please.  And what is this line right here, sir?

10:35:53   25   A.   This line is the timeline of the loans Mr. Colorado received

10:35:57   1    from Arian Jaff.

10:35:59   2    Q.   And you've been present and discussed and reviewed Mr.

10:36:03   3    Jaff's material, correct?

10:36:04   4    A.   I have.

10:36:05   5    Q.   Next, please.  So I'm showing the jury -- you'll recall Mr.

10:36:11   6    Jaff's testimony -- but we have Mr. Colorado meeting?

10:36:15   7    A.   That's correct.

10:36:16   8    Q.   Meeting Mr. Jaff.  Next, please.

10:36:20   9    A.   This is the first loan for $500,000.  Mr. Colorado initially

10:36:27   10   asked Mr. Jaff for a $10 million loan and only got $500,000.

10:36:32   11   Q.   And do you recall the interest rate on that particular loan?

10:36:35   12   A.   I don't.  It was around 15 percent or so.

10:36:38   13   Q.   Next, please.

10:36:41   14   A.   And this is the second loan that Mr. Colorado obtained

10:36:45   15   through Mr. Jaff.  This loan was actually a million-dollar loan

10:36:51   16   that Mr. Colorado paid prepaid interest on.  So he only got

10:36:56   17   $856,000 and some change out of a million dollars because of the

10:37:00   18   prepaid interest.

10:37:01   19   Q.   And describe prepaid interest for the jury, please.

10:37:04   20   A.   Well, essentially you're paying interest before the loan is

10:37:09   21   -- before the interest is due essentially.

10:37:12   22   Q.   Whether you have a loan in a month or a year, the interest

10:37:16   23   is the same?

10:37:16   24   A.   So essentially what Mr. Colorado was doing -- I don't

10:37:19   25   specifically recall the terms of the loan, whether they were

10:37:22   1   six-month loan or a year loan, but essentially Mr. Colorado was

10:37:26   2   paying the entire amount of the interest.  For instance, say if

10:37:29   3   it was a year loan, he was paying a year's worth of interest up

10:37:33   4   front.

10:37:33   5   Q.   So if he would have paid that back in six months, would it

10:37:37   6   still have been the same amount?

10:37:38   7   A.   That's right.  He would have eaten six months worth of

10:37:41   8   interest.

10:37:41   9   Q.   Next, please.  And what are these, sir?

10:37:44   10  A.   These are the repayments to Mr. Jaff for the first two

10:37:48   11  loans.  And the $1 million on December 21st, that was from

10:37:58   12  Mr. Colorado's retirement account at Compass.

10:38:01   13  Q.   Compass Bank?

10:38:02   14  A.   From Compass Bank.

10:38:03   15  Q.   So not from UBS?

10:38:05   16  A.   Not from UBS, not from ADT.

10:38:08   17  Q.   Next, please.  And Mr. Jaff just testified, so I'm sure that

10:38:31   18  testimony is fresh in the jury's mind.

10:38:33   19        But, again, this is something that you accounted for in

10:38:35   20  your analysis as funds available to.

10:38:37   21  A.   That's funds available.  Correct.

10:38:40   22  Q.   And right here at the end, what is this?

10:38:46   23  A.   Mr. Colorado still owes Mr. Jaff $88,000.

10:38:49   24  Q.   So are these right here repayments on that?

10:38:52   25  A.   That's correct.  The dots in red are the loans.  Beneath

| | | |
|---|---|---|
| 10:38:57 | 1 | those, the yellow dots are the repayments. |
| 10:38:59 | 2 | Q.   So the last loan was made in November on the 16th up -- |
| 10:39:06 | 3 | except for the $88,000, how long did it take the Defendant |
| 10:39:09 | 4 | Colorado to repay that loan? |
| 10:39:19 | 5 | A.   Almost six months. |
| 10:39:21 | 6 | Q.   Next, please.  Now, this slide says, horse purchases.  What |
| 10:39:28 | 7 | did you do with respect to tracking the number of purchases that |
| 10:39:33 | 8 | you identified as being associated with Defendant Colorado? |
| 10:39:37 | 9 | A.   Well, I've had several conversations with the case agents |
| 10:39:40 | 10 | about the horse purchases and those agents that were responsible |
| 10:39:44 | 11 | for essentially tracking those purchases.  So the purchases are |
| 10:39:50 | 12 | based upon the bank accounts that I reviewed, as well.  But the |
| 10:39:54 | 13 | number of horses is based upon my conversations with the -- my |
| 10:39:58 | 14 | fellow case agents. |
| 10:39:58 | 15 | Q.   So in terms of the bank accounts, the actual checks or |
| 10:40:01 | 16 | wires? |
| 10:40:02 | 17 | A.   The actual transaction was within the -- the accounts that I |
| 10:40:05 | 18 | reviewed. |
| 10:40:05 | 19 | Q.   Okay.  And whose name did you evaluate to put on this chart? |
| 10:40:11 | 20 | A.   This is solely Francisco Colorado-Cessa or ADT Petro |
| 10:40:17 | 21 | Servicios. |
| 10:40:17 | 22 | Q.   Next, please.  And so, this one, sir? |
| 10:40:20 | 23 | A.   And this is, again, by year, those horse purchases in 2008, |
| 10:40:28 | 24 | about a half-million dollars. |
| 10:40:29 | 25 | Q.   And do you recall where that purchase was made? |

```
10:40:33   1   A.   Those were through the American Express Bank.

10:40:36   2   Q.   Next, please.

10:40:39   3   A.   Again, the purchases in 2009, over half a million dollars.

10:40:44   4   Q.   Next, please.  And where were these purchases made in 2010?

10:40:50   5   A.   These purchases were in 2010.  And then, below there in the

10:40:54   6   gray, those are the expenses that Mr. Colorado or ADT paid.

10:40:58   7   Q.   So when you say purchase, I believe we heard from Ms. Diane

10:41:02   8   Reed from Ruidoso.  Is that the $2.2 million personal check?

10:41:06   9   A.   That's the personal check coming out of Compass Bank that

10:41:09  10   was funded with wires from ADT.

10:41:11  11   Q.   And when you say expenses, what do you refer to?  What type

10:41:16  12   of expenses?

10:41:17  13   A.   Boarding expenses, training expenses, entry fee, things of

10:41:21  14   that nature.

10:41:21  15   Q.   And this right here, couple of months later?

10:41:25  16   A.   That's correct.  More.

10:41:27  17   Q.   Next, please.

10:41:28  18   A.   I believe that 12,000 was a partial payment.

10:41:31  19   Q.   And these two horse purchases, where did those two come

10:41:36  20   from?

10:41:39  21   A.   The 131,00 and 300,000, I would have to look.  I don't

10:41:43  22   recall exactly where they came from.  Either ADT or the personal

10:41:47  23   accounts in the United States.

10:41:49  24   Q.   They didn't come from UBS?

10:41:51  25   A.   No.  I'm sorry.  The 300,000 did come from UBS to Mueller
```

| | | |
|---|---|---|
| 10:41:57 | 1 | Racing. |
| 10:41:57 | 2 | Q.   This is Mueller Racing? |
| 10:41:59 | 3 | A.   That's Mueller Racing. |
| 10:42:00 | 4 | Q.   Next, please. |
| 10:42:09 | 5 | A.   Just more expenses. |
| 10:42:11 | 6 | Q.   Next, please.  Where does this 3,700,000 come from? |
| 10:42:18 | 7 | A.   That's the cumulative amount.  So essentially because we ran |
| 10:42:23 | 8 | out of room on the chart, we had to put it like this.  That's a |
| 10:42:27 | 9 | cumulative amount that consisted of eight transactions that |
| 10:42:31 | 10 | totaled $3.7 million. |
| 10:42:34 | 11 | Q.   Next, please. |
| 10:42:37 | 12 | A.   And then, there was a subsequent purchase in the next month |
| 10:42:40 | 13 | of almost a million dollars.  And you see below there, more |
| 10:42:44 | 14 | expenses.  And as you continue on, there's just more purchases |
| 10:42:47 | 15 | and expenses. |
| 10:42:51 | 16 | Q.   Next, please.  And can you give me the last one?  And is |
| 10:42:58 | 17 | this the last expense you tracked in June of 2012? |
| 10:43:00 | 18 | A.   That's correct. |
| 10:43:01 | 19 | Q.   That's for $177,979? |
| 10:43:04 | 20 | A.   That's correct. |
| 10:43:07 | 21 | Q.   Special Agent Fernald, were you able to determine if there's |
| 10:43:12 | 22 | any other source of income for the Defendant Colorado? |
| 10:43:16 | 23 | A.   No. |
| 10:43:18 | 24 | Q.   Any other personal accounts that you discovered in the U.S. |
| 10:43:21 | 25 | or Mexico, either through your investigation or through the |

| | | |
|---|---|---|
| 10:43:24 | 1 | material provided by the defendant? |
| 10:43:26 | 2 | A.   Not that I'm aware. |
| 10:43:27 | 3 | Q.   All right.  So in your opinion, what is your analysis of the |
| 10:43:31 | 4 | cash flow coming in and out of ADT and Defendant Colorado's |
| 10:43:36 | 5 | personal accounts? |
| 10:43:37 | 6 | A.   Based upon my analysis of the 2008, 2009 and 2010 financial |
| 10:43:43 | 7 | statements for ADT, at best, ADT broke even, meaning the expenses |
| 10:43:49 | 8 | of the company were equal to or exceeded the moneys that were |
| 10:43:53 | 9 | available to pay them. |
| 10:43:56 | 10 | Q.   And so, this right here, is this basically a summary over |
| 10:44:00 | 11 | here on the right-hand side, a summary of the number of horses he |
| 10:44:03 | 12 | purchased during that timeframe? |
| 10:44:04 | 13 | A.   That's correct. |
| 10:44:06 | 14 | Q.   And a summary of the horses still maintained in his name |
| 10:44:09 | 15 | during that timeframe? |
| 10:44:10 | 16 | A.   That's correct. |
| 10:44:11 | 17 | Q.   Next, please.  This bottom line, is that, again, a sum of |
| 10:44:36 | 18 | this line up here with respect to horse purchases and horse |
| 10:44:39 | 19 | expenses? |
| 10:44:40 | 20 | A.   That's correct, $10.1 million. |
| 10:44:47 | 21 | Q.   What is the significance of that number to the opinion you |
| 10:44:50 | 22 | just gave on ADT's breaking even? |
| 10:44:56 | 23 | A.   That Mr. Colorado through ADT could not do both.  He |
| 10:44:59 | 24 | couldn't operate and pay the expenses of the company and buy and |
| 10:45:05 | 25 | pay for $10.1 million worth of horses.  It essentially reaffirms |

10:45:10   1   the results of the investigation in that Mr. Colorado had to get

10:45:14   2   money from somewhere else.

10:45:15   3   Q.   And when you say at best, what do you mean by that?  At

10:45:21   4   best, he's breaking even.  What do you mean by at best in terms

10:45:24   5   of your analysis as applied to ADT and Mr. Colorado?

10:45:28   6   A.   When I referred to at best, meaning he had enough money to

10:45:31   7   pay the expenses.  So the expenses, the money available were the

10:45:35   8   same, they equaled each other.

10:45:39   9   Q.   Ms. Sims, could I have the lights, please?

10:45:41  10        Now, you also stated earlier that you reviewed the

10:45:48  11   accounts of Jose Trevino.

10:45:50  12   A.   I did.

10:45:51  13   Q.   What accounts did you review for the Defendant Jose Trevino?

10:45:56  14   A.   I reviewed eight bank accounts for Mr. Trevino.  There were

10:46:00  15   three personal accounts, two accounts for Tremor Enterprises, one

10:46:07  16   account for 66 Land, and two accounts for Zule Farms.

10:46:11  17   Q.   Did you review the tax returns of Defendant Trevino?

10:46:15  18   A.   I did not.

10:46:15  19   Q.   And why not?

10:46:18  20   A.   Well, the tax returns are only as good as the information

10:46:21  21   that's on them, and people are known to lie on their tax returns.

10:46:23  22   That's why there's criminal investigators with the IRS.

10:46:26  23   Q.   So your analysis is solely based on the bank accounts?

10:46:30  24   A.   That's correct.

10:46:30  25   Q.   Now, have you used the same process with respect to the

| | | |
|---|---|---|
| 10:46:36 | 1 | source and applications of funds for Jose Trevino's accounts as |
| 10:46:40 | 2 | you did for Colorado-Cessa? |
| 10:46:42 | 3 | A.   I did. |
| 10:46:43 | 4 | Q.   Were there any financial statements for any of the Defendant |
| 10:46:46 | 5 | Jose Trevino's companies? |
| 10:46:47 | 6 | A.   There were financial statements prepared for Tremor, for 66 |
| 10:46:54 | 7 | Land and Zule Farms.  But in my analysis, I used the bank |
| 10:46:57 | 8 | statements, and the bank statements were also utilized to prepare |
| 10:46:59 | 9 | the financial statements.  So I had all the information. |
| 10:47:02 | 10 | Q.   That was the testimony of Ms. Sharon Moore? |
| 10:47:05 | 11 | A.   I believe that's what it would have been. |
| 10:47:07 | 12 | Q.   Now, again, I'm not going to show the jury a spreadsheet, |
| 10:47:11 | 13 | but on there, you have a number of what you call balance checks. |
| 10:47:15 | 14 | What's a balance check? |
| 10:47:16 | 15 | A.   Essentially what I did for Mr. Trevino is for every bank |
| 10:47:21 | 16 | account, again, I input the information from the bank statement |
| 10:47:24 | 17 | into an Excel spreadsheet, and that just affords me the ability |
| 10:47:28 | 18 | to sort and find and manipulate the data.  So essentially what I |
| 10:47:33 | 19 | did was I took the information, but I wanted to make sure that I |
| 10:47:37 | 20 | had a continuing balance in the account.  So I knew that at any |
| 10:47:41 | 21 | given point for any transaction, I knew what the balance was in |
| 10:47:45 | 22 | the account.  In order to do that and know that it's accurate, I |
| 10:47:49 | 23 | had to ensure that the beginning balance and that the ending |
| 10:47:52 | 24 | balance of every month matched the bank statement. |
| 10:47:55 | 25 | So if you recall in your bank statements, I'm sure you |

| | | |
|---|---|---|
| 10:47:58 | 1 | have them, there's an opening balance and an ending balance, and |
| 10:48:01 | 2 | in my spreadsheets, the opening balance and the beginning balance |
| 10:48:06 | 3 | match.  And on my spreadsheets where you see a little X under the |
| 10:48:09 | 4 | balance checked, that is to verify that those balances do match. |
| 10:48:14 | 5 | Q.   Like balancing a checkbook? |
| 10:48:16 | 6 | A.   It's like balancing your checkbook. |
| 10:48:17 | 7 | Q.   So did you track both the expenses coming out of these |
| 10:48:20 | 8 | accounts as well as the income coming in? |
| 10:48:23 | 9 | A.   I did. |
| 10:48:23 | 10 | Q.   When we talk about income, what did you look at to determine |
| 10:48:28 | 11 | that? |
| 10:48:29 | 12 | A.   Just deposits from the -- to the account from any source, |
| 10:48:32 | 13 | regardless of source. |
| 10:48:33 | 14 | Q.   And what sources did you look at to see where the deposits |
| 10:48:36 | 15 | were coming from? |
| 10:48:37 | 16 | A.   Well, for all deposits, like I said, regardless of source. |
| 10:48:41 | 17 | Q.   So let's talk about wages.  Did you look at wages? |
| 10:48:44 | 18 | A.   There were wages to the personal account. |
| 10:48:46 | 19 | Q.   Let's talk generally from 1990 until 2009, where did you see |
| 10:48:54 | 20 | the wages coming from? |
| 10:48:55 | 21 | A.   I found Social Security statements in the search warrant |
| 10:48:59 | 22 | evidence, which summarizes the wage and income amounts for Mr. |
| 10:49:03 | 23 | Trevino and his wife Zulema. |
| 10:49:07 | 24 | Q.   Showing you Government's Exhibit 178.  Are these the Social |
| 10:49:11 | 25 | Security wage statements, 178A and 178B?  Can you just discuss |

| | | |
|---|---|---|
| 10:49:18 | 1 | these from the Dallas search warrant site? |
| 10:49:22 | 2 | A.   That's correct.  For Mr. Trevino, there's a summary for 1991 |
| 10:49:27 | 3 | to 2009.  And for Zulema Trevino, his wife, there's a summary of |
| 10:49:34 | 4 | wages for 1990 through 2005. |
| 10:49:38 | 5 | Q.   Your Honor, I'd offer Government's Exhibit 178A and 178B |
| 10:49:56 | 6 | per relevance objection, your Honor.  It's already been admitted. |
| 10:50:00 | 7 | MS. WILLIAMS:  I don't have any objection. |
| 10:50:02 | 8 | MR. GARDNER:  Okay.  Thank you. |
| 10:50:05 | 9 | Q.   (BY MR. GARDNER) I'm showing you 178A and this is the -- |
| 10:50:19 | 10 | again, the Social Security statement for Jose Trevino, correct? |
| 10:50:29 | 11 | A.   That's correct. |
| 10:50:30 | 12 | Q.   Is this something everyone gets in the mail every year? |
| 10:50:34 | 13 | A.   If you paid in Social Security. |
| 10:50:35 | 14 | Q.   And what is that based off? |
| 10:50:37 | 15 | A.   Wages. |
| 10:50:41 | 16 | Q.   Was there what you testified to as the earnings record for |
| 10:50:45 | 17 | Defendant Jose Trevino? |
| 10:50:46 | 18 | A.   That's correct. |
| 10:50:49 | 19 | Q.   So on the left-hand column is the year and the middle column |
| 10:50:54 | 20 | is the reported wages? |
| 10:50:58 | 21 | A.   Up to the Social Security limit, correct. |
| 10:51:00 | 22 | Q.   Correct.  And you also did the same on 178B for Zulema |
| 10:51:07 | 23 | Trevino, correct? |
| 10:51:08 | 24 | A.   That's correct. |
| 10:51:08 | 25 | Q.   Just for the record, they were living at 12909 Timothy Lane, |

10:51:13   1   Balch Springs, Texas?

10:51:15   2   A.   That's correct.

10:51:17   3   Q.   Again, did you use Zulema Trevino's wages to factor into

10:51:25   4   your analysis?

10:51:25   5   A.   I did.

10:51:26   6   Q.   And why did you consider both Jose Trevino and Zulema

10:51:29   7   Trevino?

10:51:30   8   A.   Well, they were -- obviously they're married and I wanted to

10:51:33   9   get their joint income of funds, again, available to them.

10:51:37   10   Q.   And so, based on your search warrants and discovery of

10:51:43   11   evidence and subpoenas, were you able to determine the employment

10:51:49   12   during this period 1990, say, 2005 for Zulema Trevino?

10:51:53   13   A.   I don't know they went back to 1990, but certainly around

10:51:57   14   2000 and 2001.

10:51:59   15   Q.   And what about for the Defendant Jose Trevino, were you able

10:52:02   16   to determine the nature of his employment for those years?

10:52:05   17   A.   I was.   Not necessarily all the way back to '91 but

10:52:08   18   certainly back in the mid-'90s.

10:52:11   19   Q.   So I'd like to turn your attention now to the -- you talk

10:52:14   20   about a Prosperity Bank account?

10:52:17   21   A.   That's correct.

10:52:17   22   Q.   And what are the dates that you reviewed the Trevinos'

10:52:24   23   Prosperity account?

10:52:25   24   A.   For Prosperity, we had records from December of 2007 to

10:52:31   25   September of 2008, when the account was closed.

| | | |
|---|---|---|
| 10:52:34 | 1 | Q.   Could you tell the ladies and gentlemen of the jury the |
| 10:52:36 | 2 | source of income for that Prosperity account? |
| 10:52:38 | 3 | A.   Correct.  Solely wages or there was a tax refund deposit. |
| 10:52:46 | 4 | Q.   What was the highest balance on that account on that date |
| 10:52:52 | 5 | you just said, 2007, 2008? |
| 10:52:54 | 6 | A.   $8,692.24 and that was after a $4,890 tax refund deposit. |
| 10:53:06 | 7 | Q.   And what type of expenses were coming out of that account? |
| 10:53:09 | 8 | A.   Just everyday general, what I would consider to be living |
| 10:53:12 | 9 | expenses, groceries, gasoline, clothing. |
| 10:53:17 | 10 | Q.   And do you know how many children Jose and Zulema Trevino |
| 10:53:20 | 11 | have? |
| 10:53:20 | 12 | A.   I know they at least have three.  Maybe four. |
| 10:53:23 | 13 | Q.   And were there expenses related to the care and upbringing |
| 10:53:26 | 14 | of the children? |
| 10:53:26 | 15 | A.   That's correct. |
| 10:53:28 | 16 | Q.   And based on your review of that account, did you determine |
| 10:53:31 | 17 | the nature of the employment for Mr. Jose Trevino? |
| 10:53:35 | 18 | A.   Mr. Jose Trevino was in construction and, more specifically, |
| 10:53:39 | 19 | a mason.  Masonry. |
| 10:53:42 | 20 | Q.   Was there any indication that there was a $25,000 amount |
| 10:53:47 | 21 | that was available to either Zulema Trevino or Jose Trevino at |
| 10:53:52 | 22 | that time? |
| 10:53:52 | 23 | A.   No. |
| 10:53:54 | 24 | Q.   During your review of the search warrant items, did you |
| 10:53:57 | 25 | discover any record that would reflect they had $25,000 available |

| | | |
|---|---|---|
| 10:54:03 | 1 | to them? |
| 10:54:04 | 2 | A.    I did not. |
| 10:54:04 | 3 | Q.    Was there any will or any property deeds that indicated they |
| 10:54:11 | 4 | inherited money or sold property? |
| 10:54:14 | 5 | A.    No. |
| 10:54:17 | 6 | Q.    When was that account closed, the Prosperity account? |
| 10:54:20 | 7 | A.    In September.  On September 21, 2008. |
| 10:54:24 | 8 | Q.    And where did you trace the accounts from there? |
| 10:54:28 | 9 | A.    About two months prior to that, they had opened up another |
| 10:54:31 | 10 | account, another personal account at Bank of America. |
| 10:54:35 | 11 | Q.    And how was that account funded? |
| 10:54:39 | 12 | A.    Again, just deposits from wages. |
| 10:54:42 | 13 | Q.    And do you recall the employment at that point that was |
| 10:54:49 | 14 | being deposited into the accounts? |
| 10:54:50 | 15 | A.    At that time Mr. Trevino was working for a company D Brown, |
| 10:54:54 | 16 | Inc. Construction Company.  And his wife Zulema, I believe at |
| 10:54:58 | 17 | that time, was working for Lakeshore Staffing, a temporary |
| 10:55:02 | 18 | employment-type agency. |
| 10:55:04 | 19 | Q.    And what was the highest balance in 2008 at any given point |
| 10:55:11 | 20 | with the Bank of America account? |
| 10:55:16 | 21 | A.    Well, in 2008, it was not over $5,000.  I don't know the |
| 10:55:24 | 22 | exact highest balance, but it was not over $5,000 up to December |
| 10:55:29 | 23 | of 2009. |
| 10:55:32 | 24 | Q.    Were there any indications of any other accounts that were |
| 10:55:35 | 25 | in existence either through transfers or other checks written to |

10:55:39   1   other accounts?

10:55:39   2   A.   There was a very small de minimis savings account.  We call

10:55:44   3   it keep-the-change account essentially.  Literally pennies were

10:55:48   4   deposited into that savings account.  But the balance on that

10:55:53   5   account over the course of six months was $68.

10:55:57   6   Q.   So based on your analysis of the Social Security, the

10:56:02   7   Prosperity Bank, and the bank account, after that point, what did

10:56:05   8   you conclude that the Defendant Trevino did for a living?

10:56:09   9   A.   He was in construction and his wife worked whatever jobs

10:56:13   10  that she could get, and they needed every single penny that they

10:56:16   11  needed to support themselves and their family.  They did not have

10:56:19   12  disposable income.

10:56:20   13  Q.   Did you see any entertainment expense, any plane trips, any

10:56:25   14  other hotel stays coming out of that account?

10:56:27   15  A.   No.

10:56:28   16  Q.   Was that for both the Prosperity account and the Bank of

10:56:32   17  America account?

10:56:32   18  A.   That's correct.

10:56:33   19  Q.   Now, the jury has heard some testimony from Dr. Shalyn

10:56:38   20  Bliss, a veterinarian.  Did your analysis reveal the sale of any

10:56:42   21  construction company?

10:56:44   22  A.   I saw nothing that would lead me to believe that he sold a

10:56:47   23  construction company.

10:56:48   24  Q.   Was there any sales documents or corporate documents for any

10:56:52   25  construction company discovered at either the Lexington, Oklahoma

| | | |
|---|---|---|
| 10:56:54 | 1 | or the Dallas, Texas search warrant location? |
| 10:56:57 | 2 | A.   I saw nothing like that. |
| 10:56:58 | 3 | Q.   Are you aware of the valuation of his home located at the |
| 10:57:03 | 4 | previous address, Balch Springs, Texas? |
| 10:57:06 | 5 | A.   I recall seeing a county of Dallas tax statement.  I don't |
| 10:57:09 | 6 | recall exactly what year.  It was relatively recent, within the |
| 10:57:13 | 7 | past five years around $60,000. |
| 10:57:17 | 8 | Q.   So do you see the activity in the Trevinos' account change |
| 10:57:23 | 9 | in late 2009? |
| 10:57:24 | 10 | A.   I did. |
| 10:57:24 | 11 | Q.   And what do you notice in that account? |
| 10:57:27 | 12 | A.   $441,855 deposit December 14th of '09. |
| 10:57:34 | 13 | Q.   And do you recall what that was from? |
| 10:57:37 | 14 | A.   My understanding, it was from the winnings of a horse named |
| 10:57:40 | 15 | Tempting Dash. |
| 10:57:41 | 16 | Q.   Was there any indication of your analysis that there was a |
| 10:57:49 | 17 | purchase of that horse coming from the Trevinos' accounts? |
| 10:57:53 | 18 | A.   No. |
| 10:57:55 | 19 | Q.   There's been testimony that horse was worth approximately |
| 10:57:57 | 20 | $25,000.  Were you able to determine what source of -- where the |
| 10:58:05 | 21 | source of that purchase price came from based on your analysis? |
| 10:58:08 | 22 | A.   Mr. Trevino didn't have $25,000. |
| 10:58:14 | 23 | Q.   Do you recall the date of the sale of Tempting Dash from |
| 10:58:19 | 24 | Ramiro Villarreal to Jose Trevino? |
| 10:58:20 | 25 | A.   If I recall, it was sometime in September. |

| | | |
|---|---|---|
| 10:58:23 | 1 | Q.   September 22nd, 2009? |
| 10:58:25 | 2 | A.   That sounds accurate. |
| 10:58:26 | 3 | Q.   From September 22nd, 2009 till the date of the deposit in |
| 10:58:40 | 4 | December 2009, did you review Jose Trevino's bank accounts? |
| 10:58:47 | 5 | A.   I did. |
| 10:58:49 | 6 | Q.   Did you see anything consistent with entry fees for races? |
| 10:58:54 | 7 | A.   I did not. |
| 10:58:55 | 8 | Q.   Did you see anything consistent with boarding fees for that |
| 10:58:59 | 9 | horse? |
| 10:58:59 | 10 | A.   No. |
| 10:59:00 | 11 | Q.   Did you see anything consistent with training fees? |
| 10:59:03 | 12 | A.   No. |
| 10:59:04 | 13 | Q.   Jockey fees? |
| 10:59:05 | 14 | A.   No. |
| 10:59:06 | 15 | Q.   Farrier or horse-shoeing fees? |
| 10:59:10 | 16 | A.   No. |
| 10:59:10 | 17 | Q.   Veterinary fees? |
| 10:59:11 | 18 | A.   No. |
| 10:59:12 | 19 | Q.   See any AQHA transfer fees? |
| 10:59:14 | 20 | A.   No. |
| 10:59:14 | 21 | Q.   See any horse dental work fees? |
| 10:59:16 | 22 | A.   No. |
| 10:59:17 | 23 | Q.   When, in fact, based on your review of Jose Trevino |
| 10:59:21 | 24 | accounts, did you discover any payment to the American Quarter |
| 10:59:28 | 25 | Horse Association? |

| | | |
|---|---|---|
| 10:59:28 | 1 | A.    That was later.  That was several months, I believe in June |
| 10:59:31 | 2 | of 2010, which was subsequent -- about six months after the |
| 10:59:36 | 3 | deposit from Tempting Dash. |
| 10:59:39 | 4 | Q.    At some point, did the Defendant Jose Trevino open another |
| 10:59:44 | 5 | account? |
| 10:59:45 | 6 | A.    He did. |
| 10:59:45 | 7 | Q.    And when was that? |
| 10:59:49 | 8 | A.    On December 1st of 2009, he opened up an account under the |
| 10:59:53 | 9 | name of Tremor Enterprises. |
| 10:59:55 | 10 | Q.    So now, he has a Bank of America account under Jose Trevino |
| 10:59:59 | 11 | and an account under Tremor Enterprises and what bank is that? |
| 11:00:03 | 12 | A.    Also Bank of America. |
| 11:00:04 | 13 | Q.    And I want to jump forward a little bit.  Did you find |
| 11:00:08 | 14 | evidence in your analysis that he opened accounts under other |
| 11:00:11 | 15 | entities, business entities? |
| 11:00:13 | 16 | A.    He did. |
| 11:00:13 | 17 | Q.    And what were those, sir? |
| 11:00:14 | 18 | A.    He had a Bank of America account for 66 Land and two Bank of |
| 11:00:20 | 19 | America accounts for Zule Farms. |
| 11:00:23 | 20 | Q.    And can you tell the jury how those accounts were funded? |
| 11:00:26 | 21 | A.    Those accounts were funded with transfers from Tremor |
| 11:00:31 | 22 | account. |
| 11:00:34 | 23 | Q.    And did you speak with Ms. Sharon Moore? |
| 11:00:37 | 24 | A.    I have. |
| 11:00:38 | 25 | Q.    And do you understand her testimony with respect to the |

| | | |
|---|---|---|
| 11:00:40 | 1 | structure of Jose Trevino's business operation? |
| 11:00:44 | 2 | A.    Yes. |
| 11:00:44 | 3 | Q.    And based on your independent review, as well? |
| 11:00:47 | 4 | A.    Correct. |
| 11:00:47 | 5 | Q.    So who was the parent company? |
| 11:00:50 | 6 | A.    Tremor. |
| 11:00:51 | 7 | Q.    And who was the subsidiaries? |
| 11:00:53 | 8 | A.    66 Land and Zule Farms. |

11:00:55  9  Q.    I'm showing you Bates stamp 12603 of the Government's
11:01:05  10  Exhibit 250.  What does this reflect, Special Agent Fernald?
11:01:15  11  A.    It's a management fee from Tremor Enterprises to 66 Land in
11:01:20  12  the amount of $650,000.
11:01:26  13  Q.    Why is Tremor Enterprises, the parent company, paying 66
11:01:31  14  Land a management fee?
11:01:32  15  A.    That's a good question.  It should be the other way around.
11:01:37  16  Q.    And all these companies, 66 Land, Tremor and Zule Farms,
11:01:42  17  they're all controlled and managed by who?
11:01:44  18  A.    By Tremor, Jose Trevino.
11:01:48  19  Q.    Did you find any management agreements in the search warrant
11:01:51  20  material or subpoena records?
11:01:53  21  A.    No.
11:01:53  22  Q.    Did you find any loan agreements in the search warrant or
11:01:58  23  subpoena records?
11:01:58  24  A.    No.
11:01:59  25  Q.    Did you discover other checks in the Defendant Jose

| | |
|---|---|
| 11:02:03 | 1 |
| 11:02:07 | 2 |
| 11:02:09 | 3 |
| 11:02:10 | 4 |
| 11:02:16 | 5 |
| 11:02:18 | 6 |
| 11:02:23 | 7 |
| 11:02:26 | 8 |
| 11:02:29 | 9 |
| 11:02:35 | 10 |
| 11:02:37 | 11 |
| 11:02:38 | 12 |
| 11:02:41 | 13 |
| 11:02:46 | 14 |
| 11:02:54 | 15 |
| 11:02:56 | 16 |
| 11:02:59 | 17 |
| 11:03:10 | 18 |
| 11:03:11 | 19 |
| 11:03:11 | 20 |
| 11:03:16 | 21 |
| 11:03:20 | 22 |
| 11:03:23 | 23 |
| 11:03:31 | 24 |
| 11:03:38 | 25 |

Trevino's business records that indicate he was making loans to
and from the various entities?

A.    I did.

Q.    Based on your opinion and your experience, what's that an
indicator of?

A.    He's just trying to disguise moving money from Tremor to 66
Land, had to account for it somehow.

Q.    And based on those notations on the checks, did you discover
any promissory notes, any amortization schedule, any employee or
employment agreements, as well?

A.    No.

Q.    Were there any indications of any other accounts?

A.    There was a subsequent Tremor account that he opened up.  I
don't recall in December of 2010.

Q.    I'm going to show you what's already been admitted into
evidence as Government's Exhibit 301.  It is a business record
from the Adolphus Hotel.  Showing you page 55-2093.  Have you
reviewed this document?

A.    Yes.

Q.    This is stated for the Trevino-Garcia wedding, Ms.
Alexandra.  Do you know who Ms. Alexandra Trevino is?

A.    Mr. Trevino's daughter.

Q.    And specific to this date, 4-13-12 -- let me just start from
the beginning.  1-9 of '12, there's a check No. 2332 deposit for
$3,500?

| 11:03:38 | 1 | A.   That's correct. |

11:03:38   1   A.   That's correct.

11:03:39   2   Q.   Did you have that recorded in your financial analysis of the

11:03:43   3   Defendant Trevino's accounts?

11:03:44   4   A.   I did.

11:03:46   5   Q.   And with respect to the next entry on April 13, 2012, a cash

11:03:53   6   payment of $9,500.  Was there any indication that during that

11:03:59   7   period of time, the Defendant Jose Trevino withdrew any cash from

11:04:05   8   any of his accounts that you analyzed?

11:04:08   9   A.   No.  In April of 2012, April 13, 2012, his balance was

11:04:15   10  $1,600 in his account.

11:04:17   11  Q.   And now, did your analysis cover this last payment of May 29

11:04:23   12  of '12, cash, $19,400?

11:04:27   13  A.   It did not.  My records stopped on April 30th of 2012.

11:04:41   14  Q.   I'm showing you Government's Exhibit 36 that was found in

11:04:46   15  the Lexington, Oklahoma search warrant.  Check dated 6-7-2011,

11:04:57   16  No. 1301 from the Tremor account to Francisco Colorado, 400,000

11:05:04   17  for the notation of purchase of Fly First Down.

11:05:08   18       Based on your review of the Defendant Trevino's

11:05:11   19  accounts, did you discover if this check was negotiated?

11:05:14   20  A.   That check never cleared.

11:05:18   21  Q.   Was it returned for insufficient funds, or was it never

11:05:22   22  submitted to the bank?

11:05:23   23  A.   It was never submitted.

11:05:24   24  Q.   Did you subsequently find in your analysis an insurance

11:05:28   25  payment to Tremor Enterprises for the death of that horse?

| 11:05:31 | 1 | A.   I did. |
| 11:05:31 | 2 | Q.   And when was that, sir? |
| 11:05:34 | 3 | A.   I don't recall. |
| 11:05:37 | 4 | Q.   Let me just jump ahead.  Showing you the same Government's |
| 11:05:43 | 5 | Exhibit's 250B, Bates No. 593136.  Was the insurance check before |
| 11:05:51 | 6 | March 21st of 2012?  Go ahead and take your time if you need to |
| 11:05:58 | 7 | refresh. |
| 11:05:59 | 8 | A.   Insurance check was cleared was deposited to the Tremor |
| 11:06:03 | 9 | account at Bank of America on January 18th of 2012 in the amount |
| 11:06:09 | 10 | of 400,000. |
| 11:06:11 | 11 | Q.   So that's money received to Jose Trevino? |
| 11:06:17 | 12 | A.   Right.  That's his insurance proceeds from the death of the |
| 11:06:20 | 13 | horse. |
| 11:06:23 | 14 | Q.   And did you review the insurance documents to see whether or |
| 11:06:27 | 15 | not Mr. Trevino was the payee on that, the loss payee? |
| 11:06:30 | 16 | A.   I don't recall. |
| 11:06:31 | 17 | Q.   Now, this check also to Francisco Colorado, would you agree |
| 11:06:38 | 18 | with me that it's on March 21st, after the insurance check for |
| 11:06:42 | 19 | 400? |
| 11:06:42 | 20 | A.   That's correct. |
| 11:06:43 | 21 | Q.   And just for the record, this is for $50,000? |
| 11:06:46 | 22 | A.   That's correct. |
| 11:06:47 | 23 | Q.   All right.  And the same notation? |
| 11:06:49 | 24 | A.   That's correct. |
| 11:06:50 | 25 | Q.   And when I say same notation, I'm referring to Government's |

| | | |
|---|---|---|
| 11:06:53 | 1 | Exhibit 36, purchase of Fly First Down? |
| 11:06:55 | 2 | A.   Correct. |
| 11:06:57 | 3 | Q.   So was this check negotiated? |
| 11:07:02 | 4 | A.   As of April 30th, 2012, no. |
| 11:07:06 | 5 | Q.   And when was it negotiated -- oh. |
| 11:07:08 | 6 | A.   I don't know.  My records stop on April 30th. |
| 11:07:10 | 7 | Q.   I understand.  And does it appear to be that an individual |
| 11:07:14 | 8 | has signed it, endorsed it or deposited it? |
| 11:07:16 | 9 | A.   Yes. |
| 11:07:17 | 10 | Q.   Okay.  Does the bank information on the back of the next |
| 11:07:21 | 11 | page 3137 indicate the bank routing numbers that it was, in fact, |
| 11:07:26 | 12 | negotiated? |
| 11:07:26 | 13 | A.   That's correct.  If I could correct myself.  That check was |
| 11:07:37 | 14 | negotiated April 20th. |
| 11:07:40 | 15 | Q.   And so, how much? |
| 11:07:42 | 16 | A.   I'm sorry.  It cleared the bank on April 20th. |
| 11:07:45 | 17 | Q.   What's the -- I'll call it the delta, the change between the |
| 11:07:49 | 18 | amount of money that he received from the insurance company and |
| 11:07:52 | 19 | the amount he gets paid from Francisco Colorado? |
| 11:07:56 | 20 | A.   $350,000. |
| 11:08:00 | 21 | Q.   Now, did you also prepare a chart so we're not subjected to |
| 11:08:09 | 22 | your spreadsheets to explain your testimony? |
| 11:08:11 | 23 | A.   I did. |
| 11:08:12 | 24 | Q.   And do you recognize that, sir? |
| 11:08:14 | 25 | A.   I do. |

| | | |
|---|---|---|
| 11:08:14 | 1 | Q.   And is that the chart you prepared with respect to your |
| 11:08:17 | 2 | financial analysis of Jose Trevino and his entities? |
| 11:08:21 | 3 | A.   It is. |
| 11:08:22 | 4 | Q.   For the record, your Honor, that's 404A.  We offer for |
| 11:08:26 | 5 | demonstrative purposes only. |
| 11:08:27 | 6 | MS. WILLIAMS:  No objection. |
| 11:08:32 | 7 | THE COURT:  Received. |
| 11:08:33 | 8 | Q.   (BY MR. GARDNER) Ms. Sims, could I have the lights down, |
| 11:08:38 | 9 | please? |
| 11:08:39 | 10 | Special Agent Fernald, what does this chart reflect in |
| 11:08:51 | 11 | terms of your analysis? |
| 11:08:53 | 12 | A.   This is solely the -- this is a cash flow analysis, |
| 11:08:56 | 13 | essentially is any earnings or deposits to Mr. Trevino, Tremor |
| 11:09:04 | 14 | Enterprises, 66 Land, or Zule Farms.  And it's cumulative -- as |
| 11:09:08 | 15 | you go, it's cumulative, strictly solely deposits. |
| 11:09:11 | 16 | Q.   When you say cumulative, I'm basically adding, say, 1990, |
| 11:09:16 | 17 | 1991? |
| 11:09:17 | 18 | A.   Correct. |
| 11:09:17 | 19 | Q.   And adding 1992 to that amount? |
| 11:09:19 | 20 | A.   Correct. |
| 11:09:20 | 21 | Q.   And it goes through that? |
| 11:09:21 | 22 | A.   Correct. |
| 11:09:21 | 23 | Q.   Does it take into account any expenses, or any deductions, |
| 11:09:25 | 24 | or other items that might be considered an expense? |
| 11:09:29 | 25 | A.   It does not.  This is simply gross, meaning there are no |

| | | |
|---|---|---|
| 11:09:31 | 1 | expenses factored into this analysis. |
| 11:09:35 | 2 | Q.   Could I have the first tab, please?  And where do these come |
| 11:09:41 | 3 | from, these items? |
| 11:09:42 | 4 | A.   That's the cumulative or the joint earnings from the Social |
| 11:09:46 | 5 | Security statements for Mr. Trevino and his wife. |
| 11:09:49 | 6 | Q.   And that was the 1990, 1991 and 1992, correct? |
| 11:09:56 | 7 | A.   Correct.  So the way to read this is in 1990, jointly, Mr. |
| 11:10:02 | 8 | Trevino and his wife had wages of $3,178.  In 1991, they jointly |
| 11:10:10 | 9 | had $16,351.  And in 1992, they jointly had $21,388. |
| 11:10:29 | 10 | Q.   I'll give you a second.  Stay right there. |
| 11:10:33 | 11 |          All right.  So this line here that runs along is just |
| 11:10:36 | 12 | simply adding up the wages that are recorded by the Social |
| 11:10:41 | 13 | Security Administration to that point, December-November of 2009? |
| 11:10:46 | 14 | A.   Well, up to when I have the bank records, which was in late |
| 11:10:49 | 15 | 2007.  So from 1990 up through at least 2006, that's coming off |
| 11:10:55 | 16 | the Social Security statements. |
| 11:10:58 | 17 | Q.   And then, from there, it comes from the bank records? |
| 11:11:01 | 18 | A.   From deposits to the bank accounts. |
| 11:11:04 | 19 | Q.   Okay.  So what does this line here represent in terms of |
| 11:11:07 | 20 | your analysis? |
| 11:11:08 | 21 | A.   That line is when Tremor Enterprises was formed on November |
| 11:11:12 | 22 | 30th of 2009. |
| 11:11:14 | 23 | Q.   Next, please.  So this is a 20-year time span from here, |
| 11:11:21 | 24 | right? |
| 11:11:21 | 25 | A.   Right.  Just short of a month.  So from 1990 through the end |

| | |
|---|---|
| 11:11:25 | 1 |
| 11:11:30 | 2 |
| 11:11:36 | 3 |
| 11:11:40 | 4 |
| 11:11:42 | 5 |
| 11:11:44 | 6 |
| 11:11:45 | 7 |
| 11:11:51 | 8 |
| 11:11:56 | 9 |
| 11:11:59 | 10 |
| 11:12:03 | 11 |
| 11:12:06 | 12 |
| 11:12:11 | 13 |
| 11:12:16 | 14 |
| 11:12:21 | 15 |
| 11:12:24 | 16 |
| 11:12:27 | 17 |
| 11:12:32 | 18 |
| 11:12:36 | 19 |
| 11:12:39 | 20 |
| 11:12:40 | 21 |
| 11:12:42 | 22 |
| 11:12:42 | 23 |
| 11:12:47 | 24 |
| 11:12:51 | 25 |

1  of November 2009, you could see cumulatively Mr. Trevino and his

2  wife earned just under $500,000 in 20 years.

3  Q.   So that's the amount right there, that's the total they made

4  over the 20 years previous?

5  A.   No.  So in --

6  Q.   Okay.

7  A.   So the $441,85, that's the deposit from the winnings of

8  Tempting Dash.  So within one month essentially, they doubled the

9  amount of money that was deposited into their account.  They

10  doubled their cumulative earnings in 20 years.

11  Q.   Next, please.  So what year is this?

12  A.   This is for 2010 and this consists of any deposits to Mr.

13  Trevino's personal account or at the time, the Tremor account,

14  regardless of source, and that was $1.1 million.  So, again, they

15  double their earnings in a year.

16  Q.   Next, please.  This is 2011?

17  A.   2011.  Again, any and all deposits, regardless of source, to

18  the personal accounts or the business accounts related to Mr.

19  Trevino.  They more than doubled the money coming through their

20  accounts, the cash flow.

21  Q.   From the previous year?

22  A.   Right.

23  Q.   Next, please.  This, sir?

24  A.   Again, $1.7 million flowing through the account.  The other

25  thing that's important to point out here, it's $6 million

| | |
|---|---|
| 11:12:55 | 1 |
| 11:12:57 | 2 |
| 11:13:01 | 3 |

11:12:55  1   cumulatively.  It doesn't mean they've got $6 million in their

11:12:57  2   account.  That's just the cumulative amount that they've made

11:13:01  3   from 1990 that was deposited into the account.

11:13:05  4   Q.   Next, please.

11:13:07  5   A.   And that's in a 30-month time period.

11:13:12  6   Q.   I just want to get on this before I go to the next portion

11:13:15  7   of that chart.

11:13:16  8        So these right here, 20 years, correct?

11:13:18  9   A.   That's correct.

11:13:19  10   Q.   And 30 months?

11:13:20  11   A.   Thirty months.

11:13:21  12   Q.   Here?

11:13:22  13   A.   That's 30 months representing from when Tremor Enterprises

11:13:25  14   was formed in November of '09 to the end of my bank records,

11:13:31  15   which is the end of April 2012.

11:13:33  16   Q.   So what does this summary chart up here state?

11:13:37  17   A.   Essentially it summarizes the chart below and you can read

11:13:41  18   it by looking at it.  So from 1990 to 2009, the end of November

11:13:45  19   2009, the cumulative amount of earnings or deposits to Mr.

11:13:50  20   Trevino and his wife were $452,359, and if you average that over

11:13:57  21   20 years, that averages about $22,000 a year.  From December '09

11:14:03  22   to June of 2012, it was $5.4 million cash flow through their

11:14:09  23   account, average that over 30 months, two-and-a-half years,

11:14:14  24   that's $2.1 million of cash flow.

11:14:18  25   Q.   And, sir, did you conduct an analysis to determine the

11:14:21  1  percentage change?

11:14:22  2  A.   I did.

11:14:25  3  Q.   What was your results from that?

11:14:28  4  A.   That's 9,518 percent increase in 30 months from 20 years.

11:14:36  5  Q.   And, sir, is it your opinion that based on the analysis of

11:14:39  6  the Trevino account, it's consistent with the other aspects of

11:14:41  7  this investigation?

11:14:42  8  A.   That's correct.

11:14:43  9  Q.   May I have one moment, your Honor?  Your Honor, I'll pass

11:14:48  10  the witness.

11:14:51  11       MS. WILLIAMS:  Your Honor, do you have objection if we

11:14:52  12  switch order of cross in connection with the order that the --

11:14:56  13       THE COURT:  No.  As long as we keep going around so I

11:15:03  14  don't get confused.  All right.

11:15:18  15       MR. SANCHEZ:  Your Honor, before -- can we get the

11:15:21  16  lights?  Before we start, there are some business records the

11:15:28  17  witness has already discussed, and the government doesn't have an

11:15:31  18  objection if we introduce those records now, which we will

11:15:35  19  mention during the cross.

11:15:37  20       THE COURT:  All right.  Give me the number.

11:15:40  21       MR. SANCHEZ:  Are we up to Colorado 5?

11:15:54  22       THE CLERK:  Let me get that list.  I think we're up

11:16:00  23  to --

11:16:01  24       THE COURT:  I've got Colorado 6, 6A and 6B.

11:16:05  25       THE CLERK:  Should be 7.

| | | |
|---|---|---|
| 11:16:06 | 1 | MR. SANCHEZ:  Colorado 7. |
| 11:16:08 | 2 | THE CLERK:  I gave you a list. |
| 11:16:31 | 3 | MR. SANCHEZ:  So, your Honor, we're introducing |
| 11:16:34 | 4 | Colorado 7, which are business records from ADT Petro Servicios. |
| 11:16:39 | 5 | MR. GARDNER:  No objection, your Honor. |
| 11:16:40 | 6 | MR. SANCHEZ:  And the range is from -- the Bates range |
| 11:16:44 | 7 | that has been placed on here is D-FC-00001, all the way up to |
| 11:16:55 | 8 | 1567.  So 1567 pages. |
| 11:17:36 | 9 | CROSS-EXAMINATION |
| 11:17:38 | 10 | BY MR. SANCHEZ: |
| 11:17:38 | 11 | Q.   Mr. Fernald, my name is Andres Sanchez.  Other than meeting |
| 11:17:41 | 12 | briefly a moment ago, we haven't met before? |
| 11:17:43 | 13 | A.   Never. |
| 11:17:43 | 14 | Q.   And you know that I represent Mr. Colorado? |
| 11:17:45 | 15 | A.   I do now. |
| 11:17:47 | 16 | Q.   Well, you knew. |
| 11:17:49 | 17 | A.   I do. |
| 11:17:49 | 18 | Q.   About an hour ago. |
| 11:17:51 | 19 | I provided a binder to Mr. Gardner.  Have you had a |
| 11:17:56 | 20 | chance to review that? |
| 11:17:58 | 21 | A.   I briefly looked through it. |
| 11:18:00 | 22 | Q.   Okay.  I'll ask you about that later. |
| 11:18:02 | 23 | A.   Okay. |
| 11:18:02 | 24 | Q.   I just wanted to make sure you still had it so we don't have |
| 11:18:05 | 25 | to track it down. |

| | | |
|---|---|---|
| 11:18:07 | 1 | You talked a little bit -- can you put up 404B?  So |
| 11:18:22 | 2 | this is your summary of your analysis of ADT; is that right? |
| 11:18:27 | 3 | A.   Well, these are select transactions.  Correct. |
| 11:18:31 | 4 | Q.   Right.  Okay.  Yeah.  It's not the total sum -- total |
| 11:18:35 | 5 | analysis, but it's at least the sum? |
| 11:18:37 | 6 | A.   You wouldn't be able to read it if it was the total. |
| 11:18:40 | 7 | Q.   Okay.  And what I want to go back through, I tried to write |
| 11:18:44 | 8 | down different things you reviewed.  But you reviewed bank |
| 11:18:51 | 9 | statements of statements -- primarily bank statements from here |
| 11:18:55 | 10 | in the United States? |
| 11:18:55 | 11 | A.   Correct. |
| 11:18:57 | 12 | Q.   And you reviewed financial statements and those financial |
| 11:18:59 | 13 | statements was financial statements that ADT submitted to UBS? |
| 11:19:04 | 14 | A.   Correct. |
| 11:19:05 | 15 | Q.   Witness statements and other conversations with case agents? |
| 11:19:09 | 16 | A.   That's correct. |
| 11:19:10 | 17 | Q.   And the -- you talked about the number of horses that on the |
| 11:19:14 | 18 | far right, the 121 and 42.  Did you talk to the agent here in the |
| 11:19:20 | 19 | first row? |
| 11:19:20 | 20 | A.   I did. |
| 11:19:21 | 21 | Q.   Is he the one who helped go through those number of horses |
| 11:19:24 | 22 | with you? |
| 11:19:24 | 23 | A.   He did. |
| 11:19:25 | 24 | Q.   We heard him testify yesterday that as far as horses |
| 11:19:31 | 25 | maintained by Colorado, the horse -- the documents that he |

| | | |
|---|---|---|
| 11:19:35 | 1 | reviewed were just the documents regarding horses here in the |
| 11:19:41 | 2 | United States.  He didn't look at vet bills in Mexico.  He didn't |
| 11:19:46 | 3 | look at race payments in Mexico.  He didn't look at boarding fees |
| 11:19:48 | 4 | in Mexico.  So that number would be the number of horses |
| 11:19:51 | 5 | maintained here in the United States? |
| 11:19:53 | 6 | A.   I got that number from Agent Schutt.  Correct. |
| 11:19:57 | 7 | Q.   Okay. |
| 11:19:58 | 8 | A.   I don't know what it consists of. |
| 11:19:59 | 9 | Q.   All right.  Then you also briefly went through the three |
| 11:20:03 | 10 | sources that you attempted to get records from in Mexico, right? |
| 11:20:08 | 11 | A.   Correct. |
| 11:20:09 | 12 | Q.   You said Fin-something? |
| 11:20:10 | 13 | A.   FinCEN. |
| 11:20:12 | 14 | Q.   FinCEN? |
| 11:20:12 | 15 | A.   FinCEN is a financial crimes center. |
| 11:20:16 | 16 | Q.   Okay.  You also checked with the attaché for the IRS down in |
| 11:20:23 | 17 | Mexico City? |
| 11:20:23 | 18 | A.   Correct. |
| 11:20:24 | 19 | Q.   And you did a formal request between the United States |
| 11:20:30 | 20 | government and the Mexican government? |
| 11:20:31 | 21 | A.   That's correct. |
| 11:20:32 | 22 | Q.   And at that time you were requesting bank records of ADT -- |
| 11:20:36 | 23 | or what were you requesting specifically? |
| 11:20:38 | 24 | A.   Bank records of ADT.  For Francisco Colorado. |
| 11:20:43 | 25 | Q.   And I know some records were provided to you by ADT.  Did |

11:20:46   1   you request those records directly from ADT?  Did you ever send a

11:20:50   2   letter to ADT?

11:20:52   3   A.   I never sent a letter to ADT.

11:20:54   4   Q.   But ADT did provide some records to you on their own?

11:20:58   5   A.   The Saturday before trial.  I received some incomplete bank

11:21:02   6   records.

11:21:02   7   Q.   Okay.  And I want to go through those records.

11:21:05   8        So you never told ADT:  This is what I'd like to look

11:21:08   9   through, or this is what I would like to see?

11:21:10  10   A.   No.

11:21:12  11   Q.   So you mentioned something what you would have really wanted

11:21:16  12   to see were some Pemex contracts or Pemex payment, right?

11:21:20  13   A.   I'm not -- was not concerned about the contracts.  Just

11:21:24  14   because you got a contract doesn't mean you've got money.

11:21:26  15   Q.   Right.  So I guess what you would have been interested to

11:21:28  16   see are Pemex payments to ADT?

11:21:31  17   A.   I saw what I wanted to see was the cash available to Mr.

11:21:35  18   Colorado.

11:21:36  19   Q.   And where did you see that?

11:21:37  20   A.   On the financial statements.

11:21:38  21   Q.   Okay.  So you just relied on those financial statements?

11:21:41  22   A.   That's the amount of money that Mr. Colorado reported --

11:21:46  23   reportedly had through ADT.

11:21:48  24   Q.   That's one of the distinctions I wanted to try to make.  So

11:21:50  25   you're relying on ADT financial statements alone?

| | | |
|---|---|---|
| 11:21:54 | 1 | A.    Okay. |
| 11:21:55 | 2 | Q.    And not Francisco Colorado financial statements? |
| 11:21:59 | 3 | A.    My understanding, Mr. Colorado did not maintain financial |
| 11:22:01 | 4 | statements. |
| 11:22:03 | 5 | Q.    And what I'm trying to figure out -- yesterday, we heard |
| 11:22:06 | 6 | that Mr. Colorado had several companies besides ADT.  So your |
| 11:22:11 | 7 | analysis of his cash flow is really just analysis of one of his |
| 11:22:15 | 8 | companies ADT. |
| 11:22:18 | 9 | A.    That's correct.  ADT was the entity that purchased the |
| 11:22:21 | 10 | horses. |
| 11:22:22 | 11 | Q.    Right.  And what you didn't do is look at MTTM.  You didn't |
| 11:22:28 | 12 | look at his real estate company.  You didn't look at any other |
| 11:22:32 | 13 | businesses associated with Mr. Colorado. |
| 11:22:37 | 14 | A.    I was never provided anything as related to those entities. |
| 11:22:41 | 15 | Q.    So when you're talking about Mr. Colorado's access to cash, |
| 11:22:46 | 16 | it's just the access to cash that he has based on that financial |
| 11:22:48 | 17 | statement that was submitted to UBS that only pertains to ADT. |
| 11:22:54 | 18 | A.    That's correct. |
| 11:22:55 | 19 | Q.    All right.  We also heard -- do you have those financial |
| 11:22:59 | 20 | statements? |
| 11:23:29 | 21 |       We heard yesterday -- by the way, your training and |
| 11:23:36 | 22 | your experience is in accounting? |
| 11:23:40 | 23 | A.    I'm a CPA.  That's correct. |
| 11:23:42 | 24 | Q.    And while accounting is accounting, but there's some rules |
| 11:23:47 | 25 | and regulations that pertain to companies doing business here in |

11:23:51  1  the United States and different rules that pertain to other

11:23:54  2  companies in other countries.

11:23:58  3  A.   Right.

11:24:00  4  Q.   We heard yesterday that one of the issues that when

11:24:15  5  Mr. Colorado was at least exploring the idea of selling ADT, one

11:24:19  6  of the issues was -- is that the firm that valued his company at

11:24:24  7  $70 to $90 million, they said he was having expenses, his own

11:24:31  8  personal expenses showing up as ADT expenses.  Did you hear that

11:24:36  9  previously?

11:24:37  10  A.   I don't know how he accounted for personal expenses in ADT,

11:24:43  11  if he did at all.  I don't know.

11:24:44  12  Q.   And what I'm trying to figure out is when you're looking at

11:24:47  13  the expenses here and you're looking at the income and you're

11:24:49  14  saying that it's just breaking even, were you aware that within

11:24:54  15  those ADT expenses were some of his personal expenses?

11:24:58  16  A.   I understood that Mr. Colorado commingled personal and

11:25:02  17  business.  Correct.

11:25:03  18  Q.   So some of those horse purchases were actually listed in his

11:25:10  19  ADT records as ADT expenses.  Did you understand that?

11:25:13  20  A.   No.

11:25:14  21  Q.   You didn't?

11:25:14  22  A.   I don't know that -- I don't know if they were.  And that's

11:25:18  23  the balance sheet, that's not going to have the expenses on

11:25:20  24  there.

11:25:21  25  Q.   Okay.  I'm sorry.  Is this where it talks about the

11:25:23  1   expenses?

11:25:24  2   A.    Yes.

11:25:24  3   Q.    This one?

11:25:25  4   A.    Yes.

11:25:25  5   Q.    Okay.  These are actually your copies?

11:25:38  6   A.    Those are just my copies.  Correct.

11:25:54  7   Q.    So I want to make this -- if I've already gone over this, I

11:25:58  8   apologize, but I just want to make sure I understand it.

11:26:00  9             Your request through those three sources for

11:26:04  10  information down in Mexico were only for ADT records.  You didn't

11:26:07  11  request payments from Pemex -- or request information directly

11:26:12  12  from Pemex regarding payments to ADT, did you?

11:26:17  13  A.    I believe that was included in the general request, any and

11:26:19  14  all transactions or payments from -- to or from Mr. Colorado, or

11:26:24  15  ADT, or any other entities that he's related to.

11:26:27  16  Q.    And I guess maybe --

11:26:29  17  A.    It's pretty broad.  It should have covered everything.

11:26:31  18  Q.    So you're requesting the government to give you -- to ask

11:26:35  19  Pemex -- or you're requesting the government to ask banks in

11:26:38  20  Mexico?  What is the request, actually?

11:26:41  21  A.    I don't understand your question.

11:26:45  22  Q.    Did you request information from banks, or did you request

11:26:49  23  information from Pemex directly?

11:26:51  24  A.    The request was through the government of Mexico.

11:26:54  25  Q.    So you're asking the government to request information from

| | |
|---|---|
| 11:26:57 | 1 |
| 11:26:59 | 2 |
| 11:27:01 | 3 |
| 11:27:03 | 4 |
| 11:27:06 | 5 |
| 11:27:11 | 6 |
| 11:27:15 | 7 |
| 11:27:17 | 8 |
| 11:27:21 | 9 |
| 11:27:25 | 10 |
| 11:27:26 | 11 |
| 11:27:28 | 12 |
| 11:27:36 | 13 |
| 11:27:39 | 14 |
| 11:27:44 | 15 |
| 11:27:44 | 16 |
| 11:27:46 | 17 |
| 11:27:47 | 18 |
| 11:27:49 | 19 |
| 11:27:53 | 20 |
| 11:27:57 | 21 |
| 11:27:59 | 22 |
| 11:28:01 | 23 |
| 11:28:05 | 24 |
| 11:28:10 | 25 |

1  banks or information from Pemex?

2  A.   However they can obtain the information.

3  Q.   So you didn't give them specifics?

4  A.   I'm not going to tell the government in Mexico how they

5  needed to obtain the information.

6  Q.   So you didn't give them any direction as to what records you

7  want, whether you want bank records or Pemex?

8  A.   Well, certainly there's a specific request for bank records

9  or -- I mean, I don't recall exactly what was in it.

10  Q.   Do you have those?

11  A.   I don't have them with me.  No.

12  Q.   So when you reviewed the bank statements, you're just -- you

13  focused a lot on the bank statements that are here in the U.S.,

14  but you discount the bank statements from Mexico?  Is that a fair

15  statement?

16  A.   I didn't discount them.  I didn't have them until the

17  Saturday before trial.

18  Q.   And did you analyze those?

19  A.   Didn't have time to analyze them, sir.  No.  They were in

20  Spanish.  They were incomplete and the activity --

21  Q.   Let's go over that.  What do you mean by incomplete?

22  A.   The activity in the bank statements should have been

23  reflected in the financial statements.  So I didn't really need

24  to analyze the bank statements of ADT or Mr. Colorado.  They

25  should have been reflected in the financial statements.

| | | |
|---|---|---|
| 11:28:12 | 1 | THE COURT:  Wait now, let's -- you've been on the stand |
| 11:28:15 | 2 | before.  You wait for a question. |
| 11:28:16 | 3 | THE WITNESS:  Yes, sir. |
| 11:28:17 | 4 | THE COURT:  And just answer.  Now you've been at a |
| 11:28:21 | 5 | lectern before.  You wait for the answer and then, you ask the |
| 11:28:23 | 6 | questions. |
| 11:28:25 | 7 | MR. SANCHEZ:  Yes, your Honor. |
| 11:28:55 | 8 | Q.   (BY MR. SANCHEZ) So what was incomplete about the records? |
| 11:29:00 | 9 | A.   They were just bank statements. |
| 11:29:02 | 10 | Q.   Okay. |
| 11:29:02 | 11 | A.   There was no checks or item of source of deposits.  I don't |
| 11:29:06 | 12 | know where the expenses were paid to.  It's just a bank statement |
| 11:29:10 | 13 | in Spanish. |
| 11:29:10 | 14 | Q.   Okay. |
| 11:29:13 | 15 | A.   I don't speak Spanish. |
| 11:29:13 | 16 | Q.   We'll get to that in a minute.  But when you receive a bank |
| 11:29:18 | 17 | statement, sometimes it includes the checks and sometimes it |
| 11:29:24 | 18 | doesn't.  Is that fair? |
| 11:29:25 | 19 | A.   Sometimes. |
| 11:29:26 | 20 | Q.   And if you need to request the checks or if you have to get |
| 11:29:29 | 21 | the checks, you have to go to the bank to ask for the checks? |
| 11:29:32 | 22 | A.   That's correct. |
| 11:29:33 | 23 | Q.   I want to talk a little bit about this $2 million from UBS |
| 11:29:45 | 24 | to Extreme. |
| 11:29:46 | 25 | A.   Okay. |

| | | |
|---|---|---|
| 11:29:47 | 1 | Q.   Do you know that Extreme -- by the way, do you know if |
| 11:29:52 | 2 | Extreme's a company in Canada? |
| 11:29:54 | 3 | A.   It's my understanding. |
| 11:29:55 | 4 | Q.   That's your understanding?  And do you know the surroundings |
| 11:29:59 | 5 | or the information -- I guess information's not the right word. |
| 11:30:05 | 6 | Do you know the full contract or negotiations between ADT, |
| 11:30:12 | 7 | Extreme and HSBC? |
| 11:30:16 | 8 | A.   I don't. |
| 11:30:16 | 9 | Q.   So the only thing you have at this time, this is just from |
| 11:30:20 | 10 | the UBS records? |
| 11:30:21 | 11 | A.   Correct. |
| 11:30:22 | 12 | Q.   These payments here from ADT to Compass. |
| 11:30:51 | 13 | A.   Okay. |
| 11:30:53 | 14 | Q.   What month were those? |
| 11:31:01 | 15 | A.   August. |
| 11:31:05 | 16 | Q.   August of? |
| 11:31:06 | 17 | A.   2010. |
| 11:31:09 | 18 | Q.   And those particular ones that you have here, was that what |
| 11:31:15 | 19 | funded this particular check? |
| 11:31:20 | 20 | A.   That's correct. |
| 11:31:21 | 21 | Q.   So the moneys coming from ADT to a Compass account and then, |
| 11:31:27 | 22 | from the Compass? |
| 11:31:29 | 23 | A.   No.  It's coming from ADT to Compass. |
| 11:31:31 | 24 | Q.   Yeah.  I'm sorry. |
| 11:31:33 | 25 | A.   Correct. |

| 11:31:33 | 1 | Q. That's what I meant to say. From ADT accounts in Mexico to |
| 11:31:36 | 2 | Compass? |
| 11:31:37 | 3 | A. That's correct. |
| 11:31:38 | 4 | Q. Here in the United States? |
| 11:31:39 | 5 | A. That's correct. |
| 11:31:40 | 6 | Q. And then, checks written from Compass to Ruidoso? |
| 11:31:48 | 7 | A. That's correct. |
| 11:31:52 | 8 | Q. That binder we talked about. |
| 11:31:53 | 9 | A. Yes. |
| 11:31:54 | 10 | Q. Let me introduce it. At this time, your Honor, I'd move to |
| 11:32:14 | 11 | introduce Defendant's Exhibit 8. |
| 11:32:18 | 12 | MR. GARDNER: No objection to Colorado 8, your Honor. |
| 11:32:21 | 13 | MR. SANCHEZ: Sorry. Colorado. |
| 11:32:24 | 14 | THE COURT: It's received. |
| 11:32:26 | 15 | Q. (BY MR. SANCHEZ) So were you able to understand at least |
| 11:32:33 | 16 | some idea of this binder, this is the Ruidoso check? |
| 11:32:39 | 17 | A. Okay. |
| 11:32:40 | 18 | Q. Right? This is the Compass records that describe that |
| 11:32:48 | 19 | check? |
| 11:32:48 | 20 | A. Correct. |
| 11:32:50 | 21 | Q. These are Monex records that show where the money left Monex |
| 11:32:56 | 22 | and came to Compass? |
| 11:32:57 | 23 | A. Okay. |
| 11:32:58 | 24 | Q. And by the way, you reviewed this this morning, right? |
| 11:33:00 | 25 | A. I just got this this morning. Correct. |

| | | |
|---|---|---|
| 11:33:04 | 1 | Q.   Right.  But these records you've had for about ten days? |
| 11:33:08 | 2 | A.   About the Saturday before the trial. |
| 11:33:10 | 3 | Q.   Twelve days? |
| 11:33:11 | 4 | A.   Right.  There were about 1,500 pages. |
| 11:33:13 | 5 | Q.   And then, these records, if you can see this, these are |
| 11:33:18 | 6 | Bancomer BBVA records that are going to the Monex account. |
| 11:33:25 | 7 | A.   I don't know that for sure. |
| 11:33:26 | 8 | Q.   Okay.  What I want to do is I want to go through it.  It's |
| 11:33:49 | 9 | hard to read, but you'll agree with me that that's the check that |
| 11:33:57 | 10 | Ruidoso received that you have on your summary chart, right? |
| 11:34:01 | 11 | A.   I believe that's actually the first check out of the |
| 11:34:04 | 12 | account.  Check 101.  Correct. |
| 11:34:12 | 13 | Q.   And that's 14160 Bates stamp, right? |
| 11:34:18 | 14 | A.   Okay. |
| 11:34:19 | 15 | Q.   Will you agree with me that these bank statements and other |
| 11:34:44 | 16 | associated documents are the bank statements that correlate with |
| 11:34:48 | 17 | the check that was sent to Ruidoso? |
| 11:34:52 | 18 | A.   That's correct.  And that bank statement, I included that in |
| 11:34:56 | 19 | my analysis of Mr. Colorado's financial wherewithal.  Correct. |
| 11:34:59 | 20 | Q.   And so, this is a bank statement starting in July 16th of |
| 11:35:05 | 21 | 2010? |
| 11:35:05 | 22 | A.   Correct. |
| 11:35:08 | 23 | Q.   Going to August 16, 2010? |
| 11:35:09 | 24 | A.   Okay. |
| 11:35:10 | 25 | Q.   And there happens to be activity right on July -- or August |

| | | |
|---|---|---|
| 11:35:15 | 1 | 16 or August 17, correct? |
| 11:35:16 | 2 | A.   Correct. |
| 11:35:17 | 3 | Q.   So there's also August 17 through September 15. |
| 11:35:24 | 4 | A.   Okay. |
| 11:35:25 | 5 | Q.   And that statement here includes the check? |
| 11:35:33 | 6 | A.   That's when the check cleared the account.  Correct. |
| 11:35:46 | 7 | Q.   So there's one part of the wire, 500,000; is that right? |
| 11:35:52 | 8 | A.   That's correct. |
| 11:35:53 | 9 | Q.   And you agree -- and you have it on your chart -- that's |
| 11:35:56 | 10 | coming from ADT and Petro Servicios? |
| 11:36:01 | 11 | A.   Correct. |
| 11:36:02 | 12 | Q.   Two more wires, right? |
| 11:36:05 | 13 | A.   Correct. |
| 11:36:09 | 14 | Q.   And these pages here, is this the wire information? |
| 11:36:26 | 15 | A.   That's correct.  That's commonly referred to as the wire |
| 11:36:31 | 16 | advice. |
| 11:36:31 | 17 | Q.   And based on this record, coupled with the Monex records, |
| 11:36:41 | 18 | can you see that the money from ADT came from the Monex account? |
| 11:36:47 | 19 | A.   Point it out to me. |
| 11:36:48 | 20 | Q.   I'll show you this. |
| 11:36:49 | 21 | A.   I agree it came from the ADT.  I don't see the Monex.  It |
| 11:36:54 | 22 | went through bank of New York City as the intermediary. |
| 11:37:09 | 23 | Q.   I've now pulled out the Monex account.  Do you see that? |
| 11:37:14 | 24 | A.   Okay. |
| 11:37:23 | 25 | Q.   This is -- you agree with me that's August 16, 2010? |

| 11:37:29 | 1 | A. | I agree. |

11:37:29   1   A.   I agree.

11:37:29   2   Q.   500,000 going to Compass Bank?

11:37:32   3   A.   I do.

11:37:35   4   Q.   That account number?

11:37:36   5   A.   Okay.

11:37:43   6   Q.   That account number?

11:37:44   7   A.   Yes, sir.

11:37:45   8   Q.   So do those match up?

11:37:47   9   A.   Yes, sir.

11:37:48   10   Q.   Okay.  So from these Monex records, you can see that the ADT

11:37:57   11   money left the Monex account before it ever came into the BBVA

11:38:14   12   Compass account, okay?

11:38:15   13   A.   Okay.

11:38:16   14   Q.   I'm asking, is that correct?  Can you see that?

11:38:20   15   A.   I can see that.

11:38:22   16   Q.   And to save time, instead of going through the three wires,

11:38:41   17   that's one?

11:38:41   18   A.   So there is the one you just showed me, 500.

11:38:45   19   Q.   There's another.

11:38:49   20   A.   This is the Monex.

11:38:52   21   Q.   I'll get to that in a second.  That's the exchange.  Another

11:38:56   22   500 on the 17th.

11:39:01   23   A.   Okay.

11:39:11   24   Q.   So can we agree that all three wires that went into the

11:39:17   25   Compass account here in the United States came from this Monex

| | | |
|---|---|---|
| 11:39:25 | 1 | account? |
| 11:39:25 | 2 | A.    Yes. |
| 11:39:28 | 3 | Q.    And it's an ADT account? |
| 11:39:30 | 4 | A.    Okay. |
| 11:39:31 | 5 | Q.    Right? |
| 11:39:32 | 6 | A.    Yes. |
| 11:39:32 | 7 | Q.    Now, in each one of those -- are you familiar with this? |
| 11:39:47 | 8 | A.    This is the exchange. |
| 11:39:48 | 9 | Q.    Right.  So he would be buying $500,000 for that amount in |
| 11:39:52 | 10 | pesos? |
| 11:39:52 | 11 | A.    Pesos. |
| 11:39:54 | 12 | Q.    And there's one for each wire? |
| 11:39:55 | 13 | A.    Right. |
| 11:40:00 | 14 | Q.    You'll agree before each wire at Monex, ADT has to buy -- |
| 11:40:15 | 15 | using pesos, has to buy dollars to send to? |
| 11:40:24 | 16 | A.    I agree. |
| 11:40:24 | 17 | Q.    The bank account?  Do you agree that this is an incoming |
| 11:40:58 | 18 | account, 330 million pesos?  Do you see that coming from -- |
| 11:41:03 | 19 |        MR. GARDNER:  I'm sorry, your Honor, I can't hear the |
| 11:41:05 | 20 | question. |
| 11:41:07 | 21 | Q.    (BY MR. SANCHEZ) Just look at that and make sure you're |
| 11:41:09 | 22 | comfortable with that document before I ask you questions. |
| 11:41:17 | 23 | A.    You're going to have to help me translate.  I don't -- what |
| 11:41:20 | 24 | is this purported to be?  Thirty pesos? |
| 11:41:23 | 25 | Q.    Looks like it's 30 million pesos coming from? |

| 11:41:26 | 1 | A.   Is this coming into the Bancomer or -- |
| 11:41:29 | 2 | Q.   That's the sending bank? |
| 11:41:31 | 3 | A.   The sending bank will be deposited into where?  To Monex? |
| 11:41:36 | 4 | Okay. |
| 11:41:37 | 5 | Q.   For right now, you'll agree? |
| 11:41:38 | 6 | A.   Okay.  Correct. |
| 11:41:39 | 7 | Q.   So it looks like on August 16th, there's 30 million pesos |
| 11:41:52 | 8 | coming from Bancomer? |
| 11:41:54 | 9 | A.   Okay. |
| 11:41:56 | 10 | Q.   And before we get too far, do you know what Monex does? |
| 11:42:06 | 11 | A.   No. |
| 11:42:07 | 12 | Q.   What is their specialty?  Do you know that Monex is a bank |
| 11:42:10 | 13 | in Mexico that specializes in sending money to foreign countries? |
| 11:42:15 | 14 | A.   I didn't know that. |
| 11:42:16 | 15 | Q.   Changing and sending money to foreign countries? |
| 11:42:19 | 16 | A.   I didn't know that. |
| 11:42:20 | 17 | Q.   Okay.  So this is August 16, 2010? |
| 11:42:34 | 18 | A.   Correct. |
| 11:42:46 | 19 | Q.   Will you agree with me that this is a BBVA account from ADT |
| 11:43:08 | 20 | Petro Servicios? |
| 11:43:08 | 21 | A.   Yes. |
| 11:43:09 | 22 | Q.   And it's -- I understand the date is not what we're used to, |
| 11:43:15 | 23 | but you agree that this is August 1 through August 31, 2010? |
| 11:43:19 | 24 | A.   Correct. |
| 11:43:20 | 25 | Q.   And can you see here where the money is going to Monex?  Can |

11:44:05   1   you see that?

11:44:05   2   A.   I see 30 million.

11:44:08   3   Q.   Thirty-million pesos going to Monex?

11:44:10   4   A.   Pesos.  Okay.

11:44:11   5   Q.   And that corresponds with the Monex document we just saw

11:44:16   6   where 30 million was coming from a Bancomer account?

11:44:20   7   A.   Okay.

11:44:21   8   Q.   Do you agree with that?

11:44:22   9   A.   I agree.

11:44:27   10   Q.   So did you do any analysis to determine what was the source

11:44:35   11   of these 30 million pesos?

11:44:37   12   A.   No.

11:44:42   13   Q.   And, again, included in Colorado 8 -- I'll do this.  This is

11:45:16   14   part of that binder.  This is the month before?

11:45:27   15   A.   Okay.

11:45:28   16   Q.   Is that --

11:45:29   17   A.   It's July of 2010.

11:45:59   18   Q.   So the month before August, do you see that payment coming

11:46:11   19   into the account?

11:46:12   20   A.   I do.

11:46:13   21   Q.   Do you know how much that is?

11:46:16   22   A.   I don't know off the top of my head.

11:46:18   23   Q.   Well, this is in pesos, right?

11:46:20   24   A.   I understand that.

11:46:21   25   Q.   So it's 153,501,724 pesos?

| | | |
|---|---|---|
| 11:46:30 | 1 | A.   Okay. |
| 11:46:32 | 2 | Q.   And 30 million pesos was sent to Monex and then, sent on to |
| 11:46:42 | 3 | Compass? |
| 11:46:43 | 4 | A.   Okay. |
| 11:46:44 | 5 | Q.   So this is -- and the 30 million equaled out to around $2 |
| 11:46:50 | 6 | million, right? |
| 11:46:51 | 7 | A.   Around there. |
| 11:46:52 | 8 | Q.   So at least at this time, this appears to be around $10 |
| 11:46:57 | 9 | million payment? |
| 11:46:57 | 10 | A.   That particular payment, correct. |
| 11:47:00 | 11 | Q.   Do you know whether this payment -- this $10 million payment |
| 11:47:09 | 12 | is from Pemex? |
| 11:47:10 | 13 | A.   I have no idea. |
| 11:47:21 | 14 | Q.   Did you ask anyone? |
| 11:47:25 | 15 | A.   Did I ask anyone? |
| 11:47:26 | 16 | Q.   Did you ask anyone whether that is a payment from Pemex? |
| 11:47:30 | 17 | A.   No. |
| 11:47:34 | 18 | Q.   Continuing on July 22nd, there's another payment for 117 |
| 11:47:45 | 19 | million.  Do you see that? |
| 11:47:46 | 20 | A.   I do. |
| 11:47:47 | 21 | Q.   That would be less than 10 million but maybe 8 million or |
| 11:47:51 | 22 | so? |
| 11:47:51 | 23 | A.   Okay. |
| 11:48:01 | 24 | Q.   So when you were doing your analysis of ADT -- let me back |
| 11:48:16 | 25 | up. |

| | | |
|---|---|---|
| 11:48:19 | 1 | Here, you've got Pemex to UBS, Pemex to UBS, Pemex to |
| 11:48:39 | 2 | UBS, right? |
| 11:48:39 | 3 | A.   Correct. |
| 11:48:40 | 4 | Q.   What date is that first one, 10-12? |
| 11:49:28 | 5 | A.   Yes, sir. |
| 11:49:29 | 6 | Q.   That can't be right.  Oh, 10-12-11? |
| 11:49:37 | 7 | A.   Yes, sir. |
| 11:49:37 | 8 | Q.   Yeah, I was -- may I see the other one?  I'm sorry. |
| 11:50:20 | 9 | A.   I'm looking at my chart and that should be 12-13, I think. |
| 11:50:25 | 10 | That's a mistake. |
| 11:50:26 | 11 | Q.   All right. |
| 11:50:26 | 12 | A.   On the date. |
| 11:50:27 | 13 | Q.   So December 13? |
| 11:50:29 | 14 | A.   Right. |
| 11:50:29 | 15 | Q.   Of 2011? |
| 11:50:31 | 16 | A.   '11. |
| 11:50:37 | 17 | Q.   You're familiar with this document? |
| 11:50:59 | 18 | A.   I've seen that, yes. |
| 11:51:00 | 19 | Q.   That's the source of that dot? |
| 11:51:03 | 20 | A.   Correct. |
| 11:51:06 | 21 | Q.   And that all we have here is that it's coming from Banamex? |
| 11:51:10 | 22 | A.   Correct. |
| 11:51:11 | 23 | Q.   Doesn't necessarily say Pemex? |
| 11:51:15 | 24 | A.   No. |
| 11:51:15 | 25 | Q.   But you were able to talk to Ricardo Barrera and he told you |

| | | |
|---|---|---|
| 11:51:19 | 1 | that was from Pemex? |
| 11:51:20 | 2 | A.   That's correct. |
| 11:51:21 | 3 | Q.   So I guess my question is, did you ever ask anyone about any |
| 11:51:26 | 4 | of the other wires from Bancomer to determine whether they were |
| 11:51:38 | 5 | from Pemex? |
| 11:51:39 | 6 | A.   I didn't have to. |
| 11:51:41 | 7 | Q.   It's just not necessary in your analysis? |
| 11:51:43 | 8 | A.   No, because those transactions that you've reviewed, those |
| 11:51:46 | 9 | were all reflected in the financial statements that I used. |
| 11:51:48 | 10 | Q.   Well, and I guess that's -- |
| 11:51:50 | 11 | A.   They've been accounted for in the financial statements. |
| 11:51:53 | 12 | Okay. |
| 11:51:54 | 13 | Q.   So they should have been reflected in the financial |
| 11:51:56 | 14 | statements is what you're saying? |
| 11:51:57 | 15 | A.   I would hope they would be. |
| 11:51:59 | 16 | Q.   You would hope they would be reflected in financial |
| 11:52:02 | 17 | statements. |
| 11:52:02 | 18 | A.   That's correct. |
| 11:52:04 | 19 | Q.   And you don't know exactly what the correlation is between |
| 11:52:09 | 20 | ADT and MTTM, TrasCo, or Mr. Colorado's real estate business, |
| 11:52:17 | 21 | correct? |
| 11:52:17 | 22 | A.   Can you restate that?  I understand MTTM was formed as a |
| 11:52:23 | 23 | result of the suspension by -- |
| 11:52:24 | 24 | Q.   Hold on a second. |
| 11:52:25 | 25 | A.   -- ADT. |

| | | |
|---|---|---|
| 11:52:26 | 1 | Q.   Before we get into that information, what I'm asking you -- |
| 11:52:29 | 2 | because yesterday, we heard about several companies. |
| 11:52:32 | 3 | A.   Okay. |
| 11:52:32 | 4 | Q.   ADT, MTTM, TrasCo, and a real estate company? |
| 11:52:39 | 5 | A.   Okay. |
| 11:52:41 | 6 | Q.   Do you know the financial statements or the financial |
| 11:52:50 | 7 | ability of those companies and how they relate to ADT? |
| 11:52:54 | 8 | A.   No.  I recall in the information I got from UBS, TrasCo had |
| 11:52:58 | 9 | a loss 2008 or 2009, and the money was de minimis. |
| 11:53:06 | 10 | Q.   What about MTTM? |
| 11:53:08 | 11 | A.   I never saw any financial records from MTTM. |
| 11:53:10 | 12 | Q.   What about the real estate company? |
| 11:53:12 | 13 | A.   I never saw any financial statements from the real estate |
| 11:53:15 | 14 | company. |
| 11:53:15 | 15 | Q.   Did you ever ask about the tax advantages that come with |
| 11:53:23 | 16 | describing the income and breaking it out between those |
| 11:53:27 | 17 | companies? |
| 11:53:28 | 18 | A.   No. |
| 11:53:29 | 19 | Q.   So you're relying solely on what you believe should be in |
| 11:53:32 | 20 | the ADT financial records and those three pages, those financial |
| 11:53:37 | 21 | statements? |
| 11:53:38 | 22 | A.   That's correct. |
| 11:53:38 | 23 | Q.   And when you talked about Mr. Trevino, you said you didn't |
| 11:53:44 | 24 | look at the IRS or the tax forms.  You went to the underlying |
| 11:53:47 | 25 | documents. |

| | | |
|---|---|---|
| 11:53:48 | 1 | A.   Correct. |
| 11:53:49 | 2 | Q.   And here, instead of going to the underlying documents that |
| 11:53:53 | 3 | support the financial statements, you just looked at the |
| 11:53:55 | 4 | financial statements? |
| 11:53:56 | 5 | A.   I didn't have the underlying documents. |
| 11:53:58 | 6 | Q.   Now that you have the underlying documents, you discounted |
| 11:54:02 | 7 | those? |
| 11:54:02 | 8 | A.   Sir, again, I got those on Saturday before, 1,500 pages. |
| 11:54:07 | 9 | And, again, those transactions should have been accounted for in |
| 11:54:10 | 10 | the financial statements. |
| 11:54:11 | 11 | Q.   They should have been? |
| 11:54:13 | 12 | A.   I would hope that they would be. |
| 11:54:14 | 13 | Q.   You would hope? |
| 11:54:15 | 14 | A.   Correct. |
| 11:54:16 | 15 | Q.   But you're not an expert in Mexican law. |
| 11:54:20 | 16 | A.   No. |
| 11:54:21 | 17 | Q.   You don't know anything about MTTM? |
| 11:54:26 | 18 | A.   I know something about MTTM. |
| 11:54:28 | 19 | Q.   You don't know about their financial statements? |
| 11:54:30 | 20 | A.   No. |
| 11:54:31 | 21 | Q.   You don't know about the financial statements of the real |
| 11:54:34 | 22 | estate company? |
| 11:54:36 | 23 | A.   Again, I've seen the financial statements for the real |
| 11:54:38 | 24 | estate company, and I remember seeing a loss in one year. |
| 11:54:46 | 25 | Q.   Could I have one moment, your Honor?  Pass the witness. |

| | | |
|---|---|---|
| 11:55:10 | 1 | THE COURT:  And with that, you get lunch.  Remember the |
| 11:55:14 | 2 | instructions.  We'll start at 1:20.  1:20. |
| 11:55:52 | 3 | (Jury not present.) |
| 11:55:54 | 4 | THE COURT:  We're in recess till 1:20. |
| 12:03:26 | 5 | (Lunch recess.) |
| 13:24:43 | 6 | (Jury present.) |
| 13:26:19 | 7 | THE COURT:  I'm tempted to ask you if you enjoyed the |
| 13:26:25 | 8 | barbecue, but I will not.  I could hear, even though I'm not |
| 13:26:28 | 9 | permitted to participate. |
| 13:26:31 | 10 | But during the barbecue, did anybody attempt to talk to |
| 13:26:34 | 11 | you about this case? |
| 13:26:35 | 12 | JURORS:  No. |
| 13:26:36 | 13 | THE COURT:  Did you talk to anybody about the case? |
| 13:26:38 | 14 | JURORS:  No. |
| 13:26:39 | 15 | THE COURT:  And have you learned anything at all about |
| 13:26:41 | 16 | the case, outside the presence of one another in this courtroom? |
| 13:26:44 | 17 | JURORS:  No. |
| 13:26:44 | 18 | THE COURT:  All right.  Thank you.  Show negative |
| 13:26:47 | 19 | responses to all questions by all jurors. |
| 13:26:49 | 20 | Mr. Womack.  Do you have any questions? |
| 13:26:53 | 21 | MR. WOMACK:  No, sir. |
| 13:26:54 | 22 | THE COURT:  Okay.  Mr. Esper? |
| 13:26:56 | 23 | MR. ESPER:  I have none, your Honor. |
| 13:26:57 | 24 | THE COURT:  Mr. Mayr. |
| 13:26:59 | 25 | MR. MAYR:  Neither do I. |

```
13:27:00   1              THE COURT:  Ms. Williams?

13:27:02   2              MS. WILLIAMS:  Yes, your Honor.

13:27:03   3                    CROSS-EXAMINATION

13:27:03   4   BY MS. WILLIAMS:

13:27:09   5   Q.   Special Agent Fernald, my name is Christie Williams and I

13:27:11   6   represent Jose Trevino.

13:27:12   7   A.   Okay.

13:27:13   8   Q.   We don't know each other?

13:27:14   9   A.   No.

13:27:14  10   Q.   Have you ever heard the saying, you see what you're looking

13:27:21  11   for?

13:27:21  12   A.   No.

13:27:23  13   Q.   You're not saying, are you, that paying for something in

13:27:27  14   cash is illegal?

13:27:29  15   A.   Not in and of itself.

13:27:32  16   Q.   I'm sorry?

13:27:32  17   A.   Not in and of itself.

13:27:34  18   Q.   If I want to pay for something in cash, that's totally fine?

13:27:39  19   A.   Sure.

13:27:40  20   Q.   The IRS doesn't have a problem with that inherently?

13:27:44  21   A.   Not in and of itself, no.

13:27:47  22   Q.   Would you say that again?  Not in and of itself?

13:27:49  23   A.   Not in and of itself.  Correct.

13:27:51  24   Q.   Have you ever heard of Dave Ramsey?

13:27:55  25   A.   Never heard of him.
```

| | | |
|---|---|---|
| 13:28:01 | 1 | Q.   He's a financial advisor.  Part of his schtick, if you will, |
| 13:28:08 | 2 | is that you pay for things in cash. |
| 13:28:11 | 3 | A.   Okay. |
| 13:28:11 | 4 | Q.   And that you save money that way. |
| 13:28:13 | 5 | A.   Okay. |
| 13:28:14 | 6 | Q.   You don't have a problem with that, do you? |
| 13:28:16 | 7 | A.   No. |
| 13:28:17 | 8 | Q.   Did you see any evidence in your analysis the Trevinos -- |
| 13:28:26 | 9 | Jose Trevino's financial situation, did you see any evidence of a |
| 13:28:30 | 10 | major credit card? |
| 13:28:32 | 11 | A.   Not that I recall. |
| 13:28:33 | 12 | Q.   No Visa? |
| 13:28:35 | 13 | A.   I think there were some payments to a credit card out of the |
| 13:28:39 | 14 | account. |
| 13:28:40 | 15 | Q.   There's some payments to a department store credit card? |
| 13:28:43 | 16 | A.   Right. |
| 13:28:43 | 17 | Q.   And there weren't any payments that I could find.  And |
| 13:28:45 | 18 | correct me if I'm wrong -- a Visa, Mastercard, American Express, |
| 13:28:48 | 19 | the major credit card companies? |
| 13:28:49 | 20 | A.   Correct. |
| 13:28:49 | 21 | Q.   You don't have any reason to disagree with me, do you? |
| 13:28:51 | 22 | A.   No. |
| 13:28:52 | 23 | Q.   So I want to talk to you -- well, one more question before I |
| 13:28:57 | 24 | tell you where I'm going. |
| 13:28:58 | 25 | You didn't see evidence of anything extravagant, |

| | | |
|---|---|---|
| 13:29:03 | 1 | extravagant vacations, anything of that nature, in analyzing Jose |
| 13:29:09 | 2 | Trevino's bank accounts, did you? |
| 13:29:11 | 3 | A.   I did not.  No. |
| 13:29:13 | 4 | Q.   It appeared that the Trevinos lived frugally? |
| 13:29:19 | 5 | A.   They had to. |
| 13:29:20 | 6 | Q.   And even after they get in the horse business and they win |
| 13:29:25 | 7 | these big races, other than horse expenses, you still don't see |
| 13:29:30 | 8 | any extravagant purchases, do you? |
| 13:29:35 | 9 | A.   As far as extravagant purchases for what? |
| 13:29:38 | 10 | Q.   Vacations luxury cars, jewelry, that sort of thing? |
| 13:29:42 | 11 | A.   Not that I recall. |
| 13:29:43 | 12 | Q.   Now, I want to kind of split this into two parts.  So I want |
| 13:29:47 | 13 | to let you know where I'm going so we understand each other. |
| 13:29:50 | 14 |        First, I want to ask you about this Tempting Dash |
| 13:29:53 | 15 | money.  Fair enough? |
| 13:29:55 | 16 | A.   Okay. |
| 13:29:56 | 17 | Q.   And then, I want to talk to you about the wedding. |
| 13:29:58 | 18 | A.   Okay. |
| 13:29:58 | 19 | Q.   Okay.  So we keep those two things separate? |
| 13:30:01 | 20 | A.   Sure. |
| 13:30:02 | 21 | Q.   You showed the jury this chart and you told them that you |
| 13:30:08 | 22 | used the Social Security statements as the basis, on the bottom |
| 13:30:14 | 23 | of the chart, for how much money was coming into the Trevino |
| 13:30:17 | 24 | household. |
| 13:30:18 | 25 | A.   For 1990 through 2007, which is when we got the bank |

| | | |
|---|---|---|
| 13:30:24 | 1 | records. |
| 13:30:24 | 2 | Q.   And so, from 2007 forward, you actually used the bank |
| 13:30:28 | 3 | records? |
| 13:30:28 | 4 | A.   Correct. |
| 13:30:29 | 5 | Q.   But for 2006 backwards, back to? |
| 13:30:35 | 6 | A.   1990. |
| 13:30:36 | 7 | Q.   1990, you used these Social Security statements? |
| 13:30:41 | 8 | A.   Correct. |
| 13:30:43 | 9 | Q.   Because you didn't think that the tax statements -- that |
| 13:30:45 | 10 | they might or might not be accurate.  Is that -- was that your |
| 13:30:48 | 11 | explanation? |
| 13:30:49 | 12 | A.   No.  That's because all we had.  We don't have -- because of |
| 13:30:53 | 13 | the retention policies of banks, they don't keep records back to |
| 13:30:56 | 14 | the '90s.  They keep about five years. |
| 13:30:59 | 15 | Q.   How many years back could you have gotten tax records? |
| 13:31:04 | 16 | A.   Tax records? |
| 13:31:05 | 17 | Q.   Yes.  Tax returns. |
| 13:31:07 | 18 | A.   I guess since they filed them. |
| 13:31:10 | 19 | Q.   And did you check to see how many years back Zulema and Jose |
| 13:31:14 | 20 | Trevino had filed a tax return? |
| 13:31:16 | 21 | A.   No.  I did not. |
| 13:31:17 | 22 | Q.   And I thought you told the prosecutor that you didn't use |
| 13:31:20 | 23 | the tax return because you weren't sure that people are truthful |
| 13:31:23 | 24 | on their tax returns.  Isn't that what you said? |
| 13:31:24 | 25 | A.   I said people are known to lie on their tax returns. |

| 13:31:27 | 1 | Q.   All right.  So because of that, you used the Social Security |
| 13:31:30 | 2 | statements.  That's what I was trying to get at. |
| 13:31:32 | 3 | A.   Okay. |
| 13:31:33 | 4 | Q.   That was your previous testimony, was it not? |
| 13:31:35 | 5 | A.   Yes. |
| 13:31:35 | 6 | Q.   All right.  But tell the members of the jury what Social |
| 13:31:40 | 7 | Security statements show.  Do they really show how much money a |
| 13:31:44 | 8 | person makes in a given year? |
| 13:31:47 | 9 | A.   It shows the wages that they're -- that they're paid of the |
| 13:31:51 | 10 | wages that are paid into Social Security. |
| 13:31:52 | 11 | Q.   Doesn't really show that either, does it?  It shows -- |
| 13:31:55 | 12 | A.   I don't know what you're talking about. |
| 13:31:56 | 13 | Q.   How much money an employer reports to the government that |
| 13:32:01 | 14 | they paid that person. |
| 13:32:03 | 15 | A.   That's correct. |
| 13:32:03 | 16 | Q.   And that's not the same thing, is it? |
| 13:32:05 | 17 | A.   I disagree. |
| 13:32:08 | 18 | Q.   Well, if I work as a babysitter and I make $4,000. |
| 13:32:18 | 19 | A.   Okay. |
| 13:32:18 | 20 | Q.   The person who employees me may or may not report that to |
| 13:32:21 | 21 | the IRS, right? |
| 13:32:22 | 22 | A.   It's your responsibility to report it.  Correct. |
| 13:32:24 | 23 | Q.   Okay.  But Social Security doesn't show that.  Social |
| 13:32:28 | 24 | Security shows what the employer reports to the government. |
| 13:32:31 | 25 | Isn't that true? |

| | | |
|---|---|---|
| 13:32:32 | 1 | A.   Well, now you're getting into employee-employer |
| 13:32:35 | 2 | relationships and self-employment.   It's not that easy. |
| 13:32:39 | 3 | Q.   Doesn't a Social Security record show what a 1099 or a W-2? |
| 13:32:45 | 4 | A.   A Social Security statement? |
| 13:32:46 | 5 | Q.   Yes. |
| 13:32:47 | 6 | A.   No.  Not a 1099. |
| 13:32:51 | 7 | Q.   So if you get a 1099, does that go on your Social Security |
| 13:32:55 | 8 | statement? |
| 13:32:55 | 9 | A.   Depends on who it's from and what it's for. |
| 13:32:58 | 10 | Q.   What do you mean it depends on who it's from? |
| 13:33:00 | 11 | A.   It's from your employer. |
| 13:33:03 | 12 | Q.   If you get a -- |
| 13:33:03 | 13 | A.   Now, if you get a 1099, generally you're not an employee, |
| 13:33:07 | 14 | you're self-employed or you're independent contractor, I guess I |
| 13:33:14 | 15 | should say. |
| 13:33:14 | 16 | Q.   You're an independent contractor? |
| 13:33:15 | 17 | A.   Correct.  And it's not that simple. |
| 13:33:21 | 18 | Q.   Well, let's talk about it's not that simple. |
| 13:33:28 | 19 |      You never saw, other than what I think you -- I can't |
| 13:33:32 | 20 | remember what you called it -- some sort of promotional savings |
| 13:33:37 | 21 | account at Bank of America, you never saw any evidence of a |
| 13:33:39 | 22 | savings account. |
| 13:33:40 | 23 | A.   No. |
| 13:33:43 | 24 | Q.   So what's significant about -- do you have that chart in |
| 13:33:52 | 25 | front of you? |

| | | |
|---|---|---|
| 13:33:53 | 1 | A.   I do. |
| 13:33:53 | 2 | Q.   Is there anything significant to you with regard to the year |
| 13:33:57 | 3 | 2001? |
| 13:33:59 | 4 | A.   No. |
| 13:34:01 | 5 | Q.   Do you know that that's the year that Jose Trevino became a |
| 13:34:04 | 6 | citizen of the United States? |
| 13:34:06 | 7 | A.   I didn't know that. |
| 13:34:08 | 8 | Q.   Would that affect your analysis of his potential cash flow? |
| 13:34:15 | 9 | A.   No. |
| 13:34:16 | 10 | Q.   Would you agree with me that a person who's a citizen of the |
| 13:34:19 | 11 | United States has a better chance of getting a better job than |
| 13:34:21 | 12 | someone who's not a citizen? |
| 13:34:23 | 13 | A.   I wouldn't know. |
| 13:34:26 | 14 | Q.   If you accepted that -- and I understand that you don't -- |
| 13:34:33 | 15 | but if you accepted that as an important fact, then it would be |
| 13:34:39 | 16 | more important to look at the years from 2001 to 2009. |
| 13:34:45 | 17 | A.   Okay. |
| 13:34:46 | 18 | Q.   Right?  If you accepted that. |
| 13:34:49 | 19 | A.   Okay. |
| 13:34:52 | 20 | Q.   And if you looked at the years 2001 to 2009, what would the |
| 13:34:59 | 21 | yearly average wages have been?  That would go up, wouldn't it? |
| 13:35:06 | 22 | A.   I don't know. |
| 13:35:06 | 23 | Q.   That would go up? |
| 13:35:07 | 24 | A.   Probably. |
| 13:35:08 | 25 | Q.   Well, not probably.  Look at the chart. |

13:35:12   1   A.   Okay.  It would go up.

13:35:14   2   Q.   Okay.  If I said that it would go up to $38,420.22, would

13:35:23   3   you argue with me?  We can take the time to do the math if you

13:35:27   4   want.

13:35:27   5   A.   Is that a representation of the average for those four or

13:35:30   6   five years or whatever it --

13:35:31   7   Q.   That's my representation of those years.

13:35:32   8   A.   I would have no reason to not believe you.

13:35:37   9   Q.   Nine years?

13:35:41  10   A.   Okay.

13:35:42  11   Q.   Did you consider in your cash flow analysis the impact --

13:35:59  12   well, did you see any significant cash deposits into the

13:36:05  13   Trevinos' accounts, ever?

13:36:06  14   A.   Not that I recall.  There were some cash deposits but not

13:36:10  15   significant, however you define significant.

13:36:11  16   Q.   $200, $300, I mean, that sort of thing?

13:36:14  17   A.   Correct.

13:36:14  18   Q.   Very, very occasionally but nothing -- no $9,000 deposits,

13:36:18  19   no $5,000 deposit, that sort of thing.  Nothing significant like

13:36:21  20   that over all these years?

13:36:23  21   A.   Just wages.

13:36:24  22   Q.   Just wages.

13:36:34  23        Did you consider in your cash flow analysis the

13:36:38  24   possibility that Mr. or Mrs. Trevino amassed cash through saving

13:36:50  25   cash from their bank account?

| | | |
|---|---|---|
| 13:36:54 | 1 | A.   I don't -- I don't quite follow you. |
| 13:36:57 | 2 | Q.   If I get paid $500 and I take my paycheck to the bank and I |
| 13:37:02 | 3 | keep $100, what has happened? |
| 13:37:09 | 4 | A.   Would you say the numbers again? |
| 13:37:12 | 5 | Q.   Sure.  I get a paycheck and it's for $500. |
| 13:37:15 | 6 | A.   Okay. |
| 13:37:15 | 7 | Q.   I take it to the bank, I fill out a deposit slip, I deposit |
| 13:37:18 | 8 | $400, and I take out $100 in cash. |
| 13:37:22 | 9 | A.   Okay. |
| 13:37:24 | 10 | Q.   Did you consider the impact of that kind of transaction in |
| 13:37:29 | 11 | your cash flow analysis? |
| 13:37:31 | 12 | A.   I had no evidence that they kept cash out. |
| 13:37:36 | 13 | Q.   Well, let's talk about that.  Did you look at their |
| 13:37:42 | 14 | Prosperity Bank account? |
| 13:37:43 | 15 | A.   I did. |
| 13:37:43 | 16 | Q.   I think -- is that the earliest bank account you found? |
| 13:38:10 | 17 | A.   That is. |
| 13:38:11 | 18 | Q.   Okay.  And that's why I used it, because it's the first |
| 13:38:18 | 19 | instance, the first chance for you in doing a cash flow analysis |
| 13:38:22 | 20 | to consider the impact of withdrawing money from a person's bank |
| 13:38:27 | 21 | account.  Now, that's not illegal, is it? |
| 13:38:30 | 22 | A.   No. |
| 13:38:32 | 23 | Q.   Do you have those records in front of you? |
| 13:38:35 | 24 | A.   Well, I have my spreadsheet in front of me. |
| 13:38:37 | 25 | Q.   Well, in looking at your spreadsheet, can you tell if there |

| | | |
|---|---|---|
| 13:38:41 | 1 | were checks written for cash or cash kept out of a paycheck in a |
| 13:38:48 | 2 | deposit? |
| 13:38:48 | 3 | A.   Not in this one. |
| 13:38:51 | 4 | Q.   Because in your analysis, you didn't consider that as a |
| 13:38:54 | 5 | possibility.  Isn't that fair? |
| 13:38:59 | 6 | A.   No.  This is -- I don't believe that to be the case because |
| 13:39:05 | 7 | I also have the employment files during the same time. |
| 13:39:09 | 8 | Q.   Fair enough.  But this Prosperity -- did you make this |
| 13:39:13 | 9 | spreadsheet? |
| 13:39:13 | 10 | A.   I did. |
| 13:39:14 | 11 | Q.   This Prosperity Bank account spreadsheet doesn't have any |
| 13:39:17 | 12 | indication of how much cash was withdrawn from their bank account |
| 13:39:22 | 13 | over this nine-month period, does it? |
| 13:39:26 | 14 | A.   Well, the deposits are direct deposits, so I don't know how |
| 13:39:29 | 15 | you would withdraw cash out of it. |
| 13:39:31 | 16 | Q.   Again, I'm sorry -- |
| 13:39:32 | 17 | A.   From being deposited. |
| 13:39:33 | 18 | Q.   Some of them are direct deposits and some of them aren't. |
| 13:39:38 | 19 | Isn't that true? |
| 13:39:39 | 20 | A.   I would have to look. |
| 13:39:42 | 21 | Q.   Would you be surprised to learn that over this nine-month |
| 13:39:47 | 22 | period, Mr. Trevino or his wife withdrew legally, right there in |
| 13:39:53 | 23 | the open, over $7,500 in cash? |
| 13:40:00 | 24 | A.   I have no -- I don't guess I have any opinion about that.  I |
| 13:40:07 | 25 | have no idea. |

| | | |
|---|---|---|
| 13:40:11 | 1 | Q.   Well, did you know that? |
| 13:40:13 | 2 | A.   No. |
| 13:40:15 | 3 | Q.   If in nine months, these citizens of the United States can |
| 13:40:23 | 4 | take out $7,500 in cash, what does that do to your cash flow |
| 13:40:28 | 5 | analysis? |
| 13:40:31 | 6 | A.   Nothing, because I've already accounted for that in the |
| 13:40:40 | 7 | original deposit. |
| 13:40:47 | 8 | Q.   Your spreadsheet shows total deposits. |
| 13:40:50 | 9 | A.   Okay. |
| 13:40:50 | 10 | Q.   Right? |
| 13:40:51 | 11 | A.   Okay. |
| 13:40:53 | 12 | Q.   Well, I don't really know what okay means.  So I'm going to |
| 13:40:57 | 13 | try to ask you "Yes" or "No" questions if you'll try to answer |
| 13:41:00 | 14 | "Yes" or "No."  Is that fair? |
| 13:41:02 | 15 | A.   Yes, ma'am. |
| 13:41:03 | 16 | Q.   All right.  Your spreadsheet shows total deposits. |
| 13:41:07 | 17 | A.   Yes, ma'am. |
| 13:41:08 | 18 | Q.   And it lists out some different ways that money was |
| 13:41:12 | 19 | deposited, but nothing in here shows -- if I have a check for |
| 13:41:17 | 20 | $500 and I only deposit 400 of it and I take 100 in cash, how |
| 13:41:21 | 21 | much is going to show up on your -- |
| 13:41:25 | 22 | A.   Well, in that scenario, if it's a check, 400. |
| 13:41:27 | 23 | Q.   Okay.  And so, I don't want to take up a lot of this jury's |
| 13:41:33 | 24 | time, but over lunch, I took this Government's Exhibit 250F and I |
| 13:41:42 | 25 | added up all the cash that was taken out. |

| | | |
|---|---|---|
| 13:41:48 | 1 | A.    Okay. |
| 13:41:49 | 2 | Q.    Do you want to look at it? |
| 13:41:51 | 3 | A.    Is this the -- |
| 13:41:53 | 4 | Q.    That's the total. |
| 13:41:54 | 5 | A.    That's not $25,000. |
| 13:41:56 | 6 | Q.    No.  That's $7,500, a little more than that, right? |
| 13:42:00 | 7 | A.    I agree. |
| 13:42:01 | 8 | Q.    All right.  So if in nine months, a person could save $7,500 |
| 13:42:11 | 9 | in cash, how long would it take them to save $25,000 in cash? |
| 13:42:19 | 10 | A.    At the same rate? |
| 13:42:21 | 11 | Q.    At the same rate. |
| 13:42:23 | 12 | A.    A couple of years.  Several years. |
| 13:42:30 | 13 | Q.    Three-ish? |
| 13:42:31 | 14 | A.    I agree. |
| 13:42:34 | 15 | Q.    I'm handing you what I've marked as JT-2 and 2A, 3 and 3A, |
| 13:43:06 | 16 | all the way to 5 and 5A.  Have you seen those documents before? |
| 13:43:09 | 17 | A.    I have. |
| 13:43:10 | 18 | Q.    At this time, your Honor, I would offer Exhibits JT-2, 3, 4 |
| 13:43:37 | 19 | and 5 under Rule 902(3). |
| 13:43:44 | 20 | MR. GARDNER:  May I see those? |
| 13:43:46 | 21 | MS. WILLIAMS:  Uh-huh. |
| 13:44:11 | 22 | MR. GARDNER:  Your Honor, we object to these.  They're |
| 13:44:12 | 23 | not complete documents.  All they are are bills of sales.  They |
| 13:44:16 | 24 | don't have any property records that are behind them to indicate |
| 13:44:18 | 25 | property that is being sold. |

13:44:23   1          THE COURT:  You confused me.  You said JT-3, then you

13:44:27   2   went to 2.  And I don't know what --

13:44:28   3          MS. WILLIAMS:  I'm sorry, Judge.  It's 2, 3, 4 and 5.

13:44:32   4          THE COURT:  Would you give them to Mrs. Sims, please?

13:45:30   5          The documents are in Spanish.  I can't tell.

13:45:36   6          MS. WILLIAMS:  These are the translations, your Honor.

13:45:38   7   They're marked.

13:46:18   8          THE COURT:  Okay.  Authenticity is the objection?

13:46:22   9          MR. GARDNER:  Completeness, your Honor.

13:46:23  10          THE COURT:  Sorry?

13:46:24  11          MR. GARDNER:  We invoke the rule of completeness.  We

13:46:26  12   don't believe they're complete documents since they don't reflect

13:46:28  13   the actual property being sold.

13:46:31  14          THE COURT:  Without any further testimony, I'll sustain

13:46:36  15   the objection.

13:46:49  16   Q.   (BY MS. WILLIAMS) All right.  Let's move to the wedding.

13:47:11  17   A.   Yes, ma'am.

13:47:12  18   Q.   The government asked you about this payment to the Adolphus.

13:47:27  19   Remember that?

13:47:27  20   A.   I do.

13:47:28  21   Q.   And did -- was your opinion the same for the wedding as it

13:47:51  22   was for the Tempting Dash payment of $25,000?

13:47:55  23   A.   I saw no cash withdrawals that would equate to what was

13:47:58  24   paid.

13:47:59  25   Q.   So it was --

| | | |
|---|---|---|
| 13:48:01 | 1 | A.   Yes. |
| 13:48:01 | 2 | Q.   It was essentially the same? |
| 13:48:02 | 3 | A.   Yes. |
| 13:48:03 | 4 | Q.   And, I mean, let's be real clear, not to beat a dead horse. |
| 13:48:13 | 5 | But it's important in this case to know whether or not Jose |
| 13:48:19 | 6 | Trevino could come up with this kind of cash on his own, right? |
| 13:48:23 | 7 | I mean, that's what we're talking about. |
| 13:48:24 | 8 | A.   Source of funds is important. |
| 13:48:26 | 9 | Q.   Source of funds is very important, right? |
| 13:48:28 | 10 | A.   Correct. |
| 13:48:29 | 11 | Q.   And so, considering all possibilities and looking at all the |
| 13:48:32 | 12 | bank statements that are available to you is part of what your |
| 13:48:36 | 13 | job is, correct? |
| 13:48:38 | 14 | A.   It's correct. |
| 13:48:52 | 15 | MR. GARDNER:   No objection to 6, your Honor. |
| 13:48:59 | 16 | Q.   (BY MS. WILLIAMS) I'm going to ask you to look at |
| 13:49:02 | 17 | Defendant's Exhibit JT-6.  What are those documents? |
| 13:49:41 | 18 | A.   Checks. |
| 13:49:42 | 19 | Q.   Checks from? |
| 13:49:44 | 20 | A.   Tremor to Jose Trevino. |
| 13:49:46 | 21 | Q.   And to also -- |
| 13:49:49 | 22 | A.   I saw one or two to Zulema. |
| 13:49:51 | 23 | Q.   I'll offer Defendant's Exhibit JT-6. |
| 13:49:54 | 24 | THE COURT:   Without objection, it's received. |
| 13:49:58 | 25 | Q.   (BY MS. WILLIAMS) When were the cash payments to the |

13:50:05  1    Adolphus for Alexandra Trevino's wedding reception?

13:50:14  2    A.   Best of my recollection, it was April in 2012 and then, May.

13:50:20  3    Q.   Let me see if I can help.

13:50:23  4    A.   April and May.

13:50:27  5    Q.   Of 2012?

13:50:29  6    A.   That's correct.

13:50:30  7    Q.   And how much of that -- I don't know how much math you can

13:50:35  8    do in your head.  Hopefully more than me.

13:50:38  9         How much of that was paid in cash?

13:50:40 10    A.   $33,800.

13:50:48 11    Q.   Look at the dates of the checks, if you don't mind, in

13:50:53 12    Exhibit JT-6 and identify, if you would, the earliest that, you

13:51:01 13    know, kind of the date range, the earliest date and the latest

13:51:04 14    date.

13:51:04 15    A.   November 2011 through -- hopefully they're in order.

13:51:11 16    Q.   Close.

13:51:11 17    A.   March of 2012.

13:51:17 18    Q.   So from November of 2011 to March of 2012, Jose Trevino and

13:51:26 19    Zulema Trevino wrote some checks from their company to themselves

13:51:35 20    for payroll?

13:51:36 21    A.   That's correct.

13:51:36 22    Q.   And maybe one or two say bonus on them?

13:51:40 23    A.   That is correct.

13:51:41 24    Q.   What is significant about those checks?

13:51:43 25    A.   I don't know.

13:51:44   1   Q.   Well, were they all deposited or were they all cashed?

13:52:01   2   A.   I would have to go through the checks and look.  Looks like

13:53:14   3   these were cashed.

13:53:14   4   Q.   All those checks were cashed?

13:53:16   5   A.   That's what it appears.

13:53:17   6   Q.   Doesn't just appear that way.  The bank shows all those

13:53:21   7   checks were cashed, and there's no evidence that they were

13:53:24   8   deposited in the bank, correct?

13:53:24   9   A.   Well, there was some corresponding cash deposits around the

13:53:27   10  same time.  Correct.

13:53:28   11  Q.   And wouldn't you agree with me that the checks on Exhibit

13:53:37   12  JT-6 total more than $33,800?

13:53:44   13  A.   It's 33,800.

13:53:48   14  Q.   I'm sorry?

13:53:48   15  A.   It's $33,800.

13:53:50   16  Q.   They total more than $33,800, don't they?

13:53:53   17  A.   I don't know.  I don't know how much they total.  So you

13:54:09   18  want me to total them?

13:54:10   19  Q.   Well.

13:55:10   20  A.   40,450.

13:55:12   21  Q.   I don't have any further questions.

13:55:21   22                    RE-DIRECT EXAMINATION

13:55:21   23  BY MR. GARDNER:

13:55:31   24  Q.   Did Mr. Trevino get a number of wires from Mexico?

13:55:35   25  A.   That were deposited to one of his accounts.  Correct.

13:55:37  1   Q.   Were you able to trace the source of those funds?

13:55:41  2   A.   I was not.

13:55:43  3   Q.   Is that the --

13:55:44  4   A.   Well, there's a payee.  Correct.

13:55:47  5   Q.   A payee?

13:55:48  6   A.   Payor.  I'm sorry, payor.

13:55:50  7   Q.   But you don't know the source of his funds, correct?

13:55:52  8   A.   No.

13:55:53  9   Q.   And is that the point of this exercise and your analysis to

13:55:57  10  attempt to find the source of the funds?

13:55:59  11  A.   That's correct.

13:56:00  12  Q.   With respect to both the Jose Trevino and the ADTs, were you

13:56:04  13  able to trace the ultimate source of the funds going into their

13:56:07  14  accounts?

13:56:08  15  A.   No.

13:56:09  16  Q.   So, for example, Mr. Sanchez asked about these Bancomer and

13:56:19  17  these Monex deposits into ADT accounts.  Were you able to retain

13:56:25  18  the source documents that would indicate where that money was

13:56:27  19  coming from?

13:56:27  20  A.   I was not.

13:56:28  21  Q.   And is that why you say those records are incomplete?

13:56:30  22  A.   That's correct.

13:56:31  23  Q.   So you were able to obtain the source documents from the UBS

13:56:36  24  accounts for any of the deposits, correct?

13:56:37  25  A.   Correct.

```
13:56:38   1   Q.   Could I see 404B, please?  Ms. Sims, could you please dim
13:56:43   2   the lights?
13:57:02   3        Special Agent Fernald, you have a number of horizontal
13:57:10   4   layers here representing different types of money flow, correct?
13:57:16   5   A.   Correct.
13:57:17   6   Q.   What's the usefulness in this chart in comparing those
13:57:21   7   different lines?
13:57:22   8   A.   It just shows flow of money.
13:57:25   9   Q.   So I could take a particular date, say, November of 2011 and
13:57:31  10   compare the flow of money?
13:57:33  11   A.   At the same time, correct.
13:57:34  12   Q.   At the same time, correct?
13:57:36  13   A.   Correct.
13:57:37  14   Q.   So I want to take November of 2011.  What's going on down
13:57:41  15   here?
13:57:43  16   A.   ADT suspended from bidding on Pemex contracts.
13:57:48  17   Q.   And what's going on up here?
13:57:50  18   A.   Mr. Colorado is purchasing horses.
13:57:52  19   Q.   And where is he getting the funds to purchase those horses
13:57:55  20   from?
13:57:57  21   A.   Well, there's one purchase from the Arian Jaff.
13:58:01  22   Q.   So it's useful for you to start to look at the --
13:58:04  23   A.   Correct.
13:58:05  24   Q.   -- expenditures at any one given point?
13:58:08  25   A.   Correct.
```

| | | |
|---|---|---|
| 13:58:10 | 1 | Q.   Now, you earlier said on direct, you said I hope.  You used |
| 13:58:14 | 2 | the words, "I hope his financials were correct"? |
| 13:58:18 | 3 | A.   That's correct. |
| 13:58:18 | 4 | Q.   Why did you say that? |
| 13:58:19 | 5 | A.   Because if his financial statements were not correct, he |
| 13:58:24 | 6 | would be committing bank fraud. |
| 13:58:26 | 7 | Q.   And why is that? |
| 13:58:27 | 8 | A.   Those financials were supplied to UBS, a financial |
| 13:58:32 | 9 | institution.  They're FDIC-insured to secure loans. |
| 13:58:38 | 10 | Q.   So, in other words, you have to be truthful to the banks to |
| 13:58:41 | 11 | get a loan? |
| 13:58:41 | 12 | A.   That's correct. |
| 13:58:43 | 13 | Q.   We already heard testimony that the CAG reports show he was |
| 13:58:46 | 14 | commingling his personal and his business accounts. |
| 13:58:50 | 15 | A.   That's correct. |
| 13:58:52 | 16 | Q.   In terms of criminal offenses, what is commingling? |
| 13:58:58 | 17 | A.   It's an element that I come across often in my white-collar |
| 13:59:03 | 18 | investment fraud investigations.  Essentially what it is, it's |
| 13:59:07 | 19 | literally the mixing of moneys, one being derived from some type |
| 13:59:13 | 20 | of criminal activity, whether generally my investigations, it's |
| 13:59:16 | 21 | wire fraud, or bank fraud, or some type of fraud or |
| 13:59:20 | 22 | misinterpretation, or like in this case, potentially the |
| 13:59:25 | 23 | trafficking of narcotics and the sale of narcotics.  So some type |
| 13:59:29 | 24 | of criminally derived moneys and they are literally mixed in with |
| 13:59:34 | 25 | moneys from other sources, all in an effort to give the |

13:59:39   1   appearance that the money coming out of, say, a particular bank

13:59:42   2   account is legitimate.

13:59:45   3   Q.    If I were to give you an example of spiking the punchbowl at

13:59:49   4   a party?

13:59:50   5   A.    I think it's a great example.

13:59:51   6   Q.    And how so?

13:59:52   7   A.    Well, essentially, we've all been to parties whenever

13:59:58   8   there's a bowl of punch, and in that state it's all punch, and

14:00:04   9   somebody comes by and they spike it with a fifth of gin, or

14:00:08   10  whatever, at that point in time, that punchbowl is now commingled

14:00:12   11  with gin, and no matter how much more punch you put in it, every

14:00:16   12  time you take a drink, you're going to get some alcohol.

14:00:20   13  Q.    Mr. Sanchez asked you if you were able to obtain any race

14:00:24   14  payments, vet bills, or boarding records from Mexico.

14:00:27   15  A.    That's correct.

14:00:28   16  Q.    Let's assume you did for a second.

14:00:30   17  A.    Okay.

14:00:31   18  Q.    Would that have decreased the amount of funds available to

14:00:36   19  Mr. Colorado-Cessa?

14:00:36   20  A.    That would have been an expense.

14:00:38   21  Q.    An expense.  Could you scroll all the way over to the right,

14:00:42   22  please?

14:00:44   23        So if there are those expenses in Mexico, how much

14:00:48   24  money would he then have available with respect to the ability to

14:00:51   25  purchase horses?

| | | |
|---|---|---|
| 14:00:52 | 1 | A.   It would be less. |
| 14:00:54 | 2 | Q.   Less money available? |
| 14:00:56 | 3 | A.   That's correct. |
| 14:00:57 | 4 | Q.   And Mr. Sanchez asked you, did you request of ADT any |
| 14:01:02 | 5 | records? |
| 14:01:04 | 6 | A.   I remember that. |
| 14:01:05 | 7 | Q.   Okay.  And did you request any records from ADT? |
| 14:01:07 | 8 | A.   Not from ADT directly. |
| 14:01:09 | 9 | Q.   Following the indictment in June of 2012, did ADT |
| 14:01:13 | 10 | voluntarily provide you any records? |
| 14:01:15 | 11 | A.   Nothing. |
| 14:01:16 | 12 | Q.   Did Pemex voluntarily provide you any records? |
| 14:01:20 | 13 | A.   Nothing. |
| 14:01:22 | 14 | Q.   And are you familiar with the accounting standards in both |
| 14:01:25 | 15 | the United States and Mexico? |
| 14:01:27 | 16 | A.   Not Mexico. |
| 14:01:28 | 17 | Q.   But with respect to the accounting standards in the United |
| 14:01:32 | 18 | States, those are the standards that UBS have to adhere to, |
| 14:01:37 | 19 | correct? |
| 14:01:37 | 20 | A.   Correct. |
| 14:01:38 | 21 | Q.   Now, you said you know a little bit about MTTM.  What is |
| 14:01:44 | 22 | that? |
| 14:01:44 | 23 | A.   My understanding, MTTM was formed as a result of the second |
| 14:01:48 | 24 | suspension by ADT in order to secure the Pemex contracts. |
| 14:01:53 | 25 | Q.   So at the second suspension, could ADT obtain contracts from |

| | | |
|---|---|---|
| 14:01:57 | 1 | Pemex? |
| 14:01:57 | 2 | A.    Not my understanding. |
| 14:01:59 | 3 | Q.    So a new company was formed to do that? |
| 14:02:01 | 4 | A.    Take its place. |
| 14:02:10 | 5 | Q.    Now, Mr. Sanchez showed you check No. 101 out of that |
| 14:02:15 | 6 | Compass Bank account for the purchase of $2.2 million worth of |
| 14:02:19 | 7 | horses? |
| 14:02:19 | 8 | A.    That's correct. |
| 14:02:19 | 9 | Q.    Have you seen that type of activity before in terms of using |
| 14:02:23 | 10 | a first check in other investigations? |
| 14:02:25 | 11 | A.    I have. |
| 14:02:26 | 12 | Q.    And how do you see that? |
| 14:02:28 | 13 | A.    Essentially it's another layer of concealment to give the |
| 14:02:33 | 14 | appearance that the money's coming from another source. |
| 14:02:37 | 15 | Q.    And is that the result of opening different bank accounts? |
| 14:02:41 | 16 | A.    That's correct. |
| 14:02:42 | 17 | Q.    Now, Ms. Williams asked you about any extravagant expenses. |
| 14:02:47 | 18 | Did you see any purchases for any property during your analysis? |
| 14:02:50 | 19 | A.    Did not. |
| 14:02:52 | 20 | Q.    Did you see any purchase for any horse farms in your |
| 14:02:55 | 21 | analysis? |
| 14:02:56 | 22 | A.    I did. |
| 14:02:57 | 23 | Q.    And could you tell the ladies and gentlemen of the jury what |
| 14:02:59 | 24 | the price -- the purchase price was for that farm in Lexington, |
| 14:03:03 | 25 | Oklahoma? |

| | | |
|---|---|---|
| 14:03:04 | 1 | A.   Well, there were two separate purchases.  Each purchase was |
| 14:03:09 | 2 | around a half a million dollars.  Best of my recollection. |
| 14:03:13 | 3 | Q.   And finally, Special Agent Fernald, under Ms. Williams' |
| 14:03:18 | 4 | theory, Jose Trevino would have had to withdraw cash and stuffed |
| 14:03:20 | 5 | it under his mattress to get that $25,000? |
| 14:03:24 | 6 | A.   That's, I think, the fourth example or fourth source of |
| 14:03:29 | 7 | funds that I've heard during the course of the investigation |
| 14:03:32 | 8 | where the money was derived. |
| 14:03:33 | 9 | Q.   And what are the other three? |
| 14:03:34 | 10 | A.   I understand that he sold his construction company, and |
| 14:03:38 | 11 | that's where he got the money to pay.  I know that he supposedly |
| 14:03:44 | 12 | received an inheritance.  There was a tip from his |
| 14:03:48 | 13 | brother-in-law.  And now it's cashing checks. |
| 14:03:53 | 14 | Q.   Pass the witness, your Honor. |
| 14:03:58 | 15 | RE-CROSS EXAMINATION |
| 14:03:58 | 16 | BY MR. SANCHEZ: |
| 14:04:17 | 17 | Q.   I want to make it clear.  I think you correctly testified to |
| 14:04:23 | 18 | this, but I want to make sure there's no misunderstanding. |
| 14:04:26 | 19 | When you said the suspension, that's the suspension |
| 14:04:29 | 20 | from winning new contracts from ADT -- or ADT couldn't win new |
| 14:04:34 | 21 | contracts? |
| 14:04:35 | 22 | A.   From bidding on contracts. |
| 14:04:36 | 23 | Q.   Right. |
| 14:04:36 | 24 | A.   It's my understanding. |
| 14:04:37 | 25 | Q.   From bidding on contracts? |

```
14:04:39   1   A.   Yes.
14:04:39   2   Q.   But they could receive payments from Pemex?
14:04:42   3   A.   I surmise.
14:04:43   4   Q.   And they could increase the contracts that they had already
14:04:46   5   won?
14:04:47   6   A.   I don't know that.
14:04:48   7   Q.   But you're not saying that's not true?
14:04:50   8   A.   I don't know.
14:04:53   9   Q.   And we talked a little bit about sourcing one way or
14:05:00  10   another.  And do you remember when we went through the exercise
14:05:04  11   of going through this binder?
14:05:06  12   A.   Yes, sir.
14:05:07  13   Q.   In that exercise, did we at least source this check, the
14:05:18  14   Ruidoso check?  Did we at least --
14:05:25  15   A.   It's in 2010.
14:05:27  16   Q.   It's right there on the edge?
14:05:30  17   A.   Yes, sir.
14:05:30  18   Q.   So did we at least source that particular funds to July
14:05:48  19   2010?  Remember that exercise?
14:05:49  20   A.   I do.
14:05:50  21   Q.   Where we had two large wires of over 100 million pesos?
14:05:56  22   A.   I do.
14:05:57  23   Q.   Okay.  So I guess we've sourced it all the way to a wire for
14:06:05  24   100 million pesos, and it's just a matter of where that wire
14:06:11  25   comes from is what's in your mind, right?
```

LILY I. REZNIK, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

| | | |
|---|---|---|
| 14:06:14 | 1 | A.   Yes, sir. |
| 14:06:15 | 2 | Q.   All right.  But it was in pesos.  We know that. |
| 14:06:21 | 3 | A.   Yes, sir. |
| 14:06:22 | 4 | Q.   Wasn't cash.  It was a wire? |
| 14:06:25 | 5 | A.   Yes, sir. |
| 14:06:29 | 6 | Q.   And, in fact, did you have a chance to look through these |
| 14:06:40 | 7 | records -- and I understand you may not have the actual checks |
| 14:06:45 | 8 | when there's a check deposited in that account, and you may not |
| 14:06:49 | 9 | have more details that you would like as far as the wire.  So did |
| 14:06:54 | 10 | you have -- you can tell whether it's cash being deposited or |
| 14:06:58 | 11 | not, right? |
| 14:06:58 | 12 | A.   I couldn't.  No, sir.  They're not in English.  I don't |
| 14:07:02 | 13 | know. |
| 14:07:02 | 14 | Q.   Have you ever analyzed any bank records from Mexico? |
| 14:07:09 | 15 | A.   No, sir. |
| 14:07:10 | 16 | Q.   Do you know any Spanish? |
| 14:07:13 | 17 | A.   A little bit. |
| 14:07:39 | 18 | Q.   I'll let you read that.  Then I'll put it up on the screen. |
| 14:08:37 | 19 | You see these? |
| 14:08:38 | 20 | A.   Yes, sir. |
| 14:08:40 | 21 | Q.   That appears to be three deposits on August 9, 2010 for |
| 14:08:56 | 22 | 1,500 pesos, 600 pesos and 80 pesos.  Do you see those? |
| 14:09:00 | 23 | A.   Yes, sir. |
| 14:09:02 | 24 | Q.   So without knowing too much Spanish, you would be able to go |
| 14:09:07 | 25 | through these records, not just the ones in this book, but all |

14:09:11   1   the ADT bank statements that had been provided to determine how

14:09:16   2   much cash had been coming into that bank account.  Those bank

14:09:20   3   accounts, right?

14:09:21   4   A.    Potentially.

14:09:22   5   Q.    Did you do that?

14:09:23   6   A.    I did not.

14:09:26   7   Q.    Will you agree with me that there's relatively small --

14:09:33   8   1,500 pesos is a small amount?

14:09:34   9   A.    Yes, sir.

14:09:35   10  Q.    So somebody could go through here and could go through all

14:09:43   11  of those to determine whether cash was being deposited into the

14:09:48   12  ADT accounts, right?

14:09:53   13  A.    I agree.

14:09:56   14  Q.    And by the way, there are IRS agents that are familiar with

14:10:01   15  account statements from Mexico and statements in Spanish, right?

14:10:08   16  A.    I don't know.

14:10:09   17  Q.    You don't know?

14:10:12   18  A.    I don't know anybody.

14:10:12   19  Q.    What about from the FBI?

14:10:14   20  A.    I don't know, sir.

14:10:52   21  Q.    By the way, you understand that UBS analyzed those same

14:10:57   22  financial statements.  Looking at the financial statements --

14:11:02   23  because to them, the solvency or the financial strength of ADT

14:11:08   24  was important.  They looked at those financial statements, they

14:11:11   25  evaluated those financial statements and decided to lend money to

| | | |
|---|---|---|
| 14:11:15 | 1 | ADT.  You understand that, right? |
| 14:11:17 | 2 | A.   I understand that. |
| 14:11:21 | 3 | Q.   Pass the witness. |
| 14:11:33 | 4 | THE COURT:  Ms. Williams, one second while I call roll. |
| 14:11:37 | 5 | Mr. Womack. |
| 14:11:40 | 6 | MS. WILLIAMS:  Oh, sorry. |
| 14:11:41 | 7 | THE COURT:  Mr. Womack.  How about Mr. Esper? |
| 14:11:44 | 8 | MR. ESPER:  No, your Honor. |
| 14:11:45 | 9 | THE COURT:  And, Mr. Mayr? |
| 14:11:46 | 10 | MR. MAYR:  Pass. |
| 14:11:47 | 11 | MS. WILLIAMS:  I apologize, your Honor. |
| 14:11:50 | 12 | RE-CROSS EXAMINATION |
| 14:11:50 | 13 | BY MS. WILLIAMS: |
| 14:11:52 | 14 | Q.   Agent Fernald, Special Agent Fernald, you've heard of at |
| 14:11:58 | 15 | least one other possibility for how Jose and Zulema Trevino |
| 14:12:05 | 16 | legitimately amassed $25,000, haven't you? |
| 14:12:10 | 17 | A.   I don't know about legitimately, but I've heard several |
| 14:12:14 | 18 | different variations of how the horse was purchased or how the |
| 14:12:17 | 19 | money was derived. |
| 14:12:18 | 20 | Q.   One more than you testified to. |
| 14:12:20 | 21 | A.   I don't know.  I was just guessing. |
| 14:12:22 | 22 | Q.   And that they sold property in Mexico. |
| 14:12:24 | 23 | A.   That was not intentional.  I just forgot that one. |
| 14:12:27 | 24 | Q.   And that's why I'm asking.  That is another? |
| 14:12:29 | 25 | A.   I had heard that they had sold some property, as well. |

14:12:35   1   Q.   You would agree with me, would you not, that not all

14:12:42   2   payments to independent contractors get made through a check?

14:12:48   3   A.   Agree.

14:12:49   4   Q.   Or get reported to the IRS?

14:12:51   5   A.   I would agree.

14:12:52   6   Q.   And given what you now know, is it your testimony that it

14:13:01   7   would be impossible for Jose and Zulema Trevino to amass $25,000

14:13:12   8   and stick it under their mattress?  Is that impossible?

14:13:18   9   A.   It's not impossible, but it's certainly not consistent with

14:13:21   10  their lifestyle.

14:13:26   11  Q.   Nothing further.

14:13:27   12                      RE-DIRECT EXAMINATION

14:13:27   13  BY MR. GARDNER:

14:13:29   14  Q.   Special Agent, I just want to make sure.  Ms. Williams just

14:13:31   15  offered a fifth theory of how they got their $25,000 for Tempting

14:13:37   16  Dash, correct?

14:13:37   17  A.   Correct.  I lost count.

14:13:40   18  Q.   Pass the witness.

14:13:43   19            THE COURT:  May this witness be excused?

14:13:46   20            MS. WILLIAMS:  No objection.

14:13:47   21            THE COURT:  You may be excused.

14:13:48   22            THE WITNESS:  Yes, sir.

14:13:50   23            THE COURT:  Call your next witness.

14:13:51   24            MR. GARDNER:  Thank you, your Honor.  Government calls

14:13:54   25  Kyle Mori.

| | | |
|---|---|---|
| 14:14:19 | 1 | (Witness sworn.) |
| 14:14:34 | 2 | THE COURT:  If you'll please tell me your full name and |
| 14:14:42 | 3 | spell your last. |
| 14:14:42 | 4 | THE WITNESS:  Yes, your Honor.  It's Kyle Mori, Kyle, |
| 14:14:47 | 5 | K-Y-L-E, M-O-R-I. |
| 14:14:49 | 6 | THE COURT:  You may proceed. |
| 14:14:51 | 7 | MR. GARDNER:  Thank you, your Honor. |
| 14:14:53 | 8 | KYLE MORI, called by the Government, duly sworn. |
| 14:14:53 | 9 | DIRECT EXAMINATION |
| 14:14:53 | 10 | BY MR. GARDNER: |
| 14:14:54 | 11 | Q.   Task Force Officer?  Detective? |
| 14:14:56 | 12 | A.   Either one's fine. |
| 14:14:57 | 13 | Q.   I'll call you Task Force Officer.  Could you please |
| 14:15:00 | 14 | introduce yourself to the jury?  Tell them where you live and |
| 14:15:01 | 15 | what you do for a living. |
| 14:15:02 | 16 | A.   Sure.  My name's Kyle Mori.  I'm a task force officer for |
| 14:15:05 | 17 | the Department of Justice, Drug Enforcement Administration.  I |
| 14:15:09 | 18 | live in Los Angeles County, California, and I'm assigned to the |
| 14:15:13 | 19 | DEA Orange County resident office, which is located in Santa |
| 14:15:17 | 20 | Anna, California.  I've been a DEA about four-and-a-half years, |
| 14:15:22 | 21 | and I've been a law enforcement officer for approximately twelve |
| 14:15:26 | 22 | years in the state of California. |
| 14:15:27 | 23 | Q.   Sir, I want to turn your attention back to March of last |
| 14:15:30 | 24 | year.  And if you will, could you please explain the significance |
| 14:15:34 | 25 | of an event that occurred at the Los Alamitos, California race |

| | | |
|---|---|---|
| 14:15:39 | 1 | track? |
| 14:15:40 | 2 | A.   Yes.  March 2012, I believe the day was March 27th, it was |
| 14:15:47 | 3 | at the office and I was completing paperwork.  It was a pretty |
| 14:15:52 | 4 | routine day, and some point in the mid-morning, late morning |
| 14:15:57 | 5 | time, my supervisor came to me and said, I need you to gather up |
| 14:16:02 | 6 | some -- |
| 14:16:02 | 7 | MS. WILLIAMS:  Object to hearsay. |
| 14:16:04 | 8 | THE COURT:  Don't state what he told you.  Just what |
| 14:16:07 | 9 | you did after whatever he stated. |
| 14:16:10 | 10 | A.   Yes, your Honor. |
| 14:16:11 | 11 | Q.   (BY MR. GARDNER) So your supervisor gave you some |
| 14:16:13 | 12 | information.  What did you do after that? |
| 14:16:14 | 13 | A.   I gathered up three or four of my partners in my group and |
| 14:16:19 | 14 | responded to the Los Alamitos race track, which is located in |
| 14:16:23 | 15 | Cypress, California. |
| 14:16:24 | 16 | Q.   And who were you looking for on that day? |
| 14:16:26 | 17 | A.   We were looking for Omar Trevino-Morales. |
| 14:16:31 | 18 | Q.   And you'd received information that he might be present at |
| 14:16:35 | 19 | the track? |
| 14:16:35 | 20 | A.   That's correct. |
| 14:16:36 | 21 | Q.   So based on that information, what did you do after you got |
| 14:16:40 | 22 | to the race track? |
| 14:16:41 | 23 | A.   We contacted the Cypress Police Department and their special |
| 14:16:45 | 24 | enforcement unit.  They responded to assist us.  I conducted a |
| 14:16:51 | 25 | briefing.  We went over Mr. Trevino Morales' background and what |

| | | |
|---|---|---|
| 14:16:56 | 1 | our game plan was there.  Some point after we were there, I was |
| 14:17:03 | 2 | contacted by a supervisor from the U.S. Marshal's Service, also |
| 14:17:08 | 3 | from Orange County.  He told me that they -- |
| 14:17:11 | 4 |         MS. WILLIAMS:  Objection.  Hearsay. |
| 14:17:13 | 5 |         THE COURT:  She's right. |
| 14:17:16 | 6 | Q.   (BY MR. GARDNER) Did you conduct a search of the Los |
| 14:17:19 | 7 | Alamitos race track? |
| 14:17:19 | 8 | A.   We did. |
| 14:17:23 | 9 | Q.   Is that looking for Omar Trevino? |
| 14:17:25 | 10 | A.   Omar.  And then, later, we -- I was also looking for Miguel |
| 14:17:30 | 11 | Trevino-Morales' brother, as well. |
| 14:17:32 | 12 | Q.   And I'm going to show you Government's Exhibit 335A -- or B |
| 14:17:42 | 13 | first.  Is that the individual you were looking for that day? |
| 14:17:44 | 14 | A.   Yes. |
| 14:17:45 | 15 | Q.   Now can you give me A?  Is that Miguel Trevino's brother? |
| 14:17:55 | 16 | A.   It's Miguel, I believe.  Yes. |
| 14:17:56 | 17 | Q.   Yeah.  Miguel.  Did you encounter either one of these two |
| 14:18:00 | 18 | individuals at the race track that day? |
| 14:18:01 | 19 | A.   No. |
| 14:18:01 | 20 | Q.   Who did you encounter? |
| 14:18:03 | 21 | A.   I encountered six or seven individuals.  Among them were |
| 14:18:11 | 22 | gentleman Luis Aguirre, Carlos Nayen, Felipe Quintero and some -- |
| 14:18:20 | 23 | those are the ones that stick out of my mind.  There were some |
| 14:18:22 | 24 | others, too. |
| 14:18:24 | 25 | Q.   Could I see 335E, please?  And who do you recognize that |

14:18:30  1   person to be?  If I were to say Carlos Nayen, would that refresh

14:18:38  2   your memory?

14:18:38  3   A.   Yes.  That's Carlos.

14:18:40  4   Q.   I think the jury's heard his name enough.  And how about

14:18:57  5   this individual, sir?

14:19:00  6   A.   I believe that's Mr. Quintero.

14:19:05  7   Q.   And how did you encounter these individuals?

14:19:10  8   A.   Well, as I indicated, we conduct -- you know, I led this

14:19:13  9   search of the actual race track stables, but prior to that, we

14:19:20  10  wanted -- I wanted to ensure that the individuals we were looking

14:19:25  11  for, the Trevino-Morales brothers, didn't sort of escape out the

14:19:28  12  back door and leave in a car, and I knew a possible car they may

14:19:34  13  be driving in.  So we started stopping cars that were leaving,

14:19:38  14  and these three individual, among others, were located in some

14:19:43  15  cars that we stopped during this event on March 27th.

14:19:51  16  Q.   So was Carlos Nayen and Felipe Quintero and Luis Aguirre

14:19:57  17  traveling together?

14:19:59  18  A.   No.  I don't believe the three of them were together.  They

14:20:03  19  may have been, but I believe it was only Mr. Quintero and Mr.

14:20:05  20  Nayen, I believe, were together.  But they were in cars that were

14:20:09  21  stopped all around the same time, in the same area there at the

14:20:12  22  race track.

14:20:14  23  Q.   All the questions I have, your Honor.

14:20:18  24            MS. WILLIAMS:  No questions.

14:20:20  25            MR. DEGEURIN:  No questions.

| | | |
|---|---|---|
| 14:20:21 | 1 | MR. WOMACK:  No questions. |
| 14:20:22 | 2 | MR. ESPER:  I have nothing, Judge, thank you. |
| 14:20:24 | 3 | MR. MAYR:  None, your Honor. |
| 14:20:26 | 4 | THE COURT:  I'm tempted to say I will, but I don't. |
| 14:20:32 | 5 | May the witness be excused? |
| 14:20:33 | 6 | MR. FINN:  Yes. |
| 14:20:34 | 7 | THE COURT:  You may be excused. |
| 14:20:36 | 8 | THE WITNESS:  Thank you, your Honor. |
| 14:20:39 | 9 | THE COURT:  Call your next witness. |
| 14:20:41 | 10 | MR. GARDNER:  Government would call Felipe Quintero. |
| 14:21:10 | 11 | (Witness sworn.) |
| 14:21:34 | 12 | THE COURT:  If you'll tell me, please, sir, your full |
| 14:21:37 | 13 | name and spell your last. |
| 14:21:38 | 14 | THE WITNESS:  My full name is Felipe Alejandro |
| 14:21:41 | 15 | Quintero.  My last name starts with a Q-U-I-N-T-E-R-O. |
| 14:21:46 | 16 | FELIPE A. QUINTERO, called by the Government, duly sworn. |
| 14:21:46 | 17 | DIRECT EXAMINATION |
| 14:21:46 | 18 | BY MR. GARDNER: |
| 14:21:48 | 19 | Q.   Thank you, your Honor. |
| 14:21:48 | 20 | Mr. Quintero, if you will -- good afternoon.  Could you |
| 14:21:51 | 21 | introduce yourself for the jury?  Tell them how old you are, |
| 14:21:54 | 22 | where you live, and what you do for a living. |
| 14:21:56 | 23 | A.   My name is Felipe Alejandro Quintero.  I'm 29 years old and |
| 14:22:01 | 24 | I train horses for a living. |
| 14:22:03 | 25 | Q.   And, sir, you've pled guilty in this case; is that correct? |

| 14:22:05 | 1 | A.    Yes, sir. |

14:22:05    1    A.    Yes, sir.

14:22:06    2    Q.    Was that to a lesser charge?

14:22:08    3    A.    Yes, sir.

14:22:08    4    Q.    Okay.  Was that charge called structuring?

14:22:11    5    A.    Yes, sir.

14:22:11    6    Q.    Could you describe for the jury what your understanding of

14:22:15    7    structuring is?

14:22:16    8    A.    My understanding of structuring is where I allow people to

14:22:20    9    deposit money in my account for an amount less than $10,000 to

14:22:24   10    hide it from the banks.

14:22:27   11    Q.    And in addition to pleading to that charge, you and I also

14:22:30   12    have an agreement; is that correct?

14:22:32   13    A.    Yes, sir.

14:22:33   14    Q.    Okay.  What's the agreement between the government and you

14:22:35   15    and your attorney?

14:22:36   16    A.    A recommendation for.

14:22:40   17    Q.    Probation?

14:22:41   18    A.    Probation.  Yes, sir.

14:22:42   19    Q.    And you understand it's just a recommendation that I, as a

14:22:46   20    representative of the government, will make to the Court when you

14:22:48   21    get sentenced, correct?

14:22:49   22    A.    Yes, sir.

14:22:49   23    Q.    Okay.  Do you understand that that is entirely up to the

14:22:53   24    Judge to either accept or object that recommendation?

14:22:55   25    A.    Yes, sir.

| | | |
|---|---|---|
| 14:22:56 | 1 | Q.   You said you were a trainer for a living.  Was this also at |
| 14:23:03 | 2 | the Los Alamitos race track? |
| 14:23:05 | 3 | A.   Yes, sir. |
| 14:23:07 | 4 | Q.   How long have you been a trainer, sir? |
| 14:23:08 | 5 | A.   I've been -- I've had my trainer's license since 2007. |
| 14:23:13 | 6 | Q.   And do you also, as part of your training duties, attend |
| 14:23:17 | 7 | various auctions and assist your owners in picking horses? |
| 14:23:20 | 8 | A.   Yes, sir. |
| 14:23:22 | 9 | Q.   Let's say you had an unlimited checkbook, blank check.  What |
| 14:23:27 | 10 | type of horses, bloodlines would you favor? |
| 14:23:31 | 11 | A.   Most definitely like First Down Dashes, Corona Cartels, Mr. |
| 14:23:37 | 12 | Jess Perrys, or Walk Thru Fires, top bloodlines in the industry. |
| 14:23:41 | 13 | Q.   And so, what's the guarantee that if you purchase one of |
| 14:23:47 | 14 | these bloodlines, your horse will do better than anything else? |
| 14:23:50 | 15 | A.   Nothing's a guarantee, but it's more likely for you to get a |
| 14:23:53 | 16 | better horse with those bloodlines than all the other horses. |
| 14:23:56 | 17 | Q.   Is that fairly well-understood in the industry? |
| 14:24:01 | 18 | A.   Yes.  Yes, sir. |
| 14:24:03 | 19 | Q.   Do you have to be a rocket scientist to understand to pick |
| 14:24:06 | 20 | those horses? |
| 14:24:08 | 21 | A.   No, sir. |
| 14:24:09 | 22 | Q.   Do you know an individual by the name of Carlos Nayen? |
| 14:24:12 | 23 | A.   Yes, sir. |
| 14:24:12 | 24 | Q.   And when did you first meet him? |
| 14:24:14 | 25 | A.   I met him, I think it was, a couple of days before the |

| | | |
|---|---|---|
| 14:24:19 | 1 | Ruidoso -- the All American Futurity trials. |
| 14:24:22 | 2 | Q.   And what year was that? |
| 14:24:23 | 3 | A.   It was in 2010. |
| 14:24:25 | 4 | Q.   And when you say Ruidoso, it was in Ruidoso where you met |
| 14:24:29 | 5 | him? |
| 14:24:30 | 6 | A.   No.  We picked him up from the airport in El Paso, Texas. |
| 14:24:35 | 7 | Q.   When you say "we," who is "we"? |
| 14:24:36 | 8 | A.   Me and Fernando Garcia. |
| 14:24:39 | 9 | Q.   Do you recognize Mr. Garcia in the courtroom today? |
| 14:24:42 | 10 | A.   Yes, sir. |
| 14:24:43 | 11 | Q.   The individual standing up? |
| 14:24:44 | 12 | A.   Yes, sir. |
| 14:24:45 | 13 | Q.   Your Honor, may the record reflect the witness has |
| 14:24:47 | 14 | identified the Defendant Fernando Garcia? |
| 14:24:51 | 15 |      THE COURT:  So reflects. |
| 14:24:53 | 16 | Q.   (BY MR. GARDNER) What did Mr. Garcia tell you about Mr. |
| 14:24:57 | 17 | Nayen? |
| 14:24:57 | 18 | A.   That he was a horse trainer from Mexico and that, you know, |
| 14:25:05 | 19 | that he was -- he owned some pretty good horses himself. |
| 14:25:09 | 20 | Q.   And when you first came to California, did you have contact |
| 14:25:12 | 21 | with the Defendant Garcia? |
| 14:25:13 | 22 | A.   When who came to California? |
| 14:25:17 | 23 | Q.   I'm sorry.  Good point. |
| 14:25:18 | 24 |      When you came from California to New Mexico, did you |
| 14:25:22 | 25 | contact Defendant Garcia about that? |

| | | |
|---|---|---|
| 14:25:26 | 1 | A.    About? |
| 14:25:27 | 2 | Q.    Coming to New Mexico? |
| 14:25:28 | 3 | A.    Coming to New Mexico.  Yeah.  I actually had a friend |
| 14:25:32 | 4 | contacted him to see if he could let me borrow a stall in New |
| 14:25:36 | 5 | Mexico because I was going to take one of my horses to run in |
| 14:25:40 | 6 | Ruidoso for the trial.  So the All American Futurity. |
| 14:25:45 | 7 | Q.    So when you get there at that point -- let me define point. |
| 14:25:49 | 8 | When was that? |
| 14:25:49 | 9 | A.    I get there about around July of 2010. |
| 14:25:55 | 10 | Q.    So in July of 2010, were you the trainer for Mr. Piloto? |
| 14:26:00 | 11 | A.    No, sir. |
| 14:26:01 | 12 | Q.    At some point, did you become the trainer for Mr. Piloto? |
| 14:26:04 | 13 | A.    Yes, sir, when the horse arrived in California. |
| 14:26:08 | 14 | Q.    Going back to Mexico for both the trials and the finals, |
| 14:26:13 | 15 | were you the listed trainer? |
| 14:26:14 | 16 | A.    I was the listed trainer. |
| 14:26:16 | 17 | Q.    Can you explain what that means to the jury? |
| 14:26:18 | 18 | A.    That I was -- according to rules and regulations of the |
| 14:26:24 | 19 | AQHA, I was a program trainer for the house. |
| 14:26:26 | 20 | Q.    And what's program trainer? |
| 14:26:28 | 21 | A.    Program trainer is just pretty much I'm a licensed trainer |
| 14:26:32 | 22 | in the state of New Mexico, and the horse just runs under my name |
| 14:26:36 | 23 | because I'm the one that's authorized to have the horse run under |
| 14:26:39 | 24 | my name. |
| 14:26:40 | 25 | THE COURT:  I'm going to ask you to move that |

14:26:41   1   microphone a little bit further away from you.  Thank you.

14:26:45   2   Q.   (BY MR. GARDNER) Why didn't Fernando Garcia list himself as

14:26:50   3   the trainer of that horse?

14:26:51   4   A.   I don't think he's a licensed trainer.

14:26:56   5   Q.   And when you started to become program trainer for Mr.

14:26:59   6   Piloto, did you know who the owner was?

14:27:02   7   A.   At the moment, Fernando Garcia was the owner of the horse.

14:27:09   8   Q.   So what training, if any, did you do for Mr. Piloto?

14:27:16   9   A.   Me and Mr. Garcia would, you know, discuss a couple of

14:27:21  10   things that I do with horses, and he would take them into

14:27:25  11   consideration.

14:27:27  12   Q.   Who would do the actual training for Mr. Piloto?

14:27:32  13   A.   Mr. Garcia did.

14:27:34  14   Q.   So getting to the trials or the qualifiers, did Mr. Piloto

14:27:40  15   win his race?

14:27:40  16   A.   Yes, sir, he did.

14:27:41  17   Q.   I believe the jury's heard, he qualified for the finals?

14:27:43  18   A.   Yes, sir, he did.

14:27:44  19   Q.   And when we get to the finals, are you still the listed

14:27:48  20   trainer for that horse?

14:27:49  21   A.   Yes, sir.

14:27:49  22   Q.   Did you ever meet an individual by the name of Jose Trevino?

14:27:53  23   A.   Yes, sir, I did.

14:27:53  24   Q.   And do you recognize him in the courtroom today?

14:27:55  25   A.   Yes, I do.

| | | |
|---|---|---|
| 14:27:56 | 1 | Q.   This individual standing up here? |
| 14:27:58 | 2 | A.   Yes, sir. |
| 14:27:59 | 3 | Q.   Wearing the red tie? |
| 14:28:01 | 4 | A.   Yes, sir. |
| 14:28:01 | 5 | Q.   Your Honor, may the record reflect the witness has |
| 14:28:03 | 6 | identified the Defendant Jose Trevino? |
| 14:28:05 | 7 | THE COURT:  So reflects. |
| 14:28:07 | 8 | Q.   (BY MR. GARDNER) When were you first introduced to Jose |
| 14:28:10 | 9 | Trevino? |
| 14:28:10 | 10 | A.   I was introduced to him a couple of days before the trials |
| 14:28:14 | 11 | of the All American Futurity.  So it would be back in around |
| 14:28:17 | 12 | August 2010. |
| 14:28:19 | 13 | Q.   So before the -- |
| 14:28:20 | 14 | A.   Before the trials. |
| 14:28:21 | 15 | Q.   -- the qualifiers? |
| 14:28:22 | 16 | A.   Yes, sir. |
| 14:28:22 | 17 | Q.   Okay.  And how was he introduced to you? |
| 14:28:24 | 18 | A.   He was introduced to me as the owner of Feature Honor, |
| 14:28:29 | 19 | another horse that was in the same barn at the time. |
| 14:28:34 | 20 | Q.   And did you ever have any discussions with the Defendant |
| 14:28:38 | 21 | Garcia about him selling that horse after the qualifiers? |
| 14:28:41 | 22 | A.   No, sir.  I didn't. |
| 14:28:42 | 23 | Q.   When did you first become aware that Jose Trevino became the |
| 14:28:45 | 24 | owner between the qualifiers and the finals? |
| 14:28:48 | 25 | A.   When I went back to -- for the final.  When the horse was |

| | | |
|---|---|---|
| 14:28:50 | 1 | going to run in the final race of the All American Futurity. |
| 14:28:54 | 2 | Q.   And how did you find out? |
| 14:28:57 | 3 | A.   Because of the entry book.  The entries on the horse. |
| 14:29:01 | 4 | Q.   So did you find out through an official race program? |
| 14:29:04 | 5 | A.   Yes, sir. |
| 14:29:04 | 6 | Q.   Did either Mr. Trevino or Fernando Garcia explain to you any |
| 14:29:11 | 7 | of the circumstances surrounding the change in ownership? |
| 14:29:13 | 8 | A.   No, sir. |
| 14:29:18 | 9 | Q.   How did your horse do? |
| 14:29:19 | 10 | A.   At the final? |
| 14:29:21 | 11 | Q.   Yeah, your horse. |
| 14:29:22 | 12 | A.   Oh, my horse.  He ran third in the trials. |
| 14:29:26 | 13 | Q.   So after the All American Futurity, Mr. Piloto wins, you |
| 14:29:32 | 14 | receive the standard ten percent trainer's cut? |
| 14:29:34 | 15 | A.   Yes, sir.  I did. |
| 14:29:35 | 16 | Q.   And what do you do with that? |
| 14:29:36 | 17 | A.   I kept about $30,000 of that check. |
| 14:29:40 | 18 | Q.   So what happened to the other 70,000? |
| 14:29:43 | 19 | A.   I was told by -- I believe he's an accountant that to make |
| 14:29:48 | 20 | payments on the Oklahoma futurity -- a futurity in Oklahoma. |
| 14:29:56 | 21 | Q.   Can you recall this accountant's name? |
| 14:29:59 | 22 | A.   I do not, sir. |
| 14:30:00 | 23 | Q.   And do you recall how you were contacted by an accountant? |
| 14:30:05 | 24 | A.   By e-mail. |
| 14:30:06 | 25 | Q.   Do you recall the e-mail of that? |

| | | |
|---|---|---|
| 14:30:08 | 1 | A.   Mr. Guerrera at, I think -- I don't remember exactly what it |
| 14:30:13 | 2 | is, but Mr. Guerrera at Yahoo! |
| 14:30:19 | 3 | Q.   And was it through that e-mail communication in which you |
| 14:30:22 | 4 | were directed to send the money to Oklahoma? |
| 14:30:25 | 5 | A.   Yes, sir. |
| 14:30:25 | 6 | Q.   And do you recall the horses that you were paying for? |
| 14:30:30 | 7 | A.   No, sir. |
| 14:30:33 | 8 | Q.   And where did you send that money? |
| 14:30:35 | 9 | A.   Through wire transfer from Bank of America to Heritage Place |
| 14:30:40 | 10 | in Oklahoma City. |
| 14:30:47 | 11 | Q.   So after the All American Futurity, you were paid, you |
| 14:30:51 | 12 | returned to California? |
| 14:30:52 | 13 | A.   Yes, sir. |
| 14:30:52 | 14 | Q.   And what horses are you training at that time? |
| 14:30:58 | 15 | A.   In California? |
| 14:30:59 | 16 | Q.   Yes, sir. |
| 14:31:00 | 17 | A.   I don't remember to be honest.  I had a barn of about twelve |
| 14:31:06 | 18 | horses. |
| 14:31:07 | 19 | Q.   I probably asked the wrong question. |
| 14:31:10 | 20 |      Who were the owners you were training for at that time? |
| 14:31:17 | 21 | A.   I mean, I had owners -- I had like eight different owners. |
| 14:31:26 | 22 | I don't remember exactly who was part of my barn at that time. |
| 14:31:28 | 23 | Q.   Some point, did you start training for Carlos Nayen? |
| 14:31:31 | 24 | A.   Yes, sir, I did. |
| 14:31:32 | 25 | Q.   And what -- could you explain the circumstances of that |

| | | |
|---|---|---|
| 14:31:37 | 1 | arrangement? |
| 14:31:38 | 2 | A.   I started training for Carlos Nayen probably back in -- |
| 14:31:45 | 3 | well, as far as him, I did not train for him.  I trained for |
| 14:31:50 | 4 | Mr. Colorado back in -- probably I started training for him back |
| 14:31:53 | 5 | in November of 2010. |
| 14:31:56 | 6 | Q.   And who made the arrangements for you to train for Francisco |
| 14:32:01 | 7 | Colorado? |
| 14:32:02 | 8 | A.   Carlos Nayen did. |
| 14:32:04 | 9 | Q.   Do you recognize an individual that you know as Francisco |
| 14:32:08 | 10 | Colorado in the courtroom today? |
| 14:32:10 | 11 | A.   Yes, I do. |
| 14:32:10 | 12 | Q.   This individual, if you'll stand one more time.  This |
| 14:32:16 | 13 | individual here in the blue tie? |
| 14:32:17 | 14 | A.   Yes, sir. |
| 14:32:18 | 15 | Q.   Your Honor, may the record reflect the witness had |
| 14:32:21 | 16 | identified the Defendant Colorado? |
| 14:32:22 | 17 |         THE COURT:  So reflects. |
| 14:32:23 | 18 | Q.   (BY MR. GARDNER) And what did Carlos Nayen explain to you |
| 14:32:26 | 19 | with respect to the arrangement for training Mr. Colorado's |
| 14:32:29 | 20 | horses? |
| 14:32:30 | 21 | A.   Well, you know, he introduced me to him as an extremely |
| 14:32:37 | 22 | successful businessman from Mexico and I had -- I actually knew |
| 14:32:41 | 23 | Mr. Colorado before because he used to own horses in Los Alamitos |
| 14:32:46 | 24 | a year past. |
| 14:32:49 | 25 | Q.   Now, Mr. Quintero, I'm showing you Government's Exhibit |

| | | |
|---|---|---|
| 14:32:52 | 1 | 358H.  Do you recognize those, sir? |
| 14:32:57 | 2 | A.    Yes, sir. |
| 14:32:57 | 3 | Q.    Okay.  Are those, in fact, your e-mails? |
| 14:32:59 | 4 | A.    Yes, sir. |
| 14:33:00 | 5 | Q.    What was your company's name? |
| 14:33:04 | 6 | A.    That's FF Racing Stables. |
| 14:33:08 | 7 | Q.    And what's the FF stand for? |
| 14:33:09 | 8 | A.    It's for Felipe and Felipe.  My father and I. |
| 14:33:14 | 9 | THE COURT:  Did you say SS? |
| 14:33:15 | 10 | THE WITNESS:  FF. |
| 14:33:18 | 11 | Q.    (BY MR. GARDNER) And do you recall going through these |
| 14:33:22 | 12 | e-mails with me in a previous occasion? |
| 14:33:23 | 13 | A.    Yes, sir. |
| 14:33:24 | 14 | Q.    And I'm just going to show you a couple of them. |
| 14:33:41 | 15 | Now, this is a cover page prepared by the government. |
| 14:33:44 | 16 | You did not have any involvement preparing the cover page, |
| 14:33:47 | 17 | correct? |
| 14:33:47 | 18 | A.    Yes, sir. |
| 14:33:50 | 19 | MR. MAYR:  Your Honor, I don't believe we have these |
| 14:33:52 | 20 | admitted into evidence.  Were they -- |
| 14:33:54 | 21 | MR. GARDNER:  Oh, I'm sorry.  Did I not offer this one? |
| 14:33:57 | 22 | THE COURT:  Not this. |
| 14:33:58 | 23 | MR. GARDNER:  I apologize, your Honor.  Your Honor, I |
| 14:34:00 | 24 | offer Government's Exhibit 358H. |
| 14:35:07 | 25 | MR. DEGEURIN:  Could we approach, your Honor? |

```
14:35:09   1              THE COURT:  Why not.

14:35:15   2              (At the bench, on the record.)

14:35:24   3              MR. DEGEURIN:  This is primarily something that we just

14:35:31   4    -- when they say we have all these exhibits.

14:35:33   5              THE COURT:  What are we up again?

14:35:48   6              MR. DEGEURIN:  The reason we had a problem with some of

14:35:51   7    these statements is because even though Ms. Fernald said, you

14:35:57   8    have all the records, those records are business records for the

14:36:03   9    stables.

14:36:03   10             THE COURT:  I can see all of these --

14:36:05   11             MR. DEGEURIN:  We don't have that put together.  We

14:36:15   12   have identified an exhibit that for us to put it together to look

14:36:17   13   at it before we do here in the courtroom, we have to go through

14:36:25   14   about a thousand documents.

14:36:25   15             MR. GARDNER:  May I respond, your Honor?

14:36:27   16             MR. DEGEURIN:  Is that right?

14:36:28   17             MR. GARDNER:  We are more than frustrated.  Mr.

14:36:31   18   DeGeurin, these exhibits have been available for inspection in

14:36:36   19   our offices in which you have never visited to look at.

14:36:40   20             MR. DEGEURIN:  But I sent --

14:36:42   21             MR. GARDNER:  And -- excuse me.

14:36:43   22             THE COURT:  One at a time.  Go ahead.

14:36:44   23             MR. GARDNER:  These particular exhibits have been in

14:36:47   24   the courtroom for the last two weeks, and you have not taken the

14:36:51   25   time to look at any of them.  Your fellow counsel have had plenty
```

| | | |
|---|---|---|
| 14:36:55 | 1 | of opportunity and it was laying there to look at the exhibits |
| 14:36:58 | 2 | all the time. |
| 14:36:58 | 3 | MR. DEGEURIN:  During trial? |
| 14:37:00 | 4 | MR. GARDNER:  Yes.  Your Honor, I can only make the |
| 14:37:02 | 5 | stuff available.  I can't control how Mr. DeGeurin or any of |
| 14:37:04 | 6 | these other attorneys deal with the exhibits. |
| 14:37:07 | 7 | MR. WOMACK:  Your Honor, if I can make one comment. |
| 14:37:10 | 8 | One thing the government has done and they did it the Friday |
| 14:37:13 | 9 | before trial is they gave us a disc that had -- well, they gave |
| 14:37:16 | 10 | us several discs that had discovery, and they broke it down by |
| 14:37:19 | 11 | witnesses.  For Mr. Quintero, there were none of these e-mails. |
| 14:37:23 | 12 | All we had was a plea agreement.  I think that was it. |
| 14:37:28 | 13 | MR. GARDNER:  Interview report. |
| 14:37:31 | 14 | MR. WOMACK:  Maybe so. |
| 14:37:32 | 15 | MR. GARDNER:  I provided these -- the transcripts at |
| 14:37:33 | 16 | the request of the Court on March 13th. |
| 14:37:38 | 17 | MR. WOMACK:  All right.  And I've seen those. |
| 14:37:40 | 18 | MR. GARDNER:  That's what you're looking at. |
| 14:37:41 | 19 | MR. WOMACK:  Okay. |
| 14:37:41 | 20 | THE COURT:  All right.  I know many of you practice in |
| 14:37:47 | 21 | other courts, but here in Austin, it's been an open discovery |
| 14:37:51 | 22 | court since I came here in '91.  It's a special case, I'm told. |
| 14:37:59 | 23 | I have been told this and that's why I suggested the government |
| 14:38:03 | 24 | dates that he's given that.  I just got out of a series of multi |
| 14:38:09 | 25 | trials in a rather celebrated case that did the same thing.  But |

| | | |
|---|---|---|
| 14:38:14 | 1 | it doesn't do any good for us to be up here hollering at each |
| 14:38:18 | 2 | other. |
| 14:38:19 | 3 | You've got 358H.  What do you need?  You need time to |
| 14:38:23 | 4 | look at it? |
| 14:38:24 | 5 | MR. DEGEURIN:  Yeah. |
| 14:38:25 | 6 | THE COURT:  You've had that.  And, you know, I |
| 14:38:27 | 7 | understand, you told me you had obligation to go through all of |
| 14:38:32 | 8 | that.  I would assume that you selected what you wanted to do, |
| 14:38:36 | 9 | but it doesn't look like it's that big a deal.  So why don't -- |
| 14:38:40 | 10 | why don't y'all go look at it instead of hovering up around the |
| 14:38:45 | 11 | teepee here and complaining. |
| 14:38:46 | 12 | MR. DEGEURIN:  I think once you look at it, it's not -- |
| 14:38:52 | 13 | THE COURT:  Counsel, I know that there's a lot of paper |
| 14:38:54 | 14 | here, a lot of witnesses.  I'm not going to get mad at anybody. |
| 14:39:01 | 15 | It doesn't do anything.  I didn't get mad as a lawyer. |
| 14:39:11 | 16 | MR. DEGEURIN:  Is there any way I can get an exhibit -- |
| 14:39:18 | 17 | just ask her to first make me a copy instead of after it's |
| 14:39:20 | 18 | admitted.  And it used to be the old days, the government would |
| 14:39:25 | 19 | have an exhibit, we'd have a copy of it, maybe we wouldn't burden |
| 14:39:30 | 20 | the Court so we'd have that same exhibit. |
| 14:39:31 | 21 | THE COURT:  If you'd have gone over -- in Houston, they |
| 14:39:37 | 22 | don't practice this way.  They get it on the stand. |
| 14:39:40 | 23 | MR. DEGEURIN:  It used to be we'd get a package of |
| 14:39:43 | 24 | exhibits, the ones we're going to get -- |
| 14:39:46 | 25 | THE COURT:  My experience in Houston was I needed |

| | | |
|---|---|---|
| 14:39:49 | 1 | transfusions for the lack of formalities that lawyers have.  And |
| 14:39:53 | 2 | I've tried cases in Houston.  They just try them totally |
| 14:39:57 | 3 | different.  There was no cooperation, no information.  But that's |
| 14:40:05 | 4 | -- you could have gone over there for weeks before the trial, and |
| 14:40:09 | 5 | if you'd wanted a copy, you could have gotten a copy.  But you |
| 14:40:13 | 6 | didn't go. |
| 14:40:14 | 7 | MR. DEGEURIN:  No.  I have some. |
| 14:40:16 | 8 | THE COURT:  Well, they apparently didn't get copies of |
| 14:40:20 | 9 | what you think that they should. |
| 14:40:22 | 10 | MR. DEGEURIN:  Because we had made a copy of that whole |
| 14:40:23 | 11 | thing at your office and I didn't know about this. |
| 14:40:27 | 12 | MR. GARDNER:  No.  The question wasn't asked.  That was |
| 14:40:34 | 13 | in the room. |
| 14:40:35 | 14 | MR. DEGEURIN:  Inside the box? |
| 14:40:36 | 15 | MR. GARDNER:  Inside the room.  We laid out all our |
| 14:40:39 | 16 | exhibits inside the room.  Your son was there. |
| 14:40:42 | 17 | MR. DEGEURIN:  Yeah, my son was there.  He said, you |
| 14:40:44 | 18 | may want to come spend a couple of weeks looking over this. |
| 14:40:52 | 19 | THE COURT:  Well, you know, in antitrust cases, I spent |
| 14:40:59 | 20 | months going through all the purchases in Fort Bliss.  That's 16 |
| 14:41:04 | 21 | years.  I had eight people.  I had to go through it.  Nobody |
| 14:41:14 | 22 | helped me.  I had to go through it.  I had Bates machines.  Well, |
| 14:41:18 | 23 | Bates machines.  Isn't this a wonderful story?  And we used them. |
| 14:41:25 | 24 | Now, let's go back to 358.  It's this big? |
| 14:41:29 | 25 | MR. GARDNER:  Yes, sir, your Honor. |

14:41:30    1          THE COURT:  By this time, you could have been through

14:41:32    2    it.

14:41:34    3          MR. DEGEURIN:  And I think Andres did go through it,

14:41:40    4    but I don't -- if you get frustrated with me, your Honor, but

14:41:44    5    seriously, I'm accustomed to having copies of the exhibits that

14:41:51    6    are going to be introduced.  If he didn't know --

14:41:54    7          MR. GARDNER:  And I'm accustomed to attorneys come look

14:41:56    8    at discovery, Mike.

14:41:57    9          THE COURT:  And if you read the pleadings in this

14:42:02   10    record, you'll see that all of this material that was obtained

14:42:05   11    has been available for a long time.  And I think only one or two

14:42:10   12    people ever bothered to come look at it.  But that's not the

14:42:15   13    problem, counsel.  We've got a jury out there.  Nobody wants to

14:42:20   14    look bad.  But I'm going to let you have enough time to look at

14:42:23   15    whatever you want to look at.

14:42:26   16          Just remember the jury is sitting there.  It's not

14:42:30   17    good.  I don't want to keep sending them into the jury room

14:42:34   18    either.  I don't think that's a very good idea.  So assuming that

14:42:39   19    you've gone through these things and you've been looking at them.

14:42:51   20          MR. DEGEURIN:  No copies of.

14:42:56   21          MR. ESPER:  Your Honor, could we take a break?  I need

14:42:58   22    to use the bathroom.  I don't know if the Court's ready to or

14:43:02   23    not.

14:43:03   24          MR. WOMACK:  And we've got to look at this document.

14:43:05   25          MR. GARDNER:  Your Honor, we anticipate my foundation

```
14:43:07   1   witnesses for all the e-mails will be on this afternoon.  So I
14:43:10   2   would ask to avoid this that maybe the attorneys have the
14:43:12   3   opportunity to look at all the e-mails that the government
14:43:15   4   selected, exhibits that we intend to offer.  358 is a series,
14:43:21   5   your Honor.  There's a number of other e-mails.
14:43:22   6             THE COURT:  How long do you think it would take?
14:43:24   7             MR. GARDNER:  It's probably a stack of 500 pages in
14:43:26   8   total, your Honor.
14:43:30   9             MR. ESPER:  And, your Honor, with respect, I brought
14:43:31  10   this up at a prior hearing.  One of those e-mails from Mr. -- I
14:43:35  11   believe Mr. Garcia?  Is that one of his e-mails?  Where they have
14:43:41  12   the newspaper account.
14:43:43  13             MR. GARDNER:  Well, that's not coming in.
14:43:45  14             MR. ESPER:  Huh?
14:43:46  15             MR. GARDNER:  That's not coming in anymore because Mr.
14:43:50  16   Farias has pled.
14:43:51  17             THE COURT:  Take a break.  Use the facilities, stretch,
14:43:58  18   pray for rain.
14:44:31  19             (Jury not present.)
14:44:37  20             THE COURT:  Those of you in the courtroom, we're in
14:44:39  21   recess for 15 minutes at least.
14:44:49  22             (At the bench, on the record.)
14:44:53  23             THE COURT:  How long are you going to proceed?
14:44:55  24             MR. GARDNER:  Your Honor, these are the witness'
14:44:57  25   e-mails.  So I'm thinking he can identify them as his own
```

```
14:45:00    1    statements and his own e-mails and business records.
14:45:04    2            THE COURT:  I'm concerned about the presentation.  For
14:45:15    3    example, this next witness you're going to have will just be
14:45:19    4    concerned with these?
14:45:20    5            MR. GARDNER:  No, sir, your Honor.  The entire 358
14:45:22    6    series.
14:45:24    7            THE COURT:  So you're not going to have staggered
14:45:26    8    witnesses.  They can all go right the whole.
14:45:29    9            MR. GARDNER:  Your Honor, Special Agent Bill Johnston
14:45:34   10    with the DEA did all the search warrants for all the e-mail
14:45:37   11    accounts.  So he's going to testify as to process of the search
14:45:40   12    warrants, how he identified the accounts.  He's going to testify
14:45:42   13    as to how he received the accounts, how he printed out the
14:45:44   14    e-mails, how the government selected the e-mails.  And he's
14:45:46   15    really only going to talk about three or four e-mails from one of
14:45:50   16    the accounts.  The other e-mails will come in through probably
14:45:53   17    Special Agent Pennington or Special Agent Lawson.
14:45:57   18            So right now, today, with the exception of e-mails
14:46:00   19    pertaining directly to this witness and this account and one
14:46:04   20    other account, and the testimony of Special Agent Johnston as to
14:46:07   21    all the e-mails and three e-mails from the Fernando Garcia
14:46:12   22    account, those are the only specific e-mails the government's
14:46:15   23    going to address today.  And I can point those out to Mr. Womack,
14:46:21   24    which he knows we're going to talk about as it relates to his
14:46:24   25    client's account.
```

| | | |
|---|---|---|
| 14:46:26 | 1 | THE COURT:  And then, you can have the exhibits |
| 14:46:31 | 2 | available after. |
| 14:46:33 | 3 | MS. FERNALD:  Absolutely. |
| 14:46:35 | 4 | THE COURT:  You get through these two witnesses and |
| 14:46:37 | 5 | then, I can read them and make notes of other -- |
| 14:46:40 | 6 | MR. GARDNER:  Absolutely. |
| 14:46:41 | 7 | THE COURT:  All right.  I'll receive them.  Y'all take |
| 14:46:42 | 8 | a break. |
| 14:53:46 | 9 | (Recess.) |
| 14:59:29 | 10 | THE COURT:  All right.  Counsel, let's get settled |
| 14:59:31 | 11 | here.  I'm about ready to bring the jury in.  Is there anything |
| 14:59:42 | 12 | else that you want to bring up right now? |
| 14:59:52 | 13 | (Jury present.) |
| 15:01:45 | 14 | THE COURT:  You may proceed. |
| 15:01:45 | 15 | MR. GARDNER:  Thank you, your Honor.  Your Honor, I |
| 15:01:47 | 16 | believe we left off the government offers Exhibit 358H, as in |
| 15:01:52 | 17 | hotel. |
| 15:01:52 | 18 | THE COURT:  And that is admitted. |
| 15:01:55 | 19 | Q.   (BY MR. GARDNER) Mr. Quintero, when you arranged for the |
| 15:02:03 | 20 | training of horses with Mr. Nayen, how was the billing to be |
| 15:02:13 | 21 | conducted? |
| 15:02:15 | 22 | A.   As far as when? |
| 15:02:16 | 23 | Q.   Just in general, I'm sorry. |
| 15:02:18 | 24 | A.   Oh, in general, just there were e-mails, through e-mails to |
| 15:02:27 | 25 | the e-mail address that's on there. |

15:02:29  1   Q.   And I'm showing you one of your e-mails, and this one is

15:02:34  2   dated on 12-3 of 2012, down here at the bottom.  I'm sorry.  That

15:02:46  3   is incorrect.  This e-mail's from you; is that correct?

15:02:52  4   A.   Yes, sir.

15:02:53  5   Q.   And to who is this individual?

15:02:55  6   A.   That's an e-mail for one of Mr. Colorado's accountants, I

15:02:59  7   think.  I don't know who it is exactly.

15:03:01  8   Q.   Have you ever met this individual?

15:03:03  9   A.   To be honest, I don't think so.

15:03:05  10  Q.   All right.  And how did you obtain --

15:03:08  11         THE COURT:  What is the date on it?

15:03:10  12         MR. GARDNER:  Your Honor, the date is what has been --

15:03:13  13  I apologize, your Honor.  This date here is the day it was

15:03:16  14  created by DEA.  This date here, 12-13-2012, that's the date of

15:03:24  15  the e-mail, correct?

15:03:24  16  A.   2011.

15:03:25  17  Q.   (BY MR. GARDNER) 2011.  Excuse me.

15:03:27  18         THE COURT:  That's what I thought.  Pardon me.

15:03:29  19  Q.   (BY MR. GARDNER) So who gave you this e-mail here,

15:03:41  20  miguel.almazon@gmail.com?

15:03:44  21  A.   That one, Fernando Garcia did.

15:03:45  22  Q.   Okay.  Fernando Garcia provided you with that?

15:03:47  23  A.   Yes, sir.

15:03:48  24  Q.   Now, you've looked at these.  Most of these e-mails are in

15:03:51  25  Spanish, correct?

15:03:51  1   A.   Yes, sir.

15:03:52  2   Q.   And there's a certified English translation behind it?

15:03:56  3   A.   Yes, sir.

15:03:57  4   Q.   In Spanish, talking that date right there, buenas noches,

15:04:05  5   Fernando Garcia, correct?

15:04:06  6   A.   Yes, sir.

15:04:08  7   Q.   And is Loose Perry one of your horses you were training for

15:04:24  8   Defendant Colorado?

15:04:26  9   A.   Yes, sir.

15:04:26  10  Q.   And what was Fernando Garcia's role in the training of

15:04:32  11  "Pancho" Colorado's horses?

15:04:33  12  A.   At the moment, I would ask Fernando Garcia to see if he can

15:04:39  13  talk to Mr. Colorado because I had no communication with him.

15:04:41  14  And Mr. Colorado, at one time, owed me a good amount of money for

15:04:48  15  training them.

15:04:49  16  Q.   In this case, $71,000?

15:04:51  17  A.   Yes, sir.

15:04:51  18  Q.   How long did it take Mr. Colorado to accumulate that

15:04:55  19  particular bill?

15:04:56  20  A.   That one there, I think it was about -- I'm saying about

15:05:03  21  six, seven months.

15:05:04  22  Q.   And then, behind it, there's an attachment.  Is this your

15:05:07  23  invoice?

15:05:07  24  A.   Yes, sir.

15:05:09  25  Q.   And, again, that's the training of Loose Perry, Mireyita

| | | |
|---|---|---|
| 15:05:15 | 1 | Cartel.  Do you know how Mireyita Cartel was named? |
| 15:05:17 | 2 | A.    No, sir. |
| 15:05:20 | 3 | Q.    Do you know if it was named after anybody? |
| 15:05:23 | 4 | A.    No, sir. |
| 15:05:24 | 5 | Q.    And, again, the total at the bottom, 67,000? |
| 15:05:28 | 6 | A.    Yes, sir. |
| 15:05:28 | 7 | Q.    How were you reimbursed for the training of Loose Perry, |
| 15:05:36 | 8 | Mireyita Cartel, and the other horse listed on that statement? |
| 15:05:41 | 9 | A.    The way I was reimbursed was through a couple of wire |
| 15:05:44 | 10 | transfers from Mr. Colorado, and the bill was kept on |
| 15:05:53 | 11 | accumulating.  At the end, the final amount I was paid off to me |
| 15:05:56 | 12 | was from Mr. Nayen and was paid in cash by him. |
| 15:05:59 | 13 | Q.    Mr. Quintero, I'm showing you another e-mail, dated November |
| 15:06:06 | 14 | 12th of 2011.  This is from Fernie004@hotmail.com? |
| 15:06:14 | 15 | A.    Yes, sir. |
| 15:06:14 | 16 | Q.    And who did you know that to be associated with? |
| 15:06:17 | 17 | A.    Fernando Garcia. |
| 15:06:17 | 18 | Q.    And, again, that's your e-mail, correct? |
| 15:06:20 | 19 | A.    Yes, sir. |
| 15:06:21 | 20 | Q.    In Spanish.  And on the back, there's an English |
| 15:06:24 | 21 | translation.  I'll go to that. |
| 15:06:28 | 22 |         THE COURT:  There's nothing on that. |
| 15:06:32 | 23 | Q.    (BY MR. GARDNER) Thank you, your Honor. |
| 15:06:35 | 24 |         And sending you the transfer format.  Then we see the |
| 15:06:40 | 25 | attachment.  It is a blank AQHA transfer form.  Did you ever know |

15:06:49  1  or meet a Jorge Luis Ochoa-Gomez?

15:06:52  2  A.   No, sir.

15:06:53  3  Q.   Okay.  What were you instructed to do with this blank

15:06:57  4  transfer form?

15:06:57  5  A.   To be honest, I don't remember ever receiving this transfer.

15:07:02  6  Q.   Did you receive other transfer forms that were also blank

15:07:05  7  except for the owner?

15:07:06  8  A.   No, sir.

15:07:07  9  Q.   Approximately how many horses do you believe you trained for

15:07:18  10  Defendant Colorado?

15:07:18  11  A.   From Mr. Colorado at one time, I believe I trained about

15:07:22  12  from 10 to 14.  Don't remember the exact amount.

15:07:25  13  Q.   Have you also trained horses for Carlos Nayen?

15:07:29  14  A.   At the moment, no, I didn't.

15:07:31  15  Q.   At some point, did you train horses for Carlos Nayen?

15:07:35  16  A.   Yes, sir, I did.

15:07:36  17  Q.   And how were those billed?

15:07:37  18  A.   I actually came -- I did a deal with him and he would pay me

15:07:44  19  in cash for these horses.

15:07:45  20  Q.   Did you also fill out billing statements for him?

15:07:47  21  A.   No, sir.

15:07:53  22  Q.   I want to turn your attention to March 27th of 2012.  Were

15:08:01  23  you present at the Los Alamitos race track?  Let me ask you this.

15:08:07  24  A.   Probably.  I won't remember.

15:08:09  25  Q.   You won't remember the dates?

| | | |
|---|---|---|
| 15:08:10 | 1 | A.   Yeah. |
| 15:08:11 | 2 | Q.   Were you present when law enforcement arrested you on that |
| 15:08:13 | 3 | date? |
| 15:08:13 | 4 | A.   Oh, yes.  Yes.  Yes. |
| 15:08:16 | 5 | Q.   Not too hard to forget. |
| 15:08:20 | 6 | A.   No. |
| 15:08:21 | 7 | Q.   And who were you with that day? |
| 15:08:22 | 8 | A.   That day, I was with Carlos Nayen, Luis Guerrera and Luis |
| 15:08:31 | 9 | Gerardo Aguirre, and my father was present, my uncle was present, |
| 15:08:34 | 10 | and I think another assistant trainer for someone else was |
| 15:08:39 | 11 | present.  We were just -- it was six of us that were handcuffed |
| 15:08:43 | 12 | at the time. |
| 15:08:43 | 13 | Q.   And Luis Gerardo Aguirre, how did you meet him? |
| 15:08:47 | 14 | A.   Through Carlos Nayen. |
| 15:08:49 | 15 | Q.   And what did you understand his role to be or his job? |
| 15:08:53 | 16 | A.   Well, his role was -- what I understood was he used to go to |
| 15:08:58 | 17 | the sales to buy clean horses, yearlings, and take them back to |
| 15:09:07 | 18 | Mexico and sell them for a greater price. |
| 15:09:09 | 19 | Q.   Did you see him at any of the auctions buying his cheaper |
| 15:09:12 | 20 | horses? |
| 15:09:12 | 21 | A.   Yes, sir, I did. |
| 15:09:14 | 22 | Q.   I want to turn your attention to December of 2011.  Were you |
| 15:09:20 | 23 | present with Mr. Aguirre when he attempted to deposit a check in |
| 15:09:25 | 24 | a bank? |
| 15:09:25 | 25 | A.   Yes, sir.  I was. |

| | | |
|---|---|---|
| 15:09:26 | 1 | Q.   Could you tell the ladies and gentlemen of the jury about |
| 15:09:28 | 2 | that incident? |
| 15:09:31 | 3 | A.   I was asked to go into the bank with Mr. Aguirre and deposit |
| 15:09:35 | 4 | a check that he had for -- I don't remember the exact amount, but |
| 15:09:39 | 5 | it was a little bit over 100,000. |
| 15:09:41 | 6 | Q.   And do you remember what the -- who the check was from? |
| 15:09:44 | 7 | A.   No, sir.  I do not remember. |
| 15:09:46 | 8 | Q.   And do you remember what the check was for? |
| 15:09:47 | 9 | A.   I kind of overheard a conversation saying it was for a batch |
| 15:09:51 | 10 | of mares. |
| 15:09:52 | 11 | MS. WILLIAMS:  Objection. |
| 15:09:53 | 12 | Q.   (BY MR. GARDNER) And who was making the conversation? |
| 15:09:55 | 13 | A.   Excuse me? |
| 15:09:56 | 14 | Q.   Who was conversing?  Who was talking to you? |
| 15:09:58 | 15 | A.   Nayen and Aguirre. |
| 15:10:00 | 16 | Q.   And what was the substance of the conversation? |
| 15:10:03 | 17 | A.   I just -- I kind of overheard just the whole fact that it |
| 15:10:08 | 18 | was a batch of mares that he had sold. |
| 15:10:11 | 19 | Q.   Now, I want to go back to the raid in which you were |
| 15:10:16 | 20 | arrested.  After the raid, did you start receiving a number of |
| 15:10:20 | 21 | e-mails? |
| 15:10:21 | 22 | A.   Yes, sir, I did. |
| 15:10:24 | 23 | Q.   Showing you an e-mail dated -- apologize, your Honor.  Your |
| 15:10:29 | 24 | Honor, with respect to Government's Exhibit 358G, approach the |
| 15:10:37 | 25 | witness.  You and I have gone through the e-mails that relates |

```
15:10:41   1    specifically to you, correct?
15:10:42   2    A.   Yes, sir.
15:10:43   3    Q.   Are these e-mails related to the incident surrounding your
15:10:50   4    arrest at the track?
15:10:51   5    A.   Yes, sir.
15:10:51   6    Q.   Your Honor, for the limited purpose of 358G, I would offer
15:10:55   7    with regard to this witness' e-mails.  I'll identify those as I
15:11:01   8    go along.
15:11:01   9            THE COURT:  Okay.
15:11:04  10            MR. GARDNER:  Or without objection, I could tender the
15:11:06  11    whole Exhibit 358G.
15:11:11  12            MR. WOMACK:  No objection, your Honor.
15:11:12  13            THE COURT:  All right.  358G is admitted.
15:11:15  14    Q.   (BY MR. GARDNER) So we heard testimony from Kyle Mori that
15:11:20  15    the raid occurred on the 27th of March.  This e-mail was dated on
15:11:24  16    March 29th and the time is important, 7:25 p.m.
15:11:32  17            Do you know who A-N-R-I or Anri2319@hotmail is?
15:11:38  18    A.   At the moment, I thought it was an accountant for the
15:11:42  19    horses.
15:11:44  20    Q.   Have you ever met the person associated with that account?
15:11:46  21    A.   No, sir.
15:11:46  22    Q.   Did anybody ever give you that e-mail account before?
15:11:51  23    A.   Don't recall, sir.
15:11:53  24    Q.   And I'm just going to go to the English translation.  What's
15:12:06  25    going on old man?  Why aren't you all answering?  What's going
```

15:12:09    1    on?  Let me know.

15:12:12    2            Did you know what that individual was talking about

15:12:14    3    that time?

15:12:15    4    A.   Excuse me?

15:12:15    5    Q.   Did you know what this individual was asking you about at

15:12:18    6    this time?

15:12:18    7    A.   No.  I didn't.

15:12:22    8    Q.   The next e-mail is at 8:03 p.m. on the same date and when I

15:12:38    9    go to the translation.  This is an e-mail from you, correct?

15:12:44   10    A.   Yes, sir.

15:12:45   11    Q.   In reply to that Anri address?

15:12:48   12    A.   Yes, sir.

15:12:48   13    Q.   And what are you telling him here?

15:12:51   14    A.   I told him that I didn't know what was happening, but we

15:12:54   15    were stopped by a group of police, federal agents to say that

15:12:59   16    they're looking for some guy by the name of Bosquez.

15:13:04   17    Q.   Was this in relation to the raid in which you were arrested

15:13:07   18    two days prior?

15:13:07   19    A.   Yes, sir.  I mean, Omar.  I'm sorry.

15:13:10   20    Q.   Omar?

15:13:10   21    A.   Yes, sir.

15:13:13   22    Q.   Same date, 35 minutes later, at 8:38 p.m.  And below is your

15:13:30   23    original e-mail, correct, the one we just talked about 35 minutes

15:13:36   24    earlier?

15:13:36   25    A.   Yes, sir.

| | | |
|---|---|---|
| 15:13:36 | 1 | Q.   And is this the response you received from Anri? |
| 15:13:41 | 2 | A.   Yes, sir. |
| 15:13:42 | 3 | Q.   Who's the kid? |
| 15:13:44 | 4 | A.   The kid was referred to Carlos Nayen. |
| 15:13:47 | 5 | Q.   Okay.  You heard him referred to that or do you refer to him |
| 15:13:51 | 6 | by that? |
| 15:13:51 | 7 | A.   Yeah.  I've heard people referred to him as "Chamaco" in |
| 15:13:57 | 8 | Spanish. |
| 15:13:57 | 9 | Q.   "Chamaco"? |
| 15:13:58 | 10 | A.   Yes, sir. |
| 15:13:59 | 11 | Q.   How old is Carlos Nayen? |
| 15:14:00 | 12 | A.   About 26.  Don't know his exact age. |
| 15:14:04 | 13 | Q.   And when it talks about device, did you know what he was |
| 15:14:09 | 14 | talking about? |
| 15:14:09 | 15 | A.   I have no idea what he was talking about. |
| 15:14:12 | 16 | Q.   And did you know why Carlos Nayen -- I assume Carlos Nayen, |
| 15:14:15 | 17 | the kid and the dude are the same, right? |
| 15:14:17 | 18 | A.   Yes, sir. |
| 15:14:18 | 19 | Q.   And it says, people are concerned.  Did you have any idea |
| 15:14:23 | 20 | which people was being referred to? |
| 15:14:24 | 21 | A.   No, sir. |
| 15:14:28 | 22 | Q.   Do you know what he was referring to when he talked about a, |
| 15:14:31 | 23 | quote, unquote, safe number? |
| 15:14:33 | 24 | A.   No, sir.  I didn't. |
| 15:14:39 | 25 | Q.   And here's an e-mail, six minutes later, on the same day. |

| | | |
|---|---|---|
| 15:14:48 | 1 | This is your response, correct? |
| 15:14:49 | 2 | A.   Yes, sir. |
| 15:14:50 | 3 | Q.   Why did you make that response? |
| 15:14:52 | 4 | A.   Because I had no idea what he was talking about. |
| 15:14:56 | 5 | Q.   Pretty much what it says, right? |
| 15:15:01 | 6 | A.   Yes, sir. |
| 15:15:02 | 7 | Q.   E-mail at 8:45 p.m., few minutes later.  Sweetie, tell the |
| 15:15:21 | 8 | kid to please contact me.  Let me know something is going on. |
| 15:15:25 | 9 | Let me back up one second. |
| 15:15:38 | 10 | Did you know what this person Anri was talking about |
| 15:15:42 | 11 | wanting you to let him know something? |
| 15:15:43 | 12 | A.   He wanted me to let him know why he couldn't get a hold of |
| 15:15:47 | 13 | Carlos. |
| 15:15:53 | 14 | Q.   And the next e-mail at 8:49 p.m. on the same date.  This is |
| 15:16:04 | 15 | your response on Tuesday:  My son was ill.  Seems like he had a |
| 15:16:08 | 16 | stomach virus but he's fine now.  Just had a slight fever.  Take |
| 15:16:11 | 17 | care. |
| 15:16:13 | 18 | What are you saying there? |
| 15:16:14 | 19 | A.   I was receiving e-mails and e-mails from this person, and on |
| 15:16:21 | 20 | that Tuesday, when I got arrested, my son was ill and I was just |
| 15:16:25 | 21 | nervous about this whole incident.  And I -- you know, I e-mailed |
| 15:16:29 | 22 | him this without even, you know, thinking about it. |
| 15:16:32 | 23 | Q.   Is it pretty obvious to you at this time this person wants |
| 15:16:35 | 24 | to know and get a hold of Carlos Nayen? |
| 15:16:37 | 25 | A.   Yes, sir. |

| | | |
|---|---|---|
| 15:16:37 | 1 | Q.   10:22 p.m. on the same date.  This is the e-mail from |
| 15:16:56 | 2 | Anri2319 to you, correct? |
| 15:16:57 | 3 | A.   Yes, sir. |
| 15:17:01 | 4 | THE COURT:  2:00 p.m. on what date? |
| 15:17:03 | 5 | MR. GARDNER:  I apologize, your Honor.  It is March |
| 15:17:05 | 6 | 29th at 10:22 p.m. |
| 15:17:09 | 7 | THE COURT:  Ten? |
| 15:17:10 | 8 | MR. GARDNER:  Yes, sir. |
| 15:17:18 | 9 | Q.   (BY MR. GARDNER) 3-29, same date, at 10:42 p.m., 20 minutes |
| 15:17:26 | 10 | later, from Anri3219 to you.  Were you given the cell or not?  I |
| 15:17:41 | 11 | need you to answer me.  Did you give it to Guero?  Who is Guero? |
| 15:17:45 | 12 | A.   It's Carlos Nayen, also. |
| 15:17:47 | 13 | Q.   Is he sort of a light-complected individual? |
| 15:17:50 | 14 | A.   Yes, sir. |
| 15:17:50 | 15 | Q.   Now, when you're talking or when Anri2319 is talking about |
| 15:17:54 | 16 | the cell, did Carlos Nayen ever give you a cell? |
| 15:17:58 | 17 | A.   No, sir, he didn't. |
| 15:17:59 | 18 | Q.   Did he ever mention anything about a safe number? |
| 15:18:02 | 19 | A.   No, sir, he did not. |
| 15:18:06 | 20 | Q.   Do you know where Carlos Nayen is at this time? |
| 15:18:08 | 21 | A.   I believe he's arrested. |
| 15:18:10 | 22 | Q.   Okay.  Is he still in custody? |
| 15:18:11 | 23 | A.   Yes, sir.  He is. |
| 15:18:22 | 24 | Q.   We have the next e-mail at 10:53 p.m. on 3-29.  You respond, |
| 15:18:40 | 25 | Cata? |

| | | |
|---|---|---|
| 15:18:42 | 1 | A.   Yeah. |
| 15:18:42 | 2 | Q.   What's that mean? |
| 15:18:43 | 3 | A.   I told him to get a hold of the groom that worked for Nayen |
| 15:18:47 | 4 | at the moment. |
| 15:18:47 | 5 | Q.   So were you directing this Anri to get a hold of this |
| 15:18:50 | 6 | individual? |
| 15:18:50 | 7 | A.   Yes.  I really didn't want to talk with him anymore. |
| 15:18:54 | 8 | Q.   And this is his response? |
| 15:18:56 | 9 | A.   Yes, sir. |
| 15:19:02 | 10 | Q.   And the next e-mail, approximately two minutes later on the |
| 15:19:05 | 11 | same date at 10:55 p.m., you give the full name, call Catalan? |
| 15:19:22 | 12 | A.   Yes, sir. |
| 15:19:23 | 13 | Q.   Same number, correct? |
| 15:19:24 | 14 | A.   Yes, sir. |
| 15:19:25 | 15 | Q.   The next e-mail, approximately 50 minutes later on the same |
| 15:19:32 | 16 | date, at 11:49 p.m. from Anri to you, his response, Catalin has |
| 15:19:41 | 17 | turned it off? |
| 15:19:42 | 18 | A.   Catalan.  Yeah. |
| 15:19:45 | 19 | Q.   Catalan.  Have you ever talked to Catalan? |
| 15:19:46 | 20 | A.   After this incident? |
| 15:19:48 | 21 | Q.   Not after this, before. |
| 15:19:49 | 22 | A.   Before, yeah.  I knew him. |
| 15:19:51 | 23 | Q.   Were you aware whether or not he had his phone on or off? |
| 15:19:54 | 24 | A.   No, sir. |
| 15:19:56 | 25 | Q.   And finally, the last e-mail, the many in this string, dated |

```
15:20:01   1   early morning hours of March 30th, 12:28 a.m. from Anri to you.
15:20:29   2   Old man, please, tell me for real what is happening.  I won't
15:20:32   3   write you again.  These devices are clean.
15:20:37   4           This time, he says devices instead of device.  Were you
15:20:41   5   aware of any devices that Carlos Nayen would use?
15:20:44   6   A.    No, sir.
15:20:44   7   Q.    How would Carlos Nayen communicate?  What would he use for a
15:20:48   8   phone?
15:20:48   9   A.    I actually got a phone for him under my name, the Sprint
15:20:55  10   ones, and I would also buy him BlackBerry phones.
15:21:02  11   Q.    And why couldn't Carlos Nayen buy his own BlackBerry phones?
15:21:06  12   A.    I assume he didn't know where to buy them and I was from the
15:21:10  13   area, and he would just ask me if I can buy them for him.
15:21:15  14   Q.    One moment, your Honor.
15:21:23  15           He says he could toss it.  Did you ever have any
15:21:30  16   discussions with Carlos Nayen after this string of e-mails?
15:21:35  17   A.    No.  I actually cut all friendship with him, everything.  At
15:21:42  18   the time I was training for him at my barn, and after this whole
15:21:45  19   incident when I found out that federal agents were asking about
15:21:49  20   him, I kicked him out of my barn.
15:21:52  21   Q.    And you were arrested with everyone else in June of last
15:21:55  22   year?
15:21:55  23   A.    In June of 2012.  Yes.
15:21:57  24   Q.    May I have one moment, your Honor?
15:22:07  25           Your Honor, my co-counsel has informed me that I've
```

| | | |
|---|---|---|
| 15:22:13 | 1 | transposed the numbers.  So I just want to make sure that the |
| 15:22:17 | 2 | Government's Exhibit 358G refers to the A-N-R-I 2319 at |
| 15:22:25 | 3 | hotmail.com.  And with that, your Honor, I pass the witness. |
| 15:22:31 | 4 | MS. WILLIAMS:  No questions. |
| 15:22:55 | 5 | MR. DEGEURIN:  May it please the Court. |
| 15:22:57 | 6 | THE COURT:  Yes, sir. |
| 15:22:57 | 7 | CROSS-EXAMINATION |
| 15:22:57 | 8 | BY MR. DEGEURIN: |
| 15:23:03 | 9 | Q.   Mr. Quintero, did you own horses yourself? |
| 15:23:09 | 10 | A.   Yes, sir.  I do. |
| 15:23:10 | 11 | Q.   And your father owns horses? |
| 15:23:12 | 12 | A.   Yes, sir. |
| 15:23:13 | 13 | Q.   That's two generations.  Do you go back three generations? |
| 15:23:18 | 14 | A.   No, sir. |
| 15:23:18 | 15 | Q.   And did your father know Mr. Colorado? |
| 15:23:26 | 16 | A.   After I started training them, I introduced him to |
| 15:23:32 | 17 | Mr. Colorado. |
| 15:23:32 | 18 | Q.   Okay.  And you knew that Mr. Colorado was having some really |
| 15:23:38 | 19 | fine horses before you met Mr. Colorado? |
| 15:23:41 | 20 | A.   Yes, sir, I did. |
| 15:23:42 | 21 | Q.   One of them was Mr. Loose Perry, or Loose Perry was the name |
| 15:23:48 | 22 | of the horse? |
| 15:23:48 | 23 | A.   Yes, sir. |
| 15:23:50 | 24 | Q.   And was Mr. Perry raced in Mexico as well as United States? |
| 15:23:56 | 25 | A.   Yes, sir, he did. |

| | | |
|---|---|---|
| 15:23:57 | 1 | Q.   Was he raced in New Orleans? |
| 15:24:00 | 2 | A.   Yes, sir, he did. |
| 15:24:01 | 3 | Q.   Did you go to the race in New Orleans that Mr. Perry raced? |
| 15:24:05 | 4 | A.   Yes.  I actually took a horse out there myself, and I was |
| 15:24:08 | 5 | already training for Mr. Colorado at the moment. |
| 15:24:13 | 6 | Q.   You named a few horses that you were training for |
| 15:24:17 | 7 | Mr. Colorado.  Do you recall them offhand? |
| 15:24:19 | 8 | A.   I can try. |
| 15:24:23 | 9 | Q.   At one point, you were training maybe as many as 10 or 15 |
| 15:24:29 | 10 | horses, right? |
| 15:24:30 | 11 | A.   Yes, sir. |
| 15:24:31 | 12 | Q.   For Mr. Colorado? |
| 15:24:32 | 13 | A.   Yes, sir. |
| 15:24:33 | 14 | Q.   You had other horses you were training for other people, |
| 15:24:38 | 15 | other owners? |
| 15:24:39 | 16 | A.   Yes, sir. |
| 15:24:40 | 17 | Q.   So how many horses in all?  I mean, the other owners |
| 15:24:44 | 18 | together with Mr. Colorado's plus your own, how many were you |
| 15:24:47 | 19 | training? |
| 15:24:47 | 20 | A.   I had about 25 horses or more. |
| 15:24:52 | 21 | Q.   And you'd send -- and was Mr. Nayen -- did he accept |
| 15:24:58 | 22 | responsibility of taking care of Mr. Colorado's invoices and send |
| 15:25:04 | 23 | them to him? |
| 15:25:04 | 24 | A.   The only time Mr. Nayen said he would take care of |
| 15:25:08 | 25 | Mr. Colorado's invoice was after the fact that I wasn't getting |

| | | |
|---|---|---|
| 15:25:12 | 1 | paid, and I needed to release those horses to Mr. Colorado |
| 15:25:16 | 2 | because Mr. Colorado had entered those horses in races in Mexico. |
| 15:25:22 | 3 | And he took full -- what's the -- I'm sorry, he said that he |
| 15:25:29 | 4 | would take care of that bill if Mr. Colorado didn't pay me. |
| 15:25:33 | 5 | Q.   Because Mr. Nayen knew Mr. Colorado? |
| 15:25:35 | 6 | A.   Yes, sir.  That's what I understand. |
| 15:25:36 | 7 | Q.   And so, he -- basically he said, I will get Mr. Colorado's |
| 15:25:44 | 8 | attention? |
| 15:25:44 | 9 | A.   If Mr. Colorado doesn't finish paying you, I will pay you. |
| 15:25:46 | 10 | Q.   All right.  May I have a moment? |
| 15:25:58 | 11 |     You'd recognize Loose Perry if you saw him? |
| 15:26:00 | 12 | A.   Yes.  Definitely. |
| 15:26:02 | 13 | Q.   Is that? |
| 15:26:04 | 14 | A.   Yes, sir. |
| 15:26:08 | 15 | Q.   All right.  Just for demonstrative purposes.  This will be |
| 15:26:20 | 16 | just for demonstrative purposes. |
| 15:26:23 | 17 |     THE COURT:  All right.  Ms. Sims, what is Defendant |
| 15:26:28 | 18 | Colorado Exhibit what? |
| 15:26:30 | 19 |     THE CLERK:  It will be 8. |
| 15:26:31 | 20 |     THE COURT:  Nine? |
| 15:26:32 | 21 |     THE CLERK:  Eight. |
| 15:26:33 | 22 |     THE COURT:  We've got 8. |
| 15:26:36 | 23 |     MR. DEGEURIN:  Nine. |
| 15:26:38 | 24 |     THE CLERK:  We've got 8? |
| 15:26:39 | 25 |     THE COURT:  Seven and 8.  Well, I don't have a |

| | | |
|---|---|---|
| 15:26:46 | 1 | description on it, though.  We'll have Colorado 9, and we'll |
| 15:26:53 | 2 | figure out if we've got 8 later. |
| 15:26:55 | 3 | Q.   (BY MR. DEGEURIN) All right.  Is this -- to some of us, all |
| 15:27:03 | 4 | horses look alike.  But you wouldn't have trouble recognizing |
| 15:27:06 | 5 | Loose Perry? |
| 15:27:07 | 6 | A.   Oh, yeah. |
| 15:27:08 | 7 | Q.   Do you recognize the other? |
| 15:27:11 | 8 | A.   Yes, I do.  Yeah, I recognize them. |
| 15:27:14 | 9 | Q.   Did you train those horses? |
| 15:27:16 | 10 | A.   I just trained Rebas Corona. |
| 15:27:20 | 11 | Q.   Rebas Corona? |
| 15:27:22 | 12 | A.   Yes, sir. |
| 15:27:23 | 13 | Q.   And Maestro Corona, you did not? |
| 15:27:29 | 14 | A.   Never seen that one, sir. |
| 15:27:33 | 15 | Q.   And are you familiar with Flor de Maria? |
| 15:27:37 | 16 | A.   Yeah.  I believe that was Mr. Colorado's barn in Mexico. |
| 15:27:48 | 17 | Q.   Was -- how many times did you actually get to meet and talk |
| 15:27:54 | 18 | with Mr. Colorado? |
| 15:27:58 | 19 | A.   I would say about four or five times since we started doing |
| 15:28:04 | 20 | business with each other. |
| 15:28:06 | 21 | Q.   In California? |
| 15:28:09 | 22 | A.   Actually, the first time I met Mr. Colorado was in New |
| 15:28:12 | 23 | Mexico.  That's where I was introduced to him by Mr. Nayen.  And |
| 15:28:15 | 24 | then, the other three times were in California when he would go |
| 15:28:20 | 25 | down and watch his horses run at the Los Alamitos. |

15:28:26   1   Q.   You didn't see him in New Orleans?

15:28:28   2   A.   You're right.  Yes.  I did speak to him in New Orleans.

15:28:31   3   Yes.

15:28:33   4   Q.   All right.  I pass the witness.

15:28:38   5                      CROSS-EXAMINATION

15:28:38   6   BY MR. WOMACK:

15:28:41   7   Q.   Thank you, your Honor.

15:28:42   8            Good afternoon, Mr. Quintero.

15:28:46   9   A.   Good afternoon.

15:28:46   10   Q.   I'm Guy Womack from Houston.  I represent Fernando Garcia.

15:28:51   11   And you know Fernando, you've told us?

15:28:53   12   A.   Oh, yeah.  Yes, sir.

15:28:55   13   Q.   First thing I want to ask you about are these e-mails we

15:28:57   14   were seeing from this Anri.  You know those did not come from

15:29:01   15   Fernando Garcia?

15:29:01   16   A.   Yes, sir, I do.  That didn't come from him.

15:29:04   17   Q.   They did not?

15:29:05   18   A.   They did not come from him.

15:29:06   19   Q.   Now, I want to talk to you about horse racing.

15:29:09   20   A.   Yes, sir.

15:29:09   21   Q.   You've known Fernando Garcia for several years?

15:29:15   22   A.   Oh, yeah.

15:29:16   23   Q.   And you know that he buys and sells horses?

15:29:19   24   A.   Yes, sir.

15:29:20   25   Q.   That he has a company called Garcia Bloodstock and Racing?

| | | |
|---|---|---|
| 15:29:22 | 1 | A.   Yes, sir. |
| 15:29:23 | 2 | Q.   You know that he also represents many other buyers and |
| 15:29:28 | 3 | helping them pick horses to buy? |
| 15:29:29 | 4 | A.   Yes, sir. |
| 15:29:30 | 5 | Q.   You know he trains horses? |
| 15:29:32 | 6 | A.   Yes, sir. |
| 15:29:33 | 7 | Q.   As part of representing people, he may also hire other |
| 15:29:36 | 8 | trainers to take care of horses? |
| 15:29:39 | 9 | A.   Yes, sir. |
| 15:29:40 | 10 | Q.   In fact, has he hired you before to train horses? |
| 15:29:43 | 11 | A.   Yes, sir. |
| 15:29:43 | 12 | Q.   Now, I want to talk to you, in particular, about this |
| 15:29:50 | 13 | Ruidoso, the trial, the qualifying races for the All American |
| 15:29:58 | 14 | Futurity in 2010.  You recall that period of time? |
| 15:30:04 | 15 | A.   Excuse me? |
| 15:30:05 | 16 | Q.   You recall that period of time?  You remember that race? |
| 15:30:07 | 17 | A.   Oh, yes. |
| 15:30:08 | 18 | Q.   And you had a horse that you wanted to enter in the trials |
| 15:30:13 | 19 | to qualify for the All American? |
| 15:30:15 | 20 | A.   Yes, sir, I did. |
| 15:30:15 | 21 | Q.   And you were -- well, you actually live in California, don't |
| 15:30:20 | 22 | you? |
| 15:30:20 | 23 | A.   Yes. |
| 15:30:22 | 24 | Q.   And you wanted to bring your horse out early? |
| 15:30:25 | 25 | A.   Yeah. |

| | | |
|---|---|---|
| 15:30:25 | 1 | Q.   To New Mexico? |
| 15:30:26 | 2 | A.   Yes.  I wanted to bring her out a month and a half prior to |
| 15:30:29 | 3 | the trials to the owner. |
| 15:30:30 | 4 | Q.   Tell the jury why would you want to bring your horse out |
| 15:30:33 | 5 | early. |
| 15:30:33 | 6 | A.   Why would I want to bring it out early? |
| 15:30:35 | 7 | Q.   Yeah. |
| 15:30:35 | 8 | A.   To get her adapted to the altitude of Ruidoso because it's |
| 15:30:38 | 9 | so high above sea level.  Acclimate her. |
| 15:30:46 | 10 | Q.   So you see it has an advantage, don't you? |
| 15:30:48 | 11 | A.   Yes. |
| 15:30:49 | 12 | Q.   If you could bring the horse out and have it running and |
| 15:30:51 | 13 | training in the same environment, same climate, altitude and |
| 15:30:56 | 14 | everything that it would be racing at? |
| 15:30:57 | 15 | A.   Yes. |
| 15:30:58 | 16 | Q.   And the All American Futurity is the biggest quarter horse |
| 15:31:03 | 17 | race in America? |
| 15:31:05 | 18 | A.   It's -- yeah.  It's considered like the Kentucky Derby of |
| 15:31:10 | 19 | quarter horses. |
| 15:31:11 | 20 | Q.   Yeah.  And when I talk about trials, are the trials the |
| 15:31:15 | 21 | races that you must run to qualify for the big race? |
| 15:31:18 | 22 | A.   Yes. |
| 15:31:20 | 23 | Q.   Tell the jury, how many horses would have entered -- or that |
| 15:31:25 | 24 | year, how many horses entered the trials to try to make it to the |
| 15:31:30 | 25 | All American? |

| | | |
|---|---|---|
| 15:31:30 | 1 | A.    It was about 200, 220. |
| 15:31:34 | 2 | Q.    And of these 200 or 220 horses, when y'all race in the |
| 15:31:40 | 3 | trials, there would be ten horses on the track at one time, |
| 15:31:43 | 4 | right? |
| 15:31:44 | 5 | A.    Running, you mean? |
| 15:31:45 | 6 | Q.    Yeah.  At trial? |
| 15:31:46 | 7 | A.    Yes, sir. |
| 15:31:50 | 8 | Q.    So if you had 220 horses, the trials would actually be 22 |
| 15:31:54 | 9 | different races, each of ten horses. |
| 15:31:56 | 10 | A.    Yes, sir. |
| 15:31:58 | 11 | Q.    And the horses that were selected from the trials that went |
| 15:32:04 | 12 | on to the big race, these were the top ten finishing times; is |
| 15:32:11 | 13 | that correct? |
| 15:32:11 | 14 | A.    Yes, sir. |
| 15:32:12 | 15 | Q.    So theoretically, if you have one heat or one race and all |
| 15:32:18 | 16 | ten horses were the very fastest in time, that would have been |
| 15:32:22 | 17 | all the competitors in the big race? |
| 15:32:23 | 18 | A.    Yes, sir. |
| 15:32:25 | 19 | Q.    Winning your heat in a trial wouldn't guarantee you making |
| 15:32:31 | 20 | it to the big race. |
| 15:32:32 | 21 | A.    No, sir. |
| 15:32:32 | 22 | Q.    It was based on your time? |
| 15:32:34 | 23 | A.    Yes, sir. |
| 15:32:35 | 24 | Q.    Okay.  And when you came out to New Mexico to train and to |
| 15:32:44 | 25 | get ready for the All American trials, you -- I was tackled by |

15:32:53  1    the government.

15:32:55  2            MR. GARDNER:  I'm guilty as charged, your Honor.

15:32:58  3    Q.   (BY MR. WOMACK) You had to -- well, you stabled your horse

15:33:02  4    at Garcia Bloodstock's barn where Mr. Piloto was being stabled?

15:33:07  5    A.   Yes, sir.

15:33:08  6    Q.   So you actually saw Mr. Piloto there.

15:33:12  7    A.   Him and other horses, yes, sir, I did.

15:33:15  8    Q.   And you knew at that time, Fernando Garcia actually owned

15:33:19  9    Mr. Piloto?

15:33:20  10   A.   Yes, sir.

15:33:21  11   Q.   And Fernando Garcia was the one principally primarily

15:33:28  12   training Mr. Piloto, correct?

15:33:29  13   A.   Yes, sir.

15:33:29  14   Q.   But you said you gave him some advice on some things you do,

15:33:32  15   as well?

15:33:33  16   A.   Yes, I did.

15:33:33  17   Q.   And that was because you were trying to help him do as well

15:33:39  18   as he could with his horse?

15:33:40  19   A.   Yeah.  And, I mean, it also looked good for me.

15:33:45  20   Q.   Now, at the trials, you know that Mr. Piloto won his heat of

15:33:55  21   the trials.

15:33:56  22   A.   Yes, sir.

15:33:58  23   Q.   And he won by about half a length, didn't he?  Or do you

15:34:02  24   remember?

15:34:02  25   A.   I don't remember, to be honest.  I know he won his trial.

15:34:05   1   Q.   Okay.  But as it was, his time was tenth of those 220

15:34:12   2   horses?

15:34:13   3   A.   Yes, sir, it was.

15:34:14   4   Q.   So the horses that qualified for the main event, the biggest

15:34:20   5   race in quarter horse racing, is horse -- Mr. Piloto is actually

15:34:24   6   the slowest one that made it to the final?

15:34:27   7   A.   Yes.

15:34:27   8   Q.   Now, have you been to a lot of horse races?

15:34:30   9   A.   Yes, I have.

15:34:31   10  Q.   Have you noticed that very often, a horse that wins is not

15:34:35   11  the favorite horse?

15:34:36   12  A.   Normally the fastest qualifier is usually -- not always but

15:34:43   13  usually tends to be the favorite in the race.

15:34:45   14  Q.   And among horses, we have the ten fastest quarter horses in

15:34:49   15  America, the ten that qualify, any of those ten have a chance of

15:34:53   16  winning?

15:34:54   17  A.   Oh, yeah.

15:34:55   18  Q.   But you would expect that the top qualifier would be up near

15:34:59   19  the front somewhere?

15:35:00   20  A.   Yes, sir.

15:35:00   21  Q.   So you know that the trial, trials, the 22 of them, they

15:35:09   22  were held three weeks before the All American Futurity, correct?

15:35:16   23  A.   About, yes, sir.

15:35:17   24  Q.   Okay.  And so, for those last three weeks, the owners, the

15:35:24   25  trainers of those ten fastest horses were devoting everything to

| | | |
|---|---|---|
| 15:35:29 | 1 | getting ready for that big race? |
| 15:35:31 | 2 | A.    Yes, sir. |
| 15:35:33 | 3 | Q.    And you know that during that three-week interim -- well, |
| 15:35:38 | 4 | you learned later, Fernando Garcia actually sold Mr. Piloto for a |
| 15:35:43 | 5 | profit to Jose Trevino? |
| 15:35:47 | 6 | A.    Yes, sir. |
| 15:35:49 | 7 | Q.    And you were hired, because you're a licensed trainer, to |
| 15:35:54 | 8 | come in to be what you call the program trainer? |
| 15:35:57 | 9 | A.    Yes, sir. |
| 15:35:58 | 10 | Q.    And that means you're the trainer who would be listed in the |
| 15:36:01 | 11 | program for the race? |
| 15:36:02 | 12 | A.    Yes, sir. |
| 15:36:02 | 13 | Q.    And every one of us if we were there watching the race or |
| 15:36:05 | 14 | bought a program, we'd see that you were the listed trainer for |
| 15:36:09 | 15 | Mr. Piloto? |
| 15:36:10 | 16 | A.    Yes, sir. |
| 15:36:11 | 17 | Q.    And if he did really well, that would look really good for |
| 15:36:14 | 18 | you, wouldn't it? |
| 15:36:15 | 19 | A.    Yes, sir. |
| 15:36:16 | 20 | Q.    I mean, certainly it enhances your credentials to say, oh, |
| 15:36:20 | 21 | by the way, my horse won the biggest race in America? |
| 15:36:23 | 22 | A.    Yes, sir. |
| 15:36:24 | 23 | Q.    Okay.  And Mr. Piloto did win, didn't he? |
| 15:36:29 | 24 | A.    Yes, he did. |
| 15:36:30 | 25 | Q.    We've actually seen the videotape of that race and you |

| | | |
|---|---|---|
| 15:36:35 | 1 | recall seeing the race, don't you? |
| 15:36:36 | 2 | A.   Yes, I do. |
| 15:36:37 | 3 | Q.   To win a race like that, to win one where you had to |
| 15:36:48 | 4 | overtake the field the way Mr. Piloto did, it takes raw speed, |
| 15:36:53 | 5 | doesn't it? |
| 15:36:55 | 6 | A.   Yes. |
| 15:36:57 | 7 | Q.   And just like a human athlete that's racing, it appears the |
| 15:37:03 | 8 | horse knows that it should try to win the race, correct? |
| 15:37:05 | 9 | A.   Yes. |
| 15:37:06 | 10 | Q.   And you'll see horses that will give everything they have to |
| 15:37:09 | 11 | eke out a victory, however close? |
| 15:37:11 | 12 | A.   Yes. |
| 15:37:12 | 13 | Q.   And you saw Mr. Piloto do that? |
| 15:37:14 | 14 | A.   Yes, I did. |
| 15:37:15 | 15 | Q.   Now, after Mr. Piloto won the All American Futurity, the |
| 15:37:27 | 16 | owner, the trainer, people associated with his victory received |
| 15:37:33 | 17 | awards, didn't they? |
| 15:37:34 | 18 | A.   Yes, they did. |
| 15:37:35 | 19 | Q.   One of the awards for the trainer would be a monetary prize |
| 15:37:41 | 20 | for training the winning horse? |
| 15:37:42 | 21 | A.   Yes. |
| 15:37:43 | 22 | Q.   You'd also get your picture made in the winner's circle with |
| 15:37:48 | 23 | a champion? |
| 15:37:49 | 24 | A.   Yes. |
| 15:37:51 | 25 | Q.   And, again, that's something you could put in ads, you could |

15:37:53   1   post it at your stable.  You could share, oh, by the way, this is

15:37:58   2   me with Mr. Piloto, who I trained who won the biggest race horse

15:38:00   3   in America?

15:38:02   4   A.   Yes.

15:38:02   5   Q.   Okay.  And you also got a belt buckle that said you trained

15:38:08   6   the winning horse, correct?

15:38:10   7   A.   Yes, sir.

15:38:11   8   Q.   Tell the jury what you did with that belt buckle.

15:38:14   9   A.   I gave it to Fernando Garcia.

15:38:15  10   Q.   You gave it to Fernando because you -- actually, he's the

15:38:18  11   one that really did most of the actual training?

15:38:20  12   A.   Yes, sir.

15:38:20  13   Q.   And you felt that would be appropriate?

15:38:22  14   A.   Yes, sir.

15:38:22  15   Q.   Now, a futurity is a horse race for two-year-olds; is that

15:38:33  16   right?

15:38:33  17   A.   Yes, it is.

15:38:34  18   Q.   And the racing life of a horse, is it normally two years?

15:38:42  19   Ages two and three?

15:38:43  20   A.   What do you mean?

15:38:46  21   Q.   The career of a race horse.  I mean, other things equal,

15:38:49  22   let's assume they don't win a big race.  If a horse is racing and

15:38:52  23   racing and racing, they run as two-year-olds and three-year-olds;

15:38:56  24   is that correct?

15:38:56  25   A.   They run till -- there's horses that are eight,

| | | |
|---|---|---|
| 15:39:00 | 1 | nine-year-old running. |
| 15:39:01 | 2 | Q.   Fast horses or not? |
| 15:39:02 | 3 | A.   Yeah.  The Champions, it's another prestigious race is |
| 15:39:07 | 4 | composed of horses four-year-olds and upward.  It doesn't have an |
| 15:39:10 | 5 | age limit. |
| 15:39:11 | 6 | Q.   But compared to the life of a horse, would you agree that |
| 15:39:14 | 7 | its racing life is a fairly small percentage of its overall life? |
| 15:39:19 | 8 | A.   Yes. |
| 15:39:20 | 9 | Q.   Because a race horse, like saddle horses, may live to be 25? |
| 15:39:24 | 10 | A.   Yes. |
| 15:39:26 | 11 | Q.   If a horse wins a really big race, like the biggest race in |
| 15:39:33 | 12 | America, you have noticed that oftentimes that horse will retire |
| 15:39:38 | 13 | from racing, correct? |
| 15:39:39 | 14 | A.   Yes. |
| 15:39:39 | 15 | Q.   Tell the jury why a horse would retire after winning the |
| 15:39:42 | 16 | biggest race in America. |
| 15:39:44 | 17 | A.   Retires because it's -- I mean, the prestige of the horse is |
| 15:39:48 | 18 | -- the last thing you remember is the horse winning the biggest |
| 15:39:51 | 19 | race in quarter horse history. |
| 15:39:53 | 20 | Q.   And when a horse retires, do we turn it into glue and dog |
| 15:39:58 | 21 | food or feed it to the British at Burger King?  Or does he start |
| 15:40:06 | 22 | breeding? |
| 15:40:06 | 23 | A.   It all depends. |
| 15:40:07 | 24 | Q.   If it's a stallion? |
| 15:40:08 | 25 | A.   If it's a stallion, obviously you could start breeding. |

| | | |
|---|---|---|
| 15:40:11 | 1 | Q.   And a champion horse, let's say he won the biggest race in |
| 15:40:16 | 2 | America and he's only two years old, he can breed and make money |
| 15:40:23 | 3 | for his owner until he dies. |
| 15:40:27 | 4 | A.   Yes. |
| 15:40:28 | 5 | Q.   So that could go on for another 23 years or so? |
| 15:40:31 | 6 | A.   Yes, sir. |
| 15:40:33 | 7 | Q.   And you know that Mr. Piloto was sired by Mr. Jess Perry. |
| 15:40:42 | 8 | You know that? |
| 15:40:42 | 9 | A.   Yes, sir. |
| 15:40:43 | 10 | Q.   And Mr. Jess Perry is a famous horse for breeding purposes? |
| 15:40:49 | 11 | A.   Yes, sir. |
| 15:40:50 | 12 | Q.   The dam in that case was Ms. Pilot Point or Pilot's Point. |
| 15:41:00 | 13 | She is a very famous mare quarter horse racing? |
| 15:41:06 | 14 | A.   Yes. |
| 15:41:07 | 15 | Q.   And so, if someone were looking at a horse to use for |
| 15:41:14 | 16 | breeding, a stallion to breed their mare with, if you know the |
| 15:41:19 | 17 | particular horse -- is the foal or the offspring of Mr. Jess |
| 15:41:28 | 18 | Perry and Ms. Pilot's Point, if you know nothing else about a |
| 15:41:35 | 19 | horse, you would think a horse should have -- that offspring |
| 15:41:37 | 20 | should have some potential as a breeding stallion, correct? |
| 15:41:40 | 21 | A.   Yes. |
| 15:41:41 | 22 | Q.   And if you also hear that, oh, by the way, that horse won |
| 15:41:47 | 23 | the All American Futurity, you would think, well, that should be |
| 15:41:50 | 24 | a really valuable horse for breeding? |
| 15:41:52 | 25 | A.   Yes.  That is. |

15:41:55   1   Q.   Because having won the All American Futurity, it's proof
15:42:00   2   that those genetics for speed and that personality to win were
15:42:07   3   passed on from Mr. Jess Perry and Ms. Pilot's Point to
15:42:14   4   Mr. Piloto?
15:42:14   5   A.   Yes.
15:42:16   6   Q.   So if you're looking to breed your mare or a mare with a
15:42:22   7   stallion, Mr. Piloto should be pretty high on the list, shouldn't
15:42:29   8   he?
15:42:29   9   A.   Yes.
15:42:30   10   Q.   Okay.  And we've heard testimony about Corona Cartel.  You
15:42:34   11   know of Corona Cartel?
15:42:35   12   A.   Yes.  I do.
15:42:36   13   Q.   That's another great horse, isn't it?
15:42:38   14   A.   Yes.
15:42:39   15   Q.   You know Bruce Wise?
15:42:42   16   A.   Who?
15:42:43   17   Q.   Bruce Wise with the -- Butch Wise?
15:42:46   18   A.   Butch.
15:42:46   19   Q.   Butch Wise with the Lazy E Ranch?
15:42:50   20   A.   Yes, I do.
15:42:51   21   Q.   He's already testified.  Would it surprise you to know that
15:42:54   22   Corona Cartel is syndicated for $12 million?
15:43:03   23   A.   Uh-huh.
15:43:06   24   Q.   And a syndication only lasts about three years?  A
15:43:10   25   syndication?

15:43:11    1    A.    I do not -- I don't know.

15:43:13    2    Q.    Okay.

15:43:13    3    A.    I don't know details about syndications.

15:43:15    4    Q.    Okay.  We've had testimony from other witnesses that at

15:43:20    5    least where they do it, it's a three-year term.  If a horse is

15:43:24    6    two years old or three years old and it goes into syndication and

15:43:29    7    let's just making $12 million a syndication, if those are three

15:43:34    8    years, theoretically that horse could do like eight syndications,

15:43:39    9    correct?

15:43:39   10    A.    Yes, sir.

15:43:40   11    Q.    And if it's $12 million at a time, that's 100 -- about $100

15:43:46   12    million in syndication that a stallion could produce, correct?

15:43:50   13    A.    Right.

15:43:51   14    Q.    Would you agree with me that if you're trying to figure the

15:43:55   15    real value of a racing quarter horse, the earnings it might have

15:44:02   16    won in a race, even a big race was a million dollars, that might

15:44:07   17    be only one percent of what the horse is actually worth breeding.

15:44:13   18    A.    Yes.

15:44:14   19    Q.    Is that right?

15:44:14   20    A.    Yes.

15:44:15   21    Q.    And Mr. Corona Cartel, by the way, he never won the All

15:44:20   22    American Futurity, did he?

15:44:20   23    A.    No.  He didn't.

15:44:22   24    Q.    I want to make sure I've asked you everything I wanted to

15:44:46   25    ask you on here.

15:45:06  1          A little bird reminded me of some questions.  Going

15:45:18  2   back to the trials and the race, the All American Futurity, are

15:45:26  3   all 22 heats -- were they all run the same day?

15:45:31  4   A.   Yes, it is.  They do, I'm sorry.

15:45:33  5   Q.   Did they start like in the morning and go up into the

15:45:36  6   afternoon?

15:45:36  7   A.   Yes.  They start early, probably like around 11:00 or 10:30

15:45:40  8   in the morning and went all the way until, I don't know, 4:30,

15:45:45  9   5:30.  I don't remember exactly the time.

15:45:47  10  Q.   And did you notice that the weather conditions like wind,

15:45:51  11  like headwind, tailwind, crosswind -- did the conditions change

15:45:55  12  throughout the day?

15:45:55  13  A.   Yes.  Especially in Ruidoso, yes, they do.

15:45:58  14  Q.   And so, during the trials, some horses may have had an

15:46:00  15  advantage like a tailwind in their heat whereas other heats had a

15:46:07  16  headwind?

15:46:08  17  A.   Yes.

15:46:10  18  Q.   But for the big race, the All American Futurity, that's just

15:46:16  19  one heat, correct?

15:46:17  20  A.   It's just one race.

15:46:18  21  Q.   It's just the one race?

15:46:19  22  A.   Yes.

15:46:19  23  Q.   And so, by definition, that one race for that 20 seconds,

15:46:24  24  all the horses are running in the exact same conditions, correct?

15:46:27  25  A.   Yes.

| | | |
|---|---|---|
| 15:46:28 | 1 | Q.   Sir, I have no further questions. |
| 15:46:35 | 2 | THE COURT:  Mr. Esper. |
| 15:46:38 | 3 | MR. ESPER:  Very briefly, your Honor. |
| 15:46:39 | 4 | CROSS-EXAMINATION |
| 15:46:39 | 5 | BY MR. ESPER: |
| 15:46:41 | 6 | Q.   Mr. Quintero, I believe you said that Mr. Nayen, you never |
| 15:46:49 | 7 | sent him any invoices.  He just paid you in cash? |
| 15:46:53 | 8 | A.   Cash or check. |
| 15:46:55 | 9 | Q.   Okay.  But would you just verbally communicate or would you |
| 15:46:58 | 10 | send him an e-mail? |
| 15:46:59 | 11 | A.   No.  Just verbally communicated. |
| 15:47:01 | 12 | Q.   Okay.  And then, he would either pay you in cash or check? |
| 15:47:04 | 13 | A.   I think he paid me in check once or twice, but mostly, it |
| 15:47:09 | 14 | was cash.  For him, specifically, I only trained for him from |
| 15:47:13 | 15 | January 1st of 2012 till the day of the raid, which was -- |
| 15:47:19 | 16 | probably a week after, which was March. |
| 15:47:21 | 17 | Q.   So you trained for about three months for him? |
| 15:47:22 | 18 | A.   Three months.  Yes. |
| 15:47:23 | 19 | Q.   And how much of a bill did he accumulate with you for your |
| 15:47:29 | 20 | training fees, more or less? |
| 15:47:32 | 21 | A.   He still owed me about $2,200 when he -- I don't know if |
| 15:47:37 | 22 | that's the question.  But he paid me prior to that. |
| 15:47:41 | 23 | Q.   How much did he pay you? |
| 15:47:42 | 24 | A.   It was about -- I really don't know to be honest. |
| 15:47:49 | 25 | Q.   More than $10,000? |

| | | |
|--|--|--|
| 15:47:51 | 1 | A.    No. |
| 15:47:52 | 2 | Q.    Less than that? |
| 15:47:53 | 3 | A.    Yes. |
| 15:47:53 | 4 | Q.    And when he paid you cash, did you deposit the cash? |
| 15:47:56 | 5 | A.    No.  I would -- sometimes I would need it for my own |
| 15:47:59 | 6 | expenses.  It depends when he paid me.  Maybe I just needed it to |
| 15:48:04 | 7 | pay my workers or. |
| 15:48:06 | 8 | Q.    Okay.  Who was it that you allowed to deposit money into |
| 15:48:10 | 9 | your bank account in cash? |
| 15:48:13 | 10 | A.    It was Mr. Cabrera account. |
| 15:48:16 | 11 | Q.    Who? |
| 15:48:17 | 12 | A.    Mr. Cabrera account. |
| 15:48:18 | 13 | Q.    Mr. Cabrera? |
| 15:48:19 | 14 | A.    Accountant.  An e-mail. |
| 15:48:21 | 15 | Q.    Okay. |
| 15:48:22 | 16 | A.    Some of the e-mails. |
| 15:48:24 | 17 | Q.    Did you know who that person was? |
| 15:48:26 | 18 | A.    I have never met him before. |
| 15:48:28 | 19 | Q.    And you allowed that person to deposit cash into an account |
| 15:48:33 | 20 | controlled by you, correct? |
| 15:48:34 | 21 | A.    Yes, sir. |
| 15:48:35 | 22 | Q.    And did you give this person the account number and bank? |
| 15:48:38 | 23 | A.    Yes, sir, I did. |
| 15:48:39 | 24 | Q.    Okay.  And, all of a sudden, cash deposits come into your |
| 15:48:43 | 25 | account for payment of your training fees and expenses, correct? |

15:48:47  1   A.   Yes, sir.

15:48:47  2   Q.   Okay.  Did you know what structuring was before this time

15:48:54  3   period?

15:48:56  4   A.   No.

15:48:56  5   Q.   Had no idea?

15:48:57  6   A.   Had no idea.

15:48:58  7   Q.   Okay.  Then whenever you pled guilty, you said you gave a --

15:49:04  8   earlier, you gave a definition, which was you allowed people to

15:49:08  9   deposit money into your bank account so that they could hide the

15:49:13  10  source of the money or to avoid having the bank file a report.

15:49:19  11  A.   Yes.

15:49:20  12  Q.   Remember that?

15:49:21  13  A.   Yes.

15:49:21  14  Q.   You didn't know that back when you were getting that money,

15:49:24  15  did you?

15:49:25  16  A.   No, sir.  I didn't.

15:49:25  17  Q.   Did you -- whenever you are having this money deposited into

15:49:32  18  your account, did that -- somebody tell you, hey, I'm depositing

15:49:36  19  money less than 10,000 so I, the person depositing it, don't have

15:49:40  20  to fill out a report?

15:49:42  21  A.   No, sir.

15:49:43  22  Q.   Okay.  Nobody told you that?

15:49:44  23  A.   No, sir.

15:49:45  24  Q.   Okay.  If someone had told you that, would that have alarmed

15:49:48  25  you?

15:49:48  1    A.    Most definitely.   Yes.

15:49:51  2    Q.    But you didn't know that that was a violation of any federal

15:49:56  3    law for somebody to avoid a report being filed by depositing less

15:50:01  4    than 10,000 into your account unless you agreed to it, also,

15:50:06  5    correct?

15:50:07  6    A.    Yes, sir.

15:50:07  7    Q.    Okay.   Now, how much did you bill per day?   Does it vary

15:50:13  8    with owner to owner and horse to horse?

15:50:15  9    A.    Yes, it does.

15:50:17  10   Q.    Okay.   $45 to $100 a day?   Does that sound about right?

15:50:20  11   A.    No, sir.

15:50:21  12   Q.    What did your --

15:50:22  13   A.    My max is $45 a day.

15:50:23  14   Q.    $45 a day?

15:50:24  15   A.    Yes, sir.

15:50:25  16   Q.    And if you have a horse for a month, you bill for 30 days or

15:50:29  17   28 days, or something like that.

15:50:30  18   A.    Yeah.   It all depends how long I have the horse for.

15:50:32  19   Q.    So basically it's anywhere from a thousand to $1,200 a

15:50:35  20   month?

15:50:36  21   A.    About.

15:50:36  22   Q.    And tell the ladies and gentlemen of the jury what that

15:50:39  23   includes.

15:50:41  24   A.    Well, just the $45 a day includes as far as taking care of

15:50:46  25   the horse, feeding the horse, cleaning the horse, and exercising

| | | |
|---|---|---|
| 15:50:49 | 1 | the horse. |
| 15:50:50 | 2 | Q.   Okay.  And do you work out at -- did you work out at Los |
| 15:50:55 | 3 | Alamitos? |
| 15:50:55 | 4 | A.   That's where I was based at, yes. |
| 15:50:56 | 5 | Q.   And that's a pretty big facility, is it not? |
| 15:50:58 | 6 | A.   Yes, it is. |
| 15:50:59 | 7 | Q.   They have onsite vets; is that correct? |
| 15:51:01 | 8 | A.   Yes, they do. |
| 15:51:02 | 9 | Q.   So if a horse you're training needs veterinary care, you |
| 15:51:06 | 10 | take him to the vet and then, the vet, does he bill you or does |
| 15:51:10 | 11 | he bill the owner? |
| 15:51:11 | 12 | A.   It all depends what -- |
| 15:51:12 | 13 | Q.   The arrangements. |
| 15:51:14 | 14 | A.   The arrangements you have with the owners.  Yes. |
| 15:51:16 | 15 | Q.   Okay.  And your fees don't include vitamins, correct? |
| 15:51:20 | 16 | A.   Yes, they do. |
| 15:51:21 | 17 | Q.   They do? |
| 15:51:21 | 18 | A.   At my barn, it does.  Yes. |
| 15:51:23 | 19 | Q.   In your barn, okay? |
| 15:51:24 | 20 | A.   As well as supplemental vitamins as far as their feed goes, |
| 15:51:29 | 21 | yes. |
| 15:51:29 | 22 | Q.   I think you said you took a horse to New Orleans, is that |
| 15:51:32 | 23 | correct, to race? |
| 15:51:32 | 24 | A.   Yes, I did. |
| 15:51:33 | 25 | Q.   Now, do you charge the owner for those fees to haul that |

| | | |
|---|---|---|
| 15:51:38 | 1 | horse all the way to New Orleans? |
| 15:51:39 | 2 | A.   Yes, I do. |
| 15:51:39 | 3 | Q.   Okay.  And that's pretty substantial fees, is it not? |
| 15:51:42 | 4 | A.   Yeah.  Haul them to New Orleans is about $2,000, I think. |
| 15:51:46 | 5 | Depends also who you contract to do. |
| 15:51:50 | 6 | Q.   So, in other words, you charge for gas and all of that |
| 15:51:53 | 7 | stuff? |
| 15:51:53 | 8 | A.   Yes.  Expenses. |
| 15:51:54 | 9 | Q.   Hotels and all that. |
| 15:51:56 | 10 | A.   Yes. |
| 15:51:56 | 11 | Q.   And so, in addition, what about shoes and saddles? |
| 15:52:01 | 12 | A.   Yeah.  That's extra on the bill. |
| 15:52:02 | 13 | Q.   That's all extra? |
| 15:52:03 | 14 | A.   Yes. |
| 15:52:04 | 15 | Q.   Okay.  And you would bill an owner for that and hopefully |
| 15:52:07 | 16 | the owner pays you? |
| 15:52:09 | 17 | A.   Yes. |
| 15:52:09 | 18 | Q.   Okay.  May I have just one moment, your Honor?  That's all I |
| 15:52:18 | 19 | have, your Honor. |
| 15:52:20 | 20 | THE COURT:  Mr. Mayr. |
| 15:52:21 | 21 | MR. MAYR:  Thank you, your Honor. |
| 15:52:22 | 22 | CROSS-EXAMINATION |
| 15:52:22 | 23 | BY MR. MAYR: |
| 15:52:27 | 24 | Q.   Mr. Quintero, were you a one-man operation?  Did you have |
| 15:52:31 | 25 | other employees working with you? |

| 15:52:32 | 1 | A.   I had other employees. |
| 15:52:33 | 2 | Q.   Did you have someone working as sort of maybe like a |
| 15:52:36 | 3 | bookkeeper or someone to prepare the invoices and send them out? |
| 15:52:39 | 4 | A.   No, sir.  I did that all myself. |
| 15:52:40 | 5 | Q.   You were in charge of all that? |
| 15:52:41 | 6 | A.   Yes. |
| 15:52:42 | 7 | Q.   And we saw that in some of these e-mails that were |
| 15:52:44 | 8 | previously admitted as 358H, some of them had attachments with |
| 15:52:49 | 9 | invoices, right? |
| 15:52:50 | 10 | A.   Yes, sir. |
| 15:52:50 | 11 | Q.   You prepared these invoices? |
| 15:52:52 | 12 | A.   Yes, sir. |
| 15:52:53 | 13 | Q.   You would e-mail them to whomever? |
| 15:52:56 | 14 | A.   Yes, sir. |
| 15:52:57 | 15 | Q.   And then, when the person would pay them, you would collect |
| 15:52:59 | 16 | that money or you would verify the deposit was made? |
| 15:53:03 | 17 | A.   Yes, sir. |
| 15:53:03 | 18 | Q.   You didn't have anyone else doing that for you? |
| 15:53:05 | 19 | A.   No, sir. |
| 15:53:06 | 20 | Q.   Okay.  Now, I want to go back to some questions that Mr. |
| 15:53:10 | 21 | Esper was asking you about with your plea.  You pled guilty to |
| 15:53:17 | 22 | the structuring offense; is that right? |
| 15:53:20 | 23 | A.   Yes, I did. |
| 15:53:21 | 24 | Q.   And you received probation for that? |
| 15:53:23 | 25 | A.   Yes, sir. |

| | | |
|---|---|---|
| 15:53:24 | 1 | MR. GARDNER:  Your Honor, that's a misstatement of the |
| 15:53:25 | 2 | facts. |
| 15:53:26 | 3 | MR. MAYR:  Oh, I'm sorry.  Let me restate the question. |
| 15:53:28 | 4 | I apologize, Mr. Gardner. |
| 15:53:30 | 5 | Q.   (BY MR. MAYR) The government has offered to recommend that |
| 15:53:32 | 6 | you receive probation. |
| 15:53:33 | 7 | A.   Oh, yes, sir. |
| 15:53:34 | 8 | Q.   Thank you.  Okay. |
| 15:53:35 | 9 | Now, you told Mr. Esper that at the time that these |
| 15:53:41 | 10 | transactions were coming into your account, you didn't know that |
| 15:53:47 | 11 | what was being done was illegal; is that right? |
| 15:53:49 | 12 | A.   No, sir. |
| 15:53:50 | 13 | Q.   You learned that after the fact? |
| 15:53:52 | 14 | A.   Yes, sir. |
| 15:53:54 | 15 | Q.   So my question to you is, if you didn't know at the time |
| 15:53:57 | 16 | that it was illegal before anything illegal was happening, why |
| 15:54:02 | 17 | did you plead guilty? |
| 15:54:04 | 18 | MR. GARDNER:  Your Honor, we object.  It's improper. |
| 15:54:06 | 19 | The defendant has pled guilty.  Improper question. |
| 15:54:11 | 20 | THE COURT:  Are you going to take over his |
| 15:54:13 | 21 | representation, counsel? |
| 15:54:14 | 22 | MR. MAYR:  I'm not, Judge.  I'm just trying -- |
| 15:54:16 | 23 | THE COURT:  Well, then move on. |
| 15:54:17 | 24 | MR. MAYR:  Okay. |
| 15:54:20 | 25 | THE COURT:  That's a problem for the Court. |

| | | |
|---|---|---|
| 15:54:24 | 1 | MR. MAYR:  I'll move on, your Honor. |
| 15:54:25 | 2 | Q.   (BY MR. MAYR) Now, Mr. Quintero, you being in the racing |
| 15:54:30 | 3 | business, you were familiar with other -- many other race |
| 15:54:32 | 4 | trainers out there; is that right? |
| 15:54:34 | 5 | A.   I don't understand your question. |
| 15:54:36 | 6 | Q.   I mean, you're familiar with other horse trainers? |
| 15:54:39 | 7 | A.   Oh, yes. |
| 15:54:40 | 8 | Q.   You know who "Chevo" Huitron is, right? |
| 15:54:45 | 9 | A.   I have heard of him. |
| 15:54:45 | 10 | Q.   Okay.  Have you ever heard of Jesus Huitron being a race |
| 15:54:50 | 11 | trainer? |
| 15:54:50 | 12 | A.   Never. |
| 15:54:51 | 13 | Q.   I have no further questions, your Honor. |
| 15:54:55 | 14 | RE-DIRECT EXAMINATION |
| 15:54:55 | 15 | BY MR. GARDNER: |
| 15:54:58 | 16 | Q.   Mr. Quintero, you didn't actually physically take, say, |
| 15:55:02 | 17 | $20,000 and deposit it into the bank in less than $10,000 |
| 15:55:07 | 18 | increments? |
| 15:55:07 | 19 | A.   No, sir. |
| 15:55:08 | 20 | Q.   You've never done that? |
| 15:55:10 | 21 | A.   I don't recall. |
| 15:55:11 | 22 | Q.   Have you ever heard the phrase "ignorance is no defense of |
| 15:55:14 | 23 | the law"? |
| 15:55:15 | 24 | A.   No, sir. |
| 15:55:16 | 25 | MR. ESPER:  Objection, your Honor.  That calls for a |

15:55:17  1  legal conclusion.

15:55:18  2          THE COURT:  I don't know if it's a legal conclusion,

15:55:20  3  but we're moving away from that issue.

15:55:23  4          MR. GARDNER:  Yes, sir.

15:55:24  5  Q.  (BY MR. GARDNER) What was Mr. Piloto's time in terms of all

15:55:30  6  the All American Futurities?

15:55:33  7  A.  I don't understand your question.

15:55:35  8  Q.  Did he have the slowest time in the history --

15:55:38  9  A.  Yes.  For the final.

15:55:39  10  Q.  The final?

15:55:40  11  A.  Yes, sir, he did.

15:55:52  12  Q.  Mr. Quintero, I'm showing you Government's Exhibit 2B, taken

15:55:55  13  from the Lexington-Jose Trevino search warrant.  Do you recognize

15:55:59  14  that, sir?

15:55:59  15  A.  Yes, sir, I do.

15:56:00  16  Q.  I want to turn your attention -- your Honor, may I have the

15:56:05  17  witness step down?

15:56:06  18          THE COURT:  You may.

15:56:08  19  Q.  (BY MR. GARDNER) If you'll come over here, Mr. Quintero.

15:56:13  20  Step to this side, please.

15:56:16  21          MR. FINN:  Your Honor, could I migrate over to see

15:56:18  22  this?

15:56:18  23          THE COURT:  Yes, sure.

15:56:21  24          MR. FINN:  Thank you.

15:56:22  25  Q.  (BY MR. GARDNER) What is this a photo of right here in the

15:56:26   1   center?

15:56:26   2   A.    That's the winner's circle.

15:56:28   3   Q.    The winner's circle.  Who generally gets into the winner's

15:56:32   4   circle picture?

15:56:32   5   A.    For big races we don't have it.  I mean, generally it's just

15:56:36   6   owners, trainers, friends, family.

15:56:39   7   Q.    And I want you to help me identify some individuals here.

15:56:42   8   Who is this individual right here?

15:56:44   9   A.    Mr. Jose Trevino.

15:56:46   10  Q.    Who is this individual right here?

15:56:49   11  A.    Which one?

15:56:49   12  Q.    That one right there?

15:56:50   13  A.    Oh, Carlos Nayen.

15:56:51   14  Q.    Who is the next gentleman on his right?

15:56:53   15  A.    That's Raul Ramirez.

15:56:55   16  Q.    Who is that on his right?

15:56:57   17  A.    Fernando.

15:56:58   18  Q.    And are you in here behind this individual?

15:57:03   19  A.    Right there.

15:57:05   20  Q.    So you are in this photo, correct?

15:57:07   21  A.    Yes, sir, I am.

15:57:07   22  Q.    All right.  Thank you, Mr. Quintero.  I'll ask you to step

15:57:11   23  back.  Thank you.

15:57:14   24         Now, at that point, Mr. Quintero, who owns Mr. Piloto?

15:57:19   25  A.    For the final?

| | | |
|---|---|---|
| 15:57:20 | 1 | Q.   For the final, yes. |
| 15:57:21 | 2 | A.   Mr. Jose Trevino. |
| 15:57:23 | 3 | Q.   And when Mr. Esper asked you about syndication -- I'm sorry, |
| 15:57:29 | 4 | Mr. Womack.  When Mr. Womack asked you about syndication, a lot |
| 15:57:34 | 5 | of that depends on the success of the first crop.  Would that be |
| 15:57:39 | 6 | correct? |
| 15:57:42 | 7 | A.   It varies.  I mean, it's not -- there's not a certain rules |
| 15:57:45 | 8 | that stand for, you know, we have to wait till its first crop or |
| 15:57:51 | 9 | -- a horse can, right after running, he can be syndicated or |
| 15:57:54 | 10 | after the first crop can be syndicated. |
| 15:57:57 | 11 | Q.   I guess my question is, is there any guarantee that a horse |
| 15:58:01 | 12 | winning the All American is going to have a successful stallion? |
| 15:58:06 | 13 | A.   No guarantees. |
| 15:58:07 | 14 | Q.   And so, if you have a horse with the slowest winning time in |
| 15:58:10 | 15 | the entire history of the All American, what is another reason |
| 15:58:13 | 16 | not to run that horse again? |
| 15:58:17 | 17 | A.   Injuries.  There's a lot of reasons. |
| 15:58:21 | 18 | Q.   What about if the horse loses its next race? |
| 15:58:24 | 19 | A.   It can affect them in the breeding.  It could. |
| 15:58:29 | 20 | Q.   So, again, I showed you Government's Exhibit 2B.  That was |
| 15:58:31 | 21 | the winner's circle photo? |
| 15:58:33 | 22 | A.   Yes, sir. |
| 15:58:33 | 23 | Q.   And your testimony was that Jose Trevino was the owner at |
| 15:58:35 | 24 | that time? |
| 15:58:35 | 25 | A.   Yes, sir. |

| | | |
|---|---|---|
| 15:58:36 | 1 | Q.   I'm showing you Government's Exhibit 102J.  If you'll look |
| 15:58:48 | 2 | at your screen, Mr. Quintero, I'm going to point up here at the |
| 15:58:51 | 3 | big screen with the laser pointer, follow with me. |
| 15:58:55 | 4 |           Who is that individual right there? |
| 15:58:56 | 5 | A.   Jose Trevino. |
| 15:58:58 | 6 | Q.   Okay.  And here on this winner's circle photo, Garcia |
| 15:59:03 | 7 | Bloodstock is the owner? |
| 15:59:04 | 8 | A.   Yes, sir. |
| 15:59:04 | 9 | Q.   Okay.  This is a photo from the trial that he won? |
| 15:59:09 | 10 | A.   Yes, sir. |
| 15:59:09 | 11 | Q.   Who is this individual? |
| 15:59:14 | 12 | A.   Carlos Nayen. |
| 15:59:16 | 13 | Q.   And the individual standing next to him? |
| 15:59:18 | 14 | A.   Looks like Raul Ramirez. |
| 15:59:19 | 15 | Q.   And who is Raul Ramirez? |
| 15:59:20 | 16 | A.   I believe he was a cowboy for the barn. |
| 15:59:27 | 17 | Q.   Whose barn? |
| 15:59:27 | 18 | A.   Mr. Fernando's barn. |
| 15:59:30 | 19 | Q.   And who is that? |
| 15:59:30 | 20 | A.   That's Fernando Garcia. |
| 15:59:31 | 21 | Q.   And that? |
| 15:59:32 | 22 | A.   That's me. |
| 15:59:32 | 23 | Q.   And who is this individual? |
| 15:59:34 | 24 | A.   They called him "Negro." |
| 15:59:38 | 25 | Q.   "El Negro"? |

```
15:59:39   1   A.   Yes, sir.

15:59:40   2   Q.   Now, you also mentioned that you were introduced to Jose

15:59:43   3   Trevino as the owner of another horse called Feature Honor?

15:59:45   4   A.   Yes, sir.

15:59:46   5   Q.   Did feature Honor win its trial?

15:59:48   6   A.   Yes, sir, he did.

15:59:48   7   Q.   Showing you Government's Exhibit 102K.  Would you agree with

15:59:53   8   me that this photo is almost identical to the photo from

15:59:57   9   Mr. Piloto?

15:59:57  10   A.   Yes, sir.

15:59:58  11   Q.   And, again, for the trials photos, who generally gets in

16:00:02  12   these photos?

16:00:04  13   A.   Friends, family, I mean, there's no certain rules saying

16:00:09  14   just you can get in this picture.

16:00:11  15   Q.   But friends and family?

16:00:13  16   A.   Yes, sir.

16:00:14  17   Q.   Showing you one of the three pictures from Government's

16:00:17  18   Exhibit 102A.  Again, are these the same individuals that were in

16:00:34  19   the previous two photos?

16:00:36  20   A.   Yes, sir.

16:00:37  21   Q.   Okay.  Two photos are Feature Honor, Mr. Piloto -- I'm

16:00:42  22   sorry, three photos, Mr. Piloto qualifier and Mr. Piloto finals?

16:00:46  23   A.   Yes, sir.

16:00:47  24        MR. WOMACK:  Your Honor, if we can get just an exhibit

16:00:49  25   number.
```

| 16:00:51 | 1 | MR. GARDNER:  This one is 102A.  There's three |
| 16:00:53 | 2 | photographs and 102A. |
| 16:00:56 | 3 | MR. WOMACK:  Thank you. |
| 16:00:57 | 4 | Q.  (BY MR. GARDNER) Where are these photographs taken, Mr. |
| 16:01:00 | 5 | Quintero? |
| 16:01:00 | 6 | A.  In the infield the day after the final race. |
| 16:01:05 | 7 | Q.  And who is this individual right here, holding the trophy? |
| 16:01:08 | 8 | A.  Mr. Jose Trevino. |
| 16:01:09 | 9 | Q.  Is Jose Trevino the listed owner at the time? |
| 16:01:11 | 10 | A.  Yes, sir. |
| 16:01:12 | 11 | Q.  And who is this individual? |
| 16:01:14 | 12 | A.  Raul Ramirez. |
| 16:01:15 | 13 | Q.  And this individual? |
| 16:01:16 | 14 | A.  Carlos Nayen. |
| 16:01:18 | 15 | Q.  And who is this individual on top of the horse? |
| 16:01:20 | 16 | A.  The jockey. |
| 16:01:21 | 17 | Q.  And what's his relation to Raul Ramirez? |
| 16:01:24 | 18 | A.  Brother. |
| 16:01:26 | 19 | Q.  Is that you? |
| 16:01:27 | 20 | A.  Yes, sir. |
| 16:01:27 | 21 | Q.  This individual? |
| 16:01:29 | 22 | A.  Fernando Garcia. |
| 16:01:29 | 23 | Q.  And this individual? |
| 16:01:31 | 24 | A.  "El Negro." |
| 16:01:32 | 25 | Q.  To your knowledge, did Carlos Nayen have any association |

16:01:35    1    with this horse in terms of the training or the ownership?

16:01:39    2    A.    Yes, sir.

16:01:39    3    Q.    And what association was that?

16:01:40    4    A.    He would give -- because he's also a trainer in Mexico, so

16:01:47    5    he would give his feedback to Fernando about training the horse.

16:01:54    6    Q.    Showing you 102J, again, Mr. Quintero.  I want you to note

16:01:59    7    the color of the jockey's silks.  In 102A, second picture, is

16:02:10    8    that the same set of silks?

16:02:11    9    A.    Yes, sir.

16:02:12   10    Q.    Why is Carlos Nayen wearing the silks of a horse if he

16:02:15   11    doesn't own it?

16:02:16   12    A.    I have no idea.

16:02:21   13    Q.    And another picture from 102A, where was this picture taken?

16:02:28   14    A.    That was before getting to the saddling tack of the All

16:02:35   15    American final.

16:02:36   16    Q.    And who is that individual?

16:02:36   17    A.    That's Fernando Garcia.

16:02:38   18    Q.    That's far left and to the right of him?

16:02:40   19    A.    Carlos Nayen.

16:02:41   20    Q.    And to the right of Carlos Nayen?

16:02:42   21    A.    Raul Ramirez.

16:02:44   22    Q.    And this individual?

16:02:44   23    A.    That's me.

16:02:51   24    Q.    Now, had you attended an auction at Heritage Place in 2011?

16:02:58   25    A.    Yes, sir, I did.

213

| | | |
|---|---|---|
| 16:02:59 | 1 | Q.   And at that auction, was Carlos Nayen present? |
| 16:03:03 | 2 | A.   Yes, he was. |
| 16:03:04 | 3 | Q.   And did he give you any instructions? |
| 16:03:06 | 4 | A.   Yes.  He asked me to buy some horses. |
| 16:03:09 | 5 | Q.   And were there other people at that auction buying horses on |
| 16:03:13 | 6 | behalf of Carlos Nayen? |
| 16:03:14 | 7 | A.   Yes, there was. |
| 16:03:16 | 8 | Q.   Okay.  And whose address was provided for the purchase of |
| 16:03:19 | 9 | all those horses at that 2011 -- |
| 16:03:21 | 10 | A.   My name.  My address. |
| 16:03:23 | 11 | Q.   Your address? |
| 16:03:24 | 12 | A.   Yes, sir. |
| 16:03:24 | 13 | Q.   And why are all the various persons bidding on horses |
| 16:03:30 | 14 | putting your address on the purchase slip? |
| 16:03:33 | 15 | A.   At the moment, I was told that the address was put on there |
| 16:03:37 | 16 | because I was -- |
| 16:03:39 | 17 |         MS. WILLIAMS:  I object to hearsay. |
| 16:03:40 | 18 | Q.   (BY MR. GARDNER) Who told you this? |
| 16:03:41 | 19 | A.   Excuse me? |
| 16:03:42 | 20 | Q.   Who told you about -- |
| 16:03:43 | 21 | A.   Oh, Carlos Nayen and Tyler Graham. |
| 16:03:47 | 22 | Q.   And so, what did they tell you? |
| 16:03:49 | 23 |         MS. WILLIAMS:  I object to hearsay. |
| 16:03:50 | 24 |         THE COURT:  It's overruled. |
| 16:03:52 | 25 | Q.   (BY MR. GARDNER) You can answer the question. |

16:03:54   1   A.   Oh, I was told that to put my address so I can receive the

16:03:59   2   paperwork on the horses so they won't get lost in a Mexican

16:04:03   3   address.

16:04:04   4   Q.   And when you say paperwork, are you referring to the

16:04:06   5   transfer of ownership paperwork?

16:04:08   6   A.   Yes.  Just the paper -- yeah, the paperwork on the horses.

16:04:12   7   Q.   Did you ever receive the paperwork on the horses at your

16:04:18   8   address?

16:04:18   9   A.   No, sir.  I didn't.

16:04:18   10   Q.   Was that also an auction where a horse called Separate Fire

16:04:25   11   was purchased?

16:04:26   12   A.   I believe so.

16:04:28   13   Q.   Who purchased that horse?

16:04:30   14   A.   I don't know, sir.

16:04:32   15   Q.   Was that one of the horses that was placed in your address?

16:04:35   16   A.   I do not remember if it was or not.

16:04:37   17   Q.   Now, Mr. DeGeurin asked you about some of the other owners.

16:04:46   18   Did you have an owner that you trained for called Bonanza Racing

16:04:51   19   Stables?

16:04:51   20   A.   Yes, sir, I did.

16:04:52   21   Q.   When were you approached to train horses for Bonanza Racing

16:04:56   22   Stables?

16:04:56   23   A.   Bonanza was in November.  No.  Like around September,

16:05:03   24   November of 2011.

16:05:05   25   Q.   And how many horses did you train for Bonanza?

| | | |
|---|---|---|
| 16:05:07 | 1 | A.   Four horses. |
| 16:05:08 | 2 | Q.   And do you know who the owner or the listed owner of Bonanza |
| 16:05:12 | 3 | was? |
| 16:05:13 | 4 | A.   I think it was Francisco Silva. |
| 16:05:16 | 5 | Q.   Would that be Francisco Silva-Ramos? |
| 16:05:19 | 6 | A.   Ramos. |
| 16:05:20 | 7 | Q.   Did you ever meet this individual? |
| 16:05:21 | 8 | A.   I don't know if it was him, but I think I met him in |
| 16:05:27 | 9 | Ruidoso, but I'm not sure to be honest. |
| 16:05:29 | 10 | Q.   So how would Bonanza Racing Stables contact you with respect |
| 16:05:32 | 11 | to training horses? |
| 16:05:35 | 12 | A.   The one who told me to train these horses for Bonanza was |
| 16:05:39 | 13 | Carlos Nayen. |
| 16:05:41 | 14 | Q.   And did you bill Bonanza Racing? |
| 16:05:44 | 15 | A.   Yes, sir, I did. |
| 16:05:45 | 16 | Q.   And what were generally the bills, the amount of bills for |
| 16:05:49 | 17 | the months? |
| 16:05:50 | 18 | A.   Well, I didn't start billing them until maybe January of |
| 16:05:53 | 19 | 2012, and it was for about 4 to $6,000 a month. |
| 16:05:59 | 20 | Q.   And at some point, did they stop paying you? |
| 16:06:02 | 21 | A.   Yes, sir.  They stopped paying me like a month.  Like the |
| 16:06:11 | 22 | last -- they didn't pay me March or April, I think, and May.  It |
| 16:06:18 | 23 | was like four months.  After the raid at Los Alamitos, they |
| 16:06:22 | 24 | stopped paying me. |
| 16:06:23 | 25 | Q.   After the raid? |

| | | |
|---|---|---|
| 16:06:23 | 1 | A.   Yes, sir. |
| 16:06:23 | 2 | Q.   Thank you, Mr. Quintero.  No further questions. |
| 16:06:29 | 3 | MS. WILLIAMS:  No questions. |
| 16:06:32 | 4 | MR. DEGEURIN:  No, your Honor. |
| 16:06:33 | 5 | MR. WOMACK:  Very briefly, your Honor.  If I could see |
| 16:06:34 | 6 | the photographs 102A. |
| 16:06:37 | 7 | RE-CROSS EXAMINATION |
| 16:06:37 | 8 | BY MR. WOMACK: |
| 16:06:59 | 9 | Q.   Mr. Quintero, I'm going to show you, again, Government's |
| 16:07:02 | 10 | Exhibit 102A.  It's a series of three photographs.  This is the |
| 16:07:08 | 11 | largest one, the most focused one.  And, again, this is a picture |
| 16:07:16 | 12 | of Mr. Piloto? |
| 16:07:16 | 13 | A.   Yes, sir. |
| 16:07:17 | 14 | Q.   And this was taken the day after he won the All American |
| 16:07:20 | 15 | Futurity? |
| 16:07:21 | 16 | A.   Yes, sir. |
| 16:07:22 | 17 | Q.   And the man standing at the far -- as we look at the |
| 16:07:25 | 18 | picture, the man to the far right next to the trophy, that's |
| 16:07:33 | 19 | Fernando Garcia? |
| 16:07:33 | 20 | A.   Yes, sir. |
| 16:07:35 | 21 | Q.   Do you see the big belt buckle he's wearing? |
| 16:07:38 | 22 | A.   Yes, sir. |
| 16:07:38 | 23 | Q.   Where did he get that? |
| 16:07:39 | 24 | A.   That's the one I gave him after the race. |
| 16:07:41 | 25 | Q.   That's the one for training Mr. Piloto? |

| | | |
|---|---|---|
| 16:07:43 | 1 | A.   Yes, sir. |
| 16:07:44 | 2 | Q.   Thank you.  Now, these racing silks, is this Carlos Nayen? |
| 16:07:51 | 3 | A.   Yes, sir, it is. |
| 16:07:52 | 4 | Q.   And he's wearing, looks like to me, a jersey.  That's racing |
| 16:07:55 | 5 | silks, isn't it? |
| 16:07:56 | 6 | A.   Yes, sir. |
| 16:07:56 | 7 | Q.   Can everybody buy racing silks? |
| 16:08:00 | 8 | A.   Yeah.  Everybody can get them customized. |
| 16:08:03 | 9 | Q.   The same as you could go out and buy a jersey for your |
| 16:08:06 | 10 | favorite NFL football team, you don't have to be a Dallas Cowboy |
| 16:08:10 | 11 | or a Houston Texan.  I can buy an Arian Foster jersey, even |
| 16:08:17 | 12 | though I'm not Arian Foster? |
| 16:08:18 | 13 | A.   Yes.  Yes, sir. |
| 16:08:19 | 14 | Q.   And you could do the same if you're a fan of racing.  You |
| 16:08:21 | 15 | can buy racing silks? |
| 16:08:22 | 16 | A.   Yes, sir. |
| 16:08:27 | 17 | Q.   No further questions. |
| 16:08:55 | 18 | RE-CROSS EXAMINATION |
| 16:08:55 | 19 | BY MR. ESPER: |
| 16:08:59 | 20 | Q.   Mr. Quintero, this exhibit was previously shown to you and |
| 16:09:01 | 21 | you've identified -- there's a lot of people in this picture, |
| 16:09:04 | 22 | aren't there? |
| 16:09:05 | 23 | A.   Yes, sir. |
| 16:09:05 | 24 | Q.   And you've identified some.  Are there a number of them, you |
| 16:09:10 | 25 | don't even know who they are? |

```
16:09:11   1   A.   Yes, sir.

16:09:11   2   Q.   Probably dozens of them, you don't know who they are, right?

16:09:14   3   A.   Yes, sir.

16:09:14   4   Q.   Okay.  And -- but you've identified previously about three

16:09:18   5   or four?

16:09:18   6   A.   Yes, sir.

16:09:20   7   Q.   Do you know any of these other 35 or 40 people that are in

16:09:25   8   this picture?

16:09:25   9   A.   I probably could name another five.

16:09:29   10   Q.   Five?

16:09:29   11   A.   Yes.

16:09:30   12   Q.   So, in other words, about a third of them, you know who they

16:09:32   13   are, and the rest of them, you have no idea?

16:09:34   14   A.   Yes, sir.

16:09:34   15   Q.   And this is after the big race at Ruidoso?

16:09:39   16   A.   Yes, sir.

16:09:40   17   Q.   So all kinds of people gather in the winner's circle, right?

16:09:43   18   A.   Yes, sir.

16:09:44   19   Q.   Okay.  That's all I have.

16:09:47   20        MR. MAYR:  I have no further questions, your Honor.

16:09:50   21        THE COURT:  Anybody want to ask these questions one

16:09:52   22   more time?  Okay.  May the witness be excused?  You may be

16:10:00   23   excused, sir.

16:10:03   24        You may call your next witness.

16:10:04   25        MS. FERNALD:  Government would call Debbie Kempe.
```

| | | |
|---|---|---|
| 16:10:30 | 1 | THE COURT:  Come down here, please, ma'am. |
| 16:10:34 | 2 | (Witness sworn.) |
| 16:10:52 | 3 | THE COURT:  If you'll tell us your full name and spell |
| 16:10:57 | 4 | your last name, please. |
| 16:10:59 | 5 | THE WITNESS:  Deborah Kempe, K-E-M-P-E. |
| 16:11:05 | 6 | DEBORAH KEMPE, called by the Government, duly sworn. |
| 16:11:05 | 7 | DIRECT EXAMINATION |
| 16:11:05 | 8 | BY MS. FERNALD: |
| 16:11:08 | 9 | Q.   Will you please introduce yourself to the jury?  Tell them |
| 16:11:10 | 10 | what city you live in and what you do for a living. |
| 16:11:12 | 11 | A.   I live in Oceanside, California and I am -- |
| 16:11:15 | 12 | MR. FINN:  Judge, I'm sorry, I can't hear her. |
| 16:11:17 | 13 | MS. FERNALD:  I'm going to move the -- |
| 16:11:19 | 14 | THE COURT:  Talk into the microphone. |
| 16:11:22 | 15 | Q.   (BY MS. FERNALD) See if that's a little bit better.  Want to |
| 16:11:26 | 16 | say your name? |
| 16:11:26 | 17 | A.   My name is Deborah Kempe.  I live in Oceanside, California, |
| 16:11:29 | 18 | and I'm the controller at Vessels Stallion Farm. |
| 16:11:33 | 19 | Q.   Vessels Stallion Farm.  Can you tell the ladies and |
| 16:11:36 | 20 | gentlemen of the jury what that farm is and what it does? |
| 16:11:38 | 21 | A.   We are race horse breeding farm.  We breed quarter horses |
| 16:11:43 | 22 | and thoroughbreds, and then, we also raise and train race horses. |
| 16:11:48 | 23 | Q.   And what do you do for them? |
| 16:11:49 | 24 | A.   I'm the controller. |
| 16:11:51 | 25 | Q.   So you basically handle all their accounting and paperwork; |

16:11:54    1    is that correct?

16:11:55    2    A.    Yes.

16:11:55    3    Q.    I'm showing you now what has been marked as Government's

16:12:01    4    Exhibit 243.  You and I have met before, haven't we?

16:12:06    5    A.    Yes.

16:12:06    6    Q.    Have you had a chance to review Government's 243?

16:12:11    7    A.    Yes.

16:12:12    8    Q.    What do you recognize, just overall, those records to be?

16:12:15    9    A.    They are payments from some clients of ours.

16:12:29   10    Q.    I'd like to turn your attention to approximately February of

16:12:35   11    2010.  Did you prepare the government records during that period

16:12:43   12    of time on some breeding contracts?

16:12:46   13    A.    Yes, we did.

16:12:46   14    Q.    Is this one of your breeding contracts that I'm showing you

16:13:13   15    on Bates stamp No. 552244?

16:13:23   16    A.    Yes.

16:13:24   17    Q.    And the date on this particular breeding contract is

16:13:27   18    February the 15th of 2010; is that correct?

16:13:32   19    A.    Yes, it is.

16:13:33   20    Q.    Can you just tell the jury a little bit what this breeding

16:13:37   21    contract is?  And then, we'll talk about the details surrounding

16:13:40   22    it.  But just overall, what does Vessels go through with the

16:13:44   23    breeding contracts?

16:13:44   24    A.    We issue breeding contracts to mare owners when they agree

16:13:49   25    to breed a mare to one of our stallions and that's what this

| | | |
|---|---|---|
| 16:13:52 | 1 | contract is. |
| 16:13:53 | 2 | Q.   All right.  And who is the mare owner in this particular |
| 16:13:57 | 3 | case? |
| 16:13:57 | 4 | A.   Luis Gerardo Aguirre-Cruz. |
| 16:14:01 | 5 | Q.   And that's right here at this line where I'm pointing right |
| 16:14:03 | 6 | now; is that correct? |
| 16:14:04 | 7 | A.   Yes, it is. |
| 16:14:04 | 8 | Q.   Did you have any contact with any other individuals prior to |
| 16:14:10 | 9 | Mr. Aguirre in reference to some of his horses? |
| 16:14:15 | 10 | A.   Yes, we did. |
| 16:14:16 | 11 | Q.   Okay.  And who was that individual? |
| 16:14:18 | 12 | A.   There were actually several.  Carlos Lopez's name is on this |
| 16:14:22 | 13 | contract.  Him.  Ramiro Villarreal, Victor Lopez, Carlos Nayen. |
| 16:14:31 | 14 | That's all I can think of right now. |
| 16:14:33 | 15 | Q.   The different individuals in concession with all these |
| 16:14:37 | 16 | horses working together? |
| 16:14:38 | 17 | A.   Yes. |
| 16:14:39 | 18 | Q.   And how many breeding contracts -- I'm not going to go |
| 16:14:43 | 19 | through every single one of them, but you've reviewed these.  How |
| 16:14:46 | 20 | many breeding contracts during this period of time -- |
| 16:14:50 | 21 | A.   For 2010, there were ten. |
| 16:14:52 | 22 | Q.   There were ten different contracts that were contained in |
| 16:14:55 | 23 | your records? |
| 16:14:55 | 24 | A.   Yes. |
| 16:14:55 | 25 | Q.   Is that correct? |

| | | |
|---|---|---|
| 16:14:56 | 1 | A.    Yes. |
| 16:14:56 | 2 | Q.    The stallion in this one is First Down Dash; is that |
| 16:15:00 | 3 | correct? |
| 16:15:00 | 4 | A.    Yes, it is. |
| 16:15:01 | 5 | Q.    Are they all for First Down? |
| 16:15:06 | 6 | A.    They're all for First Down Dash. |
| 16:15:09 | 7 | Q.    Did you have any contact with an individual by the name of |
| 16:15:24 | 8 | Carlos Nayen? |
| 16:15:26 | 9 | A.    I personally did not.  I had contact with his wife but not |
| 16:15:31 | 10 | him. |
| 16:15:32 | 11 | Q.    Okay.  Was he also involved with these individuals? |
| 16:15:35 | 12 | A.    I believe so. |
| 16:15:38 | 13 | Q.    How were payments made on these two particular -- or, I'm |
| 16:15:42 | 14 | sorry, these ten breeding contracts? |
| 16:15:45 | 15 | A.    The majority of them were wire transfers that we received. |
| 16:15:49 | 16 | Q.    And do you recall, just off the top of your head, where |
| 16:15:51 | 17 | those wire transfers were from? |
| 16:15:53 | 18 | A.    The majority of them, I think, were from Mexico. |
| 16:15:57 | 19 | Q.    I'm going to show them to you -- I'm making you guess over |
| 16:16:00 | 20 | here, so I'm going to show them to you in just a second. |
| 16:16:03 | 21 |       How much -- what is the cost of the breeding contract |
| 16:16:06 | 22 | from Vessels? |
| 16:16:08 | 23 | A.    For one breeding was $30,000. |
| 16:16:18 | 24 | Q.    Have you seen these documents before that I'm putting in |
| 16:16:22 | 25 | front of you in reference to Bates stamp No. 552264? |

| | | |
|---|---|---|
| 16:16:27 | 1 | A.    Yes. |
| 16:16:28 | 2 | Q.    Have you seen these? |
| 16:16:29 | 3 | A.    Yeah. |
| 16:16:29 | 4 | Q.    And did you review them this morning? |
| 16:16:31 | 5 | A.    Yes. |
| 16:16:32 | 6 | Q.    What are basically these records of? |
| 16:16:35 | 7 | A.    These are notices we got from our bank of wire transfers |
| 16:16:39 | 8 | that were made to our account. |
| 16:16:41 | 9 | Q.    And they were paid in reference to these ten? |
| 16:16:43 | 10 | A.    Yes. |
| 16:16:44 | 11 | Q.    Breeding contracts? |
| 16:16:45 | 12 | A.    Yes. |
| 16:16:46 | 13 | Q.    Let's go through these.  Are you able to see on your |
| 16:16:53 | 14 | monitor? |
| 16:16:53 | 15 | A.    Yeah. |
| 16:17:02 | 16 | Q.    The first payment was received when on this one? |
| 16:17:09 | 17 | A.    January 22nd. |
| 16:17:11 | 18 | Q.    January the 22nd of 2010? |
| 16:17:14 | 19 | A.    Yes. |
| 16:17:14 | 20 | Q.    Okay.  And specifically, where did this one come from? |
| 16:17:18 | 21 | Where did this wire come from? |
| 16:17:22 | 22 | A.    It came -- that's all -- Security Business Bank is our bank. |
| 16:17:29 | 23 | Q.    Okay. |
| 16:17:29 | 24 | A.    So that one came from someone in Texas. |
| 16:17:31 | 25 | Q.    Okay. |

| | | |
|---|---|---|
| 16:17:33 | 1 | A.   That name I don't recognize. |
| 16:17:36 | 2 | Q.   Okay.  And it's Silva Gabriela? |
| 16:17:39 | 3 | A.   Yes. |
| 16:17:40 | 4 | Q.   But that's not a name that you recognize, as you say, |
| 16:17:43 | 5 | correct? |
| 16:17:43 | 6 | A.   No. |
| 16:17:51 | 7 | Q.   Okay.  In reference to the second payment, where did this |
| 16:17:54 | 8 | one come from? |
| 16:17:55 | 9 | A.   Texas. |
| 16:17:57 | 10 | Q.   And can you tell us the date on this particular one? |
| 16:17:59 | 11 | A.   January 25th, 2010. |
| 16:18:05 | 12 | Q.   What was the amount on this one? |
| 16:18:07 | 13 | A.   $30,000. |
| 16:18:12 | 14 | Q.   We talked about the $30,000 payment fee.  That is for the |
| 16:18:16 | 15 | breeding only, is it not? |
| 16:18:18 | 16 | A.   Yes. |
| 16:18:18 | 17 | Q.   Okay.  So if you have ten different breedings contracts, |
| 16:18:22 | 18 | obviously what would the breeding price be? |
| 16:18:24 | 19 | A.   300,000. |
| 16:18:25 | 20 | Q.   Okay.  Are there other expenses that are incurred? |
| 16:18:29 | 21 | A.   There are a lot of other expenses because the mares actually |
| 16:18:32 | 22 | come to our farm, they're boarded there, there are reproductive |
| 16:18:36 | 23 | charges, medical charges, all kinds of charges related to horse |
| 16:18:41 | 24 | care. |
| 16:18:42 | 25 | Q.   All right.  So the bill would be over $300,000, correct? |

| | | |
|---|---|---|
| 16:18:45 | 1 | A.   A lot over.  Yes. |
| 16:18:51 | 2 | Q.   What about this particular payment?  This one occurred when? |
| 16:18:55 | 3 | A.   January 25th of 2010. |
| 16:18:59 | 4 | Q.   And who was the originator? |
| 16:19:01 | 5 | A.   Alejandro Sanchez. |
| 16:19:03 | 6 | Q.   And what was the amount for? |
| 16:19:04 | 7 | A.   $70,000. |
| 16:19:13 | 8 | Q.   Next, who was the originator? |
| 16:19:15 | 9 | A.   Alejandro Sanchez. |
| 16:19:17 | 10 | Q.   That date was on? |
| 16:19:18 | 11 | A.   I can't see the date on that one. |
| 16:19:20 | 12 | Q.   Whoops, sorry. |
| 16:19:21 | 13 | A.   January 27th of 2010. |
| 16:19:23 | 14 | Q.   And what was the amount on it? |
| 16:19:25 | 15 | A.   50,000. |
| 16:19:33 | 16 | Q.   Next payment. |
| 16:19:35 | 17 | A.   April 19th of 2010. |
| 16:19:38 | 18 | Q.   Originator? |
| 16:19:40 | 19 | A.   Jose Luis Garcia-Teforio. |
| 16:19:44 | 20 | Q.   Did you know who that individual is? |
| 16:19:46 | 21 | A.   No, I don't. |
| 16:19:47 | 22 | Q.   Were you familiar with that name? |
| 16:19:48 | 23 | A.   No.  I'm not. |
| 16:19:51 | 24 | Q.   And what was the amount for? |
| 16:19:52 | 25 | A.   25,000. |

| | | |
|---|---|---|
| 16:19:59 | 1 | Q.   Next is on which date? |
| 16:20:00 | 2 | A.   April 19th, 2010. |
| 16:20:04 | 3 | Q.   Originator? |
| 16:20:07 | 4 | A.   Nicholas Mata Villa Gomez. |
| 16:20:11 | 5 | Q.   Where was it coming from? |
| 16:20:12 | 6 | A.   It came from Mexico. |
| 16:20:14 | 7 | Q.   And what was the amount on it? |
| 16:20:17 | 8 | A.   25,000. |
| 16:20:23 | 9 | Q.   Next payment? |
| 16:20:25 | 10 | A.   April 22nd of 2010. |
| 16:20:29 | 11 | Q.   Originator? |
| 16:20:34 | 12 | A.   Armando Cabrera. |
| 16:20:37 | 13 | Q.   Again, where did this originate from? |
| 16:20:39 | 14 | A.   In Mexico. |
| 16:20:40 | 15 | Q.   And the amount? |
| 16:20:43 | 16 | A.   25,000. |
| 16:20:55 | 17 | Q.   We made these tabs when you came in this morning, correct? |
| 16:21:00 | 18 | A.   Yes.   April 4 of -- I'm sorry, August 4th of 2010. |
| 16:21:07 | 19 | Q.   And where did this originate from? |
| 16:21:09 | 20 | A.   New Mexico. |
| 16:21:11 | 21 | Q.   The amount? |
| 16:21:13 | 22 | A.   $8,900. |
| 16:21:15 | 23 | Q.   And I notice there's some handwritten notes over here.   What |
| 16:21:18 | 24 | are those handwritten notes? |
| 16:21:19 | 25 | A.   That's my note to apply to the account of Luis Gerardo |

| | | |
|---|---|---|
| 16:21:23 | 1 | Aguirre-Cruz. |
| 16:21:25 | 2 | Q.   And that is your handwriting? |
| 16:21:28 | 3 | A.   That is my handwriting. |
| 16:21:38 | 4 | Q.   I missed something on this.  That's right where I had the |
| 16:21:43 | 5 | tab, too.  Do you see the name of the originator on here? |
| 16:21:45 | 6 | A.   Sergio Rincon-Guerrero. |
| 16:21:48 | 7 | Q.   Do you know if he had a nickname? |
| 16:21:51 | 8 | A.   No. |
| 16:21:57 | 9 | Q.   Payment of this one was on which date? |
| 16:21:59 | 10 | A.   August 4th of 2010. |
| 16:22:04 | 11 | Q.   Again, I see the handwritten note over here. |
| 16:22:07 | 12 | A.   That's me. |
| 16:22:08 | 13 | Q.   Same explanation? |
| 16:22:09 | 14 | A.   Yes. |
| 16:22:09 | 15 | Q.   Okay.  Aguirre-Cruz, for the record, to apply to the |
| 16:22:14 | 16 | account? |
| 16:22:14 | 17 | A.   $9,000. |
| 16:22:15 | 18 | Q.   Who made this particular one? |
| 16:22:19 | 19 | A.   Raul Ramirez. |
| 16:22:19 | 20 | Q.   And where did it come from? |
| 16:22:22 | 21 | A.   From Texas. |
| 16:22:23 | 22 | Q.   What about this particular payment? |
| 16:22:34 | 23 | A.   This was on April 20th of 2012. |
| 16:22:38 | 24 | Q.   Right here at the top; is that correct? |
| 16:22:40 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 16:22:40 | 1 | Q.   Okay.  And who did it come from? |
| 16:22:43 | 2 | A.   It came from Sandy Forwarding. |
| 16:22:46 | 3 | Q.   And what is that? |
| 16:22:48 | 4 | A.   That was just a man who called me to make payment on the |
| 16:22:55 | 5 | Aguirre-Cruz account. |
| 16:22:57 | 6 | Q.   Do you know who this man was? |
| 16:23:01 | 7 | A.   His name was either Jorge or I don't know.  He just called |
| 16:23:05 | 8 | and wanted to make a payment, so I gave him the information and |
| 16:23:08 | 9 | he paid. |
| 16:23:09 | 10 | Q.   What was the amount for? |
| 16:23:10 | 11 | A.   $12,292. |
| 16:23:12 | 12 | Q.   When you receive a phone call like that, is there anything |
| 16:23:14 | 13 | unusual about that to you? |
| 16:23:17 | 14 | A.   Not really.  If someone wants to make a payment to me on an |
| 16:23:21 | 15 | account, you know, I make arrangements to get that payment made. |
| 16:23:24 | 16 | Q.   And finally, there's a check here.  You said the majority of |
| 16:23:32 | 17 | them were from wire and this is from a check. |
| 16:23:34 | 18 | A.   Yes. |
| 16:23:34 | 19 | Q.   So these are from your records and there seems to be a |
| 16:23:37 | 20 | little bit of a obstruction here, but what is it for? |
| 16:23:40 | 21 | A.   Actually, that must be payment on Aguirre-Cruz's account. |
| 16:23:52 | 22 | Actually don't remember seeing this one, but that's my |
| 16:23:56 | 23 | handwriting right there.  So obviously I did see it. |
| 16:23:58 | 24 | Q.   And it says for eight mares; is that correct? |
| 16:24:00 | 25 | A.   Yes. |

16:24:01  1   Q.   How unusual was it to have different payments for ten

16:24:19  2   different breeding contracts like that?

16:24:23  3   A.   It's a little unusual to have that many payments come in on

16:24:30  4   one account.

16:24:31  5   Q.   But it's happened before?

16:24:32  6   A.   It's happened.  Yeah, it happens, especially with that large

16:24:37  7   of an amount.

16:24:40  8   Q.   And you had previously testified that you had had contact

16:24:45  9   with other individuals.  I want to show you just a few more

16:24:52  10  documents.  Do you recognize this document?

16:25:03  11  A.   Yeah.  That was another payment we got from Sandy

16:25:06  12  Forwarding.

16:25:06  13  Q.   In reference to the ten breeding contracts?

16:25:11  14  A.   Yes.

16:25:17  15  Q.   And this Wells Fargo 15,750 check in reference to Bates

16:25:23  16  stamp No. 552153, do you recognize that?

16:25:28  17  A.   Yes, I do.

16:25:28  18  Q.   Whose name can you see?

16:25:31  19  A.   Victor Lopez.  Yes.

16:25:32  20  Q.   And what was your contact with Victor Lopez in reference to

16:25:40  21  these accounts?

16:25:40  22  A.   He's the one I spoke to on the phone most of the time when

16:25:43  23  -- to make arrangements for the payments of the wires, you know,

16:25:46  24  to give him the information, and he was basically my only

16:25:50  25  contact.

16:25:51  1    Q.    All right.  Just so that I'm giving a fair and accurate

16:25:55  2    timeline, you were talking about Villarreal and then, Victor

16:25:58  3    Lopez.  Where do they fall on the timeline?

16:26:00  4    A.    It all started with Ramiro Villarreal, and then, he handled

16:26:06  5    things for quite a while.  And then, he -- you know, we lost

16:26:10  6    contact with him, and then, Victor seemed to take over.

16:26:12  7    Q.    Do you recall when you lost contact with Villarreal?

16:26:17  8    A.    I would guess that it was maybe 2009.  Not exactly sure.

16:26:24  9    Q.    After that period of time, have you seen him since then?

16:26:27  10   A.    No.

16:26:27  11   Q.    Is this one of the payments by Villarreal, what I'm showing

16:26:55  12   you on 552154?

16:26:58  13   A.    Yes.

16:26:58  14   Q.    And what date was that?

16:26:59  15   A.    April 13th of 2011.

16:27:02  16   Q.    Why do you have Villarreal here after the fact that you had

16:27:06  17   lost contact?

16:27:07  18   A.    Because that's -- we still have that name on the account.

16:27:12  19   Q.    And who was the originator?

16:27:14  20   A.    Grupo Aduanero.

16:27:19  21   Q.    Did good.  Where did that come from?

16:27:22  22   A.    Veracruz, Mexico.

16:27:23  23   Q.    The amount on this particular one?

16:27:25  24   A.    $10,000.

16:27:27  25   Q.    And finally, can you tell me the date on this one?

| | | |
|---|---|---|
| 16:27:39 | 1 | A.   August 13th of 2009. |
| 16:27:41 | 2 | Q.   For the record, 552155.  August the 13th of 2009? |
| 16:27:49 | 3 | A.   2009. |
| 16:27:50 | 4 | Q.   And who is the originator? |
| 16:27:52 | 5 | A.   Basic Enterprises. |
| 16:27:54 | 6 | Q.   The amount is? |
| 16:27:54 | 7 | A.   $3,850. |
| 16:27:58 | 8 | Q.   And where was Basic Enterprises the originator from? |
| 16:28:03 | 9 | A.   I believe that's Mexico. |
| 16:28:07 | 10 | Q.   And these that we went over with the exception of the checks |
| 16:28:10 | 11 | that I saw were all wires; is that correct? |
| 16:28:14 | 12 | A.   Yes. |
| 16:28:15 | 13 | Q.   Thank you. |
| 16:28:27 | 14 | A.   You're welcome. |
| 16:28:28 | 15 | Q.   Pass the witness. |
| 16:28:30 | 16 |         MS. WILLIAMS:  No questions. |
| 16:28:31 | 17 |         MR. SANCHEZ:  No questions, your Honor. |
| 16:28:33 | 18 |         MR. WOMACK:  No questions. |
| 16:28:34 | 19 |         MR. ESPER:  I have none, your Honor. |
| 16:28:36 | 20 |         MR. MAYR:  Nor do I, your Honor. |
| 16:28:37 | 21 |         THE COURT:  May the witness be excused? |
| 16:28:41 | 22 |         MS. FERNALD:  With our thanks, your Honor. |
| 16:28:42 | 23 |         THE COURT:  You may be excused. |
| 16:28:54 | 24 |         MR. GARDNER:  Your Honor, the government calls Jose |
| 16:28:56 | 25 | Flores. |

| 16:29:24 | 1 | (Witness sworn.) |
|---|---|---|

16:29:24   1                    (Witness sworn.)

16:29:41   2            THE COURT:  I want you to try to talk into that

16:29:46   3   microphone.  Tell us your full name and spell your last, please.

16:29:51   4            THE WITNESS:  Jose Antonio Flores, F-L-O-R-E-S.

16:29:56   5            THE COURT:  You may proceed.

16:29:57   6        JOSE A. FLORES, called by the Government, duly sworn.

16:29:57   7                    DIRECT EXAMINATION

16:29:57   8   BY MR. GARDNER:

16:29:58   9   Q.   Thank you, your Honor.

16:29:59   10           Good afternoon, Mr. Flores.

16:30:00   11   A.   Good afternoon.

16:30:01   12   Q.   Could you please introduce yourself to the jury and tell

16:30:03   13   them how old you are, where you live, and what you do for a

16:30:06   14   living?

16:30:06   15   A.   My name is Jose Antonio Flores.  I'm an attorney in Los

16:30:11   16   Alamitos race track, and my age is 38 years old.

16:30:15   17           THE COURT:  And you don't need to get that close.

16:30:17   18           THE WITNESS:  Okay.

16:30:18   19   Q.   (BY MR. GARDNER) It will pick you.

16:30:19   20           How long have you been a trainer, sir?

16:30:20   21   A.   About 18 years.

16:30:22   22   Q.   And mostly based out of Los Alamitos?

16:30:25   23   A.   Yes, sir.

16:30:25   24   Q.   Sir, I want to turn your attention to last year.  Do you

16:30:35   25   recall being contacted by someone to train for a company called

| | | |
|---|---|---|
| 16:30:39 | 1 | Bonanza Racing Stables? |
| 16:30:41 | 2 | A.   Yeah. |
| 16:30:41 | 3 | Q.   And who contacted you, sir? |
| 16:30:43 | 4 | A.   Francisco Silva. |
| 16:30:44 | 5 | Q.   And was there contact in person or over the phone? |
| 16:30:47 | 6 | A.   Over the phone. |
| 16:30:49 | 7 | Q.   Now, is that common in the business to be contacted by |
| 16:30:52 | 8 | someone to train horses over the phone? |
| 16:30:54 | 9 | A.   Yes. |
| 16:30:55 | 10 | Q.   And what did this Mr. Francisco Silva talk to you about? |
| 16:30:59 | 11 | A.   He had certain horses that he wanted me to train and |
| 16:31:04 | 12 | hopefully I could do the job for him. |
| 16:31:06 | 13 | Q.   And did you settle on a price for the training? |
| 16:31:09 | 14 | A.   Yes. |
| 16:31:09 | 15 | Q.   And how much did you ask per day for training fees? |
| 16:31:13 | 16 | A.   $47 a day. |
| 16:31:16 | 17 | Q.   And how many horses was it your understanding he was going |
| 16:31:25 | 18 | to send you? |
| 16:31:26 | 19 | A.   About four or five horses. |
| 16:31:28 | 20 | Q.   And, again, when did this conversation occur? |
| 16:31:32 | 21 | A.   Last year.  I can't recall the date. |
| 16:31:36 | 22 | Q.   That's fine.  Beginning of the year, early part of the year? |
| 16:31:39 | 23 | A.   Yeah.  Early part of the year. |
| 16:31:41 | 24 | Q.   And did you eventually receive some horses from this |
| 16:31:44 | 25 | Francisco Ramos? |

| | | |
|---|---|---|
| 16:31:46 | 1 | A.   Yes. |
| 16:31:47 | 2 | Q.   And when do you recall receiving horses? |
| 16:31:50 | 3 | A.   I believe it was in January, February. |
| 16:31:54 | 4 | Q.   And how many horses did you obtain? |
| 16:31:57 | 5 | A.   About five.  Around five horses. |
| 16:32:01 | 6 | Q.   And I assume you went through the normal steps to train a |
| 16:32:05 | 7 | horse, getting it ready for racing? |
| 16:32:06 | 8 | A.   Yes, sir. |
| 16:32:06 | 9 | Q.   And, sir, were you familiar with the raid at the Los |
| 16:32:10 | 10 | Alamitos race track on March 27th last year? |
| 16:32:12 | 11 | A.   I wasn't there, but I heard about it. |
| 16:32:16 | 12 | Q.   And did Bonanza Racing Stables pay you during the months of |
| 16:32:20 | 13 | January and February? |
| 16:32:23 | 14 | A.   Yes. |
| 16:32:24 | 15 | Q.   Did they pay you accurately? |
| 16:32:26 | 16 | A.   They paid me. |
| 16:32:27 | 17 | Q.   Did they pay you after the raid? |
| 16:32:29 | 18 | A.   I can't remember when they paid me after the raid, if they |
| 16:32:34 | 19 | did or not.  It's all in my books. |
| 16:32:36 | 20 | Q.   And you talked about you have a bookkeeper keep track of |
| 16:32:40 | 21 | that? |
| 16:32:40 | 22 | A.   Yes, I do. |
| 16:32:41 | 23 | Q.   Because I believe you said you weren't very organized -- |
| 16:32:43 | 24 | A.   I'm not very organized, so I have a bookkeeper takes care of |
| 16:32:46 | 25 | that. |

| | | |
|---|---|---|
| 16:32:46 | 1 | Q.   Do you know a Jose Trevino? |
| 16:32:47 | 2 | A.   Yes. |
| 16:32:48 | 3 | Q.   And how do you know him? |
| 16:32:49 | 4 | A.   Through the races. |
| 16:32:52 | 5 | Q.   Is he training horses for him? |
| 16:32:53 | 6 | A.   Yes.  I did train a couple of horses for him. |
| 16:32:55 | 7 | Q.   I want to talk about one particular horse.  Did you train a |
| 16:33:00 | 8 | horse called Mr. Ease Cartel? |
| 16:33:02 | 9 | A.   Yes, I do. |
| 16:33:03 | 10 | Q.   And whose horse was that when you first got it? |
| 16:33:07 | 11 | A.   It belonged to Francisco Silva. |
| 16:33:09 | 12 | Q.   Through Bonanza Racing? |
| 16:33:10 | 13 | A.   Bonanza Racing Stables. |
| 16:33:14 | 14 | Q.   How good a horse was Mr. Ease Cartel? |
| 16:33:16 | 15 | A.   He's a nice horse. |
| 16:33:17 | 16 | Q.   Nice horse? |
| 16:33:18 | 17 | A.   Yeah. |
| 16:33:18 | 18 | Q.   Did he do well in the races? |
| 16:33:20 | 19 | A.   He was starting to do well. |
| 16:33:24 | 20 | Q.   Now, I want to talk specifically about a race called the |
| 16:33:26 | 21 | Kindergarten Futurity. |
| 16:33:27 | 22 | A.   Okay. |
| 16:33:29 | 23 | Q.   Was that a race at the Los Alamitos race course? |
| 16:33:32 | 24 | A.   Yes.  It's the first futurity out there at the Los Angeles |
| 16:33:35 | 25 | race course. |

| 16:33:36 | 1 | Q. | Is that for two-year-olds? |

16:33:36  1   Q.   Is that for two-year-olds?

16:33:38  2   A.   For two-year-olds.

16:33:39  3   Q.   And what's the purse for that race?

16:33:41  4   A.   It varies between 270 to 300,000.

16:33:45  5   Q.   So what's the winner usually take from that type of race?

16:33:49  6   A.   About 42 percent.

16:33:52  7   Q.   So about a little less than half?

16:33:55  8   A.   Less than half.

16:33:56  9   Q.   And did Mr. Ease Cartel win the Kindergarten Futurity in

16:34:00  10  2012?

16:34:01  11  A.   No.  He didn't.

16:34:02  12  Q.   How did he do?

16:34:03  13  A.   He ran third.

16:34:05  14  Q.   What's the next race after the Kindergarten Futurity?

16:34:10  15  A.   The Ed Burke.

16:34:12  16  Q.   And was there a point where the ownership of that horse

16:34:15  17  changed?

16:34:17  18  A.   Yes.  There was a point in it where it changed.

16:34:19  19  Q.   Okay.  And who purchased or who acquired, rather, Mr. Ease

16:34:23  20  Cartel?

16:34:24  21  A.   Tremor.  Jose Trevino.

16:34:26  22  Q.   Tremor Enterprises?

16:34:28  23  A.   Right.

16:34:29  24  Q.   And what discussions did you have with either Mr. Silva or

16:34:32  25  Mr. Jose Trevino regarding the transfer of that horse?

| | | |
|---|---|---|
| 16:34:35 | 1 | A.   Nothing.  He just asked me, you know, that he was interested |
| 16:34:38 | 2 | in buying him and that he was probably going to go ahead and buy |
| 16:34:41 | 3 | him.  I advised him it was a good purchase.  Good horse. |
| 16:34:45 | 4 | Q.   And what happened at the Ed Burke? |
| 16:34:49 | 5 | A.   He won his trial and then -- he won his trial and then, he |
| 16:34:54 | 6 | never made it to the final. |
| 16:34:55 | 7 | Q.   Is that because federal law enforcement stepped in? |
| 16:34:58 | 8 | A.   Yes, sir. |
| 16:34:59 | 9 | Q.   Seized that horse? |
| 16:35:00 | 10 | A.   Uh-huh. |
| 16:35:01 | 11 | Q.   When you were training for Bonanza Racing Stables, how did |
| 16:35:07 | 12 | you pay your bills?  Or how did you get the bills to Bonanza? |
| 16:35:12 | 13 | A.   Through an e-mail. |
| 16:35:14 | 14 | Q.   Do you recall the name of the e-mail? |
| 16:35:16 | 15 | A.   My bookkeeper has more the name of it. |
| 16:35:19 | 16 | Q.   If I were to tell you A-N-R-I 2319@hotmail.com, would that |
| 16:35:25 | 17 | refresh your memory? |
| 16:35:25 | 18 | A.   That sounds familiar. |
| 16:35:27 | 19 | Q.   If I show it to you on the screen, Government's Exhibit 358, |
| 16:35:31 | 20 | is that the e-mail that your billing would go to? |
| 16:35:33 | 21 | A.   Yeah.  That sounds about right. |
| 16:35:38 | 22 | Q.   Now, Mr. Flores, you said you weren't present at the time of |
| 16:35:48 | 23 | the raid at Los Alamitos race track. |
| 16:35:50 | 24 | A.   No, sir.  Excuse me.  The first raid? |
| 16:35:55 | 25 | Q.   Yeah.  That's right.  The first raid in March 27th. |

238

| | | |
|---|---|---|
| 16:35:58 | 1 | A.    No.  I wasn't. |
| 16:35:59 | 2 | Q.    Did you receive any e-mails from this e-mail following that |
| 16:36:04 | 3 | raid? |
| 16:36:04 | 4 | A.    No. |
| 16:36:04 | 5 | Q.    Your Honor, I'll pass the witness. |
| 16:36:07 | 6 | MS. WILLIAMS:  No questions. |
| 16:36:11 | 7 | MR. DEGEURIN:  No questions. |
| 16:36:12 | 8 | MR. WOMACK:  No questions. |
| 16:36:13 | 9 | MR. ESPER:  I have none, your Honor. |
| 16:36:15 | 10 | MR. MAYR:  Nor do I, your Honor. |
| 16:36:16 | 11 | THE COURT:  You may be excused, sir. |
| 16:36:20 | 12 | THE WITNESS:  Thank you, sir. |
| 16:36:27 | 13 | MR. GARDNER:  Your Honor, the government calls Jaime |
| 16:36:37 | 14 | Gomez. |
| 16:37:19 | 15 | (Witness sworn.) |
| 16:37:42 | 16 | THE COURT:  I need for you to tell me your full name, |
| 16:37:54 | 17 | please, sir, and spell your last name. |
| 16:37:58 | 18 | THE WITNESS:  Jaime Gomez, G-O-M-E-Z. |
| 16:38:06 | 19 | JAIME GOMEZ, called by the Government, duly sworn. |
| 16:38:06 | 20 | DIRECT EXAMINATION |
| 16:38:06 | 21 | BY MR. GARDNER: |
| 16:38:07 | 22 | Q.    Thank you, your Honor. |
| 16:38:08 | 23 | Mr. Gomez, good afternoon. |
| 16:38:10 | 24 | A.    Good afternoon. |
| 16:38:12 | 25 | Q.    Would you please introduce yourself to the jury and tell |

| | | |
|---|---|---|
| 16:38:16 | 1 | them what you do for a living? |
| 16:38:18 | 2 | A.   I train horses as a living. |
| 16:38:24 | 3 | Q.   And, sir, how long have you been training horses? |
| 16:38:32 | 4 | A.   For 25 years. |
| 16:38:34 | 5 | Q.   And where are you currently training horses? |
| 16:38:43 | 6 | A.   Presently, I train horses at Los Alamitos race track. |
| 16:38:47 | 7 | Q.   Sir, have you ever trained horses for a company called |
| 16:38:50 | 8 | Bonanza Racing Stables? |
| 16:38:57 | 9 | A.   They gave me two horses in October of last year. |
| 16:39:00 | 10 | Q.   And when you say they gave you, who was that individual who |
| 16:39:04 | 11 | gave you two horses? |
| 16:39:10 | 12 | A.   A guy told me I would get two horses. |
| 16:39:14 | 13 | Q.   And do you know an individual by the name of Carlos Nayen? |
| 16:39:18 | 14 | A.   Carlos Nayen. |
| 16:39:20 | 15 | Q.   And, sir, on the screen in front of you, do you recognize |
| 16:39:29 | 16 | that person? |
| 16:39:29 | 17 | A.   Yes, sir. |
| 16:39:31 | 18 | Q.   Is that Mr. Nayen? |
| 16:39:32 | 19 | A.   Yes. |
| 16:39:33 | 20 | Q.   And with respect to Bonanza Racing Stables, what was Mr. |
| 16:39:39 | 21 | Nayen's involvement? |
| 16:39:51 | 22 | A.   I don't know exactly.  I -- he's the one that gave me the |
| 16:39:55 | 23 | horses.  I was to train them. |
| 16:39:57 | 24 | Q.   And when was this, sir? |
| 16:40:12 | 25 | A.   In October -- at the October auction of last year -- 2011. |

| | | |
|---|---|---|
| 16:40:20 | 1 | Q.   And when did you receive horses to train from Carlos Nayen? |
| 16:40:36 | 2 | A.   I picked up the horses at the auction, took them back to the |
| 16:40:49 | 3 | ranch, trained them, trained them, took them to run.  Their |
| 16:40:54 | 4 | registrations were at the office.  I don't know who took that. |
| 16:40:57 | 5 | Q.   And were you paid for your training bills on these horses? |
| 16:41:05 | 6 | A.   Only two or three payments were made. |
| 16:41:07 | 7 | Q.   And was there a point when those payments stopped? |
| 16:41:11 | 8 | A.   Yes.  There was a time that they did not pay me. |
| 16:41:18 | 9 | Q.   And, sir, are you familiar with a horse called Kind Hearted? |
| 16:41:27 | 10 | A.   Yes, sir.  That was my mare. |
| 16:41:29 | 11 | Q.   And did you eventually sell that mare? |
| 16:41:31 | 12 | A.   I sell the mare.  Yeah, I sold the mare. |
| 16:41:37 | 13 | Q.   Thank you, Mr. Gomez.  You speak very good English. |
| 16:41:41 | 14 | A.   A lot of it I don't understand completely, but I speak it |
| 16:41:49 | 15 | more or less. |
| 16:41:51 | 16 | Q.   And you also have the interpreter, so please feel free to |
| 16:41:57 | 17 | use her. |
| 16:41:57 | 18 | A.   Sorry. |
| 16:41:58 | 19 | Q.   Oh, no problem. |
| 16:42:01 | 20 | Kind Hearted, who approached you about buying that |
| 16:42:04 | 21 | horse? |
| 16:42:13 | 22 | A.   Mr. Carlos, the guy Carlos asked me if I had the mare, and I |
| 16:42:18 | 23 | said I was the owner. |
| 16:42:20 | 24 | Q.   And what was the price that y'all decided on to sell that |
| 16:42:25 | 25 | horse? |

| | | |
|---|---|---|
| 16:42:32 | 1 | A.   The mare had two good colts.  The price was 200,000. |
| 16:42:36 | 2 | Q.   And did Mr. Nayen agree to pay that 200? |
| 16:42:41 | 3 | A.   He accepted -- he agreed to the sale and said she would be |
| 16:42:53 | 4 | paid for in a month or two. |
| 16:42:55 | 5 | Q.   And was she eventually paid for? |
| 16:43:01 | 6 | A.   She was paid for.  Not to me but to my bookkeeper in |
| 16:43:08 | 7 | January. |
| 16:43:09 | 8 | Q.   And your bookkeeper is Mr. Morschauser? |
| 16:43:13 | 9 | A.   Yes. |
| 16:43:14 | 10 | Q.   And you visited with me and Mr. Morschauser back in March, I |
| 16:43:20 | 11 | believe.  And did you and Mr. Morschauser provide me with these |
| 16:43:24 | 12 | documents? |
| 16:43:24 | 13 | A.   Yes, sir. |
| 16:43:26 | 14 | Q.   Your Honor, I believe this is Government's Exhibit 322, |
| 16:43:41 | 15 | Bates stamp 60. |
| 16:43:44 | 16 | In particular, Mr. Gomez, I'm showing you page 287 of |
| 16:43:52 | 17 | Government's Exhibit 322. |
| 16:43:59 | 18 | A.   Is that going to show up on the screen? |
| 16:44:01 | 19 | Q.   In a second.  One second, your Honor.  I apologize.  Your |
| 16:44:06 | 20 | Honor, at this point, I'd offer Government's Exhibit 322.  I |
| 16:44:09 | 21 | don't see it's admitted into evidence yet. |
| 16:45:22 | 22 | MR. FINN:  Judge, I'm going to object.  They didn't lay |
| 16:45:25 | 23 | the proper predicate.  The affidavit is not sworn to. |
| 16:45:29 | 24 | MR. GARDNER:  I believe I did lay the proper predicate, |
| 16:45:30 | 25 | your Honor.  The witness has identified these are his records |

```
16:45:33   1   prepared by his accountant, Mr. Morschauser.
16:45:35   2          MR. FINN:  Judge, there's a certain procedure that
16:45:36   3   needs to be followed.
16:45:39   4          THE COURT:  At this time, you need to ask a few more
16:45:44   5   questions to qualify the admissibility.
16:45:52   6          MR. GARDNER:  I apologize.  Let me show this to Mr.
16:45:55   7   Finn.
16:46:07   8          MR. FINN:  No objection.
16:46:08   9          THE COURT:  All right.  322 is admitted.
16:46:10  10   Q.  (BY MR. GARDNER) Thank you, your Honor.
16:46:12  11          Now, Mr. Gomez, you talked about you being paid for
16:46:16  12   that horse.  Did Mr. Nayen explain to you who would be actually
16:46:20  13   making the payment?
16:46:25  14   A.  He told me he wasn't sure it was going to be Francisco
16:46:30  15   Colorado or another man.
16:46:36  16   Q.  Sir, I'm showing you a page from Bates stamp 60287, and this
16:46:51  17   shows a deposit of $200,000 into your account on January 11 from
16:46:58  18   ADT Petro Servicios.  Was that the payment for Kind Hearted?
16:47:02  19   A.  Yes, sir.
16:47:04  20   Q.  Sir, did you provide Carlos Nayen with the American Quarter
16:47:13  21   Horse Association transfer paperwork for that horse?
16:47:21  22   A.  I gave him -- when the mare was picked up, I gave him the
16:47:26  23   registration and the transfer.
16:47:29  24   Q.  The actual registration -- the certificate of registration
16:47:32  25   for the horse.
```

| | | |
|---|---|---|
| 16:47:33 | 1 | A.   Yes. |
| 16:47:34 | 2 | Q.   Do you know if that certificate of registration was ever |
| 16:47:37 | 3 | filed with the AQHA? |
| 16:47:39 | 4 | A.   I don't know. |
| 16:47:40 | 5 | Q.   And were you aware that horse was found in Lexington, |
| 16:47:44 | 6 | Oklahoma in June of 2012? |
| 16:47:47 | 7 | A.   Yes, I knew.  I was told.  The man that went to Los Alamitos |
| 16:48:04 | 8 | told -- |
| 16:48:04 | 9 | MR. FINN:  Judge, I'm going to object to hearsay. |
| 16:48:06 | 10 | MR. GARDNER:  That's fine, your Honor.  I don't have |
| 16:48:07 | 11 | any further questions for this witness. |
| 16:48:12 | 12 | THE COURT:  Mr. Finn. |
| 16:48:18 | 13 | MR. FINN:  Good afternoon.  No questions. |
| 16:48:26 | 14 | THE COURT:  Mr. Sanchez. |
| 16:48:28 | 15 | MR. SANCHEZ:  Thank you, your Honor. |
| 16:48:30 | 16 | CROSS-EXAMINATION |
| 16:48:30 | 17 | BY MR. SANCHEZ: |
| 16:49:05 | 18 | Q.   My name's Andres Sanchez.  Sorry, I don't think we |
| 16:49:07 | 19 | introduced ourselves.  I'm going to ask you a few questions. |
| 16:49:13 | 20 | A.   Fine.  I'm sorry. |
| 16:49:17 | 21 | Q.   Is this the wire we were just talking about? |
| 16:49:21 | 22 | A.   Yes, sir. |
| 16:49:23 | 23 | Q.   This is the date? |
| 16:49:24 | 24 | A.   Yes, sir. |
| 16:49:25 | 25 | Q.   Was this the -- |

16:49:35  1  A.   He's the one that does my taxes for me.  He's the one takes

16:49:38  2  the money for me.  He get the money and then, he give me the

16:49:46  3  money back later to pay horses or things.

16:50:01  4  Q.   I'm going to show you --

16:50:11  5       MR. GARDNER:  I'm sorry, Mr. Sanchez, what exhibit is

16:50:14  6  that?  I'm sorry.

16:50:20  7  Q.   (BY MR. SANCHEZ) Show you a page out of Colorado Exhibit 7.

16:50:25  8  Bates label 385.  Was this the particular wire?  Is that your

16:50:39  9  accountant?

16:50:41  10  A.   Yes, sir.

16:50:52  11  Q.   The $200,000?

16:50:54  12  A.   Yes, sir.

16:50:55  13  Q.   And that's the same date that we saw?

16:50:58  14  A.   Yes, sir.

16:51:00  15  Q.   That's January 11, 2012?

16:51:04  16  A.   Yes, sir.

16:51:05  17  Q.   Did you say you didn't know this person, Francisco

16:51:13  18  Silva-Ramos?

16:51:16  19  A.   Sir, I don't know him.

16:51:18  20  Q.   Have you heard of him?

16:51:20  21  A.   No, sir.

16:51:24  22  Q.   Does it look like on this document that this individual is

16:51:35  23  authorizing the payment to your accountant?

16:51:37  24  A.   I believe so.  He's signing the document.

16:51:51  25  Q.   I'll pass the witness.  No.  Wait.  Sorry.  Pass the

| | | |
|---|---|---|
| 16:52:01 | 1 | witness. |
| 16:52:03 | 2 | MR. WOMACK:  Thank you, your Honor. |
| 16:52:04 | 3 | CROSS-EXAMINATION |
| 16:52:06 | 4 | BY MR. WOMACK: |
| 16:52:06 | 5 | Q.   Good afternoon, Senior Gomez. |
| 16:52:07 | 6 | A.   Good afternoon. |
| 16:52:09 | 7 | Q.   Sir, I'm Guy Womack.  I live in Houston. |
| 16:52:12 | 8 | I want the jury to know who you are.  You told us that |
| 16:52:17 | 9 | you've been training for 25 years? |
| 16:52:19 | 10 | A.   Yes. |
| 16:52:21 | 11 | Q.   And you know that you're very highly regarded as a trainer. |
| 16:52:26 | 12 | A.   Yes, sir.  Thank you. |
| 16:52:29 | 13 | Q.   You're familiar with the horse Corona Cartel? |
| 16:52:32 | 14 | A.   Yes, sir. |
| 16:52:32 | 15 | Q.   You trained Corona Cartel? |
| 16:52:35 | 16 | A.   I trained Corona Cartel. |
| 16:52:38 | 17 | Q.   Corona Cartel is a very successful horse, isn't it? |
| 16:52:42 | 18 | A.   Yes, sir. |
| 16:52:44 | 19 | Q.   His racing career was while he was a two-year-old? |
| 16:52:52 | 20 | A.   Yes. |
| 16:52:53 | 21 | Q.   What was the biggest race that Corona Cartel won? |
| 16:52:57 | 22 | A.   The Million-Dollar Futurity.  It's run in September, it's -- |
| 16:53:11 | 23 | December, it's run at Los Alamitos, and they call it the |
| 16:53:16 | 24 | Million-Dollar Futurity. |
| 16:53:18 | 25 | Q.   How much money did Corona Cartel win for winning that race? |

16:53:29  1   A.   They get 41 percent of the purse.

16:53:32  2   Q.   So by winning that race, Corona Cartel won about $420,000.

16:53:39  3   A.   Something like that.

16:53:42  4   Q.   Do you know what Corona Cartel's career winnings were for

16:53:47  5   that -- he raced for one year.  What was his career winnings when

16:53:51  6   he retired?

16:53:53  7   A.   Sir, I don't remember.

16:53:54  8   Q.   Could it be around a half a million dollars?

16:54:00  9   A.   Maybe because he won the Kindergarten.  He won the

16:54:16  10  consolation race at the All American.  So he must have won

16:54:22  11  600,000, 500,000, in there, I think.

16:54:25  12  Q.   What year did Corona Cartel win the consolation race at the

16:54:32  13  All American Futurity?

16:54:38  14  A.   Seems like it was 2002.

16:54:41  15  Q.   Okay.  Corona Cartel retired as a two-year-old, didn't he?

16:54:48  16  A.   Three-year-old.

16:54:49  17  Q.   As a three-year-old?

16:54:51  18  A.   He was run one more time.

16:54:52  19       MR. GARDNER:  Your Honor, at this point, I'm going to

16:54:56  20  object to relevance.  This was not within the scope of the direct

16:54:59  21  examination.

16:55:01  22       MR. WOMACK:  Your Honor, I hate to hold him here as a

16:55:03  23  witness for the defense while he's here.  I'd like to go ahead

16:55:06  24  and just get his -- just a few questions.  When we started, they

16:55:11  25  asked him about being a trainer.  I'm going into just what a

16:55:14  1   trainer --

16:55:16  2           THE COURT:  Now, now, blanket's not over my eyes.  How

16:55:20  3   many more questions do you think?

16:55:21  4           MR. WOMACK:  About four.

16:55:22  5           THE COURT:  All right.  Proceed.

16:55:24  6           MR. WOMACK:  Thank you.

16:55:24  7   Q.  (BY MR. WOMACK) Senior Gomez, you know that Corona Cartel

16:55:34  8   now is being cared for by Butch Wise and the Lazy E Ranch?

16:55:42  9   A.   Yes, sir.

16:55:42  10  Q.   And you know that Corona Cartel is syndicating?

16:55:45  11  A.   Yes, sir.

16:55:47  12  Q.   In fact, you own a share in that syndication?

16:55:50  13  A.   Yes, sir.

16:55:51  14  Q.   How long a period of time does the syndication for Corona

16:55:58  15  Cartel run?  Is it like a period of time like two years or three

16:56:01  16  years?

16:56:09  17  A.   Are you asking setting up the syndicate, the syndication?

16:56:13  18  Are you asking about setting it up?

16:56:14  19  Q.   If one buys a share in the syndicate for Corona Cartel, for

16:56:20  20  how long a period of time are they entitled to breeding him?

16:56:25  21  A.   All his life.  Every day the horse lives, his entire life.

16:56:35  22  Q.   And do you pay additional fees or a number of -- over years?

16:56:55  23  A.   You pay a certain percentage to the ranch where he is, and

16:57:00  24  any time you inseminate, you have to pay what they call a booking

16:57:05  25  fee.  And I don't know -- remember if that's 500 or 600.

| | | |
|---|---|---|
| 16:57:09 | 1 | Q.   Dollars or thousands of dollars? |
| 16:57:11 | 2 | A.   Dollars.  $500. |
| 16:57:15 | 3 | Q.   And with regards to Corona Cartel, his value as a breeding |
| 16:57:21 | 4 | stallion will far exceed his winnings as a race horse, correct? |
| 16:57:53 | 5 | A.   Well, there was a point that he was worth more than what he |
| 16:57:58 | 6 | was syndicated for.  And there was a point where the embryos were |
| 16:58:01 | 7 | worth 50,000.  He's an old horse now.  I don't know what he can |
| 16:58:05 | 8 | do. |
| 16:58:06 | 9 | Q.   But if you compare the money that he has generated in |
| 16:58:11 | 10 | breeding as compared to the half million or so that he won, as a |
| 16:58:16 | 11 | breeding stallion, he's been worth much more, correct? |
| 16:58:20 | 12 | MR. GARDNER:  Your Honor, at this point, I'm going to |
| 16:58:21 | 13 | object to the relevance.  And Mr. Womack said he had four |
| 16:58:24 | 14 | questions and I believe that's nine. |
| 16:58:28 | 15 | MR. WOMACK:  Sorry, your Honor.  That is the last |
| 16:58:29 | 16 | question. |
| 16:58:30 | 17 | THE COURT:  He really isn't asking any questions.  He's |
| 16:58:32 | 18 | just -- no, no, no, no.  He's just making a statement and asking |
| 16:58:36 | 19 | the witness if he agreed.  And if you objected to leading, I |
| 16:58:41 | 20 | would have sustained it.  But he can answer the question. |
| 16:58:44 | 21 | A.   But I didn't understand you.  If you repeat that, please. |
| 16:58:47 | 22 | Q.   (BY MR. WOMACK) You told us that Corona Cartel won about a |
| 16:58:51 | 23 | half a million dollars racing.  And if you compare that to the |
| 16:58:57 | 24 | amount of money he has made for his owner as a breeding stallion, |
| 16:59:02 | 25 | the money he has made breeding is far greater than his winnings |

| | | |
|---|---|---|
| 16:59:06 | 1 | as a race horse, correct? |
| 16:59:08 | 2 | A.   Yes, sir. |
| 16:59:09 | 3 | MR. GARDNER:  Your Honor, objection.  Leading. |
| 16:59:10 | 4 | THE COURT:  Sustained. |
| 16:59:16 | 5 | Q.   (BY MR. WOMACK) Comparing his winnings as a race horse to |
| 16:59:18 | 6 | the amount of money that he has made as a breeding stallion, |
| 16:59:21 | 7 | which is greater? |
| 16:59:22 | 8 | MR. GARDNER:  Your Honor, objection. |
| 16:59:24 | 9 | MR. WOMACK:  It's "Yes" or "No."  It's not leading. |
| 16:59:27 | 10 | MR. GARDNER:  Relevance.  That's a different objection. |
| 16:59:31 | 11 | It's repetitive, your Honor. |
| 16:59:32 | 12 | THE COURT:  It is repetitive, too, and it's repetitive |
| 16:59:34 | 13 | with the witness.  But hopefully the gentleman can answer the |
| 16:59:37 | 14 | question or not. |
| 16:59:51 | 15 | A.   As a breeding stallion. |
| 16:59:53 | 16 | MR. WOMACK:  Thank you.  No further questions, your |
| 16:59:54 | 17 | Honor. |
| 16:59:59 | 18 | CROSS-EXAMINATION |
| 16:59:59 | 19 | BY MR. ESPER: |
| 17:00:02 | 20 | Q.   Mr. Gomez, in the 25 years as a trainer, you have always |
| 17:00:06 | 21 | focused on training the horses, correct? |
| 17:00:09 | 22 | A.   Yes, sir. |
| 17:00:11 | 23 | Q.   The collection of money and the billing, you leave to an |
| 17:00:15 | 24 | accountant or a bookkeeper, correct? |
| 17:00:29 | 25 | A.   When it's a large bill or account, it's in the hands of the |

| | | |
|---|---|---|
| 17:00:35 | 1 | accountant.  Give it to the accountant.  I don't touch it. |
| 17:00:38 | 2 | Q.    Thank you, sir. |
| 17:00:40 | 3 | THE COURT:  Mr. Mayr. |
| 17:00:42 | 4 | MR. MAYR:  With that, your Honor, I have no further |
| 17:00:44 | 5 | questions. |
| 17:00:44 | 6 | MR. FINN:  No objection. |
| 17:00:45 | 7 | THE COURT:  All right. |
| 17:00:48 | 8 | MR. GARDNER:  Nothing further, your Honor.  Thank you. |
| 17:00:49 | 9 | May this witness be excused? |
| 17:00:51 | 10 | THE COURT:  You may be excused, sir. |
| 17:00:54 | 11 | MR. GARDNER:  Your Honor, the government would call Mr. |
| 17:00:57 | 12 | Juan Aleman. |
| 17:01:23 | 13 | (Witness sworn.) |
| 17:01:36 | 14 | THE COURT:  Tell us your full name and spell your last, |
| 17:01:41 | 15 | please. |
| 17:01:41 | 16 | THE WITNESS:  Juan Gabino-Aleman.  Last name is |
| 17:01:45 | 17 | spelled, A-L-E-M-A-N. |
| 17:01:47 | 18 | JUAN GABINO-ALEMAN, called by the Government, duly sworn. |
| 17:01:47 | 19 | DIRECT EXAMINATION |
| 17:01:47 | 20 | BY MR. GARDNER: |
| 17:01:49 | 21 | Q.    Good afternoon, Mr. Aleman. |
| 17:01:50 | 22 | A.    Afternoon. |
| 17:01:50 | 23 | Q.    Could you please introduce yourself for the jury and tell |
| 17:01:53 | 24 | them how old you are and what you do for a living? |
| 17:01:55 | 25 | A.    My name is Juan G. Aleman and I'm a trainer at Los Alamitos |

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

| | | |
|---|---|---|
| 17:02:00 | 1 | race track, been training for 15 years. |
| 17:02:05 | 2 | Q.   Sir, were you ever approached on behalf of a company called |
| 17:02:09 | 3 | Bonanza Racing Stables to train horses? |
| 17:02:12 | 4 | A.   Yes. |
| 17:02:13 | 5 | Q.   And when was that roughly? |
| 17:02:20 | 6 | A.   October 2011. |
| 17:02:23 | 7 | Q.   And who approached you for that? |
| 17:02:24 | 8 | A.   Fernando. |
| 17:02:30 | 9 | Q.   And do you see an individual you know as Fernando in the |
| 17:02:33 | 10 | courtroom today? |
| 17:02:34 | 11 | A.   Yes. |
| 17:02:34 | 12 | Q.   And that's Fernando Garcia, the defendant standing up with |
| 17:02:37 | 13 | the purple shirt? |
| 17:02:38 | 14 | A.   Yes. |
| 17:02:39 | 15 | Q.   Your Honor, may the record reflect the witness has |
| 17:02:41 | 16 | identified the Defendant Fernando Garcia? |
| 17:02:43 | 17 |         THE COURT:  It does so reflect. |
| 17:02:45 | 18 |         MR. GARDNER:  Thank you, your Honor. |
| 17:02:46 | 19 | Q.   (BY MR. GARDNER) And what discussions did you have with |
| 17:02:48 | 20 | Fernando Garcia with regards to Bonanza Racing Stables? |
| 17:02:55 | 21 | A.   Just delivery of papers of registration papers. |
| 17:02:59 | 22 | Q.   For the horses that you were supposed to train? |
| 17:03:00 | 23 | A.   Yes, sir. |
| 17:03:01 | 24 | Q.   May I have one moment, your Honor? |
| 17:03:10 | 25 |         And do you recall right offhand, the top of your head, |

```
17:03:12   1   what horses you were going to train?

17:03:14   2   A.   I can remember a few but not all of them off the top of my

17:03:23   3   head.

17:03:23   4   Q.   Just give me the ones you can, please.

17:03:25   5   A.   Cartel Straw, Dashing Dude.  I can't recall the rest.

17:03:41   6   Q.   And when did you receive those horses?

17:03:46   7   A.   Roughly, November of 2011.

17:03:52   8   Q.   And do you prepare a billing statement for your training

17:03:55   9   fees?

17:03:55  10   A.   Yes, I do.

17:03:56  11   Q.   And how was that billing statement forwarded to the person

17:04:04  12   responsible for the bills?  Did you hand them to Fernando Garcia?

17:04:06  13   A.   No.  I did not.

17:04:07  14   Q.   Okay.  So how did you get the bills to whoever?

17:04:10  15   A.   I e-mailed them.

17:04:11  16   Q.   Okay.  Who provided you that e-mail address?

17:04:13  17   A.   I was texted by Fernando by e-mail.

17:04:17  18   Q.   Do you recall that e-mail?

17:04:19  19   A.   I can't.  Off the top of my head, I cannot.

17:04:21  20   Q.   Anri2319@hotmail refresh your memory?

17:04:25  21   A.   That sounds familiar.  Yes.

17:04:26  22   Q.   I'm showing you Government's Exhibit 358G.  And, again, Mr.

17:04:31  23   Aleman, was that the e-mail provided to you by the Defendant

17:04:35  24   Fernando Garcia?

17:04:36  25   A.   Yes.
```

| | | |
|---|---|---|
| 17:04:38 | 1 | Q.   And what was your understanding of the billing that you were |
| 17:04:42 | 2 | to be provided to that e-mail address? |
| 17:04:45 | 3 | A.   All the racing -- race training was to be delivered to that |
| 17:04:51 | 4 | e-mail. |
| 17:04:52 | 5 | Q.   And how did you get paid? |
| 17:04:55 | 6 | A.   I was -- they would deposit my account. |
| 17:04:59 | 7 | Q.   And did you trace the source of those deposits, or was there |
| 17:05:03 | 8 | wire, or was it check, or how was it paid? |
| 17:05:05 | 9 | A.   They just showed up on the account as deposits. |
| 17:05:10 | 10 | Q.   Do you have a bookkeeper? |
| 17:05:11 | 11 | A.   Yes, I do. |
| 17:05:12 | 12 | Q.   Mr. Aleman, I'm going to show you Government's Exhibit 313. |
| 17:05:19 | 13 | And I know you've signed this and it's been attested to in |
| 17:05:24 | 14 | California, but could you look through those real quick and tell |
| 17:05:27 | 15 | me if those are the records you provided to the government? |
| 17:05:29 | 16 | A.   Yes, sir. |
| 17:05:44 | 17 | Q.   And what company do you operate your training business |
| 17:05:47 | 18 | under, Mr. Aleman? |
| 17:05:48 | 19 | A.   JGA Racing Stables. |
| 17:05:51 | 20 | Q.   These are the business records for JGA Racing Stables? |
| 17:05:54 | 21 | A.   Yes, sir. |
| 17:05:55 | 22 | Q.   Your Honor, I offer Government's Exhibit 313. |
| 17:06:01 | 23 | THE COURT:  They're received.  Excuse me. |
| 17:06:18 | 24 | MR. GARDNER:  Bates 58, your Honor, I apologize. |
| 17:07:14 | 25 | MR. FINN:  Could we approach, your Honor? |

| | | |
|---|---|---|
| 17:07:20 | 1 | (At the bench, on the record.) |
| 17:07:22 | 2 | MR. FINN:  Judge, this is not his signature, Doug tells |
| 17:07:26 | 3 | me.  And this, quote, unquote, affidavit is not notarized.  I |
| 17:07:34 | 4 | insisted that he lay the business record predicate, and he said |
| 17:07:35 | 5 | he didn't want to do that and so. |
| 17:07:48 | 6 | MR. GARDNER:  It's a California business record |
| 17:07:50 | 7 | affidavit.  Mr. Finn does also have this.  He knows it's a |
| 17:07:54 | 8 | business record, he knows it's an affidavit. |
| 17:07:58 | 9 | MR. FINN:  It's incomplete.  I wouldn't object if it |
| 17:08:02 | 10 | were complete.  It's just not. |
| 17:08:03 | 11 | THE COURT:  I didn't allow their exhibits for the same |
| 17:08:06 | 12 | reason, Mr. Gardner, and that is they were not notarized or |
| 17:08:13 | 13 | self-proven. |
| 17:08:14 | 14 | MR. FINN:  Your Honor, Mexico. |
| 17:08:18 | 15 | THE COURT:  So I sustain the objection. |
| 17:08:20 | 16 | MR. GARDNER:  This is my fault. |
| 17:08:21 | 17 | MS. FERNALD:  I'm sorry.  I didn't want to -- |
| 17:08:24 | 18 | THE COURT:  We didn't get a second page. |
| 17:08:28 | 19 | MR. GARDNER:  I apologize, your Honor.  I did not show |
| 17:08:30 | 20 | that to Mr. Finn. |
| 17:08:42 | 21 | MR. FINN:  There's still a problem.  This is not his |
| 17:08:45 | 22 | signature.  It's somebody named Patel. |
| 17:08:49 | 23 | THE COURT:  It's probably Patel's records. |
| 17:08:54 | 24 | MR. FINN:  I don't know whose records it is but he -- |
| 17:08:58 | 25 | you know, all Doug said -- |

| | | |
|---|---|---|
| 17:08:59 | 1 | THE COURT:  Well, Patel is the notary.  And Juan |
| 17:09:10 | 2 | Gabino-Aleman did the swearing. |
| 17:09:12 | 3 | MR. FINN:  I've still got to object, Judge. |
| 17:09:13 | 4 | THE COURT:  Well, that objection is overruled.  It's |
| 17:09:15 | 5 | admitted. |
| 17:09:39 | 6 | Q.   (BY MR. GARDNER) In addition to training for Bonanza, did |
| 17:09:46 | 7 | you also train for an individual by the name of "Pancho" |
| 17:09:50 | 8 | Colorado? |
| 17:09:50 | 9 | A.   Yes, sir. |
| 17:09:51 | 10 | Q.   Okay.  Do you recognize him in the courtroom here today? |
| 17:09:56 | 11 | You may have to stand up. |
| 17:09:57 | 12 | A.   Yes, sir. |
| 17:09:57 | 13 | Q.   The individual standing with the blue tie?  And when were |
| 17:10:02 | 14 | you approached to train Defendant Colorado's horses? |
| 17:10:05 | 15 | A.   The end of October, early November of 2011. |
| 17:10:19 | 16 | Q.   The same time you were approached on Bonanza? |
| 17:10:22 | 17 | A.   Yes, sir. |
| 17:10:22 | 18 | Q.   And who was handling the arrangements for that, if you |
| 17:10:28 | 19 | recall? |
| 17:10:30 | 20 | A.   I don't recall. |
| 17:10:32 | 21 | Q.   And your records that were just introduced as Government's |
| 17:10:36 | 22 | Exhibit 313, that reflects your billing statements for both |
| 17:10:39 | 23 | Bonanza and Defendant Colorado? |
| 17:10:42 | 24 | A.   Separate accounts.  Yes. |
| 17:10:43 | 25 | Q.   Separate accounts. |

256

17:10:49  1        Now, when you're training a horse, who handles the vet
17:10:55  2   bills?  Does the trainer or the owner?
17:10:58  3   A.   The veterinary bills is -- bills the owner.
17:11:04  4   Q.   Could you explain that to the jury?  What happens if a horse
17:11:08  5   gets sick, what happens?
17:11:09  6   A.   Well, as a trainer, I call the veterinarian, veterinarian
17:11:14  7   comes, checks the horse out, and he writes the horse's name, and
17:11:18  8   they go ahead and follow up and do the billing directly to the
17:11:22  9   owner.
17:11:22  10  Q.   Was it your practice to ever pay for vet bills for an owner?
17:11:30  11  A.   Unless a special arrangement is made.
17:11:33  12  Q.   But normal practice is the owner pays for the vet bills?
17:11:36  13  A.   Yes, sir.
17:11:36  14  Q.   May I have one moment, your Honor?
17:11:39  15       THE COURT:  Yes, sir.
17:11:54  16       MR. GARDNER:  Your Honor, I'll pass the witness.
17:11:57  17       THE COURT:  Mr. Finn.
17:12:02  18       MR. FINN:  No questions, Judge.
17:12:05  19       MR. DEGEURIN:  No, your Honor.
17:12:06  20       MR. WOMACK:  Briefly, your Honor.
17:12:07  21                      CROSS-EXAMINATION
17:12:07  22  BY MR. WOMACK:
17:12:08  23  Q.   Mr. Aleman?
17:12:09  24  A.   Yes.
17:12:10  25  Q.   I'm Guy Womack from Houston.  Do you know Fernando Garcia?

| | | |
|---|---|---|
| 17:12:16 | 1 | A.   I do not know him. |
| 17:12:19 | 2 | Q.   Do you not recognize him? |
| 17:12:21 | 3 | A.   I recognize him now. |
| 17:12:21 | 4 | Q.   Okay.  That's Fernando Garcia.  Correct? |
| 17:12:24 | 5 | A.   Yes. |
| 17:12:25 | 6 | Q.   Okay.  And you've known Fernando for a number of years? |
| 17:12:29 | 7 | A.   No. |
| 17:12:30 | 8 | Q.   You don't know him as a fellow trainer? |
| 17:12:32 | 9 | A.   No. |
| 17:12:33 | 10 | Q.   Okay.  Do you know that he represents a number of buyers and |
| 17:12:37 | 11 | sellers of horses? |
| 17:12:38 | 12 | A.   I briefly met Fernando but I had no -- not much |
| 17:12:43 | 13 | communication with him. |
| 17:12:43 | 14 | Q.   Okay.  And you met him in connection with him representing |
| 17:12:48 | 15 | horse buyers and sellers? |
| 17:12:50 | 16 | A.   Yes. |
| 17:12:50 | 17 | Q.   Okay.  Now, with regards to this Bonanza Racing Stables, |
| 17:12:58 | 18 | that was the first time you had dealt with Bonanza Racing |
| 17:13:01 | 19 | Stables? |
| 17:13:01 | 20 | A.   Yes, sir. |
| 17:13:02 | 21 | Q.   And Fernando Garcia told you that you needed to submit bills |
| 17:13:09 | 22 | and statements to Bonanza to use that e-mail address, that Anri, |
| 17:13:12 | 23 | whatever? |
| 17:13:12 | 24 | A.   Yes. |
| 17:13:14 | 25 | Q.   Okay.  Thank you.  No further questions. |

| | | |
|---|---|---|
| 17:13:24 | 1 | THE COURT:  Mr. Esper? |
| 17:13:26 | 2 | MR. ESPER:  I have no questions, your Honor. |
| 17:13:28 | 3 | MR. MAYR:  Nor do I, your Honor. |
| 17:13:28 | 4 | RE-DIRECT EXAMINATION |
| 17:13:28 | 5 | BY MR. GARDNER: |
| 17:13:31 | 6 | Q.   So, Mr. Aleman, your 15 years as a trainer at Los Alamitos, |
| 17:13:34 | 7 | did you encounter the Defendant Fernando Garcia on what you would |
| 17:13:39 | 8 | term a regular basis? |
| 17:13:40 | 9 | A.   No. |
| 17:13:40 | 10 | Q.   Thank you, your Honor.  That's all I have. |
| 17:13:42 | 11 | THE COURT:  May this witness be excused? |
| 17:13:44 | 12 | MR. GARDNER:  Please, your Honor. |
| 17:13:45 | 13 | THE COURT:  You may be excused. |
| 17:13:46 | 14 | THE WITNESS:  Thank you. |
| 17:13:53 | 15 | MR. GARDNER:  Your Honor, the government would call |
| 17:13:55 | 16 | Raul Guadalajara.  He's an in-custody witness. |
| 17:15:03 | 17 | (Witness sworn.) |
| 17:15:21 | 18 | THE COURT:  Tell us your full name, please, sir. |
| 17:15:32 | 19 | THE WITNESS:  Raul Guadalajara-Guia. |
| 17:15:34 | 20 | THE COURT:  Would you spell Guadalajara, please? |
| 17:15:36 | 21 | THE WITNESS:  G-U-A-D-A-L-A-J-A-R-A. |
| 17:15:40 | 22 | RAUL GUADALAJARA GUIA, called by the Government, duly sworn. |
| 17:15:40 | 23 | DIRECT EXAMINATION |
| 17:15:40 | 24 | BY MR. GARDNER: |
| 17:15:42 | 25 | Q.   Thank you, your Honor. |

17:15:42  1            I believe, Mr. Guadalajara, you also said Guia there at
17:15:45  2   the end.  That's G-U-I-A, correct?
17:15:48  3   A.   Yes.
17:15:48  4   Q.   That's your full name?
17:15:49  5   A.   Yes.
17:15:50  6   Q.   Mr. Guadalajara, you and I have met.  Could you please
17:15:55  7   introduce yourself to the jury?  Tell them how old you are, where
17:15:57  8   you're from, and what you did before you were incarcerated.
17:16:00  9   A.   I'm from San Antonio.  I was born in San Antonio, Texas.
17:16:05 10   And I was raised in Mexico and I'm 40 years old.
17:16:09 11   Q.   And are you a United States citizen?
17:16:13 12   A.   Yes, sir.
17:16:14 13   Q.   And, sir, have you been not convicted but have you pled
17:16:19 14   guilty to drug charges in San Antonio?
17:16:20 15   A.   Yes, sir, I did.
17:16:21 16   Q.   All right.  Are you pending sentencing for that offense?
17:16:25 17   A.   Yes, sir.
17:16:26 18   Q.   And, sir, if you will, are you also pending charges in the
17:16:29 19   Eastern District of Texas in Sherman for drug charges, as well?
17:16:34 20   A.   Yes, sir.
17:16:36 21   Q.   What do you hope to get out of your testimony here today,
17:16:39 22   sir?
17:16:39 23   A.   Just time off.
17:16:43 24   Q.   Time off your sentence, whatever that may be?
17:16:45 25   A.   Yes, sir.

```
17:16:45   1   Q.   And do you understand that it's not going to be the judge
17:16:47   2   who makes that determination?
17:16:48   3   A.   Yes, sir.  I understand that.
17:16:49   4   Q.   If you will, sir, do you know an individual by the name of
17:16:54   5   "Poncho" Cuellar?
17:16:55   6   A.   Yes, sir.
17:16:56   7   Q.   Could you please tell the jury how you first met "Poncho"
17:17:00   8   Cuellar?
17:17:00   9   A.   "Poncho" Cuellar, I met him by one of my friends when he --
17:17:04  10   they sent him to get a load of marihuana in a house.  That's how
17:17:08  11   I met him and then, I started working for him.
17:17:11  12   Q.   Sir, if you will, could you speak up just a little bit?
17:17:14  13   A.   I started working for him bringing drugs over here, just
17:17:17  14   like going in the front, checking that they get past the
17:17:21  15   checkpoint and where they were going to.
17:17:24  16   Q.   And so, after being introduced to Mr. Cuellar, what did you
17:17:28  17   end up doing for him?
17:17:29  18   A.   Just bringing the cocaine over here to United States, going
17:17:34  19   in front, checking that they get to the part they were going.
17:17:38  20   Q.   And where would you transfer the cocaine from in Mexico?
17:17:41  21   A.   From Nava, Coahuila, Piedras Negras.
17:17:45  22   Q.   Piedras Negras?
17:17:45  23   A.   Yes, sir.
17:17:46  24   Q.   And where would you take the cocaine to?
17:17:47  25   A.   Sometimes San Antonio, sometimes Dallas.
```

| | | |
|---|---|---|
| 17:17:52 | 1 | Q.   How long did you transport cocaine for Mr. Cuellar? |
| 17:17:55 | 2 | A.   For three years, four years. |
| 17:17:57 | 3 | Q.   And would you also be responsible for taking the money back |
| 17:18:05 | 4 | into Mexico from the sale of cocaine? |
| 17:18:07 | 5 | A.   I was responsible for receiving the money up there and just |
| 17:18:10 | 6 | to separate haul it and take it to "Cuno."  That was bookkeeper |
| 17:18:16 | 7 | for "Zeta Cuarenta." |
| 17:18:26 | 8 | Q.   Do you recognize that person on the screen, sir? |
| 17:18:28 | 9 | A.   Yes, sir. |
| 17:18:28 | 10 | Q.   And who is that? |
| 17:18:29 | 11 | A.   Miguel Angel Morales, "Zeta Cuarenta." |
| 17:18:44 | 12 | Q.   That's Government's Exhibit 335A.  Could you pull up 335B, |
| 17:18:48 | 13 | please?  Do you recognize that individual, sir? |
| 17:18:52 | 14 | A.   Yes, sir.  That's his brother "Zeta Cuarenta Dos." |
| 17:18:57 | 15 | Q.   So when you say you separated the money, what would you mean |
| 17:19:01 | 16 | by that? |
| 17:19:02 | 17 | A.   The small bills like marking it, we would clean it, we would |
| 17:19:07 | 18 | take it away, and we only keep the 20 and the largest bills. |
| 17:19:10 | 19 | Q.   Okay.  So when you say clean the small bills, what do you |
| 17:19:13 | 20 | mean by that? |
| 17:19:13 | 21 | A.   Nothing they had like a pen or writing on it, they don't |
| 17:19:17 | 22 | want that.  We have to take that out of the way and just get like |
| 17:19:20 | 23 | the 20, 50, 100s with no marks or anything like that. |
| 17:19:23 | 24 | Q.   When you say "they," are you referring to "Cuarenta" and a |
| 17:19:27 | 25 | "Cuarenta Dos"? |

| | | |
|---|---|---|
| 17:19:28 | 1 | A.   Uh-huh.  Yes, sir. |
| 17:19:29 | 2 | Q.   How did you come to get arrested and placed in jail? |
| 17:19:34 | 3 | A.   In San Antonio? |
| 17:19:35 | 4 | Q.   Yes, sir. |
| 17:19:36 | 5 | A.   With cocaine.  One of my friends sent me cocaine from Mexico |
| 17:19:41 | 6 | and they set me up.  That's how I got arrested. |
| 17:19:44 | 7 | Q.   And do you remember how much cocaine they sent you? |
| 17:19:47 | 8 | A.   They sent me -- the first time, they sent me seven keys and |
| 17:19:50 | 9 | then five. |
| 17:19:52 | 10 | Q.   And was that person cooperating with the government? |
| 17:19:55 | 11 | A.   Yes, sir. |
| 17:19:56 | 12 | Q.   Set you up? |
| 17:19:57 | 13 | A.   Uh-huh. |
| 17:19:57 | 14 | Q.   And did you, in fact, have five or seven keys on two |
| 17:20:01 | 15 | separate occasions? |
| 17:20:02 | 16 | A.   Yes, sir. |
| 17:20:02 | 17 | Q.   So when was the first time you met "40" and "42"? |
| 17:20:07 | 18 | A.   2008.  We were Piedras Negras, Chapa.  There was a truck |
| 17:20:14 | 19 | next to the airport, Chapa was the owner. |
| 17:20:18 | 20 | Q.   And who was -- I'm sorry.  I interrupted. |
| 17:20:21 | 21 | A.   And they wanted to see a horse race so we were there. |
| 17:20:25 | 22 | That's where I met. |
| 17:20:26 | 23 | Q.   In Piedras Negras? |
| 17:20:27 | 24 | A.   Yes, sir. |
| 17:20:29 | 25 | Q.   And this Chapa, do you recall the first name of this? |

```
17:20:32   1   A.   Hector.

17:20:32   2   Q.   Hector?

17:20:33   3   A.   Yes.

17:20:33   4   Q.   And what did Hector do for a living?

17:20:36   5   A.   He's a lawyer in Piedras Negras.

17:20:37   6   Q.   Do you know if Hector Chapa has a brother who's a

17:20:41   7   veterinarian?

17:20:41   8   A.   Yes, sir.

17:20:41   9   Q.   And what's that person's name?

17:20:43  10   A.   Gerardo.

17:20:43  11   Q.   Gerardo Chapa?

17:20:45  12   A.   Yes, sir.

17:20:46  13   Q.   Let me come back to Mr. Gerardo Chapa in a second.  Do you

17:20:55  14   know a person named "Mamito"?

17:20:58  15   A.   Yes, sir.

17:20:58  16   Q.   And how do you know him?

17:20:59  17   A.   I met him there at the same place.

17:21:02  18   Q.   And, again, I didn't understand the name of the place.

17:21:06  19   Could you repeat the name of the place?

17:21:07  20   A.   It was Guala Heridad (phonetic).  They had like a barn

17:21:11  21   there.  It belongs to Chapa's dad, to Hector's dad.

17:21:14  22   Q.   And what was going on at this meeting?

17:21:16  23   A.   They just wanted to see a horse race there.

17:21:21  24   Q.   When you say a horse race.

17:21:23  25   A.   "Zeta Cuarenta," "42," they wanted to see the race against
```

17:21:26  1  another one.  It was just like a race, number race.

17:21:29  2  Q.    Was it a public race for everyone?

17:21:33  3  A.    No.  It was just for them.

17:21:34  4  Q.    Okay.  A small match race?

17:21:35  5  A.    Yeah.  "Mamito" and "Zeta Cuarento" and all them -- "Metro"

17:21:39  6  was there, also.

17:21:40  7  Q.    "Metro"?

17:21:41  8  A.    Yeah, from Piedras Negras.

17:21:42  9  Q.    And I think the jury's heard testimony.  Was he the plaza

17:21:46  10  boss of Piedras Negras?

17:21:47  11  A.    Yes, sir.  At the time, he was the plaza boss.

17:21:50  12  Q.    Do you know much about quarter horses?

17:21:52  13  A.    Yes.  I know a little bit of quarter horses.

17:21:56  14  Q.    And is that from your experience with the Zetas?

17:21:59  15  A.    It was with them.

17:22:00  16  Q.    Do you know a horse or familiar with a horse called Tempting

17:22:04  17  Dash?

17:22:04  18  A.    Yes, sir, I know.

17:22:05  19  Q.    And do you recall if that horse had another name before?

17:22:08  20  A.    Just called it a "Huesos" in Mexico.

17:22:15  21  Q.    And now, going back to Gerardo Chapa, was he the

17:22:18  22  veterinarian for that horse?

17:22:20  23  A.    Yes.

17:22:21  24  Q.    And who dealt with that horse while it was in Mexico?

17:22:26  25  A.    The trainer?

17:22:28  1   Q.   Who was responsible for the horse, I guess is a better

17:22:31  2   question?

17:22:33  3   A.   At the time the trainer was Pedro.  That was his name and

17:22:39  4   "Poncho" was the one that made like the payments there.

17:22:41  5   Q.   When you say "Poncho," that's Mr. Cuellar?

17:22:44  6   A.   Mario Cuellar.

17:22:48  7   Q.   Whose horse was Tempting Dash really?

17:22:52  8   A.   It belonged to "Zeta 40."  And "Zeta 42."  That's what they

17:23:00  9   told me.

17:23:00  10  Q.   Did either "40" or "42" buy any other horses?

17:23:03  11  A.   Yes, they did.

17:23:04  12  Q.   Did that occur in Mexico or did that occur in the United

17:23:07  13  States?

17:23:07  14  A.   No.  They buy all the horses here in the United States.

17:23:11  15  Q.   Do you know where they would buy them?

17:23:12  16  A.   They bought them at auctions, like Heritage Place, New

17:23:16  17  Mexico, and somewhere in California.

17:23:19  18  Q.   And did "40" ever tell you how much money he spent on horses

17:23:23  19  in the U.S.?

17:23:24  20  A.   There was a time when we were after the race with

17:23:28  21  Mr. Piloto, I met "40" in the gas station outside of Sabinas,

17:23:32  22  Mexico, and he told me that he spent like $4 million.

17:23:35  23  Q.   This was after the All American Futurity?

17:23:37  24  A.   Yes, sir.

17:23:39  25  Q.   And are you aware if there was an auction associated with

17:23:42    1   that race?  I'm sorry.  Was there an auction about the same time

17:23:47    2   as that race?

17:23:47    3   A.   Yeah.  Before the futurity, there was an auction before the

17:23:51    4   All American Futurity.

17:23:53    5   Q.   Before the All American Futurity?

17:23:54    6   A.   Yes, sir.

17:23:55    7   Q.   Now, when you mentioned the All American Futurity, were you

17:24:01    8   present watching that race on the internet?

17:24:03    9   A.   Yes, sir.

17:24:03   10   Q.   And who was -- who else was present?

17:24:05   11   A.   Its was "Zeta 42," Comandante Carlos, Mario Cuellar, Hector

17:24:14   12   Moreno, "Huecho" and "la Vispa."  There was also "El Chihuas"

17:24:24   13   (phonetic).  He was the commander-in-chief of the Cinco

17:24:29   14   Manantiales.

17:24:29   15   Q.   These people, you identify them by their nicknames.  Was

17:24:31   16   that the only names you knew them by?

17:24:33   17   A.   Yes, sir.

17:24:33   18   Q.   And did you watch this race on TV, or did you watch it over

17:24:37   19   the internet?

17:24:38   20   A.   It was a computer connected to the TV.

17:24:42   21   Q.   And do you know if someone logged into that computer to

17:24:46   22   watch that race?

17:24:47   23   A.   Someone sent a code for "Zeta Cuarenta" so they could put it

17:24:52   24   in there.

17:24:53   25   Q.   Do you know what that code was?

17:24:54   1   A.    No, sir.  I don't know.

17:24:58   2   Q.    And during the watching of that race on the internet, did

17:25:02   3   "40" or "42" say anything about fixing that race?

17:25:05   4   A.    He said that they had gave the gates $10,000.  He mentioned

17:25:11   5   to us, to everybody that was in the room.

17:25:13   6   Q.    Everyone that was in the room?

17:25:15   7   A.    Yes, sir.

17:25:15   8   Q.    And what did you understand that to mean, the gates $10,000?

17:25:18   9   A.    He says like they want to let his horse go first or get --

17:25:23  10   when it was ready to open the gate, not wait for other ones.

17:25:28  11   Q.    During that internet-watching party Mr. Piloto, did "40" or

17:25:34  12   "42" mention their brother Jose?

17:25:35  13   A.    Yes, he did.

17:25:36  14   Q.    Okay.  And who did?

17:25:37  15   A.    "40."

17:25:38  16   Q.    And what did he say, sir?

17:25:40  17   A.    He said that after waking every day at 5:00 in the morning

17:25:44  18   to go to work, his brother never imagined himself at the race

17:25:47  19   with the horses business.

17:25:51  20   Q.    And have you ever met Jose Trevino?

17:25:52  21   A.    No, sir.  I never met him.

17:25:55  22   Q.    And did "40" have a nickname for him or something he called

17:25:59  23   him?

17:25:59  24   A.    Yes, he did.

17:25:59  25   Q.    And what was that?

| | | |
|---|---|---|
| 17:26:00 | 1 | A.   He called him compadre. |
| 17:26:02 | 2 | Q.   And who did you understand compadre to be? |
| 17:26:05 | 3 | A.   His brother. |
| 17:26:08 | 4 | Q.   Do you know Carlos Nayen? |
| 17:26:09 | 5 | A.   Yes, I do. |
| 17:26:10 | 6 | Q.   Do you recognize that photo, sir, on the screen? |
| 17:26:17 | 7 | A.   Yes, sir. |
| 17:26:18 | 8 | Q.   And who do you recognize that photo as? |
| 17:26:19 | 9 | A.   That's Carlitos, Carlos Nayen. |
| 17:26:22 | 10 | Q.   And what was his role for the Zetas? |
| 17:26:25 | 11 | A.   He would go buy the horses at the auction, and what I |
| 17:26:29 | 12 | understand, he was a trainer for Mr. Piloto. |
| 17:26:33 | 13 | Q.   Your understanding was that Carlos Nayen was the trainer for |
| 17:26:36 | 14 | Mr. Piloto? |
| 17:26:36 | 15 | A.   Yes, sir. |
| 17:26:36 | 16 | Q.   And where did you get that information from? |
| 17:26:39 | 17 | A.   When we were there watching the TV, he would tell us. |
| 17:26:43 | 18 | "Cuarenta" would tell us that. |
| 17:26:44 | 19 | Q.   During Mr. Piloto race? |
| 17:26:48 | 20 | A.   Yes, sir. |
| 17:26:48 | 21 | Q.   Did "40" ever mention the name of Fernando Garcia as being |
| 17:26:51 | 22 | the trainer for that race? |
| 17:26:52 | 23 | A.   No.  He never mentioned that. |
| 17:26:59 | 24 | Q.   And on the occasion when you would meet Carlos Nayen, what |
| 17:27:06 | 25 | would you do with him or for him? |

17:27:08    1   A.   I would take him to a safe house in Nava.  Sometime he will

17:27:12    2   wait for "Zeta 40" or sometimes I will take him to meet "Zeta 40"

17:27:16    3   and "42" in Nava, Coahuila.

17:27:19    4   Q.   Is that right across the border from Piedras Negras?

17:27:21    5   A.   Yes, sir.  Like 40 kilometer.  Every time Carlos would get

17:27:25    6   back from United States to Mexico, I would pick him up.  There

17:27:27    7   was a time when he had a trophy from Ruidoso that he was the most

17:27:32    8   valuable buyer or he was the one that buy the most expensive

17:27:36    9   horses.

17:27:37   10   Q.   And that's at the auction?

17:27:38   11   A.   Yes, sir.

17:27:39   12   Q.   Do you know an individual by the name of "Yo Yo"?

17:27:45   13   A.   Yes, sir.  I do.

17:27:47   14   Q.   And how do you know?

17:27:48   15   A.   He's the one that took him where I could pick him up.

17:27:52   16   Q.   All right.  Pick up Mr. Nayen?

17:27:54   17   A.   Yes, sir.  In Piedras Negras, in the gas station.  And there

17:27:57   18   was a time, also, I took some money for horse expenses in Hidalgo

17:28:02   19   for "Yo Yo."

17:28:02   20   Q.   And what was this "Yo Yo's" relationship to Carlos Nayen?

17:28:06   21   A.   I think he worked for Carlos.  That's what he told me that.

17:28:09   22   Q.   So he was Carlos' worker?

17:28:11   23   A.   Yes, sir.

17:28:12   24   Q.   And do you know what he did for Carlos?

17:28:15   25   A.   I guess sent the money for -- we gave money to "Yo Yo," and

| | | |
|---|---|---|
| 17:28:20 | 1 | "Yo Yo" would send it to Carlos to United States. |
| 17:28:22 | 2 | Q.   And do you recall how much money you or your crew sent to |
| 17:28:28 | 3 | "Yo Yo"? |
| 17:28:28 | 4 | A.   There was a time we sent like $150,000, and there was |
| 17:28:31 | 5 | another time we sent like $300,000. |
| 17:28:37 | 6 | Q.   And did "40" ever mention about putting horses in different |
| 17:28:41 | 7 | companies? |
| 17:28:43 | 8 | A.   He said one time that they make false companies to where |
| 17:28:50 | 9 | they couldn't tell the difference when they buy horses. |
| 17:28:52 | 10 | Q.   And did "40" ever mention on any occasion about changing the |
| 17:28:56 | 11 | names of the owners of the horses? |
| 17:28:59 | 12 | A.   No.  He never mentioned that. |
| 17:29:00 | 13 | Q.   Did "40" ever mention about altering the documents of the |
| 17:29:05 | 14 | horses? |
| 17:29:06 | 15 | A.   Yes, he did. |
| 17:29:06 | 16 | Q.   Could you tell the jury about that, please? |
| 17:29:08 | 17 | A.   They would buy them -- when the horse buy expensive, they |
| 17:29:13 | 18 | would only say that the horse wasn't that good so they would sell |
| 17:29:16 | 19 | it cheaper to his brother. |
| 17:29:17 | 20 | Q.   Okay.  I'm sorry.  Could you repeat that question?  You're |
| 17:29:21 | 21 | speaking a little fast.  Could you slow down for me a second? |
| 17:29:24 | 22 | A.   When first buying the horses was so expensive, they would |
| 17:29:27 | 23 | say that that horse was not good so they would send it to his |
| 17:29:29 | 24 | brother cheaper. |
| 17:29:31 | 25 | Q.   Let me see if I get this straight.  They would buy a horse |

| | | |
|---|---|---|
| 17:29:35 | 1 | and if that horse would perform poorly, is that what you're |
| 17:29:39 | 2 | saying? |
| 17:29:39 | 3 | A.   Yes, sir. |
| 17:29:39 | 4 | Q.   And what would they do, then, if they had a poor-performing |
| 17:29:43 | 5 | horse? |
| 17:29:43 | 6 | A.   Just wasn't worth it what they paid for it. |
| 17:29:46 | 7 | Q.   So -- |
| 17:29:46 | 8 | A.   So they would sell it cheaper. |
| 17:29:48 | 9 | Q.   So they would sell cheaper? |
| 17:29:49 | 10 | A.   Yes.  That was supposed -- that's how they would make it. |
| 17:29:52 | 11 | Q.   And I'm sorry.  I'm not sure I understand.  When you sell it |
| 17:29:55 | 12 | cheaper, who would they sell it to cheaper to? |
| 17:29:57 | 13 | A.   Like the one that first owned it would send it back.  They |
| 17:30:02 | 14 | were like saying they would sell it back to him. |
| 17:30:03 | 15 | Q.   So you had the first owner with the expensive horse who |
| 17:30:07 | 16 | would not run well? |
| 17:30:08 | 17 | A.   Uh-huh. |
| 17:30:08 | 18 | Q.   And then, it would be sold back to that first owner? |
| 17:30:11 | 19 | A.   Yes, sir. |
| 17:30:12 | 20 | Q.   And why was that? |
| 17:30:13 | 21 | A.   So that whoever was paying attention, how much they were |
| 17:30:18 | 22 | paying for it. |
| 17:30:20 | 23 | Q.   Was that a way for the Zetas to clean money? |
| 17:30:23 | 24 | A.   Yes, sir. |
| 17:30:26 | 25 | Q.   Do you know an individual named "Chevo" Huitron? |

| | | |
|---|---|---|
| 17:30:30 | 1 | A.   Yes, I do. |
| 17:30:31 | 2 | Q.   And how do you know him, sir? |
| 17:30:33 | 3 | A.   I met him in Mexico a long time ago.  He had a horse by the |
| 17:30:37 | 4 | name of Uncle George. |
| 17:30:42 | 5 | Q.   Do you see an individual you know as "Chevo" Huitron in the |
| 17:30:45 | 6 | courtroom today? |
| 17:30:46 | 7 | A.   Yes. |
| 17:30:47 | 8 | Q.   If you need to stand up, please do. |
| 17:30:48 | 9 | A.   Yes, I do. |
| 17:30:49 | 10 | Q.   You do?  Could you point him out to me, tell me something |
| 17:30:54 | 11 | he's wearing? |
| 17:30:55 | 12 | A.   It's him right there. |
| 17:30:55 | 13 | Q.   The individual standing? |
| 17:30:57 | 14 | A.   Yes, sir. |
| 17:30:57 | 15 | Q.   Your Honor, may the record reflect the witness has |
| 17:30:59 | 16 | identified "Chevo" Huitron? |
| 17:31:02 | 17 | THE COURT:  Does. |
| 17:31:04 | 18 | Q.   (BY MR. GARDNER) Did you ever send cash to "Chevo" Huitron? |
| 17:31:07 | 19 | A.   One time I did, sir. |
| 17:31:08 | 20 | Q.   Okay.  How much? |
| 17:31:09 | 21 | A.   $15,000. |
| 17:31:11 | 22 | Q.   And what was that cash for? |
| 17:31:12 | 23 | A.   For horse expenses. |
| 17:31:14 | 24 | Q.   Did you send it or did you take it yourself? |
| 17:31:17 | 25 | A.   No.  I sent someone -- one of my workers. |

17:31:21  1   Q.   And that cash that you sent to Mr. Chevo Huitron, where did

17:31:24  2   that cash come from?

17:31:25  3   A.   From the sale of drugs that I sold in San Antonio.

17:31:29  4   Q.   And who directed you to make that payment?

17:31:32  5   A.   What?

17:31:33  6   Q.   Who told you to make that payment?

17:31:34  7   A.   "Poncho" Cuellar.

17:31:39  8   Q.   And was there a point after that delivery that you were

17:31:43  9   reprimanded for -- yeah, reprimanded for something that went on

17:31:50  10  during that delivery?

17:31:50  11  A.   They told me to send a package of something for horses.

17:31:55  12  It's called Imoterol (phonetic) or something like that.

17:31:59  13  Q.   Clenbuterol?

17:31:59  14  A.   Yeah.   That.

17:32:00  15  Q.   Okay.   And then, so what happened after the delivery?

17:32:02  16  A.   After the delivery, that guy was playing with "Chevo," he

17:32:08  17  asked him for some kilos, and "Chevo" in not less than 20

17:32:13  18  minutes, got in contact with "Zeta 40," and I got in trouble with

17:32:16  19  that back there in Mexico.

17:32:17  20  Q.   And so, when your driver was telling "Chevo" Huitron where

17:32:24  21  are the kilos, was he being serious or was he joking?

17:32:26  22  A.   No.   He was just joking, sir.

17:32:28  23  Q.   But somehow that information got back to "40"?

17:32:32  24  A.   Yes, sir.   Less than 30 minutes.

17:32:34  25  Q.   Do you know if your driver called and told that information

| | | |
|---|---|---|
| 17:32:38 | 1 | to "40"? |
| 17:32:38 | 2 | A.   No.  Not my driver, sir. |
| 17:32:40 | 3 | Q.   Okay.  Do you know who called and told "40" about that |
| 17:32:43 | 4 | incident? |
| 17:32:44 | 5 | A.   I have no idea who called them. |
| 17:32:49 | 6 | Q.   And do you know an individual named "Pancho" Colorado? |
| 17:32:52 | 7 | A.   Yes, I do, sir. |
| 17:32:53 | 8 | Q.   And do you see him in the courtroom today? |
| 17:32:55 | 9 | A.   Yes, sir. |
| 17:33:01 | 10 | Q.   Could you identify? |
| 17:33:03 | 11 | A.   The one in the gray suit. |
| 17:33:05 | 12 | Q.   Gray suit without the tie, the white shirt? |
| 17:33:08 | 13 | A.   Yes, sir. |
| 17:33:08 | 14 | Q.   Thank you, sir.  Your Honor, may the record reflect the |
| 17:33:11 | 15 | witness has identified "Pancho" Colorado? |
| 17:33:13 | 16 |         THE COURT:  So reflects. |
| 17:33:14 | 17 | Q.   (BY MR. GARDNER) Mr. Guadalajara, when did you first |
| 17:33:20 | 18 | encounter the Defendant Colorado? |
| 17:33:25 | 19 | A.   There was a race in Morelos, Coahuila.  We were trying out |
| 17:33:29 | 20 | the new -- the yearlings and "Pancho" Colorado was there with |
| 17:33:33 | 21 | "Zeta Cuarenta" at the finish line. |
| 17:33:34 | 22 | Q.   When you say trying out, I think you said yearlings? |
| 17:33:37 | 23 | A.   Yes.  The yearling. |
| 17:33:38 | 24 | Q.   The new horses? |
| 17:33:39 | 25 | A.   Yes, sir. |

| | | |
|---|---|---|
| 17:33:40 | 1 | Q.   When you say he was at the finish line, was this a public |
| 17:33:45 | 2 | race open to everyone? |
| 17:33:46 | 3 | A.   It was a private race just for Zetas.  There was like 80 |
| 17:33:51 | 4 | armed people there. |
| 17:33:52 | 5 | Q.   I'm sorry, you said they were armed people there? |
| 17:33:53 | 6 | A.   Yes, sir. |
| 17:33:54 | 7 | Q.   Okay.  Describe that for the jury, please. |
| 17:33:56 | 8 | A.   They had vests and R-15s, AK-47s, hand grenades, they had |
| 17:34:02 | 9 | everything.  It was only like 80 people and just us. |
| 17:34:06 | 10 | Q.   And who were those people protecting? |
| 17:34:08 | 11 | A.   "Zeta Cuarenta" and "42."  "Mamito" was also in there. |
| 17:34:12 | 12 | Carlos Nayen was there, too. |
| 17:34:13 | 13 | Q.   When you say they were at the finish line, what do you mean |
| 17:34:17 | 14 | by that?  They were watching the races from the start? |
| 17:34:20 | 15 | A.   From the starting gate to the finish line.  They were there |
| 17:34:22 | 16 | at the finish line. |
| 17:34:23 | 17 | Q.   Your Honor, may I have one moment? |
| 17:34:29 | 18 | THE COURT:  Yes, sir. |
| 17:34:34 | 19 | MR. GARDNER:  Your Honor, I will pass the witness. |
| 17:34:37 | 20 | THE COURT:  Mr. Finn. |
| 17:34:39 | 21 | MR. FINN:  Thank you, your Honor.  May it please the |
| 17:34:40 | 22 | Court.  Members of the jury. |
| 17:34:41 | 23 | CROSS-EXAMINATION |
| 17:34:41 | 24 | BY MR. FINN: |
| 17:34:43 | 25 | Q.   Good afternoon, Mr. Guadalajara.  How are you doing? |

| | | |
|---|---|---|
| 17:34:45 | 1 | A.   Good, sir. |
| 17:34:47 | 2 | Q.   All right.  So you've got a federal case in the Eastern |
| 17:34:49 | 3 | District of Texas; is that right? |
| 17:34:51 | 4 | A.   Yes, sir. |
| 17:34:51 | 5 | Q.   Is it pending or have you already been sentenced on that? |
| 17:34:54 | 6 | A.   It's pending, sir. |
| 17:34:55 | 7 | Q.   What are you looking at? |
| 17:34:57 | 8 | A.   I have no idea, sir.  They haven't told me anything. |
| 17:35:00 | 9 | Q.   Have you -- did you plead guilty? |
| 17:35:02 | 10 | A.   Yes, sir, I did. |
| 17:35:03 | 11 | Q.   Do you have a lawyer? |
| 17:35:04 | 12 | A.   Yes, sir. |
| 17:35:05 | 13 | Q.   Did you know what's called a presentence interview where you |
| 17:35:12 | 14 | sit down and some man or lady asks you questions, like where were |
| 17:35:18 | 15 | you born, where were you raised, what did you do for a living, |
| 17:35:21 | 16 | have you used drugs, et cetera, et cetera?  Have you done that? |
| 17:35:24 | 17 | A.   Yes, sir. |
| 17:35:25 | 18 | Q.   How long ago did you do that? |
| 17:35:26 | 19 | A.   How long I did that, like a year ago. |
| 17:35:29 | 20 | Q.   A year ago? |
| 17:35:30 | 21 | A.   Yes, sir. |
| 17:35:30 | 22 | Q.   And you're still waiting to be sentenced? |
| 17:35:32 | 23 | A.   Yes, sir. |
| 17:35:33 | 24 | Q.   Normally after a month or two after the interview that I'm |
| 17:35:39 | 25 | describing, there's a packet of information called a presentence |

17:35:44  1  report, and it's normally 25, 30 pages long.  Do you remember

17:35:48  2  seeing that?

17:35:48  3  A.   Yes, sir.

17:35:49  4  Q.   And about halfway through that packet of information, it

17:35:54  5  says what the sentencing guidelines are.  And, you know, for an

17:35:59  6  example, it doesn't say years, it says months.  Like 280 months

17:36:03  7  to 310 months and there's a range.  Do you remember seeing that?

17:36:07  8  A.   Yes, sir.

17:36:07  9  Q.   Okay.  So let me get back to the question.  What is the

17:36:11  10  range of punishment that you're facing on that case?

17:36:14  11  A.   For 120 months.

17:36:16  12  Q.   120 months?

17:36:17  13  A.   Yes, sir.

17:36:17  14  Q.   Okay.  What about San Antonio?  Is that a state or federal

17:36:22  15  case?

17:36:22  16  A.   It's a federal case.  San Antonio.

17:36:25  17  Q.   Okay.  Same question.  Did you plead guilty?

17:36:27  18  A.   Yes, sir.

17:36:27  19  Q.   And you were caught red-handed weren't you?  I mean, you got

17:36:30  20  caught holding dope, cocaine?

17:36:32  21  A.   No, sir.  I never.

17:36:33  22  Q.   No?

17:36:33  23  A.   No, sir.

17:36:34  24  Q.   What about the Eastern District?  Were you caught holding?

17:36:37  25  A.   No, sir.  Never.

17:36:37  1   Q.    Did you get set up on each one?

17:36:39  2   A.    No.  Just in San Antonio.  But I never got caught with

17:36:42  3   anything.

17:36:42  4   Q.    Okay.  Did you -- did they seize a whole bunch of evidence

17:36:47  5   from you, like your cellphone, and do surveillance and things

17:36:49  6   like that?

17:36:49  7   A.    Yes.  My cellphone.

17:36:50  8   Q.    Cellphone.  And did they confront you with what was on your

17:36:57  9   cellphone didn't look too good because you were talking to bad

17:37:00  10  guys?

17:37:00  11  A.    No, sir.  They didn't confront me.

17:37:02  12  Q.    Okay.  You pled guilty freely and voluntarily out of the

17:37:05  13  goodness of your heart?

17:37:06  14  A.    Yes, sir.

17:37:06  15  Q.    Just because you were guilty?

17:37:07  16  A.    Yes, sir.

17:37:07  17  Q.    Do you have any other criminal history besides the San

17:37:11  18  Antonio and the Eastern District federal case?

17:37:14  19  A.    No, sir.

17:37:15  20  Q.    Okay.  How much time are you looking on the San Antonio

17:37:18  21  case?

17:37:19  22  A.    In the San Antonio case?  It's about 78 months.

17:37:22  23  Q.    How many?

17:37:23  24  A.    Seventy-eight months.

17:37:24  25  Q.    Seventy-eight months?  Okay.  You understand that the judges

17:37:29   1   can decide if you get 120 months in the Eastern District and

17:37:34   2   then, you get 78 months in the San Antonio case, depending on a

17:37:38   3   lot of factors, those cases could either run concurrently, which

17:37:42   4   means together.  You understand that, right?

17:37:44   5   A.   Yes, sir.

17:37:45   6   Q.   Or consecutive, which means stacked sentences, right?  You

17:37:49   7   understand that?

17:37:49   8   A.   Yes, sir.

17:37:50   9   Q.   And obviously you're hoping that the government will like

17:37:54   10  what you have to say here today and request that whatever

17:37:57   11  sentence you get, that they run together, instead of stacked,

17:38:02   12  right?

17:38:02   13  A.   Yes, sir.

17:38:02   14  Q.   And you understand that the only way your San Antonio judge

17:38:09   15  or your Eastern District judge can give you a reduced sentence --

17:38:14   16  the only way is if the prosecutor -- the federal prosecutors on

17:38:19   17  your case file what's called -- this will be music to your ears

17:38:24   18  -- a 5K motion for downward departure, right?

17:38:28   19       You know and I know, and now the jury knows, that a man

17:38:32   20  in your position looking at a boatload of time, 5K motion for

17:38:36   21  downward departure is mui bueno, right?  Come on.

17:38:43   22  A.   Yes.

17:38:43   23  Q.   Right?

17:38:44   24       MR. GARDNER:  Your Honor, at this point, it's

17:38:46   25  argumentative.

17:38:48  1          MR. FINN:  He didn't answer my question, Judge.  That's

17:38:51  2  why I re-asked him.

17:38:53  3          THE COURT:  Okay.  Well, ask him again.

17:38:55  4  Q.   (BY MR. FINN) You're hoping for a 5K in both cases, right?

17:39:01  5  A.   Yes, sir.

17:39:02  6  Q.   Okay.  Thank you.

17:39:03  7          And the only way that any judge on this planet can give

17:39:07  8  you a 5K is if a prosecutor with the federal government, somebody

17:39:12  9  like Mr. Gardner, files the motion.  Until then, the judge can't

17:39:17  10  reduce your sentence, even if the judge wanted to.  Do you

17:39:20  11  understand that?

17:39:20  12  A.   Yes, I understand, sir.

17:39:21  13          MR. GARDNER:  Your Honor, asked and answered at this

17:39:22  14  point and argumentative.  Relevance.

17:39:28  15          THE COURT:  I'll have the lawyers.

17:39:39  16          (At the bench, on the record.)

17:39:51  17          THE COURT:  I don't put myself in the testimony

17:39:57  18  business, but I don't have anybody in 21 years, unless it's a

17:40:02  19  mandatory minimum, I can't reduce.  So I don't know what that 120

17:40:08  20  is.  It sounds like it's the top of a ten-year count, and the 78

17:40:14  21  months is low.  So the truth of the matter is, your question that

17:40:21  22  no judge can do it is wrong.  The judge can give any sentence he

17:40:26  23  wants under 18 United States Code 3553(a).  The Supreme Court's

17:40:32  24  made that clear in the last five years.  So the question's wrong.

17:40:37  25          The recommendation to the Court is right.

281

| | | |
|---|---|---|
| 17:40:43 | 1 | MR. FINN:  I can move on to something else, Judge. |
| 17:40:45 | 2 | THE COURT:  Okay.  I just think it would be better. |
| 17:40:48 | 3 | MR. WOMACK:  Your Honor, is it an accurate statement to |
| 17:40:50 | 4 | say that under 5K1, a judge could not give a downward departure |
| 17:40:54 | 5 | unless the government request so? |
| 17:40:54 | 6 | THE COURT:  I'm sorry, I couldn't hear. |
| 17:40:57 | 7 | MR. WOMACK:  Is it a correct statement that under 5K1, |
| 17:40:59 | 8 | the Court cannot give a downward departure for 5K1 unless the |
| 17:41:05 | 9 | government requests it?  That's correct, isn't it? |
| 17:41:06 | 10 | THE COURT:  No.  It's not.  That's wrong. |
| 17:41:08 | 11 | MR. WOMACK:  Under 5K1?  I thought it had to be -- |
| 17:41:10 | 12 | THE COURT:  No.  On a 5K1. |
| 17:41:13 | 13 | MR. WOMACK:  Substantial assistance. |
| 17:41:15 | 14 | THE COURT:  There's another statute that allows you to |
| 17:41:19 | 15 | go under even the mandatory minimum sentence. |
| 17:41:21 | 16 | MR. WOMACK:  It's 3553. |
| 17:41:22 | 17 | THE COURT:  But what you're thinking is a Rule 35 later |
| 17:41:26 | 18 | on. |
| 17:41:26 | 19 | MR. WOMACK:  No, sir.  That's reduction after |
| 17:41:28 | 20 | sentencing.  I'm talking about the downward departure. |
| 17:41:29 | 21 | THE COURT:  That's right.  5K1, a judge can ignore a |
| 17:41:33 | 22 | lower -- |
| 17:41:33 | 23 | MR. WOMACK:  Oh, yes, sir.  But you can't do anything |
| 17:41:37 | 24 | with a 5K1 unless the government requests it.  Even on your own |
| 17:41:41 | 25 | sua sponte, you can't do a 5K1. |

| | | |
|---|---|---|
| 17:41:44 | 1 | THE COURT:  The judge wouldn't sentence under the 5K1. |
| 17:41:48 | 2 | He'd sentence under 18 United States Code 3553. |
| 17:41:51 | 3 | MR. WOMACK:  I gotcha. |
| 17:41:52 | 4 | MR. DEGEURIN:  Judge, Mr. Colorado is sick.  By that I |
| 17:41:55 | 5 | mean he's getting ready to go to the bathroom in his pants. |
| 17:41:58 | 6 | THE COURT:  Okay.  Members of the jury, it's late in |
| 17:42:02 | 7 | the day.  I'm going to let you go home.  Remember the |
| 17:42:06 | 8 | instructions, please, and have a nice evening.  I got home just |
| 17:42:16 | 9 | in time to see that Texas finally won a baseball game. |
| 17:42:45 | 10 | (Jury not present.) |
| 17:42:56 | 11 | THE COURT:  All right, sir.  I'm going to put you with |
| 17:42:59 | 12 | the marshal.  See you in the morning, sir.  Go tell them 8:30. |
| 17:43:13 | 13 | We're in recess till 8:30. |
| 17:43:13 | 14 | (Proceedings adjourned.) |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |