```
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION

 3   UNITED STATES OF AMERICA    ) Docket No. A 12-CR-210 SS
                                 )
 4   vs.                         ) Austin, Texas
                                 )
 5   JOSE TREVINO-MORALES (3)    )
     FRANCISCO ANTONIO           )
 6   COLORADO-CESSA (6)          )
     FERNANDO SOLIS-GARCIA (7)   )
 7   EUSEVIO MALDONADO-HUITRON(11) )
     JESUS MALDONADO-HUITRON (18)  ) April 25, 2013
 8

 9                 TRANSCRIPT OF TRIAL ON THE MERITS
                   BEFORE THE HONORABLE SAM SPARKS
10                       Volume 9 of 15

11   APPEARANCES:

12   For the United States:     Ms. Michelle E. Fernald
                                Mr. Douglas W. Gardner
13                              Assistant U.S. Attorneys
                                816 Congress Avenue, Suite 1000
14                              Austin, Texas 78701

15   For Defendant Trevino-     Mr. David M. Finn
     Morales:                   Milner & Finn
16                              2828 North Harwood Street
                                Suite 1950, LB9
17                              Dallas, Texas 75201

18                              Ms. Christie Williams
                                Mills & Williams
19                              1112 South Rock Street
                                Georgetown, Texas 78626
20
     For Defendant Colorado-    Mr. Mike DeGeurin
21   Cessa:                     Mr. M. Andres Sanchez-Ross
                                Foreman, DeGeurin & DeGeurin
22                              300 Main Street
                                Houston, Texas 77002
23
                                Mr. John Parras
24                              Republic Bank Building
                                1018 Preston, Floor 2
25                              Houston, Texas 77002
```

1   **(Appearances Continued:)**

2   For Defendant Solis-Garcia: Mr. Guy L. Womack
                                Guy L. Womack & Associates
3                               402 Main Street, Suite 6 North
                                Houston, Texas 77002
4
     For Defendant Eusevio      Mr. Richard D. Esper
5    Maldonado-Huitron:         Esper Law Office
                                801 North El Paso Street, 2nd Floor
6                               El Paso, Texas 79902

7    For Defendant Jesus        Mr. Thomas Brent Mayr
     Maldonado-Huitron:         Law Office of Brent Mayr
8                               4101 Washington Avenue, 2nd Floor
                                Houston, Texas 77007
9

10   Interpreters:             Mr. Peter Heide
                                Mr. Steve Mines
11

12   Court Reporter:           Ms. Lily Iva Reznik, CRR, RMR
                                501 West 5th Street, Suite 4153
13                              Austin, Texas 78701
                                (512)391-8792
14

15

16

17

18

19

20

21

22

23

24

25   Proceedings reported by computerized stenography, transcript
     produced by computer.

1                          **I N D E X**

2                          Direct      Cross     Redirect   Recross
   Witnesses:

3

4  Raul Guadalajara-Guia              6,14

5                                     26,48     49         54,55

6                                                          126

7  Rene Amarillas          56         67,70

8  William J. Johnston     71         94,95

9                                     97,119

10                                    122       130        135,138

11                                              142        143

12 Billy Williams          144        192,196

13                                    202,207   219        223,225

14                                              226

15 Charles H. Cox          227        243,248

16                                    252

17 Kevin Hicks             255        284       285        287

18                                                         Page

19 Proceedings adjourned                                   290

20

21

22

23

24

25

<pre>
 1                          E X H I B I T S

 2                                          Offered    Admitted
     Government's
 3
 4   #352A through C                         157        158

 5   #357                                    262        262

 6   #358A through C                          81         81

 7   #358D through M                          83         83

 8   #371A through C                         183        183

 9   #372A through I                         265        265

10   #381B                                    64         64

11   #416                                    163        163

12   #418A through C                         258        258

13   #419                                     58         58

14   #420                                    145        145

15   #422                                    133        133

16

17   Defendant Colorado-Cessa's

18   #9                                       26         26

19   #10                                      95         95

20   #10A                                     95         95

21

22   Defendant Trevino-Morales'

23   #JT-8                                   207        207

24

25
</pre>

|   |   | Offered | Admitted |
|---|---|---------|----------|

**E X H I B I T S** (Continued)

Defendant Eusevio Huitron's

#EH-4 through 10                                278         278

Court's

#4                                             180         180

#5                                             289         289

| | | |
|---|---|---|
| 08:30:26 | 1 | THE COURT:  All right.  Anything before we bring in the |
| 08:30:33 | 2 | jury? |
| 08:30:33 | 3 | MR. GARDNER:  Nothing from the government, your Honor. |
| 08:30:35 | 4 | MR. MAYR:  No, sir. |
| 08:31:00 | 5 | THE COURT:  Let's bring in the witness. |
| 08:32:49 | 6 | (Jury present.) |
| 08:32:52 | 7 | THE COURT:  Members of the jury, since we last were |
| 08:32:54 | 8 | together yesterday afternoon, late, has anybody attempted to talk |
| 08:33:00 | 9 | to you about this case? |
| 08:33:02 | 10 | JURORS:  No. |
| 08:33:04 | 11 | THE COURT:  Have you talked to anybody about the case? |
| 08:33:05 | 12 | JURORS:  No. |
| 08:33:05 | 13 | THE COURT:  And have you learned anything at all, |
| 08:33:08 | 14 | outside the presence of each other in this courtroom, about this |
| 08:33:12 | 15 | case? |
| 08:33:12 | 16 | JURORS:  No. |
| 08:33:13 | 17 | THE COURT:  All right.  Thank you.  Show negative |
| 08:33:16 | 18 | responses to all questions by all jurors. |
| 08:33:18 | 19 | Mr. Guadalajara, you understand you're still under oath |
| 08:33:22 | 20 | to tell the truth? |
| 08:33:23 | 21 | THE WITNESS:  Yes, sir. |
| 08:33:23 | 22 | THE COURT:  All right.  You may proceed. |
| 08:33:25 | 23 | CROSS-EXAMINATION (Resumed) |
| 08:33:25 | 24 | BY MR. FINN: |
| 08:33:26 | 25 | Q.   Thank you, your Honor.  May it please the Court. |

| | | |
|---|---|---|
| 08:33:28 | 1 | Good morning, Mr. Guadalajara. |
| 08:33:29 | 2 | A.   Morning, sir. |
| 08:33:30 | 3 | Q.   I am not Guy Womack and I am not from Houston.  My name is |
| 08:33:33 | 4 | David Finn and I represent Jose Trevino.  And I just had a few |
| 08:33:39 | 5 | more questions for you, okay? |
| 08:33:40 | 6 | A.   Okay, sir. |
| 08:33:41 | 7 | Q.   If I'm not clear, ask me to rephrase and I'd be happy to do |
| 08:33:45 | 8 | so.  Fair enough? |
| 08:33:46 | 9 | A.   Fair enough, sir. |
| 08:33:47 | 10 | Q.   How much cocaine do you think that your and your group moved |
| 08:33:52 | 11 | into the United States?  Yesterday, I think you said one of your |
| 08:33:54 | 12 | federal cases, you were responsible for about seven kilos, and in |
| 08:33:59 | 13 | another case you were responsible for, I think you said, two |
| 08:34:03 | 14 | kilos, right? |
| 08:34:05 | 15 | A.   It was five and seven, sir. |
| 08:34:06 | 16 | Q.   Five and seven? |
| 08:34:07 | 17 | A.   Yes, sir. |
| 08:34:08 | 18 | Q.   Okay.  But that's not all the cocaine that you brought into |
| 08:34:10 | 19 | the United States, is it? |
| 08:34:12 | 20 | A.   No, sir. |
| 08:34:13 | 21 | Q.   Please tell the members of this jury how many kilos you |
| 08:34:17 | 22 | think overall that you were responsible for bringing into the |
| 08:34:21 | 23 | United States. |
| 08:34:22 | 24 | A.   Over during three years? |
| 08:34:25 | 25 | Q.   Well, you started with Mr. Cuellar in or around 1993 or |

| | | |
|---|---|---|
| 08:34:31 | 1 | 1994, right? |
| 08:34:32 | 2 | A.    Yes, sir. |
| 08:34:32 | 3 | Q.    And you worked with that crew for several years, correct? |
| 08:34:37 | 4 | A.    Yes, sir. |
| 08:34:37 | 5 | Q.    So I know it's probably hard to add it all up, but are we |
| 08:34:42 | 6 | talking about hundreds?  Maybe thousands of kilos of cocaine? |
| 08:34:45 | 7 | A.    Yes, sir.  Thousands of kilos of cocaine. |
| 08:34:47 | 8 | Q.    More than a thousand, correct? |
| 08:34:49 | 9 | A.    More than a thousand, sir. |
| 08:34:51 | 10 | Q.    And at least one time, 100 kilograms of cocaine was |
| 08:34:56 | 11 | intercepted by law enforcement in Seguin, Texas, and you |
| 08:34:59 | 12 | hightailed it back to Mexico, correct? |
| 08:35:01 | 13 | A.    Yes, sir. |
| 08:35:02 | 14 | Q.    But you're only being held responsible for less than ten, |
| 08:35:06 | 15 | correct? |
| 08:35:07 | 16 | A.    Yes, sir. |
| 08:35:09 | 17 | Q.    Now, how long ago were your arrests for the Eastern District |
| 08:35:13 | 18 | case and the San Antonio case?  Couple of years? |
| 08:35:17 | 19 | A.    No, sir.  About a year. |
| 08:35:20 | 20 | Q.    Year?  Well, you interviewed with the agents on November |
| 08:35:25 | 21 | 1st, 2011, and I assume that was after you were arrested and in |
| 08:35:29 | 22 | custody, correct? |
| 08:35:30 | 23 | A.    Yes, sir. |
| 08:35:31 | 24 | Q.    So it's been more than a year.  It's been at least a year |
| 08:35:34 | 25 | and a half, correct? |

| 08:35:35 | 1 | A.   Okay.  Yes, sir. |

08:35:35  1   A.   Okay.  Yes, sir.

08:35:36  2   Q.   But you haven't been sentenced on either case yet, correct?

08:35:40  3   A.   Yes, sir.

08:35:41  4   Q.   So you and your lawyer -- by the way, just out of curiosity,

08:35:45  5   what is your lawyer's name?

08:35:47  6   A.   Frank Perez.

08:35:48  7   Q.   Frank Perez.  Is that right?

08:35:52  8   A.   Yes, sir.

08:35:52  9   Q.   The jury's heard that name several times in this trial.

08:35:55  10          So you and your lawyer and the government have agreed

08:35:58  11  to kick the can down the road on sentencing so that you can

08:36:02  12  provide information and maybe get a benefit, correct?

08:36:05  13          MR. GARDNER:  Your Honor, I'm going to object to this

08:36:06  14  as an improper question.  If Mr. Finn wants to get into all the

08:36:11  15  ramifications of his sentencing, and the guidelines, and the

08:36:12  16  amount of relevant conduct, the government's more than happy to

08:36:15  17  do that.  But right now, it is not a proper question.

08:36:18  18          THE COURT:  Well, ladies and gentlemen, the judge in

08:36:23  19  whose court the case is pending is in charge of sentencing and in

08:36:27  20  charge of when sentencing will accomplish.  The parties may

08:36:33  21  request postponement, but the judge makes that decision, not any

08:36:37  22  of the parties.

08:36:40  23          You may proceed, sir.

08:36:41  24  Q.   (BY MR. FINN) Thank you, sir.

08:36:42  25          Mr. Guadalajara, when you were moving all this dope in

08:36:45   1   and out of the country and, also, when you were moving around in

08:36:47   2   the United States, were you ever armed?  Did you ever carry a gun

08:36:50   3   for protection?

08:36:51   4   A.   I never had a gun or anything like that, sir.

08:36:53   5   Q.   Did you ever move any guns or help anybody move any guns

08:36:57   6   down to Mexico for the Zetas?

08:36:59   7   A.   No, sir.

08:36:59   8   Q.   Okay.  Do you have any criminal history other than the two

08:37:05   9   federal cases that are pending?

08:37:06   10   A.   No, sir.

08:37:07   11   Q.   So up until the two federal cases, your record was clean,

08:37:12   12   correct?

08:37:12   13   A.   Yes, sir.

08:37:13   14   Q.   How many times would you say -- let's say over there --

08:37:17   15   well, since your cocaine business started in, I guess, 1993, how

08:37:22   16   many times would you say that you came into the United States

08:37:27   17   from Mexico?  Many times?

08:37:29   18   A.   Many times.  1993, I didn't move no coke.  I was moving

08:37:33   19   weed.

08:37:33   20   Q.   You were moving weed then?

08:37:34   21   A.   Yes, sir.

08:37:34   22   Q.   Okay.  But give the jury an idea how many times you left the

08:37:38   23   United States.  Because you're a U.S. citizen, correct?

08:37:40   24   A.   Yes, sir.

08:37:41   25   Q.   You went down to Mexico and then, you came back to the

| | | |
|---|---|---|
| 08:37:44 | 1 | United States.  Did you normally drive or did you fly? |
| 08:37:47 | 2 | A.    I drive. |
| 08:37:48 | 3 | Q.    You drive.  Okay.  And, you know, when you come into the |
| 08:37:53 | 4 | United States, there's a border agent, and you've got to be |
| 08:37:57 | 5 | processed to make sure that you're legal, correct? |
| 08:37:59 | 6 | A.    Yes, sir. |
| 08:38:00 | 7 | Q.    And did you come into the U.S. over the last 10 to 15 years, |
| 08:38:06 | 8 | 10, 20, 30, 50 times? |
| 08:38:09 | 9 | A.    Yes, sir. |
| 08:38:10 | 10 | Q.    And how many times when you came into the U.S. were you |
| 08:38:14 | 11 | handcuffed to a chair and interrogated? |
| 08:38:16 | 12 | A.    Never did.  My first time. |
| 08:38:18 | 13 | Q.    Never happened? |
| 08:38:19 | 14 | A.    No, sir. |
| 08:38:21 | 15 | Q.    Do you have any brothers? |
| 08:38:22 | 16 | A.    One brother. |
| 08:38:23 | 17 | Q.    Is he on the Most Wanted list? |
| 08:38:26 | 18 | A.    No, sir. |
| 08:38:29 | 19 | Q.    How much money would you say that you made during your |
| 08:38:33 | 20 | career moving weed and/or cocaine? |
| 08:38:37 | 21 | A.    Have no idea, sir. |
| 08:38:39 | 22 | Q.    Well, $10?  $10,000? |
| 08:38:41 | 23 | A.    Maybe about $500,000. |
| 08:38:43 | 24 | Q.    400,000? |
| 08:38:44 | 25 | A.    Yes, sir. |

| | | |
|---|---|---|
| 08:38:45 | 1 | Q.   And were you paid in cash? |
| 08:38:47 | 2 | A.   Yes. |
| 08:38:47 | 3 | Q.   And did you open a checking account and put that cash in a |
| 08:38:50 | 4 | checking account? |
| 08:38:51 | 5 | A.   No, sir. |
| 08:38:52 | 6 | Q.   Why not? |
| 08:38:53 | 7 | A.   Spent all the money. |
| 08:38:54 | 8 | Q.   You spent it all? |
| 08:38:55 | 9 | A.   Yes, sir. |
| 08:38:56 | 10 | Q.   Wine, women and song?  Or what did you spend it on? |
| 08:38:59 | 11 | A.   I spent it on houses. |
| 08:39:00 | 12 | Q.   On what? |
| 08:39:00 | 13 | A.   My house. |
| 08:39:01 | 14 | Q.   On your house.  So you told the jury yesterday that you had |
| 08:39:13 | 15 | met with "40" and "42" down in Mexico, correct? |
| 08:39:17 | 16 | A.   Yes, sir.  That is correct. |
| 08:39:18 | 17 | Q.   And there was a horse race? |
| 08:39:19 | 18 | A.   Yes, sir. |
| 08:39:20 | 19 | Q.   How did you get down there?  Did you drive? |
| 08:39:22 | 20 | A.   Yes. |
| 08:39:23 | 21 | Q.   So you knew where you were going? |
| 08:39:26 | 22 | A.   I knew I was going there, but I didn't know that we were |
| 08:39:28 | 23 | going to be there. |
| 08:39:28 | 24 | Q.   Okay.  Did you ever go down to Mexico with the FBI and help |
| 08:39:32 | 25 | them find "40" or "42"? |

08:39:34  1   A.   No, sir.

08:39:36  2   Q.   You understand that "40" has a bounty on his head for $8

08:39:42  3   million.  Did you know that?

08:39:43  4   A.   No, sir.

08:39:46  5   Q.   But you never went down -- nobody from law enforcement ever

08:39:49  6   said, hey, these guys are really, really wanted.  You've been

08:39:53  7   there.  How about you take this down and show us where these guys

08:39:56  8   are?  That never happened?

08:39:58  9   A.   Never happened, sir.

08:40:00  10  Q.   Have you ever -- you've got a brother, right?

08:40:03  11  A.   Yes, sir.

08:40:04  12  Q.   What kind of guy is your brother?

08:40:06  13  A.   He's a working man.

08:40:07  14  Q.   Hard-working man?

08:40:08  15  A.   Yes, sir.

08:40:10  16  Q.   Based on your criminal activity, has any exposure flown off

08:40:16  17  on him?

08:40:17  18  A.   No, sir.

08:40:19  19  Q.   Have you ever heard the saying, you get judged by the

08:40:22  20  company that you keep?  Have you heard that before?

08:40:25  21  A.   Yes, sir.

08:40:25  22  Q.   Have you heard the saying, you can pick your friends but not

08:40:28  23  your family?

08:40:29  24  A.   Yes, sir.

08:40:30  25  Q.   And all you know about Jose, my client, is that he's a

| | | |
|---|---|---|
| 08:40:34 | 1 | hard-working bricklayer who wakes up at 5:00 in the morning, |
| 08:40:38 | 2 | right? |
| 08:40:40 | 3 | A.   I never heard that, sir. |
| 08:40:43 | 4 | Q.   Yesterday, didn't you tell this jury that, supposedly, "40" |
| 08:40:48 | 5 | said that his brother Jose was a hard-working guy, everyday Joe |
| 08:40:52 | 6 | who woke up at 5:00 in the morning? |
| 08:40:54 | 7 | A.   "40" told me this when we were watching the movie that after |
| 08:40:56 | 8 | work, Jose waking up every time at 5:00 in the morning.  He never |
| 08:41:02 | 9 | imagine himself in the horse business. |
| 08:41:03 | 10 | Q.   So Jose exchanged a 5:00 a.m. wake-up call as a bricklayer |
| 08:41:09 | 11 | for a 5:00 a.m. wake-up call as a horse trainer.  Is that fair? |
| 08:41:13 | 12 | A.   That's what I said. |
| 08:41:13 | 13 | Q.   Okay.  Thank you.  That's all I have, your Honor.  Thank |
| 08:41:16 | 14 | you, sir. |
| 08:41:17 | 15 | THE COURT:  Mr. DeGeurin. |
| 08:41:21 | 16 | CROSS-EXAMINATION |
| 08:41:21 | 17 | BY MR. DEGEURIN: |
| 08:41:47 | 18 | Q.   Mr. Guadalajara, I'm Mike DeGeurin. |
| 08:41:57 | 19 | You met with agents and gave them information in |
| 08:42:06 | 20 | interviews in the past, have you not? |
| 08:42:08 | 21 | A.   Yes, sir. |
| 08:42:08 | 22 | Q.   And as already has been pointed out, and which you've |
| 08:42:14 | 23 | admitted to, is that your hopes are to lower your sentence by |
| 08:42:22 | 24 | giving what they call substantial assistance to the government, |
| 08:42:25 | 25 | right? |

08:42:26   1   A.   Nobody promised me anything, sir.

08:42:31   2   Q.   I thought you already admitted that you are seeking a

08:42:37   3   benefit.

08:42:38   4   A.   I admitted that, but they didn't promise me anything.

08:42:40   5   Q.   No, no.  I didn't say that they promised you how far down

08:42:44   6   your sentence would be.  But you have an agreement that if you

08:42:48   7   substantially assist the government, they may request the judge

08:42:52   8   in another district to be light on you.

08:42:55   9   A.   Yes, sir.

08:42:56  10   Q.   Is that correct?

08:42:57  11   A.   Yes, sir.

08:43:09  12   Q.   Well, what date -- isn't it true that sometime in 2011, you

08:43:16  13   met with one of these agents in the courtroom in San Antonio?

08:43:22  14   A.   Yes, I did.

08:43:23  15   Q.   When was that?

08:43:27  16   A.   It was in summer, May.

08:43:34  17   Q.   Was anybody in a hurry when you spoke to them, or did you

08:43:36  18   sit down and answer all the questions?

08:43:40  19   A.   It was just my agent up there.

08:43:42  20   Q.   Huh?

08:43:43  21   A.   There was an agent.

08:43:48  22   Q.   And did you need an interpreter or did you have an

08:43:52  23   interpreter?

08:43:52  24   A.   I needed an interpreter.  Well, they had a lady there.  That

08:43:56  25   whatever I didn't understand, they will tell me in Spanish.

| | | |
|---|---|---|
| 08:43:59 | 1 | Q.   In case you didn't understand the question? |
| 08:44:01 | 2 | A.   Yes, sir. |
| 08:44:02 | 3 | Q.   You had an interpreter to help? |
| 08:44:05 | 4 | A.   Yes, sir. |
| 08:44:09 | 5 | Q.   When you met in 2011 in San Antonio with an agent involved |
| 08:44:14 | 6 | in this case, you did not mention Mr. Francisco Colorado, did |
| 08:44:23 | 7 | you? |
| 08:44:23 | 8 | A.   I didn't tell them that, sir. |
| 08:44:28 | 9 | Q.   You told the agents that Carlos Nayen's father owned Pemex |
| 08:44:37 | 10 | Oil Company? |
| 08:44:37 | 11 | A.   Yes, at that time what I did, sir. |
| 08:44:39 | 12 | Q.   Didn't give them a name, did you? |
| 08:44:41 | 13 | A.   I did.  It was "Pancho," sir. |
| 08:44:48 | 14 | Q.   You mentioned a race track in New Mexico yesterday. |
| 08:44:56 | 15 | A.   Yes. |
| 08:44:56 | 16 | Q.   But I didn't get the name of the race track. |
| 08:45:00 | 17 | A.   It was in Morelos, Coahuila, sir. |
| 08:45:02 | 18 | Q.   Los? |
| 08:45:03 | 19 | A.   Morelos, Coahuila. |
| 08:45:08 | 20 | Q.   Is that N-O-R-E-L? |
| 08:45:10 | 21 | A.   M-O-R-E-L-O-S. |
| 08:45:15 | 22 | Q.   Los Morelos, Coahuila? |
| 08:45:19 | 23 | A.   Morelos, Coahuila. |
| 08:45:25 | 24 | Q.   And would you tell us the clothing that you say that |
| 08:45:35 | 25 | Mr. Colorado was wearing that day when you saw him? |

08:45:37  1  A.   He was wearing blue jeans and I don't know was his top, sir,

08:45:41  2  because they were sitting down on the dirt.

08:45:44  3  Q.   You saw him down on the dirt?

08:45:46  4  A.   Yeah.  They were sitting down -- he was sitting next to "40"

08:45:49  5  on the finish line.

08:45:50  6  Q.   I'm sorry?

08:45:50  7  A.   I was across the track.

08:45:54  8  Q.   You were across the track?

08:45:56  9  A.   Yes, sir.  Not exactly straight with them, like five meters

08:46:01  10  away.

08:46:02  11  Q.   I'm sorry.

08:46:02  12  A.   Not straight with them, like five meters in front of them.

08:46:07  13  Q.   Not straight across?  Five meters down?

08:46:09  14  A.   Yes, sir.

08:46:10  15  Q.   And across the track?

08:46:11  16  A.   Yes, sir.

08:46:12  17  Q.   And do you claim to have spoken to him?

08:46:20  18  A.   No.  I didn't spoke to him, anything like that.

08:46:52  19  Q.   One last thing I'd like to ask you about.  Listen to me

08:47:01  20  carefully.

08:47:04  21        In order to be used as a witness in a case, you

08:47:12  22  understand you have to have some evidence that would be relevant

08:47:19  23  to that case.  You know the word "relevant"?

08:47:22  24  A.   No, sir.

08:47:23  25  Q.   Okay.  You understand that in order to substantially assist

| | | |
|---|---|---|
| 08:47:28 | 1 | the government, you must have something -- |
| 08:47:31 | 2 | MR. GARDNER:  Your Honor, we object to these questions |
| 08:47:32 | 3 | being improper.  He's asking the witness to draw a legal |
| 08:47:36 | 4 | conclusion. |
| 08:47:37 | 5 | MR. DEGEURIN:  I didn't mean a legal -- |
| 08:47:38 | 6 | THE COURT:  Oh, it's not a legal conclusion. |
| 08:47:43 | 7 | Q.   (BY MR. DEGEURIN) Let me start over, sir. |
| 08:47:45 | 8 | Do you understand that in order for you to give |
| 08:47:49 | 9 | substantial assistance, you have to have some information that |
| 08:47:55 | 10 | would substantially assist the government, right? |
| 08:47:58 | 11 | A.   Yes, sir. |
| 08:48:03 | 12 | Q.   And if you don't, you don't get the benefit that you want, |
| 08:48:08 | 13 | right? |
| 08:48:08 | 14 | A.   Yes, sir. |
| 08:48:10 | 15 | Q.   Did I understand you correctly that to the jury yesterday, |
| 08:48:24 | 16 | you've never spoken or met personally Mr. Colorado? |
| 08:48:27 | 17 | A.   Yes.  That's what I said. |
| 08:48:28 | 18 | Q.   You've never met him? |
| 08:48:29 | 19 | A.   I never met him, sir. |
| 08:48:30 | 20 | Q.   I'm sorry? |
| 08:48:31 | 21 | A.   I never met him. |
| 08:48:33 | 22 | Q.   Okay.  May I for demonstrative purposes, your Honor? |
| 08:48:41 | 23 | MR. GARDNER:  May I see it, Mr. DeGeurin? |
| 08:49:12 | 24 | Q.   (BY MR. DEGEURIN) By the way, is your name Raul? |
| 08:49:26 | 25 | A.   Yes, sir. |

```
08:49:27   1    Q.   Guadalajara?

08:49:28   2    A.   Yes, sir.  That's my name.

08:49:30   3    Q.   Guia?  Did I spell correctly?

08:49:38   4    A.   Yes, sir.

08:49:39   5    Q.   Is it true that you -- I may repeat myself.  I want to make

08:49:43   6    sure I write this down.  Never met Mr. Colorado, right?

08:49:55   7    A.   That is true, sir.

08:50:21   8    Q.   Now, Mr. Guadalajara, I'm demonstrating to you how slowly my

08:50:52   9    mind works this early in the morning.

08:50:54   10        You saw a person you were told was "Pancho" across a

08:50:58   11   race track.

08:50:59   12   A.   Yes, sir.

08:51:00   13   Q.   And what year was that?

08:51:02   14   A.   2011.  2010.  At the beginning of 2010.

08:51:09   15   Q.   Early 2010?

08:51:10   16   A.   Yes.

08:51:11   17   Q.   Did you ever see him again?

08:51:25   18   A.   No.  I never saw him again, sir.

08:51:28   19   Q.   Were you shown photographs of him?

08:51:31   20   A.   Where?

08:51:31   21   Q.   Anywhere.

08:51:32   22   A.   No, sir.

08:51:38   23   Q.   Would it be fair for me to put down here that you hope to be

08:51:47   24   able to give substantial assistance to the government?  Would

08:51:52   25   that be a fair statement?
```

| | | |
|---|---|---|
| 08:51:54 | 1 | A.   Yes. |
| 08:51:57 | 2 | Q.   Do you face charges in Mexico? |
| 08:52:39 | 3 | A.   Not that I know of, sir. |
| 08:52:42 | 4 | Q.   But you know that in Mexico, you are believed to be high up |
| 08:52:50 | 5 | in the Zeta organization? |
| 08:52:55 | 6 | A.   I don't know nothing, sir. |
| 08:52:57 | 7 | Q.   Well, you're supposed to know "Cuarenta," No. "40"? |
| 08:53:00 | 8 | A.   Yeah.  But I was not part of them, sir. |
| 08:53:04 | 9 | Q.   You work for them, but you weren't part of them? |
| 08:53:06 | 10 | A.   I work for "Poncho" Cuellar.  Mario "Poncho" Cuellar. |
| 08:53:12 | 11 | Q.   "Poncho" Cuellar? |
| 08:53:14 | 12 | A.   Yes, sir. |
| 08:53:15 | 13 | Q.   And when you were in San Antonio, did representatives of the |
| 08:53:20 | 14 | Mexican government ever come and talk to you? |
| 08:53:22 | 15 | A.   The Mexican government?  No, sir.  Never. |
| 08:53:25 | 16 | Q.   Agents? |
| 08:53:25 | 17 | A.   No, sir. |
| 08:53:26 | 18 | Q.   DGR? |
| 08:53:29 | 19 | A.   No, sir.  Nobody -- nobody from Mexico come talk to me. |
| 08:53:33 | 20 | Q.   I'm sorry? |
| 08:53:34 | 21 | A.   Nobody from Mexico come talk to me. |
| 08:53:38 | 22 | Q.   How did you meet Mr. Perez, your lawyer? |
| 08:53:42 | 23 | A.   Perez? |
| 08:53:43 | 24 | Q.   Perez. |
| 08:53:45 | 25 | MR. GARDNER:  Your Honor, the point of relevance. |

```
08:53:48    1              MR. DEGEURIN:  I can explain at the bench, if you want
08:53:50    2    me to, without going further, but I think it's relevant.
08:53:59    3              THE COURT:  I'll permit him to answer.  You may answer.
08:54:04    4    A.   There was a friend that got in trouble when I was in Mexico,
08:54:09    5    then Perez took him up out of jail.  And when I saw my friend in
08:54:14    6    Mexico, I asked him who -- what's his lawyer and he told me it
08:54:18    7    was Mr. Perez.  That's how I got the number.
08:54:22    8    Q.   (BY MR. DEGEURIN) And the friend in Mexico that Mr. Perez
08:54:29    9    got out of jail, what's his name?
08:54:31   10    A.   Agustin.
08:54:32   11    Q.   I'm sorry?
08:54:33   12    A.   Agustin.
08:54:35   13    Q.   "Agua-kine"?
08:54:36   14    A.   Agustin.
08:54:37   15    Q.   Agustin.  I'm sorry.
08:54:38   16    A.   Yes, sir.
08:54:40   17    Q.   My Spanish and pronunciation is not that good.
08:54:44   18              And was he in jail in the United States?
08:54:47   19    A.   Yes, sir.
08:54:48   20    Q.   On drug charges?
08:54:49   21    A.   Money.
08:54:50   22    Q.   Money?
08:54:51   23    A.   Caught with money.
08:54:54   24    Q.   Is he still out of jail?
08:54:56   25    A.   Yes.
```

08:54:57  1   Q.   Is he charged in the United States?

08:54:59  2   A.   Not that I know, sir.

08:55:01  3        MR. GARDNER:  Your Honor, at this point, relevance of

08:55:03  4   some other individual.

08:55:04  5        THE COURT:  We've gone too far.  I sustain the

08:55:06  6   objection.  Let's move on to something else.

08:55:08  7        MR. DEGEURIN:  Will the Court allow me to ask the

08:55:10  8   question -- will the prosecutor allow me to ask the question

08:55:13  9   without objection:  Do you know any other people in jail with you

08:55:22  10  that are also represented --

08:55:23  11       MR. GARDNER:  Your Honor, I'm going to -- object before

08:55:26  12  he finishes the question.  He's talking about other people not

08:55:29  13  associated with this case.

08:55:33  14       MR. DEGEURIN:  Well, I'm not sure if he'd know they're

08:55:36  15  associated or not.

08:55:37  16       THE COURT:  He's indicated how he got the lawyer.  I

08:55:40  17  sustain the objection on keep going on who he may know.  He's got

08:55:48  18  the same lawyer.

08:55:49  19       MR. DEGEURIN:  One second, Judge.

08:56:15  20  Q.   (BY MR. DEGEURIN) I wanted to make sure I had this correct.

08:56:21  21  Mr. Cuellar, the person that you worked with, is he represented

08:56:25  22  by Mr. Perez, too?

08:56:28  23       MR. GARDNER:  Your Honor, can we approach?

08:56:36  24       (At the bench, hearing in progress.)

08:56:47  25       MR. GARDNER:  Your Honor, I'd object.

| | | |
|---|---|---|
| 08:57:17 | 1 | THE COURT:  You don't know either if there are any |
| 08:57:20 | 2 | conflicts that have been made that are allowed by a federal judge |
| 08:57:23 | 3 | either. |
| 08:57:25 | 4 | MR. DEGEURIN:  I don't. |
| 08:57:26 | 5 | THE COURT:  It does seem funny that he's representing |
| 08:57:29 | 6 | several. |
| 08:57:33 | 7 | MR. DEGEURIN:  My question is -- |
| 08:57:34 | 8 | THE COURT:  We do things different in San Antonio. |
| 08:57:38 | 9 | MR. WOMACK:  Yes, sir.  Another thing about that is it |
| 08:57:40 | 10 | seems to be he's a common denominator.  He represents a number of |
| 08:57:43 | 11 | these defendants and they could be giving -- |
| 08:57:44 | 12 | THE COURT:  He's not on the stand giving information. |
| 08:57:48 | 13 | MR. DEGEURIN:  I wanted to ask him a few questions |
| 08:57:49 | 14 | about his understanding of conflict of interest.  His |
| 08:57:53 | 15 | understanding of whether or not advice he's given cannot harm |
| 08:58:01 | 16 | another witness or another client of Mr. Perez.  I mean, that's |
| 08:58:09 | 17 | where I'm going. |
| 08:58:10 | 18 | THE COURT:  You're going to ask him about conflict |
| 08:58:16 | 19 | whether or not he understands his clients could harm him by |
| 08:58:19 | 20 | representing somebody else? |
| 08:58:20 | 21 | MR. DEGEURIN:  With regard to conflict of interest, I'm |
| 08:58:23 | 22 | going to ask him, was that explained to him, did anybody ask him |
| 08:58:28 | 23 | to waive the conflict of interest? |
| 08:58:32 | 24 | MR. WOMACK:  Or that this witness gave -- |
| 08:58:33 | 25 | MR. DEGEURIN:  I'm not asking a legal conclusion.  I'm |

| | | |
|---|---|---|
| 08:58:35 | 1 | not asking what a federal judge may have done in San Antonio. |
| 08:58:38 | 2 | I'm asking him for his understanding. |
| 08:58:40 | 3 | THE COURT:  I've allowed you to show who his lawyer is. |
| 08:58:44 | 4 | I'll allow you the question on Cuellar.  That's it.  We're going |
| 08:58:48 | 5 | to stay off of the rest of it. |
| 08:58:50 | 6 | MR. DEGEURIN:  Okay. |
| 08:58:51 | 7 | THE COURT:  This gentleman has got -- and, you know, |
| 08:58:56 | 8 | anybody reads the record will understand how non-intelligent and |
| 08:59:00 | 9 | unsophisticated this guy is.  He's not going to -- we'll be here |
| 08:59:06 | 10 | forever if you to try to explain conflict of interest. |
| 08:59:09 | 11 | MR. DEGEURIN:  Okay.  Finally, Judge, and I'm not |
| 08:59:12 | 12 | arguing with the Court, and I'm going to accept your ruling. |
| 08:59:16 | 13 | THE COURT:  Make your bill however you wish. |
| 08:59:19 | 14 | MR. DEGEURIN:  I'm not talking to the Court above.  I'm |
| 08:59:22 | 15 | talking to you right now, because it may come up again.  My |
| 08:59:25 | 16 | interest is what he believes -- his beliefs about conflict of |
| 08:59:31 | 17 | interest so that the jury can understand that in judging his |
| 08:59:37 | 18 | credibility.  That's what I'm -- that's why I was going down that |
| 08:59:41 | 19 | road. |
| 08:59:42 | 20 | THE COURT:  Well, he's testified as to the substance of |
| 08:59:49 | 21 | the allegations.  You have crossed him on substance of the |
| 08:59:53 | 22 | allegations.  But the fact that his lawyer may represent multiple |
| 08:59:58 | 23 | people can be excused.  I don't know whether it was or not.  But |
| 09:00:03 | 24 | this gentleman does not know. |
| 09:00:06 | 25 | MR. DEGEURIN:  I don't know.  I haven't asked him that. |

| | | |
|---|---|---|
| 09:00:10 | 1 | MR. MAYR:  And if I may, just by proxy through Mr. |
| 09:00:13 | 2 | DeGeurin.  Can he also ask if he knows that Hector Moreno was |
| 09:00:16 | 3 | also represented by Frank Perez?  In other words, you just said |
| 09:00:18 | 4 | that we could -- you just said right now that he could only |
| 09:00:21 | 5 | ask -- |
| 09:00:21 | 6 | THE COURT:  That's the only question before me. |
| 09:00:24 | 7 | MR. DEGEURIN:  One second. |
| 09:00:25 | 8 | MR. MAYR:  Sorry.  Go ahead. |
| 09:00:26 | 9 | MR. DEGEURIN:  It was my -- |
| 09:00:28 | 10 | MR. MAYR:  Go ahead.  I'm sorry. |
| 09:00:29 | 11 | MR. DEGEURIN:  I'll move on with the witness and don't |
| 09:00:37 | 12 | waive my interests.  Judge, did you cut me off? |
| 09:01:06 | 13 | THE COURT:  No.  But don't tempt me. |
| 09:01:11 | 14 | MR. DEGEURIN:  I'm not going to go there, Judge. |
| 09:01:16 | 15 | THE COURT:  Go ahead, sir. |
| 09:01:18 | 16 | Q.  (BY MR. DEGEURIN) Okay.  Do you have any -- are you -- do |
| 09:01:27 | 17 | you know yourself of any understanding about whether or not |
| 09:01:34 | 18 | you're going to be sent to Mexico for prosecutions there for drug |
| 09:01:40 | 19 | dealings that you've done in Mexico? |
| 09:01:42 | 20 | A.  No.  I don't know about it, sir, but I'm a U.S. citizen. |
| 09:01:47 | 21 | Q.  I'm sorry? |
| 09:01:47 | 22 | A.  I don't know anything about that if I'm ever sent to Mexico. |
| 09:01:50 | 23 | Q.  Okay.  Have you been in jail in Mexico? |
| 09:01:52 | 24 | A.  No, sir.  Never.  This is my first time in jail. |
| 09:02:00 | 25 | Q.  Defense Exhibit No. 8, I believe it is, for demonstrative |

| | | |
|---|---|---|
| 09:02:06 | 1 | purposes. |
| 09:02:06 | 2 | THE COURT:  Nine. |
| 09:02:08 | 3 | MR. DEGEURIN:  Nine.  I'll offer. |
| 09:02:10 | 4 | MR. GARDNER:  No objection, your Honor. |
| 09:02:11 | 5 | THE COURT:  All right.  Demonstrative Exhibit Colorado |
| 09:02:15 | 6 | 9 is admitted. |
| 09:02:18 | 7 | MR. DEGEURIN:  I'm sorry.  I want to add one more thing |
| 09:02:19 | 8 | before I admit it.  All right, Judge.  I pass the witness. |
| 09:03:05 | 9 | MR. WOMACK:  No questions, your Honor. |
| 09:03:06 | 10 | THE COURT:  Mr. Esper. |
| 09:03:08 | 11 | MR. ESPER:  Yes, your Honor.  If it please the Court. |
| 09:03:11 | 12 | CROSS-EXAMINATION |
| 09:03:11 | 13 | BY MR. ESPER: |
| 09:03:17 | 14 | Q.   Mr. Guadalajara, yesterday, I don't know if Mr. Womack asked |
| 09:03:20 | 15 | you, but are you a United States citizen? |
| 09:03:22 | 16 | A.   Yes, sir, I am. |
| 09:03:23 | 17 | Q.   Okay.  And I believe that you were dealing in drugs in the |
| 09:03:30 | 18 | early 1990s, correct? |
| 09:03:32 | 19 | A.   Yes, sir. |
| 09:03:32 | 20 | Q.   Okay.  Now, you were part of what is -- what was known as |
| 09:03:38 | 21 | Mr. Cuellar's crew; is that right? |
| 09:03:40 | 22 | A.   Yes, sir. |
| 09:03:41 | 23 | Q.   And that would consist of Mr. Cuellar, who is your boss |
| 09:03:46 | 24 | basically, right? |
| 09:03:47 | 25 | A.   Yes, sir. |

| | | |
|---|---|---|
| 09:03:49 | 1 | Q.   How about Mr. Moreno? |
| 09:03:51 | 2 | A.   No.  He was part of a crew.  He wasn't my boss. |
| 09:03:55 | 3 | Q.   But he was part of the crew? |
| 09:03:57 | 4 | A.   Yes, sir. |
| 09:03:57 | 5 | Q.   Okay.  You were part of the crew? |
| 09:03:59 | 6 | A.   Yes, sir. |
| 09:04:00 | 7 | Q.   Who else? |
| 09:04:06 | 8 | A.   "Mancha" and Agustin was also part of our crew and Hector |
| 09:04:13 | 9 | bothers. |
| 09:04:14 | 10 | Q.   Hector's what? |
| 09:04:15 | 11 | A.   Brother. |
| 09:04:17 | 12 | Q.   Brother? |
| 09:04:17 | 13 | A.   Yes. |
| 09:04:18 | 14 | Q.   Okay.  How about his brother-in-law, Mr. Mata? |
| 09:04:22 | 15 | A.   No, sir.  I don't know who Mata is. |
| 09:04:25 | 16 | Q.   You don't know who he is? |
| 09:04:26 | 17 | A.   No, sir. |
| 09:04:27 | 18 | Q.   Now, I know you haven't been sentenced yet, but when you do |
| 09:04:36 | 19 | get sentenced, or before you get sentenced, are you asking one or |
| 09:04:40 | 20 | both of the federal judges whose cases that are pending before |
| 09:04:45 | 21 | them to admit you into the 500-hour Comprehensive Drug Abuse |
| 09:04:49 | 22 | Program? |
| 09:04:51 | 23 | A.   What is that? |
| 09:04:52 | 24 | Q.   Well, when you were interviewed by U.S. Probation, did you |
| 09:04:57 | 25 | discuss with them substance abuse problems that you had? |

| 09:05:00 | 1 | A.   Yes, sir. |
| 09:05:01 | 2 | Q.   And you told them you had substance abuse problems, didn't |
| 09:05:04 | 3 | you? |
| 09:05:05 | 4 | A.   Yes, sir. |
| 09:05:05 | 5 | Q.   Okay.  Now, what substance abuse problems did you have up to |
| 09:05:11 | 6 | the time that you were apprehended? |
| 09:05:13 | 7 | A.   I was using cocaine. |
| 09:05:15 | 8 | Q.   Cocaine? |
| 09:05:16 | 9 | A.   Yes, sir. |
| 09:05:16 | 10 | Q.   And how much cocaine did you use on a frequent basis? |
| 09:05:21 | 11 | A.   Not that much, sir.  I don't know.  Probably about three 20s |
| 09:05:27 | 12 | on a weekend.  Maybe more. |
| 09:05:29 | 13 | Q.   So basically you were a weekend user of cocaine? |
| 09:05:33 | 14 | A.   Yes, sir. |
| 09:05:33 | 15 | Q.   And you used roughly three 20s, that might be, what, a gram |
| 09:05:38 | 16 | of cocaine? |
| 09:05:38 | 17 | A.   Yes. |
| 09:05:39 | 18 | Q.   Well, I'm asking you. |
| 09:05:40 | 19 | A.   Yes.  It is. |
| 09:05:41 | 20 | Q.   Okay.  And you did that almost every week for how many |
| 09:05:46 | 21 | years? |
| 09:05:47 | 22 | A.   On weekends for six years maybe. |
| 09:05:50 | 23 | Q.   Okay.  And was it explained to you that by admitting drug |
| 09:05:54 | 24 | usage, you could try to get into a program with the Bureau of |
| 09:05:59 | 25 | Prisons to get time off your sentence? |

| | | |
|---|---|---|
| 09:06:01 | 1 | A.   Yes.   It was explained that. |
| 09:06:02 | 2 | Q.   Okay.   And you're hoping to get that, aren't you? |
| 09:06:05 | 3 | A.   Yes, sir. |
| 09:06:06 | 4 | Q.   Okay.   So you admit that during this time period that you |
| 09:06:11 | 5 | were dealing drugs, you were also using drugs, correct? |
| 09:06:14 | 6 | A.   Yes, sir. |
| 09:06:14 | 7 | Q.   All right.   And the drugs that you were using was cocaine? |
| 09:06:21 | 8 | A.   That is correct. |
| 09:06:22 | 9 | Q.   And were you mixing it with alcohol? |
| 09:06:23 | 10 | A.   Yes. |
| 09:06:25 | 11 | Q.   Okay.   Now, when was it -- first, let me ask you.   You've |
| 09:06:33 | 12 | known Mr. "Chevo" Huitron, you said, from a long, long time ago, |
| 09:06:37 | 13 | correct? |
| 09:06:37 | 14 | A.   Yes, sir. |
| 09:06:38 | 15 | Q.   That would have been back in the 1990s, correct? |
| 09:06:40 | 16 | A.   Yes, sir. |
| 09:06:41 | 17 | Q.   And, actually, you indicated that he was a trainer for a |
| 09:06:45 | 18 | horse named Tio George? |
| 09:06:47 | 19 | A.   That was his horse. |
| 09:06:48 | 20 | Q.   That was his horse? |
| 09:06:49 | 21 | A.   Yes, sir. |
| 09:06:49 | 22 | Q.   And he ran that horse in Mexico, did he not? |
| 09:06:51 | 23 | A.   Yes.   In Morelos, Coahuila.   He won a futurity there. |
| 09:06:55 | 24 | Q.   And he was good at what he did, didn't he, from what you |
| 09:06:58 | 25 | knew? |

| | | |
|---|---|---|
| 09:06:58 | 1 | A.   From what I knew.   Yes. |
| 09:07:00 | 2 | Q.   And that's where you first met him was in the late 1990s in |
| 09:07:03 | 3 | Mexico, where he was racing or his horse was -- the horse that he |
| 09:07:09 | 4 | trained was racing in events, correct? |
| 09:07:11 | 5 | A.   Yes, sir. |
| 09:07:12 | 6 | Q.   Okay.   Now, how many times did you see him -- did you see |
| 09:07:16 | 7 | him a bunch of times in the 1990s? |
| 09:07:18 | 8 | A.   Yes, sir. |
| 09:07:19 | 9 | Q.   Okay.   Did you become friends with him or you just knew who |
| 09:07:22 | 10 | he was? |
| 09:07:22 | 11 | A.   I just knew he was.   I never became friends. |
| 09:07:25 | 12 | Q.   Never talked to him? |
| 09:07:26 | 13 | A.   Never talked to him. |
| 09:07:27 | 14 | Q.   Okay.   And how many times in the 1990s -- and I know this |
| 09:07:31 | 15 | might be difficult, but did you see him a bunch of times? |
| 09:07:34 | 16 | A.   Every time that there was races there. |
| 09:07:37 | 17 | Q.   Okay.   He was always in Mexico or frequently in Mexico at |
| 09:07:41 | 18 | races with horses that he either owned or trained, correct? |
| 09:07:44 | 19 | A.   Yes, sir. |
| 09:07:46 | 20 | Q.   Okay.   And are these races -- some of them are open to the |
| 09:07:49 | 21 | public, correct? |
| 09:07:50 | 22 | A.   Yes. |
| 09:07:50 | 23 | Q.   Some of them are private races, correct? |
| 09:07:53 | 24 | A.   Yes, sir. |
| 09:07:53 | 25 | Q.   And these private races, are they referred to as match |

| | | |
|---|---|---|
| 09:07:56 | 1 | races? |
| 09:07:56 | 2 | A.    Match races, yeah. |
| 09:07:57 | 3 | Q.    Okay.  Was he at some of those? |
| 09:07:59 | 4 | A.    Yes.  Sometimes there was people there. |
| 09:08:03 | 5 | Q.    Okay.  Did he ever -- did "Pancho," did he train some horses |
| 09:08:08 | 6 | for your boss, Mr. Cuellar? |
| 09:08:10 | 7 | A.    Not that I knew, sir. |
| 09:08:12 | 8 | Q.    Not that you know of? |
| 09:08:13 | 9 | A.    No. |
| 09:08:14 | 10 | Q.    Okay.  Now, who was it that sent this supposed $15,000 to |
| 09:08:23 | 11 | Mr. Huitron? |
| 09:08:24 | 12 | A.    I sent it, sir. |
| 09:08:25 | 13 | Q.    You sent it? |
| 09:08:26 | 14 | A.    Yes, sir. |
| 09:08:26 | 15 | Q.    And did Mr. Cuellar tell you to send it? |
| 09:08:29 | 16 | A.    Yes.  "Poncho" Cuellar told me, sir. |
| 09:08:33 | 17 | Q.    And did he tell you why he was sending 15,000? |
| 09:08:36 | 18 | A.    For horse expenses, he told me. |
| 09:08:38 | 19 | Q.    Horse training? |
| 09:08:39 | 20 | A.    Expenses. |
| 09:08:40 | 21 | Q.    Horse training expenses? |
| 09:08:41 | 22 | A.    Yes, sir. |
| 09:08:42 | 23 | Q.    Mr. Cuellar tells you, I want you to take $15,000 to Mr. |
| 09:08:45 | 24 | Huitron for horse-training expenses? |
| 09:08:48 | 25 | A.    Yes, sir. |

| | | |
|---|---|---|
| 09:08:48 | 1 | Q. Okay. And did he tell you where he lives? |
| 09:08:53 | 2 | A. He didn't told me where he lived, but I know that he have in |
| 09:08:57 | 3 | Austin. Because they were going to meet in Austin, my other guy. |
| 09:08:59 | 4 | Q. Had you ever been to his horse-training facilities in |
| 09:09:03 | 5 | Austin? |
| 09:09:04 | 6 | A. No. Never, sir. |
| 09:09:05 | 7 | Q. Okay. Well, how did you know where to go with this 15,000? |
| 09:09:08 | 8 | A. Because he give me the phone number. |
| 09:09:11 | 9 | Q. Oh, gave you phone number? |
| 09:09:13 | 10 | A. "Poncho" gave me a phone number and I gave it to the guy |
| 09:09:16 | 11 | that I sent over here. |
| 09:09:17 | 12 | Q. So you didn't take the 15,000? |
| 09:09:18 | 13 | A. I didn't take, no. |
| 09:09:19 | 14 | Q. Who's the guy that took the 15,000? |
| 09:09:21 | 15 | A. It's a worker for me. |
| 09:09:22 | 16 | Q. What's his name? |
| 09:09:23 | 17 | A. Rufino. |
| 09:09:24 | 18 | Q. Pardon me? |
| 09:09:25 | 19 | A. Rufino. |
| 09:09:26 | 20 | Q. Rubino? |
| 09:09:27 | 21 | A. Rufino. |
| 09:09:28 | 22 | Q. Can you spell that? |
| 09:09:29 | 23 | A. R-U-F-I-N-O. |
| 09:09:30 | 24 | Q. Okay. And Rufino was -- worked for you? |
| 09:09:34 | 25 | A. Yes, sir. |

| | | |
|---|---|---|
| 09:09:34 | 1 | Q.   And he was the guy that worked for you doing what? |
| 09:09:39 | 2 | A.   Bringing money. |
| 09:09:40 | 3 | Q.   Picking up money? |
| 09:09:41 | 4 | A.   Yeah.  Picking up money here in the United States and taking |
| 09:09:44 | 5 | it into Mexico. |
| 09:09:47 | 6 | Q.   Okay.  Did he start working for you after the seizure of |
| 09:09:51 | 7 | this cocaine when you fled to Mexico? |
| 09:09:53 | 8 | A.   Yes, sir. |
| 09:09:54 | 9 | Q.   Okay.  Before that, you were the guy that was picking up |
| 09:09:57 | 10 | money, delivering cocaine, bringing money back to Mexico, |
| 09:10:00 | 11 | correct? |
| 09:10:00 | 12 | A.   Yes, sir. |
| 09:10:01 | 13 | Q.   But you were living in the United States? |
| 09:10:02 | 14 | A.   Yes, sir. |
| 09:10:03 | 15 | Q.   Where were you living? |
| 09:10:04 | 16 | A.   San Antonio. |
| 09:10:05 | 17 | Q.   Okay.  So but you were working for Mr. Cuellar but living in |
| 09:10:09 | 18 | San Antonio? |
| 09:10:10 | 19 | A.   Yes, sir. |
| 09:10:11 | 20 | Q.   You were getting your cocaine from Mr. Cuellar, correct? |
| 09:10:13 | 21 | A.   Yes, sir. |
| 09:10:14 | 22 | Q.   Okay.  Now, what year was it that this cocaine got seized in |
| 09:10:19 | 23 | Seguin, Texas that caused you to flee to Mexico? |
| 09:10:24 | 24 | A.   I think it was 2008. |
| 09:10:26 | 25 | Q.   Okay.  And obviously somebody that had that cocaine, it was |

09:10:35  1  a person that got arrested, correct?

09:10:36  2  A.   Yes, sir.

09:10:37  3  Q.   It was somebody that you knew?

09:10:38  4  A.   No, sir.  I didn't knew the drivers.

09:10:42  5  Q.   You didn't know the drivers?

09:10:43  6  A.   No, sir.

09:10:46  7  Q.   Well, what caused it -- this seizure in Seguin, Texas get --

09:10:52  8  you get wind that this cocaine has been seized.  A bunch of

09:10:56  9  cocaine, right?

09:10:56  10  A.   Yes, sir.

09:10:57  11  Q.   Is it your cocaine?

09:10:58  12  A.   No, sir.

09:10:59  13  Q.   The driver's not your driver?

09:11:01  14  A.   No, sir.

09:11:01  15  Q.   The vehicle, does it belong to you?

09:11:03  16  A.   No, sir.

09:11:03  17  Q.   Why do you flee to Mexico?

09:11:05  18  A.   Because the guy that I hired to hire the drivers, he got

09:11:09  19  arrested.

09:11:10  20  Q.   The guy that hired the drivers got arrested, also?

09:11:13  21  A.   Yes, sir.

09:11:14  22  Q.   And you hired the guy that hired the drivers?

09:11:17  23  A.   Yes, sir.

09:11:18  24  Q.   So you were concerned that the guy who hired the drivers was

09:11:23  25  going to say things about you?

| | | |
|---|---|---|
| 09:11:25 | 1 | A.   Yes, sir. |
| 09:11:25 | 2 | Q.   What was that guy's name? |
| 09:11:32 | 3 | A.   Jose -- can't remember his last name, sir. |
| 09:11:36 | 4 | Q.   You just know him as Jose? |
| 09:11:38 | 5 | A.   Yes, sir. |
| 09:11:38 | 6 | Q.   Had you hired him on a number of occasions to drive loads of |
| 09:11:42 | 7 | cocaine? |
| 09:11:42 | 8 | A.   He only did that three or four loads of cocaine. |
| 09:11:45 | 9 | Q.   Okay.  And not only was he arrested but so was the driver, |
| 09:11:51 | 10 | correct? |
| 09:11:51 | 11 | A.   Yes, sir. |
| 09:11:51 | 12 | Q.   Okay.  Did they reach out to you and ask you for help with |
| 09:11:56 | 13 | bond or lawyer's fees? |
| 09:11:58 | 14 | A.   Nah.  They never told me anything. |
| 09:12:00 | 15 | Q.   Okay.  You just found out this load got busted and you just |
| 09:12:03 | 16 | packed your bags, went to Mexico? |
| 09:12:05 | 17 | A.   Yes. |
| 09:12:05 | 18 | Q.   Okay.  And you had a house here, did you not? |
| 09:12:08 | 19 | A.   No, sir. |
| 09:12:09 | 20 | Q.   I thought you said you lived in San Antonio? |
| 09:12:11 | 21 | A.   I live in San Antonio with my mom and dad. |
| 09:12:12 | 22 | Q.   You were renting? |
| 09:12:14 | 23 | A.   I live with my mom and dad. |
| 09:12:15 | 24 | Q.   Okay.  So you were living with your parents? |
| 09:12:17 | 25 | A.   Yes, sir. |

| | | |
|---|---|---|
| 09:12:17 | 1 | Q.   Okay.  And obviously they didn't know you were dealing |
| 09:12:24 | 2 | cocaine, did they? |
| 09:12:25 | 3 | A.   No, sir. |
| 09:12:27 | 4 | Q.   And you were pretty good about hiding that from your mom and |
| 09:12:30 | 5 | dad, correct? |
| 09:12:30 | 6 | A.   Yes, sir. |
| 09:12:31 | 7 | Q.   All right.  Now, you then go to Mexico in 2008, right? |
| 09:12:36 | 8 | A.   Yes, sir. |
| 09:12:37 | 9 | Q.   Okay.  And you're living where, in Piedras Negras? |
| 09:12:42 | 10 | A.   Piedras Negras in Nava. |
| 09:12:45 | 11 | Q.   Okay.  What year is it that this $15,000 is supposedly sent |
| 09:12:50 | 12 | to Mr. "Chevo" Huitron for horse expenses? |
| 09:12:53 | 13 | A.   2010, sir. |
| 09:12:55 | 14 | Q.   Okay.  And obviously, he didn't come to Mexico to get that |
| 09:13:01 | 15 | money, did he? |
| 09:13:02 | 16 | A.   No, sir. |
| 09:13:02 | 17 | Q.   Okay.  And it was "Poncho" Cuellar who told you, have this |
| 09:13:10 | 18 | money sent to Mr. Huitron for payment of horse expenses? |
| 09:13:13 | 19 | A.   Yes, sir. |
| 09:13:15 | 20 | Q.   Now, according to you, this driver when he makes the |
| 09:13:21 | 21 | delivery supposedly cracks a joke and says, where are the kilos? |
| 09:13:25 | 22 | A.   Yes, sir. |
| 09:13:25 | 23 | Q.   Okay.  And apparently Mr. Huitron took offense at that? |
| 09:13:29 | 24 | A.   Yes, sir.  He got mad. |
| 09:13:31 | 25 | Q.   Okay.  You were there, though? |

| | | |
|---|---|---|
| 09:13:32 | 1 | A.   No, sir. |
| 09:13:33 | 2 | Q.   Okay.  Now, apparently when the driver gets back to Mexico, |
| 09:13:38 | 3 | Mr. Cuellar reprimands him for making that comment, correct? |
| 09:13:43 | 4 | A.   The driver called me and he said that Huitron got mad at -- |
| 09:13:49 | 5 | Cuellar called me that said that "40" called him to ask him why |
| 09:13:52 | 6 | was his driver asking for kilos. |
| 09:13:53 | 7 | Q.   Okay.  Wait a minute.  The driver calls you and tells you |
| 09:13:57 | 8 | about the little wisecrack he made to Mr. Huitron and that |
| 09:14:02 | 9 | "Chevo" got mad at him? |
| 09:14:03 | 10 | A.   Yes, sir. |
| 09:14:03 | 11 | Q.   Okay.  And you then tell Mr. Cuellar? |
| 09:14:08 | 12 | A.   By that time, Cuellar had already called me and told me |
| 09:14:10 | 13 | about it. |
| 09:14:11 | 14 | Q.   Pardon me? |
| 09:14:11 | 15 | A.   By that time, Cuellar had already told me about it. |
| 09:14:14 | 16 | Q.   Okay.  Cuellar told you about it? |
| 09:14:16 | 17 | A.   Yes. |
| 09:14:16 | 18 | Q.   And Cuellar told you supposedly that "40" had already called |
| 09:14:21 | 19 | him and said, why is this guy making these wisecracks? |
| 09:14:25 | 20 | A.   Yes, sir. |
| 09:14:25 | 21 | Q.   Okay.  You don't know who called "40," do you? |
| 09:14:28 | 22 | A.   No, sir. |
| 09:14:29 | 23 | Q.   You weren't there? |
| 09:14:30 | 24 | A.   No, sir.  I wasn't there. |
| 09:14:31 | 25 | Q.   And you don't know who was present whenever this $15,000 was |

09:14:34   1   brought to Mr. Huitron and this wisecrack was made to him, do

09:14:38   2   you?

09:14:38   3   A.   He told me it was Huitron that was there.

09:14:41   4   Q.   Just "Chevo"?

09:14:41   5   A.   Yes, sir.

09:14:42   6   Q.   By himself?

09:14:43   7   A.   "Chevo."

09:14:43   8   Q.   But you didn't know who "Chevo" called to call "40," do you?

09:14:47   9   A.   No, sir.  I don't know.

09:14:48   10   Q.   All right.  Did -- you've never told Mr. Huitron you're a

09:14:56   11   cocaine dealer, are you?

09:14:57   12   A.   No, sir.

09:14:57   13   Q.   Okay.  And neither has Mr. Cuellar, has he, to your

09:15:02   14   knowledge?

09:15:02   15   A.   Mr. Cuellar what?

09:15:03   16   Q.   And to your knowledge, Mr. Cuellar has never told "Chevo,"

09:15:06   17   I'm a cocaine dealer?

09:15:08   18   A.   No, sir.

09:15:09   19   Q.   Okay.  And this driver that was taking these moneys to your

09:15:14   20   knowledge -- or you didn't instruct him to tell "Chevo," these

09:15:19   21   moneys are from drugs.  You know that?

09:15:20   22   A.   I didn't instruct him, sir.

09:15:22   23   Q.   Right.  You tried to keep that hidden, didn't you?

09:15:25   24   A.   Yes, sir.

09:15:25   25   Q.   Sure.

| | | |
|---|---|---|
| 09:15:26 | 1 | A.   Well, they knew. |
| 09:15:27 | 2 | Q.   I'm not talking about what they knew, sir.  If you didn't |
| 09:15:31 | 3 | tell them, you're just guessing that they knew.  Isn't that |
| 09:15:34 | 4 | right? |
| 09:15:34 | 5 | A.   Yes, sir. |
| 09:15:36 | 6 | Q.   Yeah.  That's what I thought. |
| 09:15:38 | 7 | Now, when you met a year and a half ago with this |
| 09:15:44 | 8 | gentleman, Mr. Lawson, you met somewhere in some building, |
| 09:15:49 | 9 | correct? |
| 09:15:49 | 10 | A.   Yes, sir. |
| 09:15:49 | 11 | Q.   And he interviewed you? |
| 09:15:51 | 12 | A.   Yes, sir. |
| 09:15:51 | 13 | Q.   Okay.  And there was someone else with him, a female FBI |
| 09:15:54 | 14 | agent who was probably taking notes, correct? |
| 09:15:56 | 15 | A.   Yes, sir. |
| 09:15:57 | 16 | Q.   And he's asking you questions, correct? |
| 09:15:59 | 17 | A.   Yes, sir. |
| 09:15:59 | 18 | Q.   And he's asking you to be truthful with him and tell him |
| 09:16:02 | 19 | everything you know about this horse racing and interweaving with |
| 09:16:09 | 20 | alleged drug dealing, correct? |
| 09:16:10 | 21 | A.   Yes, sir. |
| 09:16:11 | 22 | Q.   All right.  Now, have you seen -- I realize it was a year |
| 09:16:16 | 23 | and a half ago.  Have you met with him or any other agents about |
| 09:16:21 | 24 | this -- about testimony in this case? |
| 09:16:24 | 25 | A.   No, sir. |

| | | |
|---|---|---|
| 09:16:25 | 1 | Q.   Not talked to anybody since a year and a half ago? |
| 09:16:28 | 2 | A.   Yes, sir.  Nobody. |
| 09:16:29 | 3 | Q.   Okay.  Now, did you tell Mr. Lawson -- |
| 09:16:36 | 4 | MR. GARDNER:  Your Honor, may I have a moment to confer |
| 09:16:39 | 5 | with counsel? |
| 09:16:45 | 6 | Q.   (BY MR. ESPER) You didn't meet with any agents, but you |
| 09:16:48 | 7 | spoke with Mr. Gardner, correct? |
| 09:16:49 | 8 | A.   Yes, sir. |
| 09:16:50 | 9 | Q.   Concerning your testimony that you're giving here today? |
| 09:16:52 | 10 | A.   Yes, sir. |
| 09:16:52 | 11 | Q.   And he basically was just not telling you what to say but |
| 09:16:56 | 12 | basically going -- |
| 09:16:57 | 13 | A.   What I say. |
| 09:16:59 | 14 | Q.   Kind of rehearsing a little bit, right? |
| 09:17:01 | 15 | A.   Yes, sir. |
| 09:17:01 | 16 | Q.   Okay.  Did you ever tell Mr. Lawson about this $15,000 that |
| 09:17:08 | 17 | was supposedly sent to Mr. "Chevo" Huitron? |
| 09:17:11 | 18 | A.   I told him that. |
| 09:17:12 | 19 | Q.   You did? |
| 09:17:12 | 20 | A.   Yes, sir. |
| 09:17:13 | 21 | Q.   Did you tell him about the wisecrack that your driver made |
| 09:17:19 | 22 | to "Chevo" Huitron about the kilos of cocaine? |
| 09:17:22 | 23 | A.   Yes, sir. |
| 09:17:22 | 24 | Q.   And did you tell him that the driver got reprimanded by, |
| 09:17:29 | 25 | allegedly, Mr. -- what Mr. "40" calling Mr. Cuellar to reprimand |

| | | |
|---|---|---|
| 09:17:34 | 1 | this guy for this? |
| 09:17:35 | 2 | A.   Yes, sir. |
| 09:17:35 | 3 | Q.   You told him that? |
| 09:17:36 | 4 | A.   Yes, sir. |
| 09:17:36 | 5 | Q.   And you believe -- well -- |
| 09:17:42 | 6 | MR. DEGEURIN:  Your Honor, may I -- I'm sorry.  Mr. |
| 09:17:44 | 7 | Esper, may I approach, please, with all lawyers? |
| 09:17:52 | 8 | THE COURT:  Sure. |
| 09:17:58 | 9 | (At the bench, on the record.) |
| 09:18:11 | 10 | MR. DEGEURIN:  We are in a Bruton situation where a |
| 09:18:18 | 11 | lawyer representing his own client is asking about confessions |
| 09:18:26 | 12 | and statements made by this person to either the prosecutor or to |
| 09:18:26 | 13 | the agents that would be after arrest and not part of the |
| 09:18:32 | 14 | conspiracy covered or session.  And I don't want to waive my |
| 09:18:36 | 15 | right to object to hearsay statements that are not coconspirator |
| 09:18:41 | 16 | statements.  Therefore, I object.  I don't want to make a |
| 09:18:53 | 17 | speaking objection before the jury. |
| 09:18:54 | 18 | THE COURT:  Well, I'm not going to tolerate every |
| 09:18:56 | 19 | objection, y'all approaching the bench.  The jury's had all of |
| 09:19:00 | 20 | the approaching the bench they want.  They don't know what you're |
| 09:19:03 | 21 | saying.  But it doesn't do your client any good when you want to |
| 09:19:05 | 22 | approach the bench.  And I can't control the lawyers.  I did my |
| 09:19:12 | 23 | best a couple of days ago.  I'm not going to do it.  If he wants |
| 09:19:17 | 24 | to ask him what he said, then you can ask him what he said, too. |
| 09:19:19 | 25 | MR. DEGEURIN:  Okay.  I'm going to object on the record |

09:19:23    1    now before the jury.

09:19:24    2          THE COURT:  Yes, sir.  Any time you wish, you can.  You

09:19:28    3    have that right.

09:19:28    4          MR. DEGEURIN:  Okay.  Your Honor, I want to object in

09:19:42    5    front of the jury our discussions.  I object to Bruton material,

09:19:50    6    statements made that are not part of the exception to the hearsay

09:19:54    7    rule being asked or about any lawyer, or any prosecutor, or any

09:19:58    8    other lawyer.  I object to that being inadmissible against my

09:20:04    9    particular client.  And I would ask for an instruction to the

09:20:06   10    jury as to how they would receive such testimony.

09:20:11   11          THE COURT:  Well, I don't have a question before me.

09:20:14   12    So if there is a question that you believe needs that objection,

09:20:21   13    you make it.  The only question I have before me is a "Yes" or

09:20:28   14    "No" answer.  So we'll go to the next question by Mr. Esper.

09:20:32   15          But you make the objection anytime you wish.  That's

09:20:35   16    your privilege and obligation.

09:20:37   17          MR. DEGEURIN:  The concern is that evidence is not

09:20:41   18    relevant to my client might be believed or thought to be

09:20:49   19    admissible against my client by the jury.

09:20:50   20          THE COURT:  I'm going to give you plenty of time to

09:20:52   21    argue your case.  Just make your objections when they're timely.

09:20:58   22          All right.  Mr. Esper.  Your next question.

09:21:01   23    Q.   (BY MR. ESPER) Thank you.  Yes, your Honor.

09:21:02   24          And whenever you're being interviewed by Mr. Lawson and

09:21:06   25    there's notes being taken, you supposedly told him these things

| | | |
|---|---|---|
| 09:21:11 | 1 | that you're testifying to about Mr. "Chevo" Huitron, correct? |
| 09:21:14 | 2 | A.   Yes, sir. |
| 09:21:15 | 3 | Q.   Now, have you been shown or would it surprise you -- let me |
| 09:21:21 | 4 | ask you this.  Have you been shown any report that Mr. Lawson |
| 09:21:24 | 5 | drew up reflecting what you supposedly told him? |
| 09:21:28 | 6 | A.   No, sir. |
| 09:21:33 | 7 |         MR. GARDNER:  Your Honor, this part of the objection is |
| 09:21:35 | 8 | improper impeachment.  Mr. Esper is going to show him Special |
| 09:21:38 | 9 | Agent Lawson -- |
| 09:21:39 | 10 |         THE COURT:  I know what he's going to do.  I'm going to |
| 09:21:40 | 11 | put the jury in the jury box -- in the jury deliberation room. |
| 09:22:18 | 12 |         (Jury not present.) |
| 09:22:30 | 13 |         THE COURT:  Now, first, ladies and gentlemen out there |
| 09:22:42 | 14 | in the audience, I'm not going to have any more cellphones go |
| 09:22:46 | 15 | off.  If your cellphone goes off, I'm instructing the marshal to |
| 09:22:49 | 16 | confiscate it.  You can get it back in a month by going to the |
| 09:22:56 | 17 | United States Marshal's Office.  But I'm telling you to take any |
| 09:22:59 | 18 | cellphone that goes off again.  Okay.  That's instruction one. |
| 09:23:05 | 19 |         Instruction two is to the lawyers.  You inquire as to |
| 09:23:17 | 20 | the conversations and the report of the agent.  I will allow the |
| 09:23:21 | 21 | agent not only to tell them that this -- he was not interrogating |
| 09:23:25 | 22 | him for this case, which he wasn't a long time ago.  I will also |
| 09:23:31 | 23 | allow him to tell everything he said.  I will give the |
| 09:23:36 | 24 | instruction, as requested by Mr. DeGeurin, that they could only |
| 09:23:40 | 25 | consider this testimony regarding your client. |

| | | |
|---|---|---|
| 09:23:49 | 1 | Now, you're taking a report and you're going to try to |
| 09:23:52 | 2 | cross on what is not there, correct? |
| 09:23:57 | 3 | MR. ESPER:  Your Honor, that is correct. |
| 09:23:58 | 4 | THE COURT:  All right. |
| 09:23:58 | 5 | MR. ESPER:  If I may respond, your Honor. |
| 09:24:00 | 6 | THE COURT:  Yeah. |
| 09:24:00 | 7 | MR. ESPER:  I know this is not -- |
| 09:24:01 | 8 | THE COURT:  You respond when it's your turn.  I happen |
| 09:24:06 | 9 | to be talking right now. |
| 09:24:07 | 10 | MR. ESPER:  I'm sorry. |
| 09:24:08 | 11 | THE COURT:  All right.  Now, that can be done, but it |
| 09:24:14 | 12 | has a penalty.  And the other lawyers may be ready to make a |
| 09:24:20 | 13 | Bruton objection, but they can't make it right now because this |
| 09:24:30 | 14 | witness is available for cross-examination.  Now, I've told you |
| 09:24:37 | 15 | what I'm going to do.  If you get into why it wasn't there and |
| 09:24:41 | 16 | what was said, I'm going to allow the gentleman whose report it |
| 09:24:47 | 17 | is to respond to it.  I'll take a five-minute break.  You decide |
| 09:24:54 | 18 | how you wish to proceed. |
| 09:30:42 | 19 | (Recess.) |
| 09:34:20 | 20 | MR. ESPER:  Your Honor, before the jury comes in, I am |
| 09:34:23 | 21 | going to withdraw the question in light of the Court's comments. |
| 09:34:26 | 22 | THE COURT:  Hold on.  You may be seated.  Excuse me. |
| 09:34:29 | 23 | MR. ESPER:  What I anticipate the Court's ruling is. |
| 09:34:31 | 24 | But I would, before they come in, like to make a record, just to |
| 09:34:35 | 25 | ask him for purposes -- |

| | | |
|---|---|---|
| 09:34:37 | 1 | THE COURT:  I'll let you make a record at a later date. |
| 09:34:40 | 2 | I'm not going to keep the jury waiting any longer. |
| 09:34:42 | 3 | MR. ESPER:  It will take me one second, your Honor. |
| 09:34:44 | 4 | THE COURT:  Well, it may or may not. |
| 09:34:46 | 5 | MR. ESPER:  Okay.  All right. |
| 09:34:47 | 6 | THE COURT:  And other people may wish to participate. |
| 09:34:50 | 7 | And I don't want the witness any more confused than he is |
| 09:34:58 | 8 | already. |
| 09:34:59 | 9 | Bring the jury in. |
| 09:35:03 | 10 | (Jury present.) |
| 09:36:56 | 11 | THE COURT:  Mr. Esper, you may continue, sir. |
| 09:36:59 | 12 | MR. ESPER:  Thank you. |
| 09:36:59 | 13 | Q.  (BY MR. ESPER) Mr. Guadalajara, you said that you knew of a |
| 09:37:05 | 14 | horse called Tempting Dash? |
| 09:37:07 | 15 | A.  Yes, sir. |
| 09:37:07 | 16 | Q.  And what was the name of that horse when it was in Mexico? |
| 09:37:11 | 17 | A.  El Hueso. |
| 09:37:14 | 18 | Q.  El Hueso.  Can you spell? |
| 09:37:16 | 19 | A.  H-U-E-S-O. |
| 09:37:17 | 20 | Q.  H-U-E-S-O? |
| 09:37:19 | 21 | A.  Yes, sir. |
| 09:37:19 | 22 | Q.  Okay.  And you said that the person that trained that horse |
| 09:37:24 | 23 | was a person name Pedro? |
| 09:37:25 | 24 | A.  "Pedrito."  Yes, sir. |
| 09:37:26 | 25 | Q.  Okay.  And do you know who trained that horse when he came |

| 09:37:30 | 1 | to the United States? |
| 09:37:31 | 2 | A.   Yes, sir. |
| 09:37:32 | 3 | Q.   Who's that? |
| 09:37:32 | 4 | A.   "Chevo." |
| 09:37:33 | 5 | Q.   "Chevo" Huitron, correct? |
| 09:37:34 | 6 | A.   Yes, sir. |
| 09:37:35 | 7 | Q.   Okay.  And do you know when that horse -- and if you don't, |
| 09:37:40 | 8 | simply say so -- when that horse was brought to the United |
| 09:37:42 | 9 | States? |
| 09:37:42 | 10 | A.   No.  I don't know, sir. |
| 09:37:44 | 11 | Q.   Okay.  And do you know -- and if you don't, simply say so -- |
| 09:37:49 | 12 | whether Mr. Cuellar paid moneys for the horse expenses in |
| 09:37:54 | 13 | training that horse? |
| 09:37:55 | 14 | A.   Yes, he did. |
| 09:37:56 | 15 | Q.   He did? |
| 09:37:56 | 16 | A.   Yes, sir. |
| 09:37:56 | 17 | Q.   Okay.  And is that because he told you? |
| 09:37:59 | 18 | A.   Yes, sir. |
| 09:38:00 | 19 | Q.   Okay.  Did you ever see that horse race in the United |
| 09:38:07 | 20 | States? |
| 09:38:07 | 21 | A.   Only on TV, sir. |
| 09:38:08 | 22 | Q.   Just on TV? |
| 09:38:09 | 23 | A.   Yes. |
| 09:38:09 | 24 | Q.   Okay.  May I have just a moment, your Honor? |
| 09:38:17 | 25 | THE COURT:  Certainly. |

| | | |
|---|---|---|
| 09:38:21 | 1 | Q.   (BY MR. ESPER) When you were in the drug business, Mr. |
| 09:38:25 | 2 | Guadalajara, you were trying, of course, with people that you |
| 09:38:30 | 3 | weren't dealing drugs with to try to camouflage and hide the fact |
| 09:38:34 | 4 | that you were a drug dealer, correct? |
| 09:38:36 | 5 | A.   Yes, sir. |
| 09:38:37 | 6 | Q.   And that dealt with everybody who you came in contact with |
| 09:38:41 | 7 | except those you were dealing drugs with, correct? |
| 09:38:43 | 8 | A.   Yes, sir. |
| 09:38:45 | 9 | Q.   You didn't want it out in the open that moneys that you were |
| 09:38:48 | 10 | spending in the United States came from drug moneys, did you? |
| 09:38:52 | 11 | A.   No, sir. |
| 09:38:54 | 12 | Q.   And I believe you testified that you spent a lot of money |
| 09:39:00 | 13 | that you made on a house here in San Antonio? |
| 09:39:03 | 14 | A.   It was in Mexico, sir. |
| 09:39:05 | 15 | Q.   Pardon? |
| 09:39:05 | 16 | A.   In Mexico.  Not here. |
| 09:39:07 | 17 | Q.   In Mexico? |
| 09:39:07 | 18 | A.   Yes, sir. |
| 09:39:08 | 19 | Q.   Okay.  But when you were living here, you were living with |
| 09:39:11 | 20 | your parents, and you were spending a lot of money that you were |
| 09:39:15 | 21 | making from the drug business? |
| 09:39:17 | 22 | A.   I didn't spend a lot of money here in the United States. |
| 09:39:20 | 23 | Most of my money, I spent it in Mexico. |
| 09:39:21 | 24 | Q.   You spent it mostly in Mexico? |
| 09:39:23 | 25 | A.   Yes, sir. |

| | | |
|---|---|---|
| 09:39:23 | 1 | Q.   Even though you lived in San Antonio? |
| 09:39:24 | 2 | A.   Yes, sir. |
| 09:39:25 | 3 | Q.   That's all I have, your Honor. |
| 09:39:28 | 4 | MR. MAYR:  Just briefly, your Honor. |
| 09:39:30 | 5 | CROSS-EXAMINATION |
| 09:39:31 | 6 | BY MR. MAYR: |
| 09:39:31 | 7 | Q.   Mr. Guadalajara, do you know "Chevo" Huitron's brother |
| 09:39:35 | 8 | Isabel? |
| 09:39:35 | 9 | A.   "La Quiria"?  That's his nickname?  I think I know him.  "La |
| 09:39:39 | 10 | Quiria," that's his -- that's how I know him by. |
| 09:39:42 | 11 | Q.   How do you know him? |
| 09:39:43 | 12 | A.   When they were up there in Mexico racing. |
| 09:39:44 | 13 | Q.   So he races horses, also? |
| 09:39:46 | 14 | A.   Yes, sir. |
| 09:39:47 | 15 | Q.   What else do you know about him? |
| 09:39:48 | 16 | A.   That's all I know, sir. |
| 09:39:49 | 17 | Q.   Okay.  Do you know he's here in the courtroom? |
| 09:39:52 | 18 | A.   No, sir. |
| 09:39:52 | 19 | Q.   Okay.  What about his brother Jesus, do you know him? |
| 09:39:54 | 20 | A.   No, sir. |
| 09:39:56 | 21 | Q.   No further questions. |
| 09:40:02 | 22 | THE COURT:  Any redirect? |
| 09:40:03 | 23 | MR. GARDNER:  Yes, your Honor.  Thank you. |
| 09:40:03 | 24 | |
| 09:40:05 | 25 | |

<u>RE-DIRECT EXAMINATION</u>

BY MR. GARDNER:

Q.   Mr. DeGeurin, could I have Colorado 9, please?

     Mr. Guadalajara, you remember when Mr. DeGeurin asked you if you saw a person you were told was "Pancho" across a race track in early 2010?

A.   Yes, sir.

Q.   Do you recall the statement that Mr. DeGeurin asked you, was that a fair statement of your testimony?

A.   Yes, sir.

Q.   Okay.  Would it also be a fair statement of your testimony if I were to add this:  "Pancho" is the same person you see today and pointed out yesterday?

A.   Yes, sir.

Q.   And Mr. Finn asked you about the statement regarding Jose Trevino being a bricklayer.  Do you recall that?

A.   Yes, sir.

Q.   All right.  You speak a little fast, Mr. Guadalajara.  Could you slow down and repeat exactly what "40" told you about Jose Trevino when you were watching the Mr. Piloto race?

A.   He said that his brother, after waking every day at 5:00 in the morning to go to work, never imagine himself at the horse business.  And he was telling that to "42."  And "42" would turn around and he just laughed, he said like we made it for him.

Q.   We made it for him?

| | | |
|---|---|---|
| 09:41:51 | 1 | A.   Yes, sir. |
| 09:41:51 | 2 | Q.   Whose horse was Mr. Piloto? |
| 09:41:54 | 3 | A.   "40." |
| 09:41:56 | 4 | Q.   And did Jose Trevino manage those horses for his brother? |
| 09:42:01 | 5 | A.   Yes, he did, sir. |
| 09:42:06 | 6 | Q.   Now, both Mr. Finn and Mr. Esper asked you about your |
| 09:42:12 | 7 | criminal record and this is your first conviction, correct? |
| 09:42:15 | 8 | A.   Yes, sir. |
| 09:42:15 | 9 | Q.   You had no convictions prior to your pleading guilty in this |
| 09:42:20 | 10 | federal case? |
| 09:42:20 | 11 | A.   Yes, sir. |
| 09:42:21 | 12 | Q.   Were you conducting any illegal activities at that time? |
| 09:42:26 | 13 | A.   After I got arrested? |
| 09:42:27 | 14 | Q.   No.  Before you got arrested? |
| 09:42:28 | 15 | A.   Yes, sir. |
| 09:42:29 | 16 | Q.   Okay.  Were those out in the open or were you trying to hide |
| 09:42:33 | 17 | that from law enforcement? |
| 09:42:33 | 18 | A.   I was just trying to hide it. |
| 09:42:37 | 19 | Q.   Now, could you tell the jury, again, when you worked with |
| 09:42:45 | 20 | Mr. Cuellar, when you started working with "Poncho" Cuellar? |
| 09:42:50 | 21 | A.   Oh, 1993. |
| 09:42:52 | 22 | Q.   And when you did that, did you two sign a piece of paper |
| 09:42:55 | 23 | that said you would work for him? |
| 09:42:56 | 24 | A.   No, sir. |
| 09:42:57 | 25 | Q.   Did you know all the details of what Mr. Cuellar would do? |

| | | |
|---|---|---|
| 09:43:01 | 1 | A.    No, sir. |
| 09:43:01 | 2 | Q.    And I believe you said you didn't know Mr. Mata? |
| 09:43:04 | 3 | A.    Mr. who? |
| 09:43:05 | 4 | Q.    Mr. Mata.  I believe Mr. Esper asked you if you know Mr. |
| 09:43:10 | 5 | Mata? |
| 09:43:10 | 6 | A.    Oh, no, I didn't know him, sir. |
| 09:43:11 | 7 | Q.    Did you know all the people who worked with "Poncho" |
| 09:43:14 | 8 | Cuellar? |
| 09:43:15 | 9 | A.    Not everybody.  Just who was there. |
| 09:43:17 | 10 | Q.    And did you know all the inner workings or the details of |
| 09:43:24 | 11 | how the cocaine was moved from somewhere south of Mexico into the |
| 09:43:28 | 12 | United States? |
| 09:43:28 | 13 | A.    Not everything, sir. |
| 09:43:30 | 14 | Q.    Now, in these interviews that you conducted with Special |
| 09:43:41 | 15 | Agent Lawson over here, did you answer the questions that he |
| 09:43:44 | 16 | asked you? |
| 09:43:45 | 17 | A.    Yes, sir. |
| 09:43:47 | 18 | Q.    And is that what you're doing today, responding to questions |
| 09:43:50 | 19 | that are asked of you? |
| 09:43:51 | 20 | A.    Yes, sir. |
| 09:43:52 | 21 | Q.    Now, when you first met, according to Mr. Esper, you first |
| 09:43:58 | 22 | met "Chevo" Huitron in the '90s in Mexico, correct? |
| 09:44:02 | 23 | A.    Yes, sir. |
| 09:44:02 | 24 | Q.    Okay.  And what was he doing down there again? |
| 09:44:04 | 25 | A.    They were racing his horse in Morelos, Coahuila. |

09:44:08  1   Q.   Did you observe him talking to a number of people and making

09:44:11  2   contacts in Mexico?

09:44:12  3   A.   He talked to a bunch of people down there.

09:44:15  4   Q.   And I believe Mr. Esper asked you if "Chevo" Huitron was a,

09:44:20  5   quote, good trainer.

09:44:21  6   A.   Yes.

09:44:22  7   Q.   Did "40" use "Chevo" Huitron because he was a good trainer?

09:44:26  8   A.   Yes, sir.

09:44:27  9   Q.   He also asked you if you were high up in the organization,

09:44:35  10  and I believe your response was no.

09:44:37  11  A.   No, sir.

09:44:39  12  Q.   Do you know what "Chevo's" role was in the organization?

09:44:43  13  A.   No, sir.  Just he trained the horse for "40."  That's all I

09:44:48  14  knew.

09:44:48  15  Q.   Just trained horses for "40"?

09:44:49  16  A.   Yes, sir.

09:44:49  17  Q.   And do you know what Jose Trevino's role was in the

09:44:52  18  organization?

09:44:53  19  A.   No, sir.  All I knew is he was "40" brother, and he's the

09:44:58  20  one that managed the horses down here.

09:45:00  21  Q.   Horses in the United States?

09:45:00  22  A.   Yes, sir.  In the United States.

09:45:02  23  Q.   Okay.  Were you aware of "Pancho" Colorado's role in the

09:45:05  24  organization?

09:45:06  25  A.   No, sir.

09:45:09    1    Q.    How many times have you gone up to people and said, hey, I'm

09:45:12    2    a drug dealer?

09:45:13    3    A.    Never, sir.

09:45:15    4    Q.    And why not?

09:45:16    5    A.    Because I don't want nobody to know that.

09:45:20    6    Q.    And I believe Mr. Esper asked you if you were good at

09:45:22    7    concealing your activities from your parents.

09:45:24    8    A.    Yes, sir.

09:45:26    9    Q.    And I want to get the timing right on this call that you

09:45:32    10   received from "Poncho" Cuellar.  How soon after your driver

09:45:38    11   called you about the joke did you get a call from "Poncho"

09:45:43    12   Cuellar?

09:45:44    13   A.    About 30 minutes, sir.

09:45:46    14   Q.    And did "Poncho" Cuellar specifically mention "40's" name?

09:45:54    15   A.    Yes, sir.

09:45:55    16   Q.    And can you tell the ladies and gentlemen of the jury what

09:45:58    17   "Poncho" Cuellar relayed to you, the best of your memory?

09:46:01    18   A.    That he what?

09:46:04    19   Q.    Please tell the jury what "Poncho" Cuellar relayed to you

09:46:06    20   about what "40" said.

09:46:08    21   A.    Oh, he said that he was asking him for kilos there and to

09:46:16    22   bring up the driver to him so they can beat him up.

09:46:19    23   Q.    Who wanted to beat up the driver?

09:46:21    24   A.    "40."

09:46:23    25   Q.    Did the driver eventually get beat up?

| 09:46:26 | 1 | A.   No, sir, because "Poncho" Cuellar tell him that he was a new |
| 09:46:29 | 2 | guy, he was just joking. |
| 09:46:31 | 3 | Q.   That's all I have, your Honor. |

RE-CROSS EXAMINATION

| 09:46:34 | 4 | |
| 09:46:34 | 5 | BY MR. FINN: |
| 09:46:40 | 6 | Q.   May it please the Court.  Thank you, Judge. |
| 09:46:43 | 7 |      Mr. Guadalajara, I just have a couple of questions for |
| 09:46:47 | 8 | you.  As to what you told this jury that "40" allegedly said, I |
| 09:46:51 | 9 | want you to stand up, look around the courtroom and see if you |
| 09:46:54 | 10 | see him anywhere in the courtroom.  Would you? |
| 09:47:00 | 11 | A.   No, sir. |
| 09:47:00 | 12 | Q.   "40's" not here, is he? |
| 09:47:02 | 13 | A.   No, sir. |
| 09:47:03 | 14 | Q.   I can't question him, can I? |
| 09:47:04 | 15 | A.   No, sir. |
| 09:47:05 | 16 | Q.   So what you're telling this jury, although it's admissible, |
| 09:47:08 | 17 | it's called hearsay, correct? |
| 09:47:09 | 18 |      MR. GARDNER:  Your Honor, I'm going to object to this |
| 09:47:11 | 19 | line of questioning.  It's improper. |
| 09:47:14 | 20 |      THE COURT:  It's not a question yet.  Let's ask |
| 09:47:15 | 21 | questions. |
| 09:47:16 | 22 | Q.   (BY MR. FINN) How many hundreds of thousands of kilos do you |
| 09:47:21 | 23 | think you would have brought into the country from the date that |
| 09:47:24 | 24 | you were arrested until today if you had not been arrested? |
| 09:47:29 | 25 | A.   I have no idea, sir.  That depends on whether they give us |

| | | |
|---|---|---|
| 09:47:33 | 1 | work or not. |
| 09:47:33 | 2 | Q.   But you had no intention of getting out of the dope-running |
| 09:47:37 | 3 | business until you got arrested, right? |
| 09:47:39 | 4 | A.   Yes, sir. |
| 09:47:40 | 5 | Q.   Thank you.  That's all, your Honor. |
| 09:47:43 | 6 | MR. DEGEURIN:  No questions, your Honor. |
| 09:47:44 | 7 | THE COURT:  Mr. Womack. |
| 09:47:45 | 8 | MR. WOMACK:  No.  No questions. |
| 09:47:46 | 9 | THE COURT:  Mr. Esper. |
| 09:47:48 | 10 | RE-CROSS EXAMINATION |
| 09:47:48 | 11 | BY MR. ESPER: |
| 09:47:49 | 12 | Q.   Mr. Guadalajara, what you -- you never met "Chevo" Huitron, |
| 09:47:55 | 13 | correct? |
| 09:47:55 | 14 | A.   Only on races in Mexico is where I saw him.  I never met |
| 09:47:58 | 15 | him, sir. |
| 09:47:58 | 16 | Q.   Just saw him? |
| 09:48:00 | 17 | A.   Yes, sir. |
| 09:48:00 | 18 | Q.   And whatever you're telling the ladies and gentlemen of this |
| 09:48:03 | 19 | jury about him came from "Poncho" Cuellar, correct? |
| 09:48:06 | 20 | A.   Yes, sir. |
| 09:48:06 | 21 | Q.   Okay.  Miguel "Cuarenta" never told you anything about Mr. |
| 09:48:13 | 22 | "Chevo" Huitron, did he? |
| 09:48:14 | 23 | A.   He said he was a trainer of the horses, sir. |
| 09:48:16 | 24 | Q.   He told you -- |
| 09:48:17 | 25 | A.   Tempting Dash, yes, when we were watching the races. |

| | | |
|---|---|---|
| 09:48:19 | 1 | Q.   Okay.  He said, that's the guy who trains some of my horses? |
| 09:48:23 | 2 | A.   Yes, sir. |
| 09:48:23 | 3 | Q.   That's all I have. |
| 09:48:26 | 4 | MR. MAYR:  I have no further question, your Honor. |
| 09:48:28 | 5 | MR. GARDNER:  May the witness be excused, your Honor? |
| 09:48:30 | 6 | MR. FINN:  No objection. |
| 09:48:31 | 7 | THE COURT:  You may excuse him for the time being.  You |
| 09:48:47 | 8 | may call your next witness. |
| 09:48:48 | 9 | MR. GARDNER:  Thank you, your Honor.  Government calls |
| 09:48:50 | 10 | Special Agent Rene Amarillas. |
| 09:49:27 | 11 | (Witness sworn.) |
| 09:49:48 | 12 | THE COURT:  If you'll tell us, please, sir, your full |
| 09:49:50 | 13 | name and spell your last. |
| 09:49:51 | 14 | THE WITNESS:  My name is Rene Amarillas.  My last name |
| 09:49:56 | 15 | spelled, A-M-A-R-I-L-L-A-S. |
| 09:50:02 | 16 | RENE AMARILLAS, called by the Government, duly sworn. |
| 09:50:02 | 17 | DIRECT EXAMINATION |
| 09:50:02 | 18 | BY MR. GARDNER: |
| 09:50:03 | 19 | Q.   Thank you, your Honor. |
| 09:50:04 | 20 | Good morning, Special Agent.  Could you please |
| 09:50:07 | 21 | introduce yourself to the jury?  Tell them what you do for a |
| 09:50:09 | 22 | living. |
| 09:50:10 | 23 | A.   Yes, sir.  My name is Special Agent Rene Amarillas.  I'm |
| 09:50:15 | 24 | group supervisor of the Drug Enforcement Administration, |
| 09:50:18 | 25 | currently stationed in Tucson, Arizona. |

| | | |
|---|---|---|
| 09:50:21 | 1 | Q.    And how long have you been in Tucson, Arizona? |
| 09:50:24 | 2 | A.    I've been in Tucson, Arizona since March of 2011. |
| 09:50:28 | 3 | Q.    And how long have you been with the Drug Enforcement |
| 09:50:31 | 4 | Administration? |
| 09:50:31 | 5 | A.    Since January of 2000. |
| 09:50:34 | 6 | Q.    And have you spent some time operating for the Drug |
| 09:50:39 | 7 | Enforcement Administration in Mexico? |
| 09:50:41 | 8 | A.    Yes, sir.  I have. |
| 09:50:42 | 9 | Q.    Okay.  Could you explain that to the jury, please? |
| 09:50:45 | 10 | A.    In January or, rather, February of 2007, I was assigned to |
| 09:50:51 | 11 | the Monterrey, Nuevo Leon office in Monterrey, Mexico.  Assigned |
| 09:50:58 | 12 | there as a special agent, specifically to the U.S. consulate |
| 09:51:02 | 13 | there. |
| 09:51:03 | 14 | Q.    And what was your role while you were special agent in |
| 09:51:06 | 15 | Mexico for the U.S. law enforcement? |
| 09:51:09 | 16 | A.    My role was to further investigations specific to Mexico |
| 09:51:16 | 17 | with the time there, and assist the domestic offices.  But I also |
| 09:51:23 | 18 | carry on our own investigations there while stationed in Mexico. |
| 09:51:27 | 19 | Q.    At some point, did you become aware of the Los Zetas cartel? |
| 09:51:31 | 20 | A.    Yes, sir.  I did. |
| 09:51:32 | 21 | Q.    Okay.  And did you begin investigating them? |
| 09:51:35 | 22 | A.    Yes, sir.  I did. |
| 09:51:36 | 23 | Q.    And who was the target -- big target of your investigation? |
| 09:51:41 | 24 | A.    The big target of our investigation was the hierarchy at Los |
| 09:51:46 | 25 | Zetas that included Heriberto Lazcano-Lazcano, Miguel |

| | | |
|---|---|---|
| 09:51:51 | 1 | Trevino-Morales and Omar Trevino-Morales, amongst others. |
| 09:51:54 | 2 | Q.   And we've heard a little bit about Heriberto |
| 09:51:59 | 3 | Lazcano-Lazcano, but at the time, can you tell the jury what his |
| 09:52:02 | 4 | role was in the Zetas organization? |
| 09:52:04 | 5 | A.   At the time, he was the leader of the Zeta organization. |
| 09:52:10 | 6 | Q.   Okay.  And, sir, did you become aware of an individual named |
| 09:52:15 | 7 | Ramiro Villarreal? |
| 09:52:15 | 8 | A.   Yes, sir.  I did. |
| 09:52:21 | 9 | Q.   I'm showing you Government's Exhibit 419.  Do you recognize |
| 09:52:25 | 10 | that, sir? |
| 09:52:25 | 11 | A.   Yes, sir, I do. |
| 09:52:26 | 12 | Q.   Is that Mr. Villarreal? |
| 09:52:28 | 13 | A.   Yes, sir, it. |
| 09:52:29 | 14 | Q.   Your Honor, we offer Government's Exhibit 419. |
| 09:52:38 | 15 |         THE COURT:  It's received. |
| 09:52:54 | 16 | Q.   (BY MR. GARDNER) And, again, for the jury, Mr. Amarillas, |
| 09:52:59 | 17 | there is Mr. Villarreal, right? |
| 09:53:00 | 18 | A.   His name was Jose Romero Villarreal. |
| 09:53:05 | 19 | Q.   How did Mr. Villarreal come to your attention? |
| 09:53:07 | 20 | A.   On or about 2008, I had had a source of information of a |
| 09:53:11 | 21 | person that was providing information to me that stated that this |
| 09:53:15 | 22 | individual here -- |
| 09:53:17 | 23 |         MS. WILLIAMS:  Objection.  Hearsay. |
| 09:53:18 | 24 |         THE COURT:  Sustain the objection. |
| 09:53:20 | 25 | Q.   (BY MR. GARDNER) Did you receive information about Mr. |

09:53:22   1   Villarreal?

09:53:22   2   A.   Yes, I did.

09:53:23   3   Q.   Okay.  And based on that information, what steps did you

09:53:26   4   take?

09:53:27   5   A.   I took the steps of further -- of getting the information

09:53:31   6   and moving forward to positively identify who this person was.

09:53:35   7   Q.   And what steps were those, sir?

09:53:37   8   A.   The steps were to look into databases and indices that were

09:53:43   9   available specific to me and to others, and to corroborate first

09:53:48   10   and last name, and then, finally, I was able to ascertain a

09:53:53   11   photograph of him, showed it specific to a person that was

09:53:58   12   providing information to me to get a positive identification on

09:54:01   13   him.

09:54:02   14   Q.   And so, the photograph you obtained, you corroborated that

09:54:06   15   to be, in fact, Mr. Villarreal here on the screen?

09:54:09   16   A.   Yes, sir.

09:54:10   17   Q.   So once you corroborated Mr. Villarreal's identify, what

09:54:13   18   further investigative steps did you take?

09:54:17   19   A.   Along that time, I was also provided with a Nextel

09:54:23   20   push-to-talk number that was being utilized by Mr. Villarreal.

09:54:27   21   Q.   And what is the importance for law enforcement of obtaining

09:54:31   22   phone numbers from possible suspects?

09:54:34   23   A.   The importance is to get this telephone number and to start

09:54:38   24   looking at the specific contacts or start analysis -- doing an

09:54:44   25   analysis of the phone to see what other subjects this person is

09:54:47   1   speaking to.

09:54:48   2   Q.    And how is federal law enforcement able to look at the

09:54:53   3   contacts of a particular person's phone?

09:54:56   4   A.    Federal agents requesting a toll section or, rather, it's a

09:55:03   5   download or an indication of who this person -- or analysis of

09:55:08   6   who this person is contacting numerically.

09:55:11   7   Q.    When you say toll records, is that like a phone bill just to

09:55:14   8   show the past contacts?

09:55:15   9   A.    That's correct.

09:55:16   10   Q.    All right.  And what do you do with this contact list of

09:55:19   11   this phone bill?

09:55:20   12   A.    Normally this phone bill is run through your indices, DA

09:55:25   13   indices, and from there, we gather feedback of who this person is

09:55:30   14   talking to, other subjects.

09:55:32   15   Q.    And based on that, what was your next investigative step?

09:55:35   16   A.    Our next investigative step is that at this time, I was

09:55:39   17   liaison with our Houston DEA office.  We were again working

09:55:46   18   specifically because he was providing numbers that we knew were

09:55:50   19   being used by Miguel Trevino-Morales.

09:55:54   20   Q.    And, again, Mr. Miguel Trevino-Morales, "40," was the

09:55:59   21   subject of your investigation or the target, correct?

09:56:01   22   A.    Yes.  One of the main targets.

09:56:03   23   Q.    Could you explain to the jury what a T3 is?

09:56:07   24   A.    A T3 is, in essence, a wiretap.

09:56:12   25   Q.    And could you explain to the jury how you as an agent goes

```
09:56:15   1   about obtaining authorization for a wiretap?
09:56:17   2   A.   Yes, sir.  Gather -- initially, one has to identify a target
09:56:26   3   telephone, that is, a phone that is being used by a subject to
09:56:30   4   further a drug crime.  From there, one has to ascertain
09:56:36   5   information to show -- or, rather, through this toll analysis, as
09:56:42   6   previously mentioned, to identify other subjects within the
09:56:44   7   circle.  On top of that, one has to prepare, go through numerous
09:56:50   8   exhaustive steps and prepare what is known as an affidavit that
09:56:54   9   is to be reviewed first by the agent in coordination with the
09:57:01  10   AUSA or the federal attorney.
09:57:02  11          MR. DEGEURIN:  Pardon me.  Your Honor, I object to
09:57:04  12   relevance.
09:57:06  13          MR. GARDNER:  Your Honor, I'm laying the foundation for
09:57:08  14   a Title III before I introduce.
09:57:12  15          THE COURT:  Objection is overruled.
09:57:16  16   Q.   (BY MR. GARDNER) And so, you conduct a review, I believe the
09:57:18  17   last statement was, with the AUSA?
09:57:22  18   A.   Yes, sir.
09:57:22  19   Q.   And then, what is the next step after that?
09:57:24  20   A.   After the AUSA, again, this affidavit is laying the ground
09:57:29  21   you have to show that this wiretap is -- you've gone through very
09:57:35  22   exhaustive means, meaning that you've conducted surveillance,
09:57:40  23   you've done trash pulls, you've done other means that are
09:57:43  24   available to you.  Once you've gone through the exhaustive steps,
09:57:48  25   you have to show the Court that by those means alone, you cannot
```

09:57:50  1  fully identify or further your investigation.

09:57:54  2         So then, that means you have to go to the next step of

09:57:57  3  presenting, again, the probable cause for this phone.  This is

09:58:01  4  now reviewed by the Department of Justice.  And then, finally,

09:58:05  5  the affidavit is sent back down and it's finally authorized.  The

09:58:10  6  Court authorizes by the district court judge in that respective

09:58:14  7  jurisdiction.

09:58:14  8  Q.   And how long by law are you authorized to listen to

09:58:19  9  somebody's phone?

09:58:19  10  A.   By law, initially you're allowed 30 days and you have to

09:58:25  11  report to the Court at least every 10, 15 days, depending on the

09:58:30  12  Court's requirements of how you're coming along, rather, are you

09:58:35  13  receiving pertinent calls, how many pertinent calls to show that

09:58:39  14  you -- this means that you are actually doing what you've laid

09:58:43  15  out in your affidavit that you're going to do.

09:58:45  16  Q.   What's the difference between a pertinent call and a

09:58:48  17  non-pertinent call?

09:58:48  18  A.   A pertinent call is a call that is furthering the drug

09:58:54  19  crime.  A non-pertinent call may be just regular day-to-day

09:58:58  20  business.

09:58:59  21  Q.   And for law enforcement, what is the evidentiary value of

09:59:04  22  being able to listen to somebody's phone calls?

09:59:06  23  A.   The evidentiary value is it's -- you're gaining insight into

09:59:10  24  the conversations that are occurring between the subjects on a

09:59:15  25  day-to-day basis, coupled with what you're either seeing through

09:59:19    1   surveillance or what you're gaining from other persons that may

09:59:21    2   be cooperating in this investigation.  As you're putting the

09:59:26    3   pieces together to make sense of what's going on with these

09:59:30    4   particular subjects.

09:59:32    5   Q.   And how do you verify the conversations you hear on the

09:59:37    6   phone?

09:59:40    7   A.   If you can, during the time if it's either through

09:59:44    8   surveillances and sometimes when they're talking about a specific

09:59:49    9   situation and if you are able to seize maybe narcotics or if

09:59:54   10   you're able to cooperate via that means, then you're coupling

10:00:00   11   together.  Or in other cases, if you don't seize the narcotics at

10:00:04   12   the time of arrest, you may go back through the calls and piece

10:00:08   13   together this puzzle, as I refer to, to make sense of what was

10:00:13   14   going on during these calls to further that specific drug crime.

10:00:17   15   Q.   And did you obtain and go through those steps to obtain a

10:00:20   16   Title III authorization for Ramiro Villarreal's phone?

10:00:24   17   A.   The Houston office did, sir.

10:00:26   18   Q.   And were you part of that investigation?

10:00:28   19   A.   Yes, sir.  I was.

10:00:30   20   Q.   I'm going to show you Government's Exhibit 381A and 381B.

10:00:39   21   Sir, are those your initials on 381A?

10:00:42   22   A.   Yes, sir, they are.

10:00:43   23   Q.   And, sir, as part of this investigation, did you have the

10:00:46   24   opportunity to have a number of discussions with Mr. Villarreal?

10:00:49   25   A.   Yes, I did.

10:00:50  1   Q.   And such that you were able to rec -- were you able to

10:00:53  2   recognize his voice on the Title III?

10:00:55  3   A.   Yes, sir, I was.

10:00:56  4   Q.   All right.  And, sir, has that Title III been supplied or

10:00:59  5   the disc itself in the care, custody and control of the Drug

10:01:02  6   Enforcement Administration?

10:01:03  7   A.   Yes, sir, it has.

10:01:04  8   Q.   All right.  And, sir, have you reviewed the selected

10:01:07  9   transcripts from that call?

10:01:07  10  A.   Yes, sir, I have.

10:01:11  11  Q.   Your Honor, I'd offer Government's Exhibit 381A, which is

10:01:14  12  the actual wiretap disc, and 381B, which are selected

10:01:21  13  transcripts, your Honor.  They've been certified by the

10:01:24  14  government's translator and been reviewed by the Court's

10:01:27  15  translator, previously provided to defense counsel.

10:01:51  16         MR. FINN:  Your Honor, I'm going to have to object on

10:01:52  17  confrontation clause grounds.  And I can elaborate if you like.

10:02:04  18         THE COURT:  The objection that you wish, for the

10:02:06  19  record, I don't require elaboration.  Do you have anything in

10:02:12  20  addition to your objection?

10:02:15  21         MR. FINN:  No.  That's my objection.

10:02:16  22         THE COURT:  All right.  That objection is overruled

10:02:19  23  with regard to the 381B.  As I understand, 381A is all of the

10:02:34  24  transcriptions?

10:02:34  25         MR. GARDNER:  No, sir, your Honor.  381A is the wiretap

| | | |
|---|---|---|
| 10:02:38 | 1 | disc itself, the physical phone calls.  381B are the government's |
| 10:02:42 | 2 | selected -- |
| 10:02:43 | 3 | THE COURT:  Right. |
| 10:02:44 | 4 | MR. GARDNER:  -- translations.  Yes, sir. |
| 10:02:48 | 5 | THE COURT:  Then for the time being, I'll admit 381B. |
| 10:02:57 | 6 | If 381A needs to come in for any reason, any counsel can request |
| 10:03:03 | 7 | that they come in. |
| 10:03:05 | 8 | MR. GARDNER:  Your Honor, I don't plan on playing the |
| 10:03:06 | 9 | disc for this particular witness.  I have another witness for |
| 10:03:09 | 10 | that purpose. |
| 10:03:09 | 11 | THE COURT:  Okay. |
| 10:03:10 | 12 | Q.   (BY MR. GARDNER) And so, Special Agent Amarillas, as based |
| 10:03:18 | 13 | off this wiretap, what efforts did you conduct to corroborate |
| 10:03:25 | 14 | what you heard on the phone itself? |
| 10:03:28 | 15 | A.   During the time, there was numerous conferences that were |
| 10:03:33 | 16 | participating with us and us with them in furthering what we were |
| 10:03:35 | 17 | listening to.  We heavily -- worked really closely with our |
| 10:03:42 | 18 | Houston office and with their financial team to find out, you |
| 10:03:46 | 19 | know, as we learned that horses were being purchased to find out |
| 10:03:50 | 20 | who was owning these horses.  We learned some valuable |
| 10:03:54 | 21 | intelligence of who the horses were being transferred to. |
| 10:04:00 | 22 | And largely, we were monitoring what Mr. Villarreal's |
| 10:04:04 | 23 | travels and, also, as he -- with an ultimate goal of seeing if he |
| 10:04:10 | 24 | was -- his communication with Miguel Trevino-Morales, A/K/A "40." |
| 10:04:16 | 25 | Q.   Now, when you tap a phone, do you also seek the |

10:04:21  1  authorization to determine the geographical location based on any

10:04:27  2  of the cellphone towers or global positioning system?

10:04:30  3  A.   Yes, sir, we do.

10:04:30  4  Q.   And did you obtain that in Mr. Villarreal's case?

10:04:33  5  A.   I don't recall if that was done here on our side or not.

10:04:40  6  Q.   At some point, did you stop Mr. Villarreal?

10:04:42  7  A.   Yes, sir.  He was stopped.  Yes.

10:04:44  8  Q.   And without getting into what specifically Mr. Villarreal

10:04:47  9  said, did you have a number of discussions with him following his

10:04:52  10  stop?

10:04:52  11  A.   Yes, sir, I did.

10:04:53  12  Q.   And was he ever placed under arrest?

10:04:58  13  A.   He was held temporarily and released.

10:05:02  14  Q.   Detained?

10:05:02  15  A.   Yes, sir.

10:05:04  16  Q.   And did Mr. Villarreal agree to cooperate with the

10:05:06  17  government for a little bit?

10:05:07  18  A.   Yes.

10:05:08  19  Q.   And at some point, was your investigation with Mr.

10:05:16  20  Villarreal concluded?

10:05:17  21  A.   Yes, sir, it was.

10:05:17  22  Q.   And why was that?

10:05:18  23  A.   He died in March 2011.  I believe the specific date was

10:05:26  24  March 11, 2011.  It was a car crash on the highway leading to the

10:05:34  25  Columbia bridge on the south side.  It was a fiery crash where he

| | | |
|---|---|---|
| 10:05:38 | 1 | burned to death. |
| 10:05:39 | 2 | Q.   And with respect to Mr. Villarreal and your efforts for |
| 10:05:43 | 3 | "40," did that sort of conclude that phase of the investigation? |
| 10:05:45 | 4 | A.   Yes, sir.  And then, I transferred out of country shortly |
| 10:05:49 | 5 | thereafter. |
| 10:05:49 | 6 | Q.   May I have one moment, your Honor?  Your Honor, I'll pass |
| 10:05:56 | 7 | the witness. |
| 10:06:02 | 8 | THE COURT:  Mr. Finn or Ms. Williams? |
| 10:06:04 | 9 | MR. FINN:  No questions, Judge. |
| 10:06:06 | 10 | THE COURT:  Mr. Sanchez. |
| 10:06:08 | 11 | CROSS-EXAMINATION |
| 10:06:08 | 12 | BY MR. SANCHEZ: |
| 10:06:18 | 13 | Q.   Mr. Amarillas. |
| 10:06:19 | 14 | A.   Yes, sir. |
| 10:06:20 | 15 | Q.   My name is Andres Sanchez. |
| 10:06:23 | 16 | A.   Morning, sir. |
| 10:06:32 | 17 | Q.   I just want to ask you a couple of questions. |
| 10:06:35 | 18 | A.   Yes, sir. |
| 10:06:35 | 19 | Q.   I pulled out one of the transcripts of 381. |
| 10:07:25 | 20 | A.   Yes, sir.  Uh-huh. |
| 10:07:27 | 21 | Q.   And I'll ask you some questions about that in a minute.  But |
| 10:07:30 | 22 | I want to ask you some questions. |
| 10:07:35 | 23 | We talked a little bit about the steps you went through |
| 10:07:39 | 24 | to get a wiretap.  Do you include in those steps the people that |
| 10:07:44 | 25 | you have of interest? |

```
10:07:45   1   A.   Yes.

10:07:46   2   Q.   And did you include a person that has a last name Toncrete?

10:07:53   3   A.   I don't recall.

10:07:54   4   Q.   You don't recall?

10:07:55   5   A.   I don't recall.  No, sir.

10:07:56   6   Q.   If I said to you inside one of those applications, you have

10:08:00   7   a guy named Pancho Toncrete, would that refresh your memory?

10:08:05   8   A.   I'd have to see the affidavit, but if you will show it to

10:08:08   9   me, I'd be more than happy.

10:08:09  10   Q.   I don't have it with me.

10:08:10  11   A.   Okay.

10:08:11  12   Q.   But we'll move on.

10:08:12  13   A.   Sir.

10:08:14  14           THE COURT:  When you say transcript, I assume you're

10:08:17  15   talking about 381B?

10:08:20  16           MR. SANCHEZ:  Yes, your Honor.

10:08:20  17           THE COURT:  All right.

10:08:21  18           MR. SANCHEZ:  It's one of the -- there's how many?

10:08:23  19           THE COURT:  Well, there are only three.  Only reason I

10:08:25  20   ask you is I didn't admit 381A yet.

10:08:28  21           MR. SANCHEZ:  Right.  And I'm just pulling out --

10:08:30  22   there's 14?

10:08:31  23           MR. GARDNER:  Your Honor, if I may, there's a session

10:08:34  24   number on top of each transcript that identifies it individually.

10:08:37  25   So that may help for the record purposes.
```

| | | |
|---|---|---|
| 10:08:39 | 1 | THE COURT:  All right. |
| 10:08:45 | 2 | Q.   (BY MR. SANCHEZ) So this is session No. 1061? |
| 10:08:49 | 3 | A.   Yes, sir. |
| 10:08:50 | 4 | Q.   And that comes from 381B? |
| 10:08:53 | 5 | A.   The disks, 381A or B. |
| 10:08:57 | 6 | Q.   Okay.  Try to clear it up, your Honor. |
| 10:09:03 | 7 | Also in there, you talk -- well, first of all, are you |
| 10:09:06 | 8 | familiar with the person named Carlos Nayen? |
| 10:09:11 | 9 | A.   Yes, I am. |
| 10:09:11 | 10 | Q.   Do you know he goes by the nickname "Carlitos"? |
| 10:09:14 | 11 | A.   Yes, I do. |
| 10:09:14 | 12 | Q.   Are you also familiar with another person within the Zeta |
| 10:09:19 | 13 | organization that has the nickname "Carlitos"? |
| 10:09:23 | 14 | A.   Not that -- that rings a bell right now.  No, sir, I'm not. |
| 10:09:32 | 15 | Q.   Okay.  Do you know of a guy -- so you don't know of a Zeta |
| 10:09:35 | 16 | that goes by the name "Comandante Carlitos"? |
| 10:09:39 | 17 | A.   At this time, it does not ring a bell.  No, sir. |
| 10:09:44 | 18 | Q.   And in this call here that we were just referencing, they |
| 10:09:48 | 19 | talk about Carlitos and they also mention a "Pancho"? |
| 10:09:52 | 20 | A.   Uh-huh.  Yes, sir. |
| 10:09:54 | 21 | Q.   You don't know exactly who that "Carlitos" is or who that |
| 10:10:00 | 22 | "Pancho" is? |
| 10:10:00 | 23 | A.   No.  I do not. |
| 10:10:02 | 24 | Q.   Pass the witness, your Honor. |
| 10:10:06 | 25 | MR. WOMACK:  No questions, your Honor. |

| | | |
|---|---|---|
| 10:10:09 | 1 | MR. ESPER:  Nothing, your Honor. |
| 10:10:09 | 2 | MR. MAYR:  Briefly, your Honor. |
| 10:10:12 | 3 | CROSS-EXAMINATION |
| 10:10:12 | 4 | BY MR. MAYR: |
| 10:10:48 | 5 | Q.   Agent Amarillas, in your -- in the course of your |
| 10:10:51 | 6 | investigation, you had a number of contacts or conversations with |
| 10:10:54 | 7 | Mr. Villarreal; is that correct? |
| 10:10:55 | 8 | A.   That is correct. |
| 10:10:56 | 9 | Q.   I'm not going to go into what was said, but did he ever |
| 10:11:00 | 10 | mention the name Jesus Huitron to you? |
| 10:11:03 | 11 | A.   I knew the last name Huitron, but specific for him, no, I |
| 10:11:07 | 12 | don't recall. |
| 10:11:08 | 13 | Q.   And then, you listened -- you listened and reviewed multiple |
| 10:11:12 | 14 | conversations.  Did you ever hear the name Jesus Huitron ever |
| 10:11:15 | 15 | come up? |
| 10:11:15 | 16 | A.   No, sir.  I did not. |
| 10:11:16 | 17 | Q.   No further question, your Honor. |
| 10:11:21 | 18 | MR. GARDNER:  Nothing in light of that, your Honor. |
| 10:11:23 | 19 | THE COURT:  May this witness be excused, counsel? |
| 10:11:25 | 20 | MR. FINN:  No objection. |
| 10:11:25 | 21 | THE COURT:  You may be excused.  You may call your next |
| 10:11:29 | 22 | witness. |
| 10:11:29 | 23 | MR. GARDNER:  Your Honor, the government calls Special |
| 10:11:36 | 24 | Agent Bill Johnston. |
| 10:11:58 | 25 | THE COURT:  Be sworn, please. |

| | | |
|---|---|---|
| 10:12:00 | 1 | (Witness sworn.) |
| 10:12:13 | 2 | THE COURT:  Tell us your full name, please, sir, and |
| 10:12:20 | 3 | spell your last. |
| 10:12:20 | 4 | THE WITNESS:  Yes.  William J. Johnston, Sr.  My last |
| 10:12:24 | 5 | name is spelled, J-O-H-N-S-T-O-N. |
| 10:12:28 | 6 | THE COURT:  If you'll move that mic a little bit back. |
| 10:12:32 | 7 | That ought to do it. |
| 10:12:33 | 8 | WILLIAM J. JOHNSTON, called by the Government, duly sworn. |
| 10:12:33 | 9 | DIRECT EXAMINATION |
| 10:12:33 | 10 | BY MR. GARDNER: |
| 10:12:34 | 11 | Q.   Thank you, your Honor. |
| 10:12:35 | 12 | Special Agent Johnston, if you would, could you please |
| 10:12:38 | 13 | introduce yourself for the jury? |
| 10:12:39 | 14 | A.   Good morning -- |
| 10:12:42 | 15 | THE COURT:  Whoa, whoa, don't get that close. |
| 10:12:44 | 16 | A.   I work with DEA, Drug Enforcement Administration. |
| 10:12:49 | 17 | Q.   (BY MR. GARDNER) They're not asleep yet. |
| 10:12:51 | 18 | How long have you worked for the DEA, sir? |
| 10:12:54 | 19 | A.   About four years. |
| 10:12:54 | 20 | Q.   And where are you currently stationed? |
| 10:12:56 | 21 | A.   Laredo, Texas. |
| 10:12:57 | 22 | Q.   And you are actually a member of this investigative team, |
| 10:13:02 | 23 | correct? |
| 10:13:02 | 24 | A.   Yeah.  I was DEA's case agent for this team. |
| 10:13:04 | 25 | Q.   And as the DEA case agent, what was your task as related to |

```
10:13:10   1   this investigation?
10:13:10   2   A.   I primarily focused on the e-mail correspondence between
10:13:13   3   some of the defendants and some of the people who worked the Los
10:13:17   4   Alamitos and some of the people that worked at some of the race
10:13:19   5   horses -- the race tracks.
10:13:20   6   Q.   And did you also participate in the search warrant of Carlos
10:13:25   7   Nayen's apartment?
10:13:25   8   A.   Yes, sir.  I was there.  I was present.
10:13:28   9   Q.   Did you participate in the arrest of Mr. Carlos Nayen?
10:13:30  10   A.   Yes, sir.
10:13:30  11   Q.   Now, with respect to the search warrants, what information
10:13:37  12   did you have to indicate that members or possible members of this
10:13:40  13   organization were using e-mail traffic?
10:13:43  14   A.   We served a grand jury subpoena on multiple Los Alamitos
10:13:48  15   race track, and they responded back to us giving us e-mail
10:13:51  16   correspondence that they had with Mr. Fernando Garcia, who used
10:13:56  17   Fernie004@hotmail.com.
10:14:00  18   Q.   And based on that, what steps did you take to obtain those
10:14:04  19   e-mails?
10:14:04  20   A.   Following getting that e-mail, I produced a -- what's called
10:14:08  21   a preservation letter.  You send it to the e-mail, in this case
10:14:12  22   it was Hotmail, which is owned and operated by Microsoft.  So I
10:14:16  23   sent them a preservation letter with the e-mail address
10:14:20  24   Fernie004@hotmail.com, and asked that they do not delete any
10:14:24  25   information that was preserved on their servers.
```

10:14:27   1   Q.   And why did you send that preservation letter?

10:14:30   2   A.   We send that so that in case people are made aware that

10:14:33   3   they're under investigation, they may try to delete some of those

10:14:36   4   e-mails that are stored on the server.  So when we sent that

10:14:40   5   preservation letter, they can't delete them.  Even if they do

10:14:43   6   delete them, they're saved on their server.

10:14:45   7   Q.   And in your case, did you find that these e-mail service

10:14:49   8   providers retained deleted e-mails without that preservation

10:14:54   9   letter?

10:14:54   10  A.   No.  They won't retain them.  They're deleted.  Once they're

10:14:57   11  deleted from the user, the server deletes them.

10:15:00   12  Q.   And, sir, after that preservation letter, what steps did you

10:15:04   13  take?

10:15:04   14  A.   Following getting that preservation letter, I draft up a

10:15:07   15  search warrant.  I produce some probable cause on why I believe

10:15:13   16  -- why the government believes they're using this e-mail, in this

10:15:17   17  case, to conspire to money launder, and I give that e-mail to Mr.

10:15:21   18  Gardner.  Mr. Gardner and I review it.  Once it's given to Mr.

10:15:24   19  Gardner, it's produced to the district judge here.  The district

10:15:27   20  judge or mag judge will review it, make any changes.  Once the

10:15:32   21  changes are made by myself and Mr. Gardner, I go in front of the

10:15:35   22  judge, and he'll sign it and I'll sign it.

10:15:38   23       I'll submit that via fax to Hotmail, and once they

10:15:41   24  receive it, they'll produce their -- their response.  They send

10:15:45   25  that back to me either on an e-mail or a CD.  Once I receive

| | | |
|---|---|---|
| 10:15:50 | 1 | either a CD or the e-mail, I send that to our IT department, our |
| 10:15:54 | 2 | investigative technology department, and they upload it onto a |
| 10:15:58 | 3 | viewable database on a computer so I can read the e-mails in |
| 10:16:02 | 4 | format that's understandable. |
| 10:16:05 | 5 | Q.   And did you eventually go through that process to obtain the |
| 10:16:09 | 6 | Fernie004@hotmail.com e-mail? |
| 10:16:12 | 7 | A.   Yes, sir. |
| 10:16:13 | 8 | Q.   All right.  And did you review those e-mails? |
| 10:16:15 | 9 | A.   Yes, sir. |
| 10:16:15 | 10 | Q.   All right.  And based on that review, what steps did you |
| 10:16:19 | 11 | take to obtain other e-mails? |
| 10:16:23 | 12 | A.   Following the analysis on Fernando Garcia's e-mail, he was |
| 10:16:28 | 13 | e-mailing a number of other defendants in the case as well as |
| 10:16:32 | 14 | other people.  Once I received some of his e-mails and reviewed |
| 10:16:36 | 15 | them, I saw that they were using e-mail correspondence |
| 10:16:39 | 16 | predominantly in this case to send records to talk to one another |
| 10:16:44 | 17 | and to talk to people in Mexico.  So once I got that, I drafted |
| 10:16:49 | 18 | more preservation letters, more search warrants to several other |
| 10:16:55 | 19 | e-mail accounts.  I believe approximately 14 e-mail accounts were |
| 10:16:59 | 20 | drafted in this case. |
| 10:17:00 | 21 | Q.   And with respect to that, if you already have the |
| 10:17:04 | 22 | correspondence, for example, say from Fernie004 to someone else, |
| 10:17:08 | 23 | why did you feel it was necessary to get that person's account? |
| 10:17:11 | 24 | A.   Because sometimes when you're using your e-mail address and |
| 10:17:16 | 25 | you're done with an e-mail, you'll delete it.  Sometimes people |

| | | |
|---|---|---|
| 10:17:19 | 1 | don't do that.  They'll save their e-mails in case they have to |
| 10:17:21 | 2 | go back and check it out. |
| 10:17:23 | 3 | So what I saw in reviewing multiple e-mail accounts is |
| 10:17:27 | 4 | several of the e-mails were on one e-mail account and they were |
| 10:17:29 | 5 | not on the other e-mail account. |
| 10:17:31 | 6 | Q.   Now, I'm going to show you Government's Exhibit 71.  This is |
| 10:17:35 | 7 | already part of the stipulation that was seized at the Huitron |
| 10:17:39 | 8 | business in Austin, Texas on Highway 183.  Do you recognize that, |
| 10:17:43 | 9 | sir? |
| 10:17:44 | 10 | A.   Yes, sir. |
| 10:17:44 | 11 | Q.   Did you review this item taken from the search warrant on |
| 10:17:47 | 12 | the Huitron residence? |
| 10:17:48 | 13 | A.   Yes, sir. |
| 10:17:48 | 14 | Q.   And did you use this particular item with respect to |
| 10:17:51 | 15 | drafting your search warrant affidavits? |
| 10:17:53 | 16 | A.   Yes, sir. |
| 10:17:57 | 17 | Q.   And there's a lot of scribbles on this, is there not, |
| 10:18:07 | 18 | Special Agent? |
| 10:18:08 | 19 | A.   Yeah.  There's some scribble on there. |
| 10:18:09 | 20 | Q.   All right.  And did you review all the pages behind it? |
| 10:18:12 | 21 | A.   Yes, sir. |
| 10:18:12 | 22 | Q.   And what do they appear to be to you in general? |
| 10:18:23 | 23 | A.   Looks like a ledger for a painting. |
| 10:18:28 | 24 | Q.   And were you aware that the Huitrons were involved in the |
| 10:18:30 | 25 | painting and home business? |

10:18:32  1   A.   Yes, sir.

10:18:33  2   Q.   And so, the purpose of this exhibit on the front page is

10:18:36  3   relevant to this investigation.

10:18:38  4   A.   Yes, sir.  They contain the e-mail addresses.

10:18:41  5   Q.   So when you looked at this exhibit seized from the Huitrons,

10:18:52  6   did you see that e-mail obviously?

10:18:54  7   A.   Yes.   That's Fernando Garcia's e-mail.

10:18:58  8   Q.   And the jury has heard some of this one.  Did you also

10:19:03  9   submit a search warrant and obtain a search warrant for that

10:19:06  10  e-mail address?

10:19:06  11  A.   Yes, sir.

10:19:07  12  Q.   And finally, this one right here, Jose23.Trevino@yahoo.com,

10:19:17  13  did you obtain a search warrant for that e-mail address?

10:19:19  14  A.   Yes, sir.

10:19:19  15  Q.   I'm showing you Government's Exhibit 358A for demonstrative

10:19:41  16  purposes.

10:19:45  17          MR. WOMACK:   Your Honor, if I could get the number for

10:19:46  18  the last exhibit.

10:19:47  19          MR. GARDNER:   That was 71.

10:19:52  20  Q.   (BY MR. GARDNER) Do you recognize these, sir?

10:19:55  21  A.   Yes, sir.

10:19:55  22  Q.   And what, in fact, are they?

10:20:03  23  A.   Exhibit 358A is a business record authentication declaration

10:20:10  24  from Microsoft Corporation.  It's also a copy of the Hotmail

10:20:18  25  response, that e-mail spent to me on a DEA CD.  For, for example,

| 10:20:30 | 1 | 358B, this is a request for documents regarding |

10:20:30   1   358B, this is a request for documents regarding

10:20:39   2   Zulefarms@yahoo.com.  It's also a business records declaration

10:20:43   3   stating that the information they sent is true to the best of

10:20:50   4   their knowledge.

10:20:51   5          And for Exhibit 358C, it's a gmail, which is Google,

10:20:56   6   and it's also a certification of authenticity, which is sent from

10:21:01   7   the custodian of records.

10:21:05   8   Q.   And I believe, as you stated earlier, Special Agent, these

10:21:12   9   were the actual e-mails that you received from the various e-mail

10:21:16   10  providers?

10:21:17   11  A.   Yes, sir.

10:21:18   12  Q.   And you said you sent them to your IT, your internet

10:21:23   13  technology section?

10:21:24   14  A.   Yes, sir.

10:21:25   15  Q.   And what process was conducted there?

10:21:29   16  A.   When in this case Yahoo, Google and Hotmail sent either it's

10:21:35   17  a disk or an e-mail to myself, that data can't be read very

10:21:40   18  easily.  In this case, it was extremely hard to read some of the

10:21:45   19  data.

10:21:45   20          So what we do in DEA is I send that data to our IT

10:21:49   21  computer department, and they upload it into a viewable data.

10:21:53   22  Now, Yahoo, Hotmail and Microsoft, they don't always send it the

10:21:57   23  same.  There's no go-by.  There's no way that they have to send

10:22:02   24  it to us, so each one is sent differently.  And Yahoo, I have to

10:22:05   25  use Microsoft Explorer to look at it.  And for gmail, it's

10:22:09  1   Firefox.  So they're extremely different ways to view these

10:22:12  2   e-mails.

10:22:13  3          So what our IT department does is puts it in a viewable

10:22:16  4   data so I can check them all out and look at them and review them

10:22:19  5   very easily.

10:22:22  6   Q.   And did you go through those steps -- sorry.  One question.

10:22:26  7          Microsoft is what e-mail?

10:22:28  8   A.   Microsoft is going to be MSN, which is a Hotmail.

10:22:32  9   Q.   Everyone commonly refer to as a Hotmail account?

10:22:35  10  A.   Yes, sir.

10:22:36  11  Q.   And generally when you were going through these e-mails,

10:22:41  12  what process -- let me strike that.  Let me ask a better

10:22:46  13  question.

10:22:46  14         You said in conjunction with the IT folks that puts it

10:22:53  15  in a specific form.

10:22:55  16  A.   Yeah.  It's put on a specific format and it's also put onto

10:22:58  17  a computer program.  It's called Cool Miner and each case is

10:23:03  18  specific to our -- I'm the only one who has the ability to check

10:23:07  19  out those e-mails.  So I'll log into the computer and I'll check

10:23:10  20  out each e-mail separately.  I reviewed, I think, 16,000 e-mails

10:23:16  21  in this case.  And over that time, I produced a pertinent file, a

10:23:23  22  non-pertinent file and then, a file that was neither.

10:23:28  23         So I printed up the pertinent and the neither, and I

10:23:31  24  brought them to my case team and I brought them to AUSA Gardner,

10:23:36  25  and we reviewed them to see which ones were most pertinent, more

10:23:40  1  pertinent, and least, because there was such a high amount of

10:23:43  2  e-mails, 16,000 e-mails in this case.

10:23:45  3  Q.   And when you were reviewing these e-mails, did you observe

10:23:48  4  that many of them were in Spanish?

10:23:49  5  A.   Yes.  A lot of them were in Spanish.

10:23:50  6  Q.   And what steps did you take to interpret the e-mails that

10:23:54  7  were in Spanish?

10:23:55  8  A.   I don't speak Spanish, so one of my task force officers from

10:23:58  9  Laredo who does sat down at the computer with me, and together,

10:24:02  10  we read over each e-mail.  A lot of them were in Spanish and once

10:24:07  11  he told me what they said, I was able to say if it was pertinent

10:24:11  12  or not.  I printed them up and I had him make copies of them and

10:24:14  13  write down on the e-mails what they had said and, again, I

10:24:19  14  produced that to AUSA Gardner.

10:24:20  15  Q.   And subsequent to that, did you and I select those e-mails

10:24:24  16  that were being presented here in court today?

10:24:27  17  A.   Yes, sir.

10:24:27  18  Q.   And were those e-mails then provided to a certified

10:24:30  19  translator for the official translations?

10:24:32  20  A.   Yes, sir.  I believe the translator who translated that is

10:24:34  21  the same female who is up here helping out in the trial.

10:24:38  22  Q.   And were those rough translations by the agent and the

10:24:42  23  official translations supplied to the defense attorneys back in

10:24:45  24  March?

10:24:45  25  A.   Yes, sir.

10:24:47   1   Q.   And just roughly, I want to generally talk about this is

10:24:52   2   Government's Exhibit 358G, admitted yesterday.  I just want to

10:25:01   3   look at one particular page with the e-mail date of 3-30-2012 at

10:25:05   4   6:21 p.m.

10:25:09   5        What is this page and where does it come from just in

10:25:11   6   general?

10:25:11   7   A.   That page is the first page when I print up an e-mail, it's

10:25:16   8   going to say the source file name, what data type it is.  In this

10:25:21   9   case, it's an e-mail.  The start and date time, which is going to

10:25:26   10  be the -- when the e-mail was sent or received.  It's going to

10:25:30   11  have a source IP address and the subject on the subject line.  In

10:25:37   12  this case it's read OLA.  In this case, you're going to see a

10:25:41   13  dark black, it says e-mail address, friendly name, participant

10:25:45   14  type.  So if you can see this e-mail is sent by

10:25:52   15  Miguel.Almazon@gmail.com.  The name is Miguel Angel Almazon

10:25:56   16  Marine and that's from --

10:25:58   17  Q.   That's the friendly name, correct?

10:25:59   18  A.   Yes, sir.  That's the friendly name.  The e-mail that was to

10:26:04   19  was Anri2319@hotmail.com, and that friendly name is Diego

10:26:12   20  Verdaguer.  As I said, I don't speak Spanish.

10:26:15   21  Q.   And this down here is the DEA's file creation information,

10:26:19   22  correct?

10:26:20   23  A.   Yeah.  It's going to have a file type, how big the file size

10:26:23   24  is, when I reviewed it, or when it was uploaded into the Cool

10:26:26   25  Miner system, and then, on top, you can see it says undecided.

10:26:31  1    That's one of the e-mails because it was in Spanish, I wasn't

10:26:33  2    sure if it was pertinent or not, so I printed it up and had that

10:26:37  3    translated.

10:26:39  4    Q.    And, in particular, the e-mails in January, for example,

10:26:44  5    we'll use this one as introduced yesterday the Anri2319.  Did you

10:26:50  6    often see the friendly name changed?

10:26:52  7    A.    Yes, sir.  Not always was it the same.

10:26:55  8    Q.    What's that an indication of based on your investigation in

10:26:59  9    this case?

10:26:59  10   A.    After reviewing these e-mails, I determined that not every

10:27:04  11   e-mail from a specific e-mail address, in this case,

10:27:09  12   Anri2319@hotmail.com was sent by the same user.  Sometimes the

10:27:13  13   name under the friendly name was different.  In this case, it

10:27:16  14   says Diego, but in other cases, it says, "Yo Yo" or other names.

10:27:21  15   Q.    Your Honor, at this time, I would move to offer Government's

10:27:26  16   Exhibit 358A, 358B and 358C for demonstrative purposes only.

10:27:59  17            THE COURT:  All right.  538 hearing no objection, 358A,

10:28:04  18   B and C for demonstrative purposes are admitted.

10:28:10  19   Q.    (BY MR. GARDNER) For the purposes of the court here today,

10:28:16  20   Special Agent Johnston, we selected just a number of e-mails.  If

10:28:20  21   you could, could you just please go through the selected e-mail

10:28:23  22   accounts that you and I prepared for court today by e-mail name?

10:28:28  23   A.    Yes, sir.  The first e-mail is Fernie004@hotmail.com.

10:28:36  24   Q.    And that's Government's Exhibit 358B, correct?

10:28:40  25   A.    Yes, sir.

| | | |
|---|---|---|
| 10:28:40 | 1 | Q.   One other question on that.  When you obtained the e-mails, |
| 10:28:44 | 2 | did you obtain the subscriber information? |
| 10:28:46 | 3 | A.   Yes, sir.  This e-mail was subscribed to a Fernando Garcia. |
| 10:28:51 | 4 | Q.   And what about the subscriber information on the other |
| 10:28:54 | 5 | e-mails that you obtained? |
| 10:28:55 | 6 | A.   Some of the other e-mails were not subscribed to the person |
| 10:28:58 | 7 | I believe they were used.  In some cases, the first name was the |
| 10:29:03 | 8 | same and the last name was different.  In some cases, the first |
| 10:29:06 | 9 | name was different and the last name was also different. |
| 10:29:08 | 10 | Q.   Is that subscriber information contained within the |
| 10:29:10 | 11 | exhibits? |
| 10:29:11 | 12 | A.   Yes, sir. |
| 10:29:11 | 13 | Q.   If you will continue, please, with the next exhibit. |
| 10:29:14 | 14 | A.   Yes.  The next exhibit is going to be 358E.  It's |
| 10:29:20 | 15 | horses.quarter.racing@hotmail.com.  The next one is going to be |
| 10:29:31 | 16 | Exhibit 358F, as in Fox Trot.  It's going to be mr_cabrera@ -- |
| 10:29:40 | 17 | or, I'm sorry, @hotmail.com.  The next one is Exhibit 358H, |
| 10:29:51 | 18 | ffracingstables@gmail.com.  The next one is Exhibit 358I, |
| 10:30:04 | 19 | zule_farms@yahoo.com.  The next one is Exhibit 358J, |
| 10:30:20 | 20 | anali_faces@hotmail.com. |
| 10:30:22 | 21 | Q.   Who did you understand Anali Faces to be? |
| 10:30:25 | 22 | A.   She is the wife of Miguel Nayen-Borbolla. |
| 10:30:30 | 23 | Q.   Also known as Carlos Nayen? |
| 10:30:32 | 24 | A.   Yes, sir. |
| 10:30:33 | 25 | Q.   Next exhibit? |

| | | |
|---|---|---|
| 10:30:34 | 1 | A.    The next exhibit is 358K, sergio_rincon72@hotmail.com.   The |
| 10:30:46 | 2 | next exhibit is 358L, miguel.almazon@gmail.com.   And the last one |
| 10:30:57 | 3 | is going to be 358G, Anri2319@hotmail.com. |
| 10:31:05 | 4 | Q.    You spell Anri, A-N-R-I; is that correct? |
| 10:31:07 | 5 | A.    Yes, sir.   A-N-R-I. |
| 10:31:11 | 6 | Q.    Special Agent Johnston, did you apply the same process that |
| 10:31:13 | 7 | you just described earlier to each and every one of these Hotmail |
| 10:31:16 | 8 | or e-mail accounts? |
| 10:31:18 | 9 | A.    Yes, sir. |
| 10:31:19 | 10 | Q.    Your Honor, I would offer Government's Exhibit 358D through |
| 10:31:26 | 11 | G inclusive, although I know some of them were introduced |
| 10:31:31 | 12 | yesterday.  Your Honor, I apologize.  I'd also like to introduce |
| 10:32:19 | 13 | 358M, which is the certification by the court -- or not court |
| 10:32:25 | 14 | translator, but by the translator. |
| 10:32:28 | 15 | THE COURT:  That's M? |
| 10:32:30 | 16 | MR. GARDNER:  M, your Honor, as in Mike. |
| 10:32:37 | 17 | MR. MAYR:  We have no objection, your Honor. |
| 10:32:38 | 18 | THE COURT:  All right.  358D through. |
| 10:32:43 | 19 | MR. GARDNER:  M, your Honor. |
| 10:32:45 | 20 | THE COURT:  Well. |
| 10:32:46 | 21 | MR. GARDNER:  You're right. |
| 10:32:47 | 22 | THE COURT:  I've just got D, E, F, H, I, J, K, L, G and |
| 10:32:54 | 23 | M. |
| 10:32:57 | 24 | MR. GARDNER:  Yes, sir.  That's correct. |
| 10:33:14 | 25 | Q.    (BY MR. GARDNER) Now, Special Agent Johnston, in your |

10:33:26   1   training and experience, have you been a participant in a number

10:33:32   2   of search warrants?

10:33:33   3   A.    Yes, sir.

10:33:34   4   Q.    Physical search warrants, not e-mail search warrants?

10:33:36   5   A.    Yes, sir.

10:33:37   6   Q.    Have you conducted Title III investigations?

10:33:39   7   A.    I have.

10:33:40   8   Q.    Have you conducted surveillance?

10:33:42   9   A.    Yes, sir.

10:33:42   10   Q.    What other investigative steps have you covered in your

10:33:47   11   career?

10:33:47   12   A.    Seizure of drugs, money, guns, surveillance, like you said,

10:33:55   13   seizures, search warrants on businesses, residence, e-mail

10:33:58   14   accounts, Facebook accounts, that kind of stuff.

10:34:02   15   Q.    And in that training and experience, when law enforcement

10:34:05   16   makes one of those actions, what do you typically see is the

10:34:09   17   response from the criminal organization?

10:34:11   18   A.    Usually participants in the organization try to distance

10:34:16   19   themselves from other members of the organization, and they'll

10:34:20   20   get rid of their cellphone.  We call it dropping their cellphone,

10:34:24   21   dropping their e-mail address, their Facebook account, deleting

10:34:27   22   as much as they can to kind of remove themselves from that

10:34:30   23   organization and try to divert law enforcement from getting

10:34:35   24   evidence which could be used in the court.

10:34:39   25   Q.    So let's say, hypothetically, there is a law enforcement

10:34:42  1   action and these people drop their information.  What effect did

10:34:47  2   that have on your investigative steps?

10:34:49  3   A.   It makes it very difficult.  We might have an e-mail address

10:34:54  4   or phone number, an address.  They might move, they might drop

10:34:59  5   their phone.  It makes it very difficult for us to find them, use

10:35:04  6   their information to help out with our investigation.

10:35:07  7   Q.   And, sir, are you familiar with the raid at the Los Alamitos

10:35:11  8   race track in March 27th of last year?

10:35:14  9   A.   Yes, sir.

10:35:15  10  Q.   The jury heard testimony on this account yesterday by Mr.

10:35:19  11  Felipe Quintero.  Have you reviewed these e-mails?

10:35:22  12  A.   Yes, sir.

10:35:22  13  Q.   And when it talks about clean devices and talk to me, it's

10:35:30  14  clear, is that consistent with your testimony you just provided

10:35:33  15  regarding criminal organization activities?

10:35:35  16  A.   Yeah.  It's a clean a device is get a new phone or get a new

10:35:40  17  e-mail address in this case.

10:35:45  18  Q.   Now, I'm showing you Government's Exhibit 358E,

10:35:57  19  horses.quarter.racing@hotmail.com.  Did you see activity also

10:36:02  20  consistent with what you saw in the A-N-R-I e-mail account?

10:36:07  21  A.   Yes.

10:36:08  22  Q.   And was it on the same day?

10:36:10  23  A.   It was on the same day and I believe the day after.

10:36:14  24  Q.   When we're talking the day after, we're talking the day

10:36:18  25  after the Los Alamitos raid?

| | | |
|---|---|---|
| 10:36:19 | 1 | A.    Yes, sir.  On the 28th. |
| 10:36:20 | 2 | Q.    And in this horses.quarter.racing@hotmail e-mail address, |
| 10:36:27 | 3 | are there e-mails to and from Fernando Garcia? |
| 10:36:29 | 4 | A.    Yes, sir. |
| 10:36:29 | 5 | Q.    Is that using the Fernie004 address? |
| 10:36:32 | 6 | A.    Yes, sir. |
| 10:36:32 | 7 | Q.    And when you looked at the Fernie004 address, did you see |
| 10:36:36 | 8 | the same e-mails? |
| 10:36:38 | 9 | A.    I believe they were there. |
| 10:36:41 | 10 | Q.    Is that consistent with what you described earlier about the |
| 10:36:44 | 11 | deleting e-mails? |
| 10:36:45 | 12 | A.    Yeah.  Sometimes when an e-mail is sent and they don't want |
| 10:36:47 | 13 | them to be reviewed or they don't want to see it, then they'll |
| 10:36:50 | 14 | just delete it. |
| 10:36:51 | 15 | Q.    So, Special Agent, I want to turn your attention to an |
| 10:37:14 | 16 | e-mail, dated April 4th, 2012, 5:29, from the |
| 10:37:32 | 17 | horses.quarter.racing e-mail friendly name of? |
| 10:37:34 | 18 | A.    Javier Lopez. |
| 10:37:36 | 19 | Q.    And to who? |
| 10:37:36 | 20 | A.    To Fernie004@hotmail.com and under the friendly name, you |
| 10:37:43 | 21 | can see it says, Fernando Garcia. |
| 10:37:46 | 22 | Q.    And, again, original e-mail's in Spanish, correct? |
| 10:37:48 | 23 | A.    Yes, sir. |
| 10:37:49 | 24 | Q.    All right.  And does it show a number of what is commonly |
| 10:37:53 | 25 | referred to as an e-mail string? |

| | | |
|---|---|---|
| 10:37:55 | 1 | A.   Yeah.  It's e-mails back and forth sent over a period of |
| 10:38:01 | 2 | time that it's the same subject.  So it will keep them under the |
| 10:38:04 | 3 | same string. |
| 10:38:05 | 4 | Q.   And, again, did you see this string in the Fernie004? |
| 10:38:11 | 5 | A.   No. |
| 10:38:12 | 6 | Q.   And is this the translation? |
| 10:38:15 | 7 | A.   Yes, sir. |
| 10:38:37 | 8 | Q.   Let me get my act together here. |
| 10:38:39 | 9 |         MR. WOMACK:  Sir, could we get the exhibit number? |
| 10:38:49 | 10 |         MR. GARDNER:  358E. |
| 10:38:58 | 11 | Q.   (BY MR. GARDNER) So, Special Agent -- let me back up a |
| 10:39:00 | 12 | second. |
| 10:39:00 | 13 |         On 358E, is this what you're talking about with respect |
| 10:39:05 | 14 | to the subscriber information? |
| 10:39:07 | 15 | A.   Yeah.  If you can see on the top field, it says log in, |
| 10:39:11 | 16 | that's going to be your e-mail address. |
| 10:39:15 | 17 | Q.   Log in up here? |
| 10:39:16 | 18 | A.   Yes, sir. |
| 10:39:17 | 19 | Q.   E-mail address? |
| 10:39:18 | 20 | A.   Yeah.  So in this case, it's |
| 10:39:22 | 21 | horses.quarter.racing@hotmail.com. |
| 10:39:24 | 22 | Q.   And as you said, that information is provided for each |
| 10:39:28 | 23 | e-mail address, correct? |
| 10:39:29 | 24 | A.   Yeah.  When you sign up for an e-mail address, they'll |
| 10:39:32 | 25 | assign you whatever e-mail address you want as long as it's |

10:39:34   1   available, and you can put in any name you want as the user name.

10:39:41   2   Q.   Give me one second.  Let me start with another e-mail first.

10:39:55   3        This e-mail's dated March 31st.

10:39:59   4   A.   Yes, sir.

10:40:02   5        THE COURT:  Are you about to get into the e-mail

10:40:05   6   itself?

10:40:06   7        MR. GARDNER:  Yes, your Honor.

10:40:06   8        THE COURT:  All right.  I'm going to give -- members of

10:40:09   9   the jury, you may not need another break, but my court reporter

10:40:12   10  has been working all through the time that you've been out of the

10:40:16   11  room and she needs a break, and I expect the lawyers do, too.  So

10:40:20   12  let's take a ten-minute break to use the facilities.  Be ready to

10:40:23   13  come back.

10:40:53   14       (Jury not present.)

10:41:02   15       THE COURT:  Ten-minute recess.

10:52:33   16       (Recess.)

10:53:06   17       (Jury present.)

10:54:37   18  Q.   (BY MR. GARDNER) Special Agent Johnston, when we left, we

10:54:39   19  were ready to talk about an e-mail.  And just again, this e-mail

10:54:42   20  is dated on March 31st of 2012.

10:54:45   21  A.   Yes, sir.

10:54:45   22  Q.   And prior to the break, I believe you said the date of the

10:54:50   23  raid at Los Alamitos, when was that?

10:54:52   24  A.   It was March 27th, 2012.

10:54:54   25  Q.   And, again, this e-mail's from who, addressed to whom?

| | | |
|---|---|---|
| 10:55:03 | 1 | A.   Can you zoom out a little bit?  It's going to be from |
| 10:55:09 | 2 | horses.quarter.racing@hotmail to Fernie004@hotmail.com. |
| 10:55:17 | 3 | Q.   And, again, Spanish original e-mail, correct? |
| 10:55:21 | 4 | A.   Yes, sir. |
| 10:55:32 | 5 | Q.   And the English translation behind it? |
| 10:55:34 | 6 | A.   Yes, sir. |
| 10:55:39 | 7 | Q.   Could you do me a favor and read that into the record, |
| 10:55:42 | 8 | please? |
| 10:55:42 | 9 | A.   Yes, sir.  Shaman told me that you should toss your cell and |
| 10:55:48 | 10 | destroy everything else that was theirs.  Get rid of your face on |
| 10:55:52 | 11 | your computer.  PSS, that's what he said.  Sweetie, please, if |
| 10:55:58 | 12 | you have a pin or something or some other means, let me know so |
| 10:56:02 | 13 | that we can talk and get things organized.  Things pending. |
| 10:56:10 | 14 | Q.   Now, this toss your cell, is this consistent with your |
| 10:56:13 | 15 | earlier testimony regarding the common attributes of a criminal |
| 10:56:17 | 16 | organization? |
| 10:56:17 | 17 | A.   Yeah.  Yes, sir. |
| 10:56:19 | 18 | Q.   And destroy everything else, in your opinion, was that also |
| 10:56:25 | 19 | common? |
| 10:56:25 | 20 | A.   Yes. |
| 10:56:26 | 21 | Q.   It says, get rid of your face.  What do you interpret that |
| 10:56:29 | 22 | to be? |
| 10:56:29 | 23 | A.   I would go to say that that means they mean their Facebook |
| 10:56:33 | 24 | account on their computer. |
| 10:56:37 | 25 | Q.   And finally, down here at the end, sweetie, if you have a |

| | |
|---|---|
| 10:56:41 | 1 |
| 10:56:44 | 2 |
| 10:56:50 | 3 |
| 10:56:54 | 4 |
| 10:56:58 | 5 |
| 10:57:04 | 6 |
| 10:57:07 | 7 |
| 10:57:11 | 8 |
| 10:57:14 | 9 |
| 10:57:18 | 10 |
| 10:57:19 | 11 |
| 10:57:31 | 12 |
| 10:57:38 | 13 |
| 10:57:42 | 14 |
| 10:57:44 | 15 |
| 10:57:50 | 16 |
| 10:57:54 | 17 |
| 10:57:57 | 18 |
| 10:58:00 | 19 |
| 10:58:07 | 20 |
| 10:58:11 | 21 |
| 10:58:11 | 22 |
| 10:58:15 | 23 |
| 10:58:18 | 24 |
| 10:58:21 | 25 |

1   pin or some other means, let me know.  What is a PIN?

2   A.   A PIN is a BlackBerry.  It's PIN-to-PIN messaging.  It's a

3   very secure way of messaging someone.  Kind of like a text

4   message, but it's through the BlackBerry phone.

5   Q.   And if I had a PIN but I don't know yours, could I still

6   talk to you via that method?

7   A.   You could call, but you couldn't talk on a PIN.  A

8   PIN-to-PIN, you need to know each person's PIN.  And each

9   person's PIN is an eight digit and letter, kind of like a text

10  message, but it's more secure.

11  Q.   So I want to go to the next e-mail.  This one is dated

12  3-31-2012.  I'm sorry.  That was the same one.  This one's dated

13  April 4th, 2012.  For the record, can you say from who the e-mail

14  is and to whom it's addressed?

15  A.   Yes.  It's from horses.quarter.racing@hotmail.com and it's

16  to Fernie004@hotmail.com.

17  Q.   And, again, there's the original e-mail in Spanish, correct?

18  A.   Yes, sir.

19  Q.   Okay.  I want to start from the bottom.  And if you will,

20  just for the record so it's clear, could you read this bottom

21  portion of the e-mail?

22  A.   Yes, sir.  What's up Shayman?  What have you been doing?

23  You have a pin?

24  Q.   And then, is this the response the next line up on April

25  3rd, 2012 at 8:23?  Is that a response from Fernando Garcia?

10:58:24  1   A.   Yes.  That's from Fernie004@hotmail to

10:58:31  2   horses.quarter@hotmail.  It says, Huitron says for you to call

10:58:33  3   him.

10:58:34  4   Q.   And based on this alone, do you know whether that's "Chevo"

10:58:37  5   Huitron or?

10:58:38  6   A.   "Chevo" Huitron.

10:58:39  7   Q.   You say that because of the next line in the e-mail string

10:58:42  8   and that was dated also April 3rd at 13:44.  Is this the 24-hour

10:58:49  9   clock?

10:58:49  10  A.   Yeah.  So that would be 1:44.

10:58:51  11  Q.   If you would read that into the record for me.

10:58:53  12  A.   Yes.  Sweetie, if you come by for expenses and some

10:58:56  13  instructions, please let me know.  And Chevo is not answering.

10:59:01  14  Q.   And on the same date at what is 7:39, is this the response

10:59:05  15  from Fernando?

10:59:06  16  A.   Yes, sir.

10:59:07  17  Q.   What's that say?

10:59:08  18  A.   Where do I go?  When?

10:59:11  19  Q.   And finally, the response from horses.quarter, dated next

10:59:18  20  day at 5:24 a.m., correct?

10:59:20  21  A.   Yes, sir.

10:59:21  22  Q.   And if you will, read that one into the record.

10:59:23  23  A.   Over here where I am, sweetie, on the border.  So as to give

10:59:28  24  you a phone and some instructions.  Sweetie, I need you to send

10:59:31  25  me all the registrations.  I've been asking for them.  Please,

| | | |
|---|---|---|
| 10:59:35 | 1 | let me know what's up.  My regards, bye. |
| 10:59:39 | 2 | Q.   Sir, is this e-mail string consistent with other |
| 10:59:43 | 3 | investigations you've done in your past with regards to dropping |
| 10:59:47 | 4 | and obtaining new phones? |
| 10:59:49 | 5 | A.   Yes. |
| 10:59:49 | 6 | Q.   And the next e-mail, April 5, 2012, same individuals, |
| 11:00:04 | 7 | correct? |
| 11:00:04 | 8 | A.   Yes, sir. |
| 11:00:05 | 9 | Q.   Could you read the one dated April 5th, time 10:51:30? |
| 11:00:17 | 10 | A.   Yes, sir.  Yes, to the address that you gave me, I'll send |
| 11:00:21 | 11 | you the reference number soon.  Listen, the Texas trainer wants |
| 11:00:25 | 12 | you to call him.  Send me your BB so I can add you. |
| 11:00:31 | 13 | Q.   Do they identify in either this string or another string who |
| 11:00:35 | 14 | the Texas trainer is? |
| 11:00:37 | 15 | A.   From past e-mails, I believe the Texas trainer is -- |
| 11:00:42 | 16 |      MR. ESPER:  Objection, your Honor.  It calls for |
| 11:00:45 | 17 | speculation on the part of the witness. |
| 11:00:45 | 18 | Q.   (BY MR. GARDNER) I'll ask another question.  And the BB, |
| 11:00:48 | 19 | have you seen that before? |
| 11:00:49 | 20 | A.   Yes.  It means BlackBerry. |
| 11:00:50 | 21 | Q.   And is this the response? |
| 11:00:53 | 22 | A.   Yes, sir. |
| 11:00:54 | 23 | Q.   Could you read that into the record, please? |
| 11:00:55 | 24 | A.   All right sweetie.  I'll call him soon.  I'm on the road. |
| 11:00:59 | 25 | Send me yours.  I got a new one soon and add you. |

11:01:04   1   Q.   And if I get a new BlackBerry, does that come with its own
11:01:09   2   independent translation?
11:01:11   3   A.   Yes.  Each BlackBerry.
11:01:13   4   Q.   PIN, I'm sorry?
11:01:13   5   A.   Each BlackBerry phone has a significant PIN that's assigned
11:01:17   6   to that phone.  If I drop or toss my cellphone, that BlackBerry
11:01:23   7   PIN can only be used on that specific phone.  So for someone to
11:01:26   8   get a new BlackBerry phone to talk to someone else, they need
11:01:31   9   their specific PIN.  Like I said, it's eight digits and numbers
11:01:35   10  put together.
11:01:36   11  Q.   So the last e-mail I want to show you here is dated also
11:01:39   12  April 5th, 11:31 p.m., and let's go straight to the translation.
11:01:47   13  I'd just like to start here.
11:01:49   14          And this is from horses to Fernie.  If you could read
11:01:51   15  that, please.
11:01:52   16  A.   Sweetie, send me your BBM so I can add you.
11:01:56   17  Q.   And what is Fernando Garcia's response?
11:01:59   18  A.   Like I said, that's going to be the PIN that's associated
11:02:03   19  with the phone that he was currently using or that he currently
11:02:06   20  bought.
11:02:11   21  Q.   Sir, again, is it your opinion that this e-mail traffic is
11:02:16   22  consistent with other investigations you've conducted in the past
11:02:19   23  of similar activity?
11:02:20   24  A.   Yes, sir.
11:02:20   25  Q.   May I have one moment, your Honor?

| | | |
|---|---|---|
| 11:02:22 | 1 | THE COURT:  You may. |
| 11:02:28 | 2 | MR. GARDNER:  Your Honor, I'll pass the witness. |
| 11:02:42 | 3 | CROSS-EXAMINATION |
| 11:02:42 | 4 | BY MR. FINN: |
| 11:02:43 | 5 | Q.   Good morning, Special Agent.  How are you? |
| 11:02:44 | 6 | A.   Good, sir. |
| 11:02:45 | 7 | Q.   Good.  Another day in paradise.  My name is David Finn and I |
| 11:02:49 | 8 | just have a couple of questions.  I represent Jose Trevino. |
| 11:02:51 | 9 | A.   Yes, sir. |
| 11:02:52 | 10 | Q.   And I heard you say, just a moment ago, that tossing |
| 11:02:56 | 11 | cellphones is a common criminal organization practice; is that |
| 11:03:02 | 12 | correct? |
| 11:03:02 | 13 | A.   Yes, sir. |
| 11:03:03 | 14 | Q.   So if somebody held onto the same phone with the same number |
| 11:03:08 | 15 | for many years, that would be inconsistent with this common |
| 11:03:12 | 16 | criminal organization practice, wouldn't it? |
| 11:03:17 | 17 | A.   A lot of people have multiple phones. |
| 11:03:19 | 18 | Q.   Okay.  Let me ask the question again.  If it's true that a |
| 11:03:23 | 19 | common criminal organization practice is to toss cellphones, you |
| 11:03:29 | 20 | agree with that, correct? |
| 11:03:29 | 21 | A.   Yes, sir. |
| 11:03:30 | 22 | Q.   Then if I hold on and I'm a criminal, if I hold onto the |
| 11:03:35 | 23 | same phone number and the same phone for five years, that would |
| 11:03:38 | 24 | be in your experience and training inconsistent with common |
| 11:03:42 | 25 | criminal activity; isn't that correct? |

| | | |
|---|---|---|
| 11:03:45 | 1 | A.   For that one phone, yes, sir. |
| 11:03:46 | 2 | Q.   Thank you.  That's all. |
| 11:03:50 | 3 | THE COURT:  Mr. Sanchez. |
| 11:03:58 | 4 | MR. SANCHEZ:  Do you know what number we're up to? |
| 11:04:01 | 5 | Ten? |
| 11:04:07 | 6 | THE COURT:  I think he was using 358E?  Is that your -- |
| 11:04:16 | 7 | MR. SANCHEZ:  I've got some others. |
| 11:04:18 | 8 | CROSS-EXAMINATION |
| 11:04:20 | 9 | BY MR. SANCHEZ: |
| 11:04:20 | 10 | Q.   Mr. Johnston, we went over this during the break, these five |
| 11:04:23 | 11 | e-mails; is that right? |
| 11:04:24 | 12 | A.   Yes, sir, we did. |
| 11:04:24 | 13 | Q.   And these five e-mails are part of the e-mail search warrant |
| 11:04:32 | 14 | that you conducted? |
| 11:04:34 | 15 | A.   Yes, sir. |
| 11:04:35 | 16 | Q.   Or, in other words, as part of the return? |
| 11:04:37 | 17 | A.   Yeah.  There was a lot of e-mails. |
| 11:04:39 | 18 | Q.   16,000? |
| 11:04:40 | 19 | A.   Approximately. |
| 11:04:41 | 20 | Q.   Okay.  Your Honor, I'm going to introduce five e-mails |
| 11:04:47 | 21 | labeled as Colorado 10, one of them is translated, the other four |
| 11:04:51 | 22 | are not.  And I'll -- by agreement, I'll have them translated as |
| 11:04:55 | 23 | soon as I can. |
| 11:04:56 | 24 | MR. GARDNER:  No objection, your Honor. |
| 11:04:57 | 25 | THE COURT:  All right. |

11:05:01  1        MR. SANCHEZ:  And I'll pass the witness, your Honor.

11:05:02  2        THE COURT:  Do you want to identify them with a number?

11:05:07  3        MR. SANCHEZ:  I could do that.

11:05:15  4        THE COURT:  Would be, what, 10?

11:05:18  5  Q.   (BY MR. SANCHEZ) This is Colorado 10.  So this is the first

11:05:20  6  one that you actually had translated; is that correct?

11:05:23  7  A.   Yes.  I had it translated.

11:05:25  8  Q.   And this one is dated February 1st, 2012?

11:05:29  9  A.   Yes, sir.

11:05:32  10  Q.   And this is one that you did not have translated; is that

11:05:36  11  correct?

11:05:36  12  A.   Yes, sir.

11:05:37  13  Q.   And this one, this is the second one in the group, and this

11:05:41  14  is from February 21, 2012 from Miguel Almazon to this Anri2319?

11:05:49  15  A.   Yes, sir.

11:05:52  16        THE COURT:  Counsel, if you'd just read the

11:05:55  17  identification or the date because you're going to do it in one

11:06:00  18  exhibit.

11:06:01  19        MR. SANCHEZ:  That's right, your Honor.

11:06:02  20        THE COURT:  Just identify the number of them and --

11:06:07  21        MR. SANCHEZ:  Okay.

11:06:08  22        THE COURT:  I'll admit it, because there's no

11:06:10  23  objection, and then, you could have the translation later.

11:06:13  24        MR. SANCHEZ:  The third one is on April 15th -- or,

11:06:15  25  sorry, April 14th, 2012.  The fourth one is May 2nd, 2012.  And

| | | |
|---|---|---|
| 11:06:22 | 1 | the fifth one is from August 25th, 2012.  Your Honor, it's five |
| 11:06:26 | 2 | grouped together.  It's Colorado 10. |
| 11:06:27 | 3 | THE COURT:  Thank you.  And Colorado 10 is admitted |
| 11:06:30 | 4 | without objections.  So if you'll do your translation, it's 10A. |
| 11:06:38 | 5 | You can get those to the clerk. |
| 11:06:41 | 6 | MR. SANCHEZ:  Thank you, your Honor. |
| 11:06:42 | 7 | THE COURT:  All right.  Mr. Womack. |
| 11:06:45 | 8 | MR. WOMACK:  Yes, your Honor.  Thank you. |
| 11:06:46 | 9 | CROSS-EXAMINATION |
| 11:06:46 | 10 | BY MR. WOMACK: |
| 11:06:50 | 11 | Q.   Good morning, Special Agent Johnston. |
| 11:06:51 | 12 | A.   Good morning, sir.  How are you? |
| 11:06:52 | 13 | Q.   I'm Guy Womack from Houston.  We've never met before, have |
| 11:06:56 | 14 | we? |
| 11:06:56 | 15 | A.   No, sir. |
| 11:06:57 | 16 | Q.   But we rode the elevator this morning.  We didn't introduce |
| 11:07:00 | 17 | ourselves? |
| 11:07:01 | 18 | A.   I don't remember, sir. |
| 11:07:02 | 19 | THE COURT:  That's interesting.  Let's go to the |
| 11:07:04 | 20 | questions. |
| 11:07:04 | 21 | Q.   (BY MR. WOMACK) Yes, sir. |
| 11:07:05 | 22 | A couple of questions about establishing an e-mail |
| 11:07:08 | 23 | account. |
| 11:07:08 | 24 | A.   Uh-huh. |
| 11:07:09 | 25 | Q.   You talked about this -- and all of us that have used e-mail |

| | | |
|---|---|---|
| 11:07:14 | 1 | know that in our own e-mail account, we may have an address book? |
| 11:07:18 | 2 | A.   Yes. |
| 11:07:18 | 3 | Q.   And in that address book, we can save an e-mail if we get |
| 11:07:23 | 4 | one from someone that we want to save to use again or whatever. |
| 11:07:28 | 5 | And in our address book, it will print their e-mail address, and |
| 11:07:33 | 6 | then, it has a place for to put the person's name.  And then, it |
| 11:07:38 | 7 | has a thing, a block where you show the friendly name; is that |
| 11:07:43 | 8 | right? |
| 11:07:43 | 9 | A.   I don't know off the top of my head.  I haven't set up my |
| 11:07:46 | 10 | e-mail address like that. |
| 11:07:48 | 11 | Q.   Okay.  Your personal e-mail? |
| 11:07:50 | 12 | A.   Yes, sir. |
| 11:07:52 | 13 | Q.   If someone sends you an e-mail, family, anybody, a friend, |
| 11:07:56 | 14 | whoever, and you save it into your in box -- I mean, into your |
| 11:08:03 | 15 | address book on your e-mail account, can you not assign a |
| 11:08:06 | 16 | friendly name for that person? |
| 11:08:07 | 17 | A.   I have never done that.  I'm not saying you can't.  But I've |
| 11:08:11 | 18 | never done it. |
| 11:08:11 | 19 | Q.   Would it surprise you that that's how you establish a |
| 11:08:14 | 20 | friendly name is you put in there the friendly name that you use |
| 11:08:18 | 21 | for that person?  It could be anything you want to put.  And that |
| 11:08:22 | 22 | way when you see an e-mail come from that person, you say, oh, |
| 11:08:25 | 23 | that's what's his name, and so, you can establish your own |
| 11:08:29 | 24 | friendly name for someone.  But you didn't know that? |
| 11:08:31 | 25 | A.   I didn't know that. |

| | | |
|---|---|---|
| 11:08:32 | 1 | Q.   Okay.  Well, then, do you know how friendly names are |
| 11:08:37 | 2 | established in everybody's e-mail account?  You don't really know |
| 11:08:43 | 3 | that, do you? |
| 11:08:43 | 4 | A.   No. |
| 11:08:44 | 5 | Q.   Okay.  But yet, you would agree that the friendly -- what |
| 11:08:49 | 6 | you're calling a friendly -- is it name?  Friendly what? |
| 11:08:54 | 7 | A.   Friendly name is just how the machine that -- or the |
| 11:08:58 | 8 | computer program we use says who it's from or -- not the subject |
| 11:09:03 | 9 | line but the person who's sending it that's not identified as |
| 11:09:06 | 10 | their e-mail address. |
| 11:09:07 | 11 | Q.   Okay.  So you don't know how that friendly name is |
| 11:09:11 | 12 | established.  You just know that typically with the e-mail there |
| 11:09:14 | 13 | will be a friendly name associated with particular address? |
| 11:09:16 | 14 | A.   I believe that when you start your e-mail address, when I |
| 11:09:20 | 15 | would start an e-mail address, I would put in the friendly name I |
| 11:09:24 | 16 | would want to be identified as.  That's how I thought it was |
| 11:09:26 | 17 | used. |
| 11:09:27 | 18 | Q.   Okay.  But yet, you've never -- you've never established a |
| 11:09:32 | 19 | friendly e-mail name for the people you're receiving e-mails |
| 11:09:35 | 20 | from.  You've never done that? |
| 11:09:36 | 21 | A.   I don't have an address book. |
| 11:09:38 | 22 | Q.   Oh, okay.  I gotcha.  So you don't know how that's actually |
| 11:09:42 | 23 | done then? |
| 11:09:42 | 24 | A.   I could make an address book.  I just on my personal e-mail |
| 11:09:45 | 25 | account, I don't have one. |

| | | |
|---|---|---|
| 11:09:46 | 1 | Q.    Okay.  Now, it was Government's Exhibit 71, which is? |
| 11:10:00 | 2 | MR. GARDNER:  It's with the clerk. |
| 11:10:04 | 3 | Q.   (BY MR. WOMACK) I want to show you what's been admitted -- |
| 11:10:44 | 4 | MR. GARDNER:  Admitted. |
| 11:10:45 | 5 | Q.   (BY MR. WOMACK) -- as Government's Exhibit 71.  Now, 71 is |
| 11:10:50 | 6 | actually a -- it's a legal pad, isn't it? |
| 11:10:52 | 7 | A.    Yes, sir. |
| 11:10:53 | 8 | Q.    And you were shown one page of that legal pad when |
| 11:11:00 | 9 | discussing the exhibit; is that right? |
| 11:11:01 | 10 | A.    This morning? |
| 11:11:02 | 11 | Q.    Yes. |
| 11:11:04 | 12 | A.    I believe AUSA Gardner showed me multiple pages on it. |
| 11:11:08 | 13 | Q.    Okay.  And remember that he had -- you testified about one |
| 11:11:10 | 14 | page that had e-mail addresses and had some other information on |
| 11:11:15 | 15 | it? |
| 11:11:15 | 16 | A.    Yes, sir. |
| 11:11:16 | 17 | Q.    Is that the first page? |
| 11:11:18 | 18 | A.    That is the first page. |
| 11:11:19 | 19 | Q.    Now, do you know whose handwriting is on the first page? |
| 11:11:23 | 20 | A.    I do not know whose handwriting is on the first page. |
| 11:11:26 | 21 | Q.    Do you know if it's one person, or is it several people, or |
| 11:11:30 | 22 | do you have any idea? |
| 11:11:33 | 23 | A.    From looking at it, there's several -- at least two |
| 11:11:38 | 24 | different handwritings. |
| 11:11:39 | 25 | Q.    Okay.  But we have no idea who they were? |

| | | |
|---|---|---|
| 11:11:41 | 1 | A.   I don't know who they are. |
| 11:11:43 | 2 | Q.   Okay.  And, again, if you can tell us, where was that |
| 11:11:47 | 3 | notepad or that legal pad?  Where was it found? |
| 11:11:50 | 4 | A.   That was found during a search warrant.  I believe during |
| 11:11:57 | 5 | Eusevio Huitron's search warrant. |
| 11:11:59 | 6 | Q.   Someone serving Mr. Huitron's home, business, whatever, |
| 11:12:02 | 7 | found that legal pad there? |
| 11:12:05 | 8 | A.   I believe so. |
| 11:12:06 | 9 | Q.   Okay.  And look at the -- after the first page, look at the |
| 11:12:11 | 10 | next page.  And glance down through there.  You had a chance to |
| 11:12:18 | 11 | glance through it generally.  And go to the next page.  Does it |
| 11:12:42 | 12 | appear to be a listing of the names of horses? |
| 11:12:50 | 13 | A.   No. |
| 11:12:54 | 14 | Q.   I want to show you from looking at those few pages, |
| 11:13:22 | 15 | actually, it looks like colors of paint, doesn't it? |
| 11:13:25 | 16 | A.   Yes, sir. |
| 11:13:26 | 17 | Q.   I'm looking for an e-mail account.  I'll get it here in just |
| 11:14:24 | 18 | a second. |
| 11:14:29 | 19 |       Now, when you looked at the information and obtained |
| 11:14:37 | 20 | information from e-mail providers on Fernando Garcia, you found |
| 11:14:43 | 21 | that he had one e-mail address and it was Fernie004@. |
| 11:14:50 | 22 | A.   Hotmail. |
| 11:14:50 | 23 | Q.   Hotmail, correct? |
| 11:14:51 | 24 | A.   Yes, sir. |
| 11:14:51 | 25 | Q.   And when you looked at the subscriber information, it was |

11:14:57    1    his name, Fernando Garcia?

11:14:58    2    A.    Yes, sir.

11:15:00    3    Q.    And could you determine from that -- did they tell you that

11:15:05    4    he has had -- he's 29 years old.  He has had that same e-mail

11:15:10    5    address since he was in high school.  Did it show that it goes

11:15:13    6    back a decade or more?

11:15:14    7    A.    I believe it does show it goes back.

11:15:16    8    Q.    And it's as that same e-mail address with his name.

11:15:19    9    A.    Yes, sir.

11:15:27   10    Q.    Based on your -- well, I'll do that in a minute.  Let's look

11:15:35   11    at you said there were searches that were done, as well, correct?

11:15:39   12    A.    Can you be more specific?

11:15:41   13    Q.    Were you involved in searches as well as e-mail?  Were you

11:15:44   14    also involved in the physical searches where evidence was

11:15:48   15    obtained physically, phones, stuff like that?

11:15:50   16    A.    On this case?

11:15:51   17    Q.    Yes.

11:15:51   18    A.    Yes, sir.

11:15:52   19    Q.    Okay.  And you know that Fernando Garcia's cellphone was

11:15:58   20    seized from him at the time that he was apprehended in this case.

11:16:02   21    A.    I wasn't present when he was apprehended.

11:16:05   22    Q.    Okay.  Are you aware that his cellphone was taken from him

11:16:08   23    when he was apprehended?

11:16:10   24    A.    I wasn't.

11:16:10   25    Q.    And you've not seen any of that analysis of his cellphone?

| | | |
|---|---|---|
| 11:16:13 | 1 | A.   I don't believe I have. |
| 11:16:14 | 2 | Q.   Okay.  Are you aware that his laptop computer was seized |
| 11:16:18 | 3 | from him when he was apprehended? |
| 11:16:20 | 4 | A.   I wasn't. |
| 11:16:21 | 5 | Q.   So you have not seen any analysis of his laptop computer? |
| 11:16:24 | 6 | A.   Let me correct.  I am aware, yes.  I am aware that he was in |
| 11:16:29 | 7 | possession of a laptop or there was a laptop present when he was |
| 11:16:31 | 8 | arrested. |
| 11:16:32 | 9 | Q.   Okay.  And have you seen any of the analysis of that laptop? |
| 11:16:37 | 10 | A.   I believe I have. |
| 11:16:39 | 11 | Q.   And from looking at that, you know that the information |
| 11:16:43 | 12 | contained in his laptop goes back quite some period of time. |
| 11:16:47 | 13 | A.   It could.  I only saw certain stuff. |
| 11:16:51 | 14 | Q.   In other words, it doesn't just go back like a week, or a |
| 11:16:54 | 15 | month, or March, or whatever it was.  It goes back before that, |
| 11:16:58 | 16 | doesn't it? |
| 11:16:59 | 17 | A.   It could.  Yes. |
| 11:17:01 | 18 | Q.   In other words, and you know the same thing about his |
| 11:17:05 | 19 | cellphone.  That cellphone information was retrieved and shows |
| 11:17:08 | 20 | he's had that same cellphone for quite some time. |
| 11:17:11 | 21 | A.   My role was specifically e-mail addresses and the arrest of |
| 11:17:15 | 22 | Carlos Nayen.  I cannot testify to his cellphone. |
| 11:17:18 | 23 | Q.   Okay.  And I'm asking if you've actually seen -- as being a |
| 11:17:24 | 24 | case agent for the Laredo office on this case and being involved |
| 11:17:28 | 25 | in investigations as you have, you've actually seen some of the |

| | | |
|---|---|---|
| 11:17:35 | 1 | product where his cellphone had been searched and analyzed, |
| 11:17:38 | 2 | haven't you? |
| 11:17:39 | 3 | A.    I don't recall seeing his cellphone analysis. |
| 11:17:42 | 4 | Q.    Okay.  For a person to keep the same e-mail address for more |
| 11:17:51 | 5 | than a decade, that would appear to be inconsistent with what you |
| 11:17:56 | 6 | were talking about this common criminal activity, wouldn't it? |
| 11:17:58 | 7 | A.    For that specific e-mail address, yeah. |
| 11:18:00 | 8 | Q.    And that's the only e-mail address Fernando Garcia has, |
| 11:18:05 | 9 | isn't it? |
| 11:18:05 | 10 | A.    It's the only one that I found. |
| 11:18:06 | 11 | Q.    And you're an expert at doing this? |
| 11:18:09 | 12 | A.    I haven't been declared as an expert of doing this.  I have |
| 11:18:13 | 13 | done in this case every e-mail, but I haven't been sworn in as an |
| 11:18:16 | 14 | expert.  But in this case, I've reviewed a lot e-mails and a lot |
| 11:18:20 | 15 | of e-mail accounts. |
| 11:18:21 | 16 | Q.    Certainly you have more expertise than we do as far as how |
| 11:18:24 | 17 | it was done here.  And so, you know he's had that same e-mail |
| 11:18:27 | 18 | address, one of them, for more than a decade, correct? |
| 11:18:30 | 19 | A.    For that one. |
| 11:18:32 | 20 | Q.    As you said that would be inconsistent based on your normal |
| 11:18:35 | 21 | expectation of what someone involved in a crime would do. |
| 11:18:39 | 22 | A.    I would. |
| 11:18:40 | 23 | Q.    Likewise, keeping the same laptop would be inconsistent, |
| 11:18:43 | 24 | won't it? |
| 11:18:44 | 25 | A.    I wouldn't say inconsistent.  Many people have multiple |

11:18:49    1    laptops, multiple e-mail addresses, multiple phones, and they

11:18:53    2    don't use that specifically for something bad or dirty.

11:18:58    3    Q.   Right.

11:18:59    4    A.   Or they've had an e-mail address or a phone for a long

11:19:03    5    period of time prior to getting involved in bad stuff or illegal

11:19:07    6    activity.

11:19:07    7    Q.   Sure.  And, again, bringing it back to Fernando Garcia,

11:19:12    8    which is the only one I care about.

11:19:14    9    A.   That's fine.

11:19:15   10    Q.   You know, he's used the same e-mail address and all the

11:19:18   11    e-mails you have here that you are attributing to him came from

11:19:21   12    his e-mail address.

11:19:22   13         MR. GARDNER:  Your Honor, we object to the form of the

11:19:24   14    question, which is not a question.

11:19:28   15         MR. WOMACK:  It was.  I laid the predicate and said, is

11:19:30   16    that true?

11:19:34   17         THE COURT:  Finish it up with, is that true?

11:19:38   18    Q.   (BY MR. WOMACK) That's true, isn't it?

11:19:39   19    A.   I'm sorry, what?  Can you repeat the question?

11:19:43   20    Q.   That happens.

11:19:45   21         From your investigation, you know that Fernando Garcia

11:19:50   22    has used the one e-mail address for more than a decade, correct?

11:19:54   23    A.   I'd have to look back, but it says it on the paperwork.  And

11:20:00   24    I, off the top of my head, I cannot remember exactly when he

11:20:03   25    opened it up.

11:20:04  1    Q.   But you know it's been several years?

11:20:07  2    A.   I believe it has.

11:20:08  3    Q.   And all the e-mails that you are attributing to him, the

11:20:13  4    ones that we've seen between him and Papalotes and I forget,

11:20:19  5    horse.quarter, and all these other things, those were all using

11:20:23  6    that e-mail address, aren't they, for Fernando Garcia?

11:20:25  7    A.   From what we talked about, correct.  Yes.

11:20:27  8    Q.   Okay.  And the laptop that was seized from him, to your

11:20:38  9    knowledge, is the only laptop that's been seized from him,

11:20:41  10   correct?

11:20:42  11   A.   To the best of my knowledge, yes.

11:20:43  12   Q.   And that laptop has information and data going back quite

11:20:50  13   some period of time before this investigation.

11:20:53  14          MR. GARDNER:  Your Honor, he's already asked this

11:20:54  15   question.  Repetitive at this point.

11:20:57  16          THE COURT:  He has indicated he doesn't know.

11:21:01  17          MR. WOMACK:  I think he said he did know.  He's

11:21:04  18   actually seen on the laptop, he'd seen some information that came

11:21:06  19   out of the laptop.  I want to make sure that's clear for the

11:21:09  20   jury.

11:21:09  21   Q.   (BY MR. WOMACK) On the laptop, you know he's used --

11:21:12  22   Fernando Garcia has used one laptop that goes back before this

11:21:15  23   investigation.

11:21:17  24   A.   I don't know how long your client's had that laptop.  Off

11:21:21  25   the top of my head, I don't know.

| | | |
|---|---|---|
| 11:21:22 | 1 | Q.   But there was only one laptop seized from him. |
| 11:21:25 | 2 | A.   If he -- I don't know off the top of my head.  I believe |
| 11:21:30 | 3 | there was only one laptop, but that doesn't mean that's the only |
| 11:21:33 | 4 | laptop he had. |
| 11:21:33 | 5 | Q.   And from having looked at the information taken from that |
| 11:21:37 | 6 | laptop, you know it has information that goes back even before |
| 11:21:40 | 7 | this investigation. |
| 11:21:41 | 8 | MR. GARDNER:  Your Honor, at this point, asked and |
| 11:21:43 | 9 | answered.  Third time, I believe. |
| 11:21:45 | 10 | MR. WOMACK:  We're trying to get a straight answer, |
| 11:21:46 | 11 | your Honor. |
| 11:21:48 | 12 | THE COURT:  Now, counsel. |
| 11:21:50 | 13 | MR. WOMACK:  I mean, I'm not saying he's being |
| 11:21:52 | 14 | difficult.  He's trying to recollect things. |
| 11:21:54 | 15 | THE COURT:  He's trying to get an answer would be fine. |
| 11:21:57 | 16 | MR. WOMACK:  Yes, sir.  Trying to get an answer.  Thank |
| 11:21:57 | 17 | you. |
| 11:21:57 | 18 | THE COURT:  Read back the question to the witness, |
| 11:22:11 | 19 | please. |
| 11:22:11 | 20 | (Last question read back.) |
| 11:22:12 | 21 | THE COURT:  Can you answer that? |
| 11:22:15 | 22 | A.   If it went back before, I believe 2009, then yes, it might |
| 11:22:22 | 23 | be on his laptop from before the investigation started. |
| 11:22:27 | 24 | Q.   (BY MR. WOMACK) It certainly goes back before March of 2012 |
| 11:22:31 | 25 | when someone sent an e-mail, get rid of everything.  It goes back |

11:22:35   1   before that, doesn't it?

11:22:36   2   A.   Yes.

11:22:37   3   Q.   And that's an indication that when Fernando Garcia got an

11:22:42   4   e-mail that says, get rid of your phone, get rid of everything,

11:22:45   5   he didn't do that, did he?

11:22:47   6   A.   No.

11:22:51   7   Q.   And that would be inconsistent with a coconspirator in a

11:22:55   8   criminal case who is being told, get rid of everything.  If you

11:22:58   9   keep everything, that's inconsistent with that, from your

11:23:01   10  experience?

11:23:02   11  A.   Sometimes people don't listen to orders.

11:23:05   12  Q.   Okay.  And you know that Fernando Garcia has continued to

11:23:20   13  use his one e-mail address up until today.  You know that, don't

11:23:25   14  you?

11:23:25   15  A.   When I send e-mail search warrant, I don't know what happens

11:23:29   16  afterwards.  He might use it.  He might not.  I don't know.  I

11:23:34   17  couldn't -- I could tell you, but it would take some time.

11:23:38   18  Q.   He was arrested in June of 2012.  His family hired me, I

11:23:42   19  think, that evening or the next day.  You have seen the e-mails

11:23:47   20  since June of 2012 between Fernando and me, haven't you?

11:23:53   21  A.   Between Fernando and you?

11:23:55   22  Q.   And me.

11:23:55   23  A.   I'm.

11:23:56   24  Q.   Guy.Womack@usa.net.  That's my e-mail address.  The only one

11:24:01   25  I've got.

| | | |
|---|---|---|
| 11:24:02 | 1 | A.    Okay. |
| 11:24:02 | 2 | Q.    Have you seen e-mail traffic between Fernando to and from |
| 11:24:06 | 3 | me? |
| 11:24:07 | 4 | A.    Like I said, there's a lot of e-mails and I could have, and |
| 11:24:11 | 5 | they might have spanned after he was arrested. |
| 11:24:14 | 6 | Q.    I understand.  And when you see e-mail between a attorney |
| 11:24:18 | 7 | and client, you don't use that information, do you? |
| 11:24:20 | 8 | A.    No.  I don't read it. |
| 11:24:21 | 9 | Q.    And I'm not suggesting you're doing anything wrong.  I just |
| 11:24:24 | 10 | want to establish that you know because they've been shown to me, |
| 11:24:27 | 11 | y'all actually have e-mails of him since he hired me.  He still |
| 11:24:32 | 12 | has the same address.  You know that. |
| 11:24:34 | 13 | A.    Yes. |
| 11:24:35 | 14 | Q.    Okay.  Now, you talk about deleting e-mails.  You delete |
| 11:25:00 | 15 | e-mails, don't you? |
| 11:25:00 | 16 | A.    Occasionally.  I do have a lot in my in box, but I do. |
| 11:25:03 | 17 | Q.    And when you delete an e-mail address, it could mean that |
| 11:25:07 | 18 | you're just done with that information, correct? |
| 11:25:09 | 19 | A.    The address or the e-mail? |
| 11:25:12 | 20 | Q.    If you delete an e-mail, if you delete an e-mail, that could |
| 11:25:15 | 21 | mean you're done with that e-mail, correct? |
| 11:25:18 | 22 | A.    It could mean you're done with it, or could mean you don't |
| 11:25:20 | 23 | want to see it anymore or you don't want anyone else to see it. |
| 11:25:23 | 24 | Q.    And you don't want it to fill up your in box? |
| 11:25:26 | 25 | A.    Yes.  You only get a certain amount of space provided from |

| | | |
|---|---|---|
| 11:25:29 | 1 | the provider. |
| 11:25:31 | 2 | Q.   Right.  And so, it would be very common in your experience |
| 11:25:34 | 3 | for people to open e-mails and then, delete some of them? |
| 11:25:37 | 4 | A.   Correct.  They can do that. |
| 11:25:38 | 5 | Q.   And if they think they might need it again for some reason, |
| 11:25:44 | 6 | either for the address or the information, they may keep that? |
| 11:25:46 | 7 | A.   Yeah.  They can just not delete it and it will stay there |
| 11:25:49 | 8 | forever. |
| 11:25:50 | 9 | Q.   Okay.  358E, like echo, were the e-mails from |
| 11:26:12 | 10 | horses.quarter.racing@hotmail.com.  Do you know who that is? |
| 11:26:17 | 11 | A.   Yes. |
| 11:26:18 | 12 | Q.   Who is that? |
| 11:26:19 | 13 | A.   That's going to be Victor Lopez, and I believe Victor Lopez |
| 11:26:24 | 14 | and Carlos Nayen both use that e-mail address. |
| 11:26:26 | 15 | Q.   Okay.  From looking at -- and I don't know what page this |
| 11:26:53 | 16 | is, but it's this Exhibit 358E has two red tabs? |
| 11:26:58 | 17 | A.   Uh-huh. |
| 11:26:59 | 18 | Q.   Do you see that? |
| 11:26:59 | 19 | A.   Yes, sir. |
| 11:27:01 | 20 | Q.   That someone put there.  That's marking certain pages? |
| 11:27:05 | 21 | MR. GARDNER:  That was me, Mr. Womack. |
| 11:27:07 | 22 | Q.   (BY MR. WOMACK) And I bet it was Mr. Gardner did it.  I'm |
| 11:27:10 | 23 | going to look at the first half in the e-mail string that's on |
| 11:27:12 | 24 | there. |
| 11:27:12 | 25 | A.   Okay. |

| | | |
|---|---|---|
| 11:27:13 | 1 | Q.   I'm going to show it to you on the string.  Now, this is a |
| 11:27:16 | 2 | translation of the e-mail string; is that right? |
| 11:27:20 | 3 | A.   One of two translations, but it is.  Yes.  It's translated |
| 11:27:23 | 4 | into English. |
| 11:27:24 | 5 | Q.   Okay.  And do you speak Spanish? |
| 11:27:27 | 6 | A.   Not very well. |
| 11:27:28 | 7 | Q.   Okay.  Join the crowd. |
| 11:27:31 | 8 |       And so, the translation, though, we're assuming was |
| 11:27:35 | 9 | done properly, don't you think? |
| 11:27:37 | 10 |       MR. GARDNER:  Your Honor, I'm going to object. |
| 11:27:39 | 11 | Translation's been available for objections to the defense for |
| 11:27:42 | 12 | over a month.  That is misleading. |
| 11:27:44 | 13 |       MR. WOMACK:  Your Honor, I'm not objecting.  I'm asking |
| 11:27:46 | 14 | the witness -- I want agreement that this is a real translation. |
| 11:27:49 | 15 | I'm not challenging the translation. |
| 11:27:50 | 16 |       THE COURT:  Well, tell the jury it's a real translation |
| 11:27:53 | 17 | pursuant to my order, and the lawyers according to my order had a |
| 11:27:58 | 18 | reasonable time to object to any of the translations.  Let's go |
| 11:28:01 | 19 | on. |
| 11:28:02 | 20 |       MR. WOMACK:  Thank you, your Honor. |
| 11:28:03 | 21 | Q.   (BY MR. WOMACK) From reading this e-mail, it appears that |
| 11:28:14 | 22 | Fernando Garcia is trying to get information about where to |
| 11:28:16 | 23 | deliver or where he can pick up registration.  Do you know that |
| 11:28:21 | 24 | from reading the e-mails? |
| 11:28:22 | 25 | A.   Can you point to the e-mail?  The top one. |

| | | |
|---|---|---|
| 11:28:28 | 1 | Q.   Well, the top one -- the top e-mail is from somebody to |
| 11:28:31 | 2 | Fernando; is that right? |
| 11:28:33 | 3 | A.   You flip back the page, I'll tell you who it's from. |
| 11:28:35 | 4 | Q.   Oh, okay.  So it's on the other page? |
| 11:28:39 | 5 | A.   Right.  Yeah.  No, keep going. |
| 11:28:43 | 6 | Q.   Okay.  This page says the word "translation." |
| 11:28:46 | 7 | A.   Correct. |
| 11:28:46 | 8 | Q.   The page before looks like it has Spanish. |
| 11:28:51 | 9 | A.   Correct. |
| 11:28:52 | 10 | Q.   So I guess these two go together, don't they?  One's |
| 11:28:55 | 11 | translation of the other? |
| 11:28:56 | 12 | A.   Yes. |
| 11:28:56 | 13 | Q.   Okay.  Thank you.  Oh, okay.  And two pages back has this |
| 11:29:02 | 14 | gray box that says, e-mail participants? |
| 11:29:04 | 15 | A.   Yes, sir. |
| 11:29:05 | 16 | Q.   And so, the sender. |
| 11:29:11 | 17 | A.   It says -- |
| 11:29:12 | 18 | Q.   From is horses.quarter.racing and a friendly name Javier |
| 11:29:18 | 19 | Lopez? |
| 11:29:18 | 20 | A.   Correct. |
| 11:29:19 | 21 | Q.   And it's to Fernie004, Fernando Garcia? |
| 11:29:22 | 22 | A.   Correct. |
| 11:29:23 | 23 | Q.   Okay.  And this was on October 17, 2012? |
| 11:29:28 | 24 | A.   That's when I reviewed it. |
| 11:29:31 | 25 | Q.   Oh. |

11:29:31  1  A.   Or either -- it's either when I reviewed it or it's when it

11:29:35  2  was uploaded into that Cool Miner machine.

11:29:38  3  Q.   I gotcha.   Okay.   So the e-mail was sent on April 4th, 2012

11:29:43  4  at 5:24 in the morning.

11:29:45  5  A.   Correct.

11:29:46  6  Q.   Thank you.   And it would appear like most e-mails that as

11:29:56  7  you look at this string of e-mails, the bottom e-mail is the

11:30:01  8  oldest one.   And then, the replies or subsequent e-mails go up

11:30:05  9  the page in order, didn't they?

11:30:07  10  A.   That's correct.

11:30:08  11  Q.   And if I flip to the next page will have this same string of

11:30:16  12  e-mails in English?

11:30:17  13  A.   Correct.

11:30:17  14  Q.   Okay.   And so, the first e-mail of this string on April 2nd

11:30:27  15  is, what's up Shaman.   What you been doing?   You have a pin?   And

11:30:34  16  the reply -- and that's the morning of April 2nd because we're

11:30:44  17  using a 24-hour clock.   So the next morning, 22 hours later,

11:30:49  18  roughly, 22 and a half, Fernando Garcia replies, Huitron says for

11:30:56  19  you to call him.

11:30:57  20  A.   Correct.

11:31:02  21  Q.   And then, the reply that afternoon, five hours later is,

11:31:13  22  sweetie, if you come by for expenses and some instructions.

11:31:16  23  Please let me know.   And Chevo is not answering.

11:31:22  24       And you know from your investigation that Fernando

11:31:24  25  Garcia is involved in representing horse buyers and sellers,

11:31:29   1   training horses, managing horses.  He's involved in horse-related

11:31:35   2   activity.  You know that?

11:31:36   3   A.   Correct.

11:31:37   4   Q.   And that much of the evidence in this case deals with paying

11:31:44   5   expenses and costs associated with quarter horse racing?

11:31:51   6   A.   Correct.

11:31:51   7   Q.   Okay.  And then, after getting the e-mail from

11:32:02   8   horses.quarter, later that evening, Fernando Garcia replies,

11:32:07   9   where do I go?  When?  And this is to come by for expenses and

11:32:12   10   instructions, correct?

11:32:13   11   A.   Yeah.  Correct.

11:32:19   12   Q.   And then, the reply to that e-mail, which I presume we

11:32:31   13   believe is at April 4th at 5:24 in the morning is the top e-mail,

11:32:36   14   which says, over here where I am, sweetie, on the border.  So as

11:32:40   15   to give you a phone and some instructions.  Sweetie, I need you

11:32:45   16   to send me all of the registrations.  I'm being asked for them.

11:32:49   17   Please let me know what's up.  Correct?

11:32:53   18   A.   Yes.  That that's --

11:32:57   19   Q.   Now, from your investigation and your participation in this

11:32:59   20   investigation, you know that registrations in this case can refer

11:33:03   21   to the certificates of registration for quarter horses?

11:33:07   22   A.   Yeah.  From what I understand on the registrations, it says

11:33:10   23   the lineage of the horse and who owns it.

11:33:15   24   Q.   And it seemed to be important in the racing business to know

11:33:18   25   this or to prove that?

| | | |
|---|---|---|
| 11:33:19 | 1 | A.    Yeah.  It's very important. |
| 11:33:20 | 2 | Q.    Okay.  Now, and, again, the second tab on this exhibit, |
| 11:33:29 | 3 | which is 358 Echo -- one second.  If I'm doing it correctly, it |
| 11:33:43 | 4 | appears that this is an e-mail dated 3-31-12 and here, they're |
| 11:33:52 | 5 | not using a 24-hour clock.  It's 4:33 p.m., correct? |
| 11:33:55 | 6 | A.    Yes, sir. |
| 11:33:56 | 7 | Q.    And that's, again, from horses.quarter to Fernando Garcia? |
| 11:34:00 | 8 | A.    Yes, sir. |
| 11:34:01 | 9 | Q.    The next page is in Spanish but the second page after it. |
| 11:34:17 | 10 | Now, the top, it has an address for the Ibarra Ranch in Laredo? |
| 11:34:25 | 11 | A.    Yes, sir. |
| 11:34:33 | 12 | Q.    And this is an e-mail from this quarter.horses saying, |
| 11:34:38 | 13 | Shaman told me you should toss your cell and destroy everything |
| 11:34:41 | 14 | else that was theirs.  Get rid of your face on your computer. |
| 11:34:50 | 15 | And that's a message that was sent to Fernando Garcia? |
| 11:34:54 | 16 | A.    From the best of my knowledge, that's what it said when I |
| 11:34:57 | 17 | received it.  It's sent from and to. |
| 11:35:00 | 18 | Q.    But in reply -- make sure I'm not confusing this.  Okay. |
| 11:35:17 | 19 | I'm sorry.  I get out of order. |
| 11:35:20 | 20 | The reply from the earlier e-mail from Fernando Garcia |
| 11:35:26 | 21 | to horses.quarter was okay, fine.  Send me the address to which I |
| 11:35:30 | 22 | should send you the registrations.  Things pending.  That's the |
| 11:35:35 | 23 | e-mail from Fernando to horses.quarter. |
| 11:35:40 | 24 | A.    Yes.  It's from Fernando to horses.quarter. |
| 11:35:43 | 25 | Q.    And that's the message? |

| | | |
|---|---|---|
| 11:35:43 | 1 | A.   That's how I read it. |
| 11:35:45 | 2 | Q.   And then, the reply was, Laredo ranch Ibarra with an address |
| 11:35:51 | 3 | and toss your cell, destroy everything, right? |
| 11:35:55 | 4 | A.   Yes, sir. |
| 11:35:56 | 5 | Q.   Which we know wasn't done. |
| 11:35:58 | 6 | A.   Correct. |
| 11:36:00 | 7 | Q.   358 Delta or D is the -- these are e-mails.  It's a thick |
| 11:36:20 | 8 | stack of them on the account of Fernando Garcia? |
| 11:36:25 | 9 | A.   That's correct. |
| 11:36:39 | 10 | Q.   And it has e-mails from Papalotes@mcanales.com.  Do we know |
| 11:36:54 | 11 | who Papalotes is? |
| 11:36:55 | 12 | A.   Yes, sir. |
| 11:36:55 | 13 | Q.   Who is that? |
| 11:36:56 | 14 | A.   Jose Luis Canales. |
| 11:36:58 | 15 | Q.   Okay.  And so, if I'm doing it correctly, the first page or |
| 11:37:10 | 16 | where the first tab is, it looks like four tabs on this exhibit, |
| 11:37:14 | 17 | correct? |
| 11:37:14 | 18 | A.   I could only see three and a half. |
| 11:37:16 | 19 | Q.   Well, yeah.  Okay.  So there's three and there's a fourth |
| 11:37:18 | 20 | tab that's folded or something? |
| 11:37:20 | 21 | A.   Oh, yes, sir. |
| 11:37:20 | 22 | Q.   Okay.  And the first tab is an e-mail from Fernando Garcia |
| 11:37:36 | 23 | to Jane Eckert? |
| 11:37:37 | 24 | A.   Yes, sir. |
| 11:37:40 | 25 | Q.   And you don't know Jane Eckert, do you? |

| 11:37:42 | 1 | A.   I've never met her. |
| 11:37:43 | 2 | Q.   Okay.  But you know she's with Heritage Place.  Did you know |
| 11:37:48 | 3 | that? |
| 11:37:48 | 4 | A.   Yeah.  I knew that. |
| 11:37:49 | 5 | Q.   Okay.  And that's a horse auction? |
| 11:37:52 | 6 | A.   Yes, sir. |
| 11:37:53 | 7 | Q.   In Oklahoma City? |
| 11:37:54 | 8 | A.   Yes, sir. |
| 11:37:55 | 9 | Q.   Okay.  And so, this is an e-mail from Fernando to Jane |
| 11:37:59 | 10 | Eckert on March 2nd, 2012? |
| 11:38:03 | 11 | A.   Yes, sir. |
| 11:38:04 | 12 | Q.   At about 11:00 at night? |
| 11:38:06 | 13 | A.   Yes, sir. |
| 11:38:11 | 14 | Q.   And what had happened here is that someone named Papalotes |
| 11:38:25 | 15 | -- you told us his name.  I forgot it -- was Jose somebody? |
| 11:38:27 | 16 | A.   Luis Canales. |
| 11:38:28 | 17 | Q.   Jose Luis Canales had sent to Fernando Garcia deposit slips |
| 11:38:34 | 18 | totaling $51,700, correct? |
| 11:38:38 | 19 | A.   Yes, sir. |
| 11:38:38 | 20 | Q.   And he has a little e-mail string here that says from |
| 11:38:47 | 21 | cnb@mcanales.com, sent that day, 20 minutes earlier to Jose Luis. |
| 11:38:56 | 22 | That says, subject, attached images, correct? |
| 11:39:01 | 23 | A.   Yes, sir. |
| 11:39:02 | 24 | Q.   And the attached images are deposit slips into a bank |
| 11:39:06 | 25 | account with the Bank of America? |

| | | |
|---|---|---|
| 11:39:07 | 1 | A.   Yes, sir. |
| 11:39:09 | 2 | Q.   And if you add them up, they total $51,700? |
| 11:39:15 | 3 | A.   Correct. |
| 11:39:22 | 4 | Q.   And then, on March 2nd, we have an e-mail from Jane Eckert |
| 11:39:35 | 5 | to Fernando Garcia and a carbon copy sent to Jeff Tebow, also |
| 11:39:42 | 6 | with Heritage Place, correct? |
| 11:39:44 | 7 | A.   Yes, sir. |
| 11:39:46 | 8 | Q.   And that e-mail asks Fernando, did you ever hear from Carlos |
| 11:39:53 | 9 | when the balance will be paid on these horses?  We're coming up |
| 11:39:57 | 10 | on two months past the sale.  Jeff and the board are getting |
| 11:40:00 | 11 | really impatient.  And that was Jane Eckert with Heritage Place? |
| 11:40:05 | 12 | A.   Yes, sir. |
| 11:40:09 | 13 | Q.   And the earlier e-mail from her to Fernando, carbon copy |
| 11:40:16 | 14 | Jeff Tebow, and this is a February 23rd, 2012, says Fernando, I |
| 11:40:21 | 15 | show a payment of $228,700, which leaves $51,700 still owed.  Can |
| 11:40:28 | 16 | you tell me when that will be paid?  Thanks. |
| 11:40:32 | 17 | A.   Yes, sir. |
| 11:40:33 | 18 | Q.   And you know from this e-mail string that what Fernando did |
| 11:40:37 | 19 | is he received these deposit slips from Papalotes and forwarded |
| 11:40:44 | 20 | them to Jane Eckert showing that here, it's been paid? |
| 11:40:47 | 21 | A.   Correct. |
| 11:40:54 | 22 | Q.   Sir, I have no further questions.  Thank you. |
| 11:40:57 | 23 |      THE COURT:  Mr. Esper. |
| 11:40:57 | 24 | |
| 11:40:58 | 25 | |

|  |  |  |
|---|---|---|
| 11:40:58 | 1 | CROSS-EXAMINATION |
| 11:40:58 | 2 | BY MR. ESPER: |
| 11:41:01 | 3 | Q.   Very briefly, your Honor. |
| 11:41:03 | 4 |          Mr. Johnston, in the course of your investigation, do |
| 11:41:38 | 5 | you know -- and if you don't, simply say so -- whether Mr. |
| 11:41:41 | 6 | Huitron, "Chevo" Huitron is, in fact, literate? |
| 11:41:43 | 7 | A.   I do not know that. |
| 11:41:45 | 8 | Q.   Did you search for any e-mails or e-mail accounts belonging |
| 11:41:48 | 9 | to "Chevo" Huitron? |
| 11:41:51 | 10 | A.   I didn't find any. |
| 11:41:52 | 11 | Q.   You didn't find any? |
| 11:41:53 | 12 | A.   No. |
| 11:41:53 | 13 | Q.   Okay.  Would it be fair to say that by you -- but you did |
| 11:41:57 | 14 | search? |
| 11:41:57 | 15 | A.   I did. |
| 11:41:58 | 16 | Q.   Okay.  And because you didn't find anything, it would be |
| 11:42:01 | 17 | safe to say that he didn't have any. |
| 11:42:03 | 18 | A.   Or I didn't find any. |
| 11:42:06 | 19 | Q.   I think you're pretty good at your job, aren't you, sir? |
| 11:42:09 | 20 | A.   I think I'm pretty good at my job. |
| 11:42:11 | 21 | Q.   Okay.  So you didn't find any for Mr. "Chevo" Huitron, |
| 11:42:15 | 22 | correct? |
| 11:42:15 | 23 | A.   I did not. |
| 11:42:16 | 24 | Q.   Okay.  Now, with respect to those two e-mails that we've |
| 11:42:22 | 25 | seen already about eight times, I'm not going to show them to you |

11:42:25   1   again.  But basically, there are two e-mail accounts.  One is

11:42:28   2   horses.quarter.racing and the other is Fernie004@hotmail.

11:42:34   3   There's apparently an e-mail sent about 8:23 in the morning that

11:42:40   4   says, Huitron says to call.  Do you recall that?

11:42:44   5   A.   Yeah.  Yes, sir.

11:42:45   6   Q.   Now, that's, of course, not a e-mail from "Chevo" Huitron.

11:42:50   7   It's between two other e-mail accounts?

11:42:52   8   A.   Correct.

11:42:52   9   Q.   But basically he's saying, call me, meaning call on the

11:42:55   10  phone?

11:42:55   11  A.   Correct.

11:42:56   12  Q.   Would that be fair to assume?

11:42:57   13  A.   Yes, sir.

11:42:58   14  Q.   Okay.  Then about, I don't know, seems like about five hours

11:43:02   15  later, there's another e-mail correspondence between these two

11:43:09   16  e-mail accounts and it says, Chevo's not answering, correct?

11:43:12   17  A.   Correct.

11:43:13   18  Q.   Okay.  And he's not answering the phone.  Right?

11:43:16   19  A.   That's what --

11:43:18   20  Q.   And that's the only reference in all these e-mails that you

11:43:21   21  see to "Chevo" Huitron, correct?

11:43:22   22  A.   That's not correct.

11:43:23   23  Q.   That's not?

11:43:24   24  A.   No.

11:43:24   25  Q.   You see some other references to him?

11:43:28  1    A.    In that specific string of e-mails or?

11:43:30  2    Q.    Not in that specific string of e-mail.  Do you see other

11:43:33  3    references to him in other e-mails?

11:43:35  4    A.    I have.

11:43:36  5    Q.    Okay.  But in this string, that's the only two?

11:43:39  6    A.    Correct.  In that string, that's all I saw.

11:43:41  7    Q.    And the ones you've seen referencing him, they don't come

11:43:44  8    from any e-mail account belonging to him.

11:43:47  9    A.    They did not.

11:43:48  10   Q.    Okay.  And do you know -- and if you don't, simply say so --

11:43:53  11   whether he even has a computer to your knowledge?

11:43:56  12   A.    I don't know.

11:43:57  13   Q.    Okay.  Now, when you say a person -- and this may be

11:44:03  14   repetitive and I apologize if it is.  People drop cellphones but

11:44:08  15   some people actually keep the same cellphone, correct?

11:44:13  16   A.    I've had my cellphone for very long times.

11:44:15  17   Q.    Yeah.  And do you know -- and if you don't, simply say so --

11:44:18  18   whether or not you made a search to determine whether Mr. "Chevo"

11:44:22  19   Huitron has a cellphone?

11:44:23  20   A.    I didn't.

11:44:24  21   Q.    You did not?

11:44:24  22   A.    Particularly myself, I did not.

11:44:27  23   Q.    Okay.  That was done by some other law enforcement agent,

11:44:30  24   correct?

11:44:30  25   A.    It was a very big case.

| | | |
|---|---|---|
| 11:44:31 | 1 | Q.   I understand.  I think the jury understands that, too.  No |
| 11:44:36 | 2 | further questions. |
| 11:44:36 | 3 | THE COURT:  Mr. Mayr. |
| 11:44:38 | 4 | MR. MAYR:  Thank you, your Honor. |
| 11:44:39 | 5 | CROSS-EXAMINATION |
| 11:44:39 | 6 | BY MR. MAYR: |
| 11:44:44 | 7 | Q.   Agent Johnston, I'm going to ask you a similar question.  Do |
| 11:44:47 | 8 | you know if my client Jesus Huitron, whether he has an e-mail |
| 11:44:50 | 9 | account? |
| 11:44:51 | 10 | A.   I do not know. |
| 11:44:52 | 11 | Q.   Okay.  Did you search to find if he has an e-mail account? |
| 11:44:57 | 12 | A.   I didn't find any on the e-mails that I had in response. |
| 11:45:01 | 13 | And, again, I didn't search for his. |
| 11:45:04 | 14 | Q.   Would it be possible that he doesn't have an e-mail account? |
| 11:45:07 | 15 | A.   That's correct. |
| 11:45:08 | 16 | Q.   Okay.  Now, we did see some e-mails -- let me ask you this. |
| 11:45:14 | 17 | In going through all these 16,000 e-mails.  Did you ever see any |
| 11:45:18 | 18 | reference to Jesus Huitron? |
| 11:45:21 | 19 | A.   I didn't. |
| 11:45:23 | 20 | Q.   Did not.  Okay.  Government's Exhibit 71.  There appears to |
| 11:45:49 | 21 | be some different writing, different addresses.  Nothing that |
| 11:45:54 | 22 | shows any sort of consistent trainer -- there's nothing |
| 11:45:59 | 23 | consistent about this piece of paper.  It's just sort of like a |
| 11:46:01 | 24 | scratch piece of paper with different things written on it.  Is |
| 11:46:04 | 25 | that fair to say? |

| | | |
|---|---|---|
| 11:46:06 | 1 | A.   Can you repeat that question? |
| 11:46:07 | 2 | Q.   Sure.  That was my fault.  I'm sorry. |
| 11:46:10 | 3 | Let me just show it to you so you could see it more |
| 11:46:14 | 4 | carefully.  It doesn't appear that this first page is talking |
| 11:46:20 | 5 | strictly about horses, or painting, or any sort of -- one |
| 11:46:26 | 6 | particular topic; is that right? |
| 11:46:37 | 7 | A.   No.  There's e-mail addresses, phone numbers, there's a link |
| 11:46:43 | 8 | to a painting, user name, txusa_huitronpainting might be for a |
| 11:46:52 | 9 | computer or something.  This is -- but I don't see anything |
| 11:46:54 | 10 | besides Huitron Painting that would say it's -- I don't see |
| 11:46:59 | 11 | anything on here that has anything to do with horses besides the |
| 11:47:04 | 12 | associated e-mail addresses. |
| 11:47:05 | 13 | Q.   Okay.  Fair enough. |
| 11:47:06 | 14 | Now, as far as the rest of 71, Mr. Womack asked you |
| 11:47:14 | 15 | about this, but I'd just like to show it.  The second page, do |
| 11:47:24 | 16 | you see something like it says -- there's an address 2820 Amber |
| 11:47:29 | 17 | Valley Lane, right? |
| 11:47:30 | 18 | A.   Yes, sir. |
| 11:47:30 | 19 | Q.   Paint interior? |
| 11:47:32 | 20 | A.   Yes, sir. |
| 11:47:32 | 21 | Q.   Date.  There's a date right next to it right there, 4-8? |
| 11:47:39 | 22 | A.   No.  That looks like it's either a date or how much hours |
| 11:47:42 | 23 | they spent there at the facility. |
| 11:47:46 | 24 | Q.   Fair enough.  Or time.  Sure.  And we're not going to go |
| 11:47:49 | 25 | through each one of these, but we've got one, two, three, four, |

| | | |
|---|---|---|
| 11:48:02 | 1 | five, six, seven, eight, nine, ten, eleven, twelve, thirteen, |
| 11:48:18 | 2 | fourteen, fifteen, sixteen, seventeen, eighteen, nineteen, |
| 11:48:25 | 3 | twenty, twenty-one, twenty-two pages with identical inscriptions, |
| 11:48:32 | 4 | if you would, right? |
| 11:48:35 | 5 | A.   Looks like a ledger. |
| 11:48:36 | 6 | Q.   Right. |
| 11:48:37 | 7 | A.   Inscriptions, I wouldn't say that.  But it looks like a |
| 11:48:41 | 8 | ledger. |
| 11:48:42 | 9 | Q.   Related to painting? |
| 11:48:43 | 10 | A.   Painting. |
| 11:48:43 | 11 | Q.   Okay.  I have no further questions for this witness at this |
| 11:48:54 | 12 | time, your Honor. |
| 11:48:54 | 13 | THE COURT:  Any direct? |
| 11:48:55 | 14 | MR. GARDNER:  Yes, your Honor. |
| 11:48:57 | 15 | THE COURT:  About how long? |
| 11:49:00 | 16 | MR. GARDNER:  It might go past the noon hour, your |
| 11:49:02 | 17 | Honor. |
| 11:49:02 | 18 | THE COURT:  Okay.  Mark your place.  Members of the |
| 11:49:04 | 19 | jury, I'm going to let you eat today.  May not get barbecue, but |
| 11:49:09 | 20 | times are hard.  Remember the instructions.  Be ready to work at |
| 11:49:13 | 21 | 1:20. |
| 11:49:52 | 22 | (Jury not present.) |
| 11:49:58 | 23 | THE COURT:  You may be seated.  Bring Mr. Guadalajara |
| 11:50:01 | 24 | back in. |
| 11:50:01 | 25 | MR. FINN:  Judge, while they're doing that, can I bring |

| | | |
|---|---|---|
| 11:50:03 | 1 | something up quickly? |
| 11:50:04 | 2 | THE COURT:  Sure.  You may step down, sir. |
| 11:50:07 | 3 | MR. FINN:  The government was kind enough to provide me |
| 11:50:09 | 4 | with about ten pages of documents regarding seizure of various |
| 11:50:12 | 5 | evidence at my client's farm, at his house in Dallas, et cetera. |
| 11:50:17 | 6 | But at the bottom of every single page, the name of the agent |
| 11:50:21 | 7 | that it was received by is blacked out or redacted.  I've been |
| 11:50:26 | 8 | requesting that the government give me an unredacted copy of |
| 11:50:29 | 9 | these documents so I know who to question if I have any |
| 11:50:33 | 10 | questions.  As it stands now, I don't know who to ask the |
| 11:50:36 | 11 | questions of. |
| 11:50:37 | 12 | Mr. Gardner's position is, why do I need to know? |
| 11:50:40 | 13 | Because we've stipulated to the evidence.  That is true.  But I |
| 11:50:44 | 14 | still need to know who these agents are so I could ask |
| 11:50:46 | 15 | intelligent questions and not waste everyone's time by asking |
| 11:50:50 | 16 | every single witness, are you the one that prepared this?  I |
| 11:50:53 | 17 | think it's a reasonable request. |
| 11:50:56 | 18 | MR. GARDNER:  Your Honor, in the stipulation, the only |
| 11:50:58 | 19 | seizing agent that Mr. Finn signed, the only seizing agent is |
| 11:51:03 | 20 | Santiago Moya. |
| 11:51:05 | 21 | MR. FINN:  So Santiago Moya is the only person in the |
| 11:51:08 | 22 | bottom of these? |
| 11:51:10 | 23 | MR. GARDNER:  Yes.  Who was released based on your |
| 11:51:12 | 24 | agreement to stipulate. |
| 11:51:14 | 25 | MR. FINN:  Okay.  Well, thank you. |

| | | |
|---|---|---|
| 11:51:18 | 1 | THE COURT:  You're welcome.  Glad to accommodate. |
| 11:51:21 | 2 | Bring Mr. Guadalajara in. |
| 11:52:13 | 3 | Mr. Guadalajara, they've got some additional questions |
| 11:52:15 | 4 | they want to ask you.  Remember you're still under oath to tell |
| 11:52:18 | 5 | the truth.  Do you understand? |
| 11:52:19 | 6 | THE WITNESS:  Yes, sir. |
| 11:52:19 | 7 | THE COURT:  All right. |
| 11:52:21 | 8 | RE-CROSS EXAMINATION |
| 11:52:21 | 9 | BY MR. ESPER: |
| 11:52:33 | 10 | Q.   Mr. Guadalajara, you testified that you were interviewed by |
| 11:52:39 | 11 | Agent Lawson and there were some other agents in the room with |
| 11:52:42 | 12 | you back in November, about a year and a half ago. |
| 11:52:47 | 13 | A.   Yes, sir. |
| 11:52:47 | 14 | Q.   Here in San Antone? |
| 11:52:49 | 15 | A.   Yes, sir. |
| 11:52:50 | 16 | Q.   And do you recognize any of the other agents that were in |
| 11:52:52 | 17 | the room? |
| 11:52:52 | 18 | A.   Yes, sir. |
| 11:52:53 | 19 | THE COURT:  We're not in San Antonio. |
| 11:52:56 | 20 | MR. ESPER:  Pardon me? |
| 11:52:56 | 21 | THE COURT:  We're not in San Antonio.  The interview |
| 11:52:58 | 22 | may have been in San Antonio. |
| 11:52:59 | 23 | Q.   (BY MR. ESPER) I'm sorry, the interview was in San Antonio? |
| 11:53:03 | 24 | A.   Correct. |
| 11:53:03 | 25 | Q.   Not in Austin? |

| | | |
|---|---|---|
| 11:53:04 | 1 | A.   Not in Austin. |
| 11:53:05 | 2 | Q.   And do you recognize any of the other agents in this |
| 11:53:07 | 3 | courtroom that were present in that room? |
| 11:53:09 | 4 | A.   Yes, sir. |
| 11:53:09 | 5 | Q.   Who? |
| 11:53:10 | 6 | A.   Those two. |
| 11:53:11 | 7 | Q.   Okay.  That's Mr. Lawson in the back, correct? |
| 11:53:13 | 8 | A.   Yes. |
| 11:53:14 | 9 | Q.   This is Mr. Pennington, correct? |
| 11:53:16 | 10 | A.   Yes, sir. |
| 11:53:16 | 11 | Q.   There were some other agents there, correct? |
| 11:53:18 | 12 | A.   Yes, sir. |
| 11:53:19 | 13 | Q.   Okay.  You just don't see them here in the courtroom? |
| 11:53:24 | 14 | A.   No, sir, now. |
| 11:53:32 | 15 | Q.   Now, Mr. Guadalajara, this is a report that you've never |
| 11:53:34 | 16 | seen, correct? |
| 11:53:35 | 17 | A.   Yes, sir. |
| 11:53:36 | 18 | Q.   You have or have not seen? |
| 11:53:37 | 19 | A.   No.  I never seen that one. |
| 11:53:39 | 20 | Q.   The question was clumsily asked.  You've never seen this |
| 11:53:44 | 21 | report, have you? |
| 11:53:45 | 22 | A.   No, sir. |
| 11:53:45 | 23 | Q.   But it's got a date of November 1st, 2011 and basically it |
| 11:53:50 | 24 | says that you're there.  This is your name, correct? |
| 11:53:52 | 25 | A.   Yes, sir. |

| | | |
|---|---|---|
| 11:53:53 | 1 | Q.   And these are the agents who are interviewing you and it's |
| 11:53:55 | 2 | about a two- or three-page report.  I'm just showing this to you, |
| 11:54:01 | 3 | okay?  Now, I'm going to direct your attention to this one little |
| 11:54:03 | 4 | paragraph here that has a pink star and it's highlighted.  Can |
| 11:54:08 | 5 | you read that? |
| 11:54:09 | 6 | A.   Cuellar has several horses in Mexico and in the United |
| 11:54:13 | 7 | States.  Mamito also owned horses and had a ranch in Reynosa, |
| 11:54:19 | 8 | Tamaulipas.  Huitron was a trainer from Austin, Texas who trains |
| 11:54:22 | 9 | Miguel's horses.  Guia met Huitron once in Mexico who also have |
| 11:54:30 | 10 | horses in Mexico. |
| 11:54:30 | 11 | Q.   Okay.  Now, that's what you told them about "Chevo" Huitron? |
| 11:54:33 | 12 | A.   Yes, sir. |
| 11:54:34 | 13 | Q.   Correct? |
| 11:54:34 | 14 | A.   Yes, sir. |
| 11:54:35 | 15 | Q.   Now, you testified on cross-examination -- I mean, on direct |
| 11:54:40 | 16 | examination that -- and when I asked you on cross-examination, |
| 11:54:43 | 17 | you said you told them a lot of other things about Mr. "Chevo" |
| 11:54:47 | 18 | Huitron, correct? |
| 11:54:48 | 19 | A.   Yes, sir. |
| 11:54:49 | 20 | Q.   But that's not -- but in this report, that's all that is |
| 11:54:53 | 21 | reported by the agents as you're telling them, correct? |
| 11:54:57 | 22 | A.   Yes, sir. |
| 11:54:57 | 23 | Q.   So when I show you this report, that statement right here is |
| 11:55:04 | 24 | not totally consistent with what you testified to here in court, |
| 11:55:08 | 25 | is it? |

| 11:55:08 | 1 | A.   Yes, sir. |
| 11:55:09 | 2 | Q.   It's not accurate.  Is that what you're saying? |
| 11:55:12 | 3 | A.   No, sir.  It's not accurate. |
| 11:55:14 | 4 | Q.   It's not accurate? |
| 11:55:15 | 5 | A.   Yes, sir. |
| 11:55:16 | 6 | Q.   Okay.  That's all I have, your Honor. |
| 11:55:21 | 7 | THE COURT:  Do you wish any questions? |
| 11:55:23 | 8 | MR. GARDNER:  No, your Honor. |
| 11:55:25 | 9 | MR. ESPER:  Your Honor, I would, for the record, renew |
| 11:55:27 | 10 | my request to cross-examine him on that issue, your Honor. |
| 11:55:33 | 11 | THE COURT:  Is the information contained in the report |
| 11:55:37 | 12 | not true? |
| 11:55:40 | 13 | THE WITNESS:  It was true there. |
| 11:55:43 | 14 | THE COURT:  So it's just not complete as to what you |
| 11:55:46 | 15 | say you've told the agents. |
| 11:55:48 | 16 | THE WITNESS:  Yes, sir. |
| 11:55:49 | 17 | THE COURT:  The objection remains overruled.  We're in |
| 11:55:53 | 18 | recess until 1:20. |
| 11:56:46 | 19 | (Lunch recess.) |
| 13:21:57 | 20 | (Jury present.) |
| 13:22:34 | 21 | THE COURT:  Members of the jury, since you left before |
| 13:22:40 | 22 | noon and until the present time, has anybody attempted to talk to |
| 13:22:44 | 23 | you about this case? |
| 13:22:45 | 24 | JURORS:  No. |
| 13:22:46 | 25 | THE COURT:  Have you talked to anyone about the case? |

| | | |
|---|---|---|
| 13:22:48 | 1 | JURORS:  No. |
| 13:22:49 | 2 | THE COURT:  And have you learned anything at all about |
| 13:22:50 | 3 | the case, outside the presence of each other in this courtroom? |
| 13:22:53 | 4 | JURORS:  No. |
| 13:22:54 | 5 | THE COURT:  I didn't get the answer. |
| 13:23:06 | 6 | THE JUROR:  No, sir.  Too quiet. |
| 13:23:09 | 7 | THE COURT:  It's a blessing sometimes. |
| 13:23:13 | 8 | All right.  Mr. Johnston, you understand you're still |
| 13:23:15 | 9 | under oath? |
| 13:23:16 | 10 | THE WITNESS:  Yes, sir. |
| 13:23:16 | 11 | THE COURT:  You may proceed. |
| 13:23:19 | 12 | RE-DIRECT EXAMINATION |
| 13:23:19 | 13 | BY MR. GARDNER: |
| 13:23:21 | 14 | Q.  Special Agent Johnston, before lunch, you were obviously |
| 13:23:23 | 15 | questioned on various -- let's just go down on what Mr. Finn |
| 13:23:25 | 16 | started about. |
| 13:23:26 | 17 | Do you often find people involved in criminal |
| 13:23:28 | 18 | activities with more than one phone? |
| 13:23:29 | 19 | A.  Yes, sir. |
| 13:23:30 | 20 | Q.  And would you kind of explain to the jury -- let's use Mr. |
| 13:23:35 | 21 | Finn's example of a person with a phone for many years.  What do |
| 13:23:39 | 22 | they use that phone for? |
| 13:23:41 | 23 | A.  General conversation, friends, family. |
| 13:23:44 | 24 | Q.  And do they, I'll say, cross-pollinate with criminal |
| 13:23:49 | 25 | activity? |

13:23:49  1   A.   No.   Usually from what I've seen in the past, they'll have a
13:23:52  2   work phone.  And when I say work phone, I mean a phone that
13:23:55  3   they're going to use for criminal activity.  And they'll have a
13:23:57  4   phone that they use for friends, family, coworkers.
13:24:03  5   Q.   I'm turning to what Mr. Womack talked to you about.  Here in
13:24:12  6   Government's Exhibit 358E.  E-mail, April 4th, 2012, 5:24 a.m.
13:24:24  7   Mr. Womack talked to you about, I need you to send me all the
13:24:28  8   registrations on the border.  Mr. Womack gave you one
13:24:32  9   interpretation that he was only asking about horse business.
13:24:41  10          Based on your investigation in this case, do you have
13:24:43  11  another interpretation?
13:24:45  12  A.   Yes.  I believe that the ownership, the true owners were
13:24:49  13  asking for the registration back for the horses.
13:24:51  14  Q.   Okay.  And is that significant in conjunction with the date?
13:24:57  15  A.   Yes.  That date is four or five days following the Los
13:25:06  16  Alamitos law enforcement action.
13:25:11  17  Q.   And Mr. Womack went into a long series of questions about
13:25:18  18  Fernando Garcia having the same computer being inconsistent.
13:25:23  19  Here, I'm showing you an e-mail dated 4-5 of '12 at 12:41.  Does
13:25:33  20  it indicate here at least he was conducting consistent activity
13:25:36  21  based on your opinion of other investigations?
13:25:38  22  A.   Yeah.  He writes down here, I'll get a new one soon and add
13:25:43  23  you and by add you, he means has BlackBerry.  You have to add
13:25:47  24  somebody prior to making contact with them.  They have to accept
13:25:49  25  you.  It's kind of like instant message or Facebook friend.

| | | |
|---|---|---|
| 13:25:53 | 1 | Q.   And that's consistent with the other e-mails the jury's seen |
| 13:25:57 | 2 | multiple times? |
| 13:25:58 | 3 | A.   Yes, sir. |
| 13:25:58 | 4 | Q.   And I believe Mr. Womack showed you that was new were the |
| 13:26:05 | 5 | e-mails from Government's Exhibit 358D, Fernie@hotmail.com, and |
| 13:26:12 | 6 | this is an e-mail from Jane Eckert.  Just for the record, date of |
| 13:26:24 | 7 | e-mail is February 23rd, 2012.  Shows a payment of $228,000, |
| 13:26:29 | 8 | which leaves $51,700 still owed, correct? |
| 13:26:34 | 9 | A.   Yes, sir. |
| 13:26:34 | 10 | Q.   Then we talk about Carlos.  Do you believe that refers to |
| 13:26:38 | 11 | Carlos Nayen? |
| 13:26:38 | 12 | A.   Yes, sir.  Carlos Nayen. |
| 13:26:39 | 13 | Q.   And what Mr. Womack showed you was a series of these bank |
| 13:26:46 | 14 | receipts.  Did you have a chance to review those bank receipts |
| 13:26:51 | 15 | over the lunch hour? |
| 13:26:52 | 16 | A.   Yes, sir, I did. |
| 13:26:53 | 17 | Q.   And would you agree with me that there's eight of them |
| 13:26:57 | 18 | there? |
| 13:26:57 | 19 | A.   Yes, sir. |
| 13:26:58 | 20 | Q.   And did you have an opportunity to review not only the dates |
| 13:27:01 | 21 | but the times and the amounts? |
| 13:27:03 | 22 | A.   Yes, sir. |
| 13:27:04 | 23 | Q.   Of those? |
| 13:27:06 | 24 | A.   I'm sorry. |
| 13:27:12 | 25 | Q.   I'm showing you what has been prepared as Government's |

| | | |
|---|---|---|
| 13:27:15 | 1 | Exhibit 422.  Is that just a handwritten summary of those |
| 13:27:20 | 2 | particular deposits? |
| 13:27:21 | 3 | A.   Correct. |
| 13:27:24 | 4 | Q.   Your Honor, I'll offer 422 for demonstrative purposes. |
| 13:27:30 | 5 | THE COURT:   422 is received as a demonstrative exhibit. |
| 13:27:36 | 6 | MR. WOMACK:   No objections. |
| 13:27:38 | 7 | Q.   (BY MR. GARDNER) And would you agree with me, Special Agent, |
| 13:27:47 | 8 | that these deposits occurred over a three-day time period? |
| 13:27:51 | 9 | A.   Yes, sir. |
| 13:27:52 | 10 | Q.   And these are the actual time of day of the deposits? |
| 13:27:54 | 11 | A.   Yes, sir. |
| 13:27:55 | 12 | Q.   And would you agree with me the amount of these deposits are |
| 13:28:00 | 13 | $9,900? |
| 13:28:01 | 14 | A.   Yes, sir. |
| 13:28:01 | 15 | Q.   Are any of the deposits over $10,000? |
| 13:28:03 | 16 | A.   No, sir.  They are not. |
| 13:28:05 | 17 | Q.   In your training and experience, what is that consistent |
| 13:28:09 | 18 | with? |
| 13:28:09 | 19 | A.   Structured deposits. |
| 13:28:11 | 20 | Q.   And so, whenever you see this e-mail from Mr. Canales sent |
| 13:28:27 | 21 | to Jose Luis and then, forwarded to Fernando and then, following |
| 13:28:35 | 22 | that is forwarded to Jane Eckert, based on the results of the |
| 13:28:44 | 23 | investigation, what does that show you? |
| 13:28:45 | 24 | A.   It shows me that Fernando Garcia forwarded structured |
| 13:28:50 | 25 | deposits for payment of horses, which he received from Jose Luis |

| | | |
|---|---|---|
| 13:28:54 | 1 | Canales. |
| 13:28:55 | 2 | Q.   For payment of horses? |
| 13:28:56 | 3 | A.   For payment of horses, correct. |
| 13:28:58 | 4 | Q.   And we know that because it's Jane Eckert at Heritage Place? |
| 13:29:01 | 5 | A.   Yes, sir. |
| 13:29:01 | 6 | Q.   Going back to the e-mail on March 2nd of 2012 from Jane to |
| 13:29:17 | 7 | Fernie, Fernando, I show a payment of $228,700, which leaves a |
| 13:29:23 | 8 | 51,700 still owed.  And that 51,7 is what's contained in |
| 13:29:27 | 9 | Government's Exhibit 422? |
| 13:29:29 | 10 | A.   Correct. |
| 13:29:30 | 11 | Q.   Do you know who paid that amount to Heritage Place? |
| 13:29:36 | 12 | A.   Yes, sir. |
| 13:29:37 | 13 | Q.   Who was that? |
| 13:29:38 | 14 | A.   ADT Petro Servicios. |
| 13:29:44 | 15 | Q.   Have you ever heard of any legitimate business that uses the |
| 13:29:48 | 16 | phrase "toss your cell"? |
| 13:29:52 | 17 | A.   No, sir.  I have not. |
| 13:29:54 | 18 | Q.   Toss your cell. |
| 13:29:59 | 19 | Showing you Government's Exhibit 71, Mr. Mayr went over |
| 13:30:05 | 20 | this with you in some detail about the number of pages -- I |
| 13:30:07 | 21 | believe he said 22 -- that is behind this. |
| 13:30:11 | 22 | A.   Correct. |
| 13:30:12 | 23 | Q.   And all these deal with painting quotes or jobs, correct? |
| 13:30:18 | 24 | A.   Yes, sir. |
| 13:30:19 | 25 | Q.   So is it consistent that these quotes or jobs are part of |

13:30:23   1   the Huitron Homes/Huitron Painting business?

13:30:26   2   A.   Yes, sir.

13:30:28   3   Q.   That's all I have, your Honor.  And I'll tender 422 to the

13:30:46   4   clerk.

13:30:48   5          THE COURT:  Mr. Finn.

13:30:49   6                    RE-CROSS EXAMINATION

13:30:49   7   BY MR. FINN:

13:30:53   8   Q.   Thank you, your Honor.  May it please the Court.  Members of

13:30:55   9   the jury.

13:30:55   10          Agent, Mr. Gardner just asked you about single phones

13:31:01   11   and multiple phones, and you explained in your experience and

13:31:04   12   training, that a crook or somebody up to no good, criminal

13:31:07   13   activity, may have multiple phones and they may use one phone for

13:31:12   14   calling their husband, their wife, kids, or baby-sitter,

13:31:16   15   personal, legitimate communication, and one or more phones to

13:31:22   16   engage in criminal activity, whether it's money laundering, drug

13:31:25   17   conspiracy, things like that.

13:31:27   18          Do you remember that testimony?

13:31:28   19   A.   Yes, sir.

13:31:28   20   Q.   And that's fairly common, isn't it?

13:31:31   21   A.   Yes, sir.  It is.

13:31:32   22   Q.   In fact, it happens all the time in your experience, right?

13:31:34   23   A.   I wouldn't say all the time, but most of the time, yes, sir.

13:31:37   24   Q.   Okay.  In many cases that you've investigated over your

13:31:41   25   career -- and how long have you been an agent?

| | | |
|---|---|---|
| 13:31:43 | 1 | A.    I've been an agent for a little bit over three years. |
| 13:31:45 | 2 | Q.    Okay.  And you've received training where, at Quantico? |
| 13:31:50 | 3 | A.    Quantico, Virginia, yes. |
| 13:31:52 | 4 | Q.    Okay.  Let me ask you this.  Are you familiar with the fact |
| 13:31:55 | 5 | that there was a raid on Jose Trevino, my client's ranch up in |
| 13:32:00 | 6 | Oklahoma?  You know that, right? |
| 13:32:01 | 7 | A.    Yes, sir, I do. |
| 13:32:01 | 8 | Q.    And they grabbed everything that they could, right? |
| 13:32:04 | 9 | A.    I believe they did. |
| 13:32:06 | 10 | Q.    Yeah.  I mean, they went into cars, they went into trucks, |
| 13:32:10 | 11 | they went into bedrooms.  They looked in the attic.  They looked |
| 13:32:13 | 12 | in the -- I mean, they went all over that place and grabbed |
| 13:32:17 | 13 | anything and everything that might be relevant evidence, right? |
| 13:32:20 | 14 | A.    Yes, sir. |
| 13:32:21 | 15 | Q.    And y'all are trained to grab everything in an abundance of |
| 13:32:26 | 16 | caution so you don't leave any evidence behind, correct? |
| 13:32:29 | 17 | A.    Yes, sir. |
| 13:32:29 | 18 | Q.    For instance, if you guys see a cellphone in the bathroom, |
| 13:32:33 | 19 | you're not going to think, oh, well, maybe it's the wife's or |
| 13:32:36 | 20 | maybe it's the maid's.  You're going to grab it and analyze it, |
| 13:32:40 | 21 | correct? |
| 13:32:40 | 22 | A.    Yes.  As long as the search warrant says we can.  I would |
| 13:32:44 | 23 | take it, yes, sir. |
| 13:32:44 | 24 | Q.    And the search warrant in this case was broad enough that |
| 13:32:47 | 25 | you could grab pretty much anything, right? |

13:32:48  1   A.   I didn't read it myself.  I was in California but.

13:32:52  2   Q.   Would you take my word for it if I said it was pretty broad?

13:32:56  3   A.   Yes, sir, I would.

13:32:57  4   Q.   And y'all were able to grab not only multiple phones, in

13:33:02  5   fact, every single cellphone that you found, but you also grabbed

13:33:05  6   multiple computers and memory sticks, memory cards, hard drives,

13:33:09  7   things of that nature, correct?

13:33:10  8   A.   Yes, sir.

13:33:11  9   Q.   And you did the same thing in any vehicles at the location,

13:33:15  10  correct?

13:33:15  11  A.   I don't know if they did go inside of vehicles.  I think

13:33:19  12  that's a better question for the case agent.

13:33:21  13  Q.   If I represent to you that they not only went into the

13:33:24  14  property but they went into the vehicles on the property, that

13:33:28  15  would be normal, right?

13:33:31  16  A.   Not -- I won't say normal all the time.  But.

13:33:34  17  Q.   In this case.

13:33:35  18  A.   In this case, if the search warrant had that literature or

13:33:37  19  that wording.

13:33:38  20  Q.   Okay.  So y'all grabbed every phone that you can find, every

13:33:41  21  computer that you can find, every memory card or memory stick

13:33:44  22  that you can find, and then you do the same thing at my client's

13:33:50  23  residence just outside of Dallas, Texas; is that correct?

13:33:52  24  A.   Yes, sir.

13:33:53  25  Q.   And in that search, you grabbed every phone, every computer,

| | | |
|---|---|---|
| 13:33:58 | 1 | every memory card, anything and everything that could possibly be |
| 13:34:01 | 2 | relevant to this case, correct? |
| 13:34:03 | 3 | A.    Yes, sir. |
| 13:34:03 | 4 | Q.    And you and the FBI and the Department of Justice analyzed |
| 13:34:08 | 5 | every single phone, computer, memory card, et cetera, correct? |
| 13:34:13 | 6 | A.    I can't testify to every single one, but the case agent from |
| 13:34:18 | 7 | FBI could. |
| 13:34:18 | 8 | Q.    Who would I ask that question to? |
| 13:34:20 | 9 | A.    Special Agent Lawson. |
| 13:34:21 | 10 | Q.    Lawson? |
| 13:34:22 | 11 | A.    Yes, sir. |
| 13:34:22 | 12 | Q.    Okay.  But this was a big case, a big investigation, right? |
| 13:34:26 | 13 | A.    Very big. |
| 13:34:27 | 14 | Q.    So you guys are not going to just let something go to |
| 13:34:30 | 15 | chance, are you? |
| 13:34:32 | 16 | A.    I wouldn't. |
| 13:34:33 | 17 | Q.    Fair enough.  Thank you.  Have a good weekend. |
| 13:34:35 | 18 | A.    Thank you, sir.  You, too. |
| 13:34:39 | 19 |           MR. SANCHEZ:  No questions. |
| 13:34:40 | 20 |           MR. WOMACK:  Briefly, your Honor.  Thank you. |
| 13:34:42 | 21 |                 RE-CROSS EXAMINATION |
| 13:34:42 | 22 | BY MR. WOMACK: |
| 13:34:43 | 23 | Q.    Special Agent Johnston, about the two areas Mr. Gardner |
| 13:34:46 | 24 | asked you related to my client, again, when I asked you about |
| 13:34:49 | 25 | registration as it's referred to in the e-mails, you said in this |

13:34:53  1  case, that meant registration for horses, correct?

13:34:55  2  A.   In this case, yes.

13:34:57  3  Q.   Okay.  And then, when Mr. Gardner got back up and asked you

13:35:00  4  about registration, you said it refers to registration of horses?

13:35:04  5  A.   Correct.

13:35:05  6  Q.   So no difference, correct?

13:35:07  7  A.   I wouldn't say there's no difference.  You asked me in a

13:35:09  8  different way than AUSA Gardner did.

13:35:12  9  Q.   Okay.  But we agree that the registration, when that word is

13:35:15  10 used, it means registration of these race horses, doesn't it?

13:35:19  11 A.   Correct.

13:35:19  12 Q.   And from your investigation and your work with everyone else

13:35:24  13 in this case, you know that if you're the owner of a race horse,

13:35:28  14 the registration is in your name.  You know that if you're the

13:35:32  15 owner?

13:35:32  16 A.   Yeah.  If you're the owner and you want that paperwork

13:35:35  17 that's going to be in your name.

13:35:36  18 Q.   And so, if you hear that ranches, farms, stables, trainers

13:35:46  19 are being arrested or being questioned by the police, things are

13:35:49  20 being taken from them, if you're an owner of a horse, you'd like

13:35:52  21 to have your certificate of title back, wouldn't you?

13:35:54  22 A.   If I was an owner of a horse, I wouldn't let anyone else

13:35:56  23 have my certificate of title.  I would keep it.

13:35:58  24 Q.   Well, if you have someone racing your horse, or whatever,

13:36:01  25 they may need that registration, correct?

13:36:02   1   A.   They may.

13:36:03   2   Q.   Okay.  And my question to you is, if you're the owner of a

13:36:09   3   horse, especially we're talking about high-dollar race horses in

13:36:11   4   this case.

13:36:11   5   A.   Yes, sir.

13:36:12   6   Q.   If you're the owner of a high-dollar race horse, you would

13:36:15   7   like to have -- especially if the police are involved searching

13:36:17   8   people, you would like to have your certificate of registration

13:36:20   9   back, wouldn't you?

13:36:21   10   A.   I would want it.  Yes, sir.

13:36:22   11   Q.   Sure.  Now, other thing was about Exhibit 358 Delta, e-mails

13:36:32   12   where Jane Eckert on behalf of Heritage Place was sending to

13:36:40   13   Fernando Garcia, he had spent two months -- can you find out when

13:36:46   14   they're going to pay for these horses.  You've paid 228,700, you

13:36:52   15   know, they still owed 51,700.  And you know that in response to

13:36:56   16   that, it would look from the e-mail traffic that some Canales --

13:37:05   17   and I forget the name of this Canales sent images to Papalotes.

13:37:10   18   And then, Papalotes forwarded those images of deposit slips

13:37:14   19   directly to Fernando, who we know -- who transferred them

13:37:19   20   directly to Jane Eckert, correct?

13:37:21   21   A.   Yes, sir.

13:37:21   22   Q.   Now, when -- an interesting thing that Mr. Gardner did is he

13:37:27   23   took all these receipts and he added up the figures and totalled

13:37:31   24   it up to $51,700.  Remember that?

13:37:34   25   A.   Yes, sir.

| | | |
|---|---|---|
| 13:37:35 | 1 | Q.   If someone was trying to hide from Heritage Place that |
| 13:37:43 | 2 | people were making structured deposits, they could have done the |
| 13:37:46 | 3 | same thing.  They could have said, oh, here's the total of all |
| 13:37:50 | 4 | payments and just sent in a letter saying it's been paid, |
| 13:37:52 | 5 | correct? |
| 13:37:53 | 6 | A.   Can you rephrase the question?  I don't understand. |
| 13:37:56 | 7 | Q.   Okay.  If, for some reason, I was asked to send a note to |
| 13:38:01 | 8 | Heritage Place saying, hey, the horses are paid for, I could have |
| 13:38:06 | 9 | just sent a note saying the horses are paid for, if you look in |
| 13:38:09 | 10 | your account, there's $51,700.  Instead, what Fernando Garcia did |
| 13:38:15 | 11 | is he actually forwarded the actual receipts, didn't he? |
| 13:38:19 | 12 | A.   They were deposit slips that he -- they weren't -- |
| 13:38:23 | 13 | Q.   I'm saying receipts.  You're correct.  He forwarded the |
| 13:38:26 | 14 | actual deposit slips that had been sent to him.  Correct? |
| 13:38:29 | 15 | A.   Yes.  That's correct. |
| 13:38:29 | 16 | Q.   And we all know that that deposit slip -- those deposit |
| 13:38:34 | 17 | slips have numbers and figures telling the date and time and all |
| 13:38:39 | 18 | kinds of information about those deposits, correct? |
| 13:38:42 | 19 | A.   Yes, sir. |
| 13:38:43 | 20 | Q.   And Fernando Garcia did nothing to disguise those.  He |
| 13:38:47 | 21 | forwarded them directly to Heritage Place, didn't he? |
| 13:38:50 | 22 | A.   He did forward those deposits to Heritage. |
| 13:38:54 | 23 | Q.   Okay.  And he didn't blot out the account number.  He sent |
| 13:39:02 | 24 | the slip just the way they came to him, didn't he? |
| 13:39:04 | 25 | A.   Yeah.  He just forwarded the e-mail just like he had. |

13:39:08  1  Q.   And so, we know the deposits were made over this period of

13:39:11  2  time by someone or someone who's provided them to the Canales

13:39:17  3  that then sent them to Papalotes, who sent them to Fernando to

13:39:21  4  sent to Heritage Place, correct?

13:39:23  5  A.   Yes.  Those deposit slips which were sent to Papalotes were

13:39:29  6  then sent to Jose Luis, which were then sent to your client, and

13:39:32  7  they were sent to pay for horses.

13:39:33  8  Q.   And these were deposit slips that were sent through that

13:39:36  9  chain of people?

13:39:37  10  A.   Yes.  And the deposit slips, they were scanned into his

13:39:41  11  computer and sent.  The originals, they come out in color.

13:39:45  12  Q.   I gotcha.  Thank you.  No further questions.

13:39:48  13          MR. ESPER:  No question, your Honor.

13:39:50  14          MR. MAYR:  No questions, your Honor.

13:39:53  15                     RE-DIRECT EXAMINATION

13:39:53  16  BY MR. GARDNER:

13:39:57  17  Q.   Mr. Womack asked you to draw a conclusion about the

13:39:59  18  registrations.  What conclusion do you draw when you compare the

13:40:04  19  horses.quarter e-mail with the 51,700 payments to Heritage Place

13:40:13  20  again?

13:40:14  21  A.   That the horses which were being paid for were under the

13:40:19  22  true ownership of Los Zetas.

13:40:21  23  Q.   Thank you.  No further questions, your Honor.

13:40:25  24          MR. WOMACK:  Your Honor, I have to ask.

13:40:28  25

```
13:40:28   1                  RE-CROSS EXAMINATION

13:40:28   2   BY MR. WOMACK:

13:40:29   3   Q.   You found registrations in the name of Los Zetas?

13:40:32   4   A.   I didn't find any registrations.

13:40:33   5   Q.   Did -- okay.  Well, you were just asked about it by Mr.

13:40:37   6   Gardner and you said that.  Do you have any document that -- of

13:40:41   7   registration certificate in the name of a Zeta?

13:40:43   8   A.   Those registrations were put under a lot of different straw

13:40:47   9   purchasers' names for Los Zetas.  That's correct.

13:40:51  10   Q.   And that's the conclusion that you're reaching from your

13:40:53  11   work?

13:40:53  12   A.   From the course of this investigation, yes, sir.

13:40:55  13   Q.   Okay.  No further questions.

13:41:00  14              THE COURT:  May the witness be excused?

13:41:02  15              MR. FINN:  No objection.

13:41:03  16              MR. MAYR:  Actually, I do, your Honor.  I'd like to

13:41:05  17   keep the witness on call, have him available if I notify the

13:41:08  18   government for his agent to be recalled.

13:41:11  19              THE COURT:  You're on recall.  You remain under the

13:41:16  20   rule.

13:41:16  21              THE WITNESS:  Thank you, sir.

13:41:17  22              THE COURT:  You may call your next witness.

13:41:18  23              MR. GARDNER:  The government calls Special Agent Billy

13:41:20  24   Williams.

13:41:32  25              (Witness sworn.)
```

13:41:50 1        THE COURT:  Tell us your full name, please, sir, and
13:41:56 2   spell your last.
13:41:57 3        THE WITNESS:  My name is Billy Williams.  It's spelled,
13:42:00 4   W-I-L-L-I-A-M-S.
13:42:02 5        THE COURT:  Mr. Williams, don't speak right into that
13:42:05 6   mic.
13:42:05 7        THE WITNESS:  Okay.  I'm sorry.
13:42:07 8      BILLY WILLIAMS, called by the Government, duly sworn.
13:42:07 9                    DIRECT EXAMINATION
13:42:07 10  BY MR. GARDNER:
13:42:14 11  Q.  Special Agent Williams, could you please introduce yourself
13:42:17 12  to the jury?
13:42:17 13  A.   My name is Billy Williams.  I'm a special agent with the
13:42:20 14  Internal Revenue Service.
13:42:21 15  Q.   And, sir, could you please explain a little bit of your
13:42:23 16  background and experience and education?
13:42:25 17  A.   I received a Bachelor's of Business Administration degree.
13:42:30 18  I have a minor in accounting and a minor in economics.  I've been
13:42:34 19  with the Internal Revenue Service for 21 years, 14 as a revenue
13:42:38 20  agent and seven years as a criminal investigator.
13:42:40 21  Q.   And, sir, what was your area of responsibility in this case?
13:42:44 22  A.   Analyze bank records.  I went through search warrant items,
13:42:49 23  subpoena records, interviewed witnesses, and talked to other
13:42:54 24  agents prior to trial.
13:42:56 25  Q.   And with respect to the financial analysis, what accounts

| | | |
|---|---|---|
| 13:43:00 | 1 | did you analyze? |
| 13:43:01 | 2 | A.    I analyzed the Huitron accounts, Fernando Garcia's accounts, |
| 13:43:06 | 3 | Garcia Bloodstock's, Victor Lopez, and Bonanza Racing Stables. |
| 13:43:11 | 4 | Q.    And, again, the jury's heard a little bit about it, but |
| 13:43:16 | 5 | what's the purpose of your financial analysis? |
| 13:43:18 | 6 | A.    To determine the currency that went through each of these |
| 13:43:21 | 7 | accounts. |
| 13:43:22 | 8 | Q.    Now, the jury has seen a form by Ms. Eckert from Heritage |
| 13:43:27 | 9 | Place off of Form 8300.  I'm showing you what has been marked as |
| 13:43:30 | 10 | a demonstrative exhibit, Government's 420.  Do you recognize |
| 13:43:33 | 11 | that, sir? |
| 13:43:34 | 12 | A.    Yes, sir, I do. |
| 13:43:35 | 13 | Q.    Is that the same form that Ms. Eckert showed the jury |
| 13:43:38 | 14 | yesterday? |
| 13:43:39 | 15 | A.    No.  She would have -- this is 8300.  This is Form 104, |
| 13:43:44 | 16 | currency Transaction Report. |
| 13:43:46 | 17 | Q.    It's a different form? |
| 13:43:47 | 18 | A.    Yes. |
| 13:43:48 | 19 | Q.    Okay.  Your Honor, I offer Government's Exhibit 420 for |
| 13:43:55 | 20 | demonstrative aid. |
| 13:44:04 | 21 | THE COURT:  420 as a demonstrative exhibit is admitted. |
| 13:44:12 | 22 | Q.    (BY MR. GARDNER) Again, Special Agent Williams, you said |
| 13:44:14 | 23 | this is a Currency Transaction Report. |
| 13:44:17 | 24 | A.    Yes, it is. |
| 13:44:18 | 25 | Q.    Form 104.  How does this form differ from what Ms. Eckert |

13:44:28  1  showed us yesterday, Form 8300?

13:44:30  2  A.    Form 8300, that is normally filled out if a -- like a trade

13:44:35  3  or a business like a car lot receives over $10,000 in one or more

13:44:39  4  transactions.  And a Currency Transaction Report is when a bank,

13:44:43  5  a financial institution receives over $10,000 in one or more

13:44:48  6  transactions.

13:44:48  7  Q.    And I just want to go over this section with you briefly.

13:44:55  8  So what's this section for?

13:44:57  9  A.    Section A is for the individual, say, just myself.  If

13:45:02  10  that's my account, that would list me as the individual in that

13:45:08  11  area if I deposited over $10,000 in one or more transactions.

13:45:12  12  Q.    So let's say I had a guy and his name was Steve Law.  Would

13:45:22  13  that money be accounted -- deposited to that individual's

13:45:25  14  account?

13:45:25  15  A.    Yes, sir.

13:45:30  16  Q.    What's Section B for?

13:45:32  17  A.    Section B is for, say, another individual makes a deposit on

13:45:37  18  behalf of the person in Section A, their name would be on Section

13:45:42  19  B.

13:45:43  20  Q.    So let's say I name this guy Scott Penn.  So tell me, let's

13:45:54  21  say I had $10,000.  How does Scott Penn relate to Steve Law?

13:45:58  22  A.    In that case, they are associated with each other because A

13:46:03  23  would have to give B their bank account information, the right

13:46:09  24  number and account number to make that deposit.

13:46:10  25  Q.    So how does the bank obtain all the information in A and in

| | | |
|---|---|---|
| 13:46:17 | 1 | B? |
| 13:46:18 | 2 | A.    They would receive information from each of those |
| 13:46:22 | 3 | individuals. |
| 13:46:23 | 4 | Q.    So the individual making the deposits provides the |
| 13:46:27 | 5 | information? |
| 13:46:27 | 6 | A.    Yes. |
| 13:46:27 | 7 | Q.    And how do they provide the information? |
| 13:46:29 | 8 | A.    You provide driver's license.  As you see on line 14, they |
| 13:46:33 | 9 | would get it from those information. |
| 13:46:44 | 10 | Q.    So the bank requires a method that the individual used to |
| 13:46:48 | 11 | identify, correct? |
| 13:46:49 | 12 | A.    Yes. |
| 13:46:50 | 13 | Q.    And it says in A, driver's license, B, passport, C, alien |
| 13:46:55 | 14 | registration, or D, other? |
| 13:46:58 | 15 | A.    Yes. |
| 13:47:02 | 16 | Q.    And what does the bank do with one of these once they filled |
| 13:47:06 | 17 | it out? |
| 13:47:07 | 18 | A.    They will send it to what they call a FinCEN, which is the |
| 13:47:11 | 19 | national database and they keep track of all those. |
| 13:47:15 | 20 | Q.    Keep track for investigative purposes? |
| 13:47:20 | 21 | A.    Yes. |
| 13:47:20 | 22 | Q.    Or database track? |
| 13:47:22 | 23 | A.    Yes. |
| 13:47:23 | 24 | Q.    Could you please tell the jury what structuring is? |
| 13:47:25 | 25 | A.    Structuring is when an individual makes -- like, tries to |

13:47:33  1   make a deposit in increments of less than $10,000 to a financial

13:47:37  2   institution to make them fail to file this Form 104.

13:47:44  3   Q.   So if I give you an example, hypothetically, if I take

13:47:48  4   $90,000 in income, how could I structure that money?

13:47:54  5   A.   You would deposit 9,000 at one bank, 9,000 at another, or

13:47:59  6   come back later to the same bank, or you could go to different

13:48:02  7   banks to make that deposit.

13:48:05  8   Q.   What if I wanted to deposit that whole $90,000 at one time?

13:48:09  9   Is that a criminal act?

13:48:10  10  A.   No.  There's no problem with depositing $10,000 cash.

13:48:16  11  Q.   Let's say I take that $90,000 that I've earned from

13:48:21  12  legitimate income and I've structured it.  Do I commit a crime?

13:48:24  13  A.   Yes, you have.  You have committed violation of structuring,

13:48:28  14  Title 21, 5324.

13:48:31  15  Q.   Based on your training and experience, could you give the

13:48:34  16  ladies and gentlemen of the jury some of the indicators of

13:48:36  17  criminal activity that you look for in a financial analysis?

13:48:39  18  A.   When you do a financial analysis, you look for different

13:48:43  19  ways that they conceal the income in different accounts, the

13:48:49  20  change in their business practice.  We'll just take one of the

13:48:55  21  instances.  The Huitrons, they have separate accounts, Huitron

13:48:57  22  Homes, Huitron Painting, and they have certain activity going

13:49:03  23  into Huitron Homes, which is a bunch of currency that went into

13:49:07  24  those accounts.  So they have a change in their practice of how

13:49:10  25  they're doing their business.

13:49:12  1   Q.   And why do you look for changes or indicators of criminal

13:49:16  2   activities?

13:49:18  3   A.   To verify that people are not trying to hide large deposits,

13:49:24  4   structuring money, and so forth.

13:49:28  5   Q.   Now, one of the things the government has to prove here is

13:49:31  6   knowledge.  How do your research into these indicators of

13:49:36  7   criminal activity go to show someone has knowledge of that

13:49:38  8   particular criminal activity?

13:49:40  9   A.   Now, when people have knowledge, if you take a certain

13:49:45  10  person's account, just say the Huitrons, I analyzed their account

13:49:50  11  6769 from January 5th to 2009 to May 2012.

13:49:56  12          MR. DEGEURIN:  Excuse me, Mr. Williams.  Objection,

13:49:59  13  your Honor.  He's going to render an opinion on intent of

13:50:05  14  another.

13:50:08  15          MR. GARDNER:  I'll go ahead and lay a better

13:50:10  16  foundation, your Honor.  He has been listed as an expert witness

13:50:13  17  and notice has been given.

13:50:15  18  Q.   (BY MR. GARDNER) Let's just step back a little bit.  So I

13:50:18  19  want to talk about first an individual named Victor Lopez.  Did

13:50:21  20  you analyze his account?

13:50:22  21  A.   Yes, I did.

13:50:23  22  Q.   Just for the record, that's Government's Exhibit 254.  Sir,

13:50:32  23  is this the account you analyzed?

13:50:33  24  A.   Yes.  That's one of them.  There's two accounts on here,

13:50:37  25  6061 and the account ending 4637.

| | | |
|---|---|---|
| 13:50:40 | 1 | Q.   And what bank were Mr. Lopez's accounts at? |
| 13:50:43 | 2 | A.   Wells Fargo. |
| 13:50:47 | 3 | Q.   When you analyzed the account, did you analyze the deposits |
| 13:50:51 | 4 | going in? |
| 13:50:52 | 5 | A.   Yes, I did. |
| 13:50:53 | 6 | Q.   And did you analyze the expenses going out? |
| 13:50:59 | 7 | A.   Yes.   There weren't too many deposits that went into |
| 13:51:03 | 8 | Victor's account. |
| 13:51:04 | 9 | MR. MAYR:  Objection.  Nonresponsive. |
| 13:51:05 | 10 | THE COURT:  Just answer the question. |
| 13:51:06 | 11 | Q.   (BY MR. GARDNER) Did you analyze the accounts? |
| 13:51:09 | 12 | A.   Yes. |
| 13:51:09 | 13 | Q.   And what did you find? |
| 13:51:10 | 14 | A.   That there weren't too many cash deposits that went into |
| 13:51:13 | 15 | that account nor expenses. |
| 13:51:19 | 16 | Q.   And did you analyze the Huitron Homes account? |
| 13:51:22 | 17 | A.   Yes, I did. |
| 13:51:23 | 18 | Q.   All right.  That was a large account, correct? |
| 13:51:25 | 19 | A.   Yes. |
| 13:51:25 | 20 | Q.   And that's Government's Exhibit 256A; is that correct? |
| 13:51:32 | 21 | A.   Yes. |
| 13:51:34 | 22 | Q.   You probably don't have the exhibit sticker, do you? |
| 13:51:37 | 23 | A.   No, sir. |
| 13:51:38 | 24 | Q.   Your Honor, that's 256A that's been admitted.  Just |
| 13:51:42 | 25 | generally, can you describe to the jury what evidence you found |

13:51:46  1  in the Huitron accounts?

13:51:48  2  A.   When I was going through their account, Huitron Homes with

13:51:51  3  the account ending 6769 from January 5th to May 2012, over the

13:51:59  4  18-month period from January 5th, 2009 to July 2010, there was

13:52:05  5  only a total of $113,000 cash deposits into that account.

13:52:09  6  Q.   And, I'm sorry, could you give me the date range on that

13:52:12  7  again?

13:52:12  8  A.   July -- January 5th, 2009 to July 7th, 2010.

13:52:19  9  Q.   January 5th, 2009 to July 7th, 2010?

13:52:23  10  A.   Yes.

13:52:23  11  Q.   And the amount?

13:52:24  12  A.   $113,013.

13:52:27  13  Q.   And did you analyze the account after July of 2010?

13:52:33  14  A.   Yes, I did.

13:52:34  15  Q.   And why did you pick that date as a distinguishing date?

13:52:38  16  A.   After July 12th, 2010, that's when a large amount of cash

13:52:44  17  was starting to be structured into that account.

13:52:47  18  Q.   And if you will, could you say the last date you analyzed?

13:52:52  19  Or give me the range.  July 2010 until when?

13:52:56  20  A.   Till May 2012.

13:53:02  21  Q.   And how much cash was structured into the account from July

13:53:06  22  2010 until May of 2012?

13:53:09  23  A.   $505,007.

13:53:13  24       THE COURT:  Give me that again, please.

13:53:14  25       THE WITNESS:  $505,007.

| | | |
|---|---|---|
| 13:53:20 | 1 | Q.   (BY MR. GARDNER) And these are all cash deposits? |
| 13:53:21 | 2 | A.   Yes, all cash. |
| 13:53:22 | 3 | Q.   Was some structured and some what we call bulk cash? |
| 13:53:25 | 4 | A.   Well, yes.  Some structured.  And, I mean, there were |
| 13:53:29 | 5 | increments like 6,000, 7,000, but the bank probably wouldn't |
| 13:53:32 | 6 | catch those amounts. |
| 13:53:34 | 7 | Q.   I just want to show you a page from Government's Exhibit |
| 13:53:37 | 8 | 256A.  As an example, page 412163.  I'm showing a date of what |
| 13:53:48 | 9 | right here, Mr. Williams? |
| 13:53:50 | 10 | A.   November 15th. |
| 13:53:54 | 11 | Q.   And the amount? |
| 13:53:55 | 12 | A.   $9,000. |
| 13:53:57 | 13 | Q.   Going down here, there's a deposit at a branch store on this |
| 13:54:09 | 14 | date, 11-16? |
| 13:54:10 | 15 | A.   Yes. |
| 13:54:10 | 16 | Q.   And what's that amount? |
| 13:54:11 | 17 | A.   7,000. |
| 13:54:12 | 18 | Q.   And why do you make the conclusion that that's evidence of |
| 13:54:16 | 19 | structuring? |
| 13:54:17 | 20 | A.   Because the increments, they are 7,000, 9,000. |
| 13:54:21 | 21 | Q.   And do you combine the increments also with the timing of |
| 13:54:25 | 22 | the deposits? |
| 13:54:25 | 23 | A.   Yes. |
| 13:54:25 | 24 | Q.   I want to show you another page from the same exhibit, page |
| 13:54:37 | 25 | 41-2484.  And the date here, Special Agent? |

13:54:59  1   A.   July 6, both deposits.

13:55:03  2   Q.   And the amounts?

13:55:07  3   A.   They are both $9,900 each.

13:55:19  4   Q.   May I have one moment, your Honor, to retrieve an exhibit?

13:55:54  5        Now, you said, earlier, that you also looked at some of

13:56:00  6   the search warrant evidence; is that correct?

13:56:01  7   A.   Yes, I did.

13:56:02  8   Q.   Okay.  And I'll pull one out, Government's Exhibit 60A

13:56:07  9   through E.  I'm going to show you this second page on that

13:56:35  10  exhibit.  What are these amounts right here, Special Agent?

13:56:46  11  A.   Those amounts match the deposit statement that you just

13:56:52  12  showed me.

13:56:52  13  Q.   And, specifically, we had two other 8,000s I didn't show you

13:56:56  14  when we're talking about the 9,000 and 7,000?

13:56:58  15  A.   Yes.

13:56:59  16  Q.   And these horses, do you recognize these horses from other

13:57:03  17  involvement in this investigation?

13:57:04  18  A.   Yes, I do.

13:57:05  19  Q.   Do you recognize this name?

13:57:07  20  A.   Yes.  Jose.

13:57:09  21  Q.   So, again, based on your analysis of that account, what do

13:57:12  22  these amounts appear to consist of?

13:57:14  23  A.   Structuring.

13:57:16  24  Q.   And, again, where was this item found?

13:57:18  25        MR. MAYR:  Your Honor, may we approach?

13:57:28    1          (At the bench, on the record.)

13:57:39    2          MR. MAYR:  I'm looking at my rule book here and it says

13:57:41    3   that in a criminal case, an expert witness must not state an

13:57:43    4   opinion as to whether the defendant did or did not have a mental

13:57:47    5   state.  Now, it seems to me that the government seems to think

13:57:50    6   that structuring is just a strict liability offense, and just

13:57:54    7   because it's occurring, that the person's committing the offense.

13:57:56    8   And by keep asking him, is this evidence of structuring, evidence

13:58:01    9   of structuring, it's implying that when that's not the case.

13:58:04   10   Structuring requires a culpable mental state.

13:58:07   11          And, therefore, I would object to this continued line

13:58:12   12   of questioning of having him testify as to this is evidence that

13:58:15   13   they knew that they were committing the offense.

13:58:19   14          MR. GARDNER:  I can rephrase my question, but I can

13:58:22   15   just ask him is it consistent with structuring.

13:58:25   16          THE COURT:  I don't have a question pending and I don't

13:58:28   17   have an objection.  I've got an objection without a question.  If

13:58:33   18   you think that the question's wrong.

13:58:35   19          MR. MAYR:  If the question -- as long as the question

13:58:37   20   is, is it consistent with it, that's fine.  But what is that

13:58:40   21   evidence of and he says structuring, that's telling this jury

13:58:43   22   what my client's culpable mental state is.  They can't do that.

13:58:47   23          THE COURT:  Well, then I think that's you probable

13:58:51   24   should object instead of asking to come up here.

13:58:54   25          MR. MAYR:  All right.

| | | |
|---|---|---|
| 13:58:57 | 1 | MR. ESPER:  You're objecting now. |
| 13:58:58 | 2 | MR. MAYR:  I'm making my objection now. |
| 13:59:00 | 3 | THE COURT:  Well, there's no question before me. |
| 13:59:01 | 4 | MR. MAYR:  I understand that.  Pardon me. |
| 13:59:07 | 5 | Q.  (BY MR. GARDNER) Again, Special Agent Williams, I believe |
| 13:59:10 | 6 | the last question was, where was this item located? |
| 13:59:14 | 7 | A.  That was in the Huitrons' records in the front office. |
| 13:59:20 | 8 | Q.  This is from their business address? |
| 13:59:22 | 9 | A.  Yes. |
| 13:59:22 | 10 | Q.  At 183, Highway 183 here in Austin? |
| 13:59:26 | 11 | A.  Yes. |
| 13:59:26 | 12 | Q.  Do you know whose writing any of this is? |
| 13:59:36 | 13 | A.  The 6485 may appear to be Jessica, but I can't really tell |
| 13:59:43 | 14 | all of them. |
| 13:59:44 | 15 | Q.  Would you at least agree with me there appears to be |
| 13:59:47 | 16 | different persons' writing on here? |
| 13:59:48 | 17 | A.  Yes. |
| 13:59:49 | 18 | Q.  For example, the person writing on this portion here appears |
| 13:59:51 | 19 | to be talking about paints, I would assume? |
| 13:59:54 | 20 | A.  Yes. |
| 13:59:58 | 21 | Q.  And, again, on this side, does there also appear to be |
| 14:00:02 | 22 | different people writing? |
| 14:00:02 | 23 | A.  Yes. |
| 14:00:03 | 24 | Q.  How old is Jessica Huitron? |
| 14:00:05 | 25 | A.  Twenty-nine. |

14:00:08  1   Q.   Do you know what function she performed in the Huitron

14:00:13  2   office?

14:00:15  3   A.   I think she happened do some of the paperwork that's in the

14:00:20  4   office.

14:00:20  5   Q.   Now, I'm showing you Government's Exhibit 60E, also from the

14:00:24  6   Huitron office.  There's a lot of writing on here.

14:00:28  7   A.   Yes.

14:00:29  8   Q.   Just give an overall view.  And this includes horse names

14:00:36  9   and various amounts.  Would you agree with that?

14:00:38  10  A.   Yes.

14:00:40  11  Q.   But, specifically, what I want to refer you to is down here

14:00:44  12  in the corner.

14:00:48  13  A.   Yes.

14:00:50  14  Q.   What are these loan numbers here?  It appears to be another

14:00:53  15  handwriting in blue as it relates to this $9,900 deposit and this

14:01:04  16  $9,900 deposit?

14:01:04  17  A.   It's possibly a -- maybe a cashier's check that was

14:01:08  18  purchased with those amounts.

14:01:12  19  Q.   Special Agent Williams, I want to refer you back to

14:01:15  20  Government's Exhibit 256A, specifically, page 412484.

14:01:21  21  A.   Yes.

14:01:22  22  Q.   Did you, in fact, check that -- these two deposits?

14:01:27  23  A.   Yeah.  Those two deposits match the --

14:01:30  24  Q.   Yes.

14:01:30  25  A.   -- two numbers on those pages.

14:01:33  1   Q.   Correct.  And, again, is this two deposits here next to the

14:01:40  2   horse name, is that consistent with structuring?

14:01:43  3   A.   Yes.

14:02:05  4   Q.   Now, did you obtain an exhibit from the FinCEN center --

14:02:19  5   showing you Government's Exhibit 352.  Did you obtain those, sir?

14:02:25  6   A.   Yes, I did.

14:02:26  7   Q.   And there's three separate sets of papers there in 352.  I

14:02:31  8   probably should have labeled them A, B and C.  But generally what

14:02:35  9   are they?

14:02:35  10  A.   These are the listings of the -- which is CTR is Currency

14:02:39  11  Transaction Reports that are on file with FinCEN.

14:02:41  12  Q.   And is that just for the Huitron accounts, or is that for

14:02:45  13  all three individuals you identified?

14:02:46  14  A.   All three individuals I identified.

14:02:55  15  Q.   Your Honor, may I have a moment to log these for ease of

14:03:10  16  identification?

14:04:25  17       Special Agent Williams, I apologize.  Could you tell

14:04:29  18  the Court what 352A is, specifically, the person's accounts?

14:04:34  19  A.   352A is Victor Lopez.  The Currency Transaction Reports that

14:04:41  20  were filed on him.

14:04:42  21  Q.   And 352B?

14:04:46  22  A.   352B is for Huitron Painting and for Huitron Homes.

14:04:56  23  Q.   And 352C?

14:05:00  24  A.   Is for Fernando Garcia and Garcia Bloodstock.

14:05:04  25  Q.   Your Honor, I would offer Government's Exhibits 352A, B and

14:05:08  1   C, certified official records offered under 803(8).

14:06:33  2              MR. MAYR:  No objection, your Honor.

14:06:38  3              THE COURT:  352A, B and C are admitted.

14:06:42  4              MR. GARDNER:  A, B and C, your Honor.

14:06:47  5              THE COURT:  What did you --

14:06:48  6              MR. GARDNER:  I offered A, B and C, your Honor.

14:06:51  7              THE COURT:  Yeah, A, B and C.

14:06:55  8              MR. GARDNER:  Thank you.

14:07:00  9   Q.   (BY MR. GARDNER) Let's start with 352B, Special Agent

14:07:05  10  Williams.  Again, just to give an overview, this is a certified

14:07:16  11  record from the FinCEN center stating what?

14:07:20  12  A.   These are all the CTRs that were filed on behalf of Huitron

14:07:27  13  Homes or Jesus Huitron.

14:07:28  14  Q.   Showing you Government's Exhibit 420 for demonstrative

14:07:32  15  purposes, each one of those lines on that spreadsheet represents

14:07:35  16  one of these, correct?

14:07:36  17  A.   Yes.

14:07:37  18  Q.   With respect to these particular transactions, could you

14:07:49  19  explain to the jury who files CTRs for the Huitrons' account?

14:07:56  20  A.   If you start at the top, it shows that Jesus Huitron, they

14:08:03  21  filed a CTR on him.

14:08:05  22  Q.   Right here, Jesus Huitron?

14:08:06  23  A.   Yeah.  The first three.

14:08:08  24  Q.   First three?

14:08:09  25  A.   Then, the next three were Victor Lopez where he went in to

| | | |
|---|---|---|
| 14:08:14 | 1 | deposit money on behalf of the Huitrons, his name would have |
| 14:08:20 | 2 | shown up in the second section.  So Victor Lopez deposited money |
| 14:08:24 | 3 | into the Huitrons' account. |
| 14:08:26 | 4 | Q.   And then, again, just repeats itself? |
| 14:08:28 | 5 | A.   Yes. |
| 14:08:29 | 6 | Q.   Jesus Huitron and Victor Lopez? |
| 14:08:32 | 7 | A.   Yes. |
| 14:08:32 | 8 | Q.   Or in this case, Jesus Huitron on behalf of Huitron Homes? |
| 14:08:36 | 9 | A.   Right. |
| 14:08:37 | 10 | Q.   And then, follows that way? |
| 14:08:39 | 11 | A.   Right. |
| 14:08:40 | 12 | Q.   So then, I scroll over, those are the filing institutions? |
| 14:08:47 | 13 | A.   Yes. |
| 14:08:47 | 14 | Q.   So that shows the places of deposit to? |
| 14:08:53 | 15 | A.   Yes. |
| 14:08:54 | 16 | Q.   And could you just explain for the record the majority of |
| 14:08:57 | 17 | those deposits occurred where? |
| 14:08:58 | 18 | A.   In the city that they were -- occurred in San Francisco, |
| 14:09:02 | 19 | Laredo, Bueno Park, Austin and Buda, McAllen, Houston and Orange, |
| 14:09:07 | 20 | Texas. |
| 14:09:09 | 21 | Q.   And this next column, that's the total cash in, correct? |
| 14:09:12 | 22 | A.   Yes. |
| 14:09:13 | 23 | Q.   All right.  And on the CTRs, explain this to me.  Is a bank |
| 14:09:23 | 24 | required to fill one of these out every time I deposit less than |
| 14:09:28 | 25 | $10,000 in cash? |

14:09:29  1    A.    Not if you deposit less.  No.

14:09:31  2    Q.    All right.  So let's say I go to one branch and deposit

14:09:34  3    $9,000.  No CTR, right?

14:09:37  4    A.    No CTR.

14:09:38  5    Q.    Let's say I go to another branch the very same day and

14:09:41  6    deposit $9,000?

14:09:42  7    A.    Yeah.  The bank will back that up on their system that it

14:09:44  8    was a $10,000 transaction made within that day.

14:09:48  9    Q.    And will they file a CTR then?

14:09:49  10   A.    Yes.

14:09:50  11   Q.    All right.  And so, how it relates to Government's Exhibit

14:09:56  12   325B in the column marked total cash in, does that necessarily

14:10:02  13   reflect merely a single deposit of cash?

14:10:05  14   A.    Some may and majority of them, not so.

14:10:09  15   Q.    So, again, back with 420, when it says Jesus Huitron on the

14:10:19  16   CTR?

14:10:19  17   A.    Yes.

14:10:20  18   Q.    Who actually made that deposit?

14:10:23  19   A.    Jesus Huitron.

14:10:26  20   Q.    When it says Victor Lopez on behalf of Jesus Huitron, where

14:10:30  21   would Victor Lopez be on this Currency Transaction Report?

14:10:33  22   A.    Victor Lopez name would be under Section B.

14:10:37  23   Q.    And who would be in Section A?

14:10:40  24   A.    Jesus Huitron.

14:10:41  25   Q.    So, again, in order to fill one of these out, someone has to

14:10:45  1  provide some sort of identification?

14:10:47  2  A.   Right.  And then, again, B has to provide A their banking

14:10:51  3  information to make that deposit.

14:10:54  4  Q.   So if this were, in fact, a deposit by Victor Lopez, whose

14:11:00  5  account information would he have to have?

14:11:01  6  A.   He would have to have Jesus Huitron's account information.

14:11:16  7  Q.   Now, in your review of Government's Exhibit 352A, 352B,

14:11:27  8  352C, and the other items you reviewed -- let me back up.

14:11:30  9       When you analyzed Victor Lopez's account, how much

14:11:35  10 structuring -- or what evidence you saw consistent with

14:11:37  11 structuring did you see?

14:11:38  12 A.   Well, in his account, none.  But going over records with

14:11:43  13 CTRs with him, he had -- he structured approximately $1.3 million

14:11:49  14 in different people's account.

14:11:51  15 Q.   And could you identify for the jury whose accounts he's

14:11:55  16 depositing cash into?

14:11:58  17 A.   LA Horses, Inc., Paul Jones, Southwest Stallions, Jesus

14:12:04  18 Huitron, Equine Sports Medicine, Reba Choice, Victor Lopez, his

14:12:10  19 own, Felipe Quintero, Mario Gonzalez.

14:12:18  20 Q.   Let's move to Victor -- I'm sorry.  To Fernando Garcia's

14:12:21  21 account.  What analysis did you do on Fernando Garcia's account?

14:12:28  22 A.   I reviewed several of his accounts, as well.

14:12:33  23 Q.   Just for the record, which accounts did you review?

14:12:39  24 A.   Two Bank of America and one Wells Fargo account.

14:12:42  25 Q.   I'm showing you Bank of America ending in 1077.

14:12:46   1    A.   And 1093.

14:12:48   2    Q.   And that's Government's Exhibit 253A and 253B, your Honor.

14:13:01   3         When you did an analysis of Victor Lopez's account --

14:13:05   4    I'm sorry, Fernando Garcia's account, could you tell the ladies

14:13:07   5    and gentlemen of the jury when that account was established?

14:13:10   6    A.   The 1093 and the 1097 was established on September 8, 2008,

14:13:17   7    the day he established the name Garcia Bloodstock and Racing.

14:13:22   8    Q.   So the name of his company was established the same day he

14:13:24   9    opened this account?

14:13:26   10   A.   Yes.

14:13:28   11   Q.   And based on your review of the records, what did he do that

14:13:32   12   day?

14:13:32   13   A.   That day, he deposited like $81,000 into his account.

14:13:40   14   Q.   Showing you Government's Exhibit 252A.  Bates stamp 613075.

14:14:01   15   What are all these $9,000 counter credits?

14:14:05   16   A.   Those are all cash deposits made at different banks.

14:14:10   17   Q.   All in the same day?

14:14:11   18   A.   Yes.

14:14:11   19   Q.   But a couple, right?

14:14:12   20   A.   Right.

14:14:13   21   Q.   Now, behind that, the jury's heard what is called source

14:14:17   22   documents.  Did you obtain the source documents for the Garcia

14:14:21   23   account?

14:14:22   24   A.   Yes, we did.

14:14:23   25   Q.   And when we refer to source documents, is this an example of

14:14:27  1    the source document?

14:14:29  2    A.    Yes.

14:14:33  3    Q.    And, Special Agent Williams, a number of these are tabbed.

14:14:37  4    Would you agree me, instead of going through each one of them,

14:14:39  5    they all reflect the deposits that are reported on the bank

14:14:43  6    statement?

14:14:44  7    A.    Yes.

14:14:53  8    Q.    Showing you Government's Exhibit 416.  Do you recognize

14:14:58  9    that, sir?

14:14:58  10   A.    Yes, I do.

14:14:59  11   Q.    Did you, in fact, make it?

14:15:00  12   A.    Yes, I did.

14:15:01  13   Q.    All right.  And what is it?

14:15:03  14   A.    It's a map where Fernando Garcia started at one bank and

14:15:10  15   made all the deposits at all the different banks that day.

14:15:13  16   Q.    So on each one of these deposit slips, does it identify the

14:15:17  17   bank in which the deposit was made?

14:15:18  18   A.    Yes, it does.

14:15:19  19   Q.    And did you identify that a number of those deposits were

14:15:22  20   made at separate branches?

14:15:23  21   A.    Yes.

14:15:24  22   Q.    Your Honor, I would offer Government's Exhibit 416 as a

14:15:30  23   demonstrative exhibit only.

14:15:36  24        THE COURT:  Received as a demonstrative.

14:15:45  25   Q.    (BY MR. GARDNER) Again, Special Agent Williams, what do the

14:15:52   1   letters signify on the map?

14:15:55   2   A.    The different addresses of each bank.

14:15:58   3   Q.    And did you also check the timestamp on each one of the

14:16:01   4   deposits?

14:16:02   5   A.    Yes, I did.

14:16:03   6   Q.    For example, let me show you page 613284.  Was it El

14:16:20   7   Conquistador -- what is that?

14:16:22   8   A.    El Conquistador is the branch where he opened the account.

14:16:26   9   Q.    So the first place he made his deposit?

14:16:29   10  A.    Yes.

14:16:30   11  Q.    Going back to the map, when you put the letters, is that the

14:16:45   12  sequence in which the deposits were made?

14:16:49   13  A.    Yes.

14:16:50   14  Q.    Based on the timestamp?

14:16:51   15  A.    Yeah, based on the timestamps of the deposit slips.

14:16:55   16  Q.    And how long did it take Fernando Garcia to make one, two,

14:16:58   17  three, four, five, six, seven, eight, nine deposits?

14:17:02   18  A.    Approximately four to five hours.

14:17:04   19  Q.    And, again, he made a couple the next day, correct?

14:17:08   20  A.    Yes.

14:17:11   21  Q.    What other activity occurred in that account?

14:17:14   22  A.    The day he deposited all those moneys, like two days later

14:17:20   23  on the 10th, he sent $90,000 to Ruidoso Downs sales.

14:17:25   24  Q.    Ruidoso Downs horse auction?

14:17:28   25  A.    Yes.

| | | |
|---|---|---|
| 14:17:28 | 1 | Q.   Is that for the purchase of horses? |
| 14:17:32 | 2 | A.   Yes. |
| 14:17:36 | 3 | Q.   And how was that based?  Was that based on a cash deposit or |
| 14:17:40 | 4 | based on the wire? |
| 14:17:41 | 5 | A.   No.  He wired that. |
| 14:17:46 | 6 | Q.   Now, what other activity did you see in that particular |
| 14:17:50 | 7 | account? |
| 14:17:51 | 8 | A.   On the next day, he went and made another deposit at -- a |
| 14:17:58 | 9 | total of 10,000 in that account, the next day.  And then, he made |
| 14:18:03 | 10 | another deposit into his other account.  So he had a total of |
| 14:18:06 | 11 | $20,000 the next day. |
| 14:18:16 | 12 | Q.   And so, what account did he make the first deposit in on |
| 14:18:19 | 13 | September 9th? |
| 14:18:21 | 14 | A.   Either 1093 or at 1077. |
| 14:18:26 | 15 | Q.   One of the two accounts, correct? |
| 14:18:27 | 16 | A.   Correct. |
| 14:18:33 | 17 | Q.   And 1093, he makes one account for how much?  I'm sorry. |
| 14:18:40 | 18 | 10,000? |
| 14:18:40 | 19 | A.   Yeah. |
| 14:18:44 | 20 | Q.   And then, he makes a deposit in another account?  Was that |
| 14:18:46 | 21 | your testimony? |
| 14:18:47 | 22 | A.   Yes, 1077.  Account 1077. |
| 14:18:49 | 23 | Q.   And how much was that? |
| 14:18:51 | 24 | A.   Approximately 10,000, as well. |
| 14:18:57 | 25 | Q.   And what was the total? |

| | | |
|---|---|---|
| 14:18:59 | 1 | A.   The total -- it was a CTR prepared on that day for a total |
| 14:19:05 | 2 | of $21,500. |
| 14:19:15 | 3 | Q.   So if we were to look at Government's Exhibit 352C, which |
| 14:19:20 | 4 | would be the Fernando Garcia CTRs, correct? |
| 14:19:22 | 5 | A.   Yes. |
| 14:19:23 | 6 | Q.   In this case, subject's date of birth is recorded? |
| 14:19:44 | 7 | A.   Yes. |
| 14:19:44 | 8 | Q.   And the deposits where they're made? |
| 14:19:46 | 9 | A.   Yes. |
| 14:19:49 | 10 | Q.   And then, the total amounts, correct? |
| 14:19:52 | 11 | A.   Correct. |
| 14:19:52 | 12 | Q.   So the one I just put on the board is a $21,500? |
| 14:19:56 | 13 | A.   Right. |
| 14:19:56 | 14 | Q.   And the one we discussed with the map, is that that one |
| 14:19:59 | 15 | right there? |
| 14:19:59 | 16 | A.   That's $81,600. |
| 14:20:04 | 17 | Q.   At some point, did Mr. Garcia stop using the Bank of America |
| 14:20:12 | 18 | accounts? |
| 14:20:12 | 19 | A.   Well, he didn't use them as much in 2009.  Then he picked up |
| 14:20:18 | 20 | more in 2010 at Wells Fargo account. |
| 14:20:21 | 21 | Q.   And what did he use at the Wells Fargo account? |
| 14:20:26 | 22 | A.   What was the question? |
| 14:20:26 | 23 | Q.   I'm sorry.  And you said the Wells Fargo account.  What did |
| 14:20:30 | 24 | he use with the Wells Fargo account? |
| 14:20:33 | 25 | A.   That's where a lot more cash was being deposited into that |

| | | |
|---|---|---|
| 14:20:36 | 1 | account. |
| 14:20:40 | 2 | Q.   At some point, did he begin using another account in Ruidoso |
| 14:20:45 | 3 | Downs? |
| 14:20:45 | 4 | A.   Yes. |
| 14:20:46 | 5 | Q.   And what activity did you see in that? |
| 14:20:49 | 6 | A.   In the Ruidoso horsemen's account, there were like several |
| 14:20:54 | 7 | checks that Fernando authorized that he had written to himself. |
| 14:21:00 | 8 | Or there was one that I notice that went to Francisco |
| 14:21:06 | 9 | Colorado-Cessa. |
| 14:21:07 | 10 | Q.   I'm going to show Government's Exhibit 231B, page 14-25. |
| 14:21:22 | 11 | What is this document right here, sir? |
| 14:21:23 | 12 | A.   That's the horsemen's account for Poker Ranch. |
| 14:21:26 | 13 | Q.   Poker Ranch, LLC? |
| 14:21:28 | 14 | A.   Yes. |
| 14:21:30 | 15 | Q.   And the address of that, for the record? |
| 14:21:32 | 16 | A.   6553 Star Court.  Laredo, Texas. |
| 14:21:37 | 17 | Q.   And on the next page here, page 26, who is listed here as |
| 14:21:51 | 18 | the authorized agent? |
| 14:21:53 | 19 | A.   Fernando Garcia. |
| 14:21:54 | 20 | Q.   Going to page 66, whose account is this? |
| 14:22:07 | 21 | A.   Desiree Princess Ranch, LLC. |
| 14:22:10 | 22 | Q.   Does it have the same address as Poker Ranch? |
| 14:22:13 | 23 | A.   Yes. |
| 14:22:14 | 24 | Q.   And, again, who's the authorized agent? |
| 14:22:18 | 25 | A.   Fernando Garcia. |

| | | |
|---|---|---|
| 14:22:20 | 1 | Q.   We heard some testimony, the jury will recall, from |
| 14:22:25 | 2 | Alejandro Obregon.  Do you recall who was the listed owner on the |
| 14:22:30 | 3 | documents for Desiree Princess Ranch? |
| 14:22:32 | 4 | A.   I think it's Armando De la Vega. |
| 14:22:36 | 5 | Q.   And for Poker Ranch? |
| 14:22:37 | 6 | A.   Jorge Gomez. |
| 14:22:44 | 7 | Q.   Turn your attention to page 97.  What company is that for |
| 14:22:53 | 8 | the record? |
| 14:22:53 | 9 | A.   Fast And Furious, LLC. |
| 14:22:55 | 10 | Q.   And I believe the jury's heard from Mr. Hernando Guerra on |
| 14:23:06 | 11 | that.  And, again, who's the -- listing as the -- not necessarily |
| 14:23:11 | 12 | the agent this time, but who's listed as the contact person? |
| 14:23:14 | 13 | A.   Fernando Garcia. |
| 14:23:15 | 14 | Q.   And this individual's account? |
| 14:23:29 | 15 | A.   Santa Fe Roldan. |
| 14:23:31 | 16 | Q.   And on here, how does it state the account was opened? |
| 14:23:37 | 17 | A.   It was a check written by Fernando Garcia. |
| 14:23:41 | 18 | Q.   On the back, based on the records, that's a check, correct? |
| 14:23:49 | 19 | Right there. |
| 14:23:50 | 20 | A.   Yes. |
| 14:23:53 | 21 | Q.   Sir, did you participate in the search warrant and arrest of |
| 14:23:56 | 22 | Fernando Garcia? |
| 14:23:57 | 23 | A.   Yes, I did. |
| 14:23:57 | 24 | Q.   And did you interview Mr. Garcia? |
| 14:24:00 | 25 | A.   Yes, I did. |

| | | |
|---|---|---|
| 14:24:01 | 1 | Q.   Did you take a statement from Fernando Garcia? |
| 14:24:03 | 2 | A.   Yes. |
| 14:24:05 | 3 | Q.   And how did you organize your interview? |
| 14:24:09 | 4 | A.   We asked him certain general questions.  We read him his |
| 14:24:13 | 5 | Miranda rights first and asked him certain questions. |
| 14:24:18 | 6 | Q.   Is Mr. Garcia an English speaker? |
| 14:24:19 | 7 | A.   Yes. |
| 14:24:20 | 8 | Q.   Did you have a Spanish-speaking agent there in case he |
| 14:24:23 | 9 | wanted one? |
| 14:24:23 | 10 | A.   Yes. |
| 14:24:24 | 11 | Q.   Do you recognize Fernando Garcia in the courtroom today? |
| 14:24:27 | 12 | A.   Yes, I do. |
| 14:24:27 | 13 | Q.   Is it the individual standing? |
| 14:24:30 | 14 | A.   Yes. |
| 14:24:30 | 15 | Q.   Is that the same person you interviewed? |
| 14:24:32 | 16 | A.   Yes. |
| 14:24:32 | 17 | Q.   Okay.  Was he cooperative during his interview? |
| 14:24:34 | 18 | A.   Yes. |
| 14:24:35 | 19 | Q.   You said you read him his Miranda rights.  Did you have a |
| 14:24:39 | 20 | list of prepared questions that you were going to ask him? |
| 14:24:41 | 21 | A.   Yes, we did. |
| 14:24:42 | 22 | Q.   Was that the same list that was put to every agent at every |
| 14:24:46 | 23 | single search warrant in this case? |
| 14:24:48 | 24 | A.   Yes. |
| 14:24:53 | 25 | Q.   And when you interviewed him, did you ask him if he knew |

| | | |
|---|---|---|
| 14:24:58 | 1 | certain individuals? |
| 14:24:59 | 2 | A.   Yes. |
| 14:24:59 | 3 | Q.   If you will, could you please tell the ladies and gentlemen |
| 14:25:03 | 4 | of the jury about the interview with Fernando Garcia? |
| 14:25:05 | 5 | MR. ESPER:  Your Honor, I would object to this |
| 14:25:07 | 6 | testimony.  It violates the Bruton and the confrontation clause. |
| 14:25:10 | 7 | I object on that basis. |
| 14:25:16 | 8 | MR. GARDNER:  Your Honor, we filed -- |
| 14:25:27 | 9 | (At the bench, on the record.) |
| 14:25:38 | 10 | THE COURT:  What's your objection? |
| 14:25:41 | 11 | MR. ESPER:  My objection is, number one, he's getting |
| 14:25:43 | 12 | ready to testify to statements made to him -- post-arrest |
| 14:25:48 | 13 | statements made to him by Fernando Garcia.  My objection is it |
| 14:25:51 | 14 | violates the confrontation clause and it violates the concepts in |
| 14:25:55 | 15 | Bruton vs. United States in that I believe he's going to testify |
| 14:25:58 | 16 | to certain statements made by Mr. Garcia that I believe are -- |
| 14:26:04 | 17 | would be incriminating to my client, without me having the |
| 14:26:07 | 18 | opportunity to cross-examine Mr. Garcia, who is the declarant of |
| 14:26:12 | 19 | those statements. |
| 14:26:14 | 20 | MR. GARDNER:  Your Honor, we filed our Bruton response |
| 14:26:18 | 21 | when we talked about that chat log.  They've had the full context |
| 14:26:22 | 22 | right in Mr. Williams' report.  The government's contention is |
| 14:26:26 | 23 | that he either identifies or declines to identify any association |
| 14:26:30 | 24 | with these people.  What Mr. Esper left out is it has to be |
| 14:26:34 | 25 | incriminating statements.  That -- may I finish Mr. Esper?  Thank |

14:26:37   1   you.  You were about ready.

14:26:39   2        That statement needs to say, I was a crook and I'm

14:26:42   3   involved in crooked activity with this guy.  Mr. Garcia made no

14:26:47   4   such statement.  He merely said, I know this person, I work with

14:26:51   5   this person, or I don't know this person, or I met this person

14:26:54   6   and I met him a long time ago.  He does not say these people, in

14:26:58   7   any statement as to any defendant, was involved in criminal

14:27:01   8   activity; therefore, it is not a Bruton statement.  That was

14:27:06   9   briefed, and so, I believe that, also, Mr. Esper's objection was

14:27:09   10  untimely.

14:27:11   11        MR. ESPER:  Well, your Honor, I think I brought this up

14:27:13   12  at a hearing where you said you could object to it when it comes

14:27:15   13  in, and that's what I'm doing.  A statement that Mr. Garcia

14:27:19   14  makes, I anticipate, to this agent is he's asked about Mr.

14:27:22   15  "Chevo" Huitron, he says he doesn't know him or have anything to

14:27:25   16  do with him.  There's evidence to the contrary to that fact.

14:27:30   17        MR. GARDNER:  Absolutely.

14:27:31   18        MR. ESPER:  So this is a left-handed and indirect way

14:27:33   19  of getting in something that they can't be permitted -- it is

14:27:36   20  incriminating -- may I please finish, Mr. Gardner?  It's a

14:27:39   21  left-handed and indirect way of doing something they cannot do

14:27:41   22  directly.  We have a right to cross-examine this -- the actual

14:27:45   23  declarant, not Mr. Williams, the actual declarant, Fernando

14:27:49   24  Garcia, as to those statements.

14:27:53   25        MR. MAYR:  In other words, why he said that.  We can't

```
14:27:55   1   explore why he --

14:27:57   2          MR. GARDNER:  The objection --

14:27:57   3          THE COURT:  One at a time.

14:28:00   4          MR. MAYR:  Sure.  We can't go into -- we can't inquire

14:28:04   5   as to why Mr. Garcia told this agent that.  That's the problem.

14:28:10   6          MR. GARDNER:  Your Honor, when they say it's

14:28:12   7   left-handed, but he hasn't provided any response to the

14:28:14   8   government's intention to introduce this evidence, if he says

14:28:16   9   it's left-handed, that means that it is incriminating, even

14:28:19  10   though incriminating statements -- these are non-incriminating

14:28:23  11   statements merely identified.

14:28:24  12          Now, Mr. Garcia choses to lie, that's his choice, but

14:28:28  13   his lies are not directly incriminating.  I agree with Mr. Esper.

14:28:32  14   There's other evidence out there that draws the inference that it

14:28:36  15   is criminally connected to him, but under the law it's not

14:28:38  16   left-landed.  It's proper.  And that's what we fully briefed in

14:28:43  17   our motion.  Unless he can show me a case otherwise, I think it's

14:28:47  18   proper.

14:28:48  19          THE COURT:  I don't know if he needs to show you a

14:28:51  20   case.  He could have shown me a case.  But I'll hear his

14:28:55  21   testimony outside the presence of the jury and find out what it

14:28:58  22   is.

14:29:05  23          How many of you know how many lights are in that jury

14:29:14  24   room?  I'm going to put you in the jury room.

14:29:51  25          (Jury not present.)
```

| | | |
|---|---|---|
| 14:30:01 | 1 | THE COURT:  Okay.  Let's hear the testimony. |
| 14:30:03 | 2 | MR. GARDNER:  Your Honor, first of all, I'd like to |
| 14:30:05 | 3 | direct the Court's attention to document 379.  Specifically, the |
| 14:30:08 | 4 | summary of the memorandum of interview, which is attachment 3797, |
| 14:30:14 | 5 | filed on March 17th of this year. |
| 14:30:19 | 6 | THE COURT:  379. |
| 14:30:21 | 7 | MR. GARDNER:  379, your Honor, there are seven |
| 14:30:23 | 8 | attachments, one was a chat catalog.  The other are Jose |
| 14:30:28 | 9 | Trevino's statement, Zulema Trevino's statement, Raul Ramirez's |
| 14:30:33 | 10 | statement, which is sort of overcome by events, Mr. Quintero's |
| 14:30:38 | 11 | statement, which is overcome by events, as well as Alexandra |
| 14:30:43 | 12 | Trevino's statement, which is also overcome by events.  The |
| 14:30:47 | 13 | seventh one, your Honor, attachment seven is the Fernando Garcia |
| 14:30:52 | 14 | memorandum.  And I would ask the Court to pull that up. |
| 14:31:44 | 15 | Your Honor, I can provide the Court the government's |
| 14:31:46 | 16 | copy of the memorandum of interview as the clerk's document. |
| 14:35:24 | 17 | Your Honor, that's essentially the statements I'll be striking |
| 14:35:27 | 18 | from the witness. |
| 14:35:29 | 19 | THE COURT:  I think we'll let the witness go outside |
| 14:35:31 | 20 | for a minute. |
| 14:35:32 | 21 | MR. GARDNER:  Okay.  If you'll stand outside, Mr. |
| 14:35:37 | 22 | Williams. |
| 14:36:01 | 23 | THE COURT:  You indicate that you intend to ask him if |
| 14:36:07 | 24 | he knows certain people, including the objector clients Huitrons. |
| 14:36:21 | 25 | MR. GARDNER:  Huitron. |

```
14:36:22   1          THE COURT:  Regarded as saying he knows that Huitron is
14:36:25   2   a horse trainer and has been a trainer since 2005, but he's never
14:36:33   3   had any dealings with Huitron and that's Eusevio Huitron.  He
14:36:44   4   also denies other people knowing, like Victor Lopez.  All right.
14:36:50   5   So this statement will show that Mr. Garcia lied to a federal
14:36:56   6   agent.
14:36:58   7          MR. GARDNER:  Yes, sir.
14:37:10   8          THE COURT:  I guess I'll just ask counsel, how is that
14:37:18   9   incriminating to Eusevio Huitron when he says he knows him, he's
14:37:24  10   a trainer and he hadn't had any dealings with him?
14:37:31  11          MR. ESPER:  Your Honor, it's not incriminating when he
14:37:33  12   says he knows him as a horse trainer.  Clearly.  That's not
14:37:35  13   incriminating.  But it incriminating when he says, I've never had
14:37:39  14   any dealings with him because what it amounts to now is this
14:37:44  15   agent is stating what Mr. Garcia is telling him, and there's been
14:37:48  16   certainly evidence reflecting that arguably, Fernando Garcia has
14:37:54  17   had dealings with Mr. Huitron.
14:37:58  18          And so, he's making --
14:38:00  19          THE COURT:  Other than showing that he's --
14:38:00  20          MR. ESPER:  Lying about it.
14:38:04  21          THE COURT:  Either all that evidence is wrong or he's
14:38:06  22   lying.  What does that show?
14:38:08  23          MR. ESPER:  Well, it deprives me the opportunity of
14:38:11  24   cross-examining Mr. Garcia as to why --
14:38:13  25          THE COURT:  To prove that all the other evidence that's
```

```
14:38:17   1   come into the record is.
14:38:19   2         MR. ESPER:  It deprives me the opportunity of
14:38:20   3   questioning him as to why he would lie about something like that.
14:38:24   4   I can't ask Mr. Williams that.
14:38:29   5         THE COURT:  Oh, lord.
14:38:32   6         MR. GARDNER:  Your Honor, we would also mention that
14:38:34   7   it's not hearsay because it's not offered for the truth because
14:38:38   8   it's a lie.  And confrontation clause is only triggered by
14:38:42   9   hearsay.
14:38:44  10         MR. ESPER:  Well, you're offering it to prove he's
14:38:45  11   lying about what the truth is.
14:38:47  12         MR. GARDNER:  Well, it's still not the truth.  That's
14:38:50  13   what the definition of lying is.
14:38:52  14         MR. ESPER:  It's truth of the matter asserted.
14:38:55  15         MR. GARDNER:  Yes, sir.
14:38:56  16         MR. ESPER:  I know the statement is a lie.
14:38:57  17         THE COURT:  What other, other than to prove that he
14:38:59  18   lied about not working with.
14:39:02  19         MR. GARDNER:  He's got a statement in there, also, with
14:39:03  20   regards to Mr. Nayen, your Honor, that is not the truth either.
14:39:09  21   And, your Honor --
14:39:10  22         THE COURT:  There's a lot of statements there that's
14:39:13  23   not the truth if the other evidence is accurate.
14:39:15  24         MR. GARDNER:  Yes, sir.
14:39:16  25         THE COURT:  But what other do you intend to go into?
```

| | | |
|---|---|---|
| 14:39:20 | 1 | MR. GARDNER:  Your Honor, you have my only copy. |
| 14:39:22 | 2 | THE COURT:  Pardon? |
| 14:39:23 | 3 | MR. GARDNER:  You have my only copy.  Thank you. |

14:39:31  4   The your Honor, he talks about training specifically

14:39:34  5  for Bonanza Racing Stables and no other company.  And the

14:39:38  6  evidence that was just shown to the jury shows that he's working

14:39:43  7  for Poker Ranch, Desiree Ranch, Santa Fe Roldan.  So he wasn't

14:39:47  8  being truthful about that.

14:39:55  9   Your Honor, in paragraph 3, that, I believe, is

14:39:58  10  actually probably somewhat of a -- well, the first part's true.

14:40:01  11  The second part is his limited involvement with Jose Trevino.

14:40:05  12  The evidence obtained from the search warrants site would

14:40:08  13  demonstrate that that was a lie.

14:40:10  14   THE COURT:  He even testified he'd never heard of Jose

14:40:15  15  Trevino's brothers.

14:40:17  16   MR. GARDNER:  Yes, sir.

14:40:18  17   THE COURT:  Only one on the planet.

14:40:21  18   MR. GARDNER:  Yes, sir.

14:40:22  19   THE COURT:  All right.  So do you intend to go into his

14:40:29  20  statement, after he was warned that he never had any dealings

14:40:43  21  with Eusevio Huitron?

14:40:45  22   MR. GARDNER:  He also says he does not know Alfonso Del

14:40:50  23  Rayo-Mora, despite the fact there's a picture of him standing

14:40:52  24  next to him.

14:40:55  25   THE COURT:  And he said he never knew of Omar or.

14:41:07  1          MR. GARDNER:  Yes, your Honor.  And there's a item that

14:41:09  2    the government will introduce later, found on his computer, that

14:41:12  3    is a article about the Los Zetas that was taken at the time of

14:41:16  4    his arrest, which would indicate that it, also, is a lie.

14:41:23  5          THE COURT:  All right.  Anybody else have any objection

14:41:25  6    other than Mr. Esper?

14:41:26  7          MR. GARDNER:  We would -- I'm sorry, your Honor, I

14:41:28  8    apologize.  We would also ask that the proper Bruton -- well, not

14:41:31  9    Bruton, because it's not Bruton, the proper limiting instruction

14:41:34  10   to the jury.

14:41:35  11         THE COURT:  I'll give an instruction that they could

14:41:37  12   only consider it against Mr. Garcia, of course, and can't

14:41:41  13   consider it against any other defendants.

14:41:44  14         MR. WOMACK:  In addition to the information that Mr.

14:41:46  15   Gardner's talked about just now, during my cross-examination, I'm

14:41:50  16   going to have to bring up the fact that because of this

14:41:53  17   money-laundering stuff, that my client first met Messrs. Colorado

14:41:59  18   and Trevino in 2010 because these check transactions were done in

14:42:05  19   2008, before he even knew this gentleman.  I need to bring that

14:42:09  20   up.  But, again, that's part of his statement to the agent is I

14:42:12  21   knew him, and that might be incriminating to them.  And my client

14:42:20  22   hasn't taken the stand and there's no reason to think he will.

14:42:27  23         I'd also point out one last thing and you probably saw

14:42:29  24   it, sir.  The interviews happened on February 12th of 2012.  This

14:42:37  25   memo was created on June 29th, four-and-a-half months later.

14:42:42    1          MR. GARDNER:  Your Honor, that's a typo.  The interview

14:42:45    2    occurred when he was arrested on June 12th.

14:42:50    3          MR. WOMACK:  I've got the document, it says June 29th.

14:42:52    4    If it's wrong, it's wrong.

14:42:54    5          MR. GARDNER:  It's wrong, yeah.  Typo.

14:43:02    6          MR. WOMACK:  That's all.

14:43:05    7          MS. WILLIAMS:  I don't have anything to weigh in on

14:43:06    8    this issue, Judge, but I do have something I do need to alert the

14:43:09    9    Court.  So.

14:43:10   10          THE COURT:  Why not now?

14:43:12   11          MS. WILLIAMS:  Your Honor, I was informed this morning

14:43:14   12    that Hector Moreno, who's previously testified in this case, as

14:43:21   13    well as Mario Cuellar, who's testified in this case, have a

14:43:26   14    pending arrest warrant in Mexico for aggravated kidnapping and

14:43:31   15    murder.  I have taken some time to try to sort that out, but I

14:43:35   16    have not yet been able to, although I do have a copy of what I

14:43:40   17    believe to be the arrest warrant, as well as two police reports.

14:43:45   18    There are photographs included in the police reports, so I feel

14:43:48   19    fairly competent that we're talking about the same people.

14:43:52   20          In light, especially of the testimony of Hector Moreno

14:43:57   21    that he left Mexico because he was afraid of the Zetas, I think

14:44:04   22    that it becomes increasingly more important to find out exactly

14:44:07   23    what agreements Mr. Moreno made with the United States with

14:44:13   24    regard to coming here, and what the government might have

14:44:18   25    known -- not this government but the government might have known

14:44:21  1  about the existence of this warrant.  It was signed, I believe,

14:44:26  2  your Honor, on July the 25th of 2012.

14:44:30  3          MR. FINN:  And, Judge, there are some Spanish-speaking

14:44:32  4  lawyers that are associated with this case and they've looked at

14:44:35  5  this.  We haven't translated it yet, but we can make a good-faith

14:44:39  6  representation to the Court that this is valid.

14:44:42  7          MR. GARDNER:  What was the date again?

14:44:45  8          THE COURT:  2012.

14:44:47  9          MR. GARDNER:  After their arrests?

14:44:49  10          MS. WILLIAMS:  That the warrant was issued.  I have no

14:44:50  11  idea yet when this supposedly happened, but that the warrant was

14:44:54  12  issued on July 25th of 2012.

14:44:57  13          MR. FINN:  And, Judge, I've been told -- I don't know

14:44:58  14  this to be a fact, that, you know, there's aggravating kidnapping

14:45:02  15  and there's murder that, for whatever reason, kidnapping is

14:45:05  16  considered to be a more serious offense in Mexico than even

14:45:08  17  murder.

14:45:10  18          THE COURT:  Well, I have no certifications of any

14:45:16  19  nature in front of me that would make any of this admissible.

14:45:19  20          MS. WILLIAMS:  Judge, I'm not asking for it to be.

14:45:21  21          THE COURT:  You're just giving me a heads up and I

14:45:23  22  appreciate it.

14:45:24  23          MS. WILLIAMS:  I'm just giving you a heads up.  Over

14:45:25  24  the week and I intend to have these translated, we'll kind of

14:45:28  25  sort that out.  But I just wanted to give you a heads up and the

14:45:31   1   government a heads up that I think that information that has been

14:45:33   2   asked for previously contains a lot more relevance.

14:45:39   3        THE COURT:  All right.  Now, let's go back to first

14:45:42   4   base, and that is, other than what's going to come up on

14:45:53   5   cross-examination is neither here nor there because it's not up

14:45:58   6   yet.  Just run through my mind again, you want to ask him about

14:46:31   7   his activities with Mr. Huitron.  He doesn't know other people,

14:46:52   8   Alfonso de Rayo-Mora, Victor Lopez, never gone to Mexico with

14:47:07   9   Nayen.  He doesn't know who Miguel Trevino Morales or Omar

14:47:22  10   Trevino-Morales --

14:47:24  11        MR. GARDNER:  And, your Honor --

14:47:25  12        THE COURT:  -- was.

14:47:26  13        MR. GARDNER:  Sorry.  Just to add there, in paragraph 1

14:47:29  14   where he identifies -- when asked, he only identifies Bonanza and

14:47:32  15   Garcia Bloodstock, he does not identify any association with the

14:47:38  16   other nominee companies as the government's alleged.

14:47:43  17        THE COURT:  All right.

15:03:31  18        (Recess.)

15:03:54  19        THE COURT:  Jaye, make this Court Exhibit 4.  I'm

15:04:11  20   making the report Court Exhibit No. 4, since I've read it before

15:04:20  21   I make a legal determination, and I sustain the objection.  I'm

15:04:25  22   not going to permit the conversations, notwithstanding for the

15:04:32  23   record, I don't think a couple of them are incriminatory in any

15:04:36  24   way, shape or form, but they're statements made after the

15:04:40  25   conspiracy and that's the evidence I've heard so far.  I think

| | | |
|---|---|---|
| 15:04:52 | 1 | we'll stay with a clean record. |
| 15:04:53 | 2 | MR. GARDNER:  Got it, your Honor. |
| 15:04:56 | 3 | MR. WOMACK:  So, sir, that's as to the entirety of this |
| 15:04:59 | 4 | interview? |
| 15:04:59 | 5 | THE COURT:  Pardon me? |
| 15:05:00 | 6 | MR. WOMACK:  That's as to the entirety, correct, sir? |
| 15:05:03 | 7 | THE COURT:  Any statements made by Mr. Garcia. |
| 15:05:09 | 8 | MR. WOMACK:  Thank you. |
| 15:05:15 | 9 | MR. GARDNER:  I understand the Court's ruling.  Thank |
| 15:05:17 | 10 | you, sir. |
| 15:05:18 | 11 | THE COURT:  Okay.  Bring the jury in. |
| 15:05:34 | 12 | (Jury present.) |
| 15:07:15 | 13 | THE COURT:  Mr. Williams, you're still under oath. |
| 15:07:18 | 14 | THE WITNESS:  Okay. |
| 15:07:19 | 15 | THE COURT:  You may proceed. |
| 15:07:20 | 16 | Q.   (BY MR. GARDNER) Special Agent Williams, we were talking |
| 15:07:22 | 17 | about the search warrant.  And I want to show you a exhibit taken |
| 15:07:25 | 18 | from Fernando Garcia in New Mexico, Government's Exhibit 128A. |
| 15:07:41 | 19 | Do you recognize this, sir? |
| 15:07:42 | 20 | A.   Yes, I do. |
| 15:07:45 | 21 | Q.   And this is what? |
| 15:07:47 | 22 | A.   Bank records for Bonanza Racing Stables. |
| 15:07:50 | 23 | Q.   And so, what is this particular document here? |
| 15:07:53 | 24 | A.   That's for the authorization form that give signature |
| 15:07:58 | 25 | rights. |

| | | |
|---|---|---|
| 15:07:59 | 1 | Q.   And whose name is it? |
| 15:08:01 | 2 | A.   Francisco Silva-Ramos. |
| 15:08:03 | 3 | Q.   And does it appear to be Mr. Ramos' signature down here? |
| 15:08:06 | 4 | A.   Yes. |
| 15:08:07 | 5 | Q.   Now, back of page 2 appears to be a Wells Fargo sticky? |
| 15:08:16 | 6 | A.   Yes. |
| 15:08:17 | 7 | Q.   And for the record, what does it say? |
| 15:08:18 | 8 | A.   Please sign and return. |
| 15:08:22 | 9 | Q.   Also located with this, do you find taxpayer number |
| 15:08:26 | 10 | identification? |
| 15:08:26 | 11 | A.   Yes. |
| 15:08:28 | 12 | Q.   Page 4.  And, sir, can you tell me what this page? |
| 15:08:36 | 13 | A.   It looks like an individual that's practicing the signature |
| 15:08:40 | 14 | of Francisco Silva-Ramos. |
| 15:08:43 | 15 | Q.   I'm showing you page 1.  Is that the signature? |
| 15:08:46 | 16 | A.   Yes. |
| 15:08:47 | 17 | Q.   So when you compare these, does it appear to be a similar |
| 15:08:52 | 18 | set of signatures as is on page 1 of the authorization form? |
| 15:08:55 | 19 | A.   Yes. |
| 15:08:56 | 20 | Q.   And, again, whose possession was this one found? |
| 15:08:58 | 21 | A.   In Fernando Garcia's. |
| 15:09:03 | 22 | Q.   And I'm showing you 128B.  What is this, sir? |
| 15:09:15 | 23 | A.   Bonanza Racing Stables bank statement. |
| 15:09:19 | 24 | Q.   Let me flip it over.  What does this $100,000 reflect? |
| 15:09:32 | 25 | A.   The opening deposit that was made. |

| | | |
|---|---|---|
| 15:09:34 | 1 | Q.   Did you -- were you able to determine any other activity |
| 15:09:37 | 2 | from this bank other than that opening deposit? |
| 15:09:39 | 3 | A.   No. |
| 15:09:40 | 4 | Q.   I want to show you Government's Exhibit 24 by stipulation |
| 15:10:02 | 5 | found at Jose Trevino's property in Lexington, Oklahoma.  What is |
| 15:10:08 | 6 | that, sir? |
| 15:10:09 | 7 | A.   It's a statement that shows Garcia Bloodstock in care of |
| 15:10:14 | 8 | Jose Trevino, their connection. |
| 15:10:21 | 9 | Q.   I want to show you Government's Exhibit 371A, B and C.  Do |
| 15:10:38 | 10 | you recognize those, sir? |
| 15:10:40 | 11 | A.   Yes, I do. |
| 15:10:41 | 12 | Q.   And are those photos taken from the search warrant in New |
| 15:10:44 | 13 | Mexico? |
| 15:10:44 | 14 | A.   Yes. |
| 15:10:45 | 15 | Q.   Is that the search warrant where Mr. Garcia was arrested? |
| 15:10:47 | 16 | A.   Yes. |
| 15:10:49 | 17 | Q.   Your Honor, I offer Government's Exhibit 371A, B and C. |
| 15:10:57 | 18 |         MR. WOMACK:  No objection. |
| 15:10:58 | 19 |         THE COURT:  All right.  A, B and C of 371 are received. |
| 15:11:02 | 20 | Q.   (BY MR. GARDNER) Now, was this the automobile that Mr. |
| 15:11:09 | 21 | Garcia was driving? |
| 15:11:10 | 22 | A.   Yes, it was. |
| 15:11:13 | 23 | Q.   What's the significance of that plate number? |
| 15:11:15 | 24 | A.   That plate is registered to Jose Trevino. |
| 15:11:19 | 25 |         THE COURT:  Before we do that, which exhibit is that? |

| | | |
|---|---|---|
| 15:11:24 | 1 | MR. GARDNER:  I'm sorry, your Honor.  That's 371A. |
| 15:11:26 | 2 | THE COURT:  All right. |
| 15:11:30 | 3 | Q.  (BY MR. GARDNER) Showing you 371B.  What's that a photo of, |
| 15:11:39 | 4 | sir? |
| 15:11:42 | 5 | A.  That is a certificate of veterinary inspection.  That was a |
| 15:11:46 | 6 | document that was found inside the car. |
| 15:11:48 | 7 | Q.  And I'm showing you Government's Exhibit 135.  Is that the |
| 15:11:53 | 8 | same veterinarian inspection slip? |
| 15:11:55 | 9 | A.  Yes. |
| 15:12:00 | 10 | Q.  And for the record, could you please state the date that's |
| 15:12:06 | 11 | located on that document? |
| 15:12:07 | 12 | A.  February 2, 2012. |
| 15:12:11 | 13 | Q.  And in whose name? |
| 15:12:12 | 14 | A.  Jose Trevino. |
| 15:12:15 | 15 | Q.  Again, where was this found? |
| 15:12:18 | 16 | A.  In New Mexico. |
| 15:12:19 | 17 | Q.  And was it found in the car registered to Jose Trevino? |
| 15:12:22 | 18 | A.  Yes. |
| 15:12:23 | 19 | Q.  Showing you Government's Exhibit 137, also by stipulation, |
| 15:12:41 | 20 | taken from the Defendant Fernando Garcia in New Mexico.  What is |
| 15:12:55 | 21 | this, sir? |
| 15:12:56 | 22 | A.  That's another statement found in New Mexico where it shows |
| 15:13:04 | 23 | his connection to Eusevio Huitron. |
| 15:13:07 | 24 | Q.  The jury has heard the name of this horse, but for the |
| 15:13:09 | 25 | record, could you read that in? |

| | | |
|---|---|---|
| 15:13:11 | 1 | A.    Tamaulipas Boy. |
| 15:13:14 | 2 | Q.    Your Spanish is not very good, is it? |
| 15:13:16 | 3 | A.    No. |
| 15:13:18 | 4 | Q.    Would that be Tamaulipas? |
| 15:13:19 | 5 | A.    Tamaulipas.  I guess so. |
| 15:13:22 | 6 |        THE COURT:  What number is that? |
| 15:13:24 | 7 |        MR. GARDNER:  Again, your Honor, that's Government's |
| 15:13:26 | 8 | Exhibit 137. |
| 15:13:28 | 9 | Q.    (BY MR. GARDNER) Was this the envelope in which it was |
| 15:13:32 | 10 | found? |
| 15:13:33 | 11 | A.    Yes. |
| 15:13:35 | 12 | Q.    So addressed to Fernando Garcia, a bill for Eusevio Huitron? |
| 15:13:41 | 13 | A.    Right.  Yes. |
| 15:13:42 | 14 | Q.    In all fairness, it was paid for, correct? |
| 15:13:45 | 15 | A.    Yes.  It was paid for. |
| 15:13:53 | 16 | Q.    I'm showing you Government's Exhibit 139, also by |
| 15:13:56 | 17 | stipulation found in New Mexico.  Do you recognize 139, sir? |
| 15:14:02 | 18 | A.    Yes, I do. |
| 15:14:03 | 19 | Q.    And speed things up, it's a Fed Ex envelope, is it not? |
| 15:14:08 | 20 | A.    Yes.  It is a Fed Ex. |
| 15:14:11 | 21 | Q.    And whose name is it in? |
| 15:14:12 | 22 | A.    Jesus Huitron and the company Huitron Homes. |
| 15:14:20 | 23 | Q.    While my mind's on the Fed Ex envelope, yesterday, the jury |
| 15:14:27 | 24 | heard some testimony with regards to a voided check. |
| 15:14:43 | 25 | Specifically, I'll ask the jury to recall the testimony -- and |

15:14:46  1  this is Government's Exhibit 6 by stipulation taken from

15:14:49  2  Lexington, Oklahoma.

15:14:59  3          Special Agent Williams, I know you weren't in the

15:15:01  4  courtroom, but the jury saw this check on the testimony of Brian

15:15:06  5  Schutt, and the testimony was -- or the indication was this check

15:15:11  6  was lost.  Did you review this check?

15:15:13  7  A.    Yes, I did.

15:15:13  8  Q.    And what on this check indicates to you it was not, in fact,

15:15:18  9  lost?

15:15:18  10  A.    That it -- it's the original check and it's voided, and on

15:15:23  11  the back of it, it was endorsed by Hernando Guerra.

15:15:35  12  Q.    So, again, if we turn over to the back, there appears to be

15:15:39  13  an endorsement by Hernando Guerra?

15:15:43  14  A.    Yes.

15:15:44  15  Q.    Yet, that check is voided?

15:15:45  16  A.    Correct.

15:15:46  17  Q.    And, again, for the record, is that the purchase of Blues

15:15:53  18  Ferrari?

15:15:53  19  A.    Yes.

15:15:54  20  Q.    What is unusual -- give me one second.  Who is Hernando

15:16:06  21  Guerra associated with?

15:16:07  22  A.    Fast And Furious.

15:16:08  23  Q.    That's stated here?

15:16:11  24  A.    Yes.

15:16:19  25  Q.    So Hernando Guerra's signature, at least one point,

| | | |
|---|---|---|
| 15:16:23 | 1 | indicates he touched that check? |
| 15:16:25 | 2 | A.   Yeah.  That he received it, yes. |
| 15:16:28 | 3 | Q.   Going back to the subject of Mr. Garcia.  Showing you |
| 15:16:33 | 4 | Government's Exhibits 58A and 58B by stipulation taken from |
| 15:16:41 | 5 | Eusevio and Jesus Huitron.  58A, a race photo; is that correct? |
| 15:16:51 | 6 | A.   Yes. |
| 15:16:52 | 7 | Q.   Okay.  The horse's name in this case is Jukebox Zoom.  So |
| 15:16:57 | 8 | it's Fernando Garcia, owner and Eusevio Huitron, trainer? |
| 15:17:01 | 9 | A.   Yes. |
| 15:17:02 | 10 | Q.   And 58B is a horse called Reba Reba Corona and who's the |
| 15:17:08 | 11 | owner? |
| 15:17:08 | 12 | A.   Garcia Bloodstock and Racing. |
| 15:17:10 | 13 | Q.   And who's the trainer? |
| 15:17:12 | 14 | A.   Erika Huitron. |
| 15:17:14 | 15 | Q.   Do you know if Erika Huitron is associated with Jesus and |
| 15:17:17 | 16 | Eusevio Huitron? |
| 15:17:18 | 17 | A.   Yes. |
| 15:17:26 | 18 | Q.   Showing you Government's Exhibit 138 by stipulation taken |
| 15:17:31 | 19 | from the Defendant Fernando Garcia in New Mexico.  What are |
| 15:17:38 | 20 | those, sir? |
| 15:17:40 | 21 | A.   Membership ID cards for American Quarter Horse Association. |
| 15:17:44 | 22 | Q.   Bonanza Racing Stables on top? |
| 15:17:46 | 23 | A.   Yes. |
| 15:17:47 | 24 | Q.   And who on the bottom part? |
| 15:17:49 | 25 | A.   Luis Gerardo Aguirre. |

| | | |
|---|---|---|
| 15:17:51 | 1 | Q.   And, again, the evidentiary significance of that? |
| 15:17:53 | 2 | A.   It shows his connection to Luis Aguirre. |
| 15:18:00 | 3 | Q.   And, again, these were all in Mr. Garcia's -- are the ones |
| 15:18:04 | 4 | identified from Mexico were all in Mr. Garcia's possession? |
| 15:18:06 | 5 | A.   Yes. |
| 15:18:07 | 6 | Q.   Okay.  Showing you Government's Exhibit 134 taken by |
| 15:18:16 | 7 | stipulation from Mr. Fernando Garcia in New Mexico.  Do you |
| 15:18:22 | 8 | recognized that, sir? |
| 15:18:23 | 9 | A.   Yes.  State of New Mexico Racing Commission ID badge. |
| 15:18:28 | 10 | Q.   Sir, have you reviewed the pocket trash testified to by the |
| 15:18:35 | 11 | Customs and Border Protection officer? |
| 15:18:37 | 12 | A.   Yes. |
| 15:18:38 | 13 | Q.   Is this the same card that you saw on that exhibit? |
| 15:18:40 | 14 | A.   Yes. |
| 15:18:55 | 15 | Q.   Showing you what has been taken from Fernando Garcia by |
| 15:18:58 | 16 | stipulation, Government's Exhibit 142A from New Mexico.  What is |
| 15:19:03 | 17 | this, sir? |
| 15:19:14 | 18 | A.   That is a Poker Ranch horsemen's account. |
| 15:19:17 | 19 | Q.   And, again, this was in Mr. Garcia's possession? |
| 15:19:19 | 20 | A.   Yes. |
| 15:19:22 | 21 | THE COURT:  What? |
| 15:19:24 | 22 | MR. GARDNER:  142A, your Honor. |
| 15:19:26 | 23 | THE COURT:  But what ranch? |
| 15:19:29 | 24 | MR. GARDNER:  Poker Ranch. |
| 15:19:30 | 25 | THE WITNESS:  Poker Ranch. |

15:19:31  1  Q.   (BY MR. GARDNER) And 142B, whose horsemen's account is that?

15:19:38  2  A.   Desiree Princess Ranch and, also, the statements that you're

15:19:42  3  putting back on there, also, it shows that those checks were

15:19:45  4  written to Fernando Garcia that you put your finger back on.

15:19:50  5  Q.   The checks that were found with the exhibit.  The paid name

15:19:54  6  is Fernando Garcia?

15:19:55  7  A.   Exactly.  And that was on Poker Ranch, as well.

15:20:05  8  Q.   Government's Exhibit 179 taken by stipulation from the

15:20:13  9  Dallas residence of Jose Trevino.  What is that, sir?

15:20:24  10  A.   It's the envelope that's for Poker Ranch and for Fernando to

15:20:29  11  pick up.  And these were tickets that was found in Jose Trevino's

15:20:34  12  search warrant stuff.

15:20:35  13  Q.   And inside are the actual tickets to the Turf Club in

15:20:41  14  Ruidoso for the All American Futurity for 2011?

15:20:45  15  A.   Yes.

15:20:50  16  Q.   And, again, the evidentiary significance?

15:20:52  17  A.   It shows his connection to Jose Trevino.

15:21:03  18  Q.   I'm showing you Government's Exhibit 132, also by

15:21:06  19  stipulation, taken from Fernando Garcia in New Mexico.  132,

15:21:11  20  series of one, two, three, four, five AQHA registration

15:21:21  21  certificates.  This is a horse called Adan Farias -- I'm sorry,

15:21:32  22  Don Hervy.  This is what I was getting to.  Whose name is at the

15:21:35  23  top in pencil?

15:21:36  24  A.   Adan Farias.

15:21:38  25  Q.   And the name of the current owner?

| | | |
|---|---|---|
| 15:21:40 | 1 | A.   Garcia Bloodstock and Racing. |
| 15:21:48 | 2 | Q.   And the second page, what's the name of the horse? |
| 15:21:50 | 3 | A.   Corona James. |
| 15:21:52 | 4 | Q.   And who is the owner listed on this horse? |
| 15:21:54 | 5 | A.   Sergio Rincon. |
| 15:22:05 | 6 | Q.   And who is the horse previously owned by? |
| 15:22:08 | 7 | A.   Francisco Colorado-Cessa. |
| 15:22:11 | 8 | Q.   So it went from Francisco Colorado-Cessa to Sergio Rincon? |
| 15:22:17 | 9 | A.   Yes. |
| 15:22:18 | 10 | Q.   And whose possession was it? |
| 15:22:20 | 11 | A.   Fernando Garcia's. |
| 15:22:24 | 12 | Q.   Horse called BP Hesa Jess.  Who's the registered owner? |
| 15:22:29 | 13 | A.   Poker Ranch. |
| 15:22:36 | 14 | Q.   And attached to the back is what the jury has heard referred |
| 15:22:38 | 15 | to as a Coggins report.  Who is listed on the Coggins report as |
| 15:22:47 | 16 | the name and address? |
| 15:22:48 | 17 | A.   Eusevio Huitron. |
| 15:22:53 | 18 | Q.   And the next horse is called Loose Chick.  And who is listed |
| 15:23:04 | 19 | as the current owner? |
| 15:23:05 | 20 | A.   Francisco Colorado-Cessa. |
| 15:23:10 | 21 | Q.   And this is a horse called Molotov? |
| 15:23:13 | 22 | A.   Yes. |
| 15:23:13 | 23 | Q.   And who's the current owner? |
| 15:23:14 | 24 | A.   Carmina, LLC. |
| 15:23:16 | 25 | Q.   And who do you know Carmina, LLC to be associated with? |

15:23:19   1   A.   Carlos Nayen.

15:23:21   2   Q.   And who's listed in the top right-hand corner?

15:23:24   3   A.   "E" stands for Eusevio Huitron.

15:23:30   4   Q.   Again, what's the significance of that?

15:23:31   5   A.   Shows their connection.

15:23:33   6   Q.   Special Agent Williams, was that the -- what you attempt to

15:23:37   7   do in a law enforcement investigation, sir, the connections?

15:23:39   8   A.   Yes, we do.

15:23:40   9   Q.   And why is that?

15:23:41  10   A.   Show the environment of what you call a conspiracy.

15:23:46  11        MR. ESPER:  Objection, your Honor.  He's invading the

15:23:48  12   province of the jury.

15:23:50  13        MR. GARDNER:  I'll rephrase and ask another question.

15:23:55  14   Q.   (BY MR. GARDNER) Is one of the things the government has to

15:23:57  15   prove is knowledge?

15:23:58  16   A.   Yes.

15:23:59  17   Q.   Not only knowledge of the underlying offense but knowledge

15:24:02  18   of other coconspirators?

15:24:04  19   A.   Yes.

15:24:05  20   Q.   And does that evidence that you reviewed and selected, at

15:24:09  21   least in your understanding, help demonstrate that?

15:24:12  22   A.   Yes.

15:24:14  23        MR. MAYR:  Objection, your Honor.  Again, it goes to an

15:24:16  24   ultimate conclusion, and invades the province of the jury, and

15:24:18  25   inadmissible under 704.

15:24:21   1          MR. GARDNER:  Your Honor, that's all the questions I

15:24:23   2   have.

15:24:24   3          THE COURT:  The last answer, do not consider for any

15:24:28   4   purpose, although it was a late objection.  You stood up, you

15:24:32   5   waited till the answer and then, you objected.

15:24:34   6          MR. MAYR:  Well, but the problem is the answer, your

15:24:37   7   Honor, is -- he goes a little bit beyond what the question -- I

15:24:40   8   can't anticipate the questions and I apologize.

15:24:43   9          THE COURT:  All right.  I've sustained the objection.

15:24:47   10  The jury will not consider it.

15:24:48   11         MR. GARDNER:  Thank you, your Honor.  I pass the

15:24:49   12  witness.

15:24:50   13         THE COURT:  All right.  Ms. Williams.

15:24:54   14                      CROSS-EXAMINATION

15:24:54   15  BY MS. WILLIAMS:

15:25:11   16  Q.   Good afternoon.

15:25:12   17  A.   Hi.

15:25:13   18  Q.   I'm handing you what's been marked as Government's Exhibit

15:25:15   19  264 and it's admitted.  Can you tell the members of the jury what

15:25:19   20  that is?

15:25:19   21  A.   It's a signature card for IBC for Tyler Graham.

15:25:29   22  Q.   It's an IBC Bank account for Tyler Graham?

15:25:33   23  A.   Correct.

15:25:33   24  Q.   And when was that account opened?  June 28, 2010?

15:25:45   25  A.   Let me find the date on it.

| | | |
|---|---|---|
| 15:25:57 | 1 | Q.   It's on that first page. |
| 15:26:05 | 2 | A.   Okay, yeah.  June 28, 2010. |
| 15:26:09 | 3 | Q.   All right.  After the date of the opening of that bank |
| 15:26:11 | 4 | account, a check was deposited; is that correct? |
| 15:26:25 | 5 | A.   Yes.  There was a deposit made.  Yes. |
| 15:26:27 | 6 | Q.   And it was a check? |
| 15:26:28 | 7 | A.   Yes. |
| 15:26:30 | 8 | Q.   $2,855? |
| 15:26:36 | 9 | A.   Correct. |
| 15:26:37 | 10 | Q.   On the same date that it was opened? |
| 15:26:39 | 11 | A.   Correct. |
| 15:26:42 | 12 | Q.   All right.  Then over a period of two days, a couple of |
| 15:26:47 | 13 | things happen.  There are a series of $9,000 deposits made in |
| 15:26:56 | 14 | cash into that bank account? |
| 15:26:58 | 15 | A.   Correct. |
| 15:26:59 | 16 | Q.   True? |
| 15:27:00 | 17 | A.   Yes. |
| 15:27:00 | 18 | Q.   All right.  So on July the 13th, $9,000 is deposited? |
| 15:27:13 | 19 | A.   Correct. |
| 15:27:14 | 20 | THE COURT:  Are you saying July the 13th? |
| 15:27:18 | 21 | MS. WILLIAMS:  I did, your Honor. |
| 15:27:19 | 22 | THE COURT:  And the account was opened. |
| 15:27:21 | 23 | MS. WILLIAMS:  Opened on June 28th. |
| 15:27:23 | 24 | THE COURT:  Okay. |
| 15:27:32 | 25 | Q.   (BY MS. WILLIAMS) And then, at that same branch, I don't |

15:27:36   1   know if you can tell what time it is.  I sure can't.  Another

15:27:44   2   $9,000 is deposited?

15:27:45   3   A.   Right.

15:27:45   4   Q.   And then, on that same date at a different branch of IBC

15:27:50   5   bank, another $9,000 was deposited.

15:27:55   6   A.   Correct.

15:27:56   7   Q.   And then, some money was taken out, $1,700; is that right?

15:28:14   8   A.   Yes.  Right.

15:28:15   9   Q.   Is it in cash?  Can you tell?

15:28:17   10   A.   No.  It was a check.

15:28:18   11   Q.   It was a check.  So like he wrote a check to himself?

15:28:37   12   A.   No.  He wrote a check to.

15:28:39   13   Q.   Somebody else?

15:28:39   14   A.   Yeah.

15:28:40   15   Q.   All right.  Then, the next day, on July the 14th, 2010, back

15:28:46   16   at the original branch, branch 130, another deposit of $9,000 was

15:28:59   17   made.

15:29:00   18   A.   Correct.

15:29:03   19        THE COURT:  What date was that, counsel?

15:29:05   20        MS. WILLIAMS:  July the 14th, 2010.

15:29:09   21   Q.   (BY MS. WILLIAMS) And, again, on July 14, 2010 at branch

15:29:12   22   130, another $9,000.

15:29:15   23   A.   Right.

15:29:17   24   Q.   And just as in the previous day, the third deposit is made

15:29:22   25   at branch 101 for another $9,000?

| | | |
|---|---|---|
| 15:29:28 | 1 | A.   Correct. |
| 15:29:29 | 2 | Q.   And then, on July the 27th of 2010, what happened?  It's the |
| 15:29:40 | 3 | last thing -- I mean, this is all the transactions in this |
| 15:29:43 | 4 | account, right?  Everything I've described is what happens in |
| 15:29:46 | 5 | this account. |
| 15:29:49 | 6 | A.   Let me get to the last page and check.  Yeah.  There were |
| 15:30:05 | 7 | two checks, three checks written.  Oh, no, no, no. |
| 15:30:10 | 8 | Q.   Two checks? |
| 15:30:11 | 9 | A.   Two. |
| 15:30:11 | 10 | Q.   Right?  Two checks.  Two cashier's checks, I think. |
| 15:30:27 | 11 | A.   Yeah.  Two cashier's checks.  Yes. |
| 15:30:32 | 12 | Q.   One to Heritage Place? |
| 15:30:35 | 13 | A.   Right. |
| 15:30:37 | 14 | Q.   And one to Tyler Graham? |
| 15:30:39 | 15 | A.   Correct. |
| 15:30:42 | 16 | Q.   Now, this activity that takes -- well, do you see in this |
| 15:30:47 | 17 | bank account -- and maybe it wouldn't be here.  But do you have |
| 15:30:51 | 18 | any evidence that a suspicious activity report was filed as a |
| 15:30:54 | 19 | result of this activity? |
| 15:30:55 | 20 | A.   A suspicious activity report, no. |
| 15:30:58 | 21 | Q.   Should it have been? |
| 15:31:00 | 22 | A.   That would be depending on the branch.  Those are not |
| 15:31:03 | 23 | required forms to be filed. |
| 15:31:04 | 24 | Q.   All right.  What would you call this activity that took |
| 15:31:09 | 25 | place on July 13 and July 14? |

| | | |
|---|---|---|
| 15:31:12 | 1 | A.   Possibly structuring transactions. |
| 15:31:16 | 2 | Q.   No further questions. |
| 15:31:26 | 3 | MR. SANCHEZ:  No questions. |
| 15:31:28 | 4 | MR. WOMACK:  Just a few, your Honor. |
| 15:31:30 | 5 | CROSS-EXAMINATION |
| 15:31:30 | 6 | BY MR. WOMACK: |
| 15:31:33 | 7 | Q.   Mr. Williams, how are you doing? |
| 15:31:35 | 8 | A.   I'm doing fine. |
| 15:31:36 | 9 | Q.   We've met before, haven't we? |
| 15:31:38 | 10 | A.   Yes, we have. |
| 15:31:39 | 11 | Q.   Handful of questions about this bank account. |
| 15:31:41 | 12 | A.   Okay. |
| 15:31:41 | 13 | Q.   On -- |
| 15:31:42 | 14 | A.   The same bank account or which bank account? |
| 15:31:45 | 15 | Q.   Garcia Bloodstock, Fernando Garcia.  And you know Fernando |
| 15:31:48 | 16 | Garcia? |
| 15:31:48 | 17 | A.   Yes. |
| 15:31:49 | 18 | Q.   Stand up.  You know him? |
| 15:31:50 | 19 | A.   Yeah. |
| 15:31:51 | 20 | Q.   Okay.  Have a seat. |
| 15:31:54 | 21 | In September of 2008. |
| 15:31:58 | 22 | A.   Right. |
| 15:32:00 | 23 | Q.   On the day that Fernando Garcia opened his company, Garcia |
| 15:32:06 | 24 | Bloodstock and Racing? |
| 15:32:06 | 25 | A.   Correct. |

| | | |
|---|---|---|
| 15:32:07 | 1 | Q.   You told us he made around -- I think it was $81,000 in |
| 15:32:12 | 2 | deposits? |
| 15:32:13 | 3 | A.   Yes. |
| 15:32:15 | 4 | Q.   And that was the money basically to establish his account, |
| 15:32:18 | 5 | his bank account for his company, correct? |
| 15:32:20 | 6 | A.   I don't know what he had the $90,000 for. |
| 15:32:25 | 7 | Q.   Right.  But remember it was the initial deposit.  When you |
| 15:32:27 | 8 | open a bank account, you have to put something in it. |
| 15:32:29 | 9 | A.   Well, the initial deposit was just $9,000 at FirstBank at El |
| 15:32:33 | 10 | Conquistador.  Not 80,000. |
| 15:32:36 | 11 | Q.   Okay.  So during that timeframe he opened a bank account, |
| 15:32:39 | 12 | the same day that he started his company, he made a deposit of |
| 15:32:44 | 13 | $9,000 in the bank? |
| 15:32:46 | 14 | A.   Right. |
| 15:32:46 | 15 | Q.   That was a brand-new bank account opened that day? |
| 15:32:49 | 16 | A.   Right. |
| 15:32:49 | 17 | Q.   And you told us that he made a series of deposits, like |
| 15:32:53 | 18 | $9,000 each totaling around 80 -- I think it was 81,000 or more? |
| 15:32:57 | 19 | A.   Yes. |
| 15:32:57 | 20 | Q.   Okay.  And to you, as a trained IRS agent, that would look |
| 15:33:04 | 21 | very suspicious, wouldn't it? |
| 15:33:06 | 22 | A.   Yes. |
| 15:33:07 | 23 | Q.   Now, would you agree with me that to be guilty of |
| 15:33:12 | 24 | structuring, the depositor, the person taking the money and |
| 15:33:18 | 25 | depositing it into the bank would have to know that the bank has |

15:33:23   1   a requirement of making a report of some kind to the IRS any time

15:33:30   2   you make a deposit of more than $10,000, correct?  Is that part

15:33:34   3   of it?

15:33:35   4   A.   Could you rephrase that now?

15:33:36   5   Q.   Yeah.  I'm trying to make it very simple for me.

15:33:42   6          To commit structuring, which is a criminal offense or

15:33:46   7   can be -- to commit structuring, the person making the deposit,

15:33:53   8   the depositor, we'll call him.

15:33:56   9   A.   Right.

15:33:56   10  Q.   First would have to know that a bank has a requirement that

15:34:02   11  when someone makes a deposit of more than $10,000 cash, they, the

15:34:07   12  bank has to report that in this Currency Transaction Report to

15:34:11   13  the IRS?

15:34:13   14          MR. GARDNER:  Your Honor, may I approach?

15:34:14   15          THE COURT:  You may.

15:34:21   16          MR. GARDNER:  I'm sorry.

15:34:22   17          (At the bench, on the record.)

15:34:31   18          MR. GARDNER:  Your Honor, Mr. Womack's line of

15:34:32   19  questioning, I believe he's kicking open the door for me to start

15:34:35   20  asking about all these lies to show he has knowledge.  And I

15:34:43   21  understand the Court's ruling, and I agree with it under the

15:34:46   22  circumstances, but what Mr. Womack is asking is whether we can't

15:34:50   23  show there's knowledge under structure.  All the lies in his

15:34:53   24  statements should come in to show he has knowledge of

15:34:57   25  structuring.

15:34:58   1          MS. FERNALD:  With a limiting instruction on Bruton in

15:35:04   2   order to state the appellate record.

15:35:04   3          MR. WOMACK:  None of these statements talk about

15:35:06   4   structuring.

15:35:06   5          THE COURT:  What?

15:35:07   6          MR. WOMACK:  None of the statements talk about --

15:35:08   7          THE COURT:  You're asking him a question that has a lot

15:35:14   8   of places.

15:35:14   9          MR. WOMACK:  And that's a good reason not to because of

15:35:16   10   that.

15:35:17   11          THE COURT:  He's got to have intent to -- doesn't even

15:35:20   12   have to have any knowledge --

15:35:21   13          MR. WOMACK:  You'll give instructions on that.  Yes,

15:35:23   14   sir.  I know that.  I'll withdraw that.

15:35:24   15          MR. MAYR:  Judge, what was that last part?  He doesn't

15:35:26   16   have to have acknowledge?

15:35:27   17          THE COURT:  He doesn't have to know -- actually, it's

15:35:31   18   he has to have knowledge that he was trying to avoid the

15:35:36   19   reporting.

15:35:36   20          MR. MAYR:  But he does have to know that there is a

15:35:38   21   reporting requirement.

15:35:38   22          MR. WOMACK:  Assume he had to know to avoid it.

15:35:41   23          MR. MAYR:  Yeah, he does.

15:35:42   24          THE COURT:  Not in a particular bank.  You wouldn't

15:35:44   25   have to know that.  He just knows that he's supposed to report

| | | |
|---|---|---|
| 15:35:49 | 1 | it -- the bank's supposed to report it. |
| 15:35:51 | 2 | MR. WOMACK:  Two things.  First, you have to know |
| 15:35:52 | 3 | there's a requirement for the bank to do it and you have to |
| 15:35:54 | 4 | intend to avoid that by breaking it down into small deposits. |
| 15:35:58 | 5 | But I understand he's not a proper witness.  I would -- I |
| 15:36:01 | 6 | understand, sir.  Thank you. |
| 15:36:09 | 7 | Q.   (BY MR. WOMACK) In the Marine Corps, we have a saying, as |
| 15:36:13 | 8 | you were.  That means to forget everything else and go back to |
| 15:36:15 | 9 | square one, okay?  As you were. |
| 15:36:17 | 10 | A.   Okay. |
| 15:36:23 | 11 | Q.   You were shown a signature card for Bonanza Racing Stables? |
| 15:36:31 | 12 | A.   Yes. |
| 15:36:58 | 13 | Q.   You were shown the bank account signature card or signature |
| 15:37:05 | 14 | records for Bonanza Racing Stables.  Remember that? |
| 15:37:09 | 15 | A.   Yes. |
| 15:37:10 | 16 | Q.   And it has that real distinctive signature of Francisco |
| 15:37:16 | 17 | Silva-Ramos on the signature card, correct? |
| 15:37:18 | 18 | A.   Correct. |
| 15:37:19 | 19 | Q.   When someone opens a bank account, personal or commercial. |
| 15:37:31 | 20 | In addition to the guy that owns the company or owns the account, |
| 15:37:35 | 21 | he or she can designate other people to be signatories on that |
| 15:37:39 | 22 | account? |
| 15:37:40 | 23 | A.   Correct. |
| 15:37:41 | 24 | Q.   So when Mr. Silva-Ramos opened the bank account for Bonanza |
| 15:37:50 | 25 | Stables, he could have, if he wanted to, added any of his |

15:37:56   1   employees or anyone associated with his company, he could have

15:38:01   2   added them on the account as signatories if he had wanted to,

15:38:05   3   correct?

15:38:05   4   A.   Yes.

15:38:06   5   Q.   And if he doesn't do that, then they're not authorized to

15:38:12   6   draw money on his account, are they?

15:38:13   7   A.   Correct.

15:38:15   8   Q.   And I think you told us when Bonanza Racing Stables opened

15:38:20   9   their account on the account that we have here in evidence, they

15:38:26   10   started with a balance of $100,000?

15:38:28   11   A.   Right.

15:38:30   12   Q.   And you know that they never drew anything on that account,

15:38:35   13   did they?

15:38:35   14   A.   Right, because the check that was written bounced.

15:38:40   15   Q.   Oh, there's a check that was written that bounced?

15:38:43   16   A.   Right.

15:38:43   17   Q.   And who was that to, do you know?

15:38:46   18   A.   The check was written to Tremor Enterprises.  Well, from

15:38:51   19   Tremor Enterprises to Bonanza Racing Stables.

15:38:53   20   Q.   And was it for more than $100,000?

15:38:54   21   A.   No.  It was 100,000 for the purchase of Mr. Ease Cartel.

15:39:00   22   Q.   Okay.  So no one, not even Mr. Silva-Ramos, no one

15:39:08   23   successfully drew money on that account, did they?

15:39:11   24   A.   According to -- no.  Not with that check.  No.

15:39:18   25   Q.   That's all the questions I have.

15:39:27   1                    CROSS-EXAMINATION

15:39:27   2   BY MR. ESPER:

15:39:33   3   Q.   Mr. Williams, how long have you been with the IRS, sir?

15:39:37   4   A.   Twenty-one years.

15:39:40   5   Q.   And you are a Certified Public Accountant?

15:39:42   6   A.   No.  I'm not.

15:39:43   7   Q.   Just an accountant.  You have a degree in accounting?

15:39:46   8   A.   No.  It's a business administration and I have minor in

15:39:49   9   accounting.

15:39:49  10   Q.   Are you attached to the CID division or are you just an IRS

15:39:54  11   agent?

15:39:54  12   A.   No.  I'm a special agent in CID department.

15:39:58  13   Q.   Okay.  Let's just assume a hypothetical I want to pose to

15:40:05  14   you.  Then I'll ask you some questions, okay?

15:40:07  15   A.   Okay.

15:40:07  16   Q.   Let's assume that you're not an IRS agent.  You're a

15:40:11  17   reputable horse person.

15:40:13  18   A.   Well, I can't assume I'm not one and I'm not a reputable

15:40:17  19   horse person.

15:40:18  20   Q.   Pardon?

15:40:18  21   A.   I can't assume I'm not an IRS agent or a reputable horse

15:40:23  22   person.  I'm not either one.

15:40:24  23   Q.   Let's just for purposes of this hypothetical.  Let's just

15:40:27  24   assume you are a reputable horse buyer, person who evaluates

15:40:32  25   horses?

| | | |
|---|---|---|
| 15:40:32 | 1 | A.   Okay.  I'll try. |
| 15:40:34 | 2 | Q.   I'm not a lawyer, but I'm a reputable horse trainer. |
| 15:40:38 | 3 | A.   Okay. |
| 15:40:39 | 4 | Q.   You now come to me and you say, Mr. Esper, I represent some |
| 15:40:44 | 5 | people who own some horses.  They want them trained so that they |
| 15:40:50 | 6 | can enter them in racing events, and they'd like -- and my |
| 15:40:57 | 7 | recommendation to my clients is they bring them to you, meaning |
| 15:41:02 | 8 | me, and I say, okay.  And you ask me, how much are your fees, I |
| 15:41:07 | 9 | tell you.  Minimum of thousand dollars plus certain things are |
| 15:41:12 | 10 | extra, and you then, say, okay, here's my contact information. |
| 15:41:18 | 11 | The bills will -- you send the bills to me and I'll make sure you |
| 15:41:23 | 12 | get paid, okay? |
| 15:41:24 | 13 | A.   Uh-huh. |
| 15:41:25 | 14 | Q.   With me?  Okay.  Now, all of a sudden, here comes about 40 |
| 15:41:30 | 15 | horses that are now on my little modest racing facility.  That's |
| 15:41:33 | 16 | a minimum of about 40,000 a month, correct? |
| 15:41:37 | 17 | A.   Yeah. |
| 15:41:38 | 18 | Q.   Okay.  Now, I start having my office girl bill you for that |
| 15:41:46 | 19 | $40,000 every month.  And based on your representations to me, |
| 15:41:53 | 20 | you're going to collect that 40,000 and pay me for my services. |
| 15:41:57 | 21 | Fair enough? |
| 15:41:57 | 22 | A.   Okay.  Are you saying I'm going -- who's going to collect |
| 15:42:00 | 23 | it? |
| 15:42:01 | 24 | Q.   You are.  You represented that you're the representative of |
| 15:42:04 | 25 | some people that own horses. |

15:42:05  1   A.   So why wouldn't they just go directly to the person that

15:42:08  2   they're paying?

15:42:09  3   Q.   Well, because you're their agent, sir.

15:42:10  4   A.   But they could send that person the check.  Why would they

15:42:13  5   go through me to get to you?

15:42:15  6   Q.   I'm not trying to be argumentative.

15:42:16  7   A.   Well, I know, but you said I'm being a reputable person and

15:42:20  8   you're asking me my opinion, and I'm saying I would have the

15:42:23  9   person go directly to that person, instead of doing a triangle.

15:42:26  10  Q.   Let's say the owners live in Mexico and they don't want to

15:42:30  11  come over to the United States, for whatever reason.

15:42:33  12  A.   You mail a check.

15:42:33  13  Q.   They know you travel back and forth.

15:42:35  14  A.   Mail a check.

15:42:36  15  Q.   Pardon me?

15:42:37  16  A.   I would mail a check or wire to them directly.

15:42:39  17  Q.   Okay.  So whenever the bill is sent to you, you would tell

15:42:43  18  them, hey, just wire it into.

15:42:46  19  A.   My account.

15:42:46  20  Q.   Wire it into your account and then, you would make sure I

15:42:49  21  would get paid?

15:42:49  22  A.   No.  I mean, I would have them wire to you, not to me.

15:42:52  23  Q.   That's what you'd have them do.  Wire it to Mr. Esper,

15:42:56  24  either wire it into his account or wire the money to him

15:42:59  25  directly?

15:43:00  1   A.   Yeah.  Not to me.

15:43:02  2   Q.   I understand.  I understand.  But I'm looking to you.  I'm

15:43:07  3   looking to you.  You're telling me you look to me for payment of

15:43:10  4   the bills.  So I'm looking to you for payment of the bills.  Now,

15:43:14  5   you say you're going to tell the owners, hey, don't give me the

15:43:18  6   money, give it to him directly.  That's what you're saying?

15:43:22  7   A.   Yeah.  Why include a third person?  Go directly to the

15:43:25  8   person that's --

15:43:27  9   Q.   I understand.

15:43:28  10  A.   -- billing each other.

15:43:29  11  Q.   Now, do I have any control how those owners pay me?

15:43:39  12  A.   Do you have any control?

15:43:41  13  Q.   Yes.

15:43:41  14  A.   If you request to be paid by check and not cash, yes, you

15:43:44  15  do.

15:43:44  16  Q.   Well, let's just say, here's my bank account.  Please either

15:43:48  17  wire-transfer me the money into my account.  I make that

15:43:52  18  request --

15:43:53  19  A.   But when you do that --

15:43:54  20  Q.   I make that request.

15:43:55  21  A.   But you have to really trust that person and know them real

15:43:58  22  well to give them your banking information.

15:43:59  23  Q.   Well, but you're the one that has approached me, Mr.

15:44:02  24  Williams, in the hypothetical.

15:44:03  25  A.   Okay, well, I got lost in this hypothetical.

15:44:06    1          THE COURT:  We're not getting anywhere.  Plus the fact
15:44:10    2    you've got the horses.
15:44:11    3          MR. ESPER:  Yes, sir.
15:44:12    4          THE COURT:  So let's go on to something germane.
15:44:15    5    Q.   (BY MR. ESPER) Okay.  If I'm being paid and I tell the
15:44:17    6    owners, this is how I want to be paid, pay it into my bank
15:44:22    7    account, if it's paid differently, if it's paid differently, am I
15:44:28    8    responsible for how it's paid differently than what I requested?
15:44:30    9    A.   If you have knowledge of how it's getting there, you do.
15:44:32   10    Q.   If I have knowledge, absolutely.
15:44:33   11    A.   But you know when you get your statement how it's getting
15:44:36   12    paid.
15:44:36   13    Q.   If I know when I get my statement, I see how I'm being paid.
15:44:40   14    Correct.
15:44:42   15    A.   Exactly.
15:44:42   16    Q.   But if I don't know how I'm being paid --
15:44:43   17    A.   But you see it.
15:44:45   18    Q.   Wait a minute, sir.  If it's contrary to what I requested,
15:44:49   19    I'm not accountable unless I knew they were trying to violate the
15:44:52   20    law, correct?
15:44:53   21    A.   Right.  But if you continue --
15:44:55   22    Q.   That's all I have.
15:44:57   23          MR. GARDNER:  Your Honor, I think he could answer the
15:45:00   24    last question posed.
15:45:02   25          THE COURT:  We've had enough of that.

| | | |
|---|---|---|
| 15:45:06 | 1 | MR. MAYR:  Your Honor, if I may have a moment, I need |
| 15:45:08 | 2 | to set up my laptop because I'm going to ask him questions based |
| 15:45:11 | 3 | on this. |
| 15:45:12 | 4 | MS. WILLIAMS:  During that moment, your Honor, I |
| 15:45:14 | 5 | intended to offer my notes as JT-8 for demonstrative purposes |
| 15:45:22 | 6 | only. |
| 15:45:22 | 7 | MR. GARDNER:  No objection, your Honor. |
| 15:45:23 | 8 | THE COURT:  JT-8 is received. |
| 15:46:04 | 9 | MR. GARDNER:  May we approach, your Honor? |
| 15:46:12 | 10 | (At the bench, on the record.) |
| 15:46:25 | 11 | THE COURT:  I can tell that these meetings here at the |
| 15:46:28 | 12 | pitching mound have to stop. |
| 15:46:31 | 13 | MR. MAYR:  I tried to work out an agreement with him. |
| 15:46:35 | 14 | What Mr. Womack did was a little bit confusing to the jury.  I've |
| 15:46:37 | 15 | actually prepared a PowerPoint with the elements from a court of |
| 15:46:43 | 16 | appeals decision setting forth the elements for structuring.  I |
| 15:46:46 | 17 | want to -- |
| 15:46:46 | 18 | THE COURT:  I will instruct them on the elements.  Not |
| 15:46:49 | 19 | you. |
| 15:46:50 | 20 | MR. MAYR:  Okay.  Fair enough. |
| 15:46:51 | 21 | THE COURT:  End of question. |
| 15:46:52 | 22 | MR. MAYR:  Fair enough.  Okay. |
| 15:47:03 | 23 | CROSS-EXAMINATION |
| 15:47:03 | 24 | BY MR. MAYR: |
| 15:47:08 | 25 | Q.   Agent Williams. |

15:47:09  1   A.    Yes.

15:47:10  2   Q.    Classic example of structuring.  You give me $20,000.  I

15:47:15  3   don't want the IRS to know about it, so I take 5,000 of it and I

15:47:20  4   deposit it into one account.  Take another 7,500, deposit it into

15:47:25  5   another bank account.  And I take the last 7,500 and I deposit it

15:47:28  6   into another bank account at a completely different bank.  That's

15:47:31  7   pretty classic example of structuring, right?

15:47:34  8   A.    Yes.

15:47:34  9   Q.    Because it shows that I'm intending to avoid the reporting

15:47:38  10  requirement in filling out those CTRs or Cash Transaction Reports

15:47:41  11  that you were talking about with Mr. Gardner, correct?

15:47:43  12  A.    Yes.

15:47:44  13  Q.    Okay.  So the key there is that I don't want to fill those

15:47:49  14  forms out because I don't want the IRS to know, right?

15:47:52  15  A.    Right.

15:47:53  16  Q.    Okay.  Showing you what's been admitted as 352B.  Can you

15:48:10  17  see that okay up there?  I'm going to zoom in.

15:48:12  18  A.    Yeah.

15:48:15  19  Q.    Okay.  What you previously testified to is that this is a

15:48:19  20  certified record of all cash transaction reports that were filed

15:48:25  21  in relation to my client Jesus Huitron's account; is that right?

15:48:29  22  A.    Yes.

15:48:29  23  Q.    Okay.  This is it.  This is accurate.  There is no

15:48:35  24  discrepancies here whatsoever, right?

15:48:37  25  A.    I'm basing it on the certification of FinCEN.

15:48:41   1   Q.   That one right there, right?

15:48:43   2   A.   Yes.

15:48:43   3   Q.   Okay.  Now, for the jury's sake, I'm not going to go through

15:48:48   4   each one of these transactions here, but if I understand this

15:48:52   5   correctly, what this means is that, for instance, on -- so, for

15:49:03   6   instance, right here, on July 12, 2010, that means there was a

15:49:16   7   total cash and deposit of $14,150 that was deposited by Jesus

15:49:30   8   Huitron, right?

15:49:30   9   A.   Correct.

15:49:31   10   Q.   Okay.  Now, this deposit shows to be filed in Laredo; is

15:49:36   11   that right?

15:49:36   12   A.   Correct.

15:49:37   13   Q.   So does that mean that my client would have had to go down

15:49:39   14   to Laredo and make the deposit down there?

15:49:42   15   A.   Based on this form, yes.

15:49:45   16   Q.   Okay.  Did you make any attempts to obtain the actual CTRs

15:49:51   17   from these banks?

15:49:52   18   A.   The actual CTRs?  Yes.  We had a backup to this.  Yes.

15:50:01   19   Q.   I may ask you about those later.

15:50:03   20   A.   Okay.

15:50:03   21   Q.   Let's focus on -- I want to just focus, rather than going

15:50:07   22   through each one of these, the three overt acts that are alleged

15:50:10   23   in the indictment, okay?  I'm going to start first with the

15:50:13   24   transaction from May 20th of 2011, okay?

15:50:18   25              May 20th, 2011.  We've got it right there, correct?

| 15:50:42 | 1 | May 20th, 2011. |

A.    Right.

Q.    We see total cash in, $19,800.

A.    Correct.

Q.    And if we go all the way across, we see that Victor Lopez made a deposit to Jesus Huitron's account; is that right?

A.    Correct.

Q.    Okay.  In Laredo, right?

A.    Correct.

          MR. GARDNER:  Mr. Mayr, we have no objection to introducing any of the underlying CTRs.  We have no objection to introducing to the jury any of the underlying CTRs that form the basis of the FinCEN report.

          MR. MAYR:  I need an opportunity to review these first before I get to this point.  Let me just hold off on these for now and just focus on this.  Let me come back over here since I've got them over here, Agent Williams.

Q.    (BY MR. MAYR) Okay.  So we're talking about 5-20-11 and we see on my client's bank statements here, those are the two deposits right there; is that right?  See them right there?

A.    Yes.

Q.    If you go through the bank statements, you see that there's -- there's lots of transactions consistent with a home building and painting business, right?

A.    Which transaction are you talking about?  The deposits or?

| | | |
|---|---|---|
| 15:53:09 | 1 | Q.   Yeah.   The deposits. |
| 15:53:09 | 2 | A.   I can't tell from those deposits where they're home |
| 15:53:15 | 3 | builders. |
| 15:53:15 | 4 | Q.   Well, the banks statements have deposit slips.  So let me |
| 15:53:19 | 5 | show you this.  This is page 2398 of -- this is Bates stamp |
| 15:53:27 | 6 | 41-002398.  That appears to be a deposit slip, correct? |
| 15:53:30 | 7 | A.   Correct. |
| 15:53:30 | 8 | Q.   Okay.  And do you recognize the writing on that deposit |
| 15:53:34 | 9 | slip? |
| 15:53:40 | 10 | A.   It possibly could be Jessica's. |
| 15:53:43 | 11 | Q.   It is Jessica's, right?  Let me see -- let me see 55B, |
| 15:53:58 | 12 | please.  There it is.  We got it.  Good. |
| 15:54:54 | 13 | Okay.  You see I'm showing you 55B, which was |
| 15:54:58 | 14 | previously admitted into evidence.  You see the handwriting there |
| 15:55:00 | 15 | with the name Jessica Huitron, right? |
| 15:55:03 | 16 | A.   Uh-huh. |
| 15:55:04 | 17 | Q.   Could I have the next page, please?  And you see this |
| 15:55:08 | 18 | handwriting of these names next to these horses.  That appears to |
| 15:55:11 | 19 | be the same handwriting, correct? |
| 15:55:12 | 20 | A.   Correct. |
| 15:55:14 | 21 | Q.   And with the IRS working in conjunction with the FBI, you |
| 15:55:17 | 22 | have access to handwriting experts who can compare and contrast |
| 15:55:21 | 23 | to determine if it's someone else, right? |
| 15:55:23 | 24 | A.   Yeah.  Yes. |
| 15:55:25 | 25 | Q.   Now, let's go back to these deposit slips.  Again, that |

15:55:34   1   appears to be the similar handwriting of Jessica Huitron?

15:55:38   2   A.   Correct.

15:55:39   3   Q.   And you know from your investigation that she is -- I think

15:55:44   4   Mr. Esper called it the -- I forgot what it was.  She basically

15:55:48   5   runs the office, right?

15:55:49   6   A.   Right.

15:55:50   7   Q.   Okay.  So she's filling out the deposit slip.  Let's keep

15:55:54   8   going through.  I'm going to the next page, 2399.  Now, 2400 is a

15:56:00   9   check from Fernando Garcia, right?

15:56:02   10   A.   Correct.

15:56:03   11   Q.   Now, I'm not concerned so much about the check, but look at

15:56:06   12   the endorsement on the back.  Do you see that there?

15:56:08   13   A.   Correct.

15:56:09   14   Q.   Jessica Huitron's handwriting, right?

15:56:10   15   A.   Correct.

15:56:11   16   Q.   Consistent with the fact that she's the one who is making

15:56:15   17   out the deposits and preparing them; is that right?

15:56:17   18   A.   Right.

15:56:17   19   Q.   Okay.  Let's keep jumping ahead.  Okay.  There's a deposit

15:56:31   20   slip that was shown on the bank statement, right?

15:56:35   21   A.   Correct.

15:56:36   22   Q.   And it's shown here.

15:56:38   23   A.   Uh-huh.

15:56:39   24   Q.   And then, here's the second deposit right here.  Right?

15:56:43   25   A.   Correct.

| | | |
|---|---|---|
| 15:56:43 | 1 | Q.   Okay.  Now, in this particular case, it's Victor Lopez who's |
| 15:56:48 | 2 | going and making the deposit, right? |
| 15:56:50 | 3 | A.   It depends on which deposit you're talking about. |
| 15:56:54 | 4 | Q.   Well, I'm still -- |
| 15:56:56 | 5 | A.   You're still on 520? |
| 15:56:58 | 6 | Q.   I'm still on 520.  That's Victor Lopez, right? |
| 15:57:01 | 7 | A.   Right. |
| 15:57:01 | 8 | Q.   So Victor Lopez goes down to Laredo and makes this deposit, |
| 15:57:08 | 9 | possibly my client doesn't know that he's making that deposit, |
| 15:57:10 | 10 | right? |
| 15:57:13 | 11 | A.   In order for him to get his bank account information, Jesus |
| 15:57:17 | 12 | had to give it to him. |
| 15:57:17 | 13 | Q.   Sure.  And there's nothing wrong with giving someone my bank |
| 15:57:22 | 14 | account information to make a deposit into my account.  Right? |
| 15:57:25 | 15 | A.   Right.  But his relationship with Victor Lopez, what is |
| 15:57:30 | 16 | Victor Lopez? |
| 15:57:31 | 17 | Q.   That's not my -- |
| 15:57:32 | 18 | A.   Okay.  I'm just -- |
| 15:57:32 | 19 | Q.   Okay.  Victor Lopez reports it, so he does what he's |
| 15:57:38 | 20 | supposed to do, right? |
| 15:57:39 | 21 | A.   Correct. |
| 15:57:41 | 22 | Q.   There was a Cash Transaction Report notifying that this was |
| 15:57:45 | 23 | actually taking place? |
| 15:57:46 | 24 | A.   Correct. |
| 15:57:46 | 25 | Q.   Now, the next one I want to go to is the next one in the |

| | | |
|---|---|---|
| 15:57:56 | 1 | indictment, July 6th.  Okay.  July 6, 2011.  Do you see that |
| 15:58:19 | 2 | there? |
| 15:58:20 | 3 | A.    Yes. |
| 15:58:20 | 4 | Q.    Deposit for $19,800? |
| 15:58:24 | 5 | A.    Correct. |
| 15:58:25 | 6 | Q.    Made by my client Jesus Huitron? |
| 15:58:28 | 7 | A.    Correct. |
| 15:58:56 | 8 | Q.    Okay.  Here's his July bank statement, right, that we're |
| 15:58:59 | 9 | looking at here? |
| 15:59:01 | 10 | A.    Not on the 6th. |
| 15:59:05 | 11 | Q.    We're on -- no.  That's right.  We're not there.  But there |
| 15:59:07 | 12 | is his July of 2011 bank statement? |
| 15:59:12 | 13 | A.    Correct. |
| 15:59:12 | 14 | Q.    In the account here in question. |
| 15:59:15 | 15 | A.    Right. |
| 15:59:16 | 16 | Q.    For the record, I'm actually going to go to Bates page |
| 15:59:21 | 17 | 41-0002487.  Actually, go back.  I'm looking at page 2484. |
| 15:59:54 | 18 | They're right there, 7-6, the two deposits, right? |
| 15:59:58 | 19 | A.    Correct. |
| 15:59:59 | 20 | Q.    Okay.  Now, just going through some of these other checks |
| 16:00:12 | 21 | that are being deposited in the account, we see this one here is |
| 16:00:16 | 22 | from an Albert Vera to Eusevio Huitron for?  Can you read what |
| 16:00:25 | 23 | says in the memo line here?  This is page 2495. |
| 16:00:25 | 24 | A.    Yeah, training and winning and travel. |
| 16:00:29 | 25 | Q.    Okay.  Albert Vera, he's not part of this alleged |

| | | |
|---|---|---|
| 16:00:33 | 1 | conspiracy, is he? |
| 16:00:34 | 2 | A.   No. |
| 16:00:35 | 3 | Q.   Okay.  And can you read what it says there in the middle of |
| 16:00:44 | 4 | the line? |
| 16:00:48 | 5 | A.   The top part, expenses, All American races, executive. |
| 16:00:54 | 6 | There's a dash on the right, I can't read that.  Is that |
| 16:00:57 | 7 | Executive Precision? |
| 16:00:58 | 8 | Q.   But it seems to be related to horse racing, right? |
| 16:01:02 | 9 | A.   Right. |
| 16:01:03 | 10 | Q.   Now, we see a check from an Alejandra Lopez, D/B/A, AL |
| 16:01:14 | 11 | Welding, right? |
| 16:01:15 | 12 | A.   Correct. |
| 16:01:15 | 13 | Q.   They're not doing anything wrong, are they? |
| 16:01:17 | 14 | A.   No. |
| 16:01:18 | 15 | Q.   Okay.  Now, do you know -- actually, I remember this one. |
| 16:01:46 | 16 | Do you remember whether the actual deposit slips were shown on |
| 16:01:48 | 17 | this bank statement for this account? |
| 16:01:50 | 18 | A.   To. |
| 16:01:51 | 19 | Q.   This one that we're talking about, the alleged act in the |
| 16:01:54 | 20 | indictment, these deposits that were made on July 7, 2011, do you |
| 16:02:00 | 21 | know if they were deposit slips similar to -- or cancelled checks |
| 16:02:04 | 22 | similar to this? |
| 16:02:05 | 23 | A.   When you're talking about are they available? |
| 16:02:07 | 24 | Q.   Right.  In other words, yes.  That's what I'm asking. |
| 16:02:09 | 25 | A.   Well, they should be within this exhibit here with the bank |

| | | |
|---|---|---|
| 16:02:14 | 1 | statements. |
| 16:02:14 | 2 | Q.   Right.  But they're not for this particular transaction, |
| 16:02:17 | 3 | though. |
| 16:02:18 | 4 | A.   No.  Well, I can't tell you if they actually were then. |
| 16:02:22 | 5 | Q.   You went through all these bank statements, right? |
| 16:02:24 | 6 | A.   Yeah.  Majority of them.  What I'm saying is I went through |
| 16:02:27 | 7 | these, but these transactions is based on the CTR that was filed |
| 16:02:32 | 8 | with the bank. |
| 16:02:33 | 9 | Q.   Well, let's just talk about that then.  So maybe there's no |
| 16:02:36 | 10 | deposit slip here, but my client's bank statement shows the |
| 16:02:39 | 11 | deposits being made? |
| 16:02:39 | 12 | A.   Correct. |
| 16:02:40 | 13 | Q.   And this document right here shows that he filed the Cash |
| 16:02:52 | 14 | Transaction Report, right? |
| 16:02:54 | 15 | A.   Not that he did.  The bank did. |
| 16:02:56 | 16 | Q.   But he had to fill it out, right? |
| 16:02:58 | 17 | A.   The bank would fill it out. |
| 16:03:00 | 18 | Q.   And then, he -- he would present identification, right? |
| 16:03:04 | 19 | A.   Correct. |
| 16:03:04 | 20 | Q.   Okay.  So a Cash Transaction Report was filled out. |
| 16:03:10 | 21 | A.   Right. |
| 16:03:13 | 22 | Q.   Let me go to the last transaction and we'll move on. |
| 16:03:26 | 23 | December 12, 2011.  Right there. |
| 16:03:35 | 24 | A.   Correct. |
| 16:03:36 | 25 | Q.   At the top.  December 12, 2011.  The indictment says that |

| | | |
|---|---|---|
| 16:03:44 | 1 | this transaction is part of this conspiracy, but a Cash |
| 16:03:49 | 2 | Transaction Report is being submitted, right? |
| 16:03:51 | 3 | A.   Right. |
| 16:03:55 | 4 | Q.   You said you did a financial analysis of my client's |
| 16:03:59 | 5 | business; is that right? |
| 16:04:00 | 6 | A.   The bank statement, I did the currency transactions only. |
| 16:04:02 | 7 | Q.   So you didn't do a full financial analysis of my client's |
| 16:04:08 | 8 | business; is that right? |
| 16:04:08 | 9 | A.   No. |
| 16:04:11 | 10 | Q.   So were you aware that they kept their books using |
| 16:04:18 | 11 | QuickBooks software and other software on their computers? |
| 16:04:21 | 12 | A.   No. |
| 16:04:22 | 13 | Q.   Okay.  Fair enough.  I can ask someone else about that. |
| 16:05:01 | 14 | I'm showing you Government's Exhibit 60.  I'm going to |
| 16:05:05 | 15 | start with 60D.  This handwriting with all these numbers, that's |
| 16:05:15 | 16 | Jessica Huitron's handwriting, to the best of your knowledge? |
| 16:05:20 | 17 | A.   Yeah.  To the best of my knowledge, yes. |
| 16:05:22 | 18 | Q.   All right.  Over here, to the best of your knowledge, right? |
| 16:05:26 | 19 | A.   Right. |
| 16:05:34 | 20 | Q.   Then, again, this is also her handwriting over here.  Let's |
| 16:05:37 | 21 | just come back to this one right here.  When this document, was |
| 16:05:42 | 22 | it found like hidden in some safe or buried under the house?  Do |
| 16:05:46 | 23 | you know where exactly in the house it was found? |
| 16:05:48 | 24 | A.   No.  It was in the office. |
| 16:05:49 | 25 | Q.   Okay.  It was in an office, right? |

16:05:51  1   A.   Right.

16:05:51  2   Q.   So it wasn't concealed, or hidden, or anything else like

16:05:54  3   that?

16:05:54  4   A.   No.

16:05:54  5   Q.   All right.  So you could go into this business and you can

16:05:59  6   get documents that show that they are keeping track of these

16:06:02  7   things, right?

16:06:03  8   A.   Right.

16:06:03  9   Q.   You can go into their computers and look to see whether

16:06:07  10  these transactions are being recorded, right?

16:06:12  11  A.   Their computers were there, yes.

16:06:13  12  Q.   Okay.  And you could go down to bank and you could get the

16:06:16  13  bank records that show that the deposits are being made.

16:06:19  14  A.   Right.

16:06:20  15  Q.   And if you -- you can contact the bank and see whether

16:06:24  16  there's a Cash Transaction Report that was filled out and

16:06:28  17  submitted at that time, right?

16:06:28  18  A.   Right.

16:06:29  19  Q.   Is that consistent with someone trying to hide something?

16:06:45  20  A.   Or not trying to hide, but if you look at your deposits that

16:06:47  21  you were showing me, there were 9,900, 9,900, they were

16:06:52  22  structuring.

16:06:52  23  Q.   Is it consistent with someone trying -- I'm not asking you

16:06:56  24  to explain.  Is it consistent with hiding or not, all those

16:06:58  25  things I just spelled out for you?  Documents in the open,

16:07:02    1   recordings on computer, bank statements, and Cash Transaction

16:07:06    2   Reports that were filled out.  It would be another thing if there

16:07:09    3   were no Cash Transaction Reports filled out, right, Agent

16:07:12    4   Williams?

16:07:13    5   A.   Well, the bank -- they wouldn't fill them out.  It's up to

16:07:17    6   the bank to fill them out.

16:07:18    7   Q.   All of these things, though, to you, that's consistent with

16:07:22    8   hiding or intent to evade the reporting requirements?

16:07:27    9   A.   When you're structuring $9,900, that is.

16:07:33   10   Q.   But there's documentation --

16:07:35   11   A.   Or if you do it on the same day --

16:07:36   12   Q.   It's not my question.  But there's documentation to support,

16:07:41   13   right?

16:07:41   14   A.   That a CTR was found -- filed?

16:07:44   15   Q.   Yes.

16:07:45   16   A.   Yes.

16:07:45   17   Q.   I have no further questions, your Honor.

16:07:49   18              THE COURT:  Any further questions?

16:07:51   19              MR. GARDNER:  Just a few, your Honor.

16:07:53   20                      RE-DIRECT EXAMINATION

16:07:53   21   BY MR. GARDNER:

16:07:56   22   Q.   Who files the CTR and the Cash Transaction Report?  The bank

16:08:00   23   or the individual?

16:08:00   24   A.   The bank does.

16:08:01   25   Q.   Who fills out the Cash Transaction Report, the bank or the

| | | |
|---|---|---|
| 16:08:05 | 1 | individual? |
| 16:08:05 | 2 | A.   The bank does. |
| 16:08:06 | 3 | Q.   If I were to make a deposit of $8,000 in the morning, would |
| 16:08:10 | 4 | the bank necessarily fill out a Cash Transaction Report? |
| 16:08:13 | 5 | A.   No.  Not that day. |
| 16:08:14 | 6 | Q.   If I were to make another deposit the same day of $9,900, |
| 16:08:18 | 7 | would the bank necessarily fill out a transaction report? |
| 16:08:21 | 8 | A.   Yeah, they would file it.  Because once the transaction |
| 16:08:24 | 9 | reached over 10,000, they would file that CTR. |
| 16:08:27 | 10 | Q.   What does the customer provide in terms of the bank filling |
| 16:08:30 | 11 | out that form? |
| 16:08:31 | 12 | A.   Identification. |
| 16:08:33 | 13 | Q.   So is it possible that the customer doesn't -- or is not |
| 16:08:40 | 14 | aware of the bank filling out the CTR? |
| 16:08:42 | 15 | A.   That is correct. |
| 16:08:42 | 16 | Q.   How old is Jessica Huitron? |
| 16:08:44 | 17 | A.   Twenty-nine. |
| 16:08:45 | 18 | Q.   How old is Eusevio Huitron? |
| 16:08:48 | 19 | A.   I want to say he's 60, maybe. |
| 16:08:53 | 20 | Q.   And Jesus Huitron? |
| 16:08:56 | 21 | A.   In his 60s. |
| 16:08:58 | 22 | Q.   Showing you Exhibit 51A.  This is by stipulation taken from |
| 16:09:03 | 23 | Huitron Homes, Huitron Painting business on Highway 183 in |
| 16:09:09 | 24 | Austin, Texas.  And just for the record, could you read across |
| 16:09:13 | 25 | the line and, specifically, the date? |

16:09:15  1    A.    Eusevio Huitron, June 26, 2008 and President as the title.

16:09:21  2    Q.    President of?

16:09:22  3    A.    Huitron Painting.

16:09:24  4    Q.    Showing you Government's Exhibit 51B, also by stipulation,

16:09:28  5    taken from the Huitron Homes, Huitron Painting business.  What's

16:09:35  6    the date on this, sir?

16:09:36  7    A.    December 28, 2010.

16:09:39  8    Q.    And what's it state down here?

16:09:41  9    A.    Jesse Huitron, President.

16:09:44  10   Q.    Did you see any transfer or corporate documents that would

16:09:48  11   indicate that Eusevio Huitron transferred the presidency of

16:09:52  12   Huitron Painting to Jesse Huitron?

16:09:54  13   A.    No.

16:09:57  14   Q.    If you could, starting here, could you please read this?

16:10:02  15   A.    If you have any further questions, please feel free to

16:10:05  16   contact me at --

16:10:08  17   Q.    I'm sorry.  Let's go up above.  Eusevio?

16:10:11  18   A.    Okay.  Since the economy has slowed down, Eusevio was

16:10:15  19   working currently whenever he is needed.  He earns $350 weekly

16:10:19  20   and is paid cash.  If you have any further questions, please feel

16:10:22  21   free to contact me at the number listed above.

16:10:25  22   Q.    Is Jesse Huitron the same thing as Jesus?

16:10:28  23   A.    No.  Oh, Jesus, yes.

16:10:31  24   Q.    Now, this date, remind the jury, again, the amount of cash

16:10:35  25   flowing into the Huitron Homes or Huitron Painting account.

| | | |
|---|---|---|
| 16:10:38 | 1 | A.   During that time, first of all, it was approximately that |
| 16:10:44 | 2 | $505,000 going in during that period. |
| 16:10:46 | 3 | Q.   And that's in cash, correct? |
| 16:10:47 | 4 | A.   That's in cash. |
| 16:10:48 | 5 | Q.   Now, when Mr. Mayr showed you -- and let me combine two |
| 16:10:54 | 6 | things.  When Mr. Mayr and Mr. Esper talked about being a |
| 16:10:57 | 7 | reputable individual, do you remember those questions by Mr. |
| 16:11:00 | 8 | Esper? |
| 16:11:00 | 9 | A.   Yes. |
| 16:11:01 | 10 | Q.   Okay.  Those checks that Mr. Mayr showed you, do they appear |
| 16:11:04 | 11 | to be from legitimate businesses? |
| 16:11:08 | 12 | A.   The ones from which? |
| 16:11:11 | 13 | Q.   The ones Mr. Mayr showed you on his computer, the various |
| 16:11:14 | 14 | checks to Huitron Painting -- or, I'm sorry, to Eusevio Huitron |
| 16:11:19 | 15 | for horse training? |
| 16:11:20 | 16 | A.   Oh, yes.  Yes. |
| 16:11:21 | 17 | Q.   The personal checks? |
| 16:11:22 | 18 | A.   Yes. |
| 16:11:23 | 19 | Q.   Does that appear consistent with legitimate businesses? |
| 16:11:26 | 20 | A.   Yes. |
| 16:11:26 | 21 | Q.   The $500,000 in structured cash if you were legitimate? |
| 16:11:30 | 22 | A.   No. |
| 16:11:31 | 23 | MR. ESPER:  I'm going to object, your Honor, to the |
| 16:11:33 | 24 | question.  It's improper. |
| 16:11:35 | 25 | MR. GARDNER:  I believe it's proper cross-examination, |

16:11:37   1    your Honor.

16:11:38   2              MR. ESPER:  No.  The form of the question, your Honor,

16:11:40   3    I object.

16:11:41   4              MR. GARDNER:  I could rephrase, your Honor.

16:11:42   5              THE COURT:  Well, he's already answered.

16:11:43   6              MR. GARDNER:  Yes, sir.

16:11:44   7              THE COURT:  Let's go on.

16:11:46   8              MR. GARDNER:  I don't have any further questions.

16:11:48   9              THE COURT:  Any --

16:11:49   10             MS. WILLIAMS:  No, your Honor.

16:11:52   11             MR. WOMACK:  No, your Honor.

16:11:53   12             MR. SANCHEZ:  No, your Honor.

16:11:56   13                       RE-CROSS EXAMINATION

16:11:56   14   BY MR. ESPER:

16:11:57   15   Q.   Mr. Williams, if I quote a fee to a client -- I've never

16:12:00   16   done this, but if I quote a fee of $500,000 to represent somebody

16:12:03   17   in a case, the client can either pay me with a check, correct?

16:12:08   18   A.   Uh-huh.

16:12:09   19   Q.   Assuming they have it?

16:12:10   20   A.   Right.

16:12:11   21   Q.   They could pay me with a cashier's check, correct?

16:12:14   22   A.   Correct.

16:12:14   23   Q.   They could have the money wire-transferred into my account?

16:12:17   24   A.   Correct.

16:12:19   25   Q.   Or if they ask me, can I have your account, I'll have the

16:12:24  1   money deposited into your account.  That's one of the four ways I

16:12:26  2   could be paid, correct?

16:12:27  3   A.   Right.

16:12:28  4   Q.   Okay.  Now, if they bring me the $500,000 cash, of course I

16:12:34  5   have an obligation to report that as income, correct?

16:12:37  6   A.   Correct.

16:12:37  7   Q.   Or otherwise, I would get in trouble?

16:12:38  8   A.   Right.

16:12:39  9   Q.   I would get in trouble if I then took that $500,000 and

16:12:43  10  started making deposits into my account over about a ten-day

16:12:47  11  period of $9,000, $9,000 at different branches?

16:12:50  12  A.   Right.

16:12:50  13  Q.   That clearly is structuring, correct?

16:12:53  14  A.   Right.

16:12:55  15  Q.   Now, if the client who's paying me does that without my

16:12:58  16  knowledge and the client is committing the structuring, correct?

16:13:04  17  A.   Right.  But if you keep getting a series of those.

16:13:07  18  Q.   I understand.

16:13:08  19  A.   You have -- if you review your bank statements and you get

16:13:11  20  9,900 this day, 99, 99, and continue on, you have knowledge that

16:13:16  21  you're getting structured --

16:13:17  22  Q.   If I get my bank statement at the end of the month and

16:13:19  23  that's when I see this, that's when I should notify that person,

16:13:24  24  hey, you can't be doing this?

16:13:25  25  A.   But in this case, most of the time --

| | | |
|---|---|---|
| 16:13:27 | 1 | Q.   I'm asking you, sir, what I just told you, if I get at the |
| 16:13:31 | 2 | end of the month and I see these deposits, that's when I become |
| 16:13:34 | 3 | aware that you shouldn't be doing this? |
| 16:13:37 | 4 | A.   Right. |
| 16:13:37 | 5 | Q.   Okay.  That's all I have. |
| 16:13:42 | 6 |         MR. MAYR:  Briefly, your Honor. |
| 16:13:43 | 7 |                   RE-CROSS EXAMINATION |
| 16:13:43 | 8 | BY MR. MAYR: |
| 16:13:44 | 9 | Q.   Agent Williams, Mr. Gardner asked you some questions about |
| 16:13:46 | 10 | -- or posed a hypothetical to you that if I were to go in a bank |
| 16:13:50 | 11 | and make an $8,000 deposit tomorrow morning, there's nothing |
| 16:13:54 | 12 | illegal about that? |
| 16:13:54 | 13 | A.   Right. |
| 16:13:55 | 14 | Q.   Cash deposit, nothing illegal? |
| 16:13:56 | 15 | A.   Right. |
| 16:13:57 | 16 | Q.   I don't have to fill out any forms? |
| 16:13:58 | 17 | A.   Right. |
| 16:13:59 | 18 | Q.   Okay.  But if I deposit that $8,000, knowing that I'm going |
| 16:14:05 | 19 | to go back later in the day to deposit another $7,000 for a total |
| 16:14:09 | 20 | of $15,000 and I walk into the bank and the cashier says, Mr. |
| 16:14:16 | 21 | Mayr, you need to fill this form out, I take off running, that's |
| 16:14:20 | 22 | pretty indicative of my intent to avoid reporting it, right? |
| 16:14:24 | 23 |         MR. GARDNER:  Excuse me, your Honor, that's misleading. |
| 16:14:27 | 24 | The CTR's filled out by the bank.  I believe there's plenty of |
| 16:14:31 | 25 | testimony -- |

| | | |
|---|---|---|
| 16:14:31 | 1 | A.    Correct. |
| 16:14:32 | 2 | THE COURT:  The jury's heard that frequently.  Just go |
| 16:14:40 | 3 | ahead and act it out, or whatever you want to do.  But let the |
| 16:14:44 | 4 | record reflect that the counsel ran halfway across the courtroom |
| 16:14:50 | 5 | clumsily. |
| 16:14:52 | 6 | MR. MAYR:  Thank you, your Honor. |
| 16:14:53 | 7 | THE COURT:  You're welcome. |
| 16:14:54 | 8 | Q.   (BY MR. MAYR) They fill it out and say, we need to see some |
| 16:15:00 | 9 | ID and verify who you are.  I book it out of there.  That would |
| 16:15:04 | 10 | be indicative of my intent to not want to report it, right? |
| 16:15:09 | 11 | A.    If you take off. |
| 16:15:10 | 12 | Q.    Yeah.  But each time these deposits are made, all the forms |
| 16:15:16 | 13 | and the identification and everything is being presented and |
| 16:15:20 | 14 | filled out, right? |
| 16:15:21 | 15 | A.    Want me to explain something to you? |
| 16:15:23 | 16 | Q.    That's not my -- |
| 16:15:25 | 17 | A.    Okay.  Yes. |
| 16:15:25 | 18 | Q.    Okay.  It is "Yes"? |
| 16:15:26 | 19 | A.    Uh-huh. |
| 16:15:27 | 20 | Q.    No further questions. |
| 16:15:29 | 21 | RE-DIRECT EXAMINATION |
| 16:15:29 | 22 | BY MR. GARDNER: |
| 16:15:31 | 23 | Q.    I'm sorry.  Go ahead and explain that, Special Agent |
| 16:15:32 | 24 | Williams. |
| 16:15:34 | 25 | MR. MAYR:  Objection.  Form of the question calls for a |

| | | |
|---|---|---|
| 16:15:36 | 1 | narrative. |
| 16:15:36 | 2 | Q.   (BY MR. GARDNER) Would you please explain your reasoning |
| 16:15:40 | 3 | behind your answer to Mr. Mayr's last question? |
| 16:15:45 | 4 | A.   Like when he was saying, if you go in and make those |
| 16:15:49 | 5 | deposits, the bank doesn't necessarily have to ask you if that's |
| 16:15:54 | 6 | your account.  They would already have that information on file |
| 16:15:57 | 7 | and file it from the information they have. |
| 16:16:00 | 8 | Q.   That's all I have, your Honor. |
| 16:16:03 | 9 | THE COURT:  May this witness be excused? |
| 16:16:05 | 10 | MS. WILLIAMS:  Yes, your Honor. |
| 16:16:06 | 11 | MR. MAYR:  Sure, your Honor.  No problem. |
| 16:16:08 | 12 | THE COURT:  You may be excused. |
| 16:16:11 | 13 | All right.  You may call your next witness. |
| 16:16:14 | 14 | MS. FERNALD:  Charles Cox. |
| 16:16:55 | 15 | (Witness sworn.) |
| 16:17:09 | 16 | THE COURT:  If you'll tell us your full name and spell |
| 16:17:18 | 17 | your last, please. |
| 16:17:18 | 18 | THE WITNESS:  Yes, sir.  My name is Charles Hampton |
| 16:17:22 | 19 | Cox, III, and that's C-O-X. |
| 16:17:25 | 20 | THE COURT:  You may proceed. |
| 16:17:26 | 21 | CHARLES H. COX, called by the Government, duly sworn. |
| 16:17:26 | 22 | DIRECT EXAMINATION |
| 16:17:26 | 23 | BY MS. FERNALD: |
| 16:17:27 | 24 | Q.   And could you introduce yourself to the jury?  Tell them |
| 16:17:29 | 25 | where you live, what city you live in, and what you do for a |

16:17:32  1  living.

16:17:32  2  A.   Yes, ma'am.  I am Special Agent Charles Cox of the FBI.  I

16:17:37  3  am stationed in the San Antonio field office.  I've been in San

16:17:41  4  Antonio for approximately in the past five years.

16:17:45  5  Q.   And at the FBI office, can you tell them basically what your

16:17:49  6  duties are, what your responsibilities are?

16:17:51  7  A.   Yes.  I am a computer forensic expert.  That is my duty, my

16:17:56  8  day-to-day job.  I provide forensic examinations of computers

16:18:01  9  that are involved in investigations for our office in San

16:18:06  10  Antonio.

16:18:06  11  Q.   A variety of different criminal activities, correct?

16:18:09  12  A.   Yes, ma'am.

16:18:09  13  Q.   Agent Cox, can you tell the ladies and gentlemen of the jury

16:18:13  14  a little bit about your educational background, your training and

16:18:17  15  your experience as it comes to the forensic study of computers?

16:18:23  16  A.   Yes, ma'am.  I have a Bachelor's of Economics from

16:18:27  17  Vanderbilt University.  After that, I was in the military where I

16:18:29  18  started working on some computers for several years.  After that,

16:18:33  19  I got into computer support and network administration before I

16:18:36  20  joined with the FBI in 1998.  At that time, I started working

16:18:42  21  cybercrime investigations, in addition to counterterrorism and,

16:18:45  22  also, counterintelligence.

16:18:48  23       In 2001, I started with the computer analysis response

16:18:52  24  team, which is the FBI's forensic computer expert.  I was

16:18:58  25  certified as a computer expert by the FBI in 2002, and I have

| | | |
|---|---|---|
| 16:19:04 | 1 | served in that capacity since then.  I received over 500 hours of |
| 16:19:08 | 2 | forensic training, specializing in computers, cellphones, GPS |
| 16:19:12 | 3 | devices, recovering data from these devices, and providing them |
| 16:19:17 | 4 | to the case agents for these investigations. |
| 16:19:21 | 5 | My training has been from the FBI and also through |
| 16:19:23 | 6 | commercial entities.  And we do yearly required trainings, |
| 16:19:28 | 7 | certification and proficiency testing to make sure we maintain |
| 16:19:33 | 8 | our standards yearly. |
| 16:19:33 | 9 | Q.   Over the past 11 years, how many examinations have you |
| 16:19:37 | 10 | conducted of computers? |
| 16:19:40 | 11 | A.   I have probably conducted exams of over almost a thousand |
| 16:19:45 | 12 | but definitely over 800 computers.  Several hundred cellphones, |
| 16:19:50 | 13 | removal media, CDs, floppy discs.  I don't see too many of those |
| 16:19:56 | 14 | anymore, but all of the different types of media that are |
| 16:19:58 | 15 | associated with computers and digital electronics devices. |
| 16:20:01 | 16 | Q.   And have you ever -- |
| 16:20:02 | 17 | THE COURT:  Mr. Cox, you're kind of like a computer |
| 16:20:06 | 18 | from the standpoint that you talk very fast. |
| 16:20:10 | 19 | THE WITNESS:  Yes, sir. |
| 16:20:11 | 20 | THE COURT:  And you're wearing out my interpreter.  If |
| 16:20:14 | 21 | you'll be a little slower, please. |
| 16:20:16 | 22 | THE WITNESS:  Certainly.  Yes, your Honor. |
| 16:20:18 | 23 | Q.   (BY MS. FERNALD) Have you ever been called as an expert in |
| 16:20:21 | 24 | federal court on forensic in computers? |
| 16:20:23 | 25 | A.   Yes, ma'am.  I have testified in federal courts six times |

16:20:27  1   before as a defendant -- or as a computer forensic expert.

16:20:32  2   Q.   Can you tell the ladies and gentlemen of the jury exactly

16:20:36  3   what happens in a typical case when there's computer located?

16:20:41  4   Kind of walk us through the process of search warrant and what

16:20:43  5   you typically do.

16:20:44  6   A.   Okay.  Yes, ma'am.

16:20:46  7        When an investigator requests our support, generally

16:20:51  8   we'll assist, if necessary, on a search warrant, we will go out,

16:20:56  9   participate in a search warrant, help identify digital media that

16:21:00  10  we can collect as part of an investigation.  We will create if

16:21:05  11  onsite and is required, we'll create a forensic image of the

16:21:10  12  computers there onsite; otherwise, we will seize them and take

16:21:13  13  them back and process them as other evidence.

16:21:17  14       As part of our then-forensic process, we always create

16:21:20  15  a forensic image of the computers and other media that we have

16:21:26  16  seized so that we never work on the original image.  We don't

16:21:30  17  want to take a chance of actually working on the original.  We

16:21:32  18  always work on a forensic image.  We take images when we're

16:21:36  19  creating these images.  We create a digital signature associated

16:21:42  20  with that data that is on the device so that later, at the end of

16:21:47  21  our examination, we can also go back and create that same digital

16:21:50  22  signature as long as it verifies we know we have not touched or

16:21:54  23  changed the data in any way and that the integrity is still the

16:21:57  24  same.

16:21:59  25       As part of our investigations, the main role for what

16:22:02   1   we do as a forensic examiner is we process the data that is

16:22:06   2   collected on these digital devices and provide it in a more human

16:22:12   3   readable format to the investigator so that when they're looking

16:22:15   4   at the evidence or at a computer's hard drive, they will see the

16:22:20   5   documents, the spreadsheets, the e-mails, the graphics.  And so,

16:22:25   6   basically it is taking that digital data and providing it to them

16:22:29   7   in a more easily recognizable format.

16:22:32   8   Q.   And also to the assistant United States attorney?

16:22:35   9   A.   Yes, ma'am.

16:22:35   10   Q.   We keep talking about a digital image or an image of.  Is

16:22:40   11   that an exact copy?  Or can you explain the bit-by-bit a little

16:22:44   12   bit to the jury?

16:22:46   13   A.   Yes, ma'am.

16:22:47   14         What we're doing when we take a forensic image, we're

16:22:50   15   actually reading every single bit of data on a hard drive, or CD,

16:22:53   16   or other kind of media, and what it does, it's reading every one

16:23:00   17   and zero off that data and collecting the -- because a lot of

16:23:03   18   times, there are files that have been deleted or are recoverable

16:23:06   19   later.  So we're not just making a copy, but we're actually

16:23:09   20   making what we term a forensic image.

16:23:11   21         So it is an exact bit-for-bit, every one, every zero

16:23:15   22   that is on the hard drive.  We are collecting that onto another

16:23:19   23   -- onto our media as we collect that digital signature I was

16:23:22   24   talking about.

16:23:22   25   Q.   In the case of a search warrant, you have the option, I

16:23:26  1   think you said, first of actually seizing the media or the

16:23:30  2   computer, or you can actually go ahead and make that image there.

16:23:35  3   Can you explain a little bit about that?

16:23:36  4   A.   Yes, ma'am.

16:23:37  5        Depending on the scenario, if we go to a search site

16:23:41  6   where computers are too large to where we could not take them,

16:23:45  7   say, a large business, or something like that, or where

16:23:50  8   especially if the judge or magistrate has ordered that we cannot

16:23:53  9   shut a company down, we will make an image so that we have to --

16:23:56  10  because we have to leave the computer there.  We take an image.

16:23:59  11       If it is -- because of the time required to copy and

16:24:03  12  make these images, we're talking nowadays, the hard drives and

16:24:07  13  the media are quite large.  They can take seven or eight hours to

16:24:11  14  actually image a one-terabit hard drive or what we're starting to

16:24:16  15  see in a common computer.  So what we do is we will seize the

16:24:19  16  evidence onsite, take it back and enter it into our evidence

16:24:24  17  system as to which time I will go down and retrieve it from our

16:24:27  18  secure evidence storage, take it up to my laboratory in San

16:24:30  19  Antonio, and create that image there on that site.

16:24:33  20       The image is the same whether we get it onsite or off

16:24:37  21  but generally we will -- if we can, we will seize the evidence so

16:24:40  22  that we can then make the image as -- because of the time

16:24:45  23  required is so long.

16:24:47  24  Q.   We've been talking a lot about computers.  Can you tell the

16:24:51  25  jury a little bit about many of the devices like telephones?  Do

16:24:56   1   you also -- do you also deal with that?

16:25:00   2   A.    Yes, ma'am.  I do also process cellphones and GPS and

16:25:06   3   certified as a forensic examiner by the FBI for that.

16:25:09   4   Q.    Can you tell me what Cellebrite is and how it functions?

16:25:14   5   A.    Cellebrite is a commercial product created by a company

16:25:18   6   called Cellebrite that originally when it came out, it was for

16:25:22   7   the cellphone stores.  If you took your cellphone into a Verizon

16:25:27   8   store and wanted to upgrade, they would have a device that would

16:25:29   9   copy all of the data from your old cellphone and put it onto your

16:25:32   10  new one.  They decided that this is a very important forensic

16:25:34   11  tool, also, that is necessary for law enforcement and other

16:25:39   12  investigative reasons.

16:25:39   13         What the Cellebrite does is they have spent a lot of

16:25:44   14  time and effort developing basically how the data is laid out on

16:25:49   15  a cellphone.  Every cellphone manufacturer makes their programs

16:25:53   16  different.  What Cellebrite does is they study that and they make

16:25:56   17  it easy for an investigator or for, like I said, Verizon sales

16:26:01   18  associate to just hook up a cellphone and pull all the data off

16:26:04   19  of that.

16:26:05   20         What we do at the Cellebrite generally is we will hook

16:26:07   21  up a cellphone, and it extracts the data and puts its onto a

16:26:12   22  thumb drive or directly onto a computer, and so, it's retrieving

16:26:16   23  information off of the cellphone, the call logs, the contact

16:26:20   24  list, text messages, and basically exports it out into a usable

16:26:25   25  format so that we can get the stuff off of the phone quickly and

16:26:29   1   easily to retain it.

16:26:31   2   Q.    And this is a common tool that's used with the investigators

16:26:34   3   in the field?

16:26:34   4   A.    Yes, ma'am, it is.

16:26:35   5   Q.    And then, how do they take that information and relay it to

16:26:38   6   you?

16:26:38   7   A.    There's a couple of methods.  The Cellebrite, we're actually

16:26:42   8   using it as an investigative tool by the investigator.  If it is

16:26:47   9   nothing special, the investigators, we train them on how to use

16:26:51   10  the Cellebrite.  They do actually hook it up.  It's all very

16:26:54   11  menu-driven to where they can select it.  It will output the data

16:26:57   12  either to a thumb drive or to a computer, at which time either

16:27:01   13  one, we'll take the data and burn it into a CD or DVD so it can

16:27:06   14  be then entered into the investigative case file or evidence.

16:27:09   15  And then, if there is further analysis, they can actually bring

16:27:13   16  the phone to myself where I have a Cellebrite also.  I use that

16:27:16   17  for data analysis.  There's some advance tools that we can run,

16:27:20   18  also, to help try and find deleted files off of the cellphones

16:27:25   19  through the same tool.

16:27:26   20  Q.    Once you make either one of these tools -- or let's go back

16:27:31   21  to computers since I'm jumping around a little bit.

16:27:34   22          Once you make these images, could you tell the jury

16:27:38   23  exactly what you do at this point, your role versus the role of

16:27:40   24  the investigator on the particular case?

16:27:43   25  A.    Yes, ma'am.  My role as a forensic examiner, generally I do

16:27:48   1   not have a knowledge -- an in-depth knowledge of the

16:27:52   2   investigation as it is ongoing.  What my job is is to provide the

16:27:57   3   information that is recovered from a computer because my tools,

16:28:00   4   like I said, they're recovering and categorizing documents,

16:28:03   5   pictures, spreadsheets, videos, audio.  They are providing it in

16:28:10   6   a manner to where we can allow the case agent who is

16:28:14   7   knowledgeable of the investigation to then go through and decide

16:28:18   8   what is relevant that is on the computer.

16:28:21   9        My role is to process the -- or process the hard drive.

16:28:26   10  It also recovers deleted files.  It does what we call a data

16:28:31   11  carve where it just examines the whole hard drive for files that

16:28:34   12  the computer has long ago deleted and doesn't even consider to be

16:28:38   13  active anymore.  But the role I have is to provide that to the

16:28:41   14  case agent so then, the case agent can then determine what is

16:28:44   15  relevant that is on the computer.

16:28:47   16  Q.   In June of 2012, did you actually conduct the forensic

16:28:56   17  searches on seven different computers that were seized in seven

16:28:59   18  different locations throughout the United States in reference to

16:29:02   19  Special Agent Scott Lawson's request?

16:29:04   20  A.   Yes, ma'am.

16:29:04   21  Q.   Those seven different locations were in Oklahoma, Austin and

16:29:13   22  California, among some of them, correct?

16:29:16   23  A.   Yes, ma'am.

16:29:17   24  Q.   Tell the ladies and gentlemen of the jury, did you actually

16:29:18   25  have the image made there at the site, or did you retrieve or

16:29:23   1   have the agents to retrieve the computers?

16:29:26   2   A.    For the images that I've been working with, the case agent

16:29:29   3   on these cases, I actually made the images myself.  I actually

16:29:33   4   had the computers, physically removed the hard drives and created

16:29:37   5   the images for the ones that we have been discussing.  There was

16:29:41   6   one in California at Carlos Nayen's residence.

16:29:44   7   Q.    Was that actually an image that was made of that particular

16:29:47   8   location?

16:29:47   9   A.    I believe that one was --

16:29:53   10  Q.    That was actually in New Mexico, wasn't it?  I'm sorry.  I

16:29:55   11  was confused on that.  Was that correct?

16:29:58   12  A.    Actually, I believe I did the image on that one.  I created

16:30:01   13  that in my laboratory in San Antonio.

16:30:03   14  Q.    Make sure you're on your toes.

16:30:04   15  A.    Yes, ma'am.

16:30:05   16  Q.    So once you got the computers back to the laboratory and

16:30:09   17  made the image, what did you do at that point?

16:30:12   18  A.    Okay.  The original computers we'll put back into our

16:30:15   19  evidence.  Like I said before, we don't want to use the original

16:30:20   20  evidence for our processing.  So it was the forensic image that I

16:30:26   21  had made, that is when I connect them to my forensic

16:30:29   22  workstations, run the software.  It categorizes all the different

16:30:33   23  data that it finds, including the deleted files, which now we

16:30:39   24  call un-deleted, and then, also, the carved files, which are

16:30:42   25  those files that are just out in the free space, which are then

| | | |
|---|---|---|
| 16:30:46 | 1 | available to the case agent for his review. |
| 16:30:48 | 2 | Q.   And Special Agent Scott Lawson, have you worked extensively |
| 16:30:52 | 3 | with him on this particular case? |
| 16:30:53 | 4 | A.   Yes, ma'am.  I have. |
| 16:30:54 | 5 | Q.   Spent quite a few hours with him? |
| 16:30:56 | 6 | A.   Quite a few hours familiarizing him with the actual |
| 16:31:01 | 7 | software, how to use it, working with him as he has questions as |
| 16:31:04 | 8 | he was going through and actually conducting the review of the |
| 16:31:07 | 9 | evidence in this matter. |
| 16:31:08 | 10 | Q.   And in fact, last night, the three of us met and we went |
| 16:31:11 | 11 | over some of this evidence; is that correct? |
| 16:31:13 | 12 | A.   Yes, ma'am.  That is correct. |
| 16:31:15 | 13 | Q.   I'd like to show you what has been marked as Government's |
| 16:31:29 | 14 | Exhibit 364OK, Exhibit A.  Try not to get these out of order.  Do |
| 16:31:37 | 15 | you recognize that? |
| 16:31:38 | 16 | A.   Yes, I do.  This is a DVD that I produced after Special |
| 16:31:42 | 17 | Agent Lawson had completed his review and marked the files that |
| 16:31:46 | 18 | he was interested in.  I copied them out and exported them and |
| 16:31:50 | 19 | created a DVD that has those files for him.  I created this DVD |
| 16:31:54 | 20 | and it contains my initials from when I did create it. |
| 16:31:58 | 21 | Q.   And that was a computer that was located in Lexington, |
| 16:32:02 | 22 | correct? |
| 16:32:02 | 23 | A.   Yes, ma'am. |
| 16:32:03 | 24 | Q.   Government's Exhibit 364N, as in Nancy, M as in Mary, A? |
| 16:32:25 | 25 | A.   Yes, ma'am.  Once again, another DVD, containing the files |

| | | |
|---|---|---|
| 16:32:29 | 1 | selected by Case Agent Lawson that I exported and copied onto a |
| 16:32:33 | 2 | DVD, the CD, the DVD I created with my initials on them. |
| 16:32:39 | 3 | Q.   And the jury can see that attached to each of these CDs, |
| 16:32:43 | 4 | there are some images that are attached to each one of these. |
| 16:32:46 | 5 | Are these the relevant images that come from each of these CDs |
| 16:32:50 | 6 | that will be presented by Special Agent Scott Lawson? |
| 16:32:52 | 7 | A.   Yes, ma'am. |
| 16:32:53 | 8 | Q.   All right.  And I should say, for the record, this is what |
| 16:33:00 | 9 | you reviewed yesterday when we went over the evidence, correct? |
| 16:33:02 | 10 | A.   Yes, ma'am. |
| 16:33:06 | 11 | Q.   All right.  364ATX, Austin, Texas.  Will you look in and |
| 16:33:12 | 12 | look at the disc on A of this exhibit and identify it for us? |
| 16:33:18 | 13 | A.   Yes, ma'am.  Once again, DVD that I created containing the |
| 16:33:23 | 14 | file selected by the case agent, copied onto a DVD containing my |
| 16:33:27 | 15 | initials as I created it. |
| 16:33:29 | 16 | Q.   And, again, did you go through and make sure that the images |
| 16:33:32 | 17 | that were attached were actually contained on this CD? |
| 16:33:35 | 18 | A.   Yes, ma'am.  I have reviewed them with case Agent Lawson. |
| 16:33:40 | 19 | Q.   Government's Exhibit 364CA.  Do you recognize that disc? |
| 16:33:48 | 20 | A.   Yes, ma'am.  Once again, DVD containing those case files, |
| 16:33:53 | 21 | containing my initials and CD -- or DVD I created. |
| 16:33:59 | 22 | Q.   And each one of these are identified through the exhibit |
| 16:34:02 | 23 | number actually where they were located.  CA meaning California. |
| 16:34:05 | 24 | OK obviously meaning Oklahoma.  NM meaning New Mexico.  ATX |
| 16:34:12 | 25 | meaning Austin, Texas; is that correct? |

16:34:14   1   A.   Yes, ma'am.   That is correct.

16:34:16   2   Q.   As you went through the images that are contained with these

16:34:23   3   CDs, did you determine the path that these images were actually

16:34:36   4   located?

16:34:36   5   A.   As part of the forensic report that I create for the files

16:34:40   6   that the case agent selected, it exports a report that shows the

16:34:45   7   path or the location on each computer hard drive where these

16:34:49   8   files are located.   And then, I went over with case Agent Lawson

16:34:55   9   for each of these submitted evidence items, the path that where

16:34:59   10   they came from, what item or computer.

16:35:04   11   Q.   And instead of going through 15 to 100 different images and

16:35:08   12   their paths, did we go ahead and put them in certain categories

16:35:10   13   so that we could do this a little bit quicker for the jury?

16:35:13   14   A.   Yes, ma'am.   We did.

16:35:14   15   Q.   The first category that we put in was user files.   Can you

16:35:20   16   tell the ladies and gentlemen of the jury what it means to have

16:35:23   17   an image in a user file?

16:35:25   18   A.   Well, I was trying to categorize where we're going to find

16:35:29   19   specifically in this case the files that were relevant.   And the

16:35:32   20   first one was -- is the user folder.   When you create a user

16:35:36   21   account on your computer, it puts all of your user data by

16:35:42   22   default into certain folders.   If you save a document, if you

16:35:46   23   start Word -- Microsoft Word and save a document, it's going to

16:35:50   24   put it in My Documents folder.   Well, that folder is located

16:35:54   25   under a user folder that is given a name when you first establish

16:35:58   1   your computer.  It can be anything from a name -- your name is

16:36:05   2   John and you create your user ID as John.  You will see that on

16:36:09   3   the computer, you will see a user folder where they put all the

16:36:12   4   different users, and each user identified in the computer will be

16:36:15   5   -- if there's a John and a Elizabeth, you'll see a folder for

16:36:18   6   each one, and that's where their files are kept by default.

16:36:22   7          So files that are generally stored in a user folder are

16:36:26   8   put there by an action, by creating a document, saving a

16:36:31   9   document, or something like that.  And so, the computer is merely

16:36:36   10   trying to keep everyone's documents separated and segregated into

16:36:39   11   their users areas.

16:36:40   12   Q.   So it's an affirmative step?

16:36:42   13   A.   Yes, ma'am.

16:36:42   14   Q.   All right.  The other category was a thumb cache.  What is a

16:36:46   15   cache?

16:36:47   16   A.   A cache is commonly now used as a computing term for

16:36:52   17   basically it is a store.  It is where a computer is trying to

16:36:56   18   save time and everything is about time.  Where a computer is

16:37:00   19   actually saving something so if it needs to reuse it, it can

16:37:04   20   quickly pull it.  Most commonly talked about, an internet cache.

16:37:10   21   In this case, we're talking about internet cache is where you go

16:37:13   22   to a website and you've downloaded the website to your computer.

16:37:16   23   The computer actually saves that.  So if you go back to that

16:37:19   24   website, it will see if the website has changed or not.  If it

16:37:24   25   hasn't, it can just load the cache directly off of your hard

16:37:28   1  drive and represent the website to you immediately again.  If it

16:37:32   2  has changed, it will go ahead and download again.

16:37:33   3          But basically what it is, it is a store so where if you

16:37:37   4  have visited a website, it will save that website or files from

16:37:40   5  that website on your computer in the cache directory.

16:37:45   6  Q.   So if I go to a particular internet website and I have that

16:37:50   7  image of Target, or a newspaper, or something like that, it will

16:37:54   8  just pull it right back up.  Is that what you're saying?

16:37:56   9  A.   If it sees that it's the same as it was before, right.  It

16:38:00  10  will just pull it right up.

16:38:02  11  Q.   And that will be an Internet Explorer cache.  Is that what

16:38:06  12  you're saying?

16:38:06  13  A.   Yes, ma'am.

16:38:07  14  Q.   What is a Firefox cache then?

16:38:09  15  A.   Firefox cache is basically the same thing.  It's just used

16:38:12  16  by the Firefox browser.  It does exactly the same thing:  It

16:38:16  17  caches the information for use again.

16:38:18  18  Q.   I think my previous question was the thumbs cache.  Tell me

16:38:22  19  about that.  Is that a little different?

16:38:23  20  A.   Thumbs cache is a little different.  The thumbs cache, every

16:38:27  21  time on Windows computers you open up a folder on your computer

16:38:31  22  and you're looking at images, one of the options you have to see

16:38:34  23  those files is either large, small icons, extra large icons.

16:38:40  24  When you open up a folder and look at pictures within a folder,

16:38:43  25  what it's doing is it's creating what it calls a thumbnail.  It

| | |
|---|---|
| 16:38:47 | 1 |

16:38:47  1   is creating that icon image that it shows on the folder.  Well,

16:38:50  2   the computer stores that because it doesn't want to have to

16:38:52  3   recreate these icons every time.

16:38:55  4          So what it does, it creates a thumbs cache, which is a

16:38:58  5   file that contains multiple sizes.  It has the small, medium and

16:39:02  6   large icon size pictures that it stores on the computer.  And so,

16:39:06  7   what it does is if you go back to that folder and open the folder

16:39:09  8   with those pictures in it again and want to see the pictures

16:39:13  9   represented as icons, it doesn't have to rescan or recreate the

16:39:16  10  thumbnail image.  It just pulls it from the thumbs cache.  Once

16:39:20  11  again, it's trying to shortcut and make the computer work faster

16:39:22  12  that way.

16:39:22  13  Q.   Something a little bit different than all these is called a

16:39:26  14  carved file.  Is that correct?

16:39:28  15  A.   Yes, ma'am.

16:39:28  16  Q.   What is that?

16:39:29  17  A.   A carved file, this is where a file has been deleted or is

16:39:33  18  no longer used by the operating system, and it's basically in the

16:39:36  19  free space of the computer that isn't being used anymore.  It's a

16:39:40  20  file that's been -- either the system created it and no longer

16:39:43  21  needs it or it's a file you deleted and entered in the recycle

16:39:47  22  bin and it's been quite a while, and the computer has basically

16:39:50  23  allocated that space saying -- or unallocated it saying it's

16:39:53  24  available for any kind of use.

16:39:55  25          What the software we use when processing this evidence,

| | | |
|---|---|---|
| 16:39:59 | 1 | it scans all of these free areas and finds remnants of files and |
| 16:40:04 | 2 | it names them carved files because literally, it just carves it |
| 16:40:08 | 3 | out of all of the bits and bytes that are out there in the free |
| 16:40:11 | 4 | space. |
| 16:40:12 | 5 | Q.   And, again, you went over all of these different path files |
| 16:40:17 | 6 | with Special Agent Lawson, right? |
| 16:40:19 | 7 | A.   Yes, ma'am. |
| 16:40:20 | 8 | Q.   One final question.  If you have -- you're on the Internet |
| 16:40:24 | 9 | Explorer cache, does that mean that at least at some point, a |
| 16:40:28 | 10 | user has been entering into a website to view that image? |
| 16:40:34 | 11 | A.   If a file is on an internet cache, it means the computer has |
| 16:40:38 | 12 | loaded that web page is what that means.  So at some point on the |
| 16:40:42 | 13 | screen, that web page was displayed. |
| 16:40:49 | 14 | Q.   Pass the witness, your Honor. |
| 16:40:54 | 15 | CROSS-EXAMINATION |
| 16:40:54 | 16 | BY MR. FINN: |
| 16:40:56 | 17 | Q.   May it please the Court, members of the jury. |
| 16:40:58 | 18 | Special Agent Cox, my name is David Finn.  I don't |
| 16:41:01 | 19 | think we've ever met, have we? |
| 16:41:02 | 20 | A.   No, sir.  We haven't. |
| 16:41:03 | 21 | Q.   I've got a lot of respect for what you do.  My dad was in |
| 16:41:05 | 22 | the FBI under J. Edgar Hoover about 50 years ago. |
| 16:41:10 | 23 | A.   Thank you, sir. |
| 16:41:11 | 24 | Q.   I just have a couple of questions.  I represent Jose over |
| 16:41:14 | 25 | here.  Thank you, Jose, Trevino. |

16:41:18  1        And did you look at some of the other computers or all

16:41:22  2   of the computers that were seized from the ranch up in Oklahoma?

16:41:26  3   A.   Yes, sir, I did.

16:41:27  4   Q.   And there were quite a few of them, weren't there?

16:41:29  5   A.   Yes, sir.  There were.

16:41:30  6   Q.   Like, I don't know, six, seven maybe?

16:41:32  7   A.   There were eight.

16:41:33  8   Q.   Eight.  Okay.  And what about the computers that were seized

16:41:38  9   from the Balch Springs house, the residence?  Balch Springs is up

16:41:43  10  by Dallas.  Do you remember looking at those?

16:41:45  11  A.   That one, not specifically.  I don't remember because, once

16:41:49  12  again, when I processed them, I don't necessarily get into the

16:41:53  13  guts of what is on there.

16:41:54  14  Q.   Fair enough.  And did you also look at the various

16:41:58  15  telephones that were seized from the ranch and from the

16:42:01  16  residence?

16:42:01  17  A.   I did look at a selection.  I don't know where exactly they

16:42:04  18  were, if they were from a ranch or not.

16:42:06  19  Q.   Do you remember about how many phones you looked at,

16:42:11  20  approximately, ballpark?

16:42:15  21  A.   Maybe ten.  I don't know for sure because -- we did have

16:42:19  22  CART personnel in Oklahoma.  I believe at the ranch.

16:42:22  23  Q.   Right.  And you understand there are a lot of workers there,

16:42:27  24  there was construction going on, there's a wife, there's kids,

16:42:30  25  there were quite a few people in that area.  Did you understand

| 16:42:32 | 1 | that? |

16:42:32   2   A.   I guess.   I wasn't involved in that search area.

16:42:35   3   Q.   You weren't there for it?

16:42:35   4   A.   No, sir.   I was not.

16:42:36   5   Q.   So you looked and analyzed -- and if you did.   I don't want

16:42:41   6   to put words in your mouth -- every single computer that was

16:42:46   7   seized to your knowledge and every single phone that was seized

16:42:50   8   to your knowledge; is that correct?

16:42:52   9   A.   Well, every computer that the case agent asked me to analyze

16:42:57   10   are the ones I did.

16:42:58   11   Q.   Okay.   Well, was the agent Agent Lawson, the gentleman

16:43:01   12   seated over here?

16:43:02   13   A.   Yes, sir.

16:43:02   14   Q.   And he's been around for a while.   He's no spring chicken,

16:43:06   15   right?   No offense.   He's experienced, right?

16:43:09   16   A.   Okay.   Yes, sir.

16:43:12   17   Q.   Okay.   So if he thought something was worthy of being

16:43:16   18   analyzed and it's safe to say, he grabs something worthy of being

16:43:21   19   analyzed in his opinion and he gave it to you, correct?

16:43:24   20   A.   I would assume so.   Yes, sir.

16:43:26   21   Q.   Okay.   Well, I mean, you know, you don't want to assume so.

16:43:29   22   You know him, he's good?

16:43:30   23   A.   I don't know what was collected in the whole case.   I only

16:43:33   24   know what they asked me to process.

16:43:34   25   Q.   Let me ask it this way.   You don't have any reason to

16:43:36   1   believe that Special Agent Lawson withheld anything that might

16:43:40   2   have been relevant to your analysis, do you?

16:43:42   3   A.    No, sir.  I do not.

16:43:43   4   Q.    Okay.  Good.

16:43:45   5          The evidence that just got admitted, do you know which

16:43:52   6   computer that came from?  Because I haven't seen it.  I have no

16:43:55   7   idea what's on that disc.

16:43:56   8   A.    Right.  Each one, I do know which ones they came from.

16:44:00   9   Q.    You do?

16:44:01  10   A.    Yes, sir.  On the CD, it actually shows which computers of

16:44:05  11   which areas they came from.

16:44:06  12   Q.    Okay.  Well, the only one that I'm concerned with is the

16:44:09  13   computer or computers that are alleged to belong to my client

16:44:13  14   Jose Trevino, okay?

16:44:14  15   A.    Yes, sir.

16:44:14  16   Q.    So I know it's late in the day, but I've got a piece of

16:44:19  17   paper and I've got a pen.  I have not seen this to my knowledge.

16:44:23  18   It may have been available.  I don't know.  But this is kind of

16:44:27  19   news to me.

16:44:28  20          MS. FERNALD:  For the record, this has been available

16:44:30  21   for the defense for a very long time.

16:44:31  22          THE COURT:  It has.  It's been available.

16:44:33  23          MS. FERNALD:  December, I think, of 2012.

16:44:39  24          THE COURT:  You may proceed.

16:44:41  25   Q.    (BY MR. FINN) Okay.  Let's go over whatever you found that

16:44:46  1   you think is relevant, okay?  Because whatever is on that disc is

16:44:51  2   deemed by someone over at this table to be relevant or important.

16:44:54  3   A.   Yes, sir.

16:44:55  4   Q.   So give me and the jurors a little preview what we can

16:44:58  5   expect to see on that disc as it pertains to Lexington, Oklahoma

16:45:02  6   for Jose Trevino.

16:45:03  7   A.   Okay.  Like I said, I didn't select them, but I would -- I

16:45:08  8   know from the sample that we were reviewing, many pictures, PDFs

16:45:14  9   or documents, scanned documents.  I don't know in detail which

16:45:20  10  ones, but that would be mainly photographs and documents, I guess

16:45:24  11  I scanned images.

16:45:25  12  Q.   Photographs of horses, horse documents, things like that?

16:45:29  13  A.   I didn't see any horse pictures.  Yes, sir.

16:45:31  14  Q.   Okay.  Any smoking guns?

16:45:34  15  A.   Once again, within the relevance or what are the key factors

16:45:38  16  of the case.  So I don't know what to say to about that.

16:45:41  17  Q.   Okay.  So if I wanted to ask those specific questions

16:45:44  18  instead of directing them to you, I should direct them to Special

16:45:47  19  Agent Lawson; is that fair?

16:45:48  20  A.   Yes, sir.

16:45:49  21  Q.   All right.  Thank you.  That's all I have, your Honor.

16:45:53  22          MR. SANCHEZ:  No questions, your Honor.

16:45:54  23          THE COURT:  Mr. Womack.

16:45:55  24          MR. WOMACK:  Very briefly.

16:45:56  25

| | | |
|---|---|---|
| 16:45:56 | 1 | CROSS-EXAMINATION |
| 16:45:56 | 2 | BY MR. WOMACK: |
| 16:46:01 | 3 | Q.   Special Agent Cox, I'm Guy Womack from Houston. |
| 16:46:03 | 4 | A.   Yes, sir. |
| 16:46:03 | 5 | Q.   We have -- I guess these computer things somewhere.  Sir, |
| 16:46:39 | 6 | I'm going to hand you Government's Exhibit 364NM. |
| 16:46:43 | 7 | A.   Yes. |
| 16:46:43 | 8 | Q.   Appear to be a series of tabs in there.  Sir, from your |
| 16:46:49 | 9 | analysis of that media. |
| 16:46:54 | 10 | A.   Yes, sir. |
| 16:46:55 | 11 | Q.   How many computers were seized from New Mexico? |
| 16:47:05 | 12 | A.   I can't say right offhand.  I know we have -- |
| 16:47:08 | 13 | Q.   If you look at that, would it be obvious to you or not? |
| 16:47:11 | 14 | A.   Well, the way we did -- it just says this is from New |
| 16:47:16 | 15 | Mexico.  I divided them up by location.  These do not have the |
| 16:47:21 | 16 | actual paths.  But the paths that we worked on from where the |
| 16:47:25 | 17 | files came from, they actually do have which computer each of the |
| 16:47:31 | 18 | documents comes from.  But I can't tell just by looking at it |
| 16:47:34 | 19 | which computers they came from. |
| 16:47:35 | 20 | Q.   Okay.  And I guess what I really want to know is, is all |
| 16:47:42 | 21 | that from one laptop computer that was seized in New Mexico? |
| 16:47:46 | 22 | A.   I can't remember exactly how many boxes from New Mexico.  I |
| 16:47:50 | 23 | wouldn't be able to say. |
| 16:47:51 | 24 | Q.   Okay. |
| 16:47:55 | 25 | A.   It's possible. |

16:47:56  1   Q.   So you don't know if there was more than one computer.

16:48:01  2   Well --

16:48:02  3   A.   No, sir.

16:48:02  4   Q.   Do you know if these -- it that's all from a laptop?  Was it

16:48:04  5   from a desktop or some other kind of computer?

16:48:07  6   A.   By looking through -- just through the documents, I can't

16:48:10  7   say where they came from exactly.  My CD basically or my evidence

16:48:14  8   item just says that it's from New Mexico.  So I don't remember

16:48:16  9   exactly what the models are.

16:48:18  10  Q.   I gotcha.

16:48:19  11  A.   For each of the ones.

16:48:20  12  Q.   And there's nothing that you have, like an evidence custody

16:48:24  13  document or any kind of a document available here that will tell

16:48:27  14  you how many computers that data came from?

16:48:32  15  A.   I don't have any of the evidence documents.  Nothing would

16:48:36  16  be here.  Like I said, we were going through talking about which

16:48:40  17  -- when we talk about paths as to where the path is for where

16:48:43  18  these files come from, the path actually starts with an indicator

16:48:47  19  showing which computer and which evidence item, which as we call

16:48:51  20  it, a 1B number each of these items come from.

16:48:54  21  Q.   Can you tell me the timeframe of the data found within these

16:49:03  22  computers?  For example, does it have data going back to 2009 or

16:49:07  23  is it all in 2012?

16:49:10  24  A.   I wouldn't be able to tell without actually looking at the

16:49:13  25  items on the CD because that wasn't part of my analysis.  It was

16:49:18  1  providing timeline analysis showing any of the date -- all the

16:49:21  2  dates are included on the CD showing what each file has on there

16:49:26  3  or the creation modified and access times.  Those are all on

16:49:30  4  there, but I did not look at it specifically.

16:49:33  5  Q.   You picked up a little envelope with a disc.  Is that a CD

16:49:36  6  or a DVD?

16:49:38  7  A.   It's a DVD.

16:49:38  8  Q.   DVD?

16:49:39  9  A.   It's labeled as DVD.

16:49:40  10  Q.   And would you create one DVD per computer?

16:49:42  11  A.   No, sir.

16:49:44  12  Q.   Would you do more than one DVD per computer?

16:49:47  13  A.   Depends on -- I can do more than one computer on one DVD.

16:49:51  14  But it depends on the size of the evidence that the case agent

16:49:54  15  decides.  A lot of times, you know, a DVD will only hold so much

16:49:58  16  data.  If it goes over the 4.7 gigabytes, I have to use another

16:50:02  17  DVD.

16:50:02  18  Q.   Okay.  And that particular exhibit, New Mexico, how many

16:50:07  19  DVDs do you have?

16:50:08  20  A.   One.

16:50:10  21  Q.   And so, that DVD would have all the data seized from one or

16:50:19  22  more computers in New Mexico?

16:50:20  23  A.   They came in with the batch of evidence that I was provided

16:50:24  24  for the New Mexico search site that they did that would all be on

16:50:28  25  one -- as one DVD.

| 16:50:30 | 1 | Q.   Right.  And if we were to open that DVD and look at it, is |
| 16:50:38 | 2 | there some kind of a menu or something that would show us how |
| 16:50:43 | 3 | many computers are on that DVD? |
| 16:50:44 | 4 | A.   It will show -- well, what it's showing is it's showing the |
| 16:50:48 | 5 | files that are collected and there were -- marked as relevant by |
| 16:50:52 | 6 | case Agent Lawson.  It will show the files and where they came |
| 16:50:55 | 7 | from for each file. |
| 16:50:59 | 8 | Q.   And looking at that, can we tell how many computers were |
| 16:51:03 | 9 | seized and analyzed by you? |
| 16:51:07 | 10 | A.   Well, as long as, once again, if there was a computer that |
| 16:51:11 | 11 | had no relevant files, those files would not be included on this. |
| 16:51:15 | 12 | So it would only be the files that were deemed relevant would be |
| 16:51:19 | 13 | on here.  So if there's another computer -- I can't remember |
| 16:51:22 | 14 | exactly how many computers came from New Mexico.  That would be |
| 16:51:27 | 15 | in our evidence logs.  But those computers, if there was anything |
| 16:51:32 | 16 | relevant would be all collected together and put onto the DVD. |
| 16:51:36 | 17 | Q.   Okay, sir.  Thank you.  I'll collect that back up.  And, |
| 16:51:45 | 18 | sir, I have no further questions. |
| 16:51:46 | 19 | THE COURT:  Mr. Esper. |
| 16:51:48 | 20 | MR. ESPER:  I wouldn't even know where to start, Judge. |
| 16:51:50 | 21 | No questions. |
| 16:51:51 | 22 | MR. MAYR:  That's what I'm here for, Judge.  If I may. |
| 16:51:54 | 23 | THE COURT:  You may. |
| 16:51:54 | 24 | |
| 16:51:55 | 25 | |

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 16:51:55 | 1  | <u>CROSS-EXAMINATION</u>                                 |
| 16:51:55 | 2  | BY MR. MAYR:                                              |
| 16:51:58 | 3  | Q.   Special Agent Cox, good afternoon.                  |
| 16:52:00 | 4  | A.   Yes, sir.                                           |
| 16:52:01 | 5  | Q.   My name is Brent Mayr.  Do you recognize that name? |
| 16:52:04 | 6  | A.   Yes, sir, I do.                                     |

<table>
<tr><td>16:52:04</td><td>7</td><td>Q.   Do you recognize that name because I left you several</td></tr>
<tr><td>16:52:07</td><td>8</td><td>messages trying to get a copy of my client's image, right?</td></tr>
<tr><td>16:52:10</td><td>9</td><td>A.   Right.</td></tr>
<tr><td>16:52:10</td><td>10</td><td>Q.   And I did receive that from you and I appreciate that.  Took</td></tr>
<tr><td>16:52:15</td><td>11</td><td>a little bit of time.  I just need to ask you a couple of brief</td></tr>
<tr><td>16:52:18</td><td>12</td><td>questions.</td></tr>
<tr><td>16:52:18</td><td>13</td><td>A.   Certainly.</td></tr>
<tr><td>16:52:18</td><td>14</td><td>Q.   These relevant items that you pulled out of here -- and,</td></tr>
<tr><td>16:52:23</td><td>15</td><td>again, there's been already a question about that that was</td></tr>
<tr><td>16:52:25</td><td>16</td><td>determined by Agent Lawson, right?</td></tr>
<tr><td>16:52:27</td><td>17</td><td>A.   Yes, sir.</td></tr>
<tr><td>16:52:27</td><td>18</td><td>Q.   Would he know where these specific files, whether it be a</td></tr>
<tr><td>16:52:34</td><td>19</td><td>JPEG, whether it be a TIFF, whether it be a Word document, would</td></tr>
<tr><td>16:52:40</td><td>20</td><td>he know where exactly on the computer those were located?</td></tr>
<tr><td>16:52:43</td><td>21</td><td>A.   As he's going through, if he selects an image or something,</td></tr>
<tr><td>16:52:47</td><td>22</td><td>it will show him where it came from.</td></tr>
<tr><td>16:52:49</td><td>23</td><td>Q.   Okay.</td></tr>
<tr><td>16:52:49</td><td>24</td><td>A.   And then, once he selects it, marks it as a relevant file,</td></tr>
<tr><td>16:52:53</td><td>25</td><td>bookmarks it, as we call it, when I create my final forensic</td></tr>
</table>

16:52:58  1   report that's on the DVD, that is when basically it gives all the

16:53:03  2   pertinent information about the file.  It gives the dates, the

16:53:05  3   path, and all of that.

16:53:06  4   Q.   Now, if I asked you specific questions about my client's

16:53:14  5   computers and how many were seized, what was on them, are those

16:53:17  6   questions that you could answer right now, or are you just not

16:53:19  7   prepared to do that?

16:53:21  8   A.   I mean, I can go over -- I can't say exactly what's on each

16:53:25  9   one.  I know that there were a number of computers from the

16:53:28  10  Austin site.

16:53:29  11  Q.   Right.

16:53:30  12  A.   I do remember those well.

16:53:31  13  Q.   Do you remember that it appeared from file names, user

16:53:38  14  profiles, documents created, that the computer was used primarily

16:53:44  15  by a Jessica Huitron?

16:53:46  16  A.   I do remember that user folder name.  Yes.

16:53:48  17  Q.   All right.  Now, if there's relevant -- what I deem or

16:53:56  18  relevant to my client's case -- let me ask you this.  Do you

16:54:01  19  recall seeing QuickBooks files on those computers?

16:54:04  20  A.   I cannot say for sure on that.  I do not remember.

16:54:06  21  Q.   Okay.  Any sort of accounting or tax software, who would be

16:54:13  22  the person to talk to about that to explain those other things

16:54:16  23  found on there?

16:54:17  24  A.   Once again, the case agent is the one that was going through

16:54:20  25  to look at what exactly was on the computer.

| | | |
|---|---|---|
| 16:54:23 | 1 | Q.   If there's something relevant that's on the computer, like a |
| 16:54:27 | 2 | QuickBooks -- access to a QuickBooks account and I said that |
| 16:54:30 | 3 | that's relevant, could you help me pull that off? |
| 16:54:32 | 4 | A.   Yes, sir. |
| 16:54:33 | 5 | Q.   Okay.  With that, Judge, I have no further questions. |
| 16:54:39 | 6 | THE COURT:  Any redirect? |
| 16:54:42 | 7 | MS. FERNALD:  No further questions, your Honor.  May |
| 16:54:44 | 8 | this witness be excused? |
| 16:54:46 | 9 | MR. FINN:  No objection. |
| 16:54:48 | 10 | MR. MAYR:  Judge, I do.  I would like to keep him on |
| 16:54:49 | 11 | call and available if we need to shore up anything with the |
| 16:54:52 | 12 | computer materials. |
| 16:54:55 | 13 | THE COURT:  Be available.  Don't go -- |
| 16:54:58 | 14 | THE WITNESS:  Do you need me in town or San Antonio? |
| 16:55:01 | 15 | THE COURT:  I don't need you in town until he does.  If |
| 16:55:05 | 16 | he thinks he does. |
| 16:55:06 | 17 | THE WITNESS:  Yes, sir. |
| 16:55:07 | 18 | THE COURT:  But he will not need you until Monday. |
| 16:55:12 | 19 | THE WITNESS:  Okay, sir.  I'll be available for the |
| 16:55:14 | 20 | Court. |
| 16:55:14 | 21 | THE COURT:  Run like a rabbit. |
| 16:55:16 | 22 | THE WITNESS:  Yes, sir, I will. |
| 16:55:19 | 23 | THE COURT:  All right. |
| 16:55:20 | 24 | MR. MAYR:  Thank you, sir. |
| 16:55:21 | 25 | THE COURT:  He's on call. |

| | | |
|---|---|---|
| 16:55:24 | 1 | THE WITNESS:  Okay.  Thank you, sir. |
| 16:55:25 | 2 | THE COURT:  Yes. |
| 16:55:30 | 3 | Members of the jury, how are you doing?  You want a |
| 16:55:32 | 4 | little short break? |
| 16:55:33 | 5 | THE JUROR:  Yes. |
| 16:55:34 | 6 | THE COURT:  Okay.  Short break.  Remember the |
| 16:55:36 | 7 | instructions. |
| 16:56:08 | 8 | (Jury not present.) |
| 17:06:33 | 9 | (Recess.) |
| 17:07:20 | 10 | (Jury present.) |
| 17:08:04 | 11 | THE COURT:  You may call your witness. |
| 17:08:07 | 12 | MR. GARDNER:  Government calls Special Agent Kevin |
| 17:08:09 | 13 | Hicks. |
| 17:08:29 | 14 | (Witness sworn.) |
| 17:08:34 | 15 | THE COURT:  Tell us, please, your full name and spell |
| 17:08:41 | 16 | your last, please. |
| 17:08:42 | 17 | THE WITNESS:  Kevin Hicks, H-I-C-K-S. |
| 17:08:46 | 18 | MR. GARDNER:  Thank you, your Honor. |
| 17:08:47 | 19 | KEVIN HICKS, called by the Government, duly sworn. |
| 17:08:47 | 20 | DIRECT EXAMINATION |
| 17:08:47 | 21 | BY MR. GARDNER: |
| 17:08:48 | 22 | Q.  Good afternoon, Special Agent.  If you will, could you |
| 17:08:51 | 23 | please introduce yourself to the jury?  Tell them what you do for |
| 17:08:53 | 24 | a living and where. |
| 17:08:53 | 25 | A.  I'm a special agent with the FBI.  My name is Kevin Hicks. |

17:08:56    1    I've been employed with the FBI for a little over 17 years.

17:09:00    2    Currently assigned to the Drug Enforcement Administration, HIDA

17:09:05    3    Task Force in Austin.

17:09:06    4    Q.    And, sir, did you participate in the execution of a search

17:09:10    5    warrant involved in this investigation?

17:09:11    6    A.    A consent search at 8008 Seeling Drive, the residence of

17:09:17    7    Eusevio Huitron.  And I was also -- participated in limited

17:09:23    8    capacity at a search warrant at Huitron Homes, which is 4216

17:09:28    9    Highway 183 in Austin.

17:09:29   10    Q.    If you will, can you explain to the jury -- you talked about

17:09:34   11    the Seeling Drive?

17:09:36   12    A.    Seeling.

17:09:40   13    Q.    Can you talk about exactly what a consent search exists of?

17:09:42   14    A.    On the morning of the 12th, I was a team leader on a team

17:09:46   15    that was responsible for the execution of an arrest warrant on

17:09:49   16    Mr. Eusevio Huitron.  Executed that arrest warrant and then, in

17:09:56   17    speaking with Mr. Huitron, he gave us consent to search his

17:09:58   18    residence, and based on that consent, we searched the residence.

17:10:02   19    Q.    And during the time that you were searching the residence,

17:10:08   20    did you have the opportunity to observe Mr. Huitron speaking in

17:10:11   21    Spanish at one point?

17:10:12   22    A.    Yes.

17:10:13   23    Q.    And did you address him about him speaking -- let me back

17:10:17   24    up.  Who was he talking to?

17:10:18   25    A.    He was speaking to his sons.  They were present in the

| | | |
|---|---|---|
| 17:10:21 | 1 | house. |
| 17:10:21 | 2 | Q.   And did that cause you some amount of concern? |
| 17:10:23 | 3 | A.   It did.  We had five individuals in the -- five adults in |
| 17:10:27 | 4 | the house that day, and they were asked not to speak with one |
| 17:10:31 | 5 | another directly while we're in the house but, rather, speak to a |
| 17:10:34 | 6 | law enforcement agent regarding any questions, needs or concerns |
| 17:10:38 | 7 | while we're in the house. |
| 17:10:39 | 8 | Q.   And do you speak Spanish, sir? |
| 17:10:40 | 9 | A.   I don't. |
| 17:10:41 | 10 | Q.   And did you address Mr. Huitron with regards to the fact he |
| 17:10:44 | 11 | was speaking to other members? |
| 17:10:46 | 12 | A.   He was addressed and asked not to speak with other family |
| 17:10:49 | 13 | members in Spanish. |
| 17:10:50 | 14 | Q.   And did you address him in English or in Spanish? |
| 17:10:53 | 15 | A.   Through a translator in Spanish. |
| 17:10:55 | 16 | Q.   Okay.  And what was his response? |
| 17:10:57 | 17 | A.   After being asked not to do that the last time, he said, |
| 17:11:03 | 18 | "I'll speak whatever fucking language I want," and he said that |
| 17:11:06 | 19 | in English. |
| 17:11:06 | 20 | Q.   Okay.  And so, you understand where Mr. Huitron might have |
| 17:11:10 | 21 | been upset that federal agents are in his house? |
| 17:11:13 | 22 | A.   Certainly. |
| 17:11:13 | 23 | Q.   But the point is, did he understand and speak English? |
| 17:11:17 | 24 | A.   Yes. |
| 17:11:18 | 25 | Q.   And was Mr. Huitron removed from the house after that? |

17:11:21  1   A.   He was removed, taken out to the front yard where a DPS

17:11:25  2   cruiser was parked, and that's where he remained for the

17:11:27  3   remainder of the search.

17:11:29  4   Q.   I'm going to show you Government's Exhibits 418, 41 -- I'm

17:11:33  5   sorry, 418A, B and C.  Do you recognize those, sir?

17:11:38  6   A.   I do.  418A is the front of 8008 Seeling Drive, Mr.

17:11:48  7   Huitron's home.  418B is the dresser that was located on the --

17:11:52  8   as you see the house on the left side in a bedroom, and the

17:11:57  9   dresser contains clothing and large sum of cash.  And 418C is a

17:12:07  10  dresser drawer above the one just described that contains a box

17:12:09  11  with $100 bills in that box.

17:12:13  12  Q.   Your Honor, we'd offer Government's Exhibits 418A through C.

17:12:18  13          MR. ESPER:  No objection, your Honor.

17:12:19  14          THE COURT:  They're received.

17:12:24  15  Q.   (BY MR. GARDNER) Again, could you explain to the jury,

17:12:39  16  showing on the screen 418A, just the front of the house to help

17:12:43  17  identify the house; is that correct?

17:12:44  18  A.   That's correct.

17:12:47  19  Q.   Show the next picture, please.

17:12:53  20  A.   That's in a bedroom, a large sum of cash in the second

17:12:57  21  drawer of the dresser in the bedroom.

17:12:59  22  Q.   Now, other than this drawer, was there cash located in other

17:13:02  23  locations?

17:13:03  24  A.   The drawer right above it, there was a box with cash in it.

17:13:07  25  And then, on top of the dresser was a wallet that had $100 bills

| | | |
|---|---|---|
| 17:13:13 | 1 | in it. |
| 17:13:13 | 2 | Q.   To be perfectly up front, did you discover through visiting |
| 17:13:18 | 3 | with other family members who this room belonged to? |
| 17:13:20 | 4 | A.   Yes. |
| 17:13:20 | 5 | Q.   And who was that? |
| 17:13:21 | 6 | A.   Adrian Huitron. |
| 17:13:24 | 7 | Q.   Now, turning your attention -- it's a little dark on the |
| 17:13:27 | 8 | screen, but how is this amount of money that I'm circling in the |
| 17:13:31 | 9 | lower left-hand corner packaged or banded together? |
| 17:13:37 | 10 | A.   That since there's no banding, it's obviously been folded |
| 17:13:41 | 11 | together for a period of time based on crease.  Then looking at |
| 17:13:45 | 12 | the one directly to the right of that, obviously there's money |
| 17:13:50 | 13 | that's held together with rubber-bands.  And if you look closely, |
| 17:13:53 | 14 | especially the one at the top, within the big rubber-band, there |
| 17:13:56 | 15 | are smaller rubber-bands that separate amounts of currency. |
| 17:14:02 | 16 | Q.   And have you seen this type of banding before on currency? |
| 17:14:06 | 17 | A.   I have. |
| 17:14:06 | 18 | Q.   I guess main question is, is this consistent with one |
| 17:14:10 | 19 | payment or multiple payments? |
| 17:14:13 | 20 | A.   Based on the packaging alone, it would appear that it's - |
| 17:14:16 | 21 |       MR. ESPER:  Objection, your Honor.  Calls for |
| 17:14:18 | 22 | speculation on the part of the witness. |
| 17:14:20 | 23 |       MR. GARDNER:  I believe it calls for his experience, |
| 17:14:23 | 24 | your Honor. |
| 17:14:23 | 25 |       THE COURT:  Now. |

17:14:25   1          MR. GARDNER:  Yes, sir.

17:14:25   2          THE COURT:  Overrule the objection.  You may answer.

17:14:27   3   A.   Based on packaging alone, it appears to have come from

17:14:30   4   different sources.

17:14:31   5   Q.   (BY MR. GARDNER) Next photograph, please.  And you could see

17:14:40   6   both from here, but is this the long portion you were discussing

17:14:44   7   earlier here on top?

17:14:45   8   A.   Yes.

17:14:45   9   Q.   And this is another portion of cash?

17:14:47  10   A.   Yes.

17:14:47  11   Q.   All right.  And the denominations of this cash here?

17:14:50  12   A.   $100 bills.

17:14:52  13   Q.   And, sir, between the three locations of cash, did you add

17:14:56  14   them up?

17:14:57  15   A.   Yes.

17:14:58  16   Q.   And what did you come to as an amount?

17:15:00  17   A.   Final sum was $12,758.

17:15:10  18   Q.   Now, you had some items in front of you from a little

17:15:14  19   show-and-tell?

17:15:14  20   A.   Yes.

17:15:15  21   Q.   The jury's already heard from a Charles Cox about the use of

17:15:19  22   a Cellebrite.  Was the use of a Cellebrite conducted at the

17:15:25  23   search warrant or the arrest warrant of Eusevio Huitron?

17:15:29  24   A.   Yes.

17:15:29  25   Q.   Could you just kind of pick up that machine on top and show

17:15:32    1    it to the jury, please?

17:15:34    2    A.    This is the actual forensic extraction device.   This is the

17:15:38    3    Cellebrite.

17:15:38    4    Q.    And what's in your black case there?

17:15:41    5    A.    And the black case contains the -- basically the cables that

17:15:45    6    would connect your Cellebrite to a particular cellphone.

17:15:48    7    Q.    Okay.  Can you lift that up so the jury can see it, please?

17:15:52    8    I'm sorry.  Special Agent Hicks, could you show them like that?

17:15:59    9    And so, purpose of those cords is what?

17:16:02   10    A.    The purpose of the cords is to have a conduit from yourself

17:16:07   11    brought to the port of a cellphone.  And all cellphones are

17:16:11   12    generally different, so you have the different types of cables.

17:16:16   13    Q.    You would agree with me, obviously the record won't reflect,

17:16:18   14    but is it a very portable instrument?

17:16:21   15    A.    Yes.

17:16:22   16    Q.    And in this case, did you hook up the phone of Eusevio

17:16:27   17    Huitron?

17:16:27   18    A.    We identified Mr. Huitron's phone in the residence, took it

17:16:32   19    out to a vehicle that was parked in the front and did the

17:16:34   20    extraction from the vehicle.

17:16:36   21    Q.    And then, as Mr. Cox testified to, that device creates its

17:16:43   22    own report, correct?

17:16:44   23    A.    That's correct.

17:16:44   24    Q.    Showing you Government's Exhibit 357.  Is this a report

17:16:47   25    created from Eusevio Huitron's telephone?

17:16:51  1  A.   Yes.

17:16:53  2  Q.   And is this a report that you provided to the U.S.

17:16:55  3  Attorney's Office following the execution of the arrest warrant

17:16:59  4  on Mr. Eusevio Huitron?

17:17:01  5  A.   Yes.

17:17:02  6  Q.   Your Honor, we'd offer Government's Exhibit 357.

17:17:05  7       MR. ESPER:   No objection, your Honor.

17:17:07  8       THE COURT:   357 is received.

17:17:10  9  Q.   (BY MR. GARDNER) Special Agent Hicks, during the course of

17:17:14  10 your career, have you also been involved in the interception and

17:17:21  11 use of telephones?

17:17:22  12 A.   Yes.

17:17:23  13 Q.   And are you familiar with country codes with respect to

17:17:27  14 certain telephone numbers?

17:17:28  15 A.   Yes.

17:17:34  16 Q.   I'd like to identify this one to you.  What I'm looking on

17:17:47  17 this page, what is this page right here?  Where is this

17:17:50  18 information normally stored on a phone?

17:17:52  19 A.   This is the address box for Mr. Huitron's phone.

17:17:55  20 Q.   Okay.  So if I wanted to look up Special Agent Hicks, I'd go

17:17:58  21 to him and then, hit call, correct?

17:18:00  22 A.   Correct.

17:18:00  23 Q.   So this individual named "Yo Yo" here on line 61?

17:18:06  24 A.   Okay.

17:18:07  25 Q.   Now, when you say country codes, the next line, 72 star 9

17:18:13  1   star 25922, what do you recognize that country as?

17:18:18  2   A.   That's going to be a UFNI, a urban fleet number for a

17:18:24  3   Mexican Nextel phone.

17:18:26  4   Q.   Mexican Nextel phone and what particular set of numbers here

17:18:31  5   identify it as such?

17:18:33  6   A.   During the course of my wire intercepts, anything that will

17:18:38  7   start with 52, 62, 72, 92, those are all going to be Mexican

17:18:44  8   Nextel telephones.

17:18:46  9   Q.   I'm showing you the next page.  Actually identifies page 11

17:18:58  10  of 14.  There's an entry for Victor.  Are you familiar with the

17:19:04  11  U.S. area code 956?

17:19:06  12  A.   Yes.

17:19:06  13  Q.   And what location in the United States is that?

17:19:09  14  A.   It's Laredo, McAllen, area code.

17:19:15  15  Q.   And Carlos Nayen, spelled G-A-R-L-O-S in this case, and are

17:19:22  16  you familiar with that particular code?

17:19:24  17  A.   The 124 with the star, it's going to be a domestic

17:19:29  18  push-to-talk number for a Nextel phone.

17:19:31  19  Q.   In the United States?

17:19:32  20  A.   Correct.

17:19:33  21  Q.   And with respect to the 135 under Victor, what is that?

17:19:37  22  A.   It's going to be, again, a domestic or United States

17:19:42  23  push-to-talk number.

17:19:43  24  Q.   And showing you page 9 of 14, identifying the index No. 68,

17:20:05  25  that's that Saltillo, correct?

17:20:07  1   A.   Correct.

17:20:08  2   Q.   All right.   512 area code?

17:20:10  3   A.   Austin, Central Texas.

17:20:11  4   Q.   Okay.  And a 143?

17:20:13  5   A.   That's going to be, again, push-to-talk number in the United

17:20:21  6   States.

17:20:21  7   Q.   Special Agent, you also said you took a part of a limited

17:20:26  8   search in the Highway 183 Huitron Homes, Huitron Painting?

17:20:29  9   A.   I did.  Once we had executed the arrest warrant on Mr.

17:20:32  10  Huitron, asked for keys, asked Mr. Huitron and his son for keys

17:20:39  11  for the business.  Adrian Huitron identified the keys and which

17:20:44  12  key opened the business, and I took that key to Huitron Painting

17:20:49  13  and it was used to open the door.

17:20:51  14  Q.   So, again, they were cooperative with respect to providing

17:20:54  15  you the keys?

17:20:54  16  A.   Yes.

17:20:55  17  Q.   All right.  And did you, in fact, have a search warrant for

17:20:57  18  the 183 address?

17:20:59  19  A.   Yes.

17:21:00  20  Q.   All right.  So could you have opened the door with or

17:21:02  21  without the keys?

17:21:03  22  A.   Yes, we could have.

17:21:04  23  Q.   Showing you pictures identified as Government's Exhibit 372A

17:21:08  24  through I.

17:21:10  25  A.   Okay.

17:21:10   1   Q.   Would you looked through those, please, sir, and see if you

17:21:13   2   could identify them?

17:21:14   3   A.   372A is the front of Huitron Homes, 4216 Highway 183.  372B,

17:21:24   4   if you're looking at the business, that's going to be an office,

17:21:29   5   the first office at the front on the left-hand side.  372C is

17:21:37   6   just another picture of the same office.  372D is going to be a

17:21:43   7   computer in that office.  372E, again, another computer and a

17:21:51   8   storage device in that office.  372F, as you come into the front

17:21:58   9   door of the office on the right-hand side, there was an office

17:22:01  10   space, and that's going to be a picture of that office.  372G, an

17:22:10  11   overall picture of the same office.

17:22:13  12            372H, that's going to be a computer in that office.

17:22:19  13   372I, as you proceed through the front two offices, there's a

17:22:24  14   hallway that leads into what's labeled here as room 5 and

17:22:29  15   essentially was a storage room, but it was set up -- kind of had

17:22:32  16   a little break area in there, coffee pot, microwave, et cetera, a

17:22:37  17   lot of filing cabinets in that room.

17:22:41  18   Q.   And were these photos taken on June 12th of 2012?

17:22:45  19   A.   Yes.

17:22:46  20   Q.   Your Honor, I'll offer Government's Exhibit 372A through I.

17:22:50  21            MR. ESPER:  No objection, your Honor.

17:22:55  22            THE COURT:  372 A through I are admitted.

17:23:01  23   Q.   (BY MR. GARDNER) Special Agent Hicks, while those gentlemen

17:23:04  24   are looking those through photos, it's kind of hard to see the

17:23:08  25   layout or understand the layout from the photos.  Would you agree

17:23:10    1    with that?

17:23:10    2    A.   Yes.

17:23:11    3    Q.   Could you just generally describe the layout of the office

17:23:13    4    itself?

17:23:14    5    A.   As you come through the front door, on your left is just

17:23:19    6    kind of a narrow hallway or a box size office.  At the very end

17:23:22    7    of that hallway is a closet.  And then, when we made entry, there

17:23:27    8    was a locked door on the office that was on the left.  Made entry

17:23:33    9    into that room to make sure it was clear.  Going to the right,

17:23:38   10    again, in the main hallway on the right was the office that had

17:23:42   11    the paintings or the picture of the horses, et cetera.  You come

17:23:46   12    out of that office, there's a hallway that leads into what looked

17:23:49   13    like was a break room, doors were on, clear passage through.  And

17:23:54   14    you go through that room and looked like another utility room

17:23:57   15    that was used for storage, and I believe there was a dryer in

17:24:01   16    that room.  And there were no doors or closed doors from the

17:24:07   17    offices on the right, all the way to the back.

17:24:09   18    Q.   Okay.  So would you characterize the office but for that one

17:24:12   19    locked door as fairly open?

17:24:14   20    A.   Yes.

17:24:15   21    Q.   Okay.  People seem to have the ability to access any room in

17:24:19   22    the open space?

17:24:19   23    A.   Yes.

17:24:20   24    Q.   And, Special Agent Hicks, I'm only going to show you a

17:24:26   25    picture just for reference so the jury understands what we're

17:24:28  1   talking about.  This is 372A.  What is that, sir?

17:24:33  2   A.    That's the front of Huitron Homes.

17:24:36  3   Q.    Would you agree with me that the remainder of the pictures

17:24:39  4   just generally show the outline or the layout, rather, of the

17:24:42  5   rest of the office?

17:24:42  6   A.    Yes.

17:24:43  7   Q.    One second, your Honor.  Your Honor, I'll pass the witness.

17:24:53  8             MS. WILLIAMS:  No questions.

17:24:55  9             MR. WOMACK:  No questions.

17:24:59  10            MR. ESPER:  I have a few, your Honor.

17:25:00  11            THE COURT:  All right, sir.

17:25:01  12                       CROSS-EXAMINATION

17:25:01  13  BY MR. ESPER:

17:25:30  14  Q.    Mr. Hicks, when you went out to Mr. Huitron's house, the

17:25:38  15  home there is a very modest home, is it not?

17:25:40  16  A.    Yes.

17:25:41  17  Q.    Okay.  Do you know the size of it, the square footage by any

17:25:46  18  chance?

17:25:46  19  A.    I don't.

17:25:47  20  Q.    Okay.  Very modest furniture in there?

17:25:50  21  A.    It was a nice home.

17:25:52  22  Q.    It was nice, but it's very modest, correct?  Not anything

17:25:56  23  elaborate, is it?

17:25:57  24  A.    No.

17:25:57  25  Q.    Okay.  And when you went there, you went with how many

17:26:05  1  agents?

17:26:06  2  A.   I don't remember the total number, sir.

17:26:07  3  Q.   There's usually a pretty -- a cadre of agents that go along

17:26:12  4  on these, isn't there?

17:26:13  5  A.   Usually eight to ten.  Maybe more.

17:26:15  6  Q.   Sure.  And you went there at about 6:30 in the morning,

17:26:19  7  correct?

17:26:19  8  A.   Yes.

17:26:19  9  Q.   Okay.  And were you the -- were you the leader of the agents

17:26:24  10  there?  Team leader?

17:26:26  11  A.   Yes.

17:26:27  12  Q.   Okay.  Now, you also prepared in connection with this case a

17:26:36  13  report, did you not, that documented what you did, what you saw,

17:26:40  14  what happened, correct?

17:26:41  15  A.   That's correct.

17:26:42  16  Q.   And I realize it's basically just a two-page report, is it

17:26:47  17  not?

17:26:47  18  A.   That's correct.

17:26:48  19  Q.   And it doesn't include every minute detail.  You want to

17:26:51  20  include details that are significant, correct?

17:26:53  21  A.   Correct.

17:26:54  22  Q.   Okay.  Now, I believe -- and did you use this report to

17:26:58  23  refresh your memory before you came into court today?

17:27:00  24  A.   Not today, but I have seen it.

17:27:02  25  Q.   Sure.  And you authored it, didn't you?

17:27:05  1    A.   That's correct.

17:27:06  2    Q.   I believe when you went in there, when you and your fellow

17:27:08  3    agents went in, of course, whenever you executed a search warrant

17:27:12  4    or execute an arrest warrant, you've got jackets on to -- so that

17:27:16  5    people know you're law enforcement.

17:27:17  6    A.   Correct.

17:27:18  7    Q.   Okay.  Do you have weapons on you when you go?

17:27:21  8    A.   Yes.

17:27:22  9    Q.   Are they drawn or are they holstered?

17:27:26  10   A.   Drawn.

17:27:26  11   Q.   They're drawn?

17:27:28  12   A.   Correct.

17:27:28  13   Q.   So, in other words, you come into somebody's home and you're

17:27:31  14   there to -- basically it's a show of force, is it not?

17:27:34  15   A.   Yes.

17:27:35  16   Q.   Sure.  Okay.  And, actually, Mrs. Huitron, Denise Huitron

17:27:40  17   was -- actually had been outside and was walking back into the

17:27:43  18   house, right?

17:27:44  19   A.   Yeah.  That was the second time she had come out that

17:27:46  20   morning.

17:27:46  21   Q.   Okay.  And you had observed her come there and go out and

17:27:50  22   come in and go out, correct?

17:27:52  23   A.   Two times.

17:27:53  24   Q.   Okay.  And, I mean, she wasn't coming out to scout around

17:27:55  25   and look for people, was she?

| | | |
|---|---|---|
| 17:27:57 | 1 | A.    The second time, she actually talked to a neighbor, which, |
| 17:28:02 | 2 | embarrassing enough, the neighbor had come up to my vehicle |
| 17:28:04 | 3 | across the street and asked why I was there.   So once we saw her |
| 17:28:10 | 4 | speaking with them, then we went ahead and executed the arrest |
| 17:28:14 | 5 | warrant.   The initial plan was to -- for him to get his ride, |
| 17:28:20 | 6 | which he usually arrived around 7:00, and then, to have the |
| 17:28:23 | 7 | traffic stop conducted on that vehicle.   But based on those |
| 17:28:26 | 8 | events, we sped up the process. |
| 17:28:27 | 9 | Q.    Your plan was to conduct a traffic stop? |
| 17:28:30 | 10 | A.    Correct. |
| 17:28:31 | 11 | Q.    On Mr. Huitron? |
| 17:28:32 | 12 | A.    Actually, he would be a passenger through watching his house |
| 17:28:35 | 13 | for multiple days.   There was a white Ford truck or white Dodge |
| 17:28:40 | 14 | truck that was picking him up about 7:00 in the morning every |
| 17:28:42 | 15 | day.   So. |
| 17:28:43 | 16 | Q.    And where do you follow him to? |
| 17:28:45 | 17 | A.    Basically just watch them pick him up and then, a couple of |
| 17:28:48 | 18 | times, we followed them out to his ranch in Dale. |
| 17:28:52 | 19 | Q.    And whenever this vehicle would pick him up, it was very |
| 17:28:55 | 20 | early in the morning, wasn't it? |
| 17:28:56 | 21 | A.    Usually around 7:00. |
| 17:28:59 | 22 | Q.    And as it turned out on this particular day, he was already |
| 17:29:03 | 23 | at the home, correct?   He hadn't left? |
| 17:29:05 | 24 | A.    He was still at the house.   Yes. |
| 17:29:07 | 25 | Q.    Okay.   And, actually, the day before when you were |

17:29:11   1   surveilling, you made a determination that he wasn't even there

17:29:13   2   that day, correct?

17:29:15   3   A.   The morning, the day before I saw him there.

17:29:18   4   Q.   You saw him there the day before?

17:29:20   5   A.   Uh-huh.

17:29:21   6   Q.   In the evening or the morning?

17:29:22   7   A.   Morning.

17:29:22   8   Q.   Okay.   You're certain about that?

17:29:24   9   A.   I believe so.

17:29:25  10   Q.   Okay.   Well, I asked you if you're certain.   Are you certain

17:29:29  11   or not?

17:29:29  12   A.   There were a number of mornings that I was out there

17:29:32  13   observing and saw the white Dodge truck pick him up.   And I

17:29:38  14   believe I was out there the morning -- to say with a hundred

17:29:40  15   percent certainty, I can't.

17:29:42  16   Q.   But you didn't generate any reports.   It was with respect to

17:29:45  17   that surveillance the day or two before?

17:29:47  18   A.   No.

17:29:47  19   Q.   All right.   Now, in your report, you tell Mrs. Huitron that

17:29:54  20   you're there to arrest her husband, correct?

17:29:57  21   A.   That's correct.

17:29:58  22   Q.   And he comes to the door and you arrest him?

17:30:01  23   A.   That's correct.

17:30:01  24   Q.   And I believe your report says without incident?

17:30:04  25   A.   That's correct.

17:30:05  1    Q.   Okay.  Without incident means he was very cooperative with

17:30:09  2    you?

17:30:09  3    A.   We didn't have any problems putting cuffs on him.

17:30:12  4    Q.   Okay.  And in your report, you don't say anything about him

17:30:18  5    mouthing off to you and I'll talk in any language I want, do you?

17:30:22  6    A.   I didn't.

17:30:22  7    Q.   Okay.  Now, the consent to search form, you now ask -- and

17:30:29  8    you had a Spanish speaker agent with you, correct?

17:30:31  9    A.   That's correct.

17:30:32  10   Q.   You now ask Mr. Huitron and Mrs. Huitron, can we -- would

17:30:36  11   you give us consent to search your home?

17:30:38  12   A.   Correct.

17:30:38  13   Q.   And, of course, the search of one's home, that's very

17:30:44  14   personal to people, is it not?

17:30:45  15   A.   Yes.

17:30:46  16   Q.   Okay.  And they said yes.  Right?

17:30:48  17   A.   Correct.

17:30:49  18   Q.   And so, somebody read the form in Spanish, correct?

17:30:53  19   A.   That's correct.

17:30:53  20   Q.   And Mrs. Huitron signed the form?

17:30:57  21   A.   No.  That was signed by Eusevio.  Mr. Huitron signed the

17:31:13  22   receipt.

17:31:14  23   Q.   But the form was read to him because in the course of your

17:31:16  24   investigation, you know Mr. Huitron is illiterate.  Can't read or

17:31:20  25   write?

17:31:20   1    A.   No.  I don't know that.

17:31:21   2    Q.   You didn't know that?

17:31:22   3    A.   I don't.

17:31:22   4    Q.   Okay.  But you do have forms in English and in Spanish, do

17:31:26   5    you not?

17:31:26   6    A.   Yes.

17:31:27   7    Q.   Okay.  This form was in English?

17:31:29   8    A.   This was in Spanish.

17:31:30   9    Q.   It was in Spanish?

17:31:31   10   A.   Yes.

17:31:31   11   Q.   But it had to be read to him, correct?

17:31:34   12   A.   Yeah.  That's common.

17:31:36   13   Q.   Okay.  Did he take the time to read it before he signed it?

17:31:40   14   A.   He was asked if he understood after it was read to him,

17:31:44   15   certainly which he said he did.

17:31:45   16   Q.   Okay.  Now, he then is put in handcuffs, right?

17:31:50   17   A.   He was in cuffs.

17:31:51   18   Q.   From the beginning?

17:31:51   19   A.   Yes.

17:31:52   20   Q.   Okay.  Now, you go and you secure -- there's other children

17:31:55   21   or adult children who live in the home, correct?

17:31:58   22   A.   Yeah.  There were five adults.  I believe the youngest was

17:32:02   23   16 or 17 at the time.  Then there were some smaller children.

17:32:05   24   Q.   Okay.  And in Adrian Huitron's room, you find this cash.

17:32:10   25   A.   Yes.

| | | |
|---|---|---|
| 17:32:11 | 1 | Q.   And as a matter of fact, Adrian Huitron, was he put in |
| 17:32:16 | 2 | handcuffs and taken outside? |
| 17:32:17 | 3 | A.   No.  He was in the residence.  He was cuffed for -- he was |
| 17:32:21 | 4 | detained initially. |
| 17:32:22 | 5 | Q.   Sure.  For safety purposes? |
| 17:32:24 | 6 | A.   Correct. |
| 17:32:25 | 7 | Q.   So the safety of the agents, correct?  You say in your |
| 17:32:28 | 8 | report that Mr. Adrian Huitron was interviewed about that money. |
| 17:32:36 | 9 | A.   That's correct. |
| 17:32:36 | 10 | Q.   Okay.  And he was interviewed, according to you, by Special |
| 17:32:42 | 11 | Agent Will Snodgrass. |
| 17:32:43 | 12 | A.   Yes. |
| 17:32:43 | 13 | Q.   And you even make reference to a DEA-6, dated June 12, 2012, |
| 17:32:52 | 14 | that apparently was written by Agent Snodgrass? |
| 17:32:54 | 15 | A.   I made reference to that, the report was never written. |
| 17:32:58 | 16 | Q.   Okay.  So you make reference to a report that details Agent |
| 17:33:03 | 17 | Snodgrass' interview with Mr. Huitron, but he never writes up the |
| 17:33:08 | 18 | report? |
| 17:33:08 | 19 | A.   It was never written. |
| 17:33:09 | 20 | Q.   Okay.  So you thought a report was going to be written, and |
| 17:33:12 | 21 | it was not? |
| 17:33:12 | 22 | A.   That's correct. |
| 17:33:13 | 23 | Q.   Okay.  But Mr. Huitron explained to Agent Snodgrass -- |
| 17:33:18 | 24 | MR. GARDNER:  Excuse me, your Honor, which Mr. Huitron? |
| 17:33:21 | 25 | MR. ESPER:  I'm not going to ask what he said. |

| | | |
|---|---|---|
| 17:33:22 | 1 | MR. GARDNER:  Okay. |
| 17:33:23 | 2 | Q.   (BY MR. ESPER) Did Adrian Huitron give an explanation to |
| 17:33:27 | 3 | Agent Snodgrass about the money? |
| 17:33:29 | 4 | A.   Yes. |
| 17:33:29 | 5 | Q.   Okay.  Now, this -- what's the name of this machine that |
| 17:33:40 | 6 | does -- |
| 17:33:42 | 7 | A.   Cellebrite? |
| 17:33:43 | 8 | Q.   Does this also have the ability to retrieve fax messaging? |
| 17:33:51 | 9 | A.   I've never seen it retrieve fax.  It's essentially any |
| 17:33:55 | 10 | information that would be stored on a cellphone. |
| 17:33:56 | 11 | Q.   Okay.  And I believe there are 14 pages that were -- of |
| 17:34:02 | 12 | telephone numbers that were extracted out of Mr. Huitron's phone? |
| 17:34:07 | 13 | A.   I'd have to look at the number of pages. |
| 17:34:10 | 14 | Q.   Of course. |
| 17:34:20 | 15 | A.   There are telephone numbers 13 of the 14 pages. |
| 17:34:24 | 16 | Q.   Okay. |
| 17:34:25 | 17 | A.   Last page. |
| 17:34:25 | 18 | Q.   And on each page, it lists about 10 to a page, correct? |
| 17:34:35 | 19 | A.   May I see that? |
| 17:34:36 | 20 | Q.   Sure. |
| 17:34:36 | 21 | A.   Actually, I believe on this page, there are 10, but they |
| 17:34:39 | 22 | give you the number of actual numbers that are on here. |
| 17:34:42 | 23 | Q.   Okay. |
| 17:34:43 | 24 | A.   So there's 11 on this phone, there would have been 100 -- |
| 17:34:48 | 25 | well, the last three are recalls.  Looks like 104 telephone |

| | | |
|---|---|---|
| 17:34:51 | 1 | numbers stored on this phone. |
| 17:34:52 | 2 | Q.   And a lot of them have telephone numbers for people that |
| 17:34:56 | 3 | live in Mexico, correct? |
| 17:34:57 | 4 | A.   That' correct. |
| 17:34:58 | 5 | Q.   Not just the three you identified? |
| 17:35:00 | 6 | A.   There were additional numbers in Mexico. |
| 17:35:02 | 7 | Q.   Okay.  Now, did Mr. Huitron -- he had a cellular telephone, |
| 17:35:07 | 8 | did he not? |
| 17:35:08 | 9 | A.   Yes. |
| 17:35:08 | 10 | Q.   And that's where you got that information out of? |
| 17:35:10 | 11 | A.   That's correct. |
| 17:35:11 | 12 | Q.   Okay.  And do you know this cellular telephone number? |
| 17:35:15 | 13 | A.   It was 512-844-0095. |
| 17:35:18 | 14 | Q.   Okay.  And do you know -- and if you don't, simply say so -- |
| 17:35:21 | 15 | whether you or anyone else have subpoenaed the subscriber |
| 17:35:25 | 16 | information for that? |
| 17:35:27 | 17 | A.   It was subpoenaed.  There was -- in fact, the day of the |
| 17:35:31 | 18 | arrest, there was a tracking warrant that would have already been |
| 17:35:35 | 19 | issued and installed on that phone.  So that information was |
| 17:35:40 | 20 | acquired. |
| 17:35:40 | 21 | Q.   And do you know -- and if you don't, simply say -- that he's |
| 17:35:44 | 22 | had that same phone number for a long time?  Do you know? |
| 17:35:47 | 23 | A.   I don't know. |
| 17:35:48 | 24 | Q.   You don't know? |
| 17:35:49 | 25 | A.   I don't know. |

| | | |
|---|---|---|
| 17:35:49 | 1 | Q.   Did you make any determination as to whether he had or not? |
| 17:35:52 | 2 | A.   No. |
| 17:35:52 | 3 | Q.   Did he have one of those Nextel push-to-talk phones? |
| 17:35:56 | 4 | A.   Yes. |
| 17:35:56 | 5 | Q.   He did? |
| 17:35:57 | 6 | A.   Uh-huh. |
| 17:35:57 | 7 | Q.   And can you extract numbers out of that? |
| 17:36:01 | 8 | A.   Yes. |
| 17:36:01 | 9 | Q.   And did you do that? |
| 17:36:03 | 10 | A.   That's this report. |
| 17:36:04 | 11 | Q.   That's that? |
| 17:36:05 | 12 | A.   This is a Nextel phone. |
| 17:36:06 | 13 | Q.   Okay.  That's not out of the cellphone? |
| 17:36:08 | 14 | A.   It's a cellphone.  Correct. |
| 17:36:10 | 15 | Q.   I'm sorry? |
| 17:36:11 | 16 | A.   It's a Nextel telephone.  You're able to make direct calls |
| 17:36:15 | 17 | as you normally would, 512-344.  Or if you want to use the |
| 17:36:19 | 18 | push-to-talk or direct connect function, you put in the urban |
| 17:36:24 | 19 | fleet number. |
| 17:36:24 | 20 | Q.   Okay.  Now, I believe, your Honor, the last exhibit I have |
| 17:36:30 | 21 | for EH was, I think, 3, but I don't want to be mistaken. |
| 17:36:37 | 22 |         THE CLERK:  Wait a second.  You're correct. |
| 17:37:53 | 23 | Q.   (BY MR. ESPER) Mr. Hicks, I'm going to show you what I have |
| 17:37:57 | 24 | marked as Defendant's Exhibit EH-4 through 10 inclusive.  Can you |
| 17:38:00 | 25 | identify those photographs? |

| | | |
|---|---|---|
| 17:38:03 | 1 | A.   The first photograph, which is Exhibit 10. |
| 17:38:06 | 2 | Q.   Yes. |
| 17:38:07 | 3 | A.   That's taken looking North 183, the business would be to the |
| 17:38:12 | 4 | left.  There's a tire shop next to that business.  That's a photo |
| 17:38:16 | 5 | of essentially the front -- one side of the tire shop, some hay |
| 17:38:22 | 6 | bales and the Highway 183. |
| 17:38:25 | 7 | Q.   Okay.  EH-9, what is that? |
| 17:38:28 | 8 | A.   EH-9, I don't know. |
| 17:38:31 | 9 | Q.   Is that part of the ranch? |
| 17:38:33 | 10 | A.   I don't know. |
| 17:38:33 | 11 | Q.   You don't know? |
| 17:38:34 | 12 | A.   No. |
| 17:38:34 | 13 | Q.   There's some horses in it. |
| 17:38:36 | 14 | A.   Well, I don't know. |
| 17:38:37 | 15 | MR. GARDNER:  Your Honor, we'll stipulate to the fact |
| 17:38:39 | 16 | to those are pictures taken by government agents at the Rianna |
| 17:38:43 | 17 | Woods address in Austin, Texas, the ranch of Eusevio and Jesus |
| 17:38:46 | 18 | Huitron. |
| 17:38:47 | 19 | MR. ESPER:  Thank you, your Honor. |
| 17:38:50 | 20 | THE COURT:  All right.  EH-4 through 10 are admitted. |
| 17:38:54 | 21 | Q.   (BY MR. ESPER) Mr. Huitron, you -- I'm sorry.  Mr. Hicks, |
| 17:38:59 | 22 | you actually went out to the ranch, correct? |
| 17:39:03 | 23 | A.   I've seen the ranch.  Yes, sir. |
| 17:39:04 | 24 | Q.   Okay.  And is this the entry to the ranch? |
| 17:39:11 | 25 | A.   It appears to be.  Yes, sir. |

| 17:39:12 | 1 | Q. Okay. And I know you're probably not a horse aficionado. |
| 17:39:19 | 2 | A. No. |
| 17:39:19 | 3 | Q. But there is a pretty primitive, elementary-type facility, |
| 17:39:24 | 4 | is it not? |
| 17:39:24 | 5 | A. I wouldn't know, sir. |
| 17:39:25 | 6 | Q. You wouldn't know? |
| 17:39:27 | 7 | A. No. |
| 17:39:27 | 8 | Q. It's not anything like the Ponderosa or anything we used to |
| 17:39:30 | 9 | see on TV. |
| 17:39:32 | 10 | A. No, sir. |
| 17:39:32 | 11 | Q. No? Okay. Nothing elaborate to it? |
| 17:39:35 | 12 | A. Essentially my familiarity with this is driving down that |
| 17:39:39 | 13 | dirt road and making the corner. So I really don't have anything |
| 17:39:42 | 14 | to offer. |
| 17:39:43 | 15 | Q. Yeah. It's a very simple structure, is it not? |
| 17:39:46 | 16 | A. There's a house off in the distance. It's far away. I |
| 17:39:52 | 17 | couldn't tell you, sir. |
| 17:39:52 | 18 | Q. There's horses on it and the stables look a little |
| 17:39:55 | 19 | primitive, do they not? |
| 17:39:57 | 20 | A. Sir, I don't know. |
| 17:39:58 | 21 | Q. Okay. Is this the structure that is part of the stables |
| 17:40:09 | 22 | area? |
| 17:40:09 | 23 | A. I've only seen the structure from the road, which is |
| 17:40:11 | 24 | probably, I don't know, six, seven-hundred yards. I couldn't say |
| 17:40:15 | 25 | with certainty. |

17:40:16  1  Q.   Okay.  Now, you said that when you walked into the office

17:40:27  2  area, the area was pretty much just wide open except for one door

17:40:33  3  and that was locked?

17:40:34  4  A.   On the left side, that door was locked.  Everything else,

17:40:37  5  the doors were open.

17:40:38  6  Q.   Did you subsequently find out who used that particular

17:40:41  7  office that was locked?

17:40:42  8  A.   I didn't.  No.

17:40:43  9  Q.   You didn't?

17:40:43  10  A.   No.

17:40:46  11  Q.   But that was the only -- that was the only part of the

17:40:50  12  structure that had any type of lock to it?

17:40:54  13  A.   Other than the front door.  Yes, sir.

17:40:56  14  Q.   Okay.  And was there anything of -- you found a bunch of

17:41:00  15  files, all kinds of files and documents, did you not?

17:41:03  16  A.   A lot of files found there.  I did not conduct the search

17:41:05  17  there.

17:41:06  18  Q.   You didn't do any searching?

17:41:07  19  A.   Not there.  No, sir.

17:41:08  20  Q.   All you did was just observe that -- the inside of those

17:41:13  21  premises?

17:41:14  22  A.   Brought the key over, unlocked the front door, helped on the

17:41:18  23  security sweep and then, went back to the other location.

17:41:21  24  Q.   Okay.  Now, let's get to the key part.  You did have a valid

17:41:26  25  lawfully executed search warrant for the training or the horse

17:41:31   1   facilities, correct?

17:41:34   2   A.   You're talking about his ranch?

17:41:36   3   Q.   Yeah.   The ranch.

17:41:37   4   A.   No.

17:41:37   5   Q.   You didn't have a search warrant for that?

17:41:39   6   A.   No.

17:41:39   7   Q.   What did you have a search warrant for?

17:41:40   8   A.   We had a search warrant for Huitron Homes at 4216 Highway

17:41:47   9   183.

17:41:48  10   Q.   Okay.   That's the -- that's not this ranch?

17:41:51  11   A.   That's correct.

17:41:52  12   Q.   So when you asked for the keys to the ranch, you did have a

17:41:59  13   search warrant for the actual office?

17:42:00  14   A.   I didn't ask for keys to the ranch.   I asked for keys for

17:42:04  15   Huitron Homes.

17:42:04  16   Q.   And that was the -- and the Huitron Homes is out there where

17:42:07  17   this particular ranch is, correct?

17:42:09  18   A.   No.

17:42:09  19   Q.   It's not?

17:42:10  20   A.   No.

17:42:10  21   Q.   Okay.   Mr. "Chevo" Huitron or Adrian Huitron gave you the

17:42:16  22   keys to the offices for Huitron Homes?

17:42:19  23   A.   Correct.

17:42:19  24   Q.   Okay.   And this particular ranch out there, you didn't have

17:42:25  25   a search warrant for that, did you?

| | | |
|---|---|---|
| 17:42:26 | 1 | A.   No. |
| 17:42:26 | 2 | Q.   Did you get consent to go search? |
| 17:42:28 | 3 | A.   No. |
| 17:42:28 | 4 | Q.   You didn't? |
| 17:42:29 | 5 | A.   Huh-uh. |
| 17:42:30 | 6 | Q.   All of the Huitrons, "Chevo" Huitron, his wife, his |
| 17:42:40 | 7 | children, they were all very cooperative with law enforcement, |
| 17:42:42 | 8 | weren't they? |
| 17:42:43 | 9 | A.   "Chevo."  Which one is "Chevo"? |
| 17:42:48 | 10 | Q.   He's the man right here, the one you put the handcuffs -- |
| 17:42:50 | 11 | A.   Eusevio, yes. |
| 17:42:51 | 12 | Q.   They were all very cooperative with you? |
| 17:42:53 | 13 | A.   Until he became a little agitated about not being able to |
| 17:42:57 | 14 | speak with his sons. |
| 17:42:57 | 15 | Q.   Okay.  And that's, of course, the agitation that you didn't |
| 17:43:00 | 16 | bother to note in your report? |
| 17:43:01 | 17 | A.   No.  It's fairly common. |
| 17:43:03 | 18 | Q.   Okay.  It's fairly common for people to be a little |
| 17:43:06 | 19 | irritated when somebody comes in their house at 6:00 in the |
| 17:43:09 | 20 | morning, guns a blazing, so to speak.  I don't mean fire but -- |
| 17:43:11 | 21 |          MR. GARDNER:  Your Honor. |
| 17:43:13 | 22 | Q.   (BY MR. ESPER) Guns drawn and that's normal procedure, is it |
| 17:43:15 | 23 | not? |
| 17:43:16 | 24 | A.   People like to be able to speak whatever language they like |
| 17:43:20 | 25 | in their house.  Obviously in normal circumstances, you would |

17:43:23  1    agree with them.

17:43:23  2    Q.   And you had a Spanish-speaking agent there who could have

17:43:26  3    told you what he was saying?

17:43:27  4    A.   On the premises?

17:43:29  5    Q.   Well, you had somebody that read the consent to search form,

17:43:32  6    right?

17:43:32  7    A.   That's correct.

17:43:33  8    Q.   So if he was trying to say something to tell his son to do

17:43:37  9    something surreptitiously, there was an agent right there, wasn't

17:43:40  10   there?

17:43:41  11   A.   No.  It didn't matter what language he's speaking.  If he's

17:43:43  12   speaking English to his son, I still want --

17:43:45  13   Q.   You didn't want him speaking?

17:43:47  14   A.   Correct.

17:43:47  15   Q.   You didn't want him saying anything to anyone?

17:43:49  16   A.   We don't want the adults communicating and creating a

17:43:53  17   security issue for the team that's there.

17:43:54  18   Q.   Okay.  Did you feel he was creating a security issue or you

17:43:57  19   just didn't know?

17:43:57  20   A.   We didn't know.

17:43:58  21   Q.   Okay.  May I have just a moment, your Honor?

17:44:04  22        And you were out there for about two hours, were you

17:44:07  23   not, more or less?

17:44:12  24   A.   The consent to search form was signed at 6:45.  We probably

17:44:18  25   weren't on location more than two hours.

284

| | | |
|---|---|---|
| 17:44:23 | 1 | Q.   And is Agent Snodgrass, is he assigned to the Austin DEA |
| 17:44:31 | 2 | office? |
| 17:44:31 | 3 | A.   Yes. |
| 17:44:32 | 4 | Q.   He is? |
| 17:44:34 | 5 | A.   Uh-huh. |
| 17:44:34 | 6 | Q.   Okay.  That's all I have, your Honor. |
| 17:44:45 | 7 | THE COURT:  Mr. Mayr. |
| 17:44:48 | 8 | MR. MAYR:  Thank you, your Honor. |
| 17:44:49 | 9 | CROSS-EXAMINATION |
| 17:44:49 | 10 | BY MR. MAYR: |
| 17:44:57 | 11 | Q.   Agent Hicks, I'm going to show you what I've marked as JH-2, |
| 17:45:02 | 12 | JH-3 and JH-4.  Do you recognize those locations? |
| 17:45:10 | 13 | A.   Looking at JH-2, I believe that's looking northbound on -- |
| 17:45:17 | 14 | to Seeling Drive. |
| 17:45:18 | 15 | Q.   Okay. |
| 17:45:19 | 16 | A.   JH-4, I don't recognize that dwelling. |
| 17:45:23 | 17 | Q.   Okay. |
| 17:45:25 | 18 | A.   And JH-3, that appears to be the Seeling address.  I'd have |
| 17:45:30 | 19 | to look at it from the very front. |
| 17:45:32 | 20 | Q.   If you can pull up 418, please.  A, sorry.  Thanks.  It was |
| 17:46:06 | 21 | an A.  There we go. |
| 17:46:08 | 22 | A.   That's 8008 Seeling Drive. |
| 17:46:10 | 23 | Q.   Okay.  And JH-3, that appear to be the same house? |
| 17:46:16 | 24 | A.   That doesn't look like it from that angle. |
| 17:46:18 | 25 | Q.   Do you recall if this is the house that was next door? |

17:46:20  1  A.   I don't recall.

17:46:21  2  Q.   When you were out there at Eusevio Huitron's residence, did

17:46:26  3  you learn that his brother, my client Jesus Huitron, lived right

17:46:31  4  across the street from him?

17:46:32  5  A.   No.

17:46:33  6  Q.   Did you learn that his brother Isabel lived in the house

17:46:37  7  next door that I just showed you there, JH-3?

17:46:40  8  A.   No.

17:46:41  9  Q.   Could you help me figure out who would have discovered that

17:46:48  10  or learned about that?  There's other individuals out there with

17:46:53  11  you, right?

17:46:54  12  A.   Certainly.  Our focus was pretty much we had one focus:

17:46:59  13  Execute the arrest warrant on Mr. Huitron at this residence and

17:47:03  14  that's where the plan was.  Who his neighbors were at that time

17:47:06  15  was not a concern.

17:47:07  16  Q.   Did you all have a search warrant for Jesus Huitron's

17:47:10  17  residence that day?

17:47:12  18  A.   No.

17:47:13  19  Q.   To your knowledge, has there ever been a search warrant to

17:47:16  20  obtain a search of Jesus Huitron?

17:47:19  21  A.   I don't know.

17:47:20  22  Q.   Okay.  I have no further questions.

17:47:23  23                    RE-DIRECT EXAMINATION

17:47:23  24  BY MR. GARDNER:

17:47:26  25  Q.   Mr. Esper, I believe, made the statement to you that you

17:47:29   1   don't include everything in your offense reports.  Do you recall

17:47:32   2   that?

17:47:32   3   A.   Yes.

17:47:33   4   Q.   Okay.  I believe he showed you or referenced you a two-page

17:47:38   5   report?

17:47:38   6   A.   Yes.

17:47:39   7   Q.   Can you include everything that happens in a single day in a

17:47:44   8   two-page offense report?

17:47:45   9   A.   No.

17:47:46   10  Q.   And why not?

17:47:48   11  A.   A lot of things happen that just aren't testimonial in

17:47:52   12  nature.  Things happen that obviously you may not see because as

17:47:57   13  you break up on search teams, people basically conduct their job,

17:48:01   14  do their job, then there's a process for collecting the evidence,

17:48:05   15  and that's what you put in your report.

17:48:07   16  Q.   So what's the purpose of that report in relation to your

17:48:10   17  testimony here today?

17:48:11   18  A.   The purpose of the report is to document the issuance of the

17:48:15   19  arrest warrant, the consent to search that day, the parties that

17:48:18   20  were present during that search, the items that were seized

17:48:21   21  during that search, and that's essentially the nuts and bolts of

17:48:26   22  that report.

17:48:26   23  Q.   And when you were preparing to execute the arrest warrant on

17:48:30   24  Eusevio Huitron, were you aware that you were possibly dealing

17:48:35   25  with either members or associates of the Zetas organization?

| | | |
|---|---|---|
| 17:48:38 | 1 | A.   Yes. |
| 17:48:39 | 2 |         MR. ESPER:  Object, your Honor.  I object. |
| 17:48:40 | 3 |         MR. GARDNER:  I believe he asked about why he was armed |
| 17:48:42 | 4 | and guns drawn, your Honor.  I believe that's a fair response. |
| 17:48:45 | 5 |         MR. ESPER:  He said that's normal procedure for |
| 17:48:48 | 6 | executing a warrant. |
| 17:48:49 | 7 |         THE COURT:  He did.  You asked him.  You may answer. |
| 17:48:52 | 8 | A.   I was aware. |
| 17:48:54 | 9 | Q.   (BY MR. GARDNER) And were you aware that they are a |
| 17:48:56 | 10 | dangerous organization? |
| 17:48:57 | 11 | A.   Yes. |
| 17:48:57 | 12 | Q.   That's all I have, your Honor. |
| 17:49:00 | 13 |                     RE-CROSS EXAMINATION |
| 17:49:00 | 14 | BY MR. ESPER: |
| 17:49:04 | 15 | Q.   Mr. Hicks, have you inquired of Agent Snodgrass why he did |
| 17:49:08 | 16 | not memorialize in a report what Adrian Huitron told him about |
| 17:49:14 | 17 | the money? |
| 17:49:15 | 18 | A.   Yes. |
| 17:49:16 | 19 | Q.   And has he given you an explanation? |
| 17:49:21 | 20 |         MR. GARDNER:  Your Honor, that would be hearsay.  He |
| 17:49:24 | 21 | could call Mr. Snodgrass if he wants to.  I've discussed it with |
| 17:49:27 | 22 | Mr. Esper.  I told him I would make Agent Snodgrass available to |
| 17:49:30 | 23 | him if he so desires. |
| 17:49:32 | 24 | Q.   (BY MR. ESPER) But you did ask him why he didn't memorialize |
| 17:49:35 | 25 | it? |

| | | |
|---|---|---|
| 17:49:35 | 1 | A.   Yes. |
| 17:49:36 | 2 | Q.   Okay.  That's all I have, your Honor. |
| 17:49:45 | 3 |      MR. GARDNER:  Nothing further, sir. |
| 17:49:48 | 4 |      THE COURT:  Members of the jury, I don't want anybody |
| 17:49:50 | 5 | ever to say I'm not nice to jurors.  I'm going to give you nine |
| 17:49:54 | 6 | minutes.  It will be hard because long weekend, but please |
| 17:50:03 | 7 | remember the instructions.  8:30 Monday so that you can answer |
| 17:50:09 | 8 | the questions that I ask each time.  So don't talk or learn |
| 17:50:14 | 9 | anything about it.  Don't read the paper about it if it's in |
| 17:50:18 | 10 | there.  Just have a nice weekend and be back here Monday. |
| 17:50:55 | 11 |      (Jury not present.) |
| 17:51:01 | 12 |      THE COURT:  Couple of things for the record.  The |
| 17:51:10 | 13 | Defendant Colorado ended up with two Exhibit 9s.  If you'd come |
| 17:51:21 | 14 | up here. |
| 17:51:21 | 15 |      MR. DEGEURIN:  If that's the worst I did today. |
| 17:51:27 | 16 |      THE COURT:  Well, the Court came up with two Court |
| 17:51:30 | 17 | Exhibit 4s.  So other than being -- do you have any preference as |
| 17:51:33 | 18 | to how we renumber these? |
| 17:51:35 | 19 |      MR. DEGEURIN:  No.  I do not. |
| 17:51:36 | 20 |      THE COURT:  Okay.  So make the one with the picture of |
| 17:51:40 | 21 | the horses, not the witness, the next number, which is what? |
| 17:51:51 | 22 |      THE CLERK:  Ten. |
| 17:51:52 | 23 |      THE COURT:  Okay.  Either way.  So we're going to make |
| 17:51:54 | 24 | the picture of Raul Guadalajara-Guia No. 10 and the horses win. |
| 17:52:07 | 25 | Okay.  And we'll make Court Exhibit, which is the memorandum of |

17:52:13  1  interview, Court Exhibit 5, rather than 4.

17:52:23  2          Counsel, I've got a full day tomorrow of criminal

17:52:26  3  matters.  I need to tell you that you're going to have to take

17:52:30  4  your equipment.  If you want to leave it, John will help you a

17:52:37  5  little bit with it.  But I wouldn't leave it in this room because

17:52:42  6  it will be full all day long with folks in criminal cases.

17:52:53  7          MR. GARDNER:  Your Honor, as to demonstrative exhibits,

17:52:56  8  I don't know if the Court's concerned about the record including

17:52:58  9  the government's addition to Colorado.

17:53:01  10          MR. DEGEURIN:  You can't add to it.

17:53:03  11          MR. GARDNER:  Add something on my own.

17:53:04  12          THE COURT:  I'm sorry, I don't.

17:53:05  13          MR. GARDNER:  The government put this sticker on

17:53:08  14  Colorado.

17:53:10  15          MR. DEGEURIN:  And I left it on there until the end of

17:53:13  16  the day and then, I gave it back to -- you can't add to my

17:53:16  17  exhibit without offering it.

17:53:18  18          THE COURT:  You know, they used to be able just to take

17:53:22  19  the demonstrative exhibit and erase it on the board.  So it was

17:53:28  20  attached, it remains attached.  Just put it down at the bottom

17:53:32  21  where it doesn't bother you.

17:53:35  22          MR. DEGEURIN:  On the back, upsidedown?

17:53:39  23          MR. FINN:  In Spanish.

17:53:42  24          THE COURT:  But that's the way it ended up.

17:53:45  25          All right.  Anything else before we break for the week?

17:53:48   1            MR. GARDNER:  Nothing from the government, your Honor.

17:53:50   2            THE COURT:  All right.  Y'all have a safe weekend.

17:53:50   3            (Proceedings adjourned.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25