<pre>
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
 2                         AUSTIN DIVISION

 3   UNITED STATES OF AMERICA    ) Docket No. A 12-CR-210 SS
                                 )
 4   vs.                         ) Austin, Texas
                                 )
 5   JOSE TREVINO-MORALES (3)    )
     FRANCISCO ANTONIO           )
 6   COLORADO-CESSA (6)          )
     FERNANDO SOLIS-GARCIA (7)   )
 7   EUSEVIO MALDONADO-HUITRON(11) )
     JESUS MALDONADO-HUITRON (18)  ) April 30, 2013
 8

 9                  TRANSCRIPT OF TRIAL ON THE MERITS
                    BEFORE THE HONORABLE SAM SPARKS
10                        Volume 11 of 15

11   APPEARANCES:

12   For the United States:      Ms. Michelle E. Fernald
                                 Mr. Douglas W. Gardner
13                               Assistant U.S. Attorneys
                                 816 Congress Avenue, Suite 1000
14                               Austin, Texas 78701

15   For Defendant Trevino-      Mr. David M. Finn
     Morales:                    Milner & Finn
16                               2828 North Harwood Street
                                 Suite 1950, LB9
17                               Dallas, Texas 75201

18                               Ms. Christie Williams
                                 Mills & Williams
19                               1112 South Rock Street
                                 Georgetown, Texas 78626
20
     For Defendant Colorado-     Mr. Mike DeGeurin
21   Cessa:                      Mr. M. Andres Sanchez-Ross
                                 Foreman, DeGeurin & DeGeurin
22                               300 Main Street
                                 Houston, Texas 77002
23
                                 Mr. John Parras
24                               Republic Bank Building
                                 1018 Preston, Floor 2
25                               Houston, Texas 77002
</pre>

1   **(Appearances Continued:)**

2   For Defendant Solis-Garcia:   Mr. Guy L. Womack
                                  Guy L. Womack & Associates
3                                 402 Main Street, Suite 6 North
                                  Houston, Texas 77002
4
     For Defendant Eusevio         Mr. Richard D. Esper
5    Maldonado-Huitron:            Esper Law Office
                                   801 North El Paso Street, 2nd Floor
6                                  El Paso, Texas 79902

7    For Defendant Jesus           Mr. Thomas Brent Mayr
     Maldonado-Huitron:            Law Office of Brent Mayr
8                                  4101 Washington Avenue, 2nd Floor
                                   Houston, Texas 77007
9

10   Interpreters:                 Mr. Peter Heide
                                    Ms. Maureen McLean
11

12   Court Reporter:               Ms. Lily Iva Reznik, CRR, RMR
                                    501 West 5th Street, Suite 4153
13                                  Austin, Texas 78701
                                    (512)391-8792
14

15

16

17

18

19

20

21

22

23

24

25   Proceedings reported by computerized stenography, transcript
     produced by computer.

08:15:10

08:15:10

# I N D E X

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Tyler D. Graham | | 7,16 | | |
| | | 39,54 | 68 | |
| Steve Pennington | 76 | 131,142 | | |
| | | 149,162 | | |
| | | 163 | 200 | 204,205 |

| | | | | Page |
|---|---|---|---|---|
| Proceedings Adjourned | | | | 223 |

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

# E X H I B I T S

|                              | Offered | Admitted |
|------------------------------|---------|----------|
| Government's                 |         |          |
| #364ATX CC                   | 61      | 61       |
| #376A through E              | 209     | 210      |
| #377A through H              | 212     | 212      |
| #378A through G              | 215     | 215      |
| #428                         | 120     | 120      |
| #430                         | 200     | 200      |
|                              |         |          |
| Defendant Trevino-Morales'   |         |          |
| #JT-2 through 5              | 220     |          |

| | | |
|---|---|---|
| 09:32:11 | 1 | THE COURT:  I'll have counsel up here. |
| 09:32:20 | 2 | (At the bench, on the record.) |
| 09:32:36 | 3 | THE COURT:  Okay.  I've reviewed all the notes.  I've |
| 09:32:43 | 4 | reviewed all of the statements that were obviously typed up from |
| 09:32:49 | 5 | the notes.  I've viewed the pictures.  I've viewed the book. |
| 09:33:01 | 6 | What I don't know is whether there's been furnished Mr. Rejon |
| 09:33:12 | 7 | plea agreement, penalty statement, and the proffer letter. |
| 09:33:14 | 8 | MR. GARDNER:  They have, your Honor. |
| 09:33:15 | 9 | THE COURT:  All three. |
| 09:33:16 | 10 | MR. GARDNER:  That would have been Jencks material. |
| 09:33:18 | 11 | Yes, sir. |
| 09:33:18 | 12 | THE COURT:  That's the only possible Giglio material |
| 09:33:22 | 13 | that's available.  I'll so enter it sealed, all of the orders. |
| 09:33:27 | 14 | There is no Brady in there. |
| 09:33:32 | 15 | MR. WOMACK:  The only plea agreement was the one with |
| 09:33:33 | 16 | Washington, D.C. |
| 09:33:34 | 17 | THE COURT:  Yes. |
| 09:33:35 | 18 | MR. WOMACK:  Okay.  We've had that from Friday. |
| 09:33:37 | 19 | THE COURT:  That's the only one he's got. |
| 09:33:39 | 20 | MR. WOMACK:  Yes, sir. |
| 09:33:39 | 21 | THE COURT:  Of course, shows mandatory deportation the |
| 09:33:43 | 22 | day he gets out of the penitentiary.  The penalty is ten to life. |
| 09:33:52 | 23 | I don't know what the deal is.  But the only thing I could see |
| 09:33:55 | 24 | that could possibly be any help at all, I can assure you, you do |
| 09:34:03 | 25 | not want. |

| | | |
|---|---|---|
| 09:34:08 | 1 | MR. GARDNER:  Your Honor. |
| 09:34:09 | 2 | THE COURT:  It convicts every one of them. |
| 09:34:16 | 3 | MR. GARDNER:  I've tendered to defense counsel, I'll |
| 09:34:17 | 4 | tender this to the Court for the Court's record, this is the |
| 09:34:19 | 5 | immigration documents for Hector Moreno that shows a $2,000 |
| 09:34:21 | 6 | payment.  It shows a parole authorization and it shows two |
| 09:34:25 | 7 | employment authorizations.  This is the individual that the |
| 09:34:28 | 8 | defense counsel have asked to retain until they got this |
| 09:34:31 | 9 | information.  It lists there under Javier Gonzalez, verified that |
| 09:34:35 | 10 | that is his assumed name for purposes of his immigration -- |
| 09:34:38 | 11 | MR. WOMACK:  Okay. |
| 09:34:40 | 12 | MR. GARDNER:  I will provide that to counsel. |
| 09:34:47 | 13 | THE COURT:  It's going to take me a little bit to seal |
| 09:34:49 | 14 | all of this up and to put an order on it and the order will be |
| 09:34:53 | 15 | sealed, too.  So this will be the only record.  All right. |
| 09:34:58 | 16 | MR. MAYR:  Thank you, Judge. |
| 09:35:15 | 17 | (Recess.) |
| 10:18:40 | 18 | THE COURT:  Bring the jury in. |
| 10:18:42 | 19 | (Jury present.) |
| 10:20:37 | 20 | THE COURT:  Well, as you probable know, because you saw |
| 10:20:49 | 21 | me, I came in the same time you did this morning.  I had to wait |
| 10:20:58 | 22 | until y'all were upstairs.  So I thought this was a good |
| 10:21:00 | 23 | opportunity to see if we could break the longevity record of 16 |
| 10:21:04 | 24 | people staying in that little room, and I just want you to know |
| 10:21:10 | 25 | that there are 16 people that stayed in that little room.  Y'all |

| | | |
|---|---|---|
| 10:21:14 | 1 | -- that's the record so far.  We're new, a new building, but the |
| 10:21:20 | 2 | truth of the matter is the delay has been all mine.  It's just |
| 10:21:24 | 3 | been things that come up that I have to do.  So chalk it off to |
| 10:21:31 | 4 | me.  I can guarantee that if I could have avoided the delay, I |
| 10:21:36 | 5 | would have. |
| 10:21:37 | 6 |         Now, since we last saw each other yesterday, has |
| 10:21:42 | 7 | anybody attempted to talk to you about this case? |
| 10:21:44 | 8 |         JURORS:  No. |
| 10:21:45 | 9 |         THE COURT:  Have you talked to anybody about the case? |
| 10:21:47 | 10 |         JURORS:  No. |
| 10:21:48 | 11 |         THE COURT:  And have you talked to -- have you learned |
| 10:21:50 | 12 | anything at all about the case, outside the presence of each |
| 10:21:53 | 13 | other in this courtroom? |
| 10:21:54 | 14 |         JURORS:  No. |
| 10:21:54 | 15 |         THE COURT:  All right.  Show negative responses to all |
| 10:21:59 | 16 | questions by all jurors. |
| 10:22:00 | 17 |         And, Ms. Williams. |
| 10:22:09 | 18 |         Mr. Graham, you're still under oath. |
| 10:22:11 | 19 |         THE WITNESS:  Yes, sir. |
| 10:22:13 | 20 |     TYLER D. GRAHAM, called by the Government, duly sworn. |
| 10:22:13 | 21 |                   CROSS-EXAMINATION (Resumed) |
| 10:22:13 | 22 | BY MS. WILLIAMS: |
| 10:22:26 | 23 | Q.   Sometime after Tempting Dash came to Southwest Stallion |
| 10:22:31 | 24 | Station, he got colic.  Do you remember that? |
| 10:22:35 | 25 | A.   Yes, ma'am. |

| | | |
|---|---|---|
| 10:22:37 | 1 | Q.   And you called Jose in the middle of the night. |
| 10:22:42 | 2 | A.   Yes. |
| 10:22:43 | 3 | Q.   And Jose Trevino got in his car and drove and met the horse |
| 10:22:46 | 4 | at the vet clinic? |
| 10:22:48 | 5 | A.   Yes. |
| 10:22:48 | 6 | Q.   And stayed there night and day until the horse was well -- |
| 10:22:53 | 7 | well enough for him to leave. |
| 10:22:55 | 8 | A.   He was in and out. |
| 10:22:57 | 9 | Q.   Did he spend the night at the horse clinic? |
| 10:23:02 | 10 | A.   I believe I left the clinic around 4:00, and I don't know |
| 10:23:05 | 11 | where he stayed after that. |
| 10:23:08 | 12 | Q.   4:00 in the morning? |
| 10:23:09 | 13 | A.   Yes, ma'am. |
| 10:23:10 | 14 | Q.   You knew about Tempting Dash when you raced in Mexico.  You |
| 10:23:16 | 15 | said that yesterday? |
| 10:23:17 | 16 | A.   Correct. |
| 10:23:18 | 17 | Q.   And he had run a good race in Mexico, however, and had good |
| 10:23:24 | 18 | bloodlines, yes? |
| 10:23:25 | 19 | A.   Yes. |
| 10:23:27 | 20 | Q.   But buying Tempting Dash was still a pretty good risk. |
| 10:23:31 | 21 | Wouldn't you agree? |
| 10:23:32 | 22 | A.   I think that buying any race horse is a risk. |
| 10:23:35 | 23 | Q.   Fair enough.  Tempting Dash had had at least one surgery on |
| 10:23:41 | 24 | his ankle; is that correct? |
| 10:23:43 | 25 | A.   I believe so. |

| | | |
|---|---|---|
| 10:23:44 | 1 | Q.   Do you know what that was for? |
| 10:23:46 | 2 | A.   I don't know specifically. |
| 10:23:49 | 3 | Q.   But after Tempting Dash won in Dallas, obviously he became a |
| 10:23:56 | 4 | lot more valuable as a race horse and for breeding? |
| 10:23:59 | 5 | A.   That's correct. |
| 10:24:00 | 6 | Q.   How many times did you try to buy Tempting Dash from Jose |
| 10:24:04 | 7 | Trevino? |
| 10:24:04 | 8 | A.   Never tried to buy the horse from Mr. Trevino. |
| 10:24:12 | 9 | Q.   You never told Jose Trevino that you wanted to buy Tempting |
| 10:24:15 | 10 | Dash? |
| 10:24:15 | 11 | A.   I couldn't afford the horse personally. |
| 10:24:19 | 12 | Q.   Did Jose Trevino have other offers to sell Tempting Dash |
| 10:24:23 | 13 | throughout the time that he was at Southwest Stallion Station to |
| 10:24:28 | 14 | your knowledge? |
| 10:24:28 | 15 | A.   I believe he probably did. |
| 10:24:29 | 16 | Q.   Do you know that he did? |
| 10:24:31 | 17 | A.   I didn't talk to anybody personally about it. |
| 10:24:38 | 18 | Q.   Did you talk to Jose Trevino about syndicating Tempting |
| 10:24:42 | 19 | Dash? |
| 10:24:42 | 20 | A.   We discussed it before we started to stand the horse. |
| 10:24:48 | 21 | Q.   And did you have to explain to Mr. Trevino how syndication |
| 10:24:52 | 22 | worked? |
| 10:24:53 | 23 | A.   Yeah.  I explained it to him. |
| 10:24:55 | 24 | Q.   And you gave him different scenarios for how the syndication |
| 10:24:59 | 25 | might work? |

| | | |
|---|---|---|
| 10:25:00 | 1 | A.   Correct. |
| 10:25:01 | 2 | Q.   And you drew a diagram showing him how that might work, |
| 10:25:05 | 3 | depending on how much money ultimately you wanted to get, and how |
| 10:25:09 | 4 | many shares you wanted to sell, and those kinds of options? |
| 10:25:12 | 5 | A.   Yeah.  I think we might have scratched up and down on paper. |
| 10:25:15 | 6 | Q.   Do you think that you did do that? |
| 10:25:17 | 7 | A.   Yeah.  I think it was on a napkin, actually. |
| 10:25:22 | 8 | Q.   And one of the options for syndicating Tempting Dash was to |
| 10:25:28 | 9 | sell 40 shares for $200,000 apiece; is that correct? |
| 10:25:31 | 10 | A.   It could have been one of the possibilities.  I don't |
| 10:25:33 | 11 | remember talking about those specific numbers. |
| 10:25:35 | 12 | Q.   Do you remember talking about any specific number? |
| 10:25:38 | 13 | A.   Forty shares would have been a viable number of shares. |
| 10:25:41 | 14 | Q.   Okay.  And do you remember any other numbers that you |
| 10:25:45 | 15 | specifically discussed? |
| 10:25:47 | 16 | A.   I don't think I would have said 200,000.  That seems kind of |
| 10:25:51 | 17 | high to me. |
| 10:25:51 | 18 | Q.   How much do you think you said?  $175,000? |
| 10:25:55 | 19 | A.   I don't recall the exact number. |
| 10:25:58 | 20 | Q.   There was more than one scenario, though. |
| 10:26:02 | 21 | A.   Yeah.  There's a lot of different ways to syndicate horses. |
| 10:26:05 | 22 | Q.   But my question is, there was more than one scenario that |
| 10:26:08 | 23 | you and Jose Trevino specifically discussed together? |
| 10:26:11 | 24 | A.   I'm sure we talked about several scenarios. |
| 10:26:14 | 25 | Q.   And once Tempting Dash stood at Southwest Stallion Station, |

10:26:25   1  in addition to that being the moneymaking operation for you,

10:26:30   2  which it was, correct?

10:26:32   3  A.   It's a moneymaking operation for the owners of the stallion

10:26:35   4  farm.

10:26:36   5  Q.   Okay.  That's what I meant.

10:26:38   6  A.   Yeah.  We're in business to make money.

10:26:40   7  Q.   In addition to the money, you also got a number of breedings

10:26:46   8  that you didn't have to pay for.

10:26:48   9  A.   In trade for advertising.

10:26:50  10  Q.   In trade for Southwest Stallion Station advertising that

10:26:55  11  Tempting Dash was standing at Southwest Stallion Station?

10:26:58  12  A.   Correct.

10:26:58  13  Q.   And that was part of the original deal?

10:27:00  14  A.   Correct.

10:27:00  15  Q.   And how many breedings a year did you get for Tempting Dash?

10:27:05  16  A.   I think the ranch was granted four breedings.

10:27:10  17  Q.   You could give those out among your family if you wished.  I

10:27:13  18  think your mother bred a horse to Tempting Dash?

10:27:15  19  A.   That was a separate breeding.  I didn't have anything to do

10:27:17  20  with the breeding.

10:27:20  21  Q.   When you say the ranch could breed, what does that mean to

10:27:23  22  you?

10:27:23  23  A.   You know, ranch-owned mares.

10:27:27  24  Q.   Owned by Southwest Stallion Station?

10:27:29  25  A.   Owned by Southwest Stallion Station or me personally.

| | | |
|---|---|---|
| 10:27:31 | 1 | Q.   Well, a mare owned by you personally wouldn't be a |
| 10:27:37 | 2 | ranch-owned mare, right? |
| 10:27:40 | 3 | A.   Correct. |
| 10:27:41 | 4 | Q.   And how many breedings a year did you personally with your |
| 10:27:45 | 5 | own horse get with Tempting Dash? |
| 10:27:50 | 6 | A.   He didn't give me any personally. |
| 10:27:55 | 7 | Q.   Did you not just say that there were four? |
| 10:27:58 | 8 | A.   I used some of the ranch breedings on my mares. |
| 10:28:00 | 9 | Q.   All right.  How many? |
| 10:28:02 | 10 | A.   I believe four the first year. |
| 10:28:05 | 11 | Q.   The first year being 2011? |
| 10:28:07 | 12 | A.   Correct. |
| 10:28:07 | 13 | Q.   And since then? |
| 10:28:09 | 14 | A.   I'd have to go back and look at the breeding records for |
| 10:28:12 | 15 | 2012. |
| 10:28:13 | 16 | Q.   Can you guess? |
| 10:28:15 | 17 | A.   Probably used four -- maybe six in 2012. |
| 10:28:28 | 18 | Q.   Now, when you consign a horse as the agent, you make money, |
| 10:28:35 | 19 | correct? |
| 10:28:36 | 20 | A.   Yeah.  I make a nominal amount. |
| 10:28:38 | 21 | Q.   And that's your money, not Southwest Stallion Station's |
| 10:28:41 | 22 | money? |
| 10:28:41 | 23 | A.   The money goes to the ranch. |
| 10:28:43 | 24 | Q.   When you consign a horse personally and you make a |
| 10:28:47 | 25 | commission, that money goes to the ranch? |

| | | |
|---|---|---|
| 10:28:49 | 1 | A.   The ranch is a consign -- the horses are consigned by |
| 10:28:53 | 2 | Southwest Stallion Station, not under my name. |
| 10:28:54 | 3 | Q.   So it would say, Southwest Stallion Station, Tyler Graham, |
| 10:28:58 | 4 | agent? |
| 10:28:58 | 5 | A.   Correct. |
| 10:28:58 | 6 | Q.   And when that happens, what nominal amount does the ranch |
| 10:29:05 | 7 | make? |
| 10:29:05 | 8 | A.   I usually charge a flat fee, usually $300 a horse.  I don't |
| 10:29:10 | 9 | charge percentage or commission. |
| 10:29:13 | 10 | Q.   I'm sorry? |
| 10:29:13 | 11 | A.   I don't charge a commission. |
| 10:29:15 | 12 | Q.   I'm showing you what's in evidence as Government's Exhibit |
| 10:29:28 | 13 | 11A.  Do you recognize that photograph? |
| 10:29:30 | 14 | A.   Yes, ma'am. |
| 10:29:31 | 15 | Q.   And are you in that photograph? |
| 10:29:35 | 16 | A.   Yes, I am. |
| 10:29:36 | 17 | Q.   And your mother? |
| 10:29:40 | 18 | A.   Yes, she is. |
| 10:29:41 | 19 | Q.   And your father? |
| 10:29:41 | 20 | A.   Yes, he is. |
| 10:29:42 | 21 | Q.   And then, you also see Jose Trevino's oldest two children, |
| 10:29:48 | 22 | Alex and Jose, Jr.? |
| 10:29:49 | 23 | A.   Correct. |
| 10:29:50 | 24 | Q.   Do you remember this day? |
| 10:29:51 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 10:29:58 | 1 | Q.   You and your parents had gone to Lone Star Park to watch the |
| 10:30:05 | 2 | Dash For Cash Futurity, correct? |
| 10:30:09 | 3 | A.   Correct. |
| 10:30:10 | 4 | Q.   And that was October 9, 2010. |
| 10:30:16 | 5 | A.   Correct.  I'm assuming that's the date on the photo. |
| 10:30:19 | 6 | Q.   And do you remember that your family saw Jose Trevino's |
| 10:30:25 | 7 | family at the race that morning or that day? |
| 10:30:28 | 8 | A.   Yeah.  I believe we saw the family.  Correct. |
| 10:30:31 | 9 | Q.   And when Snowy Cartel won, you and your mother and your |
| 10:30:36 | 10 | father were going to go down to be in the photograph.  Do you |
| 10:30:39 | 11 | remember that? |
| 10:30:39 | 12 | A.   Yes. |
| 10:30:40 | 13 | Q.   And did your mother invite Jose, Jr. and Alex Trevino to |
| 10:30:46 | 14 | come and be in the photograph? |
| 10:30:47 | 15 | A.   I don't know if she did or didn't. |
| 10:30:48 | 16 | Q.   You don't have any recollection of that? |
| 10:30:50 | 17 | A.   No.  I do not. |
| 10:30:51 | 18 | Q.   You're not saying it didn't happen.  You just don't remember |
| 10:30:58 | 19 | whether or not it did? |
| 10:30:59 | 20 | A.   I don't remember if it did or didn't. |
| 10:31:00 | 21 | Q.   Did the government ask you take your Myspace and your |
| 10:31:09 | 22 | Facebook down? |
| 10:31:10 | 23 | A.   No.  They didn't.  I never had a Myspace. |
| 10:31:15 | 24 | Q.   You never had a Myspace? |
| 10:31:17 | 25 | A.   No.  I sure haven't. |

10:31:25   1   Q.   How long have you managed Southwest Stallion Station?

10:31:29   2   A.   Approximately since 2007.

10:31:35   3   Q.   So about six years?

10:31:37   4   A.   Give or take.

10:31:38   5   Q.   And you've known -- you knew of Ramiro Villarreal since the

10:31:43   6   beginning of your managing Southwest Stallion Station or before?

10:31:47   7   A.   Pretty close.

10:31:49   8   Q.   This is dealing with the government and being involved in

10:31:54   9   this case.  This is not the first time that you've ever taken

10:31:57  10   cash in exchange for horse expenses, is it?

10:32:01  11   A.   What now?

10:32:02  12   Q.   Horse expenses, this is not the first time you've had a

10:32:05  13   horse owner who had their horse at Southwest Stallion Station and

10:32:07  14   then come to pay you in cash?

10:32:08  15   A.   No.  That's not the first time.

10:32:09  16   Q.   How many times do you think that happened in the six years

10:32:12  17   that you've been there?

10:32:13  18   A.   It's probably several times.  Never on this scale.

10:32:18  19   Q.   I don't know how many several means to you.  Ten?  Five?

10:32:21  20   Two?

10:32:22  21   A.   Yeah.  I don't know.  Maybe 20.  I don't know.  It happens

10:32:25  22   all the time.

10:32:26  23   Q.   No further questions.

10:32:39  24         THE COURT:  Mr. DeGeurin.

10:32:40  25         MR. DEGEURIN:  I have no questions, your Honor.

| | | |
|---|---|---|
| 10:32:42 | 1 | THE COURT:  Mr. Womack. |
| 10:32:44 | 2 | MR. WOMACK:  Thank you, your Honor. |
| 10:32:49 | 3 | CROSS-EXAMINATION |
| 10:32:49 | 4 | BY MR. WOMACK: |
| 10:32:53 | 5 | Q.   Good morning, Mr. Graham. |
| 10:32:54 | 6 | A.   Good morning. |
| 10:32:55 | 7 | Q.   I'm Guy Womack from Houston. |
| 10:32:57 | 8 | A.   Yes, sir. |
| 10:32:57 | 9 | Q.   We've never met before, have we? |
| 10:32:59 | 10 | A.   No, sir. |
| 10:32:59 | 11 | Q.   I've got a handful of questions to ask you about Southwest |
| 10:33:04 | 12 | Stallion Station.  Now, you told us that it was formed in the |
| 10:33:08 | 13 | 1960s? |
| 10:33:09 | 14 | A.   Yes, sir. |
| 10:33:09 | 15 | Q.   And that was by your grandfather, Dr. Graham? |
| 10:33:13 | 16 | A.   Yes, sir. |
| 10:33:14 | 17 | Q.   Was your grandfather already a veterinarian when he formed |
| 10:33:24 | 18 | Southwest Stallion Station? |
| 10:33:24 | 19 | A.   Yes, sir. |
| 10:33:25 | 20 | Q.   How long do you think he's been a veterinarian? |
| 10:33:28 | 21 | A.   I think he graduated from vet school in '61, I believe. |
| 10:33:32 | 22 | Q.   '61? |
| 10:33:33 | 23 | A.   I believe so. |
| 10:33:34 | 24 | Q.   So he's been a veterinarian for 50-something years? |
| 10:33:41 | 25 | A.   Yes, sir. |

10:33:42  1  Q.   And then, he formed Southwest Stallion Station in 1966?

10:33:48  2  A.   Somewhere around there.  He had the vet clinic first.

10:33:51  3  Q.   Okay.  And he's also an owner of Heritage Place?

10:33:55  4  A.   He's a partial owner.  Correct.

10:33:57  5  Q.   And Heritage Place is one of the big, good auction houses in

10:34:02  6  America?

10:34:03  7  A.   Yes, sir.  It is.

10:34:05  8  Q.   In fact, their logo is "That's where champions are sold"?

10:34:08  9  A.   That's our logo.

10:34:09  10  Q.   And you say, our logo.  Are you associated with Heritage

10:34:12  11  Place?

10:34:12  12  A.   As a board member.

10:34:14  13  Q.   Okay.  So you're on the board at Heritage Place and you

10:34:19  14  manage Southwest Stallion Station?

10:34:21  15  A.   Correct.

10:34:26  16  Q.   Do you have any other forms of regular employment?  Not

10:34:32  17  things you might do on the side.  But I'm talking about you

10:34:34  18  personally having a job for a particular company or entity.  Do

10:34:37  19  you have any other jobs other than those two you've told us

10:34:40  20  about?

10:34:40  21  A.   Yes, sir.  I manage several of our other businesses.  We

10:34:44  22  have a feed yard, a couple of sale barns.  I mean, I'm involved

10:34:47  23  with all the businesses.

10:34:48  24  Q.   Now, the feed yard, is that for cattle?

10:34:50  25  A.   Yes, sir.

| | | |
|---|---|---|
| 10:34:51 | 1 | Q.   Okay.  So you also are involved some with companies that do |
| 10:34:55 | 2 | cattle ranching or other kinds of industry? |
| 10:34:58 | 3 | A.   Correct. |
| 10:35:00 | 4 | Q.   Okay.  How much of your day would you say is devoted on |
| 10:35:03 | 5 | average to Southwest Stallion Station? |
| 10:35:09 | 6 | A.   I would say it's devoted most of my day during breeding |
| 10:35:13 | 7 | season.  After breeding season, less of my day.  I would say |
| 10:35:18 | 8 | during breeding season, most of my time. |
| 10:35:19 | 9 | Q.   Okay.  And how long is the breeding season at the Stallion |
| 10:35:24 | 10 | Station? |
| 10:35:24 | 11 | A.   Typically we start around the first part of February, go to |
| 10:35:27 | 12 | usually the end -- middle to end of June.  So about six months. |
| 10:35:30 | 13 | Q.   Okay.  And so, that six-month period more or less in the |
| 10:35:37 | 14 | stallion breeding business, that's the real heavy time that |
| 10:35:40 | 15 | you've got to be doing something, correct? |
| 10:35:41 | 16 | A.   Yes, sir. |
| 10:35:42 | 17 | Q.   And your activities the rest of the year for, let's say, |
| 10:35:49 | 18 | triple S, for Southwest Stallion Station, would be more in the |
| 10:35:55 | 19 | line of making sure there's stalls and everything are ready for |
| 10:35:58 | 20 | the next season? |
| 10:36:02 | 21 | A.   That would be fair.  Yes, sir. |
| 10:36:02 | 22 | Q.   The infrastructure, make sure the place is in good shape? |
| 10:36:06 | 23 | A.   Correct. |
| 10:36:07 | 24 | Q.   And also, recruiting people to bring in good stallions that |
| 10:36:12 | 25 | can breed for the next season? |

| | | |
|---|---|---|
| 10:36:15 | 1 | A.    Yes, sir.  Stallions and mares. |
| 10:36:17 | 2 | Q.    And that's a large part of your job during the offseason, |
| 10:36:21 | 3 | isn't it? |
| 10:36:21 | 4 | A.    Yes, sir, it is. |
| 10:36:22 | 5 | Q.    Okay.  And tell the jury, why do you recruit the best |
| 10:36:27 | 6 | stallions you can get?  Why do you do that? |
| 10:36:29 | 7 | A.    You know, we want the best studs that we can get because |
| 10:36:32 | 8 | they're the ones that are going to bring the most mares to the |
| 10:36:35 | 9 | ranch typically. |
| 10:36:36 | 10 | Q.    Okay.  And so, just kind of like a college football team, or |
| 10:36:39 | 11 | whatever, you're trying to bring in the best athletes because you |
| 10:36:44 | 12 | can make the most money off the best athletes, correct? |
| 10:36:47 | 13 | A.    Yes, sir.  We try and bring the best horses we can possibly |
| 10:36:50 | 14 | get. |
| 10:36:51 | 15 | Q.    And the horses you bring in, these are not saddle horses. |
| 10:36:55 | 16 | These are racing quarter horses? |
| 10:36:58 | 17 | A.    Primarily racing quarter horses is our business.  We do |
| 10:37:02 | 18 | stand some other horses. |
| 10:37:03 | 19 | Q.    And so, if I were to refer to them as professional athletes, |
| 10:37:05 | 20 | that would be accurate, wouldn't it? |
| 10:37:07 | 21 | A.    I think you could refer to them to that in our business. |
| 10:37:10 | 22 | Q.    Okay.  So you try to recruit the very best stallions because |
| 10:37:15 | 23 | it will bring the most money and prestige to your stud farm? |
| 10:37:22 | 24 | A.    It's more about business than prestige with us, but yes. |
| 10:37:26 | 25 | Q.    But the prestige is part of it, isn't it? |

| | | |
|---|---|---|
| 10:37:30 | 1 | A.   It's somewhat prestigious, I guess you could say. |
| 10:37:32 | 2 | Q.   Well, I mean, you want people to know that, hey, you know, |
| 10:37:34 | 3 | if you take your stallion to triple S, they routinely handle the |
| 10:37:41 | 4 | best horses? |
| 10:37:43 | 5 | A.   Yes.  We've had a lot of good horses over the years. |
| 10:37:45 | 6 | Q.   And you advertise in all kinds of periodicals in the horsing |
| 10:37:49 | 7 | industry about your ranch, don't you? |
| 10:37:52 | 8 | A.   Correct. |
| 10:37:52 | 9 | Q.   Okay.  And, likewise, if you have the best stallions, |
| 10:37:57 | 10 | chances are, you have the best mares coming through there, too? |
| 10:37:59 | 11 | A.   Somewhat goes hand-in-hand. |
| 10:38:01 | 12 | Q.   And you would agree with me that when it comes to |
| 10:38:04 | 13 | establishing a -- building a future champion race horse, you need |
| 10:38:10 | 14 | to have both a great sire and a great dam, don't you? |
| 10:38:14 | 15 | A.   I think the mare's 50/50.  It's 50/50 in my opinion.  You |
| 10:38:20 | 16 | need both. |
| 10:38:20 | 17 | Q.   Right.  You've got to have both of them.  If you just have |
| 10:38:22 | 18 | one -- if just a sire is great and the mare is not, or if the |
| 10:38:27 | 19 | mare is great and the dam is not -- I mean, the sire is not, you |
| 10:38:31 | 20 | need to have both of them to have the best sellable horse, |
| 10:38:34 | 21 | correct? |
| 10:38:37 | 22 | A.   It's -- it increases your chances, but it's no guarantee. |
| 10:38:41 | 23 | And there's plenty of great race horses that came out of lesser |
| 10:38:46 | 24 | sires and lesser mares. |
| 10:38:47 | 25 | Q.   Yeah.  But what you expect is that the ones that come from |

10:38:52   1   the best parents should be at least genetically the best horse,

10:38:57   2   correct?

10:38:58   3   A.   Yes, sir.

10:38:59   4   Q.   Okay.  Now, you've talked about this Tempting Dash,

10:39:17   5   stallion, correct?

10:39:18   6   A.   Correct.

10:39:18   7   Q.   And he won a couple of races?

10:39:20   8   A.   Yes, sir.  Two futurities.

10:39:21   9   Q.   And he came from a great bloodline, didn't he?

10:39:23   10  A.   Yes, sir.  He's well-bred.

10:39:25   11  Q.   So a well-bred stallion that has demonstrated that he can

10:39:29   12  win races, that would be an attractive horse for you to have

10:39:36   13  breeding at triple S?

10:39:38   14  A.   That's correct.

10:39:40   15  Q.   And so, you would brag in advertisements or in talking to

10:39:46   16  prospective owners of horses that, hey, we have Tempting Dash and

10:39:51   17  other great horses like that here, correct?

10:39:53   18  A.   I wouldn't call it bragging, but we would advertise the

10:39:56   19  horse.

10:39:56   20  Q.   You would boast about it, wouldn't you?

10:39:57   21  A.   I would what?

10:39:58   22  Q.   You would boast of it that, hey, we have the best horses?

10:40:02   23  A.   I wouldn't boast of it.  I wouldn't use those words.  But, I

10:40:04   24  mean, we would definitely advertise the horse.

10:40:06   25  Q.   Okay.  Good.  And you'd agree with me that the true value of

| | | |
|---|---|---|
| 10:40:20 | 1 | a race horse to figure out what a horse is really worth, you |
| 10:40:25 | 2 | don't look at just the winnings he had during that very short |
| 10:40:28 | 3 | racing career.  You look at what he's worth breeding for the rest |
| 10:40:33 | 4 | of his life in the case of a stallion, correct? |
| 10:40:37 | 5 | A.   I don't -- I don't know if I would say look at him for what |
| 10:40:41 | 6 | he's worth the rest of his life because you don't know how long |
| 10:40:43 | 7 | their life is going to be. |
| 10:40:44 | 8 | Q.   Oh, sure.  But if you're looking back at a horse and say, |
| 10:40:47 | 9 | man, this Corona Cartel, or this Mr. Jess Perry, or Tempting |
| 10:40:53 | 10 | Dash, any of them, you look at them, you say, well, I mean, he |
| 10:40:56 | 11 | won some money, but over his lifespan, he has made millions in |
| 10:41:03 | 12 | syndication fees and stud fees. |
| 10:41:06 | 13 | The true value of that horse when you look back at it, |
| 10:41:10 | 14 | you'd expect that it's going to be mostly the breeding, isn't it? |
| 10:41:14 | 15 | A.   In a lot of cases, it is. |
| 10:41:16 | 16 | Q.   In all the great horses, it's the case, isn't it? |
| 10:41:20 | 17 | A.   In the top horses, it's the case.  Yes, sir. |
| 10:41:22 | 18 | Q.   All right.  Okay.  You said the FBI registered you as a form |
| 10:41:41 | 19 | of informant; is that right? |
| 10:41:42 | 20 | A.   They never used the word "informant." |
| 10:41:44 | 21 | Q.   What did they call it? |
| 10:41:46 | 22 | A.   Cooperating citizen.  I don't know that they ever really |
| 10:41:50 | 23 | gave me a title. |
| 10:41:50 | 24 | Q.   Okay.  But you fill out forms for them every 90 days or |
| 10:41:54 | 25 | less? |

10:41:55  1   A.   Yes, sir.

10:41:55  2   Q.   And it's called an OIA?

10:41:57  3   A.   Yes, sir.

10:41:59  4   Q.   And it had something to do -- you don't know what the OIA

10:42:02  5   stand for?

10:42:02  6   A.   I think it's otherwise illegal activity, something like

10:42:06  7   that.

10:42:06  8   Q.   And basically the form you're signing says that you promised

10:42:09  9   to work for the FBI at their direction and not to do anything

10:42:13  10  that would be illegal unless they tell you to do it?

10:42:15  11  A.   I don't believe I was working for the FBI.  They weren't

10:42:17  12  paying me.

10:42:18  13  Q.   Okay.  Well, how did you become one of their sources?  Did

10:42:23  14  you go to them and apply for a job as a source?

10:42:25  15  A.   No, sir.  I did not.

10:42:26  16  Q.   They came to you?

10:42:27  17  A.   Yes, sir.

10:42:28  18  Q.   And they came to you, they said they thought you might have

10:42:32  19  done something illegal?

10:42:33  20  A.   I don't remember them indicating that.  No, sir.

10:42:35  21  Q.   You were afraid that you might be in trouble, correct?

10:42:38  22  A.   I don't see any reason I would have been in trouble.

10:42:41  23  Q.   But is that how you felt when they came to you?

10:42:45  24  A.   They didn't intimidate me, if that's what you're asking.

10:42:48  25  Q.   Well, did you think they were look ing at you like you might

10:42:50   1   have done something wrong?

10:42:53   2   A.   If they were looking at me like that, I hadn't done anything

10:42:55   3   wrong, so I didn't have any reason to fear.

10:42:57   4   Q.   Okay.  So when the friendly FBI came out and said, hey, I'm

10:43:01   5   the FBI, how would you like to be a registered informant, you

10:43:04   6   said, I'll do that?

10:43:05   7   A.   That -- well, they didn't say, how would you like to be a

10:43:08   8   registered informant.

10:43:09   9   Q.   Well, how did that come up?

10:43:13   10   A.   You mean, on the OIA forms?

10:43:15   11   Q.   How did it become that you were a registered informant?

10:43:19   12   A.   Once again, I don't remember them ever saying registered

10:43:22   13   informant.

10:43:22   14   Q.   Okay.  Whatever you call yourself, do you have like a junior

10:43:26   15   G Man badge or something you can wear that says FBI?

10:43:28   16   A.   No, sir, I do not.

10:43:29   17   Q.   So the government --

10:43:29   18        MR. GARDNER:  Your Honor.  Relevance.

10:43:32   19        THE COURT:  Wait a minute.  When the lawyer makes an

10:43:34   20   objection, Mr. Womack.

10:43:35   21        MR. WOMACK:  Yes, sir.  I was just finishing a

10:43:36   22   question.

10:43:37   23        THE COURT:  I'll sustain the objection.

10:43:38   24        MR. WOMACK:  Okay.

10:43:39   25   Q.   (BY MR. WOMACK) So how did you come to the position that

| 10:43:42 | 1 | they would give you a cellphone and tell you to record phone |

```
10:43:42   1  they would give you a cellphone and tell you to record phone
10:43:46   2  calls with other people?
10:43:47   3  A.   Well, obviously they were looking at this group of people.
10:43:51   4  Q.   No.  How did you come to be their informant?
10:43:56   5  A.   Once again, I don't classify myself as an informant because
10:44:00   6  that's not what they ever relayed to me that I was.
10:44:03   7  Q.   Okay.
10:44:03   8  A.   I would use another word maybe.
10:44:05   9  Q.   What word did they use?
10:44:07  10  A.   They never described me as anything.  They never said,
10:44:09  11  you're this or you're that.  Like I said, I don't even -- I mean,
10:44:13  12  I've self-described cooperating citizen, I guess you could say.
10:44:16  13  Q.   Okay.  And do you think they just randomly pass out phones
10:44:21  14  to other citizens and say, here, record phone calls?
10:44:24  15          MR. GARDNER:  Your Honor, form of the question.  It's
10:44:26  16  argumentative, as well.  Not really a question, to be honest.
10:44:30  17          THE COURT:  I'd say sarcastic, I would say.
10:44:33  18          MR. WOMACK:  Yes, sir, your Honor.  It is sarcastic.
10:44:35  19          THE COURT:  Let's speak right.  What he's trying to get
10:44:37  20  to is, when the FBI came to talk to you, what did they ask you to
10:44:43  21  do?
10:44:43  22          THE WITNESS:  They just asked, you know -- initially,
10:44:46  23  you know, just on a regular basis, they came by or they called.
10:44:50  24  You know, we'd talk about what my business was with this group.
10:44:55  25  Q.   (BY MR. WOMACK) And did they tell you to be involved in
```

| | | |
|---|---|---|
| 10:44:58 | 1 | phone calls with these people and to record those phone calls? |
| 10:45:01 | 2 | A.   They never -- we never set up the phone calls.  But I talked |
| 10:45:06 | 3 | to the group on a regular basis. |
| 10:45:07 | 4 | Q.   And they encouraged you to talk to members of these |
| 10:45:10 | 5 | different sellers and owners? |
| 10:45:12 | 6 | A.   No.  They did not encourage me. |
| 10:45:13 | 7 | Q.   Okay.  But they gave you a phone? |
| 10:45:15 | 8 | A.   Yes, sir, they did. |
| 10:45:16 | 9 | Q.   Did they teach you -- |
| 10:45:17 | 10 | A.   Actually, they did not give me the phone.  I had a -- it was |
| 10:45:20 | 11 | a personal phone. |
| 10:45:21 | 12 | Q.   Okay.  So they took -- |
| 10:45:23 | 13 | A.   It was in my name. |
| 10:45:24 | 14 | Q.   Okay.  Who owned that phone? |
| 10:45:26 | 15 | A.   I owned the phone. |
| 10:45:27 | 16 | Q.   So you bought the phone yourself? |
| 10:45:29 | 17 | A.   Yes, sir. |
| 10:45:29 | 18 | Q.   And the FBI showed you how to record on it? |
| 10:45:32 | 19 | A.   No, sir.  I don't know how they recorded on it.  It was my |
| 10:45:35 | 20 | understanding that any phone call on it was being recorded. |
| 10:45:39 | 21 | Q.   Okay.  So they told you what, that there's like a wiretap on |
| 10:45:43 | 22 | it or something? |
| 10:45:43 | 23 | A.   I assume.  Something like that. |
| 10:45:44 | 24 | Q.   But they didn't tell you? |
| 10:45:45 | 25 | A.   They didn't tell me wiretap.  They just, you know, said it |

| | | |
|---|---|---|
| 10:45:49 | 1 | was like they could listen in on that phone. |
| 10:45:51 | 2 | Q.   Okay.  Is there a phone you used only for that purpose? |
| 10:45:58 | 3 | A.   No, sir.  I used it for other purposes. |
| 10:46:01 | 4 | Q.   Okay.  Now, the first time you met Fernando Garcia, you said |
| 10:46:11 | 5 | that was in the spring 2010. |
| 10:46:15 | 6 | A.   Sounds about right.  Yes, sir. |
| 10:46:16 | 7 | Q.   You had been at Southwest Stallion Station since 2007? |
| 10:46:22 | 8 | A.   Yes, sir.  Graduated college in December of 2006 and went to |
| 10:46:26 | 9 | work thereafter. |
| 10:46:27 | 10 | Q.   What did you get your degree in? |
| 10:46:29 | 11 | A.   Animal science. |
| 10:46:30 | 12 | Q.   Where did you go to school? |
| 10:46:31 | 13 | A.   Texas A & M University. |
| 10:46:33 | 14 | Q.   You're animal science degree, did it have to do with horse |
| 10:46:40 | 15 | racing? |
| 10:46:41 | 16 | A.   It wasn't specific for that.  No, sir. |
| 10:46:42 | 17 | Q.   Okay.  You know that the University of Arizona actually has |
| 10:46:51 | 18 | a Bachelor of Science in Animal Science in the horse-racing |
| 10:46:56 | 19 | industry.  Are you aware of that? |
| 10:46:56 | 20 | A.   Yes, sir.  I am aware of that. |
| 10:46:58 | 21 | Q.   In fact, you know that Fernando Garcia is pursuing a degree |
| 10:47:02 | 22 | from them? |
| 10:47:02 | 23 | A.   He talked to me about going to Arizona. |
| 10:47:06 | 24 | Q.   And that he was majoring in that program? |
| 10:47:08 | 25 | A.   I think he did mention that.  Yes. |

| | | |
|---|---|---|
| 10:47:11 | 1 | Q.   And in your experience in the horse-racing industry, how |
| 10:47:16 | 2 | many other agents, or owners, or trainers have you met that |
| 10:47:20 | 3 | actually were pursuing a bachelor of science in horse racing? |
| 10:47:24 | 4 | Have you met anyone else that was doing that? |
| 10:47:27 | 5 | A.   Not off the top of my head. |
| 10:47:29 | 6 | Q.   Okay.  And in 2010, in the spring -- well, let's see, |
| 10:47:40 | 7 | September.  You know that during the summer of 2010, Fernando |
| 10:47:46 | 8 | Garcia had bought and was training and racing Mr. Piloto? |
| 10:47:54 | 9 | A.   I don't know that he had bought the horse. |
| 10:47:56 | 10 | Q.   Okay.  Well, you know he owned it? |
| 10:47:58 | 11 | A.   I know it was in his name. |
| 10:48:00 | 12 | Q.   Okay.  And normally if a horse is registered in your name, |
| 10:48:03 | 13 | would you be called the owner? |
| 10:48:05 | 14 | A.   Normally. |
| 10:48:06 | 15 | Q.   Okay.  And that's what the American Quarter Horse |
| 10:48:10 | 16 | Association would call you if the title's in your name, correct? |
| 10:48:13 | 17 | A.   Yes, sir. |
| 10:48:14 | 18 | Q.   And every authorized race here in America when you register |
| 10:48:19 | 19 | -- when you bring in your registration and proof that you've |
| 10:48:22 | 20 | entered that horse in that race, they would call you the owner, |
| 10:48:25 | 21 | weren't they? |
| 10:48:26 | 22 | A.   Yes, sir.  They would. |
| 10:48:27 | 23 | Q.   Okay.  So you know that during the summer of 2010, prior to |
| 10:48:33 | 24 | September 6th of 2010, the day of the big All American, September |
| 10:48:38 | 25 | 6, 2010, you know sometime shortly up until then, Fernando Garcia |

| | | |
|---|---|---|
| 10:48:44 | 1 | owned Mr. Piloto and was training him.  You know that? |
| 10:48:49 | 2 | A.   He was in Fernando's name is what I would say. |
| 10:48:52 | 3 | Q.   Okay.  And you know that he then sold that horse -- after it |
| 10:48:58 | 4 | won its heat at the trials, came in tenth by time, but it won its |
| 10:49:06 | 5 | heat and qualified -- out of the 220, it was one of the top ten, |
| 10:49:09 | 6 | so it got to go to the big race.  You know that during that |
| 10:49:12 | 7 | three-week interim, he sold the horse to Jose Trevino and Tremor |
| 10:49:18 | 8 | Enterprises? |
| 10:49:18 | 9 | A.   Yes, sir.  The horse was transferred.  I don't know how they |
| 10:49:21 | 10 | worked out the buying and selling. |
| 10:49:23 | 11 | Q.   Okay.  And that's fair.  But you understand that he |
| 10:49:25 | 12 | transferred it to Jose Trevino somehow? |
| 10:49:27 | 13 | A.   Correct. |
| 10:49:27 | 14 | Q.   Okay.  And then, as you told us, Mr. Piloto won that race? |
| 10:49:34 | 15 | A.   Yes, he did. |
| 10:49:34 | 16 | Q.   Now, were you there watching the race? |
| 10:49:37 | 17 | A.   Yes, sir, I was. |
| 10:49:37 | 18 | Q.   It was a pretty exciting race, wasn't it? |
| 10:49:39 | 19 | A.   It was a very close race. |
| 10:49:41 | 20 | Q.   And we've all seen it.  We've seen the videotape off of |
| 10:49:44 | 21 | YouTube. |
| 10:49:45 | 22 |         And you said after the race, you and Jose Trevino, |
| 10:49:52 | 23 | Fernando and I think some others, y'all actually went to like a |
| 10:49:56 | 24 | casino or something? |
| 10:49:57 | 25 | A.   Yes, sir.  That's correct. |

| 10:49:58 | 1 | Q.   Horse race tracks, do they have casinos there? |
| 10:50:00 | 2 | A.   There's a casino at the race track -- at that race track. |
| 10:50:04 | 3 | Not at all race tracks. |
| 10:50:05 | 4 | Q.   Okay.  But Ruidoso Downs has a casino? |
| 10:50:08 | 5 | A.   Yes, sir, it does. |
| 10:50:09 | 6 | Q.   Now, is that the casino y'all went to? |
| 10:50:11 | 7 | A.   No, sir, it's not. |
| 10:50:12 | 8 | Q.   Y'all went to another casino somewhere else? |
| 10:50:14 | 9 | A.   Correct. |
| 10:50:15 | 10 | Q.   And you remember that at the dinner table or somewhere, |
| 10:50:21 | 11 | y'all talked about Mr. Piloto's future? |
| 10:50:22 | 12 | A.   Yes, sir.  Outside the casino. |
| 10:50:25 | 13 | Q.   And from your standpoint and from the conversation, it was |
| 10:50:33 | 14 | more of a business decision about should we race Mr. Piloto or |
| 10:50:37 | 15 | should we retire him, correct? |
| 10:50:40 | 16 | A.   I could say, yeah, it was a business conversation. |
| 10:50:43 | 17 | Q.   And your recommendation was, well, I would recommend that |
| 10:50:48 | 18 | y'all race him again because if he wins another race, it might |
| 10:50:54 | 19 | make his value go up even more, correct? |
| 10:50:56 | 20 | A.   I thought that they needed to run the horse, but I didn't |
| 10:50:59 | 21 | think he needed to win another race. |
| 10:51:00 | 22 | Q.   Oh, okay.  But if he did, that could help his value? |
| 10:51:03 | 23 | A.   Correct. |
| 10:51:04 | 24 | Q.   If he ran another race and didn't do well, could that hurt |
| 10:51:07 | 25 | his value? |

| | | |
|---|---|---|
| 10:51:07 | 1 | A.   Well, I thought if he ran another race and at least |
| 10:51:10 | 2 | qualified, it would increase his value. |
| 10:51:13 | 3 | Q.   Okay.  And, again, you were talking about that in a business |
| 10:51:17 | 4 | decision, correct? |
| 10:51:18 | 5 | A.   Correct. |
| 10:51:18 | 6 | Q.   Okay.  Now, tell us if you have an owner, an agent and |
| 10:51:26 | 7 | trainer, a man that runs a breeding station, one of the great |
| 10:51:32 | 8 | ones, by the way, who among that group would have the authority |
| 10:51:37 | 9 | to decide whether to retire Mr. Piloto? |
| 10:51:40 | 10 | A.   The owner. |
| 10:51:41 | 11 | Q.   He's the only one, right? |
| 10:51:42 | 12 | A.   In my opinion. |
| 10:51:43 | 13 | Q.   Well, you know ultimately the owner is the one that gets to |
| 10:51:46 | 14 | make the call? |
| 10:51:47 | 15 | A.   That's correct. |
| 10:51:48 | 16 | Q.   We've heard testimony from others that Fernando Garcia is an |
| 10:52:07 | 17 | expert in picking horses and training horses.  Do you agree with |
| 10:52:11 | 18 | that? |
| 10:52:11 | 19 | A.   No, sir.  I do not. |
| 10:52:12 | 20 | Q.   You told us that, really, you don't think anyone's an |
| 10:52:15 | 21 | expert? |
| 10:52:16 | 22 | A.   That's my opinion. |
| 10:52:17 | 23 | Q.   Your granddaddy with 100 years experience either as a |
| 10:52:23 | 24 | veterinarian or owning a breeding station, or owning a sales lot, |
| 10:52:29 | 25 | 150 years, I guess you should say, he's not an expert in horses? |

| | | |
|---|---|---|
| 10:52:34 | 1 | A.   He's not an expert opinion at picking race horses.  I |
| 10:52:37 | 2 | wouldn't say so. |
| 10:52:38 | 3 | Q.   Okay.  And Butch Wise, who owns the Lazy E Ranch, you've |
| 10:52:44 | 4 | heard of his ranch? |
| 10:52:45 | 5 | A.   Yes, sir. |
| 10:52:45 | 6 | Q.   He's not an expert either, is he? |
| 10:52:48 | 7 | A.   Not -- once again, not at picking race horses.  Maybe at |
| 10:52:51 | 8 | other things. |
| 10:52:52 | 9 | Q.   Okay.  And you know Billy Bob Price from Oklahoma? |
| 10:52:56 | 10 | A.   Bill Price. |
| 10:52:57 | 11 | Q.   Yeah.  His name's actually Billy Bob? |
| 10:53:00 | 12 | A.   I didn't know that. |
| 10:53:01 | 13 | Q.   Yeah.  We found that out.  But Bill Price, is he an expert |
| 10:53:04 | 14 | at picking horses? |
| 10:53:06 | 15 | A.   Like I said, I don't -- not race horses.  Not in my opinion. |
| 10:53:10 | 16 | I mean, he raises some good horses but. |
| 10:53:13 | 17 | Q.   And, again, from your perspective, running a very fine |
| 10:53:18 | 18 | breeding establishment and being associated with a great auction, |
| 10:53:24 | 19 | the Heritage Place, you don't think you've seen experts at |
| 10:53:30 | 20 | picking horses, have you? |
| 10:53:31 | 21 | A.   Not that I would describe. |
| 10:53:32 | 22 | Q.   So it may be that if people have consistently picked horses |
| 10:53:37 | 23 | that are pretty good, or at least a percentage of them pretty |
| 10:53:40 | 24 | good, it could be luck, couldn't it? |
| 10:53:42 | 25 | A.   There's a lot of luck involved.  Yes, sir. |

| 10:53:43 | 1 | Q.   What steps do potential owners, buyers of horses or their |
| 10:53:55 | 2 | agents, what steps should they go through before they bet on a |
| 10:53:58 | 3 | horse at Heritage Place? |
| 10:54:00 | 4 | A.   They usually go look at the horses.  Of course, they look at |
| 10:54:03 | 5 | their pedigrees.  Depending on the horse and the owner, they |
| 10:54:06 | 6 | might have them X-rayed or vet-checked.  But, you know, basically |
| 10:54:12 | 7 | they're going to look at the horse most of the time before, you |
| 10:54:15 | 8 | know, before they go to the sale ring.  Obviously look at their |
| 10:54:18 | 9 | pedigree and, you know, decide what their price range is in my |
| 10:54:23 | 10 | opinion. |
| 10:54:23 | 11 | Q.   And if you're lucky enough as an agent to represent someone |
| 10:54:26 | 12 | with great assets who can buy any horse he wants, he makes it |
| 10:54:32 | 13 | easier for you as an agent to buy the best horse because it's a |
| 10:54:35 | 14 | blank check, isn't it? |
| 10:54:37 | 15 | A.   Yes, sir.  In that situation, it would make it easy. |
| 10:54:40 | 16 | Q.   You've recorded or someone recorded for you a number of |
| 10:54:56 | 17 | phone conversations with Fernando Garcia.  And we saw the |
| 10:55:00 | 18 | transcripts on the screen yesterday so we could read the |
| 10:55:03 | 19 | conversation while listening to you and Fernando talk.  Do you |
| 10:55:06 | 20 | remember that? |
| 10:55:06 | 21 | A.   Yes, sir. |
| 10:55:07 | 22 | Q.   And during these conversations, Fernando was talking to you |
| 10:55:10 | 23 | about horses either that he owned or horses that Mr. |
| 10:55:20 | 24 | Colorado-Cessa may have owned, Mr. Trevino, horses that were |
| 10:55:23 | 25 | owned by other ranches like -- I think it was Fast And Furious, |

| | | |
|---|---|---|
| 10:55:26 | 1 | you mentioned Poker Ranch, Bonanza Stables, or something.  There |
| 10:55:30 | 2 | are a number of different entities that you know that Fernando |
| 10:55:33 | 3 | Garcia would talk to you on behalf of those owners, correct? |
| 10:55:37 | 4 | A.   That's correct. |
| 10:55:37 | 5 | Q.   And at least in a few of the horses -- because his assets |
| 10:55:41 | 6 | are limited.  But in at least a few of the horses, he talked |
| 10:55:45 | 7 | about were his own horses, right? |
| 10:55:46 | 8 | A.   They were in Garcia Bloodstock. |
| 10:55:50 | 9 | Q.   Right.  He owns -- he is -- Fernando Garcia is Garcia |
| 10:55:52 | 10 | Bloodstock.  You know that? |
| 10:55:53 | 11 | A.   Yes, sir, I do. |
| 10:55:54 | 12 | Q.   I had a bunch of questions I'm skimming over that you've |
| 10:56:14 | 13 | already been asked.  I anticipated. |
| 10:56:19 | 14 | Garcia Bloodstock had an account at Southwest Stallion |
| 10:56:32 | 15 | Station. |
| 10:56:32 | 16 | A.   Not Garcia Bloodstock.  Fernando Garcia personally. |
| 10:56:35 | 17 | Q.   He had his own personal account? |
| 10:56:36 | 18 | A.   Yes, sir. |
| 10:56:37 | 19 | Q.   Okay.  And that would be the one where he would manage his |
| 10:56:40 | 20 | own personal horses? |
| 10:56:42 | 21 | A.   Yes, sir. |
| 10:56:43 | 22 | Q.   And the way that would work is if somebody -- if he earned |
| 10:56:50 | 23 | money on a horse that he had there, you would put money in his |
| 10:56:52 | 24 | account for him? |
| 10:56:53 | 25 | A.   No, sir.  That's not the way it worked.  Not at the ranch. |

| | | |
|---|---|---|
| 10:56:57 | 1 | Q.   Okay. |
| 10:56:59 | 2 | A.   He didn't earn money at the ranch, in other words. |
| 10:57:01 | 3 | Q.   Okay.  So he didn't -- none of his horses brought in income |
| 10:57:05 | 4 | to him at the ranch? |
| 10:57:05 | 5 | A.   No, sir. |
| 10:57:06 | 6 | Q.   He was paying for things? |
| 10:57:08 | 7 | A.   Yes, sir. |
| 10:57:08 | 8 | Q.   It wasn't coming to him? |
| 10:57:09 | 9 | A.   Correct. |
| 10:57:10 | 10 | Q.   Okay.  In the case of Jose Trevino and Tremor Enterprises, |
| 10:57:15 | 11 | he would actually have money coming to him, wouldn't he? |
| 10:57:17 | 12 | A.   Yes, sir. |
| 10:57:18 | 13 | Q.   An that's because he had stallions that were breeding |
| 10:57:21 | 14 | through y'all? |
| 10:57:22 | 15 | A.   Correct. |
| 10:57:23 | 16 | Q.   And so, people that wanted to get their mare bred or a mare |
| 10:57:31 | 17 | that they were using bred by one of Mr. Trevino's horse, they |
| 10:57:35 | 18 | would pay money to you, you being triple S, and then, y'all would |
| 10:57:41 | 19 | give some of that to Mr. Trevino. |
| 10:57:43 | 20 | A.   Yes, sir.  The stud fee money. |
| 10:57:45 | 21 | Q.   Okay.  And y'all would keep your portion of it, whatever |
| 10:57:48 | 22 | your portion was, correct? |
| 10:57:49 | 23 | A.   The farm fee.  And are you talking about the portion of the |
| 10:57:54 | 24 | stud fee or -- |
| 10:57:55 | 25 | Q.   Yeah.  When someone -- |

| | | |
|---|---|---|
| 10:57:56 | 1 | A.   We didn't get a portion of it but a stud -- yeah. |
| 10:57:59 | 2 | Q.   If I had a mare and I wanted to breed it with a horse at |
| 10:58:02 | 3 | your ranch and the horse happened to belong to, let's say, Jose |
| 10:58:08 | 4 | Trevino, then I would pay you a fee for that, correct? |
| 10:58:12 | 5 | A.   For the stud.  Yes, sir. |
| 10:58:14 | 6 | Q.   Okay.  And that stud fee, would you give all of it to Mr. |
| 10:58:19 | 7 | Trevino or just a part of it? |
| 10:58:20 | 8 | A.   No, sir.  He got the whole stud fee.  I had a separate farm |
| 10:58:24 | 9 | fee that was separate from the stud fee. |
| 10:58:26 | 10 | Q.   Okay.  So if Mr. Trevino had a horse that was extremely |
| 10:58:32 | 11 | valuable that the, you know, the breedings were selling for like |
| 10:58:36 | 12 | $50,000, or something, or you have another horse that was selling |
| 10:58:39 | 13 | for $1,000, y'all wouldn't get any part of the money for the more |
| 10:58:44 | 14 | valuable horse? |
| 10:58:45 | 15 | A.   No, sir.  I mean, I'm assuming we wouldn't have.  We weren't |
| 10:58:48 | 16 | getting any money at the time for the two horses we had. |
| 10:58:51 | 17 | Q.   Don't you have like an agreement with owners? |
| 10:58:54 | 18 | A.   Every agreement with every horse and every owner's |
| 10:58:57 | 19 | different. |
| 10:58:58 | 20 | Q.   Okay. |
| 10:58:58 | 21 | A.   There's not a standard agreement. |
| 10:59:00 | 22 | Q.   So if I walked in with a stallion and say, I've got a great |
| 10:59:03 | 23 | horse, I think I want you to handle it for me, you're |
| 10:59:08 | 24 | prestigious, people may buy semen from my horse because it's with |
| 10:59:11 | 25 | your ranch, the contract you have with me may be different from |

| | | |
|---|---|---|
| 10:59:15 | 1 | the contract you'd have with Fernando Garcia? |
| 10:59:17 | 2 | A.   That is correct. |
| 10:59:18 | 3 | Q.   Or that you would have with Jose Trevino? |
| 10:59:20 | 4 | A.   Correct. |
| 10:59:20 | 5 | Q.   Okay.  And the ranch would get money, triple S would get |
| 10:59:27 | 6 | money for housing the horses and manipulating the breeding |
| 10:59:32 | 7 | process, correct? |
| 10:59:33 | 8 | A.   That's correct. |
| 10:59:35 | 9 | Q.   And Fernando Garcia's account with you, he had a horse, a |
| 10:59:51 | 10 | mare named SFR Mary Louise. |
| 10:59:54 | 11 | A.   Yes, sir. |
| 10:59:55 | 12 | Q.   And he had Allurist, A-L-L-U-R-I-S-T? |
| 11:00:02 | 13 | A.   He didn't own that mare.  He had an embryo out of that mare. |
| 11:00:05 | 14 | Q.   Okay.  So he had the embryo out of that mare? |
| 11:00:07 | 15 | A.   Yes, sir. |
| 11:00:08 | 16 | Q.   And so, his account was one where you would bill him and he |
| 11:00:14 | 17 | would pay you? |
| 11:00:16 | 18 | A.   Well, he's supposed to pay me. |
| 11:00:17 | 19 | Q.   And he paid you with cashier's checks? |
| 11:00:20 | 20 | A.   I don't think he ever personally sent me a cashier's check. |
| 11:00:23 | 21 | No, sir. |
| 11:00:24 | 22 | Q.   But you know he got you paid? |
| 11:00:29 | 23 | A.   You could say he got me paid. |
| 11:00:31 | 24 | Q.   Okay.  And -- but his situation was not one where you would |
| 11:00:36 | 25 | pay him money for anything? |

| | | |
|---|---|---|
| 11:00:38 | 1 | A.    No, sir. |
| 11:00:38 | 2 | Q.    Okay.  Now, you said something a minute ago about that for |
| 11:01:02 | 3 | Tempting Dash that Mr. Trevino or his company gave y'all, I think |
| 11:01:11 | 4 | you said, four breedings a year? |
| 11:01:12 | 5 | A.    Yes, sir. |
| 11:01:14 | 6 | Q.    And that was to go to the ranch for the ranch to use on its |
| 11:01:18 | 7 | horses? |
| 11:01:19 | 8 | A.    Yes, sir. |
| 11:01:20 | 9 | Q.    And that could be very valuable. |
| 11:01:23 | 10 | A.    Same, 5,000 a breeding, I guess you would say, but like I |
| 11:01:27 | 11 | said, it was a trade for advertising.  So, to me, it was a wash. |
| 11:01:30 | 12 | Q.    I understand.  But the advertising helped both Mr. Trevino, |
| 11:01:36 | 13 | the owner, and triple S ranch because you had that horse there? |
| 11:01:40 | 14 | A.    That's correct. |
| 11:01:42 | 15 | Q.    And in that particular case, you said that you actually took |
| 11:01:48 | 16 | some of the breedings for your own private mare? |
| 11:01:50 | 17 | A.    Most of the mares that the ranch owns or in my personal |
| 11:01:56 | 18 | name.  So if it's the same -- one in the same in my opinion. |
| 11:02:01 | 19 | Q.    Would the registration be in your name or in the ranch? |
| 11:02:03 | 20 | A.    In my name. |
| 11:02:04 | 21 | Q.    Okay.  And so, the board of directors for -- is there a |
| 11:02:08 | 22 | board of directors for triple S? |
| 11:02:09 | 23 | A.    No, sir.  It would me and my grandfather co-manage it. |
| 11:02:13 | 24 | Q.    Does your grandfather know you were taking the breedings for |
| 11:02:16 | 25 | your own private mares? |

| | | |
|---|---|---|
| 11:02:17 | 1 | A.   Of course. |
| 11:02:18 | 2 | Q.   Okay.  I think I'm done.  I just want to make sure I haven't |
| 11:02:43 | 3 | skipped anything here that I wanted to ask.  Thank you.  That's |
| 11:02:54 | 4 | all the questions I have. |
| 11:02:55 | 5 | A.   Thank you. |
| 11:02:55 | 6 | THE COURT:  Mr. Esper. |
| 11:02:56 | 7 | MR. ESPER:  Yes, your Honor.  Thank you. |
| 11:02:58 | 8 | CROSS-EXAMINATION |
| 11:02:58 | 9 | BY MR. ESPER: |
| 11:02:59 | 10 | Q.   Mr. Graham, you would agree, would you not, that horses and |
| 11:03:04 | 11 | matters related to horses are pretty much in your DNA, correct? |
| 11:03:08 | 12 | A.   I grew up in the horse business my whole life. |
| 11:03:11 | 13 | Q.   Sure.  And you were -- grew up in this area, did you not? |
| 11:03:15 | 14 | A.   Yes, sir. |
| 11:03:16 | 15 | Q.   Okay.  And your father, grandfather, of course, was very |
| 11:03:23 | 16 | steeped in the breeding of horses? |
| 11:03:24 | 17 | A.   Yes, sir. |
| 11:03:24 | 18 | Q.   Okay.  And you then went -- I believe you said you went to |
| 11:03:29 | 19 | Texas A & M University? |
| 11:03:30 | 20 | A.   Yes, sir. |
| 11:03:30 | 21 | Q.   Okay.  And what years would that have been, sir? |
| 11:03:33 | 22 | A.   2002 to 2006. |
| 11:03:35 | 23 | Q.   Okay.  Now, when did you first meet "Chevo" Huitron more or |
| 11:03:40 | 24 | less? |
| 11:03:40 | 25 | A.   I believe it was after I got out of college. |

| | | |
|---|---|---|
| 11:03:43 | 1 | Q. Okay. So around 2005, 2006? |
| 11:03:46 | 2 | A. I think it was after that. |
| 11:03:47 | 3 | Q. Okay. And you met him, tell us how. |
| 11:03:51 | 4 | A. I met him -- I think I initially met him at the race track |
| 11:03:55 | 5 | when Manor Downs was still running. |
| 11:03:57 | 6 | Q. When who was still running? |
| 11:03:59 | 7 | A. Manor Downs. |
| 11:04:01 | 8 | Q. Had you heard that he was a fairly reputable and good horse |
| 11:04:05 | 9 | trainer? |
| 11:04:05 | 10 | A. Yes, sir. I kept up with the local trainers. |
| 11:04:08 | 11 | Q. Okay. And you've been out to his training facilities. I |
| 11:04:13 | 12 | want to call it a ranch. It's not really a ranch, but it's a |
| 11:04:16 | 13 | training facility, correct? |
| 11:04:17 | 14 | A. Yes, sir. |
| 11:04:17 | 15 | Q. And I don't say this in a demeaning way, but it's relatively |
| 11:04:22 | 16 | simple out there, is it not? |
| 11:04:23 | 17 | A. Yes, sir. |
| 11:04:24 | 18 | Q. Nothing elaborate? |
| 11:04:25 | 19 | A. No, sir. |
| 11:04:25 | 20 | Q. Not state-of-the-art facilities? |
| 11:04:28 | 21 | A. No, sir. I wouldn't say so. |
| 11:04:30 | 22 | Q. Okay. And I know you say that not demeaningly, but that's |
| 11:04:33 | 23 | the way it is, correct? |
| 11:04:34 | 24 | A. Correct. |
| 11:04:35 | 25 | Q. Now, you came to know him and I believe you said that -- did |

11:04:40   1   you establish some sort of friendly relationship with him?

11:04:42   2   A.   Yes, sir.  I would say we were friends.

11:04:45   3   Q.   And for the last six, seven years, you've been friends with

11:04:48   4   him, correct?

11:04:49   5   A.   Yes, sir.  I would say so.

11:04:50   6   Q.   Okay.  Even up to this day, he still comes and does business

11:04:54   7   with you or your business?

11:04:55   8   A.   He's usually by the ranch weekly.

11:04:57   9   Q.   Okay.  And even though you're testifying here in court, he

11:05:02  10   still comes out to the ranch, does he not?

11:05:04  11   A.   Yes.

11:05:05  12   Q.   He's never one time asked you about what you're going to say

11:05:10  13   in court, anything like that, has he?

11:05:11  14   A.   No, sir.  He has not.

11:05:12  15   Q.   Okay.  Now, I believe you testified that you came to know

11:05:21  16   him because you actually had -- through the races and you -- he

11:05:25  17   actually trained a horse for you, correct?

11:05:26  18   A.   Yes, sir.  He trained several horses for me.

11:05:29  19   Q.   Okay.  Were they for you or for Southwest Stallion Station

11:05:31  20   or both?

11:05:32  21   A.   No.  They were for me.

11:05:33  22   Q.   They were your own personal horses?

11:05:34  23   A.   Yes, sir.

11:05:35  24   Q.   And did you feel like he did a good job?

11:05:37  25   A.   I felt like he did the best he could with the horses he had.

| | | |
|---|---|---|
| 11:05:40 | 1 | Q.   Okay.  Would it be fair to say that -- and you've seen him |
| 11:05:45 | 2 | work many times, have you not? |
| 11:05:46 | 3 | A.   Yes, sir. |
| 11:05:47 | 4 | Q.   Would it be fair to say that he's a hard-working man? |
| 11:05:50 | 5 | A.   Yes, sir, I would say he is. |
| 11:05:51 | 6 | Q.   Spends a lot of hours out there? |
| 11:05:52 | 7 | A.   He's out there a lot. |
| 11:05:54 | 8 | Q.   Okay.  Now, you indicated that you thought he was an |
| 11:05:57 | 9 | intelligent man.  Would it be fair to say that when it comes to |
| 11:06:00 | 10 | horses, he's fairly well-versed and fairly intelligent, correct? |
| 11:06:05 | 11 | A.   Yes, sir.  I would say so. |
| 11:06:06 | 12 | Q.   But you also know he's not educated, correct? |
| 11:06:10 | 13 | A.   That's -- they brought that to my attention.  I didn't know |
| 11:06:13 | 14 | that. |
| 11:06:13 | 15 | Q.   Okay.  You're able to communicate with him when it deals |
| 11:06:16 | 16 | with horse verbiage is the best way I could say it, correct? |
| 11:06:21 | 17 | A.   Yeah.  We communicate fine for the things we talked about. |
| 11:06:25 | 18 | Q.   Okay.  And basically you all talk about horses, right? |
| 11:06:28 | 19 | A.   Most of the conversation, yes. |
| 11:06:29 | 20 | Q.   Okay.  But his English is a little limited, would that be |
| 11:06:33 | 21 | fair to say, Mr. Graham? |
| 11:06:35 | 22 | A.   It's a little broken English. |
| 11:06:36 | 23 | Q.   And do you speak any Spanish at all? |
| 11:06:38 | 24 | A.   I speak some Spanish. |
| 11:06:39 | 25 | Q.   Some Spanish.  So y'all are communicating about horses, some |

11:06:42  1  of it in English, which is limited on his part, some of it in

11:06:45  2  Spanish, which is limited in your part?

11:06:47  3  A.    That's correct.

11:06:48  4  Q.    Okay.  And whenever he trained these horses, did he charge

11:06:54  5  you a fee to do that obviously?

11:06:56  6  A.    Yes, sir.

11:06:57  7  Q.    Okay.  And how was it that he billed you or you were paid?

11:07:02  8  A.    How was it that he billed me?

11:07:03  9  Q.    Yeah.

11:07:04  10 A.    Back when I had horses with him, it was they didn't really

11:07:09  11 have a formal billing system at the time.  Sometimes I would get

11:07:11  12 -- you know, I mean, it wasn't very formal.  We traded out work

11:07:15  13 that I did for him at the ranch and he -- you know, back and

11:07:18  14 forth.

11:07:18  15 Q.    Kind of a mom-and-pop billing-type system?

11:07:21  16 A.    Back then it was.  Yes, sir.

11:07:22  17 Q.    Okay.  Now, there came a time when he told you -- or there

11:07:30  18 came a time when he actually was training Tempting Dash, correct?

11:07:33  19 A.    Yes, sir.

11:07:33  20 Q.    Okay.  And about that time period, he told you, correct me

11:07:38  21 if I'm wrong, that there was a group of owners or people in

11:07:42  22 Mexico, new group, who were not only bringing horses for training

11:07:47  23 but were looking for breeding, too, correct?

11:07:51  24 A.    I don't think initially he talked about looking for a place

11:07:54  25 to go with the horse.  I mean, or with those horses.  But he did

| | | |
|---|---|---|
| 11:07:58 | 1 | talk about having some new clients from Mexico. |
| 11:08:00 | 2 | Q.   Okay.  And he also talked to you about possibly trying to |
| 11:08:06 | 3 | help you out with bringing them over for breeding purposes, |
| 11:08:10 | 4 | correct? |
| 11:08:10 | 5 | A.   Well, Tempting Dash, specifically after he had some success. |
| 11:08:14 | 6 | Yes, he did talk to me about helping him with the horse. |
| 11:08:16 | 7 | Q.   And you were present when he was training Tempting Dash |
| 11:08:20 | 8 | frequently, were you not? |
| 11:08:21 | 9 | A.   Yes, sir. |
| 11:08:21 | 10 | Q.   Okay.  And whenever you went up to Heritage Place and |
| 11:08:32 | 11 | purchased these horses, I think we've heard some testimony about, |
| 11:08:38 | 12 | that was late 2009? |
| 11:08:39 | 13 | A.   Early 2010. |
| 11:08:40 | 14 | Q.   Early 2010.  And shortly thereafter, or sometime thereafter, |
| 11:08:44 | 15 | you got a knock on your door from the FBI, correct? |
| 11:08:46 | 16 | A.   Yes, sir.  That's correct. |
| 11:08:47 | 17 | Q.   And I believe in -- one of the lawyers asked you in a |
| 11:08:52 | 18 | question and your response was, I didn't think I'd done anything |
| 11:08:54 | 19 | wrong, correct? |
| 11:08:55 | 20 | A.   That's correct. |
| 11:08:56 | 21 | Q.   Okay.  And as a matter of fact, "Chevo" Huitron had told you |
| 11:09:00 | 22 | that -- or whenever he was talking to you about these people, he |
| 11:09:03 | 23 | didn't say that he thought they were -- there was anything |
| 11:09:07 | 24 | sinister about them, did he? |
| 11:09:08 | 25 | A.   Not initially. |

| | | |
|---|---|---|
| 11:09:09 | 1 | Q.   Okay.  Did he have some concerns later on is what you're |
| 11:09:13 | 2 | saying? |
| 11:09:13 | 3 | A.   I would say later on, there was probably some concern. |
| 11:09:17 | 4 | Q.   Okay.  And now, there became some concerns later on because |
| 11:09:21 | 5 | you asked him, are you getting paid by these people? |
| 11:09:25 | 6 | A.   Yes, sir. |
| 11:09:26 | 7 | Q.   Because you were having some frustration about getting paid, |
| 11:09:30 | 8 | correct? |
| 11:09:31 | 9 | A.   Yes, sir. |
| 11:09:31 | 10 | Q.   In fact, on some of these phone calls that you have, you're |
| 11:09:34 | 11 | expressing your frustration about payment; is that right? |
| 11:09:37 | 12 | A.   Yes, sir.  I would say so. |
| 11:09:38 | 13 | Q.   And "Chevo" Huitron told you the same thing.  I'm having the |
| 11:09:41 | 14 | same problems? |
| 11:09:42 | 15 | A.   Correct. |
| 11:09:42 | 16 | Q.   Okay.  Now, you were getting paid in a combination of cash, |
| 11:09:48 | 17 | cashier's checks, sometimes wire transfers; is that right? |
| 11:09:51 | 18 | A.   Yes, sir. |
| 11:09:51 | 19 | Q.   And you asked "Chevo" Huitron, is that how you're getting |
| 11:09:54 | 20 | paid? |
| 11:09:56 | 21 | A.   Well, I mean, we just -- mainly I asked him if he was |
| 11:10:00 | 22 | getting paid. |
| 11:10:00 | 23 | Q.   And he said slowly, correct? |
| 11:10:02 | 24 | A.   Yes. |
| 11:10:03 | 25 | Q.   Okay.  And you didn't ask him, how were you getting paid? |

| 11:10:07 | 1 | A.   He talked about being paid in cash so. |
| 11:10:10 | 2 | Q.   Okay.  Some cash, some wire transfers? |
| 11:10:12 | 3 | A.   He never indicated to me that he had money wired to him.  We |
| 11:10:17 | 4 | didn't talk about that. |
| 11:10:17 | 5 | Q.   Okay.  Now, you know that he doesn't run the office where |
| 11:10:23 | 6 | the billing goes out and money comes in? |
| 11:10:27 | 7 | A.   Not typically -- no, sir.  He doesn't. |
| 11:10:30 | 8 | Q.   Okay.  And I believe you testified that Jessica, who's his |
| 11:10:34 | 9 | niece, was handling a lot of that, correct, to your knowledge? |
| 11:10:38 | 10 | A.   She did back then.  Yes, sir. |
| 11:10:39 | 11 | Q.   Okay.  We're talking a time period 2009, 2010, 2011? |
| 11:10:45 | 12 | A.   I think she was there.  I don't know how far into that time |
| 11:10:48 | 13 | period but yes. |
| 11:10:49 | 14 | Q.   Okay.  Now, you indicated that when "Chevo" was training |
| 11:10:57 | 15 | your horses, he worked very hard at it, correct? |
| 11:10:59 | 16 | A.   Yes, sir.  I would say he did. |
| 11:11:00 | 17 | Q.   And through the years that you've known him, he works hard |
| 11:11:03 | 18 | with every horse that he trained, correct? |
| 11:11:06 | 19 | A.   Yes, sir.  I would say so. |
| 11:11:07 | 20 | Q.   Okay.  Would it be fair to say, Mr. Graham, that "Chevo" |
| 11:11:13 | 21 | Huitron earns the money he works for? |
| 11:11:15 | 22 | A.   For the training you mean? |
| 11:11:16 | 23 | Q.   Yes. |
| 11:11:17 | 24 | A.   Yes, sir. |
| 11:11:17 | 25 | Q.   Okay.  Now, you and he often talked about -- before Tempting |

11:11:22  1  Dash came along about that he trains horses for a lot of people

11:11:26  2  who reside in Mexico, does he not?

11:11:28  3  A.   Yes, sir.  He does.

11:11:29  4  Q.   Okay.  And along the border here with Mexico, trains

11:11:35  5  frequently.  Would that be a fair statement?

11:11:37  6  A.   There's a lot of owners of horses here that reside in

11:11:40  7  Mexico.

11:11:41  8  Q.   Okay.  And there's a lot of owners in Mexico who are

11:11:44  9  legitimate people, correct?

11:11:46  10 A.   Yes, sir.

11:11:47  11 Q.   Okay.  And many times as a -- you're a breeder of horses,

11:11:51  12 correct?

11:11:52  13 A.   That's correct.

11:11:53  14 Q.   You don't always know if a person who is from Mexico is a

11:11:58  15 legitimate businessperson or not, do you?

11:12:00  16 A.   That's correct.

11:12:01  17 Q.   Okay.  Now, I believe you said that you saw this Sergio

11:12:13  18 Rincon -- is that his name -- out at "Chevo's" place?

11:12:16  19 A.   Yes, sir.

11:12:16  20 Q.   And I believe you indicated that he didn't work for "Chevo,"

11:12:20  21 that he was basically working for Mr. Trevino?

11:12:23  22 A.   I would say initially he was working for the group.  I'm not

11:12:27  23 saying -- I don't know that they had him on the personal payroll.

11:12:31  24 Q.   He didn't work for "Chevo"?

11:12:32  25 A.   I don't think he was being paid by "Chevo."

| | | |
|---|---|---|
| 11:12:34 | 1 | Q.   Okay.  And as a matter of fact, I believe you testified that |
| 11:12:37 | 2 | "Chevo" told you that with Tempting Dash, he thought Rudy Trevino |
| 11:12:42 | 3 | was the owner of Tempting Dash. |
| 11:12:44 | 4 | A.   Initially, yes, sir. |
| 11:12:45 | 5 | Q.   Okay.  When actually at the time, the apparent owner was |
| 11:12:49 | 6 | Ramiro Villarreal, correct? |
| 11:12:52 | 7 | A.   The first futurity or the first set of trials, whatever, he |
| 11:12:56 | 8 | was in Ramiro's name. |
| 11:12:58 | 9 | Q.   Okay.  And sometime after that, "Chevo" told you he thought |
| 11:13:02 | 10 | Rudy Trevino was the real owner? |
| 11:13:04 | 11 | A.   The first time I went down there after the Dash For Cash, |
| 11:13:07 | 12 | that's who he introduced me to. |
| 11:13:08 | 13 | Q.   Okay.  And he also introduced you to Jose Trevino, did he |
| 11:13:13 | 14 | not? |
| 11:13:13 | 15 | A.   Later.  Not the same day. |
| 11:13:14 | 16 | Q.   Okay.  Sometime in the 2009.  End of '09, 2010? |
| 11:13:21 | 17 | A.   Yes, sir. |
| 11:13:22 | 18 | Q.   And he never went with you to any of these horse auctions or |
| 11:13:25 | 19 | sales.  He being Mr. "Chevo" Huitron, did he? |
| 11:13:28 | 20 | A.   No, sir.  He did not. |
| 11:13:29 | 21 | Q.   All he does is train horses, correct? |
| 11:13:31 | 22 | A.   That's his primary business. |
| 11:13:32 | 23 | Q.   Okay.  Well, does he have another business? |
| 11:13:34 | 24 | A.   Oh, no.  I'm sorry.  Yeah.  That's what he does. |
| 11:13:36 | 25 | Q.   That's all he knows how to do, correct? |

| 11:13:38 | 1 | A.   Pretty much. |

11:13:38  1  A.   Pretty much.

11:13:39  2  Q.   Yeah.  Now, during the time that we've heard a number of

11:13:49  3  recorded conversations, you never tried to call "Chevo" and talk

11:13:54  4  to him and report his conversation, did you?

11:13:56  5  A.   I wasn't trying to record any of them.  They were just all

11:13:58  6  being listened to.

11:13:59  7  Q.   I understand.  He never called you to where you had the

11:14:02  8  opportunity to?

11:14:03  9  A.   I think I might have talked to him a few times on that

11:14:05  10  cellphone.

11:14:06  11  Q.   Okay.  He's not a guy that spends a lot of time talking on

11:14:09  12  the telephone, is he?

11:14:10  13  A.   No, sir.  I don't talk to him on the phone very often.

11:14:12  14  Q.   In fact, he's pretty hard to get a hold of on the telephone?

11:14:15  15  A.   Yes, sir.  I would say so.

11:14:17  16  Q.   And how far is his facilities from Southwest Stallion

11:14:19  17  Station?

11:14:19  18  A.   It's about 35 miles, I believe.

11:14:21  19  Q.   Okay.  And what is it that he still does when he comes over

11:14:25  20  to your facilities?  Is he buying products that you sell, feed?

11:14:30  21  A.   Medicine mainly.

11:14:31  22  Q.   Okay.  And you interact with him to this day?

11:14:34  23  A.   Yes, sir.

11:14:35  24  Q.   Okay.  May I have just one moment, your Honor?

11:14:45  25          THE COURT:  Certainly.

| | | |
|---|---|---|
| 11:14:49 | 1 | Q.   (BY MR. ESPER) In the course of your doing business with |
| 11:14:51 | 2 | "Chevo" Huitron, has it always been an honorable relationship? |
| 11:14:58 | 3 | A.   I think we got along pretty well over the years. |
| 11:15:01 | 4 | Q.   Okay.  He was always honest with you? |
| 11:15:04 | 5 | A.   In my opinion he was. |
| 11:15:05 | 6 | Q.   Never cheated you? |
| 11:15:06 | 7 | A.   No.  He's never cheated me. |
| 11:15:07 | 8 | Q.   Okay.  That's all I have, your Honor. |
| 11:15:17 | 9 | THE COURT:  Mr. Mayr? |
| 11:15:33 | 10 | MR. MAYR:  Could we approach, your Honor? |
| 11:15:34 | 11 | THE COURT:  Yes, sir. |
| 11:15:40 | 12 | (At the bench, on the record.) |
| 11:15:50 | 13 | THE COURT:  I sure am glad, Mr. Esper, you've checked |
| 11:15:52 | 14 | your notes that you didn't ask any questions that had been asked. |
| 11:15:55 | 15 | What do you want? |
| 11:15:56 | 16 | MR. MAYR:  Your Honor, I apologize for being up here. |
| 11:15:57 | 17 | Prior to the jury coming in, while we were waiting for you while |
| 11:16:01 | 18 | you were issuing your order, I asked the government if they could |
| 11:16:04 | 19 | provide me access to Government's Exhibits 1 through 74, |
| 11:16:07 | 20 | basically all the exhibits that were seized here in Austin from |
| 11:16:12 | 21 | my client's business, from Mr. Huitron's home, et cetera, et |
| 11:16:15 | 22 | cetera.  I asked them.  They said that the file is up in their |
| 11:16:19 | 23 | offices right now, and my understanding is they weren't going to |
| 11:16:23 | 24 | be brought down so that I would have them available for my |
| 11:16:27 | 25 | cross-examination. |

| 11:16:27 | 1 | They're not -- they're not here still.  I'm not sure. |

11:16:27  1    They're not -- they're not here still.  I'm not sure.

11:16:32  2    MR. GARDNER:  I'll go check.  I don't know if she's --

11:16:36  3    Ms. Fernald says we can look now for you and --

11:16:36  4    MR. MAYR:  Okay.

11:16:37  5    MR. GARDNER:  We could get them for you probably in

11:16:39  6    five minutes.

11:16:41  7    MR. MAYR:  Okay.  The other thing is that there is

11:16:44  8    another exhibit that was seized from my client's -- not my

11:16:49  9    client's computer but the computer that was seized from my

11:16:50  10   client's business that has an image on it.  It has been

11:16:55  11   identified by one of the special agents, but it has not been

11:16:58  12   offered as an exhibit by the government.  I asked if he would

11:17:02  13   provide me --

11:17:02  14   THE COURT:  Wait a minute.  Been admitted by a special

11:17:06  15   agent?

11:17:06  16   MR. MAYR:  It hasn't been admitted.  It's just been

11:17:08  17   identified as retained from my client's computer.  Now, I have a

11:17:12  18   copy of my client's hard drive and I asked if -- I asked the

11:17:18  19   government if they would provide me with this exhibit to use

11:17:21  20   during my cross-examination.  And correct me if I'm wrong.  I'm

11:17:25  21   not going to state anything -- he would agree to it and I would

11:17:29  22   agree to the admission of all the items that were seized from the

11:17:32  23   computer, which I'm not ready to -- I have an objection that I

11:17:35  24   need to raise with you.

11:17:37  25   I have the computer and I could get the disc myself.

| | | |
|---|---|---|
| 11:17:40 | 1 | The problem is -- let me say that again.  I have a copy of the |
| 11:17:44 | 2 | hard drive, which I would normally be able to access the image |
| 11:17:48 | 3 | that I want to use for cross-examination.  But right now, my |
| 11:17:52 | 4 | computer is not allowing me to access it.  So right now, the only |
| 11:17:56 | 5 | way that I can get this exhibit to use during cross-examination |
| 11:18:00 | 6 | is from the government.  And I would like you per them to let me |
| 11:18:06 | 7 | have access to this photograph that was obtained from my client's |
| 11:18:10 | 8 | computer so that I can use it during by cross-examination of this |
| 11:18:14 | 9 | witness. |
| 11:18:15 | 10 | Normally I would have it ready to go, but since my |
| 11:18:17 | 11 | computer is not cooperating, the only method I have of getting it |
| 11:18:22 | 12 | is getting it from the government's hard copy.  So -- and all of |
| 11:18:27 | 13 | these things, I need for cross-examination of this witness. |
| 11:18:30 | 14 | Otherwise, I'd have to reserve him, recall him.  I'd rather just |
| 11:18:33 | 15 | get it all done right now and not waste any more of the Court's |
| 11:18:36 | 16 | time. |
| 11:18:36 | 17 | THE COURT:  Well, you gentlemen and lady -- I exclude |
| 11:18:42 | 18 | this Ms. Williams.  She's been very efficient -- have wasted so |
| 11:18:45 | 19 | much damn time in this trial and it was intentional, and I'm |
| 11:18:49 | 20 | telling you that jury is so fed up with all of you that I don't |
| 11:18:54 | 21 | know what they're going to do with regard to your conduct and |
| 11:18:57 | 22 | your client's.  The Court is fed up with it, too. |
| 11:19:01 | 23 | So don't come up here and tell me you want to waste my |
| 11:19:04 | 24 | time because you've been wasting it for now three weeks.  Now, |
| 11:19:10 | 25 | we're going to go back.  What is the position of the government? |

| | | |
|---|---|---|
| 11:19:13 | 1 | You're not going to use that as an exhibit? |
| 11:19:16 | 2 | MR. GARDNER:  Your Honor, I just think that if he's |
| 11:19:21 | 3 | offering one piece, then everything should come in. |
| 11:19:21 | 4 | THE COURT:  Well, I don't know if it -- is it a search |
| 11:19:25 | 5 | warrant?  I don't know what -- |
| 11:19:26 | 6 | MR. GARDNER:  Not a search warrant. |
| 11:19:27 | 7 | THE COURT:  I don't have any idea what objection they |
| 11:19:29 | 8 | could make that would be valid.  But obviously y'all can't get |
| 11:19:34 | 9 | together one way or the other.  And I'm not going to order him to |
| 11:19:38 | 10 | give you anything if he's going to put it into evidence or not |
| 11:19:41 | 11 | put it into evidence.  It's just like I wouldn't order you to do |
| 11:19:45 | 12 | the same thing.  It's not my job.  I'm supposed to be neutral. |
| 11:19:49 | 13 | I'm trying my best to be neutral.  Y'all are sure making it |
| 11:19:53 | 14 | difficult.  This meeting is over. |
| 11:19:53 | 15 | MR. GARDNER:  We have the boxes. |
| 11:19:57 | 16 | MR. MAYR:  Yeah, the boxes. |
| 11:19:57 | 17 | MS. FERNALD:  Fifty-one through 74. |
| 11:20:16 | 18 | MR. MAYR:  Judge, your Honor, at this time I'd like to |
| 11:20:18 | 19 | re-invoke the rule as to Special Agents Johnston and Williams |
| 11:20:22 | 20 | that I had previously excused from the rule.  They are present in |
| 11:20:27 | 21 | the courtroom.  I'd ask that the rule be re-implemented as to |
| 11:20:31 | 22 | them and that they be ordered to be removed -- to exit the |
| 11:20:36 | 23 | courtroom. |
| 11:20:36 | 24 | THE COURT:  Members of the jury, I'm going to put you |
| 11:20:37 | 25 | in the jury room. |

| 11:21:11 | 1 | (Jury not present.) |
| 11:21:24 | 2 | THE COURT:  Counsel, y'all have five minutes to work |
| 11:21:32 | 3 | out any problems.  Then I'm going to bring back the jury, and I'm |
| 11:21:36 | 4 | going to tell them how petty that y'all are being.  Five minutes. |
| 11:26:07 | 5 | (Recess.) |
| 11:27:27 | 6 | THE COURT:  Bring them back. |
| 11:27:38 | 7 | (Jury present.) |
| 11:29:18 | 8 | THE COURT:  You may proceed, counsel. |
| 11:29:19 | 9 | MR. MAYR:  I am, your Honor. |
| 11:29:20 | 10 | THE COURT:  Go ahead. |
| 11:29:21 | 11 | CROSS-EXAMINATION |
| 11:29:21 | 12 | BY MR. MAYR: |
| 11:29:22 | 13 | Q.   Good morning, Mr. Graham.  My name is Brent Mayr.  I |
| 11:29:25 | 14 | represent Jesus Huitron. |
| 11:29:27 | 15 | A.   Yes, sir. |
| 11:29:27 | 16 | Q.   You know Jesus is Jesse; is that right? |
| 11:29:29 | 17 | A.   Yes, sir. |
| 11:29:29 | 18 | Q.   And you know him pretty well? |
| 11:29:31 | 19 | A.   Yes, sir. |
| 11:29:32 | 20 | Q.   Before we get into the nature of your relationship, let me |
| 11:29:36 | 21 | first ask you this to set something straight.  Is he a horse |
| 11:29:39 | 22 | trainer? |
| 11:29:40 | 23 | A.   No, sir. |
| 11:29:41 | 24 | Q.   Okay.  I want to first talk with you about some of the |
| 11:29:46 | 25 | things that you testified on direct examination with Mr. Gardner, |

| | | |
|---|---|---|
| 11:29:49 | 1 | and then, we'll talk about your relationship with him. |
| 11:29:52 | 2 | When you first talked about courting, I believe that |
| 11:29:57 | 3 | was your word, courting the owner of Tempting Dash, that is |
| 11:30:01 | 4 | something that you were doing, right? |
| 11:30:02 | 5 | A.    Yes, sir. |
| 11:30:04 | 6 | Q.    All right.  You really wanted their business. |
| 11:30:06 | 7 | A.    I really wanted the horse. |
| 11:30:08 | 8 | Q.    Yeah.  Okay.  And you went to great lengths to get that |
| 11:30:13 | 9 | horse? |
| 11:30:14 | 10 | A.    I did the best I could. |
| 11:30:15 | 11 | Q.    Okay.  We heard about you taking him on this deer hunt, |
| 11:30:21 | 12 | right? |
| 11:30:21 | 13 | A.    Yes, sir.  We went hunting. |
| 11:30:22 | 14 | Q.    And those deer hunts, those aren't -- those are pretty |
| 11:30:26 | 15 | expensive, right? |
| 11:30:28 | 16 | A.    You have to define expensive. |
| 11:30:29 | 17 | Q.    How much did you spend to take -- let's make sure who you |
| 11:30:34 | 18 | took on that deer hunt in South Texas.  Who did you take? |
| 11:30:37 | 19 | A.    I took Jose and I took his son. |
| 11:30:40 | 20 | Q.    Jose and his son? |
| 11:30:41 | 21 | A.    And then, they were the main ones I was taking and then, |
| 11:30:45 | 22 | Adrian Huitron, also. |
| 11:30:46 | 23 | Q.    Did Rodolfo or Rudy go with y'all, as well? |
| 11:30:49 | 24 | A.    No, sir. |
| 11:30:50 | 25 | Q.    So just three of y'all?  I'm sorry.  It was the three of |

| | | |
|---|---|---|
| 11:30:54 | 1 | them plus you, right? |
| 11:30:56 | 2 | A.   Yes, sir.  I believe so. |
| 11:30:57 | 3 | Q.   How much did it cost to take them on this deer hunt? |
| 11:31:00 | 4 | A.   I believe it was around 12,000. |
| 11:31:02 | 5 | Q.   Okay.  So definitely worth a lot if you're spending $12,000 |
| 11:31:07 | 6 | to court their business? |
| 11:31:09 | 7 | A.   You could say that. |
| 11:31:10 | 8 | Q.   What other attempts did you -- or what other expenses did |
| 11:31:14 | 9 | you incur in trying to get that horse, in your own words? |
| 11:31:19 | 10 | A.   I don't know of any other major expenses other than just -- |
| 11:31:24 | 11 | I can't think of any other major expenses. |
| 11:31:28 | 12 | Q.   Okay.  But there were expenses? |
| 11:31:29 | 13 | A.   I mean, maybe if I took them to lunch or something. |
| 11:31:32 | 14 | Q.   Did you ever offer money to my client or to his brother |
| 11:31:34 | 15 | "Chevo" to encourage them to -- to talk them into or talk Jose |
| 11:31:39 | 16 | and Rudy into bringing Tempting Dash to you? |
| 11:31:42 | 17 | A.   No, sir.  I did not. |
| 11:31:43 | 18 | Q.   Okay.  Fair enough. |
| 11:31:44 | 19 |       Now, at some point when you and Mr. Lawson began |
| 11:31:56 | 20 | working together, you're providing him and telling him everything |
| 11:32:00 | 21 | that's going on in regards to your dealing with the transactions |
| 11:32:03 | 22 | with these horses, right? |
| 11:32:05 | 23 | A.   I wouldn't say we were working together, and I wasn't |
| 11:32:07 | 24 | telling him everything that was going on. |
| 11:32:09 | 25 | Q.   Okay.  But you were communicating a lot of what was actually |

| | | |
|---|---|---|
| 11:32:12 | 1 | taking place there? |
| 11:32:14 | 2 | A.   I was commun -- I was answering the questions they asked. |
| 11:32:16 | 3 | Q.   Okay.  During all of these questioning and providing |
| 11:32:22 | 4 | information, did you ever tell them anything about Jesse Huitron |
| 11:32:25 | 5 | and what he was doing? |
| 11:32:26 | 6 | A.   About Jesse? |
| 11:32:27 | 7 | Q.   Uh-huh. |
| 11:32:28 | 8 | A.   About his part in it or -- |
| 11:32:30 | 9 | Q.   Anything. |
| 11:32:31 | 10 | A.   We probably talked about Jesse on a few occasions. |
| 11:32:34 | 11 | Q.   Okay.  Just a few occasions? |
| 11:32:35 | 12 | A.   Probably.  Yes, sir. |
| 11:32:36 | 13 | Q.   All right.  Now, when you -- I want to talk with you about |
| 11:32:40 | 14 | this "they" and "them" that you referred to. |
| 11:32:42 | 15 |      Did you consider Jesse to be a part of "they" and |
| 11:32:45 | 16 | "them" that you've continually referred to throughout your |
| 11:32:49 | 17 | testimony? |
| 11:32:49 | 18 | A.   No, sir.  In most cases, no. |
| 11:32:50 | 19 | Q.   Okay.  Now, I want to talk with you about this IBC account |
| 11:32:58 | 20 | that you talked about with Mr. Gardner.  You've testified that |
| 11:33:04 | 21 | Carlos Nayen asked you to establish a bank account at one of the |
| 11:33:07 | 22 | banks so that he could -- they could transfer money from their |
| 11:33:10 | 23 | account into your account; is that right? |
| 11:33:12 | 24 | A.   That's right. |
| 11:33:12 | 25 | Q.   And so, you went to the IBC Bank in Bastrop because that was |

| | | |
|---|---|---|
| 11:33:16 | 1 | the closest one to you? |
| 11:33:17 | 2 | A.   Yes, sir. |
| 11:33:18 | 3 | Q.   Okay.  Now, if I understand this correctly, shortly after |
| 11:33:25 | 4 | that happens, you get a call from your banker saying, we're going |
| 11:33:29 | 5 | to close this bank account down because of what's happening in |
| 11:33:32 | 6 | this account; is that right? |
| 11:33:34 | 7 | A.   Well, he called me and -- he said, are you aware of some |
| 11:33:38 | 8 | cash deposits that are going into your account?  And I said, no, |
| 11:33:40 | 9 | sir.  I didn't even have all my banking and everything set up at |
| 11:33:44 | 10 | that time. |
| 11:33:44 | 11 | Q.   Good.  Let me talk with you about that. |
| 11:33:47 | 12 |      So you don't learn until after the fact that what's |
| 11:33:51 | 13 | really happening is that Carlos Nayen and his associates are |
| 11:33:55 | 14 | depositing cash into your account, right? |
| 11:33:57 | 15 | A.   Yes, sir. |
| 11:33:58 | 16 | Q.   And you're not reviewing your bank account statement every |
| 11:34:01 | 17 | single day or going into the bank and asking them what sort of |
| 11:34:04 | 18 | activity is taking place? |
| 11:34:05 | 19 | A.   Correct. |
| 11:34:06 | 20 | Q.   Now, let me ask you just a little bit about your setup at |
| 11:34:10 | 21 | Southwest Stallion Station.  Do you have secretaries, office |
| 11:34:14 | 22 | people, or is it just you working there? |
| 11:34:15 | 23 | A.   No, sir.  We have a secretary. |
| 11:34:17 | 24 | Q.   All right.  And who handles all of the billing and receiving |
| 11:34:21 | 25 | of the payments at your Southwest Stallion Station? |

11:34:23   1   A.   Typically secretaries.

11:34:25   2   Q.   Okay.  And so, they weren't telling you, hey, Tyler, you

11:34:31   3   need to know about this money being deposited into the account,

11:34:34   4   did they?

11:34:35   5   A.   No, sir.

11:34:35   6   Q.   Okay.  A lot of times?

11:34:40   7   A.   They weren't managing that account either.

11:34:42   8   Q.   Okay.  Fair enough.

11:34:45   9        Would you monitor Southwest Stallion's business

11:34:52   10   accounts on a frequent basis, or would they be monitoring those

11:34:55   11   transactions?

11:34:56   12   A.   We both monitored on a frequent basis.

11:34:59   13   Q.   Okay.  Now, I want to jump ahead and talk about these

11:35:14   14   conversations that you were having with Victor Lopez.  At one

11:35:22   15   point, you testified that, no one told me how to apply it, I just

11:35:28   16   applied it to their accounts; is that right?

11:35:29   17   A.   Yes, sir.

11:35:29   18   Q.   Is it fair to say that trying to figure out who owed what

11:35:33   19   with regards to what horse was a typical thing to do there at

11:35:37   20   Southwest Stallion Station in regards to these horses that were

11:35:44   21   coming from Carlos Nayen?

11:35:47   22   A.   Well, I mean, I had -- at one point, I had several accounts,

11:35:50   23   I don't know, maybe eight or ten accounts with different horses

11:35:54   24   under different accounts and money coming from one source.  Like

11:35:59   25   I said, I would just make it to the best of my ability to apply

| | | |
|---|---|---|
| 11:36:05 | 1 | it to the accounts. |
| 11:36:06 | 2 | Q.    To the best of your ability? |
| 11:36:07 | 3 | A.    Yes. |
| 11:36:08 | 4 | Q.    Because it was confusing at times, right? |
| 11:36:10 | 5 | A.    Well, I don't like to get deposits in and not apply them to |
| 11:36:13 | 6 | accounts. |
| 11:36:13 | 7 | Q.    Right.  And so, trying to figure out where this payment -- |
| 11:36:17 | 8 | if this payment goes to this horse or this horse or this horse, |
| 11:36:20 | 9 | not an easy thing to do? |
| 11:36:21 | 10 | A.    It wasn't really on specific horses.  It was more on |
| 11:36:24 | 11 | specific accounts. |
| 11:36:25 | 12 | Q.    Okay.  Let's talk about your relationship with Jesse.  When |
| 11:36:33 | 13 | did you first meet my client Jesse Huitron? |
| 11:36:35 | 14 | A.    Probably around the same time I met "Chevo," like 2007, 8. |
| 11:36:41 | 15 | Somewhere in there.  I don't remember exact date. |
| 11:36:43 | 16 | Q.    Okay.  You know he's "Chevo's" brother? |
| 11:36:46 | 17 | A.    Yes, sir. |
| 11:36:47 | 18 | Q.    You know he's not a horse trainer? |
| 11:36:48 | 19 | A.    Yes, sir. |
| 11:36:48 | 20 | Q.    You know that he's in the home-building business? |
| 11:36:52 | 21 | A.    Yes, sir. |
| 11:36:52 | 22 | Q.    What do you know about his home-building business? |
| 11:36:57 | 23 | A.    I just know that he builds custom homes.  You know, I've |
| 11:37:01 | 24 | seen some of his spec homes that he built.  I mean, just custom |
| 11:37:05 | 25 | home builder, as far as I know. |

| | | |
|---|---|---|
| 11:37:06 | 1 | Q.   Okay.  Is he pretty good at it? |
| 11:37:08 | 2 | A.   I think he -- yeah.  The homes I've seen were pretty nice |
| 11:37:11 | 3 | homes. |
| 11:37:11 | 4 | Q.   Okay.  Now, is he one of these guys that sits at an office |
| 11:37:15 | 5 | all day, or is he out there at the job site supervising the |
| 11:37:17 | 6 | building of these homes? |
| 11:37:19 | 7 | A.   I wouldn't describe him as the office type. |
| 11:37:21 | 8 | Q.   Okay.  So he's usually out in the field working at the job |
| 11:37:24 | 9 | sites, right? |
| 11:37:26 | 10 | A.   I haven't witnessed him working out there, but I'm assuming |
| 11:37:30 | 11 | he's in and out of the job sites. |
| 11:37:32 | 12 | Q.   You know he has a pretty large family, right? |
| 11:37:34 | 13 | A.   Yes, sir. |
| 11:37:34 | 14 | Q.   I'm going to show you what's been marked as Government's |
| 11:37:45 | 15 | Exhibit 364, ATX CC.  That's a photograph, correct? |
| 11:37:51 | 16 | A.   Yes, sir. |
| 11:37:51 | 17 | Q.   And do you recognize the two individuals in that photograph? |
| 11:37:54 | 18 | A.   Yes, sir. |
| 11:37:54 | 19 | Q.   Who are they? |
| 11:37:56 | 20 | A.   Jessica Huitron and Sergio Rincon. |
| 11:38:05 | 21 | Q.   Judge, the government and I have an agreement to offer |
| 11:38:09 | 22 | Government's Exhibit 364ATX CC into evidence at this time. |
| 11:38:16 | 23 |         THE COURT:  Hearing no objection, it's received. |
| 11:38:18 | 24 |         MR. MAYR:  Thank you, Judge. |
| 11:38:19 | 25 | Q.   (BY MR. MAYR) That's Jessica, correct? |

| | | |
|---|---|---|
| 11:38:43 | 1 | A.   Yes, sir. |
| 11:38:43 | 2 | Q.   That's who you've testified before Sergio Rincon? |
| 11:38:47 | 3 | A.   Yes, sir. |
| 11:38:49 | 4 | Q.   Or "Saltillo" as you know him, right? |
| 11:38:51 | 5 | A.   Correct. |
| 11:38:52 | 6 | Q.   Okay.  Now, you've been to the office, you've been to their |
| 11:38:58 | 7 | office on -- over there on 183 by the airport; is that right? |
| 11:39:02 | 8 | A.   I've been there. |
| 11:39:03 | 9 | Q.   Again, there isn't a fancy high-rise office by any means? |
| 11:39:06 | 10 | A.   No, sir, it's not. |
| 11:39:07 | 11 | Q.   Okay.  How many times would you say that you have been to |
| 11:39:10 | 12 | that office over the past five years or the time that you've |
| 11:39:13 | 13 | known the Huitrons? |
| 11:39:14 | 14 | A.   I've probably been there six or eight times maybe. |
| 11:39:17 | 15 | Q.   The times that you've been there, did you ever see my client |
| 11:39:21 | 16 | Jesse there? |
| 11:39:21 | 17 | A.   Yes, sir. |
| 11:39:22 | 18 | Q.   Okay.  Did you also see Jessica there? |
| 11:39:25 | 19 | A.   Yes, sir. |
| 11:39:25 | 20 | Q.   Okay.  And Jessica's sitting there, she's got the computer. |
| 11:39:30 | 21 | To your knowledge, she's the one that's keeping track of all the |
| 11:39:33 | 22 | transactions that are occurring there at the business; is that |
| 11:39:36 | 23 | right? |
| 11:39:36 | 24 | A.   Yes, sir.  She was bookkeeper, I would say. |
| 11:39:38 | 25 | Q.   Okay.  Would you ever -- anytime you had any dealings, would |

| | | |
|---|---|---|
| 11:39:45 | 1 | you ever -- whenever you had any dealings with the Huitrons and |
| 11:39:49 | 2 | horses, did you find yourself talking with her quite frequently? |
| 11:39:53 | 3 | A.    I talked to Jessica on a regular basis. |
| 11:39:57 | 4 | Q.    Okay.  And if there was something that she needed, would she |
| 11:40:03 | 5 | communicate with you via e-mail? |
| 11:40:04 | 6 | A.    We maybe -- some e-mails probably but mainly just phone |
| 11:40:08 | 7 | calls. |
| 11:40:08 | 8 | Q.    Okay.  Jesse Huitron's primary business, was it the home |
| 11:40:33 | 9 | building or was it the horse training? |
| 11:40:36 | 10 | A.    I would say his primary business is home building. |
| 11:40:39 | 11 | Q.    Okay.  The horse -- you testified during direct examination |
| 11:40:46 | 12 | that Jesse ran the business and made business decisions; is that |
| 11:40:50 | 13 | right? |
| 11:40:50 | 14 | A.    With the horse business or? |
| 11:40:52 | 15 | Q.    Let's start with the home business.  Did he make those |
| 11:40:56 | 16 | decisions, to your knowledge, with -- was he the one making those |
| 11:40:59 | 17 | decisions? |
| 11:40:59 | 18 | A.    Yes.  I would say so. |
| 11:41:01 | 19 | Q.    Is it your position that he ran the business in terms of the |
| 11:41:04 | 20 | horses? |
| 11:41:06 | 21 | A.    I would say him and "Chevo" co-managed it to some extent. |
| 11:41:11 | 22 | Q.    Okay.  Who would send the bills out for -- or who would be |
| 11:41:15 | 23 | in charge of sending bills out or telling people, you owe money? |
| 11:41:19 | 24 | A.    That came out of Jesse's office. |
| 11:41:21 | 25 | Q.    When you say it came out of Jesse's office, it was coming |

| 11:41:24 | 1 | from Jessica, right? |
| 11:41:25 | 2 | A.   Most of the time. |
| 11:41:27 | 3 | Q.   Most of the time.  And when payments were being collected, |
| 11:41:31 | 4 | okay, was it going to Jessica or was it going to my client Jesse? |
| 11:41:36 | 5 | A.   I assume it wasn't going to Jessica.  It wasn't her |
| 11:41:40 | 6 | business. |
| 11:41:40 | 7 | Q.   Okay.  But she's in the office, right? |
| 11:41:43 | 8 | A.   Yes. |
| 11:41:43 | 9 | Q.   She's in front of the computer, right? |
| 11:41:45 | 10 | A.   Right. |
| 11:41:45 | 11 | Q.   The bank statements are coming into her, all the mail's |
| 11:41:49 | 12 | coming into the office, right? |
| 11:41:51 | 13 | A.   I'm assuming she's the one that reviewed the mail.  I don't |
| 11:41:53 | 14 | know who reviewed their mail. |
| 11:41:55 | 15 | Q.   Okay.  To your knowledge, though, she's the one who is |
| 11:42:11 | 16 | handling all of the nitty-gritty work of the horse-training |
| 11:42:15 | 17 | business, right? |
| 11:42:16 | 18 | A.   Like I said, I describe her as a bookkeeper. |
| 11:42:18 | 19 | Q.   Okay.  I'll show you what's been admitted as Government's |
| 11:42:32 | 20 | Exhibit No. 55A.  That appears to be -- that's a -- there's a fax |
| 11:42:38 | 21 | cover from Elgin Veterinary Hospital, correct? |
| 11:42:40 | 22 | A.   Yes, sir. |
| 11:42:40 | 23 | Q.   And it says, to Jessica, right? |
| 11:42:43 | 24 | A.   Right. |
| 11:42:49 | 25 | Q.   Showing you 55B, another fax from Elgin Veterinary Hospital |

| | | |
|---|---|---|
| 11:42:55 | 1 | to Jessica, right? |
| 11:42:56 | 2 | A.   That's what it says. |
| 11:42:57 | 3 | Q.   And that's her handwriting right there? |
| 11:42:59 | 4 | A.   It appears to be. |
| 11:43:00 | 5 | Q.   Okay.  And 55C with the list of horses has her name on it, |
| 11:43:09 | 6 | correct? |
| 11:43:10 | 7 | A.   Yes, sir. |
| 11:43:12 | 8 | Q.   Going back to 55B, this list of horses, that appears to be |
| 11:43:18 | 9 | her handwriting of the owners of each one of these horses? |
| 11:43:22 | 10 | A.   It appears to be. |
| 11:43:33 | 11 | Q.   Government's 56.  This is a file for, appears to be, |
| 11:43:39 | 12 | Fernando Garcia, right? |
| 11:43:40 | 13 | A.   Yes, sir. |
| 11:43:45 | 14 | Q.   And the handwriting here appears to be on Jessica's? |
| 11:43:47 | 15 | A.   Once again, it appears to be, but I don't know that that's |
| 11:43:49 | 16 | her handwriting. |
| 11:43:50 | 17 | Q.   All right.  And on the file also contained within |
| 11:43:58 | 18 | Government's Exhibit 56, this invoice of Fernando Garcia, the |
| 11:44:01 | 19 | writing appears to be Jessica's? |
| 11:44:03 | 20 | A.   Same thing. |
| 11:44:04 | 21 | Q.   Government's 60A, the writing with all of these names of |
| 11:44:19 | 22 | horses, like Forty Force, Viva Mexico, these dollar amounts |
| 11:44:25 | 23 | appears to be in Jessica's writing? |
| 11:44:26 | 24 | A.   Appears to look like the same handwriting. |
| 11:44:32 | 25 | Q.   I don't want to keep going on.  I'm going to show you just, |

| | | |
|---|---|---|
| 11:44:48 | 1 | finally, Exhibit No. 72.  That's an e-mail to Jessica Huitron, |
| 11:44:52 | 2 | right? |
| 11:44:53 | 3 | A.    Yes. |
| 11:44:54 | 4 | Q.    From this Anri2319, a Hotmail address? |
| 11:44:58 | 5 | A.    Correct. |
| 11:44:59 | 6 | Q.    So based on these documents right here, which were obtained |
| 11:45:07 | 7 | from that office, it appears that Jessica has a lot of work |
| 11:45:10 | 8 | involved in all this, correct? |
| 11:45:12 | 9 | A.    She did a lot of paperwork. |
| 11:45:13 | 10 | Q.    Okay.  We heard you testify about -- let me ask you one more |
| 11:45:26 | 11 | question before we move on. |
| 11:45:31 | 12 | We see Jessica in this photo here in Government's |
| 11:45:35 | 13 | Exhibit 364CC.  Jessica with Sergio Rincon.  Looks like they're |
| 11:45:40 | 14 | having a good time together; is that right? |
| 11:45:42 | 15 | A.    They look happy. |
| 11:45:44 | 16 | Q.    To your knowledge, did Jessica have a lot of interaction |
| 11:45:47 | 17 | with individuals like Rincon and Carlos Nayen or Jose Trevino, to |
| 11:45:54 | 18 | your knowledge? |
| 11:45:56 | 19 | A.    I'm sure she was around them quite a bit. |
| 11:45:58 | 20 | Q.    I'm just asking, do you know for certain whether she was or |
| 11:46:00 | 21 | not? |
| 11:46:00 | 22 | A.    No.  I do not know for certain. |
| 11:46:03 | 23 | Q.    Okay.  Now, you talked about the circumstance with Carlos |
| 11:46:10 | 24 | Nayen shows up at Southwest Stallion Station and he's got a bag |
| 11:46:12 | 25 | of -- large bag of cash; is that right? |

| | | |
|---|---|---|
| 11:46:14 | 1 | A.   Yes. |
| 11:46:15 | 2 | Q.   To pay his bills.  In all of your dealings with my client |
| 11:46:19 | 3 | Jesse Huitron, has he ever shown up at Southwest Stallion with a |
| 11:46:23 | 4 | bag full of cash to pay his bills? |
| 11:46:24 | 5 | A.   No, sir. |
| 11:46:25 | 6 | Q.   Have you ever had any problems with him not paying his bills |
| 11:46:29 | 7 | that he owes you? |
| 11:46:30 | 8 | A.   He's always paid his bills. |
| 11:46:31 | 9 | Q.   You all have a pretty -- you all have worked together as far |
| 11:46:38 | 10 | as training horses, correct? |
| 11:46:39 | 11 | A.   That's correct. |
| 11:46:40 | 12 | Q.   Could you tell the ladies and gentlemen of the jury a little |
| 11:46:42 | 13 | bit about that? |
| 11:46:42 | 14 | A.   Like I said, I've bred some of his mares, had them at the |
| 11:46:47 | 15 | ranch.  I stood a stallion that they owned one time. |
| 11:46:50 | 16 | Q.   What else? |
| 11:46:52 | 17 | A.   We partnered on that particular stallion on a race one time. |
| 11:46:57 | 18 | Q.   You partnered with him working together on that, right? |
| 11:47:00 | 19 | A.   Yes, sir.  We partnered on mares, also. |
| 11:47:03 | 20 | Q.   Tahiti Cartel? |
| 11:47:06 | 21 | A.   That was a baby that we raised together. |
| 11:47:08 | 22 | Q.   So you're raising horses with this gentleman sitting right |
| 11:47:11 | 23 | here? |
| 11:47:12 | 24 | A.   We raised some horses together.  Yes. |
| 11:47:14 | 25 | Q.   Okay.  Any problems with that? |

| | | |
|---|---|---|
| 11:47:21 | 1 | A.    Not particularly problems. |
| 11:47:23 | 2 | Q.    He wasn't trying to cheat you out of anything or anything, |
| 11:47:26 | 3 | was he? |
| 11:47:26 | 4 | A.    I don't feel like he tried to cheat me out of anything. |
| 11:47:29 | 5 | Q.    In fact, would you consider that your dealings with him have |
| 11:47:32 | 6 | been fair? |
| 11:47:33 | 7 | A.    I think they've been fair. |
| 11:47:34 | 8 | Q.    They've been honest? |
| 11:47:35 | 9 | A.    Honest. |
| 11:47:42 | 10 | Q.    How long ago was that that you all bred these horses |
| 11:48:01 | 11 | together? |
| 11:48:02 | 12 | A.    We bred them probably from 2007 or 8 till -- like until |
| 11:48:08 | 13 | maybe 2011, I would say.  It was the last time I had mares at the |
| 11:48:11 | 14 | ranch that Jesse owned.  We might have bred a few last year, |
| 11:48:16 | 15 | actually.  Not partnered, but I think he brought some mares just |
| 11:48:20 | 16 | for us to breed for him. |
| 11:48:21 | 17 | Q.    Did you have any regrets about that? |
| 11:48:23 | 18 | A.    No, sir. |
| 11:48:25 | 19 | Q.    I have no further questions, your Honor. |
| 11:48:28 | 20 |         THE COURT:  Any redirect? |
| 11:48:29 | 21 |         MR. GARDNER:  Yes, your Honor. |
| 11:48:31 | 22 |                RE-DIRECT EXAMINATION |
| 11:48:31 | 23 | BY MR. GARDNER: |
| 11:48:35 | 24 | Q.    Mr. Graham, yesterday, there was a phone call that we played |
| 11:48:42 | 25 | and as you were talking to Fernando Garcia, and I believe the |

| 11:48:46 | 1 | line was, quote, we don't win enough for all the horses we have. |
| 11:48:50 | 2 | Do you recall that from yesterday? |
| 11:48:50 | 3 | A.   Yes, sir. |
| 11:48:53 | 4 | Q.   Would you call the assets -- the horses that this group had, |
| 11:48:59 | 5 | how would you rate the quality of that group of horses? |
| 11:49:01 | 6 | A.   High quality.  Very high quality. |
| 11:49:04 | 7 | Q.   And when Ms. Williams asked you if you ever received cash |
| 11:49:07 | 8 | before, I believe your response was maybe 20 times? |
| 11:49:10 | 9 | A.   I just guessed out of a number off the top of my head. |
| 11:49:14 | 10 | Q.   But you also said, never on this scale.  What did you mean |
| 11:49:17 | 11 | by that? |
| 11:49:17 | 12 | A.   I meant that typical clients that pay in cash, it's -- |
| 11:49:22 | 13 | usually it's been a lot smaller amount, total amount. |
| 11:49:27 | 14 | Q.   Now, did you ever receive an amount of cash personally in |
| 11:49:32 | 15 | excess of $10,000 and made separate deposits less than $10,000 on |
| 11:49:37 | 16 | the same day? |
| 11:49:37 | 17 | A.   Yes, sir. |
| 11:49:41 | 18 | Q.   And for the cash that you were receiving with this group, |
| 11:49:47 | 19 | were they legitimate services performed for that group? |
| 11:49:50 | 20 | A.   Yes, sir. |
| 11:49:51 | 21 | Q.   Legitimate horse services? |
| 11:49:53 | 22 | A.   Yes, sir. |
| 11:49:56 | 23 | Q.   And did you know where the money came from? |
| 11:49:59 | 24 | A.   I don't know where it originated from. |
| 11:50:01 | 25 | Q.   Now, Mr. Esper asked you about three questions.  I just want |

| | | |
|---|---|---|
| 11:50:07 | 1 | to see if you remember these. |
| 11:50:09 | 2 | He said that "Chevo" Huitron told you he represented a |
| 11:50:14 | 3 | group of owners in Mexico.  Do you remember that? |
| 11:50:17 | 4 | A.   Yes, sir. |
| 11:50:17 | 5 | Q.   And Mr. Esper asked, did he, being "Chevo" Huitron, say |
| 11:50:21 | 6 | anything was wrong with this group?  And I believe your response |
| 11:50:25 | 7 | was, not initially. |
| 11:50:26 | 8 | A.   Yes, sir. |
| 11:50:27 | 9 | Q.   And finally, he asked, you don't know if an owner from |
| 11:50:30 | 10 | Mexico is legitimate or not.  Do you recall those three |
| 11:50:34 | 11 | questions? |
| 11:50:34 | 12 | A.   Yes, sir. |
| 11:50:35 | 13 | Q.   I want to turn your attention back to a conversation that |
| 11:50:38 | 14 | you had with "Chevo" Huitron about Mr. Villarreal.  What did Mr. |
| 11:50:45 | 15 | "Chevo" Huitron say happened to Ramiro Villarreal? |
| 11:50:48 | 16 | MR. ESPER:  I'd object to that being hearsay, your |
| 11:50:48 | 17 | Honor. |
| 11:50:51 | 18 | MS. WILLIAMS:  Objection, your Honor. |
| 11:50:51 | 19 | MR. GARDNER:  Your Honor, that is an admission by the |
| 11:50:52 | 20 | party opponent to show his knowledge. |
| 11:50:56 | 21 | THE COURT:  It's been brought up by cross-examination. |
| 11:50:59 | 22 | I overrule the objection. |
| 11:51:00 | 23 | Q.   (BY MR. GARDNER) You may answer that question. |
| 11:51:02 | 24 | A.   He asked me if I heard that Ramiro died. |
| 11:51:04 | 25 | Q.   And had you heard that Ramiro died? |

| | | |
|---|---|---|
| 11:51:06 | 1 | A.   Yes, I had. |
| 11:51:07 | 2 | Q.   And what did he indicate to you who might have killed or how |
| 11:51:11 | 3 | Ramiro Villarreal died? |
| 11:51:12 | 4 | A.   He didn't indicate anybody specifically. |
| 11:51:15 | 5 | Q.   Did you have a conversation also about the death of |
| 11:51:21 | 6 | Alejandro Barradas? |
| 11:51:22 | 7 | A.   Yes, sir. |
| 11:51:22 | 8 | Q.   And what did Mr. "Chevo" Huitron say with respect to that |
| 11:51:25 | 9 | incident? |
| 11:51:25 | 10 | A.   He said he heard he'd been kidnapped. |
| 11:51:27 | 11 | Q.   And did you -- |
| 11:51:28 | 12 | A.   And never came back. |
| 11:51:29 | 13 | Q.   And never came back. |
| 11:51:39 | 14 |      To your knowledge, did 29-year-old Jessica Huitron make |
| 11:51:41 | 15 | any of the business decisions for Huitron Homes? |
| 11:51:44 | 16 | A.   I wouldn't say she made business decisions. |
| 11:51:47 | 17 | Q.   Make any business decisions for the horse-racing business? |
| 11:51:51 | 18 | A.   Not business decisions.  No, sir. |
| 11:51:53 | 19 | Q.   Do you know who the account signatories are on Huitron |
| 11:51:58 | 20 | Homes' bank account? |
| 11:51:58 | 21 | A.   I'm not aware of that. |
| 11:51:59 | 22 | Q.   Were you aware if Jesse Huitron has deposited over $110,000 |
| 11:52:04 | 23 | in cash personally himself? |
| 11:52:06 | 24 |      MR. MAYR:  Objection to the form of the question, |
| 11:52:08 | 25 | leading, and lack of personal knowledge. |

| | | |
|---|---|---|
| 11:52:11 | 1 | THE COURT:  Well, I'll sustain the leading part. |
| 11:52:13 | 2 | Q.   (BY MR. GARDNER) Have you ever examined the Huitron Homes' |
| 11:52:18 | 3 | banking accounts? |
| 11:52:19 | 4 | A.   No, sir. |
| 11:52:19 | 5 | Q.   Were you aware of how they managed their finances? |
| 11:52:23 | 6 | A.   No, sir. |
| 11:52:24 | 7 | Q.   That's all the questions I have, your Honor. |
| 11:52:27 | 8 | MS. WILLIAMS:  Nothing further, your Honor. |
| 11:52:30 | 9 | MR. DEGEURIN:  No, your Honor. |
| 11:52:31 | 10 | MR. WOMACK:  Nothing, your Honor. |
| 11:52:33 | 11 | MR. ESPER:  I have nothing further. |
| 11:52:34 | 12 | MR. MAYR:  Nor do I, your Honor. |
| 11:52:35 | 13 | THE COURT:  May this witness be excused? |
| 11:52:37 | 14 | MS. WILLIAMS:  Yes, sir. |
| 11:52:38 | 15 | THE COURT:  You may be excused. |
| 11:52:42 | 16 | Okay.  Well, hadn't been too profitable a morning, but |
| 11:52:46 | 17 | the morning is gone, anyway.  Whether it was profitable or not, |
| 11:52:50 | 18 | you probably will be able to eat lunch.  So I'll let you go for |
| 11:52:54 | 19 | lunch.  Remember the instructions.  We'll start at 1:20, please. |
| 11:52:58 | 20 | 1:20 and have a nice lunch.  Remember the instructions.  Be able |
| 11:53:02 | 21 | to answer those questions. |
| 11:53:35 | 22 | (Jury not present.) |
| 11:53:43 | 23 | THE COURT:  We're in recess till 1:20. |
| 11:53:46 | 24 | MR. GARDNER:  Excuse me, may I bring up one matter?  I |
| 11:53:48 | 25 | apologize. |

| | | |
|---|---|---|
| 11:53:48 | 1 | THE COURT:  Yes.  You may be seated. |
| 11:53:50 | 2 | MR. GARDNER:  Your Honor, in discussions at the brief |
| 11:53:52 | 3 | break with Mr. Mayr, he indicated that he had some objections to |
| 11:53:55 | 4 | the images found on the computer seized at the various locations. |
| 11:54:01 | 5 | Mostly, he made the statement that he believes many of these |
| 11:54:06 | 6 | images or pictures are more prejudicial than probative.  Your |
| 11:54:09 | 7 | Honor, I know the Court doesn't like to preview evidence before |
| 11:54:12 | 8 | it's offered.  We have a stack of photos from the various search |
| 11:54:16 | 9 | warrant sites and documents.  We believe, again, they are |
| 11:54:19 | 10 | admissions -- nonverbal admissions to show knowledge.  I didn't |
| 11:54:22 | 11 | want to slow the Court down if they wanted to review those over |
| 11:54:25 | 12 | lunch. |
| 11:54:26 | 13 | What is not in these pictures, your Honor, is the |
| 11:54:29 | 14 | government has removed a number of severed heads, a number of |
| 11:54:32 | 15 | dead bodies, a number of decapitated and mangled bodies from the |
| 11:54:36 | 16 | pictures.  There's only one picture in there, in my opinion, that |
| 11:54:41 | 17 | is of a dead body, but it has a Z inscribed on its chest. |
| 11:54:47 | 18 | THE COURT:  All right.  Slow down.  Tell me where -- |
| 11:54:48 | 19 | these were obtained as a result of search warrants on whom? |
| 11:54:51 | 20 | MR. GARDNER:  Your Honor, on June 12th, officers |
| 11:54:53 | 21 | executed a search warrant.  So Government's Exhibit 364OK is from |
| 11:54:59 | 22 | Oklahoma.  There's a series of pictures in there. |
| 11:55:02 | 23 | THE COURT:  On the Trevino ranch? |
| 11:55:03 | 24 | MR. GARDNER:  On the Trevino ranch.  Government's |
| 11:55:05 | 25 | Exhibit 364ATX is seized from the Huitron business on 183. |

11:55:12  1  Government's Exhibit 364CA was obtained from Carlos Nayen's

11:55:18  2  computers.

11:55:19  3            THE COURT:  In which -- what number is that?

11:55:22  4            MR. GARDNER:  364CA, your Honor, for California.  And

11:55:26  5  Government's Exhibit 364NM is series of photos and documents

11:55:31  6  discovered on Fernando Garcia's computer in New Mexico.

11:55:39  7            THE COURT:  Any objections to the Court reviewing these

11:55:43  8  pictures during the noon hour?

11:55:45  9            MR. MAYR:  I don't, your Honor.

11:55:46  10            MR. WOMACK:  None.

11:55:48  11            MR. MAYR:  Do you want to try -- Doug, do you want to

11:55:51  12  try to see if we can agree and I could specify which ones I have

11:55:54  13  objection to?  That way, the Court's not having to look at them

11:55:57  14  all.

11:55:57  15            THE COURT:  Well, I've already looked at over 300

11:56:00  16  pages.  So this will be an ice cream.

11:56:03  17            MR. MAYR:  Okay.

11:56:05  18            THE COURT:  If you'll get those up, please.

11:56:12  19            MR. GARDNER:  Thank you, your Honor.

11:56:14  20            (Lunch recess.)

13:22:42  21            THE COURT:  Counsel, I'm returning the stack of

13:22:55  22  exhibits.  I looked at them briefly during the recess.  I've had

13:22:59  23  a few other things during the recess I had to do that pertain to

13:23:06  24  other cases.  There's just way too many of those exhibits for me

13:23:10  25  to have any idea.  You're just going to have to introduce them

| | | |
|---|---|---|
| 13:23:13 | 1 | one at a time and object to them one at a time. |
| 13:23:16 | 2 | MR. GARDNER:  Okay.  Thank you, your Honor. |
| 13:23:18 | 3 | THE COURT:  All right.  Bring the jury in. |
| 13:23:29 | 4 | MR. MAYR:  Your Honor, very briefly.  For the record, I |
| 13:23:31 | 5 | just want the record to reflect that I have excused -- I had |
| 13:23:34 | 6 | previously reserved the right to recall Special Agents Johnston |
| 13:23:37 | 7 | and Billy Williams.  I'd like the record to reflect that I have |
| 13:23:41 | 8 | -- am excusing them.  I do not believe that I need to recall |
| 13:23:46 | 9 | them. |
| 13:23:47 | 10 | THE COURT:  All right. |
| 13:23:47 | 11 | MR. MAYR:  Thank you. |
| 13:24:06 | 12 | (Jury present.) |
| 13:25:20 | 13 | THE COURT:  Members of the jury, during the noon break, |
| 13:25:23 | 14 | did anyone attempt to talk to you about this case? |
| 13:25:25 | 15 | JURORS:  No. |
| 13:25:26 | 16 | THE COURT:  Have you talked to anyone about the case? |
| 13:25:28 | 17 | JURORS:  No. |
| 13:25:28 | 18 | THE COURT:  And have you learned anything at all about |
| 13:25:30 | 19 | this case, outside the presence of each other in this courtroom? |
| 13:25:33 | 20 | JURORS:  No. |
| 13:25:34 | 21 | THE COURT:  Show negative responses to all questions. |
| 13:25:38 | 22 | You may call your next witness. |
| 13:25:39 | 23 | MR. GARDNER:  Your Honor, I believe to the relief of |
| 13:25:42 | 24 | all, the government has two witnesses left, and those are the |
| 13:25:45 | 25 | case agents.  We would call Special Agent Steve Pennington. |

| 13:25:59 | 1 | (Witness sworn.) |

13:26:06   2          MR. DEGEURIN:  Excuse me one second.  Your Honor, at

13:26:12   3   the beginning, I had requested that the two agents not be in the

13:26:16   4   courtroom when each other testifying.  You took that under

13:26:19   5   advisement.  I want to invoke the rule again with the agents.

13:26:23   6          THE COURT:  All right.  I'm going to excuse them both

13:26:25   7   and overrule your request.

13:26:37   8          If you'll tell me your full name, please, and spell

13:26:38   9   your last.

13:26:39  10          THE WITNESS:  Steve Pennington, P-E-N-N-I-N-G-T-O-N.

13:26:39  11          THE COURT:  You may proceed.

13:26:43  12      STEVE PENNINGTON, called by the Government, duly sworn.

13:26:43  13                      DIRECT EXAMINATION

13:26:43  14   BY MR. GARDNER:

13:26:44  15   Q.   Thank you, your Honor.

13:26:46  16          Special Agent Pennington, you've been sitting there for

13:26:47  17   a long time.  Could you please introduce yourself to the jury and

13:26:51  18   tell them what you do for a living?

13:26:52  19   A.   Yes, sir.  My name is Steve Pennington.  I'm a special agent

13:26:54  20   with the Internal Revenue Service, Criminal Investigation

13:26:57  21   Division.

13:26:57  22   Q.   And how long have you been with the Internal Revenue

13:26:59  23   Service?

13:26:59  24   A.   Approximately 29 years, a little over 28 years as a special

13:27:04  25   agent with IRS Criminal Investigations.

13:27:06  1   Q.   And to help things along, you investigate the same type of

13:27:10  2   crimes as Special Agent Williams and Special Agent Fernald?

13:27:13  3   A.   Yes.

13:27:13  4   Q.   Now, I want to start out with a couple of accounts.  I'm

13:27:18  5   showing you Government's Exhibit 256B, particularly page 41-90.

13:27:26  6   Is this the Huitron Wells Fargo account?

13:27:30  7   A.   Yes, sir, it is.

13:27:35  8   Q.   And just for the record, who are the customers and

13:27:39  9   authorized signers on that account?

13:27:41  10  A.   Jesus Huitron and Eusevio Huitron.

13:27:44  11  Q.   And now I'm showing you from the same exhibit 40256A, the

13:27:56  12  Northwest Bank accounts.  Who is the authorized accountholder on

13:28:02  13  that account?

13:28:03  14  A.   Jesus Huitron.

13:28:04  15  Q.   Have you ever seen Jessica Huitron as the authorized

13:28:07  16  accountholders on any of the Huitron accounts?

13:28:10  17  A.   Not from those documents.  No, sir, I have not.

13:28:13  18  Q.   We had a brief discussion last week about CTRs.  I'm showing

13:28:23  19  you Government's Exhibit 352B, which is the CTR spreadsheet.

13:28:33  20  Again, I used the abbreviation CTR.  Special Agent, just quick

13:28:36  21  reminder, what does that stand for?

13:28:38  22  A.   Currency Transaction Report.

13:28:40  23  Q.   And who fills out this Currency Transaction Report?

13:28:43  24  A.   The bank.

13:28:44  25  Q.   Does the customer have any role in actually filling out the

| | | |
|---|---|---|
| 13:28:47 | 1 | form? |
| 13:28:47 | 2 | A.   No. |
| 13:28:49 | 3 | Q.   What does the customer provide? |
| 13:28:52 | 4 | A.   If the bank does not have the information on the person, the |
| 13:28:56 | 5 | bank will request the person's name, Social Security number, |
| 13:29:01 | 6 | address, and some type of identifying document with the driver's |
| 13:29:03 | 7 | license. |
| 13:29:04 | 8 | Q.   So when it says in the column under subject name, Jesus |
| 13:29:10 | 9 | Huitron, who is physically pushing the cash across the counter? |
| 13:29:13 | 10 | A.   The CTR, it has different documents -- |
| 13:29:15 | 11 | MR. MAYR:  Objection, your Honor, form of the question. |
| 13:29:17 | 12 | Unless he has specific knowledge whether my client is making |
| 13:29:21 | 13 | this, the form of the question is who is making it. |
| 13:29:23 | 14 | MR. GARDNER:  I can rephrase, your Honor. |
| 13:29:24 | 15 | Q.   (BY MR. GARDNER) What does this bank record reflect as to |
| 13:29:28 | 16 | who's pushing the cash across the counter? |
| 13:29:29 | 17 | A.   I believe that's the person that's making the deposit. |
| 13:29:33 | 18 | Q.   And, Special Agent, over here on the totals, the total cash, |
| 13:29:38 | 19 | did you have the occasion to add that up with respect to Jesus |
| 13:29:41 | 20 | Huitron? |
| 13:29:43 | 21 | A.   Yes. |
| 13:29:44 | 22 | Q.   And what -- |
| 13:29:45 | 23 | A.   It was done. |
| 13:29:47 | 24 | THE COURT:  Adding what up?  I'm sorry. |
| 13:29:50 | 25 | Q.   (BY MR. GARDNER) That was not a good question, your Honor. |

| | | |
|---|---|---|
| 13:29:52 | 1 | With respect to Government's Exhibit 352A, there's a |
| 13:29:55 | 2 | column that reflects total cash in.  Did you add up the total |
| 13:29:59 | 3 | cash in as it relates to CTRs filed for Jesus Huitron? |
| 13:30:04 | 4 | A.    Yes, sir. |
| 13:30:06 | 5 | Q.    If you will, sir, what was that total? |
| 13:30:09 | 6 | A.    $111,261. |
| 13:30:12 | 7 | Q.    And what were the dates or the date range for that? |
| 13:30:16 | 8 | A.    July the 12th, 2010 through, I believe, May of 2012. |
| 13:30:25 | 9 | Q.    Twenty-two months? |
| 13:30:27 | 10 | A.    Approximately. |
| 13:30:28 | 11 | Q.    Showing you Government's Exhibit 368.  Have you seen this, |
| 13:30:42 | 12 | sir? |
| 13:30:42 | 13 | A.    Yes, I have. |
| 13:30:43 | 14 | Q.    Okay.  And what is it? |
| 13:30:44 | 15 | A.    That is the transcript at the detention hearing of Eusevio |
| 13:30:49 | 16 | Huitron, dated June 18, 2012. |
| 13:30:52 | 17 | Q.    And did Jesus Huitron testify at that detention hearing? |
| 13:30:54 | 18 | A.    Jesus Huitron, yes, sir. |
| 13:30:57 | 19 | Q.    And with respect to Jesus Huitron, was he originally |
| 13:31:00 | 20 | indicted in this case? |
| 13:31:00 | 21 | A.    No, sir.  He was not. |
| 13:31:02 | 22 | Q.    And at some point later on, did he get indicted? |
| 13:31:04 | 23 | A.    Yes, sir, he did. |
| 13:31:05 | 24 | Q.    What was the reason for that? |
| 13:31:09 | 25 | MR. MAYR:  Objection.  Relevance, 403. |

| | | |
|---|---|---|
| 13:31:15 | 1 | THE COURT:  The reason he did it was he was indicted. |
| 13:31:19 | 2 | Let's just move on. |
| 13:31:20 | 3 | MR. GARDNER:  Yes, sir. |
| 13:31:20 | 4 | All right.  Your Honor, I offer Government's Exhibit |
| 13:31:23 | 5 | 368. |
| 13:31:25 | 6 | MR. MAYR:  Objection to hearsay, your Honor. |
| 13:31:28 | 7 | MR. GARDNER:  Your Honor, it's Jesus Huitron's own |
| 13:31:31 | 8 | statements.  It is admission by a party opponent. |
| 13:31:36 | 9 | THE COURT:  May I see it? |
| 13:31:40 | 10 | MR. GARDNER:  Yes. |
| 13:32:07 | 11 | THE COURT:  Sworn testimony. |
| 13:32:09 | 12 | MR. DEGEURIN:  It's Bruton. |
| 13:32:11 | 13 | THE COURT:  You objected on hearsay, counsel.  Now you |
| 13:32:14 | 14 | want to increase it? |
| 13:32:15 | 15 | MR. DEGEURIN:  It is hearsay. |
| 13:32:16 | 16 | THE COURT:  Well, I overrule that objection -- |
| 13:32:18 | 17 | MR. DEGEURIN:  Okay.  Bruton -- |
| 13:32:19 | 18 | THE COURT:  -- it's not hearsay. |
| 13:32:20 | 19 | MR. DEGEURIN:  There's a Bruton issue there, Judge. |
| 13:32:25 | 20 | I'm not worried about the content.  I'm worried about the |
| 13:32:28 | 21 | procedure. |
| 13:32:31 | 22 | THE COURT:  Members of the jury, I'm going to put you |
| 13:32:32 | 23 | in the jury room. |
| 13:33:04 | 24 | (Jury not present.) |
| 13:37:05 | 25 | THE COURT:  Okay.  There's a lot covered here.  What |

13:37:07  1    exactly -- you're asking for the entire transcript?

13:37:10  2             MR. GARDNER:  Your Honor, I can separate it out.  I was

13:37:12  3    only planning on reading from pages 8, 9, 10.

13:37:18  4             THE COURT:  On page 8, you want to read his sworn

13:37:20  5    testimony he buys the horses.

13:37:24  6             MR. GARDNER:  Yes.  That he is involved in the

13:37:27  7    horse-racing business with his brother.

13:37:30  8             THE COURT:  And that his brother.

13:37:33  9             MR. GARDNER:  And then, was it a part of --

13:37:34  10            THE COURT:  Scolds him because he buys too many horses.

13:37:38  11            MR. GARDNER:  Not that particular part, your Honor.

13:37:40  12            THE COURT:  Is there any objection to that?

13:37:42  13            MR. DEGEURIN:  My objection is a Bruton.  It's not --

13:37:44  14            THE COURT:  Well, then, explain to me how Bruton could

13:37:46  15    ever come into this.

13:37:47  16            MR. DEGEURIN:  I was not invited to that detention

13:37:49  17    hearing.  We did not have a right of confrontation.  We may have

13:37:53  18    wanted to have questions ourselves.

13:37:54  19            THE COURT:  Tell me what question you would ask.

13:37:56  20            MR. DEGEURIN:  I might ask, do you know Mr. Francisco

13:38:04  21    Colorado?  I might ask, do you --

13:38:07  22            THE COURT:  We know he does.  There's testimony to

13:38:12  23    that.  What else?

13:38:13  24            MR. DEGEURIN:  No.  I don't believe so.  But I may have

13:38:15  25    missed it.

| | | |
|---|---|---|
| 13:38:16 | 1 | THE COURT:  Well, we know that -- okay. |
| 13:38:20 | 2 | MR. DEGEURIN:  Okay.  Well, let's do this then. |
| 13:38:22 | 3 | THE COURT:  Just tell me what it is.  There are |
| 13:38:24 | 4 | 30-something pages here.  If there's something specific, I want |
| 13:38:27 | 5 | to know about it. |
| 13:38:28 | 6 | MR. DEGEURIN:  No.  I have not -- I don't know if there |
| 13:38:33 | 7 | -- how they're going to use it in a negative way.  I assume they |
| 13:38:35 | 8 | will, as a group, as a conspiracy.  But that, I believe, I have a |
| 13:38:42 | 9 | right at least to an instruction to the jury that those |
| 13:38:45 | 10 | statements should not be used in any way in the case against |
| 13:38:51 | 11 | Francisco Colorado. |
| 13:38:52 | 12 | THE COURT:  Well, that's one thing.  Objection on |
| 13:38:55 | 13 | grounds of Bruton is another, and objection on hearsay is even |
| 13:38:59 | 14 | another. |
| 13:39:00 | 15 | MR. DEGEURIN:  But -- okay.  Your Honor, Bruton allows |
| 13:39:06 | 16 | me to have that instruction.  It is an out-of-court statement |
| 13:39:10 | 17 | being offered -- |
| 13:39:10 | 18 | THE COURT:  It's an in-court statement.  He's under |
| 13:39:12 | 19 | oath.  He's in the United States District courthouse. |
| 13:39:15 | 20 | MR. DEGEURIN:  Not in my court. |
| 13:39:17 | 21 | THE COURT:  Well, I didn't know you had one. |
| 13:39:19 | 22 | MR. DEGEURIN:  No.  Not in my client's court and I'm |
| 13:39:21 | 23 | allowed -- |
| 13:39:22 | 24 | THE COURT:  I understand your client wasn't present. |
| 13:39:24 | 25 | MR. DEGEURIN:  I'm sorry? |

| | | |
|---|---|---|
| 13:39:24 | 1 | THE COURT:  I said I understand your client -- I don't |
| 13:39:26 | 2 | know if he was present or not.  I don't know how many people were |
| 13:39:28 | 3 | present at the detention hearings.  I know you all had them but I |
| 13:39:33 | 4 | assume -- it doesn't say if you were present. |
| 13:39:36 | 5 | MR. DEGEURIN:  As an officer of the Court, I can tell |
| 13:39:38 | 6 | you that I was not there. |
| 13:39:39 | 7 | THE COURT:  All right.  What else are you interested in |
| 13:39:44 | 8 | this sworn statement? |
| 13:39:45 | 9 | MR. GARDNER:  Your Honor, just page 8 where it talks |
| 13:39:47 | 10 | about those -- him and his brother Eusevio being in the |
| 13:39:52 | 11 | horse-racing business. |
| 13:39:53 | 12 | THE COURT:  Oh, I understand that.  That jumped out. |
| 13:39:54 | 13 | Right out. |
| 13:39:55 | 14 | MR. GARDNER:  Page 9, starting line 15:  Was it part of |
| 13:39:58 | 15 | the business partnership you had with your brother?  Yes.  Was it |
| 13:40:03 | 16 | with your brother Eusevio as well as your other brother?  Yes. |
| 13:40:07 | 17 | Question, line 21:  What kind of -- now, this horse business, |
| 13:40:10 | 18 | what name does it have that y'all own?  And then, stop after that |
| 13:40:13 | 19 | response, your Honor.  On page 10, starting on line -- |
| 13:40:17 | 20 | THE COURT:  Wait a minute.  Okay. |
| 13:40:42 | 21 | MR. GARDNER:  Then starting on. |
| 13:40:43 | 22 | THE COURT:  Starting at page 10. |
| 13:40:45 | 23 | MR. GARDNER:  Starting on line 17, your Honor. |
| 13:40:49 | 24 | THE COURT:  All right. |
| 13:40:49 | 25 | MR. GARDNER:  And going to 25. |

13:41:01  1          THE COURT:  Well, didn't you just prove that with the

13:41:06  2   bank records?

13:41:10  3          MR. GARDNER:  Yes, your Honor.  I could skip that.

13:41:12  4          THE COURT:  What's next?

13:41:14  5          MR. GARDNER:  And then, beginning on page 14, your

13:41:17  6   Honor, the last question on line 25 and going to line 14.

13:41:35  7          MR. ESPER:  The next page?

13:41:37  8          MR. GARDNER:  Yes, sir.  That would be it, your Honor.

13:42:22  9          THE COURT:  Okay.  The only other defendant mentioned,

13:42:25 10   of course, is on page 15, where the question was about Jose

13:42:35 11   Trevino-Morales, and the statement was that Mr. Trevino pays.

13:42:48 12   Pays late but he pays.  He's not one of the people who doesn't

13:42:51 13   pay him.

13:42:55 14          All right.  Any other specific objections?

13:43:02 15          MR. DEGEURIN:  Originally Mr. Gardner said he was

13:43:06 16   introducing the entire transcript.

13:43:08 17          THE COURT:  Well, he's not.

13:43:10 18          MR. DEGEURIN:  Certainly --

13:43:11 19          THE COURT:  I'm not going to --

13:43:14 20          MR. DEGEURIN:  Not going to allow that.

13:43:15 21          THE COURT:  -- have him do that.  That's right.

13:43:17 22          MR. DEGEURIN:  So now, the only thing that would be

13:43:19 23   separated out and as an exhibit is the testimony we've just

13:43:24 24   talked about.  Am I clear on that?

13:43:26 25          THE COURT:  That's what he represents.

| | | |
|---|---|---|
| 13:43:28 | 1 | MR. GARDNER:  Your Honor, I could introduce it for |
| 13:43:30 | 2 | demonstrative purposes and just read that portion into the record |
| 13:43:32 | 3 | so the Court -- the Court later has it. |
| 13:43:37 | 4 | MR. MAYR:  Now, I've got to throw a dog in the fight. |
| 13:43:40 | 5 | For the record, I don't have any objection to this |
| 13:43:42 | 6 | exhibit coming into evidence, but it's got to be in its entirety |
| 13:43:47 | 7 | because to parse out these little pieces just takes it out of |
| 13:43:50 | 8 | context and ends up hurting my client.  So under 106, I would |
| 13:43:54 | 9 | argue that the entire transcript should be admitted into |
| 13:43:57 | 10 | evidence. |
| 13:43:57 | 11 | THE COURT:  That's very easy.  That objection is |
| 13:43:59 | 12 | overruled.  Now, anybody else has any specific?  There's a lot of |
| 13:44:03 | 13 | stuff that's totally extraneous in here.  Doesn't have anything |
| 13:44:05 | 14 | to do with anything.  Yes, ma'am. |
| 13:44:07 | 15 | MS. WILLIAMS:  I do.  I object to the part where Mr. |
| 13:44:10 | 16 | Huitron talks about Mr. Trevino-Morales. |
| 13:44:13 | 17 | THE COURT:  Even though it's supportive of him? |
| 13:44:16 | 18 | MS. WILLIAMS:  Well, I don't know whether it is or it |
| 13:44:18 | 19 | isn't, Judge. |
| 13:44:18 | 20 | THE COURT:  Well, we've had a lot of testimony of it. |
| 13:44:21 | 21 | MS. WILLIAMS:  Right. |
| 13:44:22 | 22 | THE COURT:  But I don't think there's anything to that, |
| 13:44:24 | 23 | really. |
| 13:44:34 | 24 | All right.  I'm going to permit, because it's sworn |
| 13:44:39 | 25 | testimony, pages 8, line 5 through line 25 and line 15 through |

```
13:44:58   1    line 20.
13:45:03   2           MS. FERNALD:  What page is that?
13:45:04   3           MR. GARDNER:  On page 9, your Honor?
13:45:06   4           THE COURT:  Page 9 and page 10 is what I just.
13:45:14   5           MR. GARDNER:  So the Court is not permitting page --
13:45:18   6    sorry.
13:45:31   7           THE COURT:  And page 15, line 6 through line 17 and
13:46:07   8    that's it.
13:46:08   9           MR. GARDNER:  Thank you, your Honor.
13:46:10  10           MR. MAYR:  Your Honor, now that you have made that
13:46:12  11    clear, for the record, I would renew my request under 106 to
13:46:14  12    admit the additional portions of the transcript.
13:46:20  13           THE COURT:  You'll have the witness on cross.
13:46:22  14           MR. MAYR:  Thank you, Judge.  Appreciate that.  Is that
13:46:26  15    -- you're overruling my objection again?
13:46:27  16           THE COURT:  I'm not overruling anything.  I expect
13:46:30  17    there will be objections when you ask, and I will make a ruling
13:46:34  18    at that time.
13:46:34  19           MR. MAYR:  Thank you, Judge.
13:46:48  20           THE COURT:  Bring the jury in.
13:46:50  21           (Jury present.)
13:48:24  22           THE COURT:  Members of the jury, I'm going to admit as
13:48:33  23    evidence in this case some limited sworn testimony from Jesus
13:48:38  24    Huitron, but this testimony can only be considered when you
13:48:43  25    determine the innocence or guilt of Mr. Huitron.  Cannot be used
```

13:48:49   1   as to any of the other defendants.  This is sworn testimony that

13:48:54   2   Mr. Jesus Huitron gave in this case.

13:49:00   3           You may proceed.

13:49:01   4           MR. GARDNER:  Thank you, your Honor.

13:49:02   5   Q.   (BY MR. GARDNER) Special Agent Pennington, if you will, turn

13:49:04   6   to page 8, and I will read the question, if you could respond as

13:49:08   7   to the responses made by Jesus Huitron.

13:49:11   8           Question:  Now, at some point, did y'all begin to raise

13:49:15   9   horses?

13:49:15  10   A.   We started with horse racing in 2004.  In 2003, I bought six

13:49:21  11   or seven mares in Sam Houston.  One of the seven was very

13:49:26  12   promising named Katies Star Quest.  It made 426,000 and I sold

13:49:30  13   this mare for 300,000.  Then I got 62 -- it make 200,000, little

13:49:37  14   bit more.

13:49:37  15   Q.   Now, Mr. Huitron, let me stop, okay?  Why did y'all -- or

13:49:42  16   who was involved in the horse-racing business?

13:49:43  17   A.   I did.

13:49:44  18   Q.   Question:  What about your brother?

13:49:47  19   A.   We were companions.  He and I.

13:49:49  20   Q.   Question:  Was he involved in the horse-racing business, as

13:49:52  21   well?

13:49:53  22   A.   He would scold me for buying so many race horses.

13:49:56  23   Q.   Question:  What would he do with the race horses?

13:49:59  24   A.   Train them.

13:50:00  25   Q.   And question:  What kind of background did he have to train

| | | |
|---|---|---|
| 13:50:03 | 1 | horses? |
| 13:50:03 | 2 | A.    I helped him. |
| 13:50:04 | 3 | Q.    If you will, could you please turn to page 9? |
| 13:50:13 | 4 | Question:  Was it part of the business partnership that |
| 13:50:15 | 5 | you had with your brother? |
| 13:50:17 | 6 | A.    Yes.  Yes. |
| 13:50:18 | 7 | Q.    And was it your brother Eusevio as well as your other |
| 13:50:23 | 8 | brother Isabel? |
| 13:50:24 | 9 | A.    Yes. |
| 13:50:28 | 10 | Q.    Please turn to page 15.  Question:  Okay.  Would they pay |
| 13:50:38 | 11 | anything over and above what they needed to pay for training |
| 13:50:41 | 12 | expenses? |
| 13:50:41 | 13 | A.    No.  Only what was charged. |
| 13:50:42 | 14 | Q.    Question:  And so, it would be, for example, training, |
| 13:50:46 | 15 | veterinary bills, or would those be paid directly to the vet? |
| 13:50:50 | 16 | A.    The training and the veterinary bills were paid and at the |
| 13:50:54 | 17 | clinic. |
| 13:50:54 | 18 | Q.    Question:  Okay.  So the owners of the horse would pay the |
| 13:50:58 | 19 | vet? |
| 13:50:58 | 20 | A.    Yes. |
| 13:50:59 | 21 | Q.    Question:  Okay.  So now, the -- how much does Huitron Homes |
| 13:51:05 | 22 | charge to train horse? |
| 13:51:06 | 23 | A.    1,100. |
| 13:51:15 | 24 | Q.    Special Agent Pennington, was there any discussion of |
| 13:51:18 | 25 | Jessica Huitron paying any of those bills? |

13:51:21  1   A.    In the transcript?

13:51:22  2   Q.    Correct.

13:51:22  3   A.    Not that I can recall.  No.

13:51:24  4   Q.    What is a flow-through analysis?

13:51:30  5   A.    It's money that comes from one personal entity, and it goes

13:51:34  6   to another person to its final destination.

13:51:37  7   Q.    Now, when the jury heard Special Agent Williams talk about

13:51:40  8   the money being deposited into Huitron accounts, what did your

13:51:44  9   analysis consist of?

13:51:45  10  A.    Some of that money actually flowed through to vet bills, to

13:51:51  11  racing payments, to horsemen's bookkeepers accounts for members

13:51:57  12  of this organization.

13:51:58  13  Q.    So I'm going to show you Government's Exhibit 69A by

13:52:06  14  stipulation taken from the Huitron Homes business on Highway 183.

13:52:12  15  Was this the folder in which the documents inside were located?

13:52:16  16  A.    Yes, sir, it was.

13:52:18  17  Q.    And all the documents are here, correct?  I guess the

13:52:27  18  question is, were any documents removed for the purpose of court,

13:52:30  19  or does the exhibit remain as it was found?

13:52:33  20  A.    I believe it remains as it was found.  Does it have -- I

13:52:35  21  thought that would have a few more in it.  They may be covered

13:52:38  22  up.

13:52:40  23  Q.    Now, I want to talk about these two checks here, first one

13:52:44  24  for Rodolfo Trevino on 2-8-10?

13:52:47  25  A.    Yes.

13:52:47   1    Q.   Check No. 82211, as well as a check to Huitron Homes -- or,
13:52:54   2    I'm sorry, from Huitron Homes to Jose Trevino, also on 2-8-10,
13:52:59   3    check No. 82212.
13:53:01   4           Did you look into the Huitron Homes bank accounts?
13:53:04   5    A.   Yes, sir.
13:53:06   6    Q.   And did you see a deposit from Tremor Enterprises into those
13:53:09   7    accounts?
13:53:10   8    A.   On -- yes.  There was a 1,100 --
13:53:17   9           MR. MAYR:  Objection.  Nonresponsive.
13:53:19  10    Q.   (BY MR. GARDNER) Yes, you did see a deposit on or about that
13:53:23  11    time?
13:53:23  12    A.   Yes.
13:53:23  13    Q.   And what was that amount?
13:53:24  14    A.   $1,185.
13:53:26  15    Q.   Did you find any billing statements from Jose Trevino to the
13:53:33  16    Huitron Homes?
13:53:35  17    A.   No.
13:53:48  18    Q.   And this writing here on the back side of this page, it
13:53:50  19    says, gave these to Jose Trevino.  And then, check per Jose
13:53:58  20    Trevino on check 82267.
13:54:04  21           And, again, on check No. 82217 for Jose Trevino, $500,
13:54:09  22    did you find any billing statement from Jose Trevino to Huitron
13:54:15  23    Homes to account for this $500?
13:54:17  24    A.   I did not see any.
13:54:20  25    Q.   Horse expense.  Now I'm showing you another check 82167,

| | | |
|---|---|---|
| 13:54:30 | 1 | dated 1-25 of '10.  Did you see the cash check reflected in the |
| 13:54:40 | 2 | Huitron Homes bank accounts? |
| 13:54:44 | 3 | A.   Just that copy. |
| 13:54:52 | 4 | Q.   Did you encounter Rodrigo San Juan during the course of this |
| 13:54:57 | 5 | investigation? |
| 13:54:57 | 6 | A.   Yes.  But I cannot recall specifics on that one. |
| 13:55:07 | 7 | Q.   I'm showing you Government's Exhibit 69B.  Was this also the |
| 13:55:38 | 8 | folder as it was found in the search of the Huitron Homes |
| 13:55:41 | 9 | business? |
| 13:55:42 | 10 | A.   Yes. |
| 13:55:46 | 11 | Q.   And were these documents found in the Jose Trevino folder, |
| 13:55:49 | 12 | these yellow sheets? |
| 13:55:50 | 13 | A.   Yes, they were. |
| 13:55:52 | 14 | Q.   So we have a deposit for the horsemen's bookkeeper for Fast |
| 13:55:57 | 15 | And Furious, No. 8081? |
| 13:55:59 | 16 | A.   Yes, sir. |
| 13:55:59 | 17 | Q.   And deposit for Hernando Guerra? |
| 13:56:02 | 18 | A.   Yes, sir. |
| 13:56:03 | 19 | Q.   8082.  Deposit for Azoom, LP? |
| 13:56:09 | 20 | A.   Yes, sir. |
| 13:56:09 | 21 | Q.   8080, deposit for Garcia Bloodstock? |
| 13:56:15 | 22 | A.   Yes, sir. |
| 13:56:16 | 23 | Q.   And deposit for Carmina, LLC? |
| 13:56:19 | 24 | A.   Yes, sir. |
| 13:56:20 | 25 | Q.   And when you're doing your flow-through analysis, did you |

13:56:24    1    attempt to look for the source of these funds reflected on these

13:56:27    2    horsemen's bookkeeper's deposits?

13:56:30    3    A.    Yes.  Those amounts were reflected in the horsemen's

13:56:34    4    bookkeeper for those entities.

13:56:36    5    Q.    And did you check the Huitrons' bank accounts for any

13:56:41    6    deposit activity on or around September 23rd of 2010?

13:56:45    7    A.    Yes, I did.

13:56:46    8    Q.    And what did you find, sir?

13:56:48    9    A.    I found several deposits done, some on the same day.  All in

13:56:57   10    increments of less than $10,000.

13:56:58   11    Q.    And could you give the dates and the deposits on each one of

13:57:01   12    those dates, for the record, please?

13:57:02   13    A.    Yes.  9-16-2010, 4,900, 9-16-2010, 4,015, 9-16-2010, 2,500.

13:57:15   14    Q.    And do you have it recorded in your notes who made that

13:57:19   15    deposit?

13:57:19   16    A.    Per the CTR, it's Jesus Huitron.

13:57:23   17    Q.    And what city?

13:57:23   18    A.    Laredo, Texas.

13:57:24   19    Q.    Okay.  And I believe you were about ready to go on to the

13:57:27   20    next date?

13:57:27   21    A.    Yes.  9-20-2010, 5,000, 9-20-2010, 4,900, and 9-20-2010,

13:57:37   22    2,196.

13:57:38   23    Q.    And per the CTR, who made those deposits?

13:57:41   24    A.    Jesus Huitron in Laredo, Texas.

13:57:45   25    Q.    And the next date, sir?

13:57:46   1   A.   9-21-2010, $5,000.

13:57:54   2   Q.   And was there a CTR filed on that one?

13:57:56   3   A.   No, sir.

13:57:58   4   Q.   Now, after those deposits, how is the money then sent to

13:58:03   5   these various entities the jury's heard about?

13:58:07   6   A.   Check No. 82979 was written on the Huitron Homes account,

13:58:13   7   and then, that money was split among those various accounts at

13:58:17   8   the Texas horsemen's bookkeeper.

13:58:20   9   Q.   When you say that check was written on, what day was that

13:58:23   10  check written?

13:58:27   11  A.   I want to say it's 9-21 or 9-22 of 2010.

13:58:32   12  Q.   Shortly after the deposits made in the bank accounts that

13:58:36   13  are reflected on the CTR pages?

13:58:43   14  A.   Yes.

13:58:43   15  Q.   And the same question, Special Agent, did you see any

13:58:46   16  billing statements from Garcia Bloodstock, Fernando Garcia, Fast

13:58:53   17  And Furious, Azoom, LP, or Carmina, LLC, or Jose Trevino that

13:59:00   18  would justify the expenses listed on the receipts?

13:59:04   19  A.   No.

13:59:16   20  Q.   I want to turn your attention to October 21st of 2010.  What

13:59:22   21  activity did you note in the Huitron bank accounts on that day?

13:59:43   22  A.   Okay.  Prior to October the 21st of 2010, on 10-19 of 2010,

13:59:53   23  he had a $9,900 deposit.  On 10-20-2010, $7,100 deposit.  And on

14:00:01   24  10-21-2010, an $8,000 deposit, all currency in Laredo, Texas.

14:00:09   25  Q.   I'm showing you Government's Exhibit 64, which is check No.

| | | |
|---|---|---|
| 14:00:17 | 1 | 83074.  So following the deposits made on October 19th, 20th and |
| 14:00:26 | 2 | 21st, was this check written? |
| 14:00:29 | 3 | A.    Yes, sir. |
| 14:00:30 | 4 | Q.    And obviously to the Texas horsemen's bookkeeper? |
| 14:00:34 | 5 | A.    Yes.  That was deposited into Jesus Huitron's account at the |
| 14:00:39 | 6 | Texas horsemen's bookkeeper. |
| 14:00:45 | 7 | Q.    And were there any CTRs filed on October 19th, 20th or 21st? |
| 14:00:51 | 8 | A.    No, sir. |
| 14:00:54 | 9 | Q.    And who is this particular check in Government's Exhibit 74 |
| 14:00:57 | 10 | signed by? |
| 14:00:58 | 11 | A.    Looks like Isabel Huitron. |
| 14:01:09 | 12 | Q.    Now, also from Government's Exhibit 74, I'm showing you a |
| 14:01:12 | 13 | check, Sergio Rincon for $3,200, dated 11-24-10, 83202.  What |
| 14:01:21 | 14 | activity did you see in the Huitron account on that date? |
| 14:01:25 | 15 | A.    11-24-2010, there's $4,800 in currency deposited into the |
| 14:01:31 | 16 | bank in Laredo, Texas. |
| 14:01:33 | 17 | Q.    I'm showing you another check, dated approximately seven |
| 14:01:42 | 18 | days later, also Sergio Rincon, 83225 for $6,000.  What activity |
| 14:01:49 | 19 | did you see in the Huitron account that day? |
| 14:01:55 | 20 | A.    No deposits specifically on that day.  You had some prior to |
| 14:02:02 | 21 | that. |
| 14:02:03 | 22 | Q.    And how far prior? |
| 14:02:05 | 23 | A.    11-24-2010.  So about a week prior. |
| 14:02:10 | 24 | Q.    And the last page of this exhibit, I'm showing you two |
| 14:02:12 | 25 | checks 83247, Rodolfo Trevino for $4,000, and another to an |

14:02:20   1   unknown payee for $1,100 on December 3rd, 2010.  What activity,

14:02:24   2   if any, did you see that day?

14:02:26   3   A.   $5,100 cash deposit made into a bank in Laredo, Texas to

14:02:32   4   this account.

14:02:33   5   Q.   I'm showing you Government's Exhibit 52.  What is this, sir?

14:02:53   6   A.   This is the Jesus Huitron statement of account from the

14:02:56   7   horsemen's bookkeeper.

14:02:59   8   Q.   And just to refresh, these are essentially bank accounts

14:03:03   9   maintained by TRACS in the various states, correct?

14:03:06   10  A.   For the state of Texas, this one, yes.

14:03:16   11  Q.   And I'm flipping to page -- with the first date as August 10

14:03:22   12  -- August 12th, 2010.  Now, I want to start with this right here,

14:03:35   13  Special Agent.

14:03:36   14          Check No. 83074 for a total amount of $18,500.  Could

14:03:46   15  you please explain to the jury what activity you saw on that

14:03:49   16  account prior to that check being written?

14:03:52   17  A.   That's one we just covered.

14:03:56   18  Q.   That's the one we just covered?

14:03:58   19  A.   Yes, sir.

14:03:59   20  Q.   I'm sorry.  You're right.  The one drawn on Huitron Homes in

14:04:04   21  Exhibit 74?

14:04:05   22  A.   Yes.

14:04:09   23  Q.   I got a little ahead of myself.

14:04:14   24          Okay.  This one right here, correct?

14:04:16   25  A.   Correct.

14:04:17  1   Q.   All right.  So what activity did you see or was reflected on

14:04:23  2   this sheet on the same date?

14:04:27  3   A.   The money that came in was then split to Hernando Guerra,

14:04:31  4   Carmina, LLC, Fast And Furious, LLC, Garcia Bloodstock and

14:04:35  5   Racing, and Azoom, LP.  Then they had Oscar Montemayor and then,

14:04:44  6   the Texas Classic Futurity.

14:04:47  7   Q.   And, again, did you see any billing statements from these

14:04:50  8   companies for any work performed for Jesus or Eusevio Huitron?

14:04:57  9   A.   No.

14:04:57  10  Q.   Could you generally describe the files that you found when

14:05:04  11  you were evaluating the evidence located at the Huitron Homes

14:05:12  12  search site?

14:05:15  13  A.   Many of the files were independent.  We had some files where

14:05:20  14  they would have like a -- if they're training for an individual,

14:05:25  15  they had that person by itself, if I remember correctly, on a

14:05:30  16  number of those.

14:05:31  17  Q.   So maintained separate accounts for separate customers?

14:05:34  18  A.   Yes.

14:05:36  19  Q.   Showing you Government's Exhibit 65A, also taken from the

14:05:42  20  183 Austin, Texas site.  Did you see many of the folders

14:05:47  21  identified by the customer name?

14:05:55  22  A.   I just -- I can't remember.

14:05:57  23  Q.   This one's obviously identified Fernando Garcia?

14:06:00  24  A.   Yes.

14:06:03  25          MR. WOMACK:  Your Honor, if I can just get an evidence

14:06:04   1   number.  I can't read this.

14:06:05   2           MR. GARDNER:  65A.

14:06:07   3           MR. WOMACK:  65A, thank you.

14:06:09   4   Q.   (BY MR. GARDNER) Generally what did you locate in the

14:06:11   5   folder?

14:06:12   6   A.   It was a number of things that -- billing statements,

14:06:16   7   receipts under the different entities of Carmina, LLC, Bonanza

14:06:24   8   Racing, Fast And Furious, just a number of the folks associated

14:06:28   9   with this organization.

14:06:33  10   Q.   And I want to go through these real quick.  The first

14:06:37  11   document?

14:06:37  12   A.   Sergio Rincon.

14:06:39  13   Q.   Okay.  To Felipe Quintero, correct?

14:06:42  14   A.   Correct.

14:06:42  15   Q.   Okay.  It's a Fed Ex airbill?

14:06:44  16   A.   Yes, sir.

14:06:44  17   Q.   And with respect to the horses, did you see listed on the

14:06:51  18   left-hand side of this, are you familiar with these horses and

14:06:55  19   these people?

14:06:55  20   A.   Yes, sir, I am.

14:06:57  21   Q.   And are they consistent with the individuals involved in

14:07:00  22   this case?

14:07:00  23   A.   Yes, they are.

14:07:02  24   Q.   It appears to be a couple of different types of writing

14:07:05  25   here.  Just for the record, Azoom is next to Forest Park.

14:07:08  1  Carmina is next to Lady Nayen.  Garcia Bloodstock is next to a

14:07:12  2  horse called Bugatti and Reba Reba Corona.  Carmina is next to a

14:07:18  3  horse called Coco-Pata.  And Garcia is next to One Viva Mexico.

14:07:23  4        When I go to the next page, Special Agent, is this also

14:07:26  5  consistent with other horses and entities involved in this case?

14:07:31  6  A.    Yes, sir.

14:07:38  7  Q.    I'm showing you an exhibit marked or labeled Rancho

14:07:44  8  Mensualdadt.  It says, gave to Fernando on 4-6-11.

14:07:51  9        Do the entries here reflect the handwritten notes that

14:07:53  10  the jury has just seen on the previous two pages?

14:07:56  11  A.    I believe they do.  You'd have to flip back and

14:08:00  12  double-check.

14:08:07  13  Q.    Specifically, on the next page where it says, ten percent of

14:08:09  14  races, are all the entities, again, grouped together as they were

14:08:16  15  in the Jose Trevino file?

14:08:17  16  A.    Yes.

14:08:30  17  Q.    Now, when we talk about the invoices, I just want to go

14:08:38  18  through those real quick.  So invoices for Fernando Garcia,

14:08:47  19  correct?

14:08:47  20  A.    Correct.

14:08:48  21  Q.    And is there a Eusevio Huitron vet bill?

14:09:04  22  A.    It appears to be.  Yes, sir.

14:09:07  23  Q.    And Dallas Cartel B, are you familiar with that horse?

14:09:10  24  A.    Yes.  That was one of the horses under -- came under Fast

14:09:14  25  And Furious, LLC.

14:09:22  1   Q.   And just for the record, could you read the name on that?

14:09:25  2   A.   Fernando Garcia/Carmina, LLC.

14:09:29  3   Q.   And Carmina, LLC is associated with what other individual?

14:09:35  4   A.   Carlos Nayen.

14:09:37  5   Q.   And for the record, could you please read the heading on

14:09:39  6   this one?

14:09:39  7   A.   Fernando Garcia, Carmina, LLC, Desiree Princess Ranch, LLC.

14:09:46  8   Q.   Now, on this particular invoice, Special Agent, paid by

14:09:53  9   check No. 1017 on the bottom.  There's also a number of other

14:10:00  10  payment information related here.  It says, check 1017 Carmina,

14:10:09  11  LLC and $10,000.  Did you track the $10,000?

14:10:15  12  A.   Yes, sir.

14:10:15  13  Q.   And where did you track that from?

14:10:16  14  A.   I believe it was the wire transfer from Fast And Furious,

14:10:19  15  LLC.

14:10:20  16  Q.   Could you please read for the record the heading on that

14:10:27  17  one?

14:10:27  18  A.   Fernando Garcia, Garcia Bloodstock.

14:10:29  19  Q.   And another Fernando Garcia/Carmina?

14:10:33  20  A.   Yes.

14:10:35  21  Q.   Coco-Pata, is that a company or something else?

14:10:37  22  A.   That's a horse name.

14:10:43  23  Q.   Read that one for the record, please.

14:10:44  24  A.   Poker Ranch, LLC.

14:10:46  25  Q.   Now, we've seen Poker Ranch and we've seen Desiree Princess

| | | |
|---|---|---|
| 14:10:50 | 1 | Ranch.  Could you refresh the jury's memory on who is associated |
| 14:10:53 | 2 | with those two companies? |
| 14:10:54 | 3 | A.   Those were two companies that the organization was using to |
| 14:10:59 | 4 | race horses under. |
| 14:11:04 | 5 | Q.   Another Garcia, another Desiree Princess Ranch.  Could you |
| 14:11:09 | 6 | read that one for the record, please? |
| 14:11:10 | 7 | A.   Alejandro Barradas-Lagunes. |
| 14:11:14 | 8 | Q.   What company do you associate him? |
| 14:11:16 | 9 | A.   With Grupo Aduanero. |
| 14:11:18 | 10 | Q.   What's the significance of Grupo Aduanero in this case? |
| 14:11:22 | 11 | A.   A number of wire transfers to pay for a number of horses |
| 14:11:25 | 12 | came through Grupo Aduanero and Alejandro Barradas. |
| 14:11:34 | 13 | Q.   Carmina, another Carmina.  Sir, just for the record, what is |
| 14:11:42 | 14 | that amount on 22? |
| 14:11:43 | 15 | A.   $17,010.50. |
| 14:11:46 | 16 | Q.   And there's two amounts in parentheses below it. |
| 14:11:48 | 17 | A.   Yes. |
| 14:11:50 | 18 | Q.   And what are those? |
| 14:11:52 | 19 | A.   9,900 and 7,300. |
| 14:11:58 | 20 | Q.   When I go to the bottom of the page, has the same amounts, |
| 14:12:02 | 21 | correct? |
| 14:12:02 | 22 | A.   Yes. |
| 14:12:03 | 23 | Q.   And when I go back to the sticky that's on there, just for |
| 14:12:06 | 24 | the record, it reflects Carmina, Garcia, F & F, which is what, to |
| 14:12:12 | 25 | your understanding? |

| | | |
|---|---|---|
| 14:12:13 | 1 | A.   Fast And Furious. |
| 14:12:14 | 2 | Q.   Desiree and Poker? |
| 14:12:16 | 3 | A.   Correct. |
| 14:12:16 | 4 | Q.   Did you track or compare this to the Huitron bank accounts |
| 14:12:21 | 5 | that same time, sir? |
| 14:12:21 | 6 | A.   Yes.   On 11-1-2011, there were two currency deposits:   One |
| 14:12:30 | 7 | of 9,900, the second of 7,300, and they were made in Laredo, |
| 14:12:35 | 8 | Texas. |
| 14:12:37 | 9 | Q.   Do you have an indication from the CTR on who made that |
| 14:12:41 | 10 | deposit? |
| 14:12:42 | 11 | A.   I'm sure the CTR had it, but I don't have it notated here. |
| 14:12:59 | 12 | Q.   Another Poker, Poker, Carmina. |
| 14:13:08 | 13 |          Showing you a Carmina invoice, dated November 29th of |
| 14:13:11 | 14 | 2011.   Were you able to track this payment?   Because it seems to |
| 14:13:20 | 15 | be split between Carmina and Garcia. |
| 14:13:28 | 16 | A.   No.   I didn't look at that one. |
| 14:13:43 | 17 | Q.   Showing you an invoice, dated March 28th, 2012, says, 18 New |
| 14:13:49 | 18 | Mexico horses and it has numbers down here.   Could you read these |
| 14:13:53 | 19 | for the record, please? |
| 14:13:54 | 20 | A.   9,900, 9,900 and 7,075. |
| 14:13:58 | 21 | Q.   And at the bottom of this sticky, what does that say, sir? |
| 14:14:07 | 22 | A.   3,300 left for "Pancho" Colorado. |
| 14:14:10 | 23 | Q.   And did you track any activity in the Huitron account with |
| 14:14:14 | 24 | respect to this particular transaction? |
| 14:14:15 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 14:14:16 | 1 | Q.   What was that? |
| 14:14:17 | 2 | A.   On 4-23-2012, 9,900.  4-26-2012, 3,200.  4-27-2012, 9,900. |
| 14:14:31 | 3 | Q.   Is all that activity consistent with your experience |
| 14:14:34 | 4 | regarding structuring? |
| 14:14:35 | 5 | A.   Yes. |
| 14:14:35 | 6 | MR. MAYR:  Objection.  Again, as to ultimate -- 704 as |
| 14:14:38 | 7 | to ultimate opinion. |
| 14:14:41 | 8 | THE COURT:  All right.  The objection is overruled. |
| 14:14:50 | 9 | Q.   (BY MR. GARDNER) And I'm showing you an exhibit or a page, |
| 14:14:54 | 10 | March 28, 2012.  Could you read that? |
| 14:14:57 | 11 | A.   Bonanza Racing Stables. |
| 14:14:58 | 12 | Q.   And who do you associate with Bonanza Racing Stables? |
| 14:15:01 | 13 | A.   It's another company that was used. |
| 14:15:03 | 14 | Q.   And, again, these are all in the same folder, correct, sir? |
| 14:15:06 | 15 | A.   Correct. |
| 14:15:06 | 16 | Q.   Showing you another Bonanza Racing Stable, dated May 5th, |
| 14:15:31 | 17 | 2012.  And just for the record, sir, on the bottom of this yellow |
| 14:15:40 | 18 | -- or an invoice, could you state that writing in there? |
| 14:15:47 | 19 | A.   Bonanza. |
| 14:15:49 | 20 | Q.   And also? |
| 14:15:50 | 21 | A.   "Pancho." |
| 14:15:53 | 22 | Q.   And just for the record, is there any "Pancho" Colorado |
| 14:15:56 | 23 | listed on that billing statement? |
| 14:15:57 | 24 | A.   I'm sorry, say it again. |
| 14:15:58 | 25 | Q.   Is there any "Pancho" Colorado listed on that billing |

14:16:01   1   statement?

14:16:01   2   A.    No.  It's Bonanza Racing Stables.

14:16:04   3   Q.    Showing you invoice, dated May 28, 2012.

14:16:13   4   A.    Bonanza Racing Stables, Francisco Colorado.

14:16:17   5   Q.    In your analysis of the Huitron accounts where the cash was

14:16:41   6   being deposited, what type of expenses are being paid out of that

14:16:44   7   account?

14:16:45   8   A.    I didn't look at all the expenses.  I did look at some of

14:16:49   9   them.  Some were to the Texas horsemen's bookkeeper.  Some were

14:16:54   10  to vet bills.  But I did not do an analysis of all the

14:17:00   11  expenditures from that account.

14:17:01   12  Q.    Were there expenditures for home -- Huitron Homes related

14:17:05   13  businesses?

14:17:06   14  A.    There was Huitron Homes deposits.  I think there were some

14:17:12   15  cancelled checks, too.  So I think it was being used for both.

14:17:15   16  Q.    Could you explain the concept of commingling to the jury?

14:17:21   17  A.    Yes.  Any time that you have funds, say, from an illegal

14:17:27   18  source and you put those with a ongoing business or funds that

14:17:31   19  are from a clean source, once you mix those funds together, then

14:17:36   20  you have commingled the funds, and you can't distinguish between

14:17:39   21  clean and dirty.

14:17:42   22          MR. ESPER:  Your Honor, I'm going to object to that

14:17:43   23  last statement as being clean and dirty that calls for

14:17:46   24  speculation on the part of this witness.  Number two, there's no

14:17:50   25  allegations in the indictment for commingling.

14:17:51  1          THE COURT:  The question was what was it and he

14:17:55  2  explained it.  So your objection is overruled.

14:17:59  3  Q.   (BY MR. GARDNER) And one other thing I found that I'd like

14:18:02  4  to bring to your attention, Special Agent, is Government's

14:18:05  5  Exhibit 65B.  Now, this was not located in the folder that we

14:18:10  6  previously described in Government's Exhibit 65A, correct?

14:18:13  7  A.   Correct.

14:18:13  8  Q.   All right.  Where was this found?

14:18:15  9  A.   I couldn't tell you the location.  It was, again, from the

14:18:18  10  search warrant.

14:18:18  11  Q.   And is it similar to the invoices found in the folder you

14:18:21  12  just described?

14:18:22  13  A.   Yes.

14:18:23  14  Q.   Do you know whether Fernando Garcia was acting as an agent

14:18:29  15  for Fast And Furious?

14:18:31  16  A.   It was in one of the documents through, I believe, an

14:18:33  17  insurance company where he was listed as the manager of Fast And

14:18:37  18  Furious, LLC.

14:18:39  19  Q.   Special Agent, I want to turn your attention to some of the

14:18:42  20  horse sales.  I just want to talk about three of them.  Could we

14:18:48  21  first start with the September 2010 Ruidoso sale?

14:18:52  22  A.   Yes, sir.

14:18:55  23  Q.   And just for the jury's recollection, how many horses were

14:19:01  24  purchased?

14:19:02  25  A.   Twenty-three horses.

| | | |
|---|---|---|
| 14:19:03 | 1 | Q.   And what was the purchase price? |
| 14:19:05 | 2 | A.   Little over $2.2 million. |
| 14:19:07 | 3 | Q.   And who filled out the check for that? |
| 14:19:09 | 4 | A.   It was signed by Francisco Colorado-Cessa. |
| 14:19:14 | 5 | Q.   And based on the records obtained from Southwest Stallion |
| 14:19:20 | 6 | Station and Paul Jones, were you able to trace those horses as |
| 14:19:24 | 7 | they left the auction house? |
| 14:19:25 | 8 | A.   Yes.  At some point in time. |
| 14:19:27 | 9 | Q.   And if you will, could you please explain the first step you |
| 14:19:30 | 10 | took in tracing the transportation or movement of those horses, |
| 14:19:34 | 11 | rather? |
| 14:19:34 | 12 | A.   Yes.  We reviewed the documents, both Southwest Stallion |
| 14:19:37 | 13 | Station and Paul Jones, and found that 20 of the 23 were boarded |
| 14:19:43 | 14 | and were trained at Paul Jones and Southwest Stallion under the |
| 14:19:47 | 15 | account of Carlos Nayen. |
| 14:19:50 | 16 | Q.   This was after the auction? |
| 14:19:51 | 17 | A.   Correct. |
| 14:19:54 | 18 | Q.   Now, was one of those horses bought at the auction a horse |
| 14:19:57 | 19 | named Fly First Down? |
| 14:19:59 | 20 | A.   Yes. |
| 14:19:59 | 21 | Q.   All right.  And could you explain where that horse went once |
| 14:20:03 | 22 | it was purchased at auction? |
| 14:20:04 | 23 | A.   I believe that one went to Paul Jones.  I believe it was |
| 14:20:24 | 24 | Paul Jones. |
| 14:20:25 | 25 | Q.   And whose horse was that under, according to AQHA records? |

```
14:20:30   1   A.   At the time AQHA had it under Francisco Colorado-Cessa.

14:20:34   2   Q.   Now, I'm showing you Government's Exhibit 36, which was an

14:20:38   3   agreement by stipulation seized at the Jose Trevino ranch in

14:20:44   4   Lexington, Oklahoma.  Do you recognize that check?

14:20:50   5   A.   Yes, sir, I do.

14:20:51   6   Q.   Did you go through the Tremor accounts to see if that check

14:20:54   7   was ever negotiated?

14:20:55   8   A.   Yes, and it was not.

14:20:57   9   Q.   And so, that check is dated June of 2011?

14:21:00  10   A.   Correct.

14:21:02  11   Q.   Now, do you recall the testimony of Ms. Sharon Moore?

14:21:05  12   A.   Yes.

14:21:07  13   Q.   And have you reviewed the documents provided by Ms. Moore?

14:21:11  14   A.   Some of them, yes, I have.

14:21:13  15   Q.   Does that include the balance sheet of Tremor Enterprises?

14:21:15  16   A.   Yes, it does.

14:21:16  17   Q.   Did you ever locate Fly First Down on Sharon Moore's balance

14:21:21  18   sheet?

14:21:22  19   A.   No.  I did not.

14:21:23  20   Q.   So this check was negotiated -- or not negotiated.  This

14:21:27  21   check was written June 7th, 2011?

14:21:29  22   A.   Correct.

14:21:30  23   Q.   And never cashed?

14:21:32  24   A.   Correct.

14:21:32  25   Q.   So what's the next financial transaction you see with
```

| | | |
|---|---|---|
| 14:21:35 | 1 | respect to Fly First Down? |
| 14:21:38 | 2 | A.    Financial transaction? |
| 14:21:41 | 3 | Q.    The next activity for that horse. |
| 14:21:44 | 4 | A.    The horse was transferred from Francisco Colorado to Tremor |
| 14:21:52 | 5 | Enterprises, I believe, on the same date, June 7, 2011. |
| 14:22:05 | 6 | Q.    Did that horse eventually die? |
| 14:22:16 | 7 | A.    Yes, it did.  It died in December 2011. |
| 14:22:19 | 8 | Q.    Was that horse insured? |
| 14:22:20 | 9 | A.    Yes, it was. |
| 14:22:21 | 10 | Q.    And who was the loss payee on that insurance policy? |
| 14:22:23 | 11 | A.    Tremor Enterprises. |
| 14:22:24 | 12 | Q.    And what was the amount of the loss? |
| 14:22:26 | 13 | A.    400,000. |
| 14:22:29 | 14 | Q.    And was that check paid to Tremor Enterprises? |
| 14:22:31 | 15 | A.    Yes, it was. |
| 14:22:32 | 16 | Q.    Now, I'm showing you a page from Government's Exhibit 250B, |
| 14:22:37 | 17 | Bates stamp 5916.  Again, for the record, could you note the memo |
| 14:22:46 | 18 | line, please? |
| 14:22:47 | 19 | A.    Purchase Fly First Down. |
| 14:22:50 | 20 | Q.    And the amount? |
| 14:22:51 | 21 | A.    $50,000. |
| 14:22:55 | 22 | Q.    And was this check negotiated? |
| 14:22:56 | 23 | A.    Yes, it was. |
| 14:22:59 | 24 | Q.    And after that point, did you review the balance sheet in |
| 14:23:03 | 25 | Sharon Moore's bookkeeping? |

14:23:04  1   A.   I don't believe she prepared one for 2012.

14:23:07  2   Q.   What would be the basis for tax purposes for Fly First Down?

14:23:13  3   A.   They could use this $50,000 check as a basis.

14:23:20  4   Q.   Now, with respect to some of the other horses, did you track

14:23:24  5   some of the other 22 horses?

14:23:28  6   A.   Yes, sir.

14:23:29  7   Q.   And if you will, could you please tell the jury where they

14:23:35  8   were at the time of the arrest on June 12th of 2012?

14:23:38  9   A.   Six of these horses were seized from Jose Trevino's ranch in

14:23:42  10  Lexington, Oklahoma.

14:23:44  11  Q.   And under what names were they?

14:23:47  12  A.   They were actually being carried in various nominee names.

14:23:51  13  Q.   Do you have any of those nominee names available?

14:23:54  14  A.   Victor Lopez, Nain Hernandez, Santa Fe Roldan and Efrain

14:24:01  15  Aguallo, I believe are some of the names, four nominee names that

14:24:04  16  stand out, and some of the horses would be recorded under those

14:24:09  17  names.

14:24:11  18  Q.   So six in Lexington.  What about some of the others?

14:24:14  19  A.   Two were seized in Ruidoso, New Mexico, one under Tremor,

14:24:18  20  the other under Desiree Princess Ranch.  Three were dead,

14:24:21  21  including Fly First Down.  Six were transferred to other members

14:24:26  22  of the organization.  And six remained under Colorado's name, but

14:24:33  23  their whereabouts were unknown at the time that we did the

14:24:38  24  warrants.

14:24:42  25  Q.   Now, I want to turn your attention to the November 2011

14:24:46   1    Heritage Place sale.

14:24:47   2    A.    Yes, sir.

14:24:48   3    Q.    How many horses were sold by Tremor Enterprises at that

14:24:51   4    sale?

14:24:52   5    A.    Four were put in the auction by Tremor Enterprises.

14:24:57   6    Q.    And following the auction -- and have you reviewed the AQHA

14:25:00   7    records for this?

14:25:04   8    A.    Yes.  On some -- yes.

14:25:06   9    Q.    So following the auction -- not AQHA, I'm sorry.  The

14:25:10   10   Heritage Place records.

14:25:11   11   A.    Yes, I have.

14:25:12   12   Q.    Following the auction for the Heritage Place records, where

14:25:16   13   did these horses go?

14:25:16   14   A.    To Lexington, Oklahoma.

14:25:22   15   Q.    And in addition to selling four horses, did the organization

14:25:26   16   purchase a number of horses?

14:25:29   17   A.    Yeah.  Including the four that were, quote, sold, twelve

14:25:35   18   total were purchased with funds from Francisco Colorado through

14:25:41   19   Arian Jaff.

14:25:44   20   Q.    Is that the Quick Loans?

14:25:45   21   A.    Quick Loans.  Yes.  Quick Loans, Arian Jaff.  Yes, sir.

14:25:49   22   Q.    Okay.  So the ones that were purchased, where did they go?

14:25:52   23   A.    I believe that they were moved to the ranch in Lexington,

14:26:07   24   Oklahoma because six were quickly placed in the name of Luis

14:26:10   25   Aguirre and made part of the 35 mares that we'll talk about in a

| | | |
|---|---|---|
| 14:26:15 | 1 | little bit.  And then, one more was placed in Jose Trevino's |
| 14:26:18 | 2 | ranch.  And then, we have one that is unknown. |
| 14:26:23 | 3 | Q.  Let's go to the January 2012 Heritage Place sale.  Could you |
| 14:26:39 | 4 | describe the number of horses purchased there? |
| 14:26:41 | 5 | A.  Yes.  It was five horses and two foals in utero. |
| 14:26:51 | 6 | Q.  And how were those horses purchased? |
| 14:26:53 | 7 | A.  It was a wire, 228,000 from ADT Petro Servicios, and another |
| 14:27:01 | 8 | 51,000 that was due, which was eventually paid with structured |
| 14:27:08 | 9 | funds through Jose Canales working with Fernando Garcia. |
| 14:27:14 | 10 | Q.  And were those contained in the e-mails that were shown to |
| 14:27:17 | 11 | another witness earlier? |
| 14:27:18 | 12 | A.  Yes, they were. |
| 14:27:19 | 13 | Q.  And, again, just how much was the structured funds? |
| 14:27:23 | 14 | A.  Right around 51,000.  A little over $51,000. |
| 14:27:26 | 15 | THE COURT:  And the wire of 228,000 was what from |
| 14:27:32 | 16 | where? |
| 14:27:32 | 17 | A.  228,700 from ADT Petro Servicios. |
| 14:27:37 | 18 | Q.  (BY MR. GARDNER) And going back to the previous auction, was |
| 14:27:40 | 19 | that also based on the funds obtained from "Pancho" Colorado? |
| 14:27:45 | 20 | A.  Yes. |
| 14:27:45 | 21 | Q.  Did you total the amount of money and the amount of horses |
| 14:27:49 | 22 | purchased at those two auctions? |
| 14:27:52 | 23 | A.  Yes. |
| 14:27:52 | 24 | Q.  What was the total amount spent at those two auctions? |
| 14:27:56 | 25 | A.  Approximately $1 million. |

| | | |
|---|---|---|
| 14:27:58 | 1 | Q.   For how many horses? |
| 14:28:01 | 2 | A.   Nineteen. |
| 14:28:02 | 3 | Q.   And did you track to see how many of those horses were in |
| 14:28:06 | 4 | Defendant Colorado's name? |
| 14:28:07 | 5 | A.   Yes. |
| 14:28:08 | 6 | Q.   How many, sir? |
| 14:28:09 | 7 | A.   Two. |
| 14:28:10 | 8 | Q.   And the value of those two horses? |
| 14:28:12 | 9 | A.   8,200 on one, 11,500 on the second. |
| 14:28:34 | 10 | Q.   Sir, generally, I'm showing you Government's Exhibit 8A, B, |
| 14:28:40 | 11 | C and D by stipulation.  C's from the Lexington, Oklahoma ranch. |
| 14:28:45 | 12 | Have you seen all these, sir? |
| 14:28:46 | 13 | A.   Yes, I have. |
| 14:28:47 | 14 | Q.   And what are they? |
| 14:28:48 | 15 | A.   Breeding contracts. |
| 14:28:50 | 16 | Q.   And breeding contracts in whose name? |
| 14:28:54 | 17 | A.   There's several different names on there. |
| 14:29:02 | 18 | Q.   So just an example from 8A, whose name is on this breeding |
| 14:29:09 | 19 | contract? |
| 14:29:10 | 20 | A.   Victor Nieto. |
| 14:29:15 | 21 | Q.   And 8B, whose name are on those breeding contracts? |
| 14:29:30 | 22 | A.   Nain Hernandez. |
| 14:29:35 | 23 | Q.   And 8C, whose name on those? |
| 14:29:38 | 24 | A.   Santa Fe Roldan. |
| 14:29:45 | 25 | Q.   Do you recall the name on 8D? |

| | | |
|---|---|---|
| 14:29:50 | 1 | A.   Efrain Aguallo, I believe. |
| 14:30:00 | 2 | Q.   Efrain Garcia? |
| 14:30:04 | 3 | A.   Efrain Garcia, I'm sorry. |
| 14:30:06 | 4 | Q.   Are any of these breeding contracts signed? |
| 14:30:10 | 5 | A.   I don't believe they are.  I'd have to take a look at them. |
| 14:30:14 | 6 | I don't recall their being signed. |
| 14:30:16 | 7 | Q.   Now, do you recall the testimony of Mr. Tyler Graham |
| 14:30:21 | 8 | recently? |
| 14:30:21 | 9 | A.   Yes, sir. |
| 14:30:22 | 10 | Q.   And with respect to the breeding of Carlos Nayen's horses? |
| 14:30:27 | 11 | A.   Yes. |
| 14:30:28 | 12 | Q.   Did you find any breeding contracts for Carlos Nayen at the |
| 14:30:31 | 13 | Lexington search warrant? |
| 14:30:32 | 14 | A.   No. |
| 14:30:34 | 15 | Q.   Did you find any billing records for Carlos Nayen at the |
| 14:30:38 | 16 | Lexington search warrant? |
| 14:30:39 | 17 | A.   I don't believe so. |
| 14:30:45 | 18 | Q.   Did you also locate billing records for these individuals? |
| 14:30:49 | 19 | A.   For the four individuals, yes.  Victor Nayen, Santa Fe |
| 14:30:55 | 20 | Roldan, Nain Hernandez, yes, sir. |
| 14:31:01 | 21 | THE COURT:  This was in Oklahoma? |
| 14:31:03 | 22 | THE WITNESS:  Yes, sir, it was. |
| 14:31:05 | 23 | Q.   (BY MR. GARDNER) What does an IRS auditor do? |
| 14:31:09 | 24 | A.   An IRS auditor is going to look at the first level of |
| 14:31:14 | 25 | receipts to determine whether or not what you have on your tax |

| | | |
|--|--|--|
| 14:31:17 | 1 | return, do you have a receipt for. |
| 14:31:20 | 2 | Q.   So what does an IRS criminal investigator do in contrast to |
| 14:31:23 | 3 | that? |
| 14:31:23 | 4 | A.   We're going to look below that level of receipts to try to |
| 14:31:26 | 5 | determine where the source of the funds came from and whether or |
| 14:31:30 | 6 | not the expenses you've reported are legitimate. |
| 14:31:34 | 7 | Q.   Now, do you recall the testimony of Mr. Butch Wise with |
| 14:31:37 | 8 | respect to the horse Mr. Perrys Wine? |
| 14:31:39 | 9 | A.   Yes. |
| 14:31:41 | 10 | Q.   And were these the billing statements that you were |
| 14:31:45 | 11 | referring to? |
| 14:31:46 | 12 | A.   Yes. |
| 14:31:47 | 13 | Q.   So once you looked past the breeding records, the billing |
| 14:31:54 | 14 | statements, what did you find? |
| 14:31:56 | 15 | A.   Mr. Perrys Wine, Katies Sign, two of the horses purchased in |
| 14:32:00 | 16 | the January 2012 sale were obviously not at Lexington place to be |
| 14:32:06 | 17 | boarded and placed on those invoices, and billing statements does |
| 14:32:13 | 18 | tell me that the invoice and billing statements are fictitious. |
| 14:32:16 | 19 | Q.   Did you see any deposits or any payments for any of the |
| 14:32:20 | 20 | breeding at Jose Trevino's ranch? |
| 14:32:23 | 21 | A.   Yes. |
| 14:32:24 | 22 | Q.   And who made those deposits? |
| 14:32:30 | 23 | A.   Nain Hernandez and Santa Fe Roldan. |
| 14:32:33 | 24 | Q.   And did you subpoena their bank accounts? |
| 14:32:35 | 25 | A.   Yes, we did. |

14:32:37  1   Q.   I'm showing you what's been previously entered as

14:32:39  2   Government's Exhibit 271.  Whose bank account is that?

14:32:45  3   A.   Nain Hernandez.

14:32:48  4   Q.   When you evaluated that account, what did you find?

14:32:58  5   A.   A number of structured deposits.  The account, I believe,

14:33:02  6   was opened on January 30th, 2012, a number of cash deposits were

14:33:07  7   made on the account from 1-31-2012 to 2-22-2012.  And I can give

14:33:16  8   you the dates if you want them.

14:33:18  9   Q.   Please do, sir.

14:33:20  10  A.   1-31-2012, 9,900, 2-2-2012, 9,900, 2-3-2012, 9,900,

14:33:32  11  2-7-2012, 9,000, 2-8-2012, 9,000, 2-8-2012, 2,000, 2-14-2012,

14:33:42  12  2,000, 2-15-2012, 7,000, 2-16-2012, 8,000, 2-21-2012, 9,000,

14:33:55  13  2-21-2012, 7,000, 2-22-2012, 9,000, 2-22-2012, 2,000.

14:34:03  14  Q.   And I'm showing on the screen from that exhibit page 62-712.

14:34:08  15  Does that reflect those -- generally the amounts you've just

14:34:11  16  testified to?

14:34:12  17  A.   Yes.  That's some of them.

14:34:13  18  Q.   So the cash going in, what about expenses coming out?

14:34:17  19  A.   There were two checks written on that account.

14:34:25  20  Q.   Showing the jury page 62-775.  Did this check clear?

14:34:38  21  A.   That one did not.  That one bounced.

14:34:41  22  Q.   And, again, just for the record, the check number?

14:34:44  23  A.   101.

14:34:45  24  Q.   And what's that indicate to you in your experience?

14:34:49  25  A.   That's the first check drawn on the account.  The account

| | | |
|---|---|---|
| 14:34:51 | 1 | was opened up for a specific purpose. |
| 14:34:54 | 2 | Q.   Showing you check 102 for 50,307.  Did that check clear? |
| 14:35:03 | 3 | A.   Yes, it did. |
| 14:35:04 | 4 | Q.   And to Zule Farms, correct? |
| 14:35:08 | 5 | A.   Correct.  Both of them were. |
| 14:35:08 | 6 | Q.   Sir, how about the next account Santa Fe Roldan?  Did you |
| 14:35:14 | 7 | have opportunity to review that account? |
| 14:35:16 | 8 | A.   Yes, I did. |
| 14:35:17 | 9 | Q.   For the record, that account is 262.  Government's Exhibit |
| 14:35:25 | 10 | 262.  When evaluating that account, what did you find, sir? |
| 14:35:30 | 11 | A.   Again, we had a number of cash deposits starting in February |
| 14:35:35 | 12 | 13th of 2012 and going through 2-28 of 2012. |
| 14:35:43 | 13 | Q.   Without making you read all those, I'm showing you page |
| 14:35:48 | 14 | 586964.  Are those reflective of all the cash deposits made into |
| 14:35:52 | 15 | that account? |
| 14:35:52 | 16 | A.   Yes.  Now, the 14,000 is a combination of cash and check. |
| 14:35:59 | 17 | Q.   And what activity did you see flowing from that account? |
| 14:36:02 | 18 | A.   Once the cash was deposited into the account, you had checks |
| 14:36:07 | 19 | going out. |
| 14:36:22 | 20 | Q.   And whose were those checks made out to? |
| 14:36:25 | 21 | A.   Check for 15,000 payable to Zule Farms.  Another check for |
| 14:36:30 | 22 | 15,000 to Zule Farms. |
| 14:36:36 | 23 | Q.   Just for the record, page 586968. |
| 14:36:41 | 24 | Now, in addition to looking at the bank accounts, did |
| 14:36:44 | 25 | you also see activity consistent in the e-mail accounts? |

14:36:48   1   A.   Yes, sir.

14:36:52   2   Q.   And one other question on Santa Fe Roldan.  Did you see any

14:36:56   3   checks in there from Jose Luis Canales?

14:36:58   4   A.   Yes.  There were actually a couple of checks from Jose Luis

14:37:01   5   Canales into that account.  One for 4,000, another one for

14:37:34   6   10,500.

14:37:37   7   Q.   I'm showing you what has been entered as Government's

14:37:39   8   Exhibit 358G.  It's the Anri2319@hotmail.  Specifically an

14:37:46   9   e-mail, dated March 26, 2012 at 6:18:23 p.m.  Could you tell who

14:37:57   10   -- for the record, who that e-mail is to?

14:38:00   11   A.   To Hector Roldan.

14:38:04   12   Q.   From Anri2319?

14:38:06   13   A.   Yes.

14:38:07   14   Q.   And the translation, just for the record?

14:38:15   15   A.   Here you go, this equals 3,000 U.S. dollars.

14:38:19   16   Q.   And behind that, what do you see?

14:38:23   17   A.   Deposit slips, if you see the ones ending in 3632 or 3682,

14:38:32   18   that's this account here.

14:38:33   19   Q.   Santa Fe Roldan account?

14:38:44   20   A.   Yes.  3832.

14:38:47   21   Q.   So when you say these slips, where do these slips come from?

14:38:53   22   A.   I believe they were made in Laredo, Texas based upon the

14:39:06   23   bank.

14:39:08   24   Q.   Again, on the second page, again, these are all attachments

14:39:11   25   to that e-mail?

14:39:11   1   A.    Yes.

14:39:14   2   Q.    Showing you another e-mail dated the same day at 6:19:36,

14:39:43   3   one minute later, the same addressees?

14:39:46   4   A.    Yes, sir.

14:39:47   5   Q.    And when you go to the attachments behind here, let's go to

14:39:51   6   the translation first.  For the record, could you please read

14:39:59   7   that?

14:39:59   8   A.    Receipts come to 58,957 U.S. dollars.

14:40:05   9   Q.    And behind that, do you see more of the same receipts?

14:40:08   10   A.    Yes, sir.

14:40:09   11   Q.    And where is Banquito Del Mar?

14:40:14   12   A.    I believe that's Laredo, Texas.

14:40:15   13   Q.    And, again, are all these receipts for amounts less than

14:40:19   14   $10,000?

14:40:21   15   A.    Yes, sir.

14:40:27   16   Q.    Showing you an e-mail from horses.quarter.racing@hotmail,

14:40:49   17   Government's Exhibit 358E, specifically one from horses.quarter,

14:40:58   18   dated March 9, 2012.  Again, the addressee, Special Agent?

14:41:05   19   A.    HRA Ranchos Santa Fe.

14:41:11   20   Q.    Was this amount consistent with the other amount we saw in

14:41:24   21   the Anri2319 e-mail address?

14:41:27   22   A.    Yes, sir, it is.

14:41:30   23   Q.    And Zule Farms, P.O. Box 1970, Lexington, Oklahoma?

14:41:37   24   A.    Yes, sir.

14:41:37   25   Q.    Where is Zule Farms?

14:41:38   1   A.   That is the Jose Trevino Ranch in Lexington, Oklahoma.

14:41:42   2   Q.   Also goes by 66 Land and Tremor Enterprises?

14:41:46   3   A.   Yes, sir.

14:41:47   4   Q.   Finally, Special Agent, I'm showing you Government's Exhibit

14:41:54   5   358I, which is the zulefarms@yahoo.com e-mail address,

14:42:02   6   specifically, an e-mail from 5-18 of 2012.  What does this e-mail

14:42:19   7   reflect?

14:42:23   8   A.   Sending $30,000.

14:42:25   9   Q.   And is that consistent with the activity you saw on the

14:42:28   10  Hector Santa Fe Roldan bank account?

14:42:32   11  A.   The two checks -- the amounts that I had the two checks were

14:42:35   12  back in February and March.  I don't know if you've got the

14:42:40   13  record dated in May.

14:42:46   14  Q.   And is this zulefarms@yahoo.com consistent with the

14:42:54   15  horses.quarter e-mail with respect to the address of Zule Farms?

14:42:59   16  A.   Yes.

14:43:03   17  Q.   So for those breeding payments, where did all that money

14:43:09   18  originate from, according to the bank records?

14:43:12   19  A.   Structured deposits and/or Jose Luis Canales.

14:43:16   20  Q.   And what location in the United States would that location

14:43:20   21  -- were the funds deposited in?

14:43:21   22  A.   Structured deposits, some were made in Laredo, Texas.

14:43:25   23  Q.   Showing you Government's Exhibit 180, stipulation seized

14:43:36   24  from the Dallas search warrant site of Jose Trevino in Balch

14:43:45   25  Springs.  Does this confirm the address for both the e-mail and

```
14:43:49   1   P.O. Box seen on the e-mails?

14:43:51   2   A.   Yes.

14:43:54   3   Q.   And also confirms Jose and Zulema Trevino as owners?

14:43:57   4   A.   Correct.

14:43:58   5   Q.   Now, at an earlier point in your testimony, you mentioned

14:44:09   6   six or seven horses at an auction being part of a 35-mare group.

14:44:14   7   A.   Yes, sir.

14:44:15   8   Q.   Okay.  What do you mean by a 35-mare group?

14:44:19   9   A.   Thirty-five mares that were being housed at Southwest

14:44:23  10   Stallion Station were a good portion of those 35 mares held under

14:44:26  11   the Carlos Nayen account for a period of time and paid for by

14:44:32  12   funds from Victor Lopez, Carlos Nayen and Alfonso Del Rayo were

14:44:38  13   all grouped together, transferred into the name of Luis Aguirre,

14:44:43  14   and then, transferred into the name of 66 Land, which is a

14:44:47  15   company of Jose Trevino.

14:44:51  16   Q.   And I'm showing you what been marked as Government's Exhibit

14:44:54  17   27A, 27B, 27C, 27D, 27E.  All these represent the 35 mares that

14:45:15  18   you're talking about?

14:45:18  19   A.   I can't see.

14:45:21  20   Q.   I'm sorry.  My mistake.  Let me go through those.  27A.  I'm

14:45:29  21   handing you 27A and 27B.

14:45:41  22   A.   Yes, sir.  This is a number of them.

14:45:46  23   Q.   And does 27B, what are those, sir?

14:45:52  24   A.   These are some more of them, and these came from the

14:46:04  25   Heritage Place auction house, I believe, in the November 5, 2011
```

14:46:20  1   sale that we had previously talked about.

14:46:23  2   Q.   Did you also track the course of these 35 mares over the

14:46:28  3   original place where they were purchased to where they were

14:46:30  4   ultimately found?

14:46:31  5   A.   The ones we could, yes.

14:46:36  6   Q.   Have you prepared a demonstrative exhibit to track those

14:46:42  7   mares to demonstrate the twelve of those mares?

14:46:45  8   A.   One was prepared.

14:46:47  9   Q.   Showing you Government's Exhibit 428.  Is that the

14:46:53  10  demonstrative exhibit that was prepared for your testimony with

14:46:55  11  regards to these mares?

14:46:57  12  A.   Yes, sir.

14:46:59  13  Q.   And what records do you base this off of?

14:47:01  14  A.   They come from the sales records from the various auction

14:47:06  15  houses.  Comes from AQHA records.  It comes from the Southwest

14:47:14  16  Stallion, Paul Jones records.

14:47:18  17  Q.   Your Honor, at this time we offer Government's Exhibit 428

14:47:22  18  for demonstrative purposes.

14:47:25  19            MS. WILLIAMS:  No objection.

14:47:27  20            THE COURT:  428 is admitted as a demonstrative exhibit.

14:47:33  21            MR. GARDNER:  Ms. Sims, could you lower the lights for

14:47:36  22  me?

14:47:37  23            THE CLERK:  Sure.

14:47:38  24  Q.   (BY MR. GARDNER) So what does this exhibit represent,

14:47:47  25  Special Agent?

14:47:48  1    A.    It's basically the -- kind of talking about the purchase of

14:47:53  2    the mares, how they were funded, the various different names that

14:47:56  3    they appeared under, the expenses paid by, and then, the transfer

14:48:02  4    into Luis Aguirre and transferred into 66 Land.

14:48:06  5    Q.    And these 35 mares, they all have names, correct?

14:48:11  6    A.    Yes, they do.

14:48:12  7    Q.    To keep them simple, we're calling them 35 mares?

14:48:15  8    A.    Correct.

14:48:15  9    Q.    First one, please.  What does this represent up here with

14:48:19  10   respect to your tracking these mares?

14:48:21  11   A.    Starting back in early 2000, we had some of the first mares

14:48:27  12   were actually acquired by -- either by Alejandro Barradas-Lagunes

14:48:32  13   -- or I think he's the one that acquired some of the mares early

14:48:36  14   on.

14:48:36  15   Q.    Next portion, please.  And when you list nominees, could you

14:48:42  16   focus in on that?  What does this particular column represent,

14:48:55  17   Special Agent?

14:48:55  18   A.    These are the various names that the horses appeared under

14:48:58  19   at some point in time.

14:49:00  20   Q.    Were some of these names -- I don't believe we've seen but

14:49:04  21   are you familiar with Gabriel Ortiz and Jesus Morales in this

14:49:08  22   investigation?

14:49:10  23   A.    Saying the names, I can't recall the specifics.

14:49:14  24   Q.    And the next column, please?  And where does this figure

14:49:26  25   come from?

14:49:26   1   A.   This only represents 25 of the 35 mares that we tracked

14:49:31   2   through actual purchase auction houses.   Ten were either private

14:49:38   3   sales or they were renamed, and we do not have the documents on

14:49:41   4   the purchase price.   So that dollar amount represents what the 25

14:49:45   5   of the 35 mares were purchased for.

14:49:48   6   Q.   And the next column, please?

14:49:53   7   A.   Those are the type of funds that were used at the various

14:49:55   8   auction houses to pay for the horses.   We had some of the horses

14:50:00   9   purchased with funds through Grupo Aduanero, Arian Jaff, Quick

14:50:06   10   Loans, which came to Colorado-Cessa, Banco Regional wires, Basic

14:50:11   11   Unico wires, then, Francisco Colorado-Cessa.

14:50:13   12   Q.   And when you say funded by, that refers back to the original

14:50:16   13   purchase of these horses from whatever location?

14:50:19   14   A.   Yes, sir.

14:50:26   15   Q.   Next slide, please?

14:50:27   16   A.   These horses were boarded at places like Southwest Stallion

14:50:31   17   Station, Paul Jones, and some others.   And when the expenses were

14:50:35   18   paid, they were paid by these individuals.   Carlos Nayen, Victor

14:50:39   19   Lopez, Juan Camacho, and Alfonso Del Rayo Mora were some of the

14:50:45   20   people that paid expenses on these horses.

14:50:46   21   Q.   And, again, where does that information come from?

14:50:49   22   A.   It comes from the billing statements, Southwest Stallion,

14:50:52   23   Paul Jones, and the other places that we had subpoenaed.

14:50:55   24   Q.   Next column, please.

14:50:59   25   A.   At various points in time, these mares were placed into the

| | | |
|---|---|---|
| 14:51:03 | 1 | name of Luis Aguirre, and this references the timeframe that the |
| 14:51:07 | 2 | horses were placed into his name. |
| 14:51:10 | 3 | Q.   And what point -- or this point here, November '11, are all |
| 14:51:16 | 4 | 35 mares in his name at that point? |
| 14:51:25 | 5 | A.   Yes, sir, I believe they are. |
| 14:51:28 | 6 | Q.   I'm going to show you Government's Exhibit 27F, taken by |
| 14:51:39 | 7 | stipulation from the Lexington, Oklahoma search warrants at the |
| 14:51:43 | 8 | site of Jose Trevino.  What does this check represent, Special |
| 14:51:48 | 9 | Agent, with respect to the 35 mares? |
| 14:51:50 | 10 | A.   That is a voided check in the amount of 122,500.  It says, |
| 14:51:56 | 11 | purchase 35 mares.  This check covers lost check No. 1128. |
| 14:52:05 | 12 |         THE INTERPRETER:  Excuse me, counsel, could I hear the |
| 14:52:07 | 13 | amount total on the check? |
| 14:52:08 | 14 | Q.   (BY MR. GARDNER) Could you give the amount total on the |
| 14:52:10 | 15 | check? |
| 14:52:10 | 16 | A.   $122,500. |
| 14:52:15 | 17 | Q.   Now, whether it was this check or the lost check, was there |
| 14:52:26 | 18 | ever any purchase or negotiation of the $122,500 amount? |
| 14:52:32 | 19 | A.   Check No. 1128 was actually negotiated, but that check |
| 14:52:37 | 20 | bounced.  So there were no funds that exchanged hands for those. |
| 14:52:43 | 21 | Q.   And, again, the check I just showed you wasn't 1128, it was |
| 14:52:47 | 22 | 1141, correct? |
| 14:52:48 | 23 | A.   Correct. |
| 14:52:49 | 24 | Q.   Next portion, please.  So at some point, when do those |
| 14:52:55 | 25 | horses get transferred? |

| | | |
|---|---|---|
| 14:52:56 | 1 | A.   The horses were actually transferred on January 29th, |
| 14:53:01 | 2 | January 30th, 2012. |
| 14:53:07 | 3 | Q.   I'll refer you to a page of Government's Exhibit 226, page |
| 14:53:19 | 4 | 611242.  What is this, Special Agent? |
| 14:53:23 | 5 | A.   That is the sign-in log for the American Quarter Horse |
| 14:53:26 | 6 | Association in Amarillo, Texas. |
| 14:53:29 | 7 | Q.   And, again, what is the date on the transfer of the 35 mares |
| 14:53:35 | 8 | to 66 Land? |
| 14:53:36 | 9 | A.   January 30, 2012. |
| 14:53:38 | 10 | Q.   And right here on this line at the AQHA sign-in, will you |
| 14:53:44 | 11 | state the date for the record? |
| 14:53:45 | 12 | A.   January 30. |
| 14:53:46 | 13 | Q.   And the person? |
| 14:53:47 | 14 | A.   Fernando Garcia. |
| 14:53:55 | 15 | Q.   Could I have the lights on, please, Ms. Sims? |
| 14:54:03 | 16 |      So, Special Agent Pennington, have you ever been able |
| 14:54:06 | 17 | to trace any funds paid for any of those 35 mares? |
| 14:54:09 | 18 | A.   No, sir. |
| 14:54:10 | 19 | Q.   Now, we didn't have the names of the 35 mares.  Could you |
| 14:54:17 | 20 | please tell the jury the most prominent one of those mares? |
| 14:54:20 | 21 | A.   Dashin Follies. |
| 14:54:22 | 22 | Q.   Is Dashin Follies currently -- or was in Jose Trevino's |
| 14:54:28 | 23 | name? |
| 14:54:28 | 24 | A.   It was in 66 Land.  That was the one purchased by Tyler |
| 14:54:33 | 25 | Graham as the agent, placed into Alejandro Barradas' name January |

14:54:38    1    of 2010.

14:54:40    2    Q.   Did you also trace a number of other expenditures from Jose

14:54:44    3    Trevino's accounts or operations?

14:54:50    4    A.   It was done.

14:54:52    5    Q.   I want to refer you to Government's Exhibit 261, the account

14:54:56    6    of Gerardo Quintero.  Are you familiar with that account, sir?

14:54:59    7    A.   Yes, I am.

14:55:00    8    Q.   And what kind of activity did you see in that account?

14:55:05    9    A.   There was a $213,000 wire transfer in a bunch of bulk cash

14:55:12   10    deposits into that account.

14:55:14   11    Q.   When was that account opened?

14:55:21   12    A.   That account was opened on March 2nd, 2012.

14:55:27   13    Q.   And just briefly, what type of deposits were made to that

14:55:30   14    account?

14:55:30   15    A.   Bulk currency was deposited into that account, along with a

14:55:36   16    $213,000 wire transfer from Edith Lopez.

14:55:40   17    Q.   And in what country did that wire transfer originate?

14:55:46   18    A.   I believe that one was actually in the United States.  I

14:55:49   19    think she opened another account in the U.S., put money into that

14:55:52   20    account, and then, did a wire transfer.

14:55:54   21    Q.   And who is Edith Lopez associated with?

14:55:56   22    A.   A Zeta accountant.

14:56:00   23    Q.   And what expenditures were made from that account?

14:56:03   24    A.   Two checks, the first one being a $300,000 check to Tremor

14:56:09   25    Enterprises for the, quote, purchase of Feature Honor.

| | | |
|---|---|---|
| 14:56:13 | 1 | Q.   All right.  I'm showing the jury page 52-22.  For the |
| 14:56:19 | 2 | record, what was the date, Special Agent? |
| 14:56:21 | 3 | A.   3-3 of 2012. |
| 14:56:22 | 4 | Q.   And how long after Mr. Quintero established the account did |
| 14:56:29 | 5 | he write this check? |
| 14:56:30 | 6 | A.   The next day. |
| 14:56:30 | 7 | Q.   And what's the number on the bank check? |
| 14:56:33 | 8 | A.   No. 1. |
| 14:56:34 | 9 | Q.   All right.  And in the memo section? |
| 14:56:37 | 10 | A.   Purchase of Feature Honor. |
| 14:56:38 | 11 | Q.   For $300,000, correct? |
| 14:56:40 | 12 | A.   Correct. |
| 14:56:40 | 13 | Q.   What was the original purchase price of Feature Honor? |
| 14:56:44 | 14 | A.   $12,000. |
| 14:56:46 | 15 | Q.   This check is deposited into Tremor Enterprises' accounts? |
| 14:56:50 | 16 | A.   One of his accounts.  I couldn't tell you exactly which one |
| 14:56:52 | 17 | it was. |
| 14:56:55 | 18 | Q.   You said there's two checks? |
| 14:56:57 | 19 | A.   Correct. |
| 14:57:01 | 20 | Q.   I'm showing you page 52-36, dated March 28th for $400,000 |
| 14:57:08 | 21 | for the purchase of Fly Corona.  What was the account activity |
| 14:57:15 | 22 | prior to the writing of that check? |
| 14:57:16 | 23 | A.   Again, you had bulk cash deposits in that $213,000 wire that |
| 14:57:21 | 24 | I had just talked about. |
| 14:57:22 | 25 | Q.   And with respect to Fly Corona, how much money did Tremor |

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

14:57:29   1   Enterprises pay for that horse originally?

14:57:32   2   A.   I found no documents where they paid any money for that

14:57:35   3   horse.

14:57:38   4   Q.   At the time of the 3 and $400,000 check, were you aware of

14:57:41   5   the balance in Jose Trevino's accounts?

14:57:44   6   A.   In the different accounts, I believe, but yes.

14:57:47   7   Q.   And what was that, sir?

14:57:48   8   A.   Around the timeframe of when these checks were deposited, I

14:57:54   9   believe the total money in all of his accounts was roughly around

14:57:57   10  $100,000.

14:58:01   11  Q.   Now, part of the government's indictment alleges the

14:58:04   12  international movement of funds?

14:58:06   13  A.   Yes, sir.

14:58:06   14  Q.   If you will, could you please explain to the jury what

14:58:10   15  international movement of funds were discovered in this case

14:58:14   16  based on the evidence already submitted?

14:58:16   17  A.   Yes, sir.  We had bulk currency from the sale of narcotics

14:58:20   18  being physically shipped from the United States in bulk-cash

14:58:25   19  smuggling out into Mexico.  And then, we have a number of wire

14:58:28   20  transfers going back in from various different banks in Mexico

14:58:32   21  such as Banco Monex, Banco Regional de Monterrey, Basic

14:58:39   22  Enterprises, ADT Petro Servicios.  We had some from Grupo

14:58:46   23  Aduanero from Sabanco.  Those wires originated in Mexico and the

14:58:54   24  money's wired to banks in the United States for the purchase of

14:58:58   25  quarter horses.

14:58:58   1   Q.   Sir, do you recall the testimony of Special Agent Ed O'Dwyer

14:59:03   2   with the Department of Homeland Security Investigations?

14:59:05   3   A.   Yes, sir.

14:59:05   4   Q.   And what is a CMIR?

14:59:07   5   A.   Currency Monetary Instrument Report.

14:59:10   6   Q.   Do you recall the testimony regarding individuals come

14:59:14   7   across the border?

14:59:17   8   A.   Yes.

14:59:17   9   Q.   Does that also consist of international movement of

14:59:19   10   currency?

14:59:20   11   A.   Yes, it is.

14:59:21   12   Q.   And what would you equate a CMIR to?

14:59:26   13   A.   It's equivalent to Currency Transaction Reporting.

14:59:30   14   Q.   And is it for the international crossing border?

14:59:33   15   A.   Yes.

14:59:33   16   Q.   Now, the government has also alleged the interstate movement

14:59:36   17   of funds.  What evidence did you review to indicate that there

14:59:40   18   was interstate movement of funds in this case?

14:59:42   19   A.   You had currency deposited into various banks in Laredo,

14:59:51   20   Texas, and then, you had the money from those accounts were in

14:59:55   21   California, Arizona, other states.

14:59:57   22   Q.   And what banks were they using, I'm sorry?

15:00:00   23   A.   IBC Bank, Wells Fargo, we have UBS, Bank of America.

15:00:09   24   Q.   And when I use the term "FDIC," what does that mean?

15:00:13   25   A.   It's federally insured.

| | | |
|---|---|---|
| 15:00:18 | 1 | Q.   Federal Deposit Insurance Corporation? |
| 15:00:20 | 2 | A.   Yes, sir. |
| 15:00:21 | 3 | Q.   Were the banks that you previously mentioned, were they FDIC |
| 15:00:25 | 4 | members? |
| 15:00:25 | 5 | A.   Yes. |
| 15:00:26 | 6 | Q.   Special Agent Pennington, did you make a summary of all |
| 15:00:35 | 7 | purchases for all of the horses in this case associated with this |
| 15:00:40 | 8 | organization? |
| 15:00:43 | 9 | A.   Yes. |
| 15:00:45 | 10 | Q.   And what was the total amount expended on horses in this |
| 15:00:49 | 11 | investigation? |
| 15:00:50 | 12 | A.   Over $25 million. |
| 15:00:56 | 13 | Q.   Did you locate any horses purchased at auction by Jose |
| 15:01:02 | 14 | Trevino, Tremor Enterprises, 66 Land, or Zule Farms? |
| 15:01:06 | 15 | A.   Yes. |
| 15:01:07 | 16 | Q.   How many? |
| 15:01:07 | 17 | A.   One. |
| 15:01:08 | 18 | Q.   And what was the amount of that horse? |
| 15:01:10 | 19 | A.   $5,500, I believe. |
| 15:01:18 | 20 | Q.   And, sir, were you present during the testimony of Special |
| 15:01:21 | 21 | Agent Fernald with respect to the horses purchased by |
| 15:01:25 | 22 | Colorado-Cessa? |
| 15:01:25 | 23 | A.   Yes, sir. |
| 15:01:26 | 24 | Q.   How many horses total did Colorado-Cessa purchase? |
| 15:01:31 | 25 | A.   I believe that was 121. |

15:01:36 1    Q.   And were you able to track the number of horses still in

15:01:43 2    Defendant Colorado's possession on June 12th, 2012?

15:01:46 3    A.   Yes.  He had -- I believe it was 41 still listed under his

15:01:52 4    name per AQHA records.  But some of those -- yes.

15:02:01 5    Q.   Of the 121, 41 were still listed under his records?

15:02:05 6    A.   Correct.

15:02:06 7    Q.   And did you break down that 41 even further?

15:02:09 8    A.   Yes.

15:02:10 9    Q.   And when you break down the 41, what did you discover with

15:02:14 10   respect to the location of those horses?

15:02:16 11   A.   A number of those horses were cared for at places like

15:02:22 12   Southwest Stallion, Paul Jones under the Carlos Nayen account.

15:02:28 13   And some of those horses were seized by IRS either at Lexington,

15:02:33 14   Oklahoma, or California, or New Mexico.

15:02:37 15   Q.   And horses that you discovered being stabled under various

15:02:42 16   places, how were those expenses paid for?

15:02:44 17   A.   They were paid for by currency through Carlos Nayen and

15:02:48 18   Victor Lopez and by the funds from Alfonso Del Rayo-Mora.

15:02:57 19   Q.   May I have one moment, your Honor?  Your Honor, I pass the

15:03:03 20   witness.

15:03:04 21            THE COURT:  Give you your afternoon break, members of

15:03:06 22   the jury.  Stretch, use the facilities.  Be ready to come back in

15:03:10 23   about 15 minutes.

15:03:50 24            (Jury not present.)

15:03:53 25            THE COURT:  Fifteen-minute recess.

| | | |
|---|---|---|
| 15:03:59 | 1 | (Recess.) |
| 15:20:51 | 2 | (Jury present.) |
| 15:22:24 | 3 | THE COURT:  Ms. Williams, it's your witness. |
| 15:22:27 | 4 | MS. WILLIAMS:  Thank you, your Honor. |
| 15:22:28 | 5 | CROSS-EXAMINATION |
| 15:22:28 | 6 | BY MS. WILLIAMS: |
| 15:23:10 | 7 | Q.   Agent Pennington, first I want to talk very briefly, because |
| 15:23:15 | 8 | we've already been over this, about Fly First Down.  Do you |
| 15:23:19 | 9 | remember your testimony about that? |
| 15:23:20 | 10 | A.   Yes, ma'am. |
| 15:23:20 | 11 | Q.   And Agent Schutt was already here and already told the jury |
| 15:23:23 | 12 | and I've already cross-examined Agent Schutt about Fly First |
| 15:23:26 | 13 | Down.  Do you remember that, as well? |
| 15:23:27 | 14 | A.   Yes, ma'am. |
| 15:23:27 | 15 | Q.   All right.  And so, as to Fly First Down, the issue is that |
| 15:23:36 | 16 | a check got sent that wasn't cashed, right?  A check got sent |
| 15:23:42 | 17 | that wasn't cashed and a check didn't get sent, correct? |
| 15:23:45 | 18 | A.   I believe you're confusing two horses. |
| 15:23:48 | 19 | Q.   All right.  At any rate, the issue is that you, same as |
| 15:23:56 | 20 | Agent Schutt, don't have any idea what agreement was made between |
| 15:24:05 | 21 | Mr. Colorado and Jose Trevino about the purchase of this horse, |
| 15:24:10 | 22 | do you? |
| 15:24:10 | 23 | A.   No. |
| 15:24:11 | 24 | Q.   And you heard from, as an example, Tyler Graham, that it's |
| 15:24:18 | 25 | pretty common in the horse industry to trade breedings, services, |

15:24:24  1   boarding for breeding services, boarding horses, that kind of

15:24:29  2   thing.  Isn't that what he said?

15:24:32  3   A.   You can trade breeding for boarding.  You can trade items.

15:24:38  4   Yes, ma'am.

15:24:38  5   Q.   And that is pretty common in the horse industry.  Isn't that

15:24:41  6   what Tyler Graham said?

15:24:42  7   A.   He may have.  I don't recall that.

15:24:45  8   Q.   Now, I want to talk about your testimony with regard to

15:25:03  9   tracking horses.  You said first that there were some horses that

15:25:12  10  were purchased at the January 2012 Heritage Place sale, and that

15:25:24  11  you tracked those horses and some of them -- four of them

15:25:30  12  specifically went to Victor Nieto, Nain Hernandez, Santa Fe

15:25:35  13  Roldan and Efrain Garcia, right?

15:25:37  14  A.   No.  They went to Jose's ranch in Lexington, Oklahoma.

15:25:40  15  Q.   Well, and where did they go after that?

15:25:42  16  A.   We seized them.

15:25:47  17  Q.   Those horses went to Southwest Stallion Station, did they

15:25:49  18  not?

15:25:50  19  A.   No, ma'am.

15:25:54  20  Q.   You want to look at your notes?

15:25:56  21  A.   Sure.  January of 2012.

15:26:13  22  Q.   Right.

15:26:15  23  A.   The five horses and two foals in utero.  Mr. Perrys Wine and

15:26:20  24  Katies Signs were taken to Jose Trevino ranch in Lexington,

15:26:25  25  Oklahoma and placed on billing invoices under the nominee names.

| | | |
|---|---|---|
| 15:26:29 | 1 | Q. When you say nominee name, what does that mean? |
| 15:26:32 | 2 | A. Names that are not the true owners of the horses. |
| 15:26:35 | 3 | Q. According to? |
| 15:26:37 | 4 | A. AQHA and the witnesses that we talked to. |
| 15:26:40 | 5 | Q. According to AQHA? |
| 15:26:41 | 6 | A. Uh-huh. |
| 15:26:46 | 7 | Q. All right. So in January 2012, these horses go to Jose |
| 15:26:54 | 8 | Trevino's ranch to Lexington, Oklahoma. That's what you just |
| 15:26:59 | 9 | told me? |
| 15:27:00 | 10 | A. Three of them. |
| 15:27:01 | 11 | Q. Three of them did. Where did the rest go? |
| 15:27:02 | 12 | A. Two go to the Lazy E. |
| 15:27:06 | 13 | Q. Okay. |
| 15:27:08 | 14 | A. And two which were eventually placed into Francisco |
| 15:27:12 | 15 | Colorado's name is unknown. |
| 15:27:13 | 16 | Q. All right. Then you testified about these breeding |
| 15:27:22 | 17 | contracts, Victor Nieto, Nain Hernandez, Santa Fe Roldan and |
| 15:27:30 | 18 | Efrain Garcia, right? |
| 15:27:30 | 19 | A. Yes. |
| 15:27:31 | 20 | Q. And you testified that those -- that there were billing |
| 15:27:42 | 21 | records with regard to those horses? |
| 15:27:46 | 22 | A. Those four individuals. There was billing records from Zule |
| 15:27:52 | 23 | Farms to those four individuals. |
| 15:27:53 | 24 | Q. To those four individuals? |
| 15:27:55 | 25 | A. Yes, ma'am. |

15:27:55    1    Q.   All right.  And that there were deposits or payments as a

15:28:01    2    result of those billing records, right?

15:28:02    3    A.   Just two.

15:28:05    4    Q.   One for Nain Hernandez, correct?

15:28:17    5    A.   Correct.

15:28:17    6    Q.   One bounced and one didn't.  So there were two payments, but

15:28:20    7    only one actually got through, right?

15:28:21    8    A.   Correct.

15:28:23    9    Q.   And then, the prosecutor showed you a bunch of bank records

15:28:29   10    for those four people that we've just been talking about, Nain

15:28:33   11    Hernandez, Efrain Garcia?

15:28:33   12    A.   No, ma'am.  For two of the individuals.

15:28:35   13    Q.   Okay.  And he showed you those bank records.  And I want to

15:28:37   14    make sure that it's clear that those bank records were not found

15:28:40   15    at Lexington, Oklahoma.

15:28:43   16    A.   No, ma'am.  They were not.

15:28:44   17    Q.   All right.  Those were records that you subpoenaed from the

15:28:48   18    bank?

15:28:48   19    A.   Yes, we did.

15:28:49   20    Q.   All right.  And so, there's no reason to believe that Jose

15:28:53   21    Trevino knew anything about how the money got into the bank

15:28:56   22    account, right?

15:28:56   23    A.   Whether he did or did not know, I do not know.

15:28:59   24    Q.   All right.  So $50,000 went into Jose Trevino's bank

15:29:16   25    account, right?

| | | |
|---|---|---|
| 15:29:16 | 1 | A.   Yes, ma'am. |
| 15:29:16 | 2 | Q.   And then, $30,000? |
| 15:29:18 | 3 | A.   Yes, ma'am. |
| 15:29:18 | 4 | Q.   All right.  Now, let's talk about these mares.  Well, before |
| 15:29:33 | 5 | we get there, I have one -- you talked about the purchase of |
| 15:29:38 | 6 | Feature Honor, and you told the jury that Feature Honor was |
| 15:29:42 | 7 | purchased for $12,000 and then, sold for $300,000? |
| 15:29:48 | 8 | A.   Originally purchased for 12,000 by Francisco Colorado. |
| 15:29:52 | 9 | Q.   And then sold? |
| 15:29:55 | 10 | A.   Sold as to whom? |
| 15:29:58 | 11 | Q.   Well, you just testified that Mr. Trevino sold that horse |
| 15:30:02 | 12 | and got a check for $300,000. |
| 15:30:05 | 13 | A.   The horse was transferred to -- I put sold in quotation |
| 15:30:12 | 14 | marks. |
| 15:30:21 | 15 | Q.   Do you disagree that the horse was sold? |
| 15:30:24 | 16 | A.   Oh, totally. |
| 15:30:24 | 17 | Q.   All right.  What did you leave out about what happened |
| 15:30:28 | 18 | between the time the horse was purchased for $12,000 and the time |
| 15:30:31 | 19 | the horse was sold for $300,000? |
| 15:30:35 | 20 | A.   Ownership per AQHA registration was changed to Carmina, LLC, |
| 15:30:42 | 21 | changed to Tremor Enterprises, raced, was -- |
| 15:30:42 | 22 | Q.   Stop you there. |
| 15:30:51 | 23 | A.   Give me a second.  Or transferred or whatever you want to |
| 15:30:54 | 24 | call it. |
| 15:30:54 | 25 | Q.   All right.  Let's go back to raced. |

| 15:30:56 | 1 | A. | Yes. |

15:30:56  1  A.  Yes.

15:30:57  2  Q.  What happened when this horse raced?

15:30:59  3  A.  It won some money.

15:31:01  4  Q.  Do you remember how much?

15:31:03  5  A.  I want to say $67,000.  I don't know if that's correct or

15:31:09  6  not.

15:31:09  7  Q.  Did it just win one race or did it win two races?

15:31:13  8  A.  Do not remember.

15:31:14  9  Q.  Isn't that important in determining whether or not $300,000

15:31:20  10  is a fair price or not?

15:31:22  11  A.  I'm not one to determine fair price for a horse.

15:31:25  12  Q.  Well, you stood up there and you said the horse was

15:31:28  13  purchased for 12,000 and then, sold for $300,000, right?

15:31:32  14  A.  I don't think it was a sale.

15:31:33  15  Q.  All right.  Sold for $300,000.  But you say 12,000 like you

15:31:42  16  think that's the value of the horse, right?

15:31:44  17  A.  When it was originally purchased, yes.

15:31:45  18  Q.  Right.  But the horse's value increases as good things

15:31:50  19  happen to the horse, right?

15:31:51  20  A.  Yes.

15:31:52  21  Q.  And when it wins one race, the value of the horse goes up,

15:31:56  22  right?

15:31:57  23  A.  Yes.

15:31:58  24  Q.  And if it wins two races, the value of the horse goes up

15:32:00  25  even more, right?

| | | |
|---|---|---|
| 15:32:01 | 1 | A. Don't know. I would think so, but I do not know. |
| 15:32:04 | 2 | Q. Now, you're the lead IRS investigator on this case? |
| 15:32:09 | 3 | A. Yes, ma'am. |
| 15:32:10 | 4 | Q. Correct? And you never got tax returns for Jose Trevino? |
| 15:32:19 | 5 | A. Did not. |
| 15:32:27 | 6 | Q. Now, I want to talk about the mares. Over a period of time, |
| 15:33:07 | 7 | leading up to November of 2011, various mares were purchased? |
| 15:33:12 | 8 | A. Correct. |
| 15:33:19 | 9 | Q. By various people? |
| 15:33:21 | 10 | A. Under various nominees. Yes, ma'am. |
| 15:33:26 | 11 | Q. Can we have an agreement that I'll try to ask you questions |
| 15:33:31 | 12 | and you'll try to only answer my questions? |
| 15:33:33 | 13 | A. I'll answer the best I can. |
| 15:33:35 | 14 | Q. And not add on at the end? |
| 15:33:43 | 15 | None of those purchases or names that the horses were |
| 15:33:51 | 16 | purchased under were Jose Trevino, right? |
| 15:33:54 | 17 | A. Correct. |
| 15:33:56 | 18 | Q. And it wasn't funded through any of Jose Trevino's |
| 15:34:00 | 19 | companies? |
| 15:34:02 | 20 | A. No. |
| 15:34:02 | 21 | Q. All right. And then, all these mares get transferred to Mr. |
| 15:34:10 | 22 | Aguirre? |
| 15:34:12 | 23 | A. Into his name. |
| 15:34:13 | 24 | Q. Into his name? |
| 15:34:14 | 25 | A. Yes. |

15:34:14  1   Q.   And then, they go to 66 Land?

15:34:21  2   A.   Yes.

15:34:22  3   Q.   All right.  What do we know about 66 Land operation with

15:34:27  4   regard to what it is they do?  Do they breed horses?

15:34:32  5   A.   Yes.

15:34:33  6   Q.   All right.  And so, these 35 mares come to Jose Trevino's

15:34:40  7   ranch.  And presumably, the reason that you would send 35 mares

15:34:44  8   to a breeding farm would be to breed them, right?

15:34:49  9   A.   Yes.

15:34:52  10  Q.   And we know -- well, we don't know what agreement, or what

15:35:06  11  arrangement, or anything, happened between Mr. Trevino and Mr.

15:35:12  12  Aguirre, do we?

15:35:12  13  A.   Yes, ma'am.  I believe we do.

15:35:15  14  Q.   We don't know what discussions they ever had, do we?

15:35:18  15  A.   Based on the investigation, I believe I know what the

15:35:21  16  agreement was.

15:35:24  17  Q.   What we know is that Mr. Trevino sent a check February 2nd

15:35:36  18  of 2012 that bounced?

15:35:39  19  A.   That is correct.

15:35:41  20  Q.   And we don't know when that check was sent, whether or not

15:35:45  21  there was any discussion between Jose Trevino and Mr. Aguirre

15:35:49  22  about holding the check or waiting a week to deposit it.  We

15:35:53  23  don't know any of that, do we?

15:35:54  24  A.   Correct.

15:35:58  25  Q.   And we know that if Mr. Aguirre had waited about four days,

15:36:06  1   that he could have cashed the check.  We know that, don't we?

15:36:13  2   A.   I have to look at the balance.  Yes.

15:36:32  3   Q.   And we know that another check was written on some date,

15:36:52  4   Government's Exhibit 271, to replace that check?

15:36:57  5   A.   Correct.

15:36:57  6   Q.   What date do you think that is?  April?  April 27th?  It

15:37:06  7   looks like something was written and then -- it looks like a four

15:37:09  8   was written over it.  Do you agree with that or not?

15:37:11  9   A.   I have no idea what that number is.

15:37:13  10  Q.   All right.  But this check was never negotiated or sent, to

15:37:22  11  our knowledge, correct?

15:37:25  12  A.   Correct.

15:37:25  13  Q.   And then, what would have happened on a breeding ranch

15:37:31  14  between January and April or May or June with 35 mares,

15:37:40  15  presumably, they would have been bred, correct?

15:37:41  16  A.   Yes, ma'am.

15:37:42  17  Q.   All right.  And so, when -- do you remember hearing

15:37:49  18  testimony about Oklahoma-bred baby horses?

15:37:54  19  A.   Yes.

15:37:54  20  Q.   All right.  And so, if Jose Trevino or one of his companies

15:37:59  21  owns these mares at the time they're bred, then the babies are

15:38:02  22  Oklahoma-bred?

15:38:03  23  A.   If they're born in Oklahoma, they're Oklahoma-bred.

15:38:06  24  Q.   If they're born in Oklahoma?

15:38:07  25  A.   Yes, ma'am.

15:38:08   1   Q.   And so, there presumably would have been at least 35, maybe

15:38:12   2   more, foals born of those 35 mares?

15:38:15   3   A.   If all bred and took, yes, ma'am.   Yes.

15:38:21   4   Q.   And we don't know, do we, who those foals belong to?

15:38:26   5   A.   Well, since they were all -- the 35 mares were in Jose

15:38:31   6   Trevino's name at this time, they would be Jose Trevino's.

15:38:33   7   Q.   But we don't know what the agreement was, do we?

15:38:35   8   A.   Between whom?

15:38:37   9   Q.   Well, we don't know what any agreement was.   But we

15:38:41   10   certainly don't know whether the agreement was between Jose

15:38:43   11   Trevino and the owner of the mares before they got transferred

15:38:47   12   into Jose Trevino's name, do we?

15:38:48   13   A.   I think I do.

15:38:54   14   Q.   The babies never were able to be registered by Jose Trevino

15:39:01   15   because he was arrested before that happened, right?

15:39:03   16   A.   That is correct.

15:39:04   17   Q.   And we don't know whether or not an additional check was

15:39:08   18   sent or would have been sent after this check in April of 2012

15:39:13   19   because Jose Trevino was arrested; isn't that right?

15:39:16   20   A.   He was arrested in June 12, 2012, and one was not sent prior

15:39:20   21   to that, nor was one sent after that.

15:39:23   22   Q.   One wasn't cashed, right?

15:39:26   23   A.   The what?

15:39:27   24   Q.   One wasn't cashed?

15:39:28   25   A.   It was not sent.   What are you talking about?

15:39:30    1    Q.    Well, a check didn't go through his bank account before

15:39:34    2    June, right?

15:39:34    3    A.    No.

15:39:35    4    Q.    Do you know for fact that one wasn't written?

15:39:39    5    A.    That one.  The other checks that we seized and looked at,

15:39:43    6    no.  That's the only one.

15:39:48    7    Q.    Did you look at all the checks then?

15:39:50    8    A.    They were looked at.  Yes.

15:39:51    9    Q.    All right.  Where is Dashin Follies now?

15:40:05   10    A.    It's in the possession of United States government.

15:40:07   11    Q.    But where?

15:40:12   12    A.    It's at a ranch, and I don't know the exact location of the

15:40:16   13    ranch.

15:40:17   14    Q.    Is it at Southwest Stallion Station?

15:40:18   15    A.    No.

15:40:20   16    Q.    Do you know whether or not there's a picture of Tyler Graham

15:40:26   17    holding Dashin Follies on the website of Southwest Stallion

15:40:29   18    Station?

15:40:29   19    A.    Possibly, since he was the agent at the 2012 -- January 2012

15:40:34   20    sale that was purchased for $875,000.

15:40:43   21    Q.    Nothing further.  Pass the witness.

15:40:53   22          THE COURT:  Mr. Sanchez.

15:40:55   23          MR. SANCHEZ:  Thank you, your Honor.

15:40:55   24

15:40:56   25

CROSS-EXAMINATION

BY MR. SANCHEZ:

Q.   Mr. Pennington, I want to make sure we're talking about the same auction houses.  When Mr. Gardner was asking you, he asked you -- I want to talk about three auctions.  First was September 2010 Ruidoso.

A.   Correct.

Q.   Is that one that he had you talk about?

A.   Yes.

Q.   Next one was November 2011 Heritage Place; is that right?

A.   Yes, sir.

Q.   Okay.  And then, January 2012 Heritage Place again?

A.   Yes, sir.

Q.   Okay.  But those are obviously two different auctions.  It's not -- same place but two different types of auctions?

A.   Correct.

Q.   Okay.  September 2010 Ruidoso, were there agents actually at that auction?

A.   Yes.

Q.   Were you there?

A.   No.

Q.   What days exactly was that auction?

A.   I believe it was Labor Day weekend September 2010, which would include September 3rd.  I don't know if it's 2nd, 3rd, 4th or 4th, 5th and 6th.

| | | |
|---|---|---|
| 15:42:51 | 1 | Q.   Do you know what day the check -- the BBVA check was |
| 15:42:56 | 2 | written?  Or I think we heard a woman say that it was -- she |
| 15:43:00 | 3 | filled it out inside a -- in her office.  Do you know what day |
| 15:43:05 | 4 | that was? |
| 15:43:05 | 5 | A.   No.  It's on the check. |
| 15:43:07 | 6 | Q.   Showing you Colorado 8. |
| 15:43:14 | 7 | A.   9-6-2010. |
| 15:43:17 | 8 | Q.   All right.  So 9-6-2010, that was the day after the auction, |
| 15:43:24 | 9 | right? |
| 15:43:24 | 10 | A.   The following Monday.  Yes. |
| 15:43:26 | 11 | Q.   Okay.  And so, what I'm trying to figure out with the agents |
| 15:43:30 | 12 | that you had at that auction, you know that Francisco Colorado |
| 15:43:36 | 13 | wasn't at the auction? |
| 15:43:38 | 14 | A.   He was not. |
| 15:43:40 | 15 | Q.   Carlos Nayen was at the auction? |
| 15:43:42 | 16 | A.   Correct. |
| 15:43:44 | 17 | Q.   The next auction, that November 2011 Heritage Place, |
| 15:43:50 | 18 | Francisco wasn't at the auction? |
| 15:43:52 | 19 | A.   No. |
| 15:43:54 | 20 | Q.   Carlos Nayen was at that auction? |
| 15:43:55 | 21 | A.   I believe that's correct. |
| 15:43:56 | 22 | Q.   And January 2012 Heritage Place, Francisco wasn't at the |
| 15:44:01 | 23 | auction? |
| 15:44:02 | 24 | A.   No. |
| 15:44:03 | 25 | Q.   Carlos Nayen was? |

15:44:08   1   A.   I want to say yes, but I'm not sure on that one.

15:44:11   2   Q.   Okay.  And we know, or at least its sounds like -- we don't

15:44:18   3   know exactly from that woman, but it sounds like Francisco showed

15:44:21   4   up on September 2010 and wrote the check, right?

15:44:25   5   A.   Right.  And received a trophy.

15:44:27   6   Q.   And received a trophy?

15:44:28   7   A.   Yes, sir.

15:44:29   8   Q.   We had -- and then, following that, whether it's in 2010,

15:44:35   9   2011, 2012, do you know whether Francisco went to any other

15:44:41   10  auctions?

15:44:43   11  A.   Do not know.

15:44:52   12  Q.   I want to talk for a second about this funded-through

15:45:43   13  entities.  Do you see that?

15:45:44   14  A.   Yes, sir.

15:45:47   15  Q.   You list Grupo de Aduanero and that was -- who was that

15:45:53   16  related to?

15:45:54   17  A.   Alejandro Barradas.

15:46:02   18  Q.   Do you know where Alejandro Barradas is?

15:46:05   19  A.   I think he's dead.

15:46:06   20  Q.   Okay.  Arian Jaff, Quick Loans, that's the -- we heard from

15:46:10   21  Arian Jaff, correct?

15:46:11   22  A.   Yes, we did.

15:46:12   23  Q.   And Arian Jaff, when you list Arian Jaff -- well, Arian Jaff

15:46:17   24  and Quick Loans, right?

15:46:19   25  A.   Correct.

| | | |
|---|---|---|
| 15:46:19 | 1 | Q.   Because part of it was funded by Arian Jaff.  Part of it was |
| 15:46:22 | 2 | funded by Quick Loans? |
| 15:46:23 | 3 | A.   Right.  Two separate wires. |
| 15:46:24 | 4 | Q.   And this is the wire we're talking about.  Is this the wire |
| 15:46:29 | 5 | where Arian Jaff said that Mr. Colorado had called him and seemed |
| 15:46:34 | 6 | nervous and a little out of character?  Is that the same wire and |
| 15:46:38 | 7 | the same loan we're talking about?  Is that why you listed that? |
| 15:46:41 | 8 | A.   No.  I listed that because this is where the money came |
| 15:46:44 | 9 | from. |
| 15:46:44 | 10 | Q.   Okay.  And I'm just trying to make sure because there was |
| 15:46:46 | 11 | several loans, right?  There was a loan from 2010 that Arian Jaff |
| 15:46:51 | 12 | talked about.  But we're talking about the 2011? |
| 15:46:54 | 13 | A.   November 2011. |
| 15:46:56 | 14 | Q.   Right. |
| 15:46:56 | 15 | A.   Yes, sir. |
| 15:46:57 | 16 | Q.   Not the May 2010? |
| 15:46:59 | 17 | A.   Correct. |
| 15:47:00 | 18 | Q.   Then here, at the end, you list out Francisco |
| 15:47:08 | 19 | Colorado-Cessa.  And, again, I'm going to switch there for one |
| 15:47:12 | 20 | second.  I guess, presumably -- well, I don't know if this is |
| 15:47:24 | 21 | going to work. |
| 15:47:25 | 22 |         Because of that check, that's actually Francisco |
| 15:47:31 | 23 | Antonio Colorado-Cessa's account, right? |
| 15:47:35 | 24 | A.   Not from that sale.  It was prior to that. |
| 15:47:49 | 25 | Q.   Is that the American Express account? |

15:47:52  1   A.   Yes.

15:47:53  2   Q.   Okay.  So that's from the -- so the reason you list

15:48:02  3   Francisco Colorado-Cessa is because of the 2009 Ruidoso sale

15:48:07  4   where he writes a check for around half a million dollars from

15:48:10  5   his American Express account?

15:48:11  6   A.   Correct.

15:48:13  7   Q.   Does it have anything -- or does this chart discuss at all

15:48:19  8   any horses purchased at the 2011 auction?

15:48:24  9   A.   No.  The horses purchased at 2011 were not -- which one are

15:48:33  10  you talking about?

15:48:33  11  Q.   Ruidoso or is it -- so you've got Ruidoso in September at

15:48:36  12  the beginning part, and then, you've got --

15:48:38  13  A.   You've got Ruidoso.  You have Los Alamitos and then, you

15:48:41  14  have Heritage Place.

15:48:43  15  Q.   Okay.  So does it come from either the Ruidoso 2011 or the

15:48:47  16  Los Alamitos 2011?

15:48:52  17  A.   The 35 mares is what you're talking about?

15:48:55  18  Q.   Yeah.

15:48:56  19  A.   Okay.  No.

15:48:57  20  Q.   No.  Okay.  Now, I want to talk a little bit about -- you

15:49:25  21  talked about how there was bulk cash in the United States going

15:49:32  22  down to Mexico?

15:49:33  23  A.   Yes, sir.

15:49:34  24  Q.   And then, you talked about wires or transfers coming back

15:49:38  25  from Mexico back to the United States.  Do you remember that?

| | | |
|---|---|---|
| 15:49:41 | 1 | A.   Yes. |
| 15:49:42 | 2 | Q.   All right.  And you talked for a minute about Gerardo |
| 15:49:58 | 3 | Quintero? |
| 15:49:59 | 4 | A.   Correct. |
| 15:50:00 | 5 | Q.   It's actually Gerardo Garza-Quintero? |
| 15:50:04 | 6 | A.   Yes. |
| 15:50:04 | 7 | Q.   And in that account, this is an account that's just on the |
| 15:50:07 | 8 | other side of the border; is that right? |
| 15:50:09 | 9 | A.   I believe this is actually in Laredo, Texas. |
| 15:50:12 | 10 | Q.   It's not Nuevo Laredo? |
| 15:50:14 | 11 | A.   No. |
| 15:50:15 | 12 | Q.   Okay. |
| 15:50:20 | 13 | A.   This is a United States account. |
| 15:50:21 | 14 | Q.   It's a United States account but -- |
| 15:50:24 | 15 | A.   The address that this person is giving is Nuevo Laredo, |
| 15:50:30 | 16 | Mexico. |
| 15:50:31 | 17 | Q.   Okay.  But this is a U.S. account? |
| 15:50:36 | 18 | A.   I believe it is. |
| 15:50:37 | 19 | Q.   Okay.  Do you know whether -- this is already admitted, |
| 15:50:42 | 20 | right, Doug? |
| 15:50:44 | 21 | MR. GARDNER:  Yes, it is. |
| 15:50:46 | 22 | Q.   (BY MR. SANCHEZ) This particular account, the statements at |
| 15:50:58 | 23 | least are all in Spanish, correct? |
| 15:50:59 | 24 | A.   Correct. |
| 15:51:00 | 25 | Q.   And, also, with the account from Edith, same thing, I guess |

| | | |
|---|---|---|
| 15:51:19 | 1 | -- well, let me ask you. |
| 15:51:22 | 2 | Is this also a U.S. account, but she has an address in |
| 15:51:25 | 3 | Mexico? |
| 15:51:26 | 4 | A.   Correct. |
| 15:51:26 | 5 | Q.   Okay.  But this account is also in Spanish, as well, right? |
| 15:51:31 | 6 | A.   Yes. |
| 15:51:34 | 7 | Q.   And both of these accounts, we talked about it, where there |
| 15:51:42 | 8 | was large deposits in U.S. currency, right? |
| 15:51:45 | 9 | A.   And to Mr. Quintero's account. |
| 15:51:48 | 10 | Q.   So at least into Mr. Quintero's account, you found -- you |
| 15:51:54 | 11 | did an analysis, you checked to see if there was large cash |
| 15:51:57 | 12 | deposits going into that account? |
| 15:51:59 | 13 | A.   Correct. |
| 15:51:59 | 14 | Q.   And then, there was a check written out of that account? |
| 15:52:02 | 15 | A.   Correct. |
| 15:52:03 | 16 | Q.   All right.  And were you -- I mean, I think you were present |
| 15:52:14 | 17 | where we did the analysis.  I'm showing you Colorado 8.  Do you |
| 15:52:26 | 18 | remember going through this with Agent Fernald? |
| 15:52:29 | 19 | A.   Yes. |
| 15:52:30 | 20 | Q.   And when we got down to the source account, do you remember |
| 15:52:38 | 21 | checking to see how much cash had been going into that account |
| 15:52:43 | 22 | the months prior and the months after the wire to the BBVA |
| 15:52:47 | 23 | account? |
| 15:52:48 | 24 | A.   I did the analysis of the account. |
| 15:52:52 | 25 | Q.   Let me ask you.  Since you've had the documents for the ADT |

| | | |
|---|---|---|
| 15:52:59 | 1 | accounts, have you done an analysis to determine whether any |
| 15:53:04 | 2 | large cash deposits were made into that account or those |
| 15:53:08 | 3 | accounts? |
| 15:53:09 | 4 | A.   No. |
| 15:53:16 | 5 | Q.   Do you know whether any cash deposits as reflected on the |
| 15:53:21 | 6 | statements were made into the account? |
| 15:53:25 | 7 | A.   Did not analyze the account. |
| 15:53:28 | 8 | Q.   Would you agree with me if I were to tell you that only very |
| 15:53:35 | 9 | small amounts of cash were deposited in those accounts? |
| 15:53:38 | 10 | A.   Did not analyze the account. |
| 15:53:42 | 11 | Q.   I'll pass the witness, your Honor. |
| 15:53:50 | 12 | THE COURT:  Mr. Womack. |
| 15:53:52 | 13 | MR. WOMACK:  Thank you, your Honor. |
| 15:53:53 | 14 | CROSS-EXAMINATION |
| 15:53:53 | 15 | BY MR. WOMACK: |
| 15:53:56 | 16 | Q.   Good afternoon, Special Agent. |
| 15:53:57 | 17 | A.   Afternoon. |
| 15:54:00 | 18 | Q.   From your investigation in this case, you're one of the case |
| 15:54:03 | 19 | agents; is that correct? |
| 15:54:04 | 20 | A.   Correct. |
| 15:54:05 | 21 | Q.   And part of that, that's one of the reasons you've been |
| 15:54:09 | 22 | allowed to sit throughout the entire trial and assist the |
| 15:54:11 | 23 | government in the presentation of their case? |
| 15:54:13 | 24 | A.   Yes, sir. |
| 15:54:13 | 25 | Q.   Please tell the jury, from your investigation of the people |

15:54:18   1   involved in this case that are named as coconspirators, when did

15:54:23   2   you first see Fernando Garcia interact with any of his

15:54:28   3   codefendants?

15:54:33   4   A.   Early 2010.

15:54:37   5   Q.   And -- I'm sorry.  Go ahead.

15:54:40   6   A.   It was early -- might have been September 2009.  I can

15:54:45   7   recall specific things in Spring 2010.

15:54:50   8   Q.   And you know from the indictment -- you were one of the case

15:54:53   9   agents when the indictment was returned; is that correct?

15:54:55   10   A.   Correct.

15:54:56   11   Q.   If I tell you that the first overt act that Fernando Garcia

15:55:00   12   is named in was Overt Act No. 15, and it says that on November

15:55:07   13   5th, 2011, at the Heritage Place fall mixed sale in Oklahoma

15:55:16   14   City, Defendants Garcia and Nayen assisted the organization in

15:55:20   15   purchasing eight horses for a total of about $211,500, and Mr.

15:55:28   16   Garcia acted as the surety for the purchase of the horses.

15:55:31   17         Do you remember that?

15:55:31   18   A.   Yes.  We did not list the overt act.

15:55:35   19   Q.   I understand.  But the first one you put in the indictment

15:55:37   20   with his name in it is this one, correct?

15:55:40   21   A.   I guess so.

15:55:42   22   Q.   Well, if I show it to you, would you recognize it?

15:55:45   23   A.   Certainly.  But if that's what it is, it's fine.

15:55:49   24   Q.   Ignore my stickies on here, but this is a copy of their

15:55:53   25   superseding indictment?

15:55:54  1    A.   Correct.

15:55:54  2    Q.   And back here, if you'll find the page where the overt acts

15:56:07  3    starts before that.  Do you see where it says -- it begins overt

15:56:11  4    acts?

15:56:11  5    A.   Yes.

15:56:12  6    Q.   And as you said, there could be things that are not alleged

15:56:15  7    specifically in here, correct?

15:56:16  8    A.   Correct.

15:56:16  9    Q.   Okay.  But in those that you put Fernando Garcia's name on,

15:56:20  10   would you agree with me -- if you'll look through there, is his

15:56:24  11   name first mentioned in Overt Act No. 15?  Just read to yourself,

15:56:29  12   look through there and tell me when the first time you see his

15:56:32  13   name.

15:56:50  14   A.   Yes.

15:56:51  15   Q.   Okay.  And that, again, the date of that overt act is

15:56:55  16   alleged to be November 5th, 2011?

15:57:00  17   A.   Yes.

15:57:01  18   Q.   If you'll keep it open to that page, I want to ask you a

15:57:05  19   number of questions on it.

15:57:06  20        And, again, the acts alleged were that he assisted the

15:57:09  21   organization in buying eight horses and he acted as a surety.

15:57:15  22   A.   Yes.

15:57:16  23   Q.   And also says that -- the second part of that was that Jose

15:57:20  24   Trevino brought in four horses to be sold, and Fernando Garcia

15:57:27  25   act as a surety -- or acted as a surety for those horses that

15:57:30  1  were being sold.

15:57:31  2  A.   As a buyer.  Not for Mr. Trevino.

15:57:35  3  Q.   Okay.  For the buyer?

15:57:36  4  A.   He acted as a buyer for all horses that the organization

15:57:40  5  purchased during that sale.

15:57:41  6  Q.   Does it say that?

15:57:42  7  A.   No.

15:57:42  8  Q.   Okay.  So what you alleged is that he acted as a surety.  Is

15:57:47  9  that right?

15:57:47  10  A.   Yes.

15:57:48  11  Q.   And I'm talking about for the four horses that were sold by

15:57:52  12  Mr. Trevino.

15:57:54  13  A.   I'd have to look at the documents.

15:57:56  14  Q.   Okay.  But you have the indictment there in front of you,

15:57:58  15  don't you?

15:57:59  16  A.   But I don't have the documents in front of me.

15:58:02  17  Q.   Okay.  So what I'm asking you about the indictment, Overt

15:58:06  18  Act No. 15, what it alleges is that Fernando Garcia assisted in

15:58:11  19  buying eight horses and acted as a surety; and then, with regards

15:58:15  20  to selling four horses, he acted as a surety.  Is that what the

15:58:19  21  indictment says?

15:58:20  22  A.   I could read it.

15:58:23  23  Q.   Well, read it to yourself.  I'm asking, is that what it

15:58:26  24  says?

15:58:26  25  A.   Oh, he acted as the surety for the purchase of these horses.

| | | |
|---|---|---|
| 15:58:40 | 1 | Q.   Yes.  So that's what y'all have alleged in the first overt |
| 15:58:43 | 2 | act that mentions his name specifically? |
| 15:58:46 | 3 | A.   Yes. |
| 15:58:46 | 4 | Q.   Okay.  And you'd agree with me that all of that is |
| 15:58:50 | 5 | consistent with him being an agent of the purchasers or the |
| 15:58:54 | 6 | sellers of those horses? |
| 15:58:55 | 7 | A.   For the organization.  Yes, sir. |
| 15:58:56 | 8 | Q.   Okay.  It could be an organization or it could be |
| 15:59:02 | 9 | individuals, couldn't it? |
| 15:59:03 | 10 | A.   This is the organization as we refer to it. |
| 15:59:05 | 11 | Q.   Understand.  As you refer to it, you being the government |
| 15:59:09 | 12 | with a big "G."  Y'all are referring to it as an organization, |
| 15:59:12 | 13 | but it was individuals.  At least for the purpose of all the |
| 15:59:16 | 14 | records, there was individuals who were there at the same time or |
| 15:59:20 | 15 | represented by the same people, buying horses and selling horses? |
| 15:59:24 | 16 | A.   Number of individuals. |
| 15:59:25 | 17 | Q.   Okay.  Well, or entities, correct? |
| 15:59:29 | 18 | A.   Yes. |
| 15:59:29 | 19 | Q.   Okay.  Now, Overt Act 18, in your copy of the indictment, is |
| 15:59:39 | 20 | the next one that names, specifically, Fernando Garcia? |
| 15:59:43 | 21 | A.   Correct. |
| 15:59:45 | 22 | Q.   And that says that between January 19th and 21st of 2012 at |
| 15:59:52 | 23 | a sale at Heritage Place, Fernando Garcia assisted in the |
| 15:59:57 | 24 | purchase of five horses and two foals in utero? |
| 16:00:02 | 25 | A.   Correct. |

16:00:03  1  Q.   Okay.  And you've been talking about that just a few minutes

16:00:05  2  ago, I think under cross-examination --

16:00:07  3  A.   Yes.

16:00:07  4  Q.   -- by other counsel.  And, again, what Fernando Garcia did

16:00:12  5  at that sale would be consistent with him being an agent for

16:00:16  6  entities or the organization, as you refer to it?

16:00:19  7  A.   Yes.

16:00:20  8  Q.   Okay.  Now, look at the third overt act.  That's No. 19,

16:00:26  9  isn't it?

16:00:26  10  A.   Yes.

16:00:27  11  Q.   And that alleges that between February 28th, 2012 and March

16:00:31  12  2nd, 2012, that Fernando Garcia directed that payments, totaling

16:00:40  13  $51,700, be broken up into smaller payments, structured.  Do you

16:00:46  14  see that?

16:00:47  15  A.   Yes.  It says, Garcia directed eight cash payments totaling

16:00:50  16  $51,700.  None more than 10,000.

16:00:54  17  Q.   And you say in the testimony of Jane Eckert from Heritage

16:00:59  18  Place, she was the one that was collecting the money for those

16:01:02  19  horses.

16:01:02  20  A.   Yes.  She's the accountant or comptroller at Heritage Place.

16:01:07  21  Q.   Okay.  And you also heard the testimony of Special Agent

16:01:11  22  Johnston with the DEA out of Laredo?

16:01:14  23  A.   Yes.

16:01:15  24  Q.   And he talked about -- and he presented e-mails, including

16:01:19  25  the same e-mail that Jane Eckert spoke about that had these

| | | |
|---|---|---|
| 16:01:22 | 1 | deposit slips.  Do you recall that? |
| 16:01:24 | 2 | A.   Yes. |
| 16:01:24 | 3 | Q.   And from going through the e-mails, it is obvious to |
| 16:01:31 | 4 | everyone that what happened was that Heritage Place was making a |
| 16:01:36 | 5 | demand for payment that there was still a $51,700 balance owed on |
| 16:01:41 | 6 | all these horses -- |
| 16:01:42 | 7 | MR. GARDNER:  Your Honor, we're going to object this |
| 16:01:44 | 8 | time to the form of the question.  Mr. Womack is testifying. |
| 16:01:46 | 9 | MR. WOMACK:  I'm laying out what I'm talking about. |
| 16:01:48 | 10 | That this is the transaction I'm talking about -- I don't know |
| 16:01:51 | 11 | how to break that up shorter.  I'm just saying this thing, does |
| 16:01:54 | 12 | he know what it is. |
| 16:01:55 | 13 | THE COURT:  All right. |
| 16:01:56 | 14 | Q.   (BY MR. WOMACK) Thank you, sir.  And I'll try to shorten it. |
| 16:01:59 | 15 | But you know the transaction I'm talking, you know the |
| 16:02:01 | 16 | e-mails I'm talking about. |
| 16:02:02 | 17 | A.   Yes. |
| 16:02:02 | 18 | Q.   And the transaction, this 51,700 that's named as Overt Act |
| 16:02:08 | 19 | No. 19 is the same exact payments that Jane Eckert and Special |
| 16:02:16 | 20 | Agent Johnston spoke of, correct? |
| 16:02:18 | 21 | A.   Yes. |
| 16:02:18 | 22 | Q.   Okay.  So the jury won't be confused and think there's some |
| 16:02:21 | 23 | other $51,000 payment, we're talking about that one that Jane |
| 16:02:26 | 24 | Eckert and Special Agent Johnston testified about. |
| 16:02:29 | 25 | A.   Correct. |

| | | |
|---|---|---|
| 16:02:30 | 1 | Q.   And you know from the string of e-mails that both parties -- |
| 16:02:35 | 2 | I mean, both of them testified to, Heritage Place was asking when |
| 16:02:42 | 3 | they were going to get the $51,700 bonus that was still |
| 16:02:48 | 4 | outstanding, correct? |
| 16:02:48 | 5 | A.   The balance. |
| 16:02:49 | 6 | Q.   Right.  The balance that was still outstanding? |
| 16:02:52 | 7 | A.   Yes. |
| 16:02:52 | 8 | Q.   That was a smaller part of a bigger balance of |
| 16:02:57 | 9 | 200-and-something-thousand dollars? |
| 16:02:57 | 10 | A.   Right.  280 -- about $280,000 for the seven horses. |
| 16:03:01 | 11 | Q.   Correct.  And so, they had gotten 200-and-something-thousand |
| 16:03:05 | 12 | dollars, and there was a balance owed of $51,700? |
| 16:03:08 | 13 | A.   Correct. |
| 16:03:08 | 14 | Q.   And you know from that e-mail string and from the testimony |
| 16:03:12 | 15 | of the two witnesses that someone named M. Canales forwarded the |
| 16:03:18 | 16 | images of deposit slips to this person known as "Papalotes" and |
| 16:03:26 | 17 | that "Papalotes" forwarded that e-mail with the images to |
| 16:03:30 | 18 | Fernando Garcia, and Fernando Garcia forwarded the e-mail with |
| 16:03:34 | 19 | those images to Jane Eckert. |
| 16:03:36 | 20 | A.   Yes. |
| 16:03:37 | 21 | Q.   From your investigation, you found no e-mails or |
| 16:03:44 | 22 | communications of any kind from Fernando Garcia directing anyone |
| 16:03:48 | 23 | to make structured deposits for $51,700, correct? |
| 16:03:54 | 24 | A.   I have not seen any e-mails stating that. |
| 16:03:57 | 25 | Q.   You have not seen any communications or heard any |

16:04:00  1   communications of any kind where Fernando Garcia told someone in

16:04:05  2   January to whatever it was to structure deposits of $51,700?

16:04:11  3   A.   I was not in charge of e-mails.  I did not review many

16:04:14  4   e-mails.

16:04:14  5   Q.   But as the case agent, you've had a chance to look at and

16:04:19  6   listen to all the testimony in the case, correct?

16:04:21  7   A.   Correct.

16:04:21  8   Q.   And you have not heard in your own private investigation,

16:04:26  9   you have not seen any communications from Fernando Garcia

16:04:30  10  directing anyone to make a structured deposit for $51,700; isn't

16:04:35  11  that right?

16:04:36  12  A.   I have not seen anything like that.

16:04:39  13  Q.   I want to retrieve my copy of the indictment.  Thank you.

16:05:05  14  Your Honor, if I can get someone to help me pull up Government's

16:05:09  15  Exhibit 428.  That was the slides.

16:05:18  16         Special Agent Pennington, you recall that slide, don't

16:05:24  17  you?

16:05:24  18  A.   Yes, I do.

16:05:25  19  Q.   If I could retrieve that pointer thing.  The far left column

16:05:44  20  where it says, 35 mares, analysis of events?

16:05:48  21  A.   Yes.

16:05:48  22  Q.   That's on the far left of the slide; is that right?

16:05:52  23  A.   Correct.

16:05:52  24  Q.   And this analysis is for horses, mares that were bought

16:05:58  25  between November of 2002 and 2011?

16:06:02  1  A.   Actually, between 2000 and 2011, yes, sir.

16:06:07  2  Q.   So 2000 and 2011?

16:06:09  3  A.   Yes.

16:06:10  4  Q.   And we know from your testimony and everything in this case,

16:06:14  5  that Fernando Garcia first got involved with his codefendants or

16:06:19  6  the organization, as you call it, in 2010, correct?

16:06:24  7  A.   Correct.

16:06:25  8  Q.   And so, the auctions that he could have been involved in,

16:06:30  9  the purchases of these mares would not have been 2000.  They

16:06:33  10 would have started in 2010 and run into 2011, correct?

16:06:37  11 A.   Yeah.  2010, 2011 would -- the auctions that we got records

16:06:44  12 for started in 2008.  I've only got three horses that were

16:06:48  13 purchased prior to 2008.

16:06:50  14 Q.   Okay.  But your slide says 2002 until 2011.

16:06:55  15 A.   Correct.

16:06:56  16 Q.   I'm working off your dates on the slide.

16:06:58  17 A.   Right.

16:06:59  18 Q.   And, again, so the horses that Fernando Garcia could have

16:07:02  19 been involved in were the ones in 2010, 2011, correct?

16:07:06  20 A.   Yes.

16:07:07  21 Q.   And then, you have there under nominees and when you say

16:07:10  22 nominees, these could be straw buyers, correct?

16:07:14  23 A.   Correct.  You're right.  They are.

16:07:18  24 Q.   It's people that buy a horse in their name when maybe,

16:07:21  25 really, it was someone else buying the horse?

16:07:22  1  A.   It's -- a straw buyer is basically, again, like a nominee.

16:07:27  2  It is a person that does not own the horse that's been a front

16:07:33  3  person for the person that really owns the horse.

16:07:35  4  Q.   And you know from your investigation in this case that

16:07:38  5  that's very common at these horse auctions.  You've heard that?

16:07:43  6  A.   Where people are buying other -- people, I guess you would

16:07:48  7  say agent.  Yes.

16:07:49  8  Q.   So you add on there listed at the very bottom, Garcia

16:07:52  9  Bloodstock, which you know is the company owned by and registered

16:07:56  10  in the name of Fernando Garcia?

16:07:58  11  A.   Yes.

16:07:58  12  Q.   Okay.  Now, in the fax -- well, two columns over, you talk

16:08:03  13  about funded through entities.  And what you mean in that column

16:08:08  14  is these are the entities, or companies, or whatever, that

16:08:12  15  actually paid for all these horses?

16:08:14  16  A.   Those are the ones that sent the money to the auction

16:08:17  17  houses.

16:08:18  18  Q.   Okay.  So when I say -- okay.  Fair enough.  So those are

16:08:21  19  the ones, those are the entities that actually paid money to the

16:08:25  20  auction house to satisfy the debt on those horses?

16:08:29  21  A.   Yeah.  The money came through those entities to pay the

16:08:33  22  auction houses.

16:08:34  23  Q.   And none of those -- none of these entities who paid at the

16:08:41  24  auction, none of them were Garcia Bloodstock, were they?

16:08:43  25  A.   Correct.

16:08:45    1    Q.    You have another column next to it where you say, expenses

16:08:48    2    paid by nominees.  Fernando Garcia's name is not on there, is it?

16:08:53    3    A.    No.

16:08:54    4    Q.    Because he didn't pay the expenses for these nominees, these

16:08:58    5    other people.  He didn't pay their expenses, did he?

16:09:00    6    A.    I believe the expenses were actually paid by --

16:09:03    7    Q.    No, no.  My question is Fernando Garcia did not pay them,

16:09:06    8    did he?

16:09:08    9    A.    No.  The money to these 35 did not come through Fernando

16:09:12   10    Garcia.

16:09:12   11    Q.    Okay.

16:09:13   12    A.    Or his accounts.

16:09:14   13    Q.    And that's why your chart leaves his name off, because he

16:09:17   14    didn't make those payments?

16:09:18   15    A.    Correct.

16:09:18   16    Q.    Okay.  Now, again, that would be consistent with him having

16:09:33   17    been an agent or a nominee for these individuals.  And that would

16:09:39   18    explain why he did not pay the expenses himself, because he was

16:09:42   19    merely an agent, correct?

16:09:44   20    A.    You lost me on that one.

16:09:45   21    Q.    The fact that he did not pay any of these expenses and did

16:09:50   22    not pay for any of the horses, that is consistent with him being

16:09:53   23    merely an agent for the buyers and not actually a buyer himself?

16:09:58   24    A.    I don't believe he ever bought -- well, at the auction, I

16:10:02   25    don't think he was a buyer.

| | | |
|---|---|---|
| 16:10:03 | 1 | Q.   You know from your investigation, maybe not these mares but |
| 16:10:06 | 2 | you know he did buy horses, and he had horses registered in |
| 16:10:09 | 3 | Garcia Bloodstock, just a few? |
| 16:10:10 | 4 | A.   Yes. |
| 16:10:11 | 5 | Q.   Okay.  But what you have here for these 35 mares, that's |
| 16:10:18 | 6 | consistent with him being an agent for these other individuals or |
| 16:10:20 | 7 | other entities? |
| 16:10:24 | 8 | A.   Okay. |
| 16:10:25 | 9 | Q.   That's a "Yes"? |
| 16:10:30 | 10 | A.   Yeah.  I'm not exactly sure what you're asking. |
| 16:10:32 | 11 | Q.   Okay.  I'm asking the fact that Fernando Garcia and his |
| 16:10:37 | 12 | company Garcia Bloodstock did not fund the horses that were sold? |
| 16:10:43 | 13 | A.   He did not fund the horses. |
| 16:10:44 | 14 | Q.   And did not pay the expenses for any of them? |
| 16:10:46 | 15 | A.   The moneys do not come from his accounts or making deposits. |
| 16:10:52 | 16 | Q.   Correct.  So that's consistent with him merely being an |
| 16:10:55 | 17 | agent for these other individuals who bought the horses? |
| 16:10:57 | 18 | A.   I don't know if it's consistent with anything.  He just |
| 16:11:01 | 19 | didn't make the payments on these 35. |
| 16:11:03 | 20 | Q.   And if he's merely an agent for those individuals, then that |
| 16:11:08 | 21 | would make sense that he was not paying for the horses and paying |
| 16:11:11 | 22 | their expenses, correct? |
| 16:11:14 | 23 | A.   I don't know if I could agree with that or not. |
| 16:11:18 | 24 | Q.   Okay.  Thank you.  No further questions. |
| 16:11:20 | 25 | MR. ESPER:  I have just a few, your Honor. |

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
| 16:11:23 | 1  | CROSS-EXAMINATION                                      |
| 16:11:23 | 2  | BY MR. ESPER:                                          |
| 16:11:26 | 3  | Q.   Mr. Pennington, Mr. Gardner showed you earlier an exhibit |
| 16:11:30 | 4  | where there were some checks issued to a Mr. Rincon and a Rudy |
| 16:11:37 | 5  | Trevino, correct?                                     |
| 16:11:38 | 6  | A.   Yes.                                             |
| 16:11:38 | 7  | Q.   Now, you recall Tyler Graham testifying that, number one, |
| 16:11:41 | 8  | Rincon was working at "Chevo's" ranch but basically for Mr. |
| 16:11:47 | 9  | Trevino, correct?                                     |
| 16:11:50 | 10 | A.   If he said that, I missed it.                    |
| 16:11:51 | 11 | Q.   Okay.  And then, number two, he made a comment that Rudy |
| 16:11:56 | 12 | Trevino hung out there but was kind of a deadbeat, was the word |
| 16:11:59 | 13 | he used.  Do you remember that?                       |
| 16:12:02 | 14 | A.   Yes.                                             |
| 16:12:03 | 15 | Q.   Okay.  Now, there were a number of horses that were seized |
| 16:12:09 | 16 | in June of last year in connection with this investigation by the |
| 16:12:13 | 17 | federal government, correct?                          |
| 16:12:14 | 18 | A.   That is correct.                                 |
| 16:12:14 | 19 | Q.   And do you remember how many approximately?      |
| 16:12:18 | 20 | A.   Exactly no.  Approximately 500.                  |
| 16:12:21 | 21 | Q.   And were any of those seized --                  |
| 16:12:23 | 22 | A.   Back up a second.  We seized 61 in June.  The rest were |
| 16:12:27 | 23 | under protective order.  We took custody of those on August 25th |
| 16:12:31 | 24 | of last year.                                         |
| 16:12:31 | 25 | Q.   Okay.  Were any of those horses seized at the -- let me |

| | | |
|---|---|---|
| 16:12:38 | 1 | predicate this first. |
| 16:12:39 | 2 | Mr. "Chevo" Huitron's training facilities are there in |
| 16:12:43 | 3 | Rianna Branch, which is in Dale, Texas? |
| 16:12:46 | 4 | A.   Yeah.   163 Rianna. |
| 16:12:48 | 5 | Q.   Yeah.   Okay.   Were any of those horses seized from that |
| 16:12:53 | 6 | barn? |
| 16:12:53 | 7 | A.   We did not take horses from that ranch. |
| 16:12:55 | 8 | Q.   Thank you.   That's all I got. |
| 16:12:58 | 9 | THE COURT:   Mr. Mayr. |
| 16:13:00 | 10 | CROSS-EXAMINATION |
| 16:13:00 | 11 | BY MR. MAYR: |
| 16:13:44 | 12 | Q.   Agent Pennington, on direct examination with Mr. Gardner, he |
| 16:13:49 | 13 | asked you if you had ever found any billing statements from |
| 16:13:57 | 14 | Huitron Homes, Huitron Painting to Jose Trevino.  Do you remember |
| 16:14:02 | 15 | that question? |
| 16:14:03 | 16 | A.   Yes. |
| 16:14:04 | 17 | Q.   And your response is, there were no billing statements |
| 16:14:07 | 18 | found.   That was your answer, right? |
| 16:14:09 | 19 | A.   Right. |
| 16:14:22 | 20 | Q.   I'm going to show you what's been admitted as Government's |
| 16:14:25 | 21 | Exhibit No. 69B, seized from the Huitron Homes business on 183. |
| 16:14:39 | 22 | A.   That is the opposite of what he was asking me.   That's |
| 16:14:43 | 23 | Huitron billing Jose Trevino, not the other way around.   That's |
| 16:14:50 | 24 | the opposite of what he asked me. |
| 16:14:54 | 25 | Q.   Huitron Homes is billing Jose Trevino? |

16:14:57   1   A.   Correct.  Which --

16:14:59   2   Q.   For races that this horse my brother's check was entered --

16:15:04   3   A.   Right.  So Jose Trevino should be paying Huitron Homes, not

16:15:07   4   the other way around.

16:15:09   5   Q.   Okay.  But these were billing statements, right?

16:15:15   6   A.   Yes.  From Huitron to Jose.  Not the other way around.

16:15:19   7   Q.   Okay.

16:15:20   8   A.   Which was the question.

16:15:21   9   Q.   That's what I was confused by.  So it's clear that there's

16:15:26   10   plenty of invoices being sent, right?  There's plenty of invoices

16:15:31   11   that are being sent to Jose Trevino, to Carmina, to Fernando

16:15:37   12   Garcia.  Those billing statements exist?

16:15:39   13   A.   Yes.

16:15:41   14   Q.   We'll talk about the rest of the transactions in a little

16:15:45   15   bit.  Let's talk a little bit about this Cash Transaction Report.

16:15:49   16   I want to make sure that we all have an understanding of how

16:15:52   17   these Cash Transaction Reports.

16:15:55   18        If I have $9,000 in cash and I walk into a branch and

16:16:01   19   let's say that Mr. Gardner's a teller.  If I give him the $9,000

16:16:05   20   in cash, there's nothing illegal about that at the time, right?

16:16:08   21   A.   Correct.  It's legal money.  There's nothing illegal about

16:16:12   22   it.

16:16:12   23   Q.   I may fill out a deposit slip.  I may have a preprinted slip

16:16:16   24   for my bank account.  I hand it to him.  He makes the deposit.  I

16:16:20   25   get a receipt and that's pretty much the end of it, right?

16:16:22  1    A.    Correct.

16:16:23  2    Q.    Now, I come back two hours later trying to make another

16:16:27  3    $9,000 deposit, and I hand it to Mr. Gardner and Mr. Gardner is

16:16:33  4    going to be prompted -- as the bank teller, he's going to be

16:16:36  5    prompted to get information from me so that he can prepare and

16:16:39  6    fill out a Cash Transaction Report; is that correct?

16:16:42  7    A.    If he catches the fact or remembers you from the prior, the

16:16:46  8    answer's yes.

16:16:47  9    Q.    Or it's possible that maybe even his computer system will

16:16:50  10   kind of flag, or say something, or show that I made a deposit

16:16:54  11   earlier in the day for $9,000?

16:16:57  12   A.    I would think so.

16:16:58  13   Q.    Okay.  But nevertheless, he's going to fill out this Cash

16:17:02  14   Transaction Report, right?

16:17:04  15   A.    Yes.  At the end of the day, a CTR will be filled out.

16:17:09  16   Q.    At the end of the day.  So he's going to have to get some

16:17:13  17   information from me, right?

16:17:15  18   A.    If he doesn't know you, yes, sir.

16:17:17  19   Q.    Okay.  He's going to have to get my name?

16:17:19  20   A.    Yes.

16:17:19  21   Q.    My Social Security number?

16:17:20  22   A.    Yes.

16:17:21  23   Q.    My date of birth?

16:17:23  24   A.    Yes.

16:17:24  25   Q.    Okay.  What else is he going to do?

| | | |
|---|---|---|
| 16:17:26 | 1 | A.   Address. |
| 16:17:27 | 2 | Q.   Address.  What else? |
| 16:17:28 | 3 | A.   Normally they ask for an ID of some type. |
| 16:17:30 | 4 | Q.   Okay.  Is it possible that maybe they don't ask for an ID? |
| 16:17:33 | 5 | A.   Possible. |
| 16:17:34 | 6 | Q.   It is.  Okay.  So I'm going to give that information, he's |
| 16:17:37 | 7 | going to enter it, and the Cash Transaction Report is prepared. |
| 16:17:41 | 8 | Right? |
| 16:17:42 | 9 | A.   Yes.  If they find an amount over $10,000, a CTR will be |
| 16:17:51 | 10 | filed. |
| 16:17:51 | 11 | Q.   Okay.  Mr. Gardner talked with you about -- he showed you |
| 16:17:57 | 12 | the bank records, and he showed you that there were multiple |
| 16:17:59 | 13 | individuals who were signatories on the Huitron Homes account. |
| 16:18:05 | 14 | Do you remember that? |
| 16:18:05 | 15 | A.   I believe two. |
| 16:18:06 | 16 | Q.   Okay.  My client Jesus Huitron and "Chevo" Huitron, right? |
| 16:18:10 | 17 | A.   Correct. |
| 16:18:10 | 18 | Q.   Now, it's not outside the realm of possibility for someone |
| 16:18:15 | 19 | else to write a check for that -- on that account, right? |
| 16:18:23 | 20 | A.   I suppose they could. |
| 16:18:24 | 21 | Q.   Someone could write the check, it's taken to either my |
| 16:18:29 | 22 | client or "Chevo."  They sign off on it.  But someone else fills |
| 16:18:32 | 23 | out the check, right? |
| 16:18:34 | 24 | A.   You can have somebody fill out the check, but the person who |
| 16:18:37 | 25 | are the authorized signers are the ones who are supposed to sign |

| | | |
|---|---|---|
| 16:18:40 | 1 | the checks. |
| 16:18:40 | 2 | Q.   Same thing with the deposits, okay?  It's my account. |
| 16:18:43 | 3 | Instead of me walking into the bank and giving the deposit to Mr. |
| 16:18:49 | 4 | Gardner, I send my wife in.  She goes in and she hands it to him |
| 16:18:52 | 5 | and gets my name, my Social Security number, and she's the one |
| 16:18:57 | 6 | making the deposit, right? |
| 16:19:00 | 7 | A.   Your wife can make a deposit into your account.  Yes. |
| 16:19:04 | 8 | Q.   Nothing's stopping her from doing that if she's got my |
| 16:19:06 | 9 | Social Security, and she's got the account information? |
| 16:19:08 | 10 | A.   She has your account number, yes. |
| 16:19:10 | 11 | Q.   And, likewise, when if there's a -- Mr. Gardner feels that |
| 16:19:17 | 12 | he needs to fill out a Cash Transaction Report, he can ask her |
| 16:19:19 | 13 | for her identifying information, right? |
| 16:19:21 | 14 | A.   If she is the one that brings the $10,000 -- excess of |
| 16:19:27 | 15 | 10,000, then yes, they'll ask for her identification. |
| 16:19:29 | 16 | Q.   But it's possible that they may not, right? |
| 16:19:31 | 17 | A.   If it's less than 10,000, I mean, if they know her and |
| 16:19:37 | 18 | already have the data on file, they may not ask her for the -- |
| 16:19:39 | 19 | Q.   May not.  Do you have a Cash Transaction Report with you? |
| 16:19:43 | 20 | A.   No.  I do not. |
| 16:19:44 | 21 | Q.   I'm going to hand you 32B here.  Just for the record, 32B is |
| 16:19:59 | 22 | the Cash Transaction Report that's been previously admitted into |
| 16:20:01 | 23 | evidence, correct? |
| 16:20:02 | 24 | A.   Yes. |
| 16:20:02 | 25 | Q.   Okay.  Now, it's your testimony based on this report and |

16:20:15  1  this report alone that my client Jesus Huitron is going into

16:20:19  2  Laredo and making structured deposits; is that right?

16:20:23  3  A.    That's what the CTRs show.

16:20:26  4  Q.    Now, just so we're clear, do you have any other evidence to

16:20:33  5  support that my client went into the bank in Laredo and made

16:20:37  6  these structured deposits?

16:20:39  7  A.    No.

16:20:40  8  Q.    It all comes down to this, right?

16:20:42  9  A.    Yes.

16:20:42  10  Q.    Okay.  That appears the same thing that you have in your

16:21:02  11  hands.  Let me zoom out and you can check the top.  Is that the

16:21:14  12  same thing you have right there?

16:21:19  13  A.    Yes.

16:21:19  14  Q.    Okay.  Just want to make sure.  Now, I want to start at the

16:21:23  15  very bottom of the document.  Let me back this out.  And I want

16:21:29  16  to look at these three transactions at the very bottom of the

16:21:35  17  document.

16:21:38  18        Now, we see that those transactions -- slide all the

16:21:44  19  way over -- they take place in 2007 and 2008; is that right?

16:21:51  20  A.    Correct.

16:21:52  21  Q.    So can we have an agreement that those have nothing to do

16:21:55  22  with anything related to this investigation or into this case,

16:21:59  23  that these were just other deposits made to other business

16:22:02  24  expenses?  In other words, you don't have any information that

16:22:06  25  would lead you to believe that there's anything illegal about the

16:22:09   1   transaction taking place on 2007 or 2008, do you?

16:22:13   2   A.   No.

16:22:13   3   Q.   Okay.  So can we have that agreement that there's nothing

16:22:16   4   unusual or suspicious about these transactions.  It just so

16:22:20   5   happened that when a deposit was made for over $20,000 and a Cash

16:22:24   6   Transaction Report was made at Wells Fargo Bank?

16:22:28   7   A.   Correct.

16:22:28   8   Q.   Okay.  Now, we can see here that -- let's just start right

16:22:46   9   here.  We see that there's a BSA ID.  Do you know what that is?

16:22:51  10   A.   No.

16:22:53  11   Q.   We know source, CTR, that's Cash Transaction Report?

16:22:57  12   A.   Currency Transaction Report.

16:22:59  13   Q.   Apologize.  Thank you.  Do you know what DCN is?

16:23:02  14   A.   Those are the numbers that are assigned to each Currency

16:23:06  15   Transaction Report.

16:23:06  16   Q.   Okay.  Now, we see subject EIN/SSN.  I know it seems pretty

16:23:12  17   obvious, but why don't you just tell us?

16:23:14  18   A.   The Social Security number is assigned with the subject.

16:23:20  19   Q.   We see a Social Security number ending in 6328, right?

16:23:26  20   A.   Yes.

16:23:26  21   Q.   Do you know who that belongs to?

16:23:28  22   A.   No.

16:23:29  23   Q.   You don't know?

16:23:29  24   A.   I would say Jesus Huitron.

16:23:32  25   Q.   Okay.  Now we see -- do you know what?  I just want to make

| | | |
|---|---|---|
| 16:23:41 | 1 | sure.  Let's just concede that it's my client's Social Security |
| 16:23:48 | 2 | number? |
| 16:23:49 | 3 | A.   Okay. |
| 16:23:49 | 4 | Q.   All right.  Now, we see that there's name right here, Jesus |
| 16:23:53 | 5 | Huitron, right? |
| 16:23:54 | 6 | A.   Which one are you on? |
| 16:23:56 | 7 | Q.   We're still on these right here that are highlighted? |
| 16:23:58 | 8 | A.   Oh, yes. |
| 16:23:58 | 9 | Q.   Okay.  Now, let's slide over here and let's look at these -- |
| 16:24:05 | 10 | this column right here, that's just a subject A/K/A or D/B/A, |
| 16:24:09 | 11 | right? |
| 16:24:09 | 12 | A.   Right. |
| 16:24:10 | 13 | Q.   And then, if we slide over, we've got a date of birth, |
| 16:24:17 | 14 | subject date of birth, requirement? |
| 16:24:18 | 15 | A.   Yes. |
| 16:24:18 | 16 | Q.   What's the subject date of birth right there? |
| 16:24:21 | 17 | A.   8-14 of 1963. |
| 16:24:23 | 18 | Q.   Now, would it surprise you to know that that is not my |
| 16:24:28 | 19 | client Jesus Huitron's date of birth? |
| 16:24:32 | 20 | A.   Okay. |
| 16:24:33 | 21 | Q.   Do you know what his date of birth is? |
| 16:24:35 | 22 | A.   No. |
| 16:24:35 | 23 | Q.   Do you have access to that information in all this material, |
| 16:24:38 | 24 | I imagine, right? |
| 16:24:39 | 25 | A.   Yes. |

16:24:39  1  Q.   Okay.  Would you be surprised to know that that date of

16:24:44  2  birth actually belongs to Eusevio Huitron?  Would that surprise

16:24:51  3  you?

16:24:51  4  A.   No.

16:24:51  5  Q.   And you would have his date of birth somewhere in all this

16:24:54  6  paperwork, right?

16:24:55  7  A.   Correct.

16:24:55  8  Q.   Okay.  But assume with me that that date of birth belongs to

16:25:02  9  Eusevio Huitron and not Jesus Huitron, there's an inaccuracy on

16:25:08  10  that Cash Transaction Report, right?  In other words, if that's

16:25:19  11  Chevo's birthday but the name is Jesus Huitron and that's his

16:25:24  12  Social Security number, that's an inconsistency, right?

16:25:27  13  A.   Yes.

16:25:28  14  Q.   And that would be consistent with the bank teller just

16:25:32  15  getting information from "Chevo," who went into the bank but gave

16:25:38  16  his brother's name and Social Security number, right?

16:25:40  17  A.   The bank is supposed to identify the person coming in and

16:25:43  18  making the deposit.  What they get or how they do it is supposed

16:25:47  19  to be consistent.

16:25:48  20  Q.   But it's not here, right?

16:25:53  21       Let's go to this next one up here, directly above it.

16:26:17  22  Okay.  We're looking at a transaction here.  This is the fourth

16:26:20  23  one from the bottom.  We're looking at a deposit that occurred on

16:26:23  24  September 10, 2009 in Austin, Texas, correct?

16:26:31  25  A.   Correct.

| | | |
|---|---|---|
| 16:26:31 | 1 | Q.   Deposit amount, $46,800? |
| 16:26:34 | 2 | A.   Yes. |
| 16:26:35 | 3 | Q.   Nothing illegal about this transaction, right? |
| 16:26:38 | 4 | A.   Not that I know of. |
| 16:26:40 | 5 | Q.   Okay.  Now, we slide over here and now we see that there are |
| 16:26:51 | 6 | -- we see that there's two Social Security numbers entered on |
| 16:26:54 | 7 | that report, right? |
| 16:26:55 | 8 | A.   Correct. |
| 16:26:55 | 9 | Q.   Can you explain that? |
| 16:26:57 | 10 | A.   Yes.  Jessica Huitron brought in part of the cash, made the |
| 16:27:02 | 11 | deposit on behalf of Jesus Huitron. |
| 16:27:04 | 12 | Q.   Okay.  So they actually put her name down, they get her |
| 16:27:11 | 13 | Social Security number, right? |
| 16:27:12 | 14 | A.   Yes. |
| 16:27:12 | 15 | Q.   And then, 9-9-84, that's consistent with 29-year-old Jessica |
| 16:27:24 | 16 | Huitron's date of birth, right? |
| 16:27:26 | 17 | A.   Consistent. |
| 16:27:26 | 18 | Q.   Okay.  So if we're clear about this, then what's happened |
| 16:27:31 | 19 | here is she's the one who's walking into the bank, but she has |
| 16:27:37 | 20 | not only her personal identifying information but she also has |
| 16:27:41 | 21 | her father's personal identifying information, because that's |
| 16:27:45 | 22 | whose account she's making the deposit into, correct? |
| 16:27:50 | 23 | A.   Correct. |
| 16:27:51 | 24 | Q.   Okay.  Now, you notice that in all four of these |
| 16:27:54 | 25 | transactions, they've got Social Security numbers and they've got |

16:27:58   1   a date of birth, right?

16:27:58   2   A.   Yes.

16:27:59   3   Q.   Now, fifth one from the bottom is a transaction occurring on

16:28:30   4   December 18th, 2009, correct?

16:28:33   5   A.   Yes.

16:28:33   6   Q.   Deposit for $10,100?

16:28:37   7   A.   Yes.

16:28:39   8   Q.   Showing that a deposit was made by a person who gave this

16:28:47   9   Social Security, this name, Jesus Huitron, right?  But you see

16:28:55   10   here that there's no date of birth?

16:28:57   11   A.   Correct.

16:28:57   12   Q.   You'd agree with me that that would be consistent with not

16:29:03   13   getting an identification from the individual to verify that that

16:29:06   14   is, in fact, who it is?

16:29:09   15   A.   No.  Not necessarily.

16:29:11   16   Q.   If they got the -- if they get an ID from that person to

16:29:15   17   verify that it's Jesus Huitron, the ID's going to have their date

16:29:19   18   of birth on it, right?

16:29:20   19   A.   A driver's license would.

16:29:23   20   Q.   It would, right?

16:29:25   21   A.   Not necessarily.  If they get a Social Security, they may

16:29:29   22   not include the date of birth.

16:29:30   23   Q.   There's no date of birth here, right?

16:29:33   24   A.   They did not include it on that one.

16:29:34   25   Q.   Now, let's go to these Laredo transactions.  We see a Laredo

16:29:48  1    -- before I move on to that, you would agree that what we're

16:29:51  2    seeing here in this deposit we just talked about from December

16:29:57  3    18, 2009 where there's no date of birth, that's not consistent

16:30:05  4    what we've seen in these other transactions, correct?

16:30:08  5    A.    It's different from the previous four.

16:30:16  6    Q.    Okay.  Now, let's go to these Laredo transactions.  We see

16:30:44  7    the first Cash Transaction Report filed for transaction on 7-12

16:30:49  8    of 2010; is that right?

16:30:50  9    A.    Correct.

16:30:50  10   Q.    $14,150.

16:30:54  11   A.    Yes.

16:30:55  12   Q.    Made in Laredo, right?

16:31:03  13   A.    Yes.

16:31:03  14   Q.    Okay.  That appears to be Jesus Huitron's Social Security

16:31:14  15   number?

16:31:15  16   A.    Correct.

16:31:15  17   Q.    And it has his name there, right?

16:31:17  18   A.    Correct.

16:31:17  19   Q.    But no date of birth, correct?

16:31:21  20   A.    Correct.

16:31:22  21   Q.    Now, did you or anyone, part of your investigative team,

16:31:31  22   ever go down to the -- and you know which Wells Fargo this bank

16:31:36  23   was deposited into, correct?

16:31:38  24   A.    Off the top of my head, the answer's no, but we could easily

16:31:42  25   find out.

16:31:45   1   Q.   You know what, let's just go ahead and do that.  All right.

16:32:03   2   July 27th.  Let the record reflect I'm now showing you what's

16:32:13   3   been previously -- let the record reflect I'm showing you 256B,

16:32:54   4   my client's bank account statements from Wells Fargo.  Let's go

16:32:58   5   back there so we can show.

16:33:00   6            This is, indeed, my client's bank account statements,

16:33:02   7   right?

16:33:02   8   A.   Yes.

16:33:03   9   Q.   What date was the deposit made on?  July 14th, correct?

16:33:27   10  A.   July 12.

16:33:28   11  Q.   July 12.  We see here on page 2028, we do see a -- on the

16:34:03   12  bank statement portion, we do see a deposit right here for

16:34:06   13  $9,000.  You see this up here, Agent Pennington?

16:34:09   14  A.   Yes.

16:34:10   15  Q.   Okay.  And we'll just go to the -- and that one there is one

16:34:27   16  of the bank deposit slips for the first part of that transaction

16:34:31   17  made on 7-12; is that right?

16:34:34   18  A.   Yes.

16:34:35   19  Q.   And that's made at the Wells Fargo Bank, Texas, Laredo

16:34:41   20  downtown bank, right?

16:34:42   21  A.   Correct.

16:34:43   22  Q.   Okay.  Now, we see that there's some handwriting here on

16:34:46   23  this deposit slip, which is page -- for the record, it's page

16:34:53   24  2046.  We see some handwriting on that, right?

16:34:55   25  A.   Yes.

16:34:55    1    Q.   Do you know whose handwriting that belongs to?

16:34:57    2    A.   I have no idea.

16:34:57    3    Q.   And you all have handwriting experts who can review

16:35:01    4    handwriting to determine who it belongs to, correct?

16:35:03    5    A.   Yes.

16:35:03    6    Q.   Okay.  Now, we see the first deposit made here.  We've got

16:35:08    7    that handwriting.

16:35:09    8         Now, we're going to go to the second deposit on 2050,

16:35:15    9    page 2050.  You'd agree with me the handwriting is different,

16:35:20   10    right?

16:35:20   11    A.   I don't review the handwriting.

16:35:23   12    Q.   I'm just asking for your lay opinion.  Does it look

16:35:27   13    different from what I just showed you?

16:35:28   14    A.   I have no opinion on it.

16:35:29   15    Q.   But that is a deposit that's made for $9,000 on July 14,

16:35:36   16    right?

16:35:36   17    A.   Correct.

16:35:36   18    Q.   Also made in Laredo?

16:35:38   19    A.   Right.

16:35:39   20    Q.   Okay.  Now --

16:35:39   21    A.   But that's not part of the CTR.

16:35:41   22    Q.   I understand that.  You've reviewed the bank records.

16:35:52   23         Did you review my client's bank records in preparation

16:35:54   24    for your testimony or in the course of your investigation?

16:35:58   25    A.   Yes.

16:35:58   1   Q.   Okay.  You would agree with me that not every single deposit

16:36:05   2   slip is included within the bank statements that are provided

16:36:07   3   here in this exhibit?

16:36:08   4   A.   Oh, correct.

16:36:08   5   Q.   Okay.  Now, but we know that a deposit is being made on that

16:36:15   6   date, right?

16:36:16   7   A.   Yes.

16:36:16   8   Q.   Did you or anyone, as part of your investigative team, ever

16:36:21   9   go down to -- we know where it's being made in Laredo, right?

16:36:26   10  A.   Correct.

16:36:27   11  Q.   Did any of y'all ever go down to that bank and try to obtain

16:36:30   12  video surveillance from that bank?

16:36:32   13  A.   They don't keep it that long.

16:36:34   14  Q.   Okay.  So I assume, did you make any attempts to go talk

16:36:42   15  with any of the tellers regarding the transactions?

16:36:44   16  A.   No.

16:36:44   17  Q.   And this isn't like when you go in to cash a check where

16:36:49   18  they take your fingerprint.  Nothing like that occurs with these

16:36:52   19  types of transactions?

16:36:53   20  A.   No.

16:36:54   21  Q.   Okay.  So all we have is this report, right?

16:36:59   22  A.   Yes.

16:37:03   23  Q.   I'm going to jump ahead to October 19th of 2010.  Now,

16:37:22   24  that's not on this report, but you testified that you had or

16:37:28   25  you've discovered evidence of structured deposits being made into

| | | |
|---|---|---|
| 16:37:34 | 1 | the Huitron account in Laredo; is that correct? |
| 16:37:38 | 2 | A.   Okay.  Give me the dates again. |
| 16:37:40 | 3 | Q.   Sure.  Beginning October 19th? |
| 16:37:44 | 4 | A.   Right. |
| 16:37:45 | 5 | Q.   Okay.  Remind the jury, again, what you saw on the bank |
| 16:37:49 | 6 | records that led you to believe that there was structuring. |
| 16:37:52 | 7 | A.   October 19, 2010? |
| 16:37:53 | 8 | Q.   Uh-huh. |
| 16:37:54 | 9 | A.   A $9,900 cash deposit.  On October 20th, 2010, $7,100 cash |
| 16:38:02 | 10 | deposit.  And October 21, 2010, $8,000 cash deposit. |
| 16:38:07 | 11 | Q.   Okay.  All right.  So we all understand how these work |
| 16:38:15 | 12 | because transactions are taking place on different dates.  Mr. |
| 16:38:18 | 13 | Gardner, a bank teller at Wells Fargo, he doesn't prepare a Cash |
| 16:38:23 | 14 | Transaction Report.  I'm sorry.  I apologize.  I'm so sorry. |
| 16:38:27 | 15 | It's clear that no Cash Transaction Report is made by |
| 16:38:30 | 16 | anyone at Wells Fargo in regards to these transactions, right? |
| 16:38:34 | 17 | A.   Correct.  They were successfully structured. |
| 16:38:37 | 18 | Q.   And it's not on here? |
| 16:38:38 | 19 | A.   That is correct. |
| 16:38:39 | 20 | Q.   So if it's not on here, do we know who made these deposits |
| 16:38:51 | 21 | in Laredo on the dates in question? |
| 16:38:54 | 22 | A.   No.  I don't. |
| 16:38:57 | 23 | Q.   The answer's "No"? |
| 16:38:57 | 24 | A.   No. |
| 16:38:58 | 25 | Q.   Okay.  Going back to the Cash Transaction Report summary, |

16:39:45  1   Exhibit 352, do you notice that every time -- well, not every

16:39:55  2   time, but the seventh transaction -- look at the bottom, there's

16:40:04  3   no subject date of birth; is that correct?

16:40:06  4   A.   Correct.

16:40:07  5   Q.   The one directly above that, there's no subject date of

16:40:12  6   birth?

16:40:12  7   A.   Correct.

16:40:12  8   Q.   And that's where the transaction occurred on August 9th; is

16:40:20  9   that correct?

16:40:20  10  A.   Correct.

16:40:21  11  Q.   For the one right above that occurring on September 16,

16:40:25  12  2010, also no subject date of birth?

16:40:27  13  A.   Correct.

16:40:27  14  Q.   September 20th, no date of birth?

16:40:33  15  A.   Correct.

16:40:35  16  Q.   And this one occurring on November the 12th, there's no date

16:40:39  17  of birth?

16:40:40  18  A.   Correct.

16:40:43  19  Q.   Now, you also see over here that the name Jesus Huitron but

16:40:50  20  his Social Security is given, though, right?

16:40:52  21  A.   Yes.

16:40:52  22  Q.   Okay.  Do you see that I now have highlighted the

16:41:13  23  transaction occurring on November 12, 2010?  Is that right?

16:41:18  24  A.   Yes.

16:41:18  25  Q.   Deposit for $16,000, correct?

| | | |
|---|---|---|
| 16:41:23 | 1 | A.   Yes. |
| 16:41:24 | 2 | Q.   In Laredo, Texas correct? |
| 16:41:27 | 3 | A.   Correct. |
| 16:41:29 | 4 | Q.   No date of birth? |
| 16:41:30 | 5 | A.   Correct. |
| 16:41:33 | 6 | Q.   Going back to 256B, my client's bank records, you would |
| 16:42:04 | 7 | agree that beginning on page 2159, that's the bank statement from |
| 16:42:08 | 8 | beginning November 1st, 2010? |
| 16:42:10 | 9 | A.   Yes. |
| 16:42:13 | 10 | Q.   We're looking for November 12th.  And we see a deposit made |
| 16:42:38 | 11 | in the branch for 8,000, another deposit for 8,000; is that |
| 16:42:42 | 12 | right? |
| 16:42:42 | 13 | A.   Correct. |
| 16:42:42 | 14 | Q.   And that totals up to the $16,000 with the Currency |
| 16:42:51 | 15 | Transaction Report, or CTR, was made for, right? |
| 16:42:57 | 16 | A.   Yes. |
| 16:42:59 | 17 | Q.   If we jump to page 2182, we see another handwritten deposit |
| 16:43:08 | 18 | slip, right? |
| 16:43:09 | 19 | A.   Yes. |
| 16:43:10 | 20 | Q.   A $8,000 deposit, the first one, right? |
| 16:43:15 | 21 | A.   Yes. |
| 16:43:15 | 22 | Q.   And that appears to be a different handwriting, correct? |
| 16:43:20 | 23 | A.   That one appears different. |
| 16:43:23 | 24 | Q.   And if we go to -- now, there's no -- we can see going |
| 16:43:40 | 25 | through here from page to page, we don't see the second deposit |

16:43:45  1   slip for the $8,000; is that right?

16:43:47  2   A.   Right.

16:43:48  3   Q.   This one shown here, there's one here on 2182.  2183 is just

16:43:55  4   a cash ticket form that reflects the same date and time that the

16:43:58  5   cash deposit, the first one is made, right?

16:44:01  6   A.   Correct.

16:44:01  7   Q.   We don't see the other transaction, right?  The second

16:44:07  8   $8,000 transaction?

16:44:09  9   A.   Whatever you showed.

16:44:10  10  Q.   Now, we see that -- and you may want to check your notes on

16:44:17  11  this as far as your structured transactions.  We do see that the

16:44:20  12  very next day, there's -- on November the 13th, there's a deposit

16:44:26  13  made into the Huitron Homes account for $9,000, right?

16:44:34  14  A.   Yes.  9,000 on 11-15, and 7,000 on 11-16, and 5,000 on

16:44:41  15  11-17.

16:44:41  16  Q.   Okay.  Let's go through each one of those, all right?

16:44:43  17  A.   Okay.

16:44:45  18  Q.   At least what we have in the bank records.  We see the

16:44:49  19  $9,000 deposit November 13th, the handwriting, again, it's

16:44:52  20  different from what we saw here, right?

16:44:56  21  A.   Okay.  Again, I don't know handwriting -- I don't know if

16:45:01  22  the teller's help him out.  I don't know -- I don't know.  I

16:45:04  23  don't know handwriting.

16:45:05  24  Q.   We just don't know at this point?

16:45:06  25  A.   I do not know the handwriting.

16:45:08   1   Q.   But we see a deposit for $9,000 here?

16:45:12   2   A.   Correct.

16:45:12   3   Q.   Then we keep going, different handwriting, not, or do you

16:45:21   4   not want to make an opinion?  It's okay.  I understand.

16:45:25   5        $7,000 the very next day, correct?

16:45:28   6   A.   Correct.

16:45:28   7   Q.   $5,000 deposit, different handwriting?

16:45:39   8   A.   Some of those appear different, but again, I have no

16:45:44   9   handwriting analysis.

16:45:45   10  Q.   All right.  $5,000 deposit, Laredo downtown, correct?

16:45:49   11  A.   Right.  And those, again, the CTR was not filed; therefore,

16:45:52   12  they were successfully structured.

16:45:53   13  Q.   Right.  So let's talk about that.  According to this CTR,

16:46:03   14  Jesus Huitron is the person that made the first deposit on

16:46:06   15  November 12th, 2010, correct?

16:46:10   16  A.   According to the CTR.

16:46:11   17  Q.   This one document here.  But we also see from the bank

16:46:16   18  records that deposits are being made the next day on the 13th, on

16:46:23   19  the 16th -- I'm sorry.  On the 17th.  They're continuing to be

16:46:27   20  made day after day after day, right?

16:46:30   21  A.   Into his account.

16:46:31   22  Q.   Okay.  So in your theory is that Mr. Huitron is the one

16:46:38   23  who's down in Laredo making these deposits, more than likely he

16:46:42   24  would have to be staying down in Laredo, Texas to be making these

16:46:46   25  deposits day after day after day, or at least he would have to be

| | | |
|---|---|---|
| 16:46:50 | 1 | going to Laredo every single day to make one of these deposits, |
| 16:46:54 | 2 | right? |
| 16:46:56 | 3 | A.    I'm not sure I follow what your theory is. |
| 16:46:58 | 4 | Q.    Okay.  According to this report, my client had -- according |
| 16:47:06 | 5 | to this report, my client is the one making the deposit on the |
| 16:47:09 | 6 | 12th, right? |
| 16:47:14 | 7 | A.    Yes. |
| 16:47:15 | 8 | Q.    And then, we see that another cash deposit is being made |
| 16:47:19 | 9 | into his account on the 13th, right? |
| 16:47:25 | 10 | A.    I've got the 15th, 16th and 17th. |
| 16:47:28 | 11 | Q.    15th, 16th and 17th.  So if he's making those deposits, it |
| 16:47:33 | 12 | would make sense that he would have to be either staying in |
| 16:47:36 | 13 | Laredo or going to Laredo every single day to make these |
| 16:47:39 | 14 | deposits, right? |
| 16:47:42 | 15 | A.    I don't know that he was making all the cash deposits. |
| 16:47:45 | 16 | Could have had Victor Lopez making some of the cash deposits. |
| 16:47:47 | 17 | Q.    Okay.  So it's possible that Victor Lopez is making the |
| 16:47:52 | 18 | deposits then, right? |
| 16:47:52 | 19 | A.    The ones that aren't reflected on the CTRs, you're correct. |
| 16:47:56 | 20 | Q.    We don't know.  It could be my client.  It could be Victor |
| 16:48:00 | 21 | Lopez.  It could be someone working for Victor Lopez.  It could |
| 16:48:03 | 22 | be anyone, right? |
| 16:48:05 | 23 | A.    The ones we have records for, correct. |
| 16:48:08 | 24 | Q.    Okay.  So all we have is the Cash Transaction Report showing |
| 16:48:13 | 25 | the 12th. |

16:48:14  1          Now, if my client -- let's put aside other ones and

16:48:18  2   just focus on the 12th.  My client is, according to the report,

16:48:22  3   walking into a bank in Laredo, Texas and making the deposit.  You

16:48:26  4   would agree with me that he -- you know he lives in the Austin

16:48:30  5   area, right?

16:48:30  6   A.    Yes.

16:48:30  7   Q.    So you know that he would have to travel down to Laredo to

16:48:33  8   make the deposit, right?

16:48:34  9   A.    Yes.

16:48:36  10  Q.    And he could either fly down there or fly from Austin to

16:48:41  11  Laredo?

16:48:42  12  A.    He could.

16:48:43  13  Q.    He could get in his car and drive down there, right?

16:48:45  14  A.    Yes.

16:48:46  15  Q.    And you would agree with me that if he does take a trip like

16:48:52  16  that, it's possible that you're going to see transactions

16:48:57  17  consistent with that sort of travel, right?

16:48:59  18  A.    Like what?

16:49:00  19  Q.    Well, if he's going to fly, you're going to see where he

16:49:03  20  purchased an airline ticket, right?

16:49:06  21  A.    Didn't look.

16:49:06  22  Q.    Pardon?

16:49:08  23  A.    Did not look.

16:49:08  24  Q.    Okay.  If he drove, you would see where he stopped for gas

16:49:13  25  in San Antonio, or Uvalde, or in Laredo.  Possible, right?

16:49:16  1   A.   Did not look.

16:49:18  2   Q.   Let's take a look.  Going back to page 2159, the bank

16:49:36  3   statement.  Let's just start at the very beginning here.

16:49:43  4        Do you see on the bank statement here on page 2161,

16:49:46  5   Agent Pennington, you see how there appears to be a number of

16:49:49  6   check card purchases made on this account?  Do you see that in

16:49:53  7   the first page, check card purchased, 11-1 Bastrop fee.  And I

16:49:59  8   think we're all familiar with this, but a check card is like a

16:50:02  9   credit card that is used to make a payment and it's automatically

16:50:06  10  debited from the checking account, right?

16:50:09  11  A.   Correct.

16:50:09  12  Q.   And we see a number of check card purchases.  We see one on

16:50:16  13  11-1 at the Bastrop Dairy Queen, right?

16:50:20  14  A.   Right.  But it doesn't say who's doing it.

16:50:22  15  Q.   Sure.  But we do know that's got Jesus Huitron's name on it,

16:50:38  16  right?

16:50:38  17  A.   Correct.  His account.

16:50:39  18  Q.   We see transaction after transaction.  When we go to --

16:50:47  19  first of all, let me go through this real slowly and just tell me

16:50:52  20  if you happen to catch any airline purchases on this account.  If

16:50:59  21  I'm going too fast, just let me know.

16:51:08  22       Going to page 2161.  Going to page 2162.  We see it

16:51:51  23  looks like he bounces his account here on 11-9 or 11-10; is that

16:52:00  24  right?

16:52:00  25  A.   Do what?

16:52:00   1   Q.   It looks like he bounced a check right here on 11-10 NSF,

16:52:06   2   insufficient funds.   That's what looks like happened there,

16:52:10   3   right?

16:52:10   4   A.   Correct.

16:52:10   5   Q.   Let's keep going.   Going to page 2163.   You haven't seen any

16:52:19   6   purchases for an airline ticket, have you?

16:52:21   7   A.   No.   Not by the check card, no.

16:52:25   8   Q.   All right.   Let's slow down here on page 2163.   Do you see a

16:52:31   9   transaction here on November 12th in Austin, Texas?   Is that what

16:52:36  10   you see here?

16:52:36  11   A.   Yes.

16:52:37  12   Q.   And if you look down a little bit more, there's another

16:52:41  13   purchase on 11-12 in Opelousas, Louisiana.   Do you see that?

16:52:47  14   A.   Yes.

16:52:48  15   Q.   The 11-12 one is used with a card ending in 5997, right?

16:52:52  16   A.   Correct.

16:52:53  17   Q.   And the one in Opelousas is 9400, right?

16:52:59  18   A.   Yes.

16:52:59  19   Q.   You know there's two people on this account, right?

16:53:01  20   A.   Yes.

16:53:02  21   Q.   Eusevio Huitron and Jesus Huitron?

16:53:10  22   A.   Yes.

16:53:10  23   Q.   And you don't know whose card belongs to who?

16:53:13  24   A.   Do not.

16:53:14  25   Q.   If I told you that the 9400 belongs to "Chevo," do you have

| | | |
|---|---|---|
| 16:53:18 | 1 | any reason to disagree with me on that? |
| 16:53:20 | 2 | A.   No. |
| 16:53:21 | 3 | Q.   And if I told you that the 5997 has to deal -- it belongs to |
| 16:53:26 | 4 | my client, would you have any reason to disagree with that? |
| 16:53:28 | 5 | A.   No. |
| 16:53:29 | 6 | Q.   So we have my client buying gas from Shell Oil on November |
| 16:53:36 | 7 | 12th in Austin, Texas right?  I'm sorry.  November 12th in |
| 16:53:42 | 8 | Austin, Texas. |
| 16:53:43 | 9 | A.   Yes. |
| 16:53:44 | 10 | Q.   This is when the transaction posts the account, November 15, |
| 16:53:49 | 11 | right? |
| 16:53:49 | 12 | A.   Correct. |
| 16:53:50 | 13 | Q.   This is when the transaction actually occurs, right? |
| 16:53:53 | 14 | A.   Yes. |
| 16:53:53 | 15 | Q.   And if we look at all of these series of transactions, you |
| 16:54:01 | 16 | don't see anything consistent with either of them traveling to |
| 16:54:04 | 17 | Laredo, Texas, right? |
| 16:54:06 | 18 | A.   See nothing in that account. |
| 16:54:07 | 19 | Q.   Okay.  Just so there's no doubt, you know that there's |
| 16:54:11 | 20 | multiple bank accounts that are held by my client; is that right? |
| 16:54:16 | 21 | A.   Yes. |
| 16:54:19 | 22 | Q.   Okay.  Let's go to check 523.  Page 523 -- actually, 522, |
| 16:54:33 | 23 | this is his Huitron Homes account; is that right? |
| 16:54:36 | 24 | A.   Yes. |
| 16:54:37 | 25 | Q.   And do you know that my client had access to that account |

| | | |
|---|---|---|
| 16:54:40 | 1 | and used that account in his business, right?  Did you know that? |
| 16:54:49 | 2 | A.    Different account.  Okay. |
| 16:54:51 | 3 | Q.    But it's in Huitron Homes? |
| 16:54:53 | 4 | A.    Yes. |
| 16:54:54 | 5 | Q.    Okay.  I'm just going to go through it slowly, beginning |
| 16:55:04 | 6 | with 522 and 523.  We don't see any check card purchases on this |
| 16:55:15 | 7 | one, right? |
| 16:55:17 | 8 | A.    No. |
| 16:55:18 | 9 | Q.    But we also don't see any large cash withdrawals.  We just |
| 16:55:22 | 10 | see a lot of checks being written, right? |
| 16:55:24 | 11 | A.    Correct. |
| 16:55:25 | 12 | Q.    And you have access to checks.  You can contact the bank and |
| 16:55:27 | 13 | get the actual check images if they still have it, right? |
| 16:55:30 | 14 | A.    Yes. |
| 16:55:30 | 15 | Q.    But looking at this, there's nothing -- we don't see any |
| 16:55:35 | 16 | airline tickets being purchased.  We don't see any large |
| 16:55:37 | 17 | withdrawals of cash to fund a trip to Laredo, right? |
| 16:55:41 | 18 | A.    No. |
| 16:55:42 | 19 | Q.    All right.  Let's go back to the CTR.  And let's look at the |
| 16:56:00 | 20 | one directly above it.  Give me one second. |
| 16:56:25 | 21 | We see a cash deposit of $13,000 total on November |
| 16:56:30 | 22 | 19th; is that correct?  I'm sorry, on January 19th, 2011; is that |
| 16:56:35 | 23 | right? |
| 16:56:35 | 24 | A.    Yes. |
| 16:56:36 | 25 | Q.    Is this a suspicious transaction according to you? |

| 16:56:46 | 1 | A.   No. |

A.   No.

16:56:46   1

Q.   Okay.  But if we look at it, we see that there is a date of
16:56:47   2
birth, right?
16:56:52   3

A.   Correct.
16:56:52   4

Q.   1-6-62, right?
16:56:52   5

A.   Yes.
16:56:55   6

Q.   And the names given is Jesus Huitron and Jesus Huitron,
16:56:55   7
right?
16:57:04   8

A.   Correct.
16:57:05   9

Q.   That is my client's date of birth, right?
16:57:06   10

A.   Yes.
16:57:11   11

Q.   Okay.  And, again, nothing suspicious about that
16:57:11   12
transaction?
16:57:16   13

THE COURT:  We've seen that about a dozen times.  I'm
16:57:17   14
going to give you a break before 6:00.  Use the facilities.
16:57:20   15
Stretch.  Get a deep breath.  Come back.
16:57:26   16

(Jury not present.)
16:58:05   17

MR. MAYR:  If I may, I'm only going to cover three more
16:58:19   18
of the transactions.  Then I will be done.
16:58:21   19

THE COURT:  Have it all you want.  I mean, you're just
16:58:23   20
burying everybody in the concrete.  Your entire last hour and
16:58:26   21
five minutes could have been done in three questions:  Do you
16:58:32   22
know who presented that?  They'll say "No."  Do you know if he
16:58:39   23
ever went to Laredo?  He's got to say "No."  The third one, you
16:58:45   24
might have to think about.  It'll come right back to you.  An
16:58:53   25

| | | |
|---|---|---|
| 16:58:58 | 1 | hour and ten minutes.  If you would be watching the jury as I am, |
| 16:59:02 | 2 | you would see you're not doing any good.  Three questions would |
| 16:59:07 | 3 | have cleared it. |
| 16:59:08 | 4 | MR. MAYR:  Okay. |
| 16:59:08 | 5 | THE COURT:  I don't know what they're going to do, but |
| 16:59:10 | 6 | they're sure not happy. |
| 16:59:13 | 7 | MR. MAYR:  Thank you, Judge. |
| 17:10:55 | 8 | (Recess.) |
| 17:11:01 | 9 | MR. GARDNER:  Your Honor, just one brief thing.  The |
| 17:11:03 | 10 | marshals asked me if Mr. Jose Hinojosa and Mr. Jesus Rejon were |
| 17:11:09 | 11 | needed anymore.  I've asked all counsel.  They have no further |
| 17:11:12 | 12 | need for them.  The marshals want to know if they can return them |
| 17:11:15 | 13 | from whence they came. |
| 17:11:16 | 14 | THE COURT:  Is that true, counsel? |
| 17:11:18 | 15 | MR. DEGEURIN:  No problem. |
| 17:11:19 | 16 | MR. ESPER:  Yes, your Honor. |
| 17:11:19 | 17 | MS. WILLIAMS:  Yes, your Honor. |
| 17:11:21 | 18 | MR. GARDNER:  Thank you, your Honor. |
| 17:11:22 | 19 | THE COURT:  You can tell them. |
| 17:11:44 | 20 | (Jury present.) |
| 17:12:30 | 21 | THE COURT:  Do you understand you're still under oath? |
| 17:12:31 | 22 | THE WITNESS:  Yes, sir. |
| 17:12:33 | 23 | THE COURT:  Proceed. |
| 17:12:33 | 24 | MR. MAYR:  Thank you, your Honor. |
| 17:12:34 | 25 | Q.   (BY MR. MAYR) Agent Pennington, I'm just going to ask you |

17:12:37  1  about three more transactions on this CTR.  If we look at this

17:12:41  2  one from May 20, 2011, we see a 19,800 deposit made in Laredo,

17:12:48  3  Texas; is that right?

17:12:49  4  A.    Yes.

17:12:49  5  Q.    But we see the date of birth -- the subject date of birth is

17:12:55  6  -- can you see it from there?

17:12:56  7  A.    The 2-4-81.

17:13:04  8  Q.    Right.

17:13:04  9  A.    Yes.

17:13:04  10  Q.    Who does that belong to?

17:13:05  11  A.    Victor Lopez.

17:13:06  12  Q.    And, in fact, that's what it shows over here, Victor Lopez

17:13:14  13  -- that's his Social Security number, right?

17:13:16  14  A.    I believe it is.

17:13:17  15  Q.    So we know that at some point, Victor Lopez has my client

17:13:24  16  Jesus Huitron's Social Security number, right?

17:13:26  17  A.    He's got his bank account information.

17:13:30  18  Q.    He does, right?

17:13:31  19  A.    He's got his bank account number, not necessarily Social

17:13:34  20  Security number.  No.

17:13:34  21  Q.    Well, how does the bank get his -- how does it get my

17:13:39  22  client's Social Security number?

17:13:40  23  A.    It's on file with the bank.

17:13:41  24  Q.    Okay.  Fair enough.

17:13:42  25        Now, we see that in these -- let's see, one, two, three

17:13:52   1   above, we see additional transactions in Laredo, one on August

17:14:00   2   22nd, 2011 and one on November 1st, 2011 in Laredo, Texas, and

17:14:08   3   they appear to be made also by Victor Lopez, right?

17:14:15   4   A.   Okay.  Which one are you on?

17:14:17   5   Q.   Sure.  Sorry.  It's difficult when I don't have it

17:14:21   6   highlighted.  But I'm talking about, if you want to look up here

17:14:24   7   at the screen, this one right here, August 22nd, 2011, November

17:14:28   8   1st, 2011 in Laredo, Texas, we know it's Victor Lopez who's

17:14:34   9   making the deposits, right?

17:14:35   10   A.   Yes.

17:14:35   11   Q.   Now, the last two is we see one in Buena Park, California,

17:14:44   12   just three days prior to May 20th, on May 17, 2011; is that

17:14:51   13   right?

17:14:51   14   A.   Yeah.  I see where you're pointing.

17:14:53   15   Q.   Buena Park.  Do you know where that is?

17:14:57   16   A.   No.

17:14:57   17   Q.   But according to this report, there's no subject date of

17:15:01   18   birth, right?

17:15:02   19   A.   Correct.

17:15:03   20   Q.   But according to this report, the person making the deposit

17:15:06   21   is Jesus Huitron, right?

17:15:07   22   A.   Yes.

17:15:12   23   Q.   Then we keep going up and we see another deposit that's

17:15:16   24   Victor Lopez's date of birth, making a deposit in Laredo on

17:15:20   25   November 1st, right?

17:15:21  1   A.   Correct.

17:15:22  2   Q.   Now, we see the one directly above that, we see Victor

17:15:31  3   Manuel Lopez, date of birth, 2-4-81, making a deposit at a Wells

17:15:37  4   Fargo Bank in San Francisco, right?

17:15:39  5   A.   Yes.

17:15:41  6   Q.   Are you sure you know where that is?

17:15:44  7   A.   Yes.

17:15:45  8   Q.   For $65,000, right?  And change.

17:15:51  9   A.   Yes.  That's the CTR was filed on that one, yes.

17:15:54  10   Q.   And then, CTRs following -- filed for month of March 2012,

17:16:03  11   April 2012, May 2012 in San Francisco, right?

17:16:11  12   A.   Correct.

17:16:14  13   Q.   According to this report, who's supposed to be making these

17:16:18  14   deposits?

17:16:18  15   A.   Jesus Huitron.

17:16:20  16   Q.   I'm not going to waste any more of your time or this jury's

17:16:23  17   time, but I want you to do me a favor, Agent Pennington.  When

17:16:26  18   we're done with testimony today, I want you to go back and I want

17:16:29  19   you to go through your records and any resources that you have

17:16:30  20   available, and if you can find anything that shows that my client

17:16:34  21   traveled to these locations, will you bring it back tomorrow?

17:16:39  22   Can you do that?

17:16:41  23   A.   Probably won't.

17:16:43  24   Q.   Fair enough.

17:16:45  25           Now, let's talk about the receiving end of these

17:16:48   1   transactions.  Someone else could possibly be making these

17:16:53   2   deposits into the account other than my client; is that right?

17:16:56   3   A.   Someone made the deposits into your client's account.

17:16:59   4   Q.   Someone did.  And it's possible that he never saw these

17:17:05   5   deposits being made to his account?

17:17:07   6   A.   Disagree.

17:17:08   7   Q.   Disagree.  Okay.  How often do you look at your bank

17:17:14   8   statements?

17:17:15   9   A.   Every month.

17:17:16  10   Q.   Every month.  Is it possible that average citizens maybe

17:17:21  11   don't look at it every month?

17:17:23  12   A.   There's a particular transaction that tells me that he

17:17:25  13   looked at the accounts to make sure the structured money was in

17:17:30  14   the accounts.

17:17:30  15   Q.   I'll let you talk with Mr. Gardner about that, okay?

17:17:33  16   Because I know what you're talking about.

17:17:34  17   A.   Okay.

17:17:35  18   Q.   I'll let you let him explain it.  But let me just go through

17:17:38  19   this with you.

17:17:39  20        As far as the accounts go, you know that Jessica

17:17:42  21   Huitron has access to the accounts, right?

17:17:47  22   A.   I didn't see her name on the signature card.

17:17:49  23   Q.   Okay.  But you know that she can -- if you don't know,

17:17:52  24   that's okay.  But you know that she can go in and access the

17:17:56  25   accounts and see what's occurring.  Do you know that?

17:17:59  1   A.    I don't know.

17:17:59  2   Q.    Okay.  Well, let's see what else we know about Jessica

17:18:03  3   Huitron.  I'm showing you what's been admitted and was shown to

17:18:06  4   you by Mr. Gardner on your direct testimony, Government's Exhibit

17:18:12  5   No. 69A.  Do you see that here?

17:18:17  6   A.    Yes.

17:18:17  7   Q.    This handwriting, you would agree it's consistent with

17:18:20  8   Jessica Huitron's handwriting?

17:18:21  9   A.    I have no idea.

17:18:22  10  Q.    Okay.  You've seen her writing used -- you've seen writing

17:18:26  11  similar to this on other documents; is that right?  I mean,

17:18:31  12  you've been sitting in this courtroom listening to me talk

17:18:32  13  about --

17:18:32  14  A.    I don't know anything about handwriting.

17:18:34  15  Q.    But you have access to individuals who could compare?

17:18:37  16        MR. GARDNER:  Your Honor, it's been asked and answered.

17:18:40  17        MR. MAYR:  I'll withdraw the question.

17:18:41  18        THE COURT:  Has been.

17:18:42  19  Q.    (BY MR. MAYR) Let me ask you this.  The handwriting that we

17:18:45  20  see here on 69A, would you agree that it's consistent with the

17:18:48  21  handwriting --

17:18:49  22        MR. GARDNER:  Your Honor, Special Agent Pennington has

17:18:51  23  testified, I don't know how many times, that he's not a

17:18:54  24  handwriting expert.

17:18:55  25        THE COURT:  He's asked him, he's asked him, he's asked

17:18:57  1   him, let him answer.  Ask again.

17:19:00  2   Q.  (BY MR. MAYR) I will.  And these are two different exhibits.

17:19:03  3   Would you agree that this handwriting is consistent with that on

17:19:05  4   the front of this file?

17:19:06  5   A.  With what?

17:19:07  6   Q.  This handwriting on these checks is consistent with this

17:19:10  7   handwriting right here?

17:19:14  8   A.  Go back.  No.

17:19:18  9   Q.  Okay.  How about that page?

17:19:23  10  A.  No.

17:19:24  11  Q.  How about that page?

17:19:27  12  A.  No.

17:19:29  13  Q.  These notes right here?

17:19:32  14  A.  Consistent with which?

17:19:34  15  Q.  With the handwriting that we're seeing on all of these

17:19:34  16  materials.

17:19:37  17  A.  They all appear different to me.

17:19:39  18  Q.  That clearly appears different, right?

17:19:46  19  A.  Yes.

17:19:46  20  Q.  That's signed by Isabel Huitron, right?  Or appears to be

17:19:50  21  signed by Isabel?

17:19:51  22  A.  Yes.

17:19:51  23  Q.  That's the defendant's brother?

17:19:53  24  A.  Correct.

17:19:54  25  Q.  I cashed this for Jose Trevino, Rodrigo San Juan.  Does it

| 17:20:09 | 1 | appear to be the same? |
| 17:20:10 | 2 | A.   No. |
| 17:20:10 | 3 | Q.   Do you know that Rodrigo San Juan is Jessica Huitron's |
| 17:20:14 | 4 | husband? |
| 17:20:14 | 5 | A.   No. |
| 17:20:15 | 6 | Q.   Showing you 69 -- showing you what was admitted as |
| 17:20:39 | 7 | Government's Exhibit No. 74.  Does that appear to be the same |
| 17:20:46 | 8 | handwriting? |
| 17:20:46 | 9 | A.   As what? |
| 17:20:47 | 10 | Q.   As what we've seen in all of these documents. |
| 17:20:49 | 11 | A.   I've seen numerous handwritings. |
| 17:20:51 | 12 | Q.   The ones that I've pointed out to you, Agent. |
| 17:20:54 | 13 | A.   They were different. |
| 17:20:56 | 14 | Q.   Okay.  We see that this check was signed by who? |
| 17:20:58 | 15 | A.   Eusevio -- I'm sorry.  Isabel. |
| 17:21:00 | 16 | Q.   Isabel, right? |
| 17:21:01 | 17 | A.   Yes. |
| 17:21:01 | 18 | Q.   And this handwriting appears consistent with this |
| 17:21:03 | 19 | handwriting? |
| 17:21:06 | 20 | A.   Do what now? |
| 17:21:06 | 21 | Q.   Does this handwriting appear consistent with this |
| 17:21:09 | 22 | handwriting? |
| 17:21:10 | 23 | A.   No. |
| 17:21:13 | 24 | Q.   Did you think it appears consistent with this handwriting? |
| 17:21:20 | 25 | A.   Which one are you talking about, the first or second one? |

17:21:23  1  Q.   The first one.  I'll just hold it right here, let you see

17:21:29  2  for comparative purposes.  Same or not?

17:21:35  3  A.   No.

17:21:39  4  Q.   Same or not?

17:21:42  5  A.   Don't know.

17:21:45  6  Q.   Do any of these appear to be the same to you, Agent

17:21:48  7  Pennington, except this last one?

17:21:52  8  A.   That is different.

17:21:52  9  Q.   Okay.  I'm not going to go through the rest of the exhibits

17:22:23  10  because I think I know what your testimony is going to be, but

17:22:25  11  let me ask you this.  I do need to show you this last one.

17:23:19  12       You do recall seeing an e-mail in one of these exhibits

17:23:23  13  sent from Jessica Huitron to the Anri e-mail address that we were

17:23:29  14  talking about earlier; is that right?  I mean, you've reviewed

17:23:38  15  all the evidence that was seized from the Austin, Texas search

17:23:41  16  warrant, right?

17:23:41  17  A.   There is so much evidence in this case, I have not reviewed

17:23:45  18  every single paper.  I've reviewed a lot of things.  If it's

17:23:49  19  something in particular, please show it to me, refresh my memory.

17:23:53  20  Q.   If I may have a moment, your Honor.  I'm sorry.  There it

17:24:42  21  is.  All right.  I'm just going to do this to make it quick.  72.

17:24:57  22  Can you pull up 72 for me, please?

17:25:47  23       All right.  Showing you 72, Agent Pennington.  Do you

17:25:58  24  recognize that?

17:25:59  25  A.   Yes.

17:26:01   1   Q.   That is an e-mail from Jessica Huitron to this

17:26:04   2   Anri2319@hotmail.

17:26:07   3   A.   Actually, it's from Anri to Jessica.

17:26:09   4   Q.   Right.  I apologize.  Okay.

17:26:11   5        As we previously learned, this Anri was associated with

17:26:13   6   Victor Lopez, Carlos Nayen, and a number of individuals, correct?

17:26:16   7   A.   Correct.

17:26:16   8   Q.   They appear to be communicating with Jessica Huitron?

17:26:20   9   A.   Yes.

17:26:20   10  Q.   Did you ever get Jessica Huitron's e-mails to find out

17:26:24   11  anything from her account?

17:26:25   12  A.   No.

17:26:33   13  Q.   Finally, in regards to the expenses, you testified that you

17:26:38   14  do not look at all of the expenses incurred; is that correct?

17:26:41   15  A.   That is correct.

17:26:42   16  Q.   You're aware that computers were seized from the office

17:26:45   17  located at Highway 183; is that correct?

17:26:47   18  A.   Yes.

17:26:49   19  Q.   And have you reviewed any of the QuickBooks files or any

17:26:54   20  other tax accounting files on those computers to see how these

17:26:59   21  expenses are tracked or not?

17:27:01   22  A.   No.  No need to.

17:27:03   23  Q.   But it's -- you talk about commingling and mixing funds.

17:27:08   24  A.   Correct.

17:27:09   25  Q.   If you reviewed -- well, you'd agree with me that QuickBooks

17:27:18  1  can be used to keep an accounting of which funds are for horse

17:27:21  2  expenses, which funds are for Homes' expenses, right?

17:27:25  3  A.   I would imagine they could.

17:27:27  4  Q.   I'll pass the witness.  I have no further questions.

17:27:46  5           THE COURT:  Any redirect?

17:27:47  6           MR. GARDNER:  Yes, your Honor.

17:27:47  7                    REDIRECT EXAMINATION

17:27:47  8  BY MR. GARDNER:

17:27:49  9  Q.   Special Agent Pennington, I'm showing you Government's

17:27:51  10  Exhibit 430.  Do you recognize that?

17:27:53  11  A.   Yes, sir.

17:27:54  12  Q.   Are those the underlying CTRs in that spreadsheet?

17:27:57  13  A.   Yes, they are.

17:27:58  14  Q.   Not that the jury needs any more paper, your Honor, I

17:28:03  15  introduce Government's Exhibit 430.  Certified U.S. Department of

17:28:07  16  Treasury, the CTRs.

17:28:12  17           THE COURT:  They're received.  430?

17:28:15  18           MR. GARDNER:  430, your Honor.

17:28:16  19           THE COURT:  It's received.

17:28:17  20  Q.   (BY MR. GARDNER) Now, I'm not going to go through these,

17:28:21  21  Special Agent, but if the jury ever wants to hear the word CTR

17:28:23  22  again, do they have the ability to go through these?

17:28:25  23  A.   Yes, they do.

17:28:25  24  Q.   See who made the payment and on whose behalf it was made?

17:28:29  25  A.   Correct.

17:28:29  1    Q.   With the Huitron accounts, how much cash total was deposited

17:28:41  2    into Eusevio and Jesus Huitron's account in that 22 months?

17:28:47  3    A.   505,000 I believe.

17:28:49  4    Q.   Who was in charge of those two accounts?

17:28:53  5    A.   Jesus Huitron and Eusevio Huitron were the signature cards

17:29:03  6    on those accounts.

17:29:05  7    Q.   Now, I'm not going to ask you to compare handwriting on

17:29:33  8    Government's Exhibit 74.  I'm showing you check 83202 for Sergio

17:29:39  9    Rincon.  Who signed that check?

17:29:41  10   A.   Jesus Huitron.

17:29:43  11   Q.   Showing you this other check for Carmina, LLC, 3,200, who

17:29:47  12   signed that check?

17:29:48  13   A.   Jesus Huitron.

17:29:50  14   Q.   Showing you 82059 for $2,000 for Rodolfo Trevino, who signed

17:29:56  15   that check?

17:29:57  16   A.   Jesus Huitron.

17:29:58  17   Q.   Showing you check 84382, Sergio Rincon, for the initials

17:30:04  18   there?

17:30:04  19   A.   "EH."

17:30:05  20   Q.   That stands for Eusevio Huitron?

17:30:07  21   A.   I believe so.

17:30:11  22   Q.   Mr. Womack asked you about overt acts.  Do you recall that

17:30:18  23   conversation?

17:30:18  24   A.   Yes.

17:30:19  25   Q.   Are you aware the government is not required to prove any

17:30:23    1   overt acts for this conspiracy violation?

17:30:25    2           MR. ESPER:  Object, your Honor.  Calls for a legal

17:30:27    3   conclusion.

17:30:28    4           THE COURT:  It does.  I'll so instruct the jury.

17:30:30    5           MR. GARDNER:  Thank you, your Honor.

17:30:31    6   Q.   (BY MR. GARDNER) How many overt acts with respect to Mr.

17:30:33    7   Garcia could you have alleged in that indictment?

17:30:36    8   A.   Numerous.

17:30:37    9   Q.   Would it have taken a lot of pages?

17:30:39   10   A.   Yes.

17:30:40   11   Q.   Who prepared that indictment?

17:30:41   12   A.   You did.

17:30:45   13   Q.   Now, Mr. Womack also asked you about a specific snapshot on

17:30:51   14   whether or not Fernando Garcia made any communication for

17:30:58   15   $51,000.  Do you recall that question?

17:30:59   16   A.   Yes.

17:31:00   17   Q.   Structured money?

17:31:01   18   A.   Structured.  Yes.

17:31:03   19   Q.   Let's look at the timeframe alleged in the conspiracy.

17:31:06   20           What evidence do you have that Fernando Garcia

17:31:09   21   participated in structuring funds?

17:31:13   22   A.   Going back in 2008, the 90,000 structured into his account.

17:31:19   23   And then, the testimony from the witnesses about Carlos Nayen,

17:31:28   24   Fernando Garcia and Victor Lopez responsible for paying expenses

17:31:32   25   of the horses in which we had a number of structured deposits go

| | | |
|---|---|---|
| 17:31:37 | 1 | into Huitron Homes, Paul Jones, LA Horses, Felipe Quintero. |
| 17:31:46 | 2 | Q.   Are those all overt acts that are not listed in the |
| 17:31:48 | 3 | indictment? |
| 17:31:49 | 4 | A.   Yes. |
| 17:31:50 | 5 | Q.   And Ms. Williams asked you whether you knew the agreement |
| 17:31:54 | 6 | between Aguirre and Jose Trevino on the transfer of 35 mares? |
| 17:31:58 | 7 | A.   Yes. |
| 17:31:59 | 8 | Q.   And you responded "Yes"? |
| 17:32:00 | 9 | A.   Yes. |
| 17:32:01 | 10 | Q.   What was your understanding of that agreement? |
| 17:32:03 | 11 | A.   Since the horses did not belong to Luis Aguirre, do what |
| 17:32:08 | 12 | you're told. |
| 17:32:09 | 13 | Q.   And on that cancelled check, Government's Exhibit 27F, would |
| 17:32:22 | 14 | you agree that the memo reflects an understanding of the |
| 17:32:26 | 15 | agreement to some extent? |
| 17:32:29 | 16 | A.   I'm sorry.  Your question again? |
| 17:32:30 | 17 | Q.   That was a bad question. |
| 17:32:32 | 18 |      What's it say on the memo line? |
| 17:32:34 | 19 | A.   This check covers, something, lost check 1128. |
| 17:32:41 | 20 | Q.   Above that.  I'm sorry. |
| 17:32:42 | 21 | A.   Oh, purchase of 35 mares. |
| 17:32:44 | 22 | Q.   And what was the amount? |
| 17:32:45 | 23 | A.   $122,500. |
| 17:32:48 | 24 | Q.   And, again, what was the purchase price of Dashin Follies in |
| 17:32:52 | 25 | and of herself? |

| | | |
|---|---|---|
| 17:32:53 | 1 | A.   $875,000. |
| 17:32:57 | 2 | Q.   And finally, Special Agent Pennington, you recall the dates |
| 17:33:02 | 3 | that Fernando Garcia appeared at AQHA? |
| 17:33:07 | 4 | A.   January 30th of 2012. |
| 17:33:09 | 5 | Q.   And what was the day of the transfer of the mares? |
| 17:33:12 | 6 | A.   January 30th, 2012. |
| 17:33:14 | 7 | Q.   January 30th or January 29th? |
| 17:33:17 | 8 | A.   29th was a Sunday, I believe.  I think 30th was a Monday. |
| 17:33:19 | 9 | Q.   Your Honor, we would ask the Court take judicial notice that |
| 17:33:22 | 10 | January 29th of 2012 was a Sunday.  That's all I have, your |
| 17:33:28 | 11 | Honor. |
| 17:33:29 | 12 |             THE COURT:  Ms. Williams, any further question? |
| 17:33:31 | 13 |             MS. WILLIAMS:  I do have one question, your Honor. |
| 17:33:39 | 14 | What is that day, Sunday? |
| 17:33:41 | 15 |             MR. GARDNER:  Sunday, January 29th, 2012, your Honor. |
| 17:33:50 | 16 |                     RE-CROSS EXAMINATION |
| 17:33:50 | 17 | BY MS. WILLIAMS: |
| 17:33:52 | 18 | Q.   Did you find evidence that Jose Trevino used his debit card |
| 17:33:59 | 19 | at AQHA for two large amounts, $1,330 and $1,500, early February? |
| 17:34:11 | 20 | A.   You'd have to ask somebody else that question.  I don't know |
| 17:34:12 | 21 | the answer.  Okay. |
| 17:34:27 | 22 | Q.   Do you see that?  What's the date? |
| 17:34:29 | 23 | A.   2-1-2012. |
| 17:34:31 | 24 | Q.   And do you see that? |
| 17:34:34 | 25 | A.   I'm sorry.  2-2 of 2012. |

| | | |
|---|---|---|
| 17:34:36 | 1 | Q.   2-2-2012? |
| 17:34:38 | 2 | A.   Right. |
| 17:34:38 | 3 | Q.   Which would be maybe Tuesday? |
| 17:34:40 | 4 | A.   No.  That would have been a Wednesday. |
| 17:34:42 | 5 | Q.   Okay.  Wednesday.  $1,500 and $1,330 to AQHA.  Do you know |
| 17:34:52 | 6 | whether or not that would be consistent with leasing mares, |
| 17:34:58 | 7 | filing a lease agreement with AQHA? |
| 17:35:00 | 8 | A.   Don't know. |
| 17:35:01 | 9 | Q.   No further questions. |
| 17:35:09 | 10 | THE COURT:  Mr. Sanchez. |
| 17:35:10 | 11 | MR. SANCHEZ:  No questions. |
| 17:35:11 | 12 | THE COURT:  Mr. Womack. |
| 17:35:12 | 13 | MR. WOMACK:  No questions. |
| 17:35:13 | 14 | MR. ESPER:  I have two, your Honor. |
| 17:35:15 | 15 | RE-CROSS EXAMINATION |
| 17:35:15 | 16 | BY MR. ESPER: |
| 17:35:16 | 17 | Q.   Mr. Gardner asked you a question about Paul Jones.  Who is |
| 17:35:19 | 18 | he? |
| 17:35:19 | 19 | A.   Paul Jones is a trainer in California. |
| 17:35:21 | 20 | Q.   Okay.  A lot of money went into his account, correct? |
| 17:35:23 | 21 | A.   Yes, it did. |
| 17:35:24 | 22 | Q.   Okay.  On all these checks that you have reviewed, Mr. |
| 17:35:27 | 23 | Pennington, did you see Eusevio Huitron write any check? |
| 17:35:34 | 24 | A.   Not that you showed me. |
| 17:35:36 | 25 | Q.   The one that said, okay by EH? |

17:35:39  1   A.   Yeah.

17:35:40  2   Q.   Did you see him sign -- all the documents you see -- I know

17:35:43  3   there's a ton of them -- see his signature on any of them?  Is

17:35:47  4   that a "No"?

17:35:48  5   A.   No.  I don't know.

17:35:50  6   Q.   You don't know --

17:35:50  7   A.   No.  I guess the answer would be no.

17:35:53  8   Q.   Okay.  Thank you.

17:35:56  9          MR. MAYR:  I have no further question, your Honor.

17:35:57  10          THE COURT:  May this witness step down?  You may step

17:36:01  11   down, sir.  Who's your next witness?

17:36:04  12          MR. GARDNER:  Your Honor, Special Agent Scott Lawson.

17:36:13  13          THE COURT:  Let's get in 20 minutes worth.

17:36:16  14          MR. GARDNER:  Yes, sir.  Your Honor, the government

17:36:18  15   calls Special Agent Scott Lawson.

17:36:28  16          THE COURT:  If you'll be sworn, please.

17:36:31  17          (Witness sworn.)

17:36:41  18          THE COURT:  Would you tell us your full name, please,

17:37:10  19   sir, and spell your last?

17:37:11  20          THE WITNESS:  My name is Special Agent Scott Lawson,

17:37:14  21   L-A-W-S-O-N.

17:37:16  22      SCOTT LAWSON, called by the Government, duly sworn.

17:37:16  23                    DIRECT EXAMINATION

17:37:16  24   BY MR. GARDNER:

17:37:18  25   Q.   Special Agent Lawson, the jury's been watching you for

17:37:23   1   better part of two weeks now.  Could you introduce yourself to

17:37:25   2   them, and tell them how long you've been an FBI agent, and what

17:37:29   3   your other law enforcement experience is prior to that?

17:37:30   4   A.   Yes, sir.  My name is Scott Lawson.  I entered in law

17:37:35   5   enforcement 2005.  I worked for a sheriff's office outside of

17:37:39   6   Nashville, Tennessee.  2006, I was assigned to the Interstate

17:37:43   7   Crime Enforcement Group, which focused on interstate travel of

17:37:47   8   narcotics and illicit money gain from narcotics.  In 2009, I was

17:37:55   9   hired by the FBI and sent to Laredo, Texas, and I've been in that

17:37:59  10   position since 2009.

17:38:00  11   Q.   And are you the agent who originated this case both in

17:38:04  12   Laredo at the U.S. Attorney's Office, here in Austin?

17:38:07  13   A.   Yes, sir.

17:38:07  14   Q.   I want to start with Mr. Graham, first of all.  What are the

17:38:11  15   total number of reports you would estimate Mr. Graham gave to

17:38:14  16   you?

17:38:15  17   A.   It's around 59.

17:38:19  18   Q.   And when I say reports, these are verbal reports he gave to

17:38:22  19   you.  Would that be fair?

17:38:23  20   A.   Yes, sir.  That would reflect a meeting we had or telephone

17:38:28  21   call we had.

17:38:29  22   Q.   And when you say 59, is that the number of reports that you

17:38:33  23   prepared in response to those conversations?

17:38:35  24   A.   Yes, sir.

17:38:37  25   Q.   All right.  And were those reports prepared near or after

17:38:40  1   the time that the events reported by Mr. Graham happened?

17:38:44  2   A.   Yes, sir.

17:38:44  3   Q.   And have those reports been provided to defense counsel?

17:38:48  4   A.   Yes, sir.

17:38:51  5   Q.   Now, you heard Mr. Graham's testimony.  Is everything that

17:38:55  6   he testified contained in your reports?

17:38:57  7   A.   Yes, sir.

17:39:00  8   Q.   Now, tell us about the phone with respect to how it

17:39:04  9   operates, how it was provided, and the decision behind providing

17:39:08  10  it.

17:39:09  11  A.   Sure.  In April 2011, we had been working with Mr. Graham

17:39:13  12  for a little over a year, and we asked him if he would -- how he

17:39:18  13  felt about having his calls recorded, and he agreed.  We provided

17:39:21  14  him with money to pay for a phone for one year and told him to

17:39:30  15  pick up the phone and to get a Nextel so that he would be able to

17:39:33  16  communicate with members of this organization.  Once he got the

17:39:36  17  number, he gave us the, you know, the serial number and the

17:39:40  18  specifics of the phone, our tech department is able to contact

17:39:44  19  the phone company and then, enter into an agreement to record all

17:39:49  20  calls made by that phone.

17:39:49  21  Q.   So did Mr. Graham have any responsibility in recording or

17:39:53  22  keeping or maintaining any of these calls?

17:39:55  23  A.   No.  There was never a decision made about which -- he

17:39:58  24  cannot stop it from recording a certain call, or he doesn't have

17:40:02  25  to push a button and record a call.  Any call made with that

17:40:05  1    phone would be recorded.

17:40:06  2    Q.   And in the two years you were working with Mr. Graham, did

17:40:10  3    any piece of information that he gave you prove to be untrue?

17:40:14  4    A.   No.

17:40:14  5    Q.   And how did you confirm the information that Mr. Graham gave

17:40:18  6    you?

17:40:19  7    A.   His information was confirmed by a variety of means:

17:40:22  8    subpoenaed bank documents, surveillance that -- surveillance

17:40:27  9    conducted after information he gave us, debriefs of other

17:40:31  10   witnesses, and debriefs with other law enforcement officers.

17:40:37  11   Q.   Okay.  Now, the jury's already heard Special Agent Spaeth

17:40:40  12   testify as to one surveillance and the reasons why.  How many

17:40:43  13   surveillances did you conduct?

17:40:45  14   A.   I conducted several.  I'd say between 10 and 15.

17:40:50  15   Q.   And I don't want to talk about all 10 or 15.  But did you

17:40:54  16   conduct a surveillance at the August 2010 All American

17:40:59  17   qualifiers?

17:41:00  18   A.   I did.

17:41:01  19   Q.   Showing you Government's Exhibit 376A through 376E.  Are

17:41:08  20   those the photos that you took based on your surveillance?

17:41:12  21   A.   Yes.

17:41:14  22   Q.   Your Honor, I offer Government's Exhibit 376A through 376E.

17:41:20  23   A.   I would like to clarify there were two agents on that

17:41:23  24   surveillance, and we kind of passed the camera back and forth,

17:41:25  25   but were together in that surveillance.

| | | |
|---|---|---|
| 17:41:29 | 1 | Q.   Just to follow up on that, so are the images contained in |
| 17:41:31 | 2 | those photos true and exact based on the events as you observed |
| 17:41:34 | 3 | them that day? |
| 17:41:35 | 4 | A.   Yes, sir. |
| 17:41:46 | 5 | THE COURT:  Everybody's seen them? |
| 17:41:48 | 6 | MR. ESPER:  No objection. |
| 17:41:49 | 7 | THE COURT:  All right.  276A through E are admitted. |
| 17:41:52 | 8 | MR. GARDNER:  Your Honor, I apologize.  I may have |
| 17:41:54 | 9 | misspoken.  That's 376A through E. |
| 17:41:56 | 10 | THE COURT:  That's what I thought I said, 376. |
| 17:42:00 | 11 | MR. GARDNER:  I believe that's what you did say, Judge. |
| 17:42:04 | 12 | Q.   (BY MR. GARDNER) 376A, what's this a picture of? |
| 17:42:08 | 13 | A.   That's a picture of Esgar Ramirez on, I believe, Mr. Piloto |
| 17:42:15 | 14 | for the qualifying race in 2010. |
| 17:42:18 | 15 | Q.   Is this the same set of silks that we saw on the other |
| 17:42:21 | 16 | pictures with Carlos Nayen? |
| 17:42:22 | 17 | A.   It is. |
| 17:42:23 | 18 | Q.   And 376B, who is this individual here? |
| 17:42:31 | 19 | A.   That's Felipe Quintero. |
| 17:42:33 | 20 | Q.   And this individual here? |
| 17:42:35 | 21 | A.   Fernando. |
| 17:42:36 | 22 | Q.   Fernando Garcia? |
| 17:42:37 | 23 | A.   Yes, sir. |
| 17:42:38 | 24 | Q.   And the individual in the hat? |
| 17:42:39 | 25 | A.   Jose Trevino. |

17:42:40  1    Q.   And the individual looking up?

17:42:42  2    A.   Tyler Graham.

17:42:43  3    Q.   All right.  And where is this area located?

17:42:47  4    A.   When you're at the race, there's the stands that the general

17:42:50  5    public sits in, and right in front of you would be the track

17:42:53  6    obviously.  And on the inside of the track would be the infield,

17:42:56  7    or I think they call it the paddock, but basically owners and all

17:43:00  8    those persons involved in the racing sometimes stand opposite of

17:43:04  9    the track than where the betting general public would sit.  So

17:43:10  10   they're looking at us as we're looking at them.

17:43:12  11   Q.   376C.  Those two individuals?

17:43:14  12   A.   That's Felipe Quintero and Jose Trevino.

17:43:17  13   Q.   376D?

17:43:20  14   A.   That's Felipe, Fernando Garcia, the one turned around,

17:43:28  15   that's Carlos Nayen.  And I know Rincon had a pink shirt and a

17:43:34  16   cowboy hat on that day.

17:43:35  17   Q.   So you did see Sergio Rincon that day, as well?

17:43:38  18   A.   Yes.

17:43:38  19   Q.   376E, who are these two individuals?

17:43:45  20   A.   The, I guess, Hawaiian-type shirt, maybe that's Carlos

17:43:49  21   Nayen.  And the hat would be Fernando Garcia.

17:43:53  22   Q.   At this point, had you received information from Mr. Graham

17:43:57  23   regarding whether or not these individuals would be in attendance

17:44:00  24   at this auction?

17:44:02  25   A.   At the race, yes, sir.

17:44:03  1    Q.   At the race.  I apologize.  Speaking of auctions, I'm

17:44:08  2    showing you Government's Exhibit 377A through 377H.  What are

17:44:15  3    these pictures of, sir?

17:44:16  4    A.   This is the Ruidoso sales auction, Labor Day weekend 2010.

17:44:21  5    Q.   And is that, as the jury's heard, the race where Mr. Piloto

17:44:26  6    won?

17:44:26  7    A.   Yes, sir.  This is the auction just before the race where

17:44:29  8    Mr. Piloto won.

17:44:29  9    Q.   Your Honor, I offer Government's Exhibit 377A through H,

17:44:35  10   inclusive.

17:45:06  11        THE COURT:  Any objection?  All right.  377A through H

17:45:10  12   are received.

17:45:11  13   Q.   (BY MR. GARDNER) And, Special Agent Lawson, what were you

17:45:14  14   looking for at this particular auction?  What type of activity,

17:45:18  15   rather?

17:45:18  16   A.   We were just trying to confirm or learn who Jose Trevino and

17:45:22  17   Carlos Nayen and Fernando associated with.  We were looking to

17:45:25  18   see what horses would be in which name, which companies were

17:45:29  19   being used.  And, I'm sorry, I'm talking about the race.  At the

17:45:34  20   auction, it's the same weekend.  At the auction, very similar

17:45:37  21   things.  But we were trying to find out who was raising their

17:45:40  22   hand, who was associating together.  And just we were in the

17:45:43  23   early part of the investigation.  We were trying to identify

17:45:46  24   everybody.

17:45:47  25   Q.   Showing you Government's Exhibit 377A.

17:46:10  1   A.   Yes, sir.

17:46:11  2   Q.   Who is this individual here?

17:46:12  3   A.   The pink shirt would be Carlos Nayen.

17:46:15  4   Q.   And the individual in the blue-and-white shirt?

17:46:17  5   A.   That would be Sergio Rincon, also known as "Saltillo" and

17:46:20  6   "El Negro."

17:46:21  7   Q.   And what activity is Mr. Nayen doing in 377A?

17:46:25  8   A.   He was texting at the auctions.  It appeared that he would

17:46:30  9   take pictures of this horse --

17:46:31  10            MS. WILLIAMS:  Objection to the narrative.

17:46:33  11   Nonresponsive.

17:46:34  12            THE COURT:  Just respond to questions you're asked.

17:46:37  13            THE WITNESS:  Yes, your Honor.

17:46:38  14   Q.   (BY MR. GARDNER) So let me move on to 377B.  Why did you

17:46:41  15   take that picture?

17:46:43  16   A.   Because it was evident to me that Carlos Nayen had taken a

17:46:46  17   picture of the board and of the horse associated with that board.

17:46:49  18   Q.   Okay.  Now, after he would take a picture, going back to

17:46:52  19   377A, would he conduct that type of activity?

17:46:56  20   A.   Yes, sir.

17:46:56  21   Q.   Do you know who he was texting?

17:47:00  22   A.   Through other informants, it was Miguel Trevino --

17:47:04  23            MS. WILLIAMS:  Objection, your Honor.  Hearsay.

17:47:07  24   Q.   (BY MR. GARDNER) Personally, do you know who he was texting?

17:47:10  25   A.   No.

```
17:47:10   1   Q.   Showing you Government's Exhibit 377C.  Who is this
17:47:14   2   individual?
17:47:15   3   A.   That's Carlos Nayen.
17:47:16   4   Q.   This individual in the hat and glasses?
17:47:18   5   A.   Jose Trevino.
17:47:19   6   Q.   And?
17:47:20   7   A.   Sergio Rincon.
17:47:23   8   Q.   377D, Carlos Nayen?
17:47:28   9   A.   That's Carlos Nayen, Jose Trevino to his right.  To his left
17:47:32  10   is Esgar Ramirez, the jockey.
17:47:35  11   Q.   Right here in the baseball hat?
17:47:37  12   A.   Yes.
17:47:37  13   Q.   And, again, just for the record, what activity does it
17:47:40  14   appear Carlos Nayen is doing?
17:47:42  15   A.   Texting.
17:47:45  16   Q.   377E, again, was this taken shortly after the last picture?
17:47:51  17   A.   Yes, sir.
17:47:52  18   Q.   And, again, for record, who is in this photo?
17:47:54  19   A.   That's Jose Trevino, Carlos Nayen, Sergio Rincon and Esgar
17:48:01  20   Ramirez.
17:48:04  21   Q.   377F, same group of people with the exception of?
17:48:10  22   A.   Tyler Graham.
17:48:13  23   Q.   377G, why did you take that picture?
17:48:18  24   A.   Because it appeared that Carlos Nayen bought that horse.
17:48:21  25   Q.   And did you later determine whether that hip number was, in
```

17:48:24   1   fact, one of the horses purchased by Francisco Colorado-Cessa?

17:48:28   2   A.   Yes, sir.

17:48:28   3   Q.   377H, again, is that Carlos Nayen with Jose Trevino to his

17:48:38   4   right and Sergio Rincon to his left?

17:48:41   5   A.   Yes.

17:48:41   6   Q.   Now, it appears to be they're looking at something.  What

17:48:43   7   are they looking at?

17:48:45   8   A.   I believe they were looking at the board, the sales board.

17:48:50   9   Q.   Were you also present for the actual All American Final in

17:48:55   10  2010?

17:48:56   11  A.   Yes.

17:48:58   12  Q.   Showing you Government's Exhibit 378A through G, inclusive.

17:49:07   13  Do you recognize those photos, sir?

17:49:12   14  A.   I do.

17:49:12   15  Q.   Are these photos that you or your other accompanying agent

17:49:17   16  took on that day?

17:49:18   17  A.   Yes, sir.

17:49:18   18  Q.   Do they accurately reflect the events of this day?

17:49:20   19  A.   Yes, sir.

17:49:47   20           MR. DEGEURIN:  No objection.

17:49:48   21           MR. ESPER:  No objection.

17:49:50   22           MR. WOMACK:  No objection.

17:49:51   23           THE COURT:  378A through G are admitted.

17:49:55   24  Q.   (BY MR. GARDNER) Could you pull up A, please?  A for effort.

17:50:03   25           All right.  378A, what's this a picture of, Special

17:50:11   1   Agent?

17:50:11   2   A.    That's a picture of Mr. Piloto warming up before the race.

17:50:17   3   That's my term, warming up.

17:50:19   4   Q.    And what's this on the front of Mr. Piloto?

17:50:22   5   A.    That's the headgear and it's got the colors of the Mexican

17:50:27   6   flag on it.

17:50:27   7   Q.    And what's the writing right here on that nose of the horse?

17:50:31   8   A.    It says, Hecho en Mexico, made in Mexico, and it has an

17:50:36   9   eagle with a symbol.  Country symbol, I believe.

17:50:39   10   Q.    Showing you Government's Exhibit 378B.  Is this also during

17:50:46   11   the warmup phase?

17:50:47   12   A.    No, sir.  That was after the win.

17:50:49   13   Q.    They don't give you flowers when you're warming up, right?

17:50:52   14   A.    No, sir.

17:50:53   15   Q.    So who's this individual right here?

17:50:55   16   A.    That's Jose Trevino.

17:50:57   17   Q.    And, again, pretty obvious he appears to be on the phone?

17:50:59   18   A.    Yes, sir.  He got on the phone immediately after the win.

17:51:03   19   Q.    And 378C, who's in this picture starting with this

17:51:08   20   individual?

17:51:09   21   A.    That's Raul Ramirez, Esgar's brother.

17:51:12   22   Q.    And who is that?

17:51:13   23   A.    That's Esgar.

17:51:15   24   Q.    And this individual here?

17:51:15   25   A.    That's Carlos Nayen in the black suit.

| | | |
|---|---|---|
| 17:51:17 | 1 | Q.   And do you know the person in the red? |
| 17:51:19 | 2 | A.   No, sir. |
| 17:51:19 | 3 | Q.   I'm sorry? |
| 17:51:20 | 4 | A.   No, sir.  I do not know that person. |
| 17:51:22 | 5 | Q.   And this person over here? |
| 17:51:23 | 6 | A.   That's Sergio Rincon. |
| 17:51:27 | 7 | Q.   I'm showing you Government's Exhibit 370D.  Again, sir, if |
| 17:51:32 | 8 | you could let the jury know, where are you standing and where are |
| 17:51:35 | 9 | you looking? |
| 17:51:37 | 10 | A.   I tried to sit near the finish line in the crowd area where |
| 17:51:42 | 11 | the public would sit.  The track's in the middle, and they're |
| 17:51:46 | 12 | directly across me on the other side of the fence where the |
| 17:51:49 | 13 | horses would run.  In fact, after they win, several of the |
| 17:51:54 | 14 | members jumped the fence -- |
| 17:51:56 | 15 | MS. WILLIAMS:  Objection, your Honor.  Nonresponsive. |
| 17:51:59 | 16 | Q.   (BY MR. GARDNER) Let's just go ahead and identify these |
| 17:52:02 | 17 | individuals.  Who is this individual? |
| 17:52:03 | 18 | A.   That's Rincon, Sergio Rincon. |
| 17:52:05 | 19 | Q.   And this individual? |
| 17:52:05 | 20 | A.   Jose Trevino-Morales. |
| 17:52:07 | 21 | Q.   Again, how soon after the race did you notice Jose |
| 17:52:11 | 22 | Trevino-Morales on the phone? |
| 17:52:12 | 23 | A.   Immediately. |
| 17:52:14 | 24 | Q.   And this individual here? |
| 17:52:15 | 25 | A.   Felipe Quintero. |

| | | |
|---|---|---|
| 17:52:17 | 1 | Q.   And this individual over here? |
| 17:52:19 | 2 | A.   That's Fernando Garcia. |
| 17:52:21 | 3 | Q.   And did I miss anyone? |
| 17:52:24 | 4 | A.   I think Tyler's standing in the back. |
| 17:52:27 | 5 | Q.   Right there, Tyler Graham? |
| 17:52:28 | 6 | A.   Yes, sir. |
| 17:52:29 | 7 | Q.   378D.  Is this where you're talking about individuals |
| 17:52:40 | 8 | jumping over the rail? |
| 17:52:41 | 9 | A.   Yes, sir. |
| 17:52:41 | 10 | Q.   And I want to focus your attention on these three |
| 17:52:45 | 11 | individuals here.  Who are those three individuals appear to be |
| 17:52:47 | 12 | in a hug? |
| 17:52:49 | 13 | A.   That would be Carlos Nayen, Fernando Garcia and Felipe |
| 17:52:53 | 14 | Quintero. |
| 17:52:54 | 15 | Q.   Showing you Government's Exhibit 378F.  Just for the record, |
| 17:53:10 | 16 | this individual I'm pointing at in the white shirt? |
| 17:53:13 | 17 | A.   Raul Ramirez, Carlos Nayen. |
| 17:53:15 | 18 | Q.   Who's got his arm around Carlos Nayen, do you know? |
| 17:53:21 | 19 | A.   I can't tell from that point. |
| 17:53:22 | 20 | Q.   This individual here? |
| 17:53:22 | 21 | A.   Jose Trevino. |
| 17:53:23 | 22 | Q.   This individual here? |
| 17:53:24 | 23 | A.   Fernando Garcia. |
| 17:53:27 | 24 | Q.   378G, who's this individual here? |
| 17:53:34 | 25 | A.   That's Jose Trevino. |

| 17:53:36 | 1 | Q.   And what activity is he performing? |
| 17:53:38 | 2 | A.   Immediately upon the horse winning, Jose made the sign of |
| 17:53:42 | 3 | the cross. |
| 17:53:43 | 4 | Q.   And was this immediately after winning? |
| 17:53:45 | 5 | A.   Yes, sir. |
| 17:53:46 | 6 | Q.   And who's this individual here with his head down? |
| 17:53:48 | 7 | A.   That's Carlos Nayen texting. |
| 17:53:50 | 8 | Q.   And did he immediately text following the win of the horse? |
| 17:53:53 | 9 | A.   Yes. |
| 17:53:55 | 10 | Q.   And this individual behind him? |
| 17:53:56 | 11 | A.   That's Fernando Garcia. |
| 17:54:13 | 12 | Q.   Now, the jury heard testimony and some phone calls about |
| 17:54:18 | 13 | some payments of cash made by Victor Lopez in Laredo. |
| 17:54:24 | 14 | THE COURT:  This would be a good stopping point. |
| 17:54:26 | 15 | MR. GARDNER:  Yes, sir.  Thank you. |
| 17:54:28 | 16 | THE COURT:  Okay.  Members of the jury, follow the |
| 17:54:31 | 17 | instructions.  I'll see you at 8:30.  I will not be late. |
| 17:55:13 | 18 | (Jury not present.) |
| 17:55:24 | 19 | THE COURT:  This is your last witness? |
| 17:55:28 | 20 | MR. GARDNER:  Yes, your Honor. |
| 17:55:31 | 21 | THE COURT:  And then, will you be ready to proceed if |
| 17:55:35 | 22 | you're going to proceed with witnesses tomorrow? |
| 17:55:37 | 23 | MS. WILLIAMS:  Yes, your Honor. |
| 17:55:38 | 24 | MR. FINN:  Short and sweet, your Honor. |
| 17:55:40 | 25 | THE COURT:  The rest of you, probably talk among each |

17:55:44   1   other to try to get a good time estimate.

17:55:46   2        MR. ESPER:  I will have mine here at 9:00, just to be

17:55:51   3   on the safe side.

17:55:52   4        MR. GARDNER:  Your Honor, may I request of the defense

17:55:54   5   attorneys, like we provided them an advance witness list,

17:55:57   6   sometime around 8:00 tonight, given the extensive number on their

17:55:59   7   witness list?

17:56:00   8        MS. WILLIAMS:  Yes.

17:56:01   9        MR. FINN:  Sure.  We could do that, Judge.

17:56:03  10        MR. DEGEURIN:  Your Honor.

17:56:06  11        MS. WILLIAMS:  Judge, I have some documents that I

17:56:08  12   tried to introduce that you excluded, and I just want to make a

17:56:13  13   record about that, if I could.

17:56:14  14        THE COURT:  Sure.  Are these the Mexican records?

17:56:20  15   Okay.

17:56:20  16        MS. WILLIAMS:  Yes, your Honor.

17:56:20  17        THE COURT:  Go ahead.

17:56:21  18        MS. WILLIAMS:  Your Honor, as to Exhibits JT-2, JT-3,

17:56:27  19   JT-4 and JT-5, I offer those exhibits under Rule 902(3).  They

17:56:37  20   had accompanying translations, which were provided to the

17:56:41  21   government, well in advance, to which I got no objection, and

17:56:45  22   also reviewed by the Court-certified translators in the

17:56:48  23   courtroom.  And those are JT-2A, 3A, 4A and 5A.  These documents.

17:56:56  24        THE COURT:  Okay.  So the documents were given to the

17:57:07  25   government.  They were translated and the A parts are the

| | | |
|---|---|---|
| 17:57:13 | 1 | translations from Spanish? |
| 17:57:15 | 2 | MS. WILLIAMS:  Yes, your Honor. |
| 17:57:16 | 3 | THE COURT:  All right. |
| 17:57:17 | 4 | MS. WILLIAMS:  From Spanish to English. |
| 17:57:19 | 5 | THE COURT:  Okay. |

17:57:21  6  MS. WILLIAMS:  These documents contain the seal as
17:57:25  7  required by the rule from Mexico.  They're very important to Mr.
17:57:33  8  Trevino's case in that they provide a source of money from
17:57:39  9  property that was sold in Mexico prior to the time that the horse
17:57:44  10  Tempting Dash was purchased.
17:57:48  11  MR. FINN:  Your Honor, the witness is still on the
17:57:50  12  stand.  I don't know if you --
17:57:52  13  THE COURT:  Well, he looks fine.
17:57:56  14  MR. FINN:  Okay.  Fair enough.
17:58:00  15  THE WITNESS:  Thank you, Judge.
17:58:01  16  THE COURT:  Okay.  Now, what I didn't admit, I hadn't
17:58:06  17  excluded were records that I thought you were tendering for
17:58:15  18  criminal complaints in Mexico.
17:58:20  19  MS. WILLIAMS:  Separate issue, your Honor.
17:58:21  20  THE COURT:  Okay.  I didn't -- I don't know about these
17:58:23  21  documents.
17:58:24  22  MS. WILLIAMS:  You've seen these documents.  I offered
17:58:26  23  them when Agent Fernald was testifying.  And I believe that the
17:58:33  24  government's objection was completeness because there aren't any
17:58:37  25  property documents.  They're just the bills of sale.

| | | |
|---|---|---|
| 17:59:05 | 1 | THE COURT:  Well, there's no authentications such as |
| 17:59:08 | 2 | filing or whatever occurs in Mexico.  I mean. |
| 17:59:16 | 3 | MS. WILLIAMS:  Your Honor, all I know is that the rule |
| 17:59:18 | 4 | says that if the two countries are parties to the Hague |
| 17:59:25 | 5 | Convention, which they both are, that if the country of origin |
| 17:59:28 | 6 | seals the document indicating its genuineness, that they should |
| 17:59:36 | 7 | be admitted. |
| 17:59:38 | 8 | THE COURT:  For 30 years, I had to go and get the |
| 17:59:42 | 9 | appropriate Mexican authority to put the real seal on each |
| 17:59:50 | 10 | instrument with ribbons, and depending upon the color, they would |
| 17:59:56 | 11 | put them in binders.  These are copies. |
| 18:00:01 | 12 | What says the government? |
| 18:00:02 | 13 | MR. GARDNER:  Your Honor, we would object to this. |
| 18:00:04 | 14 | They do not have a seal.  They are not complete in our opinion. |
| 18:00:07 | 15 | We believe that all they are are records manufactured by Jose |
| 18:00:13 | 16 | Trevino or other family members, and that they were essentially |
| 18:00:17 | 17 | notarized by a notary in the Republic of Mexico just for the |
| 18:00:21 | 18 | purposes of this trial. |
| 18:00:23 | 19 | So I don't believe they meet the standard state.  And I |
| 18:00:28 | 20 | believe my co-counsel has something to add. |
| 18:00:30 | 21 | MS. FERNALD:  And the objection from the government |
| 18:00:32 | 22 | would be that, although this could fall within 902, I have not |
| 18:00:37 | 23 | looked at it, based upon authenticity of the records, it does not |
| 18:00:42 | 24 | -- it is not an exception under the hearsay because it's not |
| 18:00:45 | 25 | properly certified.  I think that's what the Court was referring |

| | | |
|---|---|---|
| 18:00:48 | 1 | to.  Just for the record. |
| 18:00:51 | 2 | MR. GARDNER:  Thank you. |
| 18:00:52 | 3 | THE COURT:  Well, all I have are copies.  Is that all |
| 18:00:56 | 4 | you have is copies, too?  No original with any -- |
| 18:00:59 | 5 | MS. WILLIAMS:  Well, the original seal is on those. |
| 18:01:08 | 6 | All I have is copies.  That's right.  But the original seal |
| 18:01:11 | 7 | appears on the copies. |
| 18:01:12 | 8 | THE COURT:  Well, there is something on the copy. |
| 18:01:21 | 9 | Okay.  I'm going to give these for the clerk.  And I'd |
| 18:01:29 | 10 | like for you to give me your best legal authority in the morning, |
| 18:01:32 | 11 | please, about 8:20.  Somewhere in there. |
| 18:01:37 | 12 | MS. WILLIAMS:  Certainly. |
| 18:01:38 | 13 | THE COURT:  All right.  We're in recess until 8:30. |
| 18:01:38 | 14 | (Proceedings adjourned.) |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |