```
 1                  UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3   UNITED STATES OF AMERICA      ) Docket No. A 12-CR-210 SS
                                   )
 4   vs.                           ) Austin, Texas
                                   )
 5   JOSE TREVINO-MORALES (3)      )
     FRANCISCO ANTONIO             )
 6   COLORADO-CESSA (6)            )
     FERNANDO SOLIS-GARCIA (7)     )
 7   EUSEVIO MALDONADO-HUITRON(11) )
     JESUS MALDONADO-HUITRON (18)  ) May 1, 2013
 8

 9                  TRANSCRIPT OF TRIAL ON THE MERITS
                    BEFORE THE HONORABLE SAM SPARKS
10                        Volume 12 of 15

11   APPEARANCES:

12   For the United States:     Ms. Michelle E. Fernald
                                Mr. Douglas W. Gardner
13                              Assistant U.S. Attorneys
                                816 Congress Avenue, Suite 1000
14                              Austin, Texas 78701

15   For Defendant Trevino-     Mr. David M. Finn
     Morales:                   Milner & Finn
16                              2828 North Harwood Street
                                Suite 1950, LB9
17                              Dallas, Texas 75201

18                              Ms. Christie Williams
                                Mills & Williams
19                              1112 South Rock Street
                                Georgetown, Texas 78626
20
     For Defendant Colorado-    Mr. Mike DeGeurin
21   Cessa:                     Mr. M. Andres Sanchez-Ross
                                Foreman, DeGeurin & DeGeurin
22                              300 Main Street
                                Houston, Texas 77002
23
                                Mr. John Parras
24                              Republic Bank Building
                                1018 Preston, Floor 2
25                              Houston, Texas 77002
```

1   **(Appearances Continued:)**

2   For Defendant Solis-Garcia: Mr. Guy L. Womack
                               Guy L. Womack & Associates
3                              402 Main Street, Suite 6 North
                               Houston, Texas 77002
4
    For Defendant Eusevio      Mr. Richard D. Esper
5   Maldonado-Huitron:         Esper Law Office
                               801 North El Paso Street, 2nd Floor
6                              El Paso, Texas 79902

7   For Defendant Jesus        Mr. Thomas Brent Mayr
    Maldonado-Huitron:         Law Office of Brent Mayr
8                              4101 Washington Avenue, 2nd Floor
                               Houston, Texas 77007
9

10  Interpreters:              Mr. Peter Heide
                               Ms. Cristina Helmerichs
11                             Ms. Maureen McLean

12

13  Court Reporter:            Ms. Lily Iva Reznik, CRR, RMR
                               501 West 5th Street, Suite 4153
14                             Austin, Texas 78701
                               (512)391-8792
15

16

17

18

19

20

21

22

23

24

25  Proceedings reported by computerized stenography, transcript
    produced by computer.

1                    **I N D E X**

2                      Direct      Cross      Redirect   Recross
  Witnesses:

3

4  Scott Lawson        10          61,

5                      68          92,124

6                                  134,160

7                                  173        189        191,200

8                                                        202,203

9

10                                                       Page

11 Proceedings Adjourned                                 216

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**E X H I B I T S**

|  |  |  | Offered | Admitted |
|---|---|---|---|---|
| Government's | | | | |
| #253C | | | 7 | 8 |
| #353B through J | | | 8 | 8 |
| #364A | | | 67 | 67 |
| #364B through RR | | | 67 | 67 |
| #364CAA | | | 34 | 34 |
| #364B through H | | | 34 | 34 |
| #364NMA through DDD | | | 38 | 38 |
| #364OKA | | | 50 | 50 |
| #364OKB through T | | | 50 | 50 |
| #373A through F | | | 17 | 17 |
| #374A through C | | | 11 | 12 |
| #375A through B | | | 14 | 14 |
| #380 | | | 88 | 88 |
| #424 through 425 | | | 78 | 78 |
| | | | | |
| Defendant Trevino-Morales' | | | | |
| #14 through 17 | | | 121 | 121 |
| #18 through 19 | | | 211 | 211 |
| | | | | |
| Defendant Colorado's | | | | |
| #12 | | | 125 | 125 |
| #13 | | | 126 | 126 |

**E X H I B I T S** (Continued)

|  | Offered | Admitted |
|---|---|---|
| Defendant Colorado's | | |
| #14 | 126 | 126 |
| #15 through 16 | 129 | 129 |
| #17 | 130 | 130 |
| #18 | 200 | 200 |
| #19 | 209 | 210 |
| | | |
| Defendant Jesse Huitron's | | |
| #JH-5 through 6 | 176 | 176 |
| #JH-7 | 182 | 182 |

| | | |
|---|---|---|
| 08:42:52 | 1 | THE COURT:  All right.  Counsel, anything before we |
| 08:42:53 | 2 | bring in the jury? |
| 08:42:56 | 3 | MR. ESPER:  We've got some missing parties. |
| 08:42:59 | 4 | MS. WILLIAMS:  You asked me to -- |
| 08:43:03 | 5 | THE COURT:  Wait till all the players are here.  I've |
| 08:43:07 | 6 | already made that mistake once. |
| 08:43:41 | 7 | Ms. Williams, I didn't mean to cut you off.  Were you |
| 08:43:44 | 8 | going to tell me the authority that you looked at? |
| 08:43:46 | 9 | MS. WILLIAMS:  I was.  I sent notice to the government. |
| 08:43:52 | 10 | That was really all I had. |
| 08:43:56 | 11 | THE COURT:  But you sent me a case? |
| 08:43:57 | 12 | MS. WILLIAMS:  I did.  I sent it to Mrs. Sims because |
| 08:43:59 | 13 | that's the only e-mail address I have. |
| 08:44:02 | 14 | THE CLERK:  Let me get it for you. |
| 08:44:05 | 15 | MS. WILLIAMS:  I'm sorry. |
| 08:44:05 | 16 | THE COURT:  Well, that's far more reliable than sending |
| 08:44:08 | 17 | it to me. |
| 08:44:17 | 18 | MS. WILLIAMS:  Ms. Fernald's got a copy of the case. |
| 08:44:20 | 19 | MS. FERNALD:  It's got a little bit of highlighting on |
| 08:44:23 | 20 | it. |
| 08:44:26 | 21 | MS. WILLIAMS:  Well, it's not from the Fifth Circuit |
| 08:44:28 | 22 | and it's not a criminal case, so I'm not sure you're going to |
| 08:44:31 | 23 | need to read too much. |
| 08:44:35 | 24 | MS. FERNALD:  But she did a good job, your Honor. |
| 08:46:48 | 25 | THE COURT:  Let the record reflect that I have been |

| | | |
|---|---|---|
| 08:46:50 | 1 | given a copy of the case of Demirchyan, D-E-M-I-R-C-H-Y-A-N, |
| 08:47:00 | 2 | versus Gonzalez, 210 West Law, 3521784, 2010 case by a district |
| 08:47:21 | 3 | court in California.  It doesn't support the admissibility.  The |
| 08:47:30 | 4 | documents are neither authenticated in any original form and I |
| 08:47:34 | 5 | have no extrinsic evidence which would support the document.  So |
| 08:47:40 | 6 | at this point in time, without extrinsic evidence, I will sustain |
| 08:47:43 | 7 | the objection that there is any evidence coming in of the |
| 08:47:50 | 8 | substantive matter of those contracts, I'll reconsider the |
| 08:47:53 | 9 | ruling. |
| 08:47:54 | 10 | MS. WILLIAMS:  Thank you, your Honor. |
| 08:48:00 | 11 | MS. FERNALD:  Your Honor, I'm sorry, Mr. Hall.  I've |
| 08:48:02 | 12 | just got a couple of housekeeping, since we're about to wrap this |
| 08:48:05 | 13 | up, on evidence that we have not -- that we meant to submit on |
| 08:48:09 | 14 | the other day and did not get it in on the record. |
| 08:48:13 | 15 | Specifically, the Government's Exhibit 253C, it is |
| 08:48:18 | 16 | Garcia Bloodstock -- |
| 08:48:19 | 17 | THE COURT:  Hold on. |
| 08:48:20 | 18 | MS. FERNALD:  I'm sorry.  253C. |
| 08:48:28 | 19 | THE COURT:  Okay. |
| 08:48:28 | 20 | MS. FERNALD:  Some Wells Fargo Bank records from Garcia |
| 08:48:32 | 21 | Bloodstock that we've been referring to, but for some reason, it |
| 08:48:35 | 22 | just was not admitted by me.  It's accompanied with a business |
| 08:48:39 | 23 | record affidavit and I have shown defense counsel this morning. |
| 08:48:43 | 24 | Move for the admission. |
| 08:48:47 | 25 | THE COURT:  Any objection to 253C?  Hearing none, it's |

| | | |
|---|---|---|
| 08:48:56 | 1 | admitted. |
| 08:48:57 | 2 | MR. WOMACK:  No objection. |
| 08:48:59 | 3 | MS. FERNALD:  Your Honor, we also have some Secretary |
| 08:49:01 | 4 | of State documents that I have reviewed with the defense |
| 08:49:06 | 5 | attorneys this morning, which are 350I -- I'm sorry, 353B through |
| 08:49:17 | 6 | J.  We had already admitted A, which was Tremor Enterprises, |
| 08:49:23 | 7 | Incorporation.  The rest of them refers to Zule Farms, 66 Land, |
| 08:49:28 | 8 | Poker Ranch, Desiree Princess Ranch.  I've shown them all to the |
| 08:49:32 | 9 | defense attorneys, and I don't think there's any objection. |
| 08:49:34 | 10 | So the government would move for the admission of 353D |
| 08:49:40 | 11 | through J. |
| 08:49:42 | 12 | MR. FINN:  No objection. |
| 08:49:43 | 13 | THE COURT:  All right.  Hearing no objection, 353B |
| 08:49:48 | 14 | through J are admitted. |
| 08:49:50 | 15 | MS. FERNALD:  And then, finally, last week, when we did |
| 08:49:52 | 16 | the search warrant evidence, it was suggested that we put in a |
| 08:49:56 | 17 | evidence -- search warrant evidence list.  It was 405A and it's a |
| 08:50:03 | 18 | listing of the evidence that was seized from the different search |
| 08:50:06 | 19 | warrant locations.  Last week, the government moved to introduce |
| 08:50:10 | 20 | that list.  The defense was going to review it and let the Court |
| 08:50:15 | 21 | know that that's outstanding that needs to be admitted into |
| 08:50:18 | 22 | evidence. |
| 08:50:19 | 23 | I brought another copy this morning for them to review, |
| 08:50:21 | 24 | but at this time, the government, again, re-urges the admission |
| 08:50:24 | 25 | of 405A. |

| 08:50:27 | 1 | THE COURT:  Is this a list of all of the searches or |
| 08:50:31 | 2 | just -- |
| 08:50:32 | 3 | MS. FERNALD:  All of the searches. |
| 08:50:34 | 4 | THE COURT:  So the jury could look for a specific -- |
| 08:50:37 | 5 | MS. FERNALD:  That is correct. |
| 08:50:38 | 6 | THE COURT:  -- thing in one of those.  Any objection to |
| 08:50:40 | 7 | that index 405A for the searches? |
| 08:50:48 | 8 | MR. MAYR:  No, your Honor. |
| 08:50:48 | 9 | MR. DEGEURIN:  May I reserve on that because it's |
| 08:50:51 | 10 | something -- it's like they have a description of each thing, and |
| 08:50:54 | 11 | I just hadn't had a chance to read it through to see if any of |
| 08:50:57 | 12 | them are argumentative or opinions. |
| 08:51:01 | 13 | THE COURT:  Well, we'll reserve till they're about to |
| 08:51:05 | 14 | close. |
| 08:51:06 | 15 | MR. DEGEURIN:  Okay. |
| 08:51:06 | 16 | THE COURT:  All right.  Bring the jury in. |
| 08:51:09 | 17 | (Jury present.) |
| 08:53:30 | 18 | THE COURT:  Because I told you I wasn't going to be |
| 08:53:38 | 19 | late -- and I know one or two of you saw me sneaking into the |
| 08:53:43 | 20 | office, so I can't blame the lawyers.  So when I got home last |
| 08:53:48 | 21 | night, my wife told me that I had my annual physical set this |
| 08:53:54 | 22 | morning for 8:00 and that they'd called to confirm it.  Of |
| 08:53:58 | 23 | course, they didn't call me, they called her, which shows you |
| 08:54:01 | 24 | who's the boss.  But I've had the doctor for a long time and he's |
| 08:54:07 | 25 | a good doctor. |

08:54:08   1          So I went in this morning, 8:00, and I told him I was

08:54:16   2    in trial.  He said, you're always in trial.  And I said yeah.

08:54:20   3    And he said, well, your blood work's all right, except you need

08:54:25   4    to watch the cholesterol.  It's up a little bit.  You need to

08:54:29   5    lose pounds, not ounces, keep the pills, and holler at me in four

08:54:37   6    months.  Twelve-and-a-half-minute annual physical.  So I wasn't

08:54:52   7    too late.

08:54:52   8          And while I was doing that and while you were gone from

08:54:59   9    your seat yesterday afternoon until now, did anyone attempt to

08:55:03   10   talk to you about this case and to each other?

08:55:07   11          JURORS:  No, sir.

08:55:08   12          THE COURT:  Have you talked to anybody about the case?

08:55:09   13          JURORS:  No.

08:55:10   14          THE COURT:  Have you learned anything at all about the

08:55:12   15   case, outside the presence of one another in this courtroom?

08:55:15   16          JURORS:  No.

08:55:16   17          THE COURT:  All right.  Show negative responses to all

08:55:17   18   questions by all jurors.

08:55:20   19          Do you understand you're still under oath, sir?

08:55:22   20          THE WITNESS:  Yes, your Honor.

08:55:24   21       SCOTT LAWSON, called by the Government, duly sworn.

08:55:24   22             DIRECT EXAMINATION (Resumed)

08:55:24   23   BY MR. GARDNER:

08:55:26   24   Q.   Thank you, your Honor.

08:55:27   25          Special Agent Lawson, we left off yesterday talking

| | | |
|---|---|---|
| 08:55:29 | 1 | about surveillances, and I believe we had reached a point January |
| 08:55:35 | 2 | 2011.  Did you receive information from Tyler Graham about a |
| 08:55:41 | 3 | payment that was going to be made? |
| 08:55:43 | 4 | A.   Yes, sir. |
| 08:55:43 | 5 | Q.   And what actions did you take upon receiving that |
| 08:55:46 | 6 | information? |
| 08:55:48 | 7 | A.   Mr. Graham informed me they were wanting the same cash. |
| 08:55:52 | 8 | MS. WILLIAMS:  Objection.  Hearsay. |
| 08:55:54 | 9 | THE COURT:  Sustain the objection. |
| 08:55:56 | 10 | Q.   (BY MR. GARDNER) What actions did you take? |
| 08:55:59 | 11 | A.   I contacted our unit and lined up an undercover agent to |
| 08:56:05 | 12 | pick up cash in Laredo, Texas. |
| 08:56:07 | 13 | Q.   And how did you determine the location of where that cash |
| 08:56:10 | 14 | pickup was going to occur? |
| 08:56:12 | 15 | A.   I was provided that location. |
| 08:56:16 | 16 | Q.   And did you, in fact -- you and other agents establish |
| 08:56:19 | 17 | surveillance on that location? |
| 08:56:20 | 18 | A.   Yes, sir.  We set up a team to cover the money drop. |
| 08:56:25 | 19 | Q.   Showing you Government's Exhibit 374A, B and C.  Do you |
| 08:56:30 | 20 | recognize those photos, sir? |
| 08:56:32 | 21 | A.   Yes, sir. |
| 08:56:33 | 22 | Q.   Are those true and accurate representations of the January |
| 08:56:36 | 23 | 2011 money drop in Laredo, Texas? |
| 08:56:39 | 24 | A.   That's correct. |
| 08:56:40 | 25 | Q.   Your Honor, I'll offer Government's Exhibits 374A, B and C. |

| | | |
|---|---|---|
| 08:56:56 | 1 | THE COURT:  Hearing no objections, 374A, B and C are |
| 08:57:00 | 2 | admitted. |
| 08:57:01 | 3 | Q.   (BY MR. GARDNER) Could we have 374A?  Your Honor, the jury |
| 08:57:46 | 4 | can see it on their screens, so can defense counsel. |
| 08:57:51 | 5 | THE COURT:  Get Kelly up here, anyway. |
| 08:58:36 | 6 | THE CLERK:  Now it's coming up.  It just came on. |
| 08:58:47 | 7 | THE COURT:  You do understand we're operating with |
| 08:58:49 | 8 | government equipment. |
| 08:58:52 | 9 | Q.   (BY MR. GARDNER) Special Agent Lawson, describe the scene |
| 08:58:57 | 10 | for us.  Where is this located in Laredo? |
| 08:58:58 | 11 | A.   That's in front of the La Posada Hotel, which is directly on |
| 08:59:02 | 12 | the riverbanks -- the Rio Grande on the border in Laredo, Texas. |
| 08:59:06 | 13 | Q.   And whose vehicle or truck is this right here? |
| 08:59:08 | 14 | A.   That's the undercover's vehicle. |
| 08:59:10 | 15 | Q.   And that is -- when you say undercover, is that a police |
| 08:59:13 | 16 | officer? |
| 08:59:13 | 17 | A.   Yes, sir. |
| 08:59:14 | 18 | Q.   And this individual here, what appears to be the running |
| 08:59:18 | 19 | jacket in the red shirt, who is that? |
| 08:59:20 | 20 | A.   He was identified as Victor Lopez. |
| 08:59:22 | 21 | Q.   374B.  And, again, when does this occur in terms of the |
| 08:59:32 | 22 | actual handoff? |
| 08:59:37 | 23 | A.   I believe at this point, he had just made the handoff and |
| 08:59:39 | 24 | was walking away. |
| 08:59:41 | 25 | Q.   Probably got it out of order.  374C.  Is this Mr. Lopez |

| | | |
|---|---|---|
| 08:59:50 | 1 | making the actual handoff? |
| 08:59:51 | 2 | A.   Yes. |
| 08:59:52 | 3 | Q.   And how long did this transaction take place? |
| 08:59:56 | 4 | A.   Well, we had to wait quite some time for Victor to come, but |
| 08:59:59 | 5 | once he was there, it was very quick. |
| 09:00:02 | 6 | Q.   Seconds?  Minutes? |
| 09:00:03 | 7 | A.   Seconds. |
| 09:00:04 | 8 | Q.   And did you attempt to conduct surveillance of Mr. Lopez |
| 09:00:07 | 9 | after he left? |
| 09:00:08 | 10 | A.   Yes. |
| 09:00:08 | 11 | Q.   And what was the result of that surveillance? |
| 09:00:11 | 12 | A.   He walked back to Mexico. |
| 09:00:14 | 13 | Q.   And following the surveillance and conclusion of this, did |
| 09:00:18 | 14 | you physically count the money that was handed over? |
| 09:00:21 | 15 | A.   Yes. |
| 09:00:22 | 16 | Q.   And how much money was it? |
| 09:00:24 | 17 | A.   $35,000. |
| 09:00:28 | 18 | Q.   Now, I'd just like to say, chronologically, did you conduct |
| 09:00:31 | 19 | a surveillance at Retama Park at a horse race there? |
| 09:00:40 | 20 | A.   Yes. |
| 09:00:41 | 21 | Q.   What date was that, sir? |
| 09:00:43 | 22 | A.   It was July 2011. |
| 09:00:48 | 23 | Q.   I'm going to show you Government's Exhibit 375A and 375B. |
| 09:00:52 | 24 | Is that your photos taken from that surveillance in July of 2011? |
| 09:00:57 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 09:00:59 | 1 | Q.   Your Honor, I offer Government's Exhibit 375A and 375B. |
| 09:01:13 | 2 | THE COURT:  What was the location?  Which park? |
| 09:01:15 | 3 | MR. GARDNER:  Retama Park, your Honor. |
| 09:01:20 | 4 | THE COURT:  Hearing no objections, 375A and B are |
| 09:01:23 | 5 | admitted. |
| 09:01:29 | 6 | Q.   (BY MR. GARDNER) I forgot one thing.  Who is this, sir? |
| 09:01:32 | 7 | A.   That is Victor Lopez. |
| 09:01:33 | 8 | Q.   And that's the same individual you saw on the previous |
| 09:01:36 | 9 | surveillance? |
| 09:01:36 | 10 | A.   Yes. |
| 09:01:36 | 11 | Q.   All right.  Now, going to Government's Exhibit 375A.  What |
| 09:01:44 | 12 | was the purpose of your surveillance at Retama Park in July of |
| 09:01:47 | 13 | 2011? |
| 09:01:49 | 14 | A.   We knew the organization were running horses.  We just |
| 09:01:52 | 15 | wanted to see who showed up, what companies they used, who |
| 09:01:55 | 16 | associated with one another.  Just confirm intelligence that we |
| 09:01:59 | 17 | had. |
| 09:01:59 | 18 | Q.   And who did you observe in this picture?  Who is this? |
| 09:02:02 | 19 | A.   That's Eusevio Huitron. |
| 09:02:04 | 20 | Q.   And this individual? |
| 09:02:06 | 21 | A.   That was the jockey.  I can't remember which one they used |
| 09:02:10 | 22 | that week. |
| 09:02:11 | 23 | Q.   Not the same as Esgar Ramirez, right? |
| 09:02:13 | 24 | A.   No, sir. |
| 09:02:14 | 25 | Q.   375B, please.  And who is this individual here? |

| | | |
|---|---|---|
| 09:02:21 | 1 | A.   That's Sergio Rincon. |
| 09:02:22 | 2 | Q.   And that individual? |
| 09:02:23 | 3 | A.   Tyler Graham. |
| 09:02:25 | 4 | Q.   And did you base your surveillance off of information |
| 09:02:30 | 5 | provided by Mr. Graham? |
| 09:02:32 | 6 | A.   That is correct. |
| 09:02:34 | 7 | Q.   Now, I'm going to show you what's been previously admitted |
| 09:02:37 | 8 | as Government's Exhibit 102C.  Who is being represented as the |
| 09:02:59 | 9 | owner of Fly Corona -- I'm sorry, was it Fly Corona you saw at |
| 09:03:03 | 10 | that race? |
| 09:03:04 | 11 | A.   Yes, sir. |
| 09:03:04 | 12 | Q.   And who's being represented as the owner of Fly Corona? |
| 09:03:06 | 13 | A.   Fast And Furious. |
| 09:03:08 | 14 | Q.   And who is being represented as the trainer of Fly Corona? |
| 09:03:11 | 15 | A.   Paul Jones, according to the paperwork. |
| 09:03:22 | 16 | Q.   For the record, the individual on the left in the white |
| 09:03:25 | 17 | shirt holding the flag? |
| 09:03:26 | 18 | A.   That's Sergio Rincon, Fernando Garcia, Eusevio Huitron. |
| 09:03:31 | 19 | Q.   And this is not the race at Retama Park, correct? |
| 09:03:34 | 20 | A.   It is not the race at Retama Park. |
| 09:03:36 | 21 | Q.   Remington Park is located where? |
| 09:03:38 | 22 | A.   It is in Oklahoma.  Oklahoma City. |
| 09:03:42 | 23 | Q.   And what's the date of that race, Special Agent? |
| 09:03:44 | 24 | A.   That would be April 1st, 2011. |
| 09:03:47 | 25 | Q.   I'm showing you second page or second photo of Government's |

| | | |
|---|---|---|
| 09:03:52 | 1 | Exhibit 102C.  Is this the winning photo of the Retama Park? |
| 09:03:58 | 2 | A.   Yes, sir.  That's the surveillance we were just speaking of. |
| 09:04:03 | 3 | Q.   And how long after the previous photo of April 1st, 2011 was |
| 09:04:09 | 4 | this photo taken? |
| 09:04:11 | 5 | A.   That would be a little less than three months.  It was July |
| 09:04:14 | 6 | 2011. |
| 09:04:16 | 7 | Q.   And, again, who's listed as the owner? |
| 09:04:18 | 8 | A.   Fast And Furious. |
| 09:04:21 | 9 | Q.   And in this investigation, who is Fast And Furious |
| 09:04:24 | 10 | associated with? |
| 09:04:24 | 11 | A.   Los Zetas. |
| 09:04:26 | 12 | Q.   And this individual here? |
| 09:04:29 | 13 | A.   That's Fernando Garcia, Sergio Rincon. |
| 09:04:38 | 14 | Q.   I want to turn your attention to the next surveillance in |
| 09:04:46 | 15 | August 24th of 2011.  At this point, were you listening to the |
| 09:04:53 | 16 | phone that had been purchased by Mr. Graham? |
| 09:04:57 | 17 | A.   That is correct. |
| 09:04:58 | 18 | Q.   And do you recall a number of conversations with Victor |
| 09:05:00 | 19 | Lopez regarding a number of -- or a number of conversations |
| 09:05:05 | 20 | regarding another money drop? |
| 09:05:06 | 21 | A.   That's correct. |
| 09:05:06 | 22 | Q.   So those are conversations the jury's already heard, |
| 09:05:09 | 23 | correct? |
| 09:05:09 | 24 | A.   That's correct. |
| 09:05:10 | 25 | Q.   All right.  Based on that information, did you set up |

09:05:12  1  surveillance again?

09:05:14  2  A.   Yes, sir.  We set up another situation where we would pick

09:05:18  3  up the money.

09:05:21  4  Q.   So Mr. Graham wasn't actually involved in either money

09:05:24  5  pick-up, correct?

09:05:25  6  A.   No, sir.

09:05:25  7  Q.   Showing you 373A and F, if I don't break my neck.  Through

09:05:35  8  F, rather.  Are these accurate representations of the date,

09:05:43  9  August 24th, 2011, of the money drop?

09:05:44  10  A.   That is correct.

09:05:46  11  Q.   Your Honor, I'll offer Government's Exhibit 373A through F.

09:05:54  12          THE COURT:  373A through F are admitted.

09:05:58  13  Q.   (BY MR. GARDNER) Could you show A, please?  Where is this

09:06:05  14  location, Special Agent?

09:06:07  15  A.   This is the Mall del Norte in Laredo, Texas.

09:06:11  16  Q.   And what's the significance of this white pickup truck?

09:06:15  17  A.   That was the vehicle that -- we used a source to pick up

09:06:19  18  this money.  But that was the source's vehicle.

09:06:22  19  Q.   This is your person in this truck?

09:06:26  20  A.   That is correct.

09:06:27  21  Q.   373B, please.  And what's the significance of this picture

09:06:35  22  with the white truck next to the white cab?

09:06:38  23  A.   As per the calls, Victor had said on the call he would

09:06:41  24  arrive in a white cab, and that's, in fact, the cab that Victor

09:06:45  25  Lopez arrived in.

| | | |
|---|---|---|
| 09:06:46 | 1 | Q.   373C, please.  Special Agent, who is that person in the red |
| 09:06:55 | 2 | shirt? |
| 09:06:56 | 3 | A.   That is Victor Lopez. |
| 09:07:00 | 4 | Q.   373D.  It's kind of hard to see from here, but this foot and |
| 09:07:08 | 5 | it looks like a red shirt, what's going on in this picture? |
| 09:07:12 | 6 | A.   Victor Lopez is entering the passenger side door of the |
| 09:07:16 | 7 | source's truck. |
| 09:07:17 | 8 | Q.   373E, please.  And, again, is this Victor Lopez? |
| 09:07:25 | 9 | A.   That's correct. |
| 09:07:25 | 10 | Q.   And what activity do you observe based on this picture? |
| 09:07:31 | 11 | A.   There was a -- the source was told to pick up $60,000, and |
| 09:07:36 | 12 | when Victor handed him the bag, it was 59,750.  So the source |
| 09:07:41 | 13 | told Victor to call Tyler and make sure that was okay.  So he saw |
| 09:07:46 | 14 | Victor get in the vehicle, then he got out, got the taxi driver's |
| 09:07:50 | 15 | phone, called Tyler and then, went back to the vehicle. |
| 09:07:53 | 16 | Q.   And is that the calls that the jury heard yesterday, I |
| 09:07:55 | 17 | believe? |
| 09:07:55 | 18 | A.   That is correct. |
| 09:07:56 | 19 | Q.   All right.  Two days ago.  373F.  And what does that picture |
| 09:08:04 | 20 | reflect? |
| 09:08:05 | 21 | A.   I believe that's when Victor got the phone from the taxi |
| 09:08:08 | 22 | driver. |
| 09:08:13 | 23 | Q.   Special Agent Lawson, did you also review the border |
| 09:08:17 | 24 | crossings containing Bates stamp 62086 that were previously |
| 09:08:22 | 25 | introduced by Ms. Canida? |

09:08:26  1  A.    I believe they were introduced by Reyes, Myrna Reyes.

09:08:29  2  Q.    Myrna Reyes, you're right.  My apologies.  That's

09:08:34  3  Government's Exhibit 401.

09:08:35  4          And just for an evaluation -- I don't want to go

09:08:36  5  through all of these -- but did you count up the number and

09:08:38  6  locations of the crossings of "Chevo" Huitron?

09:08:40  7  A.    I did.

09:08:41  8  Q.    And could you just generally describe the number and places

09:08:45  9  where he crossed?

09:08:46  10  A.    Yes.  Less than a two-year period, he crossed into Mexico

09:08:52  11  seven times.  Five of those were in Eagle Pass, which leads into

09:08:57  12  Piedras Negras.  One was in Del Rio, which leads to Ciudad Acuna.

09:09:03  13  And one was in Laredo, Texas, entering Nuevo Laredo.

09:09:07  14  Q.    And generally those areas on the other side of the Rio

09:09:13  15  Grande, what drug cartel influences those areas?

09:09:16  16  A.    That is territory of Los Zetas.

09:09:19  17  Q.    I want to show you a page 62807 from Jose Trevino's

09:09:26  18  crossings.  Have you reviewed this, sir?

09:09:31  19  A.    I have.

09:09:33  20  Q.    And this is a legal crossing, correct?

09:09:37  21  A.    That is correct.

09:09:38  22  Q.    And do those records only capture legal crossings?

09:09:40  23  A.    That's correct.

09:09:42  24  Q.    And this individual here, Chapa Garcia, do you know who that

09:09:47  25  is, sir?

| | | |
|---|---|---|
| 09:09:48 | 1 | A.    He's the veterinarian from Piedras Negras, Mexico. |
| 09:09:51 | 2 | Q.    Do you know if he was involved with Tempting Dash? |
| 09:09:56 | 3 | A.    I do. |
| 09:09:56 | 4 | Q.    How so? |
| 09:09:59 | 5 | A.    You've heard testimony Tempting Dash was taken to the border |
| 09:10:02 | 6 | after he had piroplasmosis.  Dr. Chapa was the one who crossed |
| 09:10:08 | 7 | into the border, crossed to the U.S. side to take care of |
| 09:10:12 | 8 | Tempting Dash when he was on the border and came out of Texas. |
| 09:10:16 | 9 | Q.    Now, sir, did you also review a number of the search warrant |
| 09:10:19 | 10 | evidence? |
| 09:10:21 | 11 | A.    I did. |
| 09:10:22 | 12 | Q.    And a number of the e-mails? |
| 09:10:25 | 13 | A.    I did. |
| 09:10:26 | 14 | Q.    And a number of the computers taken from the search |
| 09:10:29 | 15 | warrants, correct? |
| 09:10:29 | 16 | A.    Yes, sir. |
| 09:10:30 | 17 | Q.    Okay.  I'm going to show you what's been marked as |
| 09:10:32 | 18 | Government's Exhibit 30 by agreement, taken from Jose Trevino's |
| 09:10:36 | 19 | ranch in Lexington, Oklahoma.  What are these, sir? |
| 09:10:48 | 20 | A.    It's pre-signed AQHA transfer agreements by Luis Aguirre. |
| 09:10:54 | 21 | Q.    And two blank ones, correct? |
| 09:10:59 | 22 | A.    Yes, sir.  They're signed by the transferor, but not the |
| 09:11:02 | 23 | person who had received, without a horse name. |
| 09:11:07 | 24 | Q.    Did you locate similar blank records in other documents? |
| 09:11:14 | 25 | A.    I did. |

```
09:11:15   1   Q.   Showing you Government's Exhibit 358D, Fernie004@hotmail.
09:11:30   2   First e-mail, dated 1-20 of 2012.  And Fernie004 is associated
09:11:37   3   with which defendant?
09:11:38   4   A.   Fernando Garcia.
09:11:39   5   Q.   Okay.  So who is this a blank transfer document for?
09:11:43   6   A.   It is pre-signed by Jorge Luis Ochoa-Gomez, owner of either
09:11:52   7   Poker Ranch or Desiree Princess.
09:11:53   8   Q.   All right.  So the timestamp on these are all 120.  So this
09:11:58   9   one's 8:47:40.  The previous one, 8:40:30 seconds.  And this
09:12:06  10   individual Ricardo De la Vega?
09:12:08  11   A.   Yes.
09:12:08  12   Q.   Who is he also known as?
09:12:10  13   A.   "Yo Yo."
09:12:14  14           MR. WOMACK:  Your Honor, if we could just get the
09:12:15  15   exhibit number for these transfers.
09:12:17  16           MR. GARDNER:  Yes, sir.  Exhibit No. 358B.
09:12:19  17           MR. WOMACK:  358?
09:12:21  18           MR. GARDNER:  Eight, yes, sir, B.
09:12:24  19   Q.   (BY MR. GARDNER) And this 17 seconds prior, who is this to
09:12:30  20   -- or from?
09:12:32  21   A.   I believe that's from "Yo Yo" to Fernando Garcia.
09:12:35  22   Q.   Okay.  And the actual transfer is in whose name?
09:12:39  23   A.   Omar Cabrera-De la Vega.
09:12:42  24   Q.   And do you know if he's related to Ricardo De la Vega?
09:12:46  25   A.   He is the brother of Ricardo and Armando.
```

| | | |
|---|---|---|
| 09:12:48 | 1 | Q.   Next one, timestamped 6:39:43.  And who is that, sir? |
| 09:12:57 | 2 | A.   That's Luis Aguirre. |
| 09:12:59 | 3 | Q.   When I compare that one to Government's Exhibit 30, it's |
| 09:13:04 | 4 | taken from Jose Trevino, have you compared the writing on both of |
| 09:13:10 | 5 | them? |
| 09:13:10 | 6 | A.   Looks very similar to me. |
| 09:13:14 | 7 | Q.   Next timestamp, 4:59:14, who is this transfer name in? |
| 09:13:29 | 8 | A.   That's the address that Hernando Guerra used and it appears |
| 09:13:33 | 9 | to be his written signature. |
| 09:13:35 | 10 | Q.   Next timestamp at 2:33:35 a.m., another blank one in whose |
| 09:13:41 | 11 | name? |
| 09:13:45 | 12 | A.   Jesus Javier, something, Morales. |
| 09:13:52 | 13 | Q.   Same date, 12:12:29 a.m., bank transfer to who, sir? |
| 09:14:02 | 14 | A.   Gabriel Ortiz. |
| 09:14:06 | 15 | Q.   Day before, 1-19-2012, 6:41 p.m.? |
| 09:14:11 | 16 | A.   That's Armando Cabrera, brother of "Yo Yo" and Omar Cabrera. |
| 09:14:18 | 17 | Q.   And you've seen this one, although it's a second one. |
| 09:14:21 | 18 | A.   Jorge Luis Ochoa. |
| 09:14:25 | 19 | Q.   And this is all the same e-mail, all one attachment, |
| 09:14:29 | 20 | correct? |
| 09:14:29 | 21 | A.   That is correct. |
| 09:14:34 | 22 | Q.   I'm also showing you Government's Exhibit 126, taken by |
| 09:14:46 | 23 | stipulation from Fernando Garcia's property in New Mexico.  Are |
| 09:14:55 | 24 | these more of the same, sir? |
| 09:14:56 | 25 | A.   Yes, sir. |

| | | |
|---|---|---|
| 09:14:57 | 1 | Q.   Okay.  And what's the name on that one?  Can you read that |
| 09:15:03 | 2 | name?  Does it appear to be Ramiro Villarreal? |
| 09:15:10 | 3 | A.   It does. |
| 09:15:13 | 4 | Q.   Just quickly, the second one the same? |
| 09:15:18 | 5 | A.   That's correct. |
| 09:15:19 | 6 | Q.   The third one the same? |
| 09:15:21 | 7 | A.   That's correct. |
| 09:15:27 | 8 | Q.   Can you state that name, please? |
| 09:15:32 | 9 | A.   Bonanza Racing Stables. |
| 09:15:34 | 10 | Q.   And gives an address in Tuxpan, Veracruz, correct? |
| 09:15:38 | 11 | A.   That is correct. |
| 09:15:39 | 12 | Q.   That name, sir? |
| 09:15:44 | 13 | A.   Gabriel Ortiz. |
| 09:15:45 | 14 | Q.   Also Veracruz? |
| 09:15:46 | 15 | A.   Yes. |
| 09:15:47 | 16 | Q.   Another Gabriel Ortiz? |
| 09:15:50 | 17 | A.   Yes. |
| 09:15:52 | 18 | Q.   There one's actually filled out? |
| 09:15:54 | 19 | A.   Luis Aguirre.  I'm sorry, it's transfer from Hernando Guerra |
| 09:16:00 | 20 | to Luis Aguirre. |
| 09:16:02 | 21 | Q.   And there's a blank one.  Is that the same one we've seen in |
| 09:16:06 | 22 | one of the e-mails? |
| 09:16:08 | 23 | A.   That's correct. |
| 09:16:10 | 24 | Q.   And another blank one, we've also seen in e-mails? |
| 09:16:12 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 09:16:14 | 1 | Q.   And here's another blank authorization form in the signature |
| 09:16:18 | 2 | of Francisco Silva-Ramos, correct? |
| 09:16:22 | 3 | A.   That is correct. |
| 09:16:23 | 4 | Q.   You recall the testimony of Special Agent Williams with |
| 09:16:25 | 5 | respect to the signature document he found on Francisco |
| 09:16:28 | 6 | Silva-Ramos? |
| 09:16:29 | 7 | A.   I do. |
| 09:16:29 | 8 | Q.   Now, have you also reviewed the search warrant evidence from |
| 09:16:50 | 9 | the Dallas location? |
| 09:16:51 | 10 | A.   I did. |
| 09:16:52 | 11 | Q.   I'm just going to show you 177B and 183A, have you look |
| 09:17:07 | 12 | through those. |
| 09:17:11 | 13 | A.   Yes. |
| 09:17:12 | 14 | Q.   Okay.  Again, by stipulation, these were taken from Jose |
| 09:17:25 | 15 | Trevino's house in Dallas, Texas.  In your mind, what was the |
| 09:17:33 | 16 | evidentiary significance of the photographs? |
| 09:17:36 | 17 | A.   The ones you just showed me? |
| 09:17:37 | 18 | Q.   Correct. |
| 09:17:38 | 19 | A.   It shows that Jose Trevino does have a relationship with his |
| 09:17:42 | 20 | brothers. |
| 09:17:44 | 21 | Q.   Showing you 177A, who is that? |
| 09:17:49 | 22 | A.   That's Juan Francisco Trevino. |
| 09:17:52 | 23 | Q.   And he's standing next to who? |
| 09:17:53 | 24 | A.   Jose Trevino. |
| 09:17:57 | 25 | Q.   And just to be fair to Mr. Trevino, there's no date stamps |

| | | |
|---|---|---|
| 09:18:00 | 1 | on these that indicate when they were taken, correct? |
| 09:18:02 | 2 | A.    That's correct. |
| 09:18:04 | 3 | Q.    And these individuals? |
| 09:18:07 | 4 | A.    On the left is Jose and his wife Zulema.  And on the far |
| 09:18:12 | 5 | right is Miguel Angel Trevino. |
| 09:18:17 | 6 | Q.    And 177C.  I know it's hard to see.  Who is this individual |
| 09:18:26 | 7 | in the yellow shirt? |
| 09:18:27 | 8 | A.    That's Miguel, "Zeta 40." |
| 09:18:30 | 9 | Q.    And who's this individual on the right? |
| 09:18:31 | 10 | A.    Jose Trevino. |
| 09:18:35 | 11 | Q.    Showing you 177D, who is that? |
| 09:18:40 | 12 | A.    That's Miguel Trevino. |
| 09:18:42 | 13 | Q.    And 177E? |
| 09:18:45 | 14 | A.    That's Oscar Omar Trevino, "Zeta 42." |
| 09:18:48 | 15 | Q.    And 177F? |
| 09:18:50 | 16 | A.    On the far left is Miguel Trevino. |
| 09:18:56 | 17 | Q.    Your Honor, I'm offering Government's Exhibit 183A, B, C and |
| 09:19:08 | 18 | D. |
| 09:19:21 | 19 |         MR. ESPER:  They've already been -- |
| 09:19:22 | 20 |         MS. FERNALD:  They're already in evidence. |
| 09:19:24 | 21 |         MR. GARDNER:  Already in evidence.  I'm sorry. |
| 09:19:26 | 22 | Q.    (BY MR. GARDNER) Showing you Government's Exhibit 183, |
| 09:19:31 | 23 | again, by stipulation taken from Dallas, Texas, Jose Trevino's |
| 09:19:35 | 24 | property.  What is this, sir? |
| 09:19:37 | 25 | A.    That is an overhead view of the ranch in Lexington, Oklahoma |

| | | |
|---|---|---|
| 09:19:41 | 1 | that Jose Trevino purchased. |
| 09:19:52 | 2 | Q.   Could you zoom in on this part right here?  So what are |
| 09:20:01 | 3 | these buildings located in the upper right-hand quadrant of 183A? |
| 09:20:05 | 4 | A.   The other photo was actually better.  But that's Jose |
| 09:20:11 | 5 | Trevino's -- the main home on the property. |
| 09:20:16 | 6 | Q.   And this structure here? |
| 09:20:22 | 7 | A.   That's the long barn with the office in the middle. |
| 09:20:28 | 8 | Q.   Now, did law enforcement take their own photos contained in |
| 09:20:31 | 9 | Government's Exhibit 183B, C and D? |
| 09:20:35 | 10 | A.   Yes, sir.  Prior to the takedown, we took overhead photos, |
| 09:20:39 | 11 | as well. |
| 09:20:39 | 12 | Q.   And when you say takedown, does that mean the arrests on |
| 09:20:41 | 13 | June 12th? |
| 09:20:42 | 14 | A.   That is correct. |
| 09:21:04 | 15 | Q.   Now, it's hard to tell, but did you also conduct |
| 09:21:08 | 16 | surveillance of this location prior to the arrest and search on |
| 09:21:12 | 17 | June 12th? |
| 09:21:13 | 18 | A.   I did. |
| 09:21:15 | 19 | Q.   And comparing this photo with the previous photo seized from |
| 09:21:19 | 20 | this ranch, were there a number of improvements made on the |
| 09:21:22 | 21 | ranch? |
| 09:21:22 | 22 | A.   There were several improvements. |
| 09:21:23 | 23 | Q.   So what's this structure right here in the center of 183B? |
| 09:21:26 | 24 | A.   That was a new barn that was being built, a very large barn. |
| 09:21:34 | 25 | Q.   And 183C, also a reflection of that barn? |

| | | |
|---|---|---|
| 09:21:38 | 1 | A.    Yes. |
| 09:21:42 | 2 | Q.    And did you locate any documents in either the Lexington |
| 09:21:46 | 3 | search warrant or the Dallas search warrant to indicate the cost |
| 09:21:48 | 4 | of that capital improvement on that property? |
| 09:21:50 | 5 | A.    I did. |
| 09:21:52 | 6 | Q.    Do you recall how much that was? |
| 09:21:55 | 7 | A.    That barn was approximately $80,000. |
| 09:21:58 | 8 | Q.    And Government's Exhibit 183D, was there a number of |
| 09:22:04 | 9 | structures that either seem to be built or improved upon during |
| 09:22:09 | 10 | the course of your surveillance or investigation in this case? |
| 09:22:10 | 11 | A.    Yes. |
| 09:22:11 | 12 | Q.    I want to show you Government's Exhibit 101, taken by |
| 09:22:36 | 13 | stipulation from Veronica Guerra's house in Mission, Texas.  Who |
| 09:22:44 | 14 | do you associate that residence with? |
| 09:22:46 | 15 | A.    The girlfriend of Fernando Garcia. |
| 09:22:48 | 16 | Q.    And did you locate a number of items related to Mr. Garcia |
| 09:22:52 | 17 | in that residence? |
| 09:22:53 | 18 | A.    Yes. |
| 09:22:55 | 19 | Q.    Showing you Government's Exhibit 101, what are these, |
| 09:23:01 | 20 | Special Agent Lawson? |
| 09:23:02 | 21 | A.    Called money bands. |
| 09:23:05 | 22 | Q.    Just for the record, can you read the amounts of those money |
| 09:23:09 | 23 | bands? |
| 09:23:09 | 24 | A.    The yellow is $1,000.  The blue is 2,000.  The red is 5,000. |
| 09:23:15 | 25 | Q.    And do these money bands appear to be used or unused? |

| | | |
|---|---|---|
| 09:23:19 | 1 | A.    Unused. |
| 09:23:25 | 2 | Q.    Did you also review a number of photographs seized from Mr. |
| 09:23:36 | 3 | Fernando Garcia? |
| 09:23:38 | 4 | A.    I did. |
| 09:23:39 | 5 | Q.    And what was the purpose of that? |
| 09:23:41 | 6 | A.    We reviewed photographs to seek a nexus among various |
| 09:23:46 | 7 | members of the conspiracy. |
| 09:23:50 | 8 | Q.    And the jury's already seen 102A, three photographs there. |
| 09:24:10 | 9 | So I'm not going to cover those again. |
| 09:24:13 | 10 | Let's go with 102B.  Who do you see in this photograph, |
| 09:24:24 | 11 | Special Agent? |
| 09:24:24 | 12 | A.    I see Sergio Rincon, Fernando Garcia, Eusevio Huitron. |
| 09:24:31 | 13 | Q.    Again, this is listed under Garcia Bloodstock as the owner, |
| 09:24:35 | 14 | correct? |
| 09:24:36 | 15 | A.    That is correct. |
| 09:24:39 | 16 | Q.    Showing you Government's Exhibit 102D, that horse? |
| 09:24:46 | 17 | A.    That is Juanita Mi Amor. |
| 09:24:49 | 18 | Q.    And who is listed as the owner of that horse? |
| 09:24:53 | 19 | A.    Francisco Colorado. |
| 09:24:56 | 20 | Q.    And who is in this photograph, second from the horse on the |
| 09:25:03 | 21 | left? |
| 09:25:03 | 22 | A.    That's Fernando Garcia. |
| 09:25:09 | 23 | Q.    Now, do you recall the testimony of Mr. Rejon? |
| 09:25:12 | 24 | A.    I do. |
| 09:25:15 | 25 | Q.    And do you recall him identifying Government's Exhibit 314? |

| | | |
|---|---|---|
| 09:25:22 | 1 | A.   I do. |
| 09:25:24 | 2 | Q.   And who do you recall him identifying this person as? |
| 09:25:28 | 3 | A.   As the wife of Miguel Trevino, Juanita.  Her name is |
| 09:25:32 | 4 | Juanita. |
| 09:25:33 | 5 | Q.   Now, I want to get to this in a little bit.  But did you |
| 09:25:36 | 6 | also look through the American Quarter Horse Association for any |
| 09:25:40 | 7 | name changes made by this group? |
| 09:25:44 | 8 | A.   Yes, sir.  When I saw the name, I recognized from |
| 09:25:47 | 9 | intelligence of being involved with the Zetas, I would look and |
| 09:25:51 | 10 | see if the horse was changed to that name. |
| 09:25:52 | 11 | Q.   And was this horse, Juanita Mi Amor, in Spanish, Juanita my |
| 09:25:57 | 12 | love, was that a name change on a horse? |
| 09:25:59 | 13 | A.   It was. |
| 09:26:03 | 14 | Q.   Government's Exhibit 102E, Blues Ferrari, correct? |
| 09:26:19 | 15 | A.   That's correct. |
| 09:26:20 | 16 | Q.   Who is this individual here, second from the horse's head? |
| 09:26:24 | 17 | A.   Fernando Garcia. |
| 09:26:25 | 18 | Q.   And this individual here? |
| 09:26:28 | 19 | A.   Move to the right just a little bit. |
| 09:26:30 | 20 | Q.   Sorry. |
| 09:26:31 | 21 | A.   Adan Farias.  And the horse is listed in Tremor Enterprises. |
| 09:26:37 | 22 | Q.   Tremor Enterprises.  Jose Trevino anywhere in that photo? |
| 09:26:41 | 23 | A.   No, sir. |
| 09:26:50 | 24 | Q.   Showing you Government's Exhibit 102F.  Who's listed as the |
| 09:26:54 | 25 | owner? |

| | | |
|---|---|---|
| 09:26:56 | 1 | A.   Poker Ranch. |
| 09:26:57 | 2 | Q.   Mr. Big Daddy Cartel, right? |
| 09:27:00 | 3 | A.   That is correct. |
| 09:27:00 | 4 | Q.   And the jockey? |
| 09:27:02 | 5 | A.   That would be Esgar Ramirez. |
| 09:27:07 | 6 | Q.   And this individual standing right here? |
| 09:27:09 | 7 | A.   Fernando Garcia. |
| 09:27:14 | 8 | MR. WOMACK:  Which was that? |
| 09:27:15 | 9 | MR. GARDNER:  Big Daddy Cartel. |
| 09:27:17 | 10 | MR. WOMACK:  Thank you. |
| 09:27:18 | 11 | Q.   (BY MR. GARDNER) 102G, the horse's name? |
| 09:27:22 | 12 | A.   Bugatti. |
| 09:27:23 | 13 | Q.   And the owner? |
| 09:27:25 | 14 | A.   Garcia Bloodstock. |
| 09:27:27 | 15 | Q.   The trainer? |
| 09:27:29 | 16 | A.   Eusevio Huitron. |
| 09:27:31 | 17 | Q.   And who is this individual here on the right, second from |
| 09:27:34 | 18 | the left of the horse? |
| 09:27:35 | 19 | A.   Fernando Garcia. |
| 09:27:36 | 20 | Q.   And this individual here? |
| 09:27:37 | 21 | A.   Sergio Rincon. |
| 09:27:41 | 22 | Q.   Do you see Eusevio Huitron in that photo? |
| 09:27:45 | 23 | A.   I do not. |
| 09:27:50 | 24 | Q.   Again, these were all located with Fernando Garcia in New |
| 09:27:54 | 25 | Mexico, correct? |

| | | | |
|---|---|---|---|
| 09:27:54 | 1 | A. | That is correct. |
| 09:27:57 | 2 | Q. | Government's Exhibit 102H, the owner? |
| 09:28:01 | 3 | A. | Carmina. |
| 09:28:02 | 4 | Q. | And who is Carmina associated with? |
| 09:28:04 | 5 | A. | Carlos Nayen. |
| 09:28:06 | 6 | Q. | And obviously the name on this horse? |
| 09:28:08 | 7 | A. | Lady Nayen. |
| 09:28:09 | 8 | Q. | And who is the trainer? |
| 09:28:11 | 9 | A. | Eusevio Huitron. |
| 09:28:12 | 10 | Q. | And Mr. Eusevio Huitron in that photo? |
| 09:28:20 | 11 | A. | No. |
| 09:28:20 | 12 | Q. | Who is the individual second from the left of the horse? |
| 09:28:24 | 13 | A. | Fernando Garcia. |
| 09:28:25 | 14 | Q. | And fourth from the left of the horse? |
| 09:28:27 | 15 | A. | Sergio Rincon. |
| 09:28:31 | 16 | Q. | 102I.  What's this horse? |
| 09:28:41 | 17 | A. | Times Awasting. |
| 09:28:43 | 18 | Q. | And the owner? |
| 09:28:45 | 19 | A. | Azoom, LP. |
| 09:28:47 | 20 | Q. | And how do you associate Azoom, LP with this case? |
| 09:28:52 | 21 | A. | It was owned by Alejandro Barradas, owner of Grupo de |
| 09:28:58 | 22 | | Aduanero. |
| 09:28:59 | 23 | Q. | The trainer? |
| 09:28:59 | 24 | A. | Adan Farias. |
| 09:29:02 | 25 | Q. | This individual here in the white shirt? |

| | | |
|---|---|---|
| 09:29:05 | 1 | A.   That's Carlos Nayen. |
| 09:29:11 | 2 | Q.   And the individual two from his left? |
| 09:29:14 | 3 | A.   That's Fernando Garcia. |
| 09:29:16 | 4 | Q.   And the trainer? |
| 09:29:17 | 5 | A.   Adan Farias. |
| 09:29:21 | 6 | Q.   And I think jury's already seen enough of 102J, Mr. Piloto, |
| 09:29:32 | 7 | correct? |
| 09:29:32 | 8 | A.   That's correct. |
| 09:29:38 | 9 | Q.   102I, the name of the horse? |
| 09:29:40 | 10 | A.   Number One Cartel. |
| 09:29:42 | 11 | Q.   And the owner? |
| 09:29:44 | 12 | A.   Garcia Bloodstock. |
| 09:29:45 | 13 | Q.   And this individual here? |
| 09:29:48 | 14 | A.   Adan Farias. |
| 09:29:49 | 15 | Q.   And second from the right of the horse's head? |
| 09:29:52 | 16 | A.   Carlos Nayen. |
| 09:29:53 | 17 | Q.   And over here to the far right? |
| 09:29:55 | 18 | A.   Fernando Garcia. |
| 09:30:03 | 19 | Q.   Government's Exhibit 102M, Mi Flash, the owner? |
| 09:30:08 | 20 | A.   Desiree Princess. |
| 09:30:10 | 21 | Q.   The jockey? |
| 09:30:11 | 22 | A.   Esgar. |
| 09:30:15 | 23 | Q.   And this individual here on the tan shirt and red cap? |
| 09:30:18 | 24 | A.   That's Fernando. |
| 09:30:26 | 25 | Q.   Fly First Down.  The owner? |

09:30:31  1   A.   Francisco Colorado.

09:30:32  2   Q.   This individual here?

09:30:34  3   A.   Fernando Garcia.

09:30:35  4   Q.   And the trainer?

09:30:36  5   A.   Paul Jones.

09:30:37  6   Q.   It's 102N, your Honor.  And the jury's already seen 11F,

09:30:49  7   Tempting Dash with Ramiro Villarreal, correct?

09:30:51  8   A.   That's correct.

09:30:53  9   Q.   And 102K, finally.  Who is the owner of 102K?

09:31:02  10  A.   Tremor Enterprises.

09:31:03  11  Q.   And the trainer?

09:31:07  12  A.   Felipe Quintero.

09:31:10  13  Q.   Again, is this photo almost identical to the photo of

09:31:14  14  Mr. Piloto?

09:31:14  15  A.   It is.

09:31:16  16  Q.   For the record, who's this individual?

09:31:18  17  A.   That's Jose Trevino, Carlos Nayen, Raul Ramirez, Fernando

09:31:23  18  Garcia, Felipe Quintero, Sergio Rincon and Tyler Graham.

09:31:26  19  Q.   Now, during the course of the investigation, did you ever

09:31:40  20  discover any documentation that indicated Fernando Garcia was an

09:31:44  21  agent for Tremor Enterprises?

09:31:47  22  A.   I did not.

09:31:50  23  Q.   Now, the jury heard from Mr. Charles Cox with respect to the

09:32:04  24  computer forensics?

09:32:06  25  A.   Yes.

| | | |
|---|---|---|
| 09:32:06 | 1 | Q.   And were you the agent that went through the computers to |
| 09:32:09 | 2 | pick out what you've determined relevant information? |
| 09:32:13 | 3 | A.   Yes, sir. |
| 09:32:14 | 4 | Q.   I'm going to show you Government's Exhibit 364CAA.  Was that |
| 09:32:23 | 5 | the disc that you had Mr. Cox make based on your analysis? |
| 09:32:27 | 6 | A.   That's correct. |
| 09:32:27 | 7 | Q.   And Government's Exhibit 364CAB through 364CAH.  Are these |
| 09:32:37 | 8 | pertinent files off of this disc? |
| 09:32:42 | 9 | A.   That's correct. |
| 09:32:47 | 10 | Q.   Your Honor, we offer Government's Exhibit 364CAA for |
| 09:32:53 | 11 | demonstrative purposes only. |
| 09:33:42 | 12 | Special Agent Lawson, 364CA comes from what computer? |
| 09:33:46 | 13 | A.   A computer located at Carlos Nayen's apartment. |
| 09:33:50 | 14 | Q.   And was that in California? |
| 09:33:51 | 15 | A.   Yes, sir. |
| 09:33:52 | 16 | Q.   Was that 9 McArthur Place during the search warrant arrest |
| 09:33:58 | 17 | of him? |
| 09:33:59 | 18 | A.   That's correct. |
| 09:34:11 | 19 | MR. DEGEURIN:  I have no objection, your Honor. |
| 09:34:13 | 20 | THE COURT:  All right. |
| 09:34:14 | 21 | MR. DEGEURIN:  I have no objection, your Honor. |
| 09:34:15 | 22 | THE COURT:  Government's Exhibit 364CAA is admitted for |
| 09:34:22 | 23 | demonstrative evidence only.  B through H are admitted. |
| 09:34:28 | 24 | Q.   (BY MR. GARDNER) Let's go through Government's Exhibit |
| 09:34:32 | 25 | 364CA.  And when you obtained these images from Carlos Nayen's |

| | | |
|---|---|---|
| 09:34:37 | 1 | computer and the other computers we talked about, what was your |
| 09:34:41 | 2 | goal or your purpose, or how did you determine whether something |
| 09:34:44 | 3 | was relevant or not? |
| 09:34:46 | 4 | A.   I looked for any photos, documents, Excel spreadsheets that |
| 09:34:51 | 5 | linked subjects together.  For example, if -- |
| 09:34:55 | 6 |           MR. DEGEURIN:  Your Honor, objection to relevancy |
| 09:34:59 | 7 | purposes and, also, nonresponsive. |
| 09:35:04 | 8 |           THE COURT:  Objection is over -- |
| 09:35:06 | 9 |           MR. DEGEURIN:  He looked at them.  He gathered them. |
| 09:35:08 | 10 |           THE COURT:  On the nonresponsive, restate your |
| 09:35:11 | 11 | questions. |
| 09:35:12 | 12 | Q.   (BY MR. GARDNER) What were you looking for in the computers? |
| 09:35:15 | 13 | A.   Pictures, documents, Excel spreadsheets, any kind of file |
| 09:35:20 | 14 | that had evidence of this case. |
| 09:35:24 | 15 | Q.   Showing you Government's Exhibit 364CAB.  And, again, this |
| 09:35:30 | 16 | was seized from Carlos Nayen's computer, correct? |
| 09:35:32 | 17 | A.   That's correct. |
| 09:35:34 | 18 | Q.   And just for the record, could you state what this document |
| 09:35:37 | 19 | is? |
| 09:35:39 | 20 | A.   It's a bill from Equine Hospital. |
| 09:35:42 | 21 | Q.   And who's the bill addressed to? |
| 09:35:44 | 22 | A.   It's billed to Alejandro Barradas, who was deceased at that |
| 09:35:50 | 23 | time, and in care of Victor Lopez. |
| 09:35:52 | 24 | Q.   And his address, who do you associate the 1703 Jorge, |
| 09:35:56 | 25 | Apartment 1 in Laredo, Texas with? |

09:36:00    1   A.    That's an address that Victor Lopez used in Laredo.

09:36:09    2   Q.    364CAC.  Just for the record, generally describe this

09:36:17    3   picture, please.

09:36:18    4   A.    It's a picture of Fernando Garcia holding a horse with a

09:36:21    5   halter that says, Freddy Garcia.

09:36:25    6   Q.    And 364CAD?

09:36:30    7   A.    That's a picture of criminals detained in Mexico.

09:36:35    8   Q.    Were you able to identify any of those individuals on that

09:36:37    9   picture?

09:36:38   10   A.    No.

09:36:39   11   Q.    So what was the relevance in your opinion for identifying

09:36:44   12   this picture?

09:36:45   13         MR. DEGEURIN:  Objection, form of the question, your

09:36:48   14   Honor.  Relevance determination can be made by the Court.

09:36:54   15         MR. GARDNER:  That could be rephrased, your Honor.

09:36:55   16   Q.    (BY MR. GARDNER) Why did you choose this picture?

09:36:57   17   A.    It showed me that he knew what was going on in Mexico with

09:37:00   18   the criminal element.

09:37:05   19   Q.    364CAE.  Who are these two individuals?

09:37:11   20   A.    On the right is "Pancho" Colorado, Francisco Colorado, and

09:37:16   21   on the left is Carlos Nayen.

09:37:17   22   Q.    And do you know where this picture was taken?

09:37:22   23   A.    Not for sure.

09:37:28   24   Q.    Government's Exhibit 364CAF.  Is this Fernando Garcia at the

09:37:38   25   top?

```
09:37:38   1   A.   That's correct.

09:37:38   2   Q.   Carlos Nayen?

09:37:39   3   A.   Yes.

09:37:39   4   Q.   And who is the woman to the right?

09:37:41   5   A.   That's Carlos Nayen's wife Anali Faces.

09:37:48   6   Q.   364CAG.  Who is this individual on the horse?

09:37:58   7   A.   I have no idea.

09:37:59   8   Q.   And this individual in the white shirt?

09:38:01   9   A.   Felipe Quintero.

09:38:03  10   Q.   And the individual back here in the black vest with the red

09:38:06  11   sleeve?

09:38:06  12   A.   Fernando Garcia.

09:38:08  13   Q.   364CAH.  The individual on the left?

09:38:19  14   A.   Fernando Garcia.

09:38:20  15   Q.   The center?

09:38:21  16   A.   Carlos Nayen.

09:38:22  17   Q.   To the right in blue?

09:38:23  18   A.   Paul Jones.

09:38:24  19   Q.   Do you know the person to the far right?

09:38:26  20   A.   I do not.

09:38:28  21   Q.   Slowing you Government's Exhibit 364NMA.  These are for

09:38:56  22   demonstrative or record purposes.  And Government's Exhibits

09:39:00  23   364NMB through 364NMDDD.  Do you recognize these, sir?

09:39:19  24   A.   I do.

09:39:19  25   Q.   And is this the disc you had Mr. Cox make for you?
```

09:39:23  1    A.    It is.

09:39:24  2    Q.    And where are these images taken from?

09:39:27  3    A.    It was taken from Fernando Garcia's computer in New Mexico.

09:39:34  4    Q.    Your Honor, we'd offer Government's Exhibit 364NMA for

09:39:39  5    demonstrative record purposes and 364NMB through three-D.

09:39:46  6              MR. WOMACK:  No objection, your Honor.

09:39:48  7              THE COURT:  Okay.  364NB -- New Mexico A is for

09:40:01  8    demonstrative purposes.  And then, NM, I didn't get the --

09:40:11  9              MR. GARDNER:  B through DDD, your Honor.

09:40:17  10             THE COURT:  B through.

09:40:18  11             MR. GARDNER:  DDD.

09:40:26  12             THE COURT:  Members of the jury, what he means is it

09:40:30  13   went through the complete alphabet.

09:40:38  14             MR. DEGEURIN:  No objection.

09:40:39  15   Q.    (BY MR. GARDNER) Special Agent Lawson, I'm not going to go

09:40:41  16   through all of these.  Again, what was the purpose -- or was the

09:40:44  17   purpose the same for this computer as the previous one?

09:40:46  18   A.    It was.

09:40:47  19             MR. DEGEURIN:  Objection, your Honor.  Relevance.

09:40:52  20             THE COURT:  Rephrase your question.

09:40:53  21             MR. GARDNER:  Thank you, your Honor.

09:40:55  22   Q.    (BY MR. GARDNER) Government's Exhibit 364 New Mexico B, just

09:41:00  23   for the record, what is this document?

09:41:03  24   A.    It's a bill from Lazy E Ranch as to Carlos Nayen and in care

09:41:09  25   of -- or I'm assuming that means in care of Tyler Graham.

| | | |
|---|---|---|
| 09:41:23 | 1 | Q.    New Mexico D. |
| 09:41:30 | 2 | A.    It's a -- I'm sorry. |
| 09:41:31 | 3 | Q.    Go ahead. |
| 09:41:32 | 4 | A.    It's a bill from Burnett Ranches to Luis Gerardo Aguirre. |
| 09:41:38 | 5 | Q.    Again, was this on Fernando Garcia's computer? |
| 09:41:42 | 6 | A.    That is correct. |
| 09:41:46 | 7 | Q.    New Mexico.  What are these? |
| 09:41:52 | 8 | A.    Benny Smith is a horse hauler.  It's a bill for moving |
| 09:41:56 | 9 | horses and it's to Carlos Nayen, and it lists Fernando's e-mail, |
| 09:42:02 | 10 | Anri, which is associated with Victor Lopez. |
| 09:42:11 | 11 | Q.    And on the second page, same thing? |
| 09:42:13 | 12 | A.    Yes.  It lists Carlos Nayen's e-mail and Fernando Garcia's |
| 09:42:17 | 13 | telephone number. |
| 09:42:18 | 14 | Q.    And have you reviewed the horses on these sets of documents? |
| 09:42:21 | 15 | There's a number of the same transports, correct? |
| 09:42:24 | 16 | A.    Yes. |
| 09:42:25 | 17 | Q.    Have you reviewed the horses on those documents? |
| 09:42:30 | 18 | A.    I have. |
| 09:42:31 | 19 | Q.    Who are they generally associated with? |
| 09:42:34 | 20 | A.    They're owned by members of this organization. |
| 09:42:40 | 21 | Q.    New Mexico F, who is this?  What's the address on the bank |
| 09:42:50 | 22 | statement? |
| 09:42:51 | 23 | A.    6553 Metro Court. |
| 09:42:57 | 24 | Q.    And who is it for? |
| 09:42:57 | 25 | A.    Carmina or Carlos Nayen. |

| | | | |
|---|---|---|---|
| 09:43:02 | 1 | Q. | New Mexico G.  What is this, sir? |
| 09:43:11 | 2 | A. | It's a deposit to Ruidoso Downs Racing for $9,000. |
| 09:43:18 | 3 | Q. | And this word here besides $9,000? |
| 09:43:21 | 4 | A. | Currency.  It's a cash deposit. |
| 09:43:27 | 5 | Q. | And the date on that, sir? |
| 09:43:31 | 6 | A. | January 12, 2011. |
| 09:43:41 | 7 | Q. | And the date on this one, the next page? |
| 09:43:44 | 8 | A. | January 12, 2011, same date. |
| 09:43:47 | 9 | Q. | And amount of currency deposited into the account? |
| 09:43:50 | 10 | A. | $4,500 cash. |
| 09:43:54 | 11 | Q. | And the date on the third page? |
| 09:43:58 | 12 | A. | That would be January 12, 2011, same date. |
| 09:44:01 | 13 | Q. | And the amount of currency deposited in this case? |
| 09:44:04 | 14 | A. | $4,550 -- United States dollars. |
| 09:44:12 | 15 | Q. | New Mexico J. |
| 09:44:41 | 16 | A. | It is a copy of some form of wire transfer. |
| 09:44:46 | 17 | Q. | Is that from Monex? |
| 09:44:47 | 18 | A. | From Monex. |
| 09:44:49 | 19 | Q. | Who's sending it? |
| 09:44:50 | 20 | A. | ADT Petro Servicios. |
| 09:44:52 | 21 | Q. | And the amount? |
| 09:44:53 | 22 | A. | $50,000. |
| 09:44:57 | 23 | Q. | And who's this one going to? |
| 09:44:58 | 24 | A. | Southwest Stallion Station. |
| 09:45:03 | 25 | Q. | New Mexico L.  Who is the name on the document? |

| | | |
|---|---|---|
| 09:45:16 | 1 | A.    Victor Lopez. |
| 09:45:20 | 2 | Q.    And this is a cashier's check to who for how much? |
| 09:45:24 | 3 | A.    It's a cashier's check to Victor Lopez for $4,350 from |
| 09:45:29 | 4 | Ruidoso Downs. |
| 09:45:30 | 5 | Q.    Again, was this in Fernando Garcia's computer? |
| 09:45:33 | 6 | A.    It was. |
| 09:45:43 | 7 | Q.    New Mexico O, what is this document? |
| 09:45:56 | 8 | A.    Some kind of statement to Francisco Colorado-Cessa. |
| 09:46:00 | 9 | Q.    And do you recognize this address here, Lavender Mist Court? |
| 09:46:04 | 10 | A.    That is the address that Fernando Garcia used. |
| 09:46:11 | 11 | Q.    New Mexico Q.  Addressed to who? |
| 09:46:22 | 12 | A.    Cars, Incorporated. |
| 09:46:24 | 13 | Q.    And did you hear testimony from Felipe Quintero that that |
| 09:46:28 | 14 | was his stables, correct? |
| 09:46:30 | 15 | A.    That's correct. |
| 09:46:39 | 16 | Q.    New Mexico S. |
| 09:46:51 | 17 | A.    That is a spreadsheet of horses bought at auction. |
| 09:46:57 | 18 | Q.    And are these all the names the horses were purchased under? |
| 09:47:01 | 19 | A.    That is correct. |
| 09:47:01 | 20 | Q.    And this is, again, in Fernando Garcia's possession? |
| 09:47:06 | 21 | A.    That is correct. |
| 09:47:07 | 22 | Q.    That's the total down there? |
| 09:47:09 | 23 | A.    That's correct. |
| 09:47:11 | 24 | Q.    What does this reflect in the upper right-hand corner? |
| 09:47:14 | 25 | A.    That reflects payments that came in for those purchases from |

| | | |
|---|---|---|
| 09:47:19 | 1 | ADT Petro Servicios. |
| 09:47:21 | 2 | Q.   Show you Government's Exhibit New Mexico X.   These two |
| 09:47:47 | 3 | individuals? |
| 09:47:50 | 4 | A.   That is Fernando Garcia and Carlos Nayen in Veracruz, |
| 09:47:53 | 5 | Mexico. |
| 09:48:01 | 6 | Q.   New Mexico AA? |
| 09:48:06 | 7 | A.   Back it out just a bit.   That's Fernando Garcia sleeping in |
| 09:48:12 | 8 | a bed or laying in a bed. |
| 09:48:14 | 9 | Q.   Fernando Garcia and who is this individual? |
| 09:48:16 | 10 | A.   Carlos Nayen. |
| 09:48:22 | 11 | Q.   New Mexico BB.   This individual on the far right? |
| 09:48:36 | 12 | A.   That's Fernando Garcia. |
| 09:48:37 | 13 | Q.   This individual next to him? |
| 09:48:40 | 14 | A.   That's Ismael Parra, also known as the one-eyed jockey. |
| 09:48:45 | 15 | Q.   And do you recall testimony of Mr. Graham yesterday? |
| 09:48:48 | 16 | A.   I do. |
| 09:48:48 | 17 | Q.   And where was Mr. Parra associated with this group? |
| 09:48:52 | 18 | A.   He trained horses for the group at Casey's Place in Elgin, |
| 09:48:56 | 19 | Texas. |
| 09:48:57 | 20 | Q.   Do you know this individual here? |
| 09:49:01 | 21 | A.   No, sir. |
| 09:49:02 | 22 | Q.   And this individual here? |
| 09:49:04 | 23 | A.   That's "Pancho" Colorado. |
| 09:49:05 | 24 | Q.   And this woman with his hand around? |
| 09:49:08 | 25 | A.   Identified her as Marita. |

| | | |
|---|---|---|
| 09:49:12 | 1 | Q.   And did you obtain the tail number for this particular |
| 09:49:15 | 2 | plane? |
| 09:49:16 | 3 | A.   I did. |
| 09:49:17 | 4 | Q.   Were you able to subpoena the service provided? |
| 09:49:21 | 5 | A.   I was. |
| 09:49:24 | 6 | Q.   I'm going to show you what's previously been entered into |
| 09:49:27 | 7 | evidence as Government's Exhibit 307.  What is Government's |
| 09:49:36 | 8 | Exhibit 307? |
| 09:49:37 | 9 | A.   It's subpoenaed documents from CapJets.  That's the name of |
| 09:49:42 | 10 | the company who leased that plane trip to those individuals. |
| 09:49:46 | 11 | Q.   And is this the passenger manifest down here listing all |
| 09:49:49 | 12 | those individuals you just talked about? |
| 09:49:51 | 13 | A.   It is. |
| 09:49:58 | 14 | Q.   And page Bates stamp 583915.  Is that the method of payment? |
| 09:50:06 | 15 | A.   Yes.  That was the price for the four- or five-day rental of |
| 09:50:09 | 16 | that jet. |
| 09:50:10 | 17 | Q.   Is the itinerary of this jet also contained within the |
| 09:50:13 | 18 | CapJet records? |
| 09:50:14 | 19 | A.   It is. |
| 09:50:14 | 20 | Q.   And without going into the paperwork, do you recall the |
| 09:50:17 | 21 | itinerary for that flight? |
| 09:50:19 | 22 | A.   I do.  More or less, it left from Houston and went to Los |
| 09:50:25 | 23 | Alamitos, California.  And Los Alamitos, California, Carlos Nayen |
| 09:50:30 | 24 | and Fernando Garcia got off.  And a couple of days later, the |
| 09:50:34 | 25 | rest of the crew went to Mexico. |

| | | |
|---|---|---|
| 09:50:38 | 1 | Q.   Government's Exhibit New Mexico CC.  Same picture, just a |
| 09:50:46 | 2 | little closer, correct? |
| 09:50:46 | 3 | A.   That's correct. |
| 09:50:47 | 4 | Q.   Or different view.  New Mexico DD, who is that individual? |
| 09:50:52 | 5 | A.   Fernando Garcia. |
| 09:50:55 | 6 | Q.   New Mexico EE? |
| 09:50:57 | 7 | A.   Fernando Garcia. |
| 09:50:59 | 8 | Q.   New Mexico FF? |
| 09:51:02 | 9 | A.   That's Fernando and Carlos Nayen. |
| 09:51:05 | 10 | Q.   New Mexico GG? |
| 09:51:08 | 11 | A.   Fernando Ismael Parra, Carlos Nayen. |
| 09:51:14 | 12 | Q.   New Mexico II? |
| 09:51:23 | 13 | A.   That's Sergio Rincon. |
| 09:51:27 | 14 | Q.   New Mexico KK? |
| 09:51:29 | 15 | A.   Raul Ramirez. |
| 09:51:35 | 16 | Q.   Raul Ramirez? |
| 09:51:37 | 17 | A.   Yes, sir. |
| 09:51:38 | 18 | Q.   New Mexico MM? |
| 09:51:46 | 19 | A.   That's Carlos Nayen and Felipe Quintero. |
| 09:51:58 | 20 | Q.   New Mexico WW.  Who is that? |
| 09:52:08 | 21 | A.   That's a picture of "Chevo" Huitron after he broke his leg |
| 09:52:11 | 22 | training in New Mexico. |
| 09:52:16 | 23 | Q.   New Mexico YY.  Can you tell the jury what that is? |
| 09:52:23 | 24 | A.   That was bought by the organization separately, an F650 |
| 09:52:29 | 25 | white truck.  It was subsequently leased to Luis Aguirre.  And |

09:52:33   1   the long trailer there was bought and then, registered to Huitron

09:52:37   2   Homes.

09:52:37   3   Q.   And did you conduct surveillance in which you observed this

09:52:41   4   particular truck and trailer?

09:52:43   5   A.   I did.   I received information that some of Miguel Trevino's

09:52:48   6   horses were going south to Mexico, and I found this truck on I-35

09:52:52   7   being driven by Sergio Rincon and, like I said, registered to

09:52:56   8   Luis Aguirre and the trailer to Huitron Homes.

09:52:59   9   Q.   Did that trailer actually pass into Mexico?

09:53:03   10   A.   I followed it to the warehouse at Jose Luis Canales in

09:53:08   11   Laredo.   Stayed there for a very long time, and then, it went to

09:53:14   12   a ranch in Laredo that's been identified as a place that Canales

09:53:19   13   uses to hold horses before they cross to Mexico and we

09:53:24   14   discontinued surveillance.

09:53:25   15   Q.   And New Mexico BBB.

09:53:33   16   A.   That was on Fernando's computer.   I believe it was named

09:53:37   17   Interesting Article on the Zetas.

09:53:39   18   Q.   That was the file name that someone had placed on Fernando

09:53:45   19   Garcia's computer?

09:53:46   20   A.   That is correct.

09:53:47   21          MR. DEGEURIN:   Your Honor, I'm going to have to object

09:53:48   22   to relevancy.

09:53:49   23          MR. GARDNER:   Relevance on this?

09:53:51   24          THE COURT:   Ah, ah, counsel.   The objection on

09:53:53   25   relevance is overruled.

| | | |
|---|---|---|
| 09:53:58 | 1 | Q.   (BY MR. GARDNER) Was this computer seized on June 12, 2012 |
| 09:54:02 | 2 | when Fernando Garcia was arrested? |
| 09:54:03 | 3 | A.   That is correct. |
| 09:54:04 | 4 | Q.   Was this document on the computer prior to the arrest? |
| 09:54:08 | 5 | A.   It was. |
| 09:54:15 | 6 | Q.   CCC, who is in this, sir? |
| 09:54:21 | 7 | A.   That's Carlos Nayen, Fernando Garcia and they're on "Pancho" |
| 09:54:27 | 8 | Colorado's boat. |
| 09:54:29 | 9 | Q.   And DDD, who is this individual in the red? |
| 09:54:33 | 10 | A.   That's "Pancho" Colorado. |
| 09:54:35 | 11 | Q.   And this individual down here in the white shirt, baseball |
| 09:54:38 | 12 | cap? |
| 09:54:38 | 13 | A.   Carlos Nayen. |
| 09:54:48 | 14 | Q.   I'm showing you Government's Exhibit 364, New Mexico ZZ and |
| 09:55:07 | 15 | AAA.  Do you recognize those, sir? |
| 09:55:11 | 16 | A.   I do. |
| 09:55:13 | 17 | Q.   At the same time, I'm showing you Government's Exhibit 106A, |
| 09:55:19 | 18 | 106B, 106C, E and D.  Do you recognize those, sir? |
| 09:55:28 | 19 | A.   I do. |
| 09:55:28 | 20 | Q.   And by stipulation these were seized from Fernando Garcia? |
| 09:55:36 | 21 | A.   Yes, sir.  The books from Mission, Texas and the computer |
| 09:55:42 | 22 | files from New Mexico. |
| 09:55:45 | 23 | Q.   Do you recall an e-mail presented some time ago from -- I |
| 09:55:49 | 24 | believe it's horses.quarter.racing@yahoo to Fernando Garcia? |
| 09:55:54 | 25 | A.   I do. |

| | | |
|---|---|---|
| 09:55:55 | 1 | Q.   And without showing it, generally what do you recall that |
| 09:55:59 | 2 | e-mail saying? |
| 09:56:01 | 3 | A.   Said, Shaman toss your cell. |
| 09:56:07 | 4 | Q.   Showing you 364, New Mexico ZZ.  Just for the record, what's |
| 09:56:14 | 5 | the name on the saddle blanket? |
| 09:56:16 | 6 | A.   Shaman. |
| 09:56:19 | 7 | Q.   And who's on top of that horse? |
| 09:56:20 | 8 | A.   That's Raul Ramirez. |
| 09:56:22 | 9 | Q.   And 364, New Mexico AAA on the halter? |
| 09:56:29 | 10 | A.   It's Fernando Garcia with a halter on the horse called |
| 09:56:32 | 11 | Shaman. |
| 09:56:37 | 12 | Q.   With respect to Government's Exhibit 106A, again, this was |
| 09:56:41 | 13 | seized from Mission, Texas.  Can you see the name on the spine on |
| 09:56:45 | 14 | the end of this particular book? |
| 09:56:47 | 15 | A.   I can. |
| 09:56:47 | 16 | Q.   And what does that name say? |
| 09:56:49 | 17 | A.   "Schaman." |
| 09:56:54 | 18 | Q.   These books within themselves, they have a number of |
| 09:56:57 | 19 | writings in them; is that correct? |
| 09:56:58 | 20 | A.   That is correct. |
| 09:56:58 | 21 | Q.   Showing 106A, these writings down on the left-hand side, |
| 09:57:07 | 22 | what do they generally consist of? |
| 09:57:09 | 23 | A.   Those numbers are hip numbers that were purchased at the |
| 09:57:13 | 24 | auction corresponding to that book by various members. |
| 09:57:19 | 25 | Q.   Okay.  So, in other words, this is the Heritage Place |

| | | |
|---|---|---|
| 09:57:23 | 1 | auction September 2011, correct? |
| 09:57:26 | 2 | A.    That is correct. |
| 09:57:31 | 3 | Q.    106B, Heritage Place November 2011? |
| 09:57:37 | 4 | MR. WOMACK:  Mr. Gardner, is that 106? |
| 09:57:39 | 5 | MR. GARDNER:  106B. |
| 09:57:41 | 6 | MR. WOMACK:  Thank you. |
| 09:57:42 | 7 | Q.    (BY MR. GARDNER) And, again, hip numbers? |
| 09:57:46 | 8 | A.    Yes. |
| 09:57:47 | 9 | Q.    And amounts? |
| 09:57:49 | 10 | A.    Yes. |
| 09:57:54 | 11 | Q.    And just on this particular auction, do you recall the |
| 09:58:00 | 12 | horses that were present at this auction associated with this |
| 09:58:05 | 13 | investigation? |
| 09:58:06 | 14 | A.    I do. |
| 09:58:08 | 15 | Q.    Who are the ones on the right? |
| 09:58:10 | 16 | A.    The ones on the right were the horses sold by Tremor |
| 09:58:14 | 17 | Enterprises back to members of his own organization. |
| 09:58:16 | 18 | Q.    And the one on the left? |
| 09:58:18 | 19 | A.    That was the horses that were purchased at the auction. |
| 09:58:28 | 20 | THE COURT:  What number, again? |
| 09:58:29 | 21 | MR. GARDNER:  That was 106B, your Honor. |
| 09:58:32 | 22 | Q.    (BY MR. GARDNER) 106C, a number of numbers, many of them |
| 09:58:38 | 23 | circled, correct? |
| 09:58:38 | 24 | A.    That's correct. |
| 09:58:44 | 25 | MR. WOMACK:  I'm sorry, your Honor, what exhibit was |

09:58:46  1    that one?

09:58:46  2         MR. GARDNER:  That was C.  That was the 2011 Ruidoso

09:58:53  3    yearling sale.

09:59:00  4    Q.   (BY MR. GARDNER) 106E, which is the Los Alamitos 2011 equine

09:59:05  5    sale?

09:59:06  6    A.   Yes.

09:59:07  7    Q.   More numbers, sir?

09:59:08  8    A.   Yes.

09:59:10  9    Q.   Finally, 106D from Ruidoso, as well, more hip numbers?

09:59:21  10   A.   That's correct.

09:59:23  11   Q.   So when you combine all the books in 106D, did you compare

09:59:29  12   all the numbers to the horses purchased at that auction?

09:59:32  13   A.   I did.

09:59:33  14   Q.   And what horses were purchased at auction based on your

09:59:36  15   analysis?

09:59:38  16   A.   All the horses circled in those books in Fernando Garcia's

09:59:42  17   possession were horses bought by a variety of different names but

09:59:47  18   in the control of Fernando Garcia and Carlos Nayen and Jose

09:59:50  19   Trevino.

09:59:55  20   Q.   And, I'm sorry, one thing I forgot with respect to the

09:59:58  21   overhead photos.

09:59:59  22         What was the address of the Lexington property?

10:00:01  23   A.   If you recall, it was bought from two different owners.  The

10:00:07  24   first piece of property bought was 17840 Highway 84 -- or, excuse

10:00:14  25   me, 84th Street.  That was the first property with the doublewide

| | | |
|---|---|---|
| 10:00:21 | 1 | trailer.  He then bought 17850, which was Bill Pilgrim's |
| 10:00:31 | 2 | residence that connected to that property.  And technically |
| 10:00:33 | 3 | 178 -- |
| 10:00:33 | 4 | MS. WILLIAMS:  Objection, your Honor.  Nonresponsive. |
| 10:00:40 | 5 | THE COURT:  Read me back the question, please. |
| 10:00:47 | 6 | (Last question read back.) |
| 10:00:48 | 7 | THE COURT:  Sustain the objection. |
| 10:00:53 | 8 | Q.   (BY MR. GARDNER) Showing you Government's Exhibit 364, |
| 10:00:58 | 9 | Oklahoma A, is that the disc of those files you identified as |
| 10:01:03 | 10 | pertinent? |
| 10:01:04 | 11 | A.   That is correct. |
| 10:01:07 | 12 | Q.   And Oklahoma B through T, are those files you pulled from |
| 10:01:14 | 13 | that disc? |
| 10:01:20 | 14 | A.   That is correct. |
| 10:01:21 | 15 | Q.   Your Honor, I offer Government's Exhibit 364 Oklahoma A for |
| 10:01:27 | 16 | record purposes and 364 Oklahoma B through T. |
| 10:01:33 | 17 | THE COURT:  Through T or G?  Did you say through T? |
| 10:01:47 | 18 | MR. GARDNER:  T as in tango, your Honor. |
| 10:01:50 | 19 | THE COURT:  Hearing no objection, they're admitted. |
| 10:01:53 | 20 | Q.   (BY MR. GARDNER) And where are these photos -- on what |
| 10:01:58 | 21 | computers -- let me stop. |
| 10:02:00 | 22 | Where did you seize the computer from which these |
| 10:02:02 | 23 | photos and documents came? |
| 10:02:04 | 24 | A.   I seized them out of the doublewide trailer, located at |
| 10:02:08 | 25 | 17840 84th Street, Lexington, Oklahoma. |

| | | |
|---|---|---|
| 10:02:13 | 1 | Q.   Is that the trailer -- |
| 10:02:15 | 2 | MS. WILLIAMS:  Your Honor -- oh, go ahead.  Sorry. |
| 10:02:17 | 3 | Q.   (BY MR. GARDNER) Is that the trailer Special Agent Farabow |
| 10:02:19 | 4 | testified to and showed pictures of? |
| 10:02:20 | 5 | A.   Yes. |
| 10:02:24 | 6 | MS. WILLIAMS:  Your Honor, I apologize, but I know that |
| 10:02:30 | 7 | piece of information.  Now that I do, I do object, because that's |
| 10:02:35 | 8 | Rudy Trevino's trailer.  It's his house.  And, therefore, I |
| 10:02:41 | 9 | object on relevance. |
| 10:02:44 | 10 | MR. GARDNER:  I think that's good cross-examination, |
| 10:02:48 | 11 | your Honor, but for admissibility purposes -- |
| 10:02:54 | 12 | THE COURT:  Well, let me see it. |
| 10:03:00 | 13 | Q.   (BY MR. GARDNER) Special Agent, do you recall the testimony |
| 10:03:01 | 14 | of -- |
| 10:03:02 | 15 | THE COURT:  No, no, no, no. |
| 10:03:04 | 16 | MR. GARDNER:  I was going to lay a little foundation, |
| 10:03:06 | 17 | your Honor. |
| 10:03:07 | 18 | THE COURT:  I know what -- |
| 10:03:09 | 19 | MR. GARDNER:  Okay. |
| 10:03:32 | 20 | THE COURT:  These are pictures of things taken pursuant |
| 10:03:35 | 21 | to a search warrant? |
| 10:03:36 | 22 | MR. GARDNER:  (Moving head up and down.) |
| 10:03:37 | 23 | THE COURT:  Objection is overruled.  B through T are |
| 10:03:42 | 24 | admitted. |
| 10:03:44 | 25 | Q.   (BY MR. GARDNER) Special Agent, I want to recall to you the |

10:03:49    1    testimony of Mr. Pilgrim.  Do you recall that testimony?

10:03:52    2    A.    I do.

10:03:53    3    Q.    All right.  And he testified earlier, it's separate

10:03:58    4    addresses.  What is 17840 84th Street?

10:04:03    5    A.    It is the first piece of property that Jose bought that had

10:04:07    6    the doublewide trailer.

10:04:09    7    Q.    Do you recall his testimony of Mr. Pilgrim as to Mr. Trevino

10:04:12    8    living on that property?

10:04:13    9    A.    I do.

10:04:14   10    Q.    And at what point did Mr. Trevino take possession of the

10:04:18   11    Pilgrim portion of the property?

10:04:20   12    A.    January 2012.

10:04:22   13    Q.    Was there any password controls on the computer seized from

10:04:27   14    Oklahoma?

10:04:27   15    A.    Not that I'm aware of.

10:04:30   16    Q.    Showing you Oklahoma -- in addition to the doublewide, as

10:04:33   17    Ms. Williams said, Mr. Rudy Trevino lived in there, correct?

10:04:40   18    A.    That's correct.

10:04:40   19    Q.    Who else lived in there?

10:04:41   20    A.    Rudy and Jose's mother lived there.  I believe one of Jose's

10:04:48   21    sisters lived there.  There's four or five people living in that

10:04:52   22    doublewide.

10:04:53   23    Q.    I'm showing you Oklahoma B.  Who is that a picture of?

10:05:01   24    A.    Miguel Trevino.

10:05:03   25    Q.    Showing you Oklahoma C.  What is that a picture of?

| | | |
|---|---|---|
| 10:05:09 | 1 | A.   People detained in Mexico. |
| 10:05:11 | 2 | Q.   Showing you picture of Oklahoma D, it's hard to see, but |
| 10:05:17 | 3 | what's described on that individual's chest? |
| 10:05:19 | 4 | A.   A "Z." |
| 10:05:20 | 5 | Q.   Showing you Oklahoma E. |
| 10:05:25 | 6 | A.   It's weapons. |
| 10:05:26 | 7 | Q.   Oklahoma F? |
| 10:05:30 | 8 | A.   It's bag of cash, looks like on a truck seat. |
| 10:05:33 | 9 | Q.   And the denominations of the cash? |
| 10:05:43 | 10 | A.   I believe that's $100 bills. |
| 10:05:46 | 11 | Q.   Oklahoma G? |
| 10:05:48 | 12 | A.   Chapa Guzman. |
| 10:05:51 | 13 | Q.   Oklahoma H? |
| 10:05:54 | 14 | A.   That's the Hecho en Mexico, same thing that was on the |
| 10:05:59 | 15 | horse's headgear. |
| 10:06:02 | 16 | Q.   Oklahoma I? |
| 10:06:04 | 17 | A.   Another picture of cash. |
| 10:06:08 | 18 | Q.   Oklahoma J? |
| 10:06:10 | 19 | A.   Cash and a key. |
| 10:06:13 | 20 | Q.   Oklahoma K? |
| 10:06:17 | 21 | A.   That's a picture of Mr. Piloto. |
| 10:06:22 | 22 | Q.   Oklahoma L? |
| 10:06:28 | 23 | A.   That's a picture of Tempting Dash. |
| 10:06:31 | 24 | Q.   Oklahoma M? |
| 10:06:35 | 25 | A.   Women and a young boy detained in Mexico. |

| | | |
|---|---|---|
| 10:06:39 | 1 | Q.   Oklahoma N? |
| 10:06:42 | 2 | A.   Heriberto Lazcano, the original leaders of the Zetas or past |
| 10:06:49 | 3 | leader of the Zetas. |
| 10:06:50 | 4 | Q.   And Oklahoma O is the same? |
| 10:06:51 | 5 | A.   Yes. |
| 10:06:52 | 6 | Q.   And Oklahoma P? |
| 10:06:53 | 7 | A.   Gold-plated handguns. |
| 10:06:55 | 8 | Q.   Oklahoma Q? |
| 10:06:59 | 9 | A.   I believe that one is First Down Dash.  Tempting Dash's |
| 10:07:04 | 10 | father. |
| 10:07:04 | 11 | Q.   Oklahoma R? |
| 10:07:07 | 12 | A.   That's Chapa Guzman again. |
| 10:07:10 | 13 | Q.   And who is Chapa Guzman? |
| 10:07:12 | 14 | A.   He's the leader of the Sinaloa cartel. |
| 10:07:14 | 15 | Q.   Oklahoma S? |
| 10:07:17 | 16 | A.   It's a shirt with a "Z" on the back of it and with a blur. |
| 10:07:24 | 17 | I can't read the inscription. |
| 10:07:27 | 18 | Q.   Finally, Oklahoma T? |
| 10:07:31 | 19 | A.   That's a picture of Zeta "Mamito," Jesus Rejon. |
| 10:07:35 | 20 | Q.   Was this the photo that Mr. Rejon identified during his |
| 10:07:38 | 21 | testimony? |
| 10:07:39 | 22 | A.   That's correct. |
| 10:07:42 | 23 | Q.   Showing you Government's Exhibit 364ATX, Austin, Texas A. |
| 10:08:00 | 24 | Is that the discs that you asked Mr. Cox to prepare based on your |
| 10:08:04 | 25 | evaluation? |

10:08:04   1   A.   It is.

10:08:05   2   Q.   Showing you 364 Austin, Texas B through double R.  Do you

10:08:19   3   recognize those, sir?

10:08:21   4   A.   That's the files I -- pertinent off the Austin, Texas

10:08:25   5   computers.

10:08:26   6   Q.   And these Austin, Texas computers, what location were they

10:08:29   7   seized from?

10:08:30   8   A.   From the business address on Highway 183.

10:08:33   9   Q.   And were they seized from multiple computers within --

10:08:35   10  located within that address?

10:08:36   11  A.   Three computers within the business.

10:08:39   12  Q.   Your Honor, we offer Government's Exhibit 364 Austin, Texas

10:08:42   13  A for record purposes, and 364 Austin, Texas B through double R.

10:08:50   14          MR. MAYR:  Your Honor, we're going to have a number of

10:08:52   15  objections to raise to these exhibits.

10:08:59   16          THE COURT:  Okay.  Well, then, I'll give you your

10:09:02   17  morning break.  Use the facilities.  Be ready to come back in

10:09:06   18  about ten minutes.

10:09:39   19          (Jury not present.)

10:10:22   20          MR. MAYR:  Let me start talking while I'm looking

10:10:24   21  through these, your Honor.  My objection is to relevance and

10:10:28   22  under 403, all these exhibits should not be admitted into

10:10:31   23  evidence.  The --

10:10:34   24          THE COURT:  All of them?

10:10:35   25          MR. MAYR:  All of them for this reason.  All of these,

| | |
|---|---|
| 10:10:39 | 1 |
| 10:10:46 | 2 |
| 10:10:49 | 3 |
| 10:10:54 | 4 |
| 10:10:57 | 5 |
| 10:11:00 | 6 |
| 10:11:01 | 7 |
| 10:11:03 | 8 |
| 10:11:05 | 9 |
| 10:11:12 | 10 |
| 10:11:15 | 11 |
| 10:11:18 | 12 |
| 10:11:23 | 13 |
| 10:11:30 | 14 |
| 10:11:33 | 15 |
| 10:11:38 | 16 |
| 10:11:39 | 17 |
| 10:11:42 | 18 |
| 10:11:51 | 19 |
| 10:11:54 | 20 |
| 10:11:58 | 21 |
| 10:12:00 | 22 |
| 10:12:03 | 23 |
| 10:12:07 | 24 |
| 10:12:11 | 25 |

1  we believe that -- we may need him to step off the stand.  I

2  don't want to -- if that's okay.  I may need him back in here

3  later, but let me go ahead and make my objection first.

4          THE COURT:  He's not excused from the rule.

5          MR. MAYR:  Oh, that's true.  That's fine.

6          THE COURT:  Let's go ahead and have a seat.

7          MR. MAYR:  That's fine.  All right.

8          I believe he's going to testify that all of these were

9  accessed from a computer that there's no evidence that my client

10  or Eusevio Huitron ever accessed or used, and that the only

11  person who ever accessed or used these computers was either his

12  daughter Jessica Huitron or other individuals within the office.

13  The 403 objection comes in because these come in to show that our

14  clients have knowledge when there's nothing to link them to show

15  that they accessed these, had any knowledge or any involvement

16  with any of these exhibits.

17          THE COURT:  They were taken by search warrant on your

18  client's property and, I assume, were your client's computer.  I

19  haven't heard any evidence, one way or the other, that anybody

20  operated the computers.  These are just things that are found.

21          MR. MAYR:  That's right, Judge.  And I may need to ask

22  some questions of Agent Lawson, outside of the presence of the

23  jury, to establish this.  But what I believe the testimony is is

24  that all of these were taken from a computer that apparently only

25  Jessica Huitron had access to.  And to somehow impute that these

| | | |
|---|---|---|
| 10:12:17 | 1 | defendants somehow accessed these when there's no evidence to |
| 10:12:21 | 2 | suggest that they ever got onto these computers is more |
| 10:12:24 | 3 | prejudicial than probative and should be excluded under 403. |
| 10:12:28 | 4 | THE COURT:  Well, let me look at them.  I can't imagine |
| 10:12:31 | 5 | what they are. |
| 10:12:33 | 6 | MR. ESPER:  Your Honor, in addition to that, there's |
| 10:12:34 | 7 | some images that I think are highly prejudicial and outweigh |
| 10:12:37 | 8 | the -- |
| 10:12:37 | 9 | THE COURT:  All evidence is prejudicial. |
| 10:12:39 | 10 | MR. ESPER:  I understand, your Honor. |
| 10:12:40 | 11 | THE COURT:  Good evidence is more prejudicial. |
| 10:12:42 | 12 | MR. ESPER:  Your Honor, they're photographs -- |
| 10:12:43 | 13 | THE COURT:  Now, but I understand. |
| 10:12:44 | 14 | MR. ESPER:  There's an image taken of lines of cocaine, |
| 10:12:48 | 15 | and that's what I'm talking about. |
| 10:12:51 | 16 | MR. GARDNER:  And, your Honor, these are not taken on |
| 10:12:53 | 17 | one computer.  They're taken off three computers. |
| 10:12:58 | 18 | THE COURT:  He's making an objection to all of them, |
| 10:13:00 | 19 | and so, I'll need to look at the evidence. |
| 10:13:03 | 20 | MR. MAYR:  And what I'm trying to do, Judge, is flag |
| 10:13:06 | 21 | the ones that are -- |
| 10:13:09 | 22 | THE COURT:  Okay.  I'm going to give y'all ten minutes |
| 10:13:12 | 23 | to get the ones out that you're objecting to. |
| 10:13:17 | 24 | MR. MAYR:  Here, Judge, I'm done. |
| 10:13:18 | 25 | THE COURT:  The alternative of all. |

10:13:24  1          MR. MAYR:  The ones with the yellow stickers, Judge,

10:13:28  2   are the ones that we feel are especially more prejudicial than

10:13:30  3   probative.  And then, your Honor, also to consider here is that

10:13:34  4   -- is how these images are accessed.  The fact of the matter is

10:13:38  5   that depending on what Agent Lawson can testify to, a number of

10:13:43  6   these images aren't -- a person doesn't have to make a

10:13:48  7   conscientious effort to download these onto the computer.

10:13:52  8          Someone could go to a website, read a story about

10:13:56  9   something that happened in the news, and it's going to

10:13:58  10  automatically pull it onto there.  It doesn't necessarily mean

10:14:00  11  that the person is making a conscientious effort to download and

10:14:05  12  store pictures of cocaine, pictures of cash, anything having to

10:14:09  13  do with the Zetas.

10:14:10  14         And so, again, to admit it, 403 would exceed the

10:14:15  15  probative value when there's nothing to show that our clients

10:14:17  16  took some affirmative step to download these images onto their

10:14:21  17  computers.

10:14:23  18         THE COURT:  Just fell out of the sky, did it?

10:14:26  19         MR. MAYR:  Pardon?

10:14:27  20         THE COURT:  Did it just fall out of the sky into your

10:14:29  21  clients' computers?

10:14:31  22         MR. MAYR:  No, Judge.  Some of it, we believe, came

10:14:33  23  from other individuals, not our client, who could have been

10:14:37  24  Jessica Huitron.  It could have been other individuals who had

10:14:39  25  access to the computer.  If they go to a website and pull up a

10:14:44  1  news story about the Zetas and if the news story just happens to

10:14:49  2  have a photograph of Miguel Trevino, or if it happens to have the

10:14:54  3  symbol of Hecho en Mexico, it's automatically --

10:14:58  4       THE COURT:  Counsel, there's no evidence of that, and I

10:14:59  5  guess you're going to present some?

10:15:02  6       MR. MAYR:  That's -- that it would have come out this

10:15:04  7  way?

10:15:04  8       THE COURT:  The stuff you're telling me, I have heard

10:15:07  9  no evidence of.

10:15:09  10       MR. MAYR:  Judge --

10:15:09  11       THE COURT:  Are you telling me you're going to have

10:15:11  12  evidence of it?

10:15:12  13       MR. MAYR:  Judge, I think that is why I did not excuse

10:15:15  14  Agent Cox -- I did not excuse Agent Cox.  First of all, I don't

10:15:18  15  know what Agent Lawson can testify as far as where these were

10:15:24  16  obtained from.  But that's why I saved Agent Cox so that he could

10:15:28  17  explain exactly how these images were -- were obtained.  I don't

10:15:32  18  know if Agent Lawson can.  I don't know if we need Agent Cox.

10:15:36  19  But I feel that through some questioning, we can establish

10:15:40  20  exactly where they were obtained, how they were obtained, and who

10:15:42  21  had access to them.

10:15:43  22       MS. FERNALD:  Your Honor, if I could just state for the

10:15:45  23  record that the Court will recall Agent Cox's testimony that he

10:15:48  24  went through several different types of locations where the files

10:15:52  25  could be found.  He also testified that he has reviewed that

| | | |
|---|---|---|
| 10:15:56 | 1 | information with Agent Scott Lawson on each one of these |
| 10:15:59 | 2 | photographs, and he is prepared to testify to that.  That problem |
| 10:16:02 | 3 | is solved. |
| 10:16:03 | 4 | MR. MAYR:  So we can get it out through him then.  Is |
| 10:16:06 | 5 | that right, Michelle? |
| 10:16:07 | 6 | MS. FERNALD:  That's correct. |
| 10:16:08 | 7 | THE COURT:  All right.  Everybody take a short break |
| 10:16:09 | 8 | and then, we'll start hearing the testimony and I'll look at |
| 10:16:11 | 9 | this. |
| 10:16:11 | 10 | MR. MAYR:  Okay.  Thank you, Judge. |
| 10:16:13 | 11 | (Recess.) |
| 10:31:00 | 12 | THE COURT:  I'm assuming yellow is yours. |
| 10:31:07 | 13 | MR. MAYR:  That's correct, your Honor.  There might |
| 10:31:08 | 14 | have been one more -- a few more right at the very end.  I was |
| 10:31:12 | 15 | trying to get it to you before, and I just wanted to make sure I |
| 10:31:16 | 16 | didn't leave any off so. |
| 10:31:20 | 17 | If I may, though, there's one other thing I would like |
| 10:31:23 | 18 | to present to the Court to kind of put this in perspective. |
| 10:31:26 | 19 | THE COURT:  Margaret, hand this to him.  Look at it and |
| 10:31:30 | 20 | make sure that you have each one of them so I could look at them. |
| 10:31:33 | 21 | MR. MAYR:  Sure.  Your Honor, thinking about it over |
| 10:31:37 | 22 | the break, essentially what this boils down to is, it would be |
| 10:31:43 | 23 | like attributing whatever images your daughter accessed on her |
| 10:31:48 | 24 | personal laptop to you.  And without a showing that our -- in |
| 10:31:53 | 25 | other words, there's been testimony from Agent Lawson, for |

| | | |
|---|---|---|
| 10:31:55 | 1 | instance -- Doug, you could probably help me out -- like there |
| 10:31:58 | 2 | was user names for -- |
| 10:32:00 | 3 | THE COURT:  I'm going to let you ask some questions.  I |
| 10:32:03 | 4 | don't think that's a very good example.  I raised a bunch of kids |
| 10:32:09 | 5 | and I told them, whenever it's in my house, it's my |
| 10:32:13 | 6 | responsibility. |
| 10:32:15 | 7 | MR. MAYR:  Okay. |
| 10:32:17 | 8 | THE COURT:  Go get your own house.  All right.  Come up |
| 10:32:24 | 9 | and answer his questions. |
| 10:32:37 | 10 | CROSS-EXAMINATION |
| 10:32:37 | 11 | BY MR. MAYR: |
| 10:32:39 | 12 | Q.   Agent Lawson, let me just start off by asking you the |
| 10:32:44 | 13 | simplest question to help resolve this issue. |
| 10:32:47 | 14 | In going through these computers that were found at my |
| 10:32:49 | 15 | client's business and other locations associated with him, with |
| 10:32:55 | 16 | Special Agent Cox, did you all in reviewing all these computers |
| 10:32:59 | 17 | see anything that would lead you to believe that my client Jesus |
| 10:33:05 | 18 | Huitron used any of these computers? |
| 10:33:08 | 19 | THE COURT:  Let's go to the issue.  You can do that in |
| 10:33:11 | 20 | front of the jury.  I doubt seriously this gentleman was present |
| 10:33:17 | 21 | at any time that your clients used the computers, if they did use |
| 10:33:21 | 22 | them.  That's not the point.  The point is that you're objecting |
| 10:33:25 | 23 | to what was in them, for whatever reason. |
| 10:33:28 | 24 | MR. MAYR:  Correct, Judge. |
| 10:33:29 | 25 | THE COURT:  I will overrule the objection that there's |

```
10:33:32   1   no evidence that they sat down and downloaded and got the
10:33:39   2   information.  Just like all of the other evidence that's come in,
10:33:44   3   that it was subpoenaed from the defendants and this was what was
10:33:49   4   there.  Relevance, excessive prejudice to not be probative or
10:33:58   5   less probative, or an independent reason.
10:34:01   6           But even if your clients testified that they didn't do
10:34:07   7   it, it would be a credibility issue for the jury.  So that
10:34:11   8   objection is a waste of time.  So just ask the questions about
10:34:15   9   your computers, please.
10:34:18  10   Q.   (BY MR. MAYR) Let me ask you this, Agent Lawson:  Are you
10:34:20  11   able to determine from looking at the computers who is accessing
10:34:24  12   these images or manipulating these images?
10:34:26  13   A.   No.
10:34:26  14   Q.   Based on your review of the computer, could you tell who the
10:34:33  15   users -- what individuals were accessing the computers?
10:34:38  16   A.   No.  It appeared everyone was using different computers.
10:34:41  17   Q.   Okay.  Did you see anything on the computers that indicated
10:34:49  18   that my client -- was there anything that you could tell from the
10:34:52  19   computers between you and Agent Cox that showed my client was
10:34:56  20   accessing and using that computer?
10:34:58  21   A.   There were letters signed by your client.
10:35:01  22   Q.   That were -- there were letters signed by them that were
10:35:06  23   scanned and saved on the computer?
10:35:08  24   A.   In my opinion, they were typed on Word and then, signed
10:35:10  25   after they were printed.
```

10:35:11  1    Q.    Okay.  Someone else could have typed up those letters and my

10:35:16  2    client signs them afterwards; is that right?

10:35:17  3    A.    Could have.

10:35:18  4    Q.    So that doesn't necessarily mean that my client is the one

10:35:20  5    typing the letters, right?

10:35:22  6    A.    I wouldn't know that.

10:35:23  7    Q.    Is there anything -- is there anything that you can tell

10:35:27  8    this court regarding your work with Special Agent Cox that could

10:35:31  9    show that my client took some action to use any of these

10:35:38  10   computers?

10:35:40  11   A.    I did not see him typing on the computer.

10:35:42  12   Q.    Okay.  Is there anything that you can see accessed in the

10:35:46  13   computer itself in terms of passwords, in terms of user IDs, in

10:35:51  14   terms of logins, that would show that he's the only one using

10:35:55  15   this computer?

10:35:56  16   A.    To show that he's the only one?  No.

10:35:59  17   Q.    There were -- you have to log into these computers, there

10:36:05  18   would be a user name; is that right?

10:36:08  19   A.    I would assume so.  In reviewing the computer, it's not like

10:36:12  20   you log on.  The forensic toolkit that analyzes a computer, it

10:36:19  21   just separates files by type, and then, you go into those

10:36:22  22   categories and look at what files were on that computer.

10:36:25  23   Q.    You heard when Agent Cox was on the stand.  I asked him, in

10:36:29  24   your review of these computers, it appeared that Jessica Huitron

10:36:33  25   was a primary user on a lot of these computers.  Do you remember

| | | |
|---|---|---|
| 10:36:35 | 1 | that? |
| 10:36:36 | 2 | A.   I don't remember the word "primary."  I remember you asking, |
| 10:36:39 | 3 | was she a user on some of these computers. |
| 10:36:41 | 4 | Q.   And he responded that she was a user on these computer -- on |
| 10:36:44 | 5 | these computers; is that right? |
| 10:36:45 | 6 | A.   Some of the files were stored with a path.  They indicated |
| 10:36:49 | 7 | she at least was one of the originators setting up that computer. |
| 10:36:52 | 8 | Q.   Okay.  I'm just going to focus on these flagged ones. |
| 10:37:00 | 9 | A.   Okay. |
| 10:37:00 | 10 | Q.   Starting with 364ATXV.  For the record, that's a picture of |
| 10:37:07 | 11 | some bundles of marihuana; is that correct? |
| 10:37:10 | 12 | A.   That's correct. |
| 10:37:11 | 13 | Q.   And can you tell us where on the computers those were found? |
| 10:37:15 | 14 | A.   That was in carved space, which Cox testified what carved |
| 10:37:20 | 15 | space is. |
| 10:37:20 | 16 | Q.   Okay.  Remind the Court, again, what carved space is. |
| 10:37:23 | 17 | A.   Carved space is kind of like available space not being used |
| 10:37:27 | 18 | by the computer when you delete something or when -- it could |
| 10:37:31 | 19 | come from a variety of ways where you mainly didn't intend to |
| 10:37:34 | 20 | save it, and a computer keeps it in these little fragments until |
| 10:37:39 | 21 | it needs that space for something else. |
| 10:37:41 | 22 | Q.   Okay.  So there's no way to identify who accessed this |
| 10:37:43 | 23 | particular image; is that correct? |
| 10:37:44 | 24 | A.   Exactly on the carved file, you can't tell. |
| 10:37:48 | 25 | Q.   Going to -- |

| | | |
|---|---|---|
| 10:37:49 | 1 | THE COURT:  What was that number?  364 what? |
| 10:37:52 | 2 | MR. MAYR:  ATXV, as in Victor. |
| 10:37:55 | 3 | THE COURT:  ATX? |
| 10:37:57 | 4 | MR. MAYR:  Yes. |
| 10:37:58 | 5 | THE COURT:  V. |
| 10:38:00 | 6 | MR. MAYR:  These are all 364ATX, your Honor. |
| 10:38:03 | 7 | THE COURT:  I know that. |
| 10:38:05 | 8 | Q.  (BY MR. MAYR) Going to 364ATXW, this is a Hecho en -- an |
| 10:38:12 | 9 | image that shows Hecho en what appears to be the top of a |
| 10:38:16 | 10 | marihuana leaf, right? |
| 10:38:16 | 11 | A.  That's right. |
| 10:38:17 | 12 | Q.  Where was that located? |
| 10:38:20 | 13 | A.  That was carved, as well. |
| 10:38:21 | 14 | Q.  So there would be no way to determine what individual |
| 10:38:25 | 15 | accessed this image, correct? |
| 10:38:26 | 16 | A.  No.  Just someone accessed it. |
| 10:38:28 | 17 | Q.  Okay.  Same thing with 364ATXX, for the record, are pictures |
| 10:38:35 | 18 | of bundles of cash? |
| 10:38:36 | 19 | A.  Carved. |
| 10:38:38 | 20 | Q.  No way to determine how this was accessed? |
| 10:38:41 | 21 | A.  No. |
| 10:38:42 | 22 | Q.  364ATXZ, also pictures of bundles of cash? |
| 10:38:48 | 23 | A.  I could save you some time.  Z through FF is carved. |
| 10:38:51 | 24 | Q.  Okay.  So no way to determine which user accessed these |
| 10:38:55 | 25 | images? |

10:38:56  1   A.    No.  Just that it was accessed by.

10:39:01  2   Q.    And, again, other than seeing some letters that were

10:39:03  3   ultimately signed by my client, you didn't see anything else in

10:39:06  4   any of these computers to show that where the computers could

10:39:11  5   definitively say that my client accessed these images?

10:39:15  6   A.    Could show me definitively there were different files on

10:39:20  7   there referencing your client, but who knows.

10:39:22  8   Q.    Who knows.  Okay.

10:39:23  9          MR. MAYR:  Judge, with that I'll renew my objection

10:39:25  10  under 403.  I'd also cite this court and for the purposes of the

10:39:28  11  record to the United States vs. Moreland, decision by the Fifth

10:39:33  12  Circuit.  It's 665 F. 3d 137.  It's an opinion from December of

10:39:40  13  2011.  And the relevance of this opinion, Judge, is it was a

10:39:44  14  child pornography case where images were searched in the exact

10:39:48  15  same manner that they were searched in this case, and was

10:39:51  16  presented to the jury in the same way that the government intends

10:39:54  17  to present the case.

10:39:56  18         And in that case, the Fifth Circuit reversed and

10:40:00  19  vacated the conviction for known possession of -- knowing

10:40:04  20  possession of child pornography because there wasn't -- the court

10:40:07  21  found that this ambiguous of where it came from or who accessed

10:40:13  22  it when multiple individuals have access to the computer is

10:40:16  23  insufficient to prove either actual or constructive knowledge.

10:40:20  24         Now, it's my understanding that the government intends

10:40:22  25  to offer these to show that our clients were knowing participants

| | | |
|---|---|---|
| 10:40:27 | 1 | in this Zeta conspiracy.  And without being able to establish |
| 10:40:31 | 2 | that, it's my position that under 403 that the prejudicial value |
| 10:40:35 | 3 | of these images far outweighs any probative value and, therefore, |
| 10:40:40 | 4 | should be excluded. |
| 10:40:40 | 5 | THE COURT:  Well, your statements in cross-examination |
| 10:40:43 | 6 | have all been that this is a legitimate business and that these |
| 10:40:47 | 7 | are the legitimate business records.  And I'm quite familiar with |
| 10:40:52 | 8 | Fifth Circuit law, and I overrule all objections. |
| 10:40:55 | 9 | MR. MAYR:  Thank you, your Honor. |
| 10:40:57 | 10 | THE COURT:  All right.  Bring the jury in.  And for the |
| 10:41:03 | 11 | record, the undisputed evidence is that these records were taken |
| 10:41:06 | 12 | from the possession of these defendants and their business and in |
| 10:41:10 | 13 | their home. |
| 10:41:18 | 14 | MR. ESPER:  Your Honor, for purpose of the record, I |
| 10:41:52 | 15 | don't know if it was clear, but I did object on behalf of |
| 10:41:54 | 16 | defendant -- |
| 10:41:54 | 17 | THE COURT:  Did you have any additional objection? |
| 10:41:56 | 18 | MR. ESPER:  No, your Honor.  I just wanted the record |
| 10:41:58 | 19 | to reflect -- |
| 10:41:58 | 20 | THE COURT:  The record will reflect you made identical |
| 10:42:00 | 21 | objections and I overrule them. |
| 10:42:02 | 22 | MR. ESPER:  Thank you, your Honor. |
| 10:42:03 | 23 | THE COURT:  For the same reasons. |
| 10:42:51 | 24 | (Jury present.) |
| 10:42:53 | 25 | THE COURT:  Government's Exhibit 364A and B through RR |

| | | |
|---|---|---|
| 10:42:59 | 1 | are admitted. |
| 10:43:01 | 2 | DIRECT EXAMINATION (Resumed) |
| 10:43:01 | 3 | BY MR. GARDNER: |
| 10:43:03 | 4 | Q.   May I proceed, your Honor? |
| 10:43:12 | 5 | Again, Special Agent Lawson, where were these computers |
| 10:43:20 | 6 | seized from? |
| 10:43:22 | 7 | A.   Huitron Homes on Highway 183. |
| 10:43:25 | 8 | Q.   And do these documents reflect and pictures reflect seizures |
| 10:43:32 | 9 | for multiple computers or evaluations from multiple computers at |
| 10:43:35 | 10 | that location? |
| 10:43:36 | 11 | A.   Yes, sir.  I believe it was three computers that we analyzed |
| 10:43:39 | 12 | from -- we analyzed more than three, but I selected documents |
| 10:43:43 | 13 | from three. |
| 10:43:44 | 14 | Q.   And I'm just going to start with H, Austin, Texas H364. |
| 10:43:52 | 15 | What is this document, sir? |
| 10:43:55 | 16 | A.   It appears to be the medical bill of Eusevio Huitron when he |
| 10:44:01 | 17 | broke his leg. |
| 10:44:03 | 18 | Q.   Again, for the jury, where did he break his leg? |
| 10:44:05 | 19 | A.   In Alamogordo, New Mexico, at the training facility, |
| 10:44:09 | 20 | Fernando Garcia's. |
| 10:44:09 | 21 | Q.   And did you see that particular bill located in another |
| 10:44:13 | 22 | document? |
| 10:44:14 | 23 | A.   It was in Fernando Garcia's possession in the -- in his |
| 10:44:20 | 24 | computer. |
| 10:44:25 | 25 | Q.   Again, how was the bill paid? |

10:44:27    1    A.    It says, private pay.

10:44:32    2    Q.    Amount?

10:44:32    3    A.    $24,236.09.

10:44:36    4    Q.    Showing you Austin, Texas N.  Is there a date on this

10:44:55    5    particular document?

10:45:00    6    A.    Not that I see.

10:45:03    7    Q.    Although it doesn't have a signature on it, who was it

10:45:08    8    related to?

10:45:09    9    A.    It's related to Jesus Huitron and "Chevo" Huitron.

10:45:14   10    Q.    Showing you Austin, Texas O, the name on the W-9?

10:45:24   11    A.    Jesus Huitron.

10:45:26   12    Q.    And the signature?

10:45:28   13    A.    Yes, sir.  9-14-10.

10:45:32   14    Q.    And does this indicate at least some document on that

10:45:36   15    computer related to a Jesus Huitron?

10:45:41   16    A.    That's correct.

10:45:42   17    Q.    Showing you P.  Is this similar to the documents that have

10:45:50   18    been seized from the Huitron Homes location on Highway 183?

10:45:54   19    A.    It is.

10:45:55   20    Q.    This is a picture of Austin, Texas R.  Who is in that photo?

10:46:10   21    A.    "Chevo" Huitron.

10:46:12   22    Q.    And, again, what was your purpose in taking or identifying

10:46:15   23    this photograph?

10:46:16   24    A.    To show that "Chevo" Huitron was related to that computer.

10:46:21   25    Q.    And Exhibit S?

| | | |
|---|---|---|
| 10:46:23 | 1 | A.   "Chevo" Huitron. |
| 10:46:26 | 2 | Q.   And Exhibit T? |
| 10:46:28 | 3 | A.   That's the trainer belt buckle from Tempting Dash. |
| 10:46:34 | 4 | Q.   And Exhibit U? |
| 10:46:37 | 5 | A.   It's a picture of Mr. Piloto and Esgar Ramirez. |
| 10:46:42 | 6 | Q.   Did Eusevio Huitron have any connection with the training or |
| 10:46:46 | 7 | racing of Mr. Piloto to your knowledge? |
| 10:46:48 | 8 | A.   No. |
| 10:46:51 | 9 | Q.   Government's Exhibit B, what does that appear to be? |
| 10:47:00 | 10 | A.   Soldiers and bundles of marihuana. |
| 10:47:05 | 11 | Q.   Government's Exhibit X? |
| 10:47:09 | 12 | A.   Banded cash. |
| 10:47:15 | 13 | Q.   Can you see that from up there, Special Agent? |
| 10:47:21 | 14 | A.   I believe that's Jesus Huitron. |
| 10:47:26 | 15 | Q.   And Government's Exhibit AA? |
| 10:47:32 | 16 | A.   Another picture of cash spread out. |
| 10:47:42 | 17 | Q.   And Government's Exhibit BB.  Is that the same photo from a |
| 10:47:45 | 18 | website? |
| 10:47:46 | 19 | A.   It is. |
| 10:47:49 | 20 | Q.   I believe Mr. Mayr showed this yesterday, Government's |
| 10:47:54 | 21 | Exhibit CC.  Who are those individuals? |
| 10:47:59 | 22 | A.   That's Sergio Rincon and Jessica Huitron. |
| 10:48:02 | 23 | Q.   And Government's Exhibit DD? |
| 10:48:06 | 24 | A.   That's Carlos Nayen. |
| 10:48:08 | 25 | Q.   Do you know who the small boy is? |

| | | |
|---|---|---|
| 10:48:10 | 1 | A.   I do not. |
| 10:48:12 | 2 | Q.   And Government's Exhibit FF? |
| 10:48:16 | 3 | A.   It's Carlos Nayen in front of snow. |
| 10:48:21 | 4 | Q.   Do you know the location? |
| 10:48:24 | 5 | A.   I would be guessing if I give a location of that. |
| 10:48:28 | 6 | Q.   I want to show you just for reference Government's Exhibit |
| 10:48:31 | 7 | 358D, an e-mail from Fernando Garcia, Fernie004 to Anri2319, |
| 10:48:49 | 8 | dated March 29, 2012.  Just for the record, what does that |
| 10:48:59 | 9 | translation state? |
| 10:48:59 | 10 | A.   It says, bill for "Chevo's" surgery. |
| 10:49:03 | 11 | Q.   And is this the same document located in the Eusevio Huitron |
| 10:49:08 | 12 | computers? |
| 10:49:08 | 13 | A.   It is. |
| 10:49:10 | 14 | Q.   Government's Exhibit HH.  What is this, sir? |
| 10:49:27 | 15 | A.   It's a FinCEN form that describes what a CTR is, Currency |
| 10:49:34 | 16 | Transaction Report. |
| 10:49:34 | 17 | Q.   And what else does the form go on to describe? |
| 10:49:40 | 18 | A.   Well, it describes how a CTR is filed by depositing more |
| 10:49:44 | 19 | than $10,000.  And you'd have to zoom out. |
| 10:49:50 | 20 | Q.   Thank you.  Austin, Texas II, can you list the -- what is |
| 10:49:59 | 21 | this document, sir? |
| 10:50:00 | 22 | A.   It's a Certificate of Corporate Resolution. |
| 10:50:02 | 23 | Q.   And who's listed as the president of Huitron Homes? |
| 10:50:06 | 24 | A.   Eusevio Huitron. |
| 10:50:07 | 25 | Q.   And the secretary of Huitron Homes? |

| | | |
|---|---|---|
| 10:50:09 | 1 | A.    Jesus Huitron. |
| 10:50:10 | 2 | Q.    Showing you JJ.  Is this another Certificate of Corporate |
| 10:50:16 | 3 | Resolution? |
| 10:50:16 | 4 | A.    It is. |
| 10:50:16 | 5 | Q.    What's the date on that? |
| 10:50:17 | 6 | A.    January 20, 2011. |
| 10:50:20 | 7 | Q.    And who does it identify as the president of Huitron Homes? |
| 10:50:23 | 8 | A.    Eusevio Huitron. |
| 10:50:25 | 9 | Q.    And who is it signed by at the bottom? |
| 10:50:30 | 10 | A.    President signed by what I believe is Eusevio's signature |
| 10:50:35 | 11 | and then, the secretary of Jesus Huitron. |
| 10:50:37 | 12 | Q.    And Isabel Huitron, the other brother? |
| 10:50:40 | 13 | A.    Yeah.  As treasurer. |
| 10:50:41 | 14 | Q.    Showing you KK.  Is that a tax return form for Huitron |
| 10:50:50 | 15 | Homes? |
| 10:50:50 | 16 | A.    It appears to be.  Yes, sir. |
| 10:50:52 | 17 | Q.    For what year, sir? |
| 10:50:54 | 18 | A.    2010. |
| 10:50:57 | 19 | Q.    And who is it signed by and in what capacity does he |
| 10:51:02 | 20 | represent himself? |
| 10:51:02 | 21 | A.    Jesus Huitron, signed March 28, 2011, as president. |
| 10:51:10 | 22 | Q.    Austin, Texas PP.  For the record, sir, what is that? |
| 10:51:31 | 23 | A.    That's a picture of a "Z" commonly associated with Los |
| 10:51:35 | 24 | Zetas. |
| 10:51:35 | 25 | Q.    QQ? |

| | | |
|---|---|---|
| 10:51:36 | 1 | A.   The same. |
| 10:51:37 | 2 | Q.   And why is it all pixilated? |
| 10:51:40 | 3 | A.   Because it was a small picture and we made it bigger, it |
| 10:51:43 | 4 | lost its detail. |
| 10:51:45 | 5 | Q.   And RR, is that the same file that was previously shown or a |
| 10:51:50 | 6 | separate file? |
| 10:51:51 | 7 | A.   It's a separate file, it appeared. |
| 10:51:55 | 8 | Q.   Now, do you recall the testimony of Special Agent Johnston |
| 10:52:22 | 9 | regarding e-mails? |
| 10:52:23 | 10 | A.   I do. |
| 10:52:23 | 11 | Q.   I believe Mr. Mayr asked some questions whether Huitrons had |
| 10:52:27 | 12 | an e-mail account? |
| 10:52:27 | 13 | A.   He did. |
| 10:52:28 | 14 | Q.   And did you discover an e-mail account in your review of the |
| 10:52:31 | 15 | e-mails? |
| 10:52:32 | 16 | A.   I did. |
| 10:52:32 | 17 | Q.   Showing you Government's Exhibit 358G.  The Anri2319 Hotmail |
| 10:52:38 | 18 | account? |
| 10:52:38 | 19 | A.   Yes, sir. |
| 10:52:39 | 20 | Q.   Who is that associated with? |
| 10:52:40 | 21 | A.   Victor Lopez. |
| 10:52:41 | 22 | Q.   Showing you an e-mail, dated October 19, 2011.  Who is that |
| 10:52:49 | 23 | from, sir? |
| 10:52:50 | 24 | A.   It is from huitronracing@yahoo.com. |
| 10:52:55 | 25 | Q.   And who is it to? |

74

| | | |
|---|---|---|
| 10:52:57 | 1 | A.    Anri2319@hotmail. |
| 10:53:00 | 2 | Q.    And I'm showing you Government's Exhibit 71, taken by |
| 10:53:06 | 3 | stipulation from Huitron Homes, the yellow legal pad.  Is that |
| 10:53:13 | 4 | the same e-mail address there at the bottom of the page? |
| 10:53:16 | 5 | A.    It is. |
| 10:53:20 | 6 | Q.    Now, there's a number of these e-mails from Huitron Racing, |
| 10:53:23 | 7 | is there not? |
| 10:53:24 | 8 | A.    There is. |
| 10:53:28 | 9 | Q.    Do they generally contain these billing statements? |
| 10:53:31 | 10 | A.    It does. |
| 10:53:32 | 11 | Q.    And were these the billing statements located in the folder |
| 10:53:36 | 12 | that had Fernando Garcia on it, Government's Exhibit 65B? |
| 10:53:40 | 13 | A.    Yes.  He sent -- to Anri, he sent billing statements for |
| 10:53:45 | 14 | Fast And Furious, Carmina, Garcia Bloodstock.  He sent all of |
| 10:53:49 | 15 | these members, front companies to Anri2319.  In fact, one bill is |
| 10:54:02 | 16 | made out to three of them on one bill. |
| 10:54:05 | 17 | Q.    And there's a number of these and they're all dated the same |
| 10:54:08 | 18 | date, correct? |
| 10:54:09 | 19 | A.    That's correct. |
| 10:54:10 | 20 | Q.    Desiree Princess Ranch? |
| 10:54:13 | 21 | A.    If you'll go one more.  That's the one I was speaking of. |
| 10:54:19 | 22 | Q.    All sent the same day to that e-mail address.  And, again, |
| 10:54:23 | 23 | who's that e-mail address associated with? |
| 10:54:27 | 24 | A.    Victor Lopez. |
| 10:54:36 | 25 | Q.    Speaking of e-mails, Special Agent Lawson, do you recall the |

| | | |
|---|---|---|
| 10:54:40 | 1 | testimony of Hector Moreno? |
| 10:54:42 | 2 | A.   I do. |
| 10:54:43 | 3 | Q.   I'm showing you Government's Exhibit 303.  Where did this |
| 10:54:48 | 4 | document come from? |
| 10:54:49 | 5 | A.   When Hector Moreno crossed from Mexico to the United States, |
| 10:54:55 | 6 | he brought this document with him. |
| 10:54:56 | 7 | Q.   And, again, what does this document reflect? |
| 10:54:57 | 8 | A.   It was a monthly fees of related to the horse operation. |
| 10:55:05 | 9 | Q.   And I'm showing you an exhibit from Government's Exhibit |
| 10:55:09 | 10 | 358E, horses.quarter.racing@hotmail.  Who is that e-mail account |
| 10:55:14 | 11 | associated with? |
| 10:55:15 | 12 | A.   "Yo Yo," or Ricardo Cabrera. |
| 10:55:20 | 13 | Q.   I'm showing you an e-mail from November 9, 2011, 11:59 p.m. |
| 10:55:32 | 14 | What's the date listed at the top of the sheet that Mr. Moreno |
| 10:55:37 | 15 | brought? |
| 10:55:38 | 16 | A.   December -- I'm not sure what the 1RO means. |
| 10:55:45 | 17 | Q.   Showing you the attachment on the horses.quarter e-mail. |
| 10:55:49 | 18 | What's the date on top of that? |
| 10:55:51 | 19 | A.   29th of October 2011. |
| 10:55:54 | 20 | Q.   If I put them side-by-side, they're a little different. |
| 10:56:00 | 21 | Who's generally considered "Fer" in this investigation? |
| 10:56:04 | 22 | A.   Fernando Garcia. |
| 10:56:05 | 23 | Q.   "Saltillo"? |
| 10:56:05 | 24 | A.   Sergio Rincon. |
| 10:56:06 | 25 | Q.   And "Chevo"? |

| | | |
|---|---|---|
| 10:56:07 | 1 | A.    Eusevio Huitron. |
| 10:56:12 | 2 | Q.    What I want to note is, how do they spell Tyler Graham on |
| 10:56:18 | 3 | the Hector Moreno exhibit? |
| 10:56:19 | 4 | A.    It's spelled incorrectly, but it was spelled, T-Y-L-O-R. |
| 10:56:24 | 5 | Q.    And how do they spell Tyler on the 358E exhibit? |
| 10:56:30 | 6 | A.    T-Y-L-O-R. |
| 10:56:33 | 7 | Q.    And on the 358 horses.quarter, how do they spell Paul Jones? |
| 10:56:38 | 8 | A.    They always spelled Jones incorrectly, as well, J-O-N-H. |
| 10:56:42 | 9 | Q.    And on this, how is Jones spelled? |
| 10:56:48 | 10 | A.    J-O-N-H. |
| 10:56:52 | 11 | Q.    And are the expenses on the exhibit provided by Mr. Moreno |
| 10:56:56 | 12 | generally the same type as the expenses on the exhibit in the |
| 10:57:00 | 13 | e-mail address? |
| 10:57:02 | 14 | A.    Yes.  Can you remind me who that e-mail was to? |
| 10:57:05 | 15 | Q.    E-mail is to horses.quarter.racing@hotmail? |
| 10:57:09 | 16 | A.    From who? |
| 10:57:12 | 17 | Q.    Just from Javier Lopez. |
| 10:57:14 | 18 | A.    Okay. |
| 10:57:30 | 19 | Q.    Special Agent Lawson, in preparation for your testimony, did |
| 10:57:32 | 20 | you prepare a number of exhibits? |
| 10:57:34 | 21 | A.    I did. |
| 10:57:34 | 22 | Q.    I want to show you Government's Exhibit 424.  What documents |
| 10:57:39 | 23 | are in here, sir? |
| 10:57:40 | 24 | A.    This is a small sampling of horses that had their names |
| 10:57:45 | 25 | changed after members of this group bought the horses. |

10:57:49  1  Q.   And all the documents contained within that exhibit, are

10:57:51  2  they copies of documents previously admitted in the trial?

10:57:56  3  A.   Yes.  Most are from the American Quarter Horse Association.

10:58:00  4  There's a few that are bills sent to members of the organization.

10:58:04  5  Q.   I'm showing you Government's Exhibit 425.  What is that

10:58:09  6  book, sir?

10:58:11  7  A.   In the investigation, we found several horses that were

10:58:15  8  transferred to Jose Trevino just before they had a chance to win

10:58:18  9  a lot of money, after a qualifying race, before a futurity.  So

10:58:24  10  this is eight horses that were owned by front members of the

10:58:31  11  organization and transferred to Jose Trevino just before a race.

10:58:34  12  And all of these had their paperwork backdated to make it look

10:58:39  13  like Jose had bought it before --

10:58:39  14       MS. WILLIAMS:  Objection, your Honor.  Objection, your

10:58:41  15  Honor.  That's outside the record.

10:58:46  16       THE COURT:  The objection of -- is sustained from the

10:58:51  17  standpoint that he's not responding to the question.  Just

10:58:55  18  respond to the questions.

10:58:56  19       MS. WILLIAMS:  I'd ask that the jury be instructed to

10:58:58  20  not consider that answer.

10:58:59  21       THE COURT:  Well, all right.  You're going to have to

10:59:02  22  repeat your question.  The last answer, do not consider for any

10:59:04  23  purpose and I'll let.

10:59:09  24  Q.   (BY MR. GARDNER) Where do the documents come from?

10:59:11  25  A.   These come from the American Quarter Horse Association

| | | |
|---|---|---|
| 10:59:16 | 1 | mainly and bank records. |
| 10:59:17 | 2 | Q.   And are these all records that have been previously |
| 10:59:20 | 3 | introduced in this case? |
| 10:59:20 | 4 | A.   That is correct. |
| 10:59:22 | 5 | Q.   Your Honor, I'd offer Government's Exhibit 424 and 425. |
| 10:59:30 | 6 | MR. WOMACK:  No objection. |
| 11:00:17 | 7 | MR. DEGEURIN:  No objection, your Honor. |
| 11:00:18 | 8 | THE COURT:  All right.  424 and 425 are admitted. |
| 11:00:24 | 9 | Q.   (BY MR. GARDNER) Showing you the cover of 424.  And on the |
| 11:00:31 | 10 | inside, you have them identified by tab and the horse's name, |
| 11:00:35 | 11 | correct? |
| 11:00:35 | 12 | A.   That's correct. |
| 11:00:36 | 13 | Q.   Is this the current horse's name or the original horse's |
| 11:00:39 | 14 | name? |
| 11:00:39 | 15 | A.   This is the current horse's name. |
| 11:00:41 | 16 | Q.   All right.  So I would like to go through these real quick. |
| 11:00:46 | 17 | Forty Force.  Could you tell the jury what the original |
| 11:00:49 | 18 | name of that horse was? |
| 11:00:51 | 19 | A.   One Proud Feature. |
| 11:00:54 | 20 | Q.   Now, the jury's heard testimony that a lot of the names are |
| 11:00:57 | 21 | contained within the bloodlines of the horse.  Do you see Forty |
| 11:01:02 | 22 | Force contained within the bloodlines previously known as One |
| 11:01:07 | 23 | Proud Feature? |
| 11:01:07 | 24 | A.   No, sir.  The parents of Forty Force were Feature Mr. Jess |
| 11:01:11 | 25 | and Proud Little Lady. |

11:01:13   1   Q.   And who owned that horse when it was originally named One

11:01:19   2   Proud Feature?

11:01:21   3   A.   Ramiro Villarreal.

11:01:23   4   Q.   And who changed the name to that horse?

11:01:41   5   A.   It was still One Proud Feature when it was transferred to

11:01:45   6   Tremor Enterprises, so it was changed by Tremor Enterprises.

11:01:47   7   Q.   And Juanita Mi Amor, we already covered.  How about Mi

11:01:52   8   Pequeno Amor?  What was the original name of that?

11:01:54   9   A.   Too Tempting.

11:01:56   10   Q.   And who changed -- or what organization did it belong to

11:01:59   11   when the name was changed?

11:02:06   12   A.   It was sold to Colorado-Cessa and then, the e-mail from

11:02:14   13   Fernando Garcia noting the name change.

11:02:18   14   Q.   Mr. Jess XL, we've already talked about that.  What's XL in

11:02:24   15   Roman numerals?

11:02:25   16   A.   Forty.

11:02:26   17   Q.   And that was also a name change?

11:02:27   18   A.   That's correct.

11:02:28   19   Q.   Let's talk about Tamaulipas Boy.  What was the original name

11:02:31   20   of that horse?

11:02:31   21   A.   One Famous Patriot.

11:02:35   22   Q.   And who was the listed owner of that horse when the name was

11:02:41   23   changed?

11:02:55   24   A.   I'm not certain at the exact time the name was changed.  It

11:03:10   25   was in "Pancho" Colorado was paid for.  It was sometime after

11:03:14  1  that.

11:03:14  2  Q.   And Tamaulipas, what is Tamaulipas to your knowledge?

11:03:18  3  A.   That's the state where Miguel Trevino is from.

11:03:21  4  Q.   Number One Cartel, what was the previous name on Number One

11:03:27  5  Cartel?

11:03:30  6  A.   Racing Down a Dream.

11:03:33  7  Q.   And whose horse was this when the name was changed?

11:03:38  8  A.   Fernando Garcia.

11:03:38  9  Q.   Now, to be fair to Mr. Garcia, part of the bloodline is

11:03:42  10  Corona Cartel, correct?

11:03:43  11  A.   That's correct.

11:03:44  12  Q.   Is there any Number One in the bloodline?

11:03:47  13  A.   No, sir.

11:03:50  14  Q.   And lastly, Viva Mexico.  What was the original name of that

11:03:55  15  horse?

11:03:55  16  A.   La Toscana.

11:04:03  17  Q.   And who changed the name of that horse or who's the owner?

11:04:16  18  A.   Sometimes it's hard to tell who actually changed it.  It was

11:04:20  19  after it was sold.  Santa Fe Roldan, I believe.

11:04:29  20  Q.   Now, one horse that we didn't include in there that came up

11:04:32  21  late was a horse called Mirietta Cartel.  Are you familiar with

11:04:35  22  that horse?

11:04:36  23  A.   I am.

11:04:36  24  Q.   Was that also a name change?

11:04:37  25  A.   It was.

11:04:38  1   Q.   Is that a horse in Francisco Colorado's name?

11:04:41  2   A.   That's correct.

11:04:41  3   Q.   And where did you locate in another place the name Mirietta?

11:04:46  4   A.   It was the name of the female that "Pancho" Colorado had his

11:04:52  5   arm around as he boarded the jet in the jet picture.

11:04:55  6   Q.   Showing you Government's Exhibit 425.  It says, horses that

11:05:01  7   changed ownership between qualifier and futurity.

11:05:04  8        Okay.  We've seen many of these horses, right?

11:05:08  9   Tempting Dash, Mr. Piloto, Feature Honor, Fly First Down, Eye on

11:05:15  10  Corona, Mr. Ease Cartel, Separate Fire and Big Daddy Cartel.

11:05:20  11  A.   Yes.

11:05:21  12  Q.   Now, without going through all of these, could you generally

11:05:29  13  tell the jury what you mean by horses that changed between the

11:05:33  14  qualifier and the finals?

11:05:36  15  A.   Yes.  These horses in this book predominantly --

11:05:43  16        MS. WILLIAMS:  Your Honor, I object to this question in

11:05:45  17  that it calls for a narrative.

11:05:48  18        THE COURT:  Ask specific questions.

11:05:50  19  Q.   (BY MR. GARDNER) Let's go by horse.  Tempting Dash.

11:05:57  20  A.   Yes.

11:05:57  21  Q.   Who was the owner and to whom did it get transferred to?

11:06:01  22  A.   The owner was Ramiro Villarreal and it was transferred to

11:06:05  23  Jose Trevino.

11:06:08  24  Q.   And when was the date of the transfer?

11:06:18  25  A.   Would you like the date that they put on the paperwork or

11:06:21   1   the date AQHA received it?

11:06:23   2   Q.   Start with the date that they put on the paperwork.   When

11:06:27   3   you're referring to "they," who are you referring to?

11:06:29   4   A.   In this case, Jose Trevino and Ramiro Villarreal.

11:06:34   5   Q.   What was that date?

11:06:36   6   A.   They put on the paperwork that the horse was sold on

11:06:41   7   September 22nd, 2009.

11:06:44   8   Q.   And can you relate that date to the date we saw on the Dash

11:06:49   9   For Cash futurity with Ramiro Villarreal?

11:06:51  10   A.   Yes, sir.   Still in October 24, 2009, he was running under

11:06:56  11   Ramiro Villarreal.

11:06:57  12   Q.   And so, what was the date that that paperwork was received

11:07:00  13   at AQHA?

11:07:03  14   A.   This transfer date is September 22nd, did not get to AQHA

11:07:08  15   until November 18th, 2009.

11:07:10  16   Q.   Was that before the Texas Classic?

11:07:12  17   A.   Before the Texas Classic.

11:07:14  18   Q.   Now, the next horse, Feature Honor, did you see a similar

11:07:17  19   set of transactions in that horse?

11:07:19  20   A.   I did.

11:07:21  21   Q.   Let's talk about Mr. Piloto.   Do you recall in Mr. Womack's

11:07:28  22   opening where he mentioned that his client met Jose Trevino

11:07:33  23   between the qualifier and the finals?

11:07:36  24   A.   I do.

11:07:38  25   Q.   Do you recall Mr. Womack's question that Mr. Piloto was a

| | | |
|---|---|---|
| 11:07:44 | 1 | poor-performing horse in Mexico that he bought cheap? |
| 11:07:48 | 2 | A.   I do. |
| 11:07:50 | 3 | Q.   Do you recall Mr. Womack asking the question about who |
| 11:07:55 | 4 | Fernando Garcia bought that horse from? |
| 11:07:57 | 5 | A.   I don't believe he asked who he brought the horse from. |
| 11:07:59 | 6 | Q.   Who did Fernando Garcia buy Mr. Piloto from, according to |
| 11:08:02 | 7 | AQHA records? |
| 11:08:03 | 8 | A.   Ramiro Villarreal. |
| 11:08:06 | 9 | Q.   Mr. Piloto, what is the date of the transfer when it was |
| 11:08:18 | 10 | received at AQHA? |
| 11:08:21 | 11 | A.   It was received by AQHA September 5th, 2010, one day before |
| 11:08:28 | 12 | the All American Finals. |
| 11:08:29 | 13 | Q.   Consistent with the testimony or the questions Mr. Womack |
| 11:08:33 | 14 | has been asking, correct? |
| 11:08:34 | 15 | A.   That is correct. |
| 11:08:35 | 16 | Q.   Showing you Government's Exhibit 140, taken by stipulation |
| 11:08:38 | 17 | from Fernando Garcia in New Mexico.  Do you recognize that |
| 11:08:43 | 18 | exhibit? |
| 11:08:43 | 19 | A.   I do. |
| 11:08:43 | 20 | Q.   What is Government's Exhibit 140? |
| 11:08:50 | 21 | A.   It's a notarized sale agreement between Jose Trevino and |
| 11:08:55 | 22 | Fernando Garcia of the sale of horse Mr. Piloto. |
| 11:09:01 | 23 | Q.   And what is the date of that notarized sale? |
| 11:09:05 | 24 | A.   July 10, right before the All American trials. |
| 11:09:09 | 25 | Q.   And this is a sale between Fernando Garcia and Jose Trevino, |

| | | |
|---|---|---|
| 11:09:13 | 1 | correct? |
| 11:09:14 | 2 | A.    That is correct. |
| 11:09:15 | 3 | Q.    And where is Fernando Garcia from? |
| 11:09:18 | 4 | A.    He lists his home address in Arizona. |
| 11:09:21 | 5 | Q.    And where at this time was Jose Trevino from? |
| 11:09:23 | 6 | A.    Mesquite, Texas. |
| 11:09:25 | 7 | Q.    Is that in the Dallas area? |
| 11:09:27 | 8 | A.    That is. |
| 11:09:28 | 9 | Q.    Sir, if you will, who is the notary on this particular |
| 11:09:32 | 10 | document? |
| 11:09:33 | 11 | A.    This is Jessica Huitron. |
| 11:09:35 | 12 | Q.    And where does Jessica Huitron live? |
| 11:09:37 | 13 | A.    In Austin, Texas. |
| 11:09:45 | 14 | Q.    Sir, to certify this document, both Mr. Trevino and Mr. |
| 11:09:52 | 15 | Garcia would have had to travel to Austin, Texas? |
| 11:09:55 | 16 | A.    Yes.  And Mr. Garcia was working in New Mexico at the time. |
| 11:10:00 | 17 | Q.    Slowing you the second page or second document in that |
| 11:10:05 | 18 | exhibit.  What's the date on that one? |
| 11:10:08 | 19 | A.    September 20, 2010. |
| 11:10:10 | 20 | Q.    And for what horse is this related to? |
| 11:10:13 | 21 | A.    Number One Cartel. |
| 11:10:19 | 22 | Q.    In September '10, how long after the All American was that |
| 11:10:24 | 23 | date? |
| 11:10:25 | 24 | A.    The finals, that was four days afterwards. |
| 11:10:28 | 25 | Q.    And who's the notary on this one again? |

| | | |
|---|---|---|
| 11:10:31 | 1 | A.   That would be Jessica Huitron. |
| 11:10:33 | 2 | Q.   In Austin, Texas? |
| 11:10:34 | 3 | A.   That's correct. |
| 11:10:47 | 4 | MR. WOMACK:  Sorry, what was the number of that last |
| 11:10:50 | 5 | exhibit of Number One Cartel? |
| 11:10:51 | 6 | MS. FERNALD:  140. |
| 11:10:53 | 7 | MR. WOMACK:  Thank you. |
| 11:10:55 | 8 | Q.   (BY MR. GARDNER) Special Agent, with respect to the Fly |
| 11:11:00 | 9 | First Down, Big Daddy Cartel, Eye on Corona, Mr. Ease Cartel and |
| 11:11:06 | 10 | Separate Fire, did you notice the same type of activity as you |
| 11:11:09 | 11 | did with the other two horses we previously discussed? |
| 11:11:11 | 12 | A.   Yes, sir.  Separate Fire was a little bit different. |
| 11:11:14 | 13 | MS. WILLIAMS:  Objection.  Nonresponsive. |
| 11:11:17 | 14 | THE COURT:  Sorry, Ms. Williams, I couldn't hear you. |
| 11:11:19 | 15 | MS. WILLIAMS:  I'm sorry.  Nonresponsive. |
| 11:11:20 | 16 | THE COURT:  Restate your question. |
| 11:11:22 | 17 | Q.   (BY MR. GARDNER) What was the difference between Separate |
| 11:11:26 | 18 | Fire? |
| 11:11:26 | 19 | A.   Separate Fire was bought at Heritage Place 2010.  No |
| 11:11:40 | 20 | paperwork was sent to AQHA for ownership.  Separate Fire was |
| 11:11:47 | 21 | trained in California, and the bills were sent to Carlos Nayen as |
| 11:11:52 | 22 | he was the owner.  Separate Fire had some of the fastest training |
| 11:11:58 | 23 | times in California.  And before the first race, AQHA received |
| 11:12:04 | 24 | paperwork transferring Separate Fire into Jose Trevino.  AQHA got |
| 11:12:10 | 25 | the paperwork on Separate Fire on April 28th, 2011, and the |

| 11:12:16 | 1 | purchase date shown on the paperwork goes all the way back to the |

11:12:16  1  purchase date shown on the paperwork goes all the way back to the

11:12:19  2  sale September 16th, 2010.

11:12:22  3  Q.   Okay.  Mr. Jose Trevino purchased Separate Fire at that

11:12:25  4  sale?

11:12:25  5  A.   No.  It was purchased by Hector Roldan.

11:12:36  6  Q.   Just covering the horses that we didn't cover.  Covered

11:12:40  7  Tempting Dash, who was originally owned by Ramiro Villarreal,

11:12:43  8  correct?

11:12:43  9  A.   Yes.

11:12:43  10  Q.   Mr. Piloto was owned by Mr. Villarreal, Mr. Garcia, correct?

11:12:47  11  A.   Yes.

11:12:47  12  Q.   Who was Feature Honor owned by prior to transferring to Jose

11:12:51  13  Trevino?

11:12:51  14  A.   Carlos Nayen.

11:13:00  15  Q.   Fly First Down, who was that owned by prior to transfer Mr.

11:13:04  16  Trevino?

11:13:07  17  A.   Francisco Colorado-Cessa.

11:13:10  18  Q.   Big Daddy Cartel, who was the previous owner prior to

11:13:13  19  transfer to Jose Trevino?

11:13:17  20  A.   Poker Ranch.

11:13:18  21  Q.   Eye On Corona, who was the previous owner prior to transfer

11:13:22  22  to Jose Trevino?

11:13:31  23  A.   Armando Cabrera-De la Vega.

11:13:33  24  Q.   Mr. Ease Cartel, who was the prior owner prior to the

11:13:37  25  transfer of Trevino?

| | | |
|---|---|---|
| 11:13:38 | 1 | A.   Bonanza Racing Stables. |
| 11:13:40 | 2 | Q.   You already discussed Separate Fire, correct? |
| 11:13:42 | 3 | A.   That would be correct. |
| 11:13:42 | 4 | Q.   Now, have you participated in the search warrant at Jose |
| 11:13:46 | 5 | Trevino's ranch in Oklahoma? |
| 11:13:47 | 6 | A.   I did. |
| 11:13:48 | 7 | Q.   And with respect to the phones, did you locate any phones in |
| 11:13:52 | 8 | the main building occupied by Jose Trevino? |
| 11:13:55 | 9 | A.   Yes.  I've located several phones in the house that Jose |
| 11:13:59 | 10 | Trevino lived in. |
| 11:14:00 | 11 | Q.   Did you specifically locate any phones in the master bedroom |
| 11:14:03 | 12 | associated with Mr. Jose Trevino? |
| 11:14:05 | 13 | A.   I did. |
| 11:14:05 | 14 | Q.   How many phones did you find in there? |
| 11:14:07 | 15 | A.   In the master bedroom, I believe I found two or three. |
| 11:14:14 | 16 | Q.   And of all those phones you found, was there one of |
| 11:14:19 | 17 | particular significance? |
| 11:14:20 | 18 | A.   It was.  One was a Mexican Blackberry, and it was inside a |
| 11:14:24 | 19 | drawer kind of covered with underwear. |
| 11:14:29 | 20 | Q.   And did you power up that phone? |
| 11:14:30 | 21 | A.   I did. |
| 11:14:31 | 22 | Q.   And do you recall the specific contacts that you saw? |
| 11:14:35 | 23 | A.   There were no contacts on the phone, but it had a Mexican |
| 11:14:38 | 24 | phone number. |
| 11:14:39 | 25 | Q.   Just one in the address book? |

| 11:14:41 | 1 | A.    Yeah. |
| 11:14:45 | 2 | Q.    Now, speaking of race photos, how many race photos do you |
| 11:14:49 | 3 | think you reviewed in this case? |
| 11:14:51 | 4 | A.    Well over 100. |
| 11:14:53 | 5 | Q.    Have you seen Francisco Colorado-Cessa in any one of those |
| 11:14:57 | 6 | race photos? |
| 11:15:00 | 7 | A.    Just one or two in Mexico. |
| 11:15:03 | 8 | Q.    I'm showing you Government's Exhibit 380 for demonstrative |
| 11:15:07 | 9 | purposes.  Do you recognize that, sir? |
| 11:15:11 | 10 | A.    I do. |
| 11:15:11 | 11 | Q.    And what is that a photo of or an exhibit of? |
| 11:15:16 | 12 | A.    It's a map showing where Francisco Silva-Ramos, owner of |
| 11:15:22 | 13 | Bonanza Racing, lives and where Francisco Colorado-Cessa lives. |
| 11:15:24 | 14 | Q.    And where did you obtain the address information for those |
| 11:15:27 | 15 | two locations? |
| 11:15:28 | 16 | A.    Off of business documents obtained either from subpoena or |
| 11:15:32 | 17 | in search warrant. |
| 11:15:33 | 18 | Q.    Your Honor, I offer Government's Exhibit 380 for |
| 11:15:36 | 19 | demonstrative purposes only. |
| 11:15:43 | 20 |        THE COURT:  What was the number again, 3D? |
| 11:15:46 | 21 |        MR. GARDNER:  380, your Honor. |
| 11:16:05 | 22 |        MR. DEGEURIN:  No objection for demonstrative purposes. |
| 11:16:06 | 23 |        THE COURT:  All right.  380 is admitted for |
| 11:16:09 | 24 | demonstrative purposes. |
| 11:16:10 | 25 | Q.    (BY MR. GARDNER) Again, what community is this located? |

| | | |
|---|---|---|
| 11:16:24 | 1 | A.   That's in Tuxpan. |
| 11:16:28 | 2 | Q.   This is Francisco Silva-Ramos.  Could you refresh the jury |
| 11:16:33 | 3 | what business or entity in this investigation he's associated |
| 11:16:35 | 4 | with? |
| 11:16:35 | 5 | A.   Well, he works for ADT, but he owned Bonanza Racing Stables. |
| 11:16:39 | 6 | Q.   And this is the address you obtained from the documents you |
| 11:16:44 | 7 | either subpoenaed or in the search warrant, correct? |
| 11:16:45 | 8 | A.   That's correct. |
| 11:16:46 | 9 | Q.   And where did you obtain Mr. Francisco Colorado-Cessa's |
| 11:16:50 | 10 | information? |
| 11:16:50 | 11 | A.   Off of various records in the searches and subpoenaed |
| 11:16:54 | 12 | documents. |
| 11:16:55 | 13 | Q.   So how far away is Mr. Colorado-Cessa's house from Mr. |
| 11:16:59 | 14 | Silva-Ramos' house? |
| 11:17:00 | 15 | A.   Looks like as you turn the corner, there's only one to two |
| 11:17:04 | 16 | houses between them. |
| 11:17:07 | 17 | Q.   Special Agent Lawson, did you attend the wedding at |
| 11:17:17 | 18 | Alexandra Trevino's in Dallas? |
| 11:17:21 | 19 | A.   I did. |
| 11:17:22 | 20 | Q.   You were not an invited guest? |
| 11:17:23 | 21 | A.   No, sir.  I was not invited to the wedding. |
| 11:17:25 | 22 | Q.   Were you conducting surveillance on that? |
| 11:17:26 | 23 | A.   Yes, sir. |
| 11:17:28 | 24 | Q.   And when you conducted surveillance on that wedding, what |
| 11:17:33 | 25 | band was playing at that wedding? |

| | | |
|---|---|---|
| 11:17:35 | 1 | A.    Banda Recodo. |
| 11:17:36 | 2 | Q.    Do you recall the testimony of Mr. Rejon yesterday? |
| 11:17:40 | 3 | A.    I do. |
| 11:17:40 | 4 | Q.    And how much did he say that band cost? |
| 11:17:43 | 5 | A.    I believe he said -- |
| 11:17:44 | 6 | MS. WILLIAMS:  Objection, your Honor.  I'm sure that |
| 11:17:48 | 7 | they don't mean to mislead this jury, but Mr. Rejon did not |
| 11:17:52 | 8 | testify how much the band cost at the wedding. |
| 11:17:56 | 9 | MR. GARDNER:  That's a good -- I understand that.  I'll |
| 11:17:59 | 10 | rephrase, Judge. |
| 11:18:00 | 11 | Q.    (BY MR. GARDNER) How much did Mr. Rejon say the band cost |
| 11:18:03 | 12 | him? |
| 11:18:05 | 13 | A.    He said when the Zetas listened to them, they paid $250,000 |
| 11:18:10 | 14 | for a couple of hours. |
| 11:18:11 | 15 | Q.    I'm showing you Government's Exhibit 301 at the Adolphus |
| 11:18:16 | 16 | Hotel documents.  Do you see any payment for any bands? |
| 11:18:27 | 17 | A.    I do not. |
| 11:18:28 | 18 | Q.    Did you look through this entire packet to see if there's |
| 11:18:30 | 19 | any receipt for any band payment? |
| 11:18:33 | 20 | A.    That's correct.  I looked at the subpoenaed documents and |
| 11:18:35 | 21 | the quotes that were mailed to the Trevinos. |
| 11:18:39 | 22 | Q.    And during your review of any search warrant material either |
| 11:18:43 | 23 | from Lexington or Dallas, did you see any quotes to or from the |
| 11:18:50 | 24 | Trevinos to this band? |
| 11:18:52 | 25 | A.    No. |

| | | |
|---|---|---|
| 11:18:54 | 1 | Q.   Did you see any estimates to or from the Trevinos to this |
| 11:18:57 | 2 | band? |
| 11:18:57 | 3 | A.   Just on feeding the band.  Not the band. |
| 11:19:01 | 4 | Q.   Did you see any receipts for the payment of that band? |
| 11:19:04 | 5 | A.   No. |
| 11:19:10 | 6 | Q.   And just to make sure, was Banda Recodo actually playing at |
| 11:19:21 | 7 | that wedding? |
| 11:19:22 | 8 | A.   They did.  They took a large bus and there was several |
| 11:19:25 | 9 | members playing at the wedding. |
| 11:19:33 | 10 | Q.   I'm showing you Government's Exhibit 1.  Where was this |
| 11:19:45 | 11 | taken from? |
| 11:19:49 | 12 | A.   That was taken from Jose Trevino's residence in Lexington, |
| 11:19:52 | 13 | Oklahoma. |
| 11:19:54 | 14 | Q.   And 58D, is that the same photo taken from the Huitron |
| 11:19:57 | 15 | residence? |
| 11:19:59 | 16 | A.   Yes. |
| 11:20:01 | 17 | Q.   Now, was this photo on the wall? |
| 11:20:04 | 18 | A.   It was. |
| 11:20:08 | 19 | Q.   And who was contained within the winning photo noted in |
| 11:20:12 | 20 | Exhibit 1? |
| 11:20:19 | 21 | A.   Eusevio Huitron, Carlos Nayen, Jose Trevino. |
| 11:20:30 | 22 | Q.   Right here? |
| 11:20:31 | 23 | A.   Zulema Trevino, Jose Trevino, Jr. and Alexandra Trevino. |
| 11:20:39 | 24 | Q.   Do you recall the wiretap yesterday where "42" asked Ramiro |
| 11:20:44 | 25 | to give him a sign? |

| | | |
|---|---|---|
| 11:20:45 | 1 | A.   I do. |
| 11:20:45 | 2 | Q.   With his finger? |
| 11:20:47 | 3 | A.   I do. |
| 11:20:49 | 4 | Q.   What number is Jose Trevino, Jr. displaying with his hands? |
| 11:20:53 | 5 | A.   "42" for Omar Trevino. |
| 11:20:57 | 6 | Q.   And what number is Alexandra Trevino displaying with her |
| 11:21:00 | 7 | hands? |
| 11:21:00 | 8 | A.   Four-zero for Miguel Trevino. |
| 11:21:04 | 9 | Q.   Could you zoom out, please?  And this individual? |
| 11:21:17 | 10 | A.   That's "Chevo" Huitron. |
| 11:21:18 | 11 | Q.   Who does he have his arm around? |
| 11:21:20 | 12 | A.   Carlos Nayen. |
| 11:21:22 | 13 | Q.   Do you see Carlos Nayen associated with this horse in any |
| 11:21:25 | 14 | way, shape or form? |
| 11:21:26 | 15 | A.   Not at all. |
| 11:21:36 | 16 | Q.   Pass the witness, your Honor. |
| 11:22:06 | 17 | CROSS-EXAMINATION |
| 11:22:06 | 18 | BY MS. WILLIAMS: |
| 11:22:22 | 19 | Q.   Because in the government's mind, "40" and "42" can't |
| 11:22:27 | 20 | possibly mean anything other than Miguel Trevino and Omar |
| 11:22:30 | 21 | Trevino, right? |
| 11:22:31 | 22 | A.   Not in this setting. |
| 11:22:42 | 23 | Q.   I'm showing you a document from Government's Exhibit 226, |
| 11:23:08 | 24 | the AQHA records for Tempting Dash.  You've seen these before, |
| 11:23:11 | 25 | have you not? |

| | | |
|---|---|---|
| 11:23:12 | 1 | A.    I have. |
| 11:23:12 | 2 | Q.    And how many races does this show that Tempting Dash has |
| 11:23:18 | 3 | run? |
| 11:23:23 | 4 | A.    Four. |
| 11:23:23 | 5 | Q.    And how many races does it show that Tempting Dash has set |
| 11:23:27 | 6 | the track record? |
| 11:23:33 | 7 | A.    Two times. |
| 11:23:34 | 8 | Q.    And in those four races, how many times has Tempting Dash |
| 11:23:38 | 9 | been beaten?  How many losses has Tempting Dash had? |
| 11:23:44 | 10 | A.    Zero. |
| 11:23:45 | 11 | Q.    Four and two, four and zero, correct? |
| 11:23:49 | 12 | A.    That's correct.  I don't know what the four and two you're |
| 11:23:58 | 13 | referring to, actually. |
| 11:23:59 | 14 | Q.    Objection. |
| 11:24:00 | 15 | THE COURT:  Just answer the question. |
| 11:24:06 | 16 | Q.    (BY MS. WILLIAMS) So let's talk about some more photos.  You |
| 11:24:18 | 17 | and Mr. Gardner talked about some photographs that were found in |
| 11:24:24 | 18 | -- during a search warrant at Lexington, Oklahoma.  Do you |
| 11:24:26 | 19 | remember that? |
| 11:24:26 | 20 | A.    I do. |
| 11:24:27 | 21 | Q.    And you testified, I think, that these photographs were |
| 11:24:32 | 22 | taken off of a computer where Rudy Trevino was living at the time |
| 11:24:38 | 23 | the search warrant was executed, correct? |
| 11:24:40 | 24 | A.    I believe he was living there at the time.  Yes. |
| 11:24:44 | 25 | Q.    And you showed these photographs and I think you didn't say |

| | | |
|---|---|---|
| 11:24:48 | 1 | it about these photographs -- but you said it about some other |
| 11:24:51 | 2 | photographs -- that it showed that the person who had these |
| 11:24:53 | 3 | photographs was aware of what was going on in Mexico.  Do you |
| 11:24:56 | 4 | remember that testimony? |
| 11:24:58 | 5 | A.   I remember to one particular picture. |
| 11:25:02 | 6 | Q.   And as to these photographs that you took off of Rudy |
| 11:25:07 | 7 | Trevino's computer, do you believe the same thing, that those |
| 11:25:11 | 8 | photos show that Rudy Trevino was aware of what was going on in |
| 11:25:15 | 9 | Mexico? |
| 11:25:16 | 10 | A.   I believe that the user of that computer was aware of what's |
| 11:25:19 | 11 | going on in Mexico. |
| 11:25:20 | 12 | Q.   Well, tell the members of the jury what's the significance |
| 11:25:23 | 13 | of those photographs being on a big eight-by-ten picture where |
| 11:25:27 | 14 | all of the picture is white except this little tiny part? |
| 11:25:33 | 15 | A.   I'd be speculating a little, but I believe it's a difference |
| 11:25:36 | 16 | between a thumbnail and not a thumbnail. |
| 11:25:40 | 17 | Q.   Well, I certainly don't want you to speculate. |
| 11:25:42 | 18 | A.   Okay. |
| 11:25:42 | 19 | Q.   But you did, I think, tell this jury that you sat down with |
| 11:25:47 | 20 | Mr. Cox, Special Agent Cox, who took these photos, and he tried |
| 11:25:50 | 21 | to explain to you what that significance is.  Right?  The |
| 11:25:55 | 22 | difference between a thumbnail and a photograph is that if you |
| 11:25:57 | 23 | print it out from a computer, it can come out an eight-by-ten? |
| 11:26:00 | 24 | A.   I think so. |
| 11:26:00 | 25 | Q.   All right.  There's nothing you can do to manipulate that |

| 11:26:04 | 1 | tiny photo to make it any bigger, right? |
| 11:26:06 | 2 | A.   Not when it's recovered like that.  No. |
| 11:26:08 | 3 | Q.   Right.  I mean, it is the size that it is, correct?  No |
| 11:26:13 | 4 | matter how big you -- |
| 11:26:13 | 5 | A.   You could make it bigger, but the distortion would be very, |
| 11:26:17 | 6 | very bad. |
| 11:26:17 | 7 | Q.   But you could only artificially make it bigger? |
| 11:26:20 | 8 | A.   Correct. |
| 11:26:21 | 9 | Q.   You can't make it bigger on the computer? |
| 11:26:22 | 10 | A.   When it's covered like that, yes. |
| 11:26:24 | 11 | Q.   And the significance of that, is it not, is that that is -- |
| 11:26:26 | 12 | what that shows is that somebody Googled something that caused |
| 11:26:30 | 13 | those photos to show up, or they read a newspaper article where |
| 11:26:34 | 14 | those photos were, or they did something where those photos were |
| 11:26:37 | 15 | in the part of the computer that isn't accessed on a regular |
| 11:26:45 | 16 | basis; is that true? |
| 11:26:47 | 17 | A.   I think when you talk about specific photos, but that's -- |
| 11:26:49 | 18 | that can be true. |
| 11:26:51 | 19 | Q.   Well, I mean, all the photos that you showed the jury that |
| 11:26:54 | 20 | came from Rudy Trevino's computer are all the same.  We're |
| 11:26:58 | 21 | talking they all have the same characteristics. |
| 11:27:01 | 22 | A.   I didn't say it was Rudy Trevino's computer. |
| 11:27:06 | 23 | Q.   Well, whose computer do you think it is?  Do you think it's |
| 11:27:09 | 24 | Jose Trevino's computer? |
| 11:27:10 | 25 | A.   It came from the house that Rudy was staying at.  I know |

| | | |
|---|---|---|
| 11:27:13 | 1 | Jose stayed there before Rudy did. |
| 11:27:15 | 2 | Q.   All right.  All those photos have the same characteristics, |
| 11:27:19 | 3 | do they not?  Do you need to see them? |
| 11:27:21 | 4 | A.   I'm looking at a chart.  If that's okay.  Most of those |
| 11:27:41 | 5 | pictures came -- |
| 11:27:42 | 6 | Q.   Wait. |
| 11:27:43 | 7 | A.   I thought you asked me that.  I apologize. |
| 11:27:45 | 8 | Q.   I'm sorry.  Do all those pictures share the same |
| 11:27:50 | 9 | characteristics? |
| 11:27:50 | 10 | A.   No. |
| 11:27:51 | 11 | Q.   All right.  Can you tell me which ones are different then? |
| 11:27:57 | 12 | A.   Got the exhibit number? |
| 11:28:02 | 13 | Q.   Okay.  So some of these photos came from an internet |
| 11:28:17 | 14 | browser, you can tell? |
| 11:28:18 | 15 | A.   A cache from an internet browser.  Correct. |
| 11:28:20 | 16 | Q.   And a cache from an internet browser means you're looking at |
| 11:28:23 | 17 | something on the internet, and while you're looking at whatever |
| 11:28:25 | 18 | you're looking at on the internet, these photos are automatically |
| 11:28:28 | 19 | -- not by anything you do, but the computer saves them to the |
| 11:28:31 | 20 | cache space of the computer? |
| 11:28:32 | 21 | A.   Yes.  And when you reload that page, it comes up quick. |
| 11:28:34 | 22 | Q.   Right.  So it's a function of your internet browser that |
| 11:28:38 | 23 | causes the internet to run more quickly? |
| 11:28:40 | 24 | A.   Exactly. |
| 11:28:41 | 25 | Q.   So nobody saved those pictures? |

11:28:43  1   A.    No.

11:28:44  2   Q.    Nobody said, oh, this is a picture I'm really interested in,

11:28:47  3   let me save that to my computer, right?

11:28:49  4   A.    No.

11:28:49  5   Q.    Is that right or is that wrong?  Sorry.  That was a bad

11:28:55  6   question.

11:28:55  7   A.    I think we confused each other there.

11:28:56  8   Q.    Okay.  Nobody saved that picture to the computer, right?

11:29:00  9   A.    No.  Nobody saved it.

11:29:06  10  Q.    And the rest of these pictures were from unallocated space.

11:29:12  11  In other words, we don't really know, could have been exactly the

11:29:16  12  same thing, but they were accessing the internet, but at whatever

11:29:21  13  point, it went to unallocated space?

11:29:23  14  A.    Could have been.  Yes, ma'am.

11:29:26  15  Q.    How many other computers did you seize from the property at

11:29:34  16  Lexington?  If I say there were a total of eight, does that

11:29:42  17  comport with your recollection?

11:29:43  18  A.    I think that's right.  Yes, ma'am.

11:29:44  19  Q.    And you examined all the computers, did you not?

11:29:47  20  A.    I did.

11:29:48  21  Q.    All the photographs, all the e-mails?

11:29:57  22  A.    Most of the ones in the office were very new.

11:30:09  23  Q.    Now, I want to talk to you about these actual photographs

11:30:13  24  that you seized in Lexington in Balch Springs.

11:30:17  25  A.    Okay.

| | | |
|---|---|---|
| 11:30:18 | 1 | Q.   Know which ones I'm talking about?  The family photographs? |
| 11:30:22 | 2 | A.   Oh, sure. |
| 11:30:23 | 3 | Q.   I think the prosecutor alluded to this, but you have no idea |
| 11:30:26 | 4 | what year any of those photos were taken, do you? |
| 11:30:29 | 5 | A.   No. |
| 11:30:29 | 6 | Q.   And, in fact, in quite a few of them, either by the |
| 11:30:35 | 7 | deterioration of the photograph itself or by the clothes that the |
| 11:30:40 | 8 | people are wearing, or using other clues, you could certainly |
| 11:30:44 | 9 | tell that those photographs are not recently taken? |
| 11:30:46 | 10 | A.   They're not very recent.  No. |
| 11:30:48 | 11 | Q.   By not very recent, I mean ten years at least? |
| 11:30:51 | 12 | A.   I wouldn't say ten years. |
| 11:30:53 | 13 | Q.   All right.  Did you -- well, let's finish with photographs. |
| 11:31:04 | 14 | Do you have the ability to pull up 375B?  Do you remember being |
| 11:31:13 | 15 | shown this photograph? |
| 11:31:14 | 16 | A.   I do. |
| 11:31:14 | 17 | Q.   And who's this person in the white shirt over here? |
| 11:31:17 | 18 | A.   That's Tyler Graham. |
| 11:31:18 | 19 | Q.   And what's he doing? |
| 11:31:20 | 20 | A.   He's talking on the phone and looking to the right. |
| 11:31:23 | 21 | Q.   And do you ascribe a sinister motive to who could be talking |
| 11:31:28 | 22 | on the phone? |
| 11:31:28 | 23 | A.   Could have been talking to me. |
| 11:31:29 | 24 | Q.   He could have been, couldn't he?  All right. |
| 11:31:32 | 25 | Can I see 378F?  Do you see Tyler Graham in this |

11:31:52    1    photograph?

11:31:57    2    A.    I don't think so.

11:31:59    3    Q.    Is that not him?

11:32:00    4    A.    I don't think so.

11:32:01    5    Q.    You don't?

11:32:02    6    A.    No.  I don't think that was what he was wearing that day.

11:32:07    7    Q.    What was he wearing that day?

11:32:09    8    A.    If you want to bring me the 378 photos, I could show you.

11:32:15    9    Q.    Now, you said about at least one of the photos that Jose

11:32:27   10    Trevino -- as soon as the horse won, Mr. Piloto, Jose Trevino got

11:32:30   11    on the phone?

11:32:31   12    A.    Yes, ma'am.

11:32:31   13    Q.    And did you ascribe a sinister motive to that?

11:32:35   14    A.    I believe there was a sinister reason he got on the phone.

11:32:37   15    Yes.

11:32:37   16    Q.    Could have been talking to his wife, who wasn't there,

11:32:40   17    correct?

11:32:40   18    A.    He could have.

11:32:42   19    Q.    He could have been talking to his daughter, correct?

11:32:46   20    A.    He could have been talking to anybody.

11:32:47   21    Q.    He could have been talking to anybody.  You don't know.  If

11:32:51   22    he called or if somebody called him, do you?

11:32:54   23    A.    Three years in this investigation lead me to believe he's

11:32:57   24    talking to his brother.

11:32:58   25    Q.    Do you --

| | | |
|---|---|---|
| 11:32:59 | 1 | A.   Do I know? |
| 11:33:00 | 2 | Q.   You don't know if somebody called him or if he called |
| 11:33:02 | 3 | somebody else? |
| 11:33:02 | 4 | A.   No. |
| 11:33:03 | 5 | Q.   What phone was he on? |
| 11:33:07 | 6 | A.   I don't know. |
| 11:33:08 | 7 | Q.   Was he on the 972 phone?  The phone he's had since the |
| 11:33:13 | 8 | beginning of this investigation? |
| 11:33:14 | 9 | A.   I don't know -- my intelligence, he had more than one phone. |
| 11:33:18 | 10 | Q.   Wasn't my question. |
| 11:33:19 | 11 | A.   Well, I don't know which phone he's on if I know he had more |
| 11:33:23 | 12 | than one phone. |
| 11:33:26 | 13 | Q.   Did you take any pictures of Jose Trevino during the time of |
| 11:33:33 | 14 | your surveillance talking with Dr. Burns? |
| 11:33:38 | 15 | A.   Dr. who? |
| 11:33:39 | 16 | Q.   Dr. Burns? |
| 11:33:43 | 17 | A.   Is he the vet from California?  No. |
| 11:33:46 | 18 | Q.   Did you take any pictures of Jose Trevino talking to Paul |
| 11:33:50 | 19 | Jones?  Do you know who that is? |
| 11:33:53 | 20 | A.   I do.  I never did surveillance in California. |
| 11:33:57 | 21 | Q.   What about Nancy Yearsley? |
| 11:34:02 | 22 | A.   I did not know who she was at the time I did these. |
| 11:34:05 | 23 | Q.   What about Dr. Blodgett? |
| 11:34:07 | 24 | A.   Don't know who that is. |
| 11:34:08 | 25 | Q.   What about any other prominent people in the horse-racing or |

| | | |
|---|---|---|
| 11:34:11 | 1 | horse-breeding industry?  Did you take any pictures of Jose |
| 11:34:15 | 2 | Trevino talking to those people while he was at a horse auction |
| 11:34:17 | 3 | or a horse race that you recall? |
| 11:34:23 | 4 | A.   No.  I don't know every prominent member in the horse |
| 11:34:26 | 5 | industry.  I'll give you that. |
| 11:34:27 | 6 | Q.   Well, let's talk about that.  Who in your group of people |
| 11:34:31 | 7 | was tasked with learning the quarter horse industry? |
| 11:34:34 | 8 | A.   I believe I learned it pretty well. |
| 11:34:36 | 9 | Q.   That was your job? |
| 11:34:39 | 10 | A.   Nobody was tasked to learn AQHA, but being a case agent, I |
| 11:34:44 | 11 | wanted to learn AQHA. |
| 11:34:45 | 12 | Q.   Because it was important to understand the industry? |
| 11:34:49 | 13 | A.   Yes. |
| 11:34:49 | 14 | Q.   It was important to understand how things worked? |
| 11:34:54 | 15 | A.   Yes. |
| 11:34:54 | 16 | Q.   It was important to understand regular practice in the |
| 11:34:59 | 17 | quarter horse industry? |
| 11:35:01 | 18 | A.   Yes. |
| 11:35:03 | 19 | Q.   So that you know how to interpret the things that you saw, |
| 11:35:08 | 20 | right? |
| 11:35:08 | 21 | A.   Exactly. |
| 11:35:09 | 22 | Q.   Did you check into the financial stability of Southwest |
| 11:35:16 | 23 | Stallion Station before you began using Tyler Graham? |
| 11:35:19 | 24 | A.   No. |
| 11:35:22 | 25 | Q.   Did you think that it might be important to know whether or |

| | | |
|---|---|---|
| 11:35:26 | 1 | not Tyler Graham had a financial motive to cooperate with the |
| 11:35:28 | 2 | government? |
| 11:35:29 | 3 | A.    No. |
| 11:35:30 | 4 | Q.    Did you think it would be important to find out whether or |
| 11:35:33 | 5 | not Tyler Graham had, in the past, committed criminal acts that |
| 11:35:40 | 6 | would have changed his perspective in giving the government |
| 11:35:47 | 7 | information? |
| 11:35:49 | 8 | A.    Could you repeat that, please? |
| 11:35:50 | 9 | Q.    I don't know if I can or not. |
| 11:35:54 | 10 | Did you think it would be important to know whether, in |
| 11:35:58 | 11 | the past, he had, for example, taken large sums of cash as |
| 11:36:03 | 12 | payment for horse expenses? |
| 11:36:07 | 13 | A.    What was important to me is if he could infiltrate himself |
| 11:36:11 | 14 | with this group. |
| 11:36:12 | 15 | Q.    I'm sorry.  But -- |
| 11:36:12 | 16 | THE COURT:  Listen to the question and answer the |
| 11:36:14 | 17 | question. |
| 11:36:15 | 18 | THE WITNESS:  Sure, your Honor. |
| 11:36:16 | 19 | Q.    (BY MS. WILLIAMS) Did you think that was important? |
| 11:36:21 | 20 | A.    I didn't think about it. |
| 11:36:23 | 21 | Q.    Did you think it was important to know whether or not he, |
| 11:36:28 | 22 | Tyler Graham himself, or Southwest Stallion Station, or Dr. |
| 11:36:32 | 23 | Graham had civil judgments against them? |
| 11:36:33 | 24 | A.    No.  Not at all. |
| 11:36:35 | 25 | Q.    Because that would be a part of the financial picture of |

11:36:41    1   Tyler Graham or Southwest Stallion Station.

11:36:44    2   A.    That would be outside the scope of why I wanted to recruit

11:36:48    3   Tyler Graham.

11:36:51    4   Q.    Now, you said yesterday -- well, did Tyler Graham tell you

11:36:57    5   that Jose Trevino had an offer to sell Tempting Dash for $3

11:37:05    6   million?

11:37:05    7   A.    I said that yesterday?

11:37:07    8   Q.    No.  I struck that part of my question.  Sorry.  Did Tyler

11:37:12    9   Graham tell you that?

11:37:12   10   A.    I know I've heard that.  I'm not a hundred percent sure he

11:37:18   11   told me that.  But I've heard that.

11:37:20   12   Q.    I could bring you your notes to refresh your recollection,

11:37:23   13   if you need it.

11:37:24   14   A.    Okay.

11:37:34   15   Q.    You did learn in the course of your investigation, though,

11:37:54   16   that that was the case?

11:37:55   17   A.    Yes, ma'am.

11:38:00   18   Q.    Initially, Tyler Graham told you or a member of your team --

11:38:12   19   now I'm not sure about everything that's in there -- that Jose

11:38:17   20   Trevino tried to hide Tempting Dash after it was found out that

11:38:23   21   he had piroplasmosis.  Do you remember that?

11:38:25   22   A.    I do.

11:38:25   23   Q.    And that turned out not to be true?

11:38:26   24   A.    I think that's true.

11:38:28   25   Q.    Well, did you see the records yesterday from the Texas

| 11:38:30 | 1 | Animal Health Commission? |

11:38:30    1    Animal Health Commission?

11:38:32    2    A.    Yeah.   I saw.

11:38:34    3    Q.    That showed that he had permission to take the horse from

11:38:37    4    McDade to Quemado, correct?

11:38:40    5    A.    That paperwork you showed appeared to show that.

11:38:44    6    Q.    All right.   And the other thing that was a little bit

11:38:49    7    different than what Tyler Graham testified is that Tyler Graham

11:38:52    8    told the jury that it was his idea that he wasn't going to handle

11:38:56    9    the contracts anymore after Jose moved to Oklahoma, but, in fact,

11:39:01   10    the truth is that that was Jose's idea.   Isn't that true?

11:39:05   11    A.    I don't think that could be explained with a "Yes" or "No"

11:39:07   12    answer.

11:39:09   13    Q.    All right.   Fair enough.

11:39:15   14          Isn't there a phone call where Jose Trevino tells Tyler

11:39:19   15    Graham, I'm going to handle the contracts from now on?

11:39:21   16    A.    There is.

11:39:37   17    Q.    You remember Tyler Graham telling the members of the jury

11:40:24   18    that every agreement with every owner and every horse is

11:40:28   19    different.   Do you remember him saying that?

11:40:31   20    A.    I remember him saying it was many times different.   I don't

11:40:35   21    know that he said every one.

11:40:36   22    Q.    That's what I wrote down.

11:40:38   23    A.    Okay.   Sure.

11:40:38   24    Q.    Something close to that?

11:40:39   25    A.    Sure.   Sure.

| | | |
|---|---|---|
| 11:40:40 | 1 | Q.   And that's sort of going back to what I was asking you about |
| 11:40:43 | 2 | about the industry.  This doesn't seem to be an industry where if |
| 11:40:47 | 3 | you want to buy a horse, this is the way you do it, correct? |
| 11:40:54 | 4 | A.   There are a number of ways to buy a horse. |
| 11:40:57 | 5 | Q.   I mean, it's not as simple as some other industries might |
| 11:41:03 | 6 | be, right?  There's not a form contract? |
| 11:41:06 | 7 | A.   It's an industry open to doing things in many ways. |
| 11:41:09 | 8 | Q.   Right.  There's no form contract that everybody's supposed |
| 11:41:11 | 9 | to use to buy a horse, right? |
| 11:41:13 | 10 | A.   Right. |
| 11:41:13 | 11 | Q.   And it appears from what you learned about the industry that |
| 11:41:21 | 12 | a lot of people do deals in the horse industry on a handshake? |
| 11:41:25 | 13 | A.   Yes. |
| 11:41:26 | 14 | Q.   And a lot of people do deals that require a down payment and |
| 11:41:31 | 15 | then, payment later? |
| 11:41:34 | 16 | A.   I could see that.  I don't know that that's been told to me |
| 11:41:37 | 17 | several times. |
| 11:41:37 | 18 | Q.   Well, I mean, at Heritage Place, for example, you buy a |
| 11:41:40 | 19 | horse at Heritage Place, you don't necessarily pay that whole |
| 11:41:43 | 20 | price the day you take the horse.  Sometimes you make an |
| 11:41:46 | 21 | arrangement with Heritage Place to make a down payment, go ahead |
| 11:41:48 | 22 | and take the horse, and make the payment later. |
| 11:41:50 | 23 | A.   Normally they would keep the horses until they get the |
| 11:41:53 | 24 | money. |
| 11:41:53 | 25 | Q.   Sometimes they do? |

| | | |
|---|---|---|
| 11:41:54 | 1 | A.   You don't have to pay it all up front. |
| 11:41:56 | 2 | Q.   It depends on who the person is? |
| 11:41:57 | 3 | A.   How many times they've bought. |
| 11:41:59 | 4 | Q.   It depended on a lot of factors? |
| 11:42:01 | 5 | A.   Exactly. |
| 11:42:02 | 6 | Q.   There's not a set answer, correct? |
| 11:42:03 | 7 | A.   Right. |
| 11:42:06 | 8 | Q.   And you've heard about foal shares where a stallion owner |
| 11:42:11 | 9 | and mare owner may go together and figure out amongst themselves |
| 11:42:15 | 10 | who pays what expenses? |
| 11:42:17 | 11 | A.   I have. |
| 11:42:17 | 12 | Q.   And then, they have equal share in whatever foal is made |
| 11:42:21 | 13 | from that breeding? |
| 11:42:22 | 14 | A.   I've heard of that. |
| 11:42:23 | 15 | Q.   And you've also heard multiple times that the price paid for |
| 11:42:37 | 16 | a horse may or may not reflect the true value of that horse. |
| 11:42:44 | 17 | It's a gamble, right? |
| 11:42:46 | 18 | A.   It's a gamble. |
| 11:42:48 | 19 | Q.   There are no guarantees? |
| 11:42:50 | 20 | A.   No guarantees. |
| 11:42:58 | 21 | Q.   So, for example, you remember the horse Ease Cartel? |
| 11:43:01 | 22 | A.   I do. |
| 11:43:01 | 23 | Q.   And that horse was purchased, if you remember, by Bonanza |
| 11:43:08 | 24 | Stables from Juliana Holt.  Do you remember that? |
| 11:43:12 | 25 | A.   Do you mind if I pull my file on Mr. Ease Cartel?  Can you |

| | | |
|---|---|---|
| 11:43:29 | 1 | restate your question, please, ma'am? |
| 11:43:31 | 2 | Q.   Do you know that the horse Ease Cartel was purchased by |
| 11:43:36 | 3 | Bonanza Stables from Juliana Holt? |
| 11:43:40 | 4 | A.   According to AQHA, it was purchased from Ramiro by Bonanza |
| 11:43:45 | 5 | Racing Stables. |
| 11:43:46 | 6 | Q.   And who did Ramiro purchase it from?  You don't have that |
| 11:43:49 | 7 | information? |
| 11:43:49 | 8 | A.   I do not have that. |
| 11:43:50 | 9 | Q.   All right.  Well, let's talk about A Dash Of Sweet Heat |
| 11:43:54 | 10 | then.  That horse was originally bred by Juliana Holt.  There's |
| 11:44:08 | 11 | its birthday. |
| 11:44:13 | 12 | A.   That's under the current owner. |
| 11:44:15 | 13 | Q.   Well, I'm going to get to that. |
| 11:44:16 | 14 | A.   Okay. |
| 11:44:17 | 15 | Q.   But the original owner. |
| 11:44:20 | 16 | A.   I do recall that Juliana Holt bred and sold A Dash of -- |
| 11:44:27 | 17 | Q.   To Bonanza? |
| 11:44:27 | 18 | A.   It went to an auction and was placed in Bonanza. |
| 11:44:32 | 19 | Q.   Do you remember the purchase price? |
| 11:44:34 | 20 | A.   Roughly?  I think it was maybe $600,000. |
| 11:44:39 | 21 | Q.   $650,000? |
| 11:44:40 | 22 | A.   Yes. |
| 11:44:41 | 23 | Q.   And while Bonanza had that horse -- well, I can bring you |
| 11:44:49 | 24 | these back, if you need.  But it did a race.  It was a very young |
| 11:44:54 | 25 | horse, so it wasn't bred.  Basically the horse was at Bonanza and |

11:44:59  1  then, eventually went back to auction?

11:45:01  2  A.   That's correct.

11:45:02  3  Q.   Okay.  And do you know how much Juliana Holt paid for that

11:45:07  4  horse one year and a little less than two months after she

11:45:14  5  originally sold that horse?

11:45:15  6  A.   I do.

11:45:15  7  Q.   How much was that?

11:45:16  8  A.   A million dollars.

11:45:24  9  Q.   Now, with regard to these 35 mares, you remember Agent

11:45:41 10  Pennington and I having some discussion about that yesterday?

11:45:43 11  A.   I've heard 35 mares more than I ever want to hear it again.

11:45:47 12  Q.   You and me both.

11:45:52 13         And my questions to Agent Pennington are the same as

11:45:56 14  basically my questions are going to be to you, which is, you

11:45:59 15  don't know what the agreement was between Mr. Aguirre and Jose

11:46:03 16  Trevino; isn't that true?

11:46:04 17  A.   My answer's going to be very similar to Agent Pennington's.

11:46:08 18  Q.   I know you believe -- I know you have an answer that you

11:46:11 19  believe is true, but you don't really know, do you?

11:46:15 20  A.   I don't know the context of their conversations.

11:46:17 21  Q.   Okay.  And I could, but I would like to not have to.  I

11:46:23 22  could go through and show you each of those mares and the AQHA

11:46:27 23  registration of each of those mares that shows that they were

11:46:30 24  leased to 66 Land.  Would you agree with me that that is true?

11:46:34 25  A.   After the purchase?

| | | |
|---|---|---|
| 11:46:36 | 1 | Q.   Yes. |
| 11:46:37 | 2 | A.   Yes. |
| 11:46:37 | 3 | Q.   And I could, but I would like not to have to, go through |
| 11:46:46 | 4 | each of those AQHA registrations and show you the bloodlines of |
| 11:46:50 | 5 | some of those mares and see if you would agree with me that you |
| 11:46:56 | 6 | believe that the colts of those mares and some breeding to a high |
| 11:47:03 | 7 | quality stallion would be valuable. |
| 11:47:06 | 8 | A.   I would agree with that. |
| 11:47:07 | 9 | Q.   Or fillies.  Colts or fillies, babies? |
| 11:47:10 | 10 | A.   The babies coming from very expensive mares, bred to good |
| 11:47:16 | 11 | sires should be valuable. |
| 11:47:17 | 12 | Q.   Right.  And you don't know what the agreement was between |
| 11:47:21 | 13 | Mr. Aguirre and Mr. Trevino about who was going to own those |
| 11:47:25 | 14 | babies, do you? |
| 11:47:29 | 15 | A.   I know Jose Trevino should own the babies if he owns the |
| 11:47:32 | 16 | horses. |
| 11:47:32 | 17 | Q.   But you don't know what the agreement was, right? |
| 11:47:38 | 18 | A.   We can go back and forth. |
| 11:47:42 | 19 | Q.   You don't have any documentary evidence of that agreement, |
| 11:47:45 | 20 | do you? |
| 11:47:46 | 21 | A.   No.  All I have is the documentary evidence of what he sold |
| 11:47:50 | 22 | those mares for. |
| 11:47:51 | 23 | Q.   And wouldn't you agree with me that the arrest and the |
| 11:47:56 | 24 | seizure of those horses prevented us from finding out who |
| 11:48:02 | 25 | intended to own the babies from those mares? |

| | | |
|---|---|---|
| 11:48:06 | 1 | A.   I believe Aguirre could tell us if he had some interest in |
| 11:48:11 | 2 | those mares. |
| 11:48:15 | 3 | Q.   But we still don't know, do we?  We still don't have any |
| 11:48:23 | 4 | documentary evidence of that, do we? |
| 11:48:24 | 5 | A.   All we have is the check or checks. |
| 11:48:27 | 6 | Q.   And with regard to the checks, we don't know whether that |
| 11:48:30 | 7 | was intended to be a payment, a full payment, a partial payment, |
| 11:48:36 | 8 | ten percent, one percent, two percent?  We don't know, do we? |
| 11:48:38 | 9 | A.   We know what the memo says.  It says purchase. |
| 11:48:41 | 10 | Q.   But we don't know whether that meant payment number one for |
| 11:48:44 | 11 | the purchase, do we? |
| 11:48:44 | 12 | A.   We don't know that. |
| 11:48:45 | 13 | Q.   All right.  Now, do you remember when Tyler Graham testified |
| 11:48:54 | 14 | about how he normally handles payments for stallions that stand |
| 11:49:02 | 15 | at Southwest Stallion Station? |
| 11:49:04 | 16 | A.   I think so. |
| 11:49:05 | 17 | Q.   Do you remember that he said that normally he pays those |
| 11:49:10 | 18 | fees back to the stallion owner at the end of breeding season? |
| 11:49:13 | 19 | A.   I do remember that. |
| 11:49:14 | 20 | Q.   All right.  Do you know when the end of breeding season is? |
| 11:49:16 | 21 | A.   Roughly June-something. |
| 11:49:20 | 22 | Q.   June, July, depending on when they -- |
| 11:49:22 | 23 | A.   I think end of June is what most people consider end of |
| 11:49:25 | 24 | breeding season. |
| 11:49:25 | 25 | Q.   When are the babies born? |

| | | |
|---|---|---|
| 11:49:27 | 1 | A.   You want to be born in December but before January. |
| 11:49:29 | 2 | Q.   All right. |
| 11:49:30 | 3 | A.   Ideally. |
| 11:49:30 | 4 | Q.   So the later, the better? |
| 11:49:31 | 5 | A.   The later before January.  Yes. |
| 11:49:33 | 6 | Q.   Right.  The later in the year. |
| 11:49:34 | 7 | A.   Yes. |
| 11:49:35 | 8 | Q.   The better. |
| 11:49:35 | 9 | A.   Yes. |
| 11:49:36 | 10 | Q.   Correct? |
| 11:49:37 | 11 | All right.  Let's say that you were investigating |
| 11:49:42 | 12 | Southwest Stallion Station for purposes of my hypothetical. |
| 11:49:46 | 13 | A.   You want to do a hypothetical? |
| 11:49:47 | 14 | Q.   Okay?  Let's say that you were investigating Southwest |
| 11:49:51 | 15 | Stallion Station, okay? |
| 11:49:52 | 16 | A.   Can I give the owner a hypothetical name? |
| 11:49:58 | 17 | MR. FINN:  Dr. Graham. |
| 11:50:00 | 18 | Q.   (BY MS. WILLIAMS) Dr. Graham? |
| 11:50:01 | 19 | A.   I'd like to give it a name. |
| 11:50:03 | 20 | THE COURT:  All right now.  Let's straighten out. |
| 11:50:05 | 21 | She's going to ask questions and you answer the questions. |
| 11:50:07 | 22 | THE WITNESS:  I'm sorry. |
| 11:50:10 | 23 | Q.   (BY MS. WILLIAMS) Let's say that you were investigating |
| 11:50:12 | 24 | Southwest Stallion Station, and during your investigation, you |
| 11:50:17 | 25 | learned that a number of stallions had come to Southwest Stallion |

| | | |
|---|---|---|
| 11:50:21 | 1 | Station and were being bred.  Are you with me so far? |
| 11:50:26 | 2 | A.    A number of stallions were coming and they were breeding. |
| 11:50:29 | 3 | Q.    Yes. |
| 11:50:30 | 4 | A.    Okay. |
| 11:50:30 | 5 | Q.    And that during your investigation, you learned a number of |
| 11:50:38 | 6 | things that made you very suspicious, okay? |
| 11:50:41 | 7 | A.    Okay. |
| 11:50:43 | 8 | Q.    And you decided to arrest the owner of Southwest Stallion |
| 11:50:50 | 9 | Station and seize the horses that were there in June.  Okay? |
| 11:50:59 | 10 | A.    Last June?  Any June? |
| 11:51:02 | 11 | Q.    In June of the breeding season. |
| 11:51:05 | 12 | A.    Okay. |
| 11:51:05 | 13 | Q.    Okay.  And when you did that, you discovered that these |
| 11:51:11 | 14 | stallions had been at Southwest Stallion Station for the whole of |
| 11:51:15 | 15 | the breeding season and no payments had ever been made. |
| 11:51:23 | 16 | A.    To the breeding facility from the owner?  Is that what |
| 11:51:25 | 17 | you're saying? |
| 11:51:25 | 18 | Q.    No.  To the owners of the stallions from the owner of |
| 11:51:29 | 19 | Southwest Stallion Station. |
| 11:51:30 | 20 | A.    Okay. |
| 11:51:31 | 21 | Q.    All right? |
| 11:51:31 | 22 | A.    Okay. |
| 11:51:32 | 23 | Q.    And during your raid, you didn't find any paperwork that |
| 11:51:35 | 24 | showed any agreement on paper between the owner of Southwest |
| 11:51:41 | 25 | Stallion Station and the owners of the stallions, right?  Are you |

| 11:51:41 | 1 | with me? |

11:51:41   1   with me?

11:51:47   2   A.   I may need to write this down.

11:51:49   3   Q.   It would look very suspicious if that happened?

11:51:52   4   A.   What's the last part of this?  That the -- we didn't see any

11:51:55   5   movement of money?  Is that what you said?

11:51:56   6   Q.   Right.  He hadn't paid for what he was using, right?

11:52:01   7   A.   Not if the standard is to pay after the breeding season's

11:52:04   8   over.

11:52:04   9   Q.   Well, I don't think we established that there was a

11:52:08   10  standard.  We just established that was their agreement, right?

11:52:10   11  A.   I think you asked me, don't normally people pay at the end

11:52:13   12  of the breeding season?

11:52:14   13  Q.   Well, what I asked you was, didn't Tyler Graham say that was

11:52:18   14  what he did?

11:52:20   15  A.   Either he or norm -- I thought he said normally that's how

11:52:23   16  it's done.

11:52:25   17  Q.   It would look really suspicious, wouldn't it?

11:52:32   18  A.   With the knowledge I have that that's normally how it's

11:52:35   19  done, I would not consider that suspicious.

11:52:49   20  Q.   We have heard about seven computers, eight computers,

11:53:00   21  several searches?

11:53:02   22  A.   Yes, ma'am.

11:53:04   23  Q.   Of Mr. Trevino's residence, home, car, correct?

11:53:08   24  A.   Yes.

11:53:10   25  Q.   On more than one occasion with regard to Mr. Trevino's home

| | | |
|---|---|---|
| 11:53:14 | 1 | and car? |
| 11:53:15 | 2 | A.   We've heard about it.  Yes. |
| 11:53:17 | 3 | Q.   And we've heard about a phone number that Mr. Trevino used, |
| 11:53:24 | 4 | and you got that phone number from Tyler Graham, did you not? |
| 11:53:28 | 5 | A.   The 972 number?  Yes. |
| 11:53:30 | 6 | Q.   And in addition to that, Tyler Graham recorded on his phone |
| 11:53:41 | 7 | calls for 18 months? |
| 11:53:43 | 8 | A.   It wasn't 18 months.  It was April 2011 till the arrest in |
| 11:53:48 | 9 | June 2012. |
| 11:53:51 | 10 | Q.   Okay.  Fourteen? |
| 11:53:52 | 11 | A.   Yes, ma'am. |
| 11:54:00 | 12 | Q.   Why didn't -- you have the ability to get a wiretap on a |
| 11:54:05 | 13 | phone, don't you? |
| 11:54:05 | 14 | A.   It's possible to do. |
| 11:54:09 | 15 | Q.   It's possible to do that, isn't it? |
| 11:54:10 | 16 | A.   Yes. |
| 11:54:10 | 17 | Q.   Why didn't you got a wiretap of Jose Trevino's 972 phone? |
| 11:54:14 | 18 | A.   972?  I did not believe that was the phone that he conducted |
| 11:54:24 | 19 | the kind of business I would want to hear on. |
| 11:54:30 | 20 | Q.   Well, which phone did you think he conducted that kind of |
| 11:54:33 | 21 | business on? |
| 11:54:33 | 22 | A.   On his Mexican phones. |
| 11:54:35 | 23 | Q.   We only heard about one, right?  We've only heard all this |
| 11:54:39 | 24 | time about one Mexican phone. |
| 11:54:40 | 25 | A.   We've heard about two:  One sent to Tyler Graham from Victor |

11:54:43 Lopez that was given to Jose, and a different one found at the search warrant.

11:54:46 Q. The one that Tyler Graham gave, you got all the information off of it, didn't you?

11:54:53 A. I did.

11:54:55 Q. And you didn't wiretap that one, did you?

11:54:58 A. No. It was a Mexican phone number.

11:55:00 Q. You can't wiretap a Mexican phone number?

11:55:03 A. Can't wiretap Mexican BlackBerry messenger phone.

11:55:06 Q. You can get --

11:55:07 A. BlackBerry PINs.

11:55:08 Q. You could get their PIN number, though, can't you?

11:55:10 A. I can get the number, but I can't see the content so.

11:55:15 Q. How much money was spent on this investigation?

11:55:20 A. I don't know. It's substantial. Flying me all over the country following these races was not cheap.

11:55:29 Q. Was it more than a million dollars?

11:55:31 A. I have no idea. I wouldn't say -- honestly, I wouldn't say it was that.

11:55:35 Q. You wouldn't say it was more than a million dollars?

11:55:38 A. The only way it would be that would be the takedown and bringing people in from -- to assist for that. Maybe man --

11:55:50 Q. Man hours?

11:55:51 A. If you charge hours, maybe so.

11:55:52 Q. That's part of the cost of the investigation, is it not?

| | | |
|---|---|---|
| 11:55:55 | 1 | A.   I guess.  I'm not very good with budget.  That's why Steve |
| 11:55:58 | 2 | led the money part of this case. |
| 11:56:07 | 3 | Q.   How many phone calls between Tyler Graham and Jose Trevino |
| 11:56:12 | 4 | did you listen to? |
| 11:56:15 | 5 | A.   I definitely have to estimate. |
| 11:56:17 | 6 | Q.   That's fine. |
| 11:56:21 | 7 | A.   Probably 25, 20. |
| 11:56:25 | 8 | Q.   That's it?  That's all the phone calls you listened to over |
| 11:56:29 | 9 | 14 months between those two? |
| 11:56:34 | 10 | A.   We only marked about 200 pertinent. |
| 11:56:37 | 11 | Q.   I'm not talking about the pertinent calls.  I'm not talking |
| 11:56:39 | 12 | about the calls that you decided were pertinent.  I'm talking |
| 11:56:42 | 13 | about how many phone calls do you think there were during that |
| 11:56:44 | 14 | period of time? |
| 11:56:44 | 15 | A.   Between Tyler and Jose, right? |
| 11:56:47 | 16 | Q.   Yes. |
| 11:56:50 | 17 | A.   There wasn't a whole bunch, 25, 30.  That's an estimate. |
| 11:56:55 | 18 | But he didn't call all the time.  He showed up at his ranch more |
| 11:56:58 | 19 | than he called. |
| 11:56:58 | 20 | Q.   Of course he did.  And you could have had Tyler wear a wire, |
| 11:57:02 | 21 | could you not have? |
| 11:57:03 | 22 | A.   I did a time or two. |
| 11:57:04 | 23 | Q.   And nothing came of that, did it? |
| 11:57:05 | 24 | A.   Not with Jose.  I never had him wear a wire with Jose.  I'm |
| 11:57:11 | 25 | sorry if that's how it came out. |

| | | |
|---|---|---|
| 11:57:13 | 1 | Q.   You could have? |
| 11:57:13 | 2 | A.   I could have. |
| 11:57:15 | 3 | Q.   What does wearing a wire mean? |
| 11:57:19 | 4 | A.   In this context? |
| 11:57:21 | 5 | Q.   Yes. |
| 11:57:22 | 6 | A.   You give somebody cooperating some kind of recording device |
| 11:57:26 | 7 | that could be installed in a variety of means, and you place them |
| 11:57:31 | 8 | in a scenario where they record things. |
| 11:57:33 | 9 | Q.   So that somebody who's not aware that somebody's wearing a |
| 11:57:37 | 10 | wire might say something incriminating? |
| 11:57:39 | 11 | A.   Exactly. |
| 11:57:40 | 12 | Q.   That's the point for law enforcement, right? |
| 11:57:41 | 13 | A.   Exactly. |
| 11:57:47 | 14 | Q.   Can I have a minute, your Honor? |
| 11:57:48 | 15 | THE COURT:  You may. |
| 11:57:56 | 16 | MS. WILLIAMS:  I'm about to move into something new. |
| 11:57:59 | 17 | Is it -- I have no concept of what time it is. |
| 11:58:04 | 18 | THE COURT:  Okay.  Well, you've got 50 seconds before I |
| 11:58:07 | 19 | call the noon recess. |
| 11:58:09 | 20 | MS. WILLIAMS:  I can start. |
| 11:58:10 | 21 | THE COURT:  Members of the jury, I'll give you your |
| 11:58:12 | 22 | lunch break.  1:20.  Remember the instructions, please. |
| 11:58:50 | 23 | (Jury not present.) |
| 11:58:56 | 24 | THE COURT:  Recess till 1:20. |
| 12:03:03 | 25 | (Lunch recess.) |

13:19:54    1              THE COURT:  Anything before we bring in the jury?

13:19:56    2              MR. GARDNER:  No, your Honor.

13:20:04    3              MR. DEGEURIN:  Your Honor, I'm sorry.  I was trying to

13:20:05    4    get something done before the jury walks in.  I spoke with Mr.

13:20:10    5    Gardner.  We have been collecting the rest of -- the warrants in

13:20:18    6    Mexico for Mr. Moreno.

13:20:19    7              THE COURT:  Hold on.  No, no, don't go away.

13:20:31    8              MR. DEGEURIN:  And we received those this morning, Ms.

13:20:33    9    Williams' office at 10:00, the translations.  The government is

13:20:37   10    making copies of it for themselves now.  I just wanted to, at the

13:20:41   11    proper time, be able to introduce those in the record on the

13:20:44   12    Giglio violation we've received for not having that before the

13:20:51   13    testimony of Mr. Moreno.  The witness that is not in custody that

13:20:57   14    walked in and out of the courtroom.

13:20:59   15              And so, just wanted to alert of that.  I don't want it

13:21:06   16    to be a surprise.  I think we talked to you a couple of times

13:21:09   17    about it.  We'll do that at the proper time.  Just don't want to

13:21:13   18    waive it by waiting and waiting because it wouldn't -- it was not

13:21:17   19    proper until we got it translated to English.

13:21:18   20              THE COURT:  The record should show you haven't waived

13:21:20   21    anything, and you'll have an opportunity when it's your time to

13:21:23   22    present anything you wish to present about it.

13:21:28   23              MR. DEGEURIN:  It's not in a simple form like that.

13:21:30   24    It's something we could have used in cross if we had it.

13:21:32   25              THE COURT:  What is it?

13:21:34  1          MR. DEGEURIN:  It shows that he was involved in

13:21:37  2  kidnappings and murders in Mexico and his arrest warrant in

13:21:40  3  Mexico.  He's here in the United States.  He's being paid money

13:21:43  4  by the United States or provided money in the United States for

13:21:47  5  immigration purposes.  Those things we didn't have.

13:21:53  6          THE COURT:  You think it's in the materials I've

13:21:55  7  reviewed?

13:21:56  8          MR. DEGEURIN:  I'm sorry?

13:21:58  9          THE COURT:  I said you think it's in the materials I

13:22:00  10  reviewed?

13:22:01  11          MR. DEGEURIN:  No.

13:22:04  12          THE COURT:  If the government didn't have it.

13:22:06  13          MR. DEGEURIN:  Actually, that's another witness.

13:22:12  14          THE COURT:  Okay.

13:22:14  15          MR. DEGEURIN:  That's another witness.

13:22:15  16          THE COURT:  Well.

13:22:17  17          MR. DEGEURIN:  I did the same thing.  I meshed them,

13:22:21  18  too.

13:22:22  19          THE COURT:  Well, it doesn't make any difference.

13:22:24  20          MR. DEGEURIN:  The last thing I'm talking about about

13:22:26  21  the immigration stuff, it was provided to us by Mr. Gardner

13:22:32  22  yesterday, after the witness had testified and gone for the day.

13:22:41  23  I'm assuming that Mr. Gardner himself did not have that, even

13:22:45  24  though the government did.

13:22:45  25          THE COURT:  I haven't allowed any witness to go without

13:22:49   1   the consent of the defense counsel.

13:22:54   2           MR. DEGEURIN:  When I present it, I'll make a better --

13:22:58   3   more fuller and effective argument.  Then we'll do that.  It's

13:23:03   4   just I want to let you know it's coming.  This is a timing thing.

13:23:36   5           (Jury present.)

13:24:55   6           THE COURT:  Members of the jury, during the noon hour,

13:24:57   7   has anyone attempted to talk to you about this case?

13:24:59   8           JURORS:  No.

13:25:00   9           THE COURT:  Have you talked to anyone about the case?

13:25:02  10           JURORS:  No.

13:25:03  11           THE COURT:  And have you learned anything at all about

13:25:05  12   the case, outside the presence of each other in this courtroom?

13:25:08  13           JURORS:  No.

13:25:09  14           THE COURT:  All right.  Show negative responses to all

13:25:12  15   questions by all jurors.

13:25:15  16           Do you understand you're still under oath, sir?

13:25:16  17           THE WITNESS:  I do, sir.

13:25:18  18   Q.   (BY MS. WILLIAMS) Special Agent Lawson, I'm showing you

13:25:23  19   Government's Exhibit 102K and 102J.  And my question is, did you

13:25:29  20   learn in your investigation that the blinkers worn by the horse,

13:25:35  21   this part that goes over the horse's face, that is the color of

13:25:40  22   the trainer, whereas the jockey -- the silks that the jockey

13:25:44  23   wears is the color of the owner of the horse.  Did you come to

13:25:47  24   learn that?

13:25:49  25   A.   I know one is for one.  I don't know which one is which.

| | | |
|---|---|---|
| 13:25:53 | 1 | Q.   Well, are you going to disagree with me if I say the silks |
| 13:25:56 | 2 | the jockey wears represent the colors of the owner, and the |
| 13:26:01 | 3 | blinkers that the horse wears represent the colors of the |
| 13:26:03 | 4 | trainer? |
| 13:26:03 | 5 | A.   Yes, because there's a picture of Huitron shirts on runners. |
| 13:26:09 | 6 | Q.   Objection, your Honor.  Would you disagree with that? |
| 13:26:11 | 7 | A.   Yes. |
| 13:26:11 | 8 | Q.   Now I'm going to show you what's been marked JT-14, 15, 16 |
| 13:26:24 | 9 | and 17.  Have you these seen these before? |
| 13:26:29 | 10 | A.   No.  I do not believe I have. |
| 13:26:31 | 11 | Q.   You haven't seen these before in magazines or e-mails? |
| 13:26:35 | 12 | A.   May I see? |
| 13:26:36 | 13 | Q.   Sure. |
| 13:26:54 | 14 | A.   I've seen the advertisements for the horses.  I don't know |
| 13:26:56 | 15 | if I've seen those or not. |
| 13:26:59 | 16 | Q.   And are these advertisements for horses that would have been |
| 13:27:05 | 17 | placed in a magazine, such as feed horse magazine with regard to |
| 13:27:11 | 18 | either Zule Farms or Tremor Enterprises?  The ones I just showed |
| 13:27:14 | 19 | you? |
| 13:27:15 | 20 | A.   I assume so. |
| 13:27:16 | 21 | Q.   All right.  I'll offer JT-14, 15, 16 and 17. |
| 13:27:36 | 22 | MR. GARDNER:  No objection, your Honor. |
| 13:27:38 | 23 | THE COURT:  They start with 13, did you say? |
| 13:27:40 | 24 | MS. WILLIAMS:  Fourteen, 15, 16 and 17. |
| 13:27:43 | 25 | THE COURT:  Fourteen, 15, 16, 17 JT are admitted. |

| | | |
|---|---|---|
| 13:27:49 | 1 | Q.    (BY MS. WILLIAMS) And so, these exhibits would be examples |
| 13:27:54 | 2 | of advertisements that first Tyler Graham testified about |
| 13:28:00 | 3 | yesterday that he placed advertisements for the horse Tempting |
| 13:28:03 | 4 | Dash that it was -- that it stood at Southwest Stallion Station. |
| 13:28:08 | 5 | These are examples of advertisements like that? |
| 13:28:10 | 6 | A.    Yes. |
| 13:28:11 | 7 | Q.    Correct? |
| 13:28:12 | 8 | A.    Yes. |
| 13:28:12 | 9 | Q.    But these happen to be advertisements that were placed for |
| 13:28:18 | 10 | Zule Farms and Tremor Enterprises after they moved to Oklahoma? |
| 13:28:24 | 11 | A.    I believe so. |
| 13:28:35 | 12 | Q.    Now, when you -- during the course of your investigation, we |
| 13:28:40 | 13 | talked a little bit about phone calls.  You also had a warrant to |
| 13:28:48 | 14 | take all of my client's e-mails, correct? |
| 13:28:52 | 15 | A.    Afterwards, yes, ma'am.  After the arrest, we got a warrant |
| 13:28:57 | 16 | for your client's e-mails. |
| 13:28:58 | 17 | Q.    And during your investigation, is that not part of the |
| 13:29:02 | 18 | investigation? |
| 13:29:02 | 19 | A.    Yes. |
| 13:29:02 | 20 | Q.    All right.  And so, during the investigation, you got copies |
| 13:29:05 | 21 | of all the e-mail that went to any address you knew Jose Trevino |
| 13:29:09 | 22 | to have, any e-mail address, correct? |
| 13:29:11 | 23 | A.    Yes. |
| 13:29:12 | 24 | Q.    And you also searched and seized a number of items from both |
| 13:29:18 | 25 | his home and the farm in Lexington, Oklahoma? |

| | | |
|---|---|---|
| 13:29:21 | 1 | A.   That's correct. |
| 13:29:21 | 2 | Q.   And you mentioned earlier to the members of the jury |
| 13:29:26 | 3 | something about pertinent e-mails, and that sort of means things |
| 13:29:28 | 4 | that we thought were related to our investigation, right? |
| 13:29:31 | 5 | A.   Yes. |
| 13:29:31 | 6 | Q.   And those are the things that you took and the things that |
| 13:29:34 | 7 | came over in discovery and that sort of thing, right?  Things |
| 13:29:37 | 8 | that you thought were important in the investigation, pertinent? |
| 13:29:40 | 9 | A.   Yes. |
| 13:29:40 | 10 | Q.   But during the examination of my client's e-mail and the |
| 13:29:44 | 11 | searches at both his home and the farm at Lexington, you saw, but |
| 13:29:51 | 12 | didn't seize, a lot of other horse-related information.  Is that |
| 13:29:56 | 13 | true? |
| 13:30:00 | 14 | A.   I, myself, was not in charge of any search team. |
| 13:30:04 | 15 | Q.   But you know that's true, don't you? |
| 13:30:09 | 16 | A.   The ranch was so big, a lot of the evidence I saw for the |
| 13:30:12 | 17 | first time when I got back to San Antonio. |
| 13:30:14 | 18 | Q.   But you know as the lead case agent for the FBI in this |
| 13:30:19 | 19 | particular investigation that during the search, there was a lot |
| 13:30:25 | 20 | of information that wasn't actually seized because it wasn't |
| 13:30:29 | 21 | pertinent to your investigation.  Don't you know that? |
| 13:30:31 | 22 | A.   I don't know that. |
| 13:30:33 | 23 | Q.   Do you believe that's wrong? |
| 13:30:36 | 24 | A.   I would hope the agents assigned to the search team, if it |
| 13:30:40 | 25 | was about horses, I would hope that they would have gotten it. |

| | | |
|---|---|---|
| 13:30:45 | 1 | Q.   How many boxes did you seize? |
| 13:30:49 | 2 | A.   From Oklahoma? |
| 13:30:51 | 3 | Q.   Yes. |
| 13:30:57 | 4 | A.   I want to say it was close to a little over a hundred, I |
| 13:31:01 | 5 | think. |
| 13:31:02 | 6 | Q.   No further questions. |
| 13:31:05 | 7 | THE COURT:  Mr. DeGeurin. |
| 13:31:07 | 8 | MR. DEGEURIN:  Thank you, your Honor. |
| 13:31:09 | 9 | CROSS-EXAMINATION |
| 13:31:09 | 10 | BY MR. DEGEURIN: |
| 13:31:29 | 11 | Q.   Could I have Government's Exhibit 364J? |
| 13:33:14 | 12 | Mr. Lawson, on direct examination, you referred to |
| 13:33:18 | 13 | Government's Exhibit 364MNJ.  To refresh your memory, do you |
| 13:33:29 | 14 | remember testifying about this particular? |
| 13:33:34 | 15 | A.   I do. |
| 13:33:35 | 16 | Q.   And this was -- tell us again what this is. |
| 13:33:40 | 17 | A.   It's a copy of a wire from ADT to Southwest Stallion Station |
| 13:33:47 | 18 | for $50,000. |
| 13:33:49 | 19 | Q.   And that was -- does this date reflect the date that was |
| 13:33:58 | 20 | important? |
| 13:34:01 | 21 | A.   That's the date the e-mail was sent. |
| 13:34:04 | 22 | Q.   Okay.  And the fecha, date? |
| 13:34:12 | 23 | A.   Yes, sir. |
| 13:34:15 | 24 | Q.   Now, I want to show you what's Bates stamp -- I want to show |
| 13:34:52 | 25 | you a document.  I believe it's going to be a defense exhibit in |

13:34:56  1  just a moment.

13:34:58  2  A.   Okay.

13:35:05  3  Q.   Which is an authorization for $50,000.  That's the same as

13:35:23  4  this Monex?

13:35:24  5  A.   Yes, sir.

13:35:34  6  Q.   And the authorization to wire this money comes from a

13:35:40  7  Francisco Silva-Ramos?

13:35:42  8  A.   Yes, sir.

13:35:45  9  Q.   And that's the same $50,000 that you were talking about on

13:35:51  10 direct examination from this Monex, correct?

13:35:55  11 A.   It appears to be related.

13:35:57  12 Q.   From Southwest Stallion, right?

13:36:01  13 A.   Yes.

13:36:03  14 Q.   We'll mark this as Colorado Exhibit?

13:36:09  15       THE CLERK:  Twelve.

13:36:11  16       MR. DEGEURIN:  Twelve?

13:36:12  17       MR. GARDNER:  No objection, your Honor.

13:36:20  18       THE COURT:  It's received.  Twelve is received.

13:36:35     Q.   (BY MR. DEGEURIN) Colorado 12.

13:36:45          Now, I want to show you Colorado 13, which appears to

13:37:04  be a similar authorization to wire money -- direction to wire

13:37:12  money in the amount of $35,000, and the date is December 13,

13:37:30  2011?

13:37:31  A.   Okay.

13:37:35  Q.   The interesting thing is this direction of the wire money is

13:37:43    at the authorization of whom?

13:37:46    A.   Francisco Colorado.

13:37:49    Q.   And does that appear to be his signature you've learned it

13:37:52    to be?

13:37:53    A.   I don't think I've known his signature, sir.

13:37:58    Q.   Now, is that the same date as the one that's being

13:38:17    authorized December 13th by Francisco Silva-Ramos?

13:38:27    A.   Would you put the other one up again, please, sir?  Yes.

13:38:33    Q.   I'll offer both Colorado 13 and 12, your Honor.

13:38:37         MR. GARDNER:  No objection to 13, your Honor.  I

13:38:40    believe 12's been already admitted.

13:38:42         THE COURT:  Thirteen is admitted.

13:38:50    Q.   (BY MR. DEGEURIN) Do you remember by agreement with Mr.

13:39:14    Gardner -- I think I have pulled out some other photographs that

13:39:20    you have testified that came from Mr. Carlos Nayen's laptop, his

13:39:31    computer.  You've introduced some on direct examination.  And

13:39:37    these are additional photographs.  I want to ask you if you -- a

13:39:43    couple of questions about them.

13:39:44         This is going to be Colorado 15.

13:39:51         THE CLERK:  So you have a 14?

13:39:54         MR. DEGEURIN:  I thought we did 14.  You're right.

13:40:07    This will be Colorado 14.

13:40:17    Q.   (BY MR. DEGEURIN) And who's in that photograph?

13:40:20    A.   Carlos Nayen, his wife.

13:40:22    Q.   Okay.  Let me go slower.

13:40:23   A.   Sorry.

13:40:24   Q.   That's Carlos Nayen?

13:40:25   A.   That's correct.

13:40:27   Q.   And this is his wife?

13:40:29   A.   That's correct.

13:40:29   Q.   What's her name?

13:40:31   A.   Anali Faces.

13:40:34   Q.   This?

13:40:35   A.   I do not know.

13:40:40   Q.   And this?

13:40:40   A.   I do not know.

13:40:41   Q.   And this?

13:40:41   A.   I do not know.

13:40:42   Q.   And is this Anali's father?

13:40:44   A.   I believe that's her father, yes.

13:40:45   Q.   And do you know who this is, her little brother?

13:40:49   A.   I know she has a little brother.  He's never been identified

13:40:52   to me.

13:40:59   Q.   And do you know which horse track this was taken at?

13:41:07   A.   I assume it's Los Alamitos.

13:41:09   Q.   Los Alamitos?

13:41:10   A.   That's a guess, but I think so.

13:41:14   Q.   I'll offer Colorado 14.

13:41:16        MR. GARDNER:  No objection, your Honor.

13:41:18        THE COURT:  It's received.

13:41:34   Q.   (BY MR. DEGEURIN) I'm going to show you Colorado 15.

13:41:37   A.   Okay.

13:41:49   Q.   Again, appears to be taken on the same day.  Same clothing?

13:42:04   A.   Could you put that back up, please?  I don't think that's

13:42:11   the same clothing.

13:42:14   Q.   Okay.  Well, do you recognize the horse?

13:42:18   A.   No, sir.

13:42:20   Q.   Again, is this Anali, his wife's father?

13:42:26   A.   I believe so.

13:42:27   Q.   And Carlos Nayen?

13:42:29   A.   Yes.

13:42:31   Q.   And a young boy?

13:42:32   A.   Yes.

13:42:33   Q.   And who is this?

13:42:34   A.   That's the wife, Anali.

13:42:36   Q.   And you don't know this lady?

13:42:38   A.   No, sir.

13:42:42   Q.   And is there anything that can identify which stables this

13:42:47   was taken at?  Do you recognize it?

13:42:53   A.   I don't recognize it.  I can give you an educated guess.

13:42:56   Q.   Well, and I guess the same thing holds true for this

13:43:00   particular horse that they seem to be very proud of?

13:43:03   A.   There's over 500 horses.  I don't recognize that one.

13:43:06   Q.   From the photographs that it does appear that they're at

13:43:12   least in the same general period of time, same decade, you'd say

| | |
|---|---|
| 13:43:20 | that? |
| 13:43:21 | A.   Same decade.  Yes, sir. |
| 13:43:22 | Q.   Okay.  We'll narrow it down a little bit further. |
| 13:43:26 | A.   Okay. |
| 13:43:26 | Q.   Probably after he met his wife. |
| 13:43:28 | A.   I would assume so. |
| 13:43:29 | Q.   Maybe after he married his wife? |
| 13:43:31 | A.   Maybe. |
| 13:43:34 | Q.   Well, certainly his wife's father is in both pictures? |
| 13:43:40 | A.   I can help you out.  The pictures I saw with the whole |
| 13:43:43 | family seemed to be in California. |
| 13:43:49 | Q.   Finally, with regard to his computer that you made images |
| 13:43:54 | from. |
| 13:43:54 | A.   Yes, sir. |
| 13:43:55 | Q.   Is Colorado 16 and is that -- who's this? |
| 13:44:12 | A.   That's Carlos Nayen. |
| 13:44:14 | Q.   And is that his wife? |
| 13:44:16 | A.   It is. |
| 13:44:19 | Q.   Taken at the wedding? |
| 13:44:21 | A.   Yes, sir. |
| 13:44:23 | Q.   Offer Colorado 15 and 14 -- I mean -- |
| 13:44:28 | MR. GARDNER:  No objection, your Honor. |
| 13:44:29 | THE COURT:  I assume there are no. |
| 13:44:31 | MR. DEGEURIN:  Objection. |
| 13:44:32 | THE COURT:  Objections so 15 and 16 are admitted.  But |

13:44:38  I tell you that in this courtroom, we don't publish an exhibit

13:44:43  before it's admitted.

13:44:45          MR. DEGEURIN:  I was streamlining a little bit here

13:44:48  because it's been a long trial.

13:44:50          THE COURT:  Well, you don't have to -- you don't have

13:44:53  to convince me of that.  But what I am going to tell you is it

13:44:56  takes the same sentence before the objection that you have to

13:45:01  make after.  So we're not saving a lot of time.

13:45:08  Q.  (BY MR. DEGEURIN) I want to show you a photograph.  Do you

13:45:23  recognize in the photograph Mr. Colorado?

13:45:25  A.  I do.

13:45:25  Q.  And his mother?

13:45:26  A.  I've never -- I don't know his mother.

13:45:29  Q.  But you do recognize --

13:45:31  A.  Mr. Colorado.  Yes, sir.

13:45:43  Q.  If I -- this will be No. 16?

13:46:12          THE CLERK:  Seventeen.

13:46:13          THE COURT:  You have a 16.

13:46:15          MR. DEGEURIN:  Seventeen.  I'll offer 17.

13:46:24          MR. GARDNER:  No objection, your Honor.

13:46:27  Q.  (BY MR. DEGEURIN) You recall your testimony on direct about

13:46:34  a horse named Juanita Mi Amor?

13:46:38  A.  I do.

13:46:39  Q.  And the next thing we talked about was, coincidentally, it

13:46:46  was a photograph of Miguel Trevino and a bunch of other people,

13:46:52    and below him in the photograph is some kind of portrait was his

13:46:57    wife or somebody that you said was named Juanita?

13:47:00    A.    Yes.

13:47:02    Q.    And you didn't say that the coincidence of the horse being

13:47:08    Juanita Mi Amor belonging to Mr. Colorado, there was any

13:47:15    connection between that and the fact that you recognize a

13:47:20    photograph taken at a different time of Miguel with his wife

13:47:24    Juanita.  You made no connection yourself, did you, other than

13:47:28    coincidentally?

13:47:29    A.    I had insinuated it.

13:47:30    Q.    Yeah.  You insinuated it?

13:47:32    A.    Yes, sir.

13:47:33    Q.    The impression could have been made?

13:47:34    A.    That is correct.

13:47:35    Q.    I'm going to show you Colorado 17.  It's been admitted.  And

13:47:48    in the picture is Mr. Colorado, correct?

13:47:51    A.    Yes.

13:47:53    Q.    And if I tell you that this is his mother and his mother is

13:48:00    named Juanita, in fact, it's Juanita Cessa, are you going to

13:48:07    quarrel with me on that?

13:48:08    A.    I'd like to see it before I knew it.  Yes, sir.

13:48:12    Q.    You'd like to see some birth certificate of his mother?

13:48:17    A.    I have no way to know what her name is.

13:48:20    Q.    Well, when you're looking through the documents of Mr.

13:48:24    Colorado, isn't there ways that you can find out his mother and

13:48:28   his father and their names?

13:48:29   A.   I wasn't investigating his parents.

13:48:31   Q.   Okay.  So you'll agree with me if you look at that and it

13:48:37   turns out that her name is Juanita Cessa-Canton, you have those

13:48:45   documents somewhere, you just hadn't looked at it, correct?

13:48:47   A.   No.  There is no search warrant done on the house owned by

13:48:51   Cessa to get documents like that.

13:48:52   Q.   But you have documents of Mr. Colorado that show visas or

13:49:01   passports, and things like that, don't you?  You have access to

13:49:05   those.

13:49:05   A.   I have access to some immigration documents.

13:49:08   Q.   Okay.  And some of those documents could tell you the true

13:49:13   name of his mother, correct?

13:49:14   A.   Perhaps.  I'm not sure of that.

13:49:17   Q.   So you'll agree with me, at least you did not check that out

13:49:19   before you insinuated that the fact that he named a horse that he

13:49:27   liked, that he owned Juanita Mi Amor, that Mr. Colorado couldn't

13:49:34   have been referring to his mother Juanita Cessa-Canton, as

13:49:41   opposed to some persons other -- some other person's wife,

13:49:46   correct?  Will you agree with me that far?

13:49:50   A.   I got lost.

13:49:52   Q.   Okay.

13:49:52   A.   Agree to --

13:49:53   Q.   You did say that, in all fairness, that you did not say the

13:49:58   horse was named Juanita because Trevino's wife happens to be

13:50:04   named Juanita, too.  But you did admit that you kind of

13:50:09   insinuated that, didn't you?

13:50:10   A.   Yes, sir.

13:50:11   Q.   Okay.  When you made that insinuation, you had not

13:50:18   determined whether or not Mr. Colorado's mother is named Juanita?

13:50:22   A.   That's correct.

13:50:32   Q.   You were present in Houston when Mr. Colorado in my presence

13:50:43   presented himself for arrest?

13:50:46   A.   That's not true.

13:50:47   Q.   You were not in Houston at the time?

13:50:49   A.   No, sir.

13:50:49   Q.   You learned shortly after that that Mr. Colorado had gone to

13:50:53   court to present himself, correct?

13:50:55   A.   Yes, sir.  I learned when he turned himself in.

13:50:57   Q.   Okay.  And that's when you and Ms. Fernald came to Houston

13:51:11   to meet us the next day in the courtroom, I believe?

13:51:15   A.   I did not go to Houston.

13:51:16   Q.   He wasn't --

13:51:18        MS. FERNALD:  No.

13:51:19   Q.   (BY MR. DEGEURIN) Do you have a twin?

13:51:21   A.   Is he very good-looking?

13:51:25   Q.   I'm sad to say no, he wasn't.

13:51:28   A.   No.  I may have.

13:51:32   Q.   I did sketch it.  I guess that really isn't you.  I'll pass

13:51:46   the witness, your Honor.

13:51:46        THE COURT:  Mr. Womack.

13:52:00                    CROSS-EXAMINATION

13:52:00  BY MR. WOMACK:

13:52:02  Q.   Special Agent Lawson, I didn't draw a picture of you because

13:52:06  I can't.

13:52:11        Of the calls that were made by Tyler Graham on the

13:52:19  government phone, did you record all the calls?

13:52:23  A.   Every call on that phone was recorded.

13:52:26  Q.   Right.  And then, before coming into court, or having Mr.

13:52:31  Graham testify before the Court, you went through and selected

13:52:34  all the calls that you thought were most relevant in this case?

13:52:37  A.   That's correct.

13:52:38  Q.   And those are the ones that you presented to the jury?

13:52:42  A.   We selected some of the relevant ones to the jury.

13:52:44  Q.   Okay.  Of the calls made to and from Tyler Graham, for some

13:53:18  reason, I can't say his name.  I see TG and I don't know what it

13:53:23  stands for.

13:53:24        But of the calls involving Tyler Graham, there were no

13:53:26  calls between him and Fernando Garcia where Fernando Garcia told

13:53:33  Victor Lopez -- the calls between -- yeah.  There were no calls

13:53:38  where Fernando Garcia told Tyler Graham, Victor Lopez is going to

13:53:43  call and meet you with money.  That never happened, did it?

13:53:56  A.   There were calls where the name was mentioned.

13:53:59  Q.   Correct.

13:54:00  A.   In reference to money, but I don't know if that exact

13:54:02    sentence -- exact phrase was used.

13:54:05    Q.   Well, you know if there had been one like that, we'd have

13:54:08    all seen it, right?

13:54:11    A.   The decision was made not to play a whole lot of calls and

13:54:15    make the jury go crazy, sitting here all day.

13:54:18    Q.   But you certainly picked out the best ones, the ones that

13:54:20    were most relevant to the government case, right?

13:54:22    A.   For certain points, yes, sir.

13:54:24    Q.   Now, on this transaction where you sent an agent down to

13:54:41    Laredo to pick up cash, did Tyler Graham set that up with Victor

13:54:51    Lopez that they would meet in Laredo?

13:54:53    A.   The first money pick-up?

13:54:55    Q.   The one you had pictures of.

13:54:58    A.   We had pictures of two.

13:55:00    Q.   Okay.  And the first one, I think, was the larger amount of

13:55:03    money, and it was in front of the La Posada Hotel?

13:55:07    A.   It was La Posada was a smaller amount of money, 35,000.

13:55:11    Q.   Okay.

13:55:11    A.   January 2011.

13:55:12    Q.   Okay.  And there was one before that?

13:55:15    A.   There was one after in August at the Mall del Norte for

13:55:20    $59,750.

13:55:20    Q.   Okay.  So the smaller was the first one?

13:55:24    A.   Yes, sir.

13:55:25    Q.   And that was where someone undercover was in a blue pickup

| | |
|---|---|
| 13:55:32 | truck in front of La Posada? |
| 13:55:33 | A.   Exactly. |
| 13:55:34 | Q.   Okay.  And did Tyler Graham make the phone call to arrange |
| 13:55:39 | that? |
| 13:55:39 | A.   Yes. |
| 13:55:41 | Q.   And did Tyler Graham tell Victor Lopez, I want to have |
| 13:55:45 | someone pick up the money for me? |
| 13:55:46 | A.   Yes. |
| 13:55:47 | Q.   Okay.  And did he describe the person, give them a name or |
| 13:55:51 | something? |
| 13:55:52 | A.   He portrayed as one of his workers. |
| 13:55:54 | Q.   Okay.  And at least tell Tyler -- I mean, Victor Lopez, hey, |
| 13:56:00 | it's going to be a blue pickup truck. |
| 13:56:02 | A.   He probably did.  I think so. |
| 13:56:03 | Q.   He gave them enough information that Tyler Graham could find |
| 13:56:06 | the right vehicle? |
| 13:56:07 | A.   Victor could find the right vehicle. |
| 13:56:09 | Q.   Okay.  And you told us -- I think we saw pictures where you |
| 13:56:19 | set up surveillance of this meeting.  You called it a money drop? |
| 13:56:23 | A.   Yes, sir. |
| 13:56:23 | Q.   Okay.  Did you have -- now, when you say undercover, that |
| 13:56:29 | means it's actual police officers would be undercover, correct? |
| 13:56:31 | A.   Yes, sir. |
| 13:56:32 | Q.   And so, this undercover police officer in the blue pickup |
| 13:56:35 | truck, did he have a recording device of some kind? |

13:56:38    A.   He had a transmitter, and yes, he did have a recording

13:56:42    device.

13:56:42    Q.   Okay.  So y'all were able to listen in to the conversation

13:56:45    between those two?

13:56:45    A.   Yes.

13:56:47    Q.   Okay.  And who chose the spot, that location in front of La

13:56:58    Posada Hotel?

13:57:05    A.   I'm not certain.  That's a very common area for things like

13:57:08    that to take place.

13:57:09    Q.   Okay.  Had you been to La Posada Hotel before?

13:57:12    A.   Yes.

13:57:12    Q.   You know it's one of the nicer, old hotels in Laredo, isn't

13:57:16    it?

13:57:16    A.   The nicest, I would say.

13:57:18    Q.   Yeah.  And it backs right up to the Rio Grande River?

13:57:22    A.   Yes.

13:57:23    Q.   But there's a fence going behind the hotel all the way over

13:57:27    to the checkpoint where you could drive across or walk across

13:57:32    into Mexico?

13:57:32    A.   I think so.

13:57:33    Q.   Okay.  But it's close enough to the international bridge at

13:57:41    Laredo that somebody could easily walk across from Mexico into

13:57:45    America, take a left and walk a short distance to La Posada

13:57:50    Hotel?

13:57:51    A.   Yeah.  There's a plaza there where several persons are

13:57:54    picked up from Mexico.

13:57:54    Q.   Okay.  But you could actually walk there.  It's a short

13:57:58    walk, isn't it?

13:57:58    A.   That's correct.

13:57:59    Q.   And if you look out the front door of La Posada Hotel,

13:58:03    directly across from the front door of the hotel, there's a nice

13:58:07    park, isn't there?

13:58:08    A.   That's the plaza I was referring to.  Yes, sir.

13:58:10    Q.   Okay.  And during the day, at least during the week, there's

13:58:18    almost always people out there in that plaza walking around or

13:58:22    sitting and watching pigeons, or whatever?

13:58:24    A.   Yes, sir.

13:58:25    Q.   Okay.  And then, around that square park are businesses,

13:58:31    like, you know, clothing stores, maybe a bank, but just small

13:58:35    businesses around that square?

13:58:37    A.   There's buildings around the square.  I don't pay attention

13:58:41    to what they are.

13:58:41    Q.   Okay.  You have not walked from the La Posada to a

13:58:44    restaurant or anything nearby?

13:58:45    A.   There are things like that nearby for sure.

13:58:48    Q.   Okay.  You're familiar with it?

13:58:55    A.   Yes.

13:58:55    Q.   If I can see 375A and B.  It's photographs, I think, of

13:59:09    the --

13:59:09              MS. FERNALD:  Victor Lopez.

13:59:28          MR. WOMACK:  I've got the wrong number then.  I'm

13:59:29    looking for the one where Victor Lopez walks up.  I may have the

13:59:37    wrong number.  376.

13:59:53          MS. FERNALD:  373A through F is the August money

13:59:55    drop-off.  Is this the one?

13:59:58          MR. WOMACK:  Okay.  I'm looking for the one at La

14:00:01    Posada.

14:00:03          MR. GARDNER:  374A and C.

14:00:05    Q.   (BY MR. WOMACK) Thank you.  So 374.

14:00:09          Now, of the surveillance photos, this is the one that

14:00:14    shows Victor Lopez walking to the blue truck, driven by the

14:00:20    undercover police officer, correct?

14:00:23    A.   Of the ones here, yes, sir.

14:00:25    Q.   I'm sorry?

14:00:26    A.   Of the ones we presented.  Yes, sir.

14:00:28    Q.   All right.  That's what I mean.  There may be more pictures,

14:00:30    but this is the one you chose?

14:00:31    A.   Exactly.

14:00:32    Q.   And this accurately shows the way Victor Lopez looked as he

14:00:35    was walking up to the truck?

14:00:38    A.   Yes.

14:00:38    Q.   He's not wearing like a hood over his head?

14:00:41    A.   No, sir.

14:00:43    Q.   He's just walking up to the pickup truck?

14:00:45    A.   Yes, sir.

14:00:46   Q.   Could we look at the next one?  The next one.  It's where

14:00:57   the door is open on that truck and he's giving money to the

14:01:01   driver.  There we go.

14:01:03         Now, this picture here, this is C?  Is that right?  The

14:01:15   person in the middle with the white stripe on his running suit,

14:01:19   that's Victor Lopez, correct?

14:01:20   A.   Yes, sir.

14:01:22   Q.   And there's a suspicious-looking character standing behind

14:01:26   him.  Are these Zeta bodyguards?

14:01:28   A.   No, sir.  Not that I'm aware of.

14:01:31   Q.   They look like just local folks, don't they?

14:01:34   A.   Yes, sir.

14:01:36   Q.   Nothing suspicious-looking about them?

14:01:40   A.   No, sir.

14:01:49   Q.   And then, I think it's also 373 that shows the next one with

14:02:04   a white pickup truck.  Is that the next one?  I have it marked as

14:02:08   373A through F.  It's a different date, I think.  There we go.

14:02:17         Now, the Mall del Norte, is that on the American side?

14:02:24   A.   It is.

14:02:24   Q.   Okay.  And if we advance to another picture where we see

14:02:33   Victor Lopez.  Can we advance?  I'm trying to find where Victor

14:02:45   Lopez walks up.  There we go.

14:02:54         When you see Victor Lopez on this other occasion at the

14:02:58   Mall del Norte here, he's wearing jeans, it looks like, and a red

14:03:04   T-shirt.

14:03:04    A.    Yes.

14:03:05    Q.    Again, he's doing nothing to disguise who he is?

14:03:08    A.    No.

14:03:08    Q.    Okay.  And he doesn't appear to have any bodyguards or

14:03:11    anything with him, does he?

14:03:13    A.    He wouldn't be doing a good money drop if he had bodyguards

14:03:18    with him.

14:03:18    Q.    Really?

14:03:18    A.    No.  That would be a little -- that would draw attention, I

14:03:23    would think.

14:03:25    Q.    Okay.

14:03:26           THE COURT:  Question is, does it appear he had

14:03:29    bodyguards?

14:03:30           THE WITNESS:  It does not appear he had bodyguards.

14:03:33    Q.    (BY MR. WOMACK)  Okay.  You told us about Dr. Chapa.  You

14:03:46    said he was a veterinarian that's associated with the case?

14:03:50    A.    Yes, sir.

14:03:51    Q.    Okay.  And would it be fair to say, or accurate to say, that

14:03:58    y'all suspected that Dr. Chapa might be involved in something

14:04:02    wrong?

14:04:08    A.    I suspect he may have known whose horses he was treating.

14:04:13    Q.    Okay.  And that's because he had the horses frequently or he

14:04:22    was flown out of town; is that correct?

14:04:24    A.    I don't know how long he had those horses.

14:04:27    Q.    Okay.  But he had enough contact that you think he might

14:04:30    have suspected something?

14:04:32    A.    Yes.

14:04:33    Q.    Okay.  Do you know a Dr. Varner, who's a veterinarian in

14:04:37    College Station, Texas?

14:04:38    A.    I do not know him.  I've heard of him.

14:04:41    Q.    You know that he's, I guess, like the head of the horse

14:04:47    station at the vet school at Texas A & M University?

14:04:49    A.    That's correct.

14:04:50    Q.    And you know that Tempting Dash, the same horse I think that

14:04:55    Dr. Chapa was working on, he spent some time -- that horse was

14:05:00    actually stabled at Texas A & M University for quite some time.

14:05:04    You know that?

14:05:04    A.    Yes.

14:05:06    Q.    And Dr. Varner and a number of his students or other

14:05:09    veterinarians that were there at the school all did research and

14:05:15    study of Tempting Dash because of his -- I can't even say the

14:05:21    word.  He had some kind of a disease, correct?

14:05:23    A.    I'm not sure if his students studied Tempting Dash or not.

14:05:27    Q.    Okay.  Do you remember hearing the testimony from the

14:05:29    veterinarian the first week of testimony that worked for Jose

14:05:34    Trevino that is from Texas A & M and talked about Dr. Varner and

14:05:38    the research they did on Tempting Dash?

14:05:40    A.    I remember her saying that Tempting Dash was at A & M while

14:05:43    she was there.  But I thought she said she did not meet.

14:05:46    Q.    Right.

14:05:47   A.   Jose Trevino or deal with that situation.

14:05:49   Q.   Right.  I'm talking about the horse.  The horse was at Texas

14:05:53   A & M University?

14:05:53   A.   Yes.

14:05:53   Q.   And they were researching the animal, trying to find --

14:05:57   trying to develop a protocol so that Tempting Dash could continue

14:06:01   to breed without a big risk of passing on the piroplasmosis.

14:06:09   Remember that?

14:06:09   A.   Yes.  I know Dr. Varner was.  I'm not sure how many students

14:06:13   he had.

14:06:13   Q.   But y'all don't suspect Texas A & M University of being

14:06:19   associated with the Zetas in some way?

14:06:24   A.   Dr. Varner wasn't crossing into Piedras like Dr. Chapa was

14:06:29   with Jose Trevino.

14:06:29   Q.   So was that no, you don't?

14:06:30   A.   No.

14:06:31   Q.   If we look at 358D, it's a transfer report, hopefully.

14:07:28        Now, this transfer report form for the American Quarter

14:07:32   Horse Association that we're looking at is in Spanish.

14:07:35   A.   Yes.

14:07:36   Q.   Okay.  But you've seen a lot of these forms, correct?

14:07:40   A.   I have.

14:07:40   Q.   You've seen them in Spanish and in English?

14:07:43   A.   I have.

14:07:44   Q.   And would you agree they're all laid out the same way?

14:07:46   A.   I will.

14:07:47   Q.   And the area that's filled out, I believe Mr. Gardner said

14:07:53   that this was filled -- that it was blank.  You see it's not

14:07:56   really blank, is it?

14:07:57   A.   The seller portion is filled out.

14:07:59   Q.   Right.  And from your investigation of this case and from

14:08:04   sitting in here listening to the testimony of the official who

14:08:07   came in from the American Quarter Horse Association, you know

14:08:11   that when you sell a horse, the seller fills in his information

14:08:16   and signs it, and then, he gives the form to the buyer or the

14:08:21   buyer's agent.  At that point, the seller's done with the

14:08:24   transfer report form, correct?

14:08:26   A.   I would assume they do it together but.

14:08:28   Q.   Well, you know that the American Quarter Horse lady said

14:08:33   that's not the case because the buyer may never meet the seller,

14:08:37   correct?

14:08:39   A.   I don't guess the buyer would have to meet the seller.

14:08:44   Q.   And from your investigation of this case and from looking at

14:08:47   so many horse transfers of all kinds, you know that very often,

14:08:51   the buyer and seller don't have a closing together at the same

14:08:55   time, correct?

14:08:56   A.   In this case, they definitely do not.

14:08:58   Q.   And you know that from being in court when the lady

14:09:03   testified from AQHA, that the seller just fills out his part and

14:09:08   hands off the report form, and it could be filled out anytime,

14:09:11  correct?

14:09:12  A.   I would think the seller would list the horse; that way the

14:09:15  buyer can pick the horse.

14:09:16  Q.   She said it can be done that way, didn't she?

14:09:19  A.   With the horse listed, I would assume.

14:09:22  Q.   Why?  Actually, the person who's going to take the report

14:09:26  form and turn it in to the American Quarter Horse Association is

14:09:31  the --

14:09:31  A.   Buyer.

14:09:31  Q.   -- owner of the horse, correct?

14:09:33  A.   The buyer would take that form.

14:09:35  Q.   Right.  And the buyer, when we say buyer, we mean the owner

14:09:39  of the horse who's going to register it?

14:09:41  A.   The new owner.

14:09:42  Q.   In his or her name?

14:09:43  A.   The new owner, yes.

14:09:44  Q.   All right.  And so, the owner of the horse, the buyer of the

14:09:47  horse is the one that would complete this form and then, turn it

14:09:50  in to AQHA to register the horse, correct?

14:09:54  A.   In this setting, the buyer could take any of Jorge Luis

14:09:58  Ochoa's horses that he wanted to if they did not put the name of

14:10:02  the horse on their agreement.

14:10:03  Q.   Sure.  And if he's relying on someone to sell the horse for

14:10:05  him, or whatever, then this is all the seller has to do, isn't

14:10:09  it, is sign it and it goes to the buyer, correct?

14:10:14    A.   Pick a horse and then, sign it.  Yes, sir.

14:10:16    Q.   Okay.  If we can look at Exhibit 364.  It's NM.

14:11:23         There's a folder -- I just want to show you a folder.

14:11:33    This is an exhibit, Government's Exhibit 364NM, and then, it goes

14:11:41    documents A through triple D, correct?

14:11:43    A.   That's correct.

14:11:44    Q.   Okay.  And that's a folder that contains exhibits and these

14:11:47    are things that came from, I believe, a computer of Fernando

14:11:51    Garcia?

14:11:51    A.   That's correct.

14:11:52    Q.   And that his computer is a laptop, isn't it?

14:11:55    A.   I believe it was.

14:11:59    Q.   I want to show you one of the exhibits and it's triple B,

14:12:04    like Bravo.  BBB.  And that's this article that was printed off

14:12:27    or -- it was in the electronic files of Fernando's computer,

14:12:33    correct?

14:12:33    A.   That's correct.

14:12:34    Q.   And the article is in Spanish, isn't it?

14:12:37    A.   It is.

14:12:44    Q.   And it's about 11 pages long?

14:12:49    A.   I guess so.

14:12:51    Q.   I want to hand it to you and ask you to look at it here in

14:12:57    court.

14:12:58    A.   Okay.

14:12:59    Q.   During the course of the investigation, you've had someone

14:13:04    who speaks Spanish tell you what that is, haven't you?

14:13:12    A.   I read it myself and I believe I showed it to a Spanish

14:13:15    speaker, as well.

14:13:16    Q.   Okay.  And basically what it is is a history of Los Zetas?

14:13:29    A.   I'd say so.

14:13:30    Q.   Okay.  But it talks about other people, as well.  Like, for

14:13:35    example, early on, it talks about Pablo Escobar.  You know that

14:13:38    Pablo Escobar was Columbian, right?

14:13:44    A.   I want to say that I probably didn't read past the first

14:13:47    page of this document.

14:13:47    Q.   Okay.  Well, do you notice that it has names in it?

14:13:53    A.   Do I know this now?

14:13:54    Q.   Yes.  As you look at it now, do you the see that it has

14:13:58    names?

14:14:02    A.   Yes.

14:14:03    Q.   Okay.  And would you agree with me that the name of a

14:14:09    Mexican, like Miguel Trevino-Morales or Omar Trevino-Morales, if

14:14:18    it's written in Spanish or it's written in English, it looks

14:14:23    exactly the same, doesn't it?

14:14:24    A.   It does.

14:14:25    Q.   Okay.  I want you to look through that 11-page article and

14:14:28    when you find the name Miguel Trevino-Morales or any combination,

14:14:35    Miguel Trevino, whatever, or if you find the No. 40, you know,

14:14:40    this number, or if you find the name Omar Trevino-Morales or the

14:14:45    No. 42, when you find that, if you'll look back up and let us

14:14:49    know, okay?

14:16:23    A.    I didn't see it.

14:16:25    Q.    You don't know whether or not Fernando Garcia read that

14:16:29    article, correct?

14:16:31    A.    Just know that he named it.

14:16:33    Q.    You know it's in his file, but you don't know if he read it,

14:16:36    correct?

14:16:37    A.    No.  I don't know that.

14:16:38    Q.    But you can tell the jury, if he did read it, he would not

14:16:43    have seen any names Miguel Trevino-Morales or anyone called "40."

14:16:50    He would not have seen anyone named Omar Trevino-Morales or No.

14:16:54    "42," would he?

14:16:56    A.    In my cursory review, I did not see those names.

14:16:59    Q.    So you're telling the jury, you need more time to look at

14:17:01    it?

14:17:03           MR. GARDNER:  Your Honor, we'll concede that Miguel or

14:17:05    Omar Trevino or "40" or "42" is not in that document.  We'll

14:17:09    concede that.

14:17:09           THE COURT:  Well, it's obvious from the first question

14:17:12    it's not in there.  But I think everybody can agree it's not in

14:17:16    there.

14:17:17           MR. WOMACK:  Thank you, sir.

14:17:25    Q.    (BY MR. WOMACK) In addition to that article, you just saw

14:17:50    that Fernando Garcia had lots of articles on his computer, didn't

14:17:53    he?

14:17:58   A.   I don't remember how many articles he had.

14:18:01   Q.   Okay.  But there were quite a few of them, aren't there?

14:18:04   A.   I really don't remember.

14:18:05   Q.   Okay.  Well, you remember this.  There was no other article

14:18:07   about Zetas, was there?

14:18:09   A.   If I would have seen another article, I would have flagged

14:18:12   it.

14:18:12   Q.   I'm sorry?

14:18:12   A.   If I would have seen another article in the Zetas, I

14:18:16   definitely would have flagged it.

14:18:17   Q.   Okay.  And so, you did not see others, correct?

14:18:20   A.   No.

14:18:21   Q.   Okay.  You did see articles about -- well, excuse me.  You

14:18:27   saw copies of sales catalogs, the electronic version on his

14:18:31   computer, didn't you?

14:18:32   A.   I remember that.  Yes.

14:18:32   Q.   Okay.  And, of course, you've identified sales catalogs here

14:18:38   in court that you found in his belongings, correct?

14:18:52   A.   Yes.

14:18:53   Q.   And you could tell from these that he had thumbed through

14:18:56   them, had made notations on a number of horses in those catalogs?

14:19:01   A.   That's correct.

14:19:07   Q.   Before I leave the computer to go to other things, you

14:19:23   didn't find any files in his computer that mentioned he knew

14:19:30   anything about Zetas, did you?

14:19:32   A.   Besides the one article we just saw.

14:19:34   Q.   Right.  The one article that you said he may have read or he

14:19:37   may not.  But you found nothing else, not one bit of information

14:19:41   in his computer where he talked to anyone about any Zetas,

14:19:44   correct?

14:19:47   A.   Only that one article.

14:19:48   Q.   Okay.  And you found no -- you didn't see the name Miguel

14:19:55   Trevino-Morales, or Omar Trevino-Morales, or "40," "42," anywhere

14:20:01   in his computer, did you?

14:20:05   A.   Not those names specifically, no.

14:20:06   Q.   He had a lot of photographs on his computer, too, didn't he?

14:20:14   A.   He did.

14:20:15   Q.   And there were no pictures on his computer of Miguel

14:20:19   Trevino-Morales or Omar Trevino-Morales?

14:20:23   A.   There was not.

14:20:39   Q.   From the same file there's Exhibit double B, two-B.

14:20:59   A.   Okay.

14:21:00   Q.   This picture's -- if I wrote the number down right -- of him

14:21:10   boarding a private jet?

14:21:11   A.   That's correct.

14:21:20   Q.   And had pictures taken of himself standing by the wing of

14:21:24   the plane, didn't he?

14:21:25   A.   He did.

14:21:25   Q.   And there's a series of photos like this where he's standing

14:21:28   at the doorway, commemorating this trip that he took one way from

14:21:35   Houston to California?

14:21:37   A.   Yes.

14:21:39   Q.   You could tell he seemed very excited about this, didn't he?

14:21:41   A.   He was proud of that trip.

14:21:43   Q.   And from all the photographs you've looked at, as far as you

14:21:49   could tell, this is the only trip he's never taken in his life on

14:21:53   a private jet?

14:21:59   A.   That's the only one I knew of on a private jet.

14:22:09   Q.   His computer, his laptop wasn't password-protected, was it?

14:22:15   A.   I don't know.

14:22:17   Q.   Okay.  If we look at 106C.  There we go.  This exhibit

14:23:03   that's on the overhead right now, remember seeing that?

14:23:06   A.   I do.

14:23:07   Q.   And notice it has the horses broken down into three lists?

14:23:11   A.   I do.

14:23:11   Q.   And it has the -- these numbers, the two or three different

14:23:17   numbers, we believe those are the hip numbers, don't we?

14:23:20   A.   Yes.

14:23:20   Q.   And that relates to the number identifying the horse at

14:23:23   sale?

14:23:23   A.   That's correct.

14:23:24   Q.   And you notice he broke it into columns regular, I'm going

14:23:28   to say passable, misspelled, or maybe it's in Spanish, correct?

14:23:32   I don't know.  And then, bueno.  Do you see that?

14:23:39   A.   I do.

14:23:39  Q.   As you recall looking at these horses -- you know that the

14:23:41  ones that he has under bueno, these are the best horses that he

14:23:45  identified in the catalog, wasn't it?

14:23:47  A.   That may be right.  I can't remember for sure.

14:23:51  Q.   Okay.  But it certainly appears from the headings and from

14:23:56  your investigation that he broke the horses in this particular

14:24:00  sale into three different columns.  And it would appear the far

14:24:04  right one, the buenos were, you believe, may be the best horses?

14:24:08  A.   It appears he ranked them.  Yes, sir.

14:24:10  Q.   Thank you.  Could we see Government's Exhibit 140?

14:24:59       Now, this exhibit here, if you could make it out, dated

14:25:03  10 July 2010, that appears to be a sales agreement or a contract

14:25:13  of some kind where Garcia Bloodstock is selling Mr. Piloto to

14:25:20  Jose Trevino or his company, correct?

14:25:23  A.   It does.

14:25:24  Q.   And you know that July 10, 2010, that's actually almost two

14:25:32  months before Mr. Piloto ran in the All American Futurity?

14:25:37  A.   I do.

14:25:39  Q.   Because we know from Garcia's Exhibit 32, DVD of the race

14:25:43  and other evidence in the case, that race was on September 6th of

14:25:48  2010?

14:25:49  A.   The finals were, yes, sir.

14:25:50  Q.   Okay.  And you've heard all the testimony that Garcia

14:25:55  Bloodstock, which is Fernando Garcia, owned Mr. Piloto until

14:26:00  after Mr. Piloto qualified for the finals, and then, during that

14:26:06    three-week period, he actually sold the horse to Tremor

14:26:10    Enterprises, correct?  That's what you've heard.

14:26:13    A.    We've heard that.

14:26:14    Q.    Okay.  And this contract would seem to contradict -- it

14:26:21    would make it look like the horse was sold before it qualified

14:26:25    for the All American?

14:26:26    A.    Definitely would.

14:26:27    Q.    Because you know the trials for the All American Futurity

14:26:30    were held three weeks before September 6th of 2010, correct?

14:26:36    A.    Two or three weeks.

14:26:38    Q.    Okay.  So that would put it sometime around mid-August of

14:26:42    2010?

14:26:42    A.    August 19th, 2010.

14:26:44    Q.    From your investigation in this case and from all the

14:26:48    witnesses you've talked to, like Butch Wise, Bill Price and

14:26:53    others, you know that often, there will be a sales contract

14:26:57    filled out, but you won't actually transfer the horse into the

14:27:02    name of the buyer until the closing or they pay for it, correct?

14:27:08    Is that correct?

14:27:13    A.    Will you repeat that?

14:27:14    Q.    Okay.  From your investigation in this case, which includes

14:27:18    talking to people like Butch Wise and Bill Price, hearing

14:27:22    testimony in this case, you know that it's common in the horse

14:27:25    business that there may be a sales contract, there may be an

14:27:29    agreement, whether written or oral, to sell and someone else buy

14:27:33   the horse, but you won't actually transfer the horse until you've

14:27:36   been paid or some other conditions are met, correct?

14:27:41   A.   I remember Bill Price saying that.

14:27:42   Q.   Okay.  And from your work in this case, you know that that

14:27:46   seems to be fairly common, doesn't it?  "Yes" or "No"?

14:27:51   A.   Not like this.

14:27:52   Q.   Okay.  Do you remember that Bill Price testified about a

14:27:56   horse that he sold?  I think it was a -- I probably have it

14:28:02   wrong.  I think it was A Dash Of Sweet Heat?

14:28:04   A.   No.

14:28:04   Q.   That he sold -- remember I asked him about it.  He first

14:28:08   said he sold the horse on a certain date, but then, he says he

14:28:12   got paid for it like -- and gave it to the buyer like four months

14:28:15   later.  Remember that?

14:28:16   A.   It wasn't Dash of Sweet Heat.  I remember that.  Yes.

14:28:20   Q.   Whatever horse it was, though, he said he had done that, and

14:28:23   remember I asked him about it:  Well, did you really sell it that

14:28:27   day, or do you think you sold it the day you gave it to the

14:28:29   buyer?  He said, really, I guess I sold it the day I handed it to

14:28:32   the buyer.  Remember that?

14:28:34   A.   Yeah.  They didn't do a contract like this.

14:28:36   Q.   Right.  So this was done orally?

14:28:38   A.   I assume.

14:28:39   Q.   But you know for Bill Price, a handshake is as good as

14:28:45   signing a piece of paper.  He said that to him, when the man told

14:28:48    him, I'm buying that horse, he considered it sold that day,

14:28:51    didn't he?

14:28:59    A.    I don't remember what he said to that.

14:29:01    Q.    Don't you remember he said, I kept the horse for him and I

14:29:05    started worrying about if he's going to pay me or not?

14:29:08              MR. GARDNER:  Your Honor, asked and answered at this

14:29:09    point.  He said he doesn't remember what Mr. Price said.

14:29:12              MR. WOMACK:  I'm hoping this will refresh his

14:29:14    recollection, your Honor.

14:29:14              THE COURT:  Okay.

14:29:15    Q.    (BY MR. WOMACK) Does that refresh your recollection?  Do you

14:29:17    remember that?

14:29:17    A.    I remember he held the paper till he got the money.  Yeah.

14:29:20    I remember that.

14:29:20    Q.    Remember he even laughed that all the four months he was

14:29:23    holding the horse, he was paying all the expenses for the horse

14:29:26    himself when he was waiting for the buyer to come get it?

14:29:30    A.    Yeah.  I think so.

14:29:31    Q.    Okay.  Now, the transfer from Garcia Bloodstock to Tremor

14:29:59    Enterprises actually didn't happen until just like the day before

14:30:01    the race; is that correct?

14:30:02    A.    That's correct.

14:30:03    Q.    And, in fact, you may have noticed in Garcia 3, the DVD of

14:30:11    the race on the TV screen, if you're watching, the race actually

14:30:16    showed Garcia Bloodstock is the owner of the horse, didn't it?

14:30:20   Or do you remember that?

14:30:21   A.   I don't remember.

14:30:21   Q.   Okay.  But if it does show that?

14:30:23   A.   It wouldn't surprise me.

14:30:24   Q.   But you know why.  The day before the race, the American

14:30:30   Quarter Horse Association did transfer the title into Tremor

14:30:34   Enterprises?

14:30:34   A.   In real life, yes, sir.

14:30:35   Q.   That's what we're looking at is real life?

14:30:39   A.   Yes, sir.  I hope so.

14:30:46   Q.   Government's Exhibit 1 deals with Tempting Dash.  Remember

14:30:55   that horse?

14:30:55   A.   I sure do.

14:30:56   Q.   And Tempting Dash in this photograph -- well, first of all,

14:31:01   Fernando Garcia is not in that photograph, is he?

14:31:03   A.   I don't believe so.

14:31:04   Q.   Of that host of folks, you know he's not there.  And this

14:31:08   happened in 2009, didn't it?

14:31:09   A.   That's correct.

14:31:11   Q.   And you know from your investigation of this case, Fernando

14:31:16   Garcia started interacting with these individuals that are

14:31:19   sitting here at the table in 2010, correct?

14:31:22   A.   March 2010 is the first time I heard about Fernando Garcia.

14:31:25   Q.   Okay.  I want to talk to you just a little bit about cash

14:31:50   awards for federal agents.

14:31:53   A.   Okay.

14:31:54   Q.   Who participate in criminal investigations.  At the close of

14:32:01   a criminal case, an agency of the federal government, either the

14:32:06   FBI, the U.S. Attorney's Office, a federal agency can put in

14:32:12   agents for what's called a cash award; is that correct?

14:32:16   A.   They can.

14:32:17   Q.   And you know that these cash awards for the agents can go as

14:32:21   high as $25,000.  Did you know that?

14:32:24   A.   I did not know that.

14:32:26   Q.   If I show you Title 5 of the U.S. Code, Chapter 45, which

14:32:39   I'm marking as Garcia Exhibit 5 -- you were present this morning

14:32:48   before court when I showed this to the prosecutors?

14:32:52   A.   Yes.

14:32:52   Q.   And I told them I was going to ask you about cash awards?

14:32:56   A.   Okay.  Yes.

14:32:59   Q.   If you'll look at this document, Chapter 45 is entitled,

14:33:09   incentive awards, correct?

14:33:10   A.   It is.

14:33:10   Q.   And that's Title 5 of the U.S. Code, Chapter 45.  And it

14:33:17   talks about there's a heading for 4503 -- subchapter 4503 that

14:33:22   deals with agency awards.

14:33:24   A.   Yes, sir.

14:33:25   Q.   And under 4503, agency awards, it says that the head of an

14:33:40   agency may pay a cash award to an employee who performs a special

14:33:46   act or a service in the public interest in connection with or

14:33:49    related to his official employment.

14:33:51    A.    It does.

14:34:07    Q.    Typical government document, a lot of pages.  And 4502 of

14:34:16    the chapter, general provisions says, except as provided in

14:34:21    subsection B -- and they always say that -- it makes it

14:34:25    complicated.  But except as provided in subsection B of this

14:34:28    section, a cash award under the subchapter may not exceed

14:34:32    $10,000.

14:34:32    A.    It does say that.

14:34:34    Q.    And then, the next paragraph, just to contradict it, it

14:34:36    says, B, when the head of an agency certifies to the office of

14:34:40    person --

14:34:41          MR. GARDNER:  Your Honor, I'm going to object at this

14:34:43    point.  This is Mr. Womack is just testifying from the exhibit.

14:34:45    If he wants to introduce it, we have no objection to it.  Asking

14:34:47    the special agent questions off the exhibit at this point is just

14:34:49    testimony by Mr. Womack, your Honor.

14:34:52          MR. WOMACK:  Your Honor, this will save a lot of paper

14:34:54    if he could -- let me do it this way.

14:34:55    Q.    (BY MR. WOMACK) If you'll read that paragraph B of 4502.

14:35:06    A.    Okay.

14:35:06    Q.    It says in there that if the head of the agency certifies

14:35:11    that this is a really big deal, then -- to OPM, then the actual

14:35:16    cash award could be up to $25,000?

14:35:18    A.    It does say that.

14:35:19   Q.   Sir, I've retrieved Garcia 5.  I don't plan to offer it, but

14:35:25   I'll give it to the clerk so it will be complete in the record.

14:35:31           And that award of $25,000, that could go to every agent

14:35:36   on the case, couldn't it?

14:35:40   A.   I guess it could.

14:35:51   Q.   In your time with the FBI, would it be fair to say this is

14:36:03   the biggest investigation you've been involved in?

14:36:05   A.   Oh, yeah.

14:36:07   Q.   How many FBI agents, just agents, not support, but how many

14:36:12   special agents of the FBI do you believe have worked with you on

14:36:15   this case?

14:36:17   A.   Full-time as their main case?

14:36:19   Q.   Yeah.  Let's say full-time.

14:36:24   A.   Just one other that heart and soul, their main thing.

14:36:30   Q.   And you've had other special agents assist for at least

14:36:33   brief periods of time?

14:36:33   A.   That's correct.

14:36:34   Q.   And then, the Internal Revenue Service, they have had a

14:36:37   large contingent of agents working, haven't they?

14:36:40   A.   They've had two agents and several support task force

14:36:44   officers.

14:36:44   Q.   Okay.  And we heard from Special Agent Schutt that he had a

14:36:50   team of eight working under him at his direction.

14:36:53   A.   Schutt is a task force officer that was working under

14:36:58   Special Agent Pennington.

14:36:58    Q.    Oh, okay.  Is he not in the IRS?

14:37:00    A.    No, sir.  He's a task force officer.

14:37:02    Q.    Okay.  Working with the federal government?

14:37:05    A.    Yes.

14:37:06    Q.    And he had a team of eight working for him?

14:37:11    A.    I could summarize the team if you'd like.

14:37:13    Q.    No.  Just I want to get a picture there's a lot of folks

14:37:17    involved.  The DEA has been involved?

14:37:19    A.    They have.

14:37:20    Q.    Any other federal agencies other than the U.S. Attorney's

14:37:23    Office?

14:37:23    A.    ICE or HSI has helped at times.  Border Patrol had helped at

14:37:30    times.  Customs has helped at times.  Pretty much the alphabet

14:37:38    soup has helped in some form or fashion.

14:37:40    Q.    And, again, this is because this has been a long-running,

14:37:44    very large investigation?

14:37:44    A.    It was.

14:37:45    Q.    Thank you.  Sir, we have no further questions.

14:37:51              THE COURT:  Mr. Esper.

14:37:52              MR. ESPER:  Yes, sir.

14:37:57                      CROSS-EXAMINATION

14:37:57    BY MR. ESPER:

14:38:04    Q.    Mr. Lawson, I promise you I'll be brief.

14:38:06              Mr. Gardner asked you about Eusevio Huitron's border

14:38:10    crossings.  Remember those questions?

14:38:12    A.    I do.

14:38:12    Q.    And he asked you for the years 2009, 2010 and 2011, correct?

14:38:18    A.    I gave him two years.

14:38:21    Q.    Two years?

14:38:22    A.    Yeah.  I think it covered 9 through 11.

14:38:25    Q.    2009, 2010, 2011?

14:38:27    A.    Yes.

14:38:27    Q.    I believe there were a total of seven crossings in that

14:38:30    three-year period, correct?

14:38:31    A.    Yes.

14:38:31    Q.    And if my division is correct, that's about once every five

14:38:35    or six months, roughly, two times a year?

14:38:39    A.    Yeah, a little over one every five months and some change.

14:38:43    Q.    Okay.  A couple of times year.  Would that be fair to say?

14:38:45    A.    Pretty close.

14:38:46    Q.    Okay.  Now, do you know -- and if you don't, simply say

14:38:49    so -- whether Mr. Huitron -- in the course of your investigation,

14:38:52    you've discovered that he has family that lives south of Piedras

14:38:57    Negras?

14:38:57    A.    Yes.

14:38:57    Q.    And so, obviously if he's going to visit his family, the

14:39:02    most logical place to cross would be at Eagle Pass and then, into

14:39:06    Piedras Negras?

14:39:06    A.    Yes.

14:39:06    Q.    Okay.  And these seven crossings, you have no information as

14:39:10    to what he did in Mexico on those seven occasions, do you?

14:39:15    A.    From the testimony of Cuellar, I have information on one of

14:39:18    the crossings.

14:39:19    Q.    Well, Mr. Cuellar came to this country in March of 2011, did

14:39:22    he not?

14:39:23    A.    He did.

14:39:23    Q.    Okay.  And he came here for protection, correct?

14:39:27    A.    That's pretty fair.  Yes, sir.

14:39:29    Q.    Okay.  And those crossings for 2011 for Mr. Huitron are

14:39:33    subsequent to when he came to the United States?

14:39:35    A.    I didn't say 2011.

14:39:39    Q.    You said Mr. Cuellar came to see him in 2010 or '09?

14:39:43    A.    No.  I said I know on one occasion that "Chevo" crossed to

14:39:47    Mexico, what he did there due to Mr. Cuellar's testimony.

14:39:49    Q.    That's according to Mr. Cuellar?

14:39:51    A.    Exactly.

14:39:51    Q.    Okay.  Now, in the course of your investigation, you have

14:39:59    learned, have you not, Agent Lawson, that the horse industry in

14:40:06    the United States is very heavily dominated or large membership

14:40:13    is non-based -- non-U.S.-based, correct?

14:40:18    A.    I don't know I'd use the term "dominated," but I'll

14:40:21    definitely say there's a large membership outside the U.S.

14:40:23    Q.    About 50 percent of the racing industry -- I'm talking about

14:40:27    owners and trainers are non-U.S.-based.  Would that be a fair

14:40:32    statement?

14:40:32    A.    I don't know the percentage.

14:40:33    Q.    Okay.  You don't recall whether you testified to that prior

14:40:37    in grand jury or not?

14:40:38    A.    I don't recall.

14:40:39    Q.    Okay.  Do you also know -- you've heard Mr. Graham's

14:40:44    testimony yesterday obviously?

14:40:45    A.    I did.

14:40:45    Q.    And you heard him testify that after you and your fellow

14:40:50    agents have paid him a visit, he still felt like -- even though

14:40:53    he agreed to cooperate, he felt like he hadn't done anything

14:40:55    wrong, correct?

14:40:56    A.    Yeah.  I heard him say that.

14:40:57    Q.    Now, he also told you in the course of this investigation

14:41:01    that he knew Eusevio Huitron, that they were friends, correct?

14:41:04    A.    Yes, sir.

14:41:04    Q.    And that Mr. Huitron, in fact, had trained a couple of his

14:41:08    horses, correct?

14:41:09    A.    Yes.

14:41:10    Q.    Okay.  And that there came a time, sometime in 2009, where

14:41:15    Mr. Huitron -- according to Tyler Graham, that Mr. Huitron told

14:41:21    him that, hey, there's this new group from Mexico coming up with

14:41:25    very good horses and very large pockets and they know nothing

14:41:29    about the breeding part of the business, correct?

14:41:34    A.    I know Tyler said that before.

14:41:37    Q.    Okay.  And that Mr. Huitron told Tyler that all they know is

14:41:42   spend the most money and hope the horse wins, something to that

14:41:46   effect, correct?

14:41:48   A.   I don't remember that specifically.  I could see that being

14:41:51   inferred, but I don't remember that.

14:41:52   Q.   I'm sorry.  I didn't hear that.

14:41:53   A.   I could see where that might be inferred, but I don't

14:41:56   remember seeing that specifically.

14:41:57   Q.   Do you remember testifying to that in front of the grand

14:41:59   jury?

14:41:59   A.   To what?

14:42:00   Q.   Those exact words?

14:42:02   A.   What exact words?

14:42:04   Q.   May I approach the witness, your Honor?  I could bring the

14:42:08   whole transcript, Mr. Lawson.  But there is a portion of your

14:42:11   testimony in front of a federal grand jury when you were under

14:42:14   oath.

14:42:14   A.   And what do you want me to look at?

14:42:17   Q.   This portion right here.  Does that refresh your memory, Mr.

14:43:17   Lawson?

14:43:19   A.   I guess.

14:43:20   Q.   Well, that's you testifying, isn't it?

14:43:23   A.   I'm not sure.  Multiple people testified in the grand jury.

14:43:35   I don't dispute the facts that are laid out there.

14:43:38   Q.   Okay.

14:43:39   A.   If that's where you're going.

14:43:40   Q.   You want me to show you that that's you testifying?  I will

14:43:44   if you want me to.

14:43:46   A.   Like I said, I do not dispute what is laid out in that

14:43:48   testimony.

14:43:48   Q.   Okay.  And according to Mr. Tyler Graham, Mr. Huitron said,

14:44:02   if you want me to introduce you to these people for the purposes

14:44:05   of the breeding operation, you might be able to make some money?

14:44:07   A.   Yes.

14:44:08   Q.   Okay.  And so, Tyler Graham basically said, yeah, correct?

14:44:14   A.   Yes.

14:44:15   Q.   Okay.  And, in addition, Mr. Graham also indicated -- or at

14:44:23   least you in your testimony indicated that it wasn't unusual for

14:44:26   someone to be told that there are new people with money from

14:44:29   Mexico that want to start running horses, correct?

14:44:34   A.   I said it wasn't unusual for somebody to be told there's new

14:44:37   people with horses?

14:44:38   Q.   Yes.

14:44:41   A.   I'm not sure if I said that or not.

14:44:42   Q.   Pardon me?

14:44:43   A.   I'm not sure if I said that or not.

14:44:46   Q.   Do you want me to refresh your memory again?

14:44:48   A.   You're welcome to.

14:44:50   Q.   Thank you.

14:45:18   A.   That was in the context of saying there's several people

14:45:20   from outside the country in the horse industry.

14:45:22   Q.   Yes.  And you did say, so anyway, it wasn't unusual for him

14:45:26   to be told that there are some new people with money from Mexico

14:45:29   that want to start running horses?

14:45:30   A.   I agree with that.

14:45:31   Q.   Okay.

14:45:31   A.   You've got to put it in context if you're going to use it

14:45:34   like that.

14:45:35   Q.   Okay.  Well, you've read this -- this is your grand jury

14:45:40   testimony, correct?

14:45:41   A.   I think so.

14:45:42   Q.   And the questions I'm asking you are verbatim questions from

14:45:46   your testimony, right, sir?

14:45:50   A.   Verbatim?  I didn't ask those questions in my testimony.

14:45:52   Q.   These are in -- I'm sorry.  The questions I'm asking you

14:45:55   come from -- they're verbatim questions that come directly from

14:45:59   your testimony under oath in front of a grand jury?

14:46:02   A.   Yes.  I'm not arguing any of these facts.

14:46:05   Q.   Thank you very much.

14:46:06        Now, I believe we -- could you pull up 375C?  A, B and

14:46:15   C?  Let's start with C.

14:46:23        MS. FERNALD:  We don't have that one.  375C.

14:46:47   Q.   (BY MR. ESPER) This is a photograph of Mr. "Chevo" Huitron

14:46:55   and a jockey, correct?

14:46:56   A.   That is correct.

14:46:56   Q.   And that's at Retama Park on or about July 2nd, 2011?

14:47:01    A.    Yes, sir.

14:47:02    Q.    Okay.  And the horse that is involved in this scenario is

14:47:08    Fly Corona, correct?

14:47:09    A.    That's correct.

14:47:10    Q.    Okay.  And Fly Corona, I believe, had run earlier that year

14:47:15    at Remington Park in April of 2011.

14:47:18    A.    That's right.

14:47:19    Q.    Okay.  And where is Remington Park?

14:47:21    A.    Oklahoma City.

14:47:21    Q.    Okay.  And the trainer in the Remington Park race was a

14:47:29    trainer named Paul Jones, correct?

14:47:31    A.    That seems to be right.

14:47:32    Q.    Okay.  But yet, in this -- in July of 2011, Mr. "Chevo"

14:47:36    Huitron is now the trainer?

14:47:37    A.    That's right.

14:47:38    Q.    Okay.  And did this horse win this race at Retama Park?

14:47:42    A.    Fly Corona?

14:47:43    Q.    Yes.

14:47:45    A.    Yes.

14:47:45    Q.    Okay.  And you went up there to surveil because Tyler Graham

14:47:48    had told you that some people were going to be up here that you

14:47:51    were looking at, correct?

14:47:52    A.    Yes.

14:47:53    Q.    Okay.  Now, there were a number of horses that Mr. Gardner

14:48:00    asked you about.  I believe it's an Exhibit 102.  Do you remember

14:48:04    there was -- starting out with Reba Reba Corona?  There was a

14:48:07    whole list of horses, correct?

14:48:10    A.   Several pictures of different horses.

14:48:11    Q.   Yes.  And I believe he went through about 13 different

14:48:16    horses?

14:48:16    A.   Sounds about right.

14:48:17    Q.   And I think all these horses apparently won races at

14:48:21    different times, correct?

14:48:22    A.   Yes, sir.  There were winner circle photos.

14:48:24    Q.   Okay.  And Reba Reba Corona, the trainer was "Chevo"

14:48:30    Huitron, correct?  If you recall?

14:48:31    A.   I do not recall.

14:48:32    Q.   Okay.  Juanita Mi Amor, the trainer was Paul Jones, correct?

14:48:38    Do you recall?

14:48:39    A.   Sounds right.

14:48:39    Q.   Okay.  Blues Ferrari was Adan Farias, correct?

14:48:44    A.   I think so.

14:48:45    Q.   Okay.  Big Daddy Cartel, Paul Jones, correct?

14:48:51    A.   I did not memorize the trainers for every race photo.

14:48:55    Q.   I understand.

14:48:56    A.   But that sounds right.

14:48:57    Q.   I'm trying to avoid some time in having to go through all

14:49:00    these.

14:49:00    A.   Okay.

14:49:01    Q.   "Big-utty" -- B-I-G -- or --

14:49:04    A.    Bugatti.

14:49:06    Q.    Bugatti was trained by "Chevo" Huitron, correct?

14:49:08    A.    I think so.

14:49:10    Q.    Lady Nayen, "Chevo" Huitron, correct?

14:49:13    A.    Yes.

14:49:13    Q.    Times Awasting, Adan Farias?

14:49:17    A.    I'm not sure.

14:49:18    Q.    Okay.  Mr. Piloto was Mr. Quintero?

14:49:26    A.    On paper, yes.

14:49:26    Q.    Number One Cartel, I didn't have -- the trainer was not

14:49:31    listed on there.  Would that be an accurate statement?

14:49:36    A.    I don't remember.

14:49:36    Q.    Okay.  Mi, M-I, Flash, Paul Jones being the trainer?

14:49:41    A.    Sounds right.

14:49:42    Q.    Okay.  Fly First Down, Paul Jones being the trainer?

14:49:47    A.    Sounds right.

14:49:48    Q.    Okay.  Tempting Dash, of course, "Chevo" Huitron was the

14:49:51    trainer, correct?

14:49:52    A.    Yes.

14:49:53    Q.    And Feature Honor, Mr. Quintero being the trainer?

14:49:57    A.    On paper, yes, sir.

14:49:58    Q.    Pardon me?

14:49:58    A.    On paper, yes, sir.

14:49:59    Q.    Okay.  Now, this particular -- and during the course of your

14:50:08    investigation, did you overhear any calls that Tyler Graham ever

14:50:15    made to "Chevo" Huitron?

14:50:16    A.    No.

14:50:17    Q.    No calls at all?

14:50:18    A.    No.

14:50:19    Q.    Okay.  And did you at the time of -- we've learned in the

14:50:24    course of this case that Mr. Huitron had a cellphone that was

14:50:27    seized by one of the other agents there on June the 12th?

14:50:31    A.    Yes.

14:50:31    Q.    And that we saw some testimony -- I believe it was last

14:50:34    Friday or last Thursday -- where the agent, the DEA agent had put

14:50:41    these cellphones into one of these machines that prints up all

14:50:44    the contact numbers?

14:50:45    A.    Yes, sir.  FBI Agent Kevin Hicks.

14:50:48    Q.    That one of the listings in there was for Garlos,

14:50:53    G-A-R-L-O-S, Nayen, correct?

14:50:54    A.    That was right.

14:50:54    Q.    And this particular picture, this Tempting Dash picture,

14:51:00    Government's Exhibit 1, you found a similar -- is this the one

14:51:06    found in Mr. Trevino's?

14:51:07    A.    Is that the exhibit number?

14:51:12    Q.    This is the photograph, is it not?  Can you see that?

14:51:20    Sorry.

14:51:21    A.    I can see Tempting Dash.

14:51:22    Q.    Yeah.  Okay.  This is the photograph that was, I believe,

14:51:27    seized from the Huitron Homes office?

14:51:30    A.   Yes, sir.

14:51:30    Q.   Okay.  And it shows Mr. Huitron as being the trainer?

14:51:34    A.   It does.

14:51:35    Q.   And in this winner's circle, it seems like half of Austin is

14:51:40    in that picture, does it not?

14:51:42    A.   It does.

14:51:43    Q.   Okay.  And one of the individuals is "Chevo" Huitron

14:51:45    standing next to Mr. Nayen?

14:51:46    A.   That's correct.

14:51:46    Q.   And there's a whole host of people, many of these you don't

14:51:49    know who they are, do you?

14:51:50    A.   That's correct.

14:51:51    Q.   Okay.  Do you recognize Mr. Huitron's son Adrian Huitron in

14:51:55    that picture?  Do you know what he looks like?

14:51:58    A.   I believe I know what he looks like.

14:51:59    Q.   Okay.

14:52:05    A.   Yeah.  That's him.

14:52:06    Q.   Okay.  And in the course of your investigation, Agent

14:52:16    Lawson, the horse-racing industry, at least along the southern

14:52:21    part of United States, many people know each other?

14:52:25    A.   Yes.

14:52:26    Q.   Just from interacting?

14:52:27    A.   Yes.

14:52:28    Q.   So it's not unusual for owners of one horse to know trainers

14:52:32    that belong to others, et cetera, correct?

14:52:34   A.   Correct.

14:52:37   Q.   Okay.  Your Honor, may I just have one moment?

14:52:46        THE COURT:  You may.

14:52:49        MR. ESPER:  Thank you.

14:52:54   Q.   (BY MR. ESPER) This particular vet bill where Mr. Huitron

14:52:57   broke his leg?

14:52:58   A.   Yes.

14:52:58   Q.   That was up in -- when he was up in Ruidoso?

14:53:01   A.   Alamogordo, I believe.

14:53:02   Q.   Okay.  Well, Alamogordo is near Ruidoso, is it not?

14:53:05   A.   It is.

14:53:06   Q.   And where he was treated?  Was it at a hospital in

14:53:09   Alamogordo?

14:53:11   A.   I think so.

14:53:11   Q.   And the records indicate that it was a -- that he had to pay

14:53:17   the bill.  Do you recall or do you know?

14:53:19   A.   It appeared that somebody down south was going to pay the

14:53:23   bill.

14:53:23   Q.   Somebody else was going to pay the bill?

14:53:25   A.   Yes.

14:53:26   Q.   As a matter of fact, he sent a bill, did he not, to somebody

14:53:28   for reimbursement, correct?

14:53:30   A.   Fernando e-mailed a bill.

14:53:32   Q.   Okay.

14:53:34   A.   To Victor Lopez.

14:53:35   Q.   Oh, that was Fernando had e-mailed a bill to Victor Lopez?

14:53:38   A.   Yes.

14:53:39   Q.   Okay.  And you don't know whether Mr. Huitron was ever

14:53:43   reimbursed for that, do you?

14:53:45   A.   Reimbursed?

14:53:46   Q.   Yeah.

14:53:47   A.   I don't think that Mr. Huitron paid the bill.

14:53:49   Q.   Okay.  Well, I saw -- it looked like personal pay.  That was

14:53:53   the invoice from the hospital, correct?

14:53:55   A.   It said, private pay.

14:53:57   Q.   Private pay.  So you don't know whether the hospital was

14:53:59   paid at the time that he was released, do you?

14:54:00   A.   No.

14:54:01   Q.   Okay.  That's all I have, your Honor.  Thank you.

14:54:13          THE COURT:  Members of the jury, I'll give you your

14:54:15   afternoon break.  Stretch, relax.  Use the facilities.  Be ready

14:54:20   to come back in 15 minutes.

14:54:55          (Jury not present.)

14:55:00          (Recess.)

15:12:30          (Jury present.)

15:14:05          THE COURT:  Mr. Mayr.

15:14:07          MR. MAYR:  Thank you, your Honor.

15:14:08                     CROSS-EXAMINATION

15:14:08   BY MR. MAYR:

15:14:10   Q.   Agent Lawson, I first want to start off talking to you about

15:14:14    the computers.  Do you recall questioning from Ms. Williams, she

15:14:17    was asking you questions -- or y'all were talking about this

15:14:20    computer found in Oklahoma with a user profile belonging to

15:14:24    Rodolfo Trevino; is that right?

15:14:28    A.    I don't believe I ever said the profile belonged to Rodolfo.

15:14:32    Q.    Okay.  Was there a -- well, let me just ask you this.

15:14:34          Do you know what a user profile is on a Microsoft

15:14:38    Windows-based personal computer system?

15:14:40    A.    Like a logon?

15:14:41    Q.    Uh-huh.

15:14:41    A.    Yes.

15:14:42    Q.    Just briefly explain what that is to the jury.

15:14:44    A.    I think the user profile you're speaking of is when you sign

15:14:50    onto your computer, that's your account, and everything's stored

15:14:55    under your account.

15:14:55    Q.    It can be password-protected, right?

15:14:57    A.    Yes.

15:14:58    Q.    And you could set up a computer to have multiple users using

15:15:03    that one computer, right?

15:15:04    A.    Yes.

15:15:04    Q.    So, for instance, if you were and I were sharing a computer,

15:15:08    you would have a user profile, I'd have a user profile, right?

15:15:11    A.    We could.

15:15:12    Q.    Okay.  Now, the computers that you reviewed in this case,

15:15:16    the evidence that you pulled were from three specific computers;

15:15:19    is that correct?

15:15:21    A.    For your client.

15:15:22    Q.    Uh-huh.

15:15:23    A.    Yes.

15:15:23    Q.    In Austin, Texas.  I apologize for that.  Three computers,

15:15:27    correct?

15:15:27    A.    Yes.

15:15:27    Q.    And was there anything unique about each one of these

15:15:32    computers identifying who it belonged to?

15:15:36    A.    It appeared that they were interchangeable that different

15:15:39    persons used different computers.

15:15:41    Q.    Okay.  Fair enough.

15:15:42          Now, on some of these computers, you found user

15:15:51    profiles for Jessica Huitron; is that correct?

15:15:56    A.    When I look at a file, sometimes I would see a user profile.

15:16:00    Q.    Okay.  And that would be Jessica Huitron?

15:16:02    A.    I found some for her.

15:16:03    Q.    All right.  I'll show you what I've marked as Defendant's

15:16:13    JH-5 and JH-6.  If I take 364ATXA, the disk, and I pop it in my

15:16:29    computer, this is the software program, this FTK case report,

15:16:33    it's what I use to see what files you've decided to pull off of

15:16:37    those computers; is that right?

15:16:38    A.    That's correct.

15:16:38    Q.    Okay.  That appears to be from this particular disc; is that

15:16:43    right?

15:16:43   A.   It does.

15:16:44   Q.   Okay.  Your Honor, I'd offer for demonstrative purposes only

15:16:49   JH-5 and 6.

15:17:05        MR. GARDNER:  No objection, your Honor.

15:17:07        THE COURT:  Five and 6 are admitted for demonstrative

15:17:10   purposes.

15:17:11   Q.   (BY MR. MAYR) And this is just a snapshot of some of the

15:17:18   files that you pulled off; is that correct, Agent Lawson?

15:17:20   A.   Yes, sir.

15:17:20   Q.   And we can see here by looking at each one of these files

15:17:25   that, for instance, on this first one, this is where it's taken

15:17:32   from.  This is the file location; is that right?

15:17:34   A.   That's where that file was stored on that computer.

15:17:37   Q.   All right.  And we see that it's stored in a temporary

15:17:40   internet file, right?

15:17:42   A.   Yes.

15:17:43   Q.   Now, we go down here talking about user profiles, we see on

15:17:47   this next one that this file is a JPEG file right here, is

15:17:54   located in a file with the user name Jessica Huitron, right?

15:17:57   A.   It is.

15:17:58   Q.   And it's actually located in a thumb cache folder that's

15:18:08   underneath Windows Explorer, right?

15:18:10   A.   Yes.

15:18:11   Q.   So that would be consistent with like what Ms. Williams was

15:18:17   talking about that someone, possibly Jessica Huitron, going on

15:18:20    the internet and then, that thumbnail being downloaded from the

15:18:24    New Store, or whatever website she's looking at, right?

15:18:26    A.    Someone, yes.

15:18:27    Q.    Okay.  Now, you can't say conclusively, without any doubt,

15:18:33    that Jessica Huitron was the one person who looked at this or

15:18:36    pulled up this document; is that right?

15:18:38    A.    That file?

15:18:39    Q.    Uh-huh.

15:18:39    A.    No.

15:18:40    Q.    Okay.  But the fact that it has her name on it suggests that

15:18:43    she's the one who looked at that.  Would you agree with that?

15:18:46    A.    No.

15:18:47    Q.    No?  Okay.  This next one we see here, users, Jessica

15:18:53    Huitron, also in the Windows Explorer thumb cache under temporary

15:18:57    internet file, correct?

15:18:59    A.    Yes.

15:19:01    Q.    And going to JH-6, we see here, users, Jessica Huitron

15:19:12    documents, Holland sixty diva's transfer doc.  Is that what it

15:19:19    says?

15:19:19    A.    That's what it says.

15:19:20    Q.    The next one is also in the user's Jessica Huitron file?

15:19:23    A.    Yes.

15:19:24    Q.    And so is this last one, correct?

15:19:26    A.    Yes.

15:19:27    Q.    Now, we see that these are carved JPEGs.  We've heard a

15:19:31    little bit about this from Agent Cox, but remind the jury again

15:19:33    what these carved files -- what they mean.

15:19:37    A.   A carved file is a file that's either been saved, viewed on

15:19:42    the internet that was deleted or not used again, and the computer

15:19:48    keeps it in space where it doesn't have memory at the moment.

15:19:53    Just in case you want it again.  And then, if you save more

15:19:57    things to that hard drive, it will eventually override that.  But

15:20:00    as long as the hard drive has room, it doesn't necessarily delete

15:20:03    something that you ask it to delete, nor does it necessarily get

15:20:07    rid of the internet picture that you've seen on a browser

15:20:10    website.

15:20:11    Q.   So, again, like with the questions with Ms. Williams, these

15:20:16    files don't indicate that someone is actually manipulating it or

15:20:20    saving it to their file or saving it to their computer; is that

15:20:24    correct?

15:20:24    A.   Well, the carved, you can't make that determination.

15:20:27    Q.   And I guess my point is, all of these photos that Mr.

15:20:33    Gardner showed the jury, you can't tell this jury who accessed

15:20:37    those; is that right?  Definitively, you cannot say who accessed

15:20:41    those?

15:20:41    A.   I cannot say who was sitting in front of the keyboard.

15:20:44    Q.   Fair enough.  But we know that Jessica Huitron is set up as

15:20:47    a user profile on some of the computers, correct?

15:20:51    A.   Yes.

15:20:54    Q.   Is my client Jesus Huitron -- do you see a user profile set

15:20:58   up for him on any of the computers that you looked at?

15:21:02   A.   A user profile, no.

15:21:06   Q.   Any folders with title Jesus Huitron?  Not files but

15:21:29   folders.

15:21:34   A.   No.  I didn't see files.

15:21:35   Q.   And there's files with documents or letters that are -- that

15:21:40   have his name on it, right?

15:21:42   A.   Yes.

15:21:42   Q.   But would it be uncommon for Jessica Huitron to have typed

15:21:45   up a letter for her father?  That's not out of the realm of

15:21:49   possibility, right?

15:21:50   A.   No.  It's not out of the realm of possibility.

15:21:53   Q.   Is there anything that you can say that shows that Jesus or

15:21:58   even his brother Eusevio Huitron used any of these computers

15:22:02   definitively, sitting in front of them, manipulating them to get

15:22:05   these images that Mr. Gardner showed?

15:22:08   A.   There's definitely pictures of him without Jessica and files

15:22:11   that pertain to him and not Jessica.  There's no definitive to

15:22:15   any of that.

15:22:15   Q.   Okay.  Now, of all these exhibits, you have your list there

15:22:21   in front of you, from all these, ten of them came from files with

15:22:27   the name Jessica Huitron attached to it; is that correct?

15:22:31   A.   That could be as simple as she opened that computer the

15:22:34   first time.

15:22:34   Q.   Hold on, Agent Lawson.  Do you see ten of those files coming

| | |
|---|---|
| 15:22:39 | from folders that have the name Jessica Huitron associated with |
| 15:22:42 | it? |
| 15:22:51 | A.   I see ten of them have her as a user profile. |
| 15:22:54 | Q.   And the rest of them, we don't know who is accessing those, |
| 15:22:57 | right? |
| 15:22:58 | A.   We don't know on any of those. |
| 15:22:59 | Q.   Okay.  Now, let's talk about the e-mail for a second.  This |
| 15:23:05 | may seem like a rhetorical question, but I just want to make sure |
| 15:23:08 | we're clear on this. |
| 15:23:09 |         If you don't find any e-mails from one particular |
| 15:23:13 | individual, would that be consistent with that person not knowing |
| 15:23:17 | how to use e-mail? |
| 15:23:19 | A.   No. |
| 15:23:21 | Q.   No? |
| 15:23:21 | A.   No. |
| 15:23:22 | Q.   Could it just be a person, say, I know how to use this |
| 15:23:26 | e-mail, I'm just not going to use it, right? |
| 15:23:28 | A.   Say that again. |
| 15:23:28 | Q.   Okay.  If you go out and you search the Worldwide Web for |
| 15:23:34 | any e-mails with my name attached to it and you can't find any, |
| 15:23:37 | that's possibly because I don't know how to use e-mail.  Is that |
| 15:23:40 | a fair statement or not? |
| 15:23:41 | A.   I don't know how to search the web for somebody's e-mail. |
| 15:23:44 | Q.   Fair enough.  Let's talk about the Huitron Racing e-mail |
| 15:23:52 | that we went over.  This is Government's Exhibit 358G.  Now, Mr. |

15:24:02     Gardner showed you this e-mail.

15:24:03     A.    He did.

15:24:04     Q.    From huitronracing@yahoo.com.  You don't know who's

15:24:09     associated with that e-mail address; is that right?

15:24:11     A.    No, sir.

15:24:13     Q.    It could be Jessica Huitron who set that up, right?

15:24:17     A.    Could be anybody associated with Huitron Racing.

15:24:20     Q.    They may not even be associated with Huitron Racing, right?

15:24:26     A.    Well, that would be kind of odd but.

15:24:28     Q.    It would.  But Jessica Huitron could have set it up?

15:24:32     A.    "Chevo" could have set it up.  Jesus could have set it up.

15:24:35     Q.    Sure, they could have if they know how to use e-mails,

15:24:38     right?

15:24:38     A.    Yes.

15:24:39     Q.    Okay.  And you heard the testimony of Special Agent Johnson

15:24:42     that he did a search for user profiles, and he couldn't find any

15:24:46     user profiles for Jesus Huitron, right?

15:24:49     A.    Say that again.

15:24:53     Q.    Special Agent Johnston went through all these e-mail

15:24:57     accounts.  Am I correct he's the one that subpoenaed all the

15:24:59     e-mails and everything else like that?

15:25:00     A.    Yes.

15:25:01     Q.    You remember I asked him, did you find any e-mail accounts

15:25:04     with the user -- where the user signed up -- the person who

15:25:08     signed up was Jesus Huitron?  Remember he said, no, I couldn't

15:25:11    find --

15:25:11    A.   I do remember that.

15:25:12    Q.   Okay.  Now, so that could illuminate the fact that he's --

15:25:16    so we know that he's definitely not associated with this account?

15:25:19    A.   No.  We do not know that.

15:25:20    Q.   Okay.  Now, we saw -- we've seen this Government's Exhibit

15:25:34    72 many times, this e-mail from this nefarious Anri2319@hotmail

15:25:41    to Jessica Huitron and the address is Jessica_Huitron@yahoo.com?

15:25:48    A.   It is.

15:25:49    Q.   Okay.  I'm going to show you what's been marked as JH No. 7.

15:26:12    Give you a moment to look through all of that.

15:26:14    A.   Thank you.  Okay.

15:26:35    Q.   And this appears to be an e-mail from the same

15:26:39    Jessica_Huitron@yahoo.com e-mail address to the Anri2319@hotmail

15:26:45    from May 6, 2011, right?

15:26:47    A.   It does.

15:26:48    Q.   Okay.  Your Honor, at this time, I'd offer JH-7, tender it

15:26:55    to opposing counsel.

15:26:57            MR. GARDNER:  No objection, your Honor.

15:27:03            THE COURT:  Hearing no objection, JH-7 is admitted.

15:27:07    Q.   (BY MR. MAYR) The first page is the actual e-mail with the

15:27:13    header at the top and some writing there in Spanish, correct?

15:27:17    A.   Yes.

15:27:18    Q.   And it's signed ATTE: Jessica Huitron, right?

15:27:25    A.   It is.

15:27:26   Q.   We go to the translation on the next page.  Can you read

15:27:34   that to the jury, please?  That part right there?

15:27:36   A.   Here I send you the invoice for the horses.  I need the

15:27:41   deposit to be made today because we have to pay $30,000 for food

15:27:45   and then the doctor and the workers.  And they need to pay each

15:27:50   month please.  If you have any questions or doubt, do not

15:27:53   hesitate to call me.  Sincerely, Jessica Huitron.

15:27:56   Q.   Do not hesitate to call me, right?

15:27:58   A.   It's what it says.

15:27:59   Q.   Doesn't say, call "Chevo," call my dad Jesse, right?

15:28:04   A.   It does not say that.

15:28:05   Q.   All right.  So when you're going through the computers and

15:28:17   you're pulling out these documents, these photos, you're deciding

15:28:25   what's pertinent and what's not pertinent; is that correct?

15:28:27   A.   That's correct.

15:28:28   Q.   But you are going through and seeing everything that's on

15:28:31   each one of the computers, right?

15:28:33   A.   Yes.

15:28:34   Q.   Okay.  Did you search the computers for any records of an

15:28:39   accounting of the funds that were being sent to Huitron Homes and

15:28:46   that were going out of Huitron Homes?

15:28:50   A.   Can you rephrase that?  Restate it.

15:28:52   Q.   Did you search any of the computers seized from my client's

15:28:57   business or any -- from my client's business here in Austin,

15:28:59   Texas for any sort of records of an accounting of funds coming in

15:29:07  and out, such as QuickBooks software or any other accounting

15:29:10  software?

15:29:10  A.   No.  I didn't do specific searches.  Every file in the

15:29:15  computer was put in categories, and I tried to look at

15:29:18  everything, and then, if I thought it related to this case, it

15:29:20  was flagged.

15:29:21  Q.   In going through those, did you see that there were

15:29:24  QuickBooks files and other accounting software types of files on

15:29:29  these computers related to the Huitron Homes business?

15:29:34  A.   I don't recall.  There could have been.

15:29:36  Q.   Could have been?

15:29:37  A.   I don't recall seeing.

15:29:39  Q.   So we'll have to get Agent Cox back in here to go through

15:29:42  and tell us about that.  Is that fair to say?  He would have a

15:29:45  record of that?

15:29:45  A.   You want to talk about what's not on here; is that correct?

15:29:48  Q.   I'm talking about what's on there.  I'm asking if you -- I'm

15:29:52  asking you, did you see those QuickBooks software files that were

15:29:56  on the computers?

15:29:57  A.   I don't recall.  I wasn't looking for QuickBook files.

15:30:05  Q.   And the disc is only going to have the files that you pulled

15:30:14  off as seen as being relevant, right?

15:30:25  A.   Exactly.

15:30:25  Q.   You don't think looking for QuickBooks or any other sort of

15:30:28  accounting software would have been appropriate in determining

15:30:31    how these funds were being used?

15:30:33    A.    No.  Not from my perspective.

15:30:35    Q.    Okay.  As the agent in charge of this investigation, you're

15:30:53    pretty much well aware of everything going on related to this

15:30:57    investigation.  Fair to say?

15:30:58    A.    We all have specialties.

15:31:00    Q.    Okay.  But it's safe to say that -- let me ask you this.

15:31:08          Are there any witnesses not affiliated with law

15:31:12    enforcement who have come forward and said based on their

15:31:15    personal knowledge, that Jesus Huitron was associated with the

15:31:21    Zetas?

15:31:23    A.    In this trial?

15:31:26    Q.    In your investigation.  Any witnesses who have come forward,

15:31:29    not law enforcement.  Any witnesses, paid informants,

15:31:32    confidential sources, other citizens who have come forward and

15:31:37    said, Jesus Huitron is associated with the Zetas.

15:31:44    A.    Just Tyler.

15:31:45    Q.    Just Tyler and that's his guess, right?  He's working with

15:31:49    you, right?  Did Tyler tell you that he thought he was associated

15:31:53    with the Zetas?

15:31:56    A.    He told me he believed he had knowledge of what was going on

15:31:59    of his horses that were used.

15:32:00    Q.    Okay.  He never testified that -- he never testified

15:32:03    yesterday when he was on the stand that he thought that he was

15:32:07    associated with the Zetas, did he?

15:32:09    A.    I don't know that you asked him.

15:32:13    Q.    Other than Tyler Graham, no other witnesses have come

15:32:16    forward and said that my client is associated with the Zetas?

15:32:20    A.    I don't remember asking a lot of people about your client.

15:32:26    Q.    Are there any witnesses other than those associated with law

15:32:30    enforcement who have come forward and said based on their

15:32:33    personal knowledge, not including Tyler Graham, that Jesus

15:32:38    Huitron was a knowing participant in this alleged conspiracy?

15:32:41    A.    It's not including law enforcement or Tyler; is that right?

15:32:45    Q.    That's right.  Any confidential sources, informants, private

15:32:50    citizens, anyone come forward and say, hey, Jesus Huitron, he's

15:32:56    up to no good here.  Has any witness come forward and told you

15:32:59    that or anyone associated with your investigation?

15:33:01    A.    I don't believe they were aware of the financial.

15:33:05    Q.    The answer is "No" then, right?  No one has come forward?

15:33:08    A.    No.  They didn't see his financials.

15:33:11    Q.    In the course of your investigation, are there any telephone

15:33:14    calls where Jesus Huitron -- where you can see Jesus Huitron

15:33:19    talking to anyone about any of this stuff related to the horses?

15:33:23    A.    No.

15:33:25    Q.    In your -- course of your investigation, have you or anyone

15:33:29    else associated with your team of investigators come across any

15:33:33    telephone calls where other individuals are talking about Jesus

15:33:37    Huitron?

15:33:43    A.    I don't recall.

15:33:46    Q.   In the course of your investigation, have you come across

15:33:49    any e-mails that you can conclusively say were sent or received

15:33:53    by Jesus Huitron in regards to this horse business?

15:33:58    A.   E-mails, no, sir.  Not conclusively.

15:34:01    Q.   Have you come across or has anyone else on your team come

15:34:04    across any e-mails where anyone discusses Jesus Huitron's

15:34:09    involvement with this alleged conspiracy?

15:34:13    A.   Will you repeat that?  I'm sorry.

15:34:15    Q.   Have you come across any e-mails between any of the alleged

15:34:19    participants in this conspiracy where they have mentioned Jesus

15:34:25    Huitron?

15:34:26    A.   No.  Not in e-mail.

15:34:27    Q.   You talked about surveillance activities that you conducted

15:34:29    in this case.  Did you ever conduct any surveillance on my client

15:34:32    Jesus Huitron?

15:34:33    A.   No.  I never attempted to do that.

15:34:35    Q.   Are you aware of law enforcement in any surveillance

15:34:38    actually seen my client doing anything illegal?

15:34:43    A.   Not that I'm aware of.

15:34:45    Q.   There's no records of him crossing into Mexico in what's

15:34:49    been admitted to this jury; is that right?

15:34:52    A.   I don't believe so.

15:34:54    Q.   You said that you went through hundreds of these types of

15:34:57    horse photos from all these different races; is that right?

15:35:01    Hundreds?

15:35:01   A.   I've seen hundreds.

15:35:02   Q.   Okay.  And did you see Jesus Huitron in any single one of

15:35:06   these photos?

15:35:12   A.   I don't recall seeing him, no.

15:35:14   Q.   And then, other than his own brother, have you seen any

15:35:17   photos of Jesus Huitron associated with any of the alleged

15:35:21   participants in this conspiracy that you are investigating?

15:35:26   A.   No.  Just his brother.

15:35:29   Q.   Now, you know from the course of your investigation that

15:35:35   Jessica Huitron had been in contact and communicating with a

15:35:40   number of individuals in this alleged conspiracy in regards to

15:35:44   horse-racing payments.  You're aware of that, right?

15:35:47   A.   I know she was the bookkeeper for some time.

15:35:49   Q.   Are you aware that she was communicating with other

15:35:52   individuals, like Carlos Nayen and Victor Lopez?

15:35:58   A.   I've seen the e-mails from Jessica Huitron to Anri.

15:36:01   Q.   And you have those e-mails where she's both sending e-mails

15:36:04   to that address and receiving e-mails from that address, right?

15:36:07   A.   Yes.

15:36:08   Q.   You have a computer with documents, photos and, most

15:36:13   importantly, a user profile of Jessica Huitron, right?

15:36:19   A.   She was one of the user profiles.

15:36:22   Q.   We're not going to go through these, but you have pages and

15:36:26   pages of documents seized from the business with handwriting that

15:36:29   appears to be Jessica Huitron's?

15:36:31    A.    I've never stated that.

15:36:32    Q.    Okay.  Do the handwriting on these documents belong to my

15:36:36    client?

15:36:36    A.    I have no idea.

15:36:37    Q.    All right.  Could I see Government's Exhibit No. 140,

15:36:47    please?  Government's Exhibit 140, shown on page 1 and going to

15:36:58    page 2, very bottom shows to be notarized by who?

15:37:07    A.    Jessica Huitron.

15:37:08    Q.    On the face of that document, is my client Jesus Huitron's

15:37:12    name mentioned anywhere?

15:37:14    A.    No.

15:37:15    Q.    So you have documents that Jessica Huitron is preparing and

15:37:24    notarizing, correct?

15:37:26    A.    She notarized this document and one other.

15:37:33    Q.    And you have a photo of Jessica Huitron associating with one

15:37:37    of the alleged participants in this conspiracy; is that right?

15:37:40    A.    Yes.

15:37:43    Q.    I have no further questions, your Honor.

15:37:49            THE COURT:  Any redirect?

15:37:50                         RE-DIRECT EXAMINATION

15:37:50    BY MR. GARDNER:

15:37:51    Q.    Was Jessica Huitron interviewed by law enforcement

15:37:53    authorities?

15:37:54    A.    She was.

15:37:54    Q.    And when Mr. Mayr asked, was anybody else interviewed or

15:37:57   came forward, was Jessica Huitron one of those?

15:38:00   A.   She was interviewed.

15:38:01   Q.   And what did she say about the cash flowing through Huitron

15:38:04   Homes?

15:38:04          MR. MAYR:  Objection.  Hearsay.

15:38:09          THE COURT:  You opened that door.  You asked if

15:38:12   anybody, any person had said anything.  The objection is

15:38:16   overruled.

15:38:17   Q.   (BY MR. GARDNER) What did Jessica Huitron say to the FBI

15:38:20   when interviewed about the activities of Huitron Homes?

15:38:22   A.   That she was concerned about the amount of cash going

15:38:25   through the accounts.

15:38:28   Q.   And what did she say about Jose Trevino at activities at

15:38:34   Huitron Homes?

15:38:34          MS. WILLIAMS:  Objection, your Honor.  Hearsay.

15:38:37          MR. GARDNER:  I'll rephrase that one, your Honor.

15:38:40   Q.   (BY MR. GARDNER) What did Jessica Huitron say about the

15:38:42   amount of cash flowing through Huitron Homes?

15:38:44   A.   That she was very concerned about it.

15:38:46   Q.   What other things did Ms. Huitron say about this?

15:38:49   A.   That she saw Jose Trevino with --

15:38:51          MS. WILLIAMS:  Objection, your Honor.  Hearsay.

15:38:54          THE COURT:  I'm going to limit --

15:38:56          MR. GARDNER:  Yes, sir.

15:38:56          THE COURT:  -- his admission to --

15:38:59          MR. GARDNER:  Huitron Homes.

15:38:59          THE COURT:  -- his cross-examination.

15:39:01  Q.  (BY MR. GARDNER) And was Ms. Jessica Huitron given the

15:39:03  opportunity and subpoenaed to testify?

15:39:07  A.  She was.

15:39:07  Q.  Was she given opportunity to have a use immunity for her

15:39:10  testimony?

15:39:10  A.  She was.

15:39:11  Q.  And was this prior to her father being --

15:39:14          MR. MAYR:  Objection, your Honor.  May we approach?

15:39:23  Q.  (BY MR. GARDNER) -- indicted?

15:39:24          (At the bench, on the record.)

15:39:32          MR. MAYR:  I need to know when she was offered a use

15:39:37  immunity.

15:39:37          MR. GARDNER:  She was offered a use immunity with a

15:39:37  proffer letter that we gave before your client got indicted.  And

15:39:42  when your client got indicted, that's when she decided she wanted

15:39:43  to take the Fifth.  And I was contacted by her attorney.  And now

15:39:47  I see her out there and I see her on the witness list, so that's

15:39:50  another concern.

15:39:52          MR. MAYR:  Sure.  My objection, then, if she is --

15:39:56  well, first of all, my problem here is that I was not aware that

15:40:00  a proffer agreement was made to her.  Second of all, she's

15:40:03  invoked the Fifth, and I have a Sixth Amendment confrontation

15:40:04  clause argument to make in regards to any statements that she

15:40:07   makes.

15:40:10           MR. GARDNER:  She didn't invoke the Fifth until after

15:40:12   your client was indicted.  I don't have the name of her attorney

15:40:21   or his contact --

15:40:21           MR. MAYR:  Then the problem is, if she's invoked the

15:40:24   Fifth, then I can't confront and cross-examine her on these

15:40:27   statements that are allegedly coming out, that are coming out

15:40:30   from the witness --

15:40:31           THE COURT:  She's on your witness list.

15:40:33           MR. MAYR:  She is on my witness list.

15:40:36           THE COURT:  Well, why are you up here?

15:40:37           MR. MAYR:  Well, because I want to renew my objection

15:40:42   -- I want to also expand it to not just hearsay, but it's a

15:40:45   violation of Sixth -- my client's Sixth Amendment right to

15:40:48   confrontation.

15:40:51           THE COURT:  What is -- you asked of any person that's

15:41:01   got anything criminal about your client.  And then -- I just

15:41:05   wrote it down because I knew it was coming.  I warned you during

15:41:13   this trial that you'd done that.  But make whatever objection you

15:41:18   want.  It's all overruled.  You opened the door.  The evidence is

15:41:23   there.  And any mistrial or not is something in the future.

15:41:30           MR. MAYR:  Okay.

15:41:30           THE COURT:  But you are aware of what the evidence is.

15:41:34           MR. MAYR:  Okay.

15:41:45   Q.   (BY MR. GARDNER) Special Agent Lawson, when Jesse Huitron

15:41:52   was indicted, did Jessica Huitron continue to cooperate with the

15:41:56   government?

15:41:56   A.    No.

15:41:58   Q.    In fact, she got an attorney, correct?

15:42:00   A.    She did.

15:42:01          MR. MAYR:  Objection.  403.  It's 403 and relevance,

15:42:06   your Honor.

15:42:12          MR. GARDNER:  I'll move on to something else.

15:42:14          THE COURT:  Well, whether you move on or not, the

15:42:17   question was answered before the objection was made.  The

15:42:22   objection is overruled.  It's not timely made.

15:42:26   Q.    (BY MR. GARDNER) Special Agent Lawson, I want to go back to

15:42:31   Ms. Williams' questions.

15:42:33   A.    Okay.

15:42:33   Q.    Could we bring up Government's Exhibit 1, please?  Could you

15:42:46   zoom in on the hand gestures?

15:42:48          Ms. Williams asked you about the question of the wins

15:42:52   and losses on these two.

15:42:54   A.    She did.

15:42:54   Q.    Were Alex Trevino and Jose Trevino interviewed about those

15:42:58   hand gestures?

15:42:59   A.    They were.

15:43:01   Q.    And without getting into what they said, were their

15:43:05   statements inconsistent with each other?

15:43:07   A.    Very inconsistent.

15:43:08   Q.   And were their statements inconsistent with the fact that

15:43:13   there was four wins and zero losses and four wins and two track

15:43:17   records?

15:43:17   A.   They were inconsistent with that.

15:43:20   Q.   Now, Ms. Williams also asked you questions about -- either

15:43:26   Ms. Williams or Mr. DeGeurin -- had you become knowledgeable in

15:43:30   the horse business -- quarter horse business over the last two or

15:43:34   three years?

15:43:34   A.   Yes.

15:43:34   Q.   And you gained a fair amount of knowledge.  Would that be a

15:43:38   fair statement?

15:43:38   A.   Fair amount.  Yes, sir.

15:43:41   Q.   And she also asked you about handshake deals and there's no

15:43:48   set agreements, correct?

15:43:49   A.   She did ask me that.

15:43:52   Q.   Okay.  Based on your knowledge gained in the last three

15:43:55   years, what about the American quarter horse industry that makes

15:43:59   it susceptible to money laundering, in your opinion?

15:44:03              MS. WILLIAMS:  Objection, your Honor.  This opinion is

15:44:05   not listed in the notice that we were given prior to this

15:44:10   witness' testimony.

15:44:26              THE COURT:  This was brought up in cross and,

15:44:29   therefore, might be on redirect.  But I'm going to sustain the

15:44:32   objection.

15:44:33              MR. GARDNER:  Thank you, your Honor.

15:44:35   Q.   (BY MR. GARDNER) I just want to make one thing clear,

15:44:38   Special Agent.  Showing you portions and I know you hate this

15:44:41   word, 35 mares.

15:44:42   A.   Yes, sir.

15:44:42   Q.   All right.  This is one of the 35 mares, Act Up?

15:44:46   A.   Yes, sir.

15:44:46   Q.   I'm showing you Bates stamp 54187.  Who owns that horse?

15:44:52   A.   66 Land.

15:45:00   Q.   And I'm showing you 54191.  What is this?

15:45:05   A.   It's a lease authorization from American Quarter Horse

15:45:08   Association.

15:45:09   Q.   From what?

15:45:10   A.   66 Land.

15:45:11   Q.   To who?

15:45:12   A.   Zule Farms.

15:45:14   Q.   Would you, without having to go through this, be comfortable

15:45:18   in saying there's no Luis Aguirre lease agreements in here?

15:45:22   A.   I would.

15:45:31   Q.   Showing you Government's Exhibit 33.  Do you know what this

15:45:40   is, sir?

15:45:41   A.   It's a bill to Efrain Aguallo from Zule Farms.

15:45:47   Q.   And this horse here?

15:45:48   A.   Juanita Mi Amor.

15:45:51   Q.   And where was Juanita Mi Amor seized?

15:45:54   A.   On the Trevino ranch in Lexington, Oklahoma.

15:46:02    Q.    Now, Mr. DeGeurin asked you whether or not -- or talked to

15:46:05    you about Mr. Colorado turning himself in.  At the time Mr.

15:46:10    Colorado turned himself in, had his passport been revoked?

15:46:12    A.    It had.

15:46:13    Q.    Was that by the State Department?

15:46:15    A.    Yes.

15:46:15    Q.    Had his visa been revoked?

15:46:18    A.    It had.

15:46:18    Q.    Was that by the immigration authorities?

15:46:20    A.    Yes.

15:46:20    Q.    Was there any way for Mr. Colorado-Cessa to legally exit the

15:46:26    United States at that point?

15:46:28    A.    No.

15:46:28    Q.    How long have you been doing this investigation?

15:46:31    A.    Since February of 2010.

15:46:36    Q.    I want to show you one last exhibit.  358D, the Fernie

15:46:41    e-mail, dated December 21, 2011, from Miguel Aleman to Fernando

15:46:52    Garcia.  Who do you associate Miguel Aleman with?

15:46:55    A.    Francisco Colorado.

15:46:57    Q.    And the transfer is dated 20 December 2011?

15:47:04    A.    Yes.

15:47:04    Q.    And who is it from?

15:47:06    A.    ADT Petro Servicios.

15:47:08    Q.    And who is it to?

15:47:09    A.    Sergio Rincon.

15:47:11   Q.   And the amount?

15:47:12   A.   $50,000.

15:47:13   Q.   And do you recall the testimony regarding the role of Sergio

15:47:17   Rincon in this investigation?

15:47:18   A.   I do.

15:47:18   Q.   What was that, sir?

15:47:20   A.   It was that of a hand or a mule who ran errands for the

15:47:24   organization.

15:47:32   Q.   Now, Mr. Esper asked you about one of your statements to the

15:47:40   grand jury.  Do you recall that?

15:47:42   A.   I do.

15:47:43   Q.   And he had you read it literally.  You responded, it needs

15:47:48   to be put into context.

15:47:50   A.   Yes, sir.

15:47:50   Q.   What is that context?

15:47:53   A.   It was in the section stating that how the American Quarter

15:47:57   Horse Association is comprised and that it's a lot of clients

15:48:02   from Mexico, a lot of clients from Brazil.  So my statement was

15:48:05   that there was nothing on its face odd about Tyler Graham meeting

15:48:11   new Mexican clients.

15:48:14   Q.   Now, I'm showing you Government's Exhibit 360B.  These are

15:48:17   the transcripts of the phone calls.  Would you agree with me

15:48:23   there's about 30 of them in there?

15:48:24   A.   Yes, sir.

15:48:24   Q.   And would you agree with me we played only a fraction of

15:48:28  those?

15:48:28  A.   Yes, sir.

15:48:28  Q.   So are these available for the jury to look at, at the end

15:48:31  of this trial?

15:48:31  A.   They are.

15:48:32  Q.   Now, Mr. Esper also asked you about the phone of Eusevio

15:48:43  Huitron, especially calls Nayen?

15:48:46  A.   Yes, sir.

15:48:47  Q.   There was a entry in there for a Victor.  Who is Victor?

15:48:51  A.   Victor Lopez.

15:48:53  Q.   There's an entry in there for a "Saltillo."  Who is

15:48:56  "Saltillo"?

15:48:57  A.   Sergio Rincon.

15:48:58  Q.   There was an entry in there for a "Yo Yo."  Who was "Yo Yo"?

15:49:01  A.   Ricardo Cabrera-Del la Vega, the Zeta accountant.

15:49:05  Q.   And I would agree with Mr. Mayr that there's a

15:49:11  Jessica_Huitron@yahoo account.  Would you agree with that?

15:49:14  A.   I would.

15:49:14  Q.   Would you also agree there's a huitronracing@yahoo account?

15:49:19  A.   I would.

15:49:19  Q.   So that would make at least two accounts, correct?

15:49:21  A.   That's correct.

15:49:22  Q.   Now, Mr. Womack asked you about whether or not you saw any

15:49:34  "40" or "42" in that article.

15:49:35  A.   That's correct.

15:49:37    Q.   Do you recall the download of Adan Farias' phone?

15:49:40    A.   I do.

15:49:41    Q.   Do you recall what the entry was for Fernando Garcia's name?

15:49:46    A.   It was "Fernando Z."

15:49:48    Q.   Do you understand that "Z" to stand for "40" and "42"?

15:49:52    A.   I understand it to stand for Zeta.

15:49:55    Q.   And Mr. Womack asked you about the cash awards.

15:50:05    A.   Yes.

15:50:05    Q.   Are you doing this case for three years for $25,000 cash

15:50:09    award?

15:50:10    A.   No.

15:50:12    Q.   Why are you doing this case?

15:50:16    A.   This case is important to me.  I live on the border and --

15:50:20         MS. WILLIAMS:  Objection.  Relevance.

15:50:24         THE COURT:  He's entitled to respond in light of the

15:50:26    cross-examination.

15:50:28    A.   Since my time living on the border, I know what the Zeta

15:50:32    cartel is capable of, how they entrenched themselves into the

15:50:37    United States.  And also, I'm a fan of horses, so this was a case

15:50:40    to show that United States is not a place for them to come over

15:50:44    and set up roots.

15:50:46         MR. GARDNER:  That's all I have, your Honor.

15:50:49         THE COURT:  Ms. Williams.

15:50:50         MS. WILLIAMS:  No further questions, your Honor.

15:50:52         THE COURT:  Mr. DeGeurin?

15:51:03          MR. DEGEURIN:  What is my next number?  Seventeen?

15:51:06          THE COURT:  Eighteen.

15:51:08          THE CLERK:  Eighteen's the next one.  Yeah.

15:51:08                    RE-CROSS EXAMINATION

15:51:08   BY MR. DEGEURIN:

15:51:15   Q.   Agent, you -- you were shown a document of money to a Mr.

15:51:33   Rincon-Guerra?

15:51:34   A.   Yes.

15:51:35   Q.   I'm going to offer Colorado 18.

15:51:40          MR. GARDNER:  No objection, your Honor.

15:51:41          THE COURT:  It's received.

15:51:48   Q.   And it was $50,000 that was beneficiary was Sergio Rogelio

15:52:02   Rincon-Guerra?

15:52:04   A.   Yes.

15:52:04   Q.   That's the same person you just testified about?

15:52:07   A.   Appears to be.

15:52:07   Q.   Yeah.  And who was it that authorized that payment?

15:52:22   A.   The attorney for ADT, Francisco Silva-Ramos.

15:52:27   Q.   Francisco Silva-Ramos?

15:52:28   A.   Yes, sir.

15:52:29   Q.   Ramos?

15:52:31   A.   Ramos, "Ray-mos."

15:52:33   Q.   Okay.  And we've established by some other documents that

15:52:38   that's not Mr. Colorado's signature, is it?

15:52:42   A.   I don't know that we established that.  But I don't know.

15:52:46   Q.   Do I need to show you the other one to see the difference

15:52:49   between the one -- those payments authorized by Mr. Colorado?

15:52:53   A.   You asked my if I knew the other one was Cessa's signature,

15:52:55   and I said I did not know that that was Cessa's signature.

15:53:25   Q.   Okay.  Without pressing your ability to recognize

15:53:31   signatures, will you agree that on the same day, which would be

15:53:46   December 13, 2011, Colorado 13 -- Mr. Francisco Colorado-Cessa

15:53:58   authorized this $35,000 wire transfer?

15:54:03   A.   Yes.

15:54:05   Q.   And on the same day, December 13, December 2011, this

15:54:15   document reflects that a Francisco Silva-Ramos authorized the

15:54:21   wire transfer of $50,000, which corresponded with that stallion

15:54:31   whatever it's called, invoice?

15:54:33   A.   Yes.  Colorado's employee sent the second wire.

15:54:36   Q.   Well, that's not what I asked.

15:54:37        And you say employee.  You talked with this Mr. Ramos?

15:54:41   A.   Well, raise the document back up.  It says, legal of ADT

15:54:47   Petro Servicios.

15:54:47   Q.   First of all, have you talked with him?

15:54:49   A.   No.  I have not.

15:54:56   Q.   Do you know -- well, you never talked with them, you

15:55:03   wouldn't know.  Okay.  That's all the questions.

15:55:10        MR. WOMACK:  Very briefly, your Honor.

15:55:10

15:55:11

15:55:11

RE-CROSS EXAMINATION

15:55:11 BY MR. WOMACK:

15:55:13 Q.   Special Agent Lawson, even though you're not doing this

15:55:16 investigation for the money, if a beneficent and appreciating

15:55:23 United States government gives you $25,000, you'll take it, won't

15:55:26 you?

15:55:26 A.   I'd actually be offended in the sequestration if they gave

15:55:29 me $25,000.

15:55:30 Q.   So your answer is you're going to turn it down?

15:55:32 A.   That would be a different thought.

15:55:35 Q.   Because, after all, you're a pretty smart guy, right?

15:55:37 A.   I would offended-ly probably take it.

15:55:39 Q.   And you wouldn't do anything to knock your fellow agents out

15:55:43 of being equally offended, would you?

15:55:45 A.   The biggest cash award I've ever seen is a thousand dollars.

15:55:48 Q.   Uh-huh.  And you know that -- but you've never worked on a

15:55:51 case this big, have you?

15:55:52 A.   No.  I have not.

15:55:52 Q.   Okay.  And, again, my question was, you wouldn't try to

15:55:57 knock any of your fellow agents out of their cash awards, would

15:56:00 you?

15:56:00 A.   Of course not.

15:56:01 Q.   Thank you.  No further questions.

15:56:01

15:56:04

<div style="text-align:center">RE-CROSS EXAMINATION</div>

BY MR. ESPER:

Q.    Mr. Lawson, Mr. Nayen, Mr. Victor Lopez, this individual "Yo Yo" have all been identified in the course of your investigation in this trial as people that were paying horse-related expenses, correct?

A.    Yes.

Q.    Okay.  And not just to Mr. Huitron but to Tyler Graham, Paul Jones, Quintero, host of other people, correct?

A.    That is correct.

Q.    That's all I have.

<div style="text-align:center">RE-CROSS EXAMINATION</div>

BY MR. MAYR:

Q.    Showing you Government's 140.  This is a bill of sale that certifies that on the 10th day of July 2010, Fernando Garcia and Jose Trevino arrived before me to carry out a bill of sale for Mr. Piloto; is that right?

A.    That's what it says.

Q.    What is your opinion about that document?

A.    That it's a sham.

Q.    It's a sham, right?

A.    That's my opinion.

Q.    And the person who is attesting to this document being true and correct is Jessica Huitron?

A.    That's her job as a notary.

15:57:16   Q.   And when y'all went to talk with her to ask her to

15:57:19   cooperate, she no longer cooperated with you; is that right?

15:57:22   A.   Not since her father was indicted.

15:57:24   Q.   I have no further questions, your Honor.

15:57:29         MR. GARDNER:  Based on that, your Honor, no other

15:57:31   questions.

15:57:31         THE COURT:  You may step down.

15:57:32         THE WITNESS:  Thank you, sir.

15:57:35         MR. GARDNER:  Your Honor, subject to the government

15:57:38   ensuring that all the exhibits are present, the government rests.

15:57:47         THE COURT:  Members of the jury, I'm going to put you

15:57:48   in the jury room.

15:58:26         (Jury not present.)

15:58:40         THE COURT:  Anybody wish to file or make a motion?

15:58:46         MR. DEGEURIN:  Your Honor, before we do that, remember

15:58:49   I was worried about timing on this record we wanted to make about

15:58:52   the Giglio?  I think we're prepared to make it at this point.  I

15:58:57   was trying to do it before the government rested.

15:59:02         THE COURT:  Well, what is it that you want?

15:59:05         MR. DEGEURIN:  Here's -- in a nutshell is this.  Giglio

15:59:11   and Jencks material were requested on all the witnesses and --

15:59:16   repeatedly.  Mr. Moreno --

15:59:19         THE COURT:  No, no.  The only thing I'm inquiring

15:59:22   about, from DeGeurin, is you're going to have an option to make a

15:59:27   presentation.  You're not wanting to present this to the jury.

15:59:31    This is just to make a record?

15:59:33            MR. DEGEURIN:  Well, first of all, I have a request

15:59:36    once I get -- once I'm effectively making clear to the Court what

15:59:41    our complaint is on this record, then I will make a request, and

15:59:46    it's going to have a plan A and plan B to it.  So I'm trying to

15:59:49    lay a little bit of a framework.

15:59:51            THE COURT:  All right.

15:59:52            MR. DEGEURIN:  Some background.  So just be patient

15:59:57    with me and a stay with me.

15:59:59            We asked for Giglio.  The Court said, of course you get

16:00:06    Giglio.  Mr. Moreno came and testified.  We had asked before his

16:00:11    testimony for Giglio again.  We were given very little Giglio.

16:00:21    After his testimony, a couple of days after his testimony, it was

16:00:26    my recollection, we were able to show on happen-chance that the

16:00:32    man had charges pending in Mexico where he had kidnapped and

16:00:39    murdered some people, and we were not aware of that at the time

16:00:45    he testified.

16:00:49            Also, the Court -- I mean, Mr. Gardner was given from

16:00:57    another governmental source some Giglio material on Moreno, which

16:01:04    included that he was paid some money for his testimony, not by

16:01:11    Mr. Gardner but by the government.  That came to us two days

16:01:21    late.  Obviously Giglio and Mr. Gardner agrees is Giglio and gave

16:01:26    it to us when he got it, but it came too late.

16:01:29            So based upon that, Judge, again, we'll have both of

16:01:33    those in the record and we'll actually -- I think you may have

16:01:38    seen the Giglio that was turned over but you've not -- hadn't

16:01:41    seen the charges in Mexico.  Based on that, we'd like to strike

16:01:47    his testimony.

16:01:54                MR. FINN:  Your Honor, we join in that request.

16:02:09                THE COURT:  When you're through, I'm going to ask the

16:02:12    government to respond.

16:02:13                MR. DEGEURIN:  Okay.  I --

16:02:28                MR. FINN:  And, your Honor, if I may.  We took the

16:02:32    liberty of hiring a couple of your court translators to translate

16:02:36    these documents related to the murder and aggravated kidnapping

16:02:40    warrants and we have that available.  We also were able to secure

16:02:47    under seal the arrest warrants in Mexico for these witnesses for

16:02:52    aggravated kidnapping and murder.  And, Judge, just so you know,

16:03:13    the two interpreters that we hired to translate this are

16:03:16    interpreters that have been translating during this trial.

16:03:39                THE COURT:  I've heard that materials have been

16:03:42    received, had been translated by reporters, none of them are in

16:03:51    the record.  I assume somebody wants to put them in the record.

16:03:56                MR. FINN:  Yes, sir.  I would, your Honor.  And, Judge,

16:04:01    I've got the originals under seal as well as the translations

16:04:07    from Steven Mines and --

16:04:13                MR. GARDNER:  Cristina Helmerichs.

16:04:17                MR. FINN:  Cristina Helmerichs.  As well as their

16:04:21    qualifications.

16:04:22                THE COURT:  When you say under seal, counsel, what are

16:04:25    you talking about?

16:04:26            MR. FINN:  I'm sorry, Judge.  I think the arrest

16:04:30    warrants originally were under seal.  But I've got certified

16:04:32    copies as well as the translations.  May I approach?

16:04:35            THE COURT:  Mrs. Sims will be glad to take it from you.

16:04:43            MR. GARDNER:  Your Honor, for the record, I have not

16:04:44    seen -- maybe I need a definition from Mr. Finn on what a

16:04:47    certified copy is.

16:04:49            THE COURT:  Well, have you looked at these?

16:04:52            MR. GARDNER:  I've seen them, your Honor.  I haven't

16:04:53    seen anything that I would justify as being certified.

16:04:56            MR. FINN:  Judge, they're under seal and if you look on

16:04:58    the back pages, you'll see the certification.  A lawyer in Mexico

16:05:02    provided these to us today.

16:05:27            And, Judge, I would have given Mr. Gardner and his

16:05:30    colleague a copy of this, but we literally just got this

16:05:33    translation a couple of hours ago.

16:06:35            THE COURT:  Peter.

16:06:41            INTERPRETER:  Yes, your Honor.

16:12:52            MR. FINN:  Your Honor, I know you're working on this.

16:12:54    I've been told from the Mexican attorneys that only the judge and

16:12:57    his or her assistant can certify this, and that was done in this

16:13:01    case.

16:13:03            THE COURT:  I don't see any certification whatsoever,

16:13:05    counsel.  I see a stamp of the court, unless a certification is

16:13:13    allegedly some sort of scratching on the sides.  I know not who

16:13:22    any of these people are.  All of these are copies and it has a

16:13:25    charge that was made after the indictment in this case.  I have

16:13:31    no idea if these are authentic or manufactured.  I'm not accusing

16:13:38    anybody.  I have no idea of what any of them say.

16:13:45            MR. FINN:  I think the translation's at the back, your

16:13:48    Honor.  Should be, anyway.

16:13:51            THE COURT:  Well, the back, the translations here.  The

16:14:01    documents themselves show that they are July of 2012 when this

16:14:11    indictment was made in May of --

16:14:14            MR. FINN:  Judge, I think my -- I can't speak for Mr.

16:14:17    DeGeurin, but my concern and Ms. Williams' concern, I think, is

16:14:20    these witnesses left a false impression with this jury that they

16:14:23    fled Mexico because they were concerned about violence, Zetas, et

16:14:29    cetera, et cetera, when, in fact, it looks like important to the

16:14:35    Mexican government they were guilty of aggravated kidnapping and

16:14:37    murder and that's why they left.

16:14:39            THE COURT:  Well, they anticipated after they left that

16:14:44    there would be criminal charges?

16:14:46            MR. FINN:  If they kidnapped and murdered someone, your

16:14:48    Honor, I suspect they were concerned about that.

16:14:50            THE COURT:  I don't know that they -- I don't know --

16:14:54    I'm telling you.  I have no authenticity proof.  I have nothing

16:15:02    except a bunch of pages here on a charge that clearly was made

16:15:07    after this indictment.  And you've already -- and I was trying to

16:15:17     figure out only one of the three testified and that is.

16:15:28          MR. DEGEURIN:  Mr. Moreno.

16:15:29          THE COURT:  Well, their charges of -- I can hardly make

16:15:45     out who the defendants are, but Moreno is one of them.

16:15:58          MR. DEGEURIN:  Your Honor, may I add one thing?

16:16:01          THE COURT:  Yeah, in just a minute.

16:27:53          Well, Mr. Moreno said he came to United States in March

16:27:57     of 2011 because he feared that he was going to be killed.  That

16:28:04     was substantially before this alleged criminal.  Okay.

16:28:11          MR. DEGEURIN:  Okay.  Your Honor, I just wanted to add

16:28:13     before we go too far down the road.  The government, Mr. Gardner,

16:28:19     introduced a government exhibit and he doesn't remember the

16:28:24     number.

16:28:25          MR. GARDNER:  A Court exhibit.

16:28:27          MR. DEGEURIN:  A Court exhibit.  And I have Colorado 19

16:28:29     I'd like to have you consider.  The name of Moreno is not on the

16:28:35     document, but it is directing of payments to him.  Of course,

16:28:40     it's a check purchase of information.  And then, benefits helping

16:28:46     him with immigration so that he can stay here in the United

16:28:50     States.  This was given to us days after his testimony.  It's I

16:28:57     want to repeat to the Court, good-faith -- bad faith is not a

16:29:01     requirement and we're not alleging bad faith on the part of Mr.

16:29:05     Gardner.  It's just a matter of timing, matter of us not having

16:29:09     this when he was testifying, not being able to use it.

16:29:13          And so, if you could have this to -- the problem is

16:29:17   it's under seal, so I can't show it.  I've got to just have you

16:29:21   consider it yourself and take our word for it.  Mr. Gardner will

16:29:25   stipulate that this name at the bottom is his code name.  His

16:29:30   real name is Moreno.  May I hand that to the Court?

16:29:36            THE COURT:  Sure.  Make it a Court exhibit, whatever

16:29:43   the next number is.

16:29:45            MR. DEGEURIN:  This will be Colorado 19.

16:29:46            THE CLERK:  Yes.

16:29:47            MR. FINN:  And, Judge, for record purposes, I would

16:29:49   want to put that in the record what I handed you as Trevino, I

16:29:52   don't know what the number is, 10 for record purposes, the arrest

16:29:56   warrants for murder.  And, frankly, your Honor, if a guy comes

16:30:00   into the U.S. courthouse and he's got active warrants in Mexico

16:30:04   for kidnapping and murder, one might wonder why he's not on a

16:30:09   plane going to answer those charges.  I mean.

16:30:13            THE COURT:  Well, you can wonder all you want.  I don't

16:30:16   know that these are valid, or manufactured, or made up because of

16:30:26   the indictment in this case.  I have no authenticity.

16:30:34            MR. FINN:  We got them from Mexico, Judge.

16:30:35            THE COURT:  And the -- what?

16:30:37            MR. FINN:  I didn't manufacture anything.

16:30:40            THE COURT:  I'm not talking about you, counsel.  They

16:30:41   obviously came from Mexico.  But I don't know that they're valid

16:30:47   documents.  And plus the fact, you know, it's almost so what.

16:30:54   They were crossed on murder.  They were crossed on being here in

16:31:00   the United States.  I don't know that it's --

16:31:04          MR. FINN:  Judge, they left the impression with this

16:31:05   jury that they came here out of the goodness of their heart

16:31:07   because they were scared to death.  The truth is --

16:31:10          THE COURT:  There's not a juror that believes that.

16:31:12   They came here because they were going to get killed, and that's

16:31:14   what they testified to and that's what they believed.  However --

16:31:19          MR. FINN:  Judge, this is Trevino No. 18, please, for

16:31:23   the record.

16:31:23          THE COURT:  Well, I'm going to let you put it in the

16:31:25   record, but it's not Trevino record.  It's just a symbol of a

16:31:30   whole bunch of things.  But we'll put it in there as one exhibit.

16:31:35          MR. FINN:  Thank you.

16:31:36          THE COURT:  With the translation.  Ms. Sims, make this

16:31:41   Trevino.

16:31:43          MR. FINN:  Eighteen.

16:31:44          THE COURT:  Eighteen.  At the present time, it's not

16:31:48   before the jury.  And Colorado 19, you can attach to it.

16:31:56          MR. DEGEURIN:  And so that they don't get confused,

16:31:57   Judge, you can set the charges in Mexico aside and just look at

16:32:03   19, if you want to, and see that it's a -- it is a violation of

16:32:06   Giglio.  It's just what's the remedy?

16:32:20          MR. FINN:  And, Judge, I think on the top --

16:32:21          THE COURT:  The one witness did testify that he got

16:32:23   $2,000.

16:32:25          MR. DEGEURIN:  Well, it wasn't Moreno.

16:32:27          THE COURT:  Well, he just wasn't asked.

16:32:30          MR. DEGEURIN:  Well, he didn't know about it.

16:32:31          THE COURT:  $2,000.

16:32:36          MR. FINN:  Top left box says --

16:32:37          THE COURT:  How soon can you get him back?

16:32:41          MS. FERNALD:  Your Honor, we can ask the marshals and

16:32:44    they've been extremely cooperative in this case.  I'm sure

16:32:47    they'll do what they can at this point.  It was my recollection

16:32:49    from my notes that he was asked the question, and his response

16:32:54    was that he did not believe that he had received any money.  That

16:32:58    was my recollection.  He was asked about the benefits that he had

16:33:10    received from immigration.

16:33:11          MR. FINN:  And he said none.

16:33:13          MS. FERNALD:  Right.

16:33:13          MR. FINN:  So either he lied or he has a bad memory.

16:33:17          MS. FERNALD:  Correct.

16:33:17          MR. FINN:  The jury ought to hear that.

16:33:20          MS. FERNALD:  I will also state for the record, as the

16:33:22    Court is well aware, that this witness was kept under the rule,

16:33:26    and as of yesterday, each one of these defendants excused this

16:33:30    witness.

16:33:31          THE COURT:  Yeah, but they indicated they didn't get

16:33:33    the information until afterwards.

16:33:34          MR. FINN:  Yeah.

16:33:36            MS. FERNALD:  Okay.  Then my apologies.  No.  I did not

16:33:41    know that.

16:33:55            THE COURT:  Margaret, call up there and get Darren down

16:34:01    here, in my chambers.

16:34:07            MR. GARDNER:  Your Honor, just for logistical purposes,

16:34:09    the marshals aren't handling the transport of Mr. Moreno.  He is

16:34:12    not in custody.  The FBI has been handling his transportation, if

16:34:17    that's what the Court was concerned about.

16:34:18            THE COURT:  All right.  Then get on the telephone and

16:34:22    find out from the FBI how long it will take to get him back in.

16:34:29    Take a recess.

16:34:32            Also want you to get a copy of Trevino 18 and have the

16:34:51    State Department check it, see if there's any validity to it at

16:34:53    all.

16:34:54            MR. GARDNER:  Yes, sir.

16:34:54            THE COURT:  It's hard to find any -- well, let's just

16:35:01    put it this way.  You could get any kind of thing you want in

16:35:03    Mexico.  I've had 50 years of that.

16:35:06            MR. FINN:  Judge, if we had time, we would have gone

16:35:08    through the U.S. embassy or the U.S. consulate, but we simply

16:35:13    didn't have time.

16:35:13            THE COURT:  Well, the State Department can go through

16:35:15    pretty quick.

16:35:17            (Recess.)

16:58:38            (Jury present.)

16:58:57          THE COURT:  Members of the jury, I think in the morrow,

16:59:00     we will be able to conclude the evidence.  Bad news that I'm

16:59:11     going to have to recess this case for a week or six days until a

16:59:19     week from today.  A couple of reasons for that.  Some were

16:59:23     technical, some of the fact that I am in this courthouse, and I

16:59:27     have other things that cannot be rescheduled.

16:59:31          But the main reason is I have to go to Fort Worth

16:59:36     because in this sequestration that you're hearing about in the

16:59:40     news, we're going to have to make a determination whether or not

16:59:42     we're going to close the courthouse on several days during the

16:59:48     month.  That is going on in the Eastern District of the United

16:59:53     States, as probably you've heard.  I am opposed to that and I am

16:59:56     going to meet with the judges of all of our divisions to try to

17:00:03     keep our courthouses open.  It's complex with the Department of

17:00:12     Justice, the funds, the reduction in salaries of everybody in

17:00:17     courts, and it's just something I can't avoid.

17:00:23          So I'm going to release you now.  We'll start in the

17:00:28     morning and at our regular time.  I hope that we'll be through by

17:00:35     noon, and then, you'll have the rest of this week and Monday and

17:00:39     Tuesday to try to catch back up on where you are.  If you need

17:00:44     any help with your employer or business associates, let the

17:00:47     clerk's office know, because this is just one of those things

17:00:50     that happens.  And then, we will finish it up with the final

17:00:58     arguments on a week from today.

17:01:02          Now, everybody straight?  It's going to be hard because

17:01:07   we're going to have -- you can't talk about the case.  You're

17:01:11   going to have to follow those instructions.  Is there anybody --

17:01:15   if there's anybody that's got a real problem, let me know what it

17:01:19   is.  But I can't figure any other way.  The case has just gone on

17:01:25   longer than I anticipated.

17:01:32           So I'll release you in the morning.  I'll be here at

17:01:37   8:30, I promise, and we will hear and complete the evidence, and

17:01:41   then, I will recess you until Wednesday morning at 8:30.  All

17:01:48   right.

17:02:23           (Jury not present.)

17:02:31           THE COURT:  Counsel, I want you all to give your cell

17:02:36   numbers to Mr. Gardner, Ms. Fernald, because I want them, as soon

17:02:46   as they get any information with regard to the validity of these

17:02:49   alleged criminal complaints through the State Department to give

17:02:56   you that information.  So as soon as you get that information, if

17:03:04   you'll pass it on.

17:03:05           MR. GARDNER:  Yes, sir.

17:03:06           THE COURT:  All right.  Anything else tonight?

17:03:09           MR. FINN:  No, your Honor.  Have a great night.

17:03:11           MR. GARDNER:  Your Honor, I didn't know if any of the

17:03:12   attorneys had any motions.

17:03:14           THE COURT:  We were going to hold off on that until

17:03:18   they've had an opportunity to question the -- and if he's back in

17:03:25   the morning, they'll be making their motions in the morning, I

17:03:29   hope.

17:03:31          MR. WOMACK:  Your Honor, I've got one defense exhibit I

17:03:33   could offer right now.  This is a document.  Do you want me to do

17:03:35   that now or tomorrow?

17:03:37          THE COURT:  What, Mr. Womack, is it?

17:03:39          MR. WOMACK:  It's college transcripts.  I'd given it to

17:03:41   the government -- I e-mailed it to them a week before trial.  We

17:03:44   talked about it the beginning of trial.  It's actually from the

17:03:46   registrar's office.  It's the official document.  They told me

17:03:49   they had no objection.  So if you want me to, I can offer it now.

17:03:52          MR. GARDNER:  I have no objection, your Honor.

17:03:53          THE COURT:  But you could present that when I ask you

17:03:55   if you wish to make any presentation.  You can --

17:03:58          MR. WOMACK:  Oh, yes, sir.  I just want to know if I

17:04:00   can, I'd rather admit it now so I don't have to fool with it in

17:04:05   front of -- it was previously admitted Garcia 1 and I could talk

17:04:09   about it then.  However you'd rather do it, sir.

17:04:11          THE COURT:  I'm going to give each of you an

17:04:12   opportunity to put in the record whatever you want to.

17:04:15          MR. WOMACK:  I'll do it then.  That's fine.

17:04:16          THE COURT:  All right.  Okay.  Nobody else wants to

17:04:35   talk, then I'll see you in the morning at 8:30.

17:04:35          (Proceedings adjourned.)