```
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION

 3   UNITED STATES OF AMERICA      ) Docket No. A 12-CR-210 SS
                                   )
 4   vs.                          ) Austin, Texas
                                   )
 5   JOSE TREVINO-MORALES (3)      )
     FRANCISCO ANTONIO             )
 6   COLORADO-CESSA (6)            )
     FERNANDO SOLIS-GARCIA (7)     )
 7   EUSEVIO MALDONADO-HUITRON(11) )
     JESUS MALDONADO-HUITRON (18)  ) May 2, 2013
 8

 9                 TRANSCRIPT OF TRIAL ON THE MERITS
                     BEFORE THE HONORABLE SAM SPARKS
10                        Volume 13 of 15

11   APPEARANCES:

12   For the United States:       Ms. Michelle E. Fernald
                                  Ms. Jennifer S. Freel
13                                Mr. Douglas W. Gardner
                                  Assistant U.S. Attorneys
14                                816 Congress Avenue, Suite 1000
                                  Austin, Texas 78701
15
     For Defendant Trevino-       Mr. David M. Finn
16   Morales:                     Milner & Finn
                                  2828 North Harwood Street
17                                Suite 1950, LB9
                                  Dallas, Texas 75201
18
                                  Ms. Christie Williams
19                                Mills & Williams
                                  1112 South Rock Street
20                                Georgetown, Texas 78626

21   For Defendant Colorado-      Mr. Mike DeGeurin
     Cessa:                       Mr. M. Andres Sanchez-Ross
22                                Foreman, DeGeurin & DeGeurin
                                  300 Main Street
23                                Houston, Texas 77002

24                                Mr. John Parras
                                  Republic Bank Building
25                                1018 Preston, Floor 2
                                  Houston, Texas 77002
```

1   **(Appearances Continued:)**

2   For Defendant Solis-Garcia:  Mr. Guy L. Womack
                                Guy L. Womack & Associates
3                               402 Main Street, Suite 6 North
                                Houston, Texas 77002
4
    For Defendant Eusevio        Mr. Richard D. Esper
5   Maldonado-Huitron:           Esper Law Office
                                 801 North El Paso Street, 2nd Floor
6                                El Paso, Texas 79902

7   For Defendant Jesus          Mr. Thomas Brent Mayr
    Maldonado-Huitron:           Law Office of Brent Mayr
8                                4101 Washington Avenue, 2nd Floor
                                 Houston, Texas 77007
9

10  Interpreters:                Mr. Peter Heide
                                 Ms. Cristina Helmerichs
11                               Ms. Maureen McLean

12

13  Court Reporter:              Ms. Lily Iva Reznik, CRR, RMR
                                 501 West 5th Street, Suite 4153
14                               Austin, Texas 78701
                                 (512)391-8792
15

16

17

18

19

20

21

22

23

24

25  Proceedings reported by computerized stenography, transcript
    produced by computer.

1                        **I N D E X**

2                        <u>Direct</u>    <u>Cross</u>      <u>Redirect</u>   <u>Recross</u>

<u>Witnesses</u>:

3

4   Hector Moreno                                              7

5   Shae Cox                 21        53,64

6                                      66        72         73

7   Harry J. Casler          81

8   Ruby A. Segura           94

9
                                                          <u>Page</u>
10

11  Defendant Jesse Huitron's Opening Statements        78

12  Proceedings Adjourned                               137

13

14

15

16

17

18

19

20

21

22

23

24

25

# E X H I B I T S

|  | Offered | Admitted |
|---|---|---|
| Government's | | |
| #432 | 70 | 70 |
| #433 | 66 | 66 |
| Defendant Solis-Garcia's | | |
| #1 | 20 | 20 |
| Defendant Eusevio Huitron's | | |
| #EH-11 through 19 | 30 | 30 |
| #EH-20A through Z | 78 | 78 |
| Defendant Jesse Huitron's | | |
| #JH-4 | 77 | 77 |

08:18:41

08:34:19

| | | |
|---|---|---|
| 08:34:27 | 1 | THE COURT:  I'll have counsel up here, please. |
| 08:34:33 | 2 | (At the bench, on the record.) |
| 08:34:38 | 3 | MR. MAYR:  Good morning, Judge. |
| 08:34:39 | 4 | THE COURT:  Good morning.  Get closer to this. |
| 08:34:47 | 5 | Have we been able to get Mr. Moreno here? |
| 08:34:50 | 6 | MR. GARDNER:  We've got him. |
| 08:34:52 | 7 | THE COURT:  All right.  Then we'll start with Mr. |
| 08:34:54 | 8 | Moreno. |
| 08:34:56 | 9 | MR. DEGEURIN:  There was one other thing that you'd |
| 08:34:58 | 10 | asked for the government to do is to try to verify the arrest |
| 08:35:02 | 11 | warrant. |
| 08:35:02 | 12 | THE COURT:  Yes. |
| 08:35:03 | 13 | MR. GARDNER:  We sent an e-mail to our liaison at the |
| 08:35:06 | 14 | State Department -- last night, we sent an e-mail to our liaison |
| 08:35:11 | 15 | in Mexico City at the State Department.  We e-mailed him the |
| 08:35:16 | 16 | translated portions that y'all provided, given the size and their |
| 08:35:20 | 17 | double-sided nature of the original documents.  He asked for our |
| 08:35:23 | 18 | phone number this morning.  We gave it to him about 8:00, and he |
| 08:35:26 | 19 | hasn't called us yet.  So the executive assistant to the United |
| 08:35:31 | 20 | States Attorney has been followed and waiting on his call. |
| 08:35:35 | 21 | MS. FERNALD:  When we get something, we'll let y'all |
| 08:35:37 | 22 | know. |
| 08:35:38 | 23 | THE COURT:  So we still don't know that there are |
| 08:35:42 | 24 | officially any charges or not.  We just have all of this that |
| 08:35:46 | 25 | imply that they are. |

| | | |
|---|---|---|
| 08:35:47 | 1 | MR. GARDNER:  Yes, sir.  I would like to note that on |
| 08:35:48 | 2 | one portion of the document it says sealed.  And so, how they |
| 08:35:53 | 3 | became unsealed, I'm not -- indicator of its inauthenticity. |
| 08:36:04 | 4 | THE COURT:  The main thing is what Moreno knows, if |
| 08:36:08 | 5 | anything, and y'all can explore that however you wish or not. |
| 08:36:14 | 6 | Depends on what you are.  I'll allow the government to reopen and |
| 08:36:19 | 7 | put him back on the stand.  You can ask him any questions that |
| 08:36:22 | 8 | you wish.  If you don't ask any questions, as far as the Court's |
| 08:36:27 | 9 | concerned, you'll waive the objections that you've made because |
| 08:36:33 | 10 | this is an opportunity to cross him on anything that you have. |
| 08:36:37 | 11 | All right.  Bring the jury in. |
| 08:36:47 | 12 | (Jury present.) |
| 08:38:51 | 13 | THE COURT:  Members of the jury, since you left |
| 08:38:53 | 14 | yesterday, has anybody attempted to talk to you about this case? |
| 08:38:55 | 15 | JURORS:  No. |
| 08:38:56 | 16 | THE COURT:  Have you talked to anybody about the case? |
| 08:38:58 | 17 | JURORS:  No. |
| 08:38:59 | 18 | THE COURT:  And have you learned anything at all about |
| 08:39:01 | 19 | the case, outside the presence of each other in this courtroom? |
| 08:39:03 | 20 | JURORS:  No. |
| 08:39:05 | 21 | THE COURT:  All right.  Thank you.  Show negative |
| 08:39:07 | 22 | responses to all questions by all jurors. |
| 08:39:12 | 23 | MR. GARDNER:  Thank you, your Honor. |
| 08:39:13 | 24 | Your Honor, at the request of defense counsel, the |
| 08:39:15 | 25 | government reopens its case and calls -- recalls Hector Moreno. |

| | | |
|---|---|---|
| 08:39:18 | 1 | THE COURT:  All right.  Mr. Moreno, you understand that |
| 08:39:48 | 2 | you're still under oath? |
| 08:39:51 | 3 | THE WITNESS:  Yes. |
| 08:39:51 | 4 | THE COURT:  To tell the truth under the penalties of |
| 08:39:55 | 5 | perjury? |
| 08:40:00 | 6 | THE WITNESS:  Yes. |
| 08:40:03 | 7 | MR. GARDNER:  Your Honor, the government has no |
| 08:40:04 | 8 | questions of this witness. |
| 08:40:07 | 9 | MS. WILLIAMS:  Nor do I. |
| 08:40:11 | 10 | HECTOR MORENO, called by the Government, duly sworn. |
| 08:40:11 | 11 | RE-CROSS EXAMINATION |
| 08:40:11 | 12 | BY MR. DEGEURIN: |
| 08:40:18 | 13 | Q.   Mr. Moreno, since you left the courtroom last week, has |
| 08:40:28 | 14 | anyone talked to you about this case? |
| 08:40:33 | 15 | A.   No. |
| 08:40:34 | 16 | Q.   And have you spoken to anyone yourself about the case? |
| 08:40:44 | 17 | A.   With my attorney. |
| 08:40:46 | 18 | Q.   And has anyone -- have you learned anything about this case |
| 08:40:54 | 19 | since you left? |
| 08:41:03 | 20 | A.   Through the newspaper. |
| 08:41:11 | 21 | Q.   Have you received any money from the United States |
| 08:41:16 | 22 | government? |
| 08:41:24 | 23 | A.   Yes.  Last year, to get some permits. |
| 08:41:28 | 24 | Q.   And were the permits to allow you to be in the United |
| 08:41:41 | 25 | States? |

| | | |
|---|---|---|
| 08:41:41 | 1 | A.   Yes. |
| 08:41:49 | 2 | Q.   I believe you said you met possibly 50 times with either |
| 08:41:55 | 3 | prosecutors or agents of the United States? |
| 08:42:04 | 4 | A.   Yes. |
| 08:42:06 | 5 | Q.   But you -- have you met with any prosecutors or agents since |
| 08:42:10 | 6 | you left this courtroom last week? |
| 08:42:23 | 7 | A.   With the prosecutor or an agent, no. |
| 08:42:28 | 8 | MR. GARDNER:  Your Honor, excuse me, for the record, I |
| 08:42:30 | 9 | did meet with Mr. Moreno this morning when he came in. |
| 08:42:35 | 10 | A.   Up here, yeah.  Okay. |
| 08:42:38 | 11 | Q.   (BY MR. DEGEURIN) Okay.  Only Mr. Gardner, correct? |
| 08:42:42 | 12 | A.   Yes. |
| 08:42:43 | 13 | Q.   No one else? |
| 08:42:44 | 14 | A.   No. |
| 08:42:50 | 15 | Q.   Have you told anybody about a kidnapping and murder that you |
| 08:42:59 | 16 | committed in Mexico? |
| 08:43:07 | 17 | A.   No.  I haven't committed any. |
| 08:43:11 | 18 | Q.   Are you maintaining that you did not kidnap three to four |
| 08:43:19 | 19 | people, killing two of them and one of them got away? |
| 08:43:32 | 20 | A.   No. |
| 08:43:35 | 21 | Q.   Do you know the incident which I'm asking you about? |
| 08:43:56 | 22 | A.   It was in the newspaper that "Poncho" and I were being |
| 08:43:59 | 23 | accused of murder and kidnapping. |
| 08:44:04 | 24 | Q.   Are you talking about the Mexican newspaper? |
| 08:44:09 | 25 | A.   San Antonio news. |

08:44:12  1   Q.   Sorry?

08:44:13  2   A.   The San Antonio news.

08:44:18  3   Q.   How many times did you meet with agents -- United States

08:44:25  4   agents before you were paid?

08:44:51  5   A.   It was a lot of times.  A lot of times because this was the

08:44:55  6   second time I had to get a permit.  The first time I had gotten

08:44:58  7   it, the second time the whole process had been changed, and it

08:45:02  8   was the second time I went to get my permit.

08:45:05  9   Q.   No.  I mean, how many times did you meet with them before

08:45:10  10  you were first paid money?

08:45:23  11  A.   That was -- the majority of times I already had because it

08:45:30  12  was in the second year that I was given money.

08:45:36  13  Q.   May I see Court's Exhibit 19?  What year and what month was

08:46:16  14  it that you came to the United States?

08:46:39  15  A.   It was at the end of -- the end of April -- no.  It was the

08:46:42  16  end of March or beginning of April of 2011.

08:47:31  17  Q.   Do you read English?

08:47:37  18  A.   I understand some.  I don't know exactly, but I understand.

08:47:45  19  Q.   Okay.  With permission of the Court, I want to have -- I

08:47:50  20  want to show a document to the translator and have her read

08:47:54  21  silently a few things in here and then, ask him if it refreshes

08:47:59  22  his memory.

08:48:27  23  A.   Okay.

08:48:28  24  Q.   Having seen and explained to you this particular document,

08:48:41  25  do you agree with what it says?

| | | |
|---|---|---|
| 08:48:46 | 1 | A.   Yes.   I agree. |
| 08:48:47 | 2 | Q.   Okay.  So you were paid money for the purchase of |
| 08:48:53 | 3 | information, correct? |
| 08:49:04 | 4 | A.   That's what it says.  I signed.  They gave me -- gave it to |
| 08:49:07 | 5 | me so I could get my permits. |
| 08:49:18 | 6 | MR. DEGEURIN:  Your Honor, I think this should remain |
| 08:49:20 | 7 | as a Court exhibit at this time.  Then I'll pass the witness. |
| 08:49:31 | 8 | MR. WOMACK:  No questions, your Honor. |
| 08:49:33 | 9 | THE COURT:  Mr. Esper. |
| 08:49:34 | 10 | MR. ESPER:  Other than what Mr. DeGeurin has asked, I |
| 08:49:36 | 11 | have no questions. |
| 08:49:37 | 12 | MR. MAYR:  Nor do I, your Honor. |
| 08:49:39 | 13 | MR. GARDNER:  Your Honor, may this witness be excused? |
| 08:49:41 | 14 | THE COURT:  In a minute.  I'm going to put you in the |
| 08:49:44 | 15 | jury room for a minute. |
| 08:50:20 | 16 | (Jury not present.) |
| 08:50:31 | 17 | THE COURT:  Mr. Moreno, has anybody told you that you |
| 08:50:34 | 18 | have criminal charges pending in Mexico?  I think in Piedras |
| 08:50:40 | 19 | Negras, I think is the allegation. |
| 08:50:43 | 20 | MR. GARDNER:  Your Honor, that's correct.  I did show |
| 08:50:44 | 21 | Mr. Moreno the pending charges this morning. |
| 08:51:03 | 22 | THE WITNESS:  Yeah.  They showed me the charges that |
| 08:51:08 | 23 | had to do with three people, a Miguel Uribe, his brother, and a |
| 08:51:12 | 24 | Villarreal. |
| 08:51:12 | 25 | THE COURT:  And up until your coming here giving the |

08:51:20   1   testimony last week, were you aware that those charges have been

08:51:27   2   made?

08:51:31   3            THE WITNESS:  Didn't know.

08:51:33   4            THE COURT:  Anybody else want to ask him questions on

08:51:37   5   the record?

08:51:38   6            MR. GARDNER:  No, sir.

08:51:40   7            THE COURT:  All right.  I'm going to excuse Mr. Moreno.

08:51:43   8   Bring the jury back.  Well, wait a minute, John.  I assume you're

08:51:56   9   resting.

08:51:56   10            MR. GARDNER:  Yes, sir.

08:51:59   11            MR. FINN:  Judge, just in abundance of caution,

08:52:02   12   depending on what we've learned, if anything, from the State

08:52:04   13   Department, I would ask that he not be too far away, depending

08:52:09   14   on --

08:52:09   15            THE COURT:  For a period of time, I'll.

08:52:17   16            MR. DEGEURIN:  Your Honor, I would renew the request I

08:52:20   17   made yesterday that his testimony be stricken.

08:52:23   18            THE COURT:  Okay.  That motion is denied.  Had full

08:52:33   19   opportunity to cross the witness.

08:52:34   20            Before we bring back the jury, though, the government

08:52:36   21   has rested.  Is there anybody that wishes to make any motions,

08:52:39   22   now's time to do it, because you don't want to waive any.

08:52:42   23            MS. WILLIAMS:  Your Honor, pursuant to Rule 29, Mr.

08:52:46   24   Trevino asks -- moves that the Court enter a judgment of

08:52:49   25   acquittal.

08:52:55   1          MR. DEGEURIN:  Your Honor, on behalf of Mr. Colorado,

08:53:00   2   we, too, move for a judgment of acquittal under Rule 29 for the

08:53:06   3   reasons that the government has not proved each element of the

08:53:11   4   offense in the indictment, not carried their burden to do so.

08:53:18   5          THE COURT:  What item has the government not proved or

08:53:22   6   placed evidence on, anyway?

08:53:23   7          MR. DEGEURIN:  Your Honor, I don't believe that they

08:53:26   8   have proved a money-laundering activity to a reasonable mind a

08:53:33   9   juror could prove, beyond a reasonable doubt, that he knowingly

08:53:39   10  and willingly participated in a money -- in money laundering.

08:53:45   11         THE COURT:  All right.  Your motion is that there's

08:53:50   12  insufficient evidence for a reasonable jury to find the defendant

08:53:54   13  guilty, rather than there is no evidence on one element of the

08:53:59   14  offense charged, as I understand your --

08:54:02   15         MR. DEGEURIN:  Insufficient evidence on each of them.

08:54:04   16  Thank you, Judge.

08:54:06   17         THE COURT:  Mr. Womack.

08:54:07   18         MR. WOMACK:  Your Honor, on behalf of Fernando Garcia,

08:54:09   19  the same motion, the same basis.  Evidence is insufficient as a

08:54:14   20  matter of law for a jury to convict Fernando Garcia.  Also, one

08:54:19   21  other point I'd like to make, sir.  This may be something we

08:54:22   22  could cover in instructions.  But the government --

08:54:35   23         THE COURT:  Would you come up here for a minute?

08:54:50   24         (At the bench, off the record.)

08:54:58   25         MR. WOMACK:  Sir, of course, with Federal Rule of

08:55:01  1   Criminal Procedure 29, we'd move for judgment of acquittal for

08:55:06  2   Fernando Garcia on the basis that there was insufficient evidence

08:55:09  3   as a matter of law to conclude that he joined a conspiracy

08:55:13  4   knowingly and voluntarily and intended -- specifically intended

08:55:19  5   to be involved in money laundering.

08:55:21  6         I'd like to point out one other additional fact, your

08:55:24  7   Honor, that may be more appropriate for instructions.  The

08:55:27  8   government offered evidence that in September of 2008, my client

08:55:33  9   opened a bank account for Garcia Bloodstock that, frankly, looked

08:55:37  10  like classic structuring.  But they also introduced evidence

08:55:42  11  consistently that Fernando Garcia did not join this conspiracy,

08:55:53  12  if at all, until March of -- or around March of 2010.

08:55:57  13        In other words, while he had done something in opening

08:56:00  14  his company in 2008, that would certainly look to the world like

08:56:03  15  structuring, going from place to place to place to open his

08:56:06  16  account in amounts less than $10,000, that was before there was

08:56:11  17  any evidence he even knew any of the alleged coconspirators.

08:56:14  18  Therefore, none of the coconspirators could be convicted based on

08:56:19  19  that evidence because they didn't even know him.  He couldn't

08:56:22  20  have been part of the conspiracy if there was one.

08:56:25  21        And, likewise, Mr. Garcia could not have been a member

08:56:28  22  of the conspiracy because there's no evidence he even knew these

08:56:31  23  people.  Rather, it looks like they've charged -- or they have

08:56:35  24  offered proof that he committed a substantive offense of

08:56:38  25  structuring in 2008 but not as a member of this conspiracy.  So

08:56:45  1  that evidence by itself cannot be considered by the jury as proof

08:56:49  2  that he was involved in any conspiracy a year and a half -- or

08:56:54  3  joined a conspiracy a year and a half later.

08:56:58  4          And I think if you take out that individual

08:57:02  5  transaction, then the evidence is insufficient as a matter of law

08:57:05  6  to show that Fernando Garcia directed, structured payments to be

08:57:10  7  made, or joined a conspiracy knowingly and intentionally.  Thank

08:57:14  8  you, sir.

08:57:16  9          MR. ESPER:  Your Honor, if it please the Court.

08:57:21 10          Since the government has now rested its case-in-chief,

08:57:23 11  the Defendant Eusevio Huitron would move pursuant to Rule 29(a)

08:57:28 12  of the Federal Rules of Criminal Procedure for the Court to enter

08:57:31 13  a judgment of acquittal as to Count 1 of the indictment against

08:57:34 14  him.  And it is the contention of Mr. Huitron that no rational

08:57:39 15  trier of fact could find that the evidence is sufficient to

08:57:43 16  satisfy proof beyond a reasonable doubt each element of the

08:57:47 17  offense.

08:57:48 18          There basically is two parts to this conspiracy.  The

08:57:51 19  second part, part B involved a property involving a financial

08:57:57 20  transaction representing the proceeds of some form of unlawful

08:58:00 21  activity, and that the defendant in this case, Mr. Huitron, did

08:58:03 22  transport, transmit, and transfer, and attempt to transport, a

08:58:09 23  monetary instrument and funds from a place in the United States

08:58:12 24  to or through a place outside of United States and vice versa.

08:58:16 25          I don't think there's been any evidence to establish

08:58:18   1   that prong of the money-laundering statutes.  Consequently, we

08:58:24   2   have the first prong, which is knowing that the property involved

08:58:28   3   in a financial transaction represented the proceeds of some form

08:58:32   4   of unlawful activity did conduct and attempt to conduct such a

08:58:36   5   financial transaction which involved the proceeds of specified

08:58:39   6   unlawful activity, conspiracy to distribute a controlled

08:58:43   7   substance, and extortion and bribery.

08:58:45   8        I submit to your Honor that what we have is Mr. Huitron

08:58:48   9   being involved in training horses.  And so, the government's

08:58:52   10  theory is that he knew that the proceeds that he was being paid

08:58:56   11  came from specified unlawful activity, which they definitely have

08:59:01   12  shown that there's been drug distribution and drug proceeds

08:59:04   13  generated from conduct involving Cuellar and others.  But I don't

08:59:09   14  believe that the evidence is sufficient to establish that Mr.

08:59:14   15  "Chevo" Huitron knew, number one, about the specified unlawful

08:59:17   16  activity and, number two, that he knew that the funds that were

08:59:21   17  being used to pay for his training services were the proceeds of

08:59:26   18  that specified unlawful activity.

08:59:28   19        And on that basis, we would move the Court to grant his

08:59:31   20  judgment of acquittal.

08:59:32   21        THE COURT:  Mr. Mayr.

08:59:35   22        MR. MAYR:  Thank you, your Honor.

08:59:36   23        May it please the Court.  At this time, on behalf of my

08:59:41   24  client Jesus Maldonado-Huitron, I would move pursuant to Rule 29

08:59:45   25  of the Federal Rules of Criminal Procedure for a judgment of

08:59:49  1   acquittal in this case, since the government has failed to prove

08:59:52  2   all of the elements or has failed to present evidence a rational

08:59:56  3   juror could use to find beyond a reasonable doubt that this

08:59:59  4   offense was committed.  To kind of echo what Mr. Esper just

09:00:05  5   mentioned to the Court, while I believe that there's not

09:00:09  6   sufficient evidence for each one of the elements, I would direct

09:00:13  7   this court to the third element that's set forth in the Pattern

09:00:19  8   Jury Instruction that the government have to establish that my

09:00:22  9   client, Jesus Huitron, again, knew that the property involved in

09:00:27  10  the financial transactions represented the proceeds of some form

09:00:29  11  of unlawful activity.

09:00:32  12        This court recall, there's been no individual that's

09:00:35  13  come forward or no evidence presented that my client was

09:00:38  14  associated with the Zetas or associated with any of the other

09:00:40  15  codefendants.  There was no communications involving him.  And to

09:00:46  16  -- as I go through and I look at the scant evidence that was

09:00:50  17  presented regarding my client, while there's some issue about

09:00:54  18  transactions, there's no evidence whatsoever to show this court

09:00:59  19  or to show this jury that Jesse Huitron knew that those

09:01:05  20  transactions that were being conducted through his accounts were

09:01:08  21  the form -- were -- came from some illegal activity whatsoever.

09:01:13  22        And so, on that basis, we would ask the Court to grant

09:01:15  23  the motion.  Thank you, your Honor.

09:01:18  24        THE COURT:  I take it that there were no written

09:01:20  25  motions to be filed?

| | | |
|---|---|---|
| 09:01:23 | 1 | MS. WILLIAMS:  That's correct. |
| 09:01:24 | 2 | MR. WOMACK:  That's correct, your Honor. |
| 09:01:25 | 3 | THE COURT:  All right.  The government want to make any |
| 09:01:28 | 4 | statement for the record? |
| 09:01:29 | 5 | MR. GARDNER:  Thank you, your Honor. |
| 09:01:30 | 6 | Your Honor, in order to sustain a conviction, the |
| 09:01:34 | 7 | government must prove that, one, defendant and one other person |
| 09:01:36 | 8 | made an agreement to commit money laundering and, two, the |
| 09:01:39 | 9 | defendant knew the unlawful purpose and joined with intent to |
| 09:01:43 | 10 | further the unlawful purpose. |
| 09:01:44 | 11 | Your Honor, in order to prove the conspiracy and money |
| 09:01:47 | 12 | laundering existed, the government has alleged three specified |
| 09:01:50 | 13 | unlawful activities:  That being drug trafficking in which Mr. |
| 09:01:54 | 14 | Cuellar, Mr. Vasquez, Mr. Hinojosa, Mr. Rejon, among others, |
| 09:02:00 | 15 | testified that they were responsible for the receipt -- |
| 09:02:02 | 16 | THE COURT:  I don't need a review of the evidence. |
| 09:02:04 | 17 | MR. GARDNER:  Yes, sir. |
| 09:02:05 | 18 | THE COURT:  I just want to give the opportunity to the |
| 09:02:08 | 19 | government if you wish to -- I assume you're opposed to the |
| 09:02:11 | 20 | motion? |
| 09:02:11 | 21 | MR. GARDNER:  I am, your Honor.  Yes, sir. |
| 09:02:19 | 22 | THE COURT:  All right. |
| 09:02:20 | 23 | MR. GARDNER:  Thank you. |
| 09:02:23 | 24 | THE COURT:  The motions are overruled.  Bring them in. |
| 09:02:25 | 25 | MR. MAYR:  Your Honor, before the jury, may I approach |

09:02:28   1   the bench and just -- with Mr. Gardner?  I need to state

09:02:32   2   something for the record.

09:02:37   3            THE COURT:  Sure.

09:02:37   4            (At the bench, on the record.)

09:02:40   5            MR. MAYR:  I would just like to have a motion but it

09:02:43   6   just involves us.  I would just like the record to reflect that I

09:02:46   7   had originally given notice of my intent to call Jessica Huitron

09:02:50   8   as a witness in my case.  I gave that notice to Mr. Gardner a

09:02:55   9   couple of days ago.  I have learned that Ms. Huitron is -- I have

09:03:04   10  learned through her attorney that if called to testify, she would

09:03:07   11  invoke her Fifth Amendment right and not answer any questions

09:03:10   12  that I would present to her regarding her handling of the

09:03:13   13  transactions in question.  I believe Mr. Gardner is aware of

09:03:17   14  that, as well.

09:03:17   15           Therefore, I will not be calling her to the stand nor

09:03:22   16  will I be mentioning or alluding to that fact, in light of her

09:03:28   17  willingness to invoke her Fifth Amendment right to testify.  I

09:03:31   18  would just ask that the government also be instructed not to

09:03:34   19  mention or allude to that fact that she has -- the witness is not

09:03:38   20  being called and that's because she has invoked her Fifth

09:03:42   21  Amendment right.

09:03:45   22           THE COURT:  I don't know about that you'd rather go to

09:03:49   23  the World's Fair the next couple of years.  She hasn't come to

09:03:53   24  the stand, she hasn't taken the Fifth Amendment.

09:03:56   25           MR. MAYR:  Right.

09:03:57   1          THE COURT:  I don't know if the government would offer

09:03:58   2  her immunity, and therefore, she wouldn't have to testify.  I

09:04:02   3  don't know any of those things.  So it's very unique about

09:04:06   4  witnesses.  You know, I don't doubt your representations.

09:04:12   5          MR. MAYR:  Okay.

09:04:13   6          THE COURT:  But I'm going to make rulings just based on

09:04:16   7  what's happened in the courtroom.

09:04:17   8          MR. MAYR:  Okay.  Thank you, sir.

09:04:25   9          (Jury present.)

09:05:58  10          THE COURT:  Members of the jury, the government has

09:06:01  11  rested its case-in-chief.  Mr. Finn, Ms. Williams.

09:06:06  12          MR. FINN:  Thank you, your Honor.

09:06:07  13          THE COURT:  Do you wish to present any evidence?

09:06:09  14          MR. MAYR:  Your Honor, I don't mean to interrupt, but

09:06:11  15  the Court will recall, I waived my right to open but reserved --

09:06:16  16  I waived my right to open -- to give an opening statement at the

09:06:20  17  time before the government presented their case and reserve my

09:06:22  18  right to give an opening statement.

09:06:23  19          THE COURT:  And I will give you that opportunity when

09:06:25  20  it's your turn.

09:06:26  21          MR. MAYR:  Okay.  Thank you, your Honor.

09:06:27  22          THE COURT:  Yes, sir.  Mr. Finn.

09:06:29  23          MR. FINN:  Thank you, your Honor.

09:06:30  24          May it please the Court, members of the jury, based on

09:06:33  25  the government's case-in-chief, Ms. Williams and I rest.  Thank

09:06:36  1   you.

09:06:39  2          MR. DEGEURIN:  Your Honor, we rest, also.

09:06:44  3          THE COURT:  That's for Francisco Antonio

09:06:48  4   Colorado-Cessa.  How about Fernando Solis?

09:06:51  5          MR. WOMACK:  Yes, your Honor.

09:06:53  6          The defense now offers what has been marked as Garcia

09:06:56  7   Exhibit 1.  Your Honor, these are the original transcripts from

09:07:00  8   the University of Arizona, evidencing Mr. Garcia's pursuit of a

09:07:04  9   Bachelor of Science Degree that's been talked about in court.

09:07:07  10          MR. GARDNER:  We have seen these, your Honor.  We have

09:07:08  11  no objection.

09:07:09  12          THE COURT:  All right.  Garcia 1 is received.

09:07:11  13          MR. WOMACK:  Thank you, your Honor.  And with that,

09:07:12  14  defense rests.

09:07:14  15          THE COURT:  Mr. Esper.

09:07:16  16          MR. ESPER:  Defendant Eusevio Huitron would call Ms.

09:07:19  17  Shae Cox, your Honor.

09:07:50  18          (Witness sworn.)

09:08:08  19          THE COURT:  Tell us your full name and spell your last,

09:08:15  20  please.

09:08:15  21          THE WITNESS:  Shae Cox, C-O-X.

09:08:19  22          THE COURT:  You may proceed.

09:08:19  23      SHAE COX, called by the Defendant, duly sworn.

09:08:19  24

09:08:20  25

DIRECT EXAMINATION

09:08:20   1

09:08:20   2  BY MR. ESPER:

09:08:21   3  Q.   Thank you, your Honor.

09:08:21   4        Ms. Cox, tell the ladies and gentlemen of the jury what

09:08:25   5  you do for a living.

09:08:26   6  A.   I train race horses.

09:08:28   7  Q.   Okay.  And how long have you been doing that?

09:08:31   8  A.   About eight years, licensed, and I grew up in the industry.

09:08:39   9  Q.   Okay.  And where were you raised, Ms. Cox?

09:08:42  10  A.   I was raised in El Paso, Texas.

09:08:45  11  Q.   Okay.  And is that where you sort of cut your teeth learning

09:08:50  12  the horse-training business?

09:08:51  13  A.   Yes.

09:08:51  14  Q.   And where would that have been?

09:08:53  15  A.   I was working for a gentleman named Armando Orosco.

09:08:56  16  Q.   And where at?

09:08:57  17  A.   El Paso, Sunland Park Racetrack.

09:09:00  18  Q.   Okay.  Now, tell the ladies and gentlemen of the jury a

09:09:02  19  little bit of the geographics of El Paso and Sunland Park.

09:09:06  20  A.   Sunland Park itself, pretty much all it has is a racetrack.

09:09:09  21  So it's pretty much in El Paso, Texas, but it is New Mexico.

09:09:14  22  Q.   Okay.  And does El Paso border New Mexico and the Republic

09:09:19  23  of Mexico?

09:09:19  24  A.   Yes.

09:09:19  25  Q.   Okay.  So they're all kind of one big metropolitan area?

| | | |
|---|---|---|
| 09:09:23 | 1 | A.   Yes. |
| 09:09:23 | 2 | Q.   Is that a fair statement?  Okay.  And so, you went to |
| 09:09:26 | 3 | work -- how old were you when you went to work for Mr. Orosco? |
| 09:09:29 | 4 | A.   I was about 13. |
| 09:09:31 | 5 | Q.   Okay.  And do you ride horses yourself? |
| 09:09:34 | 6 | A.   Yes. |
| 09:09:35 | 7 | Q.   Okay.  And -- |
| 09:09:37 | 8 | A.   Not race horses. |
| 09:09:38 | 9 | Q.   Pardon me? |
| 09:09:38 | 10 | A.   Not race horses. |
| 09:09:39 | 11 | Q.   Okay.  So you got involved in working for him and him being |
| 09:09:43 | 12 | Mr. Orosco, he had some horses, correct? |
| 09:09:46 | 13 | A.   Yes. |
| 09:09:46 | 14 | Q.   And did you work with other trainers when you were starting |
| 09:09:51 | 15 | at age 13? |
| 09:09:52 | 16 | A.   Yes.  He was a trainer. |
| 09:09:54 | 17 | Q.   Okay.  And he was a trainer and owner -- |
| 09:09:57 | 18 | A.   Yes. |
| 09:09:58 | 19 | Q.   -- was he?  And was he a Mexican national, if you know? |
| 09:10:02 | 20 | A.   Yes. |
| 09:10:03 | 21 | Q.   Okay.  Did he reside in Mexico, if you know? |
| 09:10:06 | 22 | A.   No. |
| 09:10:07 | 23 | Q.   Okay.  Did he reside in El Paso? |
| 09:10:09 | 24 | A.   Yes. |
| 09:10:09 | 25 | Q.   Okay.  But he was a citizen of the Republic of Mexico -- |

09:10:14   1   A.   Yes.

09:10:15   2   Q.   -- correct?  And so, did he have horses there at Sunland

09:10:18   3   Park Racetrack?

09:10:19   4   A.   Yes.  He had private property attached to the racetrack.

09:10:22   5   Q.   Okay.  And as you are in your teenage years, you're going to

09:10:27   6   high school, would it be fair to say, and working at the

09:10:30   7   racetrack?

09:10:30   8   A.   Yes.  I would usually go to his property about 4:00 a.m. and

09:10:33   9   then, at -- go to school about 8:00.  And then, as soon as I got

09:10:37  10   out of school, I'd go back to work.  I loved it.

09:10:39  11   Q.   Okay.  Tell the ladies and gentlemen of the jury, do you

09:10:42  12   know Mr. "Chevo" Huitron?

09:10:43  13   A.   Yes, I do.

09:10:44  14   Q.   And where was it or when was it that you first came to meet

09:10:49  15   "Chevo" Huitron?

09:10:50  16   A.   I met him about ten years ago or so at Sunland Park.

09:10:57  17   Q.   Okay.  And was he there -- in what capacity was he there at

09:11:02  18   Sunland Park?

09:11:02  19   A.   He had taken a horse there to race.

09:11:05  20   Q.   Okay.  And would it be fair to say that in the

09:11:11  21   horse-training or the horse-racing business, it's kind of a small

09:11:16  22   group where everybody probably knows somebody else?

09:11:18  23   A.   Oh, yes.

09:11:19  24   Q.   Okay.  So there's a lot of people that you know in the

09:11:22  25   horse-racing business, both as owners and trainers.  Would that

| | | |
|---|---|---|
| 09:11:25 | 1 | be a fair statement? |
| 09:11:26 | 2 | A.   Yes. |
| 09:11:26 | 3 | Q.   Okay.  Now, tell the ladies and gentlemen of the jury |
| 09:11:29 | 4 | basically what you charge as a fee to train a horse. |
| 09:11:35 | 5 | A.   I charge 35 a day. |
| 09:11:37 | 6 | Q.   Okay.  And you charge 35 a day.  Do you have your own |
| 09:11:41 | 7 | facilities or do you train at the track? |
| 09:11:43 | 8 | A.   At times, I will train on the racetrack.  At times, I will |
| 09:11:47 | 9 | train off the racetrack where I have to rent stables. |
| 09:11:49 | 10 | Q.   Okay.  Does the fee change if you are training at the track, |
| 09:11:54 | 11 | as opposed to not at the track? |
| 09:11:56 | 12 | A.   If you are in the racetrack and allotted stalls, then |
| 09:11:59 | 13 | they're free.  If you are off the racetrack, then you have to pay |
| 09:12:03 | 14 | stall rent. |
| 09:12:03 | 15 | Q.   Okay.  And that would be charged to the owner, correct? |
| 09:12:06 | 16 | A.   Correct. |
| 09:12:07 | 17 | Q.   Okay.  Now, what does the -- I forgot the amount that you |
| 09:12:12 | 18 | told me.  How much per day? |
| 09:12:14 | 19 | A.   Thirty-five. |
| 09:12:15 | 20 | Q.   Okay.  So if I as an owner had ten horses that you were |
| 09:12:18 | 21 | training, I'd be paying $350 a day, correct?  Would that be |
| 09:12:23 | 22 | right? |
| 09:12:23 | 23 | A.   Yes. |
| 09:12:23 | 24 | Q.   And what would that $350 a day for those ten horses include |
| 09:12:29 | 25 | with respect to you as a trainer? |

| 09:12:32 | 1 | A.   I'd include feed, vitamins that go inside the feed, shavings |

09:12:32  1   A.   I'd include feed, vitamins that go inside the feed, shavings

09:12:37  2   for the stalls.  It includes the grooms that I would be

09:12:40  3   responsible for, the gallop people that I would be responsible

09:12:42  4   for, pony people that I'm responsible for, and that's about it.

09:12:52  5   Q.   Would it be a fair statement to say that every owner that

09:12:56  6   you train a horse for is looking to see if that horse can be

09:13:00  7   entered in races?

09:13:00  8   A.   Oh, yes.  Definitely.

09:13:02  9   Q.   Okay.  And, of course, would it be fair to say that not

09:13:05  10  every horse is going to turn out to be a good one?

09:13:07  11  A.   No.  Unfortunately.

09:13:08  12  Q.   Okay.  It's somewhat of a high-risk business.  Would that be

09:13:11  13  fair?

09:13:11  14  A.   It is.  It's a gamble.

09:13:13  15  Q.   Okay.  Now, what -- that $35 a day for ten horses, 350 a

09:13:20  16  day, what does that not include?

09:13:22  17  A.   It doesn't include vet bills and it does not include the

09:13:25  18  stall rent, if paid, and it does not include shoeing.

09:13:30  19  Q.   Okay.  What about entry fees if I want to race any of those

09:13:37  20  horses in any races?

09:13:39  21  A.   If they're going toward any races that need entry fees,

09:13:43  22  that's the owner would pay that.

09:13:44  23  Q.   Okay.  Now, how can an owner pay those additional fees?

09:13:51  24  Tell us the different ways.

09:13:52  25  A.   Sometimes the owners -- most of the time, the owners that

| | | |
|---|---|---|
| 09:13:58 | 1 | own race horses are businessmen.  So sometimes they'll just let |
| 09:14:02 | 2 | the trainer take care of it.  So I would pay it and then, they |
| 09:14:06 | 3 | would give me a check for that; or they would give me a check and |
| 09:14:09 | 4 | I would pay the track.  Or sometimes the owners take care of |
| 09:14:13 | 5 | their own nomination fees and the owners pay it, and they just |
| 09:14:16 | 6 | call and notify the trainer, hey, this horse is nominated for |
| 09:14:18 | 7 | this race.  Get it ready. |
| 09:14:20 | 8 | Q.   Okay.  What about vet bills? |
| 09:14:22 | 9 | A.   Same thing.  Pretty much the same thing, yeah. |
| 09:14:24 | 10 | Q.   Okay.  Now, you have trained how many horses in your short |
| 09:14:29 | 11 | career or your eight-year career? |
| 09:14:32 | 12 | A.   A lot. |
| 09:14:33 | 13 | Q.   A lot? |
| 09:14:34 | 14 | A.   I've probably gone through a thousand. |
| 09:14:36 | 15 | Q.   Okay.  And are a number of the owners who own these horses |
| 09:14:41 | 16 | from Mexico? |
| 09:14:42 | 17 | A.   Yes. |
| 09:14:43 | 18 | Q.   Would it be fair to say that the quarter horse-racing |
| 09:14:47 | 19 | business is non-U.S.-based? |
| 09:14:52 | 20 | A.   I think that would be fair to say.  The quarter horse |
| 09:14:55 | 21 | industry or quarter horses in general have always been a |
| 09:14:58 | 22 | foundation of the Mexican culture.  Horse racing and horses, it's |
| 09:15:03 | 23 | part of their culture. |
| 09:15:05 | 24 | Q.   Okay.  Now, are you -- let's talk about how you are paid by |
| 09:15:11 | 25 | these owners that you've trained close to a thousand horses. |

| | | |
|---|---|---|
| 09:15:17 | 1 | What type of forms of payment have you received as a trainer? |
| 09:15:21 | 2 | A.   I've received mostly checks, but on occasion, I've received |
| 09:15:25 | 3 | cash. |
| 09:15:26 | 4 | Q.   And when you receive cash, have you -- how have you received |
| 09:15:30 | 5 | cash? |
| 09:15:32 | 6 | A.   Usually -- |
| 09:15:33 | 7 | Q.   Hand-to-hand? |
| 09:15:33 | 8 | A.   Yeah.  Hand-to-hand. |
| 09:15:35 | 9 | Q.   Okay.  Has any owner ever asked you for your bank account |
| 09:15:39 | 10 | number to where they could deposit cash into your account? |
| 09:15:42 | 11 | A.   No. |
| 09:15:43 | 12 | Q.   If they did, would you allow that? |
| 09:15:46 | 13 | A.   Yes. |
| 09:15:48 | 14 | Q.   Would you want to know about the owner?  Would it be |
| 09:15:52 | 15 | conditional on how well you knew the owner? |
| 09:15:54 | 16 | A.   Yes. |
| 09:15:55 | 17 | Q.   Okay.  Now, you say that you met Mr. Huitron about 2005? |
| 09:16:06 | 18 | Would that be fair?  Six? |
| 09:16:09 | 19 | A.   Yeah.  That would be fair.  Somewhere in there. |
| 09:16:12 | 20 | Q.   Okay.  And did you and he establish a rapport with each |
| 09:16:15 | 21 | other? |
| 09:16:15 | 22 | A.   Yes. |
| 09:16:16 | 23 | Q.   Okay.  And to this day, he's still your friend, is he not? |
| 09:16:19 | 24 | A.   Yes. |
| 09:16:20 | 25 | Q.   Okay.  But you established that rapport there at Sunland |

09:16:26   1   Park in New Mexico?

09:16:28   2   A.   Yes.

09:16:28   3   Q.   Did you become kind of a mentee with Mr. Huitron?

09:16:32   4   A.   We immediately became really good friends.  I helped him

09:16:35   5   because he needed help as far as entering his horses.  I knew the

09:16:41   6   people that could help him at race time, take horses to the

09:16:44   7   paddock.  Or whatever he needed, I would help him set up whenever

09:16:47   8   he would come into Sunland Park.

09:16:48   9   Q.   Okay.  And this was when he was at Sunland Park?

09:16:51   10  A.   Yes.  He just hauled in for races.  He never stayed there.

09:16:54   11  Q.   Okay.  Do you know -- and if you don't, simply say so --

09:16:58   12  whether at that time Mr. "Chevo" Huitron had his actual trainer's

09:17:02   13  license?

09:17:02   14  A.   No.  He did not.

09:17:03   15  Q.   And do you know why he didn't?

09:17:05   16  A.   At the time, I don't think he had the knowledge of racing

09:17:09   17  and the rules.  He still needed guidance before taking it a step

09:17:13   18  further and having his own license.  He still needed some more

09:17:17   19  time to become more familiar with the racetracks, the way they

09:17:20   20  work, the rules.  And he was working so hard, I don't think he

09:17:26   21  wanted that responsibility.

09:17:27   22  Q.   Now, do you speak Spanish, Ms. Cox?

09:17:30   23  A.   Fairly well.

09:17:31   24  Q.   Okay.  Does Mr. Huitron speak English well?

09:17:34   25  A.   No.  Not very well.  A little bit.

| | | |
|---|---|---|
| 09:17:37 | 1 | Q.   Is he able to communicate if the subject matter deals with |
| 09:17:41 | 2 | horses? |
| 09:17:42 | 3 | A.   Yes. |
| 09:17:42 | 4 | Q.   In English? |
| 09:17:44 | 5 | A.   Yes.  Pretty well. |
| 09:17:45 | 6 | Q.   Okay.  Do you know whether Mr. "Chevo" Huitron can read and |
| 09:17:48 | 7 | write? |
| 09:17:48 | 8 | A.   No.  He cannot. |
| 09:17:49 | 9 | Q.   Cannot at all? |
| 09:17:50 | 10 | A.   No. |
| 09:17:50 | 11 | Q.   Okay.  And you know this from your interaction with him? |
| 09:17:55 | 12 | A.   Yes.  I worked for him for two years after that. |
| 09:17:59 | 13 | Q.   Okay.  Now, I'm going to get to that in just a minute.  Did |
| 09:18:04 | 14 | there come a time when Mr. "Chevo" Huitron offered you a job to |
| 09:18:08 | 15 | come work for him? |
| 09:18:08 | 16 | A.   Yes. |
| 09:18:09 | 17 | Q.   And did you accept that job? |
| 09:18:11 | 18 | A.   Yes. |
| 09:18:11 | 19 | Q.   Was it a conditional acceptance? |
| 09:18:15 | 20 | A.   Conditional? |
| 09:18:17 | 21 | Q.   Well, were you still in high school? |
| 09:18:19 | 22 | A.   Oh, yes.  I was still in high school whenever he offered me |
| 09:18:22 | 23 | the job, and I said, I have to finish high school first.  But I |
| 09:18:26 | 24 | didn't even walk for graduation.  The day after school was out, I |
| 09:18:28 | 25 | moved to Austin. |

| | | |
|---|---|---|
| 09:18:29 | 1 | Q.    Okay.  You moved here to Austin, Texas? |
| 09:18:31 | 2 | A.    Yes. |
| 09:18:35 | 3 | Q.    May I approach the witness, your Honor? |
| 09:18:37 | 4 |       THE COURT:  You don't have to have my permission. |
| 09:18:38 | 5 | Q.    (BY MR. ESPER) I'm showing you some photographs.  Do you |
| 09:18:41 | 6 | recognize what has been marked as Defendant EH-11 and EH-12? |
| 09:18:46 | 7 | A.    Yes.  That's his house. |
| 09:18:47 | 8 | Q.    Okay.  And I'm also showing you Defendant's Exhibits EH-13, |
| 09:18:56 | 9 | EH-14, EH-15, EH-16, EH-17, EH-18.  Do you recognize those |
| 09:19:06 | 10 | exhibits? |
| 09:19:07 | 11 | A.    Yes.  That's his farm where he trains his race horses. |
| 09:19:10 | 12 | Q.    Okay.  I'm also showing you Defendant's Exhibit EH-19.  Do |
| 09:19:13 | 13 | you recognize that? |
| 09:19:14 | 14 | A.    Yes.  That's the office. |
| 09:19:15 | 15 | Q.    Okay.  Tendering these exhibits, your Honor, to Mr. Gardner |
| 09:19:30 | 16 | for inspection and objection, if any. |
| 09:19:50 | 17 |       MR. GARDNER:  No objection, your Honor. |
| 09:19:52 | 18 |       MR. ESPER:  Your Honor, Defendant Huitron -- Eusevio |
| 09:19:55 | 19 | Huitron would move for the admission of Defendant's Exhibit |
| 09:19:59 | 20 | EH-11, 12, 13, 14, 15, 16, 17, 18 and 19. |
| 09:20:07 | 21 |       THE COURT:  They are received. |
| 09:20:09 | 22 |       MR. ESPER:  And permission to publish, your Honor, |
| 09:20:12 | 23 | through this Elmo, if I could figure out how it works. |
| 09:20:16 | 24 |       MR. MAYR:  It's on. |
| 09:20:18 | 25 |       MR. ESPER:  It's on. |

| | | |
|---|---|---|
| 09:20:20 | 1 | MR. MAYR:  Yeah. |
| 09:20:21 | 2 | Q.   (BY MR. ESPER) Now, Ms. Cox, you've identified EH-11.  Can |
| 09:20:25 | 3 | you tell us what that is? |
| 09:20:26 | 4 | A.   Yes.  That's the street going to his house. |
| 09:20:28 | 5 | Q.   Okay.  And did you actually come and live with "Chevo" |
| 09:20:31 | 6 | Huitron and his family? |
| 09:20:32 | 7 | A.   Yes. |
| 09:20:33 | 8 | Q.   Okay.  They took you in like a daughter?  Would that be |
| 09:20:37 | 9 | fair? |
| 09:20:38 | 10 | A.   Well, we weren't home very much because we were on the road. |
| 09:20:40 | 11 | But yes. |
| 09:20:41 | 12 | Q.   Okay.  Now, EH -- Defendant's EH-12. |
| 09:20:47 | 13 | A.   That's his house. |
| 09:20:48 | 14 | Q.   Okay.  Now, Defendant's Exhibit EH-13? |
| 09:20:54 | 15 | A.   That's the entry to the training facility. |
| 09:20:57 | 16 | Q.   Okay.  Now, would it be fair to say that Mr. Huitron's |
| 09:21:00 | 17 | training facility is -- and I don't say this demeaningly -- |
| 09:21:06 | 18 | somewhat basic? |
| 09:21:08 | 19 | A.   Yes. |
| 09:21:08 | 20 | Q.   Okay.  Is it kind of rundown a little bit? |
| 09:21:11 | 21 | A.   Yes. |
| 09:21:12 | 22 | Q.   It's nothing elaborate, is it? |
| 09:21:13 | 23 | A.   Not at all. |
| 09:21:14 | 24 | Q.   Okay.  Defendant's Exhibit 14, can you tell the ladies and |
| 09:21:22 | 25 | gentlemen of the jury what that is? |

09:21:23   1   A.   Yes.  The building where the white truck is parked is one of

09:21:28   2   the barns that the race horses are kept in.  And the house is

09:21:32   3   where the workers live in.

09:21:34   4   Q.   Okay.  Now, are the workers that work for Mr. Huitron when

09:21:38   5   you were there, are any of them illegal aliens to your knowledge?

09:21:42   6   A.   Not to my knowledge.

09:21:43   7   Q.   Okay.  Defendant's Exhibit 15, is that the house from the

09:21:48   8   back side of the training facility?

09:21:49   9   A.   Yes.

09:21:50   10  Q.   Okay.  EH-16, can you identify what these are?

09:21:56   11  A.   Yes.  Those are just some turnout pens with some younger

09:22:00   12  horses that are not ready for training yet.

09:22:02   13  Q.   Okay.  Turnout pen?

09:22:04   14  A.   Yes.  Basically horses that are not in training yet.

09:22:06   15  Q.   Okay.  Defendant's Exhibit EH-17?

09:22:14   16  A.   Yes.  The racetrack where they gallop.

09:22:18   17  Q.   Okay.  And how long is that racetrack?

09:22:22   18  A.   Maybe about 500, 600 yards.

09:22:26   19  Q.   Okay.  And this racetrack, of course, the surface area is

09:22:30   20  nothing like what we see at --

09:22:34   21  A.   No.

09:22:34   22  Q.   -- racetracks, correct?

09:22:35   23  A.   No.  He takes pretty good care of it, but it's nothing like

09:22:38   24  a racetrack.

09:22:39   25  Q.   Okay.  And EH-18.

| | | |
|---|---|---|
| 09:22:47 | 1 | A.   That's just, specifically -- I think that's one of his |
| 09:22:55 | 2 | horses. |
| 09:22:55 | 3 | Q.   Okay.  You don't know who this horse is? |
| 09:22:57 | 4 | A.   I think it's -- I think it may be one of his better horses |
| 09:23:02 | 5 | that went to California. |
| 09:23:03 | 6 | Q.   Okay.  And EH-19, do you recognize this? |
| 09:23:07 | 7 | A.   Yes.  That's his office. |
| 09:23:08 | 8 | Q.   Okay.  Now, does he share that office with anybody? |
| 09:23:12 | 9 | A.   Well, it's the office of Huitron Homes, Huitron Painting |
| 09:23:17 | 10 | and, also, the race horse business. |
| 09:23:19 | 11 | Q.   Okay.  Now, Eusevio Huitron has a rather large family, does |
| 09:23:22 | 12 | he not? |
| 09:23:23 | 13 | A.   It's a huge family. |
| 09:23:24 | 14 | Q.   Okay.  And, first of all, he's married, correct? |
| 09:23:28 | 15 | A.   Yes. |
| 09:23:28 | 16 | Q.   And how many children do he and his wife have? |
| 09:23:32 | 17 | A.   They have five. |
| 09:23:39 | 18 | Q.   Okay.  And you've come to know all of them? |
| 09:23:41 | 19 | A.   Yes. |
| 09:23:42 | 20 | Q.   Now, do you know Jesus Huitron? |
| 09:23:45 | 21 | A.   Yes. |
| 09:23:45 | 22 | Q.   And that is -- is that Eusevio's brother? |
| 09:23:48 | 23 | A.   Yes. |
| 09:23:48 | 24 | Q.   And do you know what business he's in? |
| 09:23:52 | 25 | A.   He does the Huitron Homes and the Huitron Painting. |

| | | |
|---|---|---|
| 09:23:55 | 1 | Q.   Okay.  Now, you've come to live -- and there's a third |
| 09:23:58 | 2 | brother that lives in the same vicinity; is that correct? |
| 09:24:00 | 3 | A.   Yes. |
| 09:24:01 | 4 | Q.   And what is his name? |
| 09:24:02 | 5 | A.   Isabel. |
| 09:24:03 | 6 | Q.   Okay.  His name is Isabel but he obviously is a man? |
| 09:24:07 | 7 | A.   It is a brother. |
| 09:24:07 | 8 | Q.   Okay.  Now, Jesus Huitron, you've come to know him, have you |
| 09:24:11 | 9 | not? |
| 09:24:11 | 10 | A.   Yes. |
| 09:24:12 | 11 | Q.   And how many children does he have? |
| 09:24:21 | 12 | A.   I believe there are ten. |
| 09:24:25 | 13 | Q.   Ten?  Was -- were any of them working there in this office |
| 09:24:30 | 14 | that you've identified as Defendant's EH-19? |
| 09:24:35 | 15 | A.   Yes. |
| 09:24:36 | 16 | Q.   And who is that? |
| 09:24:37 | 17 | A.   Jessica. |
| 09:24:38 | 18 | Q.   Okay.  And I want to get to the business end of the |
| 09:24:46 | 19 | situation first.  You came to work here with "Chevo" Huitron in |
| 09:24:49 | 20 | 2006, and how long did you work there? |
| 09:24:52 | 21 | A.   Till mid or late 2008. |
| 09:24:55 | 22 | Q.   Okay.  And did you and he -- did he enter a number -- how |
| 09:25:01 | 23 | many horses did he have on a regular basis there at his farm |
| 09:25:05 | 24 | there? |
| 09:25:06 | 25 | A.   Thirty-five, more or less. |

| | | |
|---|---|---|
| 09:25:09 | 1 | Q.   Okay.  On a consistent basis? |
| 09:25:11 | 2 | A.   Yes. |
| 09:25:11 | 3 | Q.   Okay.  And do you know what he charged owners? |
| 09:25:15 | 4 | A.   I believe back at that time, it was 1,100 a month per horse. |
| 09:25:20 | 5 | Q.   Okay.  And the 1,100 a month covers the same expenses that |
| 09:25:24 | 6 | you cover with the $35 a day? |
| 09:25:26 | 7 | A.   Yes.  Oh, plus hauling.  Anytime he hauled because he was |
| 09:25:30 | 8 | always stabled off the racetrack, so he would charge for hauling |
| 09:25:32 | 9 | anytime we went in or out of the racetrack. |
| 09:25:34 | 10 | Q.   Okay.  When you say hauling, hauling -- |
| 09:25:36 | 11 | A.   The horses. |
| 09:25:37 | 12 | Q.   -- whatever horse is going to be entered, horse or horses |
| 09:25:40 | 13 | that are going to be entered in an event? |
| 09:25:41 | 14 | A.   Yes. |
| 09:25:42 | 15 | Q.   When I say event, that's an actual race, correct? |
| 09:25:45 | 16 | A.   Race. |
| 09:25:46 | 17 | Q.   Okay.  And, first of all, let's talk about Sunland Park in |
| 09:25:49 | 18 | New Mexico.  Do they have a specified racing period, season? |
| 09:25:52 | 19 | A.   Yes. |
| 09:25:53 | 20 | Q.   What is that? |
| 09:25:54 | 21 | A.   They usually start around December and end in the late part |
| 09:26:00 | 22 | of April or mid part of April. |
| 09:26:01 | 23 | Q.   Okay.  And are they governed by the New Mexico -- state of |
| 09:26:05 | 24 | New Mexico racing commission? |
| 09:26:06 | 25 | A.   Yes, they are. |

| | | |
|---|---|---|
| 09:26:06 | 1 | Q.   Now, let's talk about Ruidoso.  How far is Ruidoso from El |
| 09:26:11 | 2 | Paso? |
| 09:26:11 | 3 | A.   About two-and-a-half hours. |
| 09:26:12 | 4 | Q.   Okay.  And is it up in the mountains? |
| 09:26:15 | 5 | A.   Yes. |
| 09:26:15 | 6 | Q.   Okay.  It's kind of a ski, horse-racing resort, is it not? |
| 09:26:22 | 7 | A.   Yes. |
| 09:26:22 | 8 | Q.   Okay.  And what is their racing season in Ruidoso? |
| 09:26:27 | 9 | A.   They start in May is when the schooling races start and |
| 09:26:33 | 10 | then, they end on -- is it Labor Day, I believe? |
| 09:26:37 | 11 | Q.   Okay.  They obviously -- there's no racing going up there |
| 09:26:40 | 12 | during the winter season, correct? |
| 09:26:42 | 13 | A.   No. |
| 09:26:43 | 14 | Q.   Now, when we say racing, this is all quarter horse racing, |
| 09:26:46 | 15 | is it not? |
| 09:26:47 | 16 | A.   They actually have a mixed meet.  There will be |
| 09:26:49 | 17 | thoroughbreds there, as well, but "Chevo" never trained |
| 09:26:54 | 18 | thoroughbreds. |
| 09:26:55 | 19 | Q.   Okay.  Never trains thoroughbreds. |
| 09:26:57 | 20 |         Okay.  What about Los Alamitos?  Have you ever entered |
| 09:27:01 | 21 | any horses or been out to Los Alamitos? |
| 09:27:03 | 22 | A.   Yes, I have. |
| 09:27:04 | 23 | Q.   Okay.  And that's in the Los Angeles metroplex area, is it |
| 09:27:07 | 24 | not? |
| 09:27:07 | 25 | A.   Yes. |

| 09:27:07 | 1 | Q.   And do they race all year, to your knowledge? |
| 09:27:09 | 2 | A.   To my knowledge, yes. |

09:27:07  1  Q.   And do they race all year, to your knowledge?

09:27:09  2  A.   To my knowledge, yes.

09:27:10  3  Q.   Okay.  Now, what about here in Texas?  What race tracks are

09:27:15  4  there?

09:27:16  5  A.   You have Retama, Sam Houston.  Retama is at Selma, Texas,

09:27:22  6  close to San Antonio.  You have Sam Houston in Houston.  You have

09:27:24  7  Lone Star Park in Grand Prairie, Texas.  And back at that time,

09:27:26  8  we had Manor Downs, which is in Manor.

09:27:29  9  Q.   Okay.  And there's race tracks or racing events take place

09:27:34  10  in some other neighboring --

09:27:35  11  A.   And also, Fredericksburg, Gillespie County Fair.

09:27:38  12  Q.   Are there racing venues in other surrounding states?

09:27:42  13  A.   Yes.

09:27:43  14  Q.   And what states would those be?

09:27:44  15  A.   Oh, pretty much every state has a racetrack, but the ones

09:27:47  16  that we would go to would be Louisiana, Oklahoma, Texas and New

09:27:51  17  Mexico.

09:27:51  18  Q.   Okay.  And during this two-year period, you were working

09:27:55  19  every day with Mr. Huitron, correct?

09:27:56  20  A.   Every day.

09:27:57  21  Q.   Okay.  And tell the ladies and gentlemen of the jury what

09:28:00  22  his work schedule is like on a daily basis.

09:28:04  23  A.   It's nonstop.  A lot of the race tracks run at night, but

09:28:08  24  then, you'll have some that run during the day.  And, of course,

09:28:12  25  you have to be at the training facility in the morning time

| | | |
|---|---|---|
| 09:28:14 | 1 | because that's training hours.  So it was very normal for us to |
| 09:28:18 | 2 | be on the road all night long, get to the farm, rest for a couple |
| 09:28:22 | 3 | of hours, watch the horses gallop, pony, make sure they're not |
| 09:28:26 | 4 | injured, take them to the vet, if need be, and then, hit the road |
| 09:28:30 | 5 | again to wherever our next race is for the next night. |
| 09:28:34 | 6 | Q.   Okay.  So would it be fair to say that if you're not here on |
| 09:28:39 | 7 | the property -- this property where the training facilities are |
| 09:28:42 | 8 | at, is that in Dale, Texas? |
| 09:28:44 | 9 | A.   Dale, Texas.  Yes. |
| 09:28:45 | 10 | Q.   Okay.  And how far is that from Austin? |
| 09:28:47 | 11 | A.   About 30, 45 minutes, I guess. |
| 09:28:52 | 12 | Q.   Okay.  And if you're not there working, you're at a |
| 09:28:55 | 13 | racetrack preparing for an event, correct? |
| 09:28:58 | 14 | A.   Yes. |
| 09:28:59 | 15 | Q.   Okay.  And you say that this is a seven-day, ten-hour-a-day |
| 09:29:04 | 16 | work schedule?  Would that be correct? |
| 09:29:06 | 17 | A.   Seven-day, 24-hour-a-day. |
| 09:29:08 | 18 | Q.   Okay.  Very little time for rest? |
| 09:29:10 | 19 | A.   Very little. |
| 09:29:11 | 20 | Q.   Okay.  And is that year-round? |
| 09:29:13 | 21 | A.   Year-round. |
| 09:29:14 | 22 | Q.   Okay.  And let's talk about futurities.  What is a futurity |
| 09:29:21 | 23 | race? |
| 09:29:21 | 24 | A.   A futurity races are for two-year-olds. |
| 09:29:23 | 25 | Q.   Okay.  And it's limited to a horse being a horse -- a |

09:29:30   1   two-year-old, correct?

09:29:30   2   A.   They have to be two years of age, and they have to be

09:29:33   3   nominated for that specific race.

09:29:35   4   Q.   Okay.  And what is a derby?

09:29:37   5   A.   A derby is for three-year-olds.

09:29:39   6   Q.   Okay.  And what are stakes races?

09:29:41   7   A.   Stakes races are for older horses and most of the time they

09:29:46   8   have to be eligible.  They have to have made certain amount of

09:29:48   9   money to be qualified to go into the race.

09:29:50   10   Q.   Okay.  And challenge races?

09:29:52   11   A.   Challenge races, they have to have been nominated to the

09:29:57   12   challenge program through the AQHA.  Normally you do it when

09:30:00   13   they're very young, but you can supplement them in later and it's

09:30:04   14   very expensive to do that.

09:30:05   15   Q.   Okay.  Did you ever go to the Republic of Mexico with

09:30:09   16   "Chevo" Huitron the time you were working for him?

09:30:12   17   A.   No.  Never.

09:30:12   18   Q.   Okay.  Do you know -- and if you don't, simply say so --

09:30:15   19   whether the horses that he was training were owned by people who

09:30:20   20   resided in Mexico?

09:30:21   21   A.   Yes.

09:30:23   22   Q.   A small percentage?  Large percentage?

09:30:29   23   A.   I would say about 50/50.

09:30:31   24   Q.   Okay.  And were you involved in any of the billing

09:30:38   25   activities of Mr. "Chevo" Huitron's horse business?

| | | |
|---|---|---|
| 09:30:42 | 1 | A.   I would go to the office on a regular basis.  Yes. |
| 09:30:46 | 2 | Q.   Okay.  But were you actually involved in -- |
| 09:30:48 | 3 | A.   Yes.  I would sit down with -- I did all the entries for the |
| 09:30:52 | 4 | races. |
| 09:30:53 | 5 | Q.   Okay. |
| 09:30:53 | 6 | A.   And I would -- sat down with Jessica and figure out if we |
| 09:30:56 | 7 | had hauled a horse somewhere and make sure that the owner was |
| 09:31:00 | 8 | billed for it, who owed money, who didn't owe money. |
| 09:31:04 | 9 | Q.   Okay.  That was for the years 2006, 2007, 2008? |
| 09:31:08 | 10 | A.   Yes. |
| 09:31:09 | 11 | Q.   And, in essence, you were going there to make sure that |
| 09:31:12 | 12 | whatever expenses were incurred were being billed to the owners? |
| 09:31:16 | 13 | A.   Correct. |
| 09:31:17 | 14 | Q.   And hopefully that they were being collected, correct? |
| 09:31:19 | 15 | A.   Correct. |
| 09:31:19 | 16 | Q.   And but who carried out that function?  Was it you or? |
| 09:31:24 | 17 | A.   Jessica. |
| 09:31:25 | 18 | Q.   Okay.  But you just provided her the information? |
| 09:31:28 | 19 | A.   Yes. |
| 09:31:28 | 20 | Q.   And the data.  Okay.  Did Mr. "Chevo" -- the information you |
| 09:31:33 | 21 | got came, of course, from "Chevo" Huitron, did it not? |
| 09:31:35 | 22 | A.   Yes. |
| 09:31:36 | 23 | Q.   Okay.  Did you ever see "Chevo" Huitron in this office here |
| 09:31:44 | 24 | or with any -- |
| 09:31:45 | 25 | A.   Very rarely, but yes. |

09:31:46   1   Q.   Okay.  And that office is supplied with computers, is it
09:31:50   2   not?
09:31:51   3   A.   Yes.
09:31:51   4   Q.   Have you ever seen "Chevo" Huitron operate a computer?
09:31:55   5   A.   I don't think he could even turn one on.
09:31:57   6   Q.   Okay.  How about -- what kind of cellphone did he have?
09:32:03   7   A.   He still has a flip phone.
09:32:05   8   Q.   A flip phone?  Okay.  And has he had that flip phone the
09:32:09   9   whole time you've known him?
09:32:10   10  A.   Yes.
09:32:10   11  Q.   Has his number ever changed?
09:32:12   12  A.   No.
09:32:13   13  Q.   Never changing his cellphone numbers?
09:32:18   14  A.   Never.
09:32:19   15  Q.   Okay.  Was it difficult to get a hold of Mr. Huitron on a
09:32:23   16  phone?
09:32:24   17  A.   Depended who you were.
09:32:26   18  Q.   All right.  Was it difficult for you?
09:32:28   19  A.   No.  Never.
09:32:30   20  Q.   Did he -- other than yourself, did you ever see him on the
09:32:34   21  phone much?
09:32:35   22  A.   A lot.
09:32:36   23  Q.   Okay.  Now, let's say that a horse is entered in a race and
09:32:46   24  Mr. Huitron is the trainer and the horse -- the purse is, say,
09:32:51   25  $5,000 and the horse wins.  Now, how much does Mr. Huitron get as

| | | |
|---|---|---|
| 09:32:57 | 1 | a percentage of that purse? |
| 09:32:59 | 2 | A.   It would depend on the state, certain states vary.  But it |
| 09:33:03 | 3 | would be any where from 45 to 50 percent usually. |
| 09:33:06 | 4 | Q.   The trainer gets that? |
| 09:33:07 | 5 | A.   That's the owner of the race horse gets. |
| 09:33:10 | 6 | Q.   Okay. |
| 09:33:10 | 7 | A.   Then the owner gives ten percent of that to the trainer, ten |
| 09:33:13 | 8 | percent of that to the rider. |
| 09:33:14 | 9 | Q.   Okay.  Now, I believe you may have already answered that, |
| 09:33:19 | 10 | but there is -- what is a horsemen's account? |
| 09:33:21 | 11 | A.   A horsemen's account is basically a bank account that the |
| 09:33:26 | 12 | winnings of the horse will go into that belongs to the owner. |
| 09:33:29 | 13 | Q.   Okay.  And that money that's deposited in that account, is |
| 09:33:33 | 14 | that done by the owner, or by the trainer, or both? |
| 09:33:38 | 15 | A.   The trainer is usually not too involved with the horsemen's |
| 09:33:42 | 16 | account unless if he owns a horse himself.  But, for example, if |
| 09:33:48 | 17 | a jock mount fee is owed, or something like that, the owner would |
| 09:33:52 | 18 | put the money into the account or, at times, the trainer would if |
| 09:33:55 | 19 | the owner was not available to be there. |
| 09:33:56 | 20 | Q.   Okay.  Let's say as I an owner of -- |
| 09:33:59 | 21 | A.   And the racetrack puts the winnings in there. |
| 09:34:01 | 22 | Q.   Okay.  Let's say I as an owner want to enter two horses that |
| 09:34:04 | 23 | you're training for me in a particular event.  Do I deposit the |
| 09:34:08 | 24 | money into the horsemen's account, or do I give it to you to |
| 09:34:11 | 25 | deposit? |

09:34:11    1    A.    If it's a regular day race, really no money needs to be

09:34:15    2    deposited.  But if it is a big race, normally you would either

09:34:20    3    send me a check and I would go put it in, or you would do it

09:34:24    4    yourself if you were there.

09:34:25    5    Q.    Okay.  So it wouldn't be unusual for me to give the money to

09:34:29    6    you to enter into that horsemen's account?

09:34:32    7    A.    No.

09:34:32    8    Q.    Okay.  Now, and so, if my horse wins some of that money is

09:34:38    9    -- comes back to you as the trainer.  I mean, how is it

09:34:42   10    distributed back?

09:34:42   11    A.    The owner is responsible for paying the trainer.

09:34:46   12    Q.    Okay.  And so, that money -- the racing commission doesn't

09:34:53   13    make sure that the trainer doesn't get stiffed out of that?

09:34:56   14    A.    No.  And there are many times that we have difficulty

09:35:00   15    collecting.

09:35:00   16    Q.    Okay.  So if my horse wins, I could very easily just scoop

09:35:08   17    up that money and not pay my trainer?

09:35:10   18    A.    Yes.  Oftentimes, the race tracks will help you.  You'll

09:35:15   19    have a statement to give to the owner, and then, you can take it

09:35:18   20    before the stewards at the racetrack and they can prevent the

09:35:22   21    owner from racing.

09:35:23   22    Q.    Okay.  Now, did you ultimately take another job sometime in

09:35:28   23    2008?

09:35:29   24    A.    Yes.  I went out on my own for a little while.

09:35:32   25    Q.    Okay.  And where did you -- did you work by yourself or did

| | | |
|---|---|---|
| 09:35:35 | 1 | you work for somebody? |
| 09:35:36 | 2 | A.   Yeah.  I went track to track from mostly Texas.  I ran a |
| 09:35:41 | 3 | little bit in Louisiana.  But mostly Texas. |
| 09:35:44 | 4 | Q.   Okay.  Did that last very long? |
| 09:35:46 | 5 | A.   No.  I actually I ended up getting offered a job with Heath |
| 09:35:51 | 6 | Taylor, so I went to work for him. |
| 09:35:53 | 7 | Q.   With what? |
| 09:35:53 | 8 | A.   Heath Taylor, H-E-A-T-H. |
| 09:35:57 | 9 | Q.   And he's a trainer? |
| 09:35:58 | 10 | A.   Yes. |
| 09:35:58 | 11 | Q.   Where is he a trainer at? |
| 09:36:00 | 12 | A.   He's got a farm in Ledbetter, Texas. |
| 09:36:04 | 13 | Q.   And where is Ledbetter? |
| 09:36:06 | 14 | A.   Are you familiar with Giddings, Texas? |
| 09:36:08 | 15 | Q.   No. |
| 09:36:09 | 16 | A.   Okay.  It's about, I would say, 150 miles east of here. |
| 09:36:14 | 17 | Q.   Okay.  And is he a well-renowned trainer? |
| 09:36:18 | 18 | A.   Yes.  At the time, he was second in the nation. |
| 09:36:20 | 19 | Q.   Okay.  And you've come to know a lot of trainers in the |
| 09:36:23 | 20 | horse business, correct? |
| 09:36:24 | 21 | A.   Yes. |
| 09:36:24 | 22 | Q.   Do you know a trainer Paul Jones? |
| 09:36:26 | 23 | A.   Yes. |
| 09:36:27 | 24 | Q.   And is he a very recognized and established trainer? |
| 09:36:30 | 25 | A.   Yes.  He's number one in the nation. |

| | | |
|---|---|---|
| 09:36:33 | 1 | Q.   As a quarter horse trainer? |
| 09:36:34 | 2 | A.   As a quarter horse trainer. |
| 09:36:35 | 3 | Q.   Okay.  In your opinion, is "Chevo" Huitron an excellent |
| 09:36:38 | 4 | trainer? |
| 09:36:39 | 5 | A.   Yes. |
| 09:36:39 | 6 | Q.   Is he in the same category in your opinion as Mr. Ledbetter |
| 09:36:44 | 7 | or Mr. Jones? |
| 09:36:45 | 8 | A.   His horsemanship is, yes. |
| 09:36:47 | 9 | Q.   His horsemanship.  Define what that means. |
| 09:36:52 | 10 | A.   His knowledge of horses and the way he can handle a horse |
| 09:36:56 | 11 | and get a horse to perform to its fullest is definitely up to par |
| 09:37:01 | 12 | with the top in the nation.  I believe the only thing that's |
| 09:37:04 | 13 | really held him back from being at the top is his education and |
| 09:37:09 | 14 | being able to handle himself in a professional way to get more |
| 09:37:13 | 15 | owners and be able to go to -- it's kind of like real estate, I |
| 09:37:19 | 16 | suppose.  You kind of have to wine and dine sometimes to get the |
| 09:37:21 | 17 | top owners. |
| 09:37:22 | 18 | Q.   Okay.  Now, did there come a time where you left the state |
| 09:37:28 | 19 | of Texas and took a job? |
| 09:37:30 | 20 | A.   Yes. |
| 09:37:32 | 21 | Q.   Where was that at? |
| 09:37:33 | 22 | A.   I went back to El Paso, but before that, I actually worked |
| 09:37:37 | 23 | at Elgin Veterinary Hospital. |
| 09:37:38 | 24 | Q.   Okay.  Now, when you came back to work at Elgin Veterinary |
| 09:37:43 | 25 | Hospital, what year would that have been? |

09:37:46   1   A.   That would have been 2010.

09:37:50   2   Q.   Okay.  And how far is Elgin Veterinary Hospital from Mr.

09:37:56   3   Huitron's farm there?

09:37:59   4   A.   About an hour.

09:38:00   5   Q.   About an hour.  Did you resume -- did you stay in contact

09:38:04   6   with "Chevo" Huitron during this time period?

09:38:06   7   A.   Oh, forever.

09:38:07   8   Q.   And when you came back -- when you were here in 2010 at

09:38:10   9   Elgin Veterinary Hospital, were you in constant contact with him?

09:38:14  10   A.   Yes.

09:38:25  11   Q.   Did there come a time when you notified Mr. Huitron about --

09:38:31  12   when you were working for Elgin Veterinary Hospital about vet

09:38:37  13   bills?

09:38:38  14   A.   Yes.  I had kind of been put in charge of the accounts for

09:38:45  15   the Hispanics because I could talk to them.  I spoke enough

09:38:49  16   Spanish to be able to collect from them.  And I had noticed on

09:38:55  17   Eusevio's account that there were a lot of horses on it, and I

09:39:00  18   know how he runs his operation, so I knew that chances were, most

09:39:03  19   of the horses didn't belong to him.

09:39:05  20   Q.   When you say didn't belong to him, you mean weren't owned by

09:39:08  21   him?

09:39:09  22   A.   Correct.

09:39:09  23   Q.   Okay.  I'm showing you what's previously been admitted as

09:39:13  24   Government's Exhibit 55A.  This is a facsimile cover sheet.  Do

09:39:18  25   you recognize that?

| | | |
|---|---|---|
| 09:39:19 | 1 | A.   Yes.  I do. |
| 09:39:19 | 2 | Q.   And can you -- the date on it is February 24, 2011? |
| 09:39:24 | 3 | A.   Yes. |
| 09:39:25 | 4 | Q.   And it looks like you faxed some documents to Jessica? |
| 09:39:29 | 5 | A.   Yes, I did. |
| 09:39:29 | 6 | Q.   Who is Jessica? |
| 09:39:31 | 7 | A.   Jessica Huitron.  She was still in the office. |
| 09:39:34 | 8 | Q.   Okay.  And these are -- I'm showing you these documents.  Do |
| 09:39:41 | 9 | you recognize what they are? |
| 09:39:43 | 10 | A.   Yes.  I do. |
| 09:39:44 | 11 | Q.   Okay.  What are they? |
| 09:39:46 | 12 | A.   They're a list of all the horses that were on the account, |
| 09:39:49 | 13 | and we had to figure out how much was owed on each horse before I |
| 09:39:55 | 14 | could move the horse off of Eusevio's account and put them on the |
| 09:39:59 | 15 | correct owner's account. |
| 09:39:59 | 16 | Q.   Okay.  Is all these horses, for example, how did Mr. "Chevo" |
| 09:40:05 | 17 | Huitron get the horses he was training to Elgin Veterinary clinic |
| 09:40:08 | 18 | if they needed vet work? |
| 09:40:10 | 19 | A.   Oftentimes, he would on the road going from track to track. |
| 09:40:14 | 20 | So if he entered a horse and it got in, let's just say, for |
| 09:40:18 | 21 | example, in Lone Star Park but he was in Louisiana, he would just |
| 09:40:23 | 22 | tell the workers at the ranch, hey, get that horse to the vet |
| 09:40:26 | 23 | clinic and have him -- have a pre-race check done and make sure |
| 09:40:31 | 24 | that he's ready to run and that he has no problems. |
| 09:40:34 | 25 | And so, the workers would bring them in, they wouldn't |

| | | |
|---|---|---|
| 09:40:38 | 1 | know the names of the horses or they wouldn't know the owners. |
| 09:40:40 | 2 | We would finally figure out what the name of the horse was |
| 09:40:43 | 3 | usually because they would make a couple of phone calls.  But |
| 09:40:45 | 4 | they wouldn't know who the owners were.  So the office had been |
| 09:40:49 | 5 | just putting them under Eusevio's account, which happens often, |
| 09:40:52 | 6 | and it happened to a lot of other trainers, too.  But I wanted |
| 09:40:55 | 7 | him to understand that if, for some reason, he was fired by these |
| 09:40:58 | 8 | people, that he would be ultimately responsible for paying the |
| 09:41:02 | 9 | vet bills on horses he didn't own. |
| 09:41:04 | 10 | Q.   Okay.  And that was the reason for the fax from you to |
| 09:41:08 | 11 | Jessica? |
| 09:41:08 | 12 | A.   Yes. |
| 09:41:09 | 13 | Q.   Okay.  And Government's Exhibit 55B, there's some |
| 09:41:16 | 14 | handwriting or some handwriting, looks like hearts on it.  Do you |
| 09:41:20 | 15 | recognize that handwriting? |
| 09:41:21 | 16 | A.   Yes.  It's Jessica's. |
| 09:41:23 | 17 | Q.   Okay.  And did you establish a friendship with Jessica? |
| 09:41:26 | 18 | A.   Oh, yes.  We had been friends even before this. |
| 09:41:29 | 19 | Q.   Okay.  And this document, do you recognize that writing on |
| 09:41:34 | 20 | it? |
| 09:41:34 | 21 | A.   Yes. |
| 09:41:35 | 22 | Q.   Who is that? |
| 09:41:36 | 23 | A.   It's also Jessica's. |
| 09:41:38 | 24 | Q.   Okay.  And what's happened -- it looks like somebody has |
| 09:41:42 | 25 | written in, or arguably her, what's happened with all these |

| | | |
|---|---|---|
| 09:41:46 | 1 | horses, correct? |
| 09:41:47 | 2 | A.   Yes.  I typed out the list of each horse's name that was on |
| 09:41:50 | 3 | her account or on "Chevo's" account, and she went through and |
| 09:41:54 | 4 | figured out where the horses were. |
| 09:41:56 | 5 | Q.   Okay. |
| 09:41:56 | 6 | A.   Or who they belonged to. |
| 09:41:58 | 7 | Q.   Now, this Government's Exhibit 55C, is this the typed-up |
| 09:42:06 | 8 | list that is consistent with what's on -- was on 55B? |
| 09:42:10 | 9 | A.   Yes. |
| 09:42:10 | 10 | Q.   Okay.  So even though you weren't working for "Chevo" |
| 09:42:17 | 11 | Huitron at the time, as a friend, you were trying to help them |
| 09:42:22 | 12 | out a little bit? |
| 09:42:23 | 13 | A.   Yes. |
| 09:42:24 | 14 | Q.   Now, did you in 2010 know or meet an individual by the name |
| 09:42:36 | 15 | of Carlos Nayen? |
| 09:42:37 | 16 | A.   No. |
| 09:42:39 | 17 | Q.   Did you ever meet a Jose Trevino? |
| 09:42:42 | 18 | A.   Yes. |
| 09:42:42 | 19 | Q.   Do you see him here in the courtroom? |
| 09:42:44 | 20 | A.   Yes, I do. |
| 09:42:44 | 21 | Q.   Okay.  And where did you meet him at? |
| 09:42:47 | 22 | A.   I met him at the office at Huitron's office. |
| 09:42:51 | 23 | Q.   Okay.  And did you engage in conversations with? |
| 09:42:55 | 24 | A.   Yes, I did. |
| 09:42:56 | 25 | Q.   Okay.  Do you know -- and if you don't, simply say so -- |

| | | |
|---|---|---|
| 09:42:59 | 1 | whether or not he had some horses there at Mr. Huitron's farm? |
| 09:43:06 | 2 | A.   Yes.  He was training for him at the time, and he had gone |
| 09:43:09 | 3 | to the office to talk about how much he owed. |
| 09:43:14 | 4 | Q.   Do you know -- or if you don't, simply say so -- whether Mr. |
| 09:43:17 | 5 | Trevino had brought some of his own people to work there at the |
| 09:43:22 | 6 | farm looking after his horses with Mr. Huitron? |
| 09:43:25 | 7 | A.   Not that I'm aware of. |
| 09:43:26 | 8 | Q.   Okay.  Do you know an individual named -- whose nickname is |
| 09:43:31 | 9 | "Saltillo"? |
| 09:43:32 | 10 | A.   Yes. |
| 09:43:32 | 11 | Q.   And you didn't know his -- do you know his real name? |
| 09:43:35 | 12 | A.   I never really got to know him very well. |
| 09:43:37 | 13 | Q.   Okay.  Was he a worker for Mr. Trevino, if you know? |
| 09:43:42 | 14 | A.   I never really knew who he worked directly for.  He would |
| 09:43:46 | 15 | haul the horses sometimes. |
| 09:43:48 | 16 | Q.   Okay.  Now, you were at the Elgin vet clinic in all of 2010 |
| 09:44:04 | 17 | and 2011, correct? |
| 09:44:06 | 18 | A.   Yes. |
| 09:44:06 | 19 | Q.   Did you ultimately leave the Elgin vet clinic in August of |
| 09:44:12 | 20 | 2011? |
| 09:44:12 | 21 | A.   Yes.  I did. |
| 09:44:13 | 22 | Q.   And where did you go? |
| 09:44:17 | 23 | A.   I went to El Paso. |
| 09:44:18 | 24 | Q.   Did you stay in contact with Mr. Huitron? |
| 09:44:19 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 09:44:20 | 1 | Q.   Okay.  Did you see him frequently or less frequently now? |
| 09:44:23 | 2 | A.   I saw him less frequently until 2012. |
| 09:44:29 | 3 | Q.   Okay.  And where did you see him at 2012? |
| 09:44:31 | 4 | A.   In 2012, he called me and said that he was in Tularosa, |
| 09:44:35 | 5 | which is about a 30-minute drive to Ruidoso.  It's about an hour |
| 09:44:40 | 6 | and 15 minutes from El Paso.  And he said that he was training |
| 09:44:43 | 7 | horses there and, you know, so I could go say hello.  So I ended |
| 09:44:49 | 8 | up going up there and visiting with him and. |
| 09:44:53 | 9 | Q.   What was -- |
| 09:44:54 | 10 | A.   Watch the horses. |
| 09:44:55 | 11 | Q.   Did you assist him with any of the horses or just kind of |
| 09:44:57 | 12 | watched? |
| 09:44:57 | 13 | A.   At that time, I just watched.  But he had a broken leg at |
| 09:45:01 | 14 | the time and he looked very weathered, I suppose you could say. |
| 09:45:06 | 15 | Q.   Very what? |
| 09:45:06 | 16 | A.   Weathered. |
| 09:45:07 | 17 | Q.   Weathered?  Okay.  You hadn't seen him a while, correct? |
| 09:45:11 | 18 | A.   At that time, I hadn't seen him in probably about a year. |
| 09:45:13 | 19 | Q.   Okay.  And you say did his physical appearance seem to be |
| 09:45:18 | 20 | diminished? |
| 09:45:18 | 21 | A.   Yes. |
| 09:45:19 | 22 | Q.   Okay.  And he had a broken leg? |
| 09:45:24 | 23 | A.   Yes. |
| 09:45:25 | 24 | Q.   Okay.  May I have just one moment, your Honor? |
| 09:45:46 | 25 | THE COURT:  You may. |

| | | |
|---|---|---|
| 09:45:51 | 1 | Q.   (BY MR. ESPER) Do you know in your dealings with "Chevo" |
| 09:45:56 | 2 | Huitron, what type of person he is as far as being honest? |
| 09:46:01 | 3 | A.   He doesn't have time not to be honest.  He couldn't keep up |
| 09:46:06 | 4 | with it if he wasn't.  He's extremely honest. |
| 09:46:09 | 5 | Q.   Okay.  The financial part of the business, did Mr. "Chevo" |
| 09:46:16 | 6 | Huitron participate in any of that, to your knowledge? |
| 09:46:18 | 7 | A.   Very little. |
| 09:46:20 | 8 | Q.   Okay.  Do you know ultimately -- well, strike that. |
| 09:46:27 | 9 | He also -- although you weren't working there at the |
| 09:46:30 | 10 | time, he trained this horse called Tempting Dash, did he not? |
| 09:46:33 | 11 | A.   Yes. |
| 09:46:33 | 12 | Q.   And you're familiar with that? |
| 09:46:34 | 13 | A.   Yes. |
| 09:46:34 | 14 | Q.   Okay.  And apparently that horse won a very big race? |
| 09:46:40 | 15 | A.   Yes.  He won the Texas Classic in Lone Star Park at Grand |
| 09:46:44 | 16 | Prairie. |
| 09:46:44 | 17 | Q.   Okay.  Were you there at that race? |
| 09:46:46 | 18 | A.   No.  I wasn't. |
| 09:46:47 | 19 | Q.   Okay.  Is it normal procedure when a horse wins a big race, |
| 09:46:55 | 20 | the trainers and a lot of other people show up at the winner's |
| 09:46:58 | 21 | circle? |
| 09:46:58 | 22 | A.   Yes.  You hug whoever's close to you. |
| 09:47:00 | 23 | Q.   Okay.  You've done that before? |
| 09:47:02 | 24 | A.   Yes. |
| 09:47:08 | 25 | Q.   What about a horse -- let me ask you this.  Does a trainer, |

| | | |
|---|---|---|
| 09:47:16 | 1 | does Mr. Huitron have specific colors that he puts on a horse or |
| 09:47:23 | 2 | -- explain that. |
| 09:47:23 | 3 | A.   Yes.  Most trainers have their racing colors.  His are |
| 09:47:26 | 4 | usually pink and black. |
| 09:47:28 | 5 | Q.   Okay. |
| 09:47:29 | 6 | A.   And sometimes, though, for the racing silks, you do have to |
| 09:47:32 | 7 | use the owner's if they ask you to.  But most of the time, the |
| 09:47:35 | 8 | trainers use their own. |
| 09:47:36 | 9 | Q.   Their own color?  Does the jockey wear the same colors as |
| 09:47:39 | 10 | the trainer or -- |
| 09:47:41 | 11 | A.   Well, the jockey would wear the racing silks that were |
| 09:47:44 | 12 | provided by either the owner or the trainer. |
| 09:47:45 | 13 | Q.   Okay.  I think I'll pass the witness, your Honor. |
| 09:47:54 | 14 | THE COURT:  Mr. Mayr. |
| 09:47:56 | 15 | MR. MAYR:  Yes, Judge. |
| 09:47:59 | 16 | CROSS-EXAMINATION |
| 09:47:59 | 17 | BY MR. MAYR: |
| 09:48:13 | 18 | Q.   Ms. Sims, I'm going to JH-4. |
| 09:48:17 | 19 | Ms. Cox, I'm going to show you what I've marked as |
| 09:48:22 | 20 | Defendant's Exhibit JH-4.  Do you recognize that? |
| 09:48:24 | 21 | A.   Yes.  That's Jesse Huitron's house. |
| 09:48:27 | 22 | Q.   I believe you testified under examination from Mr. Esper |
| 09:48:30 | 23 | that you do, in fact, know my client Jesse Huitron; is that |
| 09:48:33 | 24 | right? |
| 09:48:33 | 25 | A.   Yes, I do. |

| | | |
|---|---|---|
| 09:48:33 | 1 | Q.   Ms. Sims, could I have the lights for just a moment, please? |
| 09:48:41 | 2 | I'm showing Defendant's Exhibit EH-11.  Actually, let's |
| 09:48:52 | 3 | look at JH-4.  You testified this is my client's house, correct? |
| 09:49:02 | 4 | A.   Correct. |
| 09:49:03 | 5 | Q.   It's a converted mobile home, right? |
| 09:49:06 | 6 | A.   Yes, it is. |
| 09:49:08 | 7 | Q.   And you know that because you're living right across the |
| 09:49:12 | 8 | street with "Chevo" Huitron? |
| 09:49:13 | 9 | A.   Correct. |
| 09:49:14 | 10 | Q.   Has he always lived in that house to your knowledge? |
| 09:49:18 | 11 | A.   To my knowledge. |
| 09:49:20 | 12 | Q.   And looking at Defendant's Exhibit EH-11, the way this works |
| 09:49:27 | 13 | is looking up here -- I know it's kind of hard.  Just come show |
| 09:49:36 | 14 | you the actual photograph.  That's Isabel's house right there to |
| 09:49:44 | 15 | the left? |
| 09:49:47 | 16 | A.   Yes.  I believe that would be Isabel's and then, that would |
| 09:49:51 | 17 | be Eusevio's, and then, across the street would be Jesse's. |
| 09:49:54 | 18 | Q.   Jesse's.  All right.  There on Seeling, right? |
| 09:49:57 | 19 | A.   Yes. |
| 09:49:58 | 20 | Q.   So correct me if I identify improperly, but right over here |
| 09:50:06 | 21 | is where Isabel, the brother lives? |
| 09:50:09 | 22 | A.   Isabel. |
| 09:50:09 | 23 | Q.   "Chevo" lives in the house next door? |
| 09:50:11 | 24 | A.   Yes. |
| 09:50:11 | 25 | Q.   And my client lives right across the street? |

09:50:13  1    A.    Yes.

09:50:13  2    Q.    You could turn the lights back on.

09:50:19  3          At the time that you lived there, you got to know my

09:50:22  4    client Jesse Huitron pretty well, also; is that right?

09:50:24  5    A.    Yes.  He signed my paychecks.

09:50:27  6    Q.    Did you spend a lot of time with him or did you spend more

09:50:31  7    time with "Chevo"?

09:50:31  8    A.    "Chevo."

09:50:32  9    Q.    Okay.  Let's talk a little bit about your interaction that

09:50:36  10   you did have with my client, with Jesse.  Tell the ladies and

09:50:41  11   gentlemen of the jury what his role was when you were there

09:50:43  12   working with him.

09:50:44  13   A.    He is pretty much the backbone of the family.  He is

09:50:52  14   literate, he can read, he can write.  He handles the business.

09:50:57  15   He handles the finances by having people that know what they're

09:51:02  16   doing around him.  And he always checks in on the horsemen or --

09:51:09  17   not the horsemen's account but the horse's account to make sure

09:51:14  18   that everything's running properly, owners are paying correctly.

09:51:17  19   Q.    What is his business, though?  What is his --

09:51:19  20   A.    Huitron Homes.

09:51:20  21   Q.    When you saw Huitron Homes, what is that business?

09:51:23  22   A.    He builds houses, remodels houses, paints houses.  He does

09:51:27  23   amazing work.

09:51:28  24   Q.    Now, like "Chevo," he's also from Mexico, correct?

09:51:31  25   A.    Correct.

| | | |
|---|---|---|
| 09:51:31 | 1 | Q.   And like "Chevo," he also only has a sixth-grade education? |
| 09:51:35 | 2 | A.   Yes, he does. |
| 09:51:36 | 3 | Q.   But in his business in his dealings, he's come to learn a |
| 09:51:42 | 4 | little bit more about certain business aspects, right? |
| 09:51:44 | 5 | A.   Yes. |
| 09:51:45 | 6 | Q.   But you say that he would -- what can you tell this jury |
| 09:51:48 | 7 | about his reliance on other individuals to help him run his |
| 09:51:53 | 8 | business? |
| 09:51:54 | 9 | A.   Well, located also in the office with him was his |
| 09:51:58 | 10 | accountant, and before any decisions were made financially, he |
| 09:52:03 | 11 | would always turn to Arturo to make sure that it was right. |
| 09:52:08 | 12 | Q.   Did he have -- you say that had a very intricate knowledge |
| 09:52:13 | 13 | of how banking worked and accounting worked? |
| 09:52:18 | 14 | A.   He was always sure to turn to Arturo before making any |
| 09:52:20 | 15 | decisions. |
| 09:52:21 | 16 | Q.   Okay.  You talked about -- you've talked a little bit about |
| 09:52:29 | 17 | "Chevo's" ability to use a computer.  What can you tell the jury |
| 09:52:32 | 18 | about Jesse's ability to use a computer, modern technology, and |
| 09:52:36 | 19 | whatnot? |
| 09:52:37 | 20 | A.   The same.  None. |
| 09:52:39 | 21 | Q.   Who would type his letters?  Who would handle his billing? |
| 09:52:44 | 22 | Who would do all of this for him? |
| 09:52:45 | 23 | A.   Jessica. |
| 09:52:46 | 24 | Q.   Okay.  And let's talk a little bit about what Jessica's role |
| 09:52:52 | 25 | was there in the office.  Was she just dealing with the horse |

| | | |
|---|---|---|
| 09:52:56 | 1 | racing?  Was she dealing with the painting?  The home?  What was |
| 09:52:58 | 2 | she doing? |
| 09:52:59 | 3 | A.   Everything.  She handled everything with Arturo.  She |
| 09:53:02 | 4 | handled the Huitron Homes, Huitron Painting, and the horse |
| 09:53:06 | 5 | racing. |
| 09:53:06 | 6 | Q.   Okay.  When you say everything, are we talking billing? |
| 09:53:10 | 7 | Bank accounts?  What? |
| 09:53:10 | 8 | A.   She handled billing, deposits, collecting, ordering the |
| 09:53:19 | 9 | materials for whatever projects were coming up, seeing to it that |
| 09:53:25 | 10 | the workers were there, and checking with Arturo along the way. |
| 09:53:32 | 11 | Q.   You said that my client Jesse signed her paychecks.  Who was |
| 09:53:36 | 12 | the one that was actually responsible for preparing the |
| 09:53:38 | 13 | paychecks? |
| 09:53:39 | 14 | A.    I believe at that time, it was Arturo who would prepare |
| 09:53:41 | 15 | checks. |
| 09:53:41 | 16 | Q.   Okay.  Would Jessica ever -- would you ever see Jessica |
| 09:53:46 | 17 | writing checks or handling checks? |
| 09:53:47 | 18 | A.   Yes. |
| 09:53:48 | 19 | Q.   Okay.  Now, likewise, in the time that you were there, would |
| 09:53:56 | 20 | you see -- there's computers in the office, right? |
| 09:54:01 | 21 | A.   Yes. |
| 09:54:02 | 22 | Q.   Did you ever see Jesse on those computers? |
| 09:54:04 | 23 | A.   No. |
| 09:54:04 | 24 | Q.   Who was on the computer all the time? |
| 09:54:05 | 25 | A.   Jessica. |

```
09:54:07   1   Q.   And Jessica, do you know if she had access to the bank
09:54:13   2   accounts via online banking?
09:54:14   3   A.   Yes.
09:54:15   4   Q.   She had access to the checkbooks?
09:54:17   5   A.   Yes.
09:54:18   6   Q.   Did she -- do you know how she kept track of expenses?  Did
09:54:23   7   she use any accounting software like QuickBooks or anything like
09:54:27   8   that?
09:54:27   9   A.   I believe -- I know she used some sort of system.  I believe
09:54:32  10   it was QuickBooks, but I could be wrong about that.
09:54:35  11   Q.   So she has access to the bank accounts.  You actually had
09:54:38  12   seen her maybe like log into, like, the Wells Fargo account?
09:54:41  13   A.   Oh, yes, all the time.
09:54:42  14   Q.   I want to talk with you and have you explain to the jury a
09:54:45  15   little bit about the horsemen's account that you were talking
09:54:47  16   about with Mr. Esper.
09:54:48  17        These horsemen's accounts are set up for race-related
09:54:55  18   expenses to come in and out of; is that right?
09:54:58  19   A.   Yes.  Except for if a trainer is paid by the owner, it would
09:55:03  20   go into your business account.  It wouldn't go into horsemen's
09:55:08  21   account.
09:55:09  22   Q.   How does -- how would Jessica -- or how would Jessica go
09:55:14  23   about dealing with transactions that need to occur with the
09:55:18  24   horsemen's account?  Would she call them up on the phone?  Would
09:55:24  25   she send a letter?  Would she go into a bank?  What would she --
```

| 09:55:28 | 1 | A.   She would call them pretty often. |

A.   She would call them pretty often.

Q.   Okay.  Does she have the ability to transfer funds into and out of the horsemen's account?

A.   For Huitron or for the owner?

Q.   For Huitron Homes --

A.   For Huitron Homes?

Q.   For horses that were being raced under Huitron Homes.

A.   Out, no.  In, yes.

Q.   Okay.  In order to have money transferred out, you'd have to have authorization from the owner, correct?

        MR. GARDNER:  Your Honor, at this point, I'm going to object to leading.  Mr. Mayr's been leading for a significant amount of time.

        THE COURT:  He was.  The objection is sustained.

        MR. MAYR:  Thank you, your Honor.  Rephrase.

Q.   (BY MR. MAYR) How would someone pull money out of the horsemen's account?

A.   In order to pull money out of the horsemen's account, the actual owner of the account has to call and request the money sent to their address, and they will ask you usually the last four digits of your Social Security number.

Q.   Do you know whether or not Jessica ever did that on behalf of any owners?

A.   On any owners?  No.

Q.   Okay.  Now, how much time would you say that Jesse spent in

09:56:38   1   the office working at a desk or doing whatever he was there at

09:56:41   2   the office?

09:56:41   3   A.   He's never at a desk.  He's always at his job site.

09:56:44   4   Q.   When you say job sites, you're talking about?

09:56:47   5   A.   Homes.

09:56:52   6   Q.   What sort of -- tell the jury, if you would, about his level

09:56:56   7   of interaction with Jessica during the time that you're there

09:56:59   8   from 2006, 2007, 2008.

09:57:02   9   A.   Very often on the phone.  He probably stopped by the office

09:57:06  10   once or twice a day just to make sure that paints had been

09:57:10  11   ordered, materials had been ordered, workers were in line.  If

09:57:15  12   somebody owed for a house being built, make sure that the money

09:57:18  13   had come in whenever it was time, or that the companies had been

09:57:21  14   paid for the supplies or, you know, anything like that.

09:57:25  15   Q.   As time sort of went on, what sort of level of trust did he

09:57:33  16   put in Jessica, based on what you observed?

09:57:35  17   A.   Once Jessica knew the business forwards and backward, Jesse

09:57:40  18   relied on her.  And both Jesse and "Chevo" are the type people

09:57:46  19   that when they say do something, they just expect it to be done.

09:57:48  20   And at that time, Jessica knew what to do, so it just got done.

09:57:53  21   Q.   There's been testimony before that Jesse and "Chevo" were

09:57:58  22   the decisionmakers.  Is that a fair statement?

09:58:02  23   A.   Jesse is more of a decisionmaker.

09:58:06  24   Q.   Whose responsibility was it, though, to put those things

09:58:10  25   into effect and do those things that he was asking to have done?

| | | |
|---|---|---|
| 09:58:14 | 1 | A.   To make sure that they happened?  Jessica. |
| 09:58:17 | 2 | Q.   All right.  Now, after you left in 2008, you continued to |
| 09:58:29 | 3 | deal with and maintain contact with all the Huitrons, right? |
| 09:58:33 | 4 | A.   Yes. |
| 09:58:34 | 5 | Q.   I want to go back and show you Government's Exhibit 55B. |
| 09:58:54 | 6 | Actually, let me bring it up to you and just have you flip |
| 09:58:57 | 7 | through it. |
| 09:59:02 | 8 | A.   Yes.  This is a fax that I sent to Jessica. |
| 09:59:06 | 9 | Q.   You remember this fax pretty well? |
| 09:59:08 | 10 | A.   Like it was yesterday. |
| 09:59:09 | 11 | Q.   Why don't you tell the ladies and gentlemen of the jury |
| 09:59:11 | 12 | about it? |
| 09:59:11 | 13 | A.   I spent hours working on it.  It was whenever I was working |
| 09:59:15 | 14 | on clearing up the problem on his accounts at Elgin Veterinary |
| 09:59:19 | 15 | Hospital, and going through horse by horse, figuring out how much |
| 09:59:24 | 16 | was owed on each horse, because each visit would be listed |
| 09:59:27 | 17 | differently.  Then figuring out which owner was responsible for |
| 09:59:31 | 18 | paying and then, collecting from that owner.  Some of which did |
| 09:59:34 | 19 | not live here.  They lived in Mexico.  And so, she helped out |
| 09:59:38 | 20 | with that.  She helped clear out who the owners were.  And slowly |
| 09:59:42 | 21 | but surely, I managed to get the horses off of his account and |
| 09:59:45 | 22 | onto the correct accounts. |
| 09:59:46 | 23 | Q.   You said she.  Who is she? |
| 09:59:47 | 24 | A.   Jessica. |
| 09:59:48 | 25 | Q.   Did you ever discuss this issue with Jesse? |

| | | |
|---|---|---|
| 09:59:55 | 1 | A.   With Jesse, no. |
| 09:59:56 | 2 | Q.   So why are you dealing with Jessica? |
| 10:00:00 | 3 | A.   Because she knew what was going on.  She handled the office. |
| 10:00:04 | 4 | She was the office manager. |
| 10:00:08 | 5 | Q.   And, again, that handwriting on there on the other documents |
| 10:00:12 | 6 | that Mr. Esper showed you, that -- to the best of your knowledge, |
| 10:00:15 | 7 | that's Jessica's writing, correct? |
| 10:00:17 | 8 | A.   On this one, yes. |
| 10:00:18 | 9 | Q.   And you've seen her writing plenty of times, right? |
| 10:00:21 | 10 | A.   Yes. |
| 10:00:21 | 11 | Q.   Now, this fax was sent in March of 2011; is that right? |
| 10:00:46 | 12 | A.   I believe that's what the date on it was. |
| 10:00:48 | 13 | Q.   In May of 2011, did Jessica -- was she still working there |
| 10:00:56 | 14 | at Huitron Homes?  Let me ask it this way.  At some point around |
| 10:01:04 | 15 | May of 2011, did she cease working at Huitron Homes? |
| 10:01:07 | 16 | A.   It was somewhere in that period of time, yes, that she quit. |
| 10:01:11 | 17 | Q.   Do you have any reason why she quit -- have any reason -- |
| 10:01:15 | 18 | I'm sorry.  Do you have any knowledge as to why she quit? |
| 10:01:19 | 19 | A.   I was not there.  I know it had to do with some family |
| 10:01:25 | 20 | issues. |
| 10:01:26 | 21 | MS. WILLIAMS:  Objection.  Hearsay. |
| 10:01:28 | 22 | Q.   (BY MR. MAYR) You don't -- you don't have any personal |
| 10:01:30 | 23 | knowledge as to why she left, do you? |
| 10:01:31 | 24 | A.   No. |
| 10:01:32 | 25 | THE COURT:  That's what she said. |

| | | |
|---|---|---|
| 10:01:35 | 1 | Q.   (BY MR. MAYR) Once she left, you continued to have to deal |
| 10:01:40 | 2 | with Huitron Homes and the racing; is that right? |
| 10:01:43 | 3 | A.   Yes. |
| 10:01:43 | 4 | Q.   Who took over at that point? |
| 10:01:45 | 5 | A.   Adrian Huitron. |
| 10:01:46 | 6 | Q.   And that would be "Chevo's" son, right? |
| 10:01:48 | 7 | A.   Eusevio's son, yes. |
| 10:01:50 | 8 | Q.   Did he have the same level of involvement as Jessica did in |
| 10:01:53 | 9 | terms of bank account access, checks?  Or what was he doing? |
| 10:01:57 | 10 | A.   He was doing the same thing that she had been doing. |
| 10:02:00 | 11 | Q.   If you know, did he -- was he able just to pick it right up? |
| 10:02:09 | 12 | Or was there sort of a learning curve he had to go through? |
| 10:02:11 | 13 | A.   There was a learning curve. |
| 10:02:13 | 14 | Q.   All right.  And he continued to manage the business in 2012? |
| 10:02:18 | 15 | A.   Yes. |
| 10:02:20 | 16 | Q.   In terms of business, if I were to ask you what Jesse |
| 10:02:38 | 17 | Huitron, what his primary interest is, what would that be? |
| 10:02:41 | 18 | A.   His houses. |
| 10:02:43 | 19 | Q.   Okay.  Pass the witness, your Honor. |
| 10:02:47 | 20 |         THE COURT:  Ms. Williams? |
| 10:02:51 | 21 |         MS. WILLIAMS:  I'm sorry, your Honor.  No questions. |
| 10:02:53 | 22 |         MR. DEGEURIN:  No, your Honor. |
| 10:02:55 | 23 |         MR. WOMACK:  Your Honor, briefly.  Thank you. |
| 10:02:55 | 24 | |
| 10:02:58 | 25 | |

CROSS-EXAMINATION

BY MR. WOMACK:

Q.   Good morning, Ms. Cox.  I'm Guy Womack from Houston.  We've never met before, have we?

A.   No.

Q.   We have exchanged e-mails?

A.   Yes.

Q.   I represent Fernando Garcia.  Fernando, could you stand? You know Fernando Garcia?

A.   Yes, I do.

Q.   And you know Fernando Garcia professionally from his activities in the horse-racing business?

A.   Yes.

Q.   You know that he interacted with you as the owner of horses?

A.   Yes.

Q.   And also as the agent for others who owned race horses?

A.   I didn't really know too much about him being an agent at the time.

Q.   Okay.  Well, are you aware that he has had horses treated at your vet clinic at Elgin?

A.   Yes.

Q.   And some of these horses were his own horses, correct?

A.   Yes.  Many of them.

Q.   And some of them were not his own horses, were they, or do you know?

| 10:03:44 | 1 | A.    He pretty much kept the accounts separate, so I was not |
| 10:03:48 | 2 | aware of that at the time. |
| 10:03:48 | 3 | Q.    Okay.  And from your observation of -- and this would be |
| 10:03:53 | 4 | from around 2010 through around -- I'm sorry, 2010 to 2012? |
| 10:04:01 | 5 | A.    Well, 2010 was when I met him and then. |
| 10:04:05 | 6 | Q.    And that's when you were at the Elgin clinic? |
| 10:04:07 | 7 | A.    At Elgin Veterinary Hospital.  Yes. |
| 10:04:09 | 8 | Q.    And then, you've interacted with him some after you opened |
| 10:04:11 | 9 | your stables in El Paso? |
| 10:04:12 | 10 | A.    Yes. |
| 10:04:13 | 11 | Q.    So that would cover the period from around 2010 to 2012? |
| 10:04:18 | 12 | A.    Yes. |
| 10:04:20 | 13 | Q.    And from your observation, did Fernando Garcia always |
| 10:04:25 | 14 | conduct himself as a professional in the horse-racing business? |
| 10:04:27 | 15 | A.    Always. |
| 10:04:28 | 16 | Q.    In 2012, about a month before he was arrested, your stable |
| 10:04:38 | 17 | was offered to let him use some stables preparing some horses, |
| 10:04:41 | 18 | didn't he? |
| 10:04:41 | 19 | A.    Yes. |
| 10:04:41 | 20 | Q.    Since his arrest, he's been living in Mission, Texas with |
| 10:04:45 | 21 | his family.  Have you had any contact with him since June of last |
| 10:04:48 | 22 | year when he was arrested? |
| 10:04:51 | 23 | A.    Maybe once or twice just on Facebook though.  Nothing big. |
| 10:04:54 | 24 | Q.    Okay.  But he hasn't interacted with you professionally |
| 10:04:59 | 25 | since that time? |

| | | |
|---|---|---|
| 10:04:59 | 1 | A.    No. |
| 10:04:59 | 2 | Q.    Thank you.  No further questions, your Honor. |
| 10:05:06 | 3 | THE COURT:  Mr. Esper, any redirect? |
| 10:05:09 | 4 | MR. ESPER:  I think Mr. Gardner wanted to cross. |
| 10:05:11 | 5 | THE COURT:  Oh, I'm sorry. |
| 10:05:13 | 6 | MR. GARDNER:  Thank you, your Honor.  Appreciate it, |
| 10:05:15 | 7 | Mr. Esper. |
| 10:05:16 | 8 | CROSS-EXAMINATION |
| 10:05:17 | 9 | BY MR. GARDNER: |
| 10:05:17 | 10 | Q.    Ms. Cox, you stated that you recognize Jessica Huitron's |
| 10:05:20 | 11 | handwriting.  Do you recognize that blue ink on the bottom |
| 10:05:23 | 12 | right-hand corner? |
| 10:05:24 | 13 | A.    Yes. |
| 10:05:25 | 14 | Q.    Offer Government's Exhibit 433, your Honor. |
| 10:05:47 | 15 | MR. ESPER:  I have no objection. |
| 10:05:52 | 16 | MR. MAYR:  No objection, your Honor. |
| 10:05:53 | 17 | THE COURT:  433 is received. |
| 10:05:55 | 18 | Q.    (BY MR. GARDNER) Could you read the handwriting of Jessica |
| 10:05:58 | 19 | Huitron, please, Ms. Cox? |
| 10:05:59 | 20 | A.    My dad told me that you and him have discussed the invoices. |
| 10:06:04 | 21 | So if you have any questions, please discuss it with him. |
| 10:06:08 | 22 | Q.    So at least on this occasion, Jesse Huitron was taking care |
| 10:06:12 | 23 | of the invoices.  You would agree with that, right? |
| 10:06:13 | 24 | A.    Yes. |
| 10:06:14 | 25 | Q.    Now, you've testified before on behalf of "Chevo" Huitron at |

10:06:17   1  his detention hearing?

10:06:18   2  A.   Yes, sir.

10:06:18   3  Q.   That was June 18th of 2012?

10:06:22   4  A.   Yes, sir.

10:06:22   5  Q.   Sounds about right?  You also accompanied Mr. "Chevo"

10:06:27   6  Huitron and Mr. Esper in my offices to help him look through the

10:06:30   7  evidence in this case, correct?

10:06:31   8  A.   Yes, sir.

10:06:34   9  Q.   And you also contacted Jessica Huitron to let her know law

10:06:38   10 enforcement may be coming to talk to her.

10:06:40   11 A.   No, sir.

10:06:41   12 Q.   So would it surprise you when Jessica Huitron was

10:06:44   13 interviewed by agents --

10:06:47   14      MR. ESPER:  Objection, your Honor, to form of the

10:06:48   15 question.  Assumes facts not in evidence.

10:06:51   16 Q.   (BY MR. GARDNER) Were you aware that Jessica Huitron told

10:06:54   17 agents that you contacted her and told her that law enforcement

10:06:58   18 would be coming to visit her?

10:06:59   19 A.   No, sir.

10:07:03   20 Q.   Now, you also stated that "Chevo" Huitron -- in response to

10:07:11   21 Mr. Esper's question, that "Chevo" Huitron is an excellent

10:07:15   22 trainer?

10:07:16   23 A.   Yes.

10:07:17   24 Q.   And you also stated that he was extremely honest?

10:07:20   25 A.   Yes.

```
10:07:23   1    Q.   Do you recall the question at your detention hearing when
10:07:27   2    you stated, nobody cares more about his career with horses than
10:07:30   3    he does?
10:07:31   4    A.   Yes.
10:07:32   5    Q.   Do you also recall your response to the question, did you
10:07:37   6    ever see him do things that were illegal or underhanded?
10:07:41   7    A.   Do I recall the question?  Yes.
10:07:44   8    Q.   Do you recall that?
10:07:44   9    A.   Yes, I do.
10:07:46   10   Q.   Were you aware that on August 26th of 2011, "Chevo" Huitron
10:07:59   11   was suspended and fined --
10:08:01   12        MR. ESPER:  Objection, your Honor.  Objection under
10:08:03   13   404(b), your Honor.
10:08:04   14        THE COURT:  The objection is overruled.  You placed all
10:08:07   15   of this in evidence on your direct examination.
10:08:10   16   Q.   (BY MR. GARDNER) On August 26th of 2011, were you aware that
10:08:16   17   "Chevo" Huitron was fined and suspended for doping, drugging two
10:08:21   18   horses with Clenbuterol at Retama Park?
10:08:25   19   A.   Yes.  I'm aware of those problems.
10:08:26   20   Q.   On June 17th, 2011, were you aware that "Chevo" Huitron was
10:08:31   21   fined for doping a horse with polyethylene glycol?
10:08:36   22   A.   I didn't know what the penalty was.
10:08:38   23   Q.   Were you aware on July 26th of 2010, that "Chevo" Huitron
10:08:43   24   was fined and suspended for obtaining and bribing workout -- for
10:08:49   25   obtaining fraudulent workouts through the bribe of track
```

| | | |
|---|---|---|
| 10:08:51 | 1 | personnel? |
| 10:08:52 | 2 | A.    He has many. |
| 10:08:56 | 3 | Q.    And were you aware that he failed to appear at that hearing? |
| 10:08:58 | 4 | A.    No. |
| 10:08:59 | 5 | Q.    Were you aware on May 29th of 2010, at the Sam Houston Race |
| 10:09:03 | 6 | Park where a horse called Chip Jess Got Magic, "Chevo" Huitron |
| 10:09:07 | 7 | was fined and suspended for doping his horse with Clenbuterol? |
| 10:09:11 | 8 | A.    No. |
| 10:09:11 | 9 | Q.    Were you aware on April 30th, 2010, again, at the Sam |
| 10:09:16 | 10 | Houston Race Park, "Chevo" Huitron was suspended and fined for a |
| 10:09:20 | 11 | horse called Au Contraire for Clenbuterol? |
| 10:09:23 | 12 | A.    No. |
| 10:09:23 | 13 | Q.    Were you aware he failed to appear at that hearing? |
| 10:09:26 | 14 | A.    No. |
| 10:09:27 | 15 | Q.    Were you aware on October 24th of 2009, "Chevo" Huitron was |
| 10:09:32 | 16 | fined for not adhering to track regulations? |
| 10:09:35 | 17 | A.    No. |
| 10:09:35 | 18 | Q.    Were you aware that on February 28th of 2009, "Chevo" |
| 10:09:39 | 19 | Huitron was fined and suspended for doping a horse with |
| 10:09:43 | 20 | Dextrorphan? |
| 10:09:45 | 21 | A.    No. |
| 10:09:45 | 22 | Q.    That horse was called Charal Kid. |
| 10:09:48 | 23 |        I'm going to show you Government's Exhibit 432.  Do you |
| 10:09:54 | 24 | recognize "Chevo" Huitron in that winning circles photo? |
| 10:09:57 | 25 | A.    Yes. |

| 10:09:58 | 1 | Q.   Your Honor, I offer Government's Exhibit 432. |

```
10:09:58    1   Q.   Your Honor, I offer Government's Exhibit 432.

10:10:09    2            MR. ESPER:  I have no objection, your Honor.

10:10:16    3            MR. WOMACK:  No objection.

10:10:25    4   Q.   (BY MR. GARDNER) Ms. Cox, were you aware when you get fined

10:10:27    5   or suspended --

10:10:28    6            THE COURT:  Hold on.  You're asking to be admitted?

10:10:31    7            MR. GARDNER:  Yes, your Honor.  I apologize.

10:10:32    8            THE COURT:  It's admitted.

10:10:34    9   Q.   (BY MR. GARDNER) Each time you're suspended, the Texas

10:10:36   10   Racing Commission says you're denied access to all facilities,

10:10:41   11   and horses owned or trained by the trainer are denied entry.  Are

10:10:45   12   you aware of that?

10:10:46   13   A.   Yes.

10:10:47   14   Q.   Who is the listed trainer on this horse?

10:10:53   15   A.   Erika Huitron.

10:10:55   16   Q.   So this is Charal Kid, the same one for which Mr. "Chevo"

10:11:00   17   Huitron was suspended for doping?

10:11:02   18   A.   Yes.

10:11:04   19   Q.   Are you aware that anytime Mr. Chevo Huitron got suspended,

10:11:07   20   he would simply put his daughter's name on the entry fee and

10:11:10   21   continue to train the horses?

10:11:12   22   A.   As do many others.

10:11:14   23   Q.   I didn't ask that question.  I asked about "Chevo" Huitron.

10:11:16   24   A.   Yes.

10:11:17   25   Q.   You're aware of that?
```

| 10:11:18 | 1 | A.   Yes. |

10:11:18   1   A.   Yes.

10:11:22   2   Q.   Were you aware that on November 29th of 2008, "Chevo"

10:11:26   3   Huitron was fined for having two hypodermic needles that were

10:11:30   4   illegal according to the Texas Racing Commission?

10:11:32   5   A.   No.

10:11:33   6   Q.   Were you aware on September 6th, 2008, that "Chevo" Huitron

10:11:37   7   was fined for entering an ineligible horse, also failed to appear

10:11:41   8   at that hearing?

10:11:42   9   A.   No.

10:11:43   10   Q.   Were you aware on August 16th, 2008, "Chevo" Huitron was,

10:11:48   11   again, fined for ineligible horse and failed to appear at that

10:11:51   12   hearing?

10:11:51   13   A.   No.

10:11:52   14   Q.   Were you aware on March 23rd of 2008, that "Chevo" Huitron

10:11:57   15   doped a horse called Rare Leader with Lidocaine?

10:12:00   16   A.   No.

10:12:01   17   Q.   Were you aware on September 7th of 2007, that "Chevo"

10:12:05   18   Huitron was discovered in a trailer injecting a horse with

10:12:10   19   nicotinamide and suspended?

10:12:11   20   A.   No.

10:12:12   21   Q.   Were you aware on October 4th of 2007, that "Chevo" Huitron

10:12:16   22   was suspended for injecting a horse with phenylbutazone?

10:12:21   23   A.   No.

10:12:22   24   Q.   Were you aware on August 25th of 2007, that "Chevo" Huitron

10:12:27   25   was suspended for injecting three horses with that same drug?

| 10:12:31 | 1 | A.   Yes. |

10:12:31   1   A.   Yes.

10:12:32   2   Q.   Were you aware on September 7th, 2007, injecting a horse

10:12:36   3   prior to his arrival at the horse training area?

10:12:39   4   A.   No.

10:12:40   5   Q.   Having known all that, would that change your opinion that

10:12:44   6   he's a good trainer?

10:12:45   7   A.   Not at all.

10:12:47   8   Q.   Were you aware that he applied batteries to a fixed horse

10:12:51   9   race to Tempting Dash?

10:12:54   10   A.   No.

10:12:54   11   Q.   You weren't aware of that?  So, again, being aware of all

10:12:58   12   that, would that change your opinion as to whether he's an

10:13:01   13   extremely honest person?

10:13:05   14   A.   I still believe he's honest.  Yes.

10:13:07   15   Q.   Pass the witness, your Honor.

10:13:10   16                    RE-DIRECT EXAMINATION

10:13:11   17   BY MR. ESPER:

10:13:11   18   Q.   Mrs. Cox, Mr. Gardner was asking you about your testimony at

10:13:14   19   a detention hearing.  That was sometime last year, correct?

10:13:16   20   A.   Yes, sir.

10:13:16   21   Q.   And the government at that detention hearing was trying to

10:13:19   22   detain Mr. Huitron without bond?

10:13:21   23   A.   Correct.

10:13:22   24   Q.   Pending trial.  And you testified, did you not, that you

10:13:26   25   were absolutely certain that if he was released on bail, he would

| | | |
|---|---|---|
| 10:13:30 | 1 | appear for trial? |
| 10:13:30 | 2 | A.   Yes. |
| 10:13:31 | 3 | Q.   And you were as confident about that as you are about the |
| 10:13:34 | 4 | rest of your testimony.  Would that be fair? |
| 10:13:36 | 5 | A.   Yes, sir. |
| 10:13:36 | 6 | Q.   Okay.  And at that hearing, you were under oath, just like |
| 10:13:44 | 7 | you are now, correct? |
| 10:13:45 | 8 | A.   Yes, sir. |
| 10:13:45 | 9 | Q.   Okay.  No further questions. |
| 10:13:48 | 10 | RE-CROSS EXAMINATION |
| 10:13:48 | 11 | BY MR. MAYR: |
| 10:13:53 | 12 | Q.   Ms. Cox, let's take a closer look at this Government's |
| 10:13:57 | 13 | Exhibit 433 that the government handed you.  Did you have an |
| 10:13:59 | 14 | opportunity to closely examine it? |
| 10:14:03 | 15 | A.   No. |
| 10:14:03 | 16 | Q.   He just sort of flashed it to you.  I want you to just take |
| 10:14:07 | 17 | a look at this really quick. |
| 10:14:10 | 18 | First of all, what is the date sent on that document? |
| 10:14:15 | 19 | A.   5-17 of 2008. |
| 10:14:17 | 20 | Q.   Okay.  5-17, 2008.  So was that about the time that you were |
| 10:14:22 | 21 | still working there? |
| 10:14:26 | 22 | A.   I remember the horses, so it's possible. |
| 10:14:30 | 23 | Q.   Kind of towards the end? |
| 10:14:32 | 24 | A.   Yeah.  Probably. |
| 10:14:35 | 25 | Q.   You testified earlier that Jesse was involved but that with |

| | | |
|---|---|---|
| 10:14:37 | 1 | time -- the passage of time, he came to trust and rely on her |
| 10:14:41 | 2 | more; is that right? |
| 10:14:42 | 3 | A.   Correct. |
| 10:14:42 | 4 | Q.   Okay.  So this is before Tempting Dash.  This is before any |
| 10:14:47 | 5 | of these horses that we're talking about here in this courtroom |
| 10:14:50 | 6 | today, right? |
| 10:14:50 | 7 | A.   Yes. |
| 10:14:51 | 8 | Q.   And this individual, Jaime Torres, who is that? |
| 10:14:54 | 9 | A.   He was one of the owners. |
| 10:14:55 | 10 | Q.   Okay.  And, more specifically, he was one of Jesus Huitron's |
| 10:15:01 | 11 | friends, right? |
| 10:15:02 | 12 | A.   Yes. |
| 10:15:03 | 13 | Q.   And wasn't just some random owner who showed up and wanted |
| 10:15:06 | 14 | to have his horses trained, was it? |
| 10:15:09 | 15 | A.   Correct.  He always got a little special treatment. |
| 10:15:11 | 16 | Q.   Now, I want to look at the second page here and these are |
| 10:15:18 | 17 | the invoices that are attached.  We see this is to -- this is an |
| 10:15:22 | 18 | invoice to Jaime Torres, who lives on Springdale in Austin, |
| 10:15:28 | 19 | Texas.  Do you see that right there -- |
| 10:15:29 | 20 | A.   Yes. |
| 10:15:29 | 21 | Q.   -- at the top?  Okay.  And then, right back here, right down |
| 10:15:32 | 22 | here at the bottom, it says -- what does it say right there? |
| 10:15:35 | 23 | A.   Huitron's half. |
| 10:15:37 | 24 | Q.   And over here? |
| 10:15:38 | 25 | A.   Negative 520. |

| | | |
|---|---|---|
| 10:15:41 | 1 | Q. And let's go to the next page. |
| 10:15:45 | 2 | A. Huitron's half. Negative 1,065.50. |
| 10:15:51 | 3 | Q. Next page? |
| 10:15:52 | 4 | A. Huitron's one third, Jesus Huitron's one third. |
| 10:15:56 | 5 | Q. And on the next passage, does it show the same thing? |
| 10:15:59 | 6 | A. Jesus Huitron's half. |
| 10:16:00 | 7 | Q. And again -- and on that last page. But it appears that -- |
| 10:16:12 | 8 | you would agree with me that it appears that she's referring to |
| 10:16:14 | 9 | her dad here because he has a half interest in this horse, right? |
| 10:16:19 | 10 | A. Yes. |
| 10:16:20 | 11 | Q. And so, obviously he is going to be vested and interested in |
| 10:16:24 | 12 | the invoices, right? |
| 10:16:26 | 13 | A. Yes. |
| 10:16:26 | 14 | Q. Was he this concerned and interested in every single horse |
| 10:16:29 | 15 | that came through that facility? |
| 10:16:30 | 16 | A. He was that interested in business in general. But no. He |
| 10:16:36 | 17 | wasn't that -- |
| 10:16:36 | 18 | Q. Would Jessica communicate in this same manner regarding |
| 10:16:40 | 19 | every single horse that came through there? |
| 10:16:41 | 20 | A. No. |
| 10:16:42 | 21 | Q. No further questions. |
| 10:16:47 | 22 | THE COURT: Anybody else have any questions? |
| 10:16:49 | 23 | MR. GARDNER: Based on that, your Honor, I have no |
| 10:16:50 | 24 | further questions. |
| 10:16:51 | 25 | THE COURT: May the witness be excused? |

| | | |
|---|---|---|
| 10:16:53 | 1 | MR. GARDNER:  No objection, your Honor. |
| 10:16:54 | 2 | MR. ESPER:  Yes. |
| 10:16:55 | 3 | THE COURT:  You may be excused, ma'am. |
| 10:17:03 | 4 | Members of the jury, I want to give you your morning |
| 10:17:07 | 5 | recess.  Fifteen minutes.  Use the facilities.  Be ready to come |
| 10:17:12 | 6 | back. |
| 10:17:49 | 7 | (Jury not present.) |
| 10:17:49 | 8 | THE COURT:  Fifteen-minute recess. |
| 10:17:52 | 9 | (Recess.) |
| 10:30:16 | 10 | MR. FINN:  Your Honor, before the jury comes in, would |
| 10:30:17 | 11 | you ask the government about the State Department, whether or not |
| 10:30:19 | 12 | they called, please? |
| 10:31:05 | 13 | (Jury present.) |
| 10:31:27 | 14 | THE COURT:  I'll have counsel up here, please. |
| 10:31:32 | 15 | (At the bench, on the record.) |
| 10:31:40 | 16 | THE COURT:  Mr. Finn has inquired if you have heard |
| 10:31:44 | 17 | anything. |
| 10:31:45 | 18 | MR. GARDNER:  I've got the attaché in Mexico.  There's |
| 10:31:52 | 19 | no NCIC in Mexico to confirm the presence of an arrest warrant. |
| 10:31:56 | 20 | DOJ has no authority to request the State Department obtain |
| 10:32:01 | 21 | documents in Mexico. |
| 10:32:02 | 22 | MS. FERNALD:  Mr. Gardner, you're going to have to |
| 10:32:04 | 23 | speak -- |
| 10:32:06 | 24 | MR. GARDNER:  Excuse me, Mr. DeGeurin. |
| 10:32:10 | 25 | The attaché says the Court, assume you, your Honor, |

10:32:13   1   have the authority to make such request pursuant to Title 28

10:32:16   2   U.S.C. 1781 through the use of letters rogatory from U.S. court

10:32:21   3   to Mexican court.  This process is lengthy.  MLAT is the method

10:32:27   4   by which DOJ obtains information from Mexico for criminal

10:32:30   5   prosecutions.  And obviously, your Honor, I did not request an

10:32:33   6   MLAT, based on what was recently discovered.  And recently,

10:32:37   7   Mexico would remind the U.S. that the MLAT process was the

10:32:41   8   exclusive method by which we, meaning the government, could

10:32:44   9   obtain information from Mexico for criminal prosecutions.

10:32:48   10          The treaty expressly excludes assistance to private

10:32:55   11   parties in Mexico.  They do not oblige to provide it.  That's our

10:33:00   12   answer from our attaché.

10:33:02   13          THE COURT:  Okay.

10:33:19   14          MR. MAYR:  Judge, for the record, I know that opposing

10:33:23   15   counsel was given an opportunity to raise the objections to

10:33:27   16   Defendant's Exhibit JH-4, but I don't know if I actually formally

10:33:30   17   offered and if it was admitted by you.  So I'd like to do that at

10:33:34   18   this time.

10:33:34   19          MS. FERNALD:  No objection, your Honor.

10:33:35   20          THE COURT:  Okay.  J-4 is admitted.  Mr. Mayr, you may

10:33:42   21   make your opening statement if you're going to present any

10:33:44   22   evidence.

10:33:45   23          MR. MAYR:  I believe Mr. Esper still has his case open,

10:33:47   24   your Honor.

10:33:48   25          THE COURT:  Oh, I'm sorry.  Do you have an additional

| | | |
|---|---|---|
| 10:33:50 | 1 | witness? |
| 10:33:51 | 2 | MR. ESPER:  Yes, your Honor.  Mr. Gardner and I have |
| 10:33:56 | 3 | agreed to a stipulation, with apologies to the jury.  We have |
| 10:34:01 | 4 | Exhibits EH-20A through Z that we've by stipulation agreed to |
| 10:34:08 | 5 | have admitted. |
| 10:34:09 | 6 | THE COURT:  20A through Z? |
| 10:34:12 | 7 | MR. ESPER:  Yes.  EH-20A through Z, 27 boxes of |
| 10:34:18 | 8 | documents that were seized pursuant to a search warrant issued at |
| 10:34:23 | 9 | Huitron Homes.  And with the Court's permission, we can have |
| 10:34:27 | 10 | those boxes brought later on, because I still have to tag them. |
| 10:34:33 | 11 | MR. GARDNER:  No objection, your Honor. |
| 10:34:34 | 12 | THE COURT:  Okay.  All right.  A through Z being |
| 10:34:42 | 13 | documents taken at a search warrant will be admitted.  EH-20A |
| 10:34:51 | 14 | through Z. |
| 10:34:52 | 15 | MR. ESPER:  Correct, your Honor.  And with that, the |
| 10:34:54 | 16 | Defendant Eusevio Huitron rests, your Honor. |
| 10:34:57 | 17 | THE COURT:  Now, Mr. Mayr. |
| 10:35:00 | 18 | MR. MAYR:  Thank you, your Honor.  Ms. Sims, could you |
| 10:35:04 | 19 | drop the screen?  Thank you. |
| 10:35:08 | 20 | DEFENDANT JESSE HUITRON'S OPENING STATEMENTS |
| 10:35:15 | 21 | MR. MAYR:  If it please the Court, opposing counsel. |
| 10:35:18 | 22 | Ladies and gentlemen of the jury, it's finally my time but -- |
| 10:35:22 | 23 | THE COURT:  And your time's at the lectern, too. |
| 10:35:24 | 24 | MR. MAYR:  Oh, thank you. |
| 10:35:27 | 25 | THE COURT:  You could move around the jury, but don't |

| | | |
|---|---|---|
| 10:35:30 | 1 | get any closer than that table. |
| 10:35:33 | 2 | MR. MAYR:  Fair enough. |
| 10:35:34 | 3 | It is my time, but I'm not going to take too much of |
| 10:35:38 | 4 | it.  You've heard a lot of the evidence in the case, and this is |
| 10:35:41 | 5 | what I would tell you in my opening statement.  This man right |
| 10:35:44 | 6 | here is my client, Jesus Maldonado-Huitron.  He is an innocent |
| 10:35:49 | 7 | man.  He's not a Zeta.  He's not a drug dealer.  He is not a |
| 10:35:55 | 8 | money launderer. |
| 10:35:56 | 9 | THE COURT:  And this is not time for argument.  This is |
| 10:35:58 | 10 | an opening statement.  If you have an opening statement, please |
| 10:36:01 | 11 | make it. |
| 10:36:01 | 12 | MR. MAYR:  I will. |
| 10:36:02 | 13 | What the evidence will show, ladies and gentlemen, is |
| 10:36:04 | 14 | -- some of it has already shown is that he is a home builder. |
| 10:36:09 | 15 | You're going to hear from two witnesses who work with him in the |
| 10:36:13 | 16 | home-building business, two realtors who represented him in real |
| 10:36:18 | 17 | estate transactions for all of the homes that he built and sold, |
| 10:36:22 | 18 | and they will tell you about the intricacies involved and |
| 10:36:26 | 19 | everything that he did in that process. |
| 10:36:28 | 20 | And what you will hear from them is that his commitment |
| 10:36:31 | 21 | is not to the horse-racing business.  His commitment is to his |
| 10:36:34 | 22 | home-building business.  And that he was never at his office |
| 10:36:39 | 23 | looking over every single thing that came through.  That he was, |
| 10:36:43 | 24 | in fact, out in the field working on his homes. |
| 10:36:46 | 25 | You'll hear that, like you've already heard, he wasn't |

| | | |
|---|---|---|
| 10:36:50 | 1 | a well-educated man, but he was very good at building homes.  But |
| 10:36:55 | 2 | you'll hear from them how he put trust in other people, like |
| 10:36:58 | 3 | themselves, to handle the intricacies of the real estate |
| 10:37:02 | 4 | transactions.  He had no idea what an origination fee was, what |
| 10:37:06 | 5 | certain terms were in the contract, but he questioned other |
| 10:37:10 | 6 | people, just like he put his trust in his daughter.  But his |
| 10:37:14 | 7 | commitment was to the home building.  That's what the evidence |
| 10:37:16 | 8 | will show. |
| 10:37:20 | 9 | Ladies and gentlemen, the evidence in this case has |
| 10:37:22 | 10 | shown that the Zetas are committed to destroying lives.  The |
| 10:37:26 | 11 | evidence that I will present will show that my client is |
| 10:37:29 | 12 | committed to helping build people's lives.  Thank you, your |
| 10:37:32 | 13 | Honor. |
| 10:37:33 | 14 | THE COURT:  Call your witness. |
| 10:37:35 | 15 | MR. MAYR:  Your Honor, we could call Harry Casler to |
| 10:37:37 | 16 | the stand. |
| 10:38:10 | 17 | THE COURT:  If you'll come forward.  This is Mrs. Sims. |
| 10:38:12 | 18 | She's going to administer an oath to you, sir. |
| 10:38:15 | 19 | (Witness sworn.) |
| 10:38:33 | 20 | THE COURT:  Just tell us your full name, please, sir. |
| 10:38:35 | 21 | THE WITNESS:  My name is Harry John Casler. |
| 10:38:37 | 22 | THE COURT:  Spell your last, please. |
| 10:38:39 | 23 | THE WITNESS:  Spell my name, sir? |
| 10:38:40 | 24 | THE COURT:  Just your last. |
| 10:38:41 | 25 | THE WITNESS:  C-A-S-L-E-R. |

| | | |
|---|---|---|
| 10:38:44 | 1 | THE COURT:  You may proceed. |
| 10:38:45 | 2 | HARRY J. CASLER, called by the Defendant, duly sworn. |
| 10:38:45 | 3 | DIRECT EXAMINATION |
| 10:38:45 | 4 | BY MR. MAYR: |
| 10:38:46 | 5 | Q.   Thank you, your Honor. |
| 10:38:47 | 6 | Good morning, Mr. Casler. |
| 10:38:49 | 7 | A.   Hi. |
| 10:38:49 | 8 | Q.   Would you please introduce yourself to the ladies and |
| 10:38:52 | 9 | gentlemen of the jury and just tell them a little bit about |
| 10:38:54 | 10 | yourself? |
| 10:38:55 | 11 | A.   Okay.  Where I came from.  Again, my name is Harry Casler. |
| 10:39:00 | 12 | I'm originally from upstate New York.  I grew up at a dairy farm |
| 10:39:04 | 13 | milking cows as a kid and pursued my -- in my late 20s, finished |
| 10:39:09 | 14 | college and came to Texas, worked for the government for a couple |
| 10:39:12 | 15 | of years in North Texas.  Pursued a career in restaurant industry |
| 10:39:17 | 16 | and then, finally, entered the real estate business in 1998, |
| 10:39:23 | 17 | which I am today. |
| 10:39:23 | 18 | Q.   Tell us a little bit about your involvement in the real |
| 10:39:25 | 19 | estate business. |
| 10:39:26 | 20 | A.   Well, I'm currently a real estate broker out of my home.  I |
| 10:39:30 | 21 | used to be with Keller Williams for 10 years.  Since 1998 to |
| 10:39:35 | 22 | 2008, I was with Keller Williams realty, got my broker's license, |
| 10:39:39 | 23 | and basically semiretired now. |
| 10:39:41 | 24 | Q.   All right.  Tell the ladies and gentlemen of the jury how |
| 10:39:44 | 25 | you know Jesus Huitron. |

```
10:39:46   1    A.   I met Jesse or Jesus -- I know him as Jesse -- in the middle
10:39:52   2    of 1998.  I was brand new in doing real estate.  I was a licensed
10:40:00   3    -- been licensed since 1989.  Finally, nine years later, went
10:40:04   4    into the business full-time.  And in my first year, a lot of
10:40:11   5    training that I had was to find listings to sell, and my very
10:40:16   6    first listing was in southeast Austin.  And there was this cute
10:40:21   7    little house around the corner, which it was a new home.  I had a
10:40:26   8    three-year-old resell home.  And people used to say -- they'd
10:40:29   9    come to my open houses and say, what's that house around the
10:40:32   10   corner?  They said, well, let's go look at it.  I could sell that
10:40:35   11   one, too.
10:40:36   12          So we would go look at it and it was listed with
10:40:38   13   another brokerage.  And then, it had a, we call, expired listing
10:40:43   14   when we can solicit listings from people that want to sell their
10:40:46   15   homes.  And the Huitron home --
10:40:49   16          THE COURT:  Let's go back to asking questions.
10:40:51   17          MR. MAYR:  Sure.
10:40:53   18          THE COURT:  And, sir, if you'll listen to the question
10:40:55   19   and just answer the question, then we won't be here for a month
10:40:57   20   or two.
10:40:58   21          THE WITNESS:  Okay.
10:40:58   22          THE COURT:  All right.
10:40:59   23   Q.   (BY MR. MAYR) And I think you're right about to get to the
10:41:01   24   answer.
10:41:02   25   A.   I was.
```

10:41:02  1  Q.   Tell us.

10:41:03  2  A.   I called Mr. Huitron and tried to solicit the business.  I

10:41:08  3  wanted some business.  And so, that's how I initiated the call

10:41:12  4  and met him.

10:41:12  5  Q.   All right.  And was this a home that he had built or a home

10:41:16  6  that he had purchased?

10:41:18  7  A.   It was under the name of Huitron Homes, so it was a new

10:41:21  8  constructed home.  Newly constructed home.  It was a vacant lot

10:41:25  9  that he previously purchased and built the home.

10:41:27  10  Q.   How approachable was he when you first came into contact

10:41:30  11  with him?

10:41:30  12  A.   A little -- I remember on the phone, it was okay.  He said,

10:41:35  13  well, he was going to stay with the same realtor he was with that

10:41:38  14  had accidentally let it expire.  But the next day, he called me,

10:41:41  15  said, come talk to me and I did.  Evidently, I don't, to this

10:41:46  16  day, know what happened to the other realtor.  I did meet him

10:41:50  17  later.  But I don't know what happened to their relationship, but

10:41:52  18  he was willing to give me a try.

10:41:54  19  Q.   Sure.  And from there, is it safe to say your all

10:41:59  20  relationship grew?

10:41:59  21  A.   Oh, yeah.  Again, initially, we had a language barrier.  I

10:42:05  22  speak very little Spanish.  Virtually, I cannot construct

10:42:08  23  sentences in Spanish.  I hear key words.  Again, brought up near

10:42:13  24  Canada, I did not grow up near here, and I don't find it easy to

10:42:16  25  learn the language.  But Jesse speaks broken English and people

10:42:21   1   used to say, how do you understand?  I said, well, you listen.

10:42:25   2   Takes a little extra time, but we would communicate.  So there

10:42:30   3   was official communication problem, which we would get through

10:42:32   4   through a lot of discussion.

10:42:34   5   Q.   But eventually, despite the language barrier, you were able

10:42:39   6   to develop a good, going relationship with him.

10:42:40   7   A.   Very much so.  Well, as I mentioned, I grew up on a dairy

10:42:44   8   farm, and I know what a strong work ethic is.

10:42:47   9   Q.   Mr. Casler, let me stop you there so we could keep

10:42:51  10   everything in question-and-answer format.

10:42:53  11          As your relationship with him grew, your business

10:42:56  12   relationship with him grew, did you sort of develop a personal

10:42:58  13   relationship with him and his family?

10:43:00  14   A.   Yes, because many of the transactions -- because we started

10:43:04  15   with that one home and then, Jesse started -- or Huitron Homes

10:43:06  16   started building more and I would get the listings, and most of

10:43:10  17   the communication was done either onsite or at Jesse's personal

10:43:15  18   home.

10:43:15  19   Q.   Okay.  I'm going to show you what's been previously admitted

10:43:18  20   as JH No. 4, Defendant's Exhibit JH-4.  Do you recognize that?

10:43:23  21   A.   I do.

10:43:23  22   Q.   Is that his home?

10:43:25  23   A.   It is.

10:43:27  24   Q.   We see the outside.  Can you just tell us, first of all, who

10:43:30  25   all lives in that house?

10:43:34   1   A.   When I would arrive there with offers on the homes that we

10:43:37   2   had listed, usually his wife and his lovely daughter Ashley was

10:43:44   3   there, and occasionally one of his other sons would be there, and

10:43:48   4   I believe he has stepsons, which I would see.  Didn't know them

10:43:53   5   real well, but I could see them there in that home.

10:43:55   6   Q.   And a total how many children does he have, whether stepsons

10:44:01   7   or not?

10:44:02   8   A.   To my knowledge, he had nine with his first wife, one with

10:44:05   9   his second wife, and I believe she has two stepsons.

10:44:08  10   Q.   Okay.

10:44:09  11   A.   He has two stepsons of hers.

10:44:10  12   Q.   And does he support all of those children?

10:44:13  13   A.   I don't really know.

10:44:16  14   Q.   Okay.  Fair enough.

10:44:17  15   A.   I assume so.  They lived in his home.  They ate well.

10:44:20  16   Q.   How much time would you spend with him -- let's just focus

10:44:25  17   on a personal level.  How much time would you spend with him and

10:44:27  18   his family on a personal level?  Are we talking like maybe once

10:44:31  19   every six months?  Every week?  What are we talking about?

10:44:33  20   A.   I would be at his home maybe every couple of months.  Yeah,

10:44:38  21   maybe every two or three months.  But we did most of our

10:44:44  22   communication onsite, too.

10:44:45  23   Q.   And we're going to get to that in a second.  Let's talk

10:44:47  24   about your business dealings with him.

10:44:50  25               How often -- as the relationship grew, just so we're

| | | |
|---|---|---|
| 10:44:56 | 1 | clear with the jury, what was your -- the nature of your |
| 10:44:58 | 2 | relationship with Mr. Huitron and his business dealings? |
| 10:45:03 | 3 | A.   I'm not sure I understand the question. |
| 10:45:05 | 4 | Q.   Were you his broker?  Were you representing him?  What was |
| 10:45:08 | 5 | your role? |
| 10:45:09 | 6 | A.   My main role with him was as his real estate agent and then, |
| 10:45:13 | 7 | later, broker.  Yes, he was my client. |
| 10:45:14 | 8 | Q.   How often did you have these sort of transactions where you |
| 10:45:18 | 9 | were dealing with him? |
| 10:45:21 | 10 | A.   Almost on a daily basis at least by phone. |
| 10:45:23 | 11 | Q.   All right. |
| 10:45:24 | 12 | A.   Multiple times. |
| 10:45:25 | 13 | Q.   And just so we've got a good time period in which you're |
| 10:45:28 | 14 | working for him, this is beginning in 1998 all the way to 2010? |
| 10:45:32 | 15 | A.   That's correct. |
| 10:45:33 | 16 | Q.   All right.  Daily contact with him? |
| 10:45:36 | 17 | A.   Virtually daily.  Occasionally, it would be a couple of days |
| 10:45:40 | 18 | wouldn't talk to each other, but that was rare. |
| 10:45:41 | 19 | Q.   All right.  When you did talk with him -- or when you did |
| 10:45:45 | 20 | interact with him, what was he doing? |
| 10:45:48 | 21 | A.   Usually busy coordinating subcontractors, following through, |
| 10:45:54 | 22 | needing things that I would need to provide or I would need from |
| 10:46:00 | 23 | him, documentation, things like that. |
| 10:46:02 | 24 | Q.   Now, you know that he maintained an office over on Highway |
| 10:46:07 | 25 | 183 by the airport; is that right? |

10:46:09  1   A.   Yes.

10:46:09  2   Q.   How often were you at his office working on business

10:46:11  3   transactions?

10:46:14  4   A.   Very rarely.  I was there -- I couldn't give you a time.  I

10:46:19  5   mean, if I was at that office three times a year, maybe.

10:46:23  6   Q.   Okay.  And to your knowledge, how often was he in that

10:46:28  7   office?

10:46:29  8   A.   Not very often because I would see him, we were doing a lot

10:46:32  9   work into remote areas around Austin, like the city of Kyle and

10:46:35  10  places like that, that we were doing a lot of -- he was doing a

10:46:38  11  lot of constructing and I was around there to be the real estate

10:46:45  12  agent and do my work.

10:46:46  13  Q.   You mentioned a little bit earlier about him always being at

10:46:49  14  the job site.

10:46:50  15  A.   Frequently.

10:46:51  16  Q.   Explain -- describe what he is doing at these job sites.

10:46:56  17  A.   He is coordinating his subcontractors in which there were

10:47:01  18  many that would appear on the scene.  He would make sure that

10:47:07  19  they were doing the work and the quality that he was expecting

10:47:09  20  for his soon-to-be customers buying the homes.  Mainly that.  And

10:47:19  21  we would discuss future projects, trying to find other lots to

10:47:23  22  build on things like that would come up.

10:47:25  23  Q.   When it comes to the manual labor, would he get involved in

10:47:28  24  that or was he letting his subcontractors handle that?  Or what

10:47:31  25  was his level of physical involvement?

| | | |
|---|---|---|
| 10:47:33 | 1 | A.   In most cases, the subcontractors would do the work, and he |
| 10:47:37 | 2 | would just inspect the work and maybe offer advice.  But many |
| 10:47:41 | 3 | times, Jesse and I, I along with him as we became friends, also, |
| 10:47:49 | 4 | we've been at homes as late as midnight getting them ready for |
| 10:47:52 | 5 | the next day closing, whether it be sweeping.  I mean, he and I |
| 10:47:55 | 6 | have been on the streets sweeping the streets, sidewalks, cutting |
| 10:47:57 | 7 | the grass, making sure everything was perfect, and we would work |
| 10:48:01 | 8 | so he would do it, as well. |
| 10:48:02 | 9 | Q.   Let's go ahead and move on and talk to that actual process |
| 10:48:06 | 10 | of selling the actual home. |
| 10:48:08 | 11 | A.   Uh-huh. |
| 10:48:09 | 12 | Q.   None of the jurors, I believe, are in real estate.  I think |
| 10:48:12 | 13 | they all own their own homes.  But just so it's clear and the |
| 10:48:15 | 14 | record is clear, just briefly take us through the steps in |
| 10:48:21 | 15 | assisting Mr. Huitron in selling one of his homes. |
| 10:48:26 | 16 | A.   Once they are under construction or near completion is when |
| 10:48:30 | 17 | we would decide that -- he would decide on my advice to wait till |
| 10:48:35 | 18 | they were nearly finished to put them up for sale because we were |
| 10:48:38 | 19 | concerned about safety, people walking on the properties.  Once |
| 10:48:41 | 20 | they were on the market listed in the MLS -- and I could say for |
| 10:48:45 | 21 | probably eight of the ten years I worked with Huitron Homes, that |
| 10:48:50 | 22 | every one of his homes were listed were sold within 30 days upon |
| 10:48:54 | 23 | completion because he built such a good quality product it was |
| 10:48:57 | 24 | great for me because -- |
| 10:48:58 | 25 |             THE COURT:  Well, I'm very happy about that. |

10:48:59    1          THE WITNESS:  I'm sorry.

10:49:00    2          THE COURT:  I want you to listen to the question and

10:49:01    3    answer the question.  We've been in this room for a great many

10:49:06    4    days.

10:49:08    5          THE WITNESS:  I'm sorry.

10:49:08    6          THE COURT:  And if you'll just listen to the question

10:49:10    7    and answer the question.  See all of these people, they're all

10:49:13    8    lawyers, and they're all going to get to ask you questions.

10:49:15    9          THE WITNESS:  Okay.

10:49:16   10          THE COURT:  So let's --

10:49:18   11          THE WITNESS:  I'll try to do better.  I'm sorry, sir.

10:49:20   12    Q.   (BY MR. MAYR) I'm going to try to guide you just a little

10:49:24   13    bit.  If you could listen to my question, Mr. Casler.

10:49:26   14          When we get the actual sale process.

10:49:29   15    A.   Okay.

10:49:29   16    Q.   How involved are you in working with Jesse once there's an

10:49:34   17    offer made on the home?

10:49:35   18    A.   Very involved.

10:49:36   19    Q.   Okay.  And then, going through there's an actual closing?

10:49:40   20    A.   Yes.

10:49:40   21    Q.   Would Jesse and you go to closing together?

10:49:42   22    A.   Yes.  Always.

10:49:44   23    Q.   All right.  Now, would you interact with the home buyers?

10:49:54   24    Would he interact with the home buyers?

10:49:55   25    A.   Yes.

| | | |
|---|---|---|
| 10:49:56 | 1 | Q.   Both of y'all would? |
| 10:49:56 | 2 | A.   Yes. |
| 10:49:57 | 3 | Q.   How is he in interacting with customers buying his homes? |
| 10:50:03 | 4 | A.   Excellent. |
| 10:50:04 | 5 | Q.   All right.  When we get to the actual closings and you're |
| 10:50:12 | 6 | going through the real estate transactions, I don't want to have |
| 10:50:14 | 7 | to go through the details.  But there's a lot of documents |
| 10:50:17 | 8 | involved -- |
| 10:50:18 | 9 | A.   There is. |
| 10:50:18 | 10 | Q.   -- is that correct?  Is Mr. Huitron -- is Jesse, is he the |
| 10:50:24 | 11 | type of person that would go through with the fine-toothed comb |
| 10:50:28 | 12 | and read every single one of these documents that were part of |
| 10:50:31 | 13 | the real estate transaction? |
| 10:50:32 | 14 | A.   He did not. |
| 10:50:33 | 15 | Q.   Why not? |
| 10:50:34 | 16 | A.   He trusted me. |
| 10:50:37 | 17 | Q.   Did it appear to you that he understood the meaning of all |
| 10:50:44 | 18 | of the things associated with selling one of his homes, at least |
| 10:50:46 | 19 | from the financial aspect? |
| 10:50:48 | 20 | A.   Certainly from the financial aspect.  We have very lengthy, |
| 10:50:53 | 21 | 24-paragraph contracts that we go over.  To my knowledge, I'm not |
| 10:50:59 | 22 | sure Jesse could read those legal documents and understand them. |
| 10:51:03 | 23 | I would paraphrase them for him.  Of course, we had a lot of |
| 10:51:06 | 24 | repeat similar contracts, and he really trusted me to whether |
| 10:51:15 | 25 | that was -- whether he should sign it or not. |

10:51:18  1   Q.   So you would -- he would rely on you heavily?

10:51:22  2   A.   Very much so.  Yes.

10:51:24  3   Q.   In terms of the financing, or anything else, does he

10:51:31  4   understand things like APR, and interest rates, and origination

10:51:36  5   fees, and what all of those things meant, in dealing with the

10:51:39  6   real estate transactions?

10:51:41  7   A.   I don't know what he understood.  But I know that he never

10:51:44  8   talked about those items too much other than dollars and cents.

10:51:48  9   Q.   Bottom line is what it all --

10:51:50  10  A.   Yeah.  And how we got to there.

10:51:57  11  Q.   Would he often come to you and ask you, hey, what's this for

10:52:02  12  or what's this for?  Did he ever do that in dealing with these

10:52:06  13  transactions?

10:52:06  14  A.   Not a lot.  On occasion, when there was an unexpected amount

10:52:10  15  of money being deducted or if it was a cost of his, he might ask,

10:52:15  16  and I would explain the situation the best I could.

10:52:18  17  Q.   Otherwise, he just left it in your hands.

10:52:20  18  A.   He pretty much left it in my hands, whether that would be

10:52:23  19  good or not.

10:52:24  20  Q.   Very capable hands, correct?

10:52:25  21  A.   I think so.  I think he thought so.  And I hope I gave -- I

10:52:29  22  did gain his trust.

10:52:31  23  Q.   Now, let's move away a little bit from the -- your dealings

10:52:36  24  with -- well, what sort of drew your dealings with Mr. Huitron to

10:52:42  25  a close?  Why don't you explain to the jury?

| | | |
|---|---|---|
| 10:52:44 | 1 | A.   I've had four heart attacks, three of which before 2010 and |
| 10:52:50 | 2 | which compromised my ability to work as much as I do or did.  And |
| 10:52:54 | 3 | real estate is a demanding profession and a lot of stress |
| 10:52:59 | 4 | involved and not just with Jesse but I have other clients, too. |
| 10:53:02 | 5 | Q.   And so, if I could just interrupt. |
| 10:53:04 | 6 | A.   Yes. |
| 10:53:04 | 7 | Q.   So basically there were no bad dealings, or anything else, |
| 10:53:08 | 8 | that led you to cease selling homes? |
| 10:53:11 | 9 | A.   Oh, no.  It was a sad day. |
| 10:53:12 | 10 | Q.   Okay. |
| 10:53:13 | 11 | A.   In fact, I gave him a two-month notice, please find someone |
| 10:53:15 | 12 | else.  I've got to go. |
| 10:53:18 | 13 | Q.   All right.  Now, it's safe to say you have, however, |
| 10:53:23 | 14 | continued to maintain very close relationship with Mr. Huitron? |
| 10:53:27 | 15 | A.   I have.  He's my friend. |
| 10:53:28 | 16 | Q.   Okay.  In your personal interaction with him, have you seen |
| 10:53:37 | 17 | anything -- actually, strike that question.  Let's just talk |
| 10:53:41 | 18 | about the horses. |
| 10:53:41 | 19 | You do know being his friend that he is involved with |
| 10:53:44 | 20 | horses; is that right? |
| 10:53:45 | 21 | A.   I had heard that.  Yes. |
| 10:53:46 | 22 | Q.   Have you, in all this time that you've known him, all the |
| 10:53:51 | 23 | time that you've been a friend, all those times you've been out |
| 10:53:53 | 24 | to his house here on Seeling, did you ever go out to the horse |
| 10:53:56 | 25 | ranch out in Dale, Texas? |

| | | |
|---|---|---|
| 10:53:57 | 1 | A.   Never.  I've never been to Dale, Texas. |
| 10:53:59 | 2 | Q.   How often would Jesse talk about the horses, or the |
| 10:54:03 | 3 | horse-racing business, or anything else like that? |
| 10:54:05 | 4 | A.   Very rarely.  I remember one day, he had his beat-up pickup |
| 10:54:10 | 5 | truck that he always drove and he had some hay in the back.  He |
| 10:54:13 | 6 | said, well, I've got to run some hay out to the ranch.  That's |
| 10:54:15 | 7 | about the only time I've -- he never really talked about it to |
| 10:54:19 | 8 | me. |
| 10:54:19 | 9 | Q.   Fair enough.  I'm going to ask you if you have an opinion as |
| 10:54:24 | 10 | to whether or not Mr. Huitron's, Jesse's primary focus in his |
| 10:54:33 | 11 | daily life was building homes or dealing with the horses.  Do you |
| 10:54:37 | 12 | have an opinion about that? |
| 10:54:38 | 13 | A.   I have -- yeah, I do.  His daily life was building homes. |
| 10:54:47 | 14 | Q.   I'll pass the witness, your Honor. |
| 10:54:56 | 15 | MS. WILLIAMS:  No questions. |
| 10:54:58 | 16 | MR. WOMACK:  No questions. |
| 10:55:03 | 17 | MR. SANCHEZ:  No questions. |
| 10:55:03 | 18 | THE COURT:  Mr. Esper. |
| 10:55:05 | 19 | MR. ESPER:  None, your Honor. |
| 10:55:06 | 20 | MS. FERNALD:  The government doesn't have any |
| 10:55:07 | 21 | questions. |
| 10:55:07 | 22 | THE COURT:  May Mr. Casler be excused?  You could be |
| 10:55:10 | 23 | excused.  Thank you, sir. |
| 10:55:11 | 24 | THE WITNESS:  Thank you, sir. |
| 10:55:13 | 25 | THE COURT:  Call your next witness. |

| | | |
|---|---|---|
| 10:55:15 | 1 | MR. MAYR:  Thank you, your Honor.  I would call Ruby |
| 10:55:17 | 2 | Segura to the stand. |
| 10:55:41 | 3 | THE COURT:  This is Mrs. Sims.  She's going to |
| 10:55:43 | 4 | administer an oath to you. |
| 10:55:44 | 5 | (Witness sworn.) |
| 10:55:59 | 6 | THE COURT:  Tell me your full name and your last name, |
| 10:56:13 | 7 | spell. |
| 10:56:14 | 8 | THE WITNESS:  My full name is Ruby Ann Segura. |
| 10:56:17 | 9 | THE COURT:  Would you spell your last name? |
| 10:56:18 | 10 | THE WITNESS:  My last name is S-E-G-U-R-A. |
| 10:56:20 | 11 | THE COURT:  You may proceed. |
| 10:56:22 | 12 | RUBY A. SEGURA, called by the Defendant, duly sworn. |
| 10:56:22 | 13 | DIRECT EXAMINATION |
| 10:56:22 | 14 | BY MR. MAYR: |
| 10:56:22 | 15 | Q.   Thank you, your Honor. |
| 10:56:23 | 16 | Ms. Segura, would you turn to the jury and introduce |
| 10:56:25 | 17 | yourself and just tell them just a little bit about yourself and |
| 10:56:27 | 18 | your background? |
| 10:56:28 | 19 | A.   Sure.  Good morning.  My name is Ruby Segura.  I was born in |
| 10:56:31 | 20 | San Antonio, Texas.  We moved to Austin when I was four years |
| 10:56:35 | 21 | old.  Been a resident of Austin for the past 50 years.  I never |
| 10:56:39 | 22 | left Austin.  I'm a graduate of St. Edwards University with a |
| 10:56:42 | 23 | degree in bilingual education.  I worked for the Austin |
| 10:56:45 | 24 | Independent School District for a brief period of time as a |
| 10:56:48 | 25 | consultant and, also, as a first-grade bilingual teacher.  And I |

10:56:54  1   had numerous sales jobs in -- after I left the district.

10:56:58  2          Then went to work in a family business for many years.

10:57:03  3   And in 2005, I went to -- I went into real estate.  I got my real

10:57:08  4   estate license and went to work for Caldwell Banker, United

10:57:13  5   Realtors as an agent out of the office.  I've been the top agent

10:57:18  6   in the south market for the past six of almost eight years and

10:57:24  7   have had a very -- a very rewarding experience as a realtor in

10:57:27  8   the Austin community.

10:57:28  9          I'm also a volunteer.  I'm a reading tutor at -- this

10:57:34  10  year, at Patton Elementary School.  I've volunteered at numerous

10:57:37  11  schools and that's always been a passion of mine is to help

10:57:40  12  children in the earlier years of their educational experience

10:57:44  13  learn to read.  So I work, I volunteer with struggling elementary

10:57:48  14  school students.

10:57:48  15  Q.   Ms. Segura, tell the ladies and gentlemen of the jury how

10:57:51  16  you know Jesus Huitron.

10:57:53  17  A.   I know Jesus Huitron as I was his realtor from September of

10:58:00  18  2010.  He worked with -- Harry Casler was his agent for many

10:58:06  19  years.  I represented numerous buyers that built -- that bought

10:58:12  20  homes that Huitron Homes built, that Jesse built.  And as a

10:58:18  21  result of the relationship with Harry, got to know Jesse, of

10:58:23  22  course, because he was the builder and he's very hands-on.  So I

10:58:26  23  worked with very closely with him in transaction.

10:58:30  24  Q.   And, Ms. Segura, let me just ask you really quick just to

10:58:33  25  follow up on something.  You said that you would represent buyers

10:58:36  1  buying homes that he built.  Would you also represent him in
10:58:40  2  homes that he built selling them to other buyers?
10:58:42  3  A.   I did.  I did and that was after -- that was after Harry
10:58:47  4  Casler retired as his realtor of about twelve years.  He had an
10:58:51  5  agent by the name of Lexy Graham with -- I believe it was Member
10:58:57  6  & Associates out of Elgin.
10:58:58  7  Q.   And that's actually Tyler Graham's wife, correct?
10:59:01  8  A.   Yes.  That is.
10:59:01  9  Q.   So then, after her, he came to you, correct?
10:59:04  10  A.   Correct.
10:59:05  11  Q.   All right.
10:59:05  12  A.   Yes.  For whatever reason, he decided to change brokerages
10:59:11  13  and he contacted me, and those listings were terminated; and
10:59:17  14  then, as a result of that, I became his listing agent.
10:59:21  15  Q.   In total, how many homes would you say -- first of all, to
10:59:25  16  your knowledge, how long has Jesse Huitron -- and you know him as
10:59:29  17  Jesse, right?
10:59:29  18  A.   Yes.  I know him as Jesse.
10:59:31  19  Q.   How -- in all the time that you've known him or to your
10:59:34  20  knowledge, how many homes has he built in the Austin area?
10:59:36  21  A.   Gosh, I don't know that number because I wasn't in real
10:59:43  22  estate as long as he's been a builder in Austin.  I know for a
10:59:47  23  fact in the Woodlands Park area in Kyle and in Four Seasons in
10:59:52  24  Kyle, I would say a minimum of at least 20 homes just in those
10:59:58  25  two communities.

| | | |
|---|---|---|
| 10:59:59 | 1 | Q.   Okay.  And the homes that he built, where does he normally |
| 11:00:05 | 2 | build his homes? |
| 11:00:05 | 3 | A.   Normally his original business plan was to find and fill |
| 11:00:10 | 4 | lots in Austin, in the Austin area, so he would find lots in |
| 11:00:15 | 5 | Austin in existing neighborhoods, and he did that.  He also did |
| 11:00:19 | 6 | custom built homes for people wherever they owned a lot already, |
| 11:00:23 | 7 | he would build on their lot.  And he purchased several lots in |
| 11:00:27 | 8 | the Woodlands Park -- I'm sorry, Woodland Hill neighborhood in |
| 11:00:34 | 9 | Kyle, off of 150, and, also, in the Four Seasons neighborhood in |
| 11:00:37 | 10 | Kyle. |
| 11:00:38 | 11 | Q.   What types of homes are these that he would build? |
| 11:00:41 | 12 | A.   Any characteristic of the product that Jesse built was a |
| 11:00:44 | 13 | very -- it was an affordable home, but it had the finishes of a |
| 11:00:48 | 14 | custom home.  He put crown molding, higher ceilings, upgraded |
| 11:00:53 | 15 | fixtures, solid good cabinetry.  So it was not a spec home.  They |
| 11:00:59 | 16 | were built on speculation, for the most part, but they weren't |
| 11:01:03 | 17 | your typical spec home. |
| 11:01:07 | 18 | Q.   What was your involvement in the home-building process?  In |
| 11:01:13 | 19 | other words, would you see him actually building these homes? |
| 11:01:15 | 20 | A.   Yes.  I would. |
| 11:01:16 | 21 | Q.   And what would you see when he was out there working on |
| 11:01:19 | 22 | these homes? |
| 11:01:20 | 23 | A.   Well, I would go by in the mornings at when the homes are |
| 11:01:27 | 24 | under construction, Jesse would be there in the mornings, |
| 11:01:29 | 25 | depending on what stage the house was in construction.  From the |

11:01:34   1   beginning when they're putting the forms up, Jesse was there.  He

11:01:37   2   was always there for the pour.  He would -- during framing, he

11:01:41   3   was there making sure that materials were delivered.  He was

11:01:45   4   always onsite.

11:01:47   5   Q.   Now --

11:01:48   6   A.   From the beginning to the end.

11:01:49   7   Q.   Now, you know that he had an office over on Highway 183 by

11:01:52   8   the airport; is that correct?

11:01:54   9   A.   Yes.  I do know that.

11:01:55   10  Q.   And how often -- first of all, how often would you go there

11:01:59   11  to meet with him to discuss financial aspects of selling or

11:02:02   12  buying one of his homes?

11:02:05   13  A.   To his office?

11:02:06   14  Q.   Yes.

11:02:07   15  A.   I went to his office maybe twice in the years that I've

11:02:11   16  worked for him.

11:02:12   17  Q.   All those other times that you've interacted with him, where

11:02:15   18  has it been?

11:02:15   19  A.   We always would meet at the homes, at the construction

11:02:18   20  sites, and we would meet at restaurants in Kyle.  Those were like

11:02:25   21  where we would have all of our build meetings.

11:02:27   22  Q.   And are we talking maybe just like a couple of times a

11:02:30   23  month?  Or what's the frequency?

11:02:31   24  A.   Oh, no.

11:02:32   25  Q.   How often?

11:02:32   1   A.   The joke was that I had to blame Jesse for my weight gain

11:02:38   2   because we both had very busy schedules, and what we would do is

11:02:41   3   we would oftentimes have to meet for breakfast, or we would meet

11:02:43   4   at lunch, or sometimes it would be an early dinner, because we

11:02:47   5   worked very closely together in the construction of the homes.

11:02:50   6   Q.   I may not have asked this, but I just want to be clear.  How

11:02:54   7   often, to your knowledge, was he in his office?

11:02:55   8   A.   Was he in his office?  Never.  I mean, whenever I spoke to

11:03:01   9   him, he was calling me from -- he was either picking up

11:03:06   10  materials, ordering materials, or he was actually at the homes.

11:03:09   11  Q.   In total, Ms. Segura, how many homes have you been involved

11:03:15   12  with Mr. Huitron, either representing a seller buying one of his

11:03:19   13  homes or representing him selling his homes to customers?

11:03:22   14  A.   I would say about over the years, about 15.

11:03:26   15  Q.   Fifteen?

11:03:27   16  A.   Yes.  I think that's a very good estimate.

11:03:30   17  Q.   Okay.  Now, we've already heard a little bit about the steps

11:03:34   18  that would be involved in the real estate transaction process.

11:03:37   19  But just briefly describe what your involvement was with Jesse as

11:03:43   20  far as selling one of his homes.

11:03:45   21  A.   My role changed when I became his agent, as a female, I

11:03:52   22  thought there were certain changes that would help to better sell

11:03:55   23  his product.  And Jesse allowed me to -- he gave me the

11:04:01   24  opportunity to help him kind of tweak the houses and do some

11:04:05   25  things and changing some of the floor plans.  So I was involved

11:04:08  1  from the very beginning to the very end.  I selected paint

11:04:13  2  colors, granite, stains of cabinets, the type of wood we were

11:04:18  3  going to use, tile, the direction the tile was going to be laid,

11:04:22  4  carpet, everything.  So that's why we met on a daily basis.

11:04:28  5  Q.  Was he the type of person who would micromanage everything

11:04:32  6  at one of these job sites?

11:04:33  7  A.  He micromanaged only in the sense -- no.  I wouldn't say.  I

11:04:39  8  take that back.  I don't think he was a micromanager.  He was

11:04:42  9  always there, but he wasn't telling his contractors.  He had -- I

11:04:47  10  would see the same faces every time the houses were being framed

11:04:50  11  or there was sheetrock or whatever stuff we were in.  He was

11:04:53  12  always there.  He was there working alongside them and overseeing

11:04:58  13  things.  But he allowed those people that worked for him in his

11:05:03  14  home construction.  We all did what we did best, and so, he let

11:05:07  15  us run with that.

11:05:08  16  Q.  In other words, just as he sort of placed his trust in you

11:05:10  17  to help with the design process, he put his trust in a lot of his

11:05:13  18  other employees?

11:05:14  19  A.  Yes.  If a plumber was going to show up, an electrician, he

11:05:18  20  was there to make sure that everyone was there on time and

11:05:20  21  everything was going according to schedule.  But he was not

11:05:23  22  telling them, you know, you have to hang a door a certain way or

11:05:27  23  I want something done.  He had very all, like, skilled workers.

11:05:33  24  Q.  I want to just kind of step aside for a second and just ask

11:05:35  25  this.  As far as your ability to communicate with him, do you

| | | |
|---|---|---|
| 11:05:39 | 1 | speak Spanish? |
| 11:05:40 | 2 | A.    Yes.  I am bilingual. |
| 11:05:41 | 3 | Q.    And would you communicate with him in Spanish or in English? |
| 11:05:44 | 4 | A.    I would communicate with him in Spanish.  I felt that was |
| 11:05:48 | 5 | his -- I know that that's his dominant language.  And having the |
| 11:05:52 | 6 | background as a bilingual educator, I just would make sure we |
| 11:05:57 | 7 | never missed anything in getting the houses built. |
| 11:05:59 | 8 | Q.    As far as his ability to speak and communicate in English, |
| 11:06:02 | 9 | what can you tell the jury about that? |
| 11:06:04 | 10 | A.    About Jesse? |
| 11:06:05 | 11 | Q.    His ability to speak and communicate in the English |
| 11:06:08 | 12 | language? |
| 11:06:09 | 13 | A.    Jesse's able to communicate in English, but what we did was |
| 11:06:13 | 14 | as far as towards the end -- during construction, you have |
| 11:06:19 | 15 | walk-throughs and if the home is already under contract with |
| 11:06:21 | 16 | buyers, any builder does that.  And I would always be present |
| 11:06:25 | 17 | during the walk-throughs to make sure there was no |
| 11:06:27 | 18 | miscommunication to make sure the buyer's getting what they |
| 11:06:30 | 19 | wanted, and what their expectations were, and that we were |
| 11:06:32 | 20 | delivering the finished product according to what we were all in |
| 11:06:36 | 21 | agreement to at the beginning. |
| 11:06:37 | 22 | And when we would do a final walk-through and/or after |
| 11:06:41 | 23 | inspection, I would get the inspection report.  I would meet |
| 11:06:46 | 24 | Jesse at the house.  I would go over everything with him in |
| 11:06:49 | 25 | Spanish because I want to make sure that there was not an issue |

| | | |
|---|---|---|
| 11:06:52 | 1 | because he did warranty his homes. |
| 11:06:55 | 2 | Q.   That leads to a good question.  When you would go over |
| 11:06:57 | 3 | something like an inspection report with him, was he the type of |
| 11:07:00 | 4 | person that would go through it with a fine-toothed comb, or did |
| 11:07:03 | 5 | he rely upon you to kind of explain it to him to make sure |
| 11:07:07 | 6 | everything -- |
| 11:07:08 | 7 | A.   No.  Actually, that's why he asked the inspection report to |
| 11:07:11 | 8 | come to me.  All of his homes were inspected before we would |
| 11:07:16 | 9 | close on them so that if there was any outstanding issues, he |
| 11:07:19 | 10 | would take care of it.  So he did not get the inspection report. |
| 11:07:23 | 11 | I got it, I would go over it with him.  I would make notes on it. |
| 11:07:27 | 12 | A lot of my notes would be in Spanish.  That way when he got with |
| 11:07:30 | 13 | the contractors, he was very clear on what it was that we needed |
| 11:07:35 | 14 | to have done to the house. |
| 11:07:39 | 15 | Q.   In terms of his spending in these homes, did you ever -- was |
| 11:07:45 | 16 | he making -- would he make extravagant purchases or unnecessary |
| 11:07:50 | 17 | expenses?  Expenses that you questioned when he was building |
| 11:07:54 | 18 | these homes? |
| 11:07:55 | 19 | A.   No.  I actually learned a lot by working for Jesse Huitron |
| 11:07:58 | 20 | because he ran a very, very lean, very well-thought-out |
| 11:08:05 | 21 | home-building business. |
| 11:08:05 | 22 | Q.   Okay.  Now, let's move on and let's talk about the actual |
| 11:08:11 | 23 | sale when an offer was made.  Fair to say that you're heavily |
| 11:08:16 | 24 | involved in guiding him through that process? |
| 11:08:18 | 25 | A.   Correct. |

11:08:19   1   Q.   In dealing with him, did he seem like -- he'd been doing

11:08:21   2   this for a while.  Did it seem that he understood and was

11:08:23   3   familiar with every single intricate detail of the real estate

11:08:27   4   transaction?

11:08:29   5   A.   I wouldn't say that he understood every single detail with

11:08:32   6   the real estate transaction because he relies so heavily on the

11:08:36   7   agents that he was in the relationship with to represent him in

11:08:41   8   the sale.

11:08:42   9   Q.   Would he sit and would he read through his contracts and

11:08:46   10  look over them with any degree of caution or anything like that?

11:08:50   11  A.   No.  That was my job that I took on in working with him as

11:08:55   12  his realtor.  I would go over all the points and give an

11:09:00   13  estimated net sheet, and he never would get the contract to read

11:09:05   14  it.  He would ask me, like, if we get an offer and I would call

11:09:10   15  him and tell him we got an offer, he would call me on the phone,

11:09:12   16  well, what's the meaning to the offer?  And I would give him just

11:09:17   17  the high points and then, go over the details with him in person.

11:09:21   18  Q.   And when you get to that closing, it's basically sign here,

11:09:25   19  sign here, sign here, and he would just do that because he

11:09:27   20  trusted you; is that right?

11:09:28   21  A.   Yes.  And he also has a very -- a longstanding relationship

11:09:32   22  with Gracy Title, and has closed every transaction that I ever

11:09:37   23  worked for him with with a very highly respected escrow officer

11:09:42   24  by the name of Enriqueta Reyes with Gracy Title out of Buda, and

11:09:47   25  she was also bilingual.  So his closings were in Spanish if we

| | | |
|---|---|---|
| 11:09:52 | 1 | were closing along without the buyer present. |
| 11:09:55 | 2 | Q.   And the documents would be in English -- |
| 11:09:56 | 3 | A.   Of course. |
| 11:09:57 | 4 | Q.   -- so you would have to explain to him -- |
| 11:09:59 | 5 | A.   Everything has to be done in English. |
| 11:10:02 | 6 | Q.   All right.  Let's talk a little bit about his horses.  You |
| 11:10:06 | 7 | know that he has some interest in horses; is that right? |
| 11:10:08 | 8 | A.   Yes. |
| 11:10:08 | 9 | Q.   Tell the jury what your understanding is of -- or what do |
| 11:10:11 | 10 | you know about Jesse and his horses? |
| 11:10:13 | 11 | A.   Actually, very little.  He didn't -- we never really talked |
| 11:10:17 | 12 | about horses.  He was so into his home-building business that I |
| 11:10:23 | 13 | knew that they had horses, but I had no idea.  I knew very little |
| 11:10:30 | 14 | about it.  We just -- we didn't have that in common. |
| 11:10:34 | 15 | Q.   That's okay.  But you did actually help him or assisted him |
| 11:10:39 | 16 | in the purchase of some land to expand the ranch that they have |
| 11:10:43 | 17 | out there in Dale; is that right? |
| 11:10:44 | 18 | A.   Yes.  There was -- it was a neighbor.  It was an adjacent |
| 11:10:48 | 19 | property.  It was across the street, primarily in a flood plane. |
| 11:10:51 | 20 | And this property had been on the market for quite some time, off |
| 11:10:55 | 21 | and on.  And yes, I was his buyer's agent on that. |
| 11:10:58 | 22 | Q.   Is this some multi-million-dollar ritzy listing of property |
| 11:11:02 | 23 | here? |
| 11:11:02 | 24 | A.   No.  If I remember correctly, I think it was like $52,000 |
| 11:11:06 | 25 | that the family just couldn't unload it.  It was land that would |

11:11:11   1   be of little use to somebody unless they had property across the

11:11:16   2   street.  And that that's very common in what I call in Spanish

11:11:20   3   are like ranchitos.  They're like small little ranches families

11:11:25   4   gather at on weekends.

11:11:26   5   Q.   And going out and being a part of this transaction, buying

11:11:29   6   the neighboring lot, you got to see the ranchito that they

11:11:33   7   already had?

11:11:34   8   A.   Yes.  I did.

11:11:35   9   Q.   And you know the jury's already seen photos of it, so we're

11:11:38  10   not going to show photos.  But just what is your impression of

11:11:42  11   that property out there?

11:11:44  12   A.   It's -- I've never been to a property where people have

11:11:50  13   horses.  I've sold many ranches, but the ranches that I've sold

11:11:56  14   have been like 500 acres, 200 acres.  They've been much nicer

11:12:02  15   properties.  This would -- this is kind of what I would describe

11:12:06  16   as a very rough -- a rough property.  I had never -- I'd never

11:12:12  17   been involved in a transaction with that type of construction on

11:12:16  18   it and the facilities, the sheds, and all that that are on it had

11:12:21  19   been more like finished and everything's manicured, trimmed,

11:12:25  20   large house, guest house.

11:12:27  21   Q.   Just the basics?

11:12:28  22   A.   Right.

11:12:29  23   Q.   When you were out there, did you see any evidence of any

11:12:34  24   extravagant purchases, any expensive shiny equipment, fancy

11:12:39  25   vehicles, now construction?  Did you see anything like that out

11:12:41  1   there?

11:12:41  2   A.   No.   There's old -- there's an old mobile home on it.   Maybe

11:12:45  3   two.   Maybe I saw two.   I remember seeing one when we first came

11:12:50  4   up on it.   There was a two-story house.   It looks like it had

11:12:56  5   HardiePlank siding.   It was nothing fancy.   Then there was the

11:13:02  6   stables for the horses that were just, you know, good siding and

11:13:06  7   typical pitched roof.

11:13:09  8   Q.   And, again, they've already seen the picture.   I just want

11:13:11  9   to make sure, but there's nothing that's not shown in the

11:13:15  10  pictures.   You didn't see anything else out there?

11:13:16  11  A.   No.   I did not.

11:13:17  12  Q.   Okay.   Fair much.

11:13:18  13       Ms. Segura, based on your knowledge and dealings with

11:13:23  14  Jesus Huitron, do you have an opinion as to whether or not his

11:13:27  15  primary focus was home building or horse racing?   Do you have an

11:13:30  16  opinion about that?

11:13:31  17  A.   He lived, breathed home building.   That's the Jesse that I

11:13:40  18  know that I worked with.

11:13:41  19  Q.   Thank you very much, Ms. Segura.

11:13:43  20  A.   Sure.

11:13:43  21  Q.   I have no further questions, your Honor.   Pass the witness.

11:13:45  22       THE COURT:   Mr. Esper.

11:13:47  23       MR. ESPER:   I have none, your Honor.

11:13:48  24       THE COURT:   Ms. William.

11:13:50  25       MR. FINN:   No, your Honor.   No questions.

| | | |
|---|---|---|
| 11:13:51 | 1 | MS. FERNALD:  None from the government, your Honor. |
| 11:13:52 | 2 | THE COURT:  May the witness be excused? |
| 11:13:54 | 3 | MR. MAYR:  Yes, sir. |
| 11:13:56 | 4 | THE COURT:  Thank you, ma'am. |
| 11:13:57 | 5 | THE WITNESS:  Thank you. |
| 11:14:01 | 6 | MR. MAYR:  May we approach, your Honor? |
| 11:14:03 | 7 | THE COURT:  Yes. |
| 11:14:08 | 8 | (At the bench, on the record.) |
| 11:14:16 | 9 | MR. MAYR:  Your Honor, based on the discussions that we |
| 11:14:24 | 10 | had earlier, I've been trying to get Ms. Huitron and her attorney |
| 11:14:27 | 11 | down here so that we can establish -- it is what it is -- that we |
| 11:14:31 | 12 | talked about earlier.  She's not down here.  That's Natalie. |
| 11:14:38 | 13 | That's his daughter Natalie.  Yeah.  Who I'm not calling to |
| 11:14:44 | 14 | testify. |
| 11:14:46 | 15 | I don't know if we can just have an agreement to a |
| 11:14:51 | 16 | limine instruction that you won't comment on the fact that I have |
| 11:14:54 | 17 | not called her to testify.  Or if I need to actually bring her |
| 11:14:58 | 18 | down here and have her go through all of this -- |
| 11:15:01 | 19 | THE COURT:  Let the record reflect that the lawyer is |
| 11:15:03 | 20 | not talking to a judge and asking the judge for an agreement. |
| 11:15:10 | 21 | And you've just brought everybody up here so that you could try |
| 11:15:14 | 22 | to get an agreement with the government, you're wasting |
| 11:15:16 | 23 | everybody's time.  If you have a witness, call them.  If not, |
| 11:15:19 | 24 | move on. |
| 11:15:20 | 25 | MR. MAYR:  Okay. |

| | | |
|---|---|---|
| 11:15:20 | 1 | THE COURT:  All right. |
| 11:15:21 | 2 | MR. MAYR:  Thank you, Judge. |
| 11:15:37 | 3 | Your Honor, I have no further questions and the |
| 11:15:39 | 4 | Defendant Jesus Huitron would rest. |
| 11:15:43 | 5 | MR. GARDNER:  Your Honor, the government has no case in |
| 11:15:44 | 6 | rebuttal.  Rest and close. |
| 11:15:49 | 7 | THE COURT:  That means, ladies and gentlemen, that |
| 11:15:53 | 8 | you've heard all of the evidence that you're going to hear in the |
| 11:15:56 | 9 | trial.  You've got some exhibits, other boxes coming, as you |
| 11:16:07 | 10 | heard.  We will get all of that done for you.  I'm going to |
| 11:16:11 | 11 | release you until next Wednesday morning at 9:00.  Please be |
| 11:16:20 | 12 | careful and follow the instructions. |
| 11:16:24 | 13 | Let me give you a prelude.  The lawyers have asked for |
| 11:16:28 | 14 | a lot of time, and I've decided that I'm going to limit their |
| 11:16:35 | 15 | time, but it's still going to be a while.  Each party will have |
| 11:16:39 | 16 | up to 45 minutes.  So Wednesday, you'll be in a listening mode. |
| 11:16:45 | 17 | But the notes that you take have been important to you for |
| 11:16:55 | 18 | memory, but the lawyers will tell you in their closing arguments |
| 11:17:00 | 19 | specific things that they think are important.  So the notes can |
| 11:17:03 | 20 | also be very important during the closing arguments. |
| 11:17:08 | 21 | You are instructed to remember that the lawyers just |
| 11:17:12 | 22 | represent a point of view.  They are retained and employed to |
| 11:17:18 | 23 | express that point to you.  They're not required to be objective. |
| 11:17:22 | 24 | They're not required to be evenhanded.  They are advocates.  But |
| 11:17:30 | 25 | what they say in closing arguments can be influential to you.  So |

| | |
|---|---|
| 11:17:34 | 1 |
| 11:17:40 | 2 |
| 11:17:44 | 3 |
| 11:17:48 | 4 |
| 11:17:52 | 5 |
| 11:17:56 | 6 |
| 11:18:01 | 7 |
| 11:18:38 | 8 |
| 11:18:50 | 9 |
| 11:18:52 | 10 |
| 11:18:56 | 11 |
| 11:18:59 | 12 |
| 11:19:01 | 13 |
| 11:19:06 | 14 |
| 11:19:07 | 15 |
| 11:19:09 | 16 |
| 11:19:15 | 17 |
| 11:19:16 | 18 |
| 11:19:20 | 19 |
| 11:19:22 | 20 |
| 11:19:27 | 21 |
| 11:19:29 | 22 |
| 11:19:33 | 23 |
| 11:19:37 | 24 |
| 11:19:40 | 25 |

1  I want you to listen.  So come prepared to listen.  Follow the

2  same procedures that you have been following next Wednesday.

3       It's going to be difficult for several days not to talk

4  about the case, but I will be asking those questions.  It's very

5  important that you will decide this case based only what you've

6  heard in this courtroom, sitting here together.  So I've got

7  confidence you can follow that instruction.

8       (Jury not present.)

9       MR. ESPER:  Your Honor, for the record, since all

10  parties have closed, the Defendant Eusevio Huitron would renew

11  his Rule 29(a) motion for judgment of acquittal on the same

12  grounds previously raised.

13       THE COURT:  We'll start with Mr. Finn, first, but

14  that's all right.

15       MS. WILLIAMS:  Your Honor, now that all the evidence is

16  closed, Mr. Trevino renews his motion pursuant to Rule 29.

17       MR. DEGEURIN:  Your Honor, we do the same with Mr.

18  Colorado.  We renew the Rule 29 motion.

19       MR. WOMACK:  Your Honor, on behalf of Fernando Garcia,

20  we'd renew all our Rule 29 motion at this time.

21       MR. MAYR:  And finally, your Honor, on behalf of Mr.

22  Jesus Huitron, I would, once again, ask this court to consider

23  granting a Rule 29 motion for judgment of acquittal and that no

24  rational juror could find, beyond a reasonable doubt, all the

25  elements presented in this case.  Thank you, your Honor.

| | | |
|---|---|---|
| 11:19:43 | 1 | THE COURT:  It's the Court's intention to submit all |
| 11:19:47 | 2 | five defendants to the jury for determination. |
| 11:19:53 | 3 | I'm going to have my law clerk hand to you, in just a |
| 11:19:56 | 4 | few minutes, the proposed instructions and verdict form.  Please |
| 11:20:02 | 5 | review them during the noon hour and be back here at 2:00.  2:00 |
| 11:20:09 | 6 | this afternoon. |
| 11:20:10 | 7 | All right.  You're excused and we are in recess. |
| 11:20:21 | 8 | MR. MAYR:  Your Honor, just so we're clear, are our |
| 11:20:23 | 9 | clients excused at this time? |
| 11:20:24 | 10 | THE COURT:  I don't understand. |
| 11:20:25 | 11 | MR. MAYR:  Can our clients be back here at 2:00? |
| 11:20:28 | 12 | THE COURT:  Well, of course.  The clients have to be |
| 11:20:31 | 13 | here in the courtroom when we're having any procedures unless |
| 11:20:34 | 14 | they -- |
| 11:20:34 | 15 | MR. MAYR:  Oh, we're going over jury instructions at |
| 11:20:37 | 16 | 2:00.  I understand.  I apologize, Judge.  Thank you. |
| 11:20:38 | 17 | THE COURT:  That's all right. |
| 13:53:24 | 18 | (Recess.) |
| 14:01:44 | 19 | THE COURT:  All right.  The first item of interest, |
| 14:01:49 | 20 | Juror No. 13, says, Tyler Graham's wife Lexy Graham is an |
| 14:01:57 | 21 | accountant for the realtor board that I am part of.  Of course, |
| 14:02:08 | 22 | nobody inquired of Lexy Graham, so there wasn't any voir dire one |
| 14:02:12 | 23 | way or the other. |
| 14:02:12 | 24 | MR. MAYR:  Actually, your Honor, just so the record's |
| 14:02:14 | 25 | clear, Ms. Segura testified that she -- that Ms. Lexy Graham was |

14:02:21  1   the real estate broker for my client immediately prior to her.

14:02:24  2   But I don't have any objection with that.  I just want the

14:02:27  3   record --

14:02:27  4              THE COURT:  I'm just telling you.

14:02:29  5              MR. MAYR:  Okay.

14:02:29  6              THE COURT:  The good news is that that's an alternate

14:02:32  7   juror right now.

14:02:34  8              MR. FINN:  Good.

14:02:35  9              THE COURT:  Juror 13.  And I won't ask you for any

14:02:38  10  guidance unless Juror 13 is going to be seated, and then, I'll

14:02:45  11  give you an opportunity to tell me what you want to do.

14:02:49  12             All right.  I have two verdicts.  I don't understand

14:02:59  13  how he does it, but he said that he e-mailed y'all a second

14:03:02  14  verdict that really tracks more specifically the theories of the

14:03:09  15  money laundering.  It's the government's case, so the government

14:03:13  16  suggested that.  I didn't put that in my originals.  I instructed

14:03:17  17  on it, but I didn't put it on.  So that's where we are.

14:03:23  18  Everybody's had plenty of time to review the proposed

14:03:25  19  instructions.

14:03:27  20             So, Ms. Fernald, now you have the lectern.

14:03:30  21             MS. FERNALD:  Yes, sir.

14:03:32  22             Your Honor, direct your attention to page 16 of the

14:03:37  23  proposed instructions.  The first full paragraph.  Your Honor,

14:03:54  24  we're just asking for some clarification on that first sentence,

14:03:58  25  It says, I have previously instructed you the indictment in this

14:04:01  1  case charges two means by which the defendants conspired to

14:04:04  2  violate this law.  It goes on to separate the two substantive

14:04:10  3  ways that the government could prove money laundering.  We're

14:04:14  4  requesting that instead of it saying this law, that the words,

14:04:20  5  Title 18 United States Code 1956 --

14:04:25  6              THE COURT:  Where are we?

14:04:27  7              MS. FERNALD:  The first sentence.

14:04:29  8              THE COURT:  The first full sentence or the first --

14:04:32  9              MS. FERNALD:  First paragraph, first full sentence.

14:04:34  10             THE COURT:  Okay.  The term "transaction"?

14:04:36  11             MS. FERNALD:  This law.

14:04:41  12             THE COURT:  On page 16?

14:04:44  13             MR. ESPER:  First full paragraph.

14:04:45  14             MS. FERNALD:  First full paragraph.

14:04:49  15             MR. ESPER:  First sentence.

14:04:54  16             MS. FERNALD:  We've got different copies?  My

14:04:57  17  apologies.

14:05:05  18             THE COURT:  Okay.  For some reason, I have -- the

14:05:12  19  computers do not like me.

14:05:15  20             MS. FERNALD:  I don't either.

14:05:17  21             THE COURT:  But they've given me one that does not

14:05:19  22  correspond -- okay.  As I previously instructed you, the

14:05:21  23  indictment in this case charges two means by which defendants

14:05:27  24  conspired to violate the law.  Okay.

14:05:30  25             MS. FERNALD:  And the government just for clarification

| | | |
|---|---|---|
| 14:05:32 | 1 | is requesting that instead of it saying this law, that it says, |
| 14:05:36 | 2 | Title 18, United States Code, Section 1956(a)(1)(B). |
| 14:05:48 | 3 | THE COURT:  Okay. |
| 14:05:50 | 4 | MS. FERNALD:  The reason why is if you turn -- |
| 14:05:52 | 5 | THE COURT:  Give me again.  Title 18. |
| 14:05:55 | 6 | MS. FERNALD:  United States Code. |
| 14:05:57 | 7 | THE COURT:  Yeah. |
| 14:05:58 | 8 | MS. FERNALD:  1956(a)(i)(B). |
| 14:06:07 | 9 | MS. FREEL:  One. |
| 14:06:10 | 10 | MS. FERNALD:  Oh, it is 1.  (a)(1)(B).  Excuse me, your |
| 14:06:15 | 11 | Honor. |
| 14:06:17 | 12 | THE COURT:  I've always felt that the jurors pass over |
| 14:06:25 | 13 | the statutes. |
| 14:06:26 | 14 | MS. FERNALD:  I know it. |
| 14:06:26 | 15 | THE COURT:  But it's your charge.  All right.  I don't |
| 14:06:30 | 16 | see any harm in switching that. |
| 14:06:33 | 17 | MS. FERNALD:  If you go down to the next paragraph, it |
| 14:06:36 | 18 | says, the elements of this.  If we could have first substantive |
| 14:06:40 | 19 | offense.  Because on page 19, it will go to the second theory of |
| 14:06:45 | 20 | the government's case and just so that we can distinguish those |
| 14:06:48 | 21 | two out. |
| 14:06:51 | 22 | THE COURT:  So you want the elements of the. |
| 14:06:56 | 23 | MS. FERNALD:  The first substantive offense. |
| 14:07:02 | 24 | THE COURT:  Okay. |
| 14:07:03 | 25 | MS. FERNALD:  On the second element has alleged |

| 14:07:06 | 1 | extortion -- I'm sorry, delivery of a controlled substance, |

14:07:06   1   extortion -- I'm sorry, delivery of a controlled substance,

14:07:10   2   extortion, and it says, and bribery.  The government requests or

14:07:15   3   bribery.

14:07:15   4          THE COURT:  The government requests what?

14:07:17   5          MS. FERNALD:  "Or."  It's not "and."  It's not

14:07:20   6   conjunctively.  It's disjunctively.

14:07:25   7          THE COURT:  All right.  Okay.

14:07:32   8          MS. FERNALD:  So on page 19, something very similar is

14:07:36   9   what we're requesting.  The first full sentence on page 19, this

14:07:42  10   crime is also known as money laundering -- I'm sorry.  The first

14:07:44  11   full paragraph, instead of it saying, this law, replacing that

14:07:48  12   with Title 18, United States Code, Section 1956(a)(2)(B).

14:08:05  13          THE COURT:  Okay.

14:08:06  14          MS. FERNALD:  On the elements of this substantive

14:08:08  15   offense, if we could have instead of this, of this second

14:08:14  16   substantive offense.

14:08:19  17          THE COURT:  All right.

14:08:20  18          MS. FERNALD:  And then, finally, the second element on

14:08:22  19   that page, instead of the "and," the "or," prior to bribery.

14:08:34  20          THE COURT:  Okay.

14:08:35  21          MS. FERNALD:  The only other request that the

14:08:36  22   government is making as it did in its proposed jury instructions

14:08:41  23   is the commingling instruction on the SUA.  Your Honor, we did

14:08:47  24   that on page 15 and we're requesting that with respect --

14:09:01  25          THE COURT:  Karson, let me see that question.  She's

| | | |
|---|---|---|
| 14:09:22 | 1 | going to hand it to you. |
| 14:09:23 | 2 | LAW CLERK:  Thank you. |
| 14:09:24 | 3 | MS. FERNALD:  This is what we had requested. |
| 14:10:32 | 4 | THE COURT:  Where did you take this instruction from? |
| 14:10:34 | 5 | MS. FERNALD:  This instruction has been taken from the |
| 14:10:37 | 6 | cases that are cited at the bottom. |
| 14:10:41 | 7 | THE COURT:  Combination. |
| 14:10:42 | 8 | MS. FERNALD:  Yes, your Honor. |
| 14:10:43 | 9 | THE COURT:  I have no trouble with the first three |
| 14:10:46 | 10 | paragraphs -- I mean, first three -- |
| 14:10:48 | 11 | MS. FERNALD:  First three sentences? |
| 14:10:52 | 12 | THE COURT:  Are y'all looking at anything?  The request |
| 14:10:54 | 13 | is with respect to the fourth element, the commingling of illegal |
| 14:10:59 | 14 | proceeds with legitimate business funds is evidence of an intent |
| 14:11:03 | 15 | to conceal or disguise; therefore, it would not be a defense that |
| 14:11:07 | 16 | legitimate funds were also involved in the transaction.  I don't |
| 14:11:13 | 17 | have any trouble with that.  In addition, the government would |
| 14:11:15 | 18 | not have to prove that a particular transaction was itself highly |
| 14:11:20 | 19 | unusual.  A transaction would not have -- would not have to be |
| 14:11:26 | 20 | examined wholly in isolation if the evidence tended to show it |
| 14:11:30 | 21 | was part of a larger scheme designed to conceal illegal proceeds. |
| 14:11:37 | 22 | MR. FINN:  Judge, I'm going to object to that on behalf |
| 14:11:40 | 23 | of my client.  I don't think that's appropriate. |
| 14:11:45 | 24 | THE COURT:  Okay.  Counsel, I will give you plenty of |
| 14:11:48 | 25 | time to object. |

14:12:12  1          All right.  What else?  Is that it.

14:12:13  2          MS. FERNALD:  That's it.

14:12:14  3          THE COURT:  All right.  Mr. Finn, or, Ms. Williams,

14:12:19  4  you're next.

14:12:19  5          MR. FINN:  Thank you, your Honor.  May it please the

14:12:21  6  Court.

14:12:21  7          Judge, as I just indicated, Ms. Williams and I object

14:12:24  8  to that fourth prong of the instruction.  We think it's a --

14:12:29  9  could potentially be a comment on the weight of the evidence.  We

14:12:32 10  don't think it fairly --

14:12:33 11          THE COURT:  Actually, I can comment on the weight of

14:12:35 12  the evidence.  I mean, you're in federal court.  I can comment on

14:12:38 13  anything I want to.  All I have to do is tell the jury that it's

14:12:41 14  my comment.  They've got to make an independent decision.  I

14:12:44 15  don't intend to comment on the weight of the evidence, but better

14:12:48 16  get a better objection than that.

14:12:50 17          MR. FINN:  I don't think it accurately states the law,

14:12:52 18  your Honor, and I'm going to object on those grounds.

14:12:54 19          THE COURT:  Okay.

14:12:55 20          MR. FINN:  To the entire commingling instruction.

14:12:58 21          THE COURT:  Oh, no, I'm going to give commingling.

14:13:00 22  I'll give a commingling instruction, and you can object to it.

14:13:03 23          MR. FINN:  Okay.  I am objecting to it.  Number two --

14:13:06 24          THE COURT:  Don't even know what it is yet.

14:13:07 25          MR. FINN:  Well, I got a pretty good idea.  I've read

| | | |
|---|---|---|
| 14:13:10 | 1 | it.  Secondly, and, more importantly, Judge, this deliberate |
| 14:13:13 | 2 | ignorance, willful blindness instruction, we are vigorously |
| 14:13:18 | 3 | opposed to that.  We've had a pretty clean slate so far in this |
| 14:13:20 | 4 | trial.  I think if this jury gets that instruction, it's going to |
| 14:13:24 | 5 | create some problems potentially down the road.  There's no -- |
| 14:13:28 | 6 | for two reasons, Judge. |
| 14:13:29 | 7 | One, there's no evidence that my client did what your |
| 14:13:33 | 8 | three monkeys in your office, hear no evil, see no evil -- |
| 14:13:38 | 9 | there's no evidence that Jose willfully blinded himself, number |
| 14:13:41 | 10 | one.  Number two, it relieves the government in a conspiracy case |
| 14:13:47 | 11 | -- I understand if it's a substantive count.  In a conspiracy, it |
| 14:13:51 | 12 | relieves the government of having to prove beyond a reasonable |
| 14:13:55 | 13 | doubt that my client intentionally, knowingly, willfully joined a |
| 14:13:59 | 14 | conspiracy.  So for that -- those two reasons, one, it's not |
| 14:14:03 | 15 | supported by the evidence and, two, it's completely inappropriate |
| 14:14:08 | 16 | in a conspiracy case.  I'm going to object. |
| 14:14:11 | 17 | Over the break, I went to my hotel and tried to get on |
| 14:14:14 | 18 | West Law because I believe that Justice Patrick Higginbotham at |
| 14:14:19 | 19 | the Fifth Circuit, about five years ago, addressed this issue.  I |
| 14:14:23 | 20 | was not able to pull up the case.  But I think I'm on solid |
| 14:14:28 | 21 | ground in making that objection.  Thank you. |
| 14:14:30 | 22 | THE COURT:  All right.  Is that the only objection that |
| 14:14:32 | 23 | you make? |
| 14:14:33 | 24 | MR. FINN:  To the willful blinding? |
| 14:14:35 | 25 | THE COURT:  No.  I've got that down.  I just want to |

14:14:38  1    find out to the proposed charge.

14:14:42  2          MR. FINN:  I'm objecting to any comments, any

14:14:46  3    instructions regarding commingling of funds.  That's number one.

14:14:49  4    Number two is I am objecting to the willful blinding, deliberate

14:14:55  5    ignorance instruction.  That's all I've got by way of objection,

14:15:00  6    your Honor.

14:15:00  7          THE COURT:  Okay.  That's what I -- Mr. Sanchez, Mr.

14:15:09  8    DeGeurin.

14:15:11  9          MR. DEGEURIN:  Mr. Parras is going to.

14:15:13  10          MR. PARRAS:  Good afternoon, Judge.

14:15:17  11          THE COURT:  I wondered what you were up there for.

14:15:17  12          MR. FINN:  He got the short straw, your Honor.

14:15:19  13          MR. PARRAS:  I got the stapler and the laser pointer

14:15:22  14    and things like that.

14:15:23  15          Judge, we adopt the objections that Mr. Finn has made.

14:15:25  16    I'm not going to reargue points he already has argued.  I do want

14:15:30  17    the opportunity, however, to present law on the commingling

14:15:34  18    issue.  And if you could at least before giving us what your

14:15:37  19    instruction is going to be, give us a chance to do that.

14:15:41  20    Twenty-four hours would probably be great.

14:15:45  21          THE COURT:  I'm going to give it to you now.

14:15:48  22          MR. PARRAS:  Okay.

14:15:48  23          THE COURT:  Give me your best shot now.

14:15:51  24          MR. PARRAS:  Well, I have the same objections that Mr.

14:15:54  25    Finn made.  I do think, you know, the Court's original

| | |
|---|---|
| 14:15:58 | 1 |
| 14:16:05 | 2 |
| 14:16:08 | 3 |
| 14:16:11 | 4 |
| 14:16:12 | 5 |
| 14:16:14 | 6 |
| 14:16:19 | 7 |
| 14:16:24 | 8 |
| 14:16:27 | 9 |
| 14:16:32 | 10 |
| 14:16:39 | 11 |
| 14:16:46 | 12 |
| 14:16:53 | 13 |
| 14:16:55 | 14 |
| 14:16:59 | 15 |
| 14:17:02 | 16 |
| 14:17:06 | 17 |
| 14:17:12 | 18 |
| 14:17:16 | 19 |
| 14:17:20 | 20 |
| 14:17:35 | 21 |
| 14:17:38 | 22 |
| 14:17:39 | 23 |
| 14:17:42 | 24 |
| 14:17:46 | 25 |

1  instruction, it didn't contain a commingling definition as best.

2  I know you can comment on the weight of the evidence.  Throughout

3  this trial, you've been -- you've not done so and I think to do

4  so at this point --

5       THE COURT:  I'm not about to comment on the weight of

6  the evidence, one way or the other.  I can phrase an instruction

7  without commenting.  But go ahead and tell me why you don't think

8  commingling is in this case.

9       MR. PARRAS:  With respect to Mr. Cessa, there has been

10  no evidence, Judge, that there has been any inflow of illegal

11  proceeds into any of his accounts.  No direct evidence.  There

12  have been -- there was some testimony from that they believe that

13  that's what happened.  They were told that that's what happened,

14  but there's been no evidence whatsoever of any commingling on Mr.

15  Cessa's -- Mr. Colorado's part at all.  And I don't think that

16  that has been an issue with respect to any of the other

17  defendants, as well, the idea that there was commingling and that

18  there was an effort to commingle for the purpose of concealing.

19       THE COURT:  Okay.

20       MR. PARRAS:  Getting to other points.  On page 8, the

21  Court's instruction regarding expert testimony.

22       THE COURT:  Yes, sir.

23       MR. PARRAS:  It's always been a preference of mine,

24  Judge, to use opinion testimony, instead of expert testimony.  I

25  think that using the word "expert" gives more weight than is

14:17:50  1  necessary to the testimony and to the person -- to the witness.

14:17:55  2  And so, if in the title, we could switch that to opinion

14:18:00  3  testimony.  And also at relevant places in the paragraph, for

14:18:10  4  example, at the second sentence, we would propose that it read,

14:18:18  5  you also heard opinion testimony of others, comma, including Joe

14:18:22  6  Garza, and going forward.  And I think those are the only changes

14:18:33  7  that would need to be made to that paragraph.

14:18:36  8          THE COURT:  All right.

14:18:48  9          MR. PARRAS:  Page 12, the Court defines the mental

14:18:58  10  state knowingly.  We'd request that the mental state of willfully

14:19:03  11  also be included.  I'm aware of what the Fifth Circuit Pattern

14:19:07  12  Instructions say regarding the use of willfully.  However, the

14:19:11  13  grand jury in this case did find that the -- in the indictment

14:19:16  14  the mental state willfully.  So we would ask that it be included.

14:19:22  15          THE COURT:  You've asked.  Go ahead, sir.

14:19:35  16          MR. PARRAS:  In that same regard, Judge, on page 14,

14:19:40  17  the last paragraph, second sentence, if a defendant understands

14:19:51  18  the unlawful nature of a plan or scheme and willfully, comma,

14:19:56  19  knowingly, and go on, we'd request that the word "willfully" be

14:20:01  20  inserted there before "knowingly."

14:20:10  21          THE COURT:  I can certainly see a factual scenario

14:20:14  22  where willfully could be injected into that instruction.  But I

14:20:20  23  know of no evidence that would require it in this particular case

14:20:30  24  other than the indictment, but the indictment doesn't control on

14:20:34  25  the appropriate instruction.  I'm always a little reluctant, even

14:20:39  1  in a conspiracy instruction, to change the approved one.  But

14:20:45  2  I'll think about it.

14:20:46  3           MR. PARRAS:  Okay.  And just to -- it would be the

14:20:51  4  right to a grand jury indictment, that that's the reason why we

14:20:55  5  would be requesting the willfully within that particular portion.

14:21:18  6           One more point, Judge, and I need to find it, forgive

14:21:22  7  me.  It's going to be on page 19, where the Court --

14:21:36  8           THE COURT:  You're going to object because it's too

14:21:38  9  long?

14:21:39  10          MR. PARRAS:  No.  I'm going to make it longer.  It's

14:21:41  11  too short.

14:21:42  12          THE COURT:  Oh, you're going to try to make it longer.

14:21:45  13          MR. PARRAS:  We believe that there should be another

14:21:49  14  element added, and we think it should be added as the second

14:21:52  15  element, and it would relate specifically to the specific

14:22:00  16  unlawful activity that's been alleged in the indictment.  And the

14:22:03  17  second element would read, Judge, that the monetary instrument or

14:22:09  18  funds transported, comma, transmitted, or transferred from the

14:22:15  19  United States to Mexico or from Mexico to the United States

14:22:20  20  involved the proceeds of specified unlawful activity, namely,

14:22:25  21  conspiracy to distribute controlled substance, extortion, or

14:22:30  22  bribery in sporting contests.  And then, the next two elements

14:22:36  23  would be renumbered.

14:22:49  24          THE COURT:  Okay.  Let's start that over again.

14:22:52  25          MR. PARRAS:  Okay.

14:22:53   1          THE COURT:  Read it entirely the way you want No. 2 to

14:22:58   2   be because I'm having trouble seeing any distinction.  You're

14:23:02   3   just talking about sale and distribution of controlled substance

14:23:06   4   and.

14:23:16   5          MR. PARRAS:  If we go to -- okay.  Maybe I'm trying to

14:23:25   6   figure out -- the point, Judge, is that we are working to have

14:23:30   7   the specified unlawful activity applied to what is being

14:23:37   8   transported, transmitted or transferred in element No. 1, and I

14:23:45   9   see your point, and I'm trying to think through it here.

14:24:00  10          So element one goes to the defendant's mental state.

14:24:05  11   And then, element two as we're proposing would be that the

14:24:09  12   monetary instrument or the funds are themselves proceeds of

14:24:14  13   specified unlawful activity.  That's why we're proposing.  If you

14:24:17  14   look at the first -- page 16, which gives us the first manner in

14:24:24  15   which substantive offense is committed, there's a -- the second

14:24:33  16   element of that particular offense on page 16 is what we're

14:24:36  17   looking to import into the definition on page 19.

14:25:10  18          THE COURT:  What's the comment on the government on

14:25:13  19   that?

14:25:13  20          MS. FERNALD:  Well, obviously there's not a Fifth

14:25:15  21   Circuit on that -- pattern jury instruction on this.  I don't

14:25:20  22   have any objection -- I don't think it's required, but I also

14:25:24  23   don't have any objection.  I think that we have sufficient

14:25:26  24   evidence to prove all of this on the specified unlawful activity.

14:25:31  25   And so --

| 14:25:50 | 1 | THE COURT:  So we just have the same -- all right. |

14:25:50    1        THE COURT:  So we just have the same -- all right.

14:26:20    2    Well, I'll look at that.  But I want to look at it in writing.

14:26:25    3        MS. FERNALD:  Again, I would also refer the Court to

14:26:27    4    the statute itself because it will say --

14:26:29    5        THE COURT:  The statute says that.

14:26:31    6        MS. FERNALD:  It does.  And so --

14:26:32    7        THE COURT:  But I still want to look at it in writing.

14:26:35    8        MR. PARRAS:  Do you mind if I handwrite it out, sir?

14:26:38    9        THE COURT:  No, sir.  As long as I can read it.

14:26:40   10        MR. PARRAS:  I will do so.

14:26:41   11        THE COURT:  In fact, if you had a poor hand, you might

14:26:44   12    print.  I learned that in elementary school.

14:26:47   13        Okay.  Anything further?

14:26:48   14        MR. PARRAS:  Nothing further.

14:26:51   15        THE COURT:  All right.  Mr. Womack.

14:26:53   16        MR. WOMACK:  Your Honor, on behalf of Fernando Garcia,

14:26:55   17    we would also adopt the objections of counsel for --

14:27:00   18        THE COURT:  Okay.  We're not objecting at this time.

14:27:04   19    You're just making suggestions.  I'm going to go back.

14:27:07   20        MR. WOMACK:  Yes, sir.

14:27:08   21        THE COURT:  I'm going to get you a clean sheet and

14:27:10   22    then, you're going to do your objection.

14:27:11   23        MR. WOMACK:  I gotcha.  Sir, I have two of them.  First

14:27:13   24    one is we ask that you add charge -- this is from the Fifth

14:27:18   25    Circuit Pattern Jury Instructions 2.99 on page 243, and that is

14:27:24  1    the instruction on the elements of structuring under Title 31,

14:27:29  2    U.S. Code, Section 5324.  There's been a lot of talk in this case

14:27:33  3    about structuring, over and over again.  And during the

14:27:37  4    cross-examination of Special Agent Billy Williams, I had

14:27:41  5    attempted to elicit from him the elements of structuring.  There

14:27:44  6    was an objection from the government.  We had a bench conference

14:27:47  7    and your Honor said, well, I'll give the jury instructions on

14:27:51  8    that.  The instruction is on page 243 of the Pattern Jury

14:27:54  9    Instructions.  We ask for that.

14:27:56  10            Second thing, sir, is on page 6 of your suggested

14:28:00  11   instructions, the proposed instructions where it says, similar

14:28:04  12   acts.  We'd ask that you add after you discuss --

14:28:09  13            THE COURT:  I thought about that.  I started to, but

14:28:12  14   then, the fact that your client doesn't show up until the 10th.

14:28:18  15            MR. WOMACK:  Yes, sir.

14:28:18  16            THE COURT:  The allegation is that the conspiracy

14:28:21  17   itself was going on since the 8th and I'm not so sure that --

14:28:28  18   actually thought it might be even more detrimental to your client

14:28:35  19   to put that instruction and call the jury's attention to it.

14:28:41  20            MR. WOMACK:  Well, I'm afraid the government's going to

14:28:43  21   be calling their attention to it.

14:28:43  22            THE COURT:  Well, they may be.

14:28:45  23            MR. WOMACK:  And it looks look such a classic example

14:28:48  24   of structuring going to these nine or ten different locations.

14:28:51  25            THE COURT:  Well, there's no question it was that.

14:28:52  1          MR. WOMACK:  I mean, it looks terrible.  But I'd like

14:28:55  2   for the jury not to be confused that because my client might have

14:28:59  3   done an act by himself that was a conspiracy.

14:29:02  4          THE COURT:  What says the government on that?

14:29:05  5          MR. GARDNER:  Your Honor, I recall the testimony as

14:29:07  6   being the agents didn't observe Fernando Garcia till March 2010.

14:29:13  7   The allegation he's involved in this conspiracy.

14:29:16  8          THE COURT:  Well, it seems to me that all of Mr.

14:29:19  9   Womack's cross-examination made the point nobody observed him

14:29:24  10  until that point in time.

14:29:27  11         MR. GARDNER:  Your Honor, I believe what he did with

14:29:29  12  that funds once structured into the horse business supports the

14:29:34  13  conspiracy charge.

14:29:34  14         THE COURT:  Well, you should have taken the stand and

14:29:38  15  testified he did that.

14:29:41  16         MR. GARDNER:  Request to reopen the evidence, your

14:29:43  17  Honor.  So we believe that it is an act.

14:29:45  18         THE COURT:  Well, it's counsel's issue.  If he wants it

14:29:48  19  in there, I'll put it in there.

14:29:50  20         MR. WOMACK:  Sir, I'd like it in there and just add it

14:29:52  21  right after you talk about that that involved Mr. Cessa.

14:29:55  22         THE COURT:  Well, we'll do it two ways.

14:29:57  23         MR. WOMACK:  Yes, sir.

14:29:58  24         THE COURT:  Point it out and then, say it's evidence of

14:30:01  25  ability and all that stuff.

126

14:30:02    1          MR. WOMACK:  Yes, sir.  Those are the only two

14:30:05    2    additions.  And I have one question.  Is it in evidence that

14:30:09    3    Carlos Nayen has pled guilty?

14:30:11    4          THE COURT:  Not to my notice.

14:30:12    5          MR. WOMACK:  I don't think, but I wasn't sure.  Okay.

14:30:14    6          THE COURT:  It's not in evidence that anybody that

14:30:17    7    didn't testify.

14:30:19    8          MR. GARDNER:  I didn't put it in evidence, your Honor.

14:30:22    9    It's under seal.

14:30:24   10          THE COURT:  Well, I mean, Aguilar, Aguirre -- I have no

14:30:31   11    evidence in the record of all of the people that have pled guilty

14:30:34   12    other than the ones who testified in the case.  That's the only

14:30:37   13    ones that I know of.

14:30:37   14          MR. WOMACK:  Yes, sir.  I know that was the intent of

14:30:39   15    the parties.  For some reason, I had in my mind that I thought

14:30:42   16    something had been said about Nayen doing that.  I just want to

14:30:45   17    make sure because that would trigger adding his name, but since

14:30:47   18    it's not, no addition there.  Those are the only two additions I

14:30:52   19    ask for.

14:30:53   20          THE COURT:  All right.

14:30:56   21          MR. ESPER:  Your Honor, other than what's already been

14:31:07   22    stated, the only other suggestion I have, comment with respect to

14:31:11   23    the Court accurately commented that the instruction -- the proper

14:31:16   24    instructions derive from the language in the indictment.  And I

14:31:19   25    don't recall seeing anything about the commingling allegation or

14:31:23   1   conduct in the indictment.  So, therefore, I would suggest that

14:31:27   2   that is not a proper instruction because it wasn't suggested or

14:31:32   3   tracked in the indictment.  It's something that came up in the

14:31:35   4   course of testimony that the agents believed that there was

14:31:39   5   commingling going on, but that's not an allegation in the

14:31:41   6   indictment.

14:31:42   7           THE COURT:  Unless you were going to specifically

14:31:48   8   charge under another statute, you wouldn't have to have

14:31:50   9   commingling charged in a money-laundering case, do you?

14:31:56  10           MR. ESPER:  But that's not one of the allegations in

14:31:58  11   the indictment.  Nowhere in there.  And they describe all the

14:32:01  12   different theories, and none of them in the indictment suggests

14:32:07  13   commingling as a form of money laundering.

14:32:09  14           THE COURT:  Okay.

14:32:11  15           MR. ESPER:  And then, of course, the other -- it's

14:32:13  16   already been -- I suggested deliberate ignorance.  That

14:32:16  17   instruction's inconsistent with the elements of a conspiracy, at

14:32:23  18   least the culpable mental state.

14:32:26  19           MR. MAYR:  Your Honor, I will reserve my objections

14:32:28  20   till later.  I just have one very important recommend -- change

14:32:31  21   that needs to be made.  On the new verdict form that we just --

14:32:35  22   we're working off the new verdict form with the multiple options

14:32:39  23   for the unanimity of theories.

14:32:43  24           On page 9 for the verdict form for my client, Defendant

14:32:46  25   Jesus Maldonado-Huitron, Question No. 5.

| | | |
|---|---|---|
| 14:32:56 | 1 | THE COURT:  Okay. |
| 14:32:56 | 2 | MR. MAYR:  Question No. 5, do you find beyond a |
| 14:32:59 | 3 | reasonable doubt that Defendant Eusevio Maldonado-Huitron |
| 14:33:02 | 4 | committed the offense of conspiracy?  That should obviously be |
| 14:33:04 | 5 | Jesus. |
| 14:33:11 | 6 | MS. FERNALD:  Thank you. |
| 14:33:16 | 7 | THE COURT:  On page 9? |
| 14:33:17 | 8 | MR. MAYR:  Page 9 of the verdict form. |
| 14:33:19 | 9 | THE COURT:  Oh, verdict form. |
| 14:33:20 | 10 | MR. MAYR:  Yes, Judge.  I'm sorry, I thought I made |
| 14:33:22 | 11 | that clear. |
| 14:33:26 | 12 | THE COURT:  Yeah.  Okay.  I see what you're talking |
| 14:33:29 | 13 | about. |
| 14:33:30 | 14 | MR. MAYR:  And I'll reserve my right to make my |
| 14:33:31 | 15 | objections once we get through with the verdict form.  Thank you, |
| 14:33:34 | 16 | Judge. |
| 14:33:36 | 17 | MR. FINN:  You've got to keep your eye on these U.T. |
| 14:33:39 | 18 | law grads, your Honor. |
| 14:33:44 | 19 | THE COURT:  Fortunately, that's not hard in this town. |
| 14:34:23 | 20 | All right.  Anything else?  We'll be back with you |
| 14:34:28 | 21 | shortly. |
| 14:34:29 | 22 | (Recess.) |
| 16:14:52 | 23 | THE COURT:  All right.  As I'm sure you've seen, I did |
| 16:15:12 | 24 | give a partial instruction on commingling.  I've taken out |
| 16:15:16 | 25 | deliberate ignorance.  I have changed the word "expert" to |

| 16:15:23 | 1 | "opinion" as requested.  Make your objections on willfully, I'm |
| 16:15:29 | 2 | not changing that.  I have changed, at the request of the |
| 16:15:35 | 3 | defendant without objection from the government, the second area |
| 16:15:43 | 4 | of money laundering to be consistent with the first.  I have |
| 16:15:52 | 5 | defined structuring.  I've placed an instruction on Garcia.  And |
| 16:16:01 | 6 | made the change on the verdict form on Jesus Huitron. |
| 16:16:16 | 7 | So I'll take the objections from the government. |
| 16:16:20 | 8 | MR. GARDNER:  Your Honor, they're not really |
| 16:16:22 | 9 | objections.  Just a note on page 17, third line.  The elements of |
| 16:16:34 | 10 | this and the government requests that the word "first |
| 16:16:41 | 11 | substantive."  We would just request the insertion of the word |
| 16:16:44 | 12 | "first" between the words "this" and "substantive." |
| 16:16:48 | 13 | THE COURT:  Page 17 what now? |
| 16:16:51 | 14 | MR. GARDNER:  Third line from the top, your Honor, |
| 16:16:53 | 15 | starting with the word "elements."  The words the "elements." |
| 16:16:56 | 16 | THE COURT:  Okay.  That should be first.  You're right. |
| 16:17:04 | 17 | Okay. |
| 16:17:04 | 18 | MR. GARDNER:  And, your Honor, direct the Court's |
| 16:17:08 | 19 | attention to page 6 under similar acts. |
| 16:17:11 | 20 | THE COURT:  Okay.  Everybody write that down because |
| 16:17:13 | 21 | I'll make that change.  The elements of the first substantive |
| 16:17:16 | 22 | offense of money laundering are.  All right.  And what? |
| 16:17:19 | 23 | MR. GARDNER:  Page 6, your Honor, similar acts. |
| 16:17:24 | 24 | THE COURT:  Okay. |
| 16:17:24 | 25 | MR. GARDNER:  Your Honor, we would object to the |

| | | |
|---|---|---|
| 16:17:26 | 1 | inclusion of that instruction on Mr. Garcia.  We believe that |
| 16:17:32 | 2 | beginning of the indictment starts 2008, the nature of the |
| 16:17:37 | 3 | conspiracy, and my recollection of the evidence is that offense |
| 16:17:39 | 4 | and then, there was a series of other acts -- overt acts, if you |
| 16:17:43 | 5 | will, that occurred in other bank accounts leading up to Mr. |
| 16:17:47 | 6 | Mr. Piloto and Ramiro Villarreal.  So the government would |
| 16:17:50 | 7 | object.  They say it's -- our position would be it would be part |
| 16:17:53 | 8 | of the conspiracy. |
| 16:17:54 | 9 | THE COURT:  All right.  That objection is overruled. |
| 16:17:56 | 10 | MR. GARDNER:  Thank you, your Honor.  That all I have, |
| 16:17:58 | 11 | your Honor. |
| 16:17:59 | 12 | THE COURT:  Ms. Williams. |
| 16:18:00 | 13 | MS. WILLIAMS:  Your Honor, I would renew our objection |
| 16:18:02 | 14 | to the commingling instruction in that the Rodriguez case |
| 16:18:09 | 15 | concerns a different section of the money-laundering statute than |
| 16:18:17 | 16 | this case does; and, therefore, we believe it's not applicable. |
| 16:18:22 | 17 | THE COURT:  The commingling instruction is applicable |
| 16:18:24 | 18 | to this case.  Primary reason that I put it in is I did advise |
| 16:18:32 | 19 | counsel during the presentation, in front of the jury, that I |
| 16:18:42 | 20 | would instruct them on structuring.  And so, I instructed the |
| 16:18:48 | 21 | definition of structuring, not the statute but the definition. |
| 16:18:51 | 22 | Your objection is overruled. |
| 16:18:53 | 23 | MS. WILLIAMS:  Just so we're clear, your Honor, I'm not |
| 16:18:55 | 24 | objecting to the structuring definition. |
| 16:18:56 | 25 | THE COURT:  Oh. |

131

| | | |
|---|---|---|
| 16:18:57 | 1 | MS. WILLIAMS:  I'm objecting to the addition of the |
| 16:19:00 | 2 | commingling instruction at the bottom of page 17. |
| 16:19:03 | 3 | THE COURT:  That, too, is overruled. |
| 16:19:05 | 4 | MS. WILLIAMS:  Thank you, your Honor. |
| 16:19:11 | 5 | MR. PARRAS:  Judge, we join in the objection regarding |
| 16:19:17 | 6 | the commingling.  I understand the Court's ruling. |
| 16:19:19 | 7 | THE COURT:  Yes, sir. |
| 16:19:20 | 8 | MR. PARRAS:  I didn't hear the Court's ruling on the |
| 16:19:22 | 9 | request for a separate willfully instruction.  Looks like you've |
| 16:19:26 | 10 | denied it. |
| 16:19:26 | 11 | THE COURT:  I have denied it. |
| 16:19:27 | 12 | MR. PARRAS:  Okay.  We make that objection that it's |
| 16:19:29 | 13 | not included and based on the right to a grand jury indictment |
| 16:19:33 | 14 | and the idea that this lessens the burden that the grand jury |
| 16:19:37 | 15 | imposed on the prosecutors in this case. |
| 16:19:39 | 16 | THE COURT:  All right.  That objection is overruled. |
| 16:19:42 | 17 | MR. PARRAS:  And there is one typographical error that |
| 16:19:46 | 18 | was brought to my attention on page 14 under demonstrative |
| 16:19:52 | 19 | evidence in the second sentence, should read those charts or |
| 16:20:00 | 20 | summaries. |
| 16:20:03 | 21 | THE COURT:  Thank you.  You're right. |
| 16:20:05 | 22 | MR. PARRAS:  That's all, Judge. |
| 16:20:06 | 23 | THE COURT:  It's the trouble with spell check or |
| 16:20:09 | 24 | whatever.  All right. |
| 16:20:12 | 25 | MR. PARRAS:  I'm sure I've missed something else. |

16:20:16   1          THE COURT:  Mr. Womack.

16:20:17   2          MR. WOMACK:  Your Honor, again, we would join everyone

16:20:20   3   in objecting to the commingling and, also, not having the

16:20:27   4   separate willful instruction.  And so, the last one, on page 21

16:20:32   5   where you put in -- it says, on the second paragraph, line 3, it

16:20:44   6   says, for the purpose of evading reporting requirements described

16:20:47   7   earlier, I didn't see where that was.  I might have skipped it.

16:20:52   8   I'm trying to find out where it was described earlier.

16:20:54   9          And then, also, sir, the last line of that same

16:20:56  10   paragraph, it begins, it is sufficient that the person structured

16:21:00  11   currency transactions with knowledge of the reporting

16:21:03  12   requirements.  We also would require that they specifically

16:21:06  13   intended to avoid the reporting requirements.

16:21:11  14          THE COURT:  That's not the law.

16:21:13  15          MR. WOMACK:  I think it's straight out of the Fifth

16:21:15  16   Circuit instructions, sir.

16:21:15  17          THE COURT:  Well, that objection is --

16:21:17  18          MR. WOMACK:  You're correct insofar as they don't have

16:21:20  19   to know that it's illegal to do that, but they have to

16:21:23  20   specifically intend to avoid the reporting requirement.  Even if

16:21:27  21   they don't know it's illegal, it is, as long as they specifically

16:21:30  22   intend to avoid the reporting requirement.  So I think we need to

16:21:36  23   add just that phrase to make it complete, sir.  So it would be at

16:21:46  24   the very end of the second paragraph.  And specifically intended

16:21:50  25   to avoid the reporting requirement.

16:21:53    1           THE COURT:  Well, I don't know how I could say it any

16:21:56    2    better.  You structure it with the knowledge of the reporting.

16:22:00    3    If you know the reporting.

16:22:02    4           MR. WOMACK:  Yes, sir.  But the real mental element is

16:22:05    5    that you know it and you specifically intend to avoid the

16:22:08    6    requirement.  Because like you say correctly, if you know there's

16:22:11    7    a requirement but you don't know it's illegal to do that, you're

16:22:16    8    still guilty.  The intent is that you intend to avoid that

16:22:19    9    reporting requirement that you're aware of.

16:22:21   10           And then, the other thing, like I said, sir, is in the

16:22:24   11    third line where it says, described earlier, I'm not sure where

16:22:29   12    it was described earlier.  I just need to be pointed to it.  I

16:22:32   13    didn't see it.

16:22:33   14           THE COURT:  Well, that objection's overruled.

16:23:04   15           All right.  I'm advised that we meant to eliminate the

16:23:10   16    two words in that sentence, described earlier, I will take that

16:23:14   17    one out.

16:23:15   18           MR. WOMACK:  I understand, sir.  And if I understood

16:23:19   19    you correctly, sir, you're not going to give a specific intent to

16:23:22   20    avoid?

16:23:23   21           THE COURT:  I'm tracking the statute and I'm not going

16:23:25   22    to change it.

16:23:26   23           MR. WOMACK:  Yes, sir.  I understand.  Thank you.  No

16:23:28   24    other objections.

16:23:29   25           MR. ESPER:  Ditto to Ms. Williams' and Mr. Parras'

16:23:35  1  objections, your Honor.

16:23:36  2      MR. MAYR:  I won't be that brief, but I will just say

16:23:39  3  that I do impart and adopt the previous objections.

16:23:44  4  Specifically, I would object to the inclusion of the commingling

16:23:47  5  instruction.  Both as Ms. Williams stated, I feel it's an

16:23:51  6  improper statement of the law, but, more importantly, it violates

16:23:54  7  my client's Fifth Amendment right to be brought to trial on

16:23:58  8  what's charged in the indictment and the fact that there's no

16:24:01  9  mention in the indictment of commingling.  I believe that the

16:24:04  10  instruction is improper and that's it.  Thank you, your Honor.

16:24:11  11      THE COURT:  Objections are overruled.

16:24:15  12      MR. WOMACK:  Your Honor, if I can -- I hate to belabor

16:24:17  13  the point, you've already ruled on it, but if your Honor will

16:24:19  14  look at page 244 of the Fifth Circuit instructions, the very last

16:24:23  15  line does say that avoiding has to be with a specific intent to

16:24:28  16  avoid that reporting requirement.  That's straight out of the

16:24:32  17  Fifth Circuit instructions.  It's the very last line of that on

16:24:35  18  page 244 of the Pattern Jury Instructions from the Fifth Circuit.

16:24:41  19      THE COURT:  Well, you and I just disagree as to the

16:24:44  20  meaning of that sentence.

16:24:45  21      MR. WOMACK:  Oh, absolutely.  Yes, sir.  And they have,

16:24:48  22  your Honor, and the last sentence they also say, and it's

16:24:54  23  required that the defendant specifically intend to avoid that

16:24:58  24  requirement.  Thank you, sir.

16:25:03  25      THE COURT:  Yes, sir.

16:25:05  1          MS. WILLIAMS:  Your Honor, do I get to join in

16:25:08  2  everybody's objection that came after me, since I had to go

16:25:11  3  first?

16:25:11  4          THE COURT:  Do you get to?

16:25:13  5          MS. WILLIAMS:  I would like to.

16:25:15  6          THE COURT:  Do it.

16:25:16  7          MS. WILLIAMS:  I would like to join all the objections

16:25:18  8  that came after me.

16:25:19  9          THE COURT:  All right.

16:25:20  10          MS. WILLIAMS:  Thank you, your Honor.

16:25:20  11          THE COURT:  Yes, ma'am.  And your joinder is overruled.

16:25:27  12          All right.  I have it down that y'all have requested

16:25:31  13  now an hour and a half for the government.  In my court, the

16:25:36  14  government has to make a full opening, approximately half.

16:25:42  15  Doesn't have to be exactly but -- and then, 45 each.  I'll advise

16:25:48  16  the jury that each of you have 45 minutes and that if you don't

16:25:56  17  use it, they ought to thank you.

16:26:01  18          MR. ESPER:  Does the Court give warnings before the 45,

16:26:05  19  like five-minute warnings in case it goes to 40?

16:26:08  20          THE COURT:  The Court assumes that everybody is

16:26:10  21  competent.

16:26:10  22          MR. ESPER:  Thank you.

16:26:13  23          THE COURT:  Simon also says I think it's a mistake to

16:26:29  24  argue more than 30 minutes, but that's your decision.  Or should

16:26:37  25  I say, you should make your best argument in 30 minutes.

| | | |
|---|---|---|
| 16:26:42 | 1 | All right.  Anything else, counsel?  All right.  We |
| 16:26:46 | 2 | will see you -- let's come in at 8:15 on Wednesday, just in case |
| 16:26:55 | 3 | there's something else before we bring in the jury. |
| 16:27:00 | 4 | One other thing is before 8:15 Wednesday, I want |
| 16:27:05 | 5 | everybody to check with Mrs. Sims on the evidence, make sure all |
| 16:27:11 | 6 | of the evidence comports with what you think is in the evidence |
| 16:27:17 | 7 | and have a list available as to what evidence you're going to |
| 16:27:21 | 8 | want to take out to use so that Ms. Sims can accommodate you so |
| 16:27:26 | 9 | you don't flounder around and use the 15 minutes that you don't |
| 16:27:31 | 10 | need on your arguments looking for an exhibit. |
| 16:27:33 | 11 | MR. GARDNER:  Your Honor, one housekeeping matter.  The |
| 16:27:37 | 12 | government had submitted 405A, which is the search warrant index |
| 16:27:43 | 13 | that we've provided to defense counsel some time ago for their |
| 16:27:46 | 14 | comments, and we still would like to have that introduced and I |
| 16:27:50 | 15 | don't know -- |
| 16:27:50 | 16 | THE COURT:  That's right.  Y'all wanted to review that. |
| 16:27:52 | 17 | Is there any objection to that? |
| 16:27:55 | 18 | MR. DEGEURIN:  Your Honor, it's my fault.  I have it. |
| 16:27:58 | 19 | I've reviewed it and I don't have an objection to it. |
| 16:28:02 | 20 | THE COURT:  All right. |
| 16:28:03 | 21 | MR. DEGEURIN:  Let me find it and I'll give it back to |
| 16:28:04 | 22 | you. |
| 16:28:04 | 23 | MR. GARDNER:  Okay. |
| 16:28:06 | 24 | THE COURT:  So make sure Ms. Sims gets it. |
| 16:28:09 | 25 | MR. GARDNER:  Yes, sir. |

16:28:10     1              MS. FERNALD:  I've got an extra copy.

16:28:13     2              THE COURT:  All right.  Counsel, I will see you

16:28:16     3     Wednesday morning at 8:15.  We're in recess until 9:00 in the

16:28:23     4     morning.

16:28:23     5              (Proceedings adjourned.)

             6

             7

             8

             9

            10

            11

            12

            13

            14

            15

            16

            17

            18

            19

            20

            21

            22

            23

            24

            25